**Exhibit A**

# WINSTON &STRAWN
LLP

101 California Street
San Francisco, CA 94111-5802
T: +1 (415) 591-1000
F: +1 (415) 591-1400
www.winston.com

**J. CALEB DONALDSON**
+1 (415) 591-1574
jcdonaldson@winston.com

December 28, 2011

**VIA U.S. MAIL**

Jonathan Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016-1314

Re:    **Games Workshop Ltd. v. Chapterhouse Studios LLC**
       **Civil Action No. 1:10-cv-8103**

Dear Jonathan:

I enclose a disc containing documents in response to Plaintiff's Requests for Production.
This production includes documents with Bates labels CHS00014237 through
CHS00014353. Please note that some of the documents are designated HIGHLY
CONFIDENTIAL pursuant to the protective order in this case.

Best regards,

J. Caleb Donaldson

JCD/cc

Enclosure

SF:325628.1

BEIJING

CHARLOTTE

CHICAGO

GENEVA

HONG KONG

HOUSTON

LONDON

LOS ANGELES

MOSCOW

NEW YORK

NEWARK

PARIS

SAN FRANCISCO

SHANGHAI

WASHINGTON, D.C.

# Exhibit B

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4    GAMES WORKSHOP LIMITED,         )
                                     )
5                    Plaintiff,      )    Docket No. 10 C 8103
                                     )
6              vs.                   )
                                     )
7    CHAPTERHOUSE STUDIOS, LLC,      )    Chicago, Illinois
     et al.,                         )    December 19, 2011
8                                    )    10:10 a.m.
                     Defendants.     )
9

10                   TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12   APPEARANCES:

13

     For the Plaintiff:     FOLEY & LARDNER, LLP
14                          BY:  MR. SCOTT R. KASPAR
                            321 North Clark Street, Suite 2800
15                          Chicago, Illinois  60610

16
     For the Defendant:     WINSTON & STRAWN, LLP
17                          BY:  MR. ERIC J. MERSMANN
                            35 West Wacker Drive
18                          Chicago, Illinois  60601

19

20

21

22

23
                LAURA M. BRENNAN - Official Court Reporter
24               219 South Dearborn Street - Room 2102
                    Chicago, Illinois  60604
25                        (312) 435-5785

```
 1        (The following proceedings were had in open court:)
 2        THE CLERK:  10 C 8103, Games Workshop v.
 3   Chapterhouse.
 4        THE COURT:  Good afternoon, or good morning, rather.
 5        MR. MERSMANN:  Good morning, your Honor; Eric
 6   Mersmann for defendant Chapterhouse.
 7        MR. KASPAR:  Good morning, your Honor; Scott Kaspar
 8   for plaintiff Games Workshop.
 9        THE COURT:  Okay.  Just give me a second here to get
10   organized.  I will be with you momentarily.
11     (Brief interruption.)
12        THE COURT:  All right.  So the sequence I have these
13   things in this thing here is I'm going to deal first with the
14   plaintiff's motion to compel.  So I want to start with a point
15   that is made by the defendant right at the very beginning of
16   the defendants' --
17        Remind me.  Who is plaintiff; who is defendant?
18        MR. MERSMANN:  I'm defendant, your Honor.
19        THE COURT:  You're plaintiff, you're defendant, okay.
20        So the defendant says at the beginning of the
21   response that it's already responded to many of these, quote,
22   unquote, independent creation requests, so that a good deal of
23   what is being talked about here are nonissues.
24        So can you just sort of respond on a general -- tell
25   me on a general level where you see things as being right now
```

1  as we speak in connection with your request.

2        MR. KASPAR:  Your Honor, as we stand here right now,

3  we have received from Chapterhouse approximately 2,000 or so

4  pages of documents that appear to consist of printouts from

5  their website.  I know in their motion they talk about how

6  they have produced documents or intend to produce documents

7  responsive to most everything else, but as I stand right

8  now --

9        THE COURT:  Have you gotten anything in the last --

10  so this is --

11        Have you gotten anything in the last two weeks

12  because their response was filed on the 7th of December?  So

13  since then, have you gotten anything?

14        MR. KASPAR:  I have not, no.

15        THE COURT:  Okay.

16        MR. MERSMANN:  That's not my understanding, your

17  Honor.  If a production didn't go out at the very end of last

18  week, which I understood was our intention, it's slated to go

19  out today.  I'm surprised to hear that plaintiff hasn't

20  received it.

21        THE COURT:  Okay.  So are you the two people doing

22  the discovery or is there somebody else that's doing it?

23        MR. KASPAR:  I'm primarily doing discovery for the

24  plaintiff.

25        THE COURT:  How about on your side?

1    MR. MERSMANN:  Your Honor, the discovery team is
2  primarily in our San Francisco office.
3    THE COURT:  I mean, just sort of as a basic threshold
4  kind of thing, I need to have somebody here that knows the
5  status of things.  And so I've got the lawyer on the one side
6  who is actually dealing with this stuff saying, I don't have
7  anything, and I've got you saying, that comes as news to me.
8  So I don't have people here who can answer the question for
9  me.  That's not a good state of affairs.
10    MR. MERSMANN:  I understand, your Honor.
11    I got an update from that team just this weekend, and
12  I was told that there's a large production that went out.
13    THE COURT:  Define "went out."  How is stuff being
14  produced?
15    MR. MERSMANN:  Generally, as I understand it, we have
16  been exchanging a cover letter via e-mail.  At the same time,
17  a hard copy letter along with a disk has gone out Federal
18  Express.
19    THE COURT:  Have you gotten an e-mail saying stuff is
20  coming?
21    MR. KASPAR:  I have not gotten the cover letter.  We
22  got an e-mail.  I should have a copy.
23    (Brief interruption.)
24    MR. KASPAR:  This is Monday, December 12th, saying
25  that they will shortly produce additional documents.  This

1  e-mail just says they're going to produce documents responsive

2  to our document requests 5, 6 and 10.  Their opposition also

3  includes 2, 9 and 16.  So I'm not quite sure how this e-mail

4  comes --

5          THE COURT:  Okay, so I'm past that.  I'm not going to

6  spend a second more on the contention that a bunch of stuff

7  has been produced or is about to be produced because I don't

8  have anybody in here explaining where it is --

9          MR. MERSMANN:  Your Honor --

10         THE COURT:  -- and when it's going to be produced.

11         Yes?

12         MR. MERSMANN:  If I may, regardless of the status of

13  this most recent production, the characterization of the

14  previous production is not accurate.  In that previous

15  production, there was also documents on design, communications

16  with manufacturers and communications with designers.

17         THE COURT:  All right.  I am going to deal with the

18  papers as I have them here.

19         On page 6 of the response to the motion, the top --

20  in the first paragraph, the carry-over paragraph, Chapterhouse

21  is saying, look, in terms of design documents, we work with

22  independent designers.  They're independent contractors.  Then

23  their documents aren't within our possession, custody or

24  control.

25         What's the plaintiff's view on that topic?

1          MR. KASPAR:  Your Honor, up until this opposition, we

2     were not aware that Mr. Villacci or Chapterhouse did not

3     have -- you know, apparently did not have access to those

4     documents.  They have been contending up to that point, you

5     know, this defense of independent creation, and we presume

6     they had documents they were relying on to support that

7     defense, and, you know, we --

8          THE COURT:  Okay.  Putting aside whether you believe

9     him or not, okay, so let's just take them at their word at

10    this point that they have -- that some of the design work -- I

11    don't know what the percentage of it is -- is being done by

12    independent contractors.

13         Is it your position that the defendant has the

14    obligation to produce documents by independent contractors

15    that it may have hired to do design work; yes or no?

16         MR. KASPAR:  Generally, yes.  And we don't know --

17         THE COURT:  Why?

18         MR. KASPAR:  We don't know the relationship that he

19    has with the independent contractors or the designers.  You

20    know, we presumed that he had --

21         THE COURT:  Well, part of this is that you don't even

22    know who they are because the defendant is refusing to tell

23    you.

24         MR. KASPAR:  Right.

25         MR. MERSMANN:  I mean, we have them.

1    THE COURT:  This is the whole thing about attorney's

2  eyes only, right?  You're not willing to identify who these

3  people are?

4    MR. MERSMANN:  Well, your Honor, we have actually

5  identified them.  We have designated them attorney's eyes only

6  because it constitutes trade secret material.

7    THE COURT:  Okay.  So you're telling me on the one

8  hand --

9    MR. KASPAR:  You're correct, your Honor.  That's the

10  names, and it's prevented us from proceeding.

11    THE COURT:  So you're telling me on the one hand that

12  it's a trade secret, so the identities are attorney's eyes

13  only.  Number one.

14    Number two, we don't have their documents, so we're

15  not going to produce them, which leads us to number three,

16  which is that the plaintiff is going to have to subpoena them.

17    There's no way to do a subpoena in secret.  So how

18  can you have it both ways?  Explain that to me in 25 words or

19  less.

20    MR. MERSMANN:  Your Honor --

21    THE COURT:  Go to 50 if you need 50.

22    MR. MERSMANN:  Your Honor, whether or not the

23  necessity of the case demands some adjustment to the

24  protective order or whether or not their client needs to see

25  this list in order for the attorneys to draft subpoenas, I

1   don't see how that pertains to whether or not the list itself

2   is trade secret material.

3          Even if the individual names --

4          THE COURT:  And now I'm skipping around a little bit.

5   So I guess I'm having a hard time seeing how it's a trade

6   secret that you hired John Smith to design something for you.

7   I'm really having a pretty hard time with that.  So explain

8   that one to me.

9          MR. MERSMANN:  Your Honor, it may or may not be the

10  case that an individual name is a trade secret, but the

11  compilation, the list of those designers that he relies upon

12  for his business for his livelihood, combined with their

13  contact information and the way that it was produced in the

14  case is --

15         THE COURT:  You just keep telling me that it is.

16  What I want you to tell me is why it is.  Why?  Why is it a

17  trade secret?

18         MR. MERSMANN:  List of suppliers or customers is

19  widely considered to be.

20         THE COURT:  No, it's not.  Just by saying I have a

21  list of suppliers, it doesn't automatically qualify for trade

22  secret protection.

23         What is it about this, this particular situation,

24  that makes the identity of these people collectively or

25  individually, whatever it is, a trade secret?

1      MR. MERSMANN:  As we have said in the earlier

2   briefing, one of the reasons for it is the fear that those

3   designers have of reprisal by Games Workshop.

4      THE COURT:  What is your basis for that?  Did

5   somebody get reprised against?

6      MR. MERSMANN:  Games Workshop is known in the

7   industry to be highly litigious against parties who they

8   believe are in any way, shape or form interacting with their

9   competitors or these other small design shops.  And much in

10  the same fashion that they are suing our client, these

11  designers are afraid of also being sued.

12     THE COURT:  This is what I'm telling you.  You may

13  not have it both ways.  You may not have it both ways.  You

14  can either make --

15     I'm going to do one of two things.  I'm either going

16  to say that it's not a trade secret because I'm not persuaded

17  that it is, number one; and number two, there is no way to

18  subpoena people in secret.  So, therefore, it can't be -- it

19  can't be kept attorney's eyes only.  That's one possibility.

20     Possibility number two is you find some way to get

21  past it.  Well, they're outside of our control and, therefore,

22  we can't produce their documents.

23     So which would you prefer?  It's a binary choice.

24  There is no third choice.

25     MR. MERSMANN:  Your Honor, I don't see why we have to

1  de-designate the list just to be able to serve the individual

2  subpoenas.

3          THE COURT:  Because a subpoena is a public record.

4  I'm assuming that some of these people may not be in this

5  district.

6          MR. MERSMANN:  But that would not --

7          THE COURT:  Are some of them out of this district?

8          MR. MERSMANN:  I believe so, your Honor.

9          THE COURT:  Okay.  So the only way you get the

10  subpoena is that you go get a subpoena from the district court

11  of another district and then you serve it in that district,

12  okay.

13          And then if there's an issue, which there may well be

14  because you're telling me that these people all fear for their

15  livelihood, then somebody has to file something in that

16  district, and there is no way for me to tell the District of,

17  you know, Montana or whatever it is that you must file this

18  thing under seal because that's their business.  And so we

19  can't even get to step one, okay.  And so that's why I'm

20  telling you again that this is a binary choice.  So pick one.

21          Do you want to produce their documents?  And, you

22  know, careful what you're asking for because you are now

23  stepping into their shoes, and you're going to be responsible

24  for the completeness of their production and for verifying,

25  you know, under the penalties of whatever, that you have

1  gotten all of the responsive documents from these independent

2  contractors.

3        If I were in your shoes, I would not want to do that,

4  but you may say, as between that and subjecting our people to,

5  you know, the scrutiny of the plaintiff in this case, we'll

6  take that.

7        MR. MERSMANN:  Your Honor, I would need to consult

8  with my client on this.

9        THE COURT:  No, you don't.  This is the argument on

10  this motion.  I need the people here who can talk about this

11  with authority.  I can't have -- I can't be doing this in, you

12  know, in bits and pieces.  It's here today to be argued.  I've

13  given you a schedule.  I've told you that it's not going to

14  move, come hell or high water, and today is the day I'm going

15  to decide all this stuff.  So if you're not in a position to

16  make a choice, then fine, you have forfeited the ability to

17  make the choice, and I will make it for you.

18        MR. MERSMANN:  Your Honor, I don't believe that the

19  issue about the subpoena question has been fully briefed.  If

20  you're asking me to make a choice right here, then I will, I

21  will make the choice and say that --

22        THE COURT:  You know what, everybody had an

23  opportunity to brief this, and you basically argued two

24  inconsistent things.  And maybe it's not clear from your

25  papers that they're inconsistent, but they are.  You said, on

1  the one hand, these people are outside our control.  You

2  haven't said the documents are not relevant.  You said they're

3  outside our control and we can't produce the documents.

4       Then you said, on the other hand, that their identity

5  has to be kept secret from everybody other than the outside

6  counsel for the other side, which, as a practical matter,

7  makes it impossible for the plaintiff to go get the documents

8  themselves.  It does, period.  They're inconsistent things.

9  It's been fully briefed.  You just happened to take

10 inconsistent positions on it.

11      And I'm telling you, we're done, I'm done, Judge

12 Gilbert's done.  Everybody is done with pushing this thing

13 down the row.  You're getting decisions now.  That's all

14 you're going to get.  They're going to come flowing down like

15 water, okay, starting now.  So if you're not in a position to

16 make a decision, I will make one.

17      The list is not a trade secret.  It hasn't been shown

18 to be a trade secret.  It hasn't been established.  The

19 attorney's-eyes-only designation is removed.  And you don't

20 have to produce independent contractor documents.

21      Next point.  At page 7 of the motion at the bottom,

22 Chapterhouse says that it has produced documents within its

23 possession, custody or control responsive to request 9 and is

24 producing communications with the designers of the works at

25 issue in the case that relate to creation and design, et

1  cetera.

2      So, in other words, Chapterhouse says it's produced

3  its documents relating to communications with designers.

4      Do you agree with that?  Have you gotten those

5  documents?

6      MR. KASPAR:  The documents that we have received in

7  response to number 9, which were produced during our

8  settlement conference before Magistrate Gilbert, it's about

9  five e-mail strings that address --

10      THE COURT:  Five e-mail strings, you said?

11      MR. KASPAR:  -- five products.

12      THE COURT:  Five e-mail strings?

13      MR. KASPAR:  Yes, and it totals about 200 pages.

14      THE COURT:  Okay.

15      MR. KASPAR:  But based on, you know, what they put in

16  the first paragraph of this, it says they have collected tens

17  of thousands of e-mails.  So I suspect there is more, but we

18  have not received any.

19      THE COURT:  Okay.  So has the defendant produced, as

20  you stand here right now, all of its documents in its

21  possession, custody or control responsive to document request

22  number 9?

23      MR. MERSMANN:  Document request number 9 I believe is

24  the one that refers to third party sources.

25      THE COURT:  Yes.

1    MR. MERSMANN:  In which case, yes, your Honor.

2    THE COURT:  Okay.  So it may be that there just

3 aren't that many of them.  Do you have some reason to believe

4 there are more out there?

5    MR. KASPAR:  If that's all of them, then that

6 confirmation is all we need.

7    THE COURT:  Okay, fine.  I'm taking people at their

8 words here.

9    Page 8, document request 2.  It sought, quote,

10 "documents identified, reviewed or considered by Chapterhouse

11 in preparing responses to each of Games Workshop's first set

12 of interrogatories," et cetera.

13    I have to say I'm having a hard time seeing why that

14 request just doesn't go way beyond what you need.  Explain

15 that one to me.  I don't get it.

16    Produce everything that you looked at in order to

17 respond to any interrogatory.  Why do you need that?  If you

18 get answers to the interrogatories, why do you need what they

19 looked at and consulted to do it?

20    MR. KASPAR:  Correct.  I agree with you.  If we had

21 -- if the response --

22    THE COURT:  For example, one of the things that may

23 have been reviewed -- you know, it happens this way

24 sometimes -- is that, you know, there's memos that go back and

25 forth between the lawyer and the client.  And so you're

1   basically asking for privilege stuff, and that's not the only

2   thing.  It just strikes me that that's pretty overbroad.  What

3   am I missing?

4           MR. KASPAR:  You're right, your Honor, it is

5   overbroad, and it captures that privilege stuff.

6           THE COURT:  I don't think you need --

7           My view of that one is that unless --

8           MR. KASPAR:  But the response to the --

9           THE COURT:  Unless the documents have been otherwise

10  requested through some other, you know, document request that

11  the defendant doesn't need to produce the documents that it

12  reviewed in order to answer the interrogatories.

13          On the request -- I'm moving down to the bottom of

14  page 8.  On the request for admission, there's an argument

15  that this is actually timely.

16          Do you disagree with that, that the requests for

17  admission were served in a timely way?

18          MR. KASPAR:  They may be, your Honor.  The 30th day

19  falls on a Sunday.  So they may be right with their

20  calculation.

21          THE COURT:  Honestly, even if it wasn't, I would give

22  them the extra day.

23          MR. KASPAR:  It's just really an ancillary sort of

24  issue.

25          THE COURT:  The requests for admission are considered

1   to be timely.

2           MR. KASPAR:  Okay.

3           THE COURT:  All right, the next is page 10.  That's

4   the thing about the contractor list.  I've already talked

5   about that.  It's not attorney's eyes only anymore, but it's

6   still subject to the rest of the protective order, which means

7   that it can be only used for purposes of this litigation.  I

8   assume that there's a provision like that in the protective

9   order.

10          MR. KASPAR:  Yes, there is.

11          MR. MERSMANN:  I believe so, your Honor.

12          THE COURT:  All right, moving on.  Page 11.  Let me

13  just see.  Excuse me.

14      (Brief interruption.)

15          THE COURT:  On page 12, there's an argument about

16  burdensomeness regarding interrogatory number 12.

17  Interrogatory number 12, I'm blanking on what it says right

18  now.  Oh, this is the one where I think the interrogatory is:

19  How did you come up with the names?

20          MR. KASPAR:  Right.

21          THE COURT:  Right.

22          And Chapterhouse agreed to produce documents pursuant

23  to whatever provision of Rule 33 that is that says that you

24  can do that.

25          And basically my sense of it is that the plaintiff is

1  not particularly believing the response that you got because

2  you got a page out of the Oxford English dictionary or

3  something like that.

4       MR. KASPAR:  Well, the way that they have answered

5  it, they're not committing that that's the actual source.

6  They just say it could be that.

7       THE COURT:  Why does it matter?  This is one of the

8  issues I had as I was going through it.  Why does it matter

9  how they picked their name?

10      MR. KASPAR:  Your Honor, I think it goes to -- well,

11  it goes to copying and sort of their intention behind using,

12  you know, trading on Games Workshop's stuff and if --

13      THE COURT:  I mean, really, but in the scheme of --

14  you're saying that it's going to help you prove that they --

15      First of all, you don't claim that the term

16  "Chapterhouse" is copyrighted or copyrightable, I'm assuming.

17      MR. KASPAR:  No.

18      THE COURT:  Okay.  And the theory is, I gather, that

19  they used the name Chapterhouse because that gives somebody a

20  little -- so a little light bulb goes on, and, aha, this is

21  related in some way to the plaintiff's product.

22      MR. KASPAR:  Yes.

23      THE COURT:  So you think that the fact that they

24  picked a name that includes the word "Chapterhouse" is going

25  to help you prove to a jury that they infringed your

1  copyrights and all of these other things?

2         MR. KASPAR:  It may.

3         THE COURT:  So in the words of one of my colleagues,

4  you're really going for the capillary here.  That would be as

5  opposed to the jugular, okay.  Really, I think that is such a

6  small thing that you don't really need to do it.  So I'm not

7  persuaded by the argument of the plaintiff on that one.

8         Let's see.  On page 12 of the response, item number 3

9  says Chapterhouse agreed to supplement its answer to

10  plaintiff's interrogatory number 5.  I have to tell you, I

11  looked and I couldn't find anything in the plaintiff's motion

12  that even concerned interrogatory number 5.  Maybe I missed

13  it.  In other words, this didn't look like it was an issue

14  that was actually raised by the plaintiff.

15         It also has to do with how do you go about

16  identifying products for development or creation.

17         Was there an issue on that and, if so, tell me what

18  page of the plaintiffs --

19         MR. KASPAR:  Your Honor, it's not in our motion.

20         THE COURT:  I didn't think it was, okay.  That's a

21  nonissue.  Let me make a note here.

22      (Brief interruption.)

23         THE COURT:  Next point on that page on document

24  requests 14 and 17, the defendant is saying we identified in

25  interrogatory number 9 the businesses where we have offered

1    any of the accused works for sale and that's good enough.  Do

2    you disagree?  Does the plaintiff disagree and, if so, why?

3            MR. KASPAR:  Your Honor, what they have produced for

4    -- you know, these have to do with sales information, and what

5    they have produced is sort of a summary.

6            THE COURT:  Yes.

7            MR. KASPAR:  Like a four-page summary.  It gives

8    total sales.

9            THE COURT:  But does or doesn't it identify the

10   places where they sell?

11           MR. KASPAR:  It does not.  And that's what we have

12   been asking for in the meet-and-confers.

13           THE COURT:  Tell me what it is that you have done

14   that you think answers interrogatory number 9.

15           MR. MERSMANN:  Your Honor, I believe counsel is

16   discussing the documents that we produced, but as you

17   mentioned, our briefing talks about our interrogatory

18   responses which I believe have identified the --

19           THE COURT:  No, I'm sorry.  I misspoke before.  I

20   said that you elected to produce documents.  You didn't.  You

21   actually gave the answer.

22           So document request 14 says, give us documents

23   sufficient to identify any businesses or venues where you have

24   offered any of the accused works for sale.

25           And what Chapterhouse is saying, we don't need to do

1   that because we answered an interrogatory number 9 that said

2   this is where we sell the stuff.

3          And if that's the case, I agree that you don't need

4   to produce documents because you've essentially given an

5   answer.

6          So on the plaintiff's side, do you think that the

7   answer to interrogatory 9 is irrelevant?

8          MR. KASPAR:  Your Honor, in response to interrogatory

9   number 9, they have just given a list with the third parties

10  that they sell through.

11         THE COURT:  Yes, that's what --

12         MR. KASPAR:  But they haven't given the sales volume.

13         THE COURT:  Well, but this document request 14 just

14  said documents sufficient to identify the businesses or venues

15  where they have been sold or offered for sale.

16         Maybe I'm mistaken here.  Which exhibit to which

17  motion is document request 14?

18         MR. KASPAR:  Number 9 just asks for the names.

19         THE COURT:  Right.  Document request 14, where do I

20  find it?  Which exhibit is that?

21         MR. MERSMANN:  I can tell you.  I'm sorry, your

22  Honor.  Exhibit D to plaintiff's motion to compel.

23         THE COURT:  Okay.

24         MR. MERSMANN:  It's number 117-3.

25         THE COURT:  Yes, I have got the hard copy right here.

1    So document request 14 says, "documents sufficient to

2  identify any and all websites or other businesses or venues

3  where any of the accused works has ever been offered for sale

4  or sold."

5    And document request 17 says, "documents sufficient

6  to identify any and all websites or other businesses or venues

7  where any of the accused works has ever been advertised or

8  promoted."

9    So those together say identify every place, whether

10  it's a venue or a website or a business, where you've

11  advertised, promoted, offered for sale or sold any of the

12  accused works.

13    And what the defendant is telling me is that the

14  answer to interrogatory 9, they have identified all those

15  places, and so they don't need to provide a further answer to

16  document requests 14 and 17 because those document requests

17  don't ask for volume.  They just ask for identity of places.

18    So what is wrong with that?

19    It kind of sounds right to me I guess is what I'm

20  saying.

21    MR. KASPAR:  Your Honor, based on the request, it

22  does sound right.  I think perhaps we have had additional

23  discussions about these, but that's --

24    THE COURT:  All right.  Requests 14 and 17, I think

25  they have been sufficiently complied with via the answer to

1    interrogatory number 9.

2        Document request 15 -- I'm now over to page 13 of the

3    motion.  Document request 15 says, "any documents concerning

4    sales on eBay or any other secondary market."

5        And in the request -- in the plaintiff's motion, and

6    I will get you the page for it here in just a second.  In the

7    plaintiff's motion at page number --

8        Just a minute here.

9        (Brief interruption.)

10       THE COURT:  The plaintiff's motion at page -- well,

11   it's paragraph 13, page 10.

12       What the plaintiff is complaining about is the

13   failure to identify sales volume in particular venues such as

14   eBay or Barterhouse.  And so the objection to the

15   interrogatory was it seemed to be asking about much more than

16   that, but I guess what I'm saying to you is I'm going to

17   consider it to have been narrowed by paragraph 13 of the

18   motion to compel.

19       So is there some reason why it's still unduly

20   burdensome if I read it that way?

21       MR. MERSMANN:  I believe that it actually is

22   broadened by paragraph 13.  The original document request --

23       THE COURT:  That's not what you said in your

24   response.

25       In your response at page 13, you say, quote:

1        "In its motion, plaintiff explains that it seeks

2   sales volumes in specific venues such as eBay or Barterhouse,

3   but the request as written is much broader."

4        So you say that the request is broader than the

5   motion.  Now you're saying that the motion is broader than the

6   request.

7        MR. MERSMANN:  Well, there's nothing in the original

8   request that asks for the sales volumes, and this really goes

9   back to the same issue as the previous one we argued where

10  we --

11       THE COURT:  I don't agree.  I think a request that

12  asks for documents concerning any sales asks for sales

13  volumes, I mean, because --

14       And I agree that the request is more burdensome

15  because the request would basically require you to go combing

16  through all of your records to find out anything that says

17  anything about any kind of a sale in a secondary market or on

18  eBay.  And it's been narrowed now in a way that I think asks

19  for something narrower.

20       And it may be, you know, that you have got documents

21  that summarize these things, and I think that's easier to

22  comply with than the original one, than the request as

23  originally worded.  And I think that it makes --

24       You know, the further objection that's made on

25  page 13 of the response is that "the request as written is not

1    limited to the works that are at issue in the case."

2         And I guess what I would say to that is, well, okay,

3    I don't know what your sales data looks like.  If it's item by

4    item, in other words, if it's, you know -- well, whatever.

5         If it's item by item, then you could probably take

6    the data you have and just line out the things that aren't at

7    issue, redact those out, in other words, and produce the sales

8    volume data regarding the things that are at issue.

9         If, on the other hand, your data isn't item by item,

10   if it's lumped, then it's going to be more problematic, but I

11   don't think that would be a basis to decline to produce the

12   stuff altogether.

13        So do you follow what I'm saying?

14        MR. MERSMANN:  I do, your Honor.

15        THE COURT:  And I know that on both sides, both sides

16   said, well, you know, nobody met and conferred enough.  I'm

17   done with the meeting and conferring, okay.  You can do that

18   on your own time.  I'm ruling on stuff today.

19        So on document request number 15, I'm going to order

20   production as it's been narrowed by the particular part that I

21   just referred to -- and I will put this all in an order -- in

22   the motion to compel.

23        All right.  The next item down the page says

24   Chapterhouse has agreed to produce documents responsive to

25   requests 16, 18 and 19.  And my question is:  When are they

1  being produced?

2         And I'm happy to just sort of say here's your

3  deadline, but if you know when they're going to be produced, I

4  can make the deadline after that.

5         MR. MERSMANN:  Your Honor, I believe this is part of

6  the production I may have mistakenly thought was being

7  produced last week, and so I would be -- I would expect it to

8  be this week.

9         THE COURT:  Okay.  So I'm going to say by next

10  Wednesday, produce by 12/28.

11         Next item, document request 20, has to do with

12  documents regarding any changes to the defendants' website on

13  or after December the 22nd.

14         So let me just give you some thoughts about this.

15  So, first of all, the plaintiff, I assume, has been monitoring

16  the changes on the website, so you know what changes happened

17  and when.

18         MR. KASPAR:  Yes.

19         THE COURT:  Okay.  So, first of all, I think in light

20  of that -- and even if you hadn't done that, I think I would

21  say this -- the request is overbroad.  You need to be

22  specifying the changes that you want them to provide you

23  documents about because not every change is relevant.  I mean,

24  let's say, for example, that they changed their phone number.

25  That's a change to the website on their contact information.

1   You don't need that, so you need to specify.

2          And I also think that the request for, quote,

3   unquote, all documents relating to changes is too broad.  You

4   are going have to narrow that.  I think you could narrow that

5   to, you know, produce documents that explain when and why the

6   following -- that reflect when and why the following changes

7   were made to your website.  I think if you do that in a

8   narrowed-down fashion, I think that that's -- if you do it in

9   a reasonable way, it's likely that I'm going to enforce it.

10          As far as the points that are made by the defendant

11  is concerned, I'm not really inclined to preclude requests

12  like this on the theory that any change that has ever been

13  made to anything since the lawsuit was filed is by definition

14  a subsequent remedial measure.  It may end up being the case

15  that particular things are subsequent remedial measures, but

16  that's an evidentiary -- that's an evidentiary rule, not a

17  discovery rule.  And so I am overruling that objection to

18  discovery.  I'm not saying that they're not subsequent

19  remedial changes; I'm just saying that doesn't preclude the

20  discovery.

21          And as far as -- you know, I guess I will say this to

22  both sides, and I don't know because it hasn't really come up

23  in here, you know, the extent to which people have produced

24  privilege logs.  So these kind of blanket privilege objections

25  that say, you know, we're not producing privilege documents,

1  well, I mean, everybody knows that you have got to produce a

2  privilege log.  So you need to have some sort of a date

3  certain, which I'm happy to give you -- in fact, which I

4  probably will give you -- by which people are going to be

5  producing privilege logs.

6          All right.  So moving on, and in a second here, I

7  will be with you guys.  It will be about five minutes for the

8  people in the back of the room.  I will be with you in five

9  minutes.  We'll take a break in between the two motions here.

10         Document request 21 is the next one.  So documents

11  concerning metrics for defendants' website, and I'm going to

12  just assume that all of you people are, A, young enough and,

13  B, smart enough to know what that means.  I figured it out

14  eventually.  The defendant basically says, look, we don't have

15  anything like this and we don't have to create it.

16         Do you disagree with that?

17         MR. KASPAR:  Your Honor, we understand.

18         THE COURT:  I'm assuming metrics are meaning things

19  like you might in common terms call a market study.

20         MR. KASPAR:  Right.

21         THE COURT:  In other words, this is who's looking at

22  our website, this is when they're looking at it, and this is

23  what they're looking at.

24         MR. KASPAR:  Right.  We believe they're tracking

25  that, and we believe that that information is in some sort of

1    database.  It may not be in a report that they're running

2    regularly, but, you know, I believe --

3              THE COURT:  So you think that it's something that's

4    maybe -- it maybe exists --

5              MR. KASPAR:  Right.

6              THE COURT:  -- as part of the maintenance of the

7    website?  They may not be using it, but it's there.

8              MR. KASPAR:  I think they're using it.

9              THE COURT:  Okay.

10             MR. KASPAR:  But, I mean, they may not --

11             You know, their rebuttal, or their response seems to

12   be that they don't have reports that capture that information,

13   and that may be the case.

14             THE COURT:  So a document these days is defined as

15   something that may exist just in electronic format even if you

16   haven't actually printed it out.

17             So do you know whether the defendant has, whether

18   it's printed it out or not, or whether it uses it or not even,

19   information that would give the kind of information -- I guess

20   that they have material that gives the kind of information

21   that the plaintiff's looking for?

22             MR. MERSMANN:  I don't know if that data is compiled,

23   your Honor.

24             THE COURT:  I think you need to check.  And so what

25   I'm going to tell you to do is that defendant is going to need

1    to do some due diligence to determine whether this kind of

2    information exists even if it isn't being used or even if it

3    isn't being printed out or even if it isn't being analyzed.

4           And if it exists somewhere, I mean, then the

5    objection that you don't have to create documents, I think,

6    you know, isn't going to carry water.  So we'll talk about

7    deadlines for doing all that.

8           Then the last thing in this motion is request

9    number 25.  So documents regarding consumer perceptions of

10   Chapterhouse or its products, that strikes me as a pretty

11   vague request, and in all likelihood, in my view, overbroad

12   the way it's worded.  And so I'm not going to enforce it, and,

13   you know, I'm not going to say that you couldn't come up with

14   something, you know, narrower and more focused and less vague.

15   But as worded, I think that's too vague.

16          Okay, have a seat for a second.  I've got to spend

17   about three minutes with these other people here.  I've just

18   got to get my clerk back in here.

19          Come on up.

20          (Brief recess.)

21          THE COURT:  Come on back up.

22          I'm recalling Games Workshop v. Chapterhouse, 10 C

23   8103.  I've got the same lawyers here.

24          Now we're going to move over to the defendants'

25   motion to compel.

1    All right and, again, my questions are largely going

2    to be focused on issues that are raised in the response, and

3    the first question I want to ask has to do with this issue of

4    exemplars.  I guess I'm not clear on Chapterhouse's side what

5    specifically you're looking for by way of exemplars other than

6    what the plaintiff has already produced.  And it's probably

7    partly because I don't have a real clear sense of what was

8    produced.

9    So maybe if you can sort of walk me through that and

10   give me your thoughts on it.

11   MR. MERSMANN:  Your Honor, as you know, a number of

12   Chapterhouse products have been accused.  They have provided

13   us with a claim chart that identified certain Games Workshop

14   products.  We requested exemplars of those products.

15   THE COURT:  Right.

16   MR. MERSMANN:  In many cases, all we have received

17   are print -- black-and-white printouts from their website

18   where the accused product is actually a miniature item like

19   this hammer here, your Honor, and I can --

20   Permission to approach?

21   THE COURT:  It's too small even with my glasses.

22   MR. MERSMANN:  There's a --

23   THE COURT:  Okay.  So what you handed me here is a

24   printout, it looks like, from a website called Thunder Hammer

25   Conversion Pack.  Then you handed me a little plastic bag that

1    has what I'm guessing must be a Thunder Hammer.

2         MR. MERSMANN:  Actually, your Honor, the hammer in

3    your right is the accused product, and the printout in your

4    left is the only exemplar we have been given --

5         THE COURT:  Got it.

6         MR. MERSMANN:  -- of what they claim the accused

7    product infringes.

8         THE COURT:  Got it.  So the thing in the plastic bag

9    is the defendants' product.

10        MR. MERSMANN:  That's correct.

11        THE COURT:  Okay, got it.

12        MR. MERSMANN:  And the issue we have there is if they

13   are accusing us of copying models, we think that we're

14   entitled to the models.  Where they're accusing us of copying

15   a particular piece of artwork from a book, we believe we're

16   entitled -- we believe we're entitled to a copy of that piece

17   of artwork so that we can make the comparison.

18        THE COURT:  And so in terms of what you've gotten,

19   what proportion ball park, what proportion of the exemplars

20   you've gotten are the kind of thing you're talking about right

21   now?  What you've got, in other words, is a black-and-white

22   printout from a website.

23        MR. MERSMANN:  I would guess maybe about a quarter.

24        THE COURT:  Okay.  And on the rest of it, what have

25   you gotten?  Have you gotten actual miniatures of some kind?

1     MR. MERSMANN:  No, your Honor.  We received no

2     miniatures.  On some of the books and printed works that they

3     have listed in their responses, we have received some copies,

4     some of them black and white, I believe some of them in color.

5          THE COURT:  Okay, all right.  I think I have a better

6     handle on it now.

7          Okay.  So talk to me about this.

8          MR. KASPAR:  Sure.  Your Honor, what we have produced

9     largely are copies of all the copyrighted works, so all the

10    Games Workshop reference books, manuals, how to paint a space

11    marine because that's the stuff that is copyrighted.  It

12    includes color pictures of all of the characters as well as a

13    narrative and description of, you know, how to --

14         THE COURT:  Let me ask you this.  On the thing he

15    just showed me here, and I assume you've still got it there,

16    is there something else, or is it just what's on the website

17    in terms of what it is you -- what it is you're saying that

18    that little hammer thing in the plastic bag infringes?

19         Is it just this thing on the website, or is there

20    some other exemplar of it other than that picture that might

21    appear on the website?

22         MR. KASPAR:  For that specific instance, I would have

23    to look at our claim chart and what we produced.

24         But what we have tried to do is in most of the --

25    with each of their accused products, we have tried to map it

1    out in our books where these things come from.

2              THE COURT:  Okay.

3              MR. KASPAR:  And we have produced those books, and

4    those books are -- those books are the copyrighted material.

5              THE COURT:  Yes, I get that.

6              MR. KASPAR:  In some instances, we have also pointed

7    to some of our accused products, and that may be one of them

8    where they look awfully similar to the products.

9              THE COURT:  The products that you guys have.

10             MR. KASPAR:  Correct.

11             THE COURT:  Okay.  But in those situations, have you

12   produced a little -- an example of your product, or have you

13   just given them a printout from a website?

14             MR. KASPAR:  We have given them the printouts from

15   the website.

16             THE COURT:  Yes, I think you need to do more than

17   that.  I mean, I understand if --

18             You know, and this I guess is going to be dependent

19   on what particular -- what the particular nature is of the

20   copyrighted material that the plaintiff claims that the

21   defendant is infringing on an item-by-item basis.  But it

22   seems to me that what the defendant is entitled to here is

23   kind of the -- sort of the best example of what it is that you

24   think they ripped off from you.  And I would be surprised if

25   that black-and-white printout from a website is the best

1   example.

2          And so that's what I think you need to do.  And, you

3   know, you've got this claim chart and you can kind of work

4   through that, and it doesn't seem like it's a terribly large

5   proportion of the material where what's been produced are

6   these black-and-white printouts from websites, but I think you

7   need to do better.

8          Now, it may be that the depiction on the website is

9   all there is.  If that's all there is, then that's all there

10  is, but you need to give them --

11          You know, if it's in color, you need to give them

12  something in color.  If it's three-dimensional, you need to

13  give them something three-dimensional or at least, you know,

14  some really good pictures of it so that they can see the

15  three-dimensional aspects of it, and that's what you need to

16  do.  So I'm just going to tell you, you need to do better on

17  that.

18          MR. KASPAR:  Okay.  Now, your Honor, just for

19  clarification --

20          THE COURT:  Yes.

21          MR. KASPAR:  -- a lot of the stuff -- I mean,

22  actually most of it -- of what rolls off of Games Workshop's

23  assembly line is their black plastic pieces.

24          THE COURT:  Okay.

25          MR. KASPAR:  Because they're sold that way.

1      THE COURT:  And then people go and paint them.

2      MR. KASPAR:  People paint them, and most of the hobby

3   is people painting these things according to the books that we

4   put out.  And part of why we haven't produced the black

5   plastic stuff is we don't see that as being as helpful --

6      THE COURT:  Well --

7      MR. KASPAR:  -- whereas the website shows, you know,

8   how they look.  And we know from the inspection that we took

9   in Texas that Mr. Villacci has all of this stuff in his

10  collection.

11     THE COURT:  Yes, not good enough, though.  I mean,

12  because the fact that, you know, somebody requests documents

13  from you, it's not -- I never thought it's a good response to

14  say, well, you already have this because you got it on your

15  own.  I mean, part of this is pinning people down as to what

16  they think in their case, you know, is being infringed, and I

17  think you need to do that.

18         So I don't know whether it's going to actually tell

19  the defendant anything materially different for them to get

20  this little, you know, the black or gray or whatever it is

21  piece that comes off of the assembly line, but, like I say, I

22  think you need to give them what I would refer to as the best

23  available exemplar of the items that you're contending have

24  been infringed.

25         So, Mr. Mersmann, beyond the 25 percent or so, are

1   there other kinds of categories of things where you think you

2   haven't gotten a good enough exemplar yet?

3        MR. MERSMANN:  I believe that your Honor's order did

4   just address everything.  You know, our question of in color

5   where the original was in color I think would address most of

6   our other --

7        THE COURT:  Yes, and that's definitely the case.  I

8   mean, if the original is in color, then the exemplar has to be

9   in color.

10       Okay, moving on.  So I'm now to, I guess it's

11  interrogatory -- is it interrogatory 9 that asks for

12  information about the sources of Games Workshop's works?

13       MR. MERSMANN:  Your Honor, interrogatory number 9 and

14  requests for document numbers 2 and 36.

15       THE COURT:  Okay.  All right.  And so if I'm

16  understanding this correctly, the plaintiff is saying, look,

17  they all belong to us, they're ours, and so we don't really --

18  we didn't rely on any third parties.  We obviously had people

19  working for us, employees, who did this, and so we don't

20  really -- there's no real good need to produce documents or

21  give answers that explain how we came up with, you know, what

22  we claim is copyrighted.

23       I know that that is somewhat of an

24  oversimplification.  And I have some, you know, some points

25  that I'm going to make about this whole thing about getting

1  employment agreements of people and whatnot.  But I was to a

2  large degree persuaded by the argument that the defendant made

3  that it's not just -- this information is not just relevant on

4  the issue of ownership; it's also relevant on the question of

5  originality, and the degree of originality tends to define the

6  degree of protection that is accorded to something that may be

7  copyrighted.

8        And so tell me what I'm missing here.  In other

9  words, and I recognize that it might be burdensome for

10  somebody who claims that we have infringed, that the defendant

11  has infringed, a couple of hundred copyrighted items to

12  explain how it developed those, but that's part of what comes

13  with the territory of filing a lawsuit that says somebody has

14  infringed a couple hundred of our copyrights.

15        So what am I missing here?

16        MR. KASPAR:  As a first point, your Honor, I think

17  this is particularly with request 36, it's far more sweeping

18  than what we have accused.

19        THE COURT:  Okay.  So where do I find -- remind me

20  where I find request 36.  That's going to be probably in the

21  defendants' motion.  Tell me what exhibit number.

22        Request 36.  Is it in the first -- it's not in the

23  first request.

24        MR. MERSMANN:  Your Honor, I believe that is

25  Exhibit 14.

1       THE COURT:  How many?

2       MR. MERSMANN:  14.

3       THE COURT:  14.  36, all documents concerning

4  instructions, manuals, procedures, how-to guides, FAQs, style

5  sheets, specifications or other guidelines or advice given to

6  any artist, designer, writer, model, painter, sculptor, or

7  other author or creator for use in creating works related to

8  Warhammer 40,000.

9       Okay, that's broader.  But let's say I --

10      The other document request was number 2, and I'm

11  assuming that that's going to be in Exhibit 9 maybe.  All

12  documents concerning the design, creation or authorship of the

13  copyrighted works.

14      Let's talk about number 2.  All documents concerning

15  the design, creation or authorship of the copyrighted works

16  you claim in this action.  Maybe we could pare that down a

17  little bit, but what's wrong with that?  In what way does that

18  seek irrelevant material?  I'm not seeing it.

19      MR. KASPAR:  It's not necessarily that it seeks

20  irrelevant material.  I suppose the objection would be that

21  it's just -- it's burdensome and that we would be going

22  through, you know, 35 years of files to try to find every

23  instance of, you know -- I hate to use the Disney analogy.

24      THE COURT:  See, I don't buy the Disney analogy,

25  though.  I mean, I think you've changed the example there.  I

1   mean, basically if somebody --

2          If I were contending that -- if I'm Disney and I'm

3   contending that you infringed Mickey Mouse and your defense

4   partly was that, hey, Mickey Mouse wasn't original to begin

5   with because there was this mouse and there was that mouse and

6   there was this rodent and there was that thing that were all

7   out there, then the fact that, you know, it was invented back

8   in the 1930s or '40s I don't think would be a good reason to

9   say, no, we don't have to produce that.

10         Now, that doesn't mean that you have to produce

11  everything about every Mickey Mouse that's ever been used all

12  the way from then to now.

13         MR. KASPAR:  Okay.

14         THE COURT:  But what he's talking about is the design

15  and creation and the authorship of the thing.  And so if you

16  have got --

17         I mean, I'm having a hard time seeing what's wrong

18  with the request that says, okay, you've got this thing here

19  that you claim is copyrighted.  We dispute it's copyrightable.

20  We dispute that it's a particularly strong copyright.  We

21  dispute, you know, how much scope of protection you're

22  entitled to for this, and so we want to see how you came up

23  with this.  Did you come up with this by basically seeing a

24  picture in another book or, you know, reading, you know, some

25  Tolkien novel or whatever?

1        And if the answer is, we don't remember, then the

2  answer is we don't remember, but I don't have a -- I'm having

3  a hard time seeing why I shouldn't tell you to do that.

4        36, I agree with you, maybe is a little bit different

5  because it -- I mean, that strikes me as a tad on the vague

6  side, and it's really not specified to the items that are at

7  issue in the case.  So, I mean, I'm focusing on requests for

8  production 2.

9        MR. KASPAR:  If 2 is limited to, you know, the

10  accused products?

11        THE COURT:  It is.

12        MR. KASPAR:  And to just the sort of conception of

13  the documents that go behind?

14        THE COURT:  I think 2 goes hand in hand with

15  interrogatory 9, which says, "separately for each copyright

16  you claim Chapterhouse infringes, identify any and all sources

17  consulted, used or viewed or relied on by you or your agents

18  in creating such works."

19        And then request for production 2 basically asks for

20  the documents that concern how you came up with it.

21        MR. KASPAR:  Okay.

22        THE COURT:  I think those are both enforceable.

23        36 I'm not going to enforce right now because I think

24  it's too vague, and I think it sweeps beyond what is

25  necessary.

1    But I think you're going to have to answer number 9

2    to the extent you haven't already done it, and produce

3    documents pursuant to request 2.

4    All right, moving on to the next thing.  Let's see

5    here.  Information about first publication.  If I'm

6    understanding the response correctly -- and I'm looking at

7    page 9, paragraphs 10 and 11 -- the plaintiff is contending

8    that you have already done -- that your answers to complete --

9    your answer to these requests, which is interrogatory 16, I

10   guess, is complete based on what you now know or have access

11   to you.

12   If that's the case, then fine, just tell me.  If it's

13   not case, in other words, if it's not complete, then you need

14   to tell me that it's not complete so I can tell you when you

15   need to complete it by.

16   So is the answer complete right now or not?

17   MR. KASPAR:  As I understand it, it's complete right

18   now.

19   THE COURT:  Okay.  So if they're telling you it's

20   complete, does the defendant have some reason to believe it's

21   not complete?

22   MR. MERSMANN:  I'm not sure that their response to

23   interrogatory number 16 goes to each of the items that they're

24   accusing Chapterhouse of infringing.

25   THE COURT:  Where do I see -- which exhibit do I see

1 their response in?

2      MR. MERSMANN: Your Honor, I apologize.

3      THE COURT: Is that maybe Exhibit 6 to your motion?

4      I see it. So what they say is that after making

5 objections, they say, we have produced documents responsive to

6 this request pursuant to Rule 33(d).

7      MR. KASPAR: Right, and, your Honor, we produced

8 copies of all the books and publications that have, you know,

9 their publication date and so forth.

10      THE COURT: Okay, but what you're telling me --

11      So let me go back to the question I asked you then,

12 Mr. Kaspar, in other words. You're telling me that the

13 documents that you have produced completely answer an

14 interrogatory which asks to identify the date on which the

15 work was first offered, first sold and advertised and where.

16      Are you sure about that?

17      MR. KASPAR: The information we produced, you know,

18 has certainly the date on which it was first produced.

19      THE COURT: Let me put it in a different way.

20      MR. KASPAR: Where it was produced.

21      THE COURT: So let's say that with regard to that

22 little hammer thing that they were talking about before, that

23 you produced a book and it's got -- you know, it's got a

24 publication date of August of 2008. What that means is that

25 since you have elected the option to produce documents in

1    response to that interrogatory, and you've produced that

2    particular document and you've now told me that the response

3    is complete, you are now -- you've got it hung around your

4    neck that the date of first publication was August of 2008 in

5    a way that you're going to have to live with.

6              Are you comfortable saying that?

7              MR. KASPAR:  With the date of publication, yes.

8              THE COURT:  Okay.  So this is what I'm going to say.

9    I think the defendant is entitled to a complete answer to

10   interrogatory 16.  If a complete answer is provided by your

11   production of documents, then you tell them in writing, we

12   have completely answered this by our production of documents,

13   and then you're stuck with it.  If you haven't, then you need

14   to provide a more complete answer.  Again, we're going to come

15   up with a date for all of this stuff in a minute.

16             Moving on to the next thing.  Information --

17             I referred to category E as -- excuse me.  I'm

18   looking at the wrong thing.  I referred to the last two topics

19   in the motion as hodgepodge one and hodgepodge two.  There was

20   a whole bunch of stuff kind of mushed together.

21             So under heading E of the plaintiff's response to the

22   defendants' motion -- this is the part that covers what I

23   referred to as hodgepodge one, paragraphs 13 and 14 -- that

24   the plaintiff is saying we have produced everything that we

25   have got or have agreed to produce everything that we have

1   that is responsive to this, as we understand it, except for

2   the things that we asked you to clarify but you haven't

3   clarified.

4              So I would like you to react to that.

5              MR. MERSMANN:  Your Honor, the primary topic that we

6   have been exploring in hodgepodge one was the trademark issues

7   in the case which have not really been the focus of the case

8   so far but certainly will be important at some point, no

9   doubt.

10             The questions that we asked, again, as we state in

11  our brief, primarily focus on the protectability of the

12  trademarks that Chapterhouse is being accused of infringing.

13  That includes showing their validity, their protectability and

14  the fact that they were and continue to be used in commerce.

15  And I believe we also requested specimens on those trademarks

16  that were being accused of infringing as well.

17             THE COURT:  Okay.  So what you say -- I'm looking at

18  page 11 of the motion.  You say that the plaintiff has not

19  produced specimens of use in U.S. commerce for some of the

20  marks or first use in U.S. commerce for any of the marks and

21  hasn't produced documents regarding third party use or

22  documents concerning enforcement.

23             MR. MERSMANN:  That's correct, your Honor.

24             THE COURT:  Okay.  And in the response, the plaintiff

25  says:  Well, wait a second.  When we had the meet-and-confer,

1   you didn't raise any issues about some of these things, 8, 11

2   and 12, requests 8, 11 and 12.  We agreed to supplement our

3   answer to interrogatory 16.  We produced some more documents

4   in response to interrogatory 13, and we asked you to clarify

5   what else you were asking for for interrogatories 6, 7 and 13,

6   but you haven't told us.  And then we have already produced

7   everything we have regarding document requests 20, 31, 32 and

8   33.

9           So what in what the plaintiff says in their response

10  do you disagree with and why?

11          MR. MERSMANN:  I believe we have made quite clear

12  what we're requesting in interrogatories 6 and 7 at least.

13  The sources of the trademarks that are being accused in this

14  case are relevant to the question of trademark protectability

15  and the rights that plaintiff has to even assert in this case.

16          THE COURT:  What did you rely on -- 6 is:  What did

17  you rely on in connection with selecting the marks or product

18  names?  And what would --

19          What information would that get you that helps?  I

20  mean, it's different from copyright.  In other words, the

21  scope of protection for a trademark is typically determined by

22  reference to what sort of a mark it is.  In other words, is it

23  a coined word; is it an arbitrary word, or something like

24  that?  And, I mean, my sense is that you generally decide that

25  just from looking at the word.

1      MR. MERSMANN:  That may be, your Honor, but --

2      THE COURT:  Is there a law that says that what you

3   consulted in coming up with -- let's say that what Exxon

4   consulted in coming up with the word "Exxon," that that's

5   relevant to determining the scope of protection?

6      MR. MERSMANN:  I think if it could show that they did

7   take that word from somewhere else or some obscure source or

8   even a well-known source, it would certainly go to whether or

9   not the word was arbitrary or unique.

10      THE COURT:  Well, everybody gets something from

11   somewhere.  There's really nothing new under the sun.  I mean,

12   I'm not -- I don't really find that particularly persuasive.

13   I'm not persuaded by that.  So 6 and 7, I'm just not -- I'm

14   not willing to enforce at this point.  You haven't shown me

15   why you need enforcement of those.

16      Number 13 is an interrogatory that asks for what

17   damages have you suffered, and I'm sort of missing why it is

18   that the response to that is that this is a contention

19   interrogatory best deferred to the close of discovery, seeing

20   as how it's something that the plaintiff has to put in

21   26(a)(1) disclosures, which by definition come at the

22   beginning.

23      I mean, I recognize that you say, well, we haven't

24   gotten discovery from the defendant about its sales, and I

25   recognize that in cases like this, sometimes damages or part

1    of the damages are based on the defendant's sales and profits.

2    But that doesn't provide a basis for deferring answering this

3    interrogatory altogether.  I mean, I think you need to give

4    what you can.  I think you need to say, you know, that there

5    are other categories including your profits or including, you

6    know, your sales, we don't have it yet, and then the rules

7    provide a mechanism for when and how you have to supplement

8    those things.  So interrogatory 13 you've got to answer.

9            As far as the document requests are concerned --

10   let's see.  Let me just find these again here:  8, 11 and 12.

11      (Brief interruption.)

12           THE COURT:  Well, I think that document requests 8

13   and 11 are appropriate.  What research did you do on

14   trademarks?  If it's none, then you just say none.

15           11 is specimens of first use for each of the marks.

16   I think that's an appropriate request.

17           And as far as request number 12 is concerned,

18   documents concerning the use by others, I mean, I don't think

19   any issue has been raised about that at this point.  And I

20   think --

21           And then the plaintiff says they already produced all

22   their documents under requests 20, 31, 32 and 33.  That seems

23   to me to be the end of the story on that one.

24           And then that leaves interrogatories 13 and 16, and

25   16 is the one we just talked about.  That's the author for

1  sale thing, so I already dealt with that one.

2      And then interrogatory 13 is -- just a second.

3      MR. MERSMANN:  Your Honor, I believe that's the

4  damages contention interrogatory that you also ruled on.

5      THE COURT:  Okay, right.  Then we're on to hodgepodge

6  two, which is the last thing before I start giving you some

7  dates.  Let's see.  This is about three -- let's see here.

8    (Brief interruption.)

9      THE COURT:  In paragraph 15 plaintiff is saying we

10 have already agreed to produce the documents that they are

11 referring to there and that's sufficient.

12     So what's wrong with that answer?

13     MR. MERSMANN:  Your Honor, if plaintiff is indeed

14 producing all the photographs taken at the inspection as well

15 as the video taken at the inspection, then I don't believe we

16 would have an issue there.

17     THE COURT:  All right.

18     MR. KASPAR:  Your Honor, production --

19     THE COURT:  That's what it says, right?

20     MR. KASPAR:  -- on Thursday.

21     THE COURT:  Okay, all right.

22     And then on paragraph 16, plaintiff is saying that

23 they agreed to produce copies of their prelitigation

24 correspondence with Mr. Paulson.  And have you gotten those

25 yet or has that been produced yet?

1    MR. KASPAR:  Your Honor, that's in progress.

2    Actually I brought with me, which I can produce now, the

3    letter to Mr. Paulson, and I will give you a formal copy.

4    MR. MERSMANN:  Okay.

5    THE COURT:  And as far as the correspondence post-

6    lawsuit, it wasn't clear to me.  I mean, are you producing

7    that or saying you don't have to?

8    MR. KASPAR:  We would prefer not to produce that.

9    THE COURT:  Why wouldn't it be relevant, though?

10    MR. KASPAR:  It's relevant, but it's also -- you

11    know, we settled with Mr. Paulson and --

12    THE COURT:  Do you have a confidentiality agreement

13    with him?

14    MR. KASPAR:  Yes.

15    THE COURT:  Okay.  So I think what you're going to

16    need to do on that is you're going to have to give it to me to

17    look at, and then I'm going to have to decide whether there is

18    anything relevant in there or not.

19    And also give me -- I need to see a copy of the --

20    you're going to produce this in camera.

21    MR. KASPAR:  Right.

22    THE COURT:  I need to see the agreement, too, so that

23    I can see the scope of the confidentiality.  So produce the

24    agreement and the responsive documents in camera, and I will

25    decide whether I'm going to require production of them or not.

1      And then the last thing is in paragraph 17 of the

2   response, and that's communications between the plaintiff and

3   the defendants' independent designers.  Well, now you're going

4   to have to produce that because that's no longer attorney's

5   eyes only because the identities of the designers, in other

6   words, aren't attorney's eyes only anymore.

7      MR. KASPAR:  Okay.

8      THE COURT:  Okay.  So we need to have some dates for

9   this stuff.  And what I would prefer to have you do rather

10  than me just imposing this on you is you guys sit down and

11  figure it out.  It needs to be --

12      And this is what it needs to be, though.  These are

13  my parameters.  My parameters are the deadlines that I gave

14  you for completing other stuff that you have to complete are

15  set in granite.  And so you have to come up with dates for you

16  to provide whatever further answers that I have told you you

17  have to provide long enough in advance of the fact discovery

18  cutoff date that it gives you time to digest what you have and

19  take the depositions of the people you think are necessary.

20  And so rather than me just giving dates for you, I think you

21  ought to just come up with them yourself.  Okay.

22      And the same on privilege logs.  I think you need to

23  come up with a deadline by which people are going to produce

24  privilege logs, and it needs to be soon enough that people

25  can, A, get in and discuss any challenges that you have and

1  then bring to my attention any challenges that you have so I
2  can rule on them in advance of the discovery cutoff date.  And
3  I think that's basically it.

4       And then I think you need to have a deadline by which
5  you're going to -- well, no, I already said that, by which
6  you're going to produce whatever supplemental things you have
7  to produce.

8       As far as the in camera stuff, I need it by, let's
9  say, ten days from now.

10      So the other stuff I'm going to -- the stuff we
11 haven't talked about, I will get you an order within the next
12 day or two that basically says what I think you need to do,
13 but most of it I think you're walking out of here knowing.

14      Okay.  So I'm going to give you another status in
15 about, oh, let's say, early February.  So a status hearing on
16 February the 8th at 9:30.

17      All right, anything else we've got to talk about
18 today?

19           MR. KASPAR:  No.

20           MR. MERSMANN:  No, your Honor.

21           THE COURT:  All right, take care.

22           MR. MERSMANN:  Thank you.

23           MR. KASPAR:  Thank you, your Honor.

24

25

1    (Which were all the proceedings had in the above-entitled

2    cause on the day and date aforesaid.)

3

4

5                    C E R T I F I C A T E

6

7         I hereby certify that the foregoing is a true and

8    correct transcript of the above-entitled matter.

9

10

11   */s/ Laura M. Brennan*                December 20, 2011

12

13   _____          _____
     Laura M. Brennan
14   Official Court Reporter                 Date
     Northern District of Illinois
15

16

17

18

19

20

21

22

23

24

25

**Exhibit C**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GAMES WORKSHOP LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10-cv-08103 |
| | ) | |
| v. | ) | |
| | ) | |
| CHAPTERHOUSE STUDIOS LLC and | ) | Judge Matthew F. Kennelly |
| JON PAULSON d/b/a PAULSON GAMES, | ) | Judge Jeffrey T. Gilbert |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CHAPTERHOUSE STUDIOS LLC'S SUPPLEMENTAL RESPONSE
TO GAMES WORKSHOP LTD.'S FOURTH SET OF INTERROGATORIES**

PROPOUNDING PARTY:    PLAINTIFF GAMES WORKSHOP LIMITED

RESPONDING PARTY:     DEFENDANT CHAPTERHOUSE STUDIOS LLC

SET NUMBER:           FOUR

Pursuant to Federal Rule of Civil Procedure 33, Defendant Chapterhouse Studios LLC

("Chapterhouse") hereby supplements its responses to the fourth set of interrogatories from

Plaintiff Games Workshop Limited ("Games Workshop" or "Plaintiff"), as follows:

**GENERAL OBJECTIONS:**

Chapterhouse incorporates the following General Objections as if set forth fully in

response to each interrogatory in Games Workshop's fourth set of Interrogatories.

1.      These responses are made solely for the purposes of this litigation. Chapterhouse

has not completed its investigation into the facts of this case. The responses are based solely on

the documents and information presently available and specifically known to Chapterhouse.

Chapterhouse therefore responds without prejudice to its right to supplement its responses.

1

2.      Chapterhouse objects to each interrogatory to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, and/or any other doctrine. Any inadvertent disclosure of such information will not be deemed a waiver of the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or immunity.

3.      Chapterhouse objects to each interrogatory to the extent that it purports to require Chapterhouse to disclose highly sensitive, confidential, or trade secret information of competitive and strategic significance.

4.      Chapterhouse objects to Games Workshop's fourth set of Interrogatories in their entirety as overbroad, burdensome, oppressive, and vague.

5.      Chapterhouse objects to each interrogatory to the extent that it seeks information not reasonably related to the claims or defenses in this matter.

6.      Chapterhouse objects to each interrogatory to the extent that it purports to impose any requirement or discovery obligation on Chapterhouse other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

7.      Chapterhouse objects to the definition of "Chapterhouse" in Plaintiff's first set of requests for Production, to the extent incorporated herein by reference, as overbroad to the extent it seeks information that is outside of Chapterhouse's possession, custody or control.

8.      Chapterhouse objects to the definition of "Defendants" in Plaintiff's first set of requests for Production, to the extent incorporated herein by reference, as overbroad to the extent it seeks information from other entities that is outside of Chapterhouse's possession, custody or control.

9.      Chapterhouse objects to the instructions and definitions in Plaintiff's first set of requests for Production, to the extent incorporated herein by reference, as overbroad and oppressive to the extent they purport to impose any requirement or discovery obligation on Chapterhouse other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

**INTERROGATORY NO. 15:**

Separately for each admission request in Games Workshop's First Set of Requests For Admission, if the answer is anything but an unequivocal admission, identify each third party work on which Chapterhouse relies in support thereof, and set forth the date on which and source from which Chapterhouse originally located or acquired the same.

**RESPONSE TO INTERROGATORY NO. 15:**

Chapterhouse objects to this interrogatory as vague and ambiguous. Chapterhouse further objects to this interrogatory as overbroad and unduly burdensome. Chapterhouse further objects that this interrogatory seeks information irrelevant to the claims or defenses in this litigation, and unlikely to lead to the discovery of admissible evidence. Chapterhouse objects to this interrogatory to the extent that it calls for information protected by the attorney-client privilege or the work-product doctrine or any other privilege or protection.  Chapterhouse objects to this interrogatory as containing numerous discrete subparts far in excess of the allowable number of interrogatories.  Chapterhouse further objects that the information sought by this interrogatory is duplicative of that sought by Plaintiff's Interrogatory Nos. 2 and 7.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

Chapterhouse objects to this interrogatory as vague and ambiguous. Chapterhouse further objects to this interrogatory as overbroad and unduly burdensome. Chapterhouse further objects that this interrogatory seeks information irrelevant to the claims or defenses in this litigation, and unlikely to lead to the discovery of admissible evidence. Chapterhouse objects to this interrogatory to the extent that it calls for information protected by the attorney-client privilege

3

or the work-product doctrine or any other privilege or protection. Chapterhouse objects to this interrogatory as containing numerous discrete subparts far in excess of the allowable number of interrogatories. Chapterhouse further objects that the information sought by this interrogatory is duplicative of that sought by Plaintiff's Interrogatories Nos. 2 and 7.

Without waiving, and subject to its General Objections and these specific objections, Chapterhouse responds that it has produced documents responsive to this request pursuant to Fed. R. Civ. P. 33(d). In addition, Chapterhouse has identified the following sources in response to Plaintiff's Interrogatory No. 2:

Regarding the works Chapterhouse creates, Chapterhouse draws inspiration in varying degrees from many different disciplines and sources, including, but not limited to mythology, military history, fiction, film, videogames, physics, biology, gaming, and many other disciplines and areas of study and cultural expression. Chapterhouse notes that the Internet provides a wealth of informational and inspirational material for all creative endeavors, and that Chapterhouse performs Internet and other research when creating its products.

Specifically, Chapterhouse responds that the Dungeons and Dragons hammer weapons provided inspiration for Chapterhouse's war hammers. The designs for the Celestial Lions were inspired by photographs submitted by a customer, one of a public sculpture with the head of a lion and the body of a fish, and the other of a lion in silhouette. Chapterhouse's products that look like circular-saw blades were based on actual circular saw blades. The snake on some of the Chapterhouse products was based on an image of classical Greek art. The Star Fox logo on some of Chapterhouse's products is based on a fan-created design. The lashwhips, boneswords, and the mycetic spore took inspiration from the art of HR Giger, in particular the art direction for the Alien movies. Chapterhouse consulted the tyranid codex for the Tervigon Conversion Kit; the sculptor on the project also consulted Games Workshop's Carnifex model while developing the Tervigon Conversion Kit, to ensure proper fit and alignment of the kit with the Carnifex model. The dragon/salamander images Chapterhouse used came from Google Images searches on words

4

like "dragon." Chapterhouse asked a concept artist to draw sketches of its wolf's head icon, and to adorn the icon with Nordic-style runes. The designs for the scarab and starburst shoulder pads were inspired by Egyptian art. Chapterhouse's mantis products began as a commission from a customer – the customer provided a photograph of a particular species of mantis, along with line drawings based on tracings from the photograph.

To the extent Chapterhouse is unaware of third-party works its independent contractors may have relied upon in creating the products at issue, it is unable to identify such third-party works or determine whether such third-party works are in its possession, custody, or control.

Dated: February 3, 2012

Respectfully submitted,
CHAPTERHOUSE STUDIOS LLC

By:       /s/ Thomas J. Kearney
Jennifer Golinveaux (CA Bar No. 203056)
Dean A. Morehous (CA Bar No. 111841)
Thomas J. Kearney (CA Bar No. 267087)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111-5802
Phone: (415) 591-1000
Fax: (415) 591-1400
jgolinveaux@winston.com
dmorehous@winston.com
tkearney@winston.com

5

Eric Mersmann (IL Bar No. 6286859)
Jon Raffensperger (IL Bar No. 6302802)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-1695
Phone: (312) 558-5600
Fax: (312) 558-5700
emersmann@winston.com
jraffensperger@winston.com

6

## VERIFICATION

I, Nicholas Villacci, declare:

I am authorized to make this verification for and on behalf of Defendant Chapterhouse Studio LLC, and I make this verification for that reason. I have read the foregoing DEFENDANT CHAPTERHOUSE STUDIOS LLC'S SUPPLEMENTAL RESPONSE TO GAMES WORKSHOP LTD.'S FOURTH SET OF INTERROGATORIES and know the contents thereof. On information and belief, the matters herein are true.

I declare under penalty of perjury that the foregoing is true and correct.

February 3, 2012

Nicholas Villacci

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2012, I provided service of

**DEFENDANT CHAPTERHOUSE STUDIOS LLC'S SUPPLEMENTAL RESPONSE TO GAMES WORKSHOP LTD.'S FOURTH SET OF INTERROGATORIES**

to the person or persons listed below by the following means: First Class Mail.

Scott R. Kaspar
Aaron J. Weinzierl
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: 312.832.4500
Facsimile: 312.832.4700
Email: skaspar@foley.com
aweinzierl@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

Signature: _____       Date: February 3, 2012

Name: Thomas J. Kearney

SF:327608.1

**Exhibit D**

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| BEIJING | 101 CALIFORNIA STREET | MOSCOW |
| CHARLOTTE | SAN FRANCISCO, CALIFORNIA 94111 | NEW YORK |
| CHICAGO | | NEWARK |
| GENEVA | +1 (415) 591-1000 | PARIS |
| HONG KONG | | SAN FRANCISCO |
| HOUSTON | FACSIMILE +1 (415) 591-1400 | SHANGHAI |
| LONDON | www.winston.com | WASHINGTON, D.C. |
| LOS ANGELES | | |

January 27, 2012

**THOMAS KEARNEY**
+1 (415) 591-6894
tkearney@winston.com

**VIA E-MAIL**

Scott Kaspar
Foley & Lardner LLP
90 Park Avenue
New York, NY 10016

>        Re:     **Games Workshop v. Chapterhouse Studios**

Dear Scott:

I write in response to your letter dated January 24, 2012, and in follow-up to our many attempts to reach agreement on outstanding discovery issues in light of upcoming depositions.

Unfortunately, your letter largely ignores the issues we have raised.

First, as you know, the Court instructed the parties to agree on a date certain to exchange Court-ordered discovery. In the five weeks since the Court's December 23, 2011 Order, we have received almost none of the discovery the Court has ordered Plaintiff to produce. In fact, we have received only a copy of Plaintiff's settlement agreement with Paulson; a copy of Plaintiff's December 22, 2010 letter to Chapterhouse (with exhibits reproduced in black and white instead of in color); fifteen pages of black-and-white scans of what is evidently full-color artwork (with parts of several of the pages apparently cut off in scanning, and at least one duplicate); and a copy of Plaintiff's sole copyright registration. When will Plaintiff produce its outstanding discovery? Your claim in your letter that "[w]e expect to make additional documents available within days" is vague. Does Plaintiff intend to produce its outstanding discovery by next week?

If that is the case, we propose to conduct the Rule 30(b)(6) depositions of both Plaintiff and Defendant the week of February 13. Chapterhouse will be available in Dallas, Texas and will depose Plaintiff at our offices in Chicago. As we have explained in the past, we do not intend to make Chapterhouse available for more than one 30(b)(6) deposition in light of your refusal to agree to mutual custodian depositions despite multiple requests.

WINSTON & STRAWN LLP

January 27, 2012<br>Page 2

We propose taking remaining party depositions the weeks of February 20 and 27. We currently intend to depose at least the following employees of Plaintiff (also in Chicago):

> John Blanche
> Dave Gallagher
> Jes Goodwin
> Neal Hodgson
> Andy Jones
> Alan Merrett
> Ed Spettigue

We will supplement this list as appropriate in order to provide you and your client with as much notice as practicable.

As a reminder, the following production issues, among others, are still unresolved from the Court's December 23, 2011 Order and Ms. Golinveaux's letter to you of January 5, 2012:

- The Court ordered Plaintiff to produce the "best available exemplar" of each of the works at issue. In addition to the printed and sculptural works it originally alleged but has never produced, Plaintiff has now identified a large number of new printed and sculptural works in its Second Amended Complaint and revised Exhibit A. Chapterhouse has requested and is entitled to exemplars of Plaintiff's sculptural works as well as full-color copies of Plaintiff's printed works.

- The Court ordered Plaintiff to respond in full to Chapterhouse's interrogatory no. 9 seeking "any and all sources consulted, used, reviewed, or relied on" in creating the works at issue. We still await a response.

- The Court ordered Plaintiff to respond in full to Chapterhouse's document request no. 2 seeking "[a]ll documents concerning the design, creation, or authorship of the copyrighted works You claim in this action." We still await a response.

- Document request 22 seeks documents linking Paulson, Chapterhouse, and the "Super-heavy Assault Walker" product. We strongly disagree with Plaintiff's unfounded unilateral assessment that responsive documents are irrelevant. At any rate, Plaintiff made no such objection when it agreed more than half a year ago to produce responsive documents. Plaintiff must produce the requested documents.

- Plaintiff still has not provided the organization charts Chapterhouse requested more than half a year ago. As we have repeatedly told you, Chapterhouse's document request seeks "[a]ll documents constituting" such organization charts. And, as I informed you back in July 2011 and have emphasized repeatedly since then, Plaintiff's offer to produce instead

WINSTON & STRAWN LLP

January 27, 2012
Page 3

a supposedly "representative" chart, whatever that means, is insufficient. In addition, as we have also explained many times, the handful of virtually identical charts Plaintiff has produced are not only inadequate but were apparently outdated and inaccurate even at the time they were produced. Furthermore, public records indicate that Games Workshop's corporate structure has changed again recently. Plaintiff must supplement its production with responsive, accurate, up-to-date organization charts, or confirm unequivocally that no such documents exist.

- Plaintiff must produce specimens of first use in commerce of its alleged marks responsive to document request no. 11, as well as documents concerning trademark availability research, investigation, and searches responsive to document request no. 8.

- Plaintiff must respond in full to Chapterhouse's interrogatory no. 16, identifying where and when each alleged work (including both printed works and sculptural works) was first published.

Your contention that Chapterhouse's responses are "weeks overdue" is of course baseless. With respect to Plaintiff's Interrogatory 15, as noted above, the court ordered the parties on December 23, 2011 to agree to a date to exchange discovery, including discovery Plaintiff was ordered to produce and had agreed to produce. Since then, Chapterhouse has repeatedly asked Plaintiff for a date, but Plaintiff has refused. With respect to Plaintiff's Document Requests 16, 18, and 19, at the December 19, 2011 hearing the Court instructed Chapterhouse to produce documents responsive to those requests by December 28, 2011, and Chapterhouse did so.

We are discussing the confidentiality issue you raise in your letter with our client, and will let you have our response in the next few days. Until then you are not authorized to share those documents with your client, your letter of late this afternoon notwithstanding. Doing so would violate the Agreed Protective Order, and Defendant reserves all rights to pursue any appropriate remedy for such breach.

We look forward to working with you cooperatively to complete remaining discovery in this case in the most efficient manner possible.

Sincerely,

Thomas J. Kearney

TJK:lsh

**Exhibit E**

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| BEIJING | 101 CALIFORNIA STREET | MOSCOW |
| CHARLOTTE | SAN FRANCISCO, CALIFORNIA 94111 | NEW YORK |
| CHICAGO | | NEWARK |
| GENEVA | +1 (415) 591-1000 | PARIS |
| HONG KONG | | SAN FRANCISCO |
| HOUSTON | FACSIMILE +1 (415) 591-1400 | SHANGHAI |
| LONDON | www.winston.com | WASHINGTON, D.C. |
| LOS ANGELES | | |

February 1, 2012

**THOMAS J. KEARNEY**
Attorney
415.591-6894
TKearney@winston.com

**VIA EMAIL**

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016

Re:     **Games Workshop v. Chapterhouse Studios**
        **Subpoena -- Games Workshop Retail Inc.**

Dear Jonathan:

I write in response to your letter of yesterday, January 31, 2012.

Thank you for confirming that Plaintiff expects to complete its document production and responses to discovery this week. If that changes please let us know right away. As I explained in my January 27 letter, Chapterhouse has already produced documents responsive to Plaintiff's document requests nos. 16, 18, and 19 in accordance with the Court's December 23, 2011 Order. Chapterhouse also expects to supplement its responses to Court-ordered and agreed production, including supplemental responses to interrogatories 5, 13, and 15 and document requests 20, 21, and 27, and serve a privilege log this week.

While you claim that Plaintiff has complied with the Court Order to provide its privilege log, that log identifies exactly two documents. Plaintiff's apparent position that it has had no internal correspondence or correspondence with counsel about Defendant or this litigation seems highly improbable, and is an issue we intend to take up at the appropriate time. Furthermore, Plaintiff has produced a number of other documents in redacted form, which are not reflected in its privilege log. This includes at least documents Bates numbered GW0002507-2511 (Plaintiff's purported "confusion" emails) and GW0002594-2631 (Plaintiff's license with THQ). There appears to be no legitimate grounds for claiming any of the redacted material as privileged and none of the redactions appear on Plaintiff's privilege log. Accordingly, please confirm that you will also provide unredacted versions of these documents by the end of the week.

WINSTON & STRAWN LLP

February 1, 2012<br>
Page 2

Regarding the document you reference concerning Mr. Villacci's alleged relationship with Mr. Paulson, are you claiming that Plaintiff did not make or retain a copy of the Internet document you reference?

You ask why Chapterhouse does not produce documents from its independent contractors / designers. I refer you to the Court Order stating that "Defendant is not obligated to produce documents in the hands of its independent contractors / designers." Dec. 23, 2011 Order at 1. We do now represent Mr. Nagy and Mr. Lawler for purposes of responding to Plaintiff's third-party subpoenas to them and are in the process of reviewing those subpoenas. We expect to produce certain documents responsive to the subpoena to Mr. Traina next week.

Regarding depositions, you did not respond to my proposed dates. You also repeat your request for a date for Chapterhouse's 30(b)(6) deposition, but I suggested dates in my last letter. Please respond to the dates I proposed for depositions. To be clear, I reiterate that we do not intend to stipulate to more than one 30(b)(6) deposition of Chapterhouse.

Chapterhouse will agree to take the deposition of Games Workshop Retail, Inc. in Chicago at your request, the week of February 13. Please provide dates that week for the depositions of Plaintiff and GWRI, and we will serve revised notices. Chapterhouse does not agree to limit the scope of its 30(b)(6) depositions, and intends to proceed on the noticed topics. If GWRI fails to produce a properly prepared designee to testify on the noticed topics, Chapterhouse will take that matter up as appropriate. If, as you say, GWRI does not have information about certain of the noticed topics, then I am sure that will be made clear at the deposition.

Finally, regarding your renewed request to share Chapterhouse's Highly Confidential documents with your client, the terms of the Agreed Protective Order are clear. Among other things, the party disputing the designation of documents must identify in writing the specific documents in dispute; propose a new designation; and meet and confer with the other party. Plaintiff has done none of these. Until we resolve this issue you are not authorized to share the documents with your client. Once again, Chapterhouse reserves its right to pursue appropriate remedies should you breach the Order.

Sincerely,

Thomas Kearney
TK:lsh

cc: Scott Kaspar

**Exhibit F**

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| BEIJING | 101 CALIFORNIA STREET | MOSCOW |
| CHARLOTTE | SAN FRANCISCO, CALIFORNIA 94111 | NEW YORK |
| CHICAGO | | NEWARK |
| GENEVA | +1 (415) 591-1000 | PARIS |
| HONG KONG | | SAN FRANCISCO |
| HOUSTON | FACSIMILE +1 (415) 591-1400 | SHANGHAI |
| LONDON | | WASHINGTON, D.C. |
| LOS ANGELES | www.winston.com | |

February 3, 2012

**THOMAS J. KEARNEY**
415.591-6894
tkearney@winston.com

## VIA E-MAIL (W/OUT ENCLS.) AND U.S. MAIL

Jonathan E. Moskin
Foley & Lardner LLP
90 Park Avenue
New York, New York 10016
jmoskin@foley.com

Re:    **Games Workshop v. Chapterhouse Studios**
       **Civil Action No. 1:10-cv-8103**

Dear Jonathan:

I enclose a disc containing documents in response to Plaintiff's Requests for Production. This production includes a document with Bates label CHS00014354. Please note that this document is designated CONFIDENTIAL pursuant to the Agreed Protective Order. Also enclosed is Chapterhouse's privilege log.

You still have not responded to my letters dated January 27, 2012 and February 1, 2012 regarding deposition scheduling of Plaintiff and its employees. Your letter of this afternoon mentions that you are "checking to see" if Games Workshop Retail is available for deposition the week of February 13, but you have not responded to our proposed dates for depositions of Plaintiff and Plaintiff's employees we have identified. While we are making every effort to coordinate deposition scheduling, we cannot allow you to continue to delay this process. Please confirm dates for GWR, Plaintiff, and Plaintiff's employees we have identified by the close of business on Monday, February 6, or we will have no choice but to notice the depositions during the weeks we have proposed.

As I have said repeatedly, Chapterhouse can be available for deposition in Dallas during the weeks of February 13 or February 20. Please let us know which week you prefer.

WINSTON & STRAWN LLP

February 3, 2012
Page 2

Finally, it is now clear from your letter of today that Plaintiff had no proper basis to redact
GW0002507-2511 and GW0002594-2631. Indeed, given that Plaintiff has acknowledged that
the documents in the Bates range GW0002507-2511 are the only documents it has purportedly
relating to consumer confusion, the identities of individuals named in those emails is highly
relevant, and your effort to conceal that information is improper. The terms of the THQ license
agreement will likely be relevant to Plaintiff's claims of ownership of copyright and trademark
rights and to damages, among other things. Moreover, redaction is improper as a means of
preserving confidentiality. The Agreed Protective Order provides the proper mechanism for
preserving the confidentiality of documents. As you have confirmed that Plaintiff's documents
in the Bates ranges GW0002507-2511 and GW0002594-2631 were not redacted based on
attorney-client privilege, please immediately produce unredacted versions of those documents.

Sincerely,

Thomas Kearney

cc: Scott Kaspar (without enclosures)

Encls.

SF:327651

**Exhibit G**

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| BEIJING | 101 CALIFORNIA STREET | MOSCOW |
| CHARLOTTE | SAN FRANCISCO, CALIFORNIA 94111 | NEW YORK |
| CHICAGO | | NEWARK |
| GENEVA | +1 (415) 591-1000 | PARIS |
| HONG KONG | | SAN FRANCISCO |
| HOUSTON | FACSIMILE +1 (415) 591-1400 | SHANGHAI |
| LONDON | www.winston.com | WASHINGTON, D.C. |
| LOS ANGELES | | |

February 7, 2012

**K. JOON OH**
Attorney
415.591-1564
koh@winston.com

**VIA EMAIL**

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York  10016

Re:    **Games Workshop v. Chapterhouse Studios**

Dear Mr. Moskin:

My name is Joon Oh, and I am an attorney representing Chapterhouse Studios in this matter.  I
write to you on a very important matter.

I have just reviewed the letter that you sent earlier today, February 7, 2012, to my colleague Tom
Kearney.  Chapterhouse is deeply disturbed by you reiterating your intention to disclose Highly
Confidential-Attorney's Eyes Only ("AEO") information to the Plaintiff in deliberate violation
of the Agreed Protective Order in this case (ECF No. 71).  You previously stated your intention
to improperly disclose AEO information to Plaintiff in your February 1, 2012 letter to Mr.
Kearney.  Neither your February 1 letter nor your February 7 letter identified the specific
documents in dispute; because you have never identified the Bates numbers for the documents
that you seek to disclose, you have failed to make a reasonable first attempt to seek the proper
permission from Chapterhouse.  Without Chapterhouse's permission, which you do not have
because you have not made a reasonable first attempt to seek permission, you are not authorized
to disclose AEO information to the Plaintiff.

As Mr. Kearney reminded you in his February 3, 2012 letter to you, the Agreed Protective Order
contains detailed procedures for you to properly disclose confidential information to your client.
You are obligated to follow those procedures.  Chapterhouse reserves the right to seek all
appropriate remedies and sanctions if you disclose the unspecified set of documents that you call
"creation documents," which must be assumed to be a euphemism for any and all AEO-
designated documents, including financial and sales documents, since you have failed to identify
the Bates numbers for the documents in dispute.

WINSTON & STRAWN ᴸᴸᴾ

February 7, 2012
Page 2

Chapterhouse is also deeply concerned about your admission that several potential witnesses for
depositions are no longer employed by Games Workshop. Your disclosure is especially
troublesome in light of Games Workshop's long delay in providing author information and its
ongoing failure to provide the employment status of such individuals. Please immediately
provide me with the current employment status of each of the alleged authors and artists
identified in Plaintiff's supplemented Exhibit A provided to Chapterhouse on January 19, 2012,
and the most recent contact information available for each of the alleged authors and artists who
are no longer employed by Plaintiff, including their current place of employment, email
addresses, mailing addresses, and telephone numbers. Regarding John Blanche, Dave Gallagher,
Jes Goodwin, Neil Hodgson, Andy Jones, Alan Merrett, and Ed Spettigue, not only have you failed
to provide dates for those individuals, you fail even to identify which of the individuals are
unavailable for deposition due to failing health or no longer work for Games Workshop. As Games
Workshop has delayed working with us to schedule mutually convenient dates for these individuals
and the Rule 30(b)(6) depositions of Plaintiff and Games Workshop Retail, we are left with no choice
but to proceed with noticing the depositions. Your claim that Games Workshop Retail is merely a
"service" company is vague and meaningless, and belied by our investigation, so we intend to
proceed with that deposition. If you wish to clarify your statement, you are free to do so. Please
confirm that you are authorized to accept service of a new deposition subpoena to Games Workshop
Retail.

As for scheduling a date for you to take the 30(b)(6) deposition of Chapterhouse, currently either
February 21 or 22, 2012 is the next available date. (Last month, Mr. Kearney proposed possible
dates for Chapterhouse's deposition, but Games Workshop did not respond promptly, and the
available dates have since changed). As we have repeatedly made clear, pursuant to the Federal
Rules of Civil Procedures, Games Workshop is entitled to <u>one</u> 30(b)(6) deposition, not a 30(b)(6)
deposition and a separate custodian-of-records deposition as you implied in your letter, and
Chapterhouse will object to more than one such deposition.

Regarding the third-party subpoenas to Messrs. Traina, Lawler, and Nagy, we expect to be able
to produce documents by the end of this week, or early next week at the latest.

As you likely know, Chapterhouse served supplemental discovery responses last Friday,
February 3, 2012, which should address the questions regarding discovery responses you raised
in your letter.

I will call you tomorrow, February 8, 2012, at 2 pm (Eastern time), to meet and confer about
Plaintiff's ongoing failure to provide employment status information and contact information for
non-employees, and about Bates Nos. 2507-2511 and the THQ license. Your explanation for
failing to produce unredacted versions of those documents is unavailing. In particular, raising
the European Data Protection Act as a basis for withholding the identities of *Games Workshop's
agents* in Bates Nos. 2507-2511 is not proper, especially in light of Games Workshop's ongoing
practice of disclosing the identification information of third parties in those very same
documents, and your ongoing claims to us and the Court about the importance of those
documents to Plaintiff's case. Also, Games Workshop can protect the confidentiality associated

WINSTON & STRAWN LLP

February 7, 2012
Page 3

with those documents and the THQ license without redactions by using confidentiality designations.

Sincerely,

K. Joon Oh

cc: Scott Kaspar

# Exhibit H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES<br><br>Defendants. | Civil Action No. 1:10-cv-08103<br><br>Hon. Matthew F. Kennelly<br>Hon. Jeffrey T. Gilbert |

## PLAINTIFF GAMES WORKSHOP STUDIOS LLC'S RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS TO GAMES WORKSHOP LIMITED SET TWO

Pursuant to Fed.R.Civ.P. Rules 26 and 34, Games Workshop responds as follows to the First Request For Production of Documents of Defendant Chapterhouse Studios LLC.

### GENERAL OBJECTIONS

Games Workshop will produce electronically stored information in a format mutually agreed upon among counsel, or as otherwise appropriate.

### REQUESTS FOR PRODUCTION

2.    All documents concerning the design, creation, or authorship of the copyrighted works You claim in this action.

**RESPONSE:**

Games Workshop objects that this request is overbroad and unduly burdensome given the needs of the case, given that Games Workshop is the owner of each of the copyrighted works at issue in the case and no issue has been raised as to its ownership or creation of any given work.

3.     For each person identified in Your response to Interrogatory No. 5, all documents constituting, evidencing, or relating to any employment agreement, contract, memorandum of understanding, or other statement of terms and conditions, for all periods of time during which such person was engaged in the authorship, creation, or design of any work for which You claim copyright protection.

**RESPONSE**:

Games Workshop incorporates by reference its objections to Interrogatory No. 5 that this request is overbroad and unduly burdensome given the needs of the case, given that Games Workshop is the owner of each of the copyrighted works at issue in the case and no issue has been raised as to its ownership or creation of any given work.

4.     All documents constituting the chain of title for all copyrights You claim in this action.

**RESPONSE**:

Games Workshop objects that this request vague and ambiguous, given that Games Workshop is the owner of each of the copyrighted works at issue in the case and no issue has been raised as to its ownership or creation of any given work.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any documents responsive to this request.

5.     All certificates of copyright registration for copyrighted works You claim in this action.

**RESPONSE:**

Games Workshop will produce documents responsive to this request.

6.    All documents concerning Chapterhouse or its products.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous, overbroad and unduly burdensome given the needs of the case, and, without regard to relevance, seeks documents protected by the attorney-client privilege and work-product immunity.

Without prejudice to or waiver of the foregoing objections, Games Workshop will produce non-privileged non-work-product documents responsive to this request.

7.    One exemplar of the use in commerce in the United States of each of the marks You claim in this action.

**RESPONSE:**

Games Workshop objects that this request is overbroad and unduly burdensome given the needs of the case, including Chapterhouse's admission that Games Workshop owns all of the marks in issue.

Without prejudice to or waiver of the foregoing objections, Games Workshop will produce documents responsive to this request.

8.    All documents concerning trademark availability research, investigation, and searches relating to trademarks You claim in this action.

**RESPONSE:**

Games Workshop objects that this request is overbroad and unduly burdensome given the needs of the case, including Chapterhouse's admission that Games Workshop owns all of the

marks in issue and the length of time Games Workshop has been using the subject marks.

Without prejudice to or waiver of the foregoing objections, Games Workshop will produce documents, if any, responsive to this request.

9.     All surveys, studies, or other documents relating to market (or prospective market) impressions of, reactions to, or attitude by a consumer or consumers towards the trademarks You claim in this action.

**RESPONSE**:

Games Workshop objects that this request is vague and ambiguous, overbroad and unduly burdensome given the needs of the case, insofar as it seeks "other documents" relating to market impressions, reactions, or attitudes.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any documents responsive to this request.

10.     All documents reflecting or relating to communications concerning confusion about the source of Chapterhouse's products, or between You or any of Your products and Chapterhouse or any of its products.

**RESPONSE**:

Games Workshop objects that the phrase "communications concerning confusion" is vague and ambiguous, and that this request is overbroad and unduly burdensome given the needs of the case, and, without regard to relevance, seeks documents protected by the attorney-client privilege and work-product immunity.

Without prejudice to or waiver of the foregoing objections, Games Workshop will produce non-privileged non-work-product documents responsive to this request demonstrating consumer communications responsive to this request.

11.     Specimens of first use in U.S. commerce for each of the marks You claim in this action.

**RESPONSE**:

Games Workshop objects that this request is overbroad and unduly burdensome, given the needs of the case, including the length of time Games Workshop has been using the subject marks, and seeks information that is not relevant and not likely to lead to the discovery of admissible evidence insofar as there is no issue in this case concerning Chapterhouse's alleged priority of use of any of the subject trademarks and given Chapterhouse's admission that Games Workshop owns all of the marks in issue.

12.     All documents concerning the use by others of any of the marks You claim in this action.

**RESPONSE**:

Games Workshop objects that this request is overbroad and unduly burdensome, given the needs of the case, and seeks information that is not relevant and not likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not claim any rights in or to any of the subject trademarks by or through any third parties and given Chapterhouse's admission that Games Workshop owns all of the marks in issue. The request is also vague and ambiguous insofar as the term "use" is not specified and would encompass all references to Games Workshop's products by third parties.

13.     All documents concerning measures You have taken to enforce trademark rights in any of the trademarks You claim in this action, including, without limitation, all communications with third parties regarding those rights.

**RESPONSE**:

Games Workshop objects that this request is overbroad and unduly burdensome, given the needs of the case, and seeks information that is not relevant and not likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not claim any rights in or to any of the subject trademarks by or through any third parties and given Chapterhouse's admission that Games Workshop owns all of the marks in issue.

14.     All documents concerning claims that any of the works in which You claim copyright in this action infringes third party rights.

**RESPONSE**:

Games Workshop objects that this request is overbroad and unduly burdensome, given the needs of the case, and seeks information that is not relevant and not likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not claim any rights in or to any of the subject works by or through any third parties.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any documents responsive to this request.

15.     All documents constituting, comprising, evidencing, or referring to assignments, licenses, the "purchasing of rights," or other transfers of copyrights or trademarks You claim in this action.

**RESPONSE**:

Games Workshop objects that this request is overbroad and unduly burdensome given the needs of the case, given that Games Workshop is the owner of each of the copyrighted works at issue in the case and the trademarks used in connection therewith and no issue has been raised as

to its ownership or creation of any given work or title to any of the subject trademarks.  The request is also needlessly cumulative and repetitive of Request 4 above.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any documents responsive to this request.

16.    All documents evidencing or constituting the terms of Your agreements with distributors of Your products.

**RESPONSE**:

Games Workshop objects that this request is overbroad and unduly burdensome, given the needs of the case, and seeks information that is not relevant and not likely to lead to the discovery of admissible evidence.

17.    All documents concerning Your assertion of any of the copyrights You claim in this action, against any party that designs, authors, manufactures, sells, or distributes material (such as gaming miniatures, models, add-on parts or accessories for same, as well as written matter such as rulebooks or codexes) for use with Your Warhammer 40,000 game.

**RESPONSE**:

Games Workshop objects that this request seeks information that is not relevant and not likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not claim any rights in or to any of the subject copyrights by or through any third parties.  Games Workshop further objects that the term "assertion of rights" is vague and ambiguous.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any documents responsive to this request.

18.    All documents concerning allegations that You have falsely claimed copyright rights or exclusivity of copyright rights.

**RESPONSE:**

Games Workshop objects that this request seeks information that is not relevant and not likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not claim any rights in or to any of the subject copyrights by or through any third parties, and because bare allegations, if there had been any, are not pertinent.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any documents responsive to this request.

19.    All documents concerning allegations that You have falsely claimed trademark rights or exclusivity of trademark rights.

**RESPONSE:**

Games Workshop objects that this request seeks information that is not relevant and not likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not claim any rights in or to any of the subject trademarks by or through any third parties, and because bare allegations, if there had been any, are not pertinent.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any documents responsive to this request.

20.    All documents concerning Your rules or policies, including but not limited to legal policies appearing on Your websites, regarding use of Your copyrights or trademarks by third parties.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous, overbroad and unduly burdensome given the needs of the case, and, without regard to relevance, seeks documents protected by the attorney-client privilege and work-product immunity.

Without prejudice to or waiver of the foregoing objections, Games Workshop will produce copies of any such policies appearing on its website.

21.     All documents constituting organization charts of Games Workshop Limited, including without limitation its officers, directors, employees, subsidiaries, parent companies (including without limitation Games Workshop Group PLC), sister companies, and affiliated companies.

**RESPONSE**:

Games Workshop objects that this request is overbroad and unduly burdensome, given the needs of the case, and seeks information that is not relevant and not likely to lead to the discovery of admissible evidence

Without prejudice to or waiver of the foregoing objections, Games Workshop will produce a representative organizational chart, if any.

22.     All documents supporting Your allegations in the First Amended Complaint that the product You refer to as "Super Heavy Assault Walker," "Super-Heavy Assault Walker," and "TAU Super-Heavy Assault Walker," was "designed and licensed for Chapterhouse by Paulson Games" (First Amended Complaint 28), or that it was "designed at least in part by Paulson Games" (First Amended Complaint TR 30, 31)

**RESPONSE**:

Games Workshop objects that this is a contention request, best deferred until the close of discovery and calls for documents in the possession of third parties, including Chapterhouse and defendant Paulson.

Without prejudice to or waiver of the foregoing objections, Games Workshop will produce documents responsive to this request.

23.     All documents concerning Your plans to market copyrighted works claimed by You in this action, including without limitation any and all products that are derivative works of such copyrighted works, whether such products are currently existing or planned for the future.

**RESPONSE**:

Games Workshop objects that this request seeks confidential information that is irrelevant and not likely to lead to the discovery of admissible evidence.


24.     All documents that evidence, refer to, or discuss any damages or harm, including without limitation monetary damage, You claim to have suffered, or to be likely to suffer, as a result of Chapterhouse's alleged infringements and violations as set forth in Your First Amended Complaint.

**RESPONSE**:

Games Workshop objects that this is a contention request best deferred to the close of discovery, including receipt of discovery from Chapterhouse regarding its sales.

25.     Documents sufficient to identify Your total annual profits, related to each copyrighted work claimed by You in this action, for each of the past ten (10) years.

**RESPONSE**:

Games Workshop objects that this request is vague and ambiguous, overbroad and unduly burdensome given the needs of the case. The request also seeks information that is confidential. The request is also a contention request best deferred until Games Workshop elects whether or not to pursue lost profits in this case.

Without prejudice to or waiver of the foregoing objections, subject to entry of a protective order, Games Workshop, will produce documents responsive to this request to support a claim of

lost profits to the extent it elects to pursue a claim for such lost profits.

26.     Documents sufficient to identify Your total annual revenues related to each copyrighted work claimed by You in this action, for each of the past ten (10) years.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous, overbroad and unduly burdensome given the needs of the case. The request also seeks information that is confidential. The request is also a contention request best deferred until Games Workshop elects whether or not to pursue lost profits in this case.

Without prejudice to or waiver of the foregoing objections, subject to entry of a protective order, Games Workshop, will produce documents responsive to this request to support a claim of lost profits to the extent it elects to pursue a claim for such lost profits.

27.     Documents sufficient to identify Your total annual expenses related to each copyrighted work claimed by You in this action, for each of the past ten (10) years.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous, overbroad and unduly burdensome given the needs of the case. The request also seeks information that is confidential. The request is also a contention request best deferred until Games Workshop elects whether or not to pursue lost profits in this case.

Without prejudice to or waiver of the foregoing objections, subject to entry of a protective order, Games Workshop, will produce documents responsive to this request to support a claim of lost profits to the extent it elects to pursue a claim for such lost profits.

28.     All documents concerning allegations of copyright infringement asserted against You.

**RESPONSE:**

Games Workshop objects that this request is overbroad, given the needs of the case, and seeks information that is not relevant and not likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not claim any rights in or to any of the subject copyrights by or through any third parties.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any documents responsive to this request.

29.    All documents concerning allegations of trademark infringement asserted against You.

**RESPONSE:**

Games Workshop objects that this request is overbroad, given the needs of the case, and seeks information that is not relevant and not likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not claim any rights in or to any of the subject trademarks by or through any third parties.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any documents responsive to this request.

30.    All documents concerning the Star Fox Space Marine Chapter referenced in Exhibit A to Your Response to Chapterhouse's Interrogatory No. 1.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous and seeks documents that are not relevant and not likely to lead to the discovery of admissible evidence.

31.    All documents evidencing, referring or relating to any and all statements by Chapterhouse that are allegedly false and misleading, as set forth in paragraphs 78 through 80 of

the First Amended Complaint.

**RESPONSE:**

   Games Workshop objects that this is a contention request, best deferred until the close of discovery and calls for documents in the possession of third parties, including Chapterhouse itself.

   Without prejudice to or waiver of the foregoing objections, Games Workshop will produce documents responsive to this request.

   32.   All documents evidencing, referring or relating to any and all business practices of Chapterhouse that are allegedly unfair and deceptive, as set forth in paragraphs 86 through 89 of the First Amended Complaint.

**RESPONSE:**

   Games Workshop objects that this is a contention request, best deferred until the close of discovery and calls for documents in the possession of third parties, including Chapterhouse itself.

   Without prejudice to or waiver of the foregoing objections, Games Workshop will produce documents responsive to this request.

   33.   All documents evidencing, referring or relating to any and all representations of material fact by Chapterhouse that are allegedly false and deceptive, as set forth in paragraphs 87 through 89 of the First Amended Complaint.

**RESPONSE:**

   Games Workshop objects that this is a contention request, best deferred until the close of discovery and calls for documents in the possession of third parties, including Chapterhouse itself.

Without prejudice to or waiver of the foregoing objections, Games Workshop will produce documents responsive to this request.

Dated: July 5, 2011                    Respectfully submitted,

                                       By: _____
                                           Jonathan E. Moskin

                                       Scott R. Kaspar (Ill. Bar No. 6284921)
                                       Aaron J. Weinzierl (Ill. Bar No. 6294055)
                                       FOLEY & LARDNER LLP
                                       321 North Clark Street, Suite 2800
                                       Chicago, IL 60654
                                       Telephone:  (312) 832-4500
                                       Facsimile:  (312) 832-4700
                                       Email:  skaspar@foley.com; aweinzierl@foley.com

                                       Jonathan E. Moskin
                                       FOLEY & LARDNER LLP
                                       90 Park Avenue
                                       New York, NY 10016
                                       Telephone:  (212) 682-7474
                                       Facsimile:  (212) 687-3229
                                       Email:  jmoskin@foley.com

                                       *Attorneys for Plaintiff Games Workshop Limited*

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan E. Moskin, an attorney, hereby certify that on July 5, 2011, I caused a

copy of the foregoing **PLAINTIFF GAMES WORKSHOP STUDIOS LLC'S RESPONSE**

**TO REQUEST FOR PRODUCTION OF DOCUMENTS TO GAMES WORKSHOP**

**LIMITED SET TWO** to be served on the interested parties by causing copies of this document

to be served on the following *via* United States Mail in a sealed envelope with the postage

prepaid and *via* electronic mail to the following:

> Jennifer A. Golinveaux, Esq.
> Thomas J. Kearney, Esq.
> J. Caleb Donaldson, Esq.
> WINSTON & STRAWN LLP
> 101 California Street
> San Francisco, CA 94111
> jgolinveaux@winston.com
> tkearney@winston.com
> jcdonaldson@winston.com

> Catherine B. Diggins, Esq.
> Eric J. Mersmann, Esq.
> WINSTON & STRAWN LLP
> 35 West Wacker Drive
> Chicago, IL 60601
> cdiggins@winston.com
> emersmann@winston.com

>           and

> Ronald H. Spuhler
> Ronald A. DiCerbo
> Thomas J. Campbell Jr.
> MCANDREWS, HELD & MALLOY LTD.
> 500 W. Madison Street – 34th Floor
> Chicago, IL 60061

> _____
> Jonathan E. Moskin

# Exhibit I

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3    GAMES WORKSHOP LIMITED,        )
                                     ) Docket No. 10 C 8103
 4              Plaintiff,           )
                                     ) Chicago, Illinois
 5         v                         ) September 1, 2011
                                     ) 9:30 a.m.
 6    CHAPTERHOUSE STUDIOS LLC,      )
                                     )
 7              Defendant            )

 8
                      TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE JEFFREY T. GILBERT

10

11    PRESENT:

12    For the Plaintiff:       JONATHAN E. MOSKIN (By Telephone)
                               Foley & Lardner LLP
13                             90 Park Avenue
                               New York, New York 10017
14
                               SCOTT R. KASPAR
15                             Foley & Lardner LLP
                               321 North Clark Street
16                             Suite 2800
                               Chicago, Illinois 60610
17

18    (TRANSCRIBED FROM DIGITAL RECORDING.
       PLEASE PROVIDE CORRECT SPEAKER IDENTIFICATION)
19

20

21

22

23

24

25
```

```
 1   PRESENT:  (Cont'd)

 2
     For Defendant
 3      Chapterhouse:          ERIC J. MERSMANN
                               Winston & Strawn
 4                             35 West Wacker Drive
                               Chicago, Illinois 60601
 5
 6                             JENNIFER A. GOLINVEAUX (By Telephone)
                               THOMAS J. KEARNEY (By Telephone)
 7                             JOHN C. DONALDSON (By Telephone)
                               SHANE WITOV      (By Telephone)
 8                             Winston & Strawn LLP
                               101 California Street
 9                             Suite 3900
                               San Francisco, California 94111
10

11

12

13

14
     (TRANSCRIBED FROM DIGITAL RECORDING.
15    PLEASE PROVIDE CORRECT SPEAKER IDENTIFICATION)

16

17
     Court Reporter:          Lois A. LaCorte
18                            219 South Dearborn  Room 1918
                              Chicago, Illinois 60604
19                            (312) 435-5558

20

21

22

23

24

25
```

1      THE CLERK:  10 C 8103, Games Workshop Limited v

2  Chapterhouse Studios LLC.

3      THE COURT:   We will do the courtroom first.

4      MR. KASPAR:   Scott Kaspar for Plaintiff Games Workshop.

5      THE COURT:   Good morning, Mr. Kaspar.

6      MR. MERSMANN:   Eric Mersmann for Defendant Chapterhouse.

7      THE COURT:   Good morning, Mr. Mersmann.  And who do we

8  have on the phone?

9      MR. MOSKIN: (By Telephone)   This is Jonathan Moskin at

10  Foley & Lardner in New York for Games Workshop.

11      THE COURT:   Okay.

12      MS. GOLINVEAUX: (By Telephone)   Good morning, your

13  Honor, this is Jennifer Golinveaux, Winston & Strawn for

14  Defendant Chapterhouse Studios, and with me on the line are

15  Caleb Donaldson, Tom Kearney and Shane Witnov of Winston &

16  Strawn.

17      THE COURT:   Okay.  All right, good morning, everybody.

18      Okay, I'll address myself to the folks in the courtroom,

19  but if the people on the phone want to respond to this, I'm

20  happy to do that too.

21      You have seen the order.  I spent a couple of sessions

22  with your Chicago counterparts, saw the order I issued last

23  week, and I'm wondering whether you have had a chance to talk

24  through those -- talk about those issues and what your

25  perspective -- your respective positions are on that.

1        I'll look to the plaintiff first, I guess, since this is

2   your lawsuit, or if somebody else wants to jump in, that's

3   fine.

4        Mr. Kaspar is waiting to see if, Mr. Moskin, you want to

5   take this up or not.

6        MR. MOSKIN:   Well, I have to say, and I apologize for

7   this because I was out of the office last week, that I want to

8   pull up -- I discussed with Scott the -- I think I know what

9   the content of the order is and I'm just pulling it up right

10  now to be sure that I have that -- one of the things I

11  believe -- the two things that seem to be issues --

12       THE COURT:   Hold on.  Before you begin speaking, why

13  don't we take a break, why don't you pull up the order.

14       MR. MOSKIN:   Right.

15       THE COURT:   Why don't you look at it.  We will wait.

16       MR. MOSKIN:   Right.

17       (Pause)

18       THE COURT:   And this is all in the context -- remember,

19  I'm the magistrate judge here, okay?

20       MR. MOSKIN:   Yes.

21       THE COURT:   And this case was referred to me for

22  settlement.  It wasn't referred to me for summary judgment or

23  for trial.  So my context is is it a case that we should sit

24  down and try and settle and if so, how and in what kind of

25  context or is it not or are there parts of this that we could

1    deal with.

2         But you're in front of Judge Kennelly on the merits for

3    the main case and I suppose it's also been referred to me for

4    some discovery too.  So --

5         MR. MOSKIN:   Well, as I understand the scope of your

6    Honor's proposal was that we contemplate some sort of a mock

7    trial for 10 -- each party pick 10 products and you know, we

8    get to pick our 10 best products and defendant, maybe call

9    them the 10 worst products, and I have two general concerns

10   with that, one, because the very heart of a claim for

11   copyright infringement is copying.

12        At this point we have essentially received, despite the

13   fact that we began the discovery process 5 months ago, we

14   still have received essentially zero information from the

15   defendant.  They have offered various excuses why they won't

16   provide us information and now they won't even answer my

17   letters seeking very basic information.

18        They have claimed as an affirmative defense in the case

19   that they independently created these works.  I think the law

20   is very clear, in fact, Judge Kennelly instructed us to take a

21   look at the model jury instructions that he himself had a hand

22   in drafting on copyright infringement, and they make very

23   clear that it's a common understanding in copyright law that

24   originality for purposes of copyright is not a broad objective

25   inquiry, it's essentially a subjective question of whether the

1    originator, the author, created the works him or herself, or

2    in the case of a company, by itself without copying from

3    others.

4        And as a corollary to that or the flip side of that, so

5    that, for example, if I sat down and composed, you know, just

6    started writing "When in disgrace with fortune in men's eyes I

7    all alone beweep my outcast fate," you might say that, you

8    know, I had copied Shakespeare, but if I could prove that I

9    was not looking at his sonnets but that I really came up with

10   that on my own, that's original to me and I'm entitled to

11   claim copyright in it, and whether I could show anybody copied

12   from me rather than Shakespeare is another matter, but just in

13   terms of owning copyright, it's a closed inquiry into the

14   state of mind effectively of the copyright creator.

15       And similarly, the law is clear that the infringer, if

16   the infringer is, they can try to show independent creation,

17   that is to say that they looked at -- either they created

18   things on their own or they relied on third-party sources, but

19   we have been seeking for five months to find out from the

20   defendant if it can identify any third-party sources on which

21   it relied in creating the roughly hundred or so works that we

22   have identified so far as infringement, and they have given us

23   nothing.  They have produced no documents, they have made some

24   very broad windy references to things out in the public

25   domain, but we, if we are to proceed with your Honor's

1    proposal, the first thing we need, and I think it's fair for

2    us to have to get this rather quickly, is, you know, would be

3    the documents and detailed interrogatory answers responding to

4    our requests, whether there really is any defense to the claim

5    of infringement in the case.

6         Moreover, another issue that just conceptually, part of

7    our claim in this case is, and there is abundant case law that

8    supports this, that when -- here, if you look at the website

9    as a whole, a website is a copyrightable work and the entire

10   website is devoted to selling and offering or depicting -- put

11   aside the sale issue because for purposes of copyright that's

12   less relevant -- it's for depicting the infringing items.

13   They're all collected together in one place and the entire

14   website is an infringement.

15        So -- and frankly, I think the law is sufficiently clear

16   that we could readily win summary judgment on that issue,

17   whether the website should be taken down even if some end

18   products could be sold independently as not infringing.

19        But the first step before we can move forward I think to

20   any settlement would be, and we would be very eager to do that

21   if, you know, given the right opportunity, is we need some

22   responses to discovery and really at this point, and I know

23   one of the other issues you had teed up is the issue of

24   whether there was sufficient prejudice that we should be able

25   to deal with the issue of the protective order, I'll put that

1  aside for a little later, but we really received no

2  information that I can share with my client to -- on which to

3  move forward to assess whether there are any of these products

4  that we could say are noninfringing.

5      THE COURT:   Well, I mean, I'm sure either Mr. Mersmann

6  or Ms. Golinveaux want to speak to this, but just a couple

7  things for the record here.

8      Number one, before you get to a claim of infringement and

9  whether it's copied or not, don't you have to preliminarily

10  show that the products are substantially similar or the works

11  are substantially similar?  So in your Shakespeare sonnet, you

12  know, if it's a work about the same thing Shakespeare talked

13  about, but it was a Dave Matthews band lyric, don't you first

14  have to show substantial similarity before you get to, "and

15  they copied it from us"?

16      I know -- I mean, I read the pattern jury instructions at

17  the Seventh Circuit to look at substantial similarity and

18  infringement and so forth, and I know that to some extent

19  there is some blend, but as I understand it, one of the points

20  the defendant is making is A, the chart you have given them

21  where you say "This is what we claim is infringed" is wanting,

22  but B, if you look at least at the works in the status report

23  where they reproduced in living color two different things,

24  they're saying "Look at this, Judge, look at this, Jury,

25  they're not the same."

1       So you would acknowledge you at least have to show the

2   similarity before you get to "and they copied it," right?

3       MR. MOSKIN:    Well, what you have to show is first

4   access, and they admit they had access to everything.

5       THE COURT:    Right, and I think --

6       MR. MOSKIN:    And -- I'm sorry, I didn't mean to talk

7   over you.

8       THE COURT:    Yes, I thought in one of the papers I saw

9   the defendant went so far as to say "For these purposes I'm

10  not even going to challenge access."  Go ahead.

11      MR. MOSKIN:    Right.  And you're right that you have to

12  prove substantial similarity, but what that means is not that

13  you have to show that the overall works are similar, you have

14  to simply show copying of protectable elements.

15      So for example, it's commonplace for courts to say in

16  copyright infringement cases you can't disprove copying by

17  showing how many elements of a work you didn't copy.  So as

18  long as they have taken discrete copyrightable elements in a

19  way that is clearly copied, that is sufficient.

20      But yes, there has to be substantial similarity, but you

21  don't -- it doesn't defeat a showing of substantial similarity

22  to show that there are other additional elements in a work

23  that are not similar.

24      So I think for every one of these we can show that they

25  have taken identifiable discernible original elements and

1    transposed them directly into the infringing work.

2        THE COURT:    Okay.  Let's say you could do that and

3    you're pretty confident you could do that.  But you know,

4    what, I'm putting the cart before the horse here.

5        Let me just say two more things and then I'll hear from

6    the defendant in terms of this general concept.

7        One, I think your understanding of why we're here today,

8    Mr. Moskin, is a bit circumscribed.  One of the things I

9    discussed in the two sessions I have already had with your

10   people here locally was some type of a, you know, shortened

11   proceeding like you just described, okay?  But that wasn't the

12   entirety of what I was trying to get at here.

13       If you look at my order, what I have said is what I

14   wanted to talk about today is what is necessary to put this

15   case in a posture for a productive settlement conference.  And

16   I suppose you're answering that by saying "We want the

17   discovery from the defendant that we have asked for and they

18   have stonewalled us on," and two, what information or

19   documents should be exchanged by the parties before the

20   settlement conference to increase the chances that the

21   settlement conference will be productive.  And again, I

22   suppose I hear you say "We want responses to our discovery."

23       And three, what three pre settlement conference

24   submissions should be required of the parties in terms of

25   letters or materials or other things.

1      So I'm a little bit broader than what you're talking

2  about here, and that's probably sometimes a problem of the

3  game of telephone with communications being exchanged.

4      But where I'm at is I understand you have served

5  discovery and I understand you're in a litigation here where

6  one party serves discovery and the other party opposes it and

7  we go on and on with that.  But another way to do -- another

8  way to get a case resolved is to exchange certain information

9  between the parties that give them a better sense of the

10  parties' positions and then without expenditures of hundreds

11  of thousands of dollars, come in and try and resolve it.  So

12  that's kind of why I'm here.

13      If the parties come before me and say "Judge, we have

14  read the Federal Rules of Civil Procedure and they don't say

15  anything about that stuff, and we're going to zealously

16  represent our client and we want to serve things under Rule 33

17  and 34 and 36 and we want to come before you under Rule 37 and

18  eventually we want to have a trial," that's fine.  And then

19  there is not much for a settlement judge to deal with.

20      But my goal is to try and shortcut that a little bit.

21  And you know, from what I see, let's say you're right.  Let's

22  say that you will be able to show -- I mean, the defendant is

23  not a stranger to the games, this particular game, that Games

24  Workshop puts out, right, he is a fan.  Isn't that right, Mr.

25  Mersmann?

1       MR. MERSMANN:    That's correct, your Honor.

2       THE COURT:    Okay.  And he makes these allegedly

3   infringing products, I think you said, in his garage?

4       MR. MERSMANN:    That is correct, your Honor.

5       THE COURT:    And so let's say for the sake of argument

6   and only for the sake of argument and not as any finding or

7   anything else that for at least some of your items you're

8   going to be able to show they're substantially similar and

9   you're going to be able to put together whatever

10  circumstantial or even direct evidence in terms of the types

11  of things you're asking for from the defendant of copying,

12  okay?  And for others it's going to be a little bit dicier.

13  You're not going to be able to show that they're that similar

14  and you're not going to be able to -- and maybe the defendant

15  is going to be able to articulate from whatever diaries he has

16  or whatever that he came up with the Shakespeare sonnet pretty

17  much on his own and it's going to be a bit of a reach.

18      But let say you're going to win on some of this stuff

19  after you go through all your discovery.  What then?  If Games

20  Workshop Limited's goal is to put Chapterhouse Studios out of

21  business, a death knell, cease and desist, go away, die, and

22  pay us whatever you can of our attorneys' fees, then you're

23  right, there is no basis to sit down and settle this case.

24      However, if you would like to work out some agreement

25  with Chapterhouse Studios, and I haven't yet heard whether

1  Chapterhouse is willing to do that, short of "We'll go away

2  roll up and die," but that allows both of you to go on and

3  attempt to continue to operate in the areas, the space that

4  you're operating in in some way without one or the other

5  having to give up, in the world I live that's called a

6  settlement, right?

7  So if there is a way to do that, I would love to help you

8  do that, and if there is information that should be exchanged

9  by the parties that would help you do that, I would like to do

10 that.

11 I understand that with respect to one of the defendants,

12 here, Paulson, Games Workshop already has had some productive

13 discussions that hopefully will lead toward a settlement and a

14 resolution that will not force Paulson to curl up and die.

15 And if there is a way to do that here, I would like to explore

16 that.  I would like to hear from the defendant, though.

17 MR. MERSMANN:   Your Honor, as you said, the primary

18 issue of contention that we see directly before us and that's

19 standing between us and settlement is the question of

20 substantial similarity.

21 Plaintiff obviously feels that it's -- it would be very

22 easy for them to show that there are clearly copyrightable

23 protectable elements that have been copied, and as we have

24 discussed in the previous two status hearings, we disagree.

25 So while we think that that is the number one issue that

1   both sides could use some input on, some guidance in terms of

2   coming together for a settlement, to the extent that plaintiff

3   does want broad discovery leading up to -- leading up to a

4   settlement conference that includes affirmative defenses and

5   the like, then all we would ask that it be mutual, that we get

6   discovery as to their communications about their inspirations

7   on designs and similar requests that we have tendered.

8           THE COURT:   Why has the plaintiff -- why is their

9   inspiration on designs relevant?  I understand why it's

10  relevant for the defendant because you have to show that you

11  didn't just copy what they did, but why is their inspiration

12  on something that they have a copyright or a common law

13  copyright on relevant?

14          MR. MERSMANN:   And that's to get to this issue of

15  protectable elements.  If it is a question of, you know, our

16  song lyric that's similar to their Shakespeare sonnet that is

17  similar to their sonnet that is similar to a Shakespeare

18  sonnet, if we have evidence that they did in fact copy their

19  Shakespeare sonnet from Shakespeare, then that's just not a

20  protectable element and they shouldn't be asserting that in

21  the substantially similar analysis.  That shouldn't be one of

22  the elements that the court should look at.

23          And there are, given the degree to which the phrase

24  "influence" or what the artist or designer has been influenced

25  by has been relied upon in this case by plaintiffs in

1   asserting my client's copying, it's -- the same question goes

2   back to them.

3       We believe that many of the elements that they claim are

4   the look and feel of their products that are the common

5   threads that run throughout their world are derived from other

6   creative works, other works in the public domain, and so they

7   shouldn't be, that they shouldn't be analyzed for their

8   substantial similarity.  So that's really the core of the

9   relevance there as to communications with their designers

10  saying what they were inspired by.

11      And the second issue as to individual designers, as we

12  spoke about previously, is that we actually don't even have

13  the information from them on the artists responsible for the

14  individual pieces of art that they're alleging we copied.

15  They're giving us lists of contributing artists to an entire

16  book or entire product line, and that's relevant to simple

17  ownership of the copyright, as we discussed previously.

18      MS. GOLINVEAUX:   Your Honor, this is Jennifer

19  Golinveaux, if I could just add one thing.

20      THE COURT:   Yes.

21      MS. GOLINVEAUX:   I heard opposing counsel mention in

22  terms of what discovery would be useful for a settlement

23  conference, he mentioned discovery on independent creation.

24  Defendant has supplemented an interrogatory relevant to

25  independent creation and provided detailed information as

1   specific example.  So if there are other categories of

2   discovery that plaintiff truly thinks would be useful in

3   evaluating settlement, we are certainly happy to consider

4   producing those in short order before our conference, but I

5   think your Honor put his finger on it, which is if the goal

6   here is at this point to get Chapterhouse Studios to walk away

7   from this business wholesale, then I'm just not sure a

8   settlement conference will be useful and we might be best

9   proceeding with a summary judgment motion, as burdensome as

10  that might be given the number of products.

11      But if clarity regarding whether and which of these

12  products are actually similar in any way to plaintiff's

13  products would be useful in evaluating settlement, then I

14  think a settlement conference could be productive here.

15      So I guess what I'm asking is if there are other

16  categories of documents that plaintiff thinks would be useful

17  in evaluating that issue, we would like to know what those

18  are.

19      THE COURT:   Mr. Moskin, first, I blanked when you were

20  talking about this first category of documents.  What was

21  that?

22      MR. MOSKIN:   I think -- I'm not sure -- you blanked on

23  something that I referred to?

24      THE COURT:   Well, Ms. Golinveaux was saying -- I'm

25  probably murdering that name.

1      MS. GOLINVEAUX:   Your Honor, that's exactly right,

2  actually.

3      THE COURT:   Okay.  -- was saying that you had said there

4  would be certain documents that would be helpful to you in

5  evaluating settlement.  What are those documents, whether

6  settlement would make sense?

7      MR. MOSKIN:   Right.  What I would like is -- I think

8  your Honor has seen the detailed essentially preliminary claim

9  chart that we prepared, and if what Ms. Golinveaux described

10  as a detailed interrogatory answer, I don't want to get into a

11  war of words on here, if she will stipulate that those are the

12  only sources of independent creation they can identify, then

13  we can move forward and frankly, you know, they basically have

14  no defense of independent creation.

15      If she will say on the record that there is no more

16  information they can provide on independent creation, then

17  that really -- that's fine with me, but they really haven't

18  provided any kind of detail, and I think what we would like

19  is -- I mean, my client spent dozens of hours with me putting

20  together that claim chart and they have given us slapdash

21  answers.

22      Again, I think they should give us a corresponding answer

23  for each one of the products if they can identify any actual

24  third-party works on which they relied.  I also think that

25  since he says -- I think they should give us the mockups or

1    working drawings that show how they created these things and

2    his correspondence then with the third-party designers.  This

3    goes to the confidentiality issue.

4        Your Honor left open the question of whether we were

5    prejudiced by our inability to discuss with our client these

6    matters.  I can't -- it's not just a matter of whether we want

7    to sue some third-party.  I can't -- clearly, he has got

8    designers all over the country and all over the world.  The

9    only way they can work together in creating these designs is

10   by exchanging e-mails.  These are all visual, so there have to

11   be documents, there have to be e-mails and we should have

12   those.

13       Mr. Villacci, the principal of Chapterhouse, was

14   interviewed publicly and we can provide the court a transcript

15   of his interview in which he said that the way the

16   third-party, at least some of the third-party designers make

17   these things is they get contacted by customers who want

18   specific types of products that they see in the Games Workshop

19   overall body or the Games Workshop universe of literature.

20   They request of these third-parties that they make copies and

21   then the third-party designers, you know, work together with

22   Chapterhouse to create these things and then Chapterhouse is

23   permitted to continue selling them itself.

24       So I think we should have all of the correspondence

25   between -- and we have been asking for it for four months

1   now -- between Mr. Villacci or Chapterhouse and his

2   independent designers, and we should have a detailed -- either

3   detailed interrogatory responses matching our claims chart or

4   an admission that, you know, if they can go on the record and

5   say that their interrogatory answer now is all they can tell

6   us, then that's fine.  It makes my job much easier.  But

7   again, I can't -- at this point I can't even advise the

8   client, you know, for example, some of these independent

9   designers may very well be former Games Workshop employees,

10  but if I can't tell my client their names, you know, and that

11  would be very relevant to know what access they had internally

12  to all these detailed works.

13      THE COURT:   Yes, but your client, just on that one

14  point, your client could give you a list of everybody who, you

15  know, current and former employees and you could check them

16  against the list of designers that you get under protective

17  order.

18      I'll tell you something, I think there are too many

19  lawyers here.  I like lawyers.  I am and was a lawyer, and I

20  was a lawyer in a small firm and I was a lawyer in a big firm,

21  but let's, let's assume, Mr. Moskin, you can prove exactly

22  what you just said.  Just again, for purpose of assumption

23  that communications with the designers are as what -- you will

24  prove in a court of law or in a summary judgment motion

25  through the expenditure of lots of money exactly what you have

1   shown that customers called the designers, they said "I saw

2   this Games Workshop character.  I would like you to design

3   one," they do design one, and you're going to be able to, you

4   know, show it's substantially similar and there is access and

5   copying and whatever you're going to need to show for purposes

6   of winning on that particular figure or that particular thing,

7   okay?

8        And maybe there is a bunch of them like that.  And --

9   but -- and I'll add in also I would bet with 97 or however

10  many works we are talking about here that defendant is going

11  to win some too.

12       So defendant is going to get some ruling someplace from

13  Judge Kennelly if this goes all the way through that you don't

14  have any protectable interest in certain of your works.  You

15  know, there may be some figures, there may be some other

16  things if you get into a battle on this, that lo and behold

17  Chapterhouse, which has a profitable business on this, there

18  is going to be a ruling on the record public in federal

19  district court in Chicago that you don't have rights to

20  certain things that you're now asserting rights in.

21       So let's assume that all that goes down.  But with

22  respect to the things that you win on, what do you want?  Do

23  you want Chapterhouse to cease and desist production of those

24  items, period?  Would you be satisfied if Chapterhouse owned

25  by a fan paid you a royalty of some, or your client a royalty

1    of some amount in order to do that or some other type of

2    relief that you could negotiate with them now?  Or is the only

3    way Chapterhouse is satisfied here is it proves its case, it

4    wins, and it puts Chapterhouse out of business.  I'm sorry, I

5    said Chapterhouse, I think I meant Games Workshop.

6         MR. MOSKIN:   Well, I don't think -- I hope there is no

7    issue here of Games Workshop being put out of business.

8         THE COURT:   No, no, no.

9         MR. MOSKIN:   Frankly, I'm not looking -- Games Workshop

10   is not looking to be punitive either, although concededly,

11   we're in a posture where, you know, we're not very friendly,

12   and I don't mean to -- I think it came up in the last hearing,

13   you know, this is just a fan site, but you know, it's not

14   really.  I don't think it's any more a fan site than if fans

15   of Walt Disney decided that they loved the Disney characters

16   so much that they could start create their own Mickey Mouse

17   products and so on because there is this untapped need.  You

18   know, if it's an infringement, it exceeds what fans are

19   permitted to do.

20        THE COURT:   Okay.  But let -- excuse me, let me

21   interrupt you.  I'm sorry, I'm being rude.

22        MR. MOSKIN:   Okay.

23        THE COURT:   I'm interrupting you.  First, you're right,

24   I said what does Games Workshop want from Chapterhouse, not

25   the opposite.

1       Two, I just had a Disney case, okay, and Disney came in

2  and said exactly what you wanted.  "This person is trading off

3  our names, trading off our products.  We want an injunction

4  against them doing this and if they do it again, then we want

5  a default judgment entered against this person," okay.  That

6  was clear to me.  They were not willing to settle for anything

7  less, I could not settle the case for anything less other than

8  scaling back the injunction, and the case was settled with the

9  defendant consenting to an injunction and a cease and desist

10 and an agreement if they did it again, there was a default

11 judgment, okay?

12      Chapterhouse is not willing to do that here, and so if

13 that's what you want, I can terminate my settlement referral,

14 okay?  However, if there is something short of that that you

15 would want -- what I'm trying to do is assume you win and you

16 can win or assume you get information on certain of these

17 products.  Is there a resolution here with Chapterhouse that

18 you're willing to explore?

19      Because what you're asking for, you know, what both sides

20 have said in their status report, what both sides have said

21 here is "We want lots of discovery and we want to have a

22 summary judgment proceeding in front of Judge Kennelly with

23 respect to all or most of 97 products," right?  Is that right,

24 Mr. Kaspar?

25      MR. MOSKIN:   Mr. Kaspar -- this is Mr. Moskin in New

1   York.

2        THE COURT:    I'm looking at Kaspar here.

3        MR. MOSKIN:    Okay.

4        THE COURT:    But that's what you want, Mr. Mersmann, you

5   want, you want to have a summary judgment proceeding on all

6   these things to show that they're not substantially similar?

7        MR. MERSMANN:    That was the way we had intended to

8   proceed before we were referred for settlement.

9        THE COURT:    You still may.

10       MR. MERSMANN:    That's correct.

11       MS. GOLINVEAUX:    Your Honor, I'm sorry, could I just add

12  one point there?

13       One of the reasons we think an early summary judgment

14  motion is really necessary is because it would limit the

15  discovery we would need to seek from plaintiff on ownership

16  and on protectability, on inspiration, because if we knock out

17  50 works, let's say, out of 96, then that's 50 works we don't

18  have to seek all this discovery on whereas if we don't knock

19  out those works early on, then we are going to have to serve

20  our client by seeking ownership discovery and the sources they

21  relied upon for each of those -- for each of the works in the

22  case.

23       THE COURT:    Yes, I know, but a couple of things.  One,

24  summary judgment is hard to get.  Two, staged discovery

25  sometimes makes sense and sometimes doesn't, and so nobody has

1    yet decided that your proposal that you put all substantial

2    similarity discussion on hold while you litigate this summary

3    judgment motion, nobody has yet agreed to that.  And a judge

4    could look at this and say "Look, the chances of you

5    succeeding on everything are slim and none," and yes, it could

6    cut down on the cost of expense but it may not.

7        And so a judge could say "You know what?  A pox on all

8    your houses.  Go ahead, everybody produce everything.  I'm not

9    going to stage discovery, and if, as, and when you think you

10   got a good summary judgment motion, bring it on.  And you

11   know, I'll deal with it, I'll deal with it at that time."

12       I think that the plaintiff has said that you know, some

13   of the discovery that they're seeking is necessary in order to

14   defend against some of what defendant will be raising in

15   anticipation on this summary judgment motion.  And I frankly

16   think that the -- you know, the reason that Judge Kennelly

17   candidly sent it down to me probably is because he would like

18   to avoid having to deal with this type of summary judgment

19   motion if he could at all help it.  But if he can't, you know,

20   that's fine.

21       And that's why I'm trying to force some discussion of

22   what happens at the end of the day.  I mean, does -- isn't

23   there a risk that Games Workshop will be adjudicated not to

24   have certain of the rights that it thinks it has or you think

25   that's a very, very, very minimal risk?

1      MR. MOSKIN:    I take it you're addressing that to the

2    plaintiff's side.

3      THE COURT:    Yes.

4      MR. MOSKIN:    And just to say a couple things here, of

5    course, there is some risk and I want -- you know, just to be

6    clear, I think that -- I do think that there are, conceptually

7    there are ways to try to settle this case, and just as we are

8    very close to settling the case, I would say, within

9    nanometers of settling the case with Paulson, who has done

10   something, you know, does similar -- there is a similar

11   business model to Chapterhouse but much smaller, he is only

12   selling 10 products or something, not over a hundred products,

13   you know and he is -- conceptually what we have agreed to do,

14   you know, is that he has agreed to stop selling some and make

15   changes to others.

16      And you know, that's -- you know, we're not trying to be

17   punitive to people that, you know, if we can work with them.

18   And you know, I -- it's just much harder to get to that

19   juncture with Chapterhouse partly because of the very -- well,

20   I have to say partly, and this may be the lawyers' fault, that

21   this case has been handled in a way that it has generated a

22   lot of unnecessary heat.  Maybe I'm somewhat guilty of that

23   myself, but I can tell you that the way Chapterhouse started

24   this case was by seeking leave to file what I thought was a

25   frivolous motion to dismiss that the judge wouldn't let them

1    file, that it cost us a lot of time and money to make clear

2    why it was not an appropriate motion.  We then had efforts to,

3    to make at least some minimal advances in discovery and

4    Chapterhouse has, as I said, completely stonewalled us.  They

5    won't even answer my letters.

6         The -- I thought we had resolved one issue in a meet and

7    confer in June and they then proceeded to make what I thought

8    was a, you know, completely inappropriate motion to compel.

9    It's been -- there has been a lot of unnecessary hostility

10   between counsel, but conceptually it's quite possible that,

11   more difficult and maybe that is a little naive, but at least

12   conceptually it's possible to work out a settlement where

13   Chapterhouse would agree to change, make enough changes in its

14   product and just continue selling some of them, that the

15   parties could move on.

16        But a license is not likely.  I would say that's a

17   non-starter for reasons I could explain, but it's not -- and

18   also just to say, you know, we are trying to figure out, we

19   have a deadline to amend our complaint.  We have in the

20   interrogatory responses, in that claim chart we didn't include

21   all 105 products that we had originally thought were

22   infringing because on closer inspection, you know, some of

23   them -- you know, we would probably be satisfied not to pursue

24   a claim.  There are some additional products that Chapterhouse

25   has just launched that we would need to amend the complaint,

1    but you know, I don't dispute the fact there are some, if

2    these products are viewed individually, there may be some that

3    Games Workshop would, on which it would lose, but I do think

4    it bears noting that Chapterhouse on its website

5    prominently -- not prominently, but it does, after it was sued

6    it added a statement admitting that Games Workshop owns

7    copyright in all of these things and Mr. Mersmann is raising a

8    non-issue when he says there is some question as to copyright

9    ownership or authorship because these are all made by

10   employees of Games Workshop, as we have told them repeatedly.

11        As a matter of copyright law, Games Workshop therefore

12   owns all the copyright under U.K. law.  There is just no issue

13   there.  So again, you know, there may be some risk we'll lose

14   on some of these things, and that's, of course, an incentive

15   to settle, but you know, if there is some opportunity to

16   settle based on changes in Chapterhouse's business model, then

17   that's something worth discussing.

18        MS. GOLINVEAUX:   Your Honor, may I respond briefly?

19        THE COURT:   Yes.

20        MS. GOLINVEAUX:   You know, I'm actually heartened by

21   what I have heard from plaintiff's counsel because it sounds

22   like conceptually that it's possible to reach a settlement,

23   which I hadn't heard before and that's encouraging.  I don't

24   think that defendant is adverse to producing the

25   correspondence for the designers that he is talking about if

1    they really feel like that's a sticking point for them to be

2    able to evaluate settlement.  But we would want the categories

3    that Mr. Mersmann identified earlier, which is the author

4    information and the sources that they have relied upon in

5    advance of settlement also.

6         And then I think one kind of broader category, which is

7    plaintiff hasn't produced a single e-mail to date in the case.

8    They have claimed that they have e-mails showing confusion,

9    which will be relevant on the trademark claim, for example,

10   but we haven't received a single e-mail from them.  So we

11   would want the e-mails, particularly if we're producing

12   correspondence to designers, we would want the e-mails in

13   advance of the settlement conference also so we have

14   everything on the table.

15        MR. MOSKIN:    The e-mails, there are two e-mails I think

16   that I should have this week.  As far as the authorship

17   information, they have all the authorship information and

18   the -- this is just -- again, Chapterhouse, the defendant,

19   concedes on its website that Games Workshop owns all of the

20   copyrights in all of these works, so again, they're just --

21   they're just putting us to needless burden.  If there are

22   specific issues they want to raise where they think that some

23   work was not original, that's fine, we're happy to answer

24   those questions, but just to say we have to -- this is, you

25   know, you have to understand, this business is not or the War

1    Hammer universe is not perhaps quite as vast as the Disney

2    universe, but it would be like saying to Disney, "You have to

3    identify every creative step in all of your works before we

4    can move the case forward," particularly here where they admit

5    that we own copyright in everything, that doesn't really make

6    sense, and so far that's all I can tell they're looking for,

7    is just to make us work needlessly.

8        If they have specific questions about specific works, you

9    know, what was your inspiration, that's fine, and we are happy

10   to answer that, but they haven't attempted to do that, they

11   have just said, you know, "Go reproduce for us 40 years or

12   30 years of creative inspiration, you know, for everything."

13   And that's, you know, a Sisyphean task.

14       THE COURT:   Ms. Golinveaux, if he is correct that on the

15   website or for purposes of the litigation you concede

16   authorship or ownership, I can't remember the way he phrased

17   it, but why do you need this information?

18       MS. GOLINVEAUX:   Thank you, your Honor.  I think what

19   plaintiff's counsel is referring to is simply a disclaimer

20   that Chapterhouse runs at the bottom of its website that says

21   certain trademarks, and I think it lists out the product names

22   and copyrights are claimed by plaintiff and it certainly is

23   not an admission as to ownership or scope of protectability.

24       You know, I think what -- and I think plaintiff's counsel

25   also said that we have already been given author information.

1   We have not.  And that could be highly relevant to the case

2   because if the claims were not created by employees in the

3   scope of their employment, plaintiff has already served

4   discovery responses saying that there are no chain of title

5   documents in their possession, you know, and these would be

6   documents like assignments from third-party designers.

7       So all we're asking for is the author of each of the

8   claimed works, not the entire universe of plaintiff's work,

9   but the works that they're claiming in that chart that he

10  refers to.  And that's critical to knowing whether or not they

11  even own the works that they're asserting.  We feel we have

12  not admitted or conceded ownership.

13      MR. MOSKIN:   The author of each work is Games Workshop

14  as a matter of law.  End of story.  And if there are specific

15  questions they have about any specific works, they can ask

16  them, but as a matter of law, Games Workshop is the owner of

17  every single work.  That's why there is no chain of title

18  issue because they're all written and created by employees

19  within the scope of their employment and again --

20      MS. GOLINVEAUX:   And, your Honor, that's exactly what we

21  need to test.

22      THE COURT:   Mr. Moskin, why should they take your word

23  for that?

24      MR. MOSKIN:   Well, they can -- again, they don't have to

25  take my word for it.  If they have questions about specific

1    works, that's fine.  But my client has said in an

2    interrogatory answer that that's the truth.  If they have a

3    basis to challenge that, then they can challenge it.  But they

4    have no basis to challenge it.

5         THE COURT:   You know what?  I don't have enough

6    information here to make discovery rulings as specific as what

7    we're talking about here.  The referral is for settlement and

8    I think it's for settlement related discovery.

9         So you know, Judge Kennelly and I would probably have to

10   decide if there are motions filed what is settlement related

11   discovery and what's not.  I will say that I think both --

12   just from what I'm seeing now, and this is not binding, but

13   what I'm hearing, both parties would need to explain -- on the

14   one hand, plaintiff would need to explain better why simply

15   answering an interrogatory insulates the plaintiff from

16   production of information that either could support the answer

17   to interrogatory or could be used by a defendant to

18   cross-examine and show that an interrogatory answer is

19   incomplete or not completely correct or not fully in keeping

20   with the documents or so forth.

21        So I would need to know a little bit better why an answer

22   to an interrogatory that says we own this and these all were

23   created by Games Workshop employees in and of itself would

24   insulate discovery.  By the same token, the defendant would

25   have to show a little bit more than I have seen now, it seems

1    to me, why truncated discovery so that a pretty complicated

2    summary judgment motion process could be instituted which

3    could delay this 2010 case by months or even more than that

4    should be countenanced as opposed to proceeding with all types

5    of discovery that would ready the case for trial if the

6    defendant is wrong that summary judgment is not going to

7    completely resolve this case or substantially narrow it,

8    similar to I think the motion to dismiss practice.

9        I mean, I don't know any defendant and I never

10   represented a defendant that didn't say to me at some point,

11   "Look, can't we get this resolved quicker?  Can't we just get

12   a ruling on this?  Can't we just get this done?  Why do I have

13   to respond to all of this stuff?"

14       And sometimes the answer to that is it's tough, but we

15   can't.  You know, you're in a lawsuit and you know, the other

16   side is making arguments and a judge is going to decide which

17   way to go and you know, one thing that settlement does is

18   allow the parties rather than the court and the lawyers to

19   control the outcome and that's why in our courthouse only

20   1.5 percent of the cases actually go to trial.  Most of them

21   get resolved before then, some on dispositive motions.

22       But just common sense tells me that with 97 works, you

23   know, if you knock out 30 on summary judgment, does that

24   justify staying discovery so you can go through all this

25   stuff?  And there is probably still discovery that has to be

1   had on, even with respect to the works that are subject to the

2   summary judgment.

3       But I'm speaking off-the-cuff here, and I want both sides

4   to appreciate that I'm speaking off-the-cuff and not totally

5   informed about the particular discovery issues that are going

6   to be raised and the context, and I or Judge Kennelly would

7   look at those very carefully before making any decision that

8   was controlling here.

9       Just in this conference, though, when you know -- I mean,

10  I appreciate what Mr. Moskin is saying that he as counsel to

11  Games Workshop is frustrated by his dealings with defendant's

12  counsel.  And I am sure defendant's counsel is frustrated by

13  dealings with plaintiff's counsel.  But in this exchange here

14  when Mr., when Ms. Golinveaux says she is encouraged by

15  certain things she has heard, you know, that's one of the good

16  things about parties sitting down and talking.

17      I'm not talking about a discovery request or an answer

18  date, or anything like that, but talking, because you learn

19  certain things.  Chapterhouse learned that a license is a

20  non-starter.  I'm not sure whether or not Chapterhouse knew

21  that before or not.

22      On the other hand, you know, I have heard Chapterhouse

23  say that it's encouraged that maybe there can be a settlement

24  here.  But I'm not going to wrestle you all to the ground.

25  That's not my job, okay, that's really not my job.  I think it

1    would be a shame for both sides here, one side is paying their

2    lawyers, one side is doing it for free, but it seems to me

3    both sides have risk in the litigation and it can be an

4    extremely expensive litigation.

5         And I'm very willing to sit down, even preliminarily, in

6    person, I think, rather than a phone call, to try and work out

7    either a discovery plan that gives both sides the information

8    they need to evaluate settlement or a preliminary settlement

9    discussion that brings people in to talk about things.

10        I mean, I will tell you I had a trademark case last, a

11   couple weeks ago, maybe a month ago now, that was very -- it

12   was also a zero sum game, it was very hotly fought.  The

13   principals came in, the settlement discussion for hours was

14   very hot, but in sitting with both parties I learned that the

15   principals really had a lot of animosity against each other

16   because of some prelitigation telephone calls that were had

17   and things that were said on those calls.

18        And one of the principals took it upon himself to say to

19   the other principal, "I'm sorry.  I'm sorry about how I

20   reacted when we had a phone call.  I'm sorry for saying that I

21   was going to bury you, that I was going to put you out of

22   business, that this was going to cost you too much and you

23   could not fight us.  And I have respect for your business,

24   your plan, your model and I would like to try and resolve

25   this."  The case got resolved.

1       So strange things happen when people sit down together

2   and good things happen when people sit down together to try

3   and resolve something as opposed to talking motion to dismiss

4   and all the rest.  But I can't force anybody to do that, and

5   I'm certainly not going to do that here.

6       And I don't think I have actually any motions in front of

7   me right now, do I?  I saw a motion in front of Judge Kennelly

8   to extend the time to amend pleadings because in part you

9   didn't have access to be able to talk to your client about the

10  stuff that was produced on a highly confidential basis.

11      Are there any motions in front of me?

12      MS. GOLINVEAUX:   Your Honor, defendant is prepared to

13  file a motion to compel soon, but we had wanted to wait for

14  today's call to try to figure out how that might work in the

15  context of a settlement conference and whether it made sense

16  to hold off.  But clarity as to whom we should file that in

17  front of or if you think it would be useful to do the sit down

18  that you were talking about on discovery, we would certainly

19  be open to that as an alternative.

20      MR. MOSKIN:   May I ask opposing counsel what would be

21  the subject of the motion to compel?  She refused to respond

22  to me in e-mails or my letters.  Maybe in open court you will

23  say what it is you think you're missing.  I have told you that

24  we're, for example on the, these couple e-mails that you will

25  have them shortly.  There is not a need to make a motion to

1    compel.  I previously explained that in a letter and asked if

2    there is anything else they needed and they haven't -- they

3    have refused to tell me if there is anything else, so I'm very

4    curious to know, maybe you will say so in open court, what it

5    is you think you need because I will say on, you know -- I'm

6    not aware of any motions that are pending now by Games

7    Workshop because it's not just a matter that we haven't

8    received -- I can't share this information about the creators,

9    these independent creators with my clients, but in five months

10   we have received zero, absolutely zero other information

11   except document requests and in 28 years of practice,

12   honestly, I have never had a case where I have had such

13   complete, total utter and complete lack of cooperation from

14   another side.

15       So you know, I will also say that just yesterday because

16   they refused to even tell us what documents they have or

17   produce any documents, I served a limited 30(b)(6) deposition

18   notice to take the deposition of somebody at Chapterhouse just

19   so we can identify what documents they do have so we know what

20   they're withholding from us.

21       And instead of saying -- I got an angry response saying

22   they want to just put this off indefinitely.  I said in

23   reaction to that, well, then let's pick a date within a few

24   days of that, but -- you know, discovery is set to close at

25   the end of October.  I have served discovery five months ago

1    and have learned zero in this case.  My client is as much in

2    the dark if there are any defenses or how close we are to

3    winning or losing because we have gotten no, absolutely zero

4    cooperation from the defendant.

5        So I'm really -- I would -- yes, I'm sorry.

6        THE COURT:   I would be interested too, Ms. Golinveaux,

7    but I would also say just for everybody's edification we

8    should all remember that under our local rules here, and I

9    think corresponding Rule 37, no motion to compel can be filed

10   without a Meet and Confer that goes through the details of the

11   motion.

12       So I would, I would hope that before any motion to compel

13   was filed, there was a substantive discussion by counsel for

14   the parties about the motion and efforts to resolve it because

15   it would really be a waste of time to file a motion to compel

16   that doesn't include a Rule 37.2 statement under our local

17   rule, which then could be denied simply on that basis alone.

18       MS. GOLINVEAUX:   Thank you, your Honor.  Understood.  I

19   have got to respond to a couple of things, which is

20   plaintiff's counsel, it seems to me, is trying to create the

21   impression that defendant hasn't produced documents in the

22   case and that's not accurate.  Defendant has produced

23   thousands of pages, has produced documents about financial

24   information, documents about the number of each of the

25   products sold, has produced advertising materials.

1    What neither side has produced yet is e-mail discovery

2  because that takes more time to go through, although

3  apparently plaintiff only has two responsive e-mails, maybe it

4  won't take them quite as long.

5    With respect to the motion that I mentioned, back on

6  July 29th we sent plaintiff's counsel a 6-page letter

7  detailing what we need that we haven't gotten, because they

8  have refused to provide any discovery on ownership or

9  protectability either on the trademark side or the copyright

10  side, and frankly, I think it's about 90 percent of our

11  request they just say "No,we aren't going to give this to

12  you."

13    And we got a letter in response, but it didn't address

14  our concerns and we told them that and for a little over

15  four weeks now, we have repeatedly asked plaintiff's counsel

16  for time to talk on the phone to walk through it and he has

17  flat out refused to get on the phone with us and he says he

18  does not intend to get on the phone with us.

19    The last e-mail said "I will think about whether I will

20  talk with you on the phone."  That was about 10 days ago.  So

21  we have held off from that July 29th letter that we initially

22  sent specifically to try to develop a Meet and Confer process

23  and see if there are some ways we can narrow this so that we

24  didn't have to burden the court with these issues, but if we

25  have -- we have to get this information.

1      MR. MOSKIN:   Your Honor, this is Mr. Moskin.  I just

2   cannot believe Ms. Golinveaux has the temerity to say what she

3   just said.  It is completely misleading, if not flat out

4   dishonest.  I responded to their July 29 letter in detail and

5   asked them repeatedly if there is any further -- if there were

6   any further questions they had, which I would be happy to

7   discuss on a telephone call if they would first just tell me

8   what issues they have.

9      They won't answer my e-mail.  They say they produced

10   documents.  They produced a disc that is unreadable.  I told

11   them that it's unreadable.  They refused to either give me a

12   new disc or tell me even what's on the disc.  I asked them

13   innumerable times just tell me what's on the disc.  The only

14   thing I can read on the disc are some public pages from the

15   website and yet this disc has also been designated, as far as

16   I can tell, in bad faith as attorneys' eyes only under the

17   protective order.

18      I don't know what's on it.  I have received not a single

19   document that I can read or share with my client in this case.

20   And I think it's just -- I think, Ms. Golinveaux, really, you

21   owe me and perhaps the court an apology for what you have just

22   said.

23      But they have filed motions to compel in this case

24   without meeting and conferring, without containing the Rule

25   37.2, local Rule 37.2 statement that they have met and

1    conferred.  So I also responded -- I have sent them repeated

2    letters asking, detailing what we're missing and they refuse

3    to respond to my letters.

4        So again, I just, I find it absolutely remarkable that

5    Ms. Golinveaux can say what she just said to the court with a

6    straight face.  And this is part of the problem why it's

7    difficult to discuss settlement in the case because again, I

8    can also tell you, I adverted to this earlier, and again, in

9    28 years I really have never encountered anything like this,

10   that I had a Meet and Confer, telephone call with, I think it

11   was Mr. Kearney in defendant counsel's office.  We, I thought,

12   had resolved all of the issues.  They then refused to comply

13   with the agreement that we worked out in that call and filed a

14   motion again without ever talking about me again.

15       The judge, Judge Kennelly instructed the parties to meet

16   and confer on a joint status report at the end of June.  We

17   sent them a draft joint status report, asked for comment, got

18   no comments.  We proceeded nonetheless to have a Meet and

19   Confer with us and they said "No, we're not going to give you

20   any comments on discovery because we want to move for summary

21   judgment instead."

22       So the times I have had meetings, had telephone calls

23   with them they have behaved, in all honesty, and I hate to say

24   this, but with utter bad faith, and that's why I have insisted

25   that they respond to -- respond to -- tell me what they need

1    or what they want, have an agenda for a call before we have

2    further calls where they can pull similar stunts.  And again,

3    I don't usually speak this way about opposing counsel, but

4    your Honor really must understand the level of frustration

5    here.

6        I stand by my position.  We have received absolutely zero

7    information from them in discovery.

8        THE COURT:   Well, I'm going to cut this off here now,

9    okay?  I'm going to say a couple things and then we will call

10   this hearing to a close, or a few things and we will call this

11   hearing to a close.

12       Number one, you're talking about your 28 years of

13   practice.  I have been on the bench I think for 14 months now

14   and you all win.  You win the award for, out of hundreds of

15   cases I have had, you know, big complicated cases and little

16   cases, you all win the award for the most contentious at least

17   presentation of discovery dispute and lack of cooperation in

18   discovery, from what I can see, to date.

19       So I'll give you that sense of where this case stands and

20   probably where, why Judge Kennelly was sending it down here to

21   see if we could get it resolved.  But you win that award here

22   among, you know, lots of multi party cases and contentious

23   police shooting cases and commercial cases and all the rest.

24       Two, I'm sure you can appreciate because I also practiced

25   for 28 years before I got on the bench and I don't know how

1    many years you have practiced -- Ms. Golinveaux, you can put

2    that of record too if you want, but I knew when I was

3    practicing that nobody wins in front of the court with this

4    kind of stuff, okay, because it's very, very hard for the

5    court, particularly orally, to be able to assess who really is

6    being tremendously obstreperous, dishonest, in bad faith, and

7    just totally blowing through professional obligations and who

8    is not in a food fight like I'm seeing here.  It's really,

9    really difficult for the court to see.

10        And it always frustrated me, and I didn't get involved in

11   a lot of these, but I saw a lot of them and I was in some of

12   them.  It always frustrated me because it was very difficult

13   for me to be able to let the court know that I was really

14   proceeding in a very legitimate way and the other side was

15   completely facetious, off the mark, and it's really hard.

16        Now, it's possible with, you know, very precise motions

17   attaching letters and e-mails and discovery requests and

18   responses and then talking about the law that needs to be

19   dealt with in the context on the merits and why one side or

20   the other has failed to produce and is stonewalling something,

21   why that is both objectionable and sanctionable behavior in

22   certain circumstances.

23        And if you have a judge who is willing to go through all

24   of the tedious process to look at that, at the end of that

25   process it's possible for the court to determine who is right

1    and who is wrong, who is bad and who is good, who should be

2    sanctioned and who shouldn't.  But it's tough, okay?  So right

3    now I'm hearing everything you all are saying and the

4    aspersions that you're talking about, but I honestly can't

5    assess with the information I have now who is right or who is

6    wrong.  Both sides to me look bad, I'll tell you that right

7    now, because it's -- you're costing a lot of money and not

8    getting anywhere.

9         Number two, I will continue, because I am an optimistic

10   person, I will continue to think about what would make sense

11   in terms of trying to move this case forward in settlement,

12   and from reviewing the file and thinking about it a little

13   more.

14        I'll note for the record that I really do not think

15   either side read my order and came prepared today to talk

16   constructively about how we could move to resolve the case.

17   And that's frustrating to me because, you know, I think both

18   sides came prepared to talk about what the other side was not

19   doing and why you needed discovery and so forth, but you know,

20   as evidenced by the fact that Mr. Moskin, who is participating

21   by phone, he had to pull up my order on the screen before he

22   could even respond to it, it means to me that although I'm

23   thinking about how to resolve this case, the parties are not

24   thinking hard enough about what to do and what they can do to

25   resolve the case.

1    So I urge you to do that.  I will continue to do it.  In

2    terms of the discovery motion practice, I think the safest

3    thing probably is to file that in front of Judge Kennelly,

4    because his referral order is not crystal clear as to what

5    comes to me and what comes to him.  I looked at the referral

6    order and it talks about discovery related to settlement

7    discussions, and on some level all discovery is related to

8    settlement discussions because it informs both parties as to

9    what is, what's going to be helpful to get a case settled.

10    So I think he and I will decide once the motion is filed

11    and I'll, you know, I don't know where you should file it,

12    Chapterhouse folks, but he and I will decide who should take

13    it up and so forth.  But I think it will be -- it will ill

14    serve the party filing it if you can't comply with our local

15    rules because both he and I come out of the same school of

16    trying to get that done.

17    But hearing what I hear, you know, I'm not optimistic,

18    but you got to comply with the rule or I guess in fairness the

19    rule also says you have to state in detail when you have tried

20    to comply and why you haven't and then the first threshold

21    question on the motion will be did somebody comply with it and

22    there will be a satellite proceeding on that.

23    I don't think one side or the other comes out of this in

24    front of me smelling like a rose.  I don't really.  A rose is

25    a rose, I could, you know, I don't know if that's Shakespeare

1   or somebody else, but I got to tell you that from my

2   perspective, the efforts you're putting in here, I think your

3   clients may be -- unless your clients both think you ought to

4   be gladiators here, I would put at least some effort into

5   thinking about creative approaches to information exchange,

6   whether that's through discovery or otherwise, that would

7   inform the parties so that they could sit down and try and

8   resolve all or portions of the case.

9        Those types of discussions with client and lawyer are

10  really important discussions to have here, I think, because I

11  think the way I look at it, both of you have something to lose

12  in the litigation and, you know, my experience with clients is

13  they would rather control their exposure rather than put it in

14  the hands of some judge or some jury someplace.

15       But I will say I understand this case a little bit better

16  now, having heard the perspectives of the folks on the phone

17  and I will say that if you all are the ones who are carrying

18  the laboring oar on this stuff, then I want you either here or

19  on the phone for future hearings because you have, it seems to

20  me, you know, things to offer here that I think are helpful to

21  getting down to the nitty-gritty.

22       MS. GOLINVEAUX:   Your Honor, may I ask one follow-up?

23       THE COURT:   Sure.

24       MS. GOLINVEAUX:   You had suggested that perhaps you

25  might be open to doing a sitdown conference on discovery.

1   Perhaps that would be, if plaintiff's counsel is open to that,

2   perhaps that would be a good way to try to move things forward

3   not only on the discovery issues because it would get us in

4   the same room, but in terms of teeing it up for settlement if

5   that's a possibility.

6       THE COURT:   I'm willing to do that, but I will say that

7   I'm going to need some stuff in writing to do it, whether it's

8   outlined in a motion to compel and a response that then I sit

9   down with you and try and work through or letters to me and a

10  response, which I would also entertain.

11      And I will put in my order so that nobody has to fall on

12  their sword on this, that I am willing to entertain with

13  respect to the discovery disputes you have a sitdown that

14  first I get a letter from, you know, the complaining side or

15  both of you are complaining and then a response so that I

16  actually have in front of me the issue framed, the documents

17  that we're talking about, the discovery request and response

18  that we are talking about rather than the free form that we

19  have had here, which I have a hard time with.

20      MR. MOSKIN:   If I may, your Honor, and first, I want to

21  apologize and also make clear, I wanted to be sure at the

22  outset, I hope my comments made clear I was well aware not

23  only of the content of your order but more specifically that's

24  in your order, I just wanted to be sure I hadn't forgotten

25  anything; the specific proposal of having, you know, the mock

1    trial.  But I do apologize if I created the appearance, and I

2    also think in fairness to the other side as well, I was away

3    on vacation and then the office was closed on Monday because

4    of the hurricane here.  It just has been a very -- I have only

5    had two days essentially to comply with your Honor's prior

6    order.

7         So you know, for that purpose, you know, I'll accept full

8    responsibility, but it's just -- and I don't want to foreclose

9    further discussion.  I do also want to say I think a very easy

10   way, without filing motions, we specifically -- I specifically

11   declined to file a motion in, when I thought there was a

12   reason to do it in earlier July because I thought maybe

13   informal letters would be better, is we can simply submit to

14   the court -- I have two letters to opposing counsel, they have

15   a letter to me and my response.  We can simply give those to

16   your Honor without motion practice and have a discussion about

17   what remains on those to be resolved without having the

18   burden -- that would be, give your Honor total maybe 10 pages

19   of documents to read rather than lengthy motions with long

20   arguments and so forth.

21        And I will also mention I have, in two weeks I will be in

22   Chicago anyway.  I'm happy to be in person then although it

23   may be a little unfair to opposing counsel if I happen to be

24   there.

25        But I would also just make one final request if I could.

1   I know your Honor seemed to have left open the issue whether

2   we could show sufficient prejudice beyond the scope of your

3   Honor's prior ruling to be permitted so I could share even

4   with just my in-house counsel, not with the client itself, the

5   information as to these third-party designers and suppliers,

6   but if we could -- if we could at the very least hold the

7   final resolution of that until I receive the e-mails that Ms.

8   Golinveaux I think said she would produce, the correspondence

9   between Chapterhouse and those third parties so I can at least

10  have something more substantive to look at and we can then

11  discuss this a little bit more profitably.

12          THE COURT:   With respect to your, what I'm interpreting

13  as an oral motion to reconsider the ruling on the motion to

14  continue the Highly Confidential, I think right now I'm not

15  prepared to deal with it, all right?   I mean, talk about it

16  and if you want relief from that order, having sat through

17  what I have sat through now, I think you're going to have to

18  give me a motion on it, all right, because I don't know

19  whether this is -- is this the first time you're hearing this,

20  Mr. Mersmann?

21          MR. MERSMANN:   It's the first time I'm hearing it.

22          THE COURT:   What about you, Ms. Golinveaux?

23          MS. GOLINVEAUX:   Yes, your Honor.

24          THE COURT:   I'm just not going to rule on it.   You know,

25  I mean, I don't know whether they object to it or they don't.

1    If they don't object to it, then you can agree to it among

2    yourselves without me.  If they do object to it, then I need

3    to get a better sense of -- I'm not going to wade into that

4    right here.

5         In terms of the suggestion to give me letters as opposed

6    to motions, if they frame the issues, I'm fine with that.  In

7    terms of the proposal to meet in Chicago in a couple of weeks,

8    my only problem with that is that if you're talking about the

9    week of the 12th, that's the -- I have criminal duty that

10   comes and goes.  The 12th and the 19th are weeks that I have

11   criminal duty.  However, early in the week it doesn't get as

12   busy as later in the week, and also, if you're willing to come

13   here and meet in my conference room and know that I may have

14   to absent myself for search warrants or arrest warrants or a

15   preliminary hearing or something like that while we're trying

16   to work this through, I'm fine to do it during that time.

17        I generally don't set -- for that reason I generally

18   don't set settlement conferences during that time, but if

19   we're talking on this basis, I'm happy to do that.  But I

20   am -- I'm done for the day right now, okay?  I don't want --

21   what I would like you to do is talk about whether or not you

22   will agree to submit these discovery issues to me and then

23   come in and try and work those through in a, you know, non

24   motion to compel way.  If you are willing to do that, I'm

25   willing to accommodate you and you ought to calling here and

1    start talking with my judicial assistant at the 312-435-5672

2    number and --

3        MS. GOLINVEAUX:   Your Honor, I'm actually traveling the

4    week of the 12th.  If it's possible for your schedule and for

5    opposing counsel for the week of the 19th, I could certainly

6    be there then.

7        THE COURT:   It is.  That's just the second week of my

8    criminal duty so you will, you know, you will just have to

9    work within that.  But I have some availability then too to

10   sit down and meet with you as well.  And I suppose, though I'm

11   not -- I really do think in person, and you guys are spending

12   so much money on this that I probably shouldn't even worry

13   about this, but an in-person meeting I think where I could

14   have everybody here is a lot more helpful than doing it on the

15   phone, it really is.

16       But I'm willing to do it -- you guys should consult each

17   other in terms of timing and then I have -- you know, again

18   because of the criminal duty it's tough, but I have Monday the

19   19th I could meet with you.

20       MR. MOSKIN:   That week, unfortunately, I have

21   commitments in New York throughout that week, which is bad,

22   and it was the week of the 12th I was proposing.

23       MS. GOLINVEAUX:   Unfortunately, I'm traveling the week

24   of the 12th.  We could do the week of the 26th if that works

25   for the court.

1        THE COURT:   You know what?  I'm not going to do this by

2   phone, okay?  You know, you guys should talk amongst

3   yourselves about what your proposed time would be, what you

4   would submit to me.  I mean, I want enough in advance, I want

5   information enough in advance so that I could understand the

6   nuances of the discovery disputes and what each side's

7   response is.

8        So for example, if you're just going to give me a letter

9   from one side that says "This is what we want," but I don't

10  have a response to that letter, that's not going to be helpful

11  to me.  So you need to structure this in a way that I find out

12  what plaintiff wants and what defendant wants, including this

13  issue potentially about sharing with in-house counsel, and

14  then -- and what the other side's perspective today is on

15  that, not what it was.  You know, if you're going to give me

16  letters that were exchanged on July 29th, but in between one

17  or the other parties has said "You know what, I don't have a

18  problem with that," I don't really want to waste my time

19  trying to figure out how I would propose a solution if you're

20  going to come in and tell me it was resolved.

21       So I want materials that tee up the current discovery

22  disputes that you would like to discuss and would like my help

23  in resolving.  I think it would be good to do that without

24  motion practice, without prejudice to either party's right to

25  do it on a motion, and I do want you to consider potentially

1    creative ways to bring this case to a conclusion.

2         But I need to go.  I need to close out this hearing and

3    move to something else and so I would ask you to confer about

4    potential dates, a potential structure and if you want to talk

5    to me about the structure that you're thinking about, which I

6    guess I would encourage, then you call my chambers, which is

7    312-435-5672, talk to my judicial assistant, Pat Hagenmaier,

8    Patricia Hagenmaier, we will tee it up, and we'll talk about

9    it.

10        MS. GOLINVEAUX:   Thank you, your Honor.

11        MR. MOSKIN:   Thank you, your Honor.

12        THE COURT:   Okay, hope to see you soon or talk to you

13   soon.  Bye.

14        MR. MOSKIN:   Thank you.

15             *                    *                    *

16

17             I certify that the above was transcribed was

18             digital recording to the best of my ability.

19             /s/ Lois A. LaCorte

20       _____        _____

21            Lois A. LaCorte                      Date

22

23

24

25

# Exhibit J

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>          Plaintiff,<br><br>          v.<br><br>CHAPTERHOUSE STUDIOS LLC and JON<br>PAULSON d/b/a PAULSON GAMES<br><br>          Defendants. | Civil Action No. 1:10-cv-8103<br><br>Hon. Matthew F. Kennelly<br>Hon. Jeffrey T. Gilbert |

## GAMES WORKSHOP LTD.'S RESPONSE TO CHAPTERHOUSE STUDIOS LLC'S SECOND SET OF REQUESTS FOR ADMISSION

Pursuant to Fed.R.Civ.P. Rules 26 and 36, Games Workshop responds as follows to the Second Request For Admissions of Defendant Chapterhouse Studios LLC.

### GENERAL OBJECTIONS

1.    Games Workshop objects that, cumulatively, these requests are extraordinarily overbroad and unduly burdensome given the needs of the case.  Games Workshop further objects that service of such requests while the Court has instructed the parties to minimize discovery burdens pending completion of a settlement conference is abusive, and that Chapterhouse's reliance on such general instructions in refusing to produce documents requested by Games Workshop as many as seven months ago is similarly abusive.

2.    Games Workshop objects that these requests rest on incorrect assumptions as to the meaning of what is "original" and what constitutes unlawful copying, thus adding to the needless burden imposed on Games Workshop.

1

Games Workshop is unable to admit or deny this request and therefore denies the same.

335.    FASA Corporation threatened YOU with legal action for copyright infringement for manufacturing or selling models or miniatures.

**RESPONSE:**

Games Workshop objects that this request seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence.  The request is also overbroad and needlessly burdensome.

Without prejudice to or waiver of the foregoing objections, after reasonable inquiry, Games Workshop is unable to admit or deny this request and therefore denies the same.

336.    YOU stopped selling SLOCOMBE'S WARBOTS models after FASA Corporation threatened YOU with legal action.

**RESPONSE:**

Games Workshop objects that this request seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence.  The request is also overbroad and needlessly burdensome.

Without prejudice to or waiver of the foregoing objections, after reasonable inquiry, Games Workshop is unable to admit or deny this request and therefore denies the same.

337.    Not all the works for which YOU claim copyrights in this action were created by Games Workshop employees.

**RESPONSE:**

Games Workshop admits that one product at issue in this litigation was created under contract by a third party but otherwise denies this request.

338.    YOU do not have written assignments of copyright from all of the natural

**Exhibit K**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GAMES WORKSHOP LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:10-cv-08103 |
| v. | ) | |
| | ) | |
| CHAPTERHOUSE STUDIOS LLC and JON | ) | |
| PAULSON d/b/a PAULSON GAMES, | ) | |
| | ) | Judge Matthew F. Kennelly |
| Defendants. | ) | |
| | ) | |

**DEFENDANT CHAPTERHOUSE STUDIOS LLC'S**
**INTERROGATORIES TO GAMES WORKSHOP LIMITED SET THREE**

PROPOUNDING PARTY:        DEFENDANT CHAPTERHOUSE STUDIOS LLC

RESPONDING PARTY:         PLAINTIFF GAMES WORKSHOP LIMITED

SET:                      THREE

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant

Chapterhouse Studios LLC requests that Plaintiff Games Workshop Limited respond to the

interrogatories below, within thirty (30) days of the date of service.

## INSTRUCTIONS

1.      In answering these interrogatories, furnish all information, including information

contained in or on any document, that is known or available to you, including all information in

the possession of your attorneys or other persons acting on your behalf or under your attorneys'

employment or direction.

2.      For any information that is withheld on claim of privilege or other legal

protection, state the basis for the claim, and without revealing information itself privileged or

protected, describe the nature of the information sufficiently to enable Chapterhouse to assess the

applicability of the claim. Include the identity of each person whom you believe has knowledge

of such information.

3.　　If you cannot answer the interrogatory fully and completely after exercising due diligence to make inquiries and secure information necessary to do so, so state, and answer the interrogatory to the full extent you deem possible, specify the portion of the interrogatory that you claim you are unable to answer fully and completely; and state what knowledge, information and belief you have concerning the unanswered portion of the interrogatory.

4.　　The obligation to respond to this interrogatory is continuing and requires further answer and amendment from now until the time of hearing or trial, as provided by Federal Rule of Civil Procedure 26(e).

## DEFINITIONS

1.　　The terms "YOU" or "YOUR" refer to Plaintiff Games Workshop Limited and includes any persons controlled by or acting on behalf of that entity, including without limitation all past and present officers, directors, agents, employees, contractors, agents, licensees, attorneys, predecessors, subsidiaries, parent companies (including without limitation Games Workshop Group PLC), sister companies, or affiliated companies, persons or entities acting in joint venture or partnership relationships with YOU and any others acting on their behalf and/or pursuant to their authority or control.

2.　　The terms "YOUR WORK" or "YOUR WORKS" refer to literary, pictorial, graphic, sculptural, or other works, as well as characters, in which YOU claim copyright.

3.　　The term "Chapterhouse" refers to Defendant Chapterhouse Studios LLC as well as any officers, directors, employees, and authorized representatives.

4.　　The words "or" and "and" shall be read in the conjunctive and in the disjunctive wherever they appear, and neither of these words shall be interpreted to limit the scope of the interrogatory.

5.　　The words "any," "all," and "each," shall be construed to include any, all, and each.

6.　　The term "First Amended Complaint" means the First Amended Complaint filed by YOU in this action.

2

7.     As used herein, the term "identify" requires the following information:

(a)     With respect to a natural person, provide: full name; any aliases; present or last known business address, telephone number, and email address; occupation and business position or title held; present or last known U.S. residence address, telephone number, and email address (or, if not a U.S. resident, present foreign residence address, telephone number, and email address and last known U.S. residence address).

(b)     With respect to an entity (corporation, company, partnership, joint venture or other entity which is not a natural person), provide: full name; place of incorporation or organization (if any); street address of principal place of business; and principal telephone number.

(c)     With respect to a copyright, identify the work and specify whether it is textual, graphical, sculptural, a character or other; the author; the date of creation; the current owner; any current exclusive licensee; the U.S. copyright registration or application number if any; and if the work is multi-pages, the specific page of the work alleged to be infringed.

(d)     With respect to a trademark, specify the mark and any United States state or federal application or registration; provide the date of its first use in commerce in the United States and abroad; state the description of the goods or services over which YOU claim rights to the mark; and provide the Bates-number range of an example of the use of the mark in commerce as called for in Chapterhouse's Request for Production No. 7.

(e)     With respect to a litigation, identify the full case name; the case number; all parties to the litigation; the country, court, state, and district in which the case was filed; whether the case is pending or concluded, and if concluded, how it was concluded (e.g. settlement, pretrial motion, trial).'

3

(f)     With respect to a location, identify the street address if any; the city; the state, if any; and the country.

**(g)**     With respect to an advertising medium, identify the medium, including without limitation whether such distribution channel is a retail store or stores, a magazine or other publication, a catalogue, a mailing, email, or the Internet; the name; and the business address. If the advertising medium is a print publication, identify the name and business address of the publisher. If the advertising medium is a website or other Internet publication, state the URL or other unique identifying information of such website or Internet publication.

## INTERROGATORIES

### INTERROGATORY NO. 16:

Separately for each of YOUR WORKS that YOU claim Chapterhouse infringes, identify where the work was first published by providing: (a) the date on which YOUR WORK was first offered to distributors, retailers, or resellers; (b) the date on which YOUR WORK was first sold or offered for sale to the public; (b) the advertising medium and publication, if any, through which YOUR WORK was first sold or offered for sale to the public; and (d) the geographical location or locations at which YOUR WORK was first sold or offered for sale to the public.

### INTERROGATORY NO. 17:

Identify each copyright that YOU claim Chapterhouse infringes by providing the following information for each work: (a) the title of the work; (b) whether the work is literary, pictorial, graphic, sculptural, a character, or other (and if "other" what type of work); (c) the natural person(s) who created the work; (d) the date of creation of the work; (e) the current owners; (f) any current exclusive licensee; (g) any copyright registrations or application numbers; (h) in the case of multi-page works, the specific page and textual passage or passages, if any, of the work that are alleged to be infringed; and (i) if the work is a character, the specific textual passages, pictorial illustrations, and sculptural works that define the character.

4

Dated:  September 9, 2011

Respectfully submitted,

CHAPTERHOUSE STUDIOS LLC

By:  _____

Jennifer Golinveaux (CA Bar No. 203056)
J. Caleb Donaldson (CA Bar No. 257271)
Thomas J. Kearney (CA Bar No. 267087)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA  94111-5802
Phone: (415) 591-1000
Fax: (415) 591-1400
jgolinveaux@winston.com
jcdonaldson@winston.com
tkearney@winston.com

Eric Mersmann (IL Bar No. 6286859)
Catherine B. Diggins (IL Bar No. 6296237)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-1695
Phone: (312) 558-5600
Fax: (312) 558-5700
emersmann@winston.com
cdiggins@winston.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2011, I provided service of

DEFENDANT CHAPTERHOUSE STUDIOS LLC'S INTERROGATORIES TO

GAMES WORKSHOP LIMITED SET THREE

to the person or persons listed below by the following means: U.S. Mail.

Scott R. Kaspar
Aaron J. Weinzierl
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: 312.832.4500
Facsimile: 312.832.4700
Email: skaspar@foley.com;
aweinzierl@foley.com

Jonathan E. Moskin (VIA U.S. MAIL)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com


Signature: _____          Date:  September 9, 2011

Name        _Lisa Schuh_____

**Exhibit L**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED, | |
| Plaintiff, | Civil Action No. 1:10-cv-8103 |
| v. | Hon. Matthew F. Kennelly |
| CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES | Hon. Jeffrey T. Gilbert |
| Defendants. | |

**GAMES WORKSHOP LTD.'S RESPONSE TO**
**CHAPTERHOUSE STUDIOS LLC'S INTERROGATORIES SET THREE**

Pursuant to Fed.R.Civ.P. Rules 26 and 33, Games Workshop responds as follows to the

Third Set of Interrogatories of Defendant Chapterhouse Studios LLC.

**GENERAL OBJECTIONS**

1.    Games Workshop will produce electronically stored information in a format

mutually agreed upon among counsel, or as otherwise appropriate.

2.    Games Workshop objects that the definition of the term "identify" is overbroad

and unduly burdensome and entails the multiplication of numerous individual interrogatories into

multiple separate sub-parts.

**INTERROGATORIES**

**INTERROGATORY NO. 16:**

Separately for each of YOUR WORKS that YOU claim Chapterhouse infringes, identify

where the work was first published by providing: (a) the date on which YOUR WORK was first

offered to distributors, retailers, or resellers; (b) the date on which YOUR WORK was first sold

or offered for sale to the public; (b) the advertising medium and publication, if any, through which YOUR WORK was first sold or offered for sale to the public; and (d) the geographical location or locations at which YOUR WORK was first sold or offered for sale to the public.

**RESPONSE TO INTERROGATORY NO. 16:**

Games Workshop objects that this request is merely cumulative and repetitive of prior requests and information previously provided by Games Workshop, including without limitation Interrogatory Nos. 1, 2, 8 and 10. The request otherwise seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence and is needlessly overbroad and unduly burdensome. Games Workshop further objects that this request is vague and ambiguous.

Without prejudice to or waiver of the foregoing objections, Games Workshop has produced documents responsive to this request pursuant to Fed.R.Civ.P. Rule 33(d)

**INTERROGATORY NO. 17:**

Identify each copyright that YOU claim Chapterhouse infringes by providing the following information for each work: (a) the title of the work; (b) whether the work is literary, pictorial, graphic, sculptural, a character, or other (and if "other" what type of work); (c) the natural person(s) who created the work; (d) the date of creation of the work; (e) the current owners; (f) any current exclusive licensee; (g) any copyright registrations or application numbers; (h) in the case of multi-page works, the specific page and textual passage or passages, if any, of the work that are alleged to be infringed; and (i) if the work is a character, the specific textual passages, pictorial illustrations, and sculptural works that define the character.

**RESPONSE TO INTERROGATORY NO. 17:**

Games Workshop objects that this request is needlessly cumulative and repetitive of Chapterhouse's prior discovery requests, including Interrogatory No. 1. Games Workshop

further objects that this request is overbroad and unduly burdensome and seeks information that

is irrelevant and not likely to lead to the discovery of admissible evidence.

Pursuant to Fed. R. Civ. P. Rule 33(d), Games Workshop has produced documents

responsive to this request, including Exhibit A to its prior responses summarizing its current

understanding of at least some of the likely sources of Chapterhouse's works in issue.


Dated: October 19, 2011    Respectfully submitted,


         By: _____

           Jonathan E. Moskin

          Scott R. Kaspar (Ill. Bar No. 6284921)
          Aaron J. Weinzierl (Ill. Bar No. 6294055)
          FOLEY & LARDNER LLP
          321 North Clark Street, Suite 2800
          Chicago, IL 60654
          Telephone: (312) 832-4500
          Facsimile: (312) 832-4700
          Email: skaspar@foley.com; aweinzierl@foley.com

          Jonathan E. Moskin
          FOLEY & LARDNER LLP
          90 Park Avenue
          New York, NY 10016
          Telephone: (212) 682-7474
          Facsimile: (212) 687-3229
          Email: jmoskin@foley.com

          *Attorneys for Plaintiff Games Workshop Limited*

## CERTIFICATE OF SERVICE

I, Jonathan E. Moskin, an attorney, hereby certify that on October 19, 2011, I

caused a copy of the foregoing GAMES WORKSHOP LTD.'S RESPONSE TO

CHAPTERHOUSE STUDIOS LLC'S INTERROGATORIES SET THREE to be served on the

interested parties by causing copies of this document to be served on the following *via* United

States Mail in a sealed envelope with the postage prepaid and *via* electronic mail to the

following:

        Jennifer A. Golinveaux, Esq.
        Thomas J. Kearney, Esq.
        J. Caleb Donaldson, Esq.
        WINSTON & STRAWN LLP
        101 California Street
        San Francisco, CA 94111
        jgolinveaux@winston.com
        tkearney@winston.com
        jcdonaldson@winston.com

        Catherine B. Diggins, Esq.
        Eric J. Mersmann, Esq.
        WINSTON & STRAWN LLP
        35 West Wacker Drive
        Chicago, IL 60601
        cdiggins@winston.com
        emersmann@winston.com

        and

        Ronald H. Spuhler
        Ronald A. DiCerbo
        Thomas J. Campbell Jr.
        MCANDREWS, HELD & MALLOY LTD.
        500 W. Madison Street – 34th Floor
        Chicago, IL 60061

                                    Jonathan E. Moskin

# Exhibit M

**EXHIBIT A to Games Workshop Ltd.'s Answer to Interrogatory No. 1**

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| 1 | Eagle Thunder Hammer for Space Marine (12)<br><br>This is a hammer sculpted with a Eagle or Feather theme in mind. It can be used as a power weapon or a thunder hammer. It is well suited as a Imperial Thunder Hammer for 40k or even used in Imperial Fantasy Armies. Customers have also used this for high elf and empire fantasy armies. It is a pewter bit. | Games Workshop sells Thunder Hammers available on its website.<br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1400033&rootCatGameStyle=<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1060025&rootCatGameStyle=<br><br>Miniatures designed by Jes Goodwin, Martin Footit and Dave Thomas.<br>The Thunder Hammer is a power weapon used by Space Marines. A power weapon is a close combat weapon such as a hammer or sword with a power generator built into it to produce an additional combat effect.<br><br>40K is the generally accepted abbreviation for Warhammer 40,000. It is registered as a CTM in classes 9, 16 and 28, and in the US in class 28.<br><br>Space Marines use eagles as part of their iconography.<br><br>Space Marine Collector's Guide 2003, page 14<br><br>High Elf and Empire are both Warhammer fantasy armies. |
| 2 | Shoulder Pad w/ Shield & Studs for Space Marine – Tactical (3)<br><br>This is a studded shoulder pad a shield on the side. This is similiar to the Heresy era shoulder pads that early space marines used. This shoulder pad works well with any loyalist or chaos Space Marine® armies, works especially well with black templars. This is a pewter model that fits on tactical Space Marine® models as well as other sci-fi models. | The Heresy era is a period of history in Warhammer 40,000 called the Horus Heresy. It is also a type of Space Marine armour – Mk V Heresy armour.<br><br>Forge World sell Mark V Heresy Space Marines available on its website http://www.forgeworld.co.uk/Warhammer-40000/Space_Marines/Space_Marine-Infantry-Accessories/MK-V-HERESY-ARMOUR.html<br><br>Models designed by Will Hayes and Phil Stutcinskas,<br>Chaos Space Marines are a Warhammer 40,000 army.<br><br>The Black Templars are a Space Marine Chapter. Their Chapter colours are black and white. The Chapter's icon is a black cross with a skull at its centre.<br><br>Index Astartes II 2003, page 45<br>(NH663 / NH672 / Neil Hodgson / 2000) |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
|  |  | Warhammer 40,000 Space Marine Land Speeder 1998, page 5 (NH002 / Neil Hodgson / 1998)<br><br>Tactical refers to a type of Space Marine squad. |
| 3 | Skull or Chaplain Head Bit for Space Marines (23)<br><br>This is a unique sculpt of a skull power armor head for 28 mm scale. Tired of the same old chaplain Space Marine® head, we decided to do our own.  Scaled for use with GW power armor figures. | Chaplains are a rank within the Space Marines army.  Their iconography heavily features skulls.<br><br>Miniature designed by Juan Diaz Ramos<br><br>This is just one example of a Space Marine Chaplain with skull helmet available on the Games Workshop website:<br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1050244&rootCatGameStyle=<br><br>Power armour refers to the type of armour Space Marines use. |
| 4 | Shoulder Pads for Blood Eagle – Tactical (2)<br><br>This is a shoulder pad with a Eagle or Blood raven on the face,  the wings of the bird are surrounding an inverted blood drop or gem.  This shoulder pad works well with Blood Raven or Blood Angel themed armies.  This is the standard size Space Marine® Tactical Marine shoulder pad cast in pewter. | The Blood Ravens are a Space Marine Chapter for the Dawn of War computer game (produced under licence by THQ) - http://www.dawnofwargame.com/us/game/index/gameId/1<br><br>The Art of Warhammer 40,000 2006, page 71 (NH Blood Raven / Neil Hodgson / 2005)<br><br>The Blood Raven's icon is a raven with outstretched wings (like the Aquila, double headed eagle) with a blood drop centred on its torso.<br><br>Forge World sell a Blood Raven decal/transfer sheet on its website:<br>http://www.forgeworld.co.uk/Warhammer-40000/BLOOD-RAVENS-TRANSFER-SHEET.html<br><br>Decals are used to decorate Space Marines, including shoulder pads.<br><br>(Blood Raven Transfer / Paul Rudge / 2010)<br>The Blood Angels are a Space Marine Chapter. Their iconography includes blood drops.<br><br>(NH Angels Graph Paper/ Neil Hodgson / 2001) |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | (WE322 Blood Angels Icon / Wayne England / 1995) <br><br> Index Astartes II 2002, page 31 |
| 5 | Shoulder Pads for Blood Eagle – Terminator (2) <br><br> This is a shoulder pad with a Eagle or Blood raven on the face, the wings of the bird are surrounding an inverted blood drop or gem. This shoulder pad works well with Blood Raven or Blood Angel themed armies. This is the standard size Space Marine® Terminator shoulder pad cast in pewter. | Blood Ravens – see product 4 <br><br> Terminator refers to a type of Space Marine armour. Games Workshop sells Space Marines in Terminator armour: http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1060028 <br><br> Miniatures designed by Jes Goodwin, Martin Footit and Dave Thomas. |
| 6 | Celestial Lions Left Arm Shoulder Pad Bit - Tactical (2) <br><br> This is a Lion Shoulder pad for the left arm, can be used for Celestial Lions or Lions Rampant. This is the standard size Space Marine tactical shoulder pad cast in pewter. | The Celestial Lions is a Space Marine Chapter. <br><br> White Dwarf magazine issue 249, page 33 <br> (NH672c celestial lions/ Neil Hodgson / 2000) <br><br> The Celestial Lions Chapter symbol is the head of a Lion on a blue or black background. <br><br> The Lions Rampant is a fan created Space Marine Chapter. <br><br> Tactical – see product 56 <br><br> This product is designed to be used with other Games Workshop Products and to fit within the Warhammer 40,000 Universe. It is of a size and scale to fit with Games Workshop products. The product description uses Games Workshop terms: Celestial Lions & Tactical. |
| 7 | Celestial Lions Right Arm Shoulder Pad Bit - Tactical (2) <br><br> This is a Lion Shoulder pad for the Right arm, can be used for Celestial Lions or Lions Rampant. This is the standard size Space Marine® tactical shoulder pad cast in pewter. | Celestial Lions/Lions Rampant – See product 6 <br><br> Tactical – see product 56 <br><br> This product is designed to be used with other Games Workshop Products and to fit within the Warhammer 40,000 Universe. It is of a size and scale to fit with Games Workshop products. The product description uses Games Workshop marks: Celestial Lions & Tactical. |
| 8 | Shoulder Pads for Deathwatch or Dark Angels - Tactical (2) | The Dark Angels is a Space Marine Chapter. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | This is shoulder pad is sculpted with a number of gothic style icons on the face of the shoulder pad. It would look good in any deathwatch, inquisition or dark angels themed army. This is the standard size space marine® tactical shoulder pad cast in pewter. | Index Astartes I 2002, page 19 (NH703C Dark Angel Variant 2/ Neil Hodgson / 2000)<br><br>The Death Watch is a Space Marine Chapter.<br><br>The product description uses Games Workshop marks: Death Watch, Dark Angels and Tactical.<br><br>Index Astartes II 2002, page 42 (NH Grey Knights Death Watch / Neil Hodgson / 2001)<br><br>The Inquisition is a Warhammer 40,000 army. |
| 9 | Shoulder Pads for Deathwatch or Dark Angels - Terminator (2)<br><br>This is shoulder pad is sculpted with a number of gothic style icons on the face of the shoulder pad. It would look good in any deathwatch, inquisition or dark angels themed army. This is the standard size space marine®terminator shoulder. | The product includes 3 arches: middle arch contains a Long Sword; right arch contains an angel wing - these are Dark Angel icons. The left arch may contain a storm bolter (a type of Space Marine gun).<br><br>The Dark Angels Chapter colours are bone white and green. Their iconography includes images of angel wings, broadswords and figures in hooded cassocks. Triptychs (three panelled artwork) also form a part of their iconography.<br><br>(DG1019_DA_OC / Dave Gallagher / 2006) Triptychs are shown on the central character's belt and also the gun being fired at the bottom of the artwork.<br><br>Death Watch and Inquisition – see product 8 |
| 10 | Power Armour Pad for Exorcist (2)<br><br>This power armor sized shoulder pad has a demon skull sculpted on the front as well as a raised rim with the word "perdition" etched into it. Styled after the Exorcist Space Marine® chapter. Looks good as a pad for Librarians as well. | Games Workshop's Space Marine Chapter is called Exorcists in the plural. Their icon is a skull with horns curving downwards.<br><br>White Dwarf magazine issue 249, page 33 (NH672c Exorcists/ Neil Hodgson / 2000)<br><br>Librarian is a rank in the Space Marine army. |
| 11 | Terminator pad for Exorcist Space Marine (2)<br><br>This terminator sized shoulder pad has a demon skull sculpted on a pentagram as well as a raised rim with the word "perdition" etched into it. Styled after the Exorcist space marine® chapter. Looks good as a | Exorcists & Librarians - see product 10 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | pad for Librarians as well. | |
| 12 | Sawblade Shoulder Pad & Jewel (1)<br><br>This is a shoulder pad that fits is about the same size a GW shoulder pad.  It has a sawblade on it and we also include a seperate jewel drop.  This looks great as an evil sun or if you use the jewel drop, looks spectacular for "Fleshtearer" Space Marine® shoulder pads.  Supplied in pewter. | The Flesh Tearers are a Space Marine Chapter. Their icon is a circular saw blade with a blood drop in the centre. The Chapter's colours are black and red.<br><br>Index Astartes II, page 49<br>(NH672c Flesh Tearers/ Neil Hodgson / 2000)<br><br>Games Workshop sells Flesh Tearers shoulder pads - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod550012a&rootCatGameStyle=<br><br>The Orks are a Warhammer 40,000 race. Evil Sun(z) is an Ork clan. Their icon is a circle with 'sun rays' extending outwards.<br><br>Codex Orks 1994, page 36<br>(WE258C Ork Evil Sunz Icon/ Wayne England / 1994) |
| 13 | Terminator Shoulder Pad for Flesh Tearers (2)<br><br>This is a shoulder pad that fits is about the same size a GW terminator shoulder pad.  It has a stone sawblade on it adorned with a jeweled drop and 2 smaller drops in the corner.  This pad looks spectacular on "Fleshtearer" Space Marines®. | Flesh Tearers - see product 12<br><br>Terminator – see product 5 |
| 14 | Howling Griffon Shoulder Pads for Space Marines (2)<br><br>If you are searching for Howling Griffon shoulder pads, you have come to the right website.  These work perfectly for Howling Griffons space marines or any other chapters that use Griffons as their chapter symbol.  This fits standard space marine® armored shoulders and should fit in with any standard space marine® model shoulder pads.  This is a single shoulder pad - quality cast in pewter. | The Howling Griffons are a Space Marine Chapter. Their icon is a griffon and their Chapter colours are red and yellow.<br><br>The Art of Warhammer 40,000 2006, page 71<br>(NH Howling Griffon / Neil Hodgson / 2005) |
| 15 | Shoulder Pads for Imperial Fist – Tactical Marines (2) | Loyalist refers to the Space Marine Chapters that fight for the Imperium of Mankind. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
|  | This is a shoulder pad with mailed fist on it, the fist has a wreath of flame or leaves along the top. This shoulder pad works well with any loyalist or Imperial Fist (Crimson Fist) or second founding space marine® chapter. This shoulder pad would look especially good on Imperial Fist Space Marines®. This is a pewter model that fits on tactical space marine® models as well as other sci-fi models. | The Imperial Fists are a Space Marines Chapter. Their icon is a clenched hand. The hand is always shown in a gauntlet (armoured glove). Their Chapter colour is yellow.<br><br>Index Astartes II 2002, page 13<br>(NH Imperial Fist Graph/ Neil Hodgson / 2001)<br><br>Games Workshop sells Imperial Fists shoulder pads - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1110187&rootCatGameStyle=<br><br>The Crimson Fists are a Space Marines Chapter. Their icon is also a clenched hand in a gauntlet. Their Chapter colours are red and blue.<br><br>Index Astartes IV 2004, page 39<br>(KK289 SM Crimson Fist Pads/ Karl Kopinski/ 2003)<br><br>Games Workshop sells Crimson Fists shoulder pads - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod330003a&rootCatGameStyle=<br><br>The Second Founding is when the Space Marine Legions (First Founding) were first split down into Chapters (Second Founding).<br><br>Tactical - see product 56 |
| 16 | Shoulder Pad for Imperial Fist – Terminator Marine (2)<br><br>This is a shoulder pad with mailed fist on it, the fist has a wreath of flame or leaves along the top. This shoulder pad works well with any loyalist or Imperial Fist (Crimson Fist) or second founding space marine® chapter. This shoulder pad would look especially good on Imperial Fist Space Marines®. This is a pewter model that fits on terminator space marine® models as well as other sci-fi models. | Loyalist – see product 15<br><br>Imperial Fist – see product 15<br><br>Crimson Fist – see product 15<br><br>Second Founding – see product 15<br><br>Terminator – see product 5 |
| 17 | Shoulder Pads for Serpent or Iron Snakes - Tactical  (2)<br><br>This is a Serpent or snake in a Greek style, the edges of the pads have chains on them. This is the standard size space marine® tactical shoulder pad cast in pewter. This shoulder pad fits well with any greek, serpent or iron snakes themed army. | The Iron Snakes are a Space Marine Chapter used in the Games Workshop Black Library novels. http://www.blacklibrary.com/<br><br>The Art of Warhammer 40,000 2006, page 70<br><br>(NH Iron Snakes / Neil Hodgson / 2005) |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | (CL Bro of Snake / Clint Langley / Black Library / 2007) <br><br> The Iron Snakes icon is a snake facing left with its mouth open and its body arched. |
| 18 | Shoulder Pads for Serpent or Iron Snakes - Terminator (2) <br><br> This is a Serpent or snake in a Greek style, the edges of the pads have chains on them. This is the standard size space marine® terminator shoulder pad cast in pewter. This shoulder pad fits well with any greek, serpent or iron snakes themed army. This pad is meant for the right arm. <br><br> There are two variants of this pad that ship out, on with a scroll and another with a tooth (not available for individual order). | Iron Snakes – see product 17 <br><br> Terminator – see product 5 |
| 19 | Shoulder Pad w/ Studs and Skull for Space Marine - Tactical (2) <br><br> This is a shoulder pad with a skull on it, the rest f the shoulder pad has armored studs. This shoulder pad works well with any loyalist or chaos space marine® army. Would work great for legion of the damned marines. This could also be a chapter icon for the left shoulder. This is a pewter model that fits on tactical space marine® models as well as other sci-fi models. | The shoulder pad shown is based on Mk V Heresy armour – see product 2 <br><br> Loyalist – see product 15 <br><br> Chaos Space Marine – see product 2 <br><br> The Legion of the Damned is a Space Marine Chapter. <br><br> How to paint Space Marines 2004, page 85 <br> (NH Legion of the Damned/ Neil Hodgson / 2005) <br><br> Their armour colour is black. They use the skull emblem on their shoulderpads. <br><br> Games Workshop sells Legion of the Damned models on its website - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod380007a&rootCatGameStyle= <br><br> Tactical – see product 56 <br><br> Miniatures designed by Juan Diaz Ramos. |
| 20 | Shoulder Pad w/ Skull and Flames for Space Marines - Tactical (2) | Space Marines show their Chapter icon on their left shoulder. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | This is a shoulder pad with Skull on it, the skull has flames coming out of the top. This shoulder pad works well with any loyalist or chaos space marine® army. This shoulder pad would look especially good on legion of the damned armies. This could also be a chapter icon for the left shoulder. This is a pewter model that fits on tactical space marine® models as well as other sci-fi models. | Warhammer 40,000 Chaos Space Marines 2007, page 21 (NH CH_Sanct / Neil Hodgson / 2007)<br><br>The Sanctified is a Chaos Space Marine Legion. It has a flaming skull as its icon.<br><br>Loyalist – see product 15<br><br>Chaos Space Marine – see product 2<br><br>Legion of the Damned -  see product 19<br><br>Tactical – see product 56 |
| 21 | Shoulder Pad Star Fox / Luna Wolves Tactical  (2)<br><br>This is a stylized fox or wolf head shoulder pad. This is the standard size tactical space marine® shoulder pad cast in pewter. This pad works well with fox, or luna wolves style armies. | The Star Fox is a fan created Space Marine Chapter.<br><br>The Luna Wolves are a Space Marine Legion.<br><br>Index Astartes IV 2004, page 3 (NH lunar wolves / Neil Hodgson / 2004)<br><br>Their Legion icon incorporates a black wolf's head shown face on.<br><br>Index Astartes IV, 2004, page 3 (NH lunar wolves icon / Neil Hodgson / 2004)<br><br>Tactical – see product 56 |
| 22 | Shoulder Pad Star Fox / Luna Wolves Terminator (2)<br><br>This is a stylized fox or wolf head shoulder pad. This pad works well with fox, or luna wolves style armies.<br>This is the standard size space marine® terminator shoulder pad cast in pewter. This sculpt to be used as a right arm pad. | Star Fox/Luna Wolves – see product 21<br><br>Terminator – see product 5 |
| 23 | Shoulder Pads for Chalice or Soul Drinker - Tactical (2)<br><br>This is a shoulder pad with a grail or chalice sculpet on the face,  the upper ridge has a raised face with details sculpted along the edge.  This shoulder pad works well with Soul Drinker themed armies.  This is the standard size space marine® tactical shoulder pad cast in pewter. | The Soul Drinkers are a Space Marine Chapter used in the Games Workshop Black Library novels. http://www.blacklibrary.com.<br><br>Soul Drinkers 2002, front cover (PAS030C Soul Drinker / Adrian Smith / Black Library / 2002)<br><br>The Soul Drinkers Chapter colour is purple and their icon is a gold chalice with |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | spikes rising up from the bowl of the cup.<br><br>Tactical – see product 56 |
| 24 | Shoulder Pads for Chalice or Soul Drinker - Terminator (2)<br><br>This is a shoulder pad with a grail or chalice sculpet on the face, the upper ridge has a raised face with details sculpted along the edge. This shoulder pad works well with Soul Drinker themed armies. This is the standard size space marine® terminator shoulder pad cast in pewter. | Soul Drinkers – see product 23<br><br>Terminator – see product 5 |
| 25 | Dragon or Salamander Icon Shoulder Pad Bit - Tactical (2)<br><br>This is a Dragon or Salamander flat icon on a scaled background. This is the standard size space marine® tactical shoulder pad cast in pewter. | The Salamanders are a Space Marine Chapter.<br><br>Index Astartes 2004, page 19<br>(NH Salamander Graph / Neil Hodgson / 2004)<br><br>Their iconography is a crested lizard head and they use scales as armour decoration. The Chapter's colours are green and black.<br><br>Index Astartes IV, 2004, page 19<br>(NH Salamander Icon / Neil Hodgson / 2004)<br><br>Games Workshop sells Salamanders shoulder pads –<br>http://www.forgeworld.co.uk/Warhammer-40000/SALAMANDERS-TERMINATOR-SHOULDER-PADS.html<br><br>Models designed by Simon Egan<br>Tactical – see product 56 |
| 26 | Dragon or Salamander Icon Shoulder Pad - Terminator (2)<br><br>This is a Dragon or Salamander Skull on a scaled background. This is the standard size space marine® terminator shoulder pad cast in pewter. This sculpt to be used as a right arm pad. | Salamanders – see product 25<br><br>Terminator – see product 5 |
| 27 | Dragon or Salamander Power Fist (2)<br><br>A left arm that can be used as a power fist or lightning claw on regular infantry size miniatures, works well on terminator or power armor. | Salamanders – see product 25<br><br>A power fist is a Space Marine weapon. Forge World sells a power fist as part of this pack - http://www.forgeworld.co.uk/Warhammer-40000/SPACE-MARINE- |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | There are scales sculpted onto the forearm. | CHARACTER-CONVERSION-SET.html

Model designed by Phil Stutcinskas,

A lightning claw is a Space Marine weapon. Games Workshop sells lightning claws on its website – http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1400026&rootCatGameStyle=

Miniatures designed by Jes Goodwin.

Terminator – see product 5

Power armour – see product 3 |
| 28 | Dragon or Salamander Storm Shield Diamond Scales (2)

A high detail shield based on dragon theme, useful on high elf or emperor fantasy models as well as dragon or salamanders space marine models.

The front of this shield has dragon skull on the top and diamond scales sculpted onto the front, the rear of the shield has a hand hold that enables power armor marines to hold the shield (not shown in photo). It is designed to be modeled on either power armor marines or terminators. This highly detailed bit is cast in PEWTER. | Salamanders – see product 25

Space Marines use Storm Shields – a type of shield. Games Workshop sells these on its website - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1400033&rootCatGameStyle=

High Elf – see product 1

Power armour – see product 3

Terminator – see product 5

Miniature designed by Jes Goodwin.

The Chapterhouse shield is designed to be used with Games Workshop products. The product description uses Games Workshop marks Salamanders and Storm Shield. |
| 29 | Dragon or Salamander Storm Shield - Smooth no skull (2)

A high detail shield based on dragon theme, useful on high elf or emperor fantasy models as well as dragon or salamanders space marine® models.

The front of this shield has dragon head and scales sculpted onto it, the rear of this shield has a hand hold that enables power armor marines to | Storm shield – see product 28

Index Astartes IV 2004, page 19 (NH Salamanders / Neil Hodgson / 2004)

High Elf – see product 1

Power armour – see product 3 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | hold the shield (not shown in photo). It is designed to be modeled on either power armor marines or terminators. This highly detailed bit is cast in PEWTER. | Terminator – see product 5 |
| 30 | Dragon or Salamander Storm Shield - Smooth w/ skull (2)<br><br>A high detail shield based on dragon theme, useful on high elf or emperor fantasy models as well as dragon or salamanders space marine® models.<br><br>The front of this shield has dragon head and scales sculpted onto it as well as as skulls, the rear of the shield has a hand hold that enables power armor marines to hold the shield (not shown in photo). It is designed to be modeled on either power armor marines or terminators. This highly detailed bit is cast in white metal | Salamanders – see product 25<br><br>Storm shield – see product 28<br><br>High Elf – see product 1<br><br>Power armour – see product 3<br><br>Terminator – see product 5 |
| 31 | Dragon or Salamander Thunder Hammer (2)<br><br>This is a hammer sculpted with a dragon or salamander theme in mind. It can be used as a power weapon or a thunder hammer. It can be used for dragon or salamander space marine® armies. Customers have also used this for high elf and empire fantasy armies. It is a pewter bit. | Thunder hammer – see product 1<br><br>Power weapon – see product 1<br><br>Salamanders – see product 25<br><br>High Elf and Empire – see product 1 |
| 32 | Salamander, Alpha Legion or Dragon Conversion Kit for Land Raider (1)<br><br>Our Flagship covnersion kit for landraider tanks, its composed of 9 resin components and 4 pewter components. Included in this package are 2 Front side armor panels, 2 Rear side armor panels, 2 front track guards, 2 dragon head lascannon sponson covers, 1 dragon head Heavy Bolter/Assault Cannon cover and 2 Pewter Braziers. | The Land Raider is a Space Marine vehicle. Games Workshop sells Land Raiders on its website - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1580015&rootCatGameStyle=<br><br>Miniature designed by Jes Goodwin.<br><br>Salamanders – see product 25<br><br>Forge World sells a Salamanders conversion kit for the Land Raider on its website - http://www.forgeworld.co.uk/Warhammer-40000/SALAMANDERS-LAND-RAIDER-DOORS.html<br><br>Models designed by Simon Egan, |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | The Alpha Legion is a Space Marine Legion.<br><br>Index Astartes IV 2004, page 31<br>(NH Alpha Legion / Neil Hodgson / 2004)<br><br>Its icon is a creature that has the body of a snake and three horned dragon heads. The colour of the icon is bright green.<br><br>Index Astartes IV, 2004, page 31<br><br>Forge World sells an Alpha Legion Land Raider conversion kit on its website - http://www.forgeworld.co.uk/Warhammer-40000/ALPHA-LEGION-LAND-RAIDER-DOORS.html<br><br>Models designed by Simon Egan<br>Heavy bolter and Assault cannon are Space Marine weapons. |
| 33 | Vehicle Icons for Flesh Tearers (2)<br><br>This kit consist of 7 pairs of sawblade/drops cast in resin.<br><br>Large icons measure 31 mm diameter (good for Land Raiders or Rhino top hatches)<br><br>Two medium icons measure 23.5 mm diameter (good for Rhino fronts and Land Raider side doors)<br><br>Four small icons measure 16 mm diameter (droppods, dreadnoughts, landspeeders, etc). | Flesh Tearers – see product 12<br><br>Rhinos, Land Raiders, Drop pods and Land Speeders are Space Marine vehicles.<br><br>A Dreadnought is a type of Space Marine. Games Workshop sells Dreadnoughts - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1080088&rootCatGameStyle=<br><br>Miniature designed by Jes Goodwin. |
| 34 | Combi Weapon Magnetic Kit (1)<br><br>This kit consist of one bolter combi-weapon body, one combi flamer attachment, one grenade launcher attachment, one combi plasma gun attachment and one combi melta gun attachment. We also include 5 rare-earth magnets that fit in the pre-drilled holes on the main body and on each attachment.<br><br>This is a pewter kit that allows you to switch out your special weapon choices anytime you want. The magnet has the strength to keep the | Each of the weapons is a GW weapon by name and look.<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1560135&rootCatGameStyle=<br><br>A combi weapon is a weapon such as a rifle or pistol which can have a second weapon mounted on to it.<br><br>A melta gun fires a wave of energy that heats up the target, causing it to explode. A |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | attachments from falling off with pretty heavy handling. Coupled with our unique fitting design, there is little chance of losing the attachments when on the mini.

This is a pewter kit, see our pictures for size detail

One of the first projects I had in mind were completely interchangeable combi-weapons. If you are anything like me, you magnetize your army to save money and headaches.

One of the best options out there for imperial armies is combi-weapons. Alas, combi-weapons are very rare in any plastic form, and the ones you do see go for thier weight in gold.

Enter the Chapterhouse Studios Combi-weapon Magnetic kit.

As you can see, it is a standard weapon stock and barrel (could be a bolter, could be a heavy MG), we designed some useful tracks and grips so the different combi-weapon parts will fit nice and smooth. To add to the ease of use, we also have holes pre-drilled and include the correct size rare-earth magnets with the kit (5 total).

So in essence we have:
1) base ranged weapon
2) flame thrower attachment
3) grenade launcher attachment
4) plasma gun attachment
5) melta gun attachment
6) 5 rare earth magnets to fit in predrilled holes. | plasma gun fires a ball of super heated energy.

In the Warhammer 40,000 background, Space Marines can use combi-weapons. In the game's rules this is represented by the Space Marine player having the optin of arming his models with one of three types of combi-weapon: melta, plasma or flamer. The rules also provide the option of attaching a grenade launcher to the Space Marine's combi-weapon. See Warhammer 40,000 Space Marines, page 97.

The Space Marine model shown is made from a combination of Games Workshop Space Marine components and Chapterhouse Studios Salamanders components. |
| 35 | Farseer Jetbike Seer Council Kit (1)

Games Workshop Jetbike kit not included - necessary to assemble as seen

This is a 12 piece resin conversion kit that when added to a Games Workshop Eldar jetbike will form the model shown. It is perfect for converting a regular jetbike kit into a Farseer on Jetbike model.

Each Farseer Jetbike Rider kit comes with 2 weapon choices, 1 left | A Farseer is a character from the Eldar army – see the 'Guide to the Warhammer 40,000 Universe' document. Games Workshop sells Eldar Farseers on its website - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1060019&rootCatGameStyle=

Miniature designed by Jes Goodwin and Martin Footit

Oval shaped gems are frequently used on Eldar clothing, weapons and vehicles (see models above and below). |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | arm, 2 upper torso choice (male or female), 1 lower torso,1 Farseer head, 1 control panel, 2 shield generators and 2 bike accessories. | There is an icon on the component under the sword second from left – it may be one of the Eldar runes Games Workshop has created but we can't get a clear image of it.<br><br>A jetbike is an Eldar army vehicle. Games Workshop sells Eldar jetbikes on its website – http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1090102&rootCatGameStyle=<br><br>Miniature designed by Jes Goodwin<br>The Seer Council are a unit in the Eldar army. Games Workshop sells the Seer Council on its website - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1060064&rootCatGameStyle=<br><br>Miniatures designed by Jes Goodwin and Adam Clarke<br><br>The Chapterhouse kit can make a complete rider model, plus additional components to decorate the Games Workshop Eldar Jetbike. |
| 36 | Warlock Jetbike Seer Council Kit (1)<br><br>Games Workshop Jetbike kit not included - necessary to assemble as seen<br><br>This is a 11 piece resin conversion kit that when added to a Games Workshop Eldar jetbike will form the model shown. It is perfect for converting a regular jetbike kit into a Warlock on Jetbike model.<br><br>Each Warlock Jetbike Rider kit comes with 2 weapon choices, 1 left arm, 1 top torso, 1 lower torso,1 Warlock head, 1 control panel, 2 shield generators and 2 bike accessories. | Jetbike – see product 35<br><br>Seer Council – see product 35<br><br>The Warlock is a character from the Eldar army – see the 'Guide to the Warhammer 40,000 Universe' document. Games Workshop sells Warlocks on its website – http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1060088&rootCatGameStyle=<br><br>Miniature designed by Jes Goodwin<br><br>The Chapterhouse kit can make a complete rider model, plus additional components to decorate the Games Workshop Eldar Jetbike. |
| 37 | Conversion kit for Tyranid Tervigon (1)<br><br>This resin set contains 5 high detail modular components that fit with the current Games Workshop Carnifex kit. Once assembled, it can be used as a Tyranid® Tervigon. Please note this set does NOT include a | Tyranids are a Warhammer 40,000 army. The Tervigon is a type of Tyranid creature.<br><br>Warhammer 40,000 Tyranids 2009, page 52<br>(AB930_Tervagon / Alex Boyd / 2009)<br><br>Chapterhouse's components are designed to fit on Games Workshop's Tyranid |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
|  | Games Workshop Tyranid Carnifex.<br><br>Each kit contains 5 pieces:<br><br>Top Center Torso Spine piece (fits in between the two side torsos of the carnifex)<br><br>Central Armor and Spine Bank (fits on top of the upper torso)<br><br>Head mount piece<br><br>Lower abdomen containing birth sacs and embryonic termagaunts<br><br>Standard Size Oval base (matches Trygon base diameter).<br><br>Please note while this kit is sculpted to fit a carnifex kit with no modification to either kit, some modification may be necessary to the minute variations that are present in both GW and Chapterhouse Kits. | Carnifex model – http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1050178&rootCatGameStyle=<br><br>Miniature designed by Jes Goodwin<br><br>Games Workshop has characters and details in its books.<br><br>Nick Villacci states on Warseer:<br><br>"RE: TERVIGON CONVERSION KIT FOR TYRANID CARNIFEX FROM CHAPTERHOUSE STUDIOS<br>nvillacci  19/09/2010 - 19:52<br><br>Hmm,, maybe tell me why you think it is lazy?<br><br>My goal was to make a kit that is similiar to GWs single illustration of the Tervigon.<br><br>The other part of that goal was not to charge alot for a kit and to let people use the<br><br>unused carnifexes we all have stockpiled since the new codex.<br><br>Another benefit of our kit is that it still conforms to GWs 50% rule for conversions<br><br>in GW events."<br><br>http://www.warseer.com/games_news/tervigon_conversion_kit_for_tyranid_carnifex_from_chapterhouse_studios<br><br>The Termagants and Trygon are also creatures from the Tyranid army. |
| 38 | Lashwhips - Tyrant Size (1)<br><br>This is a single pewter Lashwhip created by Chapterhouse Studios for Tyranid® monsters, it is sized to be used with Tyrants and other Large size models.  Sculpted so it can be used on the right or left arm socket, it is also bendable due to the sculpting. These Lashwhips hold the foes still so a killing strike may be inflicted. | The Tyrant is a Tyranid creature – see product 37.<br><br>The lashwhip is a weapon used by Tyranid creatures, including the Tyrant. The lashwhip forms part of the creature's arm rather than it being held in its hand.<br><br>Games Workshop sells the Tyrant on its website - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1050112&rootCatGameStyle=<br><br>Miniature designed by Jes Goodwin |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | The lashwhip is in the model's left hand above. |
| 39 | Lashwhips - Warrior Size (1)

This is a single pewter Lashwhip created by Chapterhouse Studios for Tyranid® monsters, it is sized to be used with warriors and other medium size models. Sculpted so it can be used on the right or left arm socket, it is also bendable due to the sculpting. These Lashwhips hold the foes still so a killing strike may be inflicted. | Tyranids – see product 37

Lashwhip – see product 38

A Warrior is a type of Tyranid creature. Games Workshop sells Tyranid Warrriors - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1050114&rootCatGameStyle=

Miniatures designed by Jes Goodwin |
| 40 | Tyrant Bonesword Arms for Tyranids (1)

This is a pair of Chapterhouse Studios resin Bonesword arms for Tyranid® Hive Tyrant or other monstrous creatures. Works great for converting a Swarmlord Each pair consist of 1 left and 1 right arm scaled for the larger tyranid® creatures. Sculpted with details showing the symbiotic weapons of the Tyranid® race, the swords have bio-organic crystaline growths that enable the weapons to inflict death on anyone they strike. | A bonesword is a weapon used by Tyranid creatures. It forms part of the creature's arm rather than being held in its hand.

Codex Tyranids 2009, page 66
Miniature designed by Jes Goodwin

A Swarmlord is a Tyranid creature – see the 'Guide to the Warhammer 40,000 Universe' document for further information. Games Workshop has not made a model for the Swarmlord.

Warhammer 40,000 Tyranids 2009, page 56
(PD518_Swarmlord / Paul Dainton / 2009) |
| 41 | Warrior Bonesword Arms for Tyranids (1)

This is a pair of Chapterhouse Studios resin Bonesword arms for Tyranid® Warriors. Each pair consist of 1 left and 1 right arm scaled for Tyranid® warriors. Sculpted with details showing the symbiotic weapons of the Tyranid® race, the swords have bio-organic crystaline growths that enable the weapons to inflict death on anyone they strike. | Bonesword – see product 40

Warrior – see product 39 |
| 42 | Xenomorph 28mm Head bits for Tyranids (1)

This is a six (6) piece set of 28mm resin heads. You will receive three(3) of Head A and three(3) of Head B. These heads are sculpted in the style of the classic "Aliens" xenomorphs. They work | Chapterhouse's products use Games Workshop's marks: Tyranid, Tyranid Warrior and Genestealer. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | great on many of the Tyranid® bodies, gaunts, genestealers and tyranid warriors. | |
| 43 | Ymgarl Heads for Tyranid Genestealers - Set (1)<br><br>This is a 6 piece set of pewter Alien Heads. These are scaled for 28mm heroic miniatures. You can use them as Cthulhu or Ymgarl heads on your models. We have many customers that use these on their Tyranid® Genestealers® to represent Ymgarl Genestealers® .<br><br>Each set of 6 heads includes 3 different variants, you will recieve 2 of each head in this set. There are almost no mold lines on these heads, so minimal clean-up is required. Superglue is recommended for assemblng metal bits on plastic kits.<br><br>We developed these in 2009 as variant heads that would be useful on Tyranid® Genestealers® . When GW released the new Tyranid® codex, the Ymgarl Genestealers® look incredibly like these heads! We have dated post and concept art to prove our idea came first.<br><br>Regardless, these heads will set your miniatures apart from the rest of the crowd! | Genestealers are creatures in the Tyranid army. The Ymgarl is a variant of a Genestealer.<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1050149<br><br>As part of the Tyranid Genestealer boxed set, Games Workshop included a head component which can convert a Genestealer model into a Genestealer Ymgarl. The components are © Games Workshop 2004.<br><br>Miniature designed by Jes Goodwin and Mark Harrison<br><br>Chapterhouse say in their description opposite that the Ymgarl Genestealers from Games Workshop's new Tyranid codex look like their heads. There have been no new Games Workshop Ymgarl Genestealer miniatures released since 2004. The only new visual material from the latest Warhammer 40,000 Tyranids book for the Ymgarl was the artwork below. This artwork was created in 2009 and was based on the 2004 Games Workshop model above.<br><br>Warhammer 40,000 Tyranids 2010, page 61<br>(DG1192_Ymgarl_Stealer/ Dave Gallagher / 2009) |
| 44 | Female Heads - Imperial Guard 28mm (1)<br><br>This is a sprue of 6 unpainted resin female Imperial Guard heads. These are scaled for 28mm heroic miniatures. Perfect additions to any miniature line, and look great on imperial guard figures. | Chapterhouse's products use Games Workshop's Imperial Guard mark.<br><br>The Imperial Guard is a Warhammer 40,000 army. |
| 45 | SXV-141 Super-Heavy Assault Walker SAW (1)<br><br>Our first vehicle kit, we decided to go crazy on Tau.<br><br>This is a resin model kit consisting of over 50 parts, weighing in at approximately 2kg and standing almost 30cm tall when complete. The kit components are supplied "as cast" and require cleanup, assembly | The Tau refers to the Tau Empire, a Warhammer 40,000 army.<br><br>The Tau Empire use rail guns as weapons on their vehicles.<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1090208 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | and painting for the finished product.<br><br>Needless to say I think the Imperial Titans will have their hands/fist full.<br><br>http://chapterhousestudios.com/index.php?route=product/product&path=59&product_id=201 | The rail gun is the long gun which is shown firing on the model above.<br><br>The Tau decorate their clothing, weapons and vehicles with the Tau Empire symbol.<br><br>Tau Empire decal sheet, 2001<br><br>Miniature designed by Jes Goodwin<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1620020<br><br><ul><li>Geometric grooves on hull and weapons</li><li>Circular hatches</li><li>Geometric grooves on the hatches</li><li>Large oval vents on the hull</li><li>Long thin 'nose' section of the hull</li><li>Geometric Grooves on the nose</li><li>'X' marks on power/ammo packs</li><li>Rail gun weapon</li><li>Burst Cannon weapon</li></ul><br>The Chapterhouse Walker hull fits snugly underneath the Tau Hammerhead hull with the circle sections lining up to the rear.<br><br>Games Workshop's rail gun design.<ul><li>Rectangular shape.</li><li>Two separate sections to the 'barrel'</li><li>Barrel joined by a coupler mid-way down the length</li><li>Square block nozzle with vents</li><li>Short under-slung cylinder connecting the barrel to the power source</li></ul><br>Cover Art, Codex: Tau ©2001<br>AS098 Tau Codex detail cropped from larger original)By Adrian Smith<br><br>At the end of the Tau guns there is a circle with diagonal line design. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|

**SXV-141 SUPERHEAVY ASSAULT WALKER**

| SAW | BS | FRONT | SIDE | REAR |
|---|---|---|---|---|
| | 3(4) | 14 | 13 | 13 |

POINTS: 750
SUPER HEAVY WALKER
STRUCTURE POINTS: 2

WEAPONS AND EQUIPMENT
HEAVY RAIL CANNON X 2
HEAVY SMART MISSILE RACK (6 X PENETRATOR, 6 X CLUSTER)
LONG BARRELLED BURST CANNON
TARGETING ARRAY (INCLUDED), MULTI TRACKER, UPGRADED DISRUPTION POD,
NETWORKED MARKER LIGHTS X 5, BLACK SUN FILTER, POSITIONAL RELAY, TACHYON
MARKER, TARGET LOCKS

OPTIONS:
SENSOR SPINES 20 PTS
FLECHETTE DISCHARGERS 40PTS

| WEAPON | RANGE | STR | AP | SPECIAL |
|---|---|---|---|---|
| RAIL CANNON (SOLID) | 120" | 10 | 1 | DESTROYER, EACH CANNON MAY FIRE INDEPENDENTLY (SHELL TYPE AND TARGET NOMINATED BEFORE ROLLING) |
| RAIL CANNON (SUBMUNITION) | 120" | 7 | 3 | APOC BLAST TEMPLATE |
| HEAVY BURST CANNON | 36" | 5 | 5 | ASSAULT 6 |
| HEAVY MISSILE RACK (PENETRATOR) | 48" | 8 | 3 | NO LOS NEEDED- TREAT AS SMART MISSILE |
| HEAVY MISSILE RACK (CLUSTER) | 48" | 5 | 4 | ASSAULT 8, NO LOS NEEDED- TREAT AS SMART MISSILE |
| NETWORKED MARKER LIGHTS (NWML x5) | 36" | / | / | * |
| TACHYON MARKER X1 (FORWARD FACING) | UNLIMITED | / | / | OPERATES IN THE SAME WAY AS A NETWORKED MARKER LIGHT AND IS USED IN CONJUNCTION WITH THE RAIL CANNONS (ONLY 1 MARKER LIGHT HIT CAN BE GENERATED BY THE TACHYON MARKER) |

p.9 Codex: Tau Empire ©2005
PD116 Tau Castes & Contact (detail cropped from larger original)
By Paul Dainton
This Tau pilot wears the design on his chest and arm.

Games Workshop's Tau rules.

| | Points | Armour Front | Armour Side | Armour Rear | BS |
|---|---|---|---|---|---|
| Hammerhead | 90 | 13 | 12 | 10 | 3(4) |

Front, side and rear armour values are given as well as the Ballistic Skill (BS) of the vehicle.

'Structure points' are used for Super Heavy vehicles in the game of 'Warhammer 40,000 Apocalypse'

'Str' stands for 'Strength' of the weapon.
'AP' stands for 'Armour Penetration' of the weapon.
'Assault 3' means the weapon can be fired 3 times.

The list of weapons and equipment for the Super Heavy Walker fits the lists of Tau weapons and equipment from pp.25-31 Codex: Tau Empire ©2005 corresponding text copied below.

Railgun: The Tau battlesuit railgun uses linear accelerator technology to project a solid projectile at hypervelocity. It is capable of punching through the thickest armour and of taking down the largest of enemies.
Range: 72" Str: 10 AP: 1

Smart missile system: The smart missile system fires self-guiding missiles with the intelligence of a drone, which first search for then hunt down the target, passing around any blocking terrain.
Range: 24" Str: 5 AP: 5

Burst cannon: The burst cannon finds use across the Tau military, primarily mounted on battlesuits and vehicles. Utilising the plasma induction technology found in the pulse rifle and other systems, the burst cannon is a multi-barrel weapon able to sustain high rates of

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|-----|-----------------------------------------------|----------------------|
|     |                                               | fire.<br>Range: 18" Str: 5 AP: 5 Assault 3<br><br>Targeting array: Targeting arrays assist the vehicle gunner's aim by adjusting for the target's range and speed. Add 1 to the vehicle's BS<br><br>Multi-tracker: The vehicle-mounted multi-tracker is combined with advanced stabilisers enabling a vehicle to fire as if it were a fast vehicle.<br><br>Distribution pod: A distribution pod throws out distorting images in both visual and magnetic spectra, making it hard to target at range.<br><br>Networked markerlights: A networked markerlight is a specialised version of the standard system, but it is larger and less common.<br><br>Blacksun filter: This advanced optical filter enables the user to double the distance rolled for determining how far they can see when fighting at night.<br><br>Positional relay: This records detailed battlefield data and relays it in a tight-band, encrypted burst to a single unit operating as a strategic reserve.<br><br>Target lock: The target lock identifies potential targets and plots fire plans to counter them, granting the vehicle gunner far more choice about the targets to be engaged.<br><br>Sensor spines: Sensor spines are used to feed data to an advanced ground-following flight control system.<br><br>Flechette discharger: Powerful clusters of reactive charges are attached to the hulls of many Tau vehicles. If the enemy approach, they fire off vicious clouds of high velocity flechettes. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| 46 | Assault Shoulder Pad for Space Marine with number 7 (4)<br><br>This is a number 7 Assault Shoulder pad for regular power armor, it has raised crossed arrows on the pad with a roman numeral 7 above the arrows. This is the standard size space marine® tactical shoulder pad cast in pewter. | Assault is a type of Space Marine squad. An Assault squad will have an 'X' symbol and their squad number shown on their right shoulder pads. The squad number will be between 1-10.<br><br>Games Workshop sells assault squad shoulderpads – http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1110190&rootCatGameStyle=<br><br>Power armour – see product 10<br><br>Tactical – see product 56 |
| 47 | Assault Shoulder Pad for Space Marine with number 8 (4)<br><br>This is a number 8 Assault Shoulder pad for regular power armor, it has raised crossed arrows on the pad with a roman numeral 8 above the arrows. This is the standard size space marine® tactical shoulder pad cast in pewter.<br><br>See 46 above | Assault – see product 46<br><br>Power armour – see product 10<br><br>Tactical – see product 56 |
| 48 | Assault Squad Shoulder Pad for Space Marine - Plain (4)<br><br>See 46 above<br><br>This is a unmarked Assault shoulder pad for regular power armor, it has raised arrows on the pad. This is the standard size space marine® tactical shoulder pad cast in pewter. | Assault – see product 46<br><br>Power armour – see product 10<br><br>Tactical – see product 56 |
| 49 | Crested Pad for Space Marine (4)<br><br>This is a shoulder pad with a raised crest on it. This shoulder pad works well with any loyalist or chaos space marine® army. This is a pewter model that fits on tactical space marine® models as well as other sci-fi models.<br><br>See 46 above | This Space Marine Captain has a crested shoulderpad with 'rivets' along the edge where the crest attaches to the pad - http://www.games-workshop.com/gws/catalog/productDetail.jsp?catId=cat440176a&prodId=prod1060070&rootCatGameStyle=<br><br>Miniature designed by Juan Diaz Ramos<br><br>Loyalist – see product 16<br><br>Chaos Space Marine – see product 2<br><br>Tactical – see product 56 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| 50 | Devastator Shoulder Pad for Space Marine - Plain (4)<br><br>This is a unmarked Devestator shoulder pad for regular power armor, it has a raised arrow on the pad. This is the standard size space marine® tactical shoulder pad cast in pewter.<br><br>See 46 above | Devastator is a type of Space Marine squad. A Devastator squad has an inverted 'V' symbol on their right shoulderpads.<br><br>Warhammer 40,000 Space Marines 2004, page 70<br>(NH SM Pads/ Neil Hodgson / 2004)<br><br>A Devastator squad member will have their squad number shown on their right shoulder pads. The squad number will be between 1-10. The 'X' on this pad indicates this is Devastator squad 10.<br><br>The colours on the shoulderpad refer to a Chapter colour, ie, blue and gold are the colours of the Ultramarines Space Marine Chapter.<br><br>Index Astartes III 2003, page 23<br>(NH Ultramarines Graph / Neil Hodgson / 2001)<br><br>Power armour – see product 3 |
| 51 | Devastator Shoulder Pad for Space Marine with number 9 (4)<br><br>This is a number 9 Devestator Shoulder pad for regular power armor, it has raised arrow on the pad with a roman numeral 9 embossed into the arrow. This is the standard size space marine® tactical shoulder pad cast in pewter.<br><br>See 46 above | Devastator – see product 50<br><br>Tactical – see product 56 |
| 52 | Devastator Shoulder Pad for Space Marine with number 10 (4)<br><br>This is a number 10 Devestator Shoulder pad for regular power armor, it has raised arrow on the pad with a roman numeral 10 embossed into the arrow. This is the standard size space marine® tactical shoulder pad cast in pewter.<br><br>See 46 above | Devastator – see product 50<br><br>Tactical – see product 56 |
| 53 | First Squad or I Shoulder Pads - tactical (4)<br><br>This is a shoulder pad with a roman numeral "1" or an I on the face, it is stylized and has more detail then the typical I shoulder pad. This shoulder pad works well with any loyalist space marine® armies. This could also be a chapter icon for the left shoulder. This is a pewter model that fits on tactical space marine® models as well as other sci-fi | Loyalist – see product 15<br><br>Tactical – see product 56 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | models.<br><br>See 46 above | |
| 54 | Generic Power Armour Shoulder Pad for Space Marine - Plain (4)<br><br>Just a regular Space Marine® Power Armor pad, similiar to the standard one with raised edges.<br><br>See 46 above | This is Games Workshop's unique expression of a Sci-Fi Shoulderpad, including the following unique characteristics:<br><br>    o  Covering from start of shoulder to above the elbow<br>    o  Large border around outer edge<br>    o  Left shoulderpad – squad markings<br>    o  Right shoulderpad – Chapter symbol |
| 55 | Smooth Shoulder Pad for Space Marine - no raised areas (3)<br><br>Another regular Space Marine® shoulder pad, this one has no raised areas, perfectly smooth for something different.<br><br>Single pewter bit.<br><br>See 46 above | See 54 above |
| 56 | Tactical Shoulder Pad for Space Marine (3)<br><br>This is a Tactical Shoulder pad for regular power armor, it has a raised arrow on the pad. This is the standard size space marine® tactical shoulder pad cast in pewter.<br>See 46 above | Tactical is a type of Space Marine squad. A Tactical squad will have an upward pointing arrow symbol on their right shoulder pad.<br><br>Games Workshop sells Tactical shoulder pads - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1110189&rootCatGameStyle=<br><br>A Tactical squad member will have their squad number shown on their right shoulder pads. The squad number will be between 1-10.<br><br>The colours on the shoulder pad refer to a Chapter colour, ie, red and gold are the colours of the Blood Angels Space Marine Chapter.<br><br>See product 4. |
| 57 | Tactical Shoulder Pad for Space Marine with number 1 (3)<br><br>This is a number 1 Tactical Shoulder pad for regular power armor, it has a raised arrow on the pad with a roman numeral 1 inlaid in the | Tactical – see product 56 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | arrow. This is the standard size space marine® tactical shoulder pad cast in pewter.<br><br>See 46 above | |
| 58 | Tactical Shoulder Pad for Space Marine with number 2 (3)<br><br>This is a number 2 Tactical Shoulder pad for regular power armor, it has a raised arrow on the pad with a roman numeral 2 inlaid in the arrow. This is the standard size space marine® tactical shoulder pad cast in pewter.<br><br>See 46 above | Tactical – see product 56 |
| 59 | Tactical Shoulder Pad for Space Marine with Number 3 (3)<br><br>This is a number 3 Tactical Shoulder pad for regular power armor, it has a raised arrow on the pad with a roman numeral 3 inlaid in the arrow. This is the standard size space marine® tactical shoulder pad cast in pewter.<br><br>See 46 above | Tactical – see product 56 |
| 60 | Tactical Shoulder Pad for Space Marine with Number 4 (3)<br><br>This is a number 4 Tactical Shoulder pad for regular power armor, it has a raised arrow on the pad with a roman numeral 4 inlaid in the arrow. This is the standard size space marine® tactical shoulder pad cast in pewter.<br><br>See 46 above | Tactical – see product 56 |
| 61 | Tactical Shoulder Pad for Space Marine with number 5 (3)<br><br>This is a number 5 Tactical Shoulder pad for regular power armor, it has a raised arrow on the pad with a roman numeral 5 inlaid in the arrow. This is the standard size space marine® tactical shoulder pad cast in pewter.<br><br>See 46 above | Tactical – see product 56 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | |
| 62 | Tactical Shoulder Pad for Space Marine with number 6 (3)<br><br>This is a number 6 Tactical Shoulder pad for regular power armor, it has a raised arrow on the pad with a roman numeral 6 inlaid in the arrow. This is the standard size space marine® tactical shoulder pad cast in pewter.<br><br>See 46 above | Tactical – see product 56 |
| 63 | Salamanders or Dragon Drop Pod Armor or door panel (1)<br><br>This is a highly detailed resin armored panel that fits on the Drop Pod Kit door. It is a single piece that fits over the standard door, this is sculpted with a dragon or salamanders icon in the center, surrounded by scales. This is a single door. We recomend buying a set of 5 for the regular drop pod model kit. | A drop pod is a Space Marine vehicle. Games Workshop sells drop pods on its website – http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1560026&rootCatGameStyle=<br><br>Miniature designed by Tom Watton<br><br>The icon on the Chapterhouse door is based on the Salamanders Chapter icon – see product 25. |
| 64 | Salamander Dragon Skull Shoulder Pad Bit –Tactical (2)<br><br>This is a Dragon or Salamander Skull on a scaled background. This is the standard size space marine® terminator shoulder pad cast in pewter. This sculpter to be used as a right arm pad. | The icon on the Chapterhouse pad is based on the Salamanders Chapter icon – see product 25. |
| 65 | Salamander Dragon Skull Shoulder Pad - Terminator (2)<br><br>This is a Dragon or Salamander Skull on a scaled background. This is the standard size space marine® tactical shoulder pad cast in pewter. We are not concerned about copyright in this product, just trademark use. | The icon on the Chapterhouse pad is based on the Salamanders Chapter icon – see product 25<br><br>Tactical – see product 56<br><br>Terminator – see product 5 |
| 66 | Salamander Dragon Thunder Hammer - Smooth (2)<br><br>This is a hammer sculpted with a dragon or salamander theme in mind. It can be used as a power weapon or a thunder hammer. It can | The icon on the left side of the head on the far left hammer shown opposite is based on the Salamanders Chapter icon – see product 25<br><br>Power weapon and thunder hammer – see product 1 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | be used for dragon or salamander space marine® armies.  This is our new "smooth" salamander hammer.  Customers have also used this for high elf and empire fantasy armies.  It is a pewter bit. | Terminator – see product 5<br><br>High Elf and Empire – see product 1 |
| 67 | Dragon Salamander Head Bit Space Marine (3)<br><br>This is a pewter bit of the Dragon Special Character resin kit head.  We have had many request for just the head so have made these available.  A single pewter space helmet in the dragon or salamander style. | Salamanders – see product 25<br><br>Chaplains are a rank within the Space Marines army.  Their iconography heavily features skulls.<br><br>Miniature designed by Jes Goodwin<br><br>This is just one example of a Space Marine Chaplain with skull helmet available on the Games Workshop website.<br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1050244&rootCatGameStyle=<br><br>This is based on a Space Marine Mk 7 helmet.<br><br>Warhammer 40,000 Space Marines 2008, page 71<br>(AB835_SM_Techmarine / Alex Boyd / 2008)<br><br>Note the following characteristics:<br>• Rectangular open vent on top of helmet<br>• Shape of eyes<br>• Two tubes entering the jawline on each side<br>• Box shape covering ear section |
| 68 | Banded Tech Power Armor Pad (4)<br><br>This is a shoulder pad that is about the same size as a GW power armor shoulder pad.  It consist of horizontal plates or "bands" of armor similiar to older MK 1 armor.  This pad looks spectacular as a "Iron Hands" space marine® shoulder pad.  Sized to fit regular power armor figures. | Mk1 refers to a type of Space Marine armour. Games Workshop sells a Mk1 armoured Space Marine – http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1140240&rootCatGameStyle=<br><br>Miniature designed by Jes Goodwin<br><br>The Horus Heresy - Collected Visions 2007, page 139<br>(3086 LemanRuss/ Franz Vohwinkel / Black Library / 2004) |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
|  |  | Chapterhouse's shoulder pad looks most like the right hand pad on the grey armoured Space Marine above. |
|  |  | Iron Hands – see product 70 |
|  |  | Power armour – see product 3 |
| 69 | Cog Shoulder Pad - Power Armor (3)<br><br>This is a shoulder pad that is about the same size as a GW shoulder pad.  It has a cog.  The shoulder pad itself is armored strips similiar to older MK shoulder pads. This pad looks spectacular as a "Iron Hands" space marine® shoulder pad or even as Adeptus Mechanicus or Techmarines.  Sized to fit regular power armor figures. | Iron Hands – see product 70<br><br>The Adeptus Mechanicus are an organisation in the Warhammer 40,000 background. Their icon is a skull within a cog.<br><br>The Art of Warhammer 40,000 2006, page 201<br>(WE274C Titan Icon / Wayne England / 1995)<br><br>Techmarines are a rank within the Space Marines army. They are the mechanics of the army and are strongly associated with the Adeptus Mechanicus and technology.<br><br>The Chapterhouse product is designed and of a size and scale to be used with Games Workshop products and to fit within the Warhammer 40,000 Universe.  The product description uses Games Workshop Trademarks: Iron Hands, Adeptus Mechanicus and Techmarines. |
| 70 | Shield for Iron Hands (2)<br><br>A high detail shield based on the Iron Hands chapter theme, useful for fantasy models as well as Iron Hand or other hand based space marine® models.<br><br>The front of this shield has mailed hand and scales sculpted onto a round shield with power cables around the edges, the rear of the shield has a hand hold that enables power armor marines to hold the shield (not shown in photo).  It is designed to be modeled on either power armor marines or terminators. This highly detailed bit is cast in white metal. | The Iron Hands are a Space Marine Chapter.<br><br>Index Astartes 2003, page 3<br>(NH Iron Hands Graph/ Neil Hodgson / 2001)<br><br>The Iron Hands Chapter icon is a gauntleted left hand, shown palm downwards.<br>Index Astartes III 2003, page 3<br>(NH Iron Hands Icon Neil Hodgson / 2001)<br><br>The Chapter is strongly associated with technology - cogs and power cables feature both functionally and decoratively on their armour and vehicles.<br><br>Index Astartes III 2003, page 3<br>(NH Iron Hands Graph/ Neil Hodgson / 2001)<br><br>Power armour – see product 3 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | Terminator – see product 5 |
| 71 | Shoulder Pad for Iron Hands Power Armor (2)<br><br>This is a shoulder pad that is about the same size as a GW shoulder pad. It has a mailed hand on it in a clawing motion. The shoulder pad itself is armored strips similiar to older MK shoulder pads. This pad looks spectacular as a "Iron Hands" space marine® shoulder pad. Sized to fit regular power armor figures. | Iron Hands – see product 70 |
| 72 | Shoulder Pad for Iron Hands Terminator armor (2)<br><br>This is a shoulder pad that is about the same size as a GW shoulder pad. It has a mailed hand on it in a clawing motion. The shoulder pad itself is armored strips similiar to older MK shoulder pads. This pad looks spectacular as a "Iron Hands" space marine® shoulder pad. Sized to fit regular terminator armor figures. | Power armour – see product 3<br><br>Iron Hands – see product 70<br><br>Terminator – see product 5 |
| 73 | Banded Armor Terminator Pad (3)<br><br>This is a shoulder pad that is about the same size as a GW shoulder pad. It consist of horizontal plates or "bands" of armor similiar to older MK 1 armor. This pad looks spectacular as a "Iron Hands" space marine® shoulder pad. Sized to fit regular terminator armor figures. | This is Mk1 Space Marine Armour – see 68 above<br><br>Iron Hands – see product 70<br><br>Terminator – see product 5 |
| 74 | Banded Power Armour Shoulder Pads (3)<br><br>This is a shoulder pad that is about the same size as a GW power armor shoulder pad. It consist of horizontal plates or "bands" of armor similiar to older MK 1 armor. This pad looks spectacular as a "Iron Hands" space marine® shoulder pad. Sized to fit regular power armor figures. | This is Mk1 Space Marine Armour – see 68 above<br><br>Power armour – see product 3<br><br>Iron Hands – see product 70 |
| 75 | Studded Rimmed Shoulder Pad MKV (3)<br><br>This is a shoulder pad with a raised crest on it. This shoulder pad works well with any loyalist or chaos space marine® army. This is a pewter model that fits on tactical space marine® models as well as other sci-fi models. | Mk V armour – see product 2<br><br>Loyalist – see product 15<br><br>Chaos Space Marines – see product 2<br><br>Tactical – see product 56 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | |
| 76 | Five (5) Heresy Era Jump Packs for Space Marines (1)<br><br>This is a set of FIVE (5) Resin and Metal Jump Pack for Space Marines®. It is sculpted to fit in with the Heresy Style Jump Packs. The main Jump Pack is Resin and the control flaps are metal. Designed to fit on the standard Space Marines® back. Suitable for any other 28mm scale miniatures as well. | Space Marines use jump packs. Heresy refers to the type of jump pack used during the Horus Heresy.<br><br>The Horus Heresy – Collected Visions 2007, page 284<br>(2121 assault squad/ James Brady / Black Library / 2005)<br><br>Back pack designed by Aly Morrison |
| 77 | Masked Heresy Heads for Space Marines – 4 (2)<br><br>This is a resin sprue of 4 "Heresy" style heads for space marines® with rebreather mask. Each sprue comes with 4 heads. | Heresy refers to Mk V Heresy armour – see product 2. |
| 78 | MK I Heresy Era for Space Marine "Thunder Armor" Shoulder Pad (3)<br><br>This is a shoulder pad with armored plates on it, commonly known as "Thunder Armor" or Mk I space marine power armor. This shoulder pad works well with any loyalist or chaos space marine® army. Perfect for Heresy era armies. This is a pewter model that fits on tactical space marine® models as well as other sci-fi models. | Thunder armour is the alternative name for Mk 1 Space Marine armour. See product 68.<br><br>Loyalist – see product 15<br><br>Chaos Space Marines – see product 2<br><br>Tactical – see product 56 |
| 79 | Spikey Heresy Heads for Space Marines (2)<br><br>This is a resin sprue of 4 "Heresy" style heads for space marines®. | Heresy refers to Mk V Heresy armour – see product 2.<br><br>p111 *Horus Heresy: Collected Visions* ©2007 artwork by Justin Norman<br><br>p197 *Horus Heresy: Collected Visions* ©2007 artwork by Kenson Low<br><br>p309 *Horus Heresy: Collected Visions* ©2007 artwork by Kenson Low |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | |
| 80 | Studded Power Armor Pad for MK 5 (3)<br><br>This is a studded power armor shoulder pad. It works well as a MK V shoulder pad. Dimensions are equivalent to current GW plastic pads. | Mk V armour – see product 2<br><br>Power armour – see product 3 |
| 81 | Celtic Wolf Shield for Space Wolves (3)<br><br>This is a celtic style round Storm or Combat shield with a wolf on the front, it utilizes the same handles as our other shields (seperate component for the hand grip). It looks great for Space Wolf (Space Wolves) armies or any other Sons of Russ Space Marine® Chapter.<br><br>Cast in pewter.<br>Diameter of shield is 22 mm. | Space Wolves are a Space Marine Chapter.<br><br>Index Astartes II 2002, page 3<br>(NH Space Wolves Graph / Neil Hodgson / 2001)<br><br>Sons of Russ is a reference to Leman Russ, the Space Wolves founder (Primarch).<br><br>Storm shields and combat shields are used by Space Marines.<br><br>Chapterhouse's products use Games Workshop's marks: Space Wolves and Space Marines.<br><br>Miniatures in the Warhammer 40,000 game are based on a 28mm scale. |
| 82 | Rhino Conversion Kit for Space Wolves (2)<br><br>This is a resin conversion kit for the games workshop rhino kit. It consist of 2 side doors, 1 front panel, and 1 top hatch. The style incorporates wolf totems, furs, and viking like icons. Looks great when used for space wolf armies. | A Rhino is a Space Marine vehicle used by the Space Wolves Chapter.<br><br>Codex Space Wolves 2000, page 19<br>Miniature designed by Bob Naismith<br><br>The Space Wolves Chapter's iconography includes wolf skulls, wolf tails and fangs - http://www.games-workshop.com/gws/catalog/productDetail.jsp?catId=cat440177a&prodId=prod260002a&rootCatGameStyle=<br><br>Miniature designed by Jes Goodwin, Martin Footit and Juan Diaz Ramos<br><br>Space Marine Collector's Guide 2003, page 32<br>Miniature designed by Jes Goodwin<br><br>Forge World sells a Space Wolves conversion pack for the Rhino – http://www.forgeworld.co.uk/Warhammer-40000/SPACE-WOLVES-RHINO-DOORS-AND-FRONT-PLATE.html |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | Miniature designed by Simon Egan |
| 83 | Storm Combat Space Tech Shield for Wolves (3)<br><br>This is a Storm or Combat shield with a Tech-Wolf on the front, it utilizes the same handles as our other shields (seperate component for the hand grip). It is a light weight white metal bit. It looks great for Space Wolf (Space Wolves) armies or any other Sons of Russ Space Marine® Chapter. Supplied unpainted. | See 81 & 82 above for information about Space Wolves, storm shields and Sons of Russ |
| 84 | Celtic Storm or Combat Shield (3)<br><br>This is a white metal combat or storm shield for 28 mm figures. It works great on space marines® or any fantasy models. We have designed a circular celtic shield, this is more suitable for a power armor marine, vs a Terminator marine (it would look a bit small for the larger armor). It includes a seperate grip guard. Supplied unpainted. | Storm shield and combat shield – see product 81<br><br>This shield does not incorporate any Games Workshop Copyright.<br><br>Power armour – see product 3<br><br>Terminator – see product 5 |
| 85 | Generic Hammer 2 (2)<br><br>This is a Generic Thunder or Power hammer. Sold as a single white metal pewter bit. Works well with fantasy or sci-fi 28mm figures. Looks great on Empire models or on Space Marines®. | Thunder hammers – see product 1<br><br>Empire – see product 1 |
| 86 | Imperial or Eagle Storm Shield (2)<br><br>A high detail shield based on an eagle theme, useful on high elf or emperor fantasy models as well as space marine® models.<br>The front of this shield has an eagle head and feathers sculpted, the rear of the shield has a hand hold that enables power armor marines to hold the shield. It is designed to be modeled on either power armor marines or terminators. This highly detailed bit is cast in PEWTER. | High Elf and Empire – see product 1<br><br>Storm shields – see product 28<br><br>Power armour – see product 1<br><br>Terminators – see product 5 |
| 87 | "Heresy" Armoured Drop Pod Door (1)<br><br>This is a highly detailed resin armored panel that fits on the Drop Pod Kit door. It is a single piece that fits over the standard door, this is sculpted to resemble an "heresy era" armored panel. This is a single door. We recomend buying a set of 5 for the regular drop pod model kit. | Drop pod – see product 63<br><br>Heresy is a reference to Mk V Space Marine armour – see product 2. The pattern more closely resembles Mk 1 Space Marine armour. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|-----|-----------------------------------------------|----------------------|
| | | |
| 88 | Armoured Predator Armour Kit – side  (1)<br><br>This is a new Armored Predator kit for Space Marines®, it includes 3 strips of Reactive armor that can be cut to size as well as ONE heavily armored "off-centered cockpit"  Fits the standard Games Workshop Space Marine® Predator kit.<br><br>This is our answer to the silly idea that a more heavily armored predator tank has the same front as a flimsy rhino tank.  This is a Resin kit. | A Predator is a Space Marine Tank. It is a variant of the Space Marine Rhino tank.<br><br>Games Workshop sells Predator tanks – http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1660001&rootCatGameStyle=<br><br>Miniature designed by Jes Goodwin and Tim Adcock<br>Rhino - see product 28<br><br>Chapterhouse's products use Games Workshop's marks: Predator, Space Marines, Games Workshop, and Rhino. |
| 89 | Armoured Predator Kit - Centred (1)<br><br>This is a new Armored Predator kit for Space Marines®, it includes 3 strips of Reactive armor that can be cut to size as well as a heavily armored "centered cockpit"  Fits the standard Games Workshop Space Marine® Predator kit.<br>This is our answer to the silly idea that a more heavily armored predator tank has the same front as a flimsy rhino tank.  This is a Resin kit. | Predator – see product 88<br><br>Rhino – see product 28<br><br>Chapterhouse's products use Games Workshop's marks: Predator, Space Marines, Games Workshop, and Rhino. |
| 90 | Armoured Rhino for Space Marine Tank Door & Armor Kit (1)<br><br>This is an new and original Armored Space Marine® Rhino kit, it includes 2 side doors, 2 rear armor panels, 2 front armor panels, 2 top hatch armored panels and a front armored cockpit panel.  Fits the standard Games Workshop Space Marine® Rhino kit.  This is very similiar to MK I Space Marine® armor and would fit well with an Heresy era army. | The pattern on these components is Mk 1 type Space Marine armour – see product 68.<br><br>Rhino – see product 82<br><br>Heresy – see product 2 |
| 91 | Brazier – Dragon / Serpent - 2 pieces (1)<br><br>This is a stylized dragon or snake brazier, it comes in 2 pieces (flat backing and the front) and is pewter.  It is approximately .63 millimeters tall and .36 millimeters at its widest.  This is perfectly designed to add to any vehicles, we include it with our Salamanders Landraider kit.  Looks great on dreadnoughts and any other vehicles with flat areas. | Salamanders – see product 25<br><br>Land Raiders – see product 32<br><br>Chapterhouse's products use Games Workshop's marks: Salamanders, Land Raider and Dreadnought. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| 92 | Brazier – Eagle – 2 pieces (1)  This is a stylized eagle brazier, it comes in 2 pieces (flat backing and the front) and is pewter. It is approximately .62 millimeters tall and .33 millimeters at its widest.  This is perfectly designed to add to vehicles, we include it with our Salamanders Landraider kit.  Looks great on dreadnoughts and any other vehicles with flat areas. | Salamanders – see product 25  Land Raiders – see product 32  Chapterhouse's products use Games Workshop's marks: Salamanders, Land Raider and Dreadnought. |
| 93 | Mark I Rhino Conversion Kit (1)  This is an new and original Mark I or Heresy Era Rhino conversion kit, it includes 2 side doors, 2 Left Side Engine Grates, 2 Right side Engine Grates, 2 choices for the front cockpit armor panel, and one old style bolter cuppola cover. Fits the standard CURRENT Games Workshop Space Marine® Rhino kit. | Heresy – see product 2  Rhino – see product 82  Mk 1 – see product 68  A bolter is a Space Marine weapon.  Warhammer 40,000 Wargear 2005 (NK020K Bolter / Nuala Kinrade / 1998)  Chapterhouse's products use Games Workshop's marks: Rhino and Games Workshop. |
| 94 | Rhino Tank Conversion Kit for Space Marine Dragon or Salamander (1)  The rhino accessory kit is composed of doors, front panels and armor sections to accessorize the current space marine® rhino model kit. Themed in a dragon or salamander style also good for alpha legion.  It currently includes - 1 front armor panel, 2 side door, 2 top hatch panels, and 4 scaled armor panels. This kit is composed completely of unpainted resin-plastic, sometimes parts must be cut down to fit due to the casting process. | Rhino – see product 82  Salamanders – see product 25  Index Astartes IV, 2004, page 19 (NH Salamander Graph/ Neil Hodgson / 2004) |
| 95 | Mycetic Spore for Tyranids  (1)  We have our first cast in of our Mycetic Spore, available here, as you can see it could realistically transport a carnifex ora a brood of gaunts. This is a 4 piece model and will be selling for $30.00.  We will have another set that will come with a base for $34.50 in the near future. This is Chapterhouse Studios version of the Mycetic Spore.  The spore | Tyranids and Carnifex – see product 37  A Mycetic spore is a Tyranid creature. It is used to transport other Tyranid creatures from vessels in orbit onto a planet.  Warhammer 40,000  Tyranids 2009, page 54 (AB929_Mycetic_Spore / Alex Boyd / 2009) |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | is a highly detailed 4 piece resin model which includes an option weapon arm (that can have a tyranid weapon glued on the end).  It is easily assembled (coming in 2 halves and a top piece). Each spore is large enough to realistically hold a swarm of models or even a large monstrous creature like the carnifex. The Mycetic Spore is approximately 6 inches tall and 4.5 inches in diameter. We have this item in limited stock and will ship out as they are produced. | Games Workshop has not made a model of a Mycetic. Gaunts are a type of Tyranid creature. The two Tyranid miniatures in Chapterhouse's top right image are a Carnifex and a Games Workshop Termagaunt. |
| 96 | Pre-Heresy Scarab Shoulder Pads for Thousand Sons Marines – Term (1) These shoulder pads are designed to replace the current era Space Marine® Terminator Shoulder Pads. Each pad is in the pre-heresy style and has a scarab sculpted onto the surface   These pads works well with any egyption themed army, and is similiar to those worn by heresy era Thousand Sons Space Marines®. Sold in pairs or a rigth and left pad. Two shoulder pads cast in pewter. | The Thousand Sons are a Chaos Space Marine Legion. Index Astartes 2003, page 41 (NH Thousand sons / Neil Hodgson / 2003) Scarabs were featured on their armour prior to and during the Horus Heresy. (2374_TS_tacsqd / Chris Trevas / Black Library / 2007) The Horus Heresy – Collected Visions 2007, page 90 |
| 97 | Scarab Shoulder Pad for Thousand Sons - Power Armor  (1) This is a shoulder pad that is about the same size as a GW power armor shoulder pad.  It consist of a Egyption Style Scarab on a shoulder pad. This pad works well with any egyption themed army, and is similiar to those worn by heresy era Thousand Sons Space Marines® shoulder pad.  Sized to fit regular power armor figures. Single Pad Cast in pewter. | Thousand Sons - see product 96. |
| 98 | Starburst Shoulder Pad for Thousand Sons Marines - Power Armor  (1) This is a shoulder pad that is about the same size as a GW power armor shoulder pad.  It consist of a Starburst on a shoulder pad.  This pad is similiar to those worn by heresy era Thousand Sons Space Marines® shoulder pad.  Sized to fit regular power armor figures. Single Pad Cast in pewter. | The Thousand Sons Chapter icon was originally a circle with eight points. (2107_Devastators1 / Ralph Horsley/ Black Library / 2003) The Horus Heresy – Collected Visions 2007, page 48 |
| 99 | Shoulder Pad for Mantis Warriors Marines - Power Armor  (1) | The Mantis Warriors are a Space Marine Chapter. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
|  | We also have a rather nice Mantis Warriors space marine pad set, these were done for a customer.  They turned out great and he allowed us to use his painted pads to showcase the new releases.  We were able to do a Power Armor and a Terminator piece.<br>This is a shoulder pad with a Praying Mantis head on the surface, with added chains sculpted on the edges .  This shoulder pad works well with Mantis Warrior space marine armies®.  This is the standard size space marine® tactical shoulder pad cast in pewter.<br>One pewter pad. | White Dwarf 101 1988, page 72<br>(Mantis Warrior / Gary Chalk / 1988) |
| 100 | Shoulder Pad for Mantis Warriors Marines – Terminator (1)<br><br>This is a shoulder pad with a Praying Mantis head on the surface, with added chains sculpted on the edges .  This shoulder pad works well with Mantis Warrior space marine armies®.  This is the standard size space marine® terminator armor shoulder pad cast in pewter.<br>One pewter pad. | The Mantis Warriors are a Space Marine Chapter.<br><br>Chapterhouse's products use Games Workshop's marks: Space Marine; Terminator & Mantis Warriors. |
| 101 | Shoulder Pad for Blood Ravens Marines - Terminator  (1)<br><br>Lastly for the pads, we resculpted the Blood Ravens shoulder pads to have a blood drop instead of an inverted drop.  The previous pads will be listed as Blood Eagle pads, while the updated sculpts will be listed as Blood Ravens pads.<br><br>This is our NEW shoulder pad with a rave on the surface,  the wings of the bird are surrounding a blood drop or gem.  This shoulder pad works well with Blood Raven or Blood Angel themed armies.  This is the standard size space marine® terminator armor  shoulder pad cast in pewter.<br><br>Single Pewter Pad. | Blood Raven/Blood Angles – see product 4 |
| 102 | Shoulder Pad for Blood Ravens Marines - Power Armor (1)<br><br>This is our NEW shoulder pad with a rave on the surface,  the wings of the bird are surrounding a blood drop or gem.  This shoulder pad works well with Blood Raven or Blood Angel themed armies.  This is the standard size space marine® Tactical Marine shoulder pad cast in | Blood Raven/Blood Angles – see product 4 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | pewter.<br><br>Single Pewter Pad. | |
| 103 | Dragon or Salamander Variant Rhino Door Kit (1)<br><br>We also have 3 new Rhino Conversion Kits for the Space Wolves, Dragon based Chapters, and a Tactical Door kit with skulls (click on photos for product page).<br><br>The rhino accessory kit is composed of 2 side doors and 1 front panel to accessorize the current space marine® rhino model kit. Themed in a dragon or salamander style also good for alpha legion.<br><br>This kit is composed completely of unpainted resin-plastic, sometimes parts must be cut down to fit due to the casting process. | Space Wolves – see product 82<br><br>Rhino – see product 82<br><br>Alpha Legion – see product 32<br><br>The components are decorated with Salamanders Chapter icons – see product 25 |
| 104 | Rhino Conversion #2 kit For Space Wolves (1)<br><br>This is a resin conversion kit for the games workshop rhino kit. It consist of 2 side doors, 1 front panel, and 1 top hatch and extra armor. The style incorporates wolf totems, furs, and viking like icons. Looks great when used for space wolf armies.<br><br>8 piece resin kit. | Space Wolves - see product 82.<br><br>The Space Wolves Chapter decorates its vehicles with wolf's heads shown face on.<br><br>Warhammer 40,000 Space Wolves 2009, page 78.<br><br>(NH821 SW Filler/ Neil Hodgson / 2009) |
| 105 | Tactical Rhino Doors with Skulls Kit (1)<br><br>The rhino accessory kit is composed of 2 side doors and 1 front panel to accessorize the current space marine® rhino model kit. Sculpted with the standard Tactical Arrow and integrating skulls..<br><br>This kit is composed completely of unpainted resin-plastic, sometimes parts must be cut down to fit due to the casting process. | Games Workshop sells products decorated with piles of skulls.<br><br>Basilica Administratum - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1095506&rootCatGameStyle=<br><br>Miniature designed by Dave Andrews<br>Realm of Battle board - http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod730814&rootCatGameStyle=<br><br>Product designed by Dave Andrews |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | |
| 106 | Rhino Tank Conversion Kit for Iron Snakes (1)<br><br>The rhino accessory kit is composed of 2 side doors, 1 top hatch, 1 front panel and 4 scaled armor sections to accessorize the current space marine® rhino model kit. Themed in a greek and snake style with shields and spears this kit makes a great Iron Snake Rhino. This kit is composed completely of unpainted resin-plastic, designed to fit on a standard Games Workshop Rhino kit. | The components have Iron Snakes icons on them. See product 17. |
| 107 | 28mm Spartan Heads released this week - Friday, 18 February 2011 05:58<br><br>Spartan Heads compatible with Space Marine® models<br><br>This is a single pewter sprue of 5 different spartan armored heads that are scaled to be compatible with Games Workshop Space Marine® models.<br><br>The "Spartan Heads compatible with Space Marines" consist of a sprue of 5 pewter heads. Each head is different and this set sells for $5.50.<br><br>Original sculpt and painted by Tomas Fiertek. | Chapterhouse's products use Games Workshop's marks. |
| 108 | Doomseer Iyanar Model Released<br><br>Friday, 29 April 2011 19:22 | http://www.dakkadakka.com/dakkaforum/posts/list/60/347567.page   See post by Nick Villacci at19.58.36 on 29/04/2011 referring to this model as "New Female Farseer Stand-in model from ChapterhouseStudios.com - Doomseer Iyanar"<br><br>http://www.dakkadakka.com/dakkaforum/posts/list/90/347567.page<br>See post by Nick Villacci at 21.30.26 referring to the product being an Eldar model.<br><br>http://www.dakkadakka.com/dakkaforum/posts/list/150/347567.page<br>See post by Nick Villacci at 14.23.09 on 30.04.11 comparing this model to GW Eldar models<br><br>http://www.dakkadakka.com/dakkaforum/posts/list/180/347567.page<br><br>See image from Dawn of War shown on a Relic wiki |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | Just added a new model to the website. This model is special for us in a few ways. Its our first full metal miniature, not just an accessory piece. We also have recently hired Angel Giraldez as a painter for many of our pieces.<br><br>If you have ever wanted a female HQ model for your army, this may be your lucky day. So with no more delays...<br><br><br>Doomseer Iyanar-Duanna<br><br><br>Doomseer Iyanar-Duanna is cursed with the ability to forsee the slow death of her race. She shares the ability of all seers, to see the path of her race, but is only able to see the deaths of her people and nothing else. She was psychically scarred when she witnessed the death of an entire world-ship, she is now doomed to spend every moment of her life tracking down the creature responsible.<br><br>The "Doomseer" is only available from Chapterhouse Studios. The unpainted 28mm scale pewter model consist of 5 pieces - body and 4 variant arms. A 25mm slotted base is included. | http://wiki.reliccommunity.com/index.php?title=Farseer_Taldeer<br><br>http://www.dakkadakka.com/dakkaforum/posts/list/210/347567.page See post by Nick Villacci at 22.23.28 on 02/05/2011 confirming that he is trying to fill in the blanks in the GW range.<br><br>Similarities to Games Workshop's Eldar models include:<br>• Icons on the helmet and the back of robes<br>• Shape of the sword<br>• All Eldar models have spirit stone, usually on the chest. She also has one on her back.<br>• Clad in robes<br>• Singing Spear<br>• Shape of the helmet and cut out face<br><br>http://www.games-workshop.com/gws/content/article.jsp?categoryId=&pIndex=1&aId=9000012a&start=2<br><br>Standard Eldar Helmet.<br>Miniature designed by Jes Goodwin<br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?catId=cat440239a&prodId=prod1060055<br><br><br>Miniature designed by Mike McVey<br>Eldar Farseer helmet which elaborates on the standard helmet design by adding:<br>• two side extensions topped with stones, and<br>a design on the forehead featuring a triangle with a lower triangular stem, a central eye-like circle and lines coming out of the sides of the triangle. |
| 109 | June Releases out today!<br><br>Tuesday, 14 June 2011 00:15<br><br>A release that is due this month is our wheeled conversion kit for the Games Workshop Imperial Guard Chimera APC Kit. Call it a "rapid response" variant if you want. This resin kit is designed to replace the | Chapterhouse's products use Games Workshop's marks: Imperial Guard, Chimera.<br><br>Imperial Guard Chimera http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1140040a<br><br>Model designed by Adrian Wild |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | side hull and treads of the rugged Chimera APC with All Terrain Tires and a hazard-clearing front bumper. It consist of 9 resin parts and is in final stages of production.<br><br>This month we have a few items that are for sale starting today.<br><br>First off is this nice conversion kit for the Imperial Guard Chimera. Call it a rapid-response variant if you want, we just refer to is a the "Wheeled Chimera Conversion Kit". This kit is composed of 9 highly-detailed resin pieces and easily replaces the tracked side pieces on the Games Workshop Imperial Guard Chimera. MSRP will be $13.50.<br><br>Rapid Response Wheeled Kit for Chimera<br><br>This highly detailed resin conversion kit will convert the normal Games Workshop Imperial Guard Chimera (or any other vehicle that shares that chassis) into a Rapid Response Wheeled vehicle.<br><br>Each kit consist of 9 highly detailed resin pieces, Games Workshop Chimera (or other vehicle that shares same hull) required to assemble as seen.<br><br>Shown assembled model uses Games Workshop Imperial Guard Chimera which is not a Chapterhouse Studios product.<br><br>Designed by Jeffrey Nagy. | |
| 110 | Some things in the work, we are continuing to expand our "space elf" line that many players may enjoy. If you have ever wondered what male Eldar Howling Banshees may look like in a warped universe, you may like what is in the works here. I think a little more work is due for the concept. The sculptor has dubbed them "Hell Hounds". | The Eldar army is an army of 'Space Elves'.<br><br>They are using our ELDAR trademark<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1160111a<br><br>Miniature by sculpted by Juan Diaz Ramos from a Jes Goodwin design Eldar Howling Banshee model. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | Howling Banshee Warriors have:<br>• Eldar conical style helmet with hair coming out of the back<br>• Segmented armour plates over a bodysuit<br>• Grid-like mouth<br>Long loin cloths held up by circular stones |
| 111 | TRU-Scale Conversion Kit for Space Marine Storm Raven.<br><br>We are also releasing a much-needed (in this humble hobbyist opinion) TRU-Scale Conversion kit for the Games Workshop Space Marine Storm Raven.  This resin kit expands the hull of the Storm-Raven making it much longer and actually makes it realistic to think the Storm-Raven can carry the troops it is supposed to carry.  We also included a grapple for carrying dreadnoughts (easily magnetized if you want to actually mount your walkers on the transport) as well as a hatch to cover the turret mount if you are inclined.  MSRP $17.50 for the 9-piece resin kit. Availability in 2 weeks. | The Chapter House product is a conversion kit for Games Workshop's 'Stormraven Gunship'.<br><br>Miniature by sculpted by Dale Stringer from a Jes Goodwin design<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod900149a |
| 112 | Conversion Kits.<br><br>Next up are three smaller conversion kits.  First is a set of five resin "gun-halberds" for 28mm scale models (or Heroic Scale).  These weapons are composed of a power halberd that incorporates a bolter at the head.  These may be a good match for "Grey Knight" players or for those custom made custodes models.  Each 5 weapon set MSRP is $6.00. | Games Workshop sells Halberds<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1570033<br><br>'Custodes' are the personal guard of the Emperor of Mankind. Games Workshop does not yet sell miniatures of Custodes but they are depicted in artwork in *Horus Heresy: Collected Visions* ©Games Workshop Limited 2007.<br>Custodes are armed with halberds with built in 'bolters' at the head.<br><br>*Horus Heresy: Collected Visions,* ©Games Workshop Limited 2007, p152.<br>(Legio Custodes / Sam Wood / 2004)<br><br>Grey Knights are a Space Marine Chapter that fight using Halberds.<br><br>Miniature by sculpted by Martin Footit from a Jes Goodwin design<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1160008a |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| 113 | Conversion Beamer Servo Harness Kit for Space Marine Model<br><br>This resin kit sculpted and designed by Stephen Smith consist of 5 resin components.  The kit fits on a standard Games Workshop Space Marine model.  The design of the servo-backpack and conversion beamer weapon allow the model to hold the weapon under-slung on either arm.<br><br>Next we have a conversion-beamer and servo arm backpack set that is sculpted to work seamlessly with Games Workshop Space Marine models. If you are an aspiring tech-marine and are tired of trying to put together your very own conversion-beamer, this kit may save you some headaches.  Consisting of 4 resin pieces, this easily poseable and magnetized kit MSRP's for $9.50. | A 'Conversion Beamer' is a Space Marine weapon of great power and can be used as a weapon option for a Space Marine Master of the Forge. The conversion beamer was included in *Codex Space Marines* ©Games Workshop Limited 2008, p70. Chapter House released their product after the Codex description was released.<br><br>*Codex Space Marines* ©Games Workshop Limited 2008, p70. ( DG551 Conversion Techmarine/ Dave Gallagher / 2002)<br><br>VALTHEX ASTRAL CLAWS MASTER OF THE FORGE<br><br>Miniature designed by Mark Bedford<br><br>http://www.forgeworld.co.uk/Home/Search-Results.html?filter_type=6&filter_Action=0&filter_name=SearchTerm&submit=GO&filter_value=conversion+beamer<br><br>Contemptor Heavy Conversion Beamer<br><br>Miniature designed by Will Hayes<br><br>http://www.forgeworld.co.uk/Home/Search-Results.html?filter_type=6&filter_Action=0&filter_name=SearchTerm&filter_value=valthex |
| 114 | Death Angel Doors for Space Marine Land Raider kit<br><br>The Death Angel Land Raider door kit was designed to replace the standard doors on the Games Workshop Space Marine Land Raider.   Incorporating original art work, each piece allows you to add further detail to your model by adding images of the Grim Reaper or the Dark Angel.<br><br>Each piece was sculpted by and and designed by Tomas Fiertek. | This kit uses the trademarks Games Workshop, Space Marine, Land Raider and Dark Angel.<br><br>The 'death angel' on the left carries a Heavy Flamer which is a Games Workshop weapon. http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod350007a<br><br>Miniature designed by Juan Diaz Ramos<br><br>The 'death angel' on the right carries a gun which looks like Games Workshop's Assault Cannon. This style of barrelled machine gun is not unique to Games Workshop but does fit with the Warhammer 40,000 range http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1400034 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
|  | Kit consist of 6 finely sculpted resin components.<br><br>Lastly we have a new door kit for Games Workshop's Land Raider vehicle.  This 6 piece resin kit consist of 4 doors, 1 set of wings (for side door) and one chain of ammo (for same door).  The set features grim-reaper or death angels in various battle poses.  Whether you are a Dark Angel fan or just like the gloominess of grim-reapers, this set adds a personal touch to the already awesome Games Workshop Land Raider plastic kit.  This kit simply replaces the standard doors that come with the GW model.  MSRP is $11.500.<br><br>The Death Angel Land Raider door kit was designed to replace the standard doors on the Games Workshop Space Marine Land Raider. Incorporating original art work, each piece allows you to add further detail to your model by adding images of the Grim Reaper or the Dark Angel.<br><br>Each piece was sculpted by and and designed by Tomas Fiertek.<br><br>Kit consist of 6 finely sculpted resin components. |  |
| 115 | SCAR & Sniper Rifle 28mm Pack - 8<br><br>A set of 8 Various SCAR and Sniper Rifles cast in resin. Each set includes 8 highly detailed 28mm weapons modeled after present day weapons. Scaled for use with 28mm wargame minis (GW Imperial Guard).<br><br>Set contains: 2 SCAR Autoguns, 2 SCAR Autoguns with Grenade Launchers, 2 SCAR Lasguns, 2 Sniper Rifles<br>This product is sold unpainted and some cleaning may be required.<br><br>Master sculpt by Jeff Nagy. | Combo pack. See products 116-118<br><br>Chapterhouse's products use Games Workshop's marks: Imperial Guard. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| 116 | SCAR Drum Magazine Autoguns Resin 28mm - 6<br><br>A set of 6 SCAR Drum Magazine Autoguns cast in resin. Each set includes 6 highly detailed 28mm weapons modeled after present day SCAR rifles. Scaled for use with 28mm wargame minis (GW Imperial Guard).<br><br>This product is sold unpainted and some cleaning may be required.<br><br>Master sculpt by Jeff Nagy.<br><br>Painted by Jason Phillips | An 'autogun' is a gun in the Warhammer 40,000 universe.<br>P49, *Necromunda Rulebook* 1995.<br><br>( DH049K Autogun / Des Hanley / 1995)<br>Escher Ganger with Autogun, p119 *Necromunda Rulebook* 1995.<br>Now sold in a set under the product name 'House Escher Troops Booster Pack' |
| 117 | SCAR Lasguns Resin 28mm - 6<br><br>A set of 6 SCAR Lasguns cast in resin. Each set includes 6 highly detailed 28mm weapons modeled after present day SCAR rifles with laser modifications. Scaled for use with 28mm wargame minis (GW Imperial Guard).<br><br>This product is sold unpainted and some cleaning may be required.<br><br>Master sculpt by Jeff Nagy.<br><br>Painted by Jason Phillips | 'Lasguns' are the standard weapon of the Imperial Guard infantryman. A key feature of 'las' weapons is the angled end to the gun rifle.<br><br>Imperial Guard Cadian Shock Troops http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod2070014<br><br>Miniatures designed by Brian Nelson |
| 118 | Javelin Class Jet Bike.<br><br>It has been a little while since our last release. We have been hard at work at Chapterhouse Studios, looking for the next toy to release for the Heresy Era 40k players. I am happy to show the Javelin Class Jet Bike.<br><br>This multi-part customizable resin kit contains 8 resin components. We have included 2 engine options, this will allow you to make a regular | Emperor's Children Space Marine Jet Bike Squad.<br>p15, *Horus Heresy: Collected Visions* ©2007<br>This shows a Space Marine Jet Bike from the Horus Heresy era.<br><br>Space Marine Bike Sprue<br>(2034_Jet Bike Squad / Eric Ren / 2003)<br>The bike is copied from the artwork in *Horus Heresy: Collected Visions* using elements from the current Space Marine Bike model sold by Games Workshop. |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | and a scout version of the Javelin Jet Bike. We also included 2 different bolt gun mounts that will allow the addition of different special weapons (plasma, melta, grenade launchers etc). These conveniently fit our combi-weapon conversion bits.<br><br>Also included in the kit are a set of legs and arms that will allow you to use other companies torsos and heads to model a rider. Flight stand will be included.<br><br>Our target price for the Javelin Jet Bike is $14.00 and the release will be on November 5th.<br><br>Kit is shown with Chapterhouse Studios helmets and torso (not included).<br><br>Concept sketches from designer posted on DakkaDakka http://www.dakkadakka.com/dakkaforum/posts/list/335180.page | Artwork – Distinctive front grill in large straight vertical lines with the chassis protruding underneath out in front of the bike. Two boltguns on top of the front of the bike. Two exhaust pipes on the side of the bike.<br><br>Bike Model (See sprue comparison below) – the tank (section below handle bars) has been copied as the shape, trim and circle decoration are the same. Three tubes lead into engine below the tank. The Space Marine arms are identical in design.<br><br>The model riding the bike copies several key features of a Space Marine:<br>• Leg Armour<br>  o Flared with angled edges to match width of boots<br>  o Cut at bottom of leg around shape of boot<br>  o Joints at hips and back of knee are joined by grooved sections<br>• Shoulderpads<br>  o Covering from start of shoulder to above the elbow<br>  o Large border around outer edge<br>  o Large round studs on the shoulder pads are a feature of Mark V Space Marine armour worn during the Horus Heresy period.<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1060092<br><br>Miniature designed by Jes Goodwin |
| 119 | Death Angel Storm Shield<br><br>This is a single pewter combat or storm shield for 28 mm figures. This oval shaped shield has an image of a grim reaper or dark angel standing on a pile of skulls.<br><br>If to be used on Games Workshop models, this is more suitable for a terminator model as opposed to a space marine model (it would look a bit large for the smaller armor).<br><br>http://chapterhousestudios.com/webshop/component/virtuemart/?page=shop.product_details&category_id=15&flypage=flypage.tpl&product_id=127&vmcchk=1 | see 28 for Storm Shield<br><br>see 1 for Terminators with Storm Shield |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | | |
| 120 | Armana'serq Warrior Priestess<br><br>Monday, 29 August 2011 01:37<br><br>Today our second complete miniature figure is released for sale.<br><br>*The gods have always demanded worship and sacrifice but in return they grant their most zealous followers with supernatural strength and skills. Serqitet, goddess of the scorpion protects her followers through her warrior priestess. Armed with sword and pistol, Armana'serq leads her fellow warrior-priest into combat through stealth and subterfuge.*<br><br>This unpainted 28mm scale pewter model consist of 6 components - body and 5 variant arms. A 25mm slotted base is included.<br>Armana'serq is available here for $13.50<br><br>Look for our exciting TRU-Scale Storm Raven Extension kit next week!<br><br>Nick- Chapterhousestudios.com | This model has been copied from Jes Goodwin's sketches:<br><br>http://eldar.arhicks.co.uk/miniatures/craftworld/craftworld_striking_scorpions_squad_1.php<br><br>http://www.dakkadakka.com/dakkaforum/posts/list/240/347567.page<br><br>There is discussion that these are Eldar on this thread confirming confusion.<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1160108a<br><br><br>Eldar Striking Scorpions<br>• Plate armour<br>• Chainswords<br>• Thick locks of hair coming from the top of the head<br>• "The signature attack of the Striking Scorpion is made by the weapon pods housed on either side of the warrior's helmet, known as mandiblasters. These are short-ranged laser weapons used to deliver a deadly energy sting in close combat." P.33 *Codex Eldar* ©2006.<br>The Chapter House model has a similar device either side of the jaw.<br>• Striking Scorpions are stealthy infiltrators. P.33 *Codex Eldar* ©2006.<br><br>P.81 *Codex Eldar* ©2006<br><br>A unit champion known as an 'Exarch' can be armed with special weapons. One is the 'Scorpion's claw', a pincer claw with a mounted gun attachment. The other is a 'Biting blade', which is a long two handed chainsword. Both these weapons are available with Chapterhouse's model. |
| 121 | Abbithan Banshees Guardswoman 28mm figures – 10<br><br>This resin conversion kit contains 12 torsos, 12 legs, 12 heads, 12 backpacks and enough bases to assemble a 12 woman unit of Abbithan Banshees Guardswoman. Models are scaled for 28mm wargames. | Imperial Guard Cadian Shock Troops<br><br>http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod2070014 |

| No. | Chapterhouse Product and Website Description | Games Workshop Works |
|---|---|---|
| | Models do not come with arms and weapons.<br><br>Display models shown assembled with Games Workshop Cadian Imperial Guard arms and weapons for compatibility purposes.<br><br>(Chapterhouse Studios recommends Games Workshop Imperial Guard weapons and arms, in particular Cadian Imperial Guardsman arms: http://chapterhousestudios.com/index.php?route=product/product&path=77&product_id=163 ) | The arms and weapons from this kit have used on the Chapter House 'Abbithan Banshees' |

# Exhibit N

| | |
|---|---|
| **From:** | Ralph Horsley |
| **To:** | Kearney, Tom J. |
| **Subject:** | Re: Games Workshop vs. Chapterhouse Studios |
| **Date:** | Friday, February 03, 2012 10:39:46 AM |

Hi Tom,

No, I have only ever freelanced with GW.

Cheers,

Ralph
====

----- Original Message -----
**From:** Kearney, Tom J.
**To:** Ralph Horsley
**Sent:** Friday, February 03, 2012 5:46 PM
**Subject:** RE: Games Workshop vs. Chapterhouse Studios

Thanks for your email, Ralph. Can you clarify one thing. You say you do freelance for Games Workshop. Have you ever been a Games Workshop employee?

Best,

Tom


**Thomas J. Kearney**

D: +1 (415) 591-6894

www.winston.com

WINSTON
&STRAWN
LLP

**From:** Ralph Horsley [mailto:email@ralphhorsley.co.uk]
**Sent:** Friday, February 03, 2012 4:44 AM
**To:** Kearney, Tom J.
**Subject:** Re: Games Workshop vs. Chapterhouse Studios

Hi Tom,

I do freelance for Games Workshop. I have always had a positive experience with them, and haven't any further comments to add.

Cheers,

Ralph
=====

----- Original Message -----
**From:** Kearney, Tom J.
**To:** email@ralphhorsley.co.uk
**Sent:** Thursday, February 02, 2012 6:31 AM
**Subject:** Games Workshop vs. Chapterhouse Studios

Dear Ralph:

As you may be aware, Games Workshop Ltd. has recently sued a small U.S. miniatures company called Chapterhouse Studios. I am a lawyer representing Chapterhouse Studios in that lawsuit, and I understand you have worked with Games Workshop in the past. I would be very grateful if you would be willing to take a bit of time to talk with me about your experiences with the company. If you are, please let

me know how best to reach you, and a convenient time to do so.

Yours very truly,

Tom Kearney

**Thomas J. Kearney**
**Attorney**
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802
D: +1 (415) 591-6894
F: +1 (415) 591-1400
Email | www.winston.com

WINSTON
&STRAWN
LLP

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
***********************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
***********************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.