# Exhibit 7

# Exhibit 8

Civil Action No. 1:10-cv-8103

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**GAMES WORKSHOP LIMITED**

Plaintiff

v.

**CHAPTERHOUSE STUDIOS LLC**

and

**JON PAULSON d/b/a PAULSON GAMES**

Defendants

---

**EXPERT REPORT**

**OF**

**MICHAEL BLOCH QC**

**AND**

**DR HARRIS BOR**

---

**INSTRUCTIONS**

1.  We have been instructed by Foley & Lardner LLP on behalf of Games Workshop Limited, the Plaintiff in this matter, to provide expert evidence in these proceedings by way of an expert report to be supported by oral testimony, if required, on English law as it applies to certain aspects of copyright ownership in literary and artistic works.

2.  In particular, we have been asked to provide our assessment on the position in English law relating to the following matters:

1

(a)    The ownership of IP in the employment context;

(b)    The ownership of IP when works have been jointly created; and

(c)    The principle of implied or equitable assignment.

3.    We have also been asked to opine on how these principles are likely to apply to issues in this case based on the materials with which we have been provided.

4.    Annexed to this expert report is an exhibit marked "**MB1**" containing authorities which we refer to in this report.

## QUALIFICATIONS AND EXPERIENCE OF MICHAEL BLOCH QC

5.    I am an English barrister specialising in commercial and intellectual property law with experience as both a trial lawyer and appellate advocate. I was called to the bar of England and Wales in 1979 and became a Queen's Counsel in 1998. I work from Wilberforce Chambers in Lincoln's Inn, London.

6.    As an intellectual property lawyer I have advised and appeared in a series of substantial breach of confidence, copyright, design right, intellectual property licensing, passing off, patent and trademark court cases and arbitrations, including: *Star Wars* (*Lucasfilms Ltd v Ainsworth* [2009] FSR 2) (discussed below) (copyright in props and the justiciability of foreign intellectual property rights), *GSK v Abbott Laboratories* (the interpretation & application of worldwide pharmaceutical patent licences), *19 Entertainment v Simon Cowell* and others (the X Factor format copyright case), *Numatic v Qualtex* (the shape of the Henry vacuum cleaner), *Specsavers v ASDA* (the logo and strapline dispute), *easyGroup v easyJet* (a brand licence dispute), *Aspinal v*

2

*Kiki James* (registered and unregistered designs), *Odnoklassniki* (copyright , confidence, employment and partnership claims relating to a social networking site), *United Biscuits v ASD* (the Penguin v Puffin case), *Chocosuisse v Cadbury* (the Swiss Chalet chocolate case), *Inter Digital Technology Corp v Nokia* (UMTS patent dispute), *Oxford Gene Technology v Affymetri* (the Southern Patents), and several international arbitrations relating to pharmaceuticals and coating technology.

7.      A more detailed curriculum vitae/resume can be found attached to this report. I have not previously testified in any cases (either at trial or in a deposition) over the last four years. I have not published any books or articles in the last ten years.

8.      I am being compensated at £750 plus VAT per hour.

**QUALIFICATIONS AND EXPERIENCE OF DR HARRIS BOR**

9.      I am an English barrister specialising in commercial litigation, banking and financial services litigation, and international arbitration. I became an English law qualified solicitor in 2002, a solicitor-advocate in 2003, and was called to the bar of England and Wales in 2006. I work from Wilberforce Chambers in Lincoln's Inn, London.

10.     A number of  matters on which I have worked have involved intellectual property including, most recently, the following matters in the English Court of Appeal, *Les Laboratoires Servier v Apotex Inc* (a pharmaceutical patent case), and *Budejovicky Budvar Narodni Podnik v Anheuser-Busch LLC* (Budwesier trade mark case).

11.     A more detailed curriculum vitae/resume can be found attached to this report. I have not previously testified in any cases (either at trial or in a deposition) over the last four years. The legal books or articles that I have published over the last ten years are:

3

(a) "Does National Court Involvement Undermine the International Arbitration Process?" (Assisted author, Julian Lew QC), American University International Law Review, Volume 24, Number 3 (2009).

(b) "Claims without Contract: Economic Torts Come of Age", The In-House Lawyer, 13 February 2009.

(c) "Dispute Resolution Clauses - A Contradiction in Terms",The Hedge Fund Journal, 25 September 2008.

(d) "Arbitration- Running the Line", Legal Week, 15 November 2007.

(e) "Review Article: A Practical Guide to Mediation in Intellectual Property, Technology & Related Disputes by Jon Lang (2006)", The International Journal of Arbitration, Mediation and Dispute Management.

(f) "ADR Possibilities in Investor-State Disputes", The International Journal of Arbitration, Mediation and Dispute ManagementVol. 73 No. 1 February 2007.

(g) "Solvent Abuse on Schemes of Arrangement" (co-author), Legal Week, 8 September 2005.

(h) "Access to the Internet for the Visually Impaired", E-Business Law Journal, July 2004.

(i) "Special Feature Article: Restrictive Covenants and Employees Abroad" (co-author), Employment Lawyers' Association Briefing, Vol. 10, September/October 2003.

(j)     "Court Finds ISP Not Liable For Opinion Posted By Users", MLRC Media Law Letter, 27 July 2003.

12.   I am compensated at £250 plus VAT per hour.

**EXPERT'S DECLARATION**

13.   We confirm that we understand that our duty in providing this expert evidence is to the Court, and that our duty as an expert witness overrides our duty to those instructing us, that we have understood this duty and complied with it in giving our evidence impartially and objectively and that we will continue to comply with that duty. We have never previously acted for any of the parties to these proceedings.

**MATERIALS CONSIDERED**

14.   In producing this report, we have been provided with, and considered, the following materials:

(a)     The Second Amended Complaint filed on 19 January 2012;

(b)     The Second Amended Answer filed on 6 February 2012;

(c)     The Transcript of the Deposition of Jes Goodwin of 7 March 2012;

(d)     The Transcript of the Deposition of John Blanche of 2 April 2012;

(e)     The Transcript of the Deposition of Andrew Jones of 3 April 2012;

(f)     Various examples of artwork or illustrations worked on by Jim Burns and Will Rees;

(g)   A Confirmatory Assignment between John Sibbick and Games Workshop Limited of 1994;

(h)   Copyright Agreements between Games Workshop Limited and Dan Abnett dated 1996 and Ben Counter dated 2002, and subsequent commissioning forms;

(i)   A Trade Mark and Copyright Licence between Games Workshop Limited and Sabertooth Games Inc dated 19 July 2001 and amendment and confirmatory assignment relating to that agreement;

(j)   An Intellectual Property Licence between Games Workshop Limited and THQ Inc of 1 January 2007;

(k)   2012 Form of Confirmatory Assignment of Intellectual Property Rights between Games Workshop Limited and employees; and

(l)   A model jury instruction for copyright cases in the Court of Appeals for the Seventh Circuit.

## PARTIES' POSITIONS

15.   Our understanding from the documents that have been provided to us and our instructing lawyers is as set out below.

16.   The Plaintiff is a United Kingdom corporation with numerous stores in the United States, including in and around Chicago, Illinois, which is its single largest selling market in the United States (Complaint, para 1).

17.     Proceedings have been discontinued against the Second Defendant. The remaining Defendant is a Texas limited liability company (Answer, para 3).

18.     The Plaintiff has brought these proceedings for, inter alia, copyright infringement under 17 USC, para 101, as set out at paragraph 4 of the Complaint. The Defendants deny the allegation at paragraph 4 and specifically deny any wrongdoing.

19.     The copyright at issue relates to various characters, armies, accessories, and literature relating to the Plaintiff's games, designed and manufactured in England, which the Plaintiff claims were protected by copyright belonging exclusively to it (Complaint, paras 13 and 14).

20.     The game at issue is Warhammer 40,000. This was originally created in or about 1986-1987 by four individuals, all of whom were at the time employees of Games Workshop, Alan Merrett, Jes Goodwin, Rick Priestley and John Blanche. The content was first published in 1987 in a book entitled Rogue Trader.

21.     One of the defences raised or suggested by the Defendants is that, under English law, the Plaintiff does not own all of the copyright in various images or illustrations used in, or associated with, the Warhammer 40,000 game and underlying works, as these were created by independent contractors/freelancers and therefore, as stated in the Answer, the Plaintiff "*lacks standing to enforce*" them (Answer, Affirmative Defenses, pages 31 and 32).

22.     The Plaintiff's position is as follows:

(a)     An overwhelming majority of the works in issue were created by employees of the Plaintiff;

7

(b)    Freelancers were involved to some degree in the creation of some depictions of the characters, armies and literature with respect to Warhammer 40,000, but did so in close collaboration with employees of the Plaintiff and under their close direction and control. Often the role of the freelancer was to merely render works from one form created by the Plaintiff into another, e.g. to prepare an illustration from a model. Further, all of the contributions of these individuals were circumscribed by the overriding need to conform to existing literary, sculptural and illustrative works setting out the parameters of the game; the background story of the game; the rules of the game and the minute details of the characters and armies in the game and in the background story originally created by employees of the Plaintiff (namely, John Blanche, Jes Goodwin, Alan Merrett and Rick Priestley). Over time, this background "universe" has grown to number hundreds of books or magazines and tens if not hundreds of thousands of sculpted miniatures, drawings and paintings;

(c)    Many of the so-called "freelancers" referred to above were in fact employees of the Plaintiff who carried out some additional "freelance" work;

(d)    It was known to all those involved in the creation of Warhammer 40,000, that the purpose of the Plaintiff's business is to make money from selling games and associated products and that this entails the Plaintiff having an absolute and exclusive interest in any copyright created in the development of such games and products;

(e)    It has been the Plaintiff's practice to obtain confirmatory assignments from contributing independent contractors/freelancers. However, some of these agreements cannot be found for a few of the works that the Defendants are

8

accused of copying.  It is our understanding that of the 12 works in issue in which alleged independent contractors/freelancers have participated, only 2 have not as yet been located by the Plaintiff. Both of these works, were produced by people who either  had been or have since been employees of the Plaintiff; and

(f)     There has been no legal challenge by any independent contractor/freelancer concerning the use of any copyright by the Plaintiff during the extensive relevant period since 1987.

23.     In terms of factual background, the Plaintiff has also referred me to the transcripts of the depositions of Jes Goodwin, John Blanche and Andrew Jones, and has provided further background by way of interview with Mr Blanche, which indicate that in the years since 1987, while there has been substantial development of the underlying characters, armies, accessories, and literature relating to Warhammer 40,000, the vast majority (95-99%) of these materials  have been created by Games Workshop employees (Goodwin/23/11-12).

24.     The background materials we have reviewed also reveal, by way of example, the following information regarding the use made by the Plaintiff of independent contractors/freelancers:

(a)     Rogue Trader, which was published in about 1987 as the first work setting forth the major characters, armies, backstory and rules of Warhammer 40,000, used cover art produced by John Sibbick, a freelance artist (Blanche/31/10). We understand that the Plaintiff has a confirmatory assignment of copyright from Mr Sibbick.

9

(b) Jim Burns, was a freelance painter of Space Marines, a principal army in the Warhammer 40,000 game. They appeared in illustrations. He was given unpainted sculptures to work from and asked to paint with reference to colour references provided to him, as well as previous illustrations (Blanche/34-35).

(c) Will Rees, a freelancer, produced illustrations including a character called Adeptus Mechanicus. Before producing these he had been provided with concept art produced by Mr Blanche and Jes Goodwin (Blanche/38/3-16).

(d) Many or most of the people who worked on the Rogue Trader publication were employed by Games Workshop doing other things but some also produced artwork for which they were not separately compensated (Blanche/46/1-8; see also 66/11-16).

25. Mr Blanche was of the view that, when commissioning a picture, the Plaintiff paid for the rights to it: "*If an artist paints a picture of a 40K image, he cannot go off and sell that as a magazine cover for somewhere, because it is a Games Workshop image. You are commissioning the image and the artist retained the actual hard copy of the picture but not the rights to publish the picture, wherever and whenever he wanted*" (Blanche/138/8-17).

26. Mr Blanche further describes how he oversaw and managed the work of freelance artists, including by defining the parameters of their work, and using tracing paper to alter characters to fit the Plaintiff's backgrounds or other requirements (Blanche/134/25 to Blanche/135/19).

27. Mr Jones' description of the authors of the Plaintiff's publications is as follows: "*The authors, actually it was a mixture. There were some of the guys who work in our design*

10

*studio, as writers, authors and so on, or some of the game designers maybe. Then there was a bunch of contracted freelancers who we had to brief. We had very specific briefing meetings, not just in terms of the individual stories but the overarching themes of the magazine. Those were internal meetings, because everything that was done in Warhammer Monthly obviously had to meet the directions of John Blanche and Allan Merrett and those guys. Once we had got that in place we were then able to go and steer and work with external freelancers, some of whom then became full-time employees and some of whom still work with us today*" (Jones/98-99).

28.  Mr Jones further described the way in which the Plaintiff worked with independent contractors/freelancers as follows: "*so once we have created ...that framework, we can then work with freelancers to explore parts of it, to either accomplish a specific goal that we have or to explore further a specific element of the universe. So we won't just say to a freelancer: "Hey you are great. I have read some of your novels. Why don't you just go off and write a Warhammer 40,000 novel". We would never do that. We would have to sit down with them and work, like I say, hand in hand, to make sure that they would be sending—you know we would work with them on what the storyline was, to make sure it fitted, and then we would be working on Lord knows how many drafts and extra drafts. As they came in and were edited we would have to say: "That doesn't fit", or "Have you thought about this, or why don't you put this in?"*"" ((Jones/100-101).

29.  On the basis of the factual background described above, the Plaintiff maintains that as a matter of English law:

(a)  Any copyright in issue created by an employee belongs to the Plaintiff as employer;

(b)    The independent contractors/freelancers are to be treated as employees by virtue of the nature of their role with the Plaintiff and the degree of control exercised over them by the Plaintiff;

(c)    Even assuming that the Plaintiff does not hold exclusive rights by express or implied assignment, the works created by the independent contractors/freelancers in collaboration with employees of the Plaintiff appear, minimally, to be joint works, in which the Plaintiff would own at least part of the copyright in any event; and

(d)    To the extent that the Plaintiff did not initially own the copyright in the contested works, this has been assigned to the Plaintiff by way of an equitable or implied assignment by virtue of the nature of the Plaintiff's business or by written assignment.

30.    It is in this context that we have been asked to detail the relevant principles of English law that relate to these matters and opine on the possible application of these to the facts and matters in dispute in this case.

**EXECUTIVE SUMMARY**

31.    In summary, our opinion is:

(a)    English law recognises that employers own the copyright of employees (with an exception for journalists with respect to certain copyright in newspapers, periodicals or magazines for works created between 1956 and 1989). The definition of the term "employee" depends not only on what was agreed, but on other factors including how integral the work being produced is to the business;

(b)     English law recognises  a basis for joint ownership where: (i) a work has been created in collaboration with another; (ii) each author has contributed significant creative input; and (iii) there is a distinct contribution from each author. It is possible therefore to have a work of joint ownership between an independent contractor/freelancer and the entity being served in that capacity. Each owner would hold the work as a tenant in common and would have a right to bring an action against an infringer without needing to seek permission from the other owner(s);

(c)     English law recognises equitable or implied assignments in certain specific circumstances most often where: (i) the purpose in commissioning a work is for a client to multiply and sell copies on the market for which the work was created free from the sale of copies in competition with the client by the contractor or third parties; (ii) the contractor creates a work which is derivative from a pre-existing work of the client; and (iii) the contractor is engaged as part of a team with employees of the client to produce a composite or joint work; and

(d)     Based on the factual circumstances of the case as set out in the documents and as instructed, and assuming such facts are proven to the satisfaction of the Court:

   (1)    Under English law, at least some of the independent contractors/freelancers in this case can be treated as employees rather than independent contractors, by virtue of the nature of the work they were involved in and the manner in which it was performed;

   (2)    We understand that none of the individual contractors/freelancers who contributed to the works in issue created their illustrations independently,

and that close collaboration was the norm, with the Plaintiff employees contributing their skill and creativity. Under English law, such illustrations, where there is no distinct authorship, would constitute joint works, which would mean that the Plaintiff owns the copyright in the work irrespective of whether an independent contractor/freelancer also owns the same copyright; and

(3)   Under English law, even if the Plaintiff were unable to identify written assignments from each of the independent contractors/freelancers, the circumstances are consistent with an equitable assignment of works from independent contractors/freelancers to the commissioner of such works in this case. In view of the nature of the business and deposition evidence, the intention of the relevant parties appears to be for the Plaintiff to multiply and sell copies on the market for which the work was created free from the sale of copies in competition with the client by the contractor or third parties. The evidence also points to work created in collaboration and which was derivative. The factors giving rise to an equitable assignment as a matter of English law are therefore present.

## ENGLISH LAW ON COPYRIGHT OWNERSHIP

### Sources

32.   Copyright brought into existence between 1 June 1957 and 1 August 1989 is governed by the Copy Right Act 1956 (the "1956 Act"). Copyright brought into existence after the 1 August 1989 is governed by Copyright, Designs and Patents Act 1988 (the

14

"CDPA 1988"). Case law provides authority as to how these acts are to be interpreted and applied.

**General principles and overview**

33.  Ownership is important as actions for infringement can only be brought by an owner of the copyright (1956 Act, s17; CDPA 1988, s96). Exclusive licence holders also have concurrent rights to bring infringement proceedings (1956 Act, s19; CDPA 1988, ss101-102).

34.  The general rule in relation to literary and artistic works has always been that the author is the first owner of the copyright (1956 Act, s4(1); CDPA 1988, s11(1)). This includes where a work has been commissioned. The definition of the term "author", however, depends on many factors. The general rule is also subject to a number of statutory exceptions, including in the employment context, as will be discussed.

35.  English law also recognises the possibility of an equitable or implied assignment, meaning that, in specific situations, the true beneficial owner of a copyright may be found to be distinct from the original or nominal author. In this situation, the legal owner holds the copyright on trust for the beneficial owner. Equitable assignment will be discussed in detail below.

36.  In general terms, the author of a work is the person who originates the protectable elements of the work, whether the language used, dramatic incident or design. The determination as to who produces the relevant language or item turns on the specific facts of the case.

37.  A person may be the true author if he/she is responsible for creating, selecting or gathering together the detailed concepts data or emotions contained in a work (*Cala Homes (South) Ltd v Alfred McAlpine Homes East Limited* [1995] FSR 818). In the context of a literary work, a person who suggests a plot may be one of the authors provided that his/her suggestions are sufficiently substantial, well defined and original (*Ibcos Computers Ltd v Barclays Mercantile Highland Finance Ltd* [994] FSR 275, 302).

38.  In all cases, it is necessary to identify the products of the skill and labour which made the work original and thus protected and then determine the person responsible for their provision (Copinger & Skone James on Copyright, 16th edition, 2010, 4-11; 4-19).

39.  Where more than one person has contributed to a literary or artistic work, it is necessary to consider whether there is any copyright, and if so who owns it. There are a number of possibilities:

(a)  *Independent ownership*: Where two or more persons produce distinct parts of a work or distinct works, each will separately own that distinct part of the work or distinct work;

(b)  *Successive or derivative works*: Where people have worked successively on a work to provide successive versions derived from an earlier version, each version may be treated as a separate work and each version may be deemed to have a separate author. The outcome will depend on whether sufficient skill and labour has been expended by each person on the work;

(c)  *Joint ownership*: Where two authors collaborate on a work and there is no distinct authorship, ownership will be joint. This topic will be returned to below; and

16

(d)   *No ownership*: Where contributions to a literary or artistic work are minimal, the law may not recognise any author or owner of the work.

## Issue 1: Employees

40.   As indicated above, one common exception under both the 1956 Act and 1988 Act to the rule that the author is the first owner of the copyright is where the author is an employee.

*General rule*

41.   Section 4(4) of the 1956 Act, relating to  pre-1 August 1989 copyright provides that:

> *Where . . .  a work is made in the course of the author's employment by another person under a contract of service or apprenticeship, that other person shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act.*[1]

42.   Contract of service is an employment contract. An apprentice contract is where an apprentice is bound to his employer for the purposes of learning a trade or calling (The Modern Law of Copyright and Designs, 4th edition, 2011, 22.32).

43.   Section 11(2) of the CDPA 1988 provides that:

> *Where a literary, dramatic, musical or artistic work, or a film, is made by an employee in the course of his employment, his employer is the first owner of any copyright in the work subject to any agreement to the contrary.*

---

[1] There is an exception for journalist employees concerning certain exploitation rights with respect to copyright in newspapers, periodicals or magazines and the like for works created between 1956 and 1989, although with respect to publication rights, the general rule applies (1956 Act, s4(2)).

44. The position under the CDPA 1988 reflects the views of the Whitford Committee tasked to consider the Law and Copyright and Design. It found in its 1977 report that: "*As a matter of principle, if a person is employed to do a job of work and paid for his services according to the nature of those services, the product of his labour should, subject to any agreement to the contrary, belong to his employer*" (Cmnd 6732).

*Meaning of the term "employee"*

45. English law distinguishes between two types of contracts, a contract of service (employment contract) and a contract for services (service contract) i.e., between an employee and an independent contractor.

46. The test to distinguish these types of contracts that has found most favour in an English court is whether the work done is or is not integral to the business of the entity to which service is being provided. The test is set out in *Stevenson, Jordan and Harrison v MacDonald and Evans* (1952) 69 RPC, a case before the House of Lords, the highest English court (now replaced by the Supreme Court), where Lord Denning MR stated:

> *One feature which seems to run through the instances is that, under a contract for service [i.e., an employment contract] a man is employed as part of the business, and his work is done as an integral part of the business; whereas under a contract for services, his work, although done for the business, is not integrated into it, but is only accessory to it.*

47. The test was later approved and clarified by Cooke J in the Court of Appeal (i.e., second highest court) case *Market Investigations Ltd v Minister of Social Security* [1969] 2 QB 173, 184 and 188. He stated:

18

*The observations of Lord Wright, of Denning L.J. and of the judges of the Supreme Court suggest that the fundamental test to be applied is this: "Is the person who has engaged himself to perform these services performing them as a person in business on his own account?" If the answer to that question is "yes," then the contract is a contract for services. If the answer is "no," then the contract is a contract of service [i.e., an employment contract]. No exhaustive list has been compiled and perhaps no exhaustive list can be compiled of the considerations which are relevant in determining that question, nor can strict rules be laid down as to the relative weight which the various considerations should carry in particular cases. <u>The most that can be said is that control will no doubt always have to be considered, although it can no longer be regarded as the sole determining factor; and that factors which may be of importance are such matters as whether the man performing the services provides his own equipment, whether he hires his own helpers, what degree of financial risk he takes, what degree of responsibility for investment and management he has, and whether and how far he has an opportunity of profiting from sound management in the performance of his task.</u>*

*The application of the general test may be easier in a case where the person who engages himself to perform the services does so in the course of an already established business of his own; but this factor is not decisive, and a person who engages himself to perform services for another may well be an independent contractor even though he has not entered into the contract in the course of an existing business carried on by him.*(emphasis added)

48.   The above test has been approved in numerous subsequent cases including the High Court, Chancery Division, case of *Beloff v Pressdram Limited and Another* [1973] F.S.R. 33. Here, a lobby correspondent for the Observer newspaper sued the publisher of Private Eye, a magazine, for publishing an internal Observer memorandum written by her. She claimed to be entitled to the copyright on the basis that she was employed as an independent contractor or as an assignment from the editor. The Defendant denied that she was an employee. The Court reviewed the history of Ms Beloff's role with the Observer. It found that she was integrated into the business and was therefore an employee.

49.   In reaching his decision, Mr Justice Ungoed-Thomas noted that: "*the greater the skill required for an employee's work, the less significant is control in determining whether the employee is under a contract of service. Control is just one of many factors whose influence varies according to circumstances. In such highly skilled work as that of the plaintiff it seems of no substantial significance.*" In other words, if the worker is skilled he/she may still be considered to be an employee if his/her work is integral to the business, even though the employer does not exercise over him/her a particular degree of control.

50.   After the citation above, Mr Justice Ungoed-Thomas went on to say:

> *The test which emerges from the authorities seems to me, as Lord Denning said, whether on the one hand the employee is employed as part of the business and his work is an integral part of the business, or whether his work is not integrated into the business but is only accessory to it, or, as Cooke, J expressed it, the work is done by him in business on his own account.*

51.     Applying this principle to the facts in the case, he said:

> *I come to other recognised indications of contract of service, in addition to her substantial regular salary for her full-time job and her holidays. Apart from an electric typewriter, which the plaintiff has at home, the plaintiff does not provide any equipment of her own which she uses for her work. All the Observer's resources are available to her to carry out her job. She has an office in the Observer building, and a secretary who is provided by the Observer. She does not use her own capital for the job, nor is her remuneration affected by the financial success of otherwise of the Observer. In addition to P.A.Y.E. deductions, deduction for the pension scheme to which she belongs is also made by the Observer from her salary. All these indications are in favour of her contract being a contract of service.*

52.     The English Court of Appeal appears to have expanded the factors that a court can take into account in its analysis. So, in the tax case of *Hall (Inspector of Taxes) v Lorimer* [1994] 1 W.L.R. 209, Nolan LJ remarked that: "*The extent to which the individual is dependent upon or independent of a particular paymaster for the financial exploitation of his talents may well be significant*".

53.     It is evident from the above authorities that an English court will look beyond the narrow contractual arrangement (including how taxes are paid or what remuneration or other benefits are received) when determining the precise status of a service provider to consider the nature and context of the services being provided, including most importantly how integral the services are to the business. Under English law, therefore, an ostensible independent contractor/freelancer, therefore, may well be found to be an

employee as a matter of law, including for the purposes of determining copyright ownership.

*Meaning of the term "course of employment"*

54. A further issue that sometimes falls to be determined when considering copyright in a service contract context is whether the copyrighted work is made "in the course of employment", such that the employer owns the copyright.

55. The term course of employment has been interpreted as being comparable with the term "*within the scope of his duties*", and the distinction is often made between a case where an employee made the work as part of his duties as an employee and where the making was merely accessory to it and not part of it (*Stephenson, Jordan and Harrison v MacDonald and Evans* (1952) 69 RPC 10). The scope of employment can also change either explicitly or by implication (*Noah v Shuba* [1991] F.S.R. 14 Ch D; *King v The South African Weather Service* [2009] F.S.R. 6).

56. Further, commentaries confirm that:

> *The fact that work is done outside normal working hours does not necessarily mean that the work is not done in the course of employment. Indeed for many employees today there is no clear demarcation of the hours of work. It is suggested that if the work is within the scope of employment and done for the benefit of the employer, it will have been done in the course of employment.* (Copinger, 5-20)

57. It follows that an employee of a games company, employed as an illustrator, but who on request undertakes work to assist in developing a model even outside working hours,

22

will be acting in the course of his/her employment, if the work is being done for the benefit of the employer.

58.   Each case will be determined on its own facts. However, by way of illustration:

(a)   In *Byrne v Statist Co [1914]* 1 KB 622, an editor who made a translation, on request, in his own time at home, was found not to have done so in the course of his employment;

(b)    In *Stephenson, Jordan and Harrison v MacDonald and Evans* (1952) 69 RPC 10, the writing of a book by a management consultant during work hours was done within his employment, but lectures carried out for which he was not paid was not;

(c)   In *King v The South African Weather Service* [2009] F.S.R. 6, a South African Supreme Court case, King was a meteorologist who developed a computer programme eventually used by the defendant. He had initially begun his computing work after hours, but increasingly worked on it during work hours. It was found to have been carried out in the course of his employment.

59.   In a situation, therefore, where an employee provides a broad range of services to his employer, mostly in work hours or with the co-operation of his employer, and is paid for such work he/she is likely to have been found to carry out the same in the course of his/her employment.

**Issue 2: Joint authors/owners**

60.     As stated above, where two authors collaborate on a work and there is no distinct authorship, ownership will be joint. The possibility of joint ownership is recognised by both the 1956 Act and the CDPA 1988.

61.     Joint ownership is dealt with at schedule 3 of the 1956 Act. Paragraph 6 reads:

> *Subject to the preceding provisions of this Schedule, any reference in this Act to the author of a work shall (unless it is otherwise expressly provided) be construed, in relation to a work of joint authorship, as a reference to all authors of a work.*

62.     Section 10(1)-(3) of the CDPA 1988 similarly provides that:

> *(1)In this Part a "work of joint authorship" means a work produced by the collaboration of two or more authors in which the contribution of each author is not distinct from that of the other author or authors.*
>
> *...*
>
> *(3) References in this Part to the author of a work shall, except as otherwise provided, be construed in relation to a work of joint authorship as references to all the authors of the work.*

63.     This means that, regardless of whether a work falls to be considered under the 1956 Act of CDPA 1988, a joint author may bring proceedings for infringement.

64.     The factors that are required for joint authorship have been clearly set out by Lightman J, with reference to earlier decisions, in the case of *Robin Ray v Classic FM plc* [1998] FSR 62:

*A joint author is accordingly a person (1) who collaborates with another author in the production of a work; (2) who (as an author) provides a significant creative input; and (3) whose contribution is not distinct from that of the other author. He must contribute to the "production" of the work and create something protected by copyright which finds its way into the finished work: see Cala Homes (South) Ltd v. Alfred McAlpine Homes East Ltd [1995] F.S.R. 818 ("Cala"). Copyright exists, not in ideas, but the written expression of ideas. A joint author must participate in the writing and share responsibility for the form of expression in the literary work. He must accordingly do more than contribute ideas to an author: he must be an author (or creator) of the work in question. It is not enough that he thought up the plot of a play or made suggestions for a comic routine to be included (see Tate v. Thomas [1921] 1 Ch. 503); or indeed that he passed on his reminiscences to a ghost writer (see Evans v. E. Hulton & Co. Ltd [1923–8] Macg. Cop. Cas. 51). It is not sufficient that there is established to have been a division of labour between two parties in the project of writing a book if one alone is entirely responsible for the skill and labour of authorship of the book: see Fylde Microsystems Ltd v. Key Radio Systems Ltd, unreported, February 11, 1998, Laddie J.*

*In Cala Laddie J. held that there is no restriction on the way in which a joint author's contribution may be funnelled into the finished work, and in particular that there is no requirement that each of the authors must have exercised penmanship. There is no reason why penmanship should be insisted on any more in case of joint authors than in the case of a sole author, who may dictate his work to a scribe. But in my judgment what is required is something which approximates to penmanship. <u>What is essential is a direct</u>*

*responsibility for what actually appears on the paper. Accordingly in Cala, where a director of Cala provided a very detailed input (including much of the design features) in plans which architects were instructed to prepare and through regular briefing and vetting sessions with the architects ensured that the plans accorded with Cala's "image", he was held to be a joint author with the architects of the plans they prepared. As it appears to me, the architects in that case were in large part acting as "scribes" for the director. In practice such a situation is likely to be exceptional.* (emphasis added)

65. Joint owners own the copyright in the work, under English law, as Tenants in Common (*Acorn Computers v MCS Microcomputer Systems Pty Ltd* (1984) 4 IPR 214). Hence, each has an undivided interest in the property. The effect of this is in terms of exploitation is that no party owner may exercise its rights without permission of the other owners or accounting to them. However, it has long been accepted that under English law that a co-owner may bring an action for infringement against another without the consent or presence of the other co-owners. Any damages, though, are likely to be recoverable only with respect to his/her share (*Acorn Computers v MCS Microcomputer Systems Pty Ltd* (1984) 4 IPR 214); The Modern Law, 22.59).

**Commissioned works**

66. Often a party will retain or commission another to produce a particular work in return for payment. The general position both before and after 1989 is that when a party commissions another to create a work, the first legal owner of the copyright is the person that created the work and not the commissioner, unless it is agreed otherwise in writing.

67. Under the 1956 Act, there is an exception applying prior to 1 August 1989 copyright in photographs, portraits and engravings (and only those types of work) which were created as a result of a commission. Such works are owned by the commissioner and not the creator.

68. This is provided for at s4(3) of the 1956 Act:

> *...where a person commissions the taking of a photograph, or the painting or drawing of a portrait, or the making of an engraving, and pays or agrees to pay for it in money or money's worth, and the work is made in pursuance of that commission, the person who so commissioned the work shall be entitled to any copyright subsisting therein by virtue of this Part of this Act.*

69. The commission though must have been undertaken for money or money's worth that is equivalent goods or services.

70. For a work to be a photograph or portrait they must display the likeness of a person (The Modern Law, 22.42).

71. By s48(1) of the 1956 Act the term "*engraving*" is defined as including an "*etching, lithograph, woodcut, print or similar work, not being a photograph*". There are judicial statements which suggest based on this definition that the term might apply to dies and moulds used in the production of plastic items and even the plastic items themselves (The Modern Law, 22.44; see also 4.23). This may have relevance to artistic works produced in this case, for example moulds for the armies or characters used in the games.

72.    In *Wham-O Manufacturing Co v Lincoln Industries Limited* [1985] RPC 127, the Court of Appeal of New Zealand gave a very wide definition to the term "engraving" finding that it covered the mould for the making of Frisbees (i.e., plastic disks used for throwing). In reaching its decision the Court of Appeal found that:

> *Modern technology for creating reproductions has involved various new processes being devised and we doubt that the making of a "print" can any longer be identified with any one or more particular processes or procedures. There appears currently to be no good reason why an article produced by injection moulding from a mould which is an engraving should not be itself an engraving if it is produced from that mould.*

73.    The approach in *Wham-O* was followed in England by Floyd J in the English High Court in the case of *HiTech Autoparts Ltd v Towergate Two Ltd (No 1)* [2002] FSR 15).

**Issue 3: Equitable or implied assignment**

74.    English law recognises written assignments of copyright (1956 Act 236; CDPA 1988 s90). In addition, apart from the specific statutory provision for engravings and the like under the 1956 Act, English law more generally recognises the possibility of an equitable or implied assignment between the creator of a work and another. One of those situations is where a party commissions a work for payment. In such a situation, an English court will often imply a term into the commissioning agreement for the copyright to be held on trust for the commissioner as the true beneficiary of the same. This would entitle the equitable assignee to assert the copyright as against others.[2]

---

[2] An English court would expect, as a matter of procedure, save in "special cases", for an assignor of an equitable assignment to be named as a party to an action against an alleged infringer. (There is little guidance on

75.   For a term to be implied into any agreement under English law the certain general conditions are usually required to be satisfied.  As shown below, these conditions have been given more specific meaning by cases very similar to the facts here.  The general conditions have been described as follows:

(a)   The term must be reasonable and equitable;

(b)   It must be necessary to give business efficacy to the contract such that no term will be implied if the contract is effective without it;

(c)   It must be so obvious that it goes without saying [3]; and

(d)   It must be capable of clear expression; and

(e)   It must not contradict any express term of the contract.

*(BP Refinery (Westernport) Pty Ltd v The President, Councillors and Ratepayers of the Shire of Hastings* (1978) 52 A.L.J.R. 20 at 26).

76.   Further, where terms are to be implied to fill a lacuna, i.e., there has been no provision made in the contract for the specific situation, the principle is that in deciding on the various alternatives which should constitute the contents of the term to be implied, the

---

what constitutes a "*special case*".)  Even absent a determination that a case is "special", such joinder is something of a formality and can take place at any time prior to Judgment, even after trial, if the facts indicate that an equitable assignment should be found.  The equitable assignor need not actually participate in the proceedings (for example, if he or she cannot be found), but must be named so as to prevent a risk of a second judgment against the defendant.  To protect the defendant, the joinder ensures that any finding is binding on the assignor (*Performing Right Society Ltd v London Theatre of Varieties Ltd* [1924] AC 1, 14).  In 2010, the English Supreme Court confirmed the general position: "*In more modern times it has been held that, although the practice was to join the assignor, the requirement is a procedural one, the absence of which can be cured. The assignor must be joined before a final judgment can be obtained by the assignee, but the action is validly constituted without joinder, so that if the assignee sues without joining the assignor, the action is in time for the purposes of limitation [i.e., time bar]*" (*Roberts (FC) v Gill & Co Solicitors* [2010] UKSC 22).
[3]   The English court explains that this phrase "*is no more than another way of saying that, although the instrument does not expressly say so, that is what a <u>reasonable person</u> would understand it to mean*" (emphasis added) (*Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10, 23-25).

choice must be that which does not exceed what is necessary in the circumstances (House of Lords in *Liverpool City Council v. Irwin* [1977] AC 239).

*Robin Ray v Classic FM plc*

77. One of the most important authorities on this area giving specific meaning to the general conditions described above is the High Court case of *Robin Ray v Classic FM plc* [1998] FSR 620. In *Robin Ray*, the claimant entered into a consultancy agreement with the defendant to advise it on the composition of the classical music repertoire of the radio station Classic FM , to catalogue its music library, and to assist it in assessing the popularity of the specific works. The claimant was aware that the station intended to use an automated music programme selection system.

78. The claimant prepared five documents setting out a detailed categorisation of the classical music repertoire including rating each work's popularity. The defendant produced a database of these documents. The station later wanted to sell the database to foreign radio stations. The claimant objected, but the defendant went ahead.

79. The claimant sued for copyright infringement arguing that since the works had been commissioned he owned the copyright in the work. The defendant argued, among other things, that there had been an implied assignment and so the claimant held the copyright on trust for it.

80. Mr Justice Lightman summarised the matters before him as follows:

> *There has been cited to me a considerable number of authorities where a copyright, brought into existence by a person ("the contractor") pursuant to a contract for services with another ("the client"), has been held to belong in*

*equity to the client. One example is Massine v. de Basil [1936–45] Macg. Cop. Cas. 223. What was at issue in that case was the copyright in the plaintiff's choreography for a ballet intended to form part of the repertoire of the defendant's ballet company. The Court of Appeal held that the contract between the defendant and the plaintiff was that of employer and employee, and accordingly the copyright vested in the defendant as employer. But the Court also held that, even if the contract was not one of employment but for services, it was an implied term of the contract that the plaintiff as contractor would assign the copyright to the defendant as client. The Court emphasised that the ballet was a composite work of which the elements were the music, the story, the choreography or notation of the dancing, the scenery and the costumes, and held that it must necessarily have been intended that the copyright in the whole ballet and each of its component elements should be in the client.*

*The issue in every such case is what the client under the contract has agreed to pay for and whether he has "bought" the copyright. The alternatives in each case are that the client has bought the copyright, some form of copyright licence or nothing at all. It is common ground in this case that by implication the consultancy agreement at the least confers on the defendant a licence to use the copyright material for the purposes of its radio station. The issue is whether the defendant impliedly bought the copyright or a more extensive licence than the limited licence conceded.*

81.     The Judge then went on to summarise the principle of implied terms referred to above. He continued to consider the factors that may lead a court to find an implied term

between a commissioner of a work and an independent contractor/freelancer for an assignment of the copyright from the latter to the former.

> *Circumstances may exist when the necessity for an assignment of copyright may be established. As Mr Howe has submitted, these circumstances are, however, only likely to arise if the client needs in addition to the right to use the copyright works the right to exclude the contractor from using the work and the ability to enforce the copyright against third parties. Examples of when this situation may arise include: (a) where the purpose in commissioning the work is for the client to multiply and sell copies on the market for which the work was created free from the sale of copies in competition with the client by the contractor or third parties; (b) where the contractor creates a work which is derivative from a pre-existing work of the client, e.g. when a draughtsman is engaged to turn designs of an article in sketch form by the client into formal manufacturing drawings, and the draughtsman could not use the drawings himself without infringing the underlying rights of the client: (c) where the contractor is engaged as part of a team with employees of the client to produce a composite or joint work and he is unable, or cannot have been intended to be able, to exploit for his own benefit the joint work or indeed any distinct contribution of his own created in the course of his engagement: see Nichols Advanced Vehicle Systems Inc. v. Rees [1979] R.P.C. 127 at 139 and consider Sofia Bogrich v. Shape Machines, unreported, November 4, 1994, Pat Ct and in particular page 15 of the transcript of the judgment of Aldous J. In each case it is necessary to consider the price paid, the impact on the contractor of assignment of copyright and whether it can sensibly have*

> *been intended that the contractor should retain any copyright as a separate item of property.*

82. It follows that for any court the important factors when considering an equitable assignment are:

    (a)  The purpose for commissioning the work;

    (b)  Whether the work is derivative of another work; and

    (c)  Whether the contractor is engaged as part of a team with employees of the client to produce a composite or joint work.

83. These factors are referred to as "examples" in *Robin Ray* and are therefore non-exhaustive.

*R Griggs Group Ltd v Evans*

84. In *R Griggs Group Ltd v Evans* (No.1) [2005] F.S.R. 31, the English Court of Appeal considered a case where Griggs commissioned a design for the famous "Doc Martens" footwear from the second defendant, a rival manufacturer. The task was delegated to first defendant. The Judge in the lower court, applied the principle in *Robin Ray*, and found that in the circumstances copyright beneficially belonged to the claimant and that it could call for legal title to it.

85. In reaching his decision, the Judge found as follows:

> *It seems to me that when a free-lance designer is commissioned to create a logo for a client, the designer will have an uphill task if he wishes to contend that he is free to assign the copyright to a competitor. This is because, in order to give*

*business efficacy to the contract, it will rarely be enough to imply a term that the client shall enjoy a mere licence to use the logo, and nothing more. In most cases it will be obvious, it will 'go without saying', that the client will need further rights. He will surely need some right to prevent others from reproducing the logo.*

86.    The defendant appealed the decision, and this was upheld by the Court of Appeal. Robin LJ, who provided the leading Judgment, confirmed the principles set out in *Robin Ray* referring to Mr Justice Lightman's summary of the law as "*masterful*" (paragraph 14). He went on to uphold the Judge's decision stating that: "*Indeed it seems to me that, in the ordinary way, a logo is a paradigm case falling within principle in Lightman J's formulation.*" (paragraph 37).

*Lucasfilms Ltd v Ainsworth*

87.    Subsequent cases have followed a fairly consistent approach. In *Lucasfilms Ltd v Ainsworth* [2009] FSR 2, the claimant company was involved in the production of the Starwars films released in 1977 and the subsequent licensing of the IP and merchandising associated with the film. Michael Bloch QC acted for the claimant in this case, which progressed from the High Court, to the Court of Appeal, and then to the Supreme Court.

88.    The first defendant had made the armour for the film's characters in vacuum moulded plastic including the white helmet for the imperial stormtroopers. In 2004, his company which had retained the original moulds began to sell versions of the armour to members of the public. The claimant brought proceedings. The defendant claimed that it owned the copyright in the moulds.

89.     The High Court found that there was no copyright in the film props under English law, but also said that the first defendant must have known that the claimant expected full exploitation rights in the future and that he could not realistically have expected to have retained any for himself. It was relevant that the claimant had provided clear specifications to the defendant. The Judge also rejected the argument that it was only necessary to imply a licence.

90.     The most relevant passages of the Judgment are as follows:

> 185...Mr Ainsworth was working to render into 3D form the copyright designs of others. _He could not himself make further copies without infringing that copyright_. If he had produced the drawing exactly, then he would not have produced an original work, and could not have claimed copyright. He did not do that, and contributed his own bits and pieces, but in doing so he was getting as close as he conveniently could, bearing in mind technical requirements, to the client's design. _He must have known that the client would expect full exploitation rights in the future for the purposes of its dramatic offering and cannot realistically have expected to have retained any for himself_. If the officious bystander had asked the required question (suggesting that Lucas would have all the rights and that Mr Ainsworth would not be entitled to exploit them without Lucas's licence) then the required testy suppression would have been forthcoming. I think that _this is a classic case for saying that there is an implication that the commissioner would have the copyright in the helmet (if any)_.
>
> ...

*...I consider that Mr Wilson is right in applying the test of necessity, but wrong in his suggested result. Lucas was not commissioning something relatively everyday. Even if the licensing prospects could not have been foreseen, the whole appearance and "feel" of the film was central to its operation, and it cannot have been the intention of either party that there could be parallel exploitation of the props so that, for example, Mr Ainsworth could make more and sell them to other film-makers. The only thing that makes sense is an obligation to assign copyright.* (emphasis added)

91. The size of the fee paid to the defendant was also considered, but rejected as a relevant factor in the circumstances. The defendant appealed. The Court of Appeal [2010] FSR 10 at 196 to 208 upheld the analysis of the lower court. Its conclusion at paragraph 207 was as follows:

*Thus we agree with the judge that the situation in this case was in line with the circumstances discussed by Lightman J. and ruled on by this court in R Griggs Group Ltd v Evans (No.1) [2005] F.S.R. 31 . Indeed it falls within each of the circumstances (a), (b) and (c) discussed by Lightman J. in his [7] and may thus be said to be an a fortiori case. It makes no sense to consider that copyright interests should be divided between "team Lucas", if we can express it that way, and Mr Ainsworth, who in truth became part of the team when he accepted the responsibility of working on the designs provided to him in order to manufacture the finished article. That would only have been an uncommercial recipe for mutually inconsistent rights: Lucasfilm could not order more props without running the risk that Mr Ainsworth would charge a blackmailing price; it could not exploit any licensing opportunities without similar dangers; and Mr*

> *Ainsworth of course could do nothing with any copyright interests that might have remained with him without the complete co-operation of Lucasfilm.*

92.     The defendant appealed to the Supreme Court, but no permission to appeal on this point was granted. This would have been a necessary pre-requisite for the case continuing on this issue (see *Lucasfilm Ltd and others v Ainsworth and another* [2012] 1 AC 208, paragraph 7).

*Clearsprings Management Ltd v Businesslinx Ltd*

93.     A case that went the other way is *Clearsprings Management Ltd v Businesslinx Ltd* [2006] F.S.R. 3. In this case, the claimant commissioned software to be used in its own web-based database system, and later sought to prevent the defendant from using it on the basis that the software had been impliedly assigned to it.

94.     Floyd J found against the claimant after applying the test set out in *Robin Ray*. Unlike the cases above, there was nothing to indicate that the parties by necessity intended an assignment. In fact the opposite was the case. The claimant provided information to the defendant on its business for the purposes of the defendant producing the product, but the claimant was also aware that the defendant would borrow from pre-existing software to produce the product.

95.     There was therefore no collaboration or derivative work as such, but instead an understanding that the defendant may wish to utilise the software for future clients. The only implication that was necessary, therefore, was an implied licence in favour of the claimant to use the software for business purposes and a restriction on the defendant on making use of claimant's operating procedures for purposes other than the claimant (see paragraphs 36 and 37 of the Judgment).

*Other cases*

96.  Other cases highlight the distinction between situations where assignments need to be implied because no other situation is envisaged and those where some kind of licence would be sufficient (see *Nichols Advanced Vehicle System Inc v Rees* [1979] RPC 127 at 139- consultant to car industry where an assignment was implied; *Warner v Gestener* [1988] EIPR 89. Logo design where an assignment was implied; *Pasterfield v Denham* [1999] FSR 168 commission for production of promotional leaflet to promote tourist attraction where assignment was implied; *Massine v de Basil* [1936-45] Macg Cop Cas 223- choreographer for Russian Ballet, Covent Garden, London, where assignment was implied; and *Saphena Computing Ltd v Allied Collection Agencies Ltd* [1995] FSR 616 at 6340 commissioned for in-line software, licence found but no assignment).

97.  From an analysis of the relevant cases, it is evident that English courts have repeatedly implied assignments into agreements where businesses have commissioned items that form part of their business, where there is some collaboration and which they intend to promote as part of their business. However, the principle will not apply where items have been commissioned purely for internal use, and are provided by those who intend to sell items with similar components elsewhere (see also The Modern Law of Copyright, 22.78).

## APPLICATION TO THE FACTS

**Independent contractors/freelancers as employees**

98.	In our view English law supports a finding that at least some of independent contractors/freelancers working for the Plaintiff were in fact employees, as a matter of law. This most obviously applies to individuals who were in fact employees while also contributing additional efforts, but would also apply to others who were nominally freelancers but who, under the application of the general factors outlined above, would be acting in the capacity of employees.

99.	This would mean that the copyright in work produced by them is owned by the Plaintiff whether created before or after 1 August 1989, i.e., whether the 1956 Act of the CDPA 1988 applies. Copyright in a work published in a newspaper, magazine or similar periodical owned by the Plaintiff created prior to 1 August 1989 created by an employee would only belong to the Plaintiff in so far as it relates to publication of that work (and not exploitation) (1956 Act, s4(2)), unless there has been an actual or implied assignment of the exploitation rights, or the work is one of joint ownership.

100.	Some of the factors relevant under English law to determining the issue of employment are:

(a)	Whether the work was integral or subsidiary to the business of the Plaintiff. The cases confirm that this is a crucial factor;

(b)	The scope of control that the Plaintiff had over the workers. The greater the level of control, the more likely it is that a court would view the workers as employees;

(c)	The extent to which the workers benefitted from the Plaintiff's management and infrastructure;

(d)     Whether the workers used their own equipment and/or staff/assistants to perform the work;

(e)     The regularity and mechanics of remuneration;

(f)     The level of financial risk undertaken by the workers; and

(g)     Whether the workers were working for the Plaintiff exclusively, i.e., whether they had more than one paymaster.

101.    Factors suggested by the evidence that are relevant under English law in determining whether independent contractors/freelancers were employees include the following:

(a)     The centrality of the projects worked on by the independent contractors to the Plaintiff's business. The independent contractors worked on illustrating characters and painting character models, and literature, all of which appear to be integral to the Plaintiff's business. There is also evidence that freelancers saw themselves as being integral to the business (Blanche 18/8-20). The fact that independent contractors worked closely with the Plaintiff's employees is also significant in this context (Blanche/18/14-19; Blanche/31-33);

(b)     There appears to have been a significant level of control exercised over the freelancers by the Plaintiff. In terms of literature, there were briefing meetings and control over themes of the magazine (Jones/98-99), and control over writers of fictional games including making sure the storyline fitted (Jones 100-101). Mr Blanche's testimony explaining how he oversaw and managed the work of freelance artists, including by defining the parameters of their work, and using tracing paper to alter characters to fit the Plaintiff's backgrounds or other

40

requirements is also significant in this context (Blanche/134/25 to Blanche/135/19).

(c)    Independent contractors, such as John Blanche, who (before the Plaintiff created Warhammer 40,000) moved between employed and freelance status (Blanche/16/6-25) and many of the independent contractors for example who worked on Rogue Trader were employed by the Plaintiff in another capacity (Blanche/46/1-8; Blanche/66/11-16); and

(d)    In the case of John Blanche, and therefore perhaps others, work, and therefore presumably remuneration, seems to have been regular (Blanche/18/8-20).

**Joint ownership**

102.    We understand that none of the individual contractors/freelancers who contributed to the works in issue created their illustrations independently, and that close collaboration was the norm, with the Plaintiff employees contributing their skill, creativity, guidance and control. Under English law, such illustrations, where there is no distinct authorship, would constitute joint works.

103.    The effect of this is that the owners hold such works as tenants in common, subject to statutory principles applying to employees or equitable assignment. For example, if an illustration work was created by an employee and true independent contractor, the copyright would be held by the Plaintiff as employer of the employee and the contractors in equal measure, and each could bring an action against an infringer under English law.

104.    As stated above, for there to be joint ownership, there has to be:

41

(a)    Collaboration with another author in the production of a work;

(b)    Significant creative input; and

(c)    Distinct contribution is not distinct from that of the other author.

105.   The evidence in the depositions points towards a high level of collaboration with respect to writing projects, character development and illustrations in particular (Blanche 31-33). A court would have to consider each item and the relative contribution of those involved in its creation to determine whether each has made a significant creative input that is distinct from the other.

106.   In addition to there being joint ownership, it also seems likely to me that under English law there are instances where the freelancer's contribution was not sufficiently creative to establish any ownership by the freelancer. One example of this is where a painter merely paints an illustration with reference to colour references provided to him by another. There is a reference to this type of input in the evidence (Blanche/34-35).

**Equitable assignment**

107.   In view of the case law and commentaries and based on the materials which we have seen, we are of the view under English law the facts are consistent with an equitable assignment from the independent contractors/freelancers to the Plaintiff in this case. We have not been advised of any facts suggesting otherwise.

108.   Our reasons for this opinion are as follows:

(a)    The use of the works appears to be crucial to the Plaintiff's business not only in selling them in different forms but using them to develop further products. It is

difficult to imagine how the business could have been intended to operate if the intention was for copyright to be shared. Indeed, Mr Blanche testified that: "*If an artist paints a picture of a 40K image, he cannot go off and sell that as a magazine cover for somewhere, because it is a Games Workshop image. You are commissioning the image and the artist retained the actual hard copy of the picture but not the rights to publish the picture, wherever and whenever he wanted*" (Blanche/138/8-17). We conclude, therefore, that this appears to be a case where the intention was for the commissioner to be the only person entitled to exploit the works by making copies and enforce the copyright against third parties to protect its business;

(b)   We understand that all of the freelance works were created in collaboration, with the Plaintiff's employees, and that no freelance work was therefore created truly independently (Blanche/18/14-19; Blanche/31-33; Blanche/46/1-8; Blanche/47/5-15; Blanche 55/16-19);

(c)   The Plaintiff appears to have kept close control over those freelancers with which it worked and the work they produced. For example, Mr Jones testified with respect to the Warhammer Monthly that it had to "*meet the directions*" of John Blanche and Allan Merrett (Jones/98-99). He also described the creative process with respect to Warhammer 40,000 where explorations were carried out with freelancers to*: "...either accomplish a specific goal that we have or to explore further a specific element of the universe. So we won't just say to a freelancer: "Hey you are great. I have read some of your novels. Why don't you just go off and write a Warhammer 40,000 novel". We would never do that.(Jones/100-101);*

43

(d)     The copyright in issue appears to be only in derivative works, where the Plaintiff has provided ideas, concepts, sketches, or plans (Blanche/16/16-25; Blanche 34-35; Blanche/38/3-16);

(e)     It seems to have been the Plaintiff's practice, when contracts were entered into with independent contractors/freelancer and third parties licencees, to include an assignment of IP rights to it. We note, for example, the 1994 contract between John Sibbick and the Plaintiff which provides at paragraph 1 that: "*In consideration of the sum of £1,000 now paid by the Assignee to the Assignor (the receipt of which is now acknowledged), the Assignor as beneficial owner hereby assigns to the Assignee ALL property right title and interest throughout the world in the Work including all statutory and common law rights appertaining to it and the right to sue for past infringement TO HOLD the same unto the Assignee free from encumbrances absolutely during the full period of copyright including all renewals, reversions and extensions thereof*";

(f)     We also note paragraph 3.1 of Mr Abnett's copyright agreement with the Plaintiff, and Section 9 of the Intellectual Property Licence between Games Workshop Limited and THQ Inc of 1 January 2007, which provide for assignment of IP to the Plaintiff;

(g)     Our understanding is that the Plaintiff's general practice has been to obtain confirmatory assignments but that it has simply been unable to locate a small number of these agreements. This is consistent with our other conclusions regarding the parties' intent; and

(h)    Our understanding that there has been no legal challenge by any independent contractor/freelancer concerning the use of any copyright by the Plaintiff during the extensive relevant period since 1987, which, again, is consistent with all of the above facts and governing principles of law.

109.  The facts in this case are also far more closely aligned to the facts in *Lucasfilms Ltd v Ainsworth,* and even *Nichols Advanced Vehicle System Inc v Rees*, *Warner v Gestener, Pasterfield v Denham,* and *Massine v de Basil* where the copyright was integral to how business makes profits and an assignment of copyright was implied than cases, such as *Clearsprings Management Ltd v Businesslinx Ltd* (business software case), where it was not.

110.  It follows from the above that based on the general circumstances and deposition evidence it is unlikely to have sensibly been intended that the author should retain any copyright as a separate item of property.

111.  Even if an English court did decide that there was no equitable assignment in the circumstances (which we do not think would be the case), it would in our view not hesitate to find that freelancers had granted an exclusive licence to the Plaintiff which would, as explained above, still give it standing in an English court to bring infringement proceedings.

**STATEMENT OF TRUTH**

112.  We confirm that we have made clear which facts and matters in this report are within our own knowledge and which are not. Those that are within our own knowledge we confirm to be true. The opinions we have expressed represent our true and complete professional opinions on the matters to which they refer.

113. We reserve the right to supplement this report, as appropriate, to the extent that additional facts come to light.

Signed:

Dated:

1 May 2012

**Michael Bloch QC**
**Dr Harris Bor**

**Wilberforce Chambers**
**Lincoln's Inn**
**8 New Square**
**London**
**England**
**WC2A 3QP**

**1 May 2012**

# Exhibit 9

Civil Action No. 10-cv-08103

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GAMES WORKSHOP LIMITED

Plaintiff

v.

CHAPTERHOUSE STUDIOS LLC

and

JON PAULSON d/b/a PAULSON GAMES

Defendants

EXPERT REPORT

OF

PROFESSOR LIONEL BENTLY

INSTRUCTIONS

1.     I have been instructed by Winston and Strawn LLP on behalf of Chapterhouse
Studios LLC, the Defendant in this action, to provide expert evidence in these
proceedings by way of an expert report to be supported by oral testimony, if

1

required, on English law as it applies to certain aspects of copyright ownership in artistic works.

2.    In particular, I have been asked to provide an assessment on the position in English law relating to the following matters:

        (a) The subsistence of copyright

        (b) The ownership of copyright in the employment context;

        (c) The ownership of copyright when works have been jointly created; and

        (d) Other relevant issues of ownership and transfer including implied or equitable assignment.

3.    I have also been asked to highlight differences between my view of the position in English law and that of the Plaintiff's Expert Report.

4.    I have also been asked my opinion as to how these principles are likely to apply to issues in this case based on the materials with which I have been provided.

5.    Annexed to this expert report is an exhibit marked **"LB1"** containing authorities which I refer to in this report and which are not contained in the Plaintiff's Expert Report.

## QUALIFICATIONS AND EXPERIENCE

6.    I am currently the Herchel Smith Professor of Intellectual Property Law in the Faculty of Law at the University of Cambridge in England. I am also the Director of Centre of Intellectual Property and Information Law at the University of Cambridge, England. I reside at 18 Romsey Road, Cambridge, CB1 3DD.

7.    I am an expert in the field of intellectual property law, which I have been teaching since 1988. I have taught intellectual property law at various institutions of higher learning, including University of Cambridge (2004-),

King's College, London (1991-2004) and Keele University (1988-1990). I have held visiting posts at Columbia University, National University of Singapore and Murdoch University (in Western Australia).

8.   I have written extensively about intellectual property law of the United Kingdom, including copyright. In particular, I have authored or co-authored 4 books related to intellectual property (*The Making of Modern Intellectual Property Law: the British Experience*; *Intellectual Property Law* (3 editions); *Between a Rock and a Hard Place – The Problems Facing Freelance Creators in the UK Media Marketplace*; and *Gurry on Confidence*). I have edited 7 books related to intellectual property (including 3 specifically on copyright), and have contributed to numerous edited collections. I have written numerous publications on intellectual property law in leading journals around the world, including the *Journal of the Copyright Society of the USA, Modern Law Review, Columbia Journal of Law and the Arts, Chicago-Kent Law Review, Berkeley Technology Law Journal, Loyola (LA) Law Review, King's College Law Journal, Journal of Business Law, European Intellectual Property Review, Intellectual Property Quarterly*, the *Yearbook of European Law*, and the *Australian Intellectual Property Journal*.

9.   My textbook (co-authored with Brad Sherman) on *Intellectual Property Law* (Oxford University Press, 2001) (3d ed. 2008) is a leading textbook on intellectual property published by Oxford University Press. The textbook covers copyright, patents, trademarks, and designs. Since 1998, I have provided annual submissions on United Kingdom copyright law to one of the leading international copyright treatises, *International Copyright: Law and Practice* (Paul Geller ed.).

10.  I am also an English barrister specialising in intellectual property law. As such, I am attached to a set of chambers, 11 South Square, Gray's Inn, London.

11.  I have given expert evidence on British law twice previously in the United States:

3

(i) in the case of *Golan v. Gonzales* [2005] 2005 WL 914754 (D.Colo.), 74 U.S.P.Q.2d 1808 (United States District Court, District of Colorado); *Golan v. Ashcroft*, Civil Action No. 01-B-1854 (2009) (United States District Court, District of Colorado) (Constitutional challenge to U.S. provisions on restoration of lapsed copyrights, which ultimately was considered by the Supreme Court, sub. nom. *Golan v. Holder* (18 Jan 2012))

and

(ii) in *Explorologist Ltd v. Brian Sapient* (United States, Eastern District of Pennsylvania), Civ Ac/ No 2: 07-cv01848-LP (2008). This case settled.

12.   A more detailed curriculum vitae/resume can be found attached to this report.

13.   I am not being compensated for this report which I am giving pro bono. I expected to be compensated for any time spent testifying in deposition or at trial. My normal charge out rate is £300 plus VAT per hour.

**EXPERT'S DECLARATION**

14.   I confirm that I understand that my duty in providing this expert evidence is to the Court, and that my duty as an expert witness overrides my duty to those instructing me, that I have understood this duty and complied with it in giving my evidence impartially and objectively and that I will continue to comply with that duty. I have never previously acted for any of the parties to these proceedings.

**MATERIALS CONSIDERED**

15.   In producing this report, I have been provided with, and considered, the following materials:
(a) The Second Amended Complaint filed on 19 January 2012;
(b) The Second Amended Answer filed on 6 February 2012;
(c) The Transcript of the Deposition of Jes Goodwin of 7 March 2012;

4

(d) The Transcript of the Deposition of John Blanche of 2 April 2012;

(e) The Transcript of the Deposition of Andrew Jones of 3 April 2012;

(f) Games Workshops' Further Supplemental Response to Defendant's Interrogatory No. 22 of 3 May 2012

(g) Plaintiff's Amended Responses to Defendant's First Set of Interrogatories of June 15, 2011

(h) Exhibit A to Games Workshop Ltd.'s Answer to Interrogatory No. 1

(i) A 'commissioning form' between Dan Abnett and Black Library Novels relating to the Novel, *Brothers of the Snake*, of 17 July 2004

(j) An 'commissioning form' between Ben Counter and Black Library Novels relating to the Novel, *Souldrinker*, of 8 March 2002

(k) A 'copyright agreement' between Dan Abnett and Games Workshop of 11 December 1996

(l) An 'assignment of copyright' by John Sibbick to Games Workshop Ltd from 1994

(m) A 'confirmatory assignment' of rights from Adam Troke to Games workshop of 2012

(n) A 'copyright agreement' between Ben Counter and Games Workshop

(o) The Expert Report of Michael Bloch QC and Dr Harris Bor of 1 May 2012.

**EXECUTIVE SUMMARY**

16.    In summary, my opinion is:

(a) As a preliminary matter, the Court must conduct an analysis of each and every piece of subject matter in which the Plaintiff claims protection in order to determine whether each one is protected under UK law. In particular the Court will need to determine:

(i) whether any of the miniatures constitute protectable sculptures;

(ii) whether the drawings, paintings or miniatures that are regarded as sculptures in issue are original. In determining this, the Court will need to differentiate between works created before and after 22 December 2002. With

5

respect to those created after that date, the relevant threshold is whether the work is an 'intellectual creation' bearing the personal touch or stamp of its creator.

(b) As to ownership of any works that are protected by copyright, English law recognises that an employer can be the first owner of copyright in works created by an employee in the course of employment.

(i) The question of whether someone is an employee, as opposed to a freelancer, is a complex question requiring a careful analysis of the detailed relationship between the parties. This analysis is multi-factorial, and would take account of the level of control in the relationship, who provided the materials, where the work took place, the tax and pension arrangements as well as how the parties described the relationship.

(ii) If the creator of a work was an employee, it is then necessary to determine whether the work was made in the course of the employee's employment. The test is whether the making of the work fell within the normal duties of the employee, those duties being determined from the contract (understood in the context of everyday realities). Where the scope of the duties are unclear, inferences can be made from what the parties said, as well as when and where the work was created.

(iii) However, where a work was created by an employee of a journal prior to 1 August 1989 for the purpose of publication in that journal, copyright belongs to the employee (though the journal may publish the work).

(c) English law recognises joint authorship where a work has been created as a collaboration, each author has made an original and significant or substantial contribution towards the expressive form of the work; and the contributions of each author are not, in the final form of the work, distinct. While it is possible for there to be joint authorship between a freelancer and their client, whether there is such joint authorship is a question of fact requiring a close analysis of the specific contributions and relationship. Merely providing instructions or ideas or starting materials does not amount to joint authorship.

(d)    With one statutory exception, English law does not regard a person who commissions another to make a work as entitled to copyright in the work. That exception relates to commissioned paintings, portraits and engravings created prior to 1 August 1989.

(e)    However, exceptionally, the courts will find that a creator who has been commissioned to create work did so in circumstances where there was an implied undertaking to assign the copyright (making the commissioner the "equitable" assignee). Whether such an implied undertaking exists is to be determined by references to the circumstances when the contract was entered into, in particular the expectations of the parties. The case-law indicates that where some undertaking is to be implied, the court should impose the minimum necessary to meet the parties's expectations.

(f)    Based on the factual circumstances of the case as set out in the documents that I have seen

(1) There must be very serious doubts about whether any of the miniatures constitute protectable sculptures. Even if the works are intended to have visual appeal, they are intended primarily as the pieces in games. They would not be thought of, in common parlance, as 'sculptures.'

(2) It is impossible to say whether particular persons who are described as 'freelancers' may in fact be regarded in law as employees (though there is nothing in the documentation to suggest that the labels used were intended to obscure the legal realities). Only a close factual analysis of individual cases could justify a conclusion that a particular person was an employee.

(3) It is impossible to say in the abstract that the works were or were not created in the "course of employment". Certainly, in a number of situations it appears that Games Workshop employees contributed art work *outside* the course of employment.

(4) It is impossible to say, without examining particular examples of works, whether those works were created before 1 August 1989 for the purpose of publication in a magazine (such as *White Dwarf*);

(5) It is impossible to conclude at this stage that the works created by persons who were freelancers or employees who were working outside the course of employment, were co-authored by employees of the Plaintiff. Assessment of joint authorship is a factual inquiry, and requires that the parties be found to have collaborated and that each has contributed to the expressive form of the work. Merely providing instructions, ideas, material or templates would not make a person a joint author: that person must make a substantial and original contribution to the final expressive form of the work.

(6) It is impossible to generalise about whether the copyright in the works created by persons who were freelancers or employees while working outside the course of employment might have been subject to implied assignment to the Plaintiff. The inquiry involves a very close analysis of the facts, intentions and understandings of the parties involved in making each individual work.

**ANALYSIS OF THE RELEVANT "ENGLISH" LAW**

17.    The law of copyright of the United Kingdom is contained in the Copyright, Designs and Patents Act 1988 (hereafter, "C.D.P.A."). This Act came into force on 1 August 1989.

18.    The Act replaced the Copyright Act 1956. The transitional rules are contained in Schedule 1. The most important of these are that

(i) the subsistence of copyright in a work created before the 1988 Act went into effect depends on the position immediately before that date: C.D.P.A., Sched. 1, para. 5(1). Thus, a work in existence prior to July 31, 1989, will be protected under the 1988 Act if and only if it was protected by copyright under the 1956 Act on that date.

(ii) the initial ownership of copyright continues generally to be determined by the law in effect when the materials in question were made: C.D.P.A., Sched. 1, para. 11. So for any works created before August 1, 1989, the rules applicable are those in the Copyright Act 1956.

19.     The C.D.P.A. has been amended on various occasions to give effect to European Directives. These include:

Council Directive 91/250/EEC of 14 May 1991 on the Legal Protection of Computer Programs (codified as Directive 2009/24/EC of the European Parliament and of the Council of 23 April 2009)

Council Directive 92/100/EEC of 19 November 1992 on Rental Right and Lending Right (codified as Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property, which in turn has been amended by Directive 2011/77/EU of the European Parliament and of the Council of 27 September 2011)

Council Directive 93/83/EEC of 27 September 1993 on the coordination of certain rules concerning copyright and rights related to copyright applicable to satellite broadcasting and cable retransmission

Council Directive 93/98/EEC of 29 October 1993 harmonizing the term of protection of copyright and certain related rights (codified as Directive 2006/116/EC of the European Parliament and of the Council of 12 December 2006)

Directive 96/9/EC of the European Parliament and of the Council of 11 March 1996 on the Legal Protection of Databases

Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the Harmonization of Certain aspects of copyright and Related Rights in the Information Society

9

20.     According to Article 10 of Directive 2001/29, that Directive applies

> "in respect of all works and other subject-matter referred to in this Directive which are, on 22 December 2002, protected by the Member States' legislation in the field of copyright and related rights, or which meet the criteria for protection under the provisions of this Directive or the provisions referred to in Article 1(2)."

However, the Directive applies

> "without prejudice to any acts concluded and rights acquired before 22 December 2002."

21.     Although the Court of Justice of the European Union has not yet ruled on the question, it seems that issues of ownership of works created before 22 December 2002 are unaffected by the Directive. With respect to those created thereafter, English law falls to be interpreted to ensure it is compatible with and gives effect to European law.


## A. Subsistence of Copyright


22.     The Plaintiff's Expert Report at no stage broaches the question of subsistence of copyright. However, it is my understanding that the application of United States law is in fact dependent upon prior recognition that copyright subsists under U.K. law. Consequently, it is important to consider whether the material in which the Plaintiff asserts copyright would be protected. That involves two inquiries: first, whether it falls within the list of protectable subject matter; second, whether if the material is of the sort that is protectable in principle, whether it meets the relevant "originality" threshold on which protection is conditioned.

## Subject Matter

23.     The traditional position under UK law is that copyright subsists in a list of subject matter identified by the relevant statute: C.D.P.A., s. 1; Copyright Act 1956. The list is a 'closed list'. So, section 1(1) of the C.D.P.A. states:

(1) Copyright is a property right which subsists in accordance with this Part in the following descriptions of work—

    (a) original literary, dramatic, musical or artistic works,

    (b) sound recordings, films or broadcasts, and

    (c) the typographical arrangement of published editions

24.    UK law thus differs from US law, which operates an open category, "original works of authorship" (and also the laws of most European countries).

25.    The relevant subject matter in these proceedings is original literary, dramatic, musical and artistic works. Copyright Act 1956, s.2 (literary, dramatic, musical); s. 3 (artistic works).

26.    In these proceedings there is little doubt that the novels in which the Plaintiff claims copyright are "literary works."

27.    Artistic works are in turn defined exhaustively. Under section 4 of the C.D.P.A.:

    (1) In this Part "artistic work" means—

        (a) a graphic work, photograph, sculpture or collage, irrespective of artistic quality,

        (b) a work of architecture being a building or a model for a building, or

        (c) a work of artistic craftsmanship.

    (2) In this Part—

    "building" includes any fixed structure, and a part of a building or fixed structure;

    "graphic work" includes—

        (a) any painting, drawing, diagram, map, chart or plan, and

        (b) any engraving, etching, lithograph, woodcut or similar work;

    "photograph" means a recording of light or other radiation on any medium on which an image is produced or from which an image may by any means be produced, and which is not part of a film;

11

"sculpture" includes a cast or model made for purposes of sculpture.

28.     Similarly, section 3 of the Copyright Act 1956 stated:

(1) In this Act "artistic work" means a work of any of the following descriptions, that is to say,—

(a) the following, irrespective of artistic quality, namely paintings, sculptures, drawings, engravings and photographs;

(b) works of architecture, being either buildings or models for buildings;

(c) works of artistic craftsmanship, not falling within either of the preceding paragraphs.

(2) Copyright shall subsist, subject to the provisions of this Act, in every original artistic work which is unpublished, and of which the author was a qualified person at the time when the work was made, or, if the making of the work extended over a period, was a qualified person for a substantial part of that period.

(3) Where an original artistic work has been published, then, subject to the provisions of this Act, copyright shall subsist in the work (or, if copyright in the work subsisted immediately before its first publication, shall continue to subsist) if, but only if,—

(a) the first publication of the work took place in the United Kingdom, or in another country to which this section extends, or

(b) the author of the work was a qualified person at the time when the work was first published, or

(c) the author had died before that time, but was a qualified person immediately before his death.

29.     To be protected by copyright, the illustrations and miniatures on which the Plaintiff relies must thus fall within one of these designations of "artistic work". The illustrations are clearly "graphic works" under the C.D.P.A., being "paintings" or "drawings"; or "artistic works" under section 3(1) of the 1956 Act. More difficulty exists in relation to the miniatures. The key question is whether these constitute "sculptures." In my view it is very doubtful that they would do so.

30.    The question of what amounts to a "sculpture" was addressed most recently by the Supreme Court in *Lucasfilm Ltd v Ainsworth* [2011] UKSC 39, [2012] 1 AC 208, where the Supreme Court recently affirmed the ruling of the High Court and Court of Appeal that a plastic version of a Stormtrooper helmet was not a "sculpture" for the purposes of UK copyright law.

31.    In so holding, the Supreme Court approved the reasons given by Mann J at first instance ([2011] UKSC 38, [37], [48]). Mann J. had adopted a multi-factorial approach ([2008] EWHC 1878 (Ch), [2009] F.S.R. (2), at para [118]) which the Court of Appeal generally approved ([2009] EWCA Civ 1328, [2010] Ch. 503, [54], [71]). It is worth setting out:

> "From those authorities, and those approaches, a number of guidance factors can be extracted. I call them guidance rather than points of principle, because that gives them the right emphasis. The judges deciding the cases have not sought to lay down hard and fast rules in an area where subjective considerations are likely to intrude, and I will not attempt to do so either. However, I do think the following points emerge from the cases or from the concepts involved:
>
> (i) Some regard has to be had to the normal use of the word.
>
> (ii) Nevertheless, the concept can be applicable to things going beyond what one would normally expect to be art in the sense of the sort of things that one would expect to find in art galleries.
>
> (iii) It is inappropriate to stray too far from what would normally be regarded as sculpture.
>
> (iv) No judgment is to be made about artistic worth.
>
> (v) Not every three dimensional representation of a concept can be regarded as a sculpture. Otherwise every three dimensional construction or fabrication would be a sculpture, and that cannot be right.
>
> (vi) It is of the essence of a sculpture that it should have, as part of its purpose, a visual appeal in the sense that it might be enjoyed for that

13

purpose alone, whether or not it might have another purpose as well. The purpose is that of the creator. This reflects the reference to "artist's hand" in the judgment of Laddie J in *Metix,* with which I respectfully agree. An artist (in the realm of the visual arts) creates something because it has visual appeal which he wishes to be enjoyed as such. He may fail, but that does not matter (no judgments are to be made about artistic merit). It is the underlying purpose that is important. I think that this encapsulates the ideas set out in the reference works referred to in *Wham-O* and set out above (and in particular the Encyclopaedia Britannica).

(vii) The fact that the object has some other use does not necessarily disqualify it from being a sculpture, but it still has to have the intrinsic quality of being intended to be enjoyed as a visual thing. Thus the model soldier in *Britain* might be played with, but it still, apparently, had strong purely visual appeal which might be enjoyed as such. Similarly, the Critters in *Wildash* had other functions, but they still had strong purely visual appeal. It explains why the Frisbee itself should be excluded from the category, along with the moulds in *Metix* and *Davis*. It would also exclude the wooden model in *Wham-O* and the plaster casts in *Breville*, and I would respectfully disagree with the conclusions reached by the judges in those cases that those things were sculptures. Those decisions, in my view, would not accord with the ordinary view of what a sculpture is, and if one asks why then I think that the answer is that the products fail this requirement and the preceding one – there is no intention that the object itself should have visual appeal for its own sake, and every intention that it be purely functional.

(viii) I support this analysis with an example. A pile of bricks, temporarily on display at the Tate Modern for 2 weeks, is plainly capable of being a sculpture. The identical pile of bricks dumped at the end of my driveway for 2 weeks preparatory to a building project is equally plainly not. One asks why there is that difference, and the answer lies, in my view, in having regard to its purpose. One is created by the hand of an artist, for artistic purposes, and the other is created by a

14

builder, for building purposes. I appreciate that this example might be criticised for building in assumptions relating to what it seeks to demonstrate, and then extracting, or justifying, a test from that, but in the heavily subjective realms of definition in the artistic field one has to start somewhere.

(ix) The process of fabrication is relevant but not determinative. I do not see why a purely functional item, not intended to be at all decorative, should be treated as a sculpture simply because it is (for example) carved out of wood or stone."

32.     Importantly, in applying these factors, Mann J. addressed whether toys of Stormtroopers were sculptures. The matter was important because Lucasfilm had authorised the making and sale of such toys. Consequently, the duration of its copyright in the designs on which the toys were based was effectively limited under section 52 of the C.D.P.A. to 15 years unless the toys were regarded themselves as "sculptures": C.D.P.A., Sched 1, para. 20; section 10 Copyright Act 1956. The judge concluded that they were not. He stated, [2009] FSR (2), 154-155, [123]:

"Next, it is necessary to consider the toy Stormtroopers, and other characters, which are taken as being reproductions of the armour and helmets for the purposes of section 52. These are, as already described, articulated models which are sold as toys and which are intended for the purposes of play. Play is their primary, if not sole, purpose. While their appearance is obviously highly important (if they did not look like the original, the child would not be so interested) they are not made for the purposes of their visual appearance as such. While there is no accounting for taste, it is highly unlikely that they would be placed on display and periodically admired as such. The child is intended to use them in a (literally) hands-on way, in a form of delegated role play, and that is doubtless how they are actually used. That means, in my view, they are not sculptures. They can be distinguished from the model in *Britain* which apparently had a significant element of being admirable for its own visual sake. That does not apply to the Stormtrooper, whose only

15

real purpose is play. In reaching this conclusion I am not saying that the *Britain* model is better at what it portrays than the Stormtrooper model. That would be to make judgments about artistic quality, which the statute understandably forbids. It is making a judgment about whether there is anything in the model which has an artistic essence, in the sense identified above. I conclude that there is not."

33.    The case which Mann J. sought to distinguish was *Britain v. Hanks Bros* (1902) 86 *Law Times* 765. This was a case under the Sculpture Copyright Act 1814, in which the question was whether lead toy soldiers, being mounted yeoman on horseback, were sculptures. The soldiers were sculpted by William Britain junior from photographs and had his name stamped on them. Evidence was accepted by the Court that "the anatomy is good, and that the modelling shows both technical knowledge and skill." Wright J said that while he had "great doubt as to the meaning of the Act" he was nevertheless prepared to hold that these toy soldiers were sculptures.

34.    The conclusion of Mann J. that the toy stormtroopers were not sculptures was appealed to the Court of Appeal (but not further to the Supreme Court). The Court of Appeal affirmed. Jacob LJ began by considering *Britain v Hanks*. He said:

"It is difficult again to take too much from this case. It is clear that the judge rejected the defendants' contention that the models were mere toys of no artistic merit. On his view, the metal figures produced therefore qualified as sculptures or models of the human figure within the meaning of the 1814 Act. They appear to have been high quality lead soldiers cast from a model which had been made with recognisable artistic skill. It was certainly the view of the Gregory Committee which reported in October 1952 (Cmd. 8662) and recommended various changes to the Copyright Act that toy soldiers and other models did not qualify for copyright protection under the 1911 Act because of the operation of s.22(1) and Design Rule 26. Their only protection would be as registered designs assuming that they could satisfy the requirement of novelty. But, as mentioned earlier, this involves an acceptance that they would otherwise

qualify as works of sculpture. It is, however, clear from the report that the Gregory Committee had in mind toy soldiers made from a prototype model which had the qualities necessary to make it a work of sculpture. This certainly seems to be consistent with the view of the judge in *Britain v Hanks* about the quality of the models he was considering. On this basis, that case was concerned with something which was not merely a toy and which, in the hands of a collector, might not be used for that purpose at all. By comparison, the toy stormtroopers were not replicas of real soldiers and were sold essentially for use as toys. The judge was not presented with evidence about how they were made or whether the prototype could itself be regarded as a sculpture. All we know is that they were reproductions in miniature of the full-sized armour and helmet."

35.   Jacob LJ continued (at [81]-[82]):

"That leaves the toy stormtroopers. Mr Bloch submits that the distinction which the judge made based on *Britain v Hanks* is untenable and that the facts of that case are indistinguishable from those under consideration on this appeal...

As already indicated, we think the judge was right to point to the existence of what can loosely be described as a work of art as the key to the identification of sculpture. On this basis, artistic and accurate reproductions of soldiers could qualify notwithstanding that some children might wish to play with them. But in most modern cases toy soldiers, whether real or fictional, will not be works of art and will not differ materially in artistic terms from the plastic Frisbee in the *Wham-O* case. They will be playthings registrable for their design qualities but nothing else. This distinction may be difficult to draw in some cases but we suspect that the cases which will qualify for protection under the Copyright Act will be relatively rare. The judge recognised the need not to make qualitative judgments about the artistic merits of the toy soldiers in *Britain* compared to the stormtroopers and therefore emphasised the real purpose of the latter being one of play. But the true distinction between the two cases can be expressed in more fundamental terms. We

17

are not dealing here with highly crafted models designed to appeal to the collector but which might be played with by his children. These are mass produced plastic toys. They are no more works of sculpture than the helmet and armour which they reproduce."

36.     The issue was not before the Supreme Court, though Lord Walker and Collins did, in their joint speech, refer to *Britain v Hanks*. At [19] they observed

> Wright J held that copyright protection as sculpture was available to what the report refers to as "toy metal models of soldiers on horseback, or mounted yeomen." The models were designed and made by William Britain, a partner in the plaintiff firm. The report does not say how large the models were, but they were evidently large enough for each to have stamped on it the maker's name and the date of its manufacture. There was expert evidence, which the judge accepted, that the models were "artistic productions, in that the anatomy is good, and that the modelling shows both technical knowledge and skill." The judge seems to have regarded the case as near the borderline, but was prepared to hold that the models were entitled to protection.

37.     The Supreme Court makes no further remark on the case. However, in concluding that neither the judge not the Court of Appeal had erred in finding that the stormtrooper helmets were not sculptures, the Supreme Court explicitly approved Mann J's reasoning. Consequently, it seems likely that the Supreme Court would also have approved of the conclusion as to the toy stormtroopers.

38.     The importance of this should be readily apparent. The question of whether any of the miniatures in which the Plaintiff claims copyright constitutes a sculpture is one that needs to be assessed in relation to each miniature. But, as a general matter, a toy miniature of a fictional character is unlikely to be protected by copyright as a "sculpture."

*European Confusion*

39.     That said, it is right to draw the Court's attention to a recent development, which might require the UK to revisit its "closed list" of protectable subject matter. In two recent decisions under the Information Society Directive,

2001/29/EC, the Court of Justice of the European Union has implied that a "graphic user interface" might be protectable, but that football matches will not be: Case C-393/09, *Bezpečnostní softwarová asociace* (22 Dec 2010) (ECJ, 3rd Ch), [45]-[46]; Case C-403/08, *Football Association Premier League Ltd and Others v QC Leisure and Others* and Case C-429/08 *Karen Murphy v Media Protection Services Ltd*, [2012] 1 C.M.L.R. (29) 769 (ECJ, Gr Ch), [97]. In so holding, the Court appears to have taken the view that Member States should afford protection to all "intellectual creations."

40.     Whether the holdings in these cases apply to the field of "applied art" is a controversial question. In Case C-168/09 *Flos SpA v Semararo Case e Famiglia SpA* (27 January 2011) (ECJ, 2nd Ch) [34], the Court of Justice implied that they would do so. In that case the Court indicated that Italy would be obliged to protect by copyright the design of a table lamp if that table lamp satisfied the criterion of being its author's own "intellectual creation."

41.     If this is right, then the law of the United Kingdom would need to be interpreted by the courts in such a way as to ensure compliance with European law. If the miniatures in which the Plaintiff claims copyright are "intellectual creations", such that the United Kingdom is obliged to protect them by copyright under Directive 2001/29/EC, the court might well give effect to that obligation by treating them as "sculptures" under the C.D.P.A.

42.     It is by no means clear as to which works this would apply. Article 10 of Directive 2001/29/EC suggests it would apply in respect of all works created after 22 December 2002. However, following Case C-168/09 *Flos* protection might have to be offered to works created before that date if they meet the standard of being "intellectual creations" (discussed below), subject to transitional provisions.

43.     However, in my view, the Court's holding in Case C-168/09 *Flos* is not to be regarded as defensible. In particular, the *Flos* decisions fails to acknowledge important freedoms explicitly left to Member States by Article 17 of Council Directive 98/71 (the Designs Directive), and Article 10 of the Information Society Directive. Consequently, *Flos* is a decision that should not be followed. In my view, the question of which works of applied art are protected is a matter

19

that ought to be regarded as left to Member States. Consequently, *Lucasfilm* should be regarded as the governing authority.

**Originality and 'Intellectual Creation'**

44. In assessing whether the works are "original", it is necessary to differentiate between works created before and after 22 December 2002. For the works created before that date, the traditional UK standard applies. For works created after that date, the European standard operates.

*The UK Standard*

45. Traditionally, the originality threshold under UK law has not been a difficult one to meet. A work must "originate" with its author, rather than be copied: *University of London Press v. University Tutorial Press* [1916] 2 Ch. 601. In other words, it must be the product of "skill, labour and/or judgment": *Ladbroke v. William Hill* [1964] 1 All E.R. 465, 469 (Lord Reid) (HL).

46. In relation to works based on other works, the "skill, labour and judgment" must be otherwise than in the process of copying, and must result in a significant change: *Interlego AG v. Tyco Industries* [1989] A.C. 217 (Privy Council). Referring specifically to derivative works, in *Interlego v Tyco*, Lord Oliver observed, at 263,

> '[t]here must in addition be some element of material alteration or embellishment which suffices to make the totality of the work an original work.'

Moreover, with derivative artistic works the alteration or embellishment must be visual (at 266):

> "The essence of an artistic work ... is that which is "visually significant" ... With deference to the Court of Appeal ..., their Lordships can see no alteration of any visual significance such as to entitle the drawing, as a drawing, to be described as original."

47.    In relation to the works at issue in these proceedings it will be necessary for the Court to determine in each case:

    (i) whether it was a product of labour, skill and judgment;

    (ii) in the case of derivative artistic works, whether there is a visually significant material alteration or embellishment.

If there is, the works will be "original".

*The European Standard*

48.    The European standard of originality is considerably higher than that applicable under UK law prior to harmonization. The new standard, in principle, applies to works created after 22 December 2002. Any works already protected under UK law should remain protected as a result of Article 10, which indicates that the Directive is without prejudice to acquired rights.

49.    The Court of Justice of the European Union has held that there is a general "originality" standard operative in Europe. To be protected a work must be its "author's own intellectual creation." See *Case C-5/08 Infopaq International A/S v Danske Dagblades Forening* [2009] E.C.R. I-6569 (ECJ, 4th Ch), [37] ("copyright within the meaning of Article 2(a) of Directive 2001/29 is liable to apply only in relation to a subject-matter which is original in the sense that it is its author's own intellectual creation.")

50.    The Court has offered some guidance as to when a work will be its author's own intellectual creation:

    (i) In Case C-5/08, *Infopaq International A/S v Danske Dagblades Forening*, [2009] E.C.R. I-6569 (ECJ, 4th Ch), [45]-[46], the court indicated that while words are not protectable, an author may express his creativity in an original manner through the "choice, sequence and combination of" words so as to achieve a result which is an intellectual creation;

    (ii) In Case 393/09, *Bezpečnostní softwarová asociace*, (22 Dec 2010) (ECJ, 3rd Ch), [48], the Court indicated that when assessing whether a

graphic user interface was an "intellectual creation" the national court must take account, inter alia, of the specific arrangement or configuration of all the components which form part of the graphic user interface in order to determine which meet the criterion of originality.

(iii) In Case C-403/08 *Football Association Premier League Ltd and Others v QC Leisure and Others* and Case C-429/08 *Karen Murphy v Media Protection Services Ltd*, (4 October 2011) (ECJ, Gr Ch), [98] the Court indicated that "intellectual creation" involves the exercise of creative choices rather than following rules. Thus "football matches, which are subject to rules of the game, leaving no room for creative freedom for the purposes of copyright" were unprotected;

(iv) In Case C-145/10, *Eva-Maria Painer v Standard VerlagsGmbH and Others*, [2012] E.C.D.R. (6) 89 (ECJ, 3rd Ch), [87]-[93], the Court considered a portrait photograph of a young girl and indicated that this would be an "intellectual creation" if the photographer had been able to stamp the work with his or her "personal touch";

(v) In Case C-604/10, *Football Dataco v Yahoo! UK Ltd*, [2012] 2 C.M.L.R. (24) 703, (ECJ, 3rd Ch), [38], the Court was considering "intellectual creation" in the context of collections of data about soccer matches, and said that the "criterion of originality is satisfied when, through the selection or arrangement of the data which it contains, its author expresses his creative ability in an original manner by making free and creative choices … and thus stamps his 'personal touch'."

51.    Consequently, for works created after 22 December 2002, the European standard applies. This means the Plaintiff will need to establish that such works:

(i) are a result of choices rather than following rules (such as those in a 'rule book');

(ii) such that the author has stamped his or her individuality on the work.

## B. Ownership of Copyright in the Employee Context

52.     If any of the works are protected by copyright, it falls to the Plaintiff to establish it owns the copyright therein. The basic rule is that the author is the first owner of copyright, to which there is one statutory exception: works created by employees in the course of their employment. However, for works created before 1 August 1989, a different rule applies in relation to works created by employees for publication in journals, according to which the journal only gains the right to publish the work, the author retaining the remaining rights.

### The Basic Principle: Authorial Ownership

53.     Section 11(1) of the C.D.P.A. states that

> "The author of a work is the first owner of any copyright in it."

According to section 9, the "author" of a work is "the person who creates it." This has been called "the creator principle."

54.     Section 4(1) of the 1956 Act similarly stated that

> "the author of a work shall be entitled to any copyright subsisting in the work."

55.     In relation to the reproduction right, the Information Society Directive contains a corresponding rule:

> Article 2
>
> Reproduction right
>
> Member States shall provide for the exclusive right to authorise or prohibit direct or indirect, temporary or permanent reproduction by any means and in any form, in whole or in part:
>
> (a) for authors, of their works;

....

56.    Recitals of the Information Society Directive reiterate the importance of "the creator principle":

> (9) Any harmonisation of copyright and related rights must take as a basis a high level of protection, since such rights are crucial to intellectual creation. <u>Their protection helps to ensure the maintenance and development of creativity in the interests of authors,</u> performers, producers, consumers, culture, industry and the public at large. Intellectual property has therefore been recognised as an integral part of property.

> (10) <u>If authors or performers are to continue their creative and artistic work, they have to receive an appropriate reward for the use of their work,</u> as must producers in order to be able to finance this work. The investment required to produce products such as phonograms, films or multimedia products, and services such as "on-demand" services, is considerable. Adequate legal protection of intellectual property rights is necessary in order to guarantee the availability of such a reward and provide the opportunity for satisfactory returns on this investment.

> (11) <u>A rigorous, effective system for the protection of copyright</u> and related rights <u>is one of the main ways</u> of ensuring that European cultural creativity and production receive the necessary resources and <u>of safeguarding the independence and dignity of artistic creators</u> and performers.

> (12) Adequate protection of copyright works and subject-matter of related rights is also of great importance from a cultural standpoint. Article 151 of the Treaty requires the Community to take cultural aspects into account in its action.

57.    According to the principle of "autonomous meaning",[1] the question of what is meant by an "author" in this context is a matter of European law. No rulings

---

[1] This is the approach to interpretation of EU instruments, such as Directives, that has been adopted by the Court of Justice of the European Union. According to this approach "the terms of a provision of Community law which makes no express reference to the law of the Member States for the purpose of determining its meaning and scope must normally be given an autonomous and uniform interpretation throughout the Community": see

have yet been made on who is an author (except in relation to cinematographic works: Case C-277/10 *Martin Luksan v Petrus van der Let* (9 February 2012).

**Employed Authors**

58.     There is one exception to the "creator principle". This relates to employed authors. According to section 11 of the C.D.P.A.:

> S.11(2) Where a literary, dramatic, musical or artistic work, or a film, is made by an employee in the course of employment, his employer is the first owner of any copyright in the work subject to any agreement to the contrary.

59.     A similar rule operated under the Copyright Act 1956, section 4(4). This stated:

> Where, in a case not falling within either of the two last preceding subsections, a work is made in the course of the author's employment by another person under a contract of service or apprenticeship, that other person shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act.

Section 4(5) added a proviso relating to agreements to the contrary.

60.     The provision has four components:

> (i)     The work must be the right type ie a literary, dramatic, musical, artistic work, or a film;
>
> (ii)     It must have been created by someone who was at the time an "employee";
>
> (iii)     It must have been created by that person "in the course of employment."
>
> (iv)     There must have been no "agreement to the contrary".

The first component is not in issue.

---

Case C-245/00 *SENA v NOS* [2003] E.C.R. I-1251, [23]; Case C-306/05 *SGAE* [2006] E.C.R. I-11519, [31]; Case C-5/08, *Infopaq*, [2009] E.C.R. I-6569 [27]; Case C-403/08, *Football Association Premier League v Qc Leisure and Karen Murphy*, [2012] 1 C.M.L.R. (29) 769, [154].

61.    In determining whether there is an employment relationship, the courts refer to case-law from other areas (tax, employment law, tort law and so on). The distinction is drawn between a contract of service (an employment relationship) and a contract for services (involving an 'independent contractor').

62.    The Plaintiff's Expert Report is somewhat inconsistent in its analysis of the question of how employment contracts are distinguished from contracts of services. I would not take issue with the "multifactorial approach" suggested at para 100. However, I am uncomfortable with other statements in the report, in particular what I will call the "integral work test".

63.    The "integral work test" is mentioned in the Report first at para 31(a). It states:

        "The definition of the term "employee" depends not only on what was agreed, but on other factors including how integral the work being produced is to the business."

64.    Furthermore, the Plaintiff's Expert Report states, at para 46, that
        "[t]he test to distinguish these types of contracts that has found most favour in an English court is whether the work done is or is not integral to the business of the entity to which service is being provided."
        In my view, it is not clear that "the integral work test" is the test "that has found most favour."

65.    Traditionally, the courts distinguished between employment contracts and contracts for services by reference to the level of "control" exercised by the beneficiary of the contractual services. The distinction was said to lie not in *what* services were provided, but in control over *how* they were provided. The control test, however, seemed problematic in the context of highly skilled services, such as with medical doctors, where the service provider exercised virtually complete control over *how* services were provided. Consequently, the courts started to develop other tests.

66.    The courts thus moved away from "control" as the chief determining factor in all cases, and towards a multi-factor approach. One factor in the approach was

26

whether the worker is "integral" to the organisation. This has sometimes been referred to as the "organisation" test.

67. The Plaintiff's <u>Expert Report</u> places considerable emphasis on *Stevenson, Jordan and Harrison v. MacDonald and Evans* (1952) 69 R.P.C. 10, (1951) T.L.R. 101 as the foundation of the "integral work test".[2] In my view, Lord Denning MR's statement, quoted by the Plaintiffs <u>Expert Report</u> (at para 46) does not support the "integral work" test:

> (i) First, Lord Denning indicates that he has identified "one feature" which runs through the cases, a position that is consistent with a multi-factor analysis.

> (ii) Second, the feature he identifies is that "a <u>man is employed as part of the business</u> and his work is done as an integral part of the business." The focus is not merely on the work done, but the place of the person within the organisation. This is often sometimes referred to as "the organisation test".

68. The Plaintiff's <u>Expert Report</u> also states (at para 47) that the "integral work test" was "approved and clarified" by Cooke J in *Market Investigations v. Minister of Social Security*, [1969] 2 Q.B. 173.[3] Although *Stevenson, Jordan and Harrison v. MacDonald and Evans* (1952) 69 R.P.C. 10 was cited to the Court, it was not referred to by Cooke J. However he did refer to another decision of Denning LJ (as he then was), namely, *Bank voor Handel en Scheepvaart N.V. v. Slatford* [1953] 1 Q.B. 248, 295:

> "The test of being a servant does not rest nowadays on submission to orders. It depends on whether the person <u>is part and parcel of the organisation</u>."

That was Lord Denning's own re-interpretation of what he said in *Stevenson*. The distinction between and employee and an independent contractor is that an employee is "part and parcel of the organisation".

---

[2] The Plaintiff's Expert Report says, at para 46, that the case was "before the House of Lords, the highest English court." That is not correct. The case was before the Court of Appeal.
[3] The Plaintiff's Expert Report says this was a case "in the Court of Appeal (i.e. the second highest court)". The case did concern an appeal, from the Minister, finding that Mrs Irving was an employee for the purposes of national insurance. However, the case was decided by Cooke J in the High Court, Queens Bench Division.

69.     In *Market Investigations v. Minister of Social Security,* [1969] 2 Q.B. 173, 184-5, Cooke J indicated that:

> "No exhaustive list has been compiled and perhaps no exhaustive list can be compiled of considerations which are relevant in determining that question, nor can strict rules be laid down as to the relative weight which the various considerations should carry in particular cases. The most that can be said is that <u>control will no doubt always have to be considered,</u> although it can no longer be regarded as the sole determining factor; and that <u>factors, which may be of importance, are such matters as whether the man performing the services provides his own equipment, whether he hires his own helpers, what degree of financial risk he takes, what degree of responsibility for investment and management he has, and whether and how far he has an opportunity of profiting from sound management in the performance of his task.</u>"

The case thus supports a multi-factor test, not the "integral work test" proposed in the Plaintiff's <u>Expert Report</u>.

70.     The Plaintiff's <u>Expert Report</u> cites (at paras 48-51) *Beloff v. Pressdram Ltd and Another* [1973] F.S.R. 33. In this case, the Plaintiff, a journalist for the newspaper, *The Observer*, sued another paper that had reproduced a memorandum that she had written. The Defendant succeeded on the basis that the Plaintiff did not own the copyright in the memorandum. The question of ownership of copyright turned in part on whether Beloff was an employee of *The Observer*. The Court held that she was, and thus she did not own the copyright.[4] A number of features of the case are notable:

(a)     Beloff had worked for *The Observer* since the 1940s.

(b)     She had been treated by *The Observer* as an employee, and issued with an employment contract (see [1973] F.S.R. 33, 43-44).

(c)     She had been given access to the House of Commons as a result of being the Lobby Correspondent of *the Observer*.

---

[4] The statement of facts in para 48 of the Plaintiff's Expert Report contains an error: it states "The Defendant denied that she was an employee." In fact, the Defendant <u>asserted that</u> Beloff was an employee.

(d)     The letters of engagement conferred on *The Observer* the right to determine where Beloff worked;

(e)     She worked full time;

(f)     She was obliged to provide an article per week;

(g)     She attended weekly editorial meeting;

(h)     She had an office in *the Observer* building;

(i)     *The Observer* provided secretarial resources;

(j)     She took leave at various times;

(k)     Her income tax was deducted from her pay;

(l)     Her pension payments were deducted from her pay.

71.     In so far as *Beloff* supports the view that a person whose services involve a high level of individual skill and discretion can be an employee, no objection is taken to the Experts' citation of the case. In so far as the Plaintiff's Expert Report (para 49) claims that the case shows that

> "if the worker is skilled he/she may still be considered to be an employee if his/her work is integral to the business",

it elevates one component above others. Clearly, when he examined "the recognised indications of contract of service", the Judge was applying the "multi-factor test." It is worth reiterating what Ungoed-Thomas J said ([1973] F.S.R. 33, 42, which is quoted in the Expert Report (at paras 49-50):

> "Control is just one of many factors whose influence varies according to the circumstances.... The test which emerges...whether...the employee is employed as part of the business and his work is an integral part of the business..."

72.     An authoritative account is provided in *Chitty on Contract* (H Beale ed. 30th ed. London: Sweet & Maxwell, 2008) Ch 39, the leading practitioner treatise on contract law. It states:[5]

> **"The Contract of Employment or of Service and Contracts for Services**
>
> **39-002**

---

[5] For simplicity, I have omitted the footnotes.

Contracts of employment were known to the law for many years as "master and servant" contracts, but this terminology now has archaic connotations, and is not found in modern legislation. There is no comprehensive definition of such a contract and the decided cases merely indicate a number of *indicia* or factors which are relevant to a finding that a particular contract is one of employment, or a "contract of service". The presence or absence of any one such factor is not conclusive, since the decision depends on the combined effect of all the relevant factors, when those pointing towards "employment" are weighed up with those pointing against. A contract of employment or of service is generally contrasted with a contract in which an independent contractor is engaged to perform a particular task, often known as a "contract for services". In order to identify the contract of employment, it is useful first to describe its normal forms and then to indicate the current approach to defining it, which is developed in greater detail in the second section of this chapter.

### The Normal Forms of the Contract of Employment

**39-003**
It could, at least until recent transformations in the practice of the labour market, be said that in the normal case of employment the employee is selected by his employer, works "full-time" as part of the employer's organisation, with regular working hours, at a fixed place of work, with equipment provided by the employer, and under some degree of supervision (arranged by the employer) over his method of working; he enjoys a fixed wage or salary paid at regular intervals, fixed holidays on full pay, and has some security of employment in that he cannot be dismissed without notice (except for misconduct), and until the expiration of his notice of dismissal he is entitled to receive his full wages or salary, whether or not his employer can actually provide him with work to do. The instances which come before courts are those where some, but not all, of these normal features of employment are present, and it must be decided whether the departures from the normal patterns of employment are sufficiently important to justify the conclusion that the relationship is not employment for the purpose of the legal rule in question.

**39-004**
However, a large and increasing proportion of the workforce is now employed in "marginal", "atypical" or "flexible" forms of employment, such as part-time, temporary or agency employment. In such cases, it may be even more than usually difficult to decide whether or not a contract of employment exists.

### The Modern Approach to Definition of the Contract of Employment

**39-005**

The traditional statements of what constitutes a contract of service placed most emphasis on the power of the employer to control the work of the employee, when contrasting that contract with a contract with an independent contractor. The traditional distinction was that whereas the employer could merely direct *what* work was to be done by the independent contractor, he might also direct *how* the work was to be done by an employee. The current approach to this distinction, and hence to the definition of the contract of employment, has four main elements:
(1) the denial of the supremacy of the control test, whilst still acknowledging its importance;
(2) the use of some form of "organisation" test;
(3) a growing preference for asking whether the worker is "in business on his own account"-though it has been denied that this is the fundamental test;
(4) the assertion that exhaustive definition is futile and that the method of classification is by the accumulation of relevant factors in each case;
(5) an increasing tendency to treat the distinction as one to be applied at first instance rather than by an appellate court.

It should also be noted that the relationship of employment is to be contrasted not only with that between employer and independent contractor but also with those of agency, bailment and partnership. It may also still be important for certain purposes to distinguish between the contract of employment and the contract of apprenticeship; the way in which that distinction is to be drawn was considered by the Court of Appeal in *Flett v Matheson*.

### Section 2 - The Factors Identifying a Contract of Employment

#### The Factors to Be Considered

**39-010**
The case law suggests that the factors relevant to the process of identifying a contract of employment may usefully be listed as follows:

(1) the degree of control exercised by the employer;
(2) whether the worker's interest in the relationship involved any prospect of profit or risk of loss;
(3) whether the worker was properly regarded as part of the employer's organisation;
(4) whether the worker was carrying on business on his own account or carrying on the business of the employer;
(5) the provision of equipment;
(6) the incidence of tax and national insurance;
(7) the parties' own view of their relationship;
(8) the structure of the trade or profession concerned and the arrangements within it.

73.     In my view, the "integral work" test offered in the Plaintiff's Expert Report is a somewhat distorted representation of a complex area of English law. It is distorted in that:

(a) it selects one factor, when the test of employment is multi-factorial;

(b) it emphasises that factor in a rather skewed manner. The case-law which the Plaintiff's Expert Report relies on supports the view that a key question is whether the person providing the services is integrated within the organisation of the purchaser of those services – if they are, that suggests he or she is an employee. But the selected passages suggest the question is whether the work provided is integral "to the business of the entity", and that places disproportionate emphasis on the work-product, rather than the situation of the worker.

74.     As should already be clear, the courts pay considerable attention to whether typical attributes of employment are present: whether regular sums are paid as wages or salary; whether income tax deductions are made on the "pay-as-you-earn" basis used for employees; whether there is a joint contribution to a pension scheme; and whether national insurance contributions are paid by both parties as for an employee. See *Beloff v Pressdram Ltd* [1973] F.S.R. 33.

31

75.     The courts will also pay attention to the descriptions used by the parties. In *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622, 638, Lightman J. observed

> "It is explicitly stated in the consultancy agreement (as in the correspondence between the parties immediately preceding it) that the parties intended the relationship between the parties to be that of the plaintiff as an independent contractor providing services to the defendant and not that of employee and employer. That is a relevant, but not decisive, consideration."

On the facts of the case, the Court found (at 639) that Robin Ray was not an employee where agreement described him as an independent contractor and contemplated that he would have other business commitments, and he operated for a short period.

76.     The Plaintiff's Expert Report, para 98, concludes:

> In our view English law supports a finding that at least some of independent contractors/freelancers working for the Plaintiff were in fact employees, as a matter of law. This most obviously applies to individuals who were in fact employees while also contributing additional efforts, but would also apply to others who were nominally freelancers but who, under the application of the general factors outlined above, would be acting in the capacity of employees.

I am surprised that these experts would think they could predict any such conclusion from the limited deposition evidence. Clearly, a full and thorough analysis would need to be conducted in relation to each and every "freelance" author, their role, length of involvement, how they worked, how they were paid, the conditions of service etc.

77.     I certainly would not conclude as the Plaintiff's Expert Report appears to do (at para 101), based on paras 31-33 of Blanche's deposition, that the descriptive term "freelancer" that the parties chose to apply to those who Blanche says provided services through the "Young Artists" company were anything other

than independent contractors. The fact that the services were provided through an agency, that there were particular understandings as to rights allocation (Blanche, 32, lines 10-15), and that they are described as "outside artists" (Blanche, 33, line 10) seems wholly consistent with the term "freelancer". (Note also Clause 4.1 of the 'copyright agreements' between Games Workshop Ltd and Abnett dated 11 December 1996, and Counter (undated)). The fact that Blanche (Blanche, 134-135) might instruct the freelancers to alter their product would hardly be inconsistent with this.

78.     The evidence given by Blanche as to his own position as a freelancer, at 18 of his deposition, appears to relate to the pre-Warhammer 40,000 period, as he states at 10, that he became an employee Games Workshop in 1984, having worked as a freelance illustrator between 1980 and 1984.

79.     Moreover, while the Plaintiff's Expert Report notes Blanche's testimony (Blanche 10, lines 24-25) suggesting that he was paid regularly during his freelance period between 1980 and 1984, the Report does not mention the factors that are consistent with the designated freelance status: the three-day week (Blanche 10, line 14), the payment by Blanche of his own national insurance and tax (Blanche 10, line 25 to 11, line 1; 18, lines 14-22). I would not draw any inference from the use of the term "freelance" in relation to Blanche that the term was being understood incorrectly as regards services later contracted for by Games Workshop.

**The Course of Employment**

80.     Even if an employment relationship exists, it is not every work created during its subsistence that belongs presumptively to the employer, but only those made in "the course of the employment." This seems to be a particularly important consideration in relation to employees of Games Workshop who John Blanche describes in his deposition (Blanche 33, lines 4-8; 44, line 16-25; 45, line 1-6). There were people "employed by Games Workshop doing other things than being artists" but who produced art for the Rogue Trader book, "in their own time" and for a fee.

81.     The Plaintiff's Expert Report treats the question of these creators in terms of whether they were properly called "freelancers". The Plaintiff's Expert Report, para 98, concludes:

> In our view English law supports a finding that at least some of independent contractors/freelancers working for the Plaintiff were in fact employees, as a matter of law. This most obviously applies to individuals who were in fact employees while also contributing additional efforts

To my mind this conflates two distinct issues. For employees of Games Workshop, the question is not whether they were (as a matter of law) improperly referred to as freelancers when carrying out these tasks, but simply whether these tasks fell within the course of their employment.

82.     This requires an examination of the employee's duties, to determine whether the making of the work fell within the scope of those duties. The starting point of this analysis should be the written contract, if one exists. Whether the work was created during office hours, or using materials provided by the employer, may also be useful evidential pointers, but they are not in themselves determinative. Equally, the fact that the work was created outside of office hours may point toward it being made outside the course of employment, but that fact will not be determinative.

83.     In *Byrne v. Statist Company* [1914] 1 K.B. 622, Byrne was on the editorial staff of the newspaper, the *Financial Times,* and was asked by the paper to translate a speech from Portuguese for inclusion in the paper as an advertisement. Byrne did so and the translation was published in the *FT.* When the Defendant republished the translation, Byrne brought an action. The Defendant denied Byrne owned copyright on the basis that he was an employee of the *FT.* Bailhache J rejected the defence. The copyright belonged to Byrne because, even if he was an employee, the work was not created in the course of employment. The facts were that the *FT* had asked Byrne whether he would do translation, and what his charge was, so clearly the parties understood that the work fell outside his normal duties and was something he was not obliged to do. Moreover, the work was done in his own time.

84.     In *Stevenson, Jordan and Harrison v. MacDonald and Evans* (1952) 69 R.P.C. 10, T.L.R. 101,[6] DF Evans-Hemming, who was an employee and director of the Plaintiff firm, SJH, wrote a management consultancy guide entitled *Flexible Budgetary Control and Standard Costs*. The first section of the book was based on lectures he had given, in part to provide publicity for the Plaintiff firm. When he did so, his expenses were paid, and the lectures were sometimes prepared in company's time. They were also typed by company typist. The company even had some control over their content. The second section, known as the "Manchester section," was prepared while Evans was on secondment to a client of the Plaintiffs in Manchester. Some of this material was prepared after work. Again, Evans used secretarial support of SJH to prepare a typescript. Stencils were prepared for duplication. The third section of the book was completed by Evans after leaving the company. When a proof was sent to SJH, it sought injunction.

Lloyd Jacob J held that the book contained material created during employment. On appeal, the Court of Appeal allowed the appeal in part, confining the injunction to the "Manchester section" (pp 7-39) of the manual.

Lord Evershed MR began by looking at the duties "normally performed" by someone in Evans position (here referred to as an "Engineer"). They consisted principally "of attending on the premises of client companies, and applying their skill and experience in analysis and examination, and preparation of the necessary instruction manuals." He then indicated that even if Evans had been under an obligation to compose and deliver lectures, he was nevertheless entitled to copyright in them. This was both "just and common sense." (R.P.C. 18, T.L.R., 106-7) The rationale was that Evans could not have ordered "to give a lecture to any particular body on any particular topic." Consequently, giving lectures could not be said to be part of Evans' regular duties. There was nothing in the circumstances to displace "ordinary rule." In contrast, the "Manchester section" did belong to the Plaintiff. It was like the work he did in preparing manuals.

---

[6] The case is title "Stephenson" in the *Reports of Patent Cases* but "Stevenson" in the *Times Law Reports*.

Denning LJ (R.P.C. at 22, T.L.R. at 111) explained that not everything done by an employee, even if useful to the employer, is done in the course of employment. Writing the manuals were part of employment, but giving the lectures were "accessory to employment" not part of it.

Morris LJ (R.P.C. at 24, T.L.R, at 113) took a similar approach, focussing on whether Evans could have been required to write the lecture. He said that "it does not seem to me ...that Dr Evans-Hemming could have been ordered to write or deliver these lectures and it seems that it was not part of his duty to write or deliver them."

85.    In *Noah v. Shuba* [1991] F.S.R. 14, Noah was a consultant epidemiologist at the Public Health Laboratory Service (PHLS). PHLS functions included providing information on infectious diseases. Noah was obliged to research and publish in scientific journals and before learned societies. But the employer indicated that writing books and monographs "was not expected to be done in working hours" and was additional to "official duties" (though Noah could use the PHLS laboratory and library) (F.S.R. at 25). Acting on his own initiative, Noah drafted a guide to skin piercing. He wrote the draft at home in the evenings and on weekends, but he discussed the book with colleagues and researched it using the PHLS library. The manuscript was typed by a secretary at the PHLS. Once complete, PHLS published the book, *A Guide to Hygienic Skin Piercing*, in 1982, showing N as author and copyright owner.

The Defendant used a passage from Guide in an article in *Health and Beauty Salon* in a way that suggested Noah approved of the Defendant's services. Noah sued, and the Defendant argued that Noah was not the copyright owner. Mummery J held that Noah owned copyright in the guide. He explained (at 26) that Noah's position was "very similar" to that of Evans in Stevenson, Jordan and Harrison, and cited with approval the judgments of Denning and Morris LJJ.

86.    In *Intercase UK Ltd. v. Time Computers Ltd.* [2004] E.C.D.R. (8) 78, 86-87 (para. 11), a case on whether designs were created "in the course of employment" for the purposes of the UK's unregistered design right, Patten J observed:

"the Court's enquiry is ultimately directed to determining whether the creation of the design fell within the designer's duties as employee and not with the detail of whether the design was made during normal office hours or with the benefit of materials provided at the employer's expense. Issues of the latter kind are of no more than evidential value as pointers, in cases of doubt, towards whether or not the designs were brought into existence by the designer as part of his employment. In a case (such as the present) where the employee's duties are not definitively recorded in a contract, evidence that the design was created during office hours and at the expense of the employer is likely to be significant, but not conclusive. If created during office hours on, for example, a company computer, it will be more difficult for an employee who has no specific duties to prove that he was entitled to use his employer's time for the creation of a product that was to be his personal property. The more natural inference is that work done during the ordinary hours of employment, with the benefit of the employer's facilities, is done for the benefit of the employer. When, however, the design is created during the employee's own time and at his own expense, other evidence is likely to be required, to link the work to the contract of employment."

87.    Finally, copyright in works made by employees in the course of employment will not be treated as belonging to the employer where there is an agreement to the contrary. Such an agreement has been implied from custom: in *Noah v. Shuba* [1991] F.S.R. 14, 26-27, the court held that even if the guide had been written in the course of the epidemiologist's employment, past practice of the employer in allowing its employees to assign copyright to journals indicated the existence of an understanding that copyright was to be retained by its employees.

88.    However, a mere statement that a person is a consultant would not be regarded as an agreement that such a person could retain copyright if the court concluded the relationship was actually that of employer and employee: *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622, 639-40 (Lightman J.).

89.     The Plaintiff's <u>Expert Report</u> refers at para 101(c) to the employees of Games Workshop who worked on *Rogue Trader* in a different capacity (Blanche 44, line 16, 24-25; Blanche 47, line 6-7). In my view, a careful examination of the obligations of each employee would be required to assess whether the work on *Rogue Trader*/Warhammer 40,000 was in the course of employment, but the following factors suggest it was not:

> (i) the employees were thought of as acting in a freelance capacity (Blanche, 45, line 5-6; but cf. Blanche, 47, line 11-12);

> (ii) the tasks were seen as separate, stand-alone tasks, 'outside their normal work' (Blanche, p. 47, line 15-17);

> (iii) the tasks were done in their own time (Blanche 45, line 4);

> (iv) they were separately paid (Blanche p. 33, line 6; p. 47, line 13. Cf, Blanche 45, line 5).

**Contributions to Magazines and Journals of Works created before 1 August 1989**

90.     The Plaintiff's <u>Expert Report</u>, para 31(a) and para 41, n.1, acknowledges that the general rule for employees is inapplicable to certain works created before 1 August 1989. Section 4(2) of the 1956 Act states:

> Where a literary, dramatic or artistic work is made by the author in the course of his employment by the proprietor of a newspaper, magazine or similar periodical under a contract of service or apprenticeship, and is so made for the purpose of publication in a newspaper, magazine or similar periodical, the said proprietor shall be entitled to the copyright in the work in so far as the copyright relates to publication of the work in any newspaper, magazine or similar periodical, or to reproduction of the work for the purpose of its being so published; but in all other respects the author shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act

91.     The Court in these proceedings will need to consider each individual literary or <u>artistic work</u> at issue to determine whether

(i) it was made before 1 August 1989;

(ii) the author was employed;

(iii) the employer was the proprietor of a "newspaper, magazine or similar periodical";

(iv) the work was made <u>for the purpose</u> of publication of the relevant type.

If so, under the statutory regime applicable the only rights that vest in the employer are the rights to so publish the work.

92. I am unable to ascertain from the information with which I have been provided whether this is likely to be an issue. But I note that the depositions refer

(i) to the publication *White Dwarf* as a "magazine" (Blanche, p 9, line 13-14; p 12, line 10; p. 35, line 15; p. 43, line 5; p. 52, line 23; Andrew Jones, p 40, line 24-25; p 53, line 3; Jeremy Goodwin, p 64, line 1-3,;

(ii) to the operation of *White Dwarf* from as early as 1977-1978 (Blanche, p 9, line 11-14);

(iii) to the inclusion within *White Dwarf* of illustrations, concept drawings and miniatures (Goodwin, p 64line 12-16);

(iv) to a bi-monthly called *Inferno* (Jones, p 97 line 15-19);

(v) *Warhammer Monthly* (Andrew Jones, p. 96, line 12), though this latter magazine seems to have come out after 1989 (see Jones, 96, line 13-25, p 97, line 1-4) and

(vi) to some of the contributors to *Warhammer Monthly* as employees (Jones, 98, line 17-19).

Clearly, this matter needs further exploration to determine accurately the initial ownership of copyright.

93. In *De Garis v Nevill Jeffress Pidler Pty Ltd* [1990] FCA 218, (available electronically via www.austlii.edu) (1990) 18 I.P.R. 292, an Australian Federal

Court decision on the equivalent provision of the Australian Copyright Act 1968, section 35(4), Beaumont J said, at [89], that

"[t]he meanings of the words 'newspaper', 'magazine' and 'periodical' where used in s.35(4) are to be determined according to popular usage."

94.    One issue that may prove important is whether section 4(2) applies where only a work is created with a number of possible uses in mind, but is in fact published in a magazine. There appears to be no jurisprudence on this matter. It might well be that a court would apply a "primary purpose" test.

## C. Co-Authorship

95.    The Plaintiff argues that even if the works were not created by employees, or were created by employees but in circumstances falling outside the scope of employment, so that copyright vests in the relevant creators, nevertheless the Plaintiff is a co-author or joint author of the works.

96.    According to section 10 of the C.D.P.A., a work of joint authorship means

"a work produced by the collaboration of two or more authors in which the contribution of each author is not distinct from that of the other author or authors"

97.    Section 11(3) of the 1956 Copyright Act contained a very similar definition (the word "separate" being included rather than the word "distinct.") The consequences of joint authorship were elaborated in Schedule 3 of that Act.

98.    The Information Society Directive, 2001/29/EC does not contain any express rules on joint authorship. However, as the Directive refers to the rights harmonized therein being conferred on "the author", it seems to follow that rules on co-authorship would also be a matter of European law.

99.    The definition of joint authorship in section 10 of the C.D.P.A. and section 11(3) of the 1956 Act contains three elements

(i)     Two or more authors must have collaborated in the production of a work;

(ii)    Each must have contributed to the work;

      (iii)    The contribution of each must be 'not distinct' (or 'separate') from that of the other or others.[7]

100.    The first condition of collaboration of a joint work requires that the work have been made "in prosecution of a pre-concerted joint design" or at least on the basis of cooperation between the authors. See *Levy v. Rutley* (1871) L.R. 6 C.B. 583; *Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd.* [1995] F.S.R. 818. Separately elaborating a pre-existing work after it is generated does not create a work of joint authorship. If there is sufficient originality, such effort may rather generate a derivative work in which a separate copyright arises. For example, where a musician arranges a prior musical work, there may be a new copyright in the arrangement: *Chappell v. Redwood Music* [1981] R.P.C. 337.

101.    The second condition is that each of the joint authors has contributed to the work. The contribution must be the sort protected by copyright, that is, expression rather than mere ideas. According to *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622 (Lightman J.)

        "what is required is . . . a direct responsibility for what actually appears on the paper".

102.    Two important principles that flow from this are

      (i)    A person does not become a co-author merely by instructing another person to carry out some work;

      (ii)    A person does not become a co-author merely by providing ideas or material for another to work with.[8]

103.    The first proposition is illustrated by a series of cases:

---

[7] In this respect the statements of the law in the Plaintiff's Expert Report, (p 13 line 3, para 31(b), that there must be a "distinct contribution from each author," and para 104(c) saying that there must be "Distinct contribution is not distinct from that of the other author") are a little confusing: there must be a not insubstantial contribution but in the final form of the work the contribution of each author must not be distinct.

[8] In this respect, I do not agree with the Plaintiff's Expert Report in so far as it asserts at para. 36 that "the author of a work is the person who originates the protectable elements of the work, whether the language used, dramatic incident or design." The case-law could not be more clear that mere provision of "dramatic incident" does not constitute a person an author.

(i) *Nottage v. Jackson* (1882-3) L.R. 11 Q.B.D. 627 concerned copyright in a photograph of the Australian cricket team. Copyright, available under the Fine Arts Copyright Act 1862, was then conditioned on registration with the Stationers Company. Nottage and Kennard, the managers of the company, were entered on the register as the authors. Neither of them had been at The Oval at the time the picture was taken. The idea for the taking of the picture came from a foreman of the company. The photograph had been taken by one of their employees. The Court of Appeal had no doubt that the Plaintiffs were wrongly entered as authors so that the action could not be sustained. Brett MR speculated as to who was the author of the photograph, at 632-3

"Certainly it is not the man who simply gives the idea of a picture, because the proprietor may say, "Go and draw that lady with a dog at her feet, and in one hand holding a flower." He may have the idea, but still he is not there. He may be 100 miles from the place, and he may have given the instructions by letter. The nearest I can come to is that it is the person who effectively is, as near as he can be, the cause of the picture which is produced—that is, the person who has superintended the arrangement, who has actually formed the picture by putting the people into position, and arranging the place in which the people are to be—the man who is the effective cause of that. Although he may only have done it by standing in the room and giving orders about it, still it is his mind and act, as far as anybody's mind and act are concerned, which is the effective cause of the picture such as it is when it is produced. Therefore it will be a question in every case who that man is. That will be a matter of evidence. That will be a question of fact. We have not to say in this case who was that man. Suppose it was the principal man who was sent down to the Oval. At all events, it was not either of these two gentlemen who are described as the authors, and it certainly was not both of them."

(ii) *Kenrick & Co v. Lawrence & Co* (1890) L.R. 25 Q.B.D. 99. Here, the Plaintiff claimed copyright in the drawing of a hand (for use in demonstrating to illiterate voters how to vote at elections). The idea for the card had been developed by Jefferson, but as he could not draw, he engaged Bott to do the drawing. At the time, it was necessary to register copyright in drawings, and in

the registration Jefferson was named as the author. When the Plaintiff sued a third party alleging infringement, the validity of the registration was put in issue on the basis that Jefferson was not the author. Wills J agreed:

> "Jefferson is registered as the author of the drawing. It seems to me he was not the author. … I do not see how a gentleman who is incapable of drawing even such a very simple picture as a rough sketch of the human hand, and who did not, in fact, set pencil to paper in the matter, can be called the author of the drawing. He suggested the subject, and made such limited suggestions as to the treatment as the subject admitted of; but it seems to me that in an Act which gives copyright to drawings the author must mean a person who has at least some substantial share in putting the touches on to paper."

Again, providing instructions was insufficient.

(iii) *Tate v. Fulbrook* [1908] 1 K.B. 821 was an action for infringement of one dramatic sketch, 'Motoring or the Motorist,' by another, entitled 'Astronomy', which although concerned with a different subject had certain similarities in terms of the number and nature of the characters and the 'incidents' (such as one of the characters standing on a fire-cracker). The plaintiff, Tate, claimed to be author and owner of copyright in the sketch. According to the Report "It appeared that the plaintiff had not himself composed the dialogue of "Motoring or the Motorist," but had suggested the general idea and dramatic situations of the piece to a man named Pink, who had composed the dialogue in accordance with the plaintiff's suggestions, and who, in giving evidence, described his part in the matter as clothing the skeleton with words." On appeal, the Court indicated that it did not think that the plaintiff was the author of the sketch in which copyright was claimed. Vaughan Williams LJ observed (at 826):

> "It is true in this case that, to a certain extent, the plaintiff suggested to Mr. Pink the general ideas on which the sketch was to be framed. But that does not, in my opinion, make the plaintiff the author of the sketch, either alone or jointly with Mr. Pink. Many things occur and are reported in the daily newspapers which might form the subject-matter of such a dramatic sketch as is here in question; for instance, such a sketch might

43

> conceivably be based upon the adventures of the suffragettes. But a
> music-hall artist who suggested such a topic as the subject of a sketch to
> another person, who composed a sketch upon it, would not, I think, be
> the author of the sketch. As at present advised, if it were necessary to
> determine the point, I should say that there was no ground for saying that
> the plaintiff was the author of the sketch in respect of which this action is
> brought."

Providing the ideas for, and commissioning the execution of a play was not
sufficient to make Tate the author.

(iv) *Tate v. Thomas* [1921] 1 Ch. 503. Here Peterman commissioned the three
Plaintiffs (James Tate, Clifford Harris and Arthur Valentine) to contribute the
music and libretto to a play called *Lads of the Village*. Peterman himself came
up with the name of the play and the characters. Tate wrote the music, and
under the agreement was paid a fee and entitled to a royalty. Once the work
was complete Peterman assigned copyright to the Defendants, who proposed to
release a cinematographic version. The Plaintiffs objected. The question for the
court was whether Peterman was the author or a joint author. The judge, Eve J,
described him (at 509-10) as "a gentleman of a fertile imagination and
possessed of a fluency and powers well qualifying him for communicating his
views to the authors." The Plaintiffs did not contest Peterman's claim that the
work embodied some ideas and a few catch lines or words for which Mr.
Peterman may claim credit, but they argued that these did not make him the
author of the work. Eve J agreed. At 512 he explained:

> "Even were I to give Mr. Peterman credit for a much larger share than I
> am prepared to attribute to him in settling the scenes and accessories of
> this play, I could not hold his claim to be considered the author of the
> piece paramount to that of the plaintiffs. I am quite satisfied that he
> cannot be regarded as the author. Then it is said that if he is not the sole
> author, he is at least a joint author. ... The question whether Mr.
> Peterman's claim to be a joint author of this work, so far as it is subject
> matter for protection under the Act, is one of fact; and having heard all
> the evidence I have come to the conclusion that his contributions to the

matter capable of being printed and published were so insignificant and negligible as to make it quite impossible for me to hold him to have been in any sense a joint author within the Act."

The organisation of the writing of the play, even coupled with the provision of the title and ideas as to its content, did not make Peterman an author.

104.     The second proposition is best illustrated by the cases on 'ghost authorship', that is circumstances where a person provides autobiographical data from which another can prepare a text. In such cases it is the writer, rather than the subject who is regarded as the author:

(i) *Evans v. Hulton & Co Ltd* (1924) [1923-28] *MacGillivray's Copyright Cases* 51. Here the Plaintiff, Frank Evans, claimed to be author of the literary work, '*A Free-Lance Detective: Life of Hadji Lello Zeitun*', and entitled therefore to prevent Hulton, the publisher of the newspaper the *Daily Sketch*, from publishing extracts from the book. Hulton had the permission of Zeitun, the subject of the book, who claimed to be its author. The process of creation of the book was that Evans had agreed to write a book about Zeitun's life, the agreement leaving to Evans the power to exploit the work with Zeitun to receive half of the profits gained from such exploitation. Zeitun, whose first language was not English, related incidents in his life to Evans who then (according to the reporter's summary of Zeitun's evidence) "put them into proper language" (55). Evans was held to be the author. Tomlin J explained:

> The fact that he is the subject-matter of the production in the sense that it is an incident from his life, for which he provided the material, does not seem to me to make him in any sense the joint author with Mr. Evans of the manuscript which was in fact written, and, upon the facts which I have stated, I find that he did not take any part in producing the express matter which is the original literary work, the subject-matter of copyright.

(iii) *Donoghue v. Allied Newspapers Ltd* [1938] Ch. D. 106. The Plaintiff was a racecourse jockey who had agreed to provide a journalist from the newspaper, the *News of the World*, with material for a series of articles. The journalist,

45

Felstead, produced the articles, which were published. Five years later, Felstead had discussions with another publisher about republishing updated versions, and, when negotiations with the Plaintiff stalled, he brought an action to restrain publication on the basis that he was author, or even a joint author, of the articles. The Court rejected the claim. Farwell J stated (at 109)

> "a person may have a brilliant idea for a story, or for a picture, or for a play, and one which appears to him to be original; but if he communicates that idea to an author or an artist or a playwright, the production which is the result of the communication of the idea to the author or the artist or the playwright is the copyright of the person who has clothed the idea in form, whether by means of a picture, a play, or a book, and the owner of the idea has no rights in that product."

He explained his conclusion that Felstead was the sole author (at 110):

> "Although many of the stories were told in the form of dialogue, and to some extent Mr. Felstead no doubt tried to reproduce the story as it was told to him by the plaintiff, nevertheless the particular form of language in which those adventures or stories were conveyed to the public was the language of Mr. Felstead and not the language of the plaintiff."

105.    The Plaintiff's Expert Report (at para 37) states that

> "a person who suggests a plot may be one of the authors provided that his/her suggestions are sufficiently substantial, well defined and original"

It cites *Ibcos Computer Ltd v. Barclays Mercantile Highland Finance Ltd* [1994] F.S.R. 275, 302. This was an infringement case, concerning computer programs, in which the Court (obiter) suggested that copyright in a literary work might be infringed by reproducing the plot. Not surprisingly, the foregoing cases on authorship were not cited to the Court. Without wishing to contest the Plaintiff's Experts proposition, it seems clear that as a general matter that merely contributing ideas for works, including ideas for a plot, will seldom if ever be regarded as sufficient to justify a finding of joint authorship.

106.    The Plaintiff's Expert Report (at para 37) states that

"a person may be the true author if he/she is responsible for creating, selecting or gathering together the detailed concepts data or emotions contained in a work".

Although this statement derives from the judgment of Laddie J in *Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd.* [1995] F.S.R. 818, 835,[9] in the light of the case-law just set-out, in particular *Evans* and *Donughue*, I have some trouble with this as a statement of law. That case-law indicates the contribution of concepts, information (such as biographical information) and emotions may not be authorial contributions *even if* detailed. The question is not whether the concepts are detailed, but whether that detail contributes to or determines the final expressive form of the work. As we will see, Laddie J's proposition was also unnecessary for determination of the case, and so should be regarded as obiter dicta.

107.    In *Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd.* [1995] F.S.R. 818, the question arose as to ownership of copyright in designs of certain houses, Cala's 'New Standard House range,' which Cala alleged that McAlpine had copied. One of Cala's employees, a Mr Date, directed the creation of the plans, but technical draughtsmen from an outside firm of consultants (Crawley Hodgson) had been used to do the actual drafting. Laddie J found there to be joint authorship -- in fact he said Date was the main author. Importantly, Date did not just provide "concepts, data or emotions": he obsessively supervised the detailed features of the plans. The Judge summarised the evidence (at 831-2, 833, 834):

    Mr Date's evidence was that he was a workaholic who only passed the drawing exercise to Crawley Hodgson because he no longer had sufficient time to put the lines on the paper. However, save in this respect, it was clearly his view that he was responsible for deciding, in detail, what those drawings were to look like. Having seen Mr Date in the

---

[9] "In my view, to have regard merely to who pushed the pen is too narrow a view of authorship. What is protected by copyright in a drawing or a literary work is more than just the skill of making marks on paper or some other medium. It is both the words or lines and the skill and effort involved in creating, selecting or gathering together the detailed concepts, data or emotions which those words or lines have fixed in some tangible form which is protected. It is wrong to think that only the person who carries out the mechanical act of fixation is an author. There may well be skill and expertise in drawing clearly and well but that does not mean that it is only that skill and expertise which is relevant."

47

witness box I have no doubt that he is a man who has very firm views of what he does and does not like and of the designs which he thinks are suitable for Cala. His evidence was that he told Mr Hodgson precisely what features were to be incorporated into each house. In many cases this was done with the aid of sketches, which no longer exist, drawn by him.

...

Mr Hodgson's evidence is consistent with that given by Mr Date. He said that Mr Date gave Crawley Hodgson a very detailed brief and that he was even specific as to the choice of materials to be used. The original briefing session with Mr Date took a whole day in which the design of each of the first group of 12 house designs were considered in detail. He stated that in the case of some designs, his firm's design input could be measured as a few percent.

...

It is clear from the evidence that much if not most of the design features to be found in the Crawley Hodgson drawings came from and were insisted upon by Mr Date during the briefing and vetting sessions he had with Mr Hodgson. However not only were the Crawley Hodgson drawings not produced by Mr Date, they were also not drawn by Mr Hodgson. The actual draughtsmanship was the responsibility of more junior employees of Crawley Hodgson. Although neither Mr Date nor Mr Hodgson was able to be certain, it is likely that one or more of these employees sat in on some of the Date/Hodgson meetings. One other employee who did attend the meetings was a Mr Steadman. He was in charge of co-ordination between Cala and the junior draughtsmen who actually drew the drawings. Mr Steadman was Mr Date's contact with regard to the actual physical drawing side of the commission to Crawley Hodgson. However the evidence is that he did not make any design suggestions of his own.

In these very unusual circumstance, a finding that Date was an author of the plans seems consistent with the general principle that the contribution must be

to the expression (rather than merely to ideas): the detailed <u>expressive forms</u> came from him, he supervised the draughtsmanship in a controlling manner and neither welcomed nor tolerated any deviation from the forms he had specified. The draughtsperson here was the architectural equivalent of an amanuensis.

108.     The Plaintiff's <u>Expert Report</u> (para 104(b)) also rightly states that to be a basis of co-authorship, there must be "significant creative input" and (at para 37) that contributions must be "sufficiently substantial, well-defined and original."

109.     The third requirement is that the contributions are not "distinct." This excludes from joint authorship the situation where one person writes certain parts and another the others, for example, where one writes the words and the other the music of an opera or a song. But it has been held that, where one person added an introduction to the music of a song, this introduction was not "distinct" because it was "heavily dependent" on the rest of the tune and because, by itself, it would "sound odd and lose meaning": *Beckingham v. Hodgens* [2003] F.S.R. 238, 248.

110.     Under current British law, one joint owner may not exploit a joint work without the licence of the other or others. C.D.P.A., Sec. 173(2). In *Cescinsky v. Routledge* [1916] 2 K.B. 325 (Rowlatt J), where a publisher and author co-owned copyright in a book, the author was held to be entitled to sue the publisher co-owner, who without the author's consent had published a derivative version. See also *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622, 637-638 (Lightman J.).

111.     The Plaintiff's <u>Expert Report</u> says the works that were developed by freelancers were created through collaboration (paras 102). It goes on to say that

> "the Plaintiff employees [contributed] their skill, creativity, guidance and control. Under English law, such illustrations...would constitute joint works."

As should now be clear, that conclusion is not warranted from what is known about the nature of the contributions at this stage. Mere contribution of "skill,

creativity, guidance and control" is beside the point. The question is whether there is a significant, original contribution <u>of expression</u>.

112.    The Plaintiff's <u>Expert Report</u> is more accurate where it states (at 105) that:

> "A court would have to consider each item and the relative contribution of those involved in its creation to determine whether each has made a significant creative input..."

In carrying out that analysis, relevant creative inputs do not include taking the initiative, giving abstract instructions, making suggestions as to subject matter. The relevant input must contribute directly to the expressive form of the work.

### D. Other Relevant Principles of Ownership

113.    The Plaintiff also claims it might have become the owner of copyright in various works by other means. These include (i) in relation to works created before 1 August 1989, by virtue of the special rule on commissions; (ii) by assignment; and (iii) by implied or equitable assignment.

### Commissioned Works under the Copyright Act 1956

114.    Under the C.D.P.A., the only exception to the principle that the author owns copyright relates to employees. However, for works created prior to 1 August 1989, the Copyright Act 1956 determines ownership. Under that Act there was a second exception relating to a narrow category of works. Section 4(3) provided that:

> Subject to the last preceding subsection, where a person commissions the taking of a photograph, or the painting or drawing of a portrait, or the making of an engraving, and pays or agrees to pay for it in money or money's worth, and the work is made in pursuance of that commission, the person who so commissioned the work shall be entitled to any copyright subsisting therein by virtue of this Part of this Act.

115.   The rule on commissions was particularly aimed at protecting the privacy of those who had their portraits taken (and could be traced back to the Fine Arts Copyright Act 1862). The inclusion in the provision of "engravings" is less easy to explain.

116.   The Plaintiff's Expert Report (paras 71-73) cites various case-law giving an expansive definition of "engraving". One of those was a Court of Appeal decision from New Zealand, *Wham-O Manufacturing Co v Lincoln Industries Ltd* [1985] RPC 127. The cases that are binding on an English court are at first instance only (and thus would only bind a court of first instance). However, this stream of authority must now be regarded as unsafe.

117.   In *Lucasfilm v Ainsworth* [2012] 1 AC 208,[10] the Supreme Court referred to *Wham-O*, and Lords Collins and Walker (with whom Baroness Hale and Lord Phillips agreed) stated (at 223, [30]):

>   "Much of the judgment is taken up with reasoning leading to the rather surprising conclusion that the moulds and final products were engravings."

This suggests that the Supreme Court regarded itself as unlikely to reach a similar conclusion.

118.   As already noted, in *Lucasfilms* the Supreme Court affirmed the views of the lower courts that defining the concept of "sculpture" involved looking for a number of factors (Mann J, para 118; Jacob LJ, at para 54; Supreme Court, at 228, [47] ). These included:

>   (i) the ordinary meaning of the term;

>   (ii) whether the object had, as part of its purpose, a visual appeal in the sense that it might be enjoyed for that purpose alone, whether or not it might have another purpose as well. The purpose is that of the creator.

>   (iii) the process of fabrication;

---

[10] The Plaintiff's Expert Report cites the case as "Lucasfilms".

These factors seem applicable, *mutatis mutandis*, to the definition of the term "engraving."

119. The Supreme Court observed (at 228, [48]) that the relationship between copyright law and designs itself provided a policy reason to interpret copyright in a limited way:

> "the court should not, in our view, encourage the boundaries of full copyright protection to creep outwards."

That policy consideration seems equally applicable to the construction of the term "engraving."

120. To determine whether any of the moulds or miniatures are engravings for the purpose of section 4(3) of the 1956 Act, in my view, the Court will need to make a close analysis of how the models are made, their purpose, and whether in their final form they fall within the ordinary meaning of "engraving". One factor of over-riding relevance is likely to be Games Workshop Ltd's own description of process of production. The depositions identify a department of the business as "a sculpting department". See eg Blanche, p. 18, line 1; page 54, line 17).

121. The provision on commissions was removed in the 1988 reforms. In relation to portraits, the concern with privacy was addressed through a special moral right in C.D.P.A. s 85. In its report, *Copyright and Designs Law. Report of the Committee to Consider the Law of Copyright and Designs* (1977) Cmnd. 6732, the Whitford Committee noted that, portraits aside, no one had been able to suggest any valid ground for treating photographs and engravings differently from other commissioned works. See (Cmnd. 6732), para. 561.

**Transfers**

122. Copyright is a property right: C.D.P.A., s. 1. It is capable of transfer. The principles governing transfers are contained in C.D.P.A., s. 90. This reads:

> (1) Copyright is transmissible by assignment, by testamentary disposition or by operation of law, as personal or moveable property.

52

(2) An assignment or other transmission of copyright may be partial, that is, limited so as to apply—

(a) to one or more, but not all, of the things the copyright owner has the exclusive right to do;

(b) to part, but not the whole, of the period for which the copyright is to subsist.

(3) An assignment of copyright is not effective unless it is in writing signed by or on behalf of the assignor.

(4) A licence granted by a copyright owner is binding on every successor in title to his interest in the copyright, except a purchaser in good faith for valuable consideration and without notice (actual or constructive) of the licence or a person deriving title from such a purchaser; and references in this Part to doing anything with, or without, the licence of the copyright owner shall be construed accordingly.

Similar provisions were contained in Copyright Act 1956, s. 36. For transitional arrangements, see C.D.P.A., Sched 1, para 25.

123.  The recitals to the Information Society Directive also confirm that the rights that are harmonized under European law are assignable:

(30) The rights referred to in this Directive may be transferred, assigned or subject to the granting of contractual licences, without prejudice to the relevant national legislation on copyright and related rights

124.  Consequently, even if the copyrights in various pieces of concept art, sculpture of miniatures or illustrations vest initially in the author/creator, that copyright can be transferred or licensed.

125.  As should be clear, an assignment must be in writing. Assignments of rights in relation to works that are not yet in existence is also recognised: C.D.P.A., s. 91; Copyright Act 1956, s. 37.

126.  Consequently, there is little doubt that where the Plaintiff can establish written assignments, it will be regarded as the owner of copyright in the subject matter to which the assignment relates. Thus, for example, the copyright agreement

between Dan Abnett and Games Workshop Ltd dated 11 December 1996 is, on its face, a signed and effective assignment of copyright (see Clause 3.1), though the precise works which it covers would need to be identified by extrinsic evidence. So, too, is that between Games Workshop and John Sibbick (though this is dated only '1994') and that between Games Workshop and Ben Counter (though this one has no date at all), though, once again, the dates of these agreements would need to be proved by the Plaintiff through extrinsic evidence. In contrast, the so-called 'confirmatory assignment' between Adam Troke and Games Workshop has no signature, and thus is not a valid assignment.

127.    The purpose of the rule that assignments must be in writing has been little explored in UK commentaries or jurisprudence. However, in the United States there has been some valuable comment. In *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) Circuit Judge Alex Kozinski explained 17 U.S.C. § 204(a) thus:

"Common sense tells us that agreements should routinely be put in writing. This simple practice prevents misunderstandings by spelling out the terms of a deal in black and white, forces parties to clarify their thinking and consider problems that could potentially arise, and encourages them to take their promises seriously because it's harder to backtrack on a written contract than on an oral one. Copyright law dovetails nicely with common sense by requiring that a transfer of copyright ownership be in writing. Section 204 ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price... Most importantly, section 204 enhances predictability and certainty of copyright ownership--"Congress' paramount goal" when it revised the Act in 1976. ... Rather than look to the courts every time they disagree as to whether a particular use of the work violates their mutual

54

understanding, parties need only look to the writing that sets out their respective rights."

128. A licence need not be in writing, and indeed can be implied. The circumstances in which licences are to be implied and the scope of such implied licences is discussed by Lightman J in *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622. This case is included in the documents annexed to the Plaintiff's Expert Report. The relevant passages are 640-645, selections of which appear in the Plaintiff's Report, and other parts of which I set out below. The key feature is that the courts will only imply terms in narrowly defined circumstances and the terms that are implied will be the mimimum necessary to achieve the mutually intended result.

**Equitable assignment**

129. The Plaintiff raises the possibility that where the works were created by freelancers, their copyright might belong to the Plaintiff even absent an express written assignment. This is as a result of an "implied assignment." The Plaintiff's Expert Report (paras 74-96) recognises that English courts have occasionally held that even in the absence of an agreement the court can re-allocate the rights under general principles of contract and equity.

130. The rules are discussed by Lightman J in *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622. It is important to highlight for the Court a number of propositions made by the judge in his review (at 640-645) that are not reproduced in the Plaintiff's Expert Report:

> The general principles governing the respective rights of the contractor and client in the copyright in a work commissioned by the client appear to me to be as follows:
>
> (1) the contractor is entitled to retain the copyright in default of some express or implied term to the contrary effect;
>
> (2) the contract itself may expressly provide as to who shall be entitled to the copyright in work produced pursuant to the contract. ....
>
> (3) the mere fact that the contractor has been commissioned is insufficient to entitle the client to the copyright. Where Parliament intended the act of commissioning alone to vest copyright in the client,

55

*e.g.* in case of unregistered design rights and registered designs, the legislation expressly so provides (see section 215of the 1988 Act and section 2(1A) of the Registered Designs Act 1949 as amended by the 1988 Act). In all other cases the client has to establish the entitlement under some express or implied term of the contract;

(4) the law governing the implication of terms in a contract has been firmly established (if not earlier) by the decision of the House of Lords in *Liverpool City Council v. Irwin* [1977] A.C. 239 ("Liverpool"). In the words of Lord Bingham M.R. in *Philips Electronique v. British Sky Broadcasting Ltd* [1995] E.M.L.R. 472 ("Philips") at 481, the essence of much learning on implied terms is distilled in the speech of Lord Simon of Glaisdale on behalf of the majority of the Judicial Committee of the Privy Council in *BP Refinery (Westernport) Pty Ltd v. The President, Councillors and Ratepayers of the Shire of Hastings* (1978) 52 A.L.J.R. 20 at 26:

> Their Lordships do not think it necessary to review exhaustively the authorities on the implication of a term in a contract which the parties have not thought fit to express. In their view, for a term to be implied, the following conditions (which may overlap) must be satisfied:
>
> (1) it must be reasonable and equitable;
>
> (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it;
>
> (3) it must be so obvious that "it goes without saying";
>
> (4) it must be capable of clear expression;
>
> (5) it must not contradict any express term of the contract.

Lord Bingham added an explanation and warning:

> The courts' usual role in contractual interpretation is, by resolving ambiguities or reconciling apparent inconsistencies, to attribute the true meaning to the language in which the parties themselves have expressed their contract. The implication of contract terms involves a different and altogether more ambitious undertaking: the interpolation of terms to deal with matters for which, *ex hypothesi*, the parties themselves have made no provision. It is because the implication of terms is so potentially intrusive that the law imposes strict constrains on the exercise of this extraordinary power . . .The question of whether a term should be implied, and if so what, almost inevitably arises after a crisis has been reached in the performance of the contract. So the court comes to the task or implication with the benefit of hindsight, and it is tempting for the court then to fashion a term which will reflect the merits of the situation as they can appear. Tempting, but wrong.

(5) where (as in the present case) it is necessary to imply the grant of some right to fill a lacuna in the contract and the question arises how this lacuna is to be filled, guidance is again to be found in *Liverpool*. The principle is clearly stated that in deciding which of various alternatives should constitute the contents of the term to be implied, the choice must be that which does not exceed what is necessary in the circumstances (see Lord Wilberforce at 245F—G). In short a minimalist approach is called for. An implication may only be made if this is necessary, and then only of what is necessary and no more;

(6) accordingly if it is necessary to imply some grant of rights in respect of a copyright work, and the need could be satisfied by the grant of a licence or an assignment of the copyright, the implication will be of the grant of a licence only;

(7) circumstances may exist when the necessity for an assignment of copyright may be established. [This passage is quoted in the Plaintiff's Expert Report and so is not repeated here];

(8) if necessity requires only the grant of a licence, the ambit of the licence must be the minimum which is required to secure to the client the entitlement which the parties to contract must have intended to confer upon him. The amount of the purchase price which the client under the contract has obliged himself to pay may be relevant to the ambit of the licence. ...[I]t seems to me that the principle involved is this; that the engagement for reward of a person to produce material of a nature which is capable of being the subject of copyright implies a permission, or consent, or licence in the person giving the engagement to use the material in the manner and for the purpose in which and for which it was contemplated between the parties that it would be used at the time of the engagement.

(9) the licence accordingly is to be limited to what is in the joint contemplation of the parties at the date of the contract, and does not extend to enable the client to take advantage of a new unexpected profitable opportunity (consider *Meikle v. Maufe* [1941] 3 All E.R. 144).

These statements of principle accord with a number of cases where the client has been refused an assignment of copyright and granted only a licence (see, *e.g. Cooper v. Stephens* [1895] 1 Ch. 567); and a number of other cases where the licence granted to the client has been limited to use the copyright work for the purposes for which it was commissioned (see, *e.g. Stovin-Bradford v. Volpoint Properties Ltd* [1971] 1 Ch. 1007). These statements may appear difficult to reconcile with the actual decisions in a number of the cases where a term has been implied into a contract for services for the assignment of copyright by the contractor to the client. Some of the cases cited as instances where an obligation to assign has been implied may in fact have only decided that a licence should be implied: see, *e.g. Harold Drabble Ltd v. Hycolite Manufacturing Co.* [1923–8] Macg. Cop. Cas. 322; and in others the

exact relationship of the contractor and client is not clear: see *Merchant Adventurers Ltd v. M Grew & Co. Ltd* [1973] R.P.C. 1, (a case where the contractor supported the client's claim against the infringer). It is however to be noted that: (1) in most, if not all, of those where a term has been implied for assignment, assumed that, if a term was to be implied conferring rights on the client, that term should be that there should be an assignment. The alternative implication of a licence was not considered (see, *e.g. Ironside v. Attorney-General* [1988] R.P.C. 197); and (2) it was not until the Copyright Act 1956 that an exclusive licence could be granted conferring rights of action against third party infringers: before that date in order to confer a right of action against infringers it was necessary to assign the copyright. These authorities accordingly afford limited guidance today where the issue raised is whether the necessary implication is of an assignment or some form of licence. Indeed today it may be rare that necessity requires an assignment and the grant of an exclusive licence will not suffice.

131.   In *Grisbrook v MGN Ltd*, [2009] EWHC 2520 (Ch), Patten LJ referred to that statement and observed:

> Although the law on implied terms has recently been considered by the Privy Council in *Attorney General of Belize v Belize Telecom Limited* [2009] UKPC 10 , there is nothing, I think, in that judgment which undermines this statement of principle in a case where no relevant express terms have been agreed.

Lightman J's summary was also treated as authoritative by the Court of Appeal in *Lucasfilm v Ainsworth* (at para 207).

132.   Let me draw out the following points from Lightman J's summary:

(i) The implication of terms is intended to give effect to what is in the joint contemplation of the parties at the date of the contract;

(ii) Terms will only be implied where they are necessary;

(iii) The terms that are to be implied are the minimum necessary to give effect to those intentions;

(iv) It will rarely be necessary to imply an assignment;

(v) A commissioning arrangement does not of itself imply such an assignment;

(vi) The determination of whether an assignment is to be implied depends on a range of considerations.

133. The Plaintiff's Expert Report (para 74)

"an English court will often imply a term into the commissioning agreement for the copyright to be held on trust for the commissioner as the true beneficiary of the same" (my emphasis).

That proposition must be regarded as dubious in the light of proposition 3 and 9 of Lightman J.'s analysis, where he says that it will rarely be necessary to imply an assignment. Indeed in paragraph 9, Lightman J. casts doubt on the correctness of a host of previous decisions that seemed to imply assignments. It is also notable that, on the facts of *Robin Ray*, the Court rejected a claim that there was an implied assignment.

134. The Plaintiff's Expert Report (paras 31(c), 82, 97) seems to elevate the categories or situations listed by Lightman J in proposition 7 into categories of law. In my view, that is an inadvisable approach for four reasons:

(i) First, it loses track of the rationale for implying the terms, that is to give effect to the intention of the parties at the time of the contract;

(ii) Second, it is inconsistent with what Lightman J in fact said. Having set out the three examples of situations in which it "may" be appropriate to imply an assignment, Lightman J reiterates that

In each case it is necessary to consider the price paid, the impact on the contractor of assignment of copyright and whether it can sensibly have been intended that the contractor should retain any copyright as a separate item of property.

(iii) Third, in *R. Griggs Group v. Raben Footwear* [2005] F.S.R. (31) 706, 714 (para 14) Jacob LJ noted:

"para. 7 on its own does not purport to lay down a universal rule. Lightman J. merely says that in such circumstances the implied term is 'likely to arise.' The passage rightly recognises that in each case whether or not a term is implied and, if so, what it is will depend on all the factual circumstances. Lightman J. is here no

59

more than pointing out powerful factors for copyright entitlement to lie with the client."

See, to similar effect, *Clearsprings Management Ltd. v. Businesslinx Ltd.* [2006] F.S.R. (3) 21, para 9 (Floyd J) (set out below).

(iv) Fourth, it transforms a process of inferring the intention of the parties into a rule of law. Recently the Court of Justice of the European Union has indicated, (in relation presumably to transactions after 2002) that Member States may not operate legal provisions transferring ownership automatically from the designated beneficiary under the Information Society Directive (in our circumstances, "the author"): Case C-277/10 *Martin Luksan v. Petrus van der Let* (9 February 2012).

135. The Plaintiff's Expert Report presents these principles as of common application to ordinary cases. To my mind, for a host of reasons, equitable assignments should be ordered only in exceptional circumstance following a close analysis of the facts. In this respect, it is notable that in a number of cases referred to in the Plaintiff's Expert Report, the holdings on implied/equitable assignments were *obiter dicta*, the court ruling on a different ground. This is true of:

(i) *Massine v. De Basil* [1936–45] *MacGillvray's Copyright Cases* 223 (referred to in the Plaintiff's Expert Report, at para 96) where the Court held that choreographic works that had been created by Massine belonged to De Basil under section 5(1) of the Copyright Act 1911, as he was a salaried servant of the defendant, and in preparing the choreography was acting in that capacity.

(ii) *Nichols Advance Vehicle Systems Inc v. Rees* [1979] R.P.C. 127 where the statements regarding implied terms were also *obiter* because the Court found the author to have created the drawings as an employee in the course of employment.

(iii) *Pasterfield v. Denham* [1999] F.S.R. 168. This is ambiguous as an authority because, having held that there was an implicit understanding that the commissioner was to own copyright in the drawings in issue, Judge Overend stated that if he was wrong there was an implied licence.

136.    The Plaintiff's <u>Expert Report</u> refers in particular to *R. Griggs Group v. Raben Footwear* [2005] F.S.R. (31) 706[11]; and *Lucasfilm v Ainsworth* [2009] F.S.R. (2) 103.

137.    In *R. Griggs Group v. Raben Footwear*, Griggs, distributors of DR. MARTEN'S AIRWAIRS, had in 1988 commissioned the advertising agency, Jordan, to produce a logo for it. Evans, who did freelance work for Jordan, produced the logo and was paid on his standard rate of £15 an hour. Nothing was said about copyright in the logo. In 2002, Evans purported to assign copyright in the artistic work to Raben Footwear, an Australian competitor of Griggs. In response, Griggs brought an action seeking a declaration that it was beneficial owner of copyright, and an assignment of legal title. Deputy Judge Prescott QC held that Griggs was entitled to the copyright and the Court of Appeal dismissed the appeal.

Deputy Judge Prescott QC held that while Evans was the author, and first owner of the legal title, an agreement that copyright was to belong to Griggs was to be implied. Such an agreements was necessary to give business efficacy to the arrangement, under which it was clearly contemplated that Griggs would be able to use the logo and stop others from using it (para 57). This could only be achieved if the implied agreement was to assign the copyright or give a perpetual exclusive licence (and the latter solution would be less convenient for Evans). In turn, this gave rise to a trust with respect to the copyright in the commissioned work, and rendered the commissioner the equitable owner. Raben Footwear were purchasers from Evans, but were not 'Equity's Darling',[12] and, having notice of the position, were bound by Griggs's equitable rights. Subject to the question of jurisdiction, the court would order Raben footwear to transfer the copyright to the claimant, Griggs.

On appeal, Jacob LJ agreed that an officious bystander would take the view that Evans was not to retain any interest. The argument that all Jordan (and in turn Griggs) required was a limited licence was, he said 'fantastic' (para 19). He explained:

---

[11] The account of this case in the Plaintiff's Expert Report, para. 84, is inaccurate when it states that the design was commissioned from "the second defendant, a rival manufacturer".
[12] Third party purchasers for value and without notice of the equitable interest.

> If an officious bystander had asked at the time of contract whether Mr Evans was going to retain rights in the combined logo which could be used against the client by Mr Evans (or anyone to whom he sold the rights) anywhere in the world, other than in respect of point of sale material in the UK, the answer would surely have been "of course not." Mr Evans had no conceivable further interest in the work being created— indeed he surely would never have had the job at all if there had been a debate about this and he had asserted that that was to be the basis of his work."

Lest he be thought to have been creating a categorical rule it is worth noting Jacob LJ's further observation at para 21:

> Further use does indeed often cause problems as between an author and his commissioner and it is always better if payment for this is spelt out in the contract. A right to further payment for unforeseen or undisclosed further use may in some cases be implied. <u>In others the author may indeed retain copyright and actually be able to prevent further use. All depends on the circumstances.</u> In the present case, however, there is simply no such problem.

138.   *Lucasfilm Ltd v. Ainsworth*, [2010] Ch 502 concerned ownership of copyright in the helmets of the stormtroopers for the Star wars movies. In brief, the drawings were produced by McQuarrie for Lucas; a clay version was then produced by Pemberton; when Lucas asked Pemberton to produce a plastic version he commissioned Ainsworth. Ainsworth was informed the helmet was for use as a prop in a dramatic production, and made certain small deviations from Pemberton's model. Lucas liked the plastic version, and initially ordered 50 at £20 each. Further orders were made, and ultimately Ainsworth received a fee of £30,000. Mann J. held that Lucas owned copyright, and Ainsworth appealed. The Court of Appeal affirmed, applying the reasoning in Griggs and Robin Ray. Jacob LJ explained that

> " it was always inherent in the relationship that if it proceeded to a contract, it would be on terms that would reward Mr Ainsworth for his preliminary work but would confer the primary copyright interests on the

commissioning party."

And later, at 556-7 (para 208), that:

"The fact that the parties may not have anticipated the success of the film is quite beside the point. The question, which has to be answered objectively and does not depend in any way on what might in fact have gone through the minds of particular parties, is what the parties would have agreed if the question of licensing opportunities had been raised. We agree that in those circumstances, it would never have occurred to anyone to say that Mr Ainsworth should have retained any (necessarily limited) copyright interests. We agree that an obligation to assign was necessarily to be implied. It was also reasonable, and there is nothing in the commercial arrangements then made, eg in the prices agreed, to suggest that it was unreasonable."

139. *Griggs* and *Lucasfilm* can (and should) be regarded as exceptional cases where assignment was implied. Some key facts worth drawing out were:

(i) *Griggs* concerned a commercial logo (a work of relatively low authorship);

(ii) The work commissioned involved combination of two existing logos;

(iii) It was clear to the parties that it would be exploited commercially;

(iv) Evans understood this to be "point of sale" material, but would not have charged differently had the use been intended to extend to other;

(v) The assignment by Evans to Raben Footwear in 2002 was opportunistic.

And in *Lucasfilm v Ainsworth*:

(i) Ainsworth was commissioned to produce something that was a virtual replica of an existing sculpture, and thus appreciated that he was one step in a production process;

(ii) Ainsworth knew of the purpose (a "dramatic production" – though he understood a play, rather than a film: see [2009] F.S.R. (2) 103, 124, [35]);

63

(iii) Ainsworth was well-remunerated ([2009] F.S.R. (2) 103, 175, [189] ("was not plainly of such a sum which must inevitably have meant that he retained some of the intellectual property rights").

140.    There are a host of cases where the Plaintiff claimed an equitable assignment but did not succeed. These include:

(i) *Tate v. Thomas* [1921] 1 Ch. 503, which concerned the commissioning of a play as a composite work with the benefit of some material provided by the Plaintiff. Eve J rejected a claim that there was an implied/equitable assignment of the copyright because there was an express agreement as to staging rights for a play.

(ii) *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622, which concerned the compilation of a catalogue of recordings for inclusion in the Defendant's database (that would be used to programme automatically what recordings would be broadcast over the radio). The Defendant claimed to be entitled to exploit the database abroad. Lightman J. held, at 644-5, that this was not within the contemplation of the parties at the time of the contract, so there was no need for anything more than a licence to be implied permitting the Defendant to use the database in the UK, and an implied undertaking by the Claimant not to licence a competitor.

(iii) *Clearsprings Management Ltd. v. Businesslinx Ltd.* [2006] F.S.R. (3) 21. Here the commissioner of a web-based database was held only to be entitled to perpetual and irrevocable, royalty-free, non-exclusive personal license, as opposed to the copyright ownership or exclusive license contended for. Floyd J stated (at para 9)

"I would stress, as is already apparent from this passage from Lightman J.'s judgment, that whether a term is to be implied, and if so what term, is entirely dependent on the circumstances of the individual case. The examples given in Lightman J.'s judgment are no more than examples of cases where, as he says, the necessity for a transfer of ownership or exclusivity *may* arise. Unlike a contract

for the sale of goods, where it can be said that certain terms will be universally implied unless excluded expressly, the circumstances in which a copyright work may be created by an independent contractor are extremely varied. <u>One should not forget that the starting point is that Parliament has conferred copyright on the author of the work and that there it will remain unless the circumstances are such as to make it necessary to imply obligations which have the effect of transferring it to the client or otherwise cutting down its scope</u>."

(iv) *Slater v. Wimmer* [2012] EWPCC 7. Here the dispute was over ownership of copyright in film footage of a skydive over Everest. Wimmer had heard about the skydive and wanted to be in it and be filmed. He planned to make two films, one for Danish audiences and one to be exploited more generally. The films would incorporate the footage with other material. He needed a cameraman. Slater, a 21 year old, was recommended and agreed to do it; Wimmer agreed to pay Slater's costs for the trip. Slater knew the purpose of the footage (para 92). Two year's after the trip, Slater discovered that a documentary had been broadcast on Danish TV which contained 150 seconds of footage from the film. HH Judge Birss QC, the Judge in the Patent County Court (a specialist intellectual property court providing for cheap litigation) found that Wimmer was "producer" and Slater "director" of the film, which was thus a work of joint authorship. He declined to imply an assignment of Slater's share to Wimmer. Even though this was a case where the commissioner intended to exploit the work, to incorporate it with other material and to license it to third parties, the Judge thought it inappropriate to imply an assignment that would vary the statutory allocation of authorship and thus ownership. In so holding he was clearly influenced by the fact that Slater was unpaid (para 93), as well as by the fact that Wimmer could assert rights against third parties by virtue of his joint interest.

141.    The Plaintiff's <u>Expert Report</u> treats the cases, where no assignment is found, as cases "where items have been commissioned purely for internal use." It should

be evident that this cannot explain *Tate v. Thomas* [1921] 1 Ch. 503 nor the case of *Slater v. Wimmer* [2012] EWPCC 7. The circumstances in which an obligation to assign will be implied cannot be reduced to a simple formula. As Floyd J. observed in *Clearsprings*:

> "there are dangers in listing these factors and then looking at the degree to which each of them may be present. The factors are based on Lightman J.'s examples of cases where a need for assignment or more probably exclusivity may arise. But my task overall is to see what term needs to be implied in this case, not to see what analogies, partial or otherwise, can be made to the facts of other cases."

142.    The issues of ownership of copyright in this case will need to be determined specifically in relation to each and every work of which it is alleged the Plaintiff owns copyright. The evidence reveals the involvement in the creative activities of the Plaintiff of different people at different times, those people having varying status, contributing in different ways and operating, very possibly, under different assumptions about copyright ownership. Consequently, different conclusions as to ownership of copyright may well be arrived at for different pieces of art. Generalisations are unhelpful.

143.    In determining the intention of the parties/whether it is necessary to imply an obligation to assign the copyright the following matters (not referred to in the Plaintiff's <u>Expert Report</u>) warrant attention:

> (i) the changing nature of the Games Workshop business model and business generally in the relevant period, as this will have informed the changing expectations of the parties (see eg Blanche, 66, line 6-10, 19);

> (ii) the fact that the Plaintiff's could secure some protection, both from the acts of its freelancers and employees and from third parties, through the law of designs. Both before and after 1989, miniatures would have been registrable as designs under the Registered Designs Act 1989. After 1989, designs would have been automatically protected through unregistered design right. The right to apply for registered designs and the right to unregistered design right vests in the commissioner of the

66

design: RDA, s2 ("where the design is executed by the author for another person for good consideration, that other person shall be treated for the purposes of this Act as the proprietor"); C.D.P.A., s 215(2), s 263 ("Where a design is created in pursuance of a commission, the person commissioning the design is the first owner of any design right in it");

(iii) there are suggestions in the depositions that there were understandings about rights ownership, at least with some freelancers. See eg Blanche, 32, line 14-15. Moreover, the assignment of copyright in various colour illustrations by John Sibbick, dated 1994, indicates that the assignor had hitherto been regarded as "the proprietor and benefiticial owner of copyright in the work." These prior understandings would make it difficult to imply other further terms.

144. I reserve the right to supplement this report, as appropriate, to the extent that additional facts come to light.

Signed: _____

Dated: 15 June 2012

Professor Lionel Bently

University of Cambridge

# CURRICULUM VITAE

## A. PERSONAL

Name: Lionel Alexander Fiennes Bently

Date of Birth: 2 July 1964

Age: 47

Nationality: British Citizen

Post: Herchel Smith Professor of Intellectual Property Law, University of Cambridge; Director of Centre of Intellectual Property and Information Law, University of Cambridge; Professorial Fellow, Emmanuel College, Cambridge

Work Address:
Centre for Intellectual Property and Information Law,
Faculty of Laws,
University of Cambridge
Cambridge
CB3 9DZ

Tel: 01223-330081/762876

Fax: 01223-330086

## B. EMPLOYMENT

1987-88 Research Assistant, Law Commission
1988-1990 Lecturer in Law, University of Keele
1990-91, Research Fellow, King's College, London
1991- 2000 Lecturer in Law, King's College, London (teaching intellectual property, property)
1998-9 Visiting Senior Research Fellow, Murdoch University
July/August 2000, Visiting Research Fellow, Queensland University of Technology
August-October 2002, Visiting Research Fellow, University of New South Wales
September 2002- 2004 Professor of Law, King's College, London
October 2004- Herchel Smith Professor of Intellectual Property Law, University of Cambridge; Director of Centre of Intellectual Property and Information Law, University of Cambridge; Professorial Fellow, Emmanuel College, Cambridge
August-Sept 2007, Yong Shook Lin Visiting Professor, National University of Singapore
January-April 2008, BNL Visiting Professor of European Law, Columbia University

## C. MISCELLANEOUS

Research Grants
Principal Investigator, AHRC Resource Enhancement Project, Primary Materials Relating to the History of Copyright (1450-1900) in 5 Jurisdictions (with. M. Kretschmer, Bournemouth University) (value: £300,000) now available at www.copyrighthistory.org

Investigation in Project Examining the Changes on Contracts Between Illustrators and Photographers and Publishers, on behalf of Design and Artistic Copyright Society (£24,000) (with Bournemouth University) (2009-2010)

HERA (Humanities in the European Research Area), 'The Work of Authorship in the Digital Age', with Mireille Van Eechoud (IViR) and Jostein Gripsrud (Bergen) (value Euro 1 million)

Lectures:
I have given invited lectures at Columbia University, New York University, Chicago-Kent School of Law, U.C.L.A., Fordham Law School's Annual Conference on International Intellectual Property Law and Policy, McGill University, University of Kanazawa, Kobe University, Griffith University, the Australian National University (Canberra), the Singapore IP Academy's Global Forum on Intellectual Property, Bayreuth University, Bergen University, the University of Bonn, University of Leiden, University of Amsterdam, Montpellier University, Strasbourg University, Reading University, Brunel University, Bournemouth University, University of Edinburgh, Manchester University, Aberystwyth University, the University of Oxford, London School of Economics, Queen Mary College, University of London as well as for international organisations including A.T.R.I.P. (Utrecht, Parma), A.L.A.I (Paris, Barcelona), the A.I.P.P.I. (London), I.T.M.A. (the Second Distinguished Professors lecture at the Press Club in Washington), and G.R.U.R. (Nuremberg 2009).

Prestigious Lectures:
Lecturer, Darwin Lecture Series, Darwin College, University of Cambridge (2007) (on Identity)
Lecturer, Annual Manges Lecture at Columbia University (2007)
Lecturer, Stephen Stewart Memorial Lecture, (November 2009)
Current Legal Problems, University College, London (2011)

Research Networks:
Member, ITER, Sophistication vs. Transparency, International Network (2002-4), organised by University of Nijmegen/University of Amsterdam; Member, Wittem Group on European Copyright Code (2004-)
Member, AHRB Copyright Network, organised by Birkbeck College, London (2003-6)
Associate, Australian Centre for Intellectual Property in Agriculture, A.N.U., Canberra/Griffith University, Brisbane

Policy Roles:
Member, Copyright Expert Panel, Strategic Advisory Board on Intellectual Property (2008-2011)
Gave evidence to Legal Affairs Committee of European Parliament on Proposals to Extend the Term of Copyright in sound recording (November 2008)

Editorial roles:
Series Editor, *Cambridge Studies in Intellectual Property* (CUP)
Editorial Board, *European Intellectual Property Review*

Editorial Board, *Script-ed*, on-line publication, University of Edinburgh
Editorial Board, *Media and Arts Law Review*

Societies:
Executive Committee, British Literary and Artistic Copyright Association (2006-2012)
(responsible for academic programme for ALAI 2009)
Council Member, Intellectual Property Institute (2004-)
Steering Committee, International Society for the History and Theory of Intellectual
Property (2008-)

Academic Advisory Roles:
Advisory Board, Institute of Brands and Innovation Law, University College, London
Advisory Board, Osgoode Hall IP
Honorary Legal Adviser, Royal Historical Society

Relations with Legal Practice
Called to the Bar (Inner Temple, November 2009)
Academic Door Tenant, Hogarth Chambers, Lincoln's Inn (2004-2012)
Expert Advice on Law of UK to lawyers and courts in Canada, Brazil, Germany and the
United States, including *Golan* case
Door Tenant, 11 South Square, Gray's Inn (from February 2012-)

**D. SELECTED PUBLICATIONS**

**Books:**

*Gurry on Confidence: The Law of Trade Secret* (Oxford: OUP, 2012, with T Aplin, P
Johnson and S Malynicz)

*The Making of Modern Intellectual Property Law* (with Brad Sherman) (Cambridge:
Cambridge University Press, 1999)

*Intellectual Property Law* (with Brad Sherman) (Oxford, Oxford University Press, 2001)
(2nd ed, 2004; 3d. ed, 2008)

*Between a Rock and a Hard Place: The Problems Facing Freelance Creators in the UK
Media Market Place* (London: Institute for Employment Rights, 2002)

*Performers Rights: Options for Reform to the Interdepartmental Committee of the
Australian Government* (1996; with Brad Sherman)

**Edited Books:**

*Privilege and Property: Essays in the History of Copyright* (with R. Deazley & M.
Kretschmer eds) (Cambridge: OpenBook, 2010)

*The Common Law of Intellectual Property: Essays in Honour of Professor David Vaver* (Oxford: Hart, 2010)

*Global Copyright* (with P Torremans & U Suthersanen eds) (Cheltenham: Edward Elgar, 2010)

*Copyright and Piracy: An Interdisciplinary Critique* (Cambridge: CUP, 2010, forthcoming)

*Trade Marks and Brands: An Interdisciplinary Critique* (Cambridge: CUP, 2008) (ed. With Jane C. Ginsburg, Jennifer Davis)

*Intellectual Property in the New Millennium: Essays in Honour of Professor W.R. Cornish* (eds. L. Bently & D. Vaver) (Cambridge: CUP, 2004)

*Law and the Senses: Sensational Jurisprudence* (Eds. L.Bently & L.Flynn) (London: Pluto, 1996).

*Intellectual Property and Ethics*, Perspectives on Intellectual Property (Vol.IV) (Eds. L.Bently & S. Maniatis) (London: Sweet & Maxwell, 1998)

**Selected Articles and Contributions to Edited Books:**

Annual revision (since 1998) of 'United Kingdom' in M. Nimmer & P. Geller (eds.) *International Copyright Law and Policy* (New York: Lexis/Nexis)

'Prince Albert v Strange (1849)' in C. Mitchell and P. Mitchell, *Landmark Cases on Equity* Ch 8 (Oxford: Hart, 2012, forthcoming) 235-267

'Patents and Trade Secrets' in S Basheer and N Wilkof (eds), *Overlapping Intellectual Property Rights*, (Oxford: OUP, 2012) Ch 3 (forthcoming)

'Exclusions from Patentability and Exceptions to Patentees' Right: Taking Exceptions Seriously', (2011) 64 *Current Legal Problems,* 315-347

'The Extraordinary Multiplicity of Intellectual Property Laws in the British Colonies in the Nineteenth Century' (2011) 12 *Theoretical Inquiries in Law* 160-200

'"The Sole Right....Shall Return to the Authors": Anglo-American Authors' Reversion Rights from the Statute of Anne to Contemporary US Copyright', (2010) 25(3) *Berkeley Technology Law Journal* 1475 (with Jane C Ginsburg)

'*R. v The Author*: From Death Penalty to Community Service' (2008) 32 *Columbia Journal of Law and the Arts* 1-109

'Identity and the Law' in G. Walker and E. Leedham-Green (eds), *Identity* (Cambridge: CUP, 2010)

'Authorship of Popular Music in UK Copyright Law' (2009) 12(2) *Information, Communication and Society* 179-204 (special issue, 2009)

'From communication to thing: historical aspects of the conceptualisation of trade marks as property' in G. Dinwoodie & M. Janis, *Trademark Law and Theory: A Handbook of Contemporary Research* (Cheltenham: Edward Elgar, 2008) (also published in Japanese (trans. Nobuhide Otomo) in 19 *Intellectual Property Law and Policy Journal* 1-50 (2008)

'The Making of Modern Trade Marks Law: The Construction of the Legal Concept of Trade Mark (1860-80)' in L. Bently, Jane C. Ginsburg, Jennifer Davis (eds.) *Trade Marks and Brands: An Interdisciplinary Critique* (Cambridge: CUP, 2008)

'Parody and Copyright in the Common Law World' in *Copyright and Freedom of Expression* (Alai, 2008)

'Copyright, Translations, and Relations Between Britain and India in the nineteenth and early twentieth centuries' (2007) 82(3) *Chicago-Kent Law Review*1181-1240

Commentary on EC Directive on Legal Protection of Computer Programs in T. Dreier & B. Hugenholtz, <u>*Concise European Copyright Law*</u> *(*Hague: Kluwer, 2006) 211-238

'Interpretation of Copyright Rules: The Role of the Interpreter – The Creation Function', in *Exploring the Sources of Copyright* (Alai, 2005) 365-381

The Impact of European Geographical Indications on National Rights in Member States' (2006) 96 *Trademark Reporter* 850-905 (with Brad Sherman)

'Copyright and the Victorian Internet: Telegraphic Property Laws in Colonial Australia' (2004) 38 *Loyola Los Angeles Law Review* 71-176

'Developments in European Trade Marks: The Jurisprudence of the ECJ since January 1 2002' [2003] *Yearbook of European Law* 583-632.

'Art and the Making of Modern Copyright Law' in D.McClean & K.Schubert, <u>*Dear Images: Art, Copyright and Culture*</u> (London: ICA/Ridinghouse, 2002)

'Great Britain and the Signing of the Berne Convention in 1886' (with B. Sherman) (2001) 48 *Journal of the Copyright Society of the USA* 311-340

'Visuality and Textuality in Nineteenth Century Intellectual Property Law', *Intellectual Property Forum* (Journal of the Intellectual Property Society of Australia and New Zealand) (Issue 29, May 1997) 28-33

'The UK's Forgotten Utility Model: The Utility Designs Act 1843' (1997) 3 *Intellectual Property Quarterly* 267-78 (with B.Sherman)

'Requiem for Registration? Reflections on the History of the The UK Registered Design System' in A.Firth (ed), <u>Perspectives on Intellectual Property Vol 1: The Prehistory of Intellectual Property Law</u> 1-48 (London: Sweet & Maxwell, 1996)

'Copyright and the Death of the Author in Law and Literature' (1994) 57 *Modern Law Review* 973-986

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2012, I served

### EXPERT REPORT OF PROFESSOR LIONEL BENTLY

on the persons listed below by the following means: First Class Mail.

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 15, 2012        Signature: _____
                                 Name:        Thomas Kearney



# Exhibit 10

***Status:*** *This version of this Act contains provisions that no longer have effect.*
***Changes to legislation:*** *There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Copyright, Designs and Patents Act 1988. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*



# Copyright, Designs and Patents Act 1988

## 1988 CHAPTER 48

An Act to restate the law of copyright, with amendments; to make fresh provision as to the rights of performers and others in performances; to confer a design right in original designs; to amend the Registered Designs Act 1949; to make provision with respect to patent agents and trade mark agents; to confer patents and designs jurisdiction on certain county courts; to amend the law of patents; to make provision with respect to devices designed to circumvent copy-protection of works in electronic form; to make fresh provision penalising the fraudulent reception of transmissions; to make the fraudulent application or use of a trade mark an offence; to make provision for the benefit of the Hospital for Sick Children, Great Ormond Street, London; to enable financial assistance to be given to certain international bodies; and for connected purposes.                                                    [15th November 1988]

Be it enacted by the Queen's most Excellent Majesty, by and with the advice and consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the authority of the same, as follows:—

**Annotations:**

**Modifications etc. (not altering text)**

**C1**     Act amended by Broadcasting Act 1990 (c. 42, SIF 96), s. 176, **Sch. 17 para. 7(1)**

**Annotations:**

**Modifications etc. (not altering text)**

**C1**     Act amended by Broadcasting Act 1990 (c. 42, SIF 96), s. 176, **Sch. 17 para. 7(1)**

***Status:*** *This version of this Act contains provisions that no longer have effect.*
***Changes to legislation:*** *There are outstanding changes not yet made by the legislation.gov.uk editorial team to Copyright, Designs and Patents Act 1988. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

# PART I

# COPYRIGHT

| Annotations: |
| --- |
| **Modifications etc. (not altering text)** |
| C2    Pt. I (ss. 1-179) modified by S.I. 1989/988, **art. 2(3)** |
| C3    Pt. I (ss. 1-179) extended by S.I. 1989/1293, **arts. 2(3)**, 3, 4(4)-(6) |
| C4    Pt. I (ss. 1-179) applied (with modifications) by S.I. 1993/942, arts. 2(3), 5, **Sch. 4** (with art. 6) |
| C5    Pt. I (ss. 1-179) applied by S.I. 1993/942, arts. 4, 5, **Sch. 4** (with art. 6) |
|      Pt. I (ss. 1-179) applied (with modifications) (22.7.1999) by S.I. 1999/1751, arts. 2(3), 3, 4(3)(5), 5, 7, Schs. 2, 4, 5 (as amended (22.4.2003) by S.I. 2003/774, **arts. 2-5**) (which S.I. and amending S.I. were revoked (1.5.2005) by S.I. 2005/852, **art. 8(b)(d)**) |
| C6    Pt. I (ss. 1-179) extended in part (with modifications) by The Copyright (Bermuda) Order 2003 (S.I. 2003/1517), art. 2, **Sch.** (the amendment coming into force in accordance with art. 1 of the amending S.I.) |
| C7    Pt. I (ss. 1-179) modified (31.10.2003) by The Copyright and Related Rights Regulations 2003 (S.I. 2003/2498), **reg. 37(2)** (with regs. 31-40) |
| C8    Pt. I (ss. 1-179) extended (with modifications) (1.5.2005) by The Copyright and Performances (Application to Other Countries) Order 2005 (S.I. 2005/852), **arts. 2-5**, Sch. (with art. 7) (which S.I. was revoked (6.4.2006) by SI 2006/316, art. 1(3)) |
| C9    Pt. I (ss. 1-179) extended in part (with modifications) by The Copyright (Gibraltar) Order 2005 (S.I. 2005/853), art. 2, **Sch.** (the amendment coming into force in accordance with art. 1 of the amending S.I.) |
| C10    Pt. I (ss. 1-179) extended (with modifications) (6.4.2006) by The Copyright and Performances (Application to Other Countries) Order 2006 (S.I. 2006/316), {arts. 2- 5}, Sch. (with art. 7) (which S.I. was revoked (6.4.2007) by S.I. 2007/273, **art. 1(3)**) |
| C11    Pt. I (ss. 1-179) extended (with modifications) (6.4.2007) by The Copyright and Performances (Application to Other Countries) Order 2007 (S.I. 2007/273), **arts. 2-5**, Sch. (with art. 7) (which S.I. was revoked (6.4.2008) by SI 2008/677, art. 1(3)) |
| C12    Pt. I (ss. 1-179) extended (with modifications) (6.4.2008) by The Copyright and Performances (Application to Other Countries) Order 2008 (S.I. 2008/677), **arts. 2-5**, Sch. (with art. 7) |

# CHAPTER I

# SUBSISTENCE, OWNERSHIP AND DURATION OF COPYRIGHT

| Annotations: |
| --- |
| **Modifications etc. (not altering text)** |
| C13    Pt. I Ch. 1 (ss. 1-15) applied in part (1.12.1996) by S.I. 1996/2967, **reg. 17(4)** (with Pt. III) |

*Introductory*

**1**      **Copyright and copyright works.**

(1) Copyright is a property right which subsists in accordance with this Part in the following descriptions of work—

     (a)    original literary, dramatic, musical or artistic works,

**Status:** *This version of this Act contains provisions that no longer have effect.*
**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial team to Copyright, Designs and Patents Act 1988. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

   (b)   sound recordings, films **[**<sup>F1</sup>or broadcasts**]**, and

   (c)   the typographical arrangement of published editions.

(2) In this Part "copyright work" means a work of any of those descriptions in which copyright subsists.

(3) Copyright does not subsist in a work unless the requirements of this Part with respect to qualification for copyright protection are met (see section 153 and the provisions referred to there).

---

**Annotations:**

**Amendments (Textual)**
**F1**   Words in s. 1(1)(b) substituted (31.10.2003) by The Copyright and Related Rights Regulations 2003 (S.I. 2003/2498), **reg. 5(2)** (with regs. 31-40)

---

## 2    Rights subsisting in copyright works.

(1) The owner of the copyright in a work of any description has the exclusive right to do the acts specified in Chapter II as the acts restricted by the copyright in a work of that description.

(2) In relation to certain descriptions of copyright work the following rights conferred by Chapter IV (moral rights) subsist in favour of the author, director or commissioner of the work, whether or not he is the owner of the copyright—

   (a)   section 77 (right to be identified as author or director),

   (b)   section 80 (right to object to derogatory treatment of work), and

   (c)   section 85 (right to privacy of certain photographs and films).

*Descriptions of work and related provisions*

## 3    Literary, dramatic and musical works.

(1) In this Part—

      "literary work" means any work, other than a dramatic or musical work, which is written, spoken or sung, and accordingly includes—

   (a)   a table or compilation **[**<sup>F2</sup>other than a database**]**, <sup>F3</sup>. . .

   (b)   a computer program; <sup>F4</sup>. . .**[**<sup>F5</sup>(c) preparatory design material for a computer program**][**<sup>F6</sup>and

   (d)   a database**]**

      "dramatic work" includes a work of dance or mime; and

      "musical work" means a work consisting of music, exclusive of any words or action intended to be sung, spoken or performed with the music.

(2) Copyright does not subsist in a literary, dramatic or musical work unless and until it is recorded, in writing or otherwise; and references in this Part to the time at which such a work is made are to the time at which it is so recorded.

(3) It is immaterial for the purposes of subsection (2) whether the work is recorded by or with the permission of the author; and where it is not recorded by the author, nothing in

---

***Status:*** *This version of this Act contains provisions that no longer have effect.*
***Changes to legislation:*** *There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Copyright, Designs and Patents Act 1988. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

---

that subsection affects the question whether copyright subsists in the record as distinct from the work recorded.

---

**Annotations:**

**Amendments (Textual)**

**F2**     Words in s. 3(1)(a) inserted (1.1.1998) by S.I. 1997/3032, **reg. 5(a)** (with Pt. IV)
**F3**     Word in s. 3(1) omitted (1.1.1993) by virtue of S.I. 1992/3233, **reg. 3**
**F4**     Word in s. 3(1)(b) left out (1.1.1998) by virtue of S.I. 1997/3032, **reg. 5(b)** (with Pt. IV)
**F5**     Word and s. 3(1)(c) inserted (1.1.1993) by S.I. 1992/3233, **reg. 3**
**F6**     S. 3(1)(d) and word preceding it inserted (1.1.1998) by S.I. 1997/3032, **reg. 5(c)** (with Pt. IV)

---

**[F73A  Databases**

(1) In this Part "database" means a collection of independent works, data or other materials which—

    (a)  are arranged in a systematic or methodical way, and

    (b)  are individually accessible by electronic or other means.

(2) For the purposes of this Part a literary work consisting of a database is original if, and only if, by reason of the selection or arrangement of the contents of the database the database constitutes the author's own intellectual creation.]

---

**Annotations:**

**Amendments (Textual)**

**F7**     S. 3A inserted (1.1.1998) by S.I. 1997/3032, **reg. 6** (with Pt. IV)

---

**4        Artistic works.**

(1) In this Part "artistic work" means—

    (a)  a graphic work, photograph, sculpture or collage, irrespective of artistic quality,

    (b)  a work of architecture being a building or a model for a building, or

    (c)  a work of artistic craftsmanship.

(2) In this Part—

        "building" includes any fixed structure, and a part of a building or fixed structure;

        "graphic work" includes—

    (a)  any painting, drawing, diagram, map, chart or plan, and

    (b)  any engraving, etching, lithograph, woodcut or similar work;

        "photograph" means a recording of light or other radiation on any medium on which an image is produced or from which an image may by any means be produced, and which is not part of a film;

        "sculpture" includes a cast or model made for purposes of sculpture.

---

**[F85A  Sound recordings.**

(1) In this Part "sound recording" means—

---

*Status: This version of this Act contains provisions that no longer have effect.*
*Changes to legislation: There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Copyright, Designs and Patents Act 1988. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

---

    (a)   a recording of sounds, from which the sounds may be reproduced, or

    (b)   a recording of the whole or any part of a literary, dramatic or musical work, from which sounds reproducing the work or part may be produced,

regardless of the medium on which the recording is made or the method by which the sounds are reproduced or produced.

(2) Copyright does not subsist in a sound recording which is, or to the extent that it is, a copy taken from a previous sound recording.]

---

**Annotations:**

**Amendments (Textual)**
   **F8**   Ss. 5A, 5B substituted for s. 5 (1.1.1996) by S.I. 1995/3297, **reg. 9(1)** (with Pt. III)

---

## [F95B  Films.

(1) In this Part "film" means a recording on any medium from which a moving image may by any means be produced.

(2) The sound track accompanying a film shall be treated as part of the film for the purposes of this Part.

(3) Without prejudice to the generality of subsection (2), where that subsection applies—

    (a)   references in this Part to showing a film include playing the film sound track to accompany the film,

    [F10(b)   references in this Part to playing a sound recording, or to communicating a sound recording to the public, do not include playing or communicating the film sound track to accompany the film,

    (c)   references in this Part to copying a work, so far as they apply to a sound recording, do not include copying the film sound track to accompany the film, and

    (d)   references in this Part to the issuing, rental or lending of copies of a work, so far as they apply to a sound recording, do not include the issuing, rental or lending of copies of the sound track to accompany the film.]

(4) Copyright does not subsist in a film which is, or to the extent that it is, a copy taken from a previous film.

(5) Nothing in this section affects any copyright subsisting in a film sound track as a sound recording.]

---

**Annotations:**

**Amendments (Textual)**
   **F9**   Ss. 5A, 5B substituted for s. 5 (1.1.1996) by S.I. 1995/3297, **reg. 9(1)** (with Pt. III)
   **F10**   S. 5B(3)(b)-(d) substituted (1.2.2006) for s. 5B(3)(b) and preceding word by The Performances (Moral Rights, etc.) Regulations 2006 (S.I. 2006/18), reg. 2, **Sch. para. 2** (with reg. 8)

---

**Status:** *This version of this Act contains provisions that no longer have effect.*
**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial team to Copyright, Designs and Patents Act 1988. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)*

(5) For the purposes of this Part the identity of an author shall be regarded as unknown if it is not possible for a person to ascertain his identity by reasonable inquiry; but if his identity is once known it shall not subsequently be regarded as unknown.

---

**Annotations:**

**Amendments (Textual)**

F23 S. 9(2)(aa)(ab) substituted for s. 9(2)(a) (1.12.1996 with effect in relation to films made on or after 1.7.1994) by S.I. 1996/2967, **regs. 18(1)**, 36

F24 S. 9(2)(c) repealed (31.10.2003) by The Copyright and Related Rights Regulations 2003 (S.I. 2003/2498), regs. 2(2), 5(4), **Sch. 2** (with regs. 31-40)

---

**10      Works of joint authorship.**

(1) In this Part a "work of joint authorship" means a work produced by the collaboration of two or more authors in which the contribution of each author is not distinct from that of the other author or authors.

[**F25**(1A) A film shall be treated as a work of joint authorship unless the producer and the principal director are the same person.**]**

(2) A broadcast shall be treated as a work of joint authorship in any case where more than one person is to be taken as making the broadcast (see section 6(3)).

(3) References in this Part to the author of a work shall, except as otherwise provided, be construed in relation to a work of joint authorship as references to all the authors of the work.

---

**Annotations:**

**Amendments (Textual)**

F25 S. 10(1A) inserted (1.12.1996 with effet in relation to films made on or after 1.7.1994) by S.I. 1996/2967, **regs. 18(2)**, 36

---

**11      First ownership of copyright.**

(1) The author of a work is the first owner of any copyright in it, subject to the following provisions.

(2) Where a literary, dramatic, musical or artistic work [**F26**, or a film,**]** is made by an employee in the course of his employment, his employer is the first owner of any copyright in the work subject to any agreement to the contrary.

(3) This section does not apply to Crown copyright or Parliamentary copyright (see sections 163 and 165) or to copyright which subsists by virtue of section 168 (copyright of certain international organisations).

**Status:** *This version of this Act contains provisions that no longer have effect.*
**Changes to legislation:** *There are outstanding changes not yet made by the legislation.gov.uk editorial*
*team to Copyright, Designs and Patents Act 1988. Any changes that have already been made by the*
*team appear in the content and are referenced with annotations. (See end of Document for details)*

    (b)    a waiver under section 87 by one of them does not affect the rights of the others.

## 89    Application of provisions to parts of works.

(1) The rights conferred by section 77 (right to be identified as author or director) and section 85 (right to privacy of certain photographs and films) apply in relation to the whole or any substantial part of a work.

(2) The rights conferred by section 80 (right to object to derogatory treatment of work) and section 84 (false attribution) apply in relation to the whole or any part of a work.

## CHAPTER V

### DEALINGS WITH RIGHTS IN COPYRIGHT WORKS

| Annotations: |
| --- |
| **Modifications etc. (not altering text)**
**C30**    Pt. I Ch. V (ss. 90-95) applied (with modifications) (1.12.1996) by S.I. 1996/2967, **reg. 17(1)-(3)** (with Pt. III) |

### *Copyright*

## 90    Assignment and licences.

(1) Copyright is transmissible by assignment, by testamentary disposition or by operation of law, as personal or moveable property.

(2) An assignment or other transmission of copyright may be partial, that is, limited so as to apply—

    (a)    to one or more, but not all, of the things the copyright owner has the exclusive right to do;

    (b)    to part, but not the whole, of the period for which the copyright is to subsist.

(3) An assignment of copyright is not effective unless it is in writing signed by or on behalf of the assignor.

(4) A licence granted by a copyright owner is binding on every successor in title to his interest in the copyright, except a purchaser in good faith for valuable consideration and without notice (actual or constructive) of the licence or a person deriving title from such a purchaser; and references in this Part to doing anything with, or without, the licence of the copyright owner shall be construed accordingly.

| Annotations: |
| --- |
| **Modifications etc. (not altering text)**
**C31**    Ss. 90-93, 96-98, 101, 102 applied (1.1.1998) by S.I. 1997/3032, **reg. 23** (with Pt. IV) |