**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED, | |
| Plaintiff, | Civil Action No. 1:10-cv-8103 |
| v. | Hon. Matthew F. Kennelly |
| CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES | Hon. Jeffrey T. Gilbert |
| Defendants. | |

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Jason J. Keener (Ill. Bar No. 6280337)
Aaron J. Weinzierl (Ill. Bar No. 6294055)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: 312.832.4500
Facsimile: 312.832.4700
Email: jkeener@foley.com;
aweinzierl@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

*Attorneys for Plaintiff
Games Workshop Limited*

4849-8374-8368.1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I. PRELIMINARY STATEMENT ................................................................................ 1

II. ARGUMENT ............................................................................................................ 6

    A. Summary Judgment Standard ................................................................. 6

    B. Chapterhouse Has Infringed Games Workshop's Copyrighted Works ................. 6

    C. Chapterhouse's Independent Creation Defense Should Be Dismissed................. 16

    D. Chapterhouse's Copyrightability Defense Under English Law Should Be Dismissed ................................................................................................... 17

    E. Chapterhouse Has Infringed Games Workshop's Trademarks............................ 19

III. CONCLUSION ....................................................................................................... 25

4849-8374-8368.1

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Atari, Inc. v. N. Amer. Phillips Consumer Elec. Corp.*,
672 F.2d 607 (7th Cir. 1982) ........................................................................................ *passim*

*Au-Tomotive Gold Inc. v. Volkswagen of America Inc.*,
457 F.3d 1062 (9th Cir. 2006) ..................................................................................................22

*Baker v. Master Printers Union*,
34 F.Supp. 808 (D.N.J.1940) ......................................................................................................3

*Bouchat v. Balt Ravens, Inc.*,
241 F.3d 350 (4th Cir. 2001) ....................................................................................................15

*Bridgeman Art Library v. Corel Corp.*,
36 F. Supp. 2d 191 (S.D.N.Y. 1999)..................................................................................... 18-19

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP*,
329 F.3d 923 (7th Cir. 2003) ......................................................................................................8

*Burrow-Giles Lithographic Co. v. Sarony*,
111 U.S. 53 (1884)......................................................................................................................6

*CAE, Inc. v. Clean Air Eng'g Inc.*,
267 F.3d 660 (7th Cir. 2001) ..............................................................................................20, 24

*Castle Rock Entm't. v. Carol Publg. Group, Inc.*,
955 F. Supp. 2d 260 (S.D.N.Y. 1997),
*aff'd*, 150 F.3d 132 (2d Cir. 1998).................................................................................. *passim*

*Costco Wholesale Corp. v. Omega S.A.*
131 S.Ct 565 (2010).................................................................................................................15

*D. C. Comics, Inc. v. Powers*,
465 F. Supp 843 (S.D.N.Y. 1978) ............................................................................................23

*DeCarlo v. Archie Comic Publn's., Inc.*,
127 F. Supp. 2d 497 (S.D.N.Y. 2001)......................................................................................15

Décor Grates v. Faraco,
No. 92 C 6395, 1997 U.S. Dist. LEXIS 3328 (N.D. Ill. Mar. 13, 1997) ................................19

*Detective Comics, Inc. v. Bruns Pub, Inc.*,
111 F.2d 432 (2d Cir. 1940) (Hand, J.)................................................................................ 15-16

ii

*Eli Lilly & Co. v. Natural Answers, Inc.*,
  233 F.3d 456 (7th Cir. 2000) ..................................................................................21, 23

*Facebook, Inc. v. Teachbook.com LLC*,
  819 F. Supp. 2d 764 (N.D. Ill. 2011) ...................................................................21

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
  499 U.S. 340 (1991)......................................................................................................6

*Harley-Davidson, Inc. v. Grottanelli*,
  164 F.3d 806 (2d Cir. 1999)......................................................................................23

*Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*,
  780 F.2d 189 (2d Cir. 1985)......................................................................................17

*JCW Investments, Inc. v. Novelty Inc.*,
  289 F. Supp. 2d 1023 (N.D. Ill. 2003),
  *aff'd*, 482 F.3d 910 (7th Cir. 2007)................................................................. *passim*

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
  799 F.2d 867 (2d Cir. 1986)......................................................................................24

*Morningside Group, Ltd. v. Morningside Capital Group, LLC*,
  182 F.3d 133 (2d Cir. 1999)......................................................................................19

*Paramount Pictures Corp. v. Carol Pub. Group*,
  11 F. Supp.2d 329 (S.D.N.Y. 1998), aff'd, 181 F.3d 83 (2d Cir. 1999)...................8

*Pickett v. Prince*,
  207 F.3d 402 (7th Cir. 2000) ...................................................................................14

*Processed Plastic Co. v. Warner Comm'ns, Inc.*,
  675 F.2d 852 (7th Cir. 1982) ...................................................................................22

*Ringgold v. Black Entertainment Television, Inc.*,
  126 F.3d 70 (2d Cir. 1997).........................................................................................8

*Sadhu Singh Hamad Trust v. Ajit Newspaper Advert., Marketing and Comm'ns, Inc.*,
  503 F. Supp. 2d 577 (E.D.N.Y. 2007) ............................................................. 17-18

*Sands, Taylor & Wood v. The Quaker Oats Co.*,
  No. 84 c 8075, U.S.Dist. LEXIS 17342 (N.D. Ill. Dec. 18, 1990) ................... 23-24

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
  81 F.2d 49 (2d Cir.), *cert. denied*, 298 U.S. 669 (1936)........................................10

*Shine v. Childs*,
  382 F. Supp. 2d 602 (S.D.N.Y. 2005)........................................................................15

iii

*Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*,
  272 F.3d 441 (7th Cir. 2001) ..........................................................................7, 16

*Thomas & Betts Corp. v. Panduit Corp.*,
  138 F.3d 277 (7th Cir. 1998) ...............................................................................24

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
  996 F.2d 1366 (2d Cir. 1993)................................................................................11

*Ty, Inc. v. GMA Accessories, Inc.*,
  132 F.3d 1167 (7th Cir. 1997) ........................................................................16, 19

*Ty, Inc. v. Jones Group Inc.*,
  237 F.3d 891 (7th Cir. 2001) ...................................................................... 19, 24-25

*Univ. Pictures Co. v. Harold Lloyd Corp.*,
  162 F.2d 354 (9th Cir. 1947) ...............................................................................10

*Walt Disney Prods. v. Air Pirates*,
  581 F.2d 751 (9th Cir. 1978) ...............................................................................16

*Warner Bros. Ent'mt Inc. v. RDR Books*,
  575 F. Supp. 2d 513 (S.D.N.Y. 2008)...................................................................11

*Warner Bros., Inc. v. Gay Toys, Inc.*,
  658 F.2d 76 (2d Cir. 1981)............................................................................. 22-23

*Wildlife Express Corp. v. Carol Wright Sales, Inc.*,
  18 F.3d 502 (7th Cir. 1994) .........................................................................7, 9, 19

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

15 U.S.C. § 1125(a) ..............................................................................................19

17 U.S.C. § 410(c) ..................................................................................................6

Copyright Act § 104................................................................................................18

Copyright Designs and Patents Act § 52 ...............................................................18

Lanham Act §43(a) ...............................................................................................19,

**OTHER AUTHORITIES**

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §12.11[D], at 12-175
  (2001).....................................................................................................................16

*Britain v. Hanks Bros.*,
  86 Law Times 765 (1902)......................................................................................18

iv

*LucasFilm Ltd v. Ainsworth,*
    UKSC 39, [2012] 1 AC 208[2011] .........................................................................................18

Plaintiff Games Workshop Limited ("Games Workshop"), by and through its undersigned counsel, respectfully submits this Memorandum in support of its Motion for Summary Judgment against Defendant Chapterhouse Studios LLC ("Chapterhouse").

## I.  PRELIMINARY STATEMENT

Twenty-five years ago, Games Workshop created a vast fictional universe set in the 41st Millennium ("Warhammer 40,000" or "Warhammer 40K") where Mankind must battle for survival in a galaxy riven by bloodshed and destruction.  (Undisputed Fact #3.)  In the 25 years since the Warhammer 40K universe was first described in the book Rogue Trader, it has enjoyed a cult-like following and great commercial success, with annual sales in 2011 of over $156 million (including almost $54 million in the United States).  (Undisputed Fact #2).

In the story underlying Warhammer 40,000, humanity teeters on the brink of extinction, assailed on all sides by alien races, traitors, and Daemons.  (*Id.* # 3.)  Games Workshop has populated this universe with myriad alien races, characters, vehicles, weapons, stories, legends, and armies.  (*Id.*)  The Warhammer 40K universe is presented through hundreds of books (some of which novels have been *New York Times* bestsellers), magazines, a movie, and a number of computer games.  (Undisputed Fact #2.)  Furthermore, Games Workshop produces thousands of resin, pewter and plastic scale miniatures representing the various soldiers, creatures, and vehicles of war.  (Undisputed Fact #5.)  These miniatures are collected and painted by hobbyists and fans of Warhammer 40K.  (Undisputed Fact #6.)  If enough miniatures of a specific type are collected, the hobbyist can use rules created by Games Workshop and a large tabletop to recreate "historical" battles or to engage the miniatures in mythical new battles against another hobbyist. (Undisputed Fact #7.)  In the Chicago metro area alone, Games Workshop itself operates a dozen stores selling its Warhammer 40K books and products.  Thousands of devotees come to Chicago

1

to attend Games Workshop's Games Day event (which occurred on July 28, 2012) and the independently organized Adepticon (which occurred on April 19-21, 2012). (Undisputed Fact #2). Dozens of online forums are devoted to Warhammer 40K. The Court can gain some immediate understanding of the Warhammer 40K universe by viewing a short 2-minute video of some of the recent Games Day event attached as Exhibit 123 or the introduction to one of the Warhammer 40K video games or Warhammer 40K movie (Undisputed Fact # 2; Exs 124.).

Defendant Chapterhouse exists solely to trade on the success of Warhammer 40K. Although the owner of Chapterhouse claims no creative abilities (Undisputed Fact #24), he has developed a successful and growing business that serves as a clearinghouse of sorts for independent designers he employs to copy Games Workshop materials. (*Id.*). Although he says he scarcely monitors what these designers do in copying Warhammer 40K (*id.* at #26), he admits that every product he sells is derived from Games Workshop's creative universe. (Undisputed Fact #26.) Chapterhouse's own internal documents show a consistent and single-minded focus in copying Games Workshop's materials. (Undisputed Fact #26-27). One such designer explained at his deposition that his instructions were to sculpt a "Flesh Tearer" icon[1] that Warhammer 40K players will recognize as Games Workshop's Flesh Tearer icon, and be able to use the icon on their miniatures to convert a standard Space Marine army into a Flesh Tearer army. (Undisputed Fact #24). More simply put, Mr. Villaci instructed Mr. Traina that █████

████████████████████████████████████████████████████████

████████, effectively acknowledging that the "ordinary observer" must be able to recognize the

---

[1] A Flesh Tearer is one of the military organizations, or "chapters", that exist in the Warhammer 40K universe. For each chapter, Games Workshop has created various characters, histories, miniatures, pictures, as well as various symbology or icons that represent the chapter. The Flesh Tearer icon is a saw blade with a drop of blood in the center set against a black background. (Undisputed Facts #63-64).

2

real meaning of the product.  Other Chapterhouse designers' testimony and documents reveal innumerable similar admissions of copying (Undisputed Facts #27-78), thus reflecting a misguided philosophy that so long as it avoids exact copies, Chapterhouse is free to appropriate the defining *combinations* of features (names, imagery, designs and meanings) that define the key characters in Warhammer 40K.  Seeking to defend himself in one of the online forums mentioned above of having copied his "Doomseer" figure from Games Workshop's Eldar characters, Mr. Villacci ultimately admitted it was indeed just a female Eldar.  (Undisputed Fact #38).  However, one forum member challenging Mr. Villacci's initial demurrer asked simply and pointedly: "How stupid do you really think people are?" (*id*.), thus calling to mind the oft-cited truism "that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." *Baker v. Master Printers Union*, 34 F.Supp. 808, 811 (D.N.J.1940).  There is no record of any effort by Chapterhouse to create any wholly new works or to design any products other than products derived from and set in Games Workshop's Warhammer 40K universe.

Warhammer 40K's cult fame may render it less readily understood to the uninitiated than other similarly expansive bodies of fantasy work such Lord of the Rings or the Harry Potter series.  However, inasmuch as all of the figures, weapons and accessories Chapterhouse sells are copied from paintings, drawings and descriptions in the Warhammer 40K universe it is as if a party had decided (just before Warner Bros. began licensing products) to create a website selling hundreds of Harry Potter-themed items such as Gryffindor sweaters; Slytherin mugs; Hogwarts ties; Sirius Black wands; Dumbledore caps; Lord Voldemort action figures; Professor Snape capes; Golden Snitches; Nimbus 2000 and Firebolt broomsticks and the like (all made to simulate the pictures and accounts in the books and movies).  As in this example, Chapterhouse

3

products are also all advertised and promoted using names and marks made famous by Games Workshop. (Undisputed Fact #79). Because the products Games Workshop has discovered in the market (Undisputed Fact #17) have not been marked with any permanent designations of origin with Chapterhouse, they are sold on eBay and elsewhere simply as Games Workshop products. (*Id.*) In reality, Games Workshop *does* license its intellectual property (Undisputed Fact #2), and particularly as Chapterhouse's copying has grow and become more sophisticated, there is ample reason for customers to believe that these copies are indeed licensed by Games Workshop if not actually produced by Games Workshop.

Despite (or perhaps because of) the large number of copied products, this is a very simple case, and little different from *Castle Rock Entm't. v. Carol Publg. Group, Inc*., 955 F. Supp. 2d 260 (S.D.N.Y. 1997), *aff'd,* 150 F.3d 132, 137 (2d Cir. 1998), where summary judgment was granted by then-district-court-judge Sonia Sotomayor (and upheld on appeal). In *Castle Rock*, defendant's little book contained 643 trivia questions having no narrative relationship other than that they were derived from 84 of the 86 episodes of the *Seinfeld* television series - mere fragments copied from vastly longer individual episodes. *Id*. at 139. In much the same way, all of Chapterhouse's 123 products that Games Workshop identified before the close of discovery[2] are derived from aspects of the original fictional universe Games Workshop has created, and are made to be used in connection with that original creative universe. (Undisputed Facts #18-21). The very number of instances of copying, all collected on the defendant's website, confirms how interrelated are all of the works and confirms that the entire website is an infringement.

---

[2] As Games Workshop noted during the during the July 23, 2012 status conference, during the course of this litigation, Chapterhouse has also continued to launch new products, including 17 products for which Games Workshop has received no discovery. To simplify the case, Games Workshop has also clarified to Chapterhouse that there are 33 of the original 123 products for which it claims only trademark infringement, not copyright infringement.

4

(Undisputed Facts #31-78). Similarly, and because access cannot be denied, the individual products conform to the dictum enunciated by the Chapterhouse designer, Mr. Traina, to use Games Workshop materials ███████████████████████████████████████ ██████████████████████████ by using iconography recognizable to 40K players as a Games Workshop icon (Undisputed Fact #24), thus satisfying infringement under the "ordinary observer" test of infringement. Summary judgment thus is appropriate not only on these ultimate questions but also on subsidiary issues such as Games Workshop's ownership of copyright in all of its works at issue, the lack of any independent creation by defendant and the irrelevance of issues of copyrightability under English law of certain Games Workshop sculptural miniatures – an issue Chapterhouse belatedly and improperly has sought to raise.

As Chapterhouse's products are all marketed and sold using Games Workshop's trademarks, summary judgment is also appropriate on the issue of trademark infringement. Defendant is selling essentially replacements, yet to be released products, and accessories for plaintiff's own goods, bearing plaintiff's identical marks with the intent of trading on the goodwill in Games Workshop's names and marks. The Chapterhouse products Games Workshop has found in the market bear no permanent markings of their own. Chapterhouse's defense that at the point of sale on its website it uses a disclaimer is irrelevant for two reasons. Not only have courts recognized that disclaimers are ineffective, they are of no effect whatsoever when, as here, defendant's goods are sold on the open market (such as on eBay), by Chapterhouse or resold by its customers, without such a disclaimer and solely under Games Workshop's trademarks.

4849-8374-8368.1

## II.     ARGUMENT

### A.     Summary Judgment Standard

A copyright case involving a toy design, *JCW Investments, Inc. v. Novelty Inc.*, 289 F. Supp. 2d 1023 (N.D. Ill. 2003), *aff'd*, 482 F.3d 910 (7th Cir. 2007), set forth the familiar standard for summary judgment:

> A moving party is entitled to summary judgment under Rule 56 when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56 (c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Stewart v. McGinnis*, 5 F.3d 1031, 1033 (7th Cir. 1993), *cert. denied*, 510 U.S. 1121 (1994). Once the movant has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56 (e). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *O'Connor v. DePaul University,* 123 F.3d 665, 669 (7th Cir. 1997).

289 F. Supp. 2d at 1031.

### B.     Chapterhouse Has Infringed Games Workshop's Copyrighted Works

Copyright infringement entails proof of two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361. 1282 (1991). What is required for copyright protection is "some minimal degree of creativity," or "the existence of . . . intellectual production, of thought, and conception." *Id.* at 362, (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 59-6, (1884)) *See JCW Investments*, 482 F.3d at 915. As noted in *JCW Investments,* a certificate of copyright is *"prima facie* evidence" of its validity. *Id.* (citing 17 U.S.C. § 410(c)). Although most or all of the subject works are created and first published in England, Games Workshop has also obtained U.S. copyright registrations or filed applications for the works in issue. (Undisputed Fact #12.). It did so after determining that Chapterhouse could not specify on which specific works it had relied on in creating the accused works because

it does not monitor its designers (Undisputed Fact # 26).  Nor are there any known facts to challenge the conclusion that all of the subject works were created by Games Workshop employees or, to the extent that some were created by independent contractors, that Games Workshop has confirmatory assignments from the individuals.  (Undisputed Fact #11).

Typically, where a defendant denies copying, proof of infringement requires a two-step analysis.  The first is a demonstration of both access and sufficient overall similarity to support an inference of copying.  Only then does the court assess whether the copying was of protectable elements.[3]  However, it is not clear that defendant does or plausibly could deny actual copying of all of the accused works (which Chapterhouse admits were all influenced by Warhammer 40K). Rather, Chapterhouse seems only to dispute exact copying, which is not the test of infringement. *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 511 (7th Cir. 1994).  It is thus relevant that the type of proof needed to demonstrate the act of copying (typically access and substantial similarity in cases where there is no direct proof of copying) differs from the type of illicit copying needed to prove infringement.  Regarding the latter, *Atari, Inc.*, 672 F.2d at 614, explained that "the test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression  by taking material of substance and value."

---

[3] *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 450 (7th Cir. 2001) ("Once it is established that a party has a valid copyright, whether registered or not, the next question is whether another person has copied the protected work. Copying may be proven by direct evidence, but that is often hard to come by.  In the alternative, copying may be inferred 'where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work.'" (quoting *Atari, Inc. v. N. Amer. Phillips Consumer Elec. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982)) *Accord Castle Rock Entm't.*, 150 F.3d at 137 ("As we have noted before, 'probative,' rather than 'substantial' similarity is the correct term in referring to the plaintiff's initial burden of proving actual copying by indirect evidence. … 'It is only after actual copying is established that one claiming infringement' then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears "substantial similarity" to protected expression in the earlier work.") (Citations omitted.)

7

The act of copying cannot realistically be disputed here, as the development documents for *every* product expressly and repeatedly reference Games Workshop's originals (and make clear in various instances that the models are simply recast from Games Workshop's originals with the tracks simply obscured after the fact) (Undisputed Facts #54-56); defendant admits that every product it sells was derived from Games Workshop's works, and the products even use Games Workshop's names.[4] Hence, the assessment of substantial similarity is simplified. Consistent with the *Atari* test (*i.e.*, whether there has been a "taking [of] material of substance and value") *Castle Rock* explained that the similarity needed to prove infringement:

> requires that the copying [be] quantitatively *and* qualitatively sufficient to support the legal conclusion that infringement (*actionable* copying) has occurred. The qualitative component concerns the copying of expression, rather than ideas [, facts, works in the public domain, or any other non-protectable elements] . . . . The quantitative component generally concerns the amount of the copyrighted work that is copied, which must be more than "*de minimis.*"

150 F.3d at 138 (citing *Ringgold v. Black Entertainment Television, Inc*, 126 F.3d 70, 75 (2d Cir. 1997)(emphasis added)). Here there is no issue as to the qualitative component as the copying is directed to the combination of features of original characters created by Games Workshop and, whether one views Chapterhouse's works individually or collectively, the quantitative copying is extensive.

The test of similarity is the "ordinary observer" test. *JCW Investments Inc.* explains:

> The test for substantial similarity is an objective one. See *Incredible Technologies, Inc. v. Virtual Technologies, Inc.*, 400 F.3d 1007, 1011 [74 USPQ2d 1031] (7th Cir. 2005) (noting that we look at "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would

---

[4] See *Paramount Pictures Corp. v. Carol Pub. Group*, 11 F. Supp.2d 329, 332-33 (S.D.N.Y. 1998) ("As an initial matter, it would be absurd to suggest that Ramer has not copied from the Star Trek Properties. His book contains quotations taken directly from these works, and the Middle Portion is devoted to telling a large portion of the Star Trek story."), *aff'd*, 181 F.3d 83 (2d Cir. 1999).

conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value").[5]

482 F.3d at 916. *Accord Atari, Inc.,* 672 F.2d at 614 ("[A]n ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value.") *Atari* further explained: "It has been said that this test does not involve 'analytic dissection and expert testimony,' but depends on whether the accused work has captured the 'total concept and feel' of the copyrighted work." *Id.* (citations and internal quotation marks omitted). S*ee also JCW Investments*, 482 F.3d at 916 (in assessing whether "an ordinary reasonable person would conclude that defendant" had taken "material of substance and value" … "[w]e look at the dolls themselves to determine substantial similarity…."); *Wildlife Express Corp.*, 18 F.3d at 510-11 (total concept and feel outweighs differences to ordinary observer). In *JCW Investments*, the court reviewed pictures of the parties' dolls, both of which were simply plush dolls of middle-aged men sitting in armchairs that fart and tell jokes. Both also had crooked smiles showing their teeth, balding heads with a fringe of black hair, large protruding noses, blue pants, and white tank tops. Yet they were hardly identical: among other things, the infringing version had his name "Fartman" written in red on his chest, their shoes and chairs were different colors, and the infringing version wore a hat. 482 F.2d at 916. Nonetheless, the similarities were sufficient to find infringement and support summary judgment.

---

[5] *JCW Investments* summarized the factual basis for finding infringement, which did not entail proof of exact copying: "…the similarities between Fred and Fartman go far beyond the fact that both are plush dolls of middle-aged men sitting in armchairs that fart and tell jokes. Both have crooked smiles that show their teeth, balding heads with a fringe of black hair, a rather large protruding nose, blue pants that are identical colors, and white tank tops. On the other hand, Fartman has his name emblazoned in red across his chest, his shoes are a different color from Fred's, as is his chair, and Fartman wears a hat. In the end, despite the small cosmetic differences, the two dolls give off more than a similar air." 482 F.3d at 916.

9

Similarly, *Atari* explained that "[e]xact reproduction or near identity is not necessary to establish infringement. 'An infringement … includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy.'" 672 F.2d at 618 (quoting *Univ. Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354, 360 (9th Cir. 1947)). Said the court: "'[I]t is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate.'" *Id.* at 619 (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir.), *cert. denied*, 298 U.S. 669 (1936)). *Atari* thus deemed infringing the character icons in defendant's game (albeit not the game itself) based upon "the relative size and shape of the 'body,' the V-shaped 'mouth,' its distinctive gobbling action (with appropriate sounds), and especially the way in which it disappears upon being captured." *Id.* at 618. *Atari* discounted the many differences pointed out by defendant because there, as here, "[t]hose characters are wholly fanciful creations, without reference to the real world," *id.* and constituted the "taking [of] material of substance and value." *Id.* at 619

In view of the large number of individual works appearing on defendant's website, all of which are admittedly derived from Games Workshop's original works, this case is very similar to *Castle Rock,* 150 F.3d at 137, where a grant of summary judgment was upheld. In *Castle Rock*, defendant's short book contained 643 trivia questions derived from 84 of the 86 episodes of the *Seinfeld* television series. The Second Circuit affirmed a grant of summary judgment by then-district-court-judge Sonia Sotomayor where, as here, there was no genuine dispute as to the defendants' actual (and only) source for its accused copying. *Castle Rock* held that the trivia book infringed the *Seinfeld* television series because the trivia tested aspects of the *Seinfeld* characters, such as expressions and mannerisms, based on the fictitious expression created by the

10

authors, notwithstanding that only fragments were copied from individual episodes. *Id.* at 139. The individual episodes were all part of a continuing (if disjointed story) involving the same characters. In much the same way, all of Games Workshop's Warhammer 40K works are interrelated parts of one ongoing and evolving story involving the same essential characters, and all of Chapterhouse's products are derived from aspects of the original fictional universe Games Workshop has created and are made to be used only in connection with that original creative universe. The extent of copying of creative elements is as great if not greater here, rendering the entire Chapterhouse website an infringement. Even if it might be true, as Chapterhouse seems to argue, that some individual Chapterhouse products could in theory escape a finding of copyright infringement, so long as they are sold together on Chapterhouse's website, which itself constitutes a copyrightable collective whole, the entire website is an infringement. *Accord Warner Bros. Ent'mt Inc. v. RDR Books*, 575 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) (finding substantial similarity where "[m]ost of the Lexicon's 2,437 entries contain direct quotations or paraphrases, plot details or summaries of scenes from one or more of the Harry Potter novels."); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1372-73, 1381 (2d Cir. 1993) (finding substantial similarity between book containing plot synopses of 8 episodes of *Twin Peaks* weekly television series and the series a whole).

The finding that Chapterhouse's copying as a whole is substantial and substantially similar to Games Workshop's Warhammer 40K is reinforced by reviewing specific products Chapterhouse sells, 36 representative samples of which are set forth in the accompanying statement of fact. (Undisputed Facts #31-78). For instance, Chapterhouse's "Doomseer" product (launched after suit began and one of only two products in issue for which Chapterhouse

11

even *sought* to pick a new name[6]) was immediately recognized by the relevant public and by prospective customers as barely distinguishable from Games Workshop's Eldar figures, a point Mr. Villacci ultimately admitted publicly (as he had revealed earlier in internal documents). (Undisputed Fact #38)  The Tyranid conversion kit was sculpted directly from Games Workshop original products and directly copied from a painting in the Tyranid Codex  (Undisputed Facts #50-51).  The Imperial Jet Bike is a direct copy from a picture in *The Horus Heresy Collected Visions* (which the designer acknowledged he had in hand when creating the design thus saving Chapterhous the trouble of sending copies as offered) (Undisputed Facts #54-56).  Even on products as simple as a shoulder pad for Space Marines, Chapterhouse has in every instance copied unique combinations of colors, symbols, the unique shape of the pad itself (including the little aesthetic indents on the back of the rim), together with the specific name given to the underlying character by Games Workshop.  (Undisputed Facts #57-68).  Thus Chapterhouse has created a series of shoulder pads for Space Marine Tactical, Space Marine Assault and Space Marine Devastator squads that copy the exact multifaceted iconography and intricate numerical sequencing of Games Workshop's  Space Marine Tactical, Space Marine Assault and Space Marine Devastator squad (assigned Roman numerals I-VI, VII-VIII and IX-X respectively), combined with a chevron and using the exact character names and precise product shape created by Games Workshop (Undisputed Facts #60-62).  All such products adhere to Mr. Villacci's instructions to his designers to ensure that the products are all sufficiently  "recognizable" to Games Workshop's customers.  To permit such copying would be no different from allowing

---

[6] Even the name was apparently derived from Games Workshop's Eldar mythology.  (Undisputed Facts # 38)  The second product for which Chapterhouse sought a new name is also a female Eldar character plainly inspired by Games Workshop's Eldar imagery but named by Chapterhouse "Armana'serq."

12

unauthorized reproduction of elements and figures from the Harry Potter story, as noted at the outset.

Moreover, because Chapterhouse produced virtually no documents from most of its independent designers (Undisputed Fact #51) (and purports not to know what exactly the designers do in creating the accused works, Undisputed Fact #26) the documents produced likely only scratch the surface in revealing Chapterhouse's actual methods. Similarly, because Chapterhouse failed to produce *any* of its advertising or promotional materials (despite an express Court order) (Undisputed Fact #51 n.19), there is no reason to believe that Games Workshop has been able to unearth on its own more than a fraction of the admissions in Chapterhouse's on-line promotions. Those that Games Workshop has found accentuate to ordinary observers the great likeness of the copies to Games Workshop's originals and some recent forum posts (post litigation) suggest that Mr. Villacci in the past was even more explicit in admitting Chapterhouse's copying. For instance, in response to Mr. Villacci's disagreement that his Javelin Class Jet Bike was not simply recast using Games Workshop parts, one forum member wrote about Villacci: "Suddenly, you don't use Games Workshop models for your 'parts'. Guy used to brag about spitting in the face of Games Workshop, now he won't acknowledge that he uses their models." (Undisputed Fact #56) Chapterhouse has failed to produce those promotional materials "spitting in the face of Games Workshop."

That some individual elements in certain of Games Workshop's products (viewed in isolation) happen to have historical antecedents is irrelevant. Games Workshop is not seeking to protect (nor is Chapterhouse using) items such as Roman numerals or crosses or blood drops in isolation. Plaintiff *and* defendant only use such symbols integrated with other designs, colors, names and other features giving them specific meanings belonging to entirely-formed characters

13

created by Games Workshop. (Undisputed Fact #9) As in *Atari*, even the "the relative size and shape" of the figures and parts exactly match Games Workshop's. 672 F.2d at 618. And Chapterhouse only uses such symbols consistent with the unique meanings Games Workshop has given them in the context of the Warhammer 40,000 universe and the specific characters to which those features belong. Chapterhouse does not use general imagery from heraldry, such as crowns or flowers; it uses only the specific symbols Games Workshop has incorporated into its characters and only for the same characters. Chapterhouse does not make miniature birds or animals; it makes miniature Eldars and Space Marines. Even something as simple as the Roman numerals IX and X (together with a chevron), which are used by Games Workshop to designate squads of "Devastator" Space Marines, are used by Chapterhouse only on its own Devastator Space Marine shoulder pads – together, of course, with the other design features created by Games Workshop. (Undisputed Facts #60-61). It does not use these symbols in any other way. It also similarly uses the number I-VI and VII-VIII for "Tactical" and "Assault" squad shoulder pads (expressly so-named), just as Games Workshop does. And the colors and shapes of the shoulder pads have all been borrowed from Games Workshop – right down to the tiny aesthetic indents on the rear of the pads. *Pickett v. Prince*, 207 F.3d 402, 405 (7th Cir. 2000), explained: "Many works of art rely for their effect on the juxtaposition of familiar elements ordinarily held separate (like a mustache painted on a photograph of the Mona Lisa); indeed, all works of art are ultimately combinations of familiar, uncopyrightable items." Accord *JCW Investments*, 482 F.3d at 917 ("Novelty urges that the similarity of the two dolls reflects the fact that Fred himself is only minimally creative, representing a combination of elements that were in the public domain or were *scenes a faire.* The problem with this argument is that the very combination of these elements as well as the expression that is Fred himself are creative.") Just so here, the qualitative

14

originality and qualitative copying is abundantly clear in the entire context in which iconography, colors and shapes created and combined by Games Workshop are all used *together* (interwoven in the story of Warhammer 40K and named by Games Workshop) in wholly original ways.  There are no antecedents whatsoever for the actual works or the combinations of elements in the works.[7]

Indeed, something as simple as a logo made up entirely of undistinctive elements has been deemed protectable.  *Bouchat v. Balt Ravens, Inc.*, 241 F.3d 350, 356 (4th Cir. 2001), thus protected the plaintiff's design of the Baltimore Ravens' logo, consisting simply of the letter B, a shield, wings and the name "Ravens."  Said the court:  "Bouchat's drawing contains several public domain elements which are not protectable. These elements, however, were selected, coordinated, and arranged in such a way as to render the work original."[8]  *Id.* at 357.  Particularly where characters from fictional works have any visual component (as do the different chapters of the Space Marines, or the Eldar figures or Tau race) such characters are readily protected under

---

[7] Another recent case (involving the architectural design of the Freedom Tower) summarized:

> Our Circuit has held that "a work may be copyrightable even though it is entirely a compilation of unprotectible elements." *Knitwaves* [*Inc. v. Lollytogs Ltd.*], 71 F.3d [996] 1003-04 [(2d Cir. 1995)]. If the court followed defendants' suggestion and analyzed the elements of plaintiff's works separately, comparing only those elements that are copyrightable to those present in the designs for the Freedom Tower, as our Circuit noted, "we might have to decide that there can be no originality in a painting because all colors of paint have been used somewhere in the past." *Id.* at 1003 (internal quotation marks omitted); see also, e.g., *Covington Indus., Inc. v. Nichols*, No. 02 Civ. 8037, 2004 U.S. Dist. LEXIS 6210, at *8-*11 (S.D.N.Y. Apr. 12, 2004) (holding that although neither vertical nor horizontal stripes, nor individual colors, nor the practice of basket weaving was original, the total concept of plaintiff's design for a colored, striped basket was original); *Sunham Home Fashions, LLC v. Pem-America, Inc.*, No. 02 Civ. 6284, 2002 U.S. Dist. LEXIS 24185, at *18-*19 (S.D.N.Y. Dec. 17, 2002) ("Although the idea of a plaid or floral pattern may not of its own be original, the patterns' sizes, shapes, arrangements and colors taken together are original and copyrightable.").

*Shine v. Childs*, 382 F. Supp. 2d 602, 610 (S.D.N.Y. 2005)

[8] Another recent case where copyright in a simple logo was protected is *Costco Wholesale Corp. v. Omega S.A.* 131 S.Ct 565 (2010) (globe logo for Omega watches).

copyright. *Atari* (Pacman character icons); *DeCarlo v. Archie Comic Publn's., Inc.*, 127 F. Supp. 2d 497 (S.D.N.Y. 2001) (Josie character in Archie comics); *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751 (9th Cir. 1978) (Disney characters); *Detective Comics, Inc. v. Bruns Pub, Inc.*, 111 F.2d 432 (2d Cir. 1940) (Hand, J.) (Superman not simply a "comic Hercules" but "an original arrangement of incidents and a pictorial and literary form"). Here, Chapterhouse's products copy not only the precise combinations of elements originated by Games Workshop that make the characters immediately *recognizable* (which it must do to make its products salable to Games Workshop's customer base), as in *Atari*, it has plainly taken "material of substance and value." Indeed, it is *only* that material of substance and value that permits Chapterhouse's products to be sold at all. As in *JCW Investments* and *Castle Rock*, summary judgment is appropriate.

## C.    Chapterhouse's Independent Creation Defense Should Be Dismissed

"A defendant independently created a work if it created its own work without copying anything or if it copied something other than the plaintiff's copyrighted work." *Susan Wakeen Doll Co.* 272 F.3d at 450 (citing 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §12.11[D], at 12-175 (2001)). See *JCW Investments*, 482 F.3d at 915.[9]

Although one of Chapterhouse's 23 affirmative defenses is "independent creation" Chapterhouse ultimately admitted in discovery that all of its works are derived from Warhammer 40K. (Undisputed Fact #26). Indeed, Chapterhouse admits it does not even know what sources its designers consult (Undisputed Fact #26). Although Chapterhouse may contend it also

---

[9] Ty, Inc. v. GMA Accessories, Inc., 132 F.3d 1167 (7th Cir. 1997), shows how the issues of copying and independent creation are inextricably intertwined. In Ty, Inc., where (unlike here) defendant disputed having access to Ty's "Squealer" bean bag pig toys, defendant might have defended a claim of copying by pointing to proof it relied on real pigs or even other pig toys in the public domain in creating its own toy (named "Preston"). Judge Posner explained: "Real pigs are not the only pigs in the public domain. But GMA has not pointed to any fictional pig in the public domain that Preston resembles. Preston resembles only Squealer, and resembles him so closely as to warrant an inference that GMA copied Squealer." *Id.* at 1170.

consulted a small number of other sources outside the Games Workshop universe,[10] that

Chapterhouse's designers may occasionally consult such sources is hardly proof of creation

independent of Warhammer 40,000.

**D.      Chapterhouse's Copyrightability Defense Under English Law Should Be Dismissed**

In the report of its rebuttal expert on English law, Chapterhouse offered opinions on an

issue not raised by plaintiff's expert (and not raised by among Chapterhouse's 23 affirmative

defenses or anywhere previously in the case– indeed contrary to Chapterhouse's prior position in

this case[11]): namely, that copyright in Games Workshop's sculptural miniatures might not be

enforceable under English law.  Laying aside that the issue is not proper rebuttal to Games

Workshop's expert (who said nothing on the subject), English law on copyrightability is

irrelevant and, at any rate, for any given product, there are two-dimensional paintings and

drawings Chapterhouse was easily able to copy.[12]

Consistent with the express language of Section 104 of the Copyright Act, precedents

confirm that United States law applies to copyrightability and infringement, whereas the law of

the country of origin applies only to ownership.  *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780

---

[10] In answer to Interrogatory 2, Chapterhouse identified various sources it says it consulted (e.g., actual saw blades, Greek art, unspecified artwork of HR Giger, Google searches for dragons and a few other items). (Undisputed Facts #67). However, it failed to produce documents showing any actual reliance on most of these with the exception of a few submissions by fans of Games Workshop who wanted versions of the original iconography but also submitted their own images of, for instance, a lion or raven as being close enough to the Games Workshop originals.

[11] Among the 23 affirmative defenses raised by Chapterhouse, it contended in its second defense that Games Workshop required registrations for its *US copyrights*, not that there was any question as to its English copyrights.  (Dkt. No. 150.)

[12] Although almost all of the copying at issue has focused on images from Games Workshop's books that Chapterhouse has rendered in three-dimensional form, because Games Workshop had no reason to expect this new issue to be raised on rebuttal after the close of fact discovery, Games Workshop supplemented its document production on August 9, 2012 to include six two-dimensional images of the characters depicted as miniatures in its original production.

17

F.2d 189, 192 (2d Cir. 1985) (applying U.S. law on copyrightability "[a]lthough the toys enjoyed no copyright protection under Japanese law…"); *Sadhu Singh Hamad Trust v. Ajit Newspaper Advert., Marketing and Comm'ns, Inc.*, 503 F. Supp. 2d 577, 584 (E.D.N.Y. 2007) ("[T]he law that determines the extent of what is subject to copyright protection is the copyright law of the country in which the infringement occurred, not the country in which the work was first published."); *Bridgeman Art Library v. Corel Corp.*, 36 F. Supp. 2d 191, 194-95 (S.D.N.Y. 1999) (originality and copyrightability evaluated under Section 104 of the Copyright Act). Indeed, this conclusion follows directly from the statute itself. Section 104 of the Copyright Act thus states: "The works specified by sections 102" which includes sculptural works, "and 103, when published, are subject to protection under this title if … (1) on the date of first publication, one or more of the authors is a national or domiciliary of the United States, or is a national, domiciliary … of a treaty party … or (2) the work is first published in the United States or in a foreign nation that, on the date of first publication, is a treaty party."

There is no question that England is a "treaty party". Hence, upon publication Games Workshop's sculptural works were protected under Section 104, irrespective of English law. Chapterhouse's own expert agreed that *Bridgeman* sets forth the relevant U.S. law (Undisputed Fact # 83). Moreover, his report suggests at most that copyright *enforcement* remedies might be limited under English law for some mass-produced figurines (arguably of the type Games Workshop produces), not that copyright does not *subsist* in the works.[13]  Even under

---

[13] Referring to *LucasFilm Ltd. v. Ainsworth*, [2011] UKSC 39, [2012] 1 AC 208, involving alleged infringement of the Stormtrooper helmet used as a prop in the Star Wars movie, Bently explained that "the *duration* of its copyright in the designs on which the toys were based was effectively limited under Section 52 of the [Copyright Designs and Patents Act] to 15 years unless the toys were regarded themselves as sculptures." (Undisputed Fact # 83) (emphasis added.) The decision, which apparently did limit protection, coexists with another older English case, *Britain v. Hanks Bros*, (1902) 86 Law Times 765, in which the enforceability of copyright in toy soldiers was upheld (Bently Report ¶ 36).  Regardless whether the duration of copyright is limited under English law, the principle of "national treatment" under the Berne Convention, discussed in *Bridgeman*, 36 F. Supp. 2d  at

Chapterhouse's theory, so long as copyright subsists in some form in England, it would be irrelevant in this proceeding whether Games Workshop's enforcement remedies might be limited abroad. Chapterhouse does not question that U.S. law applies to infringement. In short, US law applies to the issue of copyrightability, and under U.S. law there is no question Games Workshop's figurines and other sculptural works are copyrightable. *See, e.g.*, *JCW Investments* (doll figure copyrightable); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167 (7th Cir. 1997) (soft sculpture toy pig); *Wildlife Express Corp,* (soft sculpture duffle bags).

## E.   Chapterhouse Has Infringed Games Workshop's Trademarks

"[T]o prevail in an action under §43(a) of the Lanham Act[14], [the trademark owner] must establish: '(1) that it has a protectable trademark, and (2) a likelihood of confusion as to the origin of the defendant's product.'" *Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) (Citation omitted.) Games Workshop's ownership and priority of use of its registered and unregistered marks can scarcely be debated here given the evidence of sales presented by Games Workshop (Undisputed Facts #1-2); by Chapterhouse's having named all of its products using Games Workshop's *preexisting* names and by Chapterhouse's admission on its website that Games Workshop owns all of the marks in issue. (Undisputed Fact #22) Indeed, the very fact of copying of Games Workshop's product and character names is proof of the recognition and goodwill in those names. *Decor Grates v. Fararo*, No. 92 C 6395, 1997 U.S.Dist LEXIS 3328 at

---

194, and Section 104 of the Copyright Act requires that Games Workshop's sculptural works be protected as any other sculptural works under US law**.** Moreover, Professor Bently acknowledges that English law has likely been supplanted by European law under a 2002 directive, such that prior limits on the enforceability of copyrights in figurines such as the Stormtrooper helmets in England is at best ambiguous or has now been reversed by recent European case law and the 2002 European directive. (Undisputed Fact #83)**.**

[14] Section 43(a) prohibits use in commerce "on or in connection with any goods or services, or any container for goods" of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, … which …is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a).

4849-8374-8368.1

* 30 (N.D. Ill. Mar. 13, 1997) (trademark significance inferred from intentional copying of trade

dress).[15]

> The test of trademark infringement is straightforward.:
>
> Seven factors comprise the likelihood of confusion analysis: (1) similarity
> between the marks in appearance and suggestion; (2) similarity of the products;
> (3) the area and manner of concurrent use; (4) the degree of care likely to be
> exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual
> confusion exists; and (7) whether the defendant intended to "palm off" his product
> as that of the plaintiff. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897-98 (7th
> Cir. 2001); see also *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041,
> 1043-44 (7th Cir. 2000). "The likelihood of confusion test is an equitable
> balancing test." *Barbecue Marx*, 235 F.2d at 1044. No single factor is dispositive
> and courts may assign varying weights to each of the factors depending on the
> facts presented. *See id.* In many cases, however, three of the factors are likely to
> be particularly important: the similarity of the marks, the defendant's intent, and
> actual confusion. *See id.*

*CAE, Inc. v. Clean Air Eng'g Inc.*, 267 F.3d 660, 677-78 (7th Cir. 2001).

Here, the factors all favor Games Workshop. Chapterhouse uses Games Workshop's

exact names and marks[16] to advertise and promote its products. The products are not only

similar to but are directly based on Games Workshop's products and made to be used

interchangeably with Games Workshop's products, including in Games Workshop's game. The

---

[15] That Games Workshop does not engage in traditional advertising is not relevant. *Morningside Group, Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 139 (2d Cir. 1999) ("When a claimant has no need for traditional advertising because of the nature of its market, it should not feel compelled to advertise simply to protect its service mark.").

[16] These include the registered marks Warhammer, Warhammer 40,000, Warhammer 40K, 40K, Space Marine, Eldar, Dark Angel, and Tau, and the unregistered marks Adeptus Mechanicus, Assault Space Marine, Alpha Legion, Black Templars, Blood Angels, Blood Ravens, Tyranid Bonesword, Cadian, Carnifex, Chaos Space Marines, Chaplain, Chimera, Crimson Fists, Dark Angel, Death Watch, Devastator Space Marine, Dreadnought, Drop Pod, Eldar, Elder Farseer, Eldar Jetbike, Eldar Warlock, Eldar Seer Council, Empire, Exorcist, Flesh Tearers, Gaunt, Genestealer, Heavy bolter, Heresy Armour, Hellhound, High Elf, Hive Tyrant, Horus Heresy, Howling Banshee, Howling Griffons, Imperial Fists, Imperial Guard, Inquisition, Iron Hands, Jetbike, Jump Pack, Land Raider, Land Speeder, Tyranid Lashwhip, Legion of the Damned, Librarian, Lightning Claw, Melta, Mk II Armour, Mk V Armour, Mycetic Spore, Plasma, Predator, Rhino, Salamander, Striking Scorpion, Soul Drinker, Space Wolves, Stormraven, Storm Shield, Tactical Space Marine, Techmarine, Termagants, Terminator, Tervigon, Thousand Sons, Thunder Hammer, Tyrant, Tyranid, Tyranid Warrior, Ymgarl.

products are all marketed to (and only to) Games Workshop's user base. The products are relatively inexpensive and not the sort of goods that require great consumer care. Although a few of Games Workshop's marks have been used by third parties (such as Exorcist), none are used for fantasy games or related products and all are highly distinctive within the context of the Warhammer 40K universe. Once again, the very act of copying proves that the marks have secondary meaning, as there can be no reason for Chapterhouse's use of Games Workshop's names other than its awareness that relevant consumers do recognize those names. There is some evidence of actual confusion where individuals thought Chapterhouse must have been license by Games Workshop (Undisputed Fact #17) and the defendant plainly *intended* to trade on the goodwill Games Workshop has created in its products and its game. In *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir. 2000), where the defendant used the name Prozac in the source code of its website promoting its Herbrozac" product the court said the clear intent was to "divert [i]nternet users searching for information on Prozac" to its website. *Eli Lilly* held this bad intent "can even be weighed more heavily than other factors." *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 779-80, 783 (N.D. Ill. 2011)..

Because Chapterhouse's business model is to create parts or accessories copied from Warhammer 40K, where Games Workshop has created and shown a character or vehicle or weapon in its books, magazines, video games or the like but does not yet sell a miniature based on its imagery, the case is thus little different from *Au-Tomotive Gold Inc. v. Volkswagen of America Inc.*, 457 F.3d 1062 (9th Cir. 2006). There a prima facie case of infringement was found (subject to possible affirmative defenses) where the infringer used counterclaim-plaintiffs' "Volkswagen" and "Audi" trademarks on accessories such as license plate frames and key chains. The marks were deemed strong and distinctive; the infringer's products competed

21

directly with accessories sold by the car companies' licensed marketers and were related to their

primary products; and the infringer specifically targeted owners of Audi and VW cars. As here,

the parties' products thus had identical marks and were destined for same buyers. Similarly,

consumers did not need to exercise great care in selecting the infringing products, and the

infringer knowingly and intentionally appropriated defendants' exact marks. Moreover, just as

Chapterhouse defends this case on grounds it uses a disclaimer on its website, *Au-Tomotive Gold*

noted regarding a disclaimer used on the infringer's packaging:

> Courts have been justifiably skeptical of such devices … particularly when exact
> copying is involved. *See, e.g.*, *Pebble Beach*, 155 F.3d at 543 (upholding lower
> court determination that disclaimers were "inadequate where present and …
> absent from the majority of advertisements and promotional materials."),
> *superseded on other grounds as recognized in Eppendorf-Netheler-Hinz*, 289 F.3d
> at 356; *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079,
> 1093 (7th Cir. 1988) ("[W]here the infringement in issue is a verbatim copying …
> plaintiff's reputation and goodwill should not be rendered forever dependent on
> the effectiveness of fineprint disclaimers often ignored by consumers.").

457 F.3d at 1077. *Au-Tomotive Gold* also noted in language directly applicable here, that a

disclaimer is utterly ineffective to prevent post-sale confusion: "Shorn of their disclaimer-

covered packaging, Auto Gold's products display no indication visible to the general public that

the items are not associated with Audi or Volkswagen. The disclaimers do nothing to dispel post-

purchase confusion." *Id.* at 1077-1078. So too here, even if anyone reads or understands the

disclaimer on Chapterhouse's website, once the products are sold, the disclaimer does no good as

there are no permanent markings on the products.

What Chapterhouse does in finding imagery from Games Workshop's books and rushing

to market its own versions before Games Workshop (Undisputed Fact #68, #78) is little different

from the conduct deemed unlawful in *Processed Plastic Co. v. Warner Comm'ns, Inc.*, 675 F.2d

852 (7th Cir. 1982) and *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir. 1981). There,

4849-8374-8368.1

defendant sought to capitalize on the recognition of the "Dixie Racer" car in plaintiff's "Dukes of Hazard" television series before a licensed version was made. Such a deliberate attempt to trade on plaintiff's goodwill constituted unfair competition in violation of Section 43(a). Here, all of Games Workshop's trademarks in issue (with the possible exception of "Mycetic Spore", "Ymgarl" and "Tervigon") have been used on actual products. But even a name such as Mycetic Spore that has appeared only in Games Workshop's fictional works is associated only with Games Workshop for fantasy games and miniatures. Here, as in the twin "Dixie Racer" cases, Chapterhouse directly trades on the goodwill Games Workshop has developed in its names and marks. *Accord*, *D. C. Comics, Inc. v. Powers*, 465 F. Supp 843 (S.D.N.Y. 1978) (Daily Planet so closely associated with the Superman story as to be likely to cause confusion).

Even at its website, and notwithstanding the disclaimer, the prominence with which Chapterhouse has promoted its business as "Specializing in Bits and Sculpts for Warhammer 40,000" exceeds the scope of permissible fair use. See, e.g., *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812-13(2d Cir. 1999) (confusion caused by prominent but unauthorized use of Harley Davidson logo for motorcycle repair shop was not remedied by use of a disclaimer that defendant was an unauthorized Harley Davidson repair shop). The prominence with which Chapterhouse uses the WARHAMMER trademark (not to mention the fact that it uses innumerable Games Workshop product and character names to identify its own products, not Games Workshop's products), also makes the fair use defense inapplicable here. The very name "Chapterhouse" plainly conveys a meaning associated with the "Chapters" of the "Space Marines", as does its winged logo call to mind Games Workshop's registered Aquila

23

design mark.[17] *Sands, Taylor & Wood v. The Quaker Oats Co.*, No. 84 c 8075, U.S.Dist. LEXIS

17342 (N.D. Ill. Dec. 18, 1990) (likelihood of confusion judged by sight sound and meaning of

marks). See And virtually every product is identified by use of Games Workshop's original

names. Games Workshop has also produced evidence that individuals have been confused

whether Chapterhouse is licensed by Games Workshop. Although evidence of actual confusion

is not required, it is understood that because consumers rarely complain (particularly regarding

inexpensive items) "[o]ne instance of actual confusion has been deemed sufficient to weigh in

favor of finding a likelihood of confusion." *CAE, Inc.*, 267 F.3d at 686.

Moreover, when such products are sold by Chapterhouse on third-party sites, such as

eBay, or even resold on such sites by Chapterhouse's customers, it becomes impossible for

purchasers to know whether they originated with Games Workshop. It was on eBay and a

similar site, Bartertown, where Games Workshop first discovered the infringing products. *CAE,

Inc.* recently reaffirmed that post-sale confusion is actionable in this circuit: "Post-sale confusion

refers to a situation, in which, for example, a potential customer sees a product bearing the label

'CAE Rental Equipment' without reference to Clean Air and, consistent with the customer's

familiarity with CAE, Inc., mistakenly attributes the products to CAE, Inc., thereby influencing

his buying decision, either positively or negatively." 267 F.3d at 683.[18]

---

[17] However, in discovery, Chapterhouse has offered a plainly contrived answer to the interrogatory as to the intended meaning of its name, saying instead only that it is possible (even if implausible) that people will think of a building attached to a monastery or Frank Herbert's novel "Chapterhouse Dune". (Undisputed Fact #19) *See Eli Lilly & Co.* 233 F.3d at 465 ("Natural Answers now claims that the intent of the name is only to describe the general function of the product and to distinguish it from PROZAC®, we have a difficult time believing this innocent explanation. The HERBROZAC name does nothing … other than through its reference to the PROZAC® mark … to describe the function of 'mood elevation.'").

[18] The court cited, *inter alia, Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872-73 (2d Cir. 1986), which explained that although product labels might inform actual buyers in the store as to the source of the plaintiff's jeans, similarity in trade dress could cause prospective buyers sighting the jeans outside the store to associate the defendant's jeans with the plaintiff, thereby influencing their buying decision. *Accord, Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 297 (7th Cir. 1998).

24

Moreover, just as Games Workshop has licensed its intellectual property to third parties, consumers encountering the wide range of Warhammer 40K products sold by Chapterhouse – whether on its website or on third party sites such as eBay, are likely to conclude that the products (if not actually made by Games Workshop) are produced under license. *See Ty, Inc. v. Jones Group Inc.*, 237 F.3d at 899 ("The additional marks on the Beanie Racers may not reduce the likelihood of confusion among consumers because they still may believe that Ty licensed, approved, or authorized Jones' production of the Beanie Racers.")

### III.   <u>CONCLUSION</u>

For the foregoing reasons, Games Workshop requests summary judgment on the issues of copyright infringement and trademark infringement and on the subsidiary issues of ownership of copyright, copying and the copyrightability of Games Workshop's work under United States law, together with such other and further relief as the Court may deem just and proper.

Dated:  August 14, 2012                              Respectfully submitted,

/s/  Jason J. Keener
    Jason J. Keener (Ill. Bar No. 6280337)
    FOLEY & LARDNER LLP
    321 North Clark Street, Suite 2800
    Chicago, IL 60654-5313
    Telephone:  312.832.4500
    Facsimile:  312.832.4700
    Email:  jkeener@foley.com

    Jonathan E. Moskin
    FOLEY & LARDNER LLP
    90 Park Avenue
    New York, New York 10016
    Telephone:  (212) 682-7474
    Facsimile:  (212) 687-3229
    Email:  jmoskin@foley.com

    *Attorneys for Plaintiff*
    *Games Workshop Limited*

4849-8374-8368.1

<u>**CERTIFICATE OF SERVICE**</u>

I, Jason J. Keener, an attorney, hereby certify that on August 14, 2012, I caused to

be filed electronically the foregoing PLAINTIFF'S MEMORANDUM IN SUPPORT OF

MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF

system, which will send an electronic copy of the foregoing to counsel of record and constitutes

service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the

Northern District of Illinois.


/s/  Jason J. Keener
Jason J. Keener

4849-8374-8368.1