# Exhibit

# 121

Highly Confidential – Filed Under Seal

# Exhibit

# 122

# FILE NOTE

| | |
|---|---|
| Case Ref: | 10591 |
| Action: | Unknown action type (IE) |
| Date: | 16/10/2009 |
| Time: | 11:24:55 |
| Handler: | Talima Fox |
| Typist: | GLS |
| No. of Units: | 1 |
| Cost Value: | £0.00 |
| Correspondent: | |

## DETAILS

Unsolicited correspondence received:
Subject: FW: GW IP
Detail:


Our ref:



Gill Stevenson
Legal Manager
Group Legal Department
Games Workshop Group PLC
Tel: +44 (0)115 900 4124

---

From: Wil and Vicky [mailto:pen_filia@yahoo.co.uk]
Sent: 16 October 2009 09:14
To: Legal (UK)
Subject: GW IP


http://chapterhousestudios.com/webshop/component/virtuemart/?page=shop
.browse&category_id=4

Hi, I've just found this website and they are offering their own
resin cast conversion kits for space marine rhino and land raider          (Continued ...)

tanks along with a few other GW things. I don't know if they are
doing this under license, but thought you may want to take a look at
this just in case.

Kind Regards

Vicky

# FILE NOTE

| | |
|---|---|
| Case Ref: | 10591 |
| Action: | Unknown action type (IE) |
| Date: | 30/09/2009 |
| Time: | 10:35:21 |
| Handler: | Gill Stevenson |
| Typist: | TF |
| No. of Units: | 1 |
| Cost Value: | £0.00 |
| Correspondent: | |

## DETAILS

Unsolicited correspondence received:
Subject: Fw: Chapterhouse Studios
Detail:

----- Forwarded Message ----
From: ALAN RICHMOND <alanrichmond879@btinternet.com>
To: legal@games-workshop.co.uk
Sent: Sunday, 27 September, 2009 10:33:52 AM
Subject: Chapterhouse Studios

Dear Sir / Madam

I have recently come across this website (http://chapterhousestudios.com/webshop/) selling conversion bits for Games Workshop kits, but they are using Games Workshop trademarks in their product names, as well as iconography that looks remarkably similar to some stuff I've seen produced by yourselves. I'm looking at their Space Marine shoulder pads nere (Salamander, Luna Wolves etc) which look reasonable enough, but perhaps lack the sharpness and detail of 'official' GW products...

My question is are they legit. Is what they doing even legal, or does it infringe on your IP / trademark policies.

Hope this of use, and I look forward to hearing from you.

Kind regards

Alan Richmond

# FILE NOTE

| | |
|---|---|
| Case Ref: | 10591 |
| Action: | Unknown action type (IE) |
| Date: | 15/02/2010 |
| Time: | 12:47:15 |
| Handler: | Talima Fox |
| Typist: | GLS |
| No. of Units: | 1 |
| Cost Value: | £0.00 |
| Correspondent: | |

## DETAILS

Unsolicited correspondence received:
Subject: Is this legal?
Detail:
http://chapterhousestudios.com/webshop/component/virtuemart/?page=shop
.browse&category_id=7

I was thinking of the power fist and the leg parts for the Chaplain.
They are clearly Citadel parts with added details sculpted to them.

Is this legal?

Regards // Andreas Bergman

———

Hitta kärleken! Klicka här MSN Dejting
<http://dejting.se.msn.com/channel/index.aspx?trackingid=1002952>

# Exhibit

# 123

**Filed Separately via CD**

# Exhibit

# 124

**Filed Separately via CD**

# Exhibit

# 125

Highly Confidential - AEO



# Exhibit

# 126



# Exhibit

# 127

Civil Action No. 10-cv-08103

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GAMES WORKSHOP LIMITED

Plaintiff

v.

CHAPTERHOUSE STUDIOS LLC

and

JON PAULSON d/b/a PAULSON GAMES

Defendants

_____

EXPERT REPORT

OF

PROFESSOR LIONEL BENTLY

_____

INSTRUCTIONS

1.     I have been instructed by Winston and Strawn LLP on behalf of Chapterhouse
       Studios LLC, the Defendant in this action, to provide expert evidence in these
       proceedings by way of an expert report to be supported by oral testimony, if

1

required, on English law as it applies to certain aspects of copyright ownership in artistic works.

2.    In particular, I have been asked to provide an assessment on the position in English law relating to the following matters:

    (a) The subsistence of copyright

    (b) The ownership of copyright in the employment context;

    (c) The ownership of copyright when works have been jointly created; and

    (d) Other relevant issues of ownership and transfer including implied or equitable assignment.

3.    I have also been asked to highlight differences between my view of the position in English law and that of the Plaintiff's Expert Report.

4.    I have also been asked my opinion as to how these principles are likely to apply to issues in this case based on the materials with which I have been provided.

5.    Annexed to this expert report is an exhibit marked **"LB1"** containing authorities which I refer to in this report and which are not contained in the Plaintiff's Expert Report.

## QUALIFICATIONS AND EXPERIENCE

6.    I am currently the Herchel Smith Professor of Intellectual Property Law in the Faculty of Law at the University of Cambridge in England. I am also the Director of Centre of Intellectual Property and Information Law at the University of Cambridge, England. I reside at 18 Romsey Road, Cambridge, CB1 3DD.

7.    I am an expert in the field of intellectual property law, which I have been teaching since 1988. I have taught intellectual property law at various institutions of higher learning, including University of Cambridge (2004-),

2

(4) It is impossible to say, without examining particular examples of works, whether those works were created before 1 August 1989 for the purpose of publication in a magazine (such as *White Dwarf*);

(5) It is impossible to conclude at this stage that the works created by persons who were freelancers or employees who were working outside the course of employment, were co-authored by employees of the Plaintiff. Assessment of joint authorship is a factual inquiry, and requires that the parties be found to have collaborated and that each has contributed to the expressive form of the work. Merely providing instructions, ideas, material or templates would not make a person a joint author: that person must make a substantial and original contribution to the final expressive form of the work.

(6) It is impossible to generalise about whether the copyright in the works created by persons who were freelancers or employees while working outside the course of employment might have been subject to implied assignment to the Plaintiff. The inquiry involves a very close analysis of the facts, intentions and understandings of the parties involved in making each individual work.

**ANALYSIS OF THE RELEVANT "ENGLISH" LAW**

17.   The law of copyright of the United Kingdom is contained in the Copyright, Designs and Patents Act 1988 (hereafter, "C.D.P.A."). This Act came into force on 1 August 1989.

18.   The Act replaced the Copyright Act 1956. The transitional rules are contained in Schedule 1. The most important of these are that

(i) the subsistence of copyright in a work created before the 1988 Act went into effect depends on the position immediately before that date: C.D.P.A., Sched. 1, para. 5(1). Thus, a work in existence prior to July 31, 1989, will be protected under the 1988 Act if and only if it was protected by copyright under the 1956 Act on that date.

(ii) the initial ownership of copyright continues generally to be determined by the law in effect when the materials in question were made: C.D.P.A., Sched. 1, para. 11. So for any works created before August 1, 1989, the rules applicable are those in the Copyright Act 1956.

19.    The C.D.P.A. has been amended on various occasions to give effect to European Directives. These include:

Council Directive 91/250/EEC of 14 May 1991 on the Legal Protection of Computer Programs (codified as Directive 2009/24/EC of the European Parliament and of the Council of 23 April 2009)

Council Directive 92/100/EEC of 19 November 1992 on Rental Right and Lending Right (codified as Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property, which in turn has been amended by Directive 2011/77/EU of the European Parliament and of the Council of 27 September 2011)

Council Directive 93/83/EEC of 27 September 1993 on the coordination of certain rules concerning copyright and rights related to copyright applicable to satellite broadcasting and cable retransmission

Council Directive 93/98/EEC of 29 October 1993 harmonizing the term of protection of copyright and certain related rights (codified as Directive 2006/116/EC of the European Parliament and of the Council of 12 December 2006)

Directive 96/9/EC of the European Parliament and of the Council of 11 March 1996 on the Legal Protection of Databases

Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the Harmonization of Certain aspects of copyright and Related Rights in the Information Society

20. According to Article 10 of Directive 2001/29, that Directive applies

> "in respect of all works and other subject-matter referred to in this Directive which are, on 22 December 2002, protected by the Member States' legislation in the field of copyright and related rights, or which meet the criteria for protection under the provisions of this Directive or the provisions referred to in Article 1(2)."

However, the Directive applies

> "without prejudice to any acts concluded and rights acquired before 22 December 2002."

21. Although the Court of Justice of the European Union has not yet ruled on the question, it seems that issues of ownership of works created before 22 December 2002 are unaffected by the Directive. With respect to those created thereafter, English law falls to be interpreted to ensure it is compatible with and gives effect to European law.

## A. Subsistence of Copyright

22. The Plaintiff's <u>Expert Report</u> at no stage broaches the question of subsistence of copyright. However, it is my understanding that the application of United States law is in fact dependent upon prior recognition that copyright subsists under U.K. law. Consequently, it is important to consider whether the material in which the Plaintiff asserts copyright would be protected. That involves two inquiries: first, whether it falls within the list of protectable subject matter; second, whether if the material is of the sort that is protectable in principle, whether it meets the relevant "originality" threshold on which protection is conditioned.

## Subject Matter

23. The traditional position under UK law is that copyright subsists in a list of subject matter identified by the relevant statute: C.D.P.A., s. 1; Copyright Act 1956. The list is a 'closed list'. So, section 1(1) of the C.D.P.A. states:

(1) Copyright is a property right which subsists in accordance with this Part in the following descriptions of work—

    (a) original literary, dramatic, musical or artistic works,

    (b) sound recordings, films or broadcasts, and

    (c) the typographical arrangement of published editions

24.    UK law thus differs from US law, which operates an open category, "original works of authorship" (and also the laws of most European countries).

25.    The relevant subject matter in these proceedings is original literary, dramatic, musical and artistic works. Copyright Act 1956, s.2 (literary, dramatic, musical); s. 3 (artistic works).

26.    In these proceedings there is little doubt that the novels in which the Plaintiff claims copyright are "literary works."

27.    Artistic works are in turn defined exhaustively. Under section 4 of the C.D.P.A.:

(1) In this Part "artistic work" means—

    (a) a graphic work, photograph, sculpture or collage, irrespective of artistic quality,

    (b) a work of architecture being a building or a model for a building, or

    (c) a work of artistic craftsmanship.

(2) In this Part—

"building" includes any fixed structure, and a part of a building or fixed structure;

"graphic work" includes—

    (a) any painting, drawing, diagram, map, chart or plan, and

    (b) any engraving, etching, lithograph, woodcut or similar work;

"photograph" means a recording of light or other radiation on any medium on which an image is produced or from which an image may by any means be produced, and which is not part of a film;

11

"sculpture" includes a cast or model made for purposes of sculpture.

28.     Similarly, section 3 of the Copyright Act 1956 stated:

> (1) In this Act "artistic work" means a work of any of the following descriptions, that is to say,—
>
>> (a) the following, irrespective of artistic quality, namely paintings, sculptures, drawings, engravings and photographs;
>>
>> (b) works of architecture, being either buildings or models for buildings;
>>
>> (c) works of artistic craftsmanship, not falling within either of the preceding paragraphs.
>
> (2) Copyright shall subsist, subject to the provisions of this Act, in every original artistic work which is unpublished, and of which the author was a qualified person at the time when the work was made, or, if the making of the work extended over a period, was a qualified person for a substantial part of that period.
>
> (3) Where an original artistic work has been published, then, subject to the provisions of this Act, copyright shall subsist in the work (or, if copyright in the work subsisted immediately before its first publication, shall continue to subsist) if, but only if,—
>
>> (a) the first publication of the work took place in the United Kingdom, or in another country to which this section extends, or
>>
>> (b) the author of the work was a qualified person at the time when the work was first published, or
>>
>> (c) the author had died before that time, but was a qualified person immediately before his death.

29.     To be protected by copyright, the illustrations and miniatures on which the Plaintiff relies must thus fall within one of these designations of "artistic work". The illustrations are clearly "graphic works" under the C.D.P.A., being "paintings" or "drawings"; or "artistic works" under section 3(1) of the 1956 Act. More difficulty exists in relation to the miniatures. The key question is whether these constitute "sculptures." In my view it is very doubtful that they would do so.

30.  The question of what amounts to a "sculpture" was addressed most recently by the Supreme Court in *Lucasfilm Ltd v Ainsworth* [2011] UKSC 39, [2012] 1 AC 208, where the Supreme Court recently affirmed the ruling of the High Court and Court of Appeal that a plastic version of a Stormtrooper helmet was not a "sculpture" for the purposes of UK copyright law.

31.  In so holding, the Supreme Court approved the reasons given by Mann J at first instance ([2011] UKSC 38, [37], [48]). Mann J. had adopted a multi-factorial approach ([2008] EWHC 1878 (Ch), [2009] F.S.R. (2), at para [118]) which the Court of Appeal generally approved ([2009] EWCA Civ 1328, [2010] Ch. 503, [54], [71]). It is worth setting out:

> "From those authorities, and those approaches, a number of guidance factors can be extracted. I call them guidance rather than points of principle, because that gives them the right emphasis. The judges deciding the cases have not sought to lay down hard and fast rules in an area where subjective considerations are likely to intrude, and I will not attempt to do so either. However, I do think the following points emerge from the cases or from the concepts involved:
>
> (i) Some regard has to be had to the normal use of the word.
>
> (ii) Nevertheless, the concept can be applicable to things going beyond what one would normally expect to be art in the sense of the sort of things that one would expect to find in art galleries.
>
> (iii) It is inappropriate to stray too far from what would normally be regarded as sculpture.
>
> (iv) No judgment is to be made about artistic worth.
>
> (v) Not every three dimensional representation of a concept can be regarded as a sculpture. Otherwise every three dimensional construction or fabrication would be a sculpture, and that cannot be right.
>
> (vi) It is of the essence of a sculpture that it should have, as part of its purpose, a visual appeal in the sense that it might be enjoyed for that

13

purpose alone, whether or not it might have another purpose as well. The purpose is that of the creator. This reflects the reference to "artist's hand" in the judgment of Laddie J in *Metix,* with which I respectfully agree. An artist (in the realm of the visual arts) creates something because it has visual appeal which he wishes to be enjoyed as such. He may fail, but that does not matter (no judgments are to be made about artistic merit). It is the underlying purpose that is important. I think that this encapsulates the ideas set out in the reference works referred to in *Wham-O* and set out above (and in particular the Encyclopaedia Britannica).

(vii) The fact that the object has some other use does not necessarily disqualify it from being a sculpture, but it still has to have the intrinsic quality of being intended to be enjoyed as a visual thing. Thus the model soldier in *Britain* might be played with, but it still, apparently, had strong purely visual appeal which might be enjoyed as such. Similarly, the Critters in *Wildash* had other functions, but they still had strong purely visual appeal. It explains why the Frisbee itself should be excluded from the category, along with the moulds in *Metix* and *Davis*. It would also exclude the wooden model in *Wham-O* and the plaster casts in *Breville*, and I would respectfully disagree with the conclusions reached by the judges in those cases that those things were sculptures. Those decisions, in my view, would not accord with the ordinary view of what a sculpture is, and if one asks why then I think that the answer is that the products fail this requirement and the preceding one – there is no intention that the object itself should have visual appeal for its own sake, and every intention that it be purely functional.

(viii) I support this analysis with an example. A pile of bricks, temporarily on display at the Tate Modern for 2 weeks, is plainly capable of being a sculpture. The identical pile of bricks dumped at the end of my driveway for 2 weeks preparatory to a building project is equally plainly not. One asks why there is that difference, and the answer lies, in my view, in having regard to its purpose. One is created by the hand of an artist, for artistic purposes, and the other is created by a

builder, for building purposes. I appreciate that this example might be criticised for building in assumptions relating to what it seeks to demonstrate, and then extracting, or justifying, a test from that, but in the heavily subjective realms of definition in the artistic field one has to start somewhere.

(ix) The process of fabrication is relevant but not determinative. I do not see why a purely functional item, not intended to be at all decorative, should be treated as a sculpture simply because it is (for example) carved out of wood or stone."

32.   Importantly, in applying these factors, Mann J. addressed whether toys of Stormtroopers were sculptures. The matter was important because Lucasfilm had authorised the making and sale of such toys. Consequently, the duration of its copyright in the designs on which the toys were based was effectively limited under section 52 of the C.D.P.A. to 15 years unless the toys were regarded themselves as "sculptures": C.D.P.A., Sched 1, para. 20; section 10 Copyright Act 1956. The judge concluded that they were not. He stated, [2009] FSR (2), 154-155, [123]:

"Next, it is necessary to consider the toy Stormtroopers, and other characters, which are taken as being reproductions of the armour and helmets for the purposes of section 52. These are, as already described, articulated models which are sold as toys and which are intended for the purposes of play. Play is their primary, if not sole, purpose. While their appearance is obviously highly important (if they did not look like the original, the child would not be so interested) they are not made for the purposes of their visual appearance as such. While there is no accounting for taste, it is highly unlikely that they would be placed on display and periodically admired as such. The child is intended to use them in a (literally) hands-on way, in a form of delegated role play, and that is doubtless how they are actually used. That means, in my view, they are not sculptures. They can be distinguished from the model in *Britain* which apparently had a significant element of being admirable for its own visual sake. That does not apply to the Stormtrooper, whose only

15

real purpose is play. In reaching this conclusion I am not saying that the *Britain* model is better at what it portrays than the Stormtrooper model. That would be to make judgments about artistic quality, which the statute understandably forbids. It is making a judgment about whether there is anything in the model which has an artistic essence, in the sense identified above. I conclude that there is not."

33.     The case which Mann J. sought to distinguish was *Britain v. Hanks Bros* (1902) 86 *Law Times* 765. This was a case under the Sculpture Copyright Act 1814, in which the question was whether lead toy soldiers, being mounted yeoman on horseback, were sculptures. The soldiers were sculpted by William Britain junior from photographs and had his name stamped on them. Evidence was accepted by the Court that "the anatomy is good, and that the modelling shows both technical knowledge and skill." Wright J said that while he had "great doubt as to the meaning of the Act" he was nevertheless prepared to hold that these toy soldiers were sculptures.

34.     The conclusion of Mann J. that the toy stormtroopers were not sculptures was appealed to the Court of Appeal (but not further to the Supreme Court). The Court of Appeal affirmed. Jacob LJ began by considering *Britain v Hanks*. He said:

> "It is difficult again to take too much from this case. It is clear that the judge rejected the defendants' contention that the models were mere toys of no artistic merit. On his view, the metal figures produced therefore qualified as sculptures or models of the human figure within the meaning of the 1814 Act. They appear to have been high quality lead soldiers cast from a model which had been made with recognisable artistic skill. It was certainly the view of the Gregory Committee which reported in October 1952 (Cmd. 8662) and recommended various changes to the Copyright Act that toy soldiers and other models did not qualify for copyright protection under the 1911 Act because of the operation of s.22(1) and Design Rule 26. Their only protection would be as registered designs assuming that they could satisfy the requirement of novelty. But, as mentioned earlier, this involves an acceptance that they would otherwise

qualify as works of sculpture. It is, however, clear from the report that the Gregory Committee had in mind toy soldiers made from a prototype model which had the qualities necessary to make it a work of sculpture. This certainly seems to be consistent with the view of the judge in *Britain v Hanks* about the quality of the models he was considering. On this basis, that case was concerned with something which was not merely a toy and which, in the hands of a collector, might not be used for that purpose at all. <u>By comparison, the toy stormtroopers were not replicas of real soldiers and were sold essentially for use as toys.</u> The judge was not presented with evidence about how they were made or whether the prototype could itself be regarded as a sculpture. All we know is that they were reproductions in miniature of the full-sized armour and helmet."

35.    Jacob LJ continued (at [81]-[82]):

"That leaves the toy stormtroopers. Mr Bloch submits that the distinction which the judge made based on *Britain v Hanks* is untenable and that the facts of that case are indistinguishable from those under consideration on this appeal...

As already indicated, we think the judge was right to point to the existence of what can loosely be described as a work of art as the key to the identification of sculpture. On this basis, artistic and accurate reproductions of soldiers could qualify notwithstanding that some children might wish to play with them. <u>But in most modern cases toy soldiers, whether real or fictional, will not be works of art</u> and will not differ materially in artistic terms from the plastic Frisbee in the *Wham-O* case. <u>They will be playthings registrable for their design qualities but nothing else. This distinction may be difficult to draw in some cases but we suspect that the cases which will qualify for protection under the Copyright Act will be relatively rare.</u> The judge recognised the need not to make qualitative judgments about the artistic merits of the toy soldiers in *Britain* compared to the stormtroopers and therefore emphasised the real purpose of the latter being one of play. But the true distinction between the two cases can be expressed in more fundamental terms. <u>We</u>

17

are not dealing here with highly crafted models designed to appeal to the collector but which might be played with by his children. These are mass produced plastic toys. They are no more works of sculpture than the helmet and armour which they reproduce."

36.    The issue was not before the Supreme Court, though Lord Walker and Collins did, in their joint speech, refer to *Britain v Hanks*. At [19] they observed

> Wright J held that copyright protection as sculpture was available to what the report refers to as "toy metal models of soldiers on horseback, or mounted yeomen." The models were designed and made by William Britain, a partner in the plaintiff firm. The report does not say how large the models were, but they were evidently large enough for each to have stamped on it the maker's name and the date of its manufacture. There was expert evidence, which the judge accepted, that the models were "artistic productions, in that the anatomy is good, and that the modelling shows both technical knowledge and skill." The judge seems to have regarded the case as near the borderline, but was prepared to hold that the models were entitled to protection.

37.    The Supreme Court makes no further remark on the case. However, in concluding that neither the judge not the Court of Appeal had erred in finding that the stormtrooper helmets were not sculptures, the Supreme Court explicitly approved Mann J's reasoning. Consequently, it seems likely that the Supreme Court would also have approved of the conclusion as to the toy stormtroopers.

38.    The importance of this should be readily apparent. The question of whether any of the miniatures in which the Plaintiff claims copyright constitutes a sculpture is one that needs to be assessed in relation to each miniature. But, as a general matter, a toy miniature of a fictional character is unlikely to be protected by copyright as a "sculpture."

*European Confusion*

39.    That said, it is right to draw the Court's attention to a recent development, which might require the UK to revisit its "closed list" of protectable subject matter. In two recent decisions under the Information Society Directive,

18

2001/29/EC, the Court of Justice of the European Union has implied that a "graphic user interface" might be protectable, but that football matches will not be: Case C-393/09, *Bezpečnostní softwarová asociace* (22 Dec 2010) (ECJ, 3rd Ch), [45]-[46]; Case C-403/08, *Football Association Premier League Ltd and Others v QC Leisure and Others* and Case C-429/08 *Karen Murphy v Media Protection Services Ltd*, [2012] 1 C.M.L.R. (29) 769 (ECJ, Gr Ch), [97]. In so holding, the Court appears to have taken the view that Member States should afford protection to all "intellectual creations."

40. Whether the holdings in these cases apply to the field of "applied art" is a controversial question. In Case C-168/09 *Flos SpA v Semararo Case e Famiglia SpA* (27 January 2011) (ECJ, 2nd Ch) [34], the Court of Justice implied that they would do so. In that case the Court indicated that Italy would be obliged to protect by copyright the design of a table lamp if that table lamp satisfied the criterion of being its author's own "intellectual creation."

41. If this is right, then the law of the United Kingdom would need to be interpreted by the courts in such a way as to ensure compliance with European law. If the miniatures in which the Plaintiff claims copyright are "intellectual creations", such that the United Kingdom is obliged to protect them by copyright under Directive 2001/29/EC, the court might well give effect to that obligation by treating them as "sculptures" under the C.D.P.A.

42. It is by no means clear as to which works this would apply. Article 10 of Directive 2001/29/EC suggests it would apply in respect of all works created after 22 December 2002. However, following Case C-168/09 *Flos* protection might have to be offered to works created before that date if they meet the standard of being "intellectual creations" (discussed below), subject to transitional provisions.

43. However, in my view, the Court's holding in Case C-168/09 *Flos* is not to be regarded as defensible. In particular, the *Flos* decisions fails to acknowledge important freedoms explicitly left to Member States by Article 17 of Council Directive 98/71 (the Designs Directive), and Article 10 of the Information Society Directive. Consequently, *Flos* is a decision that should not be followed. In my view, the question of which works of applied art are protected is a matter

19

that ought to be regarded as left to Member States. Consequently, *Lucasfilm* should be regarded as the governing authority.

## Originality and 'Intellectual Creation'

44. In assessing whether the works are "original", it is necessary to differentiate between works created before and after 22 December 2002. For the works created before that date, the traditional UK standard applies. For works created after that date, the European standard operates.

*The UK Standard*

45. Traditionally, the originality threshold under UK law has not been a difficult one to meet. A work must "originate" with its author, rather than be copied: *University of London Press v. University Tutorial Press* [1916] 2 Ch. 601. In other words, it must be the product of "skill, labour and/or judgment": *Ladbroke v. William Hill* [1964] 1 All E.R. 465, 469 (Lord Reid) (HL).

46. In relation to works based on other works, the "skill, labour and judgment" must be otherwise than in the process of copying, and must result in a significant change: *Interlego AG v. Tyco Industries* [1989] A.C. 217 (Privy Council). Referring specifically to derivative works, in *Interlego v Tyco*, Lord Oliver observed, at 263,

> '[t]here must in addition be some element of material alteration or embellishment which suffices to make the totality of the work an original work.'

Moreover, with derivative artistic works the alteration or embellishment must be visual (at 266):

> "The essence of an artistic work … is that which is "visually significant" … With deference to the Court of Appeal …, their Lordships can see no alteration of any visual significance such as to entitle the drawing, as a drawing, to be described as original."

20

47. In relation to the works at issue in these proceedings it will be necessary for the Court to determine in each case:

> (i) whether it was a product of labour, skill and judgment;

> (ii) in the case of derivative artistic works, whether there is a visually significant material alteration or embellishment.

If there is, the works will be "original".

*The European Standard*

48. The European standard of originality is considerably higher than that applicable under UK law prior to harmonization. The new standard, in principle, applies to works created after 22 December 2002. Any works already protected under UK law should remain protected as a result of Article 10, which indicates that the Directive is without prejudice to acquired rights.

49. The Court of Justice of the European Union has held that there is a general "originality" standard operative in Europe. To be protected a work must be its "author's own intellectual creation." See *Case C-5/08 Infopaq International A/S v Danske Dagblades Forening* [2009] E.C.R. I-6569 (ECJ, 4th Ch), [37] ("copyright within the meaning of Article 2(a) of Directive 2001/29 is liable to apply only in relation to a subject-matter which is original in the sense that it is its author's own intellectual creation.")

50. The Court has offered some guidance as to when a work will be its author's own intellectual creation:

> (i) In Case C-5/08, *Infopaq International A/S v Danske Dagblades Forening*, [2009] E.C.R. I-6569 (ECJ, 4[th] Ch), [45]-[46], the court indicated that while words are not protectable, an author may express his creativity in an original manner through the "choice, sequence and combination of" words so as to achieve a result which is an intellectual creation;

> (ii) In Case 393/09, *Bezpečnostní softwarová asociace*, (22 Dec 2010) (ECJ, 3[rd] Ch), [48], the Court indicated that when assessing whether a

# Exhibit

# 128

Page 1

1      IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION

3

4

5  - - - - - - - - - - - - - - - -

6  GAMES WORKSHOP LIMITED,

7      Plaintiff,

8    v.       Civil Action No.: 1:10-cv-8103

9  CHAPTERHOUSE STUDIOS LLC and JON
    PAULSON d/b/a PAULSON GAMES,
10      Defendants.

11  - - - - - - - - - - - - - - - -

12

13

14

15     DEPOSITION OF PROFESSOR LIONEL BENTLY

16    Thursday, July 12, 2012 at 9:28 a.m.

17

18

19         Held at:
        The offices of Eversheds
20       1 Wood Street
       London EC2V 7WS
21      United Kingdom

22

23  Court Reporter: Fiona Farson

24

25

---

Page 2

1     A P P E A R A N C E S

2  For the Plaintiff:

3     Jonathan E Moskin
     FOLEY & LARDNER LLP
4     90 Park Avenue
     New York, NY 10016-1314
5     Tel: 212.682.7474
     Fax: 212.687.2329
6     email: jmoskin@foley.com

7

8     Gill Stevenson, Legal Manager
     GAMES WORKSHOP LIMITED
9     Willow Road
     Lenton
10    Nottingham, NG7 2WS
     Tel: +44 (0) 115 900 4124
11    Fax: +44 (0) 115 916 811
     email: Gill.Stevenson@games-workshop.com

12

13

14  For the Defendant:

15    Scotia Hicks
     WINSTON & STRAWN LLP
16    101 California Street, 39th Floor
     San Francisco, CA 94111-5802
17    Tel: (415) 591-1000
     Fax: (415) 591-1400
18    email: shicks@winston.com

19

20

21

22

23

24

25

---

Page 3

1         I N D E X

2  EXAMINATION

3  BY MR. MOSKIN           5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 4

1     E X H I B I T  I N D E X

2  Exhibit 119    Curriculum vitae of Professor Lionel Bently    9

3  Exhibit 120    Email dated 05/30/12 from Winston & Strawn    20

4  Exhibit 121    Email dated 05/29/12 from Tom Kearney    28

5  Exhibit 122    Expert report of Professor Lionel

6            Bently         29

7  Exhibit 123   Expert report of Mr. Michael Bloch QC

8            and Dr. Harris Bor     35

9  Exhibit 124   Transcript of deposition of John

10           Blanche      93

11  Exhibit 125   Black Library Novels Commissioning Form

12           for Dan Abnett    96

13  Exhibit 126   Black Library Novels Commissioning Form

14           for Ben Counter    96

15  Exhibit 127   Confirmatory assignment for John

16           Sibbick     98

17  Exhibit 128   Exhibit A to Games Workshop Ltd's answer

18           to Interrogatory No 1    129

19  Exhibit 129   Excerpt from Intellectual Property Law,

20           Third Edition    166

21  Exhibit 130   Between a Rock and a Hard Place:

22           The Problems Facing Freelance Creators

23           in the UK Media Market-place    171

24

25



1       LIONEL BENTLY, sworn
2       Examination by MR. MOSKIN:
3  BY MR. MOSKIN:
4  Q.  Would you please state your full name and address for
5      the record.
6  A.  My name is Lionel Alexander Fiennes Bently.  My address
7      is 18 Romsey Road, Cambridge, postcode CB1 3DD.
8  Q.  Have you ever been deposed before?
9  A.  I have, yes.
10 Q.  And can you explain when that was?
11 A.  That was in a case called Golan v Gonzales, which was
12     a constitutional challenge to the Uruguay Round
13     Agreements Act, and I gave evidence for the defendant on
14     the history of the implementation of Article 18 of the
15     Berne Convention, which allows members of the Berne
16     Union to set certain limitations on the -- the
17     implementation of retroactivity in copyright, and the
18     case went to the Supreme Court, and I just gave evidence
19     at first instance, and I was deposed in Cambridge by the
20     Department of Justice, US Department of Justice.
21 Q.  Okay.  You -- so you probably understand very generally
22     the mechanics of how the deposition works:  That we
23     shouldn't speak over one another; if there's anything
24     I ask you you don't understand, please let me know, and
25     I will be happy to try to reframe it; if you need to

1      take a break at any point, as long as a question is not
2      pending, I'm happy to oblige, more or less.
3          Is there any reason -- are you suffering from any
4      disability, taking medication or anything that would
5      impair your ability to give full and accurate answers
6      today?
7  A.  No.
8  Q.  Have you -- other than the one case, the Golan v
9      Gonzalez, have you ever been qualified as an expert
10     witness in a proceeding in the United States?
11 A.  I'm -- I'm qualified as an expert witness.  I'm not
12     quite sure what you mean.
13 Q.  Have you -- well, explain the one instance, or whatever
14     instance you have in mind, and I'll --
15 A.  Okay.  So I've also given expert testimony in a second
16     case, called Explorologist v Sapient, which was expert
17     evidence on UK law concerning the place where a making
18     available of the copyright work took place, where the
19     work was created and put on a server in the United
20     States but could be accessed from the UK.  And the
21     question was whether that was a making available in the
22     UK.
23 Q.  Okay.
24 A.  And that was settled, so that's why I didn't understand
25     your -- the "qualifying" bit.

1  Q.  I see.  Was there any question or any challenge made to
2      your status as expert in either the Golan case or the --
3      I may not get the name right -- the Explorologist --
4  A.  Explorologist, yeah.  Not in Explorologist, because
5      there was no deposition and no examination of any sort
6      from the other side of my testimony.
7          In the Golan case, the Department of Justice's
8      counsel asked some questions about why I considered
9      myself to be an expert -- you know, early on in the
10     deposition process.
11 Q.  Okay.  And to your knowledge, or do you have any
12     knowledge whether a challenge was ever made in court?
13 A.  No, not as far as I'm aware.
14 Q.  Okay.  Did you actually testify in court in either of
15     those cases in the US?
16 A.  No.
17 Q.  Have you ever been retained as an expert in a proceeding
18     in the United Kingdom or elsewhere?
19 A.  Well, United Kingdom courts regard UK law, which is my
20     field of expertise, as a matter that's known to the
21     court, so they wouldn't admit expert evidence on UK law.
22         So the answer to the first part is no, not in
23     the UK.  I have given expert reports in cases or in
24     relation to disputes in Canada, Brazil, and -- I don't
25     know whether it was a dispute, but also for firms in

1      Germany and the Netherlands.
2  Q.  And on what subjects?
3  A.  Okay, so -- the Brazilian and Canadian expertise was in
4      relation to the law of patents.  The Canadian case,
5      I was giving expert evidence for the plaintiff in
6      relation to a challenge to the Canadian law that then --
7      I think still does -- allow the government to set the
8      price of pharmaceuticals under certain licensing
9      regimes.
10         In the Brazilian case, it related to the invalidity
11     of -- or the effect of the grant of a European patent on
12     a previously-applied-for UK patent, and that had
13     implications for what was going on in Brazil.
14         The Dutch case was -- concerned personality rights
15     in relation to footballers, and merchandising of
16     football-related materials.
17 Q.  Mm-hmm?
18 A.  And the German case concerned a new technology that
19     would allow for certain sorts of recording of broadcast
20     programs, such that the user would be able to just see
21     the highlights of the program.  So it was essentially --
22     the recording mechanism was sensitive to the sound, so
23     when the crowd cheered, it would record that bit and not
24     the bit where the crowd wasn't cheering, so that
25     somebody would be able just to watch the highlights.



1    originality -- excuse me, not 21; referring to
2    paragraph 20 on the issue of originality.
3  A.  Mm-hmm.
4  Q.  Your -- strike that question.  I'll come back to it
5     later.
6        Now, on the question of subsistence of copyright --
7     and I think, as you noted earlier, you state in
8     paragraph 22 that the plaintiffs' expert report at no
9     stages broaches the question of subsistence of
10    copyright; is that right?
11 A.  That's right, yeah.
12 Q.  So you would agree that your report is not -- does not
13    operate as rebuttal to anything that Mr. Bloch or
14    Mr. Bor said -- Dr. Bor said on that question, on this
15    issue?
16 MS. HICKS:  Objection.  Lacks foundation.
17 A.  It's certainly true that their report says nothing about
18    the question of subsistence of copyright.
19 BY MR. MOSKIN:
20 Q.  So again, you're not rebutting anything they've said on
21    subsistence of copyright?
22 MS. HICKS:  Same objection.
23 A.  I'm not contradicting anything, but I am highlighting an
24    issue that I thought was relevant to the case and that
25    had been omitted from the report.

1  BY MR. MOSKIN:
2  Q.  And -- but just --
3        Can you read that back.
4              (Record read.)
5  BY MR. MOSKIN:
6  Q.  So you're raising a new issue that was just not raised
7     by Mr. Bloch and Dr. Bor?
8  MS. HICKS:  Objection.  Mischaracterizes the testimony.
9  A.  The issue was not raised by Mr. Bloch and Dr. Bor.  I'm
10    sorry; I realize now that I'd not been giving him his
11    correct title earlier on.
12       But my understanding of what an expert in these
13    circumstances is asked to do is to provide relevant
14    information of the -- in their field of expertise to the
15    court.  And I discussed with counsel whether this was
16    relevant and should be included, and we concluded that
17    it was and should be.
18 BY MR. MOSKIN:
19 Q.  What did you -- what was the nature of that discussion?
20 A.  Well, I referred to it earlier, and I don't recall
21    whether it was me who raised it or whether it was Tom
22    Kearney who raised it, but I wanted certainly to know
23    whether it should be included.  And we determined in
24    a phone call that it should, for the reasons that I just
25    gave.

1  Q.  And what's the basis for your understanding that an
2     expert should address any issue that is generally
3     relevant?
4  A.  My understanding is that the expert owes a duty to the
5     court to present the court with -- with material that
6     the expert thinks is important for deciding the case.
7     So the primary job I had was to provide a rebuttal
8     report; but given this omission, I would have thought it
9     would have been highly remiss of me not to raise this
10    issue.
11 Q.  Did somebody tell you that that's a duty that an expert
12    has in a US court?
13 A.  Well, I make a declaration at the beginning, I think,
14    about my understanding.  My duties to provide expert
15    evidence "overrides my duty to those instructing me,
16    that I have understood this duty and complied with it in
17    giving my evidence impartially and objectively..."
18    et cetera .
19 Q.  My question is:  Did anybody tell you that that's a duty
20    to provide this sort of additional commentary?
21 A.  No, I don't think so.
22 Q.  Okay.
23       You say here that it's your understanding that
24    application of United States law is dependent on prior
25    recognition that copyright subsists under UK law.

1        What's the basis for that understanding?
2  A.  I think the basis for that understanding is my
3     discussion with Tom Kearney --
4  Q.  And did --
5  A.  -- when I -- when we had this discussion about whether
6     this section was relevant and was something that the
7     court would want or need to know.
8  Q.  And what did he tell you?
9  A.  I think he told me precisely that, that -- and what
10    I said earlier in relation to the private international
11    law of the US, that in this case, UK law is relevant as
12    regards subsistence and ownership, but that US law
13    becomes relevant to determine infringement.
14       This would not be the private international law of
15    copyright in the UK, so I am -- was relying for that
16    assumption on what I was told by counsel.
17 MR. MOSKIN:  Can you read that back.
18              (Record read.)
19 BY MR. MOSKIN:
20 Q.  Okay.  Again, did he tell you anything specific as to
21    why he thought UK law would be relevant --
22 MS. HICKS:  Objection.
23 BY MR. MOSKIN:
24 Q.  -- on subsistence?
25 MS. HICKS:  I'm going to instruct you not to answer.



Page 49

1    I'm objecting as a privileged conversation.
2  MR. MOSKIN:  That goes to the very heart of what he wrote in
3    a third of his report, and he doesn't express any reason
4    why he's opining on this subject in the report.
5  MS. HICKS:  Well, he's identified it as an assumption that
6    he was given; but asking why Tom Kearney thought it was
7    the way it was is invading privilege.
8  BY MR. MOSKIN:
9  Q.  Do you accept your counsel's advice not to answer?
10 A.  Yes, I guess.
11 Q.  Okay.  Did you -- have you done any independent research
12   of your own to determine whether US law would apply or
13   UK law would apply on the issue of subsistence of
14   copyright?
15 A.  No.
16   I have in the back of my mind a case, of a name
17   which I can't remember, concerning photographs, where an
18   action was brought in the Second Circuit,
19   I think.  And the judge, who I recollect was
20   Judge Kaplan, referred to the UK law of originality when
21   assessing -- assessing whether the photographs were
22   protected for the purposes of US law.  It's called
23   Black -- I can't remember what it's called, I'm afraid,
24   right now.
25   But, you know, that wasn't an assumption on which

Page 50

1    I was working, I just sort of ...
2  Q.  Are you referring to Bridgeman Art v Corel Corp?
3  A.  That is the case that I -- that I have in the back of my
4    mind as confirming the assumption I was given.
5  Q.  Okay.  Any other basis for your assumption as to which
6    law would govern on the question of subsistence?
7  A.  No.
8  Q.  Okay.  Now, in assessing, as you do in your report, the
9    issue of subsistence of copyright in Games Workshop's
10   miniatures or figures, I think you carve out those
11   miniatures from other types of works at issue here.  And
12   I'm referring you to paragraph 29.
13   You would agree, I think, that illustrations,
14   paintings and drawings are subject matter as to which
15   you don't question the issue of subsistence of
16   copyright?
17 A.  Yeah, that's absolutely right.  And the literary works
18   as well.  I don't know whether I mentioned them there,
19   but ...
20 Q.  Thank you.  You've answered my next question.
21 A.  Okay.
22 Q.  And what is the -- the basis, the legal basis under
23   English law to question the subsistence of copyright in
24   the figurines?  Is there a statutory basis?
25 A.  Yes.  So in order to be protected under UK law, you --

Page 51

1    a work has to fall within one of the listed categories,
2    and it's -- so it's an exhaustive list.
3    For artistic works, that list is in section 4 of the
4    1988 Act, which I set out at paragraph 27.  And you see
5    in section 4.1, there's graphic works, photographs,
6    sculptures or collages.  And so the question in relation
7    to the figurines is just one question, and certainly the
8    most pertinent question is whether the figurines
9    constitute sculptures for the purposes of UK law.
10 Q.  And is there some other basis under UK law, statutory
11   or -- a statutory basis under UK law for questioning
12   whether figurines would be sculptures?
13 A.  Sorry, could you repeat that question?
14        (Record read.)
15 A.  So no, if I understand your question, the question then
16   of what is a sculpture, it has been elaborated in the
17   case law.  There is a statutory definition that says
18   sculpture includes a cast or model made for the purposes
19   of sculpture; but that don't really take you very far,
20   because it clearly has sculpture as part of its vision.
21   So the definition of what is a sculpture is one the
22   courts have provided guidance on.
23        Is that an answer?
24 Q.  Is there -- are there any statutory provisions that bear
25   on whether Games Workshop's figurines would be

Page 52

1    considered sculptures under copyright law?
2  A.  Not -- well, not specific ones within -- as I've told
3    you, the rest of the question is a matter of case law.
4    One thing that the case law indicates is pertinent
5    is the fact that there are other statutory regimes for
6    protecting registered designs and unregistered designs.
7    And one of the things that the Supreme Court says in the
8    Lucasfilm case is that the existence of those regimes
9    means that, 1, courts should not stretch the definition
10   of a sculpture beyond its ordinary meaning, because to
11   do so would implicate the policies of those other
12   statutory regimes.
13   So, for example, with a -- well, with a Games
14   Workshop figurine, or at least the sort of thing that
15   I saw, like the space --
16 Q.  Space marine?
17 A.  -- space marine, it would be possible to register
18   a space marine as a registered design, or to claim
19   unregistered design right protection in it, potentially.
20   And I guess one of the key things that the Supreme
21   Court is saying is for that reason, one wouldn't need to
22   stretch the notion of sculpture to cover it, unless they
23   fell within the normal definition of the word
24   "sculpture" as elaborated by the High Court and the
25   Court of Appeal.



Page 53

1  Q. Let me refer to you paragraph 32 of your report.
2  A. Yes, sure.
3  Q. I don't want to read the whole thing, by any means; it's
4     in your report. But you say there, in the third
5     paragraph, consequently the duration of copyright in
6     these Stormtrooper toys at issue in Lucasfilm, in the
7     designs of those toys --
8  MS. HICKS: Are you looking at paragraph 32?
9  MR. MOSKIN: Yes.
10 MS. HICKS: There's only two paragraphs in paragraph 32.
11 MR. MOSKIN: Excuse me?
12 MS. HICKS: Did you say the third paragraph?
13 MR. MOSKIN: Third sentence:
14    "Consequently, the duration of its copyright in the
15    designs on which the toys were based was effectively
16    limited under section 52 of the CDPA to 15 years unless
17    the toys were themselves regarded as 'sculptures'..."
18 Q. Do you see that?
19 A. Yeah, I see that.
20 Q. Okay. And is that an accurate statement summarizing
21    parts of -- or at least part of the decision in
22    Lucasfilm?
23 A. This is -- this is referring to -- I mean, it's an
24    actual statement; it's referring to a provision of
25    section 52 of the CDPA and its transitional state. What

Page 54

1     section 52 does is says that where an artistic work is
2     applied industrially, a defense applies that allows
3     third parties to manufacture articles corresponding to
4     the artistic work to which the artistic work is applied.
5     After -- in the 1988 Act it's 25 years, but in the
6     transitional provisions, where works were created before
7     1989, it's 15 years -- and the Lucasfilm case concerned
8     a work created under the 1956 Act.
9        There is an exception in section -- or there is an
10    exception to that limitation -- what is effectively
11    a limitation on term protection, which is made by
12    statutory instrument called the Industrial Processes and
13    Excluded Articles Order, Industrial Processes and
14    Excluded Articles Order 1989, that says that that
15    limitation does not apply to certain materials, and one
16    of those sets of materials is sculptures. So there's
17    a reference to sculpture again in that Industrial
18    Processes and Excluded Articles Order.
19       I haven't got it with me, but it elaborates a little
20    bit.
21 Q. Now, that's fine, but more specifically, my question is
22    that the effect of the Lucasfilm holding was that the
23    term of copyright in the toys there at issue was limited
24    to 15 years.
25 A. So -- so the issue of sculpture arose in the Lucasfilm

Page 55

1     case in a number of different ways, one of which was, at
2     the first instance and in the Court of Appeal, was
3     referred to as this limited term aspect, the section 52
4     aspect.
5        Another was the effect of section 51, which I can
6     explain to you if you'd like.
7  Q. Mm-hmm?
8  A. Section 51 relates to design documents, and says that it
9     is not an infringement of copyright in a design document
10    to make an article to that design, but this only applies
11    where the design document is a design for something
12    other than an artistic work. So if I do a sketch from
13    which somebody makes a -- so if I do a sketch of your
14    head, from which somebody makes a sculpture, that is
15    a design document for artistic work in the sculpture;
16    whereas if I do is sketch of an exhaust pipe of
17    a motor-vehicle, that's a design document for something
18    other than an artistic work. So the question of whether
19    the article is an artistic work becomes relevant in
20    assessing the application on that defense.
21 Q. Mm-hmm?
22 A. And so that was also one of the ways in which it
23    mattered whether the Stormtrooper helmets were -- were
24    artistic works or not in the Lucasfilm case.
25 Q. Right. But coming back to my question, in the --

Page 56

1  A. Sorry.
2  Q. -- as you describe in paragraph 32, the question seems
3     to have been whether -- one of the duration of copyright
4     in the designs, not the original subsistence of
5     copyright in the designs.
6  A. That's right, though -- so the -- in the case -- that
7     issue arose when they were sculptures for the
8     purposes of either the section 51 or the section 52
9     exception, and then also for whether they were protected
10    in themselves, so for subsistence, and as this is --
11    arises at different points in the case.
12       So ultimately, when the Supreme Court was dealing
13    with the matter, it wasn't differentiating; it was
14    assuming that what counted as a sculpture would be
15    relevant in the same way for all three legal issues:
16    Subsistence, section 52, section 51.
17 Q. And would you agree that section 51 of the CDPA also
18    simply limits the remedies to a claim copyright owner,
19    the ability of a copyright owner in a design document to
20    sue for infringement?
21 A. It creates the defense or exception. That's different
22    from limiting the remedies.
23 Q. Okay. Well, why don't you explain what that means?
24 A. So to have a defense or an exception means that if
25    a defendant pleads that defense, they will have held



1   not -- not to be liable. In contrast, you might have
2   a provision on -- relating to remedies that might limit
3   the claims of remedies that would follow from liability.
4   This is not relating to remedies; it means that you are
5   not liable in the first place.
6   Q. But it doesn't -- the defense under section 51 is not --
7   is that there's no infringement, as distinct from
8   that there's no copyright?
9   A. That's absolutely right.
10      And the same for section 52.
11  Q. But at 52, the difference is it simply limits the term
12  of copyright?
13  A. Section 52's purpose, essentially, is to limit the term,
14  but its form is in the form of a defense. It's not an
15  infringement to make articles carrying the relevant
16  artistic work.
17      I don't have the text of it here, but ...
18  Q. Okay. And your report doesn't cite the text or content
19  of sections 51 or 52; is that right?
20  A. I'm fairly certain that that's right.
21      Yeah, I don't deal, as I've said, with infringement
22  issues.
23  Q. In paragraph 16 of your report, you state that a court
24  "must conduct an analysis of each and every piece of
25  subject matter in which ... Plaintiff claims protection

1   to determine whether each ... is protected under UK
2   law"; is that right?
3   A. Yeah.
4   Q. How many items -- how many Games Workshop figurines did
5   you analyze to assess that they had the quality
6   necessary to make them sculptures or not under UK law?
7   A. As I've mentioned, I haven't -- I haven't conducted
8   a specific analysis of any particular sculpture in order
9   to draw that conclusion. And the reason is that to draw
10  that conclusion, you need to have a lot of information
11  that I don't have.
12  Q. What information would you need?
13  A. Well, in the Lucasfilm case -- this is at
14  paragraph 31 -- Mr. Justice Mann set out nine different
15  considerations bearing on whether something would be
16  regarded as a sculpture. And some of those, I think,
17  would apply to particular situations.
18      "Some regard has to be had to the normal use of the
19  word...
20      It is inappropriate to stray too far from what would
21  be normally regarded a sculpture.
22      No judgment is to be made about artistic worth.
23      Not every three dimensional representation of a
24  concept can be regarded as a sculpture."
25      But then there are other things on which information

1   would be required.
2       "It is of the essence of" -- this is 6 of --
3   paragraph 6 of his factors:
4       "It is of the essence of ... sculpture that it
5   should have, as part of its purpose, a visual appeal in
6   the sense that it might be enjoyed for that purpose
7   alone, whether or not it might have another purpose..."
8   Q. Okay.
9   A. So one would need to know what the artists or the people
10  who create the figurines create them for, and how they
11  are used: Information that I don't have.
12      Paragraph 9 talks about the process of fabrication
13  being relevant.
14  Q. Paragraph 9, I'm sorry, of your --
15  A. No, paragraph 9 of Mr. Justice Mann's statement of the
16  factors. Talks about the process of fabrication being
17  relevant but not determinative. I have not been given
18  any information as to the process of fabrication -- and
19  so on.
20  Q. Just also to be clear, I think you -- this is perhaps
21  just a quote, but part of the quote appearing on page 13
22  in paragraph 31, this list, this is for general
23  guidance; it's not an exhaustive list, and the facts of
24  the case may require other factors to be considered.
25  A. Yeah.

1   Q. Now, you say at paragraph 16(f) of your report -- I'm
2   not sure; I think it's on page 7 -- that even if the
3   works -- and you're referring to specifically the
4   figurines or miniatures, as distinct from the literary
5   works and the graphic works -- that even if those works
6   are intended to have visual appeal, they are intended
7   primarily as pieces in games.
8       What's your understanding or the basis for your
9   understanding that they're primarily intended as pieces
10  in a game?
11  A. That's a good question. It is almost certainly an
12  understanding that I garnered from reading the
13  depositions, but I can't attribute any single source for
14  that assumption. And you referred to them earlier on as
15  table-top -- did I know anything about table-top games,
16  and it's quite conceivable that the language of games is
17  the language in which -- it's called Games Workshop.
18  You know, I don't know -- so --
19  Q. Okay.
20  A. So ...
21  Q. So you don't know to what extent these figurines are
22  made by Games Workshop simply for collectors, rather
23  than as pieces in games?
24  A. No, I've not been presented with any evidence as to --
25  as to that question about whether they are -- yeah, I've



Page 61

1  not been presented with any evidence on that.  That's an
2  assumption that I'm making there, that they are intended
3  primarily as pieces in games.
4  Q.  And would you agree that if in fact it's true that the
5  game pieces are primarily made for and sold to
6  collectors to use them simply as -- for purposes of
7  painting and collecting and displaying as opposed to
8  playing in a game, that that factor would favor
9  a finding that they're sculptures?
10  A.  I think if -- if they are created for collection and
11  consumed by collectors, that is certainly a factor that
12  is relevant under Mann's list, insofar as it indicates
13  that things are created for their visual appeal and are
14  consumed for that visual appeal.
15      There are other factors that would -- would point
16  the other way, so I wouldn't say that it swings it
17  heavily one way or the other.  But, say, the Star Wars
18  game -- Star Wars pieces, I have had personal knowledge
19  of people who've collected the Star Wars toys, and -- so
20  -- that the Star Wars toys were treated as not being
21  sculptures.
22  Q.  My question was more specific, whether the games were
23  created, or rather -- strike that.
24      My question was more specific, as to whether -- if
25  it's true that the figurines are created with the

Page 62

1  understanding that they are used primarily for
2  collection, painting, decoration and display, whether
3  that would be a factor favoring a finding that they are
4  sculptures.
5  A.  I think it would be a factor, yes.
6  Q.  Okay.  What are the factors you're aware of that you
7  think counsel against finding that they're sculptures?
8  A.  Well, firstly, the courts have given two big steers in
9  this respect:  The Court of Appeal, when considering the
10  case, the Lucasfilm case, said -- this is quoted at
11  paragraph 35 of my report:
12      "... in most modern cases toy soldiers, whether real
13  or fictional, will not be works of art... "
14      And secondly, the Supreme Court gave the steer that
15  one should not -- one should not stretch the notion of
16  sculptures much beyond its ordinary -- or anywhere
17  beyond its ordinary understanding.
18      So I think the judicial steers are that these things
19  would be unlikely to be concluded.  But you would still
20  need to apply this multifactor -- these multifactor
21  guidelines to determine it.
22      I don't know about what the processes of fabrication
23  are, but I do note that -- from the deposition evidence,
24  that Games Workshop is a big enterprise, and these are
25  mass produced.  But I would have thought that the sorts

Page 63

1  of production processes would be something that you
2  would want to look -- a court would want to look closely
3  at.
4      And then the extent to which they are used as games,
5  as having functional characteristics relevant to those
6  games.
7      And then, you know, if you step back, I suppose, the
8  question is:  Would somebody ordinarily understand these
9  figurines to be sculptures?  Now, we all know the easy
10  cases of what is a sculpture; you know, a head of
11  somebody in a museum, or created out of clay, maybe cast
12  in bronze, by somebody who regards themselves as an
13  artist, signs the work, et cetera.
14      These seem quite a long way from that, but -- you
15  know, as I tried to emphasize, this is a -- something
16  that I'd want a close analysis of the facts to
17  determine.
18  Q.  Okay.  Just to be sure, there are other factors that you
19  think, based on your knowledge of the case, that weigh
20  against a finding that the figurines are sculptures?
21  A.  My working understanding that they were primarily used
22  in games, is -- and would fall within the generic
23  category of toys, works strongly, I think, against
24  finding that they are sculptures.  And my --
25  Q.  But that's a factor that I think you agreed might need

Page 64

1  to be revised if the facts show that they in fact are
2  primarily used by collectors, to paint them and display
3  them?
4  A.  Yeah.  I think one characteristic of my report is that I
5  am reluctant, without more factual evidence, to draw
6  anything like a concrete conclusion.  But I think, on
7  the sculpture issue, things are stacked against Games
8  Workshop.  But -- but let's see what the evidence is.
9  Q.  Stacked against Games Workshop why?
10  A.  Well, because, as I said, the steers that have been
11  given in that Court of Appeal decision.
12  Q.  The two steers --
13  A.  Yeah, the two -- yeah, I'm going back to the two steers.
14  So the two steers are -- you know, whatever may have
15  happened in 1902 in Britain v Hanks, these sorts of
16  things are probably not sculptures.  So Stormtrooper
17  toys, not sculptures, and they talk about toy soldiers
18  more generally, so ...
19  Q.  Would you also agree that the -- the fact that -- strike
20  that.
21      Would you also agree that to the extent Games
22  Workshop actually credits individual sculptures in
23  connection with the sale of these figurines is in favor
24  of finding that they are sculptural works?
25  A.  I think that's a relevant factor.



Page 65

1  Q.  And would you agree that the level of artistic detail in
2     the sculpting of the figurines is a fact for that would
3     favor a finding that they are sculptures rather than --
4     not -- than otherwise?
5  A.  The level of artistic detail.  Hmm.  The level of
6     detail, certainly, I think might be a factor.  If you
7     tried to draw a distinction between Star Wars and
8     Britain v Hanks, the case about the mounted yeoman toy
9     solders from the early 20th century, it might be that
10    the level of detail is one distinguishing factor between
11    those cases.
12       But again, you would want to see the mounted yeoman
13    from Britain v Hanks, and the -- you'd want to see the
14    Lucasfilms toy -- Lucasfilm toys, before you started
15    drawing that conclusion.
16  Q.  Mm-hmm.
17  A.  I mean, I took out "artistic" from your question; you
18    said level of artistic detail.  I think I qualified it
19    to be level of detail.  And I did that specifically,
20    I think, because clearly this question of things being
21    intended to create -- intended to be works of art and
22    enjoyed for their visual appeal is one of the factors.
23    But it seemed to me that you were -- this is something
24    that you wanted, really, me to focus on the detail.
25  Q.  Are there cases you are aware of, other than Lucasfilm

Page 66

1     and Britain v Hanks, that particularly bear on this
2     question?
3  A.  No, not -- not that particularly bear on this question.
4     I think Lucasfilm is -- being a Supreme Court decision,
5     and being so from -- being so recent, it's the governing
6     authority, bar none.  Britain v Hanks is relevant only,
7     I think, because they didn't say it was wrong.  They
8     tried to differentiate between Britain v Hanks.
9        But I think all the guidance now -- you know, there
10    were cases on whether a sandwich toaster was a sculpture
11    and whether a Frisbee -- all those authorities now are
12    just irrelevant, and I'd say they're just wrong, after
13    Lucasfilm.  So Lucasfilm is really where you want to
14    look to answer this question.  I don't think anybody
15    would disagree there.
16  Q.  Okay.
17       You offer no opinion whether the sort of painted
18    miniatures that you saw on the Games Workshop website,
19    the photographs of painted miniatures, whether those are
20    protectable with copyright, have you?
21  A.  No, I've offered no specific opinion in relation to any
22    specific figurine.  And the reason is that I would like
23    more facts of the kind we've been talking about before
24    I try to apply it.
25       But as I said, it might -- the steer given by the

Page 67

1     court is -- is against, and it's only with those facts
2     that you might be able to conclude that these are
3     sculptures.
4  Q.  My question was whether -- more specific; maybe I'll try
5     to clarify -- that you've offered no opinion whether
6     the photographs of painted figurines, as you saw on the
7     Games Workshop website, are or are not protected by
8     copyright?
9  A.  I've offered no opinion on that.
10  Q.  And I take it you have no knowledge of the extent to
11    which the defendant Chapterhouse is accused of copying
12    specific figurines, as distinct from graphic works such
13    as photographs on the website, or drawings and paintings
14    in the books, and so forth?
15  A.  I have no knowledge of that, no.  And as I indicated,
16    I have not been presented with what the defendants are
17    alleged to have done, really, at all, apart from in very
18    general terms.
19  Q.  I'd like to ask you some questions about another case
20    you discuss, beyond Britain v Hanks and Lucasfilm,
21    namely Flos v Semararo.  And I think as you -- you can
22    correct me if I am wrong, but I think as you explain in
23    your report, starting at paragraph 40, that in Flos v
24    Semararo, a table lamp was deemed protectable as
25    a sculptural work because it had sufficient intellectual

Page 68

1     creation.  Is that a fair summary?
2  A.  No, not really.
3  Q.  All right.  Then you can explain it better than I can.
4  A.  So the starting point here is that under the European
5     harmonized law, the Information Society Directive, as
6     I told you before, the courts have -- the European Court
7     of Justice has taken upon itself to refer to certain
8     matters relating to subsistence; in particular,
9     originality.  So it's also, in a couple of cases,
10    seemed to say that if something is an intellectual
11    creation, then it should be protected by copyright in
12    the law of Member States.
13  Q.  Mm-hmm.
14  A.  But to be clear, these are only a couple of cases where
15    the court has not really articulated or elaborated very
16    much on its reasoning.  But in Flos v Semararo, in one
17    statement, the Court of Justice indicated that a design
18    of a table lamp would be required to be protected under
19    laws of the Member State, if it constituted its author's
20    own intellectual creation.
21       And it said that was a matter for the Member State
22    to decide.  It doesn't -- the court didn't say anything
23    about sculptural or it being protected as a sculptural
24    work.  It doesn't -- "sculpture" is a term in UK law,
25    not in the EC directives.



1   Q.  Okay.  I will thank you for clarifying.  But what was --
2       did the court elaborate there on what about the table
3       lamp qualified it as having intellectual creation?
4   A.  No, it didn't say that the table -- Okay.  So what you
5       need -- as background for you, questions are referred to
6       the European Court of Justice on principles of law.
7       They give answers that are usually quite abstract in
8       form.  They give answers in terms of principles of law
9       that are then applied by Member States' courts to the
10      particular facts in front of them.
11          So they will say something like -- you know, the
12      design in this case would be protected under Member
13      States' law, if, under -- applying the standards of
14      intellectual creation, it was regarded as an
15      intellectual creation.
16  Q.  Right.
17  A.  So it doesn't elaborate at all on whether the thing is
18      an intellectual creation.
19  Q.  Well, did it -- the court elaborate on what, as
20      a general matter, are the elements constituting
21      intellectual creation?
22  A.  Not in that case.  But in other cases, they have
23      elaborated on the -- on the notion of intellectual
24      creation, pretty much on the same terms as originality.
25      So if something is a product of creative choice that

1       bears the personal stamp of the author, rather than
2       the -- being a product of following rules, then it might
3       constitute an intellectual creation.
4           And I set out that sort of reasoning just so that
5       you can cross-reference, when I talk about the European
6       standard of originality at paragraph 50.
7   Q.  All right.
8   A.  Now, I don't know whether it's -- whether you want me to
9       carry on, but I have doubts about the Flos case in,
10      particular, because one particular provision in the
11      Information Society Directive -- I think I've put at
12      paragraph 43 that it's article 10, but I actually think
13      it might be article 9 -- suggests that matters relating
14      to design rights are left unharmonized and for Member
15      States.
16          And a close analysis of the travaux, which I haven't
17      conducted in this report, suggests that Member States
18      were intended to be left free to determine issues of
19      subsistence of copyright from materials that might fall
20      within the design regime.
21          And for that reason, I am reluctant in this report
22      to treat Flos as a very strong authority.  But you know,
23      as I said before, the Court of Justice's interpretations
24      are not always predictable and don't always correspond
25      with what was understood during the legislative process,

1       so ...
2   Q.  Now, would you agree or disagree that if a table lamp
3       is, in principle, capable of having sufficient
4       intellectual creation to be copyrightable, that a -- one
5       of Games Workshop's figurines would also have sufficient
6       intellectual creation in principle be copyrightable
7       under Flos v Semararo?
8   MS. HICKS:  Objection.  Lacks foundation, mischaracterizes
9       the prior testimony.
10  A.  Well, yeah.  Firstly, as I've said, I think Flos is
11      a dubious authority.  But if Flos is followed, then
12      there would be an obligation on Member States, including
13      the United Kingdom, to protect intellectual creations by
14      copyright.
15          Now, the current UK system does not do that
16      explicitly.  It has, as I've said, this list of things.
17      So the question about whether the miniatures would be
18      protectable or protected by copyright -- because
19      copyright here, there's no registration, so we don't
20      usually talk about protectable, because they either are
21      or they aren't -- the question would, in those -- on
22      those premises, the question would shift.
23          Now, the English court is then faced with two
24      possibilities.  And the first would be to say, "We have
25      this list of subject matter, and that means that our law

1       is non-compliant with EU law because intellectual
2       creations that are not in that list are not protected;
3       but there's nothing we can do, nothing the courts can do
4       about that, because parliament has indicated it wanted
5       a closed list, and so it would go against the grain of
6       that parliamentary intention to construe it as anything
7       else."
8           So one thing the court could do is say, "Sculpture
9       is what Lucasfilms said sculpture was, and EU -- British
10      law is just out of line with EU law and will have to be
11      amended in due course by the legislature."
12          The second course that the court could take is say,
13      "These terms in section 4 are sufficiently open-textured
14      that we could redefine them in a way that ensures that
15      anything that would be regarded as requiring protection
16      as an intellectual creation under EU law is to be
17      protected under UK law."
18  BY MR. MOSKIN:
19  Q.  And under the second scenario -- given, as you just
20      noted, that in Lucasfilm, the court did not overrule
21      Britain v Hanks -- the court could simply say that "To
22      comply with Flos v Semararo, we recognize that so long
23      as there is sufficient originality in the creation of
24      figurines such as those at issue in Britain v Hanks,
25      that we will continue to extent protection to such

