**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GAMES WORKSHOP LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:10-cv-08103 |
| v. | ) | |
| | ) | |
| CHAPTERHOUSE STUDIOS LLC and | ) | |
| JON PAULSON d/b/a PAULSON GAMES, | ) | Judge Matthew F. Kennelly |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CHAPTERHOUSE STUDIOS LLC'S OPPOSITION TO
PLAINTIFF GAMES WORKSHOP LTD'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**PAGE NO.**

I.      INTRODUCTION ...................................................................................................1

II.     GW CANNOT ESTABLISH COPYRIGHT INFRINGEMENT........................2

    A.      GW Fails To Meet Its Burden to Show Ownership of The Works at Issue............2

        1.      GW Is Not Entitled to A Presumption of Ownership .................................3

        2.      Under Applicable UK Law, GW Cannot Establish Ownership...................4

    B.      GW's Toy Soldiers Are Unprotectable Under UK Law...........................................7

    C.      GW Cannot Establish Copying or Substantial Similarity........................................9

        1.      GW Cannot Establish Copying of Any Protectable Elements...................10

        2.      CHS's Products Are Not Substantially Similar to Protectable
               Elements of Any GW Alleged Work ........................................................10

               a.      GW Misrepresents the Facts and the Record in Comparing
                      Its Works to CHS's Products. ........................................................11

               b.      GW Seeks to Protect Unprotectable Elements Such as
                      Roman Numerals, Chevrons, Crosses, and Blood Drops .............13

               c.      GW's "Harry Potter" Analogy Is Inapposite ................................13

    D.      CHS's Website Is Not Substantially Similar to GW's Alleged Works .................14

    E.      GW Is Not Entitled to Summary Judgment as to Independent Creation ...............14

III.    GW CANNOT ESTABLISH TRADEMARK INFRINGEMENT. ...................15

    A.      GW Has Abandoned Its Claims for 14 of the 80 Claimed Marks. ........................15

    B.      GW Cannot Establish U.S. Rights for Its Alleged Marks.....................................16

        1.      GW Provided No Evidence of Use of The Alleged Marks in the
               U.S. ..........................................................................................................16

        2.      GW Fails to Provide Evidence of Secondary Meaning. ...........................18

    C.      GW Fails To Show Trademark Use By CHS Of Each Mark. ...............................20

    D.      GW Cannot Show Infringement of Any Mark. .....................................................21

| | | |
|---|---|---|
| 1. | CHS's Use of GW's Alleged Marks Is Nominative Fair Use. | 21 |
| 2. | No Likelihood of Confusion | 22 |
| | a. There Is No Evidence of Actual Confusion. | 22 |
| | b. There Is No Evidence of Intent to Palm Off. | 24 |
| | c. Customers Are Likely to Exercise a High Degree of Care. | 24 |
| | d. GW's Alleged Marks Are Weak | 24 |
| | e. Similarity of Marks/Products/Concurrent Use | 25 |
| IV. | CONCLUSION | 25 |

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Alassani v. Walter,*
No. 10-4491, 2011 WL 135018 (E.D. Pa. Jan. 14 2011) ........................................................16

*Albiero v. City of Kankakee,*
246 F.3d 927 (7th Cir. 2001) .............................................................................................5, 16

*Atari, Inc. v. N. Amer. Philips Consumer Elec. Corp.,*
672 F.2d 607 (7th Cir. 1982) .................................................................................................10

*Au-Tomotive Gold Inc. v. Volkswagen of Am. Inc.,*
457 F.3d 1062 (9th Cir. 2006) ...............................................................................................24

*Barbecue Marx, Inc. v. 551 Ogden, Inc.,*
235 F.3d 1041 (7th Cir. 2000) .........................................................................................22, 24

*Bobak Sausage Co. v. A&J Seven Bridges, Inc.,*
805 F. Supp. 2d 503 (N.D. Ill. 2011) ................................................................................24, 25

*Bouchat v. Baltimore Ravens, Inc.,*
241 F.3d 350 (4th Cir. 2001) .................................................................................................11

*CAE, Inc. v. Clean Air Eng'g Inc.,*
267 F.3d 660 (7th Cir. 2001) .................................................................................................24

*Cambridge Univ. Press v. Becker,*
No. 8-cv-1425, 2012 WL 1835696 (N.D. Ga. May 11, 2012) ...................................................5

*Castle Rock Ent. v. Carol Pub. Group, Inc.,*
150 F.3d 132 (2d Cir. 1998) ...................................................................................................14

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................................................9

*Central Mfg., Inc. v. Brett,*
492 F.3d 876 (7th Cir. 2007) .............................................................................................16, 17

*D. C. Comics, Inc. v. Powers,*
465 F. Supps 843 (S.D.N.Y. 1978) .........................................................................................19

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
539 U.S. 23 (2003) ................................................................................................................25

*Decor Grate v. Fararo*,
　　No. 92 6395, 1997 U.S. Dist. Lexis 3328 (N.D. Ill Mar. 13, 1997) .......................................19

*Durham Inds., Inc. v. Tomy Corp.*,
　　630 F. 2d 905 (2d Cir. 1980)..................................................................................................4

*Echo Travel, Inc. v. Travel Assocs., Inc.*,
　　870 F.2d 1264 (7th Cir. 1989) ...............................................................................................19

*Eva's Bridal Ltd. v. Halanick Enters., Inc.*,
　　No. 07 C 1668, 2010 WL 2035720 (N.D. Ill. 2010)................................................................16

*Faulkner v. Nat'l Geographic Enters. Inc.*,
　　409 F.3d 26 (2d Cir. 2005)......................................................................................................3

*Feist Pubs., Inc. v. Rural Television Serv. Co.*,
　　499 U.S. 340 (1991)................................................................................................................3

*Fractional Villas, Inc. v. Tahoe Clubhouse*,
　　[No. 08-cv-1396] 2009 U.S. Dist. LEXIS 4191 [(S.D. Cal Jan. 22, 2009)] ...........................25

*Harley-Davidson, Inc. v. Grottanelli*,
　　164 F.3d 806 (2d Cir. 1999).................................................................................................21

*Hasbro-Bradley v. Sparkle Toys*,
　　780 F.2d 189 (2d Cir. 1985)....................................................................................................9

*In re National Council Books, Inc.*,
　　121 U.S.P.Q. 198 (TTAB 1959) .......................................................................................17, 18

*James Burrough Ltd. v. Sign of Beefeater, Inc.*,
　　540 F. 2d 266 (7th Cir. 1976) ...............................................................................................25

*JCW Investments, Inc. v. Novelty Inc.*,
　　289 F. Supp. 2d 1023 (N.D. Ill 2003) ...............................................................................10, 11

*Johnson v. Cypress Hill*,
　　619 F. Supp. 2d 537 (N.D. Ill. 2008) .......................................................................................3

*Kohler Co. v. Moen Inc.*,
　　12 F.3d 632 (7th Cir. 1993) ...................................................................................................18

*Lucasfilm Limited and Others v. Ainsworth and another*,
　　[2011] UKSC 39 (UK Supreme Ct. 2011)................................................................................7

*Lucasfilm Ltd. v. Ainsworth*,
　　[2010] F.S.R. 10 (Ct. Appeal 2010)......................................................................................7, 8

*Martin v. Walt Disney Internet Group,*
  No. 09-CV-1601, 2010 WL 2634695 (S.D. Cal. June 20, 2010)............................................25

*Merriam-Webster, Inc. v. Random House, Inc.,*
  35 F.3d 65 (2d Cir. 1994) ......................................................................................................23

*Morningside Group, Ltd. v. Morningside Capital Group, LLC,*
  182 F.3d 133 (2d Cir. 1999)...................................................................................................25

*Nat'l Center for Jewish Film, Inc. v. Goldman,*
  943 F. Supp. 113 (D. Mass. 1996) ..........................................................................................6

*New Kids on the Block v. News Am. Publ'g, Inc.,*
  971 F.2d 302 (9th Cir. 1992) ................................................................................................21

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.,*
  269 F.3d 114 (2d Cir. 2001)..................................................................................................23

*Ohio Art Co. v. Lewis Galoob Toys, Inc.,*
  799 F. Supp. 2d 870 (N.D. Ill. 1992) ...................................................................................22

*Packman v. Chicago Tribune Co.,*
  267 F.3d 628 (7th Cir. 2001) ...........................................................................................22, 23

*Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.,*
  80 F. Supp. 2d 815 (N.D. Ill. 1999) ................................................................................23, 24

*Platinum Home Mortg. Corp. v. Platinum Fin. Group,*
  149 F.3d 722 (7th Cir. 1998) ...........................................................................................18, 19

*Processed Plastic Co. v. Warner Comm'ns, Inc.,*
  675 F.2d 852 (7th Cir. 1982) ...........................................................................................19, 20

*Rudnicki v. WPNA 1490 AM,*
  No. 04 C 5719, 2009 WL 4800030 (N.D. Ill. Dec. 10, 2009) .................................................8

*Selle v. Gibb,*
  741 F.2d 896 (7th Cir. 1984) .................................................................................................10

*Spex, Inc. v. Joy of Spex, Inc.,*
  847 F. Supp. 567 (N.D. Ill. 1994) ....................................................................................23, 25

*Sugar Busters LLC v. Brennan,*
  177 F.3d 258 (5th Cir. 1999) .................................................................................................17

*Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries,*
  272 F.3d 441, 450 (7th Cir. 2001) .........................................................................................15

*Theotokatos v. Sara Lee Personal Products*,
 971 F. Supp. 332 (N.D. Ill., July 08, 1997) .......................................................................3

*Top Tobacco, L.P. v. North Atlantic Operating Co., Inc.*,
 No. 06-c-950, 2007 WL 118527 (N.D. Ill. Jan. 4, 2007).........................................................23

*Ty, Inc. v. Publications Intern., Ltd.*,
 No. 99 CC 5565, 2005 WL 464688 (N.D. Ill. Feb. 25, 2005) .........................................21, 22

*Warner Bros., Inc. v. Gay Toys, Inc.*,
 658 F.2d 76 (2d Cir. 1981)....................................................................................................19, 20

*Welding Services, Inc. v. Forman*,
 509 F.3d 1351 (11th Cir. 2007) .............................................................................................18

*World Impressions, Inc. v. McDonald's Corp.*,
 235 F. Supp. 2d 831 (N.D. Ill. 2002) ....................................................................................21

## STATUTES

15 U.S.C. § 1114.........................................................................................................................20, 22

15 U.S.C. § 1125(a) ...................................................................................................................20, 22, 23

15 U.S.C. § 1127.........................................................................................................................17, 20, 25

17 U.S.C. § 103(b) .....................................................................................................................3

17 U.S.C. § 104(b)(2) ................................................................................................................9

## OTHER AUTHORITIES

3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §12.11[D], at 12-175
 (2001).................................................................................................................................15

Copyright Compendium II § 503.02(a)-(b) ..............................................................................13

Fed. Rules of Evid. § 702(b)......................................................................................................6

Lanham Act § 43(a) ...................................................................................................................17, 20

N.D. IL. Local Rule 56.1(b)(3)..................................................................................................2

McCarthy on Trademarks § 19:118 ...........................................................................................17

McCarthy on Trademarks, § 23:11.50 ......................................................................................21, 22

Patry on Copyright § 25:20........................................................................................................9

U.S. Copyright Act § 102 ...................................................................................................9

U.S. Copyright Act § 103 ...................................................................................................9

U.S. Copyright Act § 104 ...................................................................................................9

UK Copyright, Designs, and Patents Act 1988 § 90(3) .....................................................5

UK Copyright, Designs, and Patents Act 1988 §1...............................................................8

UK Copyright, Designs, and Patents Act 1988 §11.............................................................4

UK Copyright, Designs, and Patents Act 1988 §11(2)........................................................5

UK Copyright, Designs, and Patents Act 1988 §4...............................................................8

## I.   INTRODUCTION

Plaintiff Games Workshop ("GW") filed this lawsuit in 2010 alleging that *all* of Defendant Chapterhouse Studio's ("CHS"'s) products infringed unspecified copyrights in materials related to GW's Warhammer 40,000 war game, and that CHS's reference to GW toy armies or products infringed scores of GW trademarks.

After dragging CHS through more than a year and a half of broad discovery on those claims, on August 3, 2012—eleven days before the deadline for dispositive motions—GW dropped its copyright claims as to more than a quarter of CHS's products. Although GW claims that it merely "clarified to Chapterhouse that there are 33 of the original 123 products for which it claims only trademark infringement" (Mot. at 4 n.2), its original and amended complaints, and subsequent discovery responses, were clear that it alleged *all* of CHS's products infringed its copyrights, and it sought and received broad discovery from CHS on that very basis. Assessing the claims GW dropped, it is clear there was no legitimate basis for them in the first place.

GW's remaining claims fare no better. GW's theory of copyright infringement, about which it is surprisingly candid—that all of CHS's products are "influenced by" GW's products and that CHS is "selling essentially replacements, yet to be released products, and accessories for plaintiff's own goods" (Mot. at 5, 7)—lacks any basis under U.S. copyright law, which specifically allows creators the freedom to build upon the ideas of others. GW's motion is soft focus, failing even to specify which CHS products it is moving on, or the specific infringements of its claimed marks, because under scrutiny its claims fail.

If CHS created a substantially similar version of a character or illustration for which GW owned the copyright, that would be infringement. That is not the case. Neither can GW claim exclusive copyright in such common elements as the basic shape of a shoulder pad, or symbols that are squarely in the public domain, such as Roman numerals, arrows, chevrons, or simple combinations of such symbols. CHS is entitled to make bits and pieces that fit on to GW's toys, or alternative figures, that players can use to enhance their toy armies. Just because one of GW's armies uses the symbol of a lion's head does not mean that CHS cannot sell shoulder pads

depicting different lions. Likewise, GW cannot stop third parties from using its alleged marks to reference GW's own armies or products where there is no consumer confusion.

GW's motion is also a transparent attempt to supplement the record on its claims. The Court gave GW every opportunity to produce key documents necessary to support its case during discovery, such as exemplars of its allegedly infringed works, documentation of use in the U.S. of its alleged marks, and documentation supporting ownership of its alleged rights. GW represented it had done so, and yet for the first time with its motion, and leading up to the filing, submitted many never produced documents about which CHS did not have the opportunity to take discovery. Such tactics should not be countenanced.

Far from being entitled to summary judgment, GW cannot meet its burden to establish ownership of alleged rights, or that any CHS product is infringing. Its motion should be denied.

## II.    GW CANNOT ESTABLISH COPYRIGHT INFRINGEMENT

As a threshold matter, it is not clear on which works GW moves for summary judgment of copyright infringement. Its motion refers to "all of Chapterhouse's 123 products that Games Workshop identified before the close of fact discovery" being "derived from aspects of the original fiction universe [GW] has created, and . . . made to be used in connection with that original creative universe." (Mot. at 4.) However, GW identified only 121 CHS products before the close of fact discovery, and recently dropped its copyright claims for 33 of those products. (Mot. at 4 fn. 2; CHS Additional Material Fact ("AMF") No. 1 (at Section B of CHS's Local Rule 56.1(b)(3) Response.) At the same time it added copyright claims against 15 never-before-identified CHS products. (AMF 2.) GW thus appears to be moving on 88 CHS products. Its Motion, however, argues substantial similarity only with respect to 36 "representative samples." (Mot. at 11.) The undisputed facts show that all of GW's copyright claims fail.

### A.    GW Fails To Meet Its Burden to Show Ownership of The Works at Issue

As GW acknowledges, "[c]opyright infringement entails proof of . . . ownership of a valid copyright." (Mot. at 6.) But GW fails to present evidence that it owns any of the copyrights it claims and fails to meet its burden to show a *prima facie* case of copyright infringement.

Indeed, GW addresses ownership (which it describes as a "subsidiary issue," (Mot. at 5) in a total of two sentences in its brief, making the conclusory statement that it meets its *prima facie* burden to show ownership of its alleged copyrights because: (1) it has "obtained U.S. copyright registrations or filed applications for the works in issue"; and (2) there are "[no] known facts to challenge the conclusion that all of the subject works were created by [GW] employees or, to the extent that some were created by independent contractors, that [GW] has confirmatory assignments from the individuals." (*Id.* at 6-7.) GW misstates the facts and its burden. A copyright plaintiff bears the burden of proving that it owns the copyrights it alleges, as part of its *prima facie* case. *Feist Pubs., Inc. v. Rural Television Serv. Co.*, 499 U.S. 340, 361 (1991).

### 1.    GW Is Not Entitled to A Presumption of Ownership

While registering a copyright with the U.S. Copyright Office within five years of publication creates a presumption that the copyright is valid, a plaintiff lacking a valid, timely registration "has the burden of proving the validity of its copyright." *Johnson v. Cypress Hill*, 619 F. Supp. 2d 537, 542 (N.D. Ill. 2008). GW does not have timely registrations for any of the works at issue (AMF 3 - 5), and is not entitled to any presumption of ownership.

When it sued, GW had only a single U.S. copyright registration relevant to works alleged in this case, for a Catalog (the "Catalog"), but GW does not claim that any of CHS's products infringe the Catalog. (AMF 3 - 4, 7) While GW now claims it has "obtained U.S. copyright registrations . . . for the works in issue," it attaches only a registration for the Catalog (which is not a work at issue), and 12 new registrations, all of which were applied for more than a year in to this lawsuit—and *only after* GW filed its Second Amended Complaint ("SAC"). And, of the 12 new registrations, only *four* were filed within five years of publication. (AMF 3 - 5). Of these four arguably, two are compilations, one is a derivative work, and the remaining registration is for a book that contains only three of GW's alleged works at issue. (*Id.* 3 - 6, 37.)

It is black letter law that "[the] copyright in a compilation or derivative work . . . does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b); *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26 (2d Cir. 2005); *Theotokatos v. Sara Lee Personal*

*Products*, 971 F. Supp. 332, 341 (N.D. Ill., July 08, 1997) ("the copyright protection afforded to a derivative work is limited to the 'incremental originality' added to the work, and does not extend to the underlying preexisting works"). Because there is no evidence that GW owns the underlying works, or that they were created within five years of GW's copyright registrations for the compilations or derivative works, GW is not entitled to a presumption of ownership. GW fails to show when the underlying works were created; who created them; or whether the author of any included work was a GW employee at the relevant time. For example, although GW alleges that the Catalog "contain[s] many of the individual works at issue herein" (SAC ¶ 6), GW never specified which works the Catalog contained, nor is there any record evidence that the works included in the catalog were created within five years of the Catalog's registration. (AMF 8.) Moreover, GW did not even produce the Catalog until after the close of fact discovery, and the Court made clear to GW that it would not be entitled to rely on exemplars of works that were not timely produced during discovery. (AMF 9; Dkt. 171 (Dec. 19, 2011 Hearing Tr.) at 35:22-24 (". . . you need to give them what I would refer to as the best available exemplar of the items that you're contending have been infringed"); Dkt. 139 at 1 (Dec. 23, 2011 Order) (same).

Finally, even if any of GW's registrations for compilations or derivative works did create a presumption that GW also owns a valid copyright for any included work (and they do not), it is a rebuttable presumption. *Durham Inds., Inc. v. Tomy Corp.*, 630 F. 2d 905, 908 (2d Cir. 1980) ("a certificate of registration creates no irrebuttable presumption of copyright validity . . . Where other evidence in the record casts doubt on the question, validity will not be assumed.") There is ample evidence in the record that casts doubt on GW's ownership of many alleged works.

### 2. Under Applicable UK Law, GW Cannot Establish Ownership

The UK Copyright, Designs, and Patents Act 1988 ("CDPA"), which GW, a UK company, concedes determines ownership of its alleged works (AMF 10), provides a clear baseline rule: the author of a UK work is the presumptive owner of copyright. CDPA, §11; Expert Report of Prof. Lionel Bently ("Bently Report"), ¶¶52-57.[1] Two narrow statutory

---

[1] The Bently Report attached to the Declaration of Thomas Kearney ("Kearney Decl.") ¶ 22 & Ex. 17.

exceptions are that (a) where a work was created by an employee, acting in the course and scope of his employment, the employer owns the copyright; and (b) an owner may assign his copyright to another by a signed writing. CDPA, §§11(2), 90(3). "[W]here a contributing author's contract is missing it cannot be presumed that a contract exists or that the missing contract would contain particular provisions . . . Therefore, where the evidence does not include a contract with a contributing author, **that will be fatal to Plaintiffs' prima facie case** where the [work] at issue is the subject of the alleged infringement." *Cambridge Univ. Press v. Becker*, No. 8-cv-1425, 2012 WL 1835696 at **22, 130 (N.D. Ga. May 11, 2012) (emphasis added) (holding plaintiff failed to make its *prima facie* case of copyright infringement where there was "no evidence that the . . . author [of a work first published outside the US] either agreed that [the work] was a work made for hire or that she transferred her rights to [plaintiff]").

GW's Motion fails to provide any evidence that GW owns the alleged works other than unsupported and self-serving claims made by its Director of IP, Alan Merrett, which are flatly contradicted by GW's discovery responses. (AMF 11.) During discovery, GW conceded that a certain number of authors were independent contractors, was unable to provide any employment dates or assignments for several authors and conceded that another was not an employee at relevant times. (AMF 12 - 14.) For example:[2]

- GW provided no evidence that the following authors were ever GW employees: Wayne England (Nos. 4, 12, 69); Clint Langley (No. 17); Mike McVey (No. 108); Bob Naismith (No. 82). (AMF 13.)

- GW concedes that Adrian Smith (Nos. 23, 45) was not its employee during the time he created the alleged works. (AMF 14.)

- GW has no evidence that Simon Egan (No. 82) was its employee during the time he created the alleged works. (AMF 15.)

GW's mere allegations are not evidence to the contrary, for such "conclusory statements, unsupported by the evidence of record, are insufficient to avoid summary judgment." *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001). Merrett's unsubstantiated claim in a

---

[2] Parenthetical references are to GW's Second Rev. Copyright Claim Chart, Kearney Decl. Ex. 7.

declaration submitted with this motion, that "it is [GW's] customary practice to obtain confirmatory assignments from [freelancers]," but that "[o]ver the years, some of these have been misplaced," is implausible, unsubstantiated, and contradicted by the record. Merrett Decl. (GW MSJ Ex. 1) ¶ 12. With the exception of a single contract from 1994, GW failed to produced a single such "confirmatory assignment" that was executed before **April 20, 2012**, more than a month after the close of fact discovery and nearly a year and a half into this case. (AMF 11.) A "practice" of obtaining blanket, retroactive assignments *after* bringing copyright claims, and after it is too late to depose witnesses, is not evidence that GW owns other copyrights for which it has neither assignments nor other evidence of ownership. *See Nat'l Center for Jewish Film, Inc. v. Goldman*, 943 F. Supp. 113, 119 (D. Mass. 1996) (detailing "fatal flaws in the chain of title," including that "the only evidence to support the Defendants' contention" of a valid assignment was the unsubstantiated affidavit of an interested third party). Moreover, although the so-called confirmatory assignments were recently executed, GW never produced any of the correspondence with the authors, despite agreeing to do so. Kearney Decl., ¶73.

GW's unsubstantiated claims are particularly unreliable since, after maintaining for much of this lawsuit that *all* alleged works were created by employees (and refusing to provide discovery on that basis), it now admits that a certain number were indeed created by freelancers. Dkt. 83 at 10, ¶ 19; Dkt. 115 at 7; Dkt. 130 ¶¶ 2, 5-6; Bloch Report 22(e). GW's expert on UK copyright law, English solicitor Michael Bloch, who acknowledges that at least 12 authors were independent contractors, opines generally that "*assuming*" GW's alleged facts are proven, "*some* of the independent contractors/freelancers in this case can be treated as employees", and that in his opinion, the circumstances of this case are "*consistent with*" an "equitable assignment" to GW. GW MSJ Ex. 10, Expert Report of Michael Bloch QC and Dr. Harris Bor ("Bloch Report") ¶ 31 (d) (1), (3) (emphases added). As the hedging indicates, the Bloch Report is not "based on sufficient facts or data" as required under FRE 702(b). As CHS's expert Professor Bently, a leading copyright scholar at the University of Cambridge, notes, Bloch's broad generalizations about ownership are not supported by UK law; rather, "the question of whether someone is an

employee, as opposed to a freelancer, is a complex question requiring a careful analysis of the detailed relationship between the parties." Bently Report at ¶16(b)(i). GW's own expert makes clear that GW cannot prove facts sufficient to make such a showing. And GW refused to provide contact information for all but two of its non-employee authors so CHS could not contact them – even though GW had contact information for at least one such author. (AMF 16.) As explained by Professor Bently, and as GW's expert acknowledged during deposition, determining whether an employment relationship exists requires a court to consider multiple factors, such as "[who exercises] control over *how* [services] are provided," "whether the person is part and parcel of the organization," "whether the man performing the services provides his own equipment, whether he hires his own helpers, what degree of financial risk he takes, what degree of responsibility for investment and management he has, and whether and how far he has an opportunity of profiting from sound management in the performance of his task." Bently Report ¶¶ 65, 68, 69. GW offers no such evidence. it fails to make out a *prima facie* case of ownership of the alleged works, and its motion should be denied.

**B.    GW's Toy Soldiers Are Unprotectable Under UK Law**

GW alleges infringement of miniature toy soldiers, model vehicles, and assorted toy accessories. (AMF 40.) But UK copyright does not extend protection to such "mass produced . . . toys." *Lucasfilm Ltd. v. Ainsworth*, [2010] F.S.R. 10, ¶ 82 (Ct. Appeal 2010); *aff'd*, *Lucasfilm Limited and Others v. Ainsworth and another*, [2011] UKSC 39 (UK Supreme Ct. 2011);[3] Bently Report, ¶¶ 22-29, 38 ("as a general matter, a toy miniature of a fictional character is unlikely to be protected by [UK] copyright as a sculpture.") GW concedes it is primarily a "toy manufacturer," and indeed refused to respond to CHS's discovery requests on that basis. Pl.'s Opp. to Mot. for Sanctions & Cross-Motion, Dkt. 83 (Aug. 15, 2011) at 10 ("[Games Workshop] has no duty to identify individual artists who were involved in creating any of the subject game pieces. No **toy manufacturer** does so, and Games Workshop never understood that to be part of CHS's discovery requests.") (emphasis added). Where there is no copyright to own, GW can

---

[3] A copy of the *Lucasfilm* decision is attached as Exhibit 44 to the Kearney Decl. at ¶ 61.

prove no set of facts to satisfy its burden with respect to its *prima facie* case of infringement.[4]

Copyright ownership is determined by the laws of the work's country of origin. *Rudnicki v. WPNA 1490 AM*, No. 04 C 5719, 2009 WL 4800030, at *7 (N.D. Ill. Dec. 10, 2009) (Pallmeyer, J.) ("the law of the [Berne Convention] signatory country with the closest relationship to the international work at issue governs determination of copyright ownership.") Under UK law, copyright subsists in GW's miniature figures only to the extent they are "sculptures" or "works of artistic craftsmanship" under the meaning of the CDPA §§1, 4. Its toy soldiers are neither. As an English Court of Appeal recently held, in a case argued and lost by GW's expert Bloch, "in most modern cases toy soldiers, whether real or fictional, will not be works of art . . . They will be playthings registrable for their design qualities but nothing else . . . [T]he cases which will qualify for protection under the Copyright Act will be relatively rare." *Lucasfilm*, [2010] F.S.R. 10 at ¶ 82. *Lucasfilm* upheld a lower court's ruling that toy *Star Wars* Stormtroopers were not protected under UK copyright law because they were not sculptures as defined by the statute, and thus were categorically unprotectable under UK copyright law. Here, as in *Lucasfilm*, many of the works at issue "are mass produced plastic toys [that] are no more works of sculpture than the helmet and armour which they reproduce." *Id.* ¶ 83.

GW does not dispute that its miniature figures are unprotectable under UK law. Instead, it argues that "English law on copyrightability is irrelevant" because its toy soldiers would be eligible for protection under U.S. copyright law.[5] But CHS does not argue that GW's alleged works would not be copyrightable in the U.S., rather that copyright *ownership* is determined by

---

[4] GW's argument that "[this] issue is not proper rebuttal to Games Workshop's expert" fails. Its expert opines generally on questions of copyright ownership, and extensively addresses the *Lucasfilm* decision. *See, e.g.*, Bloch Report ¶ 38 ("In all cases, it is necessary to identify the products of the skill and labour which made the work original and thus protected and then determine the person responsible for their provision"); *id.* at ¶¶ 87-92 (discussing *Lucasfilm Ltd v Ainsworth* [2009] FSR 2 and its progeny).

[5] GW further argues that the threshold question of whether its miniatures are protected by copyright is irrelevant, because "for any given product, there are two-dimensional paintings and drawings CHS was easily able to copy." (Mot. at 17.) Indeed, GW "supplemented its document production August 9, 2012", three business days before the deadline for filing dispositive motions, to include six such additional works that it never identified as infringed. *Id.* n.12. CHS's products do not infringe these drawings, and GW should not be allowed to supplement its identification of works months after the close of discovery.

law of the country of origin, and under UK law, GW's toys are not protected by copyright. GW cannot, therefore, prove ownership of copyright in those works.

GW's argument that governing UK law is "irrelevant" misconstrues fundamental choice of law issues, and follows a line of Second Circuit cases that are not binding on this Court and have been widely criticized. *See, e.g.*, Patry on Copyright § 25:20 ("*Hasbro-Bradley*: confusion of national treatment with national eligibility"); Mot. at 17-18 (relying on *Hasbro-Bradley v. Sparkle Toys*, 780 F.2d 189, 194 (2d Cir. 1985)). Under GW's interpretation, "foreign authors [automatically] have U.S. copyrights even when they have no such rights in their country of origin." *Id*. But this view of the law makes little sense. GW even argues that Section 104 of the U.S. Copyright Act mandates such broad protection, but its statutory construction is unpersuasive. Section 104 provides that "[t]he works specified by sections 102 and 103 [of the Act], when published, are subject to protection under this title if the work is first published in the United States or in a foreign nation that, on the date of first publication, is a treaty party[.]" 17 U.S.C. § 104(b)(2). But merely because a work is "subject to protection" does not mean it is automatically granted protection. Such an interpretation "confuse[s] standing with substantive law [because] Section 104's national eligibility provisions merely provide the basis of points of attachment—connecting factors by which works become **eligible for protection** in the United States; the provision does not address the very different question of which law to apply to foreign works . . . ." Patry on Copyright § 25:20 (emphasis added) (arguing that *Hasbro-Bradley* was wrongly decided, and setting out the legislative history of the applicable treaty).

GW cannot prove it owns the copyrights in its alleged miniature figures, model vehicles, accessories, and other "mass produced . . . toys," for the simple reason that under governing UK law, there is no copyright to own. GW's arguments to the contrary are unpersuasive.

### C.     GW Cannot Establish Copying or Substantial Similarity.

"Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). GW fails to do so for the essential elements of copying and substantial similarity. The cases GW cites regarding substantial similarity do not support its case.

### 1.    GW Cannot Establish Copying of Any Protectable Elements

"Proof of copying is crucial to any claim of copyright infringement because no matter how similar the two works may be (even to the point of identity), if the defendant did not copy the accused work, there is no infringement." *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984). A plaintiff can attempt to show copying by direct evidence, or by showing both that the defendant had access to its alleged works, and that defendant's work bears a "striking similarity" to plaintiff's. *Id.* Even if a plaintiff succeeds in showing access and copying by defendant, it must still prove that defendant's work is substantially similar to plaintiff's. *Id.*

GW relies on unfounded speculation and conclusory allegations in an attempt to bypass this essential element. It speculates that "it is not clear that defendant does or plausibly could deny actual copying of all of the accused works," (Mot. at 7), and states in conclusory fashion—without citing to any evidence—that "[t]he act of copying cannot realistically be disputed here." *Id.* at 8. But CHS has denied, and does dispute, that it copied *any* of GW's alleged works.[6] GW fails to meet its burden to show no genuine issue of material fact with respect to the essential element of copying and its motion fails.

### 2.    CHS's Products Are Not Substantially Similar to Protectable Elements of Any GW Alleged Work

As CHS has said from the beginning of this lawsuit, none of its products are substantially similar to protectable elements of GW's works. GW even acknowledges that individual CHS products "could . . . escape liability." (Mot. at 11.) GW acknowledges that it must establish substantial similarity with respect to each product, but argues that this case is similar to *Atari* and *JCW* because of the total number of claimed similarities. Both cases are distinguishable, however, because they involved copying of particularized, protectable expression. *Atari, Inc. v.*

---

[6] *See, e.g.*, CHS's Answer to GW's SAC, Answers to ¶¶ 32, 44 (denying allegations of copying); Answer to ¶ 38 (denying allegation of copying with respect to CHS "Javelin Jet Bike" product); Answers to ¶¶ 61-65 (denying allegations of copyright infringement).

*N. Amer. Philips Consumer Elec. Corp.,* 672 F.2d 607, 618 (7th Cir. 1982) (detailing multiple similarities between the parties' "wholly fanciful creations, without reference to the real world"); *JCW Investments, Inc. v. Novelty Inc.*, 289 F. Supp. 2d 1023, 1039 (N.D. Ill 2003) (noting at least a dozen "overwhelming similarities" of specific, particularized expression between the two works at issue).[7] Indeed, GW argues substantial similarity as to only 36 "representative samples" of CHS products, despite claiming that *all* CHS's products are infringing. *Id.*; SAC at ¶¶ 43-44, 61-65; First Rev. Copyright Claim Chart; Second Rev. Copyright Claim Chart. Its motion should be denied out of hand as to any CHS products not embraced by GW's "representative samples." Summary judgment is also not warranted as to the 36 "representative samples" because GW cannot show substantial similarity as to any of them. As detailed in CHS's Motion for Summary Judgment (Dkt. 208 at 8-17) and the accompanying Product Binder (Dkt. 224-224.17), and further explained below, none of GW's 36 supposedly "representative samples" shows substantial similarity.

> **a.      GW Misrepresents the Facts and the Record in Comparing Its Works to CHS's Products.**

GW grossly misrepresents the facts in comparing its works to CHS's products. First, it reproduces images of CHS's works in color, when it is undisputed that the works are sold *unpainted*. (AMF 17.) Second, GW submits images of many of its own alleged works in color, when the exemplars it produced in discovery were black and white, and the Court made clear GW would be held to the exemplars it produced in discovery. *E.g.*, *supra* Dkt. 171 at 35:22-24; Dkt. 139 at 1.  Third, GW attempts to introduce other purported evidence that it failed to produce in discovery, despite the Court's order that "Plaintiff must produce the best available exemplar of the works in question." Dkt. 139. Fourth, GW misrepresents facts, including by claiming that various CHS products have certain features that are found only on GW's products, and claiming falsely that certain exhibits are images of CHS products when they are not. (CHS addresses these

---

[7] GW's reliance on *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350 (4th Cir. 2001) is misplaced. The *Bouchat* court merely held that the mere presence of public domain elements in plaintiff's drawing did not disqualify his work for copyright protection.

misrepresentations in detail in response to GW's SUF Nos. 50 and 59.)

For example, one of GW's "representative examples" is the CHS "Tervigon Conversion Kit for Carnifex Model" (the "Conversion Kit") that allows a player to add a few pieces of additional armor to a pre-existing GW "Carnifex" model (which the player must own or buy) in order to turn it into a different, larger figure (a "Tervigon") for purposes of game play. GW misleadingly claims that CHS's Conversion Kit "contains the same unique characteristics as [GW's] depiction of a Tervigon, including two small hind legs, four large pointed legs that each have a small horn extending off the 'elbow' of the leg, several bony protrusions that extend off the back of the creature, and the overall stance of the creature." GW's SUF No. 50. But those features **are not part of CHS's accused product.** Rather, they are features of GW's **own** pre-existing "Carnifex" figure. GW reproduces an image of CHS's Kit that shows it assembled on top of a GW model (for purposes of showing fit and compatibility), but misleadingly shows an assembled version of its own "Carnifex" model that **omits** the relevant features—even though GW's "Carnifex" model as sold **does** include those features. Response to GW's SUF 50. A side-by-side comparison of two different views of GW's assembled "Carnifex" model with CHS's Conversion Kit, shown assembled on a GW "Carnifex" model to demonstrate fit and compatibility, shows that the only alleged similarities are due to the presence of GW's model in the picture, and are not part of CHS's product. Response to GW SUF No. 50.

GW's purported evidence concerning CHS's Conversion Kit is misleading; misrepresents the facts; and fails to show infringement because the works at issue are not substantially similar.[8]

GW also misrepresents facts with its Ex. 126, which falsely purports to be an image of the back of CHS's "Generic Power Armor Shoulder Pad for Space Marine." GW SUF No. 59. GW offers no foundation for this exhibit, so it is impossible to ascertain the actual source of the

---

[8] Even if the Court were to find that the "protrusions" on CHS's product are similar to those depicted in GW's illustration (they are not), any similarity based on the simple shape of a hollow tube is *de minimis* – and, in any event, the idea and general shape of such a "protrusion" is not original to GW but is patently derived from the works of Swiss artist HR Giger, who created the original illustrations on which the Alien (from the movie of the same name) was based. *See* Request for Judicial Notice filed concurrently herewith and Ex. A thereto.

image, but it is clearly not CHS's product. (AMF 18.) *See* Dkt. 208-1 (Kearney MSJ Decl.,¶24, Ex. 7, product no. 54) (actual CHS product).

### b. GW Seeks to Protect Unprotectable Elements Such as Roman Numerals, Chevrons, Crosses, and Blood Drops

Contrary to GW's claim that it "is not seeking to protect . . . items such as Roman numerals or crosses or blood drops in isolation," that is precisely what it is seeking. GW expressly claims protection for its use of Roman numerals I through X (which it refers to as an "intricate numerical sequencing"). (Mot. at 12.) GW also seeks to protect simple, unprotectable geometric shapes and common symbols, including a chevron (No. 50), a single "parking lot" arrow (no. 56), a symbol of arrows crossed in an "X" (no. 48), and the simple, common half-hemisphere shape of a traditional bandshell (nos. 21, 22, 49, 53-55, and 97-100). (All parenthetical references are to GW's Second Rev. Copyright Claim Chart, Kearney Decl. Ex. 7). GW also seeks to protect the abstract *idea* of combining Roman numerals with such simple geometric shapes and common symbols. *See, e.g.*, nos. 46, 47, 51, 52, and 57-62. What GW misleading calls "multifaceted iconography," (Mot. at 12) is merely the abstract idea of combining no more than two simple, unprotectable symbols. "[T]he creative expression capable of supporting copyright must consist of something more than *the mere bringing together of two or three standard forms or shapes* with minor linear or spatial variations." Copyright Compendium II § 503.02(a)-(b)(emphasis added).

### c. GW's "Harry Potter" Analogy Is Inapposite

GW's labored analogy to a hypothetical situation involving Harry Potter merchandise does nothing to legitimize its copyright claims. (Mot. at 3, 13) (analogizing to "reproduction of elements and figures from the Harry Potter story"). Because none of CHS's accused products is substantially similar to protectable elements of GW's works, there is no actionable "reproduction" of protectable "elements and figures." GW fails to show the contrary, and a side-by-side comparison of CHS's products with GW's alleged works confirms the lack of substantial similarity. In the same way—to use GW's analogy—if a hypothetical Warner Bros. brought

copyright claims against a company for manufacturing and selling toy broomsticks that featured a bundle of straw tied to a stick, claiming that its rival's use of these "unique elements" infringed Harry Potter's "Nimbus 2000" broomstick even in the absence of substantial similarity, then it surely would not prevail. Similarly, GW's copyright claims also fail.

### D.    CHS's Website Is Not Substantially Similar to GW's Alleged Works

GW advances the novel theory that CHS's website is itself an infringing work *irrespective of whether CHS's products infringe any GW copyrights*. (Mot. at 11) ("Even if . . . individual Chapterhouse products could in theory escape a finding of copyright infringement, so long as they are sold together on Chapterhouse's website . . . the entire website is an infringement"). GW's "immaculate infringement" theory that non-infringing works can somehow become infringing, if only there are enough of them, is without support. The case on which GW relies, *Castle Rock Ent. v. Carol Pub. Group, Inc.*, 150 F.3d 132 (2d Cir. 1998), is inapposite. The *Castle Rock* court merely found defendant's *de minimis* defense inapplicable where each of 634 instances of alleged infringement was admittedly "based directly upon original, protectable expression." *Id.* at 138. *Castle Rock* does not apply here: CHS's products do not infringe GW's alleged works, many of which are neither "original [nor] protectable." And contrary to GW's repeated and unfounded statement, it is simply not true that CHS's works are "admittedly derived from [GW's] . . . works." (Mot. at 10); Response to GW SUF No. 26. GW fails to produce any evidence that particular CHS products on its website—still less "the entire website"—are substantially similar to any GW's products or GW's website. Indeed, GW provides only scattered screenshots from its website, none of which supports GW's theory.

Far from demonstrating the absence of any genuine issue of material fact, GW's mere conclusory assertions of copying, unsupported by any evidence whatsoever, fail to support its motion for summary judgment. Its motion should be denied.

### E.    GW Is Not Entitled to Summary Judgment as to Independent Creation[9]

---

[9] As the Court has stated, and GW acknowledged, "independent creation" is not technically an affirmative defense, and thus GW's motion is moot. Rather, "the burden of proving copying is always on the party

GW's argument against CHS's independent creation defense is specious. First, GW misstates the record when it claims falsely that "Chapterhouse . . . admitted in discovery that all of its works are derived from Warhammer 40K." (Mot. at 16; GW SUF No. 26.) Rather, CHS's principal, Nick Villacci, stated that "everything that [Chapterhouse] [has] created has been influenced by what I have been exposed to. Be it, Star Wars movies, Games Workshop products. I can't exclude anything from my personal experience." Response to GW SUF No. 26. And CHS provided detailed evidence of independent creation in discovery. Response to GW SUF No. 67.

Second, GW concedes that CHS's designers "consulted . . . sources outside the Games Workshop universe." (Mot. at 16-17 and n.10) (conceding CHS produced documents concerning "submissions by fans of Games Workshop who . . . submitted their own images" of what they wanted the products to look like). But this evidence *supports* CHS's independent creation defense. "A defendant independently created a work if it created its own work without copying anything or if it copied something other than the plaintiff's copyrighted work." *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 450 (7th Cir. 2001) (citing 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §12.11[D], at 12-175 (2001)).

## III.   GW CANNOT ESTABLISH TRADEMARK INFRINGEMENT.

After initially alleging infringement of more than 125 claimed marks,[10] GW moves for summary judgment of trademark infringement on eight registered and 72 unregistered marks. (Mot. at 20 n.16.) GW is not entitled to partial summary judgment[11] of trademark infringement for any alleged marks because (1) it has abandoned claims for 14 of the 80 marks on which it moves; (2) it fails to meet its burden of establishing basic elements of its claim, such as owning U.S. trademark rights and showing CHS use of the alleged marks; (3) CHS's reference to any GW alleged marks is nominative fair use; and (4) it cannot show likelihood of confusion.

### A.   GW Has Abandoned Its Claims for 14 of the 80 Claimed Marks.

---

who is claiming infringement and that evidence of independent creation is relevant on that, but there is no real shifting burden of proof." Dkt. 173 at 5. Because GW moves on it, CHS addresses it.
[10] Kearney Decl. ¶ 3.
[11] GW did not move for summary judgment on its trademark dilution claims.

Of the 80 marks on which it now moves (Mot. at 20 n.16), 14 were not identified in GW's response to Interrogatory No. 18, which its 30(b)(6) witness confirmed was a comprehensive list of all marks alleged in this case. AMF 36, 38. GW cannot pursue claims it has withdrawn and is not entitled to summary judgment on those 14 marks. *See Alassani v. Walter*, No. 10-4491, 2011 WL 135018, *11 n.10 (E.D. Pa. Jan. 14 2011).

**B.      GW Cannot Establish U.S. Rights for Its Alleged Marks.**

GW cannot meet its burden to show U.S. rights for any of its alleged marks because it failed to meet its burden to show trademark use in the U.S. for each mark. "An action for trademark infringement can only succeed if…the plaintiff owns the mark" and used the mark in commerce first. *Central Mfg., Inc. v. Brett*, 492 F.3d 876, 881-83 (7th Cir. 2007) (affirming summary judgment, attorney fees, and costs where plaintiff failed to establish *bona fide* use of registered mark); *Eva's Bridal Ltd. v. Halanick Enters., Inc.*, No. 07 C 1668, 2010 WL 2035720, *3 (N.D. Ill. 2010) (same re: unregistered marks). While a federal trademark registration provides *prima facie* evidence of ownership, here only eight of the terms GW moves on are registered in the U.S. and GW must still provide evidence of senior and *bona fide* use in the U.S. *Central Mfg.*, 492 F.3d. at 882 (rejecting documents that did not "evidence[] any actual orders or sales the listed products."). "Conclusory statements [to the contrary], unsupported by the evidence of record, are insufficient to avoid summary judgment." *Albiero*, 246 F.3d at 933.

**1.      GW Provided No Evidence of Use of The Alleged Marks in the U.S.**

GW fails to meet its burden to show that it sold product in U.S. commerce under any of the 80 marks. It even concedes it has not "used" all the "trademarks in issue" as trademarks "on actual products," such as "'Mycetic Spore', 'Ymgarl' and 'Tervigon'". (Mot. at 23.) Even for marks it claims its uses on products, GW concedes that its U.S. retail stores do not carry its full range of products. (AMF 19.) Asked "[w]hat records does [GW] have that demonstrate that this product was actually sold in the US?", GW's 30(b)(6) witness answered "I really don't know." As "a global company…centralized…in the UK," "you would need to talk to somebody in the American business" about records that the "American sales business keeps…" (AMF 20-21.)

CHS served GW's U.S. business, Games Workshop Retail, with a document subpoena and deposed it. (AMF 22.) Its 30(b)(6) witness confirmed its stores do not carry the full range of GW products, and that it has no records to determine whether a particular product was actually sold in the U.S., and no records of dates or geographical locations of any product sales. (AMF 21.)

GW glosses over its failure to provide evidence of *bona fide* use of each mark in the U.S. with the conclusory statement that "[GW]'s ownership and priority of use of its registered and unregistered marks *can scarcely be debated*…." (Mot. at 19 (emphasis added)). GW fails, however, to provide any actual evidence—such as sales invoices or purchase orders—for any sales in the U.S. for any product. (AMF 23.) Instead, it references three pages of an unitemized "sales summary," which fails to show any sales by product, mark, or date, as well as similarly vague and undifferentiated declarations. GW SUF Nos. 1-2, Ex. 3. This is the very type of "conclusory" evidence that, as the Seventh Circuit affirmed, should be rejected when presented in the context of summary judgment. *Central Mfg.,* 492 F.3d at 882 (plaintiffs' production of generalized, high-level sales data, price sheets, and advertising "failed completely to support their claim that they actually used the [mark]…."). Even records of "intra-company shipments. . . do not constitute *bona fide* shipments to satisfy" the use-in-commerce requirement. McCarthy on Trademarks § 19:118. Like the plaintiff in *Central Mfg.*, GW fails "to produce even a single purchase order or invoice as proof" of "*the bona fide use* of [any] mark" "*in commerce*" in the U.S. *Central Mfg.,* 492 F.3d at 883 (emphasis in original) (citing 15 U.S.C. § 1127).

Additionally, the unitemized sales summary does not even summarize sales *in the U.S.* GW's 30(b)(6) witness testified that it was for undifferentiated "North American sales, *which includes Canada*" and is only for novels[12]—not toy miniatures or other categories of products.

---

[12] Even if GW had produced itemized invoices by book titles, which it did not, a book title (unless used as a trademark for a _series_ of books) does not qualify as a trademark. *In re National Council Books, Inc.*, 121 U.S.P.Q. 198, 198 (TTAB 1959). Moreover, while an identical title used for a _series_ of books may achieve secondary meaning required for trademark protection, GW failed to produce *any* evidence of secondary meaning, discussed in detail *infra. Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999) ("for plaintiff to prevail under § 43(a), it must demonstrate (1) that its title has secondary meaning, and (2) that defendants' title is likely to confuse or mislead consumers…").

Kearney Decl. Ex. 3 (Jones Tr. at 302:15-207:15) (emphasis added). Moreover, as discussed above, GW has *no records* to determine whether a particular product was actually sold in the U.S., and no records of dates or geographical locations of any product sales. Finally, although GW refers without discussion to CHS's "admission on its website that [GW] owns all of the marks in issue" (Mot. at 19; GW SUF No. 22), CHS's disclaimer is not an admission that GW owns enforceable trademark rights in the terms in the U.S. The disclaimer, taken from language suggested by GW, merely states that certain terms and designs are either "®, TM and/or © Copyright Games Workshop Ltd 2000-2010, variably registered in the UK and other countries around the world." It does not even mention the U.S. specifically, and does not relieve GW of its burden to prove ownership of U.S. rights in the claimed marks.

GW fails to meet its burden to establish U.S. rights in its alleged marks; its motion fails.

### 2. GW Fails to Provide Evidence of Secondary Meaning.

Seventy two of GW's 80 alleged trademarks are unregistered. (Mot. at 20 n.16.) An unregistered mark is protectable if it is either inherently distinctive or has acquired secondary meaning. *See Kohler Co. v. Moen Inc.*, 12 F.3d 632, 642 (7th Cir. 1993). Here, GW fails to present any evidence that its unregistered marks are inherently distinctive. *Welding Services, Inc. v. Forman,* 509 F.3d 1351, 1357 (11th Cir. 2007) ("Distinctiveness is a question of fact, whether the question is inherent distinctiveness or acquired distinctiveness."). For example, GW claims trademark rights for the highly descriptive term "jetbike" for toy models of jet-propelled bikes. *Compare* Mot. at 20 n.16 *with* GW Ex. 32. *Platinum Home Mortg. Corp. v. Platinum Fin. Group*, 149 F.3d 722, 727-28 (7th Cir. 1998) (holding that descriptive and generic terms are not inherently distinctive). GW also claims use of terms as book titles as trademark use, e.g., "Soul Drinker" (AMF 24), but book titles do not qualify as trademarks. *In re National Council Books, Inc.*, 121 U.S.P.Q. 198, 198 (TTAB 1959). While a book title for a *series* of books may be protectable, such use does not qualify as a trademark without proof of *secondary meaning*. *Id.*

Although GW claims that its "marks have secondary meaning" required for trademark protection because they are "distinctive within the context of the Warhammer 40K universe,"

(Mot. at 21), it fails to provide evidence required to show secondary meaning in the Seventh Circuit, such as 1) amount and manner of advertising, 2) sales volume, 3) length and manner of use, 4) consumer testimony, and 5) consumer surveys. *Platinum Home Mortg. Corp.*, 149 F.3d at 728-29. To the contrary:

- GW conducts minimal advertising in the U.S.,[13] no traditional advertising (Mot. 20 n.15), and produced no studies about its advertising's success in attracting customers for *any* particular Mark At Issue.[14] (AMF 39.) Instead, GW trivialized its advertising efforts. *Id.* ("Well, if you don't advertise, it doesn't cost you anything.");

- As discussed above, GW produced general sales data, not itemized sales invoices or purchase orders for each alleged trademark. (AMF 23.); Kearney Decl. ¶¶7-8;

- As discussed above, GW has no records of dates or geographical locations of sales for any particular product;

- GW fails to produce consumer surveys or testimonials, or expert reports, for any mark. (AMF 25.) *Platinum Home Mortgage Corp.*, 149 F.3d at 728 ("While not fatal to its request [for a finding of secondary meaning], the absence of [consumer surveys and testimonials] weighs against [plaintiff].") (affirming no secondary meaning).

GW instead suggests that *Decor Grate v. Fararo*, No. 92 6395, 1997 U.S. Dist. Lexis 3328, *30 (N.D. Ill Mar. 13, 1997) establishes that "copying of [GW]'s product and characters names" *alone* "proves that the marks have secondary meaning…." (Mot. at 19, 21.) To the contrary, the *Fararo* court conducted the standard multi-factor analysis for secondary meaning for the product-configuration trade dress at issue in *Fararo*. Unlike GW, the *Fararo* plaintiff introduced evidence of secondary meaning, including evidence of (a) "extensive advertising" for the trade dress, including hundreds of thousands dollars in advertising expenditures, (b) itemized sales data (e.g., "over 1,500,000 units of its decorative scroll-type register in the United States"), and (c) customer testimonials. *Fararo*, No. 92 6395 at *25-30.[15]

---

[13] Even if GW had produced evidence of advertising expenditures for specific marks, courts discount such evidence as "entirely circumstantial" because it "does not necessarily indicate that consumers associate a mark with a particular source, particularly when the advertisements and promotions do not specifically emphasize the mark." *Id.* at 729.

[14] *See Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1270 (7th Cir. 1989) ("it is the *effect* or *success* of the advertising, not the mere *fact* of advertising, that is the test of secondary meaning.")

[15] GW's lack of evidence of secondary meaning also undermines its reliance on *Processed Plastic Co. v. Warner Comm'ns, Inc.*, 675 F.2d 852 (7th Cir. 1982), *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir. 1981), and *D. C. Comics, Inc. v. Powers*, 465 F. Supps 843 (S.D.N.Y. 1978)— Mot. 22-23—as

-19-

### C. GW Fails To Show Trademark Use By CHS Of Each Mark.

GW moves for summary judgment of infringement of 80 alleged marks.[16] Mot. at 20 n.16. GW bears the burden of proving that CHS *used* each alleged mark in commerce. 15 U.S.C. §§ 1114(1)(a), 1125(a)(1), and § 1127 (defining "use in commerce"). It fails to meet its burden.

GW fails even to claim any use by CHS for 28 of the claimed trademarks,[17] fails to point to *any* use by CHS of the vast majority of the marks, and the few references it does include fail to show trademark use. GW identifies only a handful of alleged facts in its Motion concerning CHS's use of GW's alleged marks. (Mot. at 4, 19-24 (GW SUF 17, 22, 79)); 15 U.S.C. § 1125(a)(1). Each screenshot of CHS's website includes a disclaimer that begins with: "This web site is completely unofficial and in no way endorsed by Games Workshop Limited." *E.g.*, GW SUF 22 (Ex. 18 at 3), 79 (Ex. 19 at 2). This does not evidence use in commerce of GW's alleged marks. Another screenshot is of a third-party website referencing *only two* of GW's alleged trademarks: "Salamander" and "Soul Drinker." *Compare* GW SUF 17 (Ex. 15) *with* Mot. at 20 n. 16 (list of trademarks that CHS allegedly used).[18] The cited screenshots fail to show use in commerce by CHS of the 80 claimed trademarks. GW even concedes that "there are no permanent markings on [CHS's] products." (Mot. at 22.)

---

"[a] finding of secondary meaning is implicit in the Court's discussion of the principles of law [under Section 43(a) of the Lanham Act] applicable to that case." *Processed Plastic* , 674 F. 2d at 857 n.7 (discussing *Gay Toys, Inc.*, 658 F.2d 76). *E.g.*, *Processed Plastic* , 674 F. 2d at 854-55 (consumer survey evidence); *Gay Toys*, 658 F.2d at 79 (same); *Powers*, 465 F. Supp. 843 at 849 ("overwhelming [consumer survey] response indicate an association of the Daily Planet with the Superman character").

[16] Although GW takes exception to CHS's use of "Chapterhouse" (Mot. at 23-24, n.17; GW-UF 19), GW does not claim either "Chapter" or "Chapterhouse" as a trademark. (Mot. at 20 n.16.)

It also takes exception to CHS's "winged logo" CHAPTERHOUSE STUDIOS (Mot. 23-24) because of GW's Aquila Design , which CHS's is not accused of infringing. Mot. at 20 n.16.

[17] AMF 40: Assault Space Marine; Cadian; Chaos Space Marine; Chimera; Devastator Space Marine; Dreadnought; Gaunt; Hellhound; Heresy Armour; Howling Banshee; Howling Griffons; Imperial Guard; Librarian; Melta; Mycetic Spore; Plasma; Predator; Stormraven; Striking Scorpion; Tactical Space Marine; Techmarine; Terminator; Thunder Hammer; Tyranid Bonesword; Tyranid Lashwhip; Tyrant; Warhammer 40K; and Ymgarl.

[18] GW SUF 17 also references inadmissible and unauthenticated screenshots from eBay.com regarding seven other alleged trademarks: Space Marine; 40K; Terminator; Rhino; Warhammer 40K; Drop Pod; Warhammer 40000. *Compare* GW SUF  17 *with* Mot. at 20 n.16.

### D. GW Cannot Show Infringement of Any Mark.

GW's trademark claims also fail under the doctrine of nominative fair use and because it cannot show likelihood of confusion.

### 1. CHS's Use of GW's Alleged Marks Is Nominative Fair Use.

Any reference by CHS to GW's alleged marks is nominative fair use: there is no infringement when a mark is used to truthfully identify plaintiff's goods. The crux of nominative fair use, as GW's counsel submits, is whether "the term at issue is used to tell the truth." Moskin, J., Frankenlaw: The Supreme Court's Fair and Balanced Look at Fair Use, 95 Trademark Rptr. 848, 867–868 (2005). To analyze nominative fair use, the Seventh Circuit courts apply the *New Kids* factors: 1) defendant's product is not reasonably identifiable without plaintiff's mark; 2) defendant uses no more of plaintiff's mark than is reasonably necessary; and 3) defendant does not use the mark in a manner likely to suggest sponsorship or endorsement of its product by the plaintiff. *See Ty, Inc. v. Publications Intern., Ltd.*, No. 99 CC 5565, 2005 WL 464688, *5-6 (N.D. Ill. Feb. 25, 2005) (citing *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992)); *World Impressions, Inc. v. McDonald's Corp.*, 235 F. Supp. 2d 831, 842-43 (N.D. Ill. 2002) (same). CHS's uses are fair because it refers to GW terms to tell the truth.

GW ignores the test for nominative fair use[19] to jump to the conclusion that "notwithstanding [CHS's] disclaimer, the prominence with which Chapterhouse has promoted its business as 'Specializing in Bits and Sculpts for Warhammer 40,000 [and Fantasy]' exceed the scope of permissible fair use." (Mot. at 23) (referencing Ex. 62 as incorporated in GW SUF No. 79). Applying the test demonstrates otherwise.

For example, CHS references GW terms on its home page to identify products that players may wish to use with those armies and to explain that CHS products are compatible with, fit on, or can be used to decorate such product. Ex. 62 (e.g., "Tervigon Kit to upgrade Carnifex"; "Infantry and Shoulder Pad Bits compatible with Space Marine models"); *see* Mot. at 23 (admitting GW has not used "Tervigon" on "actual products"). *See* McCarthy, § 23:11.50

---

[19] GW relies upon *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812-13 (2d Cir. 1999), which neither mentions or applies the nominative fair use test. (Mot. at 23.)

(discussing that "confusion will usually be unlikely" where defendant "is using [plaintiff's marks] as trademarks identifying the true owner in order to convey the message of alleged product compatibility.").

Second, CHS uses no more of (alleged) marks than necessary to identify GW's products and does not use any specialized stylization or color to call them out. *Cf. Ty,* 2005 WL 464688 at *8 (denying summary judgment due to use of different stylized fonts for alleged trademark). "Specializing in Bits and Sculpts for Warhammer 40,000 and Fantasy" uses the same consistent font, and in a smaller size than "Chapterhouse Studios" right above it. Ex. 62.

Third, CHS does not suggest sponsorship or endorsement by GW. It disclaims connection on its website. (AMF 26.) "In light of [a disclaimer, plaintiff] must respond with evidence that [defendant's] use of the mark suggested sponsorship or endorsement by [plaintiff]. *Ty,* 2005 WL 464688 at *10 (no issue of material fact where plaintiff failed to produce evidence). As detailed below, there is no such evidence of confusion of sponsorship or endorsement.

### 2.     No Likelihood of Confusion

Because CHS uses the alleged marks to reference GW's own products, there is *no* likelihood of confusion. McCarthy, §23:11.50. The courts weigh seven factors to determine likelihood of confusion,[20] although "no single factor is dispositive." *Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1043-44 (7th Cir. 2000). The same test applies to claims under §§ 1114 and 1125(a) of the Lanham Act. *See Packman v. Chicago Tribune Co.,* 267 F.3d 628, 638 n.8 (7th Cir. 2001). Here the relevant factors overwhelmingly indicate no confusion.

### a.     There Is No Evidence of Actual Confusion.

Although CHS and GW have co-existed for more than four years (AMF 27), there is no evidence of confusion. "It is reasonable and proper to infer from the absence of any evidence of actual confusion that there is no likelihood of confusion." *Ohio Art Co. v. Lewis Galoob Toys,*

---

[20] The factors are: 1) the similarity between the marks in appearance and suggestion; 2) the similarity of the products; 3) the area and manner of concurrent use; 4) the degree of care likely to be exercised by consumers; 5) the strength of complainant's mark; 6) whether there is actual confusion; and 7) whether defendant intended to palm off his product as complainant's. *Barbecue Marx*, 235 F.3d at 1043-44.

*Inc.,* 799 F. Supp. 2d 870, 884 (N.D. Ill. 1992) (denying preliminary injunction); *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.,* 80 F. Supp. 2d 815, 883 (N.D. Ill. 1999) (granting summary judgment and deeming it "very significant" that over an extended period of coexistence, plaintiff "has been unable to muster any evidence of actual confusion.")

There is no evidence of confusion. GW's U.S. business has *no records* of U.S. "customers expressing confusion" with CHS or even inquiring[21] about CHS. (AMF 28.) Despite years of coexistence, GW's Motion references emails with only three third parties concerning CHS, all sent to GW's legal team in England, and none of which evidence confusion.[22] GW SUF No. 17 (Ex. 122). *Packman,* 267 F.3d at 645 ("evidence that three consumers were confused did not demonstrate likelihood of confusion") (affirming summary judgment for defendant) (citation omitted). Two are from British email addresses. The third was also sent to GW's legal team in England, not to its U.S. customer service email address. GW presents no evidence that any of the senders were in the U.S. (AMF 30, 31.) And they do not evidence confusion. To the contrary, the senders are notifying GW legal about CHS, and it is clear they are not confused about the source of CHS's products. "Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (citations omitted). And GW did not produce a consumer survey or testimonials, which weighs against a finding of actual confusion.[23] The absence of actual confusion "is highly persuasive evidence that confusion is not likely." *Planet Hollywood,* 80 F. Supp. 2d at 883 (internal quotation omitted); *Top Tobacco, L.P.*

---

[21] *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994) ("evidence of occasional inquiries is superficial and trivial in the absence of evidence of actual diversion of business").

[22] GW produced two other such emails during discovery, and GW's own in-house counsel (and 30(b)(6) designee on confusion) **conceded** that the sender of one email was not confused—personally forwarding one of these emails to a colleague to note "**another one who clearly is not confused!**" and that other sender was apparently in Australia. (AMF 29, 31) (exclamation in original; emphasis added); (AMF 30) (GW "do[es]n't know that the original author is confused." ).

[23] *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) (vacating injunction and dismissing 15 U.S.C. § 1125(a) claim).

*v. North Atlantic Operating Co., Inc.*, No. 06-c-950, 2007 WL 118527 (N.D. Ill. Jan. 4, 2007) (Kennelly, J.) (summary judgment to defendant on trademark claims).[24]

#### b.      There Is No Evidence of Intent to Palm Off.

There is no evidence that CHS had an intent to "palm off" its products as GW's and profit from confusion. To the contrary, CHS uses a disclaimer on every page of its website that expressly informs customers that its products are *not* created, sponsored, or endorsed by GW. *E.g.*, GW SUF 22 (Ex. 18 at 3), 79 (Ex. 19 at 2).

#### c.      Customers Are Likely to Exercise a High Degree of Care.

"'[W]here consumers are sophisticated, deliberate buyers, confusion is less likely….'" *Bobak Sausage Co. v. A&J Seven Bridges, Inc.,* 805 F. Supp. 2d 503, 517 (N.D. Ill. 2011) (quoting *Planet Hollywood*, 80 F. Supp. 2d at 882). Moreover, where, as here, customers are "'afficionados,'" the Court "can expect that [they] will exercise a reasonable degree of care" even if the goods are relatively inexpensive. *Barbecue Marx*, 235 F.3d at 1045. Purchasers of war gaming miniatures and accessories are aficionados likely to exercise care in purchases, spending hundreds of hours using the products. (Mot. at 1) (discussing "hobbyists and fans"). Such purchasers are unlikely to be confused.[25] Villacci Decl. ¶ 3. GW offers no evidence to suggest otherwise.

#### d.      GW's Alleged Marks Are Weak

"The 'strength' of a trademark refers to the mark's 'distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source.'" *Bobak Sausage,* 805 F. Supp. 2d at 518. "[GW] bears the burden of proving the strength of its

---

[24] GW argues that the absence of actual confusion should be discounted due to the possibility of post-purchase confusion, citing *Au-Tomotive Gold Inc. v. Volkswagen of Am. Inc.*, 457 F.3d 1062 (9th Cir. 2006); *CAE, Inc. v. Clean Air Eng'g Inc.*, 267 F.3d 660, 677-78 (7th Cir. 2001). Mot. 21, 24. There is no possibility of post-sale confusion here. GW concedes that there are no permanent markings on [CHS's] products." (Mot. at 22.) In both *Au-Tomotive Gold* and *CAE*, defendants' products permanently incorporated the trademarks and/or trade dress at issue.

[25] Defining "fan" as "an enthusiastic devotee (as of a sport or a performing art) usually as a spectator". http://www.merriam-webster.com/dictionary/fan?show=2&t=1345936590; defining "hobby" as "a pursuit outside one's regular occupation engaged in especially for relaxation." http://www.merriam-webster.com/dictionary/hobbyist.

mark based on its actual strength in the marketplace." *Id.* at 519. As discussed above, GW uses descriptive terms as marks, such as "jetbike" for toy jet bikes; descriptive terms are weak. *See id.* at 518-519. GW produced no consumer surveys, testimonials, market-share analysis, itemized sales records, or sales volumes for any of its marks. (AMF 25, 32.) And GW concedes it "does not engage in traditional advertising…" (Mot. at 20 n.15.)[26] Neither registrations or even "45 years [of alleged trademark use] answer the question of whether the name resonates in the consumers' consciousness … It is the strength of its name which is the necessary predicate to establish confusion." *Bobak Sausage,* 805 F. Supp. 2d at 519. This factor also favors CHS.

### e. Similarity of Marks/Products/Concurrent Use

As discussed, where, as here, the alleged marks are used nominatively to refer to GW's own products, similarity of marks alone is not probative of likely confusion. And the parties do not sell their products through the same websites, retail stores, or distributors. (AMF 33.) They primarily sell from their respective websites, which are clearly marked, and GW also sells from its own retail shops, where no other company's products are available. *Id.* There is no evidence of any overlap in the promotion, distribution, and sales of the parties' goods. (AMF 33-35.)[27]

The relevant factors indicate no likelihood of confusion.[28]

## IV. CONCLUSION

GW fails to meet its burden to show ownership of the rights it alleges or infringement by CHS. Its motion should be denied.

---

[26] GW argues that its lack of advertising is irrelevant, citing *Morningside Group, Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 139 (2d Cir. 1999). Mot. 20 at n.15. Unlike the alleged marks here, that case involved a service mark, which require use of the service mark "in the sale or *advertising* of services" in order to establish *bona fide* use in commerce. 15 U.S.C. § 1127 (emphasis added).

[27] To the extent that GW argues that its Lanham Act claims are based on CHS's alleged copyright infringement, the Court should reject that argument. *Martin v. Walt Disney Internet Group*, No. 09-CV-1601, 2010 WL 2634695, *8 (S.D. Cal. June 20, 2010) (dismissing plaintiff's Lanham Act claim against defendants for copyrighted information from plaintiff's website) (quoting D*astar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34, 37 (2003); *Fractional Villas, Inc. v. Tahoe Clubhouse*, [No. 08-cv-1396] 2009 U.S. Dist. LEXIS 4191 *10-11 [(S.D. Cal Jan. 22, 2009)].

[28] GW's state and common law claims fail for the same reasons. *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994); *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F. 2d 266, 274 (7th Cir. 1976) ("Illinois law mandates application of the same [likelihood of confusion] test" as Lanham Act).

Dated: September  6 , 2012                    Respectfully submitted,

                                        _____/s/ Bryce Cooper_____

Jennifer A. Golinveaux (CA Bar No. 203056)
Dean A. Morehous (CA Bar No. 111841)
K. Joon Oh (CA Bar No. 246142)
Thomas J. Kearney (CA Bar No. 267087)
    WINSTON & STRAWN LLP
    101 California Street
    San Francisco, CA 94111-5802
    Phone: (415) 591-1000
    Fax: (415) 591-1400
    jgolinveaux@winston.com
    dmorehous@winston.com
    koh@winston.com
    tkearney@winston.com

Eric Mersmann (IL Bar No. 6286859)
Bryce Cooper (IL Bar No. 6296129)
Jonathon Raffensperger (IL Bar No. 6302802)
    WINSTON & STRAWN LLP
    35 West Wacker Drive
    Chicago, IL 60601-1695
    Phone: (312) 558-5600
    Fax: (312) 558-5700
    emersmann@winston.com
    bcooper@winston.com
    jraffensperger@winston.com

SF:339890.3

**CERTIFICATE OF SERVICE**


      I, Bryce A. Cooper, an attorney, hereby certify that on September 6, 2012, I caused to be filed electronically the foregoing DEFENDANT CHAPTERHOUSE STUDIOS LLC'S OPPOSITION TO PLAINTIFF GAMES WORKSHOP LTD'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.


          /s/  Bryce A. Cooper