# EXHIBIT 10

CERTIFIED COPY

# In The Matter Of:

*GAMES WORKSHOP LIMITED,*
*v.*
*CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a*
*PAULSON GAMES,*

---

*JEREMY GOODWIN - Vol. 1  30(B)(6)*
*March 7, 2012*

---

# CONFIDENTIAL - ATTORNEYS' EYES ONLY

**MERRILL CORPORATION**
**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

CONFIDENTIAL - ATTORNEYS' EYES ONLY

JEREMY  GOODWIN - 3/7/2012

| | | |
|---|---|---|
| 1 | Q    Does Games Workshop have a policy about which | 10:47:11 |
| 2 | design notes and sketches go to the archive and which | 10:47:16 |
| 3 | are kept by individual artists? | 10:47:21 |
| 4 | A    No, there is not a formal policy for that. | 10:47:23 |
| 5 | Q    Who decides where the design notes and sketches | 10:47:35 |
| 6 | are kept? | 10:47:39 |
| 7 | A    I don't, sir. | 10:47:40 |
| 8 | Q    Do the individual artists decide -- | 10:47:41 |
| 9 | A    No. | 10:47:44 |
| 10 | Q    Let me finish my question. | 10:47:45 |
| 11 | Do the individual artists decide whether to | 10:47:47 |
| 12 | keep their sketches personally or send them to the | 10:47:49 |
| 13 | archive? | 10:47:52 |
| 14 | A    No, you need to rephrase that. | 10:47:56 |
| 15 | Q    Is it up to an individual artist where to | 10:48:02 |
| 16 | store -- | 10:48:05 |
| 17 | A    No. | 10:48:05 |
| 18 | Q    -- his or her design notes and sketches? | 10:48:06 |
| 19 | A    No, it's not up to them. | 10:48:09 |
| 20 | Q    Who is it up to? | 10:48:10 |
| 21 | A    Their department manager, I guess.  I work in | 10:48:11 |
| 22 | the sculpting department.  You're asking about the | 10:48:16 |
| 23 | artists department.  It's a different department. | 10:48:19 |
| 24 | Q    Does your -- Strike that. | 10:49:01 |
| 25 | Does the department manager of the sculpting | 10:49:06 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY   GOODWIN - 3/7/2012

Page 57

| | | |
|---|---|---|
| 1 | You employ artists.  What do you employ them for? | 10:56:16 |
| 2 | Q   Does Games Workshop employ freelance artists to | 10:56:26 |
| 3 | do the cover of its codexes? | 10:56:27 |
| 4 | A   Yes, I think we've got a couple that have been | 10:56:29 |
| 5 | done.  It's not general policy. | 10:56:32 |
| 6 | Q   Does Games Workshop employ freelance artists to | 10:56:47 |
| 7 | do art for inclusion in its codexes? | 10:56:50 |
| 8 | A   You'd have to show me some examples.  Really, | 10:56:56 |
| 9 | you'd have to show me some examples for me to be able to | 10:57:00 |
| 10 | say yes or no. | 10:57:03 |
| 11 | I would say at least 95 to 99 percent of all of | 10:57:04 |
| 12 | our work is done in-house.  And because I'm not in that | 10:57:09 |
| 13 | department, it's very difficult for me without seeing | 10:57:11 |
| 14 | the thing to be able to say to you that is or that | 10:57:14 |
| 15 | isn't. | 10:57:17 |
| 16 | Q   Sorry, when you say at least 95 to 99 percent of | 10:57:40 |
| 17 | all of our work is done in-house, does that mean that | 10:57:43 |
| 18 | some of your work is done by freelancers? | 10:57:46 |
| 19 | A   It might do.  As I said, this is to do with the | 10:57:49 |
| 20 | art department.  You're asking me questions not with my | 10:57:52 |
| 21 | own department. | 10:57:57 |
| 22 | Q   Again, you understand that you're here to | 10:58:18 |
| 23 | testify about policies, procedures, or practices | 10:58:21 |
| 24 | concerning any natural person involved in the | 10:58:23 |
| 25 | development, design, and creation -- | 10:58:26 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY   GOODWIN - 3/7/2012

Page 59

| | | |
|---|---|---|
| 1 | concerning natural persons when they are involved in the | 11:17:02 |
| 2 | development of works, the design and creation of works. | 11:17:05 |
| 3 | MR. KEARNEY:   Q   Mr. Goodwin, I think you said that | 11:18:28 |
| 4 | Games Workshop -- Strike that. | 11:18:31 |
| 5 | You said you were not aware whether Games | 11:18:39 |
| 6 | Workshop entered into contracts with freelance artists | 11:18:41 |
| 7 | and sculptors? | 11:18:45 |
| 8 | A   Can we just talk about sculptors because if it's | 11:18:47 |
| 9 | artists, then I'm going to say the same thing. | 11:18:51 |
| 10 | Q   So your understanding of the scope of topic 9 is | 11:19:05 |
| 11 | that you are prepared to testify only insofar as it | 11:19:11 |
| 12 | concerns sculptors? | 11:19:16 |
| 13 | A   I would be happy to testify to the things that I | 11:19:18 |
| 14 | know about, which would be sculpting.  It's not that I'm | 11:19:22 |
| 15 | refusing to testify on anything else, I just don't think | 11:19:27 |
| 16 | I can be of much help to you. | 11:19:34 |
| 17 | Q   Is it Games Workshop's policy not to use work | 11:19:49 |
| 18 | from freelance sculptors? | 11:19:54 |
| 19 | A   Yes, I would say that was true enough. | 11:19:56 |
| 20 | Q   Are there any exceptions to that policy? | 11:20:03 |
| 21 | A   Not in our department. | 11:20:06 |
| 22 | Q   Does Games Workshop ever use sculptures from | 11:20:13 |
| 23 | employees who are not employed as sculptors? | 11:20:19 |
| 24 | A   No. | 11:20:24 |
| 25 | Q   And if someone is employed as a sculptor, they | 11:20:35 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY   GOODWIN - 3/7/2012

| | | |
|---|---|---|
| 1 | would be working in the sculpting department? | 11:20:38 |
| 2 | A    Yes. | 11:20:41 |
| 3 | Q    And they would be working under your department | 11:20:42 |
| 4 | manager? | 11:20:45 |
| 5 | A    Yes. | 11:20:45 |
| 6 | Q    Does that include sculptors who do work for | 11:20:55 |
| 7 | Forge World? | 11:20:59 |
| 8 | A    No. | 11:20:59 |
| 9 | Q    Forge World is a separate department? | 11:21:00 |
| 10 | A    Yes. | 11:21:02 |
| 11 | Q    Is Finecast or Citadel Finecast also a separate | 11:21:09 |
| 12 | department? | 11:21:14 |
| 13 | A    No. | 11:21:14 |
| 14 | Q    Are there any other separate sculpting | 11:21:15 |
| 15 | departments in Games Workshop? | 11:21:17 |
| 16 | A    No. | 11:21:21 |
| 17 | Q    Does Forge World ever use sculptures from | 11:22:00 |
| 18 | employees who are not employed as sculptors? | 11:22:03 |
| 19 | A    You would really have to ask them.  I don't have | 11:22:07 |
| 20 | any involvement with Forge World. | 11:22:09 |
| 21 | Q    So is Games Workshop's policy not to use | 11:22:12 |
| 22 | sculptures by nonemployees a policy only of the | 11:22:16 |
| 23 | sculpting department that you work in? | 11:22:21 |
| 24 | A    Well, I can definitely say it is a policy for my | 11:22:24 |
| 25 | department.  I couldn't comment on other people. | 11:22:28 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY   GOODWIN - 3/7/2012

| | | |
|---|---|---|
| 1 | would have been the miniature sculptors would have | 12:56:36 |
| 2 | helped on some of the stuff.  There would have been | 12:56:40 |
| 3 | artists at the time.  There would have been other | 12:56:42 |
| 4 | writers at the time. | 12:56:44 |
| 5 | Q   Was there a key creative team that was | 12:56:54 |
| 6 | responsible for the overall look of the Space Marines? | 12:56:57 |
| 7 | A   No. | 12:57:04 |
| 8 | Q   Were there individuals who were responsible for | 12:57:19 |
| 9 | the overall look of the Space Marines? | 12:57:20 |
| 10 | A   Yes. | 12:57:21 |
| 11 | Q   Who were those individuals? | 12:57:21 |
| 12 | A   This is in the first one?  Because -- Okay.  The | 12:57:25 |
| 13 | first Space Marine release, yes? | 12:57:28 |
| 14 | Q   Let's -- the first -- let me strike that. | 12:57:32 |
| 15 | You said the first publication of the Warhammer | 12:57:41 |
| 16 | 40,000 system was in about 1986 or 1987? | 12:57:46 |
| 17 | A   Yes. | 12:57:51 |
| 18 | Q   Who were the individuals who were responsible | 12:57:51 |
| 19 | for the overall look of the Space Marines in that first | 12:57:53 |
| 20 | appearance? | 12:57:56 |
| 21 | A   They wouldn't have been the same people.  You | 12:57:57 |
| 22 | understand this?  The individuals on the first Space | 12:58:01 |
| 23 | Marine miniatures that we made would have been myself, | 12:58:04 |
| 24 | Alistair Morrisson, and Bob Naismith. | 12:58:08 |
| 25 | Q   I'm sorry, can you spell Alistair? | 12:58:12 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY   GOODWIN - 3/7/2012

Page 81

| | | | |
|---|---|---|---|
| 1 | A | A L I -- | 12:58:16 |
| 2 | Q | I'm sorry, Alistair I got.  What was the next | 12:58:17 |
| 3 | name? | | 12:58:20 |
| 4 | A | Bob.  Alistair Morrisson? | 12:58:20 |
| 5 | Q | Alistair Morrisson, thank you. | 12:58:24 |
| 6 | A | M-O-R-R-I-S-S-O-N, I think.  He may have just | 12:58:26 |
| 7 | one S in there. | | 12:58:31 |
| 8 | Q | Did you and those other two individuals look at | 12:58:39 |
| 9 | reference materials when you were creating the first | | 12:58:44 |
| 10 | Space Marine miniatures? | | 12:58:46 |
| 11 | A | That's a very broad term.  Could you be more | 12:58:48 |
| 12 | specific, please? | | 12:58:52 |
| 13 | Q | Were there individuals other than the three you | 12:59:16 |
| 14 | just mentioned who were responsible for the overall look | | 12:59:17 |
| 15 | of the Space Marines in the first appearance? | | 12:59:20 |
| 16 | A | No. | 12:59:23 |
| 17 | Q | Were there individuals other than the three you | 12:59:32 |
| 18 | mentioned who were responsible for the overall look of | | 12:59:34 |
| 19 | the Warhammer 40,000 game? | | 12:59:36 |
| 20 | A | Yes. | 12:59:43 |
| 21 | Q | Who were they? | 12:59:44 |
| 22 | A | They would have been artists that gave sort | 12:59:46 |
| 23 | of -- you know, people who did the logos and stuff to | | 12:59:48 |
| 24 | make the actual look of the book.  I'm assuming that's | | 12:59:52 |
| 25 | what you're talking about. | | 12:59:54 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY   GOODWIN - 3/7/2012

Page 83

| | | |
|---|---|---|
| 1 | Q    Who created the Tyranids? | 13:01:35 |
| 2 | A    I think you better be a bit more specific with | 13:01:38 |
| 3 | that one. | 13:01:41 |
| 4 | Q    When did the Tyranids first appear? | 13:01:42 |
| 5 | A    I think there was an illustration of a Tyranid | 13:01:44 |
| 6 | in Rogue Trader in 40K when we published it in '86, '87. | 13:01:47 |
| 7 | Q    And Rogue Trader is the first edition of the | 13:01:56 |
| 8 | Warhammer 40,000 Rulebook? | 13:02:01 |
| 9 | A    Yes. | 13:02:03 |
| 10 | Q    When you say an illustration, was there more | 13:02:03 |
| 11 | than one illustration? | 13:02:05 |
| 12 | A    I can't remember.  I can remember one.  There | 13:02:07 |
| 13 | may have been more. | 13:02:09 |
| 14 | Q    Fewer than ten? | 13:02:10 |
| 15 | A    Fewer than ten, yes. | 13:02:13 |
| 16 | Q    Who drew the first picture or pictures of | 13:02:33 |
| 17 | Tyranids? | 13:02:36 |
| 18 | A    Anyone I can remember was by Nick Bibby. | 13:02:39 |
| 19 | Q    And that was in the first edition rulebook? | 13:02:44 |
| 20 | A    It was, yes. | 13:02:47 |
| 21 | Q    Would you generally describe the Tau race, | 13:02:59 |
| 22 | T-A-U. | 13:03:02 |
| 23 | A    A range of short blue-skinned humanoids that | 13:03:08 |
| 24 | have an empire which is made up of lots of smaller races | 13:03:14 |
| 25 | as well as themselves. | 13:03:18 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY GOODWIN - 3/7/2012

| | | |
|---|---|---|
| 1 | Marine? | 13:33:50 |
| 2 | A That's one of his shoulder pads. That's meant | 13:33:51 |
| 3 | to show what's on the shoulder pad on his right-hand | 13:33:54 |
| 4 | side that you can't see on the drawing. | 13:33:57 |
| 5 | Q And what's the design on the shoulder pad? | 13:34:01 |
| 6 | A It's for -- indicates that he is part of a | 13:34:05 |
| 7 | Devastator squad. | 13:34:07 |
| 8 | Q Does that design have a name? | 13:34:09 |
| 9 | A What, that particular chevron thing? It's a | 13:34:12 |
| 10 | chevron, I guess. It doesn't have a specific name. | 13:34:16 |
| 11 | Q Is the chevron a historical heraldry symbol? | 13:34:24 |
| 12 | A I guess it could be, yes. | 13:34:30 |
| 13 | Q It could be? | 13:34:33 |
| 14 | A Just about every geometric shape you can | 13:34:35 |
| 15 | possibly give me has been used on heraldry somewhere. | 13:34:37 |
| 16 | That's another huge open-ended place to go to, yeah? | 13:34:41 |
| 17 | Q So, for instance, moving up one Space Marine, | 13:34:48 |
| 18 | the one in the middle on the right. | 13:34:51 |
| 19 | A Yes. | 13:34:53 |
| 20 | Q That -- can I call it an arrowhead design? | 13:34:55 |
| 21 | A Yes. | 13:34:59 |
| 22 | Q Is that a symbol from heraldry? | 13:35:00 |
| 23 | A I don't think that one is, to tell you the | 13:35:02 |
| 24 | truth. But you might be able to prove me wrong there by | 13:35:03 |
| 25 | finding something that did have it on there. It's such | 13:35:06 |

| | | |
|---|---|---|
| 1 | a huge field. | 13:35:11 |
| 2 | Q    And the Roman numeral that's in the arrow -- | 13:35:12 |
| 3 | A    That's a Roman numeral, isn't it, you know. | 13:35:16 |
| 4 | Q    Is that used commonly in heraldry? | 13:35:18 |
| 5 | A    No, not in heraldry.  You very rarely find | 13:35:20 |
| 6 | things like those in heraldry. | 13:35:24 |
| 7 | Q    Where would you find it? | 13:35:26 |
| 8 | A    All over the place, wherever you see Roman | 13:35:27 |
| 9 | numerals, Rome. | 13:35:29 |
| 10 | Q    Did you consult any -- I'm sorry, did you refer | 13:35:59 |
| 11 | to any sources of heraldry when you were designing the | 13:36:02 |
| 12 | Space Marines? | 13:36:06 |
| 13 | A    No.  I don't sit there with a book of somebody | 13:36:07 |
| 14 | else's stuff in front of me when I'm working on | 13:36:11 |
| 15 | something else, that way less disaster. | 13:36:16 |
| 16 | MR. KEARNEY:  I think we're done with this article | 13:36:46 |
| 17 | if you want to hand it back. | 13:36:48 |
| 18 | (Exhibit 49 marked as requested.) | 13:37:35 |
| 19 | MR. KEARNEY:  Q   I'm handing you what's been marked | 13:37:37 |
| 20 | Exhibit 49, sorry, Defense Exhibit 49. | 13:37:39 |
| 21 | What is this? | 13:38:03 |
| 22 | A    Sorry? | 13:38:05 |
| 23 | Q    What is this pictured here? | 13:38:06 |
| 24 | A    What's pictured here, some Tyranids. | 13:38:09 |
| 25 | Q    What is the picture in the upper right of the | 13:38:18 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY  GOODWIN - 3/7/2012

Page 115

| | | | |
|---|---|---|---|
| 1 | Q | What are the characteristics of the illustration | 14:06:40 |
| 2 | in Exhibit 44 that make it an Ymgarl Genestealer as | | 14:06:42 |
| 3 | opposed to any other kind of Genestealer? | | 14:06:47 |
| 4 | A | The head. | 14:06:50 |
| 5 | Q | What about the head? | 14:06:51 |
| 6 | A | That head. | 14:06:52 |
| 7 | Q | Are there particular characteristics of the head | 14:06:53 |
| 8 | that distinguish it from other heads? | | 14:06:56 |
| 9 | A | Yes, the tentacles. | 14:06:59 |
| 10 | Q | Is the idea of creating a head with tentacles | 14:07:09 |
| 11 | your original idea? | | 14:07:14 |
| 12 | A | What, from this thing?  No. | 14:07:16 |
| 13 | Q | Where had you heard of or seen heads with | 14:07:26 |
| 14 | tentacles before you created your work? | | 14:07:30 |
| 15 | MR. MOSKIN:  Objection. | | 14:07:33 |
| 16 | MR. KEARNEY:  Q   You can answer. | | 14:07:36 |
| 17 | A | The reference here is to an original picture of | 14:07:41 |
| 18 | a Genestealer within Rogue Trader. | | 14:07:44 |
| 19 | Q | And who created the original picture of the | 14:07:48 |
| 20 | Genestealer within Rogue Trader? | | 14:07:50 |
| 21 | A | I think Tony Ackland, A-C-K-L-A-N-D. | 14:07:52 |
| 22 | Q | And are you aware of depictions of heads with | 14:08:08 |
| 23 | tentacles other than in the Warhammer 40,000 universe? | | 14:08:11 |
| 24 | A | Pictures of them?  I'd be pushed to think of it. | 14:08:24 |
| 25 | No, not really. | | 14:08:27 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY  GOODWIN - 3/7/2012

Page 124

| | | |
|---|---|---|
| 1 | A    Yes, well, the back one does. | 14:24:43 |
| 2 | MR. KEARNEY:  All right.  I think I'm done with | 14:25:02 |
| 3 | Exhibit 51. | 14:25:04 |
| 4 | (Exhibit 52 marked as requested.) | 14:25:42 |
| 5 | MR. KEARNEY:  Q   I'm going to show you what's been | 14:25:44 |
| 6 | marked Defense Exhibit 52.  The title at the top is, | 14:25:46 |
| 7 | Space Wolves Venerable Dreadnought. | 14:25:52 |
| 8 | The picture at the upper left part of the page, | 14:26:12 |
| 9 | do you recognize that? | 14:26:15 |
| 10 | A    I do. | 14:26:17 |
| 11 | Q    What is it? | 14:26:17 |
| 12 | A    It's a Space Wolves Venerable Dreadnought. | 14:26:18 |
| 13 | Q    Did you create that? | 14:26:22 |
| 14 | A    I did. | 14:26:23 |
| 15 | Q    Did you design it? | 14:26:23 |
| 16 | A    Sorry, I designed it, yes. | 14:26:24 |
| 17 | Q    And did you sculpt it, as well? | 14:26:26 |
| 18 | A    Yes. | 14:26:29 |
| 19 | Q    All of it? | 14:26:31 |
| 20 | A    Yes. | 14:26:32 |
| 21 | Q    Did you design the cross -- I'm sorry, strike | 14:26:39 |
| 22 | that. | 14:26:42 |
| 23 | What is the symbol on the center of the | 14:26:43 |
| 24 | Dreadnought, it looks like the chest plate? | 14:26:56 |
| 25 | A    Uh-huh. | 14:27:00 |

CONFIDENTIAL – ATTORNEYS' EYES ONLY
JEREMY   GOODWIN – 3/7/2012

Page 125

| | | |
|---|---|---|
| 1 | Q    Can you describe that? | 14:27:01 |
| 2 | A    It's a wolf's skull over two crossbones with a | 14:27:02 |
| 3 | diamond beneath it and a scroll underneath it that | 14:27:05 |
| 4 | somebody has painted some ruins on. | 14:27:11 |
| 5 | Q    Did you design that symbol? | 14:27:14 |
| 6 | A    I did. | 14:27:16 |
| 7 | Q    Did you refer to any pictures in designing that | 14:27:17 |
| 8 | symbol? | 14:27:20 |
| 9 | A    I would have looked at wolves' skulls just to | 14:27:21 |
| 10 | see how they go before you make a symbol of them. | 14:27:24 |
| 11 | Again, you have to understand the real world | 14:27:27 |
| 12 | stuff if you're going to design something imaginative. | 14:27:29 |
| 13 | Q    And I'm going to ask you if you can see it about | 14:27:38 |
| 14 | the symbol on the -- I guess it would be the figure's | 14:27:40 |
| 15 | right shoulder? | 14:27:46 |
| 16 | A    That's not included in the model.  That was a | 14:27:46 |
| 17 | transfer or somebody would have painted that on. | 14:27:49 |
| 18 | Q    If it was a transfer, do you know who would have | 14:27:55 |
| 19 | designed it? | 14:27:59 |
| 20 | A    I would. | 14:28:00 |
| 21 | Q    Did you design it? | 14:28:03 |
| 22 | A    Yes. | 14:28:05 |
| 23 | Q    And if someone painted it, what would be the | 14:28:09 |
| 24 | origin of that painting? | 14:28:12 |
| 25 | A    They'd use the reference on the -- that's | 14:28:13 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY   GOODWIN - 3/7/2012

| | | |
|---|---|---|
| 1 | Q    What are the characteristics of this figure that | 14:36:06 |
| 2 | make it a Farseer as opposed to any other kind of Eldar | 14:36:09 |
| 3 | figure? | 14:36:15 |
| 4 | A    The robes. | 14:36:15 |
| 5 | Q    Anything else? | 14:36:20 |
| 6 | A    The runic armor, R-U-N-I-C, armor, the | 14:36:21 |
| 7 | breastplate.  That distinguishes it from another Eldar. | 14:36:28 |
| 8 | Q    And when you say the breastplate, can you | 14:36:36 |
| 9 | describe what that is in this picture? | 14:36:38 |
| 10 | A    It's the area of armor that's over his chest. | 14:36:43 |
| 11 | Q    What about the breastplate is distinctive? | 14:36:45 |
| 12 | A    The fact that it appears to be made of bone, | 14:36:52 |
| 13 | it's based around a triangle, has a central gem. | 14:36:56 |
| 14 | Q    So do all Eldar Farseers have breastplates that | 14:37:11 |
| 15 | are made of bone based around a triangle with a central | 14:37:17 |
| 16 | gem? | 14:37:22 |
| 17 | A    No, not all of them.  They generally have one of | 14:37:22 |
| 18 | those, but it can be different shapes, different layout. | 14:37:25 |
| 19 | Q    Do they all have a central gem? | 14:37:36 |
| 20 | A    They tend to.  I couldn't say definitively that | 14:37:40 |
| 21 | all of them have that, but they tend to have a gem in | 14:37:43 |
| 22 | that place, tend to have a lot of gems. | 14:37:47 |
| 23 | Q    And when you say they have -- I'm sorry, strike | 14:37:56 |
| 24 | that. | 14:37:58 |
| 25 | When you say that they can have different | 14:37:59 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
JEREMY GOODWIN - 3/7/2012

Page 140

| | | |
|---|---|---|
| 1 | the small triangular area at the base of the face.  Does | 14:58:32 |
| 2 | that help? | 14:58:36 |
| 3 | Q   Yes. | 14:58:37 |
| 4 | What distinctive characteristics of a | 14:58:53 |
| 5 | warlock -- I'm sorry, strike that. | 14:58:55 |
| 6 | What distinctive characteristics distinguish an | 14:58:58 |
| 7 | Eldar Warlock from an Eldar Farseer, if any? | 14:59:02 |
| 8 | A   A single robe rather than a double one.  It | 14:59:11 |
| 9 | tends to have a helmet without a crest. | 14:59:16 |
| 10 | Q   Did you do concept art when you were designing | 14:59:39 |
| 11 | this Eldar Warlock? | 14:59:41 |
| 12 | A   Yes. | 14:59:43 |
| 13 | Q   And do you still have that concept art? | 14:59:49 |
| 14 | A   Yes. | 14:59:50 |
| 15 | Q   And did you search for that concept art? | 14:59:51 |
| 16 | A   Yes. | 14:59:53 |
| 17 | Q   If we can slow down, the court reporter will be | 14:59:53 |
| 18 | able to write it down. | 14:59:57 |
| 19 | A   I'm sorry. | 14:59:59 |
| 20 | Q   Did you search for that concept art in | 15:00:00 |
| 21 | connection with this lawsuit? | 15:00:03 |
| 22 | A   Yes. | 15:00:04 |
| 23 | Q   And did you turn that concept art over to | 15:00:05 |
| 24 | someone in connection with this lawsuit? | 15:00:08 |
| 25 | A   Yes. | 15:00:09 |

| | | |
|---|---|---|
| 1 | Q   And when you say the belt buckle, are you | 15:44:32 |
| 2 | referring to just the skull in the middle of -- | 15:44:35 |
| 3 | A   It appears to be the only thing that's there. | 15:44:38 |
| 4 | Q   What about the -- what looks like a winged skull | 15:44:41 |
| 5 | on the breastplate, did you -- | 15:44:44 |
| 6 | A   That's on the breastplate.  That's not on the | 15:44:46 |
| 7 | belt buckle, is it?  I've just said the skull belt | 15:44:49 |
| 8 | buckle. | 15:44:54 |
| 9 | Q   Did you sculpt the winged skull that appears on | 15:44:54 |
| 10 | the breastplate? | 15:44:56 |
| 11 | A   I sculpted the wings on that one, I think, but | 15:44:59 |
| 12 | it's probably got different -- yeah, I think in the | 15:45:03 |
| 13 | middle varies. | 15:45:05 |
| 14 | Q   Who sculpted the skull that appears on that | 15:45:33 |
| 15 | Space Marine?  I'm sorry, let me rephrase. | 15:45:37 |
| 16 | Who sculpted the skull that appears on the belt | 15:45:40 |
| 17 | buckle on the Space Marine on the top right? | 15:45:46 |
| 18 | A   I don't know.  I can't give you specifics for | 15:45:50 |
| 19 | those small amounts. | 15:45:51 |
| 20 | Q   Are skulls a common element in the Space | 15:45:52 |
| 21 | Marines? | 15:45:56 |
| 22 | A   They are. | 15:45:57 |
| 23 | Q   Is there a standard shape for a Space Marine | 15:45:57 |
| 24 | skull? | 15:46:00 |
| 25 | A   It's a skull.  No, I don't think it's that -- | 15:46:01 |

CONFIDENTIAL – ATTORNEYS' EYES ONLY
JEREMY  GOODWIN – 3/7/2012

Page 154

| | | |
|---|---|---|
| 1 | it's just a skull. | 15:46:05 |
| 2 | MR. MOSKIN:  Can you read back that question. | 15:46:15 |
| 3 | (question read) | 15:46:16 |
| 4 | MR. KEARNEY:  I think I'm done with Exhibit 56. | 15:46:22 |
| 5 | (Exhibit 57 marked as requested.) | 15:47:24 |
| 6 | MR. KEARNEY:  Q   I'm going to show you what's been | 15:47:24 |
| 7 | mark Defense Exhibit 57.  It's a web site printout with | 15:47:26 |
| 8 | the title, Terminator Lightning Claws, Bates No. GW | 15:47:31 |
| 9 | 0002480. | 15:47:38 |
| 10 | Do you recognize the picture that appears on | 15:48:12 |
| 11 | Exhibit 57? | 15:48:15 |
| 12 | A   I do. | 15:48:17 |
| 13 | Q   Sorry, once again. | 15:48:18 |
| 14 | A   Yes. | 15:48:20 |
| 15 | Q   And it is a Terminator Lightning Claws kit? | 15:48:20 |
| 16 | A   Yes. | 15:48:27 |
| 17 | Q   And did you design the Terminator Lightning | 15:48:33 |
| 18 | Claws? | 15:48:36 |
| 19 | A   I did these ones, yes, I did. | 15:48:38 |
| 20 | Q   Did you design others, as well? | 15:48:41 |
| 21 | A   Yes. | 15:48:43 |
| 22 | Q   How many others? | 15:48:48 |
| 23 | A   Two or three. | 15:48:53 |
| 24 | Q   Has anyone else designed Terminator Lightning | 15:48:58 |
| 25 | Claws? | 15:49:02 |

CONFIDENTIAL – ATTORNEYS' EYES ONLY
JEREMY  GOODWIN – 3/7/2012

Page 184

```
 1      STATE OF ILLINOIS   )
                            )    ss:
 2         COUNTY OF COOK   )

 3

 4

 5           The within and foregoing deposition of the

 6      aforementioned witness was taken before TRACY L.

 7      BLASZAK, CSR, CRR, and Notary Public, at the place, date

 8      and time aforementioned.

 9           There were present during the taking of the

10      deposition the previously named counsel.

11           The said witness was first duly sworn and was

12      then examined upon oral interrogatories; the questions

13      and answers were taken down in shorthand by the

14      undersigned, acting as stenographer and Notary Public;

15      and the within and foregoing is a true, accurate and

16      complete record of all of the questions asked of and

17      answers made by the aforementioned witness, at the time

18      and place hereinabove referred to.

19           The undersigned is not interested in the within

20      case, nor of kin or counsel to any of the parties.

21

22

23

24

25
```

1          Witness my official signature and seal as

2    Notary Public in and for Cook County, Illinois, on this

3    __20__ day of _____March_____, A.D. 2012.

4

5

6

7

8          *Tracy L. Blaszak*
           TRACY L. BLASZAK, CSR, CRR
9          Illinois CSR No. 084-002978

           OFFICIAL SEAL
           TRACY L BLASZAK
10         NOTARY PUBLIC - STATE OF ILLINOIS
           MY COMMISSION EXPIRES:03/23/15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 11



# OPUS|2

## INTERNATIONAL

Games Workshop Ltd. v. Chapterhouse Studios LLC & Ors

Deposition of John Blanche

April 2, 2012

Opus 2 International - Official Court Reporters

Phone:     +44 (0)20 3008 5900
Email:     depos@opus2international.com
Website:   http://www.opus2international.com

ORIGINAL

1        **Q**    When did the development for Warhammer

2    40K start?

3        **A**    It was a very fast process, so it would

4    be 1986, perhaps 85.

5        **Q**    Who was involved in the development?

6        **A**    Same team of people as Warhammer, that

7    would be Bryan Ansell, Alan Merrett, Rick Priestley.

8        **Q**    Again, just for the record, so we have a

9    clarification there, what is the main differences

10   between Warhammer and Warhammer 40K?

11       **A**    Warhammer is a fantasy game and 40K is a

12   fantasy game set in a futuristic universe.  So it has

13   very similar fantasy races but they have more

14   technology.

15       **Q**    What were some of influences for this

16   futuristic universe for Warhammer 40K?

17       **A**    The fantasy game of Warhammer itself was

18   the main driving force behind that.  Being an artist,

19   the influences are constant and many fold.  I have

20   points of reference or points of references that

21   constantly inspire me on an artistic and creative

22   basis.

23       **Q**    What were some, outside of the original

24   Warhammer game, what were some of the points of

25   references for the Warhammer 40K game?

1          Q    Do you have any idea if he was ever an

2    employee of Games Workshop?

3          A    I believe he was a sculptor for a while.

4          Q    But you don't know for sure?

5          A    I think for sure that he was but I don't

6    recall him.

7          Q    Chris Trevas?

8          A    I don't know the name, sorry.

9          Q    Clint Langley?

10         A    I know the name but I know him as a

11   freelance artist for the Black Library, and certainly

12   never had anything to do with him myself.

13         Q    Do you know what he did for the Black

14   Library?

15         A    I recognize his style but I couldn't

16   name any specific works.

17         Q    So he is a freelance artist?

18         A    I believe so.

19         Q    So provides illustrations?

20         A    Yes.

21         Q    Would he have done book covers?

22         A    Yes, book covers.

23         Q    Anything else that you recall?

24         A    Not that I know of.

25         Q    Eric Ren?

1      Realm of Chaos, which came after 40K.

2              Q     And what is the clarification -- what is

3      Realm of Chaos?

4              A     Realm of Chaos is a game that focuses on

5      characters and creatures from a parallel universe to

6      the world, which is known as Realm of Chaos, and they

7      involved both Warhammer and the Warhammer 40,000 game.

8              Q     And when was Realm of Chaos first

9      published?

10             A     Some time after 40K.

11             Q     When you say some time, approximately

12     couple of months, couple of years?

13             A     Couple of years.

14             Q     So maybe early 90s?

15             A     Possibly.

16             Q     But it is not something as recently as

17     two or three years ago?

18             A     No.

19             Q     Was Gary Chalk a freelancer?

20             A     He was, yes.

21             Q     Do you know if he was ever an employee?

22             A     I believe he might have been.

23             Q     But you don't know for sure?

24             A     I don't know for sure.  Again, his

25     connection would be from the London office and the

```
 1              CERTIFICATE OF COURT REPORTER

 2

 3      I, AILSA WILLIAMS, an Accredited LiveNote Reporter

 4      with Opus 2 International, hereby certify that John

 5      Blanche was duly sworn, that I took the Stenograph

 6      notes of the foregoing deposition and that the

 7      transcript thereof is a true and accurate record

 8      transcribed to the best of my skill and ability.  I

 9      further certify that I am neither counsel for, related

10      to, nor employed by any of the parties to the action

11      in which the deposition was taken, and that I am not a

12      relative or employee of any attorney or counsel

13      employed by the parties hereto, nor financially or

14      otherwise interested in the outcome of the action.

15

16

17

18

19              A.Y. Will

20      Signed:  . . . . . . . . . . . . . . . . . . . . . .

21      AILSA WILLIAMS

22      Dated:   3rd April 2012

23

24

25
```

1

2                          E R R A T A

3                  Deposition of John Blanche

4        (Please show all corrections on this page, not in the

5        transcript.)

6        Page/Line No.        Description        Reason for

7        change

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22        Signed:    ...................

23        Name:    John Blanche

24        Date:        ...................

25

# EXHIBIT 12

Highly Confidential - AEO



GAMES WORKSHOP®
www.games-workshop.com

Warning! Not suitable for children under 36 months. Choking Hazard due to small parts. Caution: The item contains essential pointed components. Citadel miniatures are fine scale models designed for gamers and collectors. Retain packaging for future reference. Games Workshop recommends this product for ages 12 and over.

Attention! Ne convient pas à des enfants de moins de 36 mois. Risque d'étouffement à cause de petites pièces. Attention: contient des éléments pointus. Les figurines Citadel sont conçues pour les joueurs et les collectionneurs. Conservez cet emballage pour référence. Âge recommandé par Games Workshop : 12 ans et plus.

Achtung! Wegen verschluckbarer Kleinteile nicht für Kinder unter 3 Jahren geeignet. Vorsicht: Dieses Produkt enthält spitze Teile. Citadel Miniaturen sind detailierte Modelle für Spieler und Sammler. Verpackung bitte zur Spielerion Referenz aufbewahren. Games Workshop empfiehlt dieses Produkt ab einem Alter von 12 Jahren.

¡Atención! No es recomendable para niños menores de 36 meses. Riesgo de asfixia debido a componentes pequeños. Cuidado: Este artículo contiene componentes afilados. Las miniaturas Citadel están diseñadas para jugadores y coleccionistas. Conserve esta caja para cualquier referencia. Games Workshop recomienda este producto para mayores de 12 años.

Attenzione! Prodotto non adatto a bambini sotto i 13 anni. Pericolo di soffocamento dovuto a componenti piccoli e appuntiti. Le miniature Citadel sono modelli in scala creati per giocatori e collezionisti. Conserva la confezione per riferimenti futuri. Games Workshop consiglia questo prodotto ad un pubblico maggiore di 12 anni.

Waarschuwing! Niet geschikt voor kinderen onder de 36 maanden. Gevaar voor verstikking door kleine onderdelen. Opgepast: Dit onderdeel bevat puntige onderdelen. Citadel Miniaturen zijn gedetailleerde modellen voor spelers en verzamelaars. Bewaar de verpakking voor latere naslag op Games Workshop beveelt dit product aan vanaf de leeftijd van 12 jaar.

警告！本製品は3歳未満のお子様には適していません。先の尖った細かいパーツを含んでおりますのでご注意ください。シタデルミニチュアはゲームやコレクション用にデザインされたスケールモデルです。パッケージは今後の参照のために大切に保管してください。ゲームズワークショップは12才以上のお子様を対象にしています。





WARHAMMER
40,000

12+ CE ♻

WARHAMMER®
NEW LINE CINEMA





- Store 9906010412 3

5 011921 001729

ELDAR WARLOCK WITH WITCHBLADE
Warehouse: 9906010412301
Batch: 885141     Made in UK

UK
Games Workshop
Willow Road, Lenton,
Nottingham,
NG7 2WS

North America
Games Workshop
23 Liverpool Street
Glen Burnie, Maryland
21060-6401

Australia
Games Workshop
23 Liverpool Street

France
Games Workshop
New South Wales 2565

Italia
Games Workshop
Via al Centro Prourio 2/B
00044 Frascati, Rome

España
Games Workshop
C/ Pau Claris nº 25
Barcelona 08010

Southern Ireland
Games Workshop
Willow Road, Lenton
Nottingham
NG7 2WS

Deutschland
Games Workshop
40215 Düsseldorf

日本
Games Workshop
103-0027
東京都中央区

Copyright © Games Workshop Limited 2010 excepting all materials pertaining to the New Line theatrical productions: The Fellowship of the Ring, The Two Towers, and The Return of the King. All such materials © New Line Productions, Inc. All Rights Reserved. The Watermark logo, The Lord of the Rings, The Fellowship of the Ring, The Two Towers, The Return of the King and the names of the characters, items, events and places therein are trademarks of The Saul Zaentz Company d/b/a Tolkien Enterprises under license to New Line Productions, Inc. and Games Workshop Ltd. All Rights Reserved. Games Workshop, the Games Workshop logo, 'Eavy Metal, Citadel and the Citadel device are either ® TM and/or © Games Workshop Ltd 2000–2010, variably registered in the UK and other countries around the world. All Rights Reserved.

Highly Confidential - AEO



GW0000494B

# EXHIBIT 13

CERTIFIED COPY

# In The Matter Of:

## *GAMES WORKSHOP LIMITED,*
### *v.*
## *CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES,*

---

## *NEIL J. HODGSON - Vol. 1  30(B)(6)*
### *March 5, 2012*

---

# *CONFIDENTIAL - ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

CONFIDENTIAL - ATTORNEYS' EYES ONLY
NEIL J.  HODGSON - 3/5/2012

Page 38

| | | |
|---|---|---|
| 1 | Workshop? | 10:30:15 |
| 2 | A    Oh, absolutely, yes.  I mean, he is our art | 10:30:16 |
| 3 | director. | 10:30:22 |
| 4 | Q    And how often do you communicate with John | 10:30:23 |
| 5 | Blanche? | 10:30:25 |
| 6 | A    When he is in. | 10:30:27 |
| 7 | Q    Do you communicate with him by phone or e-mail? | 10:30:30 |
| 8 | A    No. | 10:30:36 |
| 9 | Q    Do you communicate with Dave Gallagher by phone | 10:30:40 |
| 10 | or e-mail? | 10:30:43 |
| 11 | A    No. | 10:30:44 |
| 12 | Q    What reference materials do you use? | 10:30:57 |
| 13 | MR. MOSKIN:  Objection to form, but you can answer. | 10:31:03 |
| 14 | MR. OH:  Q   I'll rephrase. | 10:31:07 |
| 15 | Do you use reference materials as part of your | 10:31:08 |
| 16 | work? | 10:31:11 |
| 17 | A    Yes. | 10:31:11 |
| 18 | Q    Can you describe the reference materials you | 10:31:12 |
| 19 | use? | 10:31:14 |
| 20 | A    Yes, everybody who works in the studio or most | 10:31:15 |
| 21 | of the creative people who work in the studio and some | 10:31:19 |
| 22 | have a library of books like medieval armor and stuff | 10:31:29 |
| 23 | like that through the ages and flavor pieces, really. | 10:31:36 |
| 24 | Q    Now, when you say flavor pieces, what do you | 10:31:40 |
| 25 | mean by that? | 10:31:42 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
NEIL J.  HODGSON - 3/5/2012

Page 39

| | | |
|---|---|---|
| 1 | A   It's to get reference for shapes of armor or how | 10:31:43 |
| 2 | armor will fit together so you can see that when you | 10:31:57 |
| 3 | draw maybe something like that, how it's supposed to | 10:31:59 |
| 4 | hang on a body properly and all that kind of stuff, so. | 10:32:01 |
| 5 | Q   Are there other type of reference material that | 10:32:10 |
| 6 | you use besides the ones related to armor? | 10:32:11 |
| 7 | A   Weapons, tanks, World War II, World War I, | 10:32:14 |
| 8 | classic, all sorts, so. | 10:32:21 |
| 9 | Q   Anything else you can think of? | 10:32:25 |
| 10 | A   I use the Internet sometimes, as well, to | 10:32:44 |
| 11 | reference things, but I generally try not to do that. | 10:32:46 |
| 12 | Q   What type of things on the Internet would you | 10:32:49 |
| 13 | try to reference? | 10:32:53 |
| 14 | A   I generally use it to search through our archive | 10:33:10 |
| 15 | stuff because it's easier to call up an image on the | 10:33:14 |
| 16 | screen rather than try and troll through hundreds of | 10:33:17 |
| 17 | issues, back issues of White Dwarf. | 10:33:23 |
| 18 | Q   You would use previously published Games | 10:33:27 |
| 19 | Workshop material as a reference? | 10:33:29 |
| 20 | A   Absolutely. | 10:33:33 |
| 21 | Q   Anything else through the Internet that you use | 10:33:35 |
| 22 | as a reference? | 10:33:37 |
| 23 | A   Not that I could cite and give a specific | 10:33:44 |
| 24 | example of, no, no.  Google images is great for seeing | 10:33:49 |
| 25 | what things look like, generally. | 10:33:56 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
NEIL J.  HODGSON - 3/5/2012

| | | | |
|---|---|---|---|
| 1 | Q | Can you give me an example of something on a | 10:33:57 |
| 2 | Google image you looked at to see what it looked like? | | 10:34:02 |
| 3 | A | No. | 10:34:05 |
| 4 | Q | But it is something you have used as part of | 10:34:06 |
| 5 | your work? | | 10:34:08 |
| 6 | A | Yes, sure. | 10:34:08 |
| 7 | Q | And based on your experience at work, has other | 10:34:12 |
| 8 | people at -- the other artists at Games Workshop also | | 10:34:15 |
| 9 | used Google images? | | 10:34:18 |
| 10 | A | I don't know. | 10:34:22 |
| 11 | Q | Do you use a computer at work? | 10:34:23 |
| 12 | A | Yes. | 10:34:24 |
| 13 | Q | And you will look at, on occasions, Google | 10:34:25 |
| 14 | images as reference materials at work as a part of your | | 10:34:29 |
| 15 | job?  Actually, I'll strike that question. | | 10:34:32 |
| 16 | | Do you have a personal library at work, a | 10:34:51 |
| 17 | reference library that you use at work? | | 10:34:54 |
| 18 | A | No, not a personal one. | 10:34:56 |
| 19 | Q | And is there a reference library -- | 10:34:59 |
| 20 | A | We have a collection of books.  You wouldn't | 10:35:03 |
| 21 | exactly call it a great library, but, yes. | | 10:35:05 |
| 22 | Q | And is that something maintained by a specific | 10:35:07 |
| 23 | person or is it -- | | 10:35:09 |
| 24 | A | No. | 10:35:11 |
| 25 | Q | Can you describe what that is? | 10:35:14 |

CONFIDENTIAL – ATTORNEYS' EYES ONLY
NEIL J.   HODGSON – 3/5/2012

| | | | |
|---|---|---|---|
| 1 | A | It tends to be -- I think we've got -- we had a | 10:35:17 |
| 2 | | subscription to National Geographics.  We have that as | 10:35:26 |
| 3 | | a -- we have that as a reference. | 10:35:33 |
| 4 | | We have -- and, then, just, as I said, all the | 10:35:35 |
| 5 | | books, there is an interesting texture in this book or, | 10:35:40 |
| 6 | | you know, look at the way that the rust is hanging off | 10:35:45 |
| 7 | | of that old tank, that kind of stuff.  It's a technique | 10:35:47 |
| 8 | | and detail kind of thing. | 10:35:55 |
| 9 | Q | And if you had to estimate, how many of these | 10:35:57 |
| 10 | | types of reference books are there at work? | 10:35:59 |
| 11 | A | I couldn't because they're all over the place. | 10:36:04 |
| 12 | Q | More than five? | 10:36:07 |
| 13 | A | Yes. | 10:36:09 |
| 14 | Q | More than 25? | 10:36:11 |
| 15 | A | Probably. | 10:36:12 |
| 16 | Q | And based on your experience at work, who uses | 10:36:23 |
| 17 | | these reference materials? | 10:36:25 |
| 18 | A | Most people I should think. | 10:36:35 |
| 19 | Q | You also mentioned before you use other artists | 10:36:40 |
| 20 | | as reference? | 10:36:43 |
| 21 | A | Yes. | 10:36:45 |
| 22 | Q | And can you clarify what you mean by that? | 10:36:45 |
| 23 | A | Our in-house staff. | 10:36:48 |
| 24 | Q | And would they provide you a sketch or something | 10:36:51 |
| 25 | | written to use as a reference material?  Or I'm trying | 10:36:59 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
NEIL J.  HODGSON - 3/5/2012

| | | | |
|---|---|---|---|
| 1 | Q | Are there other heraldic rules? | 11:40:12 |
| 2 | A | Not that I conform to, no, but there may be. | 11:40:22 |
| 3 | | It's an ancient and venerable art form.  So there could | 11:40:27 |
| 4 | | be, but I'm not a herald, so I couldn't tell you. | 11:40:31 |
| 5 | Q | Are there any -- Well, strike that. | 11:41:07 |
| 6 | | Are you familiar with some traditional examples | 11:41:11 |
| 7 | | of symbols used with heraldry? | 11:41:17 |
| 8 | | MR. MOSKIN:  Objection. | 11:41:20 |
| 9 | | You can answer. | 11:41:22 |
| 10 | | MR. OH:  Q   I'll rephrase. | 11:41:29 |
| 11 | | Before you mentioned a fleur-de-lis? | 11:41:31 |
| 12 | A | Fleur-de-lis. | 11:41:34 |
| 13 | Q | Can you explain what that is? | 11:41:35 |
| 14 | A | It's an ancient symbol.  It's a three -- It's a | 11:41:38 |
| 15 | | central spike with two curved spikes coming off of it | 11:41:47 |
| 16 | | that's been used in heraldry for hundreds of years. | 11:41:52 |
| 17 | Q | Are there other symbols you can think of that | 11:41:56 |
| 18 | | are like that? | 11:41:59 |
| 19 | A | Pick a shape, it's been used. | 11:42:01 |
| 20 | Q | Lions? | 11:42:13 |
| 21 | A | Yes. | 11:42:14 |
| 22 | Q | Griffins? | 11:42:15 |
| 23 | A | Yes. | 11:42:16 |
| 24 | Q | Crosses? | 11:42:17 |
| 25 | A | Yes. | 11:42:18 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
NEIL J.  HODGSON - 3/5/2012

| | | | |
|---|---|---|---|
| 1 | Q | Skulls? | 11:42:32 |
| 2 | A | Yes. | 11:42:33 |
| 3 | Q | Circles? | 11:42:37 |
| 4 | A | Yes. | 11:42:38 |
| 5 | Q | Triangles? | 11:42:39 |
| 6 | A | Yes. | 11:42:40 |
| 7 | Q | Roman numerals? | 11:42:43 |
| 8 | A | Yes. | 11:42:44 |
| 9 | Q | And use of all these symbols dates back to the | 11:42:55 |
| 10 | | ancient form of heraldry? | 11:42:59 |
| 11 | A | Yes. | 11:43:03 |
| 12 | Q | Dragons? | 11:43:49 |
| 13 | A | Yes. | 11:43:51 |
| 14 | Q | Salamanders?  Or I'll strike that. | 11:43:51 |
| 15 | | MR. OH:  I'm going to hand you an exhibit that will | 11:44:02 |
| 16 | | be marked 23. | 11:44:08 |
| 17 | | (Exhibit 23 marked as requested.) | 11:44:13 |
| 18 | | MR. OH:  Q   Do you recognize this? | 11:44:52 |
| 19 | A | Yes. | 11:44:54 |
| 20 | Q | And, for the record, these are Bates labeled | 11:44:54 |
| 21 | | pages GW 0001726 through 27.  What is it?  What is this? | 11:44:57 |
| 22 | A | What is this?  This looks like it was a | 11:45:06 |
| 23 | | reproduction of a poster that I did, and I think it went | 11:45:16 |
| 24 | | into one of our book products. | 11:45:20 |
| 25 | Q | And was -- The copy in front of you is in black | 11:45:22 |

CONFIDENTIAL – ATTORNEYS' EYES ONLY
NEIL J.  HODGSON – 3/5/2012

| | | | |
|---|---|---|---|
| 1 | | and white? | 11:45:25 |
| 2 | A | Yes. | 11:45:26 |
| 3 | Q | Was the original in black and white? | 11:45:26 |
| 4 | A | No. | 11:45:27 |
| 5 | Q | Were snakes also used as heraldry symbols or | 11:45:45 |
| 6 | | heraldic symbols? | 11:45:52 |
| 7 | A | I believe they were, yes. | 11:45:54 |
| 8 | Q | Eagles or birds? | 11:45:55 |
| 9 | A | Yes, yes. | 11:45:57 |
| 10 | Q | And did you create all the -- what -- Well, let | 11:46:16 |
| 11 | | me rephrase the question. | 11:46:20 |
| 12 | | What did you create in this poster? | 11:46:22 |
| 13 | A | Some of the designs were created by me, some of | 11:46:31 |
| 14 | | the -- it was all drawn and rendered by me. | 11:46:37 |
| 15 | Q | And what do you mean by some of the designs were | 11:46:48 |
| 16 | | created by you? | 11:46:51 |
| 17 | A | There was, I believe, 99 Space Marines on this, | 11:46:54 |
| 18 | | and I think approximately 60 already existed.  And so | 11:46:59 |
| 19 | | the other ones were created for this. | 11:47:05 |
| 20 | Q | Do you recognize which ones you created versus | 11:47:12 |
| 21 | | which ones preexisted? | 11:47:15 |
| 22 | A | Maybe.  There was quite a lot. | 11:47:19 |
| 23 | Q | And you mentioned you rendered and drew | 11:47:32 |
| 24 | | everything on this poster? | 11:47:35 |
| 25 | A | Yes. | 11:47:36 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
NEIL J.  HODGSON - 3/5/2012

| | | | |
|---|---|---|---|
| 1 | Q | Did you create that design? | 11:52:42 |
| 2 | A | No, that was a preexisting design. | 11:52:45 |
| 3 | Q | Do you know who did that? | 11:52:47 |
| 4 | A | Originally I think I can recall where I first | 11:52:49 |
| 5 | | saw it, but who did it, no. | 11:52:57 |
| 6 | Q | Where did you first see it? | 11:53:00 |
| 7 | A | I think it was issue 101 of White Dwarf. | 11:53:02 |
| 8 | Q | The image is kind of murky on the copy we have | 11:53:10 |
| 9 | | here.  Do you remember what's depicted on that oval | 11:53:14 |
| 10 | | shaped -- it's kind of like a half oval? | 11:53:18 |
| 11 | A | The shoulder pads. | 11:53:25 |
| 12 | Q | Okay.  And so do you remember what was depicted | 11:53:26 |
| 13 | | on that shoulder pad? | 11:53:28 |
| 14 | A | Yes, it's a rampant griffin. | 11:53:29 |
| 15 | Q | What's a rampant griffin? | 11:53:32 |
| 16 | A | It goes back to heraldry of depending on what | 11:53:35 |
| 17 | | the creature is doing depends on what kind of -- what | 11:53:37 |
| 18 | | title it's given.  So stood upright with claws out is | 11:53:40 |
| 19 | | rampant. | 11:53:47 |
| 20 | Q | And do you know who came up with the name? | 11:53:48 |
| 21 | A | No. | 11:53:50 |
| 22 | Q | It wasn't you, though? | 11:53:52 |
| 23 | A | No.  It was before I worked at Games Workshop. | 11:53:53 |
| 24 | Q | If you turn to the first page, do you see | 11:54:12 |
| 25 | | something called the Iron Snakes? | 11:54:16 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
NEIL J.  HODGSON - 3/5/2012

```
 1     STATE OF ILLINOIS    )
                            )   ss:
 2        COUNTY OF COOK    )

 3

 4

 5          The within and foregoing deposition of the

 6     aforementioned witness was taken before TRACY L.

 7     BLASZAK, CSR, CRR, and Notary Public, at the place, date

 8     and time aforementioned.

 9          There were present during the taking of the

10     deposition the previously named counsel.

11          The said witness was first duly sworn and was

12     then examined upon oral interrogatories; the questions

13     and answers were taken down in shorthand by the

14     undersigned, acting as stenographer and Notary Public;

15     and the within and foregoing is a true, accurate and

16     complete record of all of the questions asked of and

17     answers made by the aforementioned witness, at the time

18     and place hereinabove referred to.

19          The undersigned is not interested in the within

20     case, nor of kin or counsel to any of the parties.

21

22

23          _____

24

25
```

CONFIDENTIAL – ATTORNEYS' EYES ONLY
NEIL J.  HODGSON – 3/5/2012

```
 1              Witness my official signature and seal as

 2      Notary Public in and for Cook County, Illinois, on this

 3      19   day of    March          , A.D. 2012 .

 4

 5

 6

 7

 8                     Tracy L. Blaszak
                    TRACY L. BLASZAK, CSR, CRR
 9              Illinois CSR No. 084-002978

10                      OFFICIAL SEAL
                        TRACY L BLASZAK
                 NOTARY PUBLIC - STATE OF ILLINOIS
11               MY COMMISSION EXPIRES:03/23/15

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 14

**Rule 26(a)(2)(B) Expert Report of William F. N. Brewster**

**May 1, 2012**

**in**

**Games Workshop Limited v. Chapterhouse Studios LLC**

## I.      INTRODUCTION

I am engaged as an expert witness by counsel for Defendant Chapterhouse Studios LLC ("Chapterhouse") to provide expert analysis to determine if the product designs and imagery which are at issue in this case generally fall into the area of known military equipment and depict symbols associated with existing historical examples and concepts of pattern and heraldry.

I have been engaged as an expert by Chapterhouse to use my personal and professional experience, and knowledge and expertise to review, study and analyze the evidence in this case, and provide certain opinions on substantive issues.  This report summarizes my analysis and conclusions.

If called to testify in this litigation, I expect to give testimony regarding the opinions expressed in this report and my basis for the opinions.  I may give additional testimony on these topics based on documents, issues, opinions, or testimony that may have not yet been identified or created.  In addition, I continue to examine documents and may reach opinions about those in the process.  I may give additional testimony depending upon the opinions expressed by Plaintiff's retained experts and witnesses if any.  I may modify the conclusions in this report if new, relevant information comes to my attention before or during trial.  I reserve the right to amend this report under such conditions or other appropriate circumstances.  I may assist in the development of demonstration materials to support and explain my opinions.  At or before trial, I may use any of the materials referred to in this report, including any of the documents and other information reviewed by me or made available to me as exhibits to support my opinions.  I may also create summaries of documents and other information reviewed by me, or made available to me, to support my opinions.  At trial, I may convey my testimony using images or other demonstratives.

The analysis was conducted through the examination of images of the various Games Workshop products identified as at issue in this litigation, which I understand are summarized on

Exhibit A to Games Workshop Ltd's Answer to Interrogatory No. 1 ("Games Workshop's Exhibit A") and comparing them to photographs (and in some cases original examples) of military insignia and equipment.  I have also reviewed photographs of the Chapterhouse products that I understand to be at issue in this case that were provided to me by Chapterhouse's counsel, Winston & Strawn LLP.  After examining images of the insignia and symbols, body armour, weapons, and machines claimed by Games Workshop, I find them to be in keeping with previously existing examples known within actual military material culture.

I am the Curator of Collections for the First Division Museum at Cantigny Park in Wheaton, Illinois (hereafter FDM). I have been employed by FDM in this capacity since February 2011. For the previous sixteen years I served as the Curator of Collections for the Wisconsin Veterans Museum in Madison (hereafter WVM). During my time in the field, I have developed a broad expertise and knowledge in the area of military material culture with a special focus on field uniforms and equipment.  The military object collection at FDM currently numbers 15,000 pieces.  The military object collection at WVM currently numbers 27,000 pieces. During my tenure at WVM I oversaw collection growth of 75 percent. While employed by WVM, I authored more than forty articles for the museum publication, The Bugle, and regularly lectured at the university, college, and professional level on the nature of military museum collections and military material culture.   My current resume and c.v. is attached to this report as Exhibit A.

I am only being compensated for lost wages and expenses incurred by me due to and during the period of testimony.  My employer has granted me permission to participate in this process and further allows me to conduct a reasonable amount of research and background documentation during regular work hours.

The following analysis reflects my conclusions based on my opinions and documentation obtained through multiple years of professional exposure to military material culture and a

variety of printed sources. The assessment is based on photographic examples found in these printed texts.  I will present in order, an examination of body armour and shield design, weapons and the insignia.

## II.       CONCLUSION

Following my examination of the relevant documents, I am prepared to testify on the following opinions. That the insignia, heraldry, equipment pattern and design used by Games Workshop, are compatible with and not markedly dissimilar from those elements found to exist previously within the world of military material culture. That the models Games Workshop creates incorporates patterns and designs of insignia, heraldry, and equipment that are documented to exist either currently or in the past outside of the world of fantasy gaming.

## III.      ANALYSIS

Games Workshop's Exhibit A includes references to Games Workshop products, many of which fall into categories of known military equipment and incorporate symbols from the world of military material culture.  Following are some of the more prominent examples.

1.  Shoulder Pads. Shoulder pads, (historically known as Shoulder Cops) are the most common item thematically amongst the various pieces considered in this examination. While the use of armour for the head, body and legs dates to at least the 6th Century B.C., the use of protective shoulder pads reasonably dates to the 14th Century. It is during the 15th -16th Centuries that full body armour saw extensive use in Europe and the shoulder pad became an integral component of personal protective systems. The use of shoulder pads generally fell out of favor with the diminished use of body armour following the introduction of firearms; however, 20th -21st Century incarnations of ballistic body armour have seen a reintroduction of more complete coverage including shoulder pads.

-4-

Shoulder pads are now incorporated into protective body armour. The appearance of shoulder pads through the history of personal body armour is common and wholly unremarkable. (Dean 25-35, 156-157; Halberstadt 76-80; Stone 250, Fig. 309, 563; Tarassuk 22-46). I find the Games Workshop and Chapterhouse Studios shoulder pads in keeping with previously existing examples.

2. Shields. The use of shields in combat predates recorded history. While they take many forms, traditional shields will be seen in square, round, oval, rectangular and what is known as the "heater shape". The last style is where there are three sides with the two vertically oriented sides curving to a point at the bottom. Another design element encountered is a notch or "bouche" which allows for the projection of a weapon through a circular opening in the upper right hand corner of the shield. This feature may be seen in German manufacture by the 15th Century. The application of decorative elements to the face of shields is common. (Stone 128, 207-208, 555-557; Tarassuk 422-423). I find the Games Workshop and Chapterhouse Studios shields in keeping with previously existing examples.

3. War Hammers. The use of various forms of hammers and axes as weapons in ancient warfare is very well documented. A combination of striking and thrusting elements is typical in historic examples. The lines of these elements on actual weapons are more refined, while the incorporation of larger hammer-heads is more the stuff of artistic fantasy creations which appear during the late 20th Century. (Stone 278-279; Tarassuk 499-500).

4. Firearms. The Games Workshop and Chapterhouse weapons systems presented are essentially patterned following design elements that may be found in most 20th Century automatic and semi-automatic rifles. The receiver group of the weapons is a common design resembling the Belgium FAL series, the Czech Model 61, the German FG42, and of course the Russian AK47. The barrel or "attachment" assemblies are variations on, or combinations of, traditional designs that most closely resemble various forms of flash suppressors and compensators found on the German FG42, G41 and GEW41, Hungarian AMD65, and the U.S. M1928A1; while the grenade launchers referenced by Games Workshop resemble the U.S. XM148/M203 system. (Ezell 243-248, 387-389, 476 507-508, 511-512, 706-713, 831; Hogg 162, 241-242, 246-248, 257;  Schwing 136-137, 141-142, 271, 290)

5. Decorative Elements. The majority of decorative elements presented in the images referenced on Games Workshop's Exhibit A have long been used in recorded civilian and military history. The integration and application of the various elements on components of body armour is well documented. Further, the surmounting and overlapping of multiple design elements upon one another is a common practice. Eagles (and other birds of prey), griffins, lions, crowns, wreaths, hands, arrows and spears, scales, and serpents are all encountered within the range of decoration incorporated for military purposes on Roman and Medieval body armour, shields and military standards. Further, the use of these figural designs is commonly found in the heraldic crests associated with United States Army distinctive insignia. (Kraus 34, 35, 37, 53, 269; Maxfield pls. 2a-c, 4a, 5a, c-d, 7b, 11a; Stein pls. 2, 4, 12; Stone Fig 26, 29, 34, 556, 713, 719)

Geometric Forms. Arrows and chevrons as an incorporated geometric design are encountered in 20th Century military insignia. In particular, the distinctive insignia and

shoulder sleeve insignia of the United States Army makes general use of arrows and chevrons in their heraldic design.  (Stein pls. 4, 5, 7, 8, 9, 12, 14, 67, 68, 12)

Skulls. Skulls are encountered in military decoration used by the German Imperial Army and the German Army of the Third Reich. They are also found on insignia associated with United States Army Special Forces during the Vietnam Conflict. (Britton 45; Kraus 12, 37, 53, 269, 361, 364; Tucker 318-331, 338-339, 342-347, 349)

Cruciform. Encountered on early Lolo armour from China, the cruciform can be found in many incarnations. Particularly frequent appearances occur within the makeup of United State Army heraldic insignia. The particular form of arrow cross that appears in Games Workshop imagery (for example in the images referenced at Games Workshop's Exhibit A 46-48) is associated with national socialist/neo-Nazi ideology immediately post-dating World War II. (Stein pls. 2, 6, 16, 68; Stone, Fig. 76)

Gear. The gear symbol referenced at Games Workshop's Exhibit A 69 is generally associated with socialist political philosophy. In this context it is seen incorporated into civil badges and decorations of the Nazi Party and recent non-militarist socialist organizations such as the Red Wedge. (Angolia 91-104)

Roman Numeral. The use of Roman numerals is common in 20th Century military material culture and particularly United State insignia. (Britton 1, 2, 3, 22, 23, 34, 48)

In summation, it is quite apparent that the range of equipment, weaponry and decorative elements claimed by Games Workshop in this litigation has long existed within the real world of international militaries. The use of decorative elements in combination and surmounting other

elements is neither new nor innovative. And, this is not including an examination of graphic and design materials presented over the four decades in the world of fantasy gaming. In my opinion, I find there are no remarkable or original presentations of material.

Respectfully,

_/s/ William F.N. Brewster_

William F.N. Brewster

Dated: May 1, 2012

Sources:

Angolia, John R. *For Fuhrer and Fatherland Political & Civil Awards of the Third Reich*. San Jose, CA: R. James Bender Publishing. 1978. Print

Britton, Jack, and George Washington Jr. *U.S. Military Shoulder Patches of the United States Armed Forces, Third Edition*. Tulsa, OK: M.C.N. Press. 1981. Print

Dean, Bashford. *Helmets and Body Armor in Modern Warfare*. Tuckahoe, NY: Carl J. Pugliese. 1977. Print

Ezell, Edward Clinton. *Small Arms of the World*. New York: Barnes and Noble Books. 1993. Print

Hogg, Ivan V, and John S. Weeks. *Military Small Arms of the 20th Century*. Iola, WI: Krause Publications. 2000. Print

Halberstadt, Hans. *Battle Rattle*. St. Paul, MN: MBI Publishing Company. 2006. Print

-8-

Kraus, Jurgen. *The German Army in the First world War*. Vienna. Stefan Rest. 2004. Print

Maxfield, Valerie A. *The Military Decorations of the Roman Army*. Berkeley, CA: University of California Press. 1981. Print

Stein, Barry Jason. *U.S. Army Heraldic Crests*. Columbia, SC: University of South Carolina Press. 1993. Print

Stone, Cameron George. *A Glossary of the Construction, Decoration and Use of Arms and Armor*. New York: Jack Brussel. 1961. Print

Tarassuk, Leonid, and Claude Blair. *The Complete Encyclopedia of Arms & Weapons*. Italy: Bonanza Books. 1986. Print

Tucker, Michael F. *History on Their Shoulders*. Port St. Lucie, FL: MilSpec Publishing. 2010. Print

# EXHIBIT 15

Highly Confidential - AEO

# GAMES WORKSHOP®

www.games-workshop.com





12+  CE

**Warning!** Not suitable for children under 36 months. Choking hazard due to small parts. Caution. This item contains essential pointed components. Citadel Miniatures are one scale models designed for gamers and collectors. Retain packaging for future reference. Games Workshop recommends this product for ages 12 and over.

**Achtung!** Wegen verschluckbarer Kleinteile nicht für Kinder unter 3 Jahren geeignet. Vorsicht: Dieses Produkt enthält spitze Einzelteile. Citadel-Miniaturen sind detaillierte Modelle für Spieler und Sammler. Verpackung bitte für spätere Nachweise aufbewahren. Games Workshop empfiehlt dieses Produkt ab einem Alter von 12 Jahren.

**Attention!** Ne convient pas à des enfants de moins de 36 mois. Risque d'étouffement à cause de petites pièces. Attention: contient des éléments pointus. Les figurines Citadel sont conçues pour les joueurs et les collectionneurs. Conserver cet emballage pour référence. Âge recommandé par Games Workshop: 12 ans et plus.

**Attenzione!** No conviene para niños menores de 36 meses. Peligro de asfixia debido a componentes pequeños. Cuidado: Este artículo contiene componentes afilados. Las miniaturas Citadel son modelos a escala para jugadores y coleccionistas. Conserve esta caja para cualquier referencia. Games Workshop recomienda esta producto para mayores de 12 años.

**Attenzione!** Prodotto non adatto a bambini sotto i 3 anni. Pericolo di soffocamento dovuto a componenti piccoli e appuntiti. Le miniature Citadel sono modelli in scala realizzati per giocatori e collezionisti. Conserva la confezione per riferimenti futuri. Games Workshop consiglia questo prodotto ad un pubblico maggiore di 12 anni.

**Advarsel!** Ikke egnet for børn under 36 måneder. Kvælningsfare på grund af små dele. Forsigtig: Denne vare indeholder komponenter med udstikkende dele. Citadel-miniaturer er modeller i korrekt skala beregnet for gamere og samlere. Gem emballagen til fremtidig brug. Games Workshop anbefaler dette produkt til aldersen 12 år og ældre.

**Waarschuwing!** Niet geschikt voor kinderen onder de 36 maanden. Gevaar voor verslikking door kleine onderdelen. Oppgelet: Dit voorwerp bevat scherpe onderdelen. Citadel Miniatures zijn kleinschalige modellen die zijn ontworpen voor gamers en verzamelaars. Bewaar de verpakking voor latere naslag. Games Workshop beveelt dit product aan vanaf de leeftijd van 12 jaar.

警告！本製品の包装の中には、小さい部品が含まれております。3才未満の子供には与えないで下さい。注意：この製品は、ゲームやコレクションを楽しむ大人の方のためにデザインされた精巧なミニチュアモデルです。パッケージは今後の参考のために保管して下さい。弊社は12才以上のお客様におすすめします。

**UK**
Games Workshop
Willow Road, Lenton,
Nottingham
NG7 2WS

**España**
Games Workshop
C/ Caléndula, 95, Edificio D
Local 13
Miniparc III, El Soto de la Moraleja
Alcobendas 28109
Barcelona 08970

**North America**
Games Workshop
6721 Baymeadow Drive, Suite A
Glen Burnie, Maryland
21060-6401

**France**
Games Workshop
15380 Avenue LLCC de la Lauziere
13593 Aix-en-Provence - Cedex 3

**Australia**
Games Workshop
23 Liverpool Street
Ingleburn
New South Wales 2565

**Italia**
Games Workshop
Via del Commercio 31
00044 Frascati, Roma

**Northern Europe**
Games Workshop
Willow Road, Lenton
Nottingham
NG7 2WS

**Deutschland**
Games Workshop
40670 Düsseldorf

**Japan**
Games Workshop

© Copyright Games Workshop Ltd. 2009. Games Workshop, the Games Workshop logo, Citadel, the Citadel castle, Warhammer, 'Eavy Metal, 'Eavy Metal logo, Slotta, Citadel, GW and all associated marks, logos, devices, names, characters, illustrations and images from the Warhammer world are either ®, ™ and/or © Games Workshop Ltd 2000-2009, variably registered in the UK and other countries around the world. All rights reserved.

- Store 9906010402

**5011921011193**

TERMINATOR LIGHTNING CL AW3
Warehouse: 9906-01014202 01
Batch: 8756660
Made in UK

Highly Confidential - AEO



GW0005463

**EXHIBIT 16**

CERTIFIED COPY

# In The Matter Of:

*GAMES WORKSHOP LIMITED,*
*v.*
*CHAPTERHOUSE STUDIOS LLC and JON PAULSON*
*d/b/a PAULSON GAMES,*

---

*ALAN R. MERRETT – Vol. 1*
*March 8, 2012*

---

**MERRILL CORPORATION**
**LegaLink, Inc.**                  135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

| | | |
|---|---|---|
| 1 | A. We had not previously at any stage | 15:52:02 |
| 2 | published those -- a Space Marine with that icon and | 15:52:05 |
| 3 | that color scheme. As I said, the only thing -- the | 15:52:08 |
| 4 | thing I'm not sure of is whether or not Mr. Chalk | 15:52:12 |
| 5 | included those elements under specific instruction | 15:52:16 |
| 6 | to include them or whether he -- or whether he | 15:52:18 |
| 7 | actually, if you like, came up with those elements | 15:52:22 |
| 8 | on his own -- on his own. | 15:52:27 |
| 9 | I'd just like to make a note of the date. | 15:52:31 |
| 10 | It was 1988. When we published it, I don't know | 15:52:33 |
| 11 | whether -- I don't know what month of the year that | 15:52:38 |
| 12 | was. So it could have been 1987 or 1988 when he | 15:52:44 |
| 13 | actually created that piece of artwork, and that's a | 15:52:47 |
| 14 | little bit too long ago for me to remember those | 15:52:53 |
| 15 | kinds of details or indeed have any sort of | 15:52:55 |
| 16 | documented record of that. | 15:52:58 |
| 17 | Q. I'm going to hand you what has been | 15:53:46 |
| 18 | previously marked as Exhibit 3. Do you recognize | 15:53:48 |
| 19 | this? | 15:54:00 |
| 20 | A. Yes. | 15:54:04 |
| 21 | Q. What is it? | 15:54:05 |
| 22 | A. It's a very, very poor copy of the front | 15:54:06 |
| 23 | cover of the Horus Heresy Collected Visions book. | 15:54:09 |
| 24 | Q. And I'll represent for the record this is | 15:54:14 |
| 25 | the best copy that we were produced, that were given | 15:54:15 |

```
 1      STATE OF ILLINOIS      )
                               )    SS:
 2      COUNTY OF C O O K      )

 3

 4           The within and foregoing deposition of the

 5      aforementioned witness was taken before Tina M.

 6      Alfaro, C.S.R. and Notary Public, at the place,

 7      date, and time aforementioned.

 8           There were present during the taking of the

 9      deposition the previously named counsel.

10           The said witness was first duly sworn and

11      was then examined upon oral interrogatories; the

12      questions and answers were taken down in shorthand

13      by the undersigned, acting as stenographer and

14      Notary Public; and the within and foregoing is a

15      true, accurate, and complete record of all the

16      questions asked of and answers made by the

17      aforementioned witness at the time and place

18      hereinabove referred to.

19           The signature of the witness was not

20      waived, and the deposition was submitted, pursuant

21      to Rules 30(e) and 32(d) of the Rules of Civil

22      Procedure for the United States District Court, to

23      the deponent per copy of the attached letter.

24           The undersigned is not interested in the

25      within case, nor of kin our counsel to any of the
```

```
 1   parties.

 2            Witness my official signature and seal as

 3   Notary Public, in and for Cook County, Illinois on

 4   this 20th day of ___March___, A.D., 2012.

 5

 6

 7

 8            _____

 9            Tina M. Alfaro, CSR, CRR, CLR

10            C.S.R. No. 084-004220

11            311 South Wacker Drive

12            Suite 300

13            Chicago, Illinois 60606

14            (312) 386-2000

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 17

Civil Action No. 10-cv-08103

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


GAMES WORKSHOP LIMITED

Plaintiff

v.

CHAPTERHOUSE STUDIOS LLC

and

JON PAULSON d/b/a PAULSON GAMES

Defendants


EXPERT REPORT

OF

PROFESSOR LIONEL BENTLY


INSTRUCTIONS

1.   I have been instructed by Winston and Strawn LLP on behalf of Chapterhouse
     Studios LLC, the Defendant in this action, to provide expert evidence in these
     proceedings by way of an expert report to be supported by oral testimony, if

1

required, on English law as it applies to certain aspects of copyright ownership in artistic works.

2.      In particular, I have been asked to provide an assessment on the position in English law relating to the following matters:

  (a) The subsistence of copyright

  (b) The ownership of copyright in the employment context;

  (c) The ownership of copyright when works have been jointly created; and

  (d) Other relevant issues of ownership and transfer including implied or equitable assignment.

3.      I have also been asked to highlight differences between my view of the position in English law and that of the Plaintiff's Expert Report.

4.      I have also been asked my opinion as to how these principles are likely to apply to issues in this case based on the materials with which I have been provided.

5.      Annexed to this expert report is an exhibit marked **"LB1"** containing authorities which I refer to in this report and which are not contained in the Plaintiff's Expert Report.

## QUALIFICATIONS AND EXPERIENCE

6.      I am currently the Herchel Smith Professor of Intellectual Property Law in the Faculty of Law at the University of Cambridge in England. I am also the Director of Centre of Intellectual Property and Information Law at the University of Cambridge, England. I reside at 18 Romsey Road, Cambridge, CB1 3DD.

7.      I am an expert in the field of intellectual property law, which I have been teaching since 1988. I have taught intellectual property law at various institutions of higher learning, including University of Cambridge (2004-),

2

King's College, London (1991-2004) and Keele University (1988-1990). I have held visiting posts at Columbia University, National University of Singapore and Murdoch University (in Western Australia).

8.  I have written extensively about intellectual property law of the United Kingdom, including copyright. In particular, I have authored or co-authored 4 books related to intellectual property (*The Making of Modern Intellectual Property Law: the British Experience*; *Intellectual Property Law* (3 editions); *Between a Rock and a Hard Place – The Problems Facing Freelance Creators in the UK Media Marketplace*; and *Gurry on Confidence*). I have edited 7 books related to intellectual property (including 3 specifically on copyright), and have contributed to numerous edited collections. I have written numerous publications on intellectual property law in leading journals around the world, including the *Journal of the Copyright Society of the USA, Modern Law Review, Columbia Journal of Law and the Arts, Chicago-Kent Law Review, Berkeley Technology Law Journal, Loyola (LA) Law Review, King's College Law Journal, Journal of Business Law, European Intellectual Property Review, Intellectual Property Quarterly*, the *Yearbook of European Law*, and the *Australian Intellectual Property Journal.*

9.  My textbook (co-authored with Brad Sherman) on *Intellectual Property Law* (Oxford University Press, 2001) (3d ed. 2008) is a leading textbook on intellectual property published by Oxford University Press. The textbook covers copyright, patents, trademarks, and designs. Since 1998, I have provided annual submissions on United Kingdom copyright law to one of the leading international copyright treatises, *International Copyright: Law and Practice* (Paul Geller ed.).

10.  I am also an English barrister specialising in intellectual property law. As such, I am attached to a set of chambers, 11 South Square, Gray's Inn, London.

11.  I have given expert evidence on British law twice previously in the United States:

3

(i) in the case of *Golan v. Gonzales* [2005] 2005 WL 914754 (D.Colo.), 74 U.S.P.Q.2d 1808 (United States District Court, District of Colorado); *Golan v. Ashcroft*, Civil Action No. 01-B-1854 (2009) (United States District Court, District of Colorado) (Constitutional challenge to U.S. provisions on restoration of lapsed copyrights, which ultimately was considered by the Supreme Court, sub. nom. *Golan v. Holder* (18 Jan 2012))

and

(ii) in *Explorologist Ltd v. Brian Sapient* (United States, Eastern District of Pennsylvania), Civ Ac/ No 2: 07-cv01848-LP (2008). This case settled.

12. A more detailed curriculum vitae/resume can be found attached to this report.

13. I am not being compensated for this report which I am giving pro bono. I expected to be compensated for any time spent testifying in deposition or at trial. My normal charge out rate is £300 plus VAT per hour.

**EXPERT'S DECLARATION**

14. I confirm that I understand that my duty in providing this expert evidence is to the Court, and that my duty as an expert witness overrides my duty to those instructing me, that I have understood this duty and complied with it in giving my evidence impartially and objectively and that I will continue to comply with that duty. I have never previously acted for any of the parties to these proceedings.

**MATERIALS CONSIDERED**

15. In producing this report, I have been provided with, and considered, the following materials:
(a) The Second Amended Complaint filed on 19 January 2012;
(b) The Second Amended Answer filed on 6 February 2012;
(c) The Transcript of the Deposition of Jes Goodwin of 7 March 2012;

(d) The Transcript of the Deposition of John Blanche of 2 April 2012;

(e) The Transcript of the Deposition of Andrew Jones of 3 April 2012;

(f) Games Workshops' Further Supplemental Response to Defendant's Interrogatory No. 22 of 3 May 2012

(g) Plaintiff's Amended Responses to Defendant's First Set of Interrogatories of June 15, 2011

(h) Exhibit A to Games Workshop Ltd.'s Answer to Interrogatory No. 1

(i) A 'commissioning form' between Dan Abnett and Black Library Novels relating to the Novel, *Brothers of the Snake*, of 17 July 2004

(j) An 'commissioning form' between Ben Counter and Black Library Novels relating to the Novel, *Souldrinker*, of 8 March 2002

(k) A 'copyright agreement' between Dan Abnett and Games Workshop of 11 December 1996

(l) An 'assignment of copyright' by John Sibbick to Games Workshop Ltd from 1994

(m) A 'confirmatory assignment' of rights from Adam Troke to Games workshop of 2012

(n) A 'copyright agreement' between Ben Counter and Games Workshop

(o) The <u>Expert Report</u> of Michael Bloch QC and Dr Harris Bor of 1 May 2012.

**EXECUTIVE SUMMARY**

16.     In summary, my opinion is:

(a) As a preliminary matter, the Court must conduct an analysis of each and every piece of subject matter in which the Plaintiff claims protection in order to determine whether each one is protected under UK law. In particular the Court will need to determine:

(i) whether any of the miniatures constitute protectable sculptures;

(ii) whether the drawings, paintings or miniatures that are regarded as sculptures in issue are original. In determining this, the Court will need to differentiate between works created before and after 22 December 2002. With

5

respect to those created after that date, the relevant threshold is whether the work is an 'intellectual creation' bearing the personal touch or stamp of its creator.

(b) As to ownership of any works that are protected by copyright, English law recognises that an employer can be the first owner of copyright in works created by an employee in the course of employment.

(i) The question of whether someone is an employee, as opposed to a freelancer, is a complex question requiring a careful analysis of the detailed relationship between the parties. This analysis is multi-factorial, and would take account of the level of control in the relationship, who provided the materials, where the work took place, the tax and pension arrangements as well as how the parties described the relationship.

(ii) If the creator of a work was an employee, it is then necessary to determine whether the work was made in the course of the employee's employment. The test is whether the making of the work fell within the normal duties of the employee, those duties being determined from the contract (understood in the context of everyday realities). Where the scope of the duties are unclear, inferences can be made from what the parties said, as well as when and where the work was created.

(iii) However, where a work was created by an employee of a journal prior to 1 August 1989 for the purpose of publication in that journal, copyright belongs to the employee (though the journal may publish the work).

(c)     English law recognises joint authorship where a work has been created as a collaboration, each author has made an original and significant or substantial contribution towards the expressive form of the work; and the contributions of each author are not, in the final form of the work, distinct. While it is possible for there to be joint authorship between a freelancer and their client, whether there is such joint authorship is a question of fact requiring a close analysis of the specific contributions and relationship. Merely providing instructions or ideas or starting materials does not amount to joint authorship.

(d)     With one statutory exception, English law does not regard a person who commissions another to make a work as entitled to copyright in the work. That exception relates to commissioned paintings, portraits and engravings created prior to 1 August 1989.

(e)     However, exceptionally, the courts will find that a creator who has been commissioned to create work did so in circumstances where there was an implied undertaking to assign the copyright (making the commissioner the "equitable" assignee). Whether such an implied undertaking exists is to be determined by references to the circumstances when the contract was entered into, in particular the expectations of the parties. The case-law indicates that where some undertaking is to be implied, the court should impose the minimum necessary to meet the parties's expectations.

(f)     Based on the factual circumstances of the case as set out in the documents that I have seen

> (1) There must be very serious doubts about whether any of the miniatures constitute protectable sculptures. Even if the works are intended to have visual appeal, they are intended primarily as the pieces in games. They would not be thought of, in common parlance, as 'sculptures.'

> (2) It is impossible to say whether particular persons who are described as 'freelancers' may in fact be regarded in law as employees (though there is nothing in the documentation to suggest that the labels used were intended to obscure the legal realities). Only a close factual analysis of individual cases could justify a conclusion that a particular person was an employee.

> (3) It is impossible to say in the abstract that the works were or were not created in the "course of employment". Certainly, in a number of situations it appears that Games Workshop employees contributed art work *outside* the course of employment.

7

(4) It is impossible to say, without examining particular examples of works, whether those works were created before 1 August 1989 for the purpose of publication in a magazine (such as *White Dwarf*);

(5) It is impossible to conclude at this stage that the works created by persons who were freelancers or employees who were working outside the course of employment, were co-authored by employees of the Plaintiff. Assessment of joint authorship is a factual inquiry, and requires that the parties be found to have collaborated and that each has contributed to the expressive form of the work. Merely providing instructions, ideas, material or templates would not make a person a joint author: that person must make a substantial and original contribution to the final expressive form of the work.

(6) It is impossible to generalise about whether the copyright in the works created by persons who were freelancers or employees while working outside the course of employment might have been subject to implied assignment to the Plaintiff. The inquiry involves a very close analysis of the facts, intentions and understandings of the parties involved in making each individual work.

## ANALYSIS OF THE RELEVANT "ENGLISH" LAW

17.     The law of copyright of the United Kingdom is contained in the Copyright, Designs and Patents Act 1988 (hereafter, "C.D.P.A."). This Act came into force on 1 August 1989.

18.     The Act replaced the Copyright Act 1956. The transitional rules are contained in Schedule 1. The most important of these are that

(i) the subsistence of copyright in a work created before the 1988 Act went into effect depends on the position immediately before that date: C.D.P.A., Sched. 1, para. 5(1). Thus, a work in existence prior to July 31, 1989, will be protected under the 1988 Act if and only if it was protected by copyright under the 1956 Act on that date.

>(ii) the initial ownership of copyright continues generally to be determined by the law in effect when the materials in question were made: C.D.P.A., Sched. 1, para. 11. So for any works created before August 1, 1989, the rules applicable are those in the Copyright Act 1956.

19.     The C.D.P.A. has been amended on various occasions to give effect to European Directives. These include:

>Council Directive 91/250/EEC of 14 May 1991 on the Legal Protection of Computer Programs (codified as Directive 2009/24/EC of the European Parliament and of the Council of 23 April 2009)

>Council Directive 92/100/EEC of 19 November 1992 on Rental Right and Lending Right (codified as Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property, which in turn has been amended by Directive 2011/77/EU of the European Parliament and of the Council of 27 September 2011)

>Council Directive 93/83/EEC of 27 September 1993 on the coordination of certain rules concerning copyright and rights related to copyright applicable to satellite broadcasting and cable retransmission

>Council Directive 93/98/EEC of 29 October 1993 harmonizing the term of protection of copyright and certain related rights (codified as Directive 2006/116/EC of the European Parliament and of the Council of 12 December 2006)

>Directive 96/9/EC of the European Parliament and of the Council of 11 March 1996 on the Legal Protection of Databases

>Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the Harmonization of Certain aspects of copyright and Related Rights in the Information Society

20. According to Article 10 of Directive 2001/29, that Directive applies

> "in respect of all works and other subject-matter referred to in this Directive which are, on 22 December 2002, protected by the Member States' legislation in the field of copyright and related rights, or which meet the criteria for protection under the provisions of this Directive or the provisions referred to in Article 1(2)."

However, the Directive applies

> "without prejudice to any acts concluded and rights acquired before 22 December 2002."

21. Although the Court of Justice of the European Union has not yet ruled on the question, it seems that issues of ownership of works created before 22 December 2002 are unaffected by the Directive. With respect to those created thereafter, English law falls to be interpreted to ensure it is compatible with and gives effect to European law.

## A. Subsistence of Copyright

22. The Plaintiff's Expert Report at no stage broaches the question of subsistence of copyright. However, it is my understanding that the application of United States law is in fact dependent upon prior recognition that copyright subsists under U.K. law. Consequently, it is important to consider whether the material in which the Plaintiff asserts copyright would be protected. That involves two inquiries: first, whether it falls within the list of protectable subject matter; second, whether if the material is of the sort that is protectable in principle, whether it meets the relevant "originality" threshold on which protection is conditioned.

## Subject Matter

23. The traditional position under UK law is that copyright subsists in a list of subject matter identified by the relevant statute: C.D.P.A., s. 1; Copyright Act 1956. The list is a 'closed list'. So, section 1(1) of the C.D.P.A. states:

> (1) Copyright is a property right which subsists in accordance with this Part in the following descriptions of work—
>
> > (a) original literary, dramatic, musical or artistic works,
> >
> > (b) sound recordings, films or broadcasts, and
> >
> > (c) the typographical arrangement of published editions

24.    UK law thus differs from US law, which operates an open category, "original works of authorship" (and also the laws of most European countries).

25.    The relevant subject matter in these proceedings is original literary, dramatic, musical and artistic works. Copyright Act 1956, s.2 (literary, dramatic, musical); s. 3 (artistic works).

26.    In these proceedings there is little doubt that the novels in which the Plaintiff claims copyright are "literary works."

27.    Artistic works are in turn defined exhaustively. Under section 4 of the C.D.P.A.:

> (1) In this Part "artistic work" means—
>
> > (a) a graphic work, photograph, sculpture or collage, irrespective of artistic quality,
> >
> > (b) a work of architecture being a building or a model for a building, or
> >
> > (c) a work of artistic craftsmanship.
>
> (2) In this Part—
>
> > "building" includes any fixed structure, and a part of a building or fixed structure;
> >
> > "graphic work" includes—
> >
> > > (a) any painting, drawing, diagram, map, chart or plan, and
> > >
> > > (b) any engraving, etching, lithograph, woodcut or similar work;
> >
> > "photograph" means a recording of light or other radiation on any medium on which an image is produced or from which an image may by any means be produced, and which is not part of a film;

11

"sculpture" includes a cast or model made for purposes of sculpture.

28.     Similarly, section 3 of the Copyright Act 1956 stated:

> (1) In this Act "artistic work" means a work of any of the following descriptions, that is to say,—
>
>> (a) the following, irrespective of artistic quality, namely paintings, sculptures, drawings, engravings and photographs;
>>
>> (b) works of architecture, being either buildings or models for buildings;
>>
>> (c) works of artistic craftsmanship, not falling within either of the preceding paragraphs.
>
> (2) Copyright shall subsist, subject to the provisions of this Act, in every original artistic work which is unpublished, and of which the author was a qualified person at the time when the work was made, or, if the making of the work extended over a period, was a qualified person for a substantial part of that period.
>
> (3) Where an original artistic work has been published, then, subject to the provisions of this Act, copyright shall subsist in the work (or, if copyright in the work subsisted immediately before its first publication, shall continue to subsist) if, but only if,—
>
>> (a) the first publication of the work took place in the United Kingdom, or in another country to which this section extends, or
>>
>> (b) the author of the work was a qualified person at the time when the work was first published, or
>>
>> (c) the author had died before that time, but was a qualified person immediately before his death.

29.     To be protected by copyright, the illustrations and miniatures on which the Plaintiff relies must thus fall within one of these designations of "artistic work". The illustrations are clearly "graphic works" under the C.D.P.A., being "paintings" or "drawings"; or "artistic works" under section 3(1) of the 1956 Act. More difficulty exists in relation to the miniatures. The key question is whether these constitute "sculptures." In my view it is very doubtful that they would do so.

12

30.　　The question of what amounts to a "sculpture" was addressed most recently by the Supreme Court in *Lucasfilm Ltd v Ainsworth* [2011] UKSC 39, [2012] 1 AC 208, where the Supreme Court recently affirmed the ruling of the High Court and Court of Appeal that a plastic version of a Stormtrooper helmet was not a "sculpture" for the purposes of UK copyright law.

31.　　In so holding, the Supreme Court approved the reasons given by Mann J at first instance ([2011] UKSC 38, [37], [48]). Mann J. had adopted a multi-factorial approach ([2008] EWHC 1878 (Ch), [2009] F.S.R. (2), at para [118]) which the Court of Appeal generally approved ([2009] EWCA Civ 1328, [2010] Ch. 503, [54], [71]). It is worth setting out:

> "From those authorities, and those approaches, a number of guidance factors can be extracted. I call them guidance rather than points of principle, because that gives them the right emphasis. The judges deciding the cases have not sought to lay down hard and fast rules in an area where subjective considerations are likely to intrude, and I will not attempt to do so either. However, I do think the following points emerge from the cases or from the concepts involved:
>
> (i) Some regard has to be had to the normal use of the word.
>
> (ii) Nevertheless, the concept can be applicable to things going beyond what one would normally expect to be art in the sense of the sort of things that one would expect to find in art galleries.
>
> (iii) It is inappropriate to stray too far from what would normally be regarded as sculpture.
>
> (iv) No judgment is to be made about artistic worth.
>
> (v) Not every three dimensional representation of a concept can be regarded as a sculpture. Otherwise every three dimensional construction or fabrication would be a sculpture, and that cannot be right.
>
> (vi) It is of the essence of a sculpture that it should have, as part of its purpose, a visual appeal in the sense that it might be enjoyed for that

13

purpose alone, whether or not it might have another purpose as well. The purpose is that of the creator. This reflects the reference to "artist's hand" in the judgment of Laddie J in *Metix*, with which I respectfully agree. An artist (in the realm of the visual arts) creates something because it has visual appeal which he wishes to be enjoyed as such. He may fail, but that does not matter (no judgments are to be made about artistic merit). It is the underlying purpose that is important. I think that this encapsulates the ideas set out in the reference works referred to in *Wham-O* and set out above (and in particular the Encyclopaedia Britannica).

(vii) The fact that the object has some other use does not necessarily disqualify it from being a sculpture, but it still has to have the intrinsic quality of being intended to be enjoyed as a visual thing. Thus the model soldier in *Britain* might be played with, but it still, apparently, had strong purely visual appeal which might be enjoyed as such. Similarly, the Critters in *Wildash* had other functions, but they still had strong purely visual appeal. It explains why the Frisbee itself should be excluded from the category, along with the moulds in *Metix* and *Davis*. It would also exclude the wooden model in *Wham-O* and the plaster casts in *Breville*, and I would respectfully disagree with the conclusions reached by the judges in those cases that those things were sculptures. Those decisions, in my view, would not accord with the ordinary view of what a sculpture is, and if one asks why then I think that the answer is that the products fail this requirement and the preceding one – there is no intention that the object itself should have visual appeal for its own sake, and every intention that it be purely functional.

(viii) I support this analysis with an example. A pile of bricks, temporarily on display at the Tate Modern for 2 weeks, is plainly capable of being a sculpture. The identical pile of bricks dumped at the end of my driveway for 2 weeks preparatory to a building project is equally plainly not. One asks why there is that difference, and the answer lies, in my view, in having regard to its purpose. One is created by the hand of an artist, for artistic purposes, and the other is created by a

14

builder, for building purposes. I appreciate that this example might be criticised for building in assumptions relating to what it seeks to demonstrate, and then extracting, or justifying, a test from that, but in the heavily subjective realms of definition in the artistic field one has to start somewhere.

(ix) The process of fabrication is relevant but not determinative. I do not see why a purely functional item, not intended to be at all decorative, should be treated as a sculpture simply because it is (for example) carved out of wood or stone."

32.     Importantly, in applying these factors, Mann J. addressed whether toys of Stormtroopers were sculptures. The matter was important because Lucasfilm had authorised the making and sale of such toys. Consequently, the duration of its copyright in the designs on which the toys were based was effectively limited under section 52 of the C.D.P.A. to 15 years unless the toys were regarded themselves as "sculptures": C.D.P.A., Sched 1, para. 20; section 10 Copyright Act 1956. The judge concluded that they were not. He stated, [2009] FSR (2), 154-155, [123]:

"Next, it is necessary to consider the toy Stormtroopers, and other characters, which are taken as being reproductions of the armour and helmets for the purposes of section 52. These are, as already described, articulated models which are sold as toys and which are intended for the purposes of play. Play is their primary, if not sole, purpose. While their appearance is obviously highly important (if they did not look like the original, the child would not be so interested) they are not made for the purposes of their visual appearance as such. While there is no accounting for taste, it is highly unlikely that they would be placed on display and periodically admired as such. The child is intended to use them in a (literally) hands-on way, in a form of delegated role play, and that is doubtless how they are actually used. That means, in my view, they are not sculptures. They can be distinguished from the model in *Britain* which apparently had a significant element of being admirable for its own visual sake. That does not apply to the Stormtrooper, whose only

real purpose is play. In reaching this conclusion I am not saying that the *Britain* model is better at what it portrays than the Stormtrooper model. That would be to make judgments about artistic quality, which the statute understandably forbids. It is making a judgment about whether there is anything in the model which has an artistic essence, in the sense identified above. I conclude that there is not."

33.     The case which Mann J. sought to distinguish was *Britain v. Hanks Bros* (1902) 86 *Law Times* 765. This was a case under the Sculpture Copyright Act 1814, in which the question was whether lead toy soldiers, being mounted yeoman on horseback, were sculptures. The soldiers were sculpted by William Britain junior from photographs and had his name stamped on them. Evidence was accepted by the Court that "the anatomy is good, and that the modelling shows both technical knowledge and skill." Wright J said that while he had "great doubt as to the meaning of the Act" he was nevertheless prepared to hold that these toy soldiers were sculptures.

34.     The conclusion of Mann J. that the toy stormtroopers were not sculptures was appealed to the Court of Appeal (but not further to the Supreme Court). The Court of Appeal affirmed. Jacob LJ began by considering *Britain v Hanks*. He said:

"It is difficult again to take too much from this case. It is clear that the judge rejected the defendants' contention that the models were mere toys of no artistic merit. On his view, the metal figures produced therefore qualified as sculptures or models of the human figure within the meaning of the 1814 Act. They appear to have been high quality lead soldiers cast from a model which had been made with recognisable artistic skill. It was certainly the view of the Gregory Committee which reported in October 1952 (Cmd. 8662) and recommended various changes to the Copyright Act that toy soldiers and other models did not qualify for copyright protection under the 1911 Act because of the operation of s.22(1) and Design Rule 26. Their only protection would be as registered designs assuming that they could satisfy the requirement of novelty. But, as mentioned earlier, this involves an acceptance that they would otherwise

qualify as works of sculpture. It is, however, clear from the report that the Gregory Committee had in mind toy soldiers made from a prototype model which had the qualities necessary to make it a work of sculpture. This certainly seems to be consistent with the view of the judge in *Britain v Hanks* about the quality of the models he was considering. On this basis, that case was concerned with something which was not merely a toy and which, in the hands of a collector, might not be used for that purpose at all. By comparison, the toy stormtroopers were not replicas of real soldiers and were sold essentially for use as toys. The judge was not presented with evidence about how they were made or whether the prototype could itself be regarded as a sculpture. All we know is that they were reproductions in miniature of the full-sized armour and helmet."

35. Jacob LJ continued (at [81]-[82]):

"That leaves the toy stormtroopers. Mr Bloch submits that the distinction which the judge made based on *Britain v Hanks* is untenable and that the facts of that case are indistinguishable from those under consideration on this appeal...

As already indicated, we think the judge was right to point to the existence of what can loosely be described as a work of art as the key to the identification of sculpture. On this basis, artistic and accurate reproductions of soldiers could qualify notwithstanding that some children might wish to play with them. But in most modern cases toy soldiers, whether real or fictional, will not be works of art and will not differ materially in artistic terms from the plastic Frisbee in the *Wham-O* case. They will be playthings registrable for their design qualities but nothing else. This distinction may be difficult to draw in some cases but we suspect that the cases which will qualify for protection under the Copyright Act will be relatively rare. The judge recognised the need not to make qualitative judgments about the artistic merits of the toy soldiers in *Britain* compared to the stormtroopers and therefore emphasised the real purpose of the latter being one of play. But the true distinction between the two cases can be expressed in more fundamental terms. We

17

> are not dealing here with highly crafted models designed to appeal to the collector but which might be played with by his children. These are mass produced plastic toys. They are no more works of sculpture than the helmet and armour which they reproduce."

36.    The issue was not before the Supreme Court, though Lord Walker and Collins did, in their joint speech, refer to *Britain v Hanks*. At [19] they observed

> Wright J held that copyright protection as sculpture was available to what the report refers to as "toy metal models of soldiers on horseback, or mounted yeomen." The models were designed and made by William Britain, a partner in the plaintiff firm. The report does not say how large the models were, but they were evidently large enough for each to have stamped on it the maker's name and the date of its manufacture. There was expert evidence, which the judge accepted, that the models were "artistic productions, in that the anatomy is good, and that the modelling shows both technical knowledge and skill." The judge seems to have regarded the case as near the borderline, but was prepared to hold that the models were entitled to protection.

37.    The Supreme Court makes no further remark on the case. However, in concluding that neither the judge nor the Court of Appeal had erred in finding that the stormtrooper helmets were not sculptures, the Supreme Court explicitly approved Mann J's reasoning. Consequently, it seems likely that the Supreme Court would also have approved of the conclusion as to the toy stormtroopers.

38.    The importance of this should be readily apparent. The question of whether any of the miniatures in which the Plaintiff claims copyright constitutes a sculpture is one that needs to be assessed in relation to each miniature. But, as a general matter, a toy miniature of a fictional character is unlikely to be protected by copyright as a "sculpture."

*European Confusion*

39.    That said, it is right to draw the Court's attention to a recent development, which might require the UK to revisit its "closed list" of protectable subject matter. In two recent decisions under the Information Society Directive,

18

2001/29/EC, the Court of Justice of the European Union has implied that a "graphic user interface" might be protectable, but that football matches will not be: Case C-393/09, *Bezpečnostní softwarová asociace* (22 Dec 2010) (ECJ, 3rd Ch), [45]-[46]; Case C-403/08, *Football Association Premier League Ltd and Others v QC Leisure and Others* and Case C-429/08 *Karen Murphy v Media Protection Services Ltd*, [2012] 1 C.M.L.R. (29) 769 (ECJ, Gr Ch), [97]. In so holding, the Court appears to have taken the view that Member States should afford protection to all "intellectual creations."

40.     Whether the holdings in these cases apply to the field of "applied art" is a controversial question. In Case C-168/09 *Flos SpA v Semararo Case e Famiglia SpA* (27 January 2011) (ECJ, 2nd Ch) [34], the Court of Justice implied that they would do so. In that case the Court indicated that Italy would be obliged to protect by copyright the design of a table lamp if that table lamp satisfied the criterion of being its author's own "intellectual creation."

41.     If this is right, then the law of the United Kingdom would need to be interpreted by the courts in such a way as to ensure compliance with European law. If the miniatures in which the Plaintiff claims copyright are "intellectual creations", such that the United Kingdom is obliged to protect them by copyright under Directive 2001/29/EC, the court might well give effect to that obligation by treating them as "sculptures" under the C.D.P.A.

42.     It is by no means clear as to which works this would apply. Article 10 of Directive 2001/29/EC suggests it would apply in respect of all works created after 22 December 2002. However, following Case C-168/09 *Flos* protection might have to be offered to works created before that date if they meet the standard of being "intellectual creations" (discussed below), subject to transitional provisions.

43.     However, in my view, the Court's holding in Case C-168/09 *Flos* is not to be regarded as defensible. In particular, the *Flos* decisions fails to acknowledge important freedoms explicitly left to Member States by Article 17 of Council Directive 98/71 (the Designs Directive), and Article 10 of the Information Society Directive. Consequently, *Flos* is a decision that should not be followed. In my view, the question of which works of applied art are protected is a matter

19

that ought to be regarded as left to Member States. Consequently, *Lucasfilm* should be regarded as the governing authority.

## Originality and 'Intellectual Creation'

44.     In assessing whether the works are "original", it is necessary to differentiate between works created before and after 22 December 2002. For the works created before that date, the traditional UK standard applies. For works created after that date, the European standard operates.

*The UK Standard*

45.     Traditionally, the originality threshold under UK law has not been a difficult one to meet. A work must "originate" with its author, rather than be copied: *University of London Press v. University Tutorial Press* [1916] 2 Ch. 601. In other words, it must be the product of "skill, labour and/or judgment": *Ladbroke v. William Hill* [1964] 1 All E.R. 465, 469 (Lord Reid) (HL).

46.     In relation to works based on other works, the "skill, labour and judgment" must be otherwise than in the process of copying, and must result in a significant change: *Interlego AG v. Tyco Industries* [1989] A.C. 217 (Privy Council). Referring specifically to derivative works, in *Interlego v Tyco*, Lord Oliver observed,   at 263,

> '[t]here must in addition be some element of material alteration or embellishment which suffices to make the totality of the work an original work.'

Moreover, with derivative artistic works the alteration or embellishment must be visual (at 266):

> "The essence of an artistic work ... is that which is "visually significant" ... With deference to the Court of Appeal ..., their Lordships can see no alteration of any visual significance such as to entitle the drawing, as a drawing, to be described as original."

47.     In relation to the works at issue in these proceedings it will be necessary for the
Court to determine in each case:

> (i) whether it was a product of labour, skill and judgment;

> (ii) in the case of derivative artistic works, whether there is a visually
> significant material alteration or embellishment.

If there is, the works will be "original".

*The European Standard*

48.     The European standard of originality is considerably higher than that
applicable under UK law prior to harmonization. The new standard, in
principle, applies to works created after 22 December 2002. Any works already
protected under UK law should remain protected as a result of Article 10,
which indicates that the Directive is without prejudice to acquired rights.

49.     The Court of Justice of the European Union has held that there is a general
"originality" standard operative in Europe. To be protected a work must be its
"author's own intellectual creation." See *Case C-5/08 Infopaq International
A/S v Danske Dagblades Forening* [2009] E.C.R. I-6569 (ECJ, 4th Ch), [37]
("copyright within the meaning of Article 2(a) of Directive 2001/29 is liable to
apply only in relation to a subject-matter which is original in the sense that it is
its author's own intellectual creation.")

50.     The Court has offered some guidance as to when a work will be its author's
own intellectual creation:

> (i) In Case C-5/08, *Infopaq International A/S v Danske Dagblades
> Forening*, [2009] E.C.R. I-6569 (ECJ, 4th Ch), [45]-[46], the court
> indicated that while words are not protectable, an author may express his
> creativity in an original manner through the "choice, sequence and
> combination of" words so as to achieve a result which is an intellectual
> creation;

> (ii) In Case 393/09, *Bezpečnostní softwarová asociace*, (22 Dec 2010)
> (ECJ, 3[rd] Ch), [48], the Court indicated that when assessing whether a

graphic user interface was an "intellectual creation" the national court must take account, inter alia, of the specific arrangement or configuration of all the components which form part of the graphic user interface in order to determine which meet the criterion of originality.

(iii) In Case C-403/08 *Football Association Premier League Ltd and Others v QC Leisure and Others* and Case C-429/08 *Karen Murphy v Media Protection Services Ltd*, (4 October 2011) (ECJ, Gr Ch), [98] the Court indicated that "intellectual creation" involves the exercise of creative choices rather than following rules. Thus "football matches, which are subject to rules of the game, leaving no room for creative freedom for the purposes of copyright" were unprotected;

(iv) In Case C-145/10, *Eva-Maria Painer v Standard VerlagsGmbH and Others*, [2012] E.C.D.R. (6) 89 (ECJ, 3rd Ch), [87]-[93], the Court considered a portrait photograph of a young girl and indicated that this would be an "intellectual creation" if the photographer had been able to stamp the work with his or her "personal touch";

(v) In Case C-604/10, *Football Dataco v Yahoo! UK Ltd,* [2012] 2 C.M.L.R. (24) 703, (ECJ, 3rd Ch), [38], the Court was considering "intellectual creation" in the context of collections of data about soccer matches, and said that the "criterion of originality is satisfied when, through the selection or arrangement of the data which it contains, its author expresses his creative ability in an original manner by making free and creative choices ... and thus stamps his 'personal touch'."

51.    Consequently, for works created after 22 December 2002, the European standard applies. This means the Plaintiff will need to establish that such works:

(i) are a result of choices rather than following rules (such as those in a 'rule book');

(ii) such that the author has stamped his or her individuality on the work.

## B. Ownership of Copyright in the Employee Context

52.     If any of the works are protected by copyright, it falls to the Plaintiff to establish it owns the copyright therein. The basic rule is that the author is the first owner of copyright, to which there is one statutory exception: works created by employees in the course of their employment. However, for works created before 1 August 1989, a different rule applies in relation to works created by employees for publication in journals, according to which the journal only gains the right to publish the work, the author retaining the remaining rights.

### The Basic Principle: Authorial Ownership

53.     Section 11(1) of the C.D.P.A. states that

> "The author of a work is the first owner of any copyright in it."

According to section 9, the "author" of a work is "the person who creates it." This has been called "the creator principle."

54.     Section 4(1) of the 1956 Act similarly stated that

> "the author of a work shall be entitled to any copyright subsisting in the work."

55.     In relation to the reproduction right, the Information Society Directive contains a corresponding rule:

> Article 2
>
> Reproduction right
>
> Member States shall provide for the exclusive right to authorise or prohibit direct or indirect, temporary or permanent reproduction by any means and in any form, in whole or in part:
>
> (a) for authors, of their works;

23

....

56.     Recitals of the Information Society Directive reiterate the importance of "the creator principle":

> (9) Any harmonisation of copyright and related rights must take as a basis a high level of protection, since such rights are crucial to intellectual creation. Their protection helps to ensure the maintenance and development of creativity in the interests of authors, performers, producers, consumers, culture, industry and the public at large. Intellectual property has therefore been recognised as an integral part of property.

> (10) If authors or performers are to continue their creative and artistic work, they have to receive an appropriate reward for the use of their work, as must producers in order to be able to finance this work. The investment required to produce products such as phonograms, films or multimedia products, and services such as "on-demand" services, is considerable. Adequate legal protection of intellectual property rights is necessary in order to guarantee the availability of such a reward and provide the opportunity for satisfactory returns on this investment.

> (11) A rigorous, effective system for the protection of copyright and related rights is one of the main ways of ensuring that European cultural creativity and production receive the necessary resources and of safeguarding the independence and dignity of artistic creators and performers.

> (12) Adequate protection of copyright works and subject-matter of related rights is also of great importance from a cultural standpoint. Article 151 of the Treaty requires the Community to take cultural aspects into account in its action.

57.     According to the principle of "autonomous meaning",[1] the question of what is meant by an "author" in this context is a matter of European law. No rulings

---

[1] This is the approach to interpretation of EU instruments, such as Directives, that has been adopted by the Court of Justice of the European Union. According to this approach "the terms of a provision of Community law which makes no express reference to the law of the Member States for the purpose of determining its meaning and scope must normally be given an autonomous and uniform interpretation throughout the Community": see

have yet been made on who is an author (except in relation to cinematographic works: Case C-277/10 *Martin Luksan v Petrus van der Let* (9 February 2012).

**Employed Authors**

58.     There is one exception to the "creator principle". This relates to employed authors. According to section 11 of the C.D.P.A.:

> S.11(2) Where a literary, dramatic, musical or artistic work, or a film, is made by an employee in the course of employment, his employer is the first owner of any copyright in the work subject to any agreement to the contrary.

59.     A similar rule operated under the Copyright Act 1956, section 4(4). This stated:

> Where, in a case not falling within either of the two last preceding subsections, a work is made in the course of the author's employment by another person under a contract of service or apprenticeship, that other person shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act.

Section 4(5) added a proviso relating to agreements to the contrary.

60.     The provision has four components:

> (i)     The work must be the right type ie a literary, dramatic, musical, artistic work, or a film;
>
> (ii)    It must have been created by someone who was at the time an "employee";
>
> (iii)   It must have been created by that person "in the course of employment."
>
> (iv)    There must have been no "agreement to the contrary".

The first component is not in issue.

---

Case C-245/00 *SENA v NOS* [2003] E.C.R. I-1251, [23]; Case C-306/05 *SGAE* [2006] E.C.R. I-11519, [31]; Case C-5/08, *Infopaq*, [2009] E.C.R. I-6569 [27]; Case C-403/08, *Football Association Premier League v Qc Leisure and Karen Murphy*, [2012] 1 C.M.L.R. (29) 769, [154].

61. In determining whether there is an employment relationship, the courts refer to case-law from other areas (tax, employment law, tort law and so on). The distinction is drawn between a contract of service (an employment relationship) and a contract for services (involving an 'independent contractor').

62. The Plaintiff's Expert Report is somewhat inconsistent in its analysis of the question of how employment contracts are distinguished from contracts of services. I would not take issue with the "multifactorial approach" suggested at para 100. However, I am uncomfortable with other statements in the report, in particular what I will call the "integral work test".

63. The "integral work test" is mentioned in the Report first at para 31(a). It states:

> "The definition of the term "employee" depends not only on what was agreed, but on other factors including how integral the work being produced is to the business."

64. Furthermore, the Plaintiff's Expert Report states, at para 46, that

> "[t]he test to distinguish these types of contracts that has found most favour in an English court is whether the work done is or is not integral to the business of the entity to which service is being provided."

In my view, it is not clear that "the integral work test" is the test "that has found most favour."

65. Traditionally, the courts distinguished between employment contracts and contracts for services by reference to the level of "control" exercised by the beneficiary of the contractual services. The distinction was said to lie not in *what* services were provided, but in control over *how* they were provided. The control test, however, seemed problematic in the context of highly skilled services, such as with medical doctors, where the service provider exercised virtually complete control over *how* services were provided. Consequently, the courts started to develop other tests.

66. The courts thus moved away from "control" as the chief determining factor in all cases, and towards a multi-factor approach. One factor in the approach was

26

whether the worker is "integral" to the organisation. This has sometimes been referred to as the "organisation" test.

67.  The Plaintiff's Expert Report places considerable emphasis on *Stevenson, Jordan and Harrison v. MacDonald and Evans* (1952) 69 R.P.C. 10, (1951) T.L.R. 101 as the foundation of the "integral work test".[2] In my view, Lord Denning MR's statement, quoted by the Plaintiffs Expert Report (at para 46) does not support the "integral work" test:

> (i) First, Lord Denning indicates that he has identified "one feature" which runs through the cases, a position that is consistent with a multi-factor analysis.

> (ii) Second, the feature he identifies is that "a man is employed as part of the business and his work is done as an integral part of the business." The focus is not merely on the work done, but the place of the person within the organisation. This is often sometimes referred to as "the organisation test".

68.  The Plaintiff's Expert Report also states (at para 47) that the "integral work test" was "approved and clarified" by Cooke J in *Market Investigations v. Minister of Social Security,* [1969] 2 Q.B. 173.[3] Although *Stevenson, Jordan and Harrison v. MacDonald and Evans* (1952) 69 R.P.C. 10 was cited to the Court, it was not referred to by Cooke J. However he did refer to another decision of Denning LJ (as he then was), namely, *Bank voor Handel en Scheepvaart N.V. v. Slatford* [1953] 1 Q.B. 248, 295:

> "The test of being a servant does not rest nowadays on submission to orders. It depends on whether the person is part and parcel of the organisation."

That was Lord Denning's own re-interpretation of what he said in *Stevenson.* The distinction between and employee and an independent contractor is that an employee is "part and parcel of the organisation".

---

[2] The Plaintiff's Expert Report says, at para 46, that the case was "before the House of Lords, the highest English court." That is not correct. The case was before the Court of Appeal.

[3] The Plaintiff's Expert Report says this was a case "in the Court of Appeal (i.e. the second highest court)". The case did concern an appeal, from the Minister, finding that Mrs Irving was an employee for the purposes of national insurance. However, the case was decided by Cooke J in the High Court, Queens Bench Division.

69.     In *Market Investigations v. Minister of Social Security,* [1969] 2 Q.B. 173, 184-5, Cooke J indicated that:

>  "No exhaustive list has been compiled and perhaps no exhaustive list can be compiled of considerations which are relevant in determining that question, nor can strict rules be laid down as to the relative weight which the various considerations should carry in particular cases. The most that can be said is that <u>control will no doubt always have to be considered,</u> although it can no longer be regarded as the sole determining factor; and that <u>factors, which may be of importance, are such matters as whether the man performing the services provides his own equipment, whether he hires his own helpers, what degree of financial risk he takes, what degree of responsibility for investment and management he has, and whether and how far he has an opportunity of profiting from sound management in the performance of his task.</u>"

The case thus supports a multi-factor test, not the "integral work test" proposed in the Plaintiff's <u>Expert Report</u>.

70.     The Plaintiff's <u>Expert Report</u> cites (at paras 48-51) *Beloff v. Pressdram Ltd and Another* [1973] F.S.R. 33. In this case, the Plaintiff, a journalist for the newspaper, *The Observer*, sued another paper that had reproduced a memorandum that she had written. The Defendant succeeded on the basis that the Plaintiff did not own the copyright in the memorandum. The question of ownership of copyright turned in part on whether Beloff was an employee of *The Observer*. The Court held that she was, and thus she did not own the copyright.[4] A number of features of the case are notable:

(a)     Beloff had worked for *The Observer* since the 1940s.

(b)     She had been treated by *The Observer* as an employee, and issued with an employment contract (see [1973] F.S.R. 33, 43-44).

(c)     She had been given access to the House of Commons as a result of being the Lobby Correspondent of *the Observer*.

---

[4] The statement of facts in para 48 of the Plaintiff's Expert Report contains an error: it states "The Defendant denied that she was an employee." In fact, the Defendant <u>asserted that</u> Beloff was an employee.

(d)    The letters of engagement conferred on *The Observer* the right to determine where Beloff worked;

(e)    She worked full time;

(f)    She was obliged to provide an article per week;

(g)    She attended weekly editorial meeting;

(h)    She had an office in *the Observer* building;

(i)    *The Observer* provided secretarial resources;

(j)    She took leave at various times;

(k)    Her income tax was deducted from her pay;

(l)    Her pension payments were deducted from her pay.

71.    In so far as *Beloff* supports the view that a person whose services involve a high level of individual skill and discretion can be an employee, no objection is taken to the Experts' citation of the case. In so far as the Plaintiff's Expert Report (para 49) claims that the case shows that

> "if the worker is skilled he/she may still be considered to be an employee if his/her work is integral to the business",

it elevates one component above others. Clearly, when he examined "the recognised indications of contract of service", the Judge was applying the "multi-factor test." It is worth reiterating what Ungoed-Thomas J said ([1973] F.S.R. 33, 42, which is quoted in the Expert Report (at paras 49-50):

> "Control is just one of many factors whose influence varies according to the circumstances.... The test which emerges...whether...the employee is employed as part of the business and his work is an integral part of the business..."

72.    An authoritative account is provided in *Chitty on Contract* (H Beale ed. 30th ed. London: Sweet & Maxwell, 2008) Ch 39, the leading practitioner treatise on contract law. It states:[5]

> **"The Contract of Employment or of Service and Contracts for Services**
>
> **39-002**

---

[5] For simplicity, I have omitted the footnotes.

Contracts of employment were known to the law for many years as "master and servant" contracts, but this terminology now has archaic connotations, and is not found in modern legislation. There is no comprehensive definition of such a contract and the decided cases merely indicate a number of *indicia* or factors which are relevant to a finding that a particular contract is one of employment, or a "contract of service". The presence or absence of any one such factor is not conclusive, since the decision depends on the combined effect of all the relevant factors, when those pointing towards "employment" are weighed up with those pointing against. A contract of employment or of service is generally contrasted with a contract in which an independent contractor is engaged to perform a particular task, often known as a "contract for services". In order to identify the contract of employment, it is useful first to describe its normal forms and then to indicate the current approach to defining it, which is developed in greater detail in the second section of this chapter.

### The Normal Forms of the Contract of Employment

**39-003**

It could, at least until recent transformations in the practice of the labour market, be said that in the normal case of employment the employee is selected by his employer, works "full-time" as part of the employer's organisation, with regular working hours, at a fixed place of work, with equipment provided by the employer, and under some degree of supervision (arranged by the employer) over his method of working; he enjoys a fixed wage or salary paid at regular intervals, fixed holidays on full pay, and has some security of employment in that he cannot be dismissed without notice (except for misconduct), and until the expiration of his notice of dismissal he is entitled to receive his full wages or salary, whether or not his employer can actually provide him with work to do. The instances which come before courts are those where some, but not all, of these normal features of employment are present, and it must be decided whether the departures from the normal patterns of employment are sufficiently important to justify the conclusion that the relationship is not employment for the purpose of the legal rule in question.

**39-004**

However, a large and increasing proportion of the workforce is now employed in "marginal", "atypical" or "flexible" forms of employment, such as part-time, temporary or agency employment. In such cases, it may be even more than usually difficult to decide whether or not a contract of employment exists.

### The Modern Approach to Definition of the Contract of Employment

**39-005**

The traditional statements of what constitutes a contract of service placed most emphasis on the power of the employer to control the work of the employee, when contrasting that contract with a contract with an independent contractor. The traditional distinction was that whereas the employer could merely direct *what* work was to be done by the independent contractor, he might also direct *how* the work was to be done by an employee. The current approach to this distinction, and hence to the definition of the contract of employment, has four main elements:
(1) the denial of the supremacy of the control test, whilst still acknowledging its importance;
(2) the use of some form of "organisation" test;
(3) a growing preference for asking whether the worker is "in business on his own account"-though it has been denied that this is the fundamental test;
(4) the assertion that exhaustive definition is futile and that the method of classification is by the accumulation of relevant factors in each case;
(5) an increasing tendency to treat the distinction as one to be applied at first instance rather than by an appellate court.

It should also be noted that the relationship of employment is to be contrasted not only with that between employer and independent contractor but also with those of agency, bailment and partnership. It may also still be important for certain purposes to distinguish between the contract of employment and the contract of apprenticeship; the way in which that distinction is to be drawn was considered by the Court of Appeal in *Flett v Matheson*.

**Section 2 - The Factors Identifying a Contract of Employment**

**The Factors to Be Considered**

**39-010**
The case law suggests that the factors relevant to the process of identifying a contract of employment may usefully be listed as follows:

(1) the degree of control exercised by the employer;
(2) whether the worker's interest in the relationship involved any prospect of profit or risk of loss;
(3) whether the worker was properly regarded as part of the employer's organisation;
(4) whether the worker was carrying on business on his own account or carrying on the business of the employer;
(5) the provision of equipment;
(6) the incidence of tax and national insurance;
(7) the parties' own view of their relationship;
(8) the structure of the trade or profession concerned and the arrangements within it.

73. In my view, the "integral work" test offered in the Plaintiff's Expert Report is a somewhat distorted representation of a complex area of English law. It is distorted in that:

(a) it selects one factor, when the test of employment is multi-factorial;

(b) it emphasises that factor in a rather skewed manner. The case-law which the Plaintiff's Expert Report relies on supports the view that a key question is whether the person providing the services is integrated within the organisation of the purchaser of those services – if they are, that suggests he or she is an employee. But the selected passages suggest the question is whether the work provided is integral "to the business of the entity", and that places disproportionate emphasis on the work-product, rather than the situation of the worker.

74. As should already be clear, the courts pay considerable attention to whether typical attributes of employment are present: whether regular sums are paid as wages or salary; whether income tax deductions are made on the "pay-as-you-earn" basis used for employees; whether there is a joint contribution to a pension scheme; and whether national insurance contributions are paid by both parties as for an employee. See *Beloff v Pressdram Ltd* [1973] F.S.R. 33.

31

75.     The courts will also pay attention to the descriptions used by the parties. In
        _Robin Ray v. Classic FM Ltd._ [1998] F.S.R. 622, 638, Lightman J. observed

> "It is explicitly stated in the consultancy agreement (as in the
> correspondence between the parties immediately preceding it) that the
> parties intended the relationship between the parties to be that of the
> plaintiff as an independent contractor providing services to the defendant
> and not that of employee and employer. That is a relevant, but not
> decisive, consideration."

On the facts of the case, the Court found (at 639) that Robin Ray was not an
employee where agreement described him as an independent contractor and
contemplated that he would have other business commitments, and he operated
for a short period.

76.     The Plaintiff's Expert Report, para 98, concludes:

> In our view English law supports a finding that at least some of
> independent contractors/freelancers working for the Plaintiff were in fact
> employees, as a matter of law. This most obviously applies to individuals
> who were in fact employees while also contributing additional efforts,
> but would also apply to others who were nominally freelancers but who,
> under the application of the general factors outlined above, would be
> acting in the capacity of employees.

I am surprised that these experts would think they could predict any such
conclusion from the limited deposition evidence. Clearly, a full and thorough
analysis would need to be conducted in relation to each and every "freelance"
author, their role, length of involvement, how they worked, how they were
paid, the conditions of service etc.

77.     I certainly would not conclude as the Plaintiff's Expert Report appears to do (at
        para 101), based on paras 31-33 of Blanche's deposition, that the descriptive
        term "freelancer" that the parties chose to apply to those who Blanche says
        provided services through the "Young Artists" company were anything other

than independent contractors. The fact that the services were provided through an agency, that there were particular understandings as to rights allocation (Blanche, 32, lines 10-15), and that they are described as "outside artists" (Blanche, 33, line 10) seems wholly consistent with the term "freelancer". (Note also Clause 4.1 of the 'copyright agreements' between Games Workshop Ltd and Abnett dated 11 December 1996, and Counter (undated)). The fact that Blanche (Blanche, 134-135) might instruct the freelancers to alter their product would hardly be inconsistent with this.

78.    The evidence given by Blanche as to his own position as a freelancer, at 18 of his deposition, appears to relate to the pre-Warhammer 40,000 period, as he states at 10, that he became an employee Games Workshop in 1984, having worked as a freelance illustrator between 1980 and 1984.

79.    Moreover, while the Plaintiff's Expert Report notes Blanche's testimony (Blanche 10, lines 24-25) suggesting that he was paid regularly during his freelance period between 1980 and 1984, the Report does not mention the factors that are consistent with the designated freelance status: the three-day week (Blanche 10, line 14), the payment by Blanche of his own national insurance and tax (Blanche 10, line 25 to 11, line 1; 18, lines 14-22). I would not draw any inference from the use of the term "freelance" in relation to Blanche that the term was being understood incorrectly as regards services later contracted for by Games Workshop.

**The Course of Employment**

80.    Even if an employment relationship exists, it is not every work created during its subsistence that belongs presumptively to the employer, but only those made in "the course of the employment." This seems to be a particularly important consideration in relation to employees of Games Workshop who John Blanche describes in his deposition (Blanche 33, lines 4-8; 44, line 16-25; 45, line 1-6). There were people "employed by Games Workshop doing other things than being artists" but who produced art for the Rogue Trader book, "in their own time" and for a fee.

33

81.     The Plaintiff's <u>Expert Report</u> treats the question of these creators in terms of whether they were properly called "freelancers". The Plaintiff's <u>Expert Report,</u> para 98, concludes:

> In our view English law supports a finding that <u>at least some of</u> <u>independent contractors/freelancers working for the Plaintiff were in fact</u> <u>employees</u>, as a matter of law. This most obviously applies to individuals who were in fact employees while also contributing additional efforts

To my mind this conflates two distinct issues. For employees of Games Workshop, the question is not whether they were (as a matter of law) improperly referred to as freelancers when carrying out these tasks, but simply whether these tasks fell within the course of their employment.

82.     This requires an examination of the employee's duties, to determine whether the making of the work fell within the scope of those duties. The starting point of this analysis should be the written contract, if one exists. Whether the work was created during office hours, or using materials provided by the employer, may also be useful evidential pointers, but they are not in themselves determinative. Equally, the fact that the work was created outside of office hours may point toward it being made outside the course of employment, but that fact will not be determinative.

83.     In *Byrne v. Statist Company* [1914] 1 K.B. 622, Byrne was on the editorial staff of the newspaper, the *Financial Times,* and was asked by the paper to translate a speech from Portuguese for inclusion in the paper as an advertisement. Byrne did so and the translation was published in the *FT.* When the Defendant republished the translation, Byrne brought an action. The Defendant denied Byrne owned copyright on the basis that he was an employee of the *FT.* Bailhache J rejected the defence. The copyright belonged to Byrne because, even if he was an employee, the work was not created in the course of employment. The facts were that the *FT* had asked Byrne whether he would do translation, and what his charge was, so clearly the parties understood that the work fell outside his normal duties and was something he was not obliged to do. Moreover, the work was done in his own time.

84.     In *Stevenson, Jordan and Harrison v. MacDonald and Evans* (1952) 69 R.P.C. 10, T.L.R. 101,[6] DF Evans-Hemming, who was an employee and director of the Plaintiff firm, SJH, wrote a management consultancy guide entitled *Flexible Budgetary Control and Standard Costs*. The first section of the book was based on lectures he had given, in part to provide publicity for the Plaintiff firm. When he did so, his expenses were paid, and the lectures were sometimes prepared in company's time. They were also typed by company typist. The company even had some control over their content. The second section, known as the "Manchester section," was prepared while Evans was on secondment to a client of the Plaintiffs in Manchester. Some of this material was prepared after work. Again, Evans used secretarial support of SJH to prepare a typescript. Stencils were prepared for duplication. The third section of the book was completed by Evans after leaving the company. When a proof was sent to SJH, it sought injunction.

Lloyd Jacob J held that the book contained material created during employment. On appeal, the Court of Appeal allowed the appeal in part, confining the injunction to the "Manchester section" (pp 7-39) of the manual.

Lord Evershed MR began by looking at the duties "normally performed" by someone in Evans position (here referred to as an "Engineer"). They consisted principally "of attending on the premises of client companies, and applying their skill and experience in analysis and examination, and preparation of the necessary instruction manuals." He then indicated that even if Evans had been under an obligation to compose and deliver lectures, he was nevertheless entitled to copyright in them. This was both "just and common sense." (R.P.C. 18, T.L.R., 106-7) The rationale was that Evans could not have ordered "to give a lecture to any particular body on any particular topic." Consequently, giving lectures could not be said to be part of Evans' regular duties. There was nothing in the circumstances to displace "ordinary rule." In contrast, the "Manchester section" did belong to the Plaintiff. It was like the work he did in preparing manuals.

---

[6] The case is title "Stephenson" in the *Reports of Patent Cases* but "Stevenson" in the *Times Law Reports*.

Denning LJ (R.P.C. at 22, T.L.R. at 111) explained that not everything done by an employee, even if useful to the employer, is done in the course of employment. Writing the manuals were part of employment, but giving the lectures were "accessory to employment" not part of it.

Morris LJ (R.P.C. at 24, T.L.R, at 113) took a similar approach, focussing on whether Evans could have been required to write the lecture. He said that "it does not seem to me ...that Dr Evans-Hemming could have been ordered to write or deliver these lectures and it seems that it was not part of his duty to write or deliver them."

85.    In *Noah v. Shuba* [1991] F.S.R. 14, Noah was a consultant epidemiologist at the Public Health Laboratory Service (PHLS). PHLS functions included providing information on infectious diseases. Noah was obliged to research and publish in scientific journals and before learned societies. But the employer indicated that writing books and monographs "was not expected to be done in working hours" and was additional to "official duties" (though Noah could use the PHLS laboratory and library) (F.S.R. at 25). Acting on his own initiative, Noah drafted a guide to skin piercing. He wrote the draft at home in the evenings and on weekends, but he discussed the book with colleagues and researched it using the PHLS library. The manuscript was typed by a secretary at the PHLS. Once complete, PHLS published the book, *A Guide to Hygienic Skin Piercing*, in 1982, showing N as author and copyright owner.

The Defendant used a passage from Guide in an article in *Health and Beauty Salon* in a way that suggested Noah approved of the Defendant's services. Noah sued, and the Defendant argued that Noah was not the copyright owner. Mummery J held that Noah owned copyright in the guide. He explained (at 26) that Noah's position was "very similar" to that of Evans in Stevenson, Jordan and Harrison, and cited with approval the judgments of Denning and Morris LJJ.

86.    In *Intercase UK Ltd. v. Time Computers Ltd.* [2004] E.C.D.R. (8) 78, 86-87 (para. 11), a case on whether designs were created "in the course of employment" for the purposes of the UK's unregistered design right, Patten J observed:

"the Court's enquiry is ultimately directed to determining whether the creation of the design fell within the designer's duties as employee and not with the detail of whether the design was made during normal office hours or with the benefit of materials provided at the employer's expense. Issues of the latter kind are of no more than evidential value as pointers, in cases of doubt, towards whether or not the designs were brought into existence by the designer as part of his employment. In a case (such as the present) where the employee's duties are not definitively recorded in a contract, evidence that the design was created during office hours and at the expense of the employer is likely to be significant, but not conclusive. If created during office hours on, for example, a company computer, it will be more difficult for an employee who has no specific duties to prove that he was entitled to use his employer's time for the creation of a product that was to be his personal property. The more natural inference is that work done during the ordinary hours of employment, with the benefit of the employer's facilities, is done for the benefit of the employer. When, however, the design is created during the employee's own time and at his own expense, other evidence is likely to be required, to link the work to the contract of employment."

87.    Finally, copyright in works made by employees in the course of employment will not be treated as belonging to the employer where there is an agreement to the contrary. Such an agreement has been implied from custom: in *Noah v. Shuba* [1991] F.S.R. 14, 26-27, the court held that even if the guide had been written in the course of the epidemiologist's employment, past practice of the employer in allowing its employees to assign copyright to journals indicated the existence of an understanding that copyright was to be retained by its employees.

88.    However, a mere statement that a person is a consultant would not be regarded as an agreement that such a person could retain copyright if the court concluded the relationship was actually that of employer and employee: *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622, 639-40 (Lightman J.).

89. The Plaintiff's <u>Expert Report</u> refers at para 101(c) to the employees of Games Workshop who worked on *Rogue Trader* in a different capacity (Blanche 44, line 16, 24-25; Blanche 47, line 6-7). In my view, a careful examination of the obligations of each employee would be required to assess whether the work on *Rogue Trader*/Warhammer 40,000 was in the course of employment, but the following factors suggest it was not:

> (i) the employees were thought of as acting in a freelance capacity (Blanche, 45, line 5-6; but cf. Blanche, 47, line 11-12);

> (ii) the tasks were seen as separate, stand-alone tasks, 'outside their normal work' (Blanche, p. 47, line 15-17);

> (iii) the tasks were done in their own time (Blanche 45, line 4);

> (iv) they were separately paid (Blanche p. 33, line 6; p. 47, line 13. Cf, Blanche 45, line 5).

**Contributions to Magazines and Journals of Works created before 1 August 1989**

90. The Plaintiff's <u>Expert Report</u>, para 31(a) and para 41, n.1, acknowledges that the general rule for employees is inapplicable to certain works created before 1 August 1989. Section 4(2) of the 1956 Act states:

> Where a literary, dramatic or artistic work is made by the author in the course of his employment by the proprietor of a newspaper, magazine or similar periodical under a contract of service or apprenticeship, and is so made for the purpose of publication in a newspaper, magazine or similar periodical, the said proprietor shall be entitled to the copyright in the work in so far as the copyright relates to publication of the work in any newspaper, magazine or similar periodical, or to reproduction of the work for the purpose of its being so published; but in all other respects the author shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act

91. The Court in these proceedings will need to consider each individual literary or <u>artistic work</u> at issue to determine whether

(i) it was made before 1 August 1989;

(ii) the author was employed;

(iii) the employer was the proprietor of a "newspaper, magazine or similar periodical";

(iv) the work was made <u>for the purpose</u> of publication of the relevant type.

If so, under the statutory regime applicable the only rights that vest in the employer are the rights to so publish the work.

92.　I am unable to ascertain from the information with which I have been provided whether this is likely to be an issue. But I note that the depositions refer

(i) to the publication *White Dwarf* as a "magazine" (Blanche, p 9, line 13-14; p 12, line 10; p. 35, line 15; p. 43, line 5; p. 52, line 23; Andrew Jones, p 40, line 24-25; p 53, line 3; Jeremy Goodwin, p 64, line 1-3,;

(ii) to the operation of *White Dwarf* from as early as 1977-1978 (Blanche, p 9, line 11-14);

(iii) to the inclusion within *White Dwarf* of illustrations, concept drawings and miniatures (Goodwin, p 64line 12-16);

(iv) to a bi-monthly called *Inferno* (Jones, p 97 line 15-19);

(v) *Warhammer Monthly* (Andrew Jones, p. 96, line 12), though this latter magazine seems to have come out after 1989 (see Jones, 96, line 13-25, p 97, line 1-4) and

(vi) to some of the contributors to *Warhammer Monthly* as employees (Jones, 98, line 17-19).

Clearly, this matter needs further exploration to determine accurately the initial ownership of copyright.

93.　In *De Garis v Nevill Jeffress Pidler Pty Ltd* [1990] FCA 218, (available electronically via www.austlii.edu) (1990) 18 I.P.R. 292, an Australian Federal

Court decision on the equivalent provision of the Australian Copyright Act 1968, section 35(4), Beaumont J said, at [89], that

> "[t]he meanings of the words 'newspaper', 'magazine' and 'periodical' where used in s.35(4) are to be determined according to popular usage."

94.     One issue that may prove important is whether section 4(2) applies where only a work is created with a number of possible uses in mind, but is in fact published in a magazine. There appears to be no jurisprudence on this matter. It might well be that a court would apply a "primary purpose" test.

**C. Co-Authorship**

95.     The Plaintiff argues that even if the works were not created by employees, or were created by employees but in circumstances falling outside the scope of employment, so that copyright vests in the relevant creators, nevertheless the Plaintiff is a co-author or joint author of the works.

96.     According to section 10 of the C.D.P.A., a work of joint authorship means

> "a work produced by the collaboration of two or more authors in which the contribution of each author is not distinct from that of the other author or authors"

97.     Section 11(3) of the 1956 Copyright Act contained a very similar definition (the word "separate" being included rather than the word "distinct.") The consequences of joint authorship were elaborated in Schedule 3 of that Act.

98.     The Information Society Directive, 2001/29/EC does not contain any express rules on joint authorship. However, as the Directive refers to the rights harmonized therein being conferred on "the author", it seems to follow that rules on co-authorship would also be a matter of European law.

99.     The definition of joint authorship in section 10 of the C.D.P.A. and section 11(3) of the 1956 Act contains three elements

>    (i)     Two or more authors must have collaborated in the production of a work;
>
>    (ii)    Each must have contributed to the work;

40

(iii)   The contribution of each must be 'not distinct' (or 'separate') from that of the other or others.[7]

100.   The first condition of collaboration of a joint work requires that the work have been made "in prosecution of a pre-concerted joint design" or at least on the basis of cooperation between the authors. See *Levy v. Rutley* (1871) L.R. 6 C.B. 583; *Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd.* [1995] F.S.R. 818.   Separately elaborating a pre-existing work after it is generated does not create a work of joint authorship.   If there is sufficient originality, such effort may rather generate a derivative work in which a separate copyright arises.   For example, where a musician arranges a prior musical work, there may be a new copyright in the arrangement: *Chappell v. Redwood Music* [1981] R.P.C. 337.

101.   The second condition is that each of the joint authors has contributed to the work.   The contribution must be the sort protected by copyright, that is, expression rather than mere ideas.   According to *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622 (Lightman J.)

> "what is required is . . . a direct responsibility for what actually appears on the paper".

102.   Two important principles that flow from this are

(i)   A person does not become a co-author merely by instructing another person to carry out some work;

(ii)   A person does not become a co-author merely by providing ideas or material for another to work with.[8]

103.   The first proposition is illustrated by a series of cases:

---

[7] In this respect the statements of the law in the Plaintiff's Expert Report, (p 13 line 3, para 31(b), that there must be a "distinct contribution from each author," and para 104(c) saying that there must be "Distinct contribution is not distinct from that of the other author") are a little confusing: there must be a not insubstantial contribution but in the final form of the work the contribution of each author must not be distinct.

[8] In this respect, I do not agree with the Plaintiff's Expert Report in so far as it asserts at para. 36 that "the author of a work is the person who originates the protectable elements of the work, whether the language used, dramatic incident or design." The case-law could not be more clear that mere provision of "dramatic incident" does not constitute a person an author.

(i) *Nottage v. Jackson* (1882-3) L.R. 11 Q.B.D. 627 concerned copyright in a photograph of the Australian cricket team. Copyright, available under the Fine Arts Copyright Act 1862, was then conditioned on registration with the Stationers Company. Nottage and Kennard, the managers of the company, were entered on the register as the authors. Neither of them had been at The Oval at the time the picture was taken. The idea for the taking of the picture came from a foreman of the company. The photograph had been taken by one of their employees. The Court of Appeal had no doubt that the Plaintiffs were wrongly entered as authors so that the action could not be sustained. Brett MR speculated as to who was the author of the photograph, at 632-3

> "Certainly it is not the man who simply gives the idea of a picture, because the proprietor may say, "Go and draw that lady with a dog at her feet, and in one hand holding a flower." He may have the idea, but still he is not there. He may be 100 miles from the place, and he may have given the instructions by letter. The nearest I can come to is that it is the person who effectively is, as near as he can be, the cause of the picture which is produced—that is, the person who has superintended the arrangement, who has actually formed the picture by putting the people into position, and arranging the place in which the people are to be—the man who is the effective cause of that. Although he may only have done it by standing in the room and giving orders about it, still it is his mind and act, as far as anybody's mind and act are concerned, which is the effective cause of the picture such as it is when it is produced. Therefore it will be a question in every case who that man is. That will be a matter of evidence. That will be a question of fact. We have not to say in this case who was that man. Suppose it was the principal man who was sent down to the Oval. At all events, it was not either of these two gentlemen who are described as the authors, and it certainly was not both of them."

(ii) *Kenrick & Co v. Lawrence & Co* (1890) L.R. 25 Q.B.D. 99. Here, the Plaintiff claimed copyright in the drawing of a hand (for use in demonstrating to illiterate voters how to vote at elections). The idea for the card had been developed by Jefferson, but as he could not draw, he engaged Bott to do the drawing. At the time, it was necessary to register copyright in drawings, and in

the registration Jefferson was named as the author. When the Plaintiff sued a third party alleging infringement, the validity of the registration was put in issue on the basis that Jefferson was not the author. Wills J agreed:

> "Jefferson is registered as the author of the drawing. It seems to me he was not the author. ... I do not see how a gentleman who is incapable of drawing even such a very simple picture as a rough sketch of the human hand, and who did not, in fact, set pencil to paper in the matter, can be called the author of the drawing. He suggested the subject, and made such limited suggestions as to the treatment as the subject admitted of; but it seems to me that in an Act which gives copyright to drawings the author must mean a person who has at least some substantial share in putting the touches on to paper."

Again, providing instructions was insufficient.

(iii) *Tate v. Fulbrook* [1908] 1 K.B. 821 was an action for infringement of one dramatic sketch, 'Motoring or the Motorist,' by another, entitled 'Astronomy', which although concerned with a different subject had certain similarities in terms of the number and nature of the characters and the 'incidents' (such as one of the characters standing on a fire-cracker). The plaintiff, Tate, claimed to be author and owner of copyright in the sketch. According to the Report "It appeared that the plaintiff had not himself composed the dialogue of "Motoring or the Motorist," but had suggested the general idea and dramatic situations of the piece to a man named Pink, who had composed the dialogue in accordance with the plaintiff's suggestions, and who, in giving evidence, described his part in the matter as clothing the skeleton with words." On appeal, the Court indicated that it did not think that the plaintiff was the author of the sketch in which copyright was claimed. Vaughan Williams LJ observed (at 826):

> "It is true in this case that, to a certain extent, the plaintiff suggested to Mr. Pink the general ideas on which the sketch was to be framed. But that does not, in my opinion, make the plaintiff the author of the sketch, either alone or jointly with Mr. Pink. Many things occur and are reported in the daily newspapers which might form the subject-matter of such a dramatic sketch as is here in question; for instance, such a sketch might

43

conceivably be based upon the adventures of the suffragettes. But a music-hall artist who suggested such a topic as the subject of a sketch to another person, who composed a sketch upon it, would not, I think, be the author of the sketch. As at present advised, if it were necessary to determine the point, I should say that there was no ground for saying that the plaintiff was the author of the sketch in respect of which this action is brought."

Providing the ideas for, and commissioning the execution of a play was not sufficient to make Tate the author.

(iv) *Tate v. Thomas* [1921] 1 Ch. 503. Here Peterman commissioned the three Plaintiffs (James Tate, Clifford Harris and Arthur Valentine) to contribute the music and libretto to a play called *Lads of the Village*. Peterman himself came up with the name of the play and the characters. Tate wrote the music, and under the agreement was paid a fee and entitled to a royalty. Once the work was complete Peterman assigned copyright to the Defendants, who proposed to release a cinematographic version. The Plaintiffs objected. The question for the court was whether Peterman was the author or a joint author. The judge, Eve J, described him (at 509-10) as "a gentleman of a fertile imagination and possessed of a fluency and powers well qualifying him for communicating his views to the authors." The Plaintiffs did not contest Peterman's claim that the work embodied some ideas and a few catch lines or words for which Mr. Peterman may claim credit, but they argued that these did not make him the author of the work. Eve J agreed. At 512 he explained:

"Even were I to give Mr. Peterman credit for a much larger share than I am prepared to attribute to him in settling the scenes and accessories of this play, I could not hold his claim to be considered the author of the piece paramount to that of the plaintiffs. I am quite satisfied that he cannot be regarded as the author. Then it is said that if he is not the sole author, he is at least a joint author. ... The question whether Mr. Peterman's claim to be a joint author of this work, so far as it is subject matter for protection under the Act, is one of fact; and having heard all the evidence I have come to the conclusion that his contributions to the

44

matter capable of being printed and published were so insignificant and negligible as to make it quite impossible for me to hold him to have been in any sense a joint author within the Act."

The organisation of the writing of the play, even coupled with the provision of the title and ideas as to its content, did not make Peterman an author.

104.　The second proposition is best illustrated by the cases on 'ghost authorship', that is circumstances where a person provides autobiographical data from which another can prepare a text. In such cases it is the writer, rather than the subject who is regarded as the author:

(i) *Evans v. Hulton & Co Ltd* (1924) [1923-28] *MacGillivray's Copyright Cases* 51. Here the Plaintiff, Frank Evans, claimed to be author of the literary work, '*A Free-Lance Detective: Life of Hadji Lello Zeitun*', and entitled therefore to prevent Hulton, the publisher of the newspaper the *Daily Sketch*, from publishing extracts from the book. Hulton had the permission of Zeitun, the subject of the book, who claimed to be its author. The process of creation of the book was that Evans had agreed to write a book about Zeitun's life, the agreement leaving to Evans the power to exploit the work with Zeitun to receive half of the profits gained from such exploitation. Zeitun, whose first language was not English, related incidents in his life to Evans who then (according to the reporter's summary of Zeitun's evidence) "put them into proper language" (55). Evans was held to be the author. Tomlin J explained:

> The fact that he is the subject-matter of the production in the sense that it is an incident from his life, for which he provided the material, does not seem to me to make him in any sense the joint author with Mr. Evans of the manuscript which was in fact written, and, upon the facts which I have stated, I find that he did not take any part in producing the express matter which is the original literary work, the subject-matter of copyright.

(iii) *Donoghue v. Allied Newspapers Ltd* [1938] Ch. D. 106. The Plaintiff was a racecourse jockey who had agreed to provide a journalist from the newspaper, the *News of the World*, with material for a series of articles. The journalist,

45

Felstead, produced the articles, which were published. Five years later, Felstead had discussions with another publisher about republishing updated versions, and, when negotiations with the Plaintiff stalled, he brought an action to restrain publication on the basis that he was author, or even a joint author, of the articles. The Court rejected the claim. Farwell J stated (at 109)

> "a person may have a brilliant idea for a story, or for a picture, or for a play, and one which appears to him to be original; but if he communicates that idea to an author or an artist or a playwright, the production which is the result of the communication of the idea to the author or the artist or the playwright is the copyright of the person who has clothed the idea in form, whether by means of a picture, a play, or a book, and the owner of the idea has no rights in that product."

He explained his conclusion that Felstead was the sole author (at 110):

> "Although many of the stories were told in the form of dialogue, and to some extent Mr. Felstead no doubt tried to reproduce the story as it was told to him by the plaintiff, nevertheless the particular form of language in which those adventures or stories were conveyed to the public was the language of Mr. Felstead and not the language of the plaintiff."

105.    The Plaintiff's Expert Report (at para 37) states that

> "a person who suggests a plot may be one of the authors provided that his/her suggestions are sufficiently substantial, well defined and original"

It cites *Ibcos Computer Ltd v. Barclays Mercantile Highland Finance Ltd* [1994] F.S.R. 275, 302. This was an infringement case, concerning computer programs, in which the Court (obiter) suggested that copyright in a literary work might be infringed by reproducing the plot. Not surprisingly, the foregoing cases on authorship were not cited to the Court. Without wishing to contest the Plaintiff's Experts proposition, it seems clear that as a general matter that merely contributing ideas for works, including ideas for a plot, will seldom if ever be regarded as sufficient to justify a finding of joint authorship.

106.    The Plaintiff's Expert Report (at para 37) states that

"a person may be the true author if he/she is responsible for creating, selecting or gathering together the detailed concepts data or emotions contained in a work".

Although this statement derives from the judgment of Laddie J in *Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd.* [1995] F.S.R. 818, 835,[9] in the light of the case-law just set-out, in particular *Evans* and *Donughue*, I have some trouble with this as a statement of law. That case-law indicates the contribution of concepts, information (such as biographical information) and emotions may not be authorial contributions *even if* detailed. The question is not whether the concepts are detailed, but whether that detail contributes to or determines the final expressive form of the work. As we will see, Laddie J's proposition was also unnecessary for determination of the case, and so should be regarded as obiter dicta.

107.   In *Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd.* [1995] F.S.R. 818, the question arose as to ownership of copyright in designs of certain houses, Cala's 'New Standard House range,' which Cala alleged that McAlpine had copied. One of Cala's employees, a Mr Date, directed the creation of the plans, but technical draughtsmen from an outside firm of consultants (Crawley Hodgson) had been used to do the actual drafting. Laddie J found there to be joint authorship -- in fact he said Date was the main author. Importantly, Date did not just provide "concepts, data or emotions": he obsessively supervised the detailed features of the plans. The Judge summarised the evidence (at 831-2, 833, 834):

> Mr Date's evidence was that he was a workaholic who only passed the drawing exercise to Crawley Hodgson because he no longer had sufficient time to put the lines on the paper. However, save in this respect, it was clearly his view that he was responsible for deciding, in detail, what those drawings were to look like. Having seen Mr Date in the

---

[9] "In my view, to have regard merely to who pushed the pen is too narrow a view of authorship. What is protected by copyright in a drawing or a literary work is more than just the skill of making marks on paper or some other medium. It is both the words or lines and the skill and effort involved in creating, selecting or gathering together the detailed concepts, data or emotions which those words or lines have fixed in some tangible form which is protected. It is wrong to think that only the person who carries out the mechanical act of fixation is an author. There may well be skill and expertise in drawing clearly and well but that does not mean that it is only that skill and expertise which is relevant."

witness box I have no doubt that he is a man who has very firm views of what he does and does not like and of the designs which he thinks are suitable for Cala. His evidence was that he told Mr Hodgson precisely what features were to be incorporated into each house. In many cases this was done with the aid of sketches, which no longer exist, drawn by him.

...

Mr Hodgson's evidence is consistent with that given by Mr Date. He said that Mr Date gave Crawley Hodgson a very detailed brief and that he was even specific as to the choice of materials to be used. The original briefing session with Mr Date took a whole day in which the design of each of the first group of 12 house designs were considered in detail. He stated that in the case of some designs, his firm's design input could be measured as a few percent.

...

It is clear from the evidence that much if not most of the design features to be found in the Crawley Hodgson drawings came from and were insisted upon by Mr Date during the briefing and vetting sessions he had with Mr Hodgson. However not only were the Crawley Hodgson drawings not produced by Mr Date, they were also not drawn by Mr Hodgson. The actual draughtsmanship was the responsibility of more junior employees of Crawley Hodgson. Although neither Mr Date nor Mr Hodgson was able to be certain, it is likely that one or more of these employees sat in on some of the Date/Hodgson meetings. One other employee who did attend the meetings was a Mr Steadman. He was in charge of co-ordination between Cala and the junior draughtsmen who actually drew the drawings. Mr Steadman was Mr Date's contact with regard to the actual physical drawing side of the commission to Crawley Hodgson. However the evidence is that he did not make any design suggestions of his own.

In these very unusual circumstance, a finding that Date was an author of the plans seems consistent with the general principle that the contribution must be

48

to the expression (rather than merely to ideas): the detailed <u>expressive forms</u> came from him, he supervised the draughtsmanship in a controlling manner and neither welcomed nor tolerated any deviation from the forms he had specified. The draughtsperson here was the architectural equivalent of an amanuensis.

108.    The Plaintiff's <u>Expert Report</u> (para 104(b)) also rightly states that to be a basis of co-authorship, there must be "significant creative input" and (at para 37) that contributions must be "sufficiently substantial, well-defined and original."

109.    The third requirement is that the contributions are not "distinct." This excludes from joint authorship the situation where one person writes certain parts and another the others, for example, where one writes the words and the other the music of an opera or a song. But it has been held that, where one person added an introduction to the music of a song, this introduction was not "distinct" because it was "heavily dependent" on the rest of the tune and because, by itself, it would "sound odd and lose meaning": *Beckingham v. Hodgens* [2003] F.S.R. 238, 248.

110.    Under current British law, one joint owner may not exploit a joint work without the licence of the other or others. C.D.P.A., Sec. 173(2). In *Cescinsky v. Routledge* [1916] 2 K.B. 325 (Rowlatt J), where a publisher and author co-owned copyright in a book, the author was held to be entitled to sue the publisher co-owner, who without the author's consent had published a derivative version. See also *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622, 637-638 (Lightman J.).

111.    The Plaintiff's <u>Expert Report</u> says the works that were developed by freelancers were created through collaboration (paras 102). It goes on to say that

> "the Plaintiff employees [contributed] their skill, creativity, guidance and control. Under English law, such illustrations...would constitute joint works."

As should now be clear, that conclusion is not warranted from what is known about the nature of the contributions at this stage. Mere contribution of "skill,

creativity, guidance and control" is beside the point. The question is whether there is a significant, original contribution of expression.

112.  The Plaintiff's Expert Report is more accurate where it states (at 105) that:

> "A court would have to consider each item and the relative contribution of those involved in its creation to determine whether each has made a significant creative input..."

In carrying out that analysis, relevant creative inputs do not include taking the initiative, giving abstract instructions, making suggestions as to subject matter. The relevant input must contribute directly to the expressive form of the work.

## D. Other Relevant Principles of Ownership

113.  The Plaintiff also claims it might have become the owner of copyright in various works by other means. These include (i) in relation to works created before 1 August 1989, by virtue of the special rule on commissions; (ii) by assignment; and (iii) by implied or equitable assignment.

### Commissioned Works under the Copyright Act 1956

114.  Under the C.D.P.A., the only exception to the principle that the author owns copyright relates to employees. However, for works created prior to 1 August 1989, the Copyright Act 1956 determines ownership. Under that Act there was a second exception relating to a narrow category of works. Section 4(3) provided that:

> Subject to the last preceding subsection, where a person commissions the taking of a photograph, or the painting or drawing of a portrait, or the making of an engraving, and pays or agrees to pay for it in money or money's worth, and the work is made in pursuance of that commission, the person who so commissioned the work shall be entitled to any copyright subsisting therein by virtue of this Part of this Act.

115.    The rule on commissions was particularly aimed at protecting the privacy of those who had their portraits taken (and could be traced back to the Fine Arts Copyright Act 1862). The inclusion in the provision of "engravings" is less easy to explain.

116.    The Plaintiff's Expert Report (paras 71-73) cites various case-law giving an expansive definition of "engraving". One of those was a Court of Appeal decision from New Zealand, *Wham-O Manufacturing Co v Lincoln Industries Ltd* [1985] RPC 127. The cases that are binding on an English court are at first instance only (and thus would only bind a court of first instance). However, this stream of authority must now be regarded as unsafe.

117.    In *Lucasfilm v Ainsworth* [2012] 1 AC 208,[10] the Supreme Court referred to *Wham-O*, and Lords Collins and Walker (with whom Baroness Hale and Lord Phillips agreed) stated (at 223, [30]):

> "Much of the judgment is taken up with reasoning leading <u>to the rather surprising</u> conclusion that the moulds and final products were engravings."

This suggests that the Supreme Court regarded itself as unlikely to reach a similar conclusion.

118.    As already noted, in *Lucasfilms* the Supreme Court affirmed the views of the lower courts that defining the concept of "sculpture" involved looking for a number of factors (Mann J, para 118; Jacob LJ, at para 54; Supreme Court, at 228, [47] ). These included:

> (i) the ordinary meaning of the term;

> (ii) whether the object had, as part of its purpose, a visual appeal in the sense that it might be enjoyed for that purpose alone, whether or not it might have another purpose as well. The purpose is that of the creator.

> (iii) the process of fabrication;

---

[10] The Plaintiff's Expert Report cites the case as "Lucasfilms".

These factors seem applicable, *mutatis mutandis*, to the definition of the term "engraving."

119. The Supreme Court observed (at 228, [48]) that the relationship between copyright law and designs itself provided a policy reason to interpret copyright in a limited way:

> "the court should not, in our view, encourage the boundaries of full copyright protection to creep outwards."

That policy consideration seems equally applicable to the construction of the term "engraving."

120. To determine whether any of the moulds or miniatures are engravings for the purpose of section 4(3) of the 1956 Act, in my view, the Court will need to make a close analysis of how the models are made, their purpose, and whether in their final form they fall within the ordinary meaning of "engraving". One factor of over-riding relevance is likely to be Games Workshop Ltd's own description of process of production. The depositions identify a department of the business as "a sculpting department". See eg Blanche, p. 18, line 1; page 54, line 17).

121. The provision on commissions was removed in the 1988 reforms. In relation to portraits, the concern with privacy was addressed through a special moral right in C.D.P.A. s 85. In its report, *Copyright and Designs Law. Report of the Committee to Consider the Law of Copyright and Designs (*1977) Cmnd. 6732, the Whitford Committee noted that, portraits aside, no one had been able to suggest any valid ground for treating photographs and engravings differently from other commissioned works. See (Cmnd. 6732), para. 561.

**Transfers**

122. Copyright is a property right: C.D.P.A., s. 1. It is capable of transfer. The principles governing transfers are contained in C.D.P.A., s. 90. This reads:

> (1) Copyright is transmissible by assignment, by testamentary disposition or by operation of law, as personal or moveable property.

(2) An assignment or other transmission of copyright may be partial, that is, limited so as to apply—

    (a) to one or more, but not all, of the things the copyright owner has the exclusive right to do;

    (b) to part, but not the whole, of the period for which the copyright is to subsist.

(3) <u>An assignment of copyright is not effective unless it is in writing signed by or on behalf of the assignor.</u>

(4) A licence granted by a copyright owner is binding on every successor in title to his interest in the copyright, except a purchaser in good faith for valuable consideration and without notice (actual or constructive) of the licence or a person deriving title from such a purchaser; and references in this Part to doing anything with, or without, the licence of the copyright owner shall be construed accordingly.

Similar provisions were contained in Copyright Act 1956, s. 36. For transitional arrangements, see C.D.P.A., Sched 1, para 25.

123.     The recitals to the Information Society Directive also confirm that the rights that are harmonized under European law are assignable:

    (30) The rights referred to in this Directive may be <u>transferred, assigned or subject to the granting of contractual licences</u>, without prejudice to the relevant national legislation on copyright and related rights

124.     Consequently, even if the copyrights in various pieces of concept art, sculpture of miniatures or illustrations vest initially in the author/creator, that copyright can be transferred or licensed.

125.     As should be clear, an assignment must be in writing. Assignments of rights in relation to works that are not yet in existence is also recognised: C.D.P.A., s. 91; Copyright Act 1956, s. 37.

126.     Consequently, there is little doubt that where the Plaintiff can establish written assignments, it will be regarded as the owner of copyright in the subject matter to which the assignment relates. Thus, for example, the copyright agreement

between Dan Abnett and Games Workshop Ltd dated 11 December 1996 is, on its face, a signed and effective assignment of copyright (see Clause 3.1), though the precise works which it covers would need to be identified by extrinsic evidence. So, too, is that between Games Workshop and John Sibbick (though this is dated only '1994') and that between Games Workshop and Ben Counter (though this one has no date at all), though, once again, the dates of these agreements would need to be proved by the Plaintiff through extrinsic evidence. In contrast, the so-called 'confirmatory assignment' between Adam Troke and Games Workshop has no signature, and thus is not a valid assignment.

127.    The purpose of the rule that assignments must be in writing has been little explored in UK commentaries or jurisprudence. However, in the United States there has been some valuable comment. In *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) Circuit Judge Alex Kozinski explained 17 U.S.C. § 204(a) thus:

> "Common sense tells us that agreements should routinely be put in writing. This simple practice prevents misunderstandings by spelling out the terms of a deal in black and white, forces parties to clarify their thinking and consider problems that could potentially arise, and encourages them to take their promises seriously because it's harder to backtrack on a written contract than on an oral one. Copyright law dovetails nicely with common sense by requiring that a transfer of copyright ownership be in writing. Section 204 ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price... Most importantly, section 204 enhances predictability and certainty of copyright ownership--"Congress' paramount goal" when it revised the Act in 1976. ... Rather than look to the courts every time they disagree as to whether a particular use of the work violates their mutual

> understanding, parties need only look to the writing that sets out their
> respective rights."

128.    A licence need not be in writing, and indeed can be implied. The circumstances
        in which licences are to be implied and the scope of such implied licences is
        discussed by Lightman J in *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622.
        This case is included in the documents annexed to the Plaintiff's Expert
        Report. The relevant passages are 640-645, selections of which appear in the
        Plaintiff's Report, and other parts of which I set out below. The key feature is
        that the courts will only imply terms in narrowly defined circumstances and the
        terms that are implied will be the mimimum necessary to achieve the mutually
        intended result.

## Equitable assignment

129.    The Plaintiff raises the possibility that where the works were created by
        freelancers, their copyright might belong to the Plaintiff even absent an express
        written assignment. This is as a result of an "implied assignment." The
        Plaintiff's Expert Report (paras 74-96) recognises that English courts have
        occasionally held that even in the absence of an agreement the court can re-
        allocate the rights under general principles of contract and equity.

130.    The rules are discussed by Lightman J in *Robin Ray v. Classic FM Ltd.* [1998]
        F.S.R. 622. It is important to highlight for the Court a number of propositions
        made by the judge in his review (at 640-645) that are not reproduced in the
        Plaintiff's Expert Report:

> The general principles governing the respective rights of the contractor
> and client in the copyright in a work commissioned by the client appear
> to me to be as follows:
>
> (1) the contractor is entitled to retain the copyright in default of some
> express or implied term to the contrary effect;
>
> (2) the contract itself may expressly provide as to who shall be entitled to
> the copyright in work produced pursuant to the contract. ....
>
> (3) the mere fact that the contractor has been commissioned is
> insufficient to entitle the client to the copyright. Where Parliament
> intended the act of commissioning alone to vest copyright in the client,

*e.g.* in case of unregistered design rights and registered designs, the legislation expressly so provides (see section 215of the 1988 Act and section 2(1A) of the Registered Designs Act 1949 as amended by the 1988 Act). In all other cases the client has to establish the entitlement under some express or implied term of the contract;

(4) the law governing the implication of terms in a contract has been firmly established (if not earlier) by the decision of the House of Lords in *Liverpool City Council v. Irwin* [1977] A.C. 239 ("Liverpool"). In the words of Lord Bingham M.R. in *Philips Electronique v. British Sky Broadcasting Ltd* [1995] E.M.L.R. 472 ("Philips") at 481, the essence of much learning on implied terms is distilled in the speech of Lord Simon of Glaisdale on behalf of the majority of the Judicial Committee of the Privy Council in *BP Refinery (Westernport) Pty Ltd v. The President, Councillors and Ratepayers of the Shire of Hastings* (1978) 52 A.L.J.R. 20 at 26:

> Their Lordships do not think it necessary to review exhaustively the authorities on the implication of a term in a contract which the parties have not thought fit to express. In their view, for a term to be implied, the following conditions (which may overlap) must be satisfied:
>
> (1) it must be reasonable and equitable;
>
> (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it;
>
> (3) it must be so obvious that "it goes without saying";
>
> (4) it must be capable of clear expression;
>
> (5) it must not contradict any express term of the contract.

Lord Bingham added an explanation and warning:

> The courts' usual role in contractual interpretation is, by resolving ambiguities or reconciling apparent inconsistencies, to attribute the true meaning to the language in which the parties themselves have expressed their contract. The implication of contract terms involves a different and altogether more ambitious undertaking: the interpolation of terms to deal with matters for which, *ex hypothesi*, the parties themselves have made no provision. It is because the implication of terms is so potentially intrusive that the law imposes strict constrains on the exercise of this extraordinary power . . .The question of whether a term should be implied, and if so what, almost inevitably arises after a crisis has been reached in the performance of the contract. So the court comes to the task or implication with the benefit of hindsight, and it is tempting for the court then to fashion a term which will reflect the merits of the situation as they can appear. Tempting, but wrong.

(5) where (as in the present case) it is necessary to imply the grant of some right to fill a lacuna in the contract and the question arises how this lacuna is to be filled, guidance is again to be found in *Liverpool*. The principle is clearly stated that in deciding which of various alternatives should constitute the contents of the term to be implied, the choice must be that which does not exceed what is necessary in the circumstances (see Lord Wilberforce at 245F—G). In short a minimalist approach is called for. An implication may only be made if this is necessary, and then only of what is necessary and no more;

(6) accordingly if it is necessary to imply some grant of rights in respect of a copyright work, and the need could be satisfied by the grant of a licence or an assignment of the copyright, the implication will be of the grant of a licence only;

(7) circumstances may exist when the necessity for an assignment of copyright may be established. [This passage is quoted in the Plaintiff's Expert Report and so is not repeated here];

(8) if necessity requires only the grant of a licence, the ambit of the licence must be the minimum which is required to secure to the client the entitlement which the parties to contract must have intended to confer upon him. The amount of the purchase price which the client under the contract has obliged himself to pay may be relevant to the ambit of the licence. ...[I]t seems to me that the principle involved is this; that the engagement for reward of a person to produce material of a nature which is capable of being the subject of copyright implies a permission, or consent, or licence in the person giving the engagement to use the material in the manner and for the purpose in which and for which it was contemplated between the parties that it would be used at the time of the engagement.

(9) the licence accordingly is to be limited to what is in the joint contemplation of the parties at the date of the contract, and does not extend to enable the client to take advantage of a new unexpected profitable opportunity (consider *Meikle v. Maufe* [1941] 3 All E.R. 144).

These statements of principle accord with a number of cases where the client has been refused an assignment of copyright and granted only a licence (see, *e.g. Cooper v. Stephens* [1895] 1 Ch. 567); and a number of other cases where the licence granted to the client has been limited to use the copyright work for the purposes for which it was commissioned (see, *e.g. Stovin-Bradford v. Volpoint Properties Ltd* [1971] 1 Ch. 1007). These statements may appear difficult to reconcile with the actual decisions in a number of the cases where a term has been implied into a contract for services for the assignment of copyright by the contractor to the client. Some of the cases cited as instances where an obligation to assign has been implied may in fact have only decided that a licence should be implied: see, *e.g. Harold Drabble Ltd v. Hycolite Manufacturing Co.* [1923–8] Macg. Cop. Cas. 322; and in others the

exact relationship of the contractor and client is not clear: see *Merchant Adventurers Ltd v. M Grew & Co. Ltd* [1973] R.P.C. 1, (a case where the contractor supported the client's claim against the infringer). It is however to be noted that: (1) in most, if not all, of those where a term has been implied for assignment, assumed that, if a term was to be implied conferring rights on the client, that term should be that there should be an assignment. The alternative implication of a licence was not considered (see, *e.g. Ironside v. Attorney-General* [1988] R.P.C. 197); and (2) it was not until the Copyright Act 1956 that an exclusive licence could be granted conferring rights of action against third party infringers: before that date in order to confer a right of action against infringers it was necessary to assign the copyright. These authorities accordingly afford limited guidance today where the issue raised is whether the necessary implication is of an assignment or some form of licence. Indeed today it may be rare that necessity requires an assignment and the grant of an exclusive licence will not suffice.

131.    In *Grisbrook v MGN Ltd*, [2009] EWHC 2520 (Ch), Patten LJ referred to that statement and observed:

> Although the law on implied terms has recently been considered by the Privy Council in *Attorney General of Belize v Belize Telecom Limited* [2009] UKPC 10 , there is nothing, I think, in that judgment which undermines this statement of principle in a case where no relevant express terms have been agreed.

Lightman J's summary was also treated as authoritative by the Court of Appeal in *Lucasfilm v Ainsworth* (at para 207).

132.    Let me draw out the following points from Lightman J's summary:

> (i) The implication of terms is intended to give effect to what is in the joint contemplation of the parties at the date of the contract;

> (ii) Terms will only be implied where they are necessary;

> (iii) The terms that are to be implied are the minimum necessary to give effect to those intentions;

> (iv) It will rarely be necessary to imply an assignment;

> (v) A commissioning arrangement does not of itself imply such an assignment;

(vi) The determination of whether an assignment is to be implied depends on a range of considerations.

133. The Plaintiff's <u>Expert Report</u> (para 74)

"an English court <u>will often</u> imply a term into the commissioning agreement for the copyright to be held on trust for the commissioner as the true beneficiary of the same" (my emphasis).

That proposition must be regarded as dubious in the light of proposition 3 and 9 of Lightman J.'s analysis, where he says that it will <u>rarely</u> be necessary to imply an assignment. Indeed in paragraph 9, Lightman J. casts doubt on the correctness of a host of previous decisions that seemed to imply assignments. It is also notable that, on the facts of *Robin Ray*, the Court rejected a claim that there was an implied assignment.

134. The Plaintiff's <u>Expert Report</u> (paras 31(c), 82, 97) seems to elevate the categories or situations listed by Lightman J in proposition 7 into categories of law. In my view, that is an inadvisable approach for fourreasons:

(i) First, it loses track of the rationale for implying the terms, that is to give effect to the intention of the parties at the time of the contract;

(ii) Second, it is inconsistent with what Lightman J in fact said. Having set out the three examples of situations in which it "may" be appropriate to imply an assignment, Lightman J reiterates that

In each case it is necessary to consider the price paid, the impact on the contractor of assignment of copyright and whether it can sensibly have been intended that the contractor should retain any copyright as a separate item of property.

(iii) Third, in *R. Griggs Group v. Raben Footwear* [2005] F.S.R. (31) 706, 714 (para 14) Jacob LJ noted:

"para. 7 on its own does not purport to lay down a universal rule. Lightman J. merely says that in such circumstances the implied term is 'likely to arise.' The passage rightly recognises that in each case whether or not a term is implied and, if so, what it is will depend on all the factual circumstances. Lightman J. is here no

more than pointing out powerful factors for copyright entitlement to lie with the client."

See, to similar effect, *Clearsprings Management Ltd. v. Businesslinx Ltd.* [2006] F.S.R. (3) 21, para 9 (Floyd J) (set out below).

(iv) Fourth, it transforms a process of inferring the intention of the parties into a rule of law. Recently the Court of Justice of the European Union has indicated, (in relation presumably to transactions after 2002) that Member States may not operate legal provisions transferring ownership automatically from the designated beneficiary under the Information Society Directive (in our circumstances, "the author"): Case C-277/10 *Martin Luksan v. Petrus van der Let* (9 February 2012).

135.    The Plaintiff's Expert Report presents these principles as of common application to ordinary cases. To my mind, for a host of reasons, equitable assignments should be ordered only in exceptional circumstance following a close analysis of the facts. In this respect, it is notable that in a number of cases referred to in the Plaintiff's Expert Report, the holdings on implied/equitable assignments were *obiter dicta*, the court ruling on a different ground. This is true of:

(i) *Massine v. De Basil* [1936–45] *MacGillvray's Copyright Cases* 223 (referred to in the Plaintiff's Expert Report, at para 96) where the Court held that choreographic works that had been created by Massine belonged to De Basil under section 5(1) of the Copyright Act 1911, as he was a salaried servant of the defendant, and in preparing the choreography was acting in that capacity.

(ii) *Nichols Advance Vehicle Systems Inc v. Rees* [1979] R.P.C. 127 where the statements regarding implied terms were also *obiter* because the Court found the author to have created the drawings as an employee in the course of employment.

(iii) *Pasterfield v. Denham* [1999] F.S.R. 168. This is ambiguous as an authority because, having held that there was an implicit understanding that the commissioner was to own copyright in the drawings in issue, Judge Overend stated that if he was wrong there was an implied licence.

136.    The Plaintiff's Expert Report refers in particular to *R. Griggs Group v. Raben Footwear* [2005] F.S.R. (31) 706[11]; and *Lucasfilm v Ainsworth* [2009] F.S.R. (2) 103.

137.    In *R. Griggs Group v. Raben Footwear*, Griggs, distributors of DR. MARTEN'S AIRWAIRS, had in 1988 commissioned the advertising agency, Jordan, to produce a logo for it. Evans, who did freelance work for Jordan, produced the logo and was paid on his standard rate of £15 an hour. Nothing was said about copyright in the logo. In 2002, Evans purported to assign copyright in the artistic work to Raben Footwear, an Australian competitor of Griggs. In response, Griggs brought an action seeking a declaration that it was beneficial owner of copyright, and an assignment of legal title. Deputy Judge Prescott QC held that Griggs was entitled to the copyright and the Court of Appeal dismissed the appeal.

Deputy Judge Prescott QC held that while Evans was the author, and first owner of the legal title, an agreement that copyright was to belong to Griggs was to be implied. Such an agreements was necessary to give business efficacy to the arrangement, under which it was clearly contemplated that Griggs would be able to use the logo and stop others from using it (para 57). This could only be achieved if the implied agreement was to assign the copyright or give a perpetual exclusive licence (and the latter solution would be less convenient for Evans). In turn, this gave rise to a trust with respect to the copyright in the commissioned work, and rendered the commissioner the equitable owner. Raben Footwear were purchasers from Evans, but were not 'Equity's Darling',[12] and, having notice of the position, were bound by Griggs's equitable rights. Subject to the question of jurisdiction, the court would order Raben footwear to transfer the copyright to the claimant, Griggs.

On appeal, Jacob LJ agreed that an officious bystander would take the view that Evans was not to retain any interest. The argument that all Jordan (and in turn Griggs) required was a limited licence was, he said 'fantastic' (para 19). He explained:

---

[11] The account of this case in the Plaintiff's Expert Report, para. 84, is inaccurate when it states that the design was commissioned from "the second defendant, a rival manufacturer".
[12] Third party purchasers for value and without notice of the equitable interest.

> If an officious bystander had asked at the time of contract whether Mr
> Evans was going to retain rights in the combined logo which could be
> used against the client by Mr Evans (or anyone to whom he sold the
> rights) anywhere in the world, other than in respect of point of sale
> material in the UK, the answer would surely have been "of course not."
> Mr Evans had no conceivable further interest in the work being created—
> indeed he surely would never have had the job at all if there had been a
> debate about this and he had asserted that that was to be the basis of his
> work."

Lest he be thought to have been creating a categorical rule it is worth noting
Jacob LJ's further observation at para 21:

> Further use does indeed often cause problems as between an author and
> his commissioner and it is always better if payment for this is spelt out in
> the contract. A right to further payment for unforeseen or undisclosed
> further use may in some cases be implied. In others the author may
> indeed retain copyright and actually be able to prevent further use. All
> depends on the circumstances. In the present case, however, there is
> simply no such problem.

138.   *Lucasfilm Ltd v. Ainsworth*, [2010] Ch 502 concerned ownership of copyright
in the helmets of the stormtroopers for the Star wars movies. In brief, the
drawings were produced by McQuarrie for Lucas; a clay version was then
produced by Pemberton; when Lucas asked Pemberton to produce a plastic
version he commissioned Ainsworth. Ainsworth was informed the helmet was
for use as a prop in a dramatic production, and made certain small deviations
from Pemberton's model. Lucas liked the plastic version, and initially ordered
50 at £20 each. Further orders were made, and ultimately Ainsworth received a
fee of £30,000. Mann J. held that Lucas owned copyright, and Ainsworth
appealed. The Court of Appeal affirmed, applying the reasoning in Griggs and
Robin Ray. Jacob LJ explained that

> " it was always inherent in the relationship that if it proceeded to a
> contract, it would be on terms that would reward Mr Ainsworth for his
> preliminary work but would confer the primary copyright interests on the

commissioning party."

And later, at 556-7 (para 208), that:

"The fact that the parties may not have anticipated the success of the film is quite beside the point. The question, which has to be answered objectively and does not depend in any way on what might in fact have gone through the minds of particular parties, is what the parties would have agreed if the question of licensing opportunities had been raised. We agree that in those circumstances, it would never have occurred to anyone to say that Mr Ainsworth should have retained any (necessarily limited) copyright interests. We agree that an obligation to assign was necessarily to be implied. It was also reasonable, and there is nothing in the commercial arrangements then made, eg in the prices agreed, to suggest that it was unreasonable."

139.    *Griggs* and *Lucasfilm* can (and should) be regarded as exceptional cases where assignment was implied. Some key facts worth drawing out were:

(i) *Griggs* concerned a commercial logo (a work of relatively low authorship);

(ii) The work commissioned involved combination of two existing logos;

(iii) It was clear to the parties that it would be exploited commercially;

(iv) Evans understood this to be "point of sale" material, but would not have charged differently had the use been intended to extend to other;

(v) The assignment by Evans to Raben Footwear in 2002 was opportunistic.

And in *Lucasfilm v Ainsworth*:

(i) Ainsworth was commissioned to produce something that was a virtual replica of an existing sculpture, and thus appreciated that he was one step in a production process;

(ii) Ainsworth knew of the purpose (a "dramatic production" -- though he understood a play, rather than a film: see [2009] F.S.R. (2) 103, 124, [35]);

(iii) Ainsworth was well-remunerated ([2009] F.S.R. (2) 103, 175, [189] ("was not plainly of such a sum which must inevitably have meant that he retained some of the intellectual property rights").

140.    There are a host of cases where the Plaintiff claimed an equitable assignment but did not succeed. These include:

(i) *Tate v. Thomas* [1921] 1 Ch. 503, which concerned the commissioning of a play as a composite work with the benefit of some material provided by the Plaintiff. Eve J rejected a claim that there was an implied/equitable assignment of the copyright because there was an express agreement as to staging rights for a play.

(ii) *Robin Ray v. Classic FM Ltd.* [1998] F.S.R. 622, which concerned the compilation of a catalogue of recordings for inclusion in the Defendant's database (that would be used to programme automatically what recordings would be broadcast over the radio). The Defendant claimed to be entitled to exploit the database abroad. Lightman J. held, at 644-5, that this was not within the contemplation of the parties at the time of the contract, so there was no need for anything more than a licence to be implied permitting the Defendant to use the database in the UK, and an implied undertaking by the Claimant not to licence a competitor.

(iii) *Clearsprings Management Ltd. v. Businesslinx Ltd.* [2006] F.S.R. (3) 21. Here the commissioner of a web-based database was held only to be entitled to perpetual and irrevocable, royalty-free, non-exclusive personal license, as opposed to the copyright ownership or exclusive license contended for. Floyd J stated (at para 9)

"I would stress, as is already apparent from this passage from Lightman J.'s judgment, that whether a term is to be implied, and if so what term, is entirely dependent on the circumstances of the individual case. The examples given in Lightman J.'s judgment are no more than examples of cases where, as he says, the necessity for a transfer of ownership or exclusivity *may* arise. Unlike a contract

for the sale of goods, where it can be said that certain terms will be universally implied unless excluded expressly, the circumstances in which a copyright work may be created by an independent contractor are extremely varied. <u>One should not forget that the starting point is that Parliament has conferred copyright on the author of the work and that there it will remain unless the circumstances are such as to make it necessary to imply obligations which have the effect of transferring it to the client or otherwise cutting down its scope.</u>"

(iv) *Slater v. Wimmer* [2012] EWPCC 7. Here the dispute was over ownership of copyright in film footage of a skydive over Everest. Wimmer had heard about the skydive and wanted to be in it and be filmed. He planned to make two films, one for Danish audiences and one to be exploited more generally. The films would incorporate the footage with other material. He needed a cameraman. Slater, a 21 year old, was recommended and agreed to do it; Wimmer agreed to pay Slater's costs for the trip. Slater knew the purpose of the footage (para 92). Two year's after the trip, Slater discovered that a documentary had been broadcast on Danish TV which contained 150 seconds of footage from the film. HH Judge Birss QC, the Judge in the Patent County Court (a specialist intellectual property court providing for cheap litigation) found that Wimmer was "producer" and Slater "director" of the film, which was thus a work of joint authorship. He declined to imply an assignment of Slater's share to Wimmer. Even though this was a case where the commissioner intended to exploit the work, to incorporate it with other material and to license it to third parties, the Judge thought it inappropriate to imply an assignment that would vary the statutory allocation of authorship and thus ownership. In so holding he was clearly influenced by the fact that Slater was unpaid (para 93), as well as by the fact that Wimmer could assert rights against third parties by virtue of his joint interest.

141. The Plaintiff's Expert Report treats the cases, where no assignment is found, as cases "where items have been commissioned purely for internal use." It should

be evident that this cannot explain *Tate v. Thomas* [1921] 1 Ch. 503 nor the case of *Slater v. Wimmer* [2012] EWPCC 7. The circumstances in which an obligation to assign will be implied cannot be reduced to a simple formula. As Floyd J. observed in *Clearsprings*:

> "there are dangers in listing these factors and then looking at the degree to which each of them may be present. The factors are based on Lightman J.'s examples of cases where a need for assignment or more probably exclusivity may arise. But my task overall is to see what term needs to be implied in this case, not to see what analogies, partial or otherwise, can be made to the facts of other cases."

142. The issues of ownership of copyright in this case will need to be determined specifically in relation to each and every work of which it is alleged the Plaintiff owns copyright. The evidence reveals the involvement in the creative activities of the Plaintiff of different people at different times, those people having varying status, contributing in different ways and operating, very possibly, under different assumptions about copyright ownership. Consequently, different conclusions as to ownership of copyright may well be arrived at for different pieces of art. Generalisations are unhelpful.

143. In determining the intention of the parties/whether it is necessary to imply an obligation to assign the copyright the following matters (not referred to in the Plaintiff's Expert Report) warrant attention:

> (i) the changing nature of the Games Workshop business model and business generally in the relevant period, as this will have informed the changing expectations of the parties (see eg Blanche, 66, line 6-10, 19);

> (ii) the fact that the Plaintiff's could secure some protection, both from the acts of its freelancers and employees and from third parties, through the law of designs. Both before and after 1989, miniatures would have been registrable as designs under the Registered Designs Act 1989. After 1989, designs would have been automatically protected through unregistered design right. The right to apply for registered designs and the right to unregistered design right vests in the commissioner of the

66

design: RDA, s2 ("where the design is executed by the author for another person for good consideration, that other person shall be treated for the purposes of this Act as the proprietor"); C.D.P.A., s 215(2), s 263 ("Where a design is created in pursuance of a commission, the person commissioning the design is the first owner of any design right in it");

(iii) there are suggestions in the depositions that there were understandings about rights ownership, at least with some freelancers. See eg Blanche, 32, line 14-15. Moreover, the assignment of copyright in various colour illustrations by John Sibbick, dated 1994, indicates that the assignor had hitherto been regarded as "the proprietor and beneficial owner of copyright in the work." These prior understandings would make it difficult to imply other further terms.

144.    I reserve the right to supplement this report, as appropriate, to the extent that additional facts come to light.

Signed: _____

Dated: 15 June 2012

Professor Lionel Bently
University of Cambridge

# CURRICULUM VITAE

## A. PERSONAL

<u>Name</u>: Lionel Alexander Fiennes Bently          <u>Date of Birth</u>: 2 July 1964

<u>Age:</u> 47          <u>Nationality</u>: British Citizen

<u>Post:</u> Herchel Smith Professor of Intellectual Property Law, University of Cambridge; Director of Centre of Intellectual Property and Information Law, University of Cambridge; Professorial Fellow, Emmanuel College, Cambridge

<u>Work Address:</u>
Centre for Intellectual Property and Information Law,
Faculty of Laws,
University of Cambridge
Cambridge
CB3 9DZ

Tel: 01223-330081/762876          Fax: 01223-330086

## B. EMPLOYMENT

1987-88 Research Assistant, Law Commission
1988-1990 Lecturer in Law, University of Keele
1990-91, Research Fellow, King's College, London
1991- 2000 Lecturer in Law, King's College, London (teaching intellectual property, property)
1998-9 Visiting Senior Research Fellow, Murdoch University
July/August 2000, Visiting Research Fellow, Queensland University of Technology
August-October 2002, Visiting Research Fellow, University of New South Wales
September 2002- 2004 Professor of Law, King's College, London
October 2004- Herchel Smith Professor of Intellectual Property Law, University of Cambridge; Director of Centre of Intellectual Property and Information Law, University of Cambridge; Professorial Fellow, Emmanuel College, Cambridge
August-Sept 2007, Yong Shook Lin Visiting Professor, National University of Singapore
January-April 2008, BNL Visiting Professor of European Law, Columbia University

## C. MISCELLANEOUS

<u>Research Grants</u>
Principal Investigator, AHRC Resource Enhancement Project, Primary Materials Relating to the History of Copyright (1450-1900) in 5 Jurisdictions (with. M. Kretschmer, Bournemouth University) (value: £300,000) now available at www.copyrighthistory.org

Investigation in Project Examining the Changes on Contracts Between Illustrators and Photographers and Publishers, on behalf of Design and Artistic Copyright Society (£24,000) (with Bournemouth University) (2009-2010)

HERA (Humanities in the European Research Area), 'The Work of Authorship in the Digital Age', with Mireille Van Eechoud (IViR) and Jostein Gripsrud (Bergen) (value Euro 1 million)

Lectures:
I have given invited lectures at Columbia University, New York University, Chicago-Kent School of Law, U.C.L.A., Fordham Law School's Annual Conference on International Intellectual Property Law and Policy, McGill University, University of Kanazawa, Kobe University, Griffith University, the Australian National University (Canberra), the Singapore IP Academy's Global Forum on Intellectual Property, Bayreuth University, Bergen University, the University of Bonn, University of Leiden, University of Amsterdam, Montpellier University, Strasbourg University, Reading University, Brunel University, Bournemouth University, University of Edinburgh, Manchester University, Aberystwyth University, the University of Oxford, London School of Economics, Queen Mary College, University of London as well as for international organisations including A.T.R.I.P. (Utrecht, Parma), A.L.A.I (Paris, Barcelona), the A.I.P.P.I. (London), I.T.M.A. (the Second Distinguished Professors lecture at the Press Club in Washington), and G.R.U.R. (Nuremberg 2009).

Prestigious Lectures:
Lecturer, Darwin Lecture Series, Darwin College, University of Cambridge (2007) (on Identity)
Lecturer, Annual Manges Lecture at Columbia University (2007)
Lecturer, Stephen Stewart Memorial Lecture, (November 2009)
Current Legal Problems, University College, London (2011)

Research Networks:
Member, ITER, Sophistication vs. Transparency, International Network (2002-4), organised by University of Nijmegen/University of Amsterdam; Member, Wittem Group on European Copyright Code (2004-)
Member, AHRB Copyright Network, organised by Birkbeck College, London (2003-6)
Associate, Australian Centre for Intellectual Property in Agriculture, A.N.U., Canberra/Griffith University, Brisbane

Policy Roles:
Member, Copyright Expert Panel, Strategic Advisory Board on Intellectual Property (2008-2011)
Gave evidence to Legal Affairs Committee of European Parliament on Proposals to Extend the Term of Copyright in sound recording (November 2008)

Editorial roles:
Series Editor, *Cambridge Studies in Intellectual Property* (CUP)
Editorial Board, *European Intellectual Property Review*

Editorial Board, *Script-ed*, on-line publication, University of Edinburgh
Editorial Board, *Media and Arts Law Review*

Societies:
Executive Committee, British Literary and Artistic Copyright Association (2006-2012)
(responsible for academic programme for ALAI 2009)
Council Member, Intellectual Property Institute (2004-)
Steering Committee, International Society for the History and Theory of Intellectual
Property (2008-)

Academic Advisory Roles:
Advisory Board, Institute of Brands and Innovation Law, University College, London
Advisory Board, Osgoode Hall IP
Honorary Legal Adviser, Royal Historical Society

Relations with Legal Practice
Called to the Bar (Inner Temple, November 2009)
Academic Door Tenant, Hogarth Chambers, Lincoln's Inn (2004-2012)
Expert Advice on Law of UK to lawyers and courts in Canada, Brazil, Germany and the
United States, including *Golan* case
Door Tenant, 11 South Square, Gray's Inn (from February 2012-)

## D. SELECTED PUBLICATIONS

### Books:

*Gurry on Confidence: The Law of Trade Secret* (Oxford: OUP, 2012, with T Aplin, P
Johnson and S Malynicz)

*The Making of Modern Intellectual Property Law* (with Brad Sherman) (Cambridge:
Cambridge University Press, 1999)

*Intellectual Property Law* (with Brad Sherman) (Oxford, Oxford University Press, 2001)
(2nd ed, 2004; 3d. ed, 2008)

*Between a Rock and a Hard Place: The Problems Facing Freelance Creators in the UK
Media Market Place* (London: Institute for Employment Rights, 2002)

*Performers Rights: Options for Reform to the Interdepartmental Committee of the
Australian Government* (1996; with Brad Sherman)

### Edited Books:

*Privilege and Property: Essays in the History of Copyright* (with R. Deazley & M.
Kretschmer eds) (Cambridge: OpenBook, 2010)

*The Common Law of Intellectual Property: Essays in Honour of Professor David Vaver*
(Oxford: Hart, 2010)

*Global Copyright* (with P Torremans & U Suthersanen eds) (Cheltenham: Edward Elgar,
2010)

*Copyright and Piracy: An Interdisciplinary Critique* (Cambridge: CUP, 2010,
forthcoming)

*Trade Marks and Brands: An Interdisciplinary Critique* (Cambridge: CUP, 2008) (ed.
With Jane C. Ginsburg, Jennifer Davis)

*Intellectual Property in the New Millennium: Essays in Honour of Professor W.R.
Cornish* (eds. L. Bently & D. Vaver) (Cambridge: CUP, 2004)

*Law and the Senses: Sensational Jurisprudence* (Eds. L.Bently & L.Flynn) (London:
Pluto, 1996).

*Intellectual Property and Ethics*, Perspectives on Intellectual Property (Vol.IV) (Eds.
L.Bently & S. Maniatis) (London: Sweet & Maxwell, 1998)

### Selected Articles and Contributions to Edited Books:

Annual revision (since 1998) of 'United Kingdom' in M. Nimmer & P. Geller (eds.)
*International Copyright Law and Policy* (New York: Lexis/Nexis)

'Prince Albert v Strange (1849)' in C. Mitchell and P. Mitchell, *Landmark Cases on
Equity* Ch 8 (Oxford: Hart, 2012, forthcoming) 235-267

'Patents and Trade Secrets' in S Basheer and N Wilkof (eds), *Overlapping Intellectual
Property Rights*, (Oxford: OUP, 2012) Ch 3 (forthcoming)

'Exclusions from Patentability and Exceptions to Patentees' Right: Taking Exceptions
Seriously', (2011) 64 *Current Legal Problems,* 315-347

'The Extraordinary Multiplicity of Intellectual Property Laws in the British Colonies in
the Nineteenth Century' (2011) 12 *Theoretical Inquiries in Law* 160-200

'"The Sole Right....Shall Return to the Authors": Anglo-American Authors' Reversion
Rights from the Statute of Anne to Contemporary US Copyright', (2010) 25(3) *Berkeley
Technology Law Journal* 1475 (with Jane C Ginsburg)

*'R. v The Author*: From Death Penalty to Community Service' (2008) 32 *Columbia
Journal of Law and the Arts* 1-109

'Identity and the Law' in G. Walker and E. Leedham-Green (eds), *Identity* (Cambridge:
CUP, 2010)

'Authorship of Popular Music in UK Copyright Law' (2009) 12(2) *Information, Communication and Society* 179-204 (special issue, 2009)

'From communication to thing: historical aspects of the conceptualisation of trade marks as property' in G. Dinwoodie & M. Janis, *Trademark Law and Theory: A Handbook of Contemporary Research* (Cheltenham: Edward Elgar, 2008) (also published in Japanese (trans. Nobuhide Otomo) in 19 *Intellectual Property Law and Policy Journal* 1-50 (2008)

'The Making of Modern Trade Marks Law: The Construction of the Legal Concept of Trade Mark (1860-80)' in L. Bently, Jane C. Ginsburg, Jennifer Davis (eds.) *Trade Marks and Brands: An Interdisciplinary Critique* (Cambridge: CUP, 2008)

'Parody and Copyright in the Common Law World' in *Copyright and Freedom of Expression* (Alai, 2008)

'Copyright, Translations, and Relations Between Britain and India in the nineteenth and early twentieth centuries' (2007) 82(3) *Chicago-Kent Law Review* 1181-1240

Commentary on EC Directive on Legal Protection of Computer Programs in T. Dreier & B. Hugenholtz, *Concise European Copyright Law* (Hague: Kluwer, 2006) 211-238

'Interpretation of Copyright Rules: The Role of the Interpreter – The Creation Function', in *Exploring the Sources of Copyright* (Alai, 2005) 365-381

The Impact of European Geographical Indications on National Rights in Member States' (2006) 96 *Trademark Reporter* 850-905 (with Brad Sherman)

'Copyright and the Victorian Internet: Telegraphic Property Laws in Colonial Australia' (2004) 38 *Loyola Los Angeles Law Review* 71-176

'Developments in European Trade Marks: The Jurisprudence of the ECJ since January 1 2002' [2003] *Yearbook of European Law* 583-632.

'Art and the Making of Modern Copyright Law' in D.McClean & K.Schubert, *Dear Images: Art, Copyright and Culture* (London: ICA/Ridinghouse, 2002)

'Great Britain and the Signing of the Berne Convention in 1886' (with B. Sherman) (2001) 48 *Journal of the Copyright Society of the USA* 311-340

'Visuality and Textuality in Nineteenth Century Intellectual Property Law', *Intellectual Property Forum* (Journal of the Intellectual Property Society of Australia and New Zealand) (Issue 29, May 1997) 28-33

'The UK's Forgotten Utility Model: The Utility Designs Act 1843' (1997) 3 *Intellectual Property Quarterly* 267-78 (with B.Sherman)

'Requiem for Registration? Reflections on the History of the The UK Registered Design System' in A.Firth (ed), <u>Perspectives on Intellectual Property Vol 1: The Prehistory of Intellectual Property Law</u> 1-48 (London: Sweet & Maxwell, 1996)

'Copyright and the Death of the Author in Law and Literature' (1994) 57 *Modern Law Review* 973-986

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2012, I served

## EXPERT REPORT OF PROFESSOR LIONEL BENTLY

on the persons listed below by the following means: First Class Mail.

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 15, 2012          Signature: _____
                                   Name:      Thomas Kearney



WINSTON & STRAWN LLP

June 15, 2012

Games Workshop Ltd. v. Chapterhouse Studios LLC
Civil Action No. 1:10-cv-8103

Exhibit LB1 Authorities:
Bently Expert Report

# EXHIBIT 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GAMES WORKSHOP LIMITED,

        Plaintiff,

        v.

CHAPTERHOUSE STUDIOS LLC and JON
PAULSON d/b/a PAULSON GAMES

        Defendants.

Civil Action No. 1:10-cv-8103

Hon. Matthew F. Kennelly
Hon. Jeffrey T. Gilbert

**GAMES WORKSHOP LTD.'S RESPONSE TO
CHAPTERHOUSE STUDIOS LLC FIRST SET OF REQUESTS FOR ADMISSIONS**

Pursuant to Fed.R.Civ.P. Rules 26 and 36, Games Workshop responds as follows to the

First Request For Admissions of Defendant Chapterhouse Studios LLC.

**RESPONSES TO REQUESTS FOR ADMISSION**

1.     On YOUR Website located at www.games-workshop.com YOU instruct members

of the public to "Include an appropriate disclaimer on your web site from the list on the

following webpage."

**RESPONSE:**

Games Workshop objects that this request takes out of context a single term of use on the

Games Workshop website intended for customers, hobbyists and non-commercial users and

hence is irrelevant here and not likely to lead to the discovery of admissible evidence. Games

Workshop further denies that Chapterhouse complies with the general terms of use on the Games

Workshop website and denies that Chapterhouse's infringement of Games Workshop's

intellectual property rights is excused by its use of a disclaimer.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous, in part because the request does not specify which of uses of the name is referenced.

Without prejudice to or waiver of the foregoing objections, Games Workshop avers that Chapterhouse uses the terms "Tyranids" to identify its own products, and Games Workshop therefore denies this request..

11.     YOU do not own any U.S. Copyright Registrations for any of the works identified in Exhibit A to Plaintiff's Responses to Chapterhouse Studios' First Set of Interrogatories.

**RESPONSE:**

Games Workshop objects that this request seeks information that is irrelevant as a matter of law, insofar as it is undisputed that none of the foregoing copyrighted works are United States works identified in Exhibit A to Plaintiff's Responses to Chapterhouse Studios' First Set of Interrogatories are works for which registration is required under the Copyright Act.

Without prejudice to or waiver of the foregoing objections, Games Workshop admits that the only work thusfar identified by it in this action that is registered in the United States is Registration No. TX0006541286, "Games Workshop Complete Catalog & Hobby Reference 2006-2007", containing many of the individual works at issue herein.

12.     YOU do not own any U.S. Copyright Registrations for the work "Warhammer 40,000 rule book," referred to in Plaintiff's Response to Chapterhouse's Interrogatory No. 1.

**RESPONSE:**

Games Workshop objects that this request seeks information that is irrelevant as a matter of law, insofar as it is undisputed that none of the foregoing copyrighted works are United States works identified in Exhibit A to Plaintiff's Responses to Chapterhouse Studios' First Set of Interrogatories are works for which registration is required under the Copyright Act.

Dated: October 19, 2011

Respectfully submitted,

By: _____
          Jonathan E. Moskin

Scott R. Kaspar (Ill. Bar No. 6284921)
Aaron J. Weinzierl (Ill. Bar No. 6294055)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
Email: skaspar@foley.com; aweinzierl@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

*Attorneys for Plaintiff Games Workshop Limited*

## CERTIFICATE OF SERVICE

I, Jonathan E. Moskin, an attorney, hereby certify that on October 19, 2011, I caused a copy of the foregoing GAMES WORKSHOP LTD.'S RESPONSE TO CHAPTERHOUSE STUDIOS LLC FIRST SET OF REQUESTS FOR ADMISSION to be served on the interested parties by causing copies of this document to be served on the following *via* United States Mail in a sealed envelope with the postage prepaid and *via* electronic mail to the following:

> Jennifer A. Golinveaux, Esq.
> Thomas J. Kearney, Esq.
> J. Caleb Donaldson, Esq.
> WINSTON & STRAWN LLP
> 101 California Street
> San Francisco, CA 94111
> jgolinveaux@winston.com
> tkearney@winston.com
> jcdonaldson@winston.com
>
> Catherine B. Diggins, Esq.
> Eric J. Mersmann, Esq.
> WINSTON & STRAWN LLP
> 35 West Wacker Drive
> Chicago, IL 60601
> cdiggins@winston.com
> emersmann@winston.com
>
> and
>
> Ronald H. Spuhler
> Ronald A. DiCerbo
> Thomas J. Campbell Jr.
> MCANDREWS, HELD & MALLOY LTD.
> 500 W. Madison Street – 34th Floor
> Chicago, IL 60061

_____
Jonathan E. Moskin

# EXHIBIT 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES<br><br>Defendants. | Civil Action No. 1:10-cv-08103<br><br>Hon. Matthew F. Kennelly<br>Hon. Jeffrey T. Gilbert |

## PLAINTIFF GAMES WORKSHOP STUDIOS LLC'S RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS TO GAMES WORKSHOP LIMITED SET TWO

Pursuant to Fed.R.Civ.P. Rules 26 and 34, Games Workshop responds as follows to the First Request For Production of Documents of Defendant Chapterhouse Studios LLC.

### GENERAL OBJECTIONS

Games Workshop will produce electronically stored information in a format mutually agreed upon among counsel, or as otherwise appropriate.

### REQUESTS FOR PRODUCTION

2.    All documents concerning the design, creation, or authorship of the copyrighted works You claim in this action.

**RESPONSE:**

Games Workshop objects that this request is overbroad and unduly burdensome given the needs of the case, given that Games Workshop is the owner of each of the copyrighted works at issue in the case and no issue been raised as to its ownership or creation of any given work.

3.      For each person identified in Your response to Interrogatory No. 5, all documents constituting, evidencing, or relating to any employment agreement, contract, memorandum of understanding, or other statement of terms and conditions, for all periods of time during which such person was engaged in the authorship, creation, or design of any work for which You claim copyright protection.

**RESPONSE:**

Games Workshop incorporates by reference its objections to Interrogatory No. 5 that this request is overbroad and unduly burdensome given the needs of the case, given that Games Workshop is the owner of each of the copyrighted works at issue in the case and no issue has been raised as to its ownership or creation of any given work.

4.      All documents constituting the chain of title for all copyrights You claim in this action.

**RESPONSE:**

Games Workshop objects that this request vague and ambiguous, given that Games Workshop is the owner of each of the copyrighted works at issue in the case and no issue has been raised as to its ownership or creation of any given work.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any documents responsive to this request.

5.      All certificates of copyright registration for copyrighted works You claim in this action.

**RESPONSE:**

Games Workshop will produce documents responsive to this request.


6.     All documents concerning Chapterhouse or its products.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous, overbroad and unduly

burdensome given the needs of the case, and, without regard to relevance, seeks documents

protected by the attorney-client privilege and work-product immunity.

Without prejudice to or waiver of the foregoing objections, Games Workshop will

produce non-privileged non-work-product documents responsive to this request.

7.     One exemplar of the use in commerce in the United States of each of the marks

You claim in this action.

**RESPONSE:**

Games Workshop objects that this request is overbroad and unduly burdensome given the

needs of the case, including Chapterhouse's admission that Games Workshop owns all of the

marks in issue.

Without prejudice to or waiver of the foregoing objections, Games Workshop will

produce documents responsive to this request.

8.     All documents concerning trademark availability research, investigation, and

searches relating to trademarks You claim in this action.

**RESPONSE:**

Games Workshop objects that this request is overbroad and unduly burdensome given the

needs of the case, including Chapterhouse's admission that Games Workshop owns all of the

Without prejudice to or waiver of the foregoing objections, Games Workshop will produce documents responsive to this request.

Dated: July 5, 2011                    Respectfully submitted,

                                       By: _____
                                              Jonathan E. Moskin

                                       Scott R. Kaspar (Ill. Bar No. 6284921)
                                       Aaron J. Weinzierl (Ill. Bar No. 6294055)
                                       FOLEY & LARDNER LLP
                                       321 North Clark Street, Suite 2800
                                       Chicago, IL 60654
                                       Telephone:  (312) 832-4500
                                       Facsimile:  (312) 832-4700
                                       Email:  skaspar@foley.com; aweinzierl@foley.com

                                       Jonathan E. Moskin
                                       FOLEY & LARDNER LLP
                                       90 Park Avenue
                                       New York, NY 10016
                                       Telephone:  (212) 682-7474
                                       Facsimile:  (212) 687-3229
                                       Email:  jmoskin@foley.com

                                       *Attorneys for Plaintiff Games Workshop Limited*

## CERTIFICATE OF SERVICE

I, Jonathan E. Moskin, an attorney, hereby certify that on July 5, 2011, I caused a

copy of the foregoing **PLAINTIFF GAMES WORKSHOP STUDIOS LLC'S RESPONSE**

**TO REQUEST FOR PRODUCTION OF DOCUMENTS TO GAMES WORKSHOP**

**LIMITED SET TWO** to be served on the interested parties by causing copies of this document

to be served on the following *via* United States Mail in a sealed envelope with the postage

prepaid and *via* electronic mail to the following:

> Jennifer A. Golinveaux, Esq.
> Thomas J. Kearney, Esq.
> J. Caleb Donaldson, Esq.
> WINSTON & STRAWN LLP
> 101 California Street
> San Francisco, CA 94111
> jgolinveaux@winston.com
> tkearney@winston.com
> jcdonaldson@winston.com
>
> Catherine B. Diggins, Esq.
> Eric J. Mersmann, Esq.
> WINSTON & STRAWN LLP
> 35 West Wacker Drive
> Chicago, IL 60601
> cdiggins@winston.com
> emersmann@winston.com
>
> and
>
> Ronald H. Spuhler
> Ronald A. DiCerbo
> Thomas J. Campbell Jr.
> MCANDREWS, HELD & MALLOY LTD.
> 500 W. Madison Street – 34th Floor
> Chicago, IL 60061

Jonathan E. Moskin

**EXHIBIT 20**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GAMES WORKSHOP LIMITED,

          Plaintiff,

          v.

CHAPTERHOUSE STUDIOS LLC and JON
PAULSON d/b/a PAULSON GAMES

          Defendants.

Civil Action No. 1:10-cv-8103

Hon. Matthew F. Kennelly
Hon. Jeffrey T. Gilbert

**PLAINTIFF GAMES WORKSHOP LIMITED'S SUPPLEMENTAL RESPONSE TO
DEFENDANT CHAPTERHOUSE STUDIOS LLC'S INTERROGATORIES SET FOUR**

Pursuant to Fed.R.Civ.P. Rules 26 and 33, Games Workshop responds as follows to the

Fourth Set Interrogatories of Defendant Chapterhouse Studios LLC.

**GENERAL OBJECTIONS**

1. Games Workshop will produce electronically stored information in a format mutually

agreed upon among counsel, or as otherwise appropriate.

2. Games Workshop objects that the definition of the term "identify" is overbroad and

unduly burdensome and entails the multiplication of numerous individual interrogatories into

multiple separate sub-parts.

**INTERROGATORIES**

**INTERROGATORY NO. 18:**

Separately for each mark YOU allege in this action, provide the date of first "use in
commerce" of the mark (as that term is defined in 15 U.S.C. § 1127) by you in the U.S., and the
nature of such use.

**RESPONSE:**

Games Workshop objects that this request seeks information that is irrelevant and not

likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not purport to claim priority of use over Games Workshop with respect to any of its marks in issue. As a result the request is also overbroad and unduly burdensome.

Without prejudice to or waiver of the foregoing objections, pursuant to Fed. R. Civ. P. Rule 33(d), Games Workshop has produced and/or will produce documents responsive to this request, ***including the actual packaging of the sculptural works bearing copyright dates of first publication and has produced copies of its literary works bearing the dates of first publication and sale. Moreover, Games Workshop has produced records from the United States Trademark Office for all of its registered marks in issue demonstrating the dates of first use or constructive first use and the accompanying deposit materials.***

**INTERROGATORY NO. 19:**

Separately for each mark YOU allege in this action that YOU claim is famous, identify all facts on which you base such claim.

**RESPONSE:**

Games Workshop objects that this is a contention request best deferred until the conclusion of discovery.

Without prejudice to or waiver of the foregoing objections, Games Workshop is the largest and most successful tabletop fantasy wargames company in the world, with a following of millions of gamers and hobbyists devoted to collecting, creating, painting, and building armies for use in Games Workshop's popular WARHAMMER and WARHAMMER 40,000 war games. The various characters, armies and accessories in the WARHAMMER 40,000 universe have distinct names, colors, symbols, and other characteristics by which the game is known and by which it is immediately recognized by the many fans and followers of the game Games

Workshop has very substantial annual sales of products bearing its WARHAMMER and WARHAMMER 40,000 marks, with annual sales in this country alone of approximately $40 million, and Games Workshop invests considerable sums each year in marketing and promoting these brands and in developing new products under these brand names. Games Workshop has thereby built up substantial goodwill and reputation in the marks WARHAMMER, WARHAMMER 40,000 marks, which it uses in connection with its tabletop games and miniatures and accessories for such games Deliberate copying of these symbols by parties such as Chapterhouse also confirms that the subject marks are immediately recognizable – even when slightly modified such as by replacing the specific blood raven symbol with a more generic raven symbol used in the context of the game.

**INTERROGATORY NO. 20:**

Separately for each mark YOU allege in this action that YOU claim is famous, identify the total volume of sales and gross revenue for each product or service offered under the mark.

**RESPONSE:**

Pursuant to Fed. R.Civ.P. Rule 33(d), Games Workshop has produced documents responsive to this request.

**INTERROGATORY NO. 21:**

Separately for each document YOU produced within the Bates range GW0000001 - GW0002506, identify (a) the Bates range that comprises the entire document; (b) the name or title of the entire document; (c) the work or works YOU identified in YOUR response to Defendant's Interrogatories Nos. 1 and 2, for which YOU claim the document is an exemplar; and (d) all Chapterhouse products that YOU allege infringe any work for which the document is an exemplar.

**RESPONSE:**

Games Workshop objects that this request is overbroad and unduly burdensome and seeks information beyond that contemplated by the Federal Rules. Games Workshop further

objects that this request is needlessly cumulative and repetitive of Interrogatories 1 and 2. Games Workshop refers Chapterhouse to its responses thereto.

## INTERROGATORY NO. 22:

For each person who authored any portion of the copyrighted material YOU claim Chapterhouse has infringed, provide that person's (a) dates of employment by Plaintiff; (b) job title or titles during any time YOU employed the person; and (c) most recent contact information if the person is no longer employed by Plaintiff.

## RESPONSE:

Games Workshop objects that this request is overbroad and unduly burdensome and seeks beyond that contemplated by the Federal Rules. The request also seeks personal information that is confidential. Games Workshop further objects that this request is needlessly cumulative and repetitive of prior discovery requests. Games Workshop refers Chapterhouse to its responses thereto.

Dated: March 2, 2012                    Respectfully submitted,


By:   /s/ Jonathan E. Moskin
          Jonathan E. Moskin

          Scott R. Kaspar (Ill. Bar No. 6284921)
          Aaron J. Weinzierl (Ill. Bar No. 6294055)
          FOLEY & LARDNER LLP
          321 North Clark Street, Suite 2800
          Chicago, IL 60654
          Telephone: (312) 832-4500
          Facsimile: (312) 832-4700
          Email: skaspar@foley.com; aweinzierl@foley.com

          Jonathan E. Moskin
          FOLEY & LARDNER LLP
          90 Park Avenue
          New York, NY 10016
          Telephone: (212) 682-7474
          Facsimile: (212) 687-3229
          Email: jmoskin@foley.com

*Attorneys for Games Workshop Limited*

## CERTIFICATE OF SERVICE

I, Scott R. Kaspar, an attorney, hereby certify that on March 2, 2012, I caused a copy of the foregoing GAMES WORKSHOP LIMITED'S SUPPLEMENTAL RESPONSE TO INTERROGATORIES SET FOUR to be served on the interested parties by causing copies of this document to be served on the following *via* U.S. Mail in a sealed envelope with the postage prepaid to the following:

> Jennifer A. Golinveaux, Esq.
> Thomas J. Kearney, Esq.
> WINSTON & STRAWN LLP
> 101 California Street
> San Francisco, CA 94111
> jgolinveaux@winston.com
> tkearney@winston.com
> jcdonaldson@winston.com
>
> Eric J. Mersmann, Esq.
> WINSTON & STRAWN LLP
> 35 West Wacker Drive
> Chicago, IL 60601
> cdiggins@winston.com
> emersmann@winston.com

                              /s/ Scott R. Kaspar

# EXHIBIT 21

60

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


GAMES WORKSHOP LIMITED,

                Plaintiff,

    v.               Civil Action No. 1:10-cv-08103

CHAPTERHOUSE STUDIOS LLC
and JON PAULSON
d/b/a PAULSON GAMES,

                Defendants.

    '''''''''''''''''''''''''''''''''''


HIGHLY CONFIDENTIAL

30(b)(6) DEPOSITION OF

NICHOLAS R. VILLACCI

VOLUME II


April 11, 2012

9:47 a.m.


Foley & Lardner LLP

555 California Street, Suite 1700

San Francisco, California 94104


Reported by Mary Goff - CSR
California Certificate No. 13427



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

Nicholas R. Villacci - Volume II                     April 11, 2012
HIGHLY CONFIDENTIAL

87

1       A     Factions in the fiction.

2       Q     And is that -- is it from those chapters that

3  you derived the name Chapterhouse?

4       A     No.

5       Q     How did you derive the name Chapterhouse?

6       A     We came up with the name -- I guess I came up

7  with the name, submitted it to -- to Tomas as an idea

8  when I -- during the time I was reading the Dune novels.

9  And one of them was called Chapterhouse Dune.

10      Q     What Dune novels?

11      A     Well, there's only a series of Dune novels

12  that I think Herbert wrote.

13      Q     And can you tell me any respect in which the

14  business of Chapterhouse reflects the Dune novels?

15      A     It doesn't.  It was just a catchy name, and it

16  describes a -- a meeting place or a fraternity.

17      Q     Can you -- I don't think you -- can you name

18  specifically what Dune novel -- or novels you were

19  referring to?

20      A     It's called Dune Chapterhouse.  It's the title

21  of the novel.

22      Q     When you said that the -- the pads are

23  sculpted for chapters you never see, what do you mean

24  that you never see them?

25            MS. GOLINVEAUX:  Objection; asked and



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

217

1          MR. MOSKIN:  Oh.  Did I not give you a copy?

2   I'm sorry.

3          Q    (BY MR. MOSKIN) And can you identify

4   exhibit -- what was previously marked at the deposition

5   of Mr. Traina as Exhibit 21?

6          A    It looks like an E-mail between myself and

7   Wyatt Traina, a chain of E-mails.

8          Q    In the second paragraph you say, We have gone

9   through a lot of resources, design our own stuff from

10  scratch while using the same measured dimensions in 3D

11  applications.

12         Do you see that?

13         A    Yes.

14         Q    What are you referring to here?

15         A    We had gone through great pains to make sure

16  our products were not -- copy GW products, but they

17  still shared dimensions so they could fit with stuff for

18  a GW line.

19         Q    And what do you do to ensure that your

20  products have the same measured dimensions as Games

21  Workshop products?

22         MS. GOLINVEAUX:  Objection; asked and answered

23  multiple times.

24         A    Use the digimeter to measure, like, the inside

25  diameter of the shoulder pad so it -- it would fit on



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

Nicholas R. Villacci - Volume II                April 11, 2012
                      HIGHLY CONFIDENTIAL

235

1    yet?

2        A    At that time they weren't a product that --

3    yeah, they hadn't been to the point where we were

4    selling them yet.

5        Q    Can you identify any products that you sell

6    that were not influenced in any way by Games Workshop's

7    products or its descriptions in -- in its books?

8            MS. GOLINVEAUX:  Objection; argumentative;

9    assumes facts not in evidence; vague and ambiguous.

10       A    A number -- I mean, our shields that's

11   definitely not a GW originated -- did it have a shield,

12   hammers?

13       Q    (BY MR. MOSKIN) That -- let me clarify the

14   question.  I'm not asking if GW was the only company

15   that -- that's ever conceived of shields or hammers.  I

16   asked you a different question.  Can you identify any of

17   the products that you sell that were not influenced in

18   some way by Games Workshop's products or the

19   descriptions of materials in its books?

20           MS. GOLINVEAUX:  Same objections.

21       A    Honestly, since I have been so involved in

22   scifi and miniatures and the hobby and -- I mean, when

23   you -- you have played with something and have been

24   involved with something for so long, that's bound to

25   have an effect on any ideas you come across or create.



236

1    So that's like saying -- no.  I mean, everything has

2    been influenced by -- everything that we have created

3    has been influenced by what I have been exposed to.  Be

4    it, Star Wars movies, Games Workshop products.  I can't

5    exclude anything from my personal experience.

6        Q    (BY MR. MOSKIN) Again, that's not the question

7    I'm asking.  Are there any products of yours that you

8    can identify that have not been influenced by Games

9    Workshop's products or descriptions of materials in its

10   books?

11           MS. GOLINVEAUX:  And he just answered that

12   question.

13           MR. MOSKIN:  No, he didn't.

14           MS. GOLINVEAUX:  Yes, he did.

15           MR. MOSKIN:  No, he didn't.

16       Q    (BY MR. MOSKIN) You can answer it again.

17           MS. GOLINVEAUX:  Objection; asked and

18   answered.  If you want to change your answer in some

19   way, you can feel free to do so.

20       Q    (BY MR. MOSKIN) He answered by reference to

21   Star Wars and things.  I wasn't asking him about Star

22   Wars.  I'm asking him simply about Games Workshop.

23           MS. GOLINVEAUX:  I'm sorry.  Could you read

24   the question back, please?

25           (The question was read back.)



Nicholas R. Villacci - Volume II                    April 11, 2012
HIGHLY CONFIDENTIAL

239

1    say.  I believe I have given you an answer.

2        Q    (BY MR. MOSKIN) Name a product of yours that

3    has not been influenced by Games Workshop's products or

4    materials in its books.

5            MS. GOLINVEAUX:  Objection; argumentative.

6        A    I gave you an answer.  I said all of our

7    products have been influenced by a number of things,

8    including Games Workshop's products and books.

9            I'm not going to limit myself and say our

10   products have only been influenced, inspired by -- by

11   Games Workshop stuff.  They have been inspired by a

12   number of items, a number of cultural -- pop culture

13   stuff put together to, you know, come out to that sort

14   of expression of our products.

15       Q    (BY MR. MOSKIN) And do you still have in front

16   of you Exhibit 2?

17       A    Yes.

18       Q    Oh, no.  I'm sorry.  It's not Exhibit 2.  And

19   I will show you what was previously marked Exhibit 16.

20           MS. GOLINVEAUX:  Have you introduced this

21   earlier today?

22           MR. MOSKIN:  Earlier at some point.  I don't

23   know when.

24           MS. GOLINVEAUX:  Well, if you haven't done it

25   today, if you have a copy for me, I would appreciate it.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

264

REPORTER'S CERTIFICATION

1

2

3      I, Mary J. Goff, Certified Shorthand Reporter in and

4   for the State of California, do hereby certify:

5

6      That the foregoing witness was by me duly sworn;

7   that the deposition was then taken before me at the time

8   and place herein set forth; that the testimony and

9   proceedings were reported stenographically by me and

10  later transcribed into typewriting under my direction;

11  that the foregoing is a true record of the testimony and

12  proceedings taken at that time.

13

14     IN WITNESS WHEREOF, I have subscribed my name

15  this_____day of_____,_____.

16

17

18

19

20        _____

21        Mary J. Goff, CSR No. 13427

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

265

1                    DEPOSITION ERRATA SHEET

2

3       Assignment No. 449448

4       Games Workshop

5       vs.

6       Chapterhouse

7

8           DECLARATION UNDER PENALTY OF PERJURY

9

10          I declare under penalty of perjury that I have read

11      the entire transcript of my deposition taken in the

12      above-captioned matter or the same has been read to me,

13      and the same is true and accurate, save and except for

14      changes and/or corrections, if any, as indicated by me

15      on the DEPOSITION ERRATA SHEET hereof, with the

16      understanding that I offer these changes as if still

17      under oath.

18          Signed on the __6__ day of

19      __May_____ , 20_12_ .

20

21

22          _____

23          NICHOLAS R. VILLACCI, VOLUME II

24

25

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

Nicholas R. Villacci - Volume II          April 11, 2012
HIGHLY CONFIDENTIAL

266

1    DEPOSITION ERRATA SHEET

2    Page No.____Line No.____Change to: _____

3    *No Changes* _____

4    Reason for change:_____

5    Page No.____Line No.____Change to: _____

6    _____

7    Reason for change:_____

8    Page No.____Line No.____Change to: _____

9    _____

10   Reason for change:_____

11   Page No.____Line No.____Change to: _____

12   _____

13   Reason for change:_____

14   Page No.____Line No.____Change to: _____

15   _____

16   Reason for change:_____

17   Page No.____Line No.____Change to: _____

18   _____

19   Reason for change:_____

20   Page No.____Line No.____Change to: _____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____ DATE: 5/7/12

25       NICHOLAS R. VILLACCI, VOLUME II



## ESQUIRE

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

Nicholas R. Villacci - Volume II          April 11, 2012
                  HIGHLY CONFIDENTIAL

                                                      267

1               DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to: _____

3      *No Changes*_____

4      Reason for change:_____

5      Page No._____Line No._____Change to: _____

6      _____

7      Reason for change:_____

8      Page No._____Line No._____Change to: _____

9      _____

10     Reason for change:_____

11     Page No._____Line No._____Change to: _____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to: _____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to: _____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to: _____

21     _____

22     Reason for change:_____

23

24     SIGNATURE: _____ DATE: 5/7/12

25         NICHOLAS R. VILLACCI, VOLUME II



ESQUIRE

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

**EXHIBIT 22**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>                          Plaintiff,<br><br>          v.<br><br>CHAPTERHOUSE STUDIOS LLC and JON<br>PAULSON d/b/a PAULSON GAMES<br><br>                          Defendants. | Civil Action No. 1:10-cv-8103<br><br>Hon. Matthew F. Kennelly<br>Hon. Jeffrey T. Gilbert |

## <u>GAMES WORKSHOP LTD.'S RESPONSE TO CHAPTERHOUSE STUDIOS LLC'S SECOND SET OF REQUESTS FOR ADMISSION</u>

Pursuant to Fed.R.Civ.P. Rules 26 and 36, Games Workshop responds as follows to the Second Request For Admissions of Defendant Chapterhouse Studios LLC.

### GENERAL OBJECTIONS

1.      Games Workshop objects that, cumulatively, these requests are extraordinarily overbroad and unduly burdensome given the needs of the case.  Games Workshop further objects that service of such requests while the Court has instructed the parties to minimize discovery burdens pending completion of a settlement conference is abusive, and that Chapterhouse's reliance on such general instructions in refusing to produce documents requested by Games Workshop as many as seven months ago is similarly abusive.

2.      Games Workshop objects that these requests rest on incorrect assumptions as to the meaning of what is "original" and what constitutes unlawful copying, thus adding to the needless burden imposed on Games Workshop.

1

**RESPONSE:**

Games Workshop objects that this request seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence. Games Workshop objects that this request is vague and ambiguous and compound.

Without prejudice to or waiver of the foregoing objections, Games Workshop denies this request.

243. YOU do not manufacture or sell a four-legged "walker" vehicle for the Tau army.

**RESPONSE:**

Games Workshop objects that this request seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence.

Without prejudice to or waiver of the foregoing objections, Games Workshop admits this request.

244. YOUR Imperial Titan figures, referred to in Exhibit A to YOUR response to Chapterhouse's First Set of Interrogatories, are two-legged walking weapons platforms.

**RESPONSE:**

Games Workshop objects that this request seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence. Games Workshop further objects that the term "walking weapons platforms" is vague and ambiguous.

As a result of the foregoing and without prejudice to or waiver of the foregoing objections, Games Workshop is unable to admit or deny this request.

245. YOU do not sell a four-legged walker vehicle for the Tau army.

**RESPONSE:**

Games Workshop is unable to admit or deny this request and therefore denies the same.

335.    FASA Corporation threatened YOU with legal action for copyright infringement for manufacturing or selling models or miniatures.

**RESPONSE:**

Games Workshop objects that this request seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence.  The request is also overbroad and needlessly burdensome.

Without prejudice to or waiver of the foregoing objections, after reasonable inquiry, Games Workshop is unable to admit or deny this request and therefore denies the same.

336.    YOU stopped selling SLOCOMBE'S WARBOTS models after FASA Corporation threatened YOU with legal action.

**RESPONSE:**

Games Workshop objects that this request seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence.  The request is also overbroad and needlessly burdensome.

Without prejudice to or waiver of the foregoing objections, after reasonable inquiry, Games Workshop is unable to admit or deny this request and therefore denies the same.

337.    Not all the works for which YOU claim copyrights in this action were created by Games Workshop employees.

**RESPONSE:**

Games Workshop admits that one product at issue in this litigation was created under contract by a third party but otherwise denies this request.

338.    YOU do not have written assignments of copyright from all of the natural

applicable law.

Without prejudice to or waiver of the foregoing objections, after reasonable inquiry, Games Workshop is unaware of any works for which it would have been required to obtain a written assignment outside the scope of his employment agreement and therefore denies this request.

374.    The name "Terminator armor" is not original to YOU.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous.

Without prejudice to or waiver of the foregoing objections, after reasonable inquiry, Games Workshop is unable to admit or deny this request and therefore denies the same.

Dated: November 1, 2011          Respectfully submitted,


By:    /s/  Jonathan E. Moskin
         Jonathan E. Moskin

         Scott R. Kaspar (Ill. Bar No. 6284921)
         Aaron J. Weinzierl (Ill. Bar No. 6294055)
         FOLEY & LARDNER LLP
         321 North Clark Street, Suite 2800
         Chicago, IL 60654
         Telephone:  (312) 832-4500
         Facsimile:  (312) 832-4700
         Email:  skaspar@foley.com; aweinzierl@foley.com

         Jonathan E. Moskin
         FOLEY & LARDNER LLP
         90 Park Avenue
         New York, NY 10016
         Telephone:  (212) 682-7474
         Facsimile:  (212) 687-3229
         Email:  jmoskin@foley.com


         *Attorneys for Plaintiff Games Workshop Limited*

## <u>CERTIFICATE OF SERVICE</u>

I, Scott R. Kaspar, an attorney, hereby certify that on November 1, 2011, I caused

a copy of the foregoing **GAMES WORKSHOP LTD.'S RESPONSE TO CHAPTERHOUSE**

**STUDIOS LLC'S SECOND SET OF REQUESTS FOR ADMISSION** to be served on the

interested parties by causing copies of this document to be served on the following *via* United

States Mail in a sealed envelope with the postage prepaid and *via* electronic mail to the

following:

Jennifer A. Golinveaux, Esq.
Thomas J. Kearney, Esq.
J. Caleb Donaldson, Esq.
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
jgolinveaux@winston.com
tkearney@winston.com
jcdonaldson@winston.com

Catherine B. Diggins, Esq.
Eric J. Mersmann, Esq.
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
cdiggins@winston.com
emersmann@winston.com

and

Ronald H. Spuhler
Ronald A. DiCerbo
Thomas J. Campbell Jr.
MCANDREWS, HELD & MALLOY LTD.
500 W. Madison Street – 34th Floor
Chicago, IL 60061

  /s/  Scott R. Kaspar
Scott R. Kaspar