# EXHIBIT 39

CERTIFIED COPY

# In The Matter Of:

*GAMES WORKSHOP LIMITED,*

*v.*

*CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a*
*PAULSON GAMES,*

---

*GILLIAN L. STEVENSON - Vol. 2 30(B)(6)*
*March 9, 2012*

---

# *CONFIDENTIAL - ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**

**LegaLink, Inc.**
135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax 415.357.4301

A Yes, it does say that. 10:11:00
Q And did I read that correctly? 10:11:02
A I believe so. 10:11:04
Q And if you look at the next section, it 10:11:22
references a -- what you can do, what you can't do, do 10:11:26
you see those references? 10:11:34
A I can see what you can do and what you cannot 10:11:36
do, yes. 10:11:39
Q Would that refer to a different web page on the 10:11:40
Games Workshop web site? 10:11:44
A It's the next page on. 10:11:58
MR. OH: So I am handing you what is marked as 10:12:00
Defendant's Exhibit 79. 10:12:02
(Exhibit 79 marked as requested.) 10:12:04
THE WITNESS: Thank you. 10:12:06
MR. OH: Q Is this the next page you were 10:12:21
referring to? 10:12:23
A I believe so. 10:12:26
Q And, for the record, up in the upper left-hand 10:12:33
corner of the exhibit it reads legal: Page 4 Games 10:12:35
Workshop, and it's a document consisting of five pages. 10:12:40
Now, I'm going to read the second sentence of 10:13:01
the -- Strike that. 10:13:04
Below on the page where it starts with bullets, 10:13:21
I'm going to read the third bullet, "Include an 10:13:26

CONFIDENTIAL - ATTORNEYS' EYES ONLY
GILLIAN L. STEVENSON - 3/9/2012

| | | |
|---|---|---|
| 1 | an hour and 54, so I can do some math. | 10:31:59 |
| 2 | MR. OH: A little under three hours? | 10:32:10 |
| 3 | THE VIDEOGRAPHER: Yes. | 10:32:12 |
| 4 | MR. OH: Q When did Games Workshop first learn | 10:32:33 |
| 5 | about Chapterhouse? | 10:32:35 |
| 6 | A I believe that was January, 2008. | 10:32:37 |
| 7 | Q And how did it first learn about Chapterhouse? | 10:32:39 |
| 8 | A Sorry? | 10:32:41 |
| 9 | Q How did it first learn about Chapterhouse | 10:32:42 |
| 10 | Studios? | 10:32:45 |
| 11 | A By e-mail. | 10:32:47 |
| 12 | Q Who was the e-mail from? | 10:32:48 |
| 13 | A There was one e-mail from David Johnston, and I | 10:32:51 |
| 14 | can't recall who other e-mails may have been from. | 10:32:55 |
| 15 | Q And who is David Johnston? | 10:33:02 |
| 16 | A He, I believe, is the web site owner or | 10:33:06 |
| 17 | moderator for Bolter & Chainsword. | 10:33:09 |
| 18 | Q And who was this e-mail sent to? | 10:33:14 |
| 19 | A Talima Fox. | 10:33:18 |
| 20 | Q And who is Talima Fox? | 10:33:19 |
| 21 | A She was in my team at the time. | 10:33:21 |
| 22 | Q And do you know the web address for this web | 10:33:37 |
| 23 | site? | 10:33:41 |
| 24 | A Not off the top of my head I'm afraid. | 10:33:44 |
| 25 | Q Do you know where they're based? | 10:33:47 |

| | | |
|---|---|---|
| 1 | A    No. | 11:04:04 |
| 2 | Q    And how do you know that? | 11:04:06 |
| 3 | A    Why would there be? | 11:04:11 |
| 4 | Q    Who did you ask to find out? | 11:04:12 |
| 5 | MR. MOSKIN:  Objection.  This is, again, this is | 11:04:14 |
| 6 | intruding on work product and attorney-client privilege. | 11:04:16 |
| 7 | I direct the witness not to answer. | 11:04:20 |
| 8 | MR. OH:  Q    Are you refusing to answer the question | 11:04:24 |
| 9 | based on the instruction from Jonathan Moskin? | 11:04:26 |
| 10 | A    Yes, I am.  He is my attorney. | 11:04:29 |
| 11 | Q    In 2010 did Games Workshop have any | 11:05:11 |
| 12 | communications with Chapterhouse Studios? | 11:05:16 |
| 13 | A    I don't recall. | 11:05:24 |
| 14 | Q    Has Games Workshop received any communications | 11:06:17 |
| 15 | from individuals in the United States concerning | 11:06:19 |
| 16 | Chapterhouse Studios?  And just for clarification, this | 11:06:26 |
| 17 | question does not include Games Workshop's employees or | 11:06:33 |
| 18 | agents, such as attorneys. | 11:06:37 |
| 19 | A    That would be impossible for me to say. | 11:06:41 |
| 20 | Q    And why would it be impossible for you to say? | 11:06:45 |
| 21 | A    Well, most e-mails don't have a postal address. | 11:06:48 |
| 22 | Q    So based on the e-mails, Chapterhouse -- Excuse | 11:06:55 |
| 23 | me.  Strike that. | 11:07:01 |
| 24 | So based on the e-mails that Games Workshop | 11:07:02 |
| 25 | receives, it would not be able to determine where that | 11:07:04 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
GILLIAN L. STEVENSON - 3/9/2012

Page 123

| | | |
|---|---|---|
| 1 | person sent the e-mail from? | 11:07:11 |
| 2 | A   Sorry.  Can you repeat the question again. | 11:07:18 |
| 3 | Q   So based on the e-mails that Games Workshop has | 11:07:21 |
| 4 | received concerning Chapterhouse Studios, it would not | 11:07:25 |
| 5 | be able to determine whether the person who sent that | 11:07:28 |
| 6 | e-mail resided in the United States? | 11:07:30 |
| 7 | A   Well, if somebody has a .co.uk, they usually | 11:07:33 |
| 8 | live in the U.K. | 11:07:38 |
| 9 | If somebody has .com, they could be from | 11:07:39 |
| 10 | anywhere in the world. | 11:07:42 |
| 11 | MR. OH:  How much time do we have left on the tape? | 11:08:04 |
| 12 | THE VIDEOGRAPHER:  25 minutes. | 11:08:38 |
| 13 | MR. OH:  Actually, this might be a good time to take | 11:08:39 |
| 14 | a break and switch out the tape. | 11:08:41 |
| 15 | THE VIDEOGRAPHER:  Ending tape No. 1 of the | 11:08:48 |
| 16 | deposition of Gillian L. Stevenson of day No. 2. | 11:08:49 |
| 17 | Off the record at 11:09 a.m. | 11:08:57 |
| 18 | (a brief recess was taken) | 11:08:59 |
| 19 | THE VIDEOGRAPHER:  Beginning tape No. 2 of the | 11:17:28 |
| 20 | deposition of Gillian L. Stevenson, day No. 2.  We're | 11:17:29 |
| 21 | back on the record at 11:17 a.m. | 11:17:33 |
| 22 | MR. OH:  Q   Earlier today you mentioned that your | 11:17:47 |
| 23 | legal team would monitor Chapterhouse Studios, is that | 11:17:50 |
| 24 | correct? | 11:17:53 |
| 25 | A   I believe that's what I said, yes. | 11:17:54 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
GILLIAN L. STEVENSON - 3/9/2012

Page 142

| | | |
|---|---|---|
| 1 | 0005548. | 12:48:12 |
| 2 | For the record, it also has a confidential | 12:48:15 |
| 3 | designation by Games Workshop. | 12:48:17 |
| 4 | (Exhibit 84 marked as requested.) | 12:48:22 |
| 5 | MR. OH: Q Ms. Stevenson, do you recognize this? | 12:48:29 |
| 6 | A I do. | 12:48:33 |
| 7 | Q And earlier today you mentioned that Games | 12:48:34 |
| 8 | Workshop would receive reports about -- concerning | 12:48:41 |
| 9 | alleged infringements involving Chapterhouse Studios, is | 12:48:49 |
| 10 | that correct? | 12:49:00 |
| 11 | A Yes. | 12:49:00 |
| 12 | Q And does this give an example of one of the | 12:49:00 |
| 13 | reports you're referring to? | 12:49:03 |
| 14 | A Yes, it is. It's clear that the person who has | 12:49:04 |
| 15 | written this is confused as to whether or not | 12:49:06 |
| 16 | Chapterhouse have a license or, in fact, they're | 12:49:10 |
| 17 | infringing Games Workshop's IP. | 12:49:13 |
| 18 | MR. OH: Strike everything after yes, it is, as | 12:49:19 |
| 19 | nonresponsive. I'll move to strike. | 12:49:22 |
| 20 | Q Based on the e-mail address of the person who | 12:50:16 |
| 21 | sent the e-mail, the original e-mail to Games Workshop, | 12:50:18 |
| 22 | does it indicate the -- is there a country associated | 12:50:25 |
| 23 | with that e-mail address? | 12:50:29 |
| 24 | A Yes. | 12:50:31 |
| 25 | Q What country is that? | 12:50:31 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
GILLIAN L. STEVENSON - 3/9/2012

Page 143

| | | |
|---|---|---|
| 1 | A    Australia, I believe. | 12:50:34 |
| 2 | (Whereupon, Mr. Thomas Kearney entered the | 12:52:15 |
| 3 | deposition room.) | 12:52:19 |
| 4 | MR. OH:  Q    Does this document contain the word | 12:52:20 |
| 5 | license? | 12:52:23 |
| 6 | A    No, I don't believe it does. | 12:53:18 |
| 7 | MR. OH:  And, also, let the record reflect that Tom | 12:53:22 |
| 8 | Kearney, who is representing -- who is co-counsel | 12:53:25 |
| 9 | representing the defendants, has entered the deposition | 12:53:28 |
| 10 | room. | 12:53:31 |
| 11 | THE WITNESS:  But it does clearly refer to a | 12:53:48 |
| 12 | license, whether it says the word or not, if that was | 12:53:50 |
| 13 | the question you're asking me. | 12:53:56 |
| 14 | MR. OH:  Q    Well, when you say it clearly refers to | 12:53:57 |
| 15 | a license, what portions are you referencing? | 12:53:59 |
| 16 | A    The person asks whether what Chapterhouse is | 12:54:06 |
| 17 | doing is legal.  Well, the only way it would be legal | 12:54:09 |
| 18 | would be if they had a license. | 12:54:13 |
| 19 | Q    Now, if you look at the third paragraph, do you | 12:54:15 |
| 20 | see the sentence that says, "Do GW own the IP to the | 12:54:20 |
| 21 | Tervigon, and, if so, is there some legal reason that | 12:54:27 |
| 22 | Chapterhouse can sell this kit?" | 12:54:32 |
| 23 | Did I read that correctly? | 12:54:37 |
| 24 | A    Yes. | 12:54:38 |
| 25 | Q    And does GW, from your understanding, refer to | 12:54:40 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
GILLIAN L. STEVENSON - 3/9/2012

| | | |
|---|---|---|
| 1 | who has e-mailed is saying that what Chapterhouse is | 13:02:44 |
| 2 | doing is using Games Workshop products to sell its own | 13:02:49 |
| 3 | products or it's recasting Games Workshop products. | 13:02:52 |
| 4 | Q    Is Games Workshop contending that this e-mail | 13:03:04 |
| 5 | demonstrates that the original author is confused | 13:03:17 |
| 6 | whether or not Chapterhouse Studios has a license? | 13:03:21 |
| 7 | A    Yes, because they say is this legal?  Clearly | 13:03:23 |
| 8 | what they want to know is can I buy this product -- or | 13:03:26 |
| 9 | if I buy this product, will it be a real Games Workshop | 13:03:29 |
| 10 | product. | 13:03:33 |
| 11 | Q    And is there anything else that Games Workshop | 13:03:33 |
| 12 | contends that the author of the original e-mail is | 13:03:36 |
| 13 | confused about? | 13:03:38 |
| 14 | A    No. | 13:03:40 |
| 15 | Q    And based on the information on this e-mail, is | 13:03:51 |
| 16 | there a way to determine where the person who wrote the | 13:03:54 |
| 17 | e-mail resides? | 13:03:58 |
| 18 | A    No, not as far as I can see. | 13:03:59 |
| 19 | Q    Want to hand me back that.  I'm going to | 13:04:07 |
| 20 | actually hand you back No. 85 for a second.  So you are | 13:04:10 |
| 21 | looking at now Exhibit 85. | 13:04:14 |
| 22 | Is there anything in that e-mail that would | 13:04:17 |
| 23 | identify where the author, the original author of the | 13:04:24 |
| 24 | e-mail resides? | 13:04:26 |
| 25 | A    I believe he would reside in the U.K., but I | 13:04:27 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
GILLIAN L. STEVENSON - 3/9/2012

Page 148

| | | |
|---|---|---|
| 1 | could be wrong. | 13:04:29 |
| 2 | Q   Why do you say you believe he resides in the | 13:04:30 |
| 3 | U.K.? | 13:04:32 |
| 4 | A   My understanding is that BT Internet is British | 13:04:32 |
| 5 | Telecom, as it was. | 13:04:38 |
| 6 | But I don't know whether BT Internet have | 13:04:41 |
| 7 | offered ISP services anywhere else in the world, so I | 13:04:43 |
| 8 | couldn't guarantee that was correct. | 13:04:47 |
| 9 | MR. OH:  You can hand me back that exhibit. | 13:04:50 |
| 10 | I'm handing you what is marked as Defendant's | 13:05:05 |
| 11 | Exhibit 87, again, designated confidential by the | 13:05:07 |
| 12 | plaintiff, GW 0005550. | 13:05:11 |
| 13 | (Exhibit 87 marked as requested.) | 13:05:18 |
| 14 | MR. OH:  Q   It's going to be the same set of | 13:05:45 |
| 15 | questions.  So the first one is -- | 13:05:48 |
| 16 | A   No, you can carry on. | 13:05:50 |
| 17 | Q   Is this another example of a report sent to | 13:05:57 |
| 18 | Games Workshop that it contends shows a report of an | 13:06:02 |
| 19 | alleged infringement by Chapterhouse Studios? | 13:06:10 |
| 20 | A   Yes.  It says, "They're offering their own resin | 13:06:13 |
| 21 | cast conversion kits for Space Marine Rhino and Land | 13:06:18 |
| 22 | Raider tanks along with a few other GW things.  I don't | 13:06:22 |
| 23 | know if they're doing this under license."  Clearly | 13:06:27 |
| 24 | confused. | 13:06:31 |
| 25 | Q   And when you say clearly confused? | 13:06:31 |

| | | |
|---|---|---|
| 1 | A    Not so far as I am aware. | 13:08:42 |
| 2 | Q    And is there anything on this e-mail that would | 13:08:46 |
| 3 | indicate where the author of the original e-mail | 13:08:49 |
| 4 | resides? | 13:08:57 |
| 5 | A    Yes. | 13:08:58 |
| 6 | Q    What is that? | 13:09:00 |
| 7 | A    The e-mail address. | 13:09:00 |
| 8 | Q    What about the e-mail address? | 13:09:03 |
| 9 | A    It's a .co.uk e-mail address. | 13:09:04 |
| 10 | Q    And what does it indicate? | 13:09:09 |
| 11 | A    Well, it should indicate the person is in the | 13:09:10 |
| 12 | U.K., but I don't know whether that necessarily means | 13:09:12 |
| 13 | that. | 13:09:14 |
| 14 | I don't know enough about that technology. | 13:09:15 |
| 15 | MR. OH:   If you hand me that exhibit, I'll hand you | 13:09:41 |
| 16 | a new one. | 13:09:44 |
| 17 | This is Exhibit 88, again, designated | 13:09:55 |
| 18 | confidential by the plaintiffs, GW 0005554. | 13:09:57 |
| 19 | (Exhibit 88 marked as requested.) | 13:10:06 |
| 20 | MR. OH:   Q    Do you recognize this? | 13:10:11 |
| 21 | A    Yes. | 13:10:16 |
| 22 | Q    And does Games Workshop contend that this is | 13:10:26 |
| 23 | another report of a potential infringement concerning | 13:10:30 |
| 24 | Chapterhouse Studios? | 13:10:34 |
| 25 | A    Yes. | 13:10:36 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
GILLIAN L.  STEVENSON - 3/9/2012

| | | |
|---|---|---|
| 1 | Q    And does Games Workshop contend that this e-mail | 13:10:49 |
| 2 | demonstrates confusion on the part of the original | 13:10:52 |
| 3 | author regarding licenses? | 13:10:56 |
| 4 | A    I don't know that the original author is | 13:10:59 |
| 5 | confused.  He is clearly angry, and on his own admission | 13:11:00 |
| 6 | doesn't usually care if people are ripping Games | 13:11:06 |
| 7 | Workshop off, but is a bit outraged by what he's seen, | 13:11:11 |
| 8 | so much so that he decided to e-mail me or my team. | 13:11:18 |
| 9 | Q    And is there anything on this e-mail to indicate | 13:11:26 |
| 10 | where the author of the e-mail resided? | 13:11:29 |
| 11 | A    No. | 13:11:34 |
| 12 | As we've already established, the Internet is a | 13:11:37 |
| 13 | global thing. | 13:11:41 |
| 14 | Q    Do you want to hand me back that exhibit. | 13:11:42 |
| 15 | A    Thank you. | 13:11:46 |
| 16 | MR. OH:  I'm handing you what has been marked as | 13:11:56 |
| 17 | Defendant's Exhibit 89, again, marked as confidential, | 13:11:59 |
| 18 | Bates No. GW 0005559. | 13:12:09 |
| 19 | (Exhibit 89 marked as requested.) | 13:12:13 |
| 20 | MR. OH:  Q    Do you recognize this? | 13:12:18 |
| 21 | A    I do. | 13:12:20 |
| 22 | Q    And do you see where it says, "And another one | 13:12:27 |
| 23 | who is not clearly confused!"? | 13:12:30 |
| 24 | A    It says he is clearly not confused. | 13:12:34 |
| 25 | Q    Did you write that? | 13:12:35 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
GILLIAN L.  STEVENSON - 3/9/2012

| | | | |
|---|---|---|---|
| 1 | A | I did. | 13:12:37 |
| 2 | Q | Hand back the exhibit. | 13:12:39 |
| 3 | A | As I said, he wasn't confused.  He was outraged. | 13:12:45 |
| 4 | Q | Again, that exhibit referenced, "Another one | 13:12:58 |
| 5 | | that is clearly not confused" -- | 13:13:01 |
| 6 | A | No, I think you've misread my words. | 13:13:02 |
| 7 | Q | I'm sorry.  "And another one who is not" -- let | 13:13:06 |
| 8 | | me try it again. | 13:13:09 |
| 9 | | "And another one who clearly is not confused." | 13:13:10 |
| 10 | A | Yes. | 13:13:13 |
| 11 | | Would you like me to explain the context? | 13:13:14 |
| 12 | Q | Was there another e-mail you were referencing in | 13:13:16 |
| 13 | | this e-mail? | 13:13:19 |
| 14 | A | I was referring to other e-mails where they | 13:13:20 |
| 15 | | clearly were confused that I had forwarded on to my | 13:13:23 |
| 16 | | external lawyers.  And this was another one who wasn't | 13:13:26 |
| 17 | | confused. | 13:13:31 |
| 18 | | I was distinguishing between confusion and | 13:13:32 |
| 19 | | nonconfusion. | 13:13:33 |
| 20 | | MR. OH:  I'm introducing Exhibit No. 90, marked | 13:13:34 |
| 21 | | confidential -- or designated confidential by the | 13:13:38 |
| 22 | | plaintiff, GW 0005556. | 13:13:40 |
| 23 | | (Exhibit 90 marked as requested.) | 13:13:47 |
| 24 | | MR. OH:  Q   Do you recognize this? | 13:13:50 |
| 25 | A | Yes, I do, an example of confusion. | 13:13:57 |

| | | |
|---|---|---|
| 1 | Again, can you identify what topic this | 15:21:55 |
| 2 | purports to relate to on the deposition notice? No, I'm | 15:21:59 |
| 3 | asking you, Mr. Oh. So you shake your head, so I guess | 15:22:04 |
| 4 | the witness is no. So the witness really doesn't have | 15:22:07 |
| 5 | to answer this question. | 15:22:10 |
| 6 | MR. OH: Mr. Moskin -- | 15:22:11 |
| 7 | MR. MOSKIN: It's true. So none of this testimony | 15:22:12 |
| 8 | is going to be admissible for anything. So if you want | 15:22:13 |
| 9 | to proceed, just go ahead. | 15:22:16 |
| 10 | The witness is not here to claim personal | 15:22:18 |
| 11 | knowledge of this. If you want to use the deposition as | 15:22:20 |
| 12 | you wish, go ahead. | 15:22:21 |
| 13 | I told you this is -- it's not a very useful | 15:22:23 |
| 14 | way. I know you're just trying -- it's an effective way | 15:22:26 |
| 15 | to abuse the witnesses, but not a very effective way to | 15:22:30 |
| 16 | conduct actual testimony. | 15:22:33 |
| 17 | Go ahead. | 15:22:37 |
| 18 | THE WITNESS: Sorry, could you repeat the question. | 15:22:44 |
| 19 | MR. OH: Q Does Games Workshop have records to | 15:22:47 |
| 20 | determine its advertising expenditures in the United | 15:22:49 |
| 21 | States? | 15:22:52 |
| 22 | A If it had any, then it would. | 15:22:54 |
| 23 | Q And what do you mean if it had any? | 15:22:56 |
| 24 | A Well, if you don't advertise, it doesn't cost | 15:22:59 |
| 25 | you anything. | 15:23:01 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
GILLIAN L.  STEVENSON - 3/9/2012

| | | |
|---|---|---|
| 1 | Q    So Games Workshop is not advertising in the | 15:23:05 |
| 2 | United States? | 15:23:07 |
| 3 | A    They have in the past very occasionally run very | 15:23:07 |
| 4 | localized adverts; but as a general course of business, | 15:23:13 |
| 5 | Games Workshop does not advertise. | 15:23:19 |
| 6 | Q    And are you making a distinction between | 15:23:35 |
| 7 | advertising and other forms of marketing and promotions? | 15:23:38 |
| 8 | A    Such as?  It depends on what you call | 15:23:46 |
| 9 | advertising, doesn't it? | 15:23:47 |
| 10 | You could say that a web site is an advert. | 15:23:48 |
| 11 | You could say a newsletter is an advert.  You could say | 15:23:51 |
| 12 | that a poster in a store is an advert. | 15:23:55 |
| 13 | But none of those cost us any money over and | 15:24:02 |
| 14 | above running our business. | 15:24:06 |
| 15 | Q    Has Games Workshop identified any distinct | 15:24:44 |
| 16 | losses attributed to Chapterhouse Studios? | 15:24:47 |
| 17 | MR. MOSKIN:  Same objection.  The witness was not | 15:24:53 |
| 18 | designated to testify -- Well, strike that. | 15:24:55 |
| 19 | Go ahead, just answer. | 15:24:58 |
| 20 | THE WITNESS:  No, I think that would be impossible | 15:25:06 |
| 21 | to do. | 15:25:08 |
| 22 | MR. OH:  Q    A moment ago you used the term advert? | 15:26:13 |
| 23 | A    Yes. | 15:26:18 |
| 24 | Q    Can you explain what you mean by advert? | 15:26:18 |
| 25 | A    An advert is something that you do in order to | 15:26:26 |

CONFIDENTIAL – ATTORNEYS' EYES ONLY
GILLIAN L.   STEVENSON – 3/9/2012

1                Witness my official signature and seal as

2       Notary Public in and for Cook County, Illinois, on this

3       _22_ day of _____ _March_ _____, A.D. _2012_.

4

5

6

7

8       _____
        TRACY L. BLASZAK, CSR, CRR
9       Illinois CSR No. 084-003978

        OFFICIAL SEAL
        TRACY L BLASZAK
10      NOTARY PUBLIC - STATE OF ILLINOIS
        MY COMMISSION EXPIRES:03/23/16

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 40

CERTIFIED COPY

# In The Matter Of:

*GAMES WORKSHOP LIMITED,*
*v.*
*CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a*
*PAULSON GAMES,*

---

*GILLIAN L. STEVENSON  - Vol. 1  30(B)(6)*
*March 5, 2012*

---

# *CONFIDENTIAL - ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**
**LegaLink, Inc.**
135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

| | | | |
|---|---|---|---|
| 1 | A | No. | 16:48:35 |
| 2 | Q | Have you ever testified as an expert witness? | 16:48:36 |
| 3 | A | No. | 16:48:38 |
| 4 | Q | Have you ever been a named party to a lawsuit? | 16:48:41 |
| 5 | A | No. | 16:48:43 |
| 6 | Q | Do you understand that you're designated by | 16:49:27 |
| 7 | | Games Workshop Limited to testify on certain topics as | 16:49:29 |
| 8 | | set forth in the 30(b)(6) deposition notice served by | 16:49:31 |
| 9 | | the defendants? | 16:49:37 |
| 10 | A | I believe so, yes. | 16:49:38 |
| 11 | | MR. OH: I'm handing you what is marked as Exhibit | 16:49:49 |
| 12 | | 38, which is defendant Chapterhouse Studios LLC's | 16:49:52 |
| 13 | | renotice of deposition of Games Workshop Limited | 16:49:57 |
| 14 | | pursuant to Federal Rule of Civil Procedure 30(b)(6). | 16:50:00 |
| 15 | | (Exhibit 38 marked as requested.) | 16:50:03 |
| 16 | | MR. OH: Q Have you seen this document before? | 16:50:12 |
| 17 | A | I think so, yes. | 16:50:19 |
| 18 | | MR. OH: I am handing you what is marked as | 16:50:37 |
| 19 | | Defendant's Exhibit 39, which is topic of -- excuse me, | 16:50:40 |
| 20 | | topics for deposition provided to defendants by | 16:50:44 |
| 21 | | plaintiff's counsel. | 16:50:48 |
| 22 | | (Exhibit 39 marked as requested.) | 16:50:50 |
| 23 | | MR. OH: Q Have you seen this before? | 16:50:58 |
| 24 | A | I have. I prepared it. | 16:51:00 |
| 25 | | MR. MOSKIN: Do you have a -- is there an extra | 16:51:06 |

| | | |
|---|---|---|
| 1 | copy? Thank you. Sorry, what were the numbers? | 16:51:08 |
| 2 | THE WITNESS: That was 39 and 38. | 16:51:32 |
| 3 | MR. OH: Q Just running through this quickly, do | 16:51:58 |
| 4 | you see your initials designated next to topic numbers | 16:52:00 |
| 5 | on this document? | 16:52:05 |
| 6 | A I do. | 16:52:08 |
| 7 | Q Can you identify each topic that you've been | 16:52:08 |
| 8 | identified by your initials on this document? | 16:52:11 |
| 9 | A I don't understand the question. | 16:52:14 |
| 10 | MR. MOSKIN: I think he is -- | 16:52:18 |
| 11 | MR. OH: Q Can you identify on this document every | 16:52:21 |
| 12 | topic where you've been designated or indicated by your | 16:52:25 |
| 13 | initials that you're the witness? | 16:52:29 |
| 14 | MR. MOSKIN: I previously read into the record the | 16:52:30 |
| 15 | topics where she is -- so you're asking her to repeat | 16:52:32 |
| 16 | what I already said on the record? | 16:52:35 |
| 17 | MR. OH: Mr. Moskin. | 16:52:37 |
| 18 | MR. MOSKIN: Then I object to the form of the | 16:52:41 |
| 19 | question if there is something else you're asking her to | 16:52:42 |
| 20 | do. | 16:52:45 |
| 21 | MR. OH: Q I'll rephrase real quickly. | 16:52:51 |
| 22 | For topic 16, does GS represent your initials. | 16:53:29 |
| 23 | A It does. | 16:53:40 |
| 24 | Q For 17, are those representing your initials? | 16:53:41 |
| 25 | A Yes. | 16:53:43 |

| | | | |
|---|---|---|---|
| 1 | Q | 20? | 16:53:44 |
| 2 | A | Yes. | 16:53:46 |
| 3 | Q | 27? | 16:53:47 |
| 4 | A | Yes. | 16:53:49 |
| 5 | Q | 26? | 16:53:50 |
| 6 | A | Yes. | 16:53:50 |
| 7 | Q | 29, 30, 31, and 32? | 16:53:53 |
| 8 | A | Yes. | 16:53:57 |
| 9 | Q | And then 38? | 16:53:57 |
| 10 | A | Yes. | 16:54:02 |
| 11 | Q | Are there any other topics where your initials | 16:54:03 |
| 12 | are next to? | | 16:54:04 |
| 13 | A | No. | 16:54:05 |
| 14 | Q | And, again, at the beginning of this deposition | 16:54:20 |
| 15 | Mr. Moskin informed Chapterhouse that they're also | | 16:54:23 |
| 16 | designating you as the witness pursuant to topic 6, is | | 16:54:26 |
| 17 | that correct? | | 16:54:32 |
| 18 | A | That's right. | 16:54:32 |
| 19 | MR. OH: And, again, so we reserve our rights | | 16:54:37 |
| 20 | regarding topic 6 to continue the deposition as needed | | 16:54:39 |
| 21 | with respect to that particular one. | | 16:54:43 |
| 22 | Q | Are there any other topics that Games Workshop | 16:54:47 |
| 23 | Limited has designated you to testify on except the ones | | 16:54:50 |
| 24 | we have just identified? | | 16:54:55 |
| 25 | A | Not as far as I am aware. | 16:54:56 |

1          Witness my official signature and seal as

2     Notary Public in and for Cook County, Illinois, on this

3     *19* day of ____*March*____, A.D. *2012*

4

5

6

7

8              *Tracy L. Blaszak*
               TRACY L. BLASZAK, CSR, CRR
9              Illinois CSR No. 084-002978
                   OFFICIAL SEAL
10                 TRACY L. BLASZAK
               NOTARY PUBLIC - STATE OF ILLINOIS
11             MY COMMISSION EXPIRES:03/23/15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 41

# FILE NOTE

| | |
|---|---|
| **Case Ref:** | **10591** |
| **Action:** | **Unknown action type (IE)** |
| **Date:** | **30/09/2010** |
| **Time:** | **13:42:14** |
| **Handler:** | **Gill Stevenson** |
| **Typist:** | **GLS** |
| **No. of Units:** | **0** |
| **Cost Value:** | **0.00** |
| **Correspondent:** | |

DETAILS

Unsolicited correspondence received:

Subject: FW: Chapterhouse Studios
Detail:


Our ref:



Gill Stevenson
Legal Manager
Group Legal Department
Games Workshop Group PLC
Tel: +44 (0)115 900 4124

---

From: Iain Hicken [mailto:iain_a_h@hotmail.com]
Sent: 22 September 2010 09:38
To: Legal (UK)
Subject: Chapterhouse Studios


Thought you may find this link of interest.

I'm don't usually care if someone is doing something 'Gw style' but
there is a line and for me this has crossed it.                    (Continued ...)



http://theminiaturespage.com/news/483020/

Thanks,
Iain

Confidential

# EXHIBIT 42

# FILE NOTE

| | |
|---|---|
| Case Ref: | **10591** |
| Client: | **Games Workshop Limited** |
| Action: | **Send E-mail**<br>**(to : JamesFry@eversheds.com)** |

| | |
|---|---|
| Date: | **30/09/2010** |
| Time: | **13:44:01** |
| Handler: | **Gill Stevenson** |
| Typist: | **GLS** |
| No. of Units: | **0** |
| Cost Value: | **0.00** |
| Correspondent: | **Client (Games Workshop Limited)** |

DETAILS

Our ref:10591

And another one who clearly is not confused!

Gill.

Gill Stevenson
Legal Manager
Group Legal Department
Games Workshop Group PLC
Tel: +44 (0)115 900 4124

—————————————————————

From: Iain Hicken [mailto:iain_a_h@hotmail.com]
Sent: 22 September 2010 09:38
To: Legal (UK)
Subject: Chapterhouse Studios

EXHIBIT
# 89
3-9-12 TB
PENGAD 800-631-6989

Thought you may find this link of interest.

I'm don't usually care if someone is doing something 'Gw style' but          (Continued ...)

GW0005559

there is a line and for me this has crossed it.

http://theminiaturespage.com/news/483020/

Thanks,
Iain

Confidential

# EXHIBIT 43



# THE HORUS HERESY
## Collected Visions

GW0001875

# CREDITS

WRITTEN BY ALAN MERRETT

THE BATTLE FOR PROSPERO AND THE KABAN PROJECT BY GRAHAM MCNEILL

CONCEPT ART BY JOHN BLANCHE

COVER ART BY SAM WOOD

FEATURING ART BY STEVE BELLEDIN, JOHN BLANCHE, ALEX BOYD, JAMES BRADY, ADAM BRAY, PAUL CARRICK, CAMBRIA CHRISTENSEN, KARI CHRISTENSEN, ED COX, PAUL DAINTON, WAYNE ENGLAND, AL EREMIN, CARL FRANK, DAVID GALLAGHER, JOHN GRAVATO, DES HANLEY, ANDREW HEPWORTH, PAUL (PROF) HERBERT, JON HODGSON, NEIL HODGSON, RALPH HORSLEY, DAVID HUDNUT, PAUL JEACOCK, HUGH JAMIESON, KARL KOPINSKI, KENSON LOW, CHUCK LUKACS, THOMAS MANNING, TORSTEIN NORDSTRAND, JUSTIN NORMAN, JEN PAGE, BEN PECK, MICHAEL PHILLIPPI, ERIC POLAK, ERIC REN, KARL RICHARDSON, DAN SCOTT, ADRIAN SMITH, ANNE STOKES, CHRIS TREVAS, BLEU TURRELL, FRANZ VOHWINKEL, DAN WHEATON, JOHN WIGLEY AND SAM WOOD

A BLACK LIBRARY PUBLICATION

COMPILED AND EDITED BY MATT RALPHS AND NICK KYME

GRAPHIC DESIGN AND LAYOUT BY ROSIE CHATT, DAN DRANE, DARIUS HINKS AND ANDREW WALSH

PRODUCED BY MARC GASCOIGNE

THANKS TO JOHN BLANCHE, CHRISTIAN DUNN, STEVE HORVATH, JERVIS JOHNSON, DAN KAUFMAN, CARL KWOH, LINDSEY PRIESTLEY, RICK PRIESTLEY, ALL AT SABERTOOTH AND GAMES WORKSHOP, AND OF COURSE ALL THE WONDERFUL ARTISTS WHOSE WORK IS FEATURED IN THIS BOOK

ISBN 13: 978-1-84416-424-10 · ISBN 10: 1-84416-424-1
GW Product code: 60040181012
Collector's Edition ISBN 13: 978-1-84416-425-7
ISBN 10: 1-84416-425-X · GW Product code: 60040181013
A Black Library publication. This book was previously published in the UK in the following volumes: Horus Heresy Vol.1: Visions of War (2004); Horus Heresy Vol.2: Visions of Darkness (2004); Horus Heresy Vol.3: Visions of Treachery (2005) and Horus Heresy Vol.4: Visions of Death (2006) by BL Publishing, Games Workshop Ltd, Willow Road, Lenton, Nottingham NG7 2WS, UK.

© Games Workshop Limited 2007. All rights reserved.

Black Library, the Black Library logo, Black Flame, BL Publishing, Games Workshop, the Games Workshop logo and all associated marks, names, characters, illustrations and images from the Warhammer and Warhammer 40,000 universes are either ®, TM and/or © Games Workshop Ltd 2000-2007, variably registered in the UK and other countries around the world. All rights reserved.

Find out more about the Black Library at: www.blacklibrary.com. Find out more about Games Workshop and the worlds of Warhammer at: www.games-workshop.com. Alternatively, call our mail order hotlines on 0115 - 916 40 000 (UK), 1-800-394-GAME (US), 1-888-GW TROLL (CAN) or (02) 9829 6111 AUS).

Printed in the EU.

**EXHIBIT 44**

# LUCASFILM LTD v AINSWORTH

## COURT OF APPEAL (CIVIL DIVISION)

Rix, Jacob and Patten L.JJ.: November 3–5 and December 16, 2009[1]

[2009] EWCA Civ 1328; [2010] F.S.R. 10

☞ Allocation of jurisdiction; Copyright; Foreign copyright protection;
Infringement; Sculptures

H1  *Copyright—Infringement—Armour for "Star Wars" characters—Meaning of "sculpture"—Exceptions to infringement—Reproduction by three-dimensional copying—Whether design drawings "for" anything other than an artistic work—Exploitation of design derived from artistic work—Whether claimants entitled to copyright in original armour made by first defendant—Implied terms—Whether infringement of US copyright justiciable in English courts—Whether court should enforce US judgment*

H2    The claimants (appellants) were companies involved in the production of the "Star Wars" film, which was released in 1977, and subsequent licensing of the rights relating to that film including intellectual property and merchandising rights.

H3    The first defendant (first respondent) made the armour for the film in vacuum-moulded plastic, including a white helmet for the Imperial Stormtroopers as well as the armour for other characters. He was the sole director of the second defendant (second respondent), Shepperton Design Studios Ltd. In 2004 he set up a website and began actively to sell versions of the armour to members of the public, both in the form of a complete set and of the helmet alone, as well as replicas of other helmets and a "chest box" worn by the TIE fighter pilots. He was able to do this because he had retained the tools or moulds from which the originals used in the film had been made.

H4    The claimants brought proceedings against the first defendant in the United States claiming relief in respect of copyright infringement, unfair competition and trade mark infringement. A challenge to the US Court's jurisdiction having failed, the first defendant took no further part in the US proceedings. The claimants obtained judgment for significant damages, including additional (treble) damages and injunctive relief.

H5    The claimants subsequently brought the present proceedings claiming infringement of copyright, passing off, a claim to such copyrights as the first defendant might himself have acquired, a claim in confidence to restrain him from making his helmets and armour, a claim to enforce the US monetary judgment and a claim to enforce US copyright (but no other US rights). The first defendant counterclaimed to enforce his own alleged copyright in the helmets.

---

[1] Paragraph numbers in this judgment are assigned by the court.

H6     The main issues between the parties were as follows: (i) whether any of the helmets were artistic works, either sculptures or works of artistic craftsmanship, within the Copyright, Designs and Patents Act 1988, so as to attract copyright in themselves; (ii) if there was copyright in the helmets, whether it was owned by the first defendant, either because he was the author himself, or because he had contributed his own elements to those which he had taken from the claimants; (iii) if he was otherwise entitled to the copyright, whether he was obliged to hold it for, and assign it to, the claimants; (iv) if he was otherwise entitled to use his moulds, whether he was nonetheless restricted from doing so by duties of, or akin to, confidentiality; (v) if and insofar as the claimants were entitled to any of the copyrights in drawings asserted against the first defendant, whether he had a defence under s.51 or s.52 of the 1988 Act; (vi) whether there was a claim in passing off; (vii) whether the claimants were entitled to enforce the US judgment; and (viii) whether the claimants were entitled to bring an action in this jurisdiction claiming infringement of US copyright and, if so, whether they had made out such a claim?

H7     The claimants asserted that the helmets produced by the first defendant were either sculptures or works of artistic craftsmanship and that they were entitled to that copyright. The claimants also asserted that some of the merchandising items they had sold in large numbers were sculptures to which the restriction of s.52 of the 1988 Act did not apply. The parties agreed that a toy model of a Stormtrooper could be treated as a test item. It was also necessary to consider for the purposes of s.51 of the Act whether the helmets and armour were sculptures.

H8     The claimants submitted that the drawings relied on were not "design documents" within the meaning of s.51 of the 1988 Act because their purpose, when they were created, was not to provide for the ultimate design of the helmets used in the film; that the original purpose did not involve the creation of three-dimensional articles from them; and that the purpose for which a drawing had been made had to be assessed as at the date of the drawing and not by reference to what it was used for afterwards.

H9     For the purposes of s.52 of the Act, the claimants admitted industrial application (manufacture) and scale in terms of foreign manufacture of the toy model for the Stormtrooper. They argued that for s.52 to apply, manufacture (industrial application) had to take place in the United Kingdom. They relied on the normal territorial limitation of copyright to this jurisdiction and to the express reference to the place of sales to "the United Kingdom or elsewhere" in s.10(2)(b) of the Copyright Act 1956 and s.52(1)(b) of the 1988 Act and said that the express provision as to sales to be outside the United Kingdom meant that only manufacture within the United Kingdom was intended to be within the section.

H10     The claimants also asserted that, if the first defendant had acquired any copyrights in any of the props that he had made, he was contractually bound to assign the copyrights to them. They submitted that he had merely been commissioned to produce the props from drawings supplied or made available by them and that, in the circumstances, they were the owners in equity of any ensuing copyrights.

H11     The claimants also invoked US copyright law claims in respect of infringement in the United States of US copyrights. The defendants submitted that such claims were not justiciable in the English courts because they were territorial claims which were justiciable only in the courts of the country in question. The issues of US copyright law which arose were whether there was any infringement because copyright in the drawings would not be infringed by the production of a utilitarian

or functional device and whether there was copyright in the helmets and armour made by the first defendant, the existence of copyright being disputed because they were said to be utilitarian or functional. Both sides adduced expert evidence of US copyright law. However, ultimately, the defendants expressly conceded that, in relation to articles made from drawings, on the evidence given they would be likely to lose in the United States on the basis that the articles would not be regarded as utilitarian or functional.

H12    The judge dismissed all the claims except that based on infringement of US copyright and dismissed the counterclaim.[2]

H13    The claimants appealed against the judge's findings that the prototype helmets were not sculptures within the meaning of the Copyright, Designs and Patent Act 1988; that the defendants had a defence under s.51 or s.52 of the Act; and against the judge's decision not to enforce the US default judgment. The defendants cross-appealed against the judge's decision that the claimants were entitled to enforce the US copyright in the English court and against the finding that all the copyrights, if any, in the work of the first defendant belonged in equity to the claimants and that he should make a consequential assignment.

H14    When considering the meaning of the term "sculpture" for the purposes of the Copyright, Designs and Patents Act 1988, the judge held that: (i) some regard had to be had to the normal use of the word; (ii) nevertheless, the concept could be applicable to things going beyond what would normally be expected to be art in the sense of the sort of things expected to be found in art galleries; (iii) it was inappropriate to stray too far from what would normally be regarded as sculpture; (iv) no judgment was to be made about artistic worth; (v) not every three-dimensional representation of a concept could be regarded as a sculpture, otherwise every three-dimensional construction or fabrication would be a sculpture; (vi) it was of the essence of a sculpture that it should have, as part of its purpose, a visual appeal in the sense that it might be enjoyed for that purpose alone, whether or not it might have another purpose as well; (vii) the fact that the object had some other use did not necessarily disqualify it from being a sculpture, but it still had to have the intrinsic quality of being intended to be enjoyed as a visual thing and (viii) the process of fabrication was relevant but not determinative. There was no reason why a purely functional item, not intended to be at all decorative, should be treated as a sculpture simply because it had been (for example) carved out of wood or stone.

H15    The claimants criticised this analysis and its application to the Stormtrooper items on the grounds that in copyright acts since 1911 the test of what constituted an "artistic work" concentrated on what the specific objects were rather than on whether they had any particular artistic qualities or merit; that the test was essentially descriptive and what a work was depended on how it was made; that if an object had been sculpted by a physical process to which that description could be applied then the outcome should be a sculpture; and that the helmets and armour had been made after moulds had been carved to the required shape and then used to create the finished article and accordingly were sculptures. They also submitted that if the judge were right and visual appeal was an essential quality for a work to be a sculpture then the helmets and armour in question were purely representational in character, never had any utility beyond that of a film prop and

---

[2] *Lucasfilm Ltd v Ainsworth* [2009] F.S.R. 2 Ch D

in that capacity they had been designed to be highly visual and to embody a considerable level of artistic skill and design.

H16   The claimants accepted that the drawings on which the first defendant had based the helmet and armour were design documents for the purposes of s.51 of the Copyright, Designs and Patents Act 1988. The application of that section was resisted solely on the ground that the helmet and armour were "sculptures" within the meaning of the Act.

H17   On the cross-appeal, it was common ground or undisputed that the claimants did have US copyrights and that the first defendant had infringed them. The acts which constituted infringement by US law had all been carried out in or from the United Kingdom and consisted of sales to US customers in the United States by despatch of products from the United Kingdom, advertising on the internet and the placing of advertisements in US publications. Questions of where the property passed, or where the contract was made, or what law governed it and the like appeared to be irrelevant under US law.

H18   The claimants contended that: for the EU, the courts of the member state of the defendant's domicile had, and had to exercise, subject-matter jurisdiction over any claim in any civil or commercial matter brought against the defendant unless it was one of the excluded matters provided for in Council Regulation 44/2001;[3] it made no difference that the claim was in respect of acts done by the defendant in a place far away from the EU; or that the acts, if done by the defendant in his member state of domicile, were lawful by the law of that state; or that the courts of the country where the defendant did the allegedly wrongful act also had personal jurisdiction over him; or that the dispute had no intra-member state or effect; or that there was no EU interest requiring or making it convenient that the member state concerned should have jurisdiction.

H19   The claimants also argued that in *Pearce v Ove Arup Partnership Ltd* ([1999] F.S.R. 525) the Court of Appeal had decided that the English courts had jurisdiction over all acts of infringement of copyright committed anywhere in the world. The defendants submitted that if and to the extent that the court had decided that such acts were justiciable in England provided there was personal jurisdiction over a defendant, that decision was obiter dictum and need not be followed. The claimants submitted that the ratio decidendi in *Pearce* necessarily led to such jurisdiction as the Court had decided that the *Moçambique* rule[4] did not apply to acts of infringement of copyright in a foreign state because since copyright rights did not depend on registration, there was no question of impugning a sovereign act of the government of another state.

H20   The claimants sought, if the court held that the US copyright claim was not justiciable, to enforce its US judgment. It argued that the first defendant had sufficient presence in the United States to justify enforcement of the US judgment against him solely by reason of the fact that he had operated an internet website through which he had advertised his helmets and other articles and thereby sold such articles to customers in the United States and that he had emailed existing customers directly.

H21   On the issue whether any IP rights in the helmets and armour created by the first defendant belonged in equity to the claimants the judge had held that the first

[3] Relying on *Owusu v Jackson* (C-281/02) [2005] E.C.R. I-1383 ECJ.
[4] *British South Africa Co v Companhia de Moçambique* [1893] A.C. 602 HL.

defendant had worked to render into three-dimensional form the copyright designs of others and sought to get as close as possible to his clients' designs; he must have known that his clients would have expected full exploitation rights in the future for the purposes of the film and he could not realistically have expected to have retained any for himself.

H22     On the first defendant's cross-appeal on this issue, he said that he had completed his design of the helmet before any question of any contract arose between him and the claimants into which an implied term for the assignment of his copyright could have been inserted: therefore he retained what he had obtained for himself and nothing should be implied whereby he would be deprived of the fruits of his creativity. He also submitted that, if anything should be implied into the subsequent contract whereby he had merely agreed to manufacture the 50 helmets which had been initially bought from him, it should be nothing greater than would have been necessary to enable the claimants to use the helmets, buy more in case of need, or even merchandise the relevant articles: and that would have been merely an implied licence for such purposes on payment of a reasonable royalty.

H23     **Held,** dismissing the appeal, allowing the cross-appeal in relation to the issue of the enforcement of US copyright and dismissing it in relation to the issue of equitable ownership:

H24     (1) Little or no real assistance was to be obtained from the relationship between copyright and registered design right in determining the limits of protection which the use of the word "sculpture" was intended to have. ([21]–[41])

*Pytram Ltd v Models (Leicester) Ltd* [1930] 1 Ch. 639 Ch D and *King Features Syndicate Inc v O&M Kleeman Ltd* [1941] A.C. 417; [1941] 2 All E.R. 403 HL referred to.

H25     (2) The definitions of "design" and "artistic work" were not the same and were concerned to identify different things. A model or cast could be registrable as a design under the Registered Designs Act 1949 (as originally enacted) if it was new and original and had the necessary features of shape or ornament which created visual appeal. The existence of those features (and only those features) in what might otherwise be a purely functional object were what attracted protection. Copyright protection in artistic works was defined by s.4 of the Copyright, Designs and Patents Act 1988 by reference to various categories of work with no distinction between their aesthetic merits and appeal and their functionality. The key to copyright protection was that the work created by the author fell within one or other of the descriptions contained in the 1988 Act, i.e. that it was such a work. It did not depend upon a further analysis or identification of its design features. ([42], [43])

H26     (3) Most of the authorities proceeded on the footing that one should not stray too far from the ordinary meaning of the word "sculpture" but there was considerable disagreement as to what that was. One of the difficulties was that the word could be used to describe both the physical process of moulding or carving necessary to create the finished object and that object itself. Copyright existed in the product of one's skill and labour; not in the skill and labour itself. In looking, therefore, at the finished article, it was wrong to interpret the use of the word "sculpture" in the Copyright Act 1911 (and therefore in succeeding copyright acts) divorced from the earlier legislative history. The Sculpture Copyright Act 1814 had been clearly concerned to identify sculpture as an artistic work. Its transposition into a wider category of "artistic work" under the 1911 Act did not mean that that

context could be ignored. Sculpture, like painting (however good or bad it might be), did connote the work of the artist's hand and the visual purpose attributed to it by the judge. It had, broadly speaking, to be a work at least intended to be a work of art. The first six points of the judge's analysis when considering the meaning of "sculpture" within the meaning of the Copyright, Designs and Patents Act 1988 were correct. ([57]–[71])

*Caproni v Alberti* (1891) 65 L.T. 785 Ch D; *Britain v Hanks Bros & Co* (1902) 86 L.T. 765 Ch D; *Pytram Ltd v Models (Leicester) Ltd* [1930] 1 Ch. 639 Ch D; *Davis (J & S) Holdings Ltd v Wright Health Group Ltd* [1988] R.P.C. 403 Ch D; *Wildash v Klein* (2004) 61 I.P.R. 324 Sup. Ct. Northern Territory Australia and *Metix (UK) Ltd v GH Maughan (Plastics) Ltd* [1997] F.S.R. 718 Ch D (Pat Ct) referred to. *Wham-O Manufacturing Co v Lincoln Industries Ltd* [1985] R.P.C. 127 CA (NZ) and *Breville Europe Plc v Thorn EMI Domestic Appliances Ltd* [1995] F.S.R. 77 Ch D disapproved.

H27    (4) Even on the approach outlined in the first six points of the judge's analysis, there could be difficulties in some cases in drawing the line between sculpture and an object which, though well designed, did not qualify as such. A line had to be drawn somewhere otherwise almost any moulded version of a functional object would be included in the definition of "sculpture". The judge had identified the purpose of the object as being one of the relevant guides to whether it qualified as a sculpture. A comprehensive or exclusive definition of "sculpture" was neither wise nor possible and the judge had been correct in adopting a multi-factorial approach. ([72]–[77])

H28    (5) The judge had been entitled to come to the view that the Stormtrooper helmet and armour were not "sculptures" within the meaning of the 1988 Act. Although invented, the helmet and armour were still recognisable as such and had a function within the confines of the film as the equipment of the Stormtrooper. To that extent they were no different from and served the same purpose as any real helmet or armour used in the film. ([79], [80])

*Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2001] F.S.R. 11 HL referred to.

H29    (6) The judge had been correct in pointing to the existence of what could loosely be described as a work of art as the key to the identification of sculpture. On that basis, artistic and accurate reproductions of soldiers could qualify notwithstanding that some children might wish to play with them. However, the toy Stormtroopers were not highly crafted models designed to appeal to the collector but which might be played with by children; they were mass-produced plastic toys. The judge had been correct to hold that they were no more works of sculpture than the helmet and armour which they reproduced. ([81]–[82])

*Britain v Hanks Bros & Co* (1902) 86 L.T. 765 Ch D referred to.

H30    (7) The judge had been correct in holding that the defendants had a defence under s.51 of the Copyright, Designs and Patents Act 1988. ([83]–[87])

H31    (8) *Obiter.* Because they were not sculptures the production of the Stormtrooper toys would not have started time running under s.10 of the Copyright Act 1956. The judge had held that the 15-year period provided by the transitional provisions of the 1988 Act had expired before the first defendant had started to make his reproductions in 2004. He was correct in holding that the defendants were entitled to rely on the s.52 defence. ([88]–[98])

276        LUCASFILM LTD v AINSWORTH

H32    (9) Regulation 44/2001 had not created the extra-EU jurisdiction contended for by the claimants. There was nothing in the *traveaux préparatoires* nor in the Jenard/Schlosser Reports which preceded the Brussels Convention (which the Regulation had replaced) to suggest that such a jurisdiction should be created. Examination of the Regulation itself strongly suggested that the suggested extra-EU jurisdiction would lead to absurd and anomalous results. ([106]–[119])

H33    (10) *Owusu v Jackson* (C-281/02) did not support the claimants' contention. In *Owusu* the court of the member state concerned (England) had both personal and subject-matter jurisdiction and the issue was whether it should decline jurisdiction on the basis of *forum non conveniens*. The European Court of Justice had decided that where art.2 of the Regulation conferred jurisdiction in a court of a member state by reason of the defendant's domicile in that state, the court could not refuse to hear the case because there was a more convenient forum abroad. The court had not addressed the question whether, given personal jurisdiction, subject-matter jurisdiction of the court was also displaced by art.2. It did not follow, as the claimants had contended, that because art.2 conferred subject-matter jurisdiction in respect of acts done elsewhere in the EU, it also had to have the same effect as regards acts done outside the EU. The point was acte clair and would not be referred to the European Court of Justice. ([120]–[134])

    *Owusu v Jackson* (C-281/02) [2005] E.C.R. I-1383 ECJ considered. *Gesellschaft für Antriebstechnik mbH & Co KG (GAT) v Lamellen und Kupplungsbau Beteiligungs KG (LuK)* (C-4/03) [2006] F.S.R. 45 ECJ; *Voda v Cordis Corp* [2007] USCAFED 29, 476 F. 3d. 887 US Fed. Ct. of Appeals; *Konkola Copper Mines Plc v Coromin Ltd* [2006] 2 Lloyd's Rep. 446 and *Catalyst Investment Group Ltd v Lewinsohn* [2009] EWHC 1964 (Ch) referred to.

H34    (11) The argument that the Court of Appeal in *Pearce v Ove Arup Partnership Ltd* was addressing was that the fact that art.2 of the Brussels Convention gave the court personal jurisdiction did not mean that the claim of infringement of a foreign intellectual property right was, therefore, justiciable. In considering this question the court confined its attention to the situation between the contracting states of the Convention and in holding that an infringement of a foreign intellectual property right (not involving questions of the validity of that right) was justiciable in an English court its decision was confined to the question of an alleged infringement of an IP right conferred by the law of a contracting state. *Pearce* did not decide that an English court had jurisdiction generally, as opposed to within the confines of the Convention, over foreign intellectual property rights where it had personal jurisdiction over a defendant. ([135]–[155])

    *Pearce v Ove Arup Partnership Ltd* [2000] Ch. 403; [1999] F.S.R. 525 CA (Civ Div) considered. *British South Africa Co v Companhia de Moçambique* [1893] A.C. 602 HL; *Tyburn Productions Ltd v Conan Doyle* [1991] Ch. 75 Ch D and *Hesperides Hotels Ltd v Muftizade* [1979] A.C. 508 HL referred to.

H35    (12) There was no basis for applying the doctrine of stare decisis. The court was not bound by the decision in *Pearce*. ([155], [156])

    *Great Western Railway Co v Owners of SS Mostyn* [1928] A.C. 57 HL referred to.

H36    (13) The two-fold rule in *Moçambique* applied to such claims. *Moçambique* was not limited to claims about land, nor to claims about title or validity of the foreign right relied upon. Infringement of an IP right (especially copyright, which was

largely unharmonised) was essentially a local matter involving local policies and local public interest. It was a matter for local judges. ([175])

    *British South Africa Co v Companhia de Moçambique* [1893] A.C. 602 HL applied.

H37    (14) Enforcement could involve a clash of the IP policies of different countries. This case was a good example. The effect of the injunction granted by the judge was that the first defendant was restrained from doing acts in this country which by the laws of this country were lawful. This was because American law said they are not lawful. ([176])

H38    (15) Extra-territorial jurisdiction would involve (and did here) a restraint on actions in another country—an interference which prima facie a foreign judge should avoid. ([177])

H39    (16) If national courts of different countries all assumed jurisdiction there was far too much room for forum-shopping, applications for stays on *forum non conveniens* grounds, applications for anti-suit injunctions and applications for declarations of non-infringement. ([178])

H40    (17) It was quite clear that those concerned with international agreements about copyright had refrained from putting in place a regime for the international litigation of copyrights by the courts of a single state. A system of mutual recognition of copyright jurisdiction and of copyright judgments could have been created but it had not. ([179])

H41    (18) Considerations of comity and the principle of avoiding unreasonable interference with the authority of other sovereigns dictated led to the conclusion that the court did not have extra-territorial jurisdiction over foreign IP (non-EU or Lugano) infringements. ([180])

    *Voda v Cordis Corp* [2007] USCAFED 29, 476 F. 3d. 887 US Fed. Ct. of Appeals referred to.

H42    (19) English law regarded claims for infringement of foreign, non-EU (or Lugano) copyrights as non-justiciable. ([174]–[180])

H43    (20) There was no real distinction of substance between questions of subsistence or registration of a right and its infringement. Adjudicating on infringement would frequently require a court to decide on the scope of the right granted by the foreign sovereign. Commercially speaking all IP rights, whether registrable or not, were essentially the right to exclude others. ([181])

H44    (21) It was true that reg.44/2001 drew a distinction in principle between questions of subsistence and enforcement but it did so in the context of a fully balanced scheme and it was considered that allowing one member state to revoke a patent or similar right registered in another member state was going too far at that stage of the development of a European cross-border jurisdiction. ([182])

H45    (22) For sound policy reasons international jurisdiction over copyright infringement claims did not exist. ([183])

H46    (23) The judge had erred in holding that the US copyright claim was justiciable in the English courts. The defendants' cross-appeal on this point would be allowed. ([184]–[186])

H47    (24) The court had jurisdiction to enforce the US judgment if, at the time the proceedings were instituted, the first defendant was "present" in the United States. Such presence, although it might be temporary, reflected some form of concept or metaphor of allegiance to the laws of the country concerned, and, in the case of a company as distinct from an individual, required the establishment of a fixed place

of business from which either the company defendant itself or its agent on its behalf carried on business. ([191])

    *Adams v Cape Industries Plc* [1990] Ch. 433 CA (Civ Div) applied.

H48    (25) It was not possible to say that advertising into a foreign country could render the advertiser present there. No case had been cited where the targeting of sales in a foreign country by outside sales material had been held to be presence for these purposes. For current purposes the internet or a website were not fundamentally different from other matters which had enabled business persons to present themselves and their products where they were not themselves present: such as advertisements, salesmen, the post, telephone, telex and the like. The sheer omnipresence of the internet suggested that it did not easily create, outside the jurisdiction or jurisdictions in which its website owners were on established principle already to be found, that presence, partaking in some sense of allegiance, which had been recognised by English jurisprudence and rules of private international law as a necessary ingredient in the enforceability of foreign judgments. ([193]–[194])

    *Foster v Driscoll* [1929] 1 K.B. 470 CA; *Adams v Cape Industries Plc* [1990] Ch. 433 CA (Civ Div); *Dow Jones & Co Inc v Gutnick* [2003] H.C.A. 56; 210 C.L.R. 575 High Ct. Australia; *Littauer Glove Corp v F W Millington* (1920) Ltd (1928) 44 T.L.R. 746 and *Vogel v R & A Kohnstamm Ltd* [1973] Q.B. 133 QBD referred to.

H49    (26) The claimants appeal on this ground would be dismissed. ([195])

H50    (27) The judge had been correct in finding that any IP rights in the helmets and armour created by the first defendant belonged in equity to the claimants. However the matter was put, it had always been inherent in the relationship between the parties that if it proceeded to a contract, it would be on terms that would have rewarded the first defendant for his preliminary work but would have conferred the primary copyright interests on the commissioning party. ([200]–[206])

H51    (28) In truth the first defendant had become part of the claimants' "team" when he accepted responsibility for working on the designs provided to him in order to manufacture the finished article. It made no sense for the copyright interests to have been divided between the first defendant and the claimants: the claimants could not have ordered more props without running the risk that the first defendant would have charged a blackmailing price and could not have exploited any licensing opportunities without similar dangers while the first defendant could have done nothing with the copyright interests without the complete co-operation of the claimants. ([207])

    *Ray v Classic FM Plc* [1998] F.S.R. 622 Ch D and *R Griggs Group Ltd v Evans (No.1)* [2005] F.S.R. 31 followed.

H52    (29) The fact that the parties might not have anticipated the success of the film was immaterial. The question, which had to be answered objectively and did not depend in any way on what might in fact have gone through the minds of particular parties, was what the parties would have agreed if the question of licensing opportunities had been raised. In those circumstances, it would never have occurred to anyone to say that the first defendant should have retained any (necessarily limited) copyright interests. An obligation to assign had necessarily to be implied. It was also reasonable, and there was nothing in the commercial arrangements then made, e.g. in the prices agreed, to suggest that it was unreasonable. ([208])

H53  **Cases referred to:**
*Adams v Cape Industries Plc* [1990] Ch. 433; [1990] 2 W.L.R. 657; [1991] 1 All E.R. 929 CA (Civ Div)
*Atkinson Footwear Ltd v Hodgskin International Services Ltd* (1994) 31 I.P.R. 186 Sup. Ct. NZ
*Badische Anilin und Soda Fabrik v Hickson* [1906] A.C. 419 HL
*Brancusi v United States* (1898) T.D. 43063
*Breville Europe Plc v Thorn EMI Domestic Appliances Ltd* [1995] F.S.R. 77 Ch D
*Britain v Hanks Bros & Co* (1902) 86 L.T. 765 Ch D
*British Leyland Motor Corp Ltd v Armstrong Patents Co Ltd* [1986] A.C. 577; [1986] R.P.C. 279; [1986] F.S.R. 221 HL
*British South Africa Co v Companhia de Moçambique* [1893] A.C. 602 HL
*Caproni v Alberti* (1891) 65 L.T. 785 Ch D
*Catalyst Investment Group Ltd v Lewinsohn* [2009] EWHC 1964 (Ch)
*Clarke's Design* (1896) 13 R.P.C. 351
*Coin Controls Ltd v Suzo International (UK) Ltd* [1999] Ch. 33; [1997] F.S.R. 660 Ch D
*Davis (J & S) Holdings Ltd v Wright Health Group Ltd* [1988] R.P.C. 403 Ch D
*Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2000] 1 W.L.R. 2416; [2001] 1 All E.R. 700; [2001] F.S.R. 11 HL
*Dow Jones & Co Inc v Gutnick* [2003] H.C.A. 56; 210 C.L.R. 575 High Ct. Australia
*Foster v Driscoll* [1929] 1 K.B. 470 CA
*Gesellschaft für Antriebstechnik mbH & Co KG (GAT) v Lamellen und Kupplungsbau Beteiligungs KG (LUK)* (C-4/03) [2006] E.C.R. I-6509; [2006] F.S.R. 45 ECJ
*Great Western Railway Co v Owners of SS Mostyn* [1928] A.C. 57 HL
*Hesperides Hotels Ltd v Muftizade* [1979] A.C. 508; [1978] 3 W.L.R. 378; [1978] 2 All E.R. 1168 HL
*King Features Syndicate Inc v O&M Kleeman Ltd* [1941] A.C. 417; [1941] 2 All E.R. 403 HL
*Konkola Copper Mines Plc v Coromin Ltd* [2005] EWHC 898 (Comm); [2005] 2 Lloyd's Rep. 555
*Littauer Glove Corp v F W Millington (1920) Ltd* (1928) 44 T.L.R. 746
*London Film Productions Ltd v Intercontinental Communications Inc* (1984) 580 F. Supp. 47 District Ct. New York
*Metix (UK) Ltd v GH Maughan (Plastics) Ltd* [1997] F.S.R. 718 Ch D (Pat Ct)
*Owusu v Jackson* (C-281/02) [2005] Q.B. 801; [2005] 2 W.L.R. 942; [2005] E.C.R. I-1383 ECJ
*Pearce v Ove Arup Partnership Ltd* [2000] Ch. 403; [2000] 3 W.L.R. 332; [1999] F.S.R. 525 CA (Civ Div)
*Plastus Kreativ AB v Minnesota Mining & Manufacturing Co* [1995] R.P.C. 438 Ch D (Pat Ct)
*Potter v Broken Hill Pty Co Ltd* [1906] 3 C.L.R. 479 High Ct. Australia
*Pytram Ltd v Models (Leicester) Ltd* [1930] 1 Ch. 639 Ch D
*Ray v Classic FM Plc* [1998] F.S.R. 622 Ch D
*R Griggs Group Ltd v Evans (No.1)* [2005] EWCA Civ 11; [2005] E.C.D.R. 30; [2005] F.S.R. 31

*R Griggs Group Ltd v Evans (No.2)* [2004] EWHC 1088 (Ch); [2005] Ch. 153; [2004] F.S.R. 48

*Roche Nederland NV v Primus* (C-539/03) [2006] E.C.R. I-6535; [2007] F.S.R. 5 ECJ

*Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWHC 31 (Comm); [2008] 1 All E.R. (Comm) 737

*TS Productions LLC v Drew Pictures Pty Ltd* [2008] FCAFC 194 Fed Ct. Australia

*Tyburn Productions Ltd v Conan Doyle* [1991] Ch. 75; [1990] 3 W.L.R. 167; [1990] 1 All E.R. 909 Ch D

*Usher v Barlow* [1952] Ch. 255; [1952] 1 All E.R. 205 CA

*Voda v Cordis Corp* [2007] USCAFED 29, 476 F. 3d. 887 US Fed. Ct. of Appeals

*Vogel v R & A Kohnstamm Ltd* [1973] Q.B. 133; [1971] 3 W.L.R. 537; [1971] 2 All E.R. 1428 QBD

*Wham-O Manufacturing Co v Lincoln Industries Ltd* [1982] R.P.C. 281 High Ct. (NZ); [1985] R.P.C. 127 CA (NZ)

*Wildash v Klein* (2004) 61 I.P.R. 324 Sup. Ct. Northern Territory Australia

H54 **Legislation referred to:**
38 Geo III c.71 (1798)
Brussels Convention art.2
Copyright Act 1911 ss.22(1), (2), 35
Copyright Act 1956 ss.3, 10(4)
Copyright Act 1956 s.10, Sch.7, para.8(2)
Copyright, Designs and Patents Act 1988 ss.4(1), (2)(b), 51, 52, Sch.1, para.20
Copyright of Designs Act 1839
Copyright of Designs Act 1842
Copyright (Industrial Processes and Excluded Articles) (No.2) Order 1989 arts 2, 3
Council Regulation 44/2001 recitals 1–3, 15, art.2
EC Treaty arts 61(c), 65
Patents and Designs Act 1907 s.93
Patents and Designs Act 1919 s.19
Registered Designs Act 1949 (as originally enacted) ss.1(3), (4), 44(now repealed)
Registered Designs Rules 1920 r.89
Registered Design Rules 1949 r. 26
Sculpture Copyright Act 1814

H55 *Michael Bloch QC* and *Alan Bryson* (instructed by Harbottle & Lewis LLP) for the appellants/claimants.
*Alastair Wilson QC* and *George Hamer* (instructed by Simmons Cooper Andrew) for the respondents/defendants.


**JUDGMENT**

**JACOB L.J.:**

1    This is the judgment of the court. All its members have contributed to each part of it. It is an appeal and cross-appeal from a judgment of Mann J. of July 31, 2008 ([2008] EWHC 1878 (Ch); [2009] F.S.R. 2).

2      Lucasfilm Ltd and two other claimants (collectively "Lucasfilm", there being no material distinction between the claimants for present purposes) sue Mr Andrew Ainsworth and his company. Nothing turns on the presence of the latter.

3      Mr Michael Bloch QC and Mr Alan Bryson argued the case for Lucasfilm. Mr Alastair Wilson QC and Mr George Hamer that of Mr Ainsworth.

**The principal facts**

4      These are set out by the judge at [26]–[84]. Most of the detail no longer matters so we confine ourselves to the essentials.

5      In the course of making the first Star Wars film a number of works were created. They include some paintings and drawings by a Mr McQuarrie showing scenes including Stormtroopers in their helmets and armour and a clay model of a Stormtrooper helmet made by a Mr Pemberton. Mr Ainsworth was asked to produce a final version in plastic based on the model and McQuarrie's works and did so, incorporating his own improvements. In doing so he used what can fairly be called "sculpting" techniques. We say a little more about the detail of what happened when we come to Mr Ainsworth's cross-claim.

6      So far as UK law is concerned it is accepted that the two-dimensional works produced (e.g. the scene paintings) are copyright works. Whether the models for the helmet are in themselves copyright works depends on whether they are "sculptures" within the meaning of s.4 of the Copyright Designs and Patents Act 1988.

7      Mr Ainsworth has admittedly made and sold copies of the helmet and armour. The appeal has concentrated on the Stormtrooper helmet, there being no separate point about the armour or helmets made for other characters. He accepts that he has reproduced the paintings but says he has a defence to an infringement claim under s.51 or s.52 of the 1988 Act.

8      As far as the position under US law is concerned, it is now accepted that US law regards what Mr Ainsworth did as an infringement of various US copyrights. Lucasfilm claims that the English court should itself enforce US copyright law against Mr Ainsworth.

9      Lucasfilm has obtained a default judgment for trade mark and copyright infringement in California against him in the sum of US $20 million. That sum sounds strange to English ears given that he only sold about US $14,500 worth. No less than US $10 million of the US $20 million is "compensatory damages" by US law. Lucasfilm claims that the English court should recognise and enforce the judgment to the extent of the US $10 million "compensatory" element. Perhaps not wanting to seem oppressive, it only seeks to enforce its US judgment to that extent that if it cannot succeed on its claim to enforce its US copyrights directly in the English courts.

10     Mr Ainsworth claims that if the work he did in producing the helmet amounts to the creation of a work of sculpture, he is the owner of the copyright in it.

11     Although there are a mass of other works relied upon by Lucasfilm (e.g. as to the design of parts of the armour) this case turns on the helmets—as was effectively agreed by the parties. If Mr Ainsworth has infringed copyrights relating to these he loses, if not, not. It is not necessary to go into the detail of other works relied on or referred to in the evidence.

**The holdings of the judge**

12    Mann J. rejected all of Lucasfilm's copyright infringement claims under UK law. He held that the models for the helmets did not have an independent copyright as being "sculptures" or "works of artistic craftsmanship" and that Mr Ainsworth had defences under ss.51 and 52.

13    The judge also rejected claims in passing off and breach of confidence and the claim to enforce the US judgment.

14    He upheld Lucasfilm's claim to equitable ownership of such copyrights as Mr Ainsworth might have acquired anywhere in the world as a result of his work in the creation of the original helmet and rejected Mr Ainsworth's own conditional cross-claim for infringement. Mr Ainsworth was ordered to execute all necessary assignments of such copyright as may subsist anywhere in the world in his work.

15    Finally he upheld Lucasfilm's claim to enforce US copyright here, granting an injunction restraining Mr Ainsworth from advertising in any publication directed to the United States or sending to the United States replicas of identified props—including particularly the Stormtrooper helmets.

**The issues on the appeal**

16    These have narrowed compared with those before the judge. No appeal is pursued in respect of passing off, breach of confidence or the claim that the prototype helmets were works of artistic craftsmanship. What Lucasfilm does appeal are the findings that the prototypes were not "sculptures" and the findings that there is a defence under s.51 or s.52. It also appeals the decision not to enforce the US default judgment.

17    Mr Ainsworth cross-appeals the decision to enforce the US copyright. He also seeks permission to appeal (for it was refused by the judge and by Jacob L.J. provisionally on the papers) the finding that all the copyrights (if any) in the work done by Mr Ainsworth for Lucasfilm belong in equity to Lucasfilm and that he should make a consequential assignment.

**Sculpture**

18    This issue is primarily relevant to the defences under ss.51 and 52 of the 1988 Act. It is also of great significance as to the term of protection. If the prototype helmet is a "sculpture" Lucasfilm will get the full term of protection for an artistic work, 70 years from the year of death of the author. If the helmet is not a work of sculpture then there is a much shorter period of protection (under the copyright in the painting and drawings)—broadly 15 years from first marketing of reproductions—a period which has now expired.

19    The issue also determines whether Mr Ainsworth could have acquired his own copyright in the helmets which he produced based on the refinements he made to the facial details when working on the prototype. This is dealt with by the judge at [36]. Lucasfilm contends that the helmets and armour and the toy Stormtroopers which were subsequently produced (and which are reproductions of the Stormtrooper helmet and armour) are "sculptures" within the meaning of what is now s.4(1) of the 1988 Act.

20    Section 4 defines "artistic work" in the following terms:

**"4. Artistic works**

(1) In this Part 'artistic work' means—

    (a) a graphic work, photograph, sculpture or collage, irrespective of artistic quality,

    (b) a work of architecture being a building or a model for a building, or

    (c) a work of artistic craftsmanship.

(2) In this Part—

    'building' includes any fixed structure, and a part of a building or fixed structure;

    'graphic work' includes—

        (a) any painting, drawing, diagram, map, chart or plan, and

        (b) any engraving, etching, lithograph, woodcut or similar work;

    'photograph' means a recording of light or other radiation on any medium on which an image is produced or from which an image may by any means be produced, and which is not part of a film;

    'sculpture' includes a cast or model made for purposes of sculpture."

21    In order to deal with some of the arguments about the meaning of these provisions it is necessary to say something about the legislative history of this definition. Copyright protection for sculptures was first granted by an Act of 1798 (38 Geo III c.71). It was not unlimited. It extended to models or casts of any bust, any part of the human figure, any statue of the human figure or the head of any animal, any part of any animal or the statue of any animal. The word "sculpture" was not used in the Act and the range of models or casts protected seems to reflect eighteenth century taste and fashion. The first reference to sculpture comes in a subsequent Act of 1814 (referred to in the chronological table of statutes as the Sculpture Copyright Act) which extended the protection granted by the 1798 Act to:

> "... any new and original Sculpture, or Model, or Copy, or Cast of the Human Figure or Human Figures, or of any Bust or Busts, or of any Part or Parts of the Human Figure, clothed in Drapery or otherwise, or of any Animal or Animals, or of any Part or Parts of any Animal combined with the Human Figure or otherwise, or of any Subject being Matter of Invention in Sculpture, or of any Alto or Basso-Relievo representing any of the Matters or Things hereinbefore mentioned."

22    The 1814 Act records in its preamble that it was passed for giving further encouragement to the "Art of making new models and casts of busts and other things" and for giving further encouragement to such arts. It remained in force until repealed by the 1911 Copyright Act. This defined an "artistic work" as including "works of painting, drawing, sculpture and artistic craftsmanship, and architectural works of art and engravings and photographs". A work of sculpture included casts and models: see s.35.

23    Section 22 of the 1911 Act provided that:

284                    LUCASFILM LTD V AINSWORTH

"(1) This Act shall not apply to designs capable of being registered under the Patents and Designs Act, 1907, except designs which, though capable of being so registered, are not used or intended to be used as models or patterns to be multiplied by any industrial process.

(2) General rules under section eighty-six of the Patents and Designs Act, 1907, may be made for determining the conditions under which a design shall be deemed to be used for such purposes as aforesaid."

24      The 1907 Act gave registered designs a maximum of 15 years' protection for what it rather confusingly called "copyright in the design": see s.53. The right was a true monopoly, unlike a copyright which only provides protection against copying. "Design" was defined in s.93 as meaning:

"... any design (not being a design for a sculpture or other thing within the protection of the Sculpture Copyright Act, 1814) applicable to any article, whether the design is applicable for the pattern, or for the shape or configuration, or for the ornament thereof, or for any two or more of such purposes, and by whatever means it is applicable, whether by printing, painting, embroidering, weaving, sewing, modelling, casting, embossing, engraving, staining, or any other means whatever, manual, mechanical, or chemical, separate or combined."

25      The position therefore at the time of the 1911 Act was that works of sculpture as defined continued to attract full copyright protection and were not excluded by the operation of s.22 because of the definition of "design" in the 1907 Act. This had been the case since soon after the introduction of copyright protection for designs. The Copyright of Designs Act 1839 gave one year's protection to:

"... a new and original Design made for the Modelling, or the Casting, or the Embossment, or the Chasing, or the Engraving, or for any other Kind of Impression or Ornament on any Article of Manufacture ..."

and three years' if it was made of metal. This created the potential for works of sculpture to be protected under both the 1814 and the 1839 Acts but this changed when sculpture was excluded from the definition of "design" in the Copyright of Designs Act 1842.

26      Sculptures were included in the system of registration for designs under the Designs Act 1850 but continued to enjoy the period of protection granted by the Sculpture Copyright Acts. The 1850 Act was repealed by the Patents, Designs and Trade Mark Act 1883 which granted five years' protection for a registered design and removed sculptures from the system of registration by defining "design" so as to exclude a design for sculpture within the protection of the Sculpture Copyright Act 1814: see s.60. This was the definition and treatment that was carried forward when the 1883 Act was repealed and replaced by the Patents and Designs Act 1907.

27      The 1907 Act was amended by the Patents and Designs Act 1919 which included a new definition of "Design". Section 19 provided that:

"'Design' means only the features of shape, configuration, pattern, or ornament applied to any article by any industrial process or means, whether manual, mechanical, or chemical, separate or combined, which in the finished article

appeal to and are judged solely by the eye; but does not include any mode or principle of construction, or anything which is in substance a mere mechanical 'device'."

28    This definition removed the express exclusion of sculpture and therefore had the effect of excluding a work of sculpture from copyright protection under the 1911 Act unless the design was not used or intended to be used as a model for multiplication by an industrial process: see s.22(1). Rule 89 of the 1920 Designs Rules made reproduction in more than 50 single articles as the test of whether there was multiplication by an industrial process. The consequence of this was that sculpture which was not to be mass produced in numbers exceeding 50 retained full copyright protection but could also in theory be protected as a design under the 1919 Act. But, in cases which were not within the exception to s.22(1) (i.e. models for production in numbers over 50), only registered design protection was available.

29    The consequences of this change caught a number of copyright owners unawares. In *Pytram Ltd v Models (Leicester) Ltd* [1930] 1 Ch. 639 a model of a wolf cub's head was produced from a papier mâché mould in order to be used as a totem by the Boy Scouts Association. They failed to register it as a design under what at the time was the 1907 Act and sued for infringement of their copyright under the 1911 Act. Clauson J. accepted that the item was an artistic work under the 1911 Act but held that it also fell within the definition of a "design" under the 1907 Act as amended by the 1919 Act. As a consequence of the amended definition of "design", it was excluded from protection under the 1911 Act and no protection existed for it under the 1907 Act because it had not been registered.

30    On Clauson J.'s reasoning, full copyright protection would have ceased in 1911 when the 1911 Act repealed the Sculpture Copyright Act of 1814 and so rendered otiose and ineffective the reference in parenthesis to the 1814 Act contained in the definition of design in s.93 of the 1907 Act (see [24] above). The new definition in s.19 of the 1919 Act did no more than to recognise this.

31    In *Pytram* the judge found as a fact that the wolf's head had been made with the intention of being reproduced in large quantities. There was therefore no room for disputing that it was outside the exception contained in s.22(1) of the 1911 Act. But in *King Features Syndicate Inc v O&M Kleeman Ltd* [1941] A.C. 417; (1941) 58 R.P.C. 207 the owners of copyright in drawings of "Popeye, the Sailor" brought proceedings for infringement of their copyright against the importers of "Popeye" dolls and other toys. The defendants contended that the copyright in the original work had been lost by the operation of s.22 of the 1911 Act because the designs were capable of registration under the 1907 Act (although not registered) and the plaintiffs had previously licensed other companies to manufacture dolls and other items based on those designs. The House of Lords rejected this argument (which had been accepted by the majority in the Court of Appeal) on the ground that the condition of use or intention to use for multiplication by an industrial process had to be satisfied or not at the date when the design first came into existence. If it was not satisfied at that time then full copyright protection under the 1911 Act could not be lost by the grant of subsequent licences for the multiple reproduction of the design.

32    In 1947 the Swan Committee recommended that the policy of allowing a copyright owner to be able to retain protection for his work under the 1911 Act

after he had consented to the reproduction of the whole or a substantial part of his work as a registered design should be re-considered particularly in relation to copyright in artistic works. In para.310 of the Report (Cmd. 7206) the Committee noted that:

> "Our attention has also been directed to the position of works of sculpture. Prior to 1919, these works had always been excluded from the definition of 'design' in the design provisions of the Acts. The Act of 1919 abolished this exclusion, and the decision in the case of *Pytram Ltd v Models (Leicester) Ltd* [1930] 1 Ch. Div., p. 639) makes it clear that a work of sculpture intended to be reproduced more than 50 times enjoys no protection unless it is registered under the design provisions. Although questions of artistic copyright do not come within our terms of reference, we wish to express the opinion that there seems to be no sufficient reason to draw a distinction between the sculptor and the painter, writer or composer, and that accordingly works of sculpture should be excluded from the definition of designs registrable under the design provisions."

33 The Registered Designs Act 1949 therefore added to the definition of a "design" in s.1(3) a further provision in s.1(4) empowering the Board of Trade to make rules for excluding from registration under the Act designs for articles which were primarily literary or artistic in character.

34 This power was exercised in the form of r.26 of the 1949 Designs Rules which provided that:

> "26. There shall be excluded from registration under the Act designs to be applied to any of the following articles, namely:-
> (1) works of sculpture other than casts or models used or intended to be used as models or patterns to be multiplied by any industrial process.
> (2) wall plaques and medals.
> (3) printed matter primarily of a literary or artistic character, including bookjackets, calendars, certificates, coupons, dressmaking patterns, greetings cards, leaflets, maps, plans, postcards, stamps, trade advertisements, trade forms, and cards, transfers, and the like."

35 The combination of the 1949 Act and the Rules was therefore effective to exclude the articles specified in r.26 from registration as designs. The reference in s.22(1) of the 1911 Act to the Patent and Designs Act 1907 fell to be read in accordance with the Interpretation Act as a reference to the 1949 Act: see *Usher v Barlow* [1952] Ch 255. The exclusion from full copyright protection contained in s.22(1) therefore no longer applied regardless of whether the articles specified in r.26 were intended to be used as models for the multiple reproduction of the design. They remained for all purposes under the umbrella of the 1911 Act. But the position was different in the case of sculptures. As a result of the qualification contained in r.26(1), an intention to use models or casts for mass production purposes meant that they continued to attract Designs Act protection and so, to that extent, they continued to be excluded by s.22(1) from full copyright protection. The reference to multiplication by an industrial process in r.26(1) is the 50 plus test.

36 The wording of r.26(1) was obviously taken from the exception in s.22(1) of the 1911 Act and must therefore be given the meaning explained by the House of Lords in *King Features*, the effect of which was set out in the Swan Report. A

model or cast in respect of which the 50 plus test is satisfied would therefore only be eligible for registered design protection if the use or intention to use existed from the date of its creation.

37    When the 1911 Act was repealed by the Copyright Act 1956 transitional provisions were included in Sch.7 to exclude from protection under the 1956 Act artistic works made before June 1, 1957 which were capable of registration under the Registered Designs Act 1949 and were intended to be used as a model or pattern to be multiplied by any industrial process: see Sch.7 para.8(2). Paragraph 8(2) included an express reference to the time when the work was made thereby confirming the construction of s.22(1) of the 1911 Act applied by the House of Lords in *King Features*.

38    In relation to new works, sculptures remained excluded by the 1949 Act and r.26(1) of the Designs Rules from registration as designs except in the case of models intended for multiple production and this position was continued following the passing of the 1988 Act. Although s.1 of the 1949 Act was replaced with a new section, the old s.1(4) continues in the form of what is now s.1(5) which provides that:

> "The Secretary of State may by rules provide for excluding from registration under this Act designs for such articles of a primarily literary or artistic character as the Secretary of State thinks fit."

39    Rule 26 of the Registered Design Rules 1989 continues to exclude from registration:

> "... works of sculpture, other than casts or models used or intended to be used as models or patterns to be multiplied by any industrial process."

40    It will be necessary to return to some of this legislative history when considering the defences relied on by Mr Ainsworth under ss.51 and 52 of the 1988 Act. But in relation to the issue of how one should construe the word "sculpture" in what is now s.4(1)(a) of the 1988 Act, two things are clear. The first is that (contrary to some of the arguments addressed to us) one gets little or no real assistance from the relationship between copyright and registered design right in determining the limits of protection which the use of the word "sculpture" was intended to have. We can ignore for the purposes of this appeal the effect of the EU Design Directive 98/71. If one concentrates on the position under the 1949 Act the definition of "design" emphasises that registered designs are intended to protect features of an industrial article which have eye appeal and not merely functional aspects of the design. Features of shape and configuration can be included in the former.

41    But a design feature comprising a shape which has eye appeal is obviously capable of including a cast or model for a sculpture. The express exclusion of such casts or models from registered design protection by r.26 except for those intended to be used for multiplication by an industrial process indicates that, but for r.26, all such items could be eligible for dual protection under both the 1988 and the 1949 Acts provided that they have the element of novelty required for registration as a design.

42    That said, the second point is that the definitions of "design" and "artistic work" are not the same and are concerned to identify different things. A model or cast could be registrable as a design under the 1949 Act if it is new and original and has the necessary features of shape or ornament which create visual appeal. The

288           Lucasfilm Ltd v Ainsworth

existence of those features (and only those features) in what might otherwise be a purely functional object are what attract protection. Even where the visual design features are those of shape, a distinction has to be drawn between the features which are part of the design and those which are intrinsic to the article in question, i.e. the difference between the shape of a thing and a thing of that shape: see *Clarke's Design* (1896) 13 R.P.C. 351 at 358.

43    The emphasis in copyright is different. Copyright protection in artistic works is defined (now in s.4 of the 1988 Act) by reference to various categories of work with no distinction between their aesthetic merits and appeal and their functionality. A graphic work can include a diagram or plan which is designed to have only practical utility. But it is still protected as an artistic work. Equally it can comprise a painting which (however bad it may be in artistic terms) is unlikely to be anything but decorative. The key therefore to copyright protection is that the work created by the author falls within one or other of the descriptions contained in the 1988 Act, i.e. that it is such a work. It does not depend upon a further analysis or identification of its design features.

44    The issue of construction raised by this appeal has therefore to be determined by reference to the copyright provisions of the 1988 Act themselves. The fact that a model or cast which qualifies as a sculpture may have design features which also entitle it to registration as a design in those respects tells one little about how to define the limits of copyright protection. They are simply different issues. A work of sculpture in the traditional fine art sense would undoubtedly have the qualities of eye appeal necessary to make its shape registrable as a design. But the converse does not follow. A principally utilitarian object with design features which could attract registered design protection is not necessarily a work of sculpture under the 1988 Act.

45    The helmet and armour were made in 1976 when the relevant definition of "artistic work" was that contained in s.3 of the 1956 Act. This included paintings, sculptures, drawings, engravings and photographs irrespective of artistic quality and is not therefore materially different from the provisions of s.4 of the 1988 Act. It is common ground that the substance of these provisions has not changed between 1911 and the present day. For convenience, we will therefore refer to the provisions of s.4.

46    Although this defines an artistic work, there is no definition of sculpture beyond the direction that it includes a cast or model made for the purposes of sculpture. The closest one ever gets to a more comprehensive definition is in the Sculpture Copyright Act of 1814 which specified in some detail the type of sculptures or models which qualified for protection. Although there is no definition of sculpture as such even in that statute, it is clear from the words used that the Act was concerned with sculpture in its traditional and conventional sense of a work of art. That much is apparent both from the terms of the preamble to the Act and from the description of the types of work included.

47    Notions of what constitutes a work of sculpture have expanded over the years. In *Wham-O Manufacturing Co v Lincoln Industries Ltd* [1982] R.P.C. 281 Davison C.J. quoted the *Encyclopaedia Britannica*:

> "In the New Encyclopaedia Britannica, Vol. 16, p.421 there appears an article on 'Art of sculpture'. The following passages are of some interest:

'Sculpture is not a fixed term that applies to a permanently circumscribed category of objects or sets of activities. It is, rather, the name of an art that grows and changes and is continually extending the range of its activities and evolving new kinds of objects. The scope of the term is much wider in the second half of the 20th century than it was only two or three decades ago, and in the present fluid state of the visual arts, nobody can predict what its future extensions are likely to be.

Certain features, which in previous centuries were considered essential to the art of sculpture, are not present in a great deal of modern sculpture and can no longer form part of its definition. One of the most important of these is representation. Before the 20th century, sculpture was considered a representational art; but its scope has now been extended to include non-representational forms. It has long been accepted that the forms of such functional three-dimensional objects as furniture, props and buildings may be expressive and beautiful without being in any way representational, but it is only in the 20th century that non-functional, non-representational, three-dimensional works of art have been produced.
...

20th century sculpture is not confined to the two traditional forming processes of carving and modelling or to such traditional natural materials as stone, metal, wood, ivory, bone and clay. Because present-day sculptors use any materials and methods of manufacture that will serve their purposes, the art of sculpture can no longer be identified with any special materials or techniques. Through all of these changes there is probably only one thing that has remained constant in the art of sculpture, and it is this that emerges as the central and abiding concern of sculptors: The art of sculpture is the branch of the visual arts that is especially concerned with the creation of expressive form in three dimensions.'"

Likewise the dictionary definitions of "sculpture" recognise that taste has changed. In the Shorter Oxford English Dictionary it is described as:

"Originally the process or art of carving or engraving a hard material so as to produce designs or figures in relief, or in intaglio, or in the round. In modern use, that branch of fine art which is concerned with producing figures in the round or in relief, either by carving, by fashioning some plastic substance, or by making a mould for casting in metal."

48    The recognition of abstract shapes as works of art was established early in the twentieth century if not before. In 1928 the sculptor Constantin Brancusi successfully argued that his bronze sculpture "Bird in Flight" was exempt from US import duties (Customs wanted to charge on the basis of its scrap metal value!) as a sculpture and work of art: see *Brancusi v United States* (1898) T.D. 43063. Today no one would dispute that abstract sculpture is a branch of the fine arts.

49    But the word sculpture can also be used to describe the process by which an object is created. Most usually this will consist of moulding or carving the relevant material into the desired shape or, in the case of a metal cast sculpture, of creating the necessary cast or mould.

50    The latter process is not, of course, confined to works of art. Casting or moulding is an industrial process commonly used where the end product is made of plastic

or metal of some kind. It is used in the production of millions of ordinary household objects, none of which would usually be described as sculptures. A motor-car is but one obvious example. Some would have qualified for protection as registered designs so as to be excluded under s.22(1) of the 1911 Act. But would they have qualified as "sculpture"?

51     The judge gave a clear no to this question. His view was that the Stormtrooper helmet, although created by a process of moulding, was primarily utilitarian in function:

> "[121] First, the original Stormtrooper helmet. This has, as its genesis, the McQuarrie paintings. The purpose of the helmet was that it was to be worn as an item of costume in a film, to identify a character, but in addition to portray something about that character – its allegiance, force, menace, purpose and, to some extent, probably its anonymity. It was a mixture of costume and prop. But its primary function is utilitarian. While it was intended to express something, that was for utilitarian purposes. While it has an interest as an object, and while it was intended to express an idea, it was not conceived, or created, with the intention that it should do so other than as part of character portrayal in the film. That, in my view, does not give it the necessary quality of artistic creation inherent in the test suggested by Laddie J. Not everything which has design appeal is necessarily a sculpture. I think that the ordinary perception of what is a sculpture would be over-stretched by including this helmet within it, and when rationalised the reasons are those just given. It is not that it lacks artistic merit; it lacks artistic purpose. I therefore find that the Stormtrooper helmet is not a sculpture.
>
> [122] The same reasoning applies to the armour, and to the other helmets. They all shared the same sort of original purpose."

52     He took the same view about the toy Stormtroopers:

> "[123] Next, it is necessary to consider the toy Stormtroopers, and other characters, which are taken as being reproductions of the armour and helmets for the purposes of section 52. These are, as already described, articulated models which are sold as toys and which are intended for the purposes of play. Play is their primary, if not sole, purpose. While their appearance is obviously highly important (if they did not look like the original, the child would not be so interested) they are not made for the purposes of their visual appearance as such. While there is no accounting for taste, it is highly unlikely that they would be placed on display and periodically admired as such. The child is intended to use them in a (literally) hands-on way, in a form of delegated role-play, and that is doubtless how they are actually used. That means, in my view, they are not sculptures. They can be distinguished from the model in *Britain* which apparently had a significant element of being admirable for its own visual sake. That does not apply to the Stormtrooper, whose only real purpose is play. In reaching this conclusion I am not saying that the *Britain* model is better at what it portrays than the Stormtrooper model. That would be to make judgments about artistic quality, which the statute understandably forbids. It is making a judgment about whether there is anything in the model which has an artistic essence, in the sense identified above. I conclude that there is not."

53    In order to reject their classification as sculpture the judge concentrated on purpose. Purely functional items (even though well designed and visually attractive) did not, in his view, qualify as sculptures because they were not created primarily for the purpose of their visual appeal. Essentially functional objects should look to protection for their visual merits as registered designs.

54    In putting forward this test the judge was expressly conscious of the need not to make value judgments about the artistic quality of the designs involved. The definition of "artistic work" in the Copyright Acts makes that impermissible. But, after a review of the authorities, he set out a list of guidelines which he considered could be derived from the cases. We set it out verbatim:

> "[118] From those authorities, and those approaches, a number of guidance factors can be extracted. I call them guidance rather than points of principle, because that gives them the right emphasis. The judges deciding the cases have not sought to lay down hard and fast rules in an area where subjective considerations are likely to intrude, and I will not attempt to do so either. However, I do think the following points emerge from the cases or from the concepts involved:
>
>    (i) Some regard has to be had to the normal use of the word.
>    (ii) Nevertheless, the concept can be applicable to things going beyond what one would normally expect to be art in the sense of the sort of things that one would expect to find in art galleries.
>    (iii) It is inappropriate to stray too far from what would normally be regarded as sculpture.
>    (iv) No judgment is to be made about artistic worth.
>    (v) Not every three dimensional representation of a concept can be regarded as a sculpture. Otherwise every three dimensional construction or fabrication would be a sculpture, and that cannot be right.
>    (vi) It is of the essence of a sculpture that it should have, as part of its purpose, a visual appeal in the sense that it might be enjoyed for that purpose alone, whether or not it might have another purpose as well. The purpose is that of the creator. This reflects the reference to 'artist's hand' in the judgment of Laddie J in *Metix*, with which I respectfully agree. An artist (in the realm of the visual arts) creates something because it has visual appeal which he wishes to be enjoyed as such. He may fail, but that does not matter (no judgments are to be made about artistic merit). It is the underlying purpose that is important. I think that this encapsulates the ideas set out in the reference works referred to in *Wham-O* and set out above (and in particular the Encyclopaedia Britannica).
>    (vii) The fact that the object has some other use does not necessarily disqualify it from being a sculpture, but it still has to have the intrinsic quality of being intended to be enjoyed as a visual thing. Thus the model soldier in *Britain* might be played with, but it still, apparently, had strong purely visual appeal which might be enjoyed as such. Similarly, the Critters in *Wildash* had other functions, but they still had strong purely visual appeal. It explains why the Frisbee itself should be excluded from the category, along with the moulds in *Metix* and *Davis*. It would also exclude the wooden model in *Wham-O* and

292                    LUCASFILM LTD v AINSWORTH

the plaster casts in *Breville*, and I would respectfully disagree with the conclusions reached by the judges in those cases that those things were sculptures. Those decisions, in my view, would not accord with the ordinary view of what a sculpture is, and if one asks why then I think that the answer is that the products fail this requirement and the preceding one – there is no intention that the object itself should have visual appeal for its own sake, and every intention that it be purely functional.

(viii) I support this analysis with an example. A pile of bricks, temporarily on display at the Tate Modern for 2 weeks, is plainly capable of being a sculpture. The identical pile of bricks dumped at the end of my driveway for 2 weeks preparatory to a building project is equally plainly not. One asks why there is that difference, and the answer lies, in my view, in having regard to its purpose. One is created by the hand of an artist, for artistic purposes, and the other is created by a builder, for building purposes. I appreciate that this example might be criticised for building in assumptions relating to what it seeks to demonstrate, and then extracting, or justifying, a test from that, but in the heavily subjective realms of definition in the artistic field one has to start somewhere.

(ix) The process of fabrication is relevant but not determinative. I do not see why a purely functional item, not intended to be at all decorative, should be treated as a sculpture simply because it is (for example) carved out of wood or stone."

55    Mr Bloch appeals against this analysis by the judge and his application of it to the Stormtrooper items on essentially two grounds. He contends that the definition of "artistic work" in the Copyright Acts since 1911 concentrates on what the specific objects are rather than on whether they have any particular artistic qualities or merit. The test is therefore essentially descriptive. What they are must depend, he says, on how they were made. A drawing is no more than the product of the draftsman's skill applying a particular technique. Artistic or visual purpose is irrelevant to its qualifying as a drawing. The same approach should be used in respect of sculpture. If the object has been sculpted by a physical process to which that description can be applied then the outcome should be a sculpture. Nothing more is needed. In this case the helmets and armour were made after moulds had been carved to the required shape and then used to create the finished article.

56    But he also submits that even if the judge's test is right and the object has to be made in order to display some kind of visual appeal then the helmet and armour qualify. They were designed to project to the audience for the film a representation of a fictional soldier whose character could be derived from the image of the design itself. They are not real helmets and suits of armour. They were, Mr Bloch submits, purely representational in character and never had any utility beyond that of a film prop. But, in that capacity, they were designed to be highly visual and embody a considerable level of artistic skill and design.

57    It is convenient at this point to examine the cases which provide the foundation for the judge's test. They begin with *Caproni v Alberti* (1891) 65 L.T. 785: a case under the Sculpture Copyright Act 1814. The defendant copied three casts made by the plaintiff of various arrangements of fruit and leaves. The defence was that

the 1814 Act did not refer to casts of flowers, leaves or fruit and that such casts did not fall within the words "any subject being matter of invention in sculpture". It was not suggested that the casts which were copied were not otherwise works of sculpture. The judge rejected this argument but his decision offers no real guidance as to what is necessary to constitute a sculpture. He found that the cast had been produced by carving an artistic reproduction of the fruit and leaves so that this was not, on any view, a borderline case.

58      The next decision chronologically is *Britain v Hanks Bros & Co* (1902) 86 L.T. 765. This also involved a claim to copyright under the 1814 Act. The defendants made copies of various metal models of soldiers produced by the plaintiffs. Their claim to copyright in these items was disputed. The defendants' argument was that the 1814 Act applied only to substantial works of art and not to metal toys of no artistic merit. Wright J. directed himself that the question whether the model figure fell within the Act had to be decided upon evidence as to its artistic character. The models were of real soldiers and were found by the judge to be artistic productions of the mounted yeoman they depicted.

59      It is difficult again to take too much from this case. It is clear that the judge rejected the defendants' contention that the models were mere toys of no artistic merit. On his view, the metal figures produced therefore qualified as sculptures or models of the human figure within the meaning of the 1814 Act. They appear to have been high quality lead soldiers cast from a model which had been made with recognisable artistic skill. It was certainly the view of the Gregory Committee which reported in October 1952 (Cmd. 8662) and recommended various changes to the Copyright Act that toy soldiers and other models did not qualify for copyright protection under the 1911 Act because of the operation of s.22(1) and Design Rule 26. Their only protection would be as registered designs assuming that they could satisfy the requirement of novelty. But, as mentioned earlier, this involves an acceptance that they would otherwise qualify as works of sculpture. It is, however, clear from the report that the Gregory Committee had in mind toy soldiers made from a prototype model which had the qualities necessary to make it a work of sculpture. This certainly seems to be consistent with the view of the judge in *Britain v Hanks Bros & Co* about the quality of the models he was considering. On this basis, that case was concerned with something which was not merely a toy and which, in the hands of a collector, might not be used for that purpose at all. By comparison, the toy Stormtroopers were not replicas of real soldiers and were sold essentially for use as toys. The judge was not presented with evidence about how they were made or whether the prototype could itself be regarded as a sculpture. All we know is that they were reproductions in miniature of the full-sized armour and helmet.

60      We have already mentioned the decision of Clauson J. in *Pytram Ltd v Models (Leicester) Ltd* where the plastic model of the wolf cub's head was held to be a sculpture within the meaning of the 1911 Act. The case was primarily concerned with the effect on copyright protection of the amendment to the definition of "design" in the Patents and Designs Act 1907. Given the judge's view about the effect of this on s.22(1), it was not necessary to decide whether the model of the head was a sculpture within the meaning of the 1911 Act and the judge proceeded on the assumption that it was. The case does not therefore really assist on the point that we have to consider, although we have no reason to doubt its correctness. The

object in question was an artistic creation of an animal's head which was in a real sense a sculpture.

61     The next case considered by Mann J. was the decision of Falconer J. in *Breville Europe Plc v Thorn EMI Domestic Appliances Ltd* [1995] F.S.R. 77. The plaintiff company claimed copyright in various plastic shapes which they had produced in order to create moulds for the heated plates in a sandwich toaster. Falconer J. did not have to consider the question whether the plastic shapes amounted to sculptures because he had already found that the defendants had not appropriated the plaintiff's designs contained in their drawings in producing their own machine. But at 94 he said this:

> "Turning to the plaster shapes or sculptures, the defendants contended that these were not sculptures within the meaning of section 3 of the Copyright Act on the ground, as I understand Mr Young, that they were purely mechanical or functional devices and he referred me to section 1 of the definition of 'sculpture' in the original statutory provision relating to copyright in sculptures, section 1 of the Sculpture Copyright Act 1814 , which is to be found reproduced in Laddie, Prescott & Vitoria's Modern Law of Copyright at page 671. I do not see why the word 'sculpture' in section 3 of the Copyright Act 1956 should not receive its ordinary dictionary meaning except in so far as the scope of the word is extended by section 48(1) which provides that '"sculpture" includes any cast or model made for the purposes of sculpture.' The Concise Oxford Dictionary defines sculpture as the Art of forming representations of objects etc or abstract designs in the round or in relief by chiselling stone, carving wood, modelling clay, casting metal, or similar processes; a work of sculpture, a definition forming the basis of paragraph 3.15 on 'sculptures' in the textbook just mentioned where it is suggested that:
>> 'Since copyright may subsist irrespective of artistic quality it would seem that, for example, carved wooden patterns intended for the purpose of casting mechanical parts in metal or plastic might well be susceptible of protection, although the point has not yet received much attention from practitioners.'"

62     As Mann J. recognised, this case would assist Lucasfilm because it rests on the method of production of the item in question rather than its purpose. Falconer J. relied on the decision of the New Zealand Court of Appeal in *Wham-O Manufacturing Co v Lincoln Industries Ltd* [1982] R.P.C. 281. There it was held that a preparatory wooden model for what became the Frisbee was protected by copyright as a sculpture even though the finished article (which was made in plastic by a process of injection from a metal mould based on the wooden model) could not be one.

63     At 156–157 Davison C.J. said that:

> "One must ask in the present case, what was the original work of the author which created the article sought to be classed as a sculpture? It was not directly the creation of the final disc. It was the creation variously of drawings, wooden models and finally dies or moulds from which the finished plastic product was formed.

It would seem that where a model which is a sculpture has been created and a cast or mould is later made from that model for the purposes of reproducing the model in metal and plastic or some other form then the articles so produced may be classified as sculptures.

But it appears to us to be straining the meaning of the word 'sculpture' to apply it to the discs produced by the injection moulding process used in the present case where the moulds concerned have simply been created by a process of engraving and no original model has been created.

Copyright subsists in 'original works'—see section 7—but no original work in the nature of the finished disc has been created before the injection moulding process has created them. We do not overlook that the definition of sculpture in section 2 of the Act 'includes any cast or model made for purposes of sculpture' But that is a different matter from a cast or model used to make the sculpture.

Furthermore it appears to be implicit in the definitions of sculpture to which we have already referred and from the article in the New Encyclopaedia Britannica, particularly the passage reading:

> 'The art of sculpture is the branch of the visual arts that is especially concerned with the creation of expressive form in three dimensions'

that sculpture should in some way express in three-dimensional form an idea of the sculptor. It seems to us inappropriate to regard utilitarian objects such as plastic flying discs, manufactured as toys, by an injection moulding process, as items of sculpture for the purposes of the Copyright Act. They lack any expressive form of the creator and any idea which the creator seeks to convey. In the result, we are unable to hold that the final plastic products—the discs—are sculptures in terms of the Act and entitled to copyright protection as sculptures."

64    Mann J. thought that the distinction drawn between the original prototype model and the finished product was somewhat arbitrary. But, correct or not, it does not arise in this case. The helmet and armour were produced by using a mould which was carved by Mr Ainsworth in order to reproduce the designs contained in the McQuarrie pictures and the clay model made by Mr Pemberton. If the finished products are sculpture then so was the mould used to create them. The New Zealand Court of Appeal accepted that this would have been the case in *Wham-O* had the mould itself been carved or sculpted rather than merely engraved. What therefore constituted the essential distinguishing factor between the wooden prototype and the finished product in that case was the court's definition of sculpture to exclude merely utilitarian objects such as the Frisbee.

65    We are not concerned on this appeal with whether the McQuarrie paintings or the Pemberton clay models were artistic works, though the paintings at least obviously were. The sculpture issue relates only to the articles (the helmet and the armour) which Mr Ainsworth produced. To qualify as artistic works they have to be sculpture. If they are then the defences under ss.51 and 52 of the 1988 Act are not available to him. We have some difficulty in accepting that the wooden model of the Frisbee should, on the reasoning of the Court of Appeal in *Wham-O*, have been accorded a different treatment to that of the plastic Frisbee which it was used to design and create. As a prototype, it was essentially utilitarian in nature in that it embodied a design for the well-known toy. Put simply, it was a model of a Frisbee

and nothing else. It was not intended to be a depiction of any animate object (like the wolf cub's head in *Pytram*) nor was it made as the model for an abstract work of art. It was therefore far removed from the creation of expressive form described in the extract from the *New Encyclopaedia Britannica* quoted by Davison C.J. in his judgment.

66   The same goes for the plastic shapes considered by Falconer J. in *Breville Europe*. No ordinary citizen—indeed no ordinary lawyer—would regard a sandwich toaster or any part of it as a work of sculpture—even if it did produce "scalloped" sandwiches. So why should a copyright lawyer take a different view? A total or almost total emphasis on the manner of creation, as in *Breville* and *Wham-O* produces a result which offends common sense and in our view is wrong. There must, as Mann J. said, be some element of artistic expression however unsuccessful.

67   It is unnecessary to say anything about the decision of Whitford J. in *Davis (J & S) Holdings Ltd v Wright Health Group Ltd* [1988] R.P.C. 403 which concerned a model of a dental impression tray. The judge rejected the submission that it was a sculpture largely on the grounds of its ephemeral nature. The only remarkable thing about the case is that anyone could have thought the work in question could remotely be considered a "sculpture".

68   But the decision of Laddie J. in *Metix (UK) Ltd v GH Maugham (Plastics) Ltd* [1997] F.S.R. 718 is more interesting. Copyright was claimed in some moulds used for making cartridges for what are described as flow mixers. The cartridges had the appearance of a double-barrelled hypodermic syringe through which different chemicals were passed using a plunging mechanism and then mixed to create a chemical reaction. The design was obviously intended to have a purely industrial application but the plaintiff sought permission to amend its pleadings to allege copyright infringement based on the moulds being works of sculpture. Laddie J. refused the application. At 721 he said:

> "The law has been bedevilled by attempts to widen out the field covered by the Copyright Acts. It is not possible to say with precision what is and what is not sculpture, but I think Mr Meade was close to the heart of the issue. He suggested that a sculpture is a three-dimensional work made by an artist's hand. It appears to me that there is no reason why the word 'sculpture' in the 1988 Act, should be extended far beyond the meaning which that word has to ordinary members of the public. There is nothing in the particulars in this case which suggests that the manufacturers of these moulds considered themselves, or were considered by anybody else, to be artists when they designed the moulds or that they were concerned in any way with the shape or appearance of what they were making, save for the purpose of achieving a precise functional effect. Nothing in the particulars given here suggests that any consideration of appeal to anything other than functional criteria was in mind or achieved. In these circumstances, it appears to me that there is no arguable case pleaded for the existence of sculpture copyright in the moulds for these products and I will not allow the statement of claim containing such a claim to be served on TAH (Europe) Inc."

69   Finally, there is the Australian case of *Wildash v Klein* (2004) 61 I.P.R. 324 which concerned three-dimensional depictions of animals made out of wire. Some of these were also functional in that they incorporated a candle holder but all were decorative. Angel J. (at 327) held that they were sculpture:

"[11] I am satisfied that the works in question are sculptures. As Pincus J said in *Greenfield Products Pty Ltd v Rover-Scott Bonnar Ltd* (1990) 95 ALR 275 at 284; 17 IPR 417 at 417:

> 'Although the definition of "sculpture" is not exhaustive, in so far as the word remains undefined it must be given its ordinary meaning, in accordance with orthodox principles of construction.'

In *Lincoln Industries Ltd v Wham-O Manufacturing Co* [1984] NZLR 641 at 662; (1984) 3 IPR 115 at 131 the New Zealand Court of Appeal concluded that 'sculpture should in some way express in three-dimensional form an idea of the sculptor'. Having said that it 'is not possible to say with precision what is and what is not sculpture', Laddie J in *Metix (UK) Ltd v GH Maughan (Plastics) Ltd* [1997] FSR 718 at 722 concluded that at 'the heart of the issue … a sculpture is a three-dimensional work made by an artist's hands. It appears to me that there is no reason why the word "sculpture" in the [UK] Act, should be extended far beyond the meaning which that word has to ordinary members of the public'.

[12] I am satisfied that the works in question are 'sculptures'. They are three dimensional craft pieces hand made with a degree of skill in the medium employed which are designed to have aesthetic appeal to potential purchasers. That some of the works in this case are also functional, such as the wall and table candle holders and 'mozzie coil' holders, does not prevent them being 'sculptures' within the meaning of that term in the Act. Although in *Wham-O Manufacturing Co*, the New Zealand Court of Appeal concluded that it was 'inappropriate to regard utilitarian objects such as plastic flying discs, manufactured as toys, by an injection moulding process, as items of sculpture for the purposes of the Copyright Act', this was so because '[t]hey lack[ed] any expressive form of the creator and any idea which the creator seeks to convey': at NZLR 662; IPR 131. The works in question here demonstrate the expression of such ideas."

70    Against this background, we can return to the judge's guidelines which are quoted in [54] above and to Mr Bloch's criticisms of them. The first point concerns the normal use of the word "sculpture". Most of the cases proceed on the footing that one should not stray too far from the ordinary meaning of the word but there is considerable disagreement as to what that is. One of the difficulties is that the word can be used to describe both the physical process of moulding or carving necessary to create the finished object and that object itself. Copyright has, of course, to exist in the product of one's skill and labour. Not in the skill and labour itself. In looking therefore at the finished article, it seems to us wrong to interpret the use of the word sculpture in the 1911 Act (and therefore in succeeding Copyright Acts) divorced from the earlier legislative history. The 1814 Act was clearly concerned to identify sculpture as an artistic work. Its transposition into a wider category of "artistic work" under the 1911 Act does not mean that one can ignore that context. Although some of the items included in the list such as a map or diagram may have a high level of functionality that should not be used as a guide to the interpretation of every item which the statutory definition contains. Sculpture, like painting (however good or bad it may be), does connote the work of the artist's hand and the visual purpose attributed to it by the judge in this case. Put simply, it has, broadly speaking, to be a work at least intended to be a work of art.

298                    LUCASFILM LTD V AINSWORTH

71    We therefore accept points (i)–(vi) on the judge's list. Mr Bloch criticises the
reference in point (v) to the three-dimensional representation of a concept on the
largely metaphysical basis that all things in the world are representations of a
concept. But that seems to be an issue about terminology. What the judge was
referring to is clearly set out in the second sentence of that paragraph. Mr Bloch
declined to accept that the well-designed saucepan or car would not be a sculpture
but we think that this merely serves to confirm the correctness of the point made
by the judge.

72    In point (vii) Mann J. deals with questions of the object's utility. This is in many
ways the most important and difficult issue because it highlights the existence of
a grey area in which, even on the approach outlined in points (i)–(vi), there may
be difficulties in drawing the line between sculpture and an object which, though
well designed, does not qualify as such. Mr Bloch submits that the creation of these
difficulties is due to the judge's concentration on the artistic or visual purpose of
the work without which possibly fine distinctions would not have to be made. But,
unless one is prepared to accept that almost any moulded version of a functional
object is to be included in the definition, a line has to be drawn somewhere and
some form of differentiation made.

73    One can think up any number of marginal examples to test where the boundary
lies. Mr Bloch posed the example of a statue of a saint created as an object of
veneration for use in a church. Its religious purpose or function would not alter its
status as a sculpture. The same goes for props. A sculpture made for use in a play
or film does not, he submits, make it any more utilitarian than the statue of the
saint and, again, should not affect its status as a sculpture for the purpose of
inclusion in the definition of artistic work.

74    None of this is necessarily controversial but we are not convinced that these
examples really help. A plaster statue of a saint can, in artistic terms, be very good
or very bad. There are many examples of both. But most people would, we think,
accept that both kinds were sculptures notwithstanding their religious purpose.
Similarly, a well-designed stage prop may be highly artistic and one knows of stage
sets for opera and ballet designed by a number of artists of great note. Again their
status as an artistic work would not be negated by the use to which their designs
were intended to be put.

75    The issue in this case and the judge's approach to it does not turn on the purpose
for which it is actually used but on the purposive nature of the object: what the
judge described as its "intrinsic quality of being intended to be enjoyed as a visual
thing". As we read his judgment, the purpose of the object is simply one of the
relevant guides to whether it qualifies as a sculpture. A precise definition of that
term is not possible which is why the judge has outlined a number of considerations
which should act as signposts to the right answer. One can demonstrate this by an
example. Most people would not regard a real soldier's helmet as a sculpture.
Although made of pressed metal from a mould, its essential functionality as such
is to take it outside any reasonable use of that term. A medieval suit of armour,
however highly decorated, is no different. Although now of largely historical
interest, it was made for a practical purpose which, again, characterises it as an
object of utility rather than an artistic work. This view of these objects would not
change if they were used as props for a play or film. Their use in that context would
not alter their nature or their description.

76    But if the soldier's helmet appears on a bronze statue of a soldier as part of an artistic representation of the man and his kit no one would, we think, dispute that it formed part of a sculpture. It has no practical utility. It cannot be used as a helmet and, to that extent, it is not one.

77    The result of this analysis is that it is not possible or wise to attempt to devise a comprehensive or exclusive definition of "sculpture" sufficient to determine the issue in any given case. Although this may be close to adopting the elephant test of knowing one when you see one, it is almost inevitable in this field. We therefore consider that the judge was right to adopt the multi-factorial approach which he did.

78    We turn then to the second aspect of Mr Bloch's appeal on this point which is whether the judge correctly applied the various guidelines he has set out. In doing so we observe that this is the type of case referred to by Lord Hoffmann in *Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2001] F.S.R. 11 in which an appellate court must pay considerable respect to the assessment made by the fact-finding judge and should not reverse his decision unless it is satisfied that he erred in principle.

79    The first class of item to consider are the helmet and armour. Mr Bloch seeks to avoid our example of a real soldier's helmet being used as a prop in a film by stressing the fictional and imaginary nature of the Stormtroopers and what they were. These were not, he submits, the helmet and armour of a real soldier and are therefore no more part of reality than the horn of a unicorn would be. That is not a real horn and this is not, in any real sense, a helmet.

80    But that argument confuses the fictional nature of the Stormtrooper with his physical depiction in the film. Although invented, the helmet and armour are still recognisable as such and have a function within the confines of the film as the equipment of the Stormtrooper. They are, to that extent, no different from and serve the same purpose as any real helmet or armour used in a film. The judge made this point by referring to the primary function of the helmet and armour as being utilitarian and lacking in artistic purpose. This is simply a shorthand for the application of the various considerations set out in his [118]. He was, in our view, entitled to come to that conclusion on the facts of this case. We also think that he was right to do so. Neither the armour nor the helmet are sculpture.

81    That leaves the toy Stormtroopers. Mr Bloch submits that the distinction which the judge made based on *Britain v Hanks Bros & Co* is untenable and that the facts of that case are indistinguishable from those under consideration on this appeal. The toy Stormtroopers would not, of course, have qualified as sculptures under the 1814 Act because they are not statues or models of the human figure but that particular qualification no longer exists. It is, however, clear from the judgment of Wright J. that the submission he had to deal with was that the models were toys of no artistic merit whereas, on the evidence, the opposite was the case.

82    As already indicated, we think the judge was right to point to the existence of what can loosely be described as a work of art as the key to the identification of sculpture. On this basis, artistic and accurate reproductions of soldiers could qualify notwithstanding that some children might wish to play with them. But in most modern cases toy soldiers, whether real or fictional, will not be works of art and will not differ materially in artistic terms from the plastic Frisbee in the *Wham-O* case. They will be playthings registrable for their design qualities but nothing else. This distinction may be difficult to draw in some cases but we suspect that the

cases which will qualify for protection under the Copyright Act will be relatively rare. The judge recognised the need not to make qualitative judgments about the artistic merits of the toy soldiers in *Britain* compared to the Stormtroopers and therefore emphasised the real purpose of the latter being one of play. But the true distinction between the two cases can be expressed in more fundamental terms. We are not dealing here with highly crafted models designed to appeal to the collector but which might be played with by his children. These are mass produced plastic toys. They are no more works of sculpture than the helmet and armour which they reproduce.

### Section 51

83    Section 51 was introduced to deal with the problem identified by the House of Lords in *British Leyland Motor Corp Ltd v Armstrong Patents Co Ltd* [1986] A.C. 577; [1986] F.S.R. 221; [1986] R.P.C. 279. A manufacturer whose product would not qualify for copyright protection because it fell outside the definition of "artistic work" might nonetheless be able to control the market through the artistic copyright in any drawings of the design. In *British Leyland* the issue was the ability of motor manufacturers to limit the production of spare parts in this way which the House of Lords dealt with by upholding a right of repair on the part of the car owner that effectively trumped the manufacturers' copyright.

84    A perhaps more principled solution came in the form of s.51 of the 1988 Act which provides that:

> **"51 Design documents and models**
>     (1) It is not an infringement of any copyright in a design document or model recording or embodying a design for anything other than an artistic work or a typeface to make an article to the design or to copy an article made to the design.
>     (3) In this section-
>         'design' means the design of any aspect of the shape or configuration (whether internal or external) of the whole or part of an article, other than surface decoration
>         'design document' means any record of a design, whether in the form of a drawing, a written description, a photograph, data stored in a computer or otherwise."

85    This, as the judge recorded, is directed to the production of a three-dimensional object in accordance with a design which is itself the subject of copyright. Except where the design is one for an artistic work, the use of the design to make what is illustrated is not an infringement.

86    The judge held that the McQuarrie paintings and other drawings were design documents within the meaning of s.51 and were used by Mr Ainsworth to create the Stormtrooper helmet and armour. On the basis of his finding that the helmet and armour were not sculpture or works of artistic craftsmanship, s.51 therefore provided a defence to a claim of infringement based on his use of those works.

87    The judge's decision that the McQuarrie paintings and drawings were design documents has not been challenged on this appeal. The application of s.51 was resisted only on the ground that the helmets and armour were sculpture. The judge

was therefore right to find that it provides Mr Ainsworth with a defence to the UK copyright claim.

## Section 52

88    The application of s.51 makes it unnecessary for Mr Ainsworth to rely on s.52. We can therefore deal with the point quite shortly.

89    So far as relevant, s.52 provides that:

> **"52. Effect of exploitation of design derived from artistic work**
>
> (1) This section applies where an artistic work has been exploited, by or with the licence of the copyright owner, by –
>> (a) making by an industrial process articles falling to be treated for the purposes of this part as copies of the work, and
>> (b) marketing such articles, in the United Kingdom or elsewhere.
>
> (2) After the end of the period of 25 years from the end of the calendar year in which such articles are first marketed, the work may be copied by making articles of any description, or doing anything for the purpose of making articles of any description, and anything may be done in relation to articles so made, without infringing copyright in the work.
>
> (3) …
>
> (4) The Secretary of State may by order make provision –
>> (a) as to the circumstances in which an article, or any description of article, is to be regarded for the purpose of this section as made by an industrial process;
>> (b) excluding from the operation of this section such articles of a primarily literary or artistic character as he thinks fit.
>
> (5) …
>
> (6) In this section –
>> (a) …
>> (b) References to the making of an article are to its being sold or let for hire or offered or exposed for sale or hire."

90    The reference in s.52(1)(a) to an industrial process is the 50 plus test referred to earlier. This is set out in the Copyright (Industrial Processes and Excluded Articles) (No.2) Order 1989 (SI 1989/1070) which was made pursuant to the power contained in s.52(4). The Order also excludes from the operation of s.52:

> "(a) works of sculpture, other than casts or models used or intended to be used as models or patterns to be multiplied by any industrial process."

91    This is obviously modelled on and reproduces the provisions of r.26 of the Registered Designs Rules 1949.

92    Mr Ainsworth's case before the judge was that copies of the Stormtrooper helmet and armour have been reproduced industrially for more than 25 years. It was conceded by Lucasfilm that the artistic work in the form of the McQuarrie works had been exploited by the making of articles by an industrial process; that more than 50 such articles were made and sold; that the manufacture took place outside the United Kingdom; and that the exploitation took place both before and after the coming into force of the 1988 Act on August 1, 1989. There was, however, no

therefore leaves intact the judge's finding that Mr Ainsworth is entitled to rely on a s.52 defence.

**Enforcement by English Court of US Copyright?**

99    Because Mr Ainsworth is physically within the jurisdiction of the courts of England and Wales, there is no doubt that these courts have "personal" jurisdiction. He was properly served. The question we have to decide is whether the court must, alternatively should, accept what conflicts lawyers called "subject-matter" jurisdiction. Must or should this court accept jurisdiction to enforce Lucasfilm's US copyrights against Mr Ainsworth for what he has done and threatens to do by way of sales from here to the United States?

100    The starting point here is that it is now common ground or undisputed that Lucasfilm does have US copyrights and that Mr Ainsworth has infringed them. The acts which constitute infringement by US law were all actually done in or from the United Kingdom. They consist of sales to US customers in the United States by despatch of products from the United Kingdom, advertising on the internet and the placing of advertisements in US publications. It would seem that questions of where the property passes, or where the contract was made, or what law governs it and the like are irrelevant under US law. They might not be if the position were the other way round (see e.g. *Badische Anilin und Soda Fabrik v Hickson* [1908] A.C. 419; [1906] 23 R.P.C. 433—under the old law no UK patent infringement by sale and despatch from Germany). It is not necessary to examine whether the concession of infringement according to US law is correct. What is to be noted is that the extent to which US copyright law extends "a long-arm" to acts in fact done only in this country is itself a question of American, not English law. Other foreign laws might extend an even longer arm: if they did it would make no difference if jurisdiction here is automatic and compulsory.

101    The arguments for subject-matter jurisdiction fall under three heads:

(a)  that the judgment in *Owusu v N.B. Jackson*(C-281/02) [2005] E.C.R. I-01383 compels it;

(b)  that this court in *Pearce v Ove Arup Partnership Ltd* [2000] Ch. 403; [1999] F.S.R. 525 decided that the English courts have subject-matter jurisdiction over all acts of infringement of copyright committed anywhere in the world.

(c)  that, even if subject-matter jurisdiction is not compelled, the courts here have a discretion to accept jurisdiction and should do so as a matter of *forum conveniens*.

102    We turn to examine the first two of these heads in detail. We do not examine the third much because, as will be seen, we do not consider that the Courts of England and Wales have subject-matter jurisdiction.

*(a) The effect of Owusu*

103    It is convenient to take this first. The point was not argued below and Mr Wilson is technically right that a necessary foundation for that argument—that Mr Ainsworth is domiciled here—was never formally pleaded or proved though it is clearly the case. Mr Wilson only took the point so as to preserve his client's position on costs, a matter which Mr Bloch seemed inclined to accept. Accordingly we are prepared to entertain the argument.

104    *Owusu* was a reference about the Brussels Convention (of September 27, 1968 as amended). That has now been replaced by Regulation (EC) 44/2001 on Jurisdiction and the Recognition of Enforcement of Judgments in Civil and Commercial Matters. It is not suggested that this makes any difference.

105    The proposition is that *Owusu* decided that, for the EU, the courts of the Member State of the defendant's domicile have, and must exercise, subject-matter jurisdiction over any claim in any civil or commercial matter brought against the defendant unless it is one of the excluded matters provided for in art.1 of the Regulation. It makes no difference that the claim is in respect of acts done by the defendant in a place far far away from the EU. Or that the acts, if done by the defendant in his Member State of domicile, are lawful by the law of that State. Or that the courts of the country where the defendant actually did the allegedly wrongful act also have personal jurisdiction over him, with the obvious consequences for forum shopping that implies. Or that the dispute concerned has no intra-Member State or effect. Or that there is no EU interest requiring or making it convenient that the Member State concerned should have jurisdiction. If correct, the rule is rigid, admitting of no exception. We will call the postulated subject-matter jurisdiction the "extra EU jurisdiction". It could also be called "universal international jurisdiction".

106    The postulate involves this: that the Convention and then its replacement Regulation which are essentially about allocation of jurisdiction and recognition of judgments of EU Member States have, by a side-wind, created the extra EU jurisdiction, even though the subject-matter has nothing to do with the EU.

107    Another consequence would be this. The courts of Member States would be required to take subject-matter jurisdiction over claims about extra-EU events where, if they had occurred in another Member State, there would be no jurisdiction. Article 22 of the Regulation provides for exclusive jurisdiction, regardless of domicile, in respect of a variety of identified matters, e.g. rights in rem in immovable property, validity of the constitution of companies, validity of entries in public registers, and validity of patents. In each case the exclusive jurisdiction is conferred on the courts of the Member State where the subject matter is situate. Thus the courts of the Member State where the immovable property is, or the company has its seat, or the public register is or the patent is registered, have exclusive jurisdiction. None of that would apply to non-EU matters of the type excluded by art.22. So, for example, if proceedings for infringement of a US patent were brought against a person domiciled in a Member State, art.22 does not exclude jurisdiction over validity. So the defendant could challenge the validity of the patent. Yet the ECJ has held (at any rate where validity is challenged) that there is no cross-border jurisdiction within the EU. You cannot sue in Member State A for an infringement of patent in Member State B at least if the defendant challenges validity, *Gesellschaft für Antriebstechnik mbH & Co KG (GAT) v Lamellen und Kupplungsbau Beteiligungs KG (LuK)* (C-4/03) [2006] F.S.R. 45 and *Roche Nederland BV v Primus, Goldenberg* (C-539/03) [2007] F.S.R. 5. Why? Because art.22(4) (formerly art.16(4)) forbids it.

108    In short, therefore, the whole of art.22 only makes sense if the proposed extra-EU jurisdiction is not conferred by the Regulation.

109    There is yet another consideration strongly pointing away from the postulated jurisdiction. It is this. The Convention was, and the Regulation is, about both jurisdiction and recognition (and enforcement) of judgments. No one suggests an

actual judgment of the court of a non-EU Member State is covered. Having got a judgment in, say, the US, you cannot use the Regulation simply to register it in a Member State and enforce it there. Lucasfilm does not invoke the Regulation in its claim to enforce the default US judgment. But the absence of a judgment-recognition rule makes no sense whatever if there were extra-EU jurisdiction. Why would the legislator provide that even where you have actually vindicated your rights in the courts of a non-EU State, if you want to pursue a defendant domiciled in an EU Member State you have to do so all over again (subject, perhaps, to some local rule about res judicata). The truth is that jurisdiction and recognition go hand-in-hand. Where the Regulation confers jurisdiction it then goes on to provide cross-border recognition. If it had been intended to confer extra-EU jurisdiction it would have provided also for cross-border recognition.

110      Further there is nothing reciprocal about the proposed extra-EU jurisdiction. If it exists, citizens of non-EU countries are entitled to sue anyone domiciled in an EU Member State in the courts of that Member State, but there is no necessary entitlement for a citizen domiciled in an EU Member State to sue for wrongs done within that Member State in the courts of any non-EU state which has personal jurisdiction over a defendant. It is wholly improbable that the EU legislator would have intended to create such a non-reciprocal state of affairs, putting EU citizens at a disadvantage against non-EU citizens.

111      Moreover although the Regulation has a clear *lis pendens* rule about parallel actions relating to the same alleged wrong in different Member States, there is no *lis pendens* rule for a similar situation concerning parallel actions in a court of a Member State and that of a third country. Nor could there be, for the EU could not legislate for third countries. So here, for instance, if Lucasfilm had sued Mr Ainsworth both in the US and here at the same time, the Regulation has no rule, "first seised" or otherwise, to deal with it. Both actions could proceed with the obvious possibility of inconsistent judgments.

112      It is also noteworthy that if this far-reaching and important jurisdiction existed, no one has noticed it from the time of the initial Brussels Convention in 1968 until now.

113      Moreover, after the oral hearing, Lucasfilm provided us with a table showing examples of cases where the courts of Member States, have, it is suggested, to some extent assumed full international jurisdiction in copyright or related rights. We have not seen the decisions themselves. And Mr Ainsworth's lawyers simply do not have the resources to deal with the table, or to try to produce a counter-table. According to the summary many, though not all, of the cases may have involved straightforward enforcement of contractual obligations or recognition of assignments rather than a full assumption of world-wide international jurisdiction over subject-matter. And other cases involve assumption of subject-matter jurisdiction for acts done in other Member States, which is of no assistance here. What is important in the present context is that it is not suggested that in any of the cases where international jurisdiction was apparently taken it was done *in reliance on* art.2. It seems that if it was done, it was done on the basis of national law alone.

114      With those important considerations in mind we turn to the legislation, including its *travaux préparatoires*. A good starting point to see whether this extra-EU jurisdiction was ever intended is obviously the power to make the Regulation itself. It stems from art.61(c) in Pt 3 of the EC Treaty (Community Policies) and comes

within Title IV, "Visas, Asylum, Immigration, and other Policies related to the Free Movement of Persons". Article 61(c) provides:

> "In order to establish progressively an area of freedom, security and justice, the Council shall adopt:
> (c) measures in the field of judicial cooperation in civil matters as provided for in Article 65 ..."

115    So the key provision is art. 65:

> **"Art. 65:**
> Measures in the field of judicial cooperation in civil matters having cross-border implications, to be taken in accordance with Article 67 and in so far as necessary for the proper functioning of the internal market, shall include:
> (a) improving and simplifying:
>     - the system for cross-border service of judicial and extrajudicial documents,
>     - cooperation in the taking of evidence,
>     - the recognition and enforcement of decisions in civil and commercial cases, including decisions in extrajudicial cases;
> (b) promoting the compatibility of the rules applicable in the Member States concerning the conflict of laws and of jurisdiction;
> (c) eliminating obstacles to the good functioning of civil proceedings, if necessary by promoting the compatibility of the rules on civil procedure applicable in the Member States."

116    There is nothing here suggesting any power to create an extra-EU jurisdiction. Quite the opposite. The judicial co-operation is between the courts of the Member States, not about co-operation between the courts of a Member State and those of third countries. It is all about the internal market.

117    Nor can one find anything in the recitals to the Treaty which would clearly cover the creation of such a power.

118    Another starting point might be the Jenard/Schlosser Reports OJ C59/1. We can find nothing in them suggesting that an extra-EU jurisdiction exists or should be created. Such an important subject would surely have been addressed by these scholars and considered explicitly. Yet it is not mentioned.

119    What about the Recitals to the Regulation? Not one suggests that one can find there an explicit purpose to create an extra-EU jurisdiction. Far from it. The Recitals show only an intention to cover the internal market. We set out certain recitals with our emphasis to show the point:

> *"Recital (1)* The Community has set itself the objective of maintaining and developing **an area of freedom, security and justice, in which the free movement of persons is ensured**. In order to establish progressively such an area, the Community should adopt, amongst other things, the measures relating to judicial cooperation in civil matters which are **necessary for the sound operation of the internal market**.
> *Recital (2)* **Certain differences between national rules governing jurisdiction and recognition of judgments hamper the sound**

operation of the internal market. Provisions to unify the rules of conflict of jurisdiction in civil and commercial matters and to simplify the formalities with a view to rapid and simple recognition and enforcement of judgments from Member States bound by this Regulation are essential.

(3) This area is within **the field of judicial cooperation in civil matters within the meaning of Article 65** of the Treaty.

(15) In the interests of the harmonious administration of justice it is necessary to minimise the possibility of concurrent proceedings and **to ensure that irreconcilable judgments will not be given in two Member States**. There must be a clear and effective mechanism for resolving cases of lis pendens and related actions and for obviating problems flowing from national differences as to the determination of the time when a case is regarded as pending. For the purposes of this Regulation that time should be defined autonomously."

120     So we now turn to *Owusu* to see whether it really had the effect contended for. The claimant, domiciled in the United Kingdom, suffered an accident in Jamaica whilst staying at a holiday villa let to him by a Mr Jackson, also domiciled in the United Kingdom. He sued Mr Jackson in contract alleging that it was a term of the contract that the beach where he had suffered the accident would be safe. It was said there was a dangerous hidden sandbank. There can be no question but that there was both personal and subject-matter jurisdiction over that claim. The claimant also sued several Jamaican companies in tort, alleging that his accident was due to their negligence. Mr Jackson was served personally in England. Leave to serve the Jamaican companies out of the jurisdiction was given by the English court.

121     Both Mr Jackson and the Jamaican defendants applied for a declaration that the English court "should not exercise its jurisdiction in relation to the claim against them both". The basis of this claim was only *forum non conveniens*. It was said that Jamaica was a more appropriate venue for the case against all the defendants.

122     What is of great importance to note is that this was not a case where it was suggested that the English court did not have subject-matter jurisdiction. On the contrary the very premise of a *forum non conveniens* argument is that the court *has* got subject-matter jurisdiction but should not exercise it because there is a more convenient forum for the litigation. So there can be no doubt that the question the ECJ had to face had nothing to do with subject-matter jurisdiction.

123     The problem for the defendants was that Mr Jackson was domiciled in England. Article 2(1) of the Brussels Convention (now art.2(1) of the Regulation) lays down the fundamental basic rule:

"1.  Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State."

124     It may be noted that if Mr Jackson was properly sued in England then the Jamaican defendants could be properly sued here too. But the latter fact was a rule of English law. As Advocate General Léger clearly accepted the jurisdictional rules of the Brussels Convention did not apply to these defendants (see [56]). They were in the proceedings by virtue of English procedural rules, not by virtue of the Convention.

125    Thus it was that the court concentrated only on whether art.2 of the Convention displaced the English *forum non conveniens* rule. There can be no doubt about that. Thus the court said:

> "[35] It follows from the foregoing that Article 2 of the Brussels Convention applies to circumstances such as those in the main proceedings, involving relationships between the courts of a single Contracting State and those of a non-Contracting State rather than relationships between the courts of a number of Contracting States.
>
> [36] It must therefore be considered whether, in such circumstances, the Brussels Convention precludes a court of a Contracting State from applying the *forum non conveniens* doctrine and declining to exercise the jurisdiction conferred on it by Article 2 of that Convention."

126    It went to analyse that very question—and no other. It decided that the doctrine was indeed displaced. It said (and ruled):

> "[46] In the light of all the foregoing considerations, the answer to the first question must be that the Brussels Convention precludes a court of a Contracting State from declining the jurisdiction conferred on it by Article 2 of that convention on the ground that a court of a non-Contracting State would be a more appropriate forum for the trial of the action even if the jurisdiction of no other Contracting State is in issue or the proceedings have no connecting factors to any other Contracting State."

127    So *Owusu* establishes where art.2 confers personal jurisdiction in a court of a Member State by reason of the defendant's domicile in that State, the court cannot refuse to hear the case because there is a more appropriate forum abroad. It does not begin to address a quite different question, namely given personal jurisdiction, is the subject-matter jurisdiction of the court also displaced by art.2?

128    Mr Bloch submitted that because art.2 does confer subject-matter jurisdiction on the courts of a Member State in respect of acts done elsewhere in the EU, it must also have the same effect as regards acts done outside the EU. We do not see why—there is an enormous difference between the two. For intra-EU events the Regulation is a carefully balanced piece of legislation. Its components are interrelated. Thus it provides for all the consequences of its allocation of jurisdiction rules—exclusive jurisdiction for court first seised, a *lis alibi pendens* rule in other courts, mutual recognition of judgments and so on. None of that balance or interrelation is provided by the suggested extra-EU jurisdiction. Nor could it be, for to achieve it you need to legislate for all the courts to which the rules apply and the Regulation has no effect on the courts of third countries.

129    So for all the reasons we have indicated above we think that it's clear that the Regulation does not create the extra-EU jurisdiction as we have defined it. The Regulation is not setting up the courts of the Member States as some kind of non-exclusive world tribunals for wrongs done outside the EU by persons who happen to be domiciled within the EU. That is the sort of thing that is done reciprocally and by an international Convention—it goes well beyond the remit of judges whose job is to interpret the law, not to legislate. We think the point is acte clair and would accordingly not refer it.

130    That really concludes the matter. However we should mention a few additional points. First of these is that in *Gesellschaft für Antriebstechnik mbH & Co KG*

*(GAT) v Lamellen und Kupplungsbau Beteiligungs KG (LUK),*(C-4/03)[2006] F.S.R. 45 the ECJ had regard to *Owusu* in the course of deciding that the exclusive jurisdiction rules of the Convention (now art.22 of the Regulation) overrode art.2 in a patent infringement action where validity is challenged. It said:

> "[25] In the light of the position of Article 16(4) within the scheme of the Convention and the objective pursued, the view must be taken that the exclusive jurisdiction provided for by that provision should apply whatever the form of proceedings in which the issue of a patent's validity is raised, be it by way of an action or a plea in objection, at the time the case is brought or at a later stage in the proceedings.
>
> [26] First, to allow a court seised of an action for infringement or for a declaration that there has been no infringement to establish, indirectly, the invalidity of the patent at issue would undermine the binding nature of the rule of jurisdiction laid down in Article 16(4) of the Convention.
>
> [27] While the parties cannot rely on Article 16(4) of the Convention, the claimant would be able, simply by the way it formulates its claims, to circumvent the mandatory nature of the rule of jurisdiction laid down in that article.
>
> [28] Second, the possibility which this offers of circumventing Article 16(4) of the Convention would have the effect of multiplying the heads of jurisdiction and would be liable to undermine the predictability of the rules of jurisdiction laid down by the Convention, and consequently to undermine the principle of legal certainty, which is the basis of the Convention (see Case C-256/00 *Besix* [2002] ECR I-1699, paragraphs 24 to 26, Case C-281/02 *Owusu* [2005] ECR I-1383, paragraph 41, and Case C-539/03 *Roche Nederland and Others* [2006] ECR I-0000, paragraph 37)."

131    None of that would make any sense if art.2 conferred subject-matter jurisdiction in respect of actions for infringement of the patents of third countries—to which art.16(4) cannot apply. The problems the court identifies would then apply.

132    Secondly our decision accords with the general philosophy of the leading US decision on extra-territorial jurisdiction of the US Courts in intellectual property matters, *Voda v Cordis Corp* [2007] USCAFED 29, 476 F. 3d. 887 a decision of the Federal Court of Appeals. We refer to this in more detail later.

133    Thirdly our view coincides with that of Colman J. in *Konkola Copper Mines Plc v Coromin Ltd* [2005] EWHC 898 (Comm); [2005] 2 Lloyd's Rep. 555. Simplifying the facts, the defendant was domiciled in England and was party to a contract which contained an exclusive jurisdiction clause in favour of the Courts of Zambia. The defendant, sued in England, said that the English Court should decline jurisdiction. The claimant said it could not by reason of *Owusu*: jurisdiction was imposed by art.2 and that was that. Article 17 of the Convention (now art.23 of the Regulation) allows exclusive jurisdiction clauses which confer jurisdiction upon the courts of a particular Member State to prevail over art.2 but says nothing about exclusive jurisdiction clauses conferring jurisdiction on the courts of third countries. Colman J. stayed the action, basing himself on the contract, not any form of *forum non conveniens* doctrine. Quite clearly he could not have done so if art.2 imposed an extra-EU jurisdiction in respect of all subject-matters.

134    Finally as regards the *Owusu* contention is concerned, our attention was drawn to a decision of Barling J., *Catalyst Investment Group Ltd v Lewinsohn* [2009]

310            LUCASFILM LTD v AINSWORTH

EWHC 1964 (Ch). The question there was whether the court could stay proceedings in a case where the same point was being litigated between the same parties in the courts of a third country. He held that *Owusu* prevented that, essentially because the *lis pendens* rule is to some extent a facet of *forum non conveniens*. We do not have decide whether that was correct, though we note that, if he his right, there is this oddity: that there is a clear *lis pendens* rule, with associated court first seised rule, for parallel cases within the EU but none for parallel cases where one is running within an EU Member State and one without. What Barling J. did not decide was that art.2 conferred extra-EU subject matter jurisdiction generally.

### (b) The effect of Pearce v Ove Arup

135    In this case, the claimant sued a number of defendants in England. The heart of the complaint was an allegation that the architect Rem Koolhaas had infringed the claimant's Dutch copyright with his design for the new art gallery in Rotterdam. The other defendants were all ancillary to that main claim. They were the English consulting engineers, Ove Arup, Mr Koolhaas' Dutch company and even the City of Rotterdam.

136    The case was one of forum shopping. The point of choosing this jurisdiction was that the plaintiff could get legal aid here whereas (perhaps because the case was not seen as having any merit) not in Holland. So Ove Arup, domiciled here, were made first defendants pursuant to art.2 of the Brussels Convention. The remaining defendants, all Dutch, were joined pursuant to the provisions of Art 6 of the Convention.

137    The defendants applied to have the claim struck out, (a) on the grounds it had no realistic prospect of success and (b) because there was no jurisdiction to hear a Dutch copyright claim here. The first instance judge, Lloyd J. acceded to the application on ground (a) but went on to hold, if he were wrong on that point, that art.2 did confer subject-matter jurisdiction over a claim for infringement. The Court of Appeal reversed his finding on (a) and upheld decision as to jurisdiction. As a matter of interest the case then went on to full trial where the claim failed miserably.

138    Lucasfilm contends that the effect of the Court of Appeal decision was indeed that there was extra-EU jurisdiction as a matter of English law. In a previous case, *Tyburn Productions Ltd v Conan Doyle* [1991] Ch. 75 Vinelott J. had perhaps (we do not need to determine whether he did) decided that there was no subject-matter jurisdiction in the English courts in respect of infringement of copyright in non-EU countries. In *Pearce*, this court (in a judgment of the court) said this at 439F:

> "We do not find it necessary to decide whether Vinelott J. was correct to take the view (if he did) that an action for alleged infringement of a foreign copyright by acts done outside the United Kingdom in a state not party to the Brussels Convention, in a case where no question as to the validity or registration of the right was in issue, was not justiciable in an English court."

So Lucasfilm's contention is bold indeed—that the Court of Appeal, by necessary implication, did decide a point which it, itself, did not think it was deciding—it knew not what it was doing.

139    And there is also this, that the Court of Appeal was not concerned with an allegation of infringement in a third country. So, Mr Ainsworth submits, if and to the extent that it decided that such acts were justiciable here provided there was personal jurisdiction over the defendant its decision was obiter dictum and we need

not follow it. Lucasfilm submits otherwise—it submitted that the ratio decidendi of *Pearce* necessarily leads to such jurisdiction.

140    To try to understand the decision in *Pearce* it is necessary to consider three earlier cases, *British South Africa Co v Companhia de Moçambique* [1893] A.C. 602; *Potter v Broken Hill Pty Co Ltd* [1906] 3 C.L.R. 479; and *Hesperides Hotels Ltd v Muftizade* [1979] A.C. 508.

141    *Moçambique* was an action brought in England for trespass to land in South Africa. The defendants disputed title to the land. The House of Lords drew a distinction between "matters which are transitory and those which are local in nature" (Lord Herschell LC's words). It held that English courts did not have jurisdiction over the latter.

142    Thus it is clearly the case that English law contains the concept that certain matters are not to be determined by the English courts even though the court has personal jurisdiction over the defendant. These matters are said to be "non-justiciable". Naturally the question then is, what are these matters?

143    As regards land the answer was provided by the House of Lords in *Hesperides Hotels*. This was a claim by two Cypriot hotel companies against a London-based travel agency which advertised holidays where people could stay at hotels belonging to the companies in Northern Cyprus. Northern Cyprus was occupied by Turkey and the hotels had de facto been taken over. It was said that the hotels were illegally occupied and so the defendants were encouraging a trespass. The claim was allowed to proceed in respect of the chattel content of the hotels but not in respect of the trespass claim.

144    As regards that claim, the House re-affirmed *Moçambique* fully. Lord Wilberforce at 534 adopted *Dicey & Morris'* exposition in r.79 of what it was that *Moçambique* decided:

> "Subject to the exceptions hereinafter mentioned, the court has no jurisdiction to entertain an action for (1) the determination of the title to, or the right to the possession of, any immovable situate out of England (foreign land); or (2) the recovery of damages for trespass to such immovable."

He pointed out that if either part of the rule applied, the court had no jurisdiction—the rule went both to the existence of the right and its infringement. The House refused the invitation to revise the rule so as to remove or attenuate the second limb. One of the reasons for its refusal was articulated by Lord Wilberforce at 537:

> "Secondly: the nature of the rule itself, involving, as it clearly must, possible conflict with foreign jurisdictions, and the possible entry into and involvement with political questions of some delicacy, does not favour revision (assuming such to be logically desirable) by judicial decision, but rather by legislation."

It may be noted that the second limb of the rule, only so far as it affected trespass to land or any other tort affecting immovable property, was abrogated by s.30 of the Civil Jurisdiction and Judgments Act 1982. It is not suggested that s.30 has any application to the present problem.

145    The last of the three important cases is *Potter*, a decision of the High Court of Australia in 1906. It was in the days when each State had its own patent registry. The patentee of a NSW patent sued a defendant in Victoria for infringement of its patent. It was held that the Victorian court had no jurisdiction. Clearly the principal

312                    LUCASFILM LTD v AINSWORTH

reason for the decision was that to hold otherwise would involve the Victorian court inquiring into the validity of an act of another state, the act in question being the grant of the patent by NSW. As Griffiths C.J. put it:

> "It is the settled law of all civilised countries that the acts of Government of a State done within its own territory are not examinable at all in the Court of another State."

146    Mr Bloch accepts that English courts have no jurisdiction to hear claims for infringement of foreign patents where validity is in issue. But he says, if validity is not in issue, so that there is no question of challenging the act of a foreign state, the position is different. And since copyright rights do not (at least in this case) depend upon registration in the United States, no question of impugning a sovereign act of the United States arises. It follows, he says, that the Moçambique rule does not apply to acts of infringement of copyright in a foreign state.

147    And, he says, that is what *Pearce v Ove Arup Partnership Ltd* [1999] F.S.R. 525 decided. We can now turn to it to see if he is right. The argument the court was addressing was this: that although art.2 of the Convention conferred jurisdiction over Ove Arup, it did not mean that the claim was justiciable. And it was not, by virtue of the *British South Africa Co v Companhia de Mocambique* [1893] A.C. 602 HL principle. Lloyd J. had held that the *Moçambique* principle did extend to foreign intellectual property rights because they were essentially local in nature, but that art.2 overrode that so far as acts of infringement in other Member States were concerned.

148    The court began with an obvious disinclination to hold that *Moçambique* applied to claims of infringement of foreign intellectual property rights at all. At 424 it said:

> "On its face the rule in *Moçambique* does not provide self-evident support for the proposition that a claim for breach of a foreign statutory intellectual property right cannot be entertained by an English court."

We do not share that disinclination. For a variety of reasons which we set out below we think that there are good reasons for holding that foreign intellectual property rights, registered or not, should not be justiciable here in the absence of a treaty governing the position.

149    The court then went on to consider *Moçambique* and *Hesperides*. After many citations from *Moçambique* it concluded at 431:

> "It is, we think, clear from an analysis of the judgments in *Moçambique* that the House of Lords treated the question whether the English courts should entertain an action for trespass to foreign land as one of justiciability. The English courts should not claim jurisdiction to adjudicate upon matters which, under generally accepted principles of private international law, were within the peculiar province and competence of another state."

150    It then went on to consider the position as regards land having regard to s.30 and art.2. It said at p.432:

> "We are satisfied that, at least in relation to land situate within a contracting state, there is no longer any basis for the rule in the *Moçambique* case. The questions which the House of Lords addressed in that case are now, as a matter

of English private international law, determined by section 2(1) of the Act of 1982—giving effect to the accession of the United Kingdom to the Brussels Convention."

Note that even in relation to land, the court confined its observation to land situate within a contracting state (i.e. of the Brussels Convention). And of course that Convention had its own rules about exclusive jurisdiction concerning title to land.

151    Next the court proceeded under a heading: "The extension of the *Moçambique* rule to intellectual property cases: the Australian cases". There follows detailed citation from *Potter* and another case. Then it turned to the Convention and the Jenard report and said at 436:

> "But, where the action is not concerned with registration or validity, the Convention gives jurisdiction to the courts of the defendant's domicile, or to the courts of other contracting states in accordance with articles 5 and 6. The question 'Can the English court inquire into the validity of a patent granted by a contracting state?' is answered by article 16(4). The question 'Does the English court have jurisdiction to entertain proceedings in respect of the alleged infringement of an intellectual property right conferred by the law of a contracting state where the proceedings fall outside article 16(4)?' is answered by article 2, 5 or 6. There is, in our view, nothing in the reasoning of the High Court of Australia which requires the answer: 'No, notwithstanding that the proceedings fall outside article 16(4) and the English court has jurisdiction to entertain the proceedings by reason of article 2, 5 or 6, the English court must nevertheless decline jurisdiction because the question is non-justiciable.' We find it impossible to accept that that answer has any place in a rational scheme of jurisprudence."

The whole of this passage is about an "alleged infringement of an IP right conferred by the law of a contracting state". Mr Bloch would have us read it without that limitation. We see no reason so to do. It is one thing to confer jurisdiction within what is a common market and quite another to extend it generally. What is said about a "rational scheme of jurisprudence" is entirely in the context of the Convention.

152    The court then turned to the English cases, putting some on one side as irrelevant to the question of justiciability. Next it referred to *Tyburn Productions Ltd v Conan Doyle* [1991] Ch. 75 Ch D We have already quoted what we regard as the key passage for present purposes. We have no hesitation in repeating it:

> "We do not find it necessary to decide whether Vinelott J. was correct to take the view (if he did) that an action for alleged infringement of a foreign copyright by acts done outside the United Kingdom in a state not party to the Brussels Convention, in a case where no question as to the validity or registration of the right was in issue, was not justiciable in an English court."

153    After considering other English cases not really on the point, the court then went on to consider an argument based on the Berne Convention. Article 5(2) of this provides:

> "The enjoyment and exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work. Consequently,

> apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed."

It was suggested this excluded the operation of the Brussels Convention. The court held not so. Before us, perhaps because of this holding, no reliance was placed on art.5(2). We therefore refrain from expressing our own view as to what is meant by "as well as the means of redress … shall be governed exclusively by the laws of the country where protection is claimed". We proceed on the basis that Berne is neutral as to questions of jurisdiction over foreign infringements of copyrights.

154    Finally the court considered the double-actionability rule. That has no relevance to our case because it was abolished by s.10 of the Private International Law (Miscellaneous Provisions) Act 1995.

155    So *Pearce* did not decide the point now before us. The argument for saying it did is at best tortured and over-subtle. That is no basis for applying the doctrine of stare decisis. As Viscount Dunedin said in *Great Western Railway Co v Owners of SS Mostyn* [1928] A.C. 57 at 73:

> "Now, when any tribunal is bound by the judgment of another Court, either superior or co-ordinate, it is, of course, bound by the judgment itself. And if from the opinions delivered it is clear - as is the case in most instances - what the *ratio decidendi* was which led to the judgment, then that ratio decidendi is also binding. But if it is not clear, then I do not think it is part of the tribunal's duty to spell out with great difficulty a *ratio decidendi* in order to be bound by it."

156    The upshot is this: the suggested ratio cannot readily be spelled out of *Pearce*. At best it can only be done with great difficulty. We are not bound by *Pearce* and must decide the point for ourselves.

157    What then of other decisions, decisions of only persuasive value one way or the other? Tipping J., a respected judge who had some experience of IP and is now in the Supreme Court of New Zealand, held that a plaintiff could not sue in New Zealand for acts said to be an infringement of copyright of another country, *Atkinson Footwear Ltd v Hodgskin International Services Ltd* (1994) 31 I.P.R. 186. He said at 190 after considering inter alia, *Potter* and *Tyburn*:

> "Whether copyright exists in another country and whether the plaintiff has title to it are treated as questions in rem not in personam and thus outside the general proposition with which I started this discussion. Therefore, whether the importation of Dianne boots and their sale in Australia constitutes a breach of copyright law of Australia is for the courts of that country to determine."

He noticed a difference with passing off—the basis of which is a misrepresentation, and then went on to make a very important point:

> "In addition to the territorial ambit of copyright law, it should also be noted that there has always been a reluctance to grant an injunction which will take effect outside the jurisdiction of the court granting it."

158    Aldous J. had that same consideration in mind in a patent case, *Plastus Kreativ AB v Minnesota Mining & Manufacturing Co* [1995] R.P.C. 438, saying at 447:

"For myself I would not welcome the task of having to decide whether a person had infringed a foreign patent. Although patent actions appear on their face to be disputes between two parties, in reality they also concern the public. A finding of infringement is a finding that a monopoly granted by the state is to be enforced. The result is invariably that the public have to pay higher prices than if the monopoly did not exist. If that be the proper result, then that result should, I believe, come about from a decision of a court situated in the state where the public have to pay the higher prices. One only has to imagine a decision of this court that the German public should pay to a British company substantial sums of money to realise the difficulties that might arise. I believe that, if the local courts are responsible for enforcing and deciding questions of validity and infringement, the conclusions reached are likely to command the respect of the public. Also a conclusion that a patent is infringed or not infringed involves in this country a decision on validity as in this country no man can infringe an invalid patent."

159    Note that Aldous J. makes two distinct points: one is that a decision as to infringement is essentially a local matter involving the state concerned and the other is that a question of validity may be involved. He does not rest his view on merely the so-called sovereign nature of a grant of a patent.

160    We do observe however, that he added a qualification:

"I also believe that it would not normally be right for the courts of this country to decide a dispute on infringement of a foreign patent in respect of acts done outside this country provided there is an adequate remedy in the relevant country. The local court is able to look at the particular acts in the context in which they are carried out. If it happened that there was not an adequate remedy in the other state, then it might be appropriate that action be taken in a state in which there was an appropriate remedy."

Mr Bloch would say that is the position here. Mr Ainsworth is not in the United States. No order of the US court can touch him—as indeed it has not. So unless the English court has jurisdiction, Mr Ainsworth can "get away with it". But on the other hand English law regards what he has done as entirely lawful. It is not part of English public policy to restrain acts done here to enforce the local IP rules of other countries.

161    Another experienced IP judge, Laddie J., clearly considered that both limbs of the *Moçambique* rule applied and ought to apply to IP disputes. In *Coin Controls Ltd v Suzo International (UK) Ltd* [1999] Ch. 33; [1997] F.S.R. 660 at 43 he said this:

"The principles which applied to land in the *Moçambique* case apply equally well to attempts to litigate foreign intellectual property rights in English courts. Those rights give rise to monopolies or quasi-monopolies which are strictly territorial in nature. In the case of patents, historically their purpose was to encourage and protect local industry. So courts following the common law tradition have declined to entertain actions concerned with the enforcement of foreign intellectual property rights."

And he concluded at 44:

316             LUCASFILM LTD v AINSWORTH

"If the *Moçambique* rule has been destroyed or limited in relation to patent and similar rights, that must be as a result of our adherence to the Brussels Convention, not because of the Acts of 1982 and 1995."

Mr Bloch has to contend that was wrong for the purposes of his *Ove Arup* argument. Although it was cited, the court did not say so.

162    Mr Bloch relied on a recent Australian case, *TS Productions LLC v Drew Pictures Pty Ltd* [2008] FCAFC 194. That was an action in Australia concerning title to the Australian copyright in a film. The defendants started proceedings in Illinois asserting title to copyright. It seems the US action included within it a claim to the Australian copyright. The Australian defendants applied for a stay on *forum non conveniens* grounds. One of the considerations was whether Australia was a "clearly inappropriate forum". Finkelstein J. thought that *Pearce* drew a distinction between foreign disputes as to title and those as to infringement—a distinction which do we not think it did so far as disputes concerning infringement of IP rights outside the EU is concerned. The other members of the court (who gave the majority reason) expressed no view on *Pearce*. In the result the Australian court refused a stay and granted an anti-suit injunction restraining continuation of the US action. We do not think this case assists.

163    Mr Bloch also relied upon a decision of Mr Peter Prescott QC sitting as a deputy judge. It was *R Griggs Group Ltd v Evans (No.2)* [2004] EWHC 1088 (Ch); [2004] F.S.R. 48. The case involved a dispute about the ownership of copyright in a logo created for the claimants. It was designed in England pursuant to an English contract. The issue was whether the foreign copyrights, as well as the UK copyright, belonged to the claimants. He held they did and that the English court had jurisdiction so to decide and to order the defendant to enter into any necessary assignment to perfect title. We find nothing remarkable in that. Our courts have always had an in personam jurisdiction to enforce a party properly before the court to perform an act required by English law. But Mr Prescott also considered the effect of *Ove Arup*. He seemed to draw from it the general principle that the court only regards as non-justiciable disputes about the existence of foreign registered rights. If and to the extent that he did, it was clearly obiter and involves a reading of *Ove Arup* which we do not endorse.

164    Mr Bloch also referred us to a decision of Flaux J. in the Commercial Court, *Satyam Computer Services Ltd v Upaid Systems Ltd* [2008] EWHC 31 (Comm). Flaux J,, obiter considered that English courts were only precluded from considering the validity of foreign IP rights. He did so by his analysis of the cases rather than for any policy reasons. So his judgment does not take matters much further.

165    Mr Bloch showed us the US decision in *London Film Productions Ltd v Intercontinental Communications Inc* (1984) 580 F. Supp. 47. This was a District Court (first instance) decision of Judge Robert Carter. He held that the US Federal Courts had jurisdiction over a New York corporation alleged to have infringed film copyright in Chile and other South American countries. The application for dismissal was on *forum non conveniens* grounds. In a short judgment the judge accepted a principle that because a US court had an interest in compliance by foreigners with US law, that interest would be furthered by showing that the US courts would enforce foreign laws. We do not think we have seen that very general and theoretical justification for cross-border jurisdiction advanced anywhere else.

And he accepted Professor Nimmer's theory that copyright infringement constitutes "a transitory cause of action".

166      However to set against *London Film* is the more recent, higher, authority of the US Court of Appeals for the Federal Circuit in *Voda v Cordis*. The defendant had manufactured in the US and was sued for patent infringement. He then moved his manufacture abroad—to Mexico. The plaintiff sought to amend his claim to allege infringement of the "European British, Canadian French and German patents". Presumably sales were being made in the countries concerned. [We are not quite clear what was meant by European—perhaps the pleader did not appreciate there are only national patents in Europe.] The question was whether that could be done under the provisions for "supplementary jurisdiction". The majority said no, giving a variety of reasons some of which were local to the US in character (e.g. the problems which would be created if a jury had to apply a series of foreign laws) but others which have general application. We go to some of these now.

167    First it noted that no international convention about intellectual property (and there are many (Paris, Berne, and TRIPS are the main ones) has sought to create such a jurisdiction. The court said:

> "The Paris Convention thus clearly expresses the independence of each country's sovereign patent systems and their systems for adjudicating those patents. Nothing in the Paris Convention contemplates nor allows one jurisdiction to adjudicate the patents of another, and as such, our courts should not determine the validity and infringement of foreign patents. Accordingly, while the Paris Convention contains no express jurisdictional-stripping statute, we relied on it in *Stein* to hold that '[o]nly a British court, applying British law, can determine validity and infringement of British patents.' 748 F.2d at 658."

And in response to a suggestion that the international trend was towards harmonisation of IP and particularly patent law (with reference to TRIPS and the PCT) the court said:

> "Regardless of the strength of the harmonization trend, however, we as the U.S. judiciary should not unilaterally decide either for our government or for other foreign sovereigns that our courts will become the adjudicating body for any foreign patent with a U.S. equivalent 'so related' to form 'the same case or controversy.' ... Permitting our district courts to exercise jurisdiction over infringement claims based on foreign patents in this case would require us to define the legal boundaries of a property right granted by another sovereign and then determine whether there has been a trespass to that right."

168    Next the court considered comity and relations between sovereigns. It said a number of things:

> "In this case, these considerations of comity do not support the district court's exercise of supplemental jurisdiction over Voda's foreign patent infringement claims. First, Voda has not identified any international duty, and we have found none, that would require our judicial system to adjudicate foreign patent infringement claims. ... Second, as discussed <u>infra</u> Part III.A.2.d, Voda has not shown that it would be more convenient for our courts to assume the

supplemental jurisdiction at issue. Third, with respect to the rights of our citizens, Voda has not shown that foreign courts will inadequately protect his foreign patent rights. ...

Fourth, assuming jurisdiction over Voda's foreign patent infringement claims could prejudice the rights of the foreign governments. None of the parties or amicus curiae have demonstrated that the British, Canadian, French, or German governments are willing to have our courts exercise jurisdiction over infringement claims based on their patents."

169    The court went on to recognise the same distinction as was recognised in *British South Africa Co v Companhia de Moçambique* [1893] A.C. 602 HL:

"In addition, the local action doctrine informs us that exercising supplemental jurisdiction in this case appears to violate our own norms of what sovereigns ordinarily expect. Courts derived the local action doctrine from the distinction between local and transitory actions beginning with *Livingston v Jefferson*, written by Justice John Marshall riding Circuit. 15 F. Cas. 660 (C.C.D. Va. 1811). In *Livingston v Jefferson*, the plaintiff sued in a Virginia court for trespass to land located in Louisiana. The court dismissed the action, holding that it could be brought only in a Louisiana court. The Supreme Court subsequently held that 'an action for trespass upon land, like an action to recover the title or the possession of the land itself, is a local action, and can only be brought within the State in which the land lies.' *Ellenwood v Marietta Chair Co.,* 158 U.S. 105, 107 (1895). The Court concluded that a federal court sitting in another state had no jurisdiction to hear the trespass claim. *Id.* In short, the local action doctrine served to prevent courts from adjudicating claims for trespass or title to real property."

170    It said the same applied to patents:

"The territorial limits of the rights granted by patents are similar to those conferred by land grants. A patent right is limited by the metes and bounds of the jurisdictional territory that granted the right to exclude. [citations omitted] Therefore, a patent right to exclude only arises from the legal right granted and recognized by the sovereign within whose territory the right is located. It would be incongruent to allow the sovereign power of one to be infringed or limited by another sovereign's extension of its jurisdiction. Therefore, while our Patent Act declares that 'patents shall have the attributes of personal property,' 35 U.S.C. § 261, and not real property, the local action doctrine constitutes an informative doctrine counselling us that exercising supplemental jurisdiction over Voda's foreign patent claims could prejudice the rights of the foreign governments."

It is to be noted that the court did not draw any distinction between existence of the right and its infringement, just as there was none between title and trespass to real property. We return to this point later.

171    The court concluded its considerations of comity saying this:

"Accordingly, comity and the principle of avoiding unreasonable interference with the authority of other sovereigns dictate in this case that the district court decline the exercise of supplemental jurisdiction under § 1367(c)."

[2010] F.S.R. 10                 319

172    Finally so far as is relevant here, the court considered an argument that consolidated multilateral patent infringement could be more efficient. It said:

> "While there may be merit in the argument, no international treaty establishes full faith and credit, nor have we found any analogous agreement that would require foreign countries to recognise or obligate the enforcement of our judgments regarding foreign patents."

The same goes for copyright infringement. If we have jurisdiction over infringements of copyright in country X, it does not follow that the courts of country X would recognise a judgment of our courts.

173    Mr Bloch also prayed in aid the recent American Law Institute *Principles Governing Jurisdiction, Choice of Law, and Judgments in Transnational Disputes* (2008) which suggests that a national court should have subject-matter jurisdiction over IP disputes in other countries. We acknowledge that is what it says, and it may, from an academic point of view, seem a good idea. For the reasons we give below we do not think it is a good idea in practice given the current, essentially national, nature of IP rights and their enforcement. As the court in *Voda v Cordis Corp* [2007] USCAFED 29 said, this is not a matter for the unilateral decision of the judges of a particular State.

**Our decision on justiciability**

174    That concludes our examination of the authorities. We have decided that there is no binding authority. So we must decide now whether English law regards claims for infringement of foreign, non-EU (or Lugano) copyrights as non-justiciable here. We do so hold. We do so for the following reasons.

175    First we think that the two-fold rule in *Moçambique* applies to such claims. *Moçambique* is not limited to claims about land, nor to claims about title or validity of the foreign right relied upon. Infringement of an IP right (especially copyright, which is largely unharmonised) is essentially a local matter involving local policies and local public interest. It is a matter for local judges.

176    Secondly enforcement may involve a clash of the IP policies of different countries. This case is a good example. The effect of the injunction granted by Mann J. is that the defendant is restrained from doing acts in this country which by the laws of this country are lawful. This is because American law says they are not lawful.

177    Thirdly there is the point touched upon by Aldous J. Extra-territorial jurisdiction will involve (and does here) a restraint on actions in another country—an interference which prima facie a foreign judge should avoid. True it is that in this particular case the defendant has no intention of actually going to the US and doing acts there, but if the jurisdiction exists one could easily imagine such a case.

178    Fourthly if national courts of different countries all assume jurisdiction there is far too much room for forum-shopping, applications for stays on *forum non conveniens* grounds, applications for anti-suit injunctions and applications for declarations of non-infringement.

179    Fifthly it is quite clear that those concerned with international agreements about copyright have refrained from putting in place a regime for the international litigation of copyrights by the courts of a single state. As we have said we do not consider whether art.5(2) of Berne precludes it. A system of mutual recognition

320                    Lucasfilm Ltd v Ainsworth

of copyright jurisdiction and of copyright judgments could have been created but it has not—a point noted by the court in *Voda v Cordis Corp* [2007] USCAFED 29.

180     Sixthly all of the other considerations which we have mentioned and which led the Court of Appeals in *Voda v Cordis Corp* to decline jurisdiction over foreign patent claims apply equally to enforcement of a foreign copyright here.

181     Seventhly we are not impressed by the supposed difference in principle between questions of subsistence or registration of the right and its infringement. We say that for several reasons:

(i)     The supposed distinction is between a foreign court adjudicating on whether the grant of a right by a State was valid and adjudicating upon whether that right is infringed. The former is said to call in question a sovereign act, the latter not. But adjudicating on infringement will itself often require the foreign court to decide on the *scope* of the right granted by the foreign sovereign. In a patent case for example, the scope of the monopoly granted is often in question, quite apart from validity. Sometimes it is on the basis that if the patent is wide enough to catch the defendant it is invalid. Questioning the scope of a monopoly granted by a sovereign state in a foreign court therefore carries with it the foreign court ruling on the scope of a sovereign act, which is not different in kind from ruling on its validity.

(ii)    Moreover the suggested difference leads to commercial absurdities. Sometimes a particular consideration under a local law means there is no copyright. In other circumstances (perhaps even in the same country) the same consideration amounts to a defence. Mr Wilson gave us an example which he said was the position in the United States (it does not actually matter whether he is right, that he could be is enough for present purposes). It relates to how US law regards functional articles. Because of the rule as to functionality, there cannot be copyright in a dress as such (i.e. no subsistence). But there can be copyright in a drawing of a dress (so subsistence). However because of a functionality defence, it is not an infringement to copy a dress.

(iii)   Nor does it make any real difference whether the right is one which requires registration (e.g. a registered trade mark, registered design) or one which does not (e.g. a right to sue for passing off/unfair competition or some sort of unregistered design right). Commercially speaking they are all the same sort of right—a right to exclude others.

(iv)    And in any event it is really rather artificial to say that questioning the validity of a registered right is somehow impugning the powers of a sovereign state. The grant of registered IP rights is governed by laws. All one is doing when challenging validity is to say that the right was wrongly granted according to law. Sovereignty in any realistic sense does not come into it.

(v)     Moreover there are in principle two sorts of registered right—those granted after examination and those granted by mere registration. Once upon a time, for example, US copyrights required registration to be enforceable (they still do for works created in the US by US citizens, though accession to the Berne Convention means that is not so for foreigners). Is mere administrative process of registration a "sovereign act"?

(vi) Now of course a foreign court cannot make an order expunging a registered right from the register of a particular country. But that makes no real difference. For it is generally a defence to a claim for infringement that the right relied upon is invalid—whether any registration of the right is subsequently cancelled is essentially beside the point as far as a defendant is concerned.

182    Of course in fact the Regulation does draw a distinction in principle between questions of subsistence and enforcement. But it does so in the context of a fully balanced scheme and where a policy decision had to be made—could the courts of one Member State revoke a patent or similar right registered in another Member State? That was seen as going too far and so was not allowed at that stage of the development of a European cross-border jurisdiction.

183    We accordingly conclude that for sound policy reasons the supposed international jurisdiction over copyright infringement claims does not exist. If it is ever to be created it should be by Treaty with all the necessary rules about mutual recognition, lis pendens and so on. It is not for judges to arrogate to themselves such a jurisdiction.

### The judge's decision: forum conveniens

184    Mann J. thought there was international jurisdiction. He said:

> "[266] I am therefore prepared to conclude that an English court can, and in an appropriate case should, determine at least questions of infringement of foreign copyright cases. Those cases will include cases where subsistence is not in issue. I would not, however, hold that questions of subsistence can never be decided here. In land cases incidental questions of title can apparently now be considered. I can see no reason why the same should not apply to copyright."

185    He recognised that there may be cases where there were public policy reasons why they should not be heard here. He resolved that problem by saying it could all be dealt with by the application of *forum non conveniens*. With respect we do not agree. We think there are real problems if this doctrine comes into play. Take this case. Mr Ainsworth sold a small amount to the United States. Should jurisdiction be assumed here because he did not go to the enormous expense of going to the United States to defend himself there? We do not see why. Other cases could be much more complicated. Suppose for instance there are competing parallel cases in several countries. Who is to decide which cases proceeds and the others not (or do they run in parallel)? The problems are potentially much more complex than the sort of case involving a claim on a contract where the issue is whether the case should be held in one jurisdiction or another. In the case of the international enforcement of copyright many jurisdictions could be involved at the same time and there could be a mass of disputes in different courts about where a case should be heard.

186    Accordingly we allow Mr Ainsworth's appeal on this point.

322        LUCASFILM LTD V AINSWORTH

**Enforcement of the US judgment**

187     The judge refused to enforce the US judgment for US $10 million "compensatory damages" which Lucasfilm had obtained against Mr Ainsworth and his company. If Lucasfilm had on this appeal continued to hold the English judgment which it obtained from the judge based directly on its US copyright, then it would not have sought to enforce its US judgment. In circumstances, however, where it is unable to enforce its US copyright directly in this country, it maintains its appeal under this heading and seeks to overturn the judge's decision that its US judgment cannot be recognised and enforced here.

188     Mr Bloch accepts that, in a situation where Mr Ainsworth neither appeared in the US proceedings nor took any other step to agree or submit to the US court's jurisdiction over him, nor had any other physical presence in the United States, the issue for these purposes has to be whether he nevertheless had sufficient presence in the United States to justify enforcement of the US judgment against him solely by reason of the fact that he had operated an internet website through which he advertised his helmets and other articles and thereby sold such articles to customers in the United States. He also emailed existing customers directly.

189     For these purposes Mr Bloch also accepts that *Adams v Cape Industries Plc* [1990] Ch. 433 CA (Civ Div) is the leading authority and binds this court. There is no discussion of the internet in it, so that the question becomes whether the operation of an internet website by a person (or company) based in the United Kingdom amounts to presence in the United States because sales have been effected through such a website to US customers. Mr Ainsworth also advertised directly in the United States, and also relied on that below to constitute presence, but no longer does so.

190     Lucasfilm contended below that Mr Ainsworth's website had been particularly targeted or directed at US customers because the price of the helmets was quoted in US dollars even before it was expressed in sterling. No other currencies were quoted. Also, shipping charges for the United States (and Canada) were specified before shipping charges to the United Kingdom and other parts of the world. However, the judge found that to say that the website was directed to the United States was to give such matters an unwarranted emphasis (at [213(i)]).

191     Dicey, Morris & Collins, *The Conflict of Laws*, 14th edn (2006), at 14R-048 states the relevant principle as follows: that a court of a foreign country has jurisdiction to give a judgment capable of enforcement or recognition in this country "if the judgment debtor was, at the time the proceedings were instituted, present in the foreign country". That rule is expressed in terms of presence rather than residence because of the views of this court in *Adams v Cape Industries Plc*. However, such presence, although it may be temporary, reflects some form of concept or metaphor of allegiance to the laws of the country concerned, and, in the case of a company as distinct from an individual, requires the establishment of a fixed place of business from which either the company defendant itself or its agent on its behalf carries on business (see at 530C/531B). Thus, Slade L.J. giving the judgment of the court said this:

> "Nevertheless, while the use of the particular phrase 'temporary allegiance' may be a misleading one in this context, we would, on the basis of the authorities referred to above, regard the source of the territorial jurisdiction of the court of a foreign country to summon a defendant to appear before it

as being his obligation for the time being to abide by its laws and accept the jurisdiction of its courts while present in its territory. So long as he remains physically present in that country, he has the benefit of its laws, and must take the rough with the smooth, by accepting his amenability to the process of its courts. In the absence of authority compelling a contrary conclusion, we would conclude that the voluntary presence of an individual in a foreign country, whether permanent or temporary and whether or not accompanied by residence, is sufficient to give the courts of that country territorial jurisdiction over him under our rules of private international law (at 519A/B)."

192    Therefore, does the use by Mr Ainsworth or his company of the website referred to above amount to such presence? It has long been recognised under our law that the mere selling of goods from country A into country B does not amount to the presence of the seller in country B. (That remains the case even though a contract in England to smuggle goods into another country by parties who know that to be contrary to the laws of that other country will fall foul of the English law of illegality: see *Foster v Driscoll* [1929] 1 K.B. 470 CA.) Otherwise nearly every exporter would have presence in many parts of the globe. Even a system of travelling salesmen will not suffice to render the exporter present where his salesmen travel (see *Littauer Glove Corp v F W Millington Corp* (1920) Ltd (1928) 44 T.L.R. 746, discussed and approved in *Adams v Cape Industries Plc* at 520/521). Similarly, in *Vogel v R & A Kohnstamm Ltd* [1973] Q.B. 133 an English seller made a contract with an Israeli buyer who had been introduced through an agent who had his own office in Israel, but the contract was made directly between the seller in England and the buyer in Israel, and the seller was held to have no presence in Israel (discussed and approved in *Adams v Cape Industries Plc* at 521/522). On this basis, it is not possible to say that advertising into a foreign country can render the advertiser present there, as the judge himself remarked. Indeed, no case has been cited to us where the targeting of sales in a foreign country by outside sales material has been held to be presence for these purposes.

193    It is true that the internet and its uses take us into a new world, and that its existence as it were in the ether (but based on servers physically located in the real world) has in general presented novel difficulties to the law and to regulators. It is also true that a website can be both wonderfully expressive and can also, subject to change and removal, be found repeatedly at its web address. The question, however, is whether for current purposes the internet or a website are fundamentally different from other matters which have enabled business persons to present themselves and their products where they are not themselves present: such as advertisements, salesmen, the post, telephone, telex and the like. We do not believe so, and Mr Bloch has been unable to show us any material from other jurisdictions, although he has searched for it, to suggest that a different answer is necessary. (Our own researches have led us to *Dow Jones & Co Inc v Gutnick* [2003] H.C.A. 56; 210 C.L.R. 575, where the internet is discussed by the High Court of Australia in the different context of defamation. However, that court was not there driven by the revolutionary omnipresence of the internet to a view of jurisdiction which was other than answerable to well-established principles.)

194    On the contrary, it might be said that the sheer omnipresence of the internet would suggest that it does not easily create, outside the jurisdiction or jurisdictions in which its website owners are on established principle already to be found, that

324                    LUCASFILM LTD V AINSWORTH

presence, partaking in some sense of allegiance, which has been recognised by our
jurisprudence and rules of private international law as a necessary ingredient in
the enforceability of foreign judgments.

195    Therefore, we dismiss Lucasfilm's appeal on this ground.

**The implied assignment of copyright**

196    In circumstances where we have held that the helmet and other articles are not
"sculpture", no rights of UK copyright arise. But there may be rights in the nature
of copyright arising from Mr Ainsworth's work in other countries. So the question
of what rights, if there had been any at all, would remain with Mr Ainsworth, and
whether any such rights would be implicitly agreed to be assigned to Lucasfilm,
is not necessarily academic. Mr Ainsworth has sought to raise this issue, which
the judge decided against him, by renewing his application for permission to appeal
on this ground.

197    Mr Bloch raised an initial point to the effect that permission to appeal should
not be granted because Mr Ainsworth had not sought permission from the judge
for this issue, at the same time as seeking (and obtaining) it on other issues. Mr
Bloch submitted that this reticence was deliberately aimed at an advantage in costs
of the trial, by seeking to portray this issue (on which Mr Ainsworth had lost) as
one of little importance. We are unable to draw that inference, however. The judge
made no order for costs, on the basis that, although Lucasfilm was the overall
winner, the points on which it had lost (not other points on which it had won) were
so substantial that the final order for costs should be that they should lie where
they fall.

198    Having heard full argument on the point, we consider it right to grant permission
to appeal.

199    Mr Wilson raises essentially two points. The first is that Mr Ainsworth had
completed his design of the helmet before any question of any contract arose
between him and Lucasfilm into which an implied term for the assignment of his
copyright could have been inserted: therefore he retained what he had obtained for
himself and nothing should be implied whereby he would be deprived of the fruits
of his creativity. The second is that, if anything should be implied into the
subsequent contract whereby he merely agreed to manufacture the 50 helmets
which were initially bought from him, it should be nothing greater than would be
necessary to enable Lucasfilm to use the helmets, buy more in case of need, or
even merchandise the relevant articles: and that would have merely been an implied
licence for such purposes on payment of a reasonable royalty.

200    The judge dealt with the underlying facts regarding the helmet at [36]–[39] and
with the analysis of those facts at [182]–[189]. The essence of the matter was this.
The real basis of the design was to be found in the paintings by Mr McQuarrie. Mr
Lucas commissioned Mr Pemberton to produce the Stormtrooper helmet shown
there. Mr Pemberton sculpted a clay helmet, which he refined under Mr Lucas's
supervision until the latter was satisfied with the result. Mr Lucas then asked Mr
Pemberton to produce a quantity of the helmets, but Mr Pemberton did not have
the expertise to manufacture them himself and so he turned to his close neighbour,
Mr Ainsworth. Mr Pemberton provided Mr Ainsworth with the McQuarrie paintings
and his own clay model. Mr Ainsworth was asked if he could produce a helmet in
accordance with the paintings and the clay model, for use by a customer of Mr

Pemberton as a prop in a dramatic production. Mr Ainsworth spent a couple of days producing a prototype. He worked from the material he had been given, but added some detail of his own. Mr Ainsworth exaggerated his input, but the fact of the matter was that his prototype was a substantial reproduction of the McQuarrie material. Further modifications were agreed in a collaborative process involving Mr Lucas's costume designer, Mr Mollo. Mr Lucas himself approved the final design and told Mr Pemberton that he needed 50 helmets. Mr Pemberton then agreed a price of £20 per helmet with Mr Ainsworth. More were commissioned later.

201     The other articles followed a similar pattern. The judge made detailed findings about the process in respect of all of them, but the appeal has been argued on the basis of the Stormtrooper helmet. In sum, however, the judge found that in each case Mr Ainsworth had exaggerated his own input, but had substantially produced copies from materials which had been provided to him, while adding some detail of his own.

202     The judge then analysed this situation by finding that it fell within what Lightman J. had said in *Ray v Classic FM Plc* [1998] F.S.R. 622, especially at 642 at [7]:

> "[7] circumstances may exist when the necessity for an assignment of copyright may be established … these circumstances are, however, only likely to arise if the client needs in addition to the right to use the copyright works the right to exclude the contractor from using the work and the ability to enforce the copyright against third parties. Examples of when this situation may arise include: (a) where the purpose in commissioning the work is for the client to multiply and sell copies on the market for which the work was created free from the sale of copies in competition with the client by the contractor or third parties; (b) where the contractor creates a work which is derivative from a pre-existing work of the client, *e.g.* when a draughtsman is engaged to turn designs of an article in sketch form by the client into formal manufacturing drawings, and the draughtsman could not use the drawings himself without infringing the underlying rights of the client; (c) where the contractor is engaged as part of a team with employees of the client to produce a composite or joint work and he is unable, or cannot have been intended to be able, to exploit for his own benefit the joint work or indeed any distinct contribution of his own created in the course of his engagement … In each case it is necessary to consider the price paid, the impact on the contractor of assignment of copyright and whether it can sensibly have been intended that the contractor can retain any copyright as a separate item of property."

203     In *R Griggs Group Ltd v Evans (No.1)* [2005] EWCA Civ 11 Lightman J.'s analysis was set out in full and approved by this court. In that case the trial judge had found that where a freelance designer had been commissioned to create a logo for a client, the designer would face an uphill task, and had in fact failed, to persuade him that he was free to assign the logo to a competitor. It would be obvious; it would go without saying, that the client would need some right to prevent others from reproducing the logo. This court agreed, and also agreed that a licence from designer to client, even an exclusive licence, was not sufficient (at [17]–[18]).

204     With the aid of these authorities, Mann J. analysed the matter as follows:

"[185] ... In the initial stages Mr Ainsworth did not know precisely for what he was being asked to provide his prototype, but there came a time when he did. I do not consider that, at the time, the prospect of exploitation via future licensing was in the minds of both parties (and particularly Mr Ainsworth), because no-one anticipated the success of the film and licensing facilities were not then what they have since become. However, Mr Ainsworth was working to render into 3D form the copyright designs of others. He could not himself make further copies without infringing that copyright. If he had produced the drawing exactly, then he would not have produced an original work, and could not have claimed copyright. He did not do that, and contributed his own bits and pieces, but in doing so he was getting as close as he conveniently could, bearing in mind technical requirements, to the client's design. He must have known that the client would expect full exploitation rights in the future for the purposes of its dramatic offering and cannot realistically have expected to have retained any for himself. If the officious bystander had asked the required question (suggesting that Lucas would have all the rights and that Mr Ainsworth would not be entitled to exploit them without Lucas's licence) then the required testy suppression would have been forthcoming. I think that this is a classic case for saying that there is an implication that the commissioner would have the copyright in the helmet (if any)."

205     The judge then extended that analysis to all the other articles:

"... he was still working to commission, producing things for which the client had provided clear specifications, and it was implicit in the relationship that he would not retain copyright."
(at [187])

Finally, the judge dealt separately with the submission that an implied licence from Mr Ainsworth to Lucas would have sufficed (at [189]). But he rejected that possibility:

"It cannot have been the intention of either party that there could be parallel exploitation of the props so that, for example, Mr Ainsworth could make more and sell them to other film-makers. The only thing that makes sense is an obligation to assign copyright."

As for the submission that Mr Ainsworth had not been paid enough to require him to assign copyright, the judge rejected that too. Mr Ainsworth was paid a fee, strictly speaking a series of fees, "which the parties agreed was right for the job". In the end Mr Ainsworth made some £30,000 out of his Star Wars activities.

206     We find this analysis to be ultimately cogent. There is no sign in the judge's reasoning of the argument put in the forefront of Mr Wilson's submissions on appeal, namely that initially there had been no contract between the parties and Mr Ainsworth had done his two days' design work on the Stormtrooper helmet, and thus had earned his copyright interest, at a time when he was simply working "on spec". In the circumstances, Mr Wilson suggested, it was too late for Lucasfilm to expect such copyright interests to be assigned at the stage of agreeing a merely manufacturing price. Mr Bloch accepted the factual basis of that submission. Nevertheless, and however the matter is put, we consider that it was always inherent

in the relationship that if it proceeded to a contract, it would be on terms that would reward Mr Ainsworth for his preliminary work but would confer the primary copyright interests on the commissioning party.

207     Thus we agree with the judge that the situation in this case was in line with the circumstances discussed by Lightman J. and ruled on by this court in *R Griggs Group Ltd v Evans (No.1)* [2005] F.S.R. 31. Indeed it falls within each of the circumstances (a), (b) and (c) discussed by Lightman J. in his [7] and may thus be said to be an a fortiori case. It makes no sense to consider that copyright interests should be divided between "team Lucas", if we can express it that way, and Mr Ainsworth, who in truth became part of the team when he accepted the responsibility of working on the designs provided to him in order to manufacture the finished article. That would only have been an uncommercial recipe for mutually inconsistent rights: Lucasfilm could not order more props without running the risk that Mr Ainsworth would charge a blackmailing price; it could not exploit any licensing opportunities without similar dangers; and Mr Ainsworth of course could do nothing with any copyright interests that might have remained with him without the complete co-operation of Lucasfilm.

208     The fact that the parties may not have anticipated the success of the film is quite beside the point. The question, which has to be answered objectively and does not depend in any way on what might in fact have gone through the minds of particular parties, is what the parties would have agreed if the question of licensing opportunities had been raised. We agree that in those circumstances, it would never have occurred to anyone to say that Mr Ainsworth should have retained any (necessarily limited) copyright interests. We agree that an obligation to assign was necessarily to be implied. It was also reasonable, and there is nothing in the commercial arrangements then made, e.g. in the prices agreed, to suggest that it was unreasonable.

**Conclusion**

209     In sum, Lucasfilm's appeal fails. There was no copyright in any sculpture. Nor could it enforce its US judgment. Mr Ainsworth's cross-appeal, on the other hand, partly succeeds and partly fails. It succeeds to the extent that we reject the judge's direct enforcement of US copyright. In the circumstances, there is no financial remedy for Lucasfilm to compensate it for the modicum of selling which Mr Ainsworth has managed to achieve into the United States: but Mr Ainsworth is aware that were he to seek any further selling into the United States, he would be in breach of its copyright laws.

**EXHIBIT 45**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GAMES WORKSHOP LIMITED,

          Plaintiff,

          v.

CHAPTERHOUSE STUDIOS LLC and JON
PAULSON d/b/a PAULSON GAMES

          Defendants.

Civil Action No. 1:10-cv-08103

Hon. Matthew F. Kennelly
Hon. Jeffrey T. Gilbert

## PLAINTIFF GAMES WORKSHOP STUDIOS LLC'S RESPONSE TO INTERROGATORIES TO GAMES WORKSHOP LIMITED SET TWO

Pursuant to Fed.R.Civ.P. Rules 26 and 34, Games Workshop responds as follows to the First

Request For Production of Documents of Defendant Chapterhouse Studios LLC.

### GENERAL OBJECTIONS

1.      Games Workshop will produce electronically stored information in a format
mutually agreed upon among counsel, or as otherwise appropriate.

2.      Games Workshop objects that the definition of the term "identify" is overbroad
and unduly burdensome and entails the multiplication of numerous individual interrogatories
into multiple separate sub-parts.

### INTERROGATORIES

### INTERROGATORY NO. 3:

Identify each trademark YOU claim Chapterhouse infringes and specify the nature of

each alleged infringement, including without limitation where and how Chapterhouse infringes each mark.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous as to the terms "nature of each alleged infringement".

Without prejudice to or waiver of the foregoing objections, Games Workshop identifies the following marks: "GAMES WORKSHOP", "GW", "WARHAMMER", "WARHAMMER 40,000", "40K", "40,000", "SPACE MARINE", "ELDAR", "ELDAR JETBIKE", "ELDAR WARLOCK", "ELDAR SEER COUNCIL", "DARK ANGELS", "TAU", "TYRANID", "CHAOS", "ADEPTUS MECHANICUS", "ALPHA LEGION", "SOUL DRINKERS", "IRON SNAKES", "IRON HANDS", "LUNA WOLVES", "IMPERIAL FIST", "DEATH WATCH", "TERVIGON", "BLOOD RAVENS", "BLACK TEMPLARS", "LEGION OF THE DAMNED", "SALAMANDERS", "MELTA GUN", "CARNIFEX", "CRIMSON FISTS", "FLESH TEARERS", "BLOOD ANGELS", "DEATH WATCH", "CELESTIAL LIONS", "ELDAR FARSEER", "THOUSAND SONS", "HORUS HERESY", "TERMAGANTS", "GENESTEALER" "ASSAULT MARINES", "DEVASTATOR MARINES", "TACTICAL MARINES", "NECRON", "DROP POD", "CHAPLAIN", "EMPIRE", "FORGEWORLD", "EXORCIST", "HIGH ELF", "HIVE TYRANT", "HEAVY BOLTER", "INQUISITION", "RHINO", "LAND SPEEDER", "MK II ARMOUR", "MK V ARMOUR", "LAND RAIDER", "SPACE WOLVES", "STORM SHIELD", LIGHTNING CLAW" and "Aquila Design".

Chapterhouse infringes the above marks by making unauthorized use of the same without authorization or consent of Games Workshop on and in connection with its products and its

website.

## INTERROGATORY NO. 4:

Identify each and every instance in which anyone has expressed any confusion or question as to the association or affiliation between Chapterhouse Studios or its products and Games Workshop or its products, including without limitation by identifying the persons involved, the date, and the substance of anything communicated.

### RESPONSE:

Games Workshop will produce documents responsive to this request pursuant to Fed.R.Civ.P. Rule 33(d).

## INTERROGATORY NO. 5:

Separately for each copyright that YOU claim Chapterhouse infringes, identify (a) each• natural or corporate person who is the author, creator, or designer, or who contributed to the authorship, creation, or design, of the work for which YOU claim copyright protection; (b) the nature of each such person's contribution to the work for which YOU claim copyright, including without limitation whether such person was the author or a joint author of the work; (c) the period .of time during which each such person was engaged in such authorship, creation, or design; and (d) the place or places where such authorship, creation, or design was undertaken. If the author of any work for which YOU claim copyright protection is unknown, so state.

### RESPONSE:

Games Workshop objects that this request is overbroad and unduly burdensome given the needs of the case, given that Games Workshop is the owner of each of the copyrighted works at issue in the case and no issue has been raised as to its ownership or creation of any given work. Games Workshop also objects that this request is needlessly cumulative and repetitive of

Chapterhouse's Interrogatory No. 1.

## INTERROGATORY NO. 6:

Set forth all sources on which YOU relied in connection with the selection of each of the marks, product names, designations or identifying information for each of YOUR WORKS that YOU claim Chapterhouse infringes.

## RESPONSE:

Games Workshop objects that this request is overbroad and unduly burdensome given the needs of the case, and given the length of time since Games Workshop adopted the subject marks, and appears to be based on a mistake of law that originality is relevant to trademark ownership. Games Workshop further objects that there no issue has been raised in this action that Games Workshop has infringed any rights of Chapterhouse in selecting the names and trademarks in issue, and Chapterhouse admits Games Workshop owns all of the subject marks. Nor is there any issue in this action that Games Workshop has infringed any rights of any third parties in selecting such names, and any such defense would be an impermissible *jus tertii* defense.

## INTERROGATORY NO. 7:

Identify the persons most knowledgeable concerning the facts and circumstances relating to the creation, sources of information, or development, for each of YOUR WORKS that YOU claim Chapterhouse infringes, specifying the nature of their knowledge.

## RESPONSE:

Games Workshop objects that this request is overbroad and unduly burdensome given the needs of the case, given that Games Workshop is the owner of each of the copyrighted works at

issue in the case and no issue has been raised as to its ownership or creation of any given work.

Without prejudice to or waiver of the foregoing objections, Games Workshop identifies Jeremy Goodwin, Creative Lead for Miniatures.

**INTERROGATORY NO. 8:**

Identify the persons most knowledgeable concerning the facts and circumstances relating to the publication, marketing, advertising, and/or sale, for each of YOUR WORKS that YOU claim Chapterhouse infringes, specifying the nature of their knowledge.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous as to the nature of the information concerning publication, marketing, advertising, and/or sale at issue and the geographic territory in issue.

Without prejudice to or waiver of the foregoing objections, Games Workshop identifies Ed Spettigue, Head of Sales Support.

**INTERROGATORY NO. 9:**

Separately for each copyright that YOU claim Chapterhouse infringes, identify any and all sources consulted, used, reviewed or relied on by YOU or YOUR agents in creating such works.

**RESPONSE:**

Games Workshop objects that this request is overbroad and unduly burdensome given the needs of the case, given that Games Workshop is the owner of each of the copyrighted works at issue in the case and no issue has been raised as to its ownership or creation of any given work. This request is also needlessly cumulative and repetitive of Interrogatories 5 and 7.

**INTERROGATORY NO. 10:**

Identify all distributors and all channels of distribution used by YOU to market or sell any and all products whose copyright YOU claim Chapterhouse infringes. If such channels of distribution include retail stores, identify all such retail stores by name, location, and state the quantity of each such product sold at each such retail store on an annual basis for each of the last ten years; if such channels include direct sales to the public, identify the type of channel (including without limitation if it is a website or a catalogue or sale at a convention or tournament) and state the quantity of each such product sold directly to the public.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous, overbroad and unduly burdensome given the needs of the case. The request also seeks information that is confidential.

Without prejudice to or waiver of the foregoing objections, Games Workshop sells copyrighted products at issue on the Internet, at special events and in retail stores. Subject to entry of a protective order, Games Workshop, pursuant to Fed.R.Civ.P. Rule 33(d), Games Workshop will produce a document summarizing sales.

**INTERROGATORY NO. 12:**

Describe in detail each instance in which any person has questioned or disputed YOUR rights, ownership, co-ownership, or control of any of YOUR WORKS that YOU claim Chapterhouse infringes.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous and seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence.

Without prejudice to or waiver of the foregoing objections, Games Workshop is not aware of any such claims.

**INTERROGATORY NO. 13:**

Describe in detail, including a quantification, all actual damages YOU claim to have suffered as a result of the infringement YOU allege in this case.

**RESPONSE:**

Games Workshop objects that this request is a contention interrogatory best deferred to the close of discovery, including receipt of discovery from Chapterhouse regarding its sales.

**INTERROGATORY NO. 14:**

Separately for each work that YOU claim Chapterhouse infringes, state on an annual basis for the past ten (10) years (a) YOUR gross revenues generated from sales of the work; and (b) YOUR gross and net profit generated from sales of the work and how such profit was calculated.

**RESPONSE:**

Games Workshop objects that this request is vague and ambiguous, overbroad and unduly burdensome given the needs of the case. The request also seeks information that is confidential. Games Workshop further objects that this request is needlessly cumulative and repetitive of Interrogatory 10.

Without prejudice to or waiver of the foregoing objections, subject to entry of a protective order, Games Workshop, pursuant to Fed.R.Civ.P. Rule 33(d), Games Workshop will produce a document summarizing sales.

**INTERROGATORY NO. 15:**

Identify each person who participated in any way in the preparation of the responses to these interrogatories and state specifically with reference to interrogatory numbers the area or areas of participation of each such person.

**RESPONSE:**

Games Workshop objects that, without regard to relevance, this request seeks information protected by the attorney-client privilege and work-product immunity.

Dated: July 5, 2011

Respectfully submitted,

By: _____
      Jonathan E. Moskin

Scott R. Kaspar (Ill. Bar No. 6284921)
Aaron J. Weinzierl (Ill. Bar No. 6294055)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
Email: skaspar@foley.com; aweinzierl@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

*Attorneys for Plaintiff Games Workshop Limited*

## CERTIFICATE OF SERVICE

I, Jonathan E. Moskin, an attorney, hereby certify that on July 5, 2011, I caused a copy of the foregoing **PLAINTIFF GAMES WORKSHOP STUDIOS LLC'S RESPONSE TO INTERROGATORIES TO GAMES WORKSHOP LIMITED SET TWO** to be served on the interested parties by causing copies of this document to be served on the following *via* United States Mail in a sealed envelope with the postage prepaid and *via* electronic mail to the following:

> Jennifer A. Golinveaux, Esq.
> Thomas J. Kearney, Esq.
> J. Caleb Donaldson, Esq.
> WINSTON & STRAWN LLP
> 101 California Street
> San Francisco, CA 94111
> jgolinveaux@winston.com
> tkearney@winston.com
> jcdonaldson@winston.com

> Catherine B. Diggins, Esq.
> Eric J. Mersmann, Esq.
> WINSTON & STRAWN LLP
> 35 West Wacker Drive
> Chicago, IL 60601
> cdiggins@winston.com
> emersmann@winston.com

> and

> Ronald H. Spuhler
> Ronald A. DiCerbo
> Thomas J. Campbell Jr.
> MCANDREWS, HELD & MALLOY LTD.
> 500 W. Madison Street – 34th Floor
> Chicago, IL 60061

Jonathan E. Moskin