**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| |
|---|
| GAMES WORKSHOP LIMITED, <br><br> Plaintiff, <br><br> v. <br><br> CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES <br><br> Defendants. |

Civil Action No. 1:10-cv-8103

Hon. Matthew F. Kennelly
Hon. Jeffrey T. Gilbert

## GAMES WORKSHOP'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Jason J. Keener (Ill. Bar No. 6280337)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: 312.832.4500
Facsimile: 312.832.4700
Email: jkeener@foley.com;
aweinzierl@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

*Attorneys for Plaintiff*
*Games Workshop Limited*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

I.  PRELIMINARY STATEMENT ................................................................. 1

II. ARGUMENT ............................................................................................. 4

    A.    **Games Workshop Is The Undisputed Owner Of All of Its Works In Issue** ................................................................................................ 4

    B.    **Chapterhouse Has Infringed Games Workshop's Copyrighted Works** .......... 6

        a.    **Games Workshop Does Not Claim Rights In Names Alone** .............. 10

        b.    **This Case Does Not Concern Copying Of Ideas** ................................ 11

        c.    **The Combinations of Elements in Games Workshop's Designs Are Copyrightable** ................................................................ 13

        d.    **There Is Nothing Functional About The Design Of Games Workshop Miniatures** ............................................................ 15

        e.    **Games Workshop Does Not Claim Rights In Geometric Shapes or Letters Alone** ................................................................ 17

        f.    **Games Workshop Has Identified The Works Chapterhouse Has Copied** ........................................................................ 19

    C.    **Chapterhouse's Copyrightability Defense Under English Law Should Be Dismissed** ................................................................ 19

    D.    **Chapterhouse Has Infringed Games Workshop's Trademarks** .................... 20

    E.    **Chapterhouse's Use of Games Workshop's Trademarks Is Not a Fair Use** ................................................................................................ 22

    F.    **Summary Judgment is Inappropriate On Games Workshop's Dilution Claim** ................................................................................ 24

III. CONCLUSION ......................................................................................... 25

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Alberto-Culver Co. v. Andrea Dumon, Inc.*,
466 F2d 705 (7th Cir. 1972) ...................................................................................10

*Atari, Inc. v. N. Amer. Phillips Consumer Elec. Corp.*,
672 F.2d 607 (7th Cir. 1982) ................................................................. 1, 6-7, 18

*Bach v. Forever Living Products U.S. Inc.*,
473 F. Supp. 2d 1127 (W.D. Wash. 2007)............................................................11

*Baker v. Master Printers Union*,
34 F.Supp. 808 (D.N.J.1940) ...................................................................................4

*Boisson v. Banian, Ltd*,
273 F.3d 262 (2d Cir. 2001)....................................................................................17

*Bouchat v. Balt Ravens, Inc.*,
241 F.3d 350 (4th Cir. 2001) *aff'd and rev'd in part by*, *remanded by* 619 F.3d 301
(4th Cir. 2010)..........................................................................................................15

*Bridgeman Art Library v. Corel Corp.*,
36 F. Supp. 2d 191 (S.D.N.Y. 1999)......................................................................19

*Bryant v. Gordon*,
483 F. Supp. 2d 605 (N.D. Ill. 2007) .......................................................................9

*Bucklew v Hawkins, Ash, Baptie & Co., LLP*,
329 F.3d 923 (7th Cir. 2003) ...................................................................................7

*CAE, Inc. v. Clean Air Engineering, Inc.*,
267 F.3d 660 (7th Cir. 2000) .................................................................................24

*Castle Rock Ent v. Carol Pub. Grp, Inc.*,
150 F.3d 132 (2d Cir. 1998).....................................................................................9

*Central Mfg., Inc. v. Brett*,
492 F.3d 876 (7th Cir. 2007) ............................................................................ 22-23

*FASA Corp. v Playmates Toys, Inc.*,
912 F. Supp. 1124 (N.D. Ill. 1996), *vacated in part*, 108 F.3d 140 (7th Cir. 1997)............. 7-8

*Francorp v. Siebert*,
210 F.Supp 2d 961 (N.D.Ill. 2001) ..........................................................................9

*Gaiman v. McFarlane*,
    360 F.3d 644 (7th Cir. 2004) ........................................................................ 10-11

*Gentieu v. Tony Stone Images/Chicago, Inc.*,
    255 F. Supp. 2d 838 (N.D. Ill. 2003) ............................................................. 8-9

*Harley-Davidson, Inc. v. Grottanelli*,
    164 F.3d 806(2d Cir. 1999)..............................................................................23

*Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*,
    780 F.2d 189 (2d Cir. 1985)............................................................................19

*JCW Investments Inc. v. Novelty Inc.*,
    482 F3d 910 (7th Cir. 2007) ........................................................................7, 9

*Pebble Beach Co. v. Tour 18 I Ltd.*,
    155 F.3d 526 (5th Cir. 1998) ..........................................................................24

*R. J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*,
    99 C 1174, 2001 U.S. Dist. LEXIS 8896 (N.D. Ill. June 28, 2001), *aff'd by R.J.*
    *Reynolds Tobacco Co. v. Cigarettes Cheaper*!, 462 F.3d 690 (7th Cir. 2006).......................23

*Sadhu Singh Hamad Trust v. Ajit Newspaper Advert., Marketing and Comm'ns, Inc.*,
    503 F. Supp. 2d 577 (E.D.N.Y. 2007) ...........................................................19

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
    978 F.2d 947,953-54 (7th Cir. 1992) ), *aff'd and vacated in part, remanded by* 34
    F.3d 1340 (7th Cir. 1994) ...............................................................................23

*Satava v Lowry*,
    323 F.3d 805 (9th Cir. 2003) ..........................................................................15

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
    996 F.2d 1366 (2d Cir. 1993)..........................................................................10

*Volkswagenwerk Aktiengesellschaft v. Church*,
    411 F.2d 350 (9th Cir. 1969) ..........................................................................24

*Walt Disney Prods. v. Air Pirates*,
    581 F.2d 751 (9th Cir. 1978) ..........................................................................11

*Warner Bros. Ent'mt Inc. v. RDR Books*,
    575 F. Supp. 2d 513 (S.D.N.Y. 2008)............................................................10

## FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

17 U.S.C. § 104...............................................................................................19

17 U.S.C. § 410(c) ..................................................................................................................6

**OTHER AUTHORITIES**

1 Melville and David Nimmer,
   *Nimmer on Copyright* §2.12 at 2-178.30 (2012)......................................................................11

J. Moskin, Frankenlaw: The Supreme Court's *Fair and Balanced Look at Fair Use* 95
   TMR 848 (2005) ..................................................................................................................24

Copyright Office Compendium II § 503.02 (a)-(b) (1984)............................................................15

Plaintiff Games Workshop Limited ("Games Workshop" or "GW"), by and through its undersigned counsel, respectfully submits this Memorandum in opposition to the Motion for Summary Judgment of Defendant Chapterhouse Studios LLC ("Chapterhouse" or "CHS").

## I.    PRELIMINARY STATEMENT

Defendant's motion for summary judgment demonstrates why no trial is needed on the issue of copyright infringement, but it does so by relying exclusively on an incorrect test of dissecting into unrelated constituent elements the original *combinations* of features integral to certain of Games Workshop's characters and simply ignoring numerous other wholly original aspects of these and other designs.  In the process, it never disputes that the "total concept and feel" of its own works (as its customers would see them) is (by design) substantially similar to Games Workshop's artwork.  Chapterhouse similarly never even questions that it deliberately copies Plaintiff's artwork to make its products immediately recognizable to Warhammer 40K fans and never disputes that "ordinary reasonable person[s] would conclude that defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value." *Atari, Inc. v. N. Amer. Phillips Consumer Elec. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982). To support its motion, Defendant further distorts reality by focusing solely on the unpainted miniatures it sells, ignoring that its website and marketing materials all show the products painted in Games Workshop's colors.  The actual basis of the claim is that Chapterhouse has directly copied designs and imagery – almost exclusively from paintings and drawings in Games Workshop's *books* but also in the form of certain *painted* figurines – that it promotes and sells in its own *painted* versions bearing Games Workshop's colors.  To support this argument, Chapterhouse falsely accuses Games Workshop of having failed to produce specimens of its works in issue, which is simply untrue.  (GW Response to CHS Undisputed Fact #20).  It has in fact produced the painted figures and artwork in the form in which Chapterhouse and all of

1

Games Workshop's customers see them.  Needlessly confusing the issue, Chapterhouse also fails to distinguish designs in which Games Workshop claims copyright from those in which it has confirmed it claims only trademark rights – including more than one third (12 out of 33) of the Games Workshop designs Chapterhouse argues are uncopyrightable under the merger doctrine (a defense that did not even appear among the 23 affirmative defenses in its Answer and is not properly raised now).  (GW Response to CHS Undisputed Fact #26; GW Add'l Undisputed Fact # 6).  Similarly, Chapterhouse draws attention to products for which it failed to produce any design documents – even after being directed by the Court to do so on March 6, 2012, including product nos. 23-24, 45, 93, 106, and 112-113.  (GW Add'l Undisputed Fact #9).  Chapterhouse should be precluded from contesting infringement as to these items.  Chapterhouse also asks the Court to adjudicate its rights in 15 newly-released products (product nos. 126-143[1]) for which Games Workshop has received no discovery.  (GW Add'l Undisputed Fact #38-40).  As Games Workshop has explained to the Court, it will presently file a supplemental complaint as to these items, certain of which carry its level of infringement to an entirely new level.[2]  (*Id.*).

---

[1] TRU-Scale Knight Praetorius Conversion Kit; Hotshot Lasgun Pack; Iconoclast Conversion Kit for Space Marine Land Raider; Magnetic Turret Kit for the Storm Raven; Magnet Turret Kit for the Razorback; Open-Fisted Power Claws compatible with Games Workshop Space Marine model; Close-Fisted Power Claws compatible with Games Workshop Space Marine model; Pilum Imperial Attack Jet Bike; Alternative Heads for Tau Crisis Suits-Set #1; Alternative Heads for Tau Crisis Suits-Set #2; Heresy-Era Shoulder Pads for Terminators Type E;  Heresy-Era Shoulder Pads for Terminators Type D; Heresy-Era Shoulder Pads for Terminators Type B; Heresy-Era Shoulder Pads for Terminators Type C; Heresy-Era Shoulder Pads for Terminators Type A; TRU-Scale Knight Praetorius "Order of the Empress's Tears" Conversion Kit; and TRU-Scale Knight Praetorius Conversion Kit.

[2] As one person commented in response to seeing Chapterhouse's new "Tru-scale" Space Marines:

If this is the culmination of what I think it is, then it was one of the chaps on Dakka who true-scaled up his Marines and just got CH to cast them iirc. Adding a couple of mm of greenstuff to the thighs doesn't constitute an even remotely original sculpt imo. …CH have gone from an 'interesting aftermarkets spares' company, to totally moronic and arrogant lamo's, to simply just common thieves.

(GW Add'l Undisputed Fact #39).

Another false premise of Chapterhouse's motion is that there exists a 28 mm industry standard, such that the size and scale of its products match Games Workshop's for some allegedly functional reason. (GW Resp. to CHS Undisputed Fact #11). In fact, the size and scale was adopted arbitrarily by Games Workshop (with other companies using different scales) – not that that would excuse copying the dimensions of original sculptural designs anyway. (*Id.*). Moreover, among the newest products Chapterhouse has launched (which are the subject of Games Workshop's separate complaint) are so-called "Tru-scale" Space Marines, which are made larger than Games Workshop's 28 mm miniatures – supposedly to conform more precisely to the artistic depictions of the figures in Games Workshop's publications than do Games Workshop's own miniatures. (GW Add'l Undisputed Fact #38-40) (Hence the harsh assessment quoted in the margin at note 2.). At any rate, the suggestion there is a required standard size is meritless.

Equally puzzling is Chapterhouse's contention that Games Workshop does not own trademarks for its character names. Indeed, the very premise of Chapterhouse's fair use defense is that it *must* use Games Workshop's preexisting trademarks so as to properly designate its unauthorized copies of the corresponding characters or accessories for those characters. This latter suggestion is itself undermined by the fact that it picked different names for two of its newest products ("Doomseer Iyanar" and "Arman'serq") and has begun picking new names for other new products not directly at issue in this litigation – although in fact they are immediately recognized as copies. Moreover, laying aside the detailed sales records Games Workshop has produced confirming use in commerce of these marks in the United States since well prior to Chapterhouse's adoption of the same names, Mr. Villacci and Chapterhouse already had purchased all of these goods on the open market in the United States, as demonstrated by defendant's collection of virtually everything Games Workshop has ever sold. (GW Add'l

Undisputed Fact #12). And Chapterhouse of course admits on its website that Games Workshop does indeed own all of these trademarks. (GW Resp. to CHS Undisputed Fact #14).

Chapterhouse's inconsistent defenses thus call to mind once again the truism "that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts," *Baker v. Master Printers Union*, 34 F. Supp. 808, 811 (D.N.J.1940), and the response of one potential customer to Mr. Villacci's denials of blatant copying: "How stupid do you really think people are?" (GW Add'l Undisputed Fact #8).

## II.     ARGUMENT

### A.     Games Workshop Is The Undisputed Owner Of All of Its Works In Issue

Chapterhouse contends that there are nine authors for which Games Workshop has been unable to demonstrate either that the individual was an employee or for whom Games Workshop lacks a confirmatory assignment. Of these nine, Games Workshop has in fact produced confirmatory assignments from its former employees, Clint Langley, Wayne England and Karl Kopinski[3], as well as its current employee, Simon Egan, and from the former freelancers, Adrian Smith and Des Hanley. (GW Resp. to CHS Undisputed Fact #34-35). Copies are submitted herewith. (Ex. 142) Games Workshop advised Chapterhouse prior to the filing of its motion that it is not claiming copyright infringement of the works prepared by Gary Chalk, Des Hanley, Adrian Wild and Des Hanley (GW Resp. to CHS Undisputed Fact #34). Regarding the remaining individuals cited (Mike McVey and Bob Naismith) as well as three other individuals

---

[3] Games Workshop was only recently able to locate Mr. England and Mr. Kopinski, who have now provided confirmatory assignments. (GW Resp. to CHS Undisputed Fact #34-35).

noted in Games Workshop's own motion (as to whom Chapterhouse does not contest ownership), the uncontroverted testimony of Alan Merrett, who worked with these individuals as one of the leaders of Games Workshop, is that they were employees. (GW Resp. to CHS Undisputed Facts # 34). That Games Workshop happens no longer to retain employment records for two of the individuals cited by Chapterhouse who ceased working at the company many years ago (in the case of Mr. Naismith, 23 years and for Mr. McVey 13 years) is hardly a basis for Chapterhouse to question ownership of the works when those individuals themselves have never done so in the intervening decades. Its pure speculation that perhaps the individuals were not employees does not raise any factual issues – particularly where these individuals have never done so themselves. And contrary to Chapterhouse's assertion that Games Workshop "refused" to produce current contact information for these individuals, the fact is the company has produced all of the information it has. (*Id.* 39). For four of the authors in issue who are former Games Workshop employees, Games Workshop did provide contact data.[4] (Id.)

Although Chapterhouse is correct that a certificate of copyright is *"prima facie* evidence" of validity only for works registered within five years of first publication, 13 of GW's registrations satisfy 17 U.S.C. § 410(c). (GW Resp. to CHS Undisputed Fact #29). Registration

---

[4] Moreover, although it should not be necessary to consider the report of Games Workshop's expert on English law (because Games Workshop has provided direct contractual proof of ownership of all the works other than for the four authors for whom it has furnished unrebutted testimony of employment status ) Chapterhouse simply misapprehends the purpose of the Bloch report, which is not to usurp the Court's fact-finding function in the case of any specific employee or work, but simply to provide the legal and conceptual framework for the Court to do so. Chapterhouse also misidentifies Mr. Bloch as a solicitor rather than a Barrister, Q.C. Moreover, Chapterhouse's own expert (who admittedly never even saw a single one of the parties' works in issue) was in almost complete agreement with Mr. Bloch on the principles of English law governing ownership – except for his personal and political views that the doctrine of equitable assignment is morally wrong because it sometimes disadvantages individuals who are the true creative source of works they make for large companies. (GW Add'l Undisputed Fact #1). His personal desire to change the law not only is irrelevant, but in the case of Games Workshop is backwards, as it is the company that is undisputably the source of Warhammer 40K, with occasional freelancers only carrying out the instructions from the creative core of the company.

of course is not required for English works. There is, in short, no basis to question Games Workshop's ownership of any of its works.

## B.    Chapterhouse Has Infringed Games Workshop's Copyrighted Works

Notable in Chapterhouse's motion is the absence of any denial of actual copying. Chapterhouse offers no defense that its works consistently copy the "total concept and feel" of Games Workshops works; that the works borrow "material of substance and value" from Games Workshop or that Chapterhouse instructs its designers to make products immediately recognizable to Games Workshop's fans. Even the declaration of the company owner, Mr. Villacci (ECF No. 208), nowhere denies copying. Nor is there any defense of Chapterhouse's flawed business model under which, so long as it avoids exact copying, it does not infringe. ("Gw pretty much has no legal say about what people make to use with their models as long as it isn't direct copies or recast of the models." (GW Add'l Undisputed Fact #8)). Thus, it is undisputed that, precisely as in *Atari, Inc.,* "an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." 672 F.2d at 614. It is precisely that "substance and value" that makes the similarity substantial. If potential consumers do not immediately recognize Chapterhouse's products as substitutable for Games Workshop's originals, Chapterhouse has no market at all.

While admitting that all the works in issue were "inspired" by Games Workshop's originals, Chapterhouse simply ignores the actual test of infringement, which "does *not* involve 'analytic dissection and expert testimony,' but depends on whether the accused work has captured the 'total concept and feel' of the copyrighted work" and appropriates "material of substance and value." *Id.* at 614 (citations and internal quotation marks omitted; emphasis added). Indeed, by focusing solely on an intricate analytic dissection of some of the works into constituent elements viewed in isolation, and never stepping back to assess the original

6

combinations that the consumer sees, Chapterhouse effectively concedes that the overall combinations of elements in Games Workshop's characters are wholly original and have been infringed.

In *Bucklew v Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 929 (7th Cir. 2003), where the work in issue was simply functional software to generate HUD forms, Judge Posner explained:

> Every expressive work can be decomposed into elements not themselves copyrightable-the cars in a car chase, the kiss in a love scene, the dive bombers in a movie about Pearl Harbor, or for that matter the letters of the alphabet in any written work. The presence of such elements obviously does not forfeit copyright protection of the work as a whole, but infringement cannot be found on the basis of such elements alone; it is the combination of elements, or particular novel twists given to them, that supply the minimal originality required for copyright protection.

Even if some isolated elements of some of the characters' iconography is creatively adapted from the public domain, it is undisputed that these items are integrated into overall designs; that characters and the overall iconography are original and that Chapterhouse has in every instance copied "material of substance and value" from the Games Workshop original artwork. *Accord JCW Invs., Inc. v. Novelty Inc.*, 482 F3d 910, 917 (7th Cir. 2007) ("Novelty urges that the similarity of the two dolls reflects the fact that Fred himself is only minimally creative, representing a combination of elements that were in the public domain or were *scènes à faire*. The problem with this argument is that the very combination of these elements as well as the expression that is Fred himself are creative.").

Chapterhouse's reliance on *FASA Corp. v Playmates Toys, Inc.*, 912 F. Supp. 1124 (N.D. Ill. 1996), *vacated in part*, 108 F.3d 140 (7th Cir. 1997), for the notion that the Court can simply disregard constituent elements of Games Workshop's overall designs is misplaced. *FASA* engaged in an analytical "dissection" of the subject works solely to determine if there had been

7

copying in fact (*i.e.*, to assess "probative similarity" at the first level of analysis). *Id.* at 1169.

Finding inadequate similarities, the court concluded the defendant's works had been

independently created. *Id.* at 1170. Moreover, the plaintiff there expressly *conceded,* under the

*scènes à faire* doctrine, that it claimed no rights in major portions of its overall works and that

"[m]uch of the total look of BATTLETECH draws heavily from preexisting material that is

common in the 'mecha' genre and in the public domain." *Id.* at 1148.[5]  Here, actual copying is

conceded by Chapterhouse and neither *scènes à faire* nor merger are even among Chapterhouse's

23 affirmative defenses.[6]  (GW Add'l Undisputed Fact #6).  Nor is there any argument in its

brief why the principles should apply here, where Games Workshop does not agree that its works

are similarly derivative of prior designs as were those in *FASA*.  Indeed, even Chapterhouse's

experts conceded the designs and iconography in Warhammer 40K are without precedent (GW

Resp. to CHS Undisputed Facts #42, #44, #45, and #46).  Nor did *FASA* purport to disrupt the

actual test of infringement as explained in *Atari*, *Bucklew* and *JCW* that original combinations of

elements, even if some of those elements can be found in the public domain, are protectable.

The other cases on which Chapterhouse principally relies are likewise inapposite here where the

*scènes à faire* and merger doctrines are not in issue and were not raised as defenses by

Chapterhouse (GW Add'l Undisputed Fact #6).[7]

---

[5] Both parties' products appear to have been inspired to some extent by Warhammer or Warhammer 40K
*Id.* at 1147, 1151.

[6] Judge Posner explains the principle of *scènes à faire* in *Bucklew* by noting "sensibly enough, that a
copyright owner can't prove infringement by pointing to features of his work that are found in the defendant's work
as well but that are so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one
work within a class of works from another." *Bucklew*, 329 F.3d at 927.

[7] *Gentieu v. Tony Stone Images/Chicago, Inc.*, 255 F. Supp. 2d 838, 849 (N.D. Ill. 2003), held only that
"Gentieu cannot claim a copyright in the idea of photographing naked or diapered babies or in any elements of

Because Chapterhouse concedes that all of its products are derived from Games Workshop's artwork, a review of the sample 38 products highlighted in detail in Games Workshop's motion[8], taken together with Chapterhouse's admission that all of its products are derived from Warhammer 40K, not to mention its business model of making parts and figures solely to trade on the recognized characters and iconography created by Games Workshop by copying the most salient elements of those works, confirms that, consistent with *Castle Rock Ent v. Carol Pub. Grp, Inc.,* 150 F.3d 132 (2d Cir. 1998), the entire Chapterhouse website is an infringement. Contrary to Chapterhouse's strawman argument, the point is not that the website is an infringement even if none of the individual works is, but rather that, as in *Castle Rock,* where the court did not separately analyze each of the trivia questions derived from the Seinfeld show in finding from where the entire collection was derived, but rather viewed the individual fragments of copying in the aggregate, *id.* at 138, here, every last work need not be analyzed in extensive detail where it is clear that most or all of the products do incorporate material of substance and value from Warhammer 40,000 and, in the aggregate, the entire website has only one purpose: to trade on the popularity of Games Workshop's intellectual property. *Accord*

---

expression that are intrinsic to that unprotected idea." The court also said "Gentieu's other claims of similarity as to the focus, angle and background of the photographs fail under the doctrine of *scènes à faire." Id.* at 851. *Francorp v. Siebert,* 210 F.Supp 2d 961, 968 (N.D. Ill. 2001) ("Ultimately, it appears that all that the iFranchise website has in common with Francorp's materials is subject matter" – namely ideas about franchising.); *Bryant v. Gordon,* 483 F. Supp. 2d 605 (N.D. Ill. 2007) (two photos of similar subject matter viewed and compared in their entireties).

[8] For many other products, Games Workshop is simply unable to provide a complete analysis because Chapterhouse failed to produce the underlying design documents, even after the Court directed it to do so on March 16. (GW Add'l Undisputed Fact #9). As late as February 29, 2012, when Mr. Villacci appeared for his deposition as document custodian, he could not explain vast apparent gaps in Chapterhouse's document production – notwithstanding that Games Workshop had alerted his counsel prior to before the deposition that that was a question he was expected to answer. (GW Add'l Undisputed Fact #9).

*Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 535 (S.D.N.Y. 2008); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1372-73, 1381 (2d Cir. 1993).

Should Chapterhouse someday design a website that does not incorporate color images of infringing products (all but two of which copy Games Workshop's character names), there will be time enough to assess such a new site. Similarly, Chapterhouse remains free to continue to sell on other forums (such as eBay) the 33 products for which Games Workshop has agreed not to pursue copyright claims (provided of course it ceases to sell them under Games Workshop's trademarks). Having gone from copying simple shoulder pad designs to entire characters such as its female versions of Games Workshop's Eldar figures (not to mention its new Tru-Scale products not yet at issue that are based on a presumptuous notion it knows better than Games Workshop the dimensions to make model figurines from Games Workshop's own artwork). Chapterhouse, if not enjoined from such copying, will no doubt only accelerate the scale and extent of such infringing conduct. As discussed below, it's other specific defenses to its admitted copying are without merit.

### a. Games Workshop Does Not Claim Rights In Names Alone

Citing merely *Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705 (7th Cir. 1972), a case involving a copyright claim in the labeling of a deodorant can, Chapterhouse argues that product names and short phrases are not copyrightable. However, Games Workshop's complaint is that Chapterhouse has copied not only the character names of original Games Workshop creations, but that it uses these names in combination with depictions of key aspects of those characters. *Gaiman v. McFarlane*, 360 F.3d 644, 660 (7th Cir. 2004) ("Cogliostro's age, obviously phony title ('Count'), what he knows and says, his name, and his faintly Mosaic facial

features combine to create a distinctive character. No more is required for a character copyright.")[9] *Accord Bach v. Forever Living Products U.S. Inc.*, 473 F. Supp. 2d 1127, 1134 (W.D. Wash. 2007) ("In determining whether a character deserves copyright protection, courts look at the many elements of the character -- visual depictions, name, dialogue, relationships with other characters, their actions and conduct, personality traits, and written descriptions -- to determine whether it is sufficiently delineated such that it is a unique expression."); *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 753 (9th Cir. 1978) (Assessing infringement the court noted: "The characters in defendants' magazines bear a marked similarity to those of plaintiff. The names given to defendants' characters are the same names used in plaintiff's copyrighted work."). *See* 1 Melville and David Nimmer, *Nimmer on Copyright* §2.12 at 2-178.30 (2012) ("Although copying of a character's name is not in itself decisive, it is a factor to be considered in determining whether the character as appropriated is sufficiently distinctive to constitute an infringement.").

### b.    This Case Does Not Concern Copying Of Ideas

The merger doctrine is inapplicable here as a matter of law because it is not among Chapterhouse's 23 affirmative defenses, and Chapterhouse has not requested leave to add the defense. (GW Add'l Undisputed Fact #6). Moreover, as a matter of fact, the newly raised defense is based on conclusory or simply false assertions.

Twelve of the thirty-three products Chapterhouse says are unprotectable under the merger doctrine (Nos. 25, 26, 28-30, 32, 38-42 and 70), are products for which Games Workshop has

---

[9] Judge Posner went on to say: "Although Gaiman's verbal description of Cogliostro may well have been of a stock character, once he was drawn and named and given speech he became sufficiently distinctive to be copyrightable." *Id.* at 661.

specifically advised Chapterhouse it is alleging only trademark infringement. (GW Add'l Undisputed Fact #2). Chapterhouse's motion thus is simply misleading in raising false issues. As set forth in Games Workshop's response to Chapterhouse's statement of fact, in every other instance that Chapterhouse seeks to characterize as the mere copying of ideas, direct comparison of the works themselves show, instead, copying of specific creative expressions. What Chapterhouse refers to as a "slimy-looking alien" with "bio-mechanical weaponry" (Products 37 and 43) are intricately detailed figures with no antecedents whatsoever. (GW Add'l Undisputed Fact #13). Simply examining the drawings and miniatures from which Chapterhouse copied its designs (GW Add'l Undisputed Fact #13 and #35-#37) reveals how irreducibly complex are Games Workshop's Tervigon and Ymgarl designs (as are the character names Chapterhouse has borrowed to reinforce that these are not simply slimy-looking aliens but direct copies of specific characters). For Chapterhouse even to contend that these complex organic designs are unprotectable under the merger doctrine reflects a gross misapplication of the doctrine. Chapterhouse's contention is further incredible as Chapterhouse failed to produce any of its design documents related to the Ymgarl Chapterhouse product. (GW Add'l Undisputed Fact #9). And Chapterhouse simply falsely characterizes Games Workshop's testimony about its Mycetic Spore (item 95) in suggesting that Mr. Merrett admitted it was just an "idea". He actually testified that the unique appearance of the Mycetic Spore included the following: "It is the size, the shape, the context. There's lots and lots of textural elements, both on the illustration and actually on the page, and in fact throughout the whole book from which this page has been photocopied. (GW Resp. to CHS Undisputed Fact #48).

What Chapterhouse refers to as a "pile of skulls" (Product 3) is a specific design of a skull with mechanical notches for a built-in helmet, red eyes and a series of striated bands and identified by the character name "Chaplain", which is a rank in the Space Marines army. (GW

Add'l Undisputed Fact #14). Chapterhouse's "Tactical Rhino Door with skulls", does incorporate a unique image of piled skulls (obviously borrowed from Games Workshop imagery such as the Basilica Administratum and Realm of Battle Board (GW Add'l Undisputed Fact #15)) together with a specific "Tactical Arrow" created by Games Workshop for its Tactical Space Marines and the unique dimensions of Games Workshop's "Rhino" vehicles. Use of the names Tactical Arrow and Rhino confirm the specific copying. Chapterhouse's Rhino Conversion kit for Space Wolves (Product 104) similarly copies the dimensions of Games Workshop's Rhino vehicles, the specific iconography of the Space Wolves, the names Space Wolves and Rhino,[10] and the distinctive "banded" armor of Heresy-era creations. (GW Add'l Undisputed Fact #16-#20). Games Workshop has shown elsewhere how the "Arman'Serq product (No. 120) is also a direct copy of Games Workshop's Eldar characters (GW Add'l Undisputed Fact #21-#22) as are the Fleshtearer and Blood Raven shoulder pads (GW Add'l Undisputed Fact #23-#28), as well as the Mycetic Spore (Product 95) (GW Resp. to CHS Undipsuted Fact #48).

### c. The Combinations of Elements in Games Workshop's Designs Are Copyrightable

Exemplifying Chapterhouse's improper reductionist argument is its suggestion that Games Workshop is claiming protection for bare combinations of only two unprotectable elements. Laying aside that there is no strict numerical threshold on originality, in the instances cited, the combinations of elements include many more than two features and include as well

---

[10] Games Workshop acknowledges that the term "rhino" was used as a nickname for certain World War II tanks. However, it is nonetheless at least modestly original as applied to a fanciful model vehicle from the 41st millennium (and there is no reason for Chapterhouse's copying of the term to refer to its copy of Games Workshop's products other than Games Workshop's creative decision to adopt it as part of the overall conception of its designs.

other original design elements. However, simply by acknowledging that combinations of more than two elements can be copyrightable, Chapterhouse exposes the fallacy of its entire argument that the combinations of elements should be analyzed solely as independent elements. The very first example cited is the Fleshtearer shoulder pad (Products 12 and 13), which include (i) a sawblade; (ii) colored white; with (iii) an elongated blood drop; (iv) colored red; (v) placed in the center of the sawblade; (vi) against a black background; (vi) on a shoulder pad the shape of which Chapterhouse's expert concedes is unique; (viii) with a raised rim around the edge and (ix) the name Fleshtearer. (GW Resp. to CHS Undisputed Fact #43; GW Add'l Undisputed Fact #23-#28).

Chapterhouse also mistakenly discusses in isolation its copying of the entire range of Assault, Tactical and Devastator shoulder pads (discussed *infra* at 17), copying the range of symbols and numerical designations of Games Workshop's originals. (GW Add'l Undisputed Fact #29-#34). Even taken in isolation, each shoulder pad incorporates the unique shape of the shoulder pad (which Chapterhouse's own expert admitted had no known antecedents (GW Resp. to CHS Undisputed Fact #43), the rim around the outer edge; the name (Assault, Tactical or Devastator); the corresponding icon (distinctive X for Assault; chevron for Devastator and upward wide arrow for Tactical); with the corresponding numerical designations (1-10); presented as Roman numerals (itself a separate design choice) and even the indents on the backs of the shoulder pads. (GW Add'l Undisputed Fact #29-#34).

In each instance, one can readily see that far more than two design decisions were involved in creating the distinctive materials that Chapterhouse has appropriated (and designated by Games Workshop's original names) The icon is no less complex than the logo deemed

14

protectable in *Bouchat v. Balt. Ravens, Inc.*, 241 F.3d 350, 356 (4th Cir. 2000), *aff'd and rev'd in part by, remanded by* 619 F.3d 301 (4th Cir, 2010).[11]  As the *Copyright Office Compendium II* § 503.02 (a)-(b) (1984) cited by Chapterhouse expressly notes, combinations of elements (even if unprotectable alone) are "eligible for copyright protection" if their arrangement is original. Laying aside that the 1984 *Compendium* has largely been superseded by 1988 and 1998 revisions (and that what remains has been undergoing further extensive revisions since 2011), in citing § 503.02(b), which concerns sculptural works, Chapterhouse never lays bare how it counts the elements Games Workshops works in issue (but if anything seems to be referring to its own works, the copyrightability of which can not possibly be in issue) and never even considers the originality of the arrangement of elements in those of Games Workshop's designs it says lack enough elements.  For this reason alone, its motion should be denied.

### d. There Is Nothing Functional About The Design Of Games Workshop Miniatures

Chapterhouse asserts that there exists a "standard" conversion scale of 28 mm that it must copy for functional reasons.  In truth, that scale was simply created by Games Workshop and has no functional aspect.  (GW Resp. to CHS Undisputed Fact #7).  Other companies follow a different scale.  (*Id*.).  Indeed, it is more than a little ironic that Chapterhouse's newest products (which are not part of this case) are premised on the notion that the scaling Games Workshop has devised for its miniatures is somehow incorrect and that it somehow knows better than Games Workshop how to adapt miniatures from Games Workshop's own two-dimensional artwork.

---

[11] In *Satava v Lowry*, 323 F.3d 805 (9th Cir. 2003), cited by Chapterhouse, the court recognized that original combinations of unoriginal elements can be protected, but found that the realistic representations of jellyfish physiology and the standard "glass-in-glass" technique used by the parties were not protectable.

(GW Add'l Undisputed Fact #38-#40). Thus, it has launched certain new products (for which Games Workshop has received no discovery) that it calls "Tru-Scale," the notion being that Games Workshop has itself failed to follow the scale of its own characters. (*Id.*). Apart from the increasing brazenness of Chapterhouse's copying, these products, which do not follow the 28 mm scaling, demonstrate the falsity of Chapterhouse's argument that there is some functional need to use the shapes and sizes Games Workshop has chosen. (*Id.*).

Moreover, although Chapterhouse states there is something utilitarian about the designs of numerous products (Nos. 32-33, 35-36, 37, 63, 82, 87-90, 93-94, 103-106, 109, 114) it's bare assertion is supported by no facts whatsoever. Although it says its copies must be able to fit Games Workshop's models, that puts the cart before the horse in assuming Chapterhouse has a right to copy the configurations of Games Workshop's original model designs in the first place. It hardly shows that there is anything utilitarian about those shapes. For example, Chapterhouse's Tervigon Conversion Kit (Item 37) is copied from a painting in a Games Workshop book (GW Add'l Undisputed Fact #35-#37). That it's copy is made to fit on and around another Games Workshop sculptural product (a Games Workshop Carnifex), does not in any way excuse the copying from the book or justify copying the distinctive designs and dimensions of the Games Workshop Tyranid product. Chapterhouse has not sought to justify either aspect of its copying. Chapterhouse's functionality argument is also inconsistent with the fact that all or virtually all of its works are copied from Games Workshop's two-dimensional paintings and drawings, such that choice of size is not constrained by physical limits. The argument further requires dissecting the works into constituent elements. For instance, the Space Wolves conversion kit, item 82, copies not only the original and arbitrary shapes and sizes of the doors on Games Workshop's "Rhino" vehicle, but also comes with the pieces to assemble replicas of the original Space Wolves iconography (an elongated wolf skull mounted in a

diamond shape). (GW Add'l Undisputed Fact #16-#20). It is the same fallacious argument Chapterhouse used to assuage its sense it had unfairly copied the Fleshtearer symbol: namely by selling the copies in two pieces and showing the user how to put the pieces together and paint them in Games Workshop's colors. Mr. Villacci concluded this separation achieved a somewhat magical legal result: "Voila no infringement." (GW Add'l Undisputed Fact #19). In reality it, at most, simply transformed direct infringement to contributory infringement. But since the pieces are shown together on the website and sold together for only one purpose, the separation is illusory only.

      e.     **Games Workshop Does Not Claim Rights In Geometric Shapes or Letters Alone**

Games Workshop likewise does not claim copyright in simple geometric shapes or Roman numerals. It claims copyright in a complex and entirely imaginary system of iconography in which, for instance, a series of Roman numerals from I to X is used for specific characters (the Tactical, Assault and Devastator Space Marines) and is used together with other symbols (such as a chevron) on shoulder pads having a very distinct shape that Chapterhouse's expert concedes is wholly original. (GW Resp. to CHS Undisputed Fact #42, #44, #45, and #46) Chapterhouse copies this precise combination of features, including character names – right down to the arbitrary series of indents on the rear side of the shoulder pads. (GW Add'l Undisputed Fact #29-#31). Something as simple as an alphabet design can be sufficiently original to merit protection. *Boisson v. Banian, Ltd,* 273 F.3d 262 (2d Cir. 2001). Chapterhouse has shown no reason to question that the vastly more complicated and original system of symbols Games Workshop has created for its original characters is protectable. Viewing one of these shoulder pads in isolation (Item 48) Chapterhouse says it consists of nothing more than an X, but simple comparison of the product to the artwork (GW Add'l Undisputed Fact #32 and

#33) shows that Chapterhouse's uses the specific style of a cross (with arrows on the corners) against a blue background with a gold border placed on the specific shaped pad that its own expert admitted was unique, and named "Assault Shoulder Pad For Space Marine" to confirm copying of the specific meanings of the symbols given to them by Games Workshop. (*Id.*). Again, what Chapterhouse calls the "common half hemisphere shape" of the basic shoulder pad design in Items 21, 22, 49, 53 – 55 and 97 - 100, is a design created by Games Workshop the uniqueness of which was attested to by Chapterhouse's expert. (GW Resp. to CHS Undisputed Fact #43; GW Add'l Undisputed Fact #31). As noted, Chapterhouse's copying was so thorough that it even copies the purely aesthetic indents on the back of the genuine product. (GW Add'l Undisputed Fact #29-#31).[12]

Mr. Villacci testified he used a "digimeter" to ensure the dimensions were exact matches, including the dimensions of actual Games Workshop shoulder pads. (GW Add'l Undisputed Fact #34). Moreover, even if Chapterhouse has not made exact replicas of physical shoulder pads (right down to the last indents) the law is clear that copying from one medium (such Games Workshops books) to another is infringement, and there is no basis for Chapterhouse's bald suggestion that it is permitted to copy design drawings of what it calls "hypothetical toy soldiers" from Games Workshop's books. As *Atari* explained: "That a work is transferred into a different medium is not itself a bar to recovery." 672 F.2d at 618 n. 12.

---

[12] Although Chapterhouse says Games Workshop has failed to identify the specific works infringed, these are set forth in great detail in the claim chart for the duration of the case (*see* GW Resp. to CHS Undisputed Fact #18, #20, #21, and #25) Games Workshop has identified specific products that Chapterhouse has copied.

**f.    Games Workshop Has Identified The Works Chapterhouse Has Copied**

Chapterhouse contends that Games Workshop has not sufficiently identified the works in issue.  In reality, Games Workshop highlighted 38 specific works to support its claim of copying and Chapterhouse does not even dispute actual copying.  As noted in opposing Chapterhouse's motion for leave to dismiss filed at the outset of the case (ECF No.. #24) and as confirmed by subsequent discovery, although it falls more naturally to defendant to say on what specific works he relied for his admitted copying, Mr. Villacci contends he simply does not know because he does not sufficiently monitor what his designers do.   (GW Add'l Undisputed Fact #11). Although Games Workshop thus is unable to say for certain on which specific works defendant relied in making its copies, the point is irrelevant insofar as it is not disputed that among the rooms-full of Warhammer 40K materials Chapterhouse has amassed (GW Add'l Undisputed Fact #12). Chapterhouse has had access to all of the subject works Games Workshop has identified.   The Warhammer 40K works are also intertwined in an ongoing story.   Thus, like copying a depiction of Mickey Mouse, it hardly matters which of the innumerable versions of the genuine works Chapterhouse has copied.

**C.    Chapterhouse's Copyrightability Defense Under English Law Should Be Dismissed**

As noted in Games Workshop's own motion for summary judgment, the belated suggestion in the report of Chapterhouse's rebuttal expert on English law that copyright in some unspecified number of sculptural works might not be fully enforceable has no relevance under U.S. law.  *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985); *Sadhu Singh Hamad Trust v. Ajit Newspaper Advert., Mktg and Comm'ns, Inc.*, 503 F. Supp. 2d 577, 584 (E.D.N.Y. 2007); *Bridgeman Art Library v. Corel Corp.*, 36 F. Supp. 2d 191, 194-95 (S.D.N.Y. 1999); 17 U.S.C. § 104. The expert never even looked at a single Games Workshop miniature in making his suggestion.  The issue is also of almost no relevance as virtually all of

19

Chapterhouse's copying is based on images in Games Workshop's books, precisely because Chapterhouse's business model is to design its own sculptural works to appeal to Warhammer 40K fans where it perceives holes in Games Workshop's product line of miniatures and can nonetheless exploit the fans' knowledge of the underlying artwork.[13]

## D.    <u>Chapterhouse Has Infringed Games Workshop's Trademarks</u>

Chapterhouse's defense that Games Workshop has not proven prior use in commerce of its trademarks is without merit. The very first documents Chapterhouse produced in discovery (under Court order) were its own collection of Games Workshop products and publications, which Games Workshop was permitted to inspect in Dallas. (GW Resp. to CHS Undispute Fact #20). Although Mr. Villacci's declaration (ECF No. 208) offers no basis to assess the scale of other fans' collections, he is clearly speaking of himself when he says that fans: "amass collections taking up entire rooms." (Villacci Decl. ¶ 8.) His leviathan collection of thousands of items purchased in the United States is shown in Ex. 136. In its Answer to the Complaint, Chapterhouse also alleged (as it does in the present motion) that in order to identify its accused products to its customers, it needs to make nominative fair use of Games Workshop's trademarks. It has indeed named all of its products at issue (except two, the Armana'Serq and the Doomseer Iyanar Eldar figures) using Games Workshop's pre-existing product names. Chapterhouse also expressly admits on its website that Games Workshop owns all of the trademarks in issue. Although Mr. Villacci surely knows that all of the character names he uses

---

[13] Although almost all of the copying at issue has focused on images from Games Workshop's books that Chapterhouse has rendered in three-dimensional form, because Games Workshop had no reason to expect this new issue to be raised on rebuttal after the close of fact discovery, Games Workshop supplemented its document production on August 9, 2012 to include two-dimensional images of the characters depicted as miniatures in its original production. (GW Resp. to CHS Undisputed Fact #25).

are copied from products Games Workshop for many years has sold in commerce, he nowhere

even addresses (much less disputes) the point in his declaration. Chapterhouse evidently

changed its theory late in discovery. Hence, after initially serving a document request

concerning profits from Games Workshop's copyrighted works, in its last set of document

requests, served at the close of discovery (with responses falling due after the parties certified the

completion of fact discovery) Chapterhouse sought individualized sales records for trademark

purposes. (Ex. 133, Moskin Decl. ¶6) Chapterhouse also began asking deposition questions of

one of Games Workshop's witnesses in April, suggesting it questioned plaintiff's ability to prove

prior use in commerce of some of the marks. Games Workshop thus produced additional sales

information in the form of detailed spreadsheets confirming what could never realistically have

been in doubt (and Chapterhouse had already conceded): i.e. that Games Workshop had made

hundreds of millions of dollars of sales of products bearing all of the subject names (with the

possible exception of such names as "Mycetic Spore," "Ymgarl" and "Tervigon"). The

spreadsheets (Ex. 145) are broken into simple sections alphabetically by trademark (e.g. Adeptus

Mechanicus, Assault, Alpha Legion, etc) and subcategories of products and trademarks listing

(from left to right) the mark in issue, the date of first use, the original source of the mark, the

products on which it is used, where one can find the items ("proof") and then US sales by year

from 2004 to date).

   As against this evidence and its own admissions, Chapterhouse now cites *Central Mfg.,

Inc. v. Brett*, 492 F.3d 876 (7th Cir. 2007), in which a trademark "troll' without any actual

business was rightly sanctioned for frivolously claiming ownership of a mark it had never used

("Stealth") and suing baseball legend, George Brett, for selling bats using that name. The case

nowhere suggests that a corporate entity can not rely on its business records (such as audited

accounting records) to demonstrate sales, but must instead produce specific purchase orders or

that Games Workshop's extensive business records can in any way be compared to a complete absence of records. Given the enormous volume of Games Workshop's U.S. sales (totaling $56 million in 2011 alone) it would have been inconceivable for the company to produce such records. And Chapterhouse nowhere suggests any reason for questioning the accuracy of those sales figures. It can not seriously contend that Games Workshop has not sold the very products defendant has itself purchased and used as the basis for naming its own infringing goods. Chapterhouse's arguments are, in short, as frivolous as those of the claimed trademark owner in *Central Mfg*. Indeed, they are contradicted by Chapterhouse's very argument that it has a fair use right to use Games Workshop's *pre-existing* names.

**E.    Chapterhouse's Use of Games Workshop's Trademarks Is Not a Fair Use**

Directly contradicting its argument that Games Workshop has not demonstrated prior use of its trademarks, Chapterhouse also alleges that its use of those same trademarks is necessary so that it can identify its own competing goods. However, here too, its own conduct belies its argument, as it has, during the course of this litigation, introduced at least two new products for which it adopted names not used by Games Workshop (namely Doomseer Iyanar and Ammana'serq). Laying aside that "Doomseer Iyanar" is an apparent derivation from Games Workshop's prior names "Farseer" and "Iyanden Craftworld", Chapterhouse's own conduct in naming some of its products without directly copying Games Workshop's existing names confirms it can not satisfy even the first fair use element that it's products can not be identified without use of plaintiff's marks.

Nor can Chapterhouse satisfy the remaining fair use elements that it has used no more of Games Workshop's marks than is necessary and that it has engaged in no other conduct to cause confusion as to source, sponsorship or affiliation. Although it has refused to comply with a December 23 Court order directing it to produce evidence of its marketing on the internet forums

which it admits are its only promotional venues (GW Add'l Undisputed Fact #10), Chapterhouse

expressly markets its products on these forums and sales sites under Games Workshop's names.

(*Id.*).  On its website too it has identified its products simply by Games Workshop's names:  (*see*

*e.g.*, Exs. 18, 52, 62, 72, 79, 92, 118).  Although it modified some of the descriptions during the

course of this litigation, if not enjoined from using Games Workshop's names, it will no doubt

become even more emboldened in its unfair business practices.  Similarly, Chapterhouse's

promotion of its business as "Specializing in Bits and Sculpts for Warhammer 40,000" exceeds

the scope of permissible fair use.  See, e.g., *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806,

812-13(2d Cir. 1999).  *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947,953-54

(7th Cir. 1992), *aff'd and vacated in part, remanded by* 34 F.3d 1340 (7th Cir. 1994) (use of a

mark as an "attention-getting symbol" in advertising is not a fair use); *See R. J. Reynolds*

*Tobacco Co. v. Premium Tobacco Stores, Inc.*, 99 C 1174, 2001 U.S. Dist. LEXIS 8896, at * 16

(N.D. Ill. June 28, 2001), *aff'd by R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper*!, 462 F.3d

690 (7th Cir. 2006) ("`By definition, the defendant cannot use the mark to identify its goods

because this would not be a nominative use, and it would also suggest affiliation, sponsorship, or

endorsement."' (quoting  *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 546 (5th Cir. 1998).

*Pebble Beach* further explained that "one who has lawfully copied another's product can tell the

public what he has copied."  *Id*. at 546.  By contrast, here, defendant has not lawfully copied.  As

such, its use of Games Workshop's names and marks is simply a reference to its own

unauthorized and unlawful copying, not a fair reference to Games Workshop's works.  Such use

is, by definition, unfair.[14]

---

[14] Games Workshop is more than happy if Chapterhouse wished to defer to plaintiff's own counsel as an

Moreover, when such products are sold by Chapterhouse on third-party sites, such as eBay, or even resold on such sites by Chapterhouse's customers, it becomes impossible for purchasers to know whether they originated with Games Workshop. *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 683 (7th Cir. 2001)(explaining post-sale confusion). It was on eBay and a similar site, Bartertown, where Games Workshop first discovered the infringing products. (GW Add'l Undisputed Fact #10). Perhaps understandably, Chapterhouse was reluctant to comply with the Court's December 23, 2011 order to produce such evidence of its promotional efforts, but such marketing an promotions on third-party sites that Chapterhouse refused to produce in discovery show it has not taken adequate steps to comply with the third element of the nominative fair use test. It has, in short, done other things in its marketing of products to encourage customers to believe it is sponsored by Games Workshop. It does not even address the issue in its motion.

### F.      Summary Judgment is Inappropriate On Games Workshop's Dilution Claim

With no analysis and citing no authority, Chapterhouse asserts Games Workshop's dilution should be dismissed. To be sure, the cult fame of Warhammer 40K makes it unusual, but Games Workshop's annual sales in excess of $50 million and wide distribution network attest to the unique status of the product that thrives without even any conventional advertising.

---

expert on the proper scope of the fair use defense (see Def. Motion for Summary Judgment at 21.) However, in citing counsel's article, Frankenlaw: The Supreme *Court's Fair and Balanced Look at Fair Use*, 95 TMR. 848 (2005), Chapterhouse mistakes the central point in that, in using Games Workshop's trademarks to identify its unlawful copying of Games Workshop's copyrighted materials, it is not using those marks to tell the truth; it is using them to deceive. As the article notes, it might be a fair use for a car repair shop to advertise truthfully that it repairs Volkswagen automobiles where he did not use distinctive lettering style, logo and coloring schemes to suggest affiliation with *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969). 95 TMR at 850 n. 12. It might also be a fair use to advertise truthfully that one has copied aspects of a competitors product *in the public domain.* Id at 870 . However, it is not fair to suggest affiliation. *Id*. at 850 n. 12, citing *Grotanelli,* or to call attention to the infringing content in one's own products.

Factual issues thus preclude summary judgment.

### III.   CONCLUSION

For the foregoing reasons, Chapterhouse's motion for summary judgment should be

denied and summary judgment entered in favor of Games Workshop, together with such other

and further relief as the Court may deem just and proper.

Dated:  September 6, 2012                    Respectfully submitted,

                                             s/  Jason J. Keener

                                             Jason J. Keener (Ill. Bar No. 6280337)
                                             Aaron J. Weinzierl (Ill. Bar No. 6294055)
                                             FOLEY & LARDNER LLP
                                             321 North Clark Street, Suite 2800
                                             Chicago, IL 60654-5313
                                             Telephone:  312.832.4500
                                             Facsimile:  312.832.4700
                                             Email:  jkeener@foley.com;
                                             aweinzierl@foley.com

                                             Jonathan E. Moskin
                                             FOLEY & LARDNER LLP
                                             90 Park Avenue
                                             New York, New York 10016
                                             Telephone:  (212) 682-7474
                                             Facsimile:  (212) 687-3229
                                             Email:  jmoskin@foley.com

                                             *Attorneys for Plaintiff*
                                             *Games Workshop Limited*

<u>**CERTIFICATE OF SERVICE**</u>

I, Jason J. Keener, an attorney, hereby certify that on September 6, 2012, I caused to be filed electronically the foregoing PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.


 s/  Jason J. Keener
Jason J. Keener