**tIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GAMES WORKSHOP LIMITED,

Plaintiff,

v.

CHAPTERHOUSE STUDIOS LLC and JON
PAULSON d/b/a PAULSON GAMES

Defendants.

Civil Action No. 1:10-cv-8103

Hon. Matthew F. Kennelly
Hon. Jeffrey T. Gilbert

## GAMES WORKSHOP'S RESPONSES TO CHAPTERHOUSE'S STATEMENT OF MATERIAL FACTS

### I.      Undisputed Materials Facts

1.   Plaintiff Games Workshop Limited ("GW") is a United Kingdom corporation and a subsidiary of Games Workshop PLC.

**Games Workshop's Response:**  Games Workshop does not contest this fact.

2.   Defendant Chapterhouse Studios LLC ("CHS") is a Texas limited liability company  whose address is 3930 Glade Road, Suite 108 # 174, Colleyville, Texas, 76034.

**Games Workshop's Response:**  Games Workshop does not contest this fact.

3.   This Court has subject matter jurisdiction over the claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction over claims arising under the statutory and common law of the State of Illinois pursuant to 28 U.S.C. § 1367 (a) because the state law claims are so related to the federal claims that they form part of the same case or controversy.

**Games Workshop's Response:**  Games Workshop does not contest this fact.

4.   Pursuant to Federal Rule of Civil Procedure 12(h), CHS waived its objections to personal jurisdiction and venue by responding to GW's complaint.

**Games Workshop's Response:**  Games Workshop does not contest this fact.

12. GW worked with freelance artists and model-makers to create certain of the intellectual property it claims in this case.

**Games Workshop's Response:**  Games Workshop does not contest this fact.

13. CHS began making limited sales on eBay and similar websites around June 2008, and in April 2009 CHS launched its website, www.chapterhousestudios.com.

**Games Workshop's Response:**  Games Workshop does not contest the fact that

Chapterhouse began making sales on eBay and similar websites around June 2008.

However, Games Workshop does not know what Chapterhouse means by the term

"limited sales."

15. GW has been aware of CHS and its products since at least the summer 2008.

**Games Workshop's Response:**  Games Workshop does not contest this fact.

26. GW's Second Rev. Copyright Claim Chart drops 32 copyright claims and adds copyright claims to 15 additional CHS products.

**Games Workshop's Response:**  Games Workshop does not contest this fact;

however, Games Workshop dropped copyright claims in 33, not 32 of defendant's

products.

27. GW has now acknowledged that CHS products nos. 8, 15, 16, 25, 26, 28-30, 32, 38- 42, 44, 70-71, 81, 84-86, 88-89, 91-93, 96, 107, 109, 115-16, and 119 do not infringe its copyrights.

**Games Workshop's Response:**  Games Workshop does not contest this fact.

28. GW designated Alan Merrett as its 30(b)(6) witness concerning certain topics, including copyright-related topics.

**Games Workshop's Response:**  Games Workshop does not contest this fact.

52. On March 9, 2012, in its second supplemental response to Interrogatory No. 18 ("Rog 18 Response"), GW claimed 110 marks were infringed by CHS—omitting 17 marks alleged in its Second Amended Complaint ("SAC") , and adding 44 marks not alleged in its SAC. The 17 omitted marks are: WARHAMMER 40,000; TYRANID; BLOOD RAVENS MARINES; ALPHA LEGION; BONESWORD; GAUNT; HOWLING GRIFFONS; LASHWHIP; LUNA WOLVES; MANTIS WARRIORS; MK

ARMOUR; MYCETIC SPORE; SONS OF RUSS; SWARMLORD; THUNDER ARMOUR; TERVIGON; and YMGARL.

**Games Workshop's Response:** Games Workshop does not contest this fact.

53. Andrew Jones, GW's Head of Legal, Licensing and Strategic Project and GW's 30(b)(6) witness on trademark-related topics, confirmed that GW's Rog 18 Response is a comprehensive list of the GW marks at issue in this lawsuit (hereinafter, the "Marks At Issue").

**Games Workshop's Response:** Games Workshop does not contest this fact; however, Mr. Jones full statement was "As of the date of this document, yes. I am sure if Chapterhouse Studios continue to release infringing products using new trademarks we will continue to add those to our claim."

58. The Marks At Issue include 11 registered marks and 99 unregistered marks.

**Games Workshop's Response:** Games Workshop does not contest this fact. Andrew Jones identifies the trademarks and design marks that are at issue.  (Ex. 2, Jones Decl. ¶¶ 4-7).

66. When asked to describe trademark use for SOUL DRINKER and Grenade Launcher, GW 30(b)(6) witness Andrew Jones contended that GW used them as trademarks in a title of books and book excerpts.

**Games Workshop's Response:** Games Workshop does not contest this fact.

77. GW has not conducted studies to evaluate the public's recognition of its marks, or the size of the market it competes in.

**Games Workshop's Response:** Games Workshop does not contest this fact.

## II.     Material Facts In Dispute.

5.   Chapterhouse Studios ("CHS") is a small company located in Grapevine, Texas that makes products players may use when playing fantasy and sci-fi war games. It was formed by a longtime enthusiast of GW's Warhammer 40,000 and other tabletop war games.

**Games Workshop's Response:** Games Workshop contests this fact to the extent

that it implies that Chapterhouse makes products for use in any games other than Games

Workshop's Warhammer 40,000 game.  At his deposition (despite repeated objections

from counsel) Mr. Villacci was unable to identify any Chapterhouse products that were

not influenced by Games Workshop's own products and books (Ex. 16, Villacci Tr. at

235-39) and ultimately admitted: "I said all of our products have been influenced by a

number of things, including Games Workshop's products and books." (Id. at 239:6-8)

6.   Most of CHS's products are accessories (or "bits") that players can use to customize the toy soldiers they use to play tabletop war games—such as toy armor shoulder pads; shields; weapons; or alternative miniature heads. In order to use CHS's bits in a game, a player must own one or more miniatures to use them with.

**Games Workshop's Response:**  Games Workshop contests this fact to the extent

that it implies that all of Chapterhouse's products are accessories or that in order to use

Chapterhouse's products, a player must own one or more of Games Workshop's

miniatures.  While some of Chapterhouse's products are accessories, Chapterhouse sells

numerous products which are stand-alone products for Games Workshop's Warhammer

40,000 universe and do not require a player to own one or more of Games Workshop's

miniatures.  Examples of such stand-alone products are: Super-Heavy Assault Walker

(Ex. 129); Mycetic Spore for Tyranids (Ex. 5, CHS001250); Doomseer Iyanar Model

(Ex. 38, CHS000381); Javelin Class Jet Bike (Ex. 72); and Armana'serq Warrior

Priestess (Ex. 33).  Additionally, Chapterhouse has continued to release stand-alone

products for Games Workshop's Warhammer 40,000 universe that have just recently

been released and are not part of this case: Pilum Imperial Attack Jet Bike (Ex. 130); and

TRU-Scale Knight Praetorius (Ex. 131).  Games Workshop further contests that any of

Chapterhouse's products are for tabletop war games generally, but rather that all have

been designed for use with Warhammer 40K and are so-designated on Chapterhouse's

website and are all created based on Games Workshop's works as shown in

Chapterhouse's design documents.

8.   CHS also makes custom-decorated spare parts, such as functional replacement doors with fanciful decorations, that fit various model vehicles sold by GW.

**Games Workshop's Response:**  Games Workshop contests this fact.  There is

nothing functional about the dimensions of Games Workshop's unique drop pod

miniatures or the doors to its "Rhino" vehicles.  Furthermore, Chapterhouse does not use

use fanciful decorations; instead, it uses Games Workshop iconography, logos, and

names to identify its products.

9.   CHS's products are cast from pewter or gray resin, and all are sold and shipped unpainted, so that players may paint the products themselves.

**Games Workshop's Response:**  Games Workshop contests this fact to the extent

that it implies that Chapterhouse does not use painted parts or figures of its products on

its website or marketing materials to sell its products.  *See, e.g.* Exs. 33, 38, 129, and 131.

10. Plaintiff Games Workshop Limited ("GW") is an international UK-based company in the business of tabletop fantasy war games. It produces miniature toy soldiers related to its Warhammer and Warhammer 40,000 war games, as well as rule books, guides, and accessories for those and other games.

**Games Workshop's Response:**  Games Workshop contests this fact to the extent it

implies that Games Workshop's products are solely related to its Warhammer and

Warhammer 40,000 games.  Games Workshop has created a vast Warhammer 40,000

universe which is represented by a body of hundreds of books and magazines as well as

video/computer games and movie (made under license), portraying the fictional world

and setting forth information and rules about the related table-top wargame of the same

name, and thousands of collectible figurines that are sculpted and produced by Games

Workshop and collected, painted and displayed by fans and used in the tabletop

wargame.  (Ex. 1, Merrett Decl. at ¶ 3).  Seven of the books have been New York Times

bestsellers (Id.)

11. Many of GW's miniatures also conform to the standard 28mm scale.

**Games Workshop's Response:** Games Workshop contests this fact. There is no "standard 28mm scale" in the production and sale of miniatures or in miniature wargaming. (Ex. 132, Sup. Merrett Decl. at ¶ 4). Throughout the 1970's, a popular size of miniature figurines was described as 25mm, but depending on the manufacturer, this description was used to describe the height of a miniature from the based of the shoe to the top of the head, from the base of the shoe to the eye, or some other measurement. (Id.). While Games Workshop self-describes most of its miniatures as 28mm scale, its Warhammer 40K models are slightly large than 28mm in size on the whole, many in excess of 30mm tall. (Id. at ¶5) Other Games Workshop miniatures vary in size from a 6mm scale to 54 mm. (Id.) Numerous other manufacturers also produce and sell wargaming miniatures to entirely different scales. (Id. at ¶6)

14. Since its launch, CHS's website has featured a prominent notice disclaiming any affiliation with GW on every page of the website.

**Games Workshop's Response:** Games Workshop contests this fact. Chapterhouse's disclaimer is not prominent feature as it is in small print at the bottom of the page. (CHS Mot., Kearney Decl., Exs. 52, 53).

16. There is no evidence that anyone has ever been confused about the relationship between GW and CHS.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop has received emails evidencing customer confusion. (Ex. 122).

29. GW does not have timely registrations for any individual works at issue in this

case.

**Games Workshop's Response:** Games Workshop contests this fact. Thirteen of the

products at issue were registered within five years of the date of first publication. (Ex.

133, Moskin Decl. ¶9). These registrations are:

| Registration | Registration Date | Date of First Publication |
|---|---|---|
| Codex: Tyranids TX 7-538-598 | 3/5/12 | 11/30/09 |
| Codex: Space Wolves TX 7-549-698 | 3/5/12 | 12/31/09 |
| Horus Heresy: Collected Visions TX 7-538-569 | 3/5/12 | 4/30/07 |
| Legion of the Damned TX 7-513-642 | 3/2/12 | 10/31/11 |
| Blood Raven Transfer Sheet VA 1-819-307 | 3/7/12 | 7/31/10 |
| Contemptor Heavy Conversion Beamer VA 1-824-754 | 3/7/12 | 7/25/11 |
| Mark V Heresy Armour VA 18-824-755 | 3/7/12 | 6/30/10 |
| Space Marine Character Conversion Kit VA 1-824-622 | 3/7/12 | 7/31/10 |
| Salamanders Terminator Shoulder Pads VA 1-824-496 | 3/7/12 | 5/25/07 |

| | | |
|---|---|---|
| Valthex Astral Claws of the Master Forge<br><br>VA 1-824-495 | 3/7/12 | 6/29/11 |
| Space Marine Drop Pod<br><br>VA 1-814-902 | 3/7/12 | 8/4/08 |
| Legion of the Damned<br><br>VA 1-824-653 | 3/9/12 | 11/30/09 |
| Grey Knights<br><br>VA 1-824-604 | 3/8/12 | 2/2/11 |

33. GW concedes that UK copyright law governs ownership of its alleged copyrights.

**Games Workshop's Response:**  Games Workshop does not contest the fact that ownership is assessed under English law (not UK law).  However, Games Workshop does contest this fact to the extent it implies that issues of copyrightability are assessed under English law.

34. For nine authors (Gary Chalk; Wayne England; Des Hanley; Clint Langley; Mike McVey; Bob Naismith; Adrian Wild, and Simon Egan), who among them created 15 of GW's alleged works identified as infringed in its Second Rev. Copyright Claim Chart, GW has provided no assignments, no employment agreements, no evidence that those individuals were ever its employees during any relevant times, and was unable to provide the employment dates for these individuals in their interrogatory response, with the exception of Mr. Smith, who was not an employee at relevant times based on GW's interrogatory responses.

**Games Workshop's Response:**  Games Workshop contests this fact. Games Workshop in fact has produced confirmatory assignments from its former employees, Clint Langley and Wayne England, its current employee, Simon Egan, as well as for the former freelancer, Adrian Smith; and does not claim any copyright issues in the works of Gary

Chalk, Adrian Wild, or Des Hanley. (Ex. 132, Suppl. Merrett Decl ¶ 2-3) Although, as estimated by Mr. Goodwin, 95-99% of the company's products are created by employees, it has over the years employed a small number of free-lance artists. (Ex. 7, Goodwin Tr. at 57:6-15; Ex. 1, Merrett Decl. at ¶ 12). However, it has had a general practice of collecting confirmatory assignments from such individuals, notwithstanding that some have been lost over the years. (Ex. 1 at ¶ 12). Nonetheless, Games Workshop has confirmatory assignments for the works here at issue in which an individual who might nominally be deemed a freelance artist participated. (Id.). Even when Games Workshop does work with freelance artists, it directly participates in and closely supervises the process, as every work must fit within the broader Warhammer 40K universe. (Id.). There are also a small number of works created by employees (Ex. 8, Sup. Resp. to Interrogatory 22) for which Games Workshop is unable to locate employment records (or confirmatory assignments). However, Alan Merrett, Games Workshop's Head of Intellectual Property is able to vouch for their employment status (Ex. 1, Merrett Decl. at ¶ 13). As a practical matter, no such individual has ever purported to challenge Games Workshop's ownership of the subject works. (Id.) Even if they had, as a matter of English law, Games Workshop would, minimally, be deemed a joint author of such works or owner by equitable assignment. (Ex. 10, Bloch Report ¶¶ 60-97, 102-111).

35. GW has produced no evidence that the following authors were ever GW employees: Gary Chalk; Wayne England; Des Hanley; Clint Langley; Mike McVey; Bob Naismith; Adrian Wild.

**Games Workshop's Response:** Games Workshop contests this fact. Alan Merrett has affirmed based on his personal knowledge that Bob Naismith, Wayne England, and Mike McVey were Games Workshop employees. (Ex. 1, Merret Decl. at ¶ 3). Games

Workshop does not claim copyright issues in any works by Gary Chalk, Des Hanley, or

Adrian Wild. (CHS Mot., Kearney Decl. Ex. 5)

36. The evidence that GW produced shows that Adrian Smith was not its employee during the time he created the alleged works.

**Games Workshop's Response:** Games Workshop admits that Mr. Smith was

engaged as a freelance artist when he created the Games Workshop works at issue (such

as the cover art for the novel Soul Drinkers), for which Games Workshop has furnished a

confirmatory assignment) and that Mr. Smith did not become an employee until 2008.

37. The evidence that GW produced shows that Simon Egan was not its employee during the time he created the alleged works.

**Games Workshop's Response:** Games Workshop contests this fact. Simon Egan

has been employed by Games Workshop since 01/06/2004. (CHS Mot., Kearney Decl.,

Ex. 45). The Space Wolves conversion pack for the Rhino sold by Forge World was

created after 01/06/2004 (Ex. 132, Suppl. Merrett Decl. ¶ 3). There are no other

copyrighted works of Simon Egan at issue in Games Workshop's Second Rev. Copyright

Claim Chart. (CHS Mot., Kearney Decl., Ex. 5).

40. GW alleges infringement of numerous miniature toy soldiers, model vehicles, and assorted accessories.

**Games Workshop's Response:** Games Workshop contests this fact to the extent it

implies that Games Workshop's allegations of infringement do not also reference

numerous sketches, drawings, and pictures (in two-dimensional format) for all of the

works in issue. (*See, e.g.* Games Workshop's Second Rev. Copyright Claim Chart, CHS

Mot., Kearney Decl. Ex. 5).

41. GW claims that CHS product nos. 21, 22, 49, 53-55, 97-100 infringe only the "shape/design of the underlying shoulder pad," and CHS products nos. 48, 49, 50, 54-56 feature simple geometric shapes such as two arrows crossed in an X; a half- hemisphere shape; a chevron; or an arrow.

**Games Workshop's Response:** Games Workshop contests this fact. Games

Workshop claims that Chapterhouse product nos. 21, 22, 53-55, and 97-100 infringe only

the "shape/design of the underlying shoulder pad." (Games Workshop's Second Rev.

Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5). Games Workshop claims that

Chapterhouse product no. 48 infringes not only the shape/design of the underlying

shoulder pad, but also that Chapterhouse copied Games Workshop's icons for a Space

Marine Assault Shoulder Pad. (Id.) Games Workshop claims that Chapterhouse product

no. 48 infringes not only the shape/design of the underlying shoulder pad but also

includes a crested shoulder pad with rivets along the edge where the crest attaches to the

pad. (Id.) Games Workshop claims that Chapterhouse product no. 50 infringes not only

the shape/design of the underlying shoulder pad but also that Chapterhouse copied Games

Workshop's icons for a Space Marine Devastator Shoulder Pad. (Id.) Games Workshop

claims that Chapterhouse product no. 49 infringes not only the shape/design of the

underlying shoulder pad but also includes a crested shoulder pad with rivets along the

edge where the crest attaches to the pad. (Id.) Games Workshop claims that

Chapterhouse product no. 56 infringes not only the shape/design of the underlying

shoulder pad but also that Chapterhouse copied Games Workshop's icons for a Space

Marine Tactical Shoulder Pad. (Id.)

42. The only element in CHS's product no. 48 that is similar to GW's alleged work is the public domain symbol of arrows crossed in an X.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop

claims that Chapterhouse product no. 48 infringes not only the shape/design of the underlying shoulder pad, but also that Chapterhouse copied Games Workshop's icons for a Space Marine Assault Shoulder Pad as well as the name Assault Space Marines. Moreover, the distinctive icon Chapterhouse has copied is not simply an "X" but an "X" with arrowed endings on each of the four extensions. (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5). While Warhammer 40K incorporates some symbols and graphic elements drawn from heraldry and other historical sources (e.g., wolves and Roman numerals and crosses), as used in Warhammer 40K, those individual elements have been modified and thoroughly integrated with other elements (graphic and sculptural) to form something unlike any known prior works. (Ex. 1 at ¶10). Although Chapterhouse's claimed experts were able to locate examples where certain symbols taken in isolation had been used previously or had historical bases, even Chapterhouses's experts were unable to identify and direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design elements they comprise (Ex. 5, Brewster Tr. at 54:14-20, 64:11-22, 66:10-14, 77:7-78:2, 90:9-93:3, 133:21- 135:1, 137:22-138:15, 144:18-145:2, 147:8-17, 162:11-15, 166:5-23, 167:8-24, 179:14-180:11, 183:24-184:6, 184:19-185:2, 186:22-187:4, 188:8-12, 190:7-16, 191:2-8, 195:11-196:2, 199:2-6, 241:3-20; and Ex. 6, Wolfe Tr. at 70:15-71:17, 75:12-16, 94:1-23, 107:13-109:9, 112:16-113:3, 148:17-149:8, 166:3-17, 173:1-8, 175:14-177:23, 179:22-180:4). Games Workshop is aware of none. (Ex. 1, Merrett Decl. at ¶ 10) For instance, although something as simple as a Roman numeral is used as one of the identifying features, it has a specific meaning within the underlying story such that only certain characters would wear the numeral on a specific location for a specific

purpose and only in combination with other specific symbols (such as an arrow, a crossed X, or a chevron). (Id.). Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique features as those created by Games Workshop. In addition to copying the iconic style of Games Workshop's basic Space Marine Shoulder Pad, these products use the same icons (arrows, crossed-Xs, and chevrons), placed in the same orientation, and of about the same size. Thus, the icons are used to depict the same squad types of identified in the Warhammer 40K universe. Moreover, Chapterhouse uses only the same Roman Numerals and only in the same combinations as does Games Workshop (I-VI for Tactical, VII-VIII for Assault, and IX-X for Devastator), thus copying and never varying from the fictional meanings given to the symbols by Games Workshop.

43. CHS's products nos. 54 and 55 are simple half-hemisphere shapes.

**Games Workshop's Response:** Games Workshop contests this fact. One of the numerous iconic aspects of Games Workshop's Power Armour is the shoulder pad. The shoulder pad is a convex shape with a curve at the top and a straight edge at the bottom. (Ex. 1, Merrett Decl. ¶ 31) There is often a large band or rim extending along the entire outer edge of the shoulder pad. (Id.) As part of the Power Armour, the shoulder pad begins above the shoulder and ends right above the elbow. (Id.) The pads are curved in a manner such that it does not cover a large portion of either the chest or the back of the Space Marine. (Id.) Chapterhouse's expert admitted there were no known antecedents for the specific shape created by Games Workshop. (Ex. 5, Brewster Tr. at 137-138) On the reverse side of the shoulder pad, there are typically a series of spaced indentations that serve no functional purpose but as Alan Merrett explained, they are used by Games Workshop to create a technical appearance. (Id.; Ex. 78, Merrett Tr. at 46:12-47:17)

44. The only element in CHS's product no. 50 that is similar to GW's alleged work is the public domain symbol of chevron / inverted V.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop claims that Chapterhouse product no. 50 infringes not only the shape/design of the underlying shoulder pad, including the gold-colored rim around the edge, but also that Chapterhouse copied Games Workshop's icons for a Space Marine Devastator Shoulder Pad and uses Games Workshop's character names "Devastator" and "Space Marine". (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5). While Warhammer 40K incorporates some symbols and graphic elements drawn from heraldry and other historical sources (e.g., wolves and Roman numerals and crosses), as used in Warhammer 40K, those individual elements have been modified and thoroughly integrated with other elements (graphic and sculptural) to form something unlike any known prior works. (Ex. 1, Merrett Decl. at ¶10). Although Chapterhouse's claimed experts were able to locate examples where certain symbols taken in isolation had been used previously or had historical bases, even Chapterhouses's experts were unable to identify and direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design elements they comprise (Ex. 5, Brewster Tr. at 54:14-20, 64:11-22, 66:10-14, 77:7-78:2, 90:9-93:3, 133:21- 135:1, 137:22-138:15, 144:18-145:2, 147:8-17, 162:11-15, 166:5-23, 167:8-24, 179:14-180:11, 183:24-184:6, 184:19-185:2, 186:22-187:4, 188:8-12, 190:7-16, 191:2-8, 195:11-196:2, 199:2-6, 241:3-20; and Ex. 6, Wolfe Tr. at 70:15-71:17, 75:12-16, 94:1-23, 107:13-109:9, 112:16-113:3, 148:17-149:8, 166:3-17, 173:1-8, 175:14-177:23, 179:22-180:4). Games Workshop is aware of none. (Ex. 1, Merrett Decl. at ¶ 10) For instance, although something as simple as a Roman numeral is used as one of the identifying features, it has

a specific meaning within the underlying story such that only certain characters would wear the numeral on a specific location for a specific purpose and only in combination with other specific symbols (such as an arrow, a crossed X, or a chevron). (Id.). Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique features as those created by Games Workshop. In addition to copying the iconic style of Games Workshop's basic Space Marine Shoulder Pad, these products use the same icons (arrows, crossed-Xs, and chevrons), placed in the same orientation, and of about the same size. Thus, the icons are used to depict the same squad types of identified in the Warhammer 40K universe. Moreover, Chapterhouse uses only the same Roman Numerals and only in the same combinations as does Games Workshop (I-VI for Tactical, VII-VIII for Assault, and IX-X for Devastator), thus copying and never varying from the fictional meanings given to the symbols by Games Workshop.

   45. The only element in CHS's product no. 56 that is similar to GW's alleged work is the public domain symbol of an arrow.

**Games Workshop's Response:**  Games Workshop contests this fact.  Games Workshop claims that Chapterhouse product no. 56 infringes not only the shape/design of the underlying shoulder pad, including the gold-colored rim around the edge of the pad, but also that Chapterhouse copied Games Workshop's icons for a Space Marine Tactical Shoulder Pad and Games Workshop's character names "Tactical" and "Space Marine". (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5).  While Warhammer 40K incorporates some symbols and graphic elements drawn from heraldry and other historical sources (e.g., wolves and Roman numerals and crosses), as used in Warhammer 40K, those individual elements have been modified and thoroughly integrated with other elements (graphic and sculptural) to form something

unlike any known prior works. (Ex. 1, Merrett Decl. at ¶10). Although Chapterhouse's

claimed experts were able to locate examples where certain symbols taken in isolation

had been used previously or had historical bases, even Chapterhouses's experts were

unable to identify and direct historical antecedents for any of Games Workshop's actual

figures and the combinations of graphic and design elements they comprise (Ex. 5,

Brewster Tr. at 54:14-20, 64:11-22, 66:10-14, 77:7-78:2, 90:9-93:3, 133:21- 135:1,

137:22-138:15, 144:18-145:2, 147:8-17, 162:11-15, 166:5-23, 167:8-24, 179:14-180:11,

183:24-184:6, 184:19-185:2, 186:22-187:4, 188:8-12, 190:7-16, 191:2-8, 195:11-196:2,

199:2-6, 241:3-20; and Ex. 6, Wolfe Tr. at 70:15-71:17, 75:12-16, 94:1-23, 107:13-109:9,

112:16-113:3, 148:17-149:8, 166:3-17, 173:1-8, 175:14-177:23, 179:22-180:4). Games

Workshop is aware of none. (Ex. 1, Merrett Decl. at ¶ 10) For instance, although

something as simple as a Roman numeral is used as one of the identifying features, it has

a specific meaning within the underlying story such that only certain characters would

wear the numeral on a specific location for a specific purpose and only in combination

with other specific symbols (such as an arrow, a crossed X, or a chevron). (Id.).

Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique

features as those created by Games Workshop. In addition to copying the iconic style of

Games Workshop's basic Space Marine Shoulder Pad, these products use the same icons

(arrows, crossed-Xs, and chevrons), placed in the same orientation, and of about the same

size. Thus, the icons are used to depict the same squad types of identified in the

Warhammer 40K universe. Moreover, Chapterhouse uses only the same Roman

Numerals and only in the same combinations as does Games Workshop (I-VI for

Tactical, VII-VIII for Assault, and IX-X for Devastator), thus copying and never varying

from the fictional meanings given to the symbols by Games Workshop.

46. Each of CHS's products nos. 12, 13, 33, 46, 47, 51, 52, and 57 - 62 combines a simple symbol, namely a chevron, arrow, sawblade, or X symbol, together with a Roman numeral or a teardrop shape.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop

claims that Chapterhouse product nos. 12, 13, 33, 46, 47, 51, 52, and 57-62 infringes not

only the shape/design of the underlying shoulder pad, but also that Chapterhouse copied

Games Workshop's icons for Terminator Space Marine, Flesh Tearer Space Marine,

Devastator Space Marine, Tactical Space Marine and Terminator Space Marine shoulder

pads as well as the character names Devastator Space Marine, Tactical Space Marine and

Terminator Space Marine, Terminator and Flesh Tearer. (Games Workshop's Second

Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5). While Warhammer 40K

incorporates some symbols and graphic elements drawn from heraldry and other

historical sources (e.g., wolves and Roman numerals and crosses) but as used in

Warhammer 40K, those individual elements have been modified and thoroughly

integrated with other elements (graphic and sculptural) to form something unlike any

known prior works. (Ex. 1, Merrett Decl. at ¶10). Although Chapterhouse's claimed

experts were able to locate examples where certain symbols taken in isolation had been

used previously or had historical bases, even Chapterhouses's experts were unable to

identify and direct historical antecedents for any of Games Workshop's actual figures and

the combinations of graphic and design elements they comprise (Ex. 5, Brewster Tr. at

54:14-20, 64:11-22, 66:10-14, 77:7-78:2, 90:9-93:3, 133:21- 135:1, 137:22-138:15,

144:18-145:2, 147:8-17, 162:11-15, 166:5-23, 167:8-24, 179:14-180:11, 183:24-184:6,

184:19-185:2, 186:22-187:4, 188:8-12, 190:7-16, 191:2-8, 195:11-196:2, 199:2-6, 241:3-

20; and Ex. 6, Wolfe Tr. at 70:15-71:17, 75:12-16, 94:1-23, 107:13-109:9, 112:16-113:3, 148:17-149:8, 166:3-17, 173:1-8, 175:14-177:23, 179:22-180:4). Games Workshop is aware of none. (Ex. 1, Merrett Decl. at ¶ 10) For instance, although something as simple as a Roman numeral is used as one of the identifying features, it has a specific meaning within the underlying story such that only certain characters would wear the numeral on a specific location for a specific purpose and only in combination with other specific symbols (such as an arrow, a crossed X, or a chevron). (Id.).  Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique features as those created by Games Workshop. In addition to copying the iconic style of Games Workshop's basic Space Marine Shoulder Pad, these products use the same icons (arrows, crossed-Xs, and chevrons), placed in the same orientation, and of about the same size. Thus, the icons are used to depict the same squad types of identified in the Warhammer 40K universe. Moreover, Chapterhouse uses only the same Roman Numerals and only in the same combinations as does Games Workshop (I-VI for Tactical, VII-VIII for Assault, and IX-X for Devastator), thus copying and never varying from the fictional meanings given to the symbols by Games Workshop.

47. GW claims that many of CHS's products infringe its copyrights because they are "designed...to be used with" or are "of a size and scale to fit with" various GW products.

**Games Workshop's Response:**  Games Workshop contests this fact to the extent that it implies that Games Workshop's claims are based solely on the size and scale of Chapterhouse's products.  While Chapterhouse only identifies three products where Games Workshop comments on the size and scale of Chapterhouse's products (Nos. 6, 7, and 69), for each of these products, Games Workshop identifies numerous other points of similarity with Games Workshop's works.  (Games Workshop's Second Rev. Copyright

Claim Chart, CHS Mot., Kearney Decl. Ex. 5).

48. Alan Merrett, GW's 30(b)(6) designee on copyright infringement, testified that the best he could "come up with" with respect to CHS Product No. 95 is that it was "a copy of [GW's] idea."

**Games Workshop's Response:**  Games Workshop contests this fact.  Mr. Merrett

testified that the unique appearance of the Mycetic Spore was "It is the size, the shape,

the context.  There's lots and lots of textural elements, both on the illustration and

actually on the page, and in fact throughout the whole book from which this page has

been photocopied. (Ex. 78, Merrett Tr. at 26, l 8-12)  Games Workshop's Mycetic Spore

is a large pod-like shape with various tendrils or protrusions extending from the top that

allow the pod to fall from space while transporting inside various other Tyranid creatures.

(Ex. 1, Merrett Decl. ¶ 25). Chapterhouse's "Mycetic Spore for Tyranids" not only uses

Games Workshop's name but contains the same unique features as Games Workshop's

depiction of a Tyranid Mycetic Spore, including a large pod-like shape with various

tendrils or protrusions extending from the top that allow the pod to fall from space while

transporting inside various other Tyranid creatures. There is no antecedent in science

fiction or gaming for Games Workshop's Mycetic Spore.  Chapterhouse's documents

confirm that it copied the design of the Mycetic Spore from Games Workshop's source

materials:

- In an email entitled "Spore Pod for Tyranid concept art" from Mr Villacci to Castro Navarro, the designer of the Mycetic Spore, Mr. Villacci stated: "Saw the codex at the store today (they wouldn't let me buy it)" (Ex. 69, CHS003522);
- Mr Villacci's message was in response to an earlier email from Mr. Navarro and a second designer, Wyatt Traina, from whom Mr Villacci sought comments, discussing the shape and features of the inchoate Mycetic Spore design. The same day, Mr Villacci circulated by email to yet another designer, Jeffrey Nagy, copies of Mr Navarro's drawings (which closely resemble the final CH product and the image in GW's Tyranids Codex). (Ex. 70, CHS003525-27); and

- Mr. Navarro explains his inspiration: "I see hive ships eject lots of spores towards planets and little to no manouvre would be required ..." (Ex. 69, CHS003523).

49. GW bases a number of its claims of copyright infringement on the names and titles of its alleged works.

**Games Workshop's Response:**  Games Workshop contests this fact to the extent it

falsely implies that Games Workshop relies solely on copying of names.  In each

instance, Chapterhouse has copied not only Games Workshop's original character names,

but also other original features and combinations of features, which together with those

names, comprise copyrightable subject matter.  Chapterhouse uses the same names

created by Games Workshop to identify its corresponding figures or other designs.  The

references in Games Workshop's Second Rev. Copyright Claim Chart (CHS Mot.,

Kearney Decl. Ex. 5) are also used to describe the iconography used in Games

Workshop's works.  For example, product no. 76, Games Workshop references the use of

the term "heresy" in the following way "Space Marines use jump packs.  Heresy refers to

the type of jump pack used during the Horus Heresy." and then the chart cites to a picture

of a jump pack used during the Horus Heresy as found in The Horus Heresy – Collected

Visions 2007, page 284.  (Id.)  Chapterhouse's use of Games Workshop's names and

titles is also the basis of Games Workshop's allegations of trademark infringement.

55. On January 6, 2012, CHS requested, for each of GW's alleged marks, the date of first use in U.S. commerce and the nature of such use. GW agreed to produce responsive documents, "*including the actual packaging of the sculptural works bearing copyright dates of first publication and . . . copies of its literary works bearing the dates of first publication and sale.*" (italics in original).

**Games Workshop's Response:**  Games Workshop contests this fact to the extent it

purports to be a complete statement of Games Workshop's response to Chapterhouse's

Interrogatory No. 18.  Games Workshop's complete response states:

Games Workshop objects that this request seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not purport to claim priority of use over Games Workshop with respect to any of its marks in issue. As a result the request is also overbroad and unduly burdensome.

Without prejudice to or waiver of the foregoing objections, pursuant to Fed. R. Civ. P. 33(d), Games Workshop has produced and/or will produce documents responsive to this request, including the actual packaging of the sculptural works bearing copyright dates of first publication and has produced copies of its literary works bearing the dates of first publication and sale. Moreover, Games Workshop has produced records from the United States Trademark Office for all of its registered marks in issue demonstrating the dates of first use or constructive first use and the accompanying deposit materials.

(CHS Motion, Kearney Decl., Ex. 41.)

57. GW 30(b)(6) witness Andrew Jones abandoned GW's claims that the following are GW trademarks:

| | |
|---|---|
| "wings." | Kearney Decl. ¶3, Ex.15: A. Jones Tr. at 128:19-20 ("It is an interesting question, isn't it, because "wings", do we claim that we own wings as a unique trademark, no..."). |
| "skulls" | Id. at 81:14-16 ("I couldn't find a particular example of a stylized skull that I would contend is being used as a trademark..."). |
| "Roman numerals (combined with) arrows." | Id. at 77:17-78:1 ("what I am saying is we cannot claim to exclusively own Roman numerals with or without arrows. That is what I am saying.") |
| "Tau – oval vents." | Id. at 108:4-6 ("I don't think we would use oval vents as a particular trademark.") |
| "plasma." | Id. at 74:7-12 ("I would call out "plasma", simply because certainly we have products that we have sold as, you know, Plasma Gun, what have you, but I can't remember us trying to use 'plasma' specifically as a trademark on its own."). |
| "tactical." | Id. at 164:8-21 ("Q So in this lawsuit is Games Workshop contending that the word phrase "Tactical" is a trademark at issue or that Chapterhouse has infringed Games Workshop's |

| | copyright to the word? A It will be once again the unique association of the elements that are at issue. So it will be the association of the word "Tactical" with the word "Space Marine", with particular armour, weapon combinations, and that will be at issue, not the word in isolation, "Tactical." Q For clarification on the record, the word phrase "Tactical" in isolation, Games Workshop is not claiming that it is -- A No."). |
|---|---|
| "halberd." | Id. at 71:6-72:16 ("my opinion is that 'Halberd' we cannot claim as an exclusive trademark."). |
| "broadswords." | Id. at 75:14 ("I put 'broadswords' in the same category as Halberds."). |
| "overlapping/banded armour." | Id. at 120:5-8 ("Q Let's move on to the overlapping/banded armour? A As a trademark, I don't know what that refers to."). |
| "Tau – geometric groves." | Id. at 74:12-14 ("I don't know what 'Tau Geometric Groves' is. It might be supposed to say 'Grooves.' It sounds like it is rather to do with trees."). |
| "wolf fur." | Id. at 83:3-7 ("Q Then with respect to wolf fur -- A Yes. Honestly, I can't imagine why we are holding it up. That is one that I would not say why we are holding it. I would say why are we holding up wolf fur as a particular trademark."). |
| "snakes" | Id. at 76:20-25 ("Again, we have a chapter of Space Marines called Iron Snakes, and it has a particular snake symbol which is a trademark rather in the way 'cog' is, but I don't think we would claim that 'snakes' is entirely our exclusive trademark."). |

**Games Workshop's Response:**  Games Workshop contests this statement.  Mr. Jones and Games Workshop contend that certain specific designs of wings, such as the registered Aquila design or Blood Eagles iconography, are trademarks, but only that

Games Workshop does not own wings as such. The statement also repeatedly quoutes out of context what Mr. Jones actually said. For instance, what he testified about Games Workshop's use of various logos incorporating wings was actually as follows: "do we claim that we own wings as a unique trademark, no, but the unique association of stylized wings so, for example, the Warhammer 40,000 logo has stylized wings on it…. One of the key icons of Warhammer 40,000 is the double headed eagle, which we have used since 1987, and in fact it is the big symbols stamped on the side of our headquarters building here in Nottingham." (Ex. 134 at 128:18-129:10). Referring to other examples, he said: "There were loads of them. We talked earlier about the Raven Wings with the Blood Drop, that is the Blood Ravens Chapter, or we talked about the Raven Wing Space Marine Chapter, that that is their unique symbol. ...They are a key part of our Dark Angel iconography, for example, and indeed the Blood Angels use stylized wings." (Id. at 129:18-130:4). What he actually said about Games Workshop's rights in Roman numerals was the following: "It is that unique combination, isn't it. So, for example, we cannot possibly claim to own Roman numerals, but when Roman numeral are combined with a particular Space Marine shoulder pad and a particular Space Marine or other back story or part of our IP, then that is where we are claiming it as a mark of our trade." (Id. at 77:1-7) What he said about the word Tactical was: "... did we ever sell a product called 'Tactical', no. We do Tactical Space Marines, Tactical Squads. It is a key part of the make-up of our game, and how we describe and label particular units of troops and their functions. So Tactical Space Marines is a key phrase, I suppose you would call it, but "Tactical" as a -- it is a word" (Id. at 163:2-164:17) He went on to clarify that it was the unique association of "Tactical" with "Space Marine" that made the phrase a

trademark.  (Id. at 164:12-17).

76. Purchasers of wargaming miniatures and accessories are aficionados and likely to exercise a great deal care in their purchases, spending hundreds of hours using the products, with collections taking up entire rooms, etc.

**Games Workshop's Response:**  Games Workshop contests this fact.  Games Workshop

has achieved great commercial success and currently represents a body of hundreds of

books and magazines and video games (made under license) portraying the fictional

world and setting forth information and rules about the related table-top wargame of the

same name, a movie, computer games, and thousands of collectible figurines that are

sculpted and produced by Games Workshop and collected, painted and displayed by fans

and used in the tabletop wargame. (Ex. 1, Merrett Decl. ¶ 3) Seven of the books have

been New York Times bestsellers. (Id. at 3).  While some of Games Workshop's

customers likely do exercise care in their purchases, Games Workshop's products are

purchased by customers of every description, some (such as a novel) are purchased by

customers with little or no familiarity with the rest of Games Workshop's products.  (Ex.

132, Suppl. Merrett Decl. ¶13).

78. There is no evidence that the parties sell their respective products through the same websites, retail stores, or distributors.

**Games Workshop's Response:**  Games Workshop contests this fact to the extent it

implies that potential customers may not see both Games Workshop products and

Chapterhouse products on the secondary market (such as eBay), at gaming conventions,

or otherwise while playing the Warhammer 40K tabletop game against other opponents.

Chapterhouse also concedes it markets it products exclusively on web forums devoted

principally if not exclusively to fans of Warhammer 40,000.

80. GW has produced no sales invoices or other records showing that GW and CHS distributed goods in any particular geographical area that overlap.

**Games Workshop's Response:**  Games Workshop contests this fact insofar as the

extensive sales data Games Workshop has produced (as well as its direct operation of

stores and relations with independent retailers throughout the United States) demonstrate

that its Warhammer 40K products are sold throughout the country.  (Ex. 145).  Nor has

Chapterhouse (which sells exclusively online through its website and third-party vendors

such as eBay) indicated any regions in which it does not sell.

### III.    Immaterial Facts.

7.   To ensure compatibility with a wide range of miniature figures, CHS's products conform to the standard 28mm scale.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses, and does not, at any rate, excuse the copying of the specific shapes and

dimensions of Games Workshop's creations.  Furthermore, there is no "standard 28mm

scale" in the production and sale of miniatures or in miniature wargaming.  (Ex. 132,

Suppl. Merrett Decl. at ¶ 4).  Throughout the 1970's, a popular size of miniature

figurines was described as 25mm, but depending on the manufacturer, this description

was used to describe the height of a miniature from the based of the shoe to the top of the

head, from the base of the shoe to the eye, or some other measurement.  (Id. at ¶ 5).

While Games Workshop self-describes most of its miniatures as 28mm scale, its

Warhammer 40K models are slightly large than 28mm in size on the whole, many in

excess of 30mm tall.  (Id.)  Other Games Workshop miniatures vary in size from a 6mm

scale to 54 mm.  (Id.)  Numerous other manufacturers also produce and sell wargaming

miniatures to entirely different scales.  (Id. at ¶ 6)

17. Games Workshop Retail ("GWR"), which is GW's U.S.-based business, produced no documents pursuant to CHS's document subpoena, including no documents in response to the following request: "All documents concerning Chapterhouse or its products.".

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Games Workshop Retail is not a party to this case.

18. As part of its June 15, 2011 response to Interrogatory No. 1, GW included a chart ("Original Copyright Claim Chart") identifying, for each of CHS's accused products, the copyrights allegedly infringed.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Games Workshop duly supplemented that chart with Games Workshop's

Second Rev. Copyright Claim Chart (CHS Mot., Kearney Decl. Ex. 5).

19. After initially pleading that all of CHS's "106 products" were infringing, the Original Copyright Claim Chart identified 95 CHS products as infringing, as well as the corresponding GW works that CHS allegedly infringed.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Games Workshop duly supplemented that chart with Games Workshop's

Second Rev. Copyright Claim Chart (CHS Mot., Kearney Decl. Ex. 5).

20. GW has not produced any of its miniature figures to CHS. GW produced a few books, book excerpts, and certain screenshots from its website, but no miniature figures, despite identifying many miniatures as infringed. GW has continued to produce some book excerpts and other materials between March 16, 2012, and August 13, 2012.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. First, all or virtually all of Chapterhouse's infringement is based on copying Games Workshop's two-dimensional artwork as Chapterhouse has primarily focused on creating models based on elements and characters from paintings and drawings of characters and accessories Games Workshop does not (yet) sell. Second, to the extent Chapterhouse has copied three-dimensional miniatures produced by Games Workshop, it has promoted those products *painted* in Games Workshop's colors, which forms the actual (full) basis of Games Workshop's claims regarding those miniatures. Indeed, none of Games Workshop's claims is based simply on copying the unpainted unfinished sprues that come unassembled in boxes sold to customers for them to assemble and paint. (*See, e.g.*, Ex. 135, comparison chart with pictures) Games Workshop's has produced all the relevant and responsive painted depictions of its miniature figures to Chapterhouse in the form in which Chapterhouse would have had access to them, *and in which customers see them and know them*, namely as the figures as shown on packaging as well as pictures of the miniatures as they exist on Games Workshop's website. (Ex. 133, Suppl. Moskin Decl. at ¶2). Additional detailed pictures of Games Workshop's miniatures are available on Games Workshop's website. (Id.). Third, Mr. Villacci's vast collection of Games Workshop miniatures already includes all or substantiall all of the products at issue. (Ex. 136, photos of Villacci's collection). Finally, although Games Workshop has made photocopies of only those portions of the many books from which the two-dimensional artwork supporting its claims are based, it has repeatedly advised Chapterhouse that the entire volumes (running to thousands of pages) are available for discovery and inspection at Foley & Lardner's Chicago office. (Ex. 133, Suppl. Moskin Decl. at ¶3)

Chapterhouse has thus, failed to identify any respect in which Games Workshop failed to comply with any relevant discovery obligation.

21. On January 19, 2012, GW served a supplemental Exhibit A (the "First Rev. Copyright Claim Chart") to its Answer to CHS's Interrogatory No. 1, adding copyright claims against 26 additional CHS products, and supplementing its identification of infringed works.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.  Games Workshop duly supplemented that chart with Games Workshop's Second Rev. Copyright Claim Chart (CHS Mot., Kearney Decl. Ex. 5).

22. GW's First Rev. Copyright Claim Chart identified a total of 121 CHS products as infringing GW's copyrights.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.  Games Workshop duly supplemented that chart with Games Workshop's Second Rev. Copyright Claim Chart (CHS Mot., Kearney Decl. Ex. 5).

23. Appearing before the Court on March 6, 2012, GW's counsel confirmed GW's March 2, 2012 certification (Dkt. 187) that GW's document production was complete "to the best of its knowledge."

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.  Furthermore, Games Workshop has a duty to supplement its document production (such as when new registrations are received from the copyright office or to rebut an improper and late claim raised by Chapterhouse that Games Workshop's products are not sculptures and thus not copyrightable in the UK.).  Moreover, Games

Workshop had a separate duty to comply with Chapterhouse's Seventh Set of Document

Requests (Nos. 62 to 86) responses to which were not due until March 12, 2012.

24. On March 12, 2012, GW served its responses to CHS's last set of discovery
requests. In those responses, GW objected to each and every request, with the exception
of Document Request No. 66, which requested "All licenses concerning the
ALLEGEDLY INFRINGED WORKS," and Requests for Admission No. 497, which was
"YOU do not own a copyright to Michael Moorcock's novel 'Stormbringer.'"

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Games Workshop properly objected to the clearly overbroad and unduly

burdensome and repetitive set of discovery served by CHS on March 12, 2012.  (CHS

Mot., Kearney Decl. Exs. 43, 46, and 49.  The statement is also incorrect in as much as

Game Workshop did produce documents after March 12, 2012 in response to requests

other than Request 66, including, Request 71 (documents to establish, if not the date of

first use, at least substantial priority of use of each of the trademarks in issue), Request 64

(agreements with certain freelancers), Requests 74 and 76 and 78 (product packaging for

all trademarks at issue), Request 81 (sales revenues for each trademark), and Request 82

(confirmatory assignments of copyright from employees and freelance artists).  (Ex. 133,

Suppl. Moskin Decl. ¶4).  Chapterhouse never sought and was not granted any order

compelling Games Workshop to supplement any of its responses to this discovery and

Chapterhouse has failed to identify any respect in which Games Workshop failed to

comply with any relevant discovery request.  (Id.)

25. On August 3, 2012, GW served a revised version of its copyright claim chart
("Second Rev. Copyright Claim Chart") in response to CHS's Interrogatory No. 1. This
revised chart dropped GW's copyright claims against 32 CHS products. It includes
claims that previously-identified CHS products also infringed dozens of previously-
unidentified GW works (only a handful of which GW had produced before GW's March

2, 2012 certification); identified 20 additional, previously- unidentified CHS products; and added copyright claims against 15 of those previously-unidentified CHS products.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.  In Games Workshop's Second Rev. Copyright Claim Chart, Games Workshop narrowed its claims of copyright infringement to simplify the case, thus confirming it made no separate claims of copyright infringement in 33 of the products Chapterhouse sells.  The statement is further immaterial in that Games Workshop's identification of additional two-dimensional works to form the basis of certain of its infringement claims was, as Games Workshop alerted Chapterhouse at the time, simply in response to Chapterhouse's improper and late claim raised by Chapterhouse rebuttal expert on English law that certain of Games Workshop's figurines may not be entitled to full copyright protection under English law.  Although Games Workshop believes the theory is incorrect, it nonetheless produced additional artwork establishing Chapterhouse's copying of not just sculptures.  (Ex. 133, Suppl. Moskin Decl. at ¶5).  Finally, as Games Workshop has already brought to the Court's attention, Chapterhouse has continued to copy Games Workshop's products, creating and selling new products for which Games Workshop has received no discovery.  (Id.).  These products were identified in Games Workshop's Second Rev. Copyright Claim Chart out of an abundance of caution but will be addressed separately in a separate complaint.  (Id.).

30. GW's Second Rev. Copyright Claim Chart does not identify infringement of its "Games Workshop Complete Catalog & Hobby Reference 2006-2007" (hereinafter, the "Catalog") by any CHS product.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Games Workshop has identified in its Second Rev. Copyright Claim Chart the

works it alleges were copied by Chapterhouse and has focused on the most relevant

imagery, regardless whether other relevant images also appear in the Games Workshop

Complete Catalog & Hobby Reference 2006-2007.

31. GW has not specified which works the Catalog contained, if any, that CHS
allegedly infringes. There is no record evidence that the works included in the Catalog
were created within 5 years of the registration.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Games Workshop has identified in its Second Rev. Copyright Claim Chart the

works it alleges were copied by Chapterhouse and has focused on the most relevant

imagery, regardless whether other relevant images also appear in the Games Workshop

Complete Catalog & Hobby Reference 2006-2007.

32. GW failed to produce the Catalog before either its Certification or the close of
fact  discovery.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Games Workshop has identified in its Second Rev. Copyright Claim Chart the

works it alleges were copied by Chapterhouse and has focused on the most relevant

imagery, regardless whether other relevant images also appear in the Games Workshop

Complete Catalog & Hobby Reference 2006-2007.  Games Workshop has also produced

photocopies of those portions of the many books from which the two-dimensional

artwork supporting its claims are based, and has repeatedly advised Chapterhouse that the

entire volumes (running to thousands of pages) are available for discovery and inspection

at Foley & Lardner's Chicago office.  (Ex. 133, Suppl. Moskin Decl. at ¶3)

Chapterhouse has thus, failed to identify any respect in which Games Workshop failed to

comply with any relevant discovery obligation.

38. GW's claims of ownership have been inconsistent. It initially represented to CHS and the Court that all works at issue were created by employees; then submitted a declaration by GW's in-house attorney that just three of the works at issue were created by non-employees; and later identified that there are at least "12 works in issue in which . . . independent contractors/freelancers have participated," but did not identify which 12 works.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Moreover, Games Workshop contests this fact.  Games Workshop claims have

not been inconsistent.  As with any large universe embodied in hundreds, if not thousands

of copyrighted works, Games Workshop has attempted to identify which works

Chapterhouse copied in order to create its products.  As additional Games Workshop

works were identified, a small percentage of these were created by supposed independent

contractors/freelancers.  (Ex. 133, Suppl. Moskin Decl. at ¶6).  Moreover, 7 of the 12

freelance authors all worked on a single licensed work (reproduced as part of the Games

Workshop publication, Horus Heresy Collected Visions); certain of the freelancers have

also been Games Workshop employees, and the line generally between the fact that

someone may be nominally a freelancer does not mean that he or she is not in fact an

employee under English law.  (Ex. 10, Bloch Report ¶¶ 60-97, 102-111.)

39. Despite CHS's request, GW failed to provide contact information for all but two of "independent contractors/freelancers" referenced in the Bloch Report.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Games Workshop provided contact information for all former employees and

independent contractors/freelancers that are in its possession.  (CHS Mot., Kearney Decl.

Ex. 45).  Games Workshop in fact provided all contact information within its control

concerning its former freelancers and employees.  (Ex. 132, Suppl. Merrett Decl. ¶ 2)


   50. GW fails to alleged that any GW work is infringed by 4 of the 20 newly-identified
CHS products in its Second Rev. Copyright Claim Chart: nos. 118, 119, 129, and 143.

   **Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  As shown in Games Workshop's Second Rev. Copyright Claim Chart (CHS

Mot. Kearney Decl. Ex. 5), for three of the four subject products (nos. 118, 119, and 129)

Games Workshop accuses Chapterhouse of infringing Games Workshop's trademarks

only, not copyrights.  (Id.)  Additionally, as indicated in Games Workshop's Second Rev.

Copyright Claim Chart, product no. 143 comprises parts from other Chapterhouse

products and thus is addressed in the rest of the chart.  (Id.) Moreover, because these new

products are not part of this action but rather will be part of a separate complaint, these

products have no relevance to this motion.


   51. CHS product no. 110 has not yet been cast, and has never been sold or offered for
sale.

   **Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Chapterhouse's creation of an infringing sketch and publication or display of

that sketch online infringes Games Workshop's copyrights even if it has not sold a

corresponding product.

54. On June 3, 2011, CHS requested from GW "[o]ne exemplar of the use in commerce in the United States of each of the marks You claim in this action." On July 5, 2011, GW agreed to produce documents responsive to this request.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.   Moreover, Games Workshop has produced in this action all available exemplars of the subject marks as used in commerce, both on its website and on packaging for such products.  (Ex. 133, Suppl. Moskin Decl. ¶7).

56. GW did not produce physical specimens of boxes or packaging for its miniature toys or tabletop games. GW produced complete copies of only 13 of its dozens of alleged literary works, including three works whose originals were in color, but which GW produced only in the form of black-and-white scans.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.  Furthermore, Games Workshop produced copies of its boxes and packaging for its products.  (Ex. 133, Suppl. Moskin Decl. at ¶2).  Games Workshop has also produced photocopies of those portions of the many books from which the two-dimensional artwork supporting its claims are based, and has repeatedly advised Chapterhouse that the entire volumes (running to thousands of pages) are available for discovery and inspection at Foley & Lardner's Chicago office.  (Id. at ¶3)  Chapterhouse has thus, failed to identify any respect in which Games Workshop failed to comply with any relevant discovery obligation.

59. GW's retail stores in the U.S. do not carry the full range of its products.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses. Mr. Villacci himself has purchased all or virtually all of the products at issue. (Ex. 136). Games Workshop produced sales information establishing the extent of its sales in the U.S. for each of the subject trademarks (Ex. 145). Chapterhouse is not accused of copying the full range of products Games Workshop sells, and there is no evidence or suggestion that any one of the products actually at issue was not or is not sold in the U.S.

60. Records concerning sales in the United States are kept by GW's U.S. business, GWR.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop produced sales information establishing the extent of its sales in the U.S. (Ex. 145). There is no evidence or suggestion that any one of the products at issue were not sold in the U.S.

61. GW has no sales records proving if or when a particular product was sold in the U.S., or in any particular geographical area such as in Illinois.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. This statement is also false, as Games Workshop produced sales information establishing sales of products bearing all of its subject trademarks in the U.S., including the specific extent of such sales in the U.S. from 2004 to date (thus substantially predating Chapterhouse's existence or first sales of its own goods). (Ex. 145). There is no evidence or suggestion that any one of the products at issue were not sold in the U.S.

62. GW did not produce itemized sales invoices or purchase orders for each or any of the Marks At Issue, including any sales invoices or purchase orders for Internet or retail

sales in the U.S. or Illinois.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop produced sales information establishing the extent of its sales in the U.S.  (Ex. 145).  There is no evidence or suggestion that any one of the products at issue were not sold in the U.S and no reason has been suggested to impose a needless burden of producing millions of dollars of invoices when actual business record summaries have been provided.

63. GW 30(b)(6) witness Andrew Jones identified 36 of the Marks At Issue as design marks (symbols, icons, or designs). Only the Aquila Design is identified as a registered mark in the SAC.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.

64. In its response to CHS's Interrogatory No. 18 ("Rog 18 Response"), which required GW to identify each allegedly infringed trademark, GW did not include a copy of its icons or identify Bates numbers for corresponding exemplars of trademark use.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.  Moreover, the request is based on an incorrect premise, because Interrogatory 18 did not seek an identification of each claimed mark (or all trade dress) in issue, but rather sought the dates of first use of the subject marks.  Believing that this was what Chapterhouse sought, Games Workshop provided the requested information without separately breaking out the use of trade dress along with trademarks for the same products.

65. GW 30(b)(6) witness Andrew Jones did not know whether GW produced exemplars for trademark use of each of the Marks At Issue.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.

67. GW 30(b)(6) witness Andrew Jones failed to identify any trademark use concerning the design marks LIONS; COG; TRIPTYCH; SKULL WITH HORNS; FLAMING SKULLS; FLAMING CHALICE; and DRAGON/SALAMANDER SCALE.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.   Moreover, Games Workshop has produced sales figures for its Chaos Space Marines (whose logo is a flaming skull); Exorcist Spae Marine products (whose logo is a skull with downturned horns) and its Salamanders Space Marines (whose logo is a salamander head.  (Ex. 146, Suppl. Jones Decl. ¶2)

68. GW conducts minimal advertising in the United States.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.  Games Workshop's success marketing its products in the United States without traditional advertising does not in any way impair its trademark rights.

69.                                                                            GW has not conducted any consumer surveys or testimonials, or commissioned any expert reports, concerning any of the Marks At Issue.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.  Given the large number of products at issue, it would not have been feasible to

conduct a survey of any one or more of the same.

70. In its response to Interrogatory No. 3 ("Rog 3 Response"), which required GW to identify allegedly infringing use by CHS for each mark that GW alleges is at issue in this case, GW did not identify use by CHS of 55 of the Marks At Issue. Those 55 Marks At Issue are:

| | | |
|---|---|---|
| 1. Warhammer 40K | 2. Cadian | 3. Chimera |
| 4. Grenade Launcher | 5. Halberd | 6. Heresy Armour |
| 7. Hellhound | 8. Howling Banshee | 9. Imperial Guard |
| 10. Jetbike | 11. Jump Pack | 12. Librarian |
| 13. Plasma | 14. Predator | 15. Scorpion |
| 16. Stormraven | 17. Techmarine | 18. Terminator |
| 19. Thunder Hammer | 20. Tyrant | 21. Skulls |
| 22. Wings (eagle wings, angel wings) | 23. Lions | 24. Griffon |
| 25. Triptychs | 26. Broadswords | 27. Skull with horns |
| 28. Storm bolter (gun) | 29. Sawblade with blood- drop | 30. Clenched first in a gauntlet [sic] |
| 31. Snakes | 32. Flaming skulls | 33. Flaming chalice |
| 34. Salamander | 35. Dragon/salamander scales pattern | 36. Tau Symbol |
| 37. Tau – Oval vents | 38. Tau – X marking on power/ammo packs | 39. Tau – circle with a diagonal line through it |
| 40. Tau –geometric groves | 41. Roman numerals (combined with) arrows | 42. X crosses and inverted V |
| 43. Cog | 44. Iron hands icon – gauntleted left hand shown palm downwards | 45. Overlapping/banded armour |

| 46. Wolf fur | 47. Wolf skulls | 48. Wolf tails |
|---|---|---|
| 49. Raven wings with blood drop in center | 50. I symbol (for Inquisition) | 51. Scarab beetles |
| 52. Spirit Stones | 53. Eldar iconography/symbols (seer icons, etc.) | 54. Eldar – Spirit Stones |
| 55. Eldar – decorative gems on weapons | | |

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Indeed, the subject interrogatory was understood to be directed primarily towards a general inquiry into the basis for "how Chapterhouse infringes each mark". Games Workshop does not contend that most of the words above are trademarks and Games Workshop has elsewhere in the course of discovery and in its subsequent pleadings detailed the marks in issue.

71. The following seven Marks At Issue are not used on the Chapterhouse website, www.chapterhouse.com: Aquila Design; BLOOD ANGELS; CHAOS SPACE MARINES; HORUS HERESY; LAND SPEEDER; MK II ARMOUR; TERMEGANTS.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. The statement is also incorrect or misleading as the Chapterhouse website had used the names "Blood Angel", "Chaos Space Marines", Horus Heresy (or simply foreshortened "Heresy" or "Heresy Era"); (*See, e.g.*, Ex. 52) and the new eagle design on the Chapterhouse website immediately calls to mind Games Workshop's registered

Aquila design.  (CHS Mot., Kearney Decl. Ex. 53)

72. GW's U.S. business has no records of U.S. customers expressing confusion between CHS and CHS or even inquiring about CHS.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Evidence of customer confusion written by English speaking customers

received by Games Workshop UK's company via email is still relevant insofar as

Chapterhouse's internet-based business originates in the United States but is not limited

to United States customers.

73. GW produced emails with five individuals not affiliated with GW relating to CHS. The emails were received by GW's legal team in the United Kingdom. Based on the email addresses, one of the emails appears to have been sent from Australia and another two appears to have been sent from the United Kingdom. For the other two emails, Gillian Stevenson, GW's 30(b)(6) witness regarding confusion related to CHS, testified that it would not be possible to determine whether those emails were sent from individuals residing in the United States based on the emails.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  Evidence of customer confusion written by English speaking customers

received by Games Workshop UK's company via email is still relevant insofar as

Chapterhouse's internet-based business originates in the United States but is not limited

to United States customers.

74. Gillian Stevenson, GW's 30(b)(6) witness regarding confusion related to CHS, testified that "I don't know that the original author is confused," with respect to Depo. Ex. 88.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses as the subject email is not among those relied upon in connection with Games

Workshop's pending motion for summary judgment.

75. GW's 30(b)(6) witness Gillian Stevenson wrote "And another one who clearly is not  confused!" after reviewing an email from a individual concerning CHS.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses as the subject email is not among those relied upon in connection with Games

Workshop's pending motion for summary judgment.  Furthermore, as Gillian Stevenson

further testified this statement was made to distinguish between the emails she received

where customers were confused and where customers were angry at Chapterhouses'

activities.  (CHS Mot., Kearney Decl., Ex. 23 at 152:14-19).

79. GW has produced no evidence that it advertises on the same websites or in the same publications as CHS.

**Games Workshop's Response:**  This statement is immaterial because, even if true, it

has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's

defenses.  This statement is also inherently misleading, as Chapterhouse's entire business

is targeted at Games Workshop's customers and only Games Workshop's customers.

## IV.    Games Workshop's Additional Undisputed Material Facts.

### Games Workshop Owns the Copyrights At Issue

1.   Chapterhouse's expert on English law is almost completely in agreement with Games Workshop's expert on the principles of English law governing ownership, except for his personal and political views that the doctrine of equitable assignment is morally wrong because it sometimes disadvantages individuals who are the true creative source of works they make for large companies.  (Ex. 149, Bently Tr. at 166:16-176:21)

**Copyrights at Issue**

2.   Twelve of the thirty-three products Chapterhouse says are unprotectable under the merger doctrine (Nos. 25, 26, 28-30, 32, 38-42 and 70) are products for which Games Workshop has specifically advised Chapterhouse it is alleging only trademark infringement.  (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5)

4.   For the Court's convenience, in Exhibit 135 Games Workshop has taken its Second Rev. Copyright Claim Chart and included representative pictures of both the Chapterhouse and Games Workshop products at issue.  (Ex. 133, Suppl. Moskin Decl. ¶14)

**Chapterhouse's Affirmative Defenses**

6.   Chapterhouse has pleaded 23 affirmative defenses.  Neither *scènes à faire* nor merger are among Chapterhouse's affirmative defenses.  (Dkt # 45 and Dkt. #150) Moreover, Chapterhouse has never requested leave to add either of these affirmative defenses.

**Chapterhouse's Infringement of Games Workshop's Copyrights**

7.   In one of Chapterhouse's unproduced forum posts Mr. Villacci shows pictures of his Doomseer product.  (Ex. 39)  The response from forum users is quite strong in detailing the many similarities between Chapterhouse's products and Games Workshop's Eldar Farseer and Eldar Warlock products.  (Id.)  In fact, at one point, a forum poster writes, concludes "you come in and say that you're NOT at all knocking off anything, and that any  similarities between your blude dude up there and an eldar warlock or farseer are completely coincidental.  You basically implicitly tell everyone that you think they are an ignorant asshole if they think they see a similarlity.  How stupid do you really think people are?" (Ex. 39 at 3)

8.   Mr. Villacci explained to one of the designers his general understanding that so long as he avoided making exact copies, he did not infringe: "Gw pretty much has no legal say about what people make to use with their models as long as it isn't direct copies or recast of the models. Still, we have gone through a lot of resources to design our own stuff from scratch, while using the same measured dimensions, in 3D applications." (Ex. 24, WT00030)  Although it is not clear in this context what is meant by "from scratch" it is undisputed that all of the models are made to correspond to Warhammer 40K.

9.   For many of Chapterhouse's products, Games Workshop is unable to specifically identify which Games Workshop work out of its Warhammer 40K universe Chapterhouse used as the basis for its copies.  This is due to the fact that for many of Chapterhouse's products, Chapterhouse failed to produce the underlying design documents, even after the Court directed it to do so on March 6, 2012.  (Ex. 133, Supp. Moskin Decl. ¶8).  These products include the Shoulder Pads for Chalice or Soul Drinker – Tactical (product no.

23), Shoulder Pads for Chalice or Sould Drinker – Terminator (product no. 24), Ymgarl Heads for Tyranid Genestealers (product no. 43), SXV-141 Super-Heavy Asault Walker SAW (product no. 45), Mark I Rhino Converstion Kit (product no. 93), Rhino Tank Conversion Kit for Iron Snakes (product no. 106), Gun-Halberds (product no. 112), and Conversion Beamer Servo Harness Kit for Space Marines (product no. 113). (Id.) As late as February 29, 2012, when Mr. Villacci appeared for his deposition as document custodian, he could not explain vast apparent gaps in Chapterhouse's document production – notwithstanding that Games Workshop had alerted his counsel 2 days before the deposition that that was a question he was expected to answer. (Ex. 21, Villacci Tr. 47:14-48:17; Ex. 148, Moskin email dated 2/27/12)

10. Although it has refused to comply with a December 23, 2011 Court order directing it to produce evidence of its marketing on the internet forums which it admits are its only promotional venues (Ex. 2, Moskin Decl. ¶46; Ex. 68, Moskin letter dated May 29, 2012), Chapterhouse expressly markets its products on these forums and sales sites under Games Workshop's names. (See e.g., Ex. 14, eBay pages, Ex. 15, Barterhouse pages, Ex. 23, Heresy-Online forum, Ex. 39, Frother's Unite forum, Ex. 65, Warseer forum).

11. Mr. Villacci, testifying in his capacity as document custodian, does not know what documents his company has for the development of its products (Ex. 21, Villacci Tr. at 47: 14–48:22). Nor does Chapterhouse know what materials its independent designers review in creating the accused products (Id. at 49:22–51:18, "I don't know what documents they [Chapterhouse's sculptors] draw inspiration from"). However, documents produced in this litigation explain Chapterhouse's general business model of creating reproductions or derivative works based on Games Workshop's books and (occasionally) its sculptural figures. Chapterhouse focuses primarily on creating models based on elements and characters from paintings and drawings of characters and accessories Games Workshop does not (yet) sell. There are no documents indicating that Chapterhouse has ever developed any products without some reference to Games Workshop's works, and despite initially refusing to participate in discovery until it could move for summary judgment on grounds of independent creation, Mr. Villacci now admits that all of Chapterhouse's works are derived from Warhammer 40K (Ex. 16 at 239:6-8, "I said all of our products have been influenced by a number of things, including Games Workshop's products and books.")

12. Mr. Villacci has amassed a large collection of Warhammer 40K books, magazines and miniatures. (Ex. 21 at 81:13-17, 82:25-83:25; Ex. 136).

13. Certain Tyranid monsters created and sold by Games Workshop are Tyranid Genestealers. As part of the Tyranid Genestealer boxed set that a consumer can purchase, Games Workshop included a head component which can convert a Genestealer model into a Games Workshop created monster called a Genestealer Ymgarl (a mutated form of Genestealer from the planet Ymgarl). Below are pictures of both the standard Tyranid Genestealer and Games Workshop sketch of the

Genesetealer Ymgarl.  (Ex. 132, Suppl. Merrett Decl. ¶10).




GW's Tyranid Genestealer          GW depiction of Genestealer Ymgarl
(Ex.137)                          (Ex. 138 )

14. One of the ranks of Space Marines is a Space Marine Chaplain.  Their iconography heavily features skulls.   A picture of chaplain made and sold by Games Workshop is shown below.  Of note, the Chaplain's skull features a specific design of a skull with mechanical notches for a built-in helmet, red eyes, and a series of striated bands.  (Ex. 132, Suppl. Merrett Decl. ¶11).




(Ex. 139)

15. Many of Games Workshop's products incorporate a unique image of piled

**Tweet**    Like    45

skulls. Two examples of this unique image are on Games Workshop's Basilica Administratum (a building) and on Games Workshop's Realm of Battle Board, both depicted below (Ex. 132, Suppl. Merrett Decl. ¶12):




(Ex. 140)                    (Ex. 141)

16. One of the Space Marine Chapters created by Games Workshop is the Space Wolves Chapter. (Ex. 1, Merrett Decl. at ¶ 15). This Chapter decorates its Space Marines and its vehicles with iconography which includes wolf skulls, wolf tails, and fangs. (Id. at ¶ 38-41). Two of these such Games Workshop Models are depicted below.



Space Wolves Rhino
(Ex. 116 at 19, GW002493)







Space Wolves Space Marine Terminator
(Ex. 117)

(Ex. 1, Merrett Decl. at ¶¶ 38-40).

17. Games Workshop's Space Wolves icons have unique characteristics. The Space Wolf icon is an unusually elongated and unique wolf skull with wide eye sockets, often set within a diamond. (Ex. 1, Merrett Decl. at ¶41).

18. Chapterhouse creates and sells a "Rhino Conversion Kit for Space Wolves" that allows a customer to take a standard Games Workshop Space Marine Rhino (which is a form of vehicle) and convert it, by adding Chapterhouse pieces, into a Space Marine Rhino for the Space Wolves Chapter:



Chapterhouse Rhino Conversion Kit for Space Wolves
(Ex. 118, CHS001258)

19. Chapterhouse's Space Wolf iconography shares the same unique characteristics as the Games Workshop depictions. Namely, the wolf skull is the same unusually elongated wolf skull with wide eye sockets. Additionally, each of the wolf skulls is made to be set within a diamond (the skull on the far left appears meant to be fit into the diamond next to it) so as to resemble almost exactly Games

Workshop's distinctive Wolf Skull within a diamond. (This device of producing the parts separately to be joined by the customer was also employed by Chapterhouse in connection with its "Flesh Tearers" shoulder pad where, by selling the blood drop separately from the rest of the iconography Mr. Villacci pronounced "Voila! No IP infringement") (See Ex. 101, TF00958).

20. Chapterhouse's documents make clear its intent to copy Games Workshop's Space Wolves iconography by copying its "art pics" in modeling clay (or greenstuff) and timing the release of their product to coincide with the Space Wolves codex:

- "Figure Ill finish the four SW [space wolf] rhino template one-piece panels tomorrow with the rest of the shields. I really want to ship both rhinos, the pad template and shields mid week." (Ex. 119, CHS004464); and

- "The SW rhino templates are almost done, I had to scratch and redo them 3 times now due to quality issues (you know me), never thought something that easy would be that hard to do.
  …
  I'm still having problems with the wolf symbol, I need some easy but good looking detailed art pics that I can copy in greenstuff, internet didn't give me anything good at all.
  I'm trying to find an artist buy you need to help out and see if you can get us a concept artist.
  Someone who you can:
  1: look at the FW SW rhino doors and do a wolf symbol inspired by that but still different" (Ex. 121, TF001823).

21. Chapterhouse has created and sells a female warrior protected by the "goddess of the Scorpion" called "Armana'serq Warrior Priestess:



Armana'serq Warrior Priestess
(Ex. 33)

 

Games Workshop's Striking Scorpion
(Ex. 27)

This female warrior princess shares the same unique characteristics as Games Workshop's all-male Striking Scorpion. The warrior is equipped with a diamond-toothed sword, a pistol attached to its wrist, and two small blasters attached to either side of the face and a gemstone on the hilt of the sword. Instead of the smaller chainsword, Chapterhouse also provides a larger two-handed chainsword. She wears plate armour and has a thick lock of hair protruding from the top of her head.

22.     As Games Workshop does not produce a female Striking Scorpion, Chapterhouse's documents make clear that Chapterhouse's intent was to fill in this perceived gap and make a female version of Games Workshop's Striking Scorpion figurine.

- In developing the product with the designer, Michio Okamura, Mr. Villacci and the designer referred to the figure as a "female space elf"[1]. Mr. Villacci explained that the idea was to do "alternate sculpts for the exarch warriors[2] (if gw makes a male version lets do a female nicer version and vice versa)." (Ex. 34, MO00002);

- Mr. Villacci further explained: "I would femalize the anatomy, but keep the basic armor structure." (Ex. 34, MO00001). He also stated ""Honestly I wouldn't mind having you flesh out the female Eldar line. That is if your up for it." (Ex. 35, MO00024);

- Although at his deposition Mr. Villacci professed ignorance as to the weapons that wrap around the figure's head (Ex. 16 at 171:17-25) in his email to the designer he correctly identified them using GW's terminology: "As for the head, can you do a open face and have the mandiblasters somehow attached around the back of the head?" (Ex. 16, 199:13-200:6) Mr. Okamura agreed: "I

---

[1] In Games Workshop's literature concerning the Eldar race, they are described and defined as a type of elf. (Ex. 1, Merrett Decl. at ¶ 16)
[2] An Exarch is a type of Eldar Warrior. (Ex. 1, Merrett Decl. at ¶ 16)

don't know, with the mandiblaster and the dreadlocks sensors, she looks much more recognizable as a Striking Scorpion." (Ex. 35, MO000026);

- Mr. Okamura referred to his initial model as an "Eldar" and explained that "I was planning on making the model so it can use the weapon options included in the GW box set for the Striking Scorpions …"  (Ex. 35, MO000029);

- As to the overall design, Mr. Okamura inquired of Mr. Villacci: "How different do the designs have to be from the GW stuff? Is the Eldar model I'm working on different enough or have I wasted my time on the model?"  Mr. Villacci responded (eschewing the "ordinary observer" test and assuming the posture of someone who knew nothing about Games Workshop's products): "From what I see, that is plenty nice and original enough.  Imagine if you had no idea its supposed to be a female scorpion, would you think that by looking at it, so in my minds eye its not a copy at all." (Ex. 35, MO000026); and

- According to Mr. Okamura, even the larger two-handed chainsword was intentionally copied from Games Workshop's design: "I'll probably be sculpting a set of arms with the chainsabre since GW hasn't released a model of them as far as I know.  I did find their concept pics of the chainsabre and it's just a shuriken pistol attached to each wrist with the hands wielding the chain blades." (Ex. 35, MO0022).


23. In addition to the numerical iconography on the right shoulder pad of the Space Marines, according to the Warhammer 40K universe, the left shoulder pad of a Space Marine contains an icon indicating the specific Space Marine Chapter to which the Space Marine belongs.  (Ex. 1, Merrett Decl. at ¶ 33).  While there were originally only 20 Space Marine Legions, after the Horus Heresy rebellion, the legions were broken down into a much larger number of smaller Space Marine Chapters.  (Id.)  Each Space Marine Legion and Chapter has in turn, its own detailed history, legends, characters, weapons, vehicles, culture, and their own unit icon. Some of the relevant unit icons created by Games Workshop are below:




Flesh Tearer
Chapter
(Ex. 49 at 71,
GW001727)



Blood Raven
Chapter
(Ex. 49)

24. Each chapter icon has a unique design:

- Flesh Tearer Chapter – Primary colors are black and red with an icon of a flat, toothed saw-blade with a drop of blood in the center of the blade (Ex. 1, Merrett Decl. at ¶ 34); and

- Blood Raven Chapter – Primary colors are black and red with an icon of a set of wings with a drop of blood in the center (Ex. 1, Merrett Decl. at ¶ 34).

25. Chapterhouse has created and sells shoulder pads for Space Marines that correspond to each of these Space Marine chapters:

 

Sawblade Shoulder Pad & Jewel     Blood Eagle Power Armor Shoulder Pad
(Ex. 18 at 2)     (Ex. 92, CHS01541)

26. Chapterhouse's Shoulder Pads for Space Marines contain the same unique characteristics (and typically the same name) as the Space Marine Chapter icons created by Games Workshop and are all combined with the unique shape of the Games Workshop shoulder pads:

- Sawblade Shoulder Pad & Jewel – Primary colors are black and red with an icon of a flat, toothed saw-blade with a drop of blood in the center of the blade;

- Blood Eagle Power Armor Shoulder Pad – Primary colors are black and red with an icon of a set of wings with a drop of blood in the center;

27. Chapterhouse's expert admitted there looking through all of the shoulder pads he identified from prior history, he did not see any shoulder pads with any insignia or design on them. (Ex. 5 at 137:22-138:2). He was unable to point to anywhere in military history where emblems or designs are applied to shoulder pads. (Id. at 138:3-6). Furthermore, while Chapterhouse's expert testified that he had found certain decorative elements (not on shoulder pads) in prior military history (such as griffins, lions, scales, etc.), he was unable to express any opinion on whether any of Games Workshop's particular combinations of decorative elements were present or common in prior military history. (Id. at 165:5-166:17). He even concluded that in his experience "applications of these designs to certain things like shoulder pads is not common in military history." (Id. at 166:18-23). Similarly,

Chapterhouse has been unable to identify anything it used for its so-called "independent creation" except for identifying random isolated elements, such as a lion or a griffin. (Ex. 95, Resp. to Interrog. No. 2).

28. Chapterhouse's documents make clear its intent to create shoulder pads with icons such that Warhammer 40K players would recognize the icons as those of Games Workshop's various Space Marine Chapters:

- "I already made the molds for the Flesh Tearer and the Tactical pads. We are going to cast them with this in-house order." (Ex. 98, CHS003503);

- Chapterhouse considered an alternate design where the sawblade was on edge sticking out of the shoulder blade but rejected the idea as it deviated too much from Games Workshop's design: "I dont think the blade sticking out of the pad would go too well for most players, most players are very hard-core players who dont like deviating too much from the 40K norm, sorry!" (Ex. 99, CHS003640);

- "I think Flesh Tearers will be a popluar army on account of the special character thats coming out for them, so you stand to make some pretty good money. I would love to know how much FT stuff you sell." (Ex. 100, CHS005422);

- Chapterhouse decided it could use a simple stratagem to avoid infringement merely by selling the blood drop separately, to be glued on by the user to either a sawblade (for Flesh Tearers) or a set of wings (for Blood Angels): "I think we will have [the designer] remove his blood drop and sekk the drops separate. :)  So the pad will have a sawblade on it and that's it.  We could sell the blood drops separately for a small price…. :) Voila non-IP infringement!" (Ex. 101, TF00958); and

- Chapterhouse deliberately timed the release of the Blood Angels shoulder pads to coincide with the release of GW's Blood Angels Codex (Ex. 102, CHS012596).

29. Most Space Marines wear Power Armour, an advanced suit of strength enhancing combat armor consisting of thick ceramite containing a full suite of life-support functions to operate in hostile environments.  (Ex. 1 at ¶ 30).  Over the history of the Warhammer 40K Universe there have been various advancements to the Power Armour, starting with Mark I through to the current Mark VIII version. (Id.)  An example of the Mark VIII Power Armour is below:






Post-Heresy
Armour
(Ex. 49 at 71)

Space Marine Shoulder Pad
(Ex. 76 at 13; Ex. 77)

Back of Space Marine
Shoulder Pad
(Ex. 125)

30. One of the numerous iconic aspects of Games Workshop's Power Armour is the shoulder pad. (Ex. 1 at ¶ 31). The shoulder pad is a convex shape with a curve at the top and a straight edge at the bottom. (Id.) There is often a large band or rim extending along the entire outer edge of the shoulder pad. (Id.) As part of the Power Armour, the shoulder pad begins above the shoulder and ends right above the elbow. (Id.) The pads are curved in a manner such that it does not cover a large portion of either the chest or the back of the Space Marine. (Id.) On the reverse side of the shoulder pad, there are typically a series of spaced indentations that serve no functional purpose but as Alan Merrett explained, they are used by Games Workshop to create a technical appearance. (Id.; Ex. 78, Merrett Tr. at 46:12-47:17)

31. Chapterhouse has created and sells a "Generic Power Armour Shoulder Pad for Space Marine:




Chapterhouse's Generic Power Armour
Shoulder Pad for Space Marine
(Ex. 79)

Back of Chapterhouse Power Armour
Shoulder Pad for Space Marine
(Ex. 126)

Chapterhouse's "Generic Power Armour Shoulder Pad for Space Marine" contains the same features as Games Workshop's iconic Space Marine Shoulder Pad, including a convex shape with a curve at the top and a straight edge at the bottom, a large band extending along the entire outer edge of the shoulder pad. When applied to power armour, the shoulder pad begins above the shoulder and ends right above the elbow; the shoulder pad is curved in a manner that it does not cover a large

portion of either the chest or the back of the Space Marine. Many of Chapterhouse's shoulder pads also contain the same purely aesthetic indentations on the back of the shoulder pad, which Mr. Villacci admitted under oath were added for "esthetics" only so as to accommodate "players …that [are] picky about details on their models, we wanted to put them on there so that they would be similar to the ones that Games Workshop has" and that the only "function" is to serve an aesthetic purpose "in the fiction, like, strengthening function" (Ex. 16 at 172:9-20.) Chapterhouse's expert admitted that Games Workshop's design of its shoulder pads was not the same or similar to any design he found in prior military history. (Ex. 4 at 133:21-134:20).

32. According to the Warhammer 40K universe, the right shoulder pad of a Space Marine contains a symbol and a roman numeral identifying the squad number and squad type to which the Space Marine belongs. (Ex. 1 at ¶ 32). Each Space Marine Chapter consists of roughly 1000 Space Marines, with 100 Space Marines in 10 Companies. (Id.) Each company is in turn divided into 10 "squads" of 10 Space Marines. (Id.) In general, a company has six Tactical Squads (equipped to fight in a broad range of conditions), two Assault Squads (equipped to fight at close quarters), and two Devastator Squads (equipped to provide heavy weapons support). (Id.)

- Tactical Space Marines are represented by an upward pointing arrow and given roman numerals I through VI on their shoulder pads (Id.);



Shoulder Pads for Tactical Space Marines
(Ex. 76 at 13)

- Assault Space Marines are represented by a crossed X and given roman numerals VII and VIII on their shoulder pads (Ex. 1 at ¶ 32); and



Shoulder Pads for Assault Marines
(Ex. 76 at 13; Ex. 80, GW002323)

- Devastator Space Marines are represented by a chevron (inverted V) and given roman numerals IX and X on their shoulder pads (Ex. 1 at ¶32).



Shoulder Pads for Devastator Space Marines
(Ex. 76 at 13, Ex. 81 at 70, GW1288)

33. Chapterhouse has created and sells "Tactical Shoulder Pads for Space Marines", "Assault Shoulder Pads for Space Marines", and "Devastator Shoulder Pads for Space Marines":



Tactical Shoulder Pad for Space Marine
(Ex. 79)



Assault Shoulder Pad for Space Marine
(Ex. 79)



Devastator Shoulder Pad for Space Marine
(Ex. 79)

Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique features as those created by Games Workshop. In addition to copying the iconic style of Games Workshop's basic Space Marine Shoulder Pad, these products use the same icons (arrows, crossed-Xs, and chevrons), placed in the same orientation, and of about the same size. Thus, the icons are used to depict the same squad types of identified in the Warhammer 40K universe. Moreover, Chapterhouse uses only the same Roman Numerals and only in the same combinations as does Games Workshop (I-VI for Tactical, VII-VIII for Assault, and IX-X for Devastator), thus copying and never varying from the fictional meanings given to the symbols by Games Workshop.

34. Chapterhouse's documents confirm its intent to copy Games Workshop's icons and numbering scheme for its Space Marine shoulder pads:

- "With that ok, I will finish the other Tactical Badge shoulder pads. By this time tomorrow I can e-mail to you all the .stl files for the following:
  Assault Symbol (without number)
  Devastator Symbol (without number)
  Tactical Symbol (without number)
  Blank (Mk6 Armor)
  ...
  T1 (Tactical Sqd. 1)
  T2 (Tactical Sqd. 2)
  T3 (Tactical Sqd. 3)
  T4 (Tactical Sqd. 4)
  T5 (Tactical Sqd. 5)
  T6 (Tactical Sqd. 6)
  Standard Shoulder Pad" (Ex. 82, CHS003109-10);

- "Any word from Nick on the legality of the number, devastator, assault and arrow pads? They are direct copies of GW art, at least with the normal rim and I know our attorney should have his say on them but I havent heard anything yet, I take it you and Nick have okeayed them." (Ex. 83, CHS009903);

- "You had asked me to put roman numerals on the shoulder pads with the tactical/assault/devastator markings. How many different numbers did you want and on which pads?" (Ex. 84, CHS009925);

- "did ALL arrow pads, both 7+8 assault pads and both 9+10 dev pads" (Ex. 85, CHS017286); and

- Mr. Villacci used a digimeter to make sure Chapterhouse's shoulder pads were identical in size to Games Workshop's shoulder pads. (Ex. 16, Villacci Tr. at 217-18).

35. In the Warhammer 40K universe, the Tyranids are a hive race of aliens whose weapons, technology, and vehicles are all organic in nature. (Ex. 1, Merrett Decl. at ¶ 23). While Games Workshop has made numerous miniatures representing various Tyranid creatures, Games Workshop's literature and other materials describe and provide artwork for additional Tyranid creatures. (Id.). Until recently, one such Tyranid creatures without a Games Workshop miniature was a Tervigon monster:



Games Workshop's Tervigon
(Ex. 60 at 52, GW001422)

(Ex. 1, Merrett Decl. at ¶¶ 23-24).  The Tervigon has numerous unique characteristics that are easier to appreciate from its picture.  However, notable characteristics include, two small hind legs, four large pointed legs that each have a small horn extending off the "elbow" of the leg, several bony protrusions that extend off the back of the creature, and the overall stance of the creature.  (Ex. 1 at ¶ 25).

36. Chapterhouse has created and sells a "Tyranid Tervigon Conversion Kit" that allows a customer to convert a Games Workshop Carnifex[3] miniature into a miniature that looks like Games Workshop's picture of a Tervigon:



Games Workshop's Carnifex
(Ex. 61, GW002335)



Games Workshop's
Tervigon
(Ex. 60 at 52)



Chapterhouse's Tervigon Conversion
Kit applied to Carnifex
(Ex. 62, CHS001921)

---

[3] A Carnifex is a type of Tyranid created by Games Workshop.  (Ex. 1 at ¶ 26).

This conversion kit contains the same unique characteristics as Games Workshop's depiction of a Tervigon, including two small hind legs, four large pointed legs that each have a small horn extending off the "elbow" of the leg, several bony protrusions that extend off the back of the creature, and the overall stance of the creature.

37. Documents produced by Chapterhouse (and other documents not produced but which Games Workshop discovered independently) show Chapterhouse's clear intent to create a miniature from Games Workshop's artwork depicting Tervigon.

- Although Chapterhouse failed to produce documents from the designer of its Tervigon Conversion Kit, the designer himself, Sam Terry, posted images and commentary on the internet. The images show he used sculpting clay on top of the Games Workshop Carnifex model so that purchasers of the Chapterhouse conversion kit could transform their Games Workshop Carnifex into Games Workshop's drawing of a Tervigon. (Ex. 63);

- "I put up a few pictures of the pieces earlier today on secondsphere. I used adobe photoshop to cover up the GW plastic that was showing." (Ex. 64, CHS005980);

- In his posting on Secondsphere, Mr. Terry, explained how he copied from the Games Workshop drawing of a Tervigon present in the Tyranid Codex: "Have you seen the Tervigon Codex entry art? I tried my best to make these parts match up." (Ex. 63);

- In advertising the product on Warseer.com Mr Villacci stated: "It's a nice design that builds upon the Carnifex kit, yet fits true to what most tyranid players envision the Tervigon to be like on the table" (Ex. 65, Warseer Posting at 1) He further stated: "Our Tervigon conversion kit has the parts necessary to turn your GW Carnifex kit into something that resembles one of their pictures." (Id. at 3); and

- Mr. Villacci explains his concept to the designer, Mr. Terry: "You are 100% correct that we don't use GW bits. Well that is a little true, you can use them as a base and sculpt on top of them, sort of like a skeleton, but if someone took our bits and compared them to GWs, you shouldn't be able to pick out GWs components in ours. My goal is to have a kit that will just fit over the Carnifex body, maybe even being able to have magnets if the user does that themselves." (Ex. 66, CHS004709).

## Chapterhouse's New TRU-Scale Products

38. Just as the 28mm sizing of Games Workshop's Warhammer 40K miniatures was the result of a creative decision by the company, there are many design choices involved in transforming paintings or drawings from Games Workshop's books into

28mm figurines.  (Ex. 132, Suppl. Merrett Decl. ¶7).  To reinforce the traits and powers of the characters, Games Workshop exaggerates certain parts of the figures or their armour and otherwise modifies the figures to create the most desired appearance.  (Id.)  This has led some followers of Warhammer 40,000 to contemplate creating "true-scale" figures that are (from their perspective) "truer" to the original imagery in the books.  (Id.)  Although Chapterhouse did not create the concept of "true-scale" Space Marines, it has very recently begun selling a line of products it calls "TRU-scale" that appear to be copies of Games Workshop's figures rendered in slightly larger size (evidently to match its sense how to more exactly replicate the imagery in Games Workshop's books).  (Id.)  Although the few announcements Games Workshop has seen have been careful to avoid direct mention of Games Workshop, the very notion of calling its products "TRU-scale" begs the question: "true to what".  (Id.)

39. Chapterhouse has marketed these "TRU-scale" products on various Internet forums.  (Ex. 132, Suppl. Merrett Decl. ¶8).  Some responses to a forum posting by Chapterhouse regarding one new "Tru-Scale" product, in which the opening post comments briefly but ironically about Chapterhouse's use of the name "Knights Praetorius" rather that Space Marines (which they obviously are); another notes simply: "Oh dear Lord, that one's not even slightly subtle."  Another forum member wonders if the named designer (Stephen Smith) isn't a Games Workshop employee, and others go even further.  (Ex. 143, forum posts; Ex. 132, Supple. Merrett Decl. ¶8).  One thus states:

> If this is the culmination of what I think it is, then it was one of the chaps on Dakka who true-scaled up his Marines and just got CH to cast them iirc. Adding a couple of mm of greenstuff to the thighs doesn't constitute an even remotely original sculpt imo. …CH have gone from an 'interesting aftermarkets spares' company, to totally moronic and arrogant lamo's, to simply just common thieves. …  (Ex. 143)

The final post on this forum is equally harsh:

> I'm not a huge fan of [Games Workshop] at the moment, they aren't impressing me with their decisions and releases. But noone has any excuse to try and get away with this kind of farcical pretense of having their own line of bits and models. Similar/inspired by and so on are a fuzzy area, and I don't know enough about the legal details to know how close is too close in those cases, but this is just blatant poor quality copying! They may as well start recasting and announcing that on their website.  (Ex. 143).

40. Another recent example of Chapterhouse's new products is found at http://www.dakkadakka.com/dakkaforum/posts/list/470169.page  (A copy of the page is attached as Exhibit 144.)  Although Mr. Villacci does not expressly identify

the product using Games Workshop's name, one of the other forum participants immediately recognizes the design as a Kroxigor, a giant crocodile-like creature from Games Workshop's Warhammer (not Warhammer 40,000). (Ex. 132, Suppl. Merrett Decl. ¶9). This marks a new departure by Chapterhouse (copying from Games Workshop's Warhammer series). However, Games Workshop has no further information whether the copying from Warhammer is part of a broader plan or regarding creation of the "TRU-scale" copies of Games Workshop's works (or other new products). (Id.)

Dated:  September 6, 2012                         Respectfully submitted,

                                                 /s/  Jason J. Keener
                                                 _____

                                                     Jason J. Keener (Ill. Bar No. 6280337)
                                                     Aaron J. Weinzierl (Ill. Bar No. 6294055)
                                                     FOLEY & LARDNER LLP
                                                     321 North Clark Street, Suite 2800
                                                     Chicago, IL 60654-5313
                                                     Telephone:  312.832.4500
                                                     Facsimile:  312.832.4700
                                                     Email:  jkeener@foley.com;
                                                     aweinzierl@foley.com

                                                     Jonathan E. Moskin
                                                     FOLEY & LARDNER LLP
                                                     90 Park Avenue
                                                     New York, New York 10016
                                                     Telephone:  (212) 682-7474
                                                     Facsimile:  (212) 687-3229
                                                     Email:  jmoskin@foley.com

                                                     *Attorneys for Plaintiff*
                                                     *Games Workshop Limited*


## CERTIFICATE OF SERVICE

        I, Jason J. Keener, an attorney, hereby certify that on September 6, 2012, I

caused to be filed electronically the foregoing GAMES WORKSHOP'S RESPONSE TO

CHAPTERHOUSES STATEMENT OF MATERIAL FACTS with the Clerk of the

Court using the CM/ECF system, which will send an electronic copy of the foregoing to

counsel of record and constitutes service under Federal Rule of Civil Procedure

5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

                                                 /s/  Jason J. Keener
                                                 _____
                                                 Jason J. Keener

4837-5188-3792.6