# EXHIBIT

# 1

4836-0565-2752.3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED, | |
| Plaintiff, | Civil Action No. 1:10-cv-8103 |
| v. | Hon. Matthew F. Kennelly |
| CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES, | Hon. Jeffrey T. Gilbert |
| Defendants. | |

## DECLARATION OF ALAN MERRETT

I, Alan Roy Merrett, hereby declare:

1.      I am Head of Intellectual Property, Games Workshop, Willow Road, Lenton, Nottingham NG7 2WS United Kingdom.  I have been employed by Games Workshop since 1981 and was one of the original creators of Warhammer 40,000 in about 1987.  I base this declaration on my personal knowledge and my complete access to the books and records of Games Workshop.

### Warhammer 40,000 Background

2.      Warhammer 40,000 (or Warhammer 40K) was first launched in 1987, in a book entitled Rogue Trader.  The fictional universe and basic game were created by a small group of key employees, John Blanche, Jeremy "Jes" Goodwin, Rick Priestley, and myself.

3.      Warhammer 40,000 quickly achieved great commercial success and currently represents a body of hundreds of books and magazines portraying the fictional world and setting forth information and rules about the related table-top wargame of the same name, a movie,

4836-0565-2752.3

computer games, and thousands of collectible figurines sculpted and produced by Games Workshop; collected, painted and displayed by fans and used in the tabletop wargame. As many as seven of the Black Library novels about Warhammer 40,000 have been New York Times bestsellers. Warhammer 40,000 is also the hub of a wide social network, some of which can be experienced at the many on-line forums devoted exclusively or primarily to Warhammer 40,000 and its fans (including Bolterandchainsword.com, Dakkadakka.com, Warseer.com, belloflostsouls.net, heresy-online.net, and others). Fans also gather at Games Day events (including the July 28, 2012 Games Day in Chicago, Illinois that was attended by over 2500 people, and the independently organized Adepticon, also in Chicago, which occurred on April 19-21 and was similarly attended by thousands). There are many YouTube videos that people have posted online that help introduce a person who is unfamiliar with Warhammer 40K to some of the elements of the overall creative universe, such as (i) http://www.youtube.com/watch?v=VGByey3BSjY showing a trailer from the recent Warhammer 40,000 motion picture[1]; (ii) http://www.youtube.com/watch?v=A-E1RcRvny8 showing a trailer from a Dawn of War Warhammer 40,000 video game; and (iii) http://www.youtube.com/watch?v=Tee9XodZou8&list=UUy0TN9NKJhyYGCavN-06c7Q&index=3&feature=plcp an interview with the designers of a new line of "Dark Eldar" figures (including one of the original creators of Warhammer 40,000, Jes Goodwin, revealing some of the creative process and the interplay between the design and the underlying story and rules. Additionally, attached as Exhibit 104 is a short Games Workshop video that provides some context for the hobby, showing fans at a Games Day event where they are able to view

---

[1] A second trailer is at http://www.youtube.com/watch?v=6vF_VLZotWc

4836-0565-2752.3

painted miniatures on display, paint their own miniatures, view artwork and play Warhammer 40,000.

4.     The Warhammer 40,000 universe is depicted throughout Games Workshop's books, articles, and other materials and is not easily summarized.  However a brief overview follows.  The Warhammer 40K universe is set in a savage 41st Millennium where Mankind must battle for survival in a galaxy riven by bloodshed and destruction.  Humanity teeters on the brink of extinction, assailed on all sides by aliens, traitors, and Daemons.  Humanity is protected by elite genetically engineered super-soldiers (called Space Marines) and innumerable "Imperial Guard" (which is the largest fighting force defending humanity).  The various races warring against Mankind include, but are not limited to:

- Eldar – An ancient alien race possessed with incredible skill, cutting edge technology, and preternatural swiftness;

- Tau – A fledgling race that is rapidly expanding its empire through the use of advanced technology to compensate for its members' meager physiques;

- Tyranids – A horrific alien bio-engineered race from beyond the galactic void that devours all in their path and incorporates the genetic materials of all they consume; and

- Chaos – Once loyal warriors who fought for Mankind who have forsaken their oaths of loyalty and turned against humanity, loyal only to the Dark Gods of Chaos.[2]

5.     For each specific race, Games Workshop's books, magazines, and other products flesh out the specific history, legends, characters, weapons, vehicles, culture, and other details of that race.  By way of example, during the 30th millennium, the Emperor of Mankind created twenty Primarchs, genetically engineered superhumans possessing immense physical and psychic power.  Each Primarch's genome was used to serve as a template for a different legion of

---

[2] The Warhammer 40K universe includes a number of other races as well, such as Necrons, Orks, Daemons, Dark Eldar, etc.

4

Space Marines. During the 30th Millennium, the Emperor used the Space Marines to conquer human-inhabited worlds to create the Imperium of Man. Near the end of this campaign, nine of the twenty legions converted to worship Chaos Gods and rebelled against the Emperor (the "Horus Heresy", named after one of the Primarchs who rebelled). The rebels were defeated and banished, but continue fighting on behalf of the Chaos Gods. The remaining legions were restructured into smaller units called "Chapters" to make future mass rebellion unlikely. Much of the Warhammer 40K universe focuses on Mankind's continued struggle for survival with the assistance of these Space Marine Chapters. Since 1993, the strapline for each new edition of Warhammer 40,000 is "In the grim darkness of the far future there is only war."

6. In additional to the numerous books and vast body of artwork depicting the Warhammer 40K universe, there is also an associated tabletop miniature war game played with 28 millimeter (approximately 1 inch/6 feet) scale miniatures that represent the futuristic soldiers, creatures, weapons and other tools of war Games Workshop has created. The background and playing rules of each army are specified in the rule books and supplemental army "codexes" published by Games Workshop, along with articles in Games Workshop's monthly magazine, *White Dwarf*. The rules attempt to account for the various unique characteristics present for each race, character, or weapon that exists in the Warhammer 40K universe.

7. The miniatures and vehicles sold by Games Workshop require assembly and painting. Hobbyists (whether or not they play the game) assemble and paint the miniatures. These miniatures are displayed in private collections, at local hobby groups, at local hobby stores (including Games Workshop stores), at conventions (including conventions hosted by Games Workshop), online, and in Games Workshop's various publications.

4836-0565-2752.3

8.      These miniatures can also be assembled into armies that can be pitted against those of other players.  Unlike other battle-themed games such as Risk or Stratego, there is no board for play.  Each player brings a roughly equal "value" of units to a tabletop "battlefield", typically 4 ft by 6-8 ft, decorated with various terrain features (hills, trees, ruined buildings, etc.). The players then decide upon a scenario, ranging from simple skirmishes to complex campaigns surrounding "historical" events in the Warhammer 40K universe involving obtaining and defending various objectives.  Subject to the game rules, players develop strategies and take turns advancing the model armies and firing their weapons on the tabletop battlefield, rolling dice to determine the results of various types of combat.  It is Games Workshop's understanding that the collection and painting of miniatures represents a larger portion of the use of the sculptural figurines than does game play.

The Origin and Ownership of Games Workshop's Works

9.      Games Workshop itself originated in London in 1975, and in 1983 developed Warhammer, set in a medieval fantasy time.  By the time it developed the futuristic Warhammer 40K in 1987, Games Workshop had moved to Nottingham where the creative core of the company (Messrs Blanche, Goodwin, Priestley and myself) were devoted full-time as employees of the company.  The creative core of the company remains here today.

10.      Among the four original creators of Warhammer 40,000, Mr. Goodwin is a sculptor and artist and Mr. Blanche a painter, and they created most of the original artwork. None of the designs for the characters, races and armies has any known antecedents.  To be sure, Warhammer 40K incorporates some symbols and graphic elements drawn from heraldry and other historical sources (e.g., wolves and Roman numerals and crosses) but as used in Warhammer 40K, those individual elements have been modified and thoroughly integrated with

4836-0565-2752.3

other elements (graphic and sculptural) to form something unlike any known prior works. For instance, although something as simple as a Roman numeral is used as one of the identifying features of squads of Space Marines, it has a specific meaning within the underlying story such that only certain characters would wear the numeral on a specific location for a specific purpose and only in combination with other specific symbols (such as an arrow, a crossed X, or a chevron).

11.     Although many of the miniatures Games Workshop produces are small, the plastic models are originally sculpted in three times the size of the final commercially sold versions  The creative process often takes several months whereby concept art is first sketched and/or painted in two dimensions and then sculpted in clay, also known as Green Stuff (a product Games Workshop produces and sells), and/or with other sculpting materials. Only then are the sculptural works readied for production. Additionally, some of the larger models are sold through Forge World, a part of Games Workshop. In almost all instances, the sculptor(s) are given credit for the product by having their name appear on the box of the mass produced versions or in the monthly *White Dwarf* magazine announcing the product release.

12.     Games Workshop has identified numerous works on which it believes Chapterhouse Studios has relied in creating the accused products at issue in this litigation. In the ordinary course, Games Workshop relies solely on its own employees to create these and other works. Indeed, the works are all created based on the basic storylines and artwork I helped create together with John Blanche, Jes Goodwin and Rick Priestley in 1987 and earlier, and as the Warhammer 40,000 universe has grown more complex and detailed, the contours within which designers work is increasingly defined by what has come before. We also never engage freelance artists without providing extensive oversight and creative direction. However, we do

rarely employ the services of independent artists – many of whom have also at times been employees of Games Workshop. When we do, it is our customary practice to obtain confirmatory assignments from these individuals. Over the years, some of these have been misplaced; however, none of the individual authors has ever challenged Games Workshop's ownership of the subject works and, during the course of this litigation, we have obtained replacement assignments from those of the individuals we have been able to locate.

13. Despite our efforts to locate all of the authors whose works are at issue in this litigation, there are six individuals who contributed to some of the works that we have not been able to contact. However, I am able to confirm that each of these seven authors was an employee at the relevant time.

a. Karl Kopinski. Mr. Kopinski was involved in creating the Crimson Fist Shoulder Pads depicted in the Index Astartes IV 2004, page 39. Mr Kopinski was an employee from 1 June 1999 to 8 February 2006

b. Adam Clarke. Together with Jes Goodwin, Mr Clarke helped design the sculptural works we refer to as "The Seer Council", which is a unit in the Eldar army. The works were created in 2002 and Mr. Clarke was an employee from 11 May 2001 to 13 December 2003.

c. Tim Adcock. Together with Jes Goodwin, Mr. Adcock helped design the sculptural work we refer to as a "Predator Space Marine Rhino tank." The work was created in 2001 and Mr. Adcock was an employee from 2 February 1994 to 20 July 2007. This was the second version of a Rhino. A prior Space Marine Rhino was created and sold in Games Workshop's 1989 catalogue.

d. Bob Naismith. Mr. Naismith helped design the sculptural work we refer to as a "Rhino", which is a vehicle used by the Space Marines. The work, as later decorated further

with Games Workshop's Space Wolf iconography (designed by Jes Goodwin and Mike McVey as noted below), was shown in the "Space Wolves Codex" published in 2000, and Mr. Naismith was an employee from May 1984 to December 1989.

e. Wayne England  Mr. England helped develop the iconography for a chapter of the Space Marines know as the Blood Angels.  The work was created in 1995, and Mr. England was an employee from the end of 1988 to early 2001.

f. Mike McVey.  Mr. McVey helped design an Eldar miniature figure during the course of his employment with us from April 1987 through November 1999 and also worked with Jes Goodwin to create an icon for the Space Wolves Space Marines in 1989.

14.     As noted, no Games Workshop employee or freelance artist has ever challenged Games Workshop's ownership of the subject works.

### Space Marine Chapters

15.     According to the Warhammer 40K universe, after the Horus Heresy Rebellion, the Space Marine Legions were broken up into a thousand smaller Space Marine Chapters. These Chapters include, but are not limited to Iron Snakes, Salamanders, Soul Drinkers, Blood Ravens, Iron Hands, Space Wolves, Blood Angels, Dark Angels, Flesh Tearers, Celestial Lions, and Exorcists.  The Standard hand weapon of a Space Marine is a "bolter."  More details about the Space Marines Chapters and imagery associated with those chapters are are provided and shown below (¶¶ 30 et seq.)

### Eldar Figures

16.     One of the armies in the Warhammer 40K universe is the Eldar, which, as noted, is an ancient alien race having mythic skills, cutting edge technology, and preternatural swiftness.  In the Warhammer 40,000 universe concerning the Eldar race, they are described and

4836-0565-2752.3

defined as a type of elf. In Games Workshop's literature concerning the Eldar race, they are described and defined as a type of elf. In the Warhammer 40K mythology, "Spirit Stones" are used by Eldar as receptacles for spirits of their ancestors. Four of the many types of individuals in Games Workshop's Eldar society are the Striking Scorpions, the Howling Banshees, the Eldar Farseer, and the Eldar Warlock. An Exarch is a type of Eldar Warrior. Additionally, a common vehicle used by the Eldar is an Eldar Jetbike. Examples of each of these are depicted below:



Eldar Striking Scorpion
(Ex. 27 at 2)

Eldar Howling Banshee
(Ex. 28 at 31, GW011375; Ex. 29)

Eldar Farseer
(Ex. 28 at 26, GW011373; Ex. 30, GW002349)







Eldar Warlock
(Ex. 28 at 28, GW011374; Ex. 31)

Eldar Jet Bike
(Ex. 28 at 40, GW011377; Ex. 32)

17.     These pictures are representative of numerous similar pictures that exist throughout Games Workshop's literature and related materials:

- The "Eldar Striking Scorpion" pictures are representative of the Eldar Striking Scorpions models created and sold by Games Workshop, a true and correct copy of which attached as Ex. 27;

- The "Eldar Howling Banshee" picture is representative of the Eldar Howling Banshees and can be found on page 31 of Codex:Eldar attached as Ex. 28. The model is a representative Eldar Howling Banshee model created and sold by Games Workshop, a true and correct copy of which attached as Ex. 29;

- The "Eldar Farseer" picture is representative of the Eldar Farseer and can be found on page 26 of Codex:Eldar attached as Ex. 28. The model is a representative Eldar Farseer model created and sold by Games Workshop, a true and correct copy of which attached as Ex. 30;

- The "Eldar Warlock" picture is representative of the Eldar Warlock and can be found on page 28 of Codex:Eldar attached as Ex. 28. The model is a representative Eldar Warlock model created and sold by Games Workshop, a true and correct copy of which attached as Ex. 31; and

- The "Eldar Jet Bike" picture is representative of the Eldar Jet Bike and can be found on page 40 of Codex:Eldar attached as Ex. 28. The model is a representative Eldar Jet Bike model created and sold by Games Workshop, a true and correct copy of which attached as Ex. 32.

18.     Each Eldar class of individuals has their own unique characteristics:

- The Striking Scorpions class of Eldar known for being skilled in close combat. Games Workshop's models of Striking Scorpions are typically male. Their unique features include a Scorpion Chainsword (a vicious blade with diamond-toothed edges and a gemstone on the hilt), a Shuriken Pistol (which can be attached to its wrist), and Mandiblasters (two small guns attached to the side of the their helmet that fire needle-

11

thin shards that act as a conductor for a highly charged laser blast). They wear plate armour and have a thick lock of hair protruding from the back of their helmet;

- The Howling Banshees are a class of Eldar also known for deadly hand-to-hand combat. Games Workshop's models of Howling Banshees are usually female. Their unique features include a conical style helmet with hair flowing out of the back, segmented armour plates over a bodysuit, a grid-like mouth, and a long loin cloth held up by circular stones.;

- The Eldar Farseer is a class of Eldar who have the ability to predict the future. Their weapons include a Spear or Sword. However, Games Workshop does not sell a Farseer miniature with a sword. Instead of armour, they wear a set of robes. While they also have the iconic Eldar style conical helmet, they also have a one or two curved protrusions extending upward;

- The Eldar Warlock is a class of Eldar with psychic abilities. Their unique weapons either include a Witch Blade or a Singing Spear. Instead of armour, they wear a set of robes, but still maintain an iconic Eldar style conical helmet; and

- The Eldar Jet Bike has a similar function to the Space Marine Jet Bike discussed below but is stylized in the Eldar style, including an elongated, smooth, tapering shape.

**Pre-Heresy Accessories**

19.     Games Workshop has produced numerous books, articles, and other products that detail the *Horus Heresy* rebellion against the Emperor in the 30th millennium (something of a prequel to the main body of the Warhammer 40,000 universe) by the nine Space Marine Legions that were corrupted by the Chaos Gods. A principal such book is "Horus Heresy: The Collected Visions" a true and correct copy of which attached as Exhibit 26.

20.     As the events of the *Horus Heresy*, occurred about 10,000 years prior to the main body of events in the Warhammer 40K universe, much of the Games Workshop artwork details "pre-heresy" armour and weapons that look different from the "post-heresy" armour and weapons that are the subject of the bulk of Games Workshop's miniatures. Examples of pre-heresy and post-heresy Space Marine armor are below:

4836-0565-2752.3



Pre-Heresy Armor (Mk 1 Thunder Armor)
(Ex. 48 at 139)



Pre-Heresy Jump Pack
(Ex. 48 at 284)



Post-Heresy Armor
(Ex. 49 at 71, GW001727)



Post-Heresy Jump Pack
(Ex. 50, GW002324)

21.     These pictures are representative of numerous similar pictures that exist throughout Games Workshop's literature and related materials:

- The "Pre-Heresy Armor" picture is a representative picture of a Space Marine wearing an early version of power armour (called Mark I or "Thunder Armour") and can be found on page 139 of The Horus Heresy: Collected Visions book, a true and correct copy of which attached as Exhibit 48;

- The "Pre-Heresy Jump Pack" picture is a representative picture of a Space Marine wearing an early version of a jump pack and can be found on page 284 of Horus Heresy: The Collected Visions book attached as Exhibit 48;

- The "Post Heresy Armour" picture is a representative picture of a Space Marine wearing current power armour (called Mark VIII) and can be found on page 71 of The Art of Warhammer 40,000 book, a true and correct copy of which attached as Ex. 49; and

- The "Post-Heresy Jump Pack" picture is a representative picture of a model created and sold by Games Workshop of a Space Marine wearing a current jump pack, a true and correct copy of which attached as Exhibit 50.

4836-0565-2752.3

22.     These pre-heresy artwork contain unique elements:

•   The pre-heresy armour has unique shoulder pads consisting of overlapping plates with a series of rivets or studs.  Additionally, the pre-heresy shoulder pad shown above has a unique shape to the various plates.  Moreover, the overall shape of the shoulder pad (rounded top, flat bottom, beginning at top of shoulder and ending at elbow) is based off of Games Workshop's iconic shoulder pad design; and

•   The pre-heresy jump packs have a unique design consisting of two large turbo-fan type barrel jets with fins protruding out the bottom.

### Tyranid Products

23.     In the Warhammer 40K universe, the Tyranids are a hive race of aliens whose weapons, technology, and vehicles are all organic in nature.  While Games Workshop has made numerous miniatures representing various Tyranid creatures, Games Workshop's literature and other materials describe and provide artwork for additional Tyranid creatures.  Until recently, two such Tyranid creatures without a Games Workshop miniature were a Tervigon monster and a Mycetic Spore (or "Drop Pod") shown below:




Games Workshop's Tervigon            Games Workshop's Mycetic Spore
(Ex. 60 at 52, GW001422)                 (Ex. 60 at 54, GW001424)

24.     These pictures are representative of numerous similar pictures that exist throughout Games Workshop's literature and related materials:

14

- The "Tervigon" picture is a representative picture of a large Tyranid monster called a Tervigon and can be found on page 52 of Codex:Tyranids, a true and correct copy of which attached as Exhibit 60; and

- The "Mycetic Spore" picture is a representative picture of an organic transport and landing vehicle for Tyranids from "Hive" ships (Tyranid transport ships) and can be found on page 54 of Codex:Tyranids attached as Exhibit 60.

25.    These Tyranid Products contain many unique elements:

- The Tervigon has numerous unique characteristics that are more easily appreciated from its picture than they are described.  However, notable characteristics include, two small hind legs, four large pointed legs that each have a small horn extending off the "elbow" of the leg, several bony protrusions that extend off the back of the creature, and the overall stance of the creature; and

- The Mycetic Spore is a large pod-like shape with various tendrils or protrusions extending from the top that allow the pod to fall from space while transporting inside various other Tyranid creatures.

26.    Another large Tyranid creature created and sold by Games Workshop is a Carnifex.  A representative picture of a Carnifex is below.  A true and correct copy of Games Worksho's webpage for the Carnifex is attached as Exhibit 61:



Games Workshop's Carnifex
(Ex. 61, GW002335)

**Javelin Class Jet Bike**

27.    One of the vehicles in the Warhammer 40K universe that may be used by Space Marines is a Jet Bike.  The *Horus Heresy: The Collected Visions* book shows a picture of what

4836-0565-2752.3

this Jet Bike looked like in the pre-heresy days. Additionally, Games Workshop produces and sells a Space Marine Bike, also shown below:



Games Workshop's Space Marine Jet Bike
(Ex. 48 at 15, GW001893)



Games Workshop's Space Marine Bike
(Ex. 71)

28. These pictures are representative of numerous similar pictures that exist throughout Games Workshop's literature and related materials:

- The "Space Marine Jet Bike" picture is a representative picture of a Jet Bike used by Space Marines during the Horus Heresy and can be found in The Horus Heresy: Collected Visions at page 15, attached as Exhibit 48; and

- The "Space Marine Bike" is a picture of an assembled and painted Space Marine Bike created and sold by Games Workshop and is representative of the Space Marine Bikes as depicted in Games Workshop's literature and related materials, a true and correct copy of which and can be found at Exhibit 71.

29. Both Games Workshop's depiction of a Space Marine Jet Bike and its Space Marine Bike contain unique characteristics, including the overall shape, a grilled front, and two large exhaust pipes on each side of the rear of the bike.

**Space Marine Shoulder Pads**

30. Most Space Marines wear Power Armour, an advanced suit of strength enhancing combat armor consisting of thick ceramite containing a full suite of life-support functions to operate in hostile environments. Over the history of the Warhammer 40 universe there have

4836-0565-2752.3

been various advancements to the Power Armour, starting with Mark I through to the current

Mark VIII version. An example of the Mark VIII Power Armour is below:

   

Post-Heresy
Armor
(Ex. 49 at 71)

Space Marine Shoulder Pad
(Ex. 76 at 13; Ex. 77)

Back of Space Marine Shoulder
Pad
(Ex. 125, GW002698)

The representative example of Post-Heresy Armour is from *The Art of Warhammer*, attached as

Exhibit 49. The representative examples of a Space Marine Shoulder Pad are from *Insignium*

*Astartes*, a true and correct copy of which is attached as Exhibit 76, and from Games

Workshop's website, a true and correct copy of which is attached as Exhibit 77. A true and

correct copy of the back of a Space Marine Shoulder Pad is attached as Exhibit 125.

     31.    One of the numerous iconic aspects of Games Workshop's Power Armour is the

shoulder pad. The shoulder pad is a convex shape with a curve at the top and a straight edge at

the bottom. There is often a large band extending along the entire outer edge of the shoulder

pad. As part of the Power Armour, the shoulder pad begins above the shoulder and ends right

above the elbow. The pads are curved in a manner that it does not cover a large portion of either

the chest or the back of the Space Marine. On the reverse side of the shoulder pad, there are

typically a series of spaced indentations that serve no functional purpose but are used by Games

Workshop to create a technical appearance.

     32.    According to the Warhammer 40K universe, the right shoulder pad of a Space

Marine contains a symbol and a roman numeral identifying the squad number and squad type to

4836-0565-2752.3

which that Space Marine belongs. Each Space Marine Chapter consists of roughly 1000 Space Marines, with 100 Space Marines in 10 Companies. Each company is in turn divided into 10 "squads" of 10 Space Marines. In general, a company has six Tactical Squads (equipped to fight in a broad range of conditions), two Assault Squads (equipped to fight at close quarters), and two Devastator Squads (equipped to provide heavy weapons support).

- Tactical Space Marines are represented by an upward pointing arrow and given roman numerals I through VI on their shoulder pads;

     

Shoulder Pads for Tactical Space Marines
(Ex. 76 at 13)

- Assault Space Marines are represented by a crossed X and given roman numerals VII and VIII on their shoulder pads; and

 

Shoulder Pads for Assault Marines
(Ex. 76 at 13; Ex. 80, GW002323)

The representative example on the right of a shoulder pad for Assault Space Marines is from Games Workshop's website, a true and correct copy of which is attached as Exhibit 80.

- Devastator Space Marines are represented by a chevron (inverted V) and given roman numerals IX and X on their shoulder pads.

 

Shoulder Pads for Devastator Space Marines
(Ex. 76 at 13, Ex. 81 at 70, GW1288)

The representative example on the right of a shoulder pad for Devastator Space Marines is from Codex: Space Marines, a true and correct copy of which is attached as Exhibit 81.

18

33.     According to the Warhammer 40K universe, the left shoulder pad of a Space Marine contains an icon indicating the specific Space Marine Chapter to which the Space Marine belongs.  While there were originally only 20 Space Marine Legions, after the Horus Heresy rebellion, the legions were broken down into a much larger number of smaller Space Marine Chapters.  Each Space Marine Legion and Chapter has in turn, its own detailed history, legends, characters, weapons, vehicles, culture, and their own unit icon.  Some of the relevant unit icons created by Games Workshop are below:

   

Excorcist Chapter (Ex. 86 at 33, GW001503)     Flesh Tearer Chapter (Ex. 49 at 71, GW001727)     Iron Snakes Chapter (Ex. 49 at 70, GW001726)     Soul Drinkers Chapter (Ex. 87, GW002391)

  

Blood Raven Chapter (Ex. 49)     Celestial Lions Chapter (Ex. 86 at 33, GW001503)     Legion of the Damned (Ex. 88 at 21, GW00803)

34.     Each chapter icon has a unique design:

- Exorcist Chapter – Primary colors are black and red with an icon of a skull (missing the bottom jaw) with downturned curved horns, the representative example above is from issue 249 of *White Dwarf*, a true and correct copy of which is attached as Exhibit 86;

- Flesh Tearer Chapter – Primary colors are black and red with an icon of a flat, toothed saw-blade with a drop of blood in the center of the blade, the

representative example above is from *The Art of Warhammer 40,000*, attached as Ex. 49;

• Iron Snakes Chapter – Primary colors are blue and red with an icon of the profile view of a snake with several tight undulations, the representative example above is from *The Art of Warhammer 40,000*, attached as Ex. 49;

• Soul Drinkers Chapter – Primary colors are gold and purple with an icon of a chalice with light rays extending out of the top of the chalice, the representative example from above is from the cover of the book *Soul Drinkers*, a true and correct copy of which is attached as Ex. 87;

• Blood Raven Chapter – Primary colors are black and red with an icon of a set of wings with a drop of blood in the center, the representative example above is from *The Art of Warhammer 40,000*, attached as Ex. 49;

• Celestial Lions Chapter – Primary colors are blue and yellow with an icon of a lion, the representative example above is from issue 249 of *White Dwarf*, attached as Exhibit 86; and

• Legion of the Damned – Primary colors are red and black with an icon of a partial skull (missing the bottom jaw), a horizontal line across the forehead, and flames coming from the top of the skull the representative example above is from Codex: Chaos Space Marines, a true and correct copy of which is attached as Ex. 88.

### Weapons

35.    Games Workshop has created a wide range of fictional weapons for the

Warhammer 40K universe.  Some of those weapons are depicted below:

4836-0565-2752.3







Bolter Halberds
(Ex. 48 at 152, GW002030)

Servo Arms
(Ex. 108 at 70, GW11383)

Conversion Beamer
(Ex. 109)







Combi-Weapon
Bolter/Melta
(Ex. 108 at 87, GW11386)

Combi-Weapon
Bolter/Plasma
(Ex. 110 at 49, GW00939)

Combi-Weapon
Bolter/Flamer
(Ex. 111)

36.     These pictures are representative of numerous similar pictures that exist throughout Games Workshop's literature and related materials:

- The "Bolter Halberds" picture is representative of the Bolter Halberd and can be found on page 152 of the Horus Heresy: The Collected Visions book, attached as Ex. 48;

- The "Servo Arms" picture is representative of the Servo Arms and can be found on page 70 of Codex: Space Marines, a true and correct copy of which is attached as Ex. 108;

- The "Conversion Beamer" picture is representative of the a Space Marine "Valthex Astral Claws Master of the Forge" equipped with a Conversion Beamer created and sold by ForgeWorld, a part of Games Workshop, a true and correct copy of which is attached as Ex. 109; and

- The "Combi-Weapon" picture are representative of various Combi-Weapons described in the Warhammer 40K universe and can be found on page 87 of Codex: Space Marines, a true and correct copy of which is attached as Ex. 108; page 49 of Codex: Dark Angels, a true and correct copy of which is attached as Ex. 110; and on a model created and sold by Games Workshop, a true and correct copy of which is attached as Ex. 111

37.     Each weapon created by Games Workshop has unique characteristics:

- Bolter Halberds – Games Workshop's twist on a medieval halberd consisting of a curved blade at the end of a staff, with a Space Marine bolter gun incorporated into the head of the staff, and a pointed protrusion at the end of the staff sticking out the opposite edge of the blade.

- Servo Arms – One or more extra arms mounted to the Space Marine's back pack. The arms are mechanical in nature and terminate in a two pronged "hand".

- Conversion Beamer – A Space Marine weapon with great power, with ribbed rifling and ending in a pointed barrel.

- Combi-Weapons -  A compact combination of two Space Marine weapons, one of which is typically the Bolter and the other one of a Melta gun, a Plasma gun, or a flamer.

**Space Wolves Vehicle Conversion Kit**

38.     In addition to decorating the right shoulder pad with a Space Marine Chapter's icon, Games Workshop often creates depictions of the Chapter's vehicles that are likewise decorated with the Chapter's icons.  One example of this is with the Space Wolves Chapter. Below are two Space Wolves models created and sold by Games Workshop:

4836-0565-2752.3



Space Wolves Rhino
(Ex. 116 at 19, GW002493)



Space Wolves Space Marine Terminator
(Ex. 117)

39.     The Rhino is a troop transport vehicle for the Space Marines.  The one shown above, a true and correct copy of which is attached as Exhibit 116, is decorated with the icons of the Space Wolf Chapter.

40.     A Space Marine Terminator is a Space Marine wearing heavier terminator armour instead of the standard issued power armour.  The above picture is a Space Marine Terminator decorated with the icons of the Space Wolf Chapter, a true and correct copy of which is attached as Exhibit 117.

4836-0565-2752.3

41.     Games Workshop's Space Wolves icons have unique characteristics.  The Space Wolf icon is an unusually elongated and unique wolf skull with wide eye sockets, often set within a diamond.

I hereby declare under penalty of perjury this 14th day of August, 2012, under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Alan Roy Merrett

4836-0565-2752.3

## CERTIFICATE OF SERVICE

I, Jason J. Keener, an attorney, hereby certify that on August 14, 2012, I caused to be filed electronically the foregoing DECLARATION OF ALAN ROY MERRETT with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

/s/  Jason J. Keener

Jason J. Keener

4836-0565-2752.3

# EXHIBIT

# 2

4836-9334-1456.2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES,<br><br>Defendants. | Civil Action No. 1:10-cv-8103<br><br>Hon. Matthew F. Kennelly<br>Hon. Jeffrey T. Gilbert |

## DECLARATION OF ANDREW JONES

I, Andrew Meredith Jones, hereby declare:

1.      I am Head of Legal, Licensing and Strategic Projects, Games Workshop, Willow Road, Lenton, Nottingham NG7 2WS United Kingdom.   I have been employed by Games Workshop since 1986 and I base this declaration on my personal knowledge and my complete access to the books and records of the company.

2.      Games Workshop markets its products in the United States through the 87 hobby stores we own (including 12 in the Chicago metro area), as well as through some 1396 independent hobby stores in the United States, of which 42 are located in the State of Illinois. We also market and sell product through our websites, gamesworkshop.com, forgeworld.co.uk and blacklibrary.com.

3.      Games Workshop produces virtually all of its works in the United Kingdom with the exception of a small number of works made under license (such as the Warhammer 40,000 computer games under the name Dawn of War and a Warhammer 40,000 card game produced by

4836-9334-1456.2

the company Sabertooth Games, which we once owned).  Because copyright registration is not required in the United Kingdom, we do not register most of our works, but do have registrations (or pending applications) for the works at issue in this case.  They are attached as Exhibits 11 and 12.

       4.     Games Workshop owns numerous registrations for its trademarks on the Principal Register in the United States Trademark Office, including the following registrations:

| Trademark | Registration Date | Registration Number |
|---|---|---|
| WARHAMMER | 2003 | 2,718,741 |
| WARHAMMER 40,000 and Design  | 2009 | 3,707,457 |
| 40K | 2010 | 3,768,909 |
| 40,000 | 2010 | 3,751,267 |
| GAMES WORKSHOP | 2009 | 3,612,759 |
| GW | 2010 | 3,878,431 |
| SPACE MARINE | 1995 | 1,922,180 |
| ELDAR | 1996 | 1,944,847 |
| DARK ANGELS | 1995 | 1,913,474 |
| TAU | 2004 | 2,820,748 |
| AQUILA Design  | 2004 | 3,646,312 |

Copies of the registration certificates are attached as Exhibit 13.

       5.     There are very substantial annual sales of products from Games Workshop's Warhammer 40,000 intellectual property and bearing Games Workshop's WARHAMMER, WARHAMMER 40,000, 40K, DARK ANGELS, ELDAR, TYRANID, CHAOS, TAU, and SPACE MARINE brand names, with annual sales at retail value in the United States alone of all

4836-9334-1456.2

such Warhammer 40K products (including our own core products such as rulebooks, miniatures, plus Black Library novels sold directly by Games Workshop and also by Simon & Schuster, plus licensed sales such as video games sold by our licensee, THQ) of approximately $54 million for our fiscal year ending May 2011. Worldwide sales of those products totaled $156 million for the same period (Sales for the immediate past year are higher partly because of the best selling Warhammer 40,000 Xbox 360 title 'Space Marine').

6.     Games Workshop also has a large number of well-known unregistered trade marks (including names of armies, Chapters, and other products) including without limitation: Adeptus Mechanicus, Assault Space Marine, Alpha Legion, Black Templars, Blood Angels, Blood Ravens, Tyranid Bonesword, Cadian, Carnifex, Chaos Space Marines, Chaplain, Chimera, Crimson Fists, Dark Angel, Death Watch, Devastator Space Marine, Dreadnought, Drop Pod, Eldar, Elder Farseer, Eldar Jetbike, Eldar Warlock, Eldar Seer Council, Empire, Exorcist, Flesh Tearers, Gaunt, Genestealer, Heavy bolter, Heresy Armour, Hellhound, High Elf, Hive Tyrant, Horus Heresy, Howling Banshee, Howling Griffons, Imperial Fists, Imperial Guard, Inquisition, Iron Hands, Jetbike, Jump Pack, Land Raider, Land Speeder, Tyranid Lashwhip, Legion of the Damned, Librarian, Lightning Claw, Melta, Mk II Armour, Mk V Armour, Mycetic Spore, Plasma, Predator, Rhino, Salamander, Striking Scorpion, Soul Drinker, Space Wolves, Stormraven, Storm Shield, Tactical Space Marine, Techmarine, Termagants, Terminator, Tervigon, Thousand Sons, Thunder Hammer, Tyrant, Tyranid, Tyranid Warrior, Ymgarl. Attached hereto as Exhibit 3 are sales summaries (broken down by relevant product name) from 2004 to date.

7.     Many of the symbols associated with the characters and armies of the WARHAMMER 40,000 universe, as well as the accessories for these characters and armies,

4

have also become well-known and immediately recognizable to the many fans of the game as used on and in connection with the respective characters, including without limitation: the Black Templars icon; the Blood Ravens icon; Blood Angels icon; Celestial Lions icon; Dark Angels winged sword icon; Exorcist skull icon; Flesh Tearers icon; Howling Griffon icon; Imperial Fists icon; Iron Snakes icon; Legion of the Damned icon; Chaos Space Marines eight-pointed star icon; Soul Drinkers icon; Salamanders icon; Tau Empire icon; Space Marine Tactical squad icon; Space Marine Assualt squad icon; Space Marine Devastator squad icon; Ultramarine icon; Adeptus Mechanicus cog icon; Iron Hands icon; Space Wolves icon; Thousand Sons icon; Mantis Warrior icon.

8.      Games Workshop first became aware of Chapterhouse when we discovered that it or its owner was selling products on eBay and a second auction site, Bartertown.com, in 2008. Attached hereto as Exhibits 14 and 15 are copies of the relevant web pages.  We also then received emails from customers attached hereto as Exhibit 112 expressing confusion whether Chapterhouse was licensed by Games Workshop.

4836-9334-1456.2

I hereby declare under penalty of perjury this 9th day of August, 2012, under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

_____
Andrew Meredith Jones

## CERTIFICATE OF SERVICE

I, Jason J. Keener, an attorney, hereby certify that on August 14, 2012, I caused to be filed electronically the foregoing DECLARATION OF ANDREW with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

/s/  Jason J. Keener
Jason J. Keener

7

# Exhibit

# 3

Highly Confidential – Filed Under Seal

# EXHIBIT

# 4

4836-2512-1552.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES,<br><br>Defendants. | Civil Action No. 1:10-cv-8103<br><br>Hon. Matthew F. Kennelly<br>Hon. Jeffrey T. Gilbert |

## DECLARATION OF JONATHAN MOSKIN

I, Jonathan Moskin, hereby declare:

1.     I am attorney at law and member in good standing of the State Bar of New York and am admitted pro hac vice in this action.  I am a partner at Foley & Lardner LP, counsel of record for Plaintiff Games Workshop, Limited ("Games Workshop").  I have personal knowledge of the facts set forth herein and, if called to testify, I could and would testify competently thereto.

2.     Exhibit 7 is a true and correct copy of portions of the deposition of Mr. Goodwin, one of the original sculptors for Warhammer 40.

3.     Exhibit 8 is a true and correct copy of portions of Games Workshop's Supplemental Response to Interrogatory No. 22.

4.     Exhibit 9 is a true and correct copy of portions of the deposition of Mr. Jones, the head of Legal, Licensing & Strategic Projects.

2

5.    Exhibit 10 is a true and correct copy of portions of the Expert Report of Games Workshop's expert, Mr. Bloch.

6.    Exhibit 16 is a true and correct copy of portions of Mr. Villacci's deposition, Volume II.

7.    Exhibit 17 is a true and correct copy of portions of Chapterhouse's Supplemental Response to Games Workshop's Interrogatories No. 3, 8 and 10.

8.    Exhibit 18 is a true and correct copy of Chapterhouse documents produced at CHS00028-30.

9.    Exhibit 19 is a true and correct copy of the home page of Chapterhousestudios.com from August, 2012.

10.    Exhibit 21 is a true and correct copy of portions of Mr. Villacci's deposition, Volume I.

11.    Exhibit 22 is a true and correct copy of portions the deposition of Mr. Traina.

12.    Exhibit 23 is a true and correct copy of portions of the online forum Heresy-Online.net dated October 24, 2009.

13.    Exhibit 24 is a true and correct copy of documents produced by Wyatt Traina at WT00030.

14.    Exhibit 25 is a true and correct copy of documents produced by J. Nagy at JN001310.

15.    Exhibit 26 is a true and correct copy of documents produced by J. Nagy at JN000087-88.

16.    Exhibit 33 is a true and correct copy of Chapterhouse's webpage selling its Armana'Serq Warrior Priestess model.

4836-2512-1552.1

17.     Exhibit 34 is a true and correct copy of documents produced by M. Okamura at MO00001-5.

18.     Exhibit 35 is a true and correct copy of documents produced by M. Okamura at MO000022-29.

19.     Exhibit 36 is a true and correct copy of documents produced by Chapterhouse at CHS001192.

20.     Exhibit 37 is a true and correct copy of documents produced by M. Okamura at MO000294-95.

21.     Exhibit 38 is a true and correct copy of documents produced by Chapterhouse at CHS000381.

22.     Exhibit 39 is a true and correct copy of portions online forum Frother's Unite.

23.     Exhibit 40 is a true and correct copy of Chapterhouse's webpages for selling its Eldar Warlock Jet Bike Conversion Kit and its Eldar Farseer Jet Bike Conversion Kit.

24.     Exhibit 41 is a true and correct copy of documents produced by Chapterhouse at CHS003606.

25.     Exhibit 42 is a true and correct copy of documents produced by Chapterhouse at CHS003624.

26.     Exhibit 43 is a true and correct copy of documents produced by Chapterhouse at CHS003628.

27.     Exhibit 44 is a true and correct copy of documents produced by Chapterhouse at CHS003629.

28.     Exhibit 45 is a true and correct copy of documents produced by Chapterhouse at CHS005431-33.

4836-2512-1552.1

29.     Exhibit 46 is a true and correct copy of documents produced by Chapterhouse at CHS006351-52.

30.     Exhibit 47 is a true and correct copy of documents produced by Chapterhouse at CHS006360.

31.     Exhibit 51 is a true and correct copy of Chapterhouse's website page for the Banded Tech Shoulder.

32.     Exhibit 52 is a true and correct copy of Chapterhouse's website page for its "Heresy Jump Pack."

33.     Exhibit 53 is a true and correct copy of documents produced by Chapterhouse at CHS0003100.

34.     Exhibit 54 is a true and correct copy of documents produced by Chapterhouse at CHS0003125-44.

35.     Exhibit 55 is a true and correct copy of documents produced by Chapterhouse at CHS0003122-24.

36.     Exhibit 56 is a true and correct copy of documents produced by J. Nagy at JN000067.

37.     Exhibit 57 is a true and correct copy of documents produced by Chapterhouse at CHS00015682-93.

38.     Exhibit 58 is a true and correct copy of documents produced by Chapterhouse at CHS0004679-95.

39.     Exhibit 59 is a true and correct copy of documents produced by Chapterhouse at CHS0005431-32.

4836-2512-1552.1

40.     Exhibit 62 is a true and correct copy of Chapterhouse's webpage for its Tervigon conversion kit.

41.     Exhibit 63 is a true and correct copy of a posting on the forum "Second Sphere" in which the designer of the Tervigon conversion kit, Sam Terry, describes the creation process, including on July 10, 2010 at 11:16.

42.     Exhibit 64 is a true and correct copy of documents produced by Chapterhouse at CHS0005978-81.

43.     Exhibit 65 is a true and correct copy of portions of the online forum Warseer.net.

44.     Exhibit 66 is a true and correct copy of documents produced by Chapterhouse at CHS0004696-714.

45.     Exhibit 67 is a true and correct copy of documents produced by Chapterhouse at CHS0001250.

46.     Exhibit 68 is a true and correct copy of my letter to opposing counsel date May 29, 2012.  As noted in the letter, Chapterhouse has declined to produce documents (other than simple banner ads) in response to the Court's Order dated December 23 2011 that it respond in full to Document Request 16 (which sought "Any and all documents or things in Chapterhouse's possession, custody or control, showing any advertising or promotion of any or all of the Accused Works").  Chapterhouse's own response to Interrogatory 10 confirmed that the places where it advertises and promotes its goods are the internet forums such as Heresy-online.net, Warseer.com, DakkaDakka.com and Frothersunite.com, yet it has produced no such documents. Moreover, in response to the Court's March 6, 2012 Order directing Chapterhouse to produce design documents from the 11 independent designers identified in its response to Interrogatory 3, it produced only 29 documents from these designers (other than Mr. Okamura; Mr. Nagy and

Mr. Villacci's partner, Mr. Fiertek), 17 of which were illegible photographs, and despite repeated requests has refused to share with Games Workshop its correspondence with these designers other than an initial email (but no responses or follow up) to demonstrate a good faith effort to comply.

47.     Exhibit 69 is a true and correct copy of documents produced by Chapterhouse at CHS0003522-24.

48.     Exhibit 70 is a true and correct copy of documents produced by Chapterhouse at CHS0003525-27.

49.     Exhibit 72 is a true and correct copy of Chapterhouse's webpage selling its "Imperial Javelin Jet Bike."

50.     Exhibit 73 is a true and correct copy of documents produced by J. Nagy at JN001698-99.

51.     Exhibit 74 is a true and correct copy of documents produced by the designer M. Okamura at MO000402-05.

52.     Exhibit 75 is a true and correct copy of documents produced by M. Okamura at MO00409-11.

53.     Exhibit 78 is a true and correct copy of portions of the A. Merrett deposition.

54.     Exhibit 79 is a true and correct copy of Chapterhouse's webpage selling its shoulder pads.

55.     Exhibit 82 is a true and correct copy of documents produced by Chapterhouse at CHS0003109-12.

56.     Exhibit 83 is a true and correct copy of documents produced by Chapterhouse at CHS0009903-04.

4836-2512-1552.1

57.     Exhibit 84 is a true and correct copy of documents produced by Chapterhouse at CHS0009924-26.

58.     Exhibit 85 is a true and correct copy of documents produced by Chapterhouse at CHS00017286.

59.     Exhibit 89 is a true and correct copy of Chapterhouse's website selling its Exorcist shoulder pads.

60.     Exhibit 90 is a true and correct copy of Chapterhouse's website selling its Iron Snakes Shoulder Pads.

61.     Exhibit 91 is a true and correct copy of Chapterhouse's website selling its Soul Drinker's Shoulder Pads.

62.     Exhibit 92 is a true and correct copy of Chapterhouse's website selling its Blood Raven Shoulder Pad.

63.     Exhibit 93 is a true and correct copy of Chapterhouse's website selling its Celestial Lions Shoulder Pads.

64.     Exhibit 94 is a true and correct copy of Chapterhouse's website selling its Skull with Flames Shoulder Pad.

65.     Exhibit 95 is a true and correct copy of Chapterhouse's Response to Interrogatory No. 2.

66.     Exhibit 96 is a true and correct copy of documents produced by Chapterhouse at CHS0004636-42.

67.     Exhibit 97 is a true and correct copy of documents produced by Chapterhouse at CHS00012719-20.

4836-2512-1552.1

68.    Exhibit 98 is a true and correct copy of documents produced by Chapterhouse at CHS0003503-04.

69.    Exhibit 99 is a true and correct copy of documents produced by Chapterhouse at CHS0003639-43.

70.    Exhibit 100 is a true and correct copy of documents produced by Chapterhouse at CHS0005420-23.

71.    Exhibit 101 is a true and correct copy of documents produced by T. Fiertek at TF00958-61.

72.    Exhibit 102 is a true and correct copy of documents produced by Chapterhouse at CHS00012596.

73.    Exhibit 103 is a true and correct copy of documents produced by Chapterhouse at CHS00010429-30.

74.    Exhibit 104 is a true and correct copy of documents produced by Chapterhouse at CHS0002413.

75.    Exhibit 105 is a true and correct copy of documents produced by Chapterhouse at CHS0006098-700.

76.    Exhibit 106 is a true and correct copy of documents produced by Chapterhouse at CHS00017255.

77.    Exhibit 107 is a true and correct copy of documents produced by Chapterhouse at CHS00017307.

78.    Exhibit 112 is a true and correct copy of Chapterhouse's webpage selling its "gun-halberd."

4836-2512-1552.1

79.     Exhibit 113 is a true and correct copy of Chapterhouse's webpage selling its servo arms with conversion beamer.

80.     Exhibit 114 is a true and correct copy of Chapterhouse's webpage selling its combi-weapon.

81.     Exhibit 115 is a true and correct copy of documents produced by Chapterhouse at CHS0003244-44.

82.     Exhibit 118 is a true and correct copy of documents produced by Chapterhouse at CHS0001258.

83.     Exhibit 119 is a true and correct copy of documents produced by Chapterhouse at CHS0004464.

84.     Exhibit 120 is a true and correct copy of documents produced by J. Nagy at JN000231.

85.     Exhibit 121 is a true and correct copy of documents produced by T. Fiertek at TF001823.

86.     Exhibit 126 is a true and correct copy of the back of Chapterhouse's Generic Power Armour Shoulder Pad for Space Marine.

I hereby declare under penalty of perjury this 14th day of August, 2012, under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

_____
Jonathan Moskin

10

## CERTIFICATE OF SERVICE

I, Jason J. Keener, an attorney, hereby certify that on August 14, 2012, I caused to be filed electronically the foregoing DECLARATION OF JONATHAN MOSKIN with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

/s/  Jason J. Keener
Jason J. Keener

4836-2512-1552.1

# Exhibit

# 5.

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4   GAMES WORKSHOP LIMITED,      )

5                  Plaintiff,  )

6      vs.                      ) Civil Action

7   CHAPTERHOUSE STUDIES LLC   ) No. 1:10-cv-08103

8   and JON PAULSON d/b/a       )

9   PAULSON GAMES,              )

10                 Defendants. )

11

12          The deposition of WILLIAM F. BREWSTER,

13   taken pursuant to the Federal Rules of Civil

14   Procedure of the United States District Courts

15   pertaining to the taking of depositions, taken

16   before PAULINE M. VARGO, a Certified Shorthand

17   Reporter within and for the State of Illinois,

18   C.S.R. No. 84-1573, at Suite 2800, 321 North Clark

19   Street, Chicago, Illinois, on June 29, 2012, at

20   9:05 a.m.

21

22

23

24

```
                                              Page 2

1    PRESENT:

2

3         FOLEY & LARDNER, LLP
          321 North Clark Street, Suite 2800
4         Chicago, Illinois  60654
          312.832.4500
5         BY:  JASON J. KEENER, ESQ.
               jkeener@foley.com
6
               appeared on behalf of the Plaintiff;
7

8         WINSTON & STRAWN, LLP
          101 California Street
9         San Francisco, California  94111-5894
          415.591.1564
10        BY:  K. JOON OH, ESQ.
               koh@winston.com
11
               appeared on behalf of the Defendant.
12

13   ALSO PRESENT VIA TELEPHONE:

14        GILL STEVENSON, ESQ.
          In-House Counsel, Games Workshop.

15

16

     REPORTED BY:

17

          PAULINE M. VARGO
18        C.S.R. No. 84-1573.

19

20

21

22

23

24
```

Page 53

1  particular Games Workshop products that contain an

2  element that you believe existed in prior military

3  material history?

4       A.    With reference to the specific tabs, no.

5       Q.    Again, my question is not --

6       A.    Or no, no.

7       Q.    Let me ask my question.  She has got to

8  take it down.

9            My question is not with regard to

10 specific tabs.  I'm saying in any way did you

11 specifically identify tabs, names, pictures,

12 anything else that would allow us to determine

13 which particular elements of which Games Workshop

14 products your opinion applies to that they are

15 found in prior military history?

16      MR. OH:  Objection, compound, vague and

17 ambiguous.

18 BY THE WITNESS:

19      A.    No.

20 BY MR. KEENER:

21      Q.    Could you have done so if you had been

22 asked to?

23      A.    Yes.

24      Q.    That same sentence we looked at, it

1    states that you found these items keeping with

2    previously examples -- I'm sorry -- keeping with

3    previously existing examples known within actual

4    military material culture.  Do you see that?

5         A.    Yes.

6         Q.    What do you mean by "keeping with"?

7         A.    Consistent with existing pieces within

8    the known world.

9         Q.    So not identical, correct?

10        MR. OH:  Objection, vague and ambiguous.

11   BY THE WITNESS:

12        A.    Some elements are identical.

13   BY MR. KEENER:

14        Q.    So do you express an opinion anywhere in

15   your report that you found an element from a Games

16   Workshop product identical to something you found

17   in existing military material culture?

18        MR. OH:  Objection, vague and ambiguous.

19   BY THE WITNESS:

20        A.    No.

21   BY MR. KEENER:

22        Q.    Could you have done so if you were

23   asked?

24        MR. OH:  Objection, vague and ambiguous.

1      Q.    Are you expressing any opinion that

2    prior military history you found existed prior to

3    the creation of Games Workshop materials?

4         MR. OH:  Objection, vague and ambiguous.

5    BY THE WITNESS:

6      A.    I only examined the Games Workshop

7    binder materials for similarities to material that

8    I know to exist within the world of military

9    material culture.

10   BY MR. KEENER:

11     Q.    Right.  That's what you did. I

12   understand that.  I want to make sure what you did

13   not did and you are not expressing an opinion on

14   whether or not anything was created prior to the

15   creation of the similar Games Workshop product?

16        MR. OH:  Objection, vague and ambiguous.

17   BY THE WITNESS:

18     A.    Yes.

19   BY MR. KEENER:

20     Q.    You agree you are not expressing an

21   opinion on that topic?

22     A.    Yes.

23     Q.    So in that sentence where you express

24   your opinion, previously existing examples known

Page 65

1    within actual military material culture, you went

2    up to present day?

3         A.   Yes.

4         Q.   I think I understand now.  Thank you.

5              Let's turn to Page 4.  You see the

6    section title, your conclusion?

7         A.   Yes.

8         Q.   And this is a similar expression of your

9    opinion and it states, "That the insignia,

10   heraldry, equipment pattern and design used by

11   Games Workshop are compatible with and not markedly

12   dissimilar from those elements found to exist

13   previously within the world of military material

14   culture."

15             Do you see that?

16        A.   Yes.

17        Q.   Is that your opinion?

18        A.   Yes.

19        Q.   And again, similar to the one we just

20   spent time on, when you say "found to exist

21   previously within the world of military material

22   culture," you are saying found to exist anywhere up

23   to the present date?

24        A.   Yes.

Page 66

1      Q.    And you are not expressing any opinion

2   on whether those works were created prior to the

3   creation of the Games Workshop works?

4      A.    I believe that all the materials that

5   are reference in the analysis cites an earlier date

6   and a later date.

7      Q.    I'm just confirming what we talked to

8   with the other sentence.

9      A.    Yes.

10      Q.    You are not expressing any opinion on

11   whether any pieces of military history were created

12   prior to the creation of any of the Games Workshop

13   products at issue?

14      A.    Correct.

15      Q.    And in this opinion where you identify

16   the insignia, heraldry, equipment pattern and

17   design used by Games Workshop --

18      A.    Yes.

19      Q.    -- you don't identify out of the

20   thousands in binder 103 of those elements which one

21   that opinion applies to?

22      A.    No.

23      Q.    And the next sentence reads, "That the

24   models Games Workshop creates incorporates patterns

Page 77

1   copyright, are you?

2       MR. OH:  Objection to the extent it is calling

3   for a legal opinion.

4   BY THE WITNESS:

5       A.    No.

6   BY MR. KEENER:

7       Q.    And as we looked at in Exhibit 103, the

8   binder, you are not expressing any opinion

9   regarding the originality of the entire product of

10  any Games Workshop product, are you?

11      MR. OH:  Objection and to the extent it is

12  calling for a legal opinion.

13  BY THE WITNESS:

14      A.    No.

15  BY MR. KEENER:

16      Q.    And you are not expressing for any

17  element of any product whether or not that element

18  is original, are you?

19      MR. OH:  Objection to the extent it is calling

20  for a legal opinion.

21          Can you repeat the question?

22              (WHEREUPON, the record was read by

23              the reporter as requested.)

24      MR. OH:  Same objection.

Page 78

1    BY THE WITNESS:

2        A.    No.

3    BY MR. KEENER:

4        Q.    Do you have any opinion on what the

5    general theme or category of Games Workshop's

6    products would be?

7        MR. OH:  Objection, vague and ambiguous,

8    compound.

9    BY THE WITNESS:

10       A.    Fantasy world military.

11   BY MR. KEENER:

12       Q.    So fantasy military world?

13       A.    Yes.

14       Q.    Are you expressing any opinion in your

15   report what elements are necessary in a fantasy

16   military world?

17       A.    No.

18       Q.    Are you an expert on fantasy military

19   worlds?

20       A.    No.

21       Q.    So you are not expressing any opinions

22   on what elements might commonly been used in

23   fantasy military worlds, are you?

24       A.    No.

Page 90

1     Q.    Let's take an example.  Turn to page

2  Tab 35 to 36, both of those two, in Exhibit 103.

3  The first page of 35, we see an Eldar Farseer and

4  the first page of 36 we also see an Eldar Farseer;

5  and if you flip through the other pages in those

6  tabs you also see an Eldar Jetbike, an Eldar Seer

7  Council and an Eldar Warlock.  Do you see those?

8     A.    Yes.

9     Q.    Now, there is nothing anywhere in your

10  report expressing any opinion on any of those Eldar

11  products, correct?

12     MR. OH:  Objection, vague and ambiguous.

13  BY THE WITNESS:

14     A.    Correct.

15  BY MR. KEENER:

16     Q.    Similarly, if you flip through Exhibit

17  103 on Tabs 37 to 43, the next few tabs, you will

18  see they all relate to various alien-type products

19  called Tyranids, and there is all sorts of

20  different ones in there.  You can take a quick

21  look.  The same question will be asked, is there

22  anywhere in your expert report that you are

23  expressing any opinion on any of those products?

24     MR. OH:  Objection, vague and ambiguous.

Page 91

1        MR. KEENER:  What's vague?

2        MR. OH:  I think you are talking so fast I

3    can't even hear the question.

4        MR. KEENER:  Do you need it repeated?

5        MR. OH:  Sure.  That would be great.  Can you

6    repeat it.

7                    (WHEREUPON, the record was read by

8                     the reporter as requested.)

9        MR. OH:  I will let my objection stand.

10        MR. KEENER:  And what is the basis of your

11    objection?

12        MR. OH:  Again, I don't think it's clear.

13        MR. KEENER:  What is unclear?

14        MR. OH:  Again, you are referencing same

15    questions.  You are not referring to questions.

16    I'm not sure at this point you are even referring

17    to the same questions you were referring to before.

18    I think again if you just simplify it and just

19    state the question without referencing to the past

20    question which may or may not be properly

21    referenced.

22    BY MR. KEENER:

23        Q.    Mr. Brewster, do you understand the

24    question you have been asked?

Page 92

1      A.      Yeah, I believe I do.

2      Q.      Let me know when you are ready to

3  answer.

4      A.      Through Tab 40- --

5      Q.      43.

6      A.      As referenced in my report, no.

7      Q.      And going to Tab 46, the Games Workshop

8  products related to Tau, T-a-u, are you expressing

9  an opinion anywhere in your expert report that

10  anything on that product is similar to anything in

11  prior military history?

12      A.      No.

13      Q.      There is also Games Workshop products

14  that relate to jump packs or jet packs that

15  somebody might wear.  Did you see that when you

16  reviewed the materials?

17      A.      I can't say that I did.

18      Q.      Assume for me that it's one of the

19  products at issue in this case, okay.  You are not

20  expressing any opinion anywhere in your report

21  about whether or not the jump packs or jetpacks

22  designed by Games Workshop exist anywhere in prior

23  military history, are you?

24      MR. OH:  Objection, lacks foundation, assumes

Page 93

1    facts not in evidence.

2    BY THE WITNESS:

3         A.    No.

4    BY MR. KEENER:

5         Q.    So let's talk about the examples in your

6    report, okay?  Turning to Page 4, the first example

7    you discussed is shoulder pads, is that right?

8         A.    Yes.

9         Q.    What is your expert opinion regarding

10   shoulder pads?

11        A.    That the use of shoulder pads started in

12   the historical periods, military historical periods

13   postdating BC.  They appeared and were used through

14   the development of armor, body armor through the

15   Middle Ages.  They fell out of favor following the

16   Middle Ages and were reintroduced in the 20th

17   century with the reimplementation or reintroduction

18   of personal body armor, personal protective armor

19   for individual soldiers, and that the use of

20   shoulder pads is something that is now part of

21   military material culture and part of a uniforming

22   -- equipment, not uniforming, of current military

23   personnel.

24        Q.    So in short, it is your expert opinion

Page 133

1    BY THE WITNESS:

2        A.    It doesn't specifically -- none of the

3    examples that I show specifically function the same

4    way, but they function in that they protect the

5    shoulder with the various pieces of material.

6    BY MR. KEENER:

7        Q.    I agree they function to protect the

8    shoulder.  My question is, did you find any designs

9    of shoulder pads in the prior military history that

10   is the same or a very similar design to the Games

11   Workshop shoulder pad?

12       MR. OH:  Objection, compound.

13   BY THE WITNESS:

14       A.    I believe that the function is very

15   similar.

16   BY MR. KEENER:

17       Q.    I'm not asking about the function.  I'm

18   asking about the design.  Design and function are

19   different, right?

20       A.    Yes.

21       Q.    So my question is only about the design.

22   The design Games Workshop made for their shoulder

23   pad, did you find any design of that shoulder pad

24   that's the same or similar to it in the prior

1    military history?

2         MR. OH:  Objection, compound.

3    BY THE WITNESS:

4         A.    I can't say that they did, no.

5    BY MR. KEENER:

6         Q.    You are not expressing any opinion that

7    the design of Games Workshop shoulder pad is the

8    same or similar to any prior existing shoulder pads

9    in military history?

10        A.    That is very consistent with those

11   designs.

12        Q.    That's not my question.  You are not

13   expressing any expert opinion that the design of

14   Games Workshop shoulder pads is the same or very

15   similar to any design you found in prior military

16   history?

17        MR. OH:  Objection, compound; objection,

18   misstating prior testimony.

19   BY THE WITNESS:

20        A.    None of the illustrations appear to, no.

21   BY MR. KEENER:

22        Q.    And beyond the illustrations, there is

23   nothing else you can point to as you are sitting

24   here?

Page 135

1          A.    No.

2                Break?

3          Q.    You want to take a break now before the

4    next one?

5          A.    Yes.

6          MR. KEENER:  Great.

7                      (WHEREUPON, a recess was had at

8                      12:00 noon until 1:05 p.m.)

9    BY MR. KEENER:

10         Q.    Welcome back, Mr. Brewster.

11               Did you discuss any of your testimony

12   with counsel during the lunch break?

13         A.    No, I did not.

14         Q.    I want to turn back to Tab 1 of

15   Plaintiff's Exhibit 103 that we've looked at a

16   couple times now picturing some space marine

17   models.  Are you there?

18         A.    Yes.

19         Q.    And do you recall when I asked you

20   earlier to point out the various elements of that

21   first model on the far left you had commented that

22   you didn't think the shoulder pad was a separate

23   element at least in this figure.  You would

24   consider it only in the context of the entire suit

Page 136

1    of armor?

2         A.    Yes.

3         Q.    I want you to now turn to Tab 12 in

4    Exhibit 103 again.

5         A.    Okay.

6         Q.    And here you see the shoulder pad

7    itself, right?

8         A.    Yes.

9         Q.    And this shoulder pad also is called a

10   flesh tearer shoulder pad.  Do you see that?

11        A.    Yes.

12        Q.    And it's got a particular design on the

13   shoulder pad?

14        A.    Yes.

15        Q.    And would you likewise agree that in

16   considering this shoulder pad you would have to

17   consider the element as a whole, the design with

18   the shoulder pad?

19        MR. OH:  Objection, vague and ambiguous.

20   BY THE WITNESS:

21        A.    I would consider the design an

22   application to the shoulder pad in my --

23   BY MR. KEENER:

24        Q.    Okay.  I'm trying to understand, the

1   prior one you said when looking at elements to see

2   if I could find them in the prior military history,

3   I would have to look at the shoulder pad as part of

4   the armor and the whole suit of armor and not

5   separately as just the shoulder pad?

6       A.   As an assemblage, yes.

7       Q.   Right.  And here would it likewise be

8   the point of your analysis was to determine whether

9   this entire shoulder pad, including the design on

10  it, was in the prior art versus separating this out

11  into different pieces and looking for each

12  individual one in the prior art?

13      MR. OH:  Objection, compound.

14  BY THE WITNESS:

15      A.   In this illustration I would look at it

16  similarly to the view of the shield in the previous

17  Tab 1 where there are elements that I can see and

18  then I would consider them separately.

19  BY MR. KEENER:

20      Q.   So you would break it apart?

21      A.   Yes.

22      Q.   And all of the shoulder pads we looked

23  at that you identified from prior history, did you

24  see any of those shoulder pads with any insignia or

Page 138

1    design on them?

2        A.    Not to my recollection, no.

3        Q.    Anywhere in your expert report do you

4    point to anywhere in military history where there

5    are emblems or designs on a shoulder pad?

6        A.    No.

7        Q.    So you are not expressing any expert

8    opinion whether it was known or used in prior

9    military history to put emblems or designs on

10   shoulder pads?

11       MR. OH:  Objection, compound.

12   BY THE WITNESS:

13       A.    To the best of my knowledge, there is no

14   evidence in history of application of design

15   insignia on shoulder pads.

16   BY MR. KEENER:

17       Q.    Let's turn back to your expert report,

18   Exhibit 107, and look at your second example, which

19   I believe is shield on Page 5.  What's your expert

20   opinion expressed in your report as to shields?

21       A.    That there is a -- the design and

22   function of a shield is a protective device that

23   started with early military history and formation

24   of armies and that those designs of shields

Page 144

1    last question.

2                    (WHEREUPON, the record was read by

3                    the reporter as requested.)

4    BY MR. KEENER:

5         Q.    I also see one other statement about

6    shields here.  You state, "The application of

7    decorative elements to the face of shields is

8    common"?

9         A.    Yes.

10        Q.    And so is it fair to say you are

11   expressing an opinion that the concept of putting

12   an image on a shield is a common concept?

13        A.    Yes.

14        Q.    Unlike shoulder pads, where it is your

15   opinion that you didn't find any examples of any

16   images on shoulder pads?

17        A.    Yes.

18        Q.    And am I correct that you are not

19   expressing any opinion about whether it was common

20   for any particular images to appear on shields?

21        A.    I did not reference particular images on

22   shields.

23        Q.    So you are not expressing any opinion on

24   whether there are any particular images that are

Page 145

1    common to put on shields?

2        A.    Correct.

3        Q.    Okay.  Let's go to your third example,

4    which is warhammers.  Did you reach an opinion

5    regarding warhammers?

6        A.    Other than the fact that they existed

7    and they were commonly used as a common, typical

8    weapon in medieval warfare, that was my opinion.

9        Q.    And that was the extent of your opinion?

10       A.    Yes.

11       Q.    Because I note at the bottom of the last

12   two examples in your report, you comment on the use

13   or what you -- strike that.

14            In the other two examples you comment on

15   your review of the Games Workshop products and how

16   it may or may not go with what you researched on

17   that topic, and I note that that is lacking from

18   your discussion on the warhammer.  Do you see that?

19       A.    Yes.

20       Q.    Was that intentional?

21       A.    I don't know that that was intentional.

22   I don't believe it was intentional.  It may be I

23   just got tired when I was writing the report.

24       Q.    So do you believe that the actual

Page 146

```
 1    warhammers used in the Games Workshop products are
 2    in keeping with the types of warhammers that were
 3    used in prior military history?
 4          A.    In design, yes.
 5          Q.    Even though you note that the design
 6    chosen in Games Workshop-type products is more of
 7    an artistic fantasy creation?
 8          MR. OH:  Objection, misstating the exhibit.
 9    BY THE WITNESS:
10          A.    The lines are still very similar.  It's
11    the proportions which are exaggerated in the game
12    pieces or the game elements, but the basic shape is
13    very similar and in keeping with existing examples.
14    BY MR. KEENER:
15          Q.    Okay, but your opinion on the other ones
16    was basically that product, if there was an actual
17    product, is in line with what you could have used
18    in prior military history, and that's different
19    from your opinion for warhammer because it would be
20    unusable, correct?
21          MR. OH:  Objection, compound, vague and
22    ambiguous.
23    BY THE WITNESS:
24          A.    Without recreating the hammers, I can't
```

Page 147

1    say that they would be not functional.

2    BY MR. KEENER:

3         Q.    But they would not be in line if it was

4    recreated with the hammers you saw in prior

5    military history?

6         A.    That I observed, I would say that in

7    proportion they would not be in line.

8         Q.    Did you find any prior versions of

9    warhammers in military history that were even close

10   to the same proportions of the Games Workshop

11   warhammer?

12        MR. OH:  Objection, compound and vague and

13   ambiguous.

14   BY THE WITNESS:

15        A.    No, I don't believe I did.  I don't

16   recall seeing any that would have been

17   proportionally similar.

18   BY MR. KEENER:

19        Q.    So the concept of an oversized, headed

20   warhammer is not something found in prior military

21   history?

22        MR. OH:  Objection, vague and ambiguous.

23   BY THE WITNESS:

24        A.    Not that I was able to determine.

Page 148

1    BY MR. KEENER:

2        Q.    And the way you comment that this

3    overlarge warhammer design is, quote, "more the

4    stuff of artistic fantasy creations," close quote,

5    you are not expressing any opinion in the field of

6    artistic fantasy creations, are you?

7        A.    No.  Just an observation.

8        Q.    And you are not an expert at all on

9    artistic fantasy creations?

10       A.    Only through observation.

11       Q.    Right.  So you are not expressing any

12   expert opinion in that area?

13       A.    No.

14       Q.    Let's go to the fourth example,

15   firearms, which is on Page 6 of your report.  What

16   opinion did you come to with regard to firearms?

17       A.    That the basic design elements that are

18   presented and exhibited in the Games Workshop

19   designs reflect components, the design elements

20   that are found in actual military weaponry or

21   components of various military weapons.

22       Q.    So certain portions of certain Games

23   Workshop weapons you found in prior military

24   weapons?

Page 162

1    prior military weapons with the secondary weapon

2    other than a grenade launcher?

3        A.    No.

4        Q.    Do any of the weapons you referred to in

5    your report show a firearm with a secondary weapon

6    other than a grenade launcher?

7        A.    A secondary weapon being a projector of

8    another round versus a stabbing instrument?

9        Q.    I will exclude the bayonet, yes.

10       A.    Okay.  No, not to my knowledge.

11       Q.    Would you agree with me that it would

12   not be a common design element in military history

13   to have a secondary weapon that is something other

14   than a grenade launcher?

15       A.    Correct, yes, I would agree.

16       Q.    So if there is a design of a firearm

17   that has two different weapons on it, neither of

18   which is a grenade launcher, that would not be a

19   common design for military history?

20       A.    As far as actual function, no.

21       Q.    Do you know which one of these exhibits

22   has a grenade launcher pictured in a firearm?

23       A.    I could find it.  Would you like me to

24   locate it?

1     Q.    If you could do it relatively quickly,

2  yes.

3     A.    It would be in "Small Arms of the

4  World."

5     Q.    Exhibit 113?

6     A.    113, Chapterhouse Page 17780,

7  publication Page 831, and the illustration at the

8  bottom of the page.

9     Q.    And this design of a rifle with a

10  grenade launcher, are there two separate handles,

11  one for each weapon?

12     A.    As far as for the firing device?

13     Q.    Yes.

14     A.    Yes.  In that presentation I believe

15  there is.  In other iterations of that weapon there

16  are.

17     Q.    Are you finished with your answer?

18     A.    Yes.  I'm sorry.

19     Q.    Do you identify any other examples of

20  rifles with grenade launchers that have a different

21  firing mechanism?

22     A.    No.

23     Q.    So the only one you rely on in your

24  report is this one?

Page 164

1      A.    Correct.

2      Q.    Let's turn to your fifth example in your

3   report on Page 6 labeled "Decorative Elements."

4   Are you there?

5      A.    Yes.

6      Q.    Have you reached an opinion regarding

7   decorative elements?

8      A.    That the application of various elements

9   of design are common within military heraldry and

10  symbol insignia design, and the combination of

11  different types of developments is a common

12  practice and has become more common in the 20th

13  century with the expansion of military forces and

14  insignias associated with military forces.

15     Q.    Is that the extent of your opinion

16  regarding decorative elements?

17     A.    Yes.

18     Q.    So it's my understanding it's your

19  expert opinion that the use of decorative elements

20  in military history is common --

21     A.    Yes.

22     Q.    -- and the combination of decorative

23  elements is common?

24     A.    Yes.

Page 165

1    Q.    Are you expressing any opinion on a very

2    specific decorative element being common?

3    A.    Beyond the range of elements that I

4    cite, no.

5    Q.    Which decorative elements do you cite?

6    A.    Birds of prey, eagles, griffins, lions,

7    crowns and wreaths and hands and arrows, spears,

8    scales, serpents.  They are all cited in the first

9    section, and it goes on to geometric forms.  Do you

10   want me to continue?

11   Q.    I want you to identify which design

12   elements you believe are common in military

13   history.

14   A.    Arrows, yes.  Arrows and chevrons,

15   skulls and cruciform designs, various forms of

16   crosses, the use of gears and Roman numerals.

17   Q.    And is that the extent of your opinion

18   on what design elements are common in military

19   history?

20   A.    That's the extent of those elements that

21   I encountered while viewing the Workshop binder.

22   Q.    So those are the only design elements

23   you are commenting on in your expert report?

24   A.    Correct.

Page 166

1    Q.    Are you expressing -- strike that.

2          One of the examples you identified was a

3    hand.

4    A.    Yes.

5    Q.    Would you agree that there are various

6    ways you could depict the hand in a design?

7    A.    Certainly.

8    Q.    Are you expressing anywhere in your

9    expert report that certain designs of a hand are

10   common in military history?

11   A.    No.

12   Q.    And would the same be true for all the

13   design elements you listed that while that concept

14   might be common, you are not commenting on whether

15   any particular design or expression of that concept

16   is common in military history?

17   A.    Correct.

18   Q.    I think you testified to this already,

19   so I apologize if I'm asking it again.  It is your

20   belief that various applications of these designs

21   to certain things like shoulder pads is not common

22   in military history?

23   A.    In my experience, no.

24   Q.    Are you expressing any opinion anywhere

Page 167

1  in your report on where it would be common to place

2  any decorative elements?

3       A.    Do I define where they are placed?  No.

4       Q.    So you are not expressing any opinion

5  anywhere in your report that it is common to put a

6  decorative element in any particular place?

7       A.    No.

8       Q.    You also comment on the fact that it may

9  be common to combine various decorative elements in

10  military history, is that right?

11       A.    Yes.

12       Q.    Are you expressing any expert opinion on

13  whether any certain combinations are common in

14  military history?

15       A.    No.

16       Q.    And you agree there could be lots of

17  different combinations --

18       A.    Yes.

19       Q.    -- almost an infinite amount?

20       A.    An infinite amount.

21       Q.    And so you are not expressing any

22  opinion that any certain ones of that infinite

23  amount are common in military history?

24       A.    No.

1     Q.   And I think you referenced the Games

2  Workshop products as falling into a futuristic

3  military theme.  Do you remember that?

4     A.   I don't, but I would imagine I do.

5     Q.   It is not on your report.  I think we

6  talked about it earlier.  I asked you what theme

7  would you place it in.  I think you said futuristic

8  military theme.  Do you recall that?

9     A.   Sure.

10    Q.   Let's start over.  What theme would you

11  place Game Workshop products in?

12    A.   Fantasy military world.  It could be a

13  future military --

14    Q.   Fantasy military world?

15    A.   Yes.

16    Q.   Are you expressing any opinion anywhere

17  in your report about what decorative elements would

18  be common in a fantasy military world?

19    A.   No.

20    Q.   Are you expressing any opinion of what

21  decorative elements would be widely used in a

22  fantasy military world?

23    A.   No.

24    Q.   If one were to be designing a fantasy

Page 179

1      A.    Yes.

2      Q.    My question is, it seems you are

3  expanding that example to say "I found one picture

4  of this design of an arrow; therefore, I am

5  concluding it is commonly used in U.S. military

6  history."  I want to understand how you are making

7  that leap.

8      A.    The use of arrows in the United States

9  military insignia and heraldry is a common

10 practice.

11     Q.    Agree.  You've represented that.

12     A.    Yes, and there are many variations of

13 arrows.

14     Q.    Agreed.  My question was, of all those

15 different variations of arrows, are you making any

16 expert opinion that any particular variations of an

17 arrow are commonly used in U.S. military history of

18 the 20th century?

19     A.    I'm only representing that arrows are

20 commonly used and not specific -- there may be

21 specific designs that are redundant, but in general

22 the use of arrows is a common practice.

23     Q.    You are not today expressing any expert

24 opinion that any particular designs of arrows are

Page 180

1    commonly used in U.S. military history of the 20th

2    century?

3         A.    No.

4         Q.    And likewise, you are not expressing any

5    expert opinion in your report or today that any

6    particular designs of an arrow are commonly used in

7    any military history?

8         MR. OH:  Objection, vague and ambiguous.

9    BY THE WITNESS:

10        A.    When referencing to a specific design,

11   no.

12   BY MR. KEENER:

13        Q.    Simply the use of arrows is common?

14        A.    The use of arrows is common.

15              Do you want me to continue citing

16   examples?

17        Q.    Just other examples of arrows you found?

18        A.    Yes.

19        Q.    No.

20        A.    Okay.

21        Q.    Because you are not expressing an

22   opinion that any of those particular examples is

23   commonly used.

24        A.    Correct.

Page 181

1     Q.     Let's move on to chevrons.  What is a

2   chevron?

3     A.     A chevron is two lines that terminate in

4   a "V," typically with regard to an insignia, a

5   shoulder insignia maybe pointing down, have the

6   point downward.  They could also have the point

7   upward.  So it is two lines that terminate in a

8   point, a central point.

9     Q.     Is the letter "V" a chevron?

10    A.     The letter "V" can be depicted as a

11  chevron.

12    Q.     Is it your expert opinion that the

13  letter "V" is a chevron?

14    A.     The letter "V," to my knowledge, is not

15  a chevron.

16    Q.     If someone were to draw the lines of a

17  "V" on something of military use, would you

18  consider it a chevron?

19    A.     It is typically considered a chevron.

20    Q.     Not mattering which way it faces?

21    A.     Not mattering which way it faces.

22    Q.     Has that always been your opinion?

23    A.     Yes.  In the course of my work, we

24  describe forms in records, and so any time that

Page 182

1  form would appear in the context of developing a

2  record, we would describe that as a chevron, that

3  form as a chevron, unless it were specifically a

4  letter "V" or a Roman numeral V.

5       Q.   Understood.  So there are many different

6  orientations a chevron could make?

7       A.   Yes.

8       Q.   And would you agree there is also, if

9  you decided on a particular orientation, many

10 different ways you could still express that

11 chevron?

12      MR. OH:  Objection, vague and ambiguous and

13 objection to the extent it is calling for a legal

14 opinion.

15 BY THE WITNESS:

16      A.   Well, it would still have to be two

17 lines that terminate and create that chevron form

18 or "V" form.

19 BY MR. KEENER:

20      Q.   Does it have to have any particular

21 degree to the angle?

22      A.   Probably, yeah, there is a degree in

23 there, but off the top of my head, I don't know

24 what that degree is.

Page 183

1      Q.    You are not going to express any expert

2   opinion about whether a particular degree is common

3   or not?

4      A.    No.

5      Q.    Are you going to express any expert

6   opinion on whether any particular thicknesses of

7   the chevron are common or not?

8      A.    The width of the lines?

9      Q.    Yes.

10     A.    No.

11     Q.    Are you going to express any expert

12  opinion on the termination of lines and what they

13  are shaped like and whether that is common or not?

14     A.    No.

15     Q.    So your expert opinion is limited solely

16  to the use of a chevron but not any particular

17  design of a chevron?

18     MR. OH:  Objection, misstates -- I will

19  rephrase.  Objection, misstates past testimony and

20  misstates the exhibit that's the expert report.

21  BY THE WITNESS:

22     A.    Correct.

23  BY MR. KEENER:

24     Q.    So your opinion is similar to arrows in

Page 184

1    that it may be common to use chevrons in 20th

2    century military history, but you are not

3    expressing any expert opinion on any particular

4    designs of a chevron being common in military

5    history?

6        A.    Correct.

7        Q.    You mentioned a few minutes ago chevrons

8    being a shoulder insignia.

9        MR. OH:  Objection.

10   BY MR. KEENER:

11       Q.    I refer you back to that testimony.  Do

12   you remember that?

13       MR. OH:  Objection, misstating his prior

14   testimony.

15   BY THE WITNESS:

16       A.    Yes, I referred to chevrons being a

17   shoulder insignia.

18   BY MR. KEENER:

19       Q.    I want to make it clear you did not find

20   any examples of chevrons being on any shoulder

21   pads, did you?

22       A.    I'm sorry?

23       Q.    You did not find any evidence of it

24   being common for a chevron to be on a shoulder pad,

1   did you?

2        A.    Within the real world, no.

3        Q.    You are not expressing any opinion on

4   whether in a future military universe it would be

5   common to use chevrons or arrows as design

6   elements, are you?

7        A.    No.

8        Q.    Let's go back to your report on Page 7,

9   the section on skulls.

10       THE WITNESS:  Can we take the break?

11       MR. KEENER:  Now would be perfect.

12              (WHEREUPON, a recess was had at

13              2:06 p.m. until 2:13 p.m.)

14   BY MR. KEENER:

15       Q.    Are you ready to continue?

16       A.    Yes.

17       Q.    Did you discuss your testimony with

18   counsel during the break?

19       A.    No.

20       Q.    Let's turn to the next item in your

21   report on Page 7, the paragraph on skulls.

22       A.    Yes.

23       Q.    And have you reached an opinion

24   regarding skulls?

1      A.    That skulls are common or become common

2   in 20th century military insignia designs and

3   emblems for military insignia starting with the

4   German Imperial Army in World War I, the German

5   armies of World War II and then for United States

6   Special Forces during the Vietnam conflict.

7      Q.    Is that the extent of your opinion?

8      A.    Yes.

9      Q.    And would you agree that you could

10  depict a skull in many different ways?

11     A.    Yes.

12     Q.    A large number of ways?

13     A.    As restrained or constrained by skull

14  shape.

15     Q.    Of whatever creature's skull you are

16  trying to depict?

17     A.    Of whatever creature's skull you are

18  trying to depict, correct.

19     Q.    So there are actually a large number of

20  ways you could depict a skull?

21     A.    Yes.

22     Q.    Are you making any opinion on whether

23  any particular designs of a skull are commonly used

24  in military history?

Page 187

1      A.    No.

2      Q.    So it is merely the fact of the use of a

3 skull you think is common?

4      A.    Yes.

5      Q.    In your review of U.S. -- strike that.

6            In your review of military history, what

7 creatures' skulls did you find being used in a

8 depiction of a skull?

9      A.    Human skulls.

10     Q.    Did you find any other creatures' skulls

11 being used?

12     A.    Not in -- no, not in the examination I

13 did.

14     Q.    So would you agree with me that it is

15 not common in military history to use a skull other

16 than a human skull?

17     MR. OH:  Objection, vague and ambiguous.

18 BY THE WITNESS:

19     A.    My examination focused on human skulls,

20 so I can't comment on any other skull use.

21 BY MR. KEENER:

22     Q.    Based on your years of experience you

23 are unable to tell me whether or not it is common

24 to use a skull other than a human skull as a

Page 188

1   decorative element within military history?

2       A.   Within my experience, no, it not common

3   practice.

4       Q.   The skulls that you point to as they are

5   human skulls, do you know whether any of them have

6   horns?

7       A.   No, not to my knowledge.

8       Q.   Would you agree that it is uncommon in

9   military history to depict a skull with horns?

10      MR. OH:  Objection, vague and ambiguous.

11  BY THE WITNESS:

12      A.   Yes.

13  BY MR. KEENER:

14      Q.   How about the number of skulls on a

15  decoration?  Do you have any opinion on whether it

16  is common to use more than one skull as decoration?

17      A.   I would say it is uncommon to use more

18  than one skull in decoration.

19      Q.   In fact, every skull you reference in

20  your report is a depiction of design utilizing only

21  one skull?

22      A.   Yes, to the best of my knowledge.

23      Q.   Let's go to the next, which is a

24  cruciform, which is on Page 7 of your report.

Page 189

1      A.      Yes.

2      Q.      What's a cruciform?

3      A.      It is an "X" pattern cross typically or

4  what's referred to as a St. Andrew's cross also

5  that terminates in this particular case with arrows

6  on the end, with arrows at the termination of each

7  of the four branches of "X" or cross.

8      Q.      And what is your expert opinion

9  regarding cruciforms?

10     A.      It was used specifically within the

11 context of political usage.  There is some evidence

12 of usage in the United States military insignia,

13 heraldic insignia, and that there were earlier uses

14 of it, ancient uses of it in China, but the primary

15 focus is on the 20th century use of it.

16              And I should state that in my last line

17 there I note that it postdates World War II where

18 I'm citing that, and that's actually an incorrect

19 statement.  It should be it ends with World War II,

20 to my historical knowledge.  It shouldn't say

21 postdates.

22     Q.      It should say predating?

23     A.      It should be through World War II.

24     Q.      So is it your opinion that the use of

Page 190

1   cruciforms is no longer common in military history

2   after World War II?

3       A.    Other than as it might appear in U.S.

4   heraldic insignia, and I would have to research

5   whether those units are still active that use that

6   insignia.

7       Q.    Is your opinion regarding cruciforms

8   similar to other opinions we have gone through,

9   that the idea of a cruciform you believe is

10  commonly used but not any particular design of a

11  cruciform?

12      A.    Correct, yes.

13      Q.    So you are not expressing any opinion on

14  whether any particular designs of cruciforms are

15  common in military history?

16      A.    No.

17      Q.    Let's go to the next topic, which is

18  gear --

19      A.    Yes.

20      Q.    -- also on Page 7 of your report.

21            What is a gear?

22      A.    A gear is a round device or a round form

23  that has teeth applied to the exterior of the form,

24  the circle, or teeth that may be flat on the top or

Page 191

1  sharp, come to points.

2      Q.    I think your opinion on this one might

3  be different than your opinion on the other

4  decorative elements we discussed.  So do you agree

5  with me that the use of a gear is not common in

6  military history?

7      A.    Not common in military history, I would

8  agree with that, yes.

9      Q.    Your report does note that you did find

10 the use of a gear in a civilian context in a

11 particular period of time in Germany?

12     A.    Yes, during World War II in relation to

13 civilian war activities the gear was common; German

14 civilian activities, the gear was common.

15     Q.    So as it regards this nonmilitary use,

16 is it your expert opinion that a gear is a common

17 design elements in nonmilitary use or that you

18 found it once in a German context in one era?

19     MR. OH:  Objection, compound.

20 BY THE WITNESS:

21     A.    Within the context of German civil

22 activities during World War II, a gear was a common

23 element.

24

Page 195

1      Q.    Let's go to the next one here, which is

2    Roman numerals.  Did you form an opinion regarding

3    Roman numerals?

4      A.    That Roman numerals appear in insignia

5    in use by the United States military.

6      Q.    And have you expressed any expert

7    opinion that they are commonly used in military

8    history anywhere other than 20th century U.S.

9    history?

10     A.    No.

11     Q.    And would you agree that Roman numerals

12   can be expressed in multiple ways?

13     A.    Yes.

14     Q.    Are you expressing any expert opinion on

15   whether any particular design of the Roman numeral

16   is common in military history?

17     A.    No.

18     Q.    Are you expressing any opinion on

19   whether it is common where to place Roman numerals

20   in military history?

21     A.    No.

22     Q.    Similar to the rest of the items we have

23   gone through, decorative elements, you are not

24   making any opinion on whether it is common to put

Page 196

1   those in certain places in military history?

2       A.    No.

3       Q.    Let's go to your summation paragraph.

4   You state, "It is quite apparent that the range of

5   equipment, weaponry and decorative elements claimed

6   by Games Workshop in this litigation has long

7   existed in the real world of international

8   militaries."  Do you see that?

9       A.    Yes.

10      Q.    You don't attempt to identify which

11  range of equipment or weaponry or decorative

12  elements that this opinion refers to, correct?

13      A.    Correct.

14      Q.    And in fact, you don't know out of this

15  binder of thousands of different pictures which

16  ones are actually in this litigation?

17      A.    Other than the ones that I observed and

18  then made reference to in general within the text

19  of this work, yes.

20      Q.    But if I point to a particular page, you

21  don't know whether that is actually at issue in

22  this litigation?

23      A.    No.

24      Q.    So how do you know what's claimed by

Page 199

1      A.    Yes.

2      Q.    But you are not expressing any opinion

3  one way or the other whether any particular

4  decorative element is new or innovative?

5      A.    No.  Simply that the combination of

6  decorative elements is a common practice.

7      Q.    And you are not expressing any opinion

8  whether any particular combination is new or

9  innovative?

10     A.    No.

11     Q.    The next sentence states, "And this is

12 not including an examination of graphic and design

13 materials presented over the four decades in the

14 world of fantasy gaming."

15           Do you see that?

16     A.    Yes.

17     Q.    You are not an expert in the world of

18 fantasy gaming, is that correct?

19     A.    That is correct.

20     Q.    So you are not expressing any opinion in

21 the world of fantasy gaming?

22     A.    Correct.

23     Q.    Your last sentence says, "In my opinion,

24 I find there are no remarkable or original

1    me, yes, it was an element that I could

2    incorporate.

3        Q.    So with your wealth of experience, while

4    you first initially saw blood drops, they did not

5    occur to you as something that would be common in

6    military history?

7        A.    They didn't initially strike me that

8    way, no.

9        Q.    Now, is your opinion with blood drops

10   similar to your opinion on all these other design

11   elements that we discussed in the fact that your

12   comment is the extent of your opinion is the use of

13   blood drops but not any particular design of blood

14   drops?

15       MR. OH:  Objection, vague and ambiguous and

16   compound.

17   BY THE WITNESS:

18       A.    Other than the basic shape of a drop,

19   yes, the basic shape of the drop and its usage, but

20   not in its specific combination.

21   BY MR. KEENER:

22       Q.    Okay.  So maybe it is different, because

23   the other ones, you were not commenting on any

24   particular shape; just the use of a skull or the

# Exhibit

# 6.

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4    GAMES WORKSHOP LIMITED,     )

5                   Plaintiff,  )

6        vs.                    ) Civil Action

7    CHAPTERHOUSE STUDIES LLC   ) No. 1:10-cv-08103

8    and JON PAULSON d/b/a      )

9    PAULSON GAMES,             )

10                  Defendants. )

11

12          The deposition of GARY WOLFE, taken

13   pursuant to the Federal Rules of Civil Procedure of

14   the United States District Courts pertaining to the

15   taking of depositions, taken before PAULINE M.

16   VARGO, a Certified Shorthand Reporter within and

17   for the State of Illinois, C.S.R. No. 84-1573, at

18   Suite 2800, 321 North Clark Street, Chicago,

19   Illinois, on June 28, 2012, at 8:56 a.m.

20

21

22

23

24

Page 2

```
 1   PRESENT:
 2
 3        FOLEY & LARDNER, LLP
          321 North Clark Street, Suite 2800
 4        Chicago, Illinois  60654
          312.832.4500
 5        BY:  JASON J. KEENER, ESQ.
               jkeener@foley.com
 6
               appeared on behalf of the Plaintiff;
 7
 8        WINSTON & STRAWN, LLP
          101 California Street
 9        San Francisco, California  94111-5894
          415.591.1564
10        BY:  K. JOON OH, ESQ.
               koh@winston.com
11
               appeared on behalf of the Defendant.
12
13   ALSO PRESENT VIA TELEPHONE:
14        GILL STEVENSON, ESQ.
          In-House Counsel, Games Workshop
15
16   REPORTED BY:
17        PAULINE M. VARGO
          C.S.R. No. 84-1573.
18
19
20
21
22
23
24
```

Page 70

1  other portions of Games Workshop's products that

2  may by found in prior works?

3       A.    That's correct.

4       Q.    You are not expressing any opinion on

5  whether Games Workshop's products are entitled to a

6  copyright, are you?

7       A.    No.

8       Q.    You are not expressing any opinion on

9  whether any of Games Workshop's products in the

10  entire design is original, are you?

11       MR. OH:  Objection, vague and ambiguous.

12  BY THE WITNESS:

13       A.    Could you restate?

14  BY MR. KEENER:

15       Q.    Sure.  We talked about where the product

16  itself may not be found in the prior works, but you

17  may believe certain elements of that product are

18  found in the prior artworks.  My question is, are

19  you expressing an opinion that for any Games

20  Workshop works the entire work, the entire product

21  was found in the prior works?

22       MR. OH:  Objection, misstating prior

23  testimony, lacks foundation and assumes facts not

24  in evidence.

Page 71

1    BY THE WITNESS:

2          A.    Are you talking about specific figures,

3    not concepts?

4    BY MR. KEENER:

5          Q.    I'm talking about any of the products

6    you analyzed.  Did you say "I found this product in

7    the prior works" versus "I found elements of this

8    product in the prior works"?

9          MR. OH:  Objection, compound.

10   BY MR. KEENER:

11         Q.    Do you understand the distinction I am

12   trying to make?

13         A.    I understand the distinction.

14         Q.    Did any fit that first bucket, where you

15   found that product in its entirety in the prior

16   works?

17         A.    No.

18         Q.    So your report is limited to saying "I

19   found elements of the products in the prior works"?

20         MR. OH:  Objection, vague and ambiguous.

21   BY THE WITNESS:

22         A.    My report is not limited to that.

23   BY MR. KEENER:

24         Q.    What else is there?

Page 72

1          A.    My report is not focusing on design

2    elements but on the construction of the universe in

3    which these design elements occur; and my argument

4    is that that universe freely draws on earlier

5    traditions, as I said in my report.

6          Q.    So you are saying the history draws on

7    the prior works?

8          MR. OH:  Objection, vague.  Objection,

9    misstates prior testimony.

10   BY MR. KEENER:

11         Q.    Is that your testimony?  I'm trying to

12   figure it out.

13         A.    The terminology, the history, elements

14   of the designs refer to prior works.

15         Q.    So you found your report is limited to

16   finding portions of the history in prior works,

17   portions of the terminology in prior works, and

18   certain elements of products in prior works?

19         A.    That is correct.

20         Q.    But you did not find an entire product

21   in prior work --

22         A.    No.

23         Q.    -- or an entire set of terminology in

24   the prior work?

Page 73

1      A.    What do you mean by "an entire set of

2  terminology"?

3      Q.    Games Workshop has all sorts of

4  terminology in its universe, correct?

5      A.    Um-hmm.

6      Q.    Yes?

7      A.    Yes.

8      Q.    You did not find that set of terminology

9  in the prior works versus finding individual

10  elements?

11      A.    No.

12      Q.    And you did not find the entire history

13  of Games Workshop in any prior works?

14      A.    No.

15      Q.    Are you expressing an opinion anywhere

16  in your report that any of the particular products

17  you looked at is similar to something in the prior

18  works?

19      MR. OH:  Objection, vague and ambiguous.

20  BY THE WITNESS:

21      A.    "Similar" is a pretty vague term.

22  BY MR. KEENER:

23      Q.    I'm trying to figure out, are you

24  expressing -- if you are not because it's too

1   vague, that's fine.  Are you expressing any opinion

2   in your expert report that any of the products that

3   you looked at is similar to something you found in

4   the prior works?

5        A.    Similar, probably, yes.

6        Q.    Do you identify in your report those

7   products that you believe are similar to prior

8   works?

9        A.    By "prior works," are you referring to

10  other models, physical models?

11       Q.    I'm referring to anything you are going

12  to say is similar to a Games Workshop product.

13       A.    Certainly some of the terminology is

14  similar.

15       Q.    I'm not focusing on terminology right

16  now.  I'm looking at the products.

17       A.    You are looking at the models

18  themselves?

19       Q.    It could be models.  It could be

20  drawings.  It could be pictorial representations.

21  It could be from their video games.  It could be

22  covers from their books.  Any of the imagery

23  associated with a Games Workshop product, are you

24  expressing an opinion in your report that that

Page 75

1   imagery, however it's conveyed, is similar to some

2   prior work you found?

3          A.    Similar, yes.

4          Q.    Do you identify in your report those

5   Games Workshop products that you are alleging are

6   similar to a prior work?

7          A.    In terms of design, no.

8          Q.    In terms of anything?

9          A.    In terms of terminology, we have already

10  established that.

11         Q.    Except for terminology?

12         A.    Except for terminology.

13         Q.    Do you identify anywhere in your report

14  the Games Workshop products that you think are

15  similar to something in prior works?

16         A.    I do not.

17         Q.    So there is no way for me to test that

18  conclusion?

19         A.    No.

20         Q.    Have you come to an opinion that you

21  express in your report on a general theme or

22  category you place Games Workshop products into?

23         A.    Yes.

24         Q.    And what would that be?

Page 94

1    Q.    So you would agree that there is a

2    common idea of a halberd as a weapon?

3    A.    Yes.

4    Q.    But there are many different ways to

5    design that halberd?

6    A.    Yes.

7    Q.    And the ones you point to in your report

8    are not the same design as the Games Workshop's

9    design?

10   A.    No.

11   Q.    So just as there might be a number of

12   ways to design a vampire, a designer could still

13   make a vampire that's unique, correct?

14   MR. OH:  Objection, vague and ambiguous.

15   BY MR. KEENER:

16   Q.    So is there anything I could find in

17   your report that leads me to believe that these

18   halberd designs from Games Workshop are not unique

19   designs?

20   A.    No.

21   Q.    So you are not making any opinion that

22   these are not unique designs?

23   A.    No.

24   Q.    Turning back to Page 5 of your report.

1      A.     Page 5.

2      Q.     Are you there?

3      A.     I am.

4      Q.     At the bottom of the first full

5  paragraph it states, "Rarely, if ever, has an

6  individual artist, publication or corporation

7  attempted to claim sole ownership of a broad

8  category of such images."

9             Do you see that?

10     A.     Yes.

11     Q.     Is that your opinion?

12     A.     Yes.

13     Q.     And do you believe that that statement

14  applies to Games Workshop?

15     A.     If Games Workshop is claiming sole

16  ownership of a broad category of images involving

17  future war, then this statement would apply to

18  Games Workshop.

19     Q.     What is your understanding of what Games

20  Workshop is claiming ownership to?

21     MR. OH:  Objection.  To the extent he can

22  answer the question without -- again, I am raising

23  the objection just in case you are trying to

24  inquire about communications with attorneys.

1      MR. OH:  Objection, same set.  I'm going to

2   add vague and ambiguous at this point.

3   BY THE WITNESS:

4      A.    I don't know.

5   BY MR. KEENER:

6      Q.    My question is, can you point to

7   anything in your report that would assist in that

8   determination?

9      MR. OH:  Same objections.

10   BY THE WITNESS:

11      A.    Yes.

12   BY MR. KEENER:

13      Q.    Please identify the portions of your

14   report that would help someone identify whether a

15   weapon that's not a halberd is either a part of the

16   future war scenario iconography or original to

17   Games Workshop?

18      A.    I would point to the second full

19   paragraph on Page 5, which refers to space marines.

20      Q.    That's not a weapon.

21      A.    No.

22      Q.    Okay.  My question was a weapon.

23      A.    Oh, okay.  Excuse me.

24      Q.    Assume they are looking at a Games

Page 108

1    Workshop weapon and they are tasked with trying to

2    figure out is this part of the common war scenario

3    iconography or something Games Workshop originally

4    developed.  Can you point to anything in your

5    report that would assist them in that

6    determination?

7         A.    Regarding a weapon, no.

8         Q.    How about any figure other than a space

9    marine or a terminator?

10        A.    A land raider.

11        Q.    Vehicles are separate.  Apart from

12   vehicles.

13        A.    Oh, okay.  All right.

14        Q.    We are going to individuals, whether

15   it's humanoid or other.  Okay.  Is there anything

16   in your report that would help them determine

17   whether something is in the prior works or a Games

18   Workshop original if it's not a space marine or a

19   terminator?

20        A.    I don't believe so.

21        Q.    Looking at any vehicle other than a land

22   raider, is there anything in your report that would

23   help them determine if that vehicle is part of the

24   prior works or a Games Workshop original?

Page 109

1      A.      No.

2      Q.      Besides those ones we just talked about,

3   is there some other product we are looking at from

4   Games Workshop, is there anything in your report

5   that would assist them in determining whether

6   that's part of the future war scenario iconography,

7   in prior works or something Games Workshop

8   original?

9      A.      Probably not.

10     Q.      So it's fair to say that your report can

11  only assist the jury in those specific Games

12  Workshop products you identify?

13     MR. OH:  Objection, again calling for a legal

14  opinion.

15  BY THE WITNESS:

16     A.      And I don't know the answer to that in

17  terms of what would assist a jury.

18  BY MR. KEENER:

19     Q.      But sitting here, you can't identify any

20  other portions of your report that would assist a

21  jury in any other products other than the ones you

22  specifically identify?

23     MR. OH:  Again, same objection.

24  BY THE WITNESS:

1      A.    I don't know.  I can't speculate on what

2  would or would not assist a jury.

3  BY MR. KEENER:

4      Q.    I'm asking can you point to anything you

5  think would assist a jury in determining whether

6  something is from the prior works or a Games

7  Workshop original?

8      MR. OH:  Objection, same.

9  BY THE WITNESS:

10      A.    In terms of referring to specific images

11  in this folder, the only ones that are referred to

12  in my document would be relevant to your question.

13  BY MR. KEENER:

14      Q.    That's not my question.

15      A.    What is your question again?

16      Q.    The question was, is there anything you

17  can point to in your report that would assist a

18  jury in determining whether something is part of

19  prior works or a Games Workshop original other than

20  the specific products you identified in your

21  report?

22      A.    Probably not.

23      Q.    Let's assume for the sake of the

24  question that you are right and that one of the

Page 111

1  products that you looked at does have certain

2  elements that are part of the prior works; you

3  found it somewhere else.

4          What's your understanding of the impact

5  to the case?

6      MR. OH:  Objection to the extent again that is

7  calling for communications with counsel.  I'm

8  instructing him not to answer the question.

9  BY THE WITNESS:

10     A.    I will not answer.

11 BY MR. KEENER:

12     Q.    Do you have an understanding what the

13 impact would be?

14     MR. OH:  Same instructions.

15     MR. KEENER:  That's a yes-or-no question.  I

16 didn't ask where he got it from.

17 BY MR. KEENER:

18     Q.    Do you have any understanding of the

19 impact of your opinion you found something in the

20 prior works?

21     A.    Impact on who or what?

22     Q.    On the case.

23     MR. OH:  Again, same instructions.

24 BY THE WITNESS:

1      A.    No, I'm not going to answer that.

2    BY MR. KEENER:

3      Q.    You are refusing to answer "yes" or "no"

4    whether or not you have an opinion?

5      A.    Yes, I am refusing to answer.

6      Q.    You are refusing to answer "yes" or "no"

7    whether or not you have any understanding of the

8    impact of your opinion?

9      A.    That's correct.

10      MR. OH:  Again, same instructions.  And

11    counsel, you know it is outside the realm for you

12    to talk about communications with counsel.

13      MR. KEENER:  I didn't ask.  I asked his

14    understanding.

15    BY MR. KEENER:

16      Q.    When going through the various Games

17    Workshop works, do you find a set of them related

18    to the Games Workshop race called Eldar?

19      A.    I came across that term.

20      Q.    And there were various personalities and

21    weapons and vehicles related to that?

22      A.    Yes.

23      Q.    Anywhere in your report do you express

24    any opinion on that race?

Page 113

1      A.    About the Eldar, no.

2      Q.    How the Tau, T-a-u?

3      A.    I did not mention that in the report.

4      Q.    Let's go to Page 5 and talk about one

5   that you did mention.  The first one, Tab 29, and

6   you refer to space marine terminator squad.  Do you

7   see that?

8      A.    Yes.

9      Q.    Now, was it your opinion that the term

10  "space marine terminator squad," we have it in

11  quotes, is a common term?

12     A.    "Space marine" is a common term.

13  "Terminator" is a common term.  "Squad" is a common

14  term.

15     Q.    That's not what I asked.

16     A.    That combination of common terms?

17     Q.    Yeah.  What you put in quotes, do you

18  believe that phrase is a common term?

19     A.    The phrase in quotations is not by

20  itself a common term.

21     Q.    So that phrase is unique to Games

22  Workshop?

23     MR. OH:  Objection, lack of foundation.

24  BY THE WITNESS:

1   compare that to?

2       A.    Really, yes.

3       Q.    And you said there was some similarity

4   you saw in the helmet?

5       A.    The helmet, I was again referring to

6   No. 9.  There is a figure inside this mechanized

7   thing, apparently, and no, it does not appear in

8   the photograph of Robot Jox.

9       Q.    And the Robot Jox, the whole figure is

10  up in the helmet, correct, a whole person?

11      A.    I believe so.

12      Q.    And that's not the case in the space

13  marine, right?  It has a head?

14      A.    That's correct.

15      Q.    So the heads are different?

16      A.    Yes.

17      Q.    And it's still your expert opinion that

18  because of the Robot Jox, the pictures of the space

19  marine you saw are not original?

20      MR. OH:  Objection, misstates.

21  BY THE WITNESS:

22      A.    I did not claim that they were not

23  original.

24  BY MR. KEENER:

1      Q.    Is it your opinion that they are not

2    original?

3      A.    I don't have an opinion.

4      Q.    So you have not expressed an opinion

5    either way on whether the design of the image of a

6    space marine is original?

7      A.    Is completely original, I will not

8    express an opinion on that.

9      Q.    And this Robot Jox was one of the three

10   closest similarities you could find in the prior

11   works?

12      MR. OH:  Objection, vague and ambiguous.

13   BY THE WITNESS:

14      A.    I wouldn't say that.

15   BY MR. KEENER:

16      Q.    You included the best evidence to

17   support your opinion in your report, right?

18      MR. OH:  Objection, vague and ambiguous, calls

19   for a legal opinion.

20   BY THE WITNESS:

21      A.    I don't know what best evidence means.

22   BY MR. KEENER:

23      Q.    What you thought was the best evidence

24   to support your opinion that space marines are

Page 166

1    in designing its Hive Tyrant?

2         A.    No.

3         Q.    In light of this picture of a Shrike,

4    would you express any opinion that the Hive Tyrant

5    is not original?

6         A.    Original in terms of what?

7         Q.    An original creation.

8         MR. OH:  Objection to the extent it calls for

9    a legal opinion.

10   BY THE WITNESS:

11        A.    Substantively original or entirely

12   original?

13   BY MR. KEENER:

14        Q.    Substantively original.

15        A.    Substantively but not entirely.

16        Q.    It is mostly original?

17        A.    Mostly original.

18        Q.    Do you know if Games Workshop has

19   accused Chapterhouse of copying the Hive Tyrants?

20        A.    No.

21        Q.    Did you do anything to determine if they

22   did?

23        A.    No.

24        Q.    Do you know if you could look at the

1      Q.    And the fact that an alien might be a

2   common iconography in this field doesn't really

3   assist with whether or not the particular alien

4   Games Workshop created existed in the prior work or

5   is an original creation, correct?

6      MR. OH:  Objection.

7   BY THE WITNESS:

8      A.    Correct.

9   BY MR. KEENER:

10     Q.    And the same goes for all the rest of

11  the iconography you identified?

12     MR. OH:  Objection, vague and ambiguous.

13  BY THE WITNESS:

14     A.    You referred to the specific iconography

15  and then you said it refers to the rest of the

16  iconography.  Which is it?

17  BY MR. KEENER:

18     Q.    I referred to -- you had a list of I

19  believe it was eight or so.

20     A.    Yes.

21     Q.    And I asked a question with regard to

22  one, and I want to see if it applied to the other

23  seven as well.

24     A.    Could you rephrase the question?

1      Q.    The question was, just because an alien

2  is part of the iconography of science fiction does

3  not really have a bearing on whether a particular

4  alien designed by a Games Workshop designer is part

5  of the prior works or is an original creation of

6  that designer?

7      MR. OH:  Objection, vague and ambiguous and

8  compound.

9  BY THE WITNESS:

10      A.    Could you rephrase it again?  I think I

11  know what you are getting at.

12  BY MR. KEENER:

13      Q.    What's unclear?

14      A.    Okay.  Let's take the alien as an

15  example.  There are, as you mentioned, many

16  hundreds of designs of aliens in science fiction,

17  art, literature or film.

18          "Freely borrowing" in my report means

19  that this is an exchange of ideas that you will see

20  frequently.  It does not mean that any particular

21  Games Workshop designer looked at any particular

22  prior model and copied that model any more than any

23  current science fiction illustrator or film

24  designer will necessarily copy a specific earlier

Page 175

1    one.

2        Q.    And it would also mean, for example, a

3    specific alien such as a Hive Tyrant might be

4    substantively original --

5        MR. OH:  Objection, vague and ambiguous.

6    BY MR. KEENER:

7        Q.    -- using the terms you used earlier?

8        MR. OH:  Same objections and misstates prior

9    testimony.

10   BY THE WITNESS:

11       A.    I think it would be fair to say that

12   substantial design elements would be original.

13   BY MR. KEENER:

14       Q.    I think you testified, using again

15   aliens as an example, that there are hundreds, if

16   not thousands, of aliens in the science fiction

17   universe?

18       A.    Correct.

19       Q.    Almost a limitless combination?

20       A.    Not limitless.

21       Q.    A very, very large number?

22       A.    A large number.

23       Q.    And by taking various parts and

24   combining them, it's a very, very large number of

Page 176

1    the number of aliens out there?

2         A.    Yes, I agree.

3         Q.    So almost unlimited when you make

4    combinations?

5         A.    Hypothetically, yes.

6         Q.    Now, assuming this large number of

7    potential aliens for a designer to choose from, do

8    you see any originality in the designer's choice of

9    which elements to combine together?

10        MR. OH:  Objection, vague and ambiguous.

11   BY THE WITNESS:

12        A.    Yeah, I don't know which designer you

13   are talking about.

14   BY MR. KEENER:

15        Q.    A hypothetical designer.  I'm going to

16   design an alien.  There is almost limitless

17   possibilities on the number of arms and face and

18   tail and size and so on, even though there are lots

19   of aliens out there.

20             Do you see originality in the designer's

21   choice of which features from the hundreds of

22   thousands of aliens it chooses to put together to

23   make its own alien?

24        A.    Yes.  There is always room for

1  originality in combining elements from prior

2  aliens.

3      Q.    So even if every feature of a Games

4  Workshop product could be traced back to different

5  elements in the prior works, you would still agree

6  Games Workshop has expressed an original product by

7  combining those elements all together in the way

8  that it has?

9      MR. OH:  Objection, lacks foundation and

10  object to the extent it is calling for a legal

11  opinion.

12  BY THE WITNESS:

13      A.    You are asking if re-combining familiar

14  elements could create an original design?

15  BY MR. KEENER:

16      Q.    Yes.

17      A.    That's correct.

18      Q.    And you are not expressing an opinion

19  either way on whether any of Games Workshop's

20  products are an original design because they are an

21  original creation of different elements?

22      A.    I'm not expressing an opinion on any

23  individual figure, if that's what your question is.

24      Q.    Or even in total?

Page 178

1      A.    In total it becomes a different

2  question.

3      Q.    In total, now they have got what choice

4  of races to include, what variety to include; the

5  choices are even greater, right?

6      A.    Correct.

7      Q.    So the total combination of what they

8  chose to include in their universe again you would

9  agree would be an original decision of that

10  combination of elements even if every single one of

11  those elements was known somewhere else?

12      MR. OH:  Objection, vague and ambiguous, and

13  could the court reporter repeat the question.

14                  (WHEREUPON, the record was read by

15                   the reporter as requested.)

16      MR. OH:  Same objection, and I will add

17  objection to the extent it calls for a legal

18  opinion and assuming facts not in evidence.

19  BY THE WITNESS:

20      A.    As I understood the question as it was

21  read back to me, the choice of combinations of

22  prior elements obviously can be an original choice

23  of combinations.

24

Page 179

1   BY MR. KEENER:

2       Q.    And you are not expressing an opinion

3   either way, on either an individual product or in

4   totality whether or not Games Workshop's

5   combination of elements is an original combination?

6       MR. OH:  Same objections.

7   BY THE WITNESS:

8       A.    I am not sure of the legal meaning of

9   original in this case.  I would say that there is a

10  difference between unique and original.

11  BY MR. KEENER:

12      Q.    We have been using "original" a lot

13  today.

14      A.    You have been using "original."

15      Q.    And you did too, substantively original

16  and so on.  What's your understanding of original

17  in the way you have been using it today?

18      A.    Well, an original design is one

19  substantively invented by the designer.  I should

20  say, a unique design would be different from any

21  prior design in a similar area.

22      Q.    So using your definition of original,

23  back to the same question.  Are you making any

24  opinion on whether a single product for the entire

1   universe of Games Workshop is a combination of

2   elements even if every element is known is an

3   original combination?

4          A.    No, I'm not making an opinion on that.

5          Q.    I think, if I recall your testimony

6   correctly, you stated that the category you would

7   put Games Workshop's products into is the future

8   war story.  Is that accurate?

9          A.    That was referring to my understanding

10  of the scenario, not to all sources of possible

11  design elements.

12         Q.    Would you similarly put Chapterhouse

13  products in that same category?

14         A.    I believe so.

15         Q.    Now, in the paragraph we were looking at

16  on Page 6 you have a list of traditions, is that

17  right?

18         A.    Correct.

19         Q.    And the first tradition is the

20  neo-medieval future?

21         A.    Correct.

22         Q.    And you cite to Gene Wolfe's "The Book

23  of the New Sun" and its various cover

24  illustrations, correct?

Page 181

1        A.      Correct.

2        Q.      Did you include or attach any of the

3    cover illustrations?

4        A.      No.

5        Q.      Did you include or attach any of the

6    portions of the book that you thought supported

7    your opinion here?

8        A.      No.

9        Q.      Did you include any information that

10   would allow one to identify what portions of that

11   book you believe support your opinion?

12       A.      Not specific portions.

13       Q.      Would you agree that not all future war

14   stories include elements from the neo-medieval

15   future?

16       A.      I would agree.

17       Q.      So it would be a choice for a designer

18   in the future war story environment whether or not

19   to include features from the neo-medieval future?

20       MR. OH:  Objection, lacks foundation, assumes

21   facts not in evidence.

22   BY THE WITNESS:

23       A.      Correct.

24

Page 182

1  BY MR. KEENER:

2      Q.    It is not something that the genre of

3  the future war story would require to include?

4      MR. OH:  Objection, vague and ambiguous.

5  BY THE WITNESS:

6      A.    I don't believe I define the future war

7  story as a genre.

8  BY MR. KEENER:

9      Q.    What would you define it as?

10      A.    It is a common theme in science fiction.

11      Q.    What genre would you put Games

12  Workshop's products into?

13      A.    The products related, the products I

14  looked at, would belong in the broad genre of far

15  future science fiction.

16      Q.    With that understanding, would it be

17  required to include aspects of the neo-medieval

18  future in the -- what did you call it -- far future

19  fiction?

20      A.    Far future.  My understanding is 40,000

21  years.

22      Q.    Yes.

23      A.    That's far future.

24      Q.    So my question is, is it your opinion

# Exhibit

# 7.

000001

01          IN THE UNITED STATES DISTRICT COURT

01          FOR THE NORTHERN DISTRICT OF ILLINOIS

02                 EASTERN DIVISION

03

04    GAMES WORKSHOP LIMITED,          )

04                                     )

05              Plaintiff,             )

05                                     )

06          -vs-                       )  No. 1:10-CV-08103

06                                     )

07    CHAPTERHOUSE STUDIOS LLC and JON )

07    PAULSON d/b/a PAULSON GAMES,     )

08                                     )

08              Defendants.            )

09

10          CONFIDENTIAL - ATTORNEYS' EYES ONLY

11          Videotaped deposition of JEREMY GOODWIN

12    individually and as a Rule (30)(b)(6) corporate designee

13    of GAMES WORKSHOP LIMITED, taken before TRACY L.

14    BLASZAK, CSR, CRR, and Notary Public, pursuant to the

15    Federal Rules of Civil Procedure for the United States

16    District Courts pertaining to the taking of depositions,

17    at Suite 3500, 35 West Wacker Drive, in the City of

18    Chicago, Cook County, Illinois at 9:16 a.m. on the 7th

19    day of March, A.D., 2012.

20

21

22

23

24

25    (2005-441521)

000002

01          There were present at the taking of this

02    deposition the following counsel:

03

03          FOLEY & LARDNER LLP by

04          MR. JONATHAN E. MOSKIN

04          90 Park Avenue

05          New York, New York 10016-1314

05          jmoskin@foley.com

06          (212) 682-7474

07              on behalf of the Plaintiff;

08

08          WINSTON & STRAWN LLP by

09          MR. THOMAS KEARNEY

09          101 California Street

10          San Francisco, California 94111-5802

17    have looked at all of those, so they must be relevant to

18    the case.

19         I don't get what you mean.

20         If I was to look for stuff to do with this

21    case, then I deliberately look at things to do with this

22    case.  So, really, that answers the question, does it

23    not?

24    Q   I'll reread the question.

25    A   Okay.


000056

01    Q   When you searched -- when you searched your

02    concepts or mockups of your sculptural works, did you

03    find any that were relevant to this case?

04    A   Yes.

05    Q   What were those?

06    A   The same list as I gave you before.

07         The list is not going to change according to

08    what format of things I look at, whether it's a drawing

09    or a piece of sculpture.

10    Q   Does Games Workshop enter into contracts with

11    freelance artists or sculptors?

12    A   I don't know.  I'm assuming that they do.

13         We don't have any freelance sculptors.  Sorry,

14    I'm going to back up.  We don't have any freelance

15    sculptors.

16    Q   Has Games Workshop ever had freelance sculptors?

17    A   May have done, but certainly not for as long as

18    I can remember.

19    Q   Does Games Workshop have freelance artists?

20    A   I think we have occasionally used them, yes.

21    Q   What do you use them for?

22    A   I would think that was obvious.

23    Q   Can you elaborate?

24    A   Illustration, painting, drawing.  That's what an

25    artist does, isn't it?  It seems an odd question to me.


000057

01    You employ artists.  What do you employ them for?

02    Q   Does Games Workshop employ freelance artists to

03    do the cover of its codexes?

04    A   Yes, I think we've got a couple that have been

05    done.  It's not general policy.

06    Q   Does Games Workshop employ freelance artists to

07    do art for inclusion in its codexes?

08    A   You'd have to show me some examples.  Really,

09    you'd have to show me some examples for me to be able to

10    say yes or no.

11         I would say at least 95 to 99 percent of all of

12    our work is done in-house.  And because I'm not in that

13    department, it's very difficult for me without seeing

14    the thing to be able to say to you that is or that

15    isn't.

16        Q   Sorry, when you say at least 95 to 99 percent of

17    all of our work is done in-house, does that mean that

18    some of your work is done by freelancers?

19        A   It might do.  As I said, this is to do with the

20    art department.  You're asking me questions not with my

21    own department.

22        Q   Again, you understand that you're here to

23    testify about policies, procedures, or practices

24    concerning any natural person involved in the

25    development, design, and creation --

000058

01        A   Sure.

02        Q   -- of Games Workshop's works?

03        A   Sure.  Yes, that's the third time you've asked

04    me that now.

05            I'm trying to answer your questions as best as

06    I ask.

07        MR. MOSKIN:  As is Alan Merrett so designated.

08        THE WITNESS:  That's two names on that.

09        MR. MOSKIN:  As noted, we have objected to the

10    format of the question, the scope of the inquiry.

11        MR. KEARNEY:  Just a moment.  Let's take a break.

12    Go off the record.

13        THE VIDEOGRAPHER:  Ending tape No. 1 of the

14    deposition of Jeremy Goodwin.  We're off the record at

15    10:59 a.m.

16            (a brief recess was taken)

17        THE VIDEOGRAPHER:  Beginning tape No. 2 of the

18    deposition of Jeremy Goodwin.  We're back on the record

19    at 11:16 a.m.

20        MR. MOSKIN:  Let me just note on the record what I

21    stated to counsel off the record five minutes ago, that

22    because a lot of, just to speed this along, that to the

23    extent that we understood what was encompassed by

24    category 9, the area for which this witness was prepared

25    to testify concerned the practices or procedures

000059

01    concerning natural persons when they are involved in the

02    development of works, the design and creation of works.

03        MR. KEARNEY:  Q   Mr. Goodwin, I think you said that

04    Games Workshop -- Strike that.

05            You said you were not aware whether Games

06    Workshop entered into contracts with freelance artists