# Exhibit

# 8.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| |
|---|
| GAMES WORKSHOP LIMITED, |
| Plaintiff, |
| v. |
| CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES |
| Defendants. |

Civil Action No. 1:10-cv-8103

Hon. Matthew F. Kennelly
Hon. Jeffrey T. Gilbert

**PLAINTIFF GAMES WORKSHOP LIMITED'S FURTHER
SUPPLEMENTAL RESPONSE TO DEFENDANT
CHAPTERHOUSE STUDIOS LLC'S INTERROGATORY 22**

Pursuant to Fed.R.Civ.P. Rules 26 and 33, Games Workshop responds as follows to the

Fourth Set Interrogatories of Defendant Chapterhouse Studios LLC.

**GENERAL OBJECTIONS**

1. Games Workshop will produce electronically stored information in a format mutually

agreed upon among counsel, or as otherwise appropriate.

2. Games Workshop objects that the definition of the term "identify" is overbroad and

unduly burdensome and entails the multiplication of numerous individual interrogatories into

multiple separate sub-parts.

**INTERROGATORIES**

**INTERROGATORY NO. 22:**

For each person who authored any portion of the copyrighted material YOU claim
Chapterhouse has infringed, provide that person's (a) dates of employment by Plaintiff; (b) job
title or titles during any time YOU employed the person; and (c) most recent contact information
if the person is no longer employed by Plaintiff.

**RESPONSE:**

Games Workshop objects that this request is overbroad and unduly burdensome and seeks beyond that contemplated by the Federal Rules. The request is also vague and ambiguous. The request further seeks personal information that is confidential. Games Workshop further objects that this request is needlessly cumulative and repetitive of prior discovery requests. Games Workshop refers Chapterhouse to its responses thereto.

Without prejudice to or waiver of the foregoing objections, Games Workshop identifies the following:

| Name | Dates of Employment | Job Title | Ex employee only – current/last known contact details |
|------|---------------------|-----------|-------------------------------------------------------|
| Jes Goodwin | 01/05/1986 - present | Lead Miniatures Designer | n/a |
| Martin Footit | 02/09/1996 - present | Miniatures Designer | n/a |
| Dave Thomas | 23/09/2002 – present | Miniatures Designer | n/a |
| Will Hayes | 04/08/2003 – present | Model Designer | n/a |
| Phil Stutcinkas | 26/03/2007 – present | Model Designer | n/a |
| Juan Diaz Ramos | 01/08/1997 – present | Miniatures Designer | n/a |
| Simon Egan | 01/06/2004 – present | Model Designer | n/a |
| Mark Harrison | 01/06/1999 – present | Miniatures Designer | n/a |
| Tom *Watton (*Walton) | 27/06/2005 – present | Miniatures Designer | n/a |
| Bob Naismith | Ex employee -no information | Miniatures Designer | |
| Brian Nelson | 06/11/1995 - present | Miniatures Designer | n/a |
| Dave Andrews | 16/08/1984 - present | Lead Hobby Designer | n/a |
| Mike McVey | Ex employee - no information | Figure Painter | |
| Adrian Wild | Ex employee - no information | Illustrator | |
| Dale Stringer | 03/09/2001 – present | Miniatures Designer | n/a |
| Mark Bedford | 10/03/1997 – present | Model Designer Supervisor | n/a |
| Neil Hodgson | 01/10/1991 - present | Established Graphic Artist | n/a |
| Paul Rudge | 13/09/2005 – present | Supervisor Layout / Graphics | n/a |

| Dave Gallagher | 12/12/1988 - present | Senior Illustrator | n/a |
|---|---|---|---|
| Karl Kopinski | 01/06/1999 – 08/02/2006 | Illustrator | |
| Alex Boyd | 04/08/1997 – present | Established Illustrator | n/a |
| Paul Dainton | 06/12/1999 – present | Established Illustrator | n/a |
| Rachel (Nuala) Kinrade | 04/08/1997 – Present | Assistant Illustrator | n/a |
| Gary Chalk | Ex employee – no information | Illustrator | |
| Adrian Smith | 01/12/2008 – 11/09/2009 | Established Illustrator | 07896067313 / Home: 01592562008 |
| John Blanche | 06/01/1984 – present | Creative Director | n/a |
| Alan Merrett | 09/01/1981 – present | Creative Director | n/a |
| Rick Priestley | 12/01/1982 – 29/10/2010 | Creative Director | Home: 01159 9831254 |
| Tim Adcock | Start date 02/02/1994 Ex employee – no other information | Miniatures Designer | 158 Warmwells Lane, Mairehay, Ripley, Derbys. DE5 8JE |
| Wayne England | Ex employee – no information | Illustrator | |
| Adam Clark | 11/5/2001 – 12/13/2003 | Trainer; Miniatures Designer | 28A Forest Road West, Nottingham, NG7 4EQ |
| Alistair Morrison | 10/10/1983 – present | Senior Miniatures Designer | n/a |
| Des Hanley | Ex employee – no information | Illustrator | |

Dated: May 3, 2012            Respectfully submitted,

By:    /s/ Jonathan E. Moskin
              Jonathan E. Moskin

          Scott R. Kaspar (Ill. Bar No. 6284921)
          FOLEY & LARDNER LLP
          321 North Clark Street, Suite 2800
          Chicago, IL 60654
          Telephone: (312) 832-4500
          Facsimile: (312) 832-4700
          Email: skaspar@foley.com; aweinzierl@foley.com

          Jonathan E. Moskin
          FOLEY & LARDNER LLP
          90 Park Avenue
          New York, NY 10016
          Telephone: (212) 682-7474
          Facsimile: (212) 687-3229
          Email: jmoskin@foley.com

          *Attorneys for Games Workshop Limited*

**VERIFICATION**

I, Jacqueline Dennison, declare:

On behalf of Games Workshop Ltd. I declare that I have read the foregoing

SUPPLEMENTAL RESPONSE TO CHAPTERHOUSE STUDIOS' INTERROGATORY NO.

22, and to the best of my knowledge and information the contents thereof are true.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge and information.

3 May, 2012

**CERTIFICATE OF SERVICE**

        I, Jason J. Keener, an attorney, hereby certify that on May 3, 2012, I caused a

copy of the foregoing GAMES WORKSHOP LIMITED'S SUPPLEMENTAL RESPONSE TO

INTERROGATORY NUMBER 22 to be served on the interested parties by causing copies of

this document to be served on the following *via* e-mail:

> Jennifer A. Golinveaux, Esq.
> Thomas J. Kearney, Esq.
> WINSTON & STRAWN LLP
> 101 California Street
> San Francisco, CA 94111
> jgolinveaux@winston.com
> tkearney@winston.com
> jcdonaldson@winston.com
>
> Eric J. Mersmann, Esq.
> WINSTON & STRAWN LLP
> 35 West Wacker Drive
> Chicago, IL 60601
> cdiggins@winston.com
> emersmann@winston.com

        /s/ Jason J. Keener
        Jason J. Keener

# Exhibit

# 10.

Civil Action No. 1:10-cv-8103

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

### GAMES WORKSHOP LIMITED

Plaintiff

v.

### CHAPTERHOUSE STUDIOS LLC

and

### JON PAULSON d/b/a PAULSON GAMES

Defendants

---

### EXPERT REPORT
### OF
### MICHAEL BLOCH QC
### AND
### DR HARRIS BOR

---

## INSTRUCTIONS

1.  We have been instructed by Foley & Lardner LLP on behalf of Games Workshop Limited, the Plaintiff in this matter, to provide expert evidence in these proceedings by way of an expert report to be supported by oral testimony, if required, on English law as it applies to certain aspects of copyright ownership in literary and artistic works.

2.  In particular, we have been asked to provide our assessment on the position in English law relating to the following matters:

1

(a)   The ownership of IP in the employment context;

(b)   The ownership of IP when works have been jointly created; and

(c)   The principle of implied or equitable assignment.

3.   We have also been asked to opine on how these principles are likely to apply to issues in this case based on the materials with which we have been provided.

4.   Annexed to this expert report is an exhibit marked "MB1" containing authorities which we refer to in this report.

## QUALIFICATIONS AND EXPERIENCE OF MICHAEL BLOCH QC

5.   I am an English barrister specialising in commercial and intellectual property law with experience as both a trial lawyer and appellate advocate. I was called to the bar of England and Wales in 1979 and became a Queen's Counsel in 1998. I work from Wilberforce Chambers in Lincoln's Inn, London.

6.   As an intellectual property lawyer I have advised and appeared in a series of substantial breach of confidence, copyright, design right, intellectual property licensing, passing off, patent and trademark court cases and arbitrations, including: *Star Wars* (*Lucasfilm Ltd v Ainsworth* [2009] FSR 2) (discussed below) (copyright in props and the justiciability of foreign intellectual property rights), *GSK v Abbott Laboratories* (the interpretation & application of worldwide pharmaceutical patent licences), *19 Entertainment v Simon Cowell* and others (the X Factor format copyright case), *Numatic v Qualtex* (the shape of the Henry vacuum cleaner), *Specsavers v ASDA* (the logo and strapline dispute), *easyGroup v easyJet* (a brand licence dispute), *Aspinal v*

*Kiki James* (registered and unregistered designs), *Odnoklassniki* (copyright , confidence, employment and partnership claims relating to a social networking site), *United Biscuits v ASD* (the Penguin v Puffin case), *Chocosuisse v Cadbury* (the Swiss Chalet chocolate case), *Inter Digital Technology Corp v Nokia* (UMTS patent dispute), *Oxford Gene Technology v Affymetri* (the Southern Patents), and several international arbitrations relating to pharmaceuticals and coating technology.

7. A more detailed curriculum vitae/resume can be found attached to this report. I have not previously testified in any cases (either at trial or in a deposition) over the last four years. I have not published any books or articles in the last ten years.

8. I am being compensated at £750 plus VAT per hour.

## QUALIFICATIONS AND EXPERIENCE OF DR HARRIS BOR

9. I am an English barrister specialising in commercial litigation, banking and financial services litigation, and international arbitration. I became an English law qualified solicitor in 2002, a solicitor-advocate in 2003, and was called to the bar of England and Wales in 2005. I work from Wilberforce Chambers in Lincoln's Inn, London.

10. A number of matters on which I have worked have involved intellectual property including, most recently, the following matters in the English Court of Appeal, *Les Laboratoires Servier v Apotex Inc* (a pharmaceutical patent case), and *Budejovicky Budvar Narodni Podnik v Anheuser-Busch LLC* (Budweiser trade mark case).

11. A more detailed curriculum vitae/resume can be found attached to this report. I have not previously testified in any cases (either at trial or in a deposition) over the last four years. The legal books or articles that I have published over the last ten years are:

(a)   "Does National Court Involvement Undermine the International Arbitration Process?" (Assisted author, Julian Lew QC), American University International Law Review, Volume 24, Number 3 (2009).

(b)   "Claims without Contract: Economic Torts Come of Age", The In-House Lawyer, 13 February 2009.

(c)   "Dispute Resolution Clauses - A Contradiction in Terms",The Hedge Fund Journal, 25 September 2008.

(d)   "Arbitration- Running the Line", Legal Week, 15 November 2007.

(e)   "Review Article: A Practical Guide to Mediation in Intellectual Property, Technology & Related Disputes by Jon Lang (2006)", The International Journal of Arbitration, Mediation and Dispute Management.

(f)   "ADR Possibilities in Investor-State Disputes", The International Journal of Arbitration, Mediation and Dispute ManagementVol. 73 No. 1 February 2007.

(g)   "Solvent Abuse on Schemes of Arrangement" (co-author), Legal Week, 8 September 2005.

(h)   "Access to the Internet for the Visually Impaired", E-Business Law Journal, July 2004.

(i)   "Special Feature Article: Restrictive Covenants and Employees Abroad" (co-author), Employment Lawyers' Association Briefing, Vol. 10, September/October 2003.

(j)   "Court Finds ISP Not Liable For Opinion Posted By Users", MLRC Media Law Letter, 27 July 2003.

12.   I am compensated at £250 plus VAT per hour.

## EXPERT'S DECLARATION

13.   We confirm that we understand that our duty in providing this expert evidence is to the Court, and that our duty as an expert witness overrides our duty to those instructing us, that we have understood this duty and complied with it in giving our evidence impartially and objectively and that we will continue to comply with that duty. We have never previously acted for any of the parties to these proceedings.

## MATERIALS CONSIDERED

14.   In producing this report, we have been provided with, and considered, the following materials:

(a)   The Second Amended Complaint filed on 19 January 2012;

(b)   The Second Amended Answer filed on 6 February 2012;

(c)   The Transcript of the Deposition of Jes Goodwin of 7 March 2012;

(d)   The Transcript of the Deposition of John Blanche of 2 April 2012;

(e)   The Transcript of the Deposition of Andrew Jones of 3 April 2012;

(f)   Various examples of artwork or illustrations worked on by Jim Burns and Will Rees;

(g)   A Confirmatory Assignment between John Sibbick and Games Workshop Limited of 1994;

(h)   Copyright Agreements between Games Workshop Limited and Dan Abnett dated 1996 and Ben Counter dated 2002, and subsequent commissioning forms;

(i)   A Trade Mark and Copyright Licence between Games Workshop Limited and Sabertooth Games Inc dated 19 July 2001 and amendment and confirmatory assignment relating to that agreement;

(j)   An Intellectual Property Licence between Games Workshop Limited and THQ Inc of 1 January 2007;

(k)   2012 Form of Confirmatory Assignment of Intellectual Property Rights between Games Workshop Limited and employees; and

(l)   A model jury instruction for copyright cases in the Court of Appeals for the Seventh Circuit.

## PARTIES' POSITIONS

15.   Our understanding from the documents that have been provided to us and our instructing lawyers is as set out below.

16.   The Plaintiff is a United Kingdom corporation with numerous stores in the United States, including in and around Chicago, Illinois, which is its single largest selling market in the United States (Complaint, para 1).

17. Proceedings have been discontinued against the Second Defendant. The remaining Defendant is a Texas limited liability company (Answer, para 3).

18. The Plaintiff has brought these proceedings for, inter alia, copyright infringement under 17 USC, para 101, as set out at paragraph 4 of the Complaint. The Defendants deny the allegation at paragraph 4 and specifically deny any wrongdoing.

19. The copyright at issue relates to various characters, armies, accessories, and literature relating to the Plaintiff's games, designed and manufactured in England, which the Plaintiff claims were protected by copyright belonging exclusively to it (Complaint, paras 13 and 14).

20. The game at issue is Warhammer 40,000. This was originally created in or about 1986-1987 by four individuals, all of whom were at the time employees of Games Workshop, Alan Merrett, Jes Goodwin, Rick Priestley and John Blanche. The content was first published in 1987 in a book entitled Rogue Trader.

21. One of the defences raised or suggested by the Defendants is that, under English law, the Plaintiff does not own all of the copyright in various images or illustrations used in, or associated with, the Warhammer 40,000 game and underlying works, as these were created by independent contractors/freelancers and therefore, as stated in the Answer, the Plaintiff "lacks standing to enforce" them (Answer, Affirmative Defenses, pages 31 and 32).

22. The Plaintiff's position is as follows:

    (a) An overwhelming majority of the works in issue were created by employees of the Plaintiff;

7

(b)  Freelancers were involved to some degree in the creation of some depictions of the characters, armies and literature with respect to Warhammer 40,000, but did so in close collaboration with employees of the Plaintiff and under their close direction and control. Often the role of the freelancer was to merely render works from one form created by the Plaintiff into another, e.g. to prepare an illustration from a model. Further, all of the contributions of these individuals were circumscribed by the overriding need to conform to existing literary, sculptural and illustrative works setting out the parameters of the game; the background story of the game; the rules of the game and the minute details of the characters and armies in the game and in the background story originally created by employees of the Plaintiff (namely, John Blanche, Jes Goodwin, Alan Merrett and Rick Priestley). Over time, this background "universe" has grown to number hundreds of books or magazines and tens if not hundreds of thousands of sculpted miniatures, drawings and paintings;

(c)  Many of the so-called "freelancers" referred to above were in fact employees of the Plaintiff who carried out some additional "freelance" work;

(d)  It was known to all those involved in the creation of Warhammer 40,000, that the purpose of the Plaintiff's business is to make money from selling games and associated products and that this entails the Plaintiff having an absolute and exclusive interest in any copyright created in the development of such games and products;

(e)  It has been the Plaintiff's practice to obtain confirmatory assignments from contributing independent contractors/freelancers. However, some of these agreements cannot be found for a few of the works that the Defendants are

accused of copying. It is our understanding that of the 12 works in issue in which alleged independent contractors/freelancers have participated, only 2 have not as yet been located by the Plaintiff. Both of these works, were produced by people who either had been or have since been employees of the Plaintiff; and

(f)   There has been no legal challenge by any independent contractor/freelancer concerning the use of any copyright by the Plaintiff during the extensive relevant period since 1987.

23.   In terms of factual background, the Plaintiff has also referred me to the transcripts of the depositions of Jes Goodwin, John Blanche and Andrew Jones, and has provided further background by way of interview with Mr Blanche, which indicate that in the years since 1987, while there has been substantial development of the underlying characters, armies, accessories, and literature relating to Warhammer 40,000, the vast majority (95-99%) of these materials have been created by Games Workshop employees (Goodwin/23/11-12).

24.   The background materials we have reviewed also reveal, by way of example, the following information regarding the use made by the Plaintiff of independent contractors/freelancers:

(a)   Rogue Trader, which was published in about 1987 as the first work setting forth the major characters, armies, backstory and rules of Warhammer 40,000, used cover art produced by John Sibbick, a freelance artist (Blanche/31/10). We understand that the Plaintiff has a confirmatory assignment of copyright from Mr Sibbick.

9

(b) Jim Burns, was a freelance painter of Space Marines, a principal army in the Warhammer 40,000 game. They appeared in illustrations. He was given unpainted sculptures to work from and asked to paint with reference to colour references provided to him, as well as previous illustrations (Blanche/34-35).

(c) Will Rees, a freelancer, produced illustrations including a character called Adeptus Mechanicus. Before producing these he had been provided with concept art produced by Mr Blanche and Jes Goodwin (Blanche/38/3-16).

(d) Many or most of the people who worked on the Rogue Trader publication were employed by Games Workshop doing other things but some also produced artwork for which they were not separately compensated (Blanche/46/1-8; see also 66/11-16).

25. Mr Blanche was of the view that, when commissioning a picture, the Plaintiff paid for the rights to it: "*If an artist paints a picture of a 40K image, he cannot go off and sell that as a magazine cover for somewhere, because it is a Games Workshop image. You are commissioning the image and the artist retained the actual hard copy of the picture but not the rights to publish the picture, wherever and whenever he wanted*" (Blanche/138/8-17).

26. Mr Blanche further describes how he oversaw and managed the work of freelance artists, including by defining the parameters of their work, and using tracing paper to alter characters to fit the Plaintiff's backgrounds or other requirements (Blanche/134/25 to Blanche/135/19).

27. Mr Jones' description of the authors of the Plaintiff's publications is as follows: "*The authors, actually it was a mixture. There were some of the guys who work in our design*

studio, as writers, authors and so on, or some of the game designers maybe. Then there was a bunch of contracted freelancers who we had to brief. We had very specific briefing meetings, not just in terms of the individual stories but the overarching themes of the magazine. Those were internal meetings, because everything that was done in Warhammer Monthly obviously had to meet the directions of John Blanche and Allan Merrett and those guys. Once we had got that in place we were then able to go and steer and work with external freelancers, some of whom then became full-time employees and some of whom still work with us today" (Jones/98-99).

28. Mr Jones further described the way in which the Plaintiff worked with independent contractors/freelancers as follows: "so once we have created ...that framework, we can then work with freelancers to explore parts of it, to either accomplish a specific goal that we have or to explore further a specific element of the universe. So we won't just say to a freelancer: "Hey you are great. I have read some of your novels. Why don't you just go off and write a Warhammer 40,000 novel". We would never do that. We would have to sit down with them and work, like I say, hand in hand, to make sure that they would be sending—you know we would work with them on what the storyline was, to make sure it fitted, and then we would be working on Lord knows how many drafts and extra drafts. As they came in and were edited we would have to say: "That doesn't fit", or "Have you thought about this, or why don't you put this in?"" ((Jones/100-101).

29. On the basis of the factual background described above, the Plaintiff maintains that as a matter of English law:

(a) Any copyright in issue created by an employee belongs to the Plaintiff as employer;

11

(b)   The independent contractors/freelancers are to be treated as employees by virtue of the nature of their role with the Plaintiff and the degree of control exercised over them by the Plaintiff;

(c)   Even assuming that the Plaintiff does not hold exclusive rights by express or implied assignment, the works created by the independent contractors/freelancers in collaboration with employees of the Plaintiff appear, minimally, to be joint works, in which the Plaintiff would own at least part of the copyright in any event; and

(d)   To the extent that the Plaintiff did not initially own the copyright in the contested works, this has been assigned to the Plaintiff by way of an equitable or implied assignment by virtue of the nature of the Plaintiff's business or by written assignment.

30.   It is in this context that we have been asked to detail the relevant principles of English law that relate to these matters and opine on the possible application of these to the facts and matters in dispute in this case.

**EXECUTIVE SUMMARY**

31.   In summary, our opinion is:

(a)   English law recognises that employers own the copyright of employees (with an exception for journalists with respect to certain copyright in newspapers, periodicals or magazines for works created between 1956 and 1989). The definition of the term "employee" depends not only on what was agreed, but on other factors including how integral the work being produced is to the business;

12

(b)    English law recognises a basis for joint ownership where: (i) a work has been created in collaboration with another; (ii) each author has contributed significant creative input; and (iii) there is a distinct contribution from each author. It is possible therefore to have a work of joint ownership between an independent contractor/freelancer and the entity being served in that capacity. Each owner would hold the work as a tenant in common and would have a right to bring an action against an infringer without needing to seek permission from the other owner(s);

(c)    English law recognises equitable or implied assignments in certain specific circumstances most often where: (i) the purpose in commissioning a work is for a client to multiply and sell copies on the market for which the work was created free from the sale of copies in competition with the client by the contractor or third parties; (ii) the contractor creates a work which is derivative from a pre-existing work of the client; and (iii) the contractor is engaged as part of a team with employees of the client to produce a composite or joint work; and

(d)    Based on the factual circumstances of the case as set out in the documents and as instructed, and assuming such facts are proven to the satisfaction of the Court:

    (1)    Under English law, at least some of the independent contractors/freelancers in this case can be treated as employees rather than independent contractors, by virtue of the nature of the work they were involved in and the manner in which it was performed;

    (2)    We understand that none of the individual contractors/freelancers who contributed to the works in issue created their illustrations independently,

and that close collaboration was the norm, with the Plaintiff employees contributing their skill and creativity. Under English law, such illustrations, where there is no distinct authorship, would constitute joint works, which would mean that the Plaintiff owns the copyright in the work irrespective of whether an independent contractor/freelancer also owns the same copyright; and

(3) Under English law, even if the Plaintiff were unable to identify written assignments from each of the independent contractors/freelancers, the circumstances are consistent with an equitable assignment of works from independent contractors/freelancers to the commissioner of such works in this case. In view of the nature of the business and deposition evidence, the intention of the relevant parties appears to be for the Plaintiff to multiply and sell copies on the market for which the work was created free from the sale of copies in competition with the client by the contractor or third parties. The evidence also points to work created in collaboration and which was derivative. The factors giving rise to an equitable assignment as a matter of English law are therefore present.

## ENGLISH LAW ON COPYRIGHT OWNERSHIP

### Sources

32. Copyright brought into existence between 1 June 1957 and 1 August 1989 is governed by the Copy Right Act 1956 (the "1956 Act"). Copyright brought into existence after the 1 August 1989 is governed by Copyright, Designs and Patents Act 1988 (the

14

"CDPA 1988"). Case law provides authority as to how these acts are to be interpreted and applied.

**General principles and overview**

33. Ownership is important as actions for infringement can only be brought by an owner of the copyright (1956 Act, s17; CDPA 1988, s96). Exclusive licence holders also have concurrent rights to bring infringement proceedings (1956 Act, s19; CDPA 1988, ss101-102).

34. The general rule in relation to literary and artistic works has always been that the author is the first owner of the copyright (1956 Act, s4(1); CDPA 1988, s11(1)). This includes where a work has been commissioned. The definition of the term "author", however, depends on many factors. The general rule is also subject to a number of statutory exceptions, including in the employment context, as will be discussed.

35. English law also recognises the possibility of an equitable or implied assignment, meaning that, in specific situations, the true beneficial owner of a copyright may be found to be distinct from the original or nominal author. In this situation, the legal owner holds the copyright on trust for the beneficial owner. Equitable assignment will be discussed in detail below.

36. In general terms, the author of a work is the person who originates the protectable elements of the work, whether the language used, dramatic incident or design. The determination as to who produces the relevant language or item turns on the specific facts of the case.

37. A person may be the true author if he/she is responsible for creating, selecting or gathering together the detailed concepts data or emotions contained in a work (*Cala Homes (South) Ltd v Alfred McAlpine Homes East Limited* [1995] FSR 818). In the context of a literary work, a person who suggests a plot may be one of the authors provided that his/her suggestions are sufficiently substantial, well defined and original (*Ibcos Computers Ltd v Barclays Mercantile Highland Finance Ltd* [994] FSR 275, 302).

38. In all cases, it is necessary to identify the products of the skill and labour which made the work original and thus protected and then determine the person responsible for their provision (Copinger & Skone James on Copyright, 16th edition, 2010, 4-11; 4-19).

39. Where more than one person has contributed to a literary or artistic work, it is necessary to consider whether there is any copyright, and if so who owns it. There are a number of possibilities:

(a) *Independent ownership*: Where two or more persons produce distinct parts of a work or distinct works, each will separately own that distinct part of the work or distinct work;

(b) *Successive or derivative works*: Where people have worked successively on a work to provide successive versions derived from an earlier version, each version may be treated as a separate work and each version may be deemed to have a separate author. The outcome will depend on whether sufficient skill and labour has been expended by each person on the work;

(c) *Joint ownership*: Where two authors collaborate on a work and there is no distinct authorship, ownership will be joint. This topic will be returned to below; and

(d)  *No ownership*: Where contributions to a literary or artistic work are minimal, the law may not recognise any author or owner of the work.

**Issue 1: Employees**

40.  As indicated above, one common exception under both the 1956 Act and 1988 Act to the rule that the author is the first owner of the copyright is where the author is an employee.

*General rule*

41.  Section 4(4) of the 1956 Act, relating to pre-1 August 1989 copyright provides that:

> *Where . . . a work is made in the course of the author's employment by another person under a contract of service or apprenticeship, that other person shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act.*[1]

42.  Contract of service is an employment contract. An apprentice contract is where an apprentice is bound to his employer for the purposes of learning a trade or calling (The Modern Law of Copyright and Designs, 4th edition, 2011, 22.32).

43.  Section 11(2) of the CDPA 1988 provides that:

> *Where a literary, dramatic, musical or artistic work, or a film, is made by an employee in the course of his employment, his employer is the first owner of any copyright in the work subject to any agreement to the contrary.*

---

[1] There is an exception for journalist employees concerning certain exploitation rights with respect to copyright in newspapers, periodicals or magazines and the like for works created between 1956 and 1989, although with respect to publication rights, the general rule applies (1956 Act, s4(2)).

44. The position under the CDPA 1988 reflects the views of the Whitford Committee tasked to consider the Law and Copyright and Design. It found in its 1977 report that: *"As a matter of principle, if a person is employed to do a job of work and paid for his services according to the nature of those services, the product of his labour should, subject to any agreement to the contrary, belong to his employer"* (Cmnd 6732).

*Meaning of the term "employee"*

45. English law distinguishes between two types of contracts, a contract of service (employment contract) and a contract for services (service contract) i.e., between an employee and an independent contractor.

46. The test to distinguish these types of contracts that has found most favour in an English court is whether the work done is or is not integral to the business of the entity to which service is being provided. The test is set out in *Stevenson, Jordan and Harrison v MacDonald and Evans* (1952) 69 RPC, a case before the House of Lords, the highest English court (now replaced by the Supreme Court), where Lord Denning MR stated:

> *One feature which seems to run through the instances is that, under a contract for service [i.e., an employment contract] a man is employed as part of the business, and his work is done as an integral part of the business; whereas under a contract for services, his work, although done for the business, is not integrated into it, but is only accessory to it.*

47. The test was later approved and clarified by Cooke J in the Court of Appeal (i.e., second highest court) case *Market Investigations Ltd v Minister of Social Security* [1969] 2 QB 173, 184 and 188. He stated:

18

*The observations of Lord Wright, of Denning L.J. and of the judges of the Supreme Court suggest that the fundamental test to be applied is this: "Is the person who has engaged himself to perform these services performing them as a person in business on his own account?" If the answer to that question is "yes," then the contract is a contract for services. If the answer is "no," then the contract is a contract of service [i.e., an employment contract]. No exhaustive list has been compiled and perhaps no exhaustive list can be compiled of the considerations which are relevant in determining that question, nor can strict rules be laid down as to the relative weight which the various considerations should carry in particular cases. The most that can be said is that control will no doubt always have to be considered, although it can no longer be regarded as the sole determining factor; and that factors which may be of importance are such matters as whether the man performing the services provides his own equipment, whether he hires his own helpers, what degree of financial risk he takes, what degree of responsibility for investment and management he has, and whether and how far he has an opportunity of profiting from sound management in the performance of his task.*

*The application of the general test may be easier in a case where the person who engages himself to perform the services does so in the course of an already established business of his own; but this factor is not decisive, and a person who engages himself to perform services for another may well be an independent contractor even though he has not entered into the contract in the course of an existing business carried on by him.* (emphasis added)

48. The above test has been approved in numerous subsequent cases including the High Court, Chancery Division, case of *Beloff v Pressdram Limited and Another* [1973] F.S.R. 33. Here, a lobby correspondent for the Observer newspaper sued the publisher of Private Eye, a magazine, for publishing an internal Observer memorandum written by her. She claimed to be entitled to the copyright on the basis that she was employed as an independent contractor or as an assignment from the editor. The Defendant denied that she was an employee. The Court reviewed the history of Ms Beloff's role with the Observer. It found that she was integrated into the business and was therefore an employee.

49. In reaching his decision, Mr Justice Ungoed-Thomas noted that: *"the greater the skill required for an employee's work, the less significant is control in determining whether the employee is under a contract of service. Control is just one of many factors whose influence varies according to circumstances. In such highly skilled work as that of the plaintiff it seems of no substantial significance."* In other words, if the worker is skilled he/she may still be considered to be an employee if his/her work is integral to the business, even though the employer does not exercise over him/her a particular degree of control.

50. After the citation above, Mr Justice Ungoed-Thomas went on to say:

> The test which emerges from the authorities seems to me, as Lord Denning said, whether on the one hand the employee is employed as part of the business and his work is an integral part of the business, or whether his work is not integrated into the business but is only accessory to it, or, as Cooke, J expressed it, the work is done by him in business on his own account.

51.   Applying this principle to the facts in the case, he said:

> *I come to other recognised indications of contract of service, in addition to her substantial regular salary for her full-time job and her holidays. Apart from an electric typewriter, which the plaintiff has at home, the plaintiff does not provide any equipment of her own which she uses for her work. All the Observer's resources are available to her to carry out her job. She has an office in the Observer building, and a secretary who is provided by the Observer. She does not use her own capital for the job, nor is her remuneration affected by the financial success of otherwise of the Observer. In addition to P.A.Y.E. deductions, deduction for the pension scheme to which she belongs is also made by the Observer from her salary. All these indications are in favour of her contract being a contract of service.*

52.   The English Court of Appeal appears to have expanded the factors that a court can take into account in its analysis. So, in the tax case of *Hall (Inspector of Taxes) v Lorimer* [1994] 1 W.L.R. 209, Nolan LJ remarked that: *"The extent to which the individual is dependent upon or independent of a particular paymaster for the financial exploitation of his talents may well be significant"*.

53.   It is evident from the above authorities that an English court will look beyond the narrow contractual arrangement (including how taxes are paid or what remuneration or other benefits are received) when determining the precise status of a service provider to consider the nature and context of the services being provided, including most importantly how integral the services are to the business. Under English law, therefore, an ostensible independent contractor/freelancer, therefore, may well be found to be an

employee as a matter of law, including for the purposes of determining copyright ownership.

*Meaning of the term "course of employment"*

54. A further issue that sometimes falls to be determined when considering copyright in a service contract context is whether the copyrighted work is made "in the course of employment", such that the employer owns the copyright.

55. The term course of employment has been interpreted as being comparable with the term *"within the scope of his duties"*, and the distinction is often made between a case where an employee made the work as part of his duties as an employee and where the making was merely accessory to it and not part of it (*Stephenson, Jordan and Harrison v MacDonald and Evans* (1952) 69 RPC 10). The scope of employment can also change either explicitly or by implication (*Noah v Shuba* [1991] F.S.R. 14 Ch D; *King v The South African Weather Service* [2009] F.S.R. 6).

56. Further, commentaries confirm that:

> The fact that work is done outside normal working hours does not necessarily mean that the work is not done in the course of employment. Indeed for many employees today there is no clear demarcation of the hours of work. It is suggested that if the work is within the scope of employment and done for the benefit of the employer, it will have been done in the course of employment.
> (Copinger, 5-20)

57. It follows that an employee of a games company, employed as an illustrator, but who on request undertakes work to assist in developing a model even outside working hours,

22

will be acting in the course of his/her employment, if the work is being done for the benefit of the employer.

58. Each case will be determined on its own facts. However, by way of illustration:

   (a)  In *Byrne v Statist Co [1914]* 1 KB 622, an editor who made a translation, on request, in his own time at home, was found not to have done so in the course of his employment;

   (b)  In *Stephenson, Jordan and Harrison v MacDonald and Evans* (1952) 69 RPC 10, the writing of a book by a management consultant during work hours was done within his employment, but lectures carried out for which he was not paid was not;

   (c)  In *King v The South African Weather Service* [2009] F.S.R. 6, a South African Supreme Court case, King was a meteorologist who developed a computer programme eventually used by the defendant. He had initially begun his computing work after hours, but increasingly worked on it during work hours. It was found to have been carried out in the course of his employment.

59. In a situation, therefore, where an employee provides a broad range of services to his employer, mostly in work hours or with the co-operation of his employer, and is paid for such work he/she is likely to have been found to carry out the same in the course of his/her employment.

**Issue 2: Joint authors/owners**

60.   As stated above, where two authors collaborate on a work and there is no distinct authorship, ownership will be joint. The possibility of joint ownership is recognised by both the 1956 Act and the CDPA 1988.

61.   Joint ownership is dealt with at schedule 3 of the 1956 Act. Paragraph 6 reads:

> *Subject to the preceding provisions of this Schedule, any reference in this Act to the author of a work shall (unless it is otherwise expressly provided) be construed, in relation to a work of joint authorship, as a reference to all authors of a work.*

62.   Section 10(1)-(3) of the CDPA 1988 similarly provides that:

> *(1)In this Part a "work of joint authorship" means a work produced by the collaboration of two or more authors in which the contribution of each author is not distinct from that of the other author or authors.*
>
> *...*
>
> *(3) References in this Part to the author of a work shall, except as otherwise provided, be construed in relation to a work of joint authorship as references to all the authors of the work.*

63.   This means that, regardless of whether a work falls to be considered under the 1956 Act of CDPA 1988, a joint author may bring proceedings for infringement.

64.   The factors that are required for joint authorship have been clearly set out by Lightman J, with reference to earlier decisions, in the case of *Robin Ray v Classic FM plc* [1998] FSR 62:

*A joint author is accordingly a person (1) who collaborates with another author in the production of a work; (2) who (as an author) provides a significant creative input; and (3) whose contribution is not distinct from that of the other author. He must contribute to the "production" of the work and create something protected by copyright which finds its way into the finished work: see Cala Homes (South) Ltd v. Alfred McAlpine Homes East Ltd [1995] F.S.R. 818 ("Cala"). Copyright exists, not in ideas, but the written expression of ideas. A joint author must participate in the writing and share responsibility for the form of expression in the literary work. He must accordingly do more than contribute ideas to an author: he must be an author (or creator) of the work in question. It is not enough that he thought up the plot of a play or made suggestions for a comic routine to be included (see Tate v. Thomas [1921] 1 Ch. 503); or indeed that he passed on his reminiscences to a ghost writer (see Evans v. E. Hulton & Co. Ltd [1923–8] Macg. Cop. Cas. 51). It is not sufficient that there is established to have been a division of labour between two parties in the project of writing a book if one alone is entirely responsible for the skill and labour of authorship of the book: see Fylde Microsystems Ltd v. Key Radio Systems Ltd, unreported, February 11, 1998, Laddie J.*

*In Cala Laddie J. held that there is no restriction on the way in which a joint author's contribution may be funnelled into the finished work, and in particular that there is no requirement that each of the authors must have exercised penmanship. There is no reason why penmanship should be insisted on any more in case of joint authors than in the case of a sole author, who may dictate his work to a scribe. But in my judgment what is required is something which approximates to penmanship. What is essential is a direct*

*responsibility for what actually appears on the paper. Accordingly in Cala, where a director of Cala provided a very detailed input (including much of the design features) in plans which architects were instructed to prepare and through regular briefing and vetting sessions with the architects ensured that the plans accorded with Cala's "image", he was held to be a joint author with the architects of the plans they prepared. As it appears to me, the architects in that case were in large part acting as "scribes" for the director. In practice such a situation is likely to be exceptional.* (emphasis added)

65. Joint owners own the copyright in the work, under English law, as Tenants in Common (*Acorn Computers v MCS Microcomputer Systems Pty Ltd* (1984) 4 IPR 214). Hence, each has an undivided interest in the property. The effect of this is in terms of exploitation is that no party owner may exercise its rights without permission of the other owners or accounting to them. However, it has long been accepted that under English law that a co-owner may bring an action for infringement against another without the consent or presence of the other co-owners. Any damages, though, are likely to be recoverable only with respect to his/her share (*Acorn Computers v MCS Microcomputer Systems Pty Ltd* (1984) 4 IPR 214); The Modern Law, 22.59).

**Commissioned works**

66. Often a party will retain or commission another to produce a particular work in return for payment. The general position both before and after 1989 is that when a party commissions another to create a work, the first legal owner of the copyright is the person that created the work and not the commissioner, unless it is agreed otherwise in writing.

67. Under the 1956 Act, there is an exception applying prior to 1 August 1989 copyright in photographs, portraits and engravings (and only those types of work) which were created as a result of a commission. Such works are owned by the commissioner and not the creator.

68. This is provided for at s4(3) of the 1956 Act:

> ...where a person commissions the taking of a photograph, or the painting or drawing of a portrait, or the making of an engraving, and pays or agrees to pay for it in money or money's worth, and the work is made in pursuance of that commission, the person who so commissioned the work shall be entitled to any copyright subsisting therein by virtue of this Part of this Act.

69. The commission though must have been undertaken for money or money's worth that is equivalent goods or services.

70. For a work to be a photograph or portrait they must display the likeness of a person (The Modern Law, 22.42).

71. By s48(1) of the 1956 Act the term "engraving" is defined as including an "etching, lithograph, woodcut, print or similar work, not being a photograph". There are judicial statements which suggest based on this definition that the term might apply to dies and moulds used in the production of plastic items and even the plastic items themselves (The Modern Law, 22.44; see also 4.23). This may have relevance to artistic works produced in this case, for example moulds for the armies or characters used in the games.

72. In *Wham-O Manufacturing Co v Lincoln Industries Limited* [1985] RPC 127, the Court of Appeal of New Zealand gave a very wide definition to the term "engraving" finding that it covered the mould for the making of Frisbees (i.e., plastic disks used for throwing). In reaching its decision the Court of Appeal found that:

> *Modern technology for creating reproductions has involved various new processes being devised and we doubt that the making of a "print" can any longer be identified with any one or more particular processes or procedures. There appears currently to be no good reason why an article produced by injection moulding from a mould which is an engraving should not be itself an engraving if it is produced from that mould.*

73. The approach in *Wham-O* was followed in England by Floyd J in the English High Court in the case of *HiTech Autoparts Ltd v Towergate Two Ltd (No 1)* [2002] FSR 15).

**Issue 3: Equitable or implied assignment**

74. English law recognises written assignments of copyright (1956 Act 236; CDPA 1988 s90). In addition, apart from the specific statutory provision for engravings and the like under the 1956 Act, English law more generally recognises the possibility of an equitable or implied assignment between the creator of a work and another. One of those situations is where a party commissions a work for payment. In such a situation, an English court will often imply a term into the commissioning agreement for the copyright to be held on trust for the commissioner as the true beneficiary of the same. This would entitle the equitable assignee to assert the copyright as against others.[2]

---

[2] An English court would expect, as a matter of procedure, save in "special cases", for an assignor of an equitable assignment to be named as a party to an action against an alleged infringer. (There is little guidance on

75.    For a term to be implied into any agreement under English law the certain general conditions are usually required to be satisfied. As shown below, these conditions have been given more specific meaning by cases very similar to the facts here. The general conditions have been described as follows:

(a)    The term must be reasonable and equitable;

(b)    It must be necessary to give business efficacy to the contract such that no term will be implied if the contract is effective without it;

(c)    It must be so obvious that it goes without saying [3]; and

(d)    It must be capable of clear expression; and

(e)    It must not contradict any express term of the contract.

*(BP Refinery (Westernport) Pty Ltd v The President, Councillors and Ratepayers of the Shire of Hastings (1978) 52 A.L.J.R. 20 at 26).*

76.    Further, where terms are to be implied to fill a lacuna, i.e., there has been no provision made in the contract for the specific situation, the principle is that in deciding on the various alternatives which should constitute the contents of the term to be implied, the

___

what constitutes a *"special case".*) Even absent a determination that a case is "special", such joinder is something of a formality and can take place at any time prior to judgment, even after trial, if the facts indicate that an equitable assignment should be found. The equitable assignor need not actually participate in the proceedings (for example, if he or she cannot be found), but must be named so as to prevent a risk of a second judgment against the defendant. To protect the defendant, the joinder ensures that any finding is binding on the assignor *(Performing Right Society Ltd v London Theatre of Varieties Ltd* [1924] AC 1, 14). In 2010, the English Supreme Court confirmed the general position: *"In more modern times it has been held that, although the practice was to join the assignor, the requirement is a procedural one, the absence of which can be cured. The assignor must be joined before a final judgment can be obtained by the assignee, but the action is validly constituted without joinder, so that if the assignee sues without joining the assignor, the action is in time for the purposes of limitation [i.e., time bar]"* *(Roberts (FC) v Gill & Co Solicitors* [2010] UKSC 22).

[3] The English court explains that this phrase *"is no more than another way of saying that, although the instrument does not expressly say so, that is what a <u>reasonable person</u> would understand it to mean"* (emphasis added) *(Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10, 23-25).

choice must be that which does not exceed what is necessary in the circumstances
(House of Lords in *Liverpool City Council v. Irwin* [1977] AC 239).

*Robin Ray v Classic FM plc*

77. One of the most important authorities on this area giving specific meaning to the
general conditions described above is the High Court case of *Robin Ray v Classic FM
plc* [1998] FSR 620. In *Robin Ray*, the claimant entered into a consultancy agreement
with the defendant to advise it on the composition of the classical music repertoire of
the radio station Classic FM , to catalogue its music library, and to assist it in assessing
the popularity of the specific works. The claimant was aware that the station intended to
use an automated music programme selection system.

78. The claimant prepared five documents setting out a detailed categorisation of the
classical music repertoire including rating each work's popularity. The defendant
produced a database of these documents. The station later wanted to sell the database to
foreign radio stations. The claimant objected, but the defendant went ahead.

79. The claimant sued for copyright infringement arguing that since the works had been
commissioned he owned the copyright in the work. The defendant argued, among other
things, that there had been an implied assignment and so the claimant held the
copyright on trust for it.

80. Mr Justice Lightman summarised the matters before him as follows:

> *There has been cited to me a considerable number of authorities where a
> copyright, brought into existence by a person ("the contractor") pursuant to a
> contract for services with another ("the client"), has been held to belong in*

30

*equity to the client. One example is Massine v. de Basil [1936–45] Macg. Cop. Cas. 223. What was at issue in that case was the copyright in the plaintiff's choreography for a ballet intended to form part of the repertoire of the defendant's ballet company. The Court of Appeal held that the contract between the defendant and the plaintiff was that of employer and employee, and accordingly the copyright vested in the defendant as employer. But the Court also held that, even if the contract was not one of employment but for services, it was an implied term of the contract that the plaintiff as contractor would assign the copyright to the defendant as client. The Court emphasised that the ballet was a composite work of which the elements were the music, the story, the choreography or notation of the dancing, the scenery and the costumes, and held that it must necessarily have been intended that the copyright in the whole ballet and each of its component elements should be in the client.*

*The issue in every such case is what the client under the contract has agreed to pay for and whether he has "bought" the copyright. The alternatives in each case are that the client has bought the copyright, some form of copyright licence or nothing at all. It is common ground in this case that by implication the consultancy agreement at the least confers on the defendant a licence to use the copyright material for the purposes of its radio station. The issue is whether the defendant impliedly bought the copyright or a more extensive licence than the limited licence conceded.*

81.  The Judge then went on to summarise the principle of implied terms referred to above. He continued to consider the factors that may lead a court to find an implied term

between a commissioner of a work and an independent contractor/freelancer for an assignment of the copyright from the latter to the former.

> *Circumstances may exist when the necessity for an assignment of copyright may be established. As Mr Howe has submitted, these circumstances are, however, only likely to arise if the client needs in addition to the right to use the copyright works the right to exclude the contractor from using the work and the ability to enforce the copyright against third parties. Examples of when this situation may arise include: (a) where the purpose in commissioning the work is for the client to multiply and sell copies on the market for which the work was created free from the sale of copies in competition with the client by the contractor or third parties; (b) where the contractor creates a work which is derivative from a pre-existing work of the client, e.g. when a draughtsman is engaged to turn designs of an article in sketch form by the client into formal manufacturing drawings, and the draughtsman could not use the drawings himself without infringing the underlying rights of the client: (c) where the contractor is engaged as part of a team with employees of the client to produce a composite or joint work and he is unable, or cannot have been intended to be able, to exploit for his own benefit the joint work or indeed any distinct contribution of his own created in the course of his engagement: see Nichols Advanced Vehicle Systems Inc. v. Rees [1979] R.P.C. 127 at 139 and consider Sofia Bogrich v. Shape Machines, unreported, November 4, 1994, Pat Ct and in particular page 15 of the transcript of the judgment of Aldous J. In each case it is necessary to consider the price paid, the impact on the contractor of assignment of copyright and whether it can sensibly have*

> *been intended that the contractor should retain any copyright as a separate item of property.*

82. It follows that for any court the important factors when considering an equitable assignment are:

    (a)    The purpose for commissioning the work;

    (b)    Whether the work is derivative of another work; and

    (c)    Whether the contractor is engaged as part of a team with employees of the client to produce a composite or joint work.

83. These factors are referred to as "examples" in *Robin Ray* and are therefore non-exhaustive.

*R Griggs Group Ltd v Evans*

84. In *R Griggs Group Ltd v Evans* (No.1) [2005] F.S.R. 31, the English Court of Appeal considered a case where Griggs commissioned a design for the famous "Doc Martens" footwear from the second defendant, a rival manufacturer. The task was delegated to first defendant. The Judge in the lower court, applied the principle in *Robin Ray*, and found that in the circumstances copyright beneficially belonged to the claimant and that it could call for legal title to it.

85. In reaching his decision, the Judge found as follows:

> *It seems to me that when a free-lance designer is commissioned to create a logo for a client, the designer will have an uphill task if he wishes to contend that he is free to assign the copyright to a competitor. This is because, in order to give*

33

> *business efficacy to the contract, it will rarely be enough to imply a term that the client shall enjoy a mere licence to use the logo, and nothing more. In most cases it will be obvious, it will 'go without saying', that the client will need further rights. He will surely need some right to prevent others from reproducing the logo.*

86. The defendant appealed the decision, and this was upheld by the Court of Appeal. Robin LJ, who provided the leading Judgment, confirmed the principles set out in *Robin Ray* referring to Mr Justice Lightman's summary of the law as *"masterful"* (paragraph 14). He went on to uphold the Judge's decision stating that: *"Indeed it seems to me that, in the ordinary way, a logo is a paradigm case falling within principle in Lightman J's formulation."* (paragraph 37).

*Lucasfilms Ltd v Ainsworth*

87. Subsequent cases have followed a fairly consistent approach. In *Lucasfilms Ltd v Ainsworth* [2009] FSR 2, the claimant company was involved in the production of the Starwars films released in 1977 and the subsequent licensing of the IP and merchandising associated with the film. Michael Bloch QC acted for the claimant in this case, which progressed from the High Court, to the Court of Appeal, and then to the Supreme Court.

88. The first defendant had made the armour for the film's characters in vacuum moulded plastic including the white helmet for the imperial stormtroopers. In 2004, his company which had retained the original moulds began to sell versions of the armour to members of the public. The claimant brought proceedings. The defendant claimed that it owned the copyright in the moulds.

89. The High Court found that there was no copyright in the film props under English law, but also said that the first defendant must have known that the claimant expected full exploitation rights in the future and that he could not realistically have expected to have retained any for himself. It was relevant that the claimant had provided clear specifications to the defendant. The Judge also rejected the argument that it was only necessary to imply a licence.

90. The most relevant passages of the Judgment are as follows:

> 185...*Mr Ainsworth was working to render into 3D form the copyright designs of others. He could not himself make further copies without infringing that copyright. If he had produced the drawing exactly, then he would not have produced an original work, and could not have claimed copyright. He did not do that, and contributed his own bits and pieces, but in doing so he was getting as close as he conveniently could, bearing in mind technical requirements, to the client's design. He must have known that the client would expect full exploitation rights in the future for the purposes of its dramatic offering and cannot realistically have expected to have retained any for himself. If the officious bystander had asked the required question (suggesting that Lucas would have all the rights and that Mr Ainsworth would not be entitled to exploit them without Lucas's licence) then the required testy suppression would have been forthcoming. I think that this is a classic case for saying that there is an implication that the commissioner would have the copyright in the helmet (if any).*
>
> ...

*...I consider that Mr Wilson is right in applying the test of necessity, but wrong in his suggested result. Lucas was not commissioning something relatively everyday. Even if the licensing prospects could not have been foreseen, the whole appearance and "feel" of the film was central to its operation, and it cannot have been the intention of either party that there could be parallel exploitation of the props so that, for example, Mr Ainsworth could make more and sell them to other film-makers. The only thing that makes sense is an obligation to assign copyright.* (emphasis added)

91. The size of the fee paid to the defendant was also considered, but rejected as a relevant factor in the circumstances. The defendant appealed. The Court of Appeal [2010] FSR 10 at 195 to 208 upheld the analysis of the lower court. Its conclusion at paragraph 207 was as follows:

*Thus we agree with the judge that the situation in this case was in line with the circumstances discussed by Lightman J. and ruled on by this court in R Griggs Group Ltd v Evans (No.1) [2005] F.S.R. 31 . Indeed it falls within each of the circumstances (a), (b) and (c) discussed by Lightman J. in his [7] and may thus be said to be an a fortiori case. It makes no sense to consider that copyright interests should be divided between "team Lucas", if we can express it that way, and Mr Ainsworth, who in truth became part of the team when he accepted the responsibility of working on the designs provided to him in order to manufacture the finished article. That would only have been an uncommercial recipe for mutually inconsistent rights: Lucasfilm could not order more props without running the risk that Mr Ainsworth would charge a blackmailing price; it could not exploit any licensing opportunities without similar dangers; and Mr*

*Ainsworth of course could do nothing with any copyright interests that might have remained with him without the complete co-operation of Lucasfilm.*

92. The defendant appealed to the Supreme Court, but no permission to appeal on this point was granted. This would have been a necessary pre-requisite for the case continuing on this issue (see *Lucasfilm Ltd and others v Ainsworth and another* [2012] 1 AC 208, paragraph 7).

*Clearsprings Management Ltd v Businesslinx Ltd*

93. A case that went the other way is *Clearsprings Management Ltd v Businesslinx Ltd* [2006] F.S.R. 3. In this case, the claimant commissioned software to be used in its own web-based database system, and later sought to prevent the defendant from using it on the basis that the software had been impliedly assigned to it.

94. Floyd J found against the claimant after applying the test set out in *Robin Ray*. Unlike the cases above, there was nothing to indicate that the parties by necessity intended an assignment. In fact the opposite was the case. The claimant provided information to the defendant on its business for the purposes of the defendant producing the product, but the claimant was also aware that the defendant would borrow from pre-existing software to produce the product.

95. There was therefore no collaboration or derivative work as such, but instead an understanding that the defendant may wish to utilise the software for future clients. The only implication that was necessary, therefore, was an implied licence in favour of the claimant to use the software for business purposes and a restriction on the defendant on making use of claimant's operating procedures for purposes other than the claimant (see paragraphs 36 and 37 of the Judgment).

*Other cases*

96.  Other cases highlight the distinction between situations where assignments need to be implied because no other situation is envisaged and those where some kind of licence would be sufficient (see *Nichols Advanced Vehicle System Inc v Rees* [1979] RPC 127 at 139- consultant to car industry where an assignment was implied; *Warner v Gestener* [1988] EIPR 89. Logo design where an assignment was implied; *Pasterfield v Denham* [1999] FSR 168 commission for production of promotional leaflet to promote tourist attraction where assignment was implied; *Massine v de Basil* [1936-45] Macg Cop Cas 223- choreographer for Russian Ballet, Covent Garden, London, where assignment was implied; and *Saphena Computing Ltd v Allied Collection Agencies Ltd* [1995] FSR 616 at 6340 commissioned for in-line software, licence found but no assignment).

97.  From an analysis of the relevant cases, it is evident that English courts have repeatedly implied assignments into agreements where businesses have commissioned items that form part of their business, where there is some collaboration and which they intend to promote as part of their business. However, the principle will not apply where items have been commissioned purely for internal use, and are provided by those who intend to sell items with similar components elsewhere (see also The Modern Law of Copyright, 22.78).

## APPLICATION TO THE FACTS

### Independent contractors/freelancers as employees

98. In our view English law supports a finding that at least some of independent contractors/freelancers working for the Plaintiff were in fact employees, as a matter of law. This most obviously applies to individuals who were in fact employees while also contributing additional efforts, but would also apply to others who were nominally freelancers but who, under the application of the general factors outlined above, would be acting in the capacity of employees.

99. This would mean that the copyright in work produced by them is owned by the Plaintiff whether created before or after 1 August 1989, i.e., whether the 1956 Act of the CDPA 1988 applies. Copyright in a work published in a newspaper, magazine or similar periodical owned by the Plaintiff created prior to 1 August 1989 created by an employee would only belong to the Plaintiff in so far as it relates to publication of that work (and not exploitation) (1956 Act, s4(2)), unless there has been an actual or implied assignment of the exploitation rights, or the work is one of joint ownership.

100. Some of the factors relevant under English law to determining the issue of employment are:

(a) Whether the work was integral or subsidiary to the business of the Plaintiff. The cases confirm that this is a crucial factor;

(b) The scope of control that the Plaintiff had over the workers. The greater the level of control, the more likely it is that a court would view the workers as employees;

(c) The extent to which the workers benefitted from the Plaintiff's management and infrastructure;

(d)   Whether the workers used their own equipment and/or staff/assistants to perform
      the work;

(e)   The regularity and mechanics of remuneration;

(f)   The level of financial risk undertaken by the workers; and

(g)   Whether the workers were working for the Plaintiff exclusively, i.e., whether they
      had more than one paymaster.

101.  Factors suggested by the evidence that are relevant under English law in determining
      whether independent contractors/freelancers were employees include the following:

(a)   The centrality of the projects worked on by the independent contractors to the
      Plaintiff's business. The independent contractors worked on illustrating
      characters and painting character models, and literature, all of which appear to be
      integral to the Plaintiff's business. There is also evidence that freelancers saw
      themselves as being integral to the business (Blanche 18/8-20). The fact that
      independent contractors worked closely with the Plaintiff's employees is also
      significant in this context (Blanche/18/14-19; Blanche/31-33);

(b)   There appears to have been a significant level of control exercised over the
      freelancers by the Plaintiff. In terms of literature, there were briefing meetings
      and control over themes of the magazine (Jones/98-99), and control over writers
      of fictional games including making sure the storyline fitted (Jones 100-101). Mr
      Blanche's testimony explaining how he oversaw and managed the work of
      freelance artists, including by defining the parameters of their work, and using
      tracing paper to alter characters to fit the Plaintiff's backgrounds or other

40

requirements is also significant in this context (Blanche/134/25 to Blanche/135/19).

(c)   Independent contractors, such as John Blanche, who (before the Plaintiff created Warhammer 40,000) moved between employed and freelance status (Blanche/16/6-25) and many of the independent contractors for example who worked on Rogue Trader were employed by the Plaintiff in another capacity (Blanche/46/1-8; Blanche/66/11-16); and

(d)   In the case of John Blanche, and therefore perhaps others, work, and therefore presumably remuneration, seems to have been regular (Blanche/18/8-20).

**Joint ownership**

102.   We understand that none of the individual contractors/freelancers who contributed to the works in issue created their illustrations independently, and that close collaboration was the norm, with the Plaintiff employees contributing their skill, creativity, guidance and control. Under English law, such illustrations, where there is no distinct authorship, would constitute joint works.

103.   The effect of this is that the owners hold such works as tenants in common, subject to statutory principles applying to employees or equitable assignment. For example, if an illustration work was created by an employee and true independent contractor, the copyright would be held by the Plaintiff as employer of the employee and the contractors in equal measure, and each could bring an action against an infringer under English law.

104.   As stated above, for there to be joint ownership, there has to be:

(a)  Collaboration with another author in the production of a work;

(b)  Significant creative input; and

(c)  Distinct contribution is not distinct from that of the other author.

105.  The evidence in the depositions points towards a high level of collaboration with respect to writing projects, character development and illustrations in particular (Blanche 31-33). A court would have to consider each item and the relative contribution of those involved in its creation to determine whether each has made a significant creative input that is distinct from the other.

106.  In addition to there being joint ownership, it also seems likely to me that under English law there are instances where the freelancer's contribution was not sufficiently creative to establish any ownership by the freelancer. One example of this is where a painter merely paints an illustration with reference to colour references provided to him by another. There is a reference to this type of input in the evidence (Blanche/34-35).

**Equitable assignment**

107.  In view of the case law and commentaries and based on the materials which we have seen, we are of the view under English law the facts are consistent with an equitable assignment from the independent contractors/freelancers to the Plaintiff in this case. We have not been advised of any facts suggesting otherwise.

108.  Our reasons for this opinion are as follows:

(a)  The use of the works appears to be crucial to the Plaintiff's business not only in selling them in different forms but using them to develop further products. It is

difficult to imagine how the business could have been intended to operate if the intention was for copyright to be shared. Indeed, Mr Blanche testified that: "*If an artist paints a picture of a 40K image, he cannot go off and sell that as a magazine cover for somewhere, because it is a Games Workshop image. You are commissioning the image and the artist retained the actual hard copy of the picture but not the rights to publish the picture, wherever and whenever he wanted*" (Blanche/138/8-17). We conclude, therefore, that this appears to be a case where the intention was for the commissioner to be the only person entitled to exploit the works by making copies and enforce the copyright against third parties to protect its business;

(b)    We understand that all of the freelance works were created in collaboration, with the Plaintiff's employees, and that no freelance work was therefore created truly independently (Blanche/18/14-19; Blanche/31-33; Blanche/46/1-8; Blanche/47/5-15; Blanche 55/16-19);

(c)    The Plaintiff appears to have kept close control over those freelancers with which it worked and the work they produced. For example, Mr Jones testified with respect to the Warhammer Monthly that it had to "*meet the directions*" of John Blanche and Allan Merrett (Jones/98-99). He also described the creative process with respect to Warhammer 40,000 where explorations were carried out with freelancers to: "*...either accomplish a specific goal that we have or to explore further a specific element of the universe. So we won't just say to a freelancer: "Hey you are great. I have read some of your novels. Why don't you just go off and write a Warhammer 40,000 novel". We would never do that.(Jones/100-101)*;

43

(d)   The copyright in issue appears to be only in derivative works, where the Plaintiff has provided ideas, concepts, sketches, or plans (Blanche/16/16-25; Blanche 34-35; Blanche/38/3-16);

(e)   It seems to have been the Plaintiff's practice, when contracts were entered into with independent contractors/freelancer and third parties licencees, to include an assignment of IP rights to it. We note, for example, the 1994 contract between John Sibbick and the Plaintiff which provides at paragraph 1 that: "*In consideration of the sum of £1,000 now paid by the Assignee to the Assignor (the receipt of which is now acknowledged), the Assignor as beneficial owner hereby assigns to the Assignee ALL property right title and interest throughout the world in the Work including all statutory and common law rights appertaining to it and the right to sue for past infringement TO HOLD the same unto the Assignee free from encumbrances absolutely during the full period of copyright including all renewals, reversions and extensions thereof*";

(f)   We also note paragraph 3.1 of Mr Abnett's copyright agreement with the Plaintiff, and Section 9 of the Intellectual Property Licence between Games Workshop Limited and THQ Inc of 1 January 2007, which provide for assignment of IP to the Plaintiff;

(g)   Our understanding is that the Plaintiff's general practice has been to obtain confirmatory assignments but that it has simply been unable to locate a small number of these agreements. This is consistent with our other conclusions regarding the parties' intent; and

(h)   Our understanding that there has been no legal challenge by any independent contractor/freelancer concerning the use of any copyright by the Plaintiff during the extensive relevant period since 1987, which, again, is consistent with all of the above facts and governing principles of law.

109.  The facts in this case are also far more closely aligned to the facts in *Lucasfilms Ltd v Ainsworth*, and even *Nichols Advanced Vehicle System Inc v Rees*, *Warner v Gestener*, *Pasterfield v Denham*, and *Massine v de Basil* where the copyright was integral to how business makes profits and an assignment of copyright was implied than cases, such as *Clearsprings Management Ltd v Businesslinx Ltd* (business software case), where it was not.

110.  It follows from the above that based on the general circumstances and deposition evidence it is unlikely to have sensibly been intended that the author should retain any copyright as a separate item of property.

111.  Even if an English court did decide that there was no equitable assignment in the circumstances (which we do not think would be the case), it would in our view not hesitate to find that freelancers had granted an exclusive licence to the Plaintiff which would, as explained above, still give it standing in an English court to bring infringement proceedings.

**STATEMENT OF TRUTH**

112.  We confirm that we have made clear which facts and matters in this report are within our own knowledge and which are not. Those that are within our own knowledge we confirm to be true. The opinions we have expressed represent our true and complete professional opinions on the matters to which they refer.

45

113. We reserve the right to supplement this report, as appropriate, to the extent that additional facts come to light.

Signed:

Dated:

1 May 2012

Michael Bloch QC
Dr Harris Bor

Wilberforce Chambers
Lincoln's Inn
8 New Square
London
England
WC2A 3QP

2 May 2012    1 May 2012

46