# Exhibit

# 116.



# TROOPS

The Grey Hunters and Blood Claws are the real backbone of a Space Wolves force, and a unit of each is a good start when collecting an army. Like all Space Marines they are highly skilled and difficult to take down. To enhance this, it's best to take them in large units, where their numbers increase their chances of survival.



*Grey Hunters pack*



*Blood Claws pack*



*The ubiquitous Rhino armoured personnel carrier.*

# FAST ATTACK & HEAVY SUPPORT





*Long Fangs*



*Leman Russ 'Exterminator'*

The fast and long-ranged units of the Space Wolves are best used to back up the infantry squads. Bikes can make rapid attacks along the flank, while Long Fangs provide heavy firepower or tank-busting support. The Space Wolves are the only Chapter to use a Leman Russ battle tank, the mobile and deadly 'Exterminator' variant. The Exterminator is perfect for cutting through enemy light vehicle and infantry squads.



*Blood Claws bike pack*



19

GW0002493

# Exhibit

# 117



Customer Service    1-800-394-4263   | Welcome! | Sign In | Why Register?

FREE SHIPPING ON ALL ORDERS OVER $50   OFFER DETAILS

0 item(s) @ $0.00

Community & Events    Virtual Gift Vouchers    Store Finder    White Dwarf    Find a Gift List    Warhammer 40,000 Guide

Product Search

Warhammer 40,000   Warhammer 40,000 Armies   Space Wolves   Elites
Space Wolves Wolf Guard Terminators

# Space Wolves Wolf Guard Terminators

Tweet   Like 135   ADD TO CART

**Have you got?**



$74.25   add to cart

**Space Marine Land Raider**



$49.50   add to cart

**Canis Wolfborn**

**Categories**

Getting Started
Warhammer 40,000 Advance Orders
Warhammer 40,000 New Releases
Warhammer 40,000: Assault on Black Reach
Warhammer 40,000 Essentials
Warhammer 40,000 Armies
Blood Angels
Chaos Daemons
Chaos Space Marines
Dark Eldar
Eldar
Grey Knights
Imperial Guard
Necrons
Orks
Sisters of Battle
Space Marines
Space Wolves
Getting Started
Army Essentials
HQ
Elites
Troops
Dedicated Transports
Fast Attack
Heavy Support
Bitz
Novels
Space Wolves Articles
Tau Empire
Tyranids
Warhammer 40,000 Expansions
Warhammer 40,000 Citadel Finecast
Warhammer 40,000 Scenery
Warhammer 40,000 Bitz
Warhammer 40,000 Collectors
Warhammer 40,000 Books
Warhammer 40,000 Articles

Follow us on Twitter
Follow us on Facebook
Bookmark & Share
Subscribe to What's New Today

Print
Email to a Friend



   

## Space Wolves Wolf Guard Terminators

The Wolf Guard are the hand-picked battle-brothers that fight alongside each Great Company's Wolf Lord. Each has earned his place through some heroic feat of arms. Wolf Guard Terminators are a brotherhood of hulking, nigh-invulnerable champions, each eager to dispense his own particular brand of death.

This box set contains five multi-part plastic Space Wolves Wolf Guard Terminators. This 100-piece set includes: five different leg variations, five torso variants and 13 different shoulder guard variants, and 13 heads. Also included are: four sets of wolf claws, an assault cannon, four thunder hammers and storm shields, a heavy flamer, five storm bolters, three power fists, two chainfists, a frost axe, and a power sword. Models supplied with 40mm round bases.

**Availability:** Usually ships within 24 hours.
**Part Code:** 99120101079

**Price: $50.00**

Quantity: 1

ADD TO CART

ADD TO GIFT LIST

Bookmark & Share

**Related Articles**

- Exclusive Battle Mission: Space Wolves
- Space Wolves - Golden Demon Showcase
- Space Wolves - Sample Armies
- Imperial Guard & Bitz, & basing materials
- Getting Started with Space Wolves
- Saga Of The Great Wolf

**With this box set you can make the following:**

### Wolf Guard Terminator Pack

| | WS | BS | S | T | W | I | A | Ld | Sv |
|---|---|---|---|---|---|---|---|---|---|
| Wolf Guard Terminator | 4 | 4 | 4 | 4 | 1 | 4 | 2 | 9 | 2+ |

**Unit Composition:** 3-10 Wolf Guard

**War Gear:** Terminator armour, Storm bolter, Power weapon

Carry Our Products    Real Estate    Privacy Policy    Legal    About Us    Black Library    Forge World    Investor Relations    Careers    Site Map    Contact Us

Country Select

Copyright    © Games Workshop Limited 2000-2012    © New Line Productions Inc    © The Saul Zaentz Company d/b/a Middle-earth Enterprises    All rights reserved to their respective owners.

# Exhibit

# 118.

# Chapterhouse Studios

Specializing in Custom Sculpts and Bits for Warhammer 40,000 and Fantasy

Show cart...
Your cart is empty.

| Home | News | About us | Contact | Order Status and Shipping | Customer Comments | Gallery |

## ☙ Our Store

**Infantry and Shoulder Pad Bits compatible with Space Marine® models**

**Heads compatible with Space Marines®**

**28mm Weapons, Jump Packs and Shields compatible with Games Workshop Models**

**Vehicle Replacement Part Kits that fit on Games Workshop Models**

Dragon or Salamander Vehicle Kits

Generic Vehicle Kits

*Non- Games Workshop Vehicle accesories for Space Wolf Players*

Non-Games Workshop Vehicle accesories for Fleshtearer Players

Non-Games Workshop Vehicle accesories for Iron Snake Players

**Bits/Conversion kits compatible with Eldar armies**

**Bits/Conversion kits compatible with Tyranids**

**Bits/Conversions for 28mm for imperial guard**

**Super Heavy Vehicle Kits**

List All Products

**Product Search**

[                    ] [Search]

Advanced Search

Username
[                    ]

Password
[                    ]

Remember me ☑

[Login]

Lost Password?

Forgot your username?

No account yet? Register

We accept Paypall



## Non- Games Workshop Vehicle accesories for Space Wolf Players 🔖

Order by: [Product Nam ▾] ▤

**Wolf Rhino Conversion kit**          **$15.00**



Average customer rating:
★★★★★ Total votes: 0 Product Details...

Quantity: [1    ] ▣▣ 🛒Add to Cart

**Wolf Rhino Conversion #2 kit**          **$16.50**



Average customer rating:
★★★★★ Total votes: 0 Product Details...

Quantity: [1    ] ▣▣ 🛒Add to Cart

«« Start « Prev  1  Next » End »»

Results 1 - 2 of 2

## Recently Viewed Products

Generic Hammer 2 (Category:  28mm Weapons, Jump Packs and Shields compatible with Games Workshop Models)

Dragon or Salamander Power Fist (Category:  28mm Weapons, Jump Packs and Shields compatible with Games Workshop Models)

Skull or Chaplain Head Bit for Power Armor (Category:  Heads compatible with Space Marines®)

Conversion Beamer Servo Harness Kit for Space Marine Model (Category:  Infantry and Shoulder Pad Bits compatible with Space Marine® models)

Tactical Rhino Doors with Skulls Kit (Category:  Generic Vehicle Kits)

Starburst Shoulder Pad for 28mm Marines - Power Armor (Category:  Thousand Sons compatible Pre-Heresy Shoulder Pads)

This web site is completely unofficial and in no way endorsed by Games Workshop Limited.

Adeptus Astartes, Battlefleet Gothic, Black Flame, Black Library, the Black Library logo, BL Publishing, Blood Angels, Bloodquest, Blood Bowl, the Blood Bowl logo, The Blood Bowl Spike Device, Cadian, Catachan, the Chaos device, Cityfight, the Chaos logo, Citadel, Citadel Device, City of the Damned, Codex,

CHS00001258

# Exhibit

# 119

Highly Confidential - Unredacted Version Filed Under Seal

# RE: prices

**From:** Nick <█████████████
**To:** Tomas F █████████████████
**Date:** Wed, 09 Sep 2009 19:39:13 -0500

Excellent on the shield

on the pieces that are strengthened, like the rhino door, is it pretty seamless from the strengthening piece, to the rhino door, to the tooth?  any gaps and the silicon will flow in there and still create the same problem, basically need it to be one smooth piece.  If it is, your good to go and mail me the bits!


Sincerely,


Nick - Sales and Design

Chapterhouse Studios




-----Original Message-----

From: Tomas F [mailto█████████████████

Sent: Wednesday, September 09, 2009 5:45 PM

To: █████████████████

Subject: Re: prices



Examples of strenghtened things sticking out.

HIGHLY CONFIDENTIAL
CHS00004464

Are these ok?


On Tue, Sep 8, 2009 at 4:31 AM, Tomas F ██████████████████ wrote:

> Sculpted tonight, was to tired to do the fine work on the remaining

> two shields but started and finished all four sallie rhino scaly

> one-piece armour panels. Damn but I can get things done when I figure

> out how to make them.

>

> Figure I´ll finish the four SW rhino template one-piece panels

> tomorrow with the rest of the shields. I really want to ship both

> rhinos, the pad template and the shields mid week.

>

> After those I´ll rush the IS rhino out and then its basically only SW

> sculpts left.

>

> Get me the hammer green.

>

> On Mon, Sep 7, 2009 at 11:26 PM, Tomas F<██████████████████

> wrote:

>> Got a visit from a friend today, he just left so nothing sculpted

>> today because of that:( Going to start now, aiming on finishing the

>> shields tomight and having all the showcase things painted up.

>>

>> Will take pics if I get time over before bed.

>>

2

HIGHLY CONFIDENTIAL

# Exhibit

# 120

Highly Confidential - Unredacted Version Filed Under Seal

| | |
|---|---|
| **From:** | Nick - Chapterhouse Studios ▮▮▮▮▮▮▮▮ |
| **Sent:** | Tuesday, June 30, 2009 11:28 AM |
| **To:** | 'Jeffrey Nagy' ▮▮▮▮▮▮▮ |
| **Subject:** | RE: Gryphon Pad and Tacital Pad Update |

He did email me today, I want to get his phone and get talking with him. No word on the stls, Ill let you know as soon as I do.
Sounds good on the other projects, RL work comes first, and your doing a great job on turnaround anyways, so no complaints, I was just wondering if we scared you off :) I get emails from tomas almost everyday so I got concerned, lol.
Have a good week.
Nick
-----Original Message-----
From: Jeffrey Nagy [mailto:▮▮▮▮▮▮▮▮]
Sent: Tuesday, June 30, 2009 2:03 PM
To: Nick - Chapterhouse Studios
Subject: Re: Gryphon Pad and Tacital Pad Update
Nick,
Progress on anything will be slow this week and next. I have started on the Retrorhino and Predator front armor, but not much more than some of the basic dimensions being outlined. Thats pretty much it.
I'll have picture for you tomorrow, but this and next week are short weeks for me so there isn't as much time to get any modeling in for you.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮? Any word on if the .stls I sent would work?
-Jeff
On Tue, Jun 30, 2009 at 9:54 AM, Nick - Chapterhouse Studios‹▮▮▮▮▮▮▮▮▮▮▮▮› wrote:
> Jeff,
>
> Just seeing if you got anything in progress and how it is going.
>
> Thanks
> Nick
>
> -----Original Message-----
> From: Jeffrey Nagy [mailto:▮▮▮▮▮▮▮▮]
> Sent: Thursday, June 25, 2009 10:43 AM
> To: Nick - Chapterhouse Studios
> Subject: Re: Gryphon Pad and Tacital Pad Update
>
> I emailed all the .stl's, did you recieve them?
>
> I will start with the Retrorhino and the retro Predator Sloped Armor
> Front. I will then do variants of the SW versions, which will have the

JN00000231

> sort of symbols I was talking about.
>

[BLACK REDACTION]

>
> I will draw up the Leman-Russ "marine-ized" battle tank to show you
> what I mean, but I realize it maybe something you don't want to
> persue.
>
> -Jeff
>
> On Thu, Jun 25, 2009 at 9:55 AM, Nick - Chapterhouse
> Studios [REDACTED] wrote:
>> Jeff,
>>
>> I guess I want to see your 3d creativity, so pick a vehicle Space Wolf
>> Project and run with it, you know the rules, no GW IP.
>>
>> I can pretty much guarantee if it looks good we will use it.
>>
>> Nick
>>
>> -----Original Message-----
>> From: Jeffrey Nagy [mailto [REDACTED]
>> Sent: Wednesday, June 24, 2009 10:31 PM
>> To: Nick - Chapterhouse Studios
>> Subject: Re: Gryphon Pad and Tacital Pad Update
>>
>> Off the top of my head we could do...
>> -Retro Rhino (Twin plate front, circle side doors, single piece cupola
>> hatch)
>> -Up armor front (like the old predator front)

[BLACK REDACTION]

HIGHLY CONFIDENTIAL

JN00000232

>>
>>
>>
>> On Wed, Jun 24, 2009 at 10:01 PM, Nick - Chapterhouse
>> Studios█████████████████████ wrote:
>>> Thanks Jeff,
>>>
>>> Since the Space Wolves codex is coming out what do you think you can do
>>> that's Space Wolfy?
>>>
>>> Nick
>>>
>>> -----Original Message-----
>>> From: Jeffrey Nagy [████████████████████]
>>> Sent: Wednesday, June 24, 2009 9:52 PM
>>> To: Chapterhouse Studios - Nick
>>> Subject: Re: Gryphon Pad and Tacital Pad Update
>>>
>>> I received payment. I will email you the stl files tomorrow afternoon.
>>> Thanks,
>>> Jeff
>>>
>>> On Wed, Jun 24, 2009 at 8:00 PM, Chapterhouse Studios -
>>> Nick█████████████████████ wrote:
>>>> Shoot me an email tommorow when you get to work, Ill do it then,
working
>>>> on orders and unpacking atm.
>>>>
>>>> Thanks Jeff,
>>>>
>>>> Sincerely,

HIGHLY CONFIDENTIAL

JN00000233

>>>>
>>>> Nick - Sales and Design
>>>> Chapterhouse Studios
>>>>
>>>>
>>>>
>>>> -----Original Message-----
>>>> From: Jeffrey Nagy █████████████
>>>> Sent: Wednesday, June 24, 2009 4:42 PM
>>>> To: Nick - Chapterhouse Studios
>>>> Subject: Re: Gryphon Pad and Tacital Pad Update
>>>>
>>>>
>>>> With that ok, I will finish the other Tactical Badge shoulder pads. By
>>>> this time tomorrow I can e-mail to you all the .stl files for the
>>>> following:
>>>> Assault Symbol (without number)
>>>> Devastator Symbol (without number)
>>>> Tactical Symbol (without number)
>>>> Blank (Mk6 Armor)
>>>> Gryphon (Howling Griffon) Shoulder Pad
>>>> Mk1 Armor Shoulder Pad
>>>> T1 (Tactical Sqd. 1)
>>>> T2 (Tactical Sqd. 2)
>>>> T3 (Tactical Sqd. 3)
>>>> T4 (Tactical Sqd. 4)
>>>> T5 (Tactical Sqd. 5)
>>>> T6 (Tactical Sqd. 6)
>>>> Standard Shoulder Pad
>>>> Land Raider Door
>>>> Land Raider Ramp
>>>> Land Raider Side Door
>>>>
>>>>
>>>>
>>>>
>>>>
of
>>>>
>>>>
>>>>
>>>>
>>>>
>>>>
>>>>
>>>>

HIGHLY CONFIDENTIAL

>>>> I will email the .stl files, tomorrow, when you're ready to make
>>>> payment.
>>>>
>>>> Thanks,
>>>> Jeff
>>>>
>>>>
>>>> On Wed, Jun 24, 2009 at 4:18 PM, Nick - Chapterhouse
>>>> Studios ███████████████████████ wrote:
>>>>> Stuff looks good from my end.
>>>>>
>>>>> -----Original Message-----
>>>>> From: Jeffrey Nagy [████████████████████
>>>>> Sent: Wednesday, June 24, 2009 2:51 PM
>>>>> To: Chapterhouse Studios - Nick; Tomas F
>>>>> Subject: Gryphon Pad and Tacital Pad Update
>>>>>
>>>>> Nick,
>>>>> I have updated the Gryphon and Tactical badges per your request. I
>>>>> wanted to verify that these changes I made were what you wanted.
>>>>>
>>>>> I also included early pictures of my very rough Mk-5 B-gun. Tomas, if
>>>>> you have input now might be the best time to give it. I'm not going to
>>>>> do any more work till I hear feedback from the two of you. I realized
>>>>> that some of the hang ups I've been having are because I haven't been
>>>>> giving you guys enough time to give me feed back. ████████████████
>>>>> ████████████████████████████████████████████████████████████
>>>>> ████████████████████████████████████████████████████████████
>>>>> ████████████████████████████████████████████████████████████
>>>>> ████████████████████████████████████████████████████████████
>>>>> ████████████████████████████████████████████████████████████
>>>>> ████████████████████████████████████████████████████████████
>>>>> ████████████████████████████████████████████████████████████
>>>>> ████████████ My general thought on creating these generations of bolters
>>>>> is that we have a progression of taking a weapon that probably started
>>>>> off as machine gun sized (to a normal human), but only needed to be
>>>>> made a bit compact for a marine to use. An 8ft, tall guy could almost
>>>>> carry a machinegun as personal weapon, you would only need to compact
>>>>> it a bit. Another evolutionary progression for the weapon will mirror
>>>>> modern development, the move from full sized rifles down to carbine
>>>>> sized weapons. If you look at my concept for the Mk1 in my photobucket
>>>>> you can kinda see how the length of the weapon would need to be a bit
>>>>> bigger than the current bolter's, thus I would treat it as such and

JN00000235

>>>>> extend the length of it a bit, but I'm getting ahead of myself.
>>>>>
>>>>> -Jeff
>>>>>
>>>>>
>>>>>
>>>>
>>>>
>>>
>>>
>>>
>>
>>
>>
>
>
>

HIGHLY CONFIDENTIAL

JN00000236

# Exhibit

# 121

Highly Confidential - Unredacted Version Filed Under Seal

| | |
|---|---|
| **From:** | Nick - Chapterhouse Studios - ▮▮▮▮▮▮▮▮▮▮ |
| **Sent:** | Tuesday, August 11, 2009 7:10 AM |
| **To:** | 'Tomas F' - ▮▮▮▮▮▮▮▮▮ |
| **Subject:** | RE: FW: Phone battery died |

Hola,

LR isn't in hand yet, lions are.

Side note, need to get that gryphon sculpted up if you can, its only one
pad, so please please please, it was paid for already.

Ask Jeff about the letters.

Nice work on the new sculpts, your moving along, damn perfectionist is going
to end you though with all your scrapping :P

Nick

-----Original Message-----
From: Tomas F ▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Monday, August 10, 2009 11:04 PM
To: Nick - Chapterhouse Studios
Subject: Re: FW: Phone battery died

How is stuff going?
You sent me the LR things and the lion masters yet?

I´m keeping things on hold a bit till the resin arrives so hurry up
with the packages.

Had some very productive sculpting days.
New hammer is starting to look finished and it will be our first generic
hammer.
The SW rhino templates are almost done, I had to scratch and redo them
3 times now due to quality issues (you know me), never thought
something that easy would be that hard to do.

And the first SW pre heresy termie pads are almost sculpted now.

I´m still having problems with the wolf symbol, I need some easy but
good looking detailed art pics that I can copy in greenstuff, intrnet
didnt give me anything good at all.
I´m trying to find an artist buy you need to help out and see if you
can get us a concept artist.
Someone who can:
1: look at the FW SW rhino doors and do a wolf symbol inspired by that
but still different.
2: Stormshield designs.
3: SW rhino concepts.
4: pre heresy helmets inspired by the HH artbooks (lack of artbooks is
no proble as I can take pics from the books and email them).
5: Leg and torso armours.


How are things going with the 3D letters?
Remember I need letters in various sizes and deapths AND the same
things mirrored as well.

I can do the studs and cast them with silicone moulds and greenstuff I
guess but its going to be a very slow process.
Making studs by hand is completely out of the question as I need
hundreds of them and they must all look exactly the same.


Laters and have fun.

HIGHLY CONFIDENTIAL

TF00001823

# Exhibit

# 122

# FILE NOTE

| | |
|---|---|
| Case Ref: | 10591 |
| Action: | Unknown action type (IE) |
| Date: | 16/10/2009 |
| Time: | 11:24:55 |
| Handler: | Talima Fox |
| Typist: | GLS |
| No. of Units: | 1 |
| Cost Value: | £0.00 |
| Correspondent: | |

## DETAILS

Unsolicited correspondence received:
Subject: FW: GW IP
Detail:


Our ref:



Gill Stevenson
Legal Manager
Group Legal Department
Games Workshop Group PLC
Tel: +44 (0)115 900 4124

---

From: Wil and Vicky [mailto:pen_filia@yahoo.co.uk]
Sent: 16 October 2009 09:14
To: Legal (UK)
Subject: GW IP


http://chapterhousestudios.com/webshop/component/virtuemart/?page=shop
.browse&category_id=4

Hi, I've just found this website and they are offering their own
resin cast conversion kits for space marine rhino and land raider          (Continued ...)

tanks along with a few other GW things. I don't know if they are doing this under license, but thought you may want to take a look at this just in case.

Kind Regards

Vicky

# FILE NOTE

| | |
|---|---|
| Case Ref: | 10591 |
| Action: | Unknown action type (IE) |
| Date: | 30/09/2009 |
| Time: | 10:35:21 |
| Handler: | Gill Stevenson |
| Typist: | TF |
| No. of Units: | 1 |
| Cost Value: | £0.00 |
| Correspondent: | |

## DETAILS

Unsolicited correspondence received:
Subject: Fw: Chapterhouse Studios
Detail:

----- Forwarded Message ----
From: ALAN RICHMOND <alanrichmond879@btinternet.com>
To: legal@games-workshop.co.uk
Sent: Sunday, 27 September, 2009 10:33:52 AM
Subject: Chapterhouse Studios

Dear Sir / Madam

I have recently come across this website (http://chapterhousestudios.com/webshop/) selling conversion bits for Games Workshop kits, but they are using Games Workshop trademarks in their product names, as well as iconography that looks remarkably similar to some stuff I've seen produced by yourselves. I'm looking at their Space Marine shoulder pads nere (Salamander, Luna Wolves etc) which look reasonable enough, but perhaps lack the sharpness and detail of 'official' GW products...

My question is are they legit. Is what they doing even legal, or does it infringe on your IP / trademark policies.

Hope this of use, and I look forward to hearing from you.

Kind regards

Alan Richmond

# FILE NOTE

| | |
|---|---|
| Case Ref: | 10591 |
| Action: | Unknown action type (IE) |
| Date: | 15/02/2010 |
| Time: | 12:47:15 |
| Handler: | Talima Fox |
| Typist: | GLS |
| No. of Units: | 1 |
| Cost Value: | £0.00 |
| Correspondent: | |

## DETAILS

Unsolicited correspondence received:
Subject: Is this legal?
Detail:
http://chapterhousestudios.com/webshop/component/virtuemart/?page=shop
.browse&category_id=7

I was thinking of the power fist and the leg parts for the Chaplain.
They are clearly Citadel parts with added details sculpted to them.

Is this legal?

Regards // Andreas Bergman

———

Hitta kärleken! Klicka här MSN Dejting
<http://dejting.se.msn.com/channel/index.aspx?trackingid=1002952>

# Exhibit

# 125

Highly Confidential - AEO



GW0004466

# Exhibit

# 126



# Exhibit

# 128

Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3

4

5   - - - - - - - - - - - - - - - - -

6   GAMES WORKSHOP LIMITED,

7            Plaintiff,

8   v.              Civil Action No.: 1:10-cv-8103

9   CHAPTERHOUSE STUDIOS LLC and JON
    PAULSON d/b/a PAULSON GAMES,
10           Defendants.

11  - - - - - - - - - - - - - - - - -

12

13

14

15        DEPOSITION OF PROFESSOR LIONEL BENTLY

16        Thursday, July 12, 2012 at 9:28 a.m.

17

18

19               Held at:
             The offices of Eversheds
20               1 Wood Street
             London EC2V 7WS
21             United Kingdom

22

23  Court Reporter: Fiona Farson

24

25
```

Page 2

```
1           A P P E A R A N C E S

2   For the Plaintiff:

3        Jonathan E Moskin
         FOLEY & LARDNER LLP
4        90 Park Avenue
         New York, NY 10016-1314
5        Tel: 212.682.7474
         Fax: 212.687.2329
6        email: jmoskin@foley.com

7

8        Gill Stevenson, Legal Manager
         GAMES WORKSHOP LIMITED
9        Willow Road
         Lenton
10       Nottingham, NG7 2WS
         Tel: +44 (0) 115 900 4124
11       Fax: +44 (0) 115 916 811
         email: Gill.Stevenson@games-workshop.com

12

13

14  For the Defendant:

15       Scotia Hicks
         WINSTON & STRAWN LLP
16       101 California Street, 39th Floor
         San Francisco, CA 94111-5802
17       Tel: (415) 591-1000
         Fax: (415) 591-1400
18       email: shicks@winston.com

19

20

21

22

23

24

25
```

Page 3

```
1                    I N D E X
2   EXAMINATION
3   BY MR. MOSKIN                              5
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              E X H I B I T   I N D E X

2   Exhibit 119    Curriculum vitae of Professor Lionel Bently    9

3   Exhibit 120    Email dated 05/30/12 from Winston & Strawn    20

4   Exhibit 121    Email dated 05/29/12 from Tom Kearney    28

5   Exhibit 122    Expert report of Professor Lionel

6                  Bently                              29

7   Exhibit 123    Expert report of Mr. Michael Bloch QC

8                  and Dr. Harris Bor              35

9   Exhibit 124    Transcript of deposition of John

10                 Blanche                         93

11  Exhibit 125    Black Library Novels Commissioning Form

12                 for Dan Abnett                  96

13  Exhibit 126    Black Library Novels Commissioning Form

14                 for Ben Counter                 96

15  Exhibit 127    Confirmatory assignment for John

16                 Sibbick                         98

17  Exhibit 128    Exhibit A to Games Workshop Ltd's answer

18                 to Interrogatory No 1          129

19  Exhibit 129    Excerpt from Intellectual Property Law,

20                 Third Edition                  166

21  Exhibit 130    Between a Rock and a Hard Place:

22                 The Problems Facing Freelance Creators

23                 in the UK Media Market-place   171

24

25
```



1      LIONEL BENTLY, sworn
2      Examination by MR. MOSKIN:
3  BY MR. MOSKIN:
4  Q.  Would you please state your full name and address for
5     the record.
6  A.  My name is Lionel Alexander Fiennes Bently.  My address
7     is 18 Romsey Road, Cambridge, postcode CB1 3DD.
8  Q.  Have you ever been deposed before?
9  A.  I have, yes.
10 Q.  And can you explain when that was?
11 A.  That was in a case called Golan v Gonzales, which was
12    a constitutional challenge to the Uruguay Round
13    Agreements Act, and I gave evidence for the defendant on
14    the history of the implementation of Article 18 of the
15    Berne Convention, which allows members of the Berne
16    Union to set certain limitations on the -- the
17    implementation of retroactivity in copyright, and the
18    case went to the Supreme Court, and I just gave evidence
19    at first instance, and I was deposed in Cambridge by the
20    Department of Justice, US Department of Justice.
21 Q.  Okay.  You -- so you probably understand very generally
22    the mechanics of how the deposition works:  That we
23    shouldn't speak over one another; if there's anything
24    I ask you you don't understand, please let me know, and
25    I will be happy to try to reframe it; if you need to

1     take a break at any point, as long as a question is not
2     pending, I'm happy to oblige, more or less.
3        Is there any reason -- are you suffering from any
4     disability, taking medication or anything that would
5     impair your ability to give full and accurate answers
6     today?
7  A.  No.
8  Q.  Have you -- other than the one case, the Golan v
9     Gonzalez, have you ever been qualified as an expert
10    witness in a proceeding in the United States?
11 A.  I'm -- I'm qualified as an expert witness.  I'm not
12    quite sure what you mean.
13 Q.  Have you -- well, explain the one instance, or whatever
14    instance you have in mind, and I'll --
15 A.  Okay.  So I've also given expert testimony in a second
16    case, called Explorologist v Sapient, which was expert
17    evidence on UK law concerning the place where a making
18    available of the copyright work took place, where the
19    work was created and put on a server in the United
20    States but could be accessed from the UK.  And the
21    question was whether that was a making available in the
22    UK.
23 Q.  Okay.
24 A.  And that was settled, so that's why I didn't understand
25    your -- the "qualifying" bit.

1  Q.  I see.  Was there any question or any challenge made to
2     your status as expert in either the Golan case or the --
3     I may not get the name right -- the Explorologist --
4  A.  Explorologist, yeah.  Not in Explorologist, because
5     there was no deposition and no examination of any sort
6     from the other side of my testimony.
7        In the Golan case, the Department of Justice's
8     counsel asked some questions about why I considered
9     myself to be an expert -- you know, early on in the
10    deposition process.
11 Q.  Okay.  And to your knowledge, or do you have any
12    knowledge whether a challenge was ever made in court?
13 A.  No, not as far as I'm aware.
14 Q.  Okay.  Did you actually testify in court in either of
15    those cases in the US?
16 A.  No.
17 Q.  Have you ever been retained as an expert in a proceeding
18    in the United Kingdom or elsewhere?
19 A.  Well, United Kingdom courts regard UK law, which is my
20    field of expertise, as a matter that's known to the
21    court, so they wouldn't admit expert evidence on UK law.
22       So the answer to the first part is no, not in
23    the UK.  I have given expert reports in cases or in
24    relation to disputes in Canada, Brazil, and -- I don't
25    know whether it was a dispute, but also for firms in

1     Germany and the Netherlands.
2  Q.  And on what subjects?
3  A.  Okay, so -- the Brazilian and Canadian expertise was in
4     relation to the law of patents.  The Canadian case,
5     I was giving expert evidence for the plaintiff in
6     relation to a challenge to the Canadian law that then --
7     I think still does -- allow the government to set the
8     price of pharmaceuticals under certain licensing
9     regimes.
10       In the Brazilian case, it related to the invalidity
11    of -- or the effect of the grant of a European patent on
12    a previously-applied-for UK patent, and that had
13    implications for what was going on in Brazil.
14       The Dutch case was -- concerned personality rights
15    in relation to footballers, and merchandising of
16    football-related materials.
17 Q.  Mm-hmm?
18 A.  And the German case concerned a new technology that
19    would allow for certain sorts of recording of broadcast
20    programs, such that the user would be able to just see
21    the highlights of the program.  So it was essentially --
22    the recording mechanism was sensitive to the sound, so
23    when the crowd cheered, it would record that bit and not
24    the bit where the crowd wasn't cheering, so that
25    somebody would be able just to watch the highlights.


ESQUIRE
SOLUTIONS

Page 45

1    originality -- excuse me, not 21; referring to
2    paragraph 20 on the issue of originality.
3  A.  Mm-hmm.
4  Q.  Your -- strike that question.  I'll come back to it
5    later.
6        Now, on the question of subsistence of copyright --
7    and I think, as you noted earlier, you state in
8    paragraph 22 that the plaintiffs' expert report at no
9    stages broaches the question of subsistence of
10   copyright; is that right?
11 A.  That's right, yeah.
12 Q.  So you would agree that your report is not -- does not
13   operate as rebuttal to anything that Mr. Bloch or
14   Mr. Bor said -- Dr. Bor said on that question, on this
15   issue?
16 MS. HICKS:  Objection.  Lacks foundation.
17 A.  It's certainly true that their report says nothing about
18   the question of subsistence of copyright.
19 BY MR. MOSKIN:
20 Q.  So again, you're not rebutting anything they've said on
21   subsistence of copyright?
22 MS. HICKS:  Same objection.
23 A.  I'm not contradicting anything, but I am highlighting an
24   issue that I thought was relevant to the case and that
25   had been omitted from the report.

Page 46

1  BY MR. MOSKIN:
2  Q.  And -- but just --
3        Can you read that back.
4            (Record read.)
5  BY MR. MOSKIN:
6  Q.  So you're raising a new issue that was just not raised
7    by Mr. Bloch and Dr. Bor?
8  MS. HICKS:  Objection.  Mischaracterizes the testimony.
9  A.  The issue was not raised by Mr. Bloch and Dr. Bor.  I'm
10   sorry; I realize now that I'd not been giving him his
11   correct title earlier on.
12       But my understanding of what an expert in these
13   circumstances is asked to do is to provide relevant
14   information of the -- in their field of expertise to the
15   court.  And I discussed with counsel whether this was
16   relevant and should be included, and we concluded that
17   it was and should be.
18 BY MR. MOSKIN:
19 Q.  What did you -- what was the nature of that discussion?
20 A.  Well, I referred to it earlier, and I don't recall
21   whether it was me who raised it or whether it was Tom
22   Kearney who raised it, but I wanted certainly to know
23   whether it should be included.  And we determined in
24   a phone call that it should, for the reasons that I just
25   gave.

Page 47

1  Q.  And what's the basis for your understanding that an
2    expert should address any issue that is generally
3    relevant?
4  A.  My understanding is that the expert owes a duty to the
5    court to present the court with -- with material that
6    the expert thinks is important for deciding the case.
7    So the primary job I had was to provide a rebuttal
8    report; but given this omission, I would have thought it
9    would have been highly remiss of me not to raise this
10   issue.
11 Q.  Did somebody tell you that that's a duty that an expert
12   has in a US court?
13 A.  Well, I make a declaration at the beginning, I think,
14   about my understanding.  My duties to provide expert
15   evidence "overrides my duty to those instructing me,
16   that I have understood this duty and complied with it in
17   giving my evidence impartially and objectively..."
18   et cetera .
19 Q.  My question is:  Did anybody tell you that that's a duty
20   to provide this sort of additional commentary?
21 A.  No, I don't think so.
22 Q.  Okay.
23       You say here that it's your understanding that
24   application of United States law is dependent on prior
25   recognition that copyright subsists under UK law.

Page 48

1        What's the basis for that understanding?
2  A.  I think the basis for that understanding is my
3    discussion with Tom Kearney --
4  Q.  And did --
5  A.  -- when I -- when we had this discussion about whether
6    this section was relevant and was something that the
7    court would want or need to know.
8  Q.  And what did he tell you?
9  A.  I think he told me precisely that, that -- and what
10   I said earlier in relation to the private international
11   law of the US, that in this case, UK law is relevant as
12   regards subsistence and ownership, but that US law
13   becomes relevant to determine infringement.
14       This would not be the private international law of
15   copyright in the UK, so I am -- was relying for that
16   assumption on what I was told by counsel.
17 MR. MOSKIN:  Can you read that back.
18            (Record read.)
19 BY MR. MOSKIN:
20 Q.  Okay.  Again, did he tell you anything specific as to
21   why he thought UK law would be relevant --
22 MS. HICKS:  Objection.
23 BY MR. MOSKIN:
24 Q.  -- on subsistence?
25 MS. HICKS:  I'm going to instruct you not to answer.



Page 49

1    I'm objecting as a privileged conversation.
2    MR. MOSKIN:  That goes to the very heart of what he wrote in
3      a third of his report, and he doesn't express any reason
4      why he's opining on this subject in the report.
5    MS. HICKS:  Well, he's identified it as an assumption that
6      he was given; but asking why Tom Kearney thought it was
7      the way it was is invading privilege.
8    BY MR. MOSKIN:
9    Q.  Do you accept your counsel's advice not to answer?
10   A.  Yes, I guess.
11   Q.  Okay.  Did you -- have you done any independent research
12     of your own to determine whether US law would apply or
13     UK law would apply on the issue of subsistence of
14     copyright?
15   A.  No.
16       I have in the back of my mind a case, of a name
17     which I can't remember, concerning photographs, where an
18     action was brought in a -- in the Second Circuit,
19     I think.  And the judge, who I recollect was
20     Judge Kaplan, referred to the UK law of originality when
21     assessing -- assessing whether the photographs were
22     protected for the purposes of US law.  It's called
23     Black -- I can't remember what it's called, I'm afraid,
24     right now.
25       But, you know, that wasn't an assumption on which

Page 50

1      I was working, I just sort of ...
2    Q.  Are you referring to Bridgeman Art v Corel Corp?
3    A.  That is the case that I -- that I have in the back of my
4      mind as confirming the assumption I was given.
5    Q.  Okay.  Any other basis for your assumption as to which
6      law would govern on the question of subsistence?
7    A.  No.
8    Q.  Okay.  Now, in assessing, as you do in your report, the
9      issue of subsistence of copyright in Games Workshop's
10     miniatures or figures, I think you carve out those
11     miniatures from other types of works at issue here.  And
12     I'm referring you to paragraph 29.
13       You would agree, I think, that illustrations,
14     paintings and drawings are subject matter as to which
15     you don't question the issue of subsistence of
16     copyright?
17   A.  Yeah, that's absolutely right.  And the literary works
18     as well.  I don't know whether I mentioned them there,
19     but ...
20   Q.  Thank you.  You've answered my next question.
21   A.  Okay.
22   Q.  And what is the -- the basis, the legal basis under
23     English law to question the subsistence of copyright in
24     the figurines?  Is there a statutory basis?
25   A.  Yes.  So in order to be protected under UK law, you --

Page 51

1      a work has to fall within one of the listed categories,
2      and it's -- so it's an exhaustive list.
3        For artistic works, that list is in section 4 of the
4      1988 Act, which I set out at paragraph 27.  And you see
5      in section 4.1, there's graphic works, photographs,
6      sculptures or collages.  And so the question in relation
7      to the figurines is just one question, and certainly the
8      most pertinent question is whether the figurines
9      constitute sculptures for the purposes of UK law.
10   Q.  And is there some other basis under UK law, statutory
11     or -- a statutory basis under UK law for questioning
12     whether figurines would be sculptures?
13   A.  Sorry, could you repeat that question?
14              (Record read.)
15   A.  So no, if I understand your question, the question then
16     of what is a sculpture, it has been elaborated in the
17     case law.  There is a statutory definition that says
18     sculpture includes a cast or model made for the purposes
19     of sculpture; but that don't really take you very far,
20     because it clearly has sculpture as part of its vision.
21     So the definition of what is a sculpture is one the
22     courts have provided guidance on.
23       Is that an answer?
24   Q.  Is there -- are there any statutory provisions that bear
25     on whether Games Workshop's figurines would be

Page 52

1      considered sculptures under copyright law?
2    A.  Not -- well, not specific ones within -- as I've told
3      you, the rest of the question is a matter of case law.
4        One thing that the case law indicates is pertinent
5      is the fact that there are other statutory regimes for
6      protecting registered designs and unregistered designs.
7      And one of the things that the Supreme Court says in the
8      Lucasfilm case is that the existence of those regimes
9      means that, 1, courts should not stretch the definition
10     of a sculpture beyond its ordinary meaning, because to
11     do so would implicate the policies of those other
12     statutory regimes.
13       So, for example, with a -- well, with a Games
14     Workshop figurine, or at least the sort of thing that
15     I saw, like the space --
16   Q.  Space marine?
17   A.  -- space marine, it would be possible to register
18     a space marine as a registered design, or to claim
19     unregistered design right protection in it, potentially.
20       And I guess one of the key things that the Supreme
21     Court is saying is for that reason, one wouldn't need to
22     stretch the notion of sculpture to cover it, unless they
23     fell within the normal definition of the word
24     "sculpture" as elaborated by the High Court and the
25     Court of Appeal.



Page 53

1 Q. Let me refer to you paragraph 32 of your report.
2 A. Yes, sure.
3 Q. I don't want to read the whole thing, by any means; it's
4    in your report. But you say there, in the third
5    paragraph, consequently the duration of copyright in
6    these Stormtrooper toys at issue in Lucasfilm, in the
7    designs of those toys --
8 MS. HICKS: Are you looking at paragraph 32?
9 MR. MOSKIN: Yes.
10 MS. HICKS: There's only two paragraphs in paragraph 32.
11 MR. MOSKIN: Excuse me?
12 MS. HICKS: Did you say the third paragraph?
13 MR. MOSKIN: Third sentence:
14    "Consequently, the duration of its copyright in the
15    designs on which the toys were based was effectively
16    limited under section 52 of the CDPA to 15 years unless
17    the toys were themselves regarded as 'sculptures'..."
18 Q. Do you see that?
19 A. Yeah, I see that.
20 Q. Okay. And is that an accurate statement summarizing
21    parts of -- or at least part of the decision in
22    Lucasfilm?
23 A. This is -- this is referring to -- I mean, it's an
24    actual statement; it's referring to a provision of
25    section 52 of the CDPA and its transitional state. What

Page 54

1    section 52 does is says that where an artistic work is
2    applied industrially, a defense applies that allows
3    third parties to manufacture articles corresponding to
4    the artistic work to which the artistic work is applied.
5    After -- in the 1988 Act it's 25 years, but in the
6    transitional provisions, where works were created before
7    1989, it's 15 years -- and the Lucasfilm case concerned
8    a work created under the 1956 Act.
9       There is an exception in section -- or there is an
10    exception to that limitation -- what is effectively
11    a limitation on term protection, which is made by
12    statutory instrument called the Industrial Processes and
13    Excluded Articles Order, Industrial Processes and
14    Excluded Articles Order 1989, that says that that
15    limitation does not apply to certain materials, and one
16    of those sets of materials is sculptures. So there's
17    a reference to sculpture again in that Industrial
18    Processes and Excluded Articles Order.
19       I haven't got it with me, but it elaborates a little
20    bit.
21 Q. Now, that's fine, but more specifically, my question is
22    that the effect of the Lucasfilm holding was that the
23    term of copyright in the toys there at issue was limited
24    to 15 years.
25 A. So -- so the issue of sculpture arose in the Lucasfilm

Page 55

1    case in a number of different ways, one of which was, at
2    the first instance and in the Court of Appeal, was
3    referred to as this limited term aspect, the section 52
4    aspect.
5       Another was the effect of section 51, which I can
6    explain to you if you'd like.
7 Q. Mm-hmm?
8 A. Section 51 relates to design documents, and says that it
9    is not an infringement of copyright in a design document
10    to make an article to that design, but this only applies
11    where the design document is a design for something
12    other than an artistic work. So if I do a sketch from
13    which somebody makes a -- so if I do a sketch of your
14    head, from which somebody makes a sculpture, that is
15    a design document for artistic work in the sculpture;
16    whereas if I do is sketch of an exhaust pipe of
17    a motor-vehicle, that's a design document for something
18    other than an artistic work. So the question of whether
19    the article is an artistic work becomes relevant in
20    assessing the application on that defense.
21 Q. Mm-hmm?
22 A. And so that was also one of the ways in which it
23    mattered whether the Stormtrooper helmets were -- were
24    artistic works or not in the Lucasfilm case.
25 Q. Right. But coming back to my question, in the --

Page 56

1 A. Sorry.
2 Q. -- as you describe in paragraph 32, the question seems
3    to have been whether -- one of the duration of copyright
4    in the designs, not the original subsistence of
5    copyright in the designs.
6 A. That's right, though -- so the -- in the case -- that's
7    issue arose when they were sculptures for the
8    purposes of either the section 51 or the section 52
9    exception, and then also for whether they were protected
10    in themselves, so for subsistence, and as this is --
11    arises at different points in the case.
12       So ultimately, when the Supreme Court was dealing
13    with the matter, it wasn't differentiating; it was
14    assuming that what counted as a sculpture would be
15    relevant in the same way for all three legal issues:
16    Subsistence, section 52, section 51.
17 Q. And would you agree that section 51 of the CDPA also
18    simply limits the remedies to a claim copyright owner,
19    the ability of a copyright owner in a design document to
20    sue for infringement?
21 A. It creates the defense or exception. That's different
22    from limiting the remedies.
23 Q. Okay. Well, why don't you explain what that means?
24 A. So to have a defense or an exception means that if
25    a defendant pleads that defense, they will have held



Page 57

1    not -- not to be liable.  In contrast, you might have
2    a provision on -- relating to remedies that might limit
3    the claims of remedies that would follow from liability.
4    This is not relating to remedies; it means that you are
5    not liable in the first place.
6    Q.  But it doesn't -- the defense under section 51 is not --
7    is that there's no infringement, as distinct from
8    that there's no copyright?
9    A.  That's absolutely right.
10       And the same for section 52.
11   Q.  But at 52, the difference is it simply limits the term
12   of copyright?
13   A.  Section 52's purpose, essentially, is to limit the term,
14   but its form is in the form of a defense.  It's not an
15   infringement to make articles carrying the relevant
16   artistic work.
17       I don't have the text of it here, but ...
18   Q.  Okay.  And your report doesn't cite the text or content
19   of sections 51 or 52; is that right?
20   A.  I'm fairly certain that that's right.
21       Yeah, I don't deal, as I've said, with infringement
22   issues.
23   Q.  In paragraph 16 of your report, you state that a court
24   "must conduct an analysis of each and every piece of
25   subject matter in which ... Plaintiff claims protection

Page 58

1    to determine whether each ... is protected under UK
2    law"; is that right?
3    A.  Yeah.
4    Q.  How many items -- how many Games Workshop figurines did
5    you analyze to assess that they had the quality
6    necessary to make them sculptures or not under UK law?
7    A.  As I've mentioned, I haven't -- I haven't conducted
8    a specific analysis of any particular sculpture in order
9    to draw that conclusion.  And the reason is that to draw
10   that conclusion, you need to have a lot of information
11   that I don't have.
12   Q.  What information would you need?
13   A.  Well, in the Lucasfilm case -- this is at
14   paragraph 31 -- Mr. Justice Mann set out nine different
15   considerations bearing on whether something would be
16   regarded as a sculpture.  And some of those, I think,
17   would apply to particular situations.
18       "Some regard has to be had to the normal use of the
19   word...
20       It is inappropriate to stray too far from what would
21   be normally regarded a sculpture.
22       No judgment is to be made about artistic worth.
23       Not every three dimensional representation of a
24   concept can be regarded as a sculpture."
25       But then there are other things on which information

Page 59

1    would be required.
2        "It is of the essence of" -- this is 6 of --
3    paragraph 6 of his factors:
4        "It is of the essence of ... sculpture that it
5    should have, as part of its purpose, a visual appeal in
6    the sense that it might be enjoyed for that purpose
7    alone, whether or not it might have another purpose..."
8    Q.  Okay.
9    A.  So one would need to know what the artists or the people
10   who create the figurines create them for, and how they
11   are used:  Information that I don't have.
12       Paragraph 9 talks about the process of fabrication
13   being relevant.
14   Q.  Paragraph 9, I'm sorry, of your --
15   A.  No, paragraph 9 of Mr. Justice Mann's statement of the
16   factors.  Talks about the process of fabrication being
17   relevant but not determinative.  I have not been given
18   any information as to the process of fabrication -- and
19   so on.
20   Q.  Just also to be clear, I think you -- this is perhaps
21   just a quote, but part of the quote appearing on page 13
22   in paragraph 31, this list, this is for general
23   guidance; it's not an exhaustive list, and the facts of
24   the case may require other factors to be considered.
25   A.  Yeah.

Page 60

1    Q.  Now, you say at paragraph 16(f) of your report -- I'm
2    not sure; I think it's on page 7 -- that even if the
3    works -- and you're referring to specifically the
4    figurines or miniatures, as distinct from the literary
5    works and the graphic works -- that even if those works
6    are intended to have visual appeal, they are intended
7    primarily as pieces in games.
8        What's your understanding or the basis for your
9    understanding that they're primarily intended as pieces
10   in a game?
11   A.  That's a good question.  It is almost certainly an
12   understanding that I garnered from reading the
13   depositions, but I can't attribute any single source for
14   that assumption.  And you referred to them earlier on as
15   table-top -- did I know anything about table-top games,
16   and it's quite conceivable that the language of games is
17   the language in which -- it's called Games Workshop.
18   You know, I don't know -- so --
19   Q.  Okay.
20   A.  So ...
21   Q.  So you don't know to what extent these figurines are
22   made by Games Workshop simply for collectors, rather
23   than as pieces in games?
24   A.  No, I've not been presented with any evidence as to --
25   as to that question about whether they are -- yeah, I've



Page 61

1  not been presented with any evidence on that.  That's an
2  assumption that I'm making there, that they are intended
3  primarily as pieces in games.
4  Q.  And would you agree that if in fact it's true that the
5    game pieces are primarily made for and sold to
6    collectors to use them simply as -- for purposes of
7    painting and collecting and displaying as opposed to
8    playing in a game, that that factor would favor
9    a finding that they're sculptures?
10  A.  I think if -- if they are created for collection and
11    consumed by collectors, that is certainly a factor that
12    is relevant under Mann's list, insofar as it indicates
13    that things are created for their visual appeal and are
14    consumed for that visual appeal.
15      There are other factors that would -- would point
16    the other way, so I wouldn't say that it swings it
17    heavily one way or the other.  But, say, the Star Wars
18    game -- Star Wars pieces, I have had personal knowledge
19    of people who've collected the Star Wars toys, and -- so
20    -- that the Star Wars toys were treated as not being
21    sculptures.
22  Q.  My question was more specific, whether the games were
23    created, or rather -- strike that.
24      My question was more specific, as to whether -- if
25    it's true that the figurines are created with the

Page 62

1    understanding that they are used primarily for
2    collection, painting, decoration and display, whether
3    that would be a factor favoring a finding that they are
4    sculptures.
5  A.  I think it would be a factor, yes.
6  Q.  Okay.  What are the factors you're aware of that you
7    think counsel against finding that they're sculptures?
8  A.  Well, firstly, the courts have given two big steers in
9    this respect:  The Court of Appeal, when considering the
10    case, the Lucasfilm case, said -- this is quoted at
11    paragraph 35 of my report:
12      "... in most modern cases toy soldiers, whether real
13    or fictional, will not be works of art... "
14      And secondly, the Supreme Court gave the steer that
15    one should not -- one should not stretch the notion of
16    sculptures much beyond its ordinary -- or anywhere
17    beyond its ordinary understanding.
18      So I think the judicial steers are that these things
19    would be unlikely to be concluded.  But you would still
20    need to apply this multifactor -- these multifactor
21    guidelines to determine it.
22      I don't know about what the processes of fabrication
23    are, but I do note that -- from the deposition evidence,
24    that Games Workshop is a big enterprise, and these are
25    mass produced.  But I would have thought that the sorts

Page 63

1  of production processes would be something that you
2  would want to look -- a court would want to look closely
3  at.
4     And then the extent to which they are used as games,
5  as having functional characteristics relevant to those
6  games.
7     And then, you know, if you step back, I suppose, the
8  question is:  Would somebody ordinarily understand these
9  figurines to be sculptures?  Now, we all know the easy
10  cases of what is a sculpture; you know, a head of
11  somebody in a museum, or created out of clay, maybe cast
12  in bronze, by somebody who regards themselves as an
13  artist, signs the work, et cetera.
14     These seem quite a long way from that, but -- you
15  know, as I tried to emphasize, this is a -- something
16  that I'd want a close analysis of the facts to
17  determine.
18  Q.  Okay.  Just to be sure, there are other factors that you
19    think, based on your knowledge of the case, that weigh
20    against a finding that the figurines are sculptures?
21  A.  My working understanding that they were primarily used
22    in games, is -- and would fall within the generic
23    category of toys, works strongly, I think, against
24    finding that they are sculptures.  And my --
25  Q.  But that's a factor that I think you agreed might need

Page 64

1  to be revised if the facts show that they in fact are
2  primarily used by collectors, to paint them and display
3  them?
4  A.  Yeah.  I think one characteristic of my report is that I
5    am reluctant, without more factual evidence, to draw
6    anything like a concrete conclusion.  But I think, on
7    the sculpture issue, things are stacked against Games
8    Workshop.  But -- but let's see what the evidence is.
9  Q.  Stacked against Games Workshop why?
10  A.  Well, because, as I said, the steers that have been
11    given in that Court of Appeal decision.
12  Q.  The two steers --
13  A.  Yeah, the two -- yeah, I'm going back to the two steers.
14    So the two steers are -- you know, whatever may have
15    happened in 1902 in Britain v Hanks, these sorts of
16    things are probably not sculptures.  So Stormtrooper
17    toys, not sculptures, and they talk about toy soldiers
18    more generally, so ...
19  Q.  Would you also agree that the -- the fact that -- strike
20    that.
21     Would you also agree that to the extent Games
22    Workshop actually credits individual sculptures in
23    connection with the sale of these figurines is in favor
24    of finding that they are sculptural works?
25  A.  I think that's a relevant factor.



Page 65

1  Q.  And would you agree that the level of artistic detail in
2      the sculpting of the figurines is a fact for that would
3      favor a finding that they are sculptures rather than --
4      not -- than otherwise?
5  A.  The level of artistic detail.  Hmm.  The level of
6      detail, certainly, I think might be a factor.  If you
7      tried to draw a distinction between Star Wars and
8      Britain v Hanks, the case about the mounted yeoman toy
9      solders from the early 20th century, it might be that
10     the level of detail is one distinguishing factor between
11     those cases.
12        But again, you would want to see the mounted yeoman
13     from Britain v Hanks, and the -- you'd want to see the
14     Lucasfilms toy -- Lucasfilm toys, before you started
15     drawing that conclusion.
16 Q.  Mm-hmm.
17 A.  I mean, I took out "artistic" from your question; you
18     said level of artistic detail.  I think I qualified it
19     to be level of detail.  And I did that specifically,
20     I think, because clearly this question of things being
21     intended to create -- intended to be works of art and
22     enjoyed for their visual appeal is one of the factors.
23     But it seemed to me that you were -- this is something
24     that you wanted, really, me to focus on the detail.
25 Q.  Are there cases you are aware of, other than Lucasfilm

Page 66

1      and Britain v Hanks, that particularly bear on this
2      question?
3  A.  No, not -- not that particularly bear on this question.
4      I think Lucasfilm is -- being a Supreme Court decision,
5      and being so from -- being so recent, it's the governing
6      authority, bar none.  Britain v Hanks is relevant only,
7      I think, because they didn't say it was wrong.  They
8      tried to differentiate between Britain v Hanks.
9         But I think all the guidance now -- you know, there
10     were cases on whether a sandwich toaster was a sculpture
11     and whether a Frisbee -- all those authorities now are
12     just irrelevant, and I'd say they're just wrong, after
13     Lucasfilm.  So Lucasfilm is really where you want to
14     look to answer this question.  I don't think anybody
15     would disagree there.
16 Q.  Okay.
17        You offer no opinion whether the sort of painted
18     miniatures that you saw on the Games Workshop website,
19     the photographs of painted miniatures, whether those are
20     protectable with copyright, have you?
21 A.  No, I've offered no specific opinion in relation to any
22     specific figurine.  And the reason is that I would like
23     more facts of the kind we've been talking about before
24     I try to apply it.
25        But as I said, it might -- the steer given by the

Page 67

1      court is -- is against, and it's only with those facts
2      that you might be able to conclude that these are
3      sculptures.
4  Q.  My question was whether -- more specific; maybe I'll try
5      to clarify -- that you've offered no opinion whether
6      the photographs of painted figurines, as you saw on the
7      Games Workshop website, are or are not protected by
8      copyright?
9  A.  I've offered no opinion on that.
10 Q.  And I take it you have no knowledge of the extent to
11     which the defendant Chapterhouse is accused of copying
12     specific figurines, as distinct from graphic works such
13     as photographs on the website, or drawings and paintings
14     in the books, and so forth?
15 A.  I have no knowledge of that, no.  And as I indicated,
16     I have not been presented with what the defendants are
17     alleged to have done, really, at all, apart from in very
18     general terms.
19 Q.  I'd like to ask you some questions about another case
20     you discuss, beyond Britain v Hanks and Lucasfilm,
21     namely Flos v Semararo.  And I think as you -- you can
22     correct me if I am wrong, but I think as you explain in
23     your report, starting at paragraph 40, that in Flos v
24     Semararo, a table lamp was deemed protectable as
25     a sculptural work because it had sufficient intellectual

Page 68

1      creation.  Is that a fair summary?
2  A.  No, not really.
3  Q.  All right.  Then you can explain it better than I can.
4  A.  So the starting point here is that under the European
5      harmonized law, the Information Society Directive, as
6      I told you before, the courts have -- the European Court
7      of Justice has taken upon itself to refer to certain
8      matters relating to subsistence; in particular,
9      originality.  But it's also, in a couple of cases,
10     seemed to say that if something is an intellectual
11     creation, then it should be protected by copyright in
12     the law of Member States.
13 Q.  Mm-hmm.
14 A.  But to be clear, these are only a couple of cases where
15     the court has not really articulated or elaborated very
16     much on its reasoning.  But in Flos v Semararo, in one
17     statement, the Court of Justice indicated that a design
18     of a table lamp would be required to be protected under
19     laws of the Member State, if it constituted its author's
20     own intellectual creation.
21        And it said that was a matter for the Member State
22     to decide.  It doesn't -- the court didn't say anything
23     about sculptural or it being protected as a sculptural
24     work.  It doesn't -- "sculpture" is a term in UK law,
25     not in the EC directives.


ESQUIRE
SOLUTIONS

1 Q. Okay. I will thank you for clarifying. But what was --
2 did the court elaborate there on what about the table
3 lamp qualified it as having intellectual creation?
4 A. No, it didn't say that the table -- Okay. So what you
5 need -- as background for you, questions are referred to
6 the European Court of Justice on principles of law.
7 They give answers that are usually quite abstract in
8 form. They give answers in terms of principles of law
9 that are then applied by Member States' courts to the
10 particular facts in front of them.
11 So they will say something like -- you know, the
12 design in this case would be protected under Member
13 States' law, if, under -- applying the standards of
14 intellectual creation, it was regarded as an
15 intellectual creation.
16 Q. Right.
17 A. So it doesn't elaborate at all on whether the thing is
18 an intellectual creation.
19 Q. Well, did it -- the court elaborate on what, as
20 a general matter, are the elements constituting
21 intellectual creation?
22 A. Not in that case. But in other cases, they have
23 elaborated on the -- on the notion of intellectual
24 creation, pretty much on the same terms as originality.
25 So if something is a product of creative choice that

1 bears the personal stamp of the author, rather than
2 the -- being a product of following rules, then it might
3 constitute an intellectual creation.
4 And I set out that sort of reasoning just so that
5 you can cross-reference, when I talk about the European
6 standard of originality at paragraph 50.
7 Q. All right.
8 A. Now, I don't know whether it's -- whether you want me to
9 carry on, but I have doubts about the Flos case, in
10 particular, because one particular provision in the
11 Information Society Directive -- I think I've put at
12 paragraph 43 that it's article 10, but I actually think
13 it might be article 9 -- suggests that matters relating
14 to design rights are left unharmonized and for Member
15 States.
16 And a close analysis of the travaux, which I haven't
17 conducted in this report, suggests that Member States
18 were intended to be left free to determine issues of
19 subsistence of copyright from materials that might fall
20 within the design regime.
21 And for that reason, I am reluctant in this report
22 to treat Flos as a very strong authority. But you know,
23 as I said before, the Court of Justice's interpretations
24 are not always predictable and don't always correspond
25 with what was understood during the legislative process,

1 so ...
2 Q. Now, would you agree or disagree that if a table lamp
3 is, in principle, capable of having sufficient
4 intellectual creation to be copyrightable, that a -- one
5 of Games Workshop's figurines would also have sufficient
6 intellectual creation in principle be copyrightable
7 under Flos v Semararo?
8 MS. HICKS: Objection. Lacks foundation, mischaracterizes
9 the prior testimony.
10 A. Well, yeah. Firstly, as I've said, I think Flos is
11 a dubious authority. But if Flos is followed, then
12 there would be an obligation on Member States, including
13 the United Kingdom, to protect intellectual creations by
14 copyright.
15 Now, the current UK system does not do that
16 explicitly. It has, as I've said, this list of things.
17 So the question about whether the miniatures would be
18 protectable or protected by copyright -- because
19 copyright here, there's no registration, so we don't
20 usually talk about protectable, because they either are
21 or they aren't -- the question would, in those -- on
22 those premises, the question would shift.
23 Now, the English court is then faced with two
24 possibilities. And the first would be to say, "We have
25 this list of subject matter, and that means that our law

1 is non-compliant with EU law because intellectual
2 creations that are not in that list are not protected;
3 but there's nothing we can do, nothing the courts can do
4 about that, because parliament has indicated it wanted
5 a closed list, and so it would go against the grain of
6 that parliamentary intention to construe it as anything
7 else."
8 So one thing the court could do is say, "Sculpture
9 is what Lucasfilms said sculpture was, and EU -- British
10 law is just out of line with EU law and will have to be
11 amended in due course by the legislature."
12 The second course that the court could take is say,
13 "These terms in section 4 are sufficiently open-textured
14 that we could redefine them in a way that ensures that
15 anything that would be regarded as requiring protection
16 as an intellectual creation under EU law is to be
17 protected under UK law."
18 BY MR. MOSKIN:
19 Q. And under the second scenario -- given, as you just
20 noted, that in Lucasfilm, the court did not overrule
21 Britain v Hanks -- the court could simply say that "To
22 comply with Flos v Semararo, we recognize that so long
23 as there is sufficient originality in the creation of
24 figurines such as those at issue in Britain v Hanks,
25 that we will continue to extent protection to such



# Exhibit

# 129



Shopping Cart | Checkout

Search Search

**PRODUCTS**

Eldar Compatible Bits

Knight Praetorius TRU-Scale
Figure Kits

Imperial Guard Compatible
Bits

Space Marine Compatible
Bits

Tau Compatible Bits

Tyranid Compatible Bits and
Kits

**Super Heavy Kits**

Resin Bases & Terrain

Cart is empty

**E-Mail Address:**

**Password:**

Forgotten Password

Login

OR

Create an Account

**Sign up for the
ChapterHouse Newsletter!**

## SXV-141 Super Heavy Walker



Product Code: SXV-141 Super Heavy Walker

Reward Points: 0

Availability: 1

### Price: $285.00

Qty: 1

Add to Cart

★★★★★ 1 reviews | Write a review

Share

  

| Description | Reviews (1) | Related Products (2) |

The SXV-141 Super-heavy Assault Walker.

This is a resin model kit consisting of over 50 parts, weighing in at approximately 2kg and standing almost 30cm tall when complete. The kit components are supplied "as cast" and require cleanup, assembly and painting for the finished product.

**US Priority domestic shipping is $14.00.**

**For an estimate on International shipping click here to go to the US Postal Service International Rate and choose your country and the shipping weight is 72 ounces (we will use a flat-rate priority medium box).**

Chapterhouse "Apocalypse" stats and Assembly Instructions available here.

Rules

Assembly instructions

This web site is completely unofficial and in no way endorsed by Games Workshop Limited.
Adeptus Astartes, Battlefleet Gothic, Black Flame, Black Library, the Black Library logo, BL Publishing, Blood Angels, Bloodquest, Blood Bowl, the Blood Bowl logo, The Blood Bowl Spike Device, Cadian, Catachan, the Chaos device, Cityfight, the Chaos logo, Citadel, Citadel Device, City of the Damned, Codex, Daemonhunters, Dark Angels, Dark Eldar, Dark Future, the Double-Headed/Imperial Eagle device, 'Eavy Metal, Eldar, Eldar symbol devices, Epic, Eye of Terror, Fanatic, the Fanatic logo, the Fanatic II logo, Fire Warrior, Forge World, Games Workshop, Games Workshop logo, Genestealer, Golden Demon, Gorkamorka, Great Unclean One, the Hammer of Sigmar logo, Horned Rat logo, Inferno, Inquisitor, the Inquisitor logo, the Inquisitor device, Inquisitor:Conspiracies, Keeper of Secrets, Khemri, Khorne, Kroot, Lord of Change, Marauder, Mordheim, the Mordheim logo, Necromunda, Necromunda stencil logo, Necromunda Plate logo, Necron, Nurgle, Ork, Ork skull devices, Sisters of Battle, Skaven, the Skaven symbol devices, Slaanesh, Space Hulk, Space Marine, Space Marine chapters, Space Marine chapter logos, Talisman, Tau, the Tau caste designations, Tomb Kings, Trio of Warriors, Twin Tailed Comet Logo, Tyranid, Tyrannid, Tzeentch, Ultramarines, Warhammer, Warhammer Historical, Warhammer Online, Warhammer 40k Device, Warhammer World logo, Warmaster, White Dwarf, the White Dwarf logo, and all associated marks, names, races, race insignia, characters, vehicles, locations, units, illustrations and images from the Blood Bowl game, the Warhammer world, the Talisaman world, and the Warhammer 40,000 universe are either ®, TM and/or © Copyright Games Workshop Ltd 2000-2010, variably registered in the UK and other countries around the world. Used without permission. No challenge to their status intended. All Rights Reserved to their respective owners.

We accept 

About us    Contact    Forum    Gallery    Commisions    Careers    Newsletter    Shipping Policy          2011 ChapterHouse Studios®

# Exhibit

# 130



Shopping Cart | Checkout

**PRODUCTS**

Search [Search]

Eldar Compatible Bits

**Knight Praetorius TRU-Scale Figure Kits**

Imperial Guard Compatible Bits

Space Marine Compatible Bits

Tau Compatible Bits

Tyranid Compatible Bits and Kits

Super Heavy Kits

Resin Bases & Terrain

Cart is empty

## Pilum Imperial Attack Jet Bike



Product Code: Pilum Imperial Attack Jet Bike

Reward Points: 0

Availability: 6

**Price: $22.50**

Qty: [1]

[Add to Cart]

☆☆☆☆☆ 0 reviews | Write a review

Share

  

**E-Mail Address:**

[                    ]

**Password:**

[                    ]

Forgotten Password

[Login]

OR

Create an Account

**Sign up for the ChapterHouse Newsletter!**

| Description | Reviews (0) | Related Products (1) |

**If we are out of stock of this item, we expect more in weekly, any orders paid for or "pre-ordered" will take precedent and ship out first.**

This multi-part customizable resin kit contains 21 resin components. This set includes our standard Javelin Jet Bike kit as well as 12 new components to upgrade it to an "attack" variant - the Pilum Jet Bike. Two side mounted weapon options are included - our Heavy Bolt Gun and a Heavy Melta Gun. **This kit is specifically designed to allow the two heavy weapon options to be magnetized and this kit includes 6 magnets as well.**

We also included 2 different bolt gun mounts that will allow the addition of different special weapons (plasma, melta, grenade launchers etc). These conveniently fit our combi-weapon conversion bits.

Also included in the kit are a set of legs and arms that will allow you to use other companies torsos and heads to model an armored rider. Flight stand will be included. Please note the peg hole is sized for Games Workshops flight bases, in order to use our bases you will have to widen the holes diameter slightly.

(Riders Shoulder Pads, Torso and Head not included and sold seperately)

Models supplied unassembled and unpainted.

This web site is completely unofficial and in no way endorsed by Games Workshop Limited.
Adeptus Astartes, Battlefleet Gothic, Black Flame, Black Library, the Black Library logo, BL Publishing, Blood Angels, Bloodquest, Blood Bowl, the Blood Bowl logo, The Blood Bowl Spike Device, Cadian, Catachan, the Chaos device, Cityfight, the Chaos logo, Citadel, Citadel Device, City of the Damned, Codex, Daemonhunters, Dark Angels, Dark Eldar, Dark Future, the Double-Headed/Imperial Eagle device, 'Eavy Metal, Eldar, Eldar symbol devices, Epic, Eye of Terror, Fanatic, the Fanatic logo, the Fanatic II logo, Fire Warrior, Forge World, Games Workshop, Games Workshop logo, Genestealer, Golden Demon, Gorkamorka, Great Unclean One, the Hammer of Sigmar logo, Horned Rat logo, Inferno, Inquisitor, the Inquisitor logo, the Inquisitor device, Inquisitor:Conspiracies, Keeper of Secrets, Khemri, Khorne, Kroot, Lord of Change, Marauder, Mordheim, the Mordheim logo, Necromunda, Necromunda stencil logo, Necromunda Plate logo, Necron, Nurgle, Ork, Ork skull devices, Sisters of Battle, Skaven, the Skaven symbol devices, Slaanesh, Space Hulk, Space Marine, Space Marine chapters, Space Marine chapter logos, Talisman, Tau, the Tau caste designations, Tomb Kings, Trio of Warriors, Twin Tailed Comet Logo, Tyranid, Tyrannid, Tzeentch, Ultramarines, Warhammer, Warhammer Historical, Warhammer Online, Warhammer 40k Device, Warhammer World logo, Warmaster, White Dwarf, the White Dwarf logo, and all associated marks, names, races, race insignia, characters, vehicles, locations, units, illustrations and images from the Blood Bowl game, the Warhammer world, the Talisaman world, and the Warhammer 40,000 universe are either ®, TM and/or © Copyright Games Workshop Ltd 2000-2010, variably registered in the UK and other countries around the world. Used without permission. No challenge to their status intended. All Rights Reserved to their respective owners.

We accept    About us   Contact   Forum   Gallery   Commisions   Careers   Newsletter   Shipping Policy          2011 ChapterHouse Studios®

# Exhibit

# 131



Shopping Cart | Checkout

Search    [Search        ]

**PRODUCTS**

Eldar Compatible Bits

**Knight Praetorius TRU-Scale Figure Kits**

Imperial Guard Compatible Bits

Space Marine Compatible Bits

Tau Compatible Bits

Tyranid Compatible Bits and Kits

Super Heavy Kits

Resin Bases & Terrain

Cart is empty

**E-Mail Address:**

[                    ]

**Password:**

[                    ]

Forgotten Password

[ Login ]

OR

Create an Account

Sign up for the ChapterHouse Newsletter!

## TRU-Scale Knight Praetorius Conversion Kit - 6



Product Code: TRU-Scale Knight Praetorius Conversion Kit - 6

Reward Points: 0

Availability: 62

### Price: $22.50

Qty: [ 1 ]

[ Add to Cart ]

★★★★☆  3 reviews  |  Write a review

Share

  



---

**Description** | Reviews (3) | Related Products (1)

The "Knights Praetorius" are the Empress' most loyal soldiers.  Each is endowed with a touch of the Empress' psychic powers when admitted into the unit.  While few in number, each is a match for 10 lesser men, the psychic unity with the Empress allows a measure of prescience as well as formidable endurance.  Both men and woman are allowed to test to join the unit, but few survive this testing.

*In a future where knowledge and technology rule. Aliens and humans battle for resources over countless worlds in a race to the become the dominate power.*
*Earth has been divided into two warring factions although each faction has claimed a whole system to rule over-, they continue to fight over who should rule over earth.*

*Queen Eva Kimlar is the leader of the Valnarian Empire, a powerful psyker that has merged psionics with technology.  Kimlar is the manipulator of men and can influence their thoughts, it is almost impossible for a male to deceive her as she can see your innermost secrets  in your eyes as if watching them play out on a screen. As a the strongest known psyker in existance she shares a  link with her most loyal followers on a level a normal human could not comprehend.*
*Her influence on peoples actions are stronger over men than women, thus she has to use her strong political skills and natural charisma to win over the female population.*

Each resin kit comes **unassembled and unpainted**.  The28 mm TRU-Scale kit comes with enough components to assemble a squad of 6 "Knight Praetorius" - 12 assorted armored pauldrons, 6 torsos, 6 sets of legs and 6 equipment backpacks.  *Please note it is necessary to purchase heads, arms, weapons and bases to assemble as shown.*  Chapterhouse Studios Marine Heads and weapons are scaled appropriately for use with this kit.  We recommend 28mm scale model kits for assembly with this kit.

Displayed model painted by Jose Veiga and incorporates kits from Chapterhouse Studios - **Spiky Marine Head, Open Fist Power Claws, and Combi-Flamer Component**

**Examples of assembled and painted models by Stephen Smith and consist of numerous components from different manufactures for the weapons, arms, heads and weapon effects are available here.**

This web site is completely unofficial and in no way endorsed by Games Workshop Limited.
Adeptus Astartes, Battlefleet Gothic, Black Flame, Black Library, the Black Library logo, BL Publishing, Blood Angels, Bloodquest, Blood Bowl, the Blood Bowl logo, The Blood Bowl Spike Device, Cadian, Catachan, the Chaos device, Cityfight, the Chaos logo, Citadel, Citadel Device, City of the Damned, Codex, Daemonhunters, Dark Angels, Dark Eldar, Dark Future, the Double-Headed/Imperial Eagle device, 'Eavy Metal, Eldar, Eldar symbol devices, Epic, Eye of Terror, Fanatic, the Fanatic logo, the Fanatic II logo, Fire Warrior, Forge World, Games Workshop, Games Workshop logo, Genestealer, Golden Demon, Gorkamorka, Great Unclean One, the Hammer of Sigmar logo, Horned Rat logo, Inferno, Inquisitor, the Inquisitor logo, the Inquisitor device, Inquisitor:Conspiracies, Keeper of Secrets, Khemri, Khorne, Kroot, Lord of Change, Marauder, Mordheim, the Mordheim logo, Necromunda, Necromunda stencil logo, Necromunda Plate logo, Necron, Nurgle, Ork, Ork skull devices, Sisters of Battle, Skaven, the Skaven symbol devices, Slaanesh, Space Hulk, Space Marine, Space Marine chapters, Space Marine chapter logos, Talisman, Tau, the Tau caste designations, Tomb Kings, Trio of Warriors, Twin Tailed Comet Logo, Tyranid, Tyrannid, Tzeentch, Ultramarines, Warhammer, Warhammer Historical, Warhammer Online, Warhammer 40k Device, Warhammer World logo, Warmaster, White Dwarf, the White Dwarf logo, and all associated marks, names, races, race insignia, characters, vehicles, locations, units, illustrations and images from the Blood Bowl game, the Warhammer world, the Talisaman world, and the Warhammer 40,000 universe are either ®, TM and/or © Copyright Games Workshop Ltd 2000-2010, variably registered in the UK and other countries around the world. Used without permission. No challenge to their status intended. All Rights Reserved to their respective owners.

We accept    

About us   Contact   Forum   Gallery   Commisions   Careers   Newsletter   Shipping Policy    2011 ChapterHouse Studios®

I hereby declare under penalty of perjury this 6 th day of September, 2012, under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Alan Roy Merrett

4844-5678-4912.1

# Exhibit

# 132

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>        Plaintiff,<br><br>    v.<br><br>CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES,<br><br>        Defendants. | Civil Action No. 1:10-cv-8103<br><br>Hon. Matthew F. Kennelly<br>Hon. Jeffrey T. Gilbert |

**SUPPLEMENTAL DECLARATION OF ALAN MERRETT IN OPPOSITION TO
CHAPTERHOUSE'S MOTION FOR SUMMARY JUDGMENT**

I, Alan Roy Merrett, hereby declare:

1.      I am Head of Intellectual Property, Games Workshop, Willow Road, Lenton, Nottingham NG7 2WS United Kingdom.  I have been employed by Games Workshop since 1981 and was one of the original creators of Warhammer 40,000 in about 1987.  I base this declaration on my personal knowledge and my complete access to the books and records of Games Workshop.

2.      As noted in my previous declaration, dated 14 August, 2012, submitted in support of Games Workshop's motion for summary judgment, virtually all of Games Workshop's copyrighted works (including those at issue in this case) are prepared by employees.  Further, our practice is to obtain confirmatory assignments from freelance authors.  We have also obtained replacement assignments from those of the individuals we have been able to locate whose works are at issue in the case.  Contrary to the statement in Chapterhouse's motion, Games Workshop

did not withhold contact information on any of the individuals; rather, we simply no longer maintain the information for some of them.

3.      Consistent with my comment that none of the former employees whose works are in issue have ever sought to challenge Games Workshop's ownership of the subject works, since the date of my prior declaration, we have received confirmatory assignments from Wayne England and Stefan Kopinski. Contrary to Chapterhouse's suggestion, we had also made available copies of confirmatory assignments from our former employee, Clint Langley and our current employee, Simon Egan.  Those assignments are submitted herewith as Exhibit 142.  I also note that the Forge World Space Wolves conversion pack was created after 6 January, 04. That is when Simon Egan started employment (he is still employed today) and he created the conversion pack.  Games Workshop has provided all the contact information within its control concerning its former freelancers and employees.

4.      Chapterhouse also asserts that there exists some industry standard size for miniatures under which 28 MM (roughly one inch) corresponds to every six feet of intended original size (as imagined in our books).  There is no such standard.  The size of our miniatures is a scale we developed arbitrarily.  A "25mm" size for miniature figurines had become popular during the 1970's amongst wargames and wargame miniatures manufacturers.  Other popular sizes at the time included 15mm and 20mm.  In theory all of these sizes are meant to correspond to the height of a human model from its feet to its head, so a 25mm model would measure just that in height if it were a standard human character.  Even as the 25mm size became more popular in the 1970's, producers all made models in slightly different sizes – partly because of differing skills and styles of individual sculptors and partly because of differences among

manufacturers in how to measure the height of the model.  The actual sizes of all these different models varied considerably (from 22mm to over 30mm in height).

5.      The founder and then owner of Citadel Miniatures and subsequently Games Workshop, Mr Bryan Ansell, wanted to differentiate our models from all the others and he decided (at some point in the early 1980's) that we should describe our models as being a different size from the competition.  We thus decided on the 28mm basic size.  However, our models are actually slightly larger than 28mm in size on the whole - many are in excess of 30mm tall.  They always have been.  Games Workshop also produces numerous miniatures lines on size scales from  6mm – 54mm.  Although our Warhammer and  Warhammer 40,000 figurines are 28 mm, our Warmaster and Epic Space Marine figurines are 6mm; our Lord of the Rings figures are 25mm, and our Inquisitor, Dreadfleet and Battlefleet Gothic are 54mm.

6.      Although there are hundreds of companies producing miniatures for wargames, board games, role playing games and rules systems, these companies use a range of different sizes.  Below I have identified some of the larger companies in the market – typically ones that produce their own games systems and miniature support.  This list is in no way exhaustive, but, rather, is designed to illustrate the breadth of the miniature market using sizes other than 28mm.

a.  The company Battlefront Miniatures (the second or third largest miniature manufacturer after Games Workshop), produces the game system**,** Flames of War on a scale of 15mm.

b.  The company Soda Pop makes the game systems Relic Knights, Super Dungeon Explore on a 32mm scale.

c.  The company Critical Mass Games makes the game system Critical Mass on a scale of 15mm

d. The company Wyrd Miniatures makes the game system Malifaux on a scale of 32mm

e. The company Dream Pod 9 makes the game system Heavy Gear Blitz on a scale of 12mm.

f. The company Hawk Miniatures produces the game system; Dropzone Commander on a scale of 10mm.

g. The company Hell Dorado makes the game system Hell Dorado on a scale of 30mm.

7.      Just as the 28mm sizing of our Warhammer 40,000 miniatures was the result of a creative decision by the company, there are many design choices involved in transforming paintings or drawings from our books into 28mm figurines.  To reinforce the traits and powers of the characters, we exaggerate certain parts of the figures or their armour and otherwise modify the figures to create the most desired appearance.  This has led some followers of Warhammer 40,000 to contemplate creating "true-scale" figures that are (from their perspective) "truer" to the original imagery in the books.  Although Chapterhouse did not create the concept of "true-scale" Space Marines, it has very recently begun selling a line of products it calls "TRU-scale" that appear to be copies of our figures rendered in slightly larger size (evidently to match its sense how to more exactly replicate the imagery in our books).  Although the few announcements we have seen have been careful to avoid direct mention of Games Workshop, the very notion of calling its products "TRU-scale" begs the question: "true to what".  It is quite clear to us it is simply carrying the copying to a new level.

8.      This, evidently, is also clear to our followers.  Attached hereto as Exhibit _ are some responses to a sample forum posting by Chapterhouse regarding one new "Tru-Scale" product, in which the opening post comments briefly but ironically about Chapterhouse's use of the name "Knights Praetorius" rather that Space Marines (which they obviously are); another

notes simply: "Oh dear Lord, that one's not even slightly subtle." Another forum member wonders if the named designer (Stephen Smith) isn't a Games Workshop employee, and others go even further. (Exhibit 143). One thus states:

> If this is the culmination of what I think it is, then it was one of the chaps on Dakka who true-scaled up his Marines and just got CH to cast them iirc. Adding a couple of mm of greenstuff to the thighs doesn't constitute an even remotely original sculpt imo. …CH have gone from an 'interesting aftermarkets spares' company, to totally moronic and arrogant lamo's, to simply just common thieves.
> …

The final post on this forum is equally harsh:

> I'm not a huge fan of [Games Workshop] at the moment, they aren't impressing me with their decisions and releases. But noone has any excuse to try and get away with this kind of farcical pretense of having their own line of bits and models. Similar/inspired by and so on are a fuzzy area, and I don't know enough about the legal details to know how close is too close in those cases, but this is just blatant poor quality copying! They may as well start recasting and announcing that on their website.

9.    Another recent example of Chapterhouse's new products is found at http://www.dakkadakka.com/dakkaforum/posts/list/470169.page (A copy of the page is attached as Exhibit 144) Although Mr. Villacci does not expressly identify the product using Games Workshop's name, one of the other forum participants immediately recognizes the design as a Kroxigor, a giant crocodile-like creature from Games Workshop's Warhammer (not Warhammer 40,000). This marks a new departure by Chapterhouse (copying from our Warhammer series. However, we have no further information whether the copying from Warhammer is part of a broader plan or regarding creation of the "TRU-scale" copies of our works (or other new products).

10.    Certain Tyranid monsters created and sold by Games Workshop are Tyranid Genestealers. As part of the Tyranid Genestealer boxed set that a consumer can purchase, Games Workshop included a head component which can convert a Genestealer model into a

Games Workshop created monster called a Genestealer Ymgarl (a mutated form of Genestealer from the planet Ymgarl). Below are pictures of both the standard Tyranid Genestealer and Games Workshop sketch of the Genesetealer Ymgarl.





GW's Tyranid Genestealer
(Ex. 137)

GW depiction of Genestealer Ymgarl
(Ex. 138)

11. One of the ranks of Space Marines is a Space Marine Chaplain. Their iconography heavily features skulls. A picture of chaplain made and sold by Games Workshop is shown below. Of note, the Chaplain's skull features a specific design of a skull with mechanical notches for a built-in helmet, red eyes, and a series of striated bands.





(Ex. 139)

12.     Many of Games Workshop's products incorporate a unique image of piled skulls.

Two examples of this unique image are on Games Workshop's Basilica Administratum (a

building) and on Games Workshop's Realm of Battle Board, both depicted below:



| (Ex. 140) | (Ex.141) |

13.     While some of Games Workshop's customers likely do exercise care in their

purchases, Games Workshop's products are purchased by customers of every description, some

(such as a novel) are purchased by customers with little or no familiarity with the rest of Games

Workshop's products.

I hereby declare under penalty of perjury this 6 th day of September, 2012, under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Alan Roy Merrett

4844-5678-4912.1

## CERTIFICATE OF SERVICE

I, Jason J. Keener, an attorney, hereby certify that on August 14, 2012, I caused to be filed electronically the foregoing DECLARATION OF ALAN ROY MERRETT with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

/s/  Jason J. Keener

Jason J. Keener

# EXHIBIT

# 133

4819-9512-7824.3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES,<br><br>Defendants. | Civil Action No. 1:10-cv-8103<br><br>Hon. Matthew F. Kennelly<br>Hon. Jeffrey T. Gilbert |

**<u>SUPPLEMENTAL DECLARATION OF JONATHAN MOSKIN</u>**

I, Jonathan Moskin, hereby declare:

1.      I am attorney at law and member in good standing of the State Bar of New York and am admitted pro hac vice in this action.  I am a partner at Foley & Lardner LP, counsel of record for Plaintiff Games Workshop, Limited ("Games Workshop").  I have personal knowledge of the facts set forth herein and, if called to testify, I could and would testify competently thereto.

**Games Workshop's Discovery Responses**

2.      Games Workshop has produced all the relevant and responsive depictions of its miniature figures to Chapterhouse in the form in which Chapterhouse would have had access to them, in which customers see them and know them, and which form the basis for Games Workshop's claims in this case: namely as the painted figures as shown on the packaging for the products as well as pictures of the miniatures as they exist on Games Workshop's website. Additional detailed pictures of Games Workshop's miniatures are available on Games

4819-9512-7824.3

Workshop's website. Similarly, Games Workshop has produced in this action all available best exemplars of the subject trademarks as used in commerce, both on its website and on packaging for such products.

3. Because of the enormous burden of photocopying thousands of pages of books (from which only specific images are in issue) Games Workshop, in responding to discovery, made photocopies of the portions of the many books from which the Games Workshop's two-dimensional artwork supporting its claims are based. However, we have also repeatedly advised Chapterhouse that the entire volumes (running to thousands of pages) are available for discovery and inspection at Foley & Lardner's Chicago Office.

4. I have reviewed the declaration of Thomas Kearney dated August 14, 2012, and while not purporting to address every point of disagreement with his declaration (many of which do not appear to be material), I am not certain the basis for his stated confusion in Paragraphs 17 – 23 as to which Games Workshop works correspond with those cited in plaintiff's claim charts, we have simply inserted into the Claim Chart, first prepared in June 2011 and revised twice during the course of the litigation, the specific images referenced therein. It is Exhibit 135 hereto.

5. Game Workshop produced documents after March 12, 2012 in response to the last set of Chapterhouse Document Requests including in response to Request 66 (licenses concerning the allegedly infringing works), Request 71 (documents to establish, if not the date of first use, at least substantial priority of use of each of the trademarks in issue), Request 64 (agreements with certain freelancers), Requests 74 and 76 and 78 (product packaging for all trademarks at issue), Request 81 (sales revenues for each trademark), and Request 82 (confirmatory assignments of copyright from employees and freelance artists) Chapterhouse

4819-9512-7824.3

never sought and was not granted any order compelling Games Workshop to supplement any of its responses to this discovery and Chapterhouse has never identified any respect in which Games Workshop failed to comply with any relevant discovery request.

6.     Indeed, regarding sales, Chapterhouse's initial discovery requests (served in June 2011) did not seek detailed sales figures, by product, to demonstrate trademark rights in each individual unregistered trademark at issue in the case, and, for reasons described in greater detail in the accompanying memorandum of law, we did not understand that Chapterhouse was raising an argument in this case that Games Workshop did not own prior rights in all of the subject marks. (In short, any such defense seemed inconsistent with Chapterhouse's contention it had a fair use right to use Games Workshop's prior existing marks to identify its complementary or competing goods.)  Rather, Chapterhouse's Request 25 in its second set of document request (responses to which we timely served on July 5, 2011, Exhibit 147 hereto) simply asked for profits regarding the copyrighted works.  Because there is no need to prove sales to establish rights under copyright, in its response, Games Workshop objected to vagueness and made clear its understanding this was simply directed at a lost profits claim (so deemed it a contention request)  By contrast, in Chapterhouse's 7th and final set of document requests, served at the close of discovery, defendant asked for sales related to trademarks.  Request 81 thus sought "For each of the unregistered trademarks YOU claim in THIS ACTION, documents sufficient to identify YOUR sales, revenues, and profits in each and every geographic region in the U.S. where YOU contend to possess common-law trademark rights for that mark."  Games Workshop timely responded to that set of requests on March 12, 2012 (after the parties were required to certify that document production to that point was complete) (Exhibit 147 hereto) and

subsequently produced sales detailed monthly sales data for each of Games Workshop's products.

7.      In Games Workshop's Second Rev. Copyright Claim Chart, Games Workshop narrowed its claims of copyright infringement to simplify the case, thus confirming it made no separate claims of copyright infringement in 33 of the products Chapterhouse sells. Games Workshop's identification of additional two-dimensional works in its Second Rev. Copyright Claim Chart to form the basis of certain of its infringement claims was, as Games Workshop alerted Chapterhouse at the time it served the revised Claim Chart, simply in response to Chapterhouse's seemingly belated claim raised by its rebuttal expert on English law (addressing an issue not raised by Games Workshop's English law expert and that Chapterhouse had not previously raised in the case) that certain of Games Workshop's figurines may not be entitled to full copyright protection under English law. Although Games Workshop believes the theory is incorrect as a matter of United States law, it nonetheless produced additional artwork establishing a simple basis to demonstrate how Chapterhouse's copying does not even require reference to Games Workshop's sculptural works. Chapterhouse has also continued to create and sell new products that Games Workshop deems infringing but for which Games Workshop has received no discovery. These products were identified in Games Workshop's Second Rev. Copyright Claim Chart out of an abundance of caution but will be addressed separately in a separate complaint being prepared now.

8.      Games Workshop's claims of ownership of its copyrights have not been inconsistent. Given the vast size of the universe of Games Workshop's works, embodied in hundreds, if not thousands of copyrighted works, and the many years since Warhammer 40K was first published in 1987, Games Workshop has used considerable effort to identify which works it

believes Chapterhouse copied in order to create its products. As additional Games Workshop works were identified, we discovered that a small percentage of these were created by supposed independent contractors/freelancers. However, 7 of the 12 freelance authors all worked on a single licensed work (reproduced as part of the Games Workshop publication, Horus Heresy Collected Visions); certain of the freelancers have also been Games Workshop employees, and as shown by the reports of both parties' English law experts, where to draw the line between freelancer and employee under English law is not a simple matter of what label the parties happen to apply to the individual at any given time. The number of authors whose works are at issue has thus grown substantially over the course of the litigation, but it remains true as Games Workshop has always contended, that virtually all of the works were created by company employees.

### Chapterhouse's Discovery Responses

9.      For many of Chapterhouse's products, Chapterhouse failed to produce the underlying design documents, even after the Court directed it to do so on March 6, 2012. These products for which no substantive design documents have been produced include the Shoulder Pads for Chalice or Soul Drinker – Tactical, Shoulder Pads for Chalice or Sould Drinker – Terminator, Ymgarl Heads for Tyranid Genestealers, SXV-141 Super-Heavy Asault Walker SAW, Mark I Rhino Converstion Kit, Rhino Tank Conversion Kit for Iron Snakes, Gun-Halberds, and Conversion Beamer Servo Harness Kit for Space Marines.

### Games Workshop's Registered Copyrights

10.     Thirteen of Games Workshop's products at issue were registered within five years of the date of first publication. These registrations are:

| Registration | Registration Date | Date of First Publication |
|---|---|---|

4819-9512-7824.3

| | | |
|---|---|---|
| Codex: Tyranids<br>TX 7-538-598 | 3/5/12 | 11/30/09 |
| Codex: Space Wolves<br><br>TX 7-549-698 | 3/5/12 | 12/31/09 |
| Horus Heresy: Collected Visions<br><br>TX 7-538-569 | 3/5/12 | 4/30/07 |
| Legion of the Damned<br><br>TX 7-513-642 | 3/2/12 | 10/31/11 |
| Blood Raven Transfer Sheet<br><br>VA 1-819-307 | 3/7/12 | 7/31/10 |
| Contemptor Heavy Conversion Beamer<br><br>VA 1-824-754 | 3/7/12 | 7/25/11 |
| Mark V Heresy Armour<br><br>VA 18-824-755 | 3/7/12 | 6/30/10 |
| Space Marine Character Conversion Kit<br><br>VA 1-824-622 | 3/7/12 | 7/31/10 |
| Salamanders Terminator Shoulder Pads<br><br>VA 1-824-496 | 3/7/12 | 5/25/07 |
| Valthex Astral Claws of the Master Forge<br><br>VA 1-824-495 | 3/7/12 | 6/29/11 |
| Space Marine Drop Pod<br><br>VA 1-814-902 | 3/7/12 | 8/4/08 |
| Legion of the Damned | 3/9/12 | 11/30/09 |

| VA 1-824-653 | | |
|---|---|---|
| Grey Knights VA 1-824-604 | 3/8/12 | 2/2/11 |

### Games Workshop's Additional Exhibits

11.     Exhibit 129 is a true and correct copy of Chapterhouse's webpage for the Tau Super Heavy Walker.

12.     Exhibit 130 is a true and correct copy of Chapterhouse's webpage for the Pilum Imperial Attack Jet Bike.

13.     Exhibit 131 is a true and correct copy of Chapterhouse's webpage for the TRU-Scale Knight Praetorius.

14.     Exhibit 134 is a true and correct copy of portions of the deposition transcript of Andrew Jones.

15.     Exhibit 135 is a true and correct copy of Games Workshop's Second Revised Copyright Claim Chart for which representative images of Chapterhouse's and Games Workshop's products have been inserted.

16.     Exhibit 136 is a true and correct copy of Games Workshop produced documents GW002636-3249, comprising of photos of Mr. Villacci's collection of Games Workshop materials.

17.     Exhibit 137 is a true and correct copy of a Games Workshop document produced at GW001439, depicting a Games Workshop Tyranid Genestealer miniature from Codex: Tyranids.

4819-9512-7824.3

18.     Exhibit 138 is a true and correct copy of a Games Workshop document producted at GW001431, depicting a drawing of a Games Workshop Genestealer Ymgarl from Codex: Tyranids.

19.     Exhibit 139 is a true and correct copy of Games Workshop's webpage for the Space Marine Chaplain with Jump Pack.

20.     Exhibit 140 is a true and correct copy of Games Workshop production document GW004488, showing Games Workshop's Basilica Administratum.

21.     Exhibit 141 is a true and correct copy of Games Workshop's webpage for the Citadel Realm of Battle Gameboard Extension.

22.      Exhibit 142 are true and correct copies of the confirmatory assignments for Wayne England, Stefan Kopinski, Clint Langley and Simon Egan.

23.     Exhibit 147 are true and correct copies of relevant portions of Games Workshop's responses to Chapterhouse's Second and Seventh Set of Document Requests.

24.     Exhibit 148 attached hereto is a true and correct copy of my February 27, 2012 email to opposing counsel preceding the deposition of Chapterhouse's document custodian.

25.     Exhibit 149 are true and correct portions of the deposition transcript of Professor Bently.

4819-9512-7824.3

I hereby declare under penalty of perjury this 6th day of September, 2012, under the laws of the

United States that the foregoing is true and correct to the best of my knowledge.


<u>        s/Jonathan E. Moskin           </u>
Jonathan E. Moskin

## CERTIFICATE OF SERVICE

I, Jason J. Keener, an attorney, hereby certify that on September 6, 2012, I caused to be filed electronically the foregoing SUPPLEMENTAL DECLARATION OF JONATHAN MOSKIN with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

/s/ Jason J. Keener
Jason J. Keener

11

4819-9512-7824.3

# Exhibit

# 134

000001

01          IN THE UNITED STATES DISTRICT COURT

02          FOR THE NORTHERN DISTRICT OF ILLINOIS

03                  EASTERN DIVISION

04   - - - - - - - - - - - - - - - - - - - - -

05   GAMES WORKSHOP LIMITED,

06          Plaintiff,

07                  Civil Action No. 1:10-cv-8103

08          v.

09   CHAPTERHOUSE STUDIOS LLC and JON

10   PAULSON d/b/a PAULSON GAMES

11          Defendants.

12   - - - - - - - - - - - - - - - - - - - - -

13

14                  Tuesday, 3 April, 2012

15                      11:15 am

16

17      Videotaped Deposition of ANDREW JONES, taken

18   at the offices of Eversheds, 1 Royal Standard Place,

19    Nottingham, UK, before Ailsa Williams, Accredited

20                  Court Reporter

21

22

23

24

25

000002

01

02           A P P E A R A N C E S:

03   Attorneys for Plaintiff:

```
04            FOLEY & LARDENER LLP

05            90 Park Avenue

06            New York, NY 10016-1314

07            BY:   JONATHAN E. MOSKIN

08                  (212) 682-7474

09                  jmoskin@foley.com

10

11   Attorneys for Defendants:

12            WINSTON & STRAWN LLP

13            101 California Street

14            San Francisco CA 94111-5894

15            BY: K. JOON OH

16                  (415) 591-1564

17                  koh@winston.com.

18       Also Present:

19            GILLIAN STEVENSON: (Games Workshop)

20            COURT REPORTER:

21            AILSA WILLIAMS

22            VIDEOGRAPHER: LINDA FLEET

23

24

25


000003

01   ANDREW JONES

02   Previously marked exhibits referred to:

03   38, 39, 66, 95

04                  INDEX OF EXHIBITS

05   Exhibit 114 Interrogatories ... ... ... ... ... ... ... 12

06

07   Exhibit 115 Battlefleet Gothic: ... ... ... ... ... ... 31
```

21    have a chapter of Space Marines called Iron Snakes,

22    and it has a particular snake symbol which is a

23    trademark rather in the way "cog" is, but I don't

24    think we would claim that "snakes" is entirely our

25    exclusive trademark.


000077

01              It is that unique combination, isn't it.

02    So, for example, we cannot possibly claim to own Roman

03    numerals, but when Roman numeral are combined with a

04    particular Space Marine shoulder pad and a particular

05    Space Marine or other back story or part of our IP,

06    then that is where we are claiming it as a mark of our

07    trade.

08              Q    Returning to where you were referring

09    to, page 5, when you were talking about the entries

10    "Roman numerals combined with arrows"?

11              A    Yes.

12              Q    Was that what you were referring to?

13              A    Yes.

14              Q    Again you are saying it is the unique

15    combination of how Games Workshop uses the Roman

16    numerals with the arrows as depicted in an icon?

17              A    Yes, what I am saying is we cannot claim

18    to exclusively own Roman numerals with or without

19    arrows.  That is what I am saying.  You asked me if

20    there is any things in this list that I felt were,

21    rather as I did with the word "plasma", that I can't

22    see how we can claim exclusivity to it.  So in and of

23    themselves we cannot claim to own Roman numerals.

24    They are unique combinations in the framework of our

25    intellectual property, and as recognized by our

000078

01    customers worldwide of course we will.

02            Q    For clarity, is Games Workshop

03    contending that it owns the trademarks about the idea

04    of Roman numerals combined with arrows?

05            A    I don't understand that, sorry.  Say

06    that question again.

07            Q    Is Games Workshop claiming that it owns

08    a trademark with respect to the general concept of

09    Roman numerals combined with arrows?

10            A    Roman numerals combined with arrows, it

11    will be -- I still don't really understand what you

12    are asking.  We are not claiming we own Roman numerals

13    and we are not claiming we own arrows, but if there is

14    a unique combination or a way of depicting Roman

15    numerals and/or arrows or other symbols that we use in

16    commerce as marks of trade, rather like, I don't know

17    rather like what, but as a unique combination, and if

18    there is products that your client has made that have

19    those same combinations, then that is where they are

20    infringing that trademark.

21            Q    For clarification, the contention is

22    that Chapterhouse Studios infringes the trademark if

23    Chapterhouse uses the combination that is identical to

24    the way Games Workshop depicts its combination of

25    Roman numerals and arrows?

000079

01            A    Depends what you mean by the word

08  and decorative gems on weapons as particular

09  stand-alone trademarks that have been used on products

10  sold in the USA, in specifics, no, I can't, but the

11  Eldar iconography, and it says Eldar iconography

12  symbol "C", that is like a collection of all of those,

13  it refers to all of those icons, those stand-alone

14  icons would certainly be on -- well, I would guess,

15  again, the memory is a wonderful thing for playing

16  tricks on you, I know it is not as accurate as you

17  would like to hope it is, but in my mind the Eldar

18  Codex Army Book that came out, and indeed associated

19  kits and so on that came out in 1991 would have had

20  that iconography and symbols as stand-alone somewhere

21  on the book, would be my memory of it.

22          Q   And when you say "somewhere on the book"

23  you mean the --

24          A   On the cover, somewhere there would be

25  some Eldar symbols.


000128

01          Q   Just for the record, we are on page six

02  of Exhibit 114.  We just finished talking about the

03  last four entries, which were:  "Spirit Stone, Eldar

04  iconography/symbols (seer icons, et cetera).  Eldar -

05  Spirit Stones", and the last one:  "Eldar decorative

06  gems on weapons."  Returning back to the one that is

07  the Eldar iconography, can you identify specific Eldar

08  iconography, for the record?

09          A   No, I can't remember specific Eldar

10  symbols, if that is what you are asking.  That might

11  be on the cover of our 1991 Eldar Codex Army Book.

12        Q   For this line of questioning I think

13   there is just one we may have missed.  Can you turn to

14   page 4.  Do you see towards the bottom there is one

15   that is for wings, eagle wings.

16        A   Yes.

17        Q   Same question here?

18        A   It is an interesting question, isn't it,

19   because "wings", do we claim that we own wings as a

20   unique trademark, no, but the unique association of

21   stylized wings so, for example, the Warhammer 40,000

22   logo has stylized wings on it, and certainly in 1987,

23   when we launched, in fact, again to my memory, the

24   Rogue Trader Warhammer 40,000 Army Book, the logo

25   itself is stylized eagle wings.  One of the key icons

000129

01   of Warhammer 40,000 is the double headed eagle, which

02   we have used since 1987, and in fact it is the big

03   symbols stamped on the side of our headquarters

04   building here in Nottingham.  So we certainly have --

05   almost any Imperium, i.e. that is for the good -- I

06   wouldn't describe anybody as good in Warhammer 40,000,

07   but the Space Marines Imperial Guard, typically, any

08   products featuring those characters would have some

09   form of winged icon somewhere on it, even if it is

10   only the Warhammer 40,000 logo.

11        Q   Excluding the Warhammer 40,000 logo, and

12   again for the record we need to kind of identify the

13   specific instances of wings that Games Workshop is

14   claiming as trademarks, so what are the other

15   instances of wings?  You mentioned the double headed

16    eagle, the Warhammer 40,000 logo, the main logo, what

17    are other examples?

18              A    There were loads of them.  We talked

19    earlier about the Raven Wings with the Blood Drop,

20    that is the Blood Ravens Chapter, or we talked about

21    the Raven Wing Space Marine Chapter, that that is

22    their unique symbol.  Wings is commonly used, you

23    know, we use it a lot, and we use stylized wings in

24    Warhammer 40,000 as identifying icons a lot, as I am

25    sure you have gleaned from talking to the guys who

000130

01    actually do that work, be it Alan as head of IP or Jes

02    or John in their roles as sculptors and artists.

03              Q    For right now, let's exclude the other

04    trademark entries that we discussed earlier, like the

05    Raven Wings or the Blood Angels or things like that.

06    I am just trying to identify what else may fall under

07    this entry for wings on page 4 that have not yet been

08    identified specifically?

09              A    Oh, gosh, again I am not --

10              Q    Again, we are only focusing on marks

11    that Games Workshop would have used as a stand-alone

12    trademark for products sold in the US.

13              A    I am kind of a bit lost at that point

14    because we use wings so much.  They are a key part of

15    our Dark Angel iconography, for example, and indeed

16    the Blood Angels use stylized wings.  You might guess

17    with the Blood Angel they use angel wings as part of

18    their -- in fact it is Angel Wings with a Blood Drop

19    is their key identifying logo icon that any Blood

20    Angels product would have had that on somewhere.

21            Dark Angels would have had their wing icon

22    on.  So yes, any Blood Angels product, any Dark Angel

23    product, any Imperial Warhammer 40,000 products -- I

24    am kind of going round in circles.

25            Q    At that point when you are referring to


000131

01    this list, were you talking about these icons being or

02    logos being used as part of actual product?

03            A    Yes, again, to the best of my memory.

04    Again, my memory of the Blood Angels Codex has that

05    icon on it.

06            Q    Are there any instances where you recall

07    separate use of these icons as part of the packaging

08    for specific products?

09            A    Again, my memory of these things is

10    that -- if by packaging you might mean the cover of a

11    book, then have we used these key icons on book covers

12    and the like, my memory, which may be wrong, tells me

13    yes, we have.

14            Q    As stand-alone?

15            A    Rather than as part of a piece of

16    artwork inside a frame, yes, that would be my guess,

17    or my memory going back.  You know, we are talking

18    about going back to 1987 here.

19            Q    But at this point you are not able to

20    identify any additional specific instances and

21    specific products?

22            A    No.

23    MR. OH:  This may be a good time now to take a break.

24   Tears".

25            Q   And what the title of this particular

000163

01   book?

02            A   This is the title page for -- that this

03   is?

04            Q   Yes.

05            A   That particular book was called the

06   "Soul Drinkers Omnibus".

07            Q   So the title of that book was the "Soul

08   Drinkers Omnibus"?

09            A   Yes.

10            Q   Has Games Workshop released any

11   subsequent books related to Soul Drinker?

12            A   Actually, I am not sure whether the

13   author might have either just written or is about to

14   do another one.  Also, I couldn't say whether we have

15   released any other Soul Drinker products.  Probably

16   not.  But yes, the Soul Drinker product I was thinking

17   about was the 2002 book by that title.

18            Q   If you could turn back to Exhibit 114,

19   and if you go to page 4, do you see an entry for

20   "Tactical"?

21            A   I do.

22            Q   Did Games Workshop use the word phrase

23   "Tactical" as a trademark for products sold in the US

24   in 1989?

25            A   You know what, I think "Tactical" is one

000164

01    of those general words.  "Tactical", did we ever sell

02    a product called "Tactical", no.  We do Tactical Space

03    Marines, Tactical Squads.  It is a key part of the

04    make-up of our game, and how we describe and label

05    particular units of troops and their functions.  So

06    Tactical Space Marines is a key phrase, I suppose you

07    would call it, but "Tactical" as a -- it is a word.

08            Q   So in this lawsuit is Games Workshop

09    contending that the word phrase "Tactical" is a

10    trademark at issue or that Chapterhouse has infringed

11    Games Workshop's copyright to the word?

12            A   It will be once again the unique

13    association of the elements that are at issue.  So it

14    will be the association of the word "Tactical" with

15    the word "Space Marine", with particular armour,

16    weapon combinations, and that will be at issue, not

17    the word in isolation, "Tactical."

18            Q   For clarification on the record, the

19    word phrase "Tactical" in isolation, Games Workshop is

20    not claiming that it is --

21            A   No.

22            Q   Returning back to Exhibit 114, if you go

23    to page 2, do you see the phrase or the mark Aquila,

24    A-Q-U-I-L-A?

25            A   Yes.


000165

01            Q   Is Games Workshop contending that it

02    used "Aquila" as a trademark for products sold in the

03    US since 1987?

04            A   The Aquila is a symbol.  We have talked