**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GAMES WORKSHOP LIMITED,

                    Plaintiff,                Civil Action No. 1:10-cv-8103

v.                                      Hon. Matthew F. Kennelly

CHAPTERHOUSE STUDIOS LLC,      Hon. Jeffrey T. Gilbert

                Defendant.

**LOCAL RULE 56.1(b)(3) RESPONSE AND EVIDENTIARY OBJECTIONS
OF DEFENDANT CHAPTERHOUSE STUDIOS LLC TO
PLAINTIFF GAMES WORKSHOP'S STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT;
CHAPTERHOUSE STUDIOS LLC'S ADDITIONAL MATERIAL FACTS**

Pursuant to Local Rule 56.1(b)(3), Defendant Chapterhouse Studios LLC ("Defendant"

or "CHS") hereby submits its Response and Evidentiary Objections to the Statement of

Undisputed Facts of Plaintiff Games Workshop Ltd ("GW" or "Plaintiff"), in support of its

motion for summary judgment.

CHS objects generally to GW's purported statements of fact and supporting declarations

and exhibits as follows:

- CHS objects to each of GW's purported statements of fact and the Declaration of
  Alan Merrett (the "Merrett Decl.") (Exhibit 1 to GW's Motion for Summary
  Judgment ["GW MSJ Ex. 1"] to the extent they reference and rely on documents and
  alleged works that GW failed to produce (*see* GW MSJ Exs. 27, 29, 31, 71, 77, 109,
  111, and 117). *See* Dkt. 139 (ordering GW to "produce the best exemplar of the
  works in question".)

- CHS further objects to each of GW's purported statements of fact and the Merrett
  Decl. to the extent they reference and rely on documents and alleged works that GW
  produced only after the close of fact discovery. (GW MSJ Exs. 28, 108). Dkt. 116
  (scheduling order).

- CHS further objects to each of GW's purported statements of fact and the Merrett Decl. to the extent they incorporate and rely on color versions of images that GW produced only in black and white, in violation of the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question".)

- CHS further objects to each of GW's purported statements of fact and the Merrett Decl. to the extent they reference and rely on works that GW failed to identify as infringed by any Chapterhouse product. (GW MSJ Exs. 27, 71, and 117)

- CHS objects to the Declaration of Andrew Jones ("Jones Decl.", GW MSJ Ex. 2) to the extent it refers to and purports to identify "symbols associated with the characters and armies of the WARHAMMER 40,000 universe," including symbols GW has never previously identified as alleged marks, such as "Ultramarine icon"; "Space Wolves icon"; "Mantis Warrior icon". Jones Decl. at ¶ 7.

- CHS objects generally to the declaration of Jonathan E. Moskin (GW MSJ Ex. 4) as lacking foundation for any of its referenced exhibits or statements and as consisting of improper speculation.

- CHS objects generally to the declaration of Jason J. Keener (GW MSJ Ex. 20) as lacking foundation for any of its referenced exhibits or statements and as consisting of improper speculation.

CHS responds to GW's statements of fact as follows:

## A.    Response to the Plaintiff's Statement of Undisputed Facts

### [A History of Warhammer 40,000][1]

**GW's Statement of Fact No. 1.** Warhammer 40,000 (or Warhammer 40K) was first launched in 1987, in a book entitled Rogue Trader. (Ex. 1, Merrett Decl. at ¶ 2). The fictional universe and basic game were created by a small group of key employees, John Blanche, Jes Goodwin, Alan Merrett and Rick Priestley. (Id.).

---

[1] For the Court's convenience, Chapterhouse includes GW's section headings. Chapterhouse does not thereby adopt, ratify, or concede the accuracy of those headings.

**CHS's RESPONSE:**

SENTENCE 1: For purposes of CHS's Response to GW's Motion for Summary Judgment, CHS does not dispute the alleged facts contained in the first sentence of this paragraph. CHS does not thereby concede that the statement is accurate.

SENTENCE 2: **DISPUTED**. GW's statement that "[t]he fictional universe and basic game were created by a small group of key employees" is vague and ambiguous because the terms "[t]he fictional universe" and "basic game" are undefined. To the extent GW implies that any or all of the works at issue in this case were created by any of the named individuals, CHS denies that claim, which is directly contradicted by GW's allegations and discovery responses. GW's alleged works at issue in this litigation ("works-in-suit") were created by dozens of different authors, including freelance authors who have never assigned their rights in the underlying works to GW, as identified by GW in the various versions of its Copyright Claim Chart.

- Declaration of Thomas J. Kearney in Support of Defendant Chapterhouse Studios LLC's Opposition to Plaintiff's Motion for Summary Judgment ("Kearney Decl.") ¶ 9 & Ex. 5 (GW Response to CHS First Set of Interrogatories ("Rog 1 Response"]; Ex. A to the Rog 1 Response [the "Original Copyright Claim Chart"]);

- Kearney Decl. ¶ 10 & Ex. 6 [the "First Rev. Copyright Claim Chart"];

- Kearney Decl. ¶ 11 & Ex. 7 [the "Second Rev. Copyright Claim Chart"];

- Kearney Decl. ¶ 12 & Ex. 8 (GW's Supp. Resp. to CHS's Interrogatory 22 (Mar. 13, 2012));

- Kearney Decl. ¶ 13 & Ex. 9 (GW's Further Supp. Resp. to CHS's Interrogatory 22 (May 3, 2012))

John Blanche, Alan Merrett, and Rick Priestley are not the authors of any of GW's alleged works-in-suit. (Second Rev. Copyright Claim Chart.)

The second sentence of GW's SUF No. 1 is also contradicted by the deposition testimony

of Jes Goodwin, GW's lead miniature designer:

> Q  Let's -- the first -- let me strike that.
>         You said the first publication of the Warhammer
> 40,000 system was in about 1986 or 1987?
>     A  Yes.
>     Q  Who were the individuals who were responsible
> for the overall look of the Space Marines in that first
> appearance?
>     A  They wouldn't have been the same people.  You
> understand this?  **The individuals on the first Space
> Marine miniatures that we made would have been myself,
> Alistair Morrisson, and Bob Naismith.**

Jeremy Goodwin Dep. Tr. (Mar. 7, 2012) ("Goodwin Dep.") at 80:14-24 (emphasis added) (cited
portions of the Goodwin Dep. are attached to Kearney Decl. at ¶14 , Ex. 10).

> Q  Were there individuals other than the three you
> just mentioned who were responsible for the overall look
> of the Space Marines in the first appearance?
>     A  No.
>     Q  Were there individuals other than the three you
> mentioned who were responsible for the overall look of
> the Warhammer 40,000 game?
>     A  Yes.
>     Q  Who were they?
>     A  They would have been artists that gave sort
> of -- you know, people who did the logos and stuff to
> make the actual look of the book.  I'm assuming that's
> what you're talking about.

*Id.* at 81:13-25.

> Q  When did the Tyranids first appear?
>     A  I think there was an illustration of a Tyranid
> in Rogue Trader in 40K when we published it in '86, '87.
>     Q  And Rogue Trader is the first edition of the
> Warhammer 40,000 Rulebook?
>     A  Yes.
>     Q  When you say an illustration, was there more
> than one illustration?
>     A  I can't remember.  I can remember one.  There
> may have been more.
>     Q  Fewer than ten?

> A   Fewer than ten, yes.
> Q   **Who drew the first picture or pictures of**
> **Tyranids?**
> A   **Anyone I can remember was by Nick Bibby.**
> Q   And that was in the first edition rulebook?
> A   It was, yes.

*Id.* at 83:4-20 (emphasis added).

> Q   Where had you heard of or seen heads with
> tentacles before you created your work?
> MR. MOSKIN:  Objection.
> MR. KEARNEY:  Q   You can answer.
> A   The reference here is to an original picture of
> a Genestealer within Rogue Trader.
> Q   **And who created the original picture of the**
> **Genestealer within Rogue Trader?**
> A   **I think Tony Ackland, A-C-K-L-A-N-D.**

*Id.* at 115:13-21 (emphasis added).

The second sentence of GW's SUF No. 1 is also contradicted by the deposition testimony

of John Blanche, GW's Art Director:

> Q   When did the development for Warhammer
> 40K start?
> A   It was a very fast process, so it would
> be 1986, perhaps 85.
> Q   Who was involved in the development?
> A   Same team of people as Warhammer, that
> would be **Bryan Ansell**, Alan Merrett, Rick Priestley.

John Blanche Dep. Tr. ("Blanche Dep.") at 19:1-7 (emphasis added) (cited portions of the
Blanche Dep. are attached to the accompanying Kearney Decl., ¶15 , Ex. 11).


**GW's Statement of Fact No. 2.**        Warhammer 40,000 quickly achieved great
commercial success and currently represents a body of hundreds of books and magazines and
video games (made under license) portraying the fictional world and setting forth information
and rules about the related table-top wargame of the same name, a movie, computer games, and
thousands of collectible figurines that are sculpted and produced by Games Workshop and
collected, painted and displayed by fans and used in the tabletop wargame. (Id. at 3) Seven of the
books have been New York Times bestsellers. (Id. at 3) Sales of the books and other products are
approximately 156 annually, including licensing (including $54 million the United States,
including licensing), where the products are sold at 87 hobby stores owned and operated by
Games Workshop and 1396 of independent hobby stores. (Ex. 2, Jones Decl. at ¶2, 5). A

complete sales summary is attached as Exhibit 3. Warhammer 40,000 is also the hub of a wide social network, some of which can be experienced at the many on-line forums devoted exclusively or primarily to Warhammer 40,000 and its fans (including Bolterandchainsword.com, Dakkadakka.com, Warseer.com, frothersunite.com, heresyonline.net, and others). (Ex. 1 at ¶3). Other online resources for Warhammer 40,000 also exist, such as lexicanum.com and Warhammer40k.wikia.com (unofficial online encyclopedias). Fans also gather at annual and other regularly scheduled events such as Games Day events organized by Games Workshop (including the July 28, 2012 Games Day in Chicago, Illinois that was attended by thousands, and the independently organized Adepticon, also in Chicago, which occurred on April 19-21 and was attended by thousands). (Id.). Videos of these events are available either on Youtube or on attached Exhibits 123 and 124 (Ex. 1 at ¶3; Ex. 20, Keener Decl. at ¶2).


**CHS's RESPONSE:**

**DISPUTED**. All of the statements in GW's narrative SUF No. 2 are vague, conclusory and without foundation (FRE 602). In particular:

- "great commercial success" – is an undefined term

- "hundreds of books and magazines and video games" – no work is identified.

- "a movie, computer games, and thousands of collectible figurines" – no work is identified.

- "Seven of the books have been New York Times bestsellers" – no work is identified. This statement lacks foundation (FRE 602) and misstates the Merrett Decl. on which it relies: the Merrett Decl. states only that "**As many as seven** of the Black Library novels about Warhammer 40,000 have been New York Times bestsellers." Merrett Decl. at ¶ 3 (emphasis added).

- "Sales of the books and other products are approximately 156 annually, including licensing (including $54 million the United States, including licensing)" – there is no record evidence supporting these figures. Jones Decl. ¶¶ 2, 5 lacks foundation (FRE 602) and offers no evidentiary support for these figures.

- "complete sales summary" – GW MSJ Ex. 3 is not a complete sales summary, does not list any products, does not differentiate between the U.S. and Canada, contains no explanation of what the entries in the various tables represent, and does not support the sales figures listed in Jones Decl. ¶ 5.

- "many on-line forums devoted exclusively or primarily to Warhammer 40,000 and its fans" – lacks foundation (FRE 602). Each of the listed online forums is devoted to a range of topics, including games other than Warhammer 40,000. To the extent GW purports to rely on statements published on or by the listed online forums, such

statements are inadmissible hearsay (FRE 802) and are without foundation (FRE 602).

- References to "unofficial online encyclopedias" are without foundation (FRE 602). To the extent GW purports to rely on statements published on or by such "unofficial online encyclopedias," such statements are inadmissible hearsay (FRE 802) and are without foundation (FRE 602).

- Statements concerning "annual and other regularly scheduled events" are without foundation (FRE 602); videos of such events are inadmissible hearsay (FRE 802) and without foundation (FRE 602). The Declaration of Jason Keener (Ex. 20, ¶ 2) concerning such videos lacks foundation (FRE 602). The Merrett Decl. (Ex. 1, ¶ 3) concerning such videos lacks foundation (FRE 602).

- Merrett Decl. ¶ 3 refers to Exhibit 104 as "a short Games Workshop video that provides some context for the hobby . . ."), but Exhibit 104 is instead an email produced by CHS, Bates labeled CHS00002413.

- To the extent Merrett Decl. ¶ 3 refers to any identifiable video, such reference lacks foundation (FRE 602), and the content of any such video is inadmissible hearsay (FRE 802).

- Exhibit 3 lacks foundation (FRE 602) and is incomprehensible.

- Exhibit 123 is inadmissible hearsay (FRE 802) and lacks foundation (FRE 602). The Declaration of Jason J. Keener (GW MSJ Ex. 20) ¶ 2 is not based on personal knowledge (FRE 402) and lacks foundation (FRE 602).

- Exhibit 124 is inadmissible hearsay (FRE 802) and lacks foundation (FRE 602); no reference to Exhibit 124 appears in any of Plaintiff's declarations.

**GW's Statement of Fact No. 3.**      The Warhammer 40K universe is set in a savage 41st Millennium where Mankind must battle for survival in a galaxy riven by bloodshed and destruction. (Ex. 1 at ¶4). Humanity teeters on the brink of extinction, assailed on all sides by aliens, traitors, and Daemons. (Id.) Humanity is protected by elite genetically engineered super-soldiers (called Space Marines) and innumerable "Imperial Guard" (which is the largest fighting force defending humanity). (Id.) The various races warring against Mankind include, but are not limited to:

- Eldar – An ancient alien race possessed with incredible skill, dazzling technology, and preternatural swiftness;

- Tau – A fledgling race that is rapidly expanding their empire through the use of advanced technology to compensate for their meager physique;

- Tyranids – An alien bio-engineered horror from beyond the galactic void that devours all in their path; and

- Chaos – Once loyal warriors who fought for Mankind who have forsaken their oaths of loyalty and turned against humanity, loyal only to the Dark Gods of Chaos. (Id.)[2]

**CHS's RESPONSE:**

Each statement in GW's SUF No. 3 is irrelevant to any issue in this case. FRE 402.

For purposes of CHS's Response to GW's Motion for Summary Judgment, the alleged facts contained in this paragraph are not disputed. CHS does not thereby concede that GW's SUF No. 3 accurately describes any aspect of GW's alleged "imaginary universe." To the extent GW alleges that the description of its "imaginary universe" are unique or original to GW, that is contradicted by the testimony of its employees. *See* Response to SUF 4, *infra*.

**GW's Statement of Fact No. 4.** For each specific race, Games Workshop's books, magazines, and other products flesh out the specific history, legends, characters, weapons, vehicles, culture, and other details of that race. (Ex. 1 at ¶ 5). By way of example[3], during the 30 millennium, the Emperor of Mankind created twenty Primarchs, genetically engineered superhumans possessing immense physical and psychic power. (Id.) Each Primarch's genome was used to serve as a template for a different legion of Space Marines. (Id.) During the 30th Millennium, the Emperor used the Space Marines to conquer human-inhabited worlds to create the Imperium of Man. (Id.) Near the end of this campaign, nine of the twenty legions converted to worship Chaos Gods and rebelled against the Emperor (the "Horus Heresy", named after one of the Primarchs who rebelled). (Id.) The rebels were defeated and banished, but continue fighting on behalf of the Chaos Gods. The remaining legions were restructured into smaller units called "Chapters" to make future mass rebellion unlikely. (Id.). Much of the Warhammer 40K universe focuses on Mankind's continued struggle for survival with the assistance of these Space Marine Chapters. (Id.) Since 1993, the strapline for each new edition of Warhammer 40,000 is "In the grim darkness of the far future there is only war." (Id.)

---

[2] The Warhammer 40K universe includes a number of other races as well, such as Necrons, Orks, Daemons, Dark Eldar, etc. (Ex. 1 at ¶ 4), that are irrelevant to the present motion as Chapterhouse has not yet focused its business on any of these races.

[3] As shown below (infra ¶¶ 41 -47) the depictions of the "pre -history" of Warhammer 40,000, occurring in the 30 millennium and described in various works as part of "The Horus Heresy" is particularly relevant here as a basis of inspiration for many of Chapterhouse's accused products.

**CHS's RESPONSE:**

**DISPUTED**. The first sentence of this paragraph is vague and ambiguous as to the meaning of "flesh out" and each of the terms "history," "legends," "characters," "weapons," "vehicles," "culture," and "other details."

For purposes of CHS's Response to GW's Motion for Summary Judgment, CHS does not dispute the alleged facts contained in the second through eighth sentences of this paragraph. CHS does not thereby concede that GW's SUF No. 4 accurately describes any aspect of GW's alleged "imaginary universe." To the extent GW alleges that such descriptions of an "imaginary universe" are unique or original to GW, that is contradicted by the testimony of its employees. For example, without limitation:

> Q   What were some, outside of the original Warhammer game, what were some of the **points of references for the Warhammer 40K game**?
> A   **Historical costume, the pageant of warfare, certainly classical art, certain literature.** It probably sounds frivolous but very important to me personally as an artist, the weather, the environment, geology, so everything I am surrounded with.
> Q   Were there any futuristic points of references?
> A   Some, but I would regard that as being very minimal in my own personal case, because I tend to view everything in a very archaic, dystopian way, so, for instance, a busy shopping center will influence me in a 40K sense more than most things.
> Q   Were there any futuristic themed literature that was a point of reference?
> A   I said **certain literature. Tolkien had a massive influence. Mervin Peake with Gormanghast trilogy books. I tend not to read many science fiction. Treasure Island.**
> Q   Are you familiar with Michael Moorcock.
> A   I am familiar with the name Michael Moorcock. I have never read a Michael Moorcock book ever.
> Q   Do you know if Michael Moorcock, his works, whether they had an influence on the Warhammer

40K games?

A   Games Workshop had a license to make some Michael Moorcock figures under the title "Eternal Champions".  So it was a very small range of figures designed and sculpted by Jes Goodwin.  Those figures I liked very much.  I really adored those very small range of figures.

Q   Do you remember when Mr. Goodwin made these figures?

A   I am sorry, no, I don't remember.

Q   Was it before the development of Warhammer 40K?

A   I couldn't say.  I don't know.

Q   Are you familiar with any artwork related to Michael Moorcock outside of the figures that Mr. Goodwin made?

A   Could you repeat that question?

Q   Are you familiar with any artwork related to Michael Moorcock besides the figures that Mr. Goodwin made?

A   A few, vaguely, through an artist called Rodney Matthews.  Full stop.

Q   Can you describe what the figures by -- actually, strike that.  Can you describe the works you were referring to by Rodney Matthews?

A   Essential fantastical environment with creatures like dragons and warriors with big swords and winged helmets.

Q   Any other symbols you recall?

A   Not at all, no.

Q   Do you remember the first time you saw something by Mr. Matthews related to Michael Moorcock?

A   No.

Q   Would it have predated the development of Warhammer 40K?

A   Possibly, but it probably would be happening all around about the same time.

Blanche Dep. at 19:23-22:11 (Kearney Decl. ¶ 15 & Ex. 11) (emphasis added).

The statement at FN 2 is conclusory, lacks foundation (FRE 602), and is an improper

conclusion of law.

**GW's Statement of Fact No. 5.**        In additional to the numerous books and artwork depicting the Warhammer 40K universe, there is also an associated tabletop miniature war game

played with 28 millimeter (approximately 1 inch/6 feet) scale miniatures that represent the futuristic soldiers, creatures, weapons and other tools of war Games Workshop has created. (Ex. 1 at ¶6). The background and playing rules of each army are specified in the rule books and supplemental army "codexes" published by Games Workshop, along with articles in Games Workshop's monthly magazine, *White Dwarf*. (Id.) The rules attempt to account for the various unique characteristics present for each race, character, or weapon that exists in the Warhammer 40K universe. (Id.).

**CHS's RESPONSE:**

Each statement in GW's SUF No. 5 is irrelevant to any issue in this case. FRE 402.

SENTENCES ONE AND TWO: For purposes of CHS's Response to GW's Motion for

Summary Judgment, the alleged facts contained in sentences one and two are not disputed. CHS

does not thereby concede that those sentences accurately describe GW's "tabletop miniature war

game."

**Otherwise DISPUTED.** SENTENCE THREE: The third sentence of GW's SUF No. 5 is

incomprehensible. To the extent GW alleges that such descriptions of an "imaginary universe"

are unique or original to GW, that is contradicted by testimony of its employees. *See* Response to

SUF 4, *supra*.

**GW's Statement of Fact No. 6.**        The miniatures and vehicles sold by Games
Workshop require assembly and painting. (Ex. 1 at ¶7). Hobbyists (whether or not they play the game) assemble and paint the miniatures. (Id.) These miniatures are displayed in private collections, at local hobby groups, at local hobby stores (including Games Workshop stores), at conventions (including conventions hosted by Games Workshop), online, and in Games Workshop's various publications. (Id.).

**CHS's RESPONSE:**

**DISPUTED.** SENTENCE ONE, and Merrett Decl. ¶ 7 on which it relies, are

contradicted by GW's documents. *See, e.g.*, GW0004948 ("Eldar Warlock with Witchblade"

product not requiring assembly). (Kearney Decl. ¶ 16 & Ex. 12.)

SENTENCES TWO AND THREE: Sentences two and three of GW's SUF No. 6 lack

foundation (FRE 602). To the extent GW claims that its toy soldiers and accessories are sold

primarily for purposes other than game play, that is contradicted by GW's SAC ¶ 13, Dkt. 147,

which states in pertinent part: "Games Workshop produces and sells army figures **for its games and a wide range of accessories for those armies and games**. . . ." (emphases added).

**GW's Statement of Fact No. 7.** These miniatures may also be assembled into armies that can be pitted against those of other players. Unlike other battle strategy games such as Risk or Stratego, there is no board for play. (Ex. 1 at ¶8). Each player brings a roughly equal "value" of units to a tabletop "battlefield", typically 4 ft by 6-8 ft, decorated with various terrain features (hills, trees, ruined buildings, etc.). (Id.) The players then decide upon a scenario, ranging from simple skirmishes to complex campaigns surrounding events in the Warhammer 40K universe involving obtaining and defending various objectives. (Id.) Subject to the game rules, players develop strategies and take turns advancing the model armies and firing their weapons on the tabletop battlefield, rolling dice to determine the results of various types of combat. (Id.). It is Games Workshop's understanding that the collection and painting of miniatures represents a larger portion of the use of the works than does game play. (Id.)

**CHS's RESPONSE:**

SENTENCES ONE THROUGH FIVE are irrelevant to any issue in this case. FRE 402.

SENTENCE FIVE: The statement in sentence five of GW's SUF No. 7 is improper speculation (FRE 701) and lacks foundation as acknowledged by the qualifying word "understanding" in the sentence. (FRE 602). Sentence five is also contradicted by GW's SAC ¶ 13, which states in pertinent part: "Games Workshop produces and sells army figures **for its games** and a wide range of accessories **for those armies and games**. . . ." (emphases added).

To the extent GW implies that "the collection and painting of miniatures" *by fans* implies that such miniatures are protectable by copyright, that is disputed: even assuming *arguendo* that painted toy soldiers would be protectable under English copyright law, GW concedes (indeed, it insists) that such paintings are the artistic creations of third parties, not GW.

**[The Origin and Ownership of Games Workshop's Works]**

**GW's Statement of Fact No. 8.** Games Workshop itself originated in London in 1975, and in 1983 developed Warhammer, set in a medieval fantasy time. (Ex. 1 at ¶9). By the time it developed Warhammer 40K in 1987, Games Workshop had moved to Nottingham where the creative core of the company (Messrs Blanche, Goodwin, Priestley and Merrett) were devoted full-time as employees of the company (the creative core of the company remains there today). (Id.).

**CHS's RESPONSE:**

SENTENCE ONE: Sentence one of GW's SUF No. 8 is irrelevant to any issue in this case. FRE 402. Alan Merrett, on whose testimony GW relies, concededly has no personal knowledge of GW's origins. Merrett  Decl. ¶ 1 ("I have been employed by Games Workshop since 1981 . . . ")

**DISPUTED:** SENTENCE TWO is contradicted by GW's Supplemental and Further Supplemental responses to Chapterhouse Studio LLC's Interrogatory 22, which states that Rick Priestley's employment with GW ended on October 29, 2010.  (Kearney Decl. ¶¶ 12-13 & Exs. 8-9.)

**GW's Statement of Fact No. 9.**　　　Among the four original creators of Warhammer 40,000, Mr. Goodwin is a sculptor and Mr. Blanche a painter, and they created most of the original artwork. (Ex. 1 at ¶ 10). None of the designs for the characters, races and armies have any known antecedents. (Id.) To be sure, Warhammer 40K incorporates some symbols and graphic elements drawn from heraldry and other historical sources (e.g., wolves and Roman numerals and crosses) but as used in [sic] Warhammer 40K, those individual elements have been modified and thoroughly integrated with other elements (graphic and sculptural) to form something unlike any known prior works. (Id). Although Chapterhouse's claimed experts were able to locate examples where certain symbols taken in isolation had been used previously or had historical bases, even Chapterhouses's experts were unable to identify and direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design features they comprise (Ex. 5, Brewster Tr. at 54:14-20, 64:11-22, 66:10-14, 77:7-78:2, 90:9-93:3, 133:21- 135:1, 137:22-138:15, 144:18-145:2, 147:8-17, 162:11-15, 166:5-23, 167:8-24, 179:14-180:11, 183:24-184:6, 184:19-185:2, 186:22-187:4, 188:8-12, 190:7-16, 191:2-8, 195:11-196:2, 199:2-6, 241:3-20; and Ex. 6, Wolfe Tr. at 70:15-71:17, 75:12-16, 94:1-23, 107:13-109:9, 112:16-113:3, 148:17-149:8, 166:3-17, 173:1-8, 175:14-177:23, 179:22-180:4). Games Workshop is aware of none. (Ex. 1 at ¶ 10) For instance, although something as simple as a Roman numeral is used as one of the identifying features, it has a specific meaning within the underlying story such that only certain characters would wear the numeral on a specific location for a specific purpose and only in combination with other specific symbols (such as an arrow, a crossed X, or a chevron). (Id.).

**CHS's RESPONSE:**

**DISPUTED**: SENTENCE ONE is contradicted by testimony of GW's employees, *see* Response to SUF 1, 8, *supra*, and including without limitation the following:

> Q  Let's -- the first -- let me strike that.
>      You said the first publication of the Warhammer
> 40,000 system was in about 1986 or 1987?
>    A  Yes.
>    Q  Who were the individuals who were responsible
> for the overall look of the Space Marines in that first
> appearance?
>    A  They wouldn't have been the same people.  You
> understand this?  The individuals on the first Space
> Marine miniatures that we made would have been myself,
> Alistair Morrisson, and Bob Naismith.

Goodwin Dep. at 80:14-24 (Kearney Decl, ¶ 14 & Ex. 10).

GW identifies dozens of authors of the works-in-suit in its Second Rev. Copyright Claim

Chart, and Mr. Blanche is not identified as an author of any of the works-in-suit. Kearney Decl.

¶ 10 Ex. 6 (Second Rev. Copyright Claim Chart).

SENTENCES TWO THROUGH SIX are contradicted by testimony of GW's employees,

including without limitation the following:

- "None of the designs for the characters, races and armies have any known antecedents." **DISPUTED.** This statement is contradicted by, without limitation, the following testimony of GW's employees:

> Q  And what's the design on the shoulder pad?
> A  It's for -- indicates that he is part of a
> Devastator squad.
>    Q  Does that design have a name?
>    A  What, that particular chevron thing?  It's a
> chevron, I guess.  It doesn't have a specific name.
>    Q  Is the chevron a historical heraldry symbol?
>    A  I guess it could be, yes.
>    Q  It could be?
>    A  **Just about every geometric shape you can
> possibly give me has been used on heraldry somewhere.
> That's another huge open-ended place to go to, yeah?**

Goodwin Dep. at 101:5-16 (emphasis added).

> Q  And the Roman numeral that's in the arrow --
> A  That's a Roman numeral, isn't it, you know.

Q   Is that used commonly in heraldry?

A   No, not in heraldry.  You very rarely find things like those in heraldry.

**Q   Where would you find it?**

**A   All over the place, wherever you see Roman numerals, Rome.**

*Id.* at 102:2-9 (emphasis added).

Q . . .     What is the symbol on the center of the Dreadnought, it looks like the chest plate?

A   Uh-huh.

Q   Can you describe that?

A   It's a wolf's skull over two crossbones with a diamond beneath it and a scroll underneath it that somebody has painted some ruins on.

Q   Did you design that symbol?

A   I did.

Q   Did you refer to any pictures in designing that symbol?

**A   I would have looked at wolves' skulls just to see how they go before you make a symbol of them.**

*Id.* at 124:23-125:10 (emphasis added).

Q   Is there a standard shape for a Space Marine skull?

A   It's a skull.  No, I don't think it's that -- it's just a skull.

Q   Is there a standard shape for a Space Marine skull?

**A   It's a skull.  No, I don't think it's that -- it's just a skull.**

*Id.* at 153:20-154:1 (emphasis added).

MR. OH:  Q   I'll rephrase.

Before you mentioned a fleur-de-lis?

A   Fleur-de-lis.

Q   Can you explain what that is?

A   It's an ancient symbol.  It's a three -- It's a central spike with two curved spikes coming off of it that's been used in heraldry for hundreds of years.

**Q   Are there other symbols you can think of that are like that?**

**A   Pick a shape, it's been used.**

Q   Lions?

> A   Yes.
> Q   Griffins?
> A   Yes.
> Q   Crosses?
> A   Yes.
> Q   Skulls?
> A   Yes.
> Q   Circles?
> A   Yes.
> Q   Triangles?
> A   Yes.
> Q   Roman numerals?
> A   Yes.
> **Q   And use of all these symbols dates back to the**
> **ancient form of heraldry?**
> **A   Yes.**
> **Q   Dragons?**
> **A   Yes.**

Neil Hodgson Dep. Tr. ("Hodgson Dep.") at 69:10-70:13 (emphasis added) (attached to the Kearney Decl. ¶ 65 Ex. 47)

> Q   Were snakes also used as heraldry symbols or
> heraldic symbols?
> A   I believe they were, yes.
> Q   Eagles or birds?
> A   Yes, yes.

*Id.* at 71:5-9.

> Q   Okay.  And so do you remember what was depicted
> on that shoulder pad?
> A   Yes, it's a rampant griffin.
> Q   What's a rampant griffin?
> A   **It goes back to heraldry** of depending on what
> the creature is doing depends on what kind of -- what
> title it's given.  So stood upright with claws out is
> rampant.

*Id.* at 75:12-19 (emphasis added).

- ". . . those individual elements have been modified and thoroughly integrated with other elements (graphic and sculptural) to form something unlike any known prior works." **DISPUTED**: This statement is contradicted by testimony of GW employees, including without limitation as detailed above.

- "Chapterhouses's experts were unable to identify any direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design elements they comprise" – **DISPUTED**: Kearney Decl. ¶ 18 &

Ex. 14 (Expert Report of William Brewster, detailing historical antecedents for GW imagery).

• "Games Workshop is aware of none" – **DISPUTED**: this statement is contradicted by the testimony of GW employees, including without limitation as detailed above.

• The last sentence of SUF 9 is irrelevant to any issue in this case. FRE 402. To the extent GW's copyright infringement claims are founded on allegations that CHS has copied the "meaning" of particular works, any such "meaning" is an unprotectable idea.

**GW's Statement of Fact No. 10.** Although many of the miniatures Games Workshop produces are small, the plastic models are originally sculpted in three times the size of the final commercially sold versions. (Ex. 1 at ¶ 11) The creative process often takes several months whereby concept art is first sketched and/or painted in two dimensions and then sculpted in clay. (Id.) Only then are the sculptural works readied for production. (Id.) In almost all instances, the sculptor(s) are given credit for the product by having their name(s) appear on the boxes of the mass produced versions or in the monthly *White Dwarf* magazine announcing the product release. (Id.).

**CHS's RESPONSE:**

SENTENCES ONE THROUGH THREE are irrelevant to any issue in this case. FRE 402. These statements also lack foundation (FRE 602).

THE LAST SENTENCE lacks foundation (FRE 602), is vague and ambiguous as to the meaning of "almost all," and is irrelevant to any issue in this case or GW's MSJ. The last sentence also lacks foundation and is not based on the personal knowledge of the declarant Alan Merrett (who gives no foundation for any personal knowledge of GW's retail or publishing practices, or White Dwarf magazine). Many of GW's products do not appear to be sold in boxes, and the packaging of such products does not give credit to a sculptor. Kearney Decl. ¶ 19 & Ex. 15 (GW0005462-63) (front and back of "Terminator Lightning Claws" packaging).

**GW's Statement of Fact No. 11.**    Although, as estimated by Mr. Goodwin, 95-99% of the company's products are created by employees[4], it has over the years employed a small number of free-lance artists. (Ex. 7, Goodwin Tr. at 57:6-15; Ex. 1 at ¶12). However, it has had a general practice of collecting confirmatory assignments from such individuals, notwithstanding that some have been lost over the years. (Ex. 1 at ¶12). Nonetheless, Games Workshop has confirmatory assignments for the works here at issue in which an individual who might nominally be deemed a freelance artist[5] participated. (Id.). Even when Games Workshop does work with freelance artists, it directly participates in and closely supervises the process, as every work must fit within the broader Warhammer 40K universe. (Id.). There are also a small number of works created by employees (Ex. 8, Sup. Resp. to Interrogatory 22) for which Games Workshop is unable to locate employment records (or confirmatory assignments). However, Alan Merrett, Games Workshop's Head of Intellectual Property is able to vouch for their employment status (Ex. 1 at ¶ 13). As a practical matter, no such individual has ever purported to challenge Games Workshop's ownership of the subject works. (Id.) Even if they had, as a matter of English law, Games Workshop would, minimally, be deemed a joint author of such works or owner by equitable assignment. (Ex. 10, Bloch Report ¶¶ 60-97, 102-111).

**CHS's RESPONSE:**

   **DISPUTED**:

- "95-99% of the company's products are created by employees" – improper speculation (FRE 701); lacks foundation (FRE 602).

   o   Kearney Decl. ¶ 14 & Ex. 10, Goodwin Dep.:

>    Q   Does Games Workshop employ freelance artists to do the cover of its codexes?
>    A   Yes, I think we've got a couple that have been done.  It's not general policy.
>    Q   Does Games Workshop employ freelance artists to do art for inclusion in its codexes?
>    A   You'd have to show me some examples.  Really, you'd have to show me some examples for me to be able to say yes or no.
>    I would say at least 95 to 99 percent of all of our work is done in-house.  And because I'm not in that department, it's very difficult for me without seeing the thing to be able to say to you that is or that isn't.

---

[4] The head of Legal, Licensing & Strategic Projects, Andy Jones, put the figure at 99.9% (Ex. 9, Jones Tr. at 99:10- 101:13)

[5] Many of these individuals have also been employees at one time or another (Ex. 1 at ¶¶ 12-13) and the line between freelancer and employee under UK law is highly fact-specific (Ex. 8, Bloch Report at ¶¶ 44-53, 98-101).

> Q   Sorry, when you say at least 95 to 99 percent of all of our work is done in-house, does that mean that some of your work is done by freelancers?
>
> A   It might do.  As I said, this is to do with the art department.  You're asking me questions not with my own department.

Goodwin Dep. at 57:2-21 (emphasis added).

> MR. KEARNEY:  Q   Mr. Goodwin, I think you said that Games Workshop -- Strike that.
>
> You said you were not aware whether Games Workshop entered into contracts with freelance artists and sculptors?
>
> A   Can we just talk about sculptors because if it's artists, then I'm going to say the same thing.
>
> Q   So your understanding of the scope of topic 9 is that you are prepared to testify only insofar as it concerns sculptors?
>
> A   **I would be happy to testify to the things that I know about, which would be sculpting.**  It's not that I'm refusing to testify on anything else, I just don't think I can be of much help to you.

Goodwin Dep. at 59:3-16 (emphasis added).

> Q   Does Forge World ever use sculptures from employees who are not employed as sculptors?
>
> A   You would really have to ask them.  **I don't have any involvement with Forge World.**

Goodwin Dep. at 60:17-20 (emphasis added).

- This statement is also contradicted by GW's discovery responses. Kearney Decl. Ex. 9 (Plaintiff Games Workshop Limited's Further Supplemental Response to Defendant Chapterhouse Studios LLC'S Interrogatory 22) ("Rog 22 Response") (listing 33 authors, including 12 "ex employee[s]" for whom GW was unable to provide dates of employment).

- "has had a general practice of collecting confirmatory assignments from such individuals" – contradicted by the fact that all but one of the only so-called "confirmatory assignments" in the record were produced en masse and were executed after April 20, 2012, more than a year into this litigation. Kearney Decl. ¶ 20.

- "has confirmatory assignments for the works here at issue in which an individual who might nominally be deemed a freelance artist participated" –

    o GW failed to provide any such "confirmatory assignments" as part of its motion for summary judgment.

    o GW has no such assignments from Wayne England; Clint Langley; Mike McVey; Bob Naismith; Adrian Smith; or Simon Egan. CHS Statement of Additional Material Fact ("AMF") Nos. 13-15 (appended hereto as Section B).

- Merrett's recollection of employment dates for various authors (Merrett Decl. ¶ 13) lacks foundation (FRE 602) and is not credible.

    o Merrett Decl. ¶ 13 is inconsistent as to whether there are six or seven authors.

    o Merrett Dec. ¶ 13 is inconsistent with GW's Supplemental and Further Supplemental responses to Chapterhouse Studio LLC's Interrogatory 22, Kearney Decl. ¶¶ 12-13 & Exs. 8-9.

    (References in parentheses below are to GW's Second Rev. Copyright Claim Chart.)

        ▪ GW has no evidence that the following authors were ever GW employees: Wayne England (Nos. 4, 12, 69); Clint Langley (No. 17); Mike McVey (No. 108); Bob Naismith (No. 82). (CHS Statement of Additional Material Fact No. 13.)

        ▪ GW concedes that Adrian Smith (Nos. 23, 45) was not its employee during the time he created the alleged works. (CHS Statement of Additional Material Fact No. 14.)

        ▪ GW has no evidence that Simon Egan (Second Rev. Copyright Claim Chart No. 82) was its employee during the time he created the alleged works. (CHS Statement of Additional Material Fact No.15.)

    o Merrett Decl. ¶ 13

    o *See* Alan Merrett Dep. Tr. Mar. 8, 2012 ("Merrett I") at 146:9-16 ("I'd just like to make a note of the date. It was 1988. When we published it, I don't know whether -- I don't know what month of the year that was. So it could have been 1987 or 1988 when he actually created that piece of artwork, and **that's a little bit too long ago for me to remember those kinds of details or indeed have any sort of documented record of that**.") (emphasis added) (cited portions of Merrett I are attached to the Kearney Decl., ¶21 , Ex. 16.)

    o *See* GW's Supplemental and Further Supplemental responses to Chapterhouse Studio LLC's Interrogatory 22 (Kearney Decl. ¶¶ 12-13 & Exs. 8-9), which

fail to give dates of employment for most or all of the individuals mentioned in Merrett Decl. ¶ 13.

- "no . . . individual has ever purported to challenge Games Workshop's ownership of the subject works" – this statement lacks foundation (FRE 602)

- "as a matter of English law, Games Workshop would, minimally, be deemed a joint author of such works or owner by equitable assignment" – **DISPUTED**: this statement misstates the Bloch Report on which it purports to rely, and mischaracterizes English law. [GW MSJ Ex. 10 ("Bloch Report") at ¶¶ 104 (listing factors required for creation of joint work);105 ("A court would have to consider each item and the relative contribution of those involved in its creation . . . ."), 107 ("**based on the materials which we have seen**, we are of the view under English law the facts are **consistent with** an equitable assignment from the independent contractors/freelancers to the Plaintiff in this case. **We have not been advised of any facts suggesting otherwise**") (emphases added); Kearney Decl. ¶ 22 & Ex. 17 (Expert Report of Lionel Bently ("Bently Report") at ¶¶ 95-112 (explaining English law concerning joint works and stating, at ¶ 111, that "[Bloch's] conclusion is not warranted from what is known about the nature of the contributions at this stage"); *id.* at ¶¶ 129-143 (explaining English law concerning equitable assignment and stating at ¶ 142 that "The issues of ownership of copyright in this case will need to be determined specifically in relation to each and every work of which it is alleged the Plaintiff owns copyright.").

- GW concedes, at Footnote 4, that "the line between freelancer and employee under UK law is highly fact-specific." However, GW has no contracts, payroll records, the indicia UK courts typically look to in order to evaluate whether there is an employment relationship, nor any other facts to show that any freelance artist could be considered an employee. Kearney Decl. ¶ 23.

**GW's Statement of Fact No. 12.**      Games Workshop owns copyright registrations or has pending applications to register copyright for the works in issue. (Ex. 2 at ¶ 3; Ex. 11, Copyright Registrations; Ex. 12, Pending Registrations) .

**CHS's RESPONSE**:

**DISPUTED**.

- GW admits that "the only work thus far identified by it in this action that is registered in the United States is Registration No. TX0006541286, 'Games Workshop Complete Catalog & Hobby Reference 2006-2007.'"

  Kearney Decl. ¶ 24 & Ex. 18 [Games Workshop Ltd.'s Response to Chapterhouse Studios LLC First Set of Requests for Admissions, Response to No. 11];

- GW only began filing for copyright registrations for the works-in-suit more than a year after bringing suit, and after the close of fact discovery, thus denying CHS the opportunity to conduct discovery or depositions concerning any of the alleged applications or registrations. GW MSJ Ex. 11; GW MSJ Ex. 12.

**GW's Statement of Fact No. 13.**　　Games Workshop has sold its Warhammer 40K publications and products in the United States since 1987 and as shown by the Sales Summary attached as Exhibit 3, it has sold products bearing the trademarks in issue since prior to Chapterhouse's launch of its competing business and products (all of which – with the possible exception of two or three of its most recent offerings launched well after commencement of this case - are designated by Chapterhouse using Games Workshop's prior product and character names . (Ex. 2 at ¶5).

**CHS's RESPONSE:**

**DISPUTED**.

- "Games Workshop has sold its Warhammer 40K publications and products in the United States since 1987" – contradicted by GW's Original Copyright Claim Chart, First Rev. Copyright Claim Chart, Second Rev. Copyright Claim Chart.

    o GW's Claim Charts show that *none* of the works-in-suit were created in 1987, but rather that *all* were created years or decades later. Second Rev. Copyright Claim Chart (Kearney Decl. Ex. 7).

- Contradicted by GW's Second Supplemental Response to Interrogatories Set 4 ("Rog 18 Response") (Kearney Decl. ¶ 4 Ex. 2).  The Rog 18 Response list dates *after* 1987 for the creation of many of GW's alleged products.

- Andrew Jones, GW's Head of Legal, Licensing and Strategic Project and GW's 30(b)(6) witness on trademark-related topics, confirmed that GW's Rog 18 Response is a comprehensive list of the GW marks at issue in this lawsuit (hereinafter, the "Marks At Issue"). CHS Additional Material Fact No. 36.  There is no evidence that products bearing the Marks At Issue were ever sold in U.S. commerce.

    On July 5, 2011, GW agreed to produce "[o]ne exemplar of the use in commerce in the United States of each of the marks You claim in this action." Kearney Decl. ¶ 25, Ex. 19 (GW's Response to Request for Production of Documents Set Two, No. 7 (July 5, 2011)).  In response to CHS's interrogatory requesting, for each of GW's alleged marks, the date of first use in U.S. commerce and the nature of such use, GW agreed to produce responsive documents, "*including the actual packaging of the sculptural works bearing copyright dates of first publication and . . . copies of its literary works bearing the dates of first publication and sale.*"  (italics in original). Kearney Decl. ¶ 26, Ex. 20 (GW's Supp. Response to CHS's Interrogatories Set Four (Mar. 2, 2012) (Rog. No. 18)). GW did not produce physical specimens of boxes or packaging for its miniature toys or tabletop games.

GW produced complete copies of only 13 of its dozens of alleged literary works, including three works whose originals were in color, but which GW produced only in the form of black-and-white scans. Kearney Decl. ¶27.

CHS Statement of Additional Material Fact No. 36 (Rog 18 Response as comprehensive list of marks).

- Kearney Decl. ¶25, Ex. 19: GW's Response to Request for Production of Documents Set Two, No. 7 (July 5, 2011).

- Kearney Decl. ¶12, Ex. 8: GW's Supp. Response to CHS's Interrogatories Set Four (Mar. 2, 2012) (Rog. No. 18).

- Kearney Decl. ¶27.

- "[GW] has sold products bearing the trademarks in issue since prior to Chapterhouse's launch of its competing business and products"

  o As stated above, there is no evidence products bearing GW's alleged Marks At Issue were ever sold in U.S. commerce.

  o Exhibit 3, on which GW relies, does not indicate sales of products under *any* of the Marks At Issue, or any marks at all. Although the term "40K" appears on a chart in Exhibit 3, that term appears to refer, not to the alleged "40K" mark, but rather to a broad, undefined category of products.

  o Jones Decl. ¶ 6 falsely states that Exhibit 3 contains "sales summaries (broken down by relevant product name) from 2004 to date." Exhibit 3 purports to contain limited financial information concerning "Channel Sales," "Variance Report," and "I/Co Summary Report." The information in Exhibit 3 covers only part of 2007; 2008, 2009, and 2010; and part of 2011. Exhibit 3 contains no product names. Although the terms "W/H" and "40K" appear on charts in Exhibit 3, those terms do not refer to any alleged marks but rather to broad, undefined categories of products.

  o Exhibit 3 contains no information, and GW has no evidence, showing that it sold products under any of its alleged marks prior to Chapterhouse's sale of any of its products.

**GW's Statement of Fact No. 14.**    Games Workshop also owns registrations for the following trademarks:
- WARHAMMER
- WARHAMMER 40,000
- 40K
- 40,000
- GAMES WORKSHOP
- GW

- SPACE MARINE
- • ELDAR
- DARK ANGELS
- TAU
- AQUILA design

(Ex. 2 at ¶ 4; Ex. 13, Trademark Registrations)

**CHS's RESPONSE:**

For purposes of this response, Chapterhouse does not dispute that the listed marks are

federally registered trademarks. "WARHAMMER 40,000," however,  is not one of the Marks At

Issue in this case. Kearney Decl. ¶ 4 & Ex. 2 (Rog 18 Response does not include

WARHAMMER 40,000 as an alleged mark; CHS Additional Material Fact No. 36 (Rog 18

Response is a comprehensive list of GW marks at issue).

**GW's Statement of Fact No. 15.**      Among the names previously adopted and used in commerce by Games Workshop that Chapterhouse has chosen to use for its products in issue are the following:

> Adeptus Mechanicus, Assault Space Marine, Alpha Legion, Black Templars, Blood Angels, Blood Ravens, Tyranid Bonesword, Cadian, Carnifex, Chaos Space Marines, Chaplain, Chimera, Crimson Fists, Dark Angel, Death Watch, Devastator Space Marine, Dreadnought, Drop Pod, Eldar, Eldar Farseer, Eldar Jetbike, Eldar Warlock, Eldar Seer Council, Empire, Exorcist, Flesh Tearers, Gaunt, Genestealer, Heavy Bolter, Heresy Armour, Hellhound, High Elf, Hive Tyrant, Horus Heresy, Howling Banshee, Howling Griffons, Imperial Fists, Imperial Guard, Inquisition, Iron Hands, Jetbike, Jump Pack, Land Raider, Land Speeder, Tyranid Lashwhip, Legion of the Damned, Librarian, Lightning Claw, Melta, Mk II Armour, Mk V Armour, Mycetic Spore, Plasma, Predator, Rhino, Salamander, Striking Scorpion, Soul Drinker, Space Wolves, Stormraven, Storm Shield, Tactical Space Marine, Techmarine, Termagants, Terminator, Tervigon, Thousand Sons, Thunder Hammer, Tyrant, Tyranid, Tyranid Warrior, Ymgarl. (Ex. 2 at ¶6).

**CHS's RESPONSE:**

**DISPUTED**, for the following reasons:

Irrelevant (FRE 402). Many of the alleged names are not Marks At Issue in this case, including: "Assault Space Marine," "Tyranid Bonesword," "Devastator Space Marine," Gaunt," "Howling Griffons," "Tyranid Lashwhip," "Mycetic Spore," "Striking Scorpion," "Tactical Space Marine," "Tervigon," "Tyranid," "Ymgarl." CHS Additional Material Fact No. 36.

- No foundation (FRE 602). GW has no evidence of use in U.S. commerce of any of the alleged marks, and offers no evidence of CHS's trademark use of the marks. There is no evidence that products bearing GW's alleged Marks At Issue were ever sold in U.S. commerce.

  On July 5, 2011, GW agreed to produce "[o]ne exemplar of the use in commerce in the United States of each of the marks You claim in this action." Kearney Decl. ¶ 25, Ex. 19 (GW's Response to Request for Production of Documents Set Two, No. 7 (July 5, 2011)). In response to CHS's interrogatory requesting, for each of GW's alleged marks, the date of first use in U.S. commerce and the nature of such use, GW agreed to produce responsive documents, "*including the actual packaging of the sculptural works bearing copyright dates of first publication and . . . copies of its literary works bearing the dates of first publication and sale*." (italics in original). Kearney Decl. ¶ 26, Ex. 20 (GW's Supp. Response to CHS's Interrogatories Set Four (Mar. 2, 2012) (Rog. No. 18)). GW did not produce physical specimens of boxes or packaging for its miniature toys or tabletop games. GW produced complete copies of only 13 of its dozens of alleged literary works, including three works whose originals were in color, but which GW produced only in the form of black-and-white scans. Kearney Decl. ¶27.

  CHS Statement of Additional Material Fact No. 36 (Rog 18 Response as comprehensive list of marks).

- As stated above, there is no evidence products bearing GW's alleged Marks At Issue were ever sold in U.S. commerce.

  o Exhibit 3, on which GW relies, does not indicate sales of products under *any* of the Marks At Issue, or any marks at all. Although the term "40K" appears on a chart in Exhibit 3, that term appears to refer, not to the alleged "40K" mark, but rather to a broad, undefined category of products.

  o Jones Decl. ¶ 6 falsely states that Exhibit 3 contains "sales summaries (broken down by relevant product name) from 2004 to date." Exhibit 3 purports to contain limited financial information concerning "Channel Sales," "Variance Report," and "I/Co Summary Report." The information in Exhibit 3 covers only part of 2007; 2008, 2009, and 2010; and part of 2011. Exhibit 3 contains

no product names. Although the terms "W/H" and "40K" appear on charts in Exhibit 3, those terms do not refer to any alleged marks but rather to broad, undefined categories of products.

o Exhibit 3 contains no information, and GW has no evidence, showing that it sold products under any of its alleged marks prior to Chapterhouse's sale of any of its products.

- Kearney Decl. ¶25, Ex. 19: GW's Response to Request for Production of Documents Set Two, No. 7 (July 5, 2011).

- Kearney Decl. ¶12, Ex. 8: GW's Supp. Response to CHS's Interrogatories Set Four (Mar. 2, 2012) (Rog. No. 18).

- Kearney Decl. ¶27.

To the extent Chapterhouse uses any of the referenced marks, it is to identify products that players may wish to use with particular armies, and/or to explain that Chapterhouse's products are compatible with, fit on, or can be used to decorate particular products. Defendant Chapterhouse Studios LLC's Opposition to Plaintiff Games Workshop Ltd's Motion for Summary Judgment ("CHS Opp."), filed concurrently herewith, at 23.

**GW's Statement of Fact No. 16.**      Additionally, many of the symbols associated with the characters and armies of the WARHAMMER 40,000 universe, as well as the accessories for these characters and armies, have also become well-known and immediately recognizable to the many fans of the game as used on and in connection with the respective characters, including without limitation:

Black Templars icon, Blood Ravens icon, Blood Angels icon, Celestial Lions icon, Dark Angels winged sword icon, Exorcist skul [*sic*] icon, Flesh Tearers icon, Howling Griffon icon, Imperial Fists icon, Iron Snakes icon, Legion of the Damned icon, Chaos Space marines eight-pointed star icon, Soul Drinkers icon, Salamanders icon, Tau Empire icon, Space Marine Tactical squad icon, Space Marine Assault squad icon, Space Marine Devastator squad icon, Ultramarine  icon, Adeptus Mechanicus cog icon, Iron Hands icon, Space Wolves icon, Thousand Sons icon, Mantis Warrior icon. (Ex. 2 at ¶7).

**CHS's RESPONSE:**

**Disputed.**

• GW has failed to identify any of the listed symbols/icons, and its statements concerning those symbols are without foundation (FRE 602).

• Many of the alleged symbols are not at issue in the case, including without limitation: Black Templars icon; Dark Angels winged sword icon; Legion of the Damned icon; Chaos Space marines eight-pointed star icon; Ultramarine icon; Thousand Sons icon. Kearney Decl. ¶ 4 Ex. 2; CHS Additional Material Fact No. 36.

• GW has produced no evidence concerning the fame or extent of recognition of any of its alleged symbols.

• GW has no evidence to support its contention that any of the alleged symbols is well-known in the United States or anywhere else. Jones Decl. ¶ 7 lacks foundation (FRE 602), and does not allege that the listed symbols are well-known in the U.S., nor that they are famous or recognized in the U.S.

### [Chapterhouse Studios]

**GW's Statement of Fact No. 17.** Games Workshop first discovered Chapterhouse in 2008, when it was selling its products on eBay (Ex 14, GW002525-27, 002530-32, 002535-37, 0002540-42) and a similar auction site called Barterhouse (Ex 15, GW002512-24). The products were sold simply under Games Workshop's trademarks (e.g. "Iron Snakes; Salamanders and Soul Drinker Shoulder Pads" on Bartertown and on eBay "Space Marine 40K Terminator Squad Bits for Salamanders"; "Space Marine 40K 10 squad bit kit Salamanders Dragon"; "Rhino Armor Kit Salamanders Warhammer 40K Space Marines" and "Resin Drop Pod for 40K Warhammer 40000 Space Marines"). (Exs. 14-15, Ex. 2 at ¶ 8) Games Workshop has received emails evidencing this customer confusion. (Ex. 122).

### CHS's RESPONSE:

For purposes of this response, Chapterhouse does not dispute that GW first became aware of Chapterhouse in 2008. Chapterhouse notes that there is no such auction site as "Barterhouse," and that GW's Exhibit 15 refers instead to a website named "bartertown.com." Chapterhouse disputes that Bartertown.com is "a similar auction site" to eBay.

Otherwise **DISPUTED**, for the following reasons:

• "The products were sold simply under Games Workshop's trademarks" - **Disputed:**

- each of the products is prominently described as a "custom" or "custom sculpted" product. SUF 17 selectively quotes and/or misquotes the auction titles from eBay

and bartertown.com. For example, the full title from the bartertown.com notice is "FS: **Custom** Iron Snake, Salamander, Soul Drinker Shoulder Pads." (emphasis added)

- There is no evidence that GW owned rights in any of the purported marks referred to in 2008.

- There is no evidence that GW has ever used any of the marks referred to in U.S. commerce.

- To the extent the eBay and Bartertown.com listings used any GW marks, it was to identify products that players might wish to use with particular armies, and/or to explain that the products were compatible with, fit on, or could be used to decorate particular products.

• "Games Workshop has received emails evidencing this customer confusion" – **Disputed:** the 3 emails at GW's Exhibit 122 do not evidence confusion. Rather, the senders are notifying GW legal about CHS, and it is clear they are not confused about the source of CHS's products.

**GW's Statement of Fact No. 18.**     At his deposition (despite repeated objections from counsel) Mr. Villacci was unable to identify any Chapterhouse products that were not influenced by Games Workshop's own products and books (Ex. 15, Villacci Tr. at 235-39) and ultimately admitted: "I said all of our products have been influenced by a number of things, including Games Workshop's products and books." (Id. at 239:6-8)

## CHS's RESPONSE:

### DISPUTED.

Irrelevant (FRE 402). Contrary to GW's claims in this case, being "influenced" by something is not actionable. Inspiration is not infringement.

This statement is also contradicted by Mr. Villacci's deposition testimony, which GW quotes only partially, selectively, and out of context. (GW also cites to the wrong exhibit: Mr. Villacci's deposition testimony appears at Ex. 16, not Ex. 15.) Although GW's counsel repeated the same question multiple times in an apparent attempt to elicit a different response from Mr. Villacci, Mr. Villacci clearly and consistently stated as follows (citations are to the Nicholas Villacci Dep. Tr. (Apr. 11, 2012) ("Villacci II"), attached to the Kearney Decl. ¶ 28, Ex. 21):

Q: Can you identify any products that you sell

> that were not influenced in any way by Games Workshop's
> products or its descriptions in -- in books?
> MS. GOLINVEAUX: Objection; argumentative;
> assumes facts not in evidence; vague and ambiguous.
> A: A number -- I mean, **our shields that's**
> **definitely not a GW originated -- did it have a shield,**
> **hammers?**

Villacci II at 235:5-12  (emphasis added).

> Q: …Can you identify any of
> the products that you sell that were not influenced in
> some way by Games Workshop's products or the
> descriptions of materials in its books?
> MS. GOLINVEAUX: Same objections.
> A: Honestly, since I have been so involved in
> scifi and miniatures and the hobby and -- I mean, when
> you -- you have played with something and have been
> involved with something for so long, that's bound to
> have an effect on any ideas you come across or create.
> So that's like saying -- no. I mean, everything has
> been influenced by -- **everything that we have created**
> **has been influenced by what I have been exposed to. Be**
> **it, Star Wars movies, Games Workshop products. I can't**
> **exclude anything from my personal experience.**

Villacci II at 235:16-236:5 (emphasis added).

> Q (BY MR. MOSKIN): Name a product of yours that
> has not been influenced by Games Workshop's products or
> materials in its books.
> MS. GOLINVEAUX: Objection; argumentative.
> A: I gave you an answer. I said all of our
> products have been influenced by a number of things,
> including Games Workshop's products and books.
> I'm not going to limit myself and say our
> products have only been influenced, inspired by -- by
> Games Workshop stuff. **They have been inspired by a**
> **number of items, a number of cultural -- pop culture**
> **stuff put together to, you know, come out to that sort**
> **of expression of our products.**

Villacci II at 239:2-14 (emphasis added).

**GW's Statement of Fact No. 19.**        Mr. Villacci stated at the time he first started selling
the accused products: "Myself and a friend have started a small enterprise. He sculpts shoulder

pads for chapters that you never see ... and we shave them cast in pewter." (Ex. 15)[6] The name Chapterhouse thus conveys an obvious association with Warhammer 40K's Space Marine "Chapters." Iron Snakes, Salamanders, and Soul Drinkers are all different established Space Marine Chapters created by Games Workshop in the Warhammer 40K universe. (Ex. 1 at ¶ 15)

**CHS's RESPONSE:**

**DISPUTED**, for the following reasons:

- "shoulder pads for chapters that you never see" – **Disputed**: irrelevant (FRE 402); lacks foundation (FRE 602) for the proposition that this refers to Chapterhouse products at issue in this case.

- "The name Chapterhouse thus conveys an obvious association with Warhammer 40K's Space Marine 'Chapters.'" – **Disputed**: GW has no evidence concerning the fame or extent of recognition of "Warhammer 40K's Space Marine 'Chapters'." CHS Additional Material Fact No. 25. GW has produced no evidence of any consumer making such an association. *Id.*

- "Iron Snakes, Salamanders, and Soul Drinkers" – GW has produced no evidence that it owns U.S. trademark rights for any of these terms. Merrett Decl. ¶ 15, on which GW relies, lacks foundation (FRE 602). Merrett Decl. ¶ 15 does not allege or support use of any of these terms sufficient to create trademark rights.

- ". . . the business is [*sic*] . . . absolutely nothing to do with churches or the book Chapterhouse Dune. . . " [fn 5] – **Disputed.** Mr. Villacci explained in his deposition:

> Q: How did you derive the name Chapterhouse?
> A: We came up with the name -- I guess I came up
> with the name, submitted it to -- to Tomas as an idea
> when I -- during the time I was reading the Dune novels.
> And one of them was called Chapterhouse Dune.
> Q: What Dune novels?
> A: Well, there's only a series of Dune novels
> that I think Herbert wrote.
> Q: And can you tell me any respect in which the
> business of Chapterhouse reflects the Dune novels?
> A: It doesn't. It was just a catchy name, and it
> describes a -- a meeting place or a fraternity.
> Q: Can you -- I don't think you -- can you name

---

[6] Notwithstanding that the business is focused only on creating products for chapters of the Space Marines and absolutely nothing to do with churches or the book Chapterhouse Dune, Chapterhouse states under oath that the meaning and derivation of the name is from the Oxford English Dictionary definition of "chapterhouse" as a "building attached to a cathedral" and the Frank Herbert novel, Chapterhouse Dune. (Ex. 17, Chapterhouse Sup. Resp. to Interrog. 8)

> specifically what Dune novel -- or novels you were
> referring to?
> A: It's called Dune Chapterhouse. It's the title
> of the novel.

Villacci II at 87:5-21.

**GW's Statement of Fact No. 20.**     In a July 18, 2011 webcast (posted well after commencement of this action), Mr. Villacci explained that his method of generating new product ideas is to derive them directly from Games Workshop's publications – particularly where Games Workshop has not yet launched a product to fill the perceived demand among players. (Sometimes these are also in response to customer requests.) In his own words, and in response to a question from the interviewer as to how he decides to launch new products, Mr. Villacci admits:

> We put ourselves in the position of the player out there who
> doesn't have a lot of options. He's read the book and says, hey
> cool, you know. You really fall in love with Soul Drinkers or you
> play a ton of war games and you fall in love with Blood Ravens[7]
> and you want to do something to use them on the table but there's
> no option.

See http://www.tangtwo.com/11thcompany/episodes.cfm, Episode 78 at 2:15:09 - 2:16:11.

**CHS's RESPONSE:**

Each statement in GW's SUF No. 20 is irrelevant to any issue in this case. FRE 402.

**DISPUTED**, for the following reasons:

- The "webcast" cited in SUF 20 lacks foundation (FRE 602).

- To the extent the "webcast" is admissible, GW mischaracterizes and selectively quotes Mr. Villacci's statements.

- GW mischaracterizes the quoted statement, which speaks for itself. (FRE 1002.)

- "created by Games Workshop" – lacks foundation (FRE 602).

**GW's Statement of Fact No. 21.**     In 2008, Chapterhouse created a website where it presents images and descriptions of all of its accused products. (See www.whois.com/whois/chapterhousestudios.com). The website had the prominent banner

---

[7] The Blood Ravens is another established chapter of the Space Marines created by Games Workshop. (Ex. 1 at ¶ 15)

headline "Specializing in Custom Sculpts and Bits for Warhammer 40,000 and Fantasy". (Ex. 18, CHS000028-30) All of the products on the website are designed for use with Warhammer 40,000, and although the website was redesigned during the pendency of this litigation to make less explicit many of the references to Warhammer 40,000 its website is still organized by reference to Games Workshops trademarked product names. (Ex. 19) Thus, there is a section of "Eldar Compatible Bits"; "Space Marine Compatible Bits"; "Tau Compatible Bits"; Tyranid Compatible Bits". Another product category is for "Super Heavy Kits" but it consists of only one product that was first launched by Chapterhouse as a "Tau" Super Heavy Walker modeled on Games Workshop's Tau vehicles. (Id.)

**CHS's RESPONSE:**

Chapterhouse does not dispute that it has a website at www.chapterhousestudios.com. Chapterhouse does not dispute that at one time its website had a banner with text reading "Specializing in Custom Sculpts and Bits for Warhammer 40,000 and Fantasy."

Otherwise **DISPUTED**, for the following reasons:

- "In 2008, Chapterhouse created a website . . ." – **Disputed.** GW's reference to whois.com is inadmissible hearsay (FRE 802) and without foundation (FRE 602). Chapterhouse launched its website in or about April, 2009. Villacci Decl. ¶ 6.

- "All of the products on the website are designed for use with Warhammer 40,000" – **Disputed.** Chapterhouse's products are designed for use with industry-standard 28mm scale miniatures.

- "its website is still organized by reference [sic] to Games Workshops trademarked product names" – **Disputed.** Chapterhouse's website features clickable links to various categories of products. GW's reference to how the site is "organized" is vague and ambiguous, and irrelevant to any issue in this case. FRE 402.

- " product that was first launched by Chapterhouse as a "Tau" Super Heavy Walker modeled on Games Workshop's Tau vehicles" – **Disputed** – this statement lacks foundation (FRE 602). In addition:

    - GW MSJ Ex. 19 does not support the statement.

    - Chapterhouse's "SXV-141 Super Heavy Walker" model has never been named a "'Tau' Super Heavy Walker." The "SXV-141 Super Heavy Walker" was not "launched" as a "'Tau' Super Heavy Walker." Villacci Decl. ¶ 7.

    - GW does not sell a Tau Super Heavy Walker vehicle, nor a Tau four-legged walker vehicle of any kind. Kearney Decl. ¶ 29 & Ex. 22 [GW Response to CHS RFA Set Two, Response to Request 243 (admitting that "YOU do not manufacture or sell a four-legged 'walker' vehicle for the Tau army")];

-      GW has offered no evidence that Chapterhouse's SXV-141 Super Heavy Walker
       was modeled on any of the works-in-suit; any GW work of any description; or any
       other vehicle.

**GW's Statement of Fact No. 22.**      The website includes a disclaimer of association
with Games Workshop (but with no other entity) and also the following admission (which was
expanded to its current format during the pendency of this litigation):

> Adeptus Astartes, Battlefleet Gothic, Black Flame, Black Library,
> the Black Library logo, BL Publishing, Blood Angels, Bloodquest,
> Blood Bowl, the Blood Bowl logo, The Blood Bowl Spike Device,
> Cadian, Catachan, the Chaos device, Cityfight, the Chaos logo,
> Citadel, Citadel Device, City of the Damned, Codex,
> Daemonhunters, Dark Angels, Dark Eldar, Dark Future, the
> Double-Headed/Imperial Eagle device, 'Eavy Metal, Eldar, Eldar
> symbol devices, Epic, Eye of Terror, Fanatic, the Fanatic logo, the
> Fanatic II logo, Fire Warrior, Forge World, Games Workshop,
> Games Workshop logo, Genestealer, Golden Demon, Gorkamorka,
> Great Unclean One, the Hammer of Sigmar logo, Horned Rat logo,
> Inferno, Inquisitor, the Inquisitor logo, the Inquisitor device,
> Inquisitor: Conspiracies, Keeper of Secrets, Khemri, Khorne,
> Kroot, Lord of Change, Marauder, Mordheim, the Mordheim logo,
> Necromunda, Necromunda stencil logo, Necromunda Plate logo,
> Necron, Nurgle, Ork, Ork skull devices, Sisters of Battle, Skaven,
> the Skaven symbol devices, Slaanesh, Space Hulk, Space Marine,
> Space Marine chapters, Space Marine chapter logos, Talisman,
> Tau, the Tau caste designations, Tomb Kings, Trio of Warriors,
> Twin Tailed Comet Logo, Tyranid, Tyrannid, Tzeentch,
> Ultramarines, Warhammer, Warhammer Historical, Warhammer
> Online, Warhammer 40k Device, Warhammer World logo,
> Warmaster, White Dwarf, the White Dwarf logo, and all associated
> marks, names, races, race insignia, characters, vehicles, locations,
> units, illustrations and images from the Blood Bowl game, the
> Warhammer world, the Talisaman world, and the Warhammer
> 40,000 universe are either ®, TM and/or © Copyright Games
> Workshop Ltd 2000-2010, variably registered in the UK and other
> countries around the world. Used without permission. No
> challenge to their status intended. All Rights Reserved to their
> respective owners.

(Ex. 18 at 3)


**CHS's RESPONSE:**

Chapterhouse does not dispute that its website at www.chapterhousestudios.com includes a prominent disclaimer of association with GW.

Otherwise **DISPUTED**.

Contrary to GW's insinuation that the quoted language is an "admission," it is patently *part of the disclaimer*. GW MSJ Ex. 18 at 3.

CHS's disclaimer is not an admission that GW owns enforceable trademark rights in the terms in the U.S. The disclaimer, taken from language suggested by GW, merely states that certain terms and designs are either "®, TM and/or © Copyright Games Workshop Ltd 2000-2010, variably registered in the UK and other countries around the world." It does not even mention the U.S. specifically, and does not relieve GW of its burden to prove ownership of U.S. rights in the claimed marks. Even if the disclaimer were an admission of anything (which it is not), it merely acknowledges that GW claims various unspecified rights in various unspecified countries around the world, and that it may have different registrations, rights, or claims, in different countries. The disclaimer does not mention any claimed rights in the U.S.

### [Chapterhouse's Use of Games Workshop's Copyrights]

**GW's Statement of Fact No. 23.** The owner of Chapterhouse, Nick Villacci, grew up collecting Warhammer 40K products. (Ex. 16 at 73:20-74:2). Mr Villacci first became a fan of Warhammer 40K when he was 11 and when he was 15 or 16 he began working in a local hobby store in Texas that sold Warhammer 40K books and model kits. (Id. at 70:24-71:24, 72:12-73:5) He has amassed a large collection of Warhammer 40K books, magazines and miniatures. (Id. at 81:13-17, 82:25-83:25)

**CHS's RESPONSE:**

Each statement of GW's Statement of Fact No. 23 is irrelevant to any issue in this case.

FRE 402.

SENTENCE ONE: **Disputed.** The statement that Mr. Villacci "grew up collecting Warhammer 40K products" is contradicted by GW's Exhibit 16, which reflects Mr. Villacci's

testimony that he first purchased "some [Warhammer 40,000] products" when he was 15 or 16 years old. (GW MSJ Ex. 16 at 72:12-74:2).

SENTENCE TWO: **Disputed.**

The statement that "Mr Villacci first became a fan of Warhammer 40K when he was 11 . . ." is contradicted by GW's Exhibit 16, which reflects Mr. Villacci's testimony that first saw the game Warhammer 40,000 in a story when he was about 11 or 10 years old. (GW MSJ Ex. 16 at 72:12-74:2).

The statement that "when [Mr. Villacci] was 15 or 16 he began working in a local hobby store in Texas that sold Warhammer 40K books and model kits" mischaracterizes the testimony, which reflects that Mr. Villacci worked in a comic book store that sold a few Warhammer 40, 000 model kits and books, among other products from other companies. (GW MSJ Ex. 16 at 72:23 – 73:12.

SENTENCE THREE: **Disputed.** Improper speculation (FRE 701); lacks foundation (FRE 602). The cited testimony does not support the statement, but merely reflects that Mr. Villacci has purchased products and books relating to Warhammer 40,000. The cited testimony discusses where Mr. Villacci had purchased "pieces" and "stuff" for Warhammer 40,000, and does not support the proposition that the "pieces" are GW-produced products.

**GW's Statement of Fact No. 24.** Mr. Villacci claims no skill as an artist (Ex. 21 at 51:8-11), but instead relies on independent designers to create the accused works (Id. at 49:22–51: 18). One of the designers succinctly explained the process:

> A: He [Villacci] wants the icon to be recognizable but still interesting.
> …
> Q: Did you, as a sculptor, take this as an instruction that whatever you did, make sure it was still recognizable to 40K players as Flesh Tearer Icon.
> A: Yes.
> Q: Did it have to be recognizable to 40K players as a Flesh Tearer icon?
> A: So people could convert a Flesh Tearer army or build a Flesh Tearer Army.
> …

Q: One of the instructions from Mr. Villacci, I think what you said, was that you could have slight variations as long as it's still recognizable as the Games Workshop icon and be okay?

A: I'd say that's a pretty accurate paraphrase.

…

Q: So your idea was instead of having the saw blade flat on the pad you'd have it sticking out from the pad?

A: Yes, basically.

Q: Why did Mr. Villacci tell you that was a bad idea?

A: Because he said they don't like deviating too much from the norm, I guess. That's what it says.

Q: What does that mean to you, deviate from the norm?

A: I think he means it's more recognizable if it's not sticking out.

Q: So as the sculptor on this icon, what do you take this instruction from Mr. Villacci to mean?

A: Don't have the blade sticking out of the pad.

Q: And instead do what?

A: Do it the way that we ended up doing it.

…

Q: And that's because it's more recognizable to 40K players as the, quote, 40K norm?

A: Yes.

(Ex. 22, Deposition of Wyatt Traina ("Traina Dep.") at 66:17-67:14, 94:16-23, 103:24-105:8)

## CHS's RESPONSE:

SENTENCE ONE: the statements in the first sentence are irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**.

SENTENCE ONE: GW's Exhibit 21 does not contain the referenced pages. Mr. Villacci's deposition testimony does not support this statement. Rather, Mr. Villacci stated:

Q. Do you do any of the design work yourself?

A. There's one product that was wholly designed by myself.

Q. What was that?

A. I believe it's a shoulder pad and we just designate it a Mach I shoulder pad.

Q. Is that -- is that a product that incorporates any -- in anything -- is that one of the products at issue

in this lawsuit?

    A.  I think so.

    Q.  So you don't have any drawings that you created?

      MS. GOLINVEAUX:  Objection, vague and ambiguous.  Was that the entire question?

    Q.  (BY MR. MOSKIN)  Let me strike that.  **Other than the Mach I product, you don't have any drawings or sketches that you personally created?**

    **A.  Yes, I do.**

    Q.  And what are those?

    A.  I couldn't tell you specifically, but during the design process, ideas and designs are e-mailed back and forth between parties.

    Q.  And some of those are drawings that are done -- that are created by you?

    A.  I wouldn't call them drawings.  I would call them doodles.  They were just rough sketches.

Villacci Dep. Tr. (Feb. 29, 2012) ("Villacci I") at 50:12-51:11 (emphasis added).

Kearney Decl. ¶ 30 & Ex. 23.

"[R]elies on independent designers to create the accused works" – Exhibit 21 does not contain the referenced pages. Assuming GW's citation refers to the Feb. 29, 2012 Deposition of Nicholas Villacci, the citation does not support GW's statement.

REMAINDER OF SUF 24: The quoted selections from the deposition of Wyatt Traina lack foundation (FRE 602); are inadmissible hearsay (FRE 802); are improper speculation (FRE 701); and are quoted selectively and taken out of context. Mr. Traina's statements are speculation about statements he did not make. (citations are to the Wyatt Traina Dep. Tr. (Mar. 15, 2012) ("Traina Dep."), attached to the Kearney Decl. ¶ 31, Ex. 24):

    Q.  **So what did you understand this sentence to mean to you**?

    A.  He wants the icon to be recognizable but still interesting.

    Q.  Did you understand it was important for 40K players to be able to recognize it as the Flesh Tearer icon?

      MS. LU:  Objection.  Lack of personal knowledge.  Calls for speculation.

> A.  **That could be.**

Traina Dep. 66:15-24 (emphases added).

> Q.  **Did you, as a sculptor, take this as
>      instruction** that whatever you did, make sure
>      it was still recognizable to 40K players as
>      Flesh Tearer icon?
>          MS. LU:  Objection.  Argumentative.
> A.  Yes.
> Q.  Did it have to be recognizable to 40K
>      players as a Flesh Tearer icon?
>          MS. LU:  Objection.  Calls for
>      facts not in evidence.
> A.  So people could convert a Flesh Tearer army
>      or build a Flesh Tearer army.

Traina Dep. at 67:3-14 (emphasis added)

> Q.  One of the instructions from Mr. Villacci, I
>      think what you said, was that you could have
>      slight variations as long as it's still
>      recognizable as the Games Workshop icon and
>      be okay?
>          MS. LU:  Objection.  Misstates
>      prior testimony.
> A.  I'd say that's a pretty accurate **paraphrase**.

Traina Dep. 94:16-23 (emphasis added).

> Q.  What was **your understanding of this
>      sentence**?
>          MS. LU:  Objection.  Calls for
>      speculation.
> A.  **I think** he was trying to say my idea about
>      making the blade come out of the pad wasn't
>      a good one.
> Q.  Why was your idea not a good one?  Sorry.
>      What was your idea?
> A.  That the saw blade would stick out of the
>      pad rather than lie flat against it.
> Q.  And that was for the Flesh Tearer icon that
>      you were sculpting?
> A.  Correct.
> Q.  So your idea was instead of having the saw
>      blade flat on the pad you'd have it sticking

out from the pad?

     MS. LU:  Objection.  Misstates prior testimony.

A.  Yes, basically.

Q.  Why did Mr. Villacci tell you that was a bad idea?

     MS. LU:  Objection.  Calls for speculation.

A.  Because he said they don't like deviating too much from the norm**, I guess**.  That's what it says.

Q.  **What does that mean to you**, deviate from the norm?

     MS. LU:  Objection.  Calls for speculation.

A.  **I think he means** it's more recognizable if it's not sticking out.

Q.  So as the sculptor of this icon, **what do you take this instruction from Mr. Villacci to mean**?

A.  Don't have the blade sticking out of the pad.

Q.  And instead do what?

A.  Do it the way that we ended up doing it.

Q.  Which was what?

A.  Lie it up flat against the pad.

Q.  And that's because it's more recognizable to 40K players as the, quote, 40K norm?

     MS. LU:  Objection.  Argumentative. Calls for speculation.

A.  Yes.

Q.  In other words, he didn't want you to change the icon too much?

     MS. LU:  Objection.  Calls for speculation.  Argumentative.

     MR. KEENER:  Let me rephrase.

Q.  You were instructed not to change the icon too much; is that true?

     MS. LU:  Objection. Mischaracterizes the document and argumentative.

A.  I was instructed not to have the blade stick out.

Traina Dep. 103:10-105:20 (emphases added).

**GW's Statement of Fact No. 25.**     Mr. Villacci himself explained the process in one of the on-line forums where Chapterhouse advertises and promotes its goods. In response to a request from a potential customer to make products for the Iron Hands Space Marine,[8] Mr. Villacci wrote: "We have been considering that chapter for a while, we just need to be able to create an icon similar enough to the real GW icon while being acceptable to players as well, but we can't copy the GW one straight on ...it's a tricky thing." (Ex. 23, Heresy-Online.net 10/24/09 at 3).

**CHS's RESPONSE:**

The statements in SUF 25 are irrelevant to any issue in this case. FRE 402. There is no

evidence that any purported statement in SUF 25 concerns any of the works-in-suit or any

Chapterhouse product at issue in this case.

Otherwise **DISPUTED**.

SENTENCE ONE: Improper speculation (FRE 701); lacks foundation (FRE 602). The

term "the process" is undefined, vague, and ambiguous.

SENTENCE TWO: inadmissible hearsay (FRE 802); lacks foundation (FRE 602). To the

extent the quoted statement is relevant and admissible, it does not support GW's claims.

FOOTNOTE 7 (Iron Hands is another Games Workshop created Space Marine Chapter")

– **disputed**: GW fails to identify the "Iron Hands" space marine chapter, and has no evidence

that it created the "Iron Hands" space marine chapter.

**GW's Statement of Fact No. 26.**     Mr. Villacci, testifying in his capacity as document custodian, does not know what documents his company has for the development of its products (Ex. 21, Villacci Tr. at 47: 14–48:22). Nor does Chapterhouse know what materials its independent designers review in creating the accused products (Id. at 49:22–51:18, "I don't know what documents they [Chapterhouse's sculptors] draw inspiration from"). However, documents produced in this litigation explain Chapterhouse's general business model of creating reproductions or derivative works based on Games Workshop's books and (occasionally) its sculptural figures. Chapterhouse focuses primarily on creating models based on elements and characters from paintings and drawings of characters and accessories Games Workshop does not (yet) sell. There are no documents indicating that Chapterhouse has ever developed any products without some reference to Games Workshop's works, and despite initially refusing to participate

---

[8] Iron Hands is another Games Workshop created Space Marine Chapter. (Ex. 1 at ¶ 15)

in discovery until it could move for summary judgment on grounds of independent creation, Mr. Villacci now admits that all of Chapterhouse's works are derived from Warhammer 40K (Ex. 16 at 239:6-8, "I said all of our products have been influenced by a number of things, including Games Workshop's products and books.")

**CHS's RESPONSE:**

   **DISPUTED**.

   SENTENCE ONE:  the cited testimony of Mr. Villacci does not support GW's statement that "Mr. Villacci . . . does not know what documents his company has for the development of its products".

>    Q.  Were there any documents concerning the
>    development of any products?
>    A.  There was some chat records between myself and the
>    developers talking about our products in development.

Villacci I at 10:24-11:2 (Kearney Decl. ¶ 30 & Ex. 23).

>    Q.  You have records how much you pay each designer?
>    A.  Yes.
>    Q.  Do those records indicate who worked on what?
>    A.  Some do.

Villacci I at 18:13-16.

>    Q.  Are you aware of any e-mail records you have kept
>    relating to any of the products at issue in this case dated
>    after January 26, 2011?
>    A.  Yes.
>    Q.  You have e-mail records after that date?
>    A.  Yes.

Villacci I at 19:5-14.

In pertinent part, the cited deposition testimony reads:

>    Q.  (BY MR. MOSKIN)  Other than the documents you
>    provided last week, had you earlier in the case provided
>    documents concerning products other than those 15 I just

read off?

    A.  Don't know what my attorneys have provided you but I've given them everything they've asked for.

    Q.  Do you know that you gave them the documents concerning the development of the 116 other products prior to last week?

    A.  If we had documents for those items, they have them.

Villacci Dep. Tr. at 47:14-48:22.

    SENTENCE TWO: **Disputed.**  The deposition testimony of Mr. Villacci contradicts GW's statement that Chapterhouse does not know "what materials its independent designers review in creating the accused products." Mr. Villacci testified that "during the design process, ideas and designs are e-mailed back and forth between parties." Villacci I at 51:5-7.

    The cited testimony reflects questioning concerning items that independent designers "drew inspiration from," which is not relevant to any issue in this case, and which does not support the statement in SUF 26. In full, the cited deposition testimony reads:

    Q.  (BY MR. MOSKIN)  I'm asking if Chapterhouse -- if you're aware that Chapterhouse has any documents showing any of those -- those items?

    A.  The items we drew inspiration from?

    Q.  Yes, the ones I just mentioned and that are referenced in your answer to interrogatory number two.

    A.  I don't have possession of any documents that show that.  The designers might.

    Q.  You don't know?

    A.  Chapterhouse itself does not have any documents showing that.

    Q.  And you don't know whether or not the designers do?

    A.  I don't know what documents they draw inspiration from.

Villacci I at 49:22-50:11.

    SENTENCES THREE THROUGH FIVE: **Disputed.**  Sentences three through five of SUF 26 lack foundation (FRE 602); are inadmissible hearsay (FRE 802); are improper

speculation (FRE 701); and constitute improper legal conclusion. The statement that "Mr. Villacci now admits that all of Chapterhouse's works are derived from Warhammer 40K" is contradicted by Mr. Villacci's deposition testimony, which GW quotes only partially, selectively, and out of context. Although GW's counsel repeated the same question multiple times in an apparent attempt to elicit a different response from Mr. Villacci, Mr. Villacci clearly and consistently stated as follows:

> Q: Can you identify any products that you sell
> that were not influenced in any way by Games Workshop's
> products or its descriptions in -- in its books?
> MS. GOLINVEAUX: Objection; argumentative;
> assumes facts not in evidence; vague and ambiguous.
> A: A number -- I mean, our shields that's
> definitely not a GW originated -- did it have a shield,
> hammers?

Villacci II at 235:5-12.

> Q: …Can you identify any of
> the products that you sell that were not influenced in
> some way by Games Workshop's products or the
> descriptions of materials in its books?
> MS. GOLINVEAUX: Same objections.
> A: Honestly, since I have been so involved in
> scifi and miniatures and the hobby and -- I mean, when
> you -- you have played with something and have been
> involved with something for so long, that's bound to
> have an effect on any ideas you come across or create.
> So that's like saying -- no. I mean, everything has
> been influenced by -- **everything that we have created
> has been influenced by what I have been exposed to. Be
> it, Star Wars movies, Games Workshop products. I can't
> exclude anything from my personal experience.**

Villacci II at 235:16-236:5 (emphases added).

> Q (BY MR. MOSKIN): Name a product of yours that
> has not been influenced by Games Workshop's products or
> materials in its books.
> MS. GOLINVEAUX: Objection; argumentative.
> A: I gave you an answer. I said **all of our
> products have been influenced by a number of things**,
> including Games Workshop's products and books.

> I'm not going to limit myself and say our
> products have only been influenced, inspired by -- by
> Games Workshop stuff. **They have been inspired by a**
> **number of items, a number of cultural -- pop culture**
> **stuff put together to, you know, come out to that sort**
> **of expression of our products.**

Villacci II at 239:2-14 (emphases added).

    **GW's Statement of Fact No. 27.**     Mr. Villacci explained to one of the designers his general understanding that so 1long as he avoided making exact copies, he did not infringe: "GW pretty much has no legal say about what people make to use with their models as long as it isn't direct copies or recast of the models. Still, we have gone through a lot of resources to design our own stuff from scratch, while using the same measured dimensions, in 3D applications." (Ex. 24, WT00030) Although it is not clear in this context what is meant by "from scratch" it is undisputed that all of the models are made to correspond to Warhammer 40K.

**CHS's RESPONSE:**

    **DISPUTED**.

    SENTENCE ONE: mischaracterizes the quoted statement, which does not support GW's

statement and speaks for itself. (FRE 1002.)

    SENTENCE TWO: the statement that "it is not clear in this context what is meant by

'from scratch'" is contradicted by GW's questioning of Mr. Villacci at his April 11, 2012

deposition:

> Q    In the second paragraph you say, We have gone
> through a lot of resources, design our own stuff from
> scratch while using the same measured dimensions in 3D
> applications.
>     Do you see that?
> A   Yes.
> Q   What are you referring to here?
> A    We had gone through great pains to make sure
> our products were not -- copy GW products, but they
> still shared dimensions so they could fit with stuff for
> a GW line.

Villacci II at 217:3-18 (Kearney Decl. Ex. 21).

    GW's statement that "all of the models are made to correspond to Warhammer 40K"

lacks foundation (FRE 602), vague, ambiguous, and not relevant to any issue in this case. There

is no evidence to support the statement that "all of the models are made to correspond to

Warhammer 40K."

**GW's Statement of Fact No. 28.**     As Mr. Villacci explained to one designer (Jeff
Nagy, who created various shoulder pads; doors for vehicle kits, the javelin class jet bike and
other items) (Ex. 17, Supp Resp to Interrog 3): "Just for the record, I'm not all about [Space]
Marines. I have Navarro pushing Tyranids too, and that army is not the most popular. It's more
about filling niches in the market that GW has left, and taking advantage of them." (Ex. 25,
JN001310)

**CHS's RESPONSE:**

The statements in SUF 28 are not relevant to any issue in this case.

**DISPUTED**: GW selectively misquotes Exhibit 25, which does not contain the term
"Space Marines" and does not capitalize the word "marines."

**GW's Statement of Fact No. 29.**     Mr. Villacci likewise explained to Mr. Nagy on June
17, 2009: ██████████████████████████████████████
████████████████████████████████
████████████████████ (Ex. 26, JN00087-88)

**CHS's RESPONSE:**

The statements of SUF 29 are irrelevant to any issue in this case. FRE 402. It is

undisputed that there is no work-in-suit called "Valhallans" and Chapterhouse does not make or

sell a "Valhallans" product.

**GW's Statement of Fact No. 30.**     Thus, instead of directly copying a miniature
produced and sold by Games Workshop, Chapterhouse's main lines of products are based off of
perceived holes or gaps in Games Workshop's product line. Chapterhouse produces products for
which Games Workshop's Warhammer 40K universe provides artwork and literary background
for, but for which Games Workshop has not, or not yet, released a miniature. A few examples
follow:

**CHS's RESPONSE:**

Chapterhouse does not dispute that it does not directly copy GW miniatures.

Chapterhouse does not dispute that it produces and sells products "for which Games

Workshop has not, or not yet, released a miniature."

Otherwise **DISPUTED**: each statement lacks foundation (FRE 602); speculative (FRE 701); and irrelevant to any issue in this case. FRE 402. GW has no evidence that "Chapterhouse produces products for which Games Workshop's Warhammer 40K universe provides artwork and literary background for [*sic*]."

### *Eldar Figures*

**GW's Statement of Fact No. 31.**      One of the armies in the Warhammer 40K universe is the Eldar, an ancient alien race having mythic skills, cutting edge technology, and preternatural swiftness. (Ex. 1 at ¶ 16). For purposes of this case, four relevant types of individuals in Games Workshop's Eldar society are the Striking Scorpions, the Howling Banshees, the Eldar Farseer, and the Eldar Warlock. (Id.) Additionally, a common vehicle used by the Eldar is an Eldar Jetbike. (Id.) Examples of each of these are depicted below:



Eldar Striking Scorpion
(Ex. 27 at 2)

Eldar Howling Banshee
(Ex. 28 at 31, GW011375; Ex. 29)

Eldar Farseer
(Ex. 28 at 26, GW011373;
Ex. 30, GW002349)



Eldar Warlock
(Ex. 28 at 28, GW011374; Ex. 31)



Eldar Jet Bike
(Ex. 28 at 40, GW011377; Ex. 32)

(Ex. 1 at ¶¶ 16-17).

**CHS's RESPONSE:**

**DISPUTED**.

To the extent GW claims that the term "Eldar" is unique to GW, that is contradicted by the uncontradicted testimony of Tomas Fiertek (the Tomas Fiertek Dep. Tr. ("Fiertek Dep.") (Apr. 13, 2012) is attached to the Kearney Decl. ¶ 32 & Ex. 25):

> Q.   And a couple lines down, do you express concern that also your Eldar miniatures copy the same style as the Games Workshop Eldar miniatures?
> MR. OH:  Objection.  Misstating the document and also misstating testimony.
> A.   That is basically a continuation of the previous paragraph, like a continuation of the discussion. **The Eldar that Mr. Tolkien created that are used by Games Workshop and us.  We share the same theme.  They are even described as "Eldar" in Mr. Tolkien's works.**  We both, meaning Chapterhouse and Games Workshop, gave the Eldar a science fiction spin.

Fiertek Dep. (Apr. 13, 2012) at 149:22-150:8.

> [MR. FIERTEK] . . . I mean, there are thousands of fantasy and sci-fi books.  They all use the same basics.  There are trolls, there are orks, there are elves.  Tolkien called them Eldar, Games Workshop called them Eldar.

Fiertek Dep. Tr. 152:4-7.

To the extent GW claims that the description of "an ancient alien race having mythic skills, cutting edge technology, and preternatural swiftness" is unique to, or original to, GW, CHS disputes that characterization.

The statement that "the Striking Scorpions, the Howling Banshees, the Eldar Farseer, and the Eldar Warlock" are "types of individuals" is disputed, including to the extent GW argues that such categories of figures constitute a recognizable, unique individual "character" for the purpose of claiming copyright protection for a character. That statement is contradicted by GW's SUF 32 and the following GW exhibits:

- "Farseers are masters of prediction, and are the eldest and most experienced of a craftworld's advisors."  GW0011373 (GW MSJ Ex. 28)

- "Howling Banshees are swift and athletic troops…" GW00011375 (GW MSJ Ex. 28)
- "This boxed set contains six Eldar Striking Scorpions." GW MSJ Ex. 27.

The alleged uniqueness of such categories of figures is also contradicted by the

testimony of GW's employees:

> Q   So do all Eldar Farseers have breastplates that are made of bone based around a triangle with a central gem?
> A   No, not all of them.  They generally have one of those, but it can be different shapes, different layout.
> Q   Do they all have a central gem?
> A   They tend to.  I couldn't say definitively that all of them have that, but they tend to have a gem in that place, tend to have a lot of gems.

Goodwin Dep. at 130:14-22 (Kearney Decl. ¶ 14 & Ex. 10)

> What distinctive characteristics distinguish an Eldar Warlock from an Eldar Farseer, if any?
> A   A single robe rather than a double one.  It tends to have a helmet without a crest.

Goodwin Dep. at 140:6-9.

CHS further objects to GW's images and references to exhibits as follows:

- GW's MSJ Ex. 27 was not produced by GW and the Court should disregard this improper and untimely attempt to supplement the record. *See* Dkt. 139 (on Dec. 23, 2011, ordering GW to "produce the best exemplar of the works in question").

- Ex. 28 (GW11370-77) was produced on August 9, 2012, four and a half months after the close of fact discovery and three business days before the deadline for dispositive motions. Kearney Decl. ¶ 33. The Court should disregard this improper and untimely attempt to supplement the record. *See* Dkt. 139 (on Dec. 23, 2011 ordering GW to "produce the best exemplar of the works in question").

- GW's MSJ Ex. 29 was not produced by GW and the Court should disregard this improper and untimely attempt to supplement the record. *See* Dkt. 139 (on Dec. 23, 2011 ordering GW to "produce the best exemplar of the works in question").

- GW's MSJ Ex. 30 and 32 – GW's SUF and the Merrett Decl. (Ex. 1) include color versions of GW's MSJ Ex. 30 (GW0002349) and Ex. 32 (GW0002350),

each of which was produced only in black and white, despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Docket No. 171) The Court should disregard this improper and untimely attempt to supplement the record. *See* Dkt. 139 (on Dec. 23, 2011 ordering GW to "produce the best exemplar of the works in question").

- GW's MSJ Ex. 31 was not produced by GW and the Court should disregard this improper and untimely attempt to supplement the record. In addition, GW's SUF and the Merrett Decl. (Ex. 1) include color versions of Ex. 31, which is a black and white exhibit.

**GW's Statement of Fact No. 32.**    Each Eldar class of individuals has their own unique characteristics:

- The Striking Scorpions class of Eldar known for being skilled in close combat. Games Workshop's models of Striking Scorpions are usually male. Their unique features include a Scorpion Chainsword (a vicious blade with diamond-toothed edges and a gemstone on the hilt), a Shuriken Pistol (which can be attached to its wrist), and Mandiblasters (two small guns attached to the side of the their helmet that fire needle-thin shards that act as a conductor for a highly charged laser blast). They wear plate armour and have a thick lock of hair protruding from the back of their helmet. (Ex. 1 at ¶ 18);

- The Howling Banshees are a class of Eldar also known for deadly hand-to-hand combat. Games Workshop's models of Howling Banshees are usually female. Their unique features include a conical style helmet with hair flowing out of the back, segmented armour plates over a bodysuit, a grid-like mouth, and a long loin cloth held up by circular stones. (Ex. 1 at ¶ 18);

- The Eldar Farseer is a class of Eldar who have the ability to predict the future. Their weapons include a Spear or Sword. However, Games Workshop does not sell a Farseer miniature with a sword. Instead of armour, they wear a set of robes. While they also have the iconic Eldar style conical helmet, they also have a one or two curved protrusions extending upward. (Ex. 1 at ¶ 18);

- The Eldar Warlock is a class of Eldar with psychic abilities. Their unique weapons either include a Witch Blade or a Singing Spear. Instead of armour, they wear a set of robes, but still maintain an iconic Eldar style conical helmet. (Ex. 1 at ¶ 18); and

- The Eldar Jet Bike has a similar function to the Space Marine Jet Bike discussed below but is stylized in the Eldar style, including an elongated, smooth, tapering shape. (Ex. 1 at ¶18).

**CHS's RESPONSE:**

Each statement in SUF 32 is irrelevant to any issue in this case. FRE 402.

**DISPUTED**. To the extent GW argues that the listed characteristics describe similarities between protectable elements of any of the unidentified works-in-suit and CHS's products, that is contradicted by a side-by-side comparison GW's exemplars and the products themselves. Dkt. 224-224.17 (the "Product Binder").

To the extent GW argues that the listed characteristics are unique to GW works, or are original to GW, Chapterhouse disputes such characterization:

- CHS's products are not "skilled in close combat"; are not "known for deadly hand-to-hand combat"; do not have "psychic abilities" or "the ability to predict the future"; and are not sold with the named accessories. *Id.*

- To the extent GW argues that CHS's product contains elements that are substantially similar to GW's "Eldar Jet Bike," "including an elongated, smooth, tapering shape," that is contradicted by the undisputed fact that CHS sells only *accessories* that fit onto GW's "Eldar Jet Bike" products. [*see* Dkt. 224-224.17, Product Binder, tabs 35, 36 (showing photo of CHS products); *id.* (images of product pages from CHS website, showing product assembled to demonstrate compatibility and fit); Kearney Decl. to CHS MSJ, Ex. 7, products nos. 35 and 36 (physical specimens of CHS products).

**GW's Statement of Fact No. 33.** Chapterhouse has created and sells a female warrior protected by the "goddess of the Scorpion" called "Armana'serq Warrior Priestess:



Armana'serq Warrior Priestess
(Ex. 33)




Games Workshop's Striking Scorpion
(Ex. 27)

This female warrior princess shares the same unique characteristics as Games Workshop's all-male Striking Scorpion. The warrior is equipped with a diamond-toothed sword, a pistol attached to its wrist, and two small blasters attached to either side of the face and a gemstone on the hilt of the sword. Instead of the smaller chainsword, Chapterhouse also provides a larger two-handed chainsword. She wears plate armour and has a thick lock of hair protruding from the top of her head.

**CHS's RESPONSE:**

CHS does not dispute that it sells a female warrior figure called "Armana'serq Warrior Priestess."

Otherwise **DISPUTED**.

- GW's MSJ Ex. 27 was not produced by GW and the Court should disregard this improper and untimely attempt to supplement the record in assessing substantial similarity. The Court should properly consider only examplars that GW timely produced during discovery; *see* Dkt. 224-224.17, Product Binder, tab 123; Dkt. No. 139 ("Plaintiff must produce the best available exemplar of the works in

52

question"); Dkt. No. 171 ("[I]f the original is in color, then the exemplar has to be in color.")

- CHS's product does not resemble GW's alleged work.

- The idea of "plate armour" or the idea of a sword that resembles a chainsaw are not protectable elements, and CHS's product is not substantially similar to GW's alleged work. GW concedes that the sword depicted by CHS's product is different from the sword depicted in its alleged work.

**GW's Statement of Fact No. 34.** As Games Workshop does not produce a female Striking Scorpion, Chapterhouse's documents make clear that Chapterhouse's intent was to fill in this perceived gap and make a female version of Games Workshop's Striking Scorpion figurine.

- In developing the product with the designer, Michio Okamura, Mr. Villacci and the designer referred to the figure as a "female space elf"[9]. Mr. Villacci explained that the idea was to do "alternate sculpts for the exarch warriors[10] (if gw makes a male version lets do a female nicer version and vice versa)." (Ex. 34, MO00002);

- Mr. Villacci further explained: "I would femalize the anatomy, but keep the basic armor structure." (Ex. 34, MO0001). He also stated ""Honestly I wouldn't mind having you flesh out the female Eldar line. That is if your up for it." (Ex. 35, MO00024);

- Although at his deposition Mr. Villacci professed ignorance as to the weapons that wrap around the figure's head (Ex. 16 at 171:17-25) in his email to the designer he correctly identified them using GW's terminology: "As for the head, can you do a open face and have the mandiblasters somehow attached around the back of the head?" (Ex. 16, 199:13- 200:6) Mr. Okamura agreed: "I don't know, with the mandiblaster and the dreadlocks sensors, she looks much more recognizable as a Striking Scorpion." (Ex. 35, MO000026);

- Mr. Okamura referred to his initial model as an "Eldar" and explained that "I was planning on making the model so it can use the weapon options included in the GW box set for the Striking Scorpions ..." (Ex. 35, MO000029);

- As to the overall design, Mr. Okamura inquired of Mr. Villacci: "How different do the designs have to be from the GW stuff? Is the Eldar model I'm working on different enough or have I wasted my time on the model?" Mr. Villacci responded (eschewing the "ordinary observer" test and assuming the posture of someone who knew nothing about Games Workshop's products): "From what I see, that is plenty nice and original enough. Imagine if you had no idea its supposed to be a female scorpion, would you think that by looking at it, so in my minds eye its not a copy at all." (Ex. 35, MO000026); and

---

[9] In Games Workshop's literature concerning the Eldar race, they are described and defined as a type of elf. (Ex. 1 at ¶ 16)
[10] An Exarch is a type of Eldar Warrior. (Ex. 1 at ¶ 16)

- According to Mr. Okamura, even the larger two-handed chainsword was intentionally copied from Games Workshop's design: "I'll probably be sculpting a set of arms with the chainsabre since GW hasn't released a model of them as far as I know. I did find their concept pics of the chainsabre and it's just a shuriken pistol attached to each wrist with the hands wielding the chain blades." (Ex. 35, MO0022).

**CHS's RESPONSE:**

CHS does not dispute that GW does not make or sell a female Striking Scorpion.

Each statement in SUF 34 is irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**: CHS disputes the other statements in SUF 34, including without limitation as follows:

- GW does not own or any rights to, nor claim infringement of the term or idea of a "female space elf."

- Mr. Okamura's alleged plan to "mak[e] the model so it can use the weapon options included in the GW box set for the Striking Scorpions" is not evidence of copyright or trademark infringement and is irrelevant to any issue in this case. FRE 402.

- GW makes improper legal argument, states a legal conclusion, and mischaracterizes the "ordinary observer" test for assessing substantial similarity. "[T]he test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value." *Atari, Inc. v. N. Amer. Phillips Consumer Elec. Corp.*, 672 F.2d 607 (7th Cir. 1982) (quoted at GW's Memorandum in Support of Plaintiff's Motion for Summary Judgment, Dkt. 213, at 7). GW's false implication that an "ordinary observer" must have substantial knowledge of GW's game, works, and "imaginary universe" is without any basis in law or common sense, and contradicts ordinary usage.

- Mr. Okamura's statement regarding his decision to sculpt arms with the "chainsabre" is irrelevant to any issue in this case. FRE 402. Mr. Okamura's statement implies that he sculpted the "chainsabre" before seeing GW's concept art. GW concedes that the sword included with CHS's product is different from GW's alleged "chainsword."

**GW's Statement of Fact No. 35.** Chapterhouse has created and displayed on its website a concept sketch for a future product called a Hell Hound, which Chapterhouse describes on its website as a "male Howling Banshee":






Chapterhouse's "Hell
Hounds"
(Ex. 36, CHS001192)

Games Workshop's
Eldar Howling Banshee
(Ex. 28 at 31)

Games Workshop's Eldar Howling Banshee
(Ex. 29)

This male Howling Banshee has the same unique characteristics as Games Workshop's female Howling Banshees, including a conical style helmet with hair flowing out of the back, segmented armour plates over a bodysuit, a grid-like mouth, and a long loin cloth held up by circular stones.

**CHS's RESPONSE:**

**DISPUTED**. The product Games Workshop refers to in its Second Rev. Copyright Claims Chart as product no. 110 has not yet been received from the casting company that is manufacturing the finished products, and has never been sold or offered for sale. Villacci Decl. ¶ 8.

GW claims copyright protection for unprotectable elements of its alleged works, and the general idea of an armored, masked warrior with long hair and a loin-cloth. CHS's particularized expression of these abstract, unprotectable ideas is not substantially similar to either one of GW's two very different expressions.

CHS further objects to GW's images and references to exhibits as follows:

- GW does not allege that the alleged concept art depicted at Ex. 36 infringes its works. Original Copyright Claim Chart; First Rev. Copyright Claim Chart; Second Rev. Copyright Claim Chart.

- Ex. 28 (GW11370-77) was produced on August 9, 2012, four and a half months after the close of fact discovery and three business days before the deadline for dispositive motions. Kearney Decl. ¶ 33. CHS's alleged concept drawing was posted May 16, 2011, *ten months before the close of fact discovery*. GW MSJ Ex. 36 (showing posting date); Dkt. 116 (close of fact discovery). *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question") The Court should not consider this late-produced document.

- GW's MSJ Ex. 29 was not produced by GW and the Court should disregard this improper and untimely attempt to supplement the record. See Dkt. 139 (ordering GW to "produce the best exemplar of the works in question")

**GW's Statement of Fact No. 36.**      As Games Workshop does not produce a male Howling Banshee,  Chapterhouse's documents make clear its intent to fill this perceived gap by creating a male version of Games Workshop's expression of a Howling Banshee:

- Mr. Villacci suggested to Mr. Okamura to attempt to create a male Howling Banshee: ████████████████████████████████████████ ████████████████████████████████████████ (Ex. 35, MO000024);

- Reflecting a deep knowledge of the Games Workshop mythology, Mr. Okamura agreed to try such a design: "I'll just keep working on the Eldar line .... Not sure about the male Banshee; the name Banshee implies female. Though the Dark Eldar has Wyches that are male, so maybe that's not so far fetched. I could give it a shot." (Ex. 35, MO000023); and

- Mr. Okamura described his vision as a male version of Games Workshop's Howling Banshee: ████████████████████████████████████ ████████████████████████████████████████ ████████████████████ (Ex. 37, MO00295).

**CHS's RESPONSE:**

CHS does not dispute that GW does not produce or sell a product similar to CHS's

proposed product.

Each of the remaining statements in GW's SUF 36 is irrelevant to any issue in this case.

FRE 402.

Otherwise **DISPUTED**.

The statement attributed to Villacci lacks foundation (FRE 602) and is irrelevant to any issue in the case. To the extent the statement is relevant and admissible it contradicts GW's theory of copyright infringement, including statements concerning differences in CHS's proposed expression of the basic ideas of a "mask".

The statements attributed to Okamura are inadmissible hearsay (FRE 802), lack foundation (FRE 602), and are irrelevant to any issue in the case. To the extent such statements are relevant and admissible, they contradict GW's theory of copyright infringement, including statements concerning differences in CHS's proposed expression of the basic ideas of chest armor" and a "helm."

**GW's Statement of Fact No. 37.**    Chapterhouse has created and sells a "Doomseer Iyanar-Duanna" model:



Chapterhouses' "Doomseer Iyanar-Duanna"
(Ex. 38, CHS000381)





Games Workshop's Eldar Farseer
(Ex. 28 at 26, Ex. 30)

This "Doomseer" has the same unique characteristics as Games Workshop's Eldar Farseer. Besides being described as having the ability to predict the future, the Doomseer's weapons also include a choice of spear or sword. Instead of armour, the Doomseer wears a set of robes. In addition to having the iconic Eldar style conical helmet, the Doomseer also has two curved protrusions extending upward that are uniquely associated with Games Workshop's Eldar Farseer.

**CHS's RESPONSE:**

**DISPUTED**. GW's allegedly "unique characteristics" merely describe the abstract idea of a miniature figure wearing a robe and a helmet with antler-like horns, and able to hold various standard weapons including spears and swords.

GW's statement that a "conical helmet" is "iconic" lacks foundation (FRE 602). GW has no evidence showing consumer recognition or association of a "conical helmet" with GW, any GW work-at-issue, or indeed any GW work.

GW's statement that a helmet with "two curved protrusions extending upward [is] uniquely associated with Games Workshop's Eldar Farseer" lacks foundation (FRE 602). GW has no evidence showing consumer recognition or association of "two curved protrusions extending upward" with GW, any GW work-at-issue, or indeed any GW work.

CHS further objects to GW's images and references to exhibits as follows:

- GW's MSJ Ex. 28 (GW11370-77) was produced on August 9, 2012, four and a half months after the close of fact discovery and three business days before the deadline for dispositive motions. Kearney Decl. ¶ 33. The Court should disregard this improper and untimely attempt to supplement the record. Dkt. 139 (ordering GW to "produce the best exemplar of the works in question").

- GW's MSJ Ex. 30 – GW'S SUF and the Merrett Decl. (Ex. 1) include color versions of GW'S MSJ Ex. 30 (GW0002349), which was produced only in black and white, despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Docket No. 171) The Court should disregard this improper and untimely attempt to supplement the record. Dkt. 139 (ordering GW to "produce the best exemplar of the works in question").

- GW'S MSJ Ex. 31 was not produced by GW. In addition, GW's SUF and the Merrett Decl. (Ex. 1) include color versions of Ex. 31, which is a black and white exhibit. For the reasons stated above, the Court should disregard this improper attempt to supplement the record.

**GW's Statement of Fact No. 38.** While Chapterhouse has produced limited documents regarding the creation of the Doomseer, its testimony and unproduced documents that Games Workshop discovered independently clearly show Chapterhouse's intent to copy Games Workshop's expression of a Eldar Farseer.

- During the July 18, 2011 webcast interview with Mr. Villacci (*supra* ¶19), the interviewer, who is plainly well-versed with Warhammer 40K, admits that when he first saw Chapterhouse's "Doomseer" product: "At first view I first thought it was a either a Forgeworld[11] or GW model [inaudible] I came to find out later it Seer was not world or GW at all". Id. at 2:12:08 - 2:12:23;

- Internally, Mr. Villacci referred to the product simply as a "female Warseer" (Ex. 35, MO000028);

- In one of the Warhammer 40K forums, Frothers Unite, Mr. Villacci admitted of the "Doomseer" (after being hotly challenged by others on the forum for his suggestion there were differences between his model and Games Workshop's Eldar figures[12]) that "Its obviously supposed to be a female sculpt for Eldar players, noone ever denied that." (Ex. 39 at 2); and

- On May 1, Another forum member openly mocked the suggestion that the figure was anything but a copy. Part of a far longer discussion of the nature of the copying included the following[13]

    "You know what, you're right, there is absolutely no resemblance between your and theirs. Its completey coincidence and there is no way that you're actually trying to knock off an eldar farseer. Doomseer. Farseer/Warlock, whatever.



It is also absolutely crazy of all of us to think that the fact that you had it painted with an Eldar rune on its head is anything other than happenstance. Given the myriad ways lines can be arranged into glyphs, it should give no more suprise when they randomly come together in a form that is completely in line stylisticly with an idiom that your sculpting also coincidentally lines up with, than it should suprise us when it doesn't. Thats how random chance works after all" (Ex. 39 at 3).

---

[11] Forge World is part of Games Workshop. (Ex. 1 at ¶ 11)

[12] At 9:54 pm one forum member wrote "No, the faceplate and frontal structure is almost identical to the second one, and indeed any of the original Warlocks, or the first Dire Avengers." Dire Avengers are Eldar figures. (Ex. 39 at 1).

[13] In response to Mr Villacci's suggestion that the "pulled her name from some ancient priestess names and changed a few letters up" (id.), the forum member further responded "Its really childish of us to think that Iyanar has any similarity to the craftworld of Iyanden. It is so obviously a randomization of 'some thing I found on google and rearranged' that to note the congruence with the estableshed IP that it sails so close to would be just plain fatuous. Shame on us." The Iyanden Craftworld was once one of the largest and most prosperous of the Eldar craftworlds, which were colossal spacecraft on which the Eldar took refuge. (Ex. 39 at 3).

**CHS's RESPONSE:**

      **DISPUTED**.

      Each statement quoted in GW's SUF 38 (including the unexplained images inserted before the final paragraph) is irrelevant (FRE 402); is inadmissible hearsay (FRE 802); is improper speculation (FRE 701); and lacks foundation (FRE 602). In particular, each statement quoted in GW's SUF 38 concerning CHS's purported "intent to copy" is inadmissible hearsay (FRE 802), improper speculation (FRE 701), and lacks foundation (FRE 602).

      Each statement of GW's SUF 38 is irrelevant to any issue in this case. FRE 402.

      Even if CHS had the alleged "intent to copy" (which it did not), that is irrelevant to substantial similarity, copyright infringement, or trademark infringement. *Incredible Techs. v. Virtual Techs.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (even if defendant "set out to copy" plaintiff's game, plaintiff must still show the copying resulted in substantial similarity); *Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 708 (7th Cir. 1972) (same); *Lifetime Homes, Inc. v. Walker Homes, Inc.*, 485 F. Supp. 2d 1314, 1320, 1323 (M.D. Fla. 2007) (even where defendants intentionally copied plaintiff's design, no substantial similarity); *Baby Buddies, Inc. v. Toys "R" Us, Inc.*, 611 F.3d 1308, 1312 (11th Cir. 2010) (summary judgment even though defendant's contractor was given a copy of Plaintiff's product and asked to "please work on a similar design"); 4 Nimmer on Copyright, § 13.03[D] at 13-92 ("Proof of access . . . logically exerts no impact on copying as a legal matter; no matter how steeped in plaintiff's work defendant may have been, if the resulting product is non-actionable as a matter of law, then the absence of substantial similarity that must underlie every successful claim still dooms the infringement suit"); *id.* at 13-91 ("[T]here is nothing wrong in having access to one's competitor's products. Nor may a showing of substantial similarity ever be avoided") (footnotes omitted).

- GW does not claim trademark or other rights to the term "doomseer." Kearney Decl. ¶ 4-6 & Exs. 2-4

- GW does not claim trademark or other rights to the term "warseer." *Id.*

- GW has no evidence that any consumer associates the term "doomseer" with GW, any work-in-suit, or indeed any GW work. CHS Additional Material Fact No. 25.

**GW's Statement of Fact No. 39.**    Chapterhouse has created and sells both a "Farseer Jetbike Conversion Kit" and a "Warlock Jetbike Conversion Kit" under its "Eldar Compatible Bits" section. These products allow a customer to convert a standard Games Workshop Eldar Jetbike product into  a representation of a Games Workshop Eldar Farseer or Eldar Warlock riding a Games Workshop Eldar Jetbike:



Farseer Jetbike Conversion
(Ex. 40)

Warlock Jetbike Conversion
(Ex. 40)

Chapterhouse's Conversion Kit
(Ex. 40)

Games' Workshop's Eldar
Farseer
(Ex. 28 at 26; Ex. 30,
GW002349)

Games Workshop's Eldar Warlock
(Ex. 28 at 28; Ex. 31)

Games Workshop's Eldar Jet Bike
(Ex. 28 at 40; Ex. 32, GW002350)

These Farseer and Warlock conversion kits share the same unique features as Games Workshop's Eldar Farseer and Eldar Warlock, including that both are equipped with either a spear or a sword; both have the iconic Eldar conical helmet; both are wearing a set of robes instead of armour and both are rendered in the same overall style.

**CHS's RESPONSE:**

CHS does not dispute that it sells a "Farseer Jetbike Conversion Kit" and a "Warlock

Jetbike Conversion Kit." CHS does not dispute that these products are meant to allow players to

convert a  regular jetbike kit, including a GW "Eldar Jet Bike," into a different-looking jetbike, including a rider.

Otherwise **DISPUTED**. GW's allegedly "unique characteristics" merely describe the abstract idea of a miniature figure wearing a helmet and robes, and able to hold various standard weapons including spears and swords. GW's statement that a "conical helmet" is "iconic" lacks foundation (FRE 602). There is no evidence of record showing consumer recognition or association of  a "conical helmet" with GW, any GW work-at-issue, or indeed any GW work.

CHS further objects to GW's images and references to exhibits as follows:

- Ex. 28 (GW11370-77) was produced on August 9, 2012, four and a half months after the close of fact discovery and three business days before the deadline for dispositive motions. Kearney Decl. ¶ 33.  The Court should disregard this improper and untimely attempt to supplement the record. Dkt. 139 (ordering GW to "produce the best exemplar of the works in question").

- GW'S MSJ Ex. 29 was not produced by GW and the Court should disregard this improper and untimely attempt to supplement the record.

- GW'S MSJ Exs. 30 and 32 – GW's SUF and the Merrett Decl. (Ex. 1) include color versions of GW'S MSJ Ex. 30 (GW0002349) and Ex. 32 (GW0002350), each of which was produced only in black and white, despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Docket No. 171).  The Court should disregard this improper attempt to supplement the record.

- GW'S MSJ Ex. 31 was not produced by GW and the Court should disregard this improper and untimely attempt to supplement the record. In addition, GW's SUF and the Merrett Decl. (Ex. 1) include color versions of Ex. 31, which is a black and white exhibit.

**GW's Statement of Fact No. 40.**      As Games Workshop does not sell an Eldar Farseer or Eldar Warlock  capable of being placed on an Eldar Jetbike, Chapterhouse's documents confirm its intent to copy both Games Workshop's Eldar Farseer and Warlock expressions in a way that will fit onto Games Workshop's Eldar Jet Bike in order to fill this perceived gap in Games Workshop's line. This was accomplished by adding copies of the Eldar's legs to fit onto the Chapterhouse Jetbike, onto which can then be mounted Eldar torsos from Games Workshop:

63

- "Feel free to post the shots in that thread. I think the head looks good, Do you have a jetbike to make sure the body will be able to fit on it correctly" (Ex. 41, CHS003606);

- "Were you going to do the legs as well (robes?) or where you thinking of using the regular jetbike rider legs. (Ex. 42, CHS003624);

- "i have think about sculpting farseer on jet bike but i am holding back for now waiting for new jetbike form Gw as the current one well it not to my test ... or i jst sculpt a female eldar farseer :D i have to draw out some concept fist so i don't bump on to Gw's copy right the last one i sculpt is in sculpey.. and the vampire sculpt i show is to be send to trolls forge .that one is in 54mm" (Ex. 43, CHS003628);

- "How is that model doing that you were sculpting and showing on Dakka dakka[14]? I would like to get a Farseer/Warlock Jetbike rider for eldar sculpted some day, but need someone familiar with the line" (Ex. 44, CHS003629);

- "Personally I feel the Farseer head is pretty good as is. The warlock head... eh, I think it needs sprucing up, its way too plain for me. I would suggest a hair piece - pony tail on it as well." (Ex. 45, CHS005431);

- "The heads are nice but scream illegal to me. They basically look like GW heads with an antenna added to it and I dont think we would be ok if we sculpted up a GW SM head replica and added an antenna to it.

- Just beware dude." (Ex. 46, CHS006351); and

- "ok i will do 2 seer body male/femal (start taking bets which one sell better) 1 warlock body both head a spirit stone [15] to stick on the canopy i can do a sword arm if you really wanted it but there is not much point using it if you mount a seer on jetbike. a seer with spear on jetbike is better as they can fly around and tosing it around barking tanks" (Ex. 47, CHS006360).

## CHS's RESPONSE:

CHS does not dispute that GW does not sell a miniature figure capable of being placed on an Eldar Jetbike.

Each remaining statement in GW's SUF 40 is irrelevant to any issue in this case. FRE 402.

---

[14] Dakka dakka is one of the online forums devoted to fans of Warhammer 40K.

[15] In the Warhammer 40K mythology, "Spirit Stones" are used by Eldar as receptacles for spirits of their ancestors. (Ex. 1 at ¶16).

Otherwise **DISPUTED**. GW's statement that "Chapterhouse's documents confirm its intent to copy both Games Workshop's Eldar Farseer and Warlock expressions" is contradicted by the quotations cited in SUF 40. Each of the cited quotations merely show that CHS used terms to identify products that players might wish to use with particular armies, and/or to explain that Chapterhouse's products are compatible with, fit on, or can be used to decorate particular products.

The quoted language from CHS0006351 apparently concerns replacement heads for a product compatible with a GW space marine, not one compatible with an Elder Jetbike. There is nothing to indicate that the quoted language concerns any CHS product at issue in this case or any of the works-in-suit.

### [*Pre -Heresy Accessories*]

**GW's Statement of Fact No. 41.**     One particularly relevant body of work that has been a source of inspiration for many of defendant's accused products is Games Workshop's *Horus Heresy*. Games Workshop has produced numerous books, articles, and other products that detail the *Horus Heresy* rebellion against the Emperor in the 30th millennium (something of a prequel to the main body of the Warhammer 40,000 universe) by the nine Space Marine Legions that were corrupted by the Chaos Gods. (Ex. 1 at ¶ 19).

### CHS's RESPONSE:

**DISPUTED**. Each statement in SUF 41 concerning "inspiration" for CHS products is improper speculation (FRE 701), and is irrelevant to any issue in this case. FRE 402.

Each statement in SUF 41 lacks foundation (FRE 602) and is improper speculation (FRE 701). The Merrett Decl. (GW MSJ Ex. 1), on which GW relies, lacks foundation (FRE 602) and is improper speculation (FRE 701).  The Merrett Decl. at ¶ 19 identifies GW MSJ Ex. 26 as a true and correct copy of "Horus Heresy: The Collected Visions," but Ex. 26 does not contain such material.

In particular, and without limitation:

- "Games Workshop's *Horus Heresy*" – this is vague and ambiguous, and appears to refer to an unidentified collection of unspecified works. GW identifies only a single work, "Horus Heresy: The Collected Visions."

- "Games Workshop has produced numerous books, articles, and other products that detail the Horus Heresy rebellion against the Emperor in the 30th millennium" – **disputed**: GW has identified and produced only a single such work, "Hourus Heresy: The Collected Visions." Kearney Decl. ¶ 27.

**GW's Statement of Fact No. 42.**      As the events of the *Horus Heresy*, occurred about 10,000 years prior to the main body of the Warhammer 40K universe, much of the Games Workshop artwork details "pre-heresy" armour and weapons that look different from the "post-heresy" armour and weapons that are the subject of the bulk of Games Workshop's miniatures. (Ex. 1 at ¶ 20). Examples of pre-heresy and post-heresy Space Marine armor are below:



Pre-Heresy Armor (Mk 1 Thunder Armor)
(Ex. 48 at 139)



Pre-Heresy Jump Pack
(Ex. 48 at 284)





Post-Heresy Armor
(Ex. 49 at 71, GW001727)

Post-Heresy Jump Pack
(Ex. 50, GW002324)

(Ex. 1 at ¶¶ 20-21).

## CHS's RESPONSE:

Each statement of GW's SUF 42 is irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**: each statement of GW's SUF 42 is vague, ambiguous, and without foundation (FRE 602).

GW'S MSJ Exs. 48 and 49 – GW's SUF and the Merrett Decl. (Ex. 1) include color versions of images from GW'S MSJ Ex. 48 (GW0001893; GW0002017)and Ex. 49 (GW0001727), each of which was produced only in black and white, despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Docket No. 171). The Court should disregard this improper and untimely attempt to supplement the record. Dkt. 139 (ordering GW to "produce the best exemplar of the works in question").

**GW's Statement of Fact No. 43.**    This pre-heresy artwork contains unique elements:

- The pre-heresy armour has unique shoulder pads consisting of overlapping plates with a series of rivets or studs. Additionally, the pre-heresy shoulder pad shown above has a unique shape to the various plates. Moreover, the overall shape of the shoulder pad (rounded top, flat bottom, beginning at top of shoulder and ending at elbow) is based off of Games Workshop's iconic shoulder pad design. (Ex. 1 at ¶22); and

- The pre-heresy jump packs have a unique design consisting of two large turbo-fan type barrel jets with fins protruding out the bottom. (Ex. 1 at ¶ 22).

**CHS's RESPONSE:**

**DISPUTED**.

GW's statement that the design of its shoulder pads is "iconic" lacks foundation (FRE 602). GW has no evidence showing consumer recognition or association of any particular shape or design of an armor shoulder protector with GW, any GW work-at-issue, or indeed any GW work. This statement is contradicted by the statement in GW's SUF 42 that "'pre-heresy' armour . . . look[s] different from the 'post-heresy' armour . . . ."

The listed characteristics of having "overlapping plates," "a series of rivets or studs," and the "overall shape" of the shoulder pads are not unique and are not original to GW.

 16  17  18  19

To the extent GW claims that a personal jet-propulsion unit with "two large turbo-fan type barrel jets with fins protruding out the bottom" is unique or original to GW, CHS disputes that statement. GW has no evidence that the idea of a jet backpack with twin turbines is

---

[16] DETAIL from CHS00017881, reconstruction of Roman *lorica segmentata* armor. Kearney Decl. ¶ 34 & Ex. 26.
[17] DETAIL from CHS00017877, armor dated ca. 1500-1508. Kearney Decl. ¶ 34 & Ex. 26.
[18] DETAIL from CHS00017882, "arquebus armor" dated ca. 1680-1690. Kearney Decl. ¶ 34 & Ex. 26.

protectable. The undisputed evidence shows that CHS's particularized expression of jet turbines is not substantially similar to any protectable elements of GW's alleged work. Dkt. 224-224.17, Product Binder at tab 76. GW has no evidence to the contrary.

**GW's Statement of Fact No. 44.** Chapterhouse makes and sells products allowing a customer to convert Games Workshop's post-heresy Space Marines into figures that appear the same as Games Workshop's pictures of Pre -Heresy Space Marines, such as the images in Games Workshop's Horus Heresy Collected Visions book and the related card game. These products include various "Banded Shoulder Pads" and "Heresy Era Jump Pack for Space Marines."

   

Banded Tech Power
Armour Shoulder Pad
(Ex. 51)

Banded Armour
Terminator Pad
(Ex. 51)

Banded Power Armour
Shoulder Pads
(Ex. 51)

Heresy Era Jump Pack for
Space Marines
(Ex. 52)

**CHS's RESPONSE:**

CHS does not dispute that it sells armor shoulder pads including the products pictured.

Otherwise **DISPUTED**.

• CHS disputes that its products are substantially similar to protectable elements of GW's works-in-suit, and GW fails to identify any such alleged works.

• GW misrepresents the names of the CHS products it depicts, which are named and described to indicate compatibility and to identify the GW products with which players may wish to use the products. (CHS also does not use the Anglicized spelling "armour" in its product names.) In the order in which they are depicted in SUF 44, the actual names of CHS's products are:

---

[19] DETAIL from GW0006805, armor dating from the early 16th century. Kearney Decl. ¶ 35 & Ex. 27

- "Banded Tech Pad - Power Armor Power **compatible**" (emphasis added)

- "Banded Armor Pad – Terminator **Capabitible** [*sic*]" (emphasis added)

- "Banded Shoulder Pads – Power Armor **Compatible**" (emphasis added)

- "5 Heresy Marine Jump Packs"

• GW has no evidence that using CHS's products allows a customer create "figures that appear the same as Games Workshop's pictures of Pre -Heresy Space Marines."

• GW's reference to unspecified "images in Games Workshop's Horus Heresy Collected Visions book and the related card game" lacks foundation (FRE 602). To the extent GW has not produced such works, they are inadmissible and the Court should not consider them. GW has not produced any "related card game" product in this case.

**GW's Statement of Fact No. 45.** These Chapterhouse products contain the same unique characteristics depicted in Games Workshop's books illustrating pre-heresy Space Marines.

• The "Banded Shoulder Pads" consist of overlapping plates with a series of rivets or studs. Additionally, the "Banded Tech Power Armour Shoulder Pad" even has the same shape to each of the plates as shown in Games Workshop's depictions. Moreover, the overall shape of the shoulder pads follow Games Workshop's iconic Space Marine shoulder pad design.



Games Workshop's Artwork
(Ex. 48 at 139, GW002017)



Chapterhouse's Product
(Ex. 51)

• The "Heresy Era Jump Pack for Space Marines" consist of two large turbo-fan type barrell jets with fins protruding out the bottom.





Games Workshop's Artwork
(Ex. 48 at 284, GW002162)

Chapterhouse's Product
(Ex. 52)

**CHS's RESPONSE:**

**DISPUTED**. As stated above, the listed characteristics of GW's shoulder armor and jet

backpacks are neither unique nor original to GW. The identified CHS products are not

substantially similar to any protected elements of GW's alleged works. In particular:

- The use of "overlapping plates" of armor with or without "rivets" is not unique or original to GW and is an unprotectable abstract idea. *See* Kearney Decl. ¶ 34 & Ex. 26. Furthermore, expressions of that unprotectable idea occur in historical types of armor:









---

[20] DETAIL from CHS00017881, reconstruction of Roman *lorica segmentata* armor. Kearney Decl. ¶ 34 & Ex. 26.
[21] DETAIL from CHS00017877, armor dated ca. 1500-1508. Kearney Decl. ¶ 34 & Ex. 26.
[22] DETAIL from CHS00017882, "arquebus armor" dated ca. 1680-1690. Kearney Decl. ¶ 34 & Ex. 26.
[23] DETAIL from GW0006805, armor dating from the early 16th century. Kearney Decl. ¶ 35 & Ex. 27

- The statement that CHS's product "has the same shape to each of the plates as shown in Games Workshop's depictions" lacks foundation (FRE 602), and is incorrect. Even a cursory inspection shows that the shape, number, and configuration of the "plates" of CHS's armor piece are very different and not substantially similar to the GW work depicted.

- GW's statement that the design of its shoulder pads is "iconic" lacks foundation (FRE 602). GW has no evidence showing consumer recognition or association of any particular shape or design of an armor shoulder protector with GW, any GW work-at-issue, or indeed any GW work. This statement is contradicted by the statement in GW's SUF 42 that "'pre-heresy' armour . . . look[s] different from the 'post-heresy' armour . . .."

- To the extent GW claims that a personal jet-propulsion unit with "two large turbo-fan type barrel jets with fins protruding out the bottom" is unique or original to GW, CHS disputes that statement. GW has no evidence that the idea of a jet backpack with twin turbines is protectable. GW has no evidence that CHS's particularized expression of jet turbines is substantially similar to any protectable elements of GW's alleged work.

CHS further objects to GW's images and references to exhibits as follows:

- GW'S MSJ Ex. 48 – GW's SUF and the Merrett Decl. (Ex. 1) include color versions of images from GW'S MSJ Ex. 48, each of which was produced only in black and white, despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Docket No. 171)  The Court should disregard this improper and untimely attempt to supplement the record. Dkt. 139 (ordering GW to "produce the best exemplar of the works in question").

**GW's Statement of Fact No. 46.**     Chapterhouse's documents reveal its intent to copy Games Workshop's artwork for the banded "Mark I" power armour in creating these pre-heresy accessories and reveal as well a detailed knowledge of the stylization and nomenclature used by Games Workshop in the Warhammer 40K universe regarding versions of the Space Marine Power Armour:

- 
  (Ex. 53, CHS003100);

- "I plan on creating more shoulder pads but the ones I've shown you are pretty much done. In case you have forgotten I have created:
  ...

72

████████████████████████████████████████████████ (Ex. 54, CHS003141-42);

- ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ██████████ Ex. 54, CHS003134);

- "Some of the changes, like Tomas' issue with the MkI shoulder pad. I can make that change. Though I honestly think both designs Tomas' version and my version are good. My version follows the two GW MkI armored models, but Tomos' design follows the a version of the shoulder pad the Space Wolves are shown wearing in the Horus Heresy art books with MkV armor, during the Horus Heresy. I think both are good, but represent different ideas." (Ex. 55, CHS003122);

- "Well as far as sale-ability of the top 5-6 shoulder pads... I think we should release the Tactical, Devestator, Assault, followed by the Mk1 I did OR the Mk1 Tomas drew up, ████████████████████████████ I know a good number of people in the gaming community would kill for a supply of those early armor shoulder pads. There is one guy on Warseer who is building a business entirely around converting marine armies in the old armors, I spoke with him and he sounded like he'd probably be in it for bulk purchasing. He's also the guy who previous to me teaming up with you was trying to get me to do some early bolter[24] patterns and helmets. ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ Particular stars seem to be in alignment on these I think." (Ex. 56, JN00067);

- "I am wondering why you did a segmented pad when we already have a MK I pad? Isn't that the same thing? Or are you going to use it for something else?
  We have one that uses 3 segments (artbooks use 5 thin ones) that are uneven and butt ugly. (sorry) I'm surprised people even buy it but I guc its from lack of other options. I will make one riveted as a dedicated generic PH [Pre-Heresy] pad or a specific SW [Space Wolves[25]] pad." (Ex. 57, CHS015689-90).

## CHS's RESPONSE:

### DISPUTED.

Each statement quoted in GW's SUF 46 is irrelevant (FRE 402); is inadmissible hearsay

(FRE 802); is improper speculation (FRE 701); and lacks foundation (FRE 602). In particular,

each statement quoted in GW's SUF 46 concerning CHS's purported "intent to copy" is

---

[24] A "bolter" is the standard hand weapon of the Space Marines. (Ex. 1 at ¶ 15).

inadmissible hearsay (FRE 802), improper speculation (FRE 701), and lacks foundation (FRE 602).

The quoted statements do not indicate an "intent to copy" but each indicates efforts to ensure compatibility and to identify the GW products with which players may wish to use the products. The unprotectable abstract idea of "banded" or segmented armor, with or without rivets, is not unique to GW and is not original to GW, and CHS's products are not substantially similar to any protectable element of the works-in-suit. GW does not cite to an exemplar of its alleged "'Mark I' power armour" work.

GW has not produced an exemplar of its alleged "Mark I power armour" work. Entry 68 of GW's Second Rev. Copyright Claim Chart states that "Games Workshop sells a Mk1 armoured Space Marine" and lists a URL. GW did not produce this work, and the Court should disregard this improper and untimely attempt to supplement the record. To the extent the Court considers such unproduced documents, the undisputed evidence shows that CHS's product is not substantially similar to the protectable elements of GW's alleged work. *See* Dkt. 224-224.17, Products Binder at tab 68.

**GW's Statement of Fact No. 47.** Chapterhouse's documents reveal its intent to copy Games Workshop's artwork for the pre-heresy jump packs for Space Marines:

- "In the same vein I'd like to do an "old" heresy era style backpack at the same time I do the turbo fan jump pack." (Ex. 54, CHS003142);

- "The PH [Pre-Heresy] jumppack is also finished but not assembled. I need to know asap: Should I make the JP in one piece or should the backpack be one piece and the two turbines be loose (pinned) for the customer to arrange (angle) as he wishes? You see I can either add the turbines so that they point straight up as the mini stands or angle them slightly so they point somewhat forward like the current GW jumppacks. Making holes and greenstuf pins will take time.
  You also see on the HH [Horus-Heresy] artbook pics that show the jumppacks something like sticking out plates on the back of the turbines. I made 4 of them on each

---

[25] Space Wolves is another Games Workshop created Space Marine Chapter. (Ex. 1 at 15).

turbine and I made them loose. The customer can either glue them on (they are form fitted) as per the HH pictures or he can opt to angle them outwards so they look like opened air brakes." (Ex. 58, CHS004689);

- If enough people whine about the size we could always spend an extra mold cost to shrink the jump pack a little. I made them smaller than pictured in the HH [Horus Heresy] visions artbooks but still..." (Ex. 59, CHS005432);

- "I have great hopes for quality pre heresy type ranges, thus all the heads I am making as well as the jump pack.
  ...
  It will be out along with a generic PH [Pre Heresy] backpack and 3 types of specific SW [Space Wolves] backpacks as well as PH [Pre Heresy] jump pack and dhelmets. Call it a complete them. I have hopes people who are into the PH [Pre Heresy] themes will buy whole sets for their armies." (Ex. 57, CHS015690); and

- On the Chapterhouse website, defendant admits that the accused product is "sculpted to fit in with the Heresy Style Jump Packs" and "Designed to fit on the standard Space Marines® back." (Ex 52)

## CHS's RESPONSE:

DISPUTED. Each statement quoted in GW's SUF 47 is irrelevant (FRE 402); is inadmissible hearsay (FRE 802); is improper speculation (FRE 701); and lacks foundation (FRE 602). In particular, each statement quoted in GW's SUF 47 concerning CHS's purported "intent to copy" is inadmissible hearsay (FRE 802), improper speculation (FRE 701), and without foundation (FRE 602).

- The quoted statements do not indicate an "intent to copy" but each indicates efforts to ensure compatibility and to identify the GW products with which players may wish to use the products.

- To the extent GW claims that a personal jet-propulsion unit with "two large turbo-fan type barrel jets with fins protruding out the bottom" is unique or original to GW, CHS disputes that statement. GW has no evidence that the idea of a jet backpack with twin turbines is protectable. GW has no evidence that CHS's particularized expression of jet turbines is substantially similar to any protectable elements of GW's alleged work.

- "sculpted to fit in with the Heresy Style Jump Packs" and "Designed to fit on the standard Space Marines® back" – GW selectively quotes and misquotes CHS's product description from GW'S MSJ Ex. 52, which reads in full:

"This is a set of FIVE (5) Resin Assault Jump Pack for 28mm models. It is sculpted to fit in with the older Heresy Era.

Capitible [*sic*] with the Games Workshop Assault Space Marines ® and suitable for any other 28mm scale miniatures as well.

Display model shown assembled with Games Workshop Space Marines ® model for compatibility purposes.

Models supplied unpainted and unassembled."

### [*Tyranid Products*]

**GW's Statement of Fact No. 48.**     In the Warhammer 40K universe, the Tyranids are a hive race of aliens whose weapons, technology, and vehicles are all organic in nature. (Ex. 1 at ¶23). While Games Workshop has made numerous miniatures representing various Tyranid creatures, Games Workshop's literature and other materials describe and provide artwork for additional Tyranid creatures. (Id.). Until recently, two such Tyranid creatures without a Games Workshop miniature were a Tervigon monster and a Mycetic Spore (or "Drop Pod") shown below. (Id.) The Mycetic Spore is depicted in Games Workshop's Tyranids Codex as something of an organic transport and landing vehicle for Tyranids from "Hive" ships[26] (Ex. 1 at ¶ 24):



Games Workshop's Tervigon
(Ex. 60 at 52, GW001422)



Games Workshop's Mycetic Spore
(Ex. 60 at 54, GW001424)

(Ex. 1 at ¶¶23 -24).

**CHS's RESPONSE:**

---

[26] A Hive ship is an interplanetary ship carrying a Tyranid army. (Ex. 1 at ¶ 24).

For purposes of its response to GW's Motion for Summary Judgment, CHS does not dispute GW's description of the Tyranids. However, CHS objects that GW's depictions of Tyranids speak for themselves. (FRE 1002.) To the extent GW's statement implies that the idea of "a hive race of aliens whose weapons, technology, and vehicles are all organic in nature" is original to GW or constitutes subject matter protectable by copyright, CHS disputes that statement.

CHS does not dispute that GW did not make a Tervigon monster miniature or a Mycetic Spore miniature prior to suing CHS for its "Tervigon conversion kit" and "Mycetic Spore" products.

Otherwise **DISPUTED**.

- The image depicted does not match GW's Exhibit 60 (GW0001424) and is obviously taken from a different source. The image is a single misleading detail from a larger picture, which self-evidently does not resemble CHS's product:



GW alleged work - GW0001424          CHS product - Kearney Decl. Ex. 6

GW MSJ Ex. 60; Product Binder (Dkt. 224-224.17) at tab 95.

- "The Mycetic Spore is depicted in Games Workshop's Tyranids Codex as something of an organic transport and landing vehicle for Tyranids from 'Hive' ships'" – **Disputed.** GW0001424 describes mycetic spores as "ablative bio-constructed shells" and "fleshy pods." GW MSJ Ex. 60. The depiction at GW MSJ Ex. 60 speaks for itself. (FRE 1002.)

- GW's produced documents do not refer to a "Mycetic Spore" as a "Drop Pod."

**GW's Statement of Fact No. 49.**      These Tyranid Products contain many unique elements:

- The Tervigon has numerous unique characteristics that are easier to appreciate from its picture. However, notable characteristics include, two small hind legs, four large pointed legs that each have a small horn extending off the "elbow" of the leg, several bony protrusions that extend off the back of the creature, and the overall stance of the creature. (Ex. 1 at ¶25); and

- The Mycetic Spore is a large pod-like shape with various tendrils or protrusions extending from the top that allow the pod to fall from space while transporting inside various other Tyranid creatures. (Ex. 1 at ¶25).

**CHS's RESPONSE:**

GW0001424

**DISPUTED**. The listed characteristics of the "Tervigon" and the "Mycetic Spore" works are not unique and are not original to GW. *See, e.g.*, the "bony protrusions" of HR Giger's "Necronomicon IV" work, which was the inspiration for the Alien in the movie of the same name (attached to CHS's Request for Judicial Notice filed concurrently herewith; image available online at Wikipedia website, http://en.wikipedia.org/wiki/File:H.R._Giger_-_Necronom_IV.jpg#filelinks):



GW's characterization of these as "Tyranid Products" is contradicted by GW's admission

at SUF 48 that the Tervigon and Mycetic Spore are "Tyranid creatures without a Games

Workshop miniature."

**GW's Statement of Fact No. 50.**    Chapterhouse has created and sells a "Tyranid Tervigon Conversion Kit" that allows a customer to convert a Games Workshop Carnifex[27] miniature into a miniature that looks like Games Workshop's picture of a Tervigon:





Games Workshop's Carnifex
(Ex. 61, GW002335)

Games Workshop's
Tervigon
(Ex. 60 at 52)

Chapterhouse's Tervigon Conversion Kit
applied to Carnifex
(Ex. 62, CHS001921)

This conversion kit contains the same unique characteristics as Games Workshop's depiction of a Tervigon, including two small hind legs, four large pointed legs that each have a small horn extending off the "elbow" of the leg, several bony protrusions that extend off the back of the creature, and the overall stance of the creature.

---

[27] A Carnifex is a type of Tyranid created by Games Workshop. (Ex. 1 at ¶ 26).

**CHS's RESPONSE:**

CHS does not dispute that it sells a kit to allow a customer to convert a Games Workshop Carnifex miniature into a different, larger creature.

Otherwise **DISPUTED**.

- "Tyranid Tervigon Conversion Kit" – **Disputed.** CHS sells a "Tervigon Conversion Kit for Carnifex Model." GW's Exhibit 62 depicts the kit under the name "Tervigon Kit to upgrade Carnifex."

- The allegedly "unique characteristics" GW lists are characteristics of *its own model*, not CHS's product.

GW very misleadingly claims that CHS's Conversion Kit "contains the same unique characteristics as Games Workshop's depiction of a Tervigon, including two small hind legs, four large pointed legs that each have a small horn extending off the 'elbow' of the leg, several bony protrusions that extend off the back of the creature, and the overall stance of the creature." But those features *are not part of CHS's accused product.* Rather, they are features of GW's *own* pre-existing "Carnifex" figure. Villacci Decl. ¶ 10; Kearney Decl. ¶ 36 & Ex. 28. GW reproduces an image of CHS's Kit that shows it assembled on top of a GW model (for purposes of showing fit and compatibility), but misleadingly shows an assembled version of its own "Carnifex" model that *omits* the relevant features – even though GW's "Carnifex" model as sold *does* include those features. A side-by-side comparison of two different views of GW's assembled "Carnifex" model with CHS's Conversion Kit, which is **shown assembled on a GW "Carnifex" model** to demonstrate fit and compatibility, shows that the only alleged similarities are due to the presence of GW's model in the picture, and are not part of CHS's product:

 

Kearney Decl. ¶ 36 & Ex. 28.



Detail from GW MSJ Ex. 62.

In fact, CHS's Conversion Kit contains only the following pieces, which are not substantially similar to GW's alleged works:

---

[28] GW's "Tyranid Carnifex" product, displayed on its website at http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1050178 (framing image of assembled "Carnifex"). Kearney Decl. ¶ 36 & Ex. 28.

[29] GW's "Tyranid Carnifex" product, as displayed on its website at http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1050178 (framing image of assembled "Carnifex"). Kearney Decl. ¶ 36 & Ex. 28.

[30] CHS Tervigon Conversion Kit for Carnifex Model, shown assembled on a GW "Carnifex" model to demonstrate fit and compatibility. DETAIL from GW MSJ Ex. 62.



Product Binder (Dkt. 224-224.17) at tab 37; *See* Declaration of Thomas J. Kearney in Support of

CHS's Motion for Summary Judgment ("Kearney MSJ Decl") Ex. 7, product no. 37. As shown

by the above images, GW's purported evidence concerning CHS's Conversion Kit misrepresents

the facts and the record.

    *See also* the "bony protrusions" of HR Giger's "Necronomicon IV" work, which was the

inspiration for the Alien in the movie of the same name (attached to CHS's Request for Judicial

Notice filed concurrently herewith; image available online at Wikipedia website,

http://en.wikipedia.org/wiki/File:H.R._Giger_-_Necronom_IV.jpg#filelinks):



**GW's Statement of Fact No. 51.**     Documents produced by Chapterhouse (and other documents not produced but which Games Workshop discovered independently) show Chapterhouse's clear intent to create a miniature from Games Workshop's artwork depicting Tervigon.

- Although Chapterhouse failed to produce documents from the designer of its Tervigon Conversion Kit[31], the designer himself, Sam Terry, posted images and commentary on the internet. The images show he used sculpting clay on top of the Games Workshop Carnifex model so that purchasers of the Chapterhouse conversion kit could transform their Games Workshop Carnifex into Games Workshop's drawing of a Tervigon. (Ex. 63);

- "I put up a few pictures of the pieces earlier today on secondsphere. I used adobe photoshop to cover up the GW plastic that was showing." (Ex. 64, CHS005980);

- In his posting on Secondsphere, Mr. Terry, explained how he copied from the Games Workshop drawing of a Tervigon present in the Tyranid Codex: "Have you seen the Tervigon Codex entry art? I tried my best to mak e these parts match up." (Ex. 63);

- In advertising the product on Warseer.com[32] Mr Villacci stated: "It's a nice design that builds upon the Carnifex kit, yet fits true to what most tyranid players envision the Tervigon to be like on the table" (Ex. 65, Warseer Posting at 1) He further stated: "Our Tervigon conversion kit has the parts necessary to turn your GW Carnifex kit into something that resembles one of their pictures." (Id. at 3); and

- Mr. Villacci explains his concept to the designer, Mr. Terry : "You are 100% correct that we don't use GW bits. Well that is a little true, you can use them as a base and sculpt on top of them, sort of like a skeleton, but if someone took our bits and compared them to GWs, you shouldn't be able to pick out GWs components in ours. My goal is to have a kit that will just fit over the Carnifex body, maybe even being able to have magnets if the user does that themselves." (Ex. 66, CHS004709).

**CHS's RESPONSE:**

Each statement in GW's SUF No. 51 is irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**, for the following reasons:

---

[31] The failure to produce such documents was despite the Court's order on March 6, 2012. (Ex. 4, Moskin Decl. ¶ 46) There is a suggestion that such documents may contain evidence of Chapterhouse's use of Games Workshop parts "designs". (Ex. 39, Frothers Unite! at 5 "Suddenly, you don't use GW models for your 'parts'. Guy used to brag about spitting in the face of GW, now he won't acknowledge that he uses their models.")

[32] Such documents are among the advertising material Chapterhouse refused to produce, notwithstanding the Court's December 23, 2011 order directing such production, notwithstanding that Chapterhouse identified such forums as the only places it advertised or promoted its products and notwithstanding reminders from Games Workshop. (Ex. 68)

- GW's statement that "Chapterhouse failed to produce documents from the designer of its Tervigon Conversion Kit" is false. CHS produced relevant documents from the designer of the "Tervigon Conversion Kit for Carnifex Model," Bates labeled 3RDPARTY00000021 -22 and 3RDPARTY00000027-35. Kearney Decl. ¶ 37. And, as GW's own exhibits show, CHS also produced emails between CHS and the designer.

- Each of the purported statements in GW's SUF 51 is inadmissible hearsay (FRE 802) and without foundation (FRE 602). In addition, the quoted statements shows, at most, that the designer of the "Tervigon Conversion Kit for Carnifex Model" took steps to ensure that the pieces of the Conversion Kit would fit properly on top of GW's "Carnifex" model, and the statements are not evidence of copying or intent to copy any GW work.

In particular:

- The statement attributed to third party website "Frothers Unite!" at SUF 51, n. 19, is inadmissible hearsay (FRE 802) and without foundation (FRE 602), and GW's interpretation of it is pure speculation.

- "The images show he used sculpting clay on top of the Games Workshop Carnifex model so that purchasers of the Chapterhouse conversion kit could transform their Games Workshop Carnifex into Games Workshop's drawing of a Tervigon" – **Disputed.** Inadmissible hearsay (FRE 802); lacks foundation (FRE 602); improper speculation (FRE 701).

- GW'S MSJ Ex. 65 prints only isolated pages from a longer thread and takes those pages out of context.

**GW's Statement of Fact No. 52.**    Chapterhouse created and sells a "Mycetic Spore for Tyranids":





Chapterhouse's Mycetic Spore for Tyranids
(Ex. 67, CHS001250)

Games Workshop's Mycetic Spore
(Ex. 60 at 54)

Chapterhouse's "Mycetic Spore for Tyranids" not only uses Games Workshop's name but contains the same unique features as Games Workshop's depiction of a Tyranid Mycetic Spore,

including a large pod-like shape with various tendrils or protrusions extending from the top that allow the pod to fall from space while transporting inside various other Tyranid creatures. There is no antecedent in science fiction or gaming for Games Workshop's Mycetic Spore.

**CHS's RESPONSE:**

CHS does not dispute that it manufactures and sells a product called "Mycetic Spore Pod."

Otherwise **DISPUTED**.

The image from GW'S MSJ Ex. 60 is a single misleading detail from a larger picture, which self-evidently does not resemble CHS's product:

 

GW alleged work - GW0001424          CHS product - Kearney Decl. Ex. 6

GW MSJ Ex. 60; Dkt. 224-224.17 (Product Binder) at tab 95.

The colored figures depicted as part of GW'S MSJ Ex. 67 are not CHS products, and are presented only to give customers a sense of scale and show compatibility of CHS's product with other 28mm scale miniature figures. Villacci Decl. ¶ 10.

The statement that "Mycetic Spore for Tyranids" "uses Games Workshop's name" lacks foundation (FRE 602) and is a improper conclusion of law. The statement is contradicted by

GW's SUF 30, which states "Chapterhouse produces products . . . for which Games Workshop

has not, or not yet, released a miniature." The statement is contradicted by the testimony of

GW's employees:

> Q . . . Now, has Games Workshop produced a Mycetic
> Spore miniature?
> A   No, Games Workshop has not produced a
> Mycetic Spore miniature.

Merrett II (Apr. 3, 2012) at 25:8-11 (the Alan Merrett Dep. Tr. Vol. 2 (Apr. 3, 2012)
("Merrett II") is attached to the Kearney Decl. as Ex. 29).

The claim that certain features of GW's work are "unique" is contradicted by the

testimony of GW's employees:

> Q   What are the copyrightable elements that
> Games Workshop contends is being infringed by Exhibit
> 102, the Chapterhouse product in front of you?
> A   It is the size, the shape, the context.
> There's lots and lots of textural elements, both on
> the illustration and actually on the page, and in fact
> throughout the whole book from which this page has
> being photocopied.

Merrett II at 26:5-12.

*See also* the "bony protrusions" of HR Giger's "Necronomicon IV" work, which was the

inspiration for the Alien in the movie of the same name (attached to CHS's Request for Judicial

Notice filed concurrently herewith; image available online at Wikipedia website,

http://en.wikipedia.org/wiki/File:H.R._Giger_-_Necronom_IV.jpg#filelinks):



GW's allegation of copyright infringement is contradicted by testimony of its employees:

> Q   For clarification, when you are saying
> that the Chapterhouse product is referencing the
> Mycetic Spores as described in Exhibit 103, are you
> saying it is directly copied from the illustration.
> Is it that the Chapterhouse product is a direct copy
> of that illustration in its Tyranid form?
> A   I did not say that.
> Q   Can you then clarify what the
> distinction is between copying and referencing?
> A   One is making a reference to and one is
> copying.  It is obvious really.  This is not a
> specific copy literally of this exact picture, but it
> is a reference to it.  Actually, it is a version of
> the thing flying down there.  The fact that that is a
> bit vague means that it is open to some level of
> interpretation, I suppose, but it is the context of
> this which is unmistakably copying a Games Workshop
> idea.  **I am sorry, it is a copy of our idea.  This
> thing is a copy of our idea.   That is the best I can
> come up with.**

Id. 31:21 – 32:15 (emphasis added).

The word "mycetic" is an adjective meaning "relating to or of the nature of a microbe."

Kearney Decl. ¶ 39 & Ex. 30 (Oxford English Dictionary definition).

The statement that the "various tendrils or protrusions extending from the top . . . allow

the pod to fall from space while transporting inside various other Tyranid creatures" lacks

foundation (FRE 602). To the extent the statement is admissible, it is evidence that those features

are functional and unprotectable by copyright, or that they are *scenes a faire* within the science fiction genre.

The statement that "There is no antecedent in science fiction or gaming for Games Workshop's Mycetic Spore" is irrelevant (FRE 402); is improper speculation (FRE 701); lacks foundation (FRE 602). Even if that were true (and it is not), copyright would not protect such an abstract idea.

The compound statement at footnote 20, stating (a) that a posting on third party site Warseer.com constitutes "advertising material" ; (b) that Chapterhouse refused to produce a copy of that post; (c) that the Court ordered CHS to produce a copy of that post; and (d) that "Chapterhouse identified such forums as the only places it advertised or promoted its products"; is false in all its parts. The post is not "advertising"; CHS never agreed to produce postings to third party websites, nor did the Court order it to do so; and the post is not within Chapterhouse's possession, custody, or control.

**GW's Statement of Fact No. 53.** Chapterhouse's documents confirm that it copied the design of the Mycetic Spore from Games Workshop's source materials:

- In an email entitled "Spore Pod for Tyranid concept art" from Mr Villacci to Castro Navarro, the designer of the Mycetic Spore, Mr. Villacci stated: "Saw the codex[33] at the store today (they wouldn't let me buy it)" (Ex. 69, CHS003522);

- Mr Villacci's message was in response to an earlier email from Mr. Navarro and a second designer, Wyatt Train a, from whom Mr Villacci sought comments, discussing the shape and features of the inchoate Mycetic Spore design. The same day, Mr Villacci circulated by email to yet another designer, Jeffrey Nagy, copies of Mr Navarro's drawings (which closely resemble the final CH product and the image in GW's Tyranids Codex). (Ex. 70, CHS003525-27); and

- Mr. Navarro explains his inspiration: "I see hive ships eject lots of spores towards planets and little to no manouvre would be required..." (Ex. 69, CHS003523).

---

[33] Codex" is the term used by Games Workshop to identify the rulebook/background story for the different races in Warhammer 40K. (Ex. 1 at ¶ 6).

**<u>CHS's RESPONSE</u>:**

Each statement in GW's SUF No. 3 is irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**, for the following reasons:

- The statements from Mr. Navarro are irrelevant (FRE 402); are inadmissible hearsay (FRE 802); and lack foundation (FRE 602).

- The statement that "Mr Navarro's drawings . . . closely resemble the final CH product and the image in GW's Tyranids Codex" lacks foundation (FRE 602) and is an improper conclusion of law.


*[Javelin Class Jet Bike]*

**<u>GW's Statement of Fact No. 54.</u>** One of the vehicles in the Warhammer 40K universe that may be used by Space Marines is a Jet Bike. (Ex. 1 at ¶27 ). The *Horus Heresy* books show a picture of what this Jet Bike looked like in the pre-heresy days. (Id.) Additionally, Games Workshop produces and sells a Space Marine Bike, for which portions of the plastic model are shown below (Id.):



Games Workshop's Space Marine Jet Bike
(Ex. 48 at 15, GW001893)



Games Workshop's Space Marine Bike
(Ex. 71)

(Ex. 1 at ¶¶27-28). Both Games Workshop's depiction of a Space Marine Jet Bike and its Space Marine Bike contain unique characteristics, including the overall shape, a grilled front, and two large exhaust pipes on each side of the rear of the bike. (Id. at ¶29 ).

**<u>CHS's RESPONSE</u>:**

**DISPUTED.** GW's "plastic model" of a Space Marine Bike is unprotectable by

copyright under governing UK law. Kearney Decl. ¶ 22 & Ex. 17 (Bently Expert Report) at ¶ 38

("as a general matter, a toy miniature of a fictional charcter is unlikely to be protected by copyright as a 'sculpture.'"")

Both depicted bikes do not share the same supposed "unique characteristics".

The supposed "unique characteristics" are not protectable by copyright because they are unprotectable ideas:

- The idea of depicting a bike that has "the overall shape" of a bike;
- The idea of depicting a bike with a grilled front;
- The idea of depicting a bike with four exhaust pipes flanking the rear

**GW's Statement of Fact No. 55.**    Chapterhouse has created and sells a "Javelin Class Imperial Jet Bike."



Chapterhouse's Javelin Class Imperial Jet Bike
(Ex. 72)

Chapterhouse's Jet Bike contains the same unique characteristics as Games Workshop's products including the overall shape, a grilled front, and two large exhaust pipes on each side of the rear of the bike.

**CHS's RESPONSE:**

CHS does not dispute that it sells a product called a "Javelin Class Imperial Jet Bike."

Otherwise **DISPUTED**, for the following reasons:

- The listed characteristics are not "unique" but merely unprotectable ideas.

- GW's depiction of CHS's product is misleading because the product is depicted assembled, and is shown combined with pieces that are not part of the product itself. *See*

Product Binder (Dkt. 224-224.17) at tab 121 (including images of CHS's product and a true and correct copy of CHS's website).

**GW's Statement of Fact No. 56.**    The documents and testimony of Chapterhouse and its designers establishes Chapterhouses' intent to copy from not only the *Horus Heresy* artwork but also from the regular Space Marine Bike produced and sold by Games Workshop as well as from the legs of Games Workshop's genuine Space Marines to complete the fit:

- In designing the Javelin Class Jet Bike, Mr. Fiertek (the minority owner of CH) counseled the third-party designer, Mr Nagy, to "Think of a normal SM [Space Marine] bike with so me added length to it." (Ex. 73, JN001698);

- Mr. Fiertek further offered: "Would you like me to provide all the jetbike pictures from all the horus heresy artbooks for added inspiration? I could take pics from the books and you could see an amalgamation of all the 40K artists individual takes on the jetbikes ..." (Ex. 73, JN001698);

- However, that proved unnecessary as Mr. Nagy confirmed the next day: "I have the Horus Heresy books. I've been looking at them." (Ex. 73, JN001698);

- After the designer, Mr. Okamura, received the resin cast from the manufacturer he exchanged emails with Mr Villacci in which the discussed how to get a Space Marine to sit in their copy of the jetbike: CH's owner stated: "The bike's overall size and length matches with GW's bike but the seats, controls/handle bars are proportionately too small for the rider." (Ex. 74, MO0000403);

- The designer initially explained: "I'll start working on the space marine compatible biker legs tomorrow," adding separately: "I personally would have no problems using the Space Marine biker legs as it is and just ignore the back foot pedals." (Ex. 75, MO00411);

- On October 17, 2011, Mr Villacci began advertising the product as his "next toy to release for the Heresy Era 40K players." (Ex. 65, Warseer at 6);

- Explaining that Chapterhouse had also copied the arms and legs of Games Workshop figures (to be used to mount the Games Workshop torsos), Mr. Villacci explained that the  kit also includes "a set of legs and arms that will allow you to use other companies torsos and heads to model a rider." (Id); and

- In response to one of Chapterhouse's unproduced marketing posts on an online forum, the reaction to seeing the Jet Bike was "It's so obvious that you took a SM torso, did a poor job of filing off the crest on the front (it's so obvious, it's funny) and then sculpted on your own back design and made castings of that." (Ex. 39, Frothers Unite! at 6).

**CHS's RESPONSE:**

Each statement of GW's SUF 56 is irrelevant to any issue in this case

Otherwise **DISPUTED**.

Each of the quoted statements from third parties is inadmissible hearsay (FRE 802) and

lacks foundation (FRE 602). The statement quoted from a third party website is also improper

speculation (FRE 701).

*[Space Marine Shoulder Pads]*

**GW's Statement of Fact No. 57.** Most Space Marines wear Power Armour, an advanced suit of strength enhancing combat armor consisting of thick ceramite containing a full suite of life-support functions to operate in hostile environments. (Ex. 1 at ¶30). Over the history of the Warhammer 40K Universe there have been various advancements to the Power Armour, starting with Mark I through to the current Mark VIII version. (Id.) An example of the Mark VIII Power Armour is below:


Post-Heresy Armour
(Ex. 49 at 71)


Space Marine Shoulder Pad
(Ex. 76 at 13; Ex. 77)


Back of Space Marine
Shoulder Pad
(Ex. 125)

**CHS's RESPONSE:**

Each statement of SUF 57 is irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**. GW's statements are without foundation (FRE 602) because a

"Space Marine" is a miniature toy soldier, and neither GW's Space Marine toy soldier nor any of

GW's scale miniature armor bits has the described characteristics.

The statement concerning "the history of the Warhammer 40K Universe" lacks

foundation (FRE 602) because it is an imaginary universe with an imaginary timeline, thus the

term "advancements" lacks foundation and is meaningless.

CHS further objects to GW's images and references to exhibits as follows:

- The image of Exhibit 125 depicted in GW's SUF 57 does not appear to match the image attached to the Merrett Decl. as Exhibit 125. (The Merrett Decl. also refers to Exhibit 125 as GW00002698, but it bears an entirely differentBates number.) Accordingly it is unclear what the image depicted in Merrett Decl. ¶ 30 and GW's SUF 57 represents.

- GW'S MSJ Ex. 77 was not produced by GW and the Court should disregard this improper and untimely attempt to supplement the record.

- GW's Exs. 49 and 76: GW's SUF and the Merrett Decl. (Ex. 1) include color versions of GW's Exs. 49 and 76 (GW0011390), each of which was produced only in black and white, despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Docket No. 171). The Court should disregard this improper and untimely attempt to supplement the record. Dkt. 139 (ordering GW to "produce the best exemplar of the works in question").

- GW's Ex 76 was not produced before the close of fact discovery, and the Court should disregard this improper and untimely attempt to supplement the record.

- GW'S MSJ Ex. 125 lacks foundation (FRE 602).

**GW's Statement of Fact No. 58.** One of the numerous iconic aspects of Games Workshop's Power Armour is the shoulder pad. (Ex. 1 at ¶ 31). The shoulder pad is a convex shape with a curve at the top and a straight edge at the bottom. (Id.) There is often a large band or rim extending along the entire outer edge of the shoulder pad. (Id.) As part of the Power Armour, the shoulder pad begins above the shoulder and ends right above the elbow. (Id.) The pads are curved in a manner such that it does not cover a large portion of either the chest or the back of the Space Marine. (Id.) On the reverse side of the shoulder pad, there are typically a series of spaced indentations that serve no functional purpose but as Alan Merrett explained, they are used by Games Workshop to create a technical appearance. (Id.; Ex. 78, Merrett Tr. at 46:12-47:17)

**CHS's RESPONSE:**

CHS does not dispute that GW's shoulder pads have the simple form of "a convex shape

with a curve at the top and a straight edge at the bottom."

Otherwise **DISPUTED**.

GW's statement that its miniature shoulder armor bits are "iconic" is contradicted by its

admission in the same paragraph that not all of them share the same features, but merely "often"

share the same characteristics, or "typically" have certain features.

- "the shoulder pad begins above the shoulder and ends right above the elbow" – **Disputed.** This is not a characteristic of a shoulder pad, but merely describes it in relationship to a hypothetical toy soldier.

- "The pads . . does [*sic*] not cover a large portion of either the chest or the back of the Space Marine." - **Disputed.** This is not a characteristic of a shoulder pad, but merely describes it in relationship to a hypothetical toy soldier.

- "there are typically a series of spaced indentations" – vague and ambiguous; without foundation (FRE 602).

**GW's Statement of Fact No. 59.**　Chapterhouse has created and sells a "Generic Power Armour Shoulder Pad for Space Marine:





Chapterhouse's Generic Power Armour
Shoulder Pad for Space Marine
(Ex. 79)

Back of Chapterhouse Power Armour Shoulder
Pad for Space Marine
(Ex. 126)

Chapterhouse's "Generic Power Armour Shoulder Pad for Space Marine" contains the same features as Games Workshop's iconic Space Marine Shoulder Pad, including a convex shape with a curve at the top and a straight edge at the bottom, a large band extending along the entire outer edge of the shoulder pad. When applied to power armour, the shoulder pad begins above the shoulder and ends right above the elbow; the shoulder pad is curved in a manner that it does not cover a large portion of either the chest or the back of the Space Marine. Many of Chapterhouse's shoulder pads also contain the same purely aesthetic indentations on the back of the shoulder pad, which Mr. Villacci admitted under oath were added for "esthetics" only so as to accommodate "players ...that [are] picky about details on their models, we wanted to put them on there so that they would be similar to the ones that Games Workshop has" and that the only "function" is to serve an aesthetic purpose "in the fiction, like, strengthening function" (Ex. 16 at 172:9-20.) Chapterhouse's expert admitted that Games Workshop's design of its shoulder pads

was not the same or similar to any design he found in prior military history. (Ex. 4 at 133:21-134:20).

**CHS's RESPONSE:**

CHS does not dispute that it sells a product called "Power Armor Shoulder Pad – Plain."

Otherwise **DISPUTED**.

- Contrary to the representation made in Moskin Decl. ¶ 86, the purported depiction of CHS's "Power Armour Shoulder Pad for Space Marine" represented in GW's SUF 59 is not an image of a CHS product. Villacci Decl ¶ 9.

- GW does not identify "indentations" on the back of shoulder pads as an infringed feature of its products. Original Copyright Claim Chart, First Rev. Copyright Claim Chart, Second Rev. Copyright Claim Chart.

- GW depicts a painted example of CHS "Power Armor Shoulder Pad – Plain", but it is undisputed that CHS's products, including this one, are sold unpainted. Villacci Decl. ¶¶ 4-5.

- GW's Exhibit 126 is not an image of the back of CHS's "Power Armor Shoulder Pad for Space Marine", as it purports to be. Because GW gives no foundation for its Exhibit 126, it is impossible to ascertain the actual source of the image, but it is clearly not CHS's product, which is depicted below:




Back of CHS "Power Armor Shoulder Pad for Space Marine (CHS Product No. 54)

DETAIL of GW MSJ Ex. 126

Villacci Decl. ¶ 9; Kearney Decl. ¶ 2 & Ex. 1 (showing image of the actual CHS product);

Kearney MSJ Decl. Ex. 7, product no. 54 (actual CHS product).

- The features of GW's supposedly "iconic" shoulder pad are concededly not consistent across GW's products, and GW fails to produce an exemplar of any work that CHS's product allegedly infringes.

- CHS's product does not contain any "indentations on the back."

- GW misrepresents the testimony of CHS's expert witness, who merely stated that he was "not expressing any expert opinion that the design of Games Workshop shoulder pads [was] the same or very similar to any design [he] found in prior military history." GW'S MSJ Ex. 4 at 134:12-16). That statement is irrelevant to any issue in this case. FRE 402.

**GW's Statement of Fact No. 60.**　　　According to the Warhammer 40K universe, the right shoulder pad of a Space Marine contains a symbol and a roman numeral identifying the squad number and squad type to which the Space Marine belongs. (Ex. 1 at ¶32). Each Space Marine Chapter consists of roughly 1000 Space Marines, with 100 Space Marines in 10 Companies. (Id.) Each company is in turn divided into 10 "squads" of 10 Space Marines. (Id.) In general, a company has six Tactical Squads (equipped to fight in a broad range of conditions), two Assault Squads (equipped to fight at close quarters), and two Devastator Squads (equipped to provide heavy weapons support). (Id.)

- Tactical Space Marines are represented by an upward pointing arrow and given roman numerals I through VI on their shoulder pads (Id.);



Shoulder Pads for Tactical Space Marines
(Ex. 76 at 13)

- Assault Space Marines are represented by a crossed X and given roman numerals VII and VIII on their shoulder pads (Ex. 1 at ¶ 32); and



Shoulder Pads for Assault Marines
(Ex. 76 at 13; Ex. 80, GW002323)

- Devastator Space Marines are represented by a chevron (inverted V) and given roman numerals IX and X on their shoulder pads (Ex. 1 at ¶32).



Shoulder Pads for Devastator Space Marines
(Ex. 76 at 13, Ex. 81 at 70, GW1288)

## CHS's RESPONSE:

**DISPUTED**.

The rules of GW's "imaginary universe" do not specify a single symbol for each type of space marine. *See* GW MSJ Ex. 81 (GW0001288) (setting out various insignia, with and without Roman numerals, and explaining that "[t]he style of marking . . . can vary between Companies and even with a company itself").

CHS further objects to GW's images and references to exhibits as follows:

- GW's MSJ Ex. 76: GW's SUF and the Merrett Decl. (Ex. 1) include color versions of GW'S MSJ Ex. 76 (GW0011390), which was produced only in black

and white, despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question".). The Court should disregard this improper and untimely attempt to supplement the record.

- GW's Ex 76 was not produced before the close of fact discovery, and the Court should disregard this improper and untimely attempt to supplement the record.

**GW's Statement of Fact No. 61.**      Chapterhouse has created and sells "Tactical Shoulder Pads for Space Marines", "Assault Shoulder Pads for Space Marines", and "Devastator Shoulder Pads for Space Marines":



Tactical Shoulder Pad for Space Marine
(Ex. 79)



Assault Shoulder Pad for Space Marine
(Ex. 79)



Devastator Shoulder Pad for Space Marine
(Ex. 79)

Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique features as those created by Games Workshop. In addition to copying the iconic style of Games Workshop's basic Space Marine Shoulder Pad, these products use the same icons (arrows, crossed-Xs, and chevrons), placed in the same orientation, and of about the same size. Thus, the icons are used to depict the same squad types of identified in the Warhammer 40K universe. Moreover, Chapterhouse uses only the same Roman Numerals and only in the same combinations as does Games Workshop (I-VI for Tactical, VII-VIII for Assault, and IX-X for Devastator), thus copying and never varying from the fictional meanings given to the symbols by Games Workshop.

**CHS's RESPONSE:**

**DISPUTED**, for the following reasons:

- GW's shoulder pads are not "iconic." *See* CHS Response to GW SUF 60.

- The features of GW's shoulder pads are not "unique." *See* CHS Response to GW SUF 60.

- The rules of GW's "imaginary universe" do not specify a single symbol for each type of space marine. *See* GW'S MSJ Ex. 81 (GW0001288) (setting out various insignia, with and without Roman numerals, and explaining that "[t]he style of marking . . . can vary between Companies and even with a company itself")

- The statement that CHS copies "the fictional meanings given to the symbols" is vague, ambiguous, without foundation (FRE 402), speculative (FRE 701), and makes no sense because a "meaning given to [a] symbol" cannot be copied.

The statement that "the icons are used to depict the same squad types of identified [sic] in the Warhammer 40K universe" is without foundation (FRE 602), is improper speculation (FRE 701), and is irrelevant to any issue in this case. FRE 402. "Common geometric shapes cannot be copyrighted," per *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 303 (7th Cir. 2011). The U.S. Copyright Office refuses to base copyright registration on the very same simple and "standard ornamentation" at issue here, "such as chevron stripes . . . a plain, ordinary cross . . . common geometric figures or shapes . . . a standard symbol such as an arrow or a five-pointed star . . . ." U.S. Copyright Office, Compendium II: Copyright Office Practices §503.02(a) (b). Also not copyrightable are simple, basic three-dimensional shapes, such as the shape of GW's "sci-fi shoulderpad," or other "common geometric figures or shapes in three dimensional form, such as the cone, cube, or sphere . . . the creative expression capable of supporting copyright must consist of something more than the mere bringing together of two or three standard forms or shapes with minor linear or spatial variations." *Id.* Typefaces, such as Roman numerals, also cannot be copyrighted. *Eltra Corp. v. Ringer*, 579 F. 2d 294, 298 (4th Cir. 1978) ("typeface is an industrial design in which the design cannot exist independently and separately as a work of art"); 37 C.F.R. § 202.1 ("works not subject to copyright . . . [include] familiar symbols or designs; mere variations of typographic ornamentation . . . [and] [t]ypeface as typeface.").

Combinations of two simple, unprotectable symbols, such as a chevron, arrow, or X symbol, together with a Roman numeral, or a sawblade in combination with a simple jewel, are also unprotectable, since "a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003); Copyright Compendium II § 503.02(a)-(b) ("[R]egistration cannot be based upon . . . a simple combination of a few standard symbols. . . [or] the mere bringing together of two or three standard forms or shapes with minor linear or spatial variations.").

- The statement that "Chapterhouse uses only the same Roman Numerals and only in the same combinations as does Games Workshop" is irrelevant to any issue in this case, and is contradicted by GW's admission that CHS sells products with the unprotectable public domain designs of an arrow, crossed arrows, and chevrons, but *without* Roman numerals.

- CHS further objects to GW's images and references to exhibits as follows:

  - GW depicts CHS's products in color, although it is undisputed that all of CHS's products are sold unpainted. Villacci Decl. ¶¶ 4-5.


**GW's Statement of Fact No. 62.**　　Chapterhouse's documents confirm its intent to copy Games Workshop's icons and numbering scheme for its Space Marine shoulder pads:

- "With that ok, I will finish the other Tactical Badge shoulder pads. By this time tomorrow I can e-mail to you all the .stl files for the following:
  Assault Symbol (without number)
  Devastator Symbol (without number)
  Tactical Symbol (without number)
  Blank (Mk6 Armor)
  ...
  T1 (Tactical Sqd. 1)
  T2 (Tactical Sqd. 2)
  T3 (Tactical Sqd. 3)
  T4 (Tactical Sqd. 4)
  T5 (Tactical Sqd. 5)
  T6 (Tactical Sqd. 6)
  Standard Shoulder Pad" (Ex. 82, CHS003109-10);

- "I plan on creating more shoulder pads but the ones I've shown you are pretty much done. In case you have forgotten I have created:



(Ex. 54, CHS003141-42);

- "Any word from Nick on the legality of the number, devastator, assault and arrow pads? They are direct copies of GW art, at least with the normal rim and I know our attorney should have his say on them but I havent heard anything yet, I take it you and Nick have okeayed them." (Ex. 83, CHS009903);

- "You had asked me to put roman numerals on the shoulder pads with the tactical/assault/devastator markings. How many different numbers did you want and on which pads?" (Ex. 84, CHS009925); and

- "did ALL arrow pads, both 7+8 assault pads and both 9+10 dev pads" (Ex. 85, CHS017286).

## CHS's RESPONSE:

**DISPUTED**. Each statement quoted is inadmissible hearsay (FRE 802) and without foundation (FRE 602).

"Games Workshop's icons" – **disputed**: the icons depicted are in the public domain, and not original to GW. *See* Response to GW SUF No. 61 (common geometric shapes and combinations of two simple, unprotectable symbols are also unprotectable).

"Games Workshop's . . . numbering scheme" – **disputed**: a "scheme" that consists of using Roman numerals from 1 to 10 is not original and is unprotectable by copyright. Roman numerals are unprotectable by copyright because they are examples of unprotectable typeface; are in the public domain; and/or are simple geometric shapes. Typefaces, such as Roman numerals, cannot be copyrighted. *See* Response to GW SUF No. 61 above; *Eltra Corp. v. Ringer*, 579 F. 2d 294, 298 (4th Cir. 1978) ("typeface is an industrial design in which the design cannot exist independently and separately as a work of art"); 37 C.F.R. § 202.1 ("works not subject to

copyright . . . [include] familiar symbols or designs; mere variations of typographic

ornamentation . . . [and] [t]ypeface as typeface.").

    **GW's Statement of Fact No. 63.**    In addition to the numerical iconography on the right shoulder pad of the Space Marines, according to the Warhammer 40K universe, the left shoulder pad of a Space Marine contains an icon indicating the specific Space Marine Chapter to which the Space Marine belongs. (Ex. 1 at ¶33). While there were originally only 20 Space Marine Legions, after the Horus Heresy rebellion, the legions were broken down into a much larger number of smaller Space Marine Chapters. (Id.) Each Space Marine Legion and Chapter has in turn, its own detailed history, legends, characters, weapons, vehicles, culture, and their own unit icon. Some of the relevant unit icons created by Games Workshop are below:






Excorcist Chapter
(Ex. 86 at 33,
GW001503)

Flesh Tearer Chapter
(Ex. 49 at 71,
GW001727)

Iron Snakes Chapter
(Ex. 49 at 70,
GW001726)

Soul Drinkers Chapter
(Ex. 87, GW002391)





Blood Raven Chapter
(Ex. 49)

Celestial Lions
Chapter
(Ex. 86 at 33,
GW001503)

Legion of the Damned
(Ex. 88 at 21,
GW00803)

**CHS's RESPONSE:**

    Each statement is irrelevant to any issue in this case and is without foundation (FRE 602).

    GW has no evidence that it owns the image depicted in its Exhibit 87 (GW0002391). GW

alleges that this image was created by Adrian Smith in 2002 (Second Rev. Copyright Claim

Chart, entry 23),but concedes that Smith was not its employee at the time he created the work

(3d Supp. Rog 22 Response, claiming Adrian Smith was a GW employee between Jan. 12, 2008

and Nov. 9, 2009), and has no assignment of copyright from Smith.

GW has no evidence that its "unit icons" were "created by Games Workshop."

CHS further objects to GW's images and references to exhibits as follows:

- Ex. 49 (GW0001726-27): GW's SUF and the Merrett Decl. (Ex. 1) include color versions of GW'S MSJ Ex. 49, which was produced only in black and white, despite the Court's order that despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question".). The Court should disregard this improper and untimely attempt to supplement the record.

**GW's Statement of Fact No. 64.**     Each chapter icon has a unique design:

- Exorcist Chapter - Primary colors are black and red with an icon of a skull (missing the bottom jaw) with downturned curved horns (Ex. 1 at ¶ 34);

- Flesh Tearer Chapter - Primary colors are black and red with an icon of a flat, toothed saw-blade with a drop of blood in the center of the blade (Ex. 1 at ¶ 34);

- Iron Snakes Chapter - Primary colors are blue and red with an icon of the profile view of a snake with several tight undulations (Ex. 1 at ¶ 34);

- Soul Drinkers Chapter - Primary colors are gold and purple with an icon of a chalice with light rays extending out of the top of the chalice (Ex. 1 at ¶ 34);

- Blood Raven Chapter - Primary colors are black and red with an icon of a set of wings with a drop of blood in the center (Ex. 1 at ¶ 34);

- Celestial Lions Chapter - Primary colors are blue and yellow with an icon of a lion (Ex. 1 at ¶ 34); and

- Legion of the Damned - Primary colors are red and black with an icon of a partial skull (missing the bottom jaw), a horizontal line across the forehead, and flames coming from the top of the skull (Ex. 1 at ¶34).

**CHS's RESPONSE:**

**DISPUTED.**

CHS disputes that the design of any of GW's alleged "chapter icons" is unique. Each of GW's statements to that effect is without foundation (FRE 602) and is improper speculation (FRE 701).

CHS further objects to GW's images and references to exhibits as follows:

- Ex. 49 (GW0001726-27): GW's SUF and the Merrett Decl. (Ex. 1) include color versions of GW'S MSJ Ex. 49, which was produced only in black and white, despite the Court's order that despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question".). The Court should disregard this improper and untimely attempt to supplement the record.

**GW's Statement of Fact No. 65.** Chapterhouse has created and sells shoulder pads for Space Marines that correspond to each of these Space Marine chapters:


Power Armour Pad for Exorcist (Ex. 89, CHS01266)


Sawblade Shoulder Pad & Jewel (Ex. 18 at 2)


Shoulder Pads for Serpent or Iron Snakes (Ex. 90, CHS001097)


Shoulder Pads for Chalice or Soul Drinker (Ex. 91, CHS01559)


Blood Eagle Power Armor Shoulder Pad (Ex. 92, CHS01541)


Celestial Lions Shoulder Pads for Space Marines (Ex. 93, CHS01153)


Shoulder Pad w/ Skull and Flames For Space Marines (Ex. 94, CHS01159)

## CHS's RESPONSE

**DISPUTED**. The statement that CHS's products "correspond" to GW's alleged chapters is vague, ambiguous, and without foundation (FRE 602). The term "these Space Marine Chapters" is vague and ambiguous.

GW also depicts CHS's products as colored, but it is undisputed that the products are sold unpainted. Villacci Decl. ¶¶ 4-5.

The names of CHS's products are irrelevant to the substantial similarity analysis. (FRE 402.)

CHS's products (which are sold unpainted) are not substantially similar to the protectable elements of any of GW's alleged works. To the extent they depict similar ideas, that is not copyright infringement, for "[n]o author may copyright his ideas." *Feist Pubs., Inc. v. Rural Television Serv. Co.*, 499 U.S. 340, 344-45 (1991) (citation and quotation marks omitted). Each of the above images resembles GW's works only to the extent (if any) that they depict unprotectable, abstract ideas, devoid of reference to any particularized expression. *See, e.g.*, Second Rev. Copyright Claim Chart at Entry 3 (alleging infringement because "[GW's] iconography heavily features skulls."), *id.* at entry 105 (alleging infringement because "Games Workshop sells products decorated with piles of skulls"). With respect to the above images, after filtering out unprotectable elements, the only similarities are the unprotectable ideas of: combining a common or public domain symbol with a blood drop; depicting a skull with downturned horns; depicting a slithering snake; depicting a chalice with flames coming from the cup; depicting a lion; or depicting a skull with flames coming out of the top.

**GW's Statement of Fact No. 66.** Chapterhouse's Shoulder Pads for Space Marines contain the same unique characteristics (and typically the same name) as the Space Marine Chapter icons created by Games Workshop and are all combined with the unique shape of the Games Workshop shoulder pads:

- Power Armour Pad for Exorcist - Primary colors are black and red with an icon of a skull (missing the bottom jaw) with downturned curved horns;

- Sawblade Shoulder Pad & Jewel - Primary colors are black and red with an icon of a flat, toothed saw-blade with a drop of blood in the center of the blade;

- Shoulder Pad for Serpent or Iron Snakes - Primary color is blue with an icon of the profile view of a snake with several tight undulations;

- Shoulder Pads for Chalice or Soul Drinker - Primary colors are gold and purple with an icon of a chalice with light extending out of the top of the chalice;

- Blood Eagle Power Armor Shoulder Pad – Primary colors are black and red with an icon of a set of wings with a drop of blood in the center;

- Howling Griffon Shoulder Pad for Space Marines – Primary colors are red and yellow with an icon of a lion;

- Shoulder Pad w/ Skull and Flames for Space Marines – An icon of a partial skull (missing the bottom jaw), a horizontal line across the forehead, and flames coming from the top of the skull.

## CHS's RESPONSE:

**DISPUTED**. CHS disputes GW's verbal descriptions of each purported design, which are irrelevant (FRE 402), without foundation (FRE 602), and inadmissible hearsay (FRE 802). The images speak for themselves. (FRE 1002.)

The characteristics of GW's shoulder pads are not "unique" and are not the same for all such works. CHS's products are not substantially similar to protectable elements of any of GW's shoulder pads.

"typically the same name" – irrelevant (FRE 402); vague and ambiguous; lacks foundation (FRE 602).

"Space Marine Chapter icons created by Games Workshop" – **Disputed**: states a legal conclusion; lacks foundation (FRE 602); GW has no evidence showing that each such symbol was created by GW or its employees.

"unique shape of the Games Workshop shoulder pads" – **Disputed**: the shape is not the same for all such works and is not unique.

**GW's Statement of Fact No. 67.**     Chapterhouse's expert admitted there [sic] looking through all of the shoulder pads he identified from prior history, he did not see any shoulder pads with any insignia or design on them. (Ex. 5 at 137:22-138:2). He was unable to point to anywhere in military history where emblems or designs are applied to shoulder pads. (Id. At 138:3-6). Furthermore, while Chapterhouse's expert testified that he had found certain decorative elements (not on shoulder pads) in prior military history (such as griffins, lions, scales, etc.), he was unable to express any opinion on whether any of Games Workshop's particular combinations of decorative elements were present or common in prior military history. (Id. at 165:5-166:17). He even concluded that in his experience "applications of these designs to certain things like shoulder pads is not common in military history." (Id. at 166:18-23). Similarly, Chapterhouse has been unable to identify anything it used for its so-called "independent creation" except for identifying random isolated elements, such as a lion or a griffin. (Ex. 95, Resp. to Interrog. No. 2).

**CHS's RESPONSE:**

**DISPUTED**. The first sentence is incomprehensible. That CHS's expert did not see such symbols applied specifically to shoulder pads is irrelevant to any issue in this case. FRE 402. GW, which bears the burdens of production and persuasion on each element of its copyright case, cannot place the burden on defendant to prove a negative. CHS's products are not substantially similar to the protectable elements of any of GW's alleged works. To the extent they depict similar ideas, that is not  copyright infringement, for "[n]o author may copyright his ideas." *Feist Pubs., Inc. v. Rural Television Serv. Co.*, 499 U.S. 340, 344-45 (1991) (citation and quotation marks omitted). To the extent (if any) that both CHS's products and GW's alleged works depict unprotectable, abstract ideas, devoid of reference to any particularized expression, that is not the basis for a claim of copyright infringement. After filtering out unprotectable elements, the only similarities (if any) are such unprotectable ideas.

In particular, CHS objects to the following quoted statements:

- "he did not see any shoulder pads with any insignia or design on them" – **disputed:** misrepresents the testimony of Chapterhouse's expert, who stated:

> Q. And all of the shoulder pads we looked
> at that you identified from prior history, did you
> see any of those shoulder pads with any insignia or
> design on them?
> A. Not to my recollection, no.

Brewster Dep. at 137:22 – 138:2 (GW MSJ Ex. 5).

- "He was unable to point to anywhere in military history where emblems or designs are applied to shoulder pads" – **disputed:** misrepresents the testimony of Chapterhouse's expert, who stated only that his report did not contain such examples. *Id.*

- "he was unable to express any opinion on whether any of Games Workshop's particular combinations of decorative elements were present or common in prior military history" – **disputed:** misrepresents the testimony of Chapterhouse's expert, who was not asked and did not address the question of "particular combinations of decorative elements":

> Q. Which decorative elements do you cite?
> A. Birds of prey, eagles, griffins, lions,
> crowns and wreaths and hands and arrows, spears,
> scales, serpents. They are all cited in the first
> section, and it goes on to geometric forms. Do you
> want me to continue?
> Q. I want you to identify which design
> elements you believe are common in military
> history.
> A. Arrows, yes. Arrows and chevrons,
> skulls and cruciform designs, various forms of
> crosses, the use of gears and Roman numerals.
> Q. And is that the extent of your opinion
> on what design elements are common in military
> history?
> A. That's the extent of those elements that
> I encountered while viewing the Workshop binder.
> Q. So those are the only design elements
> you are commenting on in your expert report?
> A. Correct.
> Q. Are you expressing -- strike that.
> One of the examples you identified was a

hand.

    A.   Yes.

    Q.   Would you agree that there are various ways you could depict the hand in a design?

    A.   Certainly.

    Q.   Are you expressing anywhere in your expert report that certain designs of a hand are common in military history?

    A.   No.

    Q.   And would the same be true for all the design elements you listed that while that concept might be common, you are not commenting on whether any particular design or expression of that concept is common in military history?

    A.   Correct.

Brewster Dep. at 165:5 – 166:17 (*id.*).

•    "in his experience 'applications of these designs to certain things like shoulder pads is not common in military history.'" – **disputed:** irrelevant (FRE 402), lacks foundation (FRE 602). There is  no foundation for the proposition that any of GW's designs are applied to shoulder pads. Furthermore, the surface to which a design is applied is irrelevant to analyzing substantial similarity.

•    "Chapterhouse has been unable to identify anything it used for its so-called "independent creation" except for identifying random isolated elements, such as a lion or a griffin." – **disputed:** lacks foundation (FRE 602); misrepresents the record. The cited document reads in pertinent part:

> . . . Chapterhouse draws inspiration in varying degrees from many different disciplines and sources, including, but not limited to mythology, military history, fiction, film, videogames, physics, biology, gaming, and many other disciplines and areas of study and cultural expression. Chapterhouse notes that the Internet provides a wealth of informational and inspirational material for all creative endeavors, and that Chapterhouse performs Internet and other research when creating its products.

> Specifically, Chapterhouse responds that the Dungeons and Dragons hammer weapons provided inspiration for Chapterhouse's war hammers. The designs for the Celestial Lions were inspired by photographs submitted by a customer, one of a public sculpture with the head of a lion and the body of a fish, and the other of a lion in silhouette. Chapterhouse's products that look like circular-saw blades were based on actual circular saw blades. The snake on some of the Chapterhouse products was based on an image of classical Greek art. The Star Fox logo on some of Chapter house's products is based on a fan-created design. The lashwhips, boneswords, and the mycetic spore took inspiration from the art of HR Giger, in particular the art direction for the Alien movies. Chapterhouse consulted the

tyranid codex for the Tervigon Conversion Kit. Chapterhouse's.sculptor on the project also consulted Games Workshop's Carnifex model while developing the Tervigon conversion kit, to ensure proper fit and alignment of the kit with the Carnifex model. The dragon/salamander images Chapterhouse used came from Google Images searches on words like "dragon." Chapterhouse asked a concept artist to draw sketches of its wolf's head icon, and to adorn the icon with Nordic-style runes. The designs for the scarab and starburst shoulder pads were inspired by Egyptian art. Chapterhouse's mantis products began as a commission from a customer - the customer provided a photograph of a particular species of mantis, along with line drawings based on tracings from the photograph.

GW MSJ Ex. 95 (CHS Second Supp. Response to GW First Set of Interrogatories [Response to Rog 2]).

**GW's Statement of Fact No. 68.**    Chapterhouse's documents make clear its intent to create shoulder pads with icons such that Warhammer 40K players would recognize the icons as those of Games Workshop's various Space Marine Chapters:

*Exorcist Chapter*

- "1 excorcist PA [Power Armour] pad, skull with downed horns and fangs and raised rim. 1 excorcist termie pad, same symbol, raised rim." – (Ex. 96, CHS004637);

- "As for excorcists and GW IP I would suggest the following: Adding fangs to the skull and placing it on a pre heresy segmented pad instead of the flat normal one. 1 Is this ok with you? 2 is this ok with the customer? 3 Will it still sell, the only alterations being a pre heresy look and fangs?" (Ex. 96, CHS004637);

- "Ah, just exorcist pads then, Will start on the skull icons today. Ask about the PH touch on the pads if he is ok with it, reason I suggested it is for legal purposes, dunno how else to different the pad from GWs art. if you or he want me to do a plain ex [Exorcist] pad then let me know e x a c t l y what alteration Im to make in order to make them legal." (Ex. 97, CHS012719); and

*Flesh Tearer and Blood Angels Chapters*

- "I already made the molds for the Flesh Tearer and the Tactical pads. We are going to cast them with this in-house order." (Ex. 98, CHS003503);

- Chapterhouse considered an alternate design where the sawblade was on edge sticking out of the shoulder blade but rejected the idea as it deviated too much from Games Workshop's design: "I dont think the blade sticking out of the pad would go too well for most players, most players are very hard-core players who dont like deviating too much from the 40K norm, sorry!" (Ex. 99, CHS003640);

- "I think Flesh Tearers will be a popluar army on account of the special character thats coming out for them, so you stand to make some pretty good money. I would love to know how much FT stuff you sell." (Ex. 100, CHS005422);

- Chapterhouse decided it could use a simple stratagem to avoid infringement merely by selling the blood drop separately, to be glued on by the user to either a sawblade (for Flesh Tearers) or a set of wings (for Blood Angels): "I think we will have [the designer] remove his blood drop and sekk the drops separate.:) So the pad will have a sawblade on it and that's it. We could sell the blood drops separately for a small price. ████████████████████████████████████████████████████ Voila non-IP infringement!" (Ex. 101, TF00958); and

- Chapterhouse deliberately timed the release of the Blood Angels shoulder pads to coincide with the release of GW's Blood Angels Codex (Ex. 102, CHS012596).

*Iron Snakes and Soul Drinkers Chapters*

- "Our plan is to release new sculpts on a monthly basis as to also get custom orders from customers who want their own marine chapters.
  At this time we have 5 new chapters with their own pads sculpted. We have stayed away from GW owned IP, so you wont see any Ultramarine or Blood Angel Icons. You will see Icons that resemble chapters as well as chapters that have been looked at in novels but never actually made by GW.
  ...
  2 Iron Snakes pads (1 Terminator 1 power armor)
  2 Soul Drinker Pads (1 Terminator 1 power armor)" (Ex. 103, CHS010429-30)

*Legion of the Damned*

- "...3 finished skull PA pads (perfect for chaos or LoTD) that on ly await final touches" (Ex. 104, CHS002413);

- "Came up with new pad and torso ideas: Legion of the damned / flames theme." (Ex. 105, CHS006098);

- "then I´m doing 15 legion of the damned showcase marines to sell our upcoming LoTD pads" (Ex. 106, CHS017255);

- "the skull pad set was for my showcase LoTD squad, it would blow your mind away ... would draw us lots of orders duded!" (Ex. 106); and

- A text conversation between Mr. Villacci and Mr. Fiertek show that even Chapterhouse was concerned that they committed copyright infringement:
  the skull pads? category for them or generic? When the brazziere pad is done its supposed to be part of a legion of the damned set
  its supposed to be there
  ill make a LoTD category
  hows that look
  looks like IP infringement :P" (Ex. 115, CHS017307).

**CHS's RESPONSE:**

**DISPUTED**, as follows:

• Each statement attributed to a third party is irrelevant (FRE 402); is without foundation (FRE 602); and is inadmissible hearsay (FRE 802). GW fails to attribute each statement to any individual, thereby creating the false impression that each such statement is attributable to Chapterhouse when it is not.

• Each statement concerning Chapterhouse's "intent" is improper speculation (FRE 701), is a legal conclusion, and is irrelevant (FRE 402).

• Each statement attributing statements of third parties to Chapterhouse "intent" misrepresents the record because the third parties are concededly independent contractors.

• Each statement concerning the intent of such third parties is improper speculation (FRE 701), is a legal conclusion, is inadmissible hearsay (FRE 802), and is irrelevant (FRE 402).

• The statement that the cited language concerns Chapterhouse products is improper speculation (FRE 701) and without foundation (FRE 602). In particular, and without limitation, Chapterhouse does not sell a product consisting of a "blood drop separately" (GW'S MSJ Ex. 101); Chapterhouse does not sell "a set of wings (for Blood Angels" (*id.*); Chapterhouse does not sell "a separate sword that will fit on the pad" (*id.*); Chapterhouse does not sell a "sawblade . . . on edge sticking out of the shoulder blade" (GW'S MSJ Ex. 99)

• There is no foundation (FRE 602) for the implication that many of the designs discussed (e.g. "the skull pads", GW'S MSJ Ex. 115) refer to or were inspired by any GW work. Even if there were (and there is not), inspiration is not infringement.


*[Weapons]*

**GW's Statement of Fact No. 69.**        Games Workshop has created a wide range of fictional weapons for the Warhammer 40K universe. (Ex. 1 at ¶35). Some of those weapons are depicted below:



Bolter Halberds
(Ex. 48 at 152, GW002030)



Servo Arms
(Ex. 108 at 70, GW11383)



Conversion Beamer
(Ex. 109)



Combi-Weapon
Bolter/Melta
(Ex. 108 at 87, GW11386)
**(Ex. 1 at ¶¶ 35-36).**



Combi-Weapon
Bolter/Plasma
(Ex. 110 at 49, GW00939)



Combi-Weapon
Bolter/Flamer
(Ex. 111)

**CHS's RESPONSE:**

    **DISPUTED.** the statement that "Games Workshop has created a wide range of fictional

weapons for the Warhammer 40K universe" is without foundation (FRE 602). GW has offered

no evidence that it was the "creator" of any of the works depicted. Where GW does not attribute

a work to an individual artist or author, GW has no evidence and no foundation (FRE 602) for

the proposition that such author was its employee working in the course and scope of his employment at the relevant time. GW has no valid written assignment of copyright for the works cited. GW MSJ Ex. 11 (copyright registrations).

CHS further objects to GW's images and references to exhibits as follows:

- GW'S MSJ Ex. 48: irrelevant (FRE 402); and without foundation (FRE 602). GW failed to identify this work as allegedly infringed in its Second Rev. Copyright Claim Chart produced on August 3, 2012.. GW produced this work (GW0002030) only in black and white, despite the court's order that despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question".). The court should disregard this improper attempt to supplement the record.

- GW's Ex 108 was not produced before the close of fact discovery, and the Court should disregard this improper and untimely attempt to supplement the record.

- GW's Exs. 109 and 111 were not produced by GW despite the Court's order. *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question".).

- GW failed to alleged the work depicted at its Ex. 110 as infringed before the close of fact discovery. *Compare* First Rev. Copyright Claim Chart (produced Jan. 19, 2012) *with* Second Rev. Copyright Claim Chart (produced August 3, 2012). Kearney Decl. Exs. 6, 7.

**GW's Statement of Fact No. 70.**      Each weapon created by Games Workshop has unique characteristics:

- Bolter Halberds – Games Workshop's twist on a medieval halberd consisting of a curved blade at the end of a staff, a gun incorporated into the head of the staff, and a pointed protrusion at the end of the staff sticking out the opposite edge of the blade. (Ex. 1 at ¶ 37);

- Servo Arms – One or more extra arms mounted to the Space Marine's back pack. The arms are mechanical in nature and terminate in a two pronged "hand". (Ex. 1 at ¶ 37);

- Conversion Beamer – A Space Marine weapon with great power, with ribbed rifling and ending in a pointed barrel. (Ex. 1 at ¶37); and

- Combi-Weapons - A compact combination of two Space Marine weapons, one of which is typically the Bolter and the other one of a Melta gun, a Plasma gun, or a flamer. (Ex. 1 at ¶37).

**CHS's RESPONSE:**

**DISPUTED.** GW has offered no evidence that it was the "creator" of any of the works depicted. Where GW does not attribute a work to an individual artist or author, GW has no evidence and no foundation (FRE 602) for the proposition that such author was its employee working in the course and scope of his employment at the relevant time. GW has no valid written assignment of copyright for the works cited. GW MSJ Ex. 11 (copyright registrations).

CHS further objects to GW's images and references to exhibits as follows:

- GW'S MSJ Ex. 48: irrelevant (FRE 402); and without foundation (FRE 602). GW failed to identify this work as allegedly infringed in its Second Rev. Copyright Claim Chart produced on August 3, 2012.. GW produced this work (GW0002030) only in black and white, despite the court's order that despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question".). The court should disregard this improper attempt to supplement the record.

- GW's Ex 108 was not produced before the close of fact discovery, and the Court should disregard this improper and untimely attempt to supplement the record.

- GW's Exs. 109 and 111 were not produced by GW despite the Court's order. *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question".).

- GW failed to alleged the work depicted at its Ex. 110 as infringed before the close of fact discovery. *Compare* First Rev. Copyright Claim Chart (produced Jan. 19, 2012) *with* Second Rev. Copyright Claim Chart (produced August 3, 2012). Kearney Decl. Exs. 6, 7.

The listed characteristics are not unique to GW. In particular, and without limitation, GW produced a copy of a book from its "reference library" that depicts an actual historical weapon that combines a gun, a curved blade, and a pointed protrusion opposite the blade:

| GW ALLEGED WORK | HISTORICAL WEAPON | CHS PRODUCT |
|---|---|---|
|  |  |  |

Images from SUF 69[34]; Kearney Decl. ¶ 35 & Ex. 27 (image from GW reference book at GW0006802, depicting 16th century weapon comprising a blade, an opposing spike, and a built-in gun); image of allegedly infringing CHS product from GW MSJ Ex. 112 (*see* SUF 71, *infra*).

The cited paragraph at Exhibit 1 is without foundation (FRE 602) and is irrelevant to any issue in this case (FRE 402).

GW's descriptions of the images depicted in its SUF 69 are irrelevant (FRE 402), without foundation (FRE 602), and inadmissible hearsay (FRE 802). The descriptions are inaccurate with respect to the images, which speak for themselves. The descriptions are also

---

[34] DETAIL of GW allegedly infringed work, from SUF 69, *supra* (attributed as GW MSJ Ex. 48, GW0002030). GW's MSJ Ex. 48 was produced in black-and-white but is misleadingly depicted at GW's SUF 69 in color.

vague and ambiguous, in particular as to the terms "one or more extra arms," "mechanical in nature," and "typically."

The descriptions make it clear that each of the alleged elements of the works is merely a vague, abstract idea, including the idea of "arms [that] are mechanical in nature and terminate in a two pronged 'hand'", and "[a] compact combination of two . . . weapons."

The descriptions list characteristics that the images do not possess. In particular, without limitation:

- GW'S MSJ Ex. 48 does not depict a weapon with a curved blade, and does not show a "gun incorporated into the head of the staff."

- GW'S MSJ Ex. 108 does not depict a "two-pronged hand"

**GW's Statement of Fact No. 71.**      Chapterhouse creates and sells weapons that correspond to each of these Games Workshop weapons:





Gun-Halberds
(Ex. 112, CHS001027)

Conversion Beamer Servo Harness Kit for Space Marine
Model
(Ex. 113, CHS000295)







Combi-Weapon
Bolter and Melta Gun
(Ex. 114, CHS00289)

Combi-Weapon
Bolter and Plasma Gun
(Ex. 114)

Combi-Weapon
Bolter and Flamethrower
(Ex. 114)

## CHS's RESPONSE:

Chapterhouse does not dispute that it sells products called "Gun-Halberds," "Conversion Beamer Weapon and Harness Kit",  and "Combi-weapon Magnetic Kit."

Otherwise **DISPUTED**.

The statement is vague and ambiguous, in particular as to the term "correspond." CHS disputes that any of the depicted products are substantially similar to any of GW's alleged works. The statement also lacks foundation (FRE 602) and irrelevant because GW does not provide or reference an exemplar of any of its alleged works.

GW misrepresents CHS's product and the record, including GW MSJ Ex. 114 which it relies on, by reproducing three separate details of a single image. GW MSJ Ex. 114. GW misrepresents CHS's product by captioning those misleading image details with arbitrary names that do not reflect CHS's product names. *Id.*

GW misrepresents CHS's product by depicting it as a color image, although it is undisputed that CHS's works are sold unpainted. Villacci Decl. ¶¶ 4-5.

**GW's Statement of Fact No. 72.** Each of these Chapterhouse products copy the same unique characteristics as the Games Workshop depictions:

- Gun-Halberds –consisting of a curved blade at the end of a staff, a gun incorporated into the head of the staff, and a pointed protrusion at the end of the staff sticking out the opposite edge of the blade.

- Conversion Beamer Servo Harness Kit for Space Marine Models - An extra arm mounted to a Space Marine's back pack. The arms are mechanical in nature and terminate in a two pronged "hand." The Conversion Beam consists of a large gun with ribbed rifling and ending in a pointed barrel.

- Combi-Weapons - A compact combination of two Space Marine weapons, one of which is the Bolter and the other one of a Melta gun, a Plasma gun, or a flamer. Chapterhouse's design is a magnetic kit, allowing the customer to change the weapon combinations.

**CHS's RESPONSE:**

**DISPUTED**. The characteristics are not "unique" and not all of the works depicted have all of the listed characteristics.

The statement that "Chapterhouse products copy . . . " is without foundation (FRE 602) and is a conclusion of law.

Each of the listed characteristics of GW's alleged works is a mere abstract idea, and is unprotectable by copyright. Similarity of ideas is not copyright infringement, for "[n]o author may copyright his ideas." *Feist Pubs., Inc. v. Rural Television Serv. Co.*, 499 U.S. 340, 344-45 (1991) (citation and quotation marks omitted). Each of the above CHS products resembles GW's

works only to the extent (if any) that they depict unprotectable, abstract ideas, devoid of reference to any particularized expression. After filtering out unprotectable elements and mere abstract ideas, CHS's products and GW's alleged works are not substantially similar.

CHS further objects to GW's images and references to exhibits as follows:

- GW'S MSJ Ex. 48: irrelevant (FRE 402); and without foundation (FRE 602). GW failed to identify this work as allegedly infringed in its Second Rev. Copyright Claim Chart produced on August 3, 2012. GW produced this work (GW0002030) only in black and white, despite the court's order that despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question".). The court should disregard this improper attempt to supplement the record.

- GW's Ex 108 was not produced before the close of fact discovery, and the Court should disregard this improper and untimely attempt to supplement the record.

- GW's Exs. 109 and 111 were not produced by GW despite the Court's order. *See* Dkt. 139 (ordering GW to "produce the best exemplar of the works in question".).

- GW failed to alleged the work depicted at its Ex. 110 as infringed before the close of fact discovery. *Compare* First Rev. Copyright Claim Chart *with* Second Rev. Copyright Claim Chart (produced August 3, 2012). Kearney Decl. Exs. 6, 7.

**GW's Statement of Fact No. 73.**     Chapterhouse did not produce any documents detailing the design process regarding either its Gun-Halberd product or its Conversion Beamer Servo Harness Kit for Space Marine Model product. Nonetheless, Chapterhouse's documents make clear its intent to create combi-weapon products based on those that Games Workshop created for the Warhammer 40K universe:

- "First, on the combi-bolter, I'd like to do two "kits" both would include the same bits as far as flamer/melta/plasma guns go, but where the distinction is the bolter. I'd like one kit to have a bolter that is based on my concept art for an "advanced prototype" bolter and the other to be based on one of the older bolters I did concept art for. That way we have one thats kinda techy and one thats archaic, one being for space marines the other for chaos space marine and pre-heresy converters." (Ex. 54, CHS003130);

- "I think we should design a bolter that the customer will get when they buy the kit. The kit would consist of all the combi-variant bits and the bolter that they will fit on." (Ex. 54 CHS003132); and

- "Its drawn to the same height, length, and thickness as a standard bolter. The melta barrel sticks out a little further.
  I really want it to have a practical look to it. Most of the GW combi weapons look too bulky. It comes from the fact that they make all their weapons kinda "squished" and fattend up. Well a combi-weapon, or an M16 with a grenade launcher (modern counterpart) are already bulky. So a bulky thing made to look bulky ends up too malproportioned. (Ex. 115, CHS003244-45).

## **CHS's RESPONSE:**

Each statement is irrelevant to any issue in this case. FRE 402.

Even if there were an intent to copy (which there is not), GW must establish substantial similarity irrespective of any evidence that CHS had access to or copied its work. *Incredible Techs. v. Virtual Techs.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (even if defendant "set out to copy" plaintiff's game, plaintiff must still show the copying resulted in substantial similarity); *Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 708 (7th Cir. 1972) (same); *Lifetime Homes, Inc. v. Walker Homes, Inc.*, 485 F. Supp. 2d 1314, 1320, 1323 (M.D. Fla. 2007) (even where defendants intentionally copied plaintiff's design, no substantial similarity); *Baby Buddies, Inc. v. Toys "R" Us, Inc.*, 611 F.3d 1308, 1312 (11th Cir. 2010) (summary judgment even though defendant's contractor was given a copy of Plaintiff's product and asked to "please work on a similar design"); 4 Nimmer on Copyright, § 13.03[D] at 13-92 ("Proof of access . . . logically exerts no impact on copying as a legal matter; no matter how steeped in plaintiff's work defendant may have been, if the resulting product is non-actionable as a matter of law, then the absence of substantial similarity that must underlie every successful claim still dooms the infringement suit"); *id.* at 13-91 ("[T]here is nothing wrong in having access to one's competitor's products. Nor may a showing of substantial similarity ever be avoided") (footnotes omitted).

Otherwise **DISPUTED**. GW's SUF is vague and ambiguous, in particular as to the term "based on." GW's SUF is improper speculation (FRE 701), in particular as to CHS's "intent", and is without foundation (FRE 602).

The quoted language in the first bullet point is without foundation (FRE 602); is inadmissible hearsay (FRE 802); and is not a statement of CHS.

The quoted language in the second bullet point is without foundation (FRE 602) and is inadmissible hearsay (FRE 802).

The quoted language in the first bullet point is without foundation (FRE 602); is inadmissible hearsay (FRE 802); and is not a statement of CHS.

## Space Wolves Vehicle Conversion Kit

**GW's Statement of Fact No. 74.**      One of the Space Marine Chapters created by Games Workshop is the Space Wolves Chapter. (Ex. 1 at ¶15). This Chapter decorates its Space Marines and its vehicles with iconography which includes wolf skulls, wolf tails, and fangs. (Id. at ¶38-41). Two of these such Games Workshop Models are depicted below.



Space Wolves Rhino
(Ex. 116 at 19, GW002493)



Space Wolves Space Marine Terminator
(Ex. 117)

(Ex. 1 at ¶¶ 38-40).

**CHS's RESPONSE:**

**DISPUTED**.

SENTENCE ONE: the statement that GW "created" the "Space Wolves Chapter" lacks

foundation (FRE 602).

SENTENCE TWO: vague and ambiguous, in particular as to "iconography which

includes wolf skulls, wolf tails, and fangs." CHS disputes that GW's statement accurately

describes the images depicted, which speak for themselves. (FRE 1002.)

CHS further objects to GW's exhibits and images as follows:

- GW'S MSJ Ex. 117 was not produced by GW. The Court should disregard this
  untimely attempt to supplement the record.

**GW's Statement of Fact No. 75.** Games Workshop's Space Wolves icons have unique characteristics. The Space Wolf icon is an unusually elongated and unique wolf skull with wide eye sockets, often set within a diamond. (Ex. 1 at ¶41)

**CHS's RESPONSE:**

**DISPUTED**.

SENTENCE ONE: The statement that unidentified and unspecified "Space Wolves icons" have "unique characteristics" is improper speculation (FRE 701) and is without foundation (FRE 602).

SENTENCE TWO: CHS disputes that GW's statement accurately describes the pictured image, which speaks for itself. (FRE 1002.) Sentence Two is vague and ambiguous, in particular as to the terms "unusually elongated", "unique," and "often."

**GW's Statement of Fact No. 76.** Chapterhouse creates and sells a "Rhino Conversion Kit for Space Wolves" that allows a customer to take a standard Games Workshop Space Marine Rhino (which is a form of vehicle) and convert it, by adding Chapterhouse pieces, into a Space Marine Rhino for the Space Wolves Chapter:



Chapterhouse Rhino Conversion Kit for Space Wolves
(Ex. 118, CHS001258)

**CHS's RESPONSE:**

CHS does not dispute that it sells a product called "Conversion Kit #1 for Space Wolf Rhino."

CHS does not dispute that its "Conversion Kit #1 for Space Wolf Rhino" product allows a customer to convert a GW "Space Marine Rhino" into a different-appearing vehicle by substituting parts from CHS's kit for parts from GW's model.

Otherwise **DISPUTED**. GW misrepresents the CHS product by depicting it in a color image, although it is undisputed that CHS's products are sold unpainted. Villacci Decl. ¶¶ 4-5.To the extent CHS's products are shown painted on its website, it is to show the products to their best advantage, and to enable customers to see fine details that might not otherwise be clearly visible were they not shown in contrasting colors. Some color choices are dictated by the subject matter of the CHS products: for instance, skulls are often painted bone-white; flames may be painted predominantly red and orange; dragons may be painted in green; insignia are often painted in primary colors for visibility. *Id.*

**GW's Statement of Fact No. 77.**    Chapterhouse's Space Wolf iconography shares the same unique characteristics as the Games Workshop depictions. Namely, the wolf skull is the same unusually elongated wolf skull with wide eye sockets. Additionally, each of the wolf skulls is made to be set within a diamond (the skull on the far left appears meant to be fit into the diamond next to it) so as to resemble almost exactly Games Workshop's distinctive Wolf Skull within a diamond. (This device of producing the parts separately to be joined by the customer was also employed by Chapterhouse in connection with its "Flesh Tearers" shoulder pad where, by selling the blood drop separately from the rest of the iconography Mr. Villacci pronounced "Voila! No IP infringement") (See Ex. 101, TF00958).

**CHS's RESPONSE:**

**DISPUTED**.

SENTENCE ONE: CHS disputes that the GW depictions have "unique characteristics." CHS disputes that its products share the characteristics of GW's depictions. GW does not argue that CHS's product is substantially similar to any GW work, which they are not.

SENTENCE TWO: CHS disputes that GW's descriptions accurately describe the images depicted, which speak for themselves.

- "the wolf skull is the same unusually elongated wolf skull with wide eye sockets" – **disputed:** improper speculation (FRE 701); lacks foundation (FRE 602). The images speak for themselves.

- "each of the wolf skulls is made to be set within a diamond" – **disputed:** improper speculation (FRE 701); lacks foundation (FRE 602).

- "the skull on the far left appears meant to be fit into the diamond next to it" – **disputed:** the statement is concededly improper speculation (FRE 701) and is without foundation (FRE 602).

- "This device of producing the parts separately to be joined by the customer was also employed by Chapterhouse in connection with its 'Flesh Tearers' shoulder pad" – **disputed:** improper speculation (FRE 701); lacks foundation (FRE 602).

**GW's Statement of Fact No. 78.**       Chapterhouse's documents make clear its intent to copy Games Workshop's Space Wolves iconography by copying its "art pics" in modeling clay (or greenstuff) and timing the release of their product to coincide with the Space Wolves codex:

- "Figure Ill finish the four SW [space wolf] rhino template one-piece panels tomorrow with the rest of the shields. I really want to ship both rhinos, the pad template and shields midweek." (Ex. 119, CHS004464);

- "Since the Space Wolves codex is coming out what do you think you can do that's Space Wolfy?
  ...
  "Off the top of my head we could do...
  ...
  ▬ ███████████████████████████████████████
  ██████████████████████████████████████████
  ████████████████████████████ (Ex. 120, JN00232-33); and

- "The SW rhino templates are almost done, I had to scratch and redo them 3 times now due to quality issues (you know me), never thought something that easy would be that hard to do.
  ...

I'm still having problems with the wolf symbol, I need some easy but good looking detailed art pics that I can copy in greenstuff, internet didn't give me anything good at all. I'm trying to find an artist buy you need to help out and see if you can get us a concept artist.
Someone who you can:
1: look at the FW SW rhino doors and do a wolf symbol inspired by that but still different" (Ex. 121, TF001823).

## CHS's RESPONSE:

Each statement is irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**.

SENTENCE ONE is improper speculation (FRE 701), in particular as to CHS's "intent";

and is without foundation (FRE 602). Sentence One misrepresents the record by implying falsely

that the term "art pics" refers to art depicting GW's works, when it is patent from the context that

the term "art pics" is used to refer to third-party illustrations, public domain images, or concept

art from one of CHS's independent contractors, and expressly contemplates art that is "different"

from GW's wolf symbols. GW MSJ Ex. 121 (TF 0001823).

- The statement quoted in the first bullet point is irrelevant to any issue in this case; is inadmissible hearsay (FRE 802); is without foundation (FRE 602); and is not a statement of CHS.

- The statement quoted in the second bullet point is irrelevant to any issue in this case; is inadmissible hearsay (FRE 802); is without foundation (FRE 602); and is not a statement of CHS.

- The statement quoted in the third bullet point is irrelevant to any issue in this case; is inadmissible hearsay (FRE 802); is without foundation (FRE 602); and is not a statement of CHS.

### [Chapterhouse's Use of Games Workshop's Trademarks]

**GW's Statement of Fact No. 79.**      With the exception of a select few recent products, all of Chapterhouse's products are specifically identified by Chapterhouse by use of the already-established Games Workshop product names. Even these new Chapterhouse products are identified as female versions of Games Workshop's corresponding Eldar characters. (see Supra

¶¶ 47-50). In advertising and promoting its products, Chapterhouse consistently references its products using the product and character names previously adopted and used in commerce by Games Workshop (Exs. 14, 15, 19)

**CHS's RESPONSE:**

     **DISPUTED**.

     SENTENCE ONE: vague and ambiguous, in particular as to the term "select few"; without foundation (FRE 602). GW has offered no evidence showing that each of its alleged "product names" is used in U.S. commerce. GW has offered no evidence showing that it has priority of use in U.S. commerce for each of its alleged "product names."

     SENTENCE TWO: to the extent GW improperly incorporates its SUF 47-50, CHS's objections to those paragraphs apply here. This statement is without foundation (FRE 602) and is improper speculation (FRE 701) .

     SENTENCE THREE: GW has offered no evidence showing that each of its alleged product names is used in U.S. commerce, or in commerce at all, or that it owns U.S. trademark rights in such terms. GW has offered no evidence showing that it has priority of use in U.S. commerce for each of its alleged product names. GW fails to produce any actual evidence—such as sales invoices or purchase orders—for *any* sales in the U.S. (or Illinois) for any product. CHS Additional Material Fact No. 23. GW's un-itemized "sales summary" fails to show any sales by product, mark, or date, nor do GW's vague and undifferentiated declarations provide such evidence. GW SUF 1- 2, Ex. 3. Such "conclusory" evidence should be rejected. *Central Mfg.,* 492 F.3d at 882 (affirming that plaintiffs' production of generalized, high-level sales data, price sheets, and advertising "failed completely to support their claim that they actually used the [mark]…."). Like the plaintiffs in *Central Mfg.*, GW failed "to produce even a single purchase

order or invoice as proof" of "*the bona fide use* of [any] mark" "*in commerce*" in the U.S.
*Central Mfg.,* 492 F.3d at 883 (emphasis in original) (citing 15 U.S.C. § 1127).

There is no foundation (FRE 602) for the proposition that any of GW's alleged product names refer to specific, identifiable characters. CHS uses the names of GW products to refer to GW's goods, to identify the particular armies that customers may want to use CHS's products with, and to identify compatibility. The only alleged GW product names that are used in auction titles in the cited exhibits are "Space Marine," "40K", "salamanders", "terminator," "Rhino", "drop pod", "Warhammer 40,000", "iron snake", "soul drinker", "jet bike," and "tau". GW MSJ Exs. 14, 15, 19. CHS disputes that GW uses each of these names in U.S. commerce or that GW has priority of use in U.S. commerce for each of the names.

### [Chapterhouse's General Model of Marketing]

**GW's Statement of Fact No. 80.**     In its interrogatory answers, Chapterhouse confirmed that the only place it advertises or promotes its products is on the following websites, each of which is a public Internet forum devoted principally or exclusively to fans of Warhammer 40K: Belloflostsouls.net; Dakkadakka.com; Heresy-online.net; Warseer.com; and invasionkenosha.com, as well as a few other general interest Internet sites such as eBay.com, Bartertown.com, Tabletopgamingnews.com, Theminiaturespage.com, and Frothersunite.com and certain gaming conventions. (Ex. 17, Resp to Interrog 10)

**CHS's RESPONSE:**

Each statement is irrelevant (FRE 402); and is without foundation (FRE 602).

**DISPUTED**. CHS disputes that the each of the listed websites are "devoted principally or exclusively to fans of Warhammar 40K. In particular, each of the websites Belloflostsouls.net; Dakkadakka.com; Heresy-online.net; and Warseer.com, is devoted to multiple games other than Warhammer 40K, including non-GW games. The website www.invasionkenosha.com is not a "public Internet forum" as GW states, but rather a website for an annual wargaming tournament that is not exclusively focused on Warhammer 40,000.  Villacci Decl. ¶ 12.

**GW's Statement of Fact No. 81.**     On December 23, 2011 the Court directed Chapterhouse to produce all advertising and promotional materials, yet it produced no documents from any of these sites. (Ex. 4 at ¶47). Chapterhouse failed to do so even after being reminded specifically of its obligation to do so by letter dated May 29, 2012. (Id.; Ex. 68).

**CHS's RESPONSE:**

**DISPUTED**. CHS produced documents responsive to GW's request for documents no. 16 referenced at GW MSJ Ex. 68. Postings on third party websites, for which CHS does not have any records or drafts, are not within CHS possession, custody, or control. GW's MSJ Ex. 68 does not support the statement that GW reminded CHS of its obligation to produce postings from third party public websites; had it done so, CHS could have explained that it had no such documents.

**GW's Statement of Fact No. 82.**     In marketing his products on-line, Chapterhouse emphasizes the importance of showing the finished models painted (in Games Workshop's colors). The products on its website are shown painted to show how they appear in Games Workshop's colors (and hence make clear to potential consumers how to do so) and although Chapterhouse failed to produce any documents showing its actual promotional activities on the internet forums it identified (in response to Interrogatory 10) as its only vehicles of advertising and promotion, to the extent Games Workshop has located such forum postings it is clear that Chapterhouse seeks to promote its products painted and in Games Workshop's colors [e.g. Ex. 65 at 4, Warseer 18- 02-2011 "I have a few more products I will be showing next week as soon as the paint jobs are done" ....]

**CHS's RESPONSE:**

**DISPUTED.** Each statement is without foundation (FRE 602), is improper speculation (FRE 701), and is inadmissible hearsay (FRE 802). To the extent CHS's products are shown painted on its website, it is to show the products to their best advantage, and to enable customers to see fine details that might not otherwise be clearly visible were they not shown in contrasting colors. Some color choices are dictated by the subject matter of the CHS products: for instance, skulls are often painted bone-white; flames may be painted predominantly red and orange; dragons may be painted in green; insignia are often painted in primary colors for visibility. Villacci Decl. ¶ 5.

GW's statement quoted from a third-party website is improper speculation (FRE 701); is

without foundation (FRE 602); and is inadmissible hearsay (FRE 802).

**[Chapterhouse's Expert's Belated Raising of Copyrightability]**

**GW's Statement of Fact No. 83.** For the first time, Chapterhouse, in the Expert Response, Report of Mr. Bently, alleges that copyright in some number of Games Workshop's sculptural figures may not be enforceable in the U.K. (Ex. 127, Bently Rep. at 10-12). However, Chapterhouses' expert agreed that the US case Bridgeman (decided by Judge Kaplan in New York) sets forth the relevant U.S. Law. (Ex. 128, Bently Tr. at 49-50). Mr. Bently's report also states only that the Lucas Film case he bases his opinion on was really an issue as to the scope of remedies under UK law for toys, not the issue of their copyrightability. (Ex. 127 at ¶32). Mr. Bently also agrees that under European law that is now binding on England, an older case involving toy soldiers, Britain v Hanks, in which copyright in the figurines was protected, would either be deemed controlling or Parliament would need to amend the relevant copyright law to comply with the European directive. (Ex 128, Bently Tr at 71-73)

**CHS's RESPONSE:**

**DISPUTED**. Each statement grossly misrepresents the testimony of Professor Bently, a

leading expert on UK copyright law. In particular:

- "Chapterhouse's expert agreed that the US case Bridgeman (decided by Judge Kaplan in New York) sets forth the relevant U.S. Law" –

    **DISPUTED**. GW misrepresents Prof. Bently's testimony, which was in pertinent part

as follows:

> Q. Okay. Did you -- have you done any independent research of your own to determine whether US law would apply or UK law would apply on the issue of subsistence of copyright?
> A. No.
>    I have in the back of my mind a case, of a name which I can't remember, concerning photographs, where an action was brought in a -- in the Second Circuit, I think. And the judge, who I recollect was Judge Kaplan, referred to the UK law of originality when assessing -- assessing whether the photographs were protected for the purposes of US law. It's called Black -- I can't remember what it's called, I'm afraid, right now.

> But, you know, that wasn't an assumption on which
> I was working, I just sort of ...
> Q.  Are you referring to Bridgeman Art v Corel Corp?
> A.  That is the case that I -- that I have in the back of my
>     mind as confirming the assumption I was given.

Bently Dep. Tr. 7/12/2012 at 49:11 – 50:4

- "Mr. Bently's report also states only that the Lucas Film case he bases his opinion on was really an issue as to the scope of remedies under UK law for toys, not the issue of their copyrightability" –

  **DISPUTED**.  ¶ 32 of the Bently Report does not address the issue of remedies. Rather, it quotes language from *Lucasfilm* where the court concluded that toy Stormtroopers were not sculptures. GW MSJ Ex. 127 at ¶ 32.

  This statement is also contradicted by the deposition testimony of Prof. Bently:

> Q.  And would you agree that section 51 of the CDPA also
>     simply limits the remedies to a claim copyright owner,
>     the ability of a copyright owner in a design document to
>     sue for infringement?
> A.  It creates the defense or exception.  That's different
>     from limiting the remedies.

Bently Dep. Tr. 7/12/2012 at 56:17-22.

- "Mr. Bently also agrees that under European law that is now binding on England, an older case involving toy soldiers, *Britain v Hanks*, in which copyright in the figurines was protected, would either be deemed controlling or Parliament would need to amend the relevant copyright law to comply with the European directive" –
  **DISPUTED**: GW grossly mischaracterizes Professor Bently's testimony. Rather, Prof. Bently was asked a series of hypothetical questions, and qualified his answer by stating that he considered the case on which GW's counsel based his hypothetical questions to be "a dubious authority." Bently Dep. Tr. 7/12/2012 at 71:10-11; see *id.* at 67:19 – 73:25 (discussing hypothetical at length, including reasons "[he is] reluctant to treat [the case] as a very strong authority").

## B.    CHS'S STATEMENT OF ADDITIONAL MATERIAL FACTS

**Additional Material Fact No. 1.**    GW identified only 121 CHS products before the close of fact discovery.

- Kearney Decl. Exs. 5 (Original Copyright Claim Chart), 6 (First Rev. Copyright Claim Chart, listing 121 CHS products).

- Dkt. 116 (Scheduling Order).

**Additional Material Fact No. 2.**    On August 3, 2012, GW served a Second Rev. Copyright Claim Chart, in which it dropped its copyright claims for 33 CHS products; added copyright claims against 15 never-before-identified CHS products; and identified five new CHS products, against which it did not bring copyright claims. GW's Second Rev. Copyright Claim Chart is a chart with 143 entries, but two entries (nos. 125 and 127) are blank.

- Kearney Decl. ¶ 10-11 & Exs. 6-7 (First Rev. Copyright Claim Chart; Second Rev. Copyright Claim Chart);
- Kearney Decl. ¶ 72;
- GW Motion for Summary Judgment at 4, fn.2.

**Additional Material Fact No. 3.**    GW attached 13 U.S. Copyright Registrations to its Motion for Summary Judgment, of which two were for works not at issue in this case ("Games Workshop Catalog 2006-07", TX 6-541-286; and "Necromunda – Battle for Survival in the Nightmare Undercity", TX 7-536-772).

- GW MSJ Ex. 11 (copyright registrations)

- Kearney Decl. at:

   o ¶ 9 & Ex. 5 (Original Copyright Claim Chart) ("Games Workshop Catalog 2006-07" and "Necromunda – Battle for Survival in the Nightmare Undercity" not listed as infringed by any CHS product).;

   o ¶ 10 & Ex. 6 (First Rev. Copyright Claim Chart) (same);

   o ¶ 11 & Ex. 7 (Second Rev. Copyright Claim Chart) (same).

**Additional Material Fact No. 4.**     Only the following five registrations attached at GW MSJ Ex. 11 were filed within five years of the alleged date of publication of the work, and one of those works ("Games Workshop Catalog 2006-07") is not at issue in this case:

- o "Blood Raven Transfer Sheet", Reg. No. VA 1-819-307;
- o "Games Workshop Catalog 2006-07", Reg. No. TX 6-541-286;
- o "Horus Heresy: Collected Visions", Reg. No. TX 7-538-569;
- o "Codex: Tyranids", Reg. No. TX 7-538-598; and
- o "Website Content from 2000 to 2011", Reg. No. TXu 1-788-290).

- GW MSJ Ex. 11 (showing alleged publication dates and registration dates for each registered work)

- Kearney Decl. at:

  - o ¶ 9 & Ex. 5 (Original Copyright Claim Chart) ("Games Workshop Catalog 2006-07" not listed as infringed by any CHS product).;

  - o ¶ 10 & Ex. 6 (First Rev. Copyright Claim Chart) (same);

  - o ¶ 11 & Ex. 7 (Second Rev. Copyright Claim Chart) (same).

**Additional Material Fact No. 5.**     The work "Horus Heresy: Collected Visions" is a compilation of four previously-published books, each of which was published more than five years before the date on which "Horus Heresy: Collected Visions" was registered with the U.S. Copyright Office.

- GW MSJ Ex. 11

- Kearney Decl. ¶ 56 & Ex. 43: credits page "Horus Heresy: Collected Visions", GW0001882, providing publication dates before 2007 for each of the books that make up the collection.

**Additional Material Fact No. 6.**     GW's registered work "Codex: Tyranids" contains only three works at issue.

- GW MSJ Ex. 11 (U.S. copyright registration for "Codex: Tyranids")

- Kearney Decl. Ex. 7: Second Rev. Copyright Claim Chart, no. 37 (alleged work "Warhammer 40,000 Tyranids 2009, page 52", credited to Alex Boyd);

- *id.* no. 43 (alleged work "Warhammer 40,000 Tyranids 2010, page 61", credited to Dave Gallagher);

- *id.* no. 95 ("Warhammer 40,000 Tyranids 2009, page 54", credited to Alex Boyd).

**Additional Material Fact No. 7.**     GW's Second Rev. Copyright Claim Chart does not identify infringement of its "Games Workshop Complete Catalog & Hobby Reference 2006-2007" (hereinafter, the "Catalog") by any CHS product.

- Kearney Decl. ¶¶57, 58;
  - o GW's Second Rev. Copyright Claim Chart does not identify the work "Games Workshop Complete Catalog & Hobby Reference 2006-2007" as an allegedly infringed work; (¶ 57)
  - o GW's First Rev. Copyright Claim Chart does not identify the work "Games Workshop Complete Catalog & Hobby Reference 2006-2007" as an allegedly infringed work; (¶ 58)
- *See* Kearney Decl. at:
  - o ¶10, Ex. 6: First Rev. Copyright Claim Chart;
  - o ¶11, Ex. 7: Second Rev. Copyright Claim Chart.

**Additional Material Fact No. 8.**     GW has not specified which works the Catalog contained, if any, that CHS allegedly infringes. There is no record evidence that the works included in the Catalog were created within 5 years of the registration.

- Kearney Decl. ¶ 59.

**Additional Material Fact No. 9.**     GW failed to produce the Catalog before either its Certification or the close of fact discovery.

- Kearney Decl. ¶ 60;
- Dkt. 187 : GW's Certification that its production was complete;
- Dkt. 116: Scheduling Order.

**Additional Material Fact No. 10.**     GW concedes that UK copyright law governs ownership of its alleged copyrights.

- Second Amended Complaint (Dkt. 147) at ¶¶ 13, 15;

- GW MSJ Ex. 10 (Bloch Report) at ¶ 19 (stating that GW's works were "designed and manufactured in England"); ¶ 29 (acknowledging that ownership of GW's copyrights is determined "as a matter of English law").

**Additional Material Fact No. 11.**     Alan Merrett's statement that "it is [GW's] customary practice to obtain confirmatory assignments from [freelancers]," but that "[o]ver the years, some

of these have been misplaced," is flatly contradicted by discovery responses in which GW stated that it was "not aware of any documents responsive to [CHS's] request" for "documents constituting the chain of title for all copyrights" it claimed in this action.

- Merrett Decl. ¶ 12 (GW MSJ Ex. 1);

- Kearney Decl. ¶ 25 Ex. 19: Plaintiff Games Workshop Studios LLC's [*sic*] Response to Request for Production of Documents to Games Workshop Limited Set Two (Response to Request 4);

- Kearney Decl. ¶ 20 (all but one of approximately 30 "confirmatory assignments" executed after April 20, 2012, more than a year into this litigation and after the close of fact discovery);

- Dkt. 116: Scheduling Order.

**Additional Material Fact No. 12.**    For six authors (Wayne England; Clint Langley; Mike McVey; Bob Naismith; Adrian Smith, and Simon Egan), who among them created nine of GW's alleged works identified as infringed in its Second Rev. Copyright Claim Chart, GW has provided no assignments, no employment agreements, no evidence that those individuals were ever its employees during any relevant times, and was unable to provide the employment dates for these individuals in their interrogatory response, with the exception of Mr. Smith, who was not an employee at relevant times based on GW's interrogatory responses.

- Kearney Decl. ¶ 23;

- Kearney Decl. at

    o  ¶13, Ex. 9: Plaintiff Games Workshop Limited's Further Supplemental Response to Defendant Chapterhouse Studios LLC's Interrogatory 22 (listing alleged authors and dates of employment if any);

    o  ¶10, Ex. 6: First Rev. Copyright Claim Chart;

    o  ¶11, Ex. 7: Second Rev. Copyright Claim Chart.

**Additional Material Fact No. 13.**    GW has produced no evidence that the following authors were ever GW employees: Wayne England; Clint Langley; Mike McVey; Bob Naismith.

Kearney Decl. ¶ 23;

Kearney Decl. at:

- ¶ 13, Ex. 9: Plaintiff Games Workshop Limited's Further Supplemental Response to Defendant Chapterhouse Studios LLC's Interrogatory 22 (listing alleged authors and dates of employment if any);

- ¶ 15, Ex. 11: Apr. 2, 2012 John Blanche Depo. Tr. at 48:9-22 ("**Q:** Clint Langley? **A:** I know the name but I know him as a freelance artist for the Black Library . . . ");

**Additional Material Fact No. 14.**    The evidence that GW produced shows that Adrian Smith was not its employee during the time he created the alleged works.

Kearney Decl. at:

- ¶ 11, Ex. 7: Second Rev. Copyright Claim Chart, No. 23 (Adrian Smith credited with work created in 2002);

- *id.* at no. 45 (Adrian Smith credited with work created in 2001).

- ¶ 13, Ex. 9: Plaintiff Games Workshop Limited's Further Supplemental Response to Defendant Chapterhouse Studios LLC's Interrogatory 22 (alleging GW employed Adrian Smith between 01/12/2008 and 11/09/2009).

**Additional Material Fact No. 15.**    GW has no evidence that  Simon Egan was its employee during the time he created the alleged works.

Kearney Decl. at:

- ¶ 11, Ex. 7: Second Rev. Copyright Claim Chart, No. 82 (Simon Egan credited with undated work);

- ¶ 13, Ex. 9: Plaintiff Games Workshop Limited's Further Supplemental Response to Defendant Chapterhouse Studios LLC's Interrogatory 22 (alleging GW employed Simon Egan from 01/06/2004 to the present).

**Additional Material Fact No. 16.**    Despite CHS's request, GW failed to provide contact information for all but two of "independent contractors/freelancers" referenced in the Bloch Report.

- Kearney Decl. at:

  o ¶ 13, Ex. 9:  Plaintiff Games Workshop Limited's Further Supplemental Response to Defendant Chapterhouse Studios LLC's Interrogatory 22;

- o ¶ 10, Ex. 6 (First Rev. Copyright Claim Chart);
- o ¶ 11, Ex. 7 (Second Rev. Copyright Claim Chart).

- GW MSJ Ex. 10 (Bloch Report) at 7-14, 38-42  (discussing "independent contractors / freelancers").

**Additional Material Fact No. 17.**    CHS's products are sold unpainted.

- Declaration of Nicholas Villacci in Support of CHS's Opposition to GW's Mot. for Summary Judgment ("Villacci Decl.") ¶¶ 4-5.

**Additional Material Fact No. 18.**    GW's Exhibit 126, which purports to be an image of the back of CHS's "Power Armor Shoulder Pad for Space Marine", is not a Chapterhouse product.

- Villacci Decl. ¶ 9.

- GW MSJ Ex. 126;

- Kearney Decl. ¶ 2, Ex. 1;




Back of CHS "Power Armor
Shoulder Pad for Space Marine
(CHS Product No. 54)

DETAIL of GW MSJ Ex. 126

**Additional Material Fact No. 19.**    GW's retail stores in the U.S. do not carry the full range of its products.

- Kearney Decl. ¶33, Ex. 15: Deposition of Andrew Jones ("Jones Dep.") at 20:21-21:6; 23:1-5:

> Q   So to backtrack about the retail range that is sold in the United States, so the retail range sold in the United States is only a subset of the Games Workshop entire product line?
>
> A   Yes . . . .

*Id.* at 7:13-18, 11:14-12:10 (re: Jones's designation as GW's 30(b)(6) witness on topics including trademark-related topics, fame, revenues and related records);

- Kearney Decl. ¶ 6, Ex. 4: Depo. Ex. 39 (GW's (30(b)(6) designation list).


**Additional Material Fact No. 20.**     Records concerning sales in the United States are kept by GW's U.S. business, Games Workshop Retail ("GWR").

- Kearney Decl. ¶ 5, Ex. 3: Jones Dep. at 24:25-25:18;

- *Id.* at 7:13-18, 11:14-12:10 (re: Jones's designation as GW's 30(b)(6) witness on topics including trademark-related topics, fame, revenues and related records),

- Kearney Decl. ¶6, Ex. 4: Depo. Ex. 39 (GW's (30(b)(6) designation list).


**Additional Material Fact No. 21.**     GW has no sales records proving if or when a particular product was sold in the U.S., or in any particular geographical area such as in Illinois.

- Kearney Decl. ¶5, Ex. 3: Jones Dep. at:

    o 23:24-24:11 ("….Have we got records that show that every single item has been sold in the States, I don't know, sorry. . . ."); 22:9-12; 24:12-25:2; 25:14-26:18;  40:20-41:4; 60:20-24;  214:19-215:14;

    o 7:13-18, 11:14-12:10 (re: Jones's designation as GW's 30(b)(6) witness on topics including trademark-related topics, fame, revenues and related records);

- Kearney Decl. at:

    o ¶6, Ex. 4: Depo. Ex. 39 (GW's (30(b)(6) designation list);
    o ¶ 4, Ex. 2: Depo. Ex. 114 (Rog 18 Response);

- Kearney Decl. ¶42, Ex. 33: Deposition of Sandra Casey (Mar. 1, 2012) ("Casey Dep.") at:

    o 37:23 – 38:4 ("Some products are not sold in our retail stores that are sold through the Internet");

    o 42:13-43:3; 50:7-51:3; 51:7-12; 64:11-65:1; e.g., at 50:14-18:

                          Q.….For any given particular product,
                             would Games Workshop Retail have a record of when
                             it first sold that product in the U.S.?

> > A.   That would not be readily available, no….

- o  12:22-13:1 (re: Casey's designation as 30(b)(6) witness for GWR);

- Kearney Decl. at:

  - o  ¶44, Ex. 35: CHS's Deposition Subpoena to GWR;

  - o  ¶43, Ex. 34: CHS's Document Subpoena to GWR;

  - o  ¶45 , Ex. 36: GWR's Response to [Document] Subpoena;

  - o  ¶46 , Ex. 37: Response to [Deposition] Subpoena to GWR;

  - o  ¶47 , Ex. 38: Re-Notice of Subpoena to GWR.

**Additional Material Fact No. 22.**   There is no evidence that anyone has ever been confused about the relationship between GW and CHS.

- Kearney Decl. ¶48;

- Kearney Decl. at

  - o  ¶42 & Ex. 33 :  Casey Dep. at 58:23-59:20;

    (e.g., Q.   Does Games Workshop Retail have any records of customers expressing confusion between their products and Chapterhouse products? A.   Not to my knowledge.);

  - o  *Id.*: Casey Dep. at 12:22-13:1(re: Casey's designation as 30(b)(6) witness for Games Workshop Retail, Inc. "GWR");

  - o  ¶44, Ex. 35: CHS's Deposition Subpoena to GWR;

  - o  ¶43, Ex. 34: CHS's Document Subpoena to GWR;

  - o  ¶45 , Ex. 36: GWR's Response to [Document] Subpoena;

  - o  ¶46 , Ex. 37: Response to [Deposition] Subpoena to GWR;

  - o  ¶47 , Ex. 38: Re-Notice of Subpoena to GWR.

- Villacci Decl. in Support of CHS Mot. for Summary Judgment ("Villacci MSJ Decl.") (Dkt. 208.43-208.44) at ¶13.

**Additional Material Fact No. 23.**    GW did not produce itemized sales invoices or purchase orders for each or any of the Marks At Issue, including any sales invoices or purchase orders for Internet or retail sales in the U.S. or Illinois.

- Kearney Decl. ¶ 49, 50;

- Kearney Decl. ¶5, Ex. 3: Jones Dep. at:

    o 23:24-24:11 ("….Have we got records that show that every single item has been sold in the States, I don't know, sorry. . . ."); 22:9-12; 24:12-25:2; 25:14-26:18;  40:20-41:4; 60:20-24;  214:19-215:14;

    o 7:13-18, 11:14-12:10 (re: Jones's designation as GW's 30(b)(6) witness on topics including trademark-related topics, fame, revenues and related records);

    o 203:15-207:10 (explaining GW0002583-85);

- GW MSJ Ex. 3 (GW0002583-85);

- Kearney Decl. at:

    o ¶42, Ex. 33: Casey Dep. at 93:14-17:

            Q.    Has Games Workshop Retail produced any documents to the Defendants in response to the document subpoena?

            A. No.

- Kearney Decl. at:

    o ¶5, Ex. 3: Jones Dep. at 7:13-18, 11:14-12:10 (re: Jones's designation as GW's 30(b)(6) witness on topics including trademark-related topics, fame, revenues and related records);

    o ¶42, Ex. 33: Casey Dep. at 12:22-13:1(re: Casey's designation as 30(b)(6) witness for Games Workshop Retail, Inc. "GWR");

    o ¶44, Ex. 35: CHS's Deposition Subpoena to GWR;

    o ¶43, Ex. 34: CHS's Document Subpoena to GWR;

- ¶45 , Ex. 36: GWR's Response to [Document] Subpoena;

- ¶46 , Ex. 37: Response to [Deposition] Subpoena to GWR;

- ¶47 , Ex. 38: Re-Notice of Subpoena to GWR.

- ¶6, Ex. 4: Depo. Ex. 39 (GW's (30(b)(6) designation list).

**Additional Material Fact No. 24.**    When asked to describe trademark use for SOUL DRINKER, GW 30(b)(6) witness Andrew Jones contended that GW used it as a trademark in a title of a book.

- Kearney Decl. ¶ 5, Ex. 3: Jones Depo. Tr.:

  - 163:14-17 (". . . I couldn't say whether we have released any other Soul Drinker products. Probably not. But yes, the Soul Drinker product I was thinking about was the 2002 book by that title.");

  - ¶5, Ex. 3: Jones Dep. at 7:13-18, 11:14-12:10 (re: Jones's designation as GW's 30(b)(6) witness on topics including trademark-related topics, fame, revenues and related records);

  - ¶6, Ex. 4: Depo. Ex. 39 (GW's (30(b)(6) designation list).

**Additional Material Fact No. 25.**    GW has not conducted any consumer surveys or testimonials, or commissioned any expert reports, concerning any of the Marks At Issue.

- Kearney Decl. ¶51;

- Kearney Decl. at:

  - ¶ 5, Ex. 3: Jones Tr. at 223:20-224:2:

        Q . . . Has Games Workshop commissioned any studies by an independent research service to evaluate the fame of its trademarks in the US?

        A   No, not to my knowledge we have not.  I suppose the closest you would get to a valuation is the fact that companies like THQ sign up to million of dollars of guarantees in the licensing agreements we have in place with them.

  - *Id.* at 225:3 – 226:8:

> Q: . . . Has Games Workshop conducted any studies to determine the brand recognition with respect to its trademark in the United States?
>
> A  I certainly have not been involved in anything like that.  I guess our US sales business might have done so at some point in its history.

- *Id.* at 7:13-18, 11:14-12:10 (re: Jones's designation as GW's 30(b)(6) witness on topics including trademark-related topics, fame, revenues and related records);

- Kearney Decl. ¶6, Ex. 4: Depo. Ex. 39 (GW's (30(b)(6) designation list).

**Additional Material Fact No. 26.**    Since its launch, CHS's website has featured a prominent notice disclaiming any affiliation with GW on every page of the website.

- Villacci Decl. ¶ 6.

**Additional Material Fact No. 27.**    GW has been aware of CHS and its products since at least the summer 2008.

- Second Amended Complaint (Dkt. 147) at ¶ 31 ("Upon information and belief, after having initiated some modest sales on eBay in 2008, sometime in or about May 2009, Chapterhouse began manufacturing and selling gaming miniatures and accessories at its website located at www.chapterhousestudios.com ('the Website')");

- Kearney Decl. at:

  - ¶52, Ex. 39:  G. Stevenson Depo. Tr. (March 9, 2012 ) ("Stevenson II") at 103:4-6 (learning of CHS in January 2008);

  - ¶ 53, Ex. 40: G. Stevenson Depo. Tr. (March 5, 2012) ("Stevenson I") at 17:22-19:25 (re: Stevenson's designations as 30(b)(6) witness, including on topics concerning document collection, confusion, CHS, and trademark policies);

  - ¶6, Ex. 4: Depo. Ex. 39 (designation list).

**Additional Material Fact No. 28.**    GW's U.S. business has no records of U.S. customers expressing confusion between CHS and CHS or even inquiring about CHS.

- Kearney Decl. at:

- o ¶42, Ex. 33: Casey Dep. 58:23-59:20:

  > Q. Does Games Workshop Retail have any records of customers expressing confusion between their products and Chapterhouse products?
  >
  > A. Not to my knowledge.
  >
  > Q. Does Games Workshop Retail have any records of anyone writing into the company about Chapterhouse Studio?
  >
  > A. Not to my knowledge.

- o *Id.*: Casey Dep. at 12:22-13:1(re: Casey's designation as 30(b)(6) witness for Games Workshop Retail, Inc. "GWR");

- o ¶44, Ex. 35: CHS's Deposition Subpoena to GWR;

- o ¶43, Ex. 34: CHS's Document Subpoena to GWR;

- o ¶45 , Ex. 36: GWR's Response to [Document] Subpoena;

- o ¶46 , Ex. 37: Response to [Deposition] Subpoena to GWR;

- o ¶47 , Ex. 38: Re-Notice of Subpoena to GWR.

**<u>Additional Material Fact No. 29.</u>**     GW's 30(b)(6) witness Gillian Stevenson wrote "And another one who clearly is not confused!" after reviewing an email from a individual concerning CHS.

- Kearney Decl. at:

  - o ¶52, Ex. 39:  Stevenson II Tr.  at 151:16-152:10;

  - o ¶54, Ex. 41: Depo. Ex. 88;

  - o ¶55, Ex. 42: Depo. Ex. 89..

  - o ¶ 53, Ex. 40: G. Stevenson I. Tr. at 17:22-19:25 (re: Stevenson's designations as 30(b)(6) witness, including on topics concerning document collection, confusion, CHS, and trademark policies);

  - o ¶6, Ex. 4: Depo. Ex. 39 (designation list).

**Additional Material Fact No. 30.**    Gillian Stevenson, GW's 30(b)(6) witness regarding confusion related to CHS, testified that "I don't know that the original author is confused," with respect to Depo. Ex. 88.

- Kearney Decl. at:

  - ¶52, Ex. 39:  Stevenson II Tr. at 151:1-8, Depo. Ex. 88;

  - ¶54, Ex. 41: Depo. Ex. 88;

  - ¶ 53, Ex. 40: G. Stevenson I. Tr. at 17:22-19:25 (re: Stevenson's designations as 30(b)(6) witness, including on topics concerning document collection, confusion, CHS, and trademark policies);

  - ¶6, Ex. 4: Depo. Ex. 39 (designation list).

**Additional Material Fact No. 31.**    Gillian Stevenson, GW's 30(b)(6) witness regarding confusion related to CHS, testified that it would not be possible to determine whether GW had received emails concerning CHS from individuals residing in the United States.

- Kearney Decl. ¶ 52, Ex. 39:  Stevenson II Tr. at:
  - 17:22-19:25 (re: Stevenson's designations as 30(b)(6) witness, including on topics concerning document collection, confusion, CHS, and trademark policies).

  - 122:14-123:10:

      Q   Has Games Workshop received any communications from individuals in the United States concerning Chapterhouse Studios?  And just for clarification, this question does not include Games Workshop's employees or agents, such as attorneys.

      A   That would be impossible for me to say….

  - 142:20-143:1 (re: Australian email address; Depo. Ex. 84);

  - 147:19-148:8, 150:2-14 (re: British email addresses; Depo. Exs. 85, 87);

  - 147:15-18 (re: no indication that sender resided in the U.S.; Depo. Ex. 86);

- 151:9-13, (re: no indication that sender resided in the U.S.; Depo. Ex. 88).

- Kearney Decl. at

  - ¶54, Ex. 41: Depo. Ex. 88;

  - ¶¶68-71, Exs. 48-51: Depo. Exs. 84-87;
  - ¶6, Ex. 4: Depo. Ex. 39 (designation list).

**Additional Material Fact No. 32.**   GW has not conducted studies to evaluate the public's recognition of its marks, or the size of the market it competes in.

- Kearney Decl. at:

  - ¶ 5, Ex. 3: Andrew Jones Tr. at 225:3-20;

  - *Id.* at 7:13-18, 11:14-12:10 (re: Jones's designation as GW's 30(b)(6) witness on topics including trademark-related topics, fame, revenues and related records);

  - ¶6, Ex. 4: Depo. Ex. 39 (GW's (30(b)(6) designation list).

**Additional Material Fact No. 33.**   There is no evidence that the parties sell their respective products through the same websites, retail stores, or distributors.

Kearney Decl. ¶ 62;

Kearney Decl. at:

- ¶ 63, Ex. 45: GW Response to CHS Interrogatories Set 2 (Interrogatory 11) ("Games Workshop sells copyrighted products at issue on the Internet, at special events and in retail stores.");

- ¶ 64, Ex. 46: Defendant Chapterhouse Studios LLC's Second Supplemental Response to Games Workshop's Ltd.'s Second Set of Interrogatories to Chapterhouse Studios LLC (Nos. 3-13) (Interrogatory 9) (listing websites and physical locations where Chapterhouse has sold products that GW claims infringe its copyrights).

**Additional Material Fact No. 34.**    GW has produced no evidence that it advertises on the same websites or in the same publications as CHS.

> Kearney Decl. ¶ 62.

**Additional Material Fact No. 35.**    GW has produced no sales invoices or other records showing that GW and CHS distributed goods in any particular geographical area that overlap.

- Kearney Decl. ¶ 7.

**Additional Material Fact No. 36.**    Andrew Jones, GW's Head of Legal, Licensing and Strategic Project and GW's 30(b)(6) witness on trademark-related topics, confirmed that GW's response to Interrogatory No. 18 was a comprehensive list of all marks alleged in this case (hereinafter, the "Marks At Issue").

- Kearney Decl. at:

  - ¶ 4 & Ex. 2: GW Second Supp. Resp. to CHS Interrogatories Set 4, Mar. 9, 2012) ("Rog 18 Response")

  - ¶ 5 & Ex. 3 (Andrew Jones Depo. Tr. at 13:22-14:8);

  - *Id.* at 7:13-18, 11:14-12:10 (re: Jones's designation as GW's 30(b)(6) witness on topics including trademark-related topics, fame, revenues and related records);

  - ¶ 6, Ex. 4: Depo. Ex. 39 (GW's (30(b)(6) designation list).

**Additional Material Fact No. 37.**    "Horus Heresy: Collected Visions", Reg. No. TX 7-538-569 and "Website Content from 2000 to 2011", Reg. No. TXu 1-788-290 are registrations for compilations of works.  "Blood Raven Transfer Sheet", Reg. No. VA 1-819-307 is a registration regarding a transfer sheet, which is a sheet with decals of icons, and a registration for a derivative work.  The "Blood Raven" icons were derived from an icon from an earlier computer game developed by a third party.  GW MSJ Ex. 11 did not include a registration for a computer game.

- GW MSJ Ex. 11;

- Kearney Decl. ¶ 56 & Ex. 43: credits page "Horus Heresy: Collected Visions", GW0001882, providing publication dates before 2007 for each of the books that make up the collection;

- Kearney Decl. ¶ 65 & Ex. 47 (Hodgson Dep. at 104:15-21: "Q   Can you describe what you mean by transfer sheets?   A   That's like a decal, like a transfer where it's an icon that's on a sheet and you cut it out and you slide it across and you put it on the model so that it -- so that you don't have to paint it on, essentially.");

- *Id*. at 76:10-78:15 (testifying that GW's employee based his "Blood Raven" icon on the "Blood Raven" icon from an earlier computer game developed by a different company).

**Additional Material Fact No. 38.**   Of the 80 marks listed in GW's Motion in footnote 16, the following 12 marks were not identified in GW's Rog 18 Response:  Assault Space Marine, Tyranid Bonesword, Devastator Space Marine, Gaunt, Howling Griffons, Tyranid Lashwhip, Mycetic Spore, Striking Scorpion, Tactical Space Marine, Tervigon, Tyranid, Ymgarl.

- GW's Mot., 20 n.16;

- Kearney Decl. at:

  - ¶ 66;

  - ¶ 4 & Ex. 2: GW Second Supp. Resp. to CHS Interrogatories Set 4, Mar. 9, 2012) ("Rog 18 Response")

  - ¶ 5 & Ex. 3 (Andrew Jones Depo. Tr. at 13:22-14:8);

  - *Id*. at 7:13-18, 11:14-12:10 (re: Jones's designation as GW's 30(b)(6) witness on topics including trademark-related topics, fame, revenues and related records);

  - ¶ 6, Ex. 4: Depo. Ex. 39 (GW's (30(b)(6) designation list).

**Additional Material Fact No. 39.**   GW conducts minimal advertising in the United States.

- Kearney Decl.  at

  - **¶42, Ex. 33**: Casey Dep. 43:9-15:
    Q. What type of advertising does Games
    Workshop Retail do?
    A. We don't do traditional advertising.
    Q. What type of nontraditional
    advertising do you do?
    A. Our advertisement is word of mouth
    from our customers.

- o **¶52, Ex. 39**: Stevenson II Tr. at 203:19 to 204:14;

  Q Does Games Workshop have records to
  determine its advertising expenditures in the United
  States?
  A If it had any, then it would.
  Q And what do you mean if it had any?
  A Well, if you don't advertise, it doesn't cost
  you anything.
  Q So Games Workshop is not advertising in the
  United States?
  A They have in the past very occasionally run very
  localized adverts; but as a general course of business,
  Games Workshop does not advertise.

- o ¶ 53, Ex. 40: G. Stevenson I. Tr. at 17:22-19:25 (re: Stevenson's designations as 30(b)(6) witness, including on topics concerning document collection, confusion, CHS, and trademark policies);

- o ¶ 6, Ex. 4: Depo. Ex. 39 (GW's (30(b)(6) designation list)

**Additional Material Fact No. 40.**     In its response to Interrogatory No. 3 ("Rog 3 Response"), which required GW to identify allegedly infringing use by CHS for each mark that GW alleges is at issue in this case, GW did not identify use by CHS of 28 marks that GW identified in its Motion in footnote 16.  The 28 marks are: Assault Space Marine; Cadian; Chaos Space Marine; Chimera; Devastator Space Marine; Dreadnought; Gaunt; Hellhound; Heresy Armour; Howling Banshee; Howling Griffons; Imperial Guard; Librarian; Melta; Mycetic Spore; Plasma; Predator; Stormraven; Striking Scorpion; Tactical Space Marine; Techmarine; Terminator; Thunder Hammer; Tyranid Bonesword; Tyranid Lashwhip; Tyrant; Warhammer 40K; and Ymgarl.

- Kearney Decl.  ¶63, Ex. 45, Response to Interrogatory No. 3 ("Rog 3 Response);

- *Id*. at ¶ 67;

- Mot. 20 n.16.

Dated: September 6 , 2012                  Respectfully submitted,


                                         /s/ Bryce Cooper

Jennifer A. Golinveaux (CA Bar No. 203056)
Dean A. Morehous (CA Bar No. 111841)
K. Joon Oh (CA Bar No. 246142)
Thomas J. Kearney (CA Bar No. 267087)
    WINSTON & STRAWN LLP
    101 California Street
    San Francisco, CA 94111-5802
    Phone: (415) 591-1000
    Fax: (415) 591-1400
    jgolinveaux@winston.com
    dmorehous@winston.com
    koh@winston.com
    tkearney@winston.com


Eric Mersmann (IL Bar No. 6286859)
Bryce Cooper (IL Bar No. 6296129)
Jonathon Raffensperger (IL Bar No. 6302802)
    WINSTON & STRAWN LLP
    35 West Wacker Drive
    Chicago, IL 60601-1695
    Phone: (312) 558-5600
    Fax: (312) 558-5700
    emersmann@winston.com
    bcooper@winston.com
    jraffensperger@winston.com


SF:339891.3

## CERTIFICATE OF SERVICE

I, Thomas J. Kearney, an attorney, hereby certify that on September 6, 2012, I caused to be filed electronically the foregoing

**[REDACTED] LOCAL RULE 56.1(b)(3) RESPONSE AND EVIDENTIARY OBJECTIONS OF DEFENDANT CHAPTERHOUSE STUDIOS LLC TO PLAINTIFF GAMES WORKSHOP'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT; CHAPTERHOUSE STUDIOS LLC'S ADDITIONAL MATERIAL FACTS**

with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.


_____/s/  Thomas J. Kearney_____

SF:339967.1