**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED, | |
| Plaintiff, | Civil Action No. 1:10-cv-8103 |
| v. | Hon. Matthew F. Kennelly |
| CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES | Hon. Jeffrey T. Gilbert |
| Defendants. | |

**GAMES WORKSHOP'S REPLY MEMORANDUM IN FURTHER
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Jason J. Keener (Ill. Bar No. 6280337)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone:  312.832.4500
Facsimile:  312.832.4700
Email:  jkeener@foley.com;
aweinzierl@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229
Email:  jmoskin@foley.com

*Attorneys for Plaintiff
Games Workshop Limited*

## TABLE OF CONTENTS

ARGUMENT ............................................................................................................... 2

   I.  Games Workshop Is Entitled To Judgment As To Copyright Ownership ............. 2

   II.  English Law of Copyrightability Is Irrelevant ........................................................ 5

   III.  Chapterhouse Has Conceded Copying and Lack of Independent Creation ........................................................................................................... 7

   IV.  Games Workshop Has Proven Substantial Similarity ........................................... 8

   V.  Chapterhouse Is Guilty of Trademark Infringement ........................................... 11

CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

CASES

*Albiero v. City of Kanhakee,*
    246 F.3d 927 (7th Cir 2001) ................................................................................5, 8

*Atari, Inc. v. N. Am. Phillips Consumer Elec. Corp.*,
    672 F.2d 607 (7th Cir. 1982) ...............................................................................8, 11

*Au-Tomotive Gold Inc. v. Volkswagen of America Inc.*,
    457 F.3d 1062 (9th Cir. 2006), *aff'd* , 603 F.3d 1133 (9th Cir. 2010). ............................ 13-14

*Bridgeman Art Library v. Corel Corp.*,
    36 F. Supp. 2d 191 (S.D.N.Y. 1999).........................................................................6

*CAE, Inc. v. Clean Air Eng'g Inc.*,
    267 F.3d 660 (7th Cir. 2001) ...............................................................................13

*Cambridge Univ. Press v. Becker*,
    No. 1:08-cv-1425-ODE, 2012 U.S. Dist. LEXIS 78123 (N.D. Ga. May 12, 2012).............. 4-5

*Castle Rock Ent v. Carol Pub. Grp, Inc.*,
    150 F.3d 132 (2d Cir.1998)............................................................................... 8-9

*Christopher Phelps & Associates, LLC v. Galloway*,
    492 F.3d 532 (4th Cir. 2007) ...............................................................................3

*Faulkner v. Nat'l Geographic Enters. Inc.*,
    409 F.3d 26 (2d Cir. 2005), *aff'd, Ward v. Nat'l Geographic Soc'y,* 284 Fed. Appx.
    822 (2d Cir. 2008).........................................................................................3

*Hasbro-Bradley v. Sparkle Toys*,
    780 F.2d 189 (2d Cir. 1985)................................................................................6

*Nielsen Co., LLC v. Truck Ads, LLC*,
    No. 08 C 6446, 2011 U.S. Dist. LEXIS 96412 (N.D. Ill. Aug. 24, 2011)................................3

*Pride Communications LP v. WCKG, Inc.*,
    851 F. Supp. 895 (N.D. Ill. 1994) .......................................................................15

*Processed Plastic Co. v. Warner Comm'ns, Inc.*,
    675 F.2d 852 (7th Cir. 1982) .............................................................................16

*Rudnicki v. WPNA 1490 AM*,
    No. 04-cv-5719, 2009 U.S. Dist. LEXIS 115236 (N.D. Ill. Dec. 10, 2009)............................7

*Sadhu Singh Hamad Trust v. Ajit Newspaper Advert., Marketing and Comm'ns, Inc.*,
  503 F. Supp. 2d 577 (E.D.N.Y. 2007) ..........................................................................6

*In re Silenus Wines, Inc.*,
  557 F.2d 806 (C.C.P.A. 1977) ...................................................................................14

*Theotakos v. Sara Lee Personal Prods.*,
  971 F. Supp. 332 (N.D. Ill 1997) ...............................................................................3

*Warner Bros., Inc. v. Gay Toys, Inc.*,
  658 F.2d 76 (2d Cir. 1981), *aff'd*, 724 F,2d 327 92d Cir. 1983) ...........................16

## OTHER AUTHORITIES

*Britain v. Hanks Bros*, (1902) 86 Law Times 765………………………………….........7

*LucasFilm Ltd v. Ainsworth*,
  UKSC 39, [2012] 1 AC 208[2011] .............................................................................6

7 William Patry, *Patry on Copyright* § 25 (2012) ......................................................6

Fed.R.Civ.P. Rule 56(c)(1) .......................................................................................7-8

Chapterhouse's conclusory denials of actual copying are supported by no statements of persons with knowledge to rebut the substantial documentary and testimonial evidence presented by Games Workshop that everything Chapterhouse makes and sells is derived from and/or designed to trade on the popular Warhammer 40,000 and is marketed solely to fans of Warhammer 40,000. Neither of Mr. Villacci's two declarations even purport to dispute that Chapterhouse copies from Games Workshop's original works and uses its trademarks to make its products immediately recognizable to Warhammer 40,000 fans. Nor does Chapterhouse point to any deposition testimony or declarations from its designers contesting copying. Under Rule 56(c)(1), summary judgment is proper. Likewise, Chapterhouse's bare speculation that some one or more of Games Workshop's works in issue are not owned by the company is contradicted by actual written assignments from all but five of the authors, each of whom was unquestionably an employee. Chapterhouse simply confuses the issues by citing names of individuals whose works are not in issue or for whom assignments have been provided or as to whom the uncontroverted testimony shows the individuals were employees. Nor does it cite any authority to show that English law should apply to the issue of copyrightability (as distinct from ownership) and grossly mis-cites the one scholar it does mention. As in its own cross-motion, Chapterhouse provides no actual analysis of the actual works in issue, pretending that the case only concerns isolated symbols (such as random Roman numerals) –as distinct from fully drawn characters from which it has appropriated recognizable iconography (which for the Assault, Tactical and Devastator Space Marines happen to *include* specific Roman numerals, with specific meanings), symbols, colors, character names and sculptural details. Just as it ignores the actual combinations of elements that make up these characters, it also ignores the reality that it presents virtually all of its subject works on its website (and on forum posts) painted in Games Workshop's *colors* and even hires a staff of painters for this purpose. (ECF No. 229-1, Kearney

1

Decl., CHS Ex. 46, CHS' 2d Supp. Resp. to Interrog. 6 (identifying five painters))  Mr. Villacci

does not deny this but, rather, admits that (among other reasons) "CHS's products are shown

painted on its website … to show the products to their best advantage…." (ECF No. 229-10,

Villacci Decl. ¶5).  Advantage indeed!

It is also puzzling that Chapterhouse accuses Games Workshop of "dragging" it through

broad discovery, given that Games Workshop served only 35 document requests as against the

86 document requests and 734 admission requests served by Chapterhouse, and Games

Workshop endured ten full days of fact depositions as against only two and one half days of

depositions of Chapterhouse's witnesses.  (Ex. 155, Supp. Moskin Decl ¶¶ 8-9).  Games

Workshop has sought to limit the scope of discovery to the extent possible and in the same spirit

sought (two weeks before briefing on summary judgment) to further narrow the scope of the case

by dropping copyright claims as to 33 individual products.  To distract from the merits of the

case, Chapterhouse brings up long-resolved discovery issues, misleading quotes from initial

discovery objections (later supplemented), newly-claimed deficiencies for which Chapterhouse

never filed a motion on, and the like – never once indicating it has been prejudiced in any way.

Indeed, although the case has had a needlessly complicated history, the facts are clear and

undisputed and can not be obscured by a smokescreen of discovery issues.  It is undisputed that

Chapterhouse's entire business is designed to trade on the popular Warhammer 40,000 (and only

Warhammer 40,000).  If its copies are not immediately recognizable to fans of the game, *i.e.,* to

ordinary observers, and if it does not use Games Workshop's trademarks they will not sell.

## ARGUMENT

### I.    Games Workshop Is Entitled To Judgment As To Copyright Ownership

Chapterhouse inexplicably questions Games Workshop's statement that it owns

registrations for 45 of the works in issue.  (GW Reply to Additional Fact #3; 2d Sup. Moskin

Decl., ¶6) (13 having been registered within 5 years of first publication, GW Reply to Additional

Fact #4), but identifies no actual reason to dispute that Games Workshop indeed owns all of the

works.  It observes that two works are compilations and one a derivative work, but where the

registrant is the owner of the underlying material, the later registration encompasses all of the

content.  *Nielsen Co., LLC v. Truck Ads, LLC*, No. 08 C 6446,  2011 U.S. Dist. LEXIS 96412,  at

*44-45  (N.D. Ill. Aug. 24, 2011) ("`[W]hen the author of the derivative work also has a

copyright on the underlying work, there is no need to protect the public domain or the author of

the underlying work, as the entire work is that of the single author.'"  (quoting *Christopher*

*Phelps & Assoc., LLC v. Galloway*, 492 F.3d 532 (4th Cir. 2007)).[1]  The cases it cites are

inapposite because the claimant did not own the underlying works.[2]  Chapterhouse cites no

specific facts to dispute that Games Workshop is, as it asserts, the author of all of the works (Ex.

1, Merrett Decl., ¶¶ 9-14; Ex. 7, Goodwin Tr. at 57:6-15).  Instead, Chapterhouse shifts gears to

raise the red herring that, despite having pleaded ownership of one catalogue in its original

complaint, Games Workshop instead focused during discovery and in its Amended Complaint on

other works it owns that better exemplify copying.  Although Chapterhouse is correct that the

presumption of ownership is rebuttable, after almost two years since the case was commenced, it

---

[1] In *Christopher Phelps*, where the plaintiff registered only a later version of its own earlier architectural drawings the court stated: "even if Phelps & Associates had only registered the Bridgeford Residence design as a derivative work, it could have sought damages and profits for infringement of all of the components, including those embodied in the Bell and Brown Residence design, because it held the copyright in all of the components. The scope of registration need not precisely trace the scope of the copyright for the holder to sue." *Christopher Phelps & Assoc. LLC,* 492 F.3d at 539.

[2] *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26 (2d Cir. 2005), *aff'd, Ward v. Nat'l Geographic Soc'y,* 284 Fed. Appx. 822 (2d Cir. 2008)(citing by Chapterhouse, involved compilations of articles by freelancers not owned by the publisher); *Theotakos v. Sara Lee Personal Prods.*, 971 F. Supp. 332 (N.D. Ill. 1997)(concerning a design of flags and Olympic symbols not created by plaintiff).

identifies no *facts* to challenge Games Workshop's ownership of all the works in issue.  It cites no testimony from *any* of Games Workshop's designers that Games Workshop does not properly own copyright, no evidence that the employees at issue were not actually employees during the dates identified by Games Workshop, and no evidence that anyone else claims interests in the works.  No trial is needed for such bare speculation.

Contrary to Chapterhouse's contention, Games Workshop has identified all of the individual authors of the works in issue, and the uncontroverted evidence shows that all were employees - or in the case of 12 arguably freelance authors, that it has obtained assignments from them all.  Chapterhouse is also incorrect that Games Workshop has failed to produce evidence that 3 authors (Mr. McVey, Mr. England, Mr. Naismith and Mr. Langley) were employees.  (GW Reply to Additional Fact # 11).  In fact, the unrebutted testimony of Mr. Merrett is that the first three were.  Mr. England has also since signed a confirmatory assignment (Ex. 132, Supp. Merrett Decl ¶ 3; Ex. 142) and Mr. Langley signed a confirmatory assignment for his one work in issue.  (*Id*.).  Simon Egan was and is an employee and has signed a confirmatory assignment  (*Id*.)., and the one work of Adrian Smith is no longer in issue (although he has since signed a full confirmatory assignment (2d Supp. Jones Decl., ¶ 4 Ex. 150,; Ex. 151). *Cambridge Univ. Press v. Becker*, No. 08-cv-1425-ODE, 2012 U.S. Dist. LEXIS 78123, at **69 (N.D. Ga. May 12, 2012), cited by Chapterhouse, is completely inapposite, as the court there was explicit that "[n]one of the authors or external editors of the works at issue in this case are employees of Cambridge, Oxford, or Sage." *Id*. at *69 n. 32.  Here, the only authors whose works Chapterhouse says are in issue were employees.  Unlike the conclusory statements in *Albiero v. City of Kanhakee*, 246 F.3d 927, 933 (7th Cir 2001), Mr. Merrett has a basis in personal knowledge to know who worked for him at Games Workshop and to know that none of them has ever challenged Games Workshop's ownership.  Contrary to Chapterhouse's

4

overblown rhetoric, Games Workshop's position as to the employment status of it's authors has been consistent. As previously noted, it's only error at the outset of discovery was in believing that all of the work, "Horus Heresy: Collected Visions" was authored by employees when one section was created under license by a former subsidiary of the company, Sabertooth Games. However, Games Workshop has provided confirmatory assignments from all 7 of the individual authors. (GW Reply to Additional Fact #5). Indeed, despite Chapterhouse's statement that Games Workshop produced only one confirmatory assignment from a nominal freelancer, it has in fact produced 12 (8 from Sabertooth, plus Langley, Abnett, Counter and Smith). Contrary to Chapterhouse's contention, Games Workshop does not rely on the report of its English law, Michael Bloch, to support this motion, which report was provided as background should it be necessary for the Court, at trial, to apply English law to the circumstances of any individual (not to usurp the Court's function in reaching the ultimate issue as to any such person - the false standard under which Chapterhouse seeks now to have the report reviewed). In short, Games Workshop has provided written assignments from all of the authors but three, and has offered the unrebutted testimony of a person with direct personal knowledge as to their employment status. Not only a preponderance of the evidence but the only evidence confirms ownership, and no trial is needed where the facts are not in dispute.

## II. <u>English Law of Copyrightability Is Irrelevant</u>

Chapterhouse cites no authorities and offers no genuine argument why English law on copyrightability has any bearing here. Given the plain language of Section 104 of the Copyright Act following U.S. adherence to the Berne Convention, plainly it has none. Chapterhouse's only response is to note that one scholar at some unknown time in the past disagreed with the reasoning of *Hasbro-Bradley v. Sparkle Toys*, 780 F.2d 189 (2d Cir. 1985), based on the law as it existed *before* U.S. adherence to Berne (for the simple reason that the Universal Copyright

5

Convention – the only relevant treaty then in place - did not embody the principle of national treatment). The discussion is now completely irrelevant, and Chapterhouse ignores that it was the same scholar, William Patry, who *urged* Judge Kaplan in *Bridgeman Art Library v. Corel Corp.*, 36 F. Supp. 2d 191 (S.D.N.Y. 1999), to uphold the principle that copyrightability of foreign works must now be governed under U.S. law.[3] *Accord Sadhu Singh Hamad Trust v. Ajit Newspaper Advert., Mktg. and Comm'ns, Inc.*, 503 F. Supp. 2d 577, 584 (E.D.N.Y. 2007). Chapterhouse also ignores that, as shown in Games Workshop's motion, its own expert opined merely that rights under copyright for some sculptural works are *limited* under English law to 15 years,[4] not that copyright is foreclosed. (Ex. 127, Bently Rpt. at ¶ 32). Citing *Rudnicki v. WPNA 1490 AM*, No. 04-cv-5719, 2009 U.S. Dist. LEXIS 115236 (N.D. Ill. Dec. 10, 2009), it further conflates the issue of ownership (which does arise under English law) with copyrightability, which every court to have considered the issue (and the one scholar it cites) has held is governed by U.S law. Chapterhouse needlessly confuses the issue further by citing an initial objection to discovery, while ignoring that Games Workshop has in fact identified the authors of all its works and indeed, often identifies its sculptors on the boxes in which the products are sold. Games Workshop does believe that its miniature figures are sculptural works (unlike the prop

---

[3] What the scholar, William Patry, concludes in his more contemporary discussion of the issue is to disfavor reliance on the government's treaty power in assessing copyrightability of foreign works (expressing a modest disagreement with some of the analysis in *Bridgeman*), but rather to rely on the statute itself (as Games Workshop argued in its moving brief) and the Constitutional threshold of originality. He thus concludes "At the same time, it should be noted that as a matter of statutory law, the U.S. originality standard applies to all works, including those of foreign origin, so the question is academic." 7 William Patry, *Patry on Copyright* § 25:15 (2012)**.**

[4] Referring to *LucasFilm Ltd. v. Ainsworth*, [2011] UKSC 39, [2012] 1 AC 208, Bently opined that "the *duration* of its copyright in the designs on which the toys were based was effectively limited under Section 52 of the [Copyright Designs and Patents Act] to 15 years unless the toys were regarded themselves as sculptures." (Undisputed Fact # 83) (emphasis added). Bently also conceded that English law has likely been supplanted by European law under a 2002 directive. (*Id.*).

Stormtrooper helmet at issue in the English case *Lucasfilm)*, and believes that the fact that its principal market is for people who collect and display the models makes the case more like older English case, *Britain v. Hanks Bros*, (1902) 86 Law Times 765, in which the enforceability of copyright in toy soldiers was upheld (Bently Report ¶ 36). However, the argument is simply irrelevant under U.S. law.

### III.    Chapterhouse Has Conceded Copying and Lack of Independent Creation

Ignoring all of the evidence submitted by Games Workshop demonstrating that Chapterhouse's products are copied directly from Warhammer 40K (including extensive email correspondence, the testimony of Mr. Villacci himself as well as his designer, Mr. Traina, not to mention the fact that all of the products are named after the Games Workshop originals) (Undisputed Facts #23-#79), Chapterhouse seizes on Games Workshop's stated doubt in its opening brief (p 7) whether Chapterhouse could even *try* to challenge this evidence as some admission by plaintiff that copying is in dispute. Clearly, no material facts are in dispute as neither of Mr. Villacci's two declarations says a word to challenge copying (or to support an independent creation defense). Nor has Chapterhouse submitted any other testimony to challenge the conclusion that every work is a copy, specifically designed to trade on the popular Games Workshops' originals to which they correspond (by name). *See* Fed.R.Civ.P. Rule 56(c)(1) (a party asserting that a fact is genuinely disputed must support the assertion by citing to admissible evidence); *Albiero*, 246 F.3d at 933. As for independent creation, the only evidence submitted by Chapterhouse (in response to Undisputed Fact #67) is that its response to Interrogatory 2 referenced certain third party works that allegedly influenced unspecified products in undisclosed ways - not that any specific product was created independently of the Games Workshop original for which it is named. That Chapterhouse may have sources of inspiration in addition to Warhammer 40K for unspecified products is hardly proof of

7

independent creation of any actual product. For his own part, Mr. Villacci and all of his designers are utterly silent as to any specific products not derived from Warhammer 40K – even if it is true they occasionally look at other things as well. No trial is needed to assess such silence.

**IV.** **Games Workshop Has Proven Substantial Similarity**

Because it would have been impossible to have analyzed in detail all 121 of Chapterhouse's products in issue under the original complaint, Games Workshop demonstrated for 38 exemplars that "material of substance and value" had been appropriated. *Atari, Inc. v. N. Amer. Phillips Consumer Elec. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982). For many of its products, Chapterhouse never even produced the underlying design documents, (Ex. 133, Supp. Moskin Decl., ¶ 9) and Games Workshop analyzed a further 3 in opposing Chapterhouse's cross-motion. Games Workshop further demonstrated that Chapterhouse's entire business model is to trade on the popularity of Games Workshop's intellectual property. Because it is undisputed that all of the works appropriate "material of substance and value" from the corresponding works in Warhammer 40,000, and because it is undisputed that Chapterhouse's products only sell if they are immediately recognizable to ordinary consumers (and hence appropriate the "total look and feel" of the originals), as in *Castle Rock Entm't v. Carol Pub. Group, Inc.,* 150 F.3d 132 (2d Cir. 1998), where the Court viewed the individual instances of copying in the aggregate, Chapterhouse's entire website is an infringement. If it can someday determine a way to reconfigure its business without such aggregated copying, that issue can await another day.

Similarly, should there come a time when Chapterhouse does not use Games Workshop's colors in marketing and selling its products, such a case might be very different. However, given that it is undisputed that Chapterhouse presents its works in Games Workshops colors – both on its website and on third party sites (which it failed to produce in discovery despite a Court order

8

to do so) – and that Chapterhouse employs a team of painters (Kearney Decl., CHS Ex. 46, CHS'
2d Supp. Resp. to Interrog. 6, (identifying five painters)), it is hardly clear why the infringement
analysis should be confined to unpainted versions of these works.  Laying aside that
Chapterhouse's designs (even unpainted) copy the names, iconography and sculptural details of
Games Workshop's originals (copies of which *were* provided to Chapterhouse in color),
Chapterhouse has offered no analysis why the full extent of its copying should not be considered.

Chapterhouse seizes on its Tervigon conversion kit, which Games Workshop readily
concedes allows a user to combine the Chapterhouse add-on with a Games Workshop Carnifex
model to create a nearly exact copy of Games Workshop's Tervigon as depicted in the "Tyranid
Codex".  Games Workshop never meant to suggest otherwise.  That Chapterhouse combines a
Games Workshop sculptural design with its own kit to produce a copy of another original Games
Workshop design does not excuse the resulting infringement.  Chapterhouse's new contention
that the Games Workshop Carnifex has some similarity to a third-party design (allegedly of H.R.
Giger) never previously mentioned in this litigation is irrelevant.  Laying aside that there is no
evidence that either party ever considered the purported H.R. Giger work in creating the original
Tervigon or the unlawful copy (to the contrary, Chapterhouse's own designer openly admitted to
directly copying the image from Games Workshop's "Tyranid Codex". (Undisputed Fact #51),
the image (found only on an unauthenticated Wikipedia page) looks so unlike either Games
Workshop's original Carnifex or Tervigon or Chapterhouse's copy of the Tervigon only adds
support to Games Workshop's contention its designs are wholly original and the copy wholly
unlawful.  Chapterhouse offers no declaration from the designer who made the copy.  It is also
more than a little ironic that Chapterhouse would seek to introduce such new evidence now when
so much of its defense of the motion is devoted to falsely accusing Games Workshop of having
failed to produce materials in discovery.  As Mr. Villacci himself publicly admitted about his

9

company's copy (without ever mentioning HR Giger), it "builds upon the Carnifex kit yet fits true to what most tyranid players envision the Tervigon to be like on the table." (Undisputed Fact #51; Ex. 65, Warseer Posting at 1).

Finally, Games Workshop has repeatedly shown why it is not concerned with copying of isolated, random Roman numerals or common symbols such as a chevron. Rather, what this case concerns (which Chapterhouse simply ignores or concedes) is the undisputed originality of entire characters (for instance, fully drawn Tactical, Assault and Devastator Space Marines) from which Chapterhouse has copied key portions - specifically, combinations of iconography that it places on shoulder pads (the shape of which its own expert concedes is unique) in precisely the manner Games Workshop does, and which it identifies using Games Workshop's original character names. It even copies the unique indents on the backs of the shoulder pads. Contrary to Chapterhouse's suggestion that there is no foundation for Exhibit 126 (showing the copying of the indents), Mr. Villacci himself authenticated this photograph at his deposition and admitted Chapterhouse's copying in creating the templates for its own shoulder pads so as to replicate the same aesthetics of enhanced strength that Games Workshop devised. (GW Reply to Additional Fact #18)) Mr. Villacci does not dispute the copying now.

Because Chapterhouse refuses even to acknowledge what the case is about (just as it refuses to acknowledge its copying of Games Workshop's coloring and character names) it never even addresses the real allegations against it and thus concedes it is guilty of copying original combinations of symbols, character names, colors and iconography created by Games Workshop for its Tactical, Assault and Devastator Space Marine characters – including their shoulder pads. And although it states conclusorily there has been no unlawful copying, it is undisputed that there has been a misappropriation of "material of substance and value." *Atari*, 672 F.2d at 614. As Chapterhouse concedes, if the products were not immediately recognizable as copies of the

10

Games Workshop originals, they would not sell to Chapterhouse's only market: *i.e.,* fans of Warhammer 40,000.

## V.   Chapterhouse Is Guilty of Trademark Infringement

Because Chapterhouse has modified its website during the course of this proceeding, and has wholly failed to comply with the Court's December 15, 2001 Order directing it to produce documents from its own or third-party sites where it promotes its goods, it is difficult to say at any given time precisely how many of Games Workshop's marks it is using to sell its competing goods.  However, examples Games Workshop has found on third party sites (that Chapterhouse failed to produce despite the Court order) include the following uses of plaintiff's trademarks:

> Sales on eBay of "*Space Marine 40K* 10 Squad Bit kit *Salamanders* Dragon"; "*Space Marine 40K Terminator* Squad Bits for *Salamanders*"; "*Rhino* Armor Kits *Salamanders Warhammer 40K Space Marine*"; "Resin *Drop Pod for Warhammer 40000 Space Marines*" (Ex 14);

> Sales on Bartertown of "Custom *Iron Snake*, *Salamander*, *Soul Drinker* Shoulder Pads" (Ex 15);

> Promotion on Warseer.com of "Chapterhouse Studios New Releases – *Tervigon* Kit, *1K Heresy Sons*, *Mantis Warriors*" (Ex 65 at 2 "*Tervigon*" and 7 "Javelin Class *Imperial Jetbike.*"

Chapterhouse's website, which also has changed repeatedly during the pendency of this action (but will no doubt revert to more extensive use of Games Workshop's trademarks if it is not enjoined), makes consistent use of Games Workshop's trademarks to identify its own products.

> Sample product names on the Chapterhouse website (not even including the product descriptions, which make further frequent reference to the Games Workshop names) include the following uses of Games Workshop trademarks: "Eagle *Thunder Hammer* for *Space Marine*";"Skull or Chaplain Head Bit for *Space Marines*"; "Shoulder Pads for *Blood Eagle – Tactical*"; "Shoulder Pads for *Blood Eagle – Terminator*"; "*Celestial Lions* Left Arm Shoulder Pad Bit – *Tactical*"; "*Celestial Lions* Right Arm Shoulder Pad Bit – *Tactical*"; "Shoulder Pads for *Deathwatch* or *Dark Angels – Tactical*"; "Shoulder Pads for *Deathwatch* or *Dark Angels – Terminator*"; "*Power Armour Pad for Exorcist Space Marine*"; "*Terminator*

11

Shoulder Pad for *Flesh Tearers*"; "*Howling Griffon* Shoulder Pads for *Space Marines*"; "Shoulder Pads for *Imperial Fist – Tactical Marines*"; "Shoulder Pad for *Imperial Fist – Terminator Marine*"; "Shoulder Pads for Serpent or *Iron Snakes – Tactical*"; "Shoulder Pads for Serpent or *Iron Snakes – Terminator*"; "Shoulder Pads for Chalice or *Soul Drinker - Terminator*"; "Shoulder Pads for Chalice or *Soul Drinker - Tactical*"; "*Salamander* Icon Shoulder Pad Bit - *Tactical*"; "*Salamander* Icon Shoulder Pad Bit - *Terminator*"; "*Salamander Power Fist*"; "*Salamander Storm Shield*"; "*Salamander Thunder Hammer*"; *Salamander*, *Alpha Legion* Conversion Kit for *Land Raider*"; "Vehicle Icons for *Flesh Tearers*"; "*Farseer* Conversion Kit for *Eldar Jetbike*";"Conversion Kit for *Tyranid Tervigon*"; "Warrior *Bonesword* Arms for *Tyranids*"; "*Ymgarl* Heads for *Tyranid Genestealers*"; "Female Heads – *Imperial Guard*"; "*Assault* Shoulder pad for *Space Marine*"; "*Devastator* Shoulder pad for *Space Marine*"; "*Power Armour* Shoulder pad for *Space Marine*"; "*Tactical* Shoulder Pad for *Space Marine*"; "*Salamanders Drop Pod* Armor"; "*Salamander* Dragon Skull Shoulder Pad – *Tactical*"; "*Salamander* Dragon Skull Shoulder Pad – *Terminator*"; "*Salamander Thunder Hammer*"; "*Salamander* Head Bit *Space Marine*"; Shield for *Iron Hands*"; "Shoulder Pad for *Iron Hands Power Armor*"; "Shoulder Pad for *Iron Hands Terminator* Armor"; "*Heresy Era Jump Packs for Space Marines*"; "Masked *Heresy* Heads for *Space Marines*"; "MK I *Heresy Era for Space Marine 'Thunder Armor'* Shoulder Pad"; "Studded *Power Armor* Pad for *MK 5*"; "Celtic Wolf Shield for *Space Wolves*"; "Storm Combat Space Tech Shield for *Space Wolves*"; "'*Heresy'* Armoured Drop Pod* Door"; "*Armoured Predator* Armour Kit"; "Armoured *Rhino for Space Marine* Tank Door"; "*Mark I Rhino* Conversion Kit"; "*Rhino* Tank Conversion Kit for *Space Marine or Salamander*"; "*Mycetic Spore for Tyranids*"; "*Pre-Heresy* Scarab Shoulder Pads for *Thousand Sons Space Marines*"; "Shoulder Pad for *Mantis Warriors – Terminator/Power Armor*"; "Shoulder pad for *Blood Ravens Marines – Terminator/Power Armor*"; "Dragon or *Salamander* Variant *Rhino* Door Kit"; "*Rhino* Conversion kit for *Space Wolves*"; "*Tactical Rhino* Doors with Skulls"; "*Rhino* Tank Conversion Kit for *Iron Snakes*"; "*Imperial Guard Chimera*" conversion kit; "*Space Marine Storm Raven*" Tru-scale conversion kit; "*Death Angel* doors for *Space Marine Land Raider* kit"; "*Death Angel Storm Shield*". (Ex. 135 Comparison Chart; Ex. 155, 2d Supp. Moskin Decl. ¶ 10)

Chapterhouse disputes that it sells its Tau Super Heavy Walker (for which it produced no design documents) under the name "Tau." In fact, Chapterhouse prominently used the name "Super Heavy Tau Walker" in announcements on its website (Ex 156), and Games Workshop's receipt from purchasing a sample confirms such use (Ex. 152, Ex. 153, Stevenson Decl. ¶ 2). Its use of the Tau logo trademark on the product immediately identifies it as a Tau figure. Moreover, Chapterhouse could scarcely have been more explicit when it first announced the new product: "Our first vehicle kit, we decided to go crazy on Tau." (Ex 157) Although it has been

12

more modest in using the Tau name following commencement of suit, it will no doubt resume such use if not enjoined.

Chapterhouse does not dispute that its use of Games Workshop's trademarks to advertise and sell its products on eBay is an infringement and that the resale on such sites of its products (which bear no permanent markings identifying Chapterhouse as source) causes post-sale confusion (even where such re-sales are made by Chapterhouse's customers). *CAE, Inc. v. Clean Air Eng'g Inc.*, 267 F.3d 660, 683 (7th Cir. 2001); *Au-Tomotive Gold Inc. v. Volkswagen of Am. Inc.*, 457 F.3d 1062 (9th Cir. 2006), *aff'd*, 603 F.3d 1133 (9th Cir. 2010). It's only defense - that the products bear no permanent markings – misses the very point that with no markings naming Chapterhouse as source, the products can only be viewed as Games Workshop's. Nor does it dispute that prominent on its website of the banner "Specializing in Custom Sculpts and Bits for Warhammer 40,000" is likely to cause confusion as to its affiliation with plaintiff.

Just as it strains credulity for Chapterhouse now to deny its own pervasive use of Games Workshop's trademarks (which it simultaneously argues it *must* use under the theory of nominative fair use as the only way to identify its products and their correspondence to Games Workshop's goods), it is unfathomable that Chapterhouse disputes Games Workshop's ownership of the very marks it admits it uses because of their association with Warhammer 40K. As Games Workshop demonstrated in opposing Chapterhouse's own motion for summary judgment, its defense that Games Workshop has not proven use in commerce and ownership is belied by the vast sales data Games Workshop did produce in response to Chapterhouse's 7th (and final) discovery requests. (2d Supp. Moskin Decl., ¶ 6) (GW Reply to Additional Facts

#19, 21, 23, and 35).[5]  Notably, it was not until the very end of discovery (in these final document requests and an April deposition after the formal close of discovery) that Chapterhouse even purported to raise the issue.  The defense is also contrary to the disclaimer Chapterhouse *voluntarily* placed on its website admitting Games Workshop owns all the marks,[6] and by Mr. Villacci's own actual purchase of all these goods (Ex 136)  Mr. Villacci's two declarations are, of course, silent on his new and baseless contention that the Games Workshop products he has actually purchased and used as the basis to name his own goods were somehow never really sold here.  That all of Games Workshop's 73 company stores and 1,216 independent accounts in thus U.S. do not carry a full range of products is simply irrelevant, given the vast evidence of sales of the *products in issue*.  As with its defense of the copyright claims against it, Chapterhouse's defenses to trademark infringement assume an alternate reality where plaintiff's enormous business presence (including over $50 million in annual sales as developed over 25 years) somehow does not exist, and defendant's actual business model is something other than trading on the popularity of that business (and only that business).  A perfect example of the *actual* reality is Mr. Villacci's visit to his local store to check the new Tyranid Codex when designing his Mycetic Spore.  (Undisputed Fact #53).  Chapterhouse also argues confusion is unlikely because it does not sell its goods in those Games Workshop's stores, ignoring that the only place

---

[5] Games Workshop has confirmed yet again that the sales figures it produced all related to sales in (or for a small number through) the United States.  (Ex. 150, 2d Supp. Jones Decl., ¶ 2). The small number of sales imported to the United States and distributed to end users in Canada all constitute sales in commerce supporting trademark rights.  *In re Silenus Wines, Inc.,* 557 F.2d 806 (C.C.P.A. 1977).

[6] Chapterhouse cites no authority that its own voluntary election to put the language on its site is not an admission.  That it took the language from Games Workshop's own website and that the language mentions that some of the marks are registered in the UK, does not make it any less an admission by Chapterhouse, *here in the United States*, that Games Workshop owns the marks it has deliberately copied.

it markets it goods is on forums devoted to fans of Warhammer 40k (evidence it refused to produce in discovery). Although there is not extensive evidence of actual confusion, *Pride Communications LP v. WCKG, Inc.*, 851 F. Supp. 895, 902 (N.D. Ill. 1994), credited a <u>single inquiry</u> as evidence of actual listener confusion and held that "any such evidence is deemed 'substantial evidence' that confusion is likely."

As noted in Games Workshop's motion, the only names in issue for which it has not commenced sales of a specific product (as distinct from creating recognition by widespread use of the names in books and magazines) are Mycetic Spore, Ymgarl and Tervigon. However, Chapterhouse does not dispute that its use of these names to trade on the reputation created by Games Workshop is unfair competition. *Processed Plastic Co. v. Warner Comm'ns, Inc.*, 675 F.2d 852 (7th Cir. 1982); *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir. 1981), *aff'd*, 724 F,2d 327 92d Cir. 1983). Although Chapterhouse says none of Games Workshop's names are inherently distinctive, it challenges only two terms: Jetbike and Soul Drinker. However, the term "Jetbike" is used by Chapterhouse together with other terms (including as noted above "Farseer Conversion Kit for Eldar Jetbike") that immediately call to mind Warhammer 40K. And "Soul Drinkers" refers to a series of 7 books (not just one) and a repeatedly-used character name. (GW Reply to Additional Fact #24). There is no dispute that a book series is protectable as a trademark. As in *Processed Plastic Co.,* Chapterhouse's use of "Soul Drinkers" – and indeed all of plaintiffs's marks - is intended solely to trade on existing goodwill in the names.

## <u>CONCLUSION</u>

For the foregoing reasons, Games Workshop requests that summary judgment be entered in its favor together with such other and further relief as the Court deems just and proper.

15

Dated:  September 20, 2012                Respectfully submitted,

  s/  Jason J. Keener

Jason J. Keener (Ill. Bar No. 6280337)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone:  312.832.4500
Facsimile:  312.832.4700
Email:  jkeener@foley.com;
aweinzierl@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229
Email:  jmoskin@foley.com

*Attorneys for Plaintiff*
*Games Workshop Limited*

## <u>CERTIFICATE OF SERVICE</u>

I, Jason J. Keener, an attorney, hereby certify that on September 20, 2012, I caused to be filed electronically the foregoing PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

s/  Jason J. Keener
Jason J. Keener