**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GAMES WORKSHOP LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:10-cv-08103 |
| v. | ) | |
| | ) | |
| CHAPTERHOUSE STUDIOS LLC and | ) | |
| JON PAULSON d/b/a PAULSON GAMES, | ) | Judge Matthew F. Kennelly |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CHAPTERHOUSE STUDIOS LLC'S
REPLY TO PLAINTIFF GAMES WORKSHOP'S RESPONSES TO
CHAPTERHOUSE'S STATEMENT OF MATERIAL FACTS AND CHAPTERHOUSE'S
RESPONSE TO GAMES WORKSHOP'S ADDITIONAL FACTS**

Pursuant to Local Rule 56.1(b)(3), Defendant Chapterhouse Studios LLC ("Defendant" or "CHS") hereby submits its Reply and Evidentiary Objections to Plaintiff Games Workshop Ltd 's Response to CHS's Statement of Material Facts in Support of its Motion for Summary Judgment. GW did not include the supporting authority to which CHS cited for each of its undisputed facts which can be found in CHS's Statement of Material Facts.

CHS replies to GW's responses to CHS's statements of fact as follows:

**I. UNDISPUTED MATERIAL FACTS**

1. Plaintiff Games Workshop Limited ("GW") is a United Kingdom corporation and a subsidiary of Games Workshop PLC. 1. Plaintiff Games Workshop Limited ("GW") is a United Kingdom corporation and a subsidiary of Games Workshop PLC.

**Games Workshop's Response:** Games Workshop does not contest this fact.

2. Defendant Chapterhouse Studios LLC ("CHS") is a Texas limited liability company whose address is 3930 Glade Road, Suite 108 # 174, Colleyville, Texas, 76034.

**Games Workshop's Response:** Games Workshop does not contest this fact.

      3.      This Court has subject matter jurisdiction over the claims pursuant to 15 U.S.C. §1121 and 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction over claims arising under the statutory and common law of the State of Illinois pursuant to 28 U.S.C. § 1367 (a) because the state law claims are so related to the federal claims that they form part of the same case or controversy.

**Games Workshop's Response:** Games Workshop does not contest this fact.

      4.      Pursuant to Federal Rule of Civil Procedure 12(h), CHS waived its objections to personal jurisdiction and venue by responding to GW's complaint.

**Games Workshop's Response:** Games Workshop does not contest this fact.

      12.      GW worked with freelance artists and model-makers to create certain of the intellectual property it claims in this case.

**Games Workshop's Response:** Games Workshop does not contest this fact.

      13.      CHS began making limited sales on eBay and similar websites around June 2008, and in April 2009 CHS launched its website, www.chapterhousestudios.com.

**Games Workshop's Response:** Games Workshop does not contest the fact that Chapterhouse began making sales on eBay and similar websites around June 2008.  However, Games Workshop does not know what Chapterhouse means by the term "limited sales."

      15.      GW has been aware of CHS and its products since at least the summer 2008.

**Games Workshop's Response:** Games Workshop does not contest this fact.

      26.      GW's Second Rev. Copyright Claim Chart drops 32 copyright claims and adds copyright claims to 15 additional CHS products.

**Games Workshop's Response:** Games Workshop does not contest this fact; however, Games Workshop dropped copyright claims in 33, not 32 of defendant's products.

27.     GW has now acknowledged that CHS products nos. 8, 15, 16, 25, 26, 28-30, 32, 38- 42, 44, 70-71, 81, 84-86, 88-89, 91-93, 96, 107, 109, 115-16, and 119 do not infringe its copyrights.

**Games Workshop's Response:** Games Workshop does not contest this fact.

28.     GW designated Alan Merrett as its 30(b)(6) witness concerning certain topics, including copyright-related topics.

**Games Workshop's Response:** Games Workshop does not contest this fact.

52.     On March 9, 2012, in its second supplemental response to Interrogatory No. 18 ("Rog 18 Response"), GW claimed 110 marks were infringed by CHS—omitting 17 marks alleged in its Second Amended Complaint ("SAC") , and adding 44 marks not alleged in its SAC. The 17 omitted marks are: WARHAMMER 40,000; TYRANID; BLOOD RAVENS MARINES; ALPHA LEGION; BONESWORD; GAUNT; HOWLING GRIFFONS; LASHWHIP; LUNA WOLVES; MANTIS WARRIORS; MK ARMOUR; MYCETIC SPORE; SONS OF RUSS; SWARMLORD; THUNDER ARMOUR; TERVIGON; and YMGARL.

**Games Workshop's Response:** Games Workshop does not contest this fact.

53.     Andrew Jones, GW's Head of Legal, Licensing and Strategic Project and GW's 30(b)(6) witness on trademark-related topics, confirmed that GW's Rog 18 Response is a comprehensive list of the GW marks at issue in this lawsuit (hereinafter, the "Marks At Issue").

**Games Workshop's Response:** Games Workshop does not contest this fact; however, Mr. Jones full statement was "As of the date of this document, yes. I am sure if Chapterhouse Studios continue to release infringing products using new trademarks we will continue to add those to our claim."

58.     The Marks At Issue include 11 registered marks and 99 unregistered marks.

**Games Workshop's Response:** Games Workshop does not contest this fact.  Andrew Jones identifies the trademarks and design marks that are at issue. (Ex. 2, Jones Decl. ¶¶ 4-7).

**CHS'S REPLY:**     It is undisputed that the Marks At Issue include 11 registered marks and 99 unregistered marks.

CHS objects to GW's statement concerning the Jones Declaration because it is irrelevant as GW's statement make no distinction between registered and unregistered marks. GW's statement is also irrelevant because his categorization of marks as trademarks or design marks is irrelevant as to the number of registered and unregistered Marks At Issue.

CHS further objects to the Jones Declaration as being inaccurate in additional to being irrelevant as it does not address the Marks At Issue; for example, the Jones Declaration at Paragraph 2 cites a registration for WARHAMMER 40,000 and Design even though that trademark is not among the Marks at Issue.  *Supra* CHS's Reply re SUF 53; Dkt. 208-42 (Ex. 66: Rog 18 Response). As another example, the Jones Declaration at best identifies 88 unregistered marks at Paragraphs 6 and 7, and many of the identified marks are not Marks at Issue, e.g., Assault Space Marine, Tyranid Bonesword, Tervigon, Howling Griffin icon, Ultramarine icon, and Mantis Warrior icon. The Jones Declaration is inconsistent with Mr. Jones's previous deposition testimony (testifying as GW's 30(b)(6) witness concerning trademark-related topics) concerning the Marks at Issue and which of those Marks at Issue were design marks. CHS's SUF 53, 63 (Dkt. 210.) GW's "[s]elf serving [] testimony is not enough to defeat a motion for summary judgment." *See Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007) (affirming summary judgment, attorney fees, and costs where plaintiff failed to establish bona fide use of registered mark).

66.     When asked to describe trademark use for SOUL DRINKER and Grenade Launcher, GW 30(b)(6) witness Andrew Jones contended that GW used them as trademarks in a title of books and book excerpts.

**Games Workshop's Response:** Games Workshop does not contest this fact.

77.     GW has not conducted studies to evaluate the public's recognition of its marks, or the size of the market it competes in.

**Games Workshop's Response:** Games Workshop does not contest this fact.

## II.     MATERIAL FACTS IN DISPUTE.

5.     Chapterhouse Studios ("CHS") is a small company located in Grapevine, Texas that makes products players may use when playing fantasy and sci-fi war games. It was formed by a longtime enthusiast of GW's Warhammer 40,000 and other tabletop war games.

**Games Workshop's Response:** Games Workshop contests this fact to the extent that it implies that Chapterhouse makes products for use in any games other than Games Workshop's Warhammer 40,000 game. At his deposition (despite repeated objections from counsel) Mr. Villacci was unable to identify any Chapterhouse products that were not influenced by Games Workshop's own products and books (Ex. 16, Villacci Tr. at 235-39) and ultimately admitted: "I said all of our products have been influenced by a number of things, including Games Workshop's products and books." (Id. at 239:6-8)

**CHS'S REPLY:**     Mischaracterizes the evidence in a manner that is immaterial to the motion.  GW's mischaracterizes Villacci's deposition testimony, where he stated in part: "everything that we have created has been influenced by what I have been exposed to. Be it, Star Wars movies, Games Workshop products. I can't exclude anything from my personal experience." *See* GW's Ex. 16: Villacci II at 235:16-236:5. GW's characterization of that testimony is also irrelevant and a non sequitur, since even if it

were true (and it is not), the works that Mr. Villacci has been "influenced by" have no

bearing on which games his products may be used to play.


6.      Most of CHS's products are accessories (or "bits") that players can use to
customize the toy soldiers they use to play tabletop war games—such as toy armor shoulder
pads; shields; weapons; or alternative miniature heads. In order to use CHS's bits in a game, a
player must own one or more miniatures to use them with.

**Games Workshop's Response:** Games Workshop contests this fact to the extent that it implies

that all of Chapterhouse's products are accessories or that in order to use Chapterhouse's

products, a player must own one or more of Games Workshop's miniatures. While some of

Chapterhouse's products are accessories, Chapterhouse sells numerous products which are stand-

alone products for Games Workshop's Warhammer 40,000 universe and do not require a player

to own one or more of Games Workshop's miniatures. Examples of such stand-alone products

are: Super-Heavy Assault Walker (Ex. 129); Mycetic Spore for Tyranids (Ex. 5, CHS001250);

Doomseer Iyanar Model (Ex. 38, CHS000381); Javelin Class Jet Bike (Ex. 72); and Armana'serq

Warrior Priestess (Ex. 33). Additionally, Chapterhouse has continued to release stand-alone

products for Games Workshop's Warhammer 40,000 universe that have just recently been

released and are not part of this case: Pilum Imperial Attack Jet Bike (Ex. 130); and TRU-Scale

Knight Praetorius (Ex. 131). Games Workshop further contests that any of Chapterhouse's

products are for tabletop war games generally, but rather that all have been designed for use with

Warhammer 40K and are so-designated on Chapterhouse's website and are all created based on

Games Workshop's works as shown in Chapterhouse's design documents.


**CHS'S REPLY:**      Mischaracterizes the evidence in a manner that is immaterial to the

motion. GW does not dispute the stated fact, but merely makes irrelevant and

argumentative statements with no evidentiary support. In particular: it is undisputed that

CHS's "stand-alone products" can be used for any game and need not be used to play

Warhammer 40,000; GW's statement that it "contests that any of Chapterhouse's products are for tabletop war games generally" is irrelevant, lacks foundation, and lacks evidentiary support. GW's statement that the listed CHS products "have been designed for use with Warhammer 40K and are so-designated on Chapterhouse's website" lacks foundation; is contradicted by the undisputed evidence and by the names of the referenced products themselves, which do not reference GW's works or its Warhammer 40,000 game; and lacks evidentiary support.

GW does not dispute that most CHS products are accessories such as toy armor shoulder pads; shields; weapons; and alternative miniature heads, and that each requires a player to own one or more miniatures to use them with. (All references are to the Second Rev. Copyright Claim Chart and the Product Binder, Dkt. No. 224-224.17). For example:

SHOULDER PADS: CHS Products 1, 2, 4-26, 46-62, 64, 65, 68, 69, 71-75, 78, 80, 96-102, 137-141.

SHIELDS: 28-30, 70, 81, 83-84, 86, 122.

WEAPONS: 1, 27, 31, 34, 38-41, 66, 85, 112, 113, 115-119, 128, 132-133,

ALTERNATIVE MINIATURE HEADS: 3, 42-44, 67, 77, 79, 107, 135-136.

8.      CHS also makes custom-decorated spare parts, such as functional replacement doors with fanciful decorations, that fit various model vehicles sold by GW.

**Games Workshop's Response:** Games Workshop contests this fact. There is nothing functional about the dimensions of Games Workshop's unique drop pod miniatures or the doors to its "Rhino" vehicles. Furthermore, Chapterhouse does not use use fanciful decorations; instead, it uses Games Workshop iconography, logos, and names to identify its products.

**CHS'S REPLY:** GW's statement that there is "nothing functional about the dimensions" of its works is irrelevant, is a non sequitur, and does not serve to dispute that CHS's products function *as doors*. GW does not dispute that its listed products have functional doors. GW's statements are irrelevant, lack foundation, and lack evidentiary support. The statement that CHS "uses Games Workshop iconography, logos, and names to identify its products" is vague and ambiguous and lacks foundation. CHS's products speak for themselves (FRE 1002); and a side-by-side comparison shows there is no substantial similarity of protectable elements; and to the extent CHS uses GW's marks, it does so to refer to GW's own products, in such a way as to indicate compatibility and to identify products that customers may wish to use CHS's products with.

GW does not dispute that copyright does not protect functional features of its alleged works, such as doors that open and close. Instead, it merely argues that, to the extent the "distinctive designs" of GW's products are not functional, they are protectable by copyright. But it is undisputed that the dimensions of GW's functional doors are precisely what allows them to function. The general shape and dimensions of the doors are therefore by definition "functional." GW's argument that the "choice of size [of CHS functional replacement parts and conversion kits] is not constrained by physical limits" (Opp. at 16) is nonsensical: a replacement door or other accessory that does not fit will not function. Once the unprotectable and functional dimensions of CHS's products and GW's models are filtered out, there is no substantial similarity. As to CHS products that merely fit onto certain models, GW's arguments ignore the fact that CHS's products are not substantially similar to protectable elements of GW's alleged works. Just as a doll's clothes would not infringe copyright in the doll they are designed to fit, merely because they fit the doll, or a spoiler designed to fit onto a certain make and model of car would not infringe a copyright in the design of the car itself, CHS's accessories and add-on parts do not infringe if they are not substantially similar to the work onto which they fit—and they are not.

9.     CHS's products are cast from pewter or gray resin, and all are sold and shipped unpainted, so that players may paint the products themselves.

**Games Workshop's Response:** Games Workshop contests this fact to the extent that it implies that Chapterhouse does not use painted parts or figures of its products on its website or marketing materials to sell its products. *See, e.g.* Exs. 33, 38, 129, and 131.

**CHS'S REPLY:**     Mischaracterizes the evidence in a manner that is immaterial to the motion. GW statement is irrelevant and does not serve to dispute the fact. GW does not dispute that CHS's products are sold and shipped unpainted, which is also demonstrated by GW's own exhibits. Villacci Decl.  at ¶ 10 (Dkt. 208-43). For example, GW's Exhibit 33 depicts a thumbnail image of CHS's product that shows the unpainted version.



(Detail of GW's Ex. 33).

The print-outs from CHS's website included in the exhibits referenced by GW also clearly state that the products ship unpainted. *See* GW's Ex. 33 ("This unpainted 28mm scale pewter model consist of 6 components - body and 5 variant arms"); GW's Ex. 129 ("the kit components are supplied 'as cast' and require cleanup, assembly and painting for the finished product); GW's Ex. 131 (displaying thumbnail images of unpainted product, and noting that "Each resin kit comes **unassembled** and **unpainted**") (emphasis in original).

10.     Plaintiff Games Workshop Limited ("GW") is an international UK-based company in the business of tabletop fantasy war games. It produces miniature toy soldiers related to its Warhammer and Warhammer 40,000 war games, as well as rule books, guides, and accessories for those and other games.

**Games Workshop's Response:** Games Workshop contests this fact to the extent it implies that

Games Workshop's products are solely related to its Warhammer and Warhammer 40,000

games. Games Workshop has created a vast Warhammer 40,000 universe which is represented

by a body of hundreds of books and magazines as well as video/computer games and movie

(made under license), portraying the fictional world and setting forth information and rules about

the related table-top wargame of the same name, and thousands of collectible figurines that are

sculpted and produced by Games Workshop and collected, painted and displayed by fans and

used in the tabletop wargame. (Ex. 1, Merrett Decl. at ¶ 3). Seven of the books have been New

York Times bestsellers (Id.)


      **CHS'S REPLY:**     Mischaracterizes the evidence in a manner that is immaterial to the

      motion.  GW's statements do not serve to dispute the fact, but rather support the

      proposition that GW's "products are solely related to its Warhammer and Warhammer

      40,000 games." GW's statements also lack foundation.


11.     Many of GW's miniatures also conform to the standard 28mm scale.

**Games Workshop's Response:** Games Workshop contests this fact. There is no "standard

28mm scale" in the production and sale of miniatures or in miniature wargaming. (Ex. 132, Sup.

Merrett Decl. at ¶ 4). Throughout the 1970's, a popular size of miniature figurines was described

as 25mm, but depending on the manufacturer, this description was used to describe the height of

a miniature from the based of the shoe to the top of the head, from the base of the shoe to the

eye, or some other measurement. (Id.). While Games Workshop self-describes most of its

miniatures as 28mm scale, its Warhammer 40K models are slightly large than 28mm in size on the whole, many in excess of 30mm tall. (Id. at ¶5) Other Games Workshop miniatures vary in size from a 6mm scale to 54 mm. (Id.) Numerous other manufacturers also produce and sell wargaming miniatures to entirely different scales. (Id. at ¶6)

> **CHS'S REPLY:** Mischaracterizes the evidence in a manner that is immaterial to the motion. GW's statements are irrelevant, lack foundation, are self-contradictory, and mischaracterize CHS's statement. CHS does not claim that there is a single scale to which all miniatures must conform. GW does not dispute that the 28mm scale is *one* standard scale, which many manufacturers use. Supplemental Declaration of Thomas Kearney ("Supp. Kearney Decl.") ¶¶ 6-7 & Exs. 1-2. The fact that a model is made to the "28mm scale" also does not mean that it is "28mm in size." That GW also makes miniatures to other scales is irrelevant, as is the fact that other manufacturers also design miniatures to other scales.

14.     Since its launch, CHS's website has featured a prominent notice disclaiming any affiliation with GW on every page of the website.

**Games Workshop's Response:** Games Workshop contests this fact. Chapterhouse's disclaimer is not prominent feature as it is in small print at the bottom of the page. (Declaration of Thomas Kearney in Support of CHS Motion for Summary Judgment ("Kearney Decl."), Exs. 52, 53).

> **CHS'S REPLY:** GW does not contest that since its launch CHS's website has featured a disclaimer on every page. Villacci Decl. at ¶12, Ex. A (Dkt. 208-43); Kearney Decl. ¶¶ 72-73 (Dkt. 208-1);Kearney Decl. Exs. 52-53 (Dkt. 208-38). The evidence speaks for itself. *See also* Dkt. 224-224.17 (Product Binder) (showing current CHS website).

16.     There is no evidence that anyone has ever been confused about the relationship between GW and CHS.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop has received emails evidencing customer confusion. (Ex. 122).

**CHS'S REPLY:**     Mischaracterizes the evidence. GW's purported evidence of confusion is insufficient as a matter of law, and also speaks for itself. Each of the three emails in GW's Ex. 122 is from an individual who is self-evidently not confused about the source of CHS's products. and therefore do not constitute evidence of confusion. To the contrary, the senders are notifying GW's UK  legal team about CHS, and it is clear they are not confused about the source of CHS's products. "Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a lack of confusion between the products such as to inspire the inquiry itself." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (citations omitted). (SUF 72-75.) Moreover, each of emails that comprise GW's Ex. 122 was also cited by CHS in SUF 72 to 75, as evidence that GW has no records of confusion of U.S. customer concerning CHS.  As discussed below, GW does not dispute SUF 72 to 75, which is therefore deemed admitted pursuant to Local Rule 56.1.

29.     GW does not have timely registrations for any individual works at issue in this case.

**Games Workshop's Response:** Games Workshop contests this fact. Thirteen of the products at issue were registered within five years of the date of first publication. (Ex. 133, Moskin Decl. ¶ 9). These registrations are:

| Registration | Registration Date | Date of First Publication |
|---|---|---|
| Codex: Tyranids<br>TX 7-538-598 | 3/5/12 | 11/30/09 |
| Codex: Space Wolves<br>TX 7-549-698 | 3/5/12 | 12/31/09 |
| Horus Heresy: Collected Visions<br>TX 7-538-569 | 3/5/12 | 4/30/07 |
| Legion of the Damned<br>TX 7-513-642 | 3/2/12 | 10/31/11 |
| Blood Raven Transfer Sheet<br>VA 1-819-307 | 3/7/12 | 7/31/10 |
| Contemptor Heavy Conversion Beamer<br>VA 1-824-754 | 3/7/12 | 7/25/11 |
| Mark V Heresy Armour<br>VA 18-824-755 | 3/7/12 | 6/30/10 |
| Space Marine Character Conversion Kit<br>VA 1-824-622 | 7/31/10 | 3/7/12 |
| Salamanders Terminator Shoulder Pads<br>VA 1-824-496 | 3/7/12 | 5/25/07 |
| Valthex Astral Claws of the Master Forge<br>VA 1-824-495 | 3/7/12 | 6/29/11 |
| Space Marine Drop Pod<br>VA 1-814-902 | 3/7/12 | 8/4/08 |
| Legion of the Damned<br>VA 1-824-653 | 3/9/12 | 11/30/09 |
| Grey Knights<br>VA 1-824-604 | 3/8/12 | 2/2/11 |

**CHS'S REPLY:**      Mischaracterizes the evidence. GW has produced only three of the purported registrations (Codex: Tyranids, TX 7-538-598; Horus Heresy: Collected Visions, TX 7-538-569; and Blood Raven Transfer Sheet, VA 1-819-307), and the claim as to the remaining registrations, therefore, lacks foundation. In addition, none of the purported registrations are timely because each application was made after the inception of this litigation and each registration was issued only after the close of fact discovery. The purported date of registration for the "Space Marine Character Conversion Kit" work predates its date of publication. The work "Horus Heresy: Collected Visions" is a compilation of four previously-published books, each of which was published more than five years before the date on which "Horus Heresy: Collected Visions" was purportedly

registered with the U.S. Copyright Office. Supp. Kearney Decl. ¶ 17 & Ex. 7: credits page "Horus Heresy: Collected Visions", GW0001882 (providing publication dates before 2007 for each of the books that make up the collection). 17 U.S.C. § 410(c) (only registration within 5 years of publication provides prima facie evidence of validity and facts served in certificate).

33.     GW concedes that UK copyright law governs ownership of its alleged copyrights.

**Games Workshop's Response:** Games Workshop does not contest the fact that ownership is assessed under English law (not UK law). However, Games Workshop does contest this fact to the extent it implies that issues of copyrightability are assessed under English law.

**CHS'S REPLY:**     GW's statement does not serve to dispute the fact. The issue of copyrightability under English law is a question of law and GW's statement is irrelevant to its determination.

34.     For nine authors (Gary Chalk; Wayne England; Des Hanley; Clint Langley; Mike McVey; Bob Naismith; Adrian Wild, and Simon Egan), who among them created 15 of GW's alleged works identified as infringed in its Second Rev. Copyright Claim Chart, GW has provided no assignments, no employment agreements, no evidence that those individuals were ever its employees during any relevant times, and was unable to provide the employment dates for these individuals in their interrogatory response, with the exception of Mr. Smith, who was not an employee at relevant times based on GW's interrogatory responses.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop in fact has produced confirmatory assignments from its former employees, Clint Langley and Wayne England, its current employee, Simon Egan, as well as for the former freelancer, Adrian Smith; and does not claim any copyright issues in the works of Gary Chalk, Adrian Wild, or Des Hanley. (Ex. 132, Suppl. Merrett Decl ¶ 2-3) Although, as estimated by Mr. Goodwin, 95-99% of the company's products are created by employees, it has over the years employed a small

number of free-lance artists. (Ex. 7, Goodwin Tr. at 57:6-15; Ex. 1, Merrett Decl. at ¶ 12).
However, it has had a general practice of collecting confirmatory assignments from such
individuals, notwithstanding that some have been lost over the years. (Ex. 1 at ¶ 12).
Nonetheless, Games Workshop has confirmatory assignments for the works here at issue in
which an individual who might nominally be deemed a freelance artist participated. (Id.). Even
when Games Workshop does work with freelance artists, it directly participates in and closely
supervises the process, as every work must fit within the broader Warhammer 40K universe.
(Id.). There are also a small number of works created by employees (Ex. 8, Sup. Resp. to
Interrogatory 22) for which Games Workshop is unable to locate employment records (or
confirmatory assignments). However, Alan Merrett, Games Workshop's Head of Intellectual
Property is able to vouch for their employment status (Ex. 1, Merrett Decl. at ¶ 13). As a
practical matter, no such individual has ever purported to challenge Games Workshop's
ownership of the subject works. (Id.) Even if they had, as a matter of English law, Games
Workshop would, minimally, be deemed a joint author of such works or owner by equitable
assignment. (Ex. 10, Bloch Report ¶¶ 60-97, 102-111).

**CHS'S REPLY:**     Mischaracterizes the evidence. The statement that "[GW] does not
claim any copyright issues in the works of . . . Des Hanley" is contradicted by GW's own
Exhibit 135, which identifies Des Hanley as the author of two allegedly infringed works.
*See* GW's Ex. 135, entries 117 and 124 (Dkt. 230-20 at 64, 79). Each of GW's statements
concerning its purported "confirmatory assignments" lacks foundation because GW has
introduced only two of the purported "confirmatory assignments." The statements of
Goodwin and Merrett lack foundation. The statement that GW "has had a general practice
of collection confirmatory assignments" is contradicted by the undisputed evidence that
each of GW's "confirmatory assignments" was executed later than April 20, 2012 after
the close of fact discovery. GW based copyright claims on works of Gary Chalk, Adrian
Wild, and Des Hanley until August 3, 2012, when GW dropped its copyright claims to

certain works it had previously claimed. Because GW's purported assignments were each executed after the inception of this lawsuit, GW has no evidence that it owned its alleged works at the time it brought suit. GW's purported assignment from Clint Langley is not for any work at issue, *see* Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150). GW misrepresents the testimony of its expert Michael Bloch, and GW has no evidence to support the detailed factual inquiry that English law requires to find joint authorship or equitable assignment.

35.   GW has produced no evidence that the following authors were ever GW employees: Gary Chalk; Wayne England; Des Hanley; Clint Langley; Mike McVey; Bob Naismith; Adrian Wild.

**Games Workshop's Response:** Games Workshop contests this fact. Alan Merrett has affirmed based on his personal knowledge that Bob Naismith, Wayne England, and Mike McVey were Games Workshop employees. (Ex. 1, Merret Decl. at ¶ 3). Games Workshop does not claim copyright issues in any works by Gary Chalk, Des Hanley, or Adrian Wild. (CHS Mot., Kearney Decl. Ex. 5)

**CHS'S REPLY:**     Mischaracterizes the evidence. Merrett's statement that "Games Workshop does not claim copyright issues in any works by . . . Des Hanley" is contradicted by the record. Although GW purports to have dropped its copyright claims with respect to all works by Des Hanley, it explicitly identifies Hanley as the author of two of its additional works. Compare GW's Ex. 132: Suppl. Merrett Decl ¶ 2-3 (claiming no copyright in Hanley works) with GW's Ex. 135, entries 117 and 124 (Dkt. 230-20 at 64, 79) (claiming CHS's products infringe Hanley works). To the extent Merrett's statements concerning GW's copyright claims imply that GW never brought copyright claims concerning works by Chalk, Hanley, and Wile, the record contradicts that. *See* Original Copyright Claim Chart (Dkt. 208-2); First Rev. Copyright Claim Chart (Dkt.

208-2). Merrett's statements concerning Bob Naismith, Wayne England, and Mike McVey are hearsay; lack foundation; and are irrelevant: the mere fact that certain individuals may have been GW employees is not evidence that they created works while they were employed, or in the course and scope of their employment. The fact that GW dropped its copyright claims as to certain works created by Chalk, Hanley, and Wild only on August 3, 2012 is also irrelevant to whether GW has any evidence that those individuals were its employees or whether GW owned the alleged works created by those individuals at any time, including before it brought its copyright claims based on those works.

GW's Second Rev. Copyright Claim Chart alleges a number of works for which it has failed to identify an author. Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150) (*passim; see, e.g.*, entries 1, 2, and 3).


36.     The evidence that GW produced shows that Adrian Smith was not its employee during the time he created the alleged works.

**Games Workshop's Response:** Games Workshop admits that Mr. Smith was engaged as a freelance artist when he created the Games Workshop works at issue (such as the cover art for the novel Soul Drinkers), for which Games Workshop has furnished a confirmatory assignment) and that Mr. Smith did not become an employee until 2008.


**CHS'S REPLY:**     Mischaracterizes the evidence. Contrary to its statement (which lacks foundation and for which GW has not provided any evidence), GW has not produced any assignment concerning cover art for the novel "Soul Drinkers." GW's Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150) identifies the relevant work as cover art for the novel "Soul Drinker," not "Soul Drinkers." GW also has not produced any assignment concerning cover art for a novel entitled "Soul Drinker." On August 13,

2012, five months after the close of fact discovery and *one* day before the deadline for dispositive motions, GW produced a "Commissioning Form" to Adrian Smith, dated 2008, concerning a work that had yet to be created as of the date of the contract's execution. Supp. Kearney Decl. ¶ 9. That work is self-evidently not the work at issue, which was entitled "Soul Drinker" and was created in 2002. *Id.*; Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150), entry 23.

37.     The evidence that GW produced shows that Simon Egan was not its employee during the time he created the alleged works.

**Games Workshop's Response:** Games Workshop contests this fact. Simon Egan has been employed by Games Workshop since 01/06/2004. (CHS Mot., Kearney Decl., Ex. 45). The Space Wolves conversion pack for the Rhino sold by Forge World was created after 01/06/2004 (Ex. 132, Suppl. Merrett Decl. ¶ 3). There are no other copyrighted works of Simon Egan at issue in Games Workshop's Second Rev. Copyright Claim Chart. (CHS Mot., Kearney Decl., Ex. 5).

**CHS'S REPLY:**     Mischaracterizes the evidence. Merrett's statement concerning the date of creation of the alleged work lacks foundation. GW failed to produce an exemplar of Egan's alleged work, and the unproduced exemplar it refers to by URL contains no information about its date of creation. *See* Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150), entry 82 (referring to work by URL but providing no Bates number); Dkt. 224-224.17, Product Binder, tab 82. GW's statement that "There are no other copyrighted works of Simon Egan at issue in Games Workshop's Second Rev. Copyright Claim Chart" is very misleading: GW's Exhibit 135, which purports to collect representative images from GW's alleged works, includes additional works purportedly authored by Simon Egan for which he is <u>not</u> identified as the author in GW's Second Rev. Copyright

Claim Chart. *See, e.g.,* Ex. 135, entries 45 and 103(Dkt. 230.19 at 50; Dkt. 230.20 at 36) (identifying Egan works).

40.     GW alleges infringement of numerous miniature toy soldiers, model vehicles, and assorted accessories.

**Games Workshop's Response:** Games Workshop contests this fact to the extent it implies that Games Workshop's allegations of infringement do not also reference numerous sketches, drawings, and pictures (in two-dimensional format) for all of the works in issue. (*See, e.g.* Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5).

**CHS'S REPLY:**     Mischaracterizes the evidence. GW does not dispute that its Second Rev. Copyright Claim Chart alleges infringement of numerous miniature toy soldiers, model vehicles, and assorted accessories. *See, e.g.*, Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150) at 1, 2, 3, 4, 5, etc. Furthermore, because the entries in GW's Second Rev. Copyright Claim Chart contain extensive cross references to other entries, most such entries refer to at least one miniature toy soldier, model vehicle, or accessory. *See, e.g.*, *id. at* entries 6 (referring to entry 56, which refers to a miniature accessory); 7 (same); etc.

41.     GW claims that CHS product nos. 21, 22, 49, 53-55, 97-100 infringe only the "shape/design of the underlying shoulder pad," and CHS products nos. 48, 49, 50, 54-56 feature simple geometric shapes such as two arrows crossed in an X; a half- hemisphere shape; a chevron; or an arrow.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop claims that Chapterhouse product nos. 21, 22, 53-55, and 97-100 infringe only the "shape/design of the underlying shoulder pad." (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5). Games Workshop claims that Chapterhouse product no. 48 infringes not

only the shape/design of the underlying shoulder pad, but also that Chapterhouse copied Games Workshop's icons for a Space Marine Assault Shoulder Pad. (Id.) Games Workshop claims that Chapterhouse product no. 48 infringes not only the shape/design of the underlying shoulder pad but also includes a crested shoulder pad with rivets along the edge where the crest attaches to the pad. (Id.) Games Workshop claims that Chapterhouse product no. 50 infringes not only the shape/design of the underlying shoulder pad but also that Chapterhouse copied Games Workshop's icons for a Space Marine Devastator Shoulder Pad. (Id.) Games Workshop claims that Chapterhouse product no. 49 infringes not only the shape/design of the underlying shoulder pad but also includes a crested shoulder pad with rivets along the edge where the crest attaches to the pad. (Id.) Games Workshop claims that Chapterhouse product no. 56 infringes not only the shape/design of the underlying shoulder pad but also that Chapterhouse copied Games Workshop's icons for a Space Marine Tactical Shoulder Pad. (Id.)

> **CHS'S REPLY:** Mischaracterizes the evidence. It is undisputed that GW has produced no exemplar of "the shape/design of the underlying shoulder pad." GW's statement does not dispute that the "icons" it names are simply two arrows crossed in an X; a chevron; and an arrow. CHS's products and GW's produced exemplars speak for themselves. (FRE 1002.) *See* Product Binder, Dkt. 224 at tabs 21, 22, 49, 53-55, 97-100 (products that infringe only the "shape/design of the underlying shoulder pad"); *id.* at tabs 48, 49, 50, 54-56 (unadorned products and products with two arrows crossed in an X; a chevron; or an arrow).

42.     The only element in CHS's product no. 48 that is similar to GW's alleged work is the public domain symbol of arrows crossed in an X.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop claims that Chapterhouse product no. 48 infringes not only the shape/design of the underlying shoulder

pad, but also that Chapterhouse copied Games Workshop's icons for a Space Marine Assault Shoulder Pad as well as the name Assault Space Marines. Moreover, the distinctive icon Chapterhouse has copied is not simply an "X" but an "X" with arrowed endings on each of the four extensions. (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5). While Warhammer 40K incorporates some symbols and graphic elements drawn from heraldry and other historical sources (e.g., wolves and Roman numerals and crosses), as used in Warhammer 40K, those individual elements have been modified and thoroughly integrated with other elements (graphic and sculptural) to form something unlike any known prior works. (Ex. 1 at ¶10). Although Chapterhouse's claimed experts were able to locate examples where certain symbols taken in isolation had been used previously or had historical bases, even Chapterhouses's experts were unable to identify and direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design elements they comprise (Ex. 5, Brewster Tr. at 54:14-20, 64:11-22, 66:10-14, 77:7-78:2, 90:9-93:3, 133:21- 135:1, 137:22-138:15, 144:18-145:2, 147:8-17, 162:11-15, 166:5-23, 167:8-24, 179:14-180:11, 183:24-184:6, 184:19-185:2, 186:22-187:4, 188:8-12, 190:7-16, 191:2-8, 195:11-196:2, 199:2-6, 241:3-20; and Ex. 6, Wolfe Tr. at 70:15-71:17, 75:12-16, 94:1-23, 107:13-109:9, 112:16-113:3, 148:17-149:8, 166:3-17, 173:1-8, 175:14-177:23, 179:22-180:4). Games Workshop is aware of none. (Ex. 1, Merrett Decl. at ¶ 10) For instance, although something as simple as a Roman numeral is used as one of the identifying features, it has a specific meaning within the underlying story such that only certain characters would wear the numeral on a specific location for a specific purpose and only in combination with other specific symbols (such as an arrow, a crossed X, or a chevron). (Id.). Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique features as those created by Games Workshop. In addition to copying the iconic style of Games Workshop's basic Space Marine Shoulder Pad, these products use the same icons (arrows, crossed-Xs, and chevrons), placed in the same orientation, and of about the same size. Thus, the icons are used to depict the same squad types of identified in the Warhammer 40K universe. Moreover, Chapterhouse uses only

the same Roman Numerals and only in the same combinations as does Games Workshop (I-VI for Tactical, VII-VIII for Assault, and IX-X for Devastator), thus copying and never varying from the fictional meanings given to the symbols by Games Workshop.

**CHS'S REPLY:** Mischaracterizes the evidence. CHS's products and GW's alleged works speak for themselves. The statement that GW claims "not simply an 'X' but an 'X' with arrowed endings on each of the four extensions" merely restates CHS's undisputed fact. GW's statement that its "'X' with arrowed endings on each of the four extensions" is "something unlike any known prior works" is contradicted by the Expert Report of William Brewster (Dkt. 208-21), CHS's Public Domain Chart (Kearney Decl. Ex. 14, Dkt. No. 208-31 at 24-33), and Exhibit 1 to CHS's Request for Judicial Notice (Dkt. No. 211 – 211-3). *Compare, e.g.,*



(Detail from GW Ex. 80, Ex. 80, GW0002323) *with*



(Detail from Dkt. No. 211-2, Ex. 1 to CHS Motion for Judicial Notice, public domain "Crosstar" white supremacist symbol originating in Hungary in the 1930s).

GW's statement that "Chapterhouses's experts were unable to identify and [*sic*] direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design elements they comprise" is contradicted by Exhibit 12-G to the Expert Report of William Brewster, CHS00017816, Dkt. 208-27 at 11, a detail of which is depicted below:



It is also undisputed that GW has produce no exemplar of "the shape/design of the underlying shoulder pad."

43.     CHS's products nos. 54 and 55 are simple half-hemisphere shapes.

**Games Workshop's Response:** Games Workshop contests this fact. One of the numerous iconic aspects of Games Workshop's Power Armour is the shoulder pad. The shoulder pad is a convex shape with a curve at the top and a straight edge at the bottom. (Ex. 1, Merrett Decl. ¶ 31) There is often a large band or rim extending along the entire outer edge of the shoulder pad. (Id.) As part of the Power Armour, the shoulder pad begins above the shoulder and ends right above the elbow. (Id.) The pads are curved in a manner such that it does not cover a large portion of either the chest or the back of the Space Marine. (Id.) Chapterhouse's expert admitted there were no known antecedents for the specific shape created by Games Workshop. (Ex. 5, Brewster Tr. at 137-138) On the reverse side of the shoulder pad, there are typically a series of spaced indentations that serve no functional purpose but as Alan Merrett explained, they are used by Games Workshop to create a technical appearance. (Id.; Ex. 78, Merrett Tr. at 46:12-47:17)

**CHS'S REPLY:**     Mischaracterizes the evidence in a manner that is immaterial to the motion. GW's entire statement is a *non sequitur* because it does not address the shape of CHS's products, but purports to describe the *unrelated shapes of GW's completely distinct products*. In addition, the statements of Merrett lack foundation and are inadmissible hearsay. It is undisputed that GW has produced no exemplar of "the shape/design of the underlying shoulder pad." GW's statement that "[t]he shoulder pad is a convex shape with a curve at the top and a straight edge at the bottom" merely restates CHS's fact, namely that the shape is a half-hemisphere. The claim that GW's shoulder pads are "iconic" is contradicted by GW's admission that it claims various shoulder pads

of different shapes, which "often" or "typically" have the characteristics described—and, by necessary implication, sometimes do not have those characteristics. GW's description of the shoulder pads in relation to a hypothetical miniature figure merely describes the relative sizes of the miniature figure and the shoulder pads, and does not describe a feature of of the shoulder pad itself. CHS's products and GW's alleged works speak for themselves.

44.     The only element in CHS's product no. 50 that is similar to GW's alleged work is the public domain symbol of chevron / inverted V.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop claims that Chapterhouse product no. 50 infringes not only the shape/design of the underlying shoulder pad, including the gold-colored rim around the edge, but also that Chapterhouse copied Games Workshop's icons for a Space Marine Devastator Shoulder Pad and uses Games Workshop's character names "Devastator" and "Space Marine". (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5). While Warhammer 40K incorporates some symbols and graphic elements drawn from heraldry and other historical sources (e.g., wolves and Roman numerals and crosses), as used in Warhammer 40K, those individual elements have been modified and thoroughly integrated with other elements (graphic and sculptural) to form something unlike any known prior works. (Ex. 1, Merrett Decl. at ¶10). Although Chapterhouse's claimed experts were able to locate examples where certain symbols taken in isolation had been used previously or had historical bases, even Chapterhouse's experts were unable to identify and direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design elements they comprise (Ex. 5, Brewster Tr. at 54:14-20, 64:11-22, 66:10-14, 77:7-78:2, 90:9-93:3, 133:21- 135:1, 137:22-138:15, 144:18-145:2, 147:8-17, 162:11-15, 166:5-23, 167:8-24, 179:14-180:11, 183:24-184:6, 184:19-185:2,

186:22-187:4, 188:8-12, 190:7-16, 191:2-8, 195:11-196:2, 199:2-6, 241:3-20; and Ex. 6, Wolfe

Tr. at 70:15-71:17, 75:12-16, 94:1-23, 107:13-109:9, 112:16-113:3, 148:17-149:8, 166:3-17,

173:1-8, 175:14-177:23, 179:22-180:4). Games Workshop is aware of none. (Ex. 1, Merrett

Decl. at ¶ 10) For instance, although something as simple as a Roman numeral is used as one of

the identifying features, it has a specific meaning within the underlying story such that only

certain characters would wear the numeral on a specific location for a specific purpose and only

in combination with other specific symbols (such as an arrow, a crossed X, or a chevron). (Id.).

Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique

features as those created by Games Workshop. In addition to copying the iconic style of Games

Workshop's basic Space Marine Shoulder Pad, these products use the same icons (arrows,

crossed-Xs, and chevrons), placed in the same orientation, and of about the same size. Thus, the

icons are used to depict the same squad types of identified in the Warhammer 40K universe.

Moreover, Chapterhouse uses only the same Roman Numerals and only in the same

combinations as does Games Workshop (I-VI for Tactical, VII-VIII for Assault, and IX-X for

Devastator), thus copying and never varying from the fictional meanings given to the symbols by

Games Workshop.

**CHS'S REPLY:**     Mischaracterizes the evidence in a manner that is immaterial to the

motion.  GW does not dispute that the images at issue are "simple . . . Roman

numeral[s]" and "specific symbols" that consist of nothing more than a simple, common,

and unprotectable geometric shapes (a chevron, an arrow, or a cross with pointed arms),

appearing either alone or in combination with a Roman numeral between I and X. But

"the creative expression capable of supporting copyright must consist of something more

than the mere bringing together of two or three standard forms or shapes with minor

linear or spatial variations." Copyright Compendium II 503.02(b); *see* 37 C.F.R. § 202.1

("Material not subject to copyright"). Though GW attempts to create an impression of

complexity through verbal descriptions of the works at issue, the works speak for

themselves. CHS's Motion catalogs precisely which claims are directed only at these unprotectable and ubiquitous elements. *See* Mot. at 10, 11. CHS's products and GW's alleged works speak for themselves.

GW's statements that "Chapterhouse's experts were unable to identify and direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design elements they comprise" and that its representation of a chevron is "something unlike any known prior works" are both contradicted by the Expert Report of William Brewster (Dkt. 208-21), the Supplement Report of William Brewster (Dkt. 208-31 at 1-23) and CHS's Public Domain Chart (Kearney Decl. Ex. 14, Dkt. No. 208-31 at 24-33). *Compare, e.g.,*

 (DETAIL of GW alleged work GW0001288 (Product Binder, Dkt. 224 at tab 50) *with*

 (Detail from Dkt. No. 208-31 at 12, Exhibit to Brewster Supp. Report, public domain chevron appearing on US Army Tank).

It is also undisputed that GW has produced no exemplar of "the shape/design of the underlying shoulder pad."

### CHS'S REPLY:

45.     The only element in CHS's product no. 56 that is similar to GW's alleged work is the public domain symbol of an arrow.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop claims that Chapterhouse product no. 56 infringes not only the shape/design of the underlying shoulder pad, including the gold-colored rim around the edge of the pad, but also that Chapterhouse copied Games Workshop's icons for a Space Marine Tactical Shoulder Pad and Games Workshop's character names "Tactical" and "Space Marine". (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5). While Warhammer 40K incorporates some symbols and graphic elements drawn from heraldry and other historical sources (e.g., wolves and Roman numerals and crosses), as used in Warhammer 40K, those individual elements have been modified and thoroughly integrated with other elements (graphic and sculptural) to form something unlike any known prior works. (Ex. 1, Merrett Decl. at ¶10). Although Chapterhouse's claimed experts were able to locate examples where certain symbols taken in isolation had been used previously or had historical bases, even Chapterhouses's experts were unable to identify and direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design elements they comprise (Ex. 5, Brewster Tr. at 54:14-20, 64:11-22, 66:10-14, 77:7-78:2, 90:9-93:3, 133:21- 135:1, 137:22-138:15, 144:18-145:2, 147:8-17, 162:11-15, 166:5-23, 167:8-24, 179:14-180:11, 183:24-184:6, 184:19-185:2, 186:22-187:4, 188:8-12, 190:7-16, 191:2-8, 195:11-196:2, 199:2-6, 241:3-20; and Ex. 6, Wolfe Tr. at 70:15-71:17, 75:12-16, 94:1-23, 107:13-109:9, 112:16-113:3, 148:17-149:8, 166:3-17, 173:1-8, 175:14-177:23, 179:22-180:4). Games Workshop is aware of none. (Ex. 1, Merrett Decl. at ¶ 10) For instance, although something as simple as a Roman numeral is used as one of the identifying features, it has a specific meaning within the underlying story such that only certain characters would wear the numeral on a specific location for a specific purpose and only in combination with other specific symbols (such as an arrow, a crossed X, or a chevron). (Id.). Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique features as those created by Games Workshop. In addition to copying the iconic style of Games Workshop's basic Space Marine Shoulder Pad, these products use the same icons (arrows, crossed-Xs, and chevrons), placed in the same orientation, and of about the same size. Thus, the

icons are used to depict the same squad types of identified in the Warhammer 40K universe. Moreover, Chapterhouse uses only the same Roman Numerals and only in the same combinations as does Games Workshop (I-VI for Tactical, VII-VIII for Assault, and IX-X for Devastator), thus copying and never varying from the fictional meanings given to the symbols by Games Workshop.

**CHS'S REPLY:**     Mischaracterizes the evidence in a manner that is immaterial to the motion.  Though GW attempts to create an impression of complexity through verbal descriptions of the works at issue, the works speak for themselves. GW's statements that its  "Chapterhouses's experts were unable to identify and direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design elements they comprise" and that its representation of an arrow is "something unlike any known prior works" are both contradicted by the Expert Report of William Brewster (Dkt. 208-21), the Supplement Report of William Brewster (Dkt. 208-31 at 1-23) and CHS's Public Domain Chart (Kearney Decl. Ex. 14, Dkt. No. 208-31 at 24-33). *Compare, e.g.,*



(Detail GW alleged work GW0002478, *see* Products Binder, Dkt. 224 tab 56.) *with*



(Brewster Expert Report Exhibit, CHS00017735, Dkt. 208-22 at 13, public domain arrow symbol appearing on US Army shoulder patch).

It is also undisputed that GW has produced no exemplar of "the shape/design of the underlying shoulder pad."

46.     Each of CHS's products nos. 12, 13, 33, 46, 47, 51, 52, and 57 - 62 combines a simple symbol, namely a chevron, arrow, sawblade, or X symbol, together with a Roman numeral or a teardrop shape.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop claims that Chapterhouse product nos. 12, 13, 33, 46, 47, 51, 52, and 57-62 infringes not only the shape/design of the underlying shoulder pad, but also that Chapterhouse copied Games Workshop's icons for Terminator Space Marine, Flesh Tearer Space Marine, Devastator Space Marine, Tactical Space Marine and Terminator Space Marine shoulder pads as well as the character names Devastator Space Marine, Tactical Space Marine and Terminator Space Marine, Terminator and Flesh Tearer. (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5). While Warhammer 40K incorporates some symbols and graphic elements drawn from heraldry and other historical sources (e.g., wolves and Roman numerals and crosses) but as used in Warhammer 40K, those individual elements have been modified and thoroughly integrated with other elements (graphic and sculptural) to form something unlike any known prior works. (Ex. 1, Merrett Decl. at ¶10). Although Chapterhouse's claimed experts were able to locate examples where certain symbols taken in isolation had been used previously or had historical bases, even Chapterhouses's experts were unable to identify and direct historical antecedents for any of Games Workshop's actual figures and the combinations of graphic and design elements they comprise (Ex. 5, Brewster Tr. at 54:14-20, 64:11-22, 66:10-14, 77:7-78:2, 90:9-93:3, 133:21- 135:1, 137:22-138:15, 144:18-145:2, 147:8-17, 162:11-15, 166:5-23, 167:8-24, 179:14-180:11, 183:24-184:6, 184:19-185:2, 186:22-187:4, 188:8-12, 190:7-16, 191:2-8, 195:11-196:2, 199:2-6, 241:3- 20; and Ex. 6, Wolfe Tr. at 70:15-71:17, 75:12-16, 94:1-23, 107:13-109:9, 112:16-113:3, 148:17-149:8, 166:3-17, 173:1-8, 175:14-177:23, 179:22-180:4). Games Workshop is aware of none. (Ex. 1, Merrett Decl. at ¶ 10) For instance, although

something as simple as a Roman numeral is used as one of the identifying features, it has a specific meaning within the underlying story such that only certain characters would wear the numeral on a specific location for a specific purpose and only in combination with other specific symbols (such as an arrow, a crossed X, or a chevron). (Id.). Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique features as those created by Games Workshop. In addition to copying the iconic style of Games Workshop's basic Space Marine Shoulder Pad, these products use the same icons (arrows, crossed-Xs, and chevrons), placed in the same orientation, and of about the same size. Thus, the icons are used to depict the same squad types of identified in the Warhammer 40K universe. Moreover, Chapterhouse uses only the same Roman Numerals and only in the same combinations as does Games Workshop (I-VI for Tactical, VII-VIII for Assault, and IX-X for Devastator), thus copying and never varying from the fictional meanings given to the symbols by Games Workshop.

**CHS'S REPLY:**     Mischaracterizes the evidence in a manner that is immaterial to the motion.  GW does not dispute that the images at issue are "simple . . . Roman numeral[s]" and "specific symbols" that consist of nothing more than a simple, common, and unprotectable geometric shapes (a chevron, an arrow, or a cross with pointed arms), appearing either alone or in combination with a Roman numeral between I and X. But "the creative expression capable of supporting copyright must consist of something more than the mere bringing together of two or three standard forms or shapes with minor linear or spatial variations." Copyright Compendium II 503.02(b); *see* 37 C.F.R. § 202.1 ("Material not subject to copyright"). Though GW attempts to create an impression of complexity through verbal descriptions of the works at issue, the works speak for themselves. CHS's Motion catalogs precisely which claims are directed only at these unprotectable and ubiquitous elements.  *See* Mot. at 10, 11. CHS's products and GW's alleged works speak for themselves.  To the extent GW's claims are based on CHS "copying . . . the fictional meanings given to the symbols," such an allegation of copying

an abstract idea cannot support a claim of copyright infringement. 17 U.S.C. 102(b) (copyright protection does not extend to ideas).

CHS's products and GW's alleged works speak for themselves. It is undisputed that GW has produced no exemplar of "the shape/design of the underlying shoulder pad."

47. GW claims that many of CHS's products infringe its copyrights because they are "designed...to be used with" or are "of a size and scale to fit with" various GW products.

**Games Workshop's Response:** Games Workshop contests this fact to the extent that it implies that Games Workshop's claims are based solely on the size and scale of Chapterhouse's products. While Chapterhouse only identifies three products where Games Workshop comments on the size and scale of Chapterhouse's products (Nos. 6, 7, and 69), for each of these products, Games Workshop identifies numerous other points of similarity with Games Workshop's works. (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5).

**CHS'S REPLY:** Mischaracterizes the evidence in a manner that is immaterial to the motion. GW does not dispute that it alleges the size and scale of shoulder pads as an allegedly infringed element, and GW's Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150) speaks for itself. It is undisputed that GW has produced no exemplar showing the size and scale of its alleged works. GW statement is contradicted by the testimony of its employee Alan Merrett, who testified in pertinent part:

> Q. Can I direct your attention to entry
> No. 14. Can you identify which Chapterhouse
> products that Games Workshop contends is
> infringing?
> A. Again, it's the same thing. It's shoulder
> pads with Games Workshop iconography on them. The
> shoulder pads are the specific size. It's called
> Howling Griffon shoulder pads.

Merrett I (3/8/2012) at180:25-181:7. Supp. Kearney Decl. ¶ 24 & Ex. 13.

48.     Alan Merrett, GW's 30(b)(6) designee on copyright infringement, testified that the best he could "come up with" with respect to CHS Product No. 95 is that it was "a copy of [GW's] idea."

**Games Workshop's Response:** Games Workshop contests this fact. Mr. Merrett testified that the unique appearance of the Mycetic Spore was "It is the size, the shape, the context. There's lots and lots of textural elements, both on the illustration and actually on the page, and in fact throughout the whole book from which this page has been photocopied. (Ex. 78, Merrett Tr. at 26, l 8-12) Games Workshop's Mycetic Spore is a large pod-like shape with various tendrils or protrusions extending from the top that allow the pod to fall from space while transporting inside various other Tyranid creatures. (Ex. 1, Merrett Decl. ¶ 25). Chapterhouse's "Mycetic Spore for Tyranids" not only uses Games Workshop's name but contains the same unique features as Games Workshop's depiction of a Tyranid Mycetic Spore, including a large pod-like shape with various tendrils or protrusions extending from the top that allow the pod to fall from space while transporting inside various other Tyranid creatures. There is no antecedent in science fiction or gaming for Games Workshop's Mycetic Spore. Chapterhouse's documents confirm that it copied the design of the Mycetic Spore from Games Workshop's source materials:

- In an email entitled "Spore Pod for Tyranid concept art" from Mr Villacci to Castro Navarro, the designer of the Mycetic Spore, Mr. Villacci stated: "Saw the codex at the store today (they wouldn't let me buy it)" (Ex. 69, CHS003522);

- Mr Villacci's message was in response to an earlier email from Mr. Navarro and a second designer, Wyatt Traina, from whom Mr Villacci sought comments, discussing the shape and features of the inchoate Mycetic Spore design. The same day, Mr Villacci circulated by email to yet another designer, Jeffrey Nagy, copies of Mr Navarro's drawings (which closely resemble the final CH product and the image in GW's Tyranids Codex). (Ex. 70, CHS003525-27); and

- Mr. Navarro explains his inspiration: "I see hive ships eject lots of spores towards planets and little to no manouvre would be required ..." (Ex. 69, CHS003523).

**CHS'S REPLY:**     Mischaracterizes the evidence in a manner that is immaterial to the motion.  GW's statements concerning the purpose of the shape and purpose of GW's

work lacks foundation, because GW concedes it does not make or sell a "mycetic spore" product. Those statements are irrelevant and lack foundation because GW's drawing of a mycetic spore does not include the listed features, and is not "a large pod-like shape with various tendrils or protrusions extending from the top that allow the pod to fall from space while transporting inside various other Tyranid creatures". To the extent GW's statement is relevant, it is evidence that GW claims unprotectable functional features of its alleged work or elements that are *scenes a faire* of alien invasion movies, science fiction, and art. GW's comparison of its drawing and CHS's three-dimensional products concerns only depictions of abstract, unprotectble ideas. CHS's product and GW's work speak for themselves and are not substantially similar.

The quotations from emails lack foundation, are irrelevant to any of GW's statements, and fail to "confirm" or support GW's allegation of copying. GW's statement that Mr Navarro's drawings "closely resemble . . . GW's Tyranids Codex" lacks foundation, is speculative, and is inadmissible hearsay. CHS's product and GW's alleged work speak for themselves.

49.     GW bases a number of its claims of copyright infringement on the names and titles of its alleged works.

**Games Workshop's Response:** Games Workshop contests this fact to the extent it falsely implies that Games Workshop relies solely on copying of names. In each instance, Chapterhouse has copied not only Games Workshop's original character names, but also other original features and combinations of features, which together with those names, comprise copyrightable subject matter. Chapterhouse uses the same names created by Games Workshop to identify its corresponding figures or other designs. The references in Games Workshop's Second Rev. Copyright Claim Chart (CHS Mot., Kearney Decl. Ex. 5) are also used to describe the iconography used in Games Workshop's works. For example, product no. 76, Games Workshop references the use of the term "heresy" in the following way "Space Marines use jump packs.

Heresy refers to the type of jump pack used during the Horus Heresy." and then the chart cites to a picture of a jump pack used during the Horus Heresy as found in The Horus Heresy – Collected Visions 2007, page 284. (Id.) Chapterhouse's use of Games Workshop's names and titles is also the basis of Games Workshop's allegations of trademark infringement.

> **CHS'S REPLY:**     Mischaracterizes the evidence.  GW does not dispute that it based a number of its claims of infringement in whole or in part on the names of CHS's products. Indeed, GW statement confirms that "[i]n each instance" it relies at least in part on "Games Workshop's . . . names,'" and that other features (if any) comprise copyrightable subject matter " when put "**together with** those names." (*supra*, emphasis added).

> GW abandoned 32 of its copyright claims more than a year and a half into the litigation and now concedes that those claims "implicate trademark issues only." Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150) (*passim*). To the extent those 32 abandoned copyright claims were not based on substantial similarity of visual elements they can only have been based on alleged similarity of the names of CHS's products, thus contradicting GW's statement. GW's selection of a single example from among the 140 CHS products against which it alleges copyright infringement is irrelevant to any other example.

55.     On January 6, 2012, CHS requested, for each of GW's alleged marks, the date of first use in U.S. commerce and the nature of such use. GW agreed to produce responsive documents, "*including the actual packaging of the sculptural works bearing copyright dates of first publication and . . . copies of its literary works bearing the dates of first publication and sale.*" (italics in original).

**Games Workshop's Response:** Games Workshop contests this fact to the extent it purports to be a complete statement of Games Workshop's response to Chapterhouse's Interrogatory No. 18. Games Workshop's complete response states:

Games Workshop objects that this request seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence insofar as Chapterhouse does not purport to claim priority of use over Games Workshop with respect to any of its marks in issue. As a result the request is also overbroad and unduly burdensome.

Without prejudice to or waiver of the foregoing objections, pursuant to Fed. R. Civ. P. 33(d), Games Workshop has produced and/or will produce documents responsive to this request, including the actual packaging of the sculptural works bearing copyright dates of first publication and has produced copies of its literary works bearing the dates of first publication and sale. Moreover, Games Workshop has produced records from the United States Trademark Office for all of its registered marks in issue demonstrating the dates of first use or constructive first use and the accompanying deposit materials.

(CHS Motion, Kearney Decl., Ex. 41.)

**CHS'S REPLY:**    GW does not contest this fact.

57.    GW 30(b)(6) witness Andrew Jones abandoned GW's claims that the following are GW trademarks:

| | |
|---|---|
| "wings." | Kearney Decl. ¶3, Ex.15: A. Jones Tr. at 128:19-20 ("It is an interesting question, isn't it, because "wings", do we claim that we own wings as a unique trademark, no..."). |
| "skulls" | Id. at 81:14-16 ("I couldn't find a particular example of a stylized skull that I would contend is being used as a trademark..."). |
| "Roman numerals (combined with) arrows." | Id. at 77:17-78:1 ("what I am saying is we cannot claim to exclusively own Roman numerals with or without arrows. That is what I am saying.") |
| "Tau – oval vents." | Id. at 108:4-6 ("I don't think we would use oval vents as a particular trademark.") |
| "plasma" | Id. at 74:7-12 ("I would call out "plasma", simply because certainly we have products that we have sold as, you know, Plasma Gun, what have you, but I can't remember us trying to use 'plasma' specifically as a trademark on its own."). |

| "tactical." | Id. at 164:8-21 ("Q So in this lawsuit is Games Workshop contending that the word phrase "Tactical" is a trademark at issue or that Chapterhouse has infringed Games Workshop's copyright to the word? A It will be once again the unique association of the elements that are at issue. So it will be the association of the word "Tactical" with the word "Space Marine", with particular armour, weapon combinations, and that will be at issue, not the word in isolation, "Tactical." Q For clarification on the record, the word phrase "Tactical" in isolation, Games Workshop is not claiming that it is -- A No."). |
|---|---|
| "halberd" | Id. at 71:6-72:16 ("my opinion is that 'Halberd' "we cannot claim as an exclusive trademark."). |
| "broadswords." | Id. at 75:14 ("I put 'broadswords' in the same category as Halberds."). |
| "overlapping/banded armour." | Id. at 120:5-8 ("Q Let's move on to the overlapping/banded armour? A As a trademark, I don't know what that refers to."). |
| "Tau – geometric groves." | Id. at 74:12-14 ("I don't know what 'Tau Geometric Groves' is. It might be supposed to say 'Grooves.' It sounds like it is rather to do with trees."). |
| "wolf fur." | Id. at 83:3-7 ("Q Then with respect to wolf fur -- A Yes. Honestly, I can't imagine why we are holding it up. That is one that I would not say why we are holding it. I would say why are we holding up wolf fur as a particular trademark."). |
| "snakes" | Id. at 76:20-25 ("Again, we have a chapter of Space Marines called Iron Snakes, and it has a particular snake symbol which is a trademark rather in the way 'cog' is, but I don't think we would claim that 'snakes' is entirely our exclusive trademark."). |

**Games Workshop's Response:** Games Workshop contests this statement. Mr. Jones and Games Workshop contend that certain specific designs of wings, such as the registered Aquila design or Blood Eagles iconography, are trademarks, but only that Games Workshop does not own wings as such. The statement also repeatedly quotes out of context what Mr. Jones actually said. For instance, what he testified about Games Workshop's use of various logos incorporating wings was actually as follows: "do we claim that we own wings as a unique trademark, no, but the unique association of stylized wings so, for example, the Warhammer 40,000 logo has stylized wings on it…. One of the key icons of Warhammer 40,000 is the double headed eagle, which we

have used since 1987, and in fact it is the big symbols stamped on the side of our headquarters building here in Nottingham." (Ex. 134 at 128:18-129:10). Referring to other examples, he said: "There were loads of them. We talked earlier about the Raven Wings with the Blood Drop, that is the Blood Ravens Chapter, or we talked about the Raven Wing Space Marine Chapter, that that is their unique symbol. ...They are a key part of our Dark Angel iconography, for example, and indeed the Blood Angels use stylized wings." (Id. at 129:18-130:4). What he actually said about Games Workshop's rights in Roman numerals was the following: "It is that unique combination, isn't it. So, for example, we cannot possibly claim to own Roman numerals, but when Roman numeral are combined with a particular Space Marine shoulder pad and a particular Space Marine or other back story or part of our IP, then that is where we are claiming it as a mark of our trade." (Id. at 77:1-7) What he said about the word Tactical was: "... did we ever sell a product called 'Tactical', no. We do Tactical Space Marines, Tactical Squads. It is a key part of the make-up of our game, and how we describe and label particular units of troops and their functions. So Tactical Space Marines is a key phrase, I suppose you would call it, but "Tactical" as a -- it is a word" (Id. at 163:2-164:17) He went on to clarify that it was the unique association of "Tactical" with "Space Marine" that made the phrase a trademark. (Id. at 164:12-17).

**CHS'S REPLY:**      Mischaracterizes the evidence in a manner that is immaterial to the motion. GW concedes in its Response it abandoned its claims to with respect to  the mark "Tactical". Neither "Tactical Space Marines", "Tactical Squads", nor Roman numerals with a design other than an arrow is among the Marks at Issue, contrary to GW's implication in its Response.  GW also does not dispute that 30(b)(6) witness Andrew Jones abandoned "wings" as a Mark at Issue,  and its mischaracterizations concerning non-Marks at Issue icons with a wing-like element is irrelevant as Mr. Jones's testified as GW's 30(b)(6) witness concerning trademark-related topics about the Marks at Issue and which of those Marks at Issue were design marks. CHS's SUF 53, 63 (Dkt. 210).

GW also concedes—by failing to identify any specific factual allegations for which there is a genuine issue of material fact—that GW 30(b)(6) witness Andrew Jones also abandoned GW's claims for the following marks: skulls; Roman numerals (combined with) arrows; Tau – oval vents; plasma; halberd; broadswords; overlapping/banded armour; Tau – geometric groves; wolf fur; snakes. GW failed to carry its burden as the non-moving party to "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (internal quotation marks and citations omitted).

76.     Purchasers of wargaming miniatures and accessories are aficionados and likely to exercise a great deal care in their purchases, spending hundreds of hours using the products, with collections taking up entire rooms, etc.

**Games Workshop's Response:** Games Workshop contests this fact. Games Workshop has achieved great commercial success and currently represents a body of hundreds of books and magazines and video games (made under license) portraying the fictional world and setting forth information and rules about the related table-top wargame of the same name, a movie, computer games, and thousands of collectible figurines that are sculpted and produced by Games Workshop and collected, painted and displayed by fans and used in the tabletop wargame. (Ex. 1, Merrett Decl. ¶ 3) Seven of the books have been New York Times bestsellers. (Id. at 3). While some of Games Workshop's customers likely do exercise care in their purchases, Games Workshop's products are purchased by customers of every description, some (such as a novel) are purchased by customers with little or no familiarity with the rest of Games Workshop's products. (Ex. 132, Suppl. Merrett Decl. ¶13).

**CHS'S REPLY:**     GW does not contest the fact but rather acknowledges that "some of Games Workshop's customers likely do exercise care in their purchases." While GW claims that some of its products "such as a novel" are purchased by customers with little

or no familiarity with the rest of GW's products, this statement is irrelevant as it is

undisputed that CHS does not sell novels.

78.     There is no evidence that the parties sell their respective products through the same websites, retail stores, or distributors.

**Games Workshop's Response:** Games Workshop contests this fact to the extent it implies that

potential customers may not see both Games Workshop products and Chapterhouse products on

the secondary market (such as eBay), at gaming conventions, or otherwise while playing the

Warhammer 40K tabletop game against other opponents. Chapterhouse also concedes it markets

it products exclusively on web forums devoted principally if not exclusively to fans of

Warhammer 40,000.

**CHS'S REPLY:**     GW does not dispute the stated fact, which is therefore deemed

admitted pursuant to Local Rule 56.1.  GW's statement concerning hypothetical

customers and secondary market is irrelevant and unsubstantiated.  GW failed to carry its

burden as the non-moving party to "go beyond the pleadings and affirmatively

demonstrate, by specific factual allegations, that there is a genuine issue of material fact."

*Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (affirming summary judgment for

defendants)  (internal quotation marks and citations omitted).  GW's statements

concerning marketing are irrelevant and unsubstantiated.

80.     GW has produced no sales invoices or other records showing that GW and CHS distributed goods in any particular geographical area that overlap.

**Games Workshop's Response:** Games Workshop contests this fact insofar as the extensive

sales data Games Workshop has produced (as well as its direct operation of stores and relations

with independent retailers throughout the United States) demonstrate that its Warhammer 40K

products are sold throughout the country. (Ex. 145). Nor has Chapterhouse (which sells exclusively online through its website and third-party vendors such as eBay) indicated any regions in which it does not sell.

**CHS'S REPLY:**     GW does not dispute the stated fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  GW's statement concerning its sales and Chapterhouse's sales is irrelevant and unsubstantiated.  GW failed to carry its burden as the non-moving party to "affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (affirming summary judgment for defendants)  (internal quotation marks and citations omitted).  GW's statements concerning marketing are irrelevant and unsubstantiated.

CHS objects to GW's Ex. 145 for the following reasons:

- Exhibit 145 is inadmissible because GW concedes it was a document created for this litigation rather than a business record kept in the regular course.  Jones Suppl. Decl. ¶2 (Dkt. 230-29);
- There is no evidence that Exhibit 145 is audited account records.  *Id.*;
- Contrary to GW's mischaracterization, GW failed to produce any portion of Exhibit 145 before the close of fact discovery, and all but two pages (the ones with Bates numbers) were provided for the first time with GW's Opposition more than 3 months *after* the deposition of GW's 30(b)(6) witness regarding trademark topics, revenues and related records. Supp. Kearney Decl. ¶13;
- CHS had no opportunity to depose GW about Exhibit 145 because GW did not produce it before its Certification, before the deposition of GW's 30(b)(6) witness Andrew Jones, or before the close of fact discovery.  *Id.*;  *See Central Mfg., Inc. v. Brett*, 492 F.3d 876, 882 (7th Cir. 2007) ("There is no way for this Court [or CHS] to know that this alleged sales sheet bears any relation to reality... [as it is]

simply something Plaintiff[] generated on a [] computer for the purposes of this litigation.");

- Contrary to GW's mischaracterization that "[t]here is no evidence or suggestion that any one of the products at issue were not sold in the U.S.," Exhibit 145 does not even list 33 of the 99 unregistered Marks At Issue. *Compare* Rog. 18 Response *with* Ex. 145.

- Exhibit 145 purportedly summarizes financial records from as early as 2004, which runs contrary to Mr. Jones's testimony that GW's policy is not to retain financial records, whether invoices, shipping sheets, or tax records, longer than six years. Dkt. 208-32 (Ex. 15: Jones Tr. at 40:11-42:10). GW also suggest that Exhibit 145 shows "detailed monthly sales data"—however, Exhibit 145 does not even contain the word "month". *Compare* Dkt. 230-18 (Moskin Decl. ¶6 "detailed monthly sales data"), Dkt. 230-29 (Jones Suppl. Decl. ¶ 2 "detailed (monthly) sales data") *with* Exhibit 145;

- GW's Ex. 145 is not evidence of the extent of GW's sales in the U.S., nor is it evidence of use in U.S. commerce of any given alleged mark. GW's statement that "there is no evidence or suggestion that any one of the products actually at issue was not or is not sold in the U.S." is irrelevant, since use in U.S. commerce is an essential element of GW's trademark claims, on which GW (not CHS) bears the burdens of production and persuasion. That statement is also contradicted by GW's 30(b)(6) witness Andrew Jones who testified that GW used SOUL DRINKER and Grenade Launcher as trademarks in a title of books and book excerpts when asked to describe GW's trademark use for SOUL DRINKER and Grenade Launcher. (SUF 66.) GW did not contest that such use *does not* constitute *bona fide* trademark use. *Compare* Mot. at 19-21 *with* Opp. at 20-25; GW also attempts to introduce never-before-produced and improperly withheld evidence despite its representations to both the Court and CHS that such evidence either did not exist or was

produced before its March 2, 2012 Certification (Dkt. 187) and the close of fact discovery  (Dkt. 116: Scheduling Order).

### III.    IMMATERIAL FACTS.

7.      To ensure compatibility with a wide range of miniature figures, CHS's products conform to the standard 28mm scale.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses, and does not, at any rate, excuse the copying of the specific shapes and dimensions of Games Workshop's creations. Furthermore, there is no "standard 28mm scale" in the production and sale of miniatures or in miniature wargaming. (Ex. 132, Suppl. Merrett Decl. at ¶ 4). Throughout the 1970's, a popular size of miniature figurines was described as 25mm, but depending on the manufacturer, this description was used to describe the height of a miniature from the based of the shoe to the top of the head, from the base of the shoe to the eye, or some other measurement. (Id. at ¶ 5). While Games Workshop self-describes most of its miniatures as 28mm scale, its Warhammer 40K models are slightly large than 28mm in size on the whole, many in excess of 30mm tall. (Id.) Other Games Workshop miniatures vary in size from a 6mm scale to 54 mm. (Id.) Numerous other manufacturers also produce and sell wargaming miniatures to entirely different scales. (Id. at ¶ 6)

**CHS'S REPLY:**      GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. The statement is material because GW bases many its allegations of copyright infringement on the size of CHS's products. *See, e.g.,* Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150), entries 6, 7, 69. CHS does not claim that there is a single scale to which all miniatures must conform. GW does not dispute

that the 28mm scale is *one* standard scale, which many manufacturers use. Supp. Kearney

Decl. ¶¶ 6-7, Exs. 1-2 (third-party screenshots showing widespread use of 28mm scale

for war gaming miniatures).


17.     Games Workshop Retail ("GWR"), which is GW's U.S.-based business, produced
no documents pursuant to CHS's document subpoena, including no documents in response to the
following request: "All documents concerning Chapterhouse or its products."

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no

bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.

Games Workshop Retail is not a party to this case.


**CHS'S REPLY:**     GW does not dispute the fact, which is therefore deemed admitted

pursuant to Local Rule 56.1. The statement is material and directly relevant that GW's

U.S.-based business, which is responsible for  GW sales in the U.S. and related records,

has no evidence of any customer confusion regarding the source, sponsorship, or

affiliation of CHS's products.  Dkt. 208-32 (Ex. 15: Jones Tr. at 24:25-25:13; 205:2-14

("…But it is all run out of Memphis, [TN], that one office."). *Infra* CHS's Reply re SUF

60, 72-75 (re no evidence of confusion).  GW's in-house testified about searching a pallet

of documents from its U.S. operations during discovery as "Games Workshop is one

organization. We have an ethos of being one business.  It's very important to us that we

have that togetherness." Supp. Kearney Decl. Exs. 5, 6 (Stevenson II Tr. at 190:2-14;

Stevenson I Tr. at  53:14-22).


18.     As part of its June 15, 2011 response to Interrogatory No. 1, GW included a chart
("Original Copyright Claim Chart") identifying, for each of CHS's accused products, the
copyrights allegedly infringed.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop duly supplemented that chart with Games Workshop's Second Rev. Copyright Claim Chart (CHS Mot., Kearney Decl. Ex. 5).

   **CHS'S REPLY:**    GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. The evolution of GW's shifting claims in this case is directly relevant to whether it had any basis for such claims when asserted.

   19.    After initially pleading that all of CHS's "106 products" were infringing, the Original Copyright Claim Chart identified 95 CHS products as infringing, as well as the corresponding GW works that CHS allegedly infringed.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop duly supplemented that chart with Games Workshop's Second Rev. Copyright Claim Chart (CHS Mot., Kearney Decl. Ex. 5).

   **CHS'S REPLY:**    GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. The evolution of GW's shifting claims in this case is directly relevant to whether it had any basis for such claims when asserted. The fact that GW was unable to identify any GW products infringed by at least eleven CHS products that it sued on as infringing GW copyrights is relevant to whether GW had any basis for such claims when asserted.

   20.    GW has not produced any of its miniature figures to CHS. GW produced a few books, book excerpts, and certain screenshots from its website, but no miniature figures, despite identifying many miniatures as infringed. GW has continued to produce some book excerpts and other materials between March 16, 2012, and August 13, 2012.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. First, all or virtually all of Chapterhouse's infringement is based on copying Games Workshop's two-dimensional artwork as Chapterhouse has primarily focused on creating models based on elements and characters from paintings and drawings of characters and accessories Games Workshop does not (yet) sell. Second, to the extent Chapterhouse has copied three-dimensional miniatures produced by Games Workshop, it has promoted those products *painted* in Games Workshop's colors, which forms the actual (full) basis of Games Workshop's claims regarding those miniatures. Indeed, none of Games Workshop's claims is based simply on copying the unpainted unfinished sprues that come unassembled in boxes sold to customers for them to assemble and paint. (*See, e.g.*, Ex. 135, comparison chart with pictures) Games Workshop's has produced all the relevant and responsive painted depictions of its miniature figures to Chapterhouse in the form in which Chapterhouse would have had access to them, *and in which customers see them and know them*, namely as the figures as shown on packaging as well as pictures of the miniatures as they exist on Games Workshop's website. (Ex. 133, Suppl. Moskin Decl. at ¶2). Additional detailed pictures of Games Workshop's miniatures are available on Games Workshop's website. (Id.). Third, Mr. Villacci's vast collection of Games Workshop miniatures already includes all or substantially all of the products at issue. (Ex. 136, photos of Villacci's collection). Finally, although Games Workshop has made photocopies of only those portions of the many books from which the two-dimensional artwork supporting its claims are based, it has repeatedly advised Chapterhouse that the entire volumes (running to thousands of pages) are available for discovery and inspection at Foley & Lardner's Chicago office. (Ex. 133, Suppl. Moskin Decl. at ¶3) Chapterhouse has thus, failed to identify any respect in which Games Workshop failed to comply with any relevant discovery obligation.

**CHS'S REPLY:**     GW does not dispute this fact, but merely states that it is immaterial. But the stated fact is material, because GW cannot base its infringement claims on works it has not produced. *See* Dkt. No. 139 (ordering GW to "produce the best available exemplar of the works in question.") GW bases a number of its claims on nothing more than "the shape/design of the underlying shoulder pad." *See., e.g,*, Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150) at entries 21, 22, 53, 97-100. However, GW does not dispute that it has not produced any exemplars that show the alleged three-dimensional "shape/design" of its alleged works.

GW's statement that it has produced all relevant exemplars "in the form in which Chapterhouse would have had access to them" is contradicted by its allegation immediately following that Nick Villacci, CHS's principal, "already [has] all or substantially all of the products at issue." The statement is also irrelevant, because GW undisputedly alleges infringement of miniature figures and because the statement is unsubstantiated. Exhibit 136 is also inadmissible hearsay. Each page is stamped with GW's Bates labels, and GW failed to introduce any testimony from CHS, Mr. Villacci, or the photographer that even describes or authenticates what the exhibit purportedly represents.

GW's statement that it has produced exemplars "in the form . . . in which *customers see them and know them*" is irrelevant to any issue in this case, because GW does not allege that any *customers* have copied any of its works.

 GW's statement that "none of [its] claims is based simply on copying the unpainted unfinished sprues that come unassembled in boxes sold to customers for them to assemble and paint" is contradicted by GW's Exhibit 135, which includes images of such "unfinished sprues." *See, e.g.*, GW's Ex. 135, entry 121:



To the extent GW attempts to excuse its failure to produce its alleged works on the ground that

CHS's principal, Nick Villacci, "already [has] all or substantially all of the products at issue", the

Court has already considered that issue and rejected GW's position:

> MR. KASPAR: . . . the [GW] website shows, you know,
> how they look. And we know from the inspection that we took
> in Texas that Mr. Villacci has all of this stuff in his
> collection.
>
> THE COURT: Yes, **not good enough**, though. I mean,
> because the fact that, you know, somebody requests documents
> from you, it's not -- **I never thought it's a good response to
> say, well, you already have this because you got it on your
> own.** I mean, part of this is pinning people down as to what
> they think in their case, you know, is being infringed, and I
> think you need to do that.
>
> So I don't know whether it's going to actually tell
> the defendant anything materially different for them to get
> this little, you know, the black or gray or whatever it is
> piece that comes off of the assembly line, but, like I say, I
> think **you need to give them what I would refer to as the best
> available exemplar of the items that you're contending have
> been infringed**.

Dkt. 171 (Dec. 19, 2011 Hearing Tr. at 35:7-24) (emphases added).

GW's statement that it "repeatedly advised Chapterhouse that the entire volumes . . . are

available for discovery and inspection at Foley & Lardner's Chicago office" lacks foundation,

and is without evidentiary support. The Supplemental Declaration of Jonathan Moskin ¶ 3 lacks foundation, is inadmissible hearsay, and is not based on personal knowledge. The statement is also false. Supp. Kearney Decl. ¶ 10. The lack of any evidentiary basis for the statement speaks for itself. GW claims that it "repeatedly advised Chapterhouse that the entire volumes (running to thousands of pages) are available for discovery and inspection at Foley & Lardner's Chicago office" before the close of fact discovery. (citing Dkt. 230-18: Moskin Suppl., ¶3). Contrary to GW's mischaracterization, GW never responded to any discovery request by stating that documents or exemplars would be made available for inspection at Foley & Lardner's Chicago office, the Court never excused GW from producing such exemplars and in fact ordered it to do so, and GW failed to attached a single communication with CHS before close of fact discovery or its Certification that any documents or exemplars would be made available for inspection at Foley & Lardner's Chicago office. GW's reference to Supplemental Moskin Declaration at ¶ 3 is also irrelevant because GW failed to carry its burden as the non-moving party to "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (affirming summary judgment for defendants) (internal quotation marks and citations omitted). GW's "[s]elf serving [] testimony is not enough to defeat a motion for summary judgment."

21.    On January 19, 2012, GW served a supplemental Exhibit A (the "First Rev. Copyright Claim Chart") to its Answer to CHS's Interrogatory No. 1, adding copyright claims against 26 additional CHS products, and supplementing its identification of infringed works.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop duly supplemented that chart with Games Workshop's Second Rev. Copyright Claim Chart (CHS Mot., Kearney Decl. Ex. 5).

**CHS'S REPLY:** GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. The evolution of GW's shifting claims in this case is directly relevant to whether it had any basis for such claims when asserted. The CHS products GW has identified as infringing and the corresponding GW products it alleges are infringed are of course relevant to GW's copyright claims.

22.     GW's First Rev. Copyright Claim Chart identified a total of 121 CHS products as infringing GW's copyrights.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop duly supplemented that chart with Games Workshop's Second Rev. Copyright Claim Chart (CHS Mot., Kearney Decl. Ex. 5).

**CHS'S REPLY:** GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. The evolution of GW's shifting claims in this case is directly relevant to whether it had any basis for such claims when asserted. The CHS products GW has identified as infringing and the corresponding GW products it alleges are infringed are of course relevant to GW's copyright claims.

23.     Appearing before the Court on March 6, 2012, GW's counsel confirmed GW's March 2, 2012 certification (Dkt. 187) that GW's document production was complete "to the best of its knowledge."

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Furthermore, Games Workshop has a duty to supplement its document production (such as when new registrations are received from the copyright office or to rebut an improper and late claim

raised by Chapterhouse that Games Workshop's products are not sculptures and thus not copyrightable in the UK.). Moreover, Games Workshop had a separate duty to comply with Chapterhouse's Seventh Set of Document Requests (Nos. 62 to 86) responses to which were not due until March 12, 2012.

**CHS'S REPLY:** GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. CHS has not raised any "improper and late claims" that would justify GW's withholding of evidence that it had certified to the court had been produced. GW mischaracterizes its responses to Chapterhouse's Seventh Set of Document Requests (Nos. 62 to 86) responses to which were not due until March 12, 2012, discussed in detail below in CHS's Reply re SUF 24. GW objected to those requests (and amongst others) as "needlessly *cumulative and repetitive of prior requests*…." Supp. Kearney Decl. Ex. 11 (GW's responses to CHS's seventh and final set of requests for documents) (emphasis added) *and* produced no document between its March 2, 2012 Certification and the close of fact discovery as GW represented that it had allegedly produced this "*cumulative*" and "*repetitive*" information beforehand. Supp. Kearney Decl. ¶ 12.

24.     On March 12, 2012, GW served its responses to CHS's last set of discovery requests. In those responses, GW objected to each and every request, with the exception of Document Request No. 66, which requested "All licenses concerning the ALLEGEDLY INFRINGED WORKS," and Requests for Admission No. 497, which was "YOU do not own a copyright to Michael Moorcock's novel 'Stormbringer.'"

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop properly objected to the clearly overbroad and unduly burdensome and repetitive set of discovery served by CHS on March 12, 2012. (CHS Mot., Kearney Decl. Exs. 43, 46, and 49. The statement is also incorrect in as much as Game Workshop did produce

documents after March 12, 2012 in response to requests other than Request 66, including,

Request 71 (documents to establish, if not the date of first use, at least substantial priority of use

of each of the trademarks in issue), Request 64 (agreements with certain freelancers), Requests

74 and 76 and 78 (product packaging for all trademarks at issue), Request 81 (sales revenues for

each trademark), and Request 82 (confirmatory assignments of copyright from employees and

freelance artists). (Ex. 133, Suppl. Moskin Decl. ¶4). Chapterhouse never sought and was not

granted any order compelling Games Workshop to supplement any of its responses to this

discovery and Chapterhouse has failed to identify any respect in which Games Workshop failed

to comply with any relevant discovery request. (Id.)

**CHS'S REPLY:**      GW does not dispute the fact, which is therefore deemed admitted

pursuant to Local Rule 56.1. This statement is material as it shows that GW failed to

produce during fact discovery evidence required for it to establish its affirmative claims

against CHS.  This statement is also material because GW now attempts to introduce

never-before-produced and improperly withheld documents despite its representations to

both the Court and CHS that such evidence either did not exist or was produced before its

March 2, 2012 Certification (Dkt. 187). On March 12, 2012, GW responded to the last set

of discovery requests objecting to each and every request, with the exception of

Document Request No. 66.  GW mischaracterizes its responses, *e.g.*, responses to

Requests Nos. 64, 71, 74, 76, 78, and 81-82, as GW objected to each of those requests

(and amongst others) as "needlessly *cumulative and repetitive of prior requests*…." Supp.

Kearney Decl. Ex. 11 (GW's responses to CHS's seventh and final set of requests for

documents) (emphasis added). GW produced no document between its March 2, 2012

Certification and the close of fact discovery as GW represented that it had allegedly

produced this "*cumulative*" and "*repetitive*" information beforehand. Supp. Kearney

Decl. ¶ 12 (GW produced no documents between March 2 and the close of fact

discovery). GW now attempts to introduce and rely upon this improperly withheld and

never-produced evidence. *E.g.*, Supp. Kearney Decl. ¶ 13 (discussing evidence never produced during discovery).

25. On August 3, 2012, GW served a revised version of its copyright claim chart ("Second Rev. Copyright Claim Chart") in response to CHS's Interrogatory No. 1. This revised chart dropped GW's copyright claims against 32 CHS products. It includes claims that previously-identified CHS products also infringed dozens of previously unidentified GW works (only a handful of which GW had produced before GW's March 2, 2012 certification); identified 20 additional, previously- unidentified CHS products; and added copyright claims against 15 of those previously-unidentified CHS products.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. In Games Workshop's Second Rev. Copyright Claim Chart, Games Workshop narrowed its claims of copyright infringement to simplify the case, thus confirming it made no separate claims of copyright infringement in 33 of the products Chapterhouse sells. The statement is further immaterial in that Games Workshop's identification of additional two-dimensional works to form the basis of certain of its infringement claims was, as Games Workshop alerted Chapterhouse at the time, simply in response to Chapterhouse's improper and late claim raised by Chapterhouse rebuttal expert on English law that certain of Games Workshop's figurines may not be entitled to full copyright protection under English law. Although Games Workshop believes the theory is incorrect, it nonetheless produced additional artwork establishing Chapterhouse's copying of not just sculptures. (Ex. 133, Suppl. Moskin Decl. at ¶5). Finally, as Games Workshop has already brought to the Court's attention, Chapterhouse has continued to copy Games Workshop's products, creating and selling new products for which Games Workshop has received no discovery. (Id.). These products were identified in Games Workshop's Second Rev. Copyright Claim Chart out of an abundance of caution but will be addressed separately in a separate complaint. (Id.).

**CHS'S REPLY:**    GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. The evolution of GW's shifting claims in this case is directly relevant to whether it had any basis for such claims when asserted. The CHS products GW has identified as infringing and the corresponding GW products it alleges are infringed are of course relevant to GW's copyright claims. GW has also offered no justification for and should not be allowed to supplement its identification of alleged infringed works months after the close of fact discovery, regarding which CHS had no opportunity to take discovery regarding ownership and creation. CHS's Interrogatory No. 1, served on April 1, 2011, required GW to identify each copyright it alleged CHS had infringed. Kearney Decl. Ex. 2 (Dkt. 208-2) . GW offers no justification for withholding that information as to certain works until August 2012, months after the close of fact discovery.

30.    GW's Second Rev. Copyright Claim Chart does not identify infringement of its "Games Workshop Complete Catalog & Hobby Reference 2006-2007" (hereinafter, the "Catalog") by any CHS product.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop has identified in its Second Rev. Copyright Claim Chart the works it alleges were copied by Chapterhouse and has focused on the most relevant imagery, regardless whether other relevant images also appear in the Games Workshop Complete Catalog & Hobby Reference 2006-2007.

**CHS'S REPLY:**    GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  The statement is material because there is no presumption of ownership or validity for works not timely registered. 17 U.S.C. 410(c). GW has admitted that "the only work thus far identified by it in this action that is registered in the

United States is Registration No. TX0006541286, 'Games Workshop Complete Catalog
& Hobby Reference 2006-2007." GW's Response to CHS's First Set of Requests for
Admission, Response No. 11 (Kearney Decl. Ex. 48 (Dkt. 208-37)).


31.     GW has not specified which works the Catalog contained, if any, that CHS
allegedly infringes. There is no record evidence that the works included in the Catalog were
created within 5 years of the registration.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no

bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.

Games Workshop has identified in its Second Rev. Copyright Claim Chart the works it alleges

were copied by Chapterhouse and has focused on the most relevant imagery, regardless whether

other relevant images also appear in the Games Workshop Complete Catalog & Hobby

Reference 2006-2007.


**CHS'S REPLY:**      GW does not dispute the fact, which is therefore deemed admitted

pursuant to Local Rule 56.1.  The statement is material because there is no presumption

of ownership for works not timely registered. 17 U.S.C. 410(c). GW has admitted that

"the only work thus far identified by it in this action that is registered in the United States

is Registration No. TX0006541286, 'Games Workshop Complete Catalog & Hobby

Reference 2006-2007." GW's Response to CHS's First Set of Requests for Admission,

Response No. 11 (Kearney Decl. Ex. 48 (Dkt. 208-37)).


32.     GW failed to produce the Catalog before either its Certification or the close of
fact discovery.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no

bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.

Games Workshop has identified in its Second Rev. Copyright Claim Chart the works it alleges were copied by Chapterhouse and has focused on the most relevant imagery, regardless whether other relevant images also appear in the Games Workshop Complete Catalog & Hobby Reference 2006-2007. Games Workshop has also produced photocopies of those portions of the many books from which the two-dimensional artwork supporting its claims are based, and has repeatedly advised Chapterhouse that the entire volumes (running to thousands of pages) are available for discovery and inspection at Foley & Lardner's Chicago office. (Ex. 133, Suppl. Moskin Decl. at ¶3) Chapterhouse has thus, failed to identify any respect in which Games Workshop failed to comply with any relevant discovery obligation.

**CHS'S REPLY:** GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. The statement is material because there is no presumption of ownership for works not timely registered. 17 U.S.C. 410(c). GW has admitted that "the only work thus far identified by it in this action that is registered in the United States is Registration No. TX0006541286, 'Games Workshop Complete Catalog & Hobby Reference 2006-2007.'" GW's Response to CHS's First Set of Requests for Admission, Response No. 11 (Kearney Decl. Ex. 48 (Dkt. 208-37)). GW's statement that it "repeatedly advised Chapterhouse that the entire volumes (running to thousands of pages) are available for discovery and inspection at Foley & Lardner's Chicago office" is irrelevant, lacks foundation, is not based on personal knowledge, and lacks evidentiary support.

38.     GW's claims of ownership have been inconsistent. It initially represented to CHS and the Court that all works at issue were created by employees; then submitted a declaration by GW's in-house attorney that just three of the works at issue were created by non-employees; and later identified that there are at least "12 works in issue in which . . . independent contractors/freelancers have participated," but did not identify which 12 works.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Moreover, Games Workshop contests this fact. Games Workshop claims have not been inconsistent. As with any large universe embodied in hundreds, if not thousands of copyrighted works, Games Workshop has attempted to identify which works Chapterhouse copied in order to create its products. As additional Games Workshop works were identified, a small percentage of these were created by supposed independent contractors/freelancers. (Ex. 133, Suppl. Moskin Decl. at ¶6). Moreover, 7 of the 12 freelance authors all worked on a single licensed work (reproduced as part of the Games Workshop publication, Horus Heresy Collected Visions); certain of the freelancers have also been Games Workshop employees, and the line generally between the fact that someone may be nominally a freelancer does not mean that he or she is not in fact an employee under English law. (Ex. 10, Bloch Report ¶¶ 60-97, 102-111.)

**CHS'S REPLY:**       GW's statement that "[its] claims have not been inconsistent" lacks foundation and is contradicted by the record and by GW's own statement here, conceding that a number of its works *were* created by freelancers. GW's statement is very misleading because the inconsistencies in its claims of ownership were for works that it claimed *from the inception of this lawsuit*, not for works that it identified only later. GW's statement that "7 of the 12 freelance authors all worked on a single licensed work" is false: each of the authors whose alleged works appeared in the compilation "Horus Heresy: Collected Visions" is credited with a distinct work, none of which are alleged to have been collaborations. *See, e.g.*, Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150), entries 68, 76, 77 (3 works by 2 authors), 79 (same), 112, 121, 137 (uncredited author), 138 (uncredited author), 139 (uncredited author).

The statement that "the line generally between the fact that someone may be nominally a freelancer does not mean that he or she is not in fact an employee under English law" is

incoherent, but appears to misapprehend the burden of proof as to questions of ownership:
plaintiff must show that it owns the works it alleges by providing, for example, evidence that the
works were created by its employees acting in the course and scope of their employment.
Defendant does not have the burden to prove a negative.


      39.     Despite CHS's request, GW failed to provide contact information for all but two
of "independent contractors/freelancers" referenced in the Bloch Report.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no
bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.
Games Workshop provided contact information for all former employees and independent
contractors/freelancers that are in its possession. (CHS Mot., Kearney Decl. Ex. 45). Games
Workshop in fact provided all contact information within its control concerning its former
freelancers and employees. (Ex. 132, Suppl. Merrett Decl. ¶ 2)


      **CHS'S REPLY:**     GW's statement that it "provided all contact information within its
control concerning its former freelancers and employees" is contradicted by the record
and the facts. GW improperly withheld contact information concerning certain authors,
*and* failed to produce correspondence with *any* of the authors, in violation of its
discovery obligations. Although GW agreed to produce all correspondence with the
authors of its alleged works, it failed to produce *any* such correspondence. Supp. Kearney
Decl. ¶ 8 & Ex. 3 (GW's Resp. to CHS's RFP Set Five, Request 41) (Nov. 7, 2011).
CHS's independent investigation reveals that GW attempted to contact at least one of its
alleged authors, Gary Chalk, multiple times, and that it dropped its copyright claims with
respect to Chalk's work at issue only after trying and failing to obtain an assignment to
the work at issue. GW failed to disclose the contact information in its possession and
failed to produce its correspondence with Chalk. *Compare* GW's Ex. 132: Supp. Merrett

Decl. at ¶¶ 2, 3 (stating under oath that "we did not withhold contact information on any of the individuals" and that "[GW] Games Workshop has provided all the contact information within its control concerning its former freelancers and employees") and Opp. at 5 (GW "produced all of the information it has" about its authors) *with* Declaration of Gary Chalk ("Chalk Decl.") filed concurrently herewith ¶¶ 16-17 & Ex. C (Aug. 9, 2012, email from GW's in-house counsel to Gary Chalk admitting possession of "an old address that we have for you"). While GW may now claim that correspondence with Chalk is no longer relevant because it has dropped its copyright claims as to works he created, that is wrong for two reasons. First, GW dropped its copyright claim as to Chalk's work only *after* attempting to contact him. *Compare* Chalk Decl. Ex. 16 (GW sent a letter to Chalk on or before late July, 2012) *with* First Rev. Copyright Claim Chart (Dkt. 208-2)(entries 99, 100, alleging copyright infringement and crediting works to Chalk), Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150) (same entries, dropping copyright claims and omitting reference to Chalk). Second, both GW's March 13, 2012 and May 3, 2012 verified responses to CHS's interrogatory No. 22 listed Chalk as an author, but both failed to supply the contact information that GW concededly possessed. Chalk Decl. ¶17 & Ex. C (Aug 9, 2012 email from GW's in-house counsel to Gary Chalk, referring to "an old address that we have for you"). Furthermore, it is not credible that GW managed to obtain "confirmatory assignments" from dozens of other far-flung authors without generating any correspondence—none of which it has produced. GW also withheld contact information from its alleged author Wayne England, yet managed to contact him and obtain a "confirmatory assignment." GW's Ex. 142 (Dkt. No. 230-27 at 29) (listing Wayne England's address).

50.     GW fails to alleged that any GW work is infringed by 4 of the 20 newly-identified CHS products in its Second Rev. Copyright Claim Chart: nos. 118, 119, 129, and 143.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. As shown in Games Workshop's Second Rev. Copyright Claim Chart (CHS Mot. Kearney Decl. Ex. 5), for three of the four subject products (nos. 118, 119, and 129) Games Workshop accuses Chapterhouse of infringing Games Workshop's trademarks only, not copyrights. (Id.) Additionally, as indicated in Games Workshop's Second Rev. Copyright Claim Chart, product no. 143 comprises parts from other Chapterhouse products and thus is addressed in the rest of the chart. (Id.) Moreover, because these new products are not part of this action but rather will be part of a separate complaint, these products have no relevance to this motion.

**CHS'S REPLY:**　　GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. Concerning product 143, GW fails to identify any allegedly infringed GW work; rather, GW's "claim" states in its entirety that

> This kit comprises parts from other Chapter House [*sic*] products.

> Although they primarily produce 'bits' and conversion kids they now have enough of their own separate products to construct full models.

CHS has moved for summary judgment on these new products and so they are directly relevant to this motion.

51.　　CHS product no. 110 has not yet been cast, and has never been sold or offered for sale.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Chapterhouse's creation of an infringing sketch and publication or display of that sketch online infringes Games Workshop's copyrights even if it has not sold a corresponding product.

**CHS'S REPLY:**  GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  GW failed to timely produce any exemplar that CHS allegedly copied. *See*  Dkt. 224-224.17, Product Binder, tab 110. GW alleges infringement of a URL that has no Bates number and was never produced; a work entitled "p51 Codex Eldar 1994" that it failed to produce; and a work entitled "p31 Codex Eldar 2006" that it produced on August 9, 2012. Supp. Kearney Decl. ¶ 14. *See* Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150), entry 110; Dkt. 224-224.17, Product Binder, tab 110. Each of these alleged works lacks foundation.

54.     On June 3, 2011, CHS requested from GW "[o]ne exemplar of the use in commerce in the United States of each of the marks You claim in this action." On July 5, 2011, GW agreed to produce documents responsive to this request.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Moreover, Games Workshop has produced in this action all available exemplars of the subject marks as used in commerce, both on its website and on packaging for such products. (Ex. 133, Suppl. Moskin Decl. ¶7).

**CHS'S REPLY:**  GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  This statement is material as GW must establish that it has used each and every alleged mark *as a trademark* in U.S. commerce and that such *bona fide* use pre-dates CHS's allegedly infringing use. GW has failed to carry its burden. For example, it is undisputed that GW 30(b)(6) witness Andrew Jones contended that GW's "trademark" use of SOUL DRINKER and Grenade Launcher was as a title of books and in book excerpts. (SUF 66.) GW does not contest that such use of terms *does not* constitute trademark use.  *Compare* Mot. at 19-21 *with* Opp. at 20-25. GW also failed to adequately identify its allegedly infringed, unregistered design marks by either including

a copy of the icons or the Bates numbers for corresponding exemplars of trademark use in its response to CHS's Interrogatory No. 18 ("Rog 18 Response" at Dkt. 208-42: Kearney Decl. Ex. 66). Without exemplars for each of the GW alleged marks, GW fails to carry its burden of showing that it owns U.S. rights in each of the alleged marks.

GW's statement that it "has produced in this action all available exemplars of the subject marks as used in commerce" is irrelevant as it does not establish that GW has carried its burden of proving *bona fide* use in U.S. commerce of each alleged mark. GW also mischaracterizes its reference to the Supplemental Moskin Declaration at Paragraph 7, as Paragraph 7 relates only to GW's copyright claims—and does not even use the terms "trademark", "exemplar", commerce", "website", or "packaging." Supp. Moskin Declaration at Paragraph 7 is also irrelevant because it does not claim, state, or represent that "Games Workshop has produced in this action all available exemplars of the subject marks as used in commerce, both on its website and on packaging for such products." GW's "[s]elf serving [] testimony is not enough to defeat a motion for summary judgment." *See Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007) (affirming summary judgment, attorney fees, and costs where plaintiff failed to establish *bona fide* use of registered mark). GW also failed to carry its burden as the non-moving party to "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (affirming summary judgment for defendants) (internal quotation marks and citations omitted).

56.     GW did not produce physical specimens of boxes or packaging for its miniature toys or tabletop games. GW produced complete copies of only 13 of its dozens of alleged literary works, including three works whose originals were in color, but which GW produced only in the form of black-and-white scans.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Furthermore, Games Workshop produced copies of its boxes and packaging for its products. (Ex.

133, Suppl. Moskin Decl. at ¶2). Games Workshop has also produced photocopies of those portions of the many books from which the two-dimensional artwork supporting its claims are based, and has repeatedly advised Chapterhouse that the entire volumes (running to thousands of pages) are available for discovery and inspection at Foley & Lardner's Chicago office. (Id. at ¶3) Chapterhouse has thus, failed to identify any respect in which Games Workshop failed to comply with any relevant discovery obligation.

**CHS'S REPLY:**     GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  The fact is material as GW must establish that it has used each and every alleged mark *as a trademark* in U.S. commerce and that such *bona fide* use pre-dates CHS's allegedly infringing use. GW has failed to carry its burden. For example, it is undisputed that GW 30(b)(6) witness Andrew Jones contended that GW's "trademark" use of SOUL DRINKER and Grenade Launcher was as a title of books and in book excerpts. (SUF 66.) GW does not contest that such use of terms *does not* constitute trademark use.  *Compare* Mot. at 19-21 *with* Opp. at 20-25. GW also failed to adequately identify its allegedly infringed, unregistered design marks by either including a copy of the icons or the Bates numbers for corresponding exemplars of trademark in its response to CHS's Interrogatory No. 18 ("Rog 18 Response" at Dkt. 208-42:  Kearney Decl. Ex.  66 ). Without exemplars for each GW alleged marks, GW fails to carry its burden of showing that it owns U.S. rights in each of the alleged marks.

This statement is also material to the extent that GW now attempts to introduce never-before-produced and improperly withheld evidence despite its representations to both the Court and CHS that such evidence either did not exist or was produced before its March 2, 2012 Certification (Dkt. 187) and the close of fact discovery  (Dkt 116: Scheduling Order). For example, GW relies on documents produced on August 9, 2012, to support its copyright allegations against numerous CHS products. *See, e.g.,* Dkt. 224-224.17, Product Binder, tabs 35,

36, 46-49, 51, 52, 57-62, 74, 77, 108, 113, 114, 126, 130, 132-134, 142 (entries detailing works produced on August 9, 2012); Supp. Kearney Decl. ¶ 14 (listing Bates range of documents GW produced on August 9, 2012).

GW also mischaracterizes its Responses to suggest that it is not relying upon never-before-produced withheld evidence. For example, GW claims that it "repeatedly advised Chapterhouse that the entire volumes (running to thousands of pages) are available for discovery and inspection at Foley & Lardner's Chicago office" before the close of fact discovery. (citing Dkt. 230-18: Moskin Suppl., ¶3). Contrary to GW's mischaracterization, GW never responded to any discovery request by stating that documents or exemplars would be made available for inspection at Foley & Lardner's Chicago office (*see, e.g.*, Kearney Decl. Exs. 35, 43, 49, 66, 70; Supp. Kearney Decl. Exs. 3, 4 (GW's discovery responses)), and GW failed to attached a single communication with CHS before the close of fact discovery or its Certification that any documents or exemplars would be made available for inspection at Foley & Lardner's Chicago office. Supp. Kearney Decl. ¶ 10. GW's reference to Supplemental Moskin Declaration at Paragraph 2 is also irrelevant because GW failed to carry its burden as the non-moving party to "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (affirming summary judgment for defendants) (internal quotation marks and citations omitted). Paragraph 2 does not identify any of the Marks at Issue or any corresponding exemplar showing use of the claimed mark as an actual trademark. GW's "[s]elf serving [] testimony is not enough to defeat a motion for summary judgment." *See Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007) (affirming summary judgment, attorney fees, and costs where plaintiff failed to establish *bona fide* use of registered mark).

59.     GW's retail stores in the U.S. do not carry the full range of its products.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Mr. Villacci himself has purchased all or virtually all of the products at issue. (Ex. 136). Games Workshop produced sales information establishing the extent of its sales in the U.S. for each of the subject trademarks (Ex. 145). Chapterhouse is not accused of copying the full range of products Games Workshop sells, and there is no evidence or suggestion that any one of the products actually at issue was not or is not sold in the U.S.

**CHS's REPLY:** GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. The statement is material because it is evidence that merely because GW has retail stores in the U.S., that does not establish that every GW product was sold or shipped in the U.S. GW must establish that it has used each and every alleged mark *as an actual trademark* in U.S. commerce and that such *bona fide* use pre-dates CHS's allegedly infringing use. The statement that "Mr. Villacci himself has purchased all or virtually all of the products at issue" lacks foundation, is not based on personal knowledge, is irrelevant, and, as the hedging shows, is meaningless; in particular, the statement is not evidence that any given GW product was ever sold or offered for sale in U.S. commerce.

Exhibit 136 is also inadmissible hearsay. Each page is stamped with GW's Bates labels, and GW failed to introduce any testimony from CHS, Mr. Villacci, or the photographer that even describes or authenticates what the exhibit purportedly represents. Exhibit 136 does not establish that GW has used each and every alleged mark in U.S. commerce, and that such use pre-dates CHS's allegedly infringing use. Exhibit 136 contains over 600 pages of unsorted and unitemized photographs. Although the photographs are poor quality, it appears that only 13 of the 110 Marks At Issue (BLOOD ANGELS, BLOOD RAVENS, CARNIFEX, DARK ANGEL, DARK ANGELS, ELDAR, GENE STEALER, THE INQUISITION, PREDATOR, RHINO, SPACE MARINE, TAU, AND WARHAMMER) even appear in GW's Ex. 136, several only as book titles, which GW does not contest is not a trademark use. *See, e.g.*, GW's Ex. 136 at

GW0003225.  GW did not contest that such use *does not* constitute *bona fide* trademark use. *Compare* Mot. at 19-21 *with* Opp. at 20-25.

CHS objects to GW's Ex. 145 for the reasons discussed above in detail in its Reply to GW's Response to SUF 80, including because it is inadmissible, not business records, never-before-produced and improperly withheld; and cannot be evidence that GW has used each and every of the Marks At Issue in U.S. commerce as it does not even list 33 of the Marks At Issue.

60.     Records concerning sales in the United States are kept by GW's U.S. business, GWR.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop produced sales information establishing the extent of its sales in the U.S. (Ex. 145). There is no evidence or suggestion that any one of the products at issue were not sold in the U.S.

**CHS'S REPLY:**     GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  The statement is material because it supports the proposition that, because GWR has no evidence that any given GW product was ever sold or shipped in U.S. commerce, no such evidence exists. GW must establish that it has used each and every alleged mark *as an actual trademark* in U.S. commerce and that such *bona fide* use pre-dates CHS's allegedly infringing use. The statement that "Mr. Villacci himself has purchased all or virtually all of the products at issue" lacks foundation, is not based on personal knowledge, is irrelevant, and, as the hedging shows, is meaningless; in particular, the statement is not evidence that any given GW product was ever sold or offered for sale in U.S. commerce.

CHS objects to GW's Ex. 145 for the reasons discussed above in detail in its Reply to GW's Response to SUF 80, including because it is inadmissible, not business records, never-before-produced and improperly withheld; and cannot be evidence that GW has used each and every of the Marks at Issue in U.S. commerce as it does not even list 33 of the Marks at Issue. Supp Kearney Decl., ¶ 29.

61.     GW has no sales records proving if or when a particular product was sold in the U.S., or in any particular geographical area such as in Illinois.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. This statement is also false, as Games Workshop produced sales information establishing sales of products bearing all of its subject trademarks in the U.S., including the specific extent of such sales in the U.S. from 2004 to date (thus substantially predating Chapterhouse's existence or first sales of its own goods). (Ex. 145). There is no evidence or suggestion that any one of the products at issue were not sold in the U.S.

> **CHS'S REPLY:**     GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  The statement is also material because proof of U.S. sales is essential to GW's trademark and dilution claims. This statement is material because the factual issue of fame in the U.S. and in Illinois, including the geographic extent and amount of sales, are factors for GW's federal and state trademark dilution claims.

CHS objects to GW's Ex. 145 for the reasons discussed above in detail in its Reply to GW's Response to SUF 80, including because it is inadmissible, not business records, never-before-produced and improperly withheld; and cannot be evidence that GW has used each and every of the Marks at Issue in U.S. commerce as it does not even list 33 of the Marks at Issue. Supp. Kearney Decl., ¶ 29.

62.     GW did not produce itemized sales invoices or purchase orders for each or any of the Marks At Issue, including any sales invoices or purchase orders for Internet or retail sales in the U.S. or Illinois.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop produced sales information establishing the extent of its sales in the U.S. (Ex. 145). There is no evidence or suggestion that any one of the products at issue were not sold in the U.S and no reason has been suggested to impose a needless burden of producing millions of dollars of invoices when actual business record summaries have been provided.

**CHS'S REPLY:**     GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  The statement is material because GW bears, but has failed to carry, the burdens of production and persuasion to show use of its alleged marks in U.S. commerce, and alleged use of the marks in Illinois. GW must establish that it has used each and every alleged mark *as an  actual trademark* in U.S. commerce and that such *bona fide* use pre-dates CHS's allegedly infringing use. Without such evidence, GW's trademark, dilution, and state law claims fail because GW fails to carry its burden of showing that it owns U.S. rights in each of the alleged Marks At Issue.

CHS objects to GW's Ex. 145 for the reasons discussed above in detail in its Reply to GW's Response to SUF 80, including because it is inadmissible, not business records, never-before-produced and improperly withheld; and cannot be evidence that GW has used each and every of the Marks at Issue in U.S. commerce as it does not even list 33 of the Marks at Issue. Supp. Kearney Decl., ¶29.

63.     GW 30(b)(6) witness Andrew Jones identified 36 of the Marks At Issue as design marks (symbols, icons, or designs). Only the Aquila Design is identified as a registered mark in the SAC.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.

**CHS'S REPLY:**     GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  GW does not dispute that there is no genuine issue of fact concerning this statement; GW only argues that this statement is not material. This statement, nonetheless, is material as GW must first adequately identify it alleged marks before establish that it has used each and every of the Mark at Issue *as actual trademarks* in U.S. commerce and that such *bona fide* use pre-dates CHS's allegedly infringing use. GW failed to identify its alleged infringed, unregistered design marks. Without adequately identifying its alleged unregistered design marks, GW cannot carry its burden of establishing that its has ever used in U.S. commerce each or any of those alleged Marks at Issue as trademarks.

64.     In its response to CHS's Interrogatory No. 18 ("Rog 18 Response"), which required GW to identify each allegedly infringed trademark, GW did not include a copy of its icons or identify Bates numbers for corresponding exemplars of trademark use.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Moreover, the request is based on an incorrect premise, because Interrogatory 18 did not seek an identification of each claimed mark (or all trade dress) in issue, but rather sought the dates of first use of the subject marks. Believing that this was what Chapterhouse sought, Games Workshop provided the requested information without separately breaking out the use of trade dress along with trademarks for the same products.

**CHS'S REPLY:**        GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  This statement is material as GW must first adequately identify it alleged marks before establish that it has used each and every of the Mark At Issue *as actual trademarks* in U.S. commerce and that such *bona fide* use pre-dates CHS's allegedly infringing use. GW failed to identify its alleged infringed, unregistered design marks. GW failed to identify its alleged design marks by either including a copy of the icons or the Bates numbers for corresponding exemplars of trademark use in its response to CHS's Interrogatory No. 18 ("Rog 18 Response" at Dkt. 208-42:  Kearney Decl. Ex.  66 ). Furthermore, Interrogatory No. 18 speaks for itself: "Separately for each mark YOU allege in this action, provide the date of first 'use in commerce' of the mark (as that term is defined in 15 U.S.C. § 1127) by you in the U.S., and the nature of such use." Without adequately identifying its alleged unregistered design marks, GW cannot carry its burden of establishing that its used ever used in U.S. commerce each or any of the alleged Marks at Issue as trademarks. GW does not allege trade dress claims, which are therefore irrelevant to any issue in this case.


65.        GW 30(b)(6) witness Andrew Jones did not know whether GW produced exemplars for trademark use of each of the Marks At Issue.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.


**CHS'S REPLY:**        GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  This statement is material as GW must establish that it has used each and every alleged mark *as a trademark* in U.S. commerce and that such *bona fide* use pre-dates CHS's allegedly infringing use. GW has failed to carry its burden. For

example, it is undisputed that GW 30(b)(6) witness Andrew Jones contended that GW's "trademark" use of SOUL DRINKER and Grenade Launcher was as a title of books and in book excerpts. (SUF 66.) GW does not contest that such use of terms *does not* constitute trademark use. *Compare* Mot. at 19-21 *with* Opp. at 20-25. GW also failed to adequately identify its allegedly infringed, unregistered design marks by either including a copy of the icons or the Bates numbers for corresponding exemplars of trademark in its response to CHS's Interrogatory No. 18 ("Rog 18 Response" at Dkt. 208-42: Ex. 66). Without exemplars for each GW alleged marks, GW fails to carry its burden of showing that it owns U.S. rights in each of the alleged Marks at Issue.

67.    GW 30(b)(6) witness Andrew Jones failed to identify any trademark use concerning the design marks LIONS; COG; TRIPTYCH; SKULL WITH HORNS; FLAMING SKULLS; FLAMING CHALICE; and DRAGON/SALAMANDER SCALE.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Moreover, Games Workshop has produced sales figures for its Chaos Space Marines (whose logo is a flaming skull); Exorcist Spae Marine products (whose logo is a skull with downturned horns) and its Salamanders Space Marines (whose logo is a salamander head. (Ex. 146, Suppl. Jones Decl. ¶2)

**CHS'S REPLY:**    GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. This statement is material as GW must establish that it has used each and every of the Mark at Issue *as actual trademarks* in U.S. commerce and that such *bona fide* use pre-dates CHS's allegedly infringing use. It is undisputed that GW 30(b)(6) witness Andrew Jones failed to identify any trademark use concerning the design marks LIONS; COG; TRIPTYCH; SKULL WITH HORNS; FLAMING SKULLS; FLAMING CHALICE; and DRAGON/SALAMANDER SCALE. GW's

"[s]elf serving [] testimony [in its Response] is not enough to defeat a motion for summary judgment." *See Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007) (affirming summary judgment, attorney fees, and costs where plaintiff failed to establish *bona fide* use of registered mark).

GW now attempts to introduce never-before-produced and improperly withheld evidence despite its representations to both the Court and CHS that such evidence either did not exist or was produced before its March 2, 2012 Certification (Dkt. 187) and the close of fact discovery (Dkt 116: Scheduling Order). GW references, though fails to identify allegedly "produced sales figures." Ex. 146 is not sales figures. GW failed to carry its burden as the non-moving party to "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (affirming summary judgment for defendants) (internal quotation marks and citations omitted).

To the extent GW intended to reference Ex. 145, CHS objects to GW's Ex. 145 for the reasons discussed above in detail in its Reply to GW's Response to SUF 80, including because it is inadmissible, not business records, never-before-produced and improperly withheld; and cannot be evidence that GW has used each and every of the Marks at Issue in U.S. commerce as it does not even list 33 of the Marks at Issue. Supp. Kearney Decl., ¶ 29.

CHS objects to the Jones Declaration as Mr. Jones's previously testified as GW's 30(b)(6) witness concerning trademark-related topics about the Marks at Issue and which of those Marks at Issue were design marks. CHS's SUF 53, 63 (Dkt. 210). GW's "[s]elf serving [] testimony is not enough to defeat a motion for summary judgment." *See Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007) (affirming summary judgment, attorney fees, and costs where plaintiff failed to establish bona fide use of registered mark).

68.     GW conducts minimal advertising in the United States.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Games Workshop's success marketing its products in the United States without traditional advertising does not in any way impair its trademark rights.

> **CHS'S REPLY:** GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. This statement is material because the factual issue concerning the reach of GW's advertising is a factor concerning fame for GW's federal and state trademark dilution claims. 15 U.S.C. 1125(c); 765 ILCS 1036/65. Additionally, "the *effect* or *success* of the advertising…is the test of secondary meaning" for protectable trademark rights. *See Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1270 (7th Cir. 1989) (emphases in original).

69. GW has not conducted any consumer surveys or testimonials, or commissioned any expert reports, concerning any of the Marks At Issue.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Given the large number of products at issue, it would not have been feasible to conduct a survey of any one or more of the same.

> **CHS'S REPLY:** GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. This statement is material because consumer surveys and consumer testimony are relevant factors for secondary meaning for protectable trademark rights. *Platinum Home Mortg. Corp. v. Platinum Fin. Group,* 149 F.3d 722, 728-29 (7th Cir. 1998). The lack of a consumer survey or testimonial also weighs against a finding of actual confusion concerning the likelihood of confusion test for trademark infringement.

*Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) (vacating

injunction and dismissing 15 U.S.C. § 1125(a) claim). GW's statement concerning its

litigation strategy is irrelevant.


70.     In its response to Interrogatory No. 3 ("Rog 3 Response"), which required GW to
identify allegedly infringing use by CHS for each mark that GW alleges is at issue in this case,
GW did not identify use by CHS of 55 of the Marks At Issue. Those 55 Marks At Issue are:

| | | |
|---|---|---|
| 1. Warhammer 40K | 2. Cadian | 3. Chimera |
| 4. Grenade Launcher | 5. Halberd | 6. Heresy Armour |
| 7. Hellhound | 8. Howling Banshee | 9. Imperial Guard |
| 10. Jetbike | 11. Jump Pack | 12. Librarian |
| 13. Plasma | 14. Predator | 15. Scorpion |
| 16. Stormraven | 17. Techmarine | 18. Terminator |
| 19. Thunder Hammer | 20. Tyrant | 21. Skulls |
| 22. Wings (eagle wings, angel wings) | 23. Lions | 24. Griffon |
| 25. Triptychs | 26. Broadswords | 27. Skull with horns |
| 28. Storm bolter (gun) | 29. Sawblade with blood- drop | 30. Clenched first in a gauntlet [sic] |
| 31. Snakes | 32. Flaming skulls | 33. Flaming chalice |
| 34. Salamander | 35. Dragon/salamander scales | 36. Tau Symbol pattern |
| 37. Tau - Oval vents | 38. Tau - X marking on power/ammo packs | 39. Tau - circle with a diagonal line through it |
| 40. Tau –geometric groves | 41. Roman numerals (combined with) arrows | 42. X crosses and inverted V |
| 43. Cog | 44. Iron hands icon - gauntleted left hand shown palm downwards | 45. Overlapping/banded armour |
| 46. Wolf fur | 47. Wolf skulls | 48. Wolf tails |
| 49. Raven wings with blood drop in center | 50. I symbol (for Inquisition) | 51. Scarab beetles |
| 52. Spirit Stones | 53. Eldar iconography/symbols Stones | 54. Eldar – Spirit |

| | (seer icons, etc.) | |
|---|---|---|
| 55. Eldar – decorative gems on weapons | | |

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Indeed, the subject interrogatory was understood to be directed primarily towards a general inquiry into the basis for "how Chapterhouse infringes each mark". Games Workshop does not contend that most of the words above are trademarks and Games Workshop has elsewhere in the course of discovery and in its subsequent pleadings detailed the marks in issue.


**CHS'S REPLY:** GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. This statement is material as GW must carry the burden of establishing that CHS used each and every one of the Marks at Issue in commerce with respect to GW's trademark infringement and dilution claims. 15 U.S.C. §§ 1114(1)(a), 1125(a)(1), 15 U.S.C. 1125(c), and § 1127 (defining "use in commerce"); 765 ILCS 1036/65.

This statement is material as GW did not identify use by CHS of at least 55 of the Marks at Issue. GW's mischaracterization of CHS's Interrogatory No. 3 and GW's Rog 3 Response is irrelevant because the interrogatory and response speak for themselves. Kearney Decl. Ex. 36 at No. 3 (Dkt. 208-36) ("Identify each trademark YOU claim Chapterhouse infringes and specific the nature of each alleged infringement, including without limitation where and how Chapterhouse infringes each mark."). GW's statement above "that it does not contend that most of the words above are trademarks" is irrelevant as GW does not dispute that Interrogatory No. 3 required it to identify use by CHS of the marks whether they were "word" marks or design marks.

71.     The following seven Marks At Issue are not used on the Chapterhouse website, www.chapterhouse.com: Aquila Design; BLOOD ANGELS; CHAOS SPACE MARINES; HORUS HERESY; LAND SPEEDER; MK II ARMOUR; TERMEGANTS.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. The statement is also incorrect or misleading as the Chapterhouse website had used the names "Blood Angel", "Chaos Space Marines", Horus Heresy (or simply foreshortened "Heresy" or "Heresy Era"); (*See, e.g.*, Ex. 52) and the new eagle design on the Chapterhouse website immediately calls to mind Games Workshop's registered Aquila design. (CHS Mot., Kearney Decl. Ex. 53)

**CHS'S REPLY:**     This statement is material as GW must carry the burden of establishing that CHS used each and every one of the Marks At Issue in commerce with respect to GW's trademark infringement and dilution claims.  15 U.S.C. §§ 1114(1)(a), 1125(a)(1), 15 U.S.C. 1125(c), and § 1127 (defining "use in commerce"); 765 ILCS 1036/65.  GW's reference to Exhibit 52 is irrelevant as that exhibit is titled "5 Heresy Marine Jump Packs" and it does not contain the phrases CHAOS SPACE MARINES; HORUS HERESY; LAND SPEEDER; MK II ARMOUR; or TERMEGANTS or the Aquila Design. The phrase BLOOD ANGELS appears only in the disclaimer. GW's mischaracterization of the logo in Kearney Decl. Ex. 53 as the "new eagle design on the Chapterhouse website" is also irrelevant, as GW's Aquila Design is a double-headed, doubled-feet, spread-winged eagle icon,

, and entirely different from CHS's logo in either exhibit referenced in GW's response,

  or  

72.     GW's U.S. business has no records of U.S. customers expressing confusion between CHS and CHS or even inquiring about CHS.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. Evidence of customer confusion written by English speaking customers received by Games Workshop UK's company via email is still relevant insofar as Chapterhouse's internet-based business originates in the United States but is not limited to United States customers.

**CHS'S REPLY:**     GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1.  This statement is material as there is no evidence of actual confusion of U.S. customers, which is a highly pertinent factor weighing against likelihood of confusion required for trademark infringement. Furthermore, GW failed to carry its burden to "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact" that there is evidence of U.S. customers expressing confusion concerning CHS. *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (affirming summary judgment for defendants)  (internal quotation marks and citations omitted). GW's statement concerning hypothetical non-U.S. customers is irrelevant.

73.     GW produced emails with five individuals not affiliated with GW relating to CHS. The emails were received by GW's legal team in the United Kingdom. Based on the email addresses, one of the emails appears to have been sent from Australia and another two appears to have been sent from the United Kingdom. For the other two emails, Gillian Stevenson, GW's 30(b)(6) witness regarding confusion related to CHS, testified that it would not be possible to determine whether those emails were sent from individuals residing in the United States based on the emails.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses.

Evidence of customer confusion written by English speaking customers received by Games Workshop UK's company via email is still relevant insofar as Chapterhouse's internet-based business originates in the United States but is not limited to United States customers.

**CHS'S REPLY:** GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. This statement is material as there is no evidence of actual confusion in concerning U.S. customers, which is a highly pertinent factor weighing against likelihood of confusion required for trademark infringement. GW's statement concerning hypothetical non-U.S. customers is irrelevant.

74. Gillian Stevenson, GW's 30(b)(6) witness regarding confusion related to CHS, testified that "I don't know that the original author is confused," with respect to Depo. Ex. 88.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses as the subject email is not among those relied upon in connection with Games Workshop's pending motion for summary judgment.

**CHS'S REPLY:** GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. This statement is material as there is no evidence of actual confusion in concerning U.S. customers, which is a highly pertinent factor weighing against likelihood of confusion required for trademark infringement. This statement is also material as it further demonstrates the lack of evidence of actual confusion. This statement is also material in that GW relies upon this email in its response to SUF 16 (discussed in CHS's Reply re SUF 16 above).

75. GW's 30(b)(6) witness Gillian Stevenson wrote "And another one who clearly is not confused!" after reviewing an email from a individual concerning CHS.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses as the subject email is not among those relied upon in connection with Games Workshop's pending motion for summary judgment. Furthermore, as Gillian Stevenson further testified this statement was made to distinguish between the emails she received where customers were confused and where customers were angry at Chapterhouse's activities. (CHS Mot., Kearney Decl., Ex. 23 at 152:14-19).

 **CHS'S REPLY:**  GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. This statement is material as there is no evidence of actual confusion in concerning U.S. customers, which is a highly pertinent factual factor weighing against likelihood of confusion required for trademark infringement. This statement is also material as it further demonstrates the lack of evidence of actual confusion. This statement is also material in that GW relies upon this email in its response to SUF 16 (discussed in CHS's Reply re SUF 16 above).

 79. GW has produced no evidence that it advertises on the same websites or in the same publications as CHS.

**Games Workshop's Response:** This statement is immaterial because, even if true, it has no bearing on the essential elements of Games Workshop's claims or Chapterhouse's defenses. This statement is also inherently misleading, as Chapterhouse's entire business is targeted at Games Workshop's customers and only Games Workshop's customers.

 **CHS'S REPLY:**  GW does not dispute the fact, which is therefore deemed admitted pursuant to Local Rule 56.1. GW does not dispute that there is no genuine issue of fact concerning this statement; This statement is material as the factual issue the reach of

GW's advertising is a factor concerning fame for GW's federal and state trademark dilution claims. 15 U.S.C. 1125(c); 765 ILCS 1036/65. Additionally, "the *effect* or *success* of the advertising…is the test of secondary meaning" for protectable trademark rights. *See Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1270 (7th Cir. 1989) (emphases in original). Furthermore, GW's statement concerning CHS's business is irrelevant as GW failed to carry its burden as the non-moving party to "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact". *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (affirming summary judgment for defendants) (internal quotation marks and citations omitted).

## IV. GAMES WORKSHOP'S ADDITIONAL UNDISPUTED MATERIAL FACTS.

### GENERAL OBJECTIONS

CHS objects generally to each of GW's purported Additional Undisputed Material Facts; the Declaration of Alan Merrett (GW's Ex. 1); Supplemental Declaration of Alan Merrett (GW's Ex. 132); Declaration of Andrew Jones (GW's Ex. 2); Supplemental Declaration of Andrew Jones (GW's Ex. 134); Declaration of Jonathan Moskin (GW Ex. 4); and Supplemental Declaration of Jonathan Moskin (GW's Ex. 133) (collectively "GW's Supporting Declarations"); and each of GW's Exhibits 1 – 149 as follows:

- CHS objects to each of GW's purported Additional Undisputed Material Facts and GW's Supporting Declarations to the extent they reference and rely on documents and alleged works that GW failed to produce. In particular, and without limitation, CHS objects to GW's Supporting Declarations and Exhibits 11, 12, 27, 29, 31, 61, 71, 77, 109, 111, 117, 135, 139, 141, 142, and 145. *See* Dkt. 139 (ordering GW to "produce the best available exemplar of the works in question".)

- CHS further objects to each of GW's purported Additional Undisputed Material Facts and GW's Supporting Declarations to the extent they incorporate, reference, and rely on documents and alleged works that GW produced only after the close of fact discovery. In

particular, and without limitation, CHS objects to GW's Supporting Declarations and Exhibits 28, 76, 108, and 135. *See* Dkt. 116 (scheduling order).

- CHS further objects to each of GW's purported Additional Undisputed Material Facts and GW's Supporting Declarations to the extent they incorporate, reference, and rely on color versions of images that GW produced only in black and white, in violation of the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). In particular, and without limitation, CHS objects to GW's Supporting Declarations and Exhibit 135. *See* Dkt. 139 (ordering GW to "produce the best available exemplar of the works in question"); Dkt. 171 "[I]f the original is in color, then the exemplar has to be in color."

- CHS further objects to each of GW's purported Additional Undisputed Material Facts and GW's Supporting Declarations to the extent they incorporate, reference, and rely on works that GW failed to identify as infringed by any Chapterhouse product.

- CHS objects generally to the Declaration of Jonathan Moskin (GW's Ex. 4) and the Supplemental Declaration of Jonathan Moskin (GW's Ex. 133) as lacking foundation for any of their referenced exhibits or statements, as not based on the declarant's personal knowledge, and as comprising improper and unfounded speculation, and improper and unfounded legal conclusions.

**Games Workshop Owns the Copyrights At Issue**

1.    Chapterhouse's expert on English law is almost completely in agreement with Games Workshop's expert on the principles of English law governing ownership, except for his personal and political views that the doctrine of equitable assignment is morally wrong because it sometimes disadvantages individuals who are the true creative source of works they make for large companies. (Ex. 149, Bently Tr. at 166:16-176:21)

**CHS'S RESPONSE: DISPUTED.** GW grossly mischaracterizes the testimony of Professor

Bently, which does not support the statement. Professor Bently's expert report speaks for itself.

The report of GW's expert is not based on sufficient facts and, as Professor Bently describes in

detail, mischaracterizes English law governing copyright ownership.

The cited testimony of Professor Bently reads in pertinent part:

> [PROFESSOR BENTLY] . . . This is a rebuttal report about what the
> law is, and I state what the law is in a way that is,
> I think, a suitable objective corrective to -- or
> balance to what I saw in the report of Bloch and Bor.
> . . .
> The statements in this report are
> about what the law is, based on a reading and citation
> of the cases.

Bently Dep. Tr. (GW's Ex. 149) at 168:20-169:15

## Copyrights at Issue

2.      Twelve of the thirty-three products Chapterhouse says are unprotectable under the merger doctrine (Nos. 25, 26, 28-30, 32, 38-42 and 70) are products for which Games Workshop has specifically advised Chapterhouse it is alleging only trademark infringement. (Games Workshop's Second Rev. Copyright Claim Chart, CHS Mot., Kearney Decl. Ex. 5)

**CHS'S RESPONSE: DISPUTED.** CHS does not argue the merger doctrine. CHS's motion speaks for itself. GW's statement that it "is alleging only trademark infringement" as to certain CHS products mischaracterizes its actions and implies falsely that GW's did not bring copyright claims against CHS's products in the first instance. However, GW's pleadings, discovery responses, and other evidence (including without limitation its Complaint [Dkt. 1], Second Amended Complaint [Dkt. 147], Original Copyright Claim Chart (Dkt. 208-2), First Rev. Copyright Claim Chart (Dkt. 208-2), and Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150)) speak for themselves. GW dropped its copyright claims against certain CHS products only on August 3, 2012, after forcing CHS to engage in extensive and protracted discovery concerning all of its copyright claims.

4.      For the Court's convenience, in Exhibit 135 Games Workshop has taken its Second Rev. Copyright Claim Chart and included representative pictures of both the Chapterhouse and Games Workshop products at issue. (Ex. 133, Suppl. Moskin Decl. ¶14)

**CHS'S RESPONSE: DISPUTED.** GW's Exhibit 135 lacks foundation, is irrelevant, and misrepresents the evidence in at least four distinct ways:

- Ex. 135 includes numerous images that GW failed to produce in discovery (e.g. Dkt. 230-19 at 3, image from unproduced work "Warhammer 40,000 Compilation"; *id.* at 7, "Cover art, Codex Black Templars 2005"; *id.* at 20, "Ork Evil Sunz Icon").

- Ex. 135 includes numerous images that are not true and correct copies of documents GW has produced because, among other things, they are color representations of documents GW produced only in black and white (*see, e.g.*, Dkt. 230-19 at 10, color image from The Art of Warhammer 40,000; *compare* black and white image at GW Ex. 49, Dkt. 230-9 at 41; *and see* Response to GW's purported Additional Undisputed Material Fact No. 29, *infra*).

- GW's Exhibit 135 includes color images of CHS products, although it is undisputed that all of CHS's products are sold and shipped unpainted. Declaration of Nicholas Villacci, Dkt. 208-43, at ¶ 10.

- GW's Exhibit 135 includes images of CHS products depicting them fully assembled on top of GW products, even though the GW products are depicted only for the purpose of demonstrating compatibility and fit of CHS's products (*see, e.g.*, Dkt. 230-19 at 43; *compare* Response to GW's purported Additional Undisputed Material Fact No. 36, *infra*).

### Chapterhouse's Affirmative Defenses

6.      Chapterhouse has pleaded 23 affirmative defenses. Neither *scènes à faire* nor merger are among Chapterhouse's affirmative defenses. (Dkt # 45 and Dkt. #150) Moreover, Chapterhouse has never requested leave to add either of these affirmative defenses.

**CHS'S RESPONSE: DISPUTED.** Merger and *scènes à faire* are not affirmative defenses.

*Liberty Am. Ins. Group, Inc. v. WestPoint Underwriters, LLC*, 199 F. Supp. 2d 1271, 1290 (M.D.

Fla. 2001) (rejecting argument that merger and *scenes a faire* are "affirmative defenses" and

stating that "[t]he important point . . . is that [the] analysis is necessary . . . [as] a means to a very

important end: filtering out all unprotectable material") (quoting *Bateman v. Mnemonics, Inc.*, 79

F.3d 1532, 1541 (11th Cir. 1996)); *Incredible Techs.*, 400 F.3d at 1011-12 (noting *scenes a faire*

doctrine is a "specific limitation[] to copyright protection"); *Atari, Inc. v. N. Amer. Philips*

*Consumer Elec. Corp.*, 672 F.2d 607, 616-17 (7th Cir. 1982) (distinguishing idea from

expression and treating "[c]ertain expressive matter . . . as *scenes a faire* [which] receive

protection only from virtually identical copying"). Even if either of these doctrines were an

affirmative defense (which they are not), CHS does not argue merger or *scènes à faire*, but

simply points out that many if not most of GW's purported "unique" designs are simple,

unprotectable geometric shapes, or unprotectable combinations of just two such elements; and

that most if not all of GW's claims are based on nothing more than similarities of commonplace,

unprotectable ideas.

**Chapterhouse's Infringement of Games Workshop's Copyrights**

7.      In one of Chapterhouse's unproduced forum posts Mr. Villacci shows pictures of his Doomseer product. (Ex. 39) The response from forum users is quite strong in detailing the many similarities between Chapterhouse's products and Games Workshop's Eldar Farseer and Eldar Warlock products. (Id.) In fact, at one point, a forum poster writes, concludes "you come in and say that you're NOT at all knocking off anything, and that any similarities between your blude dude up there and an eldar warlock or farseer are completely coincidential. You basically implicitly tell everyone that you think they are an ignorant asshole if they think they see a similarlity. How stupid do you really think people are?" (Ex. 39 at 3)

**CHS'S RESPONSE: DISPUTED.** GW's statement lacks foundation, is inadmissible hearsay, and is irrelevant to any issue in this case. The statement is vague and ambiguous, in particular as to the meaning of the phrase "quite strong." To the extent GW implies CHS had an obligation to produce Exhibit 39, that is contradicted by the fact that the post appears on a third party website not within CHS's possession, custody, or control.

8.      Mr. Villacci explained to one of the designers his general understanding that so long as he avoid*ed* making exact copies, he did not infringe: "Gw pretty much has no legal say about what people make to use with their models as long as it isn't direct copies or recast of the models. Still, we have gone through a lot of resources to design our own stuff from scratch, while using the same measured dimensions, in 3D applications." (Ex. 24, WT00030) Although it is not clear in this context what is meant by "from scratch" it is undisputed that all of the models are made to correspond to Warhammer 40K.

**CHS'S RESPONSE: DISPUTED.**

SENTENCE ONE: mischaracterizes the quoted statement, which does not support GW's statement and speaks for itself. (FRE 1002.)

SENTENCE TWO: the statement that "it is not clear in this context what is meant by 'from scratch'" is contradicted by GW's questioning of Mr. Villacci at his April 11, 2012 deposition:

> Q    In the second paragraph you say, We have gone through a lot of resources, design our own stuff from scratch while using the same measured dimensions in 3D applications.
>          Do you see that?
> A    Yes.

> Q   What are you referring to here?
> A   We had gone through great pains to make sure
> our products were not -- copy GW products, but they
> still shared dimensions so they could fit with stuff for
> a GW line.

Villacci II at 217:3-18 (Supp. Kearney Decl. Ex. 9).

GW's statement that "all of the models are made to correspond to Warhammer 40K"

lacks foundation (FRE 602), vague, ambiguous, and not relevant to any issue in this case. There

is no evidence to support the statement that "all of the models are made to correspond to

Warhammer 40K."

9.      For many of Chapterhouse's products, Games Workshop is unable to specifically
identify which Games Workshop work out of its Warhammer 40K universe Chapterhouse used
as the basis for its copies. This is due to the fact that for many of Chapterhouse's products,
Chapterhouse failed to produce the underlying design documents, even after the Court directed it
to do so on March 6, 2012. (Ex. 133, Supp. Moskin Decl. ¶8). These products include the
Shoulder Pads for Chalice or Soul Drinker – Tactical (product no. 23), Shoulder Pads for Chalice
or Soul Drinker – Terminator (product no. 24), Ymgarl Heads for Tyranid Genestealers (product
no. 43), SXV-141 Super-Heavy Assault Walker SAW (product no. 45), Mark I Rhino
Conversion Kit (product no. 93), Rhino Tank Conversion Kit for Iron Snakes (product no. 106),
Gun-Halberds (product no. 112), and Conversion Beamer Servo Harness Kit for Space Marines
(product no. 113). (Id.) As late as February 29, 2012, when Mr. Villacci appeared for his
deposition as document custodian, he could not explain vast apparent gaps in Chapterhouse's
document production – notwithstanding that Games Workshop had alerted his counsel 2 days
before the deposition that that was a question he was expected to answer. (Ex. 21, Villacci Tr.
47:14-48:17; Ex. 148, Moskin email dated 2/27/12)

**CHS'S RESPONSE:** CHS does not dispute that GW has failed to carry its burden to identify the

works CHS is alleged to have infringed. CHS does not dispute this statement to the extent GW

concedes it has no evidence that CHS's listed products infringe any GW work. Otherwise

**DISPUTED.**

SENTENCE ONE: GW has provided no evidence that CHS used or copied any GW

works as the bases for its products.

SENTENCE TWO: GW's statement that CHS failed to produce documents it had an

obligation to produce lacks foundation, is irrelevant to any issue in this case, and is inadmissible

hearsay. Mr. Moskin has no personal knowledge for his statement, which lacks foundation and is inadmissible hearsay.

LAST SENTENCE: vague and ambiguous, and lacks foundation, as to the term "vast apparent gaps," which is undefined and so qualified as to be meaningless. GW mischaracterizes Mr. Villacci's testimony, which does not support the statement.


10.     Although it has refused to comply with a December 23, 2011 Court order directing it to produce evidence of its marketing on the internet forums which it admits are its only promotional venues (Ex. 2, Moskin Decl. ¶46; Ex. 68, Moskin letter dated May 29, 2012), Chapterhouse expressly markets its products on these forums and sales sites under Games Workshop's names. (See e.g., Ex. 14, eBay pages, Ex. 15, Barterhouse pages, Ex. 23, Heresy-Online forum, Ex. 39, Frother's Unite forum, Ex. 65, Warseer forum).

**CHS'S RESPONSE: DISPUTED.**

SENTENCE ONE: The statement that CHS "admits" that "internet forums . . . are its only promotional venues" lacks foundation, is not based on Mr. Moskin's personal knowledge, and is contradicted by the record. CHS complied fully with the Court's December 23, 2011 Order, and GW's statement to the contrary lacks foundation, is not based on personal knowledge, and is false.


SENTENCE TWO: the statement that CHS "expressly markets its products on these forums and sales sites under Games Workshop's names" lacks foundation and is false. to the extent GW implies it owns trademark rights in unspecified "names," that statement lacks foundation and GW has not provided evidence of use sufficient to demonstrate it owns U.S. trademark rights to such "names." To the extent, if any, that CHS uses any marks in which GW owns trademark rights, CHS's use is nominative fair use.


11.     Mr. Villacci, testifying in his capacity as document custodian, does not know what documents his company has for the development of its products (Ex.21, Villacci Tr. at 47:14–48:22).  Nor does Chapterhouse know what materials its independent designers review in creating the accused products (Id. at 49:22–51:18, "I don't know what documents they [Chapterhouse's sculptors] draw inspiration from").  However, documents produced in this litigation explain Chapterhouse's  general business model of creating reproductions or derivative

works based on Games Workshop's books and (occasionally) its sculptural figures. Chapterhouse focuses primarily on creating models based on elements and characters from paintings and drawings of characters and accessories Games Workshop does not (yet) sell. There are no documents indicating that Chapterhouse has ever developed any products without some reference to Games Workshop's works, and despite initially refusing to participate in discovery until it could move for summary judgment on grounds of independent creation, Mr. Villacci now admits that all of Chapterhouse's works are derived from Warhammer 40K (Ex. 16 at 239:6Z8, "I said all of our products have been influenced by a number of things, including Games Workshop's products and books.")

**CHS'S RESPONSE: DISPUTED.**

SENTENCE ONE:  the cited testimony of Mr. Villacci does not support GW's statement that "Mr. Villacci . . . does not know what documents his company has for the development of its products".

> Q.   Were there any documents concerning the development of any products?
> A.   There was some chat records between myself and the developers talking about our products in development.

Villacci I at 10:24-11:2 (Supp. Kearney Decl. ¶ 21 & Ex. 10).

> Q.   You have records how much you pay each designer?
> A.   Yes.
> Q.   Do those records indicate who worked on what?
> A.   Some do.

Villacci I at 18:13-16.

> Q.   Are you aware of any e-mail records you have kept relating to any of the products at issue in this case dated after January 26, 2011?
> A.   Yes.
> Q.   You have e-mail records after that date?
> A.   Yes.

Villacci I at 19:5-14.

In pertinent part, the cited deposition testimony reads:

> Q.   (BY MR. MOSKIN)  Other than the documents you

provided last week, had you earlier in the case provided
documents concerning products other than those 15 I just
read off?

    A.  Don't know what my attorneys have provided you but
I've given them everything they've asked for.

    Q.  Do you know that you gave them the documents
concerning the development of the 116 other products prior
to last week?

    A.  If we had documents for those items, they have
them.

Villacci I at 47:14-48:22.


SENTENCE TWO: **Disputed.**  The deposition testimony of Mr. Villacci contradicts

GW's statement that Chapterhouse does not know "what materials its independent designers

review in creating the accused products." Mr. Villacci testified that "during the design process,

ideas and designs are e-mailed back and forth between parties." Villacci I at 51:5-7.

    The cited testimony reflects questioning concerning items that independent designers

"drew inspiration from," which is not relevant to any issue in this case, and which does not

support the statement in SUF 26. In full, the cited deposition testimony reads:


    Q.  (BY MR. MOSKIN)  I'm asking if Chapterhouse -- if
you're aware that Chapterhouse has any documents showing
any of those -- those items?

    A.  The items we drew inspiration from?

    Q.  Yes, the ones I just mentioned and that are
referenced in your answer to interrogatory number two.

    A.  I don't have possession of any documents that show
that.  The designers might.

    Q.  You don't know?

    A.  Chapterhouse itself does not have any documents
showing that.

    Q.  And you don't know whether or not the designers
do?

    A.  I don't know what documents they draw inspiration
from.

Villacci I at 49:22-50:11.

SENTENCES THREE THROUGH FIVE: **Disputed.** Sentences three through five of

SUF 26 lack foundation (FRE 602); are inadmissible hearsay (FRE 802); are improper

speculation (FRE 701); and constitute improper legal conclusion. The statement that "Mr.

Villacci now admits that all of Chapterhouse's works are derived from Warhammer 40K" is

contradicted by Mr. Villacci's deposition testimony, which GW quotes only partially,

selectively, and out of context. Although GW's counsel repeated the same question multiple

times in an apparent attempt to elicit a different response from Mr. Villacci, Mr. Villacci clearly

and consistently stated as follows:

> Q: Can you identify any products that you sell
> that were not influenced in any way by Games Workshop's
> products or its descriptions in -- in its books?
> MS. GOLINVEAUX: Objection; argumentative;
> assumes facts not in evidence; vague and ambiguous.
> A: A number -- I mean, our shields that's
> definitely not a GW originated -- did it have a shield,
> hammers?

Villacci II at 235:5-12 (GW's Ex. 16).

> Q: …Can you identify any of
> the products that you sell that were not influenced in
> some way by Games Workshop's products or the
> descriptions of materials in its books?
> MS. GOLINVEAUX: Same objections.
> A: Honestly, since I have been so involved in
> scifi and miniatures and the hobby and -- I mean, when
> you -- you have played with something and have been
> involved with something for so long, that's bound to
> have an effect on any ideas you come across or create.
> So that's like saying -- no. I mean, everything has
> been influenced by -- **everything that we have created
> has been influenced by what I have been exposed to. Be
> it, Star Wars movies, Games Workshop products. I can't
> exclude anything from my personal experience.**

Villacci II at 235:16-236:5 (emphases added).

> Q (BY MR. MOSKIN): Name a product of yours that
> has not been influenced by Games Workshop's products or
> materials in its books.

MS. GOLINVEAUX: Objection; argumentative.
A: I gave you an answer. I said **all of our
products have been influenced by a number of things**,
including Games Workshop's products and books.
I'm not going to limit myself and say our
products have only been influenced, inspired by -- by
Games Workshop stuff. **They have been inspired by a
number of items, a number of cultural -- pop culture
stuff put together to, you know, come out to that sort
of expression of our products.**

Villacci II at 239:2-14 (emphases added).


12.     Mr. Villacci has amassed a large collection of Warhammer 40K books, magazines
and miniatures. (Ex. 21 at 81:13-17, 82:25-83:25; Ex. 136).

**<u>CHS'S RESPONSE:</u>**

**DISPUTED.** The statement is irrelevant to any issue in this case. FRE 402. The statement is

vague and ambiguous; is improper speculation (FRE 701); lacks foundation (FRE 602). The

cited testimony does not support the statement, but merely reflects that Mr. Villacci has

purchased products and books relating to Warhammer 40,000. The cited testimony discusses

where Mr. Villacci had purchased "pieces" and "stuff" for Warhammer 40,000, and does not

support the proposition that the "pieces" are GW-produced products. Exhibit 136 is also

inadmissible hearsay. Each page is stamped with GW's Bates labels, and GW failed to introduce

any testimony from CHS, Mr. Villacci, or the photographer that even describes or authenticates

what the exhibit purportedly represents.


13.     Certain Tyranid monsters created and sold by Games Workshop are Tyranid
Genestealers. As part of the Tyranid Genestealer boxed set that a consumer can purchase, Games
Workshop included a head component which can convert a  Genestealer model into a Games
Workshop created monster called a Genestealer Ymgarl (a mutated form of Genestealer from the
planet Ymgarl). Below are pictures  of both the standard Tyranid Genestealer and Games
Workshop sketch of the Genesetealer Ymgarl. (Ex. 132, Suppl. Merrett Decl. ¶10).





GW's Tyranid Genestealer
(Ex.137)

GW depiction of Genestealer Ymgarl
(Ex.138)

**<u>CHS'S RESPONSE:</u>**

**DISPUTED.** GW has provided no evidence that it "created" any "Tyranid Genestealers" work; indeed, because English law has no "work for hire" provision that would create the legal fiction that a corporate entity is the "author" of a copyrighted work, the statement is a legal impossibility. Ex. 137 also lacks foundation because it depicts a work that GW failed to identify as allegedly infringed by any CHS product. Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150).

14.    One of the ranks of Space Marines is a Space Marine Chaplain.  Their iconography heavily features skulls.   A picture of chaplain made and sold by Games Workshop is shown below.  Of note, the Chaplain's skull features a specific design of a skull with mechanical notches for a built-in helmet, red eyes, and a series of striated bands.  (Ex. 132, Suppl. Merrett Decl. ¶11).




(Ex. 139)

**CHS'S RESPONSE:**

**DISPUTED.** Exhibit 139 lacks foundation because GW did not produce it, despite the Court's order to "produce the best available exemplar of the works in question." Dkt. No. 139.

To the extent GW's statement implies the listed features are elements protectable by copyright, it is incorrect as a matter of law. The image depicted also does not include the listed features, with the exception of "red eyes." The color of the eyes in the depicted image is irrelevant because it is undisputed that CHS's products are sold unpainted. Villacci Decl. ¶ 10 (Dkt. 208-43).

15.     Many of Games Workshop's products incorporate a unique image of piled  skulls. Two examples of this unique image are on Games Workshop's Basilica Administratum (a building) and on Games Workshop's Realm of Battle Board, both depicted below (Ex. 132, Suppl. Merrett Decl. ¶12):



(Ex. 140)                               (Ex. 141)

**CHS'S RESPONSE:**

   **DISPUTED.** The statement that the picture products incorporate a "unique image of piled skulls" is contradicted by the images themselves, which self-evidently depict *different* images of skulls. To the extent GW implies that any CHS product is substantially similar to the depicted images, that is contradicted by the products, which speak for themselves. GW's Exhibit 141 also lacks foundation because GW did not produce it in discovery. *See* GW's Ex. 141 (lacking Bates number).

   16.   One of the Space Marine Chapters created by Games Workshop is the Space Wolves Chapter.  (Ex. 1, Merrett Decl. at ¶ 15).   This Chapter decorates its Space Marines and its vehicles with iconography which includes wolf skulls, wolf tails, and fangs.  (*Id.* at ¶ 38-41). Two of these such Games Workshop Models are depicted below.



Space Wolves Rhino
(Ex. 116 at 19, GW002493)



Space Wolves Space Marine Terminator
(Ex. 117)

(Ex. 1, Merrett Decl. at ¶¶ 38-40).

**CHS'S RESPONSE:**

      **DISPUTED.**

      SENTENCE ONE: the statement that GW "created" the "Space Wolves Chapter" lacks foundation (FRE 602).

      SENTENCE TWO: vague and ambiguous, in particular as to "iconography which includes wolf skulls, wolf tails, and fangs." CHS disputes that GW's statement accurately describes the images depicted, which speak for themselves. (FRE 1002.)

      CHS further objects to GW's exhibits and images as follows:

- GW's Ex. 117 was not produced by GW. The Court should disregard this untimely attempt to supplement the record.

      17.    Games Workshop's Space Wolves icons have unique characteristics.  The Space Wolf icon is an unusually elongated and unique wolf skull with wide eye sockets, often set within a diamond.  (Ex. 1, Merrett Decl. at ¶41)

**CHS'S RESPONSE:**

      **DISPUTED.**

SENTENCE ONE: The statement that unidentified and unspecified "Space Wolves icons" have "unique characteristics" is improper speculation (FRE 701) and is without foundation (FRE 602).

SENTENCE TWO: CHS disputes that GW's statement accurately describes the pictured image, which speaks for itself. (FRE 1002.) Sentence Two is vague and ambiguous, in particular as to the terms "unusually elongated", "unique," and "often."

18.     Chapterhouse creates and sells a "Rhino Conversion Kit for Space Wolves" that allows a customer to take a standard Games Workshop Space Marine Rhino (which is a form of vehicle) and convert it, by adding Chapterhouse pieces, into a Space Marine Rhino for the Space Wolves Chapter:



Chapterhouse Rhino Conversion Kit for Space Wolves
(Ex. 118, CHS001258)

**CHS'S RESPONSE:**

CHS does not dispute that it sells a product called "Conversion Kit #1 for Space Wolf Rhino."

CHS does not dispute that its "Conversion Kit #1 for Space Wolf Rhino" product allows a customer to convert a GW "Space Marine Rhino" into a different-appearing vehicle by substituting parts from CHS's kit for parts from GW's model.

Otherwise **DISPUTED**. GW misrepresents the CHS product by depicting it in a color image, although it is undisputed that CHS's products are sold unpainted. Villacci Decl. ¶ 10 (Dkt. 208-43). To the extent CHS's products are shown painted on its website, it is to show the products to their best advantage, and to enable customers to see fine details that might not otherwise be clearly visible were they not shown in contrasting colors. Some color choices are dictated by the subject matter of the CHS products: for instance, skulls are often painted bone-white; flames may be painted predominantly red and orange; dragons may be painted in green; insignia are often painted in primary colors for visibility. *Id.*

19.     Chapterhouse's Space Wolf iconography shares the same unique characteristics as the Games Workshop depictions.  Namely, the wolf skull is the same unusually elongated wolf skull with wide eye sockets. Additionally, each of the wolf skulls is made to be set within a diamond (the skull on the far left appears meant to be fit into the diamond next to it) so as to resemble almost exactly Games Workshop's distinctive Wolf Skull within a diamond.  (This device of producing the parts separately to be joined by the customer was also employed by Chapterhouse in connection with its "Flesh Tearers" shoulder pad where, by selling the blood drop separately from the rest of the iconography Mr. Villacci pronounced "Voila!  No IP infringement") (See Ex. 101, TF00958).

## CHS'S RESPONSE:

**DISPUTED.**

SENTENCE ONE: CHS disputes that the GW depictions have "unique characteristics." CHS disputes that its products share the characteristics of GW's depictions. GW does not argue that CHS's product is substantially similar to any GW work, which they are not.

SENTENCE TWO: CHS disputes that GW's descriptions accurately describe the images depicted, which speak for themselves.

- "the wolf skull is the same unusually elongated wolf skull with wide eye sockets" – **disputed:** improper speculation (FRE 701); lacks foundation (FRE 602). The images speak for themselves.
- "each of the wolf skulls is made to be set within a diamond" – **disputed:** improper speculation (FRE 701); lacks foundation (FRE 602).
- "the skull on the far left appears meant to be fit into the diamond next to it" – **disputed:** the statement is concededly improper speculation (FRE 701) and is without foundation (FRE 602).

- "This device of producing the parts separately to be joined by the customer was also employed by Chapterhouse in connection with its 'Flesh Tearers' shoulder pad" – **disputed:** improper speculation (FRE 701); lacks foundation (FRE 602).

20.     Chapterhouse's documents make clear its intent to copy Games Workshop's Space Wolves iconography by copying its "art pics" in modeling clay (or greenstuff) and timing the release of their product to coincide with the Space Wolves codex:

- "Figure Ill finish the four SW [space wolf] rhino template one-piece panels tomorrow with the rest of the shields. I really want to ship both rhinos, the pad template and shields mid week." (Ex. 119, CHS004464); and

- "The SW rhino templates are almost done, I had to scratch and redo them 3 times now due to quality issues (you know me), never thought something that easy would be that hard to do.

        …

        I'm still having problems with the wolf symbol, I need some easy but good looking detailed art pics that I can copy in greenstuff, internet didn't give me anything good at all. I'm trying to find an artist buy you need to help out and see if you can get us a concept artist.
        Someone who you can:
        1: look at the FW SW rhino doors and do a wolf symbol inspired by that but still different" (Ex. 121, TF001823).

## CHS'S RESPONSE:

Each statement is irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**.

SENTENCE ONE is improper speculation (FRE 701), in particular as to CHS's "intent"; and is without foundation (FRE 602). Sentence One misrepresents the record by implying falsely that the term "art pics" refers to art depicting GW's works, when it is patent from the context that the term "art pics" is used to refer to third-party illustrations, public domain images, or concept art from one of CHS's independent contractors, and expressly contemplates art that is "different" from GW's wolf symbols. GW's Ex. 121 (TF 0001823).

- The statement quoted in the first bullet point is irrelevant to any issue in this case; is inadmissible hearsay (FRE 802); is without foundation (FRE 602); and is not a statement of CHS.

- The statement quoted in the third bullet point is irrelevant to any issue in this case; is inadmissible hearsay (FRE 802); is without foundation (FRE 602); and is not a statement of CHS.

21.     Chapterhouse has created and sells a female warrior protected by the "goddess of the Scorpion" called "Armana'serq Warrior Priestess:



Armana'serq Warrior Priestess
(Ex. 33)




Games Workshop's Striking Scorpion
(Ex. 27)

This female warrior princess shares the same unique characteristics as Games Workshop's all-male Striking Scorpion. The warrior is equipped with a diamond-toothed sword, a pistol attached to its wrist, and two small blasters attached to either side of the face and a gemstone on the hilt of the sword. Instead of the smaller chainsword, Chapterhouse also provides a larger two-handed chainsword. She wears plate armour and has a thick lock of hair protruding from the top of her head.

**CHS'S RESPONSE:**

CHS does not dispute that it sells a female warrior figure called "Armana'serq Warrior Priestess."

Otherwise **DISPUTED**.

- GW's Ex. 27 was not produced by GW and the Court should disregard this improper and untimely attempt to supplement the record in assessing substantial similarity. The Court should properly consider only examplars that GW timely produced during discovery; *see* Dkt. 224-224.17, Product Binder, tab 123; Dkt. No. 139 ("Plaintiff must produce the best available exemplar of the works in question"); Dkt. No. 171 ("[I]f the original is in color, then the exemplar has to be in color.")

- CHS's product does not resemble GW's alleged work.

- The idea of "plate armour" or the idea of a sword that resembles a chainsaw are not protectable elements, and CHS's product is not substantially similar to GW's alleged work. GW concedes that the sword depicted by CHS's product is different from the sword depicted in its alleged work.

22.    As Games Workshop does not produce a female Striking Scorpion, Chapterhouse's documents make clear that Chapterhouse's intent was to fill in this perceived gap and make a female version of Games Workshop's Striking Scorpion figurine.

- In developing the product with the designer, Michio Okamura, Mr. Villacci and the designer referred to the figure as a "female space elf"[1]. Mr. Villacci explained that the idea was to do "alternate sculpts for the exarch warriors[2] (if GW makes a male version lets do a female nicer version and vice versa)." (Ex. 34, MO00002);

- Mr. Villacci further explained: "I would femalize the anatomy, but keep the basic armor structure." (Ex. 34, MO0001). He also stated ""Honestly I wouldn't mind having you flesh out the female Eldar line. That is if your up for it." (Ex. 35, MO00024);

- Although at his deposition Mr. Villacci professed ignorance as to the weapons that wrap around the figure's head (Ex. 16 at 171:17Z25) in his email to the designer he correctly identified them using GW's terminology: "As for the head, can you do a open face and have the mandiblasters somehow attached around the back of the head?" (Ex. 16, 199:13Z200:6) Mr. Okamura agreed: "I don't know, with the mandiblaster and the dreadlocks sensors, she looks much more recognizable as a Striking Scorpion." (Ex. 35, MO000026);

---

[1] In Games Workshop's literature concerning the Eldar race, they are described and defined as a type of elf. (Ex. 1, Merrett Decl. at ¶ 16)

[2] An Exarch is a type of Eldar Warrior. (Ex. 1, Merrett Decl. at ¶ 16)

- Mr. Okamura referred to his initial model as an "Eldar" and explained that "I was planning on making the model so it can use the weapon options included in the GW box set for the Striking Scorpions …"  (Ex. 35, MO000029);

- As to the overall design, Mr. Okamura inquired of Mr. Villacci: "How different do the designs have to be from the GW stuff? Is the Eldar model I'm working on different enough or have I wasted my time on the model?"  Mr. Villacci responded (eschewing the "ordinary observer" test and assuming the posture of someone who knew nothing about Games Workshop's products): "From what I see, that is plenty nice and original enough. Imagine if you had no idea its supposed to be a female scorpion, would you think that by looking at it, so in my minds eye its not a copy at all." (Ex. 35, MO000026); and

- According to Mr. Okamura, even the larger twoZhanded chainsword was intentionally copied from Games Workshop's design: "I'll probably be sculpting a set of arms with the chainsabre since GW hasn't released a model of them as far as I know.  I did find their concept pics of the chainsabre and it's just a shuriken pistol attached to each wrist with the hands wielding the chain blades." (Ex. 35, MO0022).

## CHS'S RESPONSE:

CHS does not dispute that GW does not make or sell a female Striking Scorpion.

Each statement is irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**: CHS disputes the other statements, including without limitation as follows:

- GW does not own or any rights to, nor claim infringement of the term or idea of a "female space elf."

- Mr. Okamura's alleged plan to "mak[e] the model so it can use the weapon options included in the GW box set for the Striking Scorpions" is not evidence of copyright or trademark infringement and is irrelevant to any issue in this case. FRE 402.

- GW makes improper legal argument, states a legal conclusion, and mischaracterizes the "ordinary observer" test for assessing substantial similarity. "[T]he test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value." *Atari, Inc. v. N. Amer. Phillips Consumer Elec. Corp.*, 672 F.2d 607 (7th Cir. 1982) (quoted at GW's Memorandum in Support of Plaintiff's Motion for Summary Judgment at 7, Dkt. 213). GW's false implication that an "ordinary observer" must have substantial knowledge of GW's game, works, and "imaginary universe" is without any basis in law or common sense, and contradicts ordinary usage.

- Mr. Okamura's statement regarding his decision to sculpt arms with the "chainsabre" is irrelevant to any issue in this case. FRE 402. Mr. Okamura's statement implies that he sculpted the "chainsabre" before seeing GW's concept art. GW concedes that the sword included with CHS's product is different from GW's alleged "chainsword."

23.    In addition to the numerical iconography on the right shoulder pad of the Space Marines, according to the Warhammer 40K universe, the left shoulder pad of a Space Marine contains an icon indicating the specific Space Marine Chapter to which the Space Marine belongs.  (Ex. 1, Merrett Decl. at ¶ 33).  While there were originally only 20 Space Marine Legions, after the Horus Heresy rebellion, the legions were broken down into a much larger number of smaller Space Marine Chapters.  (Id.)  Each Space Marine Legion and Chapter has in turn, its own detailed history, legends, characters, weapons, vehicles, culture, and their own unit icon.  Some of the relevant unit icons created by Games Workshop are below:





Flesh Tearer
Chapter
(Ex. 49 at 71,
GW001727)

Blood Raven
Chapter
(Ex. 49)

**CHS'S RESPONSE:**

Each statement is irrelevant to any issue in this case and is without foundation (FRE 602).

**DISPUTED.**  GW has produced no evidence that its "unit icons" were "created by Games Workshop."

CHS further objects to GW's images and references to exhibits as follows:

- GW's Ex. 49 (GW0001726-27):  GW's SUF and the Merrett Decl. (GW's Ex. 1) include color versions of GW's Ex. 49, which was produced only in black and white, despite the Court's order that despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). *See* Dkt. 139 (ordering GW to "produce the best available exemplar of the works in question".). The Court should disregard this improper and untimely attempt to supplement the record.

24.    Each chapter icon has a unique design:

- Flesh Tearer Chapter – Primary colors are black and red with an icon of a flat, toothed sawZblade with a drop of blood in the center of the blade (Ex. 1, Merrett Decl. at ¶ 34); and

- Blood Raven Chapter – Primary colors are black and red with an icon of a set of wings with a drop of blood in the center (Ex. 1, Merrett Decl. at ¶ 34).

**CHS'S RESPONSE:**

**DISPUTED.**

CHS disputes that the design of any of GW's alleged "chapter icons" is unique. Each of GW's statements to that effect is without foundation (FRE 602) and is improper speculation (FRE 701).

CHS further objects to GW's images and references to exhibits as follows:

- GW's Ex. 49 (GW0001726-27): GW's SUF and the Merrett Decl. (GW's Ex. 1) include color versions of GW's Ex. 49, which was produced only in black and white, despite the Court's order that despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). *See* Dkt. 139 (ordering GW to "produce the best available exemplar of the works in question".). The Court should disregard this improper and untimely attempt to supplement the record.

25. Chapterhouse has created and sells shoulder pads for Space Marines that correspond to each of these Space Marine chapters:





Sawblade Shoulder Pad & Jewel        Blood Eagle Power Armor Shoulder Pad
(Ex. 18 at 2)        (Ex. 92, CHS01541)

**CHS'S RESPONSE:**

**DISPUTED**. The statement that CHS's products "correspond" to GW's alleged chapters is vague, ambiguous, and without foundation (FRE 602). The term "these Space Marine Chapters" is vague and ambiguous. GW depicts CHS's products as colored, but it is undisputed

that the products are sold unpainted. Villacci Decl. ¶ 10 (Dkt. 208-43). The names of CHS's

products are irrelevant to the substantial similarity analysis. (FRE 402.)

CHS's products (which are sold unpainted) are not substantially similar to the protectable

elements of any of GW's alleged works. To the extent they depict similar ideas, that is not

copyright infringement, for "[n]o author may copyright his ideas." *Feist Pubs., Inc. v. Rural

Television Serv. Co.*, 499 U.S. 340, 344-45 (1991) (citation and quotation marks omitted). Each

of the above images resembles GW's works only to the extent (if any) that they depict

unprotectable, abstract ideas, devoid of reference to any particularized expression. With respect

to the above images, after filtering out unprotectable elements, the only similarities is the

unprotectable idea of combining a common or public domain symbol with a blood drop.


26.     Chapterhouse's Shoulder Pads for Space Marines contain the same unique
characteristics (and typically the same name) as the Space Marine Chapter icons created by
Games Workshop and are all combined with the unique shape of the Games Workshop shoulder
pads:

- Sawblade Shoulder Pad & Jewel – Primary colors are black and red with an icon of a flat, toothed sawZblade with a drop of blood in the center of the blade;
- Blood Eagle Power Armor Shoulder Pad – Primary colors are black and red with an icon of a set of wings with a drop of blood in the center;

**CHS'S RESPONSE:**

**DISPUTED**. CHS disputes GW's verbal descriptions of each purported design, which

are irrelevant (FRE 402), without foundation (FRE 602), and inadmissible hearsay (FRE 802).

The images speak for themselves. (FRE 1002.) The characteristics of GW's shoulder pads are

not "unique" and are not the same for all such works. CHS's products are not substantially

similar to protectable elements of any of GW's shoulder pads.

"typically the same name" – irrelevant (FRE 402); vague and ambiguous; lacks

foundation (FRE 602).

"Space Marine Chapter icons created by Games Workshop" – **Disputed**: states a legal conclusion; lacks foundation (FRE 602); GW has no evidence showing that each such symbol was created by GW or its employees.

"unique shape of the Games Workshop shoulder pads" – **Disputed**: the shape is not the same for all such works and is not unique.

27.    Chapterhouse's expert admitted there looking through all of the shoulder pads he identified from prior history, he did not see any shoulder pads with any insignia or design on them. (Ex. 5 at 137:22-138:2). He was unable to point to anywhere in military history where emblems or designs are applied to shoulder pads. (Id. at 138:3-6). Furthermore, while Chapterhouse's expert testified that he had found certain decorative elements (not on shoulder pads) in prior military history (such as griffins, lions, scales, etc.), he was unable to express any opinion on whether any of Games Workshop's particular combinations of decorative elements were present or common in prior military history. (Id. at 165:5-166:17). He even concluded that in his experience "applications of these designs to certain things like shoulder pads is not common in military history." (Id. at 166:18-23). Similarly, Chapterhouse has been unable to identify anything it used for its so-called "independent creation" except for identifying random isolated elements, such as a lion or a griffin. (Ex. 95, Resp. to Interrog. No. 2).

## CHS'S RESPONSE:

**DISPUTED**. The first sentence is incomprehensible. That CHS's expert did not see such symbols applied specifically to shoulder pads is irrelevant to any issue in this case. FRE 402. GW, which bears the burdens of production and persuasion on each element of its copyright case, cannot place the burden on defendant to prove a negative. CHS's products are not substantially similar to the protectable elements of any of GW's alleged works. To the extent they depict similar ideas, that is not copyright infringement, for "[n]o author may copyright his ideas." *Feist Pubs., Inc. v. Rural Television Serv. Co.*, 499 U.S. 340, 344-45 (1991) (citation and quotation marks omitted). To the extent (if any) that both CHS's products and GW's alleged works depict unprotectable, abstract ideas, devoid of reference to any particularized expression, that is not the basis for a claim of copyright infringement. After filtering out unprotectable elements, the only similarities (if any) are such unprotectable ideas.

In particular, CHS objects to the following quoted statements:

- "he did not see any shoulder pads with any insignia or design on them" – disputed: misrepresents the testimony of Chapterhouse's expert, who stated:

> Q. And all of the shoulder pads we looked
> at that you identified from prior history, did you
> see any of those shoulder pads with any insignia or
> design on them?
> > A. Not to my recollection, no.

Brewster Dep. at 137:22 – 138:2 (GW's Ex. 5).

- "He was unable to point to anywhere in military history where emblems or designs are applied to shoulder pads" – disputed: misrepresents the testimony of Chapterhouse's expert, who stated only that his report did not contain such examples. Id.

- "he was unable to express any opinion on whether any of Games Workshop's particular combinations of decorative elements were present or common in prior military history" – disputed: misrepresents the testimony of Chapterhouse's expert, who was not asked and did not address the question of "particular combinations of decorative elements":

> Q. Which decorative elements do you cite?
> A. Birds of prey, eagles, griffins, lions,
> crowns and wreaths and hands and arrows, spears,
> scales, serpents. They are all cited in the first
> section, and it goes on to geometric forms. Do you
> want me to continue?
> Q. I want you to identify which design
> elements you believe are common in military
> history.
> A. Arrows, yes. Arrows and chevrons,
> skulls and cruciform designs, various forms of
> crosses, the use of gears and Roman numerals.
> Q. And is that the extent of your opinion
> on what design elements are common in military
> history?
> A. That's the extent of those elements that
> I encountered while viewing the Workshop binder.
> Q. So those are the only design elements
> you are commenting on in your expert report?
> A. Correct.
> Q. Are you expressing -- strike that.
> One of the examples you identified was a
> hand.
> A. Yes.
> Q. Would you agree that there are various
> ways you could depict the hand in a design?
> A. Certainly.

> Q.   Are you expressing anywhere in your expert report that certain designs of a hand are common in military history?
>
> A.   No.
>
> Q.   And would the same be true for all the design elements you listed that while that concept might be common, you are not commenting on whether any particular design or expression of that concept is common in military history?
>
> A.   Correct.

Brewster Dep. at 165:5 – 166:17 (*id.*).

- "in his experience 'applications of these designs to certain things like shoulder pads is not common in military history.'" – **disputed:** irrelevant (FRE 402), lacks foundation (FRE 602). There is no foundation for the proposition that any of GW's designs are applied to shoulder pads. Furthermore, the surface to which a design is applied is irrelevant to analyzing substantial similarity.

- "Chapterhouse has been able to identify anything it used for its so-called "independent creation" except for identifying random isolated elements, such as a lion or a griffin." – **disputed:** lacks foundation (FRE 602); misrepresents the record. The cited document reads in pertinent part:

> . . . Chapterhouse draws inspiration in varying degrees from many different disciplines and sources, including, but not limited to mythology, military history, fiction, film, videogames, physics, biology, gaming, and many other disciplines and areas of study and cultural expression. Chapterhouse notes that the Internet provides a wealth of informational and inspirational material for all creative endeavors, and that Chapterhouse performs Internet and other research when creating its products.
>
> Specifically, Chapterhouse responds that the Dungeons and Dragons hammer weapons provided inspiration for Chapterhouse's war hammers. The designs for the Celestial Lions were inspired by photographs submitted by a customer, one of a public sculpture with the head of a lion and the body of a fish, and the other of a lion in silhouette. Chapterhouse's products that look like circular-saw blades were based on actual circular saw blades. The snake on some of the Chapterhouse products was based on an image of classical Greek art. The Star Fox logo on some of Chapter house's products is based on a fan-created design. The lashwhips, boneswords, and the mycetic spore took inspiration from the art of HR Giger, in particular the art direction for the Alien movies. Chapterhouse consulted the tyranid codex for the Tervigon Conversion Kit. Chapterhouse's.sculptor on the project also consulted Games Workshop's Carnifex model while developing the Tervigon conversion kit, to ensure proper fit and alignment of the kit with the Carnifex model. The dragon/salamander images Chapterhouse used came from Google Images searches on words like "dragon." Chapterhouse asked a concept artist to draw sketches of its wolf's head icon, and to adorn the icon with Nordic-style runes. The designs for the

scarab and starburst shoulder pads were inspired by Egyptian art. Chapterhouse's mantis products began as a commission from a customer - the customer provided a photograph of a particular species of mantis, along with line drawings based on tracings from the photograph.

GW's Ex. 95 (Dkt. 213-19) (CHS Second Supp. Response to GW First Set of Interrogatories [Response to Rog 2]).

28.     Chapterhouse's documents make clear its intent to create shoulder pads with icons such that Warhammer 40K players would recognize the icons as those of Games Workshop's various Space Marine Chapters:

- "I already made the molds for the Flesh Tearer and the Tactical pads. We are going to cast them with this in-house order." (Ex. 98, CHS003503);

- Chapterhouse considered an alternate design where the sawblade was on edge sticking out of the shoulder blade but rejected the idea as it deviated too much from Games Workshop's design: "I dont think the blade sticking out of the pad would go too well for most players, most players are very hard-core players who don't like deviating too much from the 40K norm, sorry!" (Ex. 99, CHS003640);

- "I think Flesh Tearers will be a popluar army on account of the special character thats coming out for them, so you stand to make some pretty good money. I would love to know how much FT stuff you sell." (Ex. 100, CHS005422);

- Chapterhouse decided it could use a simple stratagem to avoid infringement merely by selling the blood drop separately, to be glued on by the user to either a sawblade (for Flesh Tearers) or a set of wings (for Blood Angels): "I think we will have [the designer] remove his blood drop and sekk the drops separate. :)  So the pad will have a sawblade on it and that's it.  We could sell the blood drops separately for a small price…. :) Voila non-IP infringement!" (Ex. 101, TF00958); and

- Chapterhouse deliberately timed the release of the Blood Angels shoulder pads to coincide with the release of GW's Blood Angels Codex (Ex. 102, CHS012596).

**CHS'S RESPONSE:**

**DISPUTED**, as follows:

- Each statement attributed to a third party is irrelevant (FRE 402); is without foundation (FRE 602); and is inadmissible hearsay (FRE 802). GW fails to attribute each statement to any individual, thereby creating the false impression that each such statement is attributable to Chapterhouse when it is not.

- Each statement concerning Chapterhouse's "intent" is improper speculation (FRE 701), is a legal conclusion, and is irrelevant (FRE 402).

- Each statement attributing statements of third parties to Chapterhouse "intent" misrepresents the record because the third parties are concededly independent contractors.

- Each statement concerning the intent of such third parties is improper speculation (FRE 701), is a legal conclusion, is inadmissible hearsay (FRE 802), and is irrelevant (FRE 402).

- The statement that the cited language concerns Chapterhouse products is improper speculation (FRE 701) and without foundation (FRE 602). In particular, and without limitation, Chapterhouse does not sell a product consisting of a "blood drop separately" (GW's Ex. 101); Chapterhouse does not sell "a set of wings (for Blood Angels" (*id.*); Chapterhouse does not sell "a separate sword that will fit on the pad" (*id.*); Chapterhouse does not sell a "sawblade . . . on edge sticking out of the shoulder blade" (GW's Ex. 99)

- There is no foundation (FRE 602) for the implication that many of the designs discussed (e.g. "the skull pads", GW's Ex. 115) refer to or were inspired by any GW work. Even if there were (and there is not), inspiration is not infringement.

29.     Most Space Marines wear Power Armour, an advanced suit of strength enhancing combat armor consisting of thick ceramite containing a full suite of life-support functions to operate in hostile environments. (Ex. 1 at ¶ 30). Over the history of the Warhammer 40K Universe there have been various advancements to the Power Armour, starting with Mark I through to the current Mark VIII version. (Id.) An example of the Mark VIII Power Armour is below:

   

| Post-Heresy Armour (Ex. 49 at 71) | Space Marine Shoulder Pad (Ex. 76 at 13; Ex. 77) | Back of Space Marine Shoulder Pad (Ex. 125) |

**CHS'S RESPONSE:**

Each statement is irrelevant to any issue in this case. FRE 402.

**DISPUTED**. GW's statements lack foundation (FRE 602) because a "Space Marine" is a miniature toy soldier, and neither GW's Space Marine toy soldier nor any of GW's scale miniature armor bits has the described characteristics.

The statement concerning "the history of the Warhammer 40K Universe" lacks foundation (FRE 602) because it is an imaginary universe with an imaginary timeline, thus the term "advancements" lacks foundation and is meaningless.

CHS further objects to GW's images and references to exhibits as follows:

- The image of Exhibit 125 depicted does not appear to match the image attached to the Merrett Decl. as Exhibit 125. (The Merrett Decl. also refers to Exhibit 125 as GW00002698, but it bears an entirely differentBates number.) Accordingly it is unclear what the image represents.
- GW's Ex. 77 was not produced by GW and the Court should disregard this improper and untimely attempt to supplement the record.
- GW's Exs. 49 and 76: GW's SUF and the Merrett Decl. (Ex. 1) include color versions of GW's Exs. 49 and 76 (GW0011390), each of which was produced only in black and white, despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Docket No. 171). The Court should disregard this improper and untimely attempt to supplement the record. Dkt. 139 (ordering GW to "produce the best available exemplar of the works in question").
- GW's Ex 76 was not produced before the close of fact discovery, and the Court should disregard this improper and untimely attempt to supplement the record.
- GW's Ex. 125 lacks foundation (FRE 602).

30.     One of the numerous iconic aspects of Games Workshop's Power Armour is the shoulder pad. (Ex. 1 at ¶ 31). The shoulder pad is a convex shape with a curve at the top and a straight edge at the bottom. (Id.) There is often a large band or rim extending along the entire outer edge of the shoulder pad. (Id.) As part of the Power Armour, the shoulder pad begins above the shoulder and ends right above the elbow. (Id.) The pads are curved in a manner such that it does not cover a large portion of either the chest or the back of the Space Marine. (Id.) On the reverse side of the shoulder pad, there are typically a series of spaced indentations that serve no functional purpose but as Alan Merrett explained, they are used by Games
Workshop to create a technical appearance. (Id.; Ex. 78, Merrett Tr. at 46:12-47:17)

**CHS'S RESPONSE:**

**DISPUTED.**

GW's statement that its shoulder pads have the simple form of "a convex shape with a curve at the top and a straight edge at the bottom" lacks foundation. GW failed to produce a single exemplar of a shoulder pad having such characteristics, despite the Court's order requiring it to "produce the best available exemplar of the works in question." Dkt. No. 139.

GW's statement that its miniature shoulder armor bits are "iconic" is contradicted by its admission in the same paragraph that not all of them share the same features, but merely "often" share the same characteristics, or "typically" have certain features.

- "the shoulder pad begins above the shoulder and ends right above the elbow" – **Disputed.** This is not a characteristic of a shoulder pad, but merely describes it in relationship to a hypothetical toy soldier.

- "The pads . . does [*sic*] not cover a large portion of either the chest or the back of the Space Marine." - **Disputed.** This is not a characteristic of a shoulder pad, but merely describes it in relationship to a hypothetical toy soldier.

- "there are typically a series of spaced indentations" – vague and ambiguous; without foundation (FRE 602).

31.     Chapterhouse has created and sells a "Generic Power Armour Shoulder Pad for Space Marine:




Chapterhouse's Generic Power Armour
Shoulder Pad for Space Marine
(Ex. 79)

Back of Chapterhouse Power Armour
Shoulder Pad for Space Marine
(Ex. 126)

Chapterhouse's "Generic Power Armour Shoulder Pad for Space Marine" contains the same features as Games Workshop's iconic Space Marine Shoulder Pad, including a convex shape with a curve at the top and a straight edge at the bottom, a large band extending along the entire outer edge of the shoulder pad. When applied to power armour, the shoulder pad begins above the shoulder and ends right above the elbow; the shoulder pad is curved in a manner that it does not cover a large portion of either the chest or the back of the Space Marine. Many of Chapterhouse's shoulder pads also contain the same purely aesthetic indentations on the back of the shoulder pad, which Mr. Villacci admitted under oath were added for "esthetics" only so as to accommodate "players …that [are] picky about details on their models, we wanted to put them on there so that they would be similar to the ones that Games Workshop has" and that the only "function" is to serve an aesthetic purpose "in the fiction, like, strengthening function" (Ex. 16 at 172:9-20.) Chapterhouse's expert admitted that Games Workshop's design of its shoulder pads was not the same or similar to any design he found in prior military history. (Ex. 4 at 133:21-134:20).

**CHS'S RESPONSE:**

CHS does not dispute that it sells a product called "Power Armor Shoulder Pad – Plain."

Otherwise **DISPUTED**.

- Contrary to the representation made in Moskin Decl. ¶ 86, the purported depiction of CHS's "Power Armour Shoulder Pad for Space Marine" is not an image of a CHS product. Dkt. 229-10 (Villacci Decl. at ¶ 9).

- GW does not identify "indentations" on the back of shoulder pads as an infringed feature of its products. Original Copyright Claim Chart (Dkt. 208-2), First Rev. Copyright Claim Chart (Dkt. 208-2), Second Rev. Copyright Claim Chart (Dkt. 208-2 at 93-150).

- GW depicts a painted example of CHS "Power Armor Shoulder Pad – Plain", but it is undisputed that CHS's products, including this one, are sold unpainted. Villacci Decl. ¶ 10 (Dkt. 208-43).

- GW's Exhibit 126 is not an image of the back of CHS's "Power Armor Shoulder Pad for Space Marine", as it purports to be. Because GW gives no foundation for its Exhibit 126, it is impossible to ascertain the actual source of the image, but it is clearly not CHS's product, which is depicted below:





Back of CHS "Power Armor Shoulder Pad for Space Marine (CHS Product No. 54)

DETAIL of GW Ex. 126

Villacci Opp. Decl. ¶ 9 (Dkt. 229-10); Supp. Kearney Decl. ¶ 22 & Ex. 11 (showing image of the actual CHS product); Kearney Decl. Ex. 7, product no. 54 (actual CHS product) (Dkt. 208-19).

- The features of GW's supposedly "iconic" shoulder pad are concededly not consistent across GW's products, and GW fails to produce an exemplar of any work that CHS's product allegedly infringes.

- CHS's product does not contain any "indentations on the back."

- GW misrepresents the testimony of CHS's expert witness, who merely stated that he was "not expressing any expert opinion that the design of Games Workshop shoulder pads [was] the same or very similar to any design [he] found in prior military history." GW Ex. 4 at 134:12-16). That statement is irrelevant to any issue in this case. FRE 402.

32.     According to the Warhammer 40K universe, the right shoulder pad of a Space Marine contains a symbol and a roman numeral identifying the squad number and squad type to which the Space Marine belongs.  (Ex. 1 at ¶ 32).  Each Space Marine Chapter consists of roughly 1000 Space Marines, with 100 Space Marines in 10 Companies.  (Id.)  Each company is in turn divided into 10 "squads" of 10 Space Marines.  (Id.)  In general, a company has six Tactical Squads (equipped to fight in a broad range of conditions), two Assault Squads (equipped to fight at close quarters), and two Devastator Squads (equipped to provide heavy weapons support).  (Id.)

- Tactical Space Marines are represented by an upward pointing arrow and given roman numerals I through VI on their shoulder pads (Id.);



Shoulder Pads for Tactical Space Marines
(Ex. 76 at 13)

- Assault Space Marines are represented by a crossed X and given roman numerals VII and VIII  on their shoulder pads (Ex. 1 at ¶ 32); and



Shoulder Pads for Assault Marines
(Ex. 76 at 13; Ex. 80, GW002323)

- Devastator Space Marines are represented by a chevron (inverted V) and given roman numerals IX and X on their shoulder pads (Ex. 1 at ¶32).



Shoulder Pads for Devastator Space Marines
(Ex. 76 at 13, Ex. 81 at 70, GW1288)

**CHS'S RESPONSE:**

**DISPUTED**.

The rules of GW's "imaginary universe" do not specify a single symbol for each type of space marine. *See* GW's Ex. 81 (GW0001288) (setting out various insignia, with and without Roman numerals, and explaining that "[t]he style of marking . . . can vary between Companies and even with a company itself").

CHS further objects to GW's images and references to exhibits as follows:

- GW's Ex. 76: GW's SUF and the Merrett Decl. (Ex. 1) include color versions of GW's Ex. 76 (GW0011390), which was produced only in black and white, despite the Court's order that "[I]f the original is in color, then the exemplar has to be in color" (Dkt. 171). *See* Dkt. 139 (ordering GW to "produce the best available exemplar of the works in question".). The Court should disregard this improper and untimely attempt to supplement the record.

- GW's Ex 76 was not produced before the close of fact discovery, and the Court should disregard this improper and untimely attempt to supplement the record.

33.    Chapterhouse has created and sells "Tactical Shoulder Pads for Space Marines", "Assault Shoulder Pads for Space Marines", and "Devastator Shoulder Pads for Space Marines":



Tactical Shoulder Pad for Space Marine
(Ex. 79)



Assault Shoulder Pad for Space Marine
(Ex. 79)



Devastator Shoulder Pad for Space Marine
(Ex. 79)

Chapterhouse's Tactical, Assault, and Devastator Shoulder Pads contain the same unique features as those created by Games Workshop. In addition to copying the iconic style of Games Workshop's basic Space Marine Shoulder Pad, these products use the same icons (arrows, crossed-Xs, and chevrons), placed in the same orientation, and of about the same size. Thus, the icons are used to depict the same squad types of identified in the Warhammer 40K universe. Moreover, Chapterhouse uses only the same Roman Numerals and only in the same combinations as does Games Workshop (I-VI for Tactical, VII-VIII for Assault, and IX-X for Devastator), thus copying and never varying from the fictional meanings given to the symbols by Games Workshop.

## CHS'S RESPONSE:

**DISPUTED**, for the following reasons:

- GW's shoulder pads are not "iconic." *See* CHS Response to GW purported Additional Undisputed Material Fact 31, *supra*.

- The features of GW's shoulder pads are not "unique." *See* CHS Response to GW Additional Undisputed Material Fact 31, *supra*.

- The rules of GW's "imaginary universe" do not specify a single symbol for each type of space marine. *See* GW's Ex. 81 (GW0001288) (setting out various insignia, with and without Roman numerals, and explaining that "[t]he style of marking . . . can vary between Companies and even with a company itself")

- The statement that CHS copies "the fictional meanings given to the symbols" is vague, ambiguous, without foundation (FRE 402), speculative (FRE 701), and makes no sense because a "meaning given to [a] symbol" cannot be copied.

The statement that "the icons are used to depict the same squad types of identified [sic] in the Warhammer 40K universe" is without foundation (FRE 602), is improper speculation (FRE 701), and is irrelevant to any issue in this case. FRE 402. "Common geometric shapes cannot be copyrighted," per *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 303 (7th Cir. 2011). The U.S. Copyright Office refuses to base copyright registration on the very same simple and "standard ornamentation" at issue here, "such as chevron stripes . . . a plain, ordinary cross . . . common geometric figures or shapes . . . a standard symbol such as an arrow or a five-pointed star . . . ."

U.S. Copyright Office, Compendium II: Copyright Office Practices §503.02(a) (b). Also not copyrightable are simple, basic three-dimensional shapes, such as the shape of GW's "sci-fi shoulderpad," or other "common geometric figures or shapes in three dimensional form, such as the cone, cube, or sphere . . . the creative expression capable of supporting copyright must consist of something more than the mere bringing together of two or three standard forms or shapes with minor linear or spatial variations." *Id.* Typefaces, such as Roman numerals, also cannot be copyrighted. *Eltra Corp. v. Ringer*, 579 F. 2d 294, 298 (4th Cir. 1978) ("typeface is an industrial design in which the design cannot exist independently and separately as a work of art"); 37 C.F.R. § 202.1 ("works not subject to copyright . . . [include] familiar symbols or designs; mere variations of typographic ornamentation . . . [and] [t]ypeface as typeface.").

Combinations of two simple, unprotectable symbols, such as a chevron, arrow, or X symbol, together with a Roman numeral, or a sawblade in combination with a simple jewel, are also unprotectable, since "a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003); Copyright Compendium II § 503.02(a)-(b) ("[R]egistration cannot be based upon . . . a simple combination of a few standard symbols. . . [or] the mere bringing together of two or three standard forms or shapes with minor linear or spatial variations.").

- The statement that "Chapterhouse uses only the same Roman Numerals and only in the same combinations as does Games Workshop" is irrelevant to any issue in this case, and is contradicted by GW's admission that CHS sells products with the unprotectable public domain designs of an arrow, crossed arrows, and chevrons, but without Roman numerals.
- CHS further objects to GW's images and references to exhibits as follows:
  - GW depicts CHS's products in color, although it is undisputed that all of CHS's products are sold unpainted. Villacci Decl. ¶ 10 (Dkt. 208-43).

34.    Chapterhouse's documents confirm its intent to copy Games Workshop's icons and numbering scheme for its Space Marine shoulder pads:

- •"With that ok, I will finish the other Tactical Badge shoulder pads. By this time tomorrow I can e-mail to you all the .stl files for the following:

  Assault Symbol (without number)
  Devastator Symbol (without number)
  Tactical Symbol (without number)
  Blank (Mk6 Armor)
  …
  T1 (Tactical Sqd. 1)
  T2 (Tactical Sqd. 2)
  T3 (Tactical Sqd. 3)
  T4 (Tactical Sqd. 4)
  T5 (Tactical Sqd. 5)
  T6 (Tactical Sqd. 6)
  Standard Shoulder Pad" (Ex. 82, CHS003109Z10);

- "Any word from Nick on the legality of the number, devastator, assault and arrow pads? They are direct copies of GW art, at least with the normal rim and I know our attorney should have his say on them but I havent heard anything yet, I take it you and Nick have okeayed them." (Ex. 83, CHS009903);

- "You had asked me to put roman numerals on the shoulder pads with the tactical/assault/devastator markings. How many different numbers did you want and on which pads?" (Ex. 84, CHS009925);

- "did ALL arrow pads, both 7+8 assault pads and both 9+10 dev pads" (Ex. 85, CHS017286); and

- Mr. Villacci used a digimeter to make sure Chapterhouse's shoulder pads were identical in size to Games Workshop's shoulder pads.  (Ex. 16, Villacci Tr. at 217-18).

**CHS'S RESPONSE:**

DISPUTED. Each statement quoted is inadmissible hearsay (FRE 802) and without foundation (FRE 602).

"Games Workshop's icons" – **disputed**: the icons depicted are in the public domain, and not original to GW. *See* Response to GW SUF No. 61 (common geometric shapes and combinations of two simple, unprotectable symbols are also unprotectable).

"Games Workshop's . . . numbering scheme" – **disputed**: a "scheme" that consists of using Roman numerals from 1 to 10 is not original and is unprotectable by copyright. Roman numerals are unprotectable by copyright because they are examples of unprotectable typeface;

are in the public domain; and/or are simple geometric shapes.  Typefaces, such as Roman numerals, cannot be copyrighted. *See* CHS's Reply reSUF No. 61 above; *Eltra Corp. v. Ringer,* 579 F. 2d 294, 298 (4th Cir. 1978) ("typeface is an industrial design in which the design cannot exist independently and separately as a work of art"); 37 C.F.R. § 202.1 ("works not subject to copyright . . . [include] familiar symbols or designs; mere variations of typographic ornamentation . . . [and] [t]ypeface as typeface.").

- "Mr. Villacci used a digimeter to make sure Chapterhouse's shoulder pads were identical in size to Games Workshop's shoulder pads." **Disputed.** GW grossly misrepresents Villacci's testimony: Villacci said that his **designers** took measurements to ensure the size of Chapterhouse's shoulder pads was **similar enough to fit** one of GW's standard, 28mm scale model. Mr. Villacci also speculated that one of his designers may have used a digimeter to take such measurements. The cited testimony reads in pertinent part:

> Q   And you say, This is a standard-sized space Marine tactical shoulder pad.
>      What do you mean by standard size?
>      MS. GOLINVEAUX:  I'm sorry.  What page are you on?
>    A   2.
>      MS. GOLINVEAUX:  Where were you reading from, please?
>    Q   (BY MR. MOSKIN) Can I see the exhibit?  Okay. It says, This is the standard 28-millimeter scale shoulder pad.
>      MS. GOLINVEAUX:  Thank you.
>    Q   (BY MR. MOSKIN) What is the standard size you're referring to?
>    A   I'm referring to a shoulder pad that fits on the -- the Games Workshop space Marine model's shoulder.
>    Q   And how do you know it's a standard size?
>    A   We took measurements to make sure the size was **similar**, fit inside the concave component that would fit on the model.
>    Q   And how did you take those measurements?
>    A   Well, **I didn't take them**.  The designers took them.  I can't remember who did this pad, but I know Tomas has a -- a digimeter that's precision.  That's how he -- I assume that's how he takes his size, shapes, and stuff.

Villacci II at 110:11-111:11 (Supp. Kearney Decl. Ex. 9).

35.     In the Warhammer 40K universe, the Tyranids are a hive race of aliens whose weapons, technology, and vehicles are all organic in nature. (Ex. 1, Merrett Decl. at ¶ 23). While Games Workshop has made numerous miniatures representing various Tyranid creatures, Games Workshop's literature and other materials describe and provide artwork for additional Tyranid creatures. (Id.). Until recently, one such Tyranid creatures without a Games Workshop miniature was a Tervigon monster:



Games Workshop's Tervigon
(Ex. 60 at 52, GW001422)

(Ex. 1, Merrett Decl. at ¶¶ 23-24). The Tervigon has numerous unique characteristics that are easier to appreciate from its picture. However, notable characteristics include, two small hind legs, four large pointed legs that each have a small horn extending off the "elbow" of the leg, several bony protrusions that extend off the back of the creature, and the overall stance of the creature. (Ex. 1 at ¶ 25).

**CHS'S RESPONSE:**

CHS objects that GW's depictions of Tyranids speak for themselves. (FRE 1002.) To the extent GW's statement implies that the idea of "a hive race of aliens whose weapons, technology, and vehicles are all organic in nature" is original to GW or constitutes subject matter protectable by copyright, CHS disputes that statement.

CHS does not dispute that GW did not make a Tervigon monster miniature prior to suing CHS for its "Tervigon conversion kit" product.

Otherwise **DISPUTED**.

The listed characteristics of the "Tervigon" work are not unique and are not original to GW. *See, e.g.*, the "bony protrusions" of HR Giger's "Necronomicon IV" work, which was the inspiration for the Alien in the movie of the same name (*see* CHS's Request for Judicial Notice, Dkt. 235, 235-1; image available online at Wikipedia website,

http://en.wikipedia.org/wiki/File:H.R._Giger_-_Necronom_IV.jpg#filelinks):



36.     Chapterhouse has created and sells a "Tyranid Tervigon Conversion Kit" that allows a customer to convert a Games Workshop Carnifex[3] miniature into a miniature that looks like Games Workshop's picture of a Tervigon:

---

[3] A Carnifex is a type of Tyranid created by Games Workshop. (Ex. 1 at ¶ 26).

  

Games Workshop's Carnifex
(Ex. 61, GW002335)

Games Workshop's
Tervigon
(Ex. 60 at 52)

Chapterhouse's Tervigon
Conversion Kit applied to Carnifex
(Ex. 62, CHS001921)

This conversion kit contains the same unique characteristics as Games Workshop's depiction of a Tervigon, including two small hind legs, four large pointed legs that each have a small horn extending off the "elbow" of the leg, several bony protrusions that extend off the back of the creature, and the overall stance of the creature.

## CHS'S RESPONSE:

CHS does not dispute that it sells a kit to allow a customer to convert a Games Workshop Carnifex miniature into a different, larger creature.

Otherwise **DISPUTED**.

- "Tyranid Tervigon Conversion Kit" – **Disputed.** CHS sells a "Tervigon Conversion Kit for Carnifex Model." GW's Exhibit 62 depicts the kit under the name "Tervigon Kit to upgrade Carnifex."

- The allegedly "unique characteristics" GW lists are characteristics of *its own model*, not CHS's product.

GW very misleadingly claims that CHS's Conversion Kit "contains the same unique characteristics as Games Workshop's depiction of a Tervigon, including two small hind legs, four large pointed legs that each have a small horn extending off the 'elbow' of the leg, several bony protrusions that extend off the back of the creature, and the overall stance of the creature." But those features *are not part of CHS's accused product*. Rather, they are features of GW's

*own* pre-existing "Carnifex" figure. Villacci Opp. Decl. ¶ 10 (Dkt. 229-10); Supp. Kearney Decl. ¶ 23 & Ex. 12. GW reproduces an image of CHS's Kit that shows it assembled on top of a GW model (for purposes of showing fit and compatibility), but misleadingly shows an assembled version of its own "Carnifex" model that ***omits*** the relevant features – even though GW's "Carnifex" model as sold ***does*** include those features. A side-by-side comparison of two different views of GW's assembled "Carnifex" model with CHS's Conversion Kit, which is **shown assembled on a GW "Carnifex" model** to demonstrate fit and compatibility, shows that the only alleged similarities are due to the presence of GW's model in the picture, and are not part of CHS's product:

 

Supp. Kearney Decl. ¶ 23 & Ex. 12.

---

[4] GW's "Tyranid Carnifex" product, displayed on its website at http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1050178 (framing image of assembled "Carnifex"). Supp. Kearney Decl. ¶ 23 & Ex. 12.
[5] GW's "Tyranid Carnifex" product, as displayed on its website at http://www.games-workshop.com/gws/catalog/productDetail.jsp?prodId=prod1050178 (framing image of assembled "Carnifex"). Supp. Kearney Decl. ¶ 23 & Ex. 12.



Detail from GW'S Ex. 62.

In fact, CHS's Conversion Kit contains only the following pieces, which are not substantially similar to GW's alleged works:



---

[6] CHS Tervigon Conversion Kit for Carnifex Model, shown assembled on a GW "Carnifex" model to demonstrate fit and compatibility. DETAIL from GW's Ex. 62.

Product Binder (Dkt. 224-224.17) at tab 37; *see* Kearney Decl. Ex. 7, product no. 37 (Dkt. 208-19). As shown by the above images, GW's purported evidence concerning CHS's Conversion Kit misrepresents the facts and the record.

    *See also* the "bony protrusions" of HR Giger's "Necronomicon IV" work, which was the inspiration for the Alien in the movie of the same name (CHS's Request for Judicial Notice, Dkt. 235, 235-1; image available online at Wikipedia website, http://en.wikipedia.org/wiki/File:H.R._Giger_-_Necronom_IV.jpg#filelinks):



    37. Documents produced by Chapterhouse (and other documents not produced but which Games Workshop discovered independently) show Chapterhouse's clear intent to create a miniature from Games Workshop's artwork depicting Tervigon.

- Although Chapterhouse failed to produce documents from the designer of its Tervigon Conversion Kit, the designer himself, Sam Terry, posted images and commentary on the internet. The images show he used sculpting clay on top of the Games Workshop Carnifex model so that purchasers of the Chapterhouse conversion kit could transform their Games Workshop Carnifex into Games Workshop's drawing of a Tervigon. (Ex. 63);

- "I put up a few pictures of the pieces earlier today on secondsphere. I used adobe photoshop to cover up the GW plastic that was showing." (Ex. 64, CHS005980);

- In his posting on Secondsphere, Mr. Terry, explained how he copied from the Games Workshop drawing of a Tervigon present in the Tyranid Codex: "Have you seen the Tervigon Codex entry art? I tried my best to make these parts match up." (Ex. 63);

- In advertising the product on Warseer.com Mr Villacci stated: "It's a nice design that builds upon the Carnifex kit, yet fits true to what most tyranid players envision the Tervigon to be like on the table" (Ex. 65, Warseer Posting at 1) He further stated: "Our

Tervigon conversion kit has the parts necessary to turn your GW Carnifex kit into something that resembles one of their pictures." (Id. at 3); and

- Mr. Villacci explains his concept to the designer, Mr. Terry: "You are 100% correct that we don't use GW bits. Well that is a little true, you can use them as a base and sculpt on top of them, sort of like a skeleton, but if someone took our bits and compared them to GWs, you shouldn't be able to pick out GWs components in ours. My goal is to have a kit that will just fit over the Carnifex body, maybe even being able to have magnets if the user does that themselves." (Ex. 66, CHS004709).

## CHS'S RESPONSE:

Each statement is irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**, for the following reasons:

- GW's statement that "Chapterhouse failed to produce documents from the designer of its Tervigon Conversion Kit" is false. CHS produced relevant documents from the designer of the "Tervigon Conversion Kit for Carnifex Model," Bates labeled 3RDPARTY00000021 -22 and 3RDPARTY00000027-35. Supp. Kearney Decl. ¶ 25. And, as GW's own exhibits show, CHS also produced emails between CHS and the designer.

- Each of the purported statements is inadmissible hearsay (FRE 802) and without foundation (FRE 602). In addition, the quoted statements shows, at most, that the designer of the "Tervigon Conversion Kit for Carnifex Model" took steps to ensure that the pieces of the Conversion Kit would fit properly on top of GW's "Carnifex" model, and the statements are not evidence of copying or intent to copy any GW work.

In particular:

- ▪ "The images show he used sculpting clay on top of the Games Workshop Carnifex model so that purchasers of the Chapterhouse conversion kit could transform their Games Workshop Carnifex into Games Workshop's drawing of a Tervigon" – Disputed. Inadmissible hearsay (FRE 802); lacks foundation (FRE 602); improper speculation (FRE 701).

- ▪ GW's Ex. 65 prints only isolated pages from a longer thread and takes those pages out of context.

### Chapterhouse's New TRU-Scale Products

38. Just as the 28mm sizing of Games Workshop's Warhammer 40K miniatures was the result of a creative decision by the company, there are many design choices involved in transforming paintings or drawings from Games Workshop's books into 28mm figurines. (Ex. 132, Suppl. Merrett Decl. ¶7). To reinforce the traits and powers of the characters, Games Workshop exaggerates certain parts of the figures or their armour and otherwise modifies the figures to create the most desired appearance. (Id.) This has led some followers of Warhammer 40,000 to contemplate creating "true-scale" figures that are (from their perspective) "truer" to the original imagery in the books. (Id.) Although Chapterhouse did not create the concept of "true-

scale" Space Marines, it has very recently begun selling a line of products it calls "TRU-scale" that appear to be copies of Games Workshop's figures rendered in slightly larger size (evidently to match its sense how to more exactly replicate the imagery in Games Workshop's books). (Id.) Although the few announcements Games Workshop has seen have been careful to avoid direct mention of Games Workshop, the very notion of calling its products "TRU-scale" begs the question: "true to what". (Id.)

**CHS'S RESPONSE:** CHS does not dispute that it markets certain products with the term "TRU-SCALE."

Otherwise **DISPUTED.** The statements are irrelevant to any issue in this case, and lack foundation. GW does not dispute that the 28mm scale is a standard scale in the war gaming miniatures industry. GW's statements concerning "some followers of Warhammer 40,000" lacks foundation, is irrelevant, and is inadmissible hearsay. GW's statement that unspecified CHS products "appear to be copies" of unidentified GW works is vague and ambiguous, lacks foundation, and is irrelevant to any issue in this case. GW's rhetorical question "true to what" is devoid of meaningful content, but to the extent it is intended to imply that CHS's TRU-scale products are copies of any GW product, that implication is vague and ambiguous, lacks foundation, is not based on personal knowledge, and has no evidentiary basis.


39.     Chapterhouse has marketed these "TRU-scale" products on various Internet forums. (Ex. 132, Suppl. Merrett Decl. ¶8). Some responses to a forum posting by Chapterhouse regarding one new "Tru-Scale" product, in which the opening post comments briefly but ironically about Chapterhouse's use of the name "Knights Praetorius" rather that Space Marines (which they obviously are); another notes simply: "Oh dear Lord, that one's not even slightly subtle." Another forum member wonders if the named designer (Stephen Smith) isn't a Games Workshop employee, and others go even further. (Ex. 143, forum posts; Ex. 132, Supple. Merrett Decl. ¶8). One thus states:

> If this is the culmination of what I think it is, then it was one of the
> chaps on Dakka who true-scaled up his Marines and just got CH to
> cast them iirc. Adding a couple of mm of greenstuff to the thighs
> doesn't constitute an even remotely original sculpt imo. …CH have
> gone from an 'interesting aftermarkets spares' company, to totally
> moronic and arrogant lamo's, to simply just common thieves. …
> (Ex. 143)

The final post on this forum is equally harsh:

> I'm not a huge fan of [Games Workshop] at the moment, they aren't impressing me with their decisions and releases. But noone has any excuse to try and get away with this kind of farcical pretense of having their own line of bits and models. Similar/inspired by and so on are a fuzzy area, and I don't know enough about the legal details to know how close is too close in those cases, but this is just blatant poor quality copying! They may as well start recasting and announcing that on their website.  (Ex. 143).

**CHS'S RESPONSE:** CHS does not dispute that it markets certain products with the term "TRU-SCALE."

Otherwise **DISPUTED.** The statements are irrelevant to any issue in this case, lack foundation, are not based on personal knowledge, are improper speculation, constitute improper legal conclusions, and are inadmissible hearsay.

40.    Another recent example of Chapterhouse's new products is found at http://www.dakkadakka.com/dakkaforum/posts/list/470169.page (A copy of the page is attached as Exhibit 144.)  Although Mr. Villacci does not expressly identify the product using Games Workshop's name, one of the other forum participants immediately recognizes the design as a Kroxigor, a giant crocodile-like creature from Games Workshop's Warhammer (not Warhammer 40,000).  (Ex. 132, Suppl. Merrett Decl. ¶9).  This marks a new departure by Chapterhouse (copying from Games Workshop's Warhammer series).  However, Games Workshop has no further information whether the copying from Warhammer is part of a broader plan or regarding creation of the "TRU-scale" copies of Games Workshop's works (or other new products).  (Id.)

**CHS'S RESPONSE:** CHS does not dispute that it does not use GW's name in the post at GW's Ex. 144.

Otherwise **DISPUTED.** Each statement is irrelevant to any issue in this case, lacks foundation, is not based on personal knowledge, is improper speculation, constitutes improper legal conclusions, and is inadmissible hearsay. GW relies entirely on hearsay and unfounded speculation, and concedes that is "has no further information" on which to base its insinuations. CHS does not yet sell the product depicted at GW's Ex. 144.

Dated: September 20 , 2012              Respectfully submitted,

                                      _____/s/ Thomas J. Kearney_____

Jennifer A. Golinveaux (CA Bar No. 203056)
Dean A. Morehous (CA Bar No. 111841)
K. Joon Oh (CA Bar No. 246142)
Thomas J. Kearney (CA Bar No. 267087)
    WINSTON & STRAWN LLP
    101 California Street
    San Francisco, CA 94111-5802
    Phone: (415) 591-1000
    Fax: (415) 591-1400
    jgolinveaux@winston.com
    dmorehous@winston.com
    koh@winston.com
    tkearney@winston.com

Eric Mersmann (IL Bar No. 6286859)
Bryce Cooper (IL Bar No. 6296129)
Jonathon Raffensperger (IL Bar No. 6302802)
    WINSTON & STRAWN LLP
    35 West Wacker Drive
    Chicago, IL 60601-1695
    Phone: (312) 558-5600
    Fax: (312) 558-5700
    emersmann@winston.com
    bcooper@winston.com
    jraffensperger@winston.com

SF:340207.13

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas J. Kearney, an attorney, hereby certify that on September 20, 2012, I caused to be filed electronically the foregoing

**DEFENDANT CHAPTERHOUSE STUDIOS LLC'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**SUPPLEMENTAL DECLARATION OF THOMAS KEARNEY**

**DEFENDANT CHAPTERHOUSE STUDIOS LLC'S REPLY TO PLAINTIFF GAMES WORKSHOP'S RESPONSES TO CHAPTERHOUSE'S STATEMENT OF MATERIAL FACTS AND CHAPTERHOUSE'S RESPONSE TO GAMES WORKSHOP'S ADDITIONAL FACTS**

**DECLARATION OF GARY CHALK**

with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.


_____/s/  Thomas J. Kearney_____

SF:340750.1