# EXHIBIT

# 5

Case: 1:10-cv-08103 Document #: 250-6 Filed: 11/06/12 Page 2 of 7 PageID #:14275

PROFESSOR LIONEL BENTLY  July 12, 2012
GAMES WORKSHOP vs. CHAPTERHOUSE  1–4

Page 1

```
 1       IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION
 3
 4
 5   -----------------
 6   GAMES WORKSHOP LIMITED,
 7          Plaintiff,
 8   v.              Civil Action No.: 1:10-cv-8103
 9   CHAPTERHOUSE STUDIOS LLC and JON
     PAULSON d/b/a PAULSON GAMES,
10          Defendants.
11   -----------------
12
13
14
15      DEPOSITION OF PROFESSOR LIONEL BENTLY
16       Thursday, July 12, 2012 at 9:28 a.m.
17
18
19               Held at:
            The offices of Eversheds
20              1 Wood Street
              London EC2V 7WS
21             United Kingdom
22
23   Court Reporter: Fiona Farson
24
25
```

Page 2

```
 1            A P P E A R A N C E S
 2   For the Plaintiff:
 3       Jonathan E Moskin
         FOLEY & LARDNER LLP
 4       90 Park Avenue
         New York, NY 10016-1314
 5       Tel: 212.682.7474
         Fax: 212.687.2329
 6       email: jmoskin@foley.com
 7
 8       Gill Stevenson, Legal Manager
         GAMES WORKSHOP LIMITED
 9       Willow Road
         Lenton
10       Nottingham, NG7 2WS
         Tel: +44 (0) 115 900 4124
11       Fax: +44 (0) 115 916 811
         email: Gill.Stevenson@games-workshop.com
12
13
14   For the Defendant:
15       Scotia Hicks
         WINSTON & STRAWN LLP
16       101 California Street, 39th Floor
         San Francisco, CA 94111-5802
17       Tel: (415) 591-1000
         Fax: (415) 591-1400
18       email: shicks@winston.com
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   EXAMINATION
 3   BY MR. MOSKIN                              5
```

Page 4

```
 1           E X H I B I T  I N D E X
 2   Exhibit 119   Curriculum vitae of Professor Lionel Bently    9
 3   Exhibit 120   Email dated 05/30/12 from Winston & Strawn    20
 4   Exhibit 121   Email dated 05/29/12 from Tom Kearney         28
 5   Exhibit 122   Expert report of Professor Lionel
 6                 Bently                                        29
 7   Exhibit 123   Expert report of Mr. Michael Bloch QC
 8                 and Dr. Harris Bor                            35
 9   Exhibit 124   Transcript of deposition of John
10                 Blanche                                       93
11   Exhibit 125   Black Library Novels Commissioning Form
12                 for Dan Abnett                                96
13   Exhibit 126   Black Library Novels Commissioning Form
14                 for Ben Counter                               96
15   Exhibit 127   Confirmatory assignment for John
16                 Sibbick                                       98
17   Exhibit 128   Exhibit A to Games Workshop Ltd's answer
18                 to Interrogatory No 1                        129
19   Exhibit 129   Excerpt from Intellectual Property Law,
20                 Third Edition                                166
21   Exhibit 130   Between a Rock and a Hard Place:
22                 The Problems Facing Freelance Creators
23                 in the UK Media Market-place                 171
```



Case: 1:10-cv-08103 Document #: 250-6 Filed: 11/06/12 Page 3 of 7 PageID #:14276

PROFESSOR LIONEL BENTLY  July 12, 2012
GAMES WORKSHOP vs. CHAPTERHOUSE  5–8

Page 5

1      LIONEL BENTLY, sworn
2         Examination by MR. MOSKIN:
3  BY MR. MOSKIN:
4  Q. Would you please state your full name and address for
5     the record.
6  A. My name is Lionel Alexander Fiennes Bently. My address
7     is 18 Romsey Road, Cambridge, postcode CB1 3DD.
8  Q. Have you ever been deposed before?
9  A. I have, yes.
10 Q. And can you explain when that was?
11 A. That was in a case called Golan v Gonzales, which was
12    a constitutional challenge to the Uruguay Round
13    Agreements Act, and I gave evidence for the defendant on
14    the history of the implementation of Article 18 of the
15    Berne Convention, which allows members of the Berne
16    Union to set certain limitations on the -- the
17    implementation of retroactivity in copyright, and the
18    case went to the Supreme Court, and I just gave evidence
19    at first instance, and I was deposed in Cambridge by the
20    Department of Justice, US Department of Justice.
21 Q. Okay. You -- so you probably understand very generally
22    the mechanics of how the deposition works: That we
23    shouldn't speak over one another; if there's anything
24    I ask you you don't understand, please let me know, and
25    I will be happy to try to reframe it; if you need to

Page 6

1     take a break at any point, as long as a question is not
2     pending, I'm happy to oblige, more or less.
3        Is there any reason -- are you suffering from any
4     disability, taking medication or anything that would
5     impair your ability to give full and accurate answers
6     today?
7  A. No.
8  Q. Have you -- other than the one case, the Golan v
9     Gonzalez, have you ever been qualified as an expert
10    witness in a proceeding in the United States?
11 A. I'm -- I'm qualified as an expert witness. I'm not
12    quite sure what you mean.
13 Q. Have you -- well, explain the one instance, or whatever
14    instance you have in mind, and I'll --
15 A. Okay. So I've also given expert testimony in a second
16    case, called Explorologist v Sapient, which was expert
17    evidence on UK law concerning the place where a making
18    available of the copyright work took place, where the
19    work was created and put on a server in the United
20    States but could be accessed from the UK. And the
21    question was whether that was a making available in the
22    UK.
23 Q. Okay.
24 A. And that was settled, so that's why I didn't understand
25    your -- the "qualifying" bit.

Page 7

1  Q. I see. Was there any question or any challenge made to
2     your status as expert in either the Golan case or the --
3     I may not get the name right -- the Explorologist --
4  A. Explorologist, yeah. Not in Explorologist, because
5     there was no deposition and no examination of any sort
6     from the other side of my testimony.
7        In the Golan case, the Department of Justice's
8     counsel asked some questions about why I considered
9     myself to be an expert -- you know, early on in the
10    deposition process.
11 Q. Okay. And to your knowledge, or do you have any
12    knowledge whether a challenge was ever made in court?
13 A. No, not as far as I'm aware.
14 Q. Okay. Did you actually testify in court in either of
15    those cases in the US?
16 A. No.
17 Q. Have you ever been retained as an expert in a proceeding
18    in the United Kingdom or elsewhere?
19 A. Well, United Kingdom courts regard UK law, which is my
20    field of expertise, as a matter that's known to the
21    court, so they wouldn't admit expert evidence on UK law.
22       So the answer to the first part is no, not in
23    the UK. I have given expert reports in cases or in
24    relation to disputes in Canada, Brazil, and -- I don't
25    know whether it was a dispute, but also for firms in

Page 8

1     Germany and the Netherlands.
2  Q. And on what subjects?
3  A. Okay, so -- the Brazilian and Canadian expertise was in
4     relation to the law of patents. The Canadian case,
5     I was giving expert evidence for the plaintiff in
6     relation to a challenge to the Canadian law that then --
7     I think still does -- allow the government to set the
8     price of pharmaceuticals under certain licensing
9     regimes.
10       In the Brazilian case, it related to the invalidity
11    of -- or the effect of the grant of a European patent on
12    a previously-applied-for UK patent, and that had
13    implications for what was going on in Brazil.
14       The Dutch case was -- concerned personality rights
15    in relation to footballers, and merchandising of
16    football-related materials.
17 Q. Mm-hmm?
18 A. And the German case concerned a new technology that
19    would allow for certain sorts of recording of broadcast
20    programs, such that the user would be able to just see
21    the highlights of the program. So it was essentially --
22    the recording mechanism was sensitive to the sound, so
23    when the crowd cheered, it would record that bit and not
24    the bit where the crowd wasn't cheering, so that
25    somebody would be able just to watch the highlights.



Page 29

1 and he was sending the documents and an engagement
2 letter.
3 Q. Okay. And the engagement letter followed the next day;
4 that's exhibit 120?
5 A. Sorry?
6    Yep, that seems right.
7 Q. Were there any other -- was there any other
8 correspondence or communications prior to your
9 engagement or retention in this case?
10 A. Any other -- apart from a phone call? Then --
11 I don't -- so there was the initial email asking me
12 whether I was interested, and we scheduled a phone call,
13 and I guess then this was sent with these documents for
14 me to look at. Yeah.
15 Q. So the answer is no, there were no other --
16 A. Sorry, the answer is --
17 Q. -- communications?
18 A. Not as -- not as far as I recollect.
19 Q. Okay.
20 A. Probably just "no," but ...
21 MR. MOSKIN: Let's mark this as exhibit 122.
22    (Exhibit 122 marked for identification.)
23 BY MR. MOSKIN:
24 Q. And can you identify what has been marked as
25    exhibit 122?

Page 30

1 A. Yeah, this is my expert report submitted in this case.
2 Q. And other than -- I just want to be sure we have
3 a complete picture. What were your instructions before
4 you prepared this report?
5 A. So my instructions were to provide a rebuttal report
6 dealing with the issues of law described in the expert
7 opinion of Mr. Bor and Mr. Bloch, and also -- and also
8 to make -- provide an analysis, insofar as I was able,
9 about the application of the law to the facts of the
10 case as -- as they appeared to me to be from the various
11 documents I was given.
12    Along the way, so not at the starting point, I think
13 I raised the issue -- but Tom may have raised it --
14 about whether there should be something in here on
15 subsistence of copyright as well as authorship and
16 ownership. And it was agreed that I would add that,
17 even though it was not in the claimant's expert opinion,
18 because the court probably needed that to provide
19 a valid answer to the questions which it was going to --
20 which were going to be raised. Or at least the court
21 would need to know that there was an issue of
22 subsistence to be raised.
23 MR. MOSKIN: Can you read back his -- that answer? Just the
24    last part of it.
25    (Record read.)

Page 31

1 A. That wasn't very well put, was it -- to be dealt with.
2 BY MR. MOSKIN:
3 Q. Referring to paragraph 2 of your report, does this
4 fairly summarize what you were asked to do?
5 A. That summarizes what I was ultimately asked to do,
6 because the issues (b), (c) and (d) were the issues in
7 the Bor and Bloch report, and (a) was added to that as
8 it became clear that it was relevant.
9 Q. Just to go through each in turn, were you told anything
10 specific -- and you touched on this in your answer
11 a moment ago, but were you told anything specific as to
12 what sort of assessment to provide on the issue of
13 subsistence of copyright?
14 A. No, so -- sorry, can you say that again?
15 MS. HICKS: Just read the question back.
16    (Record read.)
17 A. I think your language -- sorry; you'll forgive me for
18 being a bit lawyerly -- your language "what sort of an
19 assessment" carries a number of different possible
20 meanings.
21    If you're suggesting that I was asked to provide
22 a -- any kind of a partial assessment, or assessment
23 that looked at things from a one-sided way, definitely
24 not.
25 BY MR. MOSKIN:

Page 32

1 Q. I just want to find out what you were asked to do in
2 providing an assessment on the issue of subsistence of
3 copyright.
4 A. Okay. So I was asked to provide an assessment about --
5 as to whether copyright would subsist in the materials
6 on which the -- under UK law, on the materials that
7 appeared to be at the basis of the plaintiff's
8 complaint: I.e. literary works, graphic works, and the
9 figures. And I'd already indicated that there was --
10 I'd already indicated to counsel for Winston & Strawn
11 that there was an obvious issue about whether the
12 figurines qualified for copyright as sculptures because
13 of our recent Supreme Court decision in Lucasfilm v
14 Ainsworth. And so he asked me to address that, or we
15 agreed that that needed to be addressed.
16 Q. Were you provided any particular instructions as to the
17 assessment that was sought on the question of ownership
18 of copyright in the employment context?
19 A. No, I was -- I was just asked to give my view about
20 whether the -- the report of Bloch and Bor was an
21 accurate and fair statement of the law.
22 Q. Is that the -- is the same true for (c) and (d)?
23 A. Yeah.
24 Q. Okay. Were you asked to consider any other issues?
25 A. No.



Case: 1:10-cv-08103 Document #: 250-6 Filed: 11/06/12 Page 5 of 7 PageID #:14278

PROFESSOR LIONEL BENTLY                                            July 12, 2012
GAMES WORKSHOP vs. CHAPTERHOUSE                                        33–36

Page 33

1  Q. Turning to paragraph 15 of your report, is this -- the
2     list provided here, is this a full list of the materials
3     you were provided with and considered in preparing your
4     report?
5  A. Yes, that's a full list of the material I was provided
6     with.
7         As I said earlier, I considered the legal
8     authorities, relevant legal authorities and materials,
9     so that's -- those aren't in the list.
10 Q. You said you also reviewed the Games Workshop website,
11    or parts of it?
12 A. Yeah.
13 Q. Anything else missing from the list, other than that?
14 A. I don't think so.
15 Q. Did you request any specific materials from defendants'
16    counsel during the course of preparing the report?
17 A. I -- I -- the answer is no, but I may have had --
18    I think we probably had a conversation about the
19    difficulty of reaching conclusions without more specific
20    details as to, for example, the processes of production,
21    the employment relationships, the other kind of
22    relationships with creators, et cetera.
23        So in making this report, I was conscious that
24    conclusions as to the results an English court would
25    reach on the particular facts would have to wait for

Page 34

1     elaboration of the facts at the trial, because those --
2     the details of those facts were not yet, in my
3     understanding, available.
4  MR. MOSKIN: Would you read that back, please.
5         (Record read.)
6  BY MR. MOSKIN:
7  Q. But you didn't ask for additional materials beside those
8     that Winston & Strawn selected for your review?
9  A. That's right.
10 Q. Did you ever go out and acquire any of the actual
11    miniatures?
12 A. No.
13 Q. So you've never actually seen one, other than maybe what
14    you bought for your nephew some years ago?
15 A. I can't -- don't remember the details of those. And no,
16    I've only seen the images of the miniatures on the Games
17    Workshop website, and -- that's it. I've not been into
18    a Games Workshop shop, even though there is one in
19    Cambridge.
20 MS. STEVENSON: I was going to say that.
21 A. I've walked by it. It's near a very good Chinese
22    restaurant.
23 BY MR. MOSKIN:
24 Q. Other than attorneys at Winston & Strawn, did you
25    communicate with anyone else to gather information in

Page 35

1     preparing this -- your report?
2  A. No.
3  Q. Your report nowhere sets forth any factual assumptions
4     that underlie the report, does it?
5  A. No. The -- I don't have a section -- that's right,
6     I don't have a section saying actual assumptions.
7         It was a rebuttal report, primarily about the law.
8  MR. MOSKIN: Let's mark as exhibit 123 a copy of the expert
9     report of Michael Bloch and Harris Bor.
10        (Exhibit 123 marked for identification.)
11 BY MR. MOSKIN:
12 Q. And I take it you've seen this before.
13 A. Yes, this is the expert report of Michael Bloch and
14    Harris Bor to which I was asked to write this rebuttal.
15 Q. And I take it you reviewed the summary of Mr. Bloch's
16    assumptions in the section headed "Parties' Positions,"
17    do you see that, starting page 6?
18 A. Yeah, I -- I read paragraphs -- well, I've read the
19    whole report.
20 Q. And -- including the -- his summary of his assumptions
21    as to what the parties' positions -- what are the
22    parties' positions in paragraphs 15 through --
23    through 30; is that right?
24 MS. HICKS: Object to that characterization of these as
25    assumptions.

Page 36

1  A. I must say, I also think it's a bit weird to call some
2     of these assumptions, but I certainly have read these.
3  BY MR. MOSKIN:
4  Q. Do you have any basis to question the accuracy of any of
5     these assumptions or statements?
6  MS. HICKS: Same objection.
7  A. I -- I -- before I answer that, I'd rather read through
8     them. That would take some time, so I don't really want
9     us to go there; but if you want me to, I would -- in
10    order to have -- have any doubts about them, I would
11    need to read through them and try and recollect the
12    evidence that was on offer. But ...
13 Q. Well, because your report doesn't set forth any of your
14    own assumptions, I need to know if you challenge -- if
15    there's any underlying assumption that you haven't
16    stated challenging any of the premises of the Bloch and
17    Harris report.
18 A. Okay. Insofar as I would challenge the assumptions, it
19    will have been done in the body of the report, and
20    usually in the sections that deal with the relationship
21    between the law and its application. And I think it is
22    quite possible that at some points in my report, I draw
23    attention to other facts or other possible facts that
24    I've drawn from the depositions that may qualify the
25    assumptions on which Mr. -- Misters Bloch and Bor were



Page 69

1  Q. Okay. I will thank you for clarifying. But what was --
2     did the court elaborate there on what about the table
3     lamp qualified it as having intellectual creation?
4  A. No, it didn't say that the table -- Okay. So what you
5     need -- as background for you, questions are referred to
6     the European Court of Justice on principles of law.
7     They give answers that are usually quite abstract in
8     form. They give answers in terms of principles of law
9     that are then applied by Member States' courts to the
10    particular facts in front of them.
11         So they will say something like -- you know, the
12    design in this case would be protected under Member
13    States' law, if, under -- applying the standards of
14    intellectual creation, it was regarded as an
15    intellectual creation.
16 Q. Right.
17 A. So it doesn't elaborate at all on whether the thing is
18    an intellectual creation.
19 Q. Well, did it -- the court elaborate on what, as
20    a general matter, are the elements constituting
21    intellectual creation?
22 A. Not in that case. But in other cases, they have
23    elaborated on the -- on the notion of intellectual
24    creation, pretty much on the same terms as originality.
25    So if something is a product of creative choice that

Page 70

1     bears the personal stamp of the author, rather than
2     the -- being a product of following rules, then it might
3     constitute an intellectual creation.
4         And I set out that sort of reasoning just so that
5     you can cross-reference, when I talk about the European
6     standard of originality at paragraph 50.
7  Q. All right.
8  A. Now, I don't know whether it's -- whether you want me to
9     carry on, but I have doubts about the Flos case, in
10    particular, because one particular provision in the
11    Information Society Directive -- I think I've put at
12    paragraph 43 that it's article 10, but I actually think
13    it might be article 9 -- suggests that matters relating
14    to design rights are left unharmonized and for Member
15    States.
16        And a close analysis of the travaux, which I haven't
17    conducted in this report, suggests that Member States
18    were intended to be left free to determine issues of
19    subsistence of copyright from materials that might fall
20    within the design regime.
21        And for that reason, I am reluctant in this report
22    to treat Flos as a very strong authority. But you know,
23    as I said before, the Court of Justice's interpretations
24    are not always predictable and don't always correspond
25    with what was understood during the legislative process,

Page 71

1     so ...
2  Q. Now, would you agree or disagree that if a table lamp
3     is, in principle, capable of having sufficient
4     intellectual creation to be copyrightable, that a -- one
5     of Games Workshop's figurines would also have sufficient
6     intellectual creation to in principle be copyrightable
7     under Flos v Semararo?
8  MS. HICKS: Objection. Lacks foundation, mischaracterizes
9     the prior testimony.
10 A. Well, yeah. Firstly, as I've said, I think Flos is
11    a dubious authority. But if Flos is followed, then
12    there would be an obligation on Member States, including
13    the United Kingdom, to protect intellectual creations by
14    copyright.
15        Now, the current UK system does not do that
16    explicitly. It has, as I've said, this list of things.
17    So the question about whether the miniatures would be
18    protectable or protected by copyright -- because
19    copyright here, there's no registration, so we don't
20    usually talk about protectable, because they either are
21    or they aren't -- the question would, in those -- on
22    those premises, the question would shift.
23        Now, the English court is then faced with two
24    possibilities. And the first would be to say, "We have
25    this list of subject matter, and that means that our law

Page 72

1     is non-compliant with EU law because intellectual
2     creations that are not in that list are not protected;
3     but there's nothing we can do, nothing the courts can do
4     about that, because parliament has indicated it wanted
5     a closed list, and so it would go against the grain of
6     that parliamentary intention to construe it as anything
7     else."
8         So one thing the court could do is say, "Sculpture
9     is what Lucasfilms said sculpture was, and EU -- British
10    law is just out of line with EU law and will have to be
11    amended in due course by the legislature."
12        The second course that the court could take is say,
13    "These terms in section 4 are sufficiently open-textured
14    that we could redefine them in a way that ensures that
15    anything that would be regarded as requiring protection
16    as an intellectual creation under EU law is to be
17    protected under UK law."
18 BY MR. MOSKIN:
19 Q. And under the second scenario -- given, as you just
20    noted, that in Lucasfilm, the court did not overrule
21    Britain v Hanks -- the court could simply say that "To
22    comply with Flos v Semararo, we recognize that so long
23    as there is sufficient originality in the creation of
24    figurines such as those at issue in Britain v Hanks,
25    that we will continue to extent protection to such



Page 73

1  figurines as we did in Britain v Hanks"?
2  A. Yeah, I think that they -- they might do something
3  that's not dissimilar to that. They might say the
4  question of whether something is an intellectual
5  creation is a key factor -- is one of the key factors in
6  Mr Justice Mann's list of determining whether something
7  is a sculpture.
8  Q. And as a general matter, you do agree, I think -- and
9  you state this in paragraph 51 of your report -- that
10  the European directive, the Information Society
11  Directive, would apply to all of Games Workshop works?
12  MS. HICKS: Objection. Misstates the document.
13  A. So -- section 51 -- sorry, paragraph 51, firstly I'm
14  dealing with originality, so we've divided the analysis
15  in subsistence and originality.
16     You are absolutely right that I assume that the
17  European originality requirement would be applicable for
18  works created after 22nd of December 2002. I am
19  referring, I think, in this context, to all the works
20  that we are considering: The literary works, the
21  graphic works, et cetera, not just the figurines.
22     And I think one might add a qualification, referring
23  back to my view that I expressed at paragraph 43, that
24  it actually may be inappropriate to apply the
25  Information Society Directive to the figurines.

Page 74

1  BY MR. MOSKIN:
2  Q. But that's a qualification that doesn't appear in your
3  report?
4  A. It -- I'm just dealing at that point with the general
5  issue of originality, and I haven't reiterated that
6  point at paragraph 51 at all.
7  Q. Okay. And paragraph 51 is -- I think you've said, but
8  you omitted the word "figurines" -- that it would apply,
9  as you wrote it, to all of Games Workshop's works:
10  Graphic works, literary works and figurines?
11  A. That's -- well, as I wrote it, it would, and I'm adding
12  that qualification now.
13     I mean, it's a -- it's a -- well ...
14  MR. MOSKIN: Well -- did they bring lunch?
15  MS. STEVENSON: Yes.
16  MR. MOSKIN: Oh, okay. This might be a good time to take
17  a break.
18     (Lunch break taken.)
19  BY MR. MOSKIN:
20  Q. I'd like you -- to refer you to part of your report,
21  under the European standard.
22  A. Yeah.
23  Q. In particular paragraphs 48 and 51, but anything in
24  between as well.
25     You offer no opinion, do you, whether any specific

Page 75

1  works would or would not qualify for protection under
2  the European standard as you defined it?
3  A. I haven't been presented with any specific works on
4  which to make that judgment. There would be two
5  difficulties in doing that. One is to be completely
6  clear about what the European standard is, because it's
7  an evolving standard on which the Court of Justice is
8  giving us hints, piece by piece; and secondly, applying
9  that standard to the facts requires you to know about --
10  something about the process by which the particular
11  works in question were produced, and in particular, the
12  kinds of choices -- the number and kinds of choices,
13  I think -- that the creator of the relevant material
14  would have had to make.
15     I've been given no information directly bearing on
16  those.
17  Q. I mean, you have -- you've looked at least at some
18  images on the Games Workshop website, and I understand
19  there are novels and paintings, graphic works; can you
20  give any sense of how any of this might make any
21  difference, have any practical consequences in this case
22  if a court were to apply this standard --
23  A. Okay.
24  Q. -- as distinct from the current standard?
25  A. As regards, say, a novel, I think it would make

Page 76

1  absolutely no difference. The old English labor, skill,
2  judgment test would be passed. If we're talking -- so
3  here I'm assuming a novel of 150 pages, created by
4  somebody choosing the words and sentences, et cetera.
5  That would be protected under the old standard and would
6  doubtless be a product of a creative choices under the
7  new standards. So it would make no difference there.
8     With regards to some of the graphic works, I think,
9  again, many of the pieces of art that are -- or graphic
10  works that are described in Jes Goodwin's deposition, as
11  far as I can recollect it, the kind of concept art
12  things, whatever I imagine when I read the words that he
13  uses when he described it as works of art, I would
14  imagine that they would be original graphic works under
15  both the traditional English UK test and the -- and the
16  European standard.
17     Where it might get more tricky is where the works
18  are created by other participants who are given certain
19  standards or rules to follow. And again, the factual --
20  the way in which the works are created is not described
21  clearly or in detail in any of the depositions, but
22  there are references to "all books," and so on; and at
23  those points it may be that the room for the creative
24  choices of the sort that the Court of Justice has been
25  referring to is limited.

