# EXHIBIT 6

# Between a Rock and a Hard Place:

# The Problems Facing Freelance Creators

# in the UK Media Market-place

A briefing Document on behalf of

The Creators' Rights Alliance

Lionel Bently

Reader in Law, King's College, London.



# Why the Abuses Occur: The Legal and Business Framework

Although many of the abuses outlined in the previous section could be prevented under the copyright laws of other countries, as the UK law currently stands, most of these abuses are not illegal, let alone criminal.

It is not the case that UK law fails to provide rights to authors, journalists, photographers, musicians, composers, directors and other creators: on the contrary, the *Copyright, Designs and Patents Act 1988* (CDPA) confers copyright protection on (*inter alia*) literary, dramatic, musical and artistic works; films and sound recordings.[15] Except in the case of employees,[16] the copyright vests in the AUTHOR of the work (and it does so automatically, as soon as the work is created and recorded, in writing or otherwise). In principle, such copyright should provide the author with the legal means to secure a reasonable remuneration, by giving the author the power to permit others (that is, to license exploiters) to reproduce and sell, or publicly show or broadcast, the work. The problem lies in the fact that UK law treats copyright like any other property (such as a table or a house) and allows it to be sold. That is, copyright can be transferred outright, for all time, by way of a so-called "assignment". Such an assignment can relate to the whole copyright or a part of it, and will be treated as valid as long as the

---

[15] CDPA s. 1.

transaction is made in writing. (In some cases, the courts even imply assignments, so no written agreement is required).[17]

Because UK copyright is transferable like any other property, authors are vulnerable to the effects of the market. English law does not, in general, permit courts to re-open transaction because they are unfair.[18] Rather, "contracts entered into freely and voluntarily shall be held sacred."[19] For freelancers, this has often meant that they are bound by individual contracts imposed on them by publishers, broadcasting organizations and other entrepreneurs whose businesses have been created expressly for the exploitation of works and who usually have the benefit of legal opinion. Dealings between creators and exploiters rarely take place on the "level playing field" of equivalent market power which the legal principle of freedom of contract presupposes.

---

[16] CDPA s. 11(2).
[17] CDPA s.1, s.90(1). For implied assignments, see e.g. Warner v. Gestetner, Ltd. & Newell & Sorrell Design Ltd [1988] EIPR D-89 (Warner was commissioned to draw cats which Gestetner was to use in promoting products at a trade fair. When Gestetner used the cats in their promotional literature, Warner claimed that his copyright had been infringed. Mr Justice Whitford held that it was an implied term of their oral agreement that Gestetner was equitable or beneficial owner of the copyright and, as such, that Gestetner had not infringed.)
[18] Scottish law is distinct and the details are not considered here.
[19] Printing and Numerical Registering Co. v Simpson (1875) LR 19 Eq 465 (Sir George Jessel MR).

Because of the disparity in market power, the exploiters typically take whatever rights they can get, not what they need (to make a profit). They sometimes take rights that they do not need for immediate exploitation of the work, in case they may in fact need them in the future, but more often in the hope that they will gain some unintended benefit (e.g. that old works will start to be re-used and they, rather than the creator, will gain the financial benefit). The legal advice is 'You have the power. Take everything you can. Collect up the rights. Hoard them. Then if something happens, you will get the windfall.' As a leading European legal commentator has observed:

> "[W]e see the total transfer of rights becoming standard business practice, not out of necessity, not to facilitate enforcement, not for logistic purposes, not for reasons of efficiency or legal security, but as a symptom of existential insecurity, because publishers have no idea what the future has in store for them, and for the works created by 'their' authors ..."[20]

Consequently exploiters tend to:

---

[20] B. Hugenholtz, 'The Great Copyright Robbery: Rights Allocation in a Digital Environment' (paper presented at Conference, A Free Information Ecology in a Digital Environment, NYU Law School, 31 March-2 April 2000.

- Use "standard" forms; (the forms are not "standard" in the sense of hammered out through negotiation with creators' organizations, but rather in the sense of "the exploiter's usual unilaterally imposed non-negotiable set of terms");[21]

- Use forms that require authors to transfer their rights, often on a perpetual basis, for a one-off payment. For example, freelancers have found that some newspaper publishers demand that they convey and assign all rights to the newspapers (on a world wide basis, and in perpetuity).[22] Sometimes the demands cover not just rights in the work as submitted, but rights over notes, preparatory material, and even access to the journalist's computer.[23] Similar contracts are issued by BBC Worldwide and other publishers to photographers,[24] and by the BBC and the Producers Alliance for Cinema and Television (PACT) to composers for television,[25] as well as directors;[26]

---

[21] Such as the two PACT model contracts with composers and the PACT model contracts with Directors.

[22] *battling for copyright*, p.2; A. Schelin, 'Intervention' at EC Strasbourg conference on Management and Legitimate Use of Intellectual Property, (9-11 July 2000), p.87 (online at www.europa.eu.int/comm/internal_market/en/intprop/news/strasbourg2_en.pdf)

[23] Ibid, p.17.

[24] On practice as regards photographs, see AoP, *Whose Copyright Is It Anyway?*

[25] PACT Model Contracts 1999 Edition – Composer's Publishing rights letter of engagement (on file at CRA), clause 10.1 'You will promptly upon our request assign to a music publishing company designated by us (subject to the Synchronisation Licence) the entire copyright … in the Music throughout the universe for the full period of

- Employ opaque language so as to disguise the effect of the transfer. A common instance of such practice in the newspaper industry involves describing an agreement as a "licence" when its legal effect is, to all intents and purposes, to confer complete control of the work, as regards all uses for all time and in all places, on the 'licensee';

- Create "white lists" of creators who will sign contracts that comply with their contractual demands, and only use (or in some cases just prefer) creators from such lists. For example, there is evidence that a number of broadcasters have created such lists of composers who will assign publishing rights to broadcasters (and their associate companies) rather than confine assignments to the synchronization right needed by the broadcaster.[27] What is more, although the

---

copyright and all renewals, revivals, reversions and extensions thereof ...'

[26] For example, "... Director hereby assigns to Company absolutely: (a) the entire copyright (including without limitation any rental and lending rights and cable re-transmission rights) throughout the universe for the full period of copyright and all renewals, revivals, reversions and extensions thereof (and thereafter, in so far as Director is able, in perpetuity) ... and (b) all other rights in all products of Director's services hereunder, including without limitation, all literary, dramatic, artistic and musical material contributed by director to the Programme ...."

[27] Evidence of Alex Pascal OBE, journalist and performer, on *Creators Have Rights*; Evidence of Guy Mitchelmore to the Creators Rights Alliance Conference, South Bank, London, 14 March 2001; A. Schelin, 'Intervention' at EC Strasbourg conference on Management and Legitimate Use of Copyright, (9-11 July 2000).

broadcasters denied the practice, during the Directors' Rights campaign in 2000 there were publicly documented examples of blacklisting,[28] and there is evidence of blacklisting of some photographers, by newspapers and publishing organizations;[29]

- Claim that, even in the absence of such agreements, they are entitled to all the rights in the work (for example, on the basis of customary practice);[30]

- Demand retrospective grant of rights (typically without offering additional remuneration);[31]

---

[28] V. Thorpe, 'TV Soaps at Risk as Directors make Drama out of Pay Row', *The Observer*, July 30, 2000.

[29] On file with NUJ.

[30] Evidence on file with CRA/NUJ. In <u>Robin Ray v Classic FM</u> [1998] FSR 622 an expert in music was engaged by a radio station to catalogue its musical recordings, the terms of his consultancy being silent as to copyright. The radio station claimed it was the copyright owner. The court rejected this claim holding only that Ray had granted an implied licence to the radio station to do certain things with the catalogues. In other circumstances, this sort of argument has been accepted.

[31] For example, EMAP Active's "Standard Commissioning Terms and Conditions" (for photographers) contract cl 5 "You assign to us exclusively throughout the universe the entire present and future copyright and all other right, title and interest of any nature ... in and to: (a) the commissioned work and (b) all other products of your services under this agreement, *as well as any previous or future works* written wholly or partly by you for us ..." (on file with CRA). *The Independent* has claimed in letters to freelancers that the "all rights" terms "have applied to all material you have supplied ... and you

- Impose contractual terms after the work has been delivered, for example, by making the signing of an assignment a condition of being paid for work supplied (even where no such agreement existed in advance).[32] These demands are accompanied by threats, either not to pay the author for the contribution,[33] or that future contributions will not be considered for publication;[34]

- Demand that creators agree to assign rights before undertaking to put the creators forward for consideration by a commissioning producer;[35]

---

should note that all material from freelance contributors will continue to be accepted on these terms only" (on file with CRA/NUJ).

[32] Evidence of Joyce MacMillan to the Creators Rights Alliance Conference, South Bank, London, 14 March 2001. For consideration of the legality of these tactics, see Section C, Economic duress. In order for an assignment at law to be valid, it must be in writing and signed by or on behalf of the assignor. It has been held that sufficient writing might be provided by an invoice or receipt: Savoury v World of Golf [1914] 2 Ch 566.

[33] *Battling for copyright* p.30.

[34] Ibid, p.2, 12, 21; David Ferguson, on *Creators Have Rights* (explaining threat from Los Angeles lawyer when negotiating *Bravo Two Zero* that he would never be given work in the industry again).

[35] There is evidence that BBC Music has in the past pressured composers into agreeing to assign publishing rights before they can confidently tender for business with commissioning producers elsewhere in the organization. However, the recent Code of Practice with the MU hopefully indicates that such practices will no longer occur. Directors have previously been concerned about similar issues in the past in relation to S4C's Letter of Inducement by which S4C attempted to persuade its independent producers to obtain written agreements from their directors beforehand assigning their 'right in

- Include warranties and indemnities clauses that expose them, potentially, to unlimited liability.[36]

These broad and extortionate contracts are usually treated as valid under UK law because of its basic principle: that a contract freely entered into by an adult is binding (and a contract is "freely" entered unless there is some undue influence or duress). The court will not re-open the contract merely because the court thinks the terms unreasonable or unfair. Nor will the court re-open the contract because it has been made between a huge corporation, such as IPC or the BBC (a corporation whose income from the license fee is almost £3 billion), legally advised, and an individual freelance creator who is desperate to obtain sufficient work to make a living. UK law does not recognize any doctrine of "inequality of bargaining power."

**Moral Rights**

---

future works' and 'moral rights' to the broadcaster in order to induce the broadcaster to grant a commission to the independent producer. It seemed that any director who refused to comply with this request could not be engaged by the producer.

[36] For example, a PACT standard contract with directors states: "Director will indemnify and keep Company fully and effectively indemnified against all actions, costs, losses, claims and expenses of whatsoever kind or nature arising from any breach or non-performance of any of the warranties, representations, undertakings or obligations on Director's part contained in this agreement." (On file with DGGB)

in those countries where they operate. In contrast, the benefit from such an approach lies in the fact that the creator always retains some essential connection with the work. We believe that the adoption of such a provision would create and sustain a positive environment for creators and in turn encourage creative activity.[180]

**(b) Exploitation contracts must be in writing to be enforceable**

UK copyright law requires that outright transfers of copyright ("assignments"), as well as exclusive licences, be made in writing,[181] as do the laws of many other European countries (e.g. Belgium, France, Greece, Ireland and Spain).[182] In the Netherlands, an outright transfer of copyright can only be effected by means of a deed and in Portugal must be witnessed by a public notary.[183] Many such countries also require that lesser forms of transfer – licences - cannot be enforced (against the creator) unless the licence was made in writing.[184]

---

the Spanish provision states that "the exploitation rights ... may be transferred", "transfer" is understood as meaning licensed.

[180] Connected with this proposal, we would like to see a distinction drawn in all copyright legislation between "creators" and other rightholders.

[181] CDPA s. 90(3).

[182] Irish Act, s.120(3); Italy, Art.110.

[183] Copyright Act of 1912 (as amended) (hereafter 'Netherlands') Art. 2(2).

[184] Law on Copyright and Neighbouring Rights of 30 June 1994 (as amended) (hereafter Belgium) Art. 3(1)(2) (written instrument necessary to prove contract terms against an author); Law No 92-597

While the CDPA demands that assignments be in writing if they are to be valid, UK courts have sometimes tried to circumvent this rule by treating the exploiter as an "equitable assignee" (and thus not caught by the rule as to writing). (Rather ludicrously, the courts have done this by first inferring from the circumstances "agreements" to assign copyright, and then adopting a "legal fiction" – in the form of the aphorism "equity looks on as done, that which ought to be done" - that the agreement has been carried out.) The CRA believes the statutory rule requiring that assignments be made in writing has an important function in protecting authors by formalizing arrangements. We therefore call for the rule to be reinforced, with a clause to the effect that an exploitation agreement between a creator and exploiter, which is not in writing, either (i) CAN ONLY be enforced at the behest of the creator; or (ii) CAN ONLY take effect as a non-exclusive licence.

**(c) Contracts must be specific to be enforceable**

One of the biggest problems with copyright contracts is that they are esoteric, and often drafted in opaque language. An author's bargaining position requires there be greater transparency. This transparency could be enhanced by requiring the designations of the kinds of use, payment etc., in the body of a written

---

of 1 July 1992 on the Intellectual Property Code (as amended) (hereafter 'France') Art. L 131-2; Greece, Art. 14; Italy Art. 110; Code