# EXHIBIT

# 7

# INTELLECTUAL PROPERTY LAW

*Third Edition*

L. BENTLY AND B. SHERMAN




OXFORD
UNIVERSITY PRESS





Parliament attract Parliamentary copyright, but this ceases on Royal Assent, withdrawal, or rejection of the Bill.[84]

## 3.4 INTERNATIONAL ORGANIZATIONS

Where a literary, dramatic, musical, or artistic work is made by an officer or employee of an 'international organization',[85] the organization is the first owner of the resulting copyright.[86]

## 3.5 COMMISSIONED WORKS AND EQUITABLE ASSIGNMENT

Another exception to the general rule that the author is first owner arises, in limited circumstances, where a person commissions someone to make a work. Under the Copyright, Designs and Patents Act 1988, copyright in a commissioned work belongs to the author of the commissioned work.[87] However, in certain circumstances the courts may infer that an independent contractor is subject to an implied obligation to assign the copyright to the commissioner. This may give rise to a trust with respect to the copyright in the commissioned work and render the commissioner the equitable owner. A good example is provided by *Griggs v. Raben Footwear*, where Griggs, distributors of DR. MARTEN'S AIRWAIR, in 1988 commissioned the advertising agency, Jordan, to produce a logo for it.[88] Evans, who did freelance work for Jordan, produced the logo and was paid at his standard rate of £15 an hour. Nothing was said about copyright in the logo. In 2002, Evans purported to assign copyright in the artistic work to Raben Footwear, an Australian competitor of Griggs. In response, Griggs brought an action seeking a declaration that it was beneficial owner of copyright, and an assignment of legal title. Peter Prescott QC, sitting as Deputy High Court judge, granted the relief sought. He held that, while Evans was the author, and first owner of the legal title, an agreement that copyright was to belong to Griggs was to be implied. Such an agreements was necessary to give business efficacy to the arrangement, under which it was clearly contemplated that Griggs would be able to use the logo and stop others from using it.[89] This could only be achieved if the implied agreement was to assign the copyright or give a perpetual exclusive licence (and the latter solution would be less convenient for Evans). The Court of Appeal affirmed.

84 CDPA ss. 165–7.

85 This means an organization the members of which include one or more states: CDPA s. 178.

86 CDPA s. 168.

87 Under the 1956 Act, a party commissioning a photograph, portrait, or engraving for value presumptively acquired copyright in that work: CA 1956 s. 4(3), Sched. 8, para. 1(a). When this position was changed in the 1988 Act, commissioners of photographers and films for private and domestic purposes were 'compensated' with the so-called 'moral' right of 'privacy': CDPA s. 85. The right covers issuing of copies of the work to the public, its exhibition in public, and its communication to the public.

88 *R. Griggs Group v. Raben Footwear* [2004] *FSR* (31) 673; [2005] *FSR* (31) 706 (CA). This decision is remarkable in two respects. First, because the implied assignment is in favour of a third party, Griggs, rather than the design company, Jordan. The more orthodox (if artificial) view would be that there are two implied agreements: one between Jordan and Evans, and another between Griggs and Jordan. The distinction would have been important if, for example, Jordan had decided the logo supplied by Evans was unsuitable. Second, the agreement to assign is implied in this case even though Evans did not know of the use intended by Griggs, Evans thinking the use was for point-of-sale only. The judge seems to have ignored this on the ground that Evans was 'indifferent' to the use, and had he known he would have accepted the more extensive use without charging a different fee.

89 Para. 57.

Case: 1:10-cv-08103 Document #: 250-8 Filed: 11/06/12 Page 4 of 5 PageID #:14296



(organizational) control over the process of production.[38] If a person operates at the periphery of the process, such as the person who merely commissions the making of the recording, or merely provides the finance for a film or a sound recording, he or she will not be regarded as a producer. If this were not the case, banks and other lending institutions would qualify as authors. However, provision of finance may be one of the organizational matters that, in combination with others, amount to a 'necessary arrangement'.[39]

### Broadcasts

In the case of sound and television broadcasts, the author is the person who makes the broadcast.[40] Where a person receives and immediately retransmits a broadcast, the author is the maker of the original broadcast rather than the person who relays it.

### Typographical arrangements

The author of a typographical arrangement of a published edition of a work is the publisher.[41]

## JOINT AUTHORSHIP

Collaborative research and creation is often a fruitful and productive way for authors to work.[42] Copyright recognizes this mode of creation through the notion of joint authorship. A number of important consequences, such as the way the work can be exploited, flow from a work being jointly authored.[43] While joint authorship is normally associated with literary, dramatic, musical, and artistic works, it is possible for any work to be jointly authored. As we saw earlier, the 1988 Act specifically provides that films are treated as works of joint authorship between the principal director and the producer, unless those are the same person.[44] The 1988 Act also extends the concept of joint authorship to a broadcast 'where more than one person is taken as making the broadcast,' namely, those 'providing,' or taking 'responsibility' for the contents of the programme, and those making the 'arrangements necessary for its transmission'.[45] No special definition of joint authorship is applied to sound recordings, or published editions.

In cases other than those special circumstances where joint authorship is deemed, a general principle applies: a work is a work of joint authorship if it is 'a work produced by the collaboration of two or more authors in which the contribution of each author is not distinct from that of the other author or authors.' A work is one of joint authorship if it satisfies three conditions.

(i) First, it is necessary to show that each of the authors *contributed to the making of the work*. In order to render a person a joint author, the contribution must be 'significant' and

38 *Adventure Films v. Tully* [1993] *EMLR* 376.

39 Ibid. *Beggars Banquet Records v. Carlton TV* [1993] *EMLR* 349 (arguable claim that person who provided finance and arranged access to venue where event was filmed was a person who made arrangements); *Century Communications v. Mayfair Entertainment* [1993] *EMLR* 335 (person had undertaken the arrangements necessary for the production of the film when it initiated the making of the film, organized the activity necessary for making it, and paid for it).

40 CDPA s. 9(2)(b). 41 CDPA s. 9(2)(d).

42 For a discussion of collaboration in the context of universities and the role of copyright, see A. Monotti (with S. Ricketson), *Universities and Intellectual Property: Ownership and Exploitation* (2003).

43 A joint owner (or other co-owner of copyright) can sue an infringer independently and can also bring an action against another co-owner.

44 CDPA ss. 9(2)(ab) and 10(1A). Note, however, that the general scheme applies to determine authorship, or co-authorship, of the 'dramatic work': on which, see Kamina, 141–53.

45 CDPA s. 10(2), cross-referenced to s. 6(3).



Implied agreements to assign have also been found where a choreographer undertook to arrange certain dances for the Russian ballet;[90] a design of a trade mark was produced;[91] a person upgraded a previous version of a computer program;[92] and a person arranged for the making of a sound recording.[93] These decisions amount to judicial variations of a clear legislative scheme. Clearly, the judges are looking at transactions after the event, and are motivated by gut-feelings of justice to prevent opportunistic behaviour by creators. However, the impact of the decisions is to undermine a clear scheme which is designed both to achieve certainty in transactions and to protect authors. It does so by requiring parties to allocate ownership through written assignments and in so doing requires those acquiring rights to specify what they want, thus giving authors an opportunity to reflect upon whether they wish to transfer all those rights. Under that scheme, the penalty for those commissioners who fail to organize their legal rights properly, is that they risk having to bargain for them later. The courts, by repeatedly responding to their sense that rights should follow money, remove this 'penalty' and, with it, undermine the goals that the statutory scheme aims to achieve. The better view is that these cases should be confined to their specific facts.[94]

### 1.6 BREACH OF CONFIDENCE

It also seems that copyright in works that are created in breach of a fiduciary duty or in breach of confidence will be held on constructive trust for the person to whom the duty was owed.[95] The same may be true of works made 'in circumstances involving the invasion of legal or equitable rights of the [claimant] or breach of the obligation of the maker to the [claimant].'[96]

## 4 HARMONIZATION

Questions of authorship, and the position of employed authors, are matters on which there has been little harmonization. As we have already noted, the issue was tackled, but only partially, in relation to films, by stating that the director is to be regarded as one of the authors of a cinematographic work. The only other harmonization has been in respect of the position of

[90] *Massine v. De Basil* [1936–45] *MacG CC* 223. See also *Brighton v. Jones* [2005] *FSR* (16) 288 (paras 57–8) (contributions of director to play were made on behalf of theatre, and so director was unable to claim copyright therein).

[91] *Auvi Trade Mark* [1995] *FSR* 288; *R. Griggs Group v. Raben Footwear* (2 Dec. 2003) [2003] *EWHC* 2914.

[92] *Flanders v. Richardson* [1993] *FSR* 497, 516–19, Ferris J held that where a computer program was improved, in circumstances where there was an acceptance or understanding that the plaintiff owned all the rights in the program, the court would hold the plaintiff to be the copyright owner. (Ferris J relied on *Massine v. De Basil* [1936–45] *MacG CC* 223.)

[93] *A & M Records v. Video Collection* [1995] *EMLR* 25.

[94] For example, *Saphena Computing v. Allied Collection Agencies* [1995] *FSR* 616, distinguishing *Warner v. Gestetner* [1988] *EIPR* D-89.

[95] *A-G v. Guardian (No. 2)* [1990] *AC* 109, 263, 276. Insofar as the constructive trust analysis is adopted there is no obvious reason why the analysis should be restricted to cases of breach of duties owed to the Crown. See *Ultraframe UK v. Clayton (No. 2)* [2003] *EWCA Civ* 1805 (director held unregistered design rights on trust for company). See below at pp. 1064–5.

[96] *Australian Broadcasting Corp v. Lenah Game Meats Pty. Ltd* (2001) 208 *CLR* 199 *per* Gummow and Hayne JJ at paras. 101–2 and *per* Callinan J at para. 309.

