**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GAMES WORKSHOP LIMITED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10 C 8103** |
| | ) | |
| **CHAPTERHOUSE STUDIOS, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Games Workshop Ltd. has sued Chapterhouse Studios, LLC for copyright and trademark infringement and related state and federal claims. Each side has moved for summary judgment. In connection with its motion, Chapterhouse has also filed two motions requesting judicial notice. For the reasons stated below, the Court grants Chapterhouse's motions for judicial notice and grants each side's summary judgment motion in part and denies it in part.

**Background**

Games Workshop (GW) is an England-based company that sells a variety of science-fiction and fantasy products revolving around a dystopian fictional universe known as "Warhammer 40,000." Warhammer 40,000 was first created in 1987 with the release of a book entitled *Rogue Trader*, and it has since grown to include books, computer games, a movie, and an annual convention. Perhaps most famously, GW created a tabletop miniature war game based on the Warhammer 40,000 lore, where

players compete with miniature figurines that are based on creatures and armies featured in Warhammer 40,000. The figurines are based on a 28-millimeter (mm) scale. Some of the more noteworthy creatures include Space Marines, Eldars, Taus, and Tyranids. The rules of the game are complex, and GW publishes a number of rule books and supplemental materials to guide game play.

GW sells its figurines and other products online, but it also owns a number of hobby stores in the United States where it sells its works. The figurines are sold unpainted and often require assembly. To continually develop the fictional Warhammer 40,000 universe, GW has worked with a number of different employees and freelance artists on books, figurines, and supplemental rulebooks called codices.

In 2008, Nick Villacci, a longtime Warhammer 40,000 enthusiast, began Chapterhouse Studios (Chapterhouse) at his home in Texas. Chapterhouse began selling Warhammer 40,000 accessories, or "bit" parts, that conformed to the 28mm scale used by GW. These bit parts consisted predominantly of shoulder pads, shields, weapons, and alternative miniature heads to be used with Warhammer 40,000 and other miniature figurines. Like GW, Chapterhouse sells its products online. It began selling them on third-party websites like eBay but has since established its own website on which it sells its products directly.

GW learned of Chapterhouse's existence in the summer of 2008. In 2010, GW sued Chapterhouse for copyright infringement, trademark infringement, and other related state and federal claims. After dropping some claims and adding others, GW now contends that ninety-five of Chapterhouse's products infringe GW's copyrightable works and that 110 of its products infringe GW's protectable trademarks.

2

Both GW and Chapterhouse have included in their summary judgment briefs requests that the Court disregard particular evidence that the opposing party allegedly failed to provide in discovery. Both argue fervently that the opposing party ran afoul of the Court's prior orders regarding discovery. Neither side has moved for sanctions, however, and more importantly, neither side has addressed the application of the standards for exclusion of unproduced evidence under Federal Rule of Civil Procedure 37. For these reasons, the Court will not consider the parties' requests to preclude evidence in connection with the summary judgment process.

Chapterhouse also objects to many of GW's statements of material fact submitted pursuant to Local Rule 56.1. Chapterhouse argues that because the statements are based on evidence not properly produced during the course of discovery, they lack foundation under Rule 602 of the Federal Rules of Evidence. The foundation for admissibility under Rule 602, however, has nothing to do with compliance with the discovery rules. Rather, the Rule provides that a witness must have "personal knowledge of the matter" about which he or she testifies. Fed. R. Evid. 602. Thus Chapterhouse's foundational objection is unfounded.

## Discussion

Summary judgment is proper when "the admissible evidence, construed in favor of the non-movant, reveals no genuine issue as to any material facts and establishes that the movant is entitled to judgment as a matter of law." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 690–91 (7th Cir. 2010). A genuine issue of material fact exists if there is sufficient evidence to allow a reasonable jury to find in favor of the non-movant. *Id.*; *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010).

When cross-motions for summary judgment are filed, a court applies the same standard

to each motion. *Harms v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 906 (N.D. Ill. 2001);

*Stimsonite Corp. v. Nightline Markers, Inc.*, 33 F. Supp. 2d 703, 705 (N.D. Ill. 1999).

Because, however, the two sides' motions include overlapping issues, the Court will

address both motions together.

In GW's motion, it argues that there are no genuine issues of material fact

regarding its copyright infringement and trademark infringement claims. In support of its

copyright claims, GW contends that a reasonable jury could only find that GW owns all

of the products at issue in the litigation, all its works are eligible for copyright protection

under applicable U.S. law, and Chapterhouse's products are substantially similar to the

works and therefore infringe GW's rights under the copyright laws. With regard to its

trademark claims, GW argues that its 110 claimed trademarks are all eligible for

protection under the Lanham Act and that no reasonable jury could find the absence of

likelihood of confusion regarding the origin of Chapterhouse's products.

Chapterhouse has also moved for summary judgment, arguing that no

reasonable jury could find for GW on its copyright infringement, trademark infringement,

or dilution claims. As to GW's copyright claim, Chapterhouse contends that: (1) GW

cannot establish ownership of fifteen of its alleged works under English law; (2) none of

GW's miniature figurines are protectable under English copyright law; and (3) even if

GW's works are protectable in the abstract, Chapterhouse's products are not

substantially similar to them once unprotectable elements of the products are filtered

out. As to the trademark claim, Chapterhouse contends that: (1) GW's marks are not

protectable because it has not shown that it used them in interstate commerce in the

U.S.; (2) there is no likelihood of confusion between GW's products and Chapterhouse's products; and (3) alternatively, Chapterhouse's use of the marks amounts to nominative fair use. Chapterhouse also argues that it is entitled to summary judgment on GW's federal and state dilution claims because GW has provided no evidence that its marks are famous (including the date they became famous) or establishing the dates that Chapterhouse began to use the alleged marks.

## I.      Copyright infringement claims

To establish copyright infringement, a plaintiff must prove: "(1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original." *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 361 (7th Cir. 2009) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). "Because direct evidence of copying often is unavailable, copying may be inferred where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work." *Atari, Inc. v. N. Am. Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir. 1982). Substantial similarity exists when an accused work is so similar to the original work that a reasonable person would conclude that the alleged infringer "unlawfully appropriated the [owner's] protectable expression by taking material of substance and value." *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005).

GW argues that it has established copyright ownership and that no reasonable jury could conclude that the Chapterhouse did not copy the works at issue. Chapterhouse contends that GW cannot establish that it owns a number of works at issue in the litigation. Chapterhouse further argues that English law governs GW's

ownership rights in the works and that English law does not afford copyright protection to "miniature toy soldiers," meaning that GW cannot base its copyright claims on any of its miniature figurines. Chapterhouse contends that as to the remaining copyright claims, GW cannot show substantial similarity between the two companies' products once the unprotectable elements are eliminated from the comparison.

### A.    Withdrawn claims

In its Second Revised Copyright Claim Chart ("Claim Chart"), GW indicates that it is no longer pursuing copyright infringement claims regarding a number of products. Specifically, GW states that it does not claim copyright infringement for the products listed in entries 8, 15-16, 25-26, 28-30, 32, 38-42, 44, 70-72, 81, 84-86, 88-89, 91-93, 107, and 109 on the Claim Chart. Given the stage to which this litigation has advanced, GW cannot simply drop these claims without prejudice. Chapterhouse is entitled to summary judgment on Count 1 with regard to the products identified in these entries.

GW also states in its response to Chapterhouse's statement of material facts that the last fifteen entries on the Claim Chart, entries 111-125, "did not purport to assert claims in 15 new products." Pl.'s Resp. to Def.'s Stat. of Material Facts ¶ 2. It appears that those products may be the subject of a new lawsuit that GW recently filed against Chapterhouse, which is in the process of being transferred to the undersigned judge's call as a related case to the present case. This decision does not address the products identified in these entries.

### B.    Standing and ownership

United States law permits suit only by "[t]he legal or beneficial owner of an exclusive right under a copyright." 17 U.S.C. § 501(b). The parties agree that because

GW's products were created in England, its ownership of copyrights with respect to those products is governed by that country's law. *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011); *see also Rudnicki v. WPNA 1490 AM*, No. 04 C 5719, 2009 WL 4800030, at *7 (N.D. Ill. Dec. 10, 2009) ("Under the [Berne] Convention, the law of the signatory country with the closest relationship to the international work at issue governs determination of copyright ownership.").

In its opening brief in support of its motion for summary judgment, Chapterhouse identified fifteen products for which it argues GW cannot establish ownership because freelance artists created the works. Specifically, Chapterhouse contended that nine of the individuals whom GW identified as authors of a number of relevant products—Gary Chalk, Simon Egan, Wayne England, Des Hanley, Clint Langley, Mike McVey, Bob Naismith, Adrian Smith, and Adrian Wild—were not GW employees. In response, GW stated that it "is not claiming copyright infringement of the works prepared by Gary Chalk, Des Hanley, [and] Adrian Wild." Pl.'s Opp'n at 4. GW is therefore dropping all copyright claims implicated by entries 99 and 100 in the Claim Chart, as well as any copyright claims on entries 17 and 106 insofar as they rely upon work created by Des Hanley. With respect to the remaining six authors, GW submitted signed assignments of rights for some, and for others it relies on the testimony of Alan Merrett, the Head of Intellectual Property for GW and one of the original creators of Warhammer 40,000.

Section 11(1) of the U.K. Copyright, Designs and Patents Act 1988 (C.D.P.A.) provides generally that initial ownership of a copyright for a work is vested in the author of that work. C.D.P.A. § 11(1). If, however, the work is created by an employee in the course of his employment, the employer owns the initial copyright. *Id.* § 11(2). Under

English law, the difference between an employment relationship—called a contract of

service—and an independent contractor relationship—called a contract for services—is

dependent on the underlying facts. "The well[-]established position in the law of

employment generally . . . is whether or not an employer and employee relationship

exists can only be decided by having regard to all the relevant facts." *Ultraframe (UK)*

*Ltd. v. Fielding*, [2003] EWCA (Civ.) 1805, [17] (Eng.) (Waller, L.J.); *see also Sec'y of*

*State for Trade & Indus. v. Bottrill*, [2000] All E.R. 915 (Lord Woolf) ("We are anxious not

to lay down rigid guidelines for the factual inquiry which the tribunal of fact must

undertake in the particular circumstances of each case."). The treatise *International*

*Copyright Law and Practice* lists factors that English law considers relevant in

determining whether such an employer–employee relationship exists:

> [T]he courts tend to focus first on whether there is the so-called "irreducible minimum" necessary to give rise to an employment relationship: namely "mutuality of obligation" and "control." There is sufficient "mutuality" only where the employer is bound to provide work and pay, and the employee to provide his labor. Moreover, for the employment relationship to exist, one party (the employer) must be able to exercise control over the other (the employee). In those professions where a worker has a considerable amount of freedom, the control requirement is met if there is a "sufficient framework of control." . . . However, these factors are not of themselves conclusive. The court will examine all other relevant aspects and provisions to establish whether they are consistent with a contract of service. The courts pay considerable attention to whether typical attributes of employment are present: whether regular sums are paid as wages or salary; whether income tax deductions are made on the "pay-as-you-earn" basis used for employees; whether there is a joint contribution to a pension scheme; and whether national insurance contributions are paid by both parties as for an employee.

Lionel Bently & William R. Cornish, 1 *UK International Copyright Law and Practice*, at

UK § 4(1)(b)(i) (Geller, Paul E., ed., Matthew Bender 2009) (internal citations omitted).

Some courts in England focus primarily on the level of control the employer has

over the purported employee. *Collins v. Hertfordshire Cnty. Council*, [1947] 1 All E.R.

633, (Hilbery, J.) ("The distinction between a contract for services and a contract of

service can be summarized in this way:  In the one case the master can order or require

what is to be done, while in the other case he can not only order or require what is to be

done but how it shall be done.").  Other courts have disagreed, however, finding that

"clearly superintendence and control cannot be the decisive test when one is dealing

with a professional man, or a man of some particular skill and experience." *Beloff v.*

*Pressdram Ltd.*, [1973] 1 All E.R. 241.  In *Beloff*, Mr. Justice Ungoed-Thomas noted that

when the work involved requires great skill, courts should analyze "whether on the one

hand the employee is employed as part of the business and his work [is] an integral part

of the business, or whether his work is not integrated into the business but is only

accessory to it." *Id.*

### 1.     England, McVey, and Naismith

Alan Merrett, one of GW's founders and currently its Head of Intellectual

Property, has addressed in an affidavit the employment status of a number of different

individuals who created GW works at issue in the litigation.  Merrett states that Wayne

England was an employee of GW from late 1988 until early 2001.  During that time,

Merrett says, England created the "Blood Angels Icon" for a specific chapter of the

Space Marines (entry 4 on the Claim Chart), the "Ork Evil Sunz Icon" for a specific clan

of Ork creatures (entry 12), and the "Titan Icon" for the "Adeptus Mechanicus"

organization (entry 69).  Merrett further states in his affidavit that McVey worked for the

company from April 1987 until November 1999, during which time he created a

miniature figurine of an "Eldar" creature (entry 108).  Finally, Merrett states that

Naismith, who designed the miniature "Rhino" vehicle to be used in the tabletop game (entry 82), was an employee of GW from May 1984 to December 1989. Merrett states that Naismith's work was "later decorated further" by other members of the GW team and eventually published in the "Space Wolves Codex" in 2000. Pl.'s Opp'n, Ex. 1 ¶ 13(d).

Chapterhouse contends that Merrett's statements are conclusory and self-serving and that the Court should disregard all of them. Yet the fact that Merrett's affidavit is self-serving does not preclude the Court from considering it so long as the affidavit "meets the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there was a genuine issue for trial." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004). Nor is the affidavit conclusory as Chapterhouse contends. It sufficiently shows that Merrett, who has worked at GW since 1981, has personal knowledge regarding when England, McVey, and Naismith worked for the company. Chapterhouse has produced no evidence to rebut Merrett's testimony regarding the employment status of McVey, England, and Naismith at the time they created the works at issue. It argues instead that Merrett's affidavit lacks credibility because GW has been inconsistent about which works its employees created. Even if the Court were to find that inconsistency on the part of GW or its counsel somehow reflects on the credibility of Merrett – a dubious proposition at best – Chapterhouse's argument is insufficient to enable it to survive summary judgment on this point. "[A] motion for summary judgment cannot be defeated merely by an opposing party's incantation of lack of credibility over a movant's supporting affidavit." *Trans-Aire Int'l,*

*Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1257 (7th Cir. 1989) (internal quotation marks omitted).

For these reasons, the Court finds pursuant to Federal Rule of Civil Procedure 56(g) that GW was and is the owner of the relevant works implicated by entries 4, 12, 69, 82, and 108 of the Claim Chart.

### 2.    Langley and Egan

GW has provided assignments of rights signed by Langley and Egan. Specifically, it has offered Egan's employment contract, signed June 15, 2004, in which Egan assigns the rights for all of his future creations to GW.  It has also presented Langley's independent contractor agreement with GW, signed by Langley on July 17, 2007, in which Langley similarly assigns to GW the rights to any works Langley submits to the company.

The law is unclear regarding what country's law governs consideration of such assignments.  *Saregama India*, 635 F.3d at 1292 ("[T]here is no guiding case law regarding which country's law governs the issue of *copyright transfer*." (emphasis in original)); *see also Itar-Tass*, 153 F.3d at 91 n.11 ("In deciding that the law of the country of origin determines the ownership of copyright, we consider only initial ownership, and have no occasion to consider choice of law issues concerning assignment of rights.").  Because, however, both English and U.S. law recognize the kind of written, signed assignment agreements at issue here, the Court need not resolve which country's law governs this issue.

Section 90(1) of the U.K. C.D.P.A. provides that "[c]opyright is transmissible by assignment . . . as personal or moveable property."  C.D.P.A. § 90(1).  To be valid, an

assignment must be in writing and signed by (or on behalf of) the assignor. Lionel

Bently & William R. Cornish, 1 *UK International Copyright Law and Practice, supra*, at

UK § 4(2)(a). Similarly, U.S. law provides for a transfer of copyright ownership through

a written instrument of conveyance that is "signed by the owner of the rights conveyed."

17 U.S.C. § 204. Langley and Egan's assignments fit the criteria under both the U.S.

Copyright Act and the C.D.P.A.

Chapterhouse offers no further arguments regarding why these assignments,

executed years before the current litigation began, are insufficient to convey to GW

ownership of the assignors' rights. Because there is no evidence to the contrary, the

Court finds that no reasonable jury could deny that GW was and is the owner of the

relevant works implicated by entries 17 and 82. The Court therefore determines that to

be established pursuant to Federal Rule of Civil Procedure 56(g).

### 3. Smith

GW states in its reply brief that "the one work of Adrian Smith is no longer in

issue." Pl.'s Reply at 4. But GW's Claim Chart, which GW repeatedly states is the

guide for its claims against Chapterhouse, identifies Smith as the author of two works

upon which GW bases three of its infringement claims. Smith's works include an

illustration of a Space Marine found on the front cover of *Soul Drinker*, one in a series of

books about a chapter of the Space Marines (entries 23 and 24 on the Claim Chart),

and an illustration of a Tau gun found on the front cover of *Codex: Tau* (entry 45). For

entries 23 and 24, Smith's illustration is the only image that GW includes as the basis

for its copyright claims. The Court takes from this that these works are still at issue, or

at least that they may still be at issue.

GW concedes that Smith was a freelance artist, in other words, that he was not an employee of GW. With its reply in support of its own motion, GW presented a "confirmatory" assignment that Smith signed just a little over two months ago, on September 18, 2012. Pl.'s Reply, Ex. 151. This document states that "[i]t was the intention of the parties that, at the time the Works were created by [Smith] on the instruction of GW, all Intellectual Property Rights in the Works be assigned to GW" and that "[t]he Agreement has been entered into to confirm such assignment of all Intellectual Property Rights in the Works." *Id.* The effect of this is unclear and has not been addressed adequately by the parties, largely due to its belated creation and production by GW. There is, however, law to the effect that ownership rights that come into effect after a lawsuit is filed are insufficient to confer standing under 17 U.S.C. § 501(a). *See Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 777 (Fed. Cir. 1996). So the real question likely is what rights GW had at the time the lawsuit was filed.

GW has argued that even if the works at issue in the litigation were created by freelance artists, the English doctrines of joint ownership and equitable assignment make GW the owner of the copyrights on those works. If GW can show that it and Smith jointly authored the illustrations in question, it has standing to pursue its three claims against Chapterhouse. *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007) ("The right to prosecute an accrued cause of action for infringement . . . is a right that may be exercised independently of co-owners; a joint owner is not required to join his other co-owners in an action for infringement."); *Harmony Gold U.S.A., Inc. v. FASA Corp.*, No. 95 C 2972, 1996 WL 332689, at *2 (N.D. Ill. June 13, 1996) (same).

Section 10(1) of the C.D.P.A. defines a jointly authored work as one "produced by the collaboration of two or more authors in which the contribution of each author is not distinct from that of the other author or authors."  C.D.P.A. § 10(1).  To find joint ownership, English courts require a showing that each party contributed significant and original expression to the work and that each intended its contributions to be merged into a unitary whole.  *Hodgens v. Beckingham*, [2003] EWCA (Civ) 143, [12, 51] (Eng.) (Jonathan Parker, L.J.); *see also Cala Homes (South) Ltd. v. Alfred McAlpine Houses East Ltd.*, [1995] F.S.R. 818 (Laddie, J.) ("It is both the words or lines and the skill and effort involved in creating, selecting or gathering together the detailed concept, data or emotions which those words or lines have fixed in some tangible form which is protected [by copyright].").  When a person's contribution to a work is merely the communication of an idea, however, that person has no rights to the copyright in the eventual product.  *Donoghue v. Allied Newspapers Ltd.*, [1937] 3 All E.R. 503 (Ch. D.) (Farwell, J.) ("It is not until [the work] is . . . reduced into writing, or into some tangible form, that you get any right to copyright at all, and the copyright exists in the particular form of language in which, or, in the case of a picture, in the particular form of the picture by which, the information or the idea is conveyed to those who are intended to read it or to look at it.").

Andrew Jones, GW's Head of Legal, Licensing and Strategic Projects, testified during his deposition that when working with a freelance artist, GW "sit[s] down with them and work[s], like I say, hand in hand, . . . on what the storyline was, to make sure it fitted, and then we would be working on Lord knows how many drafts and extra drafts. " Def.'s Mot. for Summ. J., Ex. 15 at 100:24–101:5.  GW has presented no evidence,

14

however, that zeroes in on whether this policy was followed when Smith created the illustrations in question.  And Chapterhouse has submitted no evidence to the contrary.  As a result, there are genuine issues of material fact that preclude entry of summary judgment for either side on the joint authorship question regarding the illustrations found in entries 23, 24, and 45 on the Claim Chart.

The issue of "equitable assignment" does not get much attention from either side in their summary judgment briefs.  Each side, however, has submitted an expert report regarding English law on various ownership-related topics, and the topic is discussed at some length in those reports.  The concept of equitable assignment would appear to be roughly equivalent to what might be considered an implied contract – namely that works were created under circumstances in which both the independent contractor and the party that hired the contractor expected at the time that the hiring party would own the intellectual property rights in any works that are created.  That is all well and good, but the parties have not addressed the facts underlying Smith's work for GW or his creation of the works at issue in a way that would permit the Court to come anywhere near resolving the point on summary judgment.

For these reasons, assuming the works created by Smith (or by Smith together with GW) are still at issue, the Court cannot resolve the issue of ownership at this time.

### B. Protectability of GW's figurines

#### 1. Applicable law

Chapterhouse contends that GW's miniature figurines are ineligible for protection under English law and that as a result all of GW's copyright claims against Chapterhouse based on its figurines fail.  Chapterhouse's argument begins with an

incorrect premise. Although disputes over copyright ownership must be resolved under the laws of a work's country of origin, other issues regarding a claim of copyright infringement, including the question of copyrightability, are determined by the law of the country where the alleged infringement occurred. *Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 480 (2d Cir. 2004) ("[F]ederal copyright law protects a work that enjoys no protection in the country where the work was created."); *Rudnicki*, 2009 WL 4800030, at *7 ("For infringement issues, such as the scope of protection or recovery, the relevant law is that of the country where the alleged infringement occurred.").

### 2. Protectable elements

Besides proving that it owns valid copyrights regarding the products at issue, GW must also establish that Chapterhouse copied constituent elements of GW's works that are original and thus entitled to protection under copyright law. *Incredible Techs.*, 400 F.3d at 1011. When assessing the issue of copying, courts must take note that, "despite what the ordinary observer might see, the copyright laws preclude appropriation of only those elements of the work that are protected by the copyright." *Id.*; *Atari*, 672 F.2d at 614.

Chapterhouse contends that it is entitled to summary judgment regarding GW's copyright claims concerning many of its products because the products are unprotectable under copyright law. In the Seventh Circuit, the issue of copyrightability is a question of law—albeit one that is fact-specific—to be determined by the court. *Janky*, 576 F.3d at 363; *Gaiman v. McFarlane*, 360 F.3d 644, 648–49 (7th Cir. 2004).[1]

---

[1] In the Second and Ninth Circuits, "copyrightability is a mixed question of law and fact, at least when it depends (as it usually does) on originality." *Gaiman v. McFarlane*, 360 F.3d 644, 648

### a.    Ideas

It is a "fundamental tenet of copyright law that the idea is not protected, but the original expression of the idea is." *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 917 (7th Cir. 2007) (citing *Feist*, 499 U.S. at 348–49). "This limitation on copyright protection promotes the purpose of the Copyright Act by assuring authors the right to their original expression, but also by encouraging others to build freely upon the ideas and information conveyed by a work." *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 497 (7th Cir. 2011) (internal quotation marks omitted). Chapterhouse contends that GW's copyright claims concerning entries 3–5, 12–13, 27, 31, 33, 37, 43, 63–67, 95, and 101–05 on the Claim Chart are based on unprotected abstract ideas.

Chapterhouse's allegations are based on the Second Revised Copyright Claim Chart that GW provided to Chapterhouse during discovery. After Chapterhouse submitted its motion for summary judgment, however, GW amended the chart to include several images from its books and website. Chapterhouse has asked the Court to strike the color photographs contained in the chart, including photographs of both GW's and Chapterhouse's products. The Court declines this request for the reasons noted earlier and also because Chapterhouse had a fair opportunity to respond to GW's evidence.

Examination of the photographs and drawings included in the Claim Chart leaves little doubt that the bases for GW's copyright claims are "original works of authorship fixed in [a] tangible medium of expression"—in GW's case, a predominantly graphic and sculptural medium. 17 U.S.C. § 102(a); *see also JCW Investments*, 482 F.3d at 914 ("A

---

(7th Cir. 2004) (citing *Matthew Bender & Co. v. West Publ'g Corp.*, 158 F.3d 674, 681 (2d Cir. 1998); *North Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1035 (9th Cir. 1992)). The Seventh Circuit, however, has consistently stated that this is an issue of law for the court's determination.

work is fixed in a tangible medium of expression when its embodiment in a copy is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." (internal quotation marks omitted)).  Chapterhouse is therefore not entitled to summary judgment on the ground that GW's copyright claims are based on unprotectable ideas.

### b.  *Scènes à faire*

A second limitation on copyright protection involves the doctrine of *scènes à faire*.  Under this doctrine, GW cannot prove infringement by relying on features of its works that are also found in Chapterhouse's products but that are "so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another."  *Gaiman*, 360 F.3d at 659; *see also* 37 C.F.R. § 202.1 (familiar symbols or designs not protected by Copyright Act).

The *scènes à faire* doctrine does not bar copyright protection for a work simply because it contains unprotectable elements.  A claim of infringement, however, cannot be based on such elements alone—rather, it must be the unique combination of those elements (or "particular novel twists given to them") that provides the originality required for copyright protection.  *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 929 (7th Cir. 2003).

"To qualify for copyright protection, a work must be original to the author."  *Feist*, 499 U.S. at 345.  Originality in the copyright context "means only that the work was independently created by the author and that it possesses at least some minimal degree of creativity."  *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 519 (7th Cir. 2009). This low threshold permits even a small amount of creativity to render a product

protectable under copyright law. *Feist*, 499 U.S. at 345 ("[T]he requisite level of creativity is extremely low; even a slight amount will suffice."). Thus Chapterhouse cannot defeat GW's claims merely by pointing to evidence of prior similar works. *FASA Corp. v. Playmates Toys, Inc.*, 912 F. Supp. 1124, 1147 (N.D. Ill. 1996); *see also Feist*, 499 U.S. at 345 ("Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.").

Chapterhouse contends that the only elements in many of its products that are similar to GW's works are common symbols and shapes, elements derived from nature or other public-domain material, or simple combinations of two unprotectable elements. Specifically, Chapterhouse alleges that for entries 3–7, 12–13, 19–22, 33, 46–47, 48–65, 83, 97–98, 101–02, and 104–05 on the Claim Chart, once the unprotected elements are filtered out, no reasonable jury could find substantial similarity between the parties' works.

GW bases its copyright claims for entries 21–22, 53, and 97–98 solely on the shape and design of GW's shoulder pads. As for entries 49, and 54–55, GW's only additional basis for copyright infringement is that entry 49 has rivets and high rims along the edge of the pad nearest the head and that entries 54–55 are unique expressions of a science-fiction shoulder pad that cover the figurine from the start of the shoulder to above the elbow with a large border around the edge. Chapterhouse contends that GW's shoulder pad design is merely a common half-hemisphere shape that is not protectable.

Chapterhouse has presented a report from William F. N. Brewster, the Curator of

Collections for the First Division Museum at Cantigny Park in Wheaton, who stated that GW's shoulder pads are "in keeping" with previous examples of military-style shoulder pads found throughout history. Brewster attached to his report drawings of soldiers throughout the last several centuries, many of whom were clad in armor that included shoulder pads. During his subsequent deposition, however, Brewster admitted that he could locate no same or similar representation of GW's shoulder pad design in previous military history.

Upon independent examination, the Court finds that GW's shoulder pads involve enough originality to afford them copyright protection. The unusually large proportional size of the shoulder pads as compared to the Space Marine's head (depicted in GW's product at entry 49) is a creative addition to the common shoulder pads sometimes worn by real-life soldiers in battle. The shoulder pads created to fit onto GW's physical figurines, though more proportionally accurate, are nevertheless still larger and boxier than those typically found outside of the Warhammer 40,000 fantasy world. The Court thus concludes that GW is entitled to copyright protection as to the design of its shoulder pads.

The Court likewise rejects Chapterhouse's contention that other GW shoulder pad designs are ineligible for copyright protection. Chapterhouse contends that for GW's products in entries 48, 50, and 56 on the Claim Chart, the only similarities between the parties' works are common geometric shapes—such as an "X" or a chevron—that are in the public domain and are not copyrightable. "It is true that common geometric shapes cannot be copyrighted." *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 303 (7th Cir. 2011). Yet although GW could not base its copyright claim on a

depiction of an "X" or a chevron alone, its depiction of that otherwise-common element affixed on an original, creative shoulder pad with a distinctive color scheme is sufficient to satisfy the originality requirement. *See Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 207 (3d Cir. 2005) ("When an author combines [otherwise non-protected] elements and adds his or her own imaginative spark, creation occurs, and the author is entitled to protection for the result."); *Tufenian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003) ("[T]he defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art . . . are considered in relation to one another."). Chapterhouse's motion for summary judgment on the basis that GW's shoulder pads are not copyrightable is therefore denied. The Court's finding resolves this issue for entries 4–7, 12–13, 19–20, 46–48, 50–52, 56–62, 64–65, and 101–02 on the Claim Chart.

The GW products at issue in entries 3, 63, 83, and 104 of the Copyright Claim Chart are also copyrightable. A skull is not protectable on its own, but GW's particular depiction of a Chaplain in entry 3, which includes a skull with red eyes that wears a helmet, is copyrightable. As to the other GW products in entries 63, 83, and 104, when reproduction of an animal or other lifelike object is the subject of claimed copyright protection, "a copyright holder must then prove substantial similarity to those few aspects of the work that are expression not *required* by the idea." *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 (7th Cir. 1994). Although GW's works in entries 83 and 104 do depict wolves, they do so in a creative and non-required way. The wolf is pictured snarling sideways or with its snout pointed downward facing

forward, its eyes are represented by slits (sometimes pictured in red), and it has sharp edges behind its head representing the hair on its neck. The dragon depicted in entry 63 is based on the particularized design, shown sideways with its mouth open and pointed scales behind its head. It is on these bases that GW alleges infringement, not the mere, uncopyrightable depiction of a wolf, dragon, or skull by itself. Because GW alleges infringement based on the unique and creative aspects of its works, Chapterhouse is not entitled to summary judgment on the basis that the GW products in entries 63, 83, and 104 are not protected by copyright.

The two remaining products, found in entries 33 and 105 on the Claim Chart, require a separate analysis. GW's product in entry 33 is similar to the corresponding Chapterhouse product only insofar as both works depict a circular saw blade with a teardrop shape in the middle. Though the "flesh tearer" shoulder pad is copyrightable overall and thus could form the basis for an infringement claim regarding a similar shoulder pad design—as is the case for entries 12 and 13 on the Claim Chart—GW cannot claim copyrightability based solely on the circular saw and teardrop shapes alone. *See FASA Corp.*, 912 F. Supp. at 1147 (when determining whether plaintiff has protectable works for copyright infringement action, court should exclude unprotectable elements from the comparison). These two elements, even when combined to create a single symbol, are merely two geometric shapes placed one atop the other. This does not warrant copyright protection. *See* U.S. Copyright Office, Compendium II: Copyright Office Practices § 503.02(a)–(b).

Turning lastly to entry 105, the only basis upon which GW seeks a finding of infringement by Chapterhouse's "Tactical Rhino Doors with Skulls Kit" is that both it and

GW's products display piles of skulls. A depiction of a pile of skulls is not copyrightable without more. If it were, GW potentially would have viable claims against countless movies, paintings, or drawings. This type of generalized expression does not involve the originality required for copyright protection. The Court therefore grants summary judgment in favor of Chapterhouse with regard to GW's products in entries 33 and 105.

### c.    Utilitarian elements

Chapterhouse contends that the elements it allegedly copied in the products found in entries 32–33, 35–37, 63, 82, 87–90, 103–06, 109, and 114 on the Claim Chart are uncopyrightable because they are mechanical or utilitarian aspects of the art, barred from protection by 17 U.S.C. § 101. Section 101 provides that "pictorial, graphic, and sculptural works . . . include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned." 17 U.S.C. § 101. A useful article is copyrightable only insofar as its design "incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." *Id.* To be a "useful article" under section 101, the item must have "an intrinsic utilitarian function that is not merely to portray the appearance of the article." *Gay Toys, Inc. v. Buddy L Corp.*, 703 F.2d 970, 973 (6th Cir. 1983).

Chapterhouse contends that for its products referenced in the preceding paragraph, the "sizes and shapes . . . are dictated by the mechanical and utilitarian requirement that the add-on pieces must fit onto the base model." Def.'s Mot. for Summ. J. at 12. Chapterhouse's argument misses the relevant inquiry. The fact that *Chapterhouse's* products must be designed in a specific way to fit onto GW's products

is inapposite. Rather, the relevant inquiry focuses on *GW's* products—i.e., the copyrightable elements that GW contends Chapterhouse copied. *See, e.g., Pivot Point, Int'l, Inc. v. Charlene Prods., Inc.*, 372 F.3d 913, 919–20 (7th Cir. 2004) (focus is on the functional nature of plaintiff's product). Though some of GW's products have "working" parts—namely, doors to its miniature vehicles and "drop pods" that can be opened and shut—those features simply serve as a detail of the portrayal of the real or fantasy objects. *Gay Toys*, 703 F.2d at 974 ("[T]oys do not . . . have an intrinsic utilitarian function other than the portrayal of the real item."); *see also Lanard Toys, Ltd. v. Novelty, Inc.*, 375 Fed. Appx. 705, 710 (9th Cir. 2010). The fact that GW decided to makes its figurines with components that move in the way they might move in real life is insufficient to render those figurines, or even those particular components, utilitarian and not copyrightable. The Court therefore declines to grant summary judgment for Chapterhouse on the ground that these particular products are utilitarian.

### d. Names and titles

Finally, Chapterhouse argues that for twenty-eight of its products, GW alleges copyright infringement solely on the basis of names and titles of characters, books, or magazines. However, GW's Claim Chart includes photographs of the illustrations or figurines GW alleges are infringed by Chapterhouse's products, making it clear that GW's claims for copyright infringement are not based solely upon Chapterhouse's use of GW names and characters. Chapterhouse's argument against copyrightability on this ground therefore fails.

### C. Substantial similarity

GW contends that it is entitled to summary judgment because no reasonable jury

could deny that there is substantial similarity between its works and Chapterhouse's works, nor could a reasonable jury deny that Chapterhouse copied GW's works in creating its products. When comparing products for similarity, the predominant question is whether "the two works share enough unique features to give rise to a breach of the duty not to copy another's work." *Peters v. West*, 692 F.3d 629, 633–34 (7th Cir. 2012). The test for substantial similarity is an objective one based on what an ordinary reasonable person would conclude. *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 916 (7th Cir. 2007).

GW contends somewhat vaguely that Chapterhouse's "entire website is an infringement," Pl.'s Mot. for Summ. J. at 11, as each of Chapterhouse's products is designed to be used in connection with GW's Warhammer 40,000 tabletop game. GW's copyright infringement claims, however, are not based upon Chapterhouse's alleged copying of its website. Rather, GW bases its claims on the products that it sells through its website. Moreover, GW has not produced any evidence that Chapterhouse actually copied GW's website: its only evidence concerns Chapterhouse's copying of GW products.

Nor has GW produced evidence that both websites share enough unique features that a reasonable jury could conclude that Chapterhouse copied GW's website. Any mention of Chapterhouse's website in the evidence GW has presented is included simply to show the similarity of the products advertised and sold on Chapterhouse's website. GW's attempt to persuade the Court to consider all of its products as one unified whole is therefore unpersuasive and without evidentiary support. Rather, GW is entitled to summary judgment on all of its claims of copyright infringement only if the

Court finds that for each of its allegedly infringed products, no reasonable jury could deny that Chapterhouse copied protected expression.

Chapterhouse contends that although GW was one of the sources that influenced its products, it was also inspired by several other sources, including ancient Greek art, the game Dungeons and Dragons, and Google searches. "A defendant independently created a work if it created its own work without copying anything or if it copied something other than the plaintiff's copyrighted work." *Susan Wakeen Doll Co. v. Ashton Drake Galleries*, 272 F.3d 441, 450 (7th Cir. 2001). Independent creation can serve to rebut any inference of copying that arises from a showing of substantial similarity. *Id.* Chapterhouse argues that because it referenced several different sources in creating the products at issue, it is not liable to GW for copyright infringement.

In support of its independent-creation argument, Chapterhouse has submitted two separate motions seeking judicial notice. The first is a request for judicial notice of two political symbols displayed on the Anti-Defamation League's website. The first, a symbol for the Nationalist Movement (a white-supremacist group), depicts a white cross comprised of two double-sided arrows set against a red background. The second, a symbol for the Ku Klux Klan, depicts a white cross with a red teardrop shape in the middle set against a circular red background. In its second request for judicial notice, Chapterhouse asks the Court to take judicial notice of H.R. Giger's 1976 painting, *Necronom IV*, posted on Wikipedia. GW does not contest the motions. The Court grants Chapterhouse's requests for judicial notice. Fed. R. Civ. P. 201(b). The fact that the Court has taken judicial notice of the works in question, however, does not affect the

26

Court's conclusion on the substantial similarity or independent-creation arguments presented by Chapterhouse.

Courts generally disfavor summary judgment on the issue of substantial similarity. *See, e.g., Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010); *Narell v. Freeman*, 872 F.2d 907, 909 (9th Cir. 1989) (same). In this particular situation, the Court finds that a reasonable jury could conclude that Chapterhouse's products are substantially similar to the GW works at issue in the litigation and were not created independently. By the same token, a reasonable jury could find that Chapterhouse's products are not substantially similar or were independently created. Summary judgment on this point is therefore inappropriate for either party.

## II.    Trademark infringement claims

The Lanham Act protects words, names, symbols, or devices that a person or company uses in commerce "to identify and distinguish [its] goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. To prevail on a claim of trademark infringement under the Lanham Act, GW must show that its marks are protected under the Act and that Chapterhouse's use of them is likely to confuse consumers. *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001).

GW has alleged that Chapterhouse is infringing 110 of its protectable marks. GW has submitted registrations with the U.S. Patent and Trademark Office for ten of its marks—including "Warhammer," "Warhammer 40,000," "40,000," "Games Workshop," "GW," "Space Marine," "Eldar," "Dark Angels," and "Tau." Because they are registered,

each of these ten marks is afforded one of two presumptions: (1) that the mark is not merely descriptive or generic; or (2) if it is descriptive (as some of the marks are), the mark has a secondary meaning (i.e., it has acquired distinctiveness). *Packman*, 267 F.3d at 638.

As a preliminary matter, Chapterhouse contends that GW "abandoned" a number of its trademark infringement claims through the deposition testimony of Jones, GW's Head of Legal, Licensing and Strategic Projects. Specifically, Chapterhouse contends that via his testimony Jones, acting on behalf of GW, abandoned the company's claim to trademark infringement for the following twelve marks: (1) wings, (2) skulls, (3) "Roman numerals (combined with) arrows," (4) Tau – oval vents," (5) plasma, (6) tactical, (7) halberd, (8) broadswords, (9) overlapping/banded armor, (10) "Tau – geometric gloves," (11) wolf fur, and (12) snakes. Def.'s Stat. of Material Facts ¶ 57.

GW contends that Chapterhouse is taking Jones's testimony out of context. It argues that when Jones said that GW is "not claiming" a trademark in the twelve items above, he was only clarifying that GW did not claim protection of "wings" or "snakes" generally as trademarks, but rather that the "unique association[s]" of creatively styled wings or snakes (including those bearing the Warhammer 40,000 logo) are unique trademarks.

The Court notes that GW has not identified with specificity what marks it contends Chapterhouse has infringed. Although GW identifies "Wings (eagle wings, angel wings)" as one of its marks, it has never argued (and cannot credibly do so) that any reference to wings, eagle wings, or even angel wings qualifies as protected under the Lanham Act. As Jones himself testified in his deposition: "It is an interesting

question, isn't it, because 'wings,' do we claim that we own wings as a unique

trademark, no, but the unique association of stylized wings so, for example, the

Warhammer 40,000 logo has stylized wings on it, and certainly in 1987, when we

launched . . . the Rogue Trader Warhammer 40,000 Army Book, the logo itself is

stylized eagle wings." Def.'s Mot. for Summ. J., Ex. 16 at 128: 18–25.

Despite GW's failure to identify in particular what it is claiming, Jones never

affirmatively disavows GW's claims regarding the twelve alleged marks at issue, and

Chapterhouse's arguments to the contrary are misplaced. At most, Jones questioned

GW's choice to claim trademark protection in a certain word or phrase. *Id.* at 71:9–10

(expressing surprise at GW's inclusion of "halberds" as an allegedly protectable mark).

Chapterhouse does not argue that the twelve alleged marks mentioned above are

ineligible for trademark protection, but rather only that Jones's testimony abandoned the

claims on behalf of GW. Because the record indicates Jones did not affirmatively do so,

Chapterhouse's argument for summary judgment on this ground fails.

### A. Use in commerce

Chapterhouse contends that GW cannot show that it used any of the 110 marks

in U.S. commerce before Chapterhouse and that for this reason, Chapterhouse is

entitled to summary judgment against GW on all of its trademark infringement claims.

*See generally Central Mfg., Inc. v. Brett*, 492 F.3d 876, 881-83 (7th Cir. 2007). The

court in *Central Manufacturing* found that the plaintiff could not prove that he used his

alleged marks in interstate commerce by "simply provid[ing] a dollar amount for each

year . . . [with] nothing about any specific transactions—nothing about quantity,

particular products, names of buyers, or dates of sale." *Id.* at 882. GW has produced a

spreadsheet containing the names of each product bearing the mark that Chapterhouse allegedly infringed and listing the annual amount of sales for that product from 2004 until the present. Chapterhouse complains that GW produced this summary only after the close of fact discovery. For the reasons stated above, the Court declines to disregard the summary for purposes of consideration of the summary judgment motions. It is sufficient to defeat Chapterhouse's request for summary judgment on this point.

That aside, the very existence of Chapterhouse's business provides circumstantial evidence from which a reasonable jury could conclude that GW used the marks in U.S. commerce before Chapterhouse. Chapterhouse admits that most of its products are intended to be used with GW's products, in particular to "customize the toy soldiers [Warhammer 40,000 fans] use to play tabletop war games. . . . In order to use [Chapterhouse's] bits in a game, a player must own one or more miniatures to use them with." Def.'s Stat. of Material Facts ¶ 6. Although Chapterhouse argues that its products can be used with miniature figurines other than those created by GW, it does not contend that it created the names given to the characters. And as to certain products, Chapterhouse admits that their only purpose is to "fit various model vehicles sold by GW." *Id.* ¶ 8. It would defy credulity to suppose that Chapterhouse sold these alternative parts in the U.S. to consumers who had not yet bought the corresponding GW product. That is enough to permit a reasonable fact finder to determine that GW used the marks in U.S. commerce before Chapterhouse. In sum, summary judgment on this basis is inappropriate.

### B.     Likelihood of confusion

Chapterhouse next contends that it is entitled to summary judgment because GW cannot show any likelihood of confusion.  In analyzing the likelihood of consumer confusion, courts consider seven factors:  (1) the similarity in appearance and suggestion of the marks, (2) the similarity of the products, (3) the manner and location of the products' concurrent use, (4) the degree of care consumers are likely to exercise, (5) the strength of the plaintiff's mark, (6) evidence of actual confusion, and (7) defendant's intent, if any, to palm off its product as that of another.  *See, e.g., Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001); *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461–62 (7th Cir. 2000).  Although no one fact is dispositive, "the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important considerations."  *Eli Lilly & Co.*, 233 F.3d at 462; *see also Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000).  GW contends that all seven of the factors indicate trademark infringement.  Chapterhouse contends that consideration of all seven factors together supports a finding of no likelihood of consumer confusion.

Two of the three most important factors—Chapterhouse's intent and evidence of actual confusion among consumers—are hotly disputed by the parties.  Chapterhouse argues that its display of a disclaimer on every page of its website clearly evidences a lack of intent to palm off its goods as GW products.  GW argues in response that the banner on Chapterhouse's website, which until recently read "Specializing in Custom Sculpts and Bits for Warhammer 40,000 and Fantasy," is evidence that Chapterhouse intended to suggest it was affiliated with or supported by GW.  On the issue of actual

confusion, GW has presented evidence that Chapterhouse's products were being sold on third-party websites under the name "Warhammer 40000 [*sic*] Space Marines."  Pl.'s Opp'n, Ex. 14.  Chapterhouse, arguing against actual confusion, has submitted e-mails that customers sent to GW, notifying them that Chapterhouse had begun selling replacement parts for GW's figurines.  It contends that the customers' awareness that Chapterhouse was a separate entity shows a lack of confusion regarding the distinction between the two companies.

The remaining factors point in conflicting ways.  The first two factors (similarity of appearance and similarity of products) tend to favor GW for most of the marks in question, but how strongly they support it remains an unresolved question of fact. Chapterhouse's products often include GW's alleged marks in their names, including Chapterhouse's "Conversion kit for Tyranid Tervigon" (entry 37) and "Ymgarl Heads for Tyranid Genestealers" (entry 43).  Chapterhouse's website also uses GW's marks in describing its products:  "This shoulder pad works well with Soul Drinker themed armies. This is the standard size space marine® terminator shoulder pad cast in pewter."  Pl.'s Opp'n, Ex. 135A at 28–29 (entry 24).  The second factor, the similarity of the products, requires the Court to compare the two companies' products in much the same way it did earlier, in addressing the copyright claims.  In that regard, the extent of the alleged similarities involves questions of fact that the Court cannot resolve on summary judgment.

The third and fourth factors (the manner and location of concurrent use and consumers' likely degree of care) tend to favor Chapterhouse.  Though both parties sell their products online, neither party sells its products on the same sites or shops.  And

although both parties' products may eventually be sold through third-party websites like eBay, the parties themselves sell their works through separate channels. As to the fourth factor, Chapterhouse contends that Warhammer 40,000 fans are highly sophisticated regarding the figurines sold by the two parties. As such, Chapterhouse argues that there is no likelihood of confusion.

The fifth factor, the strength of GW's marks, does not clearly favor either party. Though some of GW's marks are arguably rather strong, others are weaker.

Because the factors point in opposite directions, question of fact, drawing of inference, and weighing of evidence abound. Summary judgment for either party on the question of the likelihood of confusion is therefore inappropriate.

### C.    Fair use

Chapterhouse contends in the alternative that its use of GW's marks should be considered nominative fair use. Unlike the statutory fair use defense, which arises when the defendant uses the plaintiff's marks to describe its own product, nominative fair use provides a defense when a defendant has made use of the plaintiff's trademark to describe the plaintiff's product. *Horphag Research Ltd. v. Pelligrini*, 337 F.3d 1036, 1040–41 (7th Cir. 2003) (citing *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1156 (9th Cir. 2002)). The Ninth Circuit has set forth three requirements that a defendant must meet to establish nominative fair use:  (1) the product in question is not readily identifiable without use of the trademark; (2) defendant used the plaintiff's marks only so far as was reasonably necessary to identify the product; and (3) the defendant did not do anything that, in conjunction with the mark, suggested sponsorship or endorsement by the plaintiff. *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th

Cir. 1992).

GW contends that Villacci, acting on behalf of Chapterhouse, set out to make its business identify as closely with GW's as possible while stepping right up to what it supposed was the legal limit. GW contends that Chapterhouse refers to one or more of GW's marks in nearly every one of Chapterhouse's products and does so in a way that is not merely descriptive but rather suggests, and is intended to suggest, sponsorship or endorsement. Chapterhouse argues in response that its inclusion of a disclaimer on every page of its website is evidence to the contrary. Chapterhouse argues further that it mentions GW's alleged marks only insofar as necessary to alert its customers regarding what particular GW products Chapterhouse's products are designed to fit. These contentions involve disputed factual issues that preclude entry of summary judgment for either side on the nominative fair use defense.

### III. GW's dilution claims

Finally, Chapterhouse moves for summary judgment on GW's state and federal dilution claims. Chapterhouse argues that GW has presented no evidence to support its claims. To prevail on a claim of federal trademark dilution, GW must show that: (1) its marks are famous, (2) Chapterhouse adopted its marks after they became famous, (3) Chapterhouse's use of its marks caused dilution of the marks, and (4) Chapterhouse's use of the marks is commercial and in commerce. *Eli Lilly*, 233 F.3d at 466. Similarly, Illinois state law provides a remedy to "[t]he owner of a mark which is famous . . . against another person's commercial use of a mark or tradename, if the use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 765 ILCS 1036/65; *see also Kern v. WKQX Radio*, 175 Ill. App. 3d

624, 634, 529 N.E.2d 1149, 1156 (1988) (courts require the allegedly aggrieved trademark be distinctive).

In response, GW contends that Warhammer 40,000's "cult fame" is evidence enough to preclude summary judgment. Yet GW's overall commercial success does not support its dilution claim for each and every one of the 110 marks at issue. Moreover, even if the Court were to assume that GW could meet the first aspect of the test, GW has presented no evidence regarding when Chapterhouse adopted each mark as compared with when the mark allegedly became famous as dilution law defines that term. Nor has GW presented any evidence that Chapterhouse diluted GW's marks through its use of them. Because GW fails to present any evidence tending to show a genuine issue of material fact on these essential elements, the Court grants summary judgment for Chapterhouse on GW's dilution claims.

## Conclusion

For the reasons stated above, the Court grants Chapterhouse's motions for judicial notice [docket nos. 211 and 235] and grants both sides' motions for summary judgment in part and denies each in part [docket nos. 208 & 213]. In particular, and as described more specifically in the body of this decision, the Court finds pursuant to Rule 56(g) that Games Workshop owns certain works listed in its Claim Chart; that certain items listed by Games Workshop on the Claim Chart are entitled to copyright protection. In addition, Chapterhouse is granted summary judgment on Games Workshop's copyright infringement claims with regard to the Chapterhouse's products found in entries 8, 15–16, 25–26, 28–30, 32–33, 38–42, 44, 70–72, 81, 84–86, 88–89, 91–93, 96, 105, 107, and 109 on the Claim Chart. Finally, Chapterhouse is granted summary

judgment on Games Workshop's federal and state dilution claims (Counts 4 and 5).

_____
United States District Judge

Date:  November 27, 2012