# Exhibit

# 12

**NICK VILLACCI**
**February 29, 2012**

1 (Pages 1 to 4)

**1**

```
1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3   GAMES WORKSHOP LIMITED,        §
                                   §
4        Plaintiff,                §
                                   §
5   V.              §   CIVIL ACTION NO.
                    §   1:10-cv-08103
6   CHAPTERHOUSE STUDIOS LLC       §
    and JON PAULSON d/b/a          §
7   PAULSON GAMES                  §
                                   §
8        Defendants.               §
9
10  ***********************************************
11             ORAL DEPOSITION OF
12                NICK VILLACI
13             FEBRUARY 29, 2012
14  ***********************************************
15
16       ORAL DEPOSITION OF NICK VILLACI, produced as a
17  witness at the instance of the Plaintiff and duly sworn,
18  was taken in the above-styled and -numbered cause on the
19  29th of February, 2012, from 1:20 p.m. to 3:10 p.m.,
20  before Melisa Duncan, CSR in and for the State of Texas,
21  reported by machine shorthand, at the offices of
22  Carrington, Coleman, Sloman & Blumenthal, 901 Main Street,
23  Suite 5500, Dallas, Texas, in accordance with the Federal
24  Rules of Civil Procedure and agreement hereinafter set
25  forth.
```

**2**

```
1              A P P E A R A N C E S
2   FOR THE PLAINTIFF(S):
3     Mr. Jonathan E. Moskin (Via Teleconference)
      FOLEY & LARDNER
4     90 Park Avenue
      New York, New York 10016
5     212.682.7474
      jmoskin@foley.com
6
7     Mr. David J. Diamond
      CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.
8     901 Main Street, Suite 5500
      Dallas, Texas 75202
9     214.758.3726
      ddiamond@ccsb.com
10
11  FOR THE DEFENDANT(S):
12    Ms. Jennifer A. Golinveaux
      WINSTON & STRAWN LLP
13    101 California Street
      San Francisco, California 94111
14    415.591.1000
      jgolinveaux@winston.com
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1                 I N D E X
2                              PAGE
3   Appearances . . . . . . . . . . . . . . . . . . .  2
4   NICK VILLACI
5     Examination by Mr. Moskin . . . . . . . . . .  5
6   Signature and Changes . . . . . . . . . . . . . 56
7   Reporter's Certificate. . . . . . . . . . . . . 58
8              E X H I B I T S
9   NO.    DESCRIPTION                          PAGE
10  1    February 28, 2012 Letter and E-mail       8
11  2    Second Set of Interrogatories            15
12  3    E-mails, January 26, 2011, Bates Nos.    18
         CHS00002535 - 2537
13  4    E-mails, October 28, 2009, Bates Nos.    23
         CHS00007792 - 7793
14  5    E-mails, December 5, 2008, Bates Nos.    23
         CHS00002017 - 2019
15  6    E-mails, June 12, 2009, Bates Nos.       23
         JN00000001 - 5
16  7    E-mails, October 7, 2009, Bates Nos.     28
         CHS00004067 - 4122
17  9    Confidentiality & Nondisclosure Agreement, 33
         Bates Nos. WT000000022 - 23
18  12   E-mails, February 10, 2011, Bates No.    37
         ML00000001 - 4
19  13   E-mails, September 21, 2009, Bates Nos. CHS 30
         00004335 - 4343
20  15   Chapterhouse Studios Privilege Log       42
21  16   First Set of Interrogatories             48
22  17   Sales by Item Summary, 1/1/2007 - 8/4/2011  52
23
24
25
```

**4**

```
1              P R O C E E D I N G S
2        THE REPORTER: We are on the record. Today's
3   date is Wednesday, February 29, 2012. The time is
4   1:20 p.m. This is the oral deposition of Nick Villaci in
5   the case styled in the United States District Court for the
6   Northern District of Illinois, Eastern Division, Games
7   Workshop Limited versus Chapterhouse Studios and Jon
8   Paulson d/b/a Paulson Games, Civil Action
9   No. 1:10-cv-08103.
10       We are located at Carrington, Coleman, Sloman
11  & Blumenthal, 901 Main Street, Suite 5500, Dallas, Texas.
12  I am Melisa Duncan with CSI Global Deposition Services.
13       Will counsel present please identify
14  yourselves for the record.
15       MS. GOLINVEAUX: Jennifer Golinveaux of
16  Winston & Strawn on behalf of defendant, Chapterhouse.
17       MR. MOSKIN: For the plaintiff present by
18  telephone and video link, Jonathan Moskin of Foley &
19  Lardner.
20       MR. DIAMOND: Then for plaintiff as well,
21  David Diamond with Carrington, Coleman.
22            NICK VILLACI,
23  having been first duly sworn, testified as follows:
24            EXAMINATION
25  BY MR. MOSKIN:
```

**NICK VILLACCI**
**February 29, 2012**

33

1    ambiguous.
2        A. No.
3        Q. (BY MR. MOSKIN) In connection with this
4    litigation, did you do anything to try to retrieve
5    photographs or other information stored on Photobucket?
6        A. No.
7        Q. How many of your designers of the 11 designers
8    that we discussed before use Photobucket accounts?
9        MS. GOLINVEAUX: Objection, vague and
10   ambiguous.
11       A. I'm not sure.
12       Q. (BY MR. MOSKIN) In connection with this
13   litigation, did you make any effort to determine how many
14   of your designers use Photobucket accounts?
15       A. No.
16       MR. MOSKIN: I'd like to show the -- the
17   witness and mark Exhibit 9, a confidentiality agreement.
18       (Exhibit 9 was marked.)
19       Q. (BY MR. MOSKIN) Can you identify this document?
20       A. On the top it says, "Confidentiality and
21   Nondisclosure Agreement."
22       Q. What is it?
23       A. It appears to be a confidentiality and
24   nondisclosure agreement. Though I'm not a lawyer so . . .
25       Q. Is this a document that it was prepared by

34

1    Chapterhouse?
2        A. I can't remember. Usually I have a signature on
3    our documents and we have a different form.
4        Q. You have a different form of nondisclosure
5    agreement?
6        A. Currently, yes.
7        Q. And did that -- when did you adopt a new form?
8        A. I don't remember a date or -- with any certainty
9    give you any certain time span.
10       Q. Within the last year?
11       A. I don't remember.
12       Q. The day after this litigation began?
13       A. I don't remember. I couldn't say yes or no on
14   that.
15       Q. And with whom does Chapterhouse enter into
16   nondisclosure agreements?
17       A. With our designers and --
18       Q. All the designers?
19       A. With our designers and our concept artists, yes.
20       Q. If you go back to Exhibit 2, the answers to
21   interrogatories. Do you see that?
22       A. Yeah, I have No. 2 in my hand right now.
23       Q. Do you -- does Chapterhouse have nondisclosure
24   agreements with all 12 designers -- well, if you can
25   exclude yourself, I suppose, with all of the other 11

35

1    designers listed in the answer to interrogatory 3 that we
2    were discussing earlier?
3        A. It is my practice to do that before working with
4    any designers. So I can't remember offhand every instance
5    of having that form signed with each designer, but that's
6    our practice.
7        Q. Did you do anything in this case to collect those
8    nondisclosure agreements to share them with your counsel?
9        A. I gave my counsel everything they've asked me to
10   give them.
11       Q. Did you give them the nondisclosure agreements?
12       A. If they asked for them, I gave them to them.
13       Q. That's not my question. Did you give them the
14   nondisclosure agreements?
15       A. I don't remember specifically giving them the
16   disclosure agreements.
17       Q. Are you aware of how the current nondisclosure
18   agreements differ from the agreement that's been marked as
19   Exhibit 9?
20       A. It looks different and it's a single page.
21       Q. Are you aware of any substantive differences?
22       A. I couldn't tell you. I have not compared. I'd
23   have to have one in front of me to tell you what the
24   differences are.
25       Q. Who -- who prepared those agreements?

36

1        A. I prepared them. Now, when you say prepare, I
2    mean, I'm the one that sent them to the designers and I
3    signed it before I sent it to them. I didn't write it out
4    or anything like that.
5        Q. Who wrote the agreements?
6        A. I don't know. It was a form document.
7        Q. Did you have a lawyer prepare this agreement,
8    Exhibit 9?
9        A. I don't remember this agreement, so I couldn't
10   tell you yes or no on that.
11       Q. Do you have any understanding what is meant by
12   "confidential information" as referred to in paragraph one
13   of Exhibit 9?
14       A. From my understanding, it is -- and this is how
15   I've used NDAs and confidentiality, that any work they do
16   for us is between myself and the designer, and they are not
17   to publicly disclose that information unless given
18   permission.
19       Q. And that covers all the design documents that the
20   designers create?
21       MS. GOLINVEAUX: Objection, vague and
22   ambiguous.
23       Q. (BY MR. MOSKIN) Or tell me if I'm wrong.
24       A. In my interpretation, yes.
25       Q. And that's true of the current agreement as well?

**NICK VILLACCI**
**February 29, 2012**

---

37

1    A.   That is the whole point of the agreement, yes --
2    well, not the whole point, it's a point of the agreement.
3    Q.   Who prepared the current agreement?
4    A.   The current agreement was a form document.
5    Q.   Where did you obtain it?
6    A.   I believe one of our designers who's been in the
7    industry provided that to me.
8         MR. MOSKIN:   Can you show the witness what
9    could be marked as Exhibit 12?
10        (Exhibit 12 was marked.)
11   Q.   (BY MR. MOSKIN)   And can you tell me what this is,
12   Mr. Villaci?
13   A.   It's an e-mail between myself and Michael Lawler.
14   Q.   Who is Michael Lawler?
15   A.   A concept artist.
16   Q.   What's the difference between a designer and
17   concept artist as you use the terms?
18   A.   Concept artist provides us artwork.  A designer is
19   more of a jack of all trades, artwork, sculpting, that's
20   how I differentiate the two.
21   Q.   All right.  I didn't hear the last word.
22   A.   That's how I differentiate the two.  One only
23   works on art, the other one designs the whole product.
24   Q.   And do you see that attached to Exhibit 12 is --
25   is a confidentiality nondisclosure agreement?

---

38

1    A.   Yes.
2    Q.   And do you -- do you see the date on that
3    agreement, February 10, 2011?
4    A.   I see the date.
5    Q.   Does that help you fix in your memory when you
6    changed to the new form?
7    A.   Well, obviously it has to be after February 10,
8    2011.  Other than that, no.
9    Q.   And do you have nondisclosure agreements, either
10   in this form or the new form, with all of your concept
11   artists as well as all the designers?
12   A.   That is what I aim to do when I hire new
13   designers.
14   Q.   To your knowledge, do you, in fact, have
15   nondisclosure agreements in one form or the other -- or the
16   other with the concept artists as well as the people you
17   described as designers?
18   A.   As far as I know, yes.
19   Q.   Is -- does that include Mr. Fiertek?
20   A.   I don't remember if he signed one or not.
21   Q.   Is that because of his different status as a
22   partner?
23   A.   Mainly because the amount of time we've worked
24   together.  It's been years.
25   Q.   You don't feel you need one with him?

---

39

1    A.   I didn't say that.  I said I can't remember if he
2    signed one or not because it was so long ago.
3    Q.   I see.  I'm sorry.  I thought you might have been
4    implying that you had a level of comfort with him all that
5    time that you didn't need one.  But you're just saying you
6    don't remember?
7    A.   Yes, don't remember.
8    Q.   I didn't mean to put words in your mouth.
9    A.   That's okay.
10   Q.   Are you aware of any reason why none of the
11   nondisclosure agreements have been produced to us in this
12   litigation, the plaintiff in this litigation?
13        MS. GOLINVEAUX:   Objection.
14   Q.   (BY MR. MOSKIN)   By Chapterhouse?
15        MS. GOLINVEAUX:   Objection, assumes facts not
16   in evidence.  I believe we've just reviewed two of them.
17        MR. MOSKIN:   Yes.  And if you look at them,
18   they were produced by third parties, not by Chapterhouse.
19   Q.   (BY MR. MOSKIN)   So to repeat the question, are
20   you aware of any reason why no nondisclosure agreements
21   have been produced by Chapterhouse to the plaintiff in this
22   litigation?
23        MS. GOLINVEAUX:   Same objection.
24   A.   I have no knowledge of that.
25   Q.   (BY MR. MOSKIN)   At any point in time during the

---

40

1    course of this litigation, did you ask any of the concept
2    artists or independent designers to provide you documents
3    in response to the requests made by Games Workshop?
4    A.   No.
5    Q.   For example, you never picked up the phone or sent
6    an instant message or e-mail to Mr. Fiertek saying Tomas, I
7    need -- I'd like you to give me all of your documents
8    regarding the creation of the works at issue in this case?
9    A.   No.
10   Q.   You never said -- you never asked Mr. Fiertek
11   that?
12   A.   No.
13   Q.   The answer is no?
14   A.   No.
15   Q.   And same for the other designers?
16   A.   That is correct.
17   Q.   And concept artists; is that right?
18   A.   That's correct.
19   Q.   Do you have similar agreements with the producers
20   or manufacturers of your goods?
21        MS. GOLINVEAUX:   Are you referring to the
22   nondisclosure agreements?
23        MR. MOSKIN:   Yes.  Thank you.
24   A.   I've -- I can't remember exactly what forms we
25   signed but there is some sort of agreement between myself

---