# EXHIBIT 4

**1**

```
1       IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF ILLINOIS
3             EASTERN DIVISION
4   GAMES WORKSHOP LIMITED,    )
            Plaintiff,    )
5                          )
         vs.       )
6                      )  Civil Action
    CHAPTERHOUSE STUDIOS LLC    )  No. 1:1--cv-08103
7   and JON PAULSON d/b/a      )
    PAULSON GAMES,         )
8          Defendant.     )
    _____
9
10
11
12      DEPOSITION OF DR. CARL GRINDLEY
13           New York, New York
14         Thursday, February 21, 2013
15
16
17
18
19
20  Reported By:
21  CATHI IRISH, RPR, CLVS, CCR
22
23
24
```

**2**

```
1
2
3
4
5
6
7           February 21, 2013
8              9:09 a.m.
9
10      Deposition of CARL GRINDLEY, held at
11  the offices of Foley & Lardner, LLP, 90 Park
12  Avenue, New York, New York, before Cathi
13  Irish, a Registered Professional Reporter and
14  Notary Public of the State of New York.
15
16
17
18
19
20
21
22
23
24
```

**3**

```
1   A P P E A R A N C E S :
2
3   FOLEY & LARDNER, LLP
4   Attorneys for Plaintiff
5       321 North Clark Street, Suite 2800
6       Chicago, Illinois 60654
7   BY:   JASON J. KEENER, ESQ.
8
9   WINSTON & STRAWN, LLP
10  Attorneys for Defendant
11      35 West Wacker Drive
12      Chicago, Illinois 60601-9703
13  BY:   BRYCE A. COOPER, ESQ.
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
1   DR.  C A R L  G R I N D L E Y,   called as
2   a  witness, having affirmed to tell the truth,
3   was examined and testified as follows:
4   EXAMINATION
5   BY MR. KEENER:
6   Q.  Good morning.
7   A.  Good morning.
8   Q.  State your name for the record.
9   A.  My name is Carl James Grindley.
10  Q.  Where do you live?
11  A.  I live in the Bronx in New York City.
12  Q.  Have you ever been deposed before?
13  A.  I've never been deposed.
14  Q.  Since you've never been deposed, I'm
15  sure your counsel has kind of told you how this is
16  going to go but I'll lay some ground rules.
17      If at any time you don't understand one
18  of my questions, can you let me know?
19  A.  Yes, I can.
20  Q.  Since the court reporter is taking
21  everything down, can we try to avoid uh-huh,
22  huh-uh's, shakes of the heads, everything has to
23  be verbal so the transcript reads clearly.  Do you
24  understand?
```

5

1    A.   I do understand.
2    Q.   I'll try to arrange it so we can try
3  and take a short break every hour or so but if
4  there's any time you need a break before that,
5  this is not a torture test.  Just let me know you
6  need a break.  Is that fair?
7    A.   That is fair.
8    Q.   Is there any reason you can't give your
9  full and complete truthful testimony today?
10   A.   No, there's not.
11   Q.   Have you ever testified in court
12  before?
13   A.   No, I have not.
14   Q.   Have you ever been qualified as an
15  expert witness in court before?
16   A.   No, I have not.
17   Q.   Have you ever attempted to testify in
18  court but you were not allowed to testify for some
19  reason?
20   A.   No, I have not.
21   Q.   What did you do to prepare for your
22  deposition?
23   A.   To prepare for the deposition, I met
24  with Mr. Cooper.

6

1    Q.   Anyone else?
2    A.   No, one else.
3    Q.   And how many times did you meet with
4  Mr. Cooper?
5    A.   Once.
6    Q.   When was that?
7    A.   That would have been Tuesday.
8    Q.   And how long did you meet with
9  Mr. Cooper on Tuesday?
10   A.   I believe it was four hours and 40
11  minutes.
12   Q.   Did you review any documents during
13  that meeting?
14   A.   We reviewed -- we reviewed my expert
15  testimony.
16   Q.   You mean report?
17   A.   Yes, is that the technical -- yeah,
18  that would be the technical term.
19   Q.   Okay.  Anything else?
20   A.   No, I don't believe we did.
21   Q.   Besides meeting with Mr. Cooper on
22  Tuesday and taking a look at your expert report,
23  did you do anything else to prepare for the
24  deposition today?

7

1    A.   I read a previous deposition.
2    Q.   What deposition did you read?
3    A.   I cannot remember the name of the
4  person being deposed.
5    Q.   Do you know if it was a Games Workshop
6  person or a Chapterhouse person?
7    A.   I believe it was a Chapterhouse person.
8    Q.   While you can't remember the person's
9  name, do you remember anything about them that
10  would help me identify them?
11   A.   It was an expert witness.
12   Q.   Two prior expert witnesses, one was
13  called Mr. Brewster and another was Mr. Wolfe, do
14  either of those names --
15   A.   Mr. Wolfe.
16   Q.   When did you review Mr. Wolfe's
17  transcript?
18   A.   I believe it would be the night of
19  Tuesday.
20   Q.   What was the purpose of your review of
21  Mr. Wolfe's deposition?
22   A.   To familiarize myself with the way that
23  a deposition is conducted.
24   Q.   Do you understand that Mr. Wolfe made

8

1  expert opinions on topics similar to the ones that
2  you've opined on?
3        MR. COOPER:  Objection to the extent it
4  mischaracterizes his testimony.
5        THE WITNESS:  I don't actually think
6        that they are that similar.
7  BY MR. KEENER:
8    Q.   When you reviewed Mr. Wolfe's
9  transcript, did it influence your opinion in this
10  case?
11   A.   No, none whatsoever.
12   Q.   Did you disagree with anything
13  Mr. Wolfe said?
14   A.   I disagreed with him when he made the
15  occasional factual error, yes.
16   Q.   Any that come to mind?
17   A.   Yes, one.
18   Q.   Which one are you thinking of?
19   A.   He claimed that in Robert Heinlein's
20  novel the term "space marine" was used when indeed
21  it was not, and that was later pointed out to him
22  and he conceded that he had made an error.
23   Q.   Anything else you were thinking of?
24   A.   Not off the top of my head.  I was

9

1 merely scanning it for how a deposition is
2 conducted rather than the topic of that
3 deposition. So for example, when you instructed
4 me to avoid ums or ahs or saying uh-huh instead of
5 the word "yes," that's one of the things that I
6 picked up from reading the deposition, which is
7 why I'm attempting to speak clearly and wait for
8 you to finish speaking before I speak.
9     Q.  Thank you, I appreciate that.
10         Other than the factual error, is there
11 anything else you saw in Mr. Wolfe's transcript
12 that you disagreed with?
13     A.  I did not complete reading it. I
14 merely read it until I understood to the best of
15 my ability how a deposition is conducted. I
16 wasn't particularly interested in what Mr. Wolfe
17 had to opine about.
18     Q.  I understand you may not have finished
19 it and it may not have been your purpose for
20 reviewing it but through the review as far as you
21 got, did you notice anything about Mr. Wolfe's
22 testimony that you disagreed with other than the
23 factual error you pointed out?
24     A.  I would have to say that I did not

10

1 develop an opinion really beyond the space marine
2 issue on whether or not I agreed with Mr. Wolfe.
3     Q.  So you did not identify anything else
4 you disagreed with on Mr. Wolfe's testimony on
5 review?
6         MR. COOPER:  Objection, asked and
7 answered.
8         THE WITNESS:  It's the concept of the
9 word "identify." To me, if I were to conduct
10 analysis of Mr. Wolfe's report, I would have
11 to conduct research into Mr. Wolfe's report,
12 and since I did not, I would be uncomfortable
13 saying whether I agreed or disagreed with any
14 other particulars than the one item that I
15 suggested to you.
16 BY MR. KEENER:
17     Q.  Okay.
18     A.  If I were to review the report, then I
19 would be able to have an informed opinion on
20 whether or not I disagreed with other aspects of
21 it.
22     Q.  Okay. So as you sit here today, you're
23 not able to identify any aspects of Mr. Wolfe's
24 testimony you disagreed with other than that

11

1 factual error you mentioned?
2     A.  That's not exactly what I said. What I
3 said is I have not formed an opinion one way or
4 another regarding the details of Mr. Wolfe's
5 report, more than one item in passing.
6     Q.  I understand you would want to do a
7 more comprehensive investigation - --
8     A.  Right.
9     Q.  -- to analyze all the differences. My
10 question is a different question.
11         As you sit here, are you able to
12 identify any areas where you disagreed with
13 Mr. Wolfe based on the testimony you reviewed?
14         MR. COOPER:  Objection, asked and
15 answered.
16         THE WITNESS:  I'll answer that again.
17         Based on my cursory reading of
18 Mr. Wolfe's deposition, and with the
19 understanding that in order to formulate an
20 opinion on someone's work, I would have to
21 attempt to replicate its results, I did not
22 have the time nor inclination to replicate
23 said results so I am unable to an opinion
24 one way or another about Mr. Wolfe's

12

1 testimony.
2 BY MR. KEENER:
3     Q.  Right. So because you have no opinion
4 one way or the other, you do not as you sit here
5 right now are able to identify any areas of
6 disagreement?
7     A.  Or agreement.
8         (Plaintiff's Exhibit 189, document
9         entitled Exhibit C, marked for
10         identification.)
11 BY MR. KEENER:
12     Q.  I'm going to hand you what's been
13 marked Plaintiff's Exhibit 189. It is entitled
14 Exhibit C and it was attached to your report.
15     A.  I'm looking for my glasses. May I get
16 a tissue?
17     Q.  Of course.
18     A.  Thanks.
19     Q.  Do you recognize Exhibit C?
20     A.  Yes, this appears to be my CV.
21     Q.  Is this CV current?
22     A.  Let me check the latest publications.
23         Yes, it does appear to be current.
24     Q.  Does this CV accurately reflect your

13

1  career history?
2  A.  Yes, it does.
3  Q.  Are there any mistakes you're aware of?
4  A.  Not that I'm aware of.
5  Q.  You can put that aside.
6  Do you have any experience in
7  copyright?
8  A.  No, I do not.
9  Q.  So similarly, no experience in
10  copyright law?
11  A.  No, I do not.
12  Q.  Have you ever attempted to register any
13  copyrights at the copyright office?
14  A.  No, I have not.
15  Q.  Do you own any registered copyrights?
16  A.  I have no knowledge of copyright law so
17  I am not aware that I have any copyrights.  Are
18  you an expert in copyrights?
19  Q.  I'm sorry, the way this works is I --
20  A.  Right, I know.
21  Q.  -- ask the questions.  If you don't
22  know, the answer would be I don't know.
23  The question is:  Do you own any
24  registered copyrights?

14

1  A.  I actually don't know.
2  Q.  That's fair enough.
3  Do you have any experience in
4  trademarks?
5  A.  No, I do not.
6  Q.  Any experience in trademark law?
7  A.  No, I do not.
8  Q.  Have you ever attempted to register any
9  trademarks?
10  A.  No, I have not.
11  Q.  Do you, to your knowledge, own any
12  trademarks?
13  A.  Not to my knowledge, no.
14  Q.  Are you experienced in miniatures?
15  A.  Could you please define "experience"?
16  Q.  What experience do you have with
17  miniatures?
18  A.  The experience I have with miniatures
19  is their use as reference items during melee
20  combat in early editions of TSRS Dungeons &
21  Dragons when I was a teenager.
22  Q.  Any other experience in miniatures?
23  A.  I could expand on that earlier
24  experience.

15

1  Q.  We'll get into that.  Any other
2  experience you've had?
3  A.  None whatsoever.
4  Q.  And so your only experience with
5  miniatures is this experience you had with
6  Dungeons & Dragons when you were a teenager?
7  A.  Yes, it is.
8  Q.  And how long ago was that?
9  A.  33 years ago.  I believe that to be
10  correct, if my math is correct.
11  Q.  Okay.
12  A.  So that would be 1980.
13  Q.  And how old were you in 1980?
14  A.  I believe I was 14.  I'm pretty sure I
15  was 14.
16  Q.  And this experience in miniatures when
17  you were 14 years old, how long did it last?
18  A.  I would actually say that was the
19  terminal date would be 1980.
20  Q.  When did it begin?
21  A.  I would say either 1978 or 1979, so
22  perhaps two years, maybe three.  It's a long time
23  ago.
24  Q.  So about 12 years old to 14 years you

16

1  played Dungeons & Dragons and there was some
2  miniatures involved?
3  A.  That's correct.
4  Q.  And that's your entire experience with
5  miniatures?
6  A.  By involvement, I'm taking you to mean
7  actively participating in their use or collecting
8  or painting in a gaming situation.
9  Q.  Fair enough.  My question is attempting
10  to be broad.  Any experience you had with
11  miniatures.  I believe that's the only experience
12  you identified.  Are there other experiences
13  you're not listing for some reason?
14  A.  Well, it's due to my confusion over the
15  word "experience" so if, for example, I was
16  walking past a gaming store and looked through the
17  window and saw a display of miniatures, I would
18  not count that as being experienced.
19  Q.  Anything else you're excluding?
20  A.  No.
21  Q.  So besides passing by a store where
22  there might be a miniature on display, your only
23  experience based on any form of the word was your
24  12- to 14-year-old experience playing Dungeons &

17

1  Dragons where there was miniatures involved?
2  A.  Yes.
3  Q.  How many miniatures did you own, if you
4  recall?
5  A.  Due to the nature of the lead
6  miniatures of the late 1970s and early 1980s,
7  these items were very fragile and would frequently
8  break along say, for example, arm joints or where
9  the characters would hold weapons or their heads
10  or their legs on the bases, so I believe that I
11  may have owned a grand total of fewer than two
12  dozen but it's very difficult to say for sure
13  because of their lack of permanence as items.
14  They would break and be replaced and it's very
15  hard to say.
16  Q.  Are you able to identify what types of
17  miniatures these were?
18  A.  These were mostly fantasy miniatures.
19  I cannot remember the company that produced them.
20  And I believe they were designed for use with the
21  Dungeons & Dragons products.
22  Q.  Were they humans or monsters or both?
23  A.  I'm having a very difficult time
24  remembering.  I would have to say that they were

18

1  probably a combination of humans and monsters in
2  various numbers to facilitate their use on a
3  tabletop grid to determine, you know, positions
4  during melees.
5  Q.  Are you relying on any of your
6  experience with those miniatures to form the basis
7  of any of the opinions you made in this case?
8  A.  One aspect, yes.
9  Q.  And what is that?
10  A.  The fragility of the lead pieces
11  necessitating a change in scale of the components
12  of the figures.
13  Q.  Did you experience any change in scale
14  in the miniatures you bought?
15  A.  I did not experience a change in scale.
16  What I did was I noticed an unrealistic nature of
17  the scale of the miniatures.
18  Q.  So the miniatures you used when you
19  were a young teenager had unrealistic scale?
20  A.  This scale was out of proportion with
21  what a human being would be.  Parts would be
22  thicker.  Weapons, for example, would be much,
23  much larger than they ever would be in real life.
24  It was a different scale.  I believe, although I

19

1  don't know for sure, I believe that it was
2  probably to stop these pieces from being so easily
3  broken which I said was a problem with them.
4  Q.  But you don't know if that was a reason
5  they were designed that way?
6  A.  No, I was 14 years old so I had no
7  access with the designers of the pieces.
8  Q.  Other than large weapons, was anything
9  else out of proportion?
10  A.  Body parts, arms, to some degree legs,
11  just because of the fragile nature of the lead.  I
12  don't even know if these things are made out of
13  lead anymore.  The exhibits I've seen seem to be
14  made out of some plastic resin but back in the
15  day, I believe it was lead.
16  Q.  And do you have any experience whether
17  the plastic resin has the same fragility problem?
18  A.  None whatsoever.
19  Q.  So you have no idea whether these
20  current models have any need for this larger scale
21  to solve what you perceived was this fragility
22  issue?
23  A.  I have no knowledge.  I have never
24  handled one of the resin models.

20

1  Q.  You never handled any of the models at
2  issue in this case?
3  A.  I have never physically handled them,
4  no, which is why when I answered the question
5  about experience, I asked if that included walking
6  past window displays, and even with the notion of
7  walking past window displays, I did not know, for
8  example, until seeing the exhibits that these
9  indeed were resin.  I had assumed they were also
10  lead.
11  Q.  Am I correct that none of these
12  miniatures you had were futuristic?
13  A.  That's something I do not remember.  I
14  remember in the 1970s, perhaps 1980 at the latest,
15  purchasing the Traveller box of six gaming manuals
16  and I may or may not have purchased some Traveller
17  miniatures but I simply do not remember.
18  Q.  As you do not remember, you are not
19  basing any of your experience opinions in your
20  report based on those miniatures?
21  A.  No, I am not.
22  Q.  So to the extent you can remember, none
23  of them were futuristic?
24  A.  From the miniatures I can remember,

21

1    none were futuristic.
2        Q.   None of them had guns?
3        A.   I don't believe so because in the first
4    edition of Dungeons & Dragons, I don't believe
5    there were any firearms listed but I couldn't tell
6    you for a fact because it's been a long time.
7        Q.   None of them were robots?
8        A.   None of them were robots.
9        Q.   None of them had spacesuits on?
10       A.   Not per se, no.
11       Q.   Do you know if any of them had shoulder
12   pads?
13       A.   I would imagine that any of the armed
14   figures would have, yes.
15       Q.   Do you know as you sit today what
16   any of those shoulder pads looked like?
17       A.   I'm sorry, I do not.  It was a very
18   long time ago and I do not remember.
19       Q.   What were the size of those shoulder
20   pads?
21       A.   I cannot recall.
22       Q.   So I appreciate your last experience
23   with miniatures was over 30 years ago but I just
24   want to make sure I understand that the only thing

22

1    you're relying upon based on your own personal
2    experience with miniatures was your experience
3    that certain lead models were fragile and your
4    inference why they made some aspects bigger.
5        A.   Yes, that is the correct
6    characterization.
7        Q.   And that's the only experience you're
8    drawing from your experience with miniatures?
9        A.   From 33 years ago.  Actually let me
10   stop for a second and say that the other aspect of
11   miniature use that I would say that I at least
12   kept in my mind was that when these items were
13   purchased from a gaming store, they are in an
14   unpainted state.
15       Q.   Anything else you're relying upon from
16   your personal experience with miniatures for
17   purposes of this case?
18       A.   I believe that to be the case, although
19   there may be other aspects that I have sublimated
20   into my unconscious knowledge.
21       Q.   But nothing you can identify now?
22       A.   Nothing that I can consciously
23   identify.
24       Q.   All I can ask is what you consciously

23

1    identified.  You understand that?
2        A.   I understand.
3        Q.   Do you have any experience in Warhammer
4    40K?
5        A.   None whatsoever.
6        Q.   Any experience with any Games Workshop
7    products?
8        A.   I think in order to answer that
9    question fully, I would need to see a list of all
10   Games Workshop games.  I do not believe so.
11       Q.   So as you sit here today, you cannot
12   identify any products you understand to be Games
13   Workshop products that you have experience in?
14       A.   No, I cannot.
15       Q.   Do you have any experience in miniature
16   wargaming?
17       A.   No, I do not.
18       Q.   Except for this period of time when you
19   were 12 to 14 years old, do you have any
20   experience with modeling in any aspect?
21       A.   Could you please expand on what you
22   mean by "modelling"?
23       Q.   Sure.  It could be assembling,
24   sculpting, painting, collecting, and we can go

24

1    into exactly what experience you have but first
2    just broad, do you have any experience in
3    modeling?
4        A.   I teach sophomore art history at the
5    university level so I know something about
6    sculpting and painting, but by modeling I'm
7    assuming you mean in a hobbyist sense, not in a
8    fine art sense?
9        Q.   Yes.
10       A.   I do not have any experience in
11   modelling in a hobbyist sense.
12       Q.   Do you consider yourself an expert in
13   miniatures?
14       A.   No, I do not.
15       Q.   Do you consider yourself an expert in
16   Warhammer 40K?
17       A.   No.
18       Q.   Do you consider yourself an expert in
19   wargaming?
20       A.   No, I do not.
21       Q.   Do you consider yourself an expert
22   modeling in the hobbyist sense?
23       A.   No, I do not.
24       Q.   Have you ever been retained as an

25

1  expert by anyone for any purpose?

2  A.  No, I have not.

3  Q.  When were you first contacted in

4  relation to this case?

5  A.  I believe it was in December of 2012,

6  although I'm not precisely sure because I was in

7  the process of moving from Connecticut to

8  New York City.

9  Q.  Do you know who contacted you?

10  A.  I believe it was Mr. Cooper, although

11  it could have been Mr. Keany?

12  Q.  You mean Kearney?

13  A.  Kearney, sorry.

14  Q.  What was the substance of that

15  conversation?

16  DI    MR. COOPER:  I'll instruct the witness

17  not to divulge anything that we'd -- actually

18  I'm going to instruct the witness not to

19  answer that question as phrased.

20  MR. KEENER:  Are you claiming discusses

21  you had with the expert are somehow

22  privileged?

23  MR. COOPER:  To the extent that I

24  revealed any of my -- any of counsel's legal

26

1  opinions on the case, to the extent --

2  MR. KEENER:  Are you suggesting

3  revealing legal opinions to an expert witness

4  you've retained to prepare an expert report

5  somehow keeps the privilege?

6  MR. COOPER:  I am that saying you can

7  reveal any facts about the case that I told

8  you.

9  MR. KEENER:  Counsel, are you saying

10  things you told to your retained expert remain

11  privileged?

12  MR. COOPER:  Yes, rephrase your

13  question though.

14  MR. KEENER:  You're saying discussions

15  you had with him in preparation for an expert

16  report are privileged?

17  MR. COOPER:  I'm not going to say it

18  that broadly.  If you're asking for facts --

19  MR. KEENER:  No, I'm asking

20  communications, the substance of his

21  conversations with counsel, and he's your

22  expert witness, you're saying those substance

23  of communications are privileged?

24  MR. COOPER:  No, I'm saying he can

27

1  answer that question to the extent he's

2  answering it and giving the facts of the case

3  as I have given him.

4  MR. KEENER:  So you're instructing him

5  to not answer for some purposes of privilege

6  here?

7  MR. COOPER:  I don't understand your

8  question, what you're looking for.

9  BY MR. KEENER:

10  Q.  My question is:  What do you recall

11  that conversation being?

12  A.  I recall a very basic conversation

13  where I was simply asked if I would be willing to

14  be an expert witness.  I do not believe I was told

15  any substantive details about anything to do with

16  the case other than would you be willing to serve

17  as an expert witness in the field of popular

18  culture and medievalisms.

19  I believe that was probably less than a

20  five-minute conversation but I was not told in

21  that initial conversation even the names of the

22  companies involved in this lawsuit.

23  Q.  At some point, did you later have a

24  more substantive conversation about the issues in

28

1  this case?

2  A.  Could you please tell me what you mean

3  by substantive issues?

4  Q.  You referred to the first call as not

5  getting into substance at all.

6  A.  Right.

7  Q.  Did you have a later call where you did

8  get into the substance?

9  A.  I think I may have inadvertently used a

10  legal term when I used "substantive."

11  Q.  I'm not using it in the legal sense.

12  I'm using it in the sense you used.

13  A.  I believe I was given the details

14  perhaps a week later.

15  Q.  What were you told?

16  A.  That Games Workshop was suing, I guess

17  is the correct word, Chapterhouse for -- I don't

18  know what the correct terminology is to use.

19  Would I say copyright infringement or

20  intellectual -- what would I say?

21  Q.  I'm asking what you were told, so what

22  were you told?

23  A.  I condensed that conversation in my

24  head so I could not recall word for word what was

29

```
1   spoken but I would say that -- now I'm trying to
2   think of what actually was -- I believe I was told
3   that Games Workshop was suing Chapterhouse over
4   copyright infringements over certain of their
5   products and would I be willing to examine the --
6   I don't know the name of the document, some
7   document that Games Workshop had produced with I
8   believe two columns, one of which was their
9   product and one of which was the Chapterhouse
10  product.
11          I wasn't really given any instructions
12  on how to conduct any research or what sort of
13  findings I was going to come up with or anything
14  like that.
15     Q.   Other than being told that Games
16  Workshop was suing Chapterhouse about certain
17  products, were you told anything else about the
18  case?
19     A.   I believe I was told that it had been
20  going on for some time.
21     Q.   Anything else?
22     A.   I think that was it.  It was kind of a
23  crazy time in my life because I was undergoing
24  this move, I had just gotten divorced yet again,
```

30

```
1   or in the process of getting divorced, so my
2   memory of those events is a little hazy.
3      Q.   Do you have any understanding on why
4   you were asked to take a look at that document?
5      A.   No, and I've actually never asked and
6   I'm kind of curious myself on how they actually
7   came up with my name.  I can only assume that it
8   must have been someone else in the scholarly
9   community must have recommended me.
10     Q.   Let me rephrase the question.
11          Do you have any understanding on what
12  the purpose of your review of that chart was?
13     A.   The purpose of my review of that chart
14  was to provide an expert opinion on whether or not
15  there were substantial similarities between the
16  two products and also to determine if there were
17  any even insignificant similarities, what the
18  origin point either in the distant past or in
19  popular culture would be.
20     Q.   Any other purpose?
21     A.   No, I believe that to be it.
22     Q.   So if I understand, I think you said
23  there were two purposes, one, to identify what
24  substantial similarities there were between the
```

31

```
1   Games Workshop products and the Chapterhouse
2   products, and two, to identify for any significant
3   similarities what origins those similarities might
4   have come from.
5      A.   That's not what I said.  I believe I
6   said that to see -- I would compare the two lines
7   of products or two columns to see if there were
8   significant similarities.
9      Q.   Okay.  So let me try again.
10          The purpose of your review was twofold,
11  one, to identify any significant similarities
12  between the Games Workshop product and the
13  Chapterhouse product, and two, for any
14  similarities you found to trace the potential
15  origin?
16     A.   Again, that's not how I phrased it.
17  The way you phrased it implies that there would be
18  significant similarities to find, whereas, the way
19  I phrased it was neutral, that I was examining it
20  to see if there were any or not.
21     Q.   Let me try again then.
22     A.   Okay.
23     Q.   The purpose of the review of the chart
24  was twofold, first, to identify, if any,
```

32

```
1   substantial similarities between the Games
2   Workshop product and the Chapterhouse product, and
3   two, if you found any similarities, to trace the
4   potential origin for those similarities?
5      A.   Yes, that's correct.
6          (Plaintiff's Exhibit 190, Expert Report
7      of Dr. Carl James Grindley, marked for
8      identification.)
9   BY MR. KEENER:
10     Q.   I'm handing you what's been marked
11  Plaintiff's Exhibit 190.
12     A.   Thank you.
13     Q.   And Exhibit 190 is entitled Expert
14  Report of Dr. Carl James Grindley?
15     A.   Grindley.
16     Q.   I apologize.  Is that your expert
17  report in this case?
18     A.   Yes, it is.
19     Q.   Can you describe to me the mechanics of
20  how this document was created?
21     A.   This document underwent a drafting
22  process of approximately a month and approximately
23  a hundred to 120 hours of my time.
24     Q.   When did you first begin drafting it?
```

33

1    A.    Approximately a month ago.
2    Q.    So if today is February 20th [sic], you
3  think you started around January 20th?
4    A.    No, because the drafting process of
5  this was completed, I guess some weeks ago, this
6  had to be produced prior to discovery or through
7  the process of discovery.
8    Q.    So when do you think you first began
9  working on it?
10    A.    I cannot recall when this item was
11  given to you.
12    Q.    If we look at the last page, it's got
13  your signature next to February 1 --
14    A.    There you have it, so January 1st --
15    Q.    I appreciate you know the answer, but
16  for the court reporter's sake --
17    A.    I'm sorry.
18    Q.    -- if you let me finish before you
19  answer, it will be a lot easier for everybody.
20    A.    I'm sorry, I'm trying very hard to be
21  good.
22    Q.    So seeing that you signed it on
23  February 1, 2013, about when do you think you
24  began drafting this document?

34

1    A.    One month earlier, January 1st.  And by
2  drafting, I'm assuming you mean physically writing
3  it rather than looking at different charts and
4  doing preliminary research.
5    Q.    Is all the text in here your own words?
6    A.    I decided what text would be in this
7  report.
8    Q.    Well, okay, understood.  You could have
9  seen a report written by someone else and said I
10  like those words and signed your name.  That's one
11  way, or you could have typed the words or it could
12  be a combination of the two.
13    A.    There was a drafting process.
14    Q.    Explain the drafting process.
15    A.    The drafting process would be me
16  drafting a response, providing that draft to the
17  Chapterhouse Studios counsel and then putting it
18  in correct format for an expert report.
19    Q.    Other than formatting changes, is the
20  text here all yours?
21    A.    The text is mine in that the final
22  approval of the text is mine.  There may be the
23  occasional item of legalese, for example, the word
24  opine where Chapterhouse Studios' counsel made the

35

1  editorial suggestion.
2    Q.    Other than format and a word of
3  legalese here and there, my question focuses on
4  are there any sections of the report for which you
5  didn't draft that section, although you might have
6  approved it, somebody else drafted that section?
7    A.    No.
8    Q.    So you drafted all the sections in this
9  report?
10    MR. COOPER:  Objection, asked and
11  answered.
12    THE WITNESS:  Yes.
13  BY MR. KEENER:
14    Q.    Looking at paragraph 57, which is on
15  the last page, the heading is Compensation.
16    A.    Uh-huh.
17    Q.    You have typed in, "I have provided my
18  services as an expert witness pro bono in this
19  case.  I am being reimbursed for any costs and
20  expenses I incur." Is that correct?
21    A.    Yes, it is correct.
22    Q.    Why did you agree to provide your
23  services pro bono in this case?
24    A.    Providing community service in one's

36

1  area of scholarly expertise is a traditional
2  responsibility of the professoriate and that is
3  why I was doing this.
4    Q.    Out of the many potential areas of
5  community service, why did you choose this one?
6    A.    That's a difficult question to answer
7  because there actually are not that many areas of
8  community service for faculty members to conduct
9  outside of the actual context of the university or
10  college system.
11    So for example, to a lay person,
12  community service might be volunteering on an aids
13  walk.  In terms of academic community service,
14  that would not be relevant.  Community service has
15  to be tied with one's area of scholarly expertise,
16  so this was an example for me to have a more
17  relevant participatory experience providing what I
18  would consider to be community service that is
19  directly tied to my areas of study.
20    Q.    And I think you said earlier that you
21  spent about a hundred or 120 hours so far in this
22  case; is that right?
23    A.    I would say that is a reasonable
24  estimate.  Since I am not being -- since I am not

37

1    receiving remuneration for these services, I did
2    not keep a log sheet of my time but over the years
3    I have become reasonably good at estimating how
4    much time I have spent on research projects so my
5    estimate is about a hundred to 120 hours.
6        Q.   And that would have been mostly in the
7    time period of when you were first contacted in
8    December through signing this report on February
9    1st?
10       A.   Yes.
11       Q.   So over a four- to six-week period?
12       A.   Yes.  At the City University of
13   New York, faculty enjoy an extended winter break
14   from the end of examinations in mid December until
15   the end of the month of January so I was able to
16   dedicate a large portion of my time to do this
17   work.
18       Q.   Do you think you were spending maybe
19   upwards of 30 hours a week that whole period in
20   January?
21       A.   No, because this would also include
22   half of December.
23       Q.   So maybe 20 hours a week?
24       A.   Yes.

38

1        Q.   And if I understand what you said, you
2    haven't been paid in any way?
3        A.   No, I have not, nor have I filed for
4    reimbursement for any costs or expenses I have
5    incurred.
6        Q.   How much in cost and expenses have you
7    incurred?
8        A.   I believe about $55.
9        Q.   And what were those expenses for?
10       A.   Obtaining PDFs of the original
11   Traveller books that I'd possessed back in -- I
12   believe I said 1980 or so, and a PDF of the
13   collected issues of the Travellers Aid Society
14   Journal.  I considered the $55 to be a trivial
15   amount of money so I did not bother.
16       Q.   Now, I asked you before what the
17   purpose of your assignment -- what your assignment
18   was and you mentioned two items, and the first
19   item was comparing the Games Workshop products to
20   the Chapterhouse products to look for things that
21   were similar.  Do you recall that?
22       A.   Yes, I do.
23       Q.   Now, looking at your report, if you
24   look at paragraph 1, about halfway down the line

39

1    that says "Specifically," and it reads,
2    "Specifically, I have been asked to opine on
3    whether elements of the Games Workshop new
4    allegedly infringed works can be found in or are
5    derived from preexisting works from historical,
6    medieval, cinematic, or science fiction sources."
7        Do you see that?
8        A.   Yes, I do.
9        Q.   Is that what you were asked to opine
10   on?
11       A.   Yes, I believe that's just another
12   way of wording the second part of my initial
13   response.
14       Q.   Right.  Where do I find in your report
15   analysis of the first part, a comparison of the
16   Games Workshop to Chapterhouse products for
17   similarities?
18       A.   You find that throughout not only the
19   fabric of the report but also through the --
20   through the fabric of the report.
21       MR. COOPER:  Also for the record, this
22   is not the entire report.
23       THE WITNESS:  I'm looking for the
24   tables.

40

1    BY MR. KEENER:
2        Q.   Exhibit 190 is your entire report
3    except for the exhibits; is that correct?
4        A.   Yes, I believe that to be so.  I don't
5    know how these exhibits are numbered or classified
6    by either counsel so I'm not really competent to
7    give an opinion on how these exhibits were
8    structured.
9        Q.   But the text of your report is all
10   here; you're referring to the charts that aren't
11   here that we'll get to a little bit later?
12       A.   Yes, except that I would also call the
13   charts text.
14       Q.   Okay.  The numbered paragraphs that you
15   sign your name at the end are all here; you're not
16   disputing any are missing?
17       A.   No, I'm not.
18       Q.   Anywhere in the text of your report
19   that are your numbered paragraphs, do you mention
20   any Chapterhouse products?
21       A.   Well, let's take a read at it.
22       (Witness perusing document.)
23       I would say -- and this is only based
24   on a cursory account but approximately one-third

41

1  of the pages in this report reference both
2  Chapterhouse products and Games Workshop products
3  as indexed in the tabular document.
4      Q.  Okay.  I'm excluding the chart right
5  now.  In the text of the your report, paragraphs 1
6  through 59, do you discuss any Chapterhouse
7  product anywhere because I don't see it anywhere
8  discussed?
9      A.  Let me point out some examples to you.
10  For example, the top of page 8, see for example
11  Exhibit B at product entries number 126, 137 to
12  141, 146 to 157, and 163.
13      Q.  So when you're referring to Exhibit B,
14  that's your chart?
15      A.  Yes.
16      Q.  And that product entry would have a
17  Chapterhouse product, a Games Workshop product and
18  some prior works that you found?
19      A.  Yes.
20      Q.  Anywhere in your report do you discuss
21  a Chapterhouse product and a Games Workshop
22  product and what similarities you identified
23  between the two?
24      A.  I don't believe I ever identified any

42

1  significant similarities between the two products.
2      Q.  Okay.  So you've testified that --
3      A.  Or two sets of products rather, sorry.
4      Q.  You testified that one of your purposes
5  was to review the Chapterhouse products and the
6  Games Workshop products and identify any
7  similarities between the two, correct?
8      A.  Correct.
9      Q.  And it's your expert testimony you were
10  not able to identify any similarities between the
11  two products?
12      A.  I was not able to identify any
13  significant similarities.
14      Q.  Okay.  Did you identify any
15  similarities between the two products?
16      A.  I identified insignificant or minor
17  similarities.
18      Q.  Let's start back again.
19          Did you identify any similarities?
20      A.  I think we would have to go over the
21  chart --
22      Q.  I'm --
23      A.  -- item by item to see that.
24      Q.  We're going to do that later.  I'm

43

1  trying to get a simple answer.
2          You said your first job was to identify
3  any similarities between the Games Workshop
4  products and the Chapterhouse products.  Did you
5  identify any similarities?
6      A.  (Witness perusing document.)
7          It's a very difficult question to
8  answer in that certain paragraphs, for example,
9  paragraph 31, I believe textually speaking would
10  by necessity include Exhibit B into the body of
11  whatever this exhibit has been called.
12      Q.  Okay.  My question is just first -- I'm
13  trying to ask a simple yes or no question.
14          Your first assignment was to identify
15  any similarities between the Games Workshop
16  products and the Chapterhouse products.  Did you
17  identify any similarities?
18      A.  Yes, I believe I did.
19      Q.  Did you attempt to list anywhere all
20  the similarities you identified between the two
21  sets of products?
22      A.  I think the best way to conceptualize
23  the process of identification was -- or is to
24  consider that after seeing a resemblance, to

44

1  continue sort of examining that resemblance to see
2  if that resemblance itself was due to borrowing
3  from one company's works to another or whether
4  that resemblance was due to another factor, and in
5  each of the situations where I found resemblances
6  and then proceeded to the next step of inquiry, I
7  always determined that the resemblances were due
8  to prior works in terms of history.
9      Q.  Okay.  I think you you've answered a
10  later question I'm going to ask.
11      A.  I'm having a difficult time, sorry,
12  with how to --
13      Q.  I think we've established you compared
14  the two sets of products.
15      A.  Yes.
16      Q.  And you found some similarities?
17      A.  Yes.
18      Q.  Did you attempt anywhere to list the
19  similarities you found?  And that should be a yes
20  or no.
21          MR. COOPER:  Object to form.
22          THE WITNESS:  Again, I'm not entirely
23  sure how to answer that.  I don't know if that
24  question can be answered in a yes or no

45

1 manner.
2 BY MR. KEENER:
3    Q.  Anywhere in your report or in the
4 charts that you attach to it do you say here are
5 the similarities between Chapterhouse and Games
6 Workshop products for this product one, two,
7 three, for this product one, two, anything like
8 that where you attempt to identify the
9 similarities you saw between the two products?
10    MR. COOPER:  I'll note that
11 Dr. Grindley hasn't been given the chart to
12 look at.
13    THE WITNESS:  I would have to see the
14 chart.
15    (Plaintiff's Exhibit 191, document
16 entitled Exhibit B, marked for
17 identification.)
18 BY MR. KEENER:
19    Q.  I will hand you what's been marked
20 Plaintiff's Exhibit 191, which is Exhibit B to
21 your report to this deposition, the chart to which
22 you're referring to.
23    And the question pending right now is:
24 Is this the chart you were referring to?

46

1    A.  Yes, it is indeed.
2    Q.  Let's look at the first entry, product
3 124.  It starts on page 2.  Do you see that?
4    A.  Yes, I do.
5    Q.  The first column is the Chapterhouse
6 product, do you agree?
7    A.  No, I don't.
8    Q.  You don't believe the first product is
9 a Chapterhouse product?
10    A.  No, I do not.
11    Q.  Why is that?
12    A.  Because it isn't.
13    Q.  Okay.  It's understand the list is
14 saying Chapterhouse Accused Products; is that
15 right?
16    A.  Yes, that is correct.
17    Q.  What do you understand to be the
18 Chapterhouse accused product for entry 124?
19    A.  For entry 124, I understand the
20 Chapterhouse accused product to be an unpainted
21 resin conversion kit containing 12 torsos, 12
22 legs, 12 heads, 12 backpacks and 12 bases.
23    Q.  Okay.
24    A.  So the image shown is not a

47

1 Chapterhouse product.
2    Q.  Right.  It's those pieces combined with
3 arms and weapons?
4    A.  And painted.
5    Q.  And painted?
6    A.  Yes.
7    Q.  Okay.  But --
8    A.  So I do not actually see an image of
9 the Chapterhouse Studios product under 124.
10    Q.  You do see the torso, legs, heads and
11 backpacks in the pictures under 124, right, as
12 part of the painted models or unpainted models?
13    A.  Considering that there are 12 of each,
14 I only see what appears to be one.
15    Q.  Okay.  So you see at least some of the
16 Chapterhouse products in 124 here?
17    A.  I think that would depend on how you're
18 defining "some."
19    Q.  Did you ask anyone to see all of
20 Chapterhouse's product for their Abbithan woman?
21    A.  No, that wasn't what I was asked to do.
22    Q.  Under the second column, do you
23 understand that to be Games Workshop's products?
24    A.  I understand it to be painted versions

48

1 of Games Workshop products as I believe Games
2 Workshop products are unpainted and not assembled
3 when people purchase them.
4    Q.  Okay.  Down --
5    A.  Judging from a later exhibit, which
6 number I can't recall, I believe Games Workshop
7 products like Chapterhouse products perhaps come
8 in an unassembled state on some sort of plastic
9 injection molded wire frame.
10    Q.  Do you have any idea whether Games
11 Workshop displays them as painted and assembled on
12 its website?
13    A.  I've never been to Games Workshop
14 website.
15    Q.  For product 124, did you conduct any
16 comparison of the Chapterhouse product and the
17 Games Workshop product to look for similarities?
18    A.  Yes.
19    Q.  Did you identify any similarities?
20    A.  No.
21    Q.  Significant or insignificant or
22 otherwise, you saw no similarities between the
23 Chapterhouse products and the Games Workshop
24 product for 124?

49

1     A.   There is an insignificant similarity in
2  that they both represent future soldiers but the
3  Chapterhouse products are female and the Games
4  Workshop products are male.
5     Q.   And I think you're going on to the next
6  question.
7          My question is:  Did you identify any
8  similarities when comparing those two products?
9     A.   Only an insignificant similarity that
10  they are both future soldiers.
11     Q.   And that's the only similarity you
12  identify?
13     A.   Yes.
14     Q.   And we know that's the only similarity
15  you identified because in the third column, you
16  say the common representation of near future
17  infantry soldiers?
18     A.   Yes.
19     Q.   And so using this chart, we can
20  identify any similarities, whether insignificant
21  or not, you saw between the two products by
22  looking at your third column?
23     A.   I think you'd have to define "we."
24     Q.   Can someone, whether it's me or the

50

1  jury or someone else, someone other than you who
2  wrote the report, identify what similarities you
3  saw between the Chapterhouse products and Games
4  Workshop products through analysis of your third
5  column?
6     A.   I believe they could.
7     Q.   And that would identify all the
8  similarities you saw between the two products?
9     A.   I believe so.
10     Q.   You didn't leave any off?
11     A.   No, I don't think so.
12     Q.   For example, if you thought the helmet
13  from the Chapterhouse product was similar to the
14  helmet in the Games Workshop product, you would
15  have noted that in the third column?
16          MR. COOPER:  Objection, form.
17          THE WITNESS:  Could you restate that
18  again?
19  BY MR. KEENER:
20     Q.   I'm trying to understand your process
21  so I can identify what similarities you found.
22     A.   Definitely.
23     Q.   So an example I'm giving, I'm not
24  saying that you saw a similarity or not but if you

51

1  saw a similarity in, for example, in the helmets,
2  you would have noted that similarity in the third
3  column then and discussed whether or not it is a
4  significant or insignificant similarity?
5     A.   In your hypothetical question, it's a
6  difficult one to answer because there may be a set
7  of insignificant similarities that are common to a
8  given -- say, for example, science fiction type.
9  So if there were major similarities that could be
10  explained from preexisting materials, then yes, I
11  would say so in the third column.  If there were
12  insignificant similarities that originated in a
13  common point, I would not list every insignificant
14  similarity.
15          Does that answer your question?
16     Q.   I think so, and I think it's different
17  than what you told me before.
18          I think before you said any similarity
19  you saw between the two you would put in the third
20  column, and now I think you're saying if it was a
21  significant similarity you would put it in the
22  third column, if it was an insignificant
23  similarity you did not list it.  Is that correct?
24     A.   No, that's not correct either.

52

1     Q.   You said that you've identified
2  similarities between the products?
3     A.   Yes.
4     Q.   And some you treated significant and
5  some you believe are insignificant?
6     A.   Yes.
7     Q.   And I'm trying to find out where I
8  would find a listing of what similarities you saw,
9  and I think you pointed me to this third column?
10     A.   Yes, I did.
11     Q.   Am I missing anywhere elsewhere you've
12  identified the similarities?
13     A.   No.
14     Q.   Does this third column contain the
15  significant similarities and the insignificant
16  similarities you saw?
17     A.   The third column contains an overall
18  analysis of the significant similarities claimed
19  by Games Workshop.  They do not list any
20  additional similarities not claimed by Games
21  Workshop.
22     Q.   Okay.  So now the third column is only
23  the significant similarities claimed by Games
24  Workshop?

53

1    A.   No, it is not.

2    Q.   Okay.  Let's try this again.

3    A.   Okay.

4    Q.   You compared the Chapterhouse product

5    to the Games Workshop product and identified

6    similarities, and the only place that you discuss

7    those similarities is in column 3 of Exhibit 191.

8    Correct so far?

9    A.   No, that's not correct either.

10   Q.   Where else do you identify the

11   similarities?

12   A.   Through the body of the expert report

13   on approximately a third of the pages with the

14   references to this document.

15   Q.   Right, we've discussed before in your

16   report the only time you discuss the similarities

17   between the Games Workshop and the Chapterhouse is

18   through reference to this chart, correct?

19   A.   Not only reference to it but

20   interpretation and discussion of the overall

21   issues raised by it.

22   Q.   Okay.  Where do I find a listing of the

23   similarities you found between the two products?

24   A.   The similarities between the two

54

1    products will be listed in that third column but

2    not in an explicit list format.

3        For example, when I say the basic

4    figure created by Games Workshop is a combination

5    of near future infantry soldiers from preexisting

6    work, this is a blanket statement of significant

7    similarities.

8    Q.   How do I understand which similarities

9    you're putting under that category?

10   A.   I don't have any idea how you

11   understand things.

12   Q.   Is there any way for me or a jury to

13   understand what similarities you identified in

14   column 3 for that?

15   A.   Yes, by reading the entry.

16   Q.   Other than future infantry soldiers,

17   you said that was a broad category?

18   A.   Yes.

19   Q.   That could include a whole number of

20   smaller similarities?

21   A.   Yes.

22   Q.   How does one reading this report such

23   as a jury identify what similarities you are

24   including in that broad category?

55

1    A.   I think that's asking for me to try and

2    figure out how.

3    Q.   Did you attempt to provide any

4    information that would assist a jury in

5    identifying what similarities you saw?

6    A.   The chart.

7    Q.   We areally said the chart only says

8    future infantry soldiers is a similarity, and you

9    said that encompasses a number of similarities?

10   A.   Correct.

11   Q.   Did you attempt in any way to identify

12   what those number of similarities were?

13   A.   I felt that was irrelevant.

14   Q.   So there's no way for anyone reading

15   the report, including the chart, to see which

16   similarities you saw between Chapterhouse's future

17   infantry soldier and Games Workshop's futuristic

18   soldier?

19       MR. COOPER:  You could ask him.

20       THE WITNESS:  I'm not really getting

21   this question, I'm sorry.

22   BY MR. KEENER:

23   Q.   My question is someone taking your

24   report and reading it and taking your chart and

56

1    reading that, is there any way for them to

2    identify or understand what similarities you saw

3    between Chapterhouse's future infantry soldier and

4    Games Workshop's infantry shoulder?

5    A.   They could ask me.

6    Q.   Is there any way for the jury to take

7    your report and your charts attached to it and

8    identify what similarities you saw between the

9    Chapterhouse future infantry soldier and the Games

10   Workshop future infantry soldier?

11       MR. COOPER:  Objection, asked and

12   answered.

13       THE WITNESS:  I believe that any

14   reasonable person could infer what those

15   similarities would be through an examination

16   of that third column's text.

17   BY MR. KEENER:

18   Q.   Okay.

19   A.   I do not believe that a reasonable

20   person would need to have the listed minutia of

21   similarities.

22   Q.   For example, is there any way from

23   reading your report in your exhibit whether you

24   thought the hats were similar?

57

1    A.   The helmet is part of a soldier's
2  uniform, and I discuss a common representation of
3  future infantry soldiers, then I would suggest,
4  yes, that could be inferred.
5    Q.   So the jury using the report and your
6  chart can infer that you believe the hats were
7  similar between the two?
8    A.   It's a very difficult question to
9  answer.
10    Q.   That's why I'm trying to figure out
11  what similarities you found.  Other than both
12  being futuristic infantry soldiers, is it the
13  hats, the boots, the shoes, the legs, what
14  similarities you identified, and you then went on
15  to try and find them in a prior work.
16       Do you understand what I'm trying to
17  figure out?
18    A.   I do.
19    Q.   Based on your report and your chart, is
20  there any way for me and a jury to find out what
21  similarities you identified between these two
22  infantry soldiers?
23    A.   I believe the logical fallacy is going
24  on. I believe this is a reductio ad absurdum in

58

1  that at what point do we therefore say that we do
2  not find insignificant similarities?  For example,
3  to go into that level of detail, it would
4  presuppose I would go into a further level of
5  detail in suggesting that both figures appear to
6  be wearing fabric or that both figures appear to
7  be wearing boots and that these boots have soles
8  or that these boots have laces, so I believe that
9  this question is not something that rationally can
10  be answered.  That's why I'm having difficulty
11  answering it.
12    Q.   So you cannot rationally answer the
13  question what similarities you see between
14  Chapterhouse's future infantry soldiers and Games
15  Workshop's infantry soldiers?
16    A.   I'm not saying I can't answer it.  I'm
17  saying no one can.  I believe the question to be
18  irrational.  I'm saying it's not irrational in
19  crazy irrational, not containing reason.
20    Q.   It would be irrational for you to
21  attempt to list the similarities you saw between
22  the two products?
23    A.   It would be irrational for someone to
24  list every significant layer of insignificant

59

1  similarity between two items of any description,
2  once an overall point of origin is determined.
3    Q.   Okay.  So once you determined that they
4  are both future infantry soldiers, you didn't go
5  any further to look at the similarities between
6  the two infantry soldiers?
7    A.   Correct.
8    Q.   Why is that?
9    A.   I just explained why.
10    Q.   Because once they are both infantry
11  soldiers, everything else is insignificant?
12       MR. COOPER:  Objection to the extent it
13    mischaracterizes testimony.
14       THE WITNESS:  No.
15  BY MR. KEENER:
16    Q.   Okay.
17    A.   To the extent that once someone has
18  identified a common source for the imagery, then
19  going through every layer of insignificant detail
20  merely leads to an even more insignificant layer
21  of detail and the resulting endeavor become
22  impractical and never ending.
23    Q.   So other than saying both are infantry
24  soldiers, you did not attempt to identify any

60

1  significance you saw between the two products?
2       MR. COOPER:  Objection to the extent it
3    mischaracterizes his testimony.
4  BY MR. KEENER:
5    Q.   I think that's what you said.  I just
6  want to make sure I understand.
7    A.   No, I want you to understand, too.  I'm
8  trying to think of a way to phrase this so that
9  it's clear for you but it's very difficult to
10  phrase it in a way that you're willing to follow.
11    Q.   Let me try this question.
12       Other than saying they are both
13  infantry soldiers, did you identify anywhere in
14  your report or the chart any other similarities
15  you saw between the Chapterhouse and Games
16  Workshop product?
17       MR. COOPER:  Objection, asked and
18    answered.
19       THE WITNESS:  See, I believe I did but
20    you're not willing to accept that as an
21    answer.
22  BY MR. KEENER:
23    Q.   I will if you tell me where.
24    A.   There, in the third column.  I'm not

61

1  understanding.
2  Q.  The only --
3  A.  I'm not understanding why you're not
4  getting this.
5  Q.  The only text in the third column is
6  "The basic figure created by GW is a common
7  representation of near future infantry soldiers
8  from preexisting works."
9  A.  Correct.
10  Q.  Do you believe that's the only text in
11  that third column?
12  A.  Correct.  Actually it is not.
13  Q.  There's other text saying what articles
14  you're referring to here, okay.  Other than saying
15  that they are both common representations of near
16  future infantry soldiers, do you identify any
17  other similarities between the Chapterhouse and
18  Games Workshop products?
19  A.  I believe that's what that does.
20  Q.  I want to make sure I'm not missing
21  anything else in your chart or your reports that
22  identifies other similarities?
23  A.  I think you're missing.
24  Q.  What other similarities do you

62

1  identify?
2  A.  I would consider that any reasonable
3  person if they see a term, for example, such as
4  infantry soldier would understand what is meant by
5  infantry soldier.  So I believe that I have,
6  through inference, provided that list through a
7  short form description of just a couple words.
8  I think my question took that into
9  account.
10  Other than future infantry soldiers and
11  whatever that encompasses, do you anywhere else
12  identify any similarities between the Chapterhouse
13  and Games Workshop products?
14  MR. COOPER:  Objection, asked and
15  answered.
16  THE WITNESS:  I think that we should
17  also discuss what is meant by text briefly,
18  and I outlined what I mean by text in my
19  expert report.
20  BY MR. KEENER:
21  Q.  Before we get into that tangent, do you
22  identify any other similarities between the
23  Chapterhouse product for 124 and the Games
24  Workshop product for 124 other than future

63

1  infantry soldiers and whatever that encompasses?
2  MR. COOPER:  Objection, asked and
3  answered.
4  THE WITNESS:  Unfortunately I can't
5  answer that question without discussing the
6  nature of what is meant by text.
7  BY MR. KEENER:
8  Q.  Okay.  You're including the pictures in
9  your definition of text?
10  A.  Yes, I am indeed.
11  Q.  Do you identify any similarities in the
12  pictures?
13  A.  I believe that any reasonable person
14  would see them.
15  Q.  I understand.  Do you attempt to
16  identify any similarities in the pictures?
17  A.  By providing the pictures, yes.
18  Q.  Other than the pictures, do you attempt
19  to identify in your own words what you believe are
20  the similarities other than the term "future
21  infantry soldiers"?
22  A.  I'm sorry to be a little frustrated.
23  My understanding of text and my understanding of
24  the pictures is that when I use the pictures as

64

1  part of this, they become a type of my own words,
2  so yes.
3  Q.  Okay.
4  A.  I'm sorry to be academic.
5  Q.  What I'm trying to understand is if I'm
6  a jury and I see you've got various pictures
7  listed here and you've got the sentence above the
8  pictures, other than the term "future infantry
9  soldiers," are you telling me anywhere what other
10  similarities you see between the Games Workshop
11  product and the Chapterhouse product?
12  MR. COOPER:  Object to form.
13  THE WITNESS:  I believe that a
14  reasonable member of a jury, not that I am in
15  any way familiar with what and how juries view
16  evidence or handle exhibits or even react to
17  testimony, but from my understanding what a
18  reasonable person would do is a reasonable
19  person would draw their understanding of this
20  document from its contents and see what was
21  being argued in a visual sense rather than
22  through words.
23  BY MR. KEENER:
24  Q.  So the juror can look at the picture

65

1  and see what they think may be similar?

2      A.   No, because I provided the images so

3  they can see what I think may be similar.

4      Q.   They could see what images you

5  provided?

6      A.   Yes.

7      Q.   And they compare the images and see

8  what elements of which images are similar,

9  correct?

10      A.   No, I do not believe that is correct.

11      Q.   Do you identify which elements of the

12  images appear similar?

13          MR. COOPER:  Objection, asked and

14  answered.

15          THE WITNESS:  Again, I have identified

16  those elements through the blanket terms that

17  are used in the column.

18  BY MR. KEENER:

19      Q.   Right.  So the blanket term is "future

20  infantry soldiers."  Other than that term, are

21  there any other terms that you use to assist and

22  identify which elements of the pictures we should

23  be looking at other than that broad term "future

24  infantry soldiers"?

66

1      A.   The pictures themselves are not unitary

2  items.

3      Q.   I think it's hopefully a yes or no

4  question.

5          Other than the words "future infantry

6  soldiers," do you identify by term or otherwise

7  what parts of the pictures they should be looking

8  at for similarities?

9      A.   Again, it's really difficult to answer

10  that question.  I'm very sorry.

11      Q.   You're unable to tell me whether or not

12  you provide any other description of what they

13  should be looking at in the pictures other than

14  the term "future infantry soldiers"?

15      A.   It's not that I'm unable to tell you,

16  it seems you're not able to ask me.

17      Q.   I've tried to ask you many times.

18      A.   I appreciate that.

19      Q.   You have pictures of soldiers that go

20  on for a couple of pages.

21      A.   Yes, I do.

22      Q.   Those pictures include numerous

23  elements.

24      A.   Yes, they do.

67

1      Q.   Other than the text "future infantry

2  soldiers," what do you describe in here that

3  points to the similarities we should be looking

4  at?

5          MR. COOPER:  Object to the term "text,"

6  form.

7          THE WITNESS:  Again, I have to say that

8  an image is a type of text that one naturally

9  knows how to read if one is reading it in a

10  reasonable way.  So I have done that.

11  BY MR. KEENER:

12      Q.   Looking at the first picture --

13      A.   Yes.

14      Q.   -- how am I or a jury to know what

15  portions of that picture you believe are similar?

16          MR. COOPER:  Object to the

17  hypothetical, calls for speculation.

18          THE WITNESS:  I have no idea how you're

19  going to read something.

20  BY MR. KEENER:

21      Q.   That's fine.

22          Do you discuss, provide any information

23  in your report or the chart that tells me what

24  portions of that picture on page 2 of Exhibit 1

68

1  you believe are similar?

2      A.   Again, I believe it's explicitly

3  inferrible.

4      Q.   Other than through inference, do you

5  describe anywhere the elements of that picture you

6  believe are similar?

7      A.   Even through words, we only offer it

8  through inference.  This is the difference between

9  the signifier and the signified.

10      Q.   I don't think you're answering my

11  question.  My question is I want to know what you

12  thought was similar in that picture.  Is there

13  anything you give me that helps me identify what

14  elements you thought were similar?

15      A.   The pictures themselves.

16      Q.   Other than the pictures themselves, is

17  there anything else that tell me what elements you

18  thought were similar?

19      A.   No.

20      Q.   Okay.  And similarly for all the

21  pictures, there's nothing in here that tell me

22  which elements of the picture you believe are

23  similar?

24      A.   I think we'd have to go through each

69

1  and every picture and each and every numbered
2  item --
3      Q.   So --
4      A.   -- to make that assertion and I don't
5  believe that's true.
6      Q.   Just looking at the pictures you have
7  for 124, is your answer the same that other than
8  the picture itself, there's no attempt by you to
9  identify what elements of the picture you believe
10  are similar?
11      MR. COOPER:  Objection,
12  mischaracterizes testimony.
13      THE WITNESS:  Could you rephrase that?
14  BY MR. KEENER:
15      Q.   I think we've gone over this a number
16  of times.
17      A.   I know we have.
18      Q.   But we'll try again.
19      You provide a number of pictures for
20  entry 124.  Each of those pictures has a number of
21  elements.  Other than the picture itself, do you
22  identify which elements of those pictures you
23  believe are similar to the products in this case?
24      A.   No, I do not.

70

1      Q.   Okay.
2      MR. KEENER:  Why don't we take a short
3  break.
4      THE WITNESS:  Sure.
5      (Recess taken from 10:39 a.m. to
6      10:45 a.m.)
7  BY MR. KEENER:
8      Q.   Let's turn back to Exhibit 190 which is
9  the text of your report, or the body of your --
10      A.   Oh, this one (indicating).
11      Q.   Looking back at the first paragraph, we
12  went over the sentence where it says,
13  "Specifically, I have been asked to opine whether
14  elements of the Games Workshop new allegedly
15  infringed works can be found in or derived from
16  preexisting works from historical, medieval,
17  cinematic, or science fiction sources."
18      Do you see that?
19      A.   Yes.
20      Q.   We agreed that was the second part of
21  your analysis.
22      A.   Yes, we did.
23      Q.   Why don't you identify the first part
24  of your analysis anywhere in your report?

71

1      A.   I believe that I do.
2      Q.   Where do you state that you were asked
3  for similarities between Games Workshop and
4  Chapterhouse products and identify those
5  similarities?
6      A.   I believe I do so in three separate
7  places, two of which are in paragraph 1.
8      Q.   Okay.
9      A.   Inasmuch that the claim chart for newly
10  accused products is listed.
11      Q.   Because you reference the claim chart,
12  we're supposed to infer what similarity you saw
13  between the Chapterhouse product and Games
14  Workshop product?
15      MR. COOPER:  Objection,
16  mischaracterizes the testimony.
17  BY MR. KEENER:
18      Q.   Is that what you're referring to?
19      A.   I'm referring to the claims chart which
20  itself is arguing that there are similarities.  So
21  by examining and critiquing that claims chart, I
22  am in essence conducting that activity which I
23  again mentioned in paragraph 3.
24      Q.   Again in paragraph 3, I don't see any

72

1  discussion of Chapterhouse products, do you?
2      A.   Yes, of course I do.
3      Q.   Where?
4      A.   Based on my research, I have concluded
5  that each of the Games Workshop new allegedly
6  infringed works.
7      Q.   Those are Games Workshop products,
8  right?
9      A.   No, it's not.
10      Q.   You don't believe that Games Workshop
11  new allegedly infringed works is a Games Workshop
12  product?
13      A.   No, I believe that to be a reference to
14  the claims made so the capitalization of "New
15  Allegedly Infringed Works" to me is the claims
16  made by Games Workshop with relation to the
17  corresponding Chapterhouse products.  That's how I
18  understand that to be and how I'd assume anyone to
19  understand that to be.
20      Q.   So the infringed works would be the --
21      A.   No, the infringed works, the way I
22  understand it, you can only have a product -- you
23  can only have an infringed product if there is a
24  corresponding product that infringes.

73

1    Q.   Right.  So the infringed product would
2    be the Games Workshop product?
3    A.   No.  In order to have something
4    infringed, there has to be a corresponding item
5    that infringes.
6    Q.   So there's a Chapterhouse allegedly
7    infringing project and a Games Workshop allegedly
8    infringing product?
9    A.   The way that works, you have to infer
10   the existence of A for the existence of B and the
11   existence of B for the existence of A.
12   Q.   So paragraph 3, are we to infer that
13   you conducted analysis between Chapterhouse
14   products and Games Workshop products to look for
15   similarities?
16   A.   Yes.
17   Q.   Where else in the report are we
18   supposed to understand that you did that analysis?
19   A.   Throughout the report.
20   Q.   You said there were three places.  I
21   think we covered 1 and 3.
22   A.   I said -- I believe I said that I
23   mention it in this format twice in paragraph 1 and
24   once in paragraph 3, but I never continued to go

74

1    through how many times that is, in fact, done.  I
2    just said here are three instances where I do.
3    Q.   Anywhere elsewhere you can say in your
4    report that you were asked to identify
5    similarities between Chapterhouse products and
6    Games Workshop products?
7    A.   Would you like me to read through this
8    and make notes of every occurrence where I do so?
9    Q.   Why don't you find the next occurrence
10   where you believe your report says you were asked
11   to look for similarity between the Chapterhouse
12   product and the Games Workshop product.
13   A.   Okay.  How about the first -- how the
14   introductory clause of paragraph 2's first
15   sentence?
16   Q.   "In researching material regarding this
17   analysis"?
18   A.   That is correct.
19   Q.   So we're to infer this analysis was
20   comparison between Games Workshop products and
21   Chapterhouse products to identify similarities?
22   A.   Yes, I don't think it raises to the
23   level of inference.  I think that one is pretty
24   obvious.

75

1    Q.   Back to that sentence in the first
2    paragraph that begins "Specifically."
3    A.   Yes.
4    Q.   You use the word "derived."
5    A.   Uh-huh.
6    Q.   What do you mean by derived?
7    A.   I mean derived.
8    Q.   Derived can mean many things and it has
9    a specific meaning in the legal sense as far as
10   copyright.  I'm asking your meaning when you use
11   the word "derived."
12   A.   Thank you.  I had no idea it had a
13   special legal meaning.
14   Q.   Okay.  So first, you definitely weren't
15   intending it to have any specific legal meaning?
16   A.   No.
17   Q.   What were you intending the word
18   "derived" to mean?
19   A.   Originated from, borrowed from, a
20   sourced to, an antecedent of, an allusion towards.
21   I could continue.
22   Q.   Okay.
23   A.   It might take me awhile but those would
24   be the kind of synonyms I would use for the word

76

1    "derived."
2    Q.   I'm trying to find out how broad --
3    A.   Ultimately originating in.
4    Q.   I'm trying to find out how broad you
5    mean the term "derived" to be.  So for example,
6    you mentioned Star Wars in your report.
7    A.   Yes, I did.
8    Q.   And Star Wars, there's Episode I and
9    Episode II.
10   A.   Yes.
11   Q.   Do you believe Star Wars Episode I is
12   derived from Star Wars Episode II?
13   A.   No, I would not.  I would say Star Wars
14   Episode II and Star Wars Episode I are derived
15   from Star Wars Episode IV.
16       MR. COOPER:  He got you there.
17       THE WITNESS:  When one is looking for
18   derivation, I would look for an ultimate
19   source rather than that transition source.
20   BY MR. KEENER:
21   Q.   So when you use the word "derived,"
22   you're not meaning a transitional source?
23   A.   It all depends.  On this particular
24   context, the ultimate sources are more compelling

77

1   than any sort of transitory stage.  And with the
2   example that you cited from Star Wars Episode I,
3   Phantom Menace, and Episode II, whatever it was
4   called, they are both although sequential in terms
5   of their composition, their ultimate derivation in
6   the Star Wars canon from what is now known as
7   Episode IV because the original crawl did not say
8   Episode IV, that is clearly their derivation, just
9   as this future Star Wars movie that JB Abrams is
10  going to direct also derives from Episode IV
11  rather than from Revenge of the Sith, which is
12  Episode III.
13      Q.   And in that context, you're saying
14  derive because, for example, they are in the same
15  universe and have similar characters and backstory
16  and that type of information?
17      A.   I think that -- I believe that the way
18  you describe the situation would misrepresent the
19  nature of how to, quote, read cinematic product.
20      Q.   Okay.  I'm just trying to figure out
21  what you mean by the word "derive."
22      A.   By the word "derived," I mean stems
23  from, originates in, alludes to, is drawn from,
24  finds an origin in and so on.

79

1   painted the Mona Lisa and someone else paints the
2   Mona Lisa but makes one eye closed than open, that
3   work is a derivative work of the Mona Lisa.  In a
4   legal sense, it's a derived from a derivative work
5   that might infringe the original Mona Lisa if that
6   person started copyright.
7       Do you kind of understand that scope of
8   the term "derived"?
9       A.   I'm really sorry to do this to you but
10  I believe that to be an incorrect definition of
11  derivation with the example given, since Salvador
12  Dali rather famously did take a Louvre postcard of
13  the Mona Lisa and, in fact, drew a mustache on it,
14  and the work is generally not considered
15  derivative at all.
16      Q.   That might be in artistic sense
17  derivative different than a legal sense
18  derivative.
19      A.   I do not believe Salvador Dali was not
20  sued by the Louvre.
21      Q.   That's a completely separate question.
22      Derivative in a legal sense is
23  different than I think you mean derivative
24  throughout your report, and I'm trying to figure

78

1       Q.   Okay.  So from the word "derived," if
2   you're going to say product X is derived from
3   product Y, are you assuming that the person who
4   created product Y is aware of product X?
5       A.   Again, we're getting into a matter
6   where it's almost impossible to answer.  I will do
7   my best to answer it.
8       It would probably be helpful if someone
9   could tell me what derived means in a legal sense
10  because I think maybe this is getting in the way
11  of a productive answer but by aware, it
12  presupposes far too much about how the creative
13  process functions in that there are levels of
14  awareness of cultural reference that go all the
15  way from deliberate knowledge and exposure to
16  certain cultural products all the way to
17  sublimated experiences with cultural products that
18  may, you know, antedate your own formation of
19  consciousness when you hit the barrier of
20  infantile amnesia.
21      Q.   This won't be a perfect description but
22  in a legal sense, one copyright a copyright owner
23  has is the right to make derivatives, things
24  derived from the work they did.  So if someone

80

1   out the scope of what you mean.
2       So back to the question of does derived
3   from a preexisting work mean that you're opining
4   that the Games Workshop person who created it had
5   knowledge of that preexisting work?
6       A.   Again, I'm sorry to say this.
7   Knowledge, have knowledge is a very difficult
8   concept to describe and discuss in that a person
9   could have knowledge without having knowledge of
10  something.
11      Q.   Okay.  Back to the example that we
12  looked at for quite awhile on product 124, that
13  first picture that you have, that's from Kill Zone
14  magazine?
15      A.   Right.
16      Q.   Is it your expert opinion that the
17  Games Workshop models are derived from that
18  picture?
19      A.   No.
20      Q.   So for any of the examples that you
21  give throughout your report, including the chart,
22  are we able to determine whether or not you're
23  opining any of the Games Workshop items are
24  derived from any of the works you identify as

81

1    preexisting works?
2         MR. COOPER:  Are you using that now in
3    the legal sense?
4         MR. KEENER:  I'm using it in his sense.
5         THE WITNESS:  That's an impossible
6    question to answer because we would have to go
7    through each and every one of the numbered
8    columns and all of the images and other types
9    of text that are associated with them.
10   BY MR. KEENER:
11        Q.   Is there any way for me to determine
12   which works you believe Games Workshop works were
13   derived from?
14        A.   I think that your legal knowledge of
15   derivation is perhaps not assisting us in the
16   answering of this question.
17        Q.   Okay.  Maybe it would help if we
18   substituted derive with a different term.
19        A.   Okay, let's do that.
20        Q.   If we go back to the sentence in
21   paragraph 10 of your report that starts
22   "Specifically," if you say Games Workshop new
23   allegedly inferred works can be found in or are in
24   some way based on preexisting works, would that be

82

1    a fair characterization?
2         A.   "Based on" would not.
3         Q.   In some way influenced by?
4         A.   Again, probably not.
5         Q.   What other word could you substitute
6    for derived?
7         A.   I would have to think about this for a
8    while.
9         Q.   Okay.
10        A.   The problem I'm facing is would it be
11   fair to say that, for example, homosapians are
12   derived from Australopithecus gigantus?
13        Q.   I'm trying to figure out what you're
14   trying to say.
15        A.   This is the problem, that I believe
16   what I'm trying to say and how you're trying to
17   understand it are at odds.
18        Q.   Okay.
19        A.   And I'm trying my best to be helpful,
20   and just give me one second to try to think this
21   through and formulate my thoughts on it in a way
22   that might be acceptable for you.
23             I'm going to begin by restating what I
24   believe is your question and you can tell me

83

1    whether or not to proceed.
2         Q.   Okay.
3         A.   What I believe you're asking me is to
4    suggest whether or not Games Workshop's designers
5    at or about the moment where they released or
6    designed their products had conscious exposure or
7    borrowed either consciously or unconsciously using
8    the example of 124 any of the specific images that
9    I have provided.  I believe that to be your
10   question.
11        Q.   Why don't you answer that question.
12        A.   The answer to that question would, A,
13   require me to know what game designer workshops'
14   artist and designers were actually thinking when
15   they were going through their creative process,
16   which I cannot do, because I don't know what's in
17   their library.  For all I know, some of these
18   items could be in their library.  I don't know the
19   titles of everything that they would have in any
20   kind of reference room they might have.
21             I also don't know the reading habits or
22   exposure to culture that they may or may not have
23   had as young adults or children, or even as adults
24   where they may have, for example, forgotten

84

1    specific elements of exposure, and that's sort of
2    one part.
3             And here I'm sort of, as a way of
4    analogy, I'm sort of recalling the Verve's
5    inadvertent borrowing of the Rolling Stones song
6    for their composition Bitter Sweet Symphony, which
7    was an unconscious borrowing apparently that no
8    one realized it was a Rolling Stones song.
9             To continue using that analogy, there
10   is the possibility that one has made an
11   unconscious or conscious borrowing of a specific
12   item but more appropriately is the derivation of
13   say, for example, a verse, chorus, verse, chorus
14   structure for a musical composition for pop music.
15             In both songs, even though they are --
16   even though they are very, very similar to the
17   fact that one has unconsciously borrowed from the
18   other, both find their ultimate derivations not
19   only in a common structure for a popular song but
20   in the structure of our tonal scale.
21             So what you're asking me to answer I
22   can only answer in that way, so when we're looking
23   at what Games Workshop has used, we can say they
24   have either been consciously or unconsciously

85

1 influenced by these either specific examples or
2 other examples that are allied to those specific
3 examples, or they have perhaps been influenced by
4 that more ultimate chain of derivations, which
5 these examples are examples themselves of.
6 Q. Okay. Let's try and break that down a
7 little.
8 A. Okay.
9 Q. You are not making any expert opinion
10 that any Games Workshop artist consciously derived
11 its work from any specific reference you've
12 identified?
13 A. Currently, and I would love it if Games
14 Workshop would provide me with the contents of
15 their reference library, that would be a matter of
16 individual examination of every single item in
17 this chart which we could do if you wanted and we
18 could go through that.
19 Q. My question was simple. As you sit
20 here today, in your report or your chart, are you
21 making an expert opinion that Games Workshop
22 consciously derived any of its works from any of
23 the examples you give?
24 A. That would really require me to look

86

1 into their psyche and I couldn't do that.
2 Q. Right, so as you sit here today, you
3 are not making any expert opinion that any Games
4 Workshop artist consciously derived its work from
5 anything you can identify?
6 A. No, that's not what I'm saying.
7 Q. Let me try again.
8 A. Okay.
9 Q. As you're sitting here today, and
10 throughout your expert report, are you making an
11 expert opinion that any Games Workshop employee
12 consciously derived their work off of any of the
13 references you identified?
14 A. I believe that question to be
15 impossible to answer.
16 Q. You can't answer that yes or no whether
17 or not you were opining on that subject?
18 A. I don't believe that's a yes or no
19 matter.
20 Q. You don't know whether or not you're
21 opining on that subject?
22 A. No, that's a different way to phrase it
23 that wasn't allied to the first way you phrased
24 it.

87

1 Q. Are you making any expert opinion that
2 the people who designed Games Workshop product 124
3 consciously derived that product out of any of the
4 images you put in the third column for product
5 124?
6 A. For product 124, I'm neither making
7 that claim or not making that claim.
8 Q. Okay, but you are not affirmatively
9 opining that you believe they consciously copied
10 anything in product 124?
11 A. I believe what we're running into here
12 is types of research and legal determinations, so
13 in the world of academia, not doing something or
14 doing something is a different result than not
15 doing something, or doing something.
16 MR. COOPER: I think he means for this
17 case, are you offering an expert opinion about
18 that.
19 BY MR. KEENER:
20 Q. Are you offering any expert opinion
21 that any Games Workshop artist consciously copied
22 any of the examples you give?
23 A. Not for number 124.
24 Q. For any of the products, are you

88

1 offering an expert opinion that Games Workshop
2 artists consciously copied any of the products you
3 identify?
4 A. Not consciously. Wait, let me rephrase
5 that, not necessarily consciously.
6 Q. Okay. Do you identify any examples
7 that you are giving your expert opinion that Games
8 Workshop consciously copied?
9 A. I cannot state consciously or
10 unconsciously.
11 Q. Are you identifying any prior works
12 that it's your expert opinion that Games Workshop
13 consciously or unconsciously copied?
14 A. Yes, all of them.
15 Q. So it's your expert opinion that
16 whether consciously or unconsciously they were
17 aware of all the works you identify?
18 A. No.
19 Q. Which works do you -- is it your expert
20 opinion that Games Workshop was consciously or
21 unconsciously aware of?
22 A. Let's use the example of 124. In the
23 example of 124, I use the phrase "near future
24 infantry soldiers." I believe that Games Workshop

89

1  designers were either consciously or unconsciously
2  aware of the concept the trope of near future
3  infantry soldiers.
4      Q.  You go on and you have pictures of 10
5  pictures under that entry.
6      A.  Yes, demonstrate the ubiquity of the
7  image.
8      Q.  Is it your expert opinion that Games
9  Workshop copied consciously or unconsciously any
10  of those 10 pictures?
11      A.  That question is impossible to answer.
12  I'm sorry.
13      Q.  It might be impossible to answer
14  because you don't know what's in their head --
15      A.  Yes.
16      Q.  -- so because you don't know what's in
17  their head, you were not offering an expert
18  opinion that any Games Workshop artist consciously
19  or unconsciously copied those because you don't
20  know?
21      A.  That also means I am not offering that.
22      Q.  I am trying to figure out you're not
23  going to go to trial and tell the jury that Games
24  Workshop consciously or unconsciously copied any

90

1  of those 10 pictures.
2      A.  That is correct.
3      Q.  Okay.  Similarly for all the pictures
4  and works you identify, you are not going to go to
5  the jury and say Games Workshop, in my expert
6  opinion, copied consciously or unconsciously any
7  of those specific works?
8      A.  Now that I think we would have to go
9  through the exhibits one at a time.
10      Q.  Anywhere in your report do you identify
11  those exhibits you believe Games Workshop
12  specifically copied consciously or unconsciously?
13      A.  I think I do actually.  Let's -- may I
14  have a few minutes to read through this again?
15      Q.  Okay.
16      A.  (Witness perusing document.)
17          I think that there are a few things I
18  would say were certainly either unconsciously or
19  consciously derivative.
20      Q.  So you believe that there are certain
21  works you've identified that you believe Games
22  Workshop consciously or unconsciously copied?
23      A.  Yes.
24      Q.  Which works are those and would you

91

1  identify them?
2      A.  In paragraph 29 of my report, I
3  identify Starship Troopers.
4      Q.  It's your opinion that Games Workshop
5  artists were conscious of -- have read the
6  Starship Trooper novels?
7      A.  Yes.
8      Q.  What is your basis for believing they
9  have read the Starship Trooper novels?
10      A.  Actually, let's use one specific item.
11  In the text of Starship Troopers, the sort of arm
12  mounted flamethrower powered item, the gun that
13  they use is called a flamer, and that's used
14  specifically in a Games Workshop product.
15      Q.  So because the word "flamer" exists in
16  Starship Troopers and Games Workshop has a weapon
17  called flamer, you're inferring the Games Workshop
18  person creating that must have read Starship
19  Troopers?
20      A.  They may not remember they read it.
21      Q.  But it's your opinion they read
22  Starship Troopers?
23      A.  Yes.
24      Q.  Other than Starship Troopers, is there

92

1  any other work that you believe Games Workshop
2  must have seen?
3      A.  Yeah, sorry, yes.  In paragraph 34, it
4  does appear that some of the Games Workshop
5  shoulder pads originated in the Star Wars films.
6      Q.  Okay.  So it's your expert opinion that
7  the Games Workshop artist who created that
8  shoulder pad must have copied it from Star Wars,
9  consciously or unconsciously?
10      A.  Consciously or unconsciously.  I would
11  suppose unconsciously.
12      Q.  Beyond the shoulder pad in Star Wars
13  and the flamer in Starship Troopers, is there
14  anything else in your expert opinion Games
15  Workshop must have copied, consciously or
16  unconsciously?
17      A.  I realize that, or at least I think I
18  realize.  Perhaps you can clarify matters for me.
19          My expert report and Exhibit B form the
20  background of or the basis for my testimony should
21  this matter ever come to trial; is that correct?
22      Q.  Yes.  Not background.  It's supposed to
23  contain all your opinions and the basis thereof.
24      A.  Would anybody during the court process

93

1    have access --
2         MR. COOPER:  He's going to ask you
3    questions.
4         THE WITNESS:  I know.  I do not believe
5    that I specifically say it in this report and
6    I believe that in Exhibit B, it is listed as a
7    similarity.  No, I do list it as recognizable
8    as a derivative of the following.  Yeah, I
9    believe that the lightning claws from the
10   space marine terminator set and from I guess
11   other products that use those lightning claws
12   are indeed a derivative of Wolverine.
13   BY MR. KEENER:
14   Q.   So it's your expert opinion that the
15   person who created Games Workshop lightening claw
16   must have copied consciously or unconsciously
17   Wolverine?
18   A.   Yes.
19   Q.   Anything else?
20   A.   We could do go through that item by
21   item.
22   Q.   For those we discussed, Starship
23   Trooper, anywhere in your report do you state I
24   believe this is a product they copied consciously

94

1    or unconsciously versus the ones where you say
2    derived from?
3    A.   I don't think I do -- perhaps I do.
4    Let me read over this for a second.
5         (Witness perusing document.)
6         I don't want to trust my memory of this
7    document because words are very important in law
8    as I'm finding out, so just give me a second and
9    I'll attempt to find the specific text so I don't
10   get my wording inconsistent for you.
11        (Witness perusing document.)
12        Yes, I do.  In paragraph 24 on page 8,
13   in the last sentence of that paragraph I say,
14   "These tropes form a kind of channel that
15   auteurs may use consciously or unconsciously when
16   creating seemingly new works."
17   Q.   Let me try and clarify my question.
18        There are certain tropes you identify
19   in this genre that you believe influence various
20   things that Games Workshop has done?
21   A.   Yes.
22   Q.   And that may be different than it's my
23   opinion they must have seen Star Wars and
24   consciously or unconsciously copied the shoulder

95

1    pad versus something else in medieval history or
2    otherwise.  How do I find out which works you
3    believe Games Workshop must have seen and must
4    have copied consciously or unconsciously versus
5    all the other works you identify?
6    A.   That's a good question.  What you would
7    do to make that determination, if you would
8    carefully go through Exhibit B looking for
9    specific instances where I use the expression
10   perhaps "clearly derivative of" and then a
11   specific work, or where you don't see "clearly
12   derivative of," then you can use the text from
13   paragraph 24's final sentence.  It's either one or
14   the other or perhaps both.
15   Q.   So if it uses the words "clearly
16   derivative of," it's your opinion that the Games
17   Workshop artist must have seen the work you
18   identify and either has consciously or
19   unconsciously copied it?
20        MR. COOPER:  Can you read that back.
21        (Record read.)
22   BY MR. KEENER:
23   Q.   Is that correct?
24   A.   Can I have a few minutes to read

96

1    through this just to make sure my wording is
2    indeed consistent?
3         MR. KEENER:  Sure.  Why don't we take a
4    quick break and you can have time to look at
5    that.
6         (Recess taken from 11:27 a.m. to
7    11:37 a.m.)
8    BY MR. KEENER:
9    Q.   So the question pending before we took
10   the break is it seems you have two types of
11   opinions, one where there's a trope out there you
12   think Games Workshop has borrowed from, and you've
13   given examples of that trope in various pictures,
14   and another set where you believe Games Workshop
15   must have seen a certain work and consciously or
16   unconsciously copied from that work, and the
17   question is how do I know which pictures in the
18   example you give fall into which category?
19   A.   And I think that had I had a better
20   understanding of the legal meaning of the word
21   "derivative" or "derived," I would have been able
22   to better prepare you to follow along with this
23   table.
24        So in reviewing my work, at least up to

Grindley, Carl  2/21/2013  9:09:00 AM

97

1　I guess page 56 or so, I have found instances
2　where I have actually said something is derived
3　from a thing, and I have found instances where
4　it's supposed to go to a general trope.
5　　　　Had I known that there was a special
6　legal meaning to the term "derived," I would have
7　been more careful in my wording, but I think that
8　a person who is examining this from a lay
9　perspective would have the same problem that I
10　have with the lack of knowledge of that legal
11　term, or if someone was going through this as an
12　expert, they would probably be able to tell the
13　difference between the two.
14　　Q.　Okay.
15　　A.　Now, more specifically, there are
16　examples, for example item 129, where the Games
17　Workshop Land Raider vehicle, that's on page 28 of
18　the exhibit, clearly as far as I'm concerned in my
19　opinion clearly derives from a Mark V tank.
20　　Q.　Let me rephrase my question here.
21　　　　Is there any way for me, looking at
22　your report and your exhibits, to figure out for
23　which pictures in your expert opinion Games
24　Workshop must have seen and copied consciously or

98

1　unconsciously and which pictures are just
2　representative of tropes in a genre?
3　　A.　That's also an impossible question to
4　answer because there are many, many pictures of
5　Mark V tanks and if I were in the United Kingdom I
6　would go to the Imperial War Museum and see one.
7　　Q.　Okay.　But you could --
8　　A.　So it's impossible to say whether or
9　not a person saw a specific photograph of this
10　particular tank or merely saw a photograph or the
11　actual tank itself, but I would definitely say in
12　this specific situation of item 129 that Games
13　Workshop's designers must have definitely seen a
14　Mark V tank.　There can be no other explanation
15　for that level of similarity.
16　　Q.　So you could have said that in your
17　report, right, Games Workshop must have seen a
18　Mark V tank, here are representative pictures of a
19　Mark V tank?
20　　A.　Indeed, I say in particular, a Games
21　Workshop Land Raider, there's a striking
22　resemblance to a British Mark V tank, and then I
23　produced a picture of the British Mark V tank.　So
24　I believe the level of explicitness that is

99

1　required from a technical legal perspective is not
2　required for a reasonable person to make that
3　inference.
4　　Q.　I'm not talking about legal
5　technicalities.　I just want to know when we go to
6　trial, for which picture are you going to say
7　Games Workshop must have seen that and copied that
8　versus this is just an example of a trope?
9　　A.　Then again, you've just used that same
10　wording.
11　　Q.　Okay.　For example, you could say well,
12　for the Land Raider, it's my expert opinion they
13　must have seen a Mark V.
14　　A.　Or an image thereof.
15　　Q.　Or an image thereof.
16　　　　For another product, you could say I
17　don't know that they necessarily saw any of these
18　images or products but here are examples of that
19　genre.
20　　A.　Yes, I believe.
21　　Q.　Those are very different opinions.
22　　Are they?
23　　Q.　I want to know is there any way for me
24　to figure out which set of pictures fall into one

100

1　category where they must have seen that picture
2　and what that picture represents, and the other
3　category is these are examples that are similar?
4　　A.　I don't believe that that is a
5　significant point.
6　　Q.　Well, I care about that point so is
7　there any way for me to determine which example --
8　for each picture which category each falls into
9　it?
10　　A.　If you care about it, I suggest you do
11　the research.
12　　Q.　But you don't attempt to identify in
13　your report which picture falls into which
14　category?
15　　A.　Like I said, sometimes I specifically
16　say it, sometimes I do not.　The point being that
17　there is an origin to this -- to a particular
18　image is all that really concerns me.
19　　Q.　So you're not concerned in any way
20　whether or not the Games Workshop person actually
21　saw any of the images that you identify?
22　　A.　Not the specific images because that's
23　impossible for anyone to say, even perhaps the
24　Games Workshop designer.

101

1     Q.  Okay.  So you are not going to go to
2 trial and say a Games Workshop designer saw any
3 specific image that's referenced in your report?
4     A.  Sometimes I will.
5     Q.  Which ones?
6     A.  For example, the ones we just dealt
7 with for 129, I would certainly say the Games
8 Workshop designer must have seen a Mark V tank or
9 an image thereof at some point in that designer's
10 life, and they must have copied that image either
11 consciously or unconsciously.
12     Q.  What other images must a Games Workshop
13 designer have seen?
14     A.  For example, number 132, which are
15 the -- what are they called?  The power claws.
16     Q.  The lightning claws.  We covered
17 Starship Troopers' flamer, Star Wars' shoulder
18 pad, lightning claw and Land Raider.  Anything
19 else the Games Workshop people must have seen?
20     A.  I haven't finished going through the
21 entire report.  Would you like me to do so?
22     Q.  I want to know what's your opinion that
23 Games Workshop must have seen certain works.
24     A.  Okay, this is going to take me a little

102

1 while.  I'm on age 156.  I have to get to page --
2     Q.  Is there any way for me to look at your
3 exhibit and determine by myself without you taking
4 the time to do it here which in your opinion Games
5 Workshop must have seen?
6     A.  I believe, although I'm not completely
7 certain, I believe that I did specify in terms of
8 language something to the effect that X is clearly
9 a derivative of Y.
10     Q.  So if I see language clearly derivative
11 or something similar, it's your opinion they might
12 have seen the work you identify?
13     A.  Yes.  I'm just attempting to determine
14 whether or not I was consistent in that usage.  If
15 I was not consistent in that usage, I apologize
16 but I had no understanding of the legal necessity
17 to distinguish between something that is
18 derivative of a specific item and something that
19 is derivative of an overall trope in a genre.
20     Q.  And since you didn't appreciate any
21 difference there, you made no attempt to
22 specifically identify which pictures fall into
23 which categories?
24     MR. COOPER:  Objection to the extent it

103

1 mischaracterizes his testimony.
2     THE WITNESS:  Sometimes -- sometimes
3 there was something that was very obvious,
4 like the Mark V tank.  But once I realized
5 that a specific Games Workshop product or item
6 could have an origin or did have an origin in
7 a more general part of either science fiction
8 or fantasy or medieval armor or historical
9 spacesuits or whatnot, once I made that
10 determination, there was no point or purpose
11 to track down a specific set of items that
12 could or could not have been consciously or
13 unconsciously viewed.  Once I knew a thing was
14 a duck, there was no point determining what
15 type of duck.
16 BY MR. KEENER:
17     Q.  So you're not going to come to trial
18 and tell them what type of duck if it's not
19 already contained in your report?
20     A.  Yes, I'm not going to do that.
21     Q.  Okay.
22     A.  But the problem is that, um -- sorry, I
23 don't mean to say um.
24     The problem is I cannot remember right

104

1 now how many specific ducks I have outlined in the
2 report.
3     Q.  Okay.  I can look at that myself then;
4 if you use language clearly derivative or
5 something similar, I can figure that out myself?
6     A.  Yes.
7     Q.  Let's go back to your example of
8 Starship Troopers.
9     Is your expert opinion that because
10 Starship Trooper uses the word "flamer" to
11 identify a flamethrower type weapon and Games
12 Workshop uses the term "flamer" to identify a
13 flamethrowing type weapon, Games Workshop must
14 have consciously or unconsciously copied that from
15 concept from Starship Troopers?
16     A.  Yes.
17     Q.  Do you have any understanding of the
18 term "independent creation"?
19     A.  No, I do not.
20     Q.  Is it possible that two people could
21 come up with the same expression without having
22 knowledge or referring to each other's works?
23     MR. COOPER:  Object to the
24 hypothetical.

105

1    THE WITNESS:  That is a very
2    complicated question and in short form, I
3    would have to say I would have no earthly
4    idea.
5    BY MR. KEENER:
6    Q.   You don't know if it's possible?
7    A.   Every single example that I can think
8    of where there have been acts of independent
9    creation, there are still lingering historical
10   questions regarding whether or not those moments
11   of individual creation are indeed true or false.
12       For example, with Newton and Liebnitz
13   creation of the calculus, we don't know for
14   certain if one could have been influenced by the
15   other, and indeed they sued one another over the
16   matter with Newton eventually winning because he
17   had been able to produce coded letters that he
18   sent to friends where he discussed the calculus in
19   it.
20   Q.   For any particular situation, it's
21   debatable whether or not there was an independent
22   creation, but do you believe it's possible for two
23   different people to independently create the same
24   concept?

106

1    A.   It depends how you define possible.
2    Q.   Do you believe it's possible that two
3    different people trying to describe flamethrowers
4    could both come up with the word "flamer" without
5    knowing of each other's use of that word?
6        MR. COOPER:  Objection, calls for
7    speculation.
8        THE WITNESS:  I do not believe that's
9    an answerable question.
10   BY MR. KEENER:
11   Q.   Why not?
12   A.   Because that's not how knowledge works.
13   Q.   So you're saying you are not able to
14   tell if it's even possible for two people to
15   independently come up with the word "flamer" to
16   describe a flamethrower?
17   A.   Yes, I'm saying it's not possible to
18   speculate on that just because I can't think of a
19   single example where we can conclusively prove
20   that that has happened.
21   Q.   I'm not trying to say conclusively
22   prove.  I'm saying could it happen?
23   A.   I'm not sure I'm interested in the
24   possibility.

107

1    Q.   I am.  Do you believe it's possible?
2    A.   Do we have like a couple of hours
3    because I don't know?  I honestly -- I mean it --
4    I don't know.
5    Q.   So if the person who came up with the
6    description flamer for Games Workshop testifies
7    that they have never read Starship Troopers --
8    A.   All right.
9    Q.   -- you would believe that would be
10   absurd?
11   A.   I would believe that would not only be
12   absurd but probably a lie.  I don't believe that
13   there would be anyone working in anything to do
14   with science fiction who has not, either as a
15   child or young adult or as an adult, read this
16   novel.
17   Q.   So if there were multiple people from
18   Games Workshop saying they have never read
19   Starship Troopers, you would call them all liars?
20       MR. COOPER:  Objection.
21       THE WITNESS:  No, I would not call
22   someone a liar.
23   BY MR. KEENER:
24   Q.   You would believe they are lying?

108

1        MR. COOPER:  Objection, outside the
2    scope, argumentative.
3        THE WITNESS:  I would be highly
4    skeptical of that claim.
5    BY MR. KEENER:
6    Q.   But not impossible, just skeptical?
7    A.   Skeptical.  It's possible someone could
8    not have read it.  It's -- in this particular
9    genre of work, it's highly unlikely.  Unlikely to
10   the extent it would beg our belief.
11   Q.   Have you done any sort of survey of
12   miniature designers to see what kind of books they
13   have knowledge of?
14   A.   That's actually also a difficult
15   question to answer in that I had wanted to.
16   Q.   That's different.  The question is did
17   you?
18   A.   I tried.
19   Q.   And how did you try?
20   A.   I tried by asking whether or not I
21   would have the ability to see which books were in
22   the reference library of Games Workshop.
23   Q.   What about asking the designers
24   themselves if they had read Starship Troopers,

109

1  would you want to do that?

2      A.  I don't think that's a matter for me to

3  do.  I think that would be a matter for counsel to

4  do.

5      Q.  If they had asked, would you want to

6  know the answer?

7      A.  I suppose so.

8      Q.  Would it have helped inform your

9  opinions?

10      A.  Not really, no.

11      Q.  So if they said they hadn't, that

12  wouldn't have changed your opinion in any way

13  whether or not they must have read Starship

14  Troopers?

15      A.  No.

16      Q.  Because you believe they would be

17  lying?

18      A.  No, because lying implies a conscious

19  act.

20      Q.  Would they be saying an untruth?

21      A.  I don't think you could unconsciously

22  say an untruth.

23      Q.  Do you think they would be incorrect in

24  saying they had not read Starship Troopers?

110

1      A.  There's also a question of how does one

2  read Starship Troopers.

3          Starship Troopers is a collection of

4  not only the text that it contains but also the

5  objects it contains.  So, for example, power

6  armor.  I believe, although I'm not a hundred

7  percent confident, I believe that power armor made

8  its first appearance in Starship Troopers so if

9  one reads any work with power armor in it, one has

10  more or less read at least that trope from

11  Starship Troopers, although you haven't actually

12  read the book itself or the words contained within

13  it.

14          I believe that it is entirely possible

15  for a person to forget a text they've read if they

16  read early enough in their development.  To

17  prepare for this expert report, I read Starship

18  Troopers and I was shocked in that when I was

19  reading Starship Troopers, it all seemed so

20  familiar to me because I had thought that I'd only

21  seen the movie.  But when I was reading the book,

22  I discovered I was actually rereading it and I

23  hadn't remembered that I'd read that specific

24  Heinlein title when I was a kid, but once I began

111

1  rereading those words, I actually could picture

2  myself back in my elementary school in British

3  Columbia sitting on a little stepstool actually

4  reading the novel.

5          So I think it's entirely reasonable to

6  be able to claim that one has not read a book and

7  in all honesty believe one has not read one when

8  in reality, one read it a long time ago and forgot

9  about it.

10          So I wouldn't put any description of

11  malice or attempts to conceal or anything of that

12  nature to any person who would say, even in a

13  court of law, I have not read that book.  I

14  wouldn't say oh, that person is lying.  I would

15  think probably that person just doesn't remember

16  reading it.

17      Q.  What documents were you provided by

18  counsel in this case?

19      A.  I believe I was provided with two

20  documents, at least I think it was two documents.

21  It could have been one document with an appendix.

22      Q.  What were those documents?

23      A.  I believe one of them was called new

24  allegedly infringed works or words to that effect.

112

1      Q.  Okay.  What was the other?

2      A.  I believe one was a document that

3  looked kind of like this (indicating), like a

4  legal thing, like -- I don't know, like a lawsuit

5  of some description or something.

6      Q.  Do you know what the concept of that

7  document was at all?

8      A.  No, I didn't really pay attention to

9  it.

10      Q.  Anything in that document you are

11  relying upon for your opinion in your report?

12      A.  No, I really wasn't interested in any

13  of that.  I was more interested in looking at this

14  table which at that time had two columns.

15      Q.  Were you provided any other documents

16  from counsel?

17      A.  No.

18      Q.  We've already talked about a transcript

19  you were given.

20      A.  Oh, yes, the transcript, sorry.  That

21  was -- when you said provided, I took that to mean

22  prior to the formation of my expert testimony.

23      Q.  At any time were you provided any other

24  documents from counsel?

113

1    A.   Just the deposition document of -- I've

2  already forgotten the gentleman's name.

3    Q.   Anything else?

4    A.   No.

5    Q.   In your report, you identify a number

6  of pictures.  Did you find those all yourself or

7  were any of those provided to you by counsel?

8    A.   What are we looking at now?

9    Q.   In both the text of your report and in

10  your chart, there are a number of pictures that

11  you have included.  Did you identify all those

12  pictures yourself or were any of them provided to

13  you by counsel?

14    A.   Some were suggested by counsel but

15  ultimately I decided what went into the report.

16    Q.   I understand.  Did they provide you

17  with any of the pictures?

18    A.   You know, it's difficult to say because

19  when I'm looking at this, I can't remember

20  specifically if -- can I give you a specific

21  example?

22    Q.   Okay.

23    On page 18, on page 18 there's an image

24  of a G.I. Joe character.  I remember finding this

114

1  image.  But I can't for the life of me remember if

2  this particular image was placed into this

3  document by me or suggested to be placed into the

4  document by counsel.  I do remember finding the

5  image myself.  I don't remember if this specific

6  one was the one placed in by me or suggested by

7  counsel and then approved by me.

8    Q.   For all the images you include, did you

9  find them all or were any of them provided to you

10  by counsel?

11    A.   This is also a difficult matter.  Yeah,

12  I believe some were provided to me by counsel or

13  suggested to me by counsel.

14    Q.   Do you know which ones?

15    A.   Off the top of my head, I can't really

16  remember because of the way the drafting process

17  went.

18    Q.   Do you know about how many you found

19  versus they found proportion wise?

20    A.   I believe I found the majority of them.

21    Q.   Did you ask for anything that you did

22  not receive?

23    A.   Yes.

24    Q.   What did you ask for?

115

1    A.   I asked for a full list of the Games

2  Workshop reference library contents.

3    Q.   In addition to that, did you ask for

4  anything else that you did not receive?

5    A.   No, I really wish I could have had that

6  reference library.  It would have made everything

7  much easier.

8    Q.   Exclude that.  Did you ask for anything

9  else you did not receive?

10    A.   No, I don't believe I asked for

11  anything at all other than that.

12    Q.   Are you aware that Chapterhouse has

13  previously written two expert reports in this

14  case?

15    A.   I could infer the existence of the

16  expert reports, or rather one expert report by the

17  deposition that I read.

18    Q.   Are you aware that there's two prior

19  expert reports in this case?

20    A.   I guess there must be.

21    Q.   And one is discussing similarities

22  between Games Workshop and prior military history

23  products; are you aware of that?

24    A.   No, I'm not.

116

1    Q.   Would you have wanted to see that

2  document?

3    A.   No, I'm really not interested in it.

4    Q.   So if there was another expert on

5  military history and medieval weaponry and they

6  were opining on similarities between Games

7  Workshop products and Chapterhouse products and

8  those prior military works, you would have had no

9  interested in seeing that in forming your

10  opinions?

11    A.   No, I would rather form my own opinions

12  on my own and then I think that it would be up to

13  someone else to read both documents.

14    Q.   And similarly, if there was another

15  expert report comparing Games Workshop products to

16  science fiction literature and pictures, you would

17  have had no interest in seeing that report?

18    A.   No, I wouldn't want it to poison the

19  well.  But if somebody were to want to make it,

20  you know, I would expect that someone would want

21  to read these things eventually.

22    Q.   Did you see any court opinions in this

23  case?

24    A.   No.

117

1    Q.   Are you aware whether the courts
2  addressed the issue of whether any specifics Games
3  Workshop items are original or not?
4    A.   Oh, wait, I would like to change my
5  answer on that.
6    Q.   Okay.
7    A.   I don't think it's a court opinion so
8  maybe I'm not changing my answer, but I do know
9  that I think last week, because I read the BBC
10  News because I'm also a British citizen, I know
11  that last week in the United Kingdom, I believe --
12  I'm not entirely even sure if there was legal
13  proceedings involved in this but there was some
14  horrible scandal where Games Workshop attempted to
15  stop someone from distributing a book on Amazon
16  that used the term "space marine."
17    Q.   Let's limit ourselves to the court in
18  this case.  Have you read any opinions by the
19  judge in this case?
20    A.   No.
21    Q.   Are you aware that the judge in this
22  case has made any rulings on whether or not
23  certain aspects of Games Workshop products are
24  original?

118

1    A.   No.
2    Q.   Are you aware that the court in this
3  case has already compared certain Games Workshop
4  items to prior things in science fiction and
5  military history?
6        MR. COOPER:  Objection to the extent it
7  misstates.
8        THE WITNESS:  No, actually I'm not, nor
9  would I be interested.
10  BY MR. KEENER:
11    Q.   Are you aware that the court has
12  already analyzed, for example, the Games Workshop
13  space marine shoulder pad?
14        MR. COOPER:  Objection to the extent it
15  misstates.
16        THE WITNESS:  I'm not aware of that,
17  no.
18  BY MR. KEENER:
19    Q.   And the court has identified what
20  it believes are original aspects that are not
21  found in prior exiting works, are you aware of
22  that?
23        MR. COOPER:  Objection.
24        THE WITNESS:  No.

119

1  BY MR. KEENER:
2    Q.   Would you be interested in seeing that
3  before you signed your report?
4    A.   No, absolutely not.  I think one of the
5  things that is very, very difficult in
6  providing -- and this is the first time I've ever
7  done it so you have to forgive me for being naive
8  about the process.
9        I think there's a huge gulf between
10  what is interesting or relevant from a legal point
11  of view and what's interesting or relevant just
12  from a mere scholarly point of view.  So to me,
13  this is a scholarly exercise.
14    Q.   Okay.
15    A.   And I'm really not interested in what
16  the court has to say about anything.  If the court
17  rules that up is down or black is white, to me
18  that doesn't change reality because rulings I
19  would imagine can be based on legal precedence or
20  the ability to get evidence in or not into the
21  record or what have you, so a ruling might not
22  have anything to do as far as I'm concerned with
23  the reality of the thing.
24    Q.   Okay, back to your report, Exhibit 190,

120

1  paragraph 3.
2    A.   Is this 190?  Paragraph 3.
3    Q.   You state, "Based on my research, I
4  have concluded that each of the Games Workshop new
5  allegedly infringed works for which Games Workshop
6  claims copyright protection are derivative of
7  preexisting works from historical sources ranging
8  from classical antiquity to the present, from
9  science fiction literature and illustration, and
10  from contemporary cinema."
11        Do you see that?
12    A.   Yes, I do.
13    Q.   Is that your expert opinion?
14    A.   Yes, it is but I'm embarrassed by my
15  pluralization error.
16    Q.   Other than that, is that your opinion?
17    A.   Yes, that is indeed my opinion.
18    Q.   And when you say each of Games Workshop
19  new allegedly infringed works, you mean in the
20  chart you made for every Games Workshop item
21  identified, this opinion applies?
22    A.   Yes, although it is difficult in this
23  context to use the word "each" in I think a manner
24  that you would want it to be used.

121

1    Q.    What's your hesitation?

2    A.    My hesitation is in -- well, I gave you

3  that first example from 124.  And in the example

4  from 124, we're looking at, from Chapterhouse,

5  very specific items.  In that situation, it was 12

6  torsos, 12 legs, 12 heads, 12 backpacks, and in

7  the Games Workshop we're looking at a whole set so

8  there seems to me to be a disparity in the Games

9  Workshop's definition of the word "each."

10        I have used "each" to refer to the

11  overall claim numbers, if that makes sense.  So

12  it's very confusing how Games Workshop defined

13  "each."

14    Q.    For example, 124, when you say the

15  Games Workshop product is derivative of

16  preexisting works, are you saying that all the

17  pictures identified in the middle column of your

18  Exhibit B are derivative of preexisting works?

19    A.    How are you using the term "derivative"

20  in that example?  Are you using it in my sense or

21  your sense?

22    Q.    I'm trying to figure -- for every work

23  of Games Workshop, it's my opinion that they are

24  all derivative of something prior.

122

1    A.    Yes.

2    Q.    I'm trying to figure out what you mean

3  by that.

4    A.    For example, in 124 I believe that the

5  images provided of the set, I would guess you

6  would call it, are indeed derivative of

7  preexisting works.

8    Q.    Every element of that image or some

9  elements?

10    A.    That question presupposes that I'm

11  going to have a definition of element in mind so I

12  will provide you with a definition of element

13  first.

14        My definition of element in this

15  situation, if we're looking at these images -- if

16  we're looking at these images, I would say yes,

17  every single element is derived from previous

18  works.

19    Q.    You were going to give me a definition

20  of elements before you used it.

21    A.    My definition of element in this

22  situation would be everything from the -- well,

23  really the colors that the figure are painted, the

24  appearance, say, for example, of a -- an object

123

1  such as a tripod, the pose of a figure putting

2  what appears to be a mortar around and do a

3  mortar.  The concept of a mortar, the concept of a

4  helmet, the concept of a uniform, the appearance

5  basically of a historically derived howitzer-like

6  weapon, the concept of a base for a miniature

7  figurine.  Every single possible element that I

8  can readily see from this diagram appears to have

9  an origin in prior works.

10    Q.    And you've identified those prior works

11  in the third column?

12    A.    Yeah, we've already gone over this.

13    Q.    Are there --

14    A.    I hope we don't have to do it again.

15    Q.    Outside the third column, are there any

16  other places you identify the prior works that you

17  believe that Games Workshop products are

18  derivative of?

19    A.    Other than the claims made in the

20  expert opinion, no.

21    Q.    Okay.  Do you believe that there's

22  anything original in the Games Workshop product at

23  124?

24    A.    No, I don't.

124

1    Q.    Do you believe there is any artistic

2  expression at all in the sculpting of those

3  models?

4    A.    Wait, could you rephrase that?

5    Q.    Do you think there is any artistic

6  expression at all in the sculpting of those

7  models?

8    A.    No, I don't.  Consider, for example,

9  the bottom figurine that shows a soldier putting

10  mortar into a mortar-like device.  I remember that

11  even from the green Army men that I had as a small

12  child.

13    Q.    So it's your opinion there's no

14  artistic opinion involved in any of that

15  sculpting?

16    A.    No, that's not to say they are not

17  nice.  They are nice.  They are just not original.

18    Q.    What do you mean by original?

19    A.    There's nothing in them that does not

20  derive from a different source, a previous source.

21    Q.    You mean the idea or the concept or the

22  exact expression of that concept the sculpture

23  made?

24    A.    I don't believe those two things can be

125

```
1    divorced.
2        Q.   So you can't divorce a concept of a
3    future military soldier from any particular
4    expression of that concept?
5        A.   No, I don't believe that there is a
6    tangible need to distinguish between those two
7    things.
8        Q.   Let's say I wanted to distinguish.  Are
9    you able to distinguish between --
10       A.   The idea of a thing and the thing
11   itself?
12       Q.   For example, there's an idea of a
13   future infantry soldier.  Are there many ways to
14   express that idea in a sculpture?
15       A.   I wish we had time this year.  This
16   goes into matters of ideal forms and neoplatonic
17   thought.
18       Q.   I'm not trying to get that theatrical
19   here.
20       A.   The problem is it's an inadvertent
21   product.
22       Q.   So in your mind there's not a way to
23   distinguish an idea from the expression of an
24   idea?
```

126

```
1        A.   That's not what I said.  In my opinion,
2    it's the expression of a thing and the thing
3    itself are two separate entities and the
4    individual expressions of an actual thing may, you
5    know, superficially seem marginally different but,
6    in fact, are not because they are both sort of
7    derivations of that other thing.
8        Q.   Okay.
9        A.   It's very difficult to explain.
10       Q.   Let's take the concept of a future
11   infantry soldier, would you agree there's many
12   different ways that concept could be expressed in
13   a sculpture?
14       A.   I think I'd have to say no.  It's
15   very -- it's a very difficult --
16       Q.   Let's take another example.
17       A.   Okay.
18       Q.   The concept of a lightening claw or a
19   clawed fist.  Do you understand that concept?
20       A.   I do understand that concept.
21       Q.   Would you agree there's many different
22   ways to express that concept in a sculpture?
23       A.   There are many different ways to
24   express that concept in a sculpture.
```

127

```
1        Q.   Is there any way for me to determine
2    looking through your chart for which products you
3    believe -- let me rephrase that.
4            Is there any way for me to determine by
5    looking through your chart for which Games
6    Workshop products you believe there is no other
7    way to express that idea such as 124 versus those
8    products which you believe there are multiple
9    ways to express the idea such as the lightning
10   claw?
11           MR. COOPER:  Objection, the first part
12       of that question misstates his testimony.
13           THE WITNESS:  Could you rephrase that
14       for me, please?
15   BY MR. KEENER:
16       Q.   Sure.  Let's take it in steps.
17           I believe you just testified that you
18   believe that there is only one way to express the
19   idea of a future infantry soldier in sculpture; is
20   that correct?
21           MR. COOPER:  Objection, that misstates
22       his testimony.
23           THE WITNESS:  No, I don't think that is
24       correct.
```

128

```
1    BY MR. KEENER:
2        Q.   Do you believe that there are multiple
3    ways to express the idea of a future infantry
4    soldier in a sculpture?
5        A.   When you're using the word "ways," I am
6    confused by whether you are referring to
7    significant or insignificant ways.
8        Q.   When you --
9        A.   In my opinion, there are many different
10   ways to express an idea but these ways may
11   insignificantly differ from one another.
12       Q.   So --
13       A.   So with the example of number 124, you
14   can express, either through words or imagery or
15   sculptured figurines, the concept of a future
16   infantry soldier, but although these ways may
17   superficially appear different, they are, in fact,
18   significantly different.
19       Q.   So it's your expert opinion that in
20   trying to express the concept of a future infantry
21   soldier, there are no significantly different ways
22   to express that concept?
23           MR. COOPER:  Objection, misstates
24       testimony.
```

129

1    THE WITNESS:  The problem with that
2    question is that it's anchored in a specific
3    moment in time so I'm going to assume when we
4    talk about a specific moment in time with
5    reference to the concept of being able to
6    create a model of a specific thing, we're
7    going to anchor, just for discussion sake, the
8    moment of time with now.
9    BY MR. KEENER:
10   Q.   Okay.
11   A.   If we consider the moment of now, it is
12   my expert opinion that I do not believe that it is
13   possible for someone to create a wholly original
14   or even significantly original future soldier.
15   Q.   But is it your opinion that you could
16   have insignificant differences in the expression
17   of a future infantry soldier?
18   A.   Yes, you could.
19   Q.   And those insignificant differences
20   could be original?
21   A.   No, I don't believe they could be
22   either.
23   Q.   So it's your opinion that there is no
24   original way to express the concept of a future

130

1    infantry soldier in a model?
2    A.   Not after a certain point in history,
3    no.
4    Q.   And that point's already passed?
5    A.   That point's already passed.
6    Q.   All original expressions of a concept
7    of a future infantry soldier have already been
8    made?
9    MR. COOPER:  Objection, calls for
10   speculation.
11   THE WITNESS:  I can't predict any sort
12   of future events, nor can I talk about things
13   that I haven't seen but so far through looking
14   at things that I have seen, I would have to
15   say that I don't believe that originality is
16   possible, but that's not to say that it is
17   not.
18   BY MR. KEENER:
19   Q.   But it's your expert opinion right now,
20   based on what you know and have seen, that it is
21   not possible to have an original expression of a
22   future infantry soldier in a model?
23   MR. COOPER:  Could you repeat that?
24   (Record read.)

131

1    MR. COOPER:  Objection, misstates
2    testimony.
3    THE WITNESS:  Could I hear that one
4    more time?
5    MR. KEENER:  Okay.
6    (Record read.)
7    THE WITNESS:  When you say "right now,"
8    I'm going to take that as one of two ways and
9    it confuses me.  I can't determine whether you
10   mean right now, as in right now it's my
11   opinion, or right now in terms of we can't --
12   there's no possibility of wholly original
13   thing being right now.
14   BY MR. KEENER:
15   Q.   Right now as in your opinion.
16   A.   Yes, right now in my opinion, it's not
17   possible to have a wholly original space marine
18   model.
19   Q.   You put the word "wholly" in there.  I
20   said original in any way.
21   A.   Yes, I believe it's not possible.
22   Q.   To have an original model in any way of
23   a future infantry soldier?
24   A.   Yes, it is not possible.

132

1    Q.   In your research, have you identify any
2    pictures which you believe are identical to any of
3    the Games Workshop products?
4    A.   That really depends on how you define
5    identical.
6    Q.   Identical means exactly the same.  Is
7    it your expert opinion, expressed anywhere
8    throughout your report or chart, that you have
9    found something in the prior works that is
10   identical to one of Games Workshop's products?
11   A.   I don't believe I've made that claim.
12   Q.   So the extent of your claim is you have
13   found prior works that are similar to the Games
14   Workshop products or share some similarities.  Is
15   that accurate?
16   MR. COOPER:  Objection to the extent it
17   misstates testimony.
18   THE WITNESS:  I don't believe it is.
19   BY MR. KEENER:
20   Q.   What am I missing?
21   A.   You're missing those situations
22   where -- well, the thing about identical that's
23   kind of troubling is when you look at, say, for
24   example, the British Mark V tank.  There are

133

1  indeed superficial differences between the Games
2  Workshop, you know, Battle Raider and the Mark V
3  tank. There's superficial differences so they are
4  technically not identical, per se.
5      Q.  But you believe there are many
6  similarities between the two?
7      A.  I believe there is a preponderance of
8  similarities between the two that render their
9  significant details unimportant.
10     Q.  But you believe there are differences
11 between the two?
12     A.  Yes.
13     Q.  So they are not identical?
14     A.  They are not identical.
15     Q.  The extent of your opinion is there are
16 a lot of similarities between the two?
17     A.  And that one is clearly derived from
18 the other.
19     MR. COOPER:  Jason, I think whenever
20 you close out your line of questioning --
21     MR. KEENER:  Sure. Why don't we take a
22 break right now.
23     (Lunch recess taken at 12:26 p.m.)
24

134

1      A F T E R N O O N   S E S S I O N
2      (Time noted:  1:05 p.m.)
3  D R.  C A R L  G R I N D L E Y,  resumed and
4      testified as follows:
5  CONTINUED EXAMINATION
6  BY MR. KEENER:
7      Q.  Before the break, we talked about how
8  you said as of today, there are no new ways to
9  express the idea of a future infantry soldier. Do
10 you remember?
11     A.  Yes, I do.
12     Q.  At what point in time did that tipping
13 point occur?
14     MR. COOPER:  Objection, calls for
15 speculation.
16     THE WITNESS:  I think sometime around
17 the turn of the millennium.
18 BY MR. KEENER:
19     Q.  Around the year 2000?
20     A.  About then, yes.
21     Q.  So was it after Games Workshop created
22 its works at issue?
23     A.  I'm not entirely sure. Let's look at
24 these dates. If we're looking at 124, it's

135

1  before.
2      Q.  You understand based on footnote 1 of
3  your report that while this current model might be
4  2003, it's based off prior Games Workshop works
5  that go back potentially to 1987?
6      A.  Yes.
7      Q.  So that tipping point occurred after
8  1987; is that fair?
9      MR. COOPER:  I'm sorry, could you
10 repeat that?
11 BY MR. KEENER:
12     Q.  After, that tipping point occurred
13 after 1987?
14     MR. COOPER:  Objection, calls for
15 speculation.
16     THE WITNESS:  I would really have to
17 think and ponder on that for a while because
18 we're looking at a variety of different ways
19 to interpret depiction. So for example, in
20 terms of cinematic sources, I haven't seen
21 really any originality from about the time of
22 Aliens or Starship Troopers but even slightly
23 before that, perhaps even as far back as
24 Terminator in '84, just in the scenes they

136

1  show from the future, there's really nothing
2  in it.
3  BY MR. KEENER:
4      Q.  So in your expert opinion, at what
5  point did all forms of expression of a future
6  infantry soldier become exhaustive?
7      MR. COOPER:  Can you read that back?
8      (Record read.)
9      THE WITNESS:  I think I have a better
10 way of phrasing that.
11 BY MR. KEENER:
12     Q.  First, can you answer that question and
13 feel free --
14     A.  No, I really can't.
15     Q.  You're unable to answer that question?
16     A.  I think because I didn't quite word
17 this concept of tipping point properly.
18     Q.  Okay.
19     A.  And it's not so much of a particular
20 date where it became impossible. It's more of a
21 particular date where it became evident that it
22 was impossible.
23     Q.  Okay. In your expert opinion, as of
24 what date was it evident that it was impossible to

137

1 have any new expressions of a future infantry
2 soldier?
3     A.   Approximately the year 2000 it became
4 evident.  That's not to suggest that it was
5 possible before then.  It's just that it was
6 evident around that time.
7     Q.   Are you going to express any expert
8 opinion that all forms of expression were
9 exhausted at any date prior to 2000?
10     MR. COOPER:  Objection, calls for
11 speculation.
12     THE WITNESS:  I don't believe I did so
13 in my report so I would have to say that I
14 would not.
15 BY MR. KEENER:
16     Q.   So prior to the year 2000, you have
17 knowledge that there were various ways to express
18 the concept of future infantry soldier?
19     MR. COOPER:  Objection, misstates the
20 testimony.
21     THE WITNESS:  I'm not entirely sure
22 that I could say one way or another, only that
23 I could say that it was evident after 2000 or
24 so.

138

1 BY MR. KEENER:
2     Q.   So you do not have an expert opinion
3 one way or the other whether or not it was
4 possible to have an original expression of a
5 future infantry soldier before the year 2000?
6     A.   In order to answer that question,
7 wouldn't I need to have a fixed terminal date
8 rather than the idea that something became
9 apparent at a particular time?  So I think it's a
10 little bit difficult to answer that question in
11 that I could do any amount of continued research
12 on this, which of course I can't do, but if I did
13 that extra research I could give you a firm date,
14 but right now I can't give you a firm date but
15 except to say by 2000 it was done.
16     Q.   Let make it simpler.
17     You have not expressed any opinion in
18 your report anywhere that all forms of expression
19 of a future infantry soldier were exhausted prior
20 to the year 2000?
21     A.   Correct.
22     Q.   This idea that there is no way to
23 express originally a future infantry soldier, does
24 that apply both to Exhibit 124 of those

139

1 guardsmen/women we saw as well as space marines?
2     A.   How are you using the term -- wait, I
3 know I'm not allowed to ask you questions.
4     When you say the word "space marines,"
5 for the purpose of this answer I'm assuming you
6 mean the Games Workshop space marine figures.
7     Q.   I'm trying to clarify when we said
8 future infantry soldiers, your meaning of that was
9 broad enough to encompass both the Games Workshop
10 guardsman figures as well as the Games Workshop
11 space marine figures.
12     Is true that you were using that
13 term broadly to encompass both types?
14     A.   I was using that term to broadly to
15 encompass both types.  I believe there was more
16 flexibility with the overall idea of, you know, a
17 future soldier than with the particular aspects of
18 a space marine so I believe that the space marine
19 figure ossified sooner.
20     Q.   At what point do you believe in your
21 expert opinion that there are no original
22 expressions of a space marine type soldier
23 possible?
24     MR. COOPER:  Could you repeat that

140

1 question?
2     (Record read.)
3     THE WITNESS:  This is a very difficult
4 question to answer because when we're thinking
5 about expressions, we can include nontangible
6 things that I don't know if they are relevant
7 or not, such as the backstory that a character
8 or characters have, or we could be just
9 considering the appearance of the characters.
10 BY MR. KEENER:
11     Q.   Let's limit it to the appearance.
12     A.   Limiting it to the appearance makes
13 that a much easier question to answer.  And
14 limiting it to the character, I would say it's
15 long done.
16     Q.   Can you give me a date?
17     A.   Probably by the very early '80s.
18     Q.   Any more specific you can give me on a
19 date?
20     A.   I would say the last nails in the
21 coffin for that were when there was a Japanese
22 anime created of Starship Troopers, I believe,
23 although I'm not entirely certain, between the
24 years 1980 and 1984.

141

1    Q.  And that's not a work that you referred
2  to or rely on in any way in your expert report,
3  right?
4    A.  I'm going to check.
5      (Witness perusing document.)
6    I did not mention that work
7  specifically by name.
8    Q.  Okay.
9    A.  Although in paragraph 29, I do say
10  about power suit, "Graphic interpretations of this
11  suit have taken a number of different forms since
12  the novel's serialization."
13    In retrospect, I should have said -- I
14  should have cited the anime from the 1980s, and I
15  would like to correct my memory if I could.
16    Q.  Okay.
17    A.  When I said the year 2000, I somehow
18  had my mind set that Aliens came out in 19 -- 1997
19  when indeed it came out in 1986.
20    Q.  Okay, so that is --
21    A.  That's going to change my dating of
22  2000 to 1990 at the latest, if Aliens came out in
23  1986.
24    Q.  Is it my understanding that your

142

1  testimony is at least as of 1990, it became
2  evident that all types of expression of a future
3  infantry soldier had been exhausted?
4    A.  Yes.
5    Q.  And that's due to the dating of the
6  movie Aliens?
7    A.  Yes.
8    Q.  Under your rationale, would you agree
9  with me that there is nothing original in any of
10  the Chapterhouse products?
11    A.  That would depend on how a person would
12  define original.
13    Q.  And in your sense, you told me there
14  was nothing --
15    A.  In my sense, yes, I would say there's
16  nothing original.
17    Q.  Would you also say that it's your
18  opinion that the Chapterhouse products are derived
19  from Games Workshop products?
20    A.  No, I would say they are both derived
21  from the same ultimate sources.
22    Q.  Do you have any expert opinion one way
23  or the other whether or not the Chapterhouse
24  designers were referring to the Games Workshop

143

1  products to design it or some ultimate source to
2  design it?
3    A.  I have no opinion on that.
4    Q.  You're not expressing any opinion
5  whether any particular Games Workshop designer
6  used any specific reference when they were
7  creating their work, are you?
8    A.  I believe I did.
9    Q.  Is that when we're talking about the
10  flamer, the lightning claw and the tank?
11    A.  I think that was either the whole or at
12  least a partial list.
13    Q.  Are you planning any expert opinions
14  whether any Games Workshop work lacks originality
15  in the copyright sense?
16    A.  I'm not an expert in copyright law.
17    Q.  What is your understanding of the word
18  "originality" when you use it?  I'm sorry?
19    A.  No, I'm formulating a response.
20    Originality would be the idea of a
21  thing wholly onto itself without an external
22  influence of any sort.
23    Q.  Okay, can something be partially
24  original?

144

1    A.  No.
2    Q.  Why not?
3    A.  For the same reason you can't be
4  partially pregnant.
5    Q.  Can something be an original
6  combination of prior works?
7    MR. COOPER:  Object to the hypothetical
8  and to the extent it calls for legal
9  conclusion.
10    THE WITNESS:  I'm not sure.
11  BY MR. KEENER:
12    Q.  When you were forming your expert
13  opinions in this case, were you assuming that
14  you could have an original combination of prior
15  works?
16    A.  I was assuming that, yes.
17    Q.  And you didn't identify any original
18  combinations of prior works?
19    A.  No, I did not.
20    Q.  For example, when we were discussing
21  the Mona Lisa, you thought it was an original
22  concept to put a mustache on the Mona Lisa?
23    MR. COOPER:  Objection, misstates prior
24  testimony.

145

BY MR. KEENER:

Q.  Is that right?

A.  No, I believe that isn't right.  I believe we were looking at that whether or not a work could be a derivative work.

Q.  And I think you testified you did not think that was a derivative work and you thought it was original.

MR. COOPER:  Objection, misstates testimony.

THE WITNESS:  I believe we were discussing the legal use of the term "derivative," in which case the argument was to the best of my recall that legally that work would be derivative but creatively it would not be derivative, which again now makes it difficult to consider what we're talking about is deemed original or not since it seems to be clouded in the nature of what is legally original or not.  So I'm kind of confused by where we're going.

BY MR. KEENER:

Q.  So the mustache on the Mona Lisa you believe creatively was original?

146

A.  No, I don't, I don't think so.

Q.  Why not?

A.  Well, actually I don't know.  I'd have to think about that for some time.

Q.  Okay.

A.  I think that's a matter, too, that our historians haven't worked out.

Q.  But for the Games Workshop products, you did not find any combination of prior things that you thought was an original combination?

A.  None rise to the level of the mustache on the Mona Lisa, and even then I'm not sure that would qualify.

Q.  Did you attempt to determine whether or not there were original combinations?

A.  By determine, I'm not entirely sure what you mean.  Could you explain "determined"?

Q.  Was that part of your work to look at whether or not any combinations used were original combinations?

A.  By look at, do you mean view the illustrations in the chart and make a determination based on those illustrations?  And if you do mean that, then I would have to say that

147

I did indeed look for originality in the combination of elements and wasn't able to find any.

Q.  For any of the products?

A.  To the best of my recollection, I was unable to find any original combinations.

Q.  At what point did you determine that all forms of expression for infantry soldier type warrior were exhausted; was that prior to or after writing your report?

A.  I think it has been knowledge that has been percolating in my mind for sometime.

Q.  So that --

A.  And yet I don't think that I ever had proper impetus to write it down before.

Q.  So prior to seeing any of the Games Workshop products, you had already formed the opinion that all forms of expression of infantry soldier had been exhausted?

MR. COOPER:  Objection, misstates testimony.

THE WITNESS:  No, because as a scholar, one is always open to having one's mind changed based on new evidence.  I suppose I

148

could change my mind again if I saw something that was new, but in my opinion right now I believe it to be impossible.

BY MR. KEENER:

Q.  And further, your opinion that the use of the word "flamer" by Games Workshop meant that that designer must have read Starship Troopers, is that an opinion that you formed before or after starting work on this case?

A.  After.

Q.  And what evidence did you learn afterwards that made you form that opinion?

A.  I reread Starship Troopers.

Q.  And did you read any of the testimony of any Games Workshop designers?

A.  No, I have not.

Q.  Why not?

A.  It has not been provided to me.

Q.  Was it something you would have wanted to review prior to form your expert opinion?

A.  No.

Q.  Why?

A.  I'm not interested in what people claim to remember or remember or influences they either

149

1  consciously or unconsciously know.  You have to
2  understand that with Barthes' work on the Death of
3  Authorship that an individual's opinion of their
4  own work is wholly irrelevant.
5      Q.   So the individual artist who created
6  these works, it's completely irrelevant the facts
7  of what they believe and testified they used to
8  create these works?
9      A.   It may make for interesting anecdotes
10  but ultimately it's unimportant.  From an artistic
11  and sort of theoretic point of view.  I don't know
12  how that works in a legal sense, and we must
13  remember that I'm only speaking about this from a
14  scholarly point of view.  And from a scholarly
15  point of view, the comments made by various types
16  of authors regarding their works are typically
17  dismissed as being unreliable.
18      Q.   Similarly, if an artist says that they
19  independently created an item and it happens to
20  look like something that existed in history,
21  that's not something you would want to know?
22      A.   No.
23      Q.   Why?
24      A.   It's irrelevant.

150

1      Q.   You don't have any personal knowledge
2  how Games Workshop created any of the products at
3  issue, do you?
4      A.   No, I don't.
5      Q.   You didn't review any of the design
6  documents or concept documents?
7      A.   No.
8      Q.   Similarly for the Chapterhouse
9  products, you don't have any opinion on what works
10  are used in those products, do you?
11      A.   None whatsoever.
12      Q.   Or whether that product was directly
13  copied from Games Workshop products?
14      A.   No.
15      Q.   You didn't speak to any of the
16  Chapterhouse designers?
17      A.   No.
18      Q.   You didn't read any of the transcripts?
19      A.   No.
20      Q.   You didn't review any of their
21  documents or e-mails?
22      A.   No.
23      Q.   You don't have any personal knowledge
24  about how they created their products?

151

1      A.   No.  Up until, I guess December, I had
2  no idea they existed.
3      Q.   I'm including after that, up until the
4  time you signed your report.
5      A.   I haven't even seen their website.
6      Q.   You're not --
7      A.   I assume they have one.
8      Q.   You're not providing an expert opinion
9  one way or another whether Chapterhouse committed
10  copyright infringement, are you?
11      A.   I'm not an expert in copyright.
12      Q.   So therefore, you're not providing any
13  opinion on whether or not Chapterhouse committed
14  copyright infringement?
15      A.   Correct.
16      Q.   And are you providing any expert
17  opinion on whether or not Chapterhouse products is
18  substantially similar to Games Workshop products?
19      A.   Yes, I am.
20      Q.   And what is your opinion?
21      A.   That there are no substantial
22  similarities.
23      Q.   Between any of the products?
24      A.   Between any of the products.

152

1      Q.   So while Games Workshop products are
2  substantially similar to the prior works you find,
3  it's your expert opinion that the Chapterhouse
4  products are not substantially similar to the
5  Games Workshop products?
6          MR. COOPER:  Objection, misstates his
7  testimony.
8          THE WITNESS:  What I am suggesting in
9  my opinion is that there are no substantial
10  similarities between Chapterhouse's products
11  and Games Workshop's products and that
12  insignificant similarities between the two are
13  resulting from their shared derivation in
14  prior works.
15  BY MR. KEENER:
16      Q.   Let me break that down.
17          Are you expressing an opinion that
18  Games Workshop products are substantially similar
19  to prior works?
20      A.   Yes.
21      Q.   Are you expressing any opinion whether
22  Chapterhouse products are substantially similar to
23  Games Workshop products?
24      A.   Yes.

153

1    Q.   Are they?

2    A.   No.

3    Q.   Are any of the products substantially

4    similar to each other?

5    A.   No.

6    Q.   In any way?

7    A.   No.

8    Q.   Do you believe that Chapterhouse

9    products are substantially similar to the prior

10   works?

11   A.   I was not asked for that opinion.

12   Q.   Is it your opinion?

13   A.   Yeah.

14        MR. COOPER:  Objection, outside the

15   scope.

16   BY MR. KEENER:

17   Q.   I didn't hear your answer.

18   A.   Yes.

19   Q.   So it's your opinion that the Games

20   Workshop products are substantially similar to the

21   prior works, yes?

22   A.   Yes.

23   Q.   And the Chapterhouse products are

24   substantially similar to the prior works, yes?

154

1    A.   Yes.

2    Q.   But it's also your opinion that the

3    Games Workshop products are not substantially

4    similar to the Chapterhouse products?

5    A.   Yes.

6    Q.   It's correct that it's your opinion

7    that they are not substantially similar?

8    A.   They are not substantially similar.

9    The similarities that they share are due to a

10   mutual origin point.

11   Q.   I'm including those.  Regardless of

12   mutual origin, take the column 3 out of the

13   equation, looking at just the Chapterhouse

14   products and the Games Workshop products, are you

15   forming an opinion whether or not those products,

16   without regard to anything prior, are

17   substantially similar?

18        MR. COOPER:  Objection, asked and

19   answered.

20        THE WITNESS:  They are similar to the

21   extent they share a mutual origin.

22   BY MR. KEENER:

23   Q.   I'm excluding mutual origin.

24   A.   I can't go further from there.

155

1    Q.   Assume for me none of those prior works

2    ever existed.  This is a hypothetical.  All you

3    have before you is the Chapterhouse products and

4    the Games Workshop products.  Are you forming any

5    opinion whether or not those two products are

6    substantially similar?

7        MR. COOPER:  Objection --

8        THE WITNESS:  That's --

9        MR. COOPER:  Hold on, to the

10   hypothetical that it calls for a legal

11   opinion, it's outside the scope of your

12   report.

13        THE WITNESS:  I'd actually have the

14   answer that calls for me to needlessly exclude

15   entities and I don't think logically I could

16   answer that.  It's a fallacy.

17   BY MR. KEENER:

18   Q.   Are you going to be offering any

19   opinion at trial, regardless of the prior works,

20   whether or not there's any substantial similarity

21   between Games Workshop product and the

22   Chapterhouse product?

23   A.   I cannot divorce the prior works.

24   Q.   So you will not be offering any opinion

156

1    whether or not the Games Workshop products and the

2    Chapterhouse products were substantially similar?

3        MR. COOPER:  Objection, that misstates

4    his testimony.

5        THE WITNESS:  I have already said that

6    they are not substantially similar.

7    BY MR. KEENER:

8    Q.   It's my understanding you're meaning

9    that to mean except for similarities with the

10   prior works, they are not substantially similar.

11   A.   Not except.

12   Q.   What am I missing?

13   A.   Two men are wearing suits.  Both suits

14   originate in previous suits.  The similarities

15   that they therefore share would be those

16   attributes of the suit that is not encompassed by

17   previous works.  So therefore, even though the two

18   suits the two men may be wearing appear virtually

19   identical, they are indeed not and do not share

20   any substantial similarities to one another.

21   Q.   Okay.  Couldn't someone looking at

22   those two suits say those two suits are virtually

23   identical, they share many similarities, and

24   compare the pockets and the sleeves and the color

157

1 and everything else, and then further go and the
2 reason they are similar is because they are both
3 off of this prior suit?
4     MR. COOPER:  Could someone do that, is
5 that the question?
6     THE WITNESS:  I suppose someone could
7 do that.
8     MR. COOPER:  Objection to the
9 hypothetical, calls for speculation.
10 BY MR. KEENER:
11    Q.   In the same instance, couldn't you look
12 at the Games Workshop products and the
13 Chapterhouse products and say they are very
14 similar and have all these similarities, yet those
15 similarities are based on a prior work?
16     MR. COOPER:  Objection, calls for
17 speculation into the hypothetical.
18     THE WITNESS:  I think that someone
19 probably could say that but it wouldn't be a
20 person well-versed in scholarship.
21 BY MR. KEENER:
22    Q.   Okay.  In your expert opinion, do the
23 Chapterhouse products and the Games Workshop
24 products share substantial similarities regardless

158

1 of where these similarities come from?
2     MR. COOPER:  Objection, asked and
3 answered --
4     THE WITNESS:  I'm sorry --
5     MR. COOPER:  Give me a second.  Asked
6 and answered, calls for speculation, calls for
7 a legal conclusion, outside the scope of his
8 report.
9     THE WITNESS:  I'm sorry, I cannot
10 divorce the prior works from this equation.
11 BY MR. KEENER:
12    Q.   So you're unable to answer that
13 question whether or not there are similarities
14 between the Games Workshop product and the
15 Chapterhouse product regardless of where these
16 similarities arise from?
17     MR. COOPER:  Same objection, and to
18 form.
19     THE WITNESS:  I'm not unable to answer
20 the question.  The question cannot be
21 answered.
22 BY MR. KEENER:
23    Q.   So for example, a Chapterhouse product
24 is in a space marine type armor and the Games

159

1 Workshop is in a space marine type armor.  Do you
2 understand that?
3    A.   No, I do not.
4    Q.   Let's turn in Exhibit B to page 11.
5     Do you see on the left-hand side a
6 Chapterhouse product called a TRU-Scale Knight
7 Praetorius?
8    A.   On page 11?
9    Q.   On the bottom of page 10 is the title
10 of that project, but the pictures start on page 11
11 and the Chapterhouse product is called a TRU-Scale
12 Knight Praetorius.
13 do you see that?
14    A.   No, I don't.
15    Q.   You don't understand those to be
16 Chapterhouse's TRU-Scale Knight Praetorius?
17    A.   They are not.
18    Q.   It's their conversion kit?
19    A.   Conversion kit is not depicted.
20    Q.   Do you understand them to be selling
21 various pieces, including legs, torso, head and
22 shoulder pads among others?
23    A.   No, I do not.
24    Q.   What was wrong with that question?

160

1    A.   It's shoulder pads, torsos, legs and
2 backpacks.
3    Q.   Okay.
4     So Chapterhouse's shoulder pads, legs,
5 torsos and backpacks you understand to be
6 Chapterhouse products in the left-hand column?
7    A.   Yes.
8    Q.   And you understand the middle column to
9 have Games Workshop products that also contain
10 legs, torsos, shoulder pads and backpacks?
11    A.   Yes.
12    Q.   Are you able to have any -- do you have
13 any expert opinion on whether or not the shoulder
14 pads between the Chapterhouse product and the
15 Games Workshop product are similar?
16    A.   No, I don't believe they are.
17    Q.   Are you forming any opinion whether the
18 legs are similar?
19    A.   No, I do not believe they are.
20    Q.   Whether the torsos are similar?
21    A.   No, I do not believe they are.
22    Q.   And whether the backpacks are similar?
23    A.   I don't believe they are.
24    Q.   You don't believe they are similar in

161

1　any way?

2　　A.　I believe they are insignificantly

3　similar but ultimately derived from the same base

4　set of sources.

5　　Q.　Now, you're adding where they are

6　derived from.  My question is not where they are

7　derived from, my question is whether these two

8　pictures are similar to each other.

9　　A.　We're getting bogged down again into

10　this notion of similarity.

11　　Q.　Are you able to answer yes or no

12　whether two pictures are similar to each other

13　without knowing the originating source?

14　　A.　I would never answer a question without

15　knowing the originating source in that sort of

16　matter.

17　　Q.　You are unable to look at two pictures

18　to say whether or not they are similar without

19　understanding the originating source?

20　　A.　As a lay person or as a scholar?

21　　Q.　I'm asking your expert opinion.

22　　A.　Then I would say no, I would not make

23　such a determination unless I had done the

24　research.

162

1　　Q.　Right, and you're saying the research

2　needed to say whether two pictures are similar to

3　each other depends on what source material they

4　may have come from?

5　　A.　Correct.

6　　Q.　Do you have an expert opinion on what

7　design elements are essential or unavoidable in

8　creating a future infantry soldier?

9　　MR. COOPER:  Object to form.

10　　THE WITNESS:  Could you rephrase that?

11　BY MR. KEENER:

12　　Q.　Sure.  You've classified -- let me

13　restart.

14　　You've stated that all the various

15　types of expressions of a future warrior have been

16　exhausted, as of 1990 at least.

17　　A.　Yes.

18　　Q.　Do you have in your expert opinion any

19　design elements of such a soldier that are

20　essential to a future space warrior?

21　　MR. COOPER:  Same objection.

22　　THE WITNESS:  It's difficult to answer

23　this question without providing you with a

24　brief analogy.

163

1　BY MR. KEENER:

2　　Q.　Okay.

3　　A.　Sometimes when people go to, say, a

4　hair salon, they can look at different

5　possibilities for haircuts.  In the same salon,

6　there might be different possibilities for your

7　sideburns or for your mustache or beard or what

8　have you.  And what happens with that process of

9　selection is that you have to choose one way to

10　have your hair cut.  There are many ways to have

11　it cut but you must choose one of them.  There are

12　many ways that you could have your sideburns or

13　your eyebrows sculpted but you must choose one of

14　them.

15　　So there is not a singular set of

16　component elements of graphic depiction of, say, a

17　future soldier.  There are, however, ranges of

18　possibility for individual items for which you may

19　make a selection, and that selection in no way

20　guarantees any sort of sense of originality.

21　You're merely choosing from a variety of stock

22　possibilities and ending up with a variant.  But

23　that variant, indeed I think all the possibilities

24　were to be exhausted.

164

1　Was that helpful?

2　　Q.　I think so.  Let's take an example.

3　　So creating a future infantry soldier,

4　how many possibilities are there for a helmet?

5　　MR. COOPER:  Objection, calls for

6　speculation.

7　　THE WITNESS:  I imagine that there are a

8　fairly large number of possibilities but a

9　very small number of actual executed

10　possibilities, so just in a quick kind of run

11　through while we're sitting here, I'm trying

12　to recall every -- and this is just from film.

13　Just from film, trying to recall how many

14　different types of helmets I've seen in future

15　soldier type characters, and I don't think it

16　numbers more than three or four if you're

17　looking at basic shapes but I would have to do

18　-- and I'm uncomfortable with this sort of

19　speculation because I would really have to sit

20　down and go through films or still images.  I

21　would have to do probably a significant amount

22　of research to give you a really hard number

23　just on helmet shapes, but I would be

24　surprised if it was more than half a dozen.  I

165

1 would be very surprised.
2 BY MR. KEENER:
3 Q. Okay, so there are only around, give or
4 take, half a dozen different types of helmets all
5 future soldiers can wear?
6 A. Not can wear, does wear.
7 Q. And how about torsos, how many
8 different types of torsos are there?
9 A. Well, if you include power armor, only
10 a couple really.
11 Q. Not including just the type of power
12 armor but every expression of that type?
13 A. Well, the expressions may be
14 insignificantly different from one another.
15 Putting an extra bauble here or there or changing
16 the paint of something isn't really significant,
17 at least from, you know, either an art or a cinema
18 or a literary point of view. I'm sure it's
19 probably different from a legalistic point of
20 view. But a smirch of paint here and a smirch of
21 paint there doesn't make any difference.
22 Q. So for example, the power armor a
23 Starship Trooper might wear you're saying is the
24 same power armor that a spaceman might wear or the

166

1 same as the power armor that Iron Man might wear?
2    MR. COOPER: Objection, misstates
3    testimony.
4    THE WITNESS: That's a very difficult
5    question to answer because in that mix has
6    actually been the originating image.
7 BY MR. KEENER:
8 Q. I'm trying to understand in your count
9 of how many types of armor there are, are you
10 treating all of those as one type of armor, one
11 expression?
12 A. It's a difficult example. There is --
13 in that example you provided, there is one
14 expression, several incarnations, and those
15 incarnations are substantially similar to the
16 original expression.
17 Q. Okay. So if I understand for those
18 examples, a Starship Trooper mobile infantry and a
19 Games Workshop space marine and an Iron Man, you
20 believe they all have the same expression of a
21 power suit, just different incarnations?
22 A. I believe that they all have -- or
23 rather if we use that example, we have Iron Man
24 and we have the space marines. They originate in

167

1 the Starship Trooper power armor. The power armor
2 from Starship Trooper is the expression. The
3 other two are merely incarnations. The other two,
4 Iron Man's various suits will have an
5 insignificant level of similarities between
6 themselves and say, for example, space marine's
7 power armor, but both of them will have
8 significant similarity to the Starship Troopers
9 originating power armor.
10 Q. So there's nothing original in the Iron
11 Man suit that's not already due to the Starship
12 Trooper influence?
13 A. Correct.
14 Q. And in the various different Iron Man
15 suits, there's nothing original in the later
16 incarnation versus the first Iron Man suit?
17 A. They are basically trivially different.
18 Q. In your mind, there's nothing original
19 about the later ones?
20 A. No.
21 Q. So going back to the example of
22 creating an infantry future space warrior, let's
23 assume there's five or six helmet choices and only
24 five or six torso choices and only five or six leg

168

1 choices and only five or six boot choices, only
2 five or six gauntlet choices, only five or six
3 backpack choices, et cetera. We quickly get to,
4 once you find the permutation, a very, very large
5 number of possibilities; do you agree?
6 A. Uh-huh.
7 Q. Yes?
8 A. Yes, I do agree that would it be five
9 factorial, which would be -- I don't know what
10 number that would be, a very large number.
11 Q. And so which combination of those,
12 would that be an original choice?
13 A. It would be but it never occurs. This
14 is the crazy thing about this particular character
15 type is that you have a vast number of
16 permeations but you never see them. You have
17 these possibilities and yet you end up with
18 virtually identical characters all the time.
19 Q. Have you identified in your report or
20 your exhibit any prior work that made all the same
21 design choices as the Games Workshop space marine
22 from the helmet to the backpack to the shoulder
23 pad to the torso to the legs to the boots to every
24 other design choice?

169

1   A.  I believe I already addressed that

2   saying that, A, I was never asked to do that, and

3   that that needlessly opens up a number of entities

4   that are not required, because then, of course,

5   where would I go from there?  Do I have to worry

6   about whether it is imitation polyester, imitation

7   cotton?  Do I have to worry about whether boots

8   have nine holes for shoelaces or 12?  It

9   unnecessarily adds these permeations.

10   Q.  Leaving out the level of item, which is

11   only maybe seven or eight different elements, did

12   you identify anything in the prior art that made

13   those same seven or eight choices that Games

14   Workshop did?

15   MR. COOPER:  Objection to the

16   hypothetical.

17   THE WITNESS:  That was never my point

18   so no, I didn't do it.  That was your point.

19   BY MR. KEENER:

20   Q.  So you are not forming any expert

21   opinion that the combination of design elements

22   chosen by Games Workshop is the same combination

23   as any of the prior works because you didn't do

24   that an analysis?

170

1   A.  I did not do that analysis.

2   Q.  You are not expressing any expert

3   opinion in your report or chart that the design

4   choices of which elements to include in the Games

5   Workshop space marine are the same combination of

6   design elements in any prior work?

7   A.  No, but I could do that if you wanted

8   me to.

9   Q.  I'm only interested in the opinions you

10   expressed in your expert report and your chart.

11   You did not form that opinion in either of those,

12   correct?

13   A.  No, I did not.

14   Q.  So you're not going to come to trial

15   and express that opinion, correct?

16   A.  Am I allowed to?  Because I think I

17   could.

18   Q.  All the opinions you're going to

19   express are supposed to be contained in your

20   report.

21   A.  Oh, then I guess I would not.

22   Q.  And can we say that's the same about

23   the other Games Workshop products in the chart,

24   that you have not expressed any opinion on whether

171

1   the combination of design elements chosen by Games

2   Workshop are the same combination of any prior

3   works you found?

4   A.  I'd have to look at the report.  I

5   don't believe I explicitly said that.

6   Q.  Implicitly or explicitly, have you

7   pointed to any prior works where you believe all

8   the same design choices which elements to include

9   is the same combination that Games Workshop chose?

10   A.  No, I have not.

11   Q.  You stated that there's only so many

12   ways a future infantry helmet is depicted and

13   various other features, correct?

14   A.  Yes.

15   Q.  Do you attempt to identify in your

16   report what those various ways are for design

17   elements?

18   A.  No, I do not.

19   Q.  Do you understand trademarks to be at

20   issue in this case?

21   A.  No, I do not.

22   Q.  So you're not making any opinion

23   anywhere about the use of various terms or

24   terminology, correct?

172

1   A.  No, I'm not, nor do I know anything

2   about trademark law.

3   Q.  I think we've covered that.

4   A.  Okay.

5   Q.  Does your report contain a complete

6   statement of each of the opinions you're going to

7   express in this case?

8   A.  That's actually difficult to answer.

9   Q.  Were you told that your report must

10   contain a complete statement of each of the

11   opinions you will express in this case?

12   A.  Yes, I was.

13   Q.  And did you attempt to do so?

14   A.  I believe that I did insomuch as the

15   complaint did.  And by this, I refer to two

16   different matters.  Matter one, when we're looking

17   at the table in its original version, there are a

18   large number of images that have been used that I

19   would imagine would be perhaps described or shown

20   to someone who was interested in this matter or

21   other ways walked through like you just did with

22   me when you said look at this torso or look at

23   these legs.

24   I am operating under the assumption

173

1  that how you just deposed me with that level of
2  information, I likewise would be able to walk
3  people through these images.
4      Q.  Anything else?
5      A.  I believe that would be all that would
6  be necessary.
7      Q.  Okay.  So you did not walk through the
8  various design elements in your report?
9      A.  No, neither did Games Workshop.
10     Q.  Okay.
11     A.  I assume that what they were doing
12 would be what I would be doing, which is what you
13 just did.
14     So your report did not contain a
15 complete statement of each of your opinions with
16 regards to any of the elements?
17     MR. COOPER:  Objection, misstates the
18 testimony.
19     THE WITNESS:  Yes, it does.
20 BY MR. KEENER:
21     Q.  Where does it contain a complete
22 statement of your opinions regarding the elements?
23     A.  In the images.
24     Q.  Beyond the images?

174

1      A.  The images are inclusive of the
2  opinion.
3      Q.  So in your opinion your report contains
4  a complete statement of the opinions you're going
5  to express?
6      A.  Yes.
7      Q.  Does your report contain a complete
8  disclosure of the basis and reason you will use to
9  support your opinions?
10     A.  Yes.
11     Q.  Does your report contain all facts
12 considered by you in forming your opinions?
13     A.  I believe it does, yes.
14     Q.  Does your report contain all data
15 considered by you in form your opinions?
16     A.  I believe it does, yes.
17     Q.  Now, let's take, for example --
18     A.  I could check a few dates but I'm
19 pretty sure it does.
20     Q.  Let's take, for example, product 124 on
21 page 2 of Exhibit 191.  Under Chapterhouse Accused
22 Products, do you see that picture there of
23 miniatures assembled and painted?
24     A.  Yes.

175

1      Q.  Do you have any understanding where
2  that picture comes from?
3      A.  None whatsoever.
4      Q.  And is it your understanding, despite
5  this picture, what Chapterhouse actually sells are
6  a number of component parts?
7      A.  Yes, because that's documented on
8  page --
9      Q.  Page 3?
10     A.  Is it 3?  Yes, page 3.  "This resin
11 conversion kit contains 12 torsos, 12 legs, 12
12 heads, 12 backpacks and enough bases to assemble a
13 12 woman unit."
14     Q.  Okay.  Now as you noted, there is a --
15 maybe you haven't noted.  Let me strike that.
16     Do you see there is a URL on the bottom
17 of that description, it's on the bottom of the
18 next page?
19     A.  Yes, I see the URL.
20     Q.  Did you go to that URL?
21     A.  No, I did not.
22     Q.  Do you know if there are other pictures
23 that further show the Chapterhouse product and the
24 individual pieces on that page?

176

1      A.  No, I do not.  I did not visit that
2  page.
3      Q.  Were you made aware by counsel whether
4  or not there's any additional images that shows
5  the Chapterhouse accused product?
6      A.  Not to my recollection, no.
7      Q.  Were you made aware there are physical
8  copies you could have looked at of these
9  miniatures?
10     A.  Not to my recollection, no.
11     Q.  Do you believe it would have helped in
12 any way in your analysis to see additional
13 pictures of these products and/or the actual
14 miniatures and/or the website?
15     A.  I do not believe the website would have
16 helped.
17     Actually let me rephrase that.
18     There's a number of different ways we
19 can look at the work "help."  Right now I'm going
20 to interpret the word "help" to mean assist me in
21 my report.
22     Q.  Yes.
23     A.  No, I don't believe it would have.
24     Q.  Even though that would have given you a

177

1   more detailed view of the legs or the torsos that
2   Chapterhouse sells?
3       A.   How dead does a horse need to be?
4       Q.   Is that your answer?
5       A.   Yes.  Once a horse is dead, it is
6   needless to keep killing it.
7       Q.   And for each of the Chapterhouse
8   products in this chart, are your answers the same
9   that you did not look for or ask for any
10  additional pictures or look at the website or see
11  the actual products?
12      A.   That is correct.
13      Q.   So your analysis of the Games Workshop
14  products to the Chapterhouse products, even though
15  it was actually accused or miniatures, you never
16  did anything to compare them other than what's in
17  this chart; is that correct?
18      A.   I looked at the chart that was provided
19  I guess to Chapterhouse by Games Workshop.
20      Q.   Do you have any understanding on
21  whether Games Workshop provided thousands of
22  additional pictures and images?
23      A.   I have no knowledge of that.
24      Q.   So you focused your report solely on

178

1   the pictures in this chart?
2       A.   Yes, I believe that's what I was
3   supposed to do.  It would have been much worse for
4   Games Workshop had I been provided with the actual
5   framed component parts like the one image that
6   actually does exist of that.
7       Q.   So it would have assisted you if you
8   had seen all the framed component parts from Games
9   Workshop?
10      A.   No, it just would have made for a
11  deader horse.
12      Q.   Do you know if Games Workshop produced
13  all those to Chapterhouse?
14      A.   No, I do not.
15      Q.   Did you ask?
16      A.   I don't believe I did.  The only thing
17  I recall asking about was the access to the titles
18  in the reference library.
19      Q.   If someone were to draw a picture of a
20  future infantry warrior today, do you believe they
21  ought to be able to protect people from copying
22  that picture?
23          MR. COOPER:  Objection, calls for
24      speculation, outside the scope.

179

1          THE WITNESS:  What do you mean by --
2   sorry, I can't ask you questions.
3          MR. COOPER:  You can ask him to
4      clarify.
5          THE WITNESS:  Could you please clarify
6   what you mean by protect?
7   BY MR. KEENER:
8       Q.   Do you think they ought to be able to
9   stop other people from copying that picture?
10         MR. COOPER:  Objection.  Same
11      objection.
12         THE WITNESS:  Could you also explain
13  what you mean by copying?
14  BY MR. KEENER:
15      Q.   Start with a Xerox.
16      A.   Start with a Xerox?  I don't know
17  because I think that's a legal matter.  I know
18  that in academia, making a Xerox of an
19  illustration is completely fair use.
20      Q.   What about making Xeroxes and selling
21  them for commercial profits?
22         MR. COOPER:  Same objections.
23         THE WITNESS:  I'm not trained in
24  copyright law.  I have no idea.

180

1   BY MR. KEENER:
2       Q.   My question is:  Do you believe they
3   ought to be able to stop someone from doing that?
4          MR. COOPER:  Same objections.
5          THE WITNESS:  I don't suppose I've ever
6      really thought about it.
7   BY MR. KEENER:
8       Q.   You have no opinion one way or another?
9       A.   Not really, no.
10      Q.   Same if they sculptured a model of a
11  future infantry warrior, you have no opinion one
12  way or another whether or not someone could make a
13  mold and reproduce it for profit?
14         MR. COOPER:  Same objections.
15         THE WITNESS:  I really don't know
16  copyright law.  I'm not a modeler.
17  BY MR. KEENER:
18      Q.   So you have no opinion either way?
19      A.   Not really, no.  It's not something I
20  really ever thought about.  Personally, when I
21  download music I pay for it, but that's the only
22  example I can think of.  I don't buy copied DVDs,
23  I buy them from the store, but I've never really
24  thought about the matter.

181

1    MR. KEENER:  Why don't we take a short

2    break here.

3    (Recess taken from 2:04 p.m. to

4    2:10 p.m.)

5    BY MR. KEENER:

6    Q.   Let's talk about the power suit or

7    powered armor.

8    A.   Okay, let's talk about that.

9    Q.   So in paragraph 27 of your report, you

10   discuss Megaman, a character from Toy Story, and

11   Games Workshop's miniatures as all wearing powered

12   armor.

13   A.   Yes.

14   Q.   Besides the fact that they all wear

15   power armor, are you saying they share any other

16   similarities?

17   A.   Yes.

18   Q.   What other similarities?

19   A.   I say the appearance of the -- even

20   across such disparate text, I say the appearance

21   of a space soldier varies very little.

22   Now, if we looked at those particular

23   ones, what we would see would be a very similar

24   approach to the lower body where you have how the

182

1    waist joins the torso, how the legs join the hips,

2    the shape of the thighs, the bulbous nature of the

3    knee pads or whatever they are, the shape and

4    size, sort of like the flared calf section, and

5    then the rounded nature of the boots, and you can

6    see that really clearly on Buzz Lightyear's

7    design, on Megaman's design and the Games

8    Workshop's space marine's design for the lower

9    torso, and similarly for the upper torso you have

10   the same sort of thing but really there's very

11   little other ways to do it.

12   Q.   Are the start from the top.  Are the

13   helmets the same?

14   MR. COOPER:  Object to form.

15   THE WITNESS:  I believe there's a large

16   number of helmets that -- is there?  Aren't

17   there a number of different types of helmets

18   for the space marines?  Maybe we can find --

19   BY MR. KEENER:

20   Q.   You can find a variety of them on page

21   11. Does Megaman's or Buzz Lightyear have a

22   helmet that looks like Games Workshop's helmet?

23   A.   No.

24   Q.   Do either of them have shoulder pads

183

1    that are the same as Games Workshop shoulder pads?

2    A.   I'm trying to picture Buzz in my head

3    right now and I can't remember what the shape of

4    his are like. I more clearly remember his lower

5    body which is virtually identical.

6    Q.   Do they have similar backpacks?

7    A.   No, Buzz's has wings.

8    Q.   What about Metroid or Megaman?

9    A.   Megaman, I can't recall.

10   Q.   Does he even have a backpack?

11   A.   I don't think he does.

12   Q.   Do you know if they have a similar belt

13   style?

14   A.   I know Buzz does.

15   Q.   Do you know if they have a similar

16   torso style where you see that sort of half moon

17   shape on the bottom of the torso?

18   A.   Oh, the stylized stomach section?

19   Q.   Yes.

20   A.   Yes, I believe at least Buzz does.  The

21   problem with the Megaman ones is they have gone

22   through a variety of iterations based on the

23   quality of the graphics from system to system so

24   it's harder to say.  With Buzz you could say

184

1    that's what he looks like.

2    Q.   You don't include any pictures of Buzz

3    Lightyear in your report --

4    A.   No, I don't.  I mention him.

5    Q.   -- or in your exhibit?

6    A.   What?

7    Q.   Or in your exhibit, your chart, you

8    don't include any picture of him?

9    A.   No, I don't.

10   Q.   Let's look at the pictures you did

11   provide because those are the only pictures you're

12   going to be opining on at trial, right?

13   A.   Yes.

14   Q.   So the first picture we have is from

15   the Analog magazine; is that right?

16   A.   That's correct.

17   Q.   And the helmet is very different; would

18   you agree?

19   A.   Yes.

20   Q.   And the shoulder pads are different?

21   A.   You can't really tell from that view.

22   Q.   So you're not commenting on the

23   similarity of shoulder pads in that picture?

24   A.   No.

185

1    Q.  The torso is different?

2    A.  Again, it's difficult to tell from that

3  image.

4    Q.  And there's no backpack?

5    A.  Again, it's difficult to tell from that

6  image.

7    Q.  And it's difficult to tell anything

8  from the lower body; is that correct?

9    A.  Yes.

10    Q.  You're not pointing to that image as

11  having any similarity to the Games Workshop

12  product?

13    A.  Yes.

14    Q.  What similarity?

15    A.  The similarity is in this is an image

16  from 1976 of a suit of power armor so the overall

17  base concept of power armor is clearly derivative.

18    Q.  Other than the concept of power armor,

19  there's no other similarity you're seeing between

20  that picture and Games Workshop's space marine?

21    MR. COOPER:  Objection, misstates

22  testimony.

23    THE WITNESS:  I am seeing a number of

24  similarities.  I'm seeing a base similarity

186

1  that they are both power armor, similar that a

2  soldier occupies the space inside the power

3  armor, the similarities of which we haven't

4  mentioned such as weaponry.

5  BY MR. KEENER:

6    Q.  You think that is something you see on

7  the other page?

8    A.  No, I'm saying the concept of this

9  suited power armor holding what would be an

10  oversized weapon for the person who is inside of

11  it.

12    Q.  So we've got a person inside of a suit

13  of power armor holding a large weapon?

14    A.  Yes.

15    Q.  Any other similarities?

16    A.  Not with that one, no.

17    Q.  So you agree that there are different

18  expressions of that same concept?

19    A.  No, they are different incarnations of

20  the same expression.  The original expression

21  being the text of Starship Troopers.

22    Q.  So based on the concept or expression

23  of a man inside of a power suit with a large

24  weapon, Games Workshop's incarnation or model of

187

1  that idea is different than the one depicted on

2  the magazine cover of the same idea?

3    A.  It's different in that it's not the

4  same.

5    Q.  It's different in that the only

6  similarities you've identified is a person inside

7  of a power armor holding a large gun?

8    A.  I don't think I would characterize that

9  as saying only.

10    Q.  Those are the only ones you've

11  identified based on the picture?

12    A.  Yes, but that's not to minimize the

13  importance.

14    Q.  Okay.  How about the next picture, can

15  we agree that the helmet is different than the

16  Games Workshop helmet?

17    I'm focusing on the second page, on

18  page 11.  That's a picture from Starship Troopers'

19  cover, correct?

20    A.  Yes.

21    Q.  Can you agree that helmet is different

22  than the helmet on Games Workshop space marine?

23    A.  Does this drawing exist as a figure?

24    Q.  Which drawing?

188

1    A.  The one on page 11.

2    Q.  Which drawing on page 11?

3    A.  There is only one drawing on page 11.

4    Q.  Were you comparing your picture to the

5  models on the top of the page or the drawing on

6  the bottom or both?

7    A.  Both.

8    Q.  So either of them, does the Starship

9  Troopers' helmet appear to be the same one used by

10  Games Workshop?

11    A.  No.

12    Q.  Do the shoulder pads look to be the

13  same as the Games Workshop shoulder pads?

14    A.  It's difficult to tell in that.

15    Q.  Are you making any expert opinion based

16  on the Starship Troopers' shoulder pads?

17    A.  No.

18    Q.  What about the gun?  Are you making any

19  expert opinion that that is similar?

20    A.  Not to this particular product, no.

21    Q.  What about the torso, is it your expert

22  opinion that is similar?

23    A.  It's difficult to tell from that image.

24    Q.  So you're not opining on that?

189

1    A.   No.

2    Q.   What about boots?

3    A.   Yes.

4    Q.   You think the boots are the same?

5    A.   I don't think they are the same.  I

6  think they are substantially similar.

7    Q.   But are they the same boots?

8    A.   No, they are not the same.

9    Q.   Let's turn to the next picture you

10  include on top of page 12.  That's just a repeat

11  of the picture we just went through, correct?

12    A.   Yeah, the way it differs is they

13  changed the beam from the gun in a movement away

14  from the original text idea of a flamer to more of

15  a laser energy weapon.

16    Q.   Other than that change, there's no new

17  opinions or similarities you're finding in that

18  picture?

19    A.   The image also seems to have been

20  darkened to make it more ominous.

21    Q.   But that's not a similarity you're

22  identifying between that picture and the Games

23  Workshop product, is it?

24    A.   I don't believe so.

190

1    Q.   So again, this cover of Starship

2  Troopers, while being a person inside of a power

3  armor suit with an overlarge weapon, other than

4  those similarities, you haven't identify any

5  between that cover and the Games Workshop

6  incarnation of the same kind of idea?

7    A.   Well, just its mere existence implies

8  that the Games Workshop's material is derivative.

9    Q.   That wasn't my question.

10    Other than what we've discussed, you're

11  not identifying any other similarities between the

12  Starship Troopers cover and the Games Workshop

13  model other than they are both different

14  incarnations of the same idea, a person inside a

15  power suit of armor holding a weapon?

16    A.   Well, you see that's the problem

17  because this is the originator of the image.

18    Q.   That's not my question again.

19    A.   I know that's not your question.

20    Q.   Please answer my question.

21    A.   If I can, I will.

22    Q.   Do you need to hear it again?

23    A.   Yes.

24    Q.   Other than the Starship Troopers cover

191

1  showing a person inside of a powered suit of armor

2  holding a large weapon, are you identifying any

3  other similarities between that picture and the

4  Games Workshop space marine?

5    A.   No.

6    Q.   They are different incarnations of a

7  similar idea?

8    A.   No.

9    Q.   They are different incarnations?

10    A.   No.

11    Q.   Okay.

12    A.   One item is derived from the other.

13    Q.   And it's your testimony that whoever

14  created this Games Workshop space marine must have

15  seen this cover?

16    A.   No.

17    Q.   How can you conclude it's derived from

18  it?

19    A.   It's derived from the text within the

20  book.

21    Q.   So they are different expressions of

22  that text?

23    A.   Yes.

24    Q.   So the Starship Troopers cover is a

192

1  different expression of the same text as the Games

2  Workshop space marine is?

3    A.   Yes.

4    Q.   The second picture you include on page

5  12 is again a cover of Starship Trooper.

6    A.   Yes.

7    Q.   And from that picture it's hard to see

8  too much detail, would you agree?

9    A.   Yes, I believe there's a better image

10  of it somewhere in here.

11    Q.   If you look on maybe page 15 of your

12  report, there's another picture.  That's a

13  different exhibit, the text.

14    A.   Oh, right.  Sorry.  It looks much

15  better on screen.

16    Q.   Are you opining, similar to the other

17  Starship Troopers, that this is yet another

18  incarnation of the text of the book Starship

19  Troopers?

20    A.   Yes.

21    Q.   And it's again a different incarnation

22  than the one Games Workshop has depicted?

23    A.   Yes.

24    Q.   And beyond both being a human inside a

193

1   power suit of armor with a large weapon, there are
2   no other similarities between that and the Games
3   Workshop product?
4       A.   In this particular one, there's
5   definitely the larger shoulder pads, from what I
6   remember of this image sort of in its --
7       Q.   Do you believe the shoulder pads are
8   the same as the Games Workshop shoulder pads?
9       A.   Not the same.
10      Q.   Do you see how they are kind of ribbed?
11      A.   Yes.
12      Q.   Do you believe they are the same shape
13  as the Games Workshop shoulder pad?
14      A.   No.
15      Q.   So a different design and a different
16  shape?
17      A.   Yeah.
18      Q.   So other than the existence of a
19  shoulder pad --
20      A.   Of an oversized shoulder pad.
21      Q.   You believe that's an oversized
22  shoulder pad?
23      A.   Yes.
24      Q.   Is it preposterously larger than the

194

1   Games Workshop one?
2       MR. COOPER:  Objection, assumes facts
3   not in evidence, and form.
4       THE WITNESS:  I believe it is probably
5   nonfunctional.
6   BY MR. KEENER:
7       Q.   Let's look at the Games Workshop one on
8   page 11 of your chart.
9       Do you see how it extends all the way
10  from above the shoulder to the elbow and is quite
11  preposterously large?
12      A.   Yes, I see that.
13      Q.   Do you believe the one depicted in the
14  Sergeant Cooper cover is nowhere near as large?
15      A.   Yes, I do.
16      Q.   And does not go up to the elbow?
17      A.   Yes.
18      Q.   So other than being a big shoulder pad,
19  that's where the similarities end with the Games
20  Workshop shoulder pad?
21      A.   Yes.
22      Q.   Let's turn to page 13 of your chart.
23  Here's another picture you include, this one from
24  Science Fiction Analog.  Do you see that?

195

1       A.   Yes.
2       Q.   Is this another depiction of a human
3   inside of a powered suit of armor?
4       A.   Yes.
5       Q.   Beyond that similarity, do you see any
6   other similarities between that picture and Games
7   Workshop's space marine?
8       A.   Yes, the matter of scale.
9       Q.   What scale?
10      A.   An oversized scale for all pieces of
11  this powered armor.
12      Q.   Do you believe that the helmet is
13  different?
14      A.   The helmet is indeed different.
15      Q.   Do you believe the shoulder pads are
16  different?
17      A.   It's difficult to tell from this
18  perspective of the image.
19      Q.   So you're not opining at all about the
20  similarities in the shoulder pad for this picture?
21      A.   Not in that picture, no.
22      Q.   Okay.  And similarly, you're making no
23  opinion about a similarity in the torso?
24      A.   Not in that image, no.

196

1       Q.   Or in the lower body?
2       A.   Well, there is one, yes.
3       Q.   What similarity in the lower body do
4   you see in that picture?
5       A.   Well, you see a flared sort of calf
6   armor that's similar to the pictures of the space
7   marine legs I guess from the space marine
8   technical squad which is on page 12.
9       Q.   Any other similarities?
10      A.   That would appear to be it.
11      Q.   And again, this picture has no
12  backpack?
13      A.   Not that I can see, no.
14      Q.   So again, this is yet another
15  incarnation of someone's depiction of a person
16  inside of a powered suit of armor?
17      A.   Yes.
18      Q.   And it's a different depiction than
19  Games Workshop's?
20      A.   Yes.
21      Q.   Turn to the next picture you include on
22  page 14, again from Science Fiction Analog.
23      A.   Indeed from the same artist.
24      Q.   Similarly, would your answers be the

197

1  same?

2  A.  Yes.

3  Q.  This is another depiction of a person

4  inside a powered suit of armor?

5  A.  Yes.

6  Q.  That's different than Games Workshop's?

7  A.  Except for this one, also you get a

8  more massive scale for the shoulder armor.

9  Q.  A different design than Games

10  Workshop's shoulder pad, correct?

11  A.  They are different in design but not in

12  degree.

13  Q.  Are they different shapes?

14  A.  They are different in design but not

15  degree.

16  Q.  Are they different shapes?

17  A.  They are indeed different shapes.

18  Q.  This one does not extend to the elbow?

19  A.  No, it does not.

20  Q.  This one has an arch where the arm

21  goes?

22  A.  Yes.

23  Q.  This one kind of goes up towards and

24  includes part of the neck?

198

1  A.  It appears to.

2  Q.  This one goes -- the picture you

3  include goes towards the center of the chest?

4  A.  It's actually difficult to tell whether

5  those two shoulder plates are articulated with the

6  helmet or not.

7  Q.  So you are unable to say whether or not

8  it's similar?

9  A.  I'm unable to say whether or not the

10  shoulder plates articulate with the head.

11  Q.  So this --

12  A.  I can tell you the scale of the

13  shoulder plates is on a massive scale.

14  Q.  Other than being a large shoulder pad,

15  this is a different depiction of large shoulder

16  pad than the one Games Workshop has designed?

17  A.  Yes.

18  Q.  Let's go to your next picture on page

19  15 from Iron Monger comic book.

20  A.  No, the character is Iron Monger, the

21  comic book -- sorry, the character is Iron Monger,

22  the comic book is Iron Man.

23  Q.  And this is yet another depiction of a

24  person inside of a powered suit of armor?

199

1  A.  Yes.

2  Q.  And the helmet is different than Games

3  Workshop's?

4  A.  I would say they are very similar.

5  Q.  And the shoulder pads, while both

6  large, are different in shape?

7  A.  I would say yes.

8  Q.  And the torsos are different?

9  A.  Not particularly.

10  Q.  They are different design of torso,

11  right, other than being armored?

12  A.  They are more similar than they are

13  dissimilar.  The problem with this image is this

14  image is more similar than dissimilar.  It is

15  still dissimilar but it is more similar.

16  Q.  He's not wearing a belt?

17  A.  No, he is not wearing a belt.

18  Q.  He doesn't have the stomach ridging

19  that the space marine has?

20  A.  No.

21  Q.  He doesn't have the arch in the stomach

22  that the space marine has?

23  A.  No.  We could likewise go through all

24  the same things he does.

200

1  Q.  He doesn't have oversized knee pads

2  that the spaceman does?

3  A.  But they are separately articulated

4  knee pads.

5  Q.  Right, but they are different designs

6  of articulated knee pads, correct?

7  A.  These two are different designs but

8  they are more similar than dissimilar.

9  Q.  He doesn't have a backpack, does he?

10  A.  No, I don't believe he does.

11  Q.  The calf portions are different,

12  correct?

13  A.  They do not appear to be, no.

14  Q.  You think the calf portions are the

15  same?

16  A.  I think the calf proportions are

17  extremely close.

18  Q.  Are the designs different?

19  A.  The design is only different in the

20  bottom quarter of the element.

21  Q.  Let's talk about the top half of the

22  calf.

23  A.  Top half of the calf appears to be

24  identical.

201

1    Q.    Do you see how the space marine calf is
2    kind of a half moon hemisphere shape?
3    A.    Yes.
4    Q.    Do you agree that the Iron Monger has a
5    different shape, kind of a three-sided design?
6    A.    No, it appears to be the same.
7    Q.    Do you believe that to be a half
8    circle?
9    A.    I do.
10   Q.    Okay.  And you believe the bottom part
11   of the calves are different?
12   A.    The ankle portion, yeah.  Yes, sorry.
13   Q.    So this is yet another artist's
14   depiction of a human inside of a powered suit of
15   armor?
16   A.    Yes.
17   Q.    Different than the depiction Games
18   Workshop designed?
19   A.    Yes.
20   Q.    The next picture on the bottom of page
21   15 is depicting a Space Knight Squadron from the
22   Rom Annual comic book?
23   A.    Yes.
24   Q.    Which picture are we supposed to be

202

1    looking at for similarities here?
2    A.    We could be looking at all of them, the
3    concept of the powered suit of armor.
4    Q.    Other than the concept of a powered
5    suit of armor, are you opining there are other
6    similarities?
7    A.    No, I'm not.
8    Q.    Going to the next picture on page 16 of
9    a Terminator from Rom comic book number 14, is
10   this again a different type of depiction of a
11   human in a powered suit of armor?
12   A.    Yes.
13   Q.    And again, is that the only similarity
14   you're relying on between that picture and Games
15   Workshop's design of a space marine?
16   A.    Yes.
17   Q.    Going to the next picture on the top of
18   page 17, it's entitled Airstrike.
19        Is this again a picture of a human in a
20   powered suit of armor?
21   A.    Yes.
22   Q.    And are you relying on any other
23   similarities between that picture and Games
24   Workshop's space marine?

203

1    A.    The presence of the shoulder pad.
2    Q.    A shoulder pad on one side?
3    A.    A shoulder pad on one side but it's
4    overscaled.
5    Q.    Is the design of the shoulder pad, is
6    it a different shape than the Games Workshop
7    shoulder pad?
8    A.    Very minorly.
9    Q.    Is it does not extend towards the
10   elbow?
11   A.    No, it does not.
12   Q.    It does not have a ridge or ribbing
13   along the side of it?
14   A.    No.  It is, however, hemispherical,
15   oversized, and as far as I could tell would be
16   nonfunctional.
17   Q.    Any other similarities between that
18   picture and Games Workshop's picture?
19   A.    Yes, the joint between the thighs and
20   the cod piece.
21   Q.    Okay.
22   A.    And a resemblance in the shape of the
23   eye slots.
24   Q.    Okay.

204

1    A.    And overall ridge going down the top of
2    -- like a crest, like a cranial ridge on the
3    helmet.  And an oversized proportion for the calf
4    pieces.
5    Q.    Any other similarities?
6    A.    No.
7    Q.    So this is another example of an
8    artistic sketch of a person's power armor?
9    A.    Yes.
10   Q.    That's different than Games Workshop's
11   design?
12   A.    Different yet similar, significantly
13   similar.
14   Q.    And your next picture is entitled
15   Coalition States Deadboy on the bottom of page 17.
16   A.    Yes.
17   Q.    Is that another example of a human
18   inside a powered suit of armor?
19   A.    Yes, it is.
20   Q.    Is that yet again a different example
21   of a design of a human in a powered suit of armor
22   than the Games Workshop design?
23   A.    Yes, but I would draw your attention to
24   the spiked nature of the shoulder pad on the

205

1  character's left side.  I would draw your
2  attention to the existence of the backpack.  I
3  would draw your attention to the way the knees are
4  sort of shaped, the way the thighs articulate with
5  the cod piece, and with a superficial resemblance
6  between at least the top half of the helmet and
7  where the eyes are.
8      Q.  The spiked shoulder pad is only on one
9  side; is that correct?
10     A.  Yes, that is correct.
11     Q.  And is not oversized and extending
12  towards the elbow?
13     A.  It's difficult to tell whether it's
14  oversized or not.
15     Q.  And does not have a ridge extending
16  along the border of it?
17     A.  It does appear to have that, yes.
18     Q.  Would you agree that the torso is
19  different than in Games Workshop's torso?
20     A.  No, I actually would not.  This one
21  does appear to have a sort of stomach section that
22  mimics human anatomy in sort of an exaggerated
23  manner.
24     Q.  Can you actually see any portion of

206

1  the stomach or the --
2      A.  Yes, I can.  I can see that there is an
3  arch that goes along approximately where our rib
4  cage goes in a sort of semicircular manner.
5      Q.  Can you tell if he has a belt in a
6  similar design to the space marine belt?
7      A.  He has a belt but it is not similar to
8  the design of the space marine belt.
9      Q.  Can you tell anything about his
10  backpack from this picture?
11     A.  Nothing beyond that he has one.
12     Q.  So again, would you agree that the
13  design choices that made up this picture are a
14  different combination of design choices than that
15  made by the Games Workshop artist?
16     A.  Yes, it is a different combination.
17     Q.  Looking at the next picture on page 18,
18  would you agree that again that's a different
19  combination of design choices than that done by
20  Games Workshop?
21     A.  I think that's impossible to tell.
22     Q.  So you're not making any opinion
23  whether or not those are the same design choices
24  that Games Workshop made?

207

1      A.  I'm not entirely sure what is being
2  represented by the Games Workshop miniatures in
3  this particular exhibit.
4      Q.  Okay.
5      A.  For example, it says, "Games Workshop
6  space marine assembled and painted by the hobby
7  team using all Games Workshop parts."
8          Since it is saying all "Games Workshop
9  parts," then they could have made a decision with
10 different parts, so what you see in the figure
11 illustrated in that middle column, in either of
12 them because they are the same ones because one is
13 painted and one is not, represents a level of
14 choice that was exercised in the assembly.
15         So for example, in that Palladium Books
16 illustration, top one, you'll see that the
17 character has one spiked shoulder pad and one
18 non-spiked shoulder pad.
19         Since these Games Workshop space
20 marines were assembled from parts, they could have
21 assembled it with one spiked and one not spiked,
22 which would have far more of a resemblance.
23     Q.  The non-spiked shoulder pad in your
24 picture is not similar to the Games Workshop

208

1  shoulder pad, is it?
2          MR. COOPER:  Objection to form.
3          THE WITNESS:  That's actually a
4  difficult matter to tell due to the position
5  of the arm.
6  BY MR. KEENER:
7      Q.  You're not making any opinion that it's
8  similar, are you?
9      A.  I suppose I could.  It does look
10 similar.
11     Q.  Is it your expert opinion that that
12 shoulder pad is similar to the space marine
13 shoulder pad?
14     A.  It is similar, yes.
15     Q.  Is it the same design?
16     A.  No, it is not the same design, it is
17 similar.
18     Q.  Would you agree that this depiction on
19 the top of 18 is another artist's design of a
20 person in powered armor that's different than
21 Games Workshop's design?
22     A.  Yes.
23     Q.  Would you make the same expert opinion
24 on the picture on the bottom of page 18 that

209

1 that's another artist's depiction of a person in a
2 powered suit of armor that's different than the
3 design Games Workshop has made?
4     A.   Yes, I would.
5     Q.   And would you say the same about the
6 remaining pictures on this entry which go on page
7 19, 20 and 21?
8     A.   Yes, I would.
9     Q.   Now, in the pictures you show here,
10 there are a number from comic books, correct?
11    A.   Yes.
12    Q.   Do you have any understanding on where
13 the Games Workshop designers reside?
14    A.   No, I've got no idea.
15    Q.   Do you know where Games Workshop is
16 located?
17    A.   No, I don't.  Wait, are they in
18 Britain?
19    Q.   They are in the United Kingdom.
20    A.   Okay.
21    Q.   You put dates next to these products.
22 Do you see that?
23    A.   Yes.
24    Q.   Do you have any understanding of

210

1 whether or not those comic books were available in
2 the United Kingdom on those dates?
3     A.   There are many different definitions of
4 the word "available."  A thing could be imported
5 and sold through a gray market source.  I lived in
6 Britain for four years when I was doing my Ph.D.
7 and through my experience with purchasing music I
8 knew that you could get imported items that
9 weren't officially being distributed, so they
10 would it be imported by local sellers rather than
11 released in the United Kingdom.  So there could be
12 a situation where something was released in the
13 United Kingdom but still for sale there.
14    Q.   Do you have any understanding whether
15 any comic books were released in the United
16 Kingdom that you've identified?
17    A.   No, I do not.
18    Q.   Do you have any idea of when they were
19 released in the United Kingdom?
20    A.   No, I do not.
21    Q.   Do you know if they were ever released
22 in the United Kingdom?
23    A.   No, I do not.
24    Q.   Would you make the same answer with

211

1 regard to the books you take pictures from, such
2 as the Palladium Book?
3     A.   Absolutely.
4     Q.   And same with the pictures of
5 miniatures you include here?
6     A.   Yes.
7     Q.   You have no idea of whether any of
8 these references were released in the United
9 Kingdom at any time?
10    A.   Correct.
11    Q.   So consequently, you have no idea
12 whether or not any Games Workshop designers saw
13 any of those references?
14    A.   No.
15    Q.   I think I've asked this question before
16 and I apologize if I have.  I think we've agreed
17 the Games Workshop design of the space marine made
18 a number of design choices, correct?
19    A.   Yes.
20    Q.   Including the style of helmet?
21    A.   Yes.
22    Q.   And the style of backpack?
23    A.   Yes.
24    Q.   And the style of shoulder pads?

212

1     A.   Yes.
2     Q.   Style of arms?
3     A.   Yes.
4     Q.   The style of torso?
5     A.   Yes.
6     Q.   The style of belt?
7     A.   Yes.
8     Q.   The style of legs?
9     A.   Yes.
10    Q.   The style of shoes?
11    A.   Yes.
12    Q.   As well as other design choices along
13 the way involved in each of those.
14    A.   Yes.
15    Q.   And you have been unable to find any
16 prior work that contained that same combination of
17 design choices, correct?
18    A.   I have been unable to show you
19 something that contains every single one of those.
20 I have shown you a large number of them that
21 contain either individual elements or in some
22 cases, such as the Iron Monger suit, or when I
23 talk about Toy Story's Buzz Lightyear, that
24 contain a preponderance of them.

213

1  Q.  So you identified some that may have a
2  few of those elements?
3  A.  I said preponderance.
4  Q.  You're meaning more than half?
5  A.  Yes.  For example, Buzz Lightyear.
6  Q.  You've not included any picture of Buzz
7  Lightyear in your report or your chart, have you?
8  A.  No.
9  Q.  So we are not going looking at any
10  picture of Buzz Lightyear at the trial, correct?
11  A.  I don't think that's for me to decide.
12  Q.  You understood you were supposed to
13  include all items you were going to use in forming
14  your expert opinion in your expert report,
15  correct?
16  A.  If I've mentioned a film, it is my
17  understanding that I have mentioned the film and
18  therefore, I get to use that film.
19  Q.  You've included the best pictures in
20  your chart that were available to you, correct?
21  A.  Yes, but if I have mentioned things in
22  my expert report, then it is my understanding I
23  get to use the items in my expert report.
24  Q.  You've included hundreds of pictures in

214

1  your expert report, right?
2  A.  I have also included references to a
3  large number of films.
4  Q.  This will go quicker if you answer the
5  questions I ask.
6  You've included hundreds of picture in
7  your expert report?
8  A.  Yes, I have.
9  Q.  And you chose which pictures to
10  include?
11  A.  Yes.
12  Q.  And you've attempted to include the
13  best representative pictures available to you?
14  A.  And the most expedient to obtain.
15  Q.  Did you attempt to include in your
16  report the best example pictures that you were
17  aware of?
18  A.  What I attempted to do in my expert
19  report was to include the best pictures that I had
20  available at the time and to make textual mention
21  of items which I was unable to expediently obtain.
22  Q.  So you were unable to obtain any
23  picture of Buzz Lightyear from the end of December
24  to January?

215

1  A.  Yes, I believe it slipped my mind.
2  Q.  So again, back to the basic question,
3  out of all the design choices Games Workshop made
4  in making its space marine, you have been unable
5  to find any prior work with those same design
6  choices, all of them, start there?
7  A.  Yes, I have been unable to find an
8  absolutely identical element-by-element copy of
9  the Games Workshop figure.
10  Q.  And you've been unable to find one that
11  contains the same backpack, the same shoulder pad,
12  the same torso, and the same legs, that
13  combination?
14  A.  Yes, I have been unable to find
15  something that is absolutely identical.
16  Q.  That's not my question.  My question is
17  with the same design choices that Games Workshop
18  made for the head, backpack, torso, shoulder pads
19  and legs.
20  A.  If I may repeat your question back to
21  you so that I know it and then answer it myself,
22  you're asking if I have found an identical set of
23  decisions that were made by any other designer in
24  envisioning a similar item?

216

1  Q.  Yes.
2  A.  No, I have not.
3  Q.  And not to the level of how many
4  shoelaces it has but to the level of type of head,
5  type of torso, the type of backpack, the type of
6  shoulder pads and the type of legs.
7  A.  I believe when we went through this,
8  especially with reference, for example, to the
9  shoulder armor, you did go to the level of
10  shoelaces.
11  Q.  Again, my question is:  The level I'm
12  giving you now, did you find any prior work with
13  those five same design choices?
14  A.  I believe that that question is not
15  specific enough in that when we were discussing
16  these different design elements, the level of
17  detail that you put into the discussion of the
18  design elements is now much, much greater than the
19  level of detail you're now asking me to comment
20  upon, so the question is unanswerable in that
21  form.
22  Q.  Let's put a little more detail in it.
23  Let's assume the shoulder pad is very
24  large, extending all the way to the elbow, and the

217

1  shape, that Games Workshop chose its shape, the
2  backpack is in the shape Games Workshop chose, the
3  torso includes the portion showing the abdominals
4  and the cutout for the abdominals, as well as a
5  belt, and the legs have that overlarge knee
6  shield.
7      With only those details, were you able
8  to find any prior work that included that same
9  combination of details?
10  A.  I do not believe that those list of
11  details were the same ones that we used in our
12  discussion of these different images.
13  Q.  I just gave you a new question though.
14  A.  I know you did.
15  Q.  Answer my question.
16  A.  That question doesn't really logically
17  follow from the discussion we had.  I know it's a
18  new question.
19  Q.  It's a new question.
20  A.  It's a new question, but it's a
21  question that's -- I mean it's -- allow me to
22  think about it for a minute.
23      With the caveat that I believe that the
24  list of attributes you've given me is arbitrary,

218

1  and somewhat misleading, in that I believe several
2  sets of them can be found in these images, I would
3  say -- also with the caveat that the general
4  description of the shoulder pads that you have
5  provided differs substantially to our previous
6  discussion of them, I would have to say yes, I was
7  unable to provide you with any particular image
8  that satisfied that full list of criteria.
9  Q.  So as you sit here today, it's your
10  expert opinion that you were unable to find any
11  prior work with that combination of elements?
12  A.  So in my understanding, the importance
13  of what you're trying to get at is --
14  Q.  I'm not asking about the importance.
15  Again, just answer the question I asked.
16  A.  Yes, there is no illustration that
17  contains all of these elements.
18  Q.  So you were unable to find any prior
19  work with that combination of elements?
20  A.  I suppose I could have found some if I
21  had more time.
22  Q.  You were unable to find any prior work
23  with that combination of elements, correct?
24  A.  Yes.

219

1  Q.  So as far as you know, based on sitting
2  here today, that combination is an original
3  combination?
4      MR. COOPER:  Objection, misstates
5  testimony.
6      THE WITNESS:  If I had more time to do
7  research, I suppose I might or might not be
8  able to find it.
9  BY MR. KEENER:
10  Q.  As you sit here today, that is an
11  original combination?
12  A.  That's impossible to tell.  Just
13  because I do not know of something's existence
14  does not affect whether or not that thing exists.
15  Q.  You are unable to make any opinion that
16  that combination is unoriginal?
17  A.  Nor am I able to make any opinion
18  whether it's original.
19  Q.  I agree.  So therefore, you are unable
20  to state an expert opinion that that combination
21  is unoriginal?
22  A.  Yes.
23  Q.  Yes, you agree with my statement?
24  A.  Yes, I do.

220

1  Q.  Let's talk about shoulder pads.
2  A.  Yes.
3  Q.  I believe it's your opinion that in
4  medieval times they tended to not use overlarge
5  shoulder pads; is that correct?
6  A.  Not wholly correct.  During medieval
7  and Renaissance times, there were overly large
8  elements of shoulder armor but they were reserved
9  for specific functions that required the shoulder
10  to be wholly immobile.
11      So for example, there was a specific
12  type of armor plate known as a grand guard which
13  goes over the shoulder, existing shoulder armor to
14  prevent motion of the arm and to prevent motion of
15  the head and provide a small amount of additional
16  protection to the chest for use in jousting where
17  it would be required for the participant's right
18  arm or left arm if he were left-handed to be fixed
19  into place.
20  Q.  Would you agree that at least in
21  medieval times there are a number of different
22  designs of shoulder pads that were used?
23  A.  They all follow a very basic similarity
24  in that they have to have structural integrity and

221

1 allow for the correct articulation of the shoulder
2 joint, so they are indeed limited to sort of
3 variety.  They can differ insignificantly from one
4 another but they all follow the same basic variety
5 or same basic property.
6    Q.    They can differ in size?
7    A.    Not usually.
8    A.    They can -- they were all small?
9    A.    They were all articulated to the joint
10 of a human shoulder.
11    Q.    Could they differ in shape?
12    A.    Only inasmuch as they would be used as
13 an articulated shoulder joint.
14    Q.    But there were a number of different
15 shapes available?
16    A.    They all basically follow the pattern
17 of the human shoulder.
18    Q.    So is it your expert opinion that they
19 follow the same shape?
20    A.    It all depends what sort of armored
21 piece you're talking about.
22    Q.    I'm talking about shoulder pads used in
23 medieval times.
24    A.    There are a fairly large number of

222

1 different types of things from ailettes to
2 spaulders to pauldrons to grand guards, and if we
3 just look at pauldrons, then they are going to be
4 basically the same shape.
5    Q.    Would you classify Games Workshop's
6 shoulder pads as a pauldron?
7    A.    Yes.
8    Q.    Does a pauldron include the armor that
9 goes on the arm?
10    A.    No.
11         (Plaintiff's Exhibit 192, document Bates
12    labeled CHS EXPERT00000012 through 027, marked
13    for identification.)
14 BY MR. KEENER:
15    Q.    I'm going to show you what's been
16 marked as Plaintiff's Exhibit 192, which is a
17 collection of pictures produced at CHS EXPERT 12
18 through 27.
19         Do you recognize these pictures?
20    A.    Yes, I do.
21    Q.    And did you take these pictures?
22    A.    Yes, I did.
23    Q.    And these were pictures you took at a
24 museum?

223

1    A.    At the Metropolitan Museum in
2 New York City.
3    Q.    Different types of shoulder armor?
4    A.    Yes.
5    Q.    Let's start with the picture on the
6 first page labeled page 12.  How would you
7 describe the shape of this piece of shoulder
8 armor?
9    A.    I would describe it as being an
10 articulated piece of shoulder armor that has a
11 sort of hemispherical top section, some
12 articulation below the actual ridge of the
13 shoulder, the start of the arm, to allow the arm
14 free motion, and a reinforced neck guard.
15    Q.    As well as an extension that goes
16 across the breast.
17    A.    Yes, a slight extension that goes
18 across the breast.
19    Q.    And that would be a very different
20 shape than Games Workshop's shoulder pad, correct?
21    A.    Yes, it would.
22    Q.    Now, you've said before Games
23 Workshop's shoulder pads is hemispherical.  Do you
24 recall that?

224

1    A.    When did I say that?
2    Q.    I think in your report, you classify it
3 as a hemispherical --
4    A.    Yes.
5    Q.    Do you believe it's hemispherical?
6    A.    Yeah, I think you could call it
7 hemispherical.
8    Q.    Do you think if you put four of those
9 together, you'd get a sphere?
10    A.    You'd get more like an egg.
11    Q.    Like an ovoid?
12    A.    Yes.
13    Q.    Sort of like a quarter of an ovoid?
14    A.    Yes, you could call it that.
15    Q.    And the picture on page 12 is not a
16 picture of an ovoid, would you agree?
17    A.    Yeah I would agree that it's not a
18 quarter of an ovoid.
19    Q.    So this shoulder armor has
20 articulation?
21    A.    Yes.
22    Q.    It has a neck guard?
23    A.    Yes.
24    Q.    It has a piece extending towards the

225

1   center of the chest?

2      A.   Yes.

3      Q.   And it has some sort of ribbing going

4   along the edge of the shoulder pad?

5      A.   Yes, some sort of decorative edging.

6      Q.   Let's take a look at the next picture

7   on page 13.  Is this another design a shoulder

8   pad?

9      A.   Yes, it is.

10     Q.   And is this shoulder pad integrated

11  with the chest armor?

12     A.   Yes, it is.

13     Q.   So it's kind of one piece with the

14  chest?

15     A.   Yeah, this is an additional plate one

16  would wear over the top of one's armor.

17     Q.   Do you see any banding around the edge

18  of the shoulder pad?

19     A.   No, I do not.

20     Q.   And you wouldn't call this oversized,

21  would you?

22     A.   Yes, I would.

23     Q.   Why?

24     A.   Because it is.  It is massively

226

1   oversized to protect the participant from

2   jousting.

3      Q.   So this would be one of your grand

4   guards?

5      A.   Yes.  Look at the elbow piece, for

6   example.  There's really no way for you to bend

7   your arm wearing that elbow piece.

8      Q.   Would you agree it's not as large as

9   the shoulder pad that Games Workshop uses?

10     A.   It's difficult to tell because that

11  would require knowledge of the backstory.

12     Q.   Do you see how the Games Workshop torso

13  is kind of dwarfed by the shoulder pads?

14     A.   Yes.

15     Q.   That's not the case in your picture on

16  page 13, is it?

17     A.   Yes, it is.

18     Q.   You believe --

19     A.   This is a unit.  This is a single

20  thing.  So it indeed blocks the chest through its

21  mere construction.

22     Q.   You would agree Games Workshop is not a

23  unitary shoulder pad as the one depicted here on

24  page 13?

227

1      A.   I would agree, yes.

2      Q.   Page 14 is yet another picture of

3   shoulder armor?

4      A.   Yes.

5      Q.   And this one has articulation in it?

6      A.   It has articulation.

7      Q.   Unlike the Games Workshop shoulder pad?

8      A.   Yes.

9      Q.   Is that a unitary piece again with a

10  chest armor?

11     A.   No, it is not.

12     Q.   And the picture has some sort of half

13  circle ridge along the bottom of it?

14     A.   Yes, it does.

15     Q.   Unlike the Games Workshop design?

16     A.   Yes.

17     Q.   So again, this is another potential

18  design for a shoulder pad?

19     A.   Yes, this one is actually a very common

20  design, and I reproduced this to show the

21  elaborate decoration that can be found on shoulder

22  armor.

23     Q.   And this common design is not the one

24  Games Workshop used?

228

1      A.   No.

2      Q.   Let's look at the next one on page 15.

3   This is another design of shoulder armor?

4      A.   Yes, it is.

5      Q.   And this one has banding all throughout

6   it?

7      A.   It has banding and it also has the

8   ridge running around it.

9      Q.   And this one is not a quarter of an

10  ovoid, is it?

11     A.   No, it is not.

12     Q.   So it's again another shape of a

13  shoulder pad?

14     A.   It is indeed.

15     Q.   Page 16, is this another shape of a

16  shoulder pad?

17     A.   Yes, it is.

18     Q.   Again, this is an articulating one?

19     A.   Yes, it is.

20     Q.   And it's not a quarter of an ovoid?

21     A.   No, it is not.  It does have the

22  decorative border around it, the edging.

23     Q.   Page 17, is that another --

24     A.   And it is decorated with --

229

1    Q.  Again, if you answer the questions I
2  ask, I didn't ask anything about decorations.
3        On page 17, is this another picture of
4  shoulder armor?
5    A.  Yes, that's another grand guard.
6    Q.  And again, that is not a half an ovoid?
7    A.  No, it is not.
8    Q.  And it's got curving around the edge of
9  its shape?
10    A.  Yes, it does.
11    Q.  And is that a unitary piece with the
12  chest armor?
13    A.  Yes, it is.
14    Q.  Again, those are different choices than
15  Games Workshop's shoulder pad, correct?
16    A.  Yes.
17    Q.  Page 18, is this another type of
18  shoulder pad?
19    A.  Yes, it is.
20    Q.  And again, it's not a quarter of an
21  ovoid?
22    A.  No, it's not.
23    Q.  And again, it's articulating?
24    A.  Yes, it is.

230

1    Q.  And again, it has various curves to it
2  instead of the straight lines of the Games
3  Workshop?
4    A.  Yes.
5    Q.  So it's yet another design of a
6  shoulder pad?
7    A.  Yes, it is.
8    Q.  Page 19, is this yet another different
9  design of a shoulder pad?
10    A.  Yes, it is.
11    Q.  And again, it's not the same shape as
12  Games Workshop?
13    A.  That is correct.
14    Q.  And it's articulating instead of Games
15  Workshop's design?
16    A.  Yes.
17    Q.  Page 20, is this another type of
18  shoulder pad?
19    A.  Yes, it is.
20    Q.  Again, a different design from that
21  chosen by Games Workshop?
22    A.  Yes, but very similar.
23    Q.  It has articulations?
24    A.  It does, so yes.

231

1    Q.  It has a large protrusion out from the
2  shoulder to protect the neck?
3    A.  Yes, it does.
4    Q.  And Games Workshop does not have that,
5  does it?
6    A.  No, Games Workshop does not.
7    Q.  It has various curves along it that
8  Games Workshop does not have?
9    A.  That is correct.
10    Q.  Page 21, is this yet another potential
11  design of a shoulder pad?
12    A.  Yes, it is.
13    Q.  And again, it has articulation?
14    A.  Yes.
15    Q.  Again the shape is not a quarter of an
16  ovoid?
17    A.  Almost, but not.
18    Q.  It's not?
19    A.  No.
20    Q.  And again, it has curves along the side
21  that are unlike Games Workshop?
22    A.  Yes.
23    Q.  Page 22, same answers, it's a different
24  shape and different design?

232

1    A.  Yes.
2    Q.  And it has articulation?
3    A.  Yes.
4    Q.  Page 23, same answers?
5    A.  It's the same piece of armor.
6    Q.  Page 24, same answers?
7    A.  No, different answers.
8    Q.  Okay.  Is this again another choice of
9  design for shoulder armor?
10    A.  Yes, it is.
11    Q.  And this has banding all throughout it?
12    A.  Yes, it does.
13    Q.  And it's not a quarter of an ovoid?
14    A.  Yes, it is.
15    Q.  You believe it is?
16    A.  I do.
17    Q.  You put four of these together, you
18  make a perfect ovoid?
19    A.  Not a perfect ovoid.  You do make an
20  ovoid.
21    Q.  In Games Workshop, if you put four of
22  them together, do you get a perfect ovoid?
23        MR. COOPER:  Objection to form.
24        THE WITNESS:  I don't know.

233

BY MR. KEENER:

Q. Looking at the shapes and pictures, do you have an opinion one way or another?

A. I would have to it.

Q. At the top of the Games Workshop shoulder pad, do you see how it's a continuous curve and straight?

A. Yes.

Q. And do you see a different design on the one on page 24 where it curves away from the neck?

A. Yes, I do.

Q. So that's a different shape than that of Games Workshop, correct?

A. Different only in the trivial degree.

Q. It's a different shape, correct?

A. Yes, it is.

Q. And do you see on the shoulder pad on page 24 how the bottom of the shoulder pad flares away?

A. Yes, I do.

Q. And Games Workshop's does not flare away, does it?

A. No, it does not. Actually I can't tell

234

from the images.

Q. You're not making an expert opinion one way or the other on that issue, are you?

A. On the flaring, no. I would actually have to see the Games Workshop pieces.

Q. And you never asked to see them?

A. No, I did not.

Q. Page 25, is that another potential way to protect the shoulder?

A. Yes, it is.

Q. Again, a different shape than that chosen from Games Workshop?

A. Yes.

Q. And it's not a quarter of an ovoid?

A. No.

Q. And it has articulation?

A. Yes, it has articulation.

Q. Same answer for the next picture on page 26?

A. Yes.

Q. Page 27, is that yet another picture of a shoulder armor?

A. Yes.

Q. Again, a different shape than Games

235

Workshop?

A. Yes.

Q. Looking at all those pictures, we saw a large number of different ways to design a shoulder pad, correct?

A. No, we did not. We saw a small number of ways to design shoulder armor.

Q. You could choose whether to have articulation or not?

A. Yes, you could, but only based on the functionality of it.

Q. You could choose whether or not to make it large and oversized or not?

A. The oversized nature of it deals with the same decision point as the articulation.

Q. You could decide whether or not to have a trimming or band along the outside?

A. No, apparently if you've made the decision to wear an articulated element of armor in that position, all the images that I provided do appear to have the banding on the outside.

Q. So if you didn't have articulating armor, it would be unusual to have banding?

A. I don't know. I would have to take a

236

look at a lot more but that does appear to be the case.

Q. You could choose whether or not to have a straight bottom on the shoulder pad or some sort of curve?

A. Again, that would be a decision I think that would take place when you're deciding whether or not this is an articulating piece or nonarticulating piece. Early articulating pieces seem to have a cutout to allow for motion of the shoulder, whereas the ones that are fixed in place do not seem to have that cutout.

Q. You could decide whether or not the shoulder pad should extend into the chest region or not?

A. Yes.

Q. You could decide whether the shoulder pad should have an extension that comes away from the shoulder pad to protect the neck?

A. Yes.

Q. You could decide whether a shoulder pad should be a particular shape or not?

A. To some degree, yes.

Q. And as far as you could tell from

237

1  looking at all these medieval choices, none of
2  them made the same design choices of Games
3  Workshop of having a quarter of an ovoid that's
4  oversized with banding around the edge and with
5  straight edges?
6  A.  That is correct.
7  Q.  So you're unable to find any prior
8  military shoulder pads that had those same design
9  choices as Games Workshop?
10  A.  Correct.
11  Q.  Turn to page 11 of your expert report
12  on paragraph 33.  You have a section entitled
13  Heroic Scale.
14  I think you've testified before that
15  you are not an expert in miniature wargaming; is
16  that correct?
17  A.  That's correct.
18  Q.  Not an expert in the design of
19  miniatures?
20  A.  No.
21  Q.  And except for playing with a few dozen
22  or two dozen miniatures when you were 12 to 14
23  years old, you've had no experience with
24  miniatures whatsoever?

238

1  A.  That's correct.
2  Q.  So what basis do you have to provide an
3  expert opinion on important aspects of the design
4  of miniatures?
5  A.  Just my experience from when I was a
6  teenager.
7  Q.  But you agreed with me that does not
8  qualify you as a an expert in the design of
9  miniatures, correct?
10  A.  Yes.
11  Q.  So you have no ability to provide any
12  expert opinion on important aspects in the design
13  of miniatures, do you?
14  MR. COOPER:  Objection to the extent it
15  calls for a legal conclusion.
16  THE WITNESS:  I don't actually know.
17  BY MR. KEENER:
18  Q.  You agreed you're not an expert in the
19  design of miniatures?
20  A.  By expert, what sort of expert do you
21  mean, legal expert or just someone who knows about
22  miniatures?
23  Q.  You testified before you were not an
24  expert in the design of miniatures.

239

1  A.  Yes.
2  Q.  What meaning were you intending when
3  you said that?
4  A.  I was imagining that I was using
5  like -- I don't know actually, I don't know now.
6  I'm not a legal expert on it and I don't think I'm
7  actually a practical expert on it.  I just had
8  experience as a child with the miniatures.
9  Q.  Other than the two years when you were
10  12 years old that you played with miniatures, you
11  have no experience in miniatures at all?
12  A.  No, I do not.
13  Q.  And no experience in the design of
14  miniatures?
15  A.  No, I do not.
16  Q.  So you are not qualified to identify at
17  all any important aspects needed in the design of
18  miniatures, correct?
19  MR. COOPER:  Objection to the extent it
20  calls for a legal conclusion.
21  THE WITNESS:  Other than on a practical
22  basis, no.
23  BY MR. KEENER:
24  Q.  And the practical basis is just your

240

1  layman common sense?
2  A.  Yes.
3  Q.  No expert basis?
4  A.  Well, in general art historical
5  context, there are issues of scale in both
6  medieval and Renaissance figure wall art.
7  Q.  I'm not asking about wall art?
8  A.  I know you're not.  I'm giving you
9  context on why I would still have the same
10  experience but based on a scholarly reason rather
11  than with miniatures.
12  So I would say that although I do not
13  have experience with miniatures, I could speak to
14  the disproportionality of scale to allow for
15  easier identification of iconographic elements.  I
16  would feel confident saying that.
17  Q.  And that's not expressed anywhere in
18  your opinion?
19  A.  No, it is not.
20  Q.  So based on what's expressed in your
21  report about important aspects in the design of
22  miniatures, you agree that's not something that
23  you have any expertise in?
24  MR. COOPER:  Objection, misstates

241

1   testimony, calls for a legal conclusion.
2       THE WITNESS:  I am not sure whether my
3   art history background enables me to have an
4   opinion on miniatures in the way that a court
5   would understand an opinion on miniatures.
6   BY MR. KEENER:
7       Q.   You agree you're not having any
8   expertise in the design of miniatures, correct?
9       A.   Correct.
10      Q.   Or their use in tabletop gaming,
11  correct?
12      A.   Correct.
13      Q.   Let's turn to page 12 of your report.
14  On page 12 there's a picture.  What's that picture
15  of?
16      A.   There are two pictures on page 12.
17      Q.   What is the picture on the left?
18      A.   The picture on the left is an AT-AT
19  driver's armor from Empire Strikes Back.
20      Q.   So although you in the text talk about,
21  quote, a Storm Trooper --
22      A.   Yes.
23      Q.   -- that's not the picture of a Storm
24  Trooper that most people would recognize from the

242

1   Star Wars movies, correct?
2       A.   I believe it probably is.
3       Q.   You're using this picture to show the
4   shoulder pad, right?
5       A.   Yes.
6       Q.   And that is not the shoulder pad used
7   on regular Storm Troopers in the Star Wars movie,
8   is it?
9       A.   I would have to take a look.  I believe
10  it is similar to it.
11      Q.   Do you know if that's the same shoulder
12  pad used?
13      A.   I do not know.
14      Q.   You don't know one way or the other?
15      A.   No, not right now.
16      Q.   Now, this picture is identified as the
17  AT-AT Driver, correct?
18      A.   Yes.
19      Q.   Do you know whether this picture is,
20  where you see the front of the armor, ever shown
21  throughout the movie?
22      A.   I'm not entirely sure.  I believe it is
23  but I could be incorrect.  I could be wrong.
24      Q.   You're not making an expert opinion on

243

1   that either way?
2       A.   I'm not making an expert recollection
3   of whether or not you can actually see the very,
4   very front of the armor in Empire Strikes Back's
5   Battle of Hoth.  I would have to look at the
6   Battle of Hoth again.
7       Q.   Do you know how long you're able to see
8   any picture of that armor during the Battle of
9   Hoth?
10      A.   No, I do not.
11      Q.   Could it be just a matter of a second
12  or two?
13      A.   I don't know.
14      Q.   Would it surprise you if it was?
15      A.   I don't know.  I'm trying to
16  reconstruct the movie in my head but -- and I
17  believe that the battle was lengthy but I can't
18  recall.
19      Q.   How many times you saw the driver of an
20  AT-AT?
21      A.   Yeah, I can't recall that.
22      Q.   But it wouldn't be shocking to you if
23  it's only for a few seconds?
24      A.   It wouldn't be shocking to me if it was

244

1   longer either.
2       Q.   So you're not making an expert opinion
3   either way on how long this image appears on the
4   screen?
5       A.   No, I don't think that's the important
6   part of idea there.
7       Q.   Well, if it only flashes for a second
8   or two on the screen, would it be your opinion
9   that the person who designed a Games Workshop
10  shoulder pad must have been copying it?
11      MR. COOPER:  Objection, calls for
12  speculation, hypothetical.
13      THE WITNESS:  What the question
14  supposes is that experience of this particular
15  prop is something that is only obtained
16  through either A, a single viewing of a motion
17  picture and not repeated viewing, nor freezing
18  the frame to view, nor encountering this piece
19  or pieces like it at any fan-oriented event,
20  and fan-oriented events are extremely popular
21  and well attended in science fiction circles,
22  and if you were to go to any number of
23  conventions, you would see this suit of armor
24  readily apparent and you can buy reproductions

245

1  of them and figurines of them so I think to
2  characterize it as something that is only
3  experienced as a fleeting moment in a film
4  viewed once doesn't quite represent the
5  experience that people in the science fiction
6  community have with these images.
7  BY MR. KEENER:
8      Q.  So it's your expert opinion that
9  whoever designed Games Workshop shoulder pad must
10  have frozen the frame or otherwise acquired a
11  miniature of this model to base it off of?
12      MR. COOPER:  Objection, misstates
13  testimony.
14      THE WITNESS:  I think that it is
15  extremely likely that a person in the science
16  fiction community would encounter this image
17  in a multiplicity of forms, not necessarily
18  any singular exposure.
19  BY MR. KEENER:
20      Q.  But you have no evidence one way or the
21  other whether or not the person who designed Games
22  Workshop shoulder pad did any of those things?
23      A.  No, I do not.
24      Q.  Now, the shoulder pad we see here is

246

1  different in design than the ones we saw
2  previously in your museum pictures, would you
3  agree?
4      A.  Yes.
5      Q.  And so it's not some sort of common
6  design that you were able to find in medieval
7  armor?
8      A.  No, it was not.  Indeed, it would be
9  hazardous to your life to wear such a piece if it
10  were real.
11      Q.  Because?
12      A.  Because there are only a very, very
13  small number of places on the human body that an
14  actual medieval combat person would try and score
15  hits.  So for example, when one shows two knights
16  fighting in a film, for example, they will often
17  show them swinging swords at one another as if to
18  chop off arms and legs, whereas in reality, very
19  few swords had sharp edges and instead would be
20  held nodally on the hilt but also on the blade
21  edge and the sword used primarily as a stabbing
22  weapon for a very small number of body parts, such
23  as the eyes, the armpit, the neck or the groin
24  with the goal of severing one of the body's major

247

1  arteries.
2      So if you were wearing that piece of
3  armor, if it really existed, and you were actually
4  having a medieval style combat with someone, they
5  would quickly kill you, which is why I said in the
6  expert report that there are many ways for
7  something to be nonfunctional but only a few ways
8  for something to be functional.
9      Q.  So the shoulder pad worn by the AT-AT
10  driver would provide very minimal protection to
11  the driver in a medieval combat?
12      A.  Yes.
13      Q.  And that's very different than the
14  shoulder pad designed by Games Workshop, correct?
15      MR. COOPER:  Objection, misstates.
16      THE WITNESS:  No, it is not.
17  BY MR. KEENER:
18      Q.  You believe similarly the Games
19  Workshop provides very little combat regular
20  protection?
21      A.  I believe it would be entirely
22  nonfunctional.
23      Q.  Would it provide different protection
24  than that from the AT-AT driver?

248

1      MR. COOPER:  Object to the
2  hypothetical.
3      THE WITNESS:  It would provide the same
4  level of nonprotection.
5  BY MR. KEENER:
6      Q.  In different ways though, right?
7      MR. COOPER:  Object to the
8  hypothetical.
9      THE WITNESS:  Yes.
10  BY MR. KEENER:
11      Q.  The Star Wars shoulder pad provides
12  non-protection because it's small?
13      MR. COOPER:  Same objection.
14      THE WITNESS:  No, it provides
15  non-protection because of the way it does not
16  articulate with the body.
17  BY MR. KEENER:
18      Q.  Does not articulate and it doesn't
19  cover anything below the top of the shoulder?
20      A.  No, the coverage is immaterial.
21      Q.  Would you agree that does not cover
22  anything beyond the top of the shoulder?
23      A.  Yes, but nobody stabs you on the top of
24  your shoulder.

249

1    Q.   Would you agree it does not cover
2    anything beyond the top of the shoulder?
3    A.   Yes, I do.
4    Q.   And that's different than the Games
5    Workshop designer's shoulder pad, which goes all
6    the way down to the elbow, correct?
7    A.   We were just talking about the top of
8    the shoulder.
9    Q.   The Star Wars shoulder pad only extends
10   down to just below the top of the shoulder,
11   correct?
12   A.   Oh, I thought you were talking about
13   going up over the shoulder.
14   Q.   It goes down just below the top of the
15   shoulder, correct?
16   A.   It goes to about -- I'd say about here
17   (indicating).
18   Q.   You're pointing a few inches --
19   A.   The Games Workshop one goes to about
20   here (indicating).
21   Q.   You're agree the Games Workshop one
22   goes significantly longer?
23   A.   Yes.
24   Q.   All the way down to the elbow?

250

1    A.   Yes.
2    Q.   You agree the Star Wars one protrudes
3    outwards away from the body?
4    A.   I think that's actually a matter of
5    photography.
6    Q.   You don't believe it extends outwards?
7    A.   From my remembrance of seeing this in
8    other contexts, I don't think it does.  I think it
9    actually kind of fits -- I'm not entirely sure.
10   I'd have to see more images of it.
11   Q.   Would you agree that it's positioned
12   differently than Games Workshop's shoulder pad?
13   A.   Well, since it's not really on a
14   person, it's impossible to tell its position
15   in situ.
16   Q.   You've see the soldier pad many times
17   on Games Workshop's space marine, correct?
18   A.   Yes.
19   Q.   Its position is quite different than
20   Games Workshop's, correct?
21   A.   No, I don't think I could make that
22   assumption right now because I'm not seeing it
23   worn on a person.  I think maybe if we saw the
24   still frame, then it might look like it was

251

1    positioned in the same manner, because this is
2    just on a display mannequin.  It's not a person.
3    Q.   It's your expert opinion that the
4    positioning of that shoulder pad is the same
5    positioning as Games Workshop's shoulder pad?
6    A.   No, I don't know.
7    Q.   You have no opinion either way?
8    A.   No.
9    Q.   Can you tell from your picture that the
10   Star Wars shoulder pad is quite thin?
11        MR. COOPER:  Object to form.
12        THE WITNESS:  Quite thin in terms of
13   the thickness of the plastic?
14   BY MR. KEENER:
15   Q.   Yes.
16   A.   Yes, it's probably no more than 16th to
17   a quarter of an inch thick.
18   Q.   And that's different than Games
19   Workshop which is designed to appear quite bulky
20   in thick armor?
21   A.   The Games Workshop one being tinier,
22   probably much thinner.
23   Q.   Based on scale.
24   A.   See, the problem with scale is scale

252

1    presupposes a knowledge of the backstory.  Am I
2    supposed to presume a knowledge of the backstory
3    for these pictures?
4    Q.   Based on the scale of the shoulder pad
5    to the rest of the armor and the rest of the body,
6    can you tell whether the shoulder pad appears to
7    be bulky or thin?
8    A.   No, you really can't.
9    Q.   And you --
10   A.   You can only tell that it's bulky if
11   you know the backstory of the figures.
12   Q.   You have no idea either way whether
13   Games Workshop's shoulder pads are bulky?
14   A.   If this was a 5 foot 7 person, they
15   could be a quarter of an inch.  If this is like a
16   7 foot tall space marine, they could be an inch
17   thick.  I don't know.
18   Q.   You have no opinion either way?
19   A.   Not really, no.  They are oversized but
20   oversize and sort of cumbersome does not equal
21   physical bulk.  You could have something that's
22   oversized and yet thin and pliable, or it could be
23   made out of a material that is incredibly
24   lightweight.

253

1    Q.    Would you agree that the Games Workshop
2  shoulder pad is much more oversized than the Star
3  Wars shoulder pad?
4        MR. COOPER:  Object to form.
5        THE WITNESS:  Yes, it's oversized in
6      comparison with the Star Wars piece.
7  BY MR. KEENER:
8    Q.    And you see in the Star Wars piece how
9  the banding around the edge has large square
10  sections in the corner?
11    A.    Yes, I do.
12    Q.    And you didn't find that in Games
13  Workshop's shoulder pad, did you?
14    A.    I don't believe I did.
15    Q.    Do you know if the Star Wars shoulder
16  pads if put together would make the same shape as
17  the Games Workshop shoulder pads?
18    A.    From the appearance, actually they
19  would, just not oriented in the same angle.  Not
20  oriented in the same direction, so instead of
21  being an egg this shaped, it would be an egg this
22  shaped (indicating).
23    Q.    Do you think the egg would be the
24  same --

254

1    A.    Ovoid.
2    Q.    The ovoid would be the same dimensions?
3    A.    The same dimensions or same
4  proportions.
5    Q.    Same proportions?
6    A.    Yes, I believe it would be the same
7  proportions oriented in a different axis.  Along a
8  different axis, sorry.
9    Q.    Did you ever look at the back of the
10  shoulder pads?
11    A.    The back of them?
12    Q.    The underside, the inside?
13    A.    No, I have not.
14    Q.    So you can't comment either way on
15  whether there's any similarities or differences
16  there?
17    A.    No, I cannot.  I'll state again, I have
18  never handled these objects.
19    Q.    You've never seen any pictures of the
20  inside either, have you?
21    A.    No, I have not.
22    Q.    Would you agree that the Star Wars
23  shoulder pad is not part of a power suit of armor?
24    A.    That's actually more difficult to

255

1  answer.  I am unsure whether the presence of the
2  integrated backpack in the Storm Trooper armor
3  indicates that there's any kind of power assist
4  for any of the component element or whether it's a
5  life support thing, so right now I do not have an
6  opinion on it.
7    Q.    You're not making any opinion that it's
8  part of a powered suit of armor?
9    A.    Nor am I not.  It very well could be.
10    Q.    I don't know what possibilities are.  I
11  want to know what your expert opinion you're going
12  to express at trial is.
13        You're not expressing any opinion that
14  the shoulder pad on the Star Wars AT-AT driver is
15  part of a powered suit of armor?
16    A.    No, I am not.
17    Q.    You're not expressing any opinion that
18  the Star Wars shoulder pad you depict here is an
19  indispensable design in sci-fi culture, are you?
20    A.    Could you rephrase the question,
21  please?
22    Q.    Sure.  You saw how we saw different
23  designs in medieval times for shoulder pads?
24    A.    Yes.

256

1    Q.    You agree there's also, as we went
2  through various for the space marine type models,
3  different designs for shoulder pads for science
4  fiction-related future infantry soldier?
5    A.    Yes.
6    Q.    You're not making any expert opinion
7  that this Star Wars design is indispensable or
8  unavoidable to use in creating this future
9  infantry soldier?
10    A.    I'm not suggesting that it is
11  indispensable.
12        MR. KEENER:  Okay.  Do you want to keep
13      going or do you want to it take a break?
14        (Recess taken from 3:33 p.m. to
15      3:40 p.m.)
16  BY MR. KEENER:
17    Q.    Let's turn to page 13 of your expert
18  report.  The image on the top is a picture of
19  armor used in the movie Alien; is that correct?
20    A.    That is correct.
21    Q.    And this is yet another design of a
22  shoulder pad?
23    A.    Yes, it is.
24    Q.    And this one is again articulated?

257

```
1    A.   Yes.
2    Q.   Unlike the Games Workshop shoulder pad?
3    A.   Yes.
4    Q.   And it has a large series of rivets on
5    the various layers.  Do you see that?
6    A.   Yes, I do.
7    Q.   And that's dissimilar to the Games
8    Workshop one as well, correct?
9    A.   Yes.
10   Q.   So this is another different design of
11   an overlarge shoulder pad?
12   A.   Yes, it is.
13   Q.   And the picture on the bottom of page
14   13 on the left, the Arzach picture, do you see
15   that?
16   A.   Yes.
17   Q.   And those appear to be cloth shoulder
18   pads; is that right?
19   A.   They do indeed.
20   Q.   So again, a different type of shoulder
21   covering?
22   A.   Yes.
23   Q.   Different than Games Workshop's design?
24   A.   Yes.
```

258

```
1    Q.   And again, the picture next to it again
2    appears to be a cloth shoulder pad; is that right?
3    A.   That's for difficult to tell.
4    Q.   Can you tell either way?
5    A.   Not really, no.
6    Q.   And again, it's yet another design a
7    shoulder pad?
8    A.   Yes, it is.
9    Q.   Different than Games Workshop's?
10   A.   Yes.
11   Q.   On page 14, you have a picture labeled
12   Michael Devlin.  Do you see that?
13   A.   Yes, I do.
14   Q.   And this is yet another design of a
15   shoulder pad?
16   A.   Yes.
17   Q.   For a future space warrior?
18   A.   Yes.
19   Q.   And this one is kind of a two-piece
20   shoulder pad?
21   A.   Yes.
22   Q.   We can't see the back.  It could be a
23   three-piece?
24   A.   It could be.
```

259

```
1    Q.   With a large square type section as one
2    of the pieces?
3    A.   It looks to be square, yes.
4    Q.   And it's attached to another shoulder
5    pad that has what you might call a cutout in it?
6    A.   Yes.
7    Q.   And that's a different design than
8    Games Workshop's shoulder pad?
9    A.   Yes, it is.
10   Q.   And this one doesn't have the ribbing
11   along it like Games Workshop's does?
12   A.   No, it doesn't.
13   Q.   So it has a different design of a large
14   shoulder pad?
15   A.   Yes.
16   Q.   On page 15, you have two pictures from
17   Robert Heinlein, correct?
18   A.   That is correct.
19   Q.   And again, those show additional
20   options and design for shoulder pads for future
21   warriors?
22   A.   Yes.
23   Q.   And again, they are both different
24   designs than that chosen by Games Workshop?
```

260

```
1    A.   Yes.
2    Q.   And on page 15 again, you have a
3    picture from Dreadstar?
4    A.   Yes.
5    Q.   Is that a robot?
6    A.   Yes.
7    Q.   So this is not a human inside of a
8    powered suit of armor?
9    A.   No.
10   Q.   So they are not shoulder pads, they are
11   actually part of the robot's skin or skeleton as
12   it were, correct?
13   A.   Exoskeleton, yes.
14   Q.   And you don't know if that picture was
15   ever released in the United Kingdom, do you?
16   A.   No, I do not.
17   Q.   Or what date it would be if it was?
18   A.   No, I don't.
19   Q.   And page 16, the Armored Trooper
20   picture is again another style of shoulder pad?
21   A.   Yes.
22   Q.   But again, this is a robot, not a
23   powered suit of armor for a human, correct?
24   A.   I believe so.
```

Grindley, Carl  2/21/2013  9:09:00 AM

261

1    Q.    And again, this is a different style
2    shoulder pad than the one chosen by Games
3    Workshop?
4    A.    Yes, it is.
5    Q.    And similarly, you have four pictures
6    from the Chronicles of Riddick.  Do you see that?
7    A.    Yes.
8    Q.    And that came out quite a bit after
9    Games Workshop's space marine design, correct?
10   A.    Yes.
11   Q.    Yet again, those feature another four
12   different potential designs for shoulder pads?
13   A.    Yes.
14   Q.    And each of them different than Games
15   Workshop's design?
16   A.    Yes.
17   Q.    And that's the extent of your pictures
18   for shoulder pads, correct?
19   A.    Yes.
20   Q.    So we've looked at a large number of
21   different potential shoulder pad designs?
22   A.    Yes, a large number.
23   Q.    On both medieval times and from science
24   fiction area?

262

1    A.    That's correct.
2    Q.    And you saw a variety of different
3    designs of shoulder pads, although they all
4    protect the shoulder?
5    A.    Yes.
6    Q.    You could have different shapes?
7    A.    You can have different shapes.
8    Q.    You can have different sizes?
9    A.    You can have different sizes.
10   Q.    You can have different banding?
11   A.    You can have different banding.
12   Q.    Different decorations?
13   A.    Different decorations.
14   Q.    Different straight lines or curve
15   lines?
16   A.    Yes.
17   Q.    Differences whether it is articulated
18   or not articulated?
19   A.    Yes.
20   Q.    Or how many articulations?
21   A.    Yes.
22   Q.    Whether or not it extends toward the
23   chest?
24   A.    Yes.

263

1    Q.    Whether or not they extend towards the
2    shoulder?
3    A.    Yes.
4    Q.    Whether they have any additional neck
5    protection?
6    A.    Yes.
7    Q.    Whether they are integrated with the
8    rest of the armor?
9    A.    Yes.
10   Q.    And other choices?
11   A.    Yes, there are a very large number of
12   choices.
13   Q.    And you did not find any shoulder pad
14   design that made all the same choices that Games
15   Workshop did in designing its space marine
16   shoulder pad, did you?
17   A.    I did not find any that were identical
18   in every aspect and every element, no.
19   Q.    All right, let's limit it to the size
20   and the shape and the banding, those three
21   elements.
22         Did you find any with all those three
23   elements?
24   A.    Not the size, the shape and the banding

264

1    for anything other than the component part of the
2    robot.
3    Q.    Okay, which you testified was not a
4    part of the powered suit of armor?
5    A.    No, it's a robot, part of a robot.
6    Q.    So a shoulder pad as a piece of armor
7    that a soldier would wear, you're not aware of any
8    shoulder pads that had those common elements of
9    the Games Workshop shoulder pad?
10   A.    It also depends, I guess, if you define
11   the exterior skin of a robot as being --
12   exoskeletal as being part of the robot.
13   Q.    Let me rephrase that again.
14         In searching for shoulder pads used on
15   future infantry warriors, a human wearing a suit
16   of power armor, you were not able to identify any
17   shoulder pads that had those three common design
18   elements of the Games Workshop, size, shape and
19   banding?
20   A.    Correct.
21   Q.    So as you sit here today, you are not
22   expressing any expert opinion that that
23   combination of design elements is in any way not
24   original?

265

```
1        MR. COOPER:  Could you read the
2   question?
3        (Record read.)
4        MR. COOPER:  Object to form, misstates
5   testimony.
6        THE WITNESS:  I'm not saying it's not
7   original?
8   BY MR. KEENER:
9    Q.   Right, you're not making an expert
10   opinion that this combination is unoriginal?
11   A.   I think I've said it's unoriginal.
12   Q.   That that combination of three
13   elements?
14   A.   I don't think that that combination of
15   three elements is relevant for originality.
16   Q.   My question is, I think you've said you
17   were not able to find anything in --
18   A.   Right.
19   Q.   -- prior military history or science
20   fiction with that combination of three elements?
21   A.   Correct.
22   Q.   So you are not making an expert opinion
23   that that combination of three elements is
24   unoriginal?
```

266

```
1        MR. COOPER:  Objection, misstates
2   testimony, define original.
3        THE WITNESS:  I do not think that those
4   three items taken together as a choice is an
5   original thing.
6   BY MR. KEENER:
7    Q.   Although you cannot point to anything
8   that you've seen with that same three choices?
9    A.   Correct.
10   Q.   And you're not making any expert
11   opinion that those three choices combined together
12   is some sort of essential combination that a
13   designer would need to do to make a future
14   infantry soldier?
15   A.   Correct.
16   Q.   Someone making a future infantry
17   soldier would have many choices on how to design a
18   shoulder pad?
19   A.   Yes, they would.
20   Q.   And there's no standard ways that they
21   would have to make it?
22   A.   No, there isn't.
23   Q.   There's a virtual unlimited amount of
24   ways?
```

267

```
1    A.   Yes.
2    Q.   And you're not identifying any
3   characteristics that you believe are
4   indispensable?
5    A.   No.
6        (Plaintiff's Exhibit 193, memorandum
7   opinion and order, marked for identification.)
8   BY MR. KEENER:
9    Q.   I'm going to show you what's been
10   marked Plaintiff's Exhibit 193.  I'm not going ask
11   you to read all of this.
12       MR. COOPER:  Well, I'm going to ask him
13   to read it to the extent he needs to to answer
14   any of your questions.
15   BY MR. KEENER:
16   Q.   My first question is:  You discussed
17   being provided some sort of legal looking document
18   but you couldn't recall what it was.  Do you know
19   if this was it?
20   A.   I do not believe this was it.
21   Q.   I would like to turn your attention to
22   page 18.  There's a section that starts
23   Scènes à faire.  Do you see that beginning of the
24   section?  Are you there?
```

268

```
1    A.   Yes, I am.
2    Q.   Okay.
3        Now I'm going to start with the second
4   paragraph that states, "The scènes à faire
5   doctrine does not bar copyright protection for
6   work simply because it contains unprotectable
7   elements.  A claim of infringement, however,
8   cannot be based on such elements alone -- rather,
9   it must be the unique combination of those
10   elements (or 'particular novel twists given to
11   them') that provides the originality required for
12   copyright protection."
13       Do you see that?
14   A.   Yes, I do.
15   Q.   Do you have any reason to disagree with
16   anything there?
17   A.   I'm not a lawyer.  I have no reason to
18   disagree nor agree with anything here.
19   Q.   Do you see where it says "a unique
20   combination of those elements"?
21   A.   I also see where it cites some sort of
22   case law.
23   Q.   That wasn't my question.
24   A.   I know that wasn't your question.  I do
```

269

1 indeed see it but it meanings nothing to me.
2    Q.  For example, on the shoulder pad, do
3 you have any opinion one way or the other whether
4 or not the combination of the size, shape and
5 banding of Games Workshop's shoulder pads is a
6 unique combination of elements?
7    A.  No, I believe it's a rudimentary
8 arbitrary combination of elements.
9    Q.  It may be arbitrary but do you believe
10 it's a unique combination?
11    A.  I believe it's a rudimentary
12 combination.
13    Q.  Do you believe anyone else has made
14 that combination?
15    A.  I have no earthly idea.
16    Q.  You are not able to express an opinion
17 that someone else has ever made that combination,
18 are you?
19    A.  Nor that they haven't made it.
20    Q.  Right, so as far as you're aware of,
21 Games Workshop could have been the first person to
22 combine those three elements?
23    A.  They could have been.
24    Q.  And you're not disputing that if they

270

1 claim they were?
2    A.  I haven't been asked to dispute it.
3    Q.  You have no basis to dispute it?
4    A.  I would have to do research to dispute
5 it.
6    Q.  And the research you've done, you have
7 not been able to find any other shoulder pad ever
8 in existence, in reality or in fantasy or in
9 science fiction, with those combination of
10 elements?
11    A.  Well, if that had actually been part of
12 the claim, I probably would have researched it to
13 look for those particular things but I was never
14 told in this document that those three arbitrary
15 and rudimentary elements would be in any way
16 important.
17    Q.  But based on the research you did do,
18 you're not able to find -- you were not able to
19 find anything --
20    A.  Based on the research I did not do,
21 yes.
22    Q.  Let me ask my question before you
23 answer it.
24    Based on the research you did and all

271

1 the images you found, you were not able to locate
2 any that had those three elements?
3    A.  No.
4    Q.  The next paragraph talks about "To
5 qualify for copyright protection, a work must be
6 original to the author."  There's a case cite.
7 "Originality in the copyright context 'means only
8 that the work was independently created by the
9 author and that it possesses at least some minimal
10 degree of creativity.'"  Another case cite.  "This
11 low threshold permits even a small amount of
12 creativity to render a product protectable under
13 copyright law."
14    Do you see those three sentences?
15    A.  Yes.
16    Q.  Do you have any opinion whether or not
17 any of the Games Workshop products have even a
18 small amount of creativity?
19    A.  I have no opinion in this legal
20 context, no.
21    Q.  Outside the legal context, looking at
22 Games Workshop space marine --
23    A.  Outside the legal context would appear
24 to be irrelevant but if I were asked to say so, I

272

1 would say that it does not possess -- actually, I
2 would say it possesses a minimal degree of
3 creativity.
4    Q.  So you agree that Games Workshop's
5 space marines possess a minimal degree of
6 creativity?
7    MR. COOPER:  Objection, misstates
8 testimony as to what product you're talking
9 about.
10    THE WITNESS:  Under this kind of
11 context, I really don't know.  I don't know
12 how to answer this question.
13 BY MR. KEENER:
14    Q.  Without regard to this context.
15    MR. COOPER:  Don't regard the opinion
16 if he tells you not to regard the opinion.
17 Put it out of your mind.
18 BY MR. KEENER:
19    Q.  My question is:  Do you believe Games
20 Workshop's design of the space marine involved a
21 minimal level of creativity?
22    A.  The problem here is that it appears to
23 be a legal term, this minimal degree of
24 creativity, not an actual sort of scholarly or

273

1  artistic or real world term.
2      Q.  Use it as you would --
3      A.  I can't use it.  I do not have
4  experience in law.
5      Q.  I'm not asking for experience in law.
6      MR. COOPER:  You did put this court
7  order in front of him.
8      MR. KEENER:  Place an objection if you
9  want.
10 BY MR. KEENER:
11     Q.  My question is:  Without regard to this
12 court opinion, do you believe Games Workshop's
13 design choices involved creating its space marine
14 involved any artistic minimal degree of
15 creativity?
16     A.  I'm sorry, I can't put this out of my
17 mind now that it's in there.
18     Q.  You're unable to answer that question?
19     A.  I'm unable to answer that question.
20     Q.  So you are not going to be opining that
21 they do not contain a minimal level of creativity?
22     MR. COOPER:  Objection to the extent it
23     calls for a legal conclusion, that this whole
24     line of questioning having been spoiled by

274

1      your use of this exhibit.
2      THE WITNESS:  I really can't answer
3      that question.
4  BY MR. KEENER:
5      Q.  You can't tell me whether or not you
6  will or will not be opining on that subject?
7      A.  I don't know.
8      Q.  That's why I'm asking, are you going to
9  be opining on the subject whether or not any Games
10 Workshop design involved a minimal level of
11 creativity?
12     MR. COOPER:  I object to the use of
13     "minimal level of creativity."  He's given you
14     what his expert opinion is.  This calls for a
15     legal conclusion.
16     THE WITNESS:  I mean in my previous
17     understanding of what the issues were before
18     seeing this document, I would say there is no
19     minimal level of creativity in the product.
20     It is merely assembled out of commonplace
21     elements from the history of science fiction
22     fantasy and the actual world, but with the
23     context of this document --
24     MR. COOPER:  He didn't ask you about

275

1  the context of the document.
2  BY MR. KEENER:
3      Q.  And you previously testified that you
4  weren't able to identify anything prior existing
5  with that same combination of known elements,
6  correct?
7      A.  Correct.
8      Q.  And do you believe there was any level
9  of creativity in choosing what elements to combine
10 together?
11     A.  Not really, no.
12     Q.  So there is no level of creativity
13 involved in combining different known elements
14 together in a unique way?
15     A.  No, it's more of a craft.
16     Q.  But no level of creativity?
17     A.  No level of art.
18     Q.  And that's your expert opinion?
19     A.  Yes, it is a craft, not an art.  Let me
20 put this away.  I don't want to look at this
21 anymore.
22     Q.  Let's look at the bottom of page 19 of
23 that same exhibit.  It begins, "Chapterhouse has
24 presented a report from William F.M. Brewster, the

276

1  Curator of Collections for the First Division
2  Museum at Cantigny Park in Wheaton, who stated
3  that Games Workshop's shoulder pads are 'in
4  keeping' with previous examples of military-style
5  shoulder pads found throughout history."
6      Stopping there, is that similar to your
7  opinion that you believe the shoulder pads are
8  similar to or derived from other shoulder pads in
9  history?
10     MR. COOPER:  Objection, this is a
11     question based on what William F.M. Brewster
12     has said, and Dr. Grindley has not read his
13     report, opined on it --
14     MR. KEENER:  Counsel, no speaking
15     objection, place an objection to form and
16     we'll continue.
17 DI    MR. COOPER:  No, I'm going instruct you
18     not to answer.  Your question is absolutely
19     outside the scope and has nothing to do with
20     Dr. Grindley's opinion.
21     Don't answer that question.
22     MR. KEENER:  You're instructing him not
23     to answer and it's not on a basis of
24     privilege; is that understood?  Is that

277

1  correct?  There's no privilege objection and
2  you're instructing the witness not to answer
3  in contrary to the rule; is that correct?
4        MR. COOPER:  That is not correct, it is
5  not in contradiction to the rules.  This is
6  absolutely outside the scope of his report.
7        MR. KEENER:  You understand you can
8  only instruct him not to answer on the basis
9  of privilege, correct?
10       MR. COOPER:  The objection here is you
11  cannot ask him to --
12       MR. KEENER:  Then place your objection.
13  Do not instruct him not to answer.
14       MR. COOPER:  I am instructing him not
15  to answer.  If you want to get to the court
16  and get the court to say he should answer a
17  question about what F.M. Brewster said and
18  opined on, then you can do that.  You can get
19  court on the phone right now and the judge can
20  decide whether or not he's going to answer the
21  question.
22  BY MR. KEENER:
23    Q.   Are you refusing to answer the
24  question?

278

1    A.   I'm refusing to answer the question.
2    Q.   Do you believe that Games Workshop
3  space marine shoulder pad is similar to other
4  shoulder pads in history?
5    A.   Yes, I do.
6    Q.   The court continues, "Brewster admitted
7  that he could locate no same or similar
8  representation of Games Workshop's shoulder pad
9  design in previous military history."
10       Do you see that?
11   A.   Yes, I do.
12   Q.   Now, do you agree that you were also
13  unable to locate any shoulder pad the same or
14  similar to Games Workshop's space marine shoulder
15  pad in prior military history?
16   A.   I disagree.
17   Q.   Which shoulder pad did you locate that
18  was the same or similar as Games Workshop's
19  shoulder pad?
20   A.   All of them were similar, none were the
21  same.
22   Q.   The court continues, "Upon independent
23  examination, the court finds that Games Workshop's
24  shoulder pads involve enough originality to afford

279

1  them copyright protection.  The unusually large
2  proportional size of the shoulder pads as compared
3  to the space marine's head is a creative addition
4  to the common shoulder pads sometimes worn by
5  real-life soldiers in battle."
6        Do you see that?
7    A.   Uh-huh.
8    Q.   Yes?
9    A.   Yes, I do.
10   Q.   Do you agree with that?
11   A.   No, I really don't.
12   Q.   You don't believe that the oversized
13  unusually large size of the shoulder pad
14  distinguishes it from those priorly used in
15  military history?
16       MR. COOPER:  Objection, he just
17  answered that.
18       THE WITNESS:  I don't agree for the
19  simple reason that it's a court decision
20  regarding copyright protection and I don't
21  know anything about copyright protection.
22  That is why I can't agree.
23  BY MR. KEENER:
24   Q.   So you can't agree or disagree with it?

280

1        MR. COOPER:  Objection, misstates
2  testimony.
3        THE WITNESS:  I have no opinion and I
4  have no expertise regarding copyright law.
5  BY MR. KEENER:
6    Q.   Okay.  The court continues, "The
7  shoulder pads created to fit onto Games Workshop's
8  physical figurines, though more proportionally
9  accurate, are nevertheless still larger and boxier
10  than those typically found outside of the
11  Warhammer 40,000 fantasy world."
12       Do you agree with the court?
13       MR. COOPER:  You can say whether you
14  agree or disagree.
15       THE WITNESS:  I disagree.
16  BY MR. KEENER:
17   Q.   Why?
18   A.   I disagree because I -- I disagree
19  because when we went through different items on
20  the chart looking at shapes, you were
21  extraordinarily concrete with your level of detail
22  to the point where things had to have an absolute
23  similarity.  They had to be the same.  Now, it
24  appears to me as if that may not actually be

281

1    either the case or not the case.  So when you

2    defined things as being only the same or similar,

3    if they are absolutely identical, then these two

4    shoulder pads in every single example are

5    dissimilar because they are not wholly identical.

6    Even by the very fact that they are slightly

7    different proportion would completely obviate any

8    sort of claim of sameness.  So yes, I would have

9    to disagree with this because it seems to be -- it

10    does not seem to be based on reason.

11    Q.   Despite your belief the court's opinion

12    is not based on reason, let's talk about

13    proportionality.

14         MR. COOPER:  Objection, that's

15    argumentative, and misstates his testimony.

16    BY MR. KEENER:

17    Q.   Do you understand whether or not Games

18    Workshop space marine shoulder pad would fit on a

19    Games Workshop space marine model?

20    A.   I'm sorry, could you repeat that?

21    Q.   Do you have any understanding on

22    whether or not a Games Workshop shoulder pad would

23    fit on a Games Workshop space marine model?

24    A.   I would suppose that it would.

282

1    Q.   Do you have any understanding on

2    whether or not the Chapterhouse shoulder pad would

3    fit on a Games Workshop space marine model?

4    A.   Yes, but I don't know how.

5    Q.   You don't have any understanding?

6    A.   Of how, no.

7    Q.   Why is that?

8    A.   I have not handled the pieces.

9    Q.   Have you seen pictures of them

10    assembled?

11    A.   I've seen pictures of them assembled

12    but I cannot tell from the pictures how they were

13    actually assembled.

14    Q.   So you don't know whether or not it

15    would fit on a Games Workshop space marine?

16    A.   I don't know if we've actually seen

17    individual shoulder pieces fitted onto actual arm

18    pieces and torsos of Games Workshop figures or if

19    we've seen shoulder pieces fitted onto torsos that

20    were produced by Chapterhouse.  I don't think

21    that's ever clear.  I could be incorrect if you

22    could show me a specific number.

23    Q.   Why don't we look at page 12 of your

24    chart.  There is a shoulder pad which I believe is

283

1    fitted on to a Games Workshop arm.

2    A.   Is it fitted on the arm or is it fitted

3    on the torso?

4    Q.   My understanding is it's fitted on the

5    arm.

6    A.   Understanding or knowledge?

7    Q.   My understanding is it's fitted on the

8    arm.

9    Q.   So you don't know?

10    Q.   I do.  It's fitted on the arm.

11    Q.   Okay, so it's fitted on the arm.  Then

12    I guess it fits on the arm.

13    Q.   Based on your research of prior

14    military shoulder pads or other instances of

15    models or pictures, have you identified any others

16    that would fit on the arm of a space marine?

17    A.   Historically.  Suits of armor have been

18    very, very large and space marines are only an

19    inch tall, so no.

20    Q.   So you have not found any that are the

21    same size as Games Workshop's shoulder pad?

22    A.   No.

23    Q.   In any of the research, in prior

24    history or science fiction history, you have found

284

1    no shoulder pads that are the same size as Games

2    Workshop shoulder pads?

3    A.   No.

4    Q.   Do you know whether or not size is

5    important in this context?

6    A.   No, I don't.

7    Q.   In artistic endeavors, do the size of

8    objects make any difference?

9    A.   That's a very complicated matter

10    because for the most part, if you're looking at

11    sculpture, even for massive items, most of them

12    are made from very tiny maquettes so I don't

13    actually know if size has a relevancy or not.  In

14    some situations it does, in many others it does

15    not and it's very difficult to say.

16    Q.   Do you know of any artists who make

17    very large representations of a real life small

18    object?

19    A.   Yes, I do as a matter of fact.

20    Q.   Claes Oldenburg come to mind, are you

21    familiar with his work?

22    A.   Could you describe it?

23    Q.   Sure, it could be a very large

24    lipstick.

285

1    A.   Oh, like the buttons on whatever avenue
2  that is.
3    Q.   Yeah.
4    A.   Is that Seventh Avenue or something?
5  The needle and thread.  There's other such things,
6  yes.
7    Q.   And those are absurdly large artistic
8  creations?
9    A.   Yes, similar to the work of Jeff Koons,
10  these are pop art.
11    Q.   And they are simply very, very large
12  representations of a real world small object?
13    A.   Yes.
14    Q.   Would you believe there's any level of
15  creativity involved in their artistic endeavors?
16    MR. COOPER:  Object to the
17  hypothetical.
18    THE WITNESS:  That's actually a
19  difficult scholarly question, especially when
20  you're looking at pop art and contemporary,
21  you know, ready-made sculpture in that there
22  is a lot of keen debate in the artistic world
23  on whether or not that does represent a true
24  level of creativity or not.  Some people would

286

1  say that it is.  Other people would say that
2  does not.  I'm not impressed by it.  I think
3  Koons and the like are hacks so no, I don't
4  think so it's all that creative.
5  BY MR. KEENER:
6    Q.   I'm not asking whether it's all that
7  creative.  I want to know whether or not you
8  believe there's any level of creativity involved
9  in those artistic expressions.
10    MR. COOPER:  Objection, outside the
11  scope.
12    THE WITNESS:  It's very difficult to
13  say.  Dissertations have been written on a
14  single, you know, cast of a Jeff Koons
15  inflatable balloon animal.  It would take me
16  too long to consider whether or not I actually
17  really think that there's any creativity or
18  not.  My dislike of Koons and his sort
19  might -- I don't know.  I honestly don't know.
20  BY MR. KEENER:
21    Q.   So you don't have an expert opinion
22  either way whether or not those types of absurdly
23  large objects or real life objects involve any
24  level of creativity?

287

1    MR. COOPER:  Objection, outside the
2  scope.
3    THE WITNESS:  No, I don't think they
4  are creative.
5  BY MR. KEENER:
6    Q.   Let's turn to paragraph 50 of your
7  report.
8    You state, "Games Workshop Assault
9  Cannons or Lascannons are little more than heroic
10  scale gatling guns, mini guns or other comparable
11  multi-barreled weapons."
12    Do you see that?
13    A.   Yes.
14    Q.   What's the basis for your opinion that
15  a Games Workshop lascannon is a multi-barreled
16  weapon?
17    MR. COOPER:  Objection, misstates his
18  expert report.
19    THE WITNESS:  It would be great if I
20  could find the page number.
21  BY MR. KEENER:
22    Q.   Starts on --
23    A.   There you go, page 38, assault cannon.
24    Q.   That wasn't my question.  My question

288

1  is:  What's your basis for saying Games Workshop
2  lascannons are little more than heroic scale
3  gatling guns, mini guns or other comparable
4  multi-barreled weapon?
5    A.   Assault cannon --
6    Q.   That wasn't my question again.
7    A.   Yes, it was.
8    Q.   My question is:  What's your basis that
9  a Games Workshop lascannon is little more than a
10  heroic scale gatling gun, mini gun or other
11  comparable multi-barreled weapon?
12    A.   I guess we could quibble about wording
13  but the assault cannon is a gatling gun.
14    Q.   My question is not about the assault
15  cannon.
16    A.   You read that sentence.
17    Q.   No, I didn't.  My question is:  What is
18  the basis for your opinion that a lascannon is
19  little more than a heroic scale gatling gun, mini
20  gun or other comparable multi-barreled weapon?
21    A.   Well, I guess there isn't one
22  because --
23    Q.   Would it be fair to strike the word
24  "lascannon" in that sentence?

289

1     A.   Yes, you can strike the lascannon out
2  of that sentence.
3     Q.   Your report then does not contain any
4  opinions on Games Workshop's lascannon, correct?
5     MR. COOPER:  Objection, misstates
6  testimony and the report.
7     THE WITNESS:  I am not sure.  I would
8  have to read the report again.
9  BY MR. KEENER:
10    Q.   I can read the report and look for
11 lascannon but that's the only place where the word
12 "lascannon" appears?
13    A.   I don't know.  I would have to read the
14 report again.
15    Q.   I'm not asking you to read the report
16 again.
17    A.   Then how can you ask me to answer the
18 question if I haven't read the report again?
19    Q.   I'll be happy striking the word
20 "lascannon" out of paragraph 50.  You agree that
21 would be appropriate?
22    A.   That would be appropriate.
23    Q.   Paragraph 51, you discuss Games
24 Workshop flamers or meltaguns.  Do you see that?

290

1     A.   Yes, I need to find 134.
2     Q.   It starts at the bottom of page 52.
3     A.   This appears to be the wrong item
4  number.  Oh, there we are.
5     Okay, yes, I see what you're talking
6  about.
7     Q.   Okay.  Do you have any understanding on
8  whether a Games Workshop flamer is different from
9  a Games Workshop meltagun?
10    A.   No.
11    Q.   Do you believe they are the same item?
12    A.   Now I'm not sure.
13    Q.   So for this opinion in your report,
14 which item are you referring to?
15    A.   I'm referring -- in 51, I'm referring
16 to flamers but that's not, as far as I can tell,
17 the picture that's on 134, which I think is the
18 meltagun.
19    Q.   Okay.  So is 51 related to flamers or
20 meltaguns or both?
21    A.   Flamers.
22    Q.   Flamers.  So you're not making any
23 opinion in 51 about meltaguns?
24    A.   No.

291

1     Q.   Do you believe flamers to be at issue
2  in this case?
3     A.   I have no idea.
4     Q.   Let's turn in your chart to item 129
5  that starts on page 28.  It's the conversion kit
6  for the Land Raider.
7     A.   Okay.
8     Q.   What's your understanding as what's at
9  issue regarding the Games Workshop and
10 Chapterhouse Land Raider?
11    A.   My understanding of what's at issue
12 here are 12 resin parts that one can affix to a
13 Land Raider model, so 12 resin parts that
14 Chapterhouse produces that then a person could use
15 to modify their Games Workshop item.
16    Q.   And what portions of the Games Workshop
17 Land Raider do those pieces modify?
18    A.   It looks like it's the side and top
19 turrets and then some parts that affix to the side
20 of the object.
21    Q.   Now, you discussed your belief that the
22 Games Workshop Land Raider is derived from the
23 British Mark V?
24    A.   Yes.

292

1     Q.   Is that because of the overall shape of
2  the Land Raider?
3     A.   Yes.
4     Q.   And you understand the overall shape
5  not to be at issue in this case, right?
6     A.   I have no idea.
7     Q.   Well, you just told me what what's at
8  issue is the side turrets and the center turret,
9  correct?
10    A.   See, that's the problem because on
11 number 129, GW says whole set and it's unclear
12 what whole set refers to, whereas the actual
13 product is just these 12 risen pieces so I don't
14 know -- I don't quite know what that means.
15    Q.   When you were analyzing this product,
16 which portions did you focus on, if any?
17    A.   Well, the pieces I focused on were the
18 12 component parts which have no resemblance
19 whatsoever to any of the Games world [sic] item.
20    Q.   Or to a British Mark V tank?
21    A.   That's actually even less possible to
22 say because they are just plastic parts that are
23 for the most part reasonably common looking
24 shapes.

293

1  Q.  Okay.  Let's look at the pictures on
2  page 29.  Can you see the side turret of the
3  Chapterhouse product and the side turret of the
4  Games Workshop product?
5  A.  Yes.
6  Q.  And would you agree that they have a
7  similar overall shape?
8  A.  No, I would not.
9  Q.  Do they both have a wider front end
10  that extends back and then tapers off into a point
11  at the back?
12  A.  Yes, they do.
13  Q.  They both have the turret portion or
14  the sponson portion at the very front of that?
15  A.  Yes, they do.
16  Q.  Do they both have a sponson that
17  appears to rotate 45 degrees?
18  A.  Yes.
19  Q.  Do they both have a protrusion in the
20  center top of the turret?
21  A.  They are entirely dissimilar
22  protrusions.
23  Q.  Do they both have protrusion there?
24  A.  They have protrusions, yes.

294

1  Q.  Do they both seem to be carrying
2  similar style weapons?
3  A.  Similar, yes.
4  MR. COOPER:  Are you representing to
5  him that the turrets here are part of the
6  Chapterhouse product?
7  MR. KEENER:  I'm not assuming anything.
8  I'm just asking questions.
9  BY MR. KEENER:
10  Q.  Would you agree that neither of those
11  turrets looks like the British Mark V turret?
12  A.  Yeah, but they both clearly originate
13  from it.
14  Q.  Looking at the top picture you have for
15  the British Mark V, we can't see the whole turret
16  there, can we?
17  A.  No, we can't.
18  Q.  Do there appear to be any weapons on
19  that turret whatsoever?
20  A.  Not that I can see.
21  Q.  So other than there being a turret
22  there, what other similarity to do you see?
23  A.  Every single other one.
24  Q.  What other one?  You can't see how it's

295

1  shaped in the back, can you?
2  A.  I don't need to.  I know how it's
3  shaped in the back.
4  Q.  From the picture you provide, you don't
5  show us how it's shaped in the back, do you?
6  A.  No.
7  Q.  You don't show us where the weapons
8  are, do you?
9  A.  No.
10  Q.  You don't see any protrusion on the top
11  center, do you?
12  A.  No.
13  Q.  So what similarities do you see in the
14  picture other than there being a turret there?
15  A.  Well, look at it.  Look at the shape of
16  the tread, look at the shape of the side of the
17  tank, look at the overall outline of the tank,
18  look at the existence of the turret.
19  Q.  My question is about the turret, not
20  the treads or the side of the tank.
21  A.  The turret has a protrusion that sticks
22  out of the side of the tank track and there are
23  weapons on it.
24  Q.  Do you see any weapons?

296

1  A.  Can't see any them but if you looked at
2  other images, you would.
3  Q.  Where are the weapons located?
4  A.  On front of the turret.
5  Q.  So why can't we see them here?
6  A.  You're looking at the back of the tank.
7  Q.  So the back of this turret does not
8  come to a point like the Games Workshop and
9  Charterhouse pictures do?
10  A.  Right.
11  Q.  So you don't show a picture of the
12  front of the tank?
13  A.  No.
14  Q.  Would you agree with me that the next
15  picture from Luther Arkwright has turrets but
16  beyond that, no other similarity to the Games
17  Workshop product?
18  A.  I think turret is enough.
19  Q.  It's a different expression of a
20  concept of a turret?
21  A.  Yes, as is the Chapterhouse one.
22  Q.  And the next picture from Epic Comics,
23  I don't see any side turrets on that picture, do
24  you?

297

1   A.   No.
2   Q.   And that's the extent, those three
3   pictures are the extent of the references you
4   found regarding this product, right?
5   A.   It's difficult to define product when
6   we're only looking at these 12 resin pieces.
7   Q.   You understand those 12 resin pieces to
8   create side turrets, correct?
9   A.   Yes.
10  Q.   And these are the only three pictures
11  of either prior military tanks or sci-fi tanks
12  that you've included in your report, correct?
13  A.   Yes.
14  Q.   And one of them doesn't have side
15  turrets?
16  A.   Yes.
17  Q.   One of them has -- looks like a series
18  of three turrets along the side.
19  A.   Yes.
20  Q.   And one of them we can't even see the
21  whole turret.
22  A.   Yes.
23  Q.   And that's the extent of the images you
24  include in your report?

298

1   A.   Yes.
2   Q.   Is it your opinion that Games Workshop
3   side turrets is based on any of these three
4   pictures?
5   A.   Based on the ultimate origin of the
6   image is indeed this tank and its turret, yes.
7   Q.   But you don't include any picture that
8   allows us to see that similarity?
9   A.   No.
10  Q.   Do you believe Games Workshop's turret
11  has any level of creativity involved in it?
12  A.   Yes.
13  Q.   What level of creativity is involved?
14  A.   The -- I don't know, the most basic
15  type, just that it's not the same as the original.
16  Q.   What about the --
17  A.   In terms of sameness as you've defined
18  it as being exactitude.
19  Q.   What about the choice of having it
20  taper toward the back of the tank, is that a level
21  of creativity that Games Workshop had?
22  A.   I think by tapered, you'd have to get
23  precise measurements since this claim, as far as I
24  can tell now, it seems to hinge on extraordinarily

299

1   minute measurements so I do not believe taping is
2   enough to make such a claim.
3   Q.   I'm not asking about minute
4   measurements.
5   Can you see where the Games Workshop
6   turret as it goes back angles in towards a point
7   at the back of the tank?
8   A.   Yes, I can see that.
9   Q.   And you see that similar shape in the
10  Chapterhouse product?
11  A.   No, I do not.
12  Q.   Do you agree that Chapterhouse product
13  angles back and tapers toward the back?
14  A.   Not in the same way, no.
15  Q.   Do they both angle back?
16  A.   They angle back but at different
17  angles.
18  Q.   Do they both taper to an end?
19  A.   I don't know, I'd have to see.  No,
20  they do not.  Clearly they do not.
21  Q.   None of the pictures you have provided
22  have any sort of angling in the back of the
23  turret, do they?
24  A.   I think that's wholly irrelevant.  Look

300

1   at the tapering of the object.
2   Q.   That's not my question.
3   Do any of the pictures you provide have
4   any angling in the back of the turret?
5   A.   Yes, 90 degree angling.
6   Q.   Other than a straight 90 degree angle,
7   do any of them have any other angle in the back of
8   the turret?
9   A.   No.
10  Q.   Let's look at product 130 starting on
11  page 32.
12  The extent of your analysis of this
13  product in column 3 simply says see analysis of GW
14  weapons in report, correct?
15  A.   Yes.
16  Q.   And by that, you mean in the numbered
17  paragraphs of your report?
18  A.   Yes.
19  Q.   Do you discuss turrets anywhere in that
20  report?
21  A.   No, I don't believe I do.
22  Q.   Do you discuss lascannons anywhere in
23  that report other than the spot we crossed off?
24  A.   No, I don't believe we do.

301

1    Q.   So where am I supposed to look in your
2  report?
3    A.   I guess now you're not.
4    Q.   So you have no opinions, expert
5  opinions about product 130?
6      MR. COOPER:  Objection, misstates
7  testimony.
8      THE WITNESS:  I have an opinion about
9  this product, yes.
10 BY MR. KEENER:
11   Q.   Nothing expressed in your report?
12     MR. COOPER:  Objection, misstates
13 testimony and the report.
14     THE WITNESS:  I don't believe I have
15 anything specifically written.
16 BY MR. KEENER:
17   Q.   I don't care if it's specific or
18 general.  I want to know if you have any expert
19 opinions you express anywhere in your report about
20 this product.
21   A.   No.
22   Q.   Let's go to product 131 starting on
23 page 38.  Again, all it says in column 3 is "See
24 analysis of GW weapons in report."

302

1      Do you have an opinion, expert opinion
2  expressed anywhere in your report about this
3  product?
4    A.   No.
5    Q.   Let's go to product 132, the
6  open-fisted power claw.
7    A.   Yes.
8    Q.   It's on page 42.  Here you include two
9  sentences discussing differences between the
10 Chapterhouse product and the Games Workshop
11 product.  Do you see that?
12   A.   Yes.
13   Q.   Prior to this, I didn't see any entry
14 where you identified anything dissimilar between
15 the Games Workshop and Chapterhouse products.
16   A.   Correct.
17   Q.   Why didn't you identify anything
18 dissimilar in the prior products?
19   A.   Probably time constraints for the
20 preparation of this report.
21   Q.   In products other than 132, so all
22 the --
23   A.   I could expand upon them if you like.
24   Q.   I'm not interested in your expanding.

303

1  I want to know what opinions you include in your
2  report.
3      So for all the products prior to 132,
4  you have not expressed any opinions anywhere in
5  your report or the chart about any differences or
6  similarities between the Games Workshop product
7  and the Chapterhouse product, correct?
8    A.   Sometimes I have, yes.
9    Q.   Where?
10   A.   By pointing to historical similarity or
11 a similarity in the world of fiction or popular
12 culture between a Games Workshop product and its
13 sort of thematic origins, that rules out a
14 significant similarity between Chapterhouse's
15 product and Games Workshop's products.
16   Q.   Here you identify two differences
17 between the Chapterhouse product and the Games
18 Workshop product, agreed?
19   A.   Agreed.
20   Q.   And prior to this, you didn't identify
21 any differences between the Chapterhouse product
22 and the Games Workshop product, correct?
23   A.   Correct.
24   Q.   Now, the two differences you identify

304

1  is -- the first difference appears to be the
2  number of claws, two for the Chapterhouse product
3  and one for the Games Workshop product, correct?
4    A.   Correct.
5    Q.   And whether the claws are mounted at
6  the wrist or the knuckle.
7    A.   Correct.
8    Q.   And those are the only differences you
9  identify between these two products, correct?
10   A.   Those make them completely dissimilar.
11   Q.   Those are the only two differences you
12 identify in these two products, correct?
13   A.   Yes.
14   Q.   And then you further state that the
15 Games Workshop product is recognizable as
16 derivative of, and you show a picture of Wolverine
17 and a picture of a Predator weapon.
18   A.   Yes.
19   Q.   And those are the only two items you
20 show here, correct?
21   A.   Correct.
22   Q.   Now, looking at the picture of
23 Wolverine, how many claws are on Wolverine?
24   A.   It appears to be three.

305

1    Q.   And are they part of a glove or some

2  sort of armored gauntlet?

3    A.   Neither.

4    Q.   What are they part of?

5    A.   They are part of like an internal

6  skeletal metal interior.

7    Q.   So they are protrusions out of his

8  skin?

9    A.   Yes.

10    Q.   Not incorporated into a metal gauntlet

11  in any way?

12    A.   No.

13    Q.   And for Predator, are we looking at a

14  weapon you hold?

15    A.   No, you're looking at a weapon that you

16  kind of bolt on over your arm, sort of arm.

17    Q.   So not integrated into a gauntlet?

18    A.   No.

19    Q.   How many claws are there?

20    A.   Well, in that particular image, there's

21  one, but in the Predator cannon it varies.

22    Q.   Other than the existence of a claw on a

23  hand, are you identifying any other similarities

24  between Games Workshop's product and the prior

306

1  works you've identified?

2    A.   No.

3    Q.   Let's take a look at the pictures on

4  page 42.

5    A.   Okay.

6    Q.   This is a picture of Games Workshop's

7  open-fisted power claw and a picture of Games

8  Workshop's power fists.  Do you agree with that?

9    A.   Yes.

10    Q.   Now, you only comment on the claws.  I

11  don't see any comment on any other aspect of these

12  arms, do you?

13    A.   No.

14    Q.   Why not?

15    A.   Because once something is not exact, it

16  is no longer similar according to what you've

17  already said to me.

18    Q.   I didn't say anything to you before you

19  wrote this report.

20    A.   I know.

21    Q.   So my question is when you're writing

22  this --

23    A.   I thought.

24    Q.   Let my finish my question -- why did

307

1  you only focus on the existence of claws?

2    A.   Because that seemed the most relevant

3  part of the design.

4    Q.   Do you see other similarities in the

5  design?

6    A.   I don't think I need to now.

7    Q.   Can you see other similarities in the

8  design?

9    A.   I see insignificant and superficial

10  resemblances but nothing that is the same.

11    Q.   Do you see a shoulder pad integrated on

12  the model?

13    A.   I'm not quite sure that's what I do

14  see.  The shoulder pad, the big ones fit over the

15  top of these.

16    Q.   Do you see some sort of shoulder armor

17  here?

18    A.   I see a shoulder.

19    Q.   The shoulder shape is similar between

20  the two?

21    A.   No, it is not.

22    Q.   Why not?  Are they both a half an

23  ovoid?

24    A.   No, they are not.  The Games Workshop

308

1  ones are clearly half circles, whereas the

2  Chapterhouse one does appear to be an oval, the

3  Games Workshop ones have a square and for the

4  hydraulic piece that moves the elbow joint,

5  whereas the Chapterhouse one appears to be more

6  rectangular in nature.  The elbows appear to be

7  more present and sort of protruding in the

8  Chapterhouse one than in the --

9    Q.   Let me stop are you here.  I didn't ask

10  any of those question.

11        MR. COOPER:  Don't interrupt the

12  witness.  Please finish your answer.

13        THE WITNESS:  The Chapterhouse elbow

14  armor protrudes further out than the Games

15  Workshop ones.  The sort of hydraulic supply

16  for the fist itself in the Chapterhouse

17  version comes from the elbow area rather than

18  the shoulder area.  The number of segments in

19  the hydraulic tube is more numerous in the

20  Chapterhouse than in the Games Workshop.  The

21  design of the glove itself differs from the

22  two.  I see really no resemblance between the

23  two products except that they are both

24  recognizably arms with hands.

309

BY MR. KEENER:

Q.   Okay.  Again, I appreciate if you'd listen to the question I ask.

Do both of them have hydraulic units to the shoulder -- to the elbow?

A.   They don't.  The Games Workshop one, the hydraulic unit clearly goes to the shoulder, whereas in the Chapterhouse one, it clearly goes to the elbow.

Q.   Okay, I'm talking about do you see a -- the shoulder armor, at the bottom and middle of the shoulder armor there is a cutout piece with a tube connecting from that cutout piece to the middle of the elbow?

MR. COOPER:  Which product are you talking about?

MR. KEENER:  Both of them.

BY MR. KEENER:

Q.   Do you see that?

A.   Yes, I see that.

Q.   So they both contain some sort of hydraulic that goes from a cutout in the shoulder armor to the middle of the elbow, correct?

A.   No, not correct.

310

Q.   What's different?

A.   The difference is the design of the elbow and the design of the hydraulic piece.  The hydraulic piece in the Games Workshop one is a two-part sort of hydraulic piston, whereas the design of the hydraulic system in the Chapterhouse one is I guess the piston part is inside the elbow plate with what looks to be a round kind of securing rivet or something on the exterior of it, so I don't think they resemble each other.

Q.   Again, my question wasn't whether they resemble each other.

Do they both have a hydraulic unit connecting a cutout in the shoulder armor to the elbow joints?

A.   Yes.

Q.   Do they both have an extra piece of armor on the bottom of the elbow joint?

A.   It's difficult to tell from the image.

Q.   You don't know one way or the other?

A.   Well, I don't know if it's a piece of armor or not.  In the Chapterhouse one, it's a much larger piece where the hydraulic system actually connection to so I'm assuming it's

311

actually part of the hydraulic unit, whereas on the Games Workshop one, it seems to be a free floating piece that doesn't have anything to do with the hydraulics.

Q.   Do they both have a cable underneath the arm hanging down connected to the glove?

A.   Well, the Chapterhouse one appears to be connected to the claw mechanism and not the glove, whereas the Games Workshop one appears to be connected to the glove itself.

Q.   Do they both have a large cable hanging underneath them?

A.   They both have a cable hanging underneath them.

Q.   Looking at the inside of the hand, which would be the right-hand picture on both sets, do you see that?

A.   Yes.

Q.   Do they both have a half circle cutout in the bottom of the palm?

A.   Yes, they do.

Q.   Do they both have a much shallower cutout circle on the top of the palm?

A.   No, the Games Workshop one seems to be

312

a much larger cutout on the finger side of the palm, whereas the one on Chapterhouse is extraordinary small.

Q.   Do they both have a cutout on the top of the palm?

A.   You mean the bottom -- the top, this part (indicating)?

Q.   Yes.

A.   Yes, they both have a cutout.

Q.   Do they both have a single line going through the middle of the top of the palm?

A.   It's very difficult -- I can't tell from this image.

Q.   Do they both have armored articulating fingers?

A.   No, they do not appear to do so.  The fingers in the Games Workshop ones do appear to be articulated and removable, whereas the fingers in the Chapterhouse one do not seem to be that way.

Q.   You don't think that picture on the right of the Chapterhouse product has lines across the fingers for articulation?

A.   No, I don't think it does because I think that's actually the underside of the square

313

1  protuberance that holds the blades in place,
2  although it's difficult to tell.
3      Q.   From the picture at the top of the next
4  page where the blades are removed, from there can
5  you tell on the right-hand picture that there are
6  actually lines across for the articulating
7  fingers?
8      A.   I can't really tell because I only see
9  the top part of the fingers.  I would have to see
10  the bottom parts to tell if they were articulated.
11     Q.   If we go to the next product, 133, am I
12  correct again since you're analysis says "See
13  product entry 132" that your opinions are the same
14  as the product we just discussed?
15     A.   Yes.
16     Q.   Let's talk about product 134, which is
17  the Pilum Imperial Attack Jet Bike.  You don't
18  discuss this product anywhere in your numbered
19  report, do you?
20     A.   No, I don't think I do.
21     Q.   And the entirety of your analysis in
22  this chart is simply a picture of an air/raft?
23     A.   Yes.
24     Q.   And no text accompanying that?

314

1      A.   No.
2      Q.   So is it your expert opinion that Games
3  Workshop design is derived off of this picture?
4      A.   No.
5      Q.   Do you have any opinions whatsoever
6  about this product?
7      A.   Yes, I do.
8      Q.   Have you expressed those opinions
9  anywhere in your expert report or this chart?
10     A.   No.
11     Q.   So you will not be opining any expert
12  opinions about this product at trial, correct?
13         MR. COOPER:  Objection, misstates
14  testimony.
15         THE WITNESS:  I do not believe these
16  products are even remotely similar.
17 BY MR. KEENER:
18     Q.   My question is:  You have not expressed
19  any expert opinion anywhere in your report or your
20  charts about this product, correct?
21     A.   Other than showing that there is a
22  common origin for any sort of floating open sort
23  of hover bike craft, no, but I would think that
24  would be self-evident.

315

1      Q.   So other than that picture, you will
2  not be expressing at trial any other opinions
3  regarding this product, correct?
4         MR. COOPER:  Objection, misstatements
5  testimony.
6         THE WITNESS:  I would probably like to
7  discuss the absence of wheels on one.  I would
8  probably like to express --
9  BY MR. KEENER:
10     Q.   None of those you've discussed anywhere
11  in your report or exhibits, correct?
12         MR. COOPER:  Objection, misstates the
13  images in this chart.
14         THE WITNESS:  I would think that I
15  would be permitted to describe both images if
16  someone is looking at them, and I would point
17  out the differences in the grill, I would
18  point out the differences in that one floats,
19  one obviously has wheels.  I would point out
20  any number of things if I was asked to lead
21  somebody through an understanding of these two
22  images.
23  BY MR. KEENER:
24     Q.   You understand your report was supposed

316

1  to contain any opinions you have about those two
2  pictures, correct?
3         MR. COOPER:  Objection, misstates
4  testimony and this report as to what is in
5  this report.
6         THE WITNESS:  I think in this report,
7  we get to see that there is no resemblance
8  between these two products.
9  BY MR. KEENER:
10     Q.   I understand.  My question is:  Was it
11  your understanding that you were supposed to write
12  down any expert opinions you were going to offer
13  at trial about this product?
14     A.   I'm sorry, could you rephrase that?
15     Q.   Was it your understanding that you were
16  supposed to write down any expert opinions you had
17  about this product?
18     A.   I thought it was more to clarify where
19  there were moments of confusion rather than to
20  state what is apparent.
21     Q.   Was it your understanding that you
22  needed to write down every expert opinion you had
23  about these products?
24     A.   I believe that the images are a form of

317

1  writing down.
2  Q.  Columns one and column two, you didn't
3  add anything to those, those were provided to you,
4  right?
5  A.  Correct.
6  Q.  The only thing you added was the
7  picture of the air/raft, right?
8  A.  Yes.
9  Q.  Other than that one picture, did you
10  write down any other opinions you had about this
11  product?
12  A.  No.
13  Q.  So you are not going to express any
14  other opinions at trial about this products,
15  correct?
16  MR. COOPER:  Objection, misstates the
17  testimony and the chart and what you're
18  allowed to testify at trial about.
19  THE WITNESS:  I don't know what I can
20  testify at trial about.
21  BY MR. KEENER:
22  Q.  Are there opinions that you have about
23  this product other than the picture of the
24  air/raft?

318

1  A.  Yes, I have a lot of opinions about it.
2  Q.  And you didn't write any of those down,
3  did you?
4  A.  No.
5  Q.  In either your text of your expert
6  report or any of your charts, correct?
7  MR. COOPER:  Objection,
8  mischaracterizes the report.
9  THE WITNESS:  I think that this chart
10  itself is now basically my work.
11  BY MR. KEENER:
12  Q.  My question is:  Did you write down any
13  of the expert opinions you have about that product
14  in either the report or your chart?
15  A.  Well, in -- this is an exhibit that
16  goes with the report and this is something that I
17  would have wanted to be in, then yes.
18  Q.  Columns one and two were provided to
19  you, you made no changes, correct.
20  A.  That is correct.
21  Q.  The only thing you added is column
22  three, which has solely the picture of the
23  air/raft?
24  A.  Correct.

319

1  Q.  So did you add anything else anywhere
2  that contain your opinions about that product?
3  A.  I don't think that the matter of adding
4  can be separated from the matter of it existing as
5  an exhibit.
6  Q.  Okay.  Let's look at page 58.
7  The top picture, there's a sidecar to
8  the bike.  Do you see that?
9  A.  Yes, I see that.
10  Q.  And there's a weapon on the sidecar?
11  A.  Yes.
12  Q.  And there's a blowup of that weapon on
13  the bottom picture?
14  A.  Yes.
15  Q.  And you understand that to be a Games
16  Workshop heavy bolter?
17  A.  Yes, I do.
18  Q.  And on the following page on 59,
19  there's another picture of a Games Workshop heavy
20  bolter?
21  A.  Yes.
22  Q.  Now, do you see how the design has in
23  addition to the hole at the front of gun where the
24  projectile comes out, there's also a large

320

1  singular circular on the side?
2  A.  Yes.
3  Q.  Were you able to find any weapons with
4  that similar design in your work on this case?
5  A.  The hole in the breach of any sort of
6  projectile weapon is just a standard part of a
7  projectile weapon.
8  Q.  I'm talking about in addition to the
9  hole where the projectile comes out, do you see
10  there's a large single hole on the side of the
11  barrel?
12  A.  Yes, that's a breach.
13  Q.  Have you identified any weapons in
14  sci-fi or prior history that have that same large
15  hole on the side?
16  A.  That have a breach?
17  Q.  No, that have a large --
18  A.  Yes, a breach on the side.
19  Q.  Let me ask the question.  To have a
20  large singular circular hole on the side of the
21  barrel.
22  A.  Where?  What?  What piece are you
23  actually talking about?
24  Q.  If you look at the tip of the barrel --

321

1    A.  Yes.

2    Q.  -- do you see a large circular hole on

3  the side --

4    A.  Oh, on the side of the barrel.  Yeah,

5  that's just, you know, a compensator, just a flash

6  hider.

7    Q.  Have you identified any weapons,

8  whether prior military history or futuristic, that

9  have that same large circle hole on the side of

10  the tip of the barrel?

11    A.  I think that's asking me to identify a

12  wheel.

13    Q.  My question is simple.  Have you

14  included any picture --

15    A.  No, I haven't.

16    Q.  Have you included any pictures that

17  include such a tip?

18    A.  No, I have not.

19    Q.  Have you included any text anywhere in

20  your report that address that tip?

21    A.  No.

22    Q.  If you look at page 59, the top weapon

23  is described as a multi-melta.  Do you see that?

24    A.  Yes.

322

1    Q.  And it is a stacked two-barreled

2  weapon?

3    A.  Yes.

4    Q.  With vents on the side?

5    A.  Yes.

6    Q.  And a tapering on the nozzle?

7    A.  No, I can't see a tapering on the

8  nozzle.

9    Q.  There's a large circular vented portion

10  and a smaller tip protruding out of that?

11    A.  Yes.

12    Q.  Did you identify anywhere in prior

13  works a design that had such two-stacked barrels?

14    A.  I believe it's absurd to claim a barrel

15  displacer as being in any way original.

16    Q.  Did you find any pictures of any weapon

17  with two stacked barrels with heating vents on the

18  side and a small protrusion coming out of them?

19    A.  The small protrusions are just the

20  barrels.

21    Q.  That's not my question.

22    Did you find any weapons in any of the

23  prior works with those elements?

24    A.  I know of many.

323

1    Q.  Did you --

2    A.  I did not provide any, no.  I didn't

3  think it was necessary.  It's so obviously not

4  original.

5    Q.  So you did not provide any expert

6  opinions anywhere in your report about those

7  design elements?

8    A.  No.

9    Q.  Okay.  Let's turn to product 137 on

10  page 73 entitled Heresy-Era shoulder pads for

11  terminators type E.

12    Are you there?

13    A.  Yes, I am.

14    Q.  Do you see in the Games Workshop

15  picture on page 74 the shape of the shoulder pad?

16    A.  Yes, I do.

17    Q.  And where there's kind of a cutout on

18  the outer portion of the shoulder pad?

19    A.  Yes.

20    Q.  Did you identify any prior shoulder

21  pads with that shape?

22    A.  I don't think I needed to.

23    Q.  Did you identify any prior shoulder

24  pads with that shape?

324

1    A.  No.

2    Q.  Do you see how there's what look to be

3  leather straps or flaps hanging down from the

4  shoulder pad?

5    A.  It's impossible to tell from that

6  picture.

7    Q.  Do you see anything hanging down from

8  the shoulder pad?

9    A.  Yes, I do.

10    Q.  Did you identify any shoulder pads with

11  similar items hanging down from them?

12    A.  No, and neither did the claim.

13    Q.  When you look at the Games Workshop

14  picture on page 75, there's a little clear to

15  see straps hanging down from the shoulder pad,

16  correct?

17    A.  Yes, they appear to be fabric.

18    Q.  Did you identify any shoulder pads that

19  had a similar design?

20    A.  No, I did not, especially not the ones

21  produced by Chapterhouse.

22    Q.  And do you see again in the Games

23  Workshop picture on 75 how the armor portion is

24  kind of an overlapping two-level shoulder pad?

325

1   A.   Yes, with a gap in between the two
2   levels, which again is unlike any of the
3   Chapterhouse products.
4   Q.   Again, that's not my question.  Please
5   focus on my question.
6        Do you see in the Games Workshop
7   picture on page 75 how the armor portion of the
8   shoulder pad is two overlapping pieces?
9   A.   To say two overlapping piece is to
10  mischaracterize them.  There are two overlapping
11  pieces where the overlap is accompanied by a large
12  airspace.
13  Q.   Did you identify any shoulder pads with
14  a similar overlapping feature?
15  A.   No, as far as I'm concerned there are
16  none, not even in the modelling world.
17  Q.   It's a completely unique design?
18  A.   It is.
19  Q.   So we found something that believe is
20  original for Games Workshop?
21  A.   Well, original in the sense that it is
22  unlike other things but it is still recognizably
23  Roman influence shoulder armor so it's not wholly
24  original.

326

1   Q.   Right, before I think you expressed the
2   opinion that you didn't think any of the Games
3   Workshop designs were in any way original.
4   A.   Well, it's not original in terms of
5   being free from any influence or origin point.
6   It's obviously from Roman armor.
7   Q.   But it is original in the sense that
8   you've never seen something designed like this
9   before?
10  A.   Not quite like it, no.
11  Q.   And similar on the picture on page 76,
12  again do you see the two overlapping pieces of
13  armor on the shoulder pad?
14  A.   Yes.
15  Q.   And again, you see the flaps hanging
16  down?
17  A.   Not really, no.
18  Q.   You can't make out any flaps hanging
19  down there?
20  A.   I can't tell what it is.
21  Q.   Did you ask to see a better picture?
22  A.   No, I did not.
23  Q.   Again, did you identify any shoulder
24  pad similar to this?

327

1   A.   Similar to?
2   Q.   Yes.
3   A.   What do you mean by similar?
4   Q.   Well, let's start with the two
5   overlapping pieces extending outwards.
6   A.   Let me see if there's any examples.  I
7   can't remember if they made it in or not.
8        (Witness perusing document.)
9        I can't see any examples.
10  Q.   Any examples with these flaps hanging
11  down?
12  A.   Yeah, I found many, many examples of
13  that.
14  Q.   Did you include any in your report?
15  A.   I did not include any in my report.
16  Q.   So you're not expressing any opinion on
17  those, correct?
18  A.   Well, I'm expressing an opinion that
19  it's an unoriginal image.
20  Q.   You have not included any opinion
21  anywhere in your report or the exhibits about
22  shoulder pads having flaps and hanging down?
23  A.   There is a multi-plate version of
24  shoulder armor in two separate plates with a Roman

328

1   or a Greek flash figure referenced in Figure 137
2   which is then referenced in 139.  I would imagine
3   that would allow me to discuss Roman armor.
4   Q.   Is that the only place where you
5   express any opinion about two overlapping shoulder
6   pieces extending outward?
7   A.   I believe so.
8   Q.   And you don't express any opinion about
9   anything hanging down the shoulder pad anywhere,
10  correct?
11  A.   No.
12  Q.   And do you see in the Games Workshop
13  picture on page 76 how the larger piece of armor
14  has a cutout as it extends toward the shoulder
15  smaller piece of armor?
16  A.   Yes.
17  Q.   Did you identify that feature in any
18  prior existing shoulder pads?
19  A.   No.
20  Q.   Would you agree looking at the
21  Chapterhouse shoulder pad on the opposite side on
22  page 76 that the larger piece of the shoulder pad
23  has a cutout as it extends towards the smaller
24  piece of the shoulder pad?

329

1    A.    Yes, I would.

2    Q.    Would you agree that both the Games

3    Workshop and the Chapterhouse pictures on that

4    page show banding around both the large piece of

5    shoulder pad and the small piece of shoulder pad?

6    A.    It's difficult to tell.  It looks it's

7    more of a painted feature on the Games Workshop

8    piece, especially since this is a drawing and not

9    an actual model.

10   Q.    But they both depict banding around the

11   edges?

12   A.    I really don't think they do.  If you

13   look at the profile of the Games Workshop one, it

14   does not appear to be in relief on the smaller of

15   the two plates.

16   Q.    So it's your opinion the Games Workshop

17   picture shows no banding at all?

18   A.    No, that's not what I said.  What I

19   said was that on the Games Workshop one, the

20   banding is not relief on the smaller plate.  It's

21   merely a painted line.

22   Q.    So they both have lines going around

23   the large piece and the small piece of the

24   shoulder pad?

330

1    A.    No, the Chapterhouse one has banding

2    that's riveted into place.  The Games Workshop one

3    is merely painted.

4    Q.    And you don't see any rivets on that

5    one?

6    A.    Not on the side that's closest to me,

7    no.

8    Q.    The side closest to you around the

9    neckline, do you see rivets?

10   A.    On the side closest to me on the

11   neckline, I do see what could be rivets, very

12   small ones closely spaced together.

13   Q.    So it wouldn't appear to be painted on,

14   those appear to be rivets?

15   A.    On the larger of the two pieces, yes.

16   Q.    And they both seem to have a series of

17   straps of some type or another hanging down?

18   A.    No, I would not be willing to say that.

19   The ones on the Games Workshop piece, it's unclear

20   what they are.  It could be strips of fabric, it

21   could be feathers, it could be basically anything,

22   whereas the one on the Chapterhouse is thick

23   straps of what appear to be leather with rings and

24   rivets through them.

331

1    Q.    In your expert opinion, are these two

2    shoulder pads similar?

3    A.    No, they are not.

4    Q.    Similar in any way?

5    A.    No, they are not.

6    Q.    Do you believe the Games Workshop

7    design has any level of creativity?

8    A.    I think the problem with that question

9    is that I am now unable to remove what this

10   judgment says is a legal definition of creativity.

11   As far as I'm concerned, no, they do not -- it

12   does not have a level of creativity.

13   Q.    Any level of creativity?

14   A.    Not according to my understanding of

15   what creativity is in a nonlegal sense.

16   Q.    What's your understanding of creativity

17   in a nonlegal sense?

18   A.    I have already given you this answer.

19   It would be the creation without outside influence

20   of a thing.

21   Q.    So completely independently developed?

22   A.    Yes.

23   Q.    And so unless something is completely

24   independently developed, it's your expert opinion

332

1    that there is no creativity involved in the

2    design?

3        MR. COOPER:  Objection, misstates

4    testimony.

5        THE WITNESS:  Creativity is a -- is not

6    a specifically useful term in terms of

7    artistic endeavor.

8    BY MR. KEENER:

9    Q.    I'm just trying to figure out how you

10   use it.

11       It sounds like your use is it's only

12   creative if it is completely independently

13   developed?

14   A.    Yes.

15   Q.    Without any basis or reference or

16   inspiration or any way in relation to anything

17   prior?

18   A.    Yeah.

19   Q.    So anything other than that you

20   classify as not being creative?

21   A.    No, I classify as being derivative.

22   Q.    And therefore, not creative?

23   A.    Not creative in the true sense of the

24   word "creative."

333

1    THE WITNESS:  May I ask precisely how
2  long we have left?
3    MR. KEENER:  Do you want to take a
4  short break.
5    (Recess taken from 5:07 p.m. to
6  5:11 p.m.)
7  BY MR. KEENER:
8    Q.  All right, let's turn to page 88, which
9  is product 144, the Werecroc.
10    A.  There we go.
11    Q.  Now, unless I missed something, I
12  didn't see any opinions expressed in the numbered
13  paragraphs in your report about this product.  Is
14  that correct?
15    A.  No, I don't think there is.
16    Q.  And the entirety of what you added to
17  this chart are two pictures?
18    A.  Yes.
19    Q.  And you added no additional text to
20  explain your opinions other than those two
21  pictures?
22    A.  Correct.
23    Q.  Looking at the Games Workshop picture,
24  would you agree that it appears to be some sort of

334

1  combination between a crocodile and an ogre?
2    A.  No, I would think that it's just a
3  lizardman.
4    Q.  You don't see any crocodile features?
5    A.  No, I just see a lizardman.
6    Q.  And that's what you see with the
7  Chapterhouse product as well?
8    A.  Yes, I just see another lizardman.
9    Q.  And so the two pictures you provided
10  are pictures of other lizardmen?
11    A.  Of other lizardmen, yes.
12    Q.  So other than the concept of lizardmen
13  being out there, are you expressing any other
14  opinions regarding this product?
15    A.  No, no, I'm not.
16    Q.  Would you agree that Games Workshop's
17  expression of a lizardman is different than the
18  two pictures you provide?
19    A.  Yes.
20    Q.  For example, your pictures are wearing
21  clothes.
22    A.  Yes.
23    Q.  And your pictures appear to have beaks.
24    A.  Yes.

335

1    Q.  And at least your first picture appears
2  to have relatively skinny legs.
3    A.  Yes.
4    Q.  And the weapons in your pictures are
5  different than the weapons in the Games Workshop
6  products.
7    A.  Oh, I would actually -- can I add
8  something?
9    Q.  Okay.
10    A.  Although they do indeed have skinny
11  legs, the point of comparison that's very
12  interesting between the first image and the Games
13  Workshop is that the legs have an extra joint in
14  them.  So you can see they are like bird legs in
15  both the Games Workshop and the provided image
16  rather human like legs.
17    Q.  You believe the Games Workshop's legs
18  are double-jointed?
19    A.  I believe that there is -- the figure
20  is standing on sort of like toes with the edge of
21  what would be the heel of the foot being carried
22  further up, so you can see that in the middle
23  picture and the picture on the left quite clearly.
24    Q.  Would you agree that your two pictures

336

1  depict someone holding a single-handed weapon?
2    A.  Yes.
3    Q.  And the Games Workshop's weapons are
4  double-handed?
5    A.  Yes.
6    Q.  Would you agree the weapons are
7  different?
8    A.  Yes.
9    Q.  Someone's described Games Workshop
10  weapons as having an Aztec influence.  Would you
11  agree?
12    A.  I think that's incorrect.  I think
13  whoever made that assertion is wrong.  They're
14  clearly Polynesian.
15    Q.  And the pictures you provided are not
16  Polynesian?
17    A.  No.
18    Q.  So would it be fair to say you did not
19  find any prior lizardman warriors where you had an
20  upright lizard without clothes carrying a
21  two-handed weapon?
22    A.  Yes.
23    Q.  So as far as you were able to
24  determine, that is an original combination of

337

1  elements?
2  A.  No.
3  Q.  You were not able to find that
4  combination of elements in any prior existing
5  works, correct?
6  A.  Yes, I am.  It just didn't make it into
7  the report.
8  Q.  I don't want to ask about things that
9  didn't make it into the report.
10  You did not include in your report any
11  examples of prior works with those three common
12  elements?
13  A.  No, I did not include the lizardmen
14  from the Dungeons & Dragons.
15  Q.  That's not the question I asked.
16  A.  I did.
17  Q.  It's a yes or no question.
18  Did you include any pictures of prior
19  works in your report or the accompanying chart
20  that include a large lizardman warrior without
21  clothes carrying a two-handed weapon?
22  A.  No, I did not.
23  Q.  Please turn to page 96 which begins
24  product 149.

338

1  A.  I found it.
2  Q.  In the entire analysis you added to
3  this product was "See analysis of space marine
4  shoulder pads in report."
5  A.  Yes.
6  Q.  That's the entirety of the analysis?
7  A.  I believe so.
8  Q.  If you look at the Chapterhouse
9  product, which a picture is on page 97 --
10  A.  Yes, I see that.
11  Q.  -- there's a design on the shoulder
12  pad.
13  A.  Yes.
14  Q.  You are not expressing any expert
15  opinion about that design, are you?
16  A.  I don't believe I am.  Wait.  No, I
17  don't believe I am.
18  Q.  You were not able to locate that design
19  in any prior works, were you?
20  A.  Yes, in Haroldry and anarchist symbols.
21  Q.  You didn't include in your report the
22  prior works that depict this design, do you?
23  A.  No.
24  Q.  So you're not making any expert opinion

339

1  about the design of that work, are you?
2  A.  No.
3  Q.  Same with the next product on page 99.
4  A.  Correct.
5  Q.  You're not expressing any expert
6  opinion about the design on that shoulder pad,
7  correct?
8  A.  Correct.
9  Q.  Go to page 102 to 103.
10  A.  Okay.
11  Q.  You include one picture of a
12  preexisting work --
13  A.  Yes.
14  Q.  -- for this analysis, correct?
15  A.  Yes.
16  Q.  You're not relying on any other
17  pictures in forming this opinion?
18  A.  Correct.
19  Q.  In the picture you included, the bottom
20  of the handles are straight in your prior work,
21  correct?
22  A.  Yes.
23  Q.  And they don't include any sort of
24  protrusion towards the inside of the weapon?

340

1  A.  No.
2  Q.  And the picture you included, that was
3  not incorporated in a shoulder pad, was it?
4  A.  I'm sorry?
5  Q.  The picture you include was not
6  incorporated in a shoulder pad, was it?
7  A.  I think it was, wasn't it?  Don't we
8  see it right there?
9  Q.  You believe that's on a shoulder pad?
10  A.  Size of the emperor, middle column, are
11  we looking at that?
12  Q.  I'm looking at the prior existing work
13  you found.
14  A.  Yeah, cross scythes in the Thirteen
15  Club logo.
16  Q.  Yes.
17  A.  I believe that is exactly what is
18  depicted in the other things.
19  Q.  My question is:  The picture you found
20  in prior works, did you find it on a shoulder pad?
21  A.  Oh, no, I did not find it on a shoulder
22  pad.
23  Q.  So you didn't find any example of cross
24  scythes on a shoulder pad?

341

1    A.   No.
2    Q.   Let's go to page 116.
3         Do you see both the Chapterhouse and
4    Games Workshop shoulder pads having a arrow
5    pointing upwards design on the shoulder pads?
6    A.   Yes, I do.
7    Q.   You're not expressing any expert
8    opinion about the design on that shoulder pad, are
9    you?
10   A.   No.
11   Q.   Let's go to page 124.
12        This is the Dark Elf Arch Torturess,
13   yes?
14   A.   Yes.  No.  Wait, which one are we
15   looking at?
16   Q.   Page 124, product 160, Chapterhouse's
17   product is labeled as a Dark Elf Arch Torturess.
18   A.   Okay, I thought we were always
19   referring to these things by the Games Workshop
20   items.
21   Q.   And the Games Workshop item is a Dark
22   Eldar Haemonculous, correct?
23   A.   Haemonculous.
24   Q.   I want to make sure we're looking at

342

1    the same thing.
2    A.   Yes, it's a Haemonculous, that's how
3    you say it.
4    Q.   You include a number of pictures on the
5    right-hand column, right?
6    A.   Yes.
7    Q.   You don't discuss this product in any
8    way in the numbered paragraphs of your report,
9    right?
10   A.   Correct.
11   Q.   And if I look at the right-hand column,
12   I believe you're making two points, the first is
13   that the pose of the two legs together is a common
14   pose.
15   A.   Yes.
16   Q.   And the second is the concept of a
17   figure with multiple arms is common.
18   A.   Yes.
19   Q.   Other than those two opinions, do you
20   have any other opinions you're expressing in this
21   chart about those products?
22   A.   Yes.  You could also take a look at on
23   127, you can see graphically the character has the
24   green syringe.  You can also see on page 129 that

343

1    the additional limbs articulate not according to
2    anatomy.
3    Q.   Any other expert opinions you have
4    about this product?
5    A.   No, I think that's it.
6    Q.   Are any of those features that you just
7    identified essential features in creating this
8    product?
9    A.   Define essential for me, please.
10   Q.   If one were to create a multi-limbed
11   creature such as this, would it have to be in the
12   pose of the legs together?
13   A.   No, I don't think it would be.
14   Q.   The artist would have many choices on
15   what pose to make?
16   A.   Yes.
17   Q.   Would it have to be carrying a syringe?
18   A.   No, it would not.
19   Q.   So again, that's a choice of what you
20   want it to hold?
21   A.   Right.
22   Q.   Would it have to be including two arms
23   that are not anatomically correct?
24   A.   No, I think that would be a choice the

344

1    artist would make.
2    Q.   Now, Games Workshop product appears to
3    have two hands that are anatomically correct and
4    other hands that are not.  Would you agree?
5    A.   It's very difficult to tell.  From the
6    figure on page 124, I'd have to say it looks like
7    two arms are anatomically correct but from the
8    drawing on the following page, it doesn't -- I
9    can't tell.  It might only be one or it might be
10   none.
11   Q.   And the Games Workshop product is
12   wearing a long, full-length coat, would you agree?
13   A.   Yes.  Well, yes.
14   Q.   Again, that would be a design choice?
15   A.   Yes.
16   Q.   Not necessary to choose in creating
17   such a product?
18   A.   No.
19   Q.   The product has bare feet?
20   A.   Yes, appears to.
21   Q.   Another design choice?
22   A.   Yes.
23   Q.   None of these design choices would you
24   characterize as the type of common feature that

345

1    would have to be used in creating these types of
2    creatures, would you?
3        A.    No.
4        Q.    Now, the fact that you found some of
5    those features similar to things in prior works,
6    are you making any expert opinion that Games
7    Workshop copied any of those prior works?
8        A.    This kind of floating image of some
9    sort of darkish monster, especially with the long
10   coat and strange arms and torture implements, is
11   extremely common in popular culture from the
12   Hellraiser films to gothic clothing to creature
13   animations from the movie The Thing.  These
14   elements are not only commonplace, they can be
15   found all together, I believe, except for maybe
16   the syringe.
17       Q.    Let's leave it to what you identified,
18   creature floating in this pose with a long,
19   flowing coat and a syringe.  Did you identify any
20   prior existing works in your report anywhere with
21   those three elements?
22       A.    No.
23       Q.    Those other items you mentioned in your
24   answer, Hellraiser and so on, you didn't include

346

1    or discuss those anywhere in your report, did you?
2        A.    No, I did not.
3        Q.    And you didn't provide any images of
4    those, did you?
5        A.    No, I do not.
6        Q.    Do you identify anywhere in your report
7    any prior works with that combination?
8        A.    No.
9        Q.    And you don't express any opinion in
10   your report that that combination is not original?
11       A.    No, I don't.
12       MR. KEENER:  Thank you, no more
13   questions.
14       THE WITNESS:  Thank you.
15       MR. COOPER:  Dr. Grindley, I just have
16   a few questions so you can get out of here.
17   EXAMINATION
18   BY MR. COOPER:
19       Q.    Counsel asked you questions about
20   design choices that Games Workshop has made in
21   creating its products.  Do you recall that?
22       A.    Yes, I do.
23       Q.    Start with product 160 in the chart.
24   It's page 124.

347

1        A.    Okay, I'm there.
2        Q.    Correct me if I'm wrong but you agreed
3    that Games Workshop made certain design choices in
4    creating this Games Workshop product?
5        A.    Yes, they did.
6        Q.    Based on your review of this chart, did
7    Chapterhouse make design choices in creating its
8    product?
9        A.    Yes, they did.
10       Q.    In your opinion based on your review,
11   did Chapterhouse make the same design choices as
12   Games Workshop?
13       A.    No, they made different design choices.
14       Q.    Could you give some examples?
15       A.    Well, for example, one would be the
16   number of arms.  The Games workhouse -- sorry,
17   Game Workshop figure has more arms than the
18   Chapterhouse figure.  The arms themselves are in
19   different sort of grasping or figurative elements
20   between Chapterhouse and Games Workshop.  The
21   Games Workshop figure, as far as I can tell from
22   these images, is male, whereas the Chapterhouse
23   figure appears to be female.
24           There's also differences in terms of

348

1    hairstyles and even distance of sort of floating
2    above the base, and also in terms of what items
3    are being held by the creature's hands.
4        Q.    In your review of this claim chart to
5    form your expert opinion, did you have any
6    understanding of what design elements or choices
7    Games Workshop claimed were unique or similar
8    about its products?
9        A.    No.
10       Q.    If you'd just look at the very first
11   page of this chart, you see in red where Games
12   Workshop has listed whole set there?  Do you see
13   that?
14       A.    Yes, I do.
15       Q.    Do you have any understanding of what
16   that means -- strike that.
17           Do you have any understanding of what
18   elements of Games Workshop's products it believes
19   are unique or --
20       A.    No, I do not, and it -- that for the
21   most part does not appear in the table.
22       Q.    Would you have found that helpful to
23   know in forming your opinion?
24       A.    If Games Workshop had specified the

349

1  design elements that it found to be infringing, my
2  report would have taken a substantially different
3  shape in that I would have documented very, very
4  comprehensively where those individual design
5  elements originate.
6      Q.   To your knowledge, has Games Workshop
7  at any point identified what elements of its
8  products in this claim chart it believes are
9  unique or dissimilar from preexisting works?
10      MR. KEENER:  Objection, form, compound.
11      MR. COOPER:  I'll break that up.
12  BY MR. COOPER:
13      Q.   To your knowledge, has Games Workshop
14  identified in any way what design elements it
15  believes are unique in its products in its claims
16  chart?
17      A.   No, I do not believe they have.
18      Q.   To your knowledge, has Games Workshop
19  identified what design elements it believes are
20  not just similar from preexisting works in its
21  claims charts?
22      A.   They have not.
23      Q.   To your knowledge, has Games Workshop
24  identified what design elements it believes are

350

1  dissimilar between its product and the
2  corresponding Chapterhouse accused product?
3      A.   No, they have not.
4      Q.   Counsel asked you a number of questions
5  about a combination of design elements.  Do you
6  recall that?
7      A.   Yes, I do.
8      Q.   And he asked you whether or not the
9  combination of design elements, with regards to
10  product 124 here, he asked you whether or not you
11  believed that the combination of design elements
12  were original in the Games Workshop products.  Do
13  you recall that?
14      A.   Yes, I do.
15      Q.   Based on your review of the claim
16  chart, do the Chapterhouse products also encompass
17  design choices?
18      A.   The Chapterhouse products incorporate
19  just as many design choices as the Games Workshop
20  products.
21      Q.   Based on your review, is there any
22  product, any Chapterhouse accused product that
23  encompassed the exact same design choices as the
24  Games Workshop new allegedly infringed work?

351

1      A.   None whatsoever.
2      Q.   Why did you find it unnecessary to list
3  insignificant similarities that you noticed
4  between the Chapterhouse accused product and Games
5  Workshop's new allegedly infringed work?
6      MR. COOPER:  Could you read my own
7  question back for me?
8      (Record read.)
9  BY MR. COOPER:
10      Q.   Do you understand the question?  I'll
11  strike it and rephrase.
12      Counsel asked you if you had listed for
13  each product entry in the chart each and every
14  similarity or dissimilarity found in your review.
15  Do you recall that?
16      A.   Yes, I do.
17      Q.   And you answered that you did not
18  undertake that effort; is that correct?
19      A.   That is correct.
20      Q.   Why not?
21      A.   I did not feel that it was a necessary
22  part of this endeavor.  I did not think it was
23  necessary to list minor insignificant similarities
24  between these two products because both of the

352

1  products find their ultimate derivation in another
2  source entirely.
3      Q.   Counsel asked you some questions about
4  the similarities and dissimilarities you saw in
5  between the Chapterhouse and Games Workshop
6  products in your review.  Do you recall that?
7      A.   Yes.
8      Q.   And I believe he expressed some
9  confusion about your statement that you've
10  concluded that the dissimilarities are
11  self-evident from your inclusion in the product
12  entry in the chart.  Do you recall that?
13      MR. KEENER:  Objection, form.
14      THE WITNESS:  Yes, I do.
15  BY MR. COOPER:
16      Q.   Are you prepared today to answer any of
17  counsel's questions to alleviate any confusion he
18  has about what you have identified in your report
19  as dissimilarities or similarities between the
20  two -- the Chapterhouse and Games Workshop
21  products?
22      A.   Yes.
23      Q.   Have you tried to do so to the best of
24  your ability today?

353

1   A.   I have tried to the best of my ability,
2   yes.
3   Q.   Just a few more items.  If you'll turn
4   to page 103 of your chart.  It's item 153.
5        Counsel asked you about differences
6   between the Games Workshop product and the
7   Thirteen Club logo that you included in your
8   chart.
9        Do you recall that?
10  A.   Yes, I do.
11  Q.   Do you recall agreeing that there are
12  differences between the two items?
13  A.   Yes.
14  Q.   Are there differences between the
15  Chapterhouse product and the Games Workshop
16  product in that chart?
17  A.   Yes, there are.
18  Q.   Could you identify them?
19  A.   The Games Workshop product is a
20  painting suggestion in the form of a drawing in
21  which there are two separate proportional scales
22  given for the item that is to be painted.
23       One appears to be a side view, just for
24  reference purposes, whereas the figure drawing

354

1   appears to be in the correct proportions for the
2   space marine.
3        For the Chapterhouse Studios, rather
4   than yellow, it's sort of a darker gold color.
5   The figures are molded on the shoulder pad.  The
6   shoulder pad is an entirely different proportion
7   than the one from Games Workshop.
8        The sides themselves go to a different
9   part and occupy more of the shoulder pad in the
10  Chapterhouse Studios, and they are apparently
11  biomechanical in nature, whereas the sides on the
12  Games Workshop do not appear to be biomechanical.
13  And that goes even with the hook on the base of
14  the sides where that actually appears just to be
15  modelled perhaps out of wood, whereas the
16  corresponding piece on Chapterhouse appears to be
17  a claw.
18       So I think there are more
19  dissimilarities than similarities between the two
20  products.
21  Q.   Did you do that analysis in forming
22  your opinion in this case?
23  A.   Yes.
24  Q.   And do you believe that is expressed in

355

1   your report?
2   A.   I believe it's expressed in the report
3   through its presentation in Exhibit B.
4   Q.   Could you turn to page 88 of your
5   chart?
6        Do you recall counsel asking you
7   questions about the differences between the Games
8   Workshop product and product item 144 and the
9   pictures you included in the third column for that
10  product?
11  A.   Yes, I do.
12  Q.   Do you recall agreeing that there are
13  differences between the two items?
14  A.   Yes.
15  Q.   Do you believe there are differences
16  between the Chapterhouse product identified in
17  item 144 and the Games Workshop product?
18  A.   Yes.
19       MR. KEENER:  Objection, outside the
20  scope of the report.
21  BY MR. COOPER:
22  Q.   Would you explain those?
23       MR. KEENER:  Objection, outside the
24  scope of the report.

356

1        THE WITNESS:  The Games Workshop
2   product's lizardman have a medial line down
3   their stomach scales which does not exist in
4   the Chapterhouse Studios.  The lizardman in
5   the Games Workshop products appear to have
6   crocodilian style heads, whereas the ones in
7   the Chapterhouse Studios appear to be more
8   snake oriented.
9        The figures in the Games Workshop items
10  have jewelry on them on their arms, their legs
11  and around their neck, whereas -- and they
12  also appear to have some sort of maybe a back
13  plate kind of armor, whereas the figures made
14  by Chapterhouse seem to be completely
15  unclothed.
16       The figures in the Chapterhouse Studios
17  product appear to have a standard human style
18  leg construction, whereas the ones in
19  Chapterhouse have what appear to be a double
20  jointed leg.
21       The tails of the lizards in the
22  Chapterhouse Studios product appears to have
23  some sort of scaly protuberances on the tails
24  which are hanging straight down, whereas the

357

1    lizard ogres from Chapterhouse Studios, the
2    tails arch up and are smooth.
3        Those are just some from a base
4    observation.
5    BY MR. COOPER:
6        Q.   Doctor, are you aware whether Games
7    Workshop has provided a rebuttal expert to your
8    opinion?
9        A.   No, I am not.
10       Q.   Do you consider yourself you're the
11   only expert in your field?
12       A.   No, I do not.
13       Q.   Do you have peers in your field with
14   similar or greater experience than you do?
15       A.   Yes, there are.
16       Q.   If your peers were provided your expert
17   report, would you expect them to be able to assess
18   your opinion?
19       MR. KEENER:  Objection, speculation.
20       THE WITNESS:  Yes, I would.
21       MR. COOPER:  I have no further
22   questions.
23       MR. KEENER:  Recross.  I have less than
24   five minutes for you here.

358

1        THE WITNESS:  This is not funny.  I've
2    got a kid waiting for me.
3        MR. KEENER:  I understand.  I have a
4    flight to go to, too.  Less than five minutes
5    here.
6        THE WITNESS:  I'm not getting paid for
7    this.  You are.
8    FURTHER EXAMINATION
9    BY MR. KEENER:
10       Q.   Counsel was asking whether or not any
11   elements of uniqueness were identified to you
12   anywhere in the Games Workshop products.
13       A.   Correct.
14       Q.   You expressed frustration that they
15   weren't?
16       A.   Correct.
17       Q.   I think previously we saw a court
18   opinion where the court identified what it thought
19   were unique characteristics in Games Workshop
20   shoulder pad.  Do you remember that?
21       MR. COOPER:  Objection to the extent it
22   misstates the court's opinion.
23       THE WITNESS:  I remember seeing small
24   portions of the court's decision when you

359

1    showed them to me.
2    BY MR. KEENER:
3        Q.   And those portions discussed what the
4    court thought were unique parts of the space
5    marine shoulder pads?
6        MR. COOPER:  Objection, misstates the
7    court order.
8        THE WITNESS:  The court expressed a
9    legal opinion, not an artistic opinion.
10   BY MR. KEENER:
11       Q.   And you never saw that before today?
12       A.   I think a legal opinion and artistic
13   opinion are two separate items so I did not see
14   it, nor would I have wanted to.
15       Q.   Do you know that Chapterhouse has taken
16   depositions and asked questions about the Games
17   Workshop people who have designed a number of
18   these products?
19       MR. COOPER:  Last week?  Go ahead and
20   answer.
21       THE WITNESS:  I believe, yes, I have
22   heard that.
23   BY MR. KEENER:
24       Q.   And do you know if they were able to

360

1    ask what unique aspects of these products were?
2        A.   No.
3        Q.   So you don't know what testimony was
4    given one way or the other?
5        A.   No.
6        Q.   And prior to this phase of the case, do
7    you understand that there were a number of
8    depositions a number of months ago in this case?
9        A.   I know that there were two because I've
10   seen one of them but that's all I know.
11       Q.   But you don't know if Chapterhouse
12   lawyers asked Games Workshop witnesses about the
13   design of the shoulder pad or space marines?
14       A.   No.
15       Q.   Would that have been useful if you saw
16   the transcripts where the Games Workshop employees
17   identified what they believe was unique about
18   their designs?
19       A.   No, I don't trust anyone's work on
20   something like that other than my own.
21       Q.   So you wouldn't have wanted to know
22   what other people thought was unique?
23       A.   I would have wanted to know what the
24   claim thought was unique, not what other people's

361

1  recollections of how they came up with the designs

2  were.  I would much rather have seen their

3  library.

4      Q.  And in counsel's questions to you, he

5  asked you to identify a number of differences in

6  the Chapterhouse or Games Workshop product, such

7  as the Werecroc.

8      A.  Yes.

9      Q.  And you said you would be willing and

10  able to do similar analysis for all the rest of

11  the products in the chart.

12      A.  Yes.

13      Q.  You didn't write down that analysis

14  anywhere in your expert report or chart, correct?

15      A.  Correct.

16      Q.  And so the only way for me to find out

17  would be to be asking you here today at your

18  deposition on what your opinion was?

19      A.  Yes.

20      Q.  And you would agree with me that

21  there's no way we have time to do that for each of

22  the entries in the chart?

23      MR. COOPER:  Objection to form.

24      THE WITNESS:  There's no way today we

363

1  BY MR. KEENER:

2      Q.  Other than what you can see from

3  looking at the pictures, you did not attempt to

4  write down what you believe were the differences

5  between the Chapterhouse products and the Games

6  Workshop products?

7      MR. COOPER:  Objection, that misstates

8  the report.

9      THE WITNESS:  Yes.

10      MR. KEENER:  No more questions.  Thank

11  you.

12      (Time noted:  5:47 p.m.)

13

14      _____

15      CARL GRINDLEY

16

17  Subscribed and sworn to before me

18  this ___ day of _____, 2013.

19

20  _____

21

22

23

24

362

1  could do it but we could do it some other day

2  at your leisure.

3  BY MR. KEENER:

4      Q.  So you're not willing to go through

5  that exercise today for all the products in the

6  chart?

7      A.  Not today, no.

8      Q.  Okay.  But you are willing to do that

9  at another time?

10      A.  Yes, I am.

11      Q.  But those opinions are not expressed,

12  written down anywhere in your report?

13      MR. COOPER:  Objection, that misstates

14  the report.

15      THE WITNESS:  They are written down in

16  the essence that the images are there.

17  BY MR. KEENER:

18      Q.  Other than the two images there, what

19  you believe are the differences in the images are

20  not written down anywhere?

21      MR. COOPER:  Objection, misstates the

22  report.

23      THE WITNESS:  I believe they are

24  evident.

364

1      C E R T I F I C A T E

2  STATE OF NEW YORK   )

3                      : ss.

4  COUNTY OF NASSAU    )

5

6      I, CATHI IRISH, a Registered

7  Professional Reporter and Notary Public within

8  and for the State of New York, do hereby

9  certify:

10      That CARL GRINDLEY, the witness whose

11  deposition is hereinbefore set forth, was duly

12  sworn by me and that such deposition is a true

13  record of the testimony given by the witness.

14      I further certify that I am not related

15  to any of the parties to this action by blood

16  or marriage, and that I am in no way

17  interested in the outcome of this matter.

18      IN WITNESS WHEREOF, I have hereunto set

19  my hand this 25th day of February, 2013.

20

21      _____

22      CATHI IRISH, RPR, CLVS, CCR

23

24

365

```
1   ------------------ I N D E X ------------------
2   WITNESS          EXAMINATION BY      PAGE
3   DR. CARL GRINDLEY   MR. KEENER       4, 358
4                    MR. COOPER      346
5
6   ---------------- INFORMATION REQUESTS ------------
7   DIRECTIONS:  25, 276
8
9   -------------------- EXHIBITS -------------------
10  EXHIBIT NUMBER     DESCRIPTION       PAGE
11  Plaintiff's Exhibit 189, document      12
12  entitled Exhibit C
13  Plaintiff's Exhibit 190, Expert Report   32
14  of Dr. Carl James Grindley
15  Plaintiff's Exhibit 191, document      45
16  entitled Exhibit B
17  Plaintiff's Exhibit 192, document Bates   222
18  labeled CHS EXPERT00000012 through 027
19  Plaintiff's Exhibit 193, memorandum      267
20  opinion and order
21
22
23
24
```

366

```
1       *** ERRATA SHEET ***
2   NAME OF CASE:  Games Workshop vs. Chapterhouse
3   DATE OF DEPOSITION:  February 21, 2013
4   WITNESS: Carl Grindley
5
6   PAGE LINE    FROM          TO
7   ____|___|_____|_____
8   ____|___|_____|_____
9   ____|___|_____|_____
10  ____|___|_____|_____
11  ____|___|_____|_____
12  ____|___|_____|_____
13  ____|___|_____|_____
14  ____|___|_____|_____
15  ____|___|_____|_____
16  ____|___|_____|_____
17
18            _____
          CARL GRINDLEY
19
20
    Witness and sworn to before me
21  this ____ day of _____, 2012.
22
    _____  _____
23  (Notary Public)     My Commission Expires:
24
```

# EXHIBIT 5



CHS_EXPERT00000013

# EXHIBIT 6



## BONUS FEATURES

- Interactive Menus
- Scene Selection
- Widescreen Format (Aspect Ratio: 2.35:1)
- Language: English 5.1 Surround
- Subtitles: English
- Deleted Scenes
- Audio Commentary by Ridley Scott

## ALIEN

ON WHAT SHOULD HAVE BEEN A TRIP BACK TO EARTH, THE NOSTROMO, A MINING FREIGHTER, IS AUTOMATICALLY RE-ROUTED TO A DESOLATE PLANET AFTER RECEIVING AN SOS COMING FROM IT. AFTER THE CREW IS AWAKENED, THEY INVESTIGATE THE SOURCE OF THE SOS, AND DISCOVER A DERELICT ALIEN SHIP ON THE PLANET. ONE OF THE CREW MEMBERS IS PUT INTO A COMA BY AN ALIEN CREATURE WHILE INVESTIGATING THE SHIP. BUT THE ALIEN PARASITE DIES AND THE CREW THINK ALL IS WELL. BUT THE SMALL ORDEAL WAS ONLY A PRELUDE FOR GREATER THINGS TO COME...

DIGITALLY FOR SUPERIOR SOUND

# A L I E N

THX MASTERED AND PICTURE QUALITY

CHS_EXPERT00001597



CHS_EXPERT00001598



CHS_EXPERT00001599



CHS_EXPERT00001600

# EXHIBIT 7



CHS_EXPERT00001611



Plot & Script
**D.G. CHICHESTER**
**MARGARET CLARK**

Lettering
**PHIL FELIX**
**JIM NOVAK**
**BILL OAKLEY**

Color
**STEVE BUCCELLATO**
**CHRISTY SCHEELE**
**NEL YOMTOV**

Design
**ROBBIN BROSTERMAN**

Editor
**MARC McLAURIN**

Executive Editor, Epic Comics
**CARL POTTS**

Special Thanks To
**STEVE BUCCELLATO** For Helping To Pull It Together,
**MARC McLAURIN** For Seeing It Through,
And To **ARCHIE GOODWIN** For Letting Us Play With
His Toys In The First Place.

**DGC & MAC**

A SHADOWLINE SAGA™: "CRITICAL MASS"™
Vol. 1, No. 7, July, 1990. OFFICE OF
PUBLICATION: 387 PARK AVENUE SOUTH,
NEW YORK, N.Y. 10016. Published monthly. Copyright
© 1990 by Epic Comics. All rights reserved. Price
$4.95 per copy in the U.S. and $6.00 in Canada. No
similarity between any of the names, characters,
persons, and/or institutions in this magazine with
those of any living or dead person or institution is
intended, and any such similarity which may exist is
purely coincidental. This periodical may not be sold
except by authorized dealers and is sold subject to the
condition that it shall not be sold or distributed with
any part of its cover or markings removed, nor in a
mutilated condition. SHADOWLINE SAGA, CRITICAL
MASS, DOCTOR ZERO, POWER LINE, and ST. GEORGE
(including all prominent characters featured in the issue
and the distinctive likenesses thereof) are trademarks
of the MARVEL ENTERTAINMENT GROUP, INC.
PRINTED IN THE U.S.A.

CHS_EXPERT00001612

# EXHIBIT 8



CHS_EXPERT00000010

By the author of the *New York Times* bestseller

A THE CAT WHO WALKS THROUGH WALLS

# STARSHIP
# TROOPERS

THE
CONTROVERSIAL
CLASSIC OF
MILITARY
ADVENTURE!



# Robert A.
# HEINLEIN

CHS_EXPERT00000011

# EXHIBIT 9

Case: 1:10-cv-08103 Document #: 289-10 Filed: 03/04/13 Page 108 of 150 PageID #:16389

# Image:Asgard-smarines-sm5.jpg

**From Lost Minis Wiki**

- Image
- File history
- Links



Asgard-smarines-sm5.jpg (22KB, MIME type: `image/jpeg`)

## File history

Legend: (cur) = this is the current file, (del) = delete this old version, (rev) = revert to this old version.
*Click on date to see the file uploaded on that date.*

- (del) (cur) 09:17, 14 May 2011 . . Rooba777 (Talk) . . 253x358 (21744 bytes)
- (del) (rev) 05:19, 2 November 2009 . . Thegrouch (Talk) . . 266x400 (25435 bytes)


- Edit this file using an external application
  See the setup instructions (http://meta.wikimedia.org/ wiki/Help:External_editors ) for more information.

## Links

The following pages link to this file:

- Space Marines

CHS_EXPERT00001749

Case: 1:10-cv-08103 Document #: 289-10 Filed: 03/04/13 Page 109 of 150 PageID #:16390

Retrieved from "http://www.miniature s-workshop.com/lostminiswiki/inde x.php?title=Image:A sgard-smarines-sm5.jpg"

- This page was last modified 05:19, 2 November 2009.
- This page has been accessed 103 times.
- Privacy policy
- About Lost Minis Wiki
- Disclaimers

CHS_EXPERT00001750

# EXHIBIT 10



CHS_EXPERT00001787



# A FAST AND FURIOUS MINIATURES BATTLE GAME

### BY BILL KING

**DESIGN:** BILL KING
**EDITING:** MATTHEW FORBECK, HENRIK STRANDBERG
**COVER ARTWORK:** PAUL BONNER
**INTERIOR ARTWORK:** PAUL BONNER, STUDIO
 PARENTE: PAOLO PARENTE & ALEX HORLEY, TONY
 BAGGE, MICHAEL STENMARK
**ART DIRECTION:** NILS GULLIKSSON
**COVER DESIGN:** STEFAN THULIN
**PAGE DESIGN:** HENRIK STRANDBERG, MICHAEL
 STENMARK, TERRY K. AMTHOR
**WARZONE MINIATURES BY:** MARK COPPLESTONE,
 PHIL LEWIS, TIM PROW, KEVIN ADAMS
**MINIATURES PAINTED BY:** KEVIN ADAMS, JACKIE
 APPLETON, TIM PROW
**PLAYTESTERS:** ALAN GORDON, MICHAEL STENMARK,
 SAMI SINERVÄ, ARVID BLOMBERG
**OTHER CONTRIBUTIONS:** BOB WATTS, MASSIMO
 TORRIANI, FREDRIK MALMBERG, MARCUS THORELL

FOR MORE INFORMATION, CONTACT:

 HEARTBREAKER HOBBIES AND GAMES
 P.O. BOX 105
 FOLSOM, PA 19033
 U.S.A.

OR

 GAMECRAFT
 A16 GARDNER'S ROW
 LIVERPOOL, L36JT
 ENGLAND



COPYRIGHT © 1995 TARGET GAMES AB. ALL RIGHTS RESERVED.
WARZONE, MUTANT CHRONICLES, DOOMTROOPER AND ALL CHARACTER NAMES AND THE DISTINCTIVE
LIKENESS(ES) THEREOF ARE TRADEMARKS OF TARGET GAMES AB. USED UNDER AUTHORIZATION.



*Martian Banshee Trooper with CAR-24 SMG*



*Capitol Free Marine*

Graveton Archipelago. They are specially trained and equipped for jungle warfare.

**SPECIAL RULES.** All Sea Lions have Jungle Training.

**EQUIPMENT.** Their Armor is 24. They are armed with an M50 and a Punisher short sword which doubles as a machete.

**STRUCTURE.** Sea Lions come in squads of squads of 3 to 5 Troopers with 1 Sergeant. One Sea Lion may carry a heavy weapon in place of the normal armament.

Sea Lion Heroes are individual models. They may use any weapons listed from the Capitol or General Armory Lists.

## FREE MARINES

The Free Marines are the most famous of Capitol's Special Forces, made up of heroic individuals who have dishonored themselves and now live only to redeem themselves. They specialize in digging in and letting the enemy roll over them, then popping up behind the lines to harass the enemy.

**SPECIAL RULES.** To simulate their unique style of fighting, Free Marines start the game hidden and waiting. They can be deployed anywhere on the table at setup except the enemy deployment zone.

Free Marines use the standard Special Forces profile.

**EQUIPMENT.** Free Marines are armed with M50s and Punisher blades for close combat.

**STRUCTURE.** Free Marines come in squads of 3 to 5 Troopers with 1 Sergeant. One Free Marine may be equipped with a heavy weapon from the Capitol or General Armory List, instead of an M50 and Punisher blade.

Free Marine Heroes are individual models and may be equipped with any weapons from the Capitol or General Armory Lists.



CHS_EXPERT00001789



**CYBERTRONIC**      **HALL OF FAME**



*Charles Sykes—a very dangerous
and secret man. Don't ask.*



**CYBERTRONIC
HALL OF FAME**



*Attila III cuirassier unit*



*"Reaver"—saved the Pagoda Center
from four Heretic bombings in two
weeks during X-mas '72.*



*Max Torino—ex-Bauhaus playboy and
broker who joined Cybertronic after
having made his first billion at 22.*

*"Banzai" continued from p. 93*

buildings: Undead Legionnaires, Necromutants and other, worse things. Dark Legion bullets whizzed all around, thick as raindrops in a monsoon. More and more warriors went down. The squad wavered. Even the demands of honor could not keep soldiers moving into that relentless hail of death. The warriors in front of him turned. Oni saw fear written in their faces. Fear of death and fear of loss of honor warred within them. Quickly, Oni measured the distance between his troopers and the village. Too far, he knew, but what matter? Death before dishonor. He drew his blades and brandished them in the air.

‹Banzai› he screamed and charged forward. He did not look back to see if his warriors would follow. Then he breathed a prayer of thankfulness. He could hear troopers splashing forward all around. Their shame had conquered their fear.

Now warriors overtook him on all sides. The tide of fire dropped them to float face first in the blood-soaked water. A suit of armor erupted as a shell caught its vulnerable hydraulic joints. Oni kept running. His heart was pounding, and sweat streamed down his back. Fifty meters. Yoshima overtook him. A shell from the black gun burst through his head and splattered Oni's face with blood and brain jelly. Twenty-five meters. Bullets bounced off Oni's armor. Bloodlust filled the Samurai. He no longer cared about death. Just let me slay the monster, he prayed.

Ten meters. He could see the Nepharite's twisted face now, its great fangs, its glowing eyes. His sword felt heavy in his hands. He lined up his stroke. He knew he would only get one. The Nepharite fired. Oni flinched. The bullet whistled over his shoulder.

Impact. Oni's blade cut at the Nepharite's neck. It bit deep into the leathery flesh, but not deep enough. The Nepharite bellowed with pain. Oni lashed out again, sending his blade deep into the Nepharite's stomach, polluting his sword's ancient steel with the creature's foul blood. The Nepharite swung around. The sharp edges of its great gun slashed towards Oni. He sprang back and tripped right amid a squad of Legionnaires. The Nepharite loomed over him, his blade held high. Oni knew he was dead. He fought the urge to close his eyes. Instead, he met the Nepharite's burning gaze. Life is a mountain, death is a feather, he thought.

Suddenly, another blade passed through the Nepharite's chest. The huge monster stumbled and fell. Oni rolled to one side, and the body hit the ground beside him. A huge, red-garbed figure loomed over him. A smoking pistol blazed softly away in one hand, its silenced bullets killing the nearest Necromutant. The Legionnaires stopped moving. Oni sprang to his feet. All around him, it was quiet. The battle was over. Samurai and Legionnaires lay everywhere. Only Oni and the red-garbed Shadow Walker moved amid the ruin. He and the Shadow Walker exchanged glances. Then, without speaking, they turned and walked away in opposite directions.

It would have been dishonorable to thank a Shadow Walker for saving his life.

CHS_EXPERT00001790

# EXHIBIT 11



AUGUST 1980 $1.50

# analog
## SCIENCE FICTION
### SCIENCE FACT

**THE CLOAK AND THE STAFF**
Gordon R. Dickson

**Dean Ing**
**Milton Rothman**

CHS_EXPERT00000029

# EXHIBIT 12

# AIRSTRIKE

**Real Name**: Dimitri Ivanovitch Bukharin

**Identity/Class**: Human (Russian), technology user

**Occupation**: Adventurer, renegade KGB agent

**Citizenship**: Russia

**Legal Status**: Unknown

**Place of Birth**: Kuybyshev, Russia

**Marital Status**: Unrevealed

**Group Membership**: None; formerly KGB, Legion Accursed, People's Protectorate/Supreme Soviets (Fantasma, Perun, Red Guardian, Vostok), Soviet Super-Soldiers (Darkstar, Titanium Man, Ursa Major, Vanguard)

**Affiliations**: Alpha Flight (Box (Madison Jeffries), Diamond Lil, Guardian (Heather Hudson), Puck, Shaman), Avengers (Captain America, Quasar, Sersi, Stingray, Vision), Beetle (Abner Jenkins), Blacklash, Blizzard (Donald Gill), Yuri Brevlov, Doppelganger, Half-Face, Jack of Hearts, Inoshiro Kondo, Nikolai Kutzov, Mephisto, Fyodr Shelkov, S.H.I.E.L.D., Space Phantom, Titanium Man (Boris Bullski), Titanium Man (Gremlin), Yuri Trifanov

**Enemies**: Arcturus, Atlanteans, Beyonder, Black Panther, Darkstar, Green Liberation Front, Hulk, Human Torch (Johnny Storm), Iron Man (Tony Stark), Cissy Ironwood, Professor Daniel Ironwood, Orka, the Pantheon (Ajax, Atalanta, Hector, Ulysses), Peace Corpse, Red Ghost, Rigellians, Silver Surfer, Valentin Shatalov, Spider-Man, Thing, Tyrak, U-Man, Ursa Major, Vanguard, Alexi Vazhin, X-Factor (Angel, Beast, Cyclops, Iceman, Marvel Girl), X-Men (Dazzler, Havok, Magneto, Rogue, Storm, Wolverine)

**Known Relatives**: None

**Aliases**: Crimson Dynamo (roughly translates into Russian as "Krashni Denamit"); impersonated Iron Man

**Base of Operations**: The People's Protectorate headquarters
formerly KGB Headquarters, Moscow
formerly Doppelganger's laboratory complex, Siberia



**First Appearance**: (as Crimson Dynamo) Iron Man I#109 (April, 1978); (as Airstrike) Soviet Super-Soldiers#1

**Powers/Abilities**: The capabilities of the Airstrike armor are not known. It contains blasters in its wrists, and presumably affords Dimitri defense and flight abilities.

The suits of Crimson Dynamo armor that Dimitri wore granted him superhuman strength and durability, could fly, contained hand-blasters, missiles, and radio equipment.

**Height**: 6' 2"; (Airstrike armor) 6' 6"; (Dynamo Mark III) 6' 5"; (Dynamo Mark IV) 6' 10"; (Dynamo Mark IV-X) 9' 3"
**Weight**: 200 lbs.; (Airstrike armor) 390 lbs.; (Dynamo Mark III) 575 lbs.; (Dynamo Mark IV) 420 lbs.; (Dynamo Mark IV-X) 1250 lbs.
**Eyes**: Brown
**Hair**: Bald (brown moustache)



**History**: (Iron Man I#109 (fb) - BTS) - After Yuri Petrovitch was retired as the Crimson Dynamo, the Russian government selected KGB operative Dimitri Bukharin as the new wearer of the armor, and he was sent to work alongside their superhuman agents Vanguard and Darkstar.

(Iron Man I#110 (fb)) - The Crimson Dynamo, Darkstar and Vanguard took a ship to Earth's moon to investigate a signal coming from the Blue Area of the Moon. They were shot by members of the extraterrestrial Rigellian race, who mistook them for their enemies, the Knights of Wundagore. They crashed on the moon.

(Iron Man I#109) - Three days later, Jack of Hearts and Iron Man arrived on the moon, also investigating the signal. The Crimson Dynamo mistakenly thought they were responsible for attacking them, and began a fight. Iron Man in turn mistook Bukharin for his predecessor, Alex Nevsky. When Darkstar realized that a mistake had been made, she had Bukharin unmask to prove to Iron Man that he was not Nevsky. Iron Man and Jack of Hearts went on to investigate the Rigellian vessel orbiting the moon.

(Iron Man I#110-111) - The Crimson Dynamo repaired their communications equipment from their craft, and they received a transmission from their superiors in Russia, asking them to work alongside Tony Stark and S.H.I.E.L.D. against the Rigellian menace.

(Iron Man I#112) - The three Russians aided Jack of Hearts against the Rigellians until the battle finally came to an end when Recorder#211 relieved the Rigellian fleet commander Arcturus of his command.

(Marvel Team-Up Annual#2) - The Crimson Dynamo, Vanguard and Darkstar invaded the U.S. to kidnap Dr. Daniel Ironwood on behalf of the KGB's Nikolai Kutzov, who wanted Ironwood to build an anti-matter bomb. They wound up taking Dr. Ironwood's daughter Cissy captive as well. When Alexi Vazhin, Spider-Man and Bruce Banner came to the site of the bomb's construction, the three Russian heroes fought them, and the Crimson Dynamo was beaten unconscious by Spider-Man.

(Incredible Hulk II#250) - When the Silver Surfer passed through Russian    

CHS_EXPERT00001729

airspace, the Crimson Dynamo and Darkstar monitored him from the air.

(Incredible Hulk II#258) - The Soviet Super-Soldiers were brought together by Colonel Yuri Brevlov and had Ursa Major added to their ranks for a mission to the "Forbidden Zone," the site of a nuclear detonation by the Presence. They were to investigate what was causing the radiation to spread. When they were teleported there by Darkstar, they found themselves face-to-face with the Hulk, and attacked him, thinking he was somehow responsible. The Hulk resisted all of the Crimson Dynamo's weaponry, and knocked him unconscious.

(Incredible Hulk II#259) - Darkstar teleported the Crimson Dynamo to a hospital where he could be treated for his injuries.

(Marvel Super-Hero Contest of Champions#1) - The Soviet Super-Soldiers attacked the Red Ghost in Novaya Zemlya to prevent him from starting tremors that would topple Russia's cities, but they were suddenly teleported away by the Grandmaster as potential participants in his game with Death.

(Marvel Super-Hero Contest of Champions#2-3 - BTS) - The Crimson Dynamo and the other Soviet Super-Soldiers remained in stasis while the game was played out, and were finally returned home when it concluded.

(Marvel Team-Up Annual#7/2) - The Crimson Dynamo fought the Human Torch and Black Panther for unknown reasons, and was ultimately defeated by them and turned over to the FBI.

(Secret Wars II#7) - The Crimson Dynamo was among the super-villains gathered by Mephisto as the Legion Accursed to attack the Beyonder in an attempt to kill him, but they were prevented from attacking him by the Thing.



(Official Handbook of the Marvel Universe Master Edition#5 - Crimson Dynamo) - Bukharin was given new armor designed by the Gremlin.

(X-Factor Annual#1) - The Crimson Dynamo was employed as defense at Doppelganger's laboratory in Siberia where mutants were being held for experiments. He fought X-Factor when they entered the complex, and was defeated when Iceman gave him Doppelganger's surrender code.

(X-Men Vs. Avengers#1) - The Crimson Dynamo helped the other Soviet Super-Soldiers (who had quit working for the government and teamed up with the Gremlin as the Titanium Man), in battling a fire at a railroad yard. The Soviet Super-Soldiers no longer trusted Bukharin because he was KGB, but he convinced them to aid him on a mission to investigate the crash of Magneto's Asteroid M base in Russian territory. When they caught up to Magneto in Kampuchea, they found the Avengers and the X-Men standing alongside him. When they refused to turn Magneto over, they attacked.

(X-Men Vs. Avengers#2) - The Crimson Dynamo's armor was badly damaged by Captain Marvel (Monica Rambeau), and he was incapacitated along with his comrades when Dr.

Druid took over Darkstar's mind and made her bind them in her darkforce.

(X-Men Vs. Avengers#3) - The Titanium Man managed to snap Darkstar out of Dr. Druid's control, and they pursued Magneto's trail to Singapore. They again fought the Avengers and X-Men aboard a ship Magneto was traveling on, and the Crimson Dynamo blasted a hole in the ship's side, nearly sinking it. After performing a rescue operation, the Avengers revealed to the Soviet Super-Soldiers that the Crimson Dynamo was responsible, and they swore off the pursuit of Magneto so that they could turn Bukharin over to maritime authorities.

(Iron Man I#229) - The Crimson Dynamo and Titanium Man were summoned together by the Russian government, who informed them of how Iron Man had been attacking armored people in the United States, and was certain to pursue them sooner or later. Bukharin had only one more week of service to the state as the Crimson Dynamo, but was committed to aid them against Iron Man. However, the Titanium Man refused to cooperate with the government. The government decided to use the Titanium Man as bait, and waited for Iron Man to come after him at his base, Bitterfrost. When Iron Man arrived, the Crimson Dynamo joined the fray, but Iron Man used a negator pack to short out his armor, rendering it useless.

(Captain America I#353 (fb) - BTS) - The Crimson Dynamo's armor was repaired and he remained in active service, now alongside the Supreme Soviets.

(Captain America I#353) - As a member of the Supreme Soviets, the Crimson Dynamo was disguised by Fantasia as Iron Man as they stole onto Avengers Island to assassinate Darkstar, Vanguard and Ursa Major, who were attempting to defect. When the three defectors appeared dead, they teleported away.

(Captain America I#354) - When "the Great Beast" created by Darkstar, Vanguard and Ursa Major's subconsciousness attacked Moscow, the Supreme Soviets responded, and were absorbed into the creature, where the three defectors intended to have revenge by killing them, but Captain America convicned the trio to let the Supreme Soviets live.

(Iron Man Annual#10/2) - Dimitri visited a bar in the United States, and alongside Half-Face, the Space Phantom, Inoshiro Kondo, Blizzard, Beetle and Blacklash, swapped stories about battling Iron Man. They all fled when Iron Man suddenly entered the bar.



(Soviet Super-Soldiers#1) - After halting some environmental activists in Yvborg with the Supreme Soviets, the Crimson Dynamo met with Fyodr Shelkov who told him that his army service extension to the Supreme Soviets had been rescinded, and either he or the armor would have to be turned over. Three days later they met with Colonel-General Valentin Shatalov, who ordered Bukharin to recover the original Titanium Man, who had been lost in New York City when a card he had electronically transferred his essence to had been torn into pieces. Dimitri began to retrieve the card fragments so that he could be re-integrated, but the Titanium Man's one-time allies in the Green Liberation Front were accidentally reactivated, and being anti-Russian, attacked the Crimson Dynamo. He was forced to bring the Titanium Man back for aid, and because parts of his body were missing, the Titanium Man went on a rampage, killing all of the Green Liberation Front. Bukharin drew

CHS_EXPERT00001731

Titanium Man over the Atlantic
Ocean, then returned him to card form.

By the time Bukharin brought the Titanium Man to Shatalov, the scandal over the massacre in the U.S. was enough to force
Bukharin to turn over the Crimson Dynamo armor. He realized that this was what Shatalov had wanted all along. He returned
to his teammates, now calling themselves the People's Protectorate, and told them that he could no longer be the Crimson
Dynamo, but they refused to accept his resignation -- they had already fashioned a new identity for him in the Protectorate as
Airstrike, and he attended the team's first press conference.

(Avengers I#319) - The People's Protectorate were sent after the British submarine Waterwind, which had been captured by
the Russian terrorists Peace Corpse. When the Avengers came after the submarine as well, the two teams quarreled over
jurisdictions. Their fight was interrupted by the arrival of Atlanteans led by Tyrak, Orka and U-Man.

(Avengers I#320) - The two teams fought off the Atlanteans together, then agreed to cooperate in pursuing the Waterwind as
it surfaced in St. John's, Newfoundland. They were confronted there by Alpha Flight, who claimed jurisdiction over both
teams.

(Avengers I#321-322) - While some of the heroes confronted the Peace Corpse within the Waterwind, the Atlanteans
attacked St. John's, and the Crimson Dynamo joined in the fight against them. Battling U-Man, he generated heat from his
armor to quickly dehydrate him. He finally turned U-Man over to Alpha Flight's Guardian to deal with.

(Avengers I#323) - When the nuclear missiles aboard Waterwind were set off, Shaman teleported all of the bystanders into
alien dimensions, including the Crimson Dynamo, who appeared in a dimension of black skies and purple water alongside
Tyrak, Madison Jeffries, Orka, Puck, Quasar and Perun. They made psychic contact with Fantasma, and gradually linked up
to the heroes scattered in all of the dimensions. Suddenly, the leaders of the Peace Corpse appeared, mutated into the
superhuman Combine.

(Avengers I#324) - The heroes fought the Combine until the other four members of Peace Corpse were able to merge with
the Combine, rendering the entity benign, and it departed. All of the heroes were returned to St. John's by Shaman, and
departed in peace.

(Incredible Hulk II#393) - The People's Protectorate were sent to retrieve former KGB agent Igor Drenkov from the U.S., but
ran into the Pantheon, led by the Hulk. The Crimson Dynamo fought the Hulk, but was defeated when he was thrown into an
electrified Perun. Vostok used his unconscious body to attack the Hulk, manipulating the armor, but the Hulk managed to
incapacitate Vostok. The Hulk finally revealed that he had only wanted to teach Drenkov a lesson for having turned him into
the Hulk years ago.

**Comments**: Created by Bill Mantlo, Carmine Infantino, and Fred Kida.

The Crimson Dynamo was about twice as big as usual when he first appeared in his new armor in X-Factor Annual#1. He
also behaved more like a robot than a human.

A Crimson Dynamo wearing the Gremlin design appeared in JLA/Avengers#4, but since the characters were pulled from
different points in time in this story it could another Dynamo wearing the same armor.

### HUGE FREAKIN' CONTINUITY ERROR!

Okay, Soviet Super-Soldiers#1 was originally intended for publication as a serial in Marvel Comics Presents. By the time it
finally appeared in one shot format, the Supreme Soviets had already made a few appearances as the People's
Protectorate...only Dimitri Bukharin was still wearing the Crimson Dynamo armor!

The way I see it, you have two choices in how you read "the Crossing Line" and Hulk II#393:

1. Shatalov let Dimitri borrow the Crimson Dynamo armor
2. Dimitri was wearing the Airstrike armor all along; it was an artist's error

Bukharin has partial entries as part of Crimson Dynamo entries in OHotMU I#3, Deluxe Edition#3, Master Edition and All-

CHS_EXPERT00001732

New OHotMU Update#2.

## by **Prime Eternal**

### CLARIFICATIONS :
Dimitri Bukharin should not be confused with:

- Crimson Dynamo, Anton Vanko, creator of the Crimson Dynamo armor, @ Tales of Suspense I#46
- Crimson Dynamo, Boris Turgenov, KGB agent who stole the armor, @ Tales of Suspense I#52
- Crimson Dynamo, Alex Nevsky, member of Titanic Three, @ Iron Man I#15
- Crimson Dynamo, Yuri Petrovitch, son of Ivan Petrovitch, @ Champions#7
- Crimson Dynamo, Valentin Shatalov, of Remont 4, @ Iron Man I#255
- Crimson Dynamo, unknown wearer, allied with the Answer, @ Captain America III#42
- Crimson Dynamo, Gennady Gavrilov, donned Mark II armor, @ Crimson Dynamo#1
- Crimson Dynamo, unknown wearer, allied with Lucia von Bardas, @ Secret War#3
- **Crimson Dynamos** of Earth X, led by Black Widow, @ Earth X#8

Images taken from:
Soviet Super-Soldiers#1, page 60, panel 5
Soviet Super-Soldiers#1, page 55, panel 4
Incredible Hulk II#258, page 16, panel 5
Official Handbook of the Marvel Universe Master Edition#5, Crimson Dynamo entry
Soviet Super-Soldiers#1, page 56, panel 3

Appearances:
Iron Man I#109 (April, 1978) - Bill Mantlo (writer), Carmine Infantino (penciler), Fred Kida (inker), Archie Goodwin (editor)
Iron Man I#110-111 (May-June, 1978) - Bill Mantlo (writer), Keith Pollard (penciler), Fred Kida (inker), Archie Goodwin (editor)
Iron Man I#112 (July, 1978) - Bill Mantlo (writer), Keith Pollard (penciler), Alfredo Alcala (inker), Jim Shooter (editor)
Marvel Team-Up Annual#2 (1979) - Chris Claremont (writer), Sal Buscema, Alan Kupperberg (pencilers), Jack Abel (inkers), Al Milgrom (editor)
Incredible Hulk II#250 (August, 1980) - Bill Mantlo (writer), Sal Buscema (artist), Al Milgrom (editor)
Incredible Hulk II#258 (April, 1981) - Bill Mantlo, Steven Grant (writers), Sal Buscema (artist), Al Milgrom (editor)
Incredible Hulk II#259 (May, 1981) - Bill Mantlo (writer), Sal Buscema (artist), Al Milgrom (editor)
Marvel Super-Hero Contest of Champions#1 (June, 1982) - Mark Gruenwald, Bill Mantlo, Steven Grant (writers), John Romita, Jr. (penciler), Pablo Marcos (inker), Mark Gruenwald, Tom DeFalco (editors)
Marvel Team-Up Annual#7 (October, 1984) - Bob DeNatale (writer), David Mazzuchelli (penciler), Brett Breeding (inker), Danny Fingeroth (editor)
Secret Wars II#7 (January, 1986) - Jim Shooter (writer), Al Milgrom (penciler), Steve Leialoha (inker)
X-Factor Annual#1 (October, 1986) - Bob Layton (writer/penciler), Brett Breeding (inker), Bob Harras (editor)
X-Men Vs. Avengers#1-3 (April-June, 1987) - Roger Stern (writer), Marc Silvestri (penciler), Josef Rubinstein (inker), Mark Gruenwald, Ann Nocenti (editors)
Iron Man I#229 (April, 1988) - David Michelinie (writer), Mark Bright (penciler), Bob Layton (writer/inker), Mark Gruenwald (editor)
Captain America I#353-354 (April-May, 1989) - Mark Gruenwald (writer), Kieron Dwyer (penciler), Al Milgrom (inker), Ralph Macchio (editor)
Iron Man Annual#10 (1989) - David Whol (writer), Jackson Guice, Gene Colan, John Byrne, Keith Pollard, Bob Layton, Mark Bright (artists)
Soviet Super-Soldiers#1 (November, 1992) - Fabian Nicieza (writer), Angel Medina, Javier Saltares (pencilers), Jeff Albrecht (inker), Terry Kavanagh (editor)
Avengers I#319 (July, 1990) - Fabian Nicieza (writer), Richard Levins (penciler), Christopher Ivy (inker), Howard Mackie (editor)
Avengers I#320 (August, 1990) - Fabian Nicieza (Writer), Paul Ryan (penciler), Tom Palmer (inker), Howard Mackie

CHS_EXPERT00001733

Case: 1:10-cv-08103 Document #: 289-10 Filed: 03/04/13 Page 124 of 150 PageID #:16405

(editor)

Avengers I#321 (August, 1990) - Fabian Nicieza (writer), Richard Levins (penciler), Christopher Ivy (inker), Howard Mackie (editor)

Avengers I#322 (September, 1990) - Fabian Nicieza (writer), Paul Ryan (penciler), Christopher Ivy (inker), Howard Mackie (editor)

Avengers I#323 (September, 1990) - Fabian Nicieza (writer), Richard Levins (penciler), Tom Palmer (inker), Howard Mackie (editor)

Avengers I#324 (October, 1990) - Fabian Nicieza (writer), Paul Ryan (penciler), Tom Palmer (inker), Howard Mackie (editor)

Incredible Hulk II#393 (May, 1992) - Peter David (writer), Dale Keown (penciler), Mark Farmer (inker), Bobbie Chase (editor)

**Last updated**: 05/26/12

Any Additions/Corrections? please let me know.

Non-Marvel Copyright info

All other characters mentioned or pictured are ™ and © 1941-2099 Marvel Characters, Inc. All Rights Reserved. If you like this stuff, you should check out the real thing!

Please visit The Marvel Official Site at: http://www.marvel.com

# Back to Characters

CHS_EXPERT00001734

# EXHIBIT 13



LIBRARY OF CONGRESS

*Copyright Office*
*of the United States*

WASHINGTON, D.C.

**THIS IS TO CERTIFY** that the attached are photocopies of the following items which appear in the correspondence files of the Copyright Office for the work entitled **ASSAULT SQUAD SHOULDER PADS**:

1. An automated email from the Copyright Office to jmoskin@foley.com sent 03/01/2012 06:36:13 PM, pertaining to the work identified as **ASSAULT SQUAD SHOULDER PADS**, service request number 1-732432166.

2. An email to Jonathan Moskin (jmoskin@foley.com) from Robin Jones, Registration Specialist, Visual Arts Division (cop-ad@loc.gov) delivered 06/07/2012 11:18:36 AM, pertaining to the work assigned service request number 1-732432166.

3. An email to Robin Jones, Registration Specialist, Visual Arts Division (cop-ad@loc.gov) from Jonathan Moskin (jmoskin@foley.com); received 06/26/2012 06:29:56 PM, pertaining to the work assigned service request number 1-732432166.

4. An inbound call from Jonathan Moskin to Denise Garrett, Information Section Head, received 11/05/2012 03:35:57PM, pertaining to the work assigned service request number 1-732432166.

5. An email to Jonathan Moskin (jmoskin@foley.com) from Robin Jones, Registration Specialist, Visual Arts Division (cop-ad@loc.gov) delivered 11/07/2012 12:39:49 PM, pertaining to the work assigned service request number 1-732432166.

6. An email to Robin Jones, Registration Specialist, Visual Arts Division (cop-ad@loc.gov) from Jonathan Moskin (jmoskin@foley.com); received 06/26/2012 06:29:56 PM, pertaining to the work assigned service request number 1-732432166.

**IN WITNESS WHEREOF**, the seal of this office is affixed hereto on December 11, 2012.

Maria A. Pallante
Register of Copyrights

By: Jarletta Walls
Acting Section Supervisor
Records Research and Certification Section
Information and Record Division

Use of this material is governed by the U.S. copyright law 17 U.S.C. 101 et seq.

**Automatic email to remitter dated March 1, 2012 06:36:13PM**

THIS IS AN AUTOMATED EMAIL - DO NOT REPLY.

Thank you for submitting your registration claim using the electronic Copyright Office (eCO) System. This email confirms that your application and fee for the work Assault Squad Shoulder Pads was received on 03/01/2012. The following applies to registration claims only (not preregistrations):

The effective date of registration is established when the application, fee AND the material being registered have been received. If you have not yet sent the material to be registered, logon to eCO and click the blue case number associated with your claim in the Open Cases table, then do one of the following:

For digital uploads: Click the Upload Deposit button at the top of the Case Summary screen, then browse and select the file(s) you wish to upload. Note: only certain classes of works may be registered with digital deposits (See FAQs: http://www.copyright.gov/eco/faq.html#eCO_1.4).

For hardcopy submissions: Click the Create Shipping Slip button at the top of the Case Summary screen, then click the Shipping Slip link that appears in the Send By Mail table. Print out and attach the shipping slip to the copy(ies) of your work. For multiple works, be sure to attach shipping slips to the corresponding copies.

A printable copy of the application will be available within 24 hours of its receipt. To access the application, click the My Applications link in the left top most navigation menu of the Home screen.

You will be issued a paper certificate by mail after the registration has been completed. You may check the status of this claim via eCO using this number [1-732432166].

**Email to Jonathan Moskin (jmoskin@foley.com) from Robin Jones, Registration Specialist, Visual Arts Division (cop-ad@loc.gov), sent June 7, 2012 11:18:36AM Subject: 1-732432166 Assault Squad Shoulder Pads**

Dear Jonathan Moskin:

I am examining this text, photograph(s), 2-D artwork, sculpture claim for Games Workshop. The application gives the year of completion as 2000, and the pub date as 9/30/2000. The copyright notice has 2010 on the packaging. Please clarify what is being registered on the 9/30/2000 date. I see what looks like graphics of the pads which we could register. Please confirm they are artwork and not photos.

Also, we cannot register the sculpture portion as it is too minimal. The text on this package appears to be the same as Crimson fist shoulder pads and cannot be registered again. Please allow permission to remove sculpture and text from the application.

Please note that if we do not receive a response to this message within 20 days, we will close this case without processing your registration or notifying you further, and forward your deposit copy(ies) under the provisions of the current copyright law. The fee is not refundable. If you re-apply for registration after the case is closed, you must send a new application, copy and fee. The effective date of registration will be based on the new submission.

Sincerely,
Robin Jones
Registration Specialist
Visual Arts Division
U.S. Copyright Office

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-CV2JUR]

**Email from Jonathan Moskin (jmoskin@foley.com) to Robin Jones, Registration Specialist, Visual Arts Division (cop-ad@loc.gov), sent June 26, 2012 06:29:56PM Subject: RE: 1-732432166 Assault Squad Shoulder Pads**

My understanding is that the 2010 copyright notice simply refers to the date of printing of this particular packaging, but that the artwork and sculpture were created and first published in 2000 as specified. I hope this answers your question about the dates but please let me know.

I would also propose speaking with you to discuss the questions you have regarding the sculptural elements. I have included a telephone number below if you wish to call. Obviously, I am mindful of the 20-day deadline you noted, which I believe expires tomorrow. I hope that while we address any remaining questions we can extend the deadline.

Thank you

Jonathan Moskin
212-338-3572

-----Original Message-----
From: Copyright Office [mailto:cop-ad@loc.gov]
Sent: Thursday, June 07, 2012 11:30 AM
To: Moskin, Jonathan
Subject: 1-732432166 Assault Squad Shoulder Pads

Dear Jonathan Moskin:

I am examining this text, photograph(s), 2-D artwork, sculpture claim for Games Workshop. The application gives the year of completion as 2000, and the pub date as 9/30/2000. The copyright notice has 2010 on the packaging. Please clarfiy what is being registered on the 9/30/2000 date. I see what looks like graphics of the pads which we could register. Please confirm they are artwork and not photos.

Also, we cannot register the sculpture portion as it is too minimal. The text on this package appears to be the same as Crimson fist shoulder pads and cannot be registered again. Please allow permission to remove sculpture and text from the application.

Please note that if we do not receive a response to this message within 20 days, we will close this case without processing your registration or notifying you further, and forward your deposit copy(ies) under the provisions of the current copyright law. The fee is not refundable. If you re-apply for registration after the case is closed, you must send a new application, copy and fee. The effective date of registration will be based on the new submission.

Sincerely,
Robin Jones
Registration Specialist
Visual Arts Division
U.S. Copyright Office

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-CV2JUR]

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

**Call Inbound from Remitter to Denise Garrett, Information Section Head, November 5, 2012 03:35:57PM**

From: Garrett, Denise
Sent: Monday, November 05, 2012 3:36 PM
To: Briganti, Bill; Ashley, John
Subject: March 2012 eCO submission pending under SR 1-732432166
Importance: High

Hi Bill and John,

Can you please review the following case?  It went no reply, however, he did reply.

TITLE:  Assault Squad Shoulder Pads
SR 1-732432166
Remitter:  Jonathan Moskin

Cell # (He will be @ polling stations tomorrow) 914-557-6757

Thanks,
Denise

**Email to Jonathan Moskin (jmoskin@foley.com) from Robin Jones, Registration Specialist, Visual Arts Division (cop-ad@loc.gov), sent November 7, 2012 12:39:49PM**
**Subject: RE: RE: 1-732432166 Assault Squad Shoulder Pads**

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-CV2JUR]

This claim in "text, photos, 2d artwork, sculpture" was delayed as I had not received permission to remove certain aspects of authorship from the appl.

The email stated that the "sculpture" was to minimal (it is basically an "X") and could not be registered. Your email stated that the (c) notice on the package refers to the printing date.

The "text" appears to be same as the text on the Crimson fist should pads package. When was the text first published/registered? If already registered, the text cannot be registered again.

In regards to the "2d artwork", there was no clarification from my previous email: "I see what looks like graphics of the [shoulder] pads which we could register [as 2d artwork]". Please confirm they are artwork and not photos."

Robin Jones
-----Original Message-----

From: JMoskin@foley.com
Sent: 6/26/2012 06:29:09 PM
To: Copyright Office <cop-ad@loc.gov>
Subject: RE: 1-732432166 Assault Squad Shoulder Pads

My understanding is that the 2010 copyright notice simply refers to the date of printing of this particular packaging, but that the artwork and sculpture were created and first published in 2000 as specified. I hope this answers your question about the dates but please let me know.

I would also propose speaking with you to discuss the questions you have regarding the sculptural elements. I have included a telephone number below if you wish to call. Obviously, I am mindful of the 20-day deadline you noted, which I believe expires

tomorrow. I hope that while we address any remaining questions we can extend the deadline.

Thank you

Jonathan Moskin
212-338-3572

-----Original Message-----
From: Copyright Office [mailto:cop-ad@loc.gov]
Sent: Thursday, June 07, 2012 11:30 AM
To: Moskin, Jonathan
Subject: 1-732432166 Assault Squad Shoulder Pads

Dear Jonathan Moskin:

I am examining this text, photograph(s), 2-D artwork, sculpture claim for Games Workshop. The application gives the year of completion as 2000, and the pub date as 9/30/2000. The copyright notice has 2010 on the packaging. Please clarfiy what is being registered on the 9/30/2000 date. I see what looks like graphics of the pads which we could register. Please confirm they are artwork and not photos.

Also, we cannot register the sculpture portion as it is too minimal. The text on this package appears to be the same as Crimson fist shoulder pads and cannot be registered again. Please allow permission to remove sculpture and text from the application.

Please note that if we do not receive a response to this message within 20 days, we will close this case without processing your registration or notifying you further, and forward your deposit copy(ies) under the provisions of the current copyright law. The fee is not refundable. If you re-apply for registration after the case is closed, you must send a new application, copy and fee. The effective date of registration will be based on the new submission.

Sincerely,
Robin Jones
Registration Specialist
Visual Arts Division
U.S. Copyright Office

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-CV2JUR]

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

**Email from Jonathan Moskin (jmoskin@foley.com), to Robin Jones, Registration Specialist, Visual Arts Division (cop-ad@loc.gov), sent December 7, 2012 04:35:26PM**
**RE: RE: 1-732432166 Assault Squad Shoulder Pads**

I left you a message to discuss this. I wanted to point out that in a recent decision, the US District Court for the Northern District of Illinois ruled that the basic shape of the Games Workshop shoulder pad is copyrightable (even without surface ornamentation). I would be happy to get you a copy of the decision.

Please also feel free to call me.

Jonathan Moskin
212-338-3572

-----Original Message-----
From: Copyright Office [mailto:cop-ad@loc.gov]
Sent: Wednesday, November 07, 2012 2:19 PM
To: Moskin, Jonathan
Subject: RE: RE: 1-732432166 Assault Squad Shoulder Pads

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-CV2JUR]

This claim in "text, photos, 2d artwork, sculpture" was delayed as I had not received permission to remove certain aspects of authorship from the appl.

The email stated that the "sculpture" was to minimal (it is basically an "X") and could not be registered. Your email stated that the (c) notice on the package refers to the printing date.

The "text" appears to be same as the text on the Crimson fist should pads package. When was the text first published/registered? If already registered, the text cannot be registered again.

In regards to the "2d artwork", there was no clarification from my previous email: "I see what looks like graphics of the [shoulder] pads which we could register [as 2d artwork]". Please confirm they are artwork and not photos."

Robin Jones
-----Original Message-----

From: JMoskin@foley.com
Sent: 6/26/2012 06:29:09 PM
To: Copyright Office <cop-ad@loc.gov>
Subject: RE: 1-732432166 Assault Squad Shoulder Pads

My understanding is that the 2010 copyright notice simply refers to the date of printing of this particular packaging, but that the artwork and sculpture were created and first published in 2000 as specified. I hope this answers your question about the dates but please let me know.

I would also propose speaking with you to discuss the questions you have regarding the sculptural elements. I have included a telephone number below if you wish to call. Obviously, I am mindful of the 20-day deadline you noted, which I believe expires tomorrow. I hope that while we address any remaining questions we can extend the deadline.

Thank you

Jonathan Moskin
212-338-3572

-----Original Message-----
From: Copyright Office [mailto:cop-ad@loc.gov]
Sent: Thursday, June 07, 2012 11:30 AM
To: Moskin, Jonathan
Subject: 1-732432166 Assault Squad Shoulder Pads

Dear Jonathan Moskin:

I am examining this text, photograph(s), 2-D artwork, sculpture claim for Games Workshop. The application gives the year of completion as 2000, and the pub date as 9/30/2000. The copyright notice has 2010 on the packaging. Please clarfiy what is being registered on the 9/30/2000 date. I see what looks like graphics of the pads which we could register. Please confirm they are artwork and not photos.

Also, we cannot register the sculpture portion as it is too minimal. The text on this package appears to be the same as Crimson fist shoulder pads and cannot be registered

again. Please allow permission to remove sculpture and text from the application.

Please note that if we do not receive a response to this message within 20 days, we will close this case without processing your registration or notifying you further, and forward your deposit copy(ies) under the provisions of the current copyright law. The fee is not refundable. If you re-apply for registration after the case is closed, you must send a new application, copy and fee. The effective date of registration will be based on the new submission.

Sincerely,
Robin Jones
Registration Specialist
Visual Arts Division
U.S. Copyright Office

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-CV2JUR]

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

# EXHIBIT 14

**Keener, Jason J.**

---

| | |
|---|---|
| **From:** | Copyright Office [cop-ad@loc.gov] |
| **Sent:** | Thursday, December 27, 2012 10:25 AM |
| **To:** | Moskin, Jonathan |
| **Subject:** | RE: RE: RE: RE: 1-732432166 Assault Squad Shoulder Pads |

Mr. Moskin,

We did receive your message with information about the court decision.  I've taken over both cases for the specialist who is on extended leave.  We look at each case on an individual basis.  You should receive an email shortly with some questions that remain about the Crimson Fists Shoulder Pads.  I will examine the materials submitted with this claim (Assault Squad Shoulder Pads) and will make a determination shortly.

Carol Frenkel
Supervisory Registration Specialist
Visual Arts Division
U.S. Copyright Office


When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-CV2JUR]


-----Original Message-----

From:  JMoskin@foley.com
Sent: 12/11/2012 11:24:01 AM
To:  "'Copyright Office'" <cop-ad@loc.gov>
Subject:  RE: RE: RE: 1-732432166 Assault Squad Shoulder Pads

I do not understand your response, which did not acknowledge my message.  As I mentioned, a Federal Court has already held, based on among other things on a review of expert testimony submitted by the adverse party to the litigation that assessed prior designs of shoulder pads in military and gaming contexts, that the shape of the shoulder pad itself is original and copyrightable.  The case is Games Workshop Limited v. Chapterhouse Studios LLC, 1:10-cv-08103 (N.D.Ill). The addition of further distinguishing material (which has additional meaning in the context of the fictional Warhammer 40,000 universe) on the protectable shoulder pad should not render it uncopyrightable.

Moreover, if you inspect the shoulder pad itself, you will see that it has a lip around the edge and that what you call an "x" has more detail than that might suggest - including triangular devices at each end and a hollowed indentation running the length of the "x" shape.  The center of each triangular shape is also hollowed.

I hope this helps clarify the matter.  Please let me know if you would like a copy of the decision or if you wish to discuss this further.

Jonathan Moskin
212-338-3572

-----Original Message-----
From: Copyright Office [mailto:cop-ad@loc.gov]
Sent: Tuesday, December 11, 2012 9:39 AM
To: Moskin, Jonathan
Subject: RE: RE: RE: 1-732432166 Assault Squad Shoulder Pads

GW0011427

When replying to this email, please include the following thread id (entire line) within
the body of your response to expedite routing to the correct office.


When replying to this email, please include the following thread id (entire line) within
the body of your response to expedite routing to the correct office.

[THREAD ID:1-CV2JUR]

this particular shoulder pad submitted is not copyrightable.  it is simply circular, with
an x or plus sign on it.

-----Original Message-----

From:  JMoskin@foley.com
Sent:  12/7/2012 04:34:54 PM
To:  "'Copyright Office'" <cop-ad@loc.gov>
Subject:  RE: RE: 1-732432166 Assault Squad Shoulder Pads

I left you a message to discuss this.  I wanted to point out that in a recent decision,
the US District Court for the Northern District of Illinois ruled that the basic shape of
the Games Workshop shoulder pad is copyrightable (even without surface ornamentation).  I
would be happy to get you a copy of the decision.

Please also feel free to call me.

Jonathan Moskin
212-338-3572

-----Original Message-----
From: Copyright Office [mailto:cop-ad@loc.gov]
Sent: Wednesday, November 07, 2012 2:19 PM
To: Moskin, Jonathan
Subject: RE: RE: 1-732432166 Assault Squad Shoulder Pads




When replying to this email, please include the following thread id (entire line) within
the body of your response to expedite routing to the correct office.


When replying to this email, please include the following thread id (entire line) within
the body of your response to expedite routing to the correct office.

[THREAD ID:1-CV2JUR]

This claim in "text, photos, 2d artwork, sculpture" was delayed as I had not received
permission to remove certain aspects of authorship from the appl.

The email stated that the "sculpture" was to minimal (it is basically an "X") and could
not be registered.  Your email stated that the (c) notice on the package refers to the
printing date.

The "text" appears to be same as the text on the Crimson fist should pads package.  When
was the text first published/registered?  If already registered, the text cannot be
registered again.

In regards to the "2d artwork", there was no clarification from my previous email: "I see

GW0011428

what looks like graphics of the [shoulder] pads which we could register [as 2d artwork]".
Please confirm they are artwork and not photos."

Robin Jones
-----Original Message-----

From:  JMoskin@foley.com
Sent:  6/26/2012 06:29:09 PM
To:  Copyright Office <cop-ad@loc.gov>
Subject:  RE: 1-732432166 Assault Squad Shoulder Pads

My understanding is that the 2010 copyright notice simply refers to the date of printing
of this particular packaging, but that the artwork and sculpture were created and first
published in 2000 as specified.  I hope this answers your question about the dates but
please let me know.

I would also propose speaking with you to discuss the questions you have regarding the
sculptural elements.  I have included a telephone number below if you wish to call.
Obviously, I am mindful of the 20-day deadline you noted, which I believe expires
tomorrow.  I hope that while we address any remaining questions we can extend the
deadline.

Thank you

Jonathan Moskin
212-338-3572

-----Original Message-----
From: Copyright Office [mailto:cop-ad@loc.gov]
Sent: Thursday, June 07, 2012 11:30 AM
To: Moskin, Jonathan
Subject: 1-732432166 Assault Squad Shoulder Pads

Dear Jonathan Moskin:

I am examining this text, photograph(s), 2-D artwork, sculpture claim for Games Workshop.
The application gives the year of completion as 2000, and the pub date as 9/30/2000.  The
copyright notice has 2010 on the packaging.  Please clarfiy what is being registered on
the  9/30/2000 date.  I see what looks like graphics of the pads which we could register.
Please confirm they are artwork and not photos.

Also, we cannot register the sculpture portion as it is too minimal.  The text on this
package appears to be the same as Crimson fist shoulder pads and cannot be registered
again.  Please allow permission to remove sculpture and text from the application.

Please note that if we do not receive a response to this message within 20 days, we will
close this case without processing your registration or notifying you further, and forward
your deposit copy(ies) under the provisions of the current copyright law.  The fee is not
refundable.  If you re-apply for registration after the case is closed, you must send a
new application, copy and fee.  The effective date of registration will be based on the
new submission.




Sincerely,
Robin Jones
Registration Specialist
Visual Arts Division
U.S. Copyright Office

When replying to this email, please include the following thread id (entire line) within
the body of your response to expedite routing to the correct office.

[THREAD ID:1-CV2JUR]

GW0011429

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons.  If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message.  Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons.  If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message.  Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons.  If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message.  Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.


The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons.  If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message.  Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

GW0011430

# EXHIBIT 15

 **United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov

January 04, 2013

Foley & Lardner LLP
Attn: Jonathan Moskin
90 Park Avenue
New York, NY 10016
United States

Correspondence ID:   1-EFNBPX

RE:   Assault Squad Shoulder Pads

Dear Jonathan Moskin:

>       We cannot register this work because it lacks the authorship necessary to support a copyright claim.

>       Copyright protects original works of authorship that are fixed in some physical form. See 17 U.S.C. §102(a). As used in the copyright context, the term "original" means that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least a minimal degree of creativity. See Feist Publications v. Rural Telephone Service Co., 499 U.S. 340 (1991).

>       To satisfy these requirements, a work of the visual arts must contain a minimum amount of pictorial, graphic or sculptural authorship. Copyright does not protect familiar symbols or designs; basic geometric shapes; words and short phrases such as names, titles, and slogans; or mere variations of typographic ornamentation, lettering or coloring. See 37 C.F.R. §202.1. Further, copyright does not extend to any idea, concept, system, or process which may be embodied in a work. 17 U.S.C. §102(b).

>       Neither the aesthetic appeal or commercial value of a work, nor the amount of time and effort expended to create a work are factors that are considered under the copyright law. See Bleistein v. Donaldson, 188 U.S. 239 (1903); Feist Publications v. Rural Telephone Service Co., 499 U.S. 340 (1991). The question is whether there is sufficient creative authorship within the meaning of the copyright statute and settled case law.

>       After careful consideration, we have determined that this particular work will not support a claim to copyright for 2-Dimensional artwork or sculpture under the standards described above. Additionally, the text appears to be identical to the standard warning text included in another claim sent by the same party and can only be registered once. The photographs submitted are of the deposit materials and serve as identifying matter rather than photographic content that is part of the published unit. Therefore we cannot issue the registration which you requested. The copyright law requires that we retain the deposit of this work. 17 U.S.C. §704(a). The nonrefundable filing fee has been applied to administrative costs.

GW0016843

Jonathan Moskin                     - 2 -                         1-EFNBPX


For more information on copyright, please visit our website at www.copyright.gov.


This letter is for your information only; no response is necessary.

Sincerely,

*Carol Frenkel*

Carol Frenkel
Supervisory Registration Specialist
Visual Arts Division
U.S. Copyright Office

Enclosures:
    Reply Sheet

GW0016844

 **United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov

# ＊1-EFNBPX＊

# Return this sheet <u>if</u> you request reconsideration.

## How to request reconsideration:

- Send your request in writing. (It must be received in the Copyright Office <u>not later than three months after the date on the Office's refusal letter.</u>)
- Explain why the claim should be registered or why it was improperly refused.
- Enclose the required fee – see below.
- Address your request to:

   **Copyright RAC Division**
   **P.O. Box 71380**
   **Washington, DC 20024-1380**

Note: To expedite delivery, <u>write "Reconsideration" on the outside of the envelope</u>. Include the Correspondence ID Number (see above) on the first page. Indicate either "First Reconsideration" or "Second Reconsideration" as appropriate on the subject line.

**Notification of decision**: The Copyright Office will send a written notification of its decision, including an explanation of its reasoning.

**First Request for Reconsideration:** The Registration and Recordation Program Office considers the first request. If it upholds the refusal, you may submit a second request.

**Second Request for Reconsideration:** The Copyright Office Board of Review considers the second request. The Board consists of the Register of Copyrights and the General Counsel (or their respective designees), and a third member appointed by the Register. <u>The Board's decision constitutes final agency action</u>.

## FEES:

| | |
|---|---|
| **First Request** | $250 |
| Additional claim in related group | $25 |
| | |
| **Second Request** | $500 |
| Additional claim in related group | $25 |

# EXHIBIT 16

**Cooper, Bryce A.**

| | |
|---|---|
| **From:** | JMoskin@foley.com |
| **Sent:** | Wednesday, January 16, 2013 7:49 PM |
| **To:** | Cooper, Bryce A. |
| **Cc:** | JKeener@foley.com; Golinveaux, Jennifer A.; Sarah Kalemeris; Julianne M. Hartzell |
| **Subject:** | Re: GW / CHS Meet and Confer |
| **Attachments:** | image001.jpg |

We understand you want to discuss the issues raised in Sarah Kalemaris' January 14 letter (to which we are preparing a response now), Julianne Hartzell's January 14 email (which I think we already answered); scheduling depositions (of as yet unidentified witnesses) as well as the request to inspect premises.   We also want to discuss the deficiencies cited in our January 8 letter and scheduling dates for Villacci and Fiertek depositions.

However, we have also just begun reviewing CH's document production.  We may be wrong but, as best we can tell, it includes nothing from the individual designers and none of CH's advertising or promotion on the forums. We would like to be surprised to find there are no other issues regarding document production, but rather than do this piecemeal, we suggest identifying all issues regarding discovery (including document production) and having a single call later this week.

I also note (in view of your keen interest in the state of matters before the Copyright Office), that we have just received another piece of correspondence regarding the Assault Squad shoulder pad that, like the prior correspondence, is not final but invites a response; and (consistent with the email we previously produced) that studiously avoids an analysis of the facts. We will produce it after we have had a chance to review it with our client and decide on how to respond.

Jonathan

Sent from my iPhone

On Jan 16, 2013, at 4:28 PM, "Cooper, Bryce A."
<BCooper@winston.com<mailto:BCooper@winston.com>> wrote:

Counsel,

We have not heard back about your availability for a meet and confer.  We will suggest tomorrow at 1:00 cst.  Let us know if that works for you and I will circulate a dial-in, or please propose several alternatives.

Bryce

Bryce A. Cooper

Associate

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703

D: +1 (312) 558-3737

F: +1 (312) 558-5700

Bio<http://www.winston.com/index.cfm?contentID=24&itemID=15451> |
VCard<http://www.winston.com/sitefiles/wsvcard/15451.vcf> | Email<mailto:bcooper@winston.com> |
www.winston.com<http://www.winston.com>

<image001.jpg>

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. ****************************************************************************** Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.