**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>                                   Plaintiff,<br><br>             v.<br><br>CHAPTERHOUSE STUDIOS LLC,<br><br><br>                                   Defendant. | Civil Action No. 1:10-cv-8103<br><br>Hon. Matthew F. Kennelly<br>Hon. Jeffrey T. Gilbert |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S SECOND MOTION**
**FOR RECONSIDERATION OF SUMMARY JUDGMENT**

Plaintiff Games Workshop Limited ("Games Workshop"), by and through its undersigned counsel, respectfully submits this Memorandum in opposition to Chapterhouse Studio's Second Motion for Reconsideration of Summary Judgment.

**INTRODUCTION**

On December 27, 2012, Chapterhouse first sought reconsideration in part of the Court's November 27, 2012 decision concerning summary judgment based on an initial objection by the Copyright Office to registration Games Workshop's Assault Squad Shoulder Pad design. Although the Court previously advised Chapterhouse on January 8, 2013 that proceeding with its motion for reconsideration without a definite showing of finality of the refusal by the Copyright Office to register the subject work would result in sanctions, Chapterhouse has now simply re-filed essentially the same motion – continuing essentially the same legally and factually inaccurate statements about the significance of what remains, *as a matter of law* under the very Copyright Office regulations Chapterhouse cites, an initial, *non-final*, refusal to register one application filed by Games Workshop. Chapterhouse has re-filed the same motion

1

notwithstanding Games Workshop's notice to the Court (Dkt 275) that rather than seek review of the initial *non-final* decision on or before the April 4, 2013 deadline to do so (a review process that could have itself been reviewed again in a second, higher level review process by the Copyright Office), it believed it would be more efficient to have the Court decide the matter. Games Workshop's right to seek such two levels of administrative review are plainly set forth in the notice from the Copyright Office produced in discovery. (Moskin Dec. Ex B.) Indeed, although Chapterhouse alleges there has now been a "final" refusal within the meaning of 37 C.F.R. § 202.5, 37 C.F.R. § 202.5(g) defines "Final agency action" as follows: "A decision by the Review Board in response to a second request for reconsideration constitutes final agency action." No first or second request for reconsideration having been filed by Games Workshop, and the deadline to do so not having expired, the motion is simply based on an inaccurate statement of Copyright Office policy.

Because Games Workshop had already given the Court jurisdiction to resolve any remaining issues as to copyrightability surviving the prior summary judgment order, and because there are no new facts supporting a motion for reconsideration, the only apparent purpose of the motion is for Chapterhouse to continue advance inaccurate and baseless statements against the undersigned counsel (made even more plainly inaccurate in light of subsequent disclosures). Indeed, the only things that are genuinely "new" since Chapterhouse withdrew its prior motion for reconsideration (all of which are ignored by Chapterhouse) are: (i) Games Workshop advised Chapterhouse (and the Court) that Games Workshop had also omitted to alert the Court during the prior round of summary judgment briefing *or* in opposing the prior motion for reconsideration that the Copyright Office had separately granted a registration for essentially the same design – namely the Flesh Tearer Shoulder Pad (VA1 824-668) – which differed from the

Assault Squad Shoulder Pad only in surface ornamentation[1]; (ii) Chapterhouse has hired a third expert who agrees with its prior two experts that there are no historical antecedents for the shape of the Space Marine shoulder pad (*infra* p. 8-9); and (iii) Chapterhouse arranged the deposition of the sculptor of the original Space Marine (a former Games Workshop designer who left the company in 1991) who confirmed he created the design in 1985 using no particular references and had entirely fanciful inspirations in creating the shoulder pad.

As further demonstrated in Games Workshop's opposition to Chapterhouse's new motion for summary judgment (which also is solely focused on seeking reconsideration of the Court's prior ruling on the copyrightability of the Space Marine shoulder pad), the new facts that have emerged in discovery are all consistent with the Court's prior ruling. Moreover, the entire dispute over the independent copyrightability of the Space Marine shoulder pad also misses the broader point that it is undisputed that the Space Marine character as a whole is copyrightable, and Chapterhouse's copying of the shoulder pad design is an infringement of part of that overall design. The Chapterhouse copy (which its owner admitted was made with a digimeter so that the company could copy the dimensions exactly, right down to the little indents on the back of the Games Workshop original), serves no purpose in the world other than to be used on Games Workshop's Space Marine figures. Typically, Chapterhouse also uses the copy of Games Workshop's shoulder pad with the name and logo of the specific Space Marine chapter. Hence, even if Games Workshop never sold stand-alone shoulder pads, the end result would be the same: that Chapterhouse is copying an immediately recognizable part of the overall Space Marine design.

---

[1] The Copyright Office has also recently acknowledged that it will register another shoulder pad design, the Crimson Fist Shoulder Pad (see Moskin Decl Ex. E) and did previously register the Salamanders Terminator Shoulder Pads, VA-I -824-496. However, this latter design is slightly different in some of the sculptural details.

## FACTUAL BACKGROUND

Although the relevant factual background was largely set forth in Games Workshop's January 4 opposition (Dkt No. 270), it is slightly modified below, mostly to add additional facts Games Workshop neglected to note in opposing the prior motion. However, because Chapterhouse's recitation of facts continues to repeat inaccurate and misleading statements from its prior motion, it is necessary to repeat the background in some detail.

1. The Copyright Office's Non-final Refusal To Register the Assault Squad Shoulder Pad

On March 1, 2012, Games Workshop applied to register copyright in the design of an "Assault Shoulder Pad" bearing an X design characteristic of the Space Marine Assault Squad, one of over one hundred applications filed by Games Workshop. On June 7, 2012, a copyright "specialist" sent an email to the undersigned counsel for Games Workshop raising various issues regarding the work, including the date of publication, the inclusion of certain text on the packaging and the extent of copyrightable elements in the sculptural design. Without refusing registration at all (much less "flatly refusing registration" as stated by Chapterhouse (Brf at 5)), the specialist, who is the lowest level of reviewing employee in the Copyright Office, requested a response to the questions raised within twenty days. On June 26, counsel responded by addressing the question regarding publication and requesting an opportunity to speak directly with the employee. Indeed, because the Copyright Office examiner reviews the applications in isolation, and because she *mischaracterized* the shoulder pad as merely a semi-circle, she would not have been aware of the origins or meaning of the design, the uniqueness of the shape and size of the shoulder pad, the significance of the particular X symbol on it, how that symbol was uniquely associated with the Assault Space Marine squad as part of a larger range of Tactical and Devastator Space Marines, and so forth. (Nor would she have been aware of the expert

testimony of Chapterhouse's own witness attesting to the historical uniqueness of the design.) Although Games Workshop does not suggest the design is a great work of art, the examiner was unaware of any of the elements that Games Workshop contends demonstrate why it is copyrightable.

Unfortunately, the employee simply neglected the matter until November 7, 2012, when, in response to a telephone call by Games Workshop's counsel to one of her colleagues, she sent a further email that included her prior message from June. The inquiry by Games Workshop's counsel was part of Games Workshop's efforts to comply with Chapterhouse's request (made days before) that Games Workshop supplement its discovery responses from more than a year earlier. (Moskin Decl ¶¶ 4,7.) She then passed the matter to a supervisor while she went on maternity leave. Chapterhouse *falsely implies* (Brf at 5 lines 8-9) that the examiner responded promptly to Games Workshop's June 26 inquiry and that she "reiterated unequivocally" her prior position, when in fact her next email was not until November 7 and she merely re-encapsulated the thread and content of her prior June email. (Cooper Decl Ex. 5 p. 83) Indeed, the same is true of the December 11 email from the Copyright Office when it refused to discuss the matter with counsel.

Indeed, despite Games Workshop's offer to submit to the Copyright Office a copy of the Court's November 27 summary judgment decision or to confer directly with the copyright examiner, the supervisor explained in a January 10, 2013 email that the Copyright Office was unable or unwilling to consider facts or law other than those matters apparent to it from consideration in isolation of the shoulder pad specimen presented to it. As set forth in the January 10 email responding to counsel's inquiry why the Copyright Office refused to discuss the matter or consider any facts, the Copyright Office stated:

> As I believe I said earlier, Registration Specialists examine submissions for copyright using the deposit copy and application materials before them for each case. They cannot get involved in any legal matters. (Moskin Decl Ex. A.)

Curiously, Chapterhouse fails to include this email chain from January 10 and 11 in its motion, although it was provided in discovery.

Following Chapterhouse's withdrawal of its prior motion for reconsideration, Games Workshop received by ordinary mail a non-final refusal from the Copyright Office to register the subject design on or about January 14 (following counsel's January 10 and January 11 emails inquiring about the status). (Moskin Decl. Ex. B) As counsel explained in a January 16 email to Chapterhouse (after counsel had returned from Chicago where there had been a hearing that Monday, January 14), Games Workshop had just received the notice but required time to consider the matter and allow attorney and client to discuss the options before producing the notice in discovery. (Moskin Decl. Ex. C) The notice from the Copyright Office was produced in discovery on January 31. (Moskin Decl. ¶ 3.)

37 C.F.R. § 202.5(g) defines "Final agency action" as follows: "A decision by the Review Board in response to a second request for reconsideration constitutes final agency action." The January 4 initial refusal from the Copyright Office contains no substantive analysis. Rather, after setting forth certain general statements of law, the Notice says simply: "After careful consideration, we have determined that this particular work will not support a claim to copyright for 2-Dimensional artwork or sculpture under the standards described above." As set forth in the Notice from the Copyright Office, Games Workshop would have (and presumably still can) seek review of the non-final decision within three months (on or before April 4, 2013) and would then be entitled to a second level of review of any such agency decision. Although Games Workshop does not actively contemplate seeking further review, no basis is offered by

Chapterhouse for its statement that Games Workshop has "*foregone*" its right to further review by the Copyright Office. (Brf. p. 8.)

More important, in view of the Copyright Office's refusal to consider any relevant facts or law, Games Workshop thought it more efficient to turn the matter over to the Court, which it also did by notice on January 31. (Dkt No. 275.)  Under 17 U.S.C. § 411(a)[2], even if there had ever been a final agency decision by the Copyright Office denying registration, the final decision as to registrability would rest with this Court, as Games Workshop would be entitled to have this Court review such a decision.  Moreover, laying aside the possibility of a second level of review were the Copyright Office to maintain its initial position regarding registrability of the shoulder pad design, 37 C.F.R. § 202.5(b)(4) itself notes that agency action on an initial request for reconsideration will be within four months.[3]  In view of the upcoming trial date, such a lengthy delay seemed inadvisable.  However, Games Workshop is not aware of any decision by it to abandon its right to seek review.

2. Consistent With The Opinions Of Chapterhouse's Three Experts and the Testimony Of The Actual Designer of the Shoulder Pad, As Well as the November 27, 2012 Decision Of This Court, The Copyright Office Registered the Flesh Tearer Shoulder Pad

Although nowhere mentioned in Chapterhouse's motion, on March 8, 2012, Games Workshop applied to register its Flesh Tearer Shoulder Pad design.  That application was passed to registration under Registration No. VA1 824-668.  (Moskin Decl., Ex. D).  Although the Flesh

---

[2] 17 U.S.C. § 411(a) provides in relevant part that:
> In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights. The Register may, at his or her option, become a party to the action with respect to the issue of registrability of the copyright claim by entering an appearance within sixty days after such service, but the Register's failure to become a party shall not deprive the court of jurisdiction to determine that issue

[3] 37 C.F.R. § 202.5(b)(4) thus provides that "if the Examining Division again refuses to register the work, it will send the applicant a written notification stating the reasons for refusal within four months of the date on which the first request for reconsideration is received by the Examining Division"

Tearer Shoulder Pad differs from the Assault Squad Shoulder Pad in surface ornamentation only, the Copyright Office never voiced any objection to the application. However, Games Workshop omitted reference to the registration for its Flesh Tearer Shoulder Pad in connection with the parties' summary judgment motions and in opposition to Chapterhouse's motion for reconsideration. (As it happens, the Court held in its November 27 decision that the design of the Flesh Tearer icon itself was not protectable, but that the shoulder pad incorporating the design was protectable.)

The decision of the Copyright Office to register the Flesh Tearer shoulder pad is consistent with the prior testimony of Chapterhouse's first two expert witnesses as well as the testimony of its third expert witness, Carl Grindley. Indeed, in connection with the prior summary judgment briefing, Chapterhouse submitted to the Court the opinion of an expert in military history who "admitted that he could locate no same or similar representation of GW's shoulder pad design in previous military history." (Dkt. 258 at 20). Moreover, although Chapterhouse did not submit to the Court in its summary judgment papers the opinion of its other expert, with claimed expertise in science fiction, he similarly was unable to opine that Games Workshop's Space Marine shoulder pad design was similar to anything in prior science fiction. (Dkt 230-1, GW Resp to Undisputed Fact #42) Finally, at the February 21, 2013 deposition of Chapterhouse's newest expert, Dr. Grindley similarly testified as follows:

> Q. So you're unable to find any prior military shoulder pads that had those same design choices as Games Workshop?
> A. Correct. (Moskin Decl., Ex. G, Grindley Tr. 237 l. 7-10)

In a belabored response to the question whether he was aware of any designs similar to Games Workshop's, including a shoulder pad that is "very large, extending all the way to the elbow" (Id. at 216 l. 23-24) he likewise eventually conceded:

> …also with the caveat that the general description of the shoulder pads that you have
> provided differs substantially to our previous discussion of them, I would have to say
> yes, I was unable to provide you with any particular image that satisfied that full list
> of criteria.. (Id. at 218 l. 3-8.)
>
>        \*       \*       \*
>
> Q: So therefore, you are unable to state an expert opinion that that combination is
> unoriginal?
> A. Yes.
> Q. Yes, you agree with my statement?
> A. Yes, I do. (Id. at 219 l. 19-24.)

He further testified that his report offered no opinion whether the Games Workshop designs

constituted an original combination of elements. (Id. at 169 l. 20 – 170 l. 13.) Indeed, he

admitted as follows:

> Q. In searching for shoulder pads used on future infantry warriors, a human wearing a
> suit of power armor, you were not able to identify any shoulder pads that had those
> three common design elements of the Games Workshop, size, shape and banding?
> A. Correct. (Id. at 264 l. 14-20.)

This testimony of Chapterhouse's most recent expert is consistent with the testimony of

the original designer of the Space Marine, Robert Naismith, who voluntarily agreed to appear for

a deposition in England at the request of Chapterhouse itself on February 25, 2013. He testified

that he created the first Space Marine in 1985 without any direct references to guide him. (He

did acknowledge some indirect influence of Napoleonic blanket rolls and American infantry

backpacks, Roman legions helmets and medieval armor, all vastly modernized. (Moskin Decl.,

Ex. H, Naismith Tr. at 29 l. 15 - 34 l. 2.)) He explained the significance of the shoulder pad:

> Q. In the same way I asked you about the function of the helmet, does the
> shoulder pad on a Space Marine have any actual function?
> A. Its main function is this idea of communicating the presence and power of the
> Space Marine in his armor. That is the story we are trying to tell.
> Q: Does that have anything to do with the size of the shoulder pad in relation to
> the figure itself?
> A. Only insofar as because it's larger than is, if you like, it adds a presence to the
> model (Id. at 62 l. 2-23.)
>
>        \*       \*       \*

Q. What about the shoulder pads do you believe added presence on the table?
A. Very much so, yes.  I suppose the simplest thing to imagine is a Space Marine without shoulder pads.  It then goes back to being just a man.  So it is part of the signal.  If you look at American football jocks with their shoulder protectors, they look really imposing, you know, by the time they have got their helmet on and they are all 6-foot something tall, so they are big men with big shoulders, and in the real world are intimidating.   So the tie with the Space Marines was to use shoulder pads to give some of that feeling to the design, so that any normal human being standing next to a Space Marine looked like a lesser being.  (*Id.* at 33 l. 13 - 34 l. 2.)

3. <u>Games Workshop's Discovery of the Status of the Subject Application</u>

As Games Workshop previously explained, its November 5 telephone call to the Copyright Office to inquire about the status of the subject application followed the parties' telephonic meet and confer on November 2, 2012 about contemplated motions in limine, which were due to be filed November 6, 2012.  Counsel for Chapterhouse had inquired into the status of any possible communications with the Copyright Office during that call.  Among the 86 document requests and voluminous other discovery served by Chapterhouse, there had been one document request (number 37), served by Chapterhouse on September 9, 2011, calling for correspondence with the Copyright Office.  Games Workshop had produced the correspondence that existed at the time of its responses, but acknowledged during the November 2 call that it would review the subsequent correspondence to arrange for production.  As Games Workshop acknowledged in open court on January 14, the failure to recall one of 86 document requests from 8 months prior to the date of the correspondence with the Copyright Office was simply an oversight, in much the same way as was the omission of any mention of the registration of the Flesh Tearer Shoulder Pad either in connection with the prior summary judgment briefing or the first motion for reconsideration.  The suggestion it had deliberately withheld any correspondence is simply false, and Games Workshop promptly confirmed by email on November 5 (after determining that there had been such a discovery request) that it would produce the materials.

Games Workshop was, indeed, eager to produce the correspondence because, in exchange for allowing Chapterhouse to use the correspondence at trial, Chapterhouse had agreed not to require Games Workshop to incur the very substantial expense of obtaining certified copies of the registrations, which it otherwise was demanding.[4]

The further suggestion that Games Workshop had deliberately withheld the correspondence from the Court is equally incorrect and equally offensive. Obviously, Games Workshop also neglected to alert the Court that the Flesh Tearer shoulder pad design *had* been registered. Moreover, as previously explained, contrary to Chapterhouse's suggestion, Games Workshop had assumed (given the lengthy passage of time without any further objection from the Copyright Office from May to November) that the application had been or was being approved. (Moskin Decl ¶¶ 9-10.) Where the Copyright Office has objections, it typically wastes little time in making them known. Moreover, the Copyright Office has been very slow in reviewing many of Games Workshop's pending applications. (*Id.* ¶ 11.)

While Games Workshop was assembling the correspondence for production (including inquiring with the Copyright Office why there had been no further correspondence concerning the subject application (Moskin Decl ¶ 6)), but before production was made, the Court notified the parties *the very next day*, on November 6, 2012, that it would be vacating the trial date (Dkt. No. 253) and then formally vacated the trial date and pretrial conference date on November 15 (Dkt. No. 256). Shortly thereafter, the Court ruled on the pending motions for summary judgment. Moreover, in the interim Chapterhouse had announced its position (which it unhesitatingly restated to the Court during the December 12, 2012 status conference) that it recognized absolutely no duty under Rule 26(e) to update its own discovery responses. That issue was then resolved by the Court during that conference by setting a deadline to update

---

[4] That agreement has been reconfirmed by the parties in the past several days.

responses by January 31, 2013.  Without even a further request (formal or informal) from

Chapterhouse whether Games Workshop would make a sooner production of the requested

materials now that mutuality of the duty was assured (or even before the Court had confirmed the

mutuality of the duty), Chapterhouse filed its initial motion without any meet and confer.  It has

filed its second motion notwithstanding the three categories of "new" facts that are consistent

with the Court's prior decision (all of which are unaddressed) and notwithstanding the express

language of the regulations it now cites defining "Final agency action"; namely, "A decision by

the Review Board in response to a second request for reconsideration constitutes final agency

action."  37 C.F.R. § 202.5(g).

## ARGUMENT

**1.      There Is No Reason To Reconsider The Court's Summary Judgment
Opinion Regarding Games Workshop's Space Marine Shoulder Pads.**

In *Ortiz v. City of Chicago*, No. 09-cv-2636, 2011 U.S. Dist. LEXIS 53206 (N.D. Ill.

May 18, 2011), the court explained that although it has the inherent power to reconsider less than

final judgment under Rule 54(b), such motions are not favored:

> However, it is well established in this district and circuit that "'[m]otions for
> reconsideration serve a limited function: to correct manifest errors of law or fact or
> to present newly discovered evidence.'" *Conditioned Ocular Enhancement, Inc. v.
> Bonaventura*, 458 F. Supp. 2d 704, 707 (N.D. Ill. 2006) (quoting *Caisse Nationale
> de Credit Agricole v. CBI Indus.,Inc.,* 90 F.3d 1264, 1269 (7th Cir. 1996)). In regard
> to the "manifest error" prong, the Seventh Circuit has explained that a motion to
> reconsider is proper only when "the Court has patently misunderstood a party, or
> has made a decision outside the adversarial issues presented to the Court by the
> parties, or has made an error not of reasoning but of apprehension." *Bank of
> Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990); see
> also *Oto v. Metropolitan Life Ins. Co.,* 224 F.3d 601, 606 (7th Cir. 2000) ("A
> 'manifest error' is not demonstrated by the disappointment of the losing party,"
> instead it "is the 'wholesale disregard, misapplication, or failure to recognize
> controlling precedent.'"); *Bilek v. American Home Mortg. Servicing,* 2010 WL
> 3306912, at *1 (N.D. Ill. Aug. 19, 2010)**.** And with respect to the second prong, the
> court of appeals has explained that a motion to reconsider may be appropriate if
> there has been "a controlling or significant change in the law or facts since the
> submission of the issue to the Court." *Id.* Because the standards for reconsideration

are exacting, our court of appeals has stressed that issues appropriate for reconsideration "rarely arise and the motion to reconsider should be equally rare." *Id*. Defendants do not invoke a change of law or the availability of new facts; thus, the Court's consideration is limited to whether the Court previously committed "manifest error." In performing this analysis, the Court keeps in mind that "[r]econsideration is not an appropriate forum for rehashing previously rejected arguments." *Caisse Nationale de Credit Agricole*, 90 F.3d at 1270.

2011 U.S. Dist. LEXIS 53206, at *4-5.

In support of its second motion for reconsideration, Chapterhouse relies on an initial, non-final refusal by the Copyright Office. Although Chapterhouse cites 37 C.F.R. § 202.5 as proof the initial refusal is final, 37 C.F.R. § 202.5(g) itself defines "Final agency action" as follows: "A decision by the Review Board in response to a second request for reconsideration constitutes final agency action." The notice itself (Moskin Decl. Ex. B) sets forth Games Workshop's right to seek both an initial review of the decision by the Copyright Office and a further review of that initial review. Nor was the initial non-final rejection of Games Workshop's application accompanied by any analysis. Rather, after noting certain general propositions of law, it simply states, in conclusory fashion, that "After careful consideration, we have determined that this particular work will not support a claim to copyright for 2-Dimensional artwork or sculpture under the standards described above." (Moskin Decl., Ex. B) The initial refusal is also squarely at odds with the decision of the Copyright Office to register the Flesh Tearer Shoulder Pad design. Precisely for these reasons, Games Workshop elected to have the Court resolve the matter pursuant to 17 U.S.C. § 411(a) rather than take the time to pursue further administrative action or await a final decision (favorable or unfavorable) from the Copyright Office.

Although, under certain circumstances not present here, some courts have shown some degree of deference to a *final* refusal by the Copyright Office to register works, at least where

such a refusal is indeed final and sets forth *adequate reasoning* for the refusal, there has been no

such final refusal here, only an initial denial (following an initial question) with no analysis

whatsoever.  Worse still, the Copyright Office refused even to consider any further facts or law.

Even following this initial denial, Games Workshop was (and still is) entitled to take advantage

of the multi-step administrative and judicial review procedures, including: (1) a "First

Reconsideration" under §202.5(b) (which in this case would not likely be complete until August

2013[5]; and (2) and then a "Second Reconsideration" of any possible continuing refusal under

§202.5 (c), which would not be due to be filed until three months thereafter[6].   Only if this

second level of review were to be denied would the decision considered a final agency action (37

C.F.R. § 202.5(g)).  Judicial review under 17 U.S.C. § 411(a) could then also be sought.

The Copyright Office's initial decision here, unsupported by any substantive analysis,

warrants no deference at all.  In *Boyds Collection, Ltd. v. Bearington Collection, Inc*., 360 F.

Supp. 2d 655 (M.D. Pa. 2005), where, as here, an initial examiner raised questions as to

copyrightability, the Court explained that such an initial review from a low level examiner is not

the type of *policy statement* by the Copyright Office that is entitled to respect as persuasive

authority.  360 F. Supp. 2d at 661.  In language directly relevant here the court explained:

> The letters are merely responses to individual copyright applications by
> Bearington and are apparently not intended as policy statements with the force of
> law. They are authored by an examiner in the Copyright Office, not a high-level
> official, and they do not indicate the source of the interpretation or the manner in

---

[5] 37 C.F.R. § 202.5(b) provides: "First reconsideration. Upon receiving a written notification from the Examining Division explaining the reasons for a refusal to register, an applicant may request that the Examining Division reconsider its initial decision to refuse registration, subject to the following requirements" (which are set forth in the rule)  37 C.F.R. § 202.5(b)(4) indicates that the rule contemplates a response within 4 months of submission, which in this case would be August 4, 2013.

[6] 37 C.F.R. § 202.5(c) provides: "Second reconsideration. Upon receiving written notification of the Examining Division's decision to refuse registration in response to the first request for reconsideration, an applicant may request that the Review Board reconsider the Examining Division's refusal to register, subject to the following requirements." (which are set forth in the rule)  37 C.F.R. § 202.5(c)(3) provides that such a second reconsideration must be initiated within three months of the conclusion of the first review.

which it was reached. Most importantly, the letters provide no rationale or explanation for the agency's construction of the statute. Their value as "persuasive authority," and the deference owed to the agency's interpretation, is thus substantially limited.

*Id.* at 662. As explained by the Court in *Boyds,* deference to an agency opinion depends on "'the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.'" *Id.* (quoting *U.S. v. Mead Corp*., 533 U.S. 218, 228 (2001)).

As previously explained in Games Workshop's January 4 opposition brief, the five cases previously cited by Chapterhouse (and now cited again without any further authorities) are simply inapposite.[7] Most merely concern the deference owed to Copyright Office *policies*, not its factual determinations in individual applications (much less its non-final factual determinations). Only two of the cases (*Design Ideas, Ltd.* and *Norris Indus., Inc.*) even concerned specific factual determinations, but under circumstances bearing little relation to those here. The point established by all of these cases (and confirmed by more general jurisprudence cited below) is that agency factual findings in specific cases are entitled only to the deference demonstrated by the actual reasoning and support found in the decisions themselves. Here there is no analysis whatsoever and an express refusal by the Copyright Office even to entertain

---

[7] In *Natkin v. Winfrey*, 111 F. Supp. 2d 1003 (N.D.Ill. 2000), the case principally relied on by Chapterhouse, the court showed deference to copyright office *policy*, not to a specific factual finding. It is utterly irrelevant here. In *Design Ideas, Ltd. v Yankee Candle Co*., No. 10-CV-3217, 2012 U.S. Dist. LEXIS 112014 (C.D. Ill. Aug. 9, 2012), the Central District gave some deference (while also conducting its own independent analysis) to three final refusals to register a functional design (which refusals the plaintiff had never challenged), one written by a Senior Examiner another written later by the Chief of the Visual Arts and Recordation Division and each accompanied with meaningful analysis, when it sued four years after the initial refusals. In *Batjac Productions Inc. v. GoodTimes Home Video Corp.,* 160 F.3d 1223 (9th Cir. 1998), the Ninth Circuit again showed deference to copyright office *policy* as stated in the Compendium of Copyright Office Practices and not to any specific factual finding.. In *Morris v. Business Concepts*, 283 F.3d 502 (2nd Cir. 2002), the Court again showed some deference to a copyright office *policy* as stated in a Copyright Office Circular, and not to any specific factual finding. Finally, in *Norris Indus., Inc. v. Int'l Tel. and Tel. Corp.*, 696 F.2d 918 (11th Cir. 1983), the Register of Copyrights was a party to the suit contesting the copyrightability of certain allegedly utilitarian designs. The Court gave some deference to the expertise and analysis expressed by the Register throughout the case as to the distinction between an ornamental and useful article. *Id.* at 922. Moreover, the copyrights at issue in the case were subject to final refusals to register by the Copyright Office.

factual submissions or legal argument.

Hence, although the non-final initial refusal of the Copyright Office, bereft of any analysis of the facts and the law, should be entitled to no deference, the Court would, by contrast, have had discretion to give some weight to the Copyright Office's actual final decision to register the Flesh Tearer's Shoulder Pad design, 17 U.S.C. § 410(c), had Games Workshop not neglected to cite it in connection with the summary judgment motions.

As a general matter, courts have treated factual findings by administrative agencies having considerably more solemnity than either the preliminary comment made here by a low-level employee or an initial non-final refusal containing absolutely no substantive analysis, with absolutely no deference. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant . . . deference"); *Hickey v. Chicago Truck Drivers, Helpers and Warehouse Workers Union*, 980 F.2d 465, 469 (7th Cir. 1992) ("Given the informal nature of these letters, the express limitations included in the IRS letter, and the absence of any reasoning to explain the basis for the statements, we do not think that . . . either of these letters . . . is entitled to deference."); *Gryl ex rel. Shire Pharms. Grp. v. Shire Pharms Grp. Plc,*, 298 F.3d 136, 145 (2nd Cir. 2002) (" . . . SEC no-action letters constitute neither agency rule-making nor adjudication and thus are entitled to no deference beyond whatever persuasive value they might have.") Even judicial opinions from separate cases are generally hearsay and thus inadmissible. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1380-81 (Fed. Cir. 1998) (administrative law judge's finding as to extent of similarity between two patents inadmissible); *Blue Cross and Blue Shield of N.J. Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001), citing

McCormick on Evidence § 318, at 894 (3d ed. 1984). *See Barnes Foundation v. Twp. of Lower Merion*, 982 F. Supp 970, 1009 (E.D. Pa 1997) ("Civil judgments are inadmissible hearsay. Noncontested facts recited in the introduction of an opinion, which have not been litigated and which do not present the same degree of reliability that a final judgment does, are likewise inadmissible hearsay.") (citations omitted). *Accord, United States v. Jones*, 29 F. 3d 1549, 1554 (11th Cir. 1994); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1185 (E.D. Pa 1980). There is no exception in Rule 803 for anything analogous to non-final, non-contested statements of an administrative employee in the Copyright Office.

The initial non-final refusal here is simply hearsay. That the preliminary assessment here at issue is anything but final; that Games Workshop has not even attempted to respond in full to the initial action, and the initial assessment was made at the lowest level of administrative review establishes none of the criteria of reliability to create an exception to Rule 803. Even after Games Workshop's January 4 opposition to the prior motion for reconsideration, which called out the same gaps in reasoning in defendant's original motion, Chapterhouse can point to no case to the contrary and has cited no reason to believe this initial non-final action is meaningful to this litigation or to the summary judgment motion or warrants a motion for reconsideration. Instead, it has simply and incorrectly characterized the initial action as a final refusal and unfairly accused Games Workshop of hiding a harmless comment (1) despite Games Workshop's unawareness of any continuing relevance to the comment (which it assumed had been resolved in the Copyright Office and which it was not aware was subject to a discovery request from a year earlier); (2) despite its prompt agreement to rectify its prior oversight by producing all such correspondence (which it has done); and (3) despite the Copyright Office's decision to register essentially the same design for Games Workshop's Flesh Tearer Shoulder Pad, which Games

Workshop also inadvertently neglected to mention to the Court, either in connection with the prior summary judgment motions or in opposing the first motion for reconsideration.

Indeed, despite the great sound and fury raised by Chapterhouse, it fails to identify any error in the Court's decision warranting reconsideration and simply repeats the same arguments it previously raised – now two times (in its initial summary judgment briefing and its prior motion for reconsideration). Nor does Chapterhouse cite anything in the initial non-final action of the Copyright Office itself that might support reconsideration of the Court's recent decision (other than recitation of a supposed presumption that, withal, is inapplicable because the initial non-final decision includes no analysis and is not offered as a statement of Copyright Office policy). For precisely such reasons, motions for reconsideration are disfavored and limited to correcting manifest error. No such error has been shown here.

As this Court correctly found in its Summary Judgment Opinion, to qualify for copyright protection, the work need only possess "at least some minimal degree of creativity." Dkt. 258 at 18, *citing Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 519 (7th Cir. 2009). Further, "This low threshold permits even a small amount of creativity to render a product protectable under copyright law." *Id.*, citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). Unlike the low-level Copyright Office employees who have reviewed the application, this Court had before it the benefit of an expert in military history who "admitted that he could locate no same or similar representation of GW's shoulder pad design in previous military history." (11/27 Decision at 20). Moreover, although Chapterhouse did not submit to the Court in its summary judgment papers the opinion of its other expert, Chapterhouse had an expert in science fiction who similarly was unable to opine that Games Workshop's Space Marine shoulder pad design was similar to anything in prior science fiction. Likewise, Chapterhouse's third expert,

Carl Grindley, now admits that that he is unable to identify any prior combination of elements similar to the Space Marine shoulder pad.[8] The Court further had the benefit of the declarations of Games Workshop employees who were able to put the design of the shoulder pad in context with the entirety of a Space Marine character and to explain the unique sculptural characteristics of the shoulder pad and the specific scaling of the design (which Chapterhouse copied precisely, using a digimeter, right down to the little indents on the back which serve only fanciful purposes to make the shoulder pad look stronger). If one wanted to make a ovoid shape with a rim, there certainly is no requirement to use the exact dimensions. With this and other evidence before it, this Court found:

> [T]hat GW's shoulder pads involve enough originality to afford them copyright protection. The unusually large proportional size of the shoulder pads as compared to the Space Marine's head (depicted in GW's product at entry 49) is a creative addition to the common shoulder pads sometimes worn by real-life soldiers in battle. The shoulder pads created to fit onto GW's physical figurines, though more proportionally accurate, are nevertheless still larger and boxier than those typically found outside of the Warhammer 40,000 fantasy world. The Court thus concludes that GW is entitled to copyright protection as to the design of its shoulder pads. *Id.* at 20.

To that prior testimony now can be added the testimony of Games Workshop's former employee, Bob Naismith, who left the company more than twenty years ago; yet who, while residing in England, voluntarily agreed to Chapterhouse's request for deposition and who confirmed both the importance of the vastly oversized shoulder pad to the appearance of the Space Marine and the absence of any prior references used in designing it. Nor did the Court have before it the Copyright Office registration of the Flesh Tearer Shoulder Pad, to which the

---

[8] Mr. Grindley did propound some eccentric theories, including his notion that nothing is original if it has any connection to, basis in, or inspiration from any external influence. Moskin Decl., Ex. G, Grindley Tr. 143:17-22. Thus, Mr. Grindley testified that it was his expert opinion that all possible expressions of a future infantry warrior, such as a Space Marine with a shoulder pad, had been exhausted around 1990 upon the release of the movie Aliens. *Id.*, Grindley Tr. 141:24-142:7. Whatever the basis for or relevance of his views, this was, of course, five years after the creation of the Space Marine.

Court would have had discretion to give some weight under 17 U.S.C. § 410(c). Likewise, the Court did not have the benefit of the admissions of Chapterhouse's third expert, Grindley.

Although Games Workshop would have been happy to supply the Copyright Office with a copy of the Court's decision and explain the underlying facts (and would do so now, before the April 4 deadline to seek agency review, if it thought the Copyright Office would read it), the fact is the agency was unwilling to consider any such information or legal analysis. That is reflected in its opaque, one-sentence decision initially declining registration. For precisely that reason, the initial finding is entitled to no deference.

In short, Chapterhouse has not even attempted to show manifest error or any other proper basis for reconsideration. Instead, it has filed this motion to fault Games Workshop gratuitously and incorrectly for not producing documents based on one unfortunately forgotten discovery request from more than a year earlier. Games Workshop had similarly forgotten to mention materials manifestly favorable to its own case (the actual registration of the Flesh Tearer Shoulder Pad). The motion is premised on a mis-citation of applicable law and a failure to address actual Copyright Office procedures, as the very regulation Chapterhouse cites, 37 C.F.R. § 202.5, confirms there has been no "final agency action" and certainly no meaningful analysis warranting deference, and appears to be little more than an excuse to reargue the same points previously rejected twice by the Court and unfairly attack Games Workshop.

## CONCLUSION

**WHEREFORE**, Games Workshop respectfully requests that the Court deny Chapterhouse's motion in its entirety, and grant such other and further relief as the Court deems appropriate and just.

Dated:  March 13, 2013                                    Respectfully submitted,


/s/  Jason J. Keener

    Jason J. Keener (Ill. Bar No. 6280337)
    FOLEY & LARDNER LLP
    321 North Clark Street, Suite 2800
    Chicago, IL 60654-5313
    Telephone:  312.832.4500
    Facsimile:  312.832.4700
    Email:  jkeener@foley.com

    Jonathan E. Moskin
    FOLEY & LARDNER LLP
    90 Park Avenue
    New York, New York 10016
    Telephone:  (212) 682-7474
    Facsimile:  (212) 687-3229
    Email:  jmoskin@foley.com

    *Attorneys for Plaintiff*
    *Games Workshop Limited*

## <u>CERTIFICATE OF SERVICE</u>

I, Jason J. Keener, an attorney, hereby certify that on March 13, 2013, I caused to be filed electronically the foregoing PLAINTIFF'S OPPOSITION TO SECOND MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

/s/  Jason J. Keener
Jason J. Keener