# EXHIBIT

# G

```
              IN THE UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF ILLINOIS

                     EASTERN DIVISION

GAMES WORKSHOP LIMITED,        )
            Plaintiff,         )
                               )
            vs.                )
                               )  Civil Action
CHAPTERHOUSE STUDIOS LLC       )  No. 1:1--cv-08103
and JON PAULSON d/b/a          )
PAULSON GAMES,                 )
            Defendant.         )
_____)
```

DEPOSITION OF DR. CARL GRINDLEY

New York, New York

Thursday, February 21, 2013

Reported By:

CATHI IRISH, RPR, CLVS, CCR

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 2

7    February 21, 2013
8    9:09 a.m.

10    Deposition of CARL GRINDLEY, held at
11    the offices of Foley & Lardner, LLP, 90 Park
12    Avenue, New York, New York, before Cathi
13    Irish, a Registered Professional Reporter and
14    Notary Public of the State of New York.

Page 3

1    A P P E A R A N C E S :

3    FOLEY & LARDNER, LLP
4    Attorneys for Plaintiff
5        321 North Clark Street, Suite 2800
6        Chicago, Illinois 60654
7    BY:  JASON J. KEENER, ESQ.

9    WINSTON & STRAWN, LLP
10    Attorneys for Defendant
11        35 West Wacker Drive
12        Chicago, Illinois 60601-9703
13    BY:  BRYCE A. COOPER, ESQ.

Page 4

1    D R.   C A R L   G R I N D L E Y,   called as
2        a  witness, having affirmed to tell the truth,
3        was examined and testified as follows:
4    EXAMINATION
5    BY MR. KEENER:
6    Q.   Good morning.
7    A.   Good morning.
8    Q.   State your name for the record.
9    A.   My name is Carl James Grindley.
10    Q.   Where do you live?
11    A.   I live in the Bronx in New York City.
12    Q.   Have you ever been deposed before?
13    A.   I've never been deposed.
14    Q.   Since you've never been deposed, I'm
15    sure your counsel has kind of told you how this is
16    going to go but I'll lay some ground rules.
17        If at any time you don't understand one
18    of my questions, can you let me know?
19    A.   Yes, I can.
20    Q.   Since the court reporter is taking
21    everything down, can we try to avoid uh-huh,
22    huh-uh's, shakes of the heads, everything has to
23    be verbal so the transcript reads clearly.  Do you
24    understand?

Page 5

1    A.   I do understand.
2    Q.   I'll try to arrange it so we can try
3    and take a short break every hour or so but if
4    there's any time you need a break before that,
5    this is not a torture test.  Just let me know you
6    need a break.  Is that fair?
7    A.   That is fair.
8    Q.   Is there any reason you can't give your
9    full and complete truthful testimony today?
10    A.   No, there's not.
11    Q.   Have you ever testified in court
12    before?
13    A.   No, I have not.
14    Q.   Have you ever been qualified as an
15    expert witness in court before?
16    A.   No, I have not.
17    Q.   Have you ever attempted to testify in
18    court but you were not allowed to testify for some
19    reason?
20    A.   No, I have not.
21    Q.   What did you do to prepare for your
22    deposition?
23    A.   To prepare for the deposition, I met
24    with Mr. Cooper.

2 (Pages 2 to 5)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 134

1      A F T E R N O O N   S E S S I O N
2          (Time noted: 1:05 p.m.)
3   D R.  C A R L  G R I N D L E Y,  resumed and
4      testified as follows:
5   CONTINUED EXAMINATION
6   BY MR. KEENER:
7      Q.   Before the break, we talked about how
8   you said as of today, there are no new ways to
9   express the idea of a future infantry soldier.  Do
10  you remember?
11     A.   Yes, I do.
12     Q.   At what point in time did that tipping
13  point occur?
14         MR. COOPER:  Objection, calls for
15     speculation.
16         THE WITNESS:  I think sometime around
17     the turn of the millennium.
18  BY MR. KEENER:
19     Q.   Around the year 2000?
20     A.   About then, yes.
21     Q.   So was it after Games Workshop created
22  its works at issue?
23     A.   I'm not entirely sure.  Let's look at
24  these dates.  If we're looking at 124, it's

Page 135

1   before.
2      Q.   You understand based on footnote 1 of
3   your report that while this current model might be
4   2003, it's based off prior Games Workshop works
5   that go back potentially to 1987?
6      A.   Yes.
7      Q.   So that tipping point occurred after
8   1987; is that fair?
9          MR. COOPER:  I'm sorry, could you
10     repeat that?
11  BY MR. KEENER:
12     Q.   After, that tipping point occurred
13  after 1987?
14         MR. COOPER:  Objection, calls for
15     speculation.
16         THE WITNESS:  I would really have to
17     think and ponder on that for a while because
18     we're looking at a variety of different ways
19     to interpret depiction.  So for example, in
20     terms of cinematic sources, I haven't seen
21     really any originality from about the time of
22     Aliens or Starship Troopers but even slightly
23     before that, perhaps even as far back as
24     Terminator in '84, just in the scenes they

Page 136

1      show from the future, there's really nothing
2      in it.
3   BY MR. KEENER:
4      Q.   So in your expert opinion, at what
5   point did all forms of expression of a future
6   infantry soldier become exhaustive?
7          MR. COOPER:  Can you read that back?
8          (Record read.)
9          THE WITNESS:  I think I have a better
10     way of phrasing that.
11  BY MR. KEENER:
12     Q.   First, can you answer that question and
13  feel free --
14     A.   No, I really can't.
15     Q.   You're unable to answer that question?
16     A.   I think because I didn't quite word
17  this concept of tipping point properly.
18     Q.   Okay.
19     A.   And it's not so much of a particular
20  date where it became impossible.  It's more of a
21  particular date where it became evident that it
22  was impossible.
23     Q.   Okay.  In your expert opinion, as of
24  what date was it evident that it was impossible to

Page 137

1   have any new expressions of a future infantry
2   soldier?
3      A.   Approximately the year 2000 it became
4   evident.  That's not to suggest that it was
5   possible before then.  It's just that it was
6   evident around that time.
7      Q.   Are you going to express any expert
8   opinion that all forms of expression were
9   exhausted at any date prior to 2000?
10         MR. COOPER:  Objection, calls for
11     speculation.
12         THE WITNESS:  I don't believe I did so
13     in my report so I would have to say that I
14     would not.
15  BY MR. KEENER:
16     Q.   So prior to the year 2000, you have
17  knowledge that there were various ways to express
18  the concept of future infantry soldier?
19         MR. COOPER:  Objection, misstates the
20     testimony.
21         THE WITNESS:  I'm not entirely sure
22     that I could say one way or another, only that
23     I could say that it was evident after 2000 or
24     so.

35 (Pages 134 to 137)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 138

BY MR. KEENER:
1  Q.   So you do not have an expert opinion
2  one way or the other whether or not it was
3  possible to have an original expression of a
4  future infantry soldier before the year 2000?
5  A.   In order to answer that question,
6  wouldn't I need to have a fixed terminal date
7  rather than the idea that something became
8  apparent at a particular time?  So I think it's a
9  little bit difficult to answer that question in
10 that I could do any amount of continued research
11 on this, which of course I can't do, but if I did
12 that extra research I could give you a firm date,
13 but right now I can't give you a firm date but
14 except to say by 2000 it was done.
15 Q.   Let make it simpler.
16     You have not expressed any opinion in
17 your report anywhere that all forms of expression
18 of a future infantry soldier were exhausted prior
19 to the year 2000?
20 A.   Correct.
21 Q.   This idea that there is no way to
22 express originally a future infantry soldier, does
23 that apply both to Exhibit 124 of those
24

Page 139

1  guardsmen/women we saw as well as space marines?
2  A.   How are you using the term -- wait, I
3  know I'm not allowed to ask you questions.
4      When you say the word "space marines,"
5  for the purpose of this answer I'm assuming you
6  mean the Games Workshop space marine figures.
7  Q.   I'm trying to clarify when we said
8  future infantry soldiers, your meaning of that was
9  broad enough to encompass both the Games Workshop
10 guardsman figures as well as the Games Workshop
11 space marine figures.
12     Is it true that you were using that
13 term broadly to encompass both types?
14 A.   I was using that term to broadly to
15 encompass both types.  I believe there was more
16 flexibility with the overall idea of, you know, a
17 future soldier than with the particular aspects of
18 a space marine so I believe that the space marine
19 figure ossified sooner.
20 Q.   At what point do you believe in your
21 expert opinion that there are no original
22 expressions of a space marine type soldier
23 possible?
24     MR. COOPER:  Could you repeat that

Page 140

1  question?
2      (Record read.)
3      THE WITNESS:  This is a very difficult
4  question to answer because when we're thinking
5  about expressions, we can include nontangible
6  things that I don't know if they are relevant
7  or not, such as the backstory that a character
8  or characters have, or we could be just
9  considering the appearance of the characters.
10 BY MR. KEENER:
11 Q.   Let's limit it to the appearance.
12 A.   Limiting it to the appearance makes
13 that a much easier question to answer.  And
14 limiting it to the character, I would say it's
15 long done.
16 Q.   Can you give me a date?
17 A.   Probably by the very early '80s.
18 Q.   Any more specific you can give me on a
19 date?
20 A.   I would say the last nails in the
21 coffin for that were when there was a Japanese
22 anime created of Starship Troopers, I believe,
23 although I'm not entirely certain, between the
24 years 1980 and 1984.

Page 141

1  Q.   And that's not a work that you referred
2  to or rely on in any way in your expert report,
3  right?
4  A.   I'm going to check.
5      (Witness perusing document.)
6      I did not mention that work
7  specifically by name.
8  Q.   Okay.
9  A.   Although in paragraph 29, I do say
10 about power suit, "Graphic interpretations of this
11 suit have taken a number of different forms since
12 the novel's serialization."
13     In retrospect, I should have said -- I
14 should have cited the anime from the 1980s, and I
15 would like to correct my memory if I could.
16 Q.   Okay.
17 A.   When I said the year 2000, I somehow
18 had my mind set that Aliens came out in 19 -- 1997
19 when indeed it came out in 1986.
20 Q.   Okay, so that is --
21 A.   That's going to change my dating of
22 2000 to 1990 at the latest, if Aliens came out in
23 1986.
24 Q.   Is it my understanding that your

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 142

1  testimony is at least as of 1990, it became
2  evident that all types of expression of a future
3  infantry soldier had been exhausted?
4      A.   Yes.
5      Q.   And that's due to the dating of the
6  movie Aliens?
7      A.   Yes.
8      Q.   Under your rationale, would you agree
9  with me that there is nothing original in any of
10 the Chapterhouse products?
11     A.   That would depend on how a person would
12 define original.
13     Q.   And in your sense, you told me there
14 was nothing --
15     A.   In my sense, yes, I would say there's
16 nothing original.
17     Q.   Would you also say that it's your
18 opinion that the Chapterhouse products are derived
19 from Games Workshop products?
20     A.   No, I would say they are both derived
21 from the same ultimate sources.
22     Q.   Do you have any expert opinion one way
23 or the other whether or not the Chapterhouse
24 designers were referring to the Games Workshop

Page 143

1  products to design it or some ultimate source to
2  design it?
3      A.   I have no opinion on that.
4      Q.   You're not expressing any opinion
5  whether any particular Games Workshop designer
6  used any specific reference when they were
7  creating their work, are you?
8      A.   I believe I did.
9      Q.   Is that when we're talking about the
10 flamer, the lightning claw and the tank?
11     A.   I think that was either the whole or at
12 least a partial list.
13     Q.   Are you planning any expert opinions
14 whether any Games Workshop work lacks originality
15 in the copyright sense?
16     A.   I'm not an expert in copyright law.
17     Q.   What is your understanding of the word
18 "originality" when you use it?  I'm sorry?
19     A.   No, I'm formulating a response.
20         Originality would be the idea of a
21 thing wholly onto itself without an external
22 influence of any sort.
23     Q.   Okay, can something be partially
24 original?

Page 144

1      A.   No.
2      Q.   Why not?
3      A.   For the same reason you can't be
4  partially pregnant.
5      Q.   Can something be an original
6  combination of prior works?
7          MR. COOPER:  Object to the hypothetical
8      and to the extent it calls for legal
9      conclusion.
10         THE WITNESS:  I'm not sure.
11 BY MR. KEENER:
12     Q.   When you were forming your expert
13 opinions in this case, were you assuming that
14 you could have an original combination of prior
15 works?
16     A.   I was assuming that, yes.
17     Q.   And you didn't identify any original
18 combinations of prior works?
19     A.   No, I did not.
20     Q.   For example, when we were discussing
21 the Mona Lisa, you thought it was an original
22 concept to put a mustache on the Mona Lisa?
23         MR. COOPER:  Objection, misstates prior
24     testimony.

Page 145

1  BY MR. KEENER:
2      Q.   Is that right?
3      A.   No, I believe that isn't right.  I
4  believe we were looking at that whether or not a
5  work could be a derivative work.
6      Q.   And I think you testified you did not
7  think that was a derivative work and you thought
8  it was original.
9          MR. COOPER:  Objection, misstates
10     testimony.
11         THE WITNESS:  I believe we were
12     discussing the legal use of the term
13     "derivative," in which case the argument was
14     to the best of my recall that legally that
15     work would be derivative but creatively it
16     would not be derivative, which again now makes
17     it difficult to consider what we're talking
18     about is deemed original or not since it seems
19     to be clouded in the nature of what is legally
20     original or not.  So I'm kind of confused by
21     where we're going.
22 BY MR. KEENER:
23     Q.   So the mustache on the Mona Lisa you
24 believe creatively was original?

37 (Pages 142 to 145)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 146

1    A.   No, I don't, I don't think so.
2    Q.   Why not?
3    A.   Well, actually I don't know.  I'd have
4  to think about that for some time.
5    Q.   Okay.
6    A.   I think that's a matter, too, that our
7  historians haven't worked out.
8    Q.   But for the Games Workshop products,
9  you did not find any combination of prior things
10 that you thought was an original combination?
11   A.   None rise to the level of the mustache
12 on the Mona Lisa, and even then I'm not sure that
13 would qualify.
14   Q.   Did you attempt to determine whether or
15 not there were original combinations?
16   A.   By determine, I'm not entirely sure
17 what you mean.  Could you explain "determined"?
18   Q.   Was that part of your work to look at
19 whether or not any combinations used were original
20 combinations?
21   A.   By look at, do you mean view the
22 illustrations in the chart and make a
23 determination based on those illustrations?  And
24 if you do mean that, then I would have to say that

Page 147

1  I did indeed look for originality in the
2  combination of elements and wasn't able to find
3  any.
4    Q.   For any of the products?
5    A.   To the best of my recollection, I was
6  unable to find any original combinations.
7    Q.   At what point did you determine that
8  all forms of expression for infantry soldier type
9  warrior were exhausted; was that prior to or after
10 writing your report?
11   A.   I think it has been knowledge that has
12 been percolating in my mind for sometime.
13   Q.   So that --
14   A.   And yet I don't think that I ever had
15 proper impetus to write it down before.
16   Q.   So prior to seeing any of the Games
17 Workshop products, you had already formed the
18 opinion that all forms of expression of infantry
19 soldier had been exhausted?
20      MR. COOPER:  Objection, misstates
21   testimony.
22      THE WITNESS:  No, because as a scholar,
23   one is always open to having one's mind
24   changed based on new evidence.  I suppose I

Page 148

1    could change my mind again if I saw something
2    that was new, but in my opinion right now I
3    believe it to be impossible.
4  BY MR. KEENER:
5    Q.   And further, your opinion that the use
6  of the word "flamer" by Games Workshop meant that
7  that designer must have read Starship Troopers, is
8  that an opinion that you formed before or after
9  starting work on this case?
10   A.   After.
11   Q.   And what evidence did you learn
12 afterwards that made you form that opinion?
13   A.   I reread Starship Troopers.
14   Q.   And did you read any of the testimony
15 of any Games Workshop designers?
16   A.   No, I have not.
17   Q.   Why not?
18   A.   It has not been provided to me.
19   Q.   Was it something you would have wanted
20 to review prior to form your expert opinion?
21   A.   No.
22   Q.   Why?
23   A.   I'm not interested in what people claim
24 to remember or remember or influences they either

Page 149

1  consciously or unconsciously know.  You have to
2  understand that with Barthes' work on the Death of
3  Authorship that an individual's opinion of their
4  own work is wholly irrelevant.
5    Q.   So the individual artist who created
6  these works, it's completely irrelevant the facts
7  of what they believe and testified they used to
8  create these works?
9    A.   It may make for interesting anecdotes
10 but ultimately it's unimportant.  From an artistic
11 and sort of theoretic point of view, I don't know
12 how that works in a legal sense, and we must
13 remember that I'm only speaking about this from a
14 scholarly point of view.  And from a scholarly
15 point of view, the comments made by various types
16 of authors regarding their works are typically
17 dismissed as being unreliable.
18   Q.   Similarly, if an artist says that they
19 independently created an item and it happens to
20 look like something that existed in history,
21 that's not something you would want to know?
22   A.   No.
23   Q.   Why?
24   A.   It's irrelevant.

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 150

1    Q.   You don't have any personal knowledge
2  how Games Workshop created any of the products at
3  issue, do you?
4    A.   No, I don't.
5    Q.   You didn't review any of the design
6  documents or concept documents?
7    A.   No.
8    Q.   Similarly for the Chapterhouse
9  products, you don't have any opinion on what works
10 are used in those products, do you?
11   A.   None whatsoever.
12   Q.   Or whether that product was directly
13 copied from Games Workshop products?
14   A.   No.
15   Q.   You didn't speak to any of the
16 Chapterhouse designers?
17   A.   No.
18   Q.   You didn't read any of the transcripts?
19   A.   No.
20   Q.   You didn't review any of their
21 documents or e-mails?
22   A.   No.
23   Q.   You don't have any personal knowledge
24 about how they created their products?

Page 151

1    A.   No.  Up until, I guess December, I had
2  no idea they existed.
3    Q.   I'm including after that, up until the
4  time you signed your report.
5    A.   I haven't even seen their website.
6    Q.   You're not --
7    A.   I assume they have one.
8    Q.   You're not providing an expert opinion
9  one way or another whether Chapterhouse committed
10 copyright infringement, are you?
11   A.   I'm not an expert in copyright.
12   Q.   So therefore, you're not providing any
13 opinion on whether or not Chapterhouse committed
14 copyright infringement?
15   A.   Correct.
16   Q.   And are you providing any expert
17 opinion on whether or not Chapterhouse products is
18 substantially similar to Games Workshop products?
19   A.   Yes, I am.
20   Q.   And what is your opinion?
21   A.   That there are no substantial
22 similarities.
23   Q.   Between any of the products?
24   A.   Between any of the products.

Page 152

1    Q.   So while Games Workshop products are
2  substantially similar to the prior works you find,
3  it's your expert opinion that the Chapterhouse
4  products are not substantially similar to the
5  Games Workshop products?
6        MR. COOPER:  Objection, misstates his
7  testimony.
8        THE WITNESS:  What I am suggesting in
9  my opinion is that there are no substantial
10 similarities between Chapterhouse's products
11 and Games Workshop's products and that
12 insignificant similarities between the two are
13 resulting from their shared derivation in
14 prior works.
15 BY MR. KEENER:
16   Q.   Let me break that down.
17        Are you expressing an opinion that
18 Games Workshop products are substantially similar
19 to prior works?
20   A.   Yes.
21   Q.   Are you expressing any opinion whether
22 Chapterhouse products are substantially similar to
23 Games Workshop products?
24   A.   Yes.

Page 153

1    Q.   Are they?
2    A.   No.
3    Q.   Are any of the products substantially
4  similar to each other?
5    A.   No.
6    Q.   In any way?
7    A.   No.
8    Q.   Do you believe that Chapterhouse
9  products are substantially similar to the prior
10 works?
11   A.   I was not asked for that opinion.
12   Q.   Is it your opinion?
13   A.   Yeah.
14        MR. COOPER:  Objection, outside the
15 scope.
16 BY MR. KEENER:
17   Q.   I didn't hear your answer.
18   A.   Yes.
19   Q.   So it's your opinion that the Games
20 Workshop products are substantially similar to the
21 prior works, yes?
22   A.   Yes.
23   Q.   And the Chapterhouse products are
24 substantially similar to the prior works, yes?

Veritext Legal Solutions - Midwest
312-442-9087        800-248-3290        fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 154

1    A.   Yes.
2    Q.   But it's also your opinion that the
3  Games Workshop products are not substantially
4  similar to the Chapterhouse products?
5    A.   Yes.
6    Q.   It's correct that it's your opinion
7  that they are not substantially similar?
8    A.   They are not substantially similar.
9  The similarities that they share are due to a
10  mutual origin point.
11   Q.   I'm including those.  Regardless of
12  mutual origin, take the column 3 out of the
13  equation, looking at just the Chapterhouse
14  products and the Games Workshop products, are you
15  forming an opinion whether or not those products,
16  without regard to anything prior, are
17  substantially similar?
18        MR. COOPER:  Objection, asked and
19     answered.
20        THE WITNESS:  They are similar to the
21     extent they share a mutual origin.
22  BY MR. KEENER:
23   Q.   I'm excluding mutual origin.
24   A.   I can't go further from there.

Page 155

1    Q.   Assume for me none of those prior works
2  ever existed.  This is a hypothetical.  All you
3  have before you is the Chapterhouse products and
4  the Games Workshop products.  Are you forming any
5  opinion whether or not those two products are
6  substantially similar?
7        MR. COOPER:  Objection --
8        THE WITNESS:  That's --
9        MR. COOPER:  Hold on, to the
10     hypothetical that it calls for a legal
11     opinion, it's outside the scope of your
12     report.
13        THE WITNESS:  I'd actually have the
14     answer that calls for me to needlessly exclude
15     entities and I don't think logically I could
16     answer that.  It's a fallacy.
17  BY MR. KEENER:
18   Q.   Are you going to be offering any
19  opinion at trial, regardless of the prior works,
20  whether or not there's any substantial similarity
21  between Games Workshop product and the
22  Chapterhouse product?
23   A.   I cannot divorce the prior works.
24   Q.   So you will not be offering any opinion

Page 156

1  whether or not the Games Workshop products and the
2  Chapterhouse products were substantially similar?
3        MR. COOPER:  Objection, that misstates
4     his testimony.
5        THE WITNESS:  I have already said that
6     they are not substantially similar.
7  BY MR. KEENER:
8    Q.   It's my understanding you're meaning
9  that to mean except for similarities with the
10  prior works, they are not substantially similar.
11   A.   Not except.
12   Q.   What am I missing?
13   A.   Two men are wearing suits.  Both suits
14  originate in previous suits.  The similarities
15  that they therefore share would be those
16  attributes of the suit that is not encompassed by
17  previous works.  So therefore, even though the two
18  suits the two men may be wearing appear virtually
19  identical, they are indeed not and do not share
20  any substantial similarities to one another.
21   Q.   Okay.  Couldn't someone looking at
22  those two suits say those two suits are virtually
23  identical, they share many similarities, and
24  compare the pockets and the sleeves and the color

Page 157

1  and everything else, and then further go and the
2  reason they are similar is because they are both
3  off of this prior suit?
4        MR. COOPER:  Could someone do that, is
5     that the question?
6        THE WITNESS:  I suppose someone could
7     do that.
8        MR. COOPER:  Objection to the
9     hypothetical, calls for speculation.
10  BY MR. KEENER:
11   Q.   In the same instance, couldn't you look
12  at the Games Workshop products and the
13  Chapterhouse products and say they are very
14  similar and have all these similarities, yet those
15  similarities are based on a prior work?
16        MR. COOPER:  Objection, calls for
17     speculation into the hypothetical.
18        THE WITNESS:  I think that someone
19     probably could say that but it wouldn't be a
20     person well-versed in scholarship.
21  BY MR. KEENER:
22   Q.   Okay.  In your expert opinion, do the
23  Chapterhouse products and the Games Workshop
24  products share substantial similarities regardless

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 158

1  of where these similarities come from?
2      MR. COOPER: Objection, asked and
3  answered --
4      THE WITNESS: I'm sorry --
5      MR. COOPER: Give me a second. Asked
6  and answered, calls for speculation, calls for
7  a legal conclusion, outside the scope of his
8  report.
9      THE WITNESS: I'm sorry, I cannot
10  divorce the prior works from this equation.
11  BY MR. KEENER:
12     Q.  So you're unable to answer that
13  question whether or not there are similarities
14  between the Games Workshop product and the
15  Chapterhouse product regardless of where these
16  similarities arise from?
17     MR. COOPER: Same objection, and to
18  form.
19     THE WITNESS: I'm not unable to answer
20  the question. The question cannot be
21  answered.
22  BY MR. KEENER:
23     Q.  So for example, a Chapterhouse product
24  is in a space marine type armor and the Games

Page 159

1  Workshop is in a space marine type armor. Do you
2  understand that?
3      A.  No, I do not.
4      Q.  Let's turn in Exhibit B to page 11.
5          Do you see on the left-hand side a
6  Chapterhouse product called a TRU-Scale Knight
7  Praetorius.
8      A.  On page 11?
9      Q.  On the bottom of page 10 is the title
10  of that project, but the pictures start on page 11
11  and the Chapterhouse product is called a TRU-Scale
12  Knight Praetorius.
13  do you see that?
14     A.  No, I don't.
15     Q.  You don't understand those to be
16  Chapterhouse's TRU-Scale Knight Praetorius?
17     A.  They are not.
18     Q.  It's their conversion kit?
19     A.  Conversion kit is not depicted.
20     Q.  Do you understand them to be selling
21  various pieces, including legs, torso, head and
22  shoulder pads among others?
23     A.  No, I do not.
24     Q.  What was wrong with that question?

Page 160

1      A.  It's shoulder pads, torsos, legs and
2  backpacks.
3      Q.  Okay.
4          So Chapterhouse's shoulder pads, legs,
5  torsos and backpacks you understand to be
6  Chapterhouse products in the left-hand column?
7      A.  Yes.
8      Q.  And you understand the middle column to
9  have Games Workshop products that also contain
10  legs, torsos, shoulder pads and backpacks?
11     A.  Yes.
12     Q.  Are you able to have any -- do you have
13  any expert opinion on whether or not the shoulder
14  pads between the Chapterhouse product and the
15  Games Workshop product are similar?
16     A.  No, I don't believe they are.
17     Q.  Are you forming any opinion whether the
18  legs are similar?
19     A.  No, I do not believe they are.
20     Q.  Whether the torsos are similar?
21     A.  No, I do not believe they are.
22     Q.  And whether the backpacks are similar?
23     A.  I don't believe they are.
24     Q.  You don't believe they are similar in

Page 161

1  any way?
2      A.  I believe they are insignificantly
3  similar but ultimately derived from the same base
4  set of sources.
5      Q.  Now, you're adding where they are
6  derived from. My question is not where they are
7  derived from, my question is whether these two
8  pictures are similar to each other.
9      A.  We're getting bogged down again into
10  this notion of similarity.
11     Q.  Are you able to answer yes or no
12  whether two pictures are similar to each other
13  without knowing the originating source?
14     A.  I would never answer a question without
15  knowing the originating source in that sort of
16  matter.
17     Q.  You are unable to look at two pictures
18  to say whether or not they are similar without
19  understanding the originating source?
20     A.  As a lay person or as a scholar?
21     Q.  I'm asking your expert opinion.
22     A.  Then I would say no, I would not make
23  such a determination unless I had done the
24  research.

41 (Pages 158 to 161)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 162

1    Q.   Right, and you're saying the research
2  needed to say whether two pictures are similar to
3  each other depends on what source material they
4  may have come from?
5    A.   Correct.
6    Q.   Do you have an expert opinion on what
7  design elements are essential or unavoidable in
8  creating a future infantry soldier?
9        MR. COOPER:  Object to form.
10       THE WITNESS:  Could you rephrase that?
11 BY MR. KEENER:
12   Q.   Sure.  You've classified -- let me
13 restart.
14       You've stated that all the various
15 types of expressions of a future warrior have been
16 exhausted, as of 1990 at least.
17   A.   Yes.
18   Q.   Do you have in your expert opinion any
19 design elements of such a soldier that are
20 essential to a future space warrior?
21       MR. COOPER:  Same objection.
22       THE WITNESS:  It's difficult to answer
23   this question without providing you with a
24   brief analogy.

Page 163

1  BY MR. KEENER:
2    Q.   Okay.
3    A.   Sometimes when people go to, say, a
4  hair salon, they can look at different
5  possibilities for haircuts.  In the same salon,
6  there might be different possibilities for your
7  sideburns or for your mustache or beard or what
8  have you.  And what happens with that process of
9  selection is that you have to choose one way to
10 have your hair cut.  There are many ways to have
11 it cut but you must choose one of them.  There are
12 many ways that you could have your sideburns or
13 your eyebrows sculpted but you must choose one of
14 them.
15       So there is not a singular set of
16 component elements of graphic depiction of, say, a
17 future soldier.  There are, however, ranges of
18 possibility for individual items for which you may
19 make a selection, and that selection in no way
20 guarantees any sort of sense of originality.
21 You're merely choosing from a variety of stock
22 possibilities and ending up with a variant.  But
23 that variant, indeed I think all the possibilities
24 were to be exhausted.

Page 164

1        Was that helpful?
2    Q.   I think so.  Let's take an example.
3        So creating a future infantry soldier,
4  how many possibilities are there for a helmet?
5        MR. COOPER:  Objection, calls for
6  speculation.
7        THE WITNESS:  I imagine that there are
8   a fairly large number of possibilities but a
9   very small number of actual executed
10  possibilities, so just in a quick kind of run
11  through while we're sitting here, I'm trying
12  to recall every -- and this is just from film.
13  Just from film, trying to recall how many
14  different types of helmets I've seen in future
15  soldier type characters, and I don't think it
16  numbers more than three or four if you're
17  looking at basic shapes but I would have to do
18  -- and I'm uncomfortable with this sort of
19  speculation because I would really have to sit
20  down and go through films or still images.  I
21  would have to do probably a significant amount
22  of research to give you a really hard number
23  just on helmet shapes, but I would be
24  surprised if it was more than half a dozen.  I

Page 165

1  would be very surprised.
2  BY MR. KEENER:
3    Q.   Okay, so there are only around, give or
4  take, half a dozen different types of helmets all
5  future soldiers can wear?
6    A.   Not can wear, does wear.
7    Q.   And how about torsos, how many
8  different types of torsos are there?
9    A.   Well, if you include power armor, only
10 a couple really.
11   Q.   Not including just the type of power
12 armor but every expression of that type?
13   A.   Well, the expressions may be
14 insignificantly different from one another.
15 Putting an extra bauble here or there or changing
16 the paint of something isn't really significant,
17 at least from, you know, either an art or a cinema
18 or a literary point of view.  I'm sure it's
19 probably different from a legalistic point of
20 view.  But a smirch of paint here and a smirch of
21 paint there doesn't make any difference.
22   Q.   So for example, the power armor a
23 Starship Trooper might wear you're saying is the
24 same power armor that a spaceman might wear or the

42 (Pages 162 to 165)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 166

1  same as the power armor that Iron Man might wear?
2      MR. COOPER: Objection, misstates
3  testimony.
4      THE WITNESS: That's a very difficult
5  question to answer because in that mix has
6  actually been the originating image.
7  BY MR. KEENER:
8      Q.  I'm trying to understand in your count
9  of how many types of armor there are, are you
10  treating all of those as one type of armor, one
11  expression?
12     A.  It's a difficult example.  There is --
13  in that example you provided, there is one
14  expression, several incarnations, and those
15  incarnations are substantially similar to the
16  original expression.
17     Q.  Okay.  So if I understand for those
18  examples, a Starship Trooper mobile infantry and a
19  Games Workshop space marine and an Iron Man, you
20  believe they all have the same expression of a
21  power suit, just different incarnations?
22     A.  I believe that they all have -- or
23  rather if we use that example, we have Iron Man
24  and we have the space marines.  They originate in

Page 167

1  the Starship Trooper power armor.  The power armor
2  from Starship Trooper is the expression.  The
3  other two are merely incarnations.  The other two,
4  Iron Man's various suits will have an
5  insignificant level of similarities between
6  themselves and say, for example, space marine's
7  power armor, but both of them will have
8  significant similarity to the Starship Troopers
9  originating power armor.
10     Q.  So there's nothing original in the Iron
11  Man suit that's not already due to the Starship
12  Trooper influence?
13     A.  Correct.
14     Q.  And in the various different Iron Man
15  suits, there's nothing original in the later
16  incarnation versus the first Iron Man suit?
17     A.  They are basically trivially different.
18     Q.  In your mind, there's nothing original
19  about the later ones?
20     A.  No.
21     Q.  So going back to the example of
22  creating an infantry future space warrior, let's
23  assume there's five or six helmet choices and only
24  five or six torso choices and only five or six leg

Page 168

1  choices and only five or six boot choices, only
2  five or six gauntlet choices, only five or six
3  backpack choices, et cetera.  We quickly get to,
4  once you find the permutation, a very, very large
5  number of possibilities; do you agree?
6      A.  Uh-huh.
7      Q.  Yes?
8      A.  Yes, I do agree that would it be five
9  factorial, which would be -- I don't know what
10  number that would be, a very large number.
11     Q.  And so which combination of those,
12  would that be an original choice?
13     A.  It would be but it never occurs.  This
14  is the crazy thing about this particular character
15  type is that you do have a vast number of
16  permeations but you never see them.  You have
17  these possibilities and yet you end up with
18  virtually identical characters all the time.
19     Q.  Have you identified in your report or
20  your exhibit any prior work that made all the same
21  design choices as the Games Workshop space marine
22  from the helmet to the backpack to the shoulder
23  pad to the torso to the legs to the boots to every
24  other design choice?

Page 169

1      A.  I believe I already addressed that
2  saying that, A, I was never asked to do that, and
3  that that needlessly opens up a number of entities
4  that are not required, because then, of course,
5  where would I go from there?  Do I have to worry
6  about whether it is imitation polyester, imitation
7  cotton?  Do I have to worry about whether boots
8  have nine holes for shoelaces or 12?  It
9  unnecessarily adds these permeations.
10     Q.  Leaving out the level of item, which is
11  only maybe seven or eight different elements, did
12  you identify anything in the prior art that made
13  those same seven or eight choices that Games
14  Workshop did?
15     MR. COOPER: Objection to the
16  hypothetical.
17     THE WITNESS: That was never my point
18  so no, I didn't do it.  That was your point.
19  BY MR. KEENER:
20     Q.  So you are not forming any expert
21  opinion that the combination of design elements
22  chosen by Games Workshop is the same combination
23  as any of the prior works because you didn't do
24  that an analysis?

43 (Pages 166 to 169)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1     A.   I did not do that analysis.
2     Q.   You are not expressing any expert
3 opinion in your report or chart that the design
4 choices of which elements to include in the Games
5 Workshop space marine are the same combination of
6 design elements in any prior work?
7     A.   No, but I could do that if you wanted
8 me to.
9     Q.   I'm only interested in the opinions you
10 expressed in your expert report and your chart.
11 You did not form that opinion in either of those,
12 correct?
13    A.   No, I did not.
14    Q.   So you're not going to come to trial
15 and express that opinion, correct?
16    A.   Am I allowed to?  Because I think I
17 could.
18    Q.   All the opinions you're going to
19 express are supposed to be contained in your
20 report.
21    A.   Oh, then I guess I would not.
22    Q.   And can we say that's the same about
23 the other Games Workshop products in the chart,
24 that you have not expressed any opinion on whether

1 the combination of design elements chosen by Games
2 Workshop are the same combination of any prior
3 works you found?
4     A.   I'd have to look at the report.  I
5 don't believe I explicitly said that.
6     Q.   Implicitly or explicitly, have you
7 pointed to any prior works where you believe all
8 the same design choices which elements to include
9 is the same combination that Games Workshop chose?
10    A.   No, I have not.
11    Q.   You stated that there's only so many
12 ways a future infantry helmet is depicted and
13 various other features, correct?
14    A.   Yes.
15    Q.   Do you attempt to identify in your
16 report what those various ways are for design
17 elements?
18    A.   No, I do not.
19    Q.   Do you understand trademarks to be at
20 issue in this case?
21    A.   No, I do not.
22    Q.   So you're not making any opinion
23 anywhere about the use of various terms or
24 terminology, correct?

1     A.   No, I'm not, nor do I know anything
2 about trademark law.
3     Q.   I think we've covered that.
4     A.   Okay.
5     Q.   Does your report contain a complete
6 statement of each of the opinions you're going to
7 express in this case?
8     A.   That's actually difficult to answer.
9     Q.   Were you told that your report must
10 contain a complete statement of each of the
11 opinions you will express in this case?
12    A.   Yes, I was.
13    Q.   And did you attempt to do so?
14    A.   I believe that I did insomuch as the
15 complaint did.  And by this, I refer to two
16 different matters.  Matter one, when we're looking
17 at the table in its original version, there are a
18 large number of images that have been used that I
19 would imagine would be perhaps described or shown
20 to someone who was interested in this matter or
21 other ways walked through like you just did with
22 me when you said look at this torso or look at
23 these legs.
24         I am operating under the assumption

1 that how you just deposed me with that level of
2 information, I likewise would be able to walk
3 people through these images.
4     Q.   Anything else?
5     A.   I believe that would be all that would
6 be necessary.
7     Q.   Okay.  So you did not walk through the
8 various design elements in your report?
9     A.   No, neither did Games Workshop.
10    Q.   Okay.
11    A.   I assume that what they were doing
12 would be what I would be doing, which is what you
13 just did.
14    Q.   So your report did not contain a
15 complete statement of each of your opinions with
16 regards to any of the elements?
17        MR. COOPER:  Objection, misstates the
18 testimony.
19        THE WITNESS:  Yes, it does.
20 BY MR. KEENER:
21    Q.   Where does it contain a complete
22 statement of your opinions regarding the elements?
23    A.   In the images.
24    Q.   Beyond the images?

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 174

1    A.   The images are inclusive of the
2  opinion.
3    Q.   So in your opinion your report contains
4  a complete statement of the opinions you're going
5  to express?
6    A.   Yes.
7    Q.   Does your report contain a complete
8  disclosure of the basis and reason you will use to
9  support your opinions?
10    A.   Yes.
11    Q.   Does your report contain all facts
12  considered by you in forming your opinions?
13    A.   I believe it does, yes.
14    Q.   Does your report contain all data
15  considered by you in form your opinions?
16    A.   I believe it does, yes.
17    Q.   Now, let's take, for example --
18    A.   I could check a few dates but I'm
19  pretty sure it does.
20    Q.   Let's take, for example, product 124 on
21  page 2 of Exhibit 191.  Under Chapterhouse Accused
22  Products, do you see that picture there of
23  miniatures assembled and painted?
24    A.   Yes.

Page 175

1    Q.   Do you have any understanding where
2  that picture comes from?
3    A.   None whatsoever.
4    Q.   And is it your understanding, despite
5  this picture, what Chapterhouse actually sells are
6  a number of component parts?
7    A.   Yes, because that's documented on
8  page --
9    Q.   Page 3?
10    A.   Is it 3?  Yes, page 3.  "This resin
11  conversion kit contains 12 torsos, 12 legs, 12
12  heads, 12 backpacks and enough bases to assemble a
13  12 woman unit."
14    Q.   Okay.  Now as you noted, there is a --
15  maybe you haven't noted.  Let me strike that.
16         Do you see there is a URL on the bottom
17  of that description, it's on the bottom of the
18  next page?
19    A.   Yes, I see the URL.
20    Q.   Did you go to that URL?
21    A.   No, I did not.
22    Q.   Do you know if there are other pictures
23  that further show the Chapterhouse product and the
24  individual pieces on that page?

Page 176

1    A.   No, I do not.  I did not visit that
2  page.
3    Q.   Were you made aware by counsel whether
4  or not there's any additional images that shows
5  the Chapterhouse accused product?
6    A.   Not to my recollection, no.
7    Q.   Were you made aware there are physical
8  copies you could have looked at of these
9  miniatures?
10    A.   Not to my recollection, no.
11    Q.   Do you believe it would have helped in
12  any way in your analysis to see additional
13  pictures of these products and/or the actual
14  miniatures and/or the website?
15    A.   I do not believe the website would have
16  helped.
17         Actually let me rephrase that.
18         There's a number of different ways we
19  can look at the work "help."  Right now I'm going
20  to interpret the word "help" to mean assist me in
21  my report.
22    Q.   Yes.
23    A.   No, I don't believe it would have.
24    Q.   Even though that would have given you a

Page 177

1  more detailed view of the legs or the torsos that
2  Chapterhouse sells?
3    A.   How dead does a horse need to be?
4    Q.   Is that your answer?
5    A.   Yes.  Once a horse is dead, it is
6  needless to keep killing it.
7    Q.   And for each of the Chapterhouse
8  products in this chart, are your answers the same
9  that you did not look for or ask for any
10  additional pictures or look at the website or see
11  the actual products?
12    A.   That is correct.
13    Q.   So your analysis of the Games Workshop
14  products to the Chapterhouse products, even though
15  it was actually accused or miniatures, you never
16  did anything to compare them other than what's in
17  this chart; is that correct?
18    A.   I looked at the chart that was provided
19  I guess to Chapterhouse by Games Workshop.
20    Q.   Do you have any understanding on
21  whether Games Workshop provided thousands of
22  additional pictures and images?
23    A.   I have no knowledge of that.
24    Q.   So you focused your report solely on

45 (Pages 174 to 177)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 210

1  whether or not those comic books were available in
2  the United Kingdom on those dates?
3     A.   There are many different definitions of
4  the word "available." A thing could be imported
5  and sold through a gray market source. I lived in
6  Britain for four years when I was doing my Ph.D.
7  and through my experience with purchasing music I
8  knew that you could get imported items that
9  weren't officially being distributed, so they
10 would it be imported by local sellers rather than
11 released in the United Kingdom. So there could be
12 a situation where something was released in the
13 United Kingdom but still for sale there.
14    Q.   Do you have any understanding whether
15 any comic books were released in the United
16 Kingdom that you've identified?
17    A.   No, I do not.
18    Q.   Do you have any idea of when they were
19 released in the United Kingdom?
20    A.   No, I do not.
21    Q.   Do you know if they were ever released
22 in the United Kingdom?
23    A.   No, I do not.
24    Q.   Would you make the same answer with

Page 211

1  regard to the books you take pictures from, such
2  as the Palladium Book?
3     A.   Absolutely.
4     Q.   And same with the pictures of
5  miniatures you include here?
6     A.   Yes.
7     Q.   You have no idea of whether any of
8  these references were released in the United
9  Kingdom at any time?
10    A.   Correct.
11    Q.   So consequently, you have no idea
12 whether or not any Games Workshop designers saw
13 any of those references?
14    A.   No.
15    Q.   I think I've asked this question before
16 and I apologize if I have. I think we've agreed
17 the Games Workshop design of the space marine made
18 a number of design choices, correct?
19    A.   Yes.
20    Q.   Including the style of helmet?
21    A.   Yes.
22    Q.   And the style of backpack?
23    A.   Yes.
24    Q.   And the style of shoulder pads?

Page 212

1     A.   Yes.
2     Q.   Style of arms?
3     A.   Yes.
4     Q.   The style of torso?
5     A.   Yes.
6     Q.   The style of belt?
7     A.   Yes.
8     Q.   The style of legs?
9     A.   Yes.
10    Q.   The style of shoes?
11    A.   Yes.
12    Q.   As well as other design choices along
13 the way involved in each of those.
14    A.   Yes.
15    Q.   And you have been unable to find any
16 prior work that contained that same combination of
17 design choices, correct?
18    A.   I have been unable to show you
19 something that contains every single one of those.
20 I have shown you a large number of them that
21 contain either individual elements or in some
22 cases, such as the Iron Monger suit, or when I
23 talk about Toy Story's Buzz Lightyear, that
24 contain a preponderance of them.

Page 213

1     Q.   So you identified some that may have a
2  few of those elements?
3     A.   I said preponderance.
4     Q.   You're meaning more than half?
5     A.   Yes. For example, Buzz Lightyear.
6     Q.   You've not included any picture of Buzz
7  Lightyear in your report or your chart, have you?
8     A.   No.
9     Q.   So we are not going looking at any
10 picture of Buzz Lightyear at the trial, correct?
11    A.   I don't think that's for me to decide.
12    Q.   You understood you were supposed to
13 include all items you were going to use in forming
14 your expert opinion in your expert report,
15 correct?
16    A.   If I've mentioned a film, it is my
17 understanding that I have mentioned the film and
18 therefore, I get to use that film.
19    Q.   You've included the best pictures in
20 your chart that were available to you, correct?
21    A.   Yes, but if I have mentioned things in
22 my expert report, then it is my understanding I
23 get to use the items in my expert report.
24    Q.   You've included hundreds of pictures in

54 (Pages 210 to 213)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 214

1  your expert report, right?
2      A.   I have also included references to a
3  large number of films.
4      Q.   This will go quicker if you answer the
5  questions I ask.
6          You've included hundreds of picture in
7  your expert report?
8      A.   Yes, I have.
9      Q.   And you chose which pictures to
10  include?
11      A.   Yes.
12      Q.   And you've attempted to include the
13  best representative pictures available to you?
14      A.   And the most expedient to obtain.
15      Q.   Did you attempt to include in your
16  report the best example pictures that you were
17  aware of?
18      A.   What I attempted to do in my expert
19  report was to include the best pictures that I had
20  available at the time and to make textual mention
21  of items which I was unable to expediently obtain.
22      Q.   So you were unable to obtain any
23  picture of Buzz Lightyear from the end of December
24  to January?

Page 215

1      A.   Yes, I believe it slipped my mind.
2      Q.   So again, back to the basic question,
3  out of all the design choices Games Workshop made
4  in making its space marine, you have been unable
5  to find any prior work with those same design
6  choices, all of them, start there?
7      A.   Yes, I have been unable to find an
8  absolutely identical element-by-element copy of
9  the Games Workshop figure.
10      Q.   And you've been unable to find one that
11  contains the same backpack, the same shoulder pad,
12  the same torso, and the same legs, that
13  combination?
14      A.   Yes, I have been unable to find
15  something that is absolutely identical.
16      Q.   That's not my question.  My question is
17  with the same design choices that Games Workshop
18  made for the head, backpack, torso, shoulder pads
19  and legs.
20      A.   If I may repeat your question back to
21  you so that I know it and then answer it myself,
22  you're asking if I have found an identical set of
23  decisions that were made by any other designer in
24  envisioning a similar item?

Page 216

1      Q.   Yes.
2      A.   No, I have not.
3      Q.   And not to the level of how many
4  shoelaces it has but to the level of type of head,
5  type of torso, the type of backpack, the type of
6  shoulder pads and the type of legs.
7      A.   I believe when we went through this,
8  especially with reference, for example, to the
9  shoulder armor, you did go to the level of
10  shoelaces.
11      Q.   Again, my question is:  The level I'm
12  giving you now, did you find any prior work with
13  those five same design choices?
14      A.   I believe that that question is not
15  specific enough in that when we were discussing
16  these different design elements, the level of
17  detail that you put into the discussion of the
18  design elements is now much, much greater than the
19  level of detail you're now asking me to comment
20  upon, so the question is unanswerable in that
21  form.
22      Q.   Let's put a little more detail in it.
23          Let's assume the shoulder pad is very
24  large, extending all the way to the elbow, and the

Page 217

1  shape, that Games Workshop chose its shape, the
2  backpack is in the shape Games Workshop chose, the
3  torso includes the portion showing the abdominals
4  and the cutout for the abdominals, as well as a
5  belt, and the legs have that overlarge knee
6  shield.
7          With only those details, were you able
8  to find any prior work that included that same
9  combination of details?
10      A.   I do not believe that those list of
11  details were the same ones that we used in our
12  discussion of these different images.
13      Q.   I just gave you a new question though.
14      A.   I know you did.
15      Q.   Answer my question.
16      A.   That question doesn't really logically
17  follow from the discussion we had.  I know it's a
18  new question.
19      Q.   It's a new question.
20      A.   It's a new question, but it's a
21  question that's -- I mean it's -- allow me to
22  think about it for a minute.
23          With the caveat that I believe that the
24  list of attributes you've given me is arbitrary,

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 218

1 and somewhat misleading, in that I believe several
2 sets of them can be found in these images, I would
3 say -- and also with the caveat that the general
4 description of the shoulder pads that you have
5 provided differs substantially to our previous
6 discussion of them, I would have to say yes, I was
7 unable to provide you with any particular image
8 that satisfied that full list of criteria.
9     Q.   So as you sit here today, it's your
10 expert opinion that you were unable to find any
11 prior work with that combination of elements?
12     A.   So in my understanding, the importance
13 of what you're trying to get at is --
14     Q.   I'm not asking about the importance.
15 Again, just answer the question I asked.
16     A.   Yes, there is no illustration that
17 contains all of these elements.
18     Q.   So you were unable to find any prior
19 work with that combination of elements?
20     A.   I suppose I could have found some if I
21 had more time.
22     Q.   You were unable to find any prior work
23 with that combination of elements, correct?
24     A.   Yes.

Page 219

1     Q.   So as far as you know, based on sitting
2 here today, that combination is an original
3 combination?
4         MR. COOPER:  Objection, misstates
5     testimony.
6         THE WITNESS:  If I had more time to do
7     research, I suppose I might or might not be
8     able to find it.
9 BY MR. KEENER:
10     Q.   As you sit here today, that is an
11 original combination?
12     A.   That's impossible to tell.  Just
13 because I do not know of something's existence
14 does not affect whether or not that thing exists.
15     Q.   You are unable to make any opinion that
16 that combination is unoriginal?
17     A.   Nor am I able to make any opinion
18 whether it's original.
19     Q.   I agree.  So therefore, you are unable
20 to state an expert opinion that that combination
21 is unoriginal?
22     A.   Yes.
23     Q.   Yes, you agree with my statement?
24     A.   Yes, I do.

Page 220

1     Q.   Let's talk about shoulder pads.
2     A.   Yes.
3     Q.   I believe it's your opinion that in
4 medieval times they tended to not use overlarge
5 shoulder pads; is that correct?
6     A.   Not wholly correct.  During medieval
7 and Renaissance times, there were overly large
8 elements of shoulder armor but they were reserved
9 for specific functions that required the shoulder
10 to be wholly immobile.
11         So for example, there was a specific
12 type of armor plate known as a grand guard which
13 goes over the shoulder, existing shoulder armor to
14 prevent motion of the arm and to prevent motion of
15 the head and provide a small amount of additional
16 protection to the chest for use in jousting where
17 it would be required for the participant's right
18 arm or left arm if he were left-handed to be fixed
19 into place.
20     Q.   Would you agree that at least in
21 medieval times there are a number of different
22 designs of shoulder pads that were used?
23     A.   They all follow a very basic similarity
24 in that they have to have structural integrity and

Page 221

1 allow for the correct articulation of the shoulder
2 joint, so they are indeed limited to sort of
3 variety.  They can differ insignificantly from one
4 another but they all follow the same basic variety
5 or same basic property.
6     Q.   They can differ in size?
7     A.   Not usually.
8     Q.   They can -- they were all small?
9     A.   They were all articulated to the joint
10 of a human shoulder.
11     Q.   Could they differ in shape?
12     A.   Only inasmuch as they would be used as
13 an articulated shoulder joint.
14     Q.   But there were a number of different
15 shapes available?
16     A.   They all basically follow the pattern
17 of the human shoulder.
18     Q.   So is it your expert opinion that they
19 follow the same shape?
20     A.   It all depends what sort of armored
21 piece you're talking about.
22     Q.   I'm talking about shoulder pads used in
23 medieval times.
24     A.   There are a fairly large number of

56 (Pages 218 to 221)

Page 222

1 different types of things from ailettes to
2 spaulders to pauldrons to grand guards, and if we
3 just look at pauldrons, then they are going to be
4 basically the same shape.
5    Q.   Would you classify Games Workshop's
6 shoulder pads as a pauldron?
7    A.   Yes.
8    Q.   Does a pauldron include the armor that
9 goes on the arm?
10   A.   No.
11       (Plaintiff's Exhibit 192, document Bates
12   labeled CHS EXPERT00000012 through 027, marked
13   for identification.)
14 BY MR. KEENER:
15   Q.   I'm going to show you what's been
16 marked as Plaintiff's Exhibit 192, which is a
17 collection of pictures produced at CHS EXPERT 12
18 through 27.
19       Do you recognize these pictures?
20   A.   Yes, I do.
21   Q.   And did you take these pictures?
22   A.   Yes, I did.
23   Q.   And these were pictures you took at a
24 museum?

Page 223

1    A.   At the Metropolitan Museum in
2 New York City.
3    Q.   Different types of shoulder armor?
4    A.   Yes.
5    Q.   Let's start with the picture on the
6 first page labeled page 12. How would you
7 describe the shape of this piece of shoulder
8 armor?
9    A.   I would describe it as being an
10 articulated piece of shoulder armor that has a
11 sort of hemispherical top section, some
12 articulation below the actual ridge of the
13 shoulder, the start of the arm, to allow the arm
14 free motion, and a reinforced neck guard.
15   Q.   As well as an extension that goes
16 across the breast?
17   A.   Yes, a slight extension that goes
18 across the breast.
19   Q.   And that would be a very different
20 shape than Games Workshop's shoulder pad, correct?
21   A.   Yes, it would.
22   Q.   Now, you've said before Games
23 Workshop's shoulder pads is hemispherical. Do you
24 recall that?

Page 224

1    A.   When did I say that?
2    Q.   I think in your report, you classify it
3 as a hemispherical --
4    A.   Yes.
5    Q.   Do you believe it's hemispherical?
6    A.   Yeah, I think you could call it
7 hemispherical.
8    Q.   Do you think if you put four of those
9 together, you'd get a sphere?
10   A.   You'd get more like an egg.
11   Q.   Like an ovoid?
12   A.   Yes.
13   Q.   Sort of like a quarter of an ovoid?
14   A.   Yes, you could call it that.
15   Q.   And the picture on page 12 is not a
16 picture of an ovoid, would you agree?
17   A.   Yeah I would agree that it's not a
18 quarter of an ovoid.
19   Q.   So this shoulder armor has
20 articulation?
21   A.   Yes.
22   Q.   It has a neck guard?
23   A.   Yes.
24   Q.   It has a piece extending towards the

Page 225

1 center of the chest?
2    A.   Yes.
3    Q.   And it has some sort of ribbing going
4 along the edge of the shoulder pad?
5    A.   Yes, some sort of decorative edging.
6    Q.   Let's take a look at the next picture
7 on page 13. Is this another design a shoulder
8 pad?
9    A.   Yes, it is.
10   Q.   And is this shoulder pad integrated
11 with the chest armor?
12   A.   Yes, it is.
13   Q.   So it's kind of one piece with the
14 chest?
15   A.   Yeah, this is an additional plate one
16 would wear over the top of one's armor.
17   Q.   Do you see any banding around the edge
18 of the shoulder pad?
19   A.   No, I do not.
20   Q.   And you wouldn't call this oversized,
21 would you?
22   A.   Yes, I would.
23   Q.   Why?
24   A.   Because it is. It is massively

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 226

1 oversized to protect the participant from
2 jousting.
3 Q. So this would be one of your grand
4 guards?
5 A. Yes. Look at the elbow piece, for
6 example. There's really no way for you to bend
7 your arm wearing that elbow piece.
8 Q. Would you agree it's not as large as
9 the shoulder pad that Games Workshop uses?
10 A. It's difficult to tell because that
11 would require knowledge of the backstory.
12 Q. Do you see how the Games Workshop torso
13 is kind of dwarfed by the shoulder pads?
14 A. Yes.
15 Q. That's not the case in your picture on
16 page 13, is it?
17 A. Yes, it is.
18 Q. You believe --
19 A. This is a unit. This is a single
20 thing. So it indeed blocks the chest through its
21 mere construction.
22 Q. You would agree Games Workshop is not a
23 unitary shoulder pad as the one depicted here on
24 page 13?

Page 227

1 A. I would agree, yes.
2 Q. Page 14 is yet another picture of
3 shoulder armor?
4 A. Yes.
5 Q. And this one has articulation in it?
6 A. It has articulation.
7 Q. Unlike the Games Workshop shoulder pad?
8 A. Yes.
9 Q. Is that a unitary piece again with a
10 chest armor?
11 A. No, it is not.
12 Q. And the picture has some sort of half
13 circle ridge along the bottom of it?
14 A. Yes, it does.
15 Q. Unlike the Games Workshop design?
16 A. Yes.
17 Q. So again, this is another potential
18 design for a shoulder pad?
19 A. Yes, this one is actually a very common
20 design, and I reproduced this to show the
21 elaborate decoration that can be found on shoulder
22 armor.
23 Q. And this common design is not the one
24 Games Workshop used?

Page 228

1 A. No.
2 Q. Let's look at the next one on page 15.
3 This is another design of shoulder armor?
4 A. Yes, it is.
5 Q. And this one has banding all throughout
6 it?
7 A. It has banding and it also has the
8 ridge running around it.
9 Q. And this one is not a quarter of an
10 ovoid, is it?
11 A. No, it is not.
12 Q. So it's again another shape of a
13 shoulder pad?
14 A. It is indeed.
15 Q. Page 16, is this another shape of a
16 shoulder pad?
17 A. Yes, it is.
18 Q. Again, this is an articulating one?
19 A. Yes, it is.
20 Q. And it's not a quarter of an ovoid?
21 A. No, it is not. It does have the
22 decorative border around it, the edging.
23 Q. Page 17, is that another --
24 A. And it is decorated with --

Page 229

1 Q. Again, if you answer the questions I
2 ask, I didn't ask anything about decorations.
3 On page 17, is this another picture of
4 shoulder armor?
5 A. Yes, that's another grand guard.
6 Q. And again, that is not a half an ovoid?
7 A. No, it is not.
8 Q. And it's got curving around the edge of
9 its shape?
10 A. Yes, it does.
11 Q. And is that a unitary piece with the
12 chest armor?
13 A. Yes, it is.
14 Q. Again, those are different choices than
15 Games Workshop's shoulder pad, correct?
16 A. Yes.
17 Q. Page 18, is this another type of
18 shoulder pad?
19 A. Yes, it is.
20 Q. And again, it's not a quarter of an
21 ovoid?
22 A. No, it's not.
23 Q. And again, it's articulating?
24 A. Yes, it is.

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1    Q.   And again, it has various curves to it
2 instead of the straight lines of the Games
3 Workshop?
4    A.   Yes.
5    Q.   So it's yet another design of a
6 shoulder pad?
7    A.   Yes, it is.
8    Q.   Page 19, is this yet another different
9 design of a shoulder pad?
10   A.   Yes, it is.
11   Q.   And again, it's not the same shape as
12 Games Workshop?
13   A.   That is correct.
14   Q.   And it's articulating instead of Games
15 Workshop's design?
16   A.   Yes.
17   Q.   Page 20, is this another type of
18 shoulder pad?
19   A.   Yes, it is.
20   Q.   Again, a different design from that
21 chosen by Games Workshop?
22   A.   Yes, but very similar.
23   Q.   It has articulations?
24   A.   It does, so yes.

1    Q.   It has a large protrusion out from the
2 shoulder to protect the neck?
3    A.   Yes, it does.
4    Q.   And Games Workshop does not have that,
5 does it?
6    A.   No, Games Workshop does not.
7    Q.   It has various curves along it that
8 Games Workshop does not have?
9    A.   That is correct.
10   Q.   Page 21, is this yet another potential
11 design of a shoulder pad?
12   A.   Yes, it is.
13   Q.   And again, it has articulation?
14   A.   Yes.
15   Q.   Again the shape is not a quarter of an
16 ovoid?
17   A.   Almost, but not.
18   Q.   It's not?
19   A.   No.
20   Q.   And again, it has curves along the side
21 that are unlike Games Workshop?
22   A.   Yes.
23   Q.   Page 22, same answers, it's a different
24 shape and different design?

1    A.   Yes.
2    Q.   And it has articulation?
3    A.   Yes.
4    Q.   Page 23, same answers?
5    A.   It's the same piece of armor.
6    Q.   Page 24, same answers?
7    A.   No, different answers.
8    Q.   Okay.  Is this again another choice of
9 design for shoulder armor?
10   A.   Yes, it is.
11   Q.   And this has banding all throughout it?
12   A.   Yes, it does.
13   Q.   And it's not a quarter of an ovoid?
14   A.   Yes, it is.
15   Q.   You believe it is?
16   A.   I do.
17   Q.   You put four of these together, you
18 make a perfect ovoid?
19   A.   Not a perfect ovoid.  You do make an
20 ovoid.
21   Q.   In Games Workshop, if you put four of
22 them together, do you get a perfect ovoid?
23     MR. COOPER:  Objection to form.
24     THE WITNESS:  I don't know.

1 BY MR. KEENER:
2    Q.   Looking at the shapes and pictures, do
3 you have an opinion one way or another?
4    A.   I would have to do it.
5    Q.   At the top of the Games Workshop
6 shoulder pad, do you see how it's a continuous
7 curve and straight?
8    A.   Yes.
9    Q.   And do you see a different design on
10 the one on page 24 where it curves away from the
11 neck?
12   A.   Yes, I do.
13   Q.   So that's a different shape than that
14 of Games Workshop, correct?
15   A.   Different only in the trivial degree.
16   Q.   It's a different shape, correct?
17   A.   Yes, it is.
18   Q.   And do you see on the shoulder pad on
19 page 24 how the bottom of the shoulder pad flares
20 away?
21   A.   Yes, I do.
22   Q.   And Games Workshop's does not flare
23 away, does it?
24   A.   No, it does not.  Actually I can't tell

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 234

1   from the images.
2       Q.   You're not making an expert opinion one
3   way or the other on that issue, are you?
4       A.   On the flaring, no.  I would actually
5   have to see the Games Workshop pieces.
6       Q.   And you never asked to see them?
7       A.   No, I did not.
8       Q.   Page 25, is that another potential way
9   to protect the shoulder?
10      A.   Yes, it is.
11      Q.   Again, a different shape than that
12  chosen from Games Workshop?
13      A.   Yes.
14      Q.   And it's not a quarter of an ovoid?
15      A.   No.
16      Q.   And it has articulation?
17      A.   Yes, it has articulation.
18      Q.   Same answer for the next picture on
19  page 26?
20      A.   Yes.
21      Q.   Page 27, is that yet another picture of
22  a shoulder armor?
23      A.   Yes.
24      Q.   Again, a different shape than Games

Page 235

1   Workshop?
2       A.   Yes.
3       Q.   Looking at all those pictures, we saw a
4   large number of different ways to design a
5   shoulder pad, correct?
6       A.   No, we did not.  We saw a small number
7   of ways to design shoulder armor.
8       Q.   You could choose whether to have
9   articulation or not?
10      A.   Yes, you could, but only based on the
11  functionality of it.
12      Q.   You could choose whether or not to make
13  it large and oversized or not?
14      A.   The oversized nature of it deals with
15  the same decision point as the articulation.
16      Q.   You could decide whether or not to have
17  a trimming or band along the outside?
18      A.   No, apparently if you've made the
19  decision to wear an articulated element of armor
20  in that position, all the images that I provided
21  do appear to have the banding on the outside.
22      Q.   So if you didn't have articulating
23  armor, it would be unusual to have banding?
24      A.   I don't know.  I would have to take a

Page 236

1   look at a lot more but that does appear to be the
2   case.
3       Q.   You could choose whether or not to have
4   a straight bottom on the shoulder pad or some sort
5   of curve?
6       A.   Again, that would be a decision I think
7   that would take place when you're deciding whether
8   or not this is an articulating piece or
9   nonarticulating piece.  Early articulating pieces
10  seem to have a cutout to allow for motion of the
11  shoulder, whereas the ones that are fixed in place
12  do not seem to have that cutout.
13      Q.   You could decide whether or not the
14  shoulder pad should extend into the chest region
15  or not?
16      A.   Yes.
17      Q.   You could decide whether the shoulder
18  pad should have an extension that comes away from
19  the shoulder pad to protect the neck?
20      A.   Yes.
21      Q.   You could decide whether a shoulder pad
22  should be a particular shape or not?
23      A.   To some degree, yes.
24      Q.   And as far as you could tell from

Page 237

1   looking at all these medieval choices, none of
2   them made the same design choices of Games
3   Workshop of having a quarter of an ovoid that's
4   oversized with banding around the edge and with
5   straight edges?
6       A.   That is correct.
7       Q.   So you're unable to find any prior
8   military shoulder pads that had those same design
9   choices as Games Workshop?
10      A.   Correct.
11      Q.   Turn to page 11 of your expert report
12  on paragraph 33.  You have a section entitled
13  Heroic Scale.
14          I think you've testified before that
15  you are not an expert in miniature wargaming; is
16  that correct?
17      A.   That's correct.
18      Q.   Not an expert in the design of
19  miniatures?
20      A.   No.
21      Q.   And except for playing with a few dozen
22  or two dozen miniatures when you were 12 to 14
23  years old, you've had no experience with
24  miniatures whatsoever?

60 (Pages 234 to 237)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 238

1     A.   That's correct.
2     Q.   So what basis do you have to provide an
3 expert opinion on important aspects of the design
4 of miniatures?
5     A.   Just my experience from when I was a
6 teenager.
7     Q.   But you agreed with me that does not
8 qualify you as a an expert in the design of
9 miniatures, correct?
10    A.   Yes.
11    Q.   So you have no ability to provide any
12 expert opinion on important aspects in the design
13 of miniatures, do you?
14         MR. COOPER:  Objection to the extent it
15    calls for a legal conclusion.
16         THE WITNESS:  I don't actually know.
17 BY MR. KEENER:
18    Q.   You agreed you're not an expert in the
19 design of miniatures?
20    A.   By expert, what sort of expert do you
21 mean, legal expert or just someone who knows about
22 miniatures?
23    Q.   You testified before you were not an
24 expert in the design of miniatures.

Page 239

1     A.   Yes.
2     Q.   What meaning were you intending when
3 you said that?
4     A.   I was imagining that I was using
5 like -- I don't know actually, I don't know now.
6 I'm not a legal expert on it and I don't think I'm
7 actually a practical expert on it.  I just had
8 experience as a child with the miniatures.
9     Q.   Other than the two years when you were
10 12 years old that you played with miniatures, you
11 have no experience in miniatures at all?
12    A.   No, I do not.
13    Q.   And no experience in the design of
14 miniatures?
15    A.   No, I do not.
16    Q.   So you are not qualified to identify at
17 all any important aspects needed in the design of
18 miniatures, correct?
19         MR. COOPER:  Objection to the extent it
20    calls for a legal conclusion.
21         THE WITNESS:  Other than on a practical
22    basis, no.
23 BY MR. KEENER:
24    Q.   And the practical basis is just your

Page 240

1 layman common sense?
2     A.   Yes.
3     Q.   No expert basis?
4     A.   Well, in general art historical
5 context, there are issues of scale in both
6 medieval and Renaissance figure wall art.
7     Q.   I'm not asking about wall art?
8     A.   I know you're not.  I'm giving you
9 context on why I would still have the same
10 experience but based a scholarly reason rather
11 than with miniatures.
12         So I would say that although I do not
13 have experience with miniatures, I could speak to
14 the disproportionality of scale to allow for
15 easier identification of iconographic elements.  I
16 would feel confident saying that.
17    Q.   And that's not expressed anywhere in
18 your opinion?
19    A.   No, it is not.
20    Q.   So based on what's expressed in your
21 report about important aspects in the design of
22 miniatures, you agree that's not something that
23 you have any expertise in?
24         MR. COOPER:  Objection, misstates

Page 241

1    testimony, calls for a legal conclusion.
2         THE WITNESS:  I am not sure whether my
3    art history background enables me to have an
4    opinion on miniatures in the way that a court
5    would understand an opinion on miniatures.
6 BY MR. KEENER:
7     Q.   You agree you're not having any
8 expertise in the design of miniatures, correct?
9     A.   Correct.
10    Q.   Or their use in tabletop gaming,
11 correct?
12    A.   Correct.
13    Q.   Let's turn to page 12 of your report.
14 On page 12 there's a picture.  What's that picture
15 of?
16    A.   There are two pictures on page 12.
17    Q.   What is the picture on the left?
18    A.   The picture on the left is an AT-AT
19 driver's armor from Empire Strikes Back.
20    Q.   So although you in the text talk about,
21 quote, a Storm Trooper --
22    A.   Yes.
23    Q.   -- that's not the picture of a Storm
24 Trooper that most people would recognize from the

61 (Pages 238 to 241)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 258

1  Q.  And again, the picture next to it again
2  appears to be a cloth shoulder pad; is that right?
3  A.  That's for difficult to tell.
4  Q.  Can you tell either way?
5  A.  Not really, no.
6  Q.  And again, it's yet another design a
7  shoulder pad?
8  A.  Yes, it is.
9  Q.  Different than Games Workshop's?
10  A.  Yes.
11  Q.  On page 14, you have a picture labeled
12  Michael Devlin.  Do you see that?
13  A.  Yes, I do.
14  Q.  And this is yet another design of a
15  shoulder pad?
16  A.  Yes.
17  Q.  For a future space warrior?
18  A.  Yes.
19  Q.  And this one is kind of a two-piece
20  shoulder pad?
21  A.  Yes.
22  Q.  We can't see the back.  It could be a
23  three-piece?
24  A.  It could be.

Page 259

1  Q.  With a large square type section as one
2  of the pieces?
3  A.  It looks to be square, yes.
4  Q.  And it's attached to another shoulder
5  pad that has what you might call a cutout in it?
6  A.  Yes.
7  Q.  And that's a different design than
8  Games Workshop's shoulder pad?
9  A.  Yes, it is.
10  Q.  And this one doesn't have the ribbing
11  along it like Games Workshop's does?
12  A.  No, it doesn't.
13  Q.  So it has a different design of a large
14  shoulder pad?
15  A.  Yes.
16  Q.  On page 15, you have two pictures from
17  Robert Heinlein, correct?
18  A.  That is correct.
19  Q.  And again, those show additional
20  options and design for shoulder pads for future
21  warriors?
22  A.  Yes.
23  Q.  And again, they are both different
24  designs than that chosen by Games Workshop?

Page 260

1  A.  Yes.
2  Q.  And on page 15 again, you have a
3  picture from Dreadstar?
4  A.  Yes.
5  Q.  Is that a robot?
6  A.  Yes.
7  Q.  So this is not a human inside of a
8  powered suit of armor?
9  A.  No.
10  Q.  So they are not shoulder pads, they are
11  actually part of the robot's skin or skeleton as
12  it were, correct?
13  A.  Exoskeleton, yes.
14  Q.  And you don't know if that picture was
15  ever released in the United Kingdom, do you?
16  A.  No, I do not.
17  Q.  Or what date it would be if it was?
18  A.  No, I don't.
19  Q.  And page 16, the Armored Trooper
20  picture is again another style of shoulder pad?
21  A.  Yes.
22  Q.  But again, this is a robot, not a
23  powered suit of armor for a human, correct?
24  A.  I believe so.

Page 261

1  Q.  And again, this is a different style
2  shoulder pad than the one chosen by Games
3  Workshop?
4  A.  Yes, it is.
5  Q.  And similarly, you have four pictures
6  from the Chronicles of Riddick.  Do you see that?
7  A.  Yes.
8  Q.  And that came out quite a bit after
9  Games Workshop's space marine design, correct?
10  A.  Yes.
11  Q.  Yet again, those feature another four
12  different potential designs for shoulder pads?
13  A.  Yes.
14  Q.  And each of them different than Games
15  Workshop's design?
16  A.  Yes.
17  Q.  And that's the extent of your pictures
18  for shoulder pads, correct?
19  A.  Yes.
20  Q.  So we've looked at a large number of
21  different potential shoulder pad designs?
22  A.  Yes, a large number.
23  Q.  On both medieval times and from science
24  fiction area?

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 262

1    A.   That's correct.
2    Q.   And you saw a variety of different
3 designs of shoulder pads, although they all
4 protect the shoulder?
5    A.   Yes.
6    Q.   You could have different shapes?
7    A.   You can have different shapes.
8    Q.   You can have different sizes?
9    A.   You can have different sizes.
10    Q.   You can have different banding?
11    A.   You can have different banding.
12    Q.   Different decorations?
13    A.   Different decorations.
14    Q.   Different straight lines or curve
15 lines?
16    A.   Yes.
17    Q.   Differences whether it is articulated
18 or not articulated?
19    A.   Yes.
20    Q.   Or how many articulations?
21    A.   Yes.
22    Q.   Whether or not it extends toward the
23 chest?
24    A.   Yes.

Page 263

1    Q.   Whether or not they extend towards the
2 shoulder?
3    A.   Yes.
4    Q.   Whether they have any additional neck
5 protection?
6    A.   Yes.
7    Q.   Whether they are integrated with the
8 rest of the armor?
9    A.   Yes.
10    Q.   And other choices?
11    A.   Yes, there are a very large number of
12 choices.
13    Q.   And you did not find any shoulder pad
14 design that made all the same choices that Games
15 Workshop did in designing its space marine
16 shoulder pad, did you?
17    A.   I did not find any that were identical
18 in every aspect and every element, no.
19    Q.   All right, let's limit it to the size
20 and the shape and the banding, those three
21 elements.
22         Did you find any with all those three
23 elements?
24    A.   Not the size, the shape and the banding

Page 264

1 for anything other than the component part of the
2 robot.
3    Q.   Okay, which you testified was not a
4 part of the powered suit of armor?
5    A.   No, it's a robot, part of a robot.
6    Q.   So a shoulder pad as a piece of armor
7 that a soldier would wear, you're not aware of any
8 shoulder pads that had those common elements of
9 the Games Workshop shoulder pad?
10    A.   It also depends, I guess, if you define
11 the exterior skin of a robot as being --
12 exoskeletal as being part of the robot.
13    Q.   Let me rephrase that again.
14         In searching for shoulder pads used on
15 future infantry warriors, a human wearing a suit
16 of power armor, you were not able to identify any
17 shoulder pads that had those three common design
18 elements of the Games Workshop, size, shape and
19 banding?
20    A.   Correct.
21    Q.   So as you sit here today, you are not
22 expressing any expert opinion that that
23 combination of design elements is in any way not
24 original?

Page 265

1         MR. COOPER:  Could you read the
2 question?
3         (Record read.)
4         MR. COOPER:  Object to form, misstates
5 testimony.
6         THE WITNESS:  I'm not saying it's not
7 original?
8 BY MR. KEENER:
9    Q.   Right, you're not making an expert
10 opinion that this combination is unoriginal?
11    A.   I think I've said it's unoriginal.
12    Q.   That that combination of three
13 elements?
14    A.   I don't think that that combination of
15 three elements is relevant for originality.
16    Q.   My question is, I think you've said you
17 were not able to find anything in --
18    A.   Right.
19    Q.   -- prior military history or science
20 fiction with that combination of three elements?
21    A.   Correct.
22    Q.   So you are not making an expert opinion
23 that that combination of three elements is
24 unoriginal?

67 (Pages 262 to 265)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 266

1      MR. COOPER:  Objection, misstates
2  testimony, define original.
3      THE WITNESS:  I do not think that those
4  three items taken together as a choice is an
5  original thing.
6  BY MR. KEENER:
7      Q.   Although you cannot point to anything
8  that you've seen with that same three choices?
9      A.   Correct.
10     Q.   And you're not making any expert
11 opinion that those three choices combined together
12 is some sort of essential combination that a
13 designer would need to do to make a future
14 infantry soldier?
15     A.   Correct.
16     Q.   Someone making a future infantry
17 soldier would have many choices on how to design a
18 shoulder pad?
19     A.   Yes, they would.
20     Q.   And there's no standard ways that they
21 would have to make it?
22     A.   No, there isn't.
23     Q.   There's a virtual unlimited amount of
24 ways?

Page 267

1      A.   Yes.
2      Q.   And you're not identifying any
3  characteristics that you believe are
4  indispensable?
5      A.   No.
6      (Plaintiff's Exhibit 193, memorandum
7      opinion and order, marked for identification.)
8  BY MR. KEENER:
9      Q.   I'm going to show you what's been
10 marked Plaintiff's Exhibit 193.  I'm not going ask
11 you to read all of this.
12     MR. COOPER:  Well, I'm going to ask him
13 to read it to the extent he needs to to answer
14 any of your questions.
15 BY MR. KEENER:
16     Q.   My first question is:  You discussed
17 being provided some sort of legal looking document
18 but you couldn't recall what it was.  Do you know
19 if this was it?
20     A.   I do not believe this was it.
21     Q.   I would like to turn your attention to
22 page 18.  There's a section that starts
23 Scènes à faire.  Do you see that beginning of the
24 section?  Are you there?

Page 268

1      A.   Yes, I am.
2      Q.   Okay.
3      Now I'm going to start with the second
4  paragraph that states, "The scènes à faire
5  doctrine does not bar copyright protection for
6  work simply because it contains unprotectable
7  elements.  A claim of infringement, however,
8  cannot be based on such elements alone -- rather,
9  it must be the unique combination of those
10 elements (or 'particular novel twists given to
11 them') that provides the originality required for
12 copyright protection."
13     Do you see that?
14     A.   Yes, I do.
15     Q.   Do you have any reason to disagree with
16 anything there?
17     A.   I'm not a lawyer.  I have no reason to
18 disagree nor agree with anything here.
19     Q.   Do you see where it says "a unique
20 combination of those elements"?
21     A.   I also see where it cites some sort of
22 case law.
23     Q.   That wasn't my question.
24     A.   I know that wasn't your question.  I do

Page 269

1  indeed see it but it meanings nothing to me.
2      Q.   For example, on the shoulder pad, do
3  you have any opinion one way or the other whether
4  or not the combination of the size, shape and
5  banding of Games Workshop's shoulder pads is a
6  unique combination of elements?
7      A.   No, I believe it's a rudimentary
8  arbitrary combination of elements.
9      Q.   It may be arbitrary but do you believe
10 it's a unique combination?
11     A.   I believe it's a rudimentary
12 combination.
13     Q.   Do you believe anyone else has made
14 that combination?
15     A.   I have no earthly idea.
16     Q.   You are not able to express an opinion
17 that someone else has ever made that combination,
18 are you?
19     A.   Nor that they haven't made it.
20     Q.   Right, so as far as you're aware of,
21 Games Workshop could have been the first person to
22 combine those three elements?
23     A.   They could have been.
24     Q.   And you're not disputing that if they

68 (Pages 266 to 269)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5