# EXHIBIT

# 2

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

```
GAMES WORKSHOP LIMITED,     )
          Plaintiff,        )
                            )
        vs.                 )
                            )  Civil Action
CHAPTERHOUSE STUDIOS LLC    )  No. 1:1--cv-08103
and JON PAULSON d/b/a       )
PAULSON GAMES,              )
          Defendant.        )
_____)
```

DEPOSITION OF DR. CARL GRINDLEY

New York, New York

Thursday, February 21, 2013

Reported By:

CATHI IRISH, RPR, CLVS, CCR

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 2

February 21, 2013
9:09 a.m.

Deposition of CARL GRINDLEY, held at the offices of Foley & Lardner, LLP, 90 Park Avenue, New York, New York, before Cathi Irish, a Registered Professional Reporter and Notary Public of the State of New York.

Page 4

1  D R.   C A R L   G R I N D L E Y,   called as
2  a witness, having affirmed to tell the truth,
3  was examined and testified as follows:
4  EXAMINATION
5  BY MR. KEENER:
6  Q.   Good morning.
7  A.   Good morning.
8  Q.   State your name for the record.
9  A.   My name is Carl James Grindley.
10  Q.   Where do you live?
11  A.   I live in the Bronx in New York City.
12  Q.   Have you ever been deposed before?
13  A.   I've never been deposed.
14  Q.   Since you've never been deposed, I'm
15  sure your counsel has kind of told you how this is
16  going to go but I'll lay some ground rules.
17      If at any time you don't understand one
18  of my questions, can you let me know?
19  A.   Yes, I can.
20  Q.   Since the court reporter is taking
21  everything down, can we try to avoid uh-huh,
22  huh-uh's, shakes of the heads, everything has to
23  be verbal so the transcript reads clearly.  Do you
24  understand?

Page 3

1  A P P E A R A N C E S:
2
3  FOLEY & LARDNER, LLP
4  Attorneys for Plaintiff
5      321 North Clark Street, Suite 2800
6      Chicago, Illinois 60654
7  BY:  JASON J. KEENER, ESQ.
8
9  WINSTON & STRAWN, LLP
10  Attorneys for Defendant
11      35 West Wacker Drive
12      Chicago, Illinois 60601-9703
13  BY:  BRYCE A. COOPER, ESQ.
14
15
16
17
18
19
20
21
22
23
24

Page 5

1  A.   I do understand.
2  Q.   I'll try to arrange it so we can try
3  and take a short break every hour or so but if
4  there's any time you need a break before that,
5  this is not a torture test.  Just let me know you
6  need a break.  Is that fair?
7  A.   That is fair.
8  Q.   Is there any reason you can't give your
9  full and complete truthful testimony today?
10  A.   No, there's not.
11  Q.   Have you ever testified in court
12  before?
13  A.   No, I have not.
14  Q.   Have you ever been qualified as an
15  expert witness in court before?
16  A.   No, I have not.
17  Q.   Have you ever attempted to testify in
18  court but you were not allowed to testify for some
19  reason?
20  A.   No, I have not.
21  Q.   What did you do to prepare for your
22  deposition?
23  A.   To prepare for the deposition, I met
24  with Mr. Cooper.

2 (Pages 2 to 5)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 14

1    A.   I actually don't know.
2    Q.   That's fair enough.
3         Do you have any experience in
4    trademarks?
5    A.   No, I do not.
6    Q.   Any experience in trademark law?
7    A.   No, I do not.
8    Q.   Have you ever attempted to register any
9    trademarks?
10   A.   No, I have not.
11   Q.   Do you, to your knowledge, own any
12   trademarks?
13   A.   Not to my knowledge, no.
14   Q.   Are you experienced in miniatures?
15   A.   Could you please define "experience"?
16   Q.   What experience do you have with
17   miniatures?
18   A.   The experience I have with miniatures
19   is their use as reference items during melee
20   combat in early editions of TSRS Dungeons &
21   Dragons when I was a teenager.
22   Q.   Any other experience in miniatures?
23   A.   I could expand on that earlier
24   experience.

Page 15

1    Q.   We'll get into that.  Any other
2    experience you've had?
3    A.   None whatsoever.
4    Q.   And so your only experience with
5    miniatures is this experience you had with
6    Dungeons & Dragons when you were a teenager?
7    A.   Yes, it is.
8    Q.   And how long ago was that?
9    A.   33 years ago.  I believe that to be
10   correct, if my math is correct.
11   Q.   Okay.
12   A.   So that would be 1980.
13   Q.   And how old were you in 1980?
14   A.   I believe I was 14.  I'm pretty sure I
15   was 14.
16   Q.   And this experience in miniatures when
17   you were 14 years old, how long did it last?
18   A.   I would actually say that was the
19   terminal date would be 1980.
20   Q.   When did it begin?
21   A.   I would say either 1978 or 1979, so
22   perhaps two years, maybe three.  It's a long time
23   ago.
24   Q.   So about 12 years old to 14 years you

Page 16

1    played Dungeons & Dragons and there was some
2    miniatures involved?
3    A.   That's correct.
4    Q.   And that's your entire experience with
5    miniatures?
6    A.   By involvement, I'm taking you to mean
7    actively participating in their use or collecting
8    or painting in a gaming situation.
9    Q.   Fair enough.  My question is attempting
10   to be broad.  Any experience you had with
11   miniatures.  I believe that's the only experience
12   you identified.  Are there other experiences
13   you're not listing for some reason?
14   A.   Well, it's due to my confusion over the
15   word "experience" so if, for example, I was
16   walking past a gaming store and looked through the
17   window and saw a display of miniatures, I would
18   not count that as being experienced.
19   Q.   Anything else you're excluding?
20   A.   No.
21   Q.   So besides passing by a store where
22   there might be a miniature on display, your only
23   experience based on any form of the word was your
24   12- to 14-year-old experience playing Dungeons &

Page 17

1    Dragons where there was miniatures involved?
2    A.   Yes.
3    Q.   How many miniatures did you own, if you
4    recall?
5    A.   Due to the nature of the lead
6    miniatures of the late 1970s and early 1980s,
7    these items were very fragile and would frequently
8    break along say, for example, arm joints or where
9    the characters would hold weapons or their heads
10   or their legs on the bases, so I believe that I
11   may have owned a grand total of fewer than two
12   dozen but it's very difficult to say for sure
13   because of their lack of permanence as items.
14   They would break and be replaced and it's very
15   hard to say.
16   Q.   Are you able to identify what types of
17   miniatures these were?
18   A.   These were mostly fantasy miniatures.
19   I cannot remember the company that produced them.
20   And I believe they were designed for use with the
21   Dungeons & Dragons products.
22   Q.   Were they humans or monsters or both?
23   A.   I'm having a very difficult time
24   remembering.  I would have to say that they were

Veritext Legal Solutions - Midwest
312-442-9087        800-248-3290        fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 18

1  probably a combination of humans and monsters in
2  various numbers to facilitate their use on a
3  tabletop grid to determine, you know, positions
4  during melees.
5      Q.  Are you relying on any of your
6  experience with those miniatures to form the basis
7  of any of the opinions you made in this case?
8      A.  One aspect, yes.
9      Q.  And what is that?
10     A.  The fragility of the lead pieces
11 necessitating a change in scale of the components
12 of the figures.
13     Q.  Did you experience any change in scale
14 in the miniatures you bought?
15     A.  I did not experience a change in scale.
16 What I did was I noticed an unrealistic nature of
17 the scale of the miniatures.
18     Q.  So the miniatures you used when you
19 were a young teenager had unrealistic scale?
20     A.  This scale was out of proportion with
21 what a human being would be.  Parts would be
22 thicker.  Weapons, for example, would be much,
23 much larger than they ever would be in real life.
24 It was a different scale.  I believe, although I

Page 19

1  don't know for sure, I believe that it was
2  probably to stop these pieces from being so easily
3  broken which I said was a problem with them.
4      Q.  But you don't know if that was a reason
5  they were designed that way?
6      A.  No, I was 14 years old so I had no
7  access with the designers of the pieces.
8      Q.  Other than large weapons, was anything
9  else out of proportion?
10     A.  Body parts, arms, to some degree legs,
11 just because of the fragile nature of the lead.  I
12 don't even know if these things are made out of
13 lead anymore.  The exhibits I've seen seem to be
14 made out of some plastic resin but back in the
15 day, I believe it was lead.
16     Q.  And do you have any experience whether
17 the plastic resin has the same fragility problem?
18     A.  None whatsoever.
19     Q.  So you have no idea whether these
20 current models have any need for this larger scale
21 to solve what you perceived was this fragility
22 issue?
23     A.  I have no knowledge.  I have never
24 handled one of the resin models.

Page 20

1      Q.  You never handled any of the models at
2  issue in this case?
3      A.  I have never physically handled them,
4  no, which is why when I answered the question
5  about experience, I asked if that included walking
6  past window displays, and even with the notion of
7  walking past window displays, I did not know, for
8  example, until seeing the exhibits that these
9  indeed were resin.  I had assumed they were also
10 lead.
11     Q.  Am I correct that none of these
12 miniatures you had were futuristic?
13     A.  That's something I do not remember.  I
14 remember in the 1970s, perhaps 1980 at the latest,
15 purchasing the Traveller box of six gaming manuals
16 and I may or may not have purchased some Traveller
17 miniatures but I simply do not remember.
18     Q.  As you do not remember, you are not
19 basing any of your experience opinions in your
20 report based on those miniatures?
21     A.  No, I am not.
22     Q.  So to the extent you can remember, none
23 of them were futuristic?
24     A.  From the miniatures I can remember,

Page 21

1  none were futuristic.
2      Q.  None of them had guns?
3      A.  I don't believe so because in the first
4  edition of Dungeons & Dragons, I don't believe
5  there were any firearms listed but I couldn't tell
6  you for a fact because it's been a long time.
7      Q.  None of them were robots?
8      A.  None of them were robots.
9      Q.  None of them had spacesuits on?
10     A.  Not per se, no.
11     Q.  Do you know if any of them had shoulder
12 pads?
13     A.  I would imagine that any of the armed
14 figures would have, yes.
15     Q.  Do you know as you sit here today what
16 any of those shoulder pads looked like?
17     A.  I'm sorry, I do not.  It was a very
18 long time ago and I do not remember.
19     Q.  What were the size of those shoulder
20 pads?
21     A.  I cannot recall.
22     Q.  So I appreciate your last experience
23 with miniatures was over 30 years ago but I just
24 want to make sure I understand that the only thing

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 22

1  you're relying upon based on your own personal
2  experience with miniatures was your experience
3  that certain lead models were fragile and your
4  inference why they made some aspects bigger.
5      A.   Yes, that is the correct
6  characterization.
7      Q.   And that's the only experience you're
8  drawing from your experience with miniatures?
9      A.   From 33 years ago.  Actually let me
10 stop for a second and say that the other aspect of
11 miniature use that I would say that I at least
12 kept in my mind was that when these items were
13 purchased from a gaming store, they are in an
14 unpainted state.
15     Q.   Anything else you're relying upon from
16 your personal experience with miniatures for
17 purposes of this case?
18     A.   I believe that to be the case, although
19 there may be other aspects that I have sublimated
20 into my unconscious knowledge.
21     Q.   But nothing you can identify now?
22     A.   Nothing that I can consciously
23 identify.
24     Q.   All I can ask is what you consciously

Page 23

1  identified.  You understand that?
2      A.   I understand.
3      Q.   Do you have any experience in Warhammer
4  40K?
5      A.   None whatsoever.
6      Q.   Any experience with any Games Workshop
7  products?
8      A.   I think in order to answer that
9  question fully, I would need to see a list of all
10 Games Workshop games.  I do not believe so.
11     Q.   So as you sit here today, you cannot
12 identify any products you understand to be Games
13 Workshop products that you have experience in?
14     A.   No, I cannot.
15     Q.   Do you have any experience in miniature
16 wargaming?
17     A.   No, I do not.
18     Q.   Except for this period of time when you
19 were 12 to 14 years old, do you have any
20 experience with modeling in any aspect?
21     A.   Could you please expand on what you
22 mean by "modelling"?
23     Q.   Sure.  It could be assembling,
24 sculpting, painting, collecting, and we can go

Page 24

1  into exactly what experience you have but first
2  just broad, do you have any experience in
3  modeling?
4      A.   I teach sophomore art history at the
5  university level so I know something about
6  sculpting and painting, but by modeling I'm
7  assuming you mean in a hobbyist sense, not in a
8  fine art sense?
9      Q.   Yes.
10     A.   I do not have any experience in
11 modelling in a hobbyist sense.
12     Q.   Do you consider yourself an expert in
13 miniatures?
14     A.   No, I do not.
15     Q.   Do you consider yourself an expert in
16 Warhammer 40K?
17     A.   No.
18     Q.   Do you consider yourself an expert in
19 wargaming?
20     A.   No, I do not.
21     Q.   Do you consider yourself an expert
22 modeling in the hobbyist sense?
23     A.   No, I do not.
24     Q.   Have you ever been retained as an

Page 25

1  expert by anyone for any purpose?
2      A.   No, I have not.
3      Q.   When were you first contacted in
4  relation to this case?
5      A.   I believe it was in December of 2012,
6  although I'm not precisely sure because I was in
7  the process of moving from Connecticut to
8  New York City.
9      Q.   Do you know who contacted you?
10     A.   I believe it was Mr. Cooper, although
11 it could have been Mr. Keany?
12     Q.   You mean Kearney?
13     A.   Kearney, sorry.
14     Q.   What was the substance of that
15 conversation?
16 DI     MR. COOPER:  I'll instruct the witness
17     not to divulge anything that we'd -- actually
18     I'm going to instruct the witness not to
19     answer that question as phrased.
20        MR. KEENER:  Are you claiming discusses
21     you had with the expert are somehow
22     privileged?
23        MR. COOPER:  To the extent that I
24     revealed any of my -- any of counsel's legal

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 82

1 a fair characterization?
2     A.   "Based on" would not.
3     Q.   In some way influenced by?
4     A.   Again, probably not.
5     Q.   What other word could you substitute
6 for derived?
7     A.   I would have to think about this for a
8 while.
9     Q.   Okay.
10     A.   The problem I'm facing is would it be
11 fair to say that, for example, homosapians are
12 derived from Australopithecus gigantus?
13     Q.   I'm trying to figure out what you're
14 trying to say.
15     A.   This is the problem, that I believe
16 what I'm trying to say and how you're trying to
17 understand it are at odds.
18     Q.   Okay.
19     A.   And I'm trying my best to be helpful,
20 and just give me one second to try to think this
21 through and formulate my thoughts on it in a way
22 that might be acceptable for you.
23         I'm going to begin by restating what I
24 believe is your question and you can tell me

Page 83

1 whether or not to proceed.
2     Q.   Okay.
3     A.   What I believe you're asking me is to
4 suggest whether or not Games Workshop's designers
5 at or about the moment where they released or
6 designed their products had conscious exposure or
7 borrowed either consciously or unconsciously using
8 the example of 124 any of the specific images that
9 I have provided.  I believe that to be your
10 question.
11     Q.   Why don't you answer that question.
12     A.   The answer to that question would, A,
13 require me to know what game designer workshops'
14 artist and designers were actually thinking when
15 they were going through their creative process,
16 which I cannot do, because I don't know what's in
17 their library.  For all I know, some of these
18 items could be in their library.  I don't know the
19 titles of everything that they would have in any
20 kind of reference room they might have.
21         I also don't know the reading habits or
22 exposure to culture that they may or may not have
23 had as young adults or children, or even as adults
24 where they may have, for example, forgotten

Page 84

1 specific elements of exposure, and that's sort of
2 one part.
3         And here I'm sort of, as a way of
4 analogy, I'm sort of recalling the Verve's
5 inadvertent borrowing of the Rolling Stones song
6 for their composition Bitter Sweet Symphony, which
7 was an unconscious borrowing apparently that no
8 one realized it was a Rolling Stones song.
9         To continue using that analogy, there
10 is the possibility that one has made an
11 unconscious or conscious borrowing of a specific
12 item but more appropriately is the derivation of
13 say, for example, a verse, chorus, verse, chorus
14 structure for a musical composition for pop music.
15         In both songs, even though they are --
16 even though they are very, very similar to the
17 fact that one has unconsciously borrowed from the
18 other, both find their ultimate derivations not
19 only in a common structure for a popular song but
20 in the structure of our tonal scale.
21         So what you're asking me to answer I
22 can only answer in that way, so when we're looking
23 at what Games Workshop has used, we can say they
24 have either been consciously or unconsciously

Page 85

1 influenced by these either specific examples or
2 other examples that are allied to those specific
3 examples, or they have perhaps been influenced by
4 that more ultimate chain of derivations, which
5 these examples are examples themselves of.
6     Q.   Okay.  Let's try and break that down a
7 little.
8     A.   Okay.
9     Q.   You are not making any expert opinion
10 that any Games Workshop artist consciously derived
11 its work from any specific reference you've
12 identified?
13     A.   Currently, and I would love it if Games
14 Workshop would provide me with the contents of
15 their reference library, that would be a matter of
16 individual examination of every single item in
17 this chart which we could do if you wanted and we
18 could go through that.
19     Q.   My question was simple.  As you sit
20 here today, in your report or your chart, are you
21 making an expert opinion that Games Workshop
22 consciously derived any of its works from any of
23 the examples you give?
24     A.   That would really require me to look

22 (Pages 82 to 85)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 86

1 into their psyche and I couldn't do that.
2  Q.  Right, so as you sit here today, you
3 are not making any expert opinion that any Games
4 Workshop artist consciously derived its work from
5 anything you can identify?
6  A.  No, that's not what I'm saying.
7  Q.  Let me try again.
8  A.  Okay.
9  Q.  As you're sitting here today, and
10 throughout your expert report, are you making an
11 expert opinion that any Games Workshop employee
12 consciously derived their work off of any of the
13 references you identified?
14  A.  I believe that question to be
15 impossible to answer.
16  Q.  You can't answer that yes or no whether
17 or not you were opining on that subject?
18  A.  I don't believe that's a yes or no
19 matter.
20  Q.  You don't know whether or not you're
21 opining on that subject?
22  A.  No, that's a different way to phrase it
23 that wasn't allied to the first way you phrased
24 it.

Page 87

1  Q.  Are you making any expert opinion that
2 the people who designed Games Workshop product 124
3 consciously derived that product out of any of the
4 images you put in the third column for product
5 124?
6  A.  For product 124, I'm neither making
7 that claim or not making that claim.
8  Q.  Okay, but you are not affirmatively
9 opining that you believe they consciously copied
10 anything in product 124?
11  A.  I believe what we're running into here
12 is types of research and legal determinations, so
13 in the world of academia, not doing something or
14 doing something is a different result than not
15 doing something, or doing something.
16  MR. COOPER:  I think he means for this
17  case, are you offering an expert opinion about
18  that.
19 BY MR. KEENER:
20  Q.  Are you offering any expert opinion
21 that any Games Workshop artist consciously copied
22 any of the examples you give?
23  A.  Not for number 124.
24  Q.  For any of the products, are you

Page 88

1 offering an expert opinion that Games Workshop
2 artists consciously copied any of the products you
3 identify?
4  A.  Not consciously.  Wait, let me rephrase
5 that, not necessarily consciously.
6  Q.  Okay.  Do you identify any examples
7 that you are giving your expert opinion that Games
8 Workshop consciously copied?
9  A.  I cannot state consciously or
10 unconsciously.
11  Q.  Are you identifying any prior works
12 that it's your expert opinion that Games Workshop
13 consciously or unconsciously copied?
14  A.  Yes, all of them.
15  Q.  So it's your expert opinion that
16 whether consciously or unconsciously they were
17 aware of all the works you identify?
18  A.  No.
19  Q.  Which works do you -- is it your expert
20 opinion that Games Workshop was consciously or
21 unconsciously aware of?
22  A.  Let's use the example of 124.  In the
23 example of 124, I use the phrase "near future
24 infantry soldiers."  I believe that Games Workshop

Page 89

1 designers were either consciously or unconsciously
2 aware of the concept the trope of near future
3 infantry soldiers.
4  Q.  You go on and you have pictures of 10
5 pictures under that entry.
6  A.  Yes, demonstrate the ubiquity of the
7 image.
8  Q.  Is it your expert opinion that Games
9 Workshop copied consciously or unconsciously any
10 of those 10 pictures?
11  A.  That question is impossible to answer.
12 I'm sorry.
13  Q.  It might be impossible to answer
14 because you don't know what's in their head --
15  A.  Yes.
16  Q.  -- so because you don't know what's in
17 their head, you were not offering an expert
18 opinion that any Games Workshop artist consciously
19 or unconsciously copied those because you don't
20 know?
21  A.  That also means I am not offering that.
22  Q.  I am trying to figure out you're not
23 going to go to trial and tell the jury that Games
24 Workshop consciously or unconsciously copied any

23 (Pages 86 to 89)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 114

1 image. But I can't for the life of me remember if
2 this particular image was placed into this
3 document by me or suggested to be placed into the
4 document by counsel. I do remember finding the
5 image myself. I don't remember if this specific
6 one was the one placed in by me or suggested by
7 counsel and then approved by me.
8    Q.   For all the images you include, did you
9 find them all or were any of them provided to you
10 by counsel?
11    A.   This is also a difficult matter. Yeah,
12 I believe some were provided to me by counsel or
13 suggested to me by counsel.
14    Q.   Do you know which ones?
15    A.   Off the top of my head, I can't really
16 remember because of the way the drafting process
17 went.
18    Q.   Do you know about how many you found
19 versus they found proportion wise?
20    A.   I believe I found the majority of them.
21    Q.   Did you ask for anything that you did
22 not receive?
23    A.   Yes.
24    Q.   What did you ask for?

Page 115

1    A.   I asked for a full list of the Games
2 Workshop reference library contents.
3    Q.   In addition to that, did you ask for
4 anything else that you did not receive?
5    A.   No, I really wish I could have had that
6 reference library. It would have made everything
7 much easier.
8    Q.   Exclude that. Did you ask for anything
9 else you did not receive?
10    A.   No, I don't believe I asked for
11 anything at all other than that.
12    Q.   Are you aware that Chapterhouse has
13 previously written two expert reports in this
14 case?
15    A.   I could infer the existence of the
16 expert reports, or rather one expert report by the
17 deposition that I read.
18    Q.   Are you aware that there's two prior
19 expert reports in this case?
20    A.   I guess there must be.
21    Q.   And one is discussing similarities
22 between Games Workshop and prior military history
23 products; are you aware of that?
24    A.   No, I'm not.

Page 116

1    Q.   Would you have wanted to see that
2 document?
3    A.   No, I'm really not interested in it.
4    Q.   So if there was another expert on
5 military history and medieval weaponry and they
6 were opining on similarities between Games
7 Workshop products and Chapterhouse products and
8 those prior military works, you would have had no
9 interested in seeing that in forming your
10 opinions?
11    A.   No, I would rather form my own opinions
12 on my own and then I think that it would be up to
13 someone else to read both documents.
14    Q.   And similarly, if there was another
15 expert report comparing Games Workshop products to
16 science fiction literature and pictures, you would
17 have had no interest in seeing that report?
18    A.   No, I wouldn't want it to poison the
19 well. But if somebody were to want to make it,
20 you know, I would expect that someone would want
21 to read these things eventually.
22    Q.   Did you see any court opinions in this
23 case?
24    A.   No.

Page 117

1    Q.   Are you aware whether the courts
2 addressed the issue of whether any specifics Games
3 Workshop items are original or not?
4    A.   Oh, wait, I would like to change my
5 answer on that.
6    Q.   Okay.
7    A.   I don't think it's a court opinion so
8 maybe I'm not changing my answer, but I do know
9 that I think last week, because I read the BBC
10 News because I'm also a British citizen, I know
11 that last week in the United Kingdom, I believe --
12 I'm not entirely even sure if there was legal
13 proceedings involved in this but there was some
14 horrible scandal where Games Workshop attempted to
15 stop someone from distributing a book on Amazon
16 that used the term "space marine."
17    Q.   Let's limit ourselves to the court in
18 this case. Have you read any opinions by the
19 judge in this case?
20    A.   No.
21    Q.   Are you aware that the judge in this
22 case has made any rulings on whether or not
23 certain aspects of Games Workshop products are
24 original?

30 (Pages 114 to 117)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 118

1    A.   No.
2    Q.   Are you aware that the court in this
3  case has already compared certain Games Workshop
4  items to prior things in science fiction and
5  military history?
6        MR. COOPER:  Objection to the extent it
7     misstates.
8        THE WITNESS:  No, actually I'm not, nor
9     would I be interested.
10 BY MR. KEENER:
11   Q.   Are you aware that the court has
12 already analyzed, for example, the Games Workshop
13 space marine shoulder pad?
14       MR. COOPER:  Objection to the extent it
15    misstates.
16       THE WITNESS:  I'm not aware of that,
17    no.
18 BY MR. KEENER:
19   Q.   And the court has identified what
20 it believes are original aspects that are not
21 found in prior exiting works, are you aware of
22 that?
23       MR. COOPER:  Objection.
24       THE WITNESS:  No.

Page 119

1  BY MR. KEENER:
2    Q.   Would you be interested in seeing that
3  before you signed your report?
4    A.   No, absolutely not.  I think one of the
5  things that is very, very difficult in
6  providing -- and this is the first time I've ever
7  done it so you have to forgive me for being naive
8  about the process.
9        I think there's a huge gulf between
10 what is interesting or relevant from a legal point
11 of view and what's interesting or relevant just
12 from a mere scholarly point of view.  So to me,
13 this is a scholarly exercise.
14   Q.   Okay.
15   A.   And I'm really not interested in what
16 the court has to say about anything.  If the court
17 rules that up is down or black is white, to me
18 that doesn't change reality because rulings I
19 would imagine can be based on legal precedence or
20 the ability to get evidence in or not into the
21 record or what have you, so a ruling might not
22 have anything to do as far as I'm concerned with
23 the reality of the thing.
24   Q.   Okay, back to your report, Exhibit 190,

Page 120

1  paragraph 3.
2    A.   Is this 190?  Paragraph 3.
3    Q.   You state, "Based on my research, I
4  have concluded that each of the Games Workshop new
5  allegedly infringed works for which Games Workshop
6  claims copyright protection are derivative of
7  preexisting works from historical sources ranging
8  from classical antiquity to the present, from
9  science fiction literature and illustration, and
10 from contemporary cinema."
11       Do you see that?
12   A.   Yes, I do.
13   Q.   Is that your expert opinion?
14   A.   Yes, it is but I'm embarrassed by my
15 pluralization error.
16   Q.   Other than that, is that your opinion?
17   A.   Yes, that is indeed my opinion.
18   Q.   And when you say each of Games Workshop
19 new allegedly infringed works, you mean in the
20 chart you made for every Games Workshop item
21 identified, this opinion applies?
22   A.   Yes, although it is difficult in this
23 context to use the word "each" in I think a manner
24 that you would want it to be used.

Page 121

1    Q.   What's your hesitation?
2    A.   My hesitation is in -- well, I gave you
3  that first example from 124.  And in the example
4  from 124, we're looking at, from Chapterhouse,
5  very specific items.  In that situation, it was 12
6  torsos, 12 legs, 12 heads, 12 backpacks, and in
7  the Games Workshop we're looking at a whole set so
8  there seems to me to be a disparity in the Games
9  Workshop's definition of the word "each."
10       I have used "each" to refer to the
11 overall claim numbers, if that makes sense.  So
12 it's very confusing how Games Workshop defined
13 "each."
14   Q.   For example, 124, when you say the
15 Games Workshop product is derivative of
16 preexisting works, are you saying that all the
17 pictures identified in the middle column of your
18 Exhibit B are derivative of preexisting works?
19   A.   How are you using the term "derivative"
20 in that example?  Are you using it in my sense or
21 your sense?
22   Q.   I'm trying to figure -- for every work
23 of Games Workshop, it's my opinion that they are
24 all derivative of something prior.

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 122

1    A.   Yes.
2    Q.   I'm trying to figure out what you mean
3  by that.
4    A.   For example, in 124 I believe that the
5  images provided of the set, I would guess you
6  would call it, are indeed derivative of
7  preexisting works.
8    Q.   Every element of that image or some
9  elements?
10    A.   That question presupposes that I'm
11  going to have a definition of element in mind so I
12  will provide you with a definition of element
13  first.
14        My definition of element in this
15  situation, if we're looking at these images -- if
16  we're looking at these images, I would say yes,
17  every single element is derived from previous
18  works.
19    Q.   You were going to give me a definition
20  of elements before you used it.
21    A.   My definition of element in this
22  situation would be everything from the -- well,
23  really the colors that the figure are painted, the
24  appearance, say, for example, of a -- an object

Page 123

1  such as a tripod, the pose of a figure putting
2  what appears to be a mortar around and do a
3  mortar.  The concept of a mortar, the concept of a
4  helmet, the concept of a uniform, the appearance
5  basically of a historically derived howitzer-like
6  weapon, the concept of a base for a miniature
7  figurine.  Every single possible element that I
8  can readily see from this diagram appears to have
9  an origin in prior works.
10    Q.   And you've identified those prior works
11  in the third column?
12    A.   Yeah, we've already gone over this.
13    Q.   Are there --
14    A.   I hope we don't have to do it again.
15    Q.   Outside the third column, are there any
16  other places you identify the prior works that you
17  believe that Games Workshop products are
18  derivative of?
19    A.   Other than the claims made in the
20  expert opinion, no.
21    Q.   Okay.  Do you believe that there's
22  anything original in the Games Workshop product at
23  124?
24    A.   No, I don't.

Page 124

1    Q.   Do you believe there is any artistic
2  expression at all in the sculpting of those
3  models?
4    A.   Wait, could you rephrase that?
5    Q.   Do you think there is any artistic
6  expression at all in the sculpting of those
7  models?
8    A.   No, I don't.  Consider, for example,
9  the bottom figurine that shows a soldier putting
10  mortar into a mortar-like device.  I remember that
11  even from the green Army men that I had as a small
12  child.
13    Q.   So it's your opinion there's no
14  artistic opinion involved in any of that
15  sculpting?
16    A.   No, that's not to say they are not
17  nice.  They are nice.  They are just not original.
18    Q.   What do you mean by original?
19    A.   There's nothing in them that does not
20  derive from a different source, a previous source.
21    Q.   You mean the idea or the concept or the
22  exact expression of that concept the sculpture
23  made?
24    A.   I don't believe those two things can be

Page 125

1  divorced.
2    Q.   So you can't divorce a concept of a
3  future military soldier from any particular
4  expression of that concept?
5    A.   No, I don't believe that there is a
6  tangible need to distinguish between those two
7  things.
8    Q.   Let's say I wanted to distinguish.  Are
9  you able to distinguish between --
10    A.   The idea of a thing and the thing
11  itself?
12    Q.   For example, there's an idea of a
13  future infantry soldier.  Are there many ways to
14  express that idea in a sculpture?
15    A.   I wish we had time this year.  This
16  goes into matters of ideal forms and neoplatonic
17  thought.
18    Q.   I'm not trying to get that theatrical
19  here.
20    A.   The problem is it's an inadvertent
21  product.
22    Q.   So in your mind there's not a way to
23  distinguish an idea from the expression of an
24  idea?

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 126

1    A.   That's not what I said.  In my opinion,
2  it's the expression of a thing and the thing
3  itself are two separate entities and the
4  individual expressions of an actual thing may, you
5  know, superficially seem marginally different but,
6  in fact, are not because they are both sort of
7  derivations of that other thing.
8    Q.   Okay.
9    A.   It's very difficult to explain.
10    Q.   Let's take the concept of a future
11  infantry soldier, would you agree there's many
12  different ways that concept could be expressed in
13  a sculpture?
14    A.   I think I'd have to say no.  It's
15  very -- it's a very difficult --
16    Q.   Let's take another example.
17    A.   Okay.
18    Q.   The concept of a lightening claw or a
19  clawed fist.  Do you understand that concept?
20    A.   I do understand that concept.
21    Q.   Would you agree there's many different
22  ways to express that concept in a sculpture?
23    A.   There are many different ways to
24  express that concept in a sculpture.

Page 127

1    Q.   Is there any way for me to determine
2  looking through your chart for which products you
3  believe -- let me rephrase that.
4         Is there any way for me to determine by
5  looking through your chart for which Games
6  Workshop products you believe there is no other
7  way to express that idea such as 124 versus those
8  products which you believe there are multiple
9  ways to express the idea such as the lightning
10  claw?
11         MR. COOPER:  Objection, the first part
12    of that question misstates his testimony.
13         THE WITNESS:  Could you rephrase that
14    for me, please?
15  BY MR. KEENER:
16    Q.   Sure.  Let's take it in steps.
17         I believe you just testified that you
18  believe that there is only one way to express the
19  idea of a future infantry soldier in sculpture; is
20  that correct?
21         MR. COOPER:  Objection, that misstates
22    his testimony.
23         THE WITNESS:  No, I don't think that is
24    correct.

Page 128

1  BY MR. KEENER:
2    Q.   Do you believe that there are multiple
3  ways to express the idea of a future infantry
4  soldier in a sculpture?
5    A.   When you're using the word "ways," I am
6  confused by whether you are referring to
7  significant or insignificant ways.
8    Q.   When you --
9    A.   In my opinion, there are many different
10  ways to express an idea but these ways may
11  insignificantly differ from one another.
12    Q.   So --
13    A.   So with the example of number 124, you
14  can express, either through words or imagery or
15  sculptured figurines, the concept of a future
16  infantry soldier, but although these ways may
17  superficially appear different, they are, in fact,
18  significantly different.
19    Q.   So it's your expert opinion that in
20  trying to express the concept of a future infantry
21  soldier, there are no significantly different ways
22  to express that concept?
23         MR. COOPER:  Objection, misstates
24    testimony.

Page 129

1         THE WITNESS:  The problem with that
2  question is that it's anchored in a specific
3  moment in time so I'm going to assume when we
4  talk about a specific moment in time with
5  reference to the concept of being able to
6  create a model of a specific thing, we're
7  going to anchor, just for discussion sake, the
8  moment of time with now.
9  BY MR. KEENER:
10    Q.   Okay.
11    A.   If we consider the moment of now, it is
12  my expert opinion that I do not believe that it is
13  possible for someone to create a wholly original
14  or even significantly original future soldier.
15    Q.   But it is your opinion that you could
16  have insignificant differences in the expression
17  of a future infantry soldier?
18    A.   Yes, you could.
19    Q.   And those insignificant differences
20  could be original?
21    A.   No, I don't believe they could be
22  either.
23    Q.   So it's your opinion that there is no
24  original way to express the concept of a future

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 130

1  infantry soldier in a model?
2      A.   Not after a certain point in history,
3  no.
4      Q.   And that point's already passed?
5      A.   That point's already passed.
6      Q.   All original expressions of a concept
7  of a future infantry soldier have already been
8  made?
9          MR. COOPER:  Objection, calls for
10     speculation.
11         THE WITNESS:  I can't predict any sort
12     of future events, nor can I talk about things
13     that I haven't seen but so far through looking
14     at things that I have seen, I would have to
15     say that I don't believe that originality is
16     possible, but that's not to say that it is
17     not.
18 BY MR. KEENER:
19     Q.   But it's your expert opinion right now,
20 based on what you know and have seen, that it is
21 not possible to have an original expression of a
22 future infantry soldier in a model?
23         MR. COOPER:  Could you repeat that?
24         (Record read.)

Page 131

1          MR. COOPER:  Objection, misstates
2      testimony.
3          THE WITNESS:  Could I hear that one
4      more time?
5          MR. KEENER:  Okay.
6          (Record read.)
7          THE WITNESS:  When you say "right now,"
8      I'm going to take that as one of two ways and
9      it confuses me.  I can't determine whether you
10     mean right now, as in right now it's my
11     opinion, or right now in terms of we can't --
12     there's no possibility of wholly original
13     thing being right now.
14 BY MR. KEENER:
15     Q.   Right now as in your opinion.
16     A.   Yes, right now in my opinion, it's not
17 possible to have a wholly original space marine
18 model.
19     Q.   You put the word "wholly" in there.  I
20 said original in any way.
21     A.   Yes, I believe it's not possible.
22     Q.   To have an original model in any way of
23 a future infantry soldier?
24     A.   Yes, it is not possible.

Page 132

1      Q.   In your research, have you identify any
2  pictures which you believe are identical to any of
3  the Games Workshop products?
4      A.   That really depends on how you define
5  identical.
6      Q.   Identical means exactly the same.  Is
7  it your expert opinion, expressed anywhere
8  throughout your report or chart, that you have
9  found something in the prior works that is
10 identical to one of Games Workshop's products?
11     A.   I don't believe I've made that claim.
12     Q.   So the extent of your claim is you have
13 found prior works that are similar to the Games
14 Workshop products or share some similarities.  Is
15 that accurate?
16         MR. COOPER:  Objection to the extent it
17     misstates testimony.
18         THE WITNESS:  I don't believe it is.
19 BY MR. KEENER:
20     Q.   What am I missing?
21     A.   You're missing those situations
22 where -- well, the thing about identical that's
23 kind of troubling is when you look at, say, for
24 example, the British Mark V tank.  There are

Page 133

1  indeed superficial differences between the Games
2  Workshop, you know, Battle Raider and the Mark V
3  tank.  There's superficial differences so they are
4  technically not identical, per se.
5      Q.   But you believe there are many
6  similarities between the two?
7      A.   I believe there is a preponderance of
8  similarities between the two that render their
9  significant details unimportant.
10     Q.   But you believe there are differences
11 between the two?
12     A.   Yes.
13     Q.   So they are not identical.
14     A.   They are not identical.
15     Q.   The extent of your opinion is there are
16 a lot of similarities between the two?
17     A.   And that one is clearly derived from
18 the other.
19         MR. COOPER:  Jason, I think whenever
20     you close out your line of questioning --
21         MR. KEENER:  Sure.  Why don't we take a
22     break right now.
23         (Lunch recess taken at 12:26 p.m.)
24

34 (Pages 130 to 133)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 134

1    A F T E R N O O N   S E S S I O N
2         (Time noted: 1:05 p.m.)
3  D R.   C A R L   G R I N D L E Y,  resumed and
4       testified as follows:
5  CONTINUED EXAMINATION
6  BY MR. KEENER:
7       Q.   Before the break, we talked about how
8  you said as of today, there are no new ways to
9  express the idea of a future infantry soldier.  Do
10 you remember?
11      A.   Yes, I do.
12      Q.   At what point in time did that tipping
13 point occur?
14      MR. COOPER:  Objection, calls for
15      speculation.
16      THE WITNESS:  I think sometime around
17      the turn of the millennium.
18 BY MR. KEENER:
19      Q.   Around the year 2000?
20      A.   About then, yes.
21      Q.   So was it after Games Workshop created
22 its works at issue?
23      A.   I'm not entirely sure.  Let's look at
24 these dates.  If we're looking at 124, it's

Page 135

1  before.
2       Q.   You understand based on footnote 1 of
3  your report that while this current model might be
4  2003, it's based off prior Games Workshop works
5  that go back potentially to 1987?
6       A.   Yes.
7       Q.   So that tipping point occurred after
8  1987; is that fair?
9       MR. COOPER:  I'm sorry, could you
10      repeat that?
11 BY MR. KEENER:
12      Q.   After, that tipping point occurred
13 after 1987?
14      MR. COOPER:  Objection, calls for
15      speculation.
16      THE WITNESS:  I would really have to
17      think and ponder on that for a while because
18      we're looking at a variety of different ways
19      to interpret depiction.  So for example, in
20      terms of cinematic sources, I haven't seen
21      really any originality from about the time of
22      Aliens or Starship Troopers but even slightly
23      before that, perhaps even as far back as
24      Terminator in '84, just in the scenes they

Page 136

1  show from the future, there's really nothing
2  in it.
3  BY MR. KEENER:
4       Q.   So in your expert opinion, at what
5  point did all forms of expression of a future
6  infantry soldier become exhaustive?
7       MR. COOPER:  Can you read that back?
8       (Record read.)
9       THE WITNESS:  I think I have a better
10      way of phrasing that.
11 BY MR. KEENER:
12      Q.   First, can you answer that question and
13 feel free --
14      A.   No, I really can't.
15      Q.   You're unable to answer that question?
16      A.   I think because I didn't quite word
17 this concept of tipping point properly.
18      Q.   Okay.
19      A.   And it's not so much of a particular
20 date where it became impossible.  It's more of a
21 particular date where it became evident that it
22 was impossible.
23      Q.   Okay.  In your expert opinion, as of
24 what date was it evident that it was impossible to

Page 137

1  have any new expressions of a future infantry
2  soldier?
3       A.   Approximately the year 2000 it became
4  evident.  That's not to suggest that it was
5  possible before then.  It's just that it was
6  evident around that time.
7       Q.   Are you going to express any expert
8  opinion that all forms of expression were
9  exhausted at any date prior to 2000?
10      MR. COOPER:  Objection, calls for
11      speculation.
12      THE WITNESS:  I don't believe I did so
13      in my report so I would have to say that I
14      would not.
15 BY MR. KEENER:
16      Q.   So prior to the year 2000, you have
17 knowledge that there were various ways to express
18 the concept of future infantry soldier?
19      MR. COOPER:  Objection, misstates the
20      testimony.
21      THE WITNESS:  I'm not entirely sure
22      that I could say one way or another, only that
23      I could say that it was evident after 2000 or
24      so.

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 138

BY MR. KEENER:
1  Q.   So you do not have an expert opinion
2  one way or the other whether or not it was
3  possible to have an original expression of a
4  future infantry soldier before the year 2000?
5  A.   In order to answer that question,
6  wouldn't I need to have a fixed terminal date
7  rather than the idea that something became
8  apparent at a particular time?  So I think it's a
9  little bit difficult to answer that question in
10 that I could do any amount of continued research
11 on this, which of course I can't do, but if I did
12 that extra research I could give you a firm date,
13 but right now I can't give you a firm date but
14 except to say by 2000 it was done.
15 Q.   Let make it simpler.
16 You have not expressed any opinion in
17 your report anywhere that all forms of expression
18 of a future infantry soldier were exhausted prior
19 to the year 2000?
20 A.   Correct.
21 Q.   This idea that there is no way to
22 express originally a future infantry soldier, does
23 that apply both to Exhibit 124 of those

Page 139

1  guardsmen/women we saw as well as space marines?
2  A.   How are you using the term -- wait, I
3  know I'm not allowed to ask you questions.
4  When you say the word "space marines,"
5  for the purpose of this answer I'm assuming you
6  mean the Games Workshop space marine figures.
7  Q.   I'm trying to clarify when we said
8  future infantry soldiers, your meaning of that was
9  broad enough to encompass both the Games Workshop
10 guardsman figures as well as the Games Workshop
11 space marine figures.
12 Is it true that you were using that
13 term broadly to encompass both types?
14 A.   I was using that term to broadly to
15 encompass both types.  I believe there was more
16 flexibility with the overall idea of, you know, a
17 future soldier than with the particular aspects of
18 a space marine so I believe that the space marine
19 figure ossified sooner.
20 Q.   At what point do you believe in your
21 expert opinion that there are no original
22 expressions of a space marine type soldier
23 possible?
24 MR. COOPER:  Could you repeat that

Page 140

1  question?
2  (Record read.)
3  THE WITNESS:  This is a very difficult
4  question to answer because when we're thinking
5  about expressions, we can include nontangible
6  things that I don't know if they are relevant
7  or not, such as the backstory that a character
8  or characters have, or we could be just
9  considering the appearance of the characters.
10 BY MR. KEENER:
11 Q.   Let's limit it to the appearance.
12 A.   Limiting it to the appearance makes
13 that a much easier question to answer.  And
14 limiting it to the character, I would say it's
15 long done.
16 Q.   Can you give me a date?
17 A.   Probably by the very early '80s.
18 Q.   Any more specific you can give me on a
19 date?
20 A.   I would say the last nails in the
21 coffin for that were when there was a Japanese
22 anime created of Starship Troopers, I believe,
23 although I'm not entirely certain, between the
24 years 1980 and 1984.

Page 141

1  Q.   And that's not a work that you referred
2  to or rely on in any way in your expert report,
3  right?
4  A.   I'm going to check.
5  (Witness perusing document.)
6  I did not mention that work
7  specifically by name.
8  Q.   Okay.
9  A.   Although in paragraph 29, I do say
10 about power suit, "Graphic interpretations of this
11 suit have taken a number of different forms since
12 the novel's serialization."
13 In retrospect, I should have said -- I
14 should have cited the anime from the 1980s, and I
15 would like to correct my memory if I could.
16 Q.   Okay.
17 A.   When I said the year 2000, I somehow
18 had my mind set that Aliens came out in 19 -- 1997
19 when indeed it came out in 1986.
20 Q.   Okay, so that is --
21 A.   That's going to change my dating of
22 2000 to 1990 at the latest, if Aliens came out in
23 1986.
24 Q.   Is it my understanding that your

36 (Pages 138 to 141)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 142

1 testimony is at least as of 1990, it became
2 evident that all types of expression of a future
3 infantry soldier had been exhausted?
4    A.   Yes.
5    Q.   And that's due to the dating of the
6 movie Aliens?
7    A.   Yes.
8    Q.   Under your rationale, would you agree
9 with me that there is nothing original in any of
10 the Chapterhouse products?
11    A.   That would depend on how a person would
12 define original.
13    Q.   And in your sense, you told me there
14 was nothing --
15    A.   In my sense, yes, I would say there's
16 nothing original.
17    Q.   Would you also say that it's your
18 opinion that the Chapterhouse products are derived
19 from Games Workshop products?
20    A.   No, I would say they are both derived
21 from the same ultimate sources.
22    Q.   Do you have any expert opinion one way
23 or the other whether or not the Chapterhouse
24 designers were referring to the Games Workshop

Page 143

1 products to design it or some ultimate source to
2 design it?
3    A.   I have no opinion on that.
4    Q.   You're not expressing any opinion
5 whether any particular Games Workshop designer
6 used any specific reference when they were
7 creating their work, are you?
8    A.   I believe I did.
9    Q.   Is that when we're talking about the
10 flamer, the lightning claw and the tank?
11    A.   I think that was either the whole or at
12 least a partial list.
13    Q.   Are you planning any expert opinions
14 whether any Games Workshop work lacks originality
15 in the copyright sense?
16    A.   I'm not an expert in copyright law.
17    Q.   What is your understanding of the word
18 "originality" when you use it?  I'm sorry?
19    A.   No, I'm formulating a response.
20         Originality would be the idea of a
21 thing wholly onto itself without an external
22 influence of any sort.
23    Q.   Okay, can something be partially
24 original?

Page 144

1    A.   No.
2    Q.   Why not?
3    A.   For the same reason you can't be
4 partially pregnant.
5    Q.   Can something be an original
6 combination of prior works?
7         MR. COOPER:  Object to the hypothetical
8    and to the extent it calls for legal
9    conclusion.
10         THE WITNESS:  I'm not sure.
11 BY MR. KEENER:
12    Q.   When you were forming your expert
13 opinions in this case, were you assuming that
14 you could have an original combination of prior
15 works?
16    A.   I was assuming that, yes.
17    Q.   And you didn't identify any original
18 combinations of prior works?
19    A.   No, I did not.
20    Q.   For example, when we were discussing
21 the Mona Lisa, you thought it was an original
22 concept to put a mustache on the Mona Lisa?
23         MR. COOPER:  Objection, misstates prior
24    testimony.

Page 145

1 BY MR. KEENER:
2    Q.   Is that right?
3    A.   No, I believe that isn't right.  I
4 believe we were looking at that whether or not a
5 work could be a derivative work.
6    Q.   And I think you testified you did not
7 think that was a derivative work and you thought
8 it was original.
9         MR. COOPER:  Objection, misstates
10    testimony.
11         THE WITNESS:  I believe we were
12    discussing the legal use of the term
13    "derivative," in which case the argument was
14    to the best of my recall that legally that
15    work would be derivative but creatively it
16    would not be derivative, which again now makes
17    it difficult to consider what we're talking
18    about is deemed original or not since it seems
19    to be clouded in the nature of what is legally
20    original or not.  So I'm kind of confused by
21    where we're going.
22 BY MR. KEENER:
23    Q.   So the mustache on the Mona Lisa you
24 believe creatively was original?

37 (Pages 142 to 145)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 166

1  same as the power armor that Iron Man might wear?
2      MR. COOPER: Objection, misstates
3  testimony.
4      THE WITNESS: That's a very difficult
5  question to answer because in that mix has
6  actually been the originating image.
7  BY MR. KEENER:
8      Q.  I'm trying to understand in your count
9  of how many types of armor there are, are you
10  treating all of those as one type of armor, one
11  expression?
12      A.  It's a difficult example.  There is --
13  in that example you provided, there is one
14  expression, several incarnations, and those
15  incarnations are substantially similar to the
16  original expression.
17      Q.  Okay.  So if I understand for those
18  examples, a Starship Trooper mobile infantry and a
19  Games Workshop space marine and an Iron Man, you
20  believe they all have the same expression of a
21  power suit, just different incarnations?
22      A.  I believe that they all have -- or
23  rather if we use that example, we have Iron Man
24  and we have the space marines.  They originate in

Page 167

1  the Starship Trooper power armor.  The power armor
2  from Starship Trooper is the expression.  The
3  other two are merely incarnations.  The other two,
4  Iron Man's various suits will have an
5  insignificant level of similarities between
6  themselves and say, for example, space marine's
7  power armor, but both of them will have
8  significant similarity to the Starship Troopers
9  originating power armor.
10      Q.  So there's nothing original in the Iron
11  Man suit that's not already due to the Starship
12  Trooper influence?
13      A.  Correct.
14      Q.  And in the various different Iron Man
15  suits, there's nothing original in the later
16  incarnation versus the first Iron Man suit?
17      A.  They are basically trivially different.
18      Q.  In your mind, there's nothing original
19  about the later ones?
20      A.  No.
21      Q.  So going back to the example of
22  creating an infantry future space warrior, let's
23  assume there's five or six helmet choices and only
24  five or six torso choices and only five or six leg

Page 168

1  choices and only five or six boot choices, only
2  five or six gauntlet choices, only five or six
3  backpack choices, et cetera.  We quickly get to,
4  once you find the permutation, a very, very large
5  number of possibilities; do you agree?
6      A.  Uh-huh.
7      Q.  Yes?
8      A.  Yes, I do agree that would it be five
9  factorial, which would be -- I don't know what
10  number that would be, a very large number.
11      Q.  And so which combination of those,
12  would that be an original choice?
13      A.  It would be but it never occurs.  This
14  is the crazy thing about this particular character
15  type is that you do have a vast number of
16  permeations but you never see them.  You have
17  these possibilities and yet you end up with
18  virtually identical characters all the time.
19      Q.  Have you identified in your report or
20  your exhibit any prior work that made all the same
21  design choices as the Games Workshop space marine
22  from the helmet to the backpack to the shoulder
23  pad to the torso to the legs to the boots to every
24  other design choice?

Page 169

1      A.  I believe I already addressed that
2  saying that, A, I was never asked to do that, and
3  that that needlessly opens up a number of entities
4  that are not required, because then, of course,
5  where would I go from there?  Do I have to worry
6  about whether it is imitation polyester, imitation
7  cotton?  Do I have to worry about whether boots
8  have nine holes for shoelaces or 12?  It
9  unnecessarily adds these permeations.
10      Q.  Leaving out the level of item, which is
11  only maybe seven or eight different elements, did
12  you identify anything in the prior art that made
13  those same seven or eight choices that Games
14  Workshop did?
15      MR. COOPER: Objection to the
16  hypothetical.
17      THE WITNESS: That was never my point
18  so no, I didn't do it.  That was your point.
19  BY MR. KEENER:
20      Q.  So you are not forming any expert
21  opinion that the combination of design elements
22  chosen by Games Workshop is the same combination
23  as any of the prior works because you didn't do
24  that an analysis?

43 (Pages 166 to 169)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1    A.   I did not do that analysis.
2    Q.   You are not expressing any expert
3 opinion in your report or chart that the design
4 choices of which elements to include in the Games
5 Workshop space marine are the same combination of
6 design elements in any prior work?
7    A.   No, but I could do that if you wanted
8 me to.
9    Q.   I'm only interested in the opinions you
10 expressed in your expert report and your chart.
11 You did not form that opinion in either of those,
12 correct?
13    A.   No, I did not.
14    Q.   So you're not going to come to trial
15 and express that opinion, correct?
16    A.   Am I allowed to?  Because I think I
17 could.
18    Q.   All the opinions you're going to
19 express are supposed to be contained in your
20 report.
21    A.   Oh, then I guess I would not.
22    Q.   And can we say that's the same about
23 the other Games Workshop products in the chart,
24 that you have not expressed any opinion on whether

1 the combination of design elements chosen by Games
2 Workshop are the same combination of any prior
3 works you found?
4    A.   I'd have to look at the report.  I
5 don't believe I explicitly said that.
6    Q.   Implicitly or explicitly, have you
7 pointed to any prior works where you believe all
8 the same design choices which elements to include
9 is the same combination that Games Workshop chose?
10    A.   No, I have not.
11    Q.   You stated that there's only so many
12 ways a future infantry helmet is depicted and
13 various other features, correct?
14    A.   Yes.
15    Q.   Do you attempt to identify in your
16 report what those various ways are for design
17 elements?
18    A.   No, I do not.
19    Q.   Do you understand trademarks to be at
20 issue in this case?
21    A.   No, I do not.
22    Q.   So you're not making any opinion
23 anywhere about the use of various terms or
24 terminology, correct?

1    A.   No, I'm not, nor do I know anything
2 about trademark law.
3    Q.   I think we've covered that.
4    A.   Okay.
5    Q.   Does your report contain a complete
6 statement of each of the opinions you're going to
7 express in this case?
8    A.   That's actually difficult to answer.
9    Q.   Were you told that your report must
10 contain a complete statement of each of the
11 opinions you will express in this case?
12    A.   Yes, I was.
13    Q.   And did you attempt to do so?
14    A.   I believe that I did insomuch as the
15 complaint did.  And by this, I refer to two
16 different matters.  Matter one, when we're looking
17 at the table in its original version, there are a
18 large number of images that have been used that I
19 would imagine would be perhaps described or shown
20 to someone who was interested in this matter or
21 other ways walked through like you just did with
22 me when you said look at this torso or look at
23 these legs.
24        I am operating under the assumption

1 that how you just deposed me with that level of
2 information, I likewise would be able to walk
3 people through these images.
4    Q.   Anything else?
5    A.   I believe that would be all that would
6 be necessary.
7    Q.   Okay.  So you did not walk through the
8 various design elements in your report?
9    A.   No, neither did Games Workshop.
10    Q.   Okay.
11    A.   I assume that what they were doing
12 would be what I would be doing, which is what you
13 just did.
14    Q.   So your report did not contain a
15 complete statement of each of your opinions with
16 regards to any of the elements?
17        MR. COOPER:  Objection, misstates the
18 testimony.
19        THE WITNESS:  Yes, it does.
20 BY MR. KEENER:
21    Q.   Where does it contain a complete
22 statement of your opinions regarding the elements?
23    A.   In the images.
24    Q.   Beyond the images?

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1  the stomach or the --
2     A.  Yes, I can.  I can see that there is an
3  arch that goes along approximately where our rib
4  cage goes in a sort of semicircular manner.
5     Q.  Can you tell if he has a belt in a
6  similar design to the space marine belt?
7     A.  He has a belt but it is not similar to
8  the design of the space marine belt.
9     Q.  Can you tell anything about his
10  backpack from this picture?
11     A.  Nothing beyond that he has one.
12     Q.  So again, would you agree that the
13  design choices that made up this picture are a
14  different combination of design choices than that
15  made by the Games Workshop artist?
16     A.  Yes, it is a different combination.
17     Q.  Looking at the next picture on page 18,
18  would you agree that again that's a different
19  combination of design choices than that done by
20  Games Workshop?
21     A.  I think that's impossible to tell.
22     Q.  So you're not making any opinion
23  whether or not those are the same design choices
24  that Games Workshop made?

1     A.  I'm not entirely sure what is being
2  represented by the Games Workshop miniatures in
3  this particular exhibit.
4     Q.  Okay.
5     A.  For example, it says, "Games Workshop
6  space marine assembled and painted by the hobby
7  team using all Games Workshop parts."
8     Since it is saying all "Games Workshop
9  parts," then they could have made a decision with
10  different parts, so what you see in the figure
11  illustrated in that middle column, in either of
12  them because they are the same ones because one is
13  painted and one is not, represents a level of
14  choice that was exercised in the assembly.
15     So for example, in that Palladium Books
16  illustration, top one, you'll see that the
17  character has one spiked shoulder pad and one
18  non-spiked shoulder pad.
19     Since these Games Workshop space
20  marines were assembled from parts, they could have
21  assembled it with one spiked and one not spiked,
22  which would have far more of a resemblance.
23     Q.  The non-spiked shoulder pad in your
24  picture is not similar to the Games Workshop

1  shoulder pad, is it?
2     MR. COOPER:  Objection to form.
3     THE WITNESS:  That's actually a
4  difficult matter to tell due to the position
5  of the arm.
6  BY MR. KEENER:
7     Q.  You're not making any opinion that it's
8  similar, are you?
9     A.  I suppose I could.  It does look
10  similar.
11     Q.  Is it your expert opinion that that
12  shoulder pad is similar to the space marine
13  shoulder pad?
14     A.  It is similar, yes.
15     Q.  Is it the same design?
16     A.  No, it is not the same design, it is
17  similar.
18     Q.  Would you agree that this depiction on
19  the top of 18 is another artist's design of a
20  person in powered armor that's different than
21  Games Workshop's design?
22     A.  Yes.
23     Q.  Would you make the same expert opinion
24  on the picture on the bottom of page 18 that

1  that's another artist's depiction of a person in a
2  powered suit of armor that's different than the
3  design Games Workshop has made?
4     A.  Yes, I would.
5     Q.  And would you say the same about the
6  remaining pictures on this entry which go on page
7  19, 20 and 21?
8     A.  Yes, I would.
9     Q.  Now, in the pictures you show here,
10  there are a number from comic books, correct?
11     A.  Yes.
12     Q.  Do you have any understanding on where
13  the Games Workshop designers reside?
14     A.  No, I've got no idea.
15     Q.  Do you know where Games Workshop is
16  located?
17     A.  No, I don't.  Wait, are they in
18  Britain?
19     Q.  They are in the United Kingdom.
20     A.  Okay.
21     Q.  You put dates next to these products.
22  Do you see that?
23     A.  Yes.
24     Q.  Do you have any understanding of

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 210

1  whether or not those comic books were available in
2  the United Kingdom on those dates?
3      A.   There are many different definitions of
4  the word "available."  A thing could be imported
5  and sold through a gray market source.  I lived in
6  Britain for four years when I was doing my Ph.D.
7  and through my experience with purchasing music I
8  knew that you could get imported items that
9  weren't officially being distributed, so they
10 would it be imported by local sellers rather than
11 released in the United Kingdom.  So there could be
12 a situation where something was released in the
13 United Kingdom but still for sale there.
14     Q.   Do you have any understanding whether
15 any comic books were released in the United
16 Kingdom that you've identified?
17     A.   No, I do not.
18     Q.   Do you have any idea of when they were
19 released in the United Kingdom?
20     A.   No, I do not.
21     Q.   Do you know if they were ever released
22 in the United Kingdom?
23     A.   No, I do not.
24     Q.   Would you make the same answer with

Page 211

1  regard to the books you take pictures from, such
2  as the Palladium Book?
3      A.   Absolutely.
4      Q.   And same with the pictures of
5  miniatures you include here?
6      A.   Yes.
7      Q.   You have no idea of whether any of
8  these references were released in the United
9  Kingdom at any time?
10     A.   Correct.
11     Q.   So consequently, you have no idea
12 whether or not any Games Workshop designers saw
13 any of those references?
14     A.   No.
15     Q.   I think I've asked this question before
16 and I apologize if I have.  I think we've agreed
17 the Games Workshop design of the space marine made
18 a number of design choices, correct?
19     A.   Yes.
20     Q.   Including the style of helmet?
21     A.   Yes.
22     Q.   And the style of backpack?
23     A.   Yes.
24     Q.   And the style of shoulder pads?

Page 212

1      A.   Yes.
2      Q.   Style of arms?
3      A.   Yes.
4      Q.   The style of torso?
5      A.   Yes.
6      Q.   The style of belt?
7      A.   Yes.
8      Q.   The style of legs?
9      A.   Yes.
10     Q.   The style of shoes?
11     A.   Yes.
12     Q.   As well as other design choices along
13 the way involved in each of those.
14     A.   Yes.
15     Q.   And you have been unable to find any
16 prior work that contained that same combination of
17 design choices, correct?
18     A.   I have been unable to show you
19 something that contains every single one of those.
20 I have shown you a large number of them that
21 contain either individual elements or in some
22 cases, such as the Iron Monger suit, or when I
23 talk about Toy Story's Buzz Lightyear, that
24 contain a preponderance of them.

Page 213

1      Q.   So you identified some that may have a
2  few of those elements?
3      A.   I said preponderance.
4      Q.   You're meaning more than half?
5      A.   Yes.  For example, Buzz Lightyear.
6      Q.   You've not included any picture of Buzz
7  Lightyear in your report or your chart, have you?
8      A.   No.
9      Q.   So we are not going looking at any
10 picture of Buzz Lightyear at the trial, correct?
11     A.   I don't think that's for me to decide.
12     Q.   You understood you were supposed to
13 include all items you were going to use in forming
14 your expert opinion in your expert report,
15 correct?
16     A.   If I've mentioned a film, it is my
17 understanding that I have mentioned the film and
18 therefore, I get to use that film.
19     Q.   You've included the best pictures in
20 your chart that were available to you, correct?
21     A.   Yes, but if I have mentioned things in
22 my expert report, then it is my understanding I
23 get to use the items in my expert report.
24     Q.   You've included hundreds of pictures in

54 (Pages 210 to 213)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 214

1 your expert report, right?
2    A.   I have also included references to a
3 large number of films.
4    Q.   This will go quicker if you answer the
5 questions I ask.
6         You've included hundreds of picture in
7 your expert report?
8    A.   Yes, I have.
9    Q.   And you chose which pictures to
10 include?
11   A.   Yes.
12   Q.   And you've attempted to include the
13 best representative pictures available to you?
14   A.   And the most expedient to obtain.
15   Q.   Did you attempt to include in your
16 report the best example pictures that you were
17 aware of?
18   A.   What I attempted to do in my expert
19 report was to include the best pictures that I had
20 available at the time and to make textual mention
21 of items which I was unable to expediently obtain.
22   Q.   So you were unable to obtain any
23 picture of Buzz Lightyear from the end of December
24 to January?

Page 215

1    A.   Yes, I believe it slipped my mind.
2    Q.   So again, back to the basic question,
3 out of all the design choices Games Workshop made
4 in making its space marine, you have been unable
5 to find any prior work with those same design
6 choices, all of them, start there?
7    A.   Yes, I have been unable to find an
8 absolutely identical element-by-element copy of
9 the Games Workshop figure.
10   Q.   And you've been unable to find one that
11 contains the same backpack, the same shoulder pad,
12 the same torso, and the same legs, that
13 combination?
14   A.   Yes, I have been unable to find
15 something that is absolutely identical.
16   Q.   That's not my question.  My question is
17 with the same design choices that Games Workshop
18 made for the head, backpack, torso, shoulder pads
19 and legs.
20   A.   If I may repeat your question back to
21 you so that I know it and then answer it myself,
22 you're asking if I have found an identical set of
23 decisions that were made by any other designer in
24 envisioning a similar item?

Page 216

1    Q.   Yes.
2    A.   No, I have not.
3    Q.   And not to the level of how many
4 shoelaces it has but to the level of type of head,
5 type of torso, the type of backpack, the type of
6 shoulder pads and the type of legs.
7    A.   I believe when we went through this,
8 especially with reference, for example, to the
9 shoulder armor, you did go to the level of
10 shoelaces.
11   Q.   Again, my question is:  The level I'm
12 giving you now, did you find any prior work with
13 those five same design choices?
14   A.   I believe that that question is not
15 specific enough in that when we were discussing
16 these different design elements, the level of
17 detail that you put into the discussion of the
18 design elements is now much, much greater than the
19 level of detail you're now asking me to comment
20 upon, so the question is unanswerable in that
21 form.
22   Q.   Let's put a little more detail in it.
23        Let's assume the shoulder pad is very
24 large, extending all the way to the elbow, and the

Page 217

1 shape, that Games Workshop chose its shape, the
2 backpack is in the shape Games Workshop chose, the
3 torso includes the portion showing the abdominals
4 and the cutout for the abdominals, as well as a
5 belt, and the legs have that overlarge knee
6 shield.
7         With only those details, were you able
8 to find any prior work that included that same
9 combination of details?
10   A.   I do not believe that those list of
11 details were the same ones that we used in our
12 discussion of these different images.
13   Q.   I just gave you a new question though.
14   A.   I know you did.
15   Q.   Answer my question.
16   A.   That question doesn't really logically
17 follow from the discussion we had.  I know it's a
18 new question.
19   Q.   It's a new question.
20   A.   It's a new question, but it's a
21 question that's -- I mean it's -- allow me to
22 think about it for a minute.
23        With the caveat that I believe that the
24 list of attributes you've given me is arbitrary,

Veritext Legal Solutions - Midwest
312-442-9087        800-248-3290        fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 218

1  and somewhat misleading, in that I believe several
2  sets of them can be found in these images, I would
3  say -- and also with the caveat that the general
4  description of the shoulder pads that you have
5  provided differs substantially to our previous
6  discussion of them, I would have to say yes, I was
7  unable to provide you with any particular image
8  that satisfied that full list of criteria.
9      Q.   So as you sit here today, it's your
10 expert opinion that you were unable to find any
11 prior work with that combination of elements?
12     A.   So in my understanding, the importance
13 of what you're trying to get at is --
14     Q.   I'm not asking about the importance.
15 Again, just answer the question I asked.
16     A.   Yes, there is no illustration that
17 contains all of these elements.
18     Q.   So you were unable to find any prior
19 work with that combination of elements?
20     A.   I suppose I could have found some if I
21 had more time.
22     Q.   You were unable to find any prior work
23 with that combination of elements, correct?
24     A.   Yes.

Page 219

1      Q.   So as far as you know, based on sitting
2  here today, that combination is an original
3  combination?
4          MR. COOPER:  Objection, misstates
5      testimony.
6          THE WITNESS:  If I had more time to do
7      research, I suppose I might or might not be
8      able to find it.
9  BY MR. KEENER:
10     Q.   As you sit here today, that is an
11 original combination?
12     A.   That's impossible to tell.  Just
13 because I do not know of something's existence
14 does not affect whether or not that thing exists.
15     Q.   You are unable to make any opinion that
16 that combination is unoriginal?
17     A.   Nor am I able to make any opinion
18 whether it's original.
19     Q.   I agree.  So therefore, you are unable
20 to state an expert opinion that that combination
21 is unoriginal?
22     A.   Yes.
23     Q.   Yes, you agree with my statement?
24     A.   Yes, I do.

Page 220

1      Q.   Let's talk about shoulder pads.
2      A.   Yes.
3      Q.   I believe it's your opinion that in
4  medieval times they tended to not use overlarge
5  shoulder pads; is that correct?
6      A.   Not wholly correct.  During medieval
7  and Renaissance times, there were overly large
8  elements of shoulder armor but they were reserved
9  for specific functions that required the shoulder
10 to be wholly immobile.
11         So for example, there was a specific
12 type of armor plate known as a grand guard which
13 goes over the shoulder, existing shoulder armor to
14 prevent motion of the arm and to prevent motion of
15 the head and provide a small amount of additional
16 protection to the chest for use in jousting where
17 it would be required for the participant's right
18 arm or left arm if he were left-handed to be fixed
19 into place.
20     Q.   Would you agree that at least in
21 medieval times there are a number of different
22 designs of shoulder pads that were used?
23     A.   They all follow a very basic similarity
24 in that they have to have structural integrity and

Page 221

1  allow for the correct articulation of the shoulder
2  joint, so they are indeed limited to sort of
3  variety.  They can differ insignificantly from one
4  another but they all follow the same basic variety
5  or same basic property.
6      Q.   They can differ in size?
7      A.   Not usually.
8      Q.   They can -- they were all small?
9      A.   They were all articulated to the joint
10 of a human shoulder.
11     Q.   Could they differ in shape?
12     A.   Only inasmuch as they would be used as
13 an articulated shoulder joint.
14     Q.   But there were a number of different
15 shapes available?
16     A.   They all basically follow the pattern
17 of the human shoulder.
18     Q.   So is it your expert opinion that they
19 follow the same shape?
20     A.   It all depends what sort of armored
21 piece you're talking about.
22     Q.   I'm talking about shoulder pads used in
23 medieval times.
24     A.   There are a fairly large number of

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 222

1  different types of things from ailettes to
2  spaulders to pauldrons to grand guards, and if we
3  just look at pauldrons, then they are going to be
4  basically the same shape.
5      Q.   Would you classify Games Workshop's
6  shoulder pads as a pauldron?
7      A.   Yes.
8      Q.   Does a pauldron include the armor that
9  goes on the arm?
10     A.   No.
11         (Plaintiff's Exhibit 192, document Bates
12     labeled CHS EXPERT00000012 through 027, marked
13     for identification.)
14  BY MR. KEENER:
15     Q.   I'm going to show you what's been
16  marked as Plaintiff's Exhibit 192, which is a
17  collection of pictures produced at CHS EXPERT 12
18  through 27.
19         Do you recognize these pictures?
20     A.   Yes, I do.
21     Q.   And did you take these pictures?
22     A.   Yes, I did.
23     Q.   And these were pictures you took at a
24  museum?

Page 223

1      A.   At the Metropolitan Museum in
2  New York City.
3      Q.   Different types of shoulder armor?
4      A.   Yes.
5      Q.   Let's start with the picture on the
6  first page labeled page 12. How would you
7  describe the shape of this piece of shoulder
8  armor?
9      A.   I would describe it as being an
10  articulated piece of shoulder armor that has a
11  sort of hemispherical top section, some
12  articulation below the actual ridge of the
13  shoulder, the start of the arm, to allow the arm
14  free motion, and a reinforced neck guard.
15     Q.   As well as an extension that goes
16  across the breast?
17     A.   Yes, a slight extension that goes
18  across the breast.
19     Q.   And that would be a very different
20  shape than Games Workshop's shoulder pad, correct?
21     A.   Yes, it would.
22     Q.   Now, you've said before Games
23  Workshop's shoulder pads is hemispherical. Do you
24  recall that?

Page 224

1      A.   When did I say that?
2      Q.   I think in your report, you classify it
3  as a hemispherical --
4      A.   Yes.
5      Q.   Do you believe it's hemispherical?
6      A.   Yeah, I think you could call it
7  hemispherical.
8      Q.   Do you think if you put four of those
9  together, you'd get a sphere?
10     A.   You'd get more like an egg.
11     Q.   Like an ovoid?
12     A.   Yes.
13     Q.   Sort of like a quarter of an ovoid?
14     A.   Yes, you could call it that.
15     Q.   And the picture on page 12 is not a
16  picture of an ovoid, would you agree?
17     A.   Yeah I would agree that it's not a
18  quarter of an ovoid.
19     Q.   So this shoulder armor has
20  articulation?
21     A.   Yes.
22     Q.   It has a neck guard?
23     A.   Yes.
24     Q.   It has a piece extending towards the

Page 225

1  center of the chest?
2      A.   Yes.
3      Q.   And it has some sort of ribbing going
4  along the edge of the shoulder pad?
5      A.   Yes, some sort of decorative edging.
6      Q.   Let's take a look at the next picture
7  on page 13. Is this another design a shoulder
8  pad?
9      A.   Yes, it is.
10     Q.   And is this shoulder pad integrated
11  with the chest armor?
12     A.   Yes, it is.
13     Q.   So it's kind of one piece with the
14  chest?
15     A.   Yeah, this is an additional plate one
16  would wear over the top of one's armor.
17     Q.   Do you see any banding around the edge
18  of the shoulder pad?
19     A.   No, I do not.
20     Q.   And you wouldn't call this oversized,
21  would you?
22     A.   Yes, I would.
23     Q.   Why?
24     A.   Because it is. It is massively

57 (Pages 222 to 225)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 226

1 oversized to protect the participant from
2 jousting.
3 Q. So this would be one of your grand
4 guards?
5 A. Yes. Look at the elbow piece, for
6 example. There's really no way for you to bend
7 your arm wearing that elbow piece.
8 Q. Would you agree it's not as large as
9 the shoulder pad that Games Workshop uses?
10 A. It's difficult to tell because that
11 would require knowledge of the backstory.
12 Q. Do you see how the Games Workshop torso
13 is kind of dwarfed by the shoulder pads?
14 A. Yes.
15 Q. That's not the case in your picture on
16 page 13, is it?
17 A. Yes, it is.
18 Q. You believe --
19 A. This is a unit. This is a single
20 thing. So it indeed blocks the chest through its
21 mere construction.
22 Q. You would agree Games Workshop is not a
23 unitary shoulder pad as the one depicted here on
24 page 13?

Page 227

1 A. I would agree, yes.
2 Q. Page 14 is yet another picture of
3 shoulder armor?
4 A. Yes.
5 Q. And this one has articulation in it?
6 A. It has articulation.
7 Q. Unlike the Games Workshop shoulder pad?
8 A. Yes.
9 Q. Is that a unitary piece again with a
10 chest armor?
11 A. No, it is not.
12 Q. And the picture has some sort of half
13 circle ridge along the bottom of it?
14 A. Yes, it does.
15 Q. Unlike the Games Workshop design?
16 A. Yes.
17 Q. So again, this is another potential
18 design for a shoulder pad?
19 A. Yes, this one is actually a very common
20 design, and I reproduced this to show the
21 elaborate decoration that can be found on shoulder
22 armor.
23 Q. And this common design is not the one
24 Games Workshop used?

Page 228

1 A. No.
2 Q. Let's look at the next one on page 15.
3 This is another design of shoulder armor?
4 A. Yes, it is.
5 Q. And this one has banding all throughout
6 it?
7 A. It has banding and it also has the
8 ridge running around it.
9 Q. And this one is not a quarter of an
10 ovoid, is it?
11 A. No, it is not.
12 Q. So it's again another shape of a
13 shoulder pad?
14 A. It is indeed.
15 Q. Page 16, is this another shape of a
16 shoulder pad?
17 A. Yes, it is.
18 Q. Again, this is an articulating one?
19 A. Yes, it is.
20 Q. And it's not a quarter of an ovoid?
21 A. No, it is not. It does have the
22 decorative border around it, the edging.
23 Q. Page 17, is that another --
24 A. And it is decorated with --

Page 229

1 Q. Again, if you answer the questions I
2 ask, I didn't ask anything about decorations.
3 On page 17, is this another picture of
4 shoulder armor?
5 A. Yes, that's another grand guard.
6 Q. And again, that is not a half an ovoid?
7 A. No, it is not.
8 Q. And it's got curving around the edge of
9 its shape?
10 A. Yes, it does.
11 Q. And is that a unitary piece with the
12 chest armor?
13 A. Yes, it is.
14 Q. Again, those are different choices than
15 Games Workshop's shoulder pad, correct?
16 A. Yes.
17 Q. Page 18, is this another type of
18 shoulder pad?
19 A. Yes, it is.
20 Q. And again, it's not a quarter of an
21 ovoid?
22 A. No, it's not.
23 Q. And again, it's articulating?
24 A. Yes, it is.

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 230

1    Q.   And again, it has various curves to it
2  instead of the straight lines of the Games
3  Workshop?
4    A.   Yes.
5    Q.   So it's yet another design of a
6  shoulder pad?
7    A.   Yes, it is.
8    Q.   Page 19, is this yet another different
9  design of a shoulder pad?
10   A.   Yes, it is.
11   Q.   And again, it's not the same shape as
12 Games Workshop?
13   A.   That is correct.
14   Q.   And it's articulating instead of Games
15 Workshop's design?
16   A.   Yes.
17   Q.   Page 20, is this another type of
18 shoulder pad?
19   A.   Yes, it is.
20   Q.   Again, a different design from that
21 chosen by Games Workshop?
22   A.   Yes, but very similar.
23   Q.   It has articulations?
24   A.   It does, so yes.

Page 231

1    Q.   It has a large protrusion out from the
2  shoulder to protect the neck?
3    A.   Yes, it does.
4    Q.   And Games Workshop does not have that,
5  does it?
6    A.   No, Games Workshop does not.
7    Q.   It has various curves along it that
8  Games Workshop does not have?
9    A.   That is correct.
10   Q.   Page 21, is this yet another potential
11 design of a shoulder pad?
12   A.   Yes, it is.
13   Q.   And again, it has articulation?
14   A.   Yes.
15   Q.   Again the shape is not a quarter of an
16 ovoid?
17   A.   Almost, but not.
18   Q.   It's not?
19   A.   No.
20   Q.   And again, it has curves along the side
21 that are unlike Games Workshop?
22   A.   Yes.
23   Q.   Page 22, same answers, it's a different
24 shape and different design?

Page 232

1    A.   Yes.
2    Q.   And it has articulation?
3    A.   Yes.
4    Q.   Page 23, same answers?
5    A.   It's the same piece of armor.
6    Q.   Page 24, same answers?
7    A.   No, different answers.
8    Q.   Okay.  Is this again another choice of
9  design for shoulder armor?
10   A.   Yes, it is.
11   Q.   And this has banding all throughout it?
12   A.   Yes, it does.
13   Q.   And it's not a quarter of an ovoid?
14   A.   Yes, it is.
15   Q.   You believe it is?
16   A.   I do.
17   Q.   You put four of these together, you
18 make a perfect ovoid?
19   A.   Not a perfect ovoid.  You do make an
20 ovoid.
21   Q.   In Games Workshop, if you put four of
22 them together, do you get a perfect ovoid?
23       MR. COOPER:  Objection to form.
24       THE WITNESS:  I don't know.

Page 233

1  BY MR. KEENER:
2    Q.   Looking at the shapes and pictures, do
3  you have an opinion one way or another?
4    A.   I would have to do it.
5    Q.   At the top of the Games Workshop
6  shoulder pad, do you see how it's a continuous
7  curve and straight?
8    A.   Yes.
9    Q.   And do you see a different design on
10 the one on page 24 where it curves away from the
11 neck?
12   A.   Yes, I do.
13   Q.   So that's a different shape than that
14 of Games Workshop, correct?
15   A.   Different only in the trivial degree.
16   Q.   It's a different shape, correct?
17   A.   Yes, it is.
18   Q.   And do you see on the shoulder pad on
19 page 24 how the bottom of the shoulder pad flares
20 away?
21   A.   Yes, I do.
22   Q.   And Games Workshop's does not flare
23 away, does it?
24   A.   No, it does not.  Actually I can't tell

59 (Pages 230 to 233)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 234

1  from the images.
2      Q.   You're not making an expert opinion one
3  way or the other on that issue, are you?
4      A.   On the flaring, no.  I would actually
5  have to see the Games Workshop pieces.
6      Q.   And you never asked to see them?
7      A.   No, I did not.
8      Q.   Page 25, is that another potential way
9  to protect the shoulder?
10     A.   Yes, it is.
11     Q.   Again, a different shape than that
12 chosen from Games Workshop?
13     A.   Yes.
14     Q.   And it's not a quarter of an ovoid?
15     A.   No.
16     Q.   And it has articulation?
17     A.   Yes, it has articulation.
18     Q.   Same answer for the next picture on
19 page 26?
20     A.   Yes.
21     Q.   Page 27, is that yet another picture of
22 a shoulder armor?
23     A.   Yes.
24     Q.   Again, a different shape than Games

Page 235

1  Workshop?
2      A.   Yes.
3      Q.   Looking at all those pictures, we saw a
4  large number of different ways to design a
5  shoulder pad, correct?
6      A.   No, we did not.  We saw a small number
7  of ways to design shoulder armor.
8      Q.   You could choose whether to have
9  articulation or not?
10     A.   Yes, you could, but only based on the
11 functionality of it.
12     Q.   You could choose whether or not to make
13 it large and oversized or not?
14     A.   The oversized nature of it deals with
15 the same decision point as the articulation.
16     Q.   You could decide whether or not to have
17 a trimming or band along the outside?
18     A.   No, apparently if you've made the
19 decision to wear an articulated element of armor
20 in that position, all the images that I provided
21 do appear to have the banding on the outside.
22     Q.   So if you didn't have articulating
23 armor, it would be unusual to have banding?
24     A.   I don't know.  I would have to take a

Page 236

1  look at a lot more but that does appear to be the
2  case.
3      Q.   You could choose whether or not to have
4  a straight bottom on the shoulder pad or some sort
5  of curve?
6      A.   Again, that would be a decision I think
7  that would take place when you're deciding whether
8  or not this is an articulating piece or
9  nonarticulating piece.  Early articulating pieces
10 seem to have a cutout to allow for motion of the
11 shoulder, whereas the ones that are fixed in place
12 do not seem to have that cutout.
13     Q.   You could decide whether or not the
14 shoulder pad should extend into the chest region
15 or not?
16     A.   Yes.
17     Q.   You could decide whether the shoulder
18 pad should have an extension that comes away from
19 the shoulder pad to protect the neck?
20     A.   Yes.
21     Q.   You could decide whether a shoulder pad
22 should be a particular shape or not?
23     A.   To some degree, yes.
24     Q.   And as far as you could tell from

Page 237

1  looking at all these medieval choices, none of
2  them made the same design choices of Games
3  Workshop of having a quarter of an ovoid that's
4  oversized with banding around the edge and with
5  straight edges?
6      A.   That is correct.
7      Q.   So you're unable to find any prior
8  military shoulder pads that had those same design
9  choices as Games Workshop?
10     A.   Correct.
11     Q.   Turn to page 11 of your expert report
12 on paragraph 33.  You have a section entitled
13 Heroic Scale.
14         I think you've testified before that
15 you are not an expert in miniature wargaming; is
16 that correct?
17     A.   That's correct.
18     Q.   Not an expert in the design of
19 miniatures?
20     A.   No.
21     Q.   And except for playing with a few dozen
22 or two dozen miniatures when you were 12 to 14
23 years old, you've had no experience with
24 miniatures whatsoever?

60 (Pages 234 to 237)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1    A.   That's correct.
2    Q.   So what basis do you have to provide an
3  expert opinion on important aspects of the design
4  of miniatures?
5    A.   Just my experience from when I was a
6  teenager.
7    Q.   But you agreed with me that does not
8  qualify you as a an expert in the design of
9  miniatures, correct?
10    A.   Yes.
11    Q.   So you have no ability to provide any
12  expert opinion on important aspects in the design
13  of miniatures, do you?
14        MR. COOPER:  Objection to the extent it
15    calls for a legal conclusion.
16        THE WITNESS:  I don't actually know.
17  BY MR. KEENER:
18    Q.   You agreed you're not an expert in the
19  design of miniatures?
20    A.   By expert, what sort of expert do you
21  mean, legal expert or just someone who knows about
22  miniatures?
23    Q.   You testified before you were not an
24  expert in the design of miniatures.

1    A.   Yes.
2    Q.   What meaning were you intending when
3  you said that?
4    A.   I was imagining that I was using
5  like -- I don't know actually, I don't know now.
6  I'm not a legal expert on it and I don't think I'm
7  actually a practical expert on it.  I just had
8  experience as a child with the miniatures.
9    Q.   Other than the two years when you were
10  12 years old that you played with miniatures, you
11  have no experience in miniatures at all?
12    A.   No, I do not.
13    Q.   And no experience in the design of
14  miniatures?
15    A.   No, I do not.
16    Q.   So you are not qualified to identify at
17  all any important aspects needed in the design of
18  miniatures, correct?
19        MR. COOPER:  Objection to the extent it
20    calls for a legal conclusion.
21        THE WITNESS:  Other than on a practical
22    basis, no.
23  BY MR. KEENER:
24    Q.   And the practical basis is just your

1  layman common sense?
2    A.   Yes.
3    Q.   No expert basis?
4    A.   Well, in general art historical
5  context, there are issues of scale in both
6  medieval and Renaissance figure wall art.
7    Q.   I'm not asking about wall art?
8    A.   I know you're not.  I'm giving you
9  context on why I would still have the same
10  experience but based a scholarly reason rather
11  than with miniatures.
12        So I would say that although I do not
13  have experience with miniatures, I could speak to
14  the disproportionality of scale to allow for
15  easier identification of iconographic elements.  I
16  would feel confident saying that.
17    Q.   And that's not expressed anywhere in
18  your opinion?
19    A.   No, it is not.
20    Q.   So based on what's expressed in your
21  report about important aspects in the design of
22  miniatures, you agree that's not something that
23  you have any expertise in?
24        MR. COOPER:  Objection, misstates

1    testimony, calls for a legal conclusion.
2        THE WITNESS:  I am not sure whether my
3    art history background enables me to have an
4    opinion on miniatures in the way that a court
5    would understand an opinion on miniatures.
6  BY MR. KEENER:
7    Q.   You agree you're not having any
8  expertise in the design of miniatures, correct?
9    A.   Correct.
10    Q.   Or their use in tabletop gaming,
11  correct?
12    A.   Correct.
13    Q.   Let's turn to page 12 of your report.
14  On page 12 there's a picture.  What's that picture
15  of?
16    A.   There are two pictures on page 12.
17    Q.   What is the picture on the left?
18    A.   The picture on the left is an AT-AT
19  driver's armor from Empire Strikes Back.
20    Q.   So although you in the text talk about,
21  quote, a Storm Trooper --
22    A.   Yes.
23    Q.   -- that's not the picture of a Storm
24  Trooper that most people would recognize from the

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 242

1 Star Wars movies, correct?
2    A.  I believe it probably is.
3    Q.  You're using this picture to show the
4 shoulder pad, right?
5    A.  Yes.
6    Q.  And that is not the shoulder pad used
7 on regular Storm Troopers in the Star Wars movie,
8 is it?
9    A.  I would have to take a look.  I believe
10 it is similar to it.
11    Q.  Do you know if that's the same shoulder
12 pad used?
13    A.  I do not know.
14    Q.  You don't know one way or the other?
15    A.  No, not right now.
16    Q.  Now, this picture is identified as the
17 AT-AT Driver, correct?
18    A.  Yes.
19    Q.  Do you know whether this picture is,
20 where you see the front of the armor, ever shown
21 throughout the movie?
22    A.  I'm not entirely sure.  I believe it is
23 but I could be incorrect.  I could be wrong.
24    Q.  You're not making an expert opinion on

Page 243

1 that either way?
2    A.  I'm not making an expert recollection
3 of whether or not you can actually see the very,
4 very front of the armor in Empire Strikes Back's
5 Battle of Hoth.  I would have to look at the
6 Battle of Hoth again.
7    Q.  Do you know how long you're able to see
8 any picture of that armor during the Battle of
9 Hoth?
10    A.  No, I do not.
11    Q.  Could it be just a matter of a second
12 or two?
13    A.  I don't know.
14    Q.  Would it surprise you if it was?
15    A.  I don't know.  I'm trying to
16 reconstruct the movie in my head but -- and I
17 believe that the battle was lengthy but I can't
18 recall.
19    Q.  How many times you saw the driver of an
20 AT-AT?
21    A.  Yeah, I can't recall that.
22    Q.  But it wouldn't be shocking to you if
23 it's only for a few seconds?
24    A.  It wouldn't be shocking to me if it was

Page 244

1 longer either.
2    Q.  So you're not making an expert opinion
3 either way on how long this image appears on the
4 screen?
5    A.  No, I don't think that's the important
6 part of idea there.
7    Q.  Well, if it only flashes for a second
8 or two on the screen, would it be your opinion
9 that the person who designed a Games Workshop
10 shoulder pad must have been copying it?
11       MR. COOPER:  Objection, calls for
12    speculation, hypothetical.
13       THE WITNESS:  What the question
14    supposes is that experience of this particular
15    prop is something that is only obtained
16    through either A, a single viewing of a motion
17    picture and not repeated viewing, nor freezing
18    the frame to view, nor encountering this piece
19    or pieces like it at any fan-oriented event,
20    and fan-oriented events are extremely popular
21    and well attended in science fiction circles,
22    and if you were to go to any number of
23    conventions, you would see this suit of armor
24    readily apparent and you can buy reproductions

Page 245

1    of them and figurines of them so I think to
2    characterize it as something that is only
3    experienced as a fleeting moment in a film
4    viewed once doesn't quite represent the
5    experience that people in the science fiction
6    community have with these images.
7 BY MR. KEENER:
8    Q.  So it's your expert opinion that
9 whoever designed Games Workshop shoulder pad must
10 have frozen the frame or otherwise acquired a
11 miniature of this model to base it off of?
12       MR. COOPER:  Objection, misstates
13    testimony.
14       THE WITNESS:  I think that it is
15    extremely likely that a person in the science
16    fiction community would encounter this image
17    in a multiplicity of forms, not necessarily
18    any singular exposure.
19 BY MR. KEENER:
20    Q.  But you have no evidence one way or the
21 other whether or not the person who designed Games
22 Workshop shoulder pad did any of those things?
23    A.  No, I do not.
24    Q.  Now, the shoulder pad we see here is

Veritext Legal Solutions - Midwest
312-442-9087        800-248-3290        fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 246

1  different in design than the ones we saw
2  previously in your museum pictures, would you
3  agree?
4      A.   Yes.
5      Q.   And so it's not some sort of common
6  design that you were able to find in medieval
7  armor?
8      A.   No, it was not.  Indeed, it would be
9  hazardous to your life to wear such a piece if it
10 were real.
11     Q.   Because?
12     A.   Because there are only a very, very
13 small number of places on the human body that an
14 actual medieval combat person would try and score
15 hits.  So for example, when one shows two knights
16 fighting in a film, for example, they will often
17 show them swinging swords at one another as if to
18 chop off arms and legs, whereas in reality, very
19 few swords had sharp edges and instead would be
20 held nodally on the hilt but also on the blade
21 edge and the sword used primarily as a stabbing
22 weapon for a very small number of body parts, such
23 as the eyes, the armpit, the neck or the groin
24 with the goal of severing one of the body's major

Page 247

1  arteries.
2          So if you were wearing that piece of
3  armor, if it really existed, and you were actually
4  having a medieval style combat with someone, they
5  would quickly kill you, which is why I said in the
6  expert report that there are many ways for
7  something to be nonfunctional but only a few ways
8  for something to be functional.
9      Q.   So the shoulder pad worn by the AT-AT
10 driver would provide very minimal protection to
11 the driver in a medieval combat?
12     A.   Yes.
13     Q.   And that's very different than the
14 shoulder pad designed by Games Workshop, correct?
15         MR. COOPER:  Objection.
16         THE WITNESS:  No, it is not.
17 BY MR. KEENER:
18     Q.   You believe similarly the Games
19 Workshop provides very little combat regular
20 protection?
21     A.   I believe it would be entirely
22 nonfunctional.
23     Q.   Would it provide different protection
24 than that from the AT-AT driver?

Page 248

1          MR. COOPER:  Object to the
2  hypothetical.
3          THE WITNESS:  It would provide the same
4  level of nonprotection.
5  BY MR. KEENER:
6      Q.   In different ways though, right?
7          MR. COOPER:  Object to the
8  hypothetical.
9          THE WITNESS:  Yes.
10 BY MR. KEENER:
11     Q.   The Star Wars shoulder pad provides
12 non-protection because it's small?
13         MR. COOPER:  Same objection.
14         THE WITNESS:  No, it provides
15 non-protection because of the way it does not
16 articulate with the body.
17 BY MR. KEENER:
18     Q.   Does not articulate and it doesn't
19 cover anything below the top of the shoulder?
20     A.   No, the coverage is immaterial.
21     Q.   Would you agree that does not cover
22 anything beyond the top of the shoulder?
23     A.   Yes, but nobody stabs you on the top of
24 your shoulder.

Page 249

1      Q.   Would you agree it does not cover
2  anything beyond the top of the shoulder?
3      A.   Yes, I do.
4      Q.   And that's different than the Games
5  Workshop designer's shoulder pad, which goes all
6  the way down to the elbow, correct?
7      A.   We were just talking about the top of
8  the shoulder.
9      Q.   The Star Wars shoulder pad only extends
10 down to just below the top of the shoulder,
11 correct?
12     A.   Oh, I thought you were talking about
13 going up over the shoulder.
14     Q.   It goes down just below the top of the
15 shoulder, correct?
16     A.   It goes to about -- I'd say about here
17 (indicating).
18     Q.   You're pointing a few inches --
19     A.   The Games Workshop one goes to about
20 here (indicating).
21     Q.   You're agree the Games Workshop one
22 goes significantly longer?
23     A.   Yes.
24     Q.   All the way down to the elbow?

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 250

1    A.   Yes.
2    Q.   You agree the Star Wars one protrudes
3  outwards away from the body?
4    A.   I think that's actually a matter of
5  photography.
6    Q.   You don't believe it extends outwards?
7    A.   From my remembrance of seeing this in
8  other contexts, I don't think it does.  I think it
9  actually kind of fits -- I'm not entirely sure.
10  I'd have to see more images of it.
11    Q.   Would you agree that it's positioned
12  differently than Games Workshop's shoulder pad?
13    A.   Well, since it's not really on a
14  person, it's impossible to tell its position
15  in situ.
16    Q.   You've see the soldier pad many times
17  on Games Workshop's space marine, correct?
18    A.   Yes.
19    Q.   Its position is quite different than
20  Games Workshop's, correct?
21    A.   No, I don't think I could make that
22  assumption right now because I'm not seeing it
23  worn on a person.  I think maybe if we saw the
24  still frame, then it might look like it was

Page 251

1  positioned in the same manner, because this is
2  just on a display mannequin.  It's not a person.
3    Q.   It's your expert opinion that the
4  positioning of that shoulder pad is the same
5  positioning as Games Workshop's shoulder pad?
6    A.   No, I don't know.
7    Q.   You have no opinion either way?
8    A.   No.
9    Q.   Can you tell from your picture that the
10  Star Wars shoulder pad is quite thin?
11       MR. COOPER:  Object to form.
12       THE WITNESS:  Quite thin in terms of
13    the thickness of the plastic?
14  BY MR. KEENER:
15    Q.   Yes.
16    A.   Yes, it's probably no more than 16th to
17  a quarter of an inch thick.
18    Q.   And that's different than Games
19  Workshop which is designed to appear quite bulky
20  in thick armor.
21    A.   The Games Workshop one being tinier,
22  probably much thinner.
23    Q.   Based on scale.
24    A.   See, the problem with scale is scale

Page 252

1  presupposes a knowledge of the backstory.  Am I
2  supposed to presume a knowledge of the backstory
3  for these pictures?
4    Q.   Based on the scale of the shoulder pad
5  to the rest of the armor and the rest of the body,
6  can you tell whether the shoulder pad appears to
7  be bulky or thin?
8    A.   No, you really can't.
9    Q.   And you --
10    A.   You can only tell that it's bulky if
11  you know the backstory of the figures.
12    Q.   You have no idea either way whether
13  Games Workshop's shoulder pads are bulky?
14    A.   If this was a 5 foot 7 person, they
15  could be a quarter of an inch.  If this is like a
16  7 foot tall space marine, they could be an inch
17  thick.  I don't know.
18    Q.   You have no opinion either way?
19    A.   Not really, no.  They are oversized but
20  oversize and sort of cumbersome does not equal
21  physical bulk.  You could have something that's
22  oversized and yet thin and pliable, or it could be
23  made out of a material that is incredibly
24  lightweight.

Page 253

1    Q.   Would you agree that the Games Workshop
2  shoulder pad is much more oversized than the Star
3  Wars shoulder pad?
4       MR. COOPER:  Object to form.
5       THE WITNESS:  Yes, it's oversized in
6    comparison with the Star Wars piece.
7  BY MR. KEENER:
8    Q.   And you see in the Star Wars piece how
9  the banding around the edge has large square
10  sections in the corner?
11    A.   Yes, I do.
12    Q.   And you didn't find that in Games
13  Workshop's shoulder pad, did you?
14    A.   I don't believe I did.
15    Q.   Do you know if the Star Wars shoulder
16  pads if put together would make the same shape as
17  the Games Workshop shoulder pads?
18    A.   From the appearance, actually they
19  would, just not oriented in the same angle.  Not
20  oriented in the same direction, so instead of
21  being an egg this shaped, it would be an egg this
22  shaped (indicating).
23    Q.   Do you think the egg would be the
24  same --

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 254

1    A.   Ovoid.
2    Q.   The ovoid would be the same dimensions?
3    A.   The same dimensions or same
4  proportions.
5    Q.   Same proportions?
6    A.   Yes, I believe it would be the same
7  proportions oriented in a different axis.  Along a
8  different axis, sorry.
9    Q.   Did you ever look at the back of the
10  shoulder pads?
11    A.   The back of them?
12    Q.   The underside, the inside?
13    A.   No, I have not.
14    Q.   So you can't comment either way on
15  whether there's any similarities or differences
16  there?
17    A.   No, I cannot.  I'll state again, I have
18  never handled these objects.
19    Q.   You've never seen any pictures of the
20  inside either, have you?
21    A.   No, I have not.
22    Q.   Would you agree that the Star Wars
23  shoulder pad is not part of a power suit of armor?
24    A.   That's actually more difficult to

Page 255

1  answer.  I am unsure whether the presence of the
2  integrated backpack in the Storm Trooper armor
3  indicates that there's any kind of power assist
4  for any of the component element or whether it's a
5  life support thing, so right now I do not have an
6  opinion on it.
7    Q.   You're not making any opinion that it's
8  part of a powered suit of armor?
9    A.   Nor am I not.  It very well could be.
10    Q.   I don't know what possibilities are.  I
11  want to know what your expert opinion you're going
12  to express at trial is.
13         You're not expressing any opinion that
14  the shoulder pad on the Star Wars AT-AT driver is
15  part of a powered suit of armor?
16    A.   No, I am not.
17    Q.   You're not expressing any opinion that
18  the Star Wars shoulder pad you depict here is an
19  indispensable design in sci-fi culture, are you?
20    A.   Could you rephrase the question,
21  please?
22    Q.   Sure.  You saw how we saw different
23  designs in medieval times for shoulder pads?
24    A.   Yes.

Page 256

1    Q.   You agree there's also, as we went
2  through various for the space marine type models,
3  different designs for shoulder pads for science
4  fiction-related future infantry soldier?
5    A.   Yes.
6    Q.   You're not making any expert opinion
7  that this Star Wars design is indispensable or
8  unavoidable to use in creating this future
9  infantry soldier?
10    A.   I'm not suggesting that it is
11  indispensable.
12        MR. KEENER:  Okay.  Do you want to keep
13  going or do you want to it take a break?
14        (Recess taken from 3:33 p.m. to
15        3:40 p.m.)
16  BY MR. KEENER:
17    Q.   Let's turn to page 13 of your expert
18  report.  The image on the top is a picture of
19  armor used in the movie Alien; is that correct?
20    A.   That is correct.
21    Q.   And this is yet another design of a
22  shoulder pad?
23    A.   Yes, it is.
24    Q.   And this one is again articulated?

Page 257

1    A.   Yes.
2    Q.   Unlike the Games Workshop shoulder pad?
3    A.   Yes.
4    Q.   And it has a large series of rivets on
5  the various layers.  Do you see that?
6    A.   Yes, I do.
7    Q.   And that's dissimilar to the Games
8  Workshop one as well, correct?
9    A.   Yes.
10    Q.   So this is another different design of
11  an overlarge shoulder pad?
12    A.   Yes, it is.
13    Q.   And the picture on the bottom of page
14  13 on the left, the Arzach picture, do you see
15  that?
16    A.   Yes.
17    Q.   And those appear to be cloth shoulder
18  pads; is that right?
19    A.   They do indeed.
20    Q.   So again, a different type of shoulder
21  covering?
22    A.   Yes.
23    Q.   Different than Games Workshop's design?
24    A.   Yes.

65 (Pages 254 to 257)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 258

1    Q.   And again, the picture next to it again
2 appears to be a cloth shoulder pad; is that right?
3    A.   That's for difficult to tell.
4    Q.   Can you tell either way?
5    A.   Not really, no.
6    Q.   And again, it's yet another design a
7 shoulder pad?
8    A.   Yes, it is.
9    Q.   Different than Games Workshop's?
10   A.   Yes.
11   Q.   On page 14, you have a picture labeled
12 Michael Devlin.  Do you see that?
13   A.   Yes, I do.
14   Q.   And this is yet another design of a
15 shoulder pad?
16   A.   Yes.
17   Q.   For a future space warrior?
18   A.   Yes.
19   Q.   And this one is kind of a two-piece
20 shoulder pad?
21   A.   Yes.
22   Q.   We can't see the back.  It could be a
23 three-piece?
24   A.   It could be.

Page 259

1    Q.   With a large square type section as one
2 of the pieces?
3    A.   It looks to be square, yes.
4    Q.   And it's attached to another shoulder
5 pad that has what you might call a cutout in it?
6    A.   Yes.
7    Q.   And that's a different design than
8 Games Workshop's shoulder pad?
9    A.   Yes, it is.
10   Q.   And this one doesn't have the ribbing
11 along it like Games Workshop's does?
12   A.   No, it doesn't.
13   Q.   So it has a different design of a large
14 shoulder pad?
15   A.   Yes.
16   Q.   On page 15, you have two pictures from
17 Robert Heinlein, correct?
18   A.   That is correct.
19   Q.   And again, those show additional
20 options and design for shoulder pads for future
21 warriors?
22   A.   Yes.
23   Q.   And again, they are both different
24 designs than that chosen by Games Workshop?

Page 260

1    A.   Yes.
2    Q.   And on page 15 again, you have a
3 picture from Dreadstar?
4    A.   Yes.
5    Q.   Is that a robot?
6    A.   Yes.
7    Q.   So this is not a human inside of a
8 powered suit of armor?
9    A.   No.
10   Q.   So they are not shoulder pads, they are
11 actually part of the robot's skin or skeleton as
12 it were, correct?
13   A.   Exoskeleton, yes.
14   Q.   And you don't know if that picture was
15 ever released in the United Kingdom, do you?
16   A.   No, I do not.
17   Q.   Or what date it would be if it was?
18   A.   No, I don't.
19   Q.   And page 16, the Armored Trooper
20 picture is again another style of shoulder pad?
21   A.   Yes.
22   Q.   But again, this is a robot, not a
23 powered suit of armor for a human, correct?
24   A.   I believe so.

Page 261

1    Q.   And again, this is a different style
2 shoulder pad than the one chosen by Games
3 Workshop?
4    A.   Yes, it is.
5    Q.   And similarly, you have four pictures
6 from the Chronicles of Riddick.  Do you see that?
7    A.   Yes.
8    Q.   And that came out quite a bit after
9 Games Workshop's space marine design, correct?
10   A.   Yes.
11   Q.   Yet again, those feature another four
12 different potential designs for shoulder pads?
13   A.   Yes.
14   Q.   And each of them different than Games
15 Workshop's design?
16   A.   Yes.
17   Q.   And that's the extent of your pictures
18 for shoulder pads, correct?
19   A.   Yes.
20   Q.   So we've looked at a large number of
21 different potential shoulder pad designs?
22   A.   Yes, a large number.
23   Q.   On both medieval times and from science
24 fiction area?

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 262

1    A.   That's correct.
2    Q.   And you saw a variety of different
3  designs of shoulder pads, although they all
4  protect the shoulder?
5    A.   Yes.
6    Q.   You could have different shapes?
7    A.   You can have different shapes.
8    Q.   You can have different sizes?
9    A.   You can have different sizes.
10    Q.   You can have different banding?
11    A.   You can have different banding.
12    Q.   Different decorations?
13    A.   Different decorations.
14    Q.   Different straight lines or curve
15  lines?
16    A.   Yes.
17    Q.   Differences whether it is articulated
18  or not articulated?
19    A.   Yes.
20    Q.   Or how many articulations?
21    A.   Yes.
22    Q.   Whether or not it extends toward the
23  chest?
24    A.   Yes.

Page 263

1    Q.   Whether or not they extend towards the
2  shoulder?
3    A.   Yes.
4    Q.   Whether they have any additional neck
5  protection?
6    A.   Yes.
7    Q.   Whether they are integrated with the
8  rest of the armor?
9    A.   Yes.
10    Q.   And other choices?
11    A.   Yes, there are a very large number of
12  choices.
13    Q.   And you did not find any shoulder pad
14  design that made all the same choices that Games
15  Workshop did in designing its space marine
16  shoulder pad, did you?
17    A.   I did not find any that were identical
18  in every aspect and every element, no.
19    Q.   All right, let's limit it to the size
20  and the shape and the banding, those three
21  elements.
22      Did you find any with all those three
23  elements?
24    A.   Not the size, the shape and the banding

Page 264

1  for anything other than the component part of the
2  robot.
3    Q.   Okay, which you testified was not a
4  part of the powered suit of armor?
5    A.   No, it's a robot, part of a robot.
6    Q.   So a shoulder pad as a piece of armor
7  that a soldier would wear, you're not aware of any
8  shoulder pads that had those common elements of
9  the Games Workshop shoulder pad?
10    A.   It also depends, I guess, if you define
11  the exterior skin of a robot as being --
12  exoskeletal as being part of the robot.
13    Q.   Let me rephrase that again.
14      In searching for shoulder pads used on
15  future infantry warriors, a human wearing a suit
16  of power armor, you were not able to identify any
17  shoulder pads that had those three common design
18  elements of the Games Workshop, size, shape and
19  banding?
20    A.   Correct.
21    Q.   So as you sit here today, you are not
22  expressing any expert opinion that that
23  combination of design elements is in any way not
24  original?

Page 265

1      MR. COOPER:  Could you read the
2  question?
3      (Record read.)
4      MR. COOPER:  Object to form, misstates
5  testimony.
6      THE WITNESS:  I'm not saying it's not
7  original?
8  BY MR. KEENER:
9    Q.   Right, you're not making an expert
10  opinion that this combination is unoriginal?
11    A.   I think I've said it's unoriginal.
12    Q.   That that combination of three
13  elements?
14    A.   I don't think that that combination of
15  three elements is relevant for originality.
16    Q.   My question is, I think you've said you
17  were not able to find anything in --
18    A.   Right.
19    Q.   -- prior military history or science
20  fiction with that combination of three elements?
21    A.   Correct.
22    Q.   So you are not making an expert opinion
23  that that combination of three elements is
24  unoriginal?

67 (Pages 262 to 265)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 266

1     MR. COOPER:  Objection, misstates
2  testimony, define original.
3     THE WITNESS:  I do not think that those
4  three items taken together as a choice is an
5  original thing.
6  BY MR. KEENER:
7     Q.   Although you cannot point to anything
8  that you've seen with that same three choices?
9     A.   Correct.
10    Q.   And you're not making any expert
11  opinion that those three choices combined together
12  is some sort of essential combination that a
13  designer would need to do to make a future
14  infantry soldier?
15    A.   Correct.
16    Q.   Someone making a future infantry
17  soldier would have many choices on how to design a
18  shoulder pad?
19    A.   Yes, they would.
20    Q.   And there's no standard ways that they
21  would have to make it?
22    A.   No, there isn't.
23    Q.   There's a virtual unlimited amount of
24  ways?

Page 267

1     A.   Yes.
2     Q.   And you're not identifying any
3  characteristics that you believe are
4  indispensable?
5     A.   No.
6     (Plaintiff's Exhibit 193, memorandum
7     opinion and order, marked for identification.)
8  BY MR. KEENER:
9     Q.   I'm going to show you what's been
10  marked Plaintiff's Exhibit 193.  I'm not going ask
11  you to read all of this.
12    MR. COOPER:  Well, I'm going to ask him
13  to read it to the extent he needs to to answer
14  any of your questions.
15  BY MR. KEENER:
16    Q.   My first question is:  You discussed
17  being provided some sort of legal looking document
18  but you couldn't recall what it was.  Do you know
19  if this was it?
20    A.   I do not believe this was it.
21    Q.   I would like to turn your attention to
22  page 18.  There's a section that starts
23  Scènes à faire.  Do you see that beginning of the
24  section?  Are you there?

Page 268

1     A.   Yes, I am.
2     Q.   Okay.
3     Now I'm going to start with the second
4  paragraph that states, "The scènes à faire
5  doctrine does not bar copyright protection for
6  work simply because it contains unprotectable
7  elements.  A claim of infringement, however,
8  cannot be based on such elements alone -- rather,
9  it must be the unique combination of those
10  elements (or 'particular novel twists given to
11  them') that provides the originality required for
12  copyright protection."
13    Do you see that?
14    A.   Yes, I do.
15    Q.   Do you have any reason to disagree with
16  anything there?
17    A.   I'm not a lawyer.  I have no reason to
18  disagree nor agree with anything here.
19    Q.   Do you see where it says "a unique
20  combination of those elements"?
21    A.   I also see where it cites some sort of
22  case law.
23    Q.   That wasn't my question.
24    A.   I know that wasn't your question.  I do

Page 269

1  indeed see it but it meanings nothing to me.
2     Q.   For example, on the shoulder pad, do
3  you have any opinion one way or the other whether
4  or not the combination of the size, shape and
5  banding of Games Workshop's shoulder pads is a
6  unique combination of elements?
7     A.   No, I believe it's a rudimentary
8  arbitrary combination of elements.
9     Q.   It may be arbitrary but do you believe
10  it's a unique combination?
11    A.   I believe it's a rudimentary
12  combination.
13    Q.   Do you believe anyone else has made
14  that combination?
15    A.   I have no earthly idea.
16    Q.   You are not able to express an opinion
17  that someone else has ever made that combination,
18  are you?
19    A.   Nor that they haven't made it.
20    Q.   Right, so as far as you're aware of,
21  Games Workshop could have been the first person to
22  combine those three elements?
23    A.   They could have been.
24    Q.   And you're not disputing that if they

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1  claim they were?
2      A.   I haven't been asked to dispute it.
3      Q.   You have no basis to dispute it?
4      A.   I would have to do research to dispute
5  it.
6      Q.   And the research you've done, you have
7  not been able to find any other shoulder pad ever
8  in existence, in reality or in fantasy or in
9  science fiction, with those combination of
10 elements?
11     A.   Well, if that had actually been part of
12 the claim, I probably would have researched it to
13 look for those particular things but I was never
14 told in this document that those three arbitrary
15 and rudimentary elements would be in any way
16 important.
17     Q.   But based on the research you did do,
18 you're not able to find -- you were not able to
19 find anything --
20     A.   Based on the research I did not do,
21 yes.
22     Q.   Let me ask my question before you
23 answer it.
24          Based on the research you did and all

1  the images you found, you were not able to locate
2  any that had those three elements?
3      A.   No.
4      Q.   The next paragraph talks about "To
5  qualify for copyright protection, a work must be
6  original to the author."  There's a case cite.
7  "Originality in the copyright context 'means only
8  that the work was independently created by the
9  author and that it possesses at least some minimal
10 degree of creativity.'"  Another case cite.  "This
11 low threshold permits even a small amount of
12 creativity to render a product protectable under
13 copyright law."
14          Do you see those three sentences?
15     A.   Yes.
16     Q.   Do you have any opinion whether or not
17 any of the Games Workshop products have even a
18 small amount of creativity?
19     A.   I have no opinion in this legal
20 context, no.
21     Q.   Outside the legal context, looking at
22 Games Workshop space marine --
23     A.   Outside the legal context would appear
24 to be irrelevant but if I were asked to say so, I

1  would say that it does not possess -- actually, I
2  would say it possesses a minimal degree of
3  creativity.
4      Q.   So you agree that Games Workshop's
5  space marines possess a minimal degree of
6  creativity?
7          MR. COOPER:  Objection, misstates
8     testimony as to what product you're talking
9     about.
10         THE WITNESS:  Under this kind of
11    context, I really don't know.  I don't know
12    how to answer this question.
13 BY MR. KEENER:
14     Q.   Without regard to this context.
15         MR. COOPER:  Don't regard the opinion
16    if he tells you not to regard the opinion.
17    Put it out of your mind.
18 BY MR. KEENER:
19     Q.   My question is:  Do you believe Games
20 Workshop's design of the space marine involved a
21 minimal level of creativity?
22     A.   The problem here is that it appears to
23 be a legal term, this minimal degree of
24 creativity, not an actual sort of scholarly or

1  artistic or real world term.
2      Q.   Use it as you would --
3      A.   I can't use it.  I do not have
4  experience in law.
5      Q.   I'm not asking for experience in law.
6          MR. COOPER:  You did put this court
7     order in front of him.
8          MR. KEENER:  Place an objection if you
9     want.
10 BY MR. KEENER:
11     Q.   My question is:  Without regard to this
12 court opinion, do you believe Games Workshop's
13 design choices involved creating its space marine
14 involved any artistic minimal degree of
15 creativity?
16     A.   I'm sorry, I can't put this out of my
17 mind now that it's in there.
18     Q.   You're unable to answer that question?
19     A.   I'm unable to answer that question.
20     Q.   So you are not going to be opining that
21 they do not contain a minimal level of creativity?
22         MR. COOPER:  Objection to the extent it
23    calls for a legal conclusion, that this whole
24    line of questioning having been spoiled by

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 274

1    your use of this exhibit.
2        THE WITNESS: I really can't answer
3    that question.
4    BY MR. KEENER:
5        Q.   You can't tell me whether or not you
6    will or will not be opining on that subject?
7        A.   I don't know.
8        Q.   That's why I'm asking, are you going to
9    be opining on the subject whether or not any Games
10   Workshop design involved a minimal level of
11   creativity?
12       MR. COOPER: I object to the use of
13   "minimal level of creativity." He's given you
14   what his expert opinion is. This calls for a
15   legal conclusion.
16       THE WITNESS: I mean in my previous
17   understanding of what the issues were before
18   seeing this document, I would say there is no
19   minimal level of creativity in the product.
20   It is merely assembled out of commonplace
21   elements from the history of science fiction
22   fantasy and the actual world, but with the
23   context of this document --
24       MR. COOPER: He didn't ask you about

Page 275

1    the context of the document.
2    BY MR. KEENER:
3        Q.   And you previously testified that you
4    weren't able to identify anything prior existing
5    with that same combination of known elements,
6    correct?
7        A.   Correct.
8        Q.   And do you believe there was any level
9    of creativity in choosing what elements to combine
10   together?
11       A.   Not really, no.
12       Q.   So there is no level of creativity
13   involved in combining different known elements
14   together in a unique way?
15       A.   No, it's more of a craft.
16       Q.   But no level of creativity?
17       A.   No level of art.
18       Q.   And that's your expert opinion?
19       A.   Yes, it is a craft, not an art. Let me
20   put this away. I don't want to look at this
21   anymore.
22       Q.   Let's look at the bottom of page 19 of
23   that same exhibit. It begins, "Chapterhouse has
24   presented a report from William F.M. Brewster, the

Page 276

1    Curator of Collections for the First Division
2    Museum at Cantigny Park in Wheaton, who stated
3    that Games Workshop's shoulder pads are 'in
4    keeping' with previous examples of military-style
5    shoulder pads found throughout history."
6        Stopping there, is that similar to your
7    opinion that you believe the shoulder pads are
8    similar to or derived from other shoulder pads in
9    history?
10       MR. COOPER: Objection, this is a
11   question based on what William F.M. Brewster
12   has said, and Dr. Grindley has not read his
13   report, opined on it --
14       MR. KEENER: Counsel, no speaking
15   objection, place an objection to form and
16   we'll continue.
17 DI    MR. COOPER: No, I'm going instruct you
18   not to answer. Your question is absolutely
19   outside the scope and has nothing to do with
20   Dr. Grindley's opinion.
21       Don't answer that question.
22       MR. KEENER: You're instructing him not
23   to answer and it's not on a basis of
24   privilege; is that understood? Is that

Page 277

1    correct? There's no privilege objection and
2    you're instructing the witness not to answer
3    in contrary to the rule; is that correct?
4        MR. COOPER: That is not correct, it is
5    not in contradiction to the rules. This is
6    absolutely outside the scope of his report.
7        MR. KEENER: You understand you can
8    only instruct him not to answer on the basis
9    of privilege, correct?
10       MR. COOPER: The objection here is you
11   cannot ask him to --
12       MR. KEENER: Then place your objection.
13   Do not instruct him not to answer.
14       MR. COOPER: I am instructing him not
15   to answer. If you want to get to the court
16   and get the court to say he should answer a
17   question about what F.M. Brewster said and
18   opined on, then you can do that. You can get
19   court on the phone right now and the judge can
20   decide whether or not he's going to answer the
21   question.
22   BY MR. KEENER:
23       Q.   Are you refusing to answer the
24   question?

70 (Pages 274 to 277)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5