**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED,       ) | |
| ) | |
| Plaintiff,     ) | Civil Action No. 1:10-cv-08103 |
| ) | |
| v.           ) | Honorable Matthew F. Kennelly |
| ) | Honorable Jeffrey T. Gilbert |
| CHAPTERHOUSE STUDIOS LLC,   ) | |
| ) | |
| Defendant.     ) | |

**LOCAL RULE 56.1(b)(3) RESPONSE AND EVIDENTIARY OBJECTIONS
OF DEFENDANT CHAPTERHOUSE STUDIOS LLC TO
PLAINTIFF GAMES WORKSHOP'S STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT;
CHAPTERHOUSE STUDIOS LLC'S ADDITIONAL MATERIAL FACTS**

Defendant Chapterhouse Studios LLC ("Chapterhouse") hereby responds to the

Plaintiff's statement of undisputed material facts as follows:

1.     Chapterhouse has produced in discovery no evidence that it has acquired any rights from any of the Games Workshop authors in question and has asserted no claim in this action concerning any such possible rights. (Moskin Dec. ¶ 2.)

**RESPONSE: UNDISPUTED** as to authors of the allegedly copyrighted works.

2.     One of the former employees for whom Games Workshop was unable to obtain a confirmatory assignment, Robert Naismith, who sculpted the first Space Marine figure in 1985 as well as the earliest Games Workshop Rhino and Landraider vehicles, confirms that he did so as an employee with all rights belonging to Games Workshop. (Naismith Tr. P. 54 l. 3 – 55 l. 22; Moskin Decl. Ex. A.)

**RESPONSE: UNDISPUTED.**

3.     Chapterhouse admits that 87 of the 107 trademarks and logos identified in Games Workshop's Third Supplemental Response to Chapterhouse Studio's Interrogatory 18 were used in commerce by Games Workshop before Chapterhouse began using the subject names in reference to its own products. (2/20/013 Villacci Tr. 167 l. 5 – 170 l. 6; Moskin Decl. Exs. B and C.)

**RESPONSE:**

Games Workshop dates of first use – lacks foundation (FRE 602)

Unregistered logos listed only as names in Games Workshop's Third Supplemental Response to Chapterhouse Studio's Interrogatory No. 18 – lacks foundation (FRE 602).

Mr. Villacci's awareness or knowledge of Games Workshop's use of any of the 107 alleged trademarks in commerce – lacks foundation (FRE 602).

The existence of trademark rights in any of the 107 words listed in Games Workshop's Third Supplemental Response to Chapterhouse Studio's Interrogatory No. 18 has not been proven – lacks foundation (FRE 602).

**DISPUTED.**

Mr. Villacci's testimony does not support the broad characterization submitted by Games Workshop. Mr. Villacci affirmatively identified certain of the words listed in Games Workshop's Third Supplemental Response to Chapterhouse Studio's Interrogatory No. 18 which he believed Chapterhouse has never used or has not used in the nature of a trademark. (2/20/2013 Villacci Rough Tr. at 169, l. 11-17, Moskin Decl. Exs. B and C.). Mr. Villacci identified one alleged trademark for which Chapterhouse obtained permission from the creator of the symbol. (2/20/2013 Villacci Rough Tr. at 170, l. 4-5, Moskin Decl. Exs. B and C.). Mr. Villacci identified certain words that he believed Chapterhouse used to describe its products prior to any use by Games Workshop sufficient to establish that consumers recognize Games Workshop as the source of the any product sold under that name. (2/20/2013 Villacci Rough Tr. at 167, l. 9- 169, l. 8; 169, l. 18- 170, l. 12, Moskin Decl. Exs. B and C.). Mr. Villacci was neither asked about nor provided any affirmative representation regarding Games Workshop's first use in commerce of the remaining words or symbols identified in Games Workshop's Third Supplemental Response to Chapterhouse Studio's Interrogatory No. 18. (2/20/013 Villacci Tr. 167 l. 5 – 170 l. 12; Moskin Decl. Exs. B and C.) Mr. Villacci further clarified that his response

2

to the preceding questions were not intended to reflect any acknowledgement of the existence of

trademark rights in the words listed in Games Workshop's Third Supplemental Response to

Chapterhouse Studio's Interrogatory No. 18. (2/20/013 Villacci Tr. 170. ll. 1-12, Moskin Decl.

Exs. B and C.)

4. Chapterhouse admits that of the remaining 20 trademarks and logos identified in Games Workshop's Third Supplemental Response to Chapterhouse Studio's Interrogatory 18, all were used (even if not in commerce) by Games Workshop before Chapterhouse began using the subject names in reference to its own products. (2/20/013 Villacci Tr. 170 l. 17 – 173 l. 4; Moskin Decl Ex. B.)

**RESPONSE:**

Games Workshop's use of particular words in a manner that does not constitute trademark usage is irrelevant to any issue in this case. (FRE 402).

Games Workshop dates of first use – lacks foundation (FRE 602)
Unregistered logos listed only as names in Games Workshop's Third Supplemental Response to Chapterhouse Studio's Interrogatory No. 18 – lacks foundation (FRE 602).

The existence of trademark rights in any of the 107 words listed in Games Workshop's Third Supplemental Response to Chapterhouse Studio's Interrogatory No. 18 has not been proven – lacks foundation (FRE 602).

The question asked of Mr. Villacci at 172, ll. 16-25 is compound.

**DISPUTED.** Mr. Villacci's testimony does not support the broad characterization

submitted by Games Workshop as an undisputed fact. Mr. Villacci testified only that Games

Workshop had used the word Blood Ravens in fiction prior to Chapterhouse's sale of a product

described using the words Blood Raven and that Games Workshop "mentioned the idea of each

of these ideas in fiction before we came out with our idea of it." (2/20/013 Villacci Tr. 170 l. 17

– 173 l. 4; Moskin Decl Ex. B.)

5. As set forth in Chapterhouse's Supplemental Response to Games Workshop's Interrogatory 8 in the second phase of the litigation (alternate number 24), attached hereto as Exhibit D, Chapterhouse has not set forth facts to support any of its affirmative defenses. (Moskin Decl. Ex. D.)

**RESPONSE: DISPUTED.**

In its Supplemental Response to Games Workshop's Eighth Set of Interrogatories, Chapterhouse explicitly outlined the basis for its affirmative defenses, including Games Workshop's failure to produce proof of its ownership of the asserted copyrights, fraud on the copyright office, copyright fair use, nominative fair use, preemption, and genericness. (Moskin Decl. Ex. D.) Chapterhouse provided additional support for its affirmative defenses in its Supplemental Responses to Plaintiff's Seventh Set of Interrogatories. Specifically, Chapterhouse provided the identification of non-Games Workshop sources relied upon by Chapterhouse's designers in creating their works (Interrogatory No. 18) and provided additional detail regarding its nominative fair use defense with respect to the selection of product names and descriptions (Interrogatory No. 22). (Hartzell Decl. Ex. A). The depositions of Chapterhouse and its designers along with the documents produced by each provide further support for these affirmative defenses. (Hartzell Decl. Ex. B, Villacci Deposition Transcript, February 20, 2013, pg. 127, line 24; pg. 136, lines 9-13; pg. 149, lines 10-11; pg. 149, lines 20-22; pg. 151, lines 1-4; pg. 153, lines 8-10; pgs. 168-169, lines 20-4; pg. 182, lines 7-9, Ex. C, Villacci Deposition Transcript, February 20, 2013, pg. 44, lines 7-10; pg. 93, line 19-95, line 25; pg. 100, lines 8-11; Ex. H, Lippman Deposition Transcript February 15, 2013, pg. 176, line 18- pg. 185, line 25]

6.     As set forth in Chapterhouse's Second Supplemental Response to Games Workshop's Interrogatory 13 in the first phase of the litigation attached hereto as Exhibit E Chapterhouse has not set forth facts to support any of its affirmative defenses. (Moskin Decl. Ex. E).

**RESPONSE: DISPUTED.** In its Second Supplemental Response to Games Workshop's Second Set of Interrogatories, Chapterhouse explicitly outlined the basis for its affirmative defenses, including its ownership dispute (which was also extensively briefed on Summary Judgment), fair use, *de minimis* copying, independent creation, waiver, acquiescence, copyright

4

misuse, license and nominative fair use. (Moskin Decl. Ex. E). Chapterhouse additionally

incorporated by reference its response to Interrogatory No. 2 which identified sources used

reviewed or relied on by Chapterhouse in creating each of the Accused Works and documents

produced in accordance with the interrogatory.

7.      Attached hereto as Exhibit(s) F is a true copy of Games Workshop's Copyright Registration No. VA1-824-668 for the Flesh Tearer shoulder pad (dated March 8, 2012). (Moskin Decl. Ex. F).

**RESPONSE: UNDISPUTED.**

8.      As set forth in the January 4, 2013 declaration of Jonathan Moskin opposing Chapterhouse's motion for reconsideration (Dkt No. 270-1) attached hereto as Exhibit G, Games Workshop made no false or misleading statements to the Copyright Office in the course of applying to register its Assault Squad Shoulder Pad design and in declining to register the work, the Copyright Office did not, at any rate, rely on any statements made by Games Worskhop.

**RESPONSE: UNDISPUTED** that the Copyright Office declined to register the work

and appears not to have relied on any statement made by Games Workshop. **DISPUTED** as to

Games Workshop's representation that it made no false or misleading statement to the Copyright

Office in the course of applying to register its Assault Squad Shoulder Pad design. *See*

GW0011428, Ex. G to Declaration of J. Hartzell.

9.      As set forth in paragraph 20 of Games Workshop's August 14, 2012 Statement of Undisputed Material Facts (Dkt No. 213-2), in a July 18, 2011 webcast (posted well after commencement of this action), Mr. Villacci explained that his method of generating new product ideas is to derive them directly from Games Workshop's publications – particularly where Games Workshop has not yet launched a product to fill the perceived demand among players. (Sometimes these are also in response to customer requests.) In his own words, and in response to a question from the interviewer as to how he decides to launch new products, Mr. Villacci admits:

> We put ourselves in the position of the player out there who doesn't have a lot of options. He's read the book and says, hey cool, you know. You really fall in love with Soul Drinkers or you play a ton of war games and you fall in love with Blood Ravens and you want to do something to use them on the table but there's No option.

See http://www.tangtwo.com/11thcompany/episodes.cfm, Episode 78 at 2:15:09 - 2:16:11.

**RESPONSE:**

Each statement in GW's SUF No. 9 is irrelevant to any issue in this case. FRE 402.

- The "webcast" cited in SUF 9 lacks foundation (FRE 602) and has not been submitted as an exhibit.

- To the extent the "webcast" is admissible, GW mischaracterizes and selectively quotes Mr. Villacci's statements.

- GW mischaracterizes the quoted statement, which speaks for itself. (FRE 1002.)

- "created by Games Workshop" – lacks foundation (FRE 602).

**DISPUTED, for the following reasons:**

To the extent admissible, the interview does not support the breadth of Games

Workshop's characterization of Mr. Villacci's comment. The question that Mr. Villacci asked

was limited in scope and his response has been taken out of context of the complete interview.

Mr. Villacci was asked a specific question about the selection of the type of non-standard

shoulder pads to make:

Patrick:    Uh, you have, um, a lot of non-standard chapter shoulder pads, like the soul drinkers, the salamanders, mantis warriors--

Nick:       Mm-hm.

Patrick:    -- Um, how do you guys decide what shoulder pads to make?  I mean it's for really a large market for mantis warrior shoulder pads.  I mean how do you guys decide to pick like the blood ravens over, like, black templars, or something like that?

*See* Players, Strategies and Tactics, Episode 78, "It's What Terminators have nightmares

about," 2:07:23 to 2:18:07 podcast.  http://www.tangtwo.com/11thcompany/episodes.cfm.

Mr. Villacci's full response emphasizes that approximately a quarter of the shoulder pad

products frequently originate from custom designs submitted by consumers created from scratch:

Nick: Um, it's, it's really, I guess, up to our personal preference. Um, obviously, I don't play all those armies, my space marines are salamanders and, uh, that's, that's why a lot of our stuff that we do is salamanders. Um, but the, the smaller things -- we just kind of look at that we put ourselves in the position of that, that player out there who doesn't really have an option to, you know -- he's read the book and said, *Hey cool*. And, you know, you really fell in love with the soul drinkers or, you know, play the dawn of war games. You fell in love with the blood ravens, and you, you want to do something to, you know, use them on the table, but there's no options. That's, that's kind of what we did for those, um, in a lot of the other factions. Um, also though there's, there's players that come with this, and they're serious about their armies. I mean we, we spend, what, hundreds of dollars on these things -- these armies -- um, and they don't have an option, uh, for their shoulder pads, or they want something designed, you know, from scratch, and something original. Um, they come to us, and we, we get lots of requests for custom shoulder pad designs, and sometimes people are willing to put the time and, uh, money into having designs sculpted up from scratch and then put into production. And that's how, uh, maybe a quarter of what our shoulder pads come out. Uh, they're custom designs people will pay for, and they give us permission to sell once we do all the work for them. Um, that's how the mantis head shoulder pads came into existence. Um, I mean I've always been intrigued by the mantis orders, too, but it, it, it's really -- we're really lucky that people come up to us and ask us to do custom designs and are willing to pay us to do, that they trust us enough and, um, it's really cool. And then when they allow us to sell them on our website it's even better. You know, it helps us recoup the time and, and the low cost for a lot of players to design those, 'cause we really don't charge all that much for, uh, creation. That's, that's how that comes into –

  Similarly, Mr. Villacci was asked in the same podcast about how other products offered by Chapterhouse were created and he identified a number of different factors upon which he relied in selecting those products. For example, when asked why the extension kit for the Storm Raven was created, he explained that it adds a new dimension to the storm raven to make it look feasible as a transport and provide additional cargo space which created additional demand for the underlying Games Workshop product that it was intended to be used with:

Patrick: Now, Nick and Chapterhouse Studios are sponsoring our, our event in November, which we're thankful for. Actually, the reason we brought him up here is to talk about some of the new releases he has. For example, you, you created an extension kit for Storm Raven.

Nick: Mm-hm.

Patrick: I'm just curious, why, why an extension kit?

7

Nick:      First off, the creator, his name's Steven Smith, and, uh, he has sculpted some other stuff for us. He did the techmarine beamer backpack, the gun halbers, which are kind of reminiscent for the custodians astardes. Anyone familiar with a horse knows who they are. Um, and he, he tends to do stuff — I call it true-scale trademark, whatever you want to call it— um, true-scale. And, uh, he's, uh, done some good work for us. I mean we got some other kits I can't really talk about yet, but, um, that was something he was working on the side, and he showed it on DakkaDakka.com, the forum, and people were just drooling all over it. And I think it adds a new dimension to the storm raven, which a lot of people really want. They want it to look -- I, I think a lot of peoples' crit-, criticized storm raven as not looking good. Um, I mean I, I seen it in person, and it -- compared to the land raider, you're just -- to me, I was underwhelmed. I was like *really*. And this little kit actually makes it look feasible as a transport comparable to the land raider, which, if you know the rules, it actually carries more than a land raider does. Um, so this little kit -- uh, it extends the cargo hold of the storm raven, and we also included a little piece that, if you magnetized it, it could actually hold a dreadnought on the back. It's a little grapple harness, as well.

Patrick:   Which makes it easier than the current model?

Nick:      Yeah, I, I would think that the current model comes with any pieces that you can actually test to a dreadnought. Again, you just got to do whatever you can to do it. Um, but, you know, that was really a secondary concern and just an additional option. But just releasing that kit, ton -- I've heard tons of people say that they were -- they were never going to buy a storm raven, but when they saw the kit, that they were like *alright, well, now GW's going to get our, our money,* just 'cause your kit makes storm raven what it should've been in the first place. Um, maybe call it a -- a baby thunder hawk, even. Um, so, yeah, so we, we did that. Steven's done a great job. Um, my -- my only concern at the moment is the demand is outpacing the supply at the moment, and that's why it's not on the website yet. I -- I did a pre-order for two weeks beforehand, and we sold -- I want to say about 60 of them within those two weeks, and unfortunately the, the caster we were working with could not keep up with that, and so that's why it's not on the website. Uh, I want to get those pre-orders filled first and build the stock up before we, you know, throw it up there. Basically, immediately you have to put "out of stock." So [laughs].

           Similarly,  when asked about the wheeled chimera products, Mr. Villacci explained how

that product came to be:

Patrick:   The -- the other thing that, that I was looking at was you have a wheel armor conversion kit for chimera.

Nick:      Mm-hm.

Patrick:   What's wrong with track chimeras? Why, why wheels? What's up with this?

Nick:      Um, I don't think there's anything wrong with track chimeras. I just -- uh, there's not really any option for the imperial guard to have wheeled vehicles, and I don't think there's any special rules for armor or anything like that. I'm not an IG player at all, but I think a lot of people would like to look at the, the U.S. striker tank. There's a few other tanks out there that are wheeled. Uh, and people just -- they would like that option, and it's, it's nothing GW or even Forge World's ever done, so it was an easy kit. It's actually an old design that we've had basically in our, in our library for about a year and a half, and we finally got it to print up and released, and it, it, works out nicely. The, the guy who did it -- his name's Jeff Nagy. Uh, he did the combi bolters, and it's all 3D design, and we printed it up, and honestly, I didn't expect the, you know, people to like it as much as they do. And it, uh, sells pretty well. It's right up there with the storm raven kit, but I think that all new kits are like that. You know, you get that high initial demand, and that tapers off after a little bit.

10.    As set forth in paragraph 22 of Games Workshop's August 14, 2012 Statement of Undisputed Material Facts (Dkt No. 213-2), the Chapterhouse website includes a disclaimer of association with Games Workshop (but with no other entity) and also the following admission (which was expanded to its current format during the pendency of this litigation):

> Adeptus Astartes, Battlefleet Gothic, Black Flame, Black Library, the Black Library logo, BL Publishing, Blood Angels, Bloodquest, Blood Bowl, the Blood Bowl logo, The Blood Bowl Spike Device, Cadian, Catachan, the Chaos device, Cityfight, the Chaos logo, Citadel, Citadel Device, City of the Damned, Codex, Daemonhunters, Dark Angels, Dark Eldar, Dark Future, the Double-Headed/Imperial Eagle device, 'Eavy Metal, Eldar, Eldar symbol devices, Epic, Eye of Terror, Fanatic, the Fanatic logo, the Fanatic II logo, Fire Warrior, Forge World, Games Workshop, Games Workshop logo, Genestealer, Golden Demon, Gorkamorka, Great Unclean One, the Hammer of Sigmar logo, Horned Rat logo, Inferno, Inquisitor, the Inquisitor logo, the Inquisitor device, Inquisitor:Conspiracies, Keeper of Secrets, Khemri, Khorne, Kroot, Lord of Change, Marauder, Mordheim, the Mordheim logo, Necromunda, Necromunda stencil logo, Necromunda Plate logo, Necron, Nurgle, Ork, Ork skull devices, Sisters of Battle, Skaven, the Skaven symbol devices, Slaanesh, Space Hulk, Space Marine, Space Marine chapters, Space Marine chapter logos, Talisman, Tau, the Tau caste designations, Tomb Kings, Trio of Warriors, Twin Tailed Comet Logo, Tyranid, Tyrannid, Tzeentch, Ultramarines, Warhammer, Warhammer Historical, Warhammer Online, Warhammer 40k Device, Warhammer World logo, Warmaster, White Dwarf, the White Dwarf logo, and all associated marks, names, races, race insignia, characters, vehicles, locations, units, illustrations and images from the Blood Bowl game, the Warhammer world, the Talisaman world, and the Warhammer 40,000 universe are either ®, TM and/or © Copyright Games Workshop Ltd 2000-2010, variably registered in the UK and other countries around the world. Used without permission. No challenge to their status intended. All Rights Reserved to their respective owners. (Ex. 18 at 3)

**RESPONSE:**

The existence and/or identification of trademark rights in the United States in any of the words listed in SUF 10 has not been proven – lacks foundation (FRE 602).

The existence of copyright protection for any particular expression of any idea listed in SUF 10 has not been proven – lacks foundation (FRE 602).

Chapterhouse does not dispute that its website at www.chapterhousestudios.com includes a prominent disclaimer of association with GW. Otherwise, **DISPUTED** as to the language of the disclaimer and Games Workshop's characterization of the legal effect of the inclusion of the disclaimer.

11.     As set forth in paragraph 24 of Games Workshop's August 14, 2012 Statement of Undisputed Material Facts (Dkt No. 213-2), Mr. Villacci claims no skill as an artist (Ex. 21 at 51:8-11), but instead relies on independent designers to create the accused works (Id. at 49:22– 51: 18). One of the designers succinctly explained the process:

> A: He [Villacci] wants the icon to be recognizable but still interesting.
> …
> Q: Did you, as a sculptor, take this as an instruction that whatever you did, make sure it was still recognizable to 40K players as Flesh Tearer Icon.
> A: Yes.
> Q: Did it have to be recognizable to 40K players as a Flesh Tearer icon?
> A: So people could convert a Flesh Tearer army or build a Flesh Tearer Army.
> …
> Q: One of the instructions from Mr. Villacci, I think what you said, was that you could have slight variations as long as it's still recognizable as the Games Workshop icon and be okay?
> A: I'd say that's a pretty accurate paraphrase.
> …
> Q: So your idea was instead of having the saw blade flat on the pad you'd have it sticking out from the pad?
> A: Yes, basically.
> Q: Why did Mr. Villacci tell you that was a bad idea?
> A: Because he said they don't like deviating too much from the norm, I guess. That's what it says.
> Q: What does that mean to you, deviate from the norm?
> A: I think he means it's more recognizable if it's not sticking out.
> Q: So as the sculptor on this icon, what do you take this instruction from Mr. Villacci to mean?
> A: Don't have the blade sticking out of the pad.

Q: And instead do what?
A: Do it the way that we ended up doing it.
…
Q: And that's because it's more recognizable to 40K players as the, quote, 40K norm?
A: Yes.

(Ex. 22, Deposition of Wyatt Traina ("Traina Dep.") at 66:17-67:14, 94:16-23, 103:24-105:8)

**RESPONSE:** SENTENCE ONE: the statements in the first sentence are irrelevant to any issue in this case. FRE 402.

Otherwise **DISPUTED**.

SENTENCE ONE: GW's Exhibit 21 does not contain the referenced pages. Mr. Villacci's deposition testimony does not support this statement. Rather, Mr. Villacci stated:

> Q.  Do you do any of the design work yourself?
> A.  There's one product that was wholly designed by myself.
> Q.  What was that?
> A.  I believe it's a shoulder pad and we just designate it a Mach I shoulder pad.
> Q.  Is that -- is that a product that incorporates any -- in anything -- is that one of the products at issue in this lawsuit?
> A.  I think so.
> Q.  So you don't have any drawings that you created?
>       MS. GOLINVEAUX:  Objection, vague and ambiguous.  Was that the entire question?
> Q.  (BY MR. MOSKIN)  Let me strike that.  **Other than the Mach I product, you don't have any drawings or sketches that you personally created?**
> **A.  Yes, I do.**
> Q.  And what are those?
> A.  I couldn't tell you specifically, but during the design process, ideas and designs are e-mailed back and forth between parties.
> Q.  And some of those are drawings that are done -- that are created by you?
> A.  I wouldn't call them drawings.  I would call them

doodles.  They were just rough sketches.
Villacci Dep. Tr. (Feb. 29, 2012) ("Villacci I") at 50:12-51:11 (emphasis added).

Kearney Decl. (Dkt No. 229-1)  ¶ 30 & Ex. 23.

Mr. Villacci testified extensively during his February, 2013 deposition as to his own contributions to the design of multiple products. (Hartzell Decl. Ex. B, Villacci Deposition Transcript, February 20, 2013, pg. 127, line 24; pg. 136, lines 9-13; pg. 149, lines 10-11; pg. 149, lines 20-22; pg. 151, lines 1-4; pg. 153, lines 8-10; pgs. 168-169, lines 20-4; pg. 182, lines 7-9, Hartzell Decl. Ex. C, Villacci Deposition Transcript, February 20, 2013, pg. 44, lines 7-10; pg. 100, lines 8-11). Mr. Villacci also verified interrogatory responses in which he himself is identified as a designer on multiple products. (Hartzell Decl. Ex. A, Chapterhouse Interrogatory Response).

- "[R]elies on independent designers to create the accused works" – Exhibit 21 does not contain the referenced pages. Assuming GW's citation refers to the Feb. 29, 2012 Deposition of Nicholas Villacci, the citation does not support GW's statement.

REMAINDER OF SUF 11: The term "the process" is undefined, vague, and ambiguous; The quoted selections from the deposition of Wyatt Traina lack foundation (FRE 602); are inadmissible hearsay (FRE 802); are improper speculation (FRE 701); and are quoted selectively and taken out of context. Mr. Traina's statements are speculation about statements he did not make. (citations are to the Wyatt Traina Dep. Tr. (Mar. 15, 2012) ("Traina Dep."), attached to the Kearney Decl. (Dkt No. 229-1)  ¶ 31, Ex. 24):

> Q.  **So what did you understand this sentence to mean to you**?
> A.  He wants the icon to be recognizable but still interesting.
> Q.  Did you understand it was important for 40K players to be able to recognize it as the Flesh Tearer icon?

> MS. LU:  Objection.  Lack of
> personal knowledge.  Calls for speculation.
> A.  **That could be.**

Traina Dep. 66:15-24 (emphases added).

> Q.  **Did you, as a sculptor, take this as
>     instruction** that whatever you did, make sure
>     it was still recognizable to 40K players as
>     Flesh Tearer icon?
>         MS. LU:  Objection.  Argumentative.
> A.  Yes.
> Q.  Did it have to be recognizable to 40K
>     players as a Flesh Tearer icon?
>         MS. LU:  Objection.  Calls for
>     facts not in evidence.
> A.  So people could convert a Flesh Tearer army
>     or build a Flesh Tearer army.

Traina Dep. at 67:3-14 (emphasis added)

> Q.  One of the instructions from Mr. Villacci, I
>     think what you said, was that you could have
>     slight variations as long as it's still
>     recognizable as the Games Workshop icon and
>     be okay?
>         MS. LU:  Objection.  Misstates
>     prior testimony.
> A.  I'd say that's a pretty accurate **paraphrase**.

Traina Dep. 94:16-23 (emphasis added).

> Q.  What was **your understanding of this
>     sentence**?
>         MS. LU:  Objection.  Calls for
>     speculation.
> A.  **I think** he was trying to say my idea about
>     making the blade come out of the pad wasn't
>     a good one.
> Q.  Why was your idea not a good one?  Sorry.
>     What was your idea?
> A.  That the saw blade would stick out of the
>     pad rather than lie flat against it.
> Q.  And that was for the Flesh Tearer icon that
>     you were sculpting?
> A.  Correct.

Q.  So your idea was instead of having the saw
    blade flat on the pad you'd have it sticking
    out from the pad?
        MS. LU:  Objection.  Misstates
    prior testimony.
A.  Yes, basically.
Q.  Why did Mr. Villacci tell you that was a bad
    idea?
        MS. LU:  Objection.  Calls for
    speculation.
A.  Because he said they don't like deviating
    too much from the norm**, I guess**.  That's
    what it says.
Q.  **What does that mean to you**, deviate from the
    norm?
        MS. LU:  Objection.  Calls for
    speculation.
A.  **I think he means** it's more recognizable if
    it's not sticking out.
Q.  So as the sculptor of this icon, **what do you
    take this instruction from Mr. Villacci to
    mean**?
A.  Don't have the blade sticking out of the
    pad.
Q.  And instead do what?
A.  Do it the way that we ended up doing it.
Q.  Which was what?
A.  Lie it up flat against the pad.
Q.  And that's because it's more recognizable to
    40K players as the, quote, 40K norm?
        MS. LU:  Objection.  Argumentative.
    Calls for speculation.
A.  Yes.
Q.  In other words, he didn't want you to change
    the icon too much?
        MS. LU:  Objection.  Calls for
    speculation.  Argumentative.
        MR. KEENER:  Let me rephrase.
Q.  You were instructed not to change the icon
    too much; is that true?
        MS. LU:  Objection.
    Mischaracterizes the document and
    argumentative.
A.  I was instructed not to have the blade stick
    out.

Traina Dep. 103:10-105:20 (emphases added).

12.     As set forth in paragraph 25 of Games Workshop's August 14, 2012 Statement of Undisputed Material Facts (Dkt No. 213-2), Mr. Villacci himself explained the process in one of the on-line forums where Chapterhouse advertises and promotes its goods.  In response to a request from a potential customer to make products for the Iron Hands Space Marines, Mr. Villacci wrote: "We have been considering that chapter for a while, we just need to be able to create an icon similar enough to the real GW icon while being acceptable to players as well, but we can't copy the GW one straight on …it's a tricky thing."  (Ex. 23, Heresy-Online.net 10/24/09 at 3)

**RESPONSE:**  The statements in SUF 12 are irrelevant to any issue in this case. FRE 402.

There is no evidence that any purported statement in SUF 12 concerns any of the works-in-suit

or any Chapterhouse product at issue in this case. The term "the process" is undefined, vague,

and ambiguous.

Otherwise **DISPUTED**.

SENTENCE ONE: Improper speculation (FRE 701); lacks foundation (FRE 602). The

term "the process" is undefined, vague, and ambiguous.

SENTENCE TWO: inadmissible hearsay (FRE 802); lacks foundation (FRE 602).  To the

extent the quoted statement is relevant and admissible, it does not support GW's claims.

FOOTNOTE 7 (Iron Hands is another Games Workshop created Space Marine Chapter")

– **disputed**: GW fails to identify the "Iron Hands" space marine chapter, and has no evidence

that it created the "Iron Hands" space marine chapter.

In the same exhibit, Mr. Villacci similarly declined to create a Death Guard product

because of its distinct icon, since he did not want to use that on anything since GW owns it. Ex.

23, Heresy-Online.net 10/24/09)

13.     As set forth in paragraph 28 of Games Workshop's August 14, 2012 Statement of Undisputed Material Facts (Dkt No. 213-2), Mr. Villacci explained to one designer (Jeff Nagy,

who created various shoulder pads; doors for vehicle kits, the javelin class jet bike and other items) (Ex. 17, Supp Resp to Interrog 3): "Just for the record, I'm not all about [Space] Marines. I have Navarro pushing Tyranids too, and that army is not the most popular. It's more about filling niches in the market that GW has left, and taking advantage of them." (Ex. 25, JN001310

**RESPONSE: DISPUTED.** GW selectively misquotes Exhibit 25, which does not contain the term "Space Marines" and does not capitalize the word "marines." Further, Chapterhouse objects to the statements of SUF 13 as not relevant to any issue in this case pursuant to FRE 402.

Mr. Villacci testified that his understanding of the term space marines encompasses generic marines that operate in space and wear armor that usually fully emcompasses the whole body as it is commonly used in science fiction, including uses in Dune books, Starcraft, and Blizzard's science fiction video game. Accordingly, there is no foundation to read Exhibit 25 as referring to any particular Games Workshop product. (2/20/013 Villacci Final Tr. 184 l. 5 – 185 l. 4; Hartzell Dec. at Ex. B).

14.     As set forth in paragraph 29 of Games Workshop's August 14, 2012 Statement of Undisputed Material Facts (Dkt No. 213-2), Mr. Villacci likewise explained to Mr. Nagy on June 17, 2009: "I think if we can take advantage of any old line GW has stopped doing? Valhallans for instance, we would succeed in bringing in old loyal IG [Imperial Guard] players that have no options from GW." (Ex. 26, JN00087-88).

**RESPONSE:** Chapterhouse objects to SUF 14 as irrelevant to any issue in this case pursuant to FRE 402. It is undisputed that there is not work-in-suit called "Valhallans" and Chapterhouse does not make or sell a "Valhallans" product.

**UNDISPUTED** as to the existence of the two sentences quoted above in Exhibit 26 (except for the inserted Imperial Guard).

## CHAPTERHOUSE STATEMENT OF ADDITIONAL MATERIAL FACTS

1.      Games Workshop identified Nick Coleman as the author of an illustration and description contained in the Warhammer 40,000 Compilation 1991. (Games Workshop Claim Chart at rows 132 and 133, p. 35-36, 38-39, Hartzell Dec. Ex. D).

2.      In its response to Chapterhouse's Interrogatory No. 37 seeking the names and employment dates of all listed designers who were Games Workshop employees at any time, Games Workshop did not identify Mr. Coleman as an employee or former employee. (Games Workshop's Response to Interrogatory No. 37, Hartzell Dec. Ex. E).

3.      On March 8, 2013, Games Workshop produced for the first time documents relating to the ownership of works created by Andrea Uderzo and Kari Christensen. Games Workshop has not produced any employment agreement, written assignment, or belated confirmatory assignment for Mr. Coleman's rights in the authored work. (Hartzell Decl. ¶8).

4.      For certain of its marks described by Games Workshop as "icons," despite the two year pendency of this litigation, the Court's acknowledgment of Games Workshop's failure to identify what it is claiming in November 27, 2012 Summary Judgment Order (Dkt. 258 at 28-29), and repeated requests from Chapterhouse, Games Workshop still has never identified the icons that it contends are at issue. (Hartzell Decl. ¶ 9).

5.       For certain alleged marks, such as assault cannon, empire, high elf, plasma, jump pack, space marine, and jet bike, extensive third party uses and Games Workshop's own witnesses show that consumers recognize the term as a phrases that describe a generic category of goods, a descriptive term, or as something other than a source identifier for Games Workshop. (Alan Merrett Deposition Tr., February 24, 2013 at 56; Thomas Walton Deposition Tr., February 15, 2013, at 21-22, Andrew Jones Deposition Tr., February 24, 2013, at pg. 75:8-21 and Ex. 11, Website pages, Hartzell Decl., Exs. I, J, K, L).

6.     Accused Products Nos. 21, 22, 97-100, 146-148, 151, 152, 155, 157, and 163 are alleged only to infringe the size and shape of the GW shoulder pad and are not alleged to have copied any other Games Workshop work.  (Games Workshop Claim Charts, Hartzell Dec. Ex. D, F).

7.     Each of these accused products identified in ASUF 6 is enhanced by a surface decoration that is not alleged to have infringed any other Games Workshop work. (Games Workshop Claim Charts, Hartzell Dec. Ex. D, F).

8.     Accused Products Nos. 146, 147, 148, 151, 152, 155, and 162 are alleged to have infringed based on the fact that they are designed to fit on or with Plaintiff's products. (Games Workshop Claim Charts, Hartzell Dec. Ex. D, F).

9.     These accused products in ASUF 6 are not stand-alone products but are products complement the market for Games Workshop's products by enhancing existing models. (CHS00011850, CHS00022628, CHS00023058, CHS00023168, Hartzell Dec. Ex. M).

10.     The Copyright Office refused to register the size and shape of the allegedly infringed shoulder pad because it "lacks the authorship necessary to support a copyright claim." (GW0016843, Hartzell Dec. Ex. N)

11.     The works alleged to have been infringed by the accused products in ASUF 6 are largely factual in that they occur in nature or are part of the public domain.  (Grindley Deposition Tr., February 21, 2013, at 92:3-11; Grindley Expert Report, para. 34-43, Hartzell Decl. Ex. O, T).

12.     Accused Products Nos. 2, 4-7, 9-14, 17-20, 23, 24, 46-62, 64, 65, 68,  69, 73-75, 78, 80, 101, 102, 137-141, 149, 150, 153, 154, and 156 are alleged to have infringed two-

dimensional artwork or overall armor type rather than a specific product. (Games Workshop Claim Charts, Hartzell Dec. Ex. D, F).

13.     The works alleged to have been infringed by the accused products in ASUF 12 are largely factual in that they occur in nature or are part of the public domain. (Grindley Deposition Tr., February 21, 2013, at 92 l. 3-11; Grindley Supp. Ex. B, ll. 137-141, 149, 150, 153, 154, 156; Games Workshop Claim Charts, Hartzell Dec. Ex. D, F, O, T).

14.     The allegedly infringing shoulder pads in ASUF 12 are a relatively miniscule portion of the Games Workshop artwork or product alleged to have been infringed. (Games Workshop Claim Charts, Hartzell Dec. Ex. D, F).

15.     The accused products in ASUF 12 are not stand-alone products but are products that complement the market for Games Workshop's products by enhancing existing models. (CHS00011850, CHS00022628, CHS00023058, CHS00023168, Hartzell Dec. Ex. M).

16.     Accused Products Nos. 35-37, 82, 90, 94, 103, 104, 106, 109, 111-114, 126, 129-131, 142, 143, 159 are not stand-alone products but are products that enhance other models by "converting" them into another form. (Games Workshop Claim Charts, Hartzell Dec. Ex. D, F).

17.     These accused products in ASUF 16 are not stand-alone products but are products that complement the market for Games Workshop's products by enhancing existing models. (CHS00024179-92, CHS00022709, Hartzell Dec. Ex. D, F).

18.     The works alleged to have been infringed by the accused products in ASUF 16 are largely factual in that they occur in nature or are part of the public domain. (Grindley Deposition Tr., February 21, 2013, at 97:15 – 99:14; Grindley Expert Report, para. 34-43; Grindley Supp. Ex. B, ll. 126, 129-131, 142, 143, 159; Games Workshop Claim Charts, Hartzell Dec. Ex. D, F, O, T).

19.     Chapterhouse has developed its own mythology for Accused Product 126, 142,

143.  (Villacci Deposition Tr., February 20, 2013, at 44:2 – 45:10; Games Workshop Claim

Charts; Advertisement for TRU-Scale Knight Praetorius Conversion Kit, CHS00028768-69,

Hartzell Dec. Ex. B, D, U)

20.     Accused Products Nos. 126, 142, 143 includes a number of elements that are

distinct from the allegedly infringed Games Workshop products.  (Footitt Deposition Tr.,

February 14, 2013, at 133:11 – 138:25, Hartzell Dec. Ex. P)

21.     The works alleged to have been infringed by the accused products in ASUF 19 are

largely factual in that they occur in nature or are part of the public domain. (Grindley Deposition

Tr., February 21, 2013, at 278:12-21, Grindley Expert Report, para. 34-43; Grindley Supp.

Exhibit B, ll. 126, 142, 143; Hartzell Decl. Ex. O, T)

22.     Accused Products Nos. 1, 3, 31, 34, 43, 45, 66, 67, 76, 77, 79, 83, 87, 117, 119,

121, 128, 132-136, 158, 161, and 162 are not stand-alone products but are products that enhance

other models. (Games Workshop Claim Charts, Hartzell Dec. Ex. D, F).

23.     These accused products in ASUF 22 complement the market for Games

Workshop's products by enhancing existing models.  (Emails expressing intent to use CHS parts

with existing Games Workshop products or to buy new Games Workshop products:

CHS00023929-30, CHS0024157-58, CHS00024193, CHS00022709; Hartzell Dec. Ex. Q).

24.     The works alleged to have been infringed by the accused products in ASUF 22 are

largely factual in that they occur in nature or are part of the public domain.  (Grindley Deposition

Tr., February 21, 2013, at 93:14-18; Grindley Expert Report para. 44-56; Grindley Supp. Ex. B

lines 128, 132-136, 158, 161, 162, Hartzell Decl. Ex. O, T)

25.     Accused Products Nos. 144 and 145 include a number of elements that are distinct from the allegedly infringed GW products.  (2/14/2013 Footitt Deposition Tr. at 111:19 – 119:18, 121:11 – 123:20, Hartzell Decl. Ex. P)

26.     The shapes of these accused products in ASUF 25 that Chapterhouse is alleged to have copied are literal interpretations of elements that exist in nature and military history. (02/14/2013 Footitt Deposition Tr. at 102:20 – 103:25, 106:18 – 107:7, 111:12-14; Footitt literal examples of lizards and dinosaurs, GW0011786-GW0011789, Hartzell Decl. at Ex. P, R)

27.     The Games Workshop website contains explicit authorization for certain IP-related activities, including use of Games Workshop's trademarks to talk about Games Workshop's own products. (Games Workshop website, Hartzell Decl. Ex. S).

28.     Accused Product No. 160 includes a number of elements that are distinct from the allegedly infringed Game Workshop product.  Any alleged copying in Accused Product No. 160 is minimal when compared with the entirety of the work. (Villacci Deposition Tr., February 20, 2013, at 167:10 – 170:1, Moskin Decl. Ex. B and C)


Dated: March 14, 2013                    By: */s/ Julianne M. Hartzell*
                                         Julianne M. Hartzell
                                         Sarah J. Kalemeris
                                         Marshall, Gerstein & Borun LLP
                                         6300 Willis Tower
                                         233 S. Wacker Dr.
                                         Chicago, IL 60606
                                         T: 312.474.6300
                                         F: 312.474.0448
                                         E: jhartzell@marshallip.com
                                         E: skalemeris@marshallip.com

                                         Jennifer Golinveaux (CA Bar No. 203056)
                                         Dean A. Morehous (CA Bar No. 111841)
                                         K. Joon Oh (CA Bar No. 246142)
                                         Thomas J. Kearney (CA Bar No. 267087)
                                         WINSTON & STRAWN LLP

101 California Street
San Francisco, CA 94111-5802
Phone: (415) 591-1000
Fax: (415) 591-1400
jgolinveaux@winston.com
dmorehous@winston.com
koh@winston.com
tkearney@winston.com

Bryce A. Cooper (IL Bar No. 6296129)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-1695
Phone: (312) 558-5600
Fax: (312) 558-5700
bcooper@winston.com

Attorneys for Defendant Chapterhouse Studios
LLC

## CERTIFICATE OF SERVICE

I, Julianne M. Hartzell, hereby certify that I caused a copy of the foregoing DEFENDANT CHAPTERHOUSE STUDIOS LLC RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACT to be served on the following parties via the Court's ECF system on March 14, 2013:

Jason J. Keener
Foley & Lardner LLP
321 North Clark Street
Suite 2800
Chicago, IL 60654

Jonathan E. Moskin
Foley & Lardner LLP
90 Park Avenue
New York, NY 10016

*Attorneys for Plaintiff Games Workshop Limited*

*/s/ Julianne M. Hartzell*
Julianne M. Hartzell