**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED, <br><br> Plaintiff, <br><br> v. <br><br> CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES <br><br> Defendants. | Civil Action No. 1:10-cv-8103 <br><br> Hon. Matthew F. Kennelly <br> Hon. Jeffrey T. Gilbert |

**PLAINTIFF'S SUPPLEMENT TO MOTION TO
ENFORCE PRIOR DISCOVERY ORDERS**

Games Workshop Limited respectfully submits this Memorandum further to the hearing conducted on February 14, 2013 in connection with its motion to enforce two prior Court orders in this case regarding discovery.

## PRELIMINARY STATEMENT

The Court previously continued Games Workshop's motion to enforce its December 23, 2011 and March 6, 2012 discovery orders to allow discovery to proceed before determining the proper remedy. What discovery confirmed is that Chapterhouse is indeed unable to account for innumerable critical records, concerning the design and creation of the accused works, and indeed *willfully destroyed* many such records, or *any* of its records of its marketing of its products in any of the venues it identified where it engages in such promotional activities. Chapterhouse is also unable to identify any efforts to direct its designers to preserve records.

For the jury to understand that it is not just a routine matter for a party to systematically fail to preserve or willfully discard key documents and disregard court orders to produce such records, minimally, some appropriate instruction to the jury is needed if, indeed, sterner sanctions are not also merited. Given the general damning nature of similar documents Games Workshop has discovered from its own searches of Internet forums and from subpoenaing designers within the United States (from which virtually every document it obtained is a smoking gun), the plain inference is that the failure to preserve or produce further records was not mere happenstance and that what was not preserved was worse than what was.

## FURTHER FACTUAL BACKGROUND

1. Documents Concerning the Development Of The Accused Products

Most of Chapterhouse's February 13 opposition to the pending motion focused on the question of waiver of attorney-client privilege, whereas Games Workshop's principal concern about Chapterhouse's claim of privilege was simply that the very assertion that such a

1

relationship exists with the parties who designed the products bespeaks a level of control that implies a corresponding duty to ensure preservation and production of documents. Indeed, this claimed community of interest exists in addition to the contractual right to which Chapterhouse previously testified, under which it claims to have control over its designers records regarding creation of the subject works.[1] That was the basis for the Court's March 6, 2012 order imposing on Chapterhouse a duty to collect such documents. Yet Mr. Villacci admitted at his February 20 deposition that Chapterhouse made, at best, only desultory efforts to preserve or produce design documents from parties with whom it contends it enjoys such a privileged relationship and over whom it says it has contractual control.

 Mr. Villacci could not recall (except in vague terms) what was done to collect documents. When shown a list of the 23 designers identified in the first phase of the case, he identified an email message from March 2012 that may have been sent to some of the designers of these products, but was uncertain to whom it was sent. (Moskin Dec. Ex. A, Villacci Tr. 17:19-19:14 ) Notably, this March 2012 email (Moskin Dec. Ex. B) nowhere even mentions the claimed contractual right Chapterhouse testified it has to assert control over the designers' creation documents. In the second phase of the litigation, Chapterhouse first sent out email requests to designers on December 26 and 27, two weeks after discovery was formally served on December 10 and a full month after the same discovery was sent informally on November 28, 2012. (Moskin Decl. ¶ 4, Moskin Decl. Ex. C). This is contrary to the statement in Mr. Villacci's declaration (Dckt No. 283-4 ¶ 3) that the requests went out soon after the second phase of the case began.

---

[1] Mr. Villacci's own testimony that Chapterhouse has written agreements with all of its supposedly independent designers and concept artists (Dkt. 278-13, Keener Decl. Ex 12, Villacci Tr. at 35:22-36:13, 39:15-24) under which Chapterhouse enjoys an express right to compel them to return to it all of the design documents in their possession (including all "nonpublic information relating to Company's … inventions … trade secrets, patents copyrights, …research and development activities, customers, business plans, promotional and marketing activities …") As Mr. Villacci admitted: "Q: And that covers all of the design documents that the designers create? … A: In my interpretation, yes." (*Id.*, Villacci Tr. at 37:25-38:5)

2

The emails in late December (*see, e.g.,* Moskin Decl Ex. C) were essentially identical to the March emails and, again, nowhere invoke Chapterhouse's claimed contractual right to control disposition of the design documents generated by the designers. Nor did these emails mention any of the other elements of the relationship that Chapterhouse now contends supports the existence of an attorney-client privilege. Rather, Chapterhouse seems instead to want it both ways: asserting attorney-client privilege to prevent discovery or use at trial of damaging admissions, while at the same time using none of the leverage it should have enjoyed to compel its designers to produce relevant documents. Hence, other than the designers directly subpoenaed by Games Workshop, Chapterhouse produced virtually no documents from those designers it contacted on its own.

Mr. Villacci conceded he could recall no efforts made to collect items from the 7 or 8 painters Chapterhouse has employed, and which were identified together with the all of the other designers in response to Interrogatory 6 in the first phase and Interrogatory 2 in the second phase and Document Requests 5-6 in the first phase and 3-4 in the second. (Moskin Decl. Ex. A, Villacci Tr. 13:19-14:5; collectively, Moskin Decl. Ex. F) He says simply that was not asked to do so (*Id.* at 14:15-17) Although the painters have received somewhat less attention than the sculptors employed by Chapterhouse, its response to Interrogatory 2 confirms some of its products were sculpted and painted by the same individuals (such as Stephen Smith and Robert Lippman) (Moskin Decl. Ex. F), and they played an integral role in the design process. Indeed, there is no known reason for Chapterhouse to have hired painters other than because of the importance of presenting its products on its website, on the internet forums and on eBay, where it promotes the goods, in painted format, notwithstanding that it ships its products to customers in unpainted form.

3

Although no documents concerning instructions to painters in the first phase were produced, it would appear that, as this case progressed and Chapterhouse became more wary of explicitly copying of Games Workshop's colors, at least one of its painters, Jose Viega (who painted a large number of products in both phases of the case) had to be instructed *not* to use Games Workshop's colors. (Moskin Decl. Ex. D). In an exchange of emails concerning the painting of the "Real Size Marine" (created by Stephen Smith and promoted by him as an "Art-Scale Space Marine," yet ultimately launched by Chapterhouse under the name Tru-Scale Knights Praetorius), the painter begins the email chain by stating "I finished the real size marine. I try to paint it cool but in a not Games Workshop way." (*Id.*) Laying aside the significance of Mr. Villacci's and the painter's candid reference to the product as a "real size marine", the point is that while the actual instructions to the painter that preceded this email have not been produced, it would appear he received new guidance to avoid familiar patterns of copying. Despite the integral role the painters played in the design process, and the centrality of the issue of color choices in Chapterhouse's marketing of its products, other communications with this individual or other painters have not been produced, nor has Games Workshop received the reference materials they used. (Moskin Decl. ¶ 5)

Mr. Villacci cannot recall any specific directions to Chapterhouse's designers to *preserve* documents. (Moskin Decl. Ex. A, Villacci Tr. 20:7-21:10) He thinks something may have been done by email (Id.) but Games Workshop is not aware of having seen any such correspondence. (Moskin Decl. ¶ 6.) He does not purport to know how many designers were asked to preserve documents:

> Q. And do you know how many of the contractors you asked to preserve documents.
> A. No.
> Q. Can you estimate? More than five? Less than five? More than ten?

4

>A. I couldn't hazard any sort of guess with any accuracy.  (Moskin Decl. Ex. A, Villacci Tr. 21:3-10)

Not surprisingly, designers did not save records and at least one refused to cooperate for fear of self-incrimination.  This was confirmed in Ms. Golinveaux's May 16, 2012 letter summary (Dkt 278-14, Keener Dec. Ex 13) and is apparent from documents Chapterhouse recently produced.[2]  No doubt this casual approach to document retention and production explains why, aside from the designers or painters Games Workshop directly subpoenaed, Chapterhouse produced only 29 (mostly illegible) documents in the first phase (from only 4 of the 7 sculptors and none from its 6 painters in the first phase) and documents from only 6 of 16 designers and painters overall in the second phase.  (Dkt. 278-1, Keener Decl. ¶15).

As previously noted regarding one designer, Stephen Smith, although he designed 4 of the products at issue in the second phase of the litigation and 3 in the first phase, as of early March 2013 he had not been contacted by Chapterhouse in over nine months.  (Smith Decl. ¶ 6).  Nor was he ever instructed to retain any documents in this case and thus deleted all email correspondence with Chapterhouse.  (Id. ¶ 5).  Chapterhouse also claims it has an attorney-client relationship with him, yet its efforts to collect documents from Mr. Smith in the second phase of the case appear to be solely the sending of an email by Mr. Villacci to a discontinued email account of Mr. Smith.  (Dkt. 278-1, Keener Decl., Ex. 15).  It presumably would have known the account was inactive because an email to the address produces an immediate bounce-back message.  (See Dkt 278-1, Keener Decl ¶ 17)  Moreover, although Chapterhouse did produce five largely irrelevant earlier emails with Mr. Smith, they all contained a different email address from the discontinued address used in Chapterhouse's effort to collect documents.  Mr. Villacci

---

[2] *See, e.g.*, CHS00029821 "I don't have the original sketches, they got thrown out a while back."; CHS00029829 "I have to look for the emails, not sure I still have them as I usually delete emails if older than 2, 3 months"; CHS00029840 "I have moved since completing that project for you and really don't have any documentation on that project" [other than progress pictures sent contemporaneously]; CHS00029892 "Nick, like I told you, all old files are dead with the company"; CHS000299906 "I'm sorry to disappoint but I don't have any relevant documentation.")  (collectively, Moskin Decl Ex. E.)

5

was unable to explain at his deposition why he used this different and invalid email address (Moskin Decl. Ex. A, Villacci Tr. at 15:1-17:16)

Chapterhouse's lax efforts to preserve and collect documents from its designers is further shown by three key failures of its co-owner and lead designer, Tomas Fiertek, including his willful destruction of documents (described below).

First, Chapterhouse was ordered by the Court to produce Mr. Fiertek's documents no later than January 11, 2013. (Dkt. 265). The Court had previously instructed Chapterhouse that it could not just produce Mr. Villacci's documents but had to separately collect and produce Mr. Fiertek's as well. However, despite repeated assurances by Chapterhouse, his documents were not produced until February 21[3], (only 4 business days prior to his desposition), and it was not until March 11, after his deposition, that it finally produced copies of some of his Games Workshop reference materials. (Moskin Decl ¶ 8.)

Second, Mr. Fiertek knowingly failed to preserve documents. Despite his knowledge that Games Workshop had sought an identification of and copies of all documents involved in the design process, Mr. Fiertek continued to design products without making any effort to save copies of the various images he allegedly used in their creation or even record where those images were located. (*See. e.g.,* Moskin Decl. Ex. G, Fiertek Tr. 32:22-36:12)

> Q. Now, if you found an image on Google Image search that you used as a reference for creating these Heresy-Era Shoulder Pads for Terminators, why didn't you save a copy of those pictures?
>
> A: This is not the way I work. I rarely if -- I'm an artist. I do not -- I do not have a picture of something in front of me while I work. I look at many things, form an idea in my head, and then I work based on that.
>
> Q. Do you have an understanding that Games Workshop has asked Chapterhouse and its designers to identify specifically any references they used in the design and development of these products at issue?

---

[3] Even the February 21 production included numerous allegedly inadvertently produced and allegedly privileged documents that hindered Games Workshop's review of the documents.

6

A Yes.

Q. Is it also your understanding that Games Workshop has asked Chapterhouse for copies of any references they used in the design and development of the products at issue?

A. Yes.

…

Q. So you've told me the reason you didn't keep these Google Image pictures that you used as a reference was because that's not how you work. And after the start of this lawsuit, you said that you've become aware that Games Workshop has physically asked Chapterhouse to identify the references and produce copies of any references used. My question is: With that knowledge, why didn't you change the way you work to retain these images?

A. Well, first of all, I -- I don't think the -- saying that I never save anything that I found, for example, on Google searches is correct. I -- this is how I tend to work. Thus, I tend not to save things. I cannot remember if I did and, if I did, then what I did. I -- I am aware of what you said. And as for saving sources for inspiration, for example, I don't really know what to say. I have a hard time changing the way I work. I was asked for -- I was asked to provide examples of Google imaging searches and I did. And I do not recall --

I -- I really don't know how to -- what to answer to that. I did not delete -- after the legal cases started, I did not delete pictures from my hard drive. So -- sorry. The question again? I -- could you restate the question?

Q. Okay. So the question is: You stated you understood that Games Workshop was asking for specific identification of any references used to create these products and copies of those references?

A. Yes.

Q. Now -- my question now is: Did you make any attempt to write down exactly which references you used as you were designing these Heresy-Era Shoulder Pads for Terminators?

A. Not as I recall, no.

Q. Did you make any effort to save copies of the references you found on Google Image searches that you used in the design and development of the Heresy-Era Shoulder Pads for Terminators?

A. Not that I recall, no.

Third, Mr. Fiertek *admittedly and knowingly destroyed relevant documents after the start of the litigation*. Mr. Fiertek admitted that he has downloaded illegal copies of various movies and books, including a large number of Games Workshop publications. (Moskin Decl. Ex. F, Fiertek Tr. 109:18-120:17. Many of these pirated materials were shared on an FTP site for Mr.

7

Villacci's use. (*Id.* at 230:3-231:6). For some of these Games Workshop publications, Mr. Fiertek had allegedly properly purchased a physical copy of the book as well. (*Id.* at 112:11-113:10). For others, he felt the price for the Games Workshop book was too great. (*Id.* at 233:5-234:11). Regardless, sometime *after* the start of the lawsuit, Mr. Fiertek systematically went through his computer and deleted all Games Workshop materials for which he did not have a properly obtained physical copy.

> Q. Do you know which books you deleted?
>
> A. No. As I said, I don't keep track on the specifics. I just deleted electronic copies of, well, pretty much everything I have.
>
> Q. So you deleted the current copies of pretty everything you have after the lawsuit started?
>
> A. Yes. THE WITNESS: Not everything.
>
> BY MR. KEENER: I didn't hear your answer. Not everything. But a large portion of electronic copies of Games Workshop materials you deleted after the litigation started?
>
> THE WITNESS: Yes.
>
> Q. BY MR. KEENER: Do you know how far after the case started you did this?
>
> A. I -- no. I just -- I just know I deleted stuff that I don't own physically, that I haven't bought in a store. Well, again, I can -- I can check it for specifics. But I don't remember the details of that.
>
> Q. Prior to deleting them, did you ever attempt to make a list of the books that you were deleting?
>
> MS. KALEMERIS: Objection. Form.
>
> THE WITNESS: No.

(*Id.* at 116:3-117:11). Mr. Fiertek did not record and does not recall the list of Games Workshop books that he destroyed. (*Id.*).

    2.    <u>Chapterhouse Made No Effort To Preserve Forum Posts Or Consumer Responses</u>

As previously noted, the Court's December 23, 2011 order directed Chapterhouse to produce all advertising and promotion for its accused products, as requested in Games Workshop's May 27, 2011 discovery requests. In response to Interrogatory 10 of those interrogatories, Chapterhouse identified ten venues where it engages in such promotional

8

activities,[4] a list that does not include other venues where its designers have also promoted the products.[5] Moreover, consumer reactions to these postings – many of which have been harshly critical of Chapterhouse's obvious copying - are also directly responsive to Games Workshop's Interrogatories 9, 10, and 12 (Dkt. 278-8, Keener Decl., Ex. 7) and document requests 14, 15, 16, 17, 25, and 26 (Dkt. 278-9, Keener Decl. Ex. 8) in the first phase of the suit and Interrogatories 5 (21), 7 (23) (Dkt. 278-10, Keener Decl. Ex. 9) and 9 (25) (Dkt. 278-12, Keener Decl. Ex. 11) and document requests 1 (39), 9 (47), 10 (48), and 12 (50) (Dkt 278-11, Keener Decl. Ex. 10) in the second phase seeking all such comments by third parties that mention Games Workshop or its products.

Mr. Villacci confirmed at his recent deposition that he made absolutely no effort whatsoever to preserve his advertising and promotion of Chapterhouse's products, either on eBay (Moskin Decl. Ex. A, Villacci Tr 28:18-23) or on the Internet forums devoted to Warhammer 40,000 or Warhammer. (*Id.* at 23:9-24:7; 28:10-17.). This is true for the products at issue in both phases of the litigation (*Id.* at 28:10-17.) After Games Workshop protested this failure, he did generate a list of Chapterhouse's forum posts in response to Interrogatory No 9 in the second phase; however, he admits he did this simply from memory. (Id. at 24:8-14) He could not even recall whether he troubled to refresh his memory by reviewing the list of forums (*supra* note 4) where Chapterhouse acknowledged in the first phase of the case it has been active in promoting its products. (*Id*. at 24:15-25:3) The list made from memory did not even include the forums previously highlighted by Games Workshop in its original summary judgment motion (as Exs

---

[4] Those venues are: (1) Belloflostsouls.net; (2) Dakkadakka.com; (3) Bartertown.com; (4) Heresy-online.net; (5) Warseer.com; (6) Tabletopgamingnews.com; (7) Theminiaturespage.com; (8) Frothersunite.com; (9) Ebay.com; and (10) http://www.invasionkenosha.com/2011

[5] One such designer has promoted his "Kroxigor" model on "The Warhammer Forum", "Lustria-online.com" and "Troll Forged Miniatures" (Moskin Decl. ¶ 12) and another has promoted the Art-Scale Space Marine he designed on Warsmith.co.uk And the designer of the Chapterhouse Tyranid conversion kit, at issue in the first phase of the case, promoted the design on the "Second Sphere" war-gaming forum. (Dkt. 237, GW Motion for Summary Judgment, Ex. 63)

9

123 and 143) and noted in the motion to enforce sanctions (Dkt 278 at n. 1) such as Frothersunite.com or Dakkadakka.com, which included some harsh exchanges between Mr. Villacci and some of his potential customers expressing their impressions he had blatantly copied from Games Workshop. He acknowledges that this is an example of the type of forum post Chapterhouse makes and to which customers respond but which Chapterhouse does not preserve. (Id. at 34:10-16; 37:1-5.)

Similarly, although Mr. Villacci conceded he has received notifications from some of the forums when potential customers respond to Chapterhouse's postings (including Heresy Online and Facebook, samples of which accompanied Games Workshop's original motion (Dkt. 278, Keener Decl. Ex 2), he makes no effort to preserve these notifications. (Moskin Decl. Ex. A, Villacci Tr. 29:10-31:16.)

> Q. Did you make any effort to preserve any of these notifications from any of the forums?
> A. No. (*Id*. at 31:5-7.)

He does acknowledge he receives such notifications from other forums but does not recall which and has not saved or produced them anyway. (*Id*. at 30:9-31:4) Counsel for Chapterhouse previously confirmed that other than the two notifications from Heresy-online.net, no additional notification messages were retained by Chapterhouse. (Dkt. 278, Keener Ex. 4). As noted in Games Workshop's original motion, Chapterhouse's own documents indicate that some postings have been removed by the Internet forums as being too overtly commercial, such that Games Workshop has no way to recover these posts. (See, e.g., Dkt. 278, Keener Decl. Ex. 6) Even following Games Workshop's recent motion, Chapterhouse has made no effort even to try to recreate the forum postings.

Regarding eBay, Mr. Villacci likewise admitted not only that Chapterhouse does not preserve its postings (Moskin Decl. Ex. A, Villacci Tr 28:18-23); and that it keeps no master list

10

of what products he has promoted on that venue (Id. at 39:24-40:10). Rather than save such materials it leaves that to its attorneys. (Id at 37:8-38:8.) However, Games Workshop is not aware of having received any such eBay postings in this case. (Moskin Decl. ¶12.) Although Mr. Villacci would like to assert that none of the products at issue in the second phase have been offered for sale on eBay, lacking any master list or record of actual postings, it is not clear on what basis he can make the assertion. He certainly has provided Games Workshop no means of assessing the same, as Chapterhouse continues to sell products on eBay to this day. As previously noted, Chapterhouse has neither identified any of its specific eBay listings in its interrogatory responses nor produced any of the listings in its document production.

3. <u>Chapterhouse Caused Games Workshop To Make A Needless Trip To Dallas To Inspect Reference Materials</u>

Games Workshop's Document Request Nos 1-2 (39-40) sought copies of (or an opportunity to inspect) the Games Workshop's works in Chapterhouse's possession that are the subject of the second phase of the action. (Dkt. 278, Keener Decl. Ex. 10). As previously noted, Games Workshop sent emails on January 28, February 4, and February 7 summarizing the works. (Dkt. 278, Keener Decl. Ex. 16). Because roughly 50-60% of Chapterhouse's accused products are based on imagery in one particular volume, *The Horus Heresy: Collected Visions*, each of the emails confirming the inspection specifically mentioned that work and plaintiff's desire to inspect Chapterhouse's own original copy or copies. (Id.) On February 8, 2013, by prearrangement, counsel for Games Workshop traveled to Dallas, Texas to inspect what was supposed to have been 39 works. However, many items that had been in Chapterhouse's possession at the outset of the case were missing, including *The Horus Heresy*, *Codex Blood Angels*, *Codex Imperial Guard*, and *How to Paint a Space Marine*. Responding to follow-up requests for production of the materials in Chicago, Chapterhouse finally confirmed on February 11, 2013 that it no longer had copies of the works. (Dkt. 278, Keener Decl., Ex. 18).

11

Following this admission, Mr. Villacci separately confirmed at his recent deposition that he made no particular efforts to preserve his copies of the Games Workshop reference materials. (Moskin Decl. Ex. A, Villacci Tr. 9:22-11:21). He also confirmed at his deposition that he had discovered two-to-three days before the scheduled inspection that these reference materials had gone missing and had told his attorneys. (Id.) Having never been so-advised by Chapterhouse, Games Workshop thus made a needless trip to Texas to review materials that Chapterhouse and its counsel already knew were missing. Moreover, even though Mr. Villacci testified at his deposition that he did not know where the book was (*id*.), following his deposition, and following Games Workshop's motion for sanctions and the hearing on the same, Chapterhouse somehow located a copy of *The Horus Heresy,* which it produced in Chicago. It is of course no longer possible to determine whether this is the same copy Chapterhouse had in its possession at the time of the creation of the accused works. It has not produced the other three works.

## ARGUMENT

Chapterhouse's duty to preserve (including any relevant evidence that the party knew or reasonably could foresee would be relevant) dates back to 2008, when Games Workshop first put Chapterhouse on notice it deemed its products to be infringing, or at the very latest when it commenced suit on December 22, 2010 or served discovery requests directly on point two years ago. *See e.g., Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008); *Danis v. USN Communications, Inc.*, 2000 U.S. Dist. LEXIS 16900, at *98-99 (N.D. Ill. Oct. 20, 2000). However, even the Court's December 2011 and March 2012 Orders directing Chapterhouse to produce such materials made no impression.

As a matter of law, even if Chapterhouse did not have a practice of preserving its own design documents, forum postings, postings on eBay, and Games Workshop reference materials, that does not excuse its failure to adopt such a practice once it knew or should have known these

categories of documents were relevant to the threatened and then actual suit against it, not to mention that they were responsive to numerous specific document requests (including requests for consumer comments[6]) and a specific Court order. As a matter of law, such documents are (and certainly were) within its "possession, custody, or control" for purposes of Rule 34 because Chapterhouse had actual possession, custody, or control, or the legal right to obtain the documents on demand. *Morningware, Inc. v. Hearthware Home Products, Inc.*, 2011 U.S. Dist. LEXIS 115524, *8-*9 (N.D. Ill. Oct. 6, 2011); *Acree v. Watson Pharmaceuticals, Inc.*, Case No. 10 C 7812, § 1 (N.D. Ill. Nov. 21, 2012); *Wilson v. Sunstrand Corp.*, 2003 WL 21961359 (N.D. Ill. Aug. 18, 2003); *Knoll Pharma. Co. v. Teva Pharms. USA, Inc.*, 2004 WL 2966964, at *2 (N.D. Ill. 2004); *Technical Concepts, L.P., v. Continental Mfg. Co.*, 1994 U.S. Dist. LEXIS 7815 (N.D. Ill. Jun. 8, 1994). For Chapterhouse to say that it no longer has access to the forum postings and postings on eBay or that it is not its business practice to retain such documents misses the obvious point that it plainly had access and the capacity to preserve such records at the time they were created, yet did not do so despite the fact (which it did not contest in opposing this motion) that it knew for years that they were relevant to this threatened and then actual action. To the extent it can no longer locate them (because of failed memory or because the forums have been taken down or for any other reason) simply confirms the prejudice to Games Workshop.

Similarly, even if Chapterhouse did not have a practice of directing its designers to preserve materials concerning the genesis of the accused products, that does not excuse its failure to exercise the control it has elsewhere argued it enjoys and to adopt proper policies once it knew or should have known the design documents were relevant to the threatened and then actual suit

---

[6] As noted in Games Workshop's original motion (Dkt. 278, Keener Decl Exs 7-11), the request for consumer comments fell within the scope of Interrogatories 9, 10 and 12 and Document Requests 14, 15, 16, 17, 25 and 26 in the first phase and Interrogatories 5 [21], 7[23] and 9 [25] and Document Requests 1 [39], 9 [47], 10 [48], and 12 [50] in the second.

against it. Again, and as a matter of law and fact, such documents are (and certainly were at relevant times) within its "possession, custody, or control" for purposes of Rule 34 because Chapterhouse had itself has acknowledged it had a contractual right to obtain the design documents on demand and had a sufficiently close relationship with its designers to assert the existence of a community of interest and shared attorney-client relationship. If the designers no longer retain the documents or refuse to produce them out of fear of liability to Games Workshop, that again is simply proof of the prejudice to Games Workshop from the failure of Chapterhouse to ensure preservation and production of precisely such incriminating documents.

Given this obvious prejudice to Games Workshop, from its inability to assess the actual design process (about which Mr. Villacci pleads ignorance) an adverse inference that the relevant products for which such documents have not been produced were in fact actually copied would be appropriate. Games Workshop further submits that such an inference is fully supported by the design documents that have been produced by those designers (based in the U.S.) that it was able to subpoena, all of which show a single-minded focus on Warhammer and Warhammer 40K and make repeated references to the most nearly parallel Games Workshop works or products. Similarly, an adverse inference that customers recognize Chapterhouse's products as copies is appropriate where Chapterhouse failed to preserve or produce the forum posts that contain such consumer reactions to Chapterhouse's advertising. For the same reason, an adverse inference that Chapterhouse makes direct use of Games Workshop's trademarks on eBay is called for, because the eBay listings that Games Workshop has found on its own reflect such usage and do not even purport to include the disclaimer of affiliation with Games Workshop found on Chapterhouse's website. (See Dkt. 278, Keener Decl. Ex 5)

Regarding the needless trip to Dallas to inspect books that Chapterhouse and its counsel had already determined were lost (but failed to tell Games Workshop), Chapterhouse has already

14

conceded that, at a minimum, an adverse inference that it had access to the works is appropriate. This, however, is not really a sanction at all because Games Workshop's initial inspection of Chapterhouse's reference materials had already confirmed actual possession of such works and, hence, access. Games Workshop believes that an appropriate remedy would be both a reimbursement of the costs for the inspection and an adverse inference of direct copying for each such work. Chapterhouse would still be permitted to challenge substantial similarity, but should not be permitted to challenge actual copying.

Finally, Mr. Fiertek's admittedly willful destruction of highly relevant documents after the start of the litigation warrants more than an adverse inference that Chapterhouse had access to all of the Games Workshop materials at issue. Chapterhouse has already conceded as much. When combined with Mr. Fiertek's similar disregard of his duty to maintain this design documents, Games Workshop believes that an appropriate remedy would be an adverse inference of direct copying for each work with which Mr. Villacci was involved.

## CONCLUSION

For the foregoing reason, Games Workshop requests that appropriate relief be entered to ensure the jury understands the proper significance of Chapterhouse's apparent failures to comply with the Court's prior discovery orders together with such other and further relief as the Court deems just and proper.

Dated: March 27, 2013　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　/s/ Jason Keener

　　　　　　　　　　　　　　　　　　　　　　　Jason Keener (Ill. Bar No. 6280337)
　　　　　　　　　　　　　　　　　　　　　　　FOLEY & LARDNER LLP
　　　　　　　　　　　　　　　　　　　　　　　321 North Clark Street, Suite 2800
　　　　　　　　　　　　　　　　　　　　　　　Chicago, IL 60654-5313
　　　　　　　　　　　　　　　　　　　　　　　Telephone: 312.832.4500
　　　　　　　　　　　　　　　　　　　　　　　Facsimile: 312.832.4700
　　　　　　　　　　　　　　　　　　　　　　　Email: jkeener@foley.com

　　　　　　　　　　　　　　　　　　　　　　　Jonathan E. Moskin
　　　　　　　　　　　　　　　　　　　　　　　FOLEY & LARDNER LLP
　　　　　　　　　　　　　　　　　　　　　　　90 Park Avenue
　　　　　　　　　　　　　　　　　　　　　　　New York, New York 10016
　　　　　　　　　　　　　　　　　　　　　　　Telephone: (212) 682-7474
　　　　　　　　　　　　　　　　　　　　　　　Facsimile: (212) 687-3229
　　　　　　　　　　　　　　　　　　　　　　　Email: jmoskin@foley.com

　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*
　　　　　　　　　　　　　　　　　　　　*Games Workshop Limited*

**CERTIFICATE OF SERVICE**

       I, Jason J. Keener, an attorney, hereby certify that on March 27, 2013, I caused to be filed electronically the foregoing PLAINTIFF'S SUPPLEMENT TO MOTION TO ENFORCE PRIOR DISCOVERY ORDERS with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

                                              /s/ Jason J. Keener
                                              Jason J. Keener