# OPUS 2

## INTERNATIONAL

**Games Workshop Limited**
**vs.**
**Chapterhouse Studios LLC**

**Highly Confidential - Attorneys' Eyes Only**
**Deposition of Tomas Fiertek**

**February 28, 2013**

Opus 2 International - Official Court Reporters

Phone:     +44 (0)20 3008 5900
Email:     depos@opus2international.com
Website:   www.opus2international.com

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 2 of 13 PageID #:17861

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                     Deposition of Tomas Fiertek

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GAMES WORKSHOP LIMITED,    )
                           )
        Plaintiff,         )
                           ) Civil Action
vs.                        ) No.: 1:10-cv-08103
                           )
CHAPTERHOUSE STUDIOS LLC,  )
                           )
        Defendant.         )
_____)

** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

VIDEOCONFERENCE DEPOSITION OF
TOMAS FIERTEK
GOTHENBURG, SWEDEN
FEBRUARY 28, 2013

REPORTED BY: BRENDA MATZOV, CA CSR NO. 9243

## Page 2

         Videoconference deposition of TOMAS FIERTEK,
taken in the above-entitled cause pending in the United
States District Court, for the Northern District of
Illinois, Eastern Division, pursuant to notice, before
BRENDA MATZOV, CA CSR No. 9243, at Gothia Towers,
Massans Gata 24, Third Floor, Room R33, Gothenburg,
Sweden, and simultaneously in Chicago, Illinois, on
Thursday, the 28th day of February, 2013, at 1:59 p.m.

APPEARANCE OF COUNSEL:
FOR PLAINTIFF:
     FOLEY & LARDNER, LLP
     By: JASON J. KEENER, ESQ.
        (via videoconference in Illinois)
     321 North Clark Street
     Suite 2800
     Chicago, Illinois 60654-5313
     (312) 832-4500 / Fax (312) 832-4700
     jkeener@foley.com

FOR DEFENDANTS:
     MARSHALL GERSTEIN & BORUN, LLP
     By: SARAH J. KALEMERIS, ESQ.
         JULIANNE M. HARTZELL, ESQ.
        (both via videoconference in Illinois)
     233 South Wacker Drive
     6300 Willis Tower
     Chicago, Illinois 60606-6357
     (312) 474-6300 / Fax (312) 474-0448
     skalemeris@marshallip.com
     jhartzell@marshallip.com

ALSO PRESENT:
     GILL STEVENSON, Games Workshop (in Sweden)

## Page 3

                    I N D E X
WITNESS:
TOMAS FIERTEK (Sworn)

EXAMINATION                          PAGE
By Mr. Keener                         7
By Ms. Kalemeris                    247
By Ms. Hartzell                     248


                  E X H I B I T S
NUMBER       DESCRIPTION                      PAGE
Exhibit 1    Document Entitled "Defendant
             Chapterhouse Studios LLC's
             Supplemental Responses to
             Plaintiff's Seventh Set of
             Interrogatories (Nos. 18-23),"
             Dated February 25, 2013
             (No Bates Number)                 11
Exhibit 2    Internet Printout Entitled
             "Felheart Shoulders by Jennifer
             Biro on DeviantART"
             (No Bates Number)                 55
Exhibit 3    E-mail from Tomas Fiertek to Tomas F,
             Dated February 3, 2013, Subject:
             "Fwd: Ideas (131-141 Plus
             Unfinished/Unreleased Things)"
             and Related E-mail Chain
             (Bates CHS00032353 to CHS00032361)   59

## Page 4

             E X H I B I T S (Continued)
NUMBER       DESCRIPTION                      PAGE
Exhibit 4    Document Entitled "Games Workshop
             Claim Chart for Newly Accused
             Products - January 11, 2013-01-11"
             (No Bates Number)                 72
Exhibit 5    Internet Printout Entitled "Shop
             Roman Cuirass - Chest Plate -
             Steel Breastplate Armor Halloween
             Costumes Pictures," Dated
             October 3, 2012
             (No Bates Number)                 94
Exhibit 6    E-mail from Tomas Fiertek to Nick
             Villacci, Dated May 24, 2011,
             Subject: "Re: Um Helmet Concept
             and Green" and Related E-mail Chain
             (Bates CHS00018562 to CHS00018563)  104
Exhibit 7    E-mail from Tomas Fiertek to Nick
             Villacci, Dated February 3, 2010,
             Subject: "Re: Da Idea" and
             Related E-mail Chain
             (Bates CHS00030991 to CHS00031002)  120
Exhibit 8    E-mail from Nick Villacci to Tomas
             Fiertek, Dated March 15, 2012,
             Subject: "Re: Pics" and Related
             E-mail Chain
             (Bates CHS00030256 to CHS00030266)  171
Exhibit 9    E-mail from Dynath Kajira to Tomas
             Fiertek, Dated January 26, 2013,
             Subject: "Re: Maginot Lines"
             and Related E-mail Chain
             (Bates CHS00030057 to CHS00030081)  187
Exhibit 10   E-mail from Tomas Fiertek to Nick
             Villacci, Dated September 28, 2011,
             Subject: "Re: Video Spot" and
             Related E-mail Chain
             (Bates CHS00030267 to CHS00030276)  195

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 3 of 13 PageID #:17862

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                        Deposition of Tomas Fiertek

Page 29

1 searches?
2   A. This is not a single-time event. This happens
3 constantly during the whole design process. I -- I
4 couldn't even tell you what Google results I was given
5 since pictures disappear over time and new -- new ones
6 are added. Thus, the same Google search performed by
7 me today would probably not show the same result as
8 the one performed one or even more years ago. This
9 is an ongoing process. So that's -- that's all I can
10 say about the Google Image searches.
11   Q. Do you know how many times you performed
12 Google Image searches in designing and developing this
13 product?
14   A. Oh, a lot. I couldn't even start to guess.
15   Q. And do you have any memory of what terms you
16 typed into Google to perform these searches?
17   A. No. This would be a question of assumption
18 again. As in, if you present me with a computer, I
19 would -- I would experiment -- experiment myself towards
20 getting the best results I -- I can think of. This
21 is -- this is how I do -- how I do it every time I
22 Google search. Just because you type in a certain
23 word doesn't mean you're given the best images.
24   Q. All right. But sitting here today, you can't
25 remember the exact search phrases you used?

Page 30

1   A. Not all of them. I could -- I could take a
2 qualified guess at a -- at a few.
3   Q. I don't want you to guess.
4      Can you remember what searches you used?
5   A. No.
6   Q. And I believe, as you said, even if you could
7 remember the search terms, it's very likely what results
8 we get today is different than what results you would
9 have gotten back when you were designing these products;
10 correct?
11     MS. KALEMERIS: Objection. Form.
12     THE WITNESS: Well, very likely? I -- I
13 don't know if it's very likely. It's, however, the
14 logical assumption that a Google search performed
15 today during -- using the same phrase as one performed
16 one year ago would most probably not produce the same
17 results due to previously mentioned reasons.
18   Q. BY MR. KEENER: Did you retain copies of any
19 of the images that you found on the Google search that
20 you used as a reference in designing these products?
21   A. I do not remember that.
22   Q. Have you looked to see if you retained any
23 copies of any of the Google images you found and used
24 as a reference in designing these works?
25   A. I don't understand the question.

Page 31

1   Q. You said you don't recall whether you retained
2 any of these images you found on Google Image.
3      My question is: Have you looked for them to
4 see if you retained them?
5   A. Yes.
6   Q. And did you find any?
7   A. I don't remember that. I -- I was asked by
8 my counselor to look through my computer --
9     MS. KALEMERIS: Object -- I'll caution
10 Mr. Fiertek not to reveal the content of any privileged
11 conversations with counsel.
12   Q. BY MR. KEENER: I don't want to know what
13 you were asked by counsel. I just want to know what
14 you physically -- what you yourself did. So if you
15 can answer what you did search for, I think that would
16 be appropriate.
17   A. Well, I searched for everything related
18 to these products that I happened to save on my hard
19 drive. I do not recall what if I found -- and if I
20 found anything. What I was trying to say previously is,
21 if I did, those things were presented to my counselor.
22 And I don't remember what I found. It's -- it's all --
23 it's all accounted for.
24   Q. How did you search your computer for images?
25   A. I went through each and every folder

Page 32

1 containing pictures on my drive, as well as my e-mails,
2 to see if pictures were sent to other people or
3 received.
4   Q. Do you have any recollection if you at any
5 point deleted any images of these Google search results
6 that you had found?
7     MS. KALEMERIS: Objection. Form.
8     THE WITNESS: I know I did delete pictures
9 on my hard drive. I cannot recall to what items those
10 pictures were related to, nor when I did that.
11   Q. BY MR. KEENER: What makes you believe that
12 you deleted pictures from your hard drive?
13   A. In the beginning, before -- before this
14 lawsuit, I had no reason to save everything on my drive.
15 I -- deletion of unwanted -- unwanted pictures and
16 other things was just a normal part of how I handle
17 my computer. Thus, it is also a logical assumption
18 that some of those things just had to be deleted.
19   Q. And how about after this lawsuit started, have
20 you deleted any pictures from your computer?
21   A. No.
22   Q. Now, if you found an image on Google Image
23 search that you used as a reference for creating these
24 Heresy-Era Shoulder Pads for Terminators, why didn't you
25 save a copy of those pictures?

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 4 of 13 PageID #:17863

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                     Deposition of Tomas Fiertek

Page 33

1    MS. KALEMERIS: Objection. Form.
2    THE WITNESS: This is not the way I work.
3  I rarely if -- I'm an artist. I do not -- I do not
4  have a picture of something in front of me while I work.
5  I look at many things, form an idea in my head, and then
6  I work based on that.
7    Q. BY MR. KEENER: Do you have an understanding
8  that Games Workshop has asked Chapterhouse and its
9  designers to identify specifically any references they
10 used in the design and development of these products
11 at issue?
12   MS. KALEMERIS: Objection. Form.
13   THE WITNESS: Yes.
14   Q. BY MR. KEENER: Is it also your understanding
15 that Games Workshop has asked Chapterhouse for copies of
16 any references they used in the design and development
17 of the products at issue?
18   A. Yes.
19   Q. And despite knowing that, is it true that you
20 didn't change your design practice in a way that would
21 retain these images?
22   MS. KALEMERIS: Objection. Form.
23   THE WITNESS: Restate the question. I did not
24 understand it.
25   Q. BY MR. KEENER: So you've told me the reason

Page 34

1  you didn't keep these Google Image pictures that you
2  used as a reference was because that's not how you work.
3  And after the start of this lawsuit, you said that
4  you've become aware that Games Workshop has physically
5  asked Chapterhouse to identify the references and
6  produce copies of any references used.
7    My question is: With that knowledge, why
8  didn't you change the way you work to retain these
9  images?
10   MS. KALEMERIS: Objection. Form.
11   THE WITNESS: Well, first of all, I -- I
12 don't think the -- saying that I never save anything
13 that I found, for example, on Google searches is
14 correct. I -- this is how I tend to work. Thus,
15 I tend not to save things. I cannot remember if
16 I did and, if I did, then what I did.
17   I -- I am aware of what you said. And as
18 for saving sources for inspiration, for example, I
19 don't really know what to say. I have a hard time
20 changing the way I work. I was asked for -- I was
21 asked to provide examples of Google imaging searches
22 and I did. And I do not recall --
23   MS. KALEMERIS: Again, in your answer,
24 Mr. Fiertek, I'll -- I'll caution you not to reveal
25 the content of any privileged conversations with

Page 35

1  counsel.
2    THE WITNESS: Sure.
3    I -- I really don't know how to -- what to
4  answer to that. I did not delete -- after the legal
5  cases started, I did not delete pictures from my hard
6  drive. So -- sorry. The question again? I -- could
7  you restate the question?
8    Q. BY MR. KEENER: Okay. So the question is:
9  You stated you understood that Games Workshop was asking
10 for specific identification of any references used to
11 create these products and copies of those references?
12   A. Yes.
13   Q. Now -- my question now is: Did you make any
14 attempt to write down exactly which references you used
15 as you were designing these Heresy-Era Shoulder Pads for
16 Terminators?
17   MS. KALEMERIS: Objection. Form. Misstates
18 testimony.
19   THE WITNESS: Not as I recall, no.
20   Q. BY MR. KEENER: Did you make any effort to
21 save copies of the references you found on Google Image
22 searches that you used in the design and development
23 of the Heresy-Era Shoulder Pads for Terminators?
24   MS. KALEMERIS: Objection. Form.
25   THE WITNESS: Not that I recall, no.

Page 36

1    Q. BY MR. KEENER: Were you ever under the
2  impression that you had a duty to write down and
3  preserve this information?
4    MS. KALEMERIS: Objection. Form.
5    THE WITNESS: No.
6    Q. BY MR. KEENER: Were you ever under the
7  impression that you had a duty to save copies of these
8  images you used as resources in designing and developing
9  these products?
10   MS. KALEMERIS: Objection. Form. Misstates
11 testimony.
12   THE WITNESS: No.
13   Q. BY MR. KEENER: The next category you
14 mentioned that you used as a resource in design and
15 developing the Heresy-Era Shoulder Pads for Terminators
16 was various art books?
17   A. Yes.
18   Q. Do you recall that?
19      What art books are you referring to?
20   A. I have four art books.
21   Q. And did you bring those today?
22   A. Yes. I bring -- I did.
23   Q. And if you need to refer to them, please feel
24 free. Could you identify the titles of the art books
25 that you're referring to?

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 5 of 13 PageID #:17864

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                          Deposition of Tomas Fiertek

Page 37

1  A. Yes. They are called the Horus Heresy
2  Vision -- Visions books.
3  Q. And you said there's four different ones.
4  Could you identify the titles?
5  A. Sure.
6  The first one is -- it's called "Visions of
7  War." The second one, "Visions of Darkness." Third
8  one, "Visions of Treachery." And the last one, "Visions
9  of Death."
10  Q. And do you understand all those books to be
11  Games Workshop books?
12  MS. KALEMERIS: Objection. Form.
13  THE WITNESS: I don't know who produced them,
14  but -- so no.
15  Q. BY MR. KEENER: Do you understand that they're
16  sold by Games Workshop?
17  A. No.
18  Q. Do you have any belief on whether or not those
19  are Games Workshop's books?
20  MS. KALEMERIS: Objection. Form.
21  THE WITNESS: Yes.
22  Q. BY MR. KEENER: What's your belief?
23  A. They picture graphic descriptions of the
24  Warhammer universe.
25  Q. And how does that relate to your belief on

Page 38

1  whether or not they're Games Workshop's books?
2  A. Because I do not know if --
3  MS. KALEMERIS: Objection. Form.
4  THE WITNESS: I did not know if Games Workshop
5  released or sold them or if another company such as, for
6  example, Black Library did. So it's like a technicality
7  for me.
8  Q. BY MR. KEENER: Do you know when you acquired
9  those four Heresy Vision books?
10  A. All I remember is that was a long time ago.
11  Q. Can you quantify that in any way?
12  Was it more than five years ago?
13  A. I would say "yes."
14  Q. Do you have a copy of "Horus Heresy Collected
15  Visions"?
16  A. No.
17  Q. Have you ever had a copy?
18  A. No.
19  Q. Do you have an electronic copy of "Horus
20  Heresy Collected Visions"?
21  A. No.
22  Q. Beyond the four Horus Heresy Vision books
23  you've identified, did you use any other art books
24  as references in the design and development of the
25  Heresy-Era Shoulder Pads for Terminators?

Page 39

1  MS. KALEMERIS: Objection. Form.
2  THE WITNESS: Not physi -- not physical books.
3  No.
4  Q. BY MR. KEENER: What do you mean by that
5  answer?
6  A. Well, amongst Google picture searches are --
7  let's see the English word for that -- pictures of pages
8  taken from historical armor books. It's like a page or
9  several electronically viewable online of -- of a -- of
10  a physical book. I do not have the physical book. But,
11  thus -- thus, the question was a little tricky for me
12  to answer.
13  Q. Okay. So that falls into the Google Image
14  search category that we've already discussed?
15  A. Yes.
16  Q. And is there any specific book on the four art
17  books -- let me rephrase that.
18  Did you refer to all four of the Horus Heresy
19  Vision books in the design and development of the
20  Heresy-Era shoulder pads?
21  MS. KALEMERIS: Objection. Form.
22  THE WITNESS: I do not remember that.
23  Q. BY MR. KEENER: Do you know which other books
24  you referred to as resources?
25  MS. KALEMERIS: Objection. Form.

Page 40

1  THE WITNESS: Don't remember that either.
2  Q. BY MR. KEENER: Do you know which pictures
3  out of any of the books that you referred to in the
4  design and development of the Heresy-Era Shoulder Pads
5  for Terminators?
6  MS. KALEMERIS: Objection. Form.
7  THE WITNESS: No.
8  Q. BY MR. KEENER: Is there any way for you to
9  identify anything from any of the Horus Heresy Vision
10  books that you referred to in any way as a reference in
11  designing the Heresy-Era Shoulder Pads for Terminators?
12  MS. KALEMERIS: Objection. Form.
13  THE WITNESS: Yes.
14  Q. BY MR. KEENER: And how would we identify
15  that?
16  A. By looking at them and recalling, I guess.
17  Q. So the only way for you to do that would be
18  to flip through each book page by page and see if any
19  pictures refreshed your memory on which ones you used?
20  MS. KALEMERIS: Objection. Form.
21  THE WITNESS: Yes.
22  Q. BY MR. KEENER: Have you made any attempt
23  to do that and identify which pictures you used as
24  a reference in creating these products?
25  MS. KALEMERIS: Objection. Form.

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 6 of 13 PageID #:17865

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

Page 105

1  Q. And you start out:
2  "Need to know how to proceed: Which one
3  looks better, A: or B:?"
4  Do you see that?
5  A. Yeah.
6  Q. Were you referring to pictures labeled "A"
7  and "B" on the next page?
8  MS. KALEMERIS: Objection. Form.
9  THE WITNESS: I think so. Not 100 [sic] on
10 that one, but I think so.
11 Q. BY MR. KEENER: And the difference between
12 "A" and "B" on the next page appears to be that, on
13 the bottom of the shoulder pad, Picture A is straight
14 and Picture B has an arch in it.
15 Is that correct?
16 MS. KALEMERIS: Objection. Form.
17 THE WITNESS: Well, that seems to be correct.
18 Yes.
19 Q. BY MR. KEENER: And that appears to be the
20 only difference; correct?
21 MS. KALEMERIS: Objection. Form.
22 THE WITNESS: Yes.
23 Q. BY MR. KEENER: And do you know whether Games
24 Workshop's Space Marine shoulder pads are straight on
25 the bottom or if they have an arch?

Page 106

1  MS. KALEMERIS: Objection. Form.
2  THE WITNESS: I -- about that arch thing,
3  I don't know. I think that there are some that are
4  not straight at the bottom. But that's just -- that's
5  just what I think. I do not --
6  Q. BY MR. KEENER: Are you familiar --
7  A. I do not recall --
8  Q. Go ahead.
9  A. I do not recall seeing one with an arched
10 bottom. I can't remember seeing that.
11 Q. The ones you do recall have a straight bottom?
12 MS. KALEMERIS: Objection. Form.
13 THE WITNESS: Yes. I'm, however, uncertain
14 if I have ever seen one that is not a straight bottom.
15 Possibly. But right now, I only recall straight bottom.
16 Q. BY MR. KEENER: Do you know which design
17 choice was chosen?
18 MS. KALEMERIS: Objection. Form.
19 THE WITNESS: I think "A."
20 Q. BY MR. KEENER: The straight bottom?
21 A. Yes.
22 Q. Looking back to the e-mail on the first page,
23 there is another e-mail on the bottom from you to
24 Mr. Villacci, dated May 22nd, 2011.
25 Do you see that?

Page 107

1  A. Yes.
2  Q. The second paragraph top says:
3  "Here is the original pic from the art book."
4  Do you know what art book you're referring to?
5  A. I think it's -- it's referring to the Heresy
6  art books.
7  Q. One of the ones -- go ahead.
8  A. I think, yes, one of the ones I previously,
9  well, looked through. I'm not sure, but that's what
10 I think.
11 Q. You think it's one of the four Horus Heresy
12 Vision books you brought today?
13 A. Either --
14 MS. KALEMERIS: Objection. Form.
15 THE WITNESS: Either that or it might be
16 something in the possession of Mr. Villacci.
17 Q. BY MR. KEENER: If it was something in the
18 possession of Mr. Villacci, how would you be sending
19 him the e-mail saying "here is the original pic from
20 the art book"?
21 A. Because this e-mail is old and I am yet to
22 read it all and, well, memory, memory. You asked me --
23 Q. Do you believe -- go ahead.
24 A. You asked me what I think it was referring to.
25 And I just answered what I think it was referring to,

Page 108

1  giving two choices.
2  Q. Now that you see that this was an e-mail you
3  sent to Mr. Villacci, do you believe it's some image
4  that you had in your possession?
5  A. Yes.
6  Q. And do you believe it's anything other than
7  one of the pictures from the Horus Heresy Vision books?
8  A. I'm not sure.
9  Q. The next sentence says:
10 "All I did was alter the 'earmuffs' to grilles
11 and maybe some detail on the plume base. But I guess
12 this would be illegal to sell."
13 Do you know what's being referred to here?
14 A. I think it's -- it refers to a series of
15 helmet heads that I made or was making. That's my
16 guess.
17 Q. And do you know if that's any of the
18 Chapterhouse products that have been released?
19 A. It might be.
20 Q. Do you know which product that is?
21 A. It might be -- well, wait, wait, wait.
22 Well, there were plume -- there is just one
23 thing on the website with a plume on. So if it's --
24 if it does refer to a released product, that would be
25 it.

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 7 of 13 PageID #:17866

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

Page 109

1  Q. And which product is that?
2  A. Well, I don't -- sheesh. I can't recall --
3  I don't recall the names. Or that's one -- one of --
4  one Roman-themed armored helmet with a plume on. That's
5  my guess. And I made several. I don't remember -- I
6  don't remember how many. But there is more than one
7  for sure.
8  Q. Do you know which one you're referring to
9  when you said "I guess this would be illegal to sell"?
10 A. I think that comment referred to details
11 previously given to Mr. Villacci by his legal counsel.
12 So that's, I guess, privileged stuff.
13 Q. Yeah. I'm not asking for that.
14    I'm asking: Do you know which of the several
15 heads that you designed that comment you made referred
16 to?
17 A. No. No idea.
18 Q. The first sentence of that e-mail says:
19    "Told not to waste time and bandwidth on
20 downloading Thor movie. It's a early poor-quality
21 version."
22    What were you referring to?
23 A. The sentence doesn't make sense. It says
24 "told not to." And if I am saying this to Mr. Villacci,
25 then I'm wondering who told me. I don't remember what

Page 110

1  this was about. I do, however, remember Mr. Villacci
2  once asking me for a movie. It might have something
3  to do with that. But both -- this happened quite some
4  time ago. I don't remember that much. And the sentence
5  is weird. It doesn't ease things for me.
6  Q. Have you downloaded unauthorized movies on
7  the Internet?
8     MS. KALEMERIS: I'm going to object to the
9  relevance of this line of questioning.
10    THE WITNESS: And define -- well, restate the
11 question again, please.
12 Q. BY MR. KEENER: Yeah. Have you downloaded
13 movies without paying for them over the Internet?
14    MS. KALEMERIS: Objection. Form.
15    THE WITNESS: Of course.
16    MS. KALEMERIS: Relevance.
17 Q. BY MR. KEENER: I didn't hear your answer.
18 A. Of course I have.
19 Q. And those would be what people might consider
20 pirated copies?
21    MS. KALEMERIS: Objection. Form. Relevance.
22    THE WITNESS: That I do not know.
23 Q. BY MR. KEENER: But they would be copies of
24 movies you didn't pay for?
25    MS. KALEMERIS: Objection. Form. Relevance.

Page 111

1     THE WITNESS: Yes.
2  Q. BY MR. KEENER: Such as movies in the theater
3  such as Thor?
4     MS. KALEMERIS: Objection. Form. Relevance.
5     THE WITNESS: Yes. That's a good example.
6  Q. BY MR. KEENER: Did you see any problem in
7  infringing the copyrights of those movies?
8     MS. KALEMERIS: Objection. Form. Relevance.
9     THE WITNESS: Well, first of all, I don't know
10 if I downloaded it or my girlfriend did. But no.
11 Q. BY MR. KEENER: How many movies do you think
12 you've downloaded like that?
13    MS. KALEMERIS: Objection. Form. Relevance.
14    THE WITNESS: I would be -- I don't know.
15 I don't keep track on what I do online.
16 Q. BY MR. KEENER: Would it be more than ten?
17 A. Yes.
18    MS. KALEMERIS: Objection. Relevance. Form.
19 Q. BY MR. KEENER: More than 50?
20    MS. KALEMERIS: Objection. Relevance.
21    THE WITNESS: I don't know.
22 Q. BY MR. KEENER: Do you see any problem in
23 doing that?
24    MS. KALEMERIS: Objection. Relevance. Form.
25    THE WITNESS: No.

Page 112

1  Q. BY MR. KEENER: Do you likewise download
2  copies of books without paying for them?
3     MS. KALEMERIS: Objection. Form. Relevance.
4     THE WITNESS: I think I've done that a few
5  times. I don't remember any specifics, though.
6  Q. BY MR. KEENER: Have you done it with any
7  of the Games Workshop books?
8     MS. KALEMERIS: Objection. Form.
9     THE WITNESS: If you restate the question --
10 I didn't catch it.
11 Q. BY MR. KEENER: Yeah. Have you copied --
12 have you downloaded or otherwise obtained electronic
13 versions of any Games Workshop books without paying
14 for them?
15    MS. KALEMERIS: Objection. Relevance. Form.
16    THE WITNESS: Yes.
17 Q. BY MR. KEENER: Which ones?
18 A. I recall a very, very old book about games
19 and rules for games called something -- something with
20 "Road Trader."
21 Q. Anything else?
22 A. No, not without not paying for them. [sic]
23 Q. Any of the --
24 A. I have --
25 Q. Any of the codexes?

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 8 of 13 PageID #:17867

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                                      Deposition of Tomas Fiertek

Page 113

1  A. I -- I -- yes. I've downloaded lots of those.
2  But I also have them in physical form in my bookshelf.
3  So you asked me if I downloaded stuff without paying.
4  No.
5  Q. You paid for the physical copies on your
6  bookshelf; correct?
7  A. Yes.
8  Q. Did you pay for the electronic versions?
9     MS. KALEMERIS: Objection. Form. Relevance.
10    THE WITNESS: No.
11 Q. BY MR. KEENER: Which Games Workshop books
12 do you have in electronic version that you did not pay
13 for the electronic version?
14    MS. KALEMERIS: Objection. Form. Relevance.
15    THE WITNESS: I have some of the codexes as
16 they are called.
17 Q. BY MR. KEENER: Which codexes?
18 A. I don't remember. A number of them.
19 Q. Can you identify any of them?
20 A. I do remember three that I can identify.
21 Q. Which ones are those?
22 A. One is called Grey Knights. One is called
23 Necrons. And one is called, I think, Blood Angels.
24 Q. Do you believe you have a physical copy of
25 codex Grey Nights?

Page 114

1  A. No, I don't believe. I know I have.
2  Q. You do have a copy?
3  A. Yes.
4  Q. Do you have a physical copy of codex Blood
5  Angels?
6  A. Yes.
7  Q. And do you have an electronic copy of codex
8  Dark Eldar?
9  A. Yes, I do.
10 Q. Codex Tyranids, T-y-r-a-n-i-d-s?
11 A. I don't know that.
12 Q. Codex Eldar?
13 A. Also don't know.
14 Q. Codex Imperial Guard?
15 A. I don't think so.
16 Q. Codex Space Marines?
17 A. I think I have that one. I don't know which
18 one, though. There are several different prints from
19 different years. I think I --
20 Q. Codex Ultramarines?
21 A. No.
22 Q. Codex Tau, T-a-u?
23 A. I think so. I'm not sure.
24 Q. Do you have a physical copy of codex Tau?
25 A. Yes.

Page 115

1  Q. Do you have a physical copy of codex
2  Ultramarines?
3  A. I don't recall that name ever being used.
4  So no.
5  Q. Do you have an electronic copy of the
6  Warhammer 40K compilation?
7  A. I don't think so. I don't know what that is.
8  I mean, if you show it to me, it will refresh my memory
9  for sure. But right now, I don't know what that is.
10 Q. Do you have electronic copies of the Horus
11 Heresy Vision books?
12 A. No.
13 Q. The Collected Visions book?
14 A. No.
15 Q. Do you have an electronic copy of any of the
16 Imperial Armor books?
17 A. Yes, I have.
18 Q. What about Volume 9: The Badab War, B-a-d-a-b?
19 A. I think so.
20 Q. Do you know if you have a physical copy of
21 that book?
22 A. I don't know. I have some of those physical.
23 But I don't remember which ones.
24 Q. Do you have an electronic copy of Warhammer
25 Armies: Lizardmen book?

Page 116

1  A. If -- if you can allow me to go back to one
2  of the first questions --
3  Q. Yes.
4  A. -- about -- about deleting stuff after the
5  law case started. I know that I deleted some of the
6  electronic copies. I think I even said that during my
7  last deposition. This is nothing I keep track of or so.
8  Well, I -- if asked to, I can re-check my drive to give
9  specifics. But --
10 Q. Do you know which books you deleted?
11 A. No. As I said, I don't keep track on the
12 specifics. I just deleted electronic copies of, well,
13 pretty much everything I have.
14 Q. So you deleted the current copies of pretty
15 much everything you have after the lawsuit started?
16 A. Yes.
17    MS. KALEMERIS: Objection.
18    THE WITNESS: Not everything.
19 Q. BY MR. KEENER: I didn't hear your answer.
20 A. Not everything.
21 Q. But a large portion of electronic copies
22 of Games Workshop materials you deleted after the
23 litigation started?
24    MS. KALEMERIS: Objection.
25    THE WITNESS: Yes.

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 9 of 13 PageID #:17868

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                      Deposition of Tomas Fiertek

Page 117

1  Q. BY MR. KEENER: Do you know how far after the
2  case started you did this?
3  A. I -- no. I just -- I just know I deleted
4  stuff that I don't own physically, that I haven't
5  bought in a store. Well, again, I can -- I can check
6  it for specifics. But I don't remember the details
7  of that.
8  Q. Prior to deleting them, did you ever attempt
9  to make a list of the books that you were deleting?
10     MS. KALEMERIS: Objection. Form.
11     THE WITNESS: No.
12 Q. BY MR. KEENER: Back to do you -- do you
13 have the electronic copy of Warhammer Armies: Lizardmen?
14 A. No.
15 Q. Have you ever had that book?
16 A. No.
17 Q. Do you have an electronic copy of Insignium
18 Astartes? I-n-s-i-g-n-i-u-m. A-s-t-a-r-t-e-s.
19 A. I don't know that.
20 Q. Do you know if you've ever had an electronic
21 version of that book?
22 A. I don't know that either.
23 Q. Do you know if you have a physical copy of
24 that book?
25 A. I'm pretty sure I have. I'm not sure which

Page 118

1  book it is. But the name rings a bell definitely.
2  And --
3  Q. It's a rather thin book with various pictures
4  of Space Marine chapters and insignias and shoulder
5  pads --
6     MS. KALEMERIS: Objection.
7  Q. BY MR. KEENER: -- and how to apply them and
8  paint colors.
9     MS. KALEMERIS: Objection. Form.
10    THE WITNESS: I am pretty sure I do have that
11 book. Not -- not -- not in --
12 Q. BY MR. KEENER: The physical copy?
13 A. I'm -- I'm talking about physical copies.
14 I'm not 100 [sic] on that. But I'm pretty sure I do
15 have that one.
16 Q. Do you have an electronic copy of the Art
17 of Clint Langley, L-a-n-g-l-e-y?
18 A. No.
19 Q. Have you previously possessed an electronic
20 copy of that book?
21 A. No.
22 Q. Do you have a physical copy of that book?
23 A. No.
24 Q. Have you ever had a physical copy of that
25 book?

Page 119

1  A. No.
2  Q. Do you have an electronic copy of How to Paint
3  Space Marines?
4  A. No.
5  Q. Have you ever had an electronic copy of that
6  book?
7  A. No.
8  Q. Do you have a physical copy of How to Paint
9  Space Marines?
10 A. No.
11 Q. Have you had a physical copy?
12 A. No.
13 Q. Do you have an electronic copy of Index
14 Astartes, Volume III?
15 A. I don't think so.
16 Q. Have you ever had an electronic copy of that
17 book?
18 A. Not sure. Possible.
19 Q. And if so, it would have been one of the ones
20 you deleted?
21    MS. KALEMERIS: Objection. Form.
22    THE WITNESS: That depends if I have it in
23 physical form or not.
24 Q. BY MR. KEENER: Do you know if you have it
25 in physical form?

Page 120

1  A. I don't know that.
2  Q. The -- the series of books I just identified
3  for you, in the last month or two, have you made any
4  attempt to look through your computer and your bookshelf
5  to see whether you had the electronic or physical copies
6  of those specific books?
7     MS. KALEMERIS: Objection. Form.
8     THE WITNESS: Restate the question. I -- I
9  didn't catch the -- the beginning.
10 Q. BY MR. KEENER: Sure. I listed various Games
11 Workshop books in the prior questions here.
12    In the past month or two, have you made any
13 attempt to identify if you have any electronic copies
14 of those specific books or physical copies of those
15 specific books?
16    MS. KALEMERIS: Same objection.
17    THE WITNESS: No.
18    MR. KEENER: All right. Let's go, Gill,
19 to document 14 and mark that Fiertek Exhibit 7.
20 Exhibit 17 -- 7 is Bates labeled Chapterhouse 30991
21 through 31002.
22    (T. Fiertek Exhibit 7 marked.)
23 Q. BY MR. KEENER: If you turn to that page that
24 ends in 998. It's near the back and it's on page 8.
25    In the middle of the page, do you see an

Highly Confidential - Attorneys' Eyes Only

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 10 of 13 PageID #:17869

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                        Deposition of Tomas Fiertek

Page 121

1  e-mail from you to Mr. Villacci dated February 1st,
2  2010?
3      A.  (Examining.)  Yes.
4      Q.  And the middle paragraphs states:
5          "Maybe some things to think about the next
6  time a codex comes out with big things being needed by
7  players is maybe we should split up bigger work projects
8  so they are done faster.  After all, we" -- capital --
9  "ARE competing with other companies.  And whoever gets
10 things out first grabs customers."
11         Do you see that?
12     A.  Yes.
13     Q.  What did you mean by that paragraph?
14         MS. KALEMERIS:  I'll caution Mr. Villacci
15 [sic] to read the context of that paragraph so that
16 he understands -- or not Mr. Villacci, excuse me --
17 Mr. Fiertek to read the context of the e-mail to
18 understand fully what's been put in front of him.
19         THE WITNESS:  (Examining.)  I don't know what
20 project we are being discussed -- we are discussing here
21 or if it's even a project or if it's brainstorming or --
22 it's three years old.
23     Q.  BY MR. KEENER:  When it says "the next time
24 a codex comes out," is that fair to say that's a
25 Games Workshop codex?

Page 122

1          MS. KALEMERIS:  Objection.  Form.
2          THE WITNESS:  Yes.
3      Q.  BY MR. KEENER:  And when you say you are
4  "competing with other companies" to see who comes
5  out and grabs customers first, would one of those
6  other companies be Games Workshop?
7          MS. KALEMERIS:  Objection.  Form.
8          THE WITNESS:  I don't think so.
9      Q.  BY MR. KEENER:  Would one of those other
10 companies be Forge World?
11         MS. KALEMERIS:  Objection.  Form.
12         THE WITNESS:  No.
13     Q.  BY MR. KEENER:  What other companies are you
14 referring to?
15     A.  I don't remember the names.  But I think there
16 are several companies that do things that can be used
17 with Games Workshop products also.
18     Q.  Is the -- go ahead.
19     A.  The -- the logical assumption is that that's
20 what the -- that's what the -- that's what's being
21 referred to.
22     Q.  Is the concept you're trying to convey that,
23 when Games Workshop releases a new codex, there may be
24 certain vehicles or miniatures or otherwise in there
25 that there aren't miniatures for and that Chapterhouse

Page 123

1  should quickly design those miniatures to get to market
2  first --
3          MS. KALEMERIS:  Objection form.
4      Q.  BY MR. KEENER:  -- and grab customers?
5          MS. KALEMERIS:  Objection.  Form.
6          THE WITNESS:  This is a possibility.  Although
7  I would rephrase it.  It's not to design --
8      Q.  BY MR. KEENER:  But you --
9      A.  It's not to design the miniatures.  It's to --
10 as in replace.  But more like as in be possible to use
11 with based on the same theme.  And, again, I think what
12 is being referred to regarding "competing" is there are
13 other companies that are doing similar things.  That
14 is my understanding of that.
15     Q.  Okay.  So if I rephrase that, it would be:
16 When Games Workshop released a new codex, there may
17 be vehicles or other miniatures in there that aren't
18 released and, therefore, Chapterhouse wants to quickly
19 develop products that are similar in theme to the
20 pictures or miniatures for people to use with that
21 codex?
22         MS. KALEMERIS:  Objection.  Form.  Misstates
23 testimony.
24         THE WITNESS:  Well, not entirely.  It's not
25 about miniatures or toys that are not -- that are not

Page 124

1  yet released.  It's about -- rather it's more about
2  things that are not released whatsoever, not even
3  planned to be released and haven't been released for
4  sometimes up to ten years or more.  And "similar,"
5  again, that's a definition issue.  There's nothing
6  similar about that, doing -- creating something that
7  shares a common theme.
8      Q.  BY MR. KEENER:  Okay.  So when you say there
9  aren't miniatures released even for a long time, all
10 that would be in the codex would be a picture of what
11 that thing might look like in the universe?
12         MS. KALEMERIS:  Objection.  Form.  Misstates
13 testimony.
14         THE WITNESS:  Sometimes there might be a
15 picture that shows either an idea, a concept, or a
16 part of something.  Far from always, though.  That's --
17 yeah, that's -- that's my take on that.
18     Q.  BY MR. KEENER:  Let's turn back a page to
19 30997.  At the bottom is another e-mail from you to
20 Mr. Villacci, dated February 1st, 2010.
21         Do you see that?
22     A.  Yes.
23     Q.  And the second paragraph starts:
24         "Regarding pre-Heresy pad series."
25         Stopping there, would that be the Heresy-Era

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 11 of 13 PageID #:17870

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                            Deposition of Tomas Fiertek

Page 225

1  address in doing so.
2      Q.  BY MR. KEENER:  Do you have any idea how it
3  could come from a different e-mail address?
4      MS. HARTZELL:  Objection to form.  Calls for
5  speculation.
6      Q.  BY MR. KEENER:  Do you have any idea how it
7  could come from a different Chapterhouse e-mail address?
8      MS. KALEMERIS:  I objected to form and calling
9  for speculation.
10     THE WITNESS:  I would have to guess.  And
11  that would be either hacking or I made it in my sleep
12  or maybe Mr. Villacci copy/pasted stuff that I wrote
13  in my normal e-mail and sent that to some customer
14  for some weird reason.  I -- as far as I can recall,
15  I haven't done that knowingly at least.
16     Q.  BY MR. KEENER:  What is Photobucket?
17     A.  That is a -- a picture -- online web picture
18  hosting service, I think, call it a web hotel.  I
19  don't know the correct term.  But I use it to store
20  my pictures on it.
21     Q.  Have you used it to store any pictures related
22  to the Chapterhouse products?
23     A.  Yes.
24     Q.  And have you collected all the pictures from
25  Photobucket that have anything to do with Chapterhouse

Page 226

1  products?
2      MS. KALEMERIS:  I caution you not to reveal
3  the content of any conversations with counsel.
4      THE WITNESS:  To my best knowledge, yes.
5      Q.  BY MR. KEENER:  Do you know, if after the
6  start of this litigation, you ever asked Mr. Villacci
7  whether or not you should delete photos from
8  Photobucket?
9      MS. KALEMERIS:  Objection.  Form.
10     THE WITNESS:  I don't know.  I know I had some
11  issues with Photobucket.  But if I asked Mr. Villacci
12  whether I should delete some pictures on that, I don't
13  think so.  I can't remember.
14     Q.  BY MR. KEENER:  Have you deleted any pictures
15  related to Chapterhouse products from Photobucket?
16     MS. KALEMERIS:  Objection.  Form.  Vague as
17  to "related."
18     THE WITNESS:  I don't think so.
19     Q.  BY MR. KEENER:  And so to the best of your
20  memory, every picture you've ever had on Photobucket
21  since the start of this case related to Chapterhouse
22  is still there?
23     MS. KALEMERIS:  Objection.  Form.  Vague as
24  to "related."
25     THE WITNESS:  Well, I -- I know I have

Page 227

1  deleted -- previous to the law case, I have deleted
2  and uploaded a bunch of stuff there.  But after the
3  law case, I don't think so.
4      Q.  BY MR. KEENER:  Let's get document No. 10
5  and mark that Chapterhouse 15 -- I'm sorry -- Fiertek
6  Exhibit 15.  Fiertek Exhibit 15 is labeled Chapterhouse
7  30382 through 30396.
8      (T. Fiertek Exhibit 15 marked.)
9      Q.  BY MR. KEENER:  And I want to direct your
10  attention to page 4 on page 30385.  And near the bottom,
11  there's an e-mail from Mr. Villacci to you, dated
12  February 28, 2012.
13     Do you see that?
14     A.  (Examining.)  Yes.
15     Q.  And Mr. Villacci states:
16     "Go ahead and do 2k for yourself monthly.
17  FYI change any passwords you may have sent me.  This
18  includes Photobucket," Dakka -- "Dakka, etc.  GW will
19  have access to those logs maybe."  (As read.)
20     Do you see that?
21     A.  Not yet.  Still looking.  Yes.
22     Q.  It's a little below halfway on the page --
23     A.  I see them now.
24     Q.  And your response is right above that on
25  February 27, 2012.  And you say:

Page 228

1      "Hmm, any pics that should be taken away from
2  pbucket?"
3      Does "pbucket" mean "Photobucket"?
4      A.  Yes.
5      Q.  And after Mr. Villacci tells you Games
6  Workshop will have access to those, is it correct
7  you're asking Mr. Villacci whether or not you should
8  take any pictures away from Photobucket?
9      MS. KALEMERIS:  To the extent this represents
10  a request for legal advice, I instruct you not to answer
11  the question.
12     THE WITNESS:  I'll follow that advice.
13     Q.  BY MR. KEENER:  What did you mean when you
14  wrote this sentence, "Hmm, any pics that should be taken
15  away from Photobucket"?  (As read.)
16     MS. KALEMERIS:  Same instruction.
17     THE WITNESS:  Same answer.
18     Q.  BY MR. KEENER:  Are you refusing to answer the
19  question on what you meant when you wrote that sentence?
20     A.  I am following the advice put to me by my
21  legal counsel.
22     Q.  And I'm trying to understand that advice.
23     Are you refusing to answer the question of
24  what you meant when you wrote that sentence?
25     MS. KALEMERIS:  He's been instructed to not

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 12 of 13 PageID #:17871

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                   Deposition of Tomas Fiertek

Page 229

1  answer to the extent that it represents a request for
2  legal advice.
3      THE WITNESS: Well, I would like to discuss
4  this with my attorney first, if possible.
5    Q. BY MR. KEENER: I'm not asking for any legal
6  advice you got.
7      I'm just asking: This sentence, which has
8  been produced and no claim of privilege has been made
9  on this sentence, what you meant when you wrote it?
10   A. I don't know. It's a question to
11 Mr. Villacci.
12   Q. And is the question about removing pictures
13 from Photobucket?
14   A. Yes.
15   Q. And the question is prompted because you were
16 told Games Workshop may have access to Photobucket?
17   A. I mean, this doesn't make sense.
18     MS. KALEMERIS: Objection to form.
19     THE WITNESS: So --
20   Q. BY MR. KEENER: Does the question come right
21 after Mr. Villacci tells you that Games Workshop may
22 have access to your Photobucket?
23     MS. KALEMERIS: Objection. Form.
24     THE WITNESS: I have no idea. This is highly
25 illogical.

Page 230

1    Q. BY MR. KEENER: Okay.
2    A. It just doesn't make sense what I meant.
3    Q. Do you use -- do you use FTP?
4    A. On rare occasion, yes.
5    Q. And do you use FTP to transfer information
6  back and forth between you and Mr. Villacci?
7      MS. KALEMERIS: Objection. Form.
8      THE WITNESS: Define "information."
9    Q. BY MR. KEENER: Any -- anything. It could be
10 documents, pictures, anything.
11     MS. KALEMERIS: Objection. Form.
12     THE WITNESS: I recall setting up an FTP
13 server so that Mr. Villacci could access my -- my
14 folder with my movies on my hard drive.
15   Q. BY MR. KEENER: So you remember setting up an
16 FTP so Mr. Villacci could copy movies from your computer
17 without paying for them?
18     MS. KALEMERIS: Objection. Form. Relevance.
19 Argumentative.
20     THE WITNESS: And also giving him -- giving --
21 giving him access only to the movie folder. So as I
22 recall, he -- he didn't have free reign to pillage my
23 hard drive. And that was quite a while ago.
24   Q. BY MR. KEENER: Do you know if you transferred
25 anything else other than movies to Mr. Villacci over

Page 231

1  FTP?
2      MS. KALEMERIS: Objection. Form. Misstates
3  the testimony.
4      THE WITNESS: I only remember him wanting
5  a couple movies. If he got other things, I don't know.
6  I don't remember.
7      MR. KEENER: Okay. Let's go to document 4 and
8  mark that Fiertek Exhibit 16.
9      (T. Fiertek Exhibit 16 marked.)
10   Q. BY MR. KEENER: Fiertek Exhibit 16 is marked
11 Chapterhouse 25126 through 137. I want to direct your
12 attention to page 2, which is marked 25127. And this
13 is an e-mail from you to Mr. Villacci, dated July 1st,
14 2011.
15     Do you see that?
16     MS. KALEMERIS: Objection. Form.
17     THE WITNESS: (Examining.) I think so. There
18 are no page numbers. So I think so.
19   Q. BY MR. KEENER: The one labeled 25127.
20   A. Yes.
21   Q. The top half of that page is an e-mail to you
22 from Mr. Villacci, dated July 1st, 2011; correct?
23   A. Yes.
24   Q. Okay. And at the top of this page, you're
25 providing an IP address and a user name and a password.

Page 232

1      Is that for the FTP server?
2      MS. KALEMERIS: Objection. Form.
3      THE WITNESS: I think so.
4    Q. BY MR. KEENER: Okay. And right under that,
5  you talk about an "office zip file," which is very big
6  and is in a certain directory.
7      What are you referring to?
8      MS. KALEMERIS: Objection. Form. Relevance.
9      THE WITNESS: I don't remember.
10   Q. BY MR. KEENER: Do you know if that's a copy
11 of Microsoft Office?
12     MS. KALEMERIS: Objection. Form. Relevance.
13     THE WITNESS: I don't know.
14   Q. BY MR. KEENER: Do you believe it to be?
15     THE WITNESS: Could be.
16     MS. KALEMERIS: Same objections.
17   Q. BY MR. KEENER: I didn't hear your answer.
18   A. It could be.
19   Q. And do you recall sending Mr. -- or giving
20 Mr. Villacci access to Microsoft Office so he didn't
21 have to pay for it?
22     MS. KALEMERIS: Objection. Form. Calls for
23 a legal conclusion.
24     THE WITNESS: All I remember is giving him
25 access to my movies.

Case: 1:10-cv-08103 Document #: 314-8 Filed: 03/27/13 Page 13 of 13 PageID #:17872

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                              Deposition of Tomas Fiertek

Page 233

1  Q. BY MR. KEENER: And the second sentence talks
2  about a couple of those movies; correct?
3      MS. KALEMERIS: Objection. Form.
4      THE WITNESS: Yes.
5  Q. BY MR. KEENER: And then it also mentions
6  a PDF copy of Kymes, K-y-m-e-s, novel from Promethean
7  Sun.
8      Do you see that?
9  A. Yes.
10 Q. Is that a Games Workshop Black Library novel?
11     MS. KALEMERIS: Objection. Form.
12     THE WITNESS: I think so.
13 Q. BY MR. KEENER: And how did you obtain a PDF
14 copy of that novel?
15 A. I do not remember.
16     MS. KALEMERIS: Objection. Objection. Form.
17 Relevance.
18 Q. BY MR. KEENER: Did you pay for that copy?
19     MS. KALEMERIS: Objection. Relevance. Form.
20     THE WITNESS: No.
21 Q. BY MR. KEENER: In fact, you go on to discuss
22 that buying that book would be very expensive, don't
23 you?
24     MS. KALEMERIS: Objection. Form.
25     THE WITNESS: I'm apparently speculating on

Page 234

1  its price on eBay, none of which I remember. But --
2  well, it's there.
3  Q. BY MR. KEENER: And you mentioned, if you were
4  to purchase it, it costs hundreds of dollars; correct?
5      MS. KALEMERIS: Objection. Form. Relevance.
6      THE WITNESS: I do mention that.
7  Q. BY MR. KEENER: Do you know if this book has
8  any pictures in it?
9  A. No.
10 Q. You don't know or it doesn't?
11 A. I don't know.
12     MS. KALEMERIS: Objection. Form.
13 Q. BY MR. KEENER: Do you know if there's a
14 picture on the cover?
15     MS. KALEMERIS: Objection. Form.
16     THE WITNESS: No.
17 Q. BY MR. KEENER: In the creation of any
18 Chapterhouse products, have you recast any Games
19 Workshop products or portions thereof?
20     MS. KALEMERIS: Objection. Form.
21     THE WITNESS: I -- no, not me.
22 Q. BY MR. KEENER: Do you know if Chapterhouse
23 has?
24     MS. KALEMERIS: Objection. Form. Calls for
25 speculation.

Page 235

1      THE WITNESS: Yes.
2  Q. BY MR. KEENER: And which products have
3  involved recasting of Games Workshop products?
4      MS. KALEMERIS: Objection. Form.
5      THE WITNESS: I remember the very first
6  shoulder pad. And then there was a so-called Chaplain
7  miniature. Yeah.
8  Q. BY MR. KEENER: Any other products or portions
9  thereof?
10 A. Yes. There were two pads in the very
11 beginning.
12 Q. Which pads are those?
13 A. I'm pretty sure there were two pads. Both
14 are -- I don't know their names. They were -- I think
15 I mentioned that during the last deposition.
16 Q. Do you recall what the pads looked like?
17 A. Yeah. They had --
18     MS. KALEMERIS: Objection. Form.
19     THE WITNESS: They had scaly patterns on them
20 and a little dragon head.
21 Q. BY MR. KEENER: Besides those two shoulder
22 pads and the Chaplain, do you know of any other
23 Chapterhouse product the creation of which involved
24 recasting of any Games Workshop product or portion?
25     MS. KALEMERIS: Objection. Form.

Page 236

1      THE WITNESS: Not that I can think of.
2  Q. BY MR. KEENER: And what do you mean by the
3  word "recasting"?
4      MS. HARTZELL: Counsel, the witness has
5  already been deposed with respect to the earlier
6  products. To the extent that you have questions
7  about the new products, you can continue. But we're
8  already late into the evening.
9      MR. KEENER: I did question about existing
10 products.
11     MS. KALEMERIS: Okay. So ask those questions.
12 Q. BY MR. KEENER: What do you mean by
13 "recasting"?
14 A. My idea or take on recasting is taking an
15 original piece of something and, with all its details
16 in intact as well as shape, make a mold of that thing
17 and then make a cast using that mold. I think, yeah,
18 that's -- that's my take on recasting.
19 Q. BY MR. KEENER: If I broaden that to say
20 recasting is where you're using something to make a
21 mold and that something has any Games Workshop pieces
22 inside of it in any way, with that definition, are there
23 any other products that involved recasting at all?
24     MS. KALEMERIS: Objection. Form.
25     THE WITNESS: Well, yes and no.