# EXHIBIT

# 5

```
        IN THE UNITED STATES DISTRICT COURT

          NORTHERN DISTRICT OF ILLINOIS

               EASTERN DIVISION

GAMES WORKSHOP LIMITED,       )
          Plaintiff,          )
                              )
          vs.                 )
                              ) Civil Action
CHAPTERHOUSE STUDIOS LLC      ) No. 1:1--cv-08103
and JON PAULSON d/b/a         )
PAULSON GAMES,                )
          Defendant.          )
_____ )




        DEPOSITION OF DR. CARL GRINDLEY

             New York, New York

          Thursday, February 21, 2013
```

Reported By:

CATHI IRISH, RPR, CLVS, CCR

Page 2

February 21, 2013
9:09 a.m.

Deposition of CARL GRINDLEY, held at the offices of Foley & Lardner, LLP, 90 Park Avenue, New York, New York, before Cathi Irish, a Registered Professional Reporter and Notary Public of the State of New York.

Page 3

APPEARANCES:

FOLEY & LARDNER, LLP
Attorneys for Plaintiff
    321 North Clark Street, Suite 2800
    Chicago, Illinois 60654
BY: JASON J. KEENER, ESQ.

WINSTON & STRAWN, LLP
Attorneys for Defendant
    35 West Wacker Drive
    Chicago, Illinois 60601-9703
BY: BRYCE A. COOPER, ESQ.

Page 4

1    D R.  C A R L  G R I N D L E Y,  called as
2    a witness, having affirmed to tell the truth,
3    was examined and testified as follows:
4    EXAMINATION
5    BY MR. KEENER:
6    Q.   Good morning.
7    A.   Good morning.
8    Q.   State your name for the record.
9    A.   My name is Carl James Grindley.
10   Q.   Where do you live?
11   A.   I live in the Bronx in New York City.
12   Q.   Have you ever been deposed before?
13   A.   I've never been deposed.
14   Q.   Since you've never been deposed, I'm
15   sure your counsel has kind of told you how this is
16   going to go but I'll lay some ground rules.
17        If at any time you don't understand one
18   of my questions, can you let me know?
19   A.   Yes, I can.
20   Q.   Since the court reporter is taking
21   everything down, can we try to avoid uh-huh,
22   huh-uh's, shakes of the heads, everything has to
23   be verbal so the transcript reads clearly.  Do you
24   understand?

Page 5

1    A.   I do understand.
2    Q.   I'll try to arrange it so we can try
3    and take a short break every hour or so but if
4    there's any time you need a break before that,
5    this is not a torture test.  Just let me know you
6    need a break.  Is that fair?
7    A.   That is fair.
8    Q.   Is there any reason you can't give your
9    full and complete truthful testimony today?
10   A.   No, there's not.
11   Q.   Have you ever testified in court
12   before?
13   A.   No, I have not.
14   Q.   Have you ever been qualified as an
15   expert witness in court before?
16   A.   No, I have not.
17   Q.   Have you ever attempted to testify in
18   court but you were not allowed to testify for some
19   reason?
20   A.   No, I have not.
21   Q.   What did you do to prepare for your
22   deposition?
23   A.   To prepare for the deposition, I met
24   with Mr. Cooper.

2  (Pages 2 to 5)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1     A.   One month earlier, January 1st.  And by
2  drafting, I'm assuming you mean physically writing
3  it rather than looking at different charts and
4  doing preliminary research.
5     Q.   Is all the text in here your own words?
6     A.   I decided what text would be in this
7  report.
8     Q.   Well, okay, understood.  You could have
9  seen a report written by someone else and said I
10  like those words and signed your name.  That's one
11  way, or you could have typed the words or it could
12  be a combination of the two.
13     A.   There was a drafting process.
14     Q.   Explain the drafting process.
15     A.   The drafting process would be me
16  drafting a response, providing that draft to the
17  Chapterhouse Studios counsel and then putting it
18  in correct format for an expert report.
19     Q.   Other than formatting changes, is the
20  text here all yours?
21     A.   The text is mine in that the final
22  approval of the text is mine.  There may be the
23  occasional item of legalese, for example, the word
24  opine where Chapterhouse Studios' counsel made the

1  editorial suggestion.
2     Q.   Other than format and a word of
3  legalese here and there, my question focuses on
4  are there any sections of the report for which you
5  didn't draft that section, although you might have
6  approved it, somebody else drafted that section?
7     A.   No.
8     Q.   So you drafted all the sections in this
9  report?
10        MR. COOPER:  Objection, asked and
11  answered.
12        THE WITNESS:  Yes.
13  BY MR. KEENER:
14     Q.   Looking at paragraph 57, which is on
15  the last page, the heading is Compensation.
16     A.   Uh-huh.
17     Q.   You have typed in, "I have provided my
18  services as an expert witness pro bono in this
19  case.  I am being reimbursed for any costs and
20  expenses I incur."  Is that correct?
21     A.   Yes, it is correct.
22     Q.   Why did you agree to provide your
23  services pro bono in this case?
24     A.   Providing community service in one's

1  area of scholarly expertise is a traditional
2  responsibility of the professoriate and that is
3  why I was doing this.
4     Q.   Out of the many potential areas of
5  community service, why did you choose this one?
6     A.   That's a difficult question to answer
7  because there actually are not that many areas of
8  community service for faculty members to conduct
9  outside of the actual context of the university or
10  college system.
11        So for example, to a lay person,
12  community service might be volunteering on an aids
13  walk.  In terms of academic community service,
14  that would not be relevant.  Community service has
15  to be tied with one's area of scholarly expertise,
16  so this was an example for me to have a more
17  relevant participatory experience providing what I
18  would consider to be community service that is
19  directly tied to my areas of study.
20     Q.   And I think you said earlier that you
21  spent about a hundred or 120 hours so far in this
22  case; is that right?
23     A.   I would say that is a reasonable
24  estimate.  Since I am not being -- since I am not

1  receiving remuneration for these services, I did
2  not keep a log sheet of my time but over the years
3  I have been reasonably good at estimating how
4  much time I have spent on research projects so my
5  estimate is about a hundred to 120 hours.
6     Q.   And that would have been mostly in the
7  time period of when you were first contacted in
8  December through signing this report on February
9  1st?
10     A.   Yes.
11     Q.   So over a four- to six-week period?
12     A.   Yes.  At the City University of
13  New York, faculty enjoy an extended winter break
14  from the end of examinations in mid December until
15  the end of the month of January so I was able to
16  dedicate a large portion of my time to do this
17  work.
18     Q.   Do you think you were spending maybe
19  upwards of 30 hours a week that whole period in
20  January?
21     A.   No, because this would also include
22  half of December.
23     Q.   So maybe 20 hours a week?
24     A.   Yes.

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1    Q.    And if I understand what you said, you
2  haven't been paid in any way?
3    A.    No, I have not, nor have I filed for
4  reimbursement for any costs or expenses I have
5  incurred.
6    Q.    How much in cost and expenses have you
7  incurred?
8    A.    I believe about $55.
9    Q.    And what were those expenses for?
10    A.    Obtaining PDFs of the original
11  Traveller books that I'd possessed back in -- I
12  believe I said 1980 or so, and a PDF of the
13  collected issues of the Travellers Aid Society
14  Journal.  I considered the $55 to be a trivial
15  amount of money so I did not bother.
16    Q.    Now, I asked you before what the
17  purpose of your assignment -- what your assignment
18  was and you mentioned two items, and the first
19  item was comparing the Games Workshop products to
20  the Chapterhouse products to look for things that
21  were similar.  Do you recall that?
22    A.    Yes, I do.
23    Q.    Now, looking at your report, if you
24  look at paragraph 1, about halfway down the line

1  that says "Specifically," and it reads,
2  "Specifically, I have been asked to opine on
3  whether elements of the Games Workshop new
4  allegedly infringed works can be found in or are
5  derived from preexisting works from historical,
6  medieval, cinematic, or science fiction sources."
7      Do you see that?
8    A.    Yes, I do.
9    Q.    Is that what you were asked to opine
10  on?
11    A.    Yes, I believe that's just another
12  way of wording the second part of my initial
13  response.
14    Q.    Right.  Where do I find in your report
15  analysis of the first part, a comparison of the
16  Games Workshop to Chapterhouse products for
17  similarities?
18    A.    You find that throughout not only the
19  fabric of the report but also through the --
20  through the fabric of the report.
21      MR. COOPER:  Also for the record, this
22    is not the entire report.
23      THE WITNESS:  I'm looking for the
24    tables.

1  BY MR. KEENER:
2    Q.    Exhibit 190 is your entire report
3  except for the exhibits; is that correct?
4    A.    Yes, I believe that to be so.  I don't
5  know how these exhibits are numbered or classified
6  by either counsel so I'm not really competent to
7  give an opinion on how these exhibits were
8  structured.
9    Q.    But the text of your report is all
10  here; you're referring to the charts that aren't
11  here that we'll get to a little bit later?
12    A.    Yes, except that I would also call the
13  charts text.
14    Q.    Okay.  The numbered paragraphs that you
15  sign your name at the end are all here; you're not
16  disputing any are missing?
17    A.    No, I'm not.
18    Q.    Anywhere in the text of your report
19  that are your numbered paragraphs, do you mention
20  any Chapterhouse products?
21    A.    Well, let's take a read at it.
22      (Witness perusing document.)
23      I would say -- and this is only based
24  on a cursory account but approximately one-third

1  of the pages in this report reference both
2  Chapterhouse products and Games Workshop products
3  as indexed in the tabular document.
4    Q.    Okay.  I'm excluding the chart right
5  now.  In the text of the your report, paragraphs 1
6  through 59, do you discuss any Chapterhouse
7  product anywhere because I don't see it anywhere
8  discussed?
9    A.    Let me point out some examples to you.
10  For example, the top of page 8, see for example
11  Exhibit B at product entries number 126, 137 to
12  141, 146 to 157, and 163.
13    Q.    So when you're referring to Exhibit B,
14  that's your chart?
15    A.    Yes.
16    Q.    And that product entry would have a
17  Chapterhouse product, a Games Workshop product and
18  some prior works that you found?
19    A.    Yes.
20    Q.    Anywhere in your report do you discuss
21  a Chapterhouse product and a Games Workshop
22  product and what similarities you identified
23  between the two?
24    A.    I don't believe I ever identified any

1  significant similarities between the two products.
2     Q.   Okay.  So you've testified that --
3     A.   Or two sets of products rather, sorry.
4     Q.   You testified that one of your purposes
5  was to review the Chapterhouse products and the
6  Games Workshop products and identify any
7  similarities between the two, correct?
8     A.   Correct.
9     Q.   And it's your expert testimony you were
10 not able to identify any similarities between the
11 two products?
12    A.   I was not able to identify any
13 significant similarities.
14    Q.   Okay.  Did you identify any
15 similarities between the two products?
16    A.   I identified insignificant or minor
17 similarities.
18    Q.   Let's start back again.
19        Did you identify any similarities?
20    A.   I think we would have to go over the
21 chart --
22    Q.   I'm --
23    A.   -- item by item to see that.
24    Q.   We're going to do that later.  I'm

1  trying to get a simple answer.
2        You said your first job was to identify
3  any similarities between the Games Workshop
4  products and the Chapterhouse products.  Did you
5  identify any similarities?
6     A.   (Witness perusing document.)
7        It's a very difficult question to
8  answer in that certain paragraphs, for example,
9  paragraph 31, I believe textually speaking would
10 by necessity include Exhibit B into the body of
11 whatever this exhibit has been called.
12    Q.   Okay.  My question is just first -- I'm
13 trying to ask a simple yes or no question.
14        Your first assignment was to identify
15 any similarities between the Games Workshop
16 products and the Chapterhouse products.  Did you
17 identify any similarities?
18    A.   Yes, I believe I did.
19    Q.   Did you attempt to list anywhere all
20 the similarities you identified between the two
21 sets of products?
22    A.   I think the best way to conceptualize
23 the process of identification was to -- or is to
24 consider that after seeing a resemblance, to

1  continue sort of examining that resemblance to see
2  if that resemblance itself was due to borrowing
3  from one company's works to another or whether
4  that resemblance was due to another factor, and in
5  each of the situations where I found resemblances
6  and then proceeded to the next step of inquiry, I
7  always determined that the resemblances were due
8  to prior works in terms of history.
9     Q.   Okay.  I think you've answered a
10 later question I'm going to ask.
11    A.   I'm having a difficult time, sorry,
12 with how to --
13    Q.   I think we've established you compared
14 the two sets of products.
15    A.   Yes.
16    Q.   And you found some similarities?
17    A.   Yes.
18    Q.   Did you attempt anywhere to list the
19 similarities you found?  And that should be a yes
20 or no.
21        MR. COOPER:  Object to form.
22        THE WITNESS:  Again, I'm not entirely
23    sure how to answer that.  I don't know if that
24    question can be answered in a yes or no

1     manner.
2  BY MR. KEENER:
3     Q.   Anywhere in your report or in the
4  charts that you attach to it do you say here are
5  the similarities between Chapterhouse and Games
6  Workshop products for this product one, two,
7  three, for this product one, two, anything like
8  that where you attempt to identify the
9  similarities you saw between the two products?
10        MR. COOPER:  I'll note that
11    Dr. Grindley hasn't been given the chart to
12    look at.
13        THE WITNESS:  I would have to see the
14    chart.
15        (Plaintiff's Exhibit 191, document
16    entitled Exhibit B, marked for
17    identification.)
18 BY MR. KEENER:
19    Q.   I will hand you what's been marked
20 Plaintiff's Exhibit 191, which is Exhibit B to
21 your report to this deposition, the chart to which
22 you're referring to.
23        And the question pending right now is:
24 Is this the chart you were referring to?

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1    A.    Yes, it is indeed.
2    Q.    Let's look at the first entry, product
3  124.  It starts on page 2.  Do you see that?
4    A.    Yes, I do.
5    Q.    The first column is the Chapterhouse
6  product, do you agree?
7    A.    No, I don't.
8    Q.    You don't believe the first product is
9  a Chapterhouse product?
10    A.    No, I do not.
11    Q.    Why is that?
12    A.    Because it isn't.
13    Q.    Okay.  It's understand the list is
14  saying Chapterhouse Accused Products; is that
15  right?
16    A.    Yes, that is correct.
17    Q.    What do you understand to be the
18  Chapterhouse accused product for entry 124?
19    A.    For entry 124, I understand the
20  Chapterhouse accused product to be an unpainted
21  resin conversion kit containing 12 torsos, 12
22  legs, 12 heads, 12 backpacks and 12 bases.
23    Q.    Okay.
24    A.    So the image shown is not a

1  Chapterhouse product.
2    Q.    Right.  It's those pieces combined with
3  arms and weapons?
4    A.    And painted.
5    Q.    And painted?
6    A.    Yes.
7    Q.    Okay.  But --
8    A.    So I do not actually see an image of
9  the Chapterhouse Studios product under 124.
10    Q.    You do see the torso, legs, heads and
11  backpacks in the pictures under 124, right, as
12  part of the painted models or unpainted models?
13    A.    Considering that there are 12 of each,
14  I only see what appears to be one.
15    Q.    Okay.  So you see at least some of the
16  Chapterhouse products in 124 here?
17    A.    I think that would depend on how you're
18  defining "some."
19    Q.    Did you ask anyone to see all of
20  Chapterhouse's product for their Abbithan woman?
21    A.    No, that wasn't what I was asked to do.
22    Q.    Under the second column, do you
23  understand that to be Games Workshop's products?
24    A.    I understand it to be painted versions

1  of Games Workshop products as I believe Games
2  Workshop products are unpainted and not assembled
3  when people purchase them.
4    Q.    Okay.  Down --
5    A.    Judging from a later exhibit, which
6  number I can't recall, I believe Games Workshop
7  products like Chapterhouse products perhaps come
8  in an unassembled state on some sort of plastic
9  injection molded wire frame.
10    Q.    Do you have any idea whether Games
11  Workshop displays them as painted and assembled on
12  its website?
13    A.    I've never been to Games Workshop
14  website.
15    Q.    For product 124, did you conduct any
16  comparison of the Chapterhouse product and the
17  Games Workshop product to look for similarities?
18    A.    Yes.
19    Q.    Did you identify any similarities?
20    A.    No.
21    Q.    Significant or insignificant or
22  otherwise, you saw no similarities between the
23  Chapterhouse products and the Games Workshop
24  product for 124?

1    A.    There is an insignificant similarity in
2  that they both represent future soldiers but the
3  Chapterhouse products are female and the Games
4  Workshop products are male.
5    Q.    And I think you're going on to the next
6  question.
7        My question is:  Did you identify any
8  similarities when comparing those two products?
9    A.    Only an insignificant similarity that
10  they are both future soldiers.
11    Q.    And that's the only similarity you
12  identify?
13    A.    Yes.
14    Q.    And we know that's the only similarity
15  you identified because in the third column, you
16  say the common representation of near future
17  infantry soldiers?
18    A.    Yes.
19    Q.    And so using this chart, we can
20  identify any similarities, whether insignificant
21  or not, you saw between the two products by
22  looking at your third column?
23    A.    I think you'd have to define "we."
24    Q.    Can someone, whether it's me or the

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 50

1  jury or someone else, someone other than you who
2  wrote the report, identify what similarities you
3  saw between the Chapterhouse products and Games
4  Workshop products through analysis of your third
5  column?
6      A.   I believe they could.
7      Q.   And that would identify all the
8  similarities you saw between the two products?
9      A.   I believe so.
10     Q.   You didn't leave any off?
11     A.   No, I don't think so.
12     Q.   For example, if you thought the helmet
13 from the Chapterhouse product was similar to the
14 helmet in the Games Workshop product, you would
15 have noted that in the third column?
16         MR. COOPER:  Objection, form.
17         THE WITNESS:  Could you restate that
18     again?
19 BY MR. KEENER:
20     Q.   I'm trying to understand your process
21 so I can identify what similarities you found.
22     A.   Definitely.
23     Q.   So an example I'm giving, I'm not
24 saying that you saw a similarity or not but if you

Page 51

1  saw a similarity in, for example, in the helmets,
2  you would have noted that similarity in the third
3  column and then discussed whether or not it is a
4  significant or insignificant similarity?
5      A.   In your hypothetical question, it's a
6  difficult one to answer because there may be a set
7  of insignificant similarities that are common to a
8  given -- say, for example, science fiction trope.
9  So if there were major similarities that could be
10 explained from preexisting materials, then yes, I
11 would say so in the third column.  If there were
12 insignificant similarities that originated in a
13 common point, I would not list every insignificant
14 similarity.
15         Does that answer your question?
16     Q.   I think so, and I think it's different
17 than what you told me before.
18         I think before you said any similarity
19 you saw between the two you would put in the third
20 column, and now I think you're saying if it was a
21 significant similarity you would put it in the
22 third column, if it was an insignificant
23 similarity you did not list it.  Is that correct?
24     A.   No, that's not correct either.

Page 52

1      Q.   You said that you've identified
2  similarities between the products?
3      A.   Yes.
4      Q.   And some you treated significant and
5  some you believe are insignificant?
6      A.   Yes.
7      Q.   And I'm trying to find out where I
8  would find a listing of what similarities you saw,
9  and I think you pointed me to this third column?
10     A.   Yes, I did.
11     Q.   Am I missing anywhere elsewhere you've
12 identified the similarities?
13     A.   No.
14     Q.   Does this third column contain the
15 significant similarities and the insignificant
16 similarities you saw?
17     A.   The third column contains an overall
18 analysis of the significant similarities claimed
19 by Games Workshop.  They do not list any
20 additional similarities not claimed by Games
21 Workshop.
22     Q.   Okay.  So now the third column is only
23 the significant similarities claimed by Games
24 Workshop?

Page 53

1      A.   No, it is not.
2      Q.   Okay.  Let's try this again.
3      A.   Okay.
4      Q.   You compared the Chapterhouse product
5  to the Games Workshop product and identified
6  similarities, and the only place that you discuss
7  those similarities is in column 3 of Exhibit 191.
8  Correct so far?
9      A.   No, that's not correct either.
10     Q.   Where else do you identify the
11 similarities?
12     A.   Through the body of the expert report
13 on approximately a third of the pages with the
14 references to this document.
15     Q.   Right, we've discussed before in your
16 report the only time you discuss the similarities
17 between the Games Workshop and the Chapterhouse is
18 through reference to this chart, correct?
19     A.   Not only reference to it but
20 interpretation and discussion of the overall
21 issues raised by it.
22     Q.   Okay.  Where do I find a listing of the
23 similarities you found between the two products?
24     A.   The similarities between the two

14  (Pages 50 to 53)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 54

1  products will be listed in that third column but
2  not in an explicit list format.
3       For example, when I say the basic
4  figure created by Games Workshop is a combination
5  of near future infantry soldiers from preexisting
6  work, this is a blanket statement of significant
7  similarities.
8       Q.   How do I understand which similarities
9  you're putting under that category?
10      A.   I don't have any idea how you
11 understand things.
12      Q.   Is there any way for me or a jury to
13 understand what similarities you identified in
14 column 3 for that?
15      A.   Yes, by reading the entry.
16      Q.   Other than future infantry soldiers,
17 you said that was a broad category?
18      A.   Yes.
19      Q.   That could include a whole number of
20 smaller similarities?
21      A.   Yes.
22      Q.   How does one reading this report such
23 as a jury identify what similarities you are
24 including in that broad category?

Page 55

1       A.   I think that's asking for me to try and
2  figure out how.
3       Q.   Did you attempt to provide any
4  information that would assist a jury in
5  identifying what similarities you saw?
6       A.   The chart.
7       Q.   We areally said the chart only says
8  future infantry soldiers is a similarity, and you
9  said that encompasses a number of similarities?
10      A.   Correct.
11      Q.   Did you attempt in any way to identify
12 what those number of similarities were?
13      A.   I felt that was irrelevant.
14      Q.   So there's no way for anyone reading
15 the report, including the chart, to see which
16 similarities you saw between Chapterhouse's future
17 infantry soldier and Games Workshop's futuristic
18 soldier?
19      MR. COOPER:  You could ask him.
20      THE WITNESS:  I'm not really getting
21 this question, I'm sorry.
22 BY MR. KEENER:
23      Q.   My question is someone taking your
24 report and reading it and taking your chart and

Page 56

1  reading that, is there any way for them to
2  identify or understand what similarities you saw
3  between Chapterhouse's future infantry soldier and
4  Games Workshop's infantry shoulder?
5       A.   They could ask me.
6       Q.   Is there any way for the jury to take
7  your report and your charts attached to it and
8  identify what similarities you saw between the
9  Chapterhouse future infantry soldier and the Games
10 Workshop future infantry soldier?
11      MR. COOPER:  Objection, asked and
12      answered.
13      THE WITNESS:  I believe that any
14      reasonable person could infer what those
15      similarities would be through an examination
16      of that third column's text.
17 BY MR. KEENER:
18      Q.   Okay.
19      A.   I do not believe that a reasonable
20 person would need to have the listed minutia of
21 similarities.
22      Q.   For example, is there any way from
23 reading your report in your exhibit whether you
24 thought the hats were similar?

Page 57

1       A.   The helmet is part of a soldier's
2  uniform, and I discuss a common representation of
3  future infantry soldiers, then I would suggest,
4  yes, that could be inferred.
5       Q.   So the jury using the report and your
6  chart can infer that you believe the hats were
7  similar between the two?
8       A.   It's a very difficult question to
9  answer.
10      Q.   That's why I'm trying to figure out
11 what similarities you found.  Other than both
12 being futuristic infantry soldiers, is it the
13 hats, the boots, the shoes, the legs, what
14 similarities you identified, and you then went on
15 to try and find them in a prior work.
16      Do you understand what I'm trying to
17 figure out?
18      A.   I do.
19      Q.   Based on your report and your chart, is
20 there any way for me and a jury to find out what
21 similarities you identified between these two
22 infantry soldiers?
23      A.   I believe the logical fallacy is going
24 on.  I believe this is a reductio ad absurdum in

15  (Pages 54 to 57)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1  that at what point do we therefore say that we do
2  not find insignificant similarities?  For example,
3  to go into that level of detail, it would
4  presuppose I would go into a further level of
5  detail in suggesting that both figures appear to
6  be wearing fabric or that both figures appear to
7  be wearing boots and that these boots have soles
8  or that these boots have laces, so I believe that
9  this question is not something that rationally can
10  be answered.  That's why I'm having difficulty
11  answering it.
12     Q.   So you cannot rationally answer the
13  question what similarities you see between
14  Chapterhouse's future infantry soldiers and Games
15  Workshop's infantry soldiers?
16     A.   I'm not saying I can't answer it.  I'm
17  saying no one can.  I believe the question to be
18  irrational.  I'm saying it's not irrational in
19  crazy irrational, not containing reason.
20     Q.   It would be irrational for you to
21  attempt to list the similarities you saw between
22  the two products?
23     A.   It would be irrational for someone to
24  list every significant layer of insignificant

1  similarity between two items of any description,
2  once an overall point of origin is determined.
3     Q.   Okay.  So once you determined that they
4  are both future infantry soldiers, you didn't go
5  any further to look at the similarities between
6  the two infantry soldiers?
7     A.   Correct.
8     Q.   Why is that?
9     A.   I just explained why.
10     Q.   Because once they are both infantry
11  soldiers, everything else is insignificant?
12        MR. COOPER:  Objection to the extent it
13  mischaracterizes testimony.
14        THE WITNESS:  No.
15  BY MR. KEENER:
16     Q.   Okay.
17     A.   To the extent that once someone has
18  identified a common source for the imagery, then
19  going through every layer of insignificant detail
20  merely leads to an even more insignificant layer
21  of detail and the resulting endeavor become
22  impractical and never ending.
23     Q.   So other than saying both are infantry
24  soldiers, you did not attempt to identify any

1  significance you saw between the two products?
2        MR. COOPER:  Objection to the extent it
3  mischaracterizes his testimony.
4  BY MR. KEENER:
5     Q.   I think that's what you said.  I just
6  want to make sure I understand.
7     A.   No, I want you to understand, too.  I'm
8  trying to think of a way to phrase this so that
9  it's clear for you but it's very difficult to
10  phrase it in a way that you're willing to follow.
11     Q.   Let me try this question.
12        Other than saying they are both
13  infantry soldiers, did you identify anywhere in
14  your report or the chart any other similarities
15  you saw between the Chapterhouse and Games
16  Workshop product?
17        MR. COOPER:  Objection, asked and
18  answered.
19        THE WITNESS:  See, I believe I did but
20  you're not willing to accept that as an
21  answer.
22  BY MR. KEENER:
23     Q.   I will if you tell me where.
24     A.   There, in the third column.  I'm not

1  understanding.
2     Q.   The only --
3     A.   I'm not understanding why you're not
4  getting this.
5     Q.   The only text in the third column is
6  "The basic figure created by GW is a common
7  representation of near future infantry soldiers
8  from preexisting works."
9     A.   Correct.
10     Q.   Do you believe that's the only text in
11  that third column?
12     A.   Correct.  Actually it is not.
13     Q.   There's other text saying what articles
14  you're referring to here, okay.  Other than saying
15  that they are both common representations of near
16  future infantry soldiers, do you identify any
17  other similarities between the Chapterhouse and
18  Games Workshop products?
19     A.   I believe that's what that does.
20     Q.   I want to make sure I'm not missing
21  anything else in your chart or your reports that
22  identifies other similarities?
23     A.   I think you're missing.
24     Q.   What other similarities do you

16 (Pages 58 to 61)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1  identify?
2     A.   I would consider that any reasonable
3  person if they see a term, for example, such as
4  infantry soldier would understand what is meant by
5  infantry soldier.  So I believe that I have,
6  through inference, provided that list through a
7  short form description of just a couple words.
8     Q.   I think my question took that into
9  account.
10        Other than future infantry soldiers and
11 whatever that encompasses, do you anywhere else
12 identify any similarities between the Chapterhouse
13 and Games Workshop products?
14        MR. COOPER:  Objection, asked and
15     answered.
16        THE WITNESS:  I think that we should
17     also discuss what is meant by text briefly,
18     and I outlined what I mean by text in my
19     expert report.
20 BY MR. KEENER:
21     Q.   Before we get into that tangent, do you
22 identify any other similarities between the
23 Chapterhouse product for 124 and the Games
24 Workshop product for 124 other than future

1  infantry soldiers and whatever that encompasses?
2        MR. COOPER:  Objection, asked and
3     answered.
4        THE WITNESS:  Unfortunately I can't
5     answer that question without discussing the
6     nature of what is meant by text.
7  BY MR. KEENER:
8     Q.   Okay.  You're including the pictures in
9  your definition of text?
10     A.   Yes, I am indeed.
11     Q.   Do you identify any similarities in the
12 pictures?
13     A.   I believe that any reasonable person
14 would see them.
15     Q.   I understand.  Do you attempt to
16 identify any similarities in the pictures?
17     A.   By providing the pictures, yes.
18     Q.   Other than the pictures, do you attempt
19 to identify in your own words what you believe are
20 the similarities other than the term "future
21 infantry soldiers"?
22     A.   I'm sorry to be a little frustrated.
23 My understanding of text and my understanding of
24 the pictures is that when I use the pictures as

1  part of this, they become a type of my own words,
2  so yes.
3     Q.   Okay.
4     A.   I'm sorry to be academic.
5     Q.   What I'm trying to understand is if I'm
6  a jury and I see you've got various pictures
7  listed here and you've got the sentence above the
8  pictures, other than the term "future infantry
9  soldiers," are you telling me anywhere what other
10 similarities you see between the Games Workshop
11 product and the Chapterhouse product?
12        MR. COOPER:  Object to form.
13        THE WITNESS:  I believe that a
14     reasonable member of a jury, not that I am in
15     any way familiar with what and how juries view
16     evidence or handle exhibits or even react to
17     testimony, but from my understanding what a
18     reasonable person would do is a reasonable
19     person would draw their understanding of this
20     document from its contents and see what was
21     being argued in a visual sense rather than
22     through words.
23 BY MR. KEENER:
24     Q.   So the juror can look at the picture

1  and see what they think may be similar?
2     A.   No, because I provided the images so
3  they can see what I think may be similar.
4     Q.   They could see what images you
5  provided?
6     A.   Yes.
7     Q.   And they compare the images and see
8  what elements of which images are similar,
9  correct?
10     A.   No, I do not believe that is correct.
11     Q.   Do you identify which elements of the
12 images appear similar?
13        MR. COOPER:  Objection, asked and
14     answered.
15        THE WITNESS:  Again, I have identified
16     those elements through the blanket terms that
17     are used in the column.
18 BY MR. KEENER:
19     Q.   Right.  So the blanket term is "future
20 infantry soldiers."  Other than that term, are
21 there any other terms that you use to assist and
22 identify which elements of the pictures we should
23 be looking at other than that broad term "future
24 infantry soldiers"?

17 (Pages 62 to 65)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1    A.   The pictures themselves are not unitary
2   items.
3    Q.   I think it's hopefully a yes or no
4   question.
5        Other than the words "future infantry
6   soldiers," do you identify by term or otherwise
7   what parts of the pictures they should be looking
8   at for similarities?
9    A.   Again, it's really difficult to answer
10  that question.  I'm very sorry.
11   Q.   You're unable to tell me whether or not
12  you provide any other description of what they
13  should be looking at in the pictures other than
14  the term "future infantry soldiers"?
15   A.   It's not that I'm unable to tell you,
16  it seems you're not able to ask me.
17   Q.   I've tried to ask you many times.
18   A.   I appreciate that.
19   Q.   You have pictures of soldiers that go
20  on for a couple of pages.
21   A.   Yes, I do.
22   Q.   Those pictures include numerous
23  elements.
24   A.   Yes, they do.

1    Q.   Other than the text "future infantry
2   soldiers," what do you describe in here that
3   points to the similarities we should be looking
4   at?
5        MR. COOPER:  Object to the term "text,"
6        form.
7        THE WITNESS:  Again, I have to say that
8        an image is a type of text that one naturally
9        knows how to read if one is reading it in a
10       reasonable way.  So I have done that.
11  BY MR. KEENER:
12   Q.   Looking at the first picture --
13   A.   Yes.
14   Q.   -- how am I or a jury to know what
15  portions of that picture you believe are similar?
16       MR. COOPER:  Object to the
17       hypothetical, calls for speculation.
18       THE WITNESS:  I have no idea how you're
19       going to read something.
20  BY MR. KEENER:
21   Q.   That's fine.
22       Do you discuss, provide any information
23  in your report or the chart that tells me what
24  portions of that picture on page 2 of Exhibit 1

1   you believe are similar?
2    A.   Again, I believe it's explicitly
3   inferrible.
4    Q.   Other than through inference, do you
5   describe anywhere the elements of that picture you
6   believe are similar?
7    A.   Even through words, we only offer it
8   through inference.  This is the difference between
9   the signifier and the signified.
10   Q.   I don't think you're answering my
11  question.  My question is I want to know what you
12  thought was similar in that picture.  Is there
13  anything you give me that helps me identify what
14  elements you thought were similar?
15   A.   The pictures themselves.
16   Q.   Other than the pictures themselves, is
17  there anything else that tell me what elements you
18  thought were similar?
19   A.   No.
20   Q.   Okay.  And similarly for all the
21  pictures, there's nothing in here that tell me
22  which elements of the picture you believe are
23  similar?
24   A.   I think we'd have to go through each

1   and every picture and each and every numbered
2   item --
3    Q.   So --
4    A.   -- to make that assertion and I don't
5   believe that's true.
6    Q.   Just looking at the pictures you have
7   for 124, is your answer the same that other than
8   the picture itself, there's no attempt by you to
9   identify what elements of the picture you believe
10  are similar?
11       MR. COOPER:  Objection,
12       mischaracterizes testimony.
13       THE WITNESS:  Could you rephrase that?
14  BY MR. KEENER:
15   Q.   I think we've gone over this a number
16  of times.
17   A.   I know we have.
18   Q.   But we'll try again.
19       You provide a number of pictures for
20  entry 124.  Each of those pictures has a number of
21  elements.  Other than the picture itself, do you
22  identify which elements of those pictures you
23  believe are similar to the products in this case?
24   A.   No, I do not.

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1  a fair characterization?
2      A.   "Based on" would not.
3      Q.   In some way influenced by?
4      A.   Again, probably not.
5      Q.   What other word could you substitute
6  for derived?
7      A.   I would have to think about this for a
8  while.
9      Q.   Okay.
10     A.   The problem I'm facing is would it be
11 fair to say that, for example, homosapians are
12 derived from Australopithecus gigantus?
13     Q.   I'm trying to figure out what you're
14 trying to say.
15     A.   This is the problem, that I believe
16 what I'm trying to say and how you're trying to
17 understand it are at odds.
18     Q.   Okay.
19     A.   And I'm trying my best to be helpful,
20 and just give me one second to try to think this
21 through and formulate my thoughts on it in a way
22 that might be acceptable for you.
23         I'm going to begin by restating what I
24 believe is your question and you can tell me

1  whether or not to proceed.
2      Q.   Okay.
3      A.   What I believe you're asking me is to
4  suggest whether or not Games Workshop's designers
5  at or about the moment where they released or
6  designed their products had conscious exposure or
7  borrowed either consciously or unconsciously using
8  the example of 124 of the specific images that
9  I have provided.  I believe that to be your
10 question.
11     Q.   Why don't you answer that question.
12     A.   The answer to that question would, A,
13 require me to know what game designer workshops'
14 artist and designers were actually thinking when
15 they were going through their creative process,
16 which I cannot do, because I don't know what's in
17 their library.  For all I know, some of these
18 items could be in their library.  I don't know the
19 titles of everything that they would have in any
20 kind of reference room they might have.
21         I also don't know the reading habits or
22 exposure to culture that they may or may not have
23 had as young adults or children, or even as adults
24 where they may have, for example, forgotten

1  specific elements of exposure, and that's sort of
2  one part.
3          And here I'm sort of, as a way of
4  analogy, I'm sort of recalling the Verve's
5  inadvertent borrowing of the Rolling Stones song
6  for their composition Bitter Sweet Symphony, which
7  was an unconscious borrowing apparently that no
8  one realized it was a Rolling Stones song.
9          To continue using that analogy, there
10 is the possibility that one has made an
11 unconscious or conscious borrowing of a specific
12 item but more appropriately is the derivation of
13 say, for example, a verse, chorus, verse, chorus
14 structure for a musical composition for pop music.
15         In both songs, even though they are --
16 even though they are very, very similar to the
17 fact that one has unconsciously borrowed from the
18 other, both find their ultimate derivations not
19 only in a common structure for a popular song but
20 in the structure of our tonal scale.
21         So what you're asking me to answer I
22 can only answer in that way, so when we're looking
23 at what Games Workshop has used, we can say they
24 have either been consciously or unconsciously

1  influenced by these either specific examples or
2  other examples that are allied to those specific
3  examples, or they have perhaps been influenced by
4  that more ultimate chain of derivations, which
5  these examples are examples themselves of.
6      Q.   Okay.  Let's try and break that down a
7  little.
8      A.   Okay.
9      Q.   You are not making any expert opinion
10 that any Games Workshop artist consciously derived
11 its work from any specific reference you've
12 identified?
13     A.   Currently, and I would love it if Games
14 Workshop would provide me with the contents of
15 their reference library, that would be a matter of
16 individual examination of every single item in
17 this chart which we could do if you wanted and we
18 could go through that.
19     Q.   My question was simple.  As you sit
20 here today, in your report or your chart, are you
21 making an expert opinion that Games Workshop
22 consciously derived any of its works from any of
23 the examples you give?
24     A.   That would really require me to look

Veritext Legal Solutions - Midwest
312-442-9087        800-248-3290        fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1 into their psyche and I couldn't do that.
2    Q.   Right, so as you sit here today, you
3 are not making any expert opinion that any Games
4 Workshop artist consciously derived its work from
5 anything you can identify?
6    A.   No, that's not what I'm saying.
7    Q.   Let me try again.
8    A.   Okay.
9    Q.   As you're sitting here today, and
10 throughout your expert report, are you making an
11 expert opinion that any Games Workshop employee
12 consciously derived their work off of any of the
13 references you identified?
14    A.   I believe that question to be
15 impossible to answer.
16    Q.   You can't answer that yes or no whether
17 or not you were opining on that subject?
18    A.   I don't believe that's a yes or no
19 matter.
20    Q.   You don't know whether or not you're
21 opining on that subject?
22    A.   No, that's a different way to phrase it
23 that wasn't allied to the first way you phrased
24 it.

1    Q.   Are you making any expert opinion that
2 the people who designed Games Workshop product 124
3 consciously derived that product out of any of the
4 images you put in the third column for product
5 124?
6    A.   For product 124, I'm neither making
7 that claim or not making that claim.
8    Q.   Okay, but you are not affirmatively
9 opining that you believe they consciously copied
10 anything in product 124?
11    A.   I believe what we're running into here
12 is types of research and legal determinations, so
13 in the world of academia, not doing something or
14 doing something is a different result than not
15 doing something, or doing something.
16       MR. COOPER:  I think he means for this
17    case, are you offering an expert opinion about
18    that.
19 BY MR. KEENER:
20    Q.   Are you offering any expert opinion
21 that any Games Workshop artist consciously copied
22 any of the examples you give?
23    A.   Not for number 124.
24    Q.   For any of the products, are you

1 offering an expert opinion that Games Workshop
2 artists consciously copied any of the products you
3 identify?
4    A.   Not consciously.  Wait, let me rephrase
5 that, not necessarily consciously.
6    Q.   Okay.  Do you identify any examples
7 that you are giving your expert opinion that Games
8 Workshop consciously copied?
9    A.   I cannot state consciously or
10 unconsciously.
11    Q.   Are you identifying any prior works
12 that it's your expert opinion that Games Workshop
13 consciously or unconsciously copied?
14    A.   Yes, all of them.
15    Q.   So it's your expert opinion that
16 whether consciously or unconsciously they were
17 aware of all the works you identify?
18    A.   No.
19    Q.   Which works do you -- is it your expert
20 opinion that Games Workshop was consciously or
21 unconsciously aware of?
22    A.   Let's use the example of 124.  In the
23 example of 124, I use the phrase "near future
24 infantry soldiers."  I believe that Games Workshop

1 designers were either consciously or unconsciously
2 aware of the concept the trope of near future
3 infantry soldiers.
4    Q.   You go on and you have pictures of 10
5 pictures under that entry.
6    A.   Yes, demonstrate the ubiquity of the
7 image.
8    Q.   Is it your expert opinion that Games
9 Workshop copied consciously or unconsciously any
10 of those 10 pictures?
11    A.   That question is impossible to answer.
12 I'm sorry.
13    Q.   It might be impossible to answer
14 because you don't know what's in their head --
15    A.   Yes.
16    Q.   -- so because you don't know what's in
17 their head, you were not offering an expert
18 opinion that any Games Workshop artist consciously
19 or unconsciously copied those because you don't
20 know?
21    A.   That also means I am not offering that.
22    Q.   I am trying to figure out you're not
23 going to go to trial and tell the jury that Games
24 Workshop consciously or unconsciously copied any

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

of those 10 pictures.
A. That is correct.
Q. Okay. Similarly for all the pictures and works you identify, you are not going to go to the jury and say Games Workshop, in my expert opinion, copied consciously or unconsciously any of those specific works?
A. Now that I think we would have to go through the exhibits one at a time.
Q. Anywhere in your report do you identify those exhibits you believe Games Workshop specifically copied consciously or unconsciously?
A. I think I do actually. Let's -- may I have a few minutes to read through this again?
Q. Okay.
A. (Witness perusing document.)
I think that there are a few things I would say were certainly either unconsciously or consciously derivative.
Q. So you believe that there are certain works you've identified that you believe Games Workshop consciously or unconsciously copied?
A. Yes.
Q. Which works are those and would you

identify them?
A. In paragraph 29 of my report, I identify Starship Troopers.
Q. It's your opinion that Games Workshop artists were conscious of -- have read the Starship Trooper novels?
A. Yes.
Q. What is your basis for believing they have read the Starship Trooper novels?
A. Actually, let's use one specific item. In the text of Starship Troopers, the sort of arm mounted flamethrower powered item, the gun that they use is called a flamer, and that's used specifically in a Games Workshop product.
Q. So because the word "flamer" exists in Starship Troopers and Games Workshop has a weapon called flamer, you're inferring the Games Workshop person creating that must have read Starship Troopers?
A. They may not remember they read it.
Q. But it's your opinion they read Starship Troopers?
A. Yes.
Q. Other than Starship Troopers, is there

any other work that you believe Games Workshop must have seen?
A. Yeah, sorry, yes. In paragraph 34, it does appear that some of the Games Workshop shoulder pads originated in the Star Wars films.
Q. Okay. So it's your expert opinion that the Games Workshop artist who created that shoulder pad must have copied it from Star Wars, consciously or unconsciously?
A. Consciously or unconsciously. I would suppose unconsciously.
Q. Beyond the shoulder pad in Star Wars and the flamer in Starship Troopers, is there anything else in your expert opinion Games Workshop must have copied, consciously or unconsciously?
A. I realize that, or at least I think I realize. Perhaps you can clarify matters for me.
My expert report and Exhibit B form the background of or the basis for my testimony should this matter ever come to trial; is that correct?
Q. Yes. Not background. It's supposed to contain all your opinions and the basis thereof.
A. Would anybody during the court process

have access --
MR. COOPER: He's going to ask you questions.
THE WITNESS: I know. I do not believe that I specifically say it in this report and I believe that in Exhibit B, it is listed as a similarity. No, I do list it as recognizable as a derivative of the following. Yeah, I believe that the lightning claws from the space marine terminator set and from I guess other products that use those lightning claws are indeed a derivative of Wolverine.
BY MR. KEENER:
Q. So it's your expert opinion that the person who created Games Workshop lightening claw must have copied consciously or unconsciously Wolverine?
A. Yes.
Q. Anything else?
A. We could do go through that item by item.
Q. For those we discussed, Starship Trooper, anywhere in your report do you state I believe this is a product they copied consciously

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 122

1    A.   Yes.
2    Q.   I'm trying to figure out what you mean
3  by that.
4    A.   For example, in 124 I believe that the
5  images provided of the set, I would guess you
6  would call it, are indeed derivative of
7  preexisting works.
8    Q.   Every element of that image or some
9  elements?
10    A.   That question presupposes that I'm
11 going to have a definition of element in mind so I
12 will provide you with a definition of element
13 first.
14        My definition of element in this
15 situation, if we're looking at these images -- if
16 we're looking at these images, I would say yes,
17 every single element is derived from previous
18 works.
19    Q.   You were going to give me a definition
20 of elements before you used it.
21    A.   My definition of element in this
22 situation would be everything from the -- well,
23 really the colors that the figure are painted, an
24 object appearance, say, for example, of a -- an object

Page 123

1  such as a tripod, the pose of a figure putting
2  what appears to be a mortar around and do a
3  mortar.  The concept of a mortar, the concept of a
4  helmet, the concept of a uniform, the appearance
5  basically of a historically derived howitzer-like
6  weapon, the concept of a base for a miniature
7  figurine.  Every single possible element that I
8  can readily see from this diagram appears to have
9  an origin in prior works.
10    Q.   And you've identified those prior works
11 in the third column?
12    A.   Yeah, we've already gone over this.
13    Q.   Are there --
14    A.   I hope we don't have to do it again.
15    Q.   Outside the third column, are there any
16 other places you identify the prior works that you
17 believe that Games Workshop products are
18 derivative of?
19    A.   Other than the claims made in the
20 expert opinion, no.
21    Q.   Okay.  Do you believe that there's
22 anything original in the Games Workshop product at
23 124?
24    A.   No, I don't.

Page 124

1    Q.   Do you believe there is any artistic
2  expression at all in the sculpting of those
3  models?
4    A.   Wait, could you rephrase that?
5    Q.   Do you think there is any artistic
6  expression at all in the sculpting of those
7  models?
8    A.   No, I don't.  Consider, for example,
9  the bottom figurine that shows a soldier putting
10 mortar into a mortar-like device.  I remember that
11 even from the green Army men that I had as a small
12 child.
13    Q.   So it's your opinion there's no
14 artistic opinion involved in any of that
15 sculpting?
16    A.   No, that's not to say they are not
17 nice.  They are nice.  They are just not original.
18    Q.   What do you mean by original?
19    A.   There's nothing in them that does not
20 derive from a different source, a previous source.
21    Q.   You mean the idea or the concept or the
22 exact expression of that concept the sculpture
23 made?
24    A.   I don't believe those two things can be

Page 125

1  divorced.
2    Q.   So you can't divorce a concept of a
3  future military soldier from any particular
4  expression of that concept?
5    A.   No, I don't believe that there is a
6  tangible need to distinguish between those two
7  things.
8    Q.   Let's say I wanted to distinguish.  Are
9  you able to distinguish between --
10    A.   The idea of a thing and the thing
11 itself?
12    Q.   For example, there's an idea of a
13 future infantry soldier.  Are there many ways to
14 express that idea in a sculpture?
15    A.   I wish we had time this year.  This
16 goes into matters of ideal forms and neoplatonic
17 thought.
18    Q.   I'm not trying to get that theatrical
19 here.
20    A.   The problem is it's an inadvertent
21 product.
22    Q.   So in your mind there's not a way to
23 distinguish an idea from the expression of an
24 idea?

Veritext Legal Solutions - Midwest
312-442-9087       800-248-3290       fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 126

1    A.   That's not what I said.  In my opinion,
2  it's the expression of a thing and the thing
3  itself are two separate entities and the
4  individual expressions of an actual thing may, you
5  know, superficially seem marginally different but,
6  in fact, are not because they are both sort of
7  derivations of that other thing.
8    Q.   Okay.
9    A.   It's very difficult to explain.
10   Q.   Let's take the concept of a future
11 infantry soldier, would you agree there's many
12 different ways that concept could be expressed in
13 a sculpture?
14   A.   I think I'd have to say no.  It's
15 very -- it's a very difficult --
16   Q.   Let's take another example.
17   A.   Okay.
18   Q.   The concept of a lightening claw or a
19 clawed fist.  Do you understand that concept?
20   A.   I do understand that concept.
21   Q.   Would you agree there's many different
22 ways to express that concept in a sculpture?
23   A.   There are many different ways to
24 express that concept in a sculpture.

Page 127

1    Q.   Is there any way for me to determine
2  looking through your chart for which products you
3  believe -- let me rephrase that.
4         Is there any way for me to determine by
5  looking through your chart for which Games
6  Workshop products you believe there is no other
7  way to express that idea such as 124 versus those
8  products which you believe there are multiple
9  ways to express the idea such as the lightning
10 claw?
11        MR. COOPER:  Objection, the first part
12   of that question misstates his testimony.
13        THE WITNESS:  Could you rephrase that
14   for me, please?
15 BY MR. KEENER:
16   Q.   Sure.  Let's take it in steps.
17        I believe you just testified that you
18 believe that there is only one way to express the
19 idea of a future infantry soldier in sculpture; is
20 that correct?
21        MR. COOPER:  Objection, that misstates
22   his testimony.
23        THE WITNESS:  No, I don't think that is
24   correct.

Page 128

1  BY MR. KEENER:
2    Q.   Do you believe that there are multiple
3  ways to express the idea of a future infantry
4  soldier in a sculpture?
5    A.   When you're using the word "ways," I am
6  confused by whether you are referring to
7  significant or insignificant ways.
8    Q.   When you --
9    A.   In my opinion, there are many different
10 ways to express an idea but these ways may
11 insignificantly differ from one another.
12   Q.   So --
13   A.   So with the example of number 124, you
14 can express, either through words or imagery or
15 sculptured figurines, the concept of a future
16 infantry soldier, but although these ways may
17 superficially appear different, they are, in fact,
18 significantly different.
19   Q.   So it's your expert opinion that in
20 trying to express the concept of a future infantry
21 soldier, there are no significantly different ways
22 to express that concept?
23        MR. COOPER:  Objection, misstates
24   testimony.

Page 129

1         THE WITNESS:  The problem with that
2  question is that it's anchored in a specific
3  moment in time so I'm going to assume when we
4  talk about a specific moment in time with
5  reference to the concept of being able to
6  create a model of a specific thing, we're
7  going to anchor, just for discussion sake, the
8  moment of time with now.
9  BY MR. KEENER:
10   Q.   Okay.
11   A.   If we consider the moment of now, it is
12 my expert opinion that I do not believe that it is
13 possible for someone to create a wholly original
14 or even significantly original future soldier.
15   Q.   But it is your opinion that you could
16 have insignificant differences in the expression
17 of a future infantry soldier?
18   A.   Yes, you could.
19   Q.   And those insignificant differences
20 could be original?
21   A.   No, I don't believe they could be
22 either.
23   Q.   So it's your opinion that there is no
24 original way to express the concept of a future

33 (Pages 126 to 129)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 130

1 infantry soldier in a model?
2    A.    Not after a certain point in history,
3 no.
4    Q.    And that point's already passed?
5    A.    That point's already passed.
6    Q.    All original expressions of a concept
7 of a future infantry soldier have already been
8 made?
9        MR. COOPER:  Objection, calls for
10    speculation.
11        THE WITNESS:  I can't predict any sort
12    of future events, nor can I talk about things
13    that I haven't seen but so far through looking
14    at things that I have seen, I would have to
15    say that I don't believe that originality is
16    possible, but that's not to say that it is
17    not.
18 BY MR. KEENER:
19    Q.    But it's your expert opinion right now,
20 based on what you know and have seen, that it is
21 not possible to have an original expression of a
22 future infantry soldier in a model?
23        MR. COOPER:  Could you repeat that?
24        (Record read.)

Page 131

1        MR. COOPER:  Objection, misstates
2    testimony.
3        THE WITNESS:  Could I hear that one
4    more time?
5        MR. KEENER:  Okay.
6        (Record read.)
7        THE WITNESS:  When you say "right now,"
8    I'm going to take that as one of two ways and
9    it confuses me.  I can't determine whether you
10    mean right now, as in right now it's my
11    opinion, or right now in terms of we can't --
12    there's no possibility of wholly original
13    thing being right now.
14 BY MR. KEENER:
15    Q.    Right now as in your opinion.
16    A.    Yes, right now in my opinion, it's not
17 possible to have a wholly original space marine
18 model.
19    Q.    You put the word "wholly" in there.  I
20 said original in any way.
21    A.    Yes, I believe it's not possible.
22    Q.    To have an original model in any way of
23 a future infantry soldier?
24    A.    Yes, it is not possible.

Page 132

1    Q.    In your research, have you identify any
2 pictures which you believe are identical to any of
3 the Games Workshop products?
4    A.    That really depends on how you define
5 identical.
6    Q.    Identical means exactly the same.  Is
7 it your expert opinion, expressed anywhere
8 throughout your report or chart, that you have
9 found something in the prior works that is
10 identical to one of Games Workshop's products?
11    A.    I don't believe I've made that claim.
12    Q.    So the extent of your claim is you have
13 found prior works that are similar to the Games
14 Workshop products or share some similarities.  Is
15 that accurate?
16        MR. COOPER:  Objection to the extent it
17    misstates testimony.
18        THE WITNESS:  I don't believe it is.
19 BY MR. KEENER:
20    Q.    What am I missing?
21    A.    You're missing those situations
22 where -- well, the thing about identical that's
23 kind of troubling is when you look at, say, for
24 example, the British Mark V tank.  There are

Page 133

1 indeed superficial differences between the Games
2 Workshop, you know, Battle Raider and the Mark V
3 tank.  There's superficial differences so they are
4 technically not identical, per se.
5    Q.    But you believe there are many
6 similarities between the two?
7    A.    I believe there is a preponderance of
8 similarities between the two that render their
9 significant details unimportant.
10    Q.    But you believe there are differences
11 between the two?
12    A.    Yes.
13    Q.    So they are not identical?
14    A.    They are not identical.
15    Q.    The extent of your opinion is there are
16 a lot of similarities between the two?
17    A.    And that one is clearly derived from
18 the other.
19        MR. COOPER:  Jason, I think whenever
20    you close out your line of questioning --
21        MR. KEENER:  Sure.  Why don't we take a
22    break right now.
23        (Lunch recess taken at 12:26 p.m.)
24

34  (Pages 130 to 133)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 134

1      A F T E R N O O N   S E S S I O N
2          (Time noted: 1:05 p.m.)
3    D R.   C A R L   G R I N D L E Y,  resumed and
4       testified as follows:
5    CONTINUED EXAMINATION
6    BY MR. KEENER:
7        Q.    Before the break, we talked about how
8    you said as of today, there are no new ways to
9    express the idea of a future infantry soldier.  Do
10   you remember?
11       A.    Yes, I do.
12       Q.    At what point in time did that tipping
13   point occur?
14           MR. COOPER:  Objection, calls for
15       speculation.
16           THE WITNESS:  I think sometime around
17       the turn of the millennium.
18   BY MR. KEENER:
19       Q.    Around the year 2000?
20       A.    About then, yes.
21       Q.    So was it after Games Workshop created
22   its works at issue?
23       A.    I'm not entirely sure.  Let's look at
24   these dates.  If we're looking at 124, it's

Page 135

1    before.
2        Q.    You understand based on footnote 1 of
3    your report that while this current model might be
4    2003, it's based off prior Games Workshop works
5    that go back potentially to 1987?
6        A.    Yes.
7        Q.    So that tipping point occurred after
8    1987; is that fair?
9            MR. COOPER:  I'm sorry, could you
10       repeat that?
11   BY MR. KEENER:
12       Q.    After, that tipping point occurred
13   after 1987?
14           MR. COOPER:  Objection, calls for
15       speculation.
16           THE WITNESS:  I would really have to
17       think and ponder on that for a while because
18       we're looking at a variety of different ways
19       to interpret depiction.  So for example, in
20       terms of cinematic sources, I haven't seen
21       really any originality from about the time of
22       Aliens or Starship Troopers but even slightly
23       before that, perhaps even as far back as
24       Terminator in '84, just in the scenes they

Page 136

1    show from the future, there's really nothing
2    in it.
3    BY MR. KEENER:
4        Q.    So in your expert opinion, at what
5    point did all forms of expression of a future
6    infantry soldier become exhaustive?
7            MR. COOPER:  Can you read that back?
8            (Record read.)
9            THE WITNESS:  I think I have a better
10       way of phrasing that.
11   BY MR. KEENER:
12       Q.    First, can you answer that question and
13   feel free --
14       A.    No, I really can't.
15       Q.    You're unable to answer that question?
16       A.    I think because I didn't quite word
17   this concept of tipping point properly.
18       Q.    Okay.
19       A.    And it's not so much of a particular
20   date where it became impossible.  It's more of a
21   particular date where it became evident that it
22   was impossible.
23       Q.    Okay.  In your expert opinion, as of
24   what date was it evident that it was impossible to

Page 137

1    have any new expressions of a future infantry
2    soldier?
3        A.    Approximately the year 2000 it became
4    evident.  That's not to suggest that it was
5    possible before then.  It's just that it was
6    evident around that time.
7        Q.    Are you going to express any expert
8    opinion that all forms of expression were
9    exhausted at any date prior to 2000?
10           MR. COOPER:  Objection, calls for
11       speculation.
12           THE WITNESS:  I don't believe I did so
13       in my report so I would have to say that I
14       would not.
15   BY MR. KEENER:
16       Q.    So prior to the year 2000, you have
17   knowledge that there were various ways to express
18   the concept of future infantry soldier?
19           MR. COOPER:  Objection, misstates the
20       testimony.
21           THE WITNESS:  I'm not entirely sure
22       that I could say one way or another, only that
23       I could say that it was evident after 2000 or
24       so.

Veritext Legal Solutions - Midwest
312-442-9087       800-248-3290       fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 138

BY MR. KEENER:
 Q.   So you do not have an expert opinion
one way or the other whether or not it was
possible to have an original expression of a
future infantry soldier before the year 2000?
 A.   In order to answer that question,
wouldn't I need to have a fixed terminal date
rather than the idea that something became
apparent at a particular time?  So I think it's a
little bit difficult to answer that question in
that I could do any amount of continued research
on this, which of course I can't do, but if I did
that extra research I could give you a firm date,
but right now I can't give you a firm date but
except to say by 2000 it was done.
 Q.   Let me make it simpler.
 You have not expressed any opinion in
your report anywhere that all forms of expression
of a future infantry soldier were exhausted prior
to the year 2000?
 A.   Correct.
 Q.   This idea that there is no way to
express originally a future infantry soldier, does
that apply both to Exhibit 124 of those

Page 139

guardsmen/women we saw as well as space marines?
 A.   How are you using the term -- wait, I
know I'm not allowed to ask you questions.
 When you say the word "space marines,"
for the purpose of this answer I'm assuming you
mean the Games Workshop space marine figures.
 Q.   I'm trying to clarify when we said
future infantry soldiers, your meaning of that was
broad enough to encompass both the Games Workshop
guardsman figures as well as the Games Workshop
space marine figures.
 Is it true that you were using that
term broadly to encompass both types?
 A.   I was using that term to broadly to
encompass both types.  I believe there was more
flexibility with the overall idea of, you know, a
future soldier than with the particular aspects of
a space marine so I believe that the space marine
figure ossified sooner.
 Q.   At what point do you believe in your
expert opinion that there are no original
expressions of a space marine type soldier
possible?
 MR. COOPER:  Could you repeat that

Page 140

question?
 (Record read.)
 THE WITNESS:  This is a very difficult
question to answer because when we're thinking
about expressions, we can include nontangible
things that I don't know if they are relevant
or not, such as the backstory that a character
or characters have, or we could be just
considering the appearance of the characters.
BY MR. KEENER:
 Q.   Let's limit it to the appearance.
 A.   Limiting it to the appearance makes
that a much easier question to answer.  And
limiting it to the character, I would say it's
long done.
 Q.   Can you give me a date?
 A.   Probably by the very early '80s.
 Q.   Any more specific you can give me on a
date?
 A.   I would say the last nails in the
coffin for that were when there was a Japanese
anime created of Starship Troopers, I believe,
although I'm not entirely certain, between the
years 1980 and 1984.

Page 141

 Q.   And that's not a work that you referred
to or rely on in any way in your expert report,
right?
 A.   I'm going to check.
 (Witness perusing document.)
 I did not mention that work
specifically by name.
 Q.   Okay.
 A.   Although in paragraph 29, I do say
about power suit, "Graphic interpretations of this
suit have taken a number of different forms since
the novel's serialization."
 In retrospect, I should have said -- I
should have cited the anime from the 1980s, and I
would like to correct my memory if I could.
 Q.   Okay.
 A.   When I said the year 2000, I somehow
had my mind set that Aliens came out in 19 -- 1997
when indeed it came out in 1986.
 Q.   Okay, so that is --
 A.   That's going to change my dating of
2000 to 1990 at the latest, if Aliens came out in
1986.
 Q.   Is it my understanding that your

36 (Pages 138 to 141)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 142

1 testimony is at least as of 1990, it became
2 evident that all types of expression of a future
3 infantry soldier had been exhausted?
4    A.   Yes.
5    Q.   And that's due to the dating of the
6 movie Aliens?
7    A.   Yes.
8    Q.   Under your rationale, would you agree
9 with me that there is nothing original in any of
10 the Chapterhouse products?
11    A.   That would depend on how a person would
12 define original.
13    Q.   And in your sense, you told me there
14 was nothing --
15    A.   In my sense, yes, I would say there's
16 nothing original.
17    Q.   Would you also say that it's your
18 opinion that the Chapterhouse products are derived
19 from Games Workshop products?
20    A.   No, I would say they are both derived
21 from the same ultimate sources.
22    Q.   Do you have any expert opinion one way
23 or the other whether or not the Chapterhouse
24 designers were referring to the Games Workshop

Page 143

1 products to design it or some ultimate source to
2 design it?
3    A.   I have no opinion on that.
4    Q.   You're not expressing any opinion
5 whether any particular Games Workshop designer
6 used any specific reference when they were
7 creating their work, are you?
8    A.   I believe I did.
9    Q.   Is that when we're talking about the
10 flamer, the lightning claw and the tank?
11    A.   I think that was either the whole or at
12 least a partial list.
13    Q.   Are you planning any expert opinions
14 whether any Games Workshop work lacks originality
15 in the copyright sense?
16    A.   I'm not an expert in copyright law.
17    Q.   What is your understanding of the word
18 "originality" when you use it?  I'm sorry?
19    A.   No, I'm formulating a response.
20    Originality would be the idea of a
21 thing wholly onto itself without an external
22 influence of any sort.
23    Q.   Okay, can something be partially
24 original?

Page 144

1    A.   No.
2    Q.   Why not?
3    A.   For the same reason you can't be
4 partially pregnant.
5    Q.   Can something be an original
6 combination of prior works?
7       MR. COOPER:  Object to the hypothetical
8    and to the extent it calls for legal
9    conclusion.
10       THE WITNESS:  I'm not sure.
11 BY MR. KEENER:
12    Q.   When you were forming your expert
13 opinions in this case, were you assuming that
14 you could have an original combination of prior
15 works?
16    A.   I was assuming that, yes.
17    Q.   And you didn't identify any original
18 combinations of prior works?
19    A.   No, I did not.
20    Q.   For example, when we were discussing
21 the Mona Lisa, you thought it was an original
22 concept to put a mustache on the Mona Lisa?
23       MR. COOPER:  Objection, misstates prior
24    testimony.

Page 145

1 BY MR. KEENER:
2    Q.   Is that right?
3    A.   No, I believe that isn't right.  I
4 believe we were looking at that whether or not a
5 work could be a derivative work.
6    Q.   And I think you testified you did not
7 think that was a derivative work and you thought
8 it was original.
9       MR. COOPER:  Objection, misstates
10    testimony.
11       THE WITNESS:  I believe we were
12    discussing the legal use of the term
13    "derivative," in which case the argument was
14    to the best of my recall that legally that
15    work would be derivative but creatively it
16    would not be derivative, which again now makes
17    it difficult to consider what we're talking
18    about is deemed original or not since it seems
19    to be clouded in the nature of what is legally
20    original or not.  So I'm kind of confused by
21    where we're going.
22 BY MR. KEENER:
23    Q.   So the mustache on the Mona Lisa you
24 believe creatively was original?

37 (Pages 142 to 145)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 146

1    A.   No, I don't, I don't think so.
2    Q.   Why not?
3    A.   Well, actually I don't know.  I'd have
4  to think about that for some time.
5    Q.   Okay.
6    A.   I think that's a matter, too, that our
7  historians haven't worked out.
8    Q.   But for the Games Workshop products,
9  you did not find any combination of prior things
10 that you thought was an original combination?
11   A.   None rise to the level of the mustache
12 on the Mona Lisa, and even then I'm not sure that
13 would qualify.
14   Q.   Did you attempt to determine whether or
15 not there were original combinations?
16   A.   By determine, I'm not entirely sure
17 what you mean.  Could you explain "determined"?
18   Q.   Was that part of your work to look at
19 whether or not any combinations used were original
20 combinations?
21   A.   By look at, do you mean view the
22 illustrations in the chart and make a
23 determination based on those illustrations?  And
24 if you do mean that, then I would have to say that

Page 147

1  I did indeed look for originality in the
2  combination of elements and wasn't able to find
3  any.
4    Q.   For any of the products?
5    A.   To the best of my recollection, I was
6  unable to find any original combinations.
7    Q.   At what point did you determine that
8  all forms of expression for infantry soldier type
9  warrior were exhausted; was that prior to or after
10 writing your report?
11   A.   I think it has been knowledge that has
12 been percolating in my mind for sometime.
13   Q.   So that --
14   A.   And yet I don't think that I ever had
15 proper impetus to write it down before.
16   Q.   So prior to seeing any of the Games
17 Workshop products, you had already formed the
18 opinion that all forms of expression of infantry
19 soldier had been exhausted?
20      MR. COOPER:  Objection, misstates
21   testimony.
22      THE WITNESS:  No, because as a scholar,
23   one is always open to having one's mind
24   changed based on new evidence.  I suppose I

Page 148

1  could change my mind again if I saw something
2  that was new, but in my opinion right now I
3  believe it to be impossible.
4  BY MR. KEENER:
5    Q.   And further, your opinion that the use
6  of the word "flamer" by Games Workshop meant that
7  that designer must have read Starship Troopers, is
8  that an opinion that you formed before or after
9  starting work on this case?
10   A.   After.
11   Q.   And what evidence did you learn
12 afterwards that made you form that opinion?
13   A.   I reread Starship Troopers.
14   Q.   And did you read any of the testimony
15 of any Games Workshop designers?
16   A.   No, I have not.
17   Q.   Why not?
18   A.   It has not been provided to me.
19   Q.   Was it something you would have wanted
20 to review prior to form your expert opinion?
21   A.   No.
22   Q.   Why?
23   A.   I'm not interested in what people claim
24 to remember or remember or influences they either

Page 149

1  consciously or unconsciously know.  You have to
2  understand that with Barthes' work on the Death of
3  Authorship that an individual's opinion of their
4  own work is wholly irrelevant.
5    Q.   So the individual artist who created
6  these works, it's completely irrelevant the facts
7  of what they believe and testified they used to
8  create these works?
9    A.   It may make for interesting anecdotes
10 but ultimately it's unimportant.  From an artistic
11 and sort of theoretic point of view, I don't know
12 how that works in a legal sense, and we must
13 remember that I'm only speaking about this from a
14 scholarly point of view.  And from a scholarly
15 point of view, the comments made by various types
16 of authors regarding their works are typically
17 dismissed as being unreliable.
18   Q.   Similarly, if an artist says that they
19 independently created an item and it happens to
20 look like something that existed in history,
21 that's not something you would want to know?
22   A.   No.
23   Q.   Why?
24   A.   It's irrelevant.

38  (Pages 146 to 149)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 150

1    Q.   You don't have any personal knowledge
2  how Games Workshop created any of the products at
3  issue, do you?
4    A.   No, I don't.
5    Q.   You didn't review any of the design
6  documents or concept documents?
7    A.   No.
8    Q.   Similarly for the Chapterhouse
9  products, you don't have any opinion on what works
10 are used in those products, do you?
11   A.   None whatsoever.
12   Q.   Or whether that product was directly
13 copied from Games Workshop products?
14   A.   No.
15   Q.   You didn't speak to any of the
16 Chapterhouse designers?
17   A.   No.
18   Q.   You didn't read any of the transcripts?
19   A.   No.
20   Q.   You didn't review any of their
21 documents or e-mails?
22   A.   No.
23   Q.   You don't have any personal knowledge
24 about how they created their products?

Page 151

1    A.   No.  Up until, I guess December, I had
2  no idea they existed.
3    Q.   I'm including after that, up until the
4  time you signed your report.
5    A.   I haven't even seen their website.
6    Q.   You're not --
7    A.   I assume they have one.
8    Q.   You're not providing an expert opinion
9  one way or another whether Chapterhouse committed
10 copyright infringement, are you?
11   A.   I'm not an expert in copyright.
12   Q.   So therefore, you're not providing any
13 opinion on whether or not Chapterhouse committed
14 copyright infringement?
15   A.   Correct.
16   Q.   And are you providing any expert
17 opinion on whether or not Chapterhouse products is
18 substantially similar to Games Workshop products?
19   A.   Yes, I am.
20   Q.   And what is your opinion?
21   A.   That there are no substantial
22 similarities.
23   Q.   Between any of the products?
24   A.   Between any of the products.

Page 152

1    Q.   So while Games Workshop products are
2  substantially similar to the prior works you find,
3  it's your expert opinion that the Chapterhouse
4  products are not substantially similar to the
5  Games Workshop products?
6         MR. COOPER:  Objection, misstates his
7  testimony.
8         THE WITNESS:  What I am suggesting in
9  my opinion is that there are no substantial
10 similarities between Chapterhouse's products
11 and Games Workshop's products and that
12 insignificant similarities between the two are
13 resulting from their shared derivation in
14 prior works.
15 BY MR. KEENER:
16   Q.   Let me break that down.
17        Are you expressing an opinion that
18 Games Workshop products are substantially similar
19 to prior works?
20   A.   Yes.
21   Q.   Are you expressing any opinion whether
22 Chapterhouse products are substantially similar to
23 Games Workshop products?
24   A.   Yes.

Page 153

1    Q.   Are they?
2    A.   No.
3    Q.   Are any of the products substantially
4  similar to each other?
5    A.   No.
6    Q.   In any way?
7    A.   No.
8    Q.   Do you believe that Chapterhouse
9  products are substantially similar to the prior
10 works?
11   A.   I was not asked for that opinion.
12   Q.   Is it your opinion?
13   A.   Yeah.
14        MR. COOPER:  Objection, outside the
15 scope.
16 BY MR. KEENER:
17   Q.   I didn't hear your answer.
18   A.   Yes.
19   Q.   So it's your opinion that the Games
20 Workshop products are substantially similar to the
21 prior works, yes?
22   A.   Yes.
23   Q.   And the Chapterhouse products are
24 substantially similar to the prior works, yes?

Veritext Legal Solutions - Midwest
312-442-9087        800-248-3290        fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 154

1     A.   Yes.
2     Q.   But it's also your opinion that the
3  Games Workshop products are not substantially
4  similar to the Chapterhouse products?
5     A.   Yes.
6     Q.   It's correct that it's your opinion
7  that they are not substantially similar?
8     A.   They are not substantially similar.
9  The similarities that they share are due to a
10 mutual origin point.
11    Q.   I'm including those.  Regardless of
12 mutual origin, take the column 3 out of the
13 equation, looking at just the Chapterhouse
14 products and the Games Workshop products, are you
15 forming an opinion whether or not those products,
16 without regard to anything prior, are
17 substantially similar?
18       MR. COOPER:  Objection, asked and
19    answered.
20       THE WITNESS:  They are similar to the
21    extent they share a mutual origin.
22 BY MR. KEENER:
23    Q.   I'm excluding mutual origin.
24    A.   I can't go further from there.

Page 155

1     Q.   Assume for me none of those prior works
2  ever existed.  This is a hypothetical.  All you
3  have before you is the Chapterhouse products and
4  the Games Workshop products.  Are you forming any
5  opinion whether or not those two products are
6  substantially similar?
7        MR. COOPER:  Objection --
8        THE WITNESS:  That's --
9        MR. COOPER:  Hold on, to the
10    hypothetical that it calls for a legal
11    opinion, it's outside the scope of your
12    report.
13       THE WITNESS:  I'd actually have the
14    answer that calls for me to needlessly exclude
15    entities and I don't think logically I could
16    answer that.  It's a fallacy.
17 BY MR. KEENER:
18    Q.   Are you going to be offering any
19 opinion at trial, regardless of the prior works,
20 whether or not there's any substantial similarity
21 between Games Workshop product and the
22 Chapterhouse product?
23    A.   I cannot divorce the prior works.
24    Q.   So you will not be offering any opinion

Page 156

1  whether or not the Games Workshop products and the
2  Chapterhouse products were substantially similar?
3        MR. COOPER:  Objection, that misstates
4    his testimony.
5        THE WITNESS:  I have already said that
6    they are not substantially similar.
7  BY MR. KEENER:
8     Q.   It's my understanding you're meaning
9  that to mean except for similarities with the
10 prior works, they are not substantially similar.
11    A.   Not except.
12    Q.   What am I missing?
13    A.   Two men are wearing suits.  Both suits
14 originate in previous suits.  The similarities
15 that they therefore share would be those
16 attributes of the suit that is not encompassed by
17 previous works.  So therefore, even though the two
18 suits the two men may be wearing appear virtually
19 identical, they are indeed not and do not share
20 any substantial similarities to one another.
21    Q.   Okay.  Couldn't someone looking at
22 those two suits say those two suits are virtually
23 identical, they share many similarities, and
24 compare the pockets and the sleeves and the color

Page 157

1  and everything else, and then further go and the
2  reason they are similar is because they are both
3  off of this prior suit?
4        MR. COOPER:  Could someone do that, is
5    that the question?
6        THE WITNESS:  I suppose someone could
7    do that.
8        MR. COOPER:  Objection to the
9    hypothetical, calls for speculation.
10 BY MR. KEENER:
11    Q.   In the same instance, couldn't you look
12 at the Games Workshop products and the
13 Chapterhouse products and say they are very
14 similar and have all these similarities, yet those
15 similarities are based on a prior work?
16       MR. COOPER:  Objection, calls for
17    speculation into the hypothetical.
18       THE WITNESS:  I think that someone
19    probably could say that but it wouldn't be a
20    person well-versed in scholarship.
21 BY MR. KEENER:
22    Q.   Okay.  In your expert opinion, do the
23 Chapterhouse products and the Games Workshop
24 products share substantial similarities regardless

40 (Pages 154 to 157)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 158

1 of where these similarities come from?
2 MR. COOPER: Objection, asked and
3 answered --
4 THE WITNESS: I'm sorry --
5 MR. COOPER: Give me a second. Asked
6 and answered, calls for speculation, calls for
7 a legal conclusion, outside the scope of his
8 report.
9 THE WITNESS: I'm sorry, I cannot
10 divorce the prior works from this equation.
11 BY MR. KEENER:
12 Q. So you're unable to answer that
13 question whether or not there are similarities
14 between the Games Workshop product and the
15 Chapterhouse product regardless of where these
16 similarities arise from?
17 MR. COOPER: Same objection, and to
18 form.
19 THE WITNESS: I'm not unable to answer
20 the question. The question cannot be
21 answered.
22 BY MR. KEENER:
23 Q. So for example, a Chapterhouse product
24 is in a space marine type armor and the Games

Page 159

1 Workshop is in a space marine type armor. Do you
2 understand that?
3 A. No, I do not.
4 Q. Let's turn in Exhibit B to page 11.
5 Do you see on the left-hand side a
6 Chapterhouse product called a TRU-Scale Knight
7 Praetorius?
8 A. On page 11?
9 Q. On the bottom of page 10 is the title
10 of that project, but the pictures start on page 11
11 and the Chapterhouse product is called a TRU-Scale
12 Knight Praetorius.
13 do you see that?
14 A. No, I don't.
15 Q. You don't understand those to be
16 Chapterhouse's TRU-Scale Knight Praetorius?
17 A. They are not.
18 Q. It's their conversion kit?
19 A. Conversion kit is not depicted.
20 Q. Do you understand them to be selling
21 various pieces, including legs, torso, head and
22 shoulder pads among others?
23 A. No, I do not.
24 Q. What was wrong with that question?

Page 160

1 A. It's shoulder pads, torsos, legs and
2 backpacks.
3 Q. Okay.
4 So Chapterhouse's shoulder pads, legs,
5 torsos and backpacks you understand to be
6 Chapterhouse products in the left-hand column?
7 A. Yes.
8 Q. And you understand the middle column to
9 have Games Workshop products that also contain
10 legs, torsos, shoulder pads and backpacks?
11 A. Yes.
12 Q. Are you able to have any -- do you have
13 any expert opinion on whether or not the shoulder
14 pads between the Chapterhouse product and the
15 Games Workshop product are similar?
16 A. No, I don't believe they are.
17 Q. Are you forming any opinion whether the
18 legs are similar?
19 A. No, I do not believe they are.
20 Q. Whether the torsos are similar?
21 A. No, I do not believe they are.
22 Q. And whether the backpacks are similar?
23 A. I don't believe they are.
24 Q. You don't believe they are similar in

Page 161

1 any way?
2 A. I believe they are insignificantly
3 similar but ultimately derived from the same base
4 set of sources.
5 Q. Now, you're adding where they are
6 derived from. My question is not where they are
7 derived from, my question is whether these two
8 pictures are similar to each other.
9 A. We're getting bogged down again into
10 this notion of similarity.
11 Q. Are you able to answer yes or no
12 whether two pictures are similar to each other
13 without knowing the originating source?
14 A. I would never answer a question without
15 knowing the originating source in that sort of
16 matter.
17 Q. You are unable to look at two pictures
18 to say whether or not they are similar without
19 understanding the originating source?
20 A. As a lay person or as a scholar?
21 Q. I'm asking your expert opinion.
22 A. Then I would say no, I would not make
23 such a determination unless I had done the
24 research.

Veritext Legal Solutions - Midwest
312-442-9087      800-248-3290      fax 312-442-9095

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 162

1    Q.   Right, and you're saying the research
2  needed to say whether two pictures are similar to
3  each other depends on what source material they
4  may have come from?
5    A.   Correct.
6    Q.   Do you have an expert opinion on what
7  design elements are essential or unavoidable in
8  creating a future infantry soldier?
9        MR. COOPER:  Object to form.
10       THE WITNESS:  Could you rephrase that?
11 BY MR. KEENER:
12   Q.   Sure.  You've classified -- let me
13 restart.
14       You've stated that all the various
15 types of expressions of a future warrior have been
16 exhausted, as of 1990 at least.
17   A.   Yes.
18   Q.   Do you have in your expert opinion any
19 design elements of such a soldier that are
20 essential to a future space warrior?
21       MR. COOPER:  Same objection.
22       THE WITNESS:  It's difficult to answer
23   this question without providing you with a
24   brief analogy.

Page 163

1  BY MR. KEENER:
2    Q.   Okay.
3    A.   Sometimes when people go to, say, a
4  hair salon, they can look at different
5  possibilities for haircuts.  In the same salon,
6  there might be different possibilities for your
7  sideburns or for your mustache or beard or what
8  have you.  And what happens with that process of
9  selection is that you have to choose one way to
10 have your hair cut.  There are many ways to have
11 it cut but you must choose one of them.  There are
12 many ways that you could have your sideburns or
13 your eyebrows sculpted but you must choose one of
14 them.
15       So there is not a singular set of
16 component elements of graphic depiction of, say, a
17 future soldier.  There are, however, ranges of
18 possibility for individual items for which you may
19 make a selection, and that selection in no way
20 guarantees any sort of sense of originality.
21 You're merely choosing from a variety of stock
22 possibilities and ending up with a variant.  But
23 that variant, indeed I think all the possibilities
24 were to be exhausted.

Page 164

1        Was that helpful?
2    Q.   I think so.  Let's take an example.
3        So creating a future infantry soldier,
4  how many possibilities are there for a helmet?
5        MR. COOPER:  Objection, calls for
6  speculation.
7        THE WITNESS:  I imagine that there are
8  a fairly large number of possibilities but a
9  very small number of actual executed
10 possibilities, so just in a quick kind of run
11 through while we're sitting here, I'm trying
12 to recall every -- and this is just from film.
13 Just from film, trying to recall how many
14 different types of helmets I've seen in future
15 soldier type characters, and I don't think it
16 numbers more than three or four if you're
17 looking at basic shapes but I would have to do
18 -- and I'm uncomfortable with this sort of
19 speculation because I would really have to sit
20 down and go through films or still images.  I
21 would have to do probably a significant amount
22 of research to give you a really hard number
23 just on helmet shapes, but I would be
24 surprised if it was more than half a dozen.  I

Page 165

1  would be very surprised.
2  BY MR. KEENER:
3    Q.   Okay, so there are only around, give or
4  take, half a dozen different types of helmets all
5  future soldiers can wear?
6    A.   Not can wear, does wear.
7    Q.   And how about torsos, how many
8  different types of torsos are there?
9    A.   Well, if you include power armor, only
10 a couple really.
11   Q.   Not including just the type of power
12 armor but every expression of that type?
13   A.   Well, the expressions may be
14 insignificantly different from one another.
15 Putting an extra bauble here or there or changing
16 the paint of something isn't really significant,
17 at least from, you know, either an art or a cinema
18 or a literary point of view.  I'm sure it's
19 probably different from a legalistic point of
20 view.  But a smirch of paint here and a smirch of
21 paint there doesn't make any difference.
22   Q.   So for example, the power armor a
23 Starship Trooper might wear you're saying is the
24 same power armor that a spaceman might wear or the

42  (Pages 162 to 165)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

Page 166

1 same as the power armor that Iron Man might wear?
2 MR. COOPER: Objection, misstates
3 testimony.
4 THE WITNESS: That's a very difficult
5 question to answer because in that mix has
6 actually been the originating image.
7 BY MR. KEENER:
8 Q. I'm trying to understand in your count
9 of how many types of armor there are, are you
10 treating all of those as one type of armor, one
11 expression?
12 A. It's a difficult example. There is --
13 in that example you provided, there is one
14 expression, several incarnations, and those
15 incarnations are substantially similar to the
16 original expression.
17 Q. Okay. So if I understand for those
18 examples, a Starship Trooper mobile infantry and a
19 Games Workshop space marine and an Iron Man, you
20 believe they all have the same expression of a
21 power suit, just different incarnations?
22 A. I believe that they all have -- or
23 rather if we use that example, we have Iron Man
24 and we have the space marines. They originate in

Page 167

1 the Starship Trooper power armor. The power armor
2 from Starship Trooper is the expression. The
3 other two are merely incarnations. The other two,
4 Iron Man's various suits will have an
5 insignificant level of similarities between
6 themselves and say, for example, space marine's
7 power armor, but both of them will have
8 significant similarity to the Starship Troopers
9 originating power armor.
10 Q. So there's nothing original in the Iron
11 Man suit that's not already due to the Starship
12 Trooper influence?
13 A. Correct.
14 Q. And in the various different Iron Man
15 suits, there's nothing original in the later
16 incarnation versus the first Iron Man suit?
17 A. They are basically trivially different.
18 Q. In your mind, there's nothing original
19 about the later ones?
20 A. No.
21 Q. So going back to the example of
22 creating an infantry future space warrior, let's
23 assume there's five or six helmet choices and only
24 five or six torso choices and only five or six leg

Page 168

1 choices and only five or six boot choices, only
2 five or six gauntlet choices, only five or six
3 backpack choices, et cetera. We quickly get to,
4 once you find the permutation, a very, very large
5 number of possibilities; do you agree?
6 A. Uh-huh.
7 Q. Yes?
8 A. Yes, I do agree that would it be five
9 factorial, which would be -- I don't know what
10 number that would be, a very large number.
11 Q. And so which combination of those,
12 would that be an original choice?
13 A. It would be but it never occurs. This
14 is the crazy thing about this particular character
15 type is that you do have a vast number of
16 permeations but you never see them. You have
17 these possibilities and yet you end up with
18 virtually identical characters all the time.
19 Q. Have you identified in your report or
20 your exhibit any prior work that made all the same
21 design choices as the Games Workshop space marine
22 from the helmet to the backpack to the shoulder
23 pad to the torso to the legs to the boots to every
24 other design choice?

Page 169

1 A. I believe I already addressed that
2 saying that, A, I was never asked to do that, and
3 that that needlessly opens up a number of entities
4 that are not required, because then, of course,
5 where would I go from there? Do I have to worry
6 about whether it is imitation polyester, imitation
7 cotton? Do I have to worry about whether boots
8 have nine holes for shoelaces or 12? It
9 unnecessarily adds these permeations.
10 Q. Leaving out the level of item, which is
11 only maybe seven or eight different elements, did
12 you identify anything in the prior art that made
13 those same seven or eight choices that Games
14 Workshop did?
15 MR. COOPER: Objection to the
16 hypothetical.
17 THE WITNESS: That was never my point
18 so no, I didn't do it. That was your point.
19 BY MR. KEENER:
20 Q. So you are not forming any expert
21 opinion that the combination of design elements
22 chosen by Games Workshop is the same combination
23 as any of the prior works because you didn't do
24 that an analysis?

43 (Pages 166 to 169)

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5

1    A.   I did not do that analysis.
2    Q.   You are not expressing any expert
3 opinion in your report or chart that the design
4 choices of which elements to include in the Games
5 Workshop space marine are the same combination of
6 design elements in any prior work?
7    A.   No, but I could do that if you wanted
8 me to.
9    Q.   I'm only interested in the opinions you
10 expressed in your expert report and your chart.
11 You did not form that opinion in either of those,
12 correct?
13    A.   No, I did not.
14    Q.   So you're not going to come to trial
15 and express that opinion, correct?
16    A.   Am I allowed to?  Because I think I
17 could.
18    Q.   All the opinions you're going to
19 express are supposed to be contained in your
20 report.
21    A.   Oh, then I guess I would not.
22    Q.   And can we say that's the same about
23 the other Games Workshop products in the chart,
24 that you have not expressed any opinion on whether

1 the combination of design elements chosen by Games
2 Workshop are the same combination of any prior
3 works you found?
4    A.   I'd have to look at the report.  I
5 don't believe I explicitly said that.
6    Q.   Implicitly or explicitly, have you
7 pointed to any prior works where you believe all
8 the same design choices which elements to include
9 is the same combination that Games Workshop chose?
10    A.   No, I have not.
11    Q.   You stated that there's only so many
12 ways a future infantry helmet is depicted and
13 various other features, correct?
14    A.   Yes.
15    Q.   Do you attempt to identify in your
16 report what those various ways are for design
17 elements?
18    A.   No, I do not.
19    Q.   Do you understand trademarks to be at
20 issue in this case?
21    A.   No, I do not.
22    Q.   So you're not making any opinion
23 anywhere about the use of various terms or
24 terminology, correct?

1    A.   No, I'm not, nor do I know anything
2 about trademark law.
3    Q.   I think we've covered that.
4    A.   Okay.
5    Q.   Does your report contain a complete
6 statement of each of the opinions you're going to
7 express in this case?
8    A.   That's actually difficult to answer.
9    Q.   Were you told that your report must
10 contain a complete statement of each of the
11 opinions you will express in this case?
12    A.   Yes, I was.
13    Q.   And did you attempt to do so?
14    A.   I believe that I did insomuch as the
15 complaint did.  And by this, I refer to two
16 different matters.  Matter one, when we're looking
17 at the table in its original version, there are a
18 large number of images that have been used that I
19 would imagine would be perhaps described or shown
20 to someone who was interested in this matter or
21 other ways walked through like you just did with
22 me when you said look at this torso or look at
23 these legs.
24         I am operating under the assumption

1 that how you just deposed me with that level of
2 information, I likewise would be able to walk
3 people through these images.
4    Q.   Anything else?
5    A.   I believe that would be all that would
6 be necessary.
7    Q.   Okay.  So you did not walk through the
8 various design elements in your report?
9    A.   No, neither did Games Workshop.
10    Q.   Okay.
11    A.   I assume that what they were doing
12 would be what I would be doing, which is what you
13 just did.
14    Q.   So your report did not contain a
15 complete statement of each of your opinions with
16 regards to any of the elements?
17         MR. COOPER:  Objection, misstates the
18 testimony.
19         THE WITNESS:  Yes, it does.
20 BY MR. KEENER:
21    Q.   Where does it contain a complete
22 statement of your opinions regarding the elements?
23    A.   In the images.
24    Q.   Beyond the images?

5ae8a386-36a0-4a15-9bc2-7eb859e5c5e5