# EXHIBIT

# 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GAMES WORKSHOP LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:10-cv-08103 |
| v. | ) | |
| | ) | |
| CHAPTERHOUSE STUDIOS LLC, | ) | |
| | ) | Judge Matthew F. Kennelly |
| Defendant. | ) | |

**SUPPLEMENTAL EXPERT REPORT OF DR. CARL JAMES GRINDLEY**

**INTRODUCTION**

1.     I, Dr. Carl James Grindley, have been engaged as an expert witness by Chapterhouse Studios LLC ("Chapterhouse") to provide expert analysis and opinion regarding the Games Workshop Limited ("Games Workshop") products and images identified in Games Workshop's January 11, 2013 Claim Chart for Newly Accused Products (the Games Workshop "New Allegedly Infringed Works"), a copy of which is attached to this report as Exhibit A (the "New Products Claim Chart"). Specifically, I have been asked to opine on whether elements of the Games Workshop New Allegedly Infringed Works can be found in or are derived from pre-existing works from historical, medieval, cinematic, or science fiction sources. By "pre-existing," I mean that the reference material was published prior to the listed creation date in Exhibit A of each New Allegedly Infringed Work I am examining. In many cases, the reference materials I examined predated *any* Games Workshop product for the Warhammer 40K universe.[1]

2.     In order to determine what design elements from the Chapterhouse and Games Workshop products are found in historical or popular culture pre-existing works, naturally I first

---

[1] I understand, based on Games Workshop's Complaint, that Warhammer 40K products were developed beginning in or about 1987. *See* Dkt. No. 261 at ¶ 18; Goodwin Dep. Tr. at 80:15-24.

had to do a visual comparison between the Chapterhouse and Games Workshop products in the New Products Claim Chart to identify the design elements I saw that were similar in order to then compare any of these similarities to design elements in pre-existing works and determine whether the similarities were significant.[2]

3.     In researching material regarding this analysis, I have relied on three main sources: 1) a comprehensive review of my past research on the Middle Ages and Popular Culture as presented and published according to my curriculum vitae and dating from the late 1990s to the present; 2) a review of the latest refereed scholarship on the field of the Middle Ages and Popular Culture; and 3) new primary source research on the transition science fiction literary and graphic texts from the 1950s to the present. In particular and with regard to new primary source research, I made a comprehensive review of over 1200 pages of material associated with the Traveller science fiction role-playing game, I studied over 50 years of cover illustrations from at least 50 different science fiction magazines, and I reviewed the book covers of science fiction author Robert Heinlein's publications from the 1950s to the present across all readily available translations and editions. In addition, I also conducted primary research at The Metropolitan Museum of Art in New York City, photographing Western European Medieval Armor. I also consulted a variety of online sources regarding armor, and reviewed arms and armor and space suits in the following films: Alien, Aliens, Beowulf, Bram Stoker's Dracula, Ghostbusters,

---

[2]   I believe this would be an obvious step in my analysis, but I specifically note it here due to professed confusion from Games Workshop counsel during my deposition.  As I explained during my deposition:

> I think the best way to conceptualize the process of identification was to – or is to consider that after seeing a resemblance, to continue sort of examining that resemblance to see if that resemblance itself was due to borrowing from one company's works to another or whether that resemblance was due to another factor, and in each of the situations where I found resemblances and then proceeded to the next step of inquiry, I always determined that the resemblances were due to prior works in terms of history."

Grindley Dep. Tr. 43:22-44:8.  I further explained, "I did not think it was necessary to list minor insignificant similarities between these two products because both of the products find their ultimate derivation in another source entirely."  *Id.* at 351:12-352:2.  I repeat what I said during my deposition, and that is that the best way to assist a jury in identifying similarities between the products is my use of the chart.  *Id.* 55:3-6.

Avatar, Outland, Starship Troopers, Robocop, Star Wars Episodes 1-6, 2001: A Space Odyssey, Moon, Prometheus, Army of Darkness, Black Knight, Ecalibur, First Knight, Monty Python and the Holy Grail, The Name of the Rose, The Fisher King, Ironman, Thor, The Avengers, The Watchmen, Timeline, LadyHawke, Joan of Arc, Robin Hood: Prince of Thieves, Lancelot du Lac, Perceval le Gallois, Brazil, The Last Temptation of Christ, Indiana Jones and the Last Crusade, A Knight's Tale, The Road Warrior, Bill and Ted's Excellent Adventure, Garden State, Merlin, Henry V, Conan the Barbarian, and The 13th Warrior.

4.     Based on my research, I have concluded that each of the Games Workshop New Allegedly Infringed Works for which Games Workshop claims copyright protection are derivative of pre-existing works from historical sources ranging from classical antiquity to the present, from science fiction literature and illustration, and from contemporary cinema. My findings are discussed below and further summarized in a chart attached as Exhibit B to this report.[3]

## BACKGROUND AND QUALIFICATIONS

5.     I am a tenured associate professor of English at Eugenio María de Hostos Community College, and consortial professor of General Education and Communications and Culture at the School of Professional Studies, both of The City University of New York. I have worked at The City University of New York since August of 2004. Prior to that, I have held appointments at The University of British Columbia, Yale University and the University of Victoria. I hold my PhD from the University of Glasgow, the fourth oldest English-language speaking university.

---

[3] Certain supplemental opinions based upon information produced to Chapterhouse and myself for the first time after I wrote my original expert report can be found at paragraphs ___ below.

6.      My academic training at the Masters and Doctoral levels centered on the historical reception of Medieval texts, and focused on the ways that non-Medieval audiences (from the sixteenth to the late nineteenth century) encountered and responded to fourteenth-century insular literary manuscripts. During my research I became increasingly interested in the contemporary world's appropriation of Medieval tropes, and more specifically I began a scholarly analysis of responses to Medievalisms.

7.      Medievalisms have interested me since my adolescence. Starting in late 1979, I began playing Advanced Dungeons & Dragons, which in turn led me to encounter other role-playing games such as the space-based game Traveller. Although I stopped playing these games as a teenager, their content eventually influenced my scholarly growth as I become more and more aware of the continuing influence that Medieval tropes had on contemporary society. As an undergraduate, I joined the Imaginative Fiction Society at the University of Victoria, and attended the VCON science fiction conventions in Vancouver. Eventually, I concluded that such tropes were a fitting subject for scholarly discourse.

8.      In the late 1990s, while a Social Sciences and Humanities Research Council of Canada postdoctoral fellow at the University of Victoria, I began to actively teach and conduct research on the Middle Ages and Popular Culture--at that time a virtually unknown field. In the summer of 2000, I developed and taught Medieval Studies 401: The Middle Ages and Popular Culture at the University of Victoria in British Columbia, Canada. In the spring of 2002, I taught a graduate class entitled Dante and Popular Culture at Yale University.

9.      Starting in 2001, I began to deliver presentations on the Middle Ages and Popular Culture at scholarly conferences, the most important of which were the University of Leeds International Medieval Conference, the International Medieval Congress at the University of

Western Michigan, the Film/History Society's biennial conferences and the Early Book Society's biennial conferences. In total, I have delivered 19 presentations on the Middle Ages and Popular Culture at refereed scholarly conferences.

10.     In 2004, I co-founded the Virtual Society for the Study of Popular Culture and the Middle Ages with Michael Torregrossa of Rhode Island. At around this time, I began to publish on the topic, including a study of the symbolism of arms and armor in film, and the symbolism of medieval and other weapons in film.

11.     In 2010, I was asked to speak at the 85th Annual Meeting of the Medieval Academy of America where I presented their first paper on the Middle Ages and Popular Culture. This spring I will be delivering presentations at the 34th Annual Medieval and Renaissance Forum at Plymouth State University in New Hampshire, and at Phillips University in Marburg, Germany.

12.     During my career, I have authored seven chapters in scholarly books and ten peer-reviewed scholarly articles, as well as numerous creative writing publications in books, anthologies, and journals. I have served as a reviewer of ten scholarly books and given over 50 distance lectures and other scholarly presentations. I have also written three science fiction novellas, "The Fear of Contagion," "Still Life," and "The Memoirs of a Supervillain," which were published by No Record Press in San Francisco in 2008. I have regularly taught Science Fiction Literature and Film since 2004 at The City University of New York.

13.     Further details regarding my qualifications, background, and experience are provided in my Curriculum Vitae, attached to this report as Exhibit C.

## SUBJECT MATTER OVERVIEW

### A. Science Fiction and Fantasy

14.     Science fiction and fantasy, whether the genres find expression in literature, film, video games, role playing games, or in some other medium, are often dependent on the distant past for their basic tropes, images and concepts, and have been subject to a self-reflexive, evolutionary process in terms of design and meaning. This pattern of influence has been noticed by a number of scholars, but most importantly by Umberto Eco in his book *Travels in Hyperreality*, where he noted the similarities between Star Wars and Medieval romance.

15.     Central to any understanding of how tropes evolve is the notion of a "text". The term "text" in academia is used to refer to any interpretable, readable cultural product. A can of soda, for example, is just as "readable" as a novel in that it conveys a meaning to the observer through its design, color, choice of font, the constructed meaning of the words on its label and so on. For the purposes of discussion, when I refer to a text, I could mean a story, a book, a film, a video game, a role playing game, a miniature model, anything that can be experienced and then examined for meaning. It is important to recognize that texts do not exist independently of one another: there is not one set of meanings that only apply to the written word and another only apply to video games. Meanings transcend textual boundaries and definitions.

16.     Major influences on science fiction and fantasy include the material cultures of classical antiquity, that of the Middle Ages (both Western and Eastern), and indeed that of nearly every conceivable moment up to and including the present. Once an influence finds its way into, for example, a sub-genre of science fiction, that original incarnation of the influence itself often becomes an influence on another text. The process continues in this manner until tropes coalesce into a type of conformity, as if guided by the hand of an unconscious auteur.

17. Although it seems counter-intuitive, science fiction frequently co-opts tropes from cultures and sources that seem to be inappropriately non-futuristic. Space suit design finds its origins not only in the real pressure suits and space suits of the 1950s to the present, but the designs also show traces of Greek, Roman and Medieval armor. Complicating matters further is that invention is difficult, so visions of the future are often crafted out of a myriad of pasts. Consider, for example, the spacesuits in Ridley Scott's 1979 film Alien. Although the environmental suits are indebted to Medieval armor--for the elaborately decorate, articulated and over-sized pauldrons--the suit design also points to actual pressure suits, deep sea diving suits, and utilizes padding from hockey and presumably cricket (baseball, cricket and football pads also play a role in the post-apocalyptic fashions of Road Warrior (1981)).

18. Since successive science fiction and fantasy texts feed off one another's influences—Peter Hyam's 1981 film *Outland*, for example, featured spacesuits whose helmets were exceptionally close to those seen in *Alien*, and, indeed, both films used the same designer, John Mollo—very few elements of design are ever entirely original. Oftentimes, a small group of individuals drive a process that soon expands beyond their intentions.

19. This pattern of influence and expression should be expected in science fiction and fantasy texts regardless of media.

**B. Why Images Appear Similar**

20. It should not be surprising when a common visual language develops within a genre or across genres, and in the case of science fiction and fantasy, it should not be assumed that a recent visual element is in any way original.

21. Medieval armor, for example, finds its reflection in everything from armored spacesuits seen in *The Chronicles of Riddick* (2004), to Sauron's armor in *The Lord of the Rings:*

7

*The Fellowship of the Ring* (2001), all the way to revisionist armor designs seen in imaginary Medieval settings, such as the opening sequences of Bram Stoker's *Dracula* (1992) or to designs seen in films based on actual medieval texts, such as *Excalibur* (1981). In many ways, these suits of armor or armor-like suits resemble one another even though their production dates are separated by many years, different continents, and a myriad of designers. All of these suits seem superficially dissimilar, and yet share striking features. All of these suits seem mostly indebted to the realm of the fantastic, and yet all are quite obviously based on actual Medieval antecedents.

22.     Over time, certain designs find resonance and take on an independent symbolic existence. For example, consider the repeated development and appearance of over-sized shoulder armor. Shoulder armor was originally created to protect the shoulders. Over time, they increased in size to symbolize virility. In the 1980s, for example, both men's and women's business suits featured increasingly larger shoulder pads for no conceivable reason. In the films that I briefly cited above, shoulder armor is preposterously large and elaborate, a trope that has held steady for over twenty years.  (*See, e.g.*, Ex. B at product entries # 126, 137-141, 146-157, and 163).

23.     As I have noted in a variety of conference presentations and in my published work on armor in film, functionality is abandoned as a visual trope enters the world of the symbolic. This is an important point. There are but a few ways for a piece of armor to be functional, but many ways for it to be non-functional. That specific pieces of armor should resemble one another in shared non-functionality should at first be surprising, but then expected, as one recognizes that as piece of armor has entered the realm of the symbolic it has undergone some modification of its original meaning to the point where functionality becomes secondary, then tertiary, then lost.

24.     In the case of the films I cited above, massive pauldrons might be symbolic, but in the context of normal suits of armor they are not functional. Shoulder armor has to allow the free movement of the wearer's shoulders and arms. In the Middle Ages, massive armor that protected the shoulders was available--grandguards--but these plates were literally fixed in place, did not allow the wearer any motion of the shoulder, and were intended for jousting. (*See*, *e.g.*, Ex. B at product entry # 155, "Photographs of Medieval Armor with Shoulder Pads: Metropolitan Museum of Art")

25.     Filmmakers, illustrators, designers, writers and the creators of other types of text use and participate in the standardization of visual imagery in order to save narrative space. For example, if I were to write a science fiction short story and mention that a character wore a powersuit, even relatively inexperienced science fiction readers would instantly understand what I meant because of the near ubiquity of powersuits in everything from Iron Man to Halo to Mobile Suit Gundam and so on. These tropes form a kind of shorthand that auteurs may use either consciously or unconsciously when creating seemingly new works.

**C. The Appearance of Future Soldiers**

26.     Sometimes, however, it is possible to track a trope to its earliest incarnation. Consider the development of the future soldier: the space marine, the mobile infantry, the space ranger. Seen in a dizzying number of different types of text, this character type finds its origins in a very specific moment in time. The basic outlines of most popular media depictions of future soldiers can be traced to two main sources: science fiction texts from the late 1950s and the illustrations that accompanied them.

27.     As far as the images are concerned, it is useful to examine illustrations published by science fiction magazines such as *Analog*. Frank Kelly Freas, Jack Gaughan, and John

9

Schoenherr were responsible for hundreds of cover illustrations and their works helped to define the appearance of future soldiers. Most of the illustrations that are most similar to the design of the Games Workshop miniatures were published from the mid-to-late 1970s to the mid-to-late 1980s.

28.     One of the types of future soldiers is the heavily armored space marine or mobile infantry soldier. This character can be seen in everything from anime to Megaman video games to Pixar's film Toy Story and to Games Workshop's miniatures. Even across such disparate texts, the appearance of a space soldier varies very little.  (*See*, *e.g.*, Ex. B, product entries # 124, 126).

29.     Although all aspects of the various Games Workshop Space Marine characters may be traced to either actual components of medieval armour (pauldrons, grandguards, spaulders, ailettes, epaulieres, and the like) or to their exaggerations, revisions and reflections in contemporary cinema (e.g. as seen in *Excalibur* (1981)), the design appears to originate in the melting pot of science fiction rather than purely in history or fantasy.

30.     One science fiction novel in particular, Robert Heinlein's 1959 novel *Starship Troopers*, appears to be extremely influential. Two concepts that have become science fiction commonplaces were first found in *Starship Troopers*: these being the idea of a) a mobile, space-based infantry whose members routinely die during training (itself taken from various descriptions of ancient Sparta), and b) the idea of a 2000 pound, power suit, a sort of armored exoskeleton that can also function as a space suit. The suit features a variety of built-in weapons including a flame thrower (called in the text a "flamer") and a number of automatic shoulder-mounted weapons including larger cannons and rockets. Graphic interpretations of this suit have taken a number of different forms since the novel's original serialization. Included in the exhibits

attached to this report are some examples from Heinlein book covers. (*See*, *e.g.*, Ex. B, product entries # 124, 126, 128, 155)

**ANALYSIS OF GAMES WORKSHOP ALLEGEDLY INFRINGED WORKS**

31.     With an understanding of this background, I have been asked to provide expert analysis to determine if the product designs, imagery, and purportedly copyrightable elements in Games Workshop's New Allegedly Infringed Works can be found in or are derived from pre-existing works from historical, medieval, cinematic, or science fiction sources. As explained above, by "pre-existing," I mean that the reference material was published prior to the listed creation date of each New Allegedly Infringed Work I am examining. In many instances, the cited reference material was published prior to the creation date of *any* Games Workshop Warhammer 40K product.

32.     To organize my findings, I recreated the Games Workshop January 11, 2013 claim chart detailing each Games Workshop New Allegedly Infringed Work and the corresponding accused Chapterhouse product.  I then added a third column to the chart, in which I included the closely similar pre-existing works I collected during my research from which the purportedly copyrightable elements of the Games Workshop work appear to have been derived.

33.     In addition to the specific findings on each Games Workshop New Allegedly Infringed Work detailed in Exhibit B, I observed a number of important patterns during my review of Games Workshops' New Allegedly Infringed Works and pre-existing works from historical, medieval, cinematic, and science fiction sources that call for further comment here.

**A.  "Heroic Scale"**

34.     An important aspect to the design of miniatures in this case is the "heroic scale," which is a loose term referring to the caricaturization of figures that are used primarily for

wargaming, resulting in elements of the figure that are exaggerated or disproportional. This design aspect is common in wargame miniatures to benefit consumers, because when they use miniature figures for wargaming, they are normally several feet away from the actual figures and are viewing them across a relatively large area. Because of this distance and area, miniatures are often exaggerated in a variety of ways to make them more readily identifiable in terms of how they function within the context of the game. Heads and shoulders are normally enlarged in order to make room for painting such elements as ranks on the figures. Weapons are also generally exaggerated. When a wargame participant is four feet away from a 1-inch tall figure, he or she wants to know at a glance if a character is armed with a rifle, a pistol, or some other weapon. Finally, miniature figures are designed at "heroic scale" to be durable. The products are meant to be handled often, and thin joints and fine parts such as gun barrels and blades would quickly break if they were made to scale.

**B.  Space Marine Shoulder Pad Shape and Size**

35.     In many ways, the general shape of the Games Workshop Space Marine shoulder pad (identified in the attached Exhibit A chart at product entries # 126, 137-141, 146-157, and 163) has been around for hundreds of years. Armorers long ago identified what is roughly a quarter of a sphere as being one of the best ways to protect and cover the shoulders, and this shape can be seen in pauldrons dating back to the 15th century. More recently, those same shapes used by historical armorers have been utilized by science fiction designers. For instance, most people are familiar with the "Storm Trooper" armor from the 1980 movie *Star Wars: The Empire Strikes Back*, from which the Games Workshop shoulder pad is clearly derived:





**AT-AT Driver Armor, The Empire Strikes Back (1980)**                               **GW Shoulder Pad, Exhibit A, Product Entry #126**

      36.    The use of disproportionately large shoulder pads also predates both the Games Workshop products listed as New Allegedly Infringed Works as well as *any* Games Workshop Space Marine product with shoulder pads. For instance, in the 1979 movie *Alien*, characters wore armored space suits with shoulder pads nearly the size of the actors' heads in order to show some level of durability:

13



**Nostromo Environmental Armor, Alien (1979)**

37. The 1970s science fiction magazine *Heavy Metal* also predates Games Workshop's Warhammer 40K and shoulder pad products and, in particular, one strip called Arzach frequently featured graphic elements that were incorporated into Games Workshop designs, including oversized shoulder pads:





**Arzach, Jean 'Moebius' Giraurd (1973)**          **The Long Tomorrow, Jean 'Moebius' Giraurd (1975)**

38. Various comic book characters published in the 1980s, before the creation of Games Workshop's New Allegedly Infringed Work shoulder pad products, were often styled after medieval knights with large shoulder pads. For example, the Marvel Comic book character

14

Michael Devlin wore large pauldrons as part of his costume, which is very similar to the shape and proportions of the shoulder pad on Games Workshop's Space Marine figures:




**Michael Devlin, Marvel Comics (1988)**



**Games Workshop Space Marine, Ex. A, Product Entry #126**

39.    The work of Robert Heinlein also provided an abundant source of pre-existing references for the Games Workshop Space Marine, including with respect to large shoulder pads:





15

Robert Heinlein (1980)                    Robert Heinlein (1987)

40.    In addition, Dreadstar was a popular science fiction comic book series produced by Marvel Comics in the early 1980s. It follows the adventures of a group of characters who often face armored enemies, robots and cyborgs, many of whom show the various armored shoulder pad elements now claimed by Games Workshop:





Dreadstar and Company #1 Marvel Comics (1985)          Games Workshop shoulder pad, Ex. A, Product Entry #126

41.    One of the more popular series from 1980s anime also featured disproportionately large, rounded shoulder pads, both on the robot vehicles and in armor worn by the characters in the movies and comic books:





Armored Trooper VOTOMS (1983)          Games Workshop shoulder pad, Ex. A, Product Entry #126

42. Disproportionately large shoulder pads have continued to be a staple of science fiction designers. In particular, the 2004 science fiction movie *Chronicles of Riddick* used armor with a variety of large shoulder pads and rather intricate ornamentation:



Lord Marshall, General Vaako and Necromonger Armors, Chronicles of Riddick (2004)

43. In sum, the shape and design—particularly the disproportionately large dimensions—of the Games Workshop shoulder pad products claimed in the New Allegedly Infringed Works can be found in numerous pre-existing historical, medieval, cinematic, and science fiction sources, and is a common element in the science fiction genre. Not only do many of the pre-existing sources outlined in this report and attached in Exhibit B predate the given date of creation for the Games Workshop New Allegedly Infringed Works, many of these sources predate the creation of *any* Games Workshop Space Marine image, period.

**C. Lasguns/Powerpacks**

44. Two of Games Workshop New Allegedly Infringed Works (Exhibit B, product entries # 128 and 158) include a "lasgun" and/or "powerpack." However, the elements therein are clearly derived from pre-existing sources.

45. Laser weapons that are entirely powered or whose power is boosted by external, back-worn power packs are a science fiction staple. Found across a variety of different media,

examples of powerpacks may be found in films such as 1984's *Ghostbusters* and in the artwork and text of the space-based RPG *Traveller*.  Additional pre-existing examples appear below:



Hentz, Dick. Space mercenary. Mercenary. Designers' Workshop (1978)

Keith, William H.. Space Mercenaries. "Broadsword Class Mercenary Cruisers." (1980)

46.     As another example, in 1982, Hasbro introduced the Laser Rifle Trooper.  This figure featured a laser rifle connected with a flexible cable to a power pack worn on the back of the figure, much like the Games Workshop products at issue:



**Flash (Laser Rifle Trooper), GI Joe, Hasbro (1982)**

47.     To some degree, powerpacks may also be said to have a parallel origin in the world of actual military research and development:



Lessig, Allan. "When Will they Issue the Laser Rifle?" Military Times (7 Oct. 2011)Lessig writes:

> I came across this 1964 archive photo on the Associated Press showing a demo of a "Laser Rifle" that promised to be a weapon of the near future for the Army. Notice the not-so-small power supply the soldier would need carry to power the laser. I guess they are still working out the bugs on this one.

> Harold Blodgett, Laser project officer of the Army Material Command, Washington, D.C., demonstrates the use of the laser, a word coined from the first

letters of Light Amplification by Stimulated Emission of Radiation. The power pack for the instrument is at lower left. Blodgett staged the demonstration at a press conference at the Frankford Arsenal in Philadelphia, March 6, 1964. Eventually the laser source will have applications of importance to the Army, possibly as a weapon.

48.     Laser rifles in the science fiction role-playing game *Traveller*, developed by GDW in the late 1970s, also utilize power packs that were worn on the back or hip for powering pistols, rifles and other energy weapons.  And more specifically, the angled weapon tip of the Games Workshop lasgun powerpack and other allegedly infringed products such as the lascannons and assault cannons is derivative of pre-existing works such as *Traveller*:



Barger, Bob. Advanced Powered Battle Armor. "Advanced Powered Battle Armor." The Journal of the Travellers' Aid Society (1979)

49.    Additional examples of pre-existing images of weapons with slanted muzzles published in the 1980s are reproduced below:



 0 Ultrawarrior
Task Force Games (1981)



SECS Troopers, Metal Magic (1988)



PBR-10, The Mechanoid Invasion
Palladium Books (1981)



Laser Eraser, Warrior (1982)

50.    In addition to various fictional characters, the slanted weapon barrel has entered the public mind through early video game controllers.  Sega and Nintendo both utilized a diagonal muzzle on their respective light guns:



NES Zapper (1984)                    Sega Light Phaser (1986)

**D. Other Weapons Claimed as Games Workshop New Allegedly Infringed Works**

51.     Games Workshop Assault Cannons or Lascannons (Ex. B, product entries # 130 and 131) are little more than heroic scale gatling guns, mini guns or other comparable multi-barreled weapons.  There are dozens of pre-existing real world examples, as well as uses in movies, comic books, games and on other miniatures, including:

  

GAU-17/A, In service since 1963          Predator (1987)

52.     The Games Workshop "flamers" or "meltaguns" (Ex. B, product entry # 134)  are largely similar in appearance and are derived from pre-existing sources. Flame throwers and other heat related-weapons and tools have had similar designs for decades.  World War II flame throwers, for instance, often featured a dual canister muzzle as seen in the ROKS-2.  The outer canister had no holes, while the inner canister had vent holes, much like the Games Workshop "meltgun":

22





**Soviet ROKS-2 flamethrower**

**Games Workshop Leman Russ Demolisher with meltgun/multi-melta, Ex. B, product entry #134**

53.     Games Workshop flame and heat weapons are also derivative of many pre-existing science fiction works, such as:





**Robert Heinlein (1986)**

**Science Fiction Analog (1976)**

54.     Vent holes in heat weapons and other products claimed by Games Workshop can be seen in many pre-existing flamethrowers, including in the *Alien* movies – making an appearance in both the 1979 and 1986 movies:



Aliens (1986)

55.    Flamethrowers featuring a muzzle with circular vents also featured prominently in the 1982 movie, *The Thing*:



The Thing (1982)

56.    Games Workshop "boltguns" (Ex. B, product entries # 126, 131, 134) also do not substantively depart from pre-existing sources. The heroic scale causes various aspects of the weapons to be exaggerated.  In particular, barrels and the stock are disproportionately larger than the rest of the weapon:



**$tar Corp$, Heavy Troopers, Lance & Laser (1992)**



**Games Workshop Heavy Bolter, Ex. B, product entry # 134**




**Mutant Chronicles Warzone(1994)**



**Science Fiction Analog (1974)**



**Robert Heinlein (1987)**

## OPINIONS AND BASIS FOR OPINIONS

57.    The opinions contained herein are based on my personal knowledge, education, and experience in the fields of English, Literature, Medievalism, Religion and the Arts, and Science Fiction. The opinions are also based on my research and investigation related to this case. The materials on which I have formed the basis of my opinion are referenced in this report and/or the exhibits thereto and/or have been produced as documents Bates labeled CHS_EXPERT00000001-CHS_EXPERT00001790 and CHS00043723-870.

**COMPENSATION**

58.     I have provided my services as an expert witness *pro bono* in this case. I am being reimbursed for any costs and expenses I incur.

**SUPPLEMENTAL OPINIONS**

59.     In my original expert report and during my deposition, I made note of certain information that Games Workshop had not yet produced that I would have found helpful to know in forming my opinions.  Specifically, and as I noted at my deposition, I did not know what design elements or choices Games Workshop claimed were unique or similar about its products at the time my original report was written.  *See* Grindley Dep. Tr. 348:4-9, 349:13-350:3.  Games Workshop often simply wrote "Whole Set" in its New Products Claim Chart to describe what elements of its products were infringed by Chapterhouse, and it was impossible for me to gather what that meant.  *Id.* at 348:10-21.  As I explained, "If Games Workshop had specified the design elements that it found to be infringing, my report would have taken a substantially different shape."  *Id.* at 22-349:5.

60.     I understand that Chapterhouse subsequently deposed Alan Merrett, whose responsibilities include being the "final authority" at Games Workshop about enforcement of Games Workshop's intellectual property.  Merrett Dep. Tr. at 3:18-25.  I have reviewed Mr. Merrett's deposition in which he identified many of the purported similarities between Games Workshop's and Chapterhouse's products.  I disagree with almost all of Mr. Merrett's assessments, particularly his common refrain that Chapterhouse has copied a nebulous "general flavor, theme, [and] style" of Games Workshop's products.  Merrett Dep. Tr. 14:7-8.  At the level of abstraction that GW has a "general flavor" or "universe," the same components of that

universe are found in other science fiction stories, tropes, and games, as I discussed in my original report and at my deposition.

61. With the benefit of Mr. Merrett's deposition, I now can and have identified a number of design differences between Games Workshop's and Chapterhouse's products that Games Workshop appears to believe are non-significant, and for which I disagree. I have amended my chart at Exhibit B to this report to specifically identify some of these design elements.

62. Of course, I have not and cannot list every similarity or dissimilarity between the Chapterhouse and Games Workshop product. As I explained in my deposition, this would be a "reductio ad absurdum in that at what point do we therefore say that we do not find insignificant similarities? For example, to go into that level of detail, it would presuppose I would go into a further level of detail in suggesting that both figures appear to be wearing fabric or that both figures appear to be wearing boots and that these boots have soles or that these boots have laces, so I believe that this question is not something that rationally can be answered." Grindley Dep. Tr. at 57:24-58:11. As I further explained, the best way to assist a jury in identifying similarities between the products is my use of the chart. *Id.* 55:3-6.

63. I further noted in my original expert report that "I believe reviewing any materials that Games Workshop product designers had access to during the creation and development of the New Allegedly Infringed Works will be important to my analysis and expert opinion." I understand that Chapterhouse has subsequently inspected the reference materials at Games Workshop's studios. Based on this inspection, I understand that Games Workshop makes available hundreds of non-Games Workshop reference materials to the designers in its studios. As I expected, many of these references contain imagery from medieval (as examples,

CHS00043826, -831, -851), heraldic (CHS00043824, -825, -839, -868), military (CHS00043785, -817), illustrative (CHS00043827, -840, -848), and science fiction sources (CHS00043768, -843). Notably, there are several works I included in Exhibit B of my original report as likely references or sources for design elements in Games Workshop's New Allegedly Infringed Works that were then discovered at the Games Workshop studios.

**POSSIBLE FURTHER REVISIONS OR SUPPLEMENTATIONS TO ANALYSIS AND OPINIONS**

64.     This report represents my opinions to date regarding the matters set forth above. I understand that Chapterhouse has sought and Games Workshop may produce additional materials, including but not limited to information regarding the source of its reference materials. Thus, I reserve the right to modify or supplement my opinions as additional information becomes available to me. I may also be called upon to provide expert testimony bearing upon any proofs offered by Games Workshop in this litigation.

65.     I may assist in the development of demonstration materials to support and explain my opinions at trial. I may use any of the materials referred to or cited in this report, including any of the documents and other information reviewed by me or made available to me to support my opinions. At trial, I may convey my testimony using images or other demonstratives.

Date: March 13, 2013_____                    /s Carl Grindley_____