# EXHIBIT

# 9

1         IN THE UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF ILLINOIS

3             EASTERN DIVISION

4 GAMES WORKSHOP LIMITED,    )

5            Plaintiff,   )

6     vs.                ) Civil Action

7 CHAPTERHOUSE STUDIES LLC   ) No. 1:10-cv-08103

8 and JON PAULSON d/b/a     )

9 PAULSON GAMES,          )

10           Defendants. )

11

12      The deposition of GARY WOLFE, taken

13 pursuant to the Federal Rules of Civil Procedure of

14 the United States District Courts pertaining to the

15 taking of depositions, taken before PAULINE M.

16 VARGO, a Certified Shorthand Reporter within and

17 for the State of Illinois, C.S.R. No. 84-1573, at

18 Suite 2800, 321 North Clark Street, Chicago,

19 Illinois, on June 28, 2012, at 8:56 a.m.

20

21

22

23

24

```
 1   PRESENT:

 2

 3         FOLEY & LARDNER, LLP
           321 North Clark Street, Suite 2800
 4         Chicago, Illinois  60654
           312.832.4500
 5         BY:  JASON J. KEENER, ESQ.
                jkeener@foley.com
 6
                appeared on behalf of the Plaintiff;
 7

 8         WINSTON & STRAWN, LLP
           101 California Street
 9         San Francisco, California  94111-5894
           415.591.1564
10         BY:  K. JOON OH, ESQ.
                koh@winston.com
11
                appeared on behalf of the Defendant.
12

13   ALSO PRESENT VIA TELEPHONE:

14         GILL STEVENSON, ESQ.
           In-House Counsel, Games Workshop
15

16   REPORTED BY:

17         PAULINE M. VARGO
           C.S.R. No. 84-1573.

18

19

20

21

22

23

24
```

Page 63

1      Q.     Thank you.  Do you express any opinion

2   in your report concerning when Games Workshop first

3   created any of the works at issue?

4      A.     In terms of dates?

5      Q.     In terms of anything.  I didn't see it,

6   so I'm making sure it's not there.

7      A.     No, it's not there.

8      Q.     Did you express any opinion in your

9   report whether Games Workshop's designers designed

10  that work independently or were referring to

11  something else?

12     A.     No.

13     Q.     Do you express anywhere in your expert

14  report an opinion that any of the designers of a

15  particular Games Workshop product were referring to

16  any particular references in creating that product?

17     A.     No.

18     Q.     You don't have any personal knowledge on

19  how Games Workshop created any of its products, do

20  you?

21     A.     No.

22     Q.     Now, I want to turn briefly to

23  Exhibit 104, which is the binder with the images of

24  Chapterhouse products.  Okay?

Page 64

1          Now, you said you referred to that

2    binder in forming your opinions expressed in your

3    report, correct?

4          A.    Yes.

5          Q.    And you relied on certain of those

6    images in forming your opinion?

7          A.    Yes.

8          Q.    Do you identify in your expert report

9    any image from any of the Chapterhouse products?

10         A.    No.

11         Q.    Is there any way for me looking at your

12    expert report to know which Chapterhouse products

13    you relied upon in forming your opinion?

14         A.    No.

15         Q.    So there is no way for me to check your

16    work on that either?

17         A.    No.

18         Q.    Do you express an opinion anywhere in

19    your expert report for the Chapterhouse products

20    what source materials were used to design those

21    products?

22         A.    No.

23         Q.    Do you express any opinion in your

24    expert report on whether or not Chapterhouse copied

Page 65

1   any of the Games Workshop designs?

2          A.    No.

3          Q.    Are you expressing any opinion whether

4   Chapterhouse referred to any of the materials you

5   referenced in your expert report in coming up with

6   their designs?

7          A.    No.

8          Q.    Did you speak to any Chapterhouse

9   designers?

10         A.    No.

11         Q.    And you didn't review any of their

12  transcripts, correct?

13         A.    I don't believe so.

14         Q.    You didn't review any of their

15  development documents or e-mails?

16         A.    No.

17         Q.    Do you have any personal knowledge on

18  how Chapterhouse designed its products?

19         A.    No.

20         Q.    What's your understanding as to the

21  copyright issues in this case?

22         MR. OH:  Objection.  Before you answer, to the

23  extent that any answer he provides would reveal any

24  communication with the attorneys, I'd instruct him

Page 75

1    imagery, however it's conveyed, is similar to some

2    prior work you found?

3         A.    Similar, yes.

4         Q.    Do you identify in your report those

5    Games Workshop products that you are alleging are

6    similar to a prior work?

7         A.    In terms of design, no.

8         Q.    In terms of anything?

9         A.    In terms of terminology, we have already

10   established that.

11        Q.    Except for terminology?

12        A.    Except for terminology.

13        Q.    Do you identify anywhere in your report

14   the Games Workshop products that you think are

15   similar to something in prior works?

16        A.    I do not.

17        Q.    So there is no way for me to test that

18   conclusion?

19        A.    No.

20        Q.    Have you come to an opinion that you

21   express in your report on a general theme or

22   category you place Games Workshop products into?

23        A.    Yes.

24        Q.    And what would that be?

1          A.      Essentially it is a future war scenario.

2          Q.      Are you expressing any opinion that

3     there are certain elements or designs that are very

4     common in a future war scenario?

5          A.      Yes.

6          Q.      And in your report do you identify what

7     all those elements or designs are?

8          A.      Some of them.

9          Q.      Which ones do you identify in your

10    report?

11         A.      Space marines, for example.

12         Q.      Anything else?

13         A.      Terminators.

14         Q.      Anything else?

15         A.      I would have to look.

16         Q.      Okay.

17         A.      Land raider.

18                 I think those are the specific images

19    referred to.

20         Q.      My question wasn't the images referred

21    to.  My question is, you said Games Workshop

22    products fit this future war scenario theme.

23         A.      Um-hmm.

24         Q.      Yes?

Page 77

1      A.    Yes.

2      Q.    And you said that there are certain

3  design elements that are very common or widely used

4  in that theme, future war scenarios?

5      A.    I did not say design elements.  I said

6  elements.

7      Q.    Okay.  Are there certain elements that

8  are very commonly found in future war scenarios?

9      A.    Yes.

10     Q.    Do you identify in your report what

11 those very common elements are?

12     A.    I just mentioned space marines,

13 terminators, aliens, weapons.

14     Q.    Do you identify in your report any other

15 elements that you believe are very common in a

16 future war scenario?

17     A.    I did not make a list of all the

18 elements common to future war scenarios.

19     Q.    Besides the one you just identified, did

20 you identify in your report any other common

21 elements you believe exist in the future war

22 scenario?

23     A.    No, I don't believe so.

24     Q.    Were there any other elements you were

1  thinking about in your head for the future war

2  scenario that you believe were very common that you

3  relied upon in forming your opinion?

4      MR. OH:  Objection, vague and ambiguous.

5  BY THE WITNESS:

6      A.    You are asking me what was in my head

7  that I relied upon?

8  BY MR. KEENER:

9      Q.    Yeah.  You just said you didn't write it

10  down.

11      MR. OH:  Objection, argumentative, misstates

12  prior testimony.

13  BY MR. KEENER:

14      Q.    Is that right, you didn't write it down

15  in your report?

16      A.    Well, I wrote the --

17      Q.    So my question is, did you have other

18  things in your mind to form your opinions that you

19  didn't write down?

20      A.    I had an entire tradition of science

21  fiction future war scenarios going back to 1870.

22      Q.    Granted.  That's not my question.

23          My question is, I'm trying to figure out

24  what you believe are the widely common elements of

Page 79

1  the future war scenario, and you said you -- let me

2  ask the question -- and you expressed in your

3  report five of them.

4          Are there other elements -- and this is

5  a yes-or-no question -- of a common war scenario

6  that you relied upon in forming your opinion that

7  you didn't identify in your report?

8      MR. OH:  Objection, vague and ambiguous.

9  BY THE WITNESS:

10     A.    Probably.

11 BY MR. KEENER:

12     Q.    You don't know?

13     A.    I would have to look at the report to

14 see exactly if I -- I mentioned, for example,

15 robots, battleship, battle suits, weapons, tanks,

16 spacecraft.  Those are all common to future war

17 scenarios.

18     Q.    Any others that you identified in your

19 report?

20     A.    I don't know if I mentioned aliens, but

21 that would certainly be included.

22     Q.    Anything else?

23     A.    Aliens, no.  High-tech battle armor.

24     Q.    Anything else?

Page 80

1      A.    I don't believe so.

2      Q.    Were there any other -- again it is a

3  yes-or-no question -- widely common elements that

4  you believe in the future war scenario that you

5  relied upon in forming your opinion that you did

6  not express in your report?

7      MR. OH:  Objection, vague and ambiguous.

8  BY THE WITNESS:

9      A.    I don't believe so.

10  BY MR. KEENER:

11     Q.    So it's fair for me to take the

12  common -- the future war scenario and say what are

13  the common elements of the future war scenario, and

14  the list would be spacecraft, tanks, battle suits,

15  robots, space marines, terminators, land raiders,

16  aliens and weapons.  Would that be fair for me?

17     A.    To say that's a complete list of the

18  entire history of --

19     Q.    That you relied upon to form your

20  opinions.

21     A.    In terms of looking at these images and

22  comparing it to the future war scenario, that is

23  correct.

24     MR. KEENER:  Now is a good time to take a

Page 81

```
 1    break.
 2                    (WHEREUPON, a recess was had at
 3                    10:22 a.m. until 10:29 a.m.)
 4    BY MR. KEENER:
 5         Q.    Welcome back.
 6         A.    Thank you.
 7         Q.    During the break did you discuss with
 8    counsel for Chapterhouse any of the questions and
 9    answers you have given?
10         A.    No.
11         Q.    I want you to turn now to Page 4 of your
12    report, Plaintiff's Exhibit 102.  It begins with
13    your analysis section.  Do you see that?
14         A.    Yes.
15         Q.    And starting with the second paragraph,
16    it reads, "More than any other popular genre,
17    science fiction has given rise to a thriving
18    worldwide subculture of fandom which has promoted
19    and extended this dialogue into a pattern of
20    consensus iconography comparable to that of folk
21    culture."
22              Do you see that?
23         A.    Yes.
24         Q.    Is that your opinion?
```

Page 105

1    A.    I have no idea what a jury would do.

2    BY MR. KEENER:

3    Q.    I'm not asking what a jury would do.

4    Would you think it would be helpful to a jury if

5    they are looking at a weapon other than a halberd,

6    is your opinion going to assist them in any way in

7    determining whether that Games Workshop weapon is

8    found in the prior works?

9    MR. OH:  Objection, same set.

10   BY THE WITNESS:

11   A.    The prior works that you are referring

12   to is this complex tradition we've talked about.

13   To the extent that the figurines, as I'm calling

14   them -- I don't know what you call them, models,

15   toys, whatever -- are essentially illustrations of

16   an imaginary future universe which matches the

17   future war scenarios as we've discussed, then any

18   image that fits into that scenario would be

19   relevant.

20   BY MR. KEENER:

21   Q.    Right, but you agree that there can be

22   things in the future war scenario that Games

23   Workshop makes that are original?

24   A.    Correct.

1      MR. OH:  Objection.

2  BY MR. KEENER:

3      Q.    So if a jury is sitting there trying to

4  determine whether or not this particular weapon is

5  original or part of that future war scenario common

6  elements and it's not a halberd, does your opinion

7  give them any help in making that decision?

8      MR. OH:  Objection, the same set of

9  objections.

10  BY THE WITNESS:

11     A.    I don't know.

12  BY MR. KEENER:

13     Q.    Well, how could it?

14     MR. OH:  Objection, argumentative.

15  BY THE WITNESS:

16     A.    I don't know what a jury will be looking

17  for.

18  BY MR. KEENER:

19     Q.    Okay.  Is there any information in your

20  report that you can point to that would assist a

21  jury in determining whether another weapon that's

22  accused is part of that common iconography of the

23  future war story as opposed to an original element

24  that Games Workshop designed?

Page 107

1        MR. OH:  Objection, same set.  I'm going to

2    add vague and ambiguous at this point.

3    BY THE WITNESS:

4        A.    I don't know.

5    BY MR. KEENER:

6        Q.    My question is, can you point to

7    anything in your report that would assist in that

8    determination?

9        MR. OH:  Same objections.

10   BY THE WITNESS:

11       A.    Yes.

12   BY MR. KEENER:

13       Q.    Please identify the portions of your

14   report that would help someone identify whether a

15   weapon that's not a halberd is either a part of the

16   future war scenario iconography or original to

17   Games Workshop?

18       A.    I would point to the second full

19   paragraph on Page 5, which refers to space marines.

20       Q.    That's not a weapon.

21       A.    No.

22       Q.    Okay.  My question was a weapon.

23       A.    Oh, okay.  Excuse me.

24       Q.    Assume they are looking at a Games

Page 108

1   Workshop weapon and they are tasked with trying to

2   figure out is this part of the common war scenario

3   iconography or something Games Workshop originally

4   developed.  Can you point to anything in your

5   report that would assist them in that

6   determination?

7        A.    Regarding a weapon, no.

8        Q.    How about any figure other than a space

9   marine or a terminator?

10       A.    A land raider.

11       Q.    Vehicles are separate.  Apart from

12  vehicles.

13       A.    Oh, okay.  All right.

14       Q.    We are going to individuals, whether

15  it's humanoid or other.  Okay.  Is there anything

16  in your report that would help them determine

17  whether something is in the prior works or a Games

18  Workshop original if it's not a space marine or a

19  terminator?

20       A.    I don't believe so.

21       Q.    Looking at any vehicle other than a land

22  raider, is there anything in your report that would

23  help them determine if that vehicle is part of the

24  prior works or a Games Workshop original?

Page 109

1      A.    No.

2      Q.    Besides those ones we just talked about,

3  is there some other product we are looking at from

4  Games Workshop, is there anything in your report

5  that would assist them in determining whether

6  that's part of the future war scenario iconography,

7  in prior works or something Games Workshop

8  original?

9      A.    Probably not.

10     Q.    So it's fair to say that your report can

11 only assist the jury in those specific Games

12 Workshop products you identify?

13     MR. OH:  Objection, again calling for a legal

14 opinion.

15 BY THE WITNESS:

16     A.    And I don't know the answer to that in

17 terms of what would assist a jury.

18 BY MR. KEENER:

19     Q.    But sitting here, you can't identify any

20 other portions of your report that would assist a

21 jury in any other products other than the ones you

22 specifically identify?

23     MR. OH:  Again, same objection.

24 BY THE WITNESS:

                                                    Page 110

1       A.    I don't know.  I can't speculate on what

2   would or would not assist a jury.

3   BY MR. KEENER:

4       Q.    I'm asking can you point to anything you

5   think would assist a jury in determining whether

6   something is from the prior works or a Games

7   Workshop original?

8       MR. OH:  Objection, same.

9   BY THE WITNESS:

10      A.    In terms of referring to specific images

11  in this folder, the only ones that are referred to

12  in my document would be relevant to your question.

13  BY MR. KEENER:

14      Q.    That's not my question.

15      A.    What is your question again?

16      Q.    The question was, is there anything you

17  can point to in your report that would assist a

18  jury in determining whether something is part of

19  prior works or a Games Workshop original other than

20  the specific products you identified in your

21  report?

22      A.    Probably not.

23      Q.    Let's assume for the sake of the

24  question that you are right and that one of the

1    BY MR. KEENER:

2         Q.    Okay.  You don't know what those

3    creatures are, do you, that you are referring to as

4    the Kraken and Behemoth?

5         A.    I don't know what they are in terms of

6    what they are supposed to represent, whether they

7    are aliens, whether they are robots.

8         Q.    Do you have any idea if they are at

9    issue in this case?

10        A.    No.

11        Q.    And those are the creatures you compare

12   to the toy Roboraptor at the back of your report?

13        A.    Yes, that's correct.

14        Q.    And if those creatures are not at issue

15   in this case, the toy roboraptor and your analysis

16   of that is superfluous?

17        A.    I don't believe so.

18        Q.    Let's turn back to your report on

19   Page 6.  In the second full paragraph you start

20   out, "Generally the Games Workshop universe is an

21   amalgam of iconography freely borrowed from a

22   number of distinct and identifiable traditions."

23              Do you see that?

24        A.    Correct, yes.

Page 171

1    Q.    When you say "freely borrowed," are you

2   intending to express an opinion that Games Workshop

3   copied from any particular reference in creating

4   its products?

5        MR. OH:  Objection to the extent the question

6   calls for a legal opinion.

7   BY THE WITNESS:

8        A.    No.

9   BY MR. KEENER:

10       Q.    Are you expressing any opinion that they

11  referred to any of the items you list in the rest

12  of the paragraph in creating their products?

13       MR. OH:  Same objection.

14  BY THE WITNESS:

15       A.    I have no knowledge of what the Games

16  Workshop -- Games Workshop designers refer to or

17  did not refer to.

18  BY MR. KEENER:

19       Q.    So when you say Games Workshop was

20  freely borrowing from the following items, what do

21  you mean?

22       A.    This is what I mean by this tradition of

23  iconography, which is freely borrowed by

24  filmmakers, television producers, artists, writers,

Page 172

1    costumers.  By "freely borrowed," I simply mean

2    that it is a widespread, widely familiar tradition

3    to most people involved in any aspect of science

4    fiction or fantasy.

5         Q.    And we are back to the iconography at

6    issue that you have identified, was that list we

7    talked about prior to the break, including tanks

8    and aliens and spaceships and weapons?

9         A.    That's correct.

10        Q.    And it is limited to that list?

11        A.    You have limited it to that list.

12        Q.    You in your report have limited to it

13   that list, right?

14        A.    Well, I've -- that was my list.

15        Q.    Right, and I asked were those the only

16   ones -- iconography I think is the list of eight I

17   read to you -- that you relied in any way in

18   forming the opinions you are expressing, and I

19   think you said yes.

20        A.    Those are the only ones that are in my

21   report.

22        Q.    And those are the only ones you relied

23   upon in forming your opinions in this case?

24        A.    In this case.