# Exhibit L

## Sarah Kalemeris

| | |
|---|---|
| **From:** | Julianne M. Hartzell |
| **Sent:** | Thursday, February 21, 2013 1:52 PM |
| **To:** | JMoskin@foley.com; JKeener@foley.com |
| **Cc:** | Golinveaux, Jennifer A.; Sarah Kalemeris; Cooper, Bryce A. |
| **Subject:** | Games Workshop v. Chapterhouse - Trademark infringement allegations |

Counsel,

During the 30(b)(6) of Chapterhouse yesterday, you stated that the Games Workshop Third Supplemental Response to Defendant Chapterhouse Studios' Interrogatory No. 4 identifies every trademark (registered or unregistered) asserted by Games Workshop in this action.

As you know, with respect to the second phase of the case, the Court ordered Games Workshop to provide a claim chart identifying every trademark and copyright asserted on January 11. Games Workshop served a claim chart on January 14, however, there are additional trademarks asserted in that claim chart that are not included in Interrogatory No. 4. In view of Sunday's 30(b)(6) deposition, please confirm by the end of the day today that Games Workshop has now withdrawn trademark infringement allegations as to any mark not included in the Third Supplemental Response to Interrogatory No. 4 and in particular, with respect to the following marks that do not appear in the Supplemental Interrogatory Response:

- Iconoclast

- plasma cannon (we do note that Plasma is asserted in the supplemental interrogatory, but are asking specifically for confirmation that plasma cannon has been withdrawn)

- assault cannon

- lascannon

- heavy weapon

- heavy flamer

- power claw

- dark elf

Further, neither the interrogatory response nor the claim chart ordered by the court identifies the specific trademark that you contend constitutes the icons listed on p. 5 of the interrogatory response. You confirmed for Mr. Villacci during the deposition that you envision those trademarks to be actually icon images. Please immediately identify images of each of the icons that you contend constitute asserted trademarks that have allegedly been infringed.

Sincerely,
Julianne Hartzell

# Exhibit M

## Sarah Kalemeris

| | |
|---|---|
| **From:** | Julianne M. Hartzell |
| **Sent:** | Friday, February 22, 2013 1:12 PM |
| **To:** | JMoskin@foley.com; JKeener@foley.com |
| **Cc:** | Golinveaux, Jennifer A.; Sarah Kalemeris; Cooper, Bryce A. |
| **Subject:** | RE: Games Workshop v. Chapterhouse - Trademark infringement allegations |

Counsel,

We have received no response to my email below regarding your inconsistent identification of the alleged trademarks that you contend are infringed in this case. Although your failure to respond to my emails is not surprising or new, with discovery closing in three days, it is unacceptable that you are unable even to provide a complete list of the marks (including images for the alleged "icons") that you are asserting. This should not be a complicated request and the court has already ordered Games Workshop to identify specifically those marks that are asserted (which was to be completed on January 11). We are entitled to this information and expect to receive it in advance of Games Workshop's 30(b)(6) deposition.

Sincerely,
Julianne Hartzell

**From:** Julianne M. Hartzell
**Sent:** Thursday, February 21, 2013 1:52 PM
**To:** 'JMoskin@foley.com'; JKeener@foley.com
**Cc:** 'Golinveaux, Jennifer A.'; Sarah Kalemeris; Cooper, Bryce A.
**Subject:** Games Workshop v. Chapterhouse - Trademark infringement allegations

Counsel,

During the 30(b)(6) of Chapterhouse yesterday, you stated that the Games Workshop Third Supplemental Response to Defendant Chapterhouse Studios' Interrogatory No. 4 identifies every trademark (registered or unregistered) asserted by Games Workshop in this action.

As you know, with respect to the second phase of the case, the Court ordered Games Workshop to provide a claim chart identifying every trademark and copyright asserted on January 11. Games Workshop served a claim chart on January 14, however, there are additional trademarks asserted in that claim chart that are not included in Interrogatory No. 4. In view of Sunday's 30(b)(6) deposition, please confirm by the end of the day today that Games Workshop has now withdrawn trademark infringement allegations as to any mark not included in the Third Supplemental Response to Interrogatory No. 4 and in particular, with respect to the following marks that do not appear in the Supplemental Interrogatory Response:

- Iconoclast

- plasma cannon (we do note that Plasma is asserted in the supplemental interrogatory, but are asking specifically for confirmation that plasma cannon has been withdrawn)

- assault cannon

- lascannon

- heavy weapon

- heavy flamer

- power claw

- dark elf

Further, neither the interrogatory response nor the claim chart ordered by the court identifies the specific trademark that you contend constitutes the icons listed on p. 5 of the interrogatory response. You confirmed for Mr. Villacci during the deposition that you envision those trademarks to be actually icon images. Please immediately identify images of each of the icons that you contend constitute asserted trademarks that have allegedly been infringed.

Sincerely,
Julianne Hartzell

# Exhibit N

## Sarah Kalemeris

| | |
|---|---|
| **From:** | Julianne M. Hartzell |
| **Sent:** | Friday, February 22, 2013 4:02 PM |
| **To:** | JMoskin@foley.com; JKeener@foley.com |
| **Cc:** | JGolinveaux@winston.com; Sarah Kalemeris; BCooper@winston.com |
| **Subject:** | RE: Games Workshop v. Chapterhouse - Trademark infringement allegations |

So you will be serving a corrected interrogatory response with the alleged dates of first use and icon images today?

JMoskin@foley.com wrote:

Apologies for the delay getting back to you. I wanted to discuss this with my client.

Although we would concede that some of these terms have been used in other contexts, in the context of table-top miniatures, we believe the names are inherently distinctive and/or have come to be associate with Games Workshop.

Jonathan

---

**From:** Julianne M. Hartzell [mailto:jhartzell@marshallip.com]
**Sent:** Friday, February 22, 2013 2:12 PM
**To:** Moskin, Jonathan; Keener, Jason J.
**Cc:** Golinveaux, Jennifer A.; Sarah Kalemeris; Cooper, Bryce A.
**Subject:** RE: Games Workshop v. Chapterhouse - Trademark infringement allegations

Counsel,

We have received no response to my email below regarding your inconsistent identification of the alleged trademarks that you contend are infringed in this case. Although your failure to respond to my emails is not surprising or new, with discovery closing in three days, it is unacceptable that you are unable even to provide a complete list of the marks (including images for the alleged "icons") that you are asserting. This should not be a complicated request and the court has already ordered Games Workshop to identify specifically those marks that are asserted (which was to be completed on January 11). We are entitled to this information and expect to receive it in advance of Games Workshop's 30(b)(6) deposition.

Sincerely,
Julianne Hartzell



**MARSHALL**
**GERSTEIN**
**BORUN** LLP

Julianne M. Hartzell
Marshall, Gerstein & Borun LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL 60606-6357
Direct: (312) 474-6625
Firm: (312) 474-6300
Fax: (312) 474-0448
jhartzell@marshallip.com
www.marshallip.com

The material in this transmission may contain confidential information. If you are not the intended recipient, any disclosure or use of this information by you is strictly prohibited. If you have received this transmission in error, please delete it, destroy all copies and notify Marshall, Gerstein & Borun LLP by return e-mail or by telephone at (312) 474-6300. Thank you.

**From:** Julianne M. Hartzell
**Sent:** Thursday, February 21, 2013 1:52 PM
**To:** 'JMoskin@foley.com'; JKeener@foley.com
**Cc:** 'Golinveaux, Jennifer A.'; Sarah Kalemeris; Cooper, Bryce A.
**Subject:** Games Workshop v. Chapterhouse - Trademark infringement allegations

Counsel,

During the 30(b)(6) of Chapterhouse yesterday, you stated that the Games Workshop Third Supplemental Response to Defendant Chapterhouse Studios' Interrogatory No. 4 identifies every trademark (registered or unregistered) asserted by Games Workshop in this action.

As you know, with respect to the second phase of the case, the Court ordered Games Workshop to provide a claim chart identifying every trademark and copyright asserted on January 11. Games Workshop served a claim chart on January 14, however, there are additional trademarks asserted in that claim chart that are not included in Interrogatory No. 4. In view of Sunday's 30(b)(6) deposition, please confirm by the end of the day today that Games Workshop has now withdrawn trademark infringement allegations as to any mark not included in the Third Supplemental Response to Interrogatory No. 4 and in particular, with respect to the following marks that do not appear in the Supplemental Interrogatory Response:

- Iconoclast

- plasma cannon (we do note that Plasma is asserted in the supplemental interrogatory, but are asking specifically for confirmation that plasma cannon has been withdrawn)

- assault cannon

- lascannon

- heavy weapon

- heavy flamer

- power claw

- dark elf

Further, neither the interrogatory response nor the claim chart ordered by the court identifies the specific trademark that you contend constitutes the icons listed on p. 5 of the interrogatory response. You confirmed for Mr. Villacci during the deposition that you envision those trademarks to be actually icon images. Please immediately identify images of each of the icons that you contend constitute asserted trademarks that have allegedly been infringed.

Sincerely,
Julianne Hartzell

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended

for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

# Exhibit O

## Home world

The Black Templars have no single home world, instead they live in their Crusade fleets, upon many battle barges, strike cruisers and other craft such as training vessels and gigantic forgeships. The Black Templars establish Chapter Keeps on every world they conquer or reclaim for the Emperor. The main purpose of the Chapter Keeps is to recruit new Space Marines from the population, and to act as staging posts for mustering the Crusades together. These Chapter Keeps are sizeable, with chambers to accommodate two to three Companies of Space Marines, but are far smaller than the Fortress Monasteries of other Chapters. However, there have been hundreds of Chapter Keeps established over the millennia, some of which are still standing, others which have fallen into ruin and disrepair and are no longer manned.

The High Marshal himself has his own battle barge, the *Eternal Crusader*, and he can travel from Crusade to Crusade lending his military genius and spiritual guidance to those under his command. The *Eternal Crusader* is gigantic, even for a battle barge, having been expanded and refitted over ten thousand years, with extra docking facilities for escort ships, additional launch bays for shuttles and Thunderhawks, as well as accommodation for twice as many Space Marines than a normal battle barge.

## Combat doctrine

The Black Templars have continued in the style of their founder, Sigismund, in preferring close combat to ranged warfare. Face-to-face with his enemy, a Space Marine can earn honour and respect and be sure that his foe is truly vanquished.

This is further emphasised by the fanaticism of Black Templars battle brothers, whose righteous anger makes them impatient and headstrong. They will drive towards the foe relentlessly, their own casualties only serving to spur them on faster, hungry for vengeance on the slayers of their brethren.

As part of their dedication to the Emperor, the Black Templars swear fell oaths of faith and protection. Before a battle, it is customary to renew one of these vows to the Emperor, the type of vow made focusing the thoughts of the Initiates on a particular aspect of their duties, encouraging extreme bravery, ruthlessness or sacred revulsion at the foe.

## Organisation

The Black Templars are a fleet-based Chapter. They are rarely assembled as a Chapter, but instead are divided into a number of Crusades at any one time. Each Crusade is led by a Marshal, while the High Marshal is responsible for monitoring the progress of all the current Crusades.

There usually numbers three or more Crusades at any one time – their history shows that during the Treachery of Dalmark there were as many as fourteen Crusades fighting across the Segmentum Solar. The size of a Crusade can also vary widely, sometimes as few as fifty to one hundred Marines, sometimes the equivalent of several Companies from a Codex Chapter. Only the Black Templars themselves have even the roughest idea how many Black Templars Space Marines are, but it is obvious that they are far more numerous than most conventional Chapters, although dispersed over a much wider area. If certain accounts are taken to be true, then they could even be as strong as five to six thousand Battle-Brethren in total, a force which in the present Imperium would be all but unstoppable if ever gathered in a single place.

The larger Crusades are often broken down by their Marshal into Fighting Companies, led by Sword Brethren given the additional honorific of 'Castellan'. Whether such Companies exist or not, individual squads are



Chapter Approved Access Level: 42 aine

Black Templars. M31

IA ref.
213/i/Personal litany

IA ref.
356.8/i/Chapter icon

Ref. 526.89

Mk.III Crusade pattern
Boltgun with personal
litany markings

Imp. ref. 658/rth/Sword Brethren markings

Mk.IV Storm Bolter

Mk.VI Power fist

Mk.VII Adeptus Astartes Power Armour

Mk.IV Adeptus Astartes Tactical Dreadnought Armour

Thought for the day: You carry the Emperor's will in your touch. With it destroy the shadows.

Imp. ref. 007/495 Codex Retrieval File 29

GW0001632

# Exhibit P

| | |
|---|---|
| **From:** | JMoskin@foley.com |
| **To:** | Cooper, Bryce A. |
| **Cc:** | JKeener@foley.com; Golinveaux, Jennifer A.; "Julianne M. Hartzell"; "Sarah Kalemeris" |
| **Subject:** | RE: GW inspection |
| **Date:** | Wednesday, March 06, 2013 12:19:12 PM |

Sorry, I didn't notice your email yesterday - probably because I have been immersed in the summary judgment motions and pretrial order - but see it now. I asked the client about this over the weekend or on Monday but haven't heard back. I will follow up.

Jonathan

-----Original Message-----
From: Cooper, Bryce A. [mailto:BCooper@winston.com]
Sent: Wednesday, March 06, 2013 1:06 PM
To: Moskin, Jonathan
Cc: Keener, Jason J.; Golinveaux, Jennifer A.; 'Julianne M. Hartzell'; 'Sarah Kalemeris'
Subject: RE: GW inspection

Jonathan,

Can I expect to hear from you today?

Bryce A. Cooper
D: +1 (312) 558-3737
F: +1 (312) 558-5700
http://www.winston.com

-----Original Message-----
From: Cooper, Bryce A.
Sent: Tuesday, March 05, 2013 12:52 PM
To: 'JMoskin@foley.com'
Cc: 'JKeener@foley.com'; Golinveaux, Jennifer A.; 'Julianne M. Hartzell'; 'Sarah Kalemeris'
Subject: RE: GW inspection

Jonathan,

I did not hear back from you yesterday. Are you going to provide the requested index?

Bryce A. Cooper
D: +1 (312) 558-3737
F: +1 (312) 558-5700
http://www.winston.com

-----Original Message-----
From: Cooper, Bryce A.
Sent: Friday, March 01, 2013 12:17 PM
To: 'JMoskin@foley.com'
Cc: JKeener@foley.com; Golinveaux, Jennifer A.; Julianne M. Hartzell; Sarah Kalemeris
Subject: RE: GW inspection

So that it is clear, I am not itching to file anything. I just want to know where those references came from, since I believed I would be touring the studios and did not know otherwise until I showed up. An index seems like a reasonable approach to me.

I will await your response Monday.

Bryce A. Cooper
D: +1 (312) 558-3737
F: +1 (312) 558-5700
http://www.winston.com

-----Original Message-----
From: JMoskin@foley.com [mailto:JMoskin@foley.com]
Sent: Friday, March 01, 2013 12:12 PM
To: Cooper, Bryce A.
Cc: JKeener@foley.com; Golinveaux, Jennifer A.; Julianne M. Hartzell; Sarah Kalemeris
Subject: RE: GW inspection

You acknowledged yesterday that there was a need to meet and confer, yet now you say there is no
need. I am not sure what has changed, but I suppose if you were simply to file a motion it would not
be the first time CH has made a discovery motion in disregard of its meet and confer obligations. But
perhaps more important, if you actually want even an answer to the question you raised, I need to
speak with my client because I have no idea whether GW even has the information you want. As far as
I know, the crates were simply labeled by department, yet I can not get that information today because
Ms. Stevenson is not in the office. She is returning home from Sweden. I spoke with her secretary
earlier today and she was not expected in until Monday.

As for your reference to the notice to inspect, laying aside our standing objections to the notice and the
fact (which I repeated the day before we left for England) that we allowed the inspection to proceed
under protest but simply as an accommodation or compromise that you are now just disregarding, I
would remind you what I said in my previous emails: that an inspection of the workplaces not only
would not have uncovered many or most of the books (which were buried under desks and papers etc
and not at all organized); and that an inspection of the premises would not have yielded the
information you now seek because there are no name tags on the employees' desks. Laying aside the
relevance issues (which have gone entirely unanswered for ten months) your email thus confirms that
CH is seeking additional information not called for by any actual discovery request and is doing so after
the close of discovery.

At any rate, although I would prefer simply to drop the matter, because I think your demands are
contrary to the accommodation we previously reached even to allow the inspection of books to proceed,
since I sense you are just itching to file a motion even in disregard of the meet and confer obligations,
we can resume this discussion once I know if there even is any further information that can be
provided. We are not at this point refusing to answer, I just have no further information.

And finally, to be clear, I do not mean in any way to fault you for taking two days or even three days to
get us the pictures. That is completely understandable and I know I have been swamped this week
catching up on other matters that I have been unable to attend to given the chaotic schedule of the last
three weeks. What I find objectionable is that you now want to hold a gun to our heads without even
giving us a chance to get a response from our client when you took a somewhat more leisurely pace in
producing the underlying information (which I still have not had a chance to review). I can't even begin
to address the full scope of the delays in CH's assembly documents directly responsive to GW's main
discovery requests, where relevance was conceded. You know precisely what I mean so I won't bother
to repeat the full litany, but just to cite the most glaring example, given the more than 40-day-delay
producing Mr. Fiertek's documents (which were subject to a specific prior court order) and given that
Mr. Fiertek didn't even begin to assemble his documents until February, I find this gun-to-the-head
approach a little out of line. While not quite as belated, CH likewise waited three weeks from formal
service of GW's discovery requests (which it had received informally a month before that) even to ask
its designers to assemble documents (doing so on the day after Christmas when little would likely be
done). This too was the subject of a prior specific court order.

At any rate, if there is anything else you think I can answer today, please let me know.

Jonathan

-----Original Message-----

From: Cooper, Bryce A. [mailto:BCooper@winston.com]
Sent: Friday, March 01, 2013 11:25 AM
To: Moskin, Jonathan
Cc: Keener, Jason J.; Golinveaux, Jennifer A.; Julianne M. Hartzell; Sarah Kalemeris
Subject: RE: GW inspection

The pertinent discovery request is the timely-served notice of inspection. I have attached it again for your convenience. Since you refused to allow inspection of that part of GW, I am offering a very reasonable and simple alternative of producing a list of where the materials were taken from. Please simply tell me whether you are going to produce this information or not so we can raise it with the Court if you refuse. You can save your various arguments for then. I think our meet and confer obligation has been met by this long strain of emails.

And please stop telling me I said I would produce the pictures on Tuesday (which was one day after the inspection, when I was on a plane for 9 hours). I did not. I said I would produce them as soon as possible after I returned to the office, and that is what I did.


Bryce A. Cooper
D: +1 (312) 558-3737
F: +1 (312) 558-5700
http://www.winston.com


-----Original Message-----
From: JMoskin@foley.com [mailto:JMoskin@foley.com]
Sent: Thursday, February 28, 2013 7:43 PM
To: Cooper, Bryce A.
Cc: JKeener@foley.com; Golinveaux, Jennifer A.; Julianne M. Hartzell; Sarah Kalemeris
Subject: Re: GW inspection

Just stamping your feet without actually saying anything once again simply confirms your inability to identify either any pertinent discovery request or any relevant issues. After all, this is not a new concern: for ten months now (since last May) you and your colleagues have been completely unable to identify any reason to inspect books having nothing to do with the development of the specific works in issue or the authors who developed the specific works in issue. Your silence now thus is very telling and I will continue to emphasize the point until you actually answer the questions. For instance, if you think you've answered the second question, please tell me pursuant to which specific interrogatory or document request GW is now supposed to identify from what work area specific books were obtained? I won't even bother to ask again why you were even looking at books having no connection with the creation of any of the works in issue because it's now completely clear it has always just been to create a sideshow. Once again our willingness to compromise (by allowing you to see admittedly irrelevant books)has just been used as a basis to create more controversy (just as you originally promised to give us all the correspondence with CH's designers after we confirmed we would give you GW's correspondence with its former employees; instead it required a court order).

At any rate, putting aside for the moment your refusal to answer these questions as to the lack of any basis for the discovery, simply as a practical matter, can you at least clarify for me on what we would be meeting and conferring? I told you in my previous message that I can't say anything until I speak with my client who is traveling back to Nottingham from Sweden.

In the meantime, as soon as possible, I will try to look at the images you sent of specific books. When I left work they still had not been loaded into our database. Naturally it would have been better had you produced them two days ago as you said you would but it is what it is.

Jonathan

Sent from my iPhone

On Feb 28, 2013, at 5:01 PM, "Cooper, Bryce A." <BCooper@winston.com> wrote:

> Jonathan,
>
> Please stop telling us what we do or do not dispute or do or do not concede. You are always incorrect when you do so. I will be perfectly clear now. We absolutely dispute that the inspection was irrelevant, a waste of time, or a needless and unfair burden on your client. We dispute that we have conceded there is no nexus between the book inspection and issues relevant to this case. We dispute that this request is outside our prior discovery requests and what GW has agreed to in agreeing to the inspection.
>
> The books that are of interest are the ones that I took pictures of and produced today. I listed the crates they came from.
>
> When are you available for a meet and confer tomorrow?
>
> Bryce A. Cooper
> D: +1 (312) 558-3737
> F: +1 (312) 558-5700
> http://www.winston.com
>
>
> -----Original Message-----
> From: JMoskin@foley.com [mailto:JMoskin@foley.com]
> Sent: Thursday, February 28, 2013 3:31 PM
> To: Cooper, Bryce A.
> Cc: JKeener@foley.com; Golinveaux, Jennifer A.; Julianne M. Hartzell; Sarah Kalemeris
> Subject: RE: GW inspection
>
> I don't know what you mean by characterizing my email as "dramatic" (it sounds a bit like your colleague's characterization last week of my offer to produce even irrelevant emails as "heroic"), but you do not dispute that the entire exercise of reviewing stacks of books having nothing to do with this case was irrelevant, a waste of time and a needless and unfair burden on my client. Had GW NOT gone to that expense of collecting all the books, you never would have found most of them in the first place, as many were behind or under desks or under piles of paper. As you know, we also were never prepared to allow you to roam through the company's workplace where new works (works of no relevance to this case but no doubt of keen interest to your client) are being developed when you could identify no reason to do so. Your "dramatic" or "prosaic" concession that there was no nexus between the book inspection and any issue actually in the case should be an end to this discussion. Full stop. However, since you also concede that this new request for further information about the irrelevant books is not within the scope of any existing discovery request, I have to add that even if you had been allowed to roam about the office you would have learned to whom the individual books belonged because the work areas are not labeled. Hence this is essentially just an additional interrogatory (when CH is already well past the limit; as I recall, I think the total in just the second phase was more than 50 discrete questions).
>
> Moreover, in addition to your inability to identify any basis in relevance or any actual discovery requests to seek this additional information from GW, it appears you are refusing to identify any books that you even contend might be of interest and have only now (two days after you said you would) produced the images from the inspection. From that refusal to identify specific books of interest I infer there are no specific books of genuine interest. (Exactly as I predicted, despite our effort to compromise and allow inspection of irrelevant books when you dropped the request to see computers and the design studio, this entire exercise was just an excuse to create another discovery sideshow and creeping additional demands outside the scope of discovery - perhaps to divert attention from your client's systematic failures to preserve evidence of its direct copying and its marketing of products to trade directly on GW's IP. I wonder why we ever allowed the inspection to proceed. It is particularly frustrating when we keep finding fresh evidence of how CH has failed to save records and failed to produce records it does have - including as disclosed in some very troubling testimony today from Mr. Fiertek.)
>
> At any rate, as a practical matter, by the time I had a chance to review your email last night, it was

long past the close of business in England. As you know, Ms. Stevenson has been in Sweden today at the deposition of your client, Mr. Fiertek. I have no way even to ask her until tomorrow at the earliest what records GW kept as to the placement of the books within GW's offices. In the meantime, I invite you again to identify any books of potential interest or any specific discovery request that you believe requires disclosure of additional information.
>
> Jonathan
>
> -----Original Message-----
> From: Cooper, Bryce A. [mailto:BCooper@winston.com]
> Sent: Thursday, February 28, 2013 10:51 AM
> To: Moskin, Jonathan
> Cc: Keener, Jason J.; Golinveaux, Jennifer A.; Julianne M. Hartzell; Sarah Kalemeris
> Subject: RE: GW inspection
>
> Jonathan,
>
> The drama of your response notwithstanding, this is an exceedingly simple and reasonable request for an index document that has already undoubtedly been created if GW expects to return the references to where they came from. For some reason, GW went to extraordinary and unnecessary lengths to remove the reference materials from where they are kept in the ordinary course of business rather than allowing a simple tour through those areas. Now, you are refusing even to tell us from where they were taken for a host of reasons regarding relevance that are speculative and inaccurate. I have listed below the crate numbers from which I took pictures of reference materials, and which we should be able to produce later today. Identify the providence of those crates (which studio and which designer they were collected from), or let me know when you can meet and confer on this today, because we will be raising this with the Court if you continue to refuse to provide this easily producible information.
>
> Crates:
> 12
> 17
> 18
> 30
> 31
> 103
> 104
> 107
> 108
> 109
> 111
> 112
> 113
> 116
> 124
> 126
> 134
> 136
> 152
> 192
> 211
>
>
> Bryce A. Cooper
> D: +1 (312) 558-3737
> F: +1 (312) 558-5700
> http://www.winston.com
>
>
> -----Original Message-----
> From: JMoskin@foley.com [mailto:JMoskin@foley.com]

> Sent: Wednesday, February 27, 2013 8:20 PM
> To: Cooper, Bryce A.
> Cc: JKeener@foley.com; Golinveaux, Jennifer A.; Julianne M. Hartzell; Sarah Kalemeris
> Subject: Re: GW inspection
>
> We made quite clear more than a month ago that GW could not agree to an inspection of the premises or computers, particularly when no remotely plausible reason to do so had been suggested. You dropped any request to see computers and the workplace when you narrowed your focus to the books. We also allowed the inspection of books only under protest and on the apparently naive assumption that it was better to let you see a lot of irrelevant materials than to allow you to argue GW was hiding something. Clearly that was a mistake as I predicted a few weeks back the inspection would only lead to additional unwarranted demands.  That phase evidently now begins. As I commented to you more than once when you were looking at books with publication dates in only the last couple of years (which may well have been acquired later still by individuals having nothing to do with any of the works in issue) none of these can have any relevance.   You had an opportunity to depose any of the designers to challenge their accounts of what works if any they referenced yet CH did not do so.
>
> What matters is that GW identified all of the references actually used by its designers. As you saw for yourself, 90% or more of the books on the premises are simply GWs own works. You made arrangements to get Bob Naismith to testify yet he made clear he looked at no references in creating the Space Marine figure and the Rhino and Landraider (the latter of which CH is accused of copying only doors and turrets - not general shape) and Mr Naismith cited incredibly disparate influences in the Space Marine alone - from Roman to Napoleonic to American infantry and so forth.
>
> I'm also not sure I understand why your client would care where the books came from. Wasn't the premise of the inspection the notion that these books and magazines were provided by GW for all of its designers (In reality that's not at all what the books are; rather many are just collections borne of personal interest and curiosity, acquired years after the underlying GW works were created.) Thus, although you spent a great deal of time looking at newly acquired books of heraldry and miitary vehicles notwithstanding that the Chapter icons were created 25 years ago and the basic vehicles were created (as Mr Naismith testified) in the same time period without any reference books or materials.
>
> In view of the above, in view of the fact that discovery is now closed, and in view of the fact that none of the books come within the scope of any if CHs discovery requests, here is what I propose.  You had said you were going to send us photos of the inspection. Why don't you do that and if you then have any particular questions about any of the specific books you can let us know
>
> Jonathan
>
>
> Sent from my iPhone
>
> On Feb 27, 2013, at 5:44 PM, "Cooper, Bryce A." <BCooper@winston.com> wrote:
>
>> Jonathan,
>>
>> Please respond to this email.
>>
>> Bryce
>>
>> Bryce A. Cooper
>> D: +1 (312) 558-3737
>> F: +1 (312) 558-5700
>> http://www.winston.com
>>
>>
>> -----Original Message-----
>> From: Cooper, Bryce A.
>> Sent: Monday, February 25, 2013 4:05 PM
>> To: Jonathan Moskin

>> Cc: Jason J. Keener; Golinveaux, Jennifer A.; Julianne M. Hartzell; Sarah Kalemeris
>> Subject: GW inspection
>>
>> Jonathan,
>>
>> Following up on our conversation today at Games Workshop, and in light of GW's refusal to allow an inspection of the design studios that the reference works were taken from, please send an index describing where each box number was taken from. I understand Gillian did not have that information with her, but I trust it has already been catalogued and is easily producible by Thursday morning. Please confirm you will do this.
>>
>> I will produce the pictures I took today as soon as I am back in Chicago and they are uploaded.
>>
>> Bryce
>> The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. ***************************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.
>
> The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.
>
> Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.
>
> The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. ***************************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.
>
> The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.
>
> Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.
>
> The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. ***************************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. *************************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. *************************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

# Exhibit Q

CERTIFIED COPY

# In The Matter Of:

*GAMES WORKSHOP LIMITED,*
*v.*
*CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a*
*PAULSON GAMES,*

---

*NEIL J. HODGSON – Vol. 1  30(B)(6)*
*March 5, 2012*

---

# *CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**
**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

CONFIDENTIAL - ATTORNEYS' EYES ONLY
NEIL J. HODGSON - 3/5/2012

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GAMES WORKSHOP LIMITED, | ) | **CERTIFIED COPY** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 1:10-CV-08103 |
| | ) | |
| CHAPTERHOUSE STUDIOS LLC and JON | ) | |
| PAULSON d/b/a PAULSON GAMES, | ) | |
| | ) | |
| Defendants. | ) | |

 

Videotaped deposition of NEIL J. HODGSON

individually and as a Rule (30)(b)(6) corporate designee

of GAMES WORKSHOP LIMITED, taken before TRACY L.

BLASZAK, CSR, CRR, and Notary Public, pursuant to the

Federal Rules of Civil Procedure for the United States

District Courts pertaining to the taking of depositions,

at Suite 3500, 35 West Wacker Drive, in the City of

Chicago, Cook County, Illinois at 9:32 a.m. on the 5th

day of March, A.D., 2012.

(#441523)

CONFIDENTIAL - ATTORNEYS' EYES ONLY
NEIL J.   HODGSON - 3/5/2012

Page 38

| | | |
|---|---|---|
| 1 | Workshop? | 10:30:15 |
| 2 | A   Oh, absolutely, yes.  I mean, he is our art | 10:30:16 |
| 3 | director. | 10:30:22 |
| 4 | Q   And how often do you communicate with John | 10:30:23 |
| 5 | Blanche? | 10:30:25 |
| 6 | A   When he is in. | 10:30:27 |
| 7 | Q   Do you communicate with him by phone or e-mail? | 10:30:30 |
| 8 | A   No. | 10:30:36 |
| 9 | Q   Do you communicate with Dave Gallagher by phone | 10:30:40 |
| 10 | or e-mail? | 10:30:43 |
| 11 | A   No. | 10:30:44 |
| 12 | Q   What reference materials do you use? | 10:30:57 |
| 13 | MR. MOSKIN:   Objection to form, but you can answer. | 10:31:03 |
| 14 | MR. OH:   Q   I'll rephrase. | 10:31:07 |
| 15 | Do you use reference materials as part of your | 10:31:08 |
| 16 | work? | 10:31:11 |
| 17 | A   Yes. | 10:31:11 |
| 18 | Q   Can you describe the reference materials you | 10:31:12 |
| 19 | use? | 10:31:14 |
| 20 | A   Yes, everybody who works in the studio or most | 10:31:15 |
| 21 | of the creative people who work in the studio and some | 10:31:19 |
| 22 | have a library of books like medieval armor and stuff | 10:31:29 |
| 23 | like that through the ages and flavor pieces, really. | 10:31:36 |
| 24 | Q   Now, when you say flavor pieces, what do you | 10:31:40 |
| 25 | mean by that? | 10:31:42 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
NEIL J.  HODGSON - 3/5/2012

| | | |
|---|---|---|
| 1 | A    It tends to be -- I think we've got -- we had a | 10:35:17 |
| 2 | subscription to National Geographics.  We have that as | 10:35:26 |
| 3 | a -- we have that as a reference. | 10:35:33 |
| 4 | We have -- and, then, just, as I said, all the | 10:35:35 |
| 5 | books, there is an interesting texture in this book or, | 10:35:40 |
| 6 | you know, look at the way that the rust is hanging off | 10:35:45 |
| 7 | of that old tank, that kind of stuff.  It's a technique | 10:35:47 |
| 8 | and detail kind of thing. | 10:35:55 |
| 9 | Q    And if you had to estimate, how many of these | 10:35:57 |
| 10 | types of reference books are there at work? | 10:35:59 |
| 11 | A    I couldn't because they're all over the place. | 10:36:04 |
| 12 | Q    More than five? | 10:36:07 |
| 13 | A    Yes. | 10:36:09 |
| 14 | Q    More than 25? | 10:36:11 |
| 15 | A    Probably. | 10:36:12 |
| 16 | Q    And based on your experience at work, who uses | 10:36:23 |
| 17 | these reference materials? | 10:36:25 |
| 18 | A    Most people I should think. | 10:36:35 |
| 19 | Q    You also mentioned before you use other artists | 10:36:40 |
| 20 | as reference? | 10:36:43 |
| 21 | A    Yes. | 10:36:45 |
| 22 | Q    And can you clarify what you mean by that? | 10:36:45 |
| 23 | A    Our in-house staff. | 10:36:48 |
| 24 | Q    And would they provide you a sketch or something | 10:36:51 |
| 25 | written to use as a reference material?  Or I'm trying | 10:36:59 |

# Exhibit R

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4

5     GAMES WORKSHOP LIMITED,   )

6               Plaintiff,      )

7               -vs-            )   Case No. 1:10-cv-08103

8     CHAPTERHOUSE STUDIOS      )

9     LLC,                      )

10              Defendant.      )

11     _____ )

12

13          Videotaped Deposition of MARTIN FOOTITT,

14     taken on February 14, 2013, at the hour of 9:06

15     a.m. at 233 South Wacker Drive, Suite 6300,

16     Chicago, Illinois, taken before Kathleen J.

17     Hendrix, Certified Shorthand Reporter, C.S.R.

18     Licence No. 84-004180

19

20

21

22

23

24

25     PAGES 1 - 148

                                        Page 1

| | | | |
|---|---|---|---|
| 1 | Q. | Where are those books? | 10:04:38 |
| 2 | A. | On a bookcase. | 10:04:40 |
| 3 | Q. | Your bookcase? | 10:04:41 |
| 4 | A. | No. | 10:04:43 |
| 5 | Q. | Whose bookcase? | 10:04:44 |
| 6 | A. | The department. | 10:04:46 |
| 7 | Q. | Which department? | 10:04:49 |
| 8 | A. | Miniature designers. | 10:04:51 |
| 9 | Q. | Do other departments have bookcases? | 10:04:55 |
| 10 | A. | Yes. | 10:05:07 |

1    Q.    Where are those books?                        10:04:38

2    A.    On a bookcase.                                10:04:40

3    Q.    Your bookcase?                                10:04:41

4    A.    No.                                           10:04:43

5    Q.    Whose bookcase?                               10:04:44

6    A.    The department.                               10:04:46

7    Q.    Which department?                             10:04:49

8    A.    Miniature designers.                          10:04:51

9    Q.    Do other departments have bookcases?          10:04:55

10   A.    Yes.                                          10:05:07

11         MR. KEENER:  If now is a good time,           10:05:38

12   it's about an hour that we've been going.  Is now a  10:05:42

13   good time for a break?                              10:05:46

14         MS. KALEMERIS:  Sure.                         10:05:49

15         THE VIDEOGRAPHER:  Off the record at          10:05:54

16   10:20 a.m.                                          10:05:54

17              (Whereupon, a short break taken.)        10:28:25

18         THE VIDEOGRAPHER:  On the record,             10:28:25

19   10:28 a.m.                                          10:28:28

20   BY MS. KALEMERIS:                                   10:28:28

21         Q.    So when we were last -- or when we      10:28:29

22   left off, you mentioned that you had a bookshelf in  10:28:30

23   your office.                                        10:28:33

24         A.    Yes.                                    10:28:34

25         Q.    Can you tell me what books are on that  10:28:34

Page 46

| | | |
|---|---|---|
| 1 | shelf? | 10:28:37 |
| 2 | A.    40K books, Warhammer books, Noreen's | 10:28:38 |
| 3 | (ph) books, catalogs, possibly some Black Library | 10:28:45 |
| 4 | books I would be guessing. | 10:28:56 |
| 5 | Q.    Are there any other books on your -- | 10:28:57 |
| 6 | on your bookshelf? | 10:29:00 |
| 7 | A.    No. | 10:29:01 |
| 8 | Q.    Are there any magazines on your | 10:29:01 |
| 9 | bookshelf? | 10:29:05 |
| 10 | A.    Yeah, I think there is. | 10:29:05 |
| 11 | Q.    What magazines on your bookshelf? | 10:29:09 |
| 12 | A.    Some modeling magazines. | 10:29:13 |
| 13 | Q.    What type of modeling magazines? | 10:29:16 |
| 14 | A.    I think historical vehicles. | 10:29:21 |
| 15 | Q.    Do you know the title of those | 10:29:30 |
| 16 | magazines? | 10:29:32 |
| 17 | A.    I can't remember. | 10:29:33 |
| 18 | Q.    Are those magazines associated with | 10:29:34 |
| 19 | Warhammer or Warhammer 40K? | 10:29:38 |
| 20 | A.    No. | 10:29:40 |
| 21 | Q.    So they are independent magazines from | 10:29:40 |
| 22 | Games Workshop? | 10:29:44 |
| 23 | A.    No. | 10:29:44 |
| 24 | Q.    So they are affiliated with Games | 10:29:45 |
| 25 | Workshop? | 10:29:50 |

Page 47

| | | | |
|---|---|---|---|
| 1 | A. | No. | 10:29:50 |
| 2 | Q. | They are not. | 10:29:51 |
| 3 | | What else is on your bookshelf? | 10:29:54 |
| 4 | A. | Folders. | 10:29:56 |
| 5 | Q. | What's in those folders? | 10:29:59 |
| 6 | A. | Work relating to my products. | 10:30:05 |
| 7 | Q. | What the type of documents do you keep | 10:30:07 |
| 8 | in those folders? | | 10:30:12 |
| 9 | A. | Any sketch I've done, any frame | 10:30:15 |
| 10 | layouts, anything relevant to the project. | | 10:30:25 |
| 11 | Q. | What are other types of documents that | 10:30:31 |
| 12 | would be relevant to the project? | | 10:30:35 |
| 13 | A. | Any -- any notes, photocopying that | 10:30:37 |
| 14 | I've done, parts lists. | | 10:30:48 |
| 15 | Q. | I'm sorry.  What did you say? | 10:30:55 |
| 16 | A. | Parts lists. | 10:30:59 |
| 17 | Q. | What is a parts list? | 10:31:00 |
| 18 | A. | A list of all the parts on the kit. | 10:31:02 |
| 19 | Q. | What is a kit? | 10:31:04 |
| 20 | A. | A plastic kit. | 10:31:07 |
| 21 | Q. | I'm sorry? | 10:31:15 |
| 22 | A. | Plastic kit. | 10:31:17 |
| 23 | Q. | What -- what -- I'm sorry.  I'm | 10:31:20 |
| 24 | unfamiliar. | | 10:31:23 |
| 25 | | What is the plastic kit? | 10:31:24 |

Page 48

# Exhibit S

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GAMES WORKSHOP LIMITED, | ) |
| | ) |
|     Plaintiff, | )   Case No. 1:10-cv-08103 |
| | ) |
| v. | ) |
| | ) |
| CHAPTERHOUSE STUDIOS LLC and | )   Judge Matthew F. Kennelly |
| JON PAULSON d/b/a PAULSON GAMES, | )   Judge Jeffrey T. Gilbert |
| | ) |
|     Defendants. | ) |

## NOTICE OF INSPECTION OF PREMISES

Pursuant to 34(a)(2) of the Federal Rules of Civil Procedure, Defendant Chapterhouse

Studios, LLC ("Chapterhouse") demands that Plaintiff Games Workshop ("GW") provide access

to Chapterhouse at its design studios for purposes of:

    1.     inspecting, observing, ascertaining, and photographing the workspaces used by

any author, co-author, or co-creator of any of the New Allegedly Infringed Works, including

without limitation the authors GW identifies in its the Exhibit A to the Third Amended

Complaint filed in this action on December 10, 2012 (Dkt. 261, erroneously titled "Second

Amended Complaint for Copyright Infringement, Trademark Infringement, Unfair and

Deceptive Trade Practices, and Unfair Competition"). To the extent any amendment is made to

Exhibit A as contemplated by the parties in the joint status report filed on December 11, 2012

(Dkt. 264), all such references to Exhibit A shall be understood to refer to such subsequent

amended claim chart.

2.    inspecting, observing, ascertaining, and photographing any and all reference materials provided or stored for the use of artists, sculptors, painters, authors, or other creators, including without limitation any and all books, magazines, photographs, files, binders, and the like that contain visual material authored by third parties, and including without limitation.

3.    observing, ascertaining, and photographing all computers located on the premises of Games Workshop's principal place of business.

The inspection will take place on January 7, 2013, beginning at 10:00 a.m. GMT, at the principal place of business of GW (previously disclosed by Games Workshop to be Willow Road, Lenton, Nottingham, NG7 2WS United Kingdom), or at such other place as such facilities may be located, and at such other date and time as the parties may otherwise agree. Pertinent parts of the inspection will be photographed and/or videotaped. The persons who will conduct the inspection will include Chapterhouse's outside counsel, technical experts, and/or one or more photographers and/or videographers.

You are invited to attend, observe, photograph and videotape the inspection.

Dated:  December 12, 2012                    Respectfully submitted,

                                             CHAPTERHOUSE STUDIOS LLC


                                             By: /s/ Sarah J. Kalemeris
                                                 Jennifer A. Golinveaux (CA Bar No. 203056)
                                                 Dean A. Morehous (CA Bar No. 111841)
                                                 K. Joon Oh (CA Bar No. 246142)
                                                 Thomas J. Kearney (CA Bar No. 267087)
                                                 WINSTON & STRAWN LLP
                                                 101 California Street
                                                 San Francisco, CA  94111-5802
                                                 Phone: (415) 591-1000
                                                 Fax: (415) 591-1400
                                                 jgolinveaux@winston.com

                                             2

dmorehous@winston.com
koh@winston.com
tkearney@winston.com

Bryce A. Cooper (IL Bar No. 6296129)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-1695
Phone: (312) 558-5600
Fax: (312) 558-5700
bcooper@winston.com

Julianne M. Hartzell (IL Bar No. 6275093)
Sarah J. Kalemeris (IL Bar No. 6303644)
MARSHALL, GERSTEIN & BORUN LLP
233 S. Wacker Drive
Willis Tower Suite 6300
Chicago, IL 60606
Phone: (312) 474-6300
Fax: (312) 474-0448
jhartzell@marshallip.com
skalemeris@marshallip.com

3

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2012, I provided service of

## NOTICE OF INSPECTION OF PREMISES

to the person or persons listed below by the following means: ELECTRONIC MAIL.

| | |
|---|---|
| Jason Keener | Jonathan E. Moskin |
| FOLEY & LARDNER LLP | FOLEY & LARDNER LLP |
| 321 North Clark Street, Suite 2800 | 90 Park Avenue |
| Chicago, IL 60654-5313 | New York, New York 10016 |
| Telephone: 312.832.4500 | Telephone: (212) 682-7474 |
| Facsimile: 312.832.4700 | Facsimile: (212) 687-3229 |
| Email: jkeener@foley.com | Email: jmoskin@foley.com |

Signature: __/s/ Sarah Kalemeris_____     Date: December 12, 2012

Name        Sarah J. Kalemeris

4

SF:346389.1