| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3

4  GAMES WORKSHOP LIMITED,     )

5               Plaintiff,  )  Docket No. 10 C 8103

6         vs.        )

7  CHAPTERHOUSE STUDIOS, LLC,  )  Chicago, Illinois
  et al.,             )  February 14, 2013
8                   )  9:40 a.m.
             Defendants.  )

9

10              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE MATTHEW F. KENNELLY

11

12  APPEARANCES:

13

14  For the Plaintiff:    FOLEY & LARDNER, LLP
                     BY:  MR. JONATHAN E. MOSKIN
                  90 Park Avenue
15                New York, New York   10017

16  For the Defendant:    WINSTON & STRAWN, LLP
                     BY:  MR. BRYCE A. COOPER
17                     MS. JULIANNE M. HARTZELL
                  35 West Wacker Drive
18                Chicago, Illinois  60601

19

20

21

22

23          LAURA M. BRENNAN - Official Court Reporter
24        219 South Dearborn Street - Room 2102
             Chicago, Illinois  60604
25              (312) 435-5785

1      (The following proceedings were had in open court:)

2          THE CLERK:  10 C 8103, Games Workshop v.

3  Chapterhouse.

4          THE COURT:  Good morning.

5          MR. MOSKIN:  Good morning, your Honor.

6          MS. HARTZELL:  Good morning, your Honor; Julianne

7  Hartzell on behalf of defendant Chapterhouse.

8          MR. COOPER:  Bryce Cooper, also on behalf of

9  Chapterhouse.

10          MR. MOSKIN:  And Jonathan Moskin on behalf of

11  plaintiff.

12          THE COURT:  Mr. Moskin, have you seen the response

13  that got filed?

14          MR. MOSKIN:  Late last night and early this morning.

15          THE COURT:  So tell me what you think is still a live

16  issue.

17          MR. MOSKIN:  Fine.  I think if I can -- it will

18  probably take me, like, four or five minutes just to summarize

19  everything and what has or hasn't been resolved.

20          THE COURT:  Okay.

21          MR. MOSKIN:  As you know, last week on the telephone,

22  I identified two issues which trail over from the first part

23  of the case.  There was actually -- we had filed a motion in

24  limine on this issue, but it continues past the duty to

25  supplement on the 31st, and there's a related problem on both

1    of these issues in the second part of the case.

2          Since we spoke last week on the phone, a third issue

3    has arisen where it's confirmed that certain documents, books,

4    were not preserved.

5          THE COURT:  These are the four books?

6          MR. MOSKIN:  Four books, correct, including

7    unquestionably the most important book in the case.

8          So the two issues -- I can go through the two issues

9    I mentioned last week on the phone.  One is the duty to

10   preserve advertising.  In the Court's December 23rd, 2011,

11   order, Chapterhouse was ordered to produce all advertising,

12   all documents showing advertising.  That was in response to

13   document request 16 in the first part of the case.

14         They had responded by largely saying that it's not in

15   his ordinary -- his regular course of business to preserve

16   these things, but that misses the point.  The issue is one of

17   control.  For the first time, we learned a couple of weeks ago

18   in the course of a meet-and-confer to resolve, and we resolved

19   most of the issues in this case, you will be happy to know,

20   but on this issue they confirmed that Chapterhouse -- neither

21   Chapterhouse nor the partner in Sweden, Mr. Fiertek, saved any

22   of the forum posts.

23         And, again, the test is one of control, and at the

24   relevant points in time --

25         THE COURT:  Okay.  So is what you're asking for at

1  this point to have them go get the stuff from somebody else,

2  or are you just asking for an adverse inference?

3      MR. MOSKIN:  Well, it may be either or both.  Let me

4  explain the problem.

5      And the problem is that they have confirmed -- I

6  mean, there is evidence that these forum posts are not saved,

7  or some of them, they have been taken down.  We have submitted

8  a document from one of their designers, Mr. Lippman, who notes

9  that because of the overtly commercial nature of some of these

10  things, some of the forums have deleted the posts.

11      They have also given us a partial list of four of the

12  forums where he from memory recalls having posted these, but

13  there were seven forums plus the designers themselves used

14  other forums as well.  Even if we don't go there, just the

15  ones that Chapterhouse has used, it's not clear that they will

16  be able to produce a complete set.  If they can, that would

17  certainly be helpful.

18      But there's a further -- there are two further

19  issues.  One, obviously, is the completeness.  The other

20  emerged when we were preparing the pretrial order, that they

21  object on hearsay grounds to our introduction of these things,

22  the ones that we found on our own.  So we would like minimally

23  that, you know, any objections other than relevance should be

24  precluded.  I think that an adverse inference might well be

25  appropriate.  Obviously, that's a very strict, you know,

1    remedy, and, you know, I'm happy to address that in more

2    detail why we think it's appropriate.

3            But among the things that he says he doesn't even

4    remember --

5            THE COURT:  He, being Mr. Villacci.

6            MR. MOSKIN:  Mr. Villacci.

7            -- including one of the forums that we attached to

8    the summary judgment papers and we have reattached to the

9    motion.

10           Allan Merrett, one of the chief executives at Games

11   Workshop, had found a forum post on one of these, Frother's

12   Unite -- again, it's attached to the motion -- where there was

13   some rather scathing comments about how about Mr. Villacci was

14   copying and stealing and so forth, and he responded to some of

15   those and so forth.  That's not even on the list of what he

16   says he remembers.

17           THE COURT:  So when your guy saw it, did he print it

18   out?

19           MR. MOSKIN:  Yes, we saved that one.

20           THE COURT:  Okay.

21           MR. MOSKIN:  So it's an issue of completeness, and

22   once -- if we are put to the burden of finding these things,

23   what then happens?  Can we use these at trial if he's going to

24   say that they're hearsay and we can't use them?

25           THE COURT:  Let me ask you this question about that.

1  From your --

2        You have deposed Mr. Villacci, of course, and is

3  he -- I mean, did you show him the one thing that you had or

4  did you have it at that point?

5        MR. MOSKIN:  I didn't have it at that point.  It was

6  subsequent to the -- he will be deposed.  He's scheduled to be

7  deposed next week on Wednesday, I believe.

8        THE COURT:  So presumably you're going to stick it in

9  front of him and you're going to say, did you write this

10  thing?

11        MR. MOSKIN:  Right.

12        THE COURT:  What's he going to say?

13        MS. HARTZELL:  I believe if it is his screen name, he

14  will say, yes, I wrote this.

15        THE COURT:  Okay.  And on other forum posts that may

16  not exist anymore anywhere that the defendants say they don't

17  have or the defendant says it doesn't have, I take it that

18  there are some that your people have and printed out, and it's

19  largely a question of authenticating them, and on others you

20  don't have them.

21        MR. MOSKIN:  Right, and some of these --

22        THE COURT:  I just want a --

23        MR. MOSKIN:  We don't know that we have them all.

24        THE COURT:  But on the ones that you do have --

25        MR. MOSKIN:  Right.

1       THE COURT:  Okay.  Are they all -- can you identify
2    from the post what the screen name is of the person who posted
3    it?

4       MR. MOSKIN:  Yes.

5       THE COURT:  Okay.  And are they all the same screen
6    name as the one that you're talking about here?

7       MR. MOSKIN:  Yes, except for the responses back.  A
8    number of the responses back that say, you know, this is --
9    some are very complimentary.  You have done a great job
10   copying --

11      THE COURT:  Why do you care about the responses?

12      MR. MOSKIN:  Because they are evidence of what
13   ordinary observers believe or even discerning observers.
14   These are fans of the game that know what they're looking at.

15      THE COURT:  So you wouldn't be offering those to
16   prove their truth.  You would be offering them to prove
17   whatever the state of mind is or belief of the other person.

18      MR. MOSKIN:  Yes.

19      THE COURT:  So that's probably not hearsay anyway.

20      MR. MOSKIN:  But, again, I'm just pointing that
21   that's an issue lurking which we are concerned about since we
22   haven't -- we have separately asked for him to identify any of
23   these people that he knows who are responding so we could
24   follow up with them as need be, but that's a separate request,
25   discovery request, which he also has not responded.

1    THE COURT:  So, for example, in a standard trademark

2    case where you're trying to prove likelihood of confusion and,

3    you know, somebody has sent a letter, let's say, to the

4    trademark holder saying, hey, this other product out here, you

5    know, it's really awful and it's not yours, and you offer this

6    letter to prove likelihood of confusion, you don't have to go

7    find that person and bring him in.

8    MR. MOSKIN:  No.

9    THE COURT:  So this doesn't strike me as a whole lot

10   different.

11   As far as the responses to the forum posts, I don't

12   think you're going to have much of a hearsay issue on that.

13   As far as the things that he posted, that you think

14   Mr. Villacci posted that you have, it just seems to me that

15   it's premature for me to be dealing with imposing penalties or

16   sanctions or preclusion orders or whatnot at least until I

17   find out what the man says at his deposition about him.

18   As far as stuff that he -- forum posts that he may

19   have made that he doesn't have, what is it that makes you

20   think that there are any?

21   MR. MOSKIN:  Because in his interrogatory answers, he

22   identified ten forums where he routinely posts and advertises.

23   THE COURT:  Okay.

24   MR. MOSKIN:  He in a recent interrogatory answer

25   referred only to four of those where he remembers having

1  posted.  So we know there are many where he says he has posted

2  but he hasn't even remembered where --

3          THE COURT:  I'm not done with him yet.  Hold on.

4          MR. MOSKIN:  So, I mean, there are also similar

5  issues regarding eBay, but we'll come to that.

6          THE COURT:  Well, we may not come to that because

7  there's only a limited amount of time in the world, okay, and

8  you're not entitled to all of it.

9          MR. MOSKIN:  I understand.

10          THE COURT:  All right.  So as far as the stuff that

11  he doesn't have, okay, that's presumably something where, you

12  know, somebody might talk about the idea of preclusion on the

13  theory that it should have been preserved if it was after the

14  litigation was filed or maybe even more so after a discovery

15  request was made.

16          But what I get from the response here is that when

17  he's posting these things -- and I will tell you that I'm not

18  a person who posts stuff on blogs, okay, surprisingly

19  enough -- but, you know, I have seen -- I have seen how people

20  do that.  And usually what happens is that there's a blank

21  down at the bottom of the screen for comments and you type it

22  in.  Now, there's probably people in the world who print those

23  things out when they do it, but probably most don't because

24  they figure it's there, or they don't care to print it out or

25  they're not into paper or whatever, you know.

1    And whether not creating a record of something you

2    did is the type of thing that might constitute spoliation or

3    the near equivalent of spoliation, it's an interesting

4    question, but I'm not sure I have to deal with it yet until I

5    have something a lot more specific as to what it is that is

6    likely missing.

7    And I think that this motion, this part of the

8    motion, seems to me is --

9    When are you deposing Mr. Villacci, or redeposing

10   him?

11   MR. MOSKIN:  Wednesday.

12   THE COURT:  Wednesday.

13   It seems to me it's a little bit premature because it

14   may be that you will be able to resolve a good deal of this

15   via the deposition.

16   I mean, if the guy comes into the deposition and

17   basically says, I don't know, I don't remember, you know,

18   Sergeant Schultz from that old t.v. show, "I see nothing, I

19   hear nothing," then, you know, you might have a lot more to

20   talk about.  But if he says, oh, yes, that's my screen name

21   and I posted that and all these other things under my screen

22   name, I posted those, too, and, you know, we got these

23   responses, yes, I got these responses, you know, it just seems

24   to me that's going to resolve a good part of the problem on

25   this particular issue.

1      MR. MOSKIN:  And I think --

2      THE COURT:  And as far as what isn't there, I mean,

3   you know, I think that the general way that judges tend to

4   look at those things is, okay, you have got to give me some

5   reason to believe that there was something there that's now

6   gone, number one.  Maybe that's number two.  And then you have

7   got show that there was a duty to preserve it and, you know,

8   whatever else you have to show.

9      I just think it's a little premature.  I'm not

10  faulting you for bringing it up because there's issues and I

11  sort of made it pretty clear that, you know, I'm not extending

12  any dates.

13     MR. MOSKIN:  Right.  Frankly, the reason we filed

14  now, we said -- I said last week that we were considering

15  holding off but thought it was better to get your guidance

16  now.

17     THE COURT:  No, it's better to get it out there.  I

18  don't disagree with that.

19     MR. MOSKIN:  I think we have the same issue regarding

20  eBay.

21     THE COURT:  It's the same stuff, right?

22     MR. MOSKIN:  The same issue.

23     THE COURT:  I'm going to say the same thing about it.

24     Do you want to say anything about this particular

25  topic, the posting topic?

1    MS. HARTZELL:  I believe it's not necessary to make

2    those arguments now.  I think that --

3         THE COURT:  It can wait until after, yes, okay.

4         MS. HARTZELL:  I think it can wait.

5         THE COURT:  So the second general topic in the motion

6    was --

7         MR. MOSKIN:  The duty to produce documents from

8    designers.

9         THE COURT:  The designer thing, okay.  So the way I

10   read the response is that we produced what -- we produced what

11   they had, or we produced what we had, right?

12        MS. HARTZELL:  And what they had.

13        THE COURT:  And then we went out and then collected

14   stuff from people, and, you know, if they sent us stuff, we

15   produced it.  If they said they didn't have anything, that

16   means they didn't have anything.  Is that more or less --

17        MS. HARTZELL:  That's accurate.

18        THE COURT:  -- the summary?

19        So, Mr. Moskin, do you take an issue with some or all

20   of that?

21        MR. MOSKIN:  Yes.

22        THE COURT:  Okay, tell me what.

23        MR. MOSKIN:  Your Honor's March 6th order in this

24   case directed them to use good faith efforts to collect

25   documents from the designers.  As part of that argument, the

1  basis for that was Mr. Villacci, or Chapterhouse, has an

2  agreement with designers.  He testified that that agreement

3  gives him the right to --

4  THE COURT:  To get stuff.

5  MR. MOSKIN:  -- get documents back.

6  At any rate, and again, this deals with both parts of

7  the case and the failure to supplement.  So in March they sent

8  out an e-mail which is attached to the motion.  The email

9  didn't ever even mention this contractual right he had to

10  demand documents.  We had a lengthy exchange of correspondence

11  back and forth.  Eventually Chapterhouse's counsel,

12  Ms. Golinveaux, responded in the May 12 letter saying --

13  giving me a summary but refusing to actually produce the

14  communications back and forth to the designers showing what

15  actually was said to them other than that one initial email

16  which, again, didn't even invoke the contract right.

17  THE COURT:  Okay.  And what I'm being told about that

18  is that, okay, we're representing them.  That communication is

19  privileged.

20  MR. MOSKIN:  Well, if they haven't produced it --

21  THE COURT:  That's not what you said?

22  MS. HARTZELL:  If I may, your Honor?

23  That's not true for every designer.  For certain

24  designers --

25  THE COURT:  But on the ones where the correspondence

1    was withheld, that's the reason for withholding it.

2          MS. HARTZELL:  For the new designers.  I believe the

3    early designers were with respect to work product in the March

4    portion of the case.

5          MR. MOSKIN:  Well, no privilege log --

6          THE COURT:  Hang on a second.

7          So we've got old designers being the ones that

8    involve the products that were in the original case, and the

9    new designers, when you are referring to the new designers,

10   are the designers for the products that were added on in the

11   most recent iteration of the complaint, right?

12         MS. HARTZELL:  Yes, your Honor.

13         THE COURT:  And you're telling me that the situations

14   where you withheld documents as attorney/client privilege were

15   all new designers, not old designers.

16         MS. HARTZELL:  That's my understanding.

17         THE COURT:  Okay.  And what was the --

18         So was there some correspondence withheld relating to

19   gathering documents from the old designers?

20         MS. HARTZELL:  I believe so.

21         THE COURT:  And you say that was on a different

22   basis, though?

23         MS. HARTZELL:  I believe that was on the basis of

24   work product.

25         MR. MOSKIN:  But no --

1    THE COURT:  Hang on a second.  Hang on a second.

2    MR. MOSKIN:  Sorry.

3    THE COURT:  Has a privilege log been provided on

4    those things?

5    MS. HARTZELL:  There has been a privilege log.  I'm

6    not sure if those were included.

7    THE COURT:  Well, he's saying they weren't.

8    MS. HARTZELL:  Okay.  That is possible.

9    THE COURT:  All right.  And, I mean, I get it.  If I

10   go to a client and I say, client, you know, I need you to

11   gather these documents and I do that, you know, in writing and

12   I describe to them this is what you have to look for and they

13   send something back to me, I mean, I get why that would be

14   privileged.

15        But, on the other hand, if the answer is nothing, I

16   mean, I think that I am entitled to make somebody prove that

17   there was a good faith diligent search done, and it would seem

18   to me that probably the easiest and simplest way of doing that

19   would be just to produce those letters so long as Mr. -- or

20   correspondence, I guess, probably email -- so long as

21   Mr. Moskin were willing to agree that that wouldn't be relied

22   on to argue some broader waiver because the only other

23   alternative is that I'm going to need to -- you're going to

24   need to start collecting affidavits from people, which is

25   going to be way more time consuming, way more expensive, and

1   it's just not as good of an alternative.

2        MS. HARTZELL:  I think the waiver limitation

3   addresses many of our concerns.

4        THE COURT:  Yes.  That would be my suggestion that

5   you talk about, you know, okay, if plaintiff says the

6   defendant -- if you give me the correspondence, you know, back

7   and forth about collecting these records between you and the

8   designers, we will agree that we're not going to argue that

9   that is some broader waiver of the privilege.

10       MR. MOSKIN:  That's fine.  I would agree to that.

11       THE COURT:  So I think that would probably deal with

12  most of that problem.

13       So now is there another piece of the documents from

14  designers issue that that doesn't cover?

15       MR. MOSKIN:  Well, just to be clear, the same issue

16  arises regarding the more recent --

17       THE COURT:  And I was talking about everybody old and

18  new as a group.

19       MR. MOSKIN:  And what I want to explain is what

20  troubles us a bit is the notion -- what we were told in that

21  lengthy meet-and-confer was that documents were being withheld

22  from some people on grounds of attorney/client privilege.  I

23  frankly don't really care.  I'm not looking so much for a

24  waiver of their privilege.

25       THE COURT:  Yes.

1    MR. MOSKIN:  It's more the issue of control.  And the

2    basis we were told initially was that there was a contractual

3    basis for the privilege.  Now, at least as to one designer,

4    they say there was a community of interest although they seem

5    to be saying there was a community of interest that arises at

6    a time when the two parties, the designer and Chapterhouse,

7    were still negotiating a deal, so there couldn't have been a

8    community of interest at the time.  That's with regard to Mr.

9    Smith.

10    And so --

11    THE COURT:  The email -- and you have got the email

12    exchange between Chapterhouse and Mr. Smith except for the

13    sentences that were redacted.

14    What's the subject matter of the email exchange?  Is

15    it again about gathering documents?

16    MS. HARTZELL:  No.

17    THE COURT:  I'm sure I have this in the 25 or so

18    exhibits I have here.

19    MS. HARTZELL:  No.  We did not provide a redacted

20    copy of that one.

21    THE COURT:  Okay.

22    MS. HARTZELL:  But I can provide you the in camera

23    version.

24    THE COURT:  Just what was --

25    The stuff that you have seen, what was the exchange

1   of correspondence about?

2          MS. HARTZELL:  If you want to answer, that's fine.

3          MR. MOSKIN:  That was just on some terms of a

4   possible deal to acquire or pay for product.

5          MS. HARTZELL:  Including which products the parties

6   would want to sell.

7          THE COURT:  Okay.

8          MR. MOSKIN:  So, again, my concern is if there was --

9   if they say there was either a contractual basis for an

10  attorney/client privilege or a community of interest, that

11  would imply a measure of control over the designers that

12  raises two issues:

13         One, they should have been told to preserve

14  documents, and they evidently never were.

15         And, two, there should have been some -- consistent

16  with your Honor's March 6th order, some real effort should

17  have been made, consistent with the allegation that there was

18  an attorney/client privilege and there was a contractual right

19  to get these documents, to get them.  And the fact is -- the

20  reality is except for people we have ourselves subpoenaed, we

21  have gotten virtually no documents from the other people.  And

22  we got 29 pages -- we got 29 documents in the first phase.

23         THE COURT:  No.  That message has come through pretty

24  clear.

25         MR. MOSKIN:  And no emails, no -- really, virtually

1  no designer in even the second phase except for one guy who's

2  a lawyer who designed one of these products, and he

3  evidently -- we're assuming he knows -- I'm taking his

4  deposition tomorrow.  He presumably knows as a lawyer that

5  he's got to save these things, just as he also saved all his

6  forum posts.

7  THE COURT:  You were about to show me something a

8  second ago.

9  MS. HARTZELL:  Would you like to see the --

10  THE COURT:  The unredacted thing.

11  MS. HARTZELL:  Yes.

12  THE COURT:  I'm going to look at this.  We're going

13  to call this in camera right up here.

14  MS. HARTZELL:  The portions that have been redacted

15  are highlighted in your copy.

16  (Brief interruption.)

17  THE COURT:  Okay.  So I think that I can -- I think

18  that I can sort of state generically.

19  So what was withheld or redacted out was one

20  sentence -- well, it's the only sentence actually in a

21  March 10, 2011, email from Mr. Villacci to Mr. Smith.  The

22  time is 15:13.  And then one sentence out of an e-mail from

23  Mr. Smith to Mr. Villacci on March the 15th, March the 15th at

24  5:08 a.m., whatever time that was.

25  And the first of those, in other words, the

1    communication from Mr. Villacci to Mr. Smith, he basically

2    describes a topic that he's planning to talk to lawyers about.

3         And then Mr. Smith in his email of March the 15th

4    refers to -- it's pretty clear in context that he's referring

5    to something that Mr. Villacci has communicated to him about

6    what the lawyers said.  I can't tell if it's the same topic as

7    Mr. Villacci had discussed in the March 10th email or not.  I

8    don't know enough about the case to say one way or another.

9         So it's the kind of thing that, unless there is a

10   community of interest that applies, the privilege would be

11   waived because it's one person telling the lawyer's advice to

12   another.

13        So your contention, Mr. Moskin -- I think I heard you

14   say this, but you will correct me if I'm wrong -- is that

15   there couldn't have been a community of interest because they

16   didn't have a deal yet.

17        MR. MOSKIN:  Well, Mr. Villacci himself says they

18   were just negotiating a deal --

19        THE COURT:  I understand.

20        MR. MOSKIN:  -- at the time.

21        THE COURT:  So let's say, for example --

22        MS. HARTZELL:  There is an --

23        THE COURT:  -- to come up with a hypothetical.

24        MS. HARTZELL:  There is an IBM case in which the

25   parties --

1    THE COURT:  Well, let me just come up with a

2    hypothetical.  Let's say, for example, that two married people

3    are going to get a divorce and they decide they don't want to

4    pay a lot of money to lawyers, so they both go consult one

5    lawyer, and the lawyer agrees to represent both of them to do

6    this divorce.  Okay, now, it's the opposite of what we're

7    talking about.  It's people splitting up as opposed to going

8    together.

9    Let me do it a different way.  Let's say two people

10   are going to get married and they decide to consult the same

11   lawyer to do a prenuptial agreement because they don't want to

12   pay two lawyers for this.  And the lawyer says, I'm going to

13   represent both of you.  And he explains the conflict and all

14   this kind of stuff, and they both make communications to the

15   lawyer about that, and then they talk to each other about the

16   communications, okay.  They don't have a deal yet.  Eventually

17   they do.

18   Wouldn't those communications be privileged?

19   MR. MOSKIN:  Are you asking me?

20   THE COURT:  I'm asking you.

21   MR. MOSKIN:  I --

22   THE COURT:  It's not exactly the same case but --

23   MR. MOSKIN:  No, and I think --

24   THE COURT:  -- I'm playing law professor here.

25   MR. MOSKIN:  No, no.  Obviously, there is an overlay

1    here of the marital privilege.  I don't know how it stands

2    here.

3            You know, in a commercial transaction, I would say

4    no, that you're still --

5            THE COURT:  You're going to need to find some

6    authority on that because logically, it seems to me that if --

7    logically it seems to me that if there is some understanding

8    that there is a lawyer who is doing this for everybody, then

9    it would be privileged.  Now, there may be a question as to

10   whether there is that understanding.

11           So maybe what you're saying is that in this case

12   company -- or A wants to do a business deal with B.  A has a

13   lawyer.  B doesn't have enough money to get a lawyer, so B

14   doesn't have a lawyer.  A consults his lawyer about issues of

15   mutual interests of theirs and then tells B, this is what my

16   lawyer told me.

17           Okay.  Your contention would be that's not community

18   of interest.  They're dealing at arm's length presumably, and

19   he's disclosed it and it's not privileged anymore.  I mean, I

20   understand that argument.  And your argument would be, no,

21   it's community of interest because the whole purpose of this

22   is one guy is really sort of relying on the other guy's

23   lawyer.

24           I'm going to need to see some law about that.

25   Honestly, it's not exactly -- I wouldn't describe it as a

1   smoking gun, I'm just going to say. So it may be that you

2   might decide --

3        Ms. Hartzell, you can have this back.

4        Maybe you might decide: Gee, do we really, really

5   want to spend all of our valuable time on this? But, you

6   know, as a lawyer once told me, paper doesn't refuse ink.

7        MR. MOSKIN: And, your Honor, the real point is -- as

8   I said at the outset, I'm really less, far less, concerned

9   about the privilege issue which prevails or is predominant in

10  their response than the control issue. So let's assume --

11       THE COURT: Let's assume there is a community of

12  interest. You're saying that that basically gives you what

13  you need in terms of control. But the whole question is: Is

14  there something that the other person didn't produce then?

15       MR. MOSKIN: Yes. He said -- we have attached his --

16  this one I actually spoke with him. They never -- they sent

17  one email to him on December 26th to a defunct email address

18  which immediately bounces back. So they would have known. I

19  don't think that's -- that's questionable as to whether that's

20  good faith in contacting. Frankly, it was a different email

21  address than they had used in the other communication.

22       THE COURT: Can I trade, because I'm sitting here

23  chanting in my head. There was a Seinfeld episode in which

24  somebody was chanting "serenity now." I'm saying this to

25  myself in my head. So let me just kind --

1    Let me just kind of see if I can simplify this a

2  little bit.  So your concern is that if they're claiming a

3  community of interest, this implies some degree of control or

4  access on the part of Chapterhouse of Smith's documents and

5  Smith's materials, number one.  And, number two, it implies

6  some sort of a relationship where there should have been some

7  communication with him about preserving things.

8    Am I kind of catching it?

9    MR. MOSKIN:  Preserving it and collecting documents,

10  and he's deleted everything.  And I think this same argument

11  probably applies to all of the designers.

12    THE COURT:  So I guess --

13    Okay, we're just going to put the pause button on

14  that one for a second.  We're going to move to another topic.

15    So have we exhausted topic two?  We're about to move

16  on to topic three except for the thing that we're about to go

17  back on topic two.

18    MR. MOSKIN:  I would just say one thing.  One of the

19  designers is Mr. Villacci's partner, Mr. Fiertek.  Although

20  counsel says that everything is resolved, it's not quite

21  right.  We still haven't seen documents that should have been

22  produced over a month ago.  So we don't know what we're going

23  to get, and there may be further issues.

24    He also doesn't --

25    THE COURT:  But that's -- you know, as Mr. Lincoln

1  said, "I will cross that bridge when I get to it."

2  MR. MOSKIN:  The last issue was we had arranged an

3  inspection of --

4  THE COURT:  Oh, the four books.

5  MS. HARTZELL:  Yes.

6  THE COURT:  So the explanation that I got in the

7  response for the four books is the guy got a divorce, he moved

8  out of the house, he doesn't have the books anymore, sorry.

9  MS. HARTZELL:  We also would note that Mr. Fiertek

10  provided a list of the documents in his possession since he is

11  located, I believe I said Sweden in the motion, but I think

12  it's --

13  THE COURT:  Mr. Moskin, is what you are trying to

14  prove here is that he had access to the stuff?

15  MR. MOSKIN:  No, it was more that the copying.  I

16  mean, about 60 percent of his works are based on this book,

17  "The Horus Heresy."

18  THE COURT:  Okay.  I said "access."  You say

19  "tomato."  It's the same thing, okay.  I mean, you want to

20  prove that he had this book right there.  And, ladies and

21  gentlemen, here's the page out of the book and here's the

22  thing he designed, right?

23  That's what you want to do, right?

24  MR. MOSKIN:  And to see if he made notes on it.

25  THE COURT:  Can you, like, answer a question with one

1 │ word?

2 │       MR. MOSKIN:  Yes.

3 │       THE COURT:  Good, that's progress.

4 │       MR. MOSKIN:  It's more than that.

5 │       THE COURT:  I understand, but that's part of it,

6 │ okay.

7 │       He doesn't have the books anymore, and so you're

8 │ afraid you're not going not to be hold up the books.  But I

9 │ think Ms. Hartzell is saying in her response, we agree he had

10 │ the books, he had the books, he had the books, we're not going

11 │ to dispute having the books.  He just doesn't have them now

12 │ because maybe his spouse has them, or maybe his spouse decided

13 │ to throw them out on the sidewalk or rip them into shreds or

14 │ something like that.  Who knows?

15 │       But if they're going to agree that he had them, and I

16 │ know I saw that in here --

17 │       MS. HARTZELL:  Yes.  We stipulate he had access.

18 │       THE COURT:  What's the problem?  What doesn't it

19 │ solve?  That's the question.

20 │       MR. MOSKIN:  Again, it's that additional point of

21 │ prejudice.  If access means the same thing as actual copying,

22 │ which is -- again, they can still make their defense at trial.

23 │       THE COURT:  What aren't you going to be able prove,

24 │ though?  What aren't you going to be able to prove?  I mean,

25 │ the guy presumably is going to admit, I had these books.

1    You're going to show them.

2              You have got a copy of the book, right?  You're going

3    to say:  Is this the book?  Yes.  Is this the book?  Is it

4    this page in the book?  Yes.

5              MR. MOSKIN:  Frankly, as I'm sure your Honor knows,

6    it's much more compelling to show a jury --

7              THE COURT:  Ah, come on.

8              MR. MOSKIN:  -- to show a jury a book that has notes

9    in it where he circled things and it's dog-eared.

10             THE COURT:  Okay.  Was that all there?  I mean, had

11   he circled things?

12             MR. MOSKIN:  We don't know because he didn't preserve

13   the book.

14             MR. COOPER:  Your Honor --

15             THE COURT:  Don't talk yet.

16             Okay.  When did you see the book?

17             MR. MOSKIN:  Excuse me?

18             THE COURT:  When did you see the book?  When did you

19   know he had it?

20             MR. MOSKIN:  Okay.  At the very outset of the case --

21             THE COURT:  Stop right there.  You answered my

22   question.

23             Okay.  When did you take his deposition?

24             MR. MOSKIN:  I think it was in March last year.

25             THE COURT:  Okay.  March of 2012.  Did you ask to

1   look at the book before the deposition?

2          MR. MOSKIN:  Not that time, no.

3          THE COURT:  Why not?

4          MR. MOSKIN:  Just one of too many things, that --

5          THE COURT:  So the contention that it's dog-eared and

6   circled and highlighted and, you know, little mustaches drawn

7   on the figures and beards and whatnot, speculation.  You have

8   no basis for saying that other than just a guess, right?

9          MR. MOSKIN:  Well, no, I wouldn't --

10         I would say we have got hundreds of emails where he's

11  talking about "The Horus Heresy" and HH.  I think there's a

12  great likelihood that there would be something in that book of

13  all.

14         THE COURT:  Okay.  So here's what I'm going to tell

15  you.  I'm not going to tell you not to preserve the issue.  By

16  all means, preserve it.

17         MR. MOSKIN:  Okay.

18         THE COURT:  You're going to lose the spoliation

19  motion on that because you're guessing.  Okay, you're

20  guessing, A.

21         And, B, it seems to me somebody on your side of the

22  case had an opportunity to look at this thing and ask the man

23  about it before he was deposed the first time.  Okay.  So go

24  ahead and file the motion, but certainly now, based on what

25  you have told me so far, it doesn't seem to me to rise to the

1   level of something that would get you an adverse inference.

2           What else?  So just the thing that we're going to

3   come back to.

4           MR. MOSKIN:  Correct.

5           THE COURT:  And because I have been chanting

6   "serenity now" in the other part of my head, I've now

7   forgotten what --

8           MS. HARTZELL:  It's the control issue.

9           THE COURT:  -- that is even though it's been only

10  five minutes.

11          MS. HARTZELL:  May I address it, your Honor?

12          THE COURT:  The which issue?

13          MS. HARTZELL:  The control issue.

14          THE COURT:  Yes, go ahead.

15          MS. HARTZELL:  The argument is based upon an

16  assumption that there were contracts with each of the

17  designers.  For the designers that we have not been able to

18  receive documents from or a response from, Smith and Stinson,

19  Mr. Villacci did not have any contractual relationship with

20  those individuals.  For example, Mr. Stinson was a customer

21  who contacted and made a request for a particular kind of

22  shoulder pad, and communication -- those emails have been

23  produced.  But there was no -- because he was not providing

24  day-to-day creation or sculpting on the product, he was not --

25  did not sign a contract.  And that is similarly true for Mr.

1    Smith who had previously designed the product.

2          THE COURT:  And, therefore, what?

3          MS. HARTZELL:  And, therefore, the argument that

4    Mr. Villacci has control over them or had control over them

5    based upon a contractual relationship is not applicable.

6          THE COURT:  Mr. Moskin.

7          MR. MOSKIN:  Well, that's fine.  I will -- except

8    that that still leaves -- we can put Stinson aside, with Smith

9    as the community of interest question.  If they had a

10    community of interest, they had some measure of control.  And

11    they were also -- in the second phase of the case, there were

12    14 other designers.  The first phase of the case, I don't

13    recall the exact number.  I think there were about 16

14    designers at issue there.

15          And if they had a contract with each of them, then I

16    think he had some measure of control.  And, again, your Honor

17    did order them to make at least a good faith effort.  Perhaps

18    if we were going to see all the correspondence now, we would

19    have a better shot -- be able to better explain to your Honor

20    when, regrettably, we might have to come back.

21          THE COURT:  Here's the way I think this ought to be

22    dealt with.  Our trial date is what?

23          MS. HARTZELL:  April 15th.

24          THE COURT:  April 15th, okay.

25          MR. MOSKIN:  And have I given you a date?  After I

1  moved the trial date, did I give you a date, a revised date,

2  for the pretrial conference?

3          MS. HARTZELL:  I believe so, yes.

4          THE COURT:  It's probably sometime in early April.

5          MS. HARTZELL:  Yes, I think so.  I don't have that

6  one memorized.

7          THE COURT:  It's April the -- I'm not seeing it.

8  It's April the 10th.  Okay.

9          And I know you already filed a set of motions in

10 limine when the trial was set before.  It seems to me that the

11 way to deal with this, and it's not, strictly speaking, a

12 motion in limine, you know, because you're asking for adverse

13 inferences and whatnot -- it seems to me that that's how it

14 ought to get teed up, though.  So why don't you --

15         So I'm just going to enter and continue this.  My

16 guess is that what you're going to want to do once you have

17 more information after taking Villacci's continued deposition

18 is you're going to want to file something modified that says,

19 okay, this is exactly what we're asking for in terms of an

20 adverse inference.  I mean, I'm not persuaded right at the

21 moment, at this particular moment in time, that, you know,

22 there is anything for me to do in terms of ordering more

23 discovery because it sounds like that's in progress and it

24 sounds like to the extent that, you know, that the

25 defendant -- as far as documents that they're collecting from

1 third parties, they have basically taken the position we have

2 done what we need to do, and I'm just not prepared to

3 adjudicate that right now.

4 MR. MOSKIN: One last thing. Are we going to get the

5 communications with the designers?

6 THE COURT: Are you going to get the communications

7 with the designers?

8 MS. HARTZELL: That was my understanding.

9 THE COURT: Yes.

10 MR. MOSKIN: Okay.

11 THE COURT: I mean, you're going to work out this

12 thing; we're not going to claim a waiver of the privilege.

13 MR. MOSKIN: No waiver. I said it in open court. I

14 don't plan to go back on my word.

15 THE COURT: All right.

16 MR. MOSKIN: Thank you, your Honor.

17 MS. HARTZELL: With one clarification, for the

18 designers that we represented in responding to the subpoenas,

19 we did have further communications with them which we do

20 believe would be attorney/client privilege.

21 THE COURT: About what? You're not looking --

22 MR. MOSKIN: I'm not interested in that. It's really

23 the control issue during the design phase.

24 THE COURT: Okay, so you're on the same page.

25 MS. HARTZELL: All right.

1        MR. MOSKIN:  This is for both parts of the case.

2        THE COURT:  So the order is just going to say the

3   motion is entered and continued generally.

4        All right, take care.

5        MS. HARTZELL:  Thank you, your Honor.

6        THE COURT:  Serenity now.

7        MR. MOSKIN:  Thank you, your Honor.

8        THE COURT:  Serenity now.

9     (Which were all the proceedings had in the above-entitled

10  cause on the day and date aforesaid.)

11

12                  C E R T I F I C A T E

13

14        I hereby certify that the foregoing is a true and

15  correct transcript of the above-entitled matter.

16

17

18  /s/ Laura M. Brennan                    March 28, 2013

19

20  _____          _____
    Laura M. Brennan
21  Official Court Reporter                   Date
    Northern District of Illinois
22

23

24

25