**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:10-cv-08103 |
| v. | ) |
| | ) |
| CHAPTERHOUSE STUDIOS LLC | ) |
| | ) Judge Matthew F. Kennelly |
| Defendant. | ) |

**CHAPTERHOUSE STUDIOS LLC'S OPPOSITION TO GAMES WORKSHOP
LIMITED'S OMNIBUS MOTION *IN LIMINE***

Jennifer A. Golinveaux (CA Bar No. 203056)
Thomas J. Kearney (CA Bar No. 267087)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111-5802
Phone: (415) 591-1000
Fax: (415) 591-1400
jgolinveaux@winston.com
tkearney@winston.com

Imron T. Aly (IL Bar No. 6269322)
Bryce A. Cooper (IL Bar No. 6296129)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-1695
Phone: (312) 558-5600
Fax: (312) 558-5700
ialy@winston.com
bcooper@winston.com

Julianne M. Hartzell (IL Bar No. 6275093)
Sarah J. Kalemeris (IL Bar No. 6303644)
MARSHALL, GERSTEIN & BORUN LLP
233 S. Wacker Drive
Willis Tower Suite 6300
Chicago, IL 60606
Phone: (312) 474-6300
Fax: (312) 474-0448
jhartzell@marshallip.com
skalemeris@marshallip.com

The Court should deny all 12 motions in Plaintiff Games Workshop Limited's ("GW") omnibus motion *in limine*.[1]

**ARGUMENT**

I.  **GW Provides No Credible Basis for Excluding CHS Expert Testimony**

GW's only basis for seeking to exclude testimony by CHS's expert, Dr. Carl Grindley, is based on its own willful confusion of Dr. Grindley's report and testimony and its conscious decision not to disclose the foundation of its copyright claims or reference materials until after Dr. Grindley issued his report. Because Dr. Grindley fully complied with the requirements of disclosure and supplementation under Rule 26 and GW thoroughly explored his opinions during his deposition, GW's motion should be denied.[2]

**A. Dr. Grindley's Opinions were Timely Disclosed in His Original Report and Thoroughly Explored During His Deposition**

"The centripetal principle of [Rule 26] is to prevent a party from being ambushed by new theories or evidence to which the party lacks sufficient time to respond." *Bone Care Intern., LLC v. Pentech Pharms., Inc.*, 2010 WL 3894444, at *13 (N.D. Ill. Sept. 30, 2010). While an expert's report must be "detailed and complete" under Rule 26, the Advisory Committee specifically noted that, "[t]he purpose of these expert reports is not to replicate every word that the expert might say on the stand. It is instead to convey the *substance* of the expert's opinion . . . so that

---

[1] CHS is awaiting GW's confirmation of the parties' agreement that neither side will offer evidence or argument regarding English law or call at trial any experts in English law. Based on this agreement, GW's motion *in limine* to preclude CHS from offering evidence or argument regarding English law should be denied as moot.

[2] GW also argues CHS experts William Brewster and Gary Wolfe should be precluded from offering any opinions about (1) any GW products not specifically identified in their expert reports; (2) any design elements not specifically discussed in their reports; and (3) any similarities or differences that exist between the GW and CHS products. CHS does not intend to introduce testimony regarding matters not disclosed under Rule 26. (Mot. at 3-4). However, it is unclear what GW seeks to exclude with regards to "(1) any GW products not specifically identified in [their] report[s]," as each expert reported that he examined and relied upon all of the GW products identified as allegedly infringed in GW's claim chart and exemplar images that correspond with those products. *See* Ex. 1, Brewster Report at 2-3; Ex. 2, Wolfe Report at 1. Accordingly, CHS intends to introduce exemplar images of these GW products with these witnesses. They will not testify regarding design elements, similarities, or differences not previously disclosed. Therefore, GW's motion with respect to Messrs. Brewster and Wolfe is moot.

the opponent will be ready to rebut, to cross examine, and to offer a competing expert if necessary." *Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 762 (7th Cir. 2010). Moreover, an expert's opinion offered in deposition testimony is not new or untimely where it is "consistent with the opinion presented in his report" or "merely expound[s] upon and supports [his] original opinion." *Wiestock v. Midwestern Reg'l Med. Ctr.*, 2010 WL 1655449, at *4 (N.D. Ill. Apr. 23, 2010); *see also Rowe Int'l Corp. v. Ecast, Inc.,* 586 F.Supp.2d 924, 934 (N.D. Ill. 2008). Where the opposing party has the opportunity to question the expert during his deposition, that party is not "ambushed," and a motion *in limine* to preclude the expert's testimony should be denied. *See Chappel v. SBC-Ameritech*, 2007 WL 2076028, at *1, 4 (N.D. Ill. Jul. 13, 2007).

That is exactly what happened here. Dr. Grindley was engaged to analyze the products and images identified in GW's January 11, 2013 Claim Chart for Newly Accused Products (the "New Products Claim Chart"), which includes both CHS and GW works. Ex. 3 at ¶ 1.[3] He performed extensive research to compare the design elements he identified in the New Products Claim Chart to other works from historical, medieval, cinematic, and science fiction sources. *Id.*; Ex. 4 at 30:13-19, 31:23-32:5. When he identified similarities amongst the works that would demonstrate common design elements in the genre, he included them in his report, identifying which claim they pertained to in a chart he created and appended to his report. Ex. 3 at ¶¶ 1, 3, 30-31 and Ex. B; Ex. 4 at 303:10-15. Thus, Dr. Grindley's selection and inclusion of specific science fiction works in his chart is telling and demonstrative—it provides a visual depiction of common design elements shared by both products and pre-existing works in science fiction. He further explained at deposition his purpose in creating this chart: "By pointing to historical similarity or a similarity in the world of fiction or popular culture between a Games Workshop product and its sort of thematic origins, that rules out a significant similarity between Chapterhouse's product and Games Workshop's products." Ex. 4 at 303:10-15.

---

[3] Exhibits cited herein are appended to the Declaration of Bryce A. Cooper, filed concurrently herewith.

GW now argues that Dr. Grindley did not disclose that he actually examined the CHS products (in addition to the GW works) for their design elements or examine similarities between the GW and CHS products, but that is wrong. Identifying the *shared* design similarities between the products at issue in this case and other science fiction works was a central point of Dr. Grindley's analysis, as he clearly stated in his expert report:

> To organize my findings, I recreated the Games Workshop January 11, 2013 claim chart detailing *each* Games Workshop New Allegedly Infringed Work *and* the corresponding accused Chapterhouse product. I then added a third column to the chart, in which I included the closely similar pre-existing works I collected during my research from which the purportedly copyrightable elements of the Games Workshop work appear to have been derived.

Ex. 3 at ¶ 31 (emphasis added). Dr. Grindley further explained during his deposition:

> I think the best way to conceptualize the process of identification . . . is to consider that after seeing a resemblance, to continue sort of examining that resemblance to see if that resemblance itself was due to borrowing from one company's works to another or whether that resemblance was due to another factor, and in each of the situations where I found resemblances and then proceeded to the next step of inquiry, I always determined that the resemblances were due to prior works in terms of history.

Ex. 4 at 43:19-44:8. As Dr. Grindley further explained, "the claims chart [] itself is arguing that there are similarities [between the GW and CHS products]. So by examining and critiquing that claims chart, I am in essence conducting that [same] activity." *Id.* at 71:19-23.

GW apparently believes adequate disclosure under Rule 26 would only be satisfied if Dr. Grindley included even more detail beyond the comparisons that the expert report contained, as if a word-for-word trial testimony were required. Rule 26 does not demand such an impractical task.[4] As Dr. Grindley explained, for a number of the claims at issue, "from my understanding what a reasonable person would do is a reasonable person would draw their understanding of this

---

[4] GW's argument that identification and disclosure of all relevant design elements must be not only provided by visual example but also include a textual description of each and every one of those elements is particularly specious in light of GW's refusal to provide such descriptions in its own claim charts. For instance, the copyrightable elements of most GW works in the New Products Claim Chart are simply listed as "Whole set," giving no indication of the design elements at issue in the case, much less what products (*see* Ex. 5 at product entries 124, 126, 129, 130, 131, 132, 133, 134, 137, 138, 139, 140, 141, 142, 144, 145, 149, 150, 153, 154, 159, 160, 163). *See also infra* at 5-7.

[Expert Report Exhibit B] from its contents and see what was being argued in a visual sense rather than through words." *Id.* at 64:17-22. That aligns with the jury's role in this case.

GW knew full well what the comparisons were that Dr. Grindley made, and had the opportunity to ask about them at his deposition In fact, GW did just that. *See*, *e.g.*, Ex. 4 at 333:11-336:21; 341:11-343:5. GW does not even attempt to claim that the answers given by Dr. Grindley at his deposition are in any way inconsistent with the opinions presented in his report. Dr. Grindley has opined that, to the extent there are design elements shared by the GW and CHS products, such similarities are due to their origin as common elements in science fiction or other works, and he has provided many examples. There is no "ambush" here, and GW's motion should be denied.[5]

**B. Dr. Grindley's Supplemental Expert Report Was Timely and Proper**

Due to the expedited nature of discovery in the second phase of litigation, fact and expert discovery ran concurrently and closed on February 25, 2013. Dkt. 265. Because of this overlap, Dr. Grindley did not have the chance to consider two important pieces of evidence when he submitted his original expert report on February 1, 2012: (1) the deposition of GW's 30(b)(6) witnesses, including Alan Merrett, who was deposed on February 24, 2013; and (2) the reference materials available to GW's designers at its studios, which GW allowed to be inspected on February 25, 2013. Cooper Decl. ¶¶ 9, 13. After this information was produced, Dr. Grindley analyzed it and timely submitted a supplementation to his report on March 13, 2013 based on this new information.[6] *See* Ex. 8. Supplemental disclosures of previously undisclosed opinions "are permitted when they are based on information acquired subsequent to the original disclosure

---

[5] GW's additional "procedural" claim that the exhibits to Dr. Grindley's report should be excluded for being served late—on February 2, 2013 at 12:19 a.m. and 12:48 a.m due to technical difficulties transmitting large files over e-mail—cannot be a serious argument in light of its failure to serve its New Products Claim Chart until January 14, 2013, *3 full days after* the Court's January 11, 2013 deadline to do so. Cooper Decl. ¶¶ 6-7, Ex. 6, Jan. 14, 2013 e-mail from GW to CHS counsel; Cooper Decl. ¶ 8, Ex. 7, Feb. 2, 2013 e-mail from CHS to GW counsel. Either both should be stricken or neither.

[6] Specifically, Dr. Grindley's additions are found at ¶¶ 2, 59-63, footnotes 2 and 3, and Exhibit B to his Supplemental Expert Report. *See* Ex. 8.

. . ." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.,* 2005 WL 1300763, at * 2 (N.D. Ill. Feb. 22, 2005); *Carter v. Finely Hospital,* 2003 WL 22232844, at *2 (N.D. Ill. Sept. 22, 2003).

Here, paragraph 2 and footnote 2 of Dr. Grindley's supplemental report simply explain in further detail the steps of his *original* analysis:

> In order to determine what design elements from the Chapterhouse and Games Workshop products are found in historical or popular culture pre-existing works, naturally I first had to do a visual comparison between the Chapterhouse and Games Workshop products in the New Products Claim Chart to identify the design elements I saw that were similar in order to then compare any of these similarities to design elements in pre-existing works and determine whether the similarities were significant.

Ex. 8 at ¶ 2. While he believed this would be an "obvious step" in his analysis, Dr. Grindley added this paragraph "due to professed confusion from Games Workshop counsel" during his deposition—the merit of which was discussed above. *Id.* at n.2.

The remaining supplemental paragraphs and exhibit additions are a result of information GW provided *after* the timely submission of Dr. Grindley's original report. Dr. Grindley specifically noted at his deposition that he would have found this information helpful in forming his opinions. For instance, Dr. Grindley did not know what design elements or choices GW alleged were protectable for most of its allegedly infringed products. *See* Ex. 4 at 348:4-9, 349:13-350:3. As he explained during his deposition, "If Games Workshop had specified the design elements that it found to be infringing, my report would have taken a substantially different shape." *Id.* at 22-349:5.

GW has made clear its intention to try this case not on the infringement of any protectable elements of its individual works, but rather on a vague infringement of its so-called "oeuvre" that has been previously rejected by the Court. *See* Dkt. 302 at 16 (GW argument that certain "ranges" of products have a "collective iconography" with a "creative significance transcending any one character or design in isolation."); *id.* at 17 n.5 (GW statement that "it does wish to present the theory to the jury at trial"); Dkt. 258 at 25 (Court holding that "GW's attempt to

5

persuade the Court to consider all of its products as one unified whole is therefore unpersuasive and without evidentiary support.").

Consistent with this approach, GW has time and again failed to identify the *specific* and *actual* design elements of its works that it believes are infringed by CHS's products. CHS even propounded an interrogatory requesting GW to "identify (a) each of your copyrights that you allege the product infringes" and (c) the "specific conduct that constitutes infringement." Ex. 9, CHS IROG at Req. 26. On December 12, 2012, GW responded that it "has already produced documents responsive to this request in the form of a detailed claim chart identifying the works that it alleges have been copied." Ex. 10, GW IROG Response at Req. 26. Thus, GW pointed only to its New Products Claim Chart for explanation of the allegedly copyrightable design elements of its works. Yet no description is given in the New Products Claim Chart for a vast majority of GW's products. For instance, while product entry 128, the CHS "Hotshot Lasgun Pack," is identified as infringing GW's "gun muzzle" on several of its works for its "key identifying feature" of an "angled end to the muzzle," the copyrightable elements of most GW works are simply listed as "Whole set" (*see* Ex. 5 at product entries 124, 126, 129, 130, 131, 132, 133, 134, 137, 138, 139, 140, 141, 142, 144, 145, 149, 150, 153, 154, 159, 160, 163). Dr. Grindley testified at his deposition that it was impossible for him to gather what "whole set" meant or respond more comprehensively than analyzing the works for the origin of their common design elements. Ex. 3 at 348:10-21; Ex. 5. Thus, Dr. Grindley's report exceeded the specificity of GW's own ability to identify product similarities.

After Dr. Grindley submitted his original support, GW offered Alan Merrett for deposition, whose responsibilities include being the "final authority" at GW about its intellectual property. Ex. 11 at 3:18-25. For many claim entries, Mr. Merrett shed more light on the design elements GW alleges are at issue in this case. *See*, *e.g.*, *id.* at 19:1-22:1; 35:6-37:21; 141:3-24. Dr. Grindley was then able to supplement his report to address Mr. Merrett's claims. Dr. Grindley wrote, "With the benefit of Mr. Merrett's deposition, I now can and have identified a number of design differences between Games Workshop's and Chapterhouse's products that

6

Games Workshop appears to believe are non-significant, and for which I disagree. I have amended my chart at Exhibit B to this report to specifically identify some of these design elements." Ex. 8 at ¶ 61.

Similarly, Dr. Grindley noted in his original report that, "I believe reviewing any materials that Games Workshop product designers had access to during the creation and development of the New Allegedly Infringed Works will be important to my analysis and expert opinion." Ex. 3 at ¶ 58. Once GW finally allowed the reference materials inspection, Dr. Grindley examined the identified reference works and issued supplemental opinions based upon his analysis of those materials. *See* Ex. 8 at ¶ 62 and Ex. B.

GW's motion offers no legitimate basis for excluding a supplemental expert report based on information disclosed by GW after service of Dr. Grindley's original report. This is precisely the circumstance in which supplemental reports are permitted. When GW finally identified design elements it alleged were significant and/or infringed, Dr. Grindley properly supplemented his report. Moreover, almost a month has passed since Dr. Grindley served his supplemental report, and GW has never requested a supplemental deposition (likely because it fully explored at his deposition all of the issues it now complains were not adequately disclosed), strategically deciding to bring this motion instead. Cooper Decl. ¶ 10. GW's attempt to exclude Dr. Grindley's relevant and timely disclosed testimony should be denied.[7]

---

[7] GW also makes a passing argument that Dr. Grindley is not qualified to opine on "substantial similarity under copyright law, product design, or any other form of comparative analysis of the parties' products." (Mot. at 6). First, Dr. Grindley will not provide an opinion on copyright law, in which he has stated he is not an expert. Second, it is impossible to understand what GW means to exclude by its reference to "product design." Third, GW has not provided *any* record citation, including deposition testimony for which GW had ample opportunity to explore Dr. Grindley's qualifications, to support its one-sentence claim that Dr. Grindley is unqualified to provide a comparative analysis of the design and artistic elements present in the GW and CHS products. *Id.* To the contrary, his extensive background, which includes Masters and Doctorate degrees and extensive scholarship and teaching on the contemporary world's appropriation of historical images, and the fields of medievalism, popular culture, and science fiction literature and film, qualify him as an expert in this case. *See* Ex. 3 at ¶¶ 4-12, Ex. C.

II. **Dr. Grindley's Testimony Regarding the Size and Shape of GW's Shoulder Pads is Timely Disclosed, Relevant, and Admissible**

GW provides no citation or basis for its conclusory argument that expert testimony from Dr. Grindley regarding the size and shape of GW's shoulder pads should be excluded because "[a]ny expert opinions [CHS] intended to provide at trial regarding [GW's] Space Marine Shoulder Pad were required to be provided in the first phase of the case." Mot. at 7. There is no basis for this claim, since GW asserted new products and new arguments in the second phase of the case, and CHS was entitled to rebut them. GW chose to amend its complaint—delaying trial and re-opening discovery—to include new claims for new products.

As a preliminary matter, GW wrongly assumes that Dr. Grindley's testimony is relevant only to whether the size and shape of shoulder pads element is eligible for copyright protection—a question CHS acknowledges the Court has already settled. But Dr. Grindley's testimony regarding the *ubiquity* of oversized and disproportionately large shoulder pads as a common design element in works of science fiction is also relevant to CHS's fair use defense and the jury's consideration of substantial similarity and the scope of the copyright. Without familiarity of the genre, a jury may see non-identical similarities between GW and CHS products and believe them to be substantial when in fact they are quite different expressions of a common theme or design in science fiction. The jury should not have to consider the issue in a vacuum and without any context. To do so would mean asking the jury to compare two components without understanding where the protectability of the shoulder pads starts and stops, and what degree of changes from the GW shoulder pads would still be substantially similar or not.

III. **Images of Science Fiction Works Containing Common or Customary Design Elements are Relevant to CHS's Fair Use and Scenes a Faire Defenses and the Jury's Consideration of Substantial Similarity**

GW erects several straw men (*i.e.*, independent creation, originality) to argue that CHS's experts should be precluded from introducing images of *any* other science fiction works containing similarities to GW's products, but ignores the relevant and admissible bases for which CHS seeks to introduce such works.

8

First, testimony and evidence regarding similarities between GW's products and other works in science fiction and history are relevant to CHS's *scenes a faire* defense. GW's argument is advanced under the false premise that the *scenes a faire* doctrine only applies if design elements are "required or indispensible." Mot. at 8. The law is not so stringent. Rather, "*[s]cenes a faire* refers to incidents, characters or settings which are as a practical matter indispensible, *or at least standard*, in the treatment of a given topic." *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 616 (7th Cir. 1982) (emphasis added). In other words, "a copyright owner can't prove infringement by pointing to features of his work that are found in the defendant's work as well but that are so *rudimentary, commonplace, standard, or unavoidable* that they do not serve to distinguish one work within a class of works from another." *Bucklew v. Hawkins, Ash, Baptie & Co.,LLP,* 329 F.3d 923, 929 (7th Cir. 2003); *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 284 F.Supp.2d 1069, 1080 (N.D. Ill. 2003) (Kennelly, J.) ("Although these elements are protected at least in their 'shapes, sizes, colors, sequence, and arrangements' . . . they are to be treated as scenes a faire, and are afforded protection only from virtually identical copying."). The use of other historical and science fiction images by CHS's experts is directly relevant to establishing whether certain design elements are common or standard in the genre.

Likewise, a jury without any knowledge of common or standard design elements in science fiction works is reasonably assisted by introduction of other works in science fiction to inform their decision on whether CHS's products may be considered substantially similar to GW's products. Again, the jury should not have to consider substantial similarity of non-identical products in a vacuum and without any context or background knowledge. These images are particularly relevant in light of the fact that, "[s]ome of the [CHS] designers relied in part upon their general knowledge of elements from science fiction, weaponry, military armor, military vehicles, military history, the middle ages, classical antiquities, steampunk, robotics, and jet powered bikes." Ex. 20, CHS Supp. Responses to GW Seventh Set of IROGs, at Req. 1.

9

CHS's interrogatory response specifically identifies the references disclosed by Dr. Grindley as "[e]xamples of the types of information generally referenced by the designers." *Id.*

Finally, fair use of a copyrighted work is a defense to a claim of copyright infringement. 17 U.S.C. § 107. In previously denying GW's motion for summary judgment on CHS's affirmative defense of fair use, the Court noted that:

> [C]haracters that GW has created undoubtedly share many of their traits with other fictional characters in science-fiction and fantasy genres, and the Space Marines include traits and armor similar to those worn by real soldiers throughout history. Thus although Warhammer 40K is undeniably fictional, many components of GW's products bear substantial similarly to items found throughout history.

Dkt. 333 at 19. This is one of several factors that must be "explored, and the results weighed together, in light of the purposes of copyright." *Id.* at 18 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577–78 (1994)). Such a "fact-intensive inquiry" should preclude exclusion of this evidence before trial even begins. Dkt. 333 at 18.

### IV. Testimony and Evidence Regarding Dismissed CHS Works are Relevant and Admissible

GW seeks to exclude testimony and evidence regarding the 37 works in the case for which GW is no longer asserting any claims of copyright infringement. But GW itself continues to make these products relevant through its continued assertion of trademark infringement for the majority of these products and the breadth of its copyright infringement allegations. GW cites to Rules 401-403 in support of its two sentence argument.

As an initial matter, GW continues to assert trademark infringement with respect to each of the dropped products; thus testimony, evidence, and argument concerning those products, how they have been marketed and sold, and defendant's intent in marketing those products remain at issue. Ex. 12, GW Second Rev. Claim Chart (*see e.g.,* products 7, 84-86, 99, 101, asserting trademark infringement); Dkt. 331 at p. 48-49 (agreed instruction regarding likelihood of confusion factors). CHS must be allowed to make clear to the jury that such products are *solely* accused of trademark infringement and not copyright infringement.

GW's argument also fails based on its allegations that the entirety of CHS's business model constitutes copyright infringement because CHS's products are allegedly inspired by GW's works and designed to allow for use in Warhammer. GW's Third Amended Complaint, filed December 10, 2012, accused, "all of the products that CHS currently markets and sells are derived from and bear unique characteristics and expressions of GW's copyrighted works." Dkt. 261 at ¶ 41; *see also* ¶ 31-33. GW continued to assert that "almost all of CHS's individual products" infringe in the pretrial order filed less than a week ago. Dkt. 331 at 2. Thus, GW seeks to exclude the 37 products that fall within its alleged definition of copyright infringement, but which CHS is now allowed to sell. CHS must have the opportunity to respond to claims that its entire business model and that "almost all of CHS's individual products" infringe, when nearly one quarter of the products GW initially accused of copyright infringement have been dismissed with prejudice from the case.

GW has also designated testimony and identified exhibits directed solely to statements by third parties alleging that CHS's products infringe GW's intellectual property; but those statements are based upon assertions made by GW itself to those third parties. Ex. 13 at 187, 192-193, Ex. 14 (Jan. 26, 2013 email); Ex. 15, "Dynath" website posting. To the extent the Court allows such testimony (which CHS believes is not relevant to any product at issue, prejudicial, and constitutes impermissible lay opinion), the fact that GW has changed its own mind about the scope of infringement with respect to nearly 40 such previously asserted—but now dropped—claims is relevant to the reasonableness of CHS's decision to independently assess the legality of its products rather than blindly adopting GW's asserted rights.

V.  **Certain Pre-Trial Rulings and Amended or Withdrawn Pleadings and Discovery Responses Should Not be Precluded**

GW argues in its motions in *limine* Nos. 6 and 11 that the parties should not be allowed to make reference to amended or withdrawn pleadings, claims, and discovery responses, or pre-

trial rulings by the Court.[8] For the reasons set forth above, CHS must be allowed to address claims that have been withdrawn and the Court's pretrial rulings regarding products dismissed with prejudice. Further, much of the testimony designated by the parties refers to the second phase of the litigation or products identified in the amended complaint. *See, e.g.*, Ex. 16 at 8; 25 (testifying that GW is aware of no consumer confusion regarding the products added in the second phase of the litigation); Ex. 17 at 25 (regarding advertisement of products at issue in the second phase of the case). CHS must reference the amended pleadings adding new products to the suit for such testimony to be understandable to the jury.[9] The only case cited by GW in support of its position is a case in which the court excluded withdrawn claims of trade dress infringement, unfair competition, and deceptive trade practices, where the withdrawn claims were entirely irrelevant to the remaining claims directed only to patent infringement. *EZ Dock, Inc. v. Schafer Sys., Inc.,* 2003 U.S. Dist. LEXIS 3634 at *37 (D. Minn. Mar. 8, 2003). Because the dismissed copyright claims are relevant to the plaintiff's asserted copyright infringement claims, this case is inapplicable.

## VI. GW's Efforts to Enforce Its Intellectual Property Rights Against Third Parties are Relevant and Admissible

GW's other enforcement attempts, and lack thereof, are relevant at least to show whether GW has consistently enforced its trademarks—which in this case include common terms such as "space marine," "jetbike," and "plasma"—so as to test whether they are generic.[10] *See, e.g., America Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 819 (4th Cir. 2001); 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 31:38 (4th ed. 2007) (noting that trademark owners have a "duty to police its rights against infringers"). GW also apparently plans to rely

---

[8] CHS is unclear what GW refers to as "newly raised perceived discovery issues," so is unable to take a position with respect to such issues.

[9] Similarly, with regard to products created during the pendency of the lawsuit, but which had not been accused of infringement until December, 2012, the timing of the infringement allegations may be relevant to the extent that GW seeks to rely upon its notice to CHS as evidence of CHS's intent.

[10] GW argues that CHS should not be allowed to mention any other legal proceedings involving GW, because that would be "wasteful and would allow the jury to draw unwarranted inferences that are irrelevant." Mot. at 12. GW does not specify what these irrelevant inferences are.

upon statements by third parties alleging that CHS's products infringe GW's IP; but those statements are based upon GW's own efforts to enforce its IP, making GW's communications with them all the more relevant. *See*, *e.g.*, Ex. 13 at 187, 192-193; Ex. 14 (Jan. 26, 2013 email); Ex. 15, "Dynath" website posting. Moreover, GW's efforts and reputation in the field are both relevant to evaluate its trademarks.

GW similarly argues that CHS cannot refer to GW's settlement with Jon Paulson—a former defendant in this case. But the naming of Paulson as a defendant shows the pattern by which GW acts: shoot first and ask questions later. It would be unfairly prejudicial to preclude CHS from informing the jury what happened with a co-defendant in this very case, along with others whom GW wrongfully accused of infringement. GW has espoused a plan or pattern, relevant under Rule 404(b)(2), simply to threaten individuals into stopping their work, whether they infringe or not.

## VII. CHS's License from Michael Moorcock is Relevant and Admissible

GW seeks to preclude evidence regarding CHS's trademark license from Michael Moorcock for use of Moorcock's eight pointed Chaos symbol. Pursuant to the Court's Memorandum Opinion and Order dated April 1, 2013, GW must show ownership and prior use in commerce of the Chaos Space Marines Eight-Pointed Star Icon. Dkt. 333. Michael Moorcock, a science fiction author, identifies himself as the originator of an eight pointed chaos symbol dating back to at least his Elric of Melnibone stories in the early 1960s and has licensed CHS to use his chaos symbol in connection with CHS's miniatures business. *See* Ex. 18, Ex. 19. GW's ownership of the mark is in dispute, and the fact a third party asserts ownership of that mark in connection with science fiction miniatures is relevant. Further, based on Moorcock's license, CHS has the right to invoke its superior rights in defense of GW's infringement claim. *Lapinee Trade, Inc. v. Paleewong Trading Co., Inc.*, 687 F.Supp. 1262, 1264 (N.D. Ill. 1988) (if a third party with superior rights grants to defendant a license to the trademark, the defendant can avoid liability for trademark infringement by invoking the third party's superior rights).

VIII.  **Evidence Regarding GW's Intellectual Property Policies are Relevant and Admissible**

GW says that CHS should not be allowed to refer to GW's published intellectual property policies, because "these general statements are irrelevant and likely to lead to jury confusion." Mot. at 14. CHS does not intend to rely affirmatively on those policies, but instead seeks only to use them as rebuttal or impeachment evidence, because GW should not be allowed to make arguments contradicting its own IP policies.[11] For example, GW previously argued that CHS disclaimed ownership in certain trademarks based on certain disclaimer language on its website. The Court recognized that CHS's mere use of disclaimer language does not automatically confer ownership of any trademark to GW. Dkt. 333 at 16. If GW makes a similar argument at trial, CHS should be allowed to refer to GW's own published IP policies, which direct the public to "include an appropriate disclaimer" and provide the language to be used (and in fact CHS used).

IX.  **Excluding Reference to CHS's Billing Arrangements Would Unduly Prejudice CHS**

As the Court is aware, CHS has been represented by several attorneys at two separate firms in this litigation in light of the sheer number of claims brought against CHS over the past two-plus years, a good number of which have now been dismissed. All of CHS's attorneys in this case have worked on a pro bono basis, with CHS covering some out-of-pocket expenses. CHS disclosed to GW at the very beginning of the case that its attorneys were working pro bono and has never objected to discovery regarding its billing arrangements. Notwithstanding GW's incorrect claim that CHS has also "hired a jury consultant" (Mot. at 15), the consultant and both of CHS's experts are also providing their services on a pro bono basis, with the exception of CHS's agreement to pay Mr. Brewster $30 per hour for time spent testifying in deposition or trial. These arrangements have all been disclosed to GW.

If the jury sees two firms, multiple attorneys, a jury consultant, and two highly qualified experts working for CHS at trial, without understanding that each of these individuals is

---

[11] Specifically, CHS will not rely on GW's online policies to argue that at least some of CHS's activities were licensed, in view of the Court's summary judgment decision that a jury could not so find. Dkt. 333 at 23.

providing their services pro bono, the jury could well assume that CHS has greater resources at its disposal than it does, or profited from the allegedly infringing activity to a far greater extent than it did. This assumption is highly relevant to damages sought in the case and the risk is compounded by GW's repeated (and wrong) refrain that CHS has spent "lavishly" on the litigation. GW has wholly failed to explain how it would be prejudiced by the jury's awareness of CHS's pro bono representation while the prejudice to CHS of keeping this fact from the jury is real.

> X. **GW's Motion to Preclude Questions and Documents on the Basis of Privilege is Unwarranted**

GW's one-sentence argument to preclude CHS from "posing questions that seek to invoke assertions of privilege" provides no examples or facts. It is impossible to understand or predict what it is that GW believes is an issue, and there is no basis to understand what GW will assert at trial as privileged or not. GW's past overbroad and unfounded assertions of privilege during discovery certainly offer no reason to exclude properly admissible questions posed during trial. GW may object at trial on the basis of privilege if appropriate to do so.

Dated: April 3, 2013

Respectfully submitted,

/s/ Bryce A. Cooper

Jennifer A. Golinveaux (CA Bar No. 203056)
Thomas J. Kearney (CA Bar No. 267087)
    WINSTON & STRAWN LLP
    101 California Street
    San Francisco, CA 94111-5802
    Phone: (415) 591-1000
    Fax: (415) 591-1400
    jgolinveaux@winston.com
    tkearney@winston.com

Imron T. Aly (IL Bar No. 6269322)
Bryce A. Cooper (IL Bar No. 6296129)
    WINSTON & STRAWN LLP
    35 West Wacker Drive
    Chicago, IL 60601-1695
    Phone: (312) 558-5600
    Fax: (312) 558-5700
    ialy@winston.com
    bcooper@winston.com

Julianne M. Hartzell (IL Bar No. 6275093)
Sarah J. Kalemeris (IL Bar No. 6303644)
    MARSHALL, GERSTEIN & BORUN LLP
    233 S. Wacker Drive
    Willis Tower Suite 6300
    Chicago, IL 60606
    Phone: (312) 474-6300
    Fax: (312) 474-0448
    jhartzell@marshallip.com
    skalemeris@marshallip.com

**CERTIFICATE OF SERVICE**

I, Bryce A. Cooper, an attorney, hereby certify that on April 3, 2013, I caused to be filed electronically the foregoing CHAPTERHOUSE STUDIOS LLC'S OPPOSITION TO GAMES WORKSHOP'S OMNIBUS MOTION IN LIMINE with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

_____/s/  Bryce A. Cooper_____