**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES<br><br>Defendants. | Civil Action No. 1:10-cv-8103<br><br>Hon. Matthew F. Kennelly |

**PLAINTIFF'S OPPOSITION TO MOTION IN *LIMINE***

Dated: April 3, 2013

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

Jason J. Keener (Ill. Bar No. 6280337)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: 312.832.4500
Facsimile: 312.832.4700
Email: jkeener@foley.com

*Attorneys for Plaintiff Games Workshop Limited*

Games Workshop Limited ("Games Workshop") respectfully submits this memorandum in opposition to Defendant's motion in limine.

**1. Blog Postings That Defendant Deliberately Failed to Produce Despite a Court Order Are Admissible**

During the February 14, 2013 hearing on Games Workshop's motion to enforce the Court's prior discovery orders, the Court noted that the responses of customers to Chapterhouse's forum posts would not appear to be hearsay.

> THE COURT: Why do you care about the responses?
> MR. MOSKIN: Because they are evidence of what ordinary observers believe or even discerning observers. These are fans of the game that know what they're looking at.
> THE COURT: So you wouldn't be offering those to prove their truth. You would be offering them to prove whatever the state of mind is or belief of the other person.
> MR. MOSKIN: Yes.
> THE COURT: So that's probably not hearsay anyway.
> (Moskin Decl Ex. A; Tr. 7:11-19.)

Additional parts of the discussion appear in the margin.[1] Equally important, Chapterhouse was explicitly asked "Do you want to say anything about this particular topic, the posting topic?" Counsel's response was "I believe it's not necessary to make those arguments now. …I think it can wait." . (*Id* at 11:23-12:4.) Because Chapterhouse did not challenge the initial determination, Games Workshop did not seek further discovery in reliance on the initial assessment and Chapterhouse's apparent acquiescence. (As noted at the same hearing (*Id* at 6:2-7), in the first phase of the case, Games Workshop only discovered Chapterhouse's failure to comply with the Court's December Order regarding the forum posts after the close of discovery.)

Disregarding the Court's initial determination without any comment, Chapterhouse's motion

[1] THE COURT: So, for example, in a standard trademark case where you're trying to prove likelihood of confusion and, you know, somebody has sent a letter, let's say, to the trademark holder saying, hey, this other product out here, you know, it's really awful and it's not yours, and you offer this letter to prove likelihood of confusion, you don't have to go find that person and bring him in.
MR. MOSKIN: No.
THE COURT: So this doesn't strike me as a whole lot different. As far as the responses to the forum posts, I don't think you're going to have much of a hearsay issue on that. (*Id* at p. 8 l. 1-12.)

seeks to exclude as hearsay all blog postings, without even analyzing any specific postings. Contrary to Chapterhouse's argument, consistent with this Court's initial assessment, courts have routinely acknowledged that audience reactions are highly relevant. *Atari, Inc. v. N. Am. Philips Consumer Elec. Corp.*, 672 F.2d 607, 619 (7th Cir. 1982) (considering statements of retailers and sales clerks' comments and expressions as extrinsic evidence that at least some lay observers view the games in question as similar); *MCA, Inc. v. Wilson*, 425 F. Supp. 443, 450 (S.D.N.Y. 1976) (spontaneous reactions of the ordinary observer are relevant and admissible as present sense impressions); *Midway Mfg. Co. v. Bandai-America, Inc.*, 546 F. Supp. 125, 153 (D.N.J. 1982) (evidence of lay observer reaction to the similarities between the games in question is relevant and admissible); 4-13 Nimmer on Copyright § 13.03 ("Certainly there can be no dispute that the spontaneous and immediate reactions of the ordinary observer are relevant evidence in determining the existence of copying"). *MCA, Inc.* specifically noted that the spontaneous reactions of cast and audience evidencing substantial similarity are present sense impressions, not hearsay. "[T]heir spontaneity provides their reliability and cures any hearsay infirmities." Id. at 450-451. So too here, spontaneous comments are not hearsay; Chapterhouse has not identified any specific comment it even contends is hearsay. Rather, Chapterhouse seeks a blanket ruling to hide the damning evidence it failed to preserve or produce during discovery..

Courts have also frequently admitted forum postings as evidence, provided that (as here) doing so is consistent with the hearsay rules. *RDK Corp. v. Larsen Bakery, Inc.*, No. 02-C-0675, 2006 WL 2168797, at * 11 n. 10 (E.D.Wis. July 31, 2006) (internet postings admissible when not offered for the "truth of the matter asserted"); *Garden of Life, Inc. v. Letzer*, 318 F. Supp. 2d 946, 965-66 (C.D.Cal. 2004) (internet message board postings showed actual confusion); *Connelly v. ValueVision Media, Inc.*, No. Civ.04-4559 DWF, 2004 WL 2569494, at *18 (D.Minn. Nov.9, 2004) (internet postings evidence of confusion). *Accord Volkswagen AG v. Verdier Microbus and*

*Camper, Inc.*, Civ. No. 09-231,2009 WL 928130 at *12-13 (N.D. Cal. Apr. 3, 2009).

The cases Chapterhouse cites miss the point. In *Bobak Sausage Co. v A&J Seven Bridges, Inc*., 805 F.Supp 2d 503 (N.D.Ill. 2011), the plaintiff offered second- and third-hand hearsay summaries of what other people said (and failed to disclose the materials in its Rule 56.1 statement and failed to identify as witnesses the employees who attested to the third party confusion). Here, the very reverse is true: Games Workshop is offering the direct and unexpurgated statements of individuals, the existence of which *Chapterhouse concealed in discovery* by refusing to preserve or produce the forum postings despite a Court order.[2]

Contrary to Chapterhouse's argument, the reactions of ordinary observers to Chapterhouse's products are not expert testimony. It is well settled that the test of copyright infringement is substantial similarity in the eyes of the ordinary observer, and as noted above, the observations of such actual observers are highly relevant. Contrary to *Steele v. Turner Broadcasting Sys., Inc*., 646 F. Supp. 2d 185 (D.Ma. 2009), cited by defendant, Games Workshop is not offering scripted affidavits from personal friends of the plaintiff, *id*. at 193, but rather the spontaneous reactions of persons viewing Chapterhouse's products on the internet – which is where Chapterhouse markets and sells its wares. These are exactly the sort of ordinary consumer reactions that are most relevant. In *La Resolana Architects, PA v. Reno, Inc.*, 555 F. 3d 1171, 1180 (10th Cir. 2009), the excluded testimony was from "a lay witness with no personal knowledge of the facts of this case," which is hardly pertinent here. The blog postings by ordinary observers are no different from comment cards at a trade show or letters to a newspaper (which are admissible) but simply in electronic format.

[2] In *Monotype Imaging v Bitstream*, 376 F.Supp. 2d 877 (N.D.Ill 2005), where the claim was for contributory infringement of plaintiff's copyright by unnamed third parties using defendant's software, the internet evidence was offered as proof of direct infringement by the unknown third parties, *not* for the mental impressions of consumers. Although it is not clear what the evidence showed, the purpose there was entirely different from that here.

Finally, despite citing *U.S. v. Jackson*, 208 F.3d 633, 637 (7th Cir. 2000), for the proposition that website content must be closely scrutinized, Chapterhouse's motion does not purport to scrutinize – closely or at all – any of the forum postings in issue. Rather, with a broad brush it says they must all be excluded. As a result, plaintiff is unable even to begin to address Chapterhouse's concerns (if any). Nor can such relevant evidence be excluded in the abstract. In addition to the evidence previously cited, as in GW's original February 1 motion to enforce discovery orders (Dkt. No. 278), here are just a few of the forum posts (from the forums Mr. Villacci cited from memory in Chapterhouse's recently amended interrogatory answers):

> "Why bother trying to copy Space Marines when you can't do them as well as GW already do?
>
> Idea [of Tru-Scale product] is good but the execution resembles 90s era GW models.
>
> So are they supposed to be Space Marines or not? Why go to all the trouble of putting them together with SM parts, writing a ludicrous fluff blurb (Empress, really?) make them look like second rate SM's and then pop up and say 'They're not what they look like if you build them with our own parts!'"
>
> "Why don't you call that lizard a Kroxigor?"
>
> "I like the lizard ogre sculpts, great artistic work, but stop lying. They are Kroxigors."
>
> "It's nice to see someone doing a true scale kit for Astartes, and these do look very easy and nicely sculpted … But it does, for me, push the line uncomfortably close, from parts for modification to replication.
>
> "The fact that I can identify the GW bits, that make up the majority of the bike, bothers me."
>
> "I like the model, but I don't think pretending it's heavily based on the look of SM bikes is going to fool anybody. Kitbash or not, several components are nearly identical to parts from the current bike: the central tank, the rear quarter panels (from the current attack bike), and even the bolters look like old rhino bolters."
>
> "So the lightning claws are like, you literally took a GW power fist and recast it and put 2 horrible looking claws on top?"
>
> "If you are going to ride on the IP of another company, the sculpt [Doomseer Iyanar] should at least be of similar quality. …It should be at least as elegant and dynamic as GW's male farseers if not more so."
>
> "I just realized one thing: chapter house now let us make an entire army of space marines, without spending a penny with GW." (Moskin Decl. Ex B)

Contrary to Chapterhouse's contention, and particularly in view of its efforts to conceal such persuasive evidence, a jury instruction is appropriate that evidence of actual consumer reactions is relevant evidence of substantial similarity, if indeed an adverse inference is not appropriate for products for which such evidence was concealed.

**2. Chapterhouse's Website Shows Relevant And Admissible Images Of Its Copies.**

Evidently conflating the concepts of trademark infringement and copyright infringement, Chapterhouse makes the novel argument, *unsupported by any legal citation*, that the accused images displayed on its website are somehow irrelevant because those images are not bought and sold. The argument ignores that Chapterhouse has *actually made* the copies and painted them in Games Workshop's colors (so as to show them on its website, on eBay and on the Internet forums). Even if it never displayed them anywhere, these copies would be exactly that: copies. At any rate, proof of copyright infringement (unlike trademark infringement) does not require use in commerce. The mere act of copying is an infringement. Just so, downloading a pirated movie or song is an infringement even if the individual never sells the copy. Sales of copies (in this instance based on marketing of products in painted form) relate only to damages. Hence, 17 U.S.C. §106 distinguishes at least three relevant rights. Sections 106(1) and (2) provide the exclusive right "to reproduce the copyrighted work in copies" and "to prepare derivative works based upon the copyrighted work," whereas subsection (3) provides the exclusive right "to distribute copies [] of the copyrighted work to the public". Even if Chapterhouse never distributed either the underlying physical painted copies it has actually made or the images of these copies it posts in various places on the Internet (although it does do so every time an Internet user opens its website, hence making a copy on his or her personal computer, or every time it posts the subject images on Internet forums or eBay) its copying of the Games Workshop works on its website – in color – is a second infringement – essentially no different from printing a catalog, which in itself can be an

infringement independent of sales of products shown.[3] The suggestion that Games Workshop should not be able to show the jury painted versions of its products (whether through product packaging, website pictures, or pictures in various books) is equally illogical. As Chapterhouse's own designers have acknowledged, these are the materials they were actually looking at during the "development" process. By Chapterhouse's logic, if a party created jigsaw puzzles copied from famous artworks and advertised them on its website (in assembled form), it would not be liable for infringement if it shipped the puzzles in pieces. Simliarly, if a party created a paint-by-numbers product copied from famous artwork, showing the final painted verison on the website but only selling the paint-by-number kit, it would not infringe.

Chapterhouse is also incorrect in suggesting its website images are not accused of infringement. During the entire action, Chapterhouse's has sought to divert attention from the fact that it copies not only the sculptural details of Games Workshop's miniatures (and the depiction of those figures in its books) but that it presents the copies in color on its website, using (not surprisingly) the colors Games Workshop uses in its books and on its product packaging and on its website. Color is one of many original elements forming part of the claim. Indeed, it is precisely because Chapterhouse recognizes the need to market its products in color that it has employed teams of painters and delays posting its products on the forums until they are painted. (See e.g. Dkt No 293, GW Undisputed Fact # 82)

Chapterhouse also makes the misleading statement that Games Workshop painted its models (as shown on its claim chart for the new works) to look like Chapterhouse's models. As Chapterhouse knows (because it was specifically told in response to Admission Request No. 754) Games Workshop made *demonstrative exhibits* for purposes of this litigation showing for one

[3] Certainly a website itself is copyright eligible (and Games Workshop has indeed registered copyright in its entire website)

product – Chapterhouse's Tru-Scale Space Marines – what a Games Workshop Space Marine would look like if painted in colors used by Chapterhouse. For this product, the evidence specifically shows that Chapterhouse directed its own painter *not* to use Games Workshop's colors (See e.g. Dkt no. 314 at 4) and for this one product (where Chapterhouse did not copy Games Workshop's colors), Games Workshop thus sought to show how similar are the sculptural elements alone. *See Atari, Inc.*, 672 F.2d at 619 ("direct[ion] to [the designer] that he make certain superficial changes in the gobbler figure may be viewed as an attempt to disguise an intentional appropriation of PAC-MAN's expression.") Games Workshop does not sell or market its own products in these colors.

Finally, what the Court previously held (correctly) was simply that Chapterhouse has not copied *Games Workshop's own website*. (11/27 Mem Dec. at p. 25.) The Court did not hold that the images on Chapterhouse's website or the physical copies it made do not infringe or fall outside the reach of the Copyright Act. As Games Workshop recently sought to clarify (Dkt No. 302 at p. 16), it was never even its contention that Chapterhouse had copied the Games Workshop website but, rather, that the collective assembly of materials on Chapterhouse's website show patterns of copying (such as the entire set of Assault, Tactical and Devastator shoulder pads, containing the unique combination of Roman Numerals with the correct cross, arrow, or chevron according to Games Workshop's universe) and infringe the overall oeuvre of Warhammer 40,000 materials - in much the same way that fragments of trivia taken from 84 of 86 full-length episodes of the "Seinfeld" show were linked together in a book held to infringe that collective whole. *See Castle Rock Ent. v. Carol Pub. Grp, Inc.*, 150 F.3d 132 (2d Cir. 1998). In this regard, the Chapterhouse website is essentially no different from a printed catalog (analogous to the book of trivia questions in *Castle Rock*) – a catalog it originally titled "Custom Bits for Warhammer 40,000 and Fantasy". Even though a catalogue, like a website, would not likely be sold for money (but rather is given out

for free as a form of promotion) there can be no question that copying copyrighted images in a catalog would be an infringement even if the catalog itself were simply distributed for free. Moreover, each individual image on the website or on internet forums or on eBay is a copy even if the collective whole is not a separate kind of infringement.

**2. Games Workshop's Fact Witnesses Are Permitted to Testify About Similarities Between Its Own Works And Chapterhouse's Copies**.

Games Workshop fails to understand the nature of Chapterhouse's motion to prevent Games Workshop's witnesses from offering expert testimony. Chapterhouse certainly has cited no law to support the proposition that a fact witness in a copyright case can not identify the salient original features of the party's own work or identify salient similarities in the accused works.[4] By the same logic, Chapterhouse's fact witness also could not identify any differences between the works, and the jury would be left clueless what either side of the case is about.

Chapterhouse seems upset that, in response to *its own question* at the deposition to Mr. Merrett as to what elements of a work Mr. Merrett deemed "copyrightable" he simply identified those elements in his answer (Cooper Decl Ex G Merrett Tr. at 195 l. 3-17) or that he referred to himself (probably sarcastically and subject to an objection to form) as having some expertise recognizing Chapterhouse's infringements (*Id* Ex H at 9. l 2-15). If Chapterhouse means only that the fact witnesses (for both parties) should avoid opining on the ultimate issue of infringement or non-infringement, or legal standards generally, or calling themselves experts (even if only sardonically) Games Workshop would agree. As Chapterhouse notes, witnesses *are* permitted to

[4] In *Home Design Serv. v. Trumble*, 2011 WL 1638910 at *5 (D.Colo. April 29, 2011), the only case cited by plaintiff, both parties agreed that one witness would only be permitted to testify as a lay witness, not as an expert on industry practices in general and the decision identifies none of the excluded testimony. Particularly given the technical nature of copyright in architectural drawings, which the court there acknowledged is entitled to narrowed protection, it is hardly clear what relevance this case has here.

talk about their claimed copyrights and trademarks. (Ch Brf at 7.) Beyond this, Games Workshop simply does not know what sort of testimony Chapterhouse is seeking to exclude.

Arguably, what Chapterhouse seeks is to give to "expert" opinions a sanctity beyond the testimony of fact witnesses (perhaps for the simple reason it found three experts to opine on new theories untethered to the facts, whereas Games Workshop felt no need to do so). Yet, as shown in Games Workshop's Motion in Limine #4 (Dkt. No. 317 at 6), none of Chapterhouse's experts opine on the similarities and differences between the Chapterhouse and Games Workshop products (except for the untimely amended report of Mr. Grindley). Thus, we would have a trial regarding over a hundred separate accused products for which no one can explain to the jury the similarities or differences relevant to the case. At any rate, as set forth in plaintiff's own motion in limine, there is no foundation for any of the opinions of Chapterhouse's experts. No reason has been shown to suppress testimony concerning the *actual* facts in issue.

**3. Games Workshop Has Identified the Subject Icons At Issue.**

Games Workshop has produced in discovery substantial evidence identifying its design marks in issue and demonstrating sales of the corresponding products in commerce, none of which is addressed in Chapterhouse's motion. To the extent it emerges at trial that one or more such marks has not been sufficiently identified, Games Workshop will obviously be unable to meet its burden of proof as to those marks. However, this is a matter of substantive proof, not a procedural or evidentiary question that can be decided in advance by a broad brush motion in limine. As the Court noted in granting in part Games Workshop's summary judgment motion, Mr. Villacci reviewed a list of Games Workshop word marks and design marks in issue yet had no difficulty understanding what they were and identified only eight such design marks he even purported to challenged for alleged lack of use in commerce. 4/1/13 Mem Dec. at 15 n. 5

### 4. Chapterhouse Has Failed To Identify Any Relevant Documents Not Produced By Games Workshop.

Chapterhouse's accusations of spoliation are not only brazenly false but entirely irrelevant. Chapterhouse does not – and could not – question that Games Workshop identified and produced all known reference materials *actually relied upon by its designers* in creating the works *actually* in issue in response to defendant's *actual* discovery requests (none of which it even troubles to cite in this motion). Instead, it has concocted a theory divorced from the facts that a vast collection of general books having no relevance to this case (and which it has elsewhere conceded have no relevance to this case) have been spoliated by Games Workshop. In fact, the books are all intact and the concept of spoliation is wholly inapplicable. Chapterhouse has never even requested copies of the books in issue even after having been given an opportunity to review them all. Nor does it identify any discovery request with which it contends Games Workshop failed to comply. There is none. The requested relief – an adverse inference designers relied on unspecified reference materials when Chapterhouse has been told just the opposite by the designers themselves – is nothing short of absurd.

This untimely discovery motion (masquerading as a motion in limine) has its genesis, not in any actual document request or interrogatory (none of which are cited in the motion), but in Chapterhouse's April 2012 follow-up inquiry to a comment made by one Games Workshop designer, Neil Hodgson, at his March 5, 2012 deposition in the first phase of the case. He said he had access at work to various publications, such as National Geographic Magazine and various books on armor. He was not even asked if those publications had anything to do with his creation of any of the works in issue. In a series of letters and emails in April and May 2012 (Moskin Decl. Ex C), Games Workshop explained that Mr. Hodgson had not testified he used any such works in the course of designing any of the products *in issue*, and that he testified he only used them to add touches of realism (such as "the way that rust is hanging off that old tank" (Hodgson Tr. p. 41 l. 1-

8) to drawings or paintings that are not at issue. (Certainly Chapterhouse is not accused of copying such details in its own miniatures or its website.) Notwithstanding the lack of relevance, but simply to avoid a needless motion, Games Workshop produced the one book Mr. Hodgson identified that he could find. (Moskin Decl ¶ 4.) However, Games Workshop maintained its objection to producing irrelevant books that did not fall within the scope of Chapterhouse's actual discovery requests. In none of the parties' extensive correspondence did Chapterhouse identify any basis related to this case to demand copies of more books or magazines. What the designer said was his principal form of reference material are Games Workshop's own prior works. (Just so, in support of its false statement that all of Games Workshop's authors have accessed all books anywhere on its premises, irrespective when they were acquired or by whom, Chapterhouse also now cites to the testimony of Martin Footit from the second phase of the case where he said he has a bookcase with Games Workshop publications, as well as some modeling magazines (Footit Tr. at 46:21-48:1.) But there is no testimony any of these are relevant to the case, and Games Workshop separately produced the reference materials Mr. Footit – and other authors - actually did use in creating the works in issue that he authored as called for by Chapterhouse's actual discovery requests. (Moskin Decl ¶ 9.)

The utter irrelevance to the full range of books on Games Workshop's premises, and the fact that none of the books correspond to any actual discovery request were set forth repeatedly, including in Games Workshop's April 30 letter and June 1, 2012 emails (Moskin Decl Ex C), neither of which Chapterhouse ever disputed in substance (as distinct from simply demanding for the sake of demanding). (One must bear in mind that there are thousands of Games Workshop products and books that are *not* at issue in this case, and tens if not hundreds of thousands of drawings and painting in those books.) Chapterhouse does not dispute the irrelevance now. After noting such irrelevance, the May 25 email concluded with the following statement: "However,

apart from avoiding a needless burden in an already-expensive case, we would much rather give you more materials if some delimiting principle can be established. In view of the above facts, perhaps you can give us a little further guidance what you would like us to do." Following this message, Chapterhouse dropped the matter and did not purport to challenge further the lack of relevance of books not used in connection with any of the works in issue. It certainly did not seek a court order, and Games Workshop assumed the matter was resolved.

However, at the commencement of discovery in the second phase of the case, it served a notice to inspect (i) Games Workshop's design studio, (ii) all of the books on the premises and (iii) all of the computers on the premises. Games Workshop objected on relevance grounds; because the inspection would needlessly intrude on confidential matters not in issue, and because such an intrusive form of discovery was not discussed by the parties when they conferred on a discovery plan (and is not mentioned in that plan) (Dkt No. 264) nor was it among the discovery scheduling issues addressed with the Court. No such discovery was mentioned in the Court's December 12 Order. The notice to inspect also went beyond the permitted scope of Rule 34(a)(2), as noted in Games Workshop's objection to the notice (Moskin Decl Ex. D). *Barnhardt v. Meridian Mun. Separate Sch. Dist*., 2012 U.S. Dist. LEXIS 42460 (S.D. Miss. March 28, 2012) (where the school district had already produced and was continuing to produce relevant documents in response to the United States' document requests, there was no need -- and therefore no right -- to inspect additional documents while on tour of the schools, and the United States could obtain the desired documents through a more tailored approach); *Flick v. WellPoint, Inc*., 2009 U.S. Dist. LEXIS 46797, 7 (N.D. Ind. June 2, 2009) ("Although this request necessarily encompasses the entire physical layout of the office, it does not entitle Plaintiffs to inspect documents, the contents of drawers, or locations where no alleged sexual harassment of Plaintiffs occurred unless necessary to demonstrate that Plaintiffs were limited to certain pathways or locations in the office.").

After an extensive series of emails and phone calls, Chapterhouse agreed not to pursue the inspection of Games Workshop's design studio (which would have revealed works in progress – some under strict confidentiality rules concerning Games Workshop's license to produce miniatures for Tolkien) or its computers. To avoid a motion concerning irrelevant books, Games Workshop agreed to allow an inspection of the books. However, prior to the inspection, Games Workshop renewed its protest and noted that the none of the books was "reference materials *provided or stored* for the use of artists, sculptors, painters" as set forth in the actual notice to inspect and none was relevant.. (Moskin Decl. Ex. E) They are simply books on the premises, almost all being Games Workshop's own publications. Indeed, Games Workshop has no record when the books were acquired (other than its own publications, which make up about 95% or more of the materials), and many of the books inspected were simply personal belongings of individual employees (most of whom have no connection to this case) or had publication dates long after the 1987 creation of most of the key characters and designs and certainly too recent to be of any possible relevance.[5] Chapterhouse does not dispute these facts. It does not even address them, but nonetheless brazenly asserts that all of Games Workshop's authors had access to all of these books. In the roughly 20 depositions it took in this case, it asked virtually no questions purporting to challenge Games Workshop's identification of the actual sources of reference used (as identified in Games Workshop's uncited interrogatory answers) (Moskin Decl. ¶ 9) yet asks this Court to create a fiction that the authors relied on works Chapterhouse knows they did not.

As explained to Chapterhouse in a March 1 email (among others) (Moskin Decl. Ex G), because the books it wished to see were spread out all over the premises, including some in the

[5] Although Chapterhouse notes that some of the books concern heraldry, most of Games Workshop's Space Marine chapter icons were created in 1987. Books it subsequently acquired could not possibly prove anything. Moreover, Games Workshop does not contend that all elements of its heraldry is wholly original, and its witnesses were happy to acknowledge as much. However, most of its chapter icons are quite different from traditional heraldry anyway.

design studio itself which the parties had agreed was off limits, and because many of the books were buried under piles of paper and under desks, Games Workshop undertook the substantial burden of assembling all of the books in one location, where they could be inspected.[6] Attached hereto (Moskin Decl Ex F) are pictures of one such desk (Mr. Hodgson's). As one can see, had Games Workshop not taken the trouble of assembling the books, Chapterhouse would have found very little. (And at any rate, Games Workshop was unwilling to allow Chapterhouse to rummage through the personal belongings of its employees.)

Following the inspection, Chapterhouse demanded to know from which desk or location each of 83 books had been obtained. Games Workshop explained that it had not in all instances assembled such information when it collected the books, and that, at any rate, that sort of information would not have been apparent on an inspection, because the desks are not labeled with employees' names. Hence, Games Workshop asked if there was some actual interrogatory or other request pursuant to which there was some duty to assemble such information. Chapterhouse identified none and identifies none in its motion. Hence, the irrelevant information it now says has been spoliated, is information Chapterhouse must concede is not contained in any request in this case. Games Workshop's counsel advised that "As far as I know, the crates were simply labeled by department", in response to which CH's counsel said "An index [of where the books came from] seems like a reasonable approach to me." (Moskin Decl. Ex. G) After Games Workshop identified the locations of the books (Id.) Chapterhouse let the issue drop, until it filed this discovery motion without any meet and confer and without any request for further information.

Nor can Chapterhouse claim any prejudice. Following its inspection, it identified half dozen books deems relevant and placed them on its exhibit list. It is free to ask Games Workshop's

[6] This was little different from the manner in which Chapterhouse produced its Games Workshop books and figurines for inspection: in a law office in Dallas, although that inspection was pursuant to a specific document request and there was no dispute as to relevance.

witnesses at trial if they relied on any of the books in creating the works in issue. (On the other hand, unless some such foundation can be laid, the books should be inadmissible.)

Although Chapterhouse has made no further objection and filed no motion to compel (in either phase of the case), it now seeks to litigate for the first time a discovery dispute that is improper under Local Rule 37.2 and Federal Rule 37 itself, as there is no predicate prior order in this case to support a motion of any kind now.[7] *Fine Line Distribs. V. Rymer Meats,* No. 93 c 5685, 1994 U.S. Dist. LEXIS 9730, *11-12 (N.D. Ill. July 15, 1994) ("the cases interpreting Rule 37(b) clearly establish that the court should only issue sanctions pursuant to Rule 37(b) for a violation of a court order regarding discovery"). Indeed, Chapterhouse has identified no discovery request with which Games Workshop failed to comply, and no relevant or even potentially relevant materials that have not been produced. Nor has it even mentioned the rule, Fed.R.Civ.P. 34(a)(2), under which it conducted the inspection or even attempted to show that Games Workshop failed to comply with the rule or the notice to inspect. The very notion of spoliation makes no sense, as Games Workshop has not destroyed anything. All of the books are still on its premises, exactly where they have been all along. Had Chapterhouse ever even asked for a copy of any work it deemed relevant, Games Workshop could have considered complying (as it did last May). It did not, and this miscast discovery motion should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Chapterhouse's Motions in *Limine.*

[7] Chapterhouse's spoliation motion no predicate Court order. By contrast, Games Workshop's motion to enforce prior discovery orders (Dkt. Nos. 278 and 314) fall under two separate Court orders, as well as a third Games Workshop did not even mention in its motion. This Court's July 6, 2011 Minute Entry (Dkt. 66) ordered Chapterhouse to produce all of Games Workshop's reference material in Chapterhouse's possession by July 29, 2011. Such an order would have encompassed Mr. Fiertek's electronic copies of Games Workshop materials.

Dated: April 3, 2013

Respectfully submitted,
/s/ Jason J. Keener

Jason J. Keener (Ill. Bar No. 6280337)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: 312.832.4500
Facsimile: 312.832.4700
Email: jkeener@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

*Attorneys for Plaintiff*
*Games Workshop Limited*

**CERTIFICATE OF SERVICE**

I, Jason J. Keener, an attorney, hereby certify that on April 3, 2013, I caused to be filed electronically the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

/s/ Jason J. Keener
Jason J. Keener