1            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3

GAMES WORKSHOP LIMITED,      )
4                       )  Docket No. 10 C 8103
           Plaintiff,   )
5                       )  Chicago, Illinois
      v.              )  April 25, 2013
6                       )  11:00 a.m.
CHAPTERHOUSE STUDIOS, LLC, et  )
7 al.,                    )
                      )
8           Defendants.  )

9             TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE MATTHEW F. KENNELLY
10

APPEARANCES:
11

For the Plaintiff     FOLEY & LARDNER, LLP
12                   BY:  MR. JONATHAN E. MOSKIN
                 90 Park Avenue
13                  New York, New York  10017

14                  FOLEY & LARDNER, LLP
                 BY:  MR. JASON K. KEENER
15                  321 North Clark Street
                 Suite 2800
16                  Chicago, Illinois  60610

17 For the Defendant:    WINSTON & STRAWN, LLP
                 BY:  MR. IMRON T. ALY
18                  35 West Wacker Drive
                 Chicago, Illinois  60601
19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARSHALL, GERSTEIN & BORUN
BY:  MS. JULIANNE M. HARTZELL
     MS. SARAH J. KALEMERIS
233 South Wacker Drive
Willis Tower # 6300
Chicago, Illinois  60606

Valarie M. Ramsey, CSR, RMR
P.O. Box 16
Hazel Crest, Illinois 60429
(708) 860-8482

 1          THE CLERK:  10 C 8103, Games Workshop versus
 2    Chapterhouse.

 3          THE COURT:  All right.  Can you give your names,
 4    please.

 5          MS. HARTZELL:  Julianne Hartzell on behalf of
 6    defendant Chapterhouse.

 7          MR. ALY:  Imron Aly, Winston & Strawn, on behalf of
 8    defendant Chapterhouse.

 9          MS. KALEMERIS:  Sara Kalemeris, Marshall, Gerstein &
10    Borun, on behalf of defendant Chapterhouse.

11          MR. MOSKIN:  Jonathan Moskin of Foley & Lardner for
12    plaintiff Games Workshop.

13          MR. KEENER:  Jason Keener of Foley & Lardner on
14    behalf of plaintiff, Games Workshop.

15          THE COURT:  Okay.  Thanks for the status report.  It
16    was long, but actually it was pretty helpful to have
17    everything all in one place.

18          Most of it I'm basically just prepared to rule on.
19    There are a couple of places, though, where I had some
20    questions, so give me just a second to pull this up here.

21          Let's see.  On the question of the so-called icon
22    marks.  And I know we've talked about this before.  I just
23    want to make sure I have it clearly.  The icon marks, that's
24    all about trademark law, not copyright, right?

25          MS. HARTZELL:  (Nodding.)

1      MR. MOSKIN:   (Nodding.)

2      THE COURT:  All right.  So I have two questions.  I

3   just need to look at the other one to see which person I want

4   to ask first.

5      Okay.  So the first question is for the defendant.

6   So at page 33 of the status report, the bottom paragraph

7   basically says -- and I'm going to acknowledge that this was

8   probably addressed to some extent in the earlier submissions,

9   but it would be helpful for me to get the kind of the response

10   to this in more or less of a nutshell.

11      It says here that Games Workshop identified all of

12   the subject icons in its response to interrogatory 18, which

13   was supplemented during the second phase of the litigation and

14   was shown to Mr. Villacci at his deposition, when he

15   acknowledged his familiarity with all of the subject design

16   marks, and Games Workshop further identified all of the icon

17   marks on its claim chart submitted earlier in the first phase

18   of the case and prior even to the commencement of the second

19   phase.  And skipping ahead, the carryover to page 4 says that

20   Mr. Villacci during I think his deposition reviewed a list of

21   the marks, didn't have anybody -- didn't have any trouble

22   understanding what they were.

23      And so I guess I regard that as an argument that they

24   were disclosed well enough, maybe not as well as they ought to

25   have been, but well enough, the idea being that if

1    Mr. Villacci got it, why isn't that good enough.  And I didn't

2    see anything with sort of a direct response to that point, so

3    can you address that?

4              MS. HARTZELL:  Sure.

5              The questions that Mr. Villacci was asked were not

6    directed to the individual icon marks.  He wasn't asked do you

7    know what this mark is, do you recognize this mark.  He was

8    asked globally which of these marks do you believe that you've

9    used before Games Workshop.

10             THE COURT:  So and I understand you're paraphrasing,

11   but when he was asked which of these marks, how would he have

12   understood what the "these" were unless he knew what somebody

13   was talking about?

14             Maybe I need to see the part of the deposition, I

15   guess.

16             MS. HARTZELL:  I don't know that I have it.  But he

17   was given a list of the words, the names for them.

18             THE COURT:  He isn't given the pictures; he's given

19   something verbal.

20             MS. HARTZELL:  Yes.  And I think in light of the fact

21   there are so many different versions of the icons, as we've

22   seen in the disclosures that the plaintiff pointed to, that

23   it's not clear at all what he was talking about or what Games

24   Workshop was talking about.  We had never seen images assigned

25   to those words until the April 19th chart that we received.

1    THE COURT:  Okay.  All right.  And, again, don't take

2    this as me attacking you on something.  There's a lot going on

3    in this case.  I want to make sure that I get it.  Did anybody

4    come in at some point and say, hey, wait a second, this claim

5    chart we got wasn't good enough?

6    MS. HARTZELL:  Yes.  We contacted --

7    THE COURT:  I have some vague memory about that, but

8    I don't recall.

9    MS. HARTZELL:  We contacted plaintiff's counsel in

10   advance of 30(b)(6) deposition and requested that they

11   identify the icon marks.

12   THE COURT:  Okay.  Then what happened?

13   MS. HARTZELL:  We received a response with an updated

14   claim chart that still didn't have images but had --

15   THE COURT:  But I mean, going into the deposition,

16   there was some level of awareness that there were these icon

17   marks out there as to which there was a trademark infringement

18   claim, right?

19   MS. HARTZELL:  Right.

20   THE COURT:  Okay.  So here's the bottom line

21   question.  I mean, really a good deal of the argument you're

22   making here, it's essentially a discovery sanction argument.

23   And Rule 37(c) talks about whether something is substantially

24   justified or whether it's harmless.  Now that you've got them,

25   and granted that it was only a week ago or less, how are you

1    harmed by the late disclosure?  I mean, you're still able to

2    address them, right?  So what would you have done differently

3    if you had had the April 19th chart three months earlier let's

4    say?

5              MS. HARTZELL:  We still don't know what products are

6    accused of using those marks, and we have looked at our

7    products and don't see some of those marks on our products.

8    So in preparation for trial we are still harmed by not knowing

9    where we're accused.  We now based on last week know what we

10   are accused of infringing, but we still don't know how we're

11   accused of infringing many of them.

12             THE COURT:  Is there any way other than that?  I

13   mean, is there different discovery that you would have done,

14   for example?

15             MS. HARTZELL:  I don't have anything specific in

16   mind.

17             THE COURT:  Okay.  So Mr. Moskin, if you can talk

18   about the last point Ms. Hartzell made is that, okay, now

19   we've got the chart, got the little pictures on it.  You

20   haven't told which products they're saying used these marks.

21   So respond to that.

22             MR. MOSKIN:  I don't understand the premise of

23   Ms. Hartzell's comment because the claim charts have always

24   had pictures of the icons in those charts, in the first phase

25   and in the second phase.  And what Mr. Villacci was shown at

1  his deposition was the answer to interrogatory 18 that had a

2  list of all of the -- conceded that that didn't have pictures

3  in it.

4           THE COURT:  Where in this stuff can I see like the

5  claim chart?  Is it somewhere in here somewhere?

6           MS. HARTZELL:  Yes.  The summary judgment.

7           THE COURT:  You think I kept that stuff?

8           MS. HARTZELL:  I don't know that we --

9           THE COURT:  Actually, I may not have kept it.  There

10  are other people sitting in the room who may have kept it.  So

11  if you can tell me what exhibit number it is, maybe we can go

12  dig it out.

13           MS. HARTZELL:  One of the claim charts is Exhibit K

14  to the Chapterhouse motion in limine.

15           THE COURT:  Oh.  So it's in the motions in limine.

16           MS. HARTZELL:  Yes.

17           THE COURT:  But that's not --

18           MS. HARTZELL:  And one is Exhibit J.  So Exhibit J

19  and Exhibit K are the claim charts.

20           THE COURT:  Exhibit J, that was an early -- J is --

21  is K one of them?

22           MR. MOSKIN:  K is, yes, it is one of them.

23           MS. HARTZELL:  And as you see in K, the plaintiff

24  highlighted in yellow the trademarks that they were accusing

25  infringement, none of which is a symbol mark.

1    THE COURT:  Say what you just said again, the last

2  thing you said.

3    MS. HARTZELL:  So in the chart when you look at

4  Exhibit K, you can see in the left-hand column there are

5  yellow highlights that are identifying the trademarks that we

6  are accused of infringing, and none of those are a symbol or

7  an icon.

8    THE COURT:  What's highlighted is a word and not --

9  I'm looking at No. 128, for example, something called a

10  Hotshot Lasgun.

11    MS. HARTZELL:  Yeah.

12    THE COURT:  L-a-s-g-u-n pac.  And the word lasgun is

13  highlighted, and the phrase Imperial Guard Storm Trooper is

14  highlighted but not the picture.

15    MS. HARTZELL:  Right.

16    THE COURT:  So can you show me one on here that would

17  have been one of these icon things?

18    MR. MOSKIN:  You really have to look at the first

19  claim chart because --

20    THE COURT:  The earlier claim chart --

21    MR. MOSKIN:  I don't think there are any icons from

22  the second phase of the case.

23    THE COURT:  Because the thing I'm looking at here is

24  just the second phase.

25    MR. MOSKIN:  Right.  So we need to look at the first

1  phase.

2           MS. HARTZELL:  This is the one that we had.

3           THE COURT:  Can somebody tell me where I would find

4  the first claim chart?

5           MS. HARTZELL:  Exhibit J is the first claim chart as

6  we understood it to be.

7           THE COURT:  The one with no pictures on it.

8           MS. HARTZELL:  Correct.  And it does have links to

9  things, but as we pointed out in our motion in limine, they're

10  inconsistent as to the mark or what might be the mark.

11          THE COURT:  Okay.  So give me a for instance of

12  something on J, which is the first claim chart, which would

13  have been one of these icon things.

14          MS. HARTZELL:  One of the instances that we cite in

15  our motion is No. 2, item No. 2.  At the bottom it says the

16  Black Templars are Space Marine Chapter.  Their chapter colors

17  are black and white.  The chapter's icon is a black cross with

18  a skull at its center.  But as identified in the new chart

19  that we received on Friday, it's just a black cross.

20          THE COURT:  Okay.  But what you were saying earlier

21  is that there wasn't any identification of which of

22  Chapterhouse's products are alleged to infringe, and the item

23  that you have cited here in the left-hand column identifies a

24  Chapterhouse product.

25          MS. HARTZELL:  But as we noted in our motion in

1  limine, that product doesn't have either a cross or a skull.

2  THE COURT:  Oh, I see what you're saying.

3  MS. HARTZELL:  It says that it works especially well

4  with Black Templars, but it doesn't have any of that imagery

5  on the product itself.

6  THE COURT:  Okay.  The April 19th thing, and I was

7  largely working off of the electronic version, is the April

8  19th thing an exhibit to the status report or not?

9  MS. HARTZELL:  It's inside the joint status report.

10  It's that chart.

11  THE COURT:  Is that the entirety of it?

12  MS. HARTZELL:  That's what we received on Friday,

13  just the chart, no words.

14  THE COURT:  Remind me what page it's on.

15  MS. HARTZELL:  Starting on page 35.

16  MR. MOSKIN:  35.

17  THE COURT:  Okay.  So what this chart does is it

18  names the icon, it shows a picture of it, and it purports to

19  identify the exhibit or exhibits or documents that were

20  produced that reference this?

21  MR. MOSKIN:  Right.  Or display the icon.

22  THE COURT:  Okay.  Okay.

23  So Mr. Moskin, let's just work on item one, which is

24  on page 35.  It's the same Black Templars thing, and it looks

25  like kind of an old style iron cross sort of --

1    MR. MOSKIN:  Um-hum.

2    THE COURT:  So if I'm Chapterhouse's lawyer, how do I

3  know which of my products is alleged to have infringed that

4  mark?  Can I do it just from this chart, or do I have to look

5  at something else?

6    MR. MOSKIN:  I think you'd have to look at something

7  else.

8    THE COURT:  Something else.

9    MR. MOSKIN:  I don't know that they specifically

10  asked this question, but they also had a whole day to depose

11  Andy Jones.

12    THE COURT:  Just answer my question.

13    MR. MOSKIN:  Off the top of my head I don't know.  It

14  may be in that -- the pictures in the claim chart, the photo

15  claim chart.  I don't recall.  There are obviously 150

16  products in the case.  I don't remember every one of them.

17    THE COURT:  And I could be mistaken here, but I'm

18  drawing this as an inference from the fact that the original

19  claim charts identified the Chapterhouse product.  I would

20  assume that that was part of what I told people they needed to

21  do, or at least what people asked for.  What is the thing

22  that -- of the plaintiff's that was infringed and what was the

23  thing of the defendant's that infringed it.  I mean, wasn't

24  that kind of the whole purpose of the thing?  So when you say

25  they didn't ask you for it, I mean, that just doesn't sound

1  right to me.

2          MR. MOSKIN:  Well, I actually think the original

3  genesis of the claim chart, we prepared it.  I don't know that

4  your Honor directed us to do it, but we prepared it at the

5  outset of the first case initially without pictures.  We later

6  added pictures, but it was really primarily to address the

7  copyright claims.  However, when we built in all the icon

8  references which were in there, I can't put a specific date on

9  it, but months before.

10          THE COURT:  So let's assume that I don't grant the

11  motion in limine.  At some point you're going to be saying to

12  the jury, okay, this Black Templars thing belongs to us.  It's

13  our trademark.  They infringed and here's where they did it.

14  What are you going to show them?  What are you going to show

15  them?  I mean, are you going to show them an item of

16  Chapterhouse's, you know, on which this Black Templars icon or

17  something confusingly similar to it was used?

18          MR. MOSKIN:  Um-hum.

19          THE COURT:  Okay.  That's a yes, by the way.

20          MR. MOSKIN:  Yes, yes.  And if we don't, then we lose

21  on that.

22          THE COURT:  Okay.  But what I think I hear

23  Ms. Hartzell saying is we don't know what they're going to

24  show the jury is our product that used that thing.  So you

25  obviously know this because we got pretty close to trial and

1    we're still pretty close to trial, I guess, and presumably

2    somebody knows or put together or is in the process of putting

3    together something that says okay, on the Black Templars thing

4    here's the stuff of theirs that infringes it, right?

5            MR. MOSKIN:  Um-hum.

6            THE COURT:  Okay.  So how difficult -- I mean, it

7    would seem to me since really the only prejudice that's

8    identified here from the, we'll just say the arguable or the

9    alleged discovery noncompliance, is we don't know which of our

10   things infringed which of these icons.  It seems to me I solve

11   that, since we're still, I said close, but really we're still

12   five, six weeks away from trial, if I say okay, tell them,

13   just tell them which ones -- on each one of these icons you

14   have to identify by, you know, a week from today each and

15   every product that you say infringes them.  That shouldn't be

16   too hard to do.

17           MR. MOSKIN:  No, not at all.

18           THE COURT:  All right.  That's the order on that one.

19   So you're to identify them with specificity, each and every

20   product that identifies each and every icon by a week from

21   today.  And I think once that's done, if there's a discovery

22   violation, which I'm not adjudicating, it's effectively

23   made -- it's been rendered harmless.

24           That I think was largely the question I had, so now

25   let me go back to my notes here and go through the stuff that

1    I think that I'm prepared to rule on.  I may have had another

2    question or two.

3            Yeah, I think I did actually.  So I'm now backing up

4    to heading one of the status report, which is the part of the

5    motion to enforce the discovery order which relates to the

6    eBay postings.  So basically what I see that as sort of the

7    30,000 foot view is that, you know, prior to the lawsuit being

8    filed and for a period of time after the lawsuit was filed

9    Chapterhouse was marketing some of its items on eBay, and so

10   it was posting things on eBay.  And, I mean, I don't do a lot

11   of eBay stuff, but people respond to it.  Then there's a

12   little bit of back and forth.  It's discussed there.  And I

13   think everybody is pretty much on the same page that none of

14   the postings that predated the lawsuit are still available.

15   Am I right about that?

16           MS. HARTZELL:  There are some that are identified as

17   exhibits to --

18           THE COURT:  These are the two things that you just

19   submitted just recently as part of your affidavit or no?

20           MS. HARTZELL:  No.  They were --

21           THE COURT:  Stuff that they found on their own.

22           MS. HARTZELL:  Correct.

23           THE COURT:  Oh, okay.

24           MR. MOSKIN:  That's what precipitated the --

25           THE COURT:  You found this stuff on you own.  You

1  hadn't gotten --

2  　　　MR. MOSKIN:  In 2008.

3  　　　THE COURT:  So okay.  So let me rephrase my question.

4  It's pretty clear that anything that Chapterhouse, any

5  postings on eBay, Chapterhouse did not preserve them at any

6  time prior to the lawsuit.

7  　　　MS. HARTZELL:  Correct.

8  　　　THE COURT:  Okay.  Was there a point in time after

9  the lawsuit was filed that Chapterhouse started preserving

10 them?

11 　　　MS. HARTZELL:  No.

12 　　　THE COURT:  Okay.  And so everything that the

13 plaintiff has gotten is some stuff that the plaintiff has

14 found on its own.

15 　　　MR. MOSKIN:  Correct.

16 　　　THE COURT:  Okay.  All right.  And so to me, I mean,

17 it's sort of I'll call it kind of a baby spoliation motion,

18 for want of a better term.  So one of the things that I

19 understand that I have to make a determination of when that

20 happens is, is there some reasonable likelihood that there was

21 something else available out there that would have been

22 favorable to Games Workshop, number one, number two, that

23 Chapterhouse had a duty to preserve, number three, they didn't

24 preserve it.

25 　　　So you start with number one.  So as I read through

1   all of this stuff, I'm left really not real sure that I could

2   say that there was anything that was still available, you

3   know, at the time you filed the lawsuit.  Because that's the

4   earliest date on which they would have had a duty to preserve,

5   is the time you filed the lawsuit.

6           MR. MOSKIN:  Well, we've cited cases to your Honor

7   that once they had a suspicion that they might be sued, they

8   have a duty to preserve.

9           THE COURT:  I don't think those cases are right.  For

10  me, the earliest date they would have had a duty to file is

11  once they knew about the lawsuit.  So I assume you served them

12  within a very short time, late 2010, beginning of 2011.  So --

13  and so what basis is there to believe that there's something

14  that would have existed before that time that you weren't able

15  to find on your own?  I mean, is there something from

16  Villacci's testimony, for example, that says, oh, yeah, I was

17  marketing the living crap out of this stuff on eBay for two or

18  three years, and sorry, I don't really have any of that

19  anymore?

20          MR. MOSKIN:  He admits there were other listings.  He

21  just doesn't remember them.  I mean, that's conceded in their

22  motion.  In fact, just yesterday -- and this is -- I'm not

23  pointing the finger specifically at Mr. Villacci, but now that

24  the client -- there are thousands of listings on eBay for

25  Warhammer 40,000 products, and it's a very difficult task to

1    go through them all.  However, because of this issue being a

2    live issue now in front of the Court, my client and I gave a

3    copy this morning to counsel, which I received this morning

4    from my client.  A third party is apparently reselling some of

5    Villacci's or Chapterhouse's products on eBay using, again,

6    same way that Chapterhouse does, just calling them by the

7    Games Workshop name.  I can show you the example.

8         It does seem to be there are shorter handles that are

9    used on eBay.  There's not -- I know part of their defense in

10   the case is that on the website there's a disclaimer, there's

11   context.  None of that context is apparent in any of the eBay

12   postings we found.

13        THE COURT:  What's your point about these recent --

14        MR. MOSKIN:  So that we know they concede there were

15   other postings.  Since the only postings we've seen all refer

16   to the Games Workshop products using, specifically using our

17   trademarks --

18        THE COURT:  Mr. Villacci admitted that there were

19   other postings.  And he's going to say that at the trial.  The

20   question is, is there something within those that no longer

21   exists that likely would be favorable to you?  What is it

22   within those?  I mean, you know that he post -- tried to sell

23   stuff on eBay.

24        MR. MOSKIN:  So maybe the way to address it, really

25   all we're asking for is an instruction to the jury to

1  understand the significance of the fact that he didn't save

2  these things.

3  THE COURT:  Okay.  Let me go about this in a

4  different way.

5  MR. MOSKIN:  All right.

6  THE COURT:  In the eBay material that you did find,

7  the stuff that you have, in other words, that you got on your

8  own, what is there in there -- obviously you're going to put

9  in that they were selling the stuff on eBay, but is there

10  something within the content of that, the discussion, what

11  Mr. Villacci said, that you think is favorable to you in terms

12  of what you found?  And if so, give me an example.

13  MR. MOSKIN:  Yes.  So those are cited in the

14  motion -- the status report.  They were attached.  The

15  exhibits were attached.

16  THE COURT:  Refer me to a page.

17  MR. MOSKIN:  Page 4.

18  THE COURT:  Page 4.

19  MR. MOSKIN:  And these were all attached to our

20  original motion as Exhibit M, that the postings that we found

21  on our own all refer to the Chapterhouse products simply using

22  Games Workshop trademarks.

23  THE COURT:  Okay.  And so what you're telling me

24  there is that basically what's favorable to you -- and I'm

25  just -- I'll just take number one.  So Mr. Villacci posted

1  this thing as a Space Marine 40 K ten squad bit kit

2  Salamanders Dragon.  So what is there within that that's

3  yours, Space Marine?

4  　　　　MR. MOSKIN:  Space Marine and salamanders and 40 K.

5  　　　　THE COURT:  So basically what you're saying -- I'm

6  trying to reduce this to something simple.  What you're saying

7  is that it's likely that if there had been some effort to

8  preserve the earlier material, we would find a whole bunch of

9  other postings in which Mr. Villacci effectively used our

10 names to describe his stuff.

11 　　　　MR. MOSKIN:  Right.

12 　　　　THE COURT:  Okay.  So when he was deposed, when you

13 took his deposition, and when it came out that he was -- he'd

14 been doing this eBay posting, he hadn't saved any of this

15 stuff, was there any discussion or was there any questioning

16 of him about, okay, were your earlier postings, did they have

17 similar types of descriptions where you used our names or

18 things like that?

19 　　　　MR. MOSKIN:  No.  What I asked him --

20 　　　　THE COURT:  If he's already admitted -- my point is

21 this:  If he's already admitted it, in other words, if he

22 says, oh, yeah, I mean, that's what I did, then you're really

23 not harmed by the absence of it because you've got an

24 admission.

25 　　　　MR. MOSKIN:  Right.  Well, what I asked him was -- I

1    didn't ask him that specific question, no.  So what I did ask

2    him and he did concede, as I think Ms. Hartzell will con --

3    counsel concedes in their papers, there were other postings,

4    and so -- and really all we're asking for is some form of

5    instruction to the jury that on eBay he uses our trademarks,

6    Chapter's -- Games Workshop's trademarks to promote his

7    products.  We're not saying that he's -- asking that every

8    product.  We don't know that, and I can't make that suggestion

9    to your Honor.  But what they acknowledge even in their papers

10   is that eBay itself doesn't save listings where there were

11   sales for more than 90 days or where there were no sales for

12   more than 30 days.  So we don't know now if he posted a

13   product and didn't sell it.

14        THE COURT:  Let me ask Ms. Hartzell a couple of

15   questions.  I think I now have a much better understanding of

16   this issue.

17        So, Ms. Hartzell, when, you know, Mr. Villacci -- or

18   when you all are confronted with the proposition that, you

19   know, when Mr. Villacci's selling his items on --

20   Chapterhouse's items on eBay, he's using Games Workshop

21   terminology, is the contention going to be it's not properly

22   trademarkable, it's a weak trademark, it's no big deal?  How

23   are you going to deal with it?  Fair use or --

24        MR. MOSKIN:  There's a wide variety of variation

25   among the trademarks that have been identified.  I think there

1   are 125.

2           THE COURT: Just talk about Space Marine.

3           MS. HARTZELL: So for Space Marine, that is a

4   registered trademark. I do believe we have some evidence that

5   we believe that it's generic, so that may be an argument. We

6   also, for example, in the Tyranid conversion kit for Tyranid

7   Carnifex model, that we would argue is a nominative fair use

8   and that in the context of the listing which also identifies

9   that Chapterhouse creates custom, custom minis, that those are

10   sufficient to avoid any likelihood of confusion.

11           THE COURT: Let me suggest this to you: Would there

12   be -- would it -- would Chapterhouse be willing to entertain

13   the proposition of stipulating that in other postings that

14   Mr. Villacci or whoever it is made on eBay selling

15   Chapterhouse products prior to the lawsuit that they used

16   terminology that Games Workshop contends is trademark, it

17   belongs to it as a trademark?

18           Now, that's probably not -- this is the danger of

19   thinking out loud. The problem there is that if you've got

20   different arguments about different trademarks, a sort of a

21   generic stipulation probably would not cover the point because

22   on some of them you're going to say, well, it's generic. On

23   some of them you're going to say it's not generic but we made

24   a fair use of it. So maybe a stipulation doesn't do it.

25           MS. HARTZELL: I would also say that it's

1    Chapterhouse's position that a sanction for those

2    pre-litigation posts does not seem warranted.

3          THE COURT:  And really your argument about that is

4    that -- well, so is your argument that there was no duty to

5    preserve either because there wasn't a request or for some

6    other reason, or is it something else?

7          MS. HARTZELL:  Well, primarily it is that the motion

8    to enforce the prior discovery orders was focused on after the

9    lawsuit, after the Court's order that Chapterhouse continue to

10   not preserve, so we understood your Honor's request on the

11   joint status report to determine what existed or what might

12   have existed.

13         THE COURT:  Okay.  So the original motion, as you're

14   putting it, really had to do with enforcing -- I mean, if

15   that's the title of it, it had to do with enforcing a

16   discovery order I made, which by definition is post lawsuit.

17         MS. HARTZELL:  Right.

18         THE COURT:  And so the discussion now about stuff

19   that's prelawsuit goes beyond that?  Is that what you're

20   trying to tell me?

21         MS. HARTZELL:  Well, in part the fact that those

22   postings appear to have taken place January 2010 or earlier,

23   and eBay saves posts for 60 to 90 days depending on whether or

24   not the product sold, that by the time the lawsuit was filed

25   they wouldn't have existed.

1            THE COURT:  Okay.  So the primary argument you're

2   making is that at whatever point in time some duty to preserve

3   documents came into existence, they didn't exist anymore.

4            MS. HARTZELL:  The earlier, the 2009.

5            THE COURT:  And then what about the later stuff?

6            MS. HARTZELL:  The 2010, everything since the

7   lawsuit are --

8            THE COURT:  You're saying still exist.

9            MS. HARTZELL:  Yeah, are the four listings that

10  currently exist.

11           THE COURT:  Okay.  Deal with that.

12           MR. MOSKIN:  Well, they're asking to make an

13  inference that -- essentially that it was irrelevant that they

14  disobeyed the Court's order and failed to preserve evidence

15  when --

16           THE COURT:  Well, the order is dated December of

17  2011.

18           MR. MOSKIN:  Right.

19           THE COURT:  Is there some reason to believe that

20  after December of 2011, number one, they didn't preserve

21  something that, number two, you haven't been able to find on

22  your own?

23           MR. MOSKIN:  Yes.

24           THE COURT:  What is that?

25           MR. MOSKIN:  He admits there were other forum posts.

1    THE COURT:  But, I mean, I think --  I think that --

2    MR. MOSKIN:  Other eBay posts.

3    THE COURT:  -- speaks too broadly.  In other words,

4    the question would be whether -- not whether there were other

5    forum posts, whether there were other forum posts that still

6    existed as of December 23, 2011, which is the date of the

7    order you're saying that you want to enforce here.

8    What reason -- I mean, he hasn't admitted that there

9    was something that was in existence a year after the lawsuit

10   was filed that he didn't preserve and that you didn't find on

11   your own.

12   MR. MOSKIN:  Yes, he --

13   THE COURT:  Show me where.  I've got everything out

14   here.  Give me the cite.

15   MR. MOSKIN:  I mean, the first thing that comes to

16   mind is what his actual testimony was at his deposition was I

17   said, Did you preserve these things?  He said no, I left that

18   to my lawyers to do it.  That means he was expecting his

19   lawyers in this lawsuit to be preserving something additional

20   which they -- which we never saw.

21   THE COURT:  No, I understand that.  But, again,

22   there's two parts to it.  I'm going to say this for the

23   umpteenth time.  There's two parts to it.  There's the failure

24   to preserve and you're harmed.  Okay.  And you found a bunch

25   of stuff on your own, and I recognize it was an onerous task

1   and you shouldn't have had to do it.  Okay.  But what you've

2   got to show me is there's something missing, missing in the

3   sense that not just that they didn't produce it but that you

4   didn't find it.  Okay.

5        Because, I mean, I might say, okay, since you had to

6   find it on your own, you tell me what it cost you to do that

7   and I'll shift that cost over as a sanction.  That would be an

8   adequate, more than adequate sanction for something that you

9   actually found.  Now what you're talking about is a sanction

10  for something that you didn't find.  And so what you have to

11  show me is that there was something that still existed as of

12  the date you said is relevant, the dates that you've said is

13  relevant that you did not find on your own.  And you keep

14  telling me, well, he's admitted he didn't produce stuff or he

15  didn't preserve stuff.  Is there some reason to believe that

16  he didn't preserve something that would have still been

17  available as of the date of either the order or the request?

18  And if so, right now is when you're going to need to show me

19  where in this two-foot high pile of paper here I find the

20  testimony or the documentation that suggests that.

21        So I'll wait for you to do that.

22        MR. MOSKIN:  I think you're asking me to do what's

23  impossible.

24        THE COURT:  No.  Honestly, with due respect, I'm not,

25  because you keep telling me that he's admitted it.  He has not

1     admitted this. Okay. And Ms. Hartzell has given me at least

2     a facially cogent argument that, okay, fine, we didn't

3     preserve the stuff, but they found it all. They found

4     everything that would have existed as of that time. So you've

5     got to show me some reason to believe that she's wrong about

6     that.

7         MR. MOSKIN: She's asking for not just no adverse

8     inference but a favorable inference that they produced

9     everything when we know they didn't produce everything.

10        THE COURT: She hasn't made a motion asking for a

11     favorable inference. You've made a motion asking for an

12     adverse inference that they've opposed.

13        MR. MOSKIN: And what we see is that for eight

14     different types of products a consistency before and after the

15     lawsuit that every time he advertises on eBay, he uses in a --

16     not in a nominative fair use way, a straight out use of our

17     trademarks, so the -- I think that does support an inference

18     that before and after the fact for more than just the four

19     products he now remembers that he has advertised other

20     products on eBay. He admits that he's done other advertising

21     on eBay. He just didn't save it, every one of the products.

22        So really what we're asking for is simply an

23     inference that these are representative of all of his eBay

24     postings, and then we can ask him at trial, and did you save

25     those other eBay postings, and the answer will be no, and he

1    didn't do that even though he was ordered by the Court to do

2    that.

3         THE COURT:  Okay.  All right.  So, I mean, I think

4    people have had more than an ample opportunity to deal with I

5    think the core issue here, and I'm just not seeing it.  So as

6    I sit here, I am not persuaded that there is something that's

7    missing.  And when I say "missing," I don't simply mean that

8    the defendant didn't preserve it.  I mean the defendant didn't

9    preserve it and the plaintiff didn't find it.  So, number one,

10   that there's something that's missing that, number two, still

11   existed as of the date or dates that the plaintiff claims is

12   relevant that, number three, would have been favorable.

13   There's no basis for an adverse inference.

14        However, I think it's appropriate and I'm going to

15   permit you -- when I say "you," I mean the plaintiff -- to

16   question Mr. Villacci at trial.  You can establish that he's,

17   you know, going back to whatever year it is, that he's sold

18   this stuff on eBay.  You're going to bring out that he's used,

19   you know, at least in these eight instances Games Workshop,

20   what I'll call Games Workshop terminology to describe it.  You

21   can ask him isn't it a fact that when you were selling this

22   stuff before on eBay you were using Games Workshop terminology

23   then.  If he says yes, you can ask him how many times, is it

24   two or 2,000 or whatever.  But the problem is largely cured.

25   If he says no, then you can bring out do you have copies of

1    any of that stuff, did you keep any of those postings.  He's

2    going to say no.  And that's going to be the end of it.

3         You're not going to get an instruction from me for

4    the reasons that I've described, and now we are moving on to

5    the next thing.  Okay.  And that would be item No. 2, which is

6    the forum posts.  Okay.

7         I know it was a large effort for everybody to get all

8    this together.  When I say it was a large effort for me to

9    plow through it, it's an understatement.

10        So I have a question.  And so when we're talking

11   about the forum posts, we're talking about really two

12   categories of things.  We're talking about entries that people

13   not affiliated with Chapterhouse made where they make comments

14   about things, and in some instances we're talking about

15   statements that Chapterhouse made.  And I really want to focus

16   and my question focuses on the statements that

17   non-Chapterhouse people made.  Are these being offered on

18   copyright claims, are they being offered on the trademark

19   claims, or both?

20        MR. MOSKIN:  99 percent of them are being offered on

21   copyright claims.  There was -- I did state in court last time

22   I was not aware of any on trade -- there was one --

23        THE COURT:  Okay.  So 99 percent.  So it's largely

24   copyright claims.  Okay.

25        And I know this was alluded to at the last

1    conference, and I just want to -- I want to revisit it a

2    little bit.  So as I'm confident you all know, in trademark

3    cases it's very common to introduce statements by consumers

4    that show confusion.  It's very common.  And the consumers

5    don't have to come into court.  I mean, that's been

6    established for dozens of years.  Okay.  That's not what we're

7    talking about here because customer confusion isn't an issue

8    on a trademark claim.  The issue is copy.  So the question I

9    have, sort of the threshold question I have is does that

10   matter?  Does the difference between the two matter in terms

11   of the admissibility of these comments by customers, consumers

12   that essentially, at least some of them essentially say, well,

13   gee, that looks just like Games Workshop's thing?  Okay.

14   That's my question.

15            And so it's really, it's another way of stating what,

16   what exactly are customer comments like that being offered to

17   prove?  So that's a question for you.  Being offered to prove

18   what?

19            MR. MOSKIN:  Right.  I think -- well, I don't think

20   there's any statement --

21            THE COURT:  Is it essentially a lay opinion about

22   similarity?  Is that what it basically amounts to?

23            MR. MOSKIN:  It's an impression.

24            THE COURT:  Yes.

25            MR. MOSKIN:  None of them are offered --

1    THE COURT:  I understand.  But it's a lay opinion.

2  And I'm not trying to back you into a corner.  It's a lay

3  opinion.  All right.  Somebody looks at it and says oh, yeah,

4  it looks just like theirs.  That's my opinion as to the two

5  things being similar.

6    MR. MOSKIN:  We have cited three cases which --

7    THE COURT:  I know what the cases say.  Please,

8  please.

9    MR. MOSKIN:  Okay.

10    THE COURT:  I'm begging you to answer a question

11  directly.  I'm just begging you.

12    MR. MOSKIN:  But in the objections to these

13  statements in no instance has Chapterhouse said that any of

14  these are true or false.

15    THE COURT:  If I had hair, I would be tearing it out

16  right now.

17    MR. MOSKIN:  Yes.  They are observations,

18  impressions.

19    THE COURT:  Thank you.  Okay.  All right.

20    And do you dispute that there's law, Ms. Hartzell, do

21  you dispute that there's law, and I recognize nothing's

22  binding because none of it comes from the Seventh Circuit, but

23  there's law that suggests that a, essentially a lay opinion

24  from an ordinary consumer about similarity of two things can

25  be admitted in a copyright case?

1          MS. HARTZELL:  I agree that there are cases that say
2    that that is relevant.

3          THE COURT:  Do you think those are wrong?

4          MS. HARTZELL:  I think that in some of those
5    instances the -- I'm not positive, but I think that some of
6    them the consumer was subject to cross examination or the
7    consumer themselves -- the individual themselves had been
8    identified in some way that -- I'm not disputing that it may
9    be relevant.

10         THE COURT:  Okay.  All right.  I think it's largely a
11   weight issue.  I mean, I think it's admissible.  It's
12   admissible.  It's effectively an out-of-court lay opinion, and
13   so you have to show a hearsay exception to it, and then it's a
14   question of what weight you give to it.

15         So with that in mind, I'm just going to plow through
16   this stuff.  And so, you know, I'm confident you're going to
17   order the transcript, but I'll identify things as I go.  And
18   I'm going to identify them by -- and I'm starting on page 15.
19   I'm going to identify them by the number, you know, 1 through,
20   you know, 35 or whatever it is.

21         So item No. 1, it's admissible under Rule 801(d).
22   It's a statement by Chapterhouse.

23         Item No. 2, it's admissible under 801(d).  Some
24   contextual material is potentially admissible, as suggested by
25   the defendant, under Rule 106, which is the rule of

1  completeness, but you're going to need to identify

2  specifically what it is, and I'm going to expect you to sit

3  down and do that, and I'm expecting that what's going to be

4  offered is just what's necessary to show context.  It's not

5  necessarily all of the other stuff in the ten-page-long, you

6  know, list of forum postings, you know, that might be on the

7  same subject.  It's really what's necessary to show context.

8       All right.  On the -- that really what I'm talking

9  about is -- are the bullet points that are at the bottom of

10  page 15 and the top of page 16.

11       Now, at the bottom of page 16 there's some more

12  bullet points that are identified as statements by ordinary

13  consumers.  And I think those are admissible as sense

14  impressions under 803(1), present sense impressions under

15  803(1).  And I think the threshold has been shown.  That's

16  something I'll come back to in a second.

17       Item No. 3, statement by Chapterhouse is admissible

18  under 801(d) because it's a statement by a party.  The

19  defendant may put in contextual information under Rule 106.

20  And, again, you're to discuss the specifics of that and try to

21  come up with some agreed upon contextual information that can

22  come in.

23       Item No. 4, the statement that's referenced in the

24  first bullet point as a statement by Chapterhouse is

25  admissible under 801(d).

1    The second bullet point, which is what's identified

2    as a statement by a consumer, I don't think that's -- I think

3    it's admissible under the hearsay objection -- or hearsay

4    exception as I've identified, 803(1).

5        What the defendant suggests down there at the bottom

6    of the page, there's a quote or a couple of quotes that the

7    defendant contends are admissible under Rule 106.  I don't

8    think it is.

9        And as far as the rest of the objection, the

10   defendant's Rule 403 objection is overruled.  I will say,

11   however, that any references to the lawsuit need to be

12   omitted.

13       Item No. 5, the statement is a statement by

14   Chapterhouse.  It's admissible under Rule 801(d).  I am not

15   persuaded that this means that everything that is said about

16   the design process comes in, which is essentially the argument

17   that the defendant makes.  On the other hand, the plaintiff

18   does not appear to have any objection to the specific items

19   that the defendant identified in this particular response

20   here.  So those are admitted for that reason.

21       No. 6, it's admissible under 801(d).  My comments are

22   essentially the same as I just said.  I'm not persuaded that

23   this means that the entirety of everything in the post is

24   admissible.  I think there's some pretty serious relevance

25   issues, and I think that goes beyond what Rule 106 provides.

1     Item No. 7, same as item No. 6.

2     Item No. 8, I think it's admissible for the purpose

3   that's argued by the plaintiff in their reply, the reply

4   that's made within the context of this status report.  That's

5   as to the thing that's identified as a statement by an

6   ordinary consumer.

7     At the bottom of page 19 there's another statement

8   there that's -- you know, it was -- there was an over strike

9   in there, and I can't see what -- it's a statement by

10  somebody.

11     MS. HARTZELL:  Chapterhouse.

12     THE COURT:  A statement by Chapterhouse.  That's

13  admissible under Rule 801(d).  And, again, as I said, I don't

14  think that means that the entirety of everything the person

15  says about the design process comes in under Rule 106.

16     And as far as this reference to Rule 803(5), I just

17  don't think that the predicate for recorded recollections come

18  in.  I mean, there's a lot of stuff you have to show in order

19  to get that in.

20     And, by the way, under 803(5) the document does not

21  actually come in.  It gets read.  But I don't think you've

22  laid the predicate for, the threshold predicate for

23  admissibility.

24     So now I'm up to item No. 9.  My comments are the

25  same as and my ruling is the same as for items 6 and 7.

1          Item No. 10, it's admissible for the purposes

2   identified by the plaintiff in reply.  And I'm referring to

3   the statements that are identified as statements by ordinary

4   customers.  I think that the threshold or the predicate for

5   admissibility under 803(1) has been shown.

6          The thing at the top of page 26, which is identified

7   as a statement by a Chapterhouse designer, that's admissible

8   under Rule 801(d).  And my comments as far as the rest of

9   Chapterhouse's response are the same as I've made with regard

10  to points 6 and 7.

11         On item No. 11.  Now I'm going to shift a little bit

12  on some of these.  So this is on pages 21 and 22.  There's

13  probably ten or so comments by customers.  The law under Rule

14  803(1) -- and I just need to pull up something here.  All

15  right.  In this circuit and other places there's a case called

16  United States versus Ruiz, R-u-i-z, 249 F3d 643 at pages 646

17  to 647, Seventh Circuit 2001.  Courts -- so first of all, the

18  rule itself, Rule 803(1), talks about something that describes

19  or explains an event or condition "made while the declarant

20  was perceiving the event or condition or immediately

21  thereafter."

22         And the criteria as stated in the Ruiz case are,

23  number one, the statement has to describe an event or

24  condition without calculated narration; number two, the

25  speaker must have personally perceived it; number three, the

1    statement must have been made while the speaker was perceiving

2    the event or condition or immediately thereafter.  And the

3    Court said, quote:  A statement that meets these requirements

4    is generally regarded as trustworthy because the substantial

5    contemporaneity -- I'm not even sure that's a word -- the

6    substantial contemporaneity of a -- I guess it is since the

7    Seventh Circuit said it, right -- the substantial

8    contemporaneity of event and statement minimizes unreliability

9    due to defective recollection or conscious fabrication.

10           I'm just going to say I wouldn't have worded that

11   that way, but you get the point.

12           There's no real per se rule saying what sort of time

13   interval's too long, but now flipping back to what I'm talking

14   about here, the specific entry, No. 13 -- or No. 11, it's not

15   apparent to me that these have the degree of spontaneity that

16   Rule 803(1) requires.  What we're talking about here -- and, I

17   mean, I reviewed the posts.  It's essentially an online

18   conversation.  It's not a reaction.  It's a conversation.  And

19   in any event, even if that weren't the case, there's too much

20   opinion going in here, and I'd exclude it under Rule 403.  But

21   we're not even going to get to that point because I don't

22   think it meets the threshold requirements for admissibility

23   under 803(1).

24           Item No. 12 is excluded for the same reasons as I

25   just said for item 11.

1    Item No. 13, I'm excluding it under Rule 403.  It's

2  just very argumentative, and I just don't see this as the type

3  of thing that's typically admitted under 803(1), but even if

4  it is, I'd exclude it under Rule 403.

5    Item No. 14 I'm excluding for the same reason stated

6  with regard to item 11.  Again, it's one of these

7  conversations.

8    Item No. 15 is admitted for the reasons stated by the

9  plaintiff in its little reply submission within the status

10  report.

11    Item No. 16, I don't think they qualify -- it

12  qualifies under 803(1), and even if it did, I'd exclude it

13  under Rule 403 for the reasons that I described earlier.

14    Under item No. 17 there's four bullet points.  The

15  first one that says "really that looks exactly like the

16  current GW lizard men with a different face and belly, even

17  the same pose/weapons," I think the basis for admissibility

18  has been shown under 803(1).  It's admissible for that reason

19  and the others described by the plaintiff in its reply.

20    The other three items are excluded under Rule 403.

21  It's just a very argumentative type of commentary.  So I'm

22  excluding it for those -- those for that reason.

23    Item No. 18, the items here are excluded under Rule

24  403 for essentially the same reasons.

25    Item No. 19, also excluded under Rule 403.  I regard

1    this more as criticism than a present sense impression.

2          Item No. 20, the comment that's referenced here is

3    admitted for the reason cited in the plaintiff's reply within

4    the status report.  However, the additional comment reference

5    to World War I that's cited by the defendant in its submission

6    is admissible under Rule 106 to show context, or it's part of

7    the same statement and it's admissible under Rule 106, I

8    think, which says that anything that should be fairly admitted

9    as part of the same statement.

10         Item No. 22, the first bullet point, the statement

11   quoted there is admissible under Rule --

12         MS. HARTZELL:  21, your Honor?

13         THE COURT:  21.  I'm sorry.

14         MS. HARTZELL:  Okay.

15         THE COURT:  The first bullet point, it's admissible

16   under Rule 803(1), and the statement by Chapterhouse which --

17   that's listed a little bit below that that I think is fairly

18   considered a response to that is also admissible.

19         The other two bullet points, no.  These are -- the

20   third bullet point it's fairly clear even from just looking at

21   what's quoted but certainly -- quoted here but certainly from

22   looking at the post itself is that this is -- it's discussion.

23   It's not a spontaneous reaction.  There's a conversation going

24   on.

25         And the second bullet point, I don't see this as

1   being covered by Rule 803(1), and no other basis has been
2   identified.

3          Item No. 22, it's admissible for the reasons that the
4   plaintiff cites in its reply in the status report here.

5          Item No. 23, it's admissible under Rule 801(d).  It's
6   a statement by Chapterhouse.

7          Item No. 24 is a fairly lengthy thing.  It's the last
8   one.  And it's excluded under Rule 403 for the reasons stated
9   in the response by the defendant here in the status report.

10          So I think I've now covered all that stuff.

11          And if this suggests that you're about to ask me to
12   go back, I will revisit something if you think I missed it.

13          MR. KEENER:  Yes.

14          THE COURT:  Only for that reason.

15          MR. MOSKIN:  There was -- in item 11 there were some
16   admissions by --

17          THE COURT:  Item 11, let me get back to that here.
18   Item 11.

19          Oh.  Yeah.  So the statements -- yeah, so the problem
20   is, is that the statements by Chapterhouse, the three things
21   that are cited there are really responses to stuff that I've
22   excluded.  I mean, it's this long conversation that goes on
23   where you've got a person or maybe more than one person sort
24   of duking it out verbally with Chapterhouse.  And the
25   statements by Chapterhouse are excluded under Rule 403 as well

1  for the same reasons that I described with regard to the

2  statements by the customer.

3        All right.  So we're moving on to the next topic,

4  which is identification of the icon marks.  I think I've dealt

5  with that, so don't need to deal with it anymore.

6        And I think that's everything, except when I was

7  going back and putting together the sort of summary order that

8  I think I entered this morning, I discovered in comparing the

9  motions with the status report that there is one thing that

10  sadly I did not make a definitive ruling on.  And I say sadly

11  because that means I have to relearn it, which I'm not really

12  in a position to do.  It was item -- in the order that was

13  entered this morning, it's item No. 11 under the plaintiff's

14  motions, amended withdrawn pleadings and claims.

15        What I said in the hearing, -- it's page 90 of the

16  transcript.  What I said is, yeah, I was told it basically

17  overlaps.  So this had to do with does the defendant get to

18  put in -- hang on a second.  Ms. Hartzell says at the top of

19  page 90:  With respect to the amended complaint and what

20  products, when these newly accused products were accused, much

21  of the designated deposition testimony by the plaintiff deals

22  with whether the documents were retained and at what point,

23  and we believe that it's relevant when products were accused

24  of infringement.  And I say:  Got it.  So in other words, if

25  the defendant and -- I meant to say the plaintiff -- if the

1    plaintiff gets to put in something that you didn't save any of

2    the documents that had to do with product X that wasn't

3    identified as being an issue until January of this year, you,

4    meaning the defendant, want to be able to put in evidence that

5    it wasn't identified as being an issue until January of this

6    year.  Ms. Hartzell says yes.

7           So that makes sense to me.  I mean, in other words,

8    if -- and I'm guessing we're not going to get there, but in

9    other words, if we have some issue that comes up at a trial

10   where there's some questioning or argument or discussion about

11   the defendant not preserving something that relates to a

12   product that wasn't even accused until January of this year,

13   first of all, you shouldn't be doing that, but if it's done,

14   I'm going to expect the defendant to tell me they just did

15   that, and then I'll tell the jury by the way, ladies and

16   gentlemen, that product wasn't even accused until January of

17   this year.  So I now think I've resolved that.

18          I believe that all open issues on all motions in

19   limine as well as the discovery enforcement motion have now

20   been resolved except to the extent that you've got to discuss

21   a couple of things and the extent to which you've got to

22   disclose something -- you've got to identify the products

23   associated with the icon marks within a week.

24          MR. MOSKIN:  Understood.

25          THE COURT:  So from my end the things that are left

1    for me to do are, number one, give you the time limits.  And

2    I'm not going to do that today because I had to spend too much

3    time focusing on this.  I've got the material all culled out,

4    and I've just got to go through it and try to make some sort

5    of reasonable allocation.  Number two, give you the

6    questionnaire that the jurors will fill out, give you a draft

7    of the questionnaire that the jurors will fill out before the

8    in-person voir dire.  And, number three, give you the draft

9    preliminary instructions.

10            And that's all going to happen way closer to the

11   trial except for the time limits thing.  I'm going to try to

12   get the time limits thing done within the next week for

13   planning purposes from your end.  The rest of it is not going

14   to come until the latter part of June -- or May, rather,

15   because of other things that I've got to do, deal with between

16   now and then.

17            So is there other things you want to bring up with

18   me?  I'm always sort of not sure I should ask that.

19            MS. HARTZELL:  I hesitate, but there is one thing

20   that we had discussed on April 1st at the hearing where your

21   Honor had just entered the summary judgment order.  And just a

22   second.

23            THE COURT:  April 1st.  Oh, not at the pretrial

24   conference, in other words.

25            MS. HARTZELL:  Right.  At the April 1st hearing.

1          And that had to do with on page 15 of the Court's

2    summary judgment order regarding priority of use of

3    trademarks, the Court --

4          THE COURT:  Let me see if I've got this.  Let me pull

5    that up.  What's the date of the summary judgment order?

6          MS. HARTZELL:  April 1st.  I have a hard copy.

7          THE COURT:  No.  That's okay.  What page?

8          MS. HARTZELL:  15.

9          THE COURT:  All right.  I'm there.

10         MS. HARTZELL:  And the Court relied on the

11   spreadsheet, detailed spreadsheet containing the names of each

12   product as proof of priority of use.

13         THE COURT:  Yes.

14         MS. HARTZELL:  And the issue that we raised on April

15   1st was that certain of the trademarks at issue in the case

16   now were not identified in that spreadsheet.  And you ordered

17   us to discuss it with the plaintiff.  So we have done that.

18         THE COURT:  You've done it.  Okay.

19         MS. HARTZELL:  We have done that.  And the plaintiff

20   agrees that the last five trademarks that were identified

21   which were first identified on March 4th, and I have a copy

22   highlighted for the Court of the identification of those, were

23   not something that Mr. Villacci testified about and were not

24   something that were in the spreadsheet.

25         Is that accurate?

1    MR. MOSKIN:  Correct.

2    MS. HARTZELL:  Okay.

3    MR. MOSKIN:  Nor were they subject to --

4    THE COURT:  So, in other words, what that means is

5    that there's no -- effectively no prior use finding on those

6    five.

7    MS. HARTZELL:  Correct.

8    THE COURT:  Okay.

9    MS. HARTZELL:  With respect to the others that were

10   added on January 31st --

11   THE COURT:  So that's five of the original ones.  No?

12   MS. HARTZELL:  No.  Five newly added.

13   THE COURT:  Five of the newly added ones.  Okay.

14   So tell me what your next point is then.

15   MS. HARTZELL:  So the next point is there's a dispute

16   as to the ones that were added on January 31st.  The plaintiff

17   asked Mr. Villacci about this interrogatory response, so it is

18   their position that that is sufficient evidence of use, but

19   they were not -- these marks were not identified in the

20   spreadsheet.

21   THE COURT:  Okay.  So give me just a second here.

22   Okay.  So basically what my conclusion had been, if

23   I'm summarizing it correctly, and if I'm not, you'll correct

24   me, that Games Workshop had produced evidence regarding sales

25   of certain products starting in 2004.  Chapterhouse didn't

1   really contest that evidence, didn't say it's inaccurate or

2   anything like that.  And it's essentially undisputed that

3   Chapterhouse didn't start selling anything until 2008.  And so

4   what I concluded at page 15 of the summary judgment opinion,

5   and it's really a reference to, I think, the earlier opinion,

6   that -- what I concluded in the second summary judgment

7   opinion is that that's enough to show prior use.

8           MS. HARTZELL:  That's my understanding.

9           THE COURT:  Okay.  And so what you're telling me is

10  that that's not exactly right for five of them because they

11  weren't in the spreadsheet?

12          MS. HARTZELL:  There are more than five but --

13          THE COURT:  But the plaintiff agrees that there are

14  five that it didn't -- that that really shouldn't cover, and

15  then there's some more beyond the five that you're disputing.

16          MR. MOSKIN:  There were five added after that were

17  not briefed.  They were not put in summary judgment.

18          THE COURT:  Oh, so they're not even part of this

19  ruling.

20          MR. MOSKIN:  Right.  So we're not arguing that those

21  were covered.  And the others, there were spreadsheets

22  produced in the first phase of the case, and there were

23  subsequent spreadsheets, and I think all of these new

24  additional marks were on the more updated spreadsheets with

25  all of the sales figures.  So I'm not sure what the issue is.

1         MS. HARTZELL:  But our point is that they were not of
2    record in the summary judgment, so to make a ruling of use
3    without evidence.
4         THE COURT:  So I don't have the document that you
5    have in front of me, but the spreadsheet on these additional
6    products, the ones that were added on January the 31st, does
7    it identify or describe sales that happened before 2008?
8         MS. HARTZELL:  I don't know offhand.
9         MR. MOSKIN:  I'm quite certain it does, but I didn't
10   prepare before today to double check that.
11        THE COURT:  So, I mean, I think the analysis was,
12   okay, if, number one, Games Workshop offers evidence that we
13   sold stuff with these marks on it before 2008, number one;
14   number two, if Chapterhouse does not dispute the veracity of
15   that evidence; and number three, it's undisputed that
16   Chapterhouse didn't sell anything before 2008, those three
17   things together make it clear beyond peradventure that there
18   was prior use in commerce by Games Workshop.  Okay.  So -- and
19   I understand if there was some stuff that because the products
20   were added newly was not part of the record in the summary
21   judgment motion, but I would think that the same ruling, if
22   those same three points exist with regard to these new things,
23   the same thing is going to happen there.  And I really sort of
24   question the -- I sort of question the utility of -- if we've
25   got each of those three items for these new products, I really

1  question the utility of spending the jury's time on that.

2         So tell me -- I mean, is there going to be a dispute

3  about this, or are you just saying I haven't found it yet?

4         MS. HARTZELL:  I'm not sure for the --

5         THE COURT:  Okay.  Well, you all need to get sure

6  about that.

7         MS. HARTZELL:  Okay.

8         THE COURT:  You know, because people are going to

9  need to figure out whether this is something that's going to

10 have to be proved up at trial or not.  And I guess what I

11 would sort of urge on everybody -- and, you know, and I

12 certainly understand that in any given case it might be in one

13 side or another side's interest to fling lots of stuff at the

14 jury, the strategic idea being if the jury doesn't get

15 something it's going to help us.  You know what, that's

16 perfectly fine.  I tried lawsuits for a living a long time,

17 and I'm not going to say I never did that.  All right.  But it

18 doesn't always cut the same way.  Sometimes that helps one

19 side; sometimes it helps the other side.

20        So I guess what I would urge you is to try to --

21 prior use in commerce is such a tiny issue in this case.  It's

22 such a tiny issue.  There are much bigger issues in this case.

23 I guess what I would urge you is to try to find ways to leave

24 it to the jury to decide the bigger stuff, not the little

25 teeny tiny stuff.

1    So, I mean, I know -- okay, so I now know I've made a
2    note that there's an issue about prior use in commerce on
3    these points, and I guess what I'm going to ask you to do then
4    is to give me -- I'm kind of liking these joint status
5    reports -- is to give me a joint status report let's say two
6    weeks from -- no.  I'm going to have you do it sooner than
7    that.  Let's say I'm going to have you give me a joint status
8    report by the 6th of May that basically describes the current
9    state of affairs or the current state of people's thinking
10   with regard to the prior use in commerce issue.  In other
11   words, you're going to tell me, okay, it's not disputed for
12   any of these additional products or it is; it isn't for these,
13   but it is for these; and if it is for certain products, you're
14   going to have to sort of lay out your dispute.  And if that's
15   a sort of a we'll call that a Rule 16, I may make a finding
16   under Rule 16 on that.  It's not really summary judgment, but
17   it's the equivalent.

18   The reason for the 6th is I'm going to be out of the
19   country from the 12th to the 19th, and I would like to get it
20   kind of resolved before that.  So I'm going to set you for
21   another status, which we can do by phone, on the 9th of May at
22   8:45.  So I'll need you to do one of those call-ins like we've
23   done before.  One of you get the other on the phone and then
24   call in.  Or get whoever on the phone that needs to be on the
25   phone and then call in.

1          MS. HARTZELL:  Thank you, your Honor.

2          THE COURT:  Any other issues?

3          MR. MOSKIN:  There were some little issues in the

4     letters that we'd submitted to the Court before the --

5          THE COURT:  The thing about time limits?

6          MR. MOSKIN:  Well, it goes to time limits, but there

7     was -- I know there was one specific issue about a call-back

8     of some allegedly privileged documents that the defendant had

9     requested.

10          THE COURT:  Oh.  This is the thing where I said the

11     letters went way beyond what I told you to put in the letters?

12          MR. MOSKIN:  Yes.

13          THE COURT:  Yeah.  Which means ain't going to

14     consider them.  I mean, what I asked you to put in the letters

15     are give me the length of direct examination for the people

16     you're actually intending to call.  Everything else, I mean, I

17     understand that some of you come from the -- practice in the

18     Southern District of New York.  This ain't, and so we don't do

19     brief by letter here.  We don't do motions by letter here

20     either.

21          MR. MOSKIN:  I don't know that I can defend the

22     entire New York bar.

23          THE COURT:  It's the Court.  It's this goofy

24     practice.

25          MR. MOSKIN:  No, I know.  It is unusual that we write

1    these lengthy letters, and which I've often wondered if

2    they're even -- to what extent they become part of the record.

3            THE COURT:  I've always regarded it as a New York

4    thing.  It's sort of the rough equivalent, the very rough

5    equivalent of the Law and Order episodes where the motion to

6    suppress would be litigated while the lawyers and the judge

7    were walking down the hallway, argued, litigated and decided.

8    I never saw a court reporter walking along with a little

9    machine.  So it's the rough equivalent.

10           MR. MOSKIN:  I've often wondered, frankly --

11           THE COURT:  People are always in a hurry.  You know,

12   you got to get things done.

13           MR. MOSKIN:  You know, because it doesn't have a

14   caption on it, whether it's even part of the appellate record

15   later on and things like that.

16           But there were some other issues in there, and we

17   frankly meant that to try to streamline some issues for the

18   trial.  I'm sorry but --

19           THE COURT:  I'm not into the streamlining business.

20   I'm not into the letting you streamline things business.

21           So there was a claw-back thing somewhere in here?

22           MR. MOSKIN:  Yes.

23           THE COURT:  Which letter should I be looking at?  I

24   think I've got them all in front of me.

25           MR. KEENER:  Yes, your Honor.  It's the April 8th

1  letter.

2       THE COURT:  By whom?  Is it the Winston & Strawn

3  letter.

4       MR. KEENER:  No.  The Foley & Lardner letter.

5       THE COURT:  So I've got, it's point 6 A on page 3?

6       MR. KEENER:  Right.  6 A is the claw-back issue.  So

7  there are three documents that were used for the deposition of

8  Mr. Fiertek, and we asked extensive questions about them.

9       THE COURT:  And the claw-back was a privilege claim?

10  And you said in there that you hadn't gotten an explanation

11  yet of the privilege.

12       MR. KEENER:  They just say it deals with

13  attorney-client information.  We don't know what attorney,

14  what time frame, who it is.  And looking at the documents,

15  some of them have nothing to do with attorneys.

16       THE COURT:  So I would think, I would think that if

17  somebody is going to make a privilege claim as part of a

18  claw-back, that presumptively you'd need to provide the same

19  sort of information regarding a privilege claim that you would

20  have had to provide had the documents been withheld in the

21  first place under rule -- whatever part of Rule 26 the

22  privilege log thing is.  It's 26(a)(5).  And so, you know, you

23  have to describe the nature of the documents, communications

24  or tangible things not produced or disclosed, and do so in a

25  manner that will enable other parties to assess the claim.

1    And so, you know, that's a bit vague but --

2            MR. KEENER:  And that's what we got, a vague

3    attorney-client privilege.

4            THE COURT:  So what's the information that you want

5    to know that you think is missing?

6            MR. KEENER:  Well, I've got the three documents here

7    because we used them at the deposition, the three statements.

8            THE COURT:  Give them to me.

9            And you're going to tell me why they're privileged.

10           (Documents tendered to the court.)

11           THE COURT:  So it's email exchanges.

12           MR. KEENER:  Yes.  So on the first document, which is

13   Exhibit 15 here.

14           THE COURT:  The thing at the top is an email from

15   Mr. Fiertek to himself.

16           MR. KEENER:  Yeah.  That was part of his own document

17   collection efforts, to email them to himself.  So this first

18   one the issue is on the fourth page.  There's two highlighted

19   excerpts.  No knowledge protection about that.

20           THE COURT:  The two highlighted things on the fourth

21   page.

22           MR. KEENER:  Yes.  So --

23           THE COURT:  Okay.

24           MR. KEENER:  I asked him about his deposition, and I

25   specifically said there is no claim of privilege on --

1    THE COURT:  Tell me what you think is privileged

2  about these.

3    MS. KALEMERIS:  Sorry.  I was ready to go in the

4  other order.

5    THE COURT:  Okay.

6    MR. KEENER:  I can tell you what the deposition

7  testimony was.

8    THE COURT:  No.  I want to hear the explanation for

9  the privilege claim first.

10    MS. KALEMERIS:  Okay.  In Exhibit 15.

11    THE COURT:  Is that what I'm looking at?

12    MS. KALEMERIS:  Yes.  So --

13    THE COURT:  So it's an email from the 28th of

14  February and one from the 27th of February.

15    MS. KALEMERIS:  Correct.

16    And Mr. Fiertek was talking with Mr. Villacci about

17  the litigation post lawsuit and was asking for advice from

18  Mr. Villacci's attorneys regarding whether or not some things

19  should be preserved.

20    THE COURT:  Remind me who Mr. Fiertek is.

21    MS. KALEMERIS:  Mr. Fiertek is the 49 percent guy.

22    THE COURT:  Okay.

23    MS. KALEMERIS:  The Swedish --

24    THE COURT:  And you're saying that in these emails

25  Mr. Fiertek is asking for advice from Mr. Villacci's attorney.

1  But he's not talking to an attorney; he's talking to

2  Mr. Villacci.

3          MS. KALEMERIS:  Correct.

4          THE COURT:  So how do I get that he's really talking

5  through him to an attorney here?

6          MS. KALEMERIS:  Well, Mr. Villacci was the plaintiff

7  contact for their legal counsel, and so anything that

8  Mr. Fiertek wanted to know regarding, you know, anything legal

9  he would ask Mr. Villacci first, and then Mr. Villacci would

10  ask the attorneys and then relay that advice back to

11  Mr. Fiertek.

12          THE COURT:  Talk about the next one.  The next one is

13  some emails dated May the 23rd, or it's an email dated May the

14  23rd of 2011.  So it looks like it's one from Mr. Fiertek to

15  Mr. Villacci and then one back from Mr. Villacci to

16  Mr. Fiertek.

17          MS. KALEMERIS:  Correct.  And in each of these

18  instances at his deposition Mr. Fiertek did let us know that

19  these were privileged conversations, and he declined to

20  answer.

21          THE COURT:  In what way did he do that?

22          MS. KALEMERIS:  He specifically said, and I have the

23  testimony here, that this related to privileged stuff.  And I

24  was defending his deposition at that point, and I instructed

25  him to the extent that these represented privileged

1  communications he should not answer any questions about them,
2  and he complied with that.
3          THE COURT:  So what this looked like, the original
4  comment from Fiertek to Villacci looks like to me is a
5  discussion or a description of how he went about designing
6  something.
7          MS. KALEMERIS:  Correct.
8          THE COURT:  Okay.  And so if Mr. Fiertek was here
9  talking, how would he explain why that was privileged?  What
10  was it about the context of it in which he made the comment?
11          MS. KALEMERIS:  So you see later on in that -- and
12  you're looking at the same one, May 22nd?
13          THE COURT:  Yep.
14          MS. KALEMERIS:  He asks if what he had done was
15  sufficient enough to make this a legal product to sell or if
16  he would have to do something else instead.
17          THE COURT:  Wait a second.  Where am I seeing that?
18          MR. KEENER:  That's the inference she's making
19  from --
20          THE COURT:  I mean, I'm not seeing a comment that
21  says that.  I mean, it doesn't look like, at least from what
22  I've been given here, there's nothing previously in the
23  string.  He's basically just describing this is how I did
24  something, and I assume that it has to do with these sketches
25  that are in the attachment.

1       MR. KEENER:  Right.  And he's comparing it to the art

2  book of Games Workshop, saying here's a change I made from the

3  art book.

4       THE COURT:  Yes, I got that part.

5       MS. KALEMERIS:  Those pictures are actually for

6  something else.  Those are related to something earlier in the

7  email which is not privileged but which Mr. Keener did

8  question Mr. Villacci about.  Those attachments were something

9  else, but later on he's asking all I did was alter these

10  things and I changed something else, but I guess this would be

11  illegal to sell.  And he was asking Mr. Villacci, and he

12  testified during his deposition that he believed he was asking

13  Mr. Villacci to ask his attorneys whether or not this was a

14  sufficient change.  And then you'll see above in the May 23rd

15  email that Mr. Villacci is relaying advice, yes, that would be

16  okay.

17       THE COURT:  Okay.  So here's the $64,000 question:

18  Is there some reason to believe that between 7:02 p.m. on

19  Sunday, May the 22nd of 2011 when Mr. Fiertek sent

20  Mr. Villacci the email and Monday, May the 23rd at 3:14 in the

21  morning Mr. Villacci talked with a lawyer?

22       MS. KALEMERIS:  I don't have that communication.  I

23  was not part of the case then.  But it is our understanding

24  that and Mr. Fiertek testified --

25       THE COURT:  I'm going to need somebody to belly up to

1  the bar, raise their right and swear an oath because this just

2  looks like to me -- and I understand that Mr. Fiertek is

3  saying, well, you know, I was asking for advice.  But if it

4  never got to a lawyer, it really doesn't matter.  I mean, it

5  ends up being business advice.

6         MS. KALEMERIS:  He was asking advice, and

7  Mr. Villacci was relaying the advice that he had previously --

8         THE COURT:  I need somebody to tell me that he

9  relayed it.  I need somebody to tell me under oath that he

10 relayed it, who he relayed it to, and then I'm probably going

11 to ask for the time sheet of the lawyer who did it, and I'm

12 going to have some lawyer come in and give me an affidavit

13 saying that sometime between 7:02 on Sunday night and 3:14 on

14 Monday morning I talked to Villacci and I told him something

15 about this.  That's what you're going to have to do to prove

16 it's privileged because on the face of this it barely passes

17 the straight face test.  Okay.  So that's what you need to do

18 on that one.

19        I haven't dealt with the first one yet.  Let's deal

20 with the third one.

21        MR. KEENER:  The third one is just the statements on

22 the first page, the two that are highlighted.

23        THE COURT:  It's an October 5th email.

24        MR. KEENER:  Same kind of issue.

25        THE COURT:  Same kind of deal.

1        MR. KEENER:  Yes.

2        THE COURT:  Okay.  Let me just look at the -- there's

3   an earlier string on this here, so I just need to look at some

4   context.  Give me a minute.

5        MR. KEENER:  I don't think any of the earlier string

6   there's any claim.

7        MS. KALEMERIS:  There is not.  This is the only one

8   on this.

9        THE COURT:  No, I understand, but I'm looking for

10  context.

11       MS. KALEMERIS:  I don't know that there is much

12  context.

13       THE COURT:  Yeah, there is.  The previous email

14  Mr. -- maybe it's after.  The times are kind of messed up on

15  this.  Where's Fiertek and where's Villacci?

16       MR. KEENER:  He's in Sweden, and he's not coming to

17  trial.

18       THE COURT:  Villacci is here, right?

19       MR. KEENER:  Yes.

20       THE COURT:  So --

21       MR. KEENER:  He's in Texas.

22       THE COURT:  One of the issues on that earlier thing

23  is that I don't know whether the time that's recorded on -- I

24  mean, I assume these were produced off of Mr. Villacci's

25  email.

1    MS. KALEMERIS:  Some of them were, and some of them
2  were for Mr. Fiertek.
3    THE COURT:  So I don't know whether the time that's
4  recorded as Mr. Fiertek --
5    MS. KALEMERIS:  These were Fiertek's --
6    THE COURT:  -- email -- let me finish the question --
7  the time that's recorded is the time in Sweden or the time in
8  Texas or if it's different depending on who's sending the
9  email.
10    That said, in the string that I'm now looking at, the
11  October 2011 string, in the previous email Mr. Villacci says
12  to Mr. Fiertek:  Yeah, just make sure you're not direct
13  copying the artwork.  Put on your own touches and spin on
14  things.  Just think Romanesque and you'll be okay.  Smiley
15  face.  Mr. Fiertek responds:  As I understood, copying
16  deals -- details -- as I understood, copying details is okay,
17  like making part of the torsos exactly alike while other parts
18  are altered.  And then Mr. Villacci responds:  You're correct.
19  No one can copyright a functional part of an idea.  Otherwise
20  no one could sculpt up a torso once the very first miniature
21  did so or a knee pad or a helmet.
22    Okay.  You know, the fact that nonlawyers are
23  discussing legal concepts, which I would imagine is not
24  terribly -- even if you didn't have the overlay of a lawsuit,
25  the fact that nonlawyers are discussing legal concepts doesn't

1    mean that a lawyer is involved, and it therefore doesn't make

2    it privileged.  And it also doesn't make it work product

3    because he's talking about a current design here.

4            So what's the basis for the claim of privilege on

5    this one?

6            MS. KALEMERIS:  Mr. Villacci had received extensive

7    advice from his counsel previous to these conversations and

8    had many conversations, had had an understanding based on

9    those conversations with counsel as to what was --

10           THE COURT:  Okay.  But so the question, though, is

11   whether the communication from Mr. Fiertek to Mr. Villacci, as

12   I understood, copying details is okay like making part of the

13   torsos exactly alike while other parts are altered, whether

14   that comment is intended to and was a communication to a

15   lawyer, albeit indirectly, for the purpose of obtaining legal

16   advice.  And that's not the way it's looking here.  It looks

17   like two businessmen talking about legal concepts.  And the

18   fact that maybe Mr. Fiertek understood that Mr. Villacci had

19   gotten all sorts of advice from lawyers, that doesn't make it

20   a communication for the purpose of obtaining legal advice.

21   That makes it a communication to somebody who had learned

22   something about legal concepts for the purpose of obtaining

23   advice.

24           So without more, I don't see that as privileged.

25   Again, I would need to see and I'd need to see some sort of

1    affidavits from people that said, okay, so what I did when I

2    got this is I communicated with my lawyer.  In other words,

3    Fiertek would have to say when I made this comment to

4    Villacci, I understood that Villacci was going to get the

5    answer from a lawyer.  Now, he may have already said that in a

6    deposition.  If not, I'd need it.  And I'd need, secondly, I'd

7    need Villacci saying, yeah, and I took Fiertek's question to a

8    lawyer and communicated back to him.  And then, because I will

9    just tell you I would be quite skeptical of one and two, I

10   would need the lawyer, which is the -- probably the most

11   cautious person in the chain, to say, yeah, and I gave him

12   advice and on this date about this thing.

13        So if you can get me all that, then I'm perfectly

14   willing to entertain a claim of privilege.  Otherwise, no.

15        And, honestly, the same is true on the first one that

16   I went back to.  What's the significance about taking pictures

17   out of Photobucket and changing passwords anyway?

18        MR. KEENER:  If you remember the last pretrial

19   hearing, Mr. Fiertek's the one who, widely admitting deleting

20   all sorts of evidence in the case, deleting all his Games

21   Workshop reference materials after the litigation started,

22   knowingly not keeping any pictures or design work of what he

23   was designing stuff because that's just not the way he works,

24   and this is further evidence of --

25        THE COURT:  That he was actually doing something.

1    MR. KEENER:  I mean, he's already admitted to

2  actively deleting Games Workshop material.  Now there's

3  evidence of further steps to try and delete --

4    THE COURT:  Except Mr. Villacci tells him don't do

5  it.

6    MR. KEENER:  Right.  Because he changed the

7  passwords, but still it shows his efforts.  I mean, once you

8  start piling on all the different things of him destroying

9  evidence, this is one more step of him actively trying to

10  conceal and destroy evidence.

11    MS. KALEMERIS:  But at his deposition Mr. Fiertek

12  said that he did not delete any photos based on --

13    THE COURT:  I understand.  But did he say, did he

14  actually say or would he say that when he asked Mr. Villacci

15  if I should delete stuff from Photobucket that he was trying

16  to get legal advice about that?

17    MS. KALEMERIS:  He made the claim of privilege during

18  the deposition.

19    THE COURT:  Yeah.  Okay.  So the same is going to

20  apply to all these.  I just don't -- I'm not persuaded without

21  more, and by more I mean affidavits along the lines I said,

22  that any of this stuff is privileged.  So I'm not ruling out

23  the possibility that you could persuade me.

24    Here's your copy.

25    MS. KALEMERIS:  Thank you, your Honor.

1          THE COURT:  But that's what you're going to have to

2  do.

3          MR. ALY:  Pending your ruling, Judge, can we seal

4  that portion of the transcript so as not to be deemed waived?

5          THE COURT:  It's not waived.  I say it's not waived,

6  and that suffices under Rule 502(d).

7          I'm not going to ask if there's anything else.

8          MS. HARTZELL:  Thank you, your Honor.

9          MR. ALY:  I have a disk for you.  Jury instructions

10  on disk, your Honor.

11          THE COURT:  Thanks a lot.

12          So I'll see you on whatever the date was I said.

13  I'll talk to you on the 9th of May at 8:45.

14          Thanks.

15          MS. HARTZELL:  Thank you.

16

17              *    *    *    *    *    *    *

18            C E R T I F I C A T E

19

20

21          I hereby certify that the foregoing is a true and

22  correct transcript of the above-entitled matter.

23

24  /s/ Valarie M. Ramsey          05-05-2013

25  _____      _____
    Court Reporter                Date