# Exhibit 1

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4   GAMES WORKSHOP LIMITED,        )
                                    )
 5              Plaintiff,          )   Docket No. 10 C 8103
                                    )
 6        vs.                       )
                                    )
 7   CHAPTERHOUSE STUDIOS, LLC,     )   Chicago, Illinois
     et al.,                        )   April 10, 2013
 8              Defendants.         )   2:30 p.m.
                                    )
 9

10              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12   APPEARANCES:

13

14   For the Plaintiff:    FOLEY & LARDNER, LLP
                           BY:  MR. JONATHAN E. MOSKIN
15                         90 Park Avenue
                           New York, New York   10017
16
                           FOLEY & LARDNER, LLP
17                         BY:  MR. JASON J. KEENER
                           321 North Clark Street
18                         Suite 2800
                           Chicago, Illinois   60610
19

20   For the Defendant:    WINSTON & STRAWN, LLP
                           BY:  MR. BRYCE A. COOPER
21                              MR. IMRON T. ALY
                           35 West Wacker Drive
22                         Chicago, Illinois   60601

23

24

25
```

2

```
 1                    MARSHALL, GERSTEIN & BORUN
                      BY:  MS. JULIANNE M. HARTZELL
 2                         MS. SARAH J. KALEMERIS
                      233 South Wacker Drive
 3                    Willis Tower #6300
                      Chicago, Illinois   60606
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23              LAURA M. BRENNAN - Official Court Reporter
                219 South Dearborn Street - Room 2102
24                    Chicago, Illinois  60604
                         (312) 435-5785
25
```

3

```
 1        (The following proceedings were had in open court:)

 2        THE COURT:  10 C 8103, Games Workshop v.

 3   Chapterhouse.

 4        MS. HARTZELL:  Julianne Hartzell on behalf of

 5   defendant Chapterhouse.

 6        MR. COOPER:  Bryce Cooper.

 7        MS. KALEMERIS:  Sarah Kalemeris on behalf of

 8   defendant Chapterhouse.

 9        MR. ALY:  Imron Aly.

10        MR. MOSKIN:  Jonathan Moskin of Foley & Lardner for

11   the plaintiff.

12        MR. KEENER:  Jason Keener, Foley & Lardner, on behalf

13   of plaintiff.

14        THE COURT:  Okay.  I'm just waiting for a second for

15   the sound system to come up.  We have got a lot to talk about

16   today.

17        I want to talk first about the trial date.  I've got

18   to tell you, folks, my initial inclination is not to move it

19   again.  And I'm going to be very just sort of candid with you

20   about why.  I will give you an example.  So I had asked both

21   sides, as you will recall, to give me a list that basically

22   said these are the witnesses we're going to call, this is how

23   long our examination is going to take.  And I got instead

24   letters that included that and about ten other disputes.

25        And so what I see this case as, and it's, frankly,
```

4

```
 1   the way it has been for about the last two years, it's an ever

 2   mushrooming font of disputes, and the more time I give you

 3   between now and the trial date, the bigger the mushroom is

 4   going to get.  And so I'm really quite disinclined to continue

 5   it again.  So that's my initial inclination.  We'll come back

 6   to that towards the end here.

 7        I mean, just to give you an example -- and I'm

 8   getting some strange facial expression from Mr. Moskin.  Your

 9   letter finished at the end of page 1, actually one line on

10   page 2, doing what I told you, and then it went on for two and

11   a half more single-spaced pages of listing, well, six issues

12   plus several subparts of issues that you thought that I should

13   rule on that weren't included in the motions in limine that

14   you thought would help streamline things.  And, you know, that

15   sort of generated a whole back and forth that went way beyond

16   what I had asked you to do.  And so there's got to be an end

17   to it at some point, and the more I think about it, the more

18   I'm inclined to say the end is coming starting on the 22nd of

19   April.

20        So we're going to start talking about the motions in

21   limine.  We're going to start with the defense motions.  So

22   the only people I need standing up and up at the podium are

23   the people who are going to be talking about them.  I'm

24   basically going to go through them in order.  And I've got

25   basically questions on some of them and others I don't.
```

5

```
 1          So let me just get the material in front of me here.
 2     (Brief interruption.)
 3          THE COURT:  So the first -- I want to start with the
 4     defendant's motions in limine.  So the first --
 5          And I know that there is an interrelationship between
 6     the first motion in limine which concerns third party website
 7     postings largely.  There is an overlap between that and this
 8     motion to enforce the prior discovery orders.  I'm just going
 9     to deal with it as an evidentiary matter at this point, and
10     then we'll come back to it when we talk about the other thing.
11          So my first problem here, so I get this motion which
12     says there's this, you know, torrent of stuff that the
13     plaintiff wants to put in that is not properly admissible.
14     You don't give me the documents.  You give me a list of the
15     documents, and the list is a really long list, you know, and
16     then Mr. Keener and Mr. Moskin attached some of them.  Mr.
17     Moskin attached some of them to the response.  But just sort
18     of general rule, if you want a judge to exclude something,
19     show it to him.
20          So I have some questions for the plaintiff.  Putting
21     aside the question of the motion that is entitled Motion to
22     Enforce Prior Discovery Orders, which basically says that, as
23     a sanction for failure to preserve, I should allow all this
24     stuff in evidence, is there some Rules of Evidence based
25     provision that says that nonproduction by somebody entitles
```

6

```
 1     you to overcome the requirement of proving a foundation and so
 2     on?  I take it no, right?
 3          MR. MOSKIN:  Well, I --
 4          THE COURT:  If somebody doesn't produce something in
 5     discovery, you're automatically allowed to put it in evidence.
 6          MR. MOSKIN:  Well, they would be -- putting aside the
 7     adverse inference type, and we can address that separately.
 8          THE COURT:  Yes.  I just want to deal with this from
 9     a Rules of Evidence standpoint here.
10          MR. MOSKIN:  Right, and I think we tried to frame it
11     solely in terms of the hearsay rule that they had cited as a
12     reason to exclude the forum posts.  Your Honor had given us an
13     initial -- I know it was just an initial assessment, I believe
14     it was on April 1.
15          THE COURT:  You know, we have got limited time here,
16     and I'm just going to insist that I get direct answers to my
17     questions.
18          MR. MOSKIN:  Fine, yes.  We tried to deal with it
19     just as an evidentiary basis on hearsay grounds, and we think
20     there are good grounds to let it in for a hearsay reason, that
21     it's not hearsay, and we cited examples that are not hearsay
22     but not --
23          THE COURT:  The material that we're talking about
24     here, are you citing it?  Are you offering it on the copyright
25     claims or on the trademark claims?
```

7

```
 1          MR. MOSKIN:  The copyright claims.
 2          THE COURT:  The copyright claims, okay.
 3          So you cited several cases in your response -- it's
 4     over on page 2 of the response -- you know, for the
 5     proposition that an out-of-court statement about copying or
 6     similarity is either not hearsay or, more specifically, I
 7     guess, it's subject to a hearsay exception.  It's page 2.
 8          So of the cases you cite there, Atari and Midway
 9     don't say anything about hearsay.  They just talk about
10     relevance.
11          MR. MOSKIN:  Yes.
12          THE COURT:  MCA addresses hearsay, but it relies on
13     the fact that the evidence in question in that case amounted
14     to spontaneous reactions.  Is that the case here?  Is there
15     some basis for you to say what we're talking about on a web
16     posting is a spontaneous reaction, and, if so, what is it?
17          MR. MOSKIN:  That just the initial reactions --
18          THE COURT:  Because that's what people do on the
19     Internet, they just sort of foam at the mouth?
20          MR. MOSKIN:  Well, I don't know that they're all
21     foaming at the mouth.  And it's very much like, as you said,
22     if you submit a -- and some of these cases do talk about this,
23     that if they had put an ad in the paper and people sent in
24     cards, that would be the same thing.  And those were deemed
25     admissible, those sorts of comments, I believe, in MCA v.
```

8

```
 1     Wilson.  They just got ordinary observer reactions to some
 2     movie.
 3          THE COURT:  Right, but what -- I mean, basically what
 4     that case relies on -- let me just find the specific reference
 5     here.  It's over on page 451.  So it's 425 F.Supp, and the
 6     pinpoint cite is 451.  They refer to them as present sense
 7     impressions.
 8          MR. MOSKIN:  Yes.
 9          THE COURT:  In the sense -- and they refer to them
10     and the judge refers to them as spontaneous reactions of cast
11     and audience to the playing of this particular song.  Quote:
12          "Their spontaneity provides their reliability and
13     cures any hearsay infirmities."  Close quote.
14          So in that case there was a pretty significant
15     foundation laid that is described in the preceding pages that
16     basically establishes just that, that it was spontaneous.
17          And so what is the corresponding foundation here?
18     That's my question.
19          MR. MOSKIN:  That I think if you look at the blog
20     postings, the forum postings, these are not analytical
21     statements.  They're just off-the-cuff comments from people.
22     And, in fact, if you look at the other examples -- I want to
23     stay on the point -- I don't think they are being offered for
24     the truth and falsity of what they are saying anyway.  But
25     they're just --
```

9

```
1        This is my reaction.  I'm looking at this and it's
2   just an off-the-cuff reaction.  I think in the same way that,
3   you know, emails are -- people say a lot of stupid things in
4   emails because there's no edit function there.
5        THE COURT:  On the other hand, there is no stupidity
6   exception to the hearsay rule.
7        MR. MOSKIN:  Right.
8        THE COURT:  Okay.  So what you're saying basically is
9   that from the context, it's relatively apparent that they're
10  spontaneous and immediate reactions.
11       MR. MOSKIN:  And although we --
12       THE COURT:  Does it make a difference that we don't
13  know who posted them?
14       MR. MOSKIN:  I'm not aware.  I can't think of a case
15  that says that.  I mean, I've cited -- we have cited some
16  examples where courts have said forum postings can be
17  admitted.  Usually --
18       I mean, I will be honest.  I think that more often
19  this does come up, and that you were asked the question, you
20  know, is this -- you know, they would be admitted for
21  trademark.
22       THE COURT:  It's more often in a trademark case to
23  prove confusion.
24       MR. MOSKIN:  Right.  And, you know, in those cases,
25  there's a long line of cases where --
```

10

```
1        THE COURT:  But, see, that's state of mind.  I mean,
2   that's a different hearsay exception.
3        MR. MOSKIN:  But just in terms of the foundation I
4   wanted to get to, if somebody calls -- you said, do we know
5   the anonymity issue.  If somebody calls in and it's just to a
6   call center and say -- and courts will routinely accept we got
7   ten phone calls, and they're not recording who they are.  It's
8   just --
9        The difference in the cases that the defendant cited,
10  they were third party accounts of what other people had said,
11  and that I would concede, that would be hearsay.  This is just
12  the -- as you said, it's the unexpurgated -- it's just the
13  foaming at the mouth or it's -- and they're not even true or
14  false statements.  They're just saying, why are you doing
15  this.  Some of them are complimentary.
16       THE COURT:  Let me hear from the defendant on this.
17       MS. HARTZELL:  With respect to whether or not it is a
18  present sense impression, many of these are conversations
19  among blog posters that occur over a period of time.  So we
20  would dispute that it is a spontaneous first reaction without
21  thought as characterized by the Court.
22       THE COURT:  So can you just sort of point me to
23  something that illustrates what you just said?
24       MS. HARTZELL:  The examples that we provided in our
25  motion were more limited in scope, and those were focused on
```

11

```
1   instances in which an individual made, which are exhibits A
2   and -- or Exhibit C and --
3        THE COURT:  Well, Exhibit A is just a list.
4        MS. HARTZELL:  -- Exhibits C and D to our motion.
5        THE COURT:  Okay.
6        MS. HARTZELL:  Those were directed more to the
7   opinion point because these are individuals who say things
8   like, this is just clearly copyright.
9        THE COURT:  This has got to be a joke, right?  I
10  mean, what the hell, this is just clearly copyright
11  infringement.
12       MS. HARTZELL:  Correct.
13       THE COURT:  That's one of the things you want to
14  allow in; yes or no?
15       MR. MOSKIN:  Yes.
16       THE COURT:  It's excluded under Rule 403.  It's a
17  conclusion about law, not something the jury has to decide.
18       MS. HARTZELL:  Exhibit D, the first example, is also
19  of that type.
20       THE COURT:  Exhibit D, the first example.
21       The problem that I have with this stuff -- and this,
22  I guess, sort of illustrates it, is that I'm having a hard
23  time getting my arms around exactly what it is that the
24  plaintiff wants to put in because what we're talking about --
25  Ms. Hartzell is right.  I mean, it's like any other blog
```

12

```
1   posting.  You have got a comment, you have got responses, you
2   have got responses to the responses and so on.
3        I don't -- I mean, I'm assuming you don't want to
4   just sort of, you know, bring up a wheelbarrow and dump the
5   stuff in the jury's lap.  You're going to focus on specific
6   things.
7        And I don't -- and what I really need here and I
8   don't have it yet, is, okay, these are the things, here is the
9   list of the comments that we want to put in and, Judge, here's
10  where you find them so that I can go back and look at these
11  things and figure out whether there's a reasonable basis to
12  say that they qualify as a present sense impression or some
13  other exception to the hearsay rule because there's -- and
14  whether there is some other basis for excluding them.
15       So, for example, under Exhibit D to the defendant's
16  motion, you know, it's an entire string.  It's a long string
17  of comments.  Well, not long; it's just four separate
18  comments, and there's all sorts of stuff in there that you,
19  know, I would almost certainly exclude.  So there's a
20  reference to "they," which I assume means Chapterhouse.  They
21  have no concept of IP.  They clearly think they have a right
22  to steal from GW, especially with a lawsuit already going on.
23  I mean, there is no way that's going to come into evidence,
24  okay.  It's just completely -- if Rule 403 doesn't cover that,
25  we might as well just rip that page out of the rules, you
```

13

```
1   know.
2           And then there's one where it says that, you know,
3   okay, well, maybe GW isn't exactly an angel of a company
4   either, I'm not a big fan of theirs.  None of that is a
5   present sense impression about anything that is relevant to
6   anything to the case.
7           So what I need you to give me, and I haven't gotten
8   it yet, I need here's the list exactly, here's the things we
9   want in, Judge, these comments.  Here attached are the
10  entirety of the exhibits that these comments are in so that I
11  can figure out what we're talking about here.  It's just --
12  and I know you had page limitations and I know there was a lot
13  of stuff here.  I mean, when you guys forwarded me -- I think
14  it was the plaintiff's motions in limine.  The file size was
15  118 megabytes, okay, one file.  I know there's a lot of stuff
16  here, but that's what I really need to have.
17          MR. MOSKIN:  And, your Honor, when I was grimacing at
18  the outset, it was because I acknowledged that this case is a
19  problem, that the disputes go on and on and on and so --
20          THE COURT:  And I understand, but the problem is
21  that, you know, it's kind of like -- I forget whose law it is.
22  You know, the disputes expand to fill the time that you give
23  them.  And so if I give you five months, we'll have five
24  months of disputes.  If I give you ten months, we'll have ten
25  months of disputes.  If I give you a week, we'll have a week
```

14

```
1   of disputes, and then at least we'll all be done with it at
2   some point.
3           MR. MOSKIN:  That's exactly why I was grimacing.
4           THE COURT:  We're going to move.  You know what I
5   want on number 1.  We'll come back around to a date in a
6   second, which is going to be a really short date.
7           MS. HARTZELL:  Your Honor?
8           THE COURT:  Yes.
9           MS. HARTZELL:  There was a second category that we
10  had identified which were the proof of actual confusion, but
11  it sounds from the plaintiff like that is not at issue, so I
12  think that --
13          THE COURT:  We're just talking about copyright here.
14          MS. HARTZELL:  Yes.
15          MR. MOSKIN:  There were two or three, maybe four,
16  separate emails that were received by the plaintiff.
17          MS. HARTZELL:  We're not talking -- trying to address
18  those.  Those were identified in discovery.
19          THE COURT:  You're not trying to exclude them.
20          MS. HARTZELL:  Right.
21          THE COURT:  Okay, all right.  So the second topic of
22  the motion in limine is images from the defendant's website.
23  Okay.  I recognize that I said in one of the summary judgment
24  rulings, I think it was the first one, that there is no claim
25  for copying the website as such.  I get that.
```

15

```
1           And what the thrust of the argument, as I'm
2   understanding it from the defendant, is that, okay, the actual
3   products are these sort of gray things.  What you see on the
4   website are colored in.  Somebody has painted them.  And the
5   jury is going to get confused because they're actually
6   supposed to be comparing the little gray things and they're
7   going to be comparing the colored things, or the painted
8   things.
9           The plaintiff says in response, well, wait a second,
10  putting these colored images on the website is like putting
11  them in a catalog.  It's a form of marketing, and so it's --
12          And what's wrong with that argument?
13          MR. ALY:  Your Honor, what is wrong with that
14  argument is the catalog is not accused of infringement.  So
15  had the plaintiff said your website images are a separate
16  infringement act and then we would have had the case about
17  that, that would have been a different scenario.
18          THE COURT:  I understand.  But, I mean, the website,
19  it seems to me, can be argued as a form of advertising the
20  unpainted things.  This is what they will look like if you
21  paint them, okay.  Just like, you know, in ancient times when
22  kids used to make model airplanes, all right, the picture on
23  the front of the box wasn't all of the gray pieces; it was a
24  painted picture of the airplane as a whole, and it's a
25  marketing device.  You're walking through the aisle at the
```

16

```
1   store and you think, that's a really cool looking picture of
2   the Wright brothers' plane, I would like that, even though
3   when you open the box, it's just a bunch of little pieces.
4           So if what's going on -- in other words, to take my
5   Wright brothers' plane example here, if the infringement was
6   we have got this model of a plane out here and you have got
7   something that's just a bunch of pieces, but when you market
8   it, you market it as this fancy-looking colored object which
9   is going to end up, you know, sort of trading off of our
10  thing, why isn't it --
11          Even if the image isn't the copyright infringement,
12  why doesn't it come in to prove their case?
13          MR. ALY:  Sure, your Honor.  Two reasons.  The
14  marketing is not the thing accused, so we have talked about
15  that already.
16          And, secondly, the marketing would be relevant for a
17  contributory infringement claim to say when somebody puts this
18  together and paints it, that's an infringing act, and there is
19  no contributory copyright infringement claim that is here.
20          So what we're stuck with is if the copyright
21  infringement comparison that the jury is supposed to make is
22  the product gray versus a gray product, and in this case it is
23  gray versus gray, they're going to instead see painted versus
24  painted and make a different conclusion, and that would be
25  impossible to undo.
```

1      THE COURT:  Okay.  So how are you harmed by it then?
2  I get your argument for why it's not relevant.  How are you
3  harmed by it?
4      MR. ALY:  The harm is the impression of a painted
5  image shows, for example, color schemes that might overlap, if
6  you just looked at one image versus the other, and you would
7  look at color as the first thing that jumps off the page
8  rather than the features on the component parts.
9      THE COURT:  Mr. Moskin.
10      MR. MOSKIN:  First of all, the premise of the
11  argument I reject, that we're not complaining that the
12  complaint is not addressed to the color images on the website.
13  The whole case all along -- they made a similar but lesser
14  argument in opposing summary judgment the first round saying
15  that the Court shouldn't focus so much on the color but never
16  said that the website was irrelevant.
17      So this seems to me just an entirely new argument
18  which is -- I mean, the lawsuit all along has been they are --
19  they have made --
20      Two levels.  They have made physical copies.  They
21  have made these sculptures and painted them.  That's a copy
22  even if they never sold a single thing.  They then publish
23  them on their website.  They publish them on forums.  They use
24  the same color images on the forums.  They put the color
25  images on eBay.  Everyplace they sell these things, they sell

1  them in color.
2      They couldn't sell a single thing if they just sold
3  them in these gray images.  That's not what people are buying.
4  The reason people buy these things is they're tapping into the
5  fantasy of the game.  And so there wouldn't be a lawsuit if
6  they were just selling gray pieces.
7      So, again, the whole premise of the argument is
8  wrong.  It's also contrary to the copyright law we have cited.
9  Section 106 of the Copyright Act identifies three separate
10  rights, one being the right to make copies, the exclusive
11  right to make copies.  One is the exclusive right to make
12  derivative works, and the third is the exclusive right to
13  display.  So just --
14      THE COURT:  Let me ask you this.  I get that.  Let me
15  ask you this.  So the colored -- let's take some hypothetical
16  colored image that is on the website.  Is there something
17  about the coloring that infringes either your copyright or
18  your trademark?
19      MR. MOSKIN:  Yes.
20      THE COURT:  Okay, describe how.  I don't want to seem
21  too dense, but describe how.
22      MR. MOSKIN:  Your Honor, the defendant hires teams of
23  painters, and there's more deposition testimony I could read
24  to your Honor --
25      THE COURT:  Yes.

1      MR. MOSKIN:  -- where he says, the reason we do that
2  is so that we can show our customers what the finished product
3  looks like.  He said in the early days, we used to do it,
4  sometimes put them up there unfinished, but we realized it's
5  much more effective to show the finished product.
6      THE COURT:  But is there something about the coloring
7  that is part of your copyright?
8      MR. MOSKIN:  Oh, yes.
9      THE COURT:  Okay.
10      MR. MOSKIN:  Games Workshop has images in color in
11  its books --
12      THE COURT:  Okay.
13      MR. MOSKIN:  -- and on its website and on the
14  packaging of the products, all of which have been produced in
15  discovery.  And so when --
16      And Games Workshop hires teams of painters as well so
17  that they can show the customers what the things look like and
18  how the finished figures look like what's in the books.  But,
19  frankly, even if Games Workshop never sold a single miniature
20  or figurine, what Chapterhouse is copying, and in many cases
21  this is exactly what it's doing because it finds holes where
22  Games Workshop doesn't sell miniatures but copies images that
23  are presented in color in the books, and that's what it's
24  copying.
25      Again, it's making -- first, it makes a model and

1  paints the model, so that's the copy in color, and so that the
2  user can make a direct comparison, and without the color, it's
3  a lot --
4      THE COURT:  Kind of harder to tell.
5      MR. MOSKIN:  And it doesn't tie in with --
6      For example, all of those chapter icons that show up
7  on, you know, that Games Workshop puts on the shoulders, to
8  give you a simple example.  The bloody eagle icon, it's an
9  eagle with a red blood spot in it.  It means something that
10  it's in color.  You know, everything is done in color, and it
11  is not an accident that the defendant has copied in color and
12  presented images on its website.  So there wouldn't be --
13      Honestly, I don't know that there would be a case at
14  all if they were just selling gray pieces because nobody would
15  know what they were.  And it's not the claim.  Again, the
16  whole -- it would be -- this is essentially a new summary
17  judgment motion with a new theory of copyright law supported
18  by no cases at all.  Really, I don't know the basis in
19  copyright law for this argument because it seems contrary to
20  just the very -- just looking at the face of the statute
21  itself, there are separate rights that have been --
22      THE COURT:  Mr. Aly, what else would you like to tell
23  me?
24      MR. ALY:  Two points.  One is that it's a notice
25  problem then because if the colors and the images on the

1  website was what was accused of infringement, we would have
2  expected to see that in the claim charts that have been many
3  times produced in the case, but the claim charts show the
4  images but accuse the product. And the problem here is that
5  the accused things are only products, not images, and that was
6  resolved, also, we thought in the summary judgment motion that
7  the websites not --
8      THE COURT: But really, I think you're really reading
9  too much into that part of the summary judgment decision.
10     MR. ALY: Perhaps.
11     THE COURT: You know, and I do want to deal with
12 that, so I've got to find the page of the summary judgment
13 decision that discusses it.
14     MR. ALY: It's around 25, your Honor.
15     THE COURT: 25, okay, thanks.
16     Yes. What I was dealing with there was a contention
17 that the website was copied, and at pages 25 and 26, I
18 basically concluded that, you know, you can't make a claim for
19 copying the website. GW has not produced -- I'm paraphrasing.
20 GW has not produced evidence that both websites share enough
21 unique features that a reasonable jury could conclude that
22 Chapterhouse copied GW's website. And he mentions --
23     So that's what I think I said was out. The ensuing
24 sentence, though, I think tends to support what Mr. Moskin is
25 arguing here. The ensuing sentence says:

1      "Any mention of Chapterhouse's website in the
2  evidence GW has presented is included simply to show the
3  similarity of the products advertised and sold on
4  Chapterhouse's website."
5      And I do that in the course of making another point.
6  I think this is admissible. I mean, I think it's a -- I think
7  there's a weight issue. I don't think it's unfairly
8  confusing. But it is a weight issue, not an admissibility
9  issue. And, you know, we're going to need to define, I
10 assume, in the instructions exactly what it is that the
11 plaintiff is contending is its protected expression so that
12 the jury can, you know, make the proper comparison. And I'm
13 obviously relying on you all to give me the, you know,
14 instructions that embody that, but I'm denying defendant's
15 motion number 2.
16     Number 3 is the contention that fact witnesses for
17 the plaintiff, and I gather this is mostly Mr. Merrill, are
18 also going to give expert testimony. So I want to get a
19 handle on, and if somebody on the defense side can tell me
20 exactly what is it that you're trying to exclude. And it
21 would be helpful if you could give me a for instance.
22     MR. ALY: Yes, your Honor. For instance -- and I
23 apologize this wasn't submitted to the Court, but we do have
24 one, and I will read it along with Mr. Moskin here at bench.
25     THE COURT: Is this something from Mr. Merrill?

1      MR. ALY: Mr. Merrett, his deposition.
2      THE COURT: Merrett, I'm sorry.
3      MR. ALY: It's from his deposition, where the
4  question is asked:
5      "What is it about the style of combat fatigues that
6  you believe are copied?"
7      And the answer is given: "They just are. I don't
8  know. I have been doing this -- I have been involved in the
9  design of miniatures for 30-odd years. So you look at
10 something and you go, that looks like the designer of this
11 thing has copied this thing. There's elements of that which
12 are indisputable."
13     So that's an example of the conclusion.
14     THE COURT: All right. And, of course, that was a
15 question that somebody on your side asked him in the
16 deposition. It doesn't necessarily mean they're offering it.
17     Are you going to elicit that testimony from Mr.
18 Merrett?
19     MR. MOSKIN: I don't remember specifically what the
20 designer --
21     THE COURT: Using that as kind of an example, this is
22 it what we think they copied. In other words, it's one thing
23 for him to say, this is what we made, this is what we made
24 that we think is original. Saying this is what we think they
25 copied in this item of theirs is arguably different from that.

1      MR. MOSKIN: Well, there is -- probably there is case
2  law on this as well where it's acceptable for -- particularly
3  given the ordinary observer test for -- and I can cite -- this
4  was a case that was cited in the context of the summary
5  judgment briefing I think by the defendant, where the Court
6  discussed the fact that in discussing expert testimony, that
7  it's perfectly admissible where there is nothing technical at
8  issue --
9      THE COURT: So what's the case? It's not in the
10 motion.
11     MR. MOSKIN: It's Gentieu against Tony Stone images.
12 And if you bear with me, I think it was in footnote 20 --
13 footnote 14.
14     THE COURT: Well, that explains why I didn't remember
15 it.
16     MR. MOSKIN: Well --
17     THE COURT: I would like to say I have a policy of
18 reading no more than three footnotes.
19     MR. MOSKIN: At any rate --
20     THE COURT: But I won't say it.
21     MR. MOSKIN: What I think, you know --
22     THE COURT: What is the citation of the case?
23     MR. MOSKIN: It is 255 F.Supp 2nd 838. It looks like
24 it's on page 854 or 5 that the -- one of the parties asserts
25 that expert testimony is unnecessary here because most of --

1  they were photographs of babies -- are not technical or
2  intricate to require specialized knowledge.  And there is
3  highly respectable authority and cites some more cases that
4  reconfirms the traditional role of lay observers in judging
5  substantial similarity in copyright cases that involve the
6  aesthetic arts such as music, visual works and literature.
7          And so while we -- it is certainly appropriate where
8  there are technical works.  And they cite one case, a
9  copyright work, and an architect -- a piece of architecture
10  where you need an expert to explain what is relevant about the
11  work.
12          Here what I anticipate Mr. Merrett will say, this is
13  how we create our works, and the question, and are there any
14  works of the defendants that you think are either similar to
15  yours or --
16          THE COURT:  Your point, though, is that making a
17  comparison like that isn't something that is inherently expert
18  testimony.
19          MR. MOSKIN:  No.
20          THE COURT:  Do both sides have experts that are going
21  to do this, too?
22          MR. MOSKIN:  No.
23          THE COURT:  You don't.  Do you?
24          MR. ALY:  Yes.
25          MR. MOSKIN:  And I don't think they do either.

1          MR. ALY:  We do.
2          THE COURT:  Well, you have got this guy from the
3  professor.
4          MR. ALY:  That's right, Carl Grindley.  He will be
5  doing that comparison.
6          THE COURT:  And I know there's an issue about that.
7  Don't jump ahead.  Okay.
8          Isn't it pretty common -- and I guess I will use a
9  trademark example.  Isn't it pretty common in -- well, in IP
10  cases generally, but certainly in trademark cases -- to say,
11  yeah, well, this is my thing and his looks just like mine?  I
12  mean, that's a pretty common thing.
13          MR. MOSKIN:  Right.
14          THE COURT:  I actually once granted -- well, I've got
15  to show you.  This is worth showing.  Hang on a second.  I'm
16  going to bring this prop out here.
17          (Brief interruption.)
18          THE COURT:  I don't remember the names of the company
19  involved, but this was the lawsuit of Top v. Zigzag.  To
20  people of a certain age, these have a particular meaning to
21  them.
22          MR. MOSKIN:  I wouldn't know anything about that.
23          THE COURT:  Yes, you might not be of that age.
24          And so the claim of infringement was based on the
25  fact that -- let's see.  I will find it here.

1          MR. MOSKIN:  Since I went to high school --
2          THE COURT:  Oh, that over here, the Zigzag package
3  had a thing that said "fresh top canister."  I swear to God
4  that was the claim because it's Top and Tops.  There was a
5  deposition at which the owner of Tops was being deposed by the
6  defendant, and the defendant's lawyer put these things in
7  front of him and said, explain to me how those are similar.
8          I'm not making this up.  You see them in front of
9  you.  The guy said at least six times under oath, and I still
10  have the video, too:  They look identical to me.  They look
11  identical to me.  I mean, I don't really see any differences
12  between the two.
13          MR. MOSKIN:  Was he color blind?
14          THE COURT:  Oh, I don't know.  He was something.
15          MR. MOSKIN:  By the way, I graduated from high school
16  in 1975.  So I knew --
17          THE COURT:  You heard stories, okay.
18          MR. MOSKIN:  I heard stories, but Bambu was the other
19  one that I --
20          THE COURT:  Bambu was the other one.
21          MR. MOSKIN:  At any rate --
22          THE COURT:  B-a-m-b-u, just to be clear about.
23          So I guess the premise of your motion here is that
24  having Mr. Merrett testify about these things amounts to
25  expert testimony.  And I'm not sure that's right.  So try to

1  persuade me that it's right.
2          MR. ALY:  Okay, I will do two things.  One is that in
3  the testimony that I read as an example, Mr. Merrett is
4  somebody who has been in the experience for 30 years and he
5  draws on the in 30 years of experience in the field:  I can
6  tell that these are copies and not.  So he himself is
7  eliciting that or drawing upon that specialized knowledge in
8  the field, which this is a particularized field of the gaming
9  industry.  So that is more specialized than just somebody
10  saying, here's what's the same and here's what's not in that
11  particular field.
12          And the second point I would make, your Honor, is
13  that the copying in some cases is not the ultimate question,
14  for example, in trademark or in patents.
15          THE COURT:  It's true.
16          MR. ALY:  But here it is the ultimate question, and
17  one of the cases that we cited was when it comes to an
18  ultimate question determination, that is expert testimony, and
19  experts can make those conclusions but lay witnesses cannot.
20          THE COURT:  Well, so as far as the first part of what
21  you just said is concerned, I mean, you know what he's going
22  to say.  You questioned him about it in the deposition.  So
23  assuming he's a -- and he's really not -- he's not a
24  Rule 26 -- hang on a second.
25          He's not an expert under Rule 26(b)(2) because -- or

29

```
1   26(a)(2), rather, because he's not -- excuse me -- under
2   26(a)(2)(B) because he hasn't been retained or specially
3   employed to provide expert testimony in this case and his
4   duties as an employee of Games Workshop don't regularly
5   involve giving expert testimony.
6       So at most he's a 26(a)(2)(A) expert which doesn't
7   require a report; it just requires disclosure of his identity.
8       Now, you might say, and I guess you are kind of
9   saying, well, they didn't tell us they were going to do this,
10  to which the answer is, or at least an answer is, you
11  questioned him about it at your deposition. How are you
12  harmed? At his deposition, how are you harmed?
13      MR. ALY: We're harmed by it because the comparisons
14  that he made at his deposition are the comparisons we asked
15  him about. So I don't know what other comparisons he's going
16  to make. So I don't think we should be kind of prejudiced by
17  the fact we asked for certain things to close him out on those
18  and then let him have free rein.
19      THE COURT: About how many things are there that he
20  was asked questions about comparisons like this?
21      MR. MOSKIN: Basically an entire day of questioning
22  mostly on that issue, and so they had full range to question
23  him about these things.
24      And the same -- frankly, the same applies to Mr.
25  Villacci. You know, we'll deal separately with the English
```

30

```
1   professor who wants to opine on the similarities, I guess, in
2   a moment, but, you know, Mr. Villacci can't point out any
3   differences either. These are not technical works. These are
4   not computer programs. They're not architectural drawings,
5   you know, where you need to understand anything besides
6   looking at it.
7       And that's, frankly, also part of the reason why we
8   think the testimony of all these other observers is relevant
9   because these are just the lay observers. These are the fans
10  of the game. And so people who actually know the game are the
11  best suited ordinary observers here to say what's similar and
12  what's different.
13      MR. ALY: And the answer to your question, your
14  Honor, 20 out of approximately 160, and all 20 are from the
15  second --
16      THE COURT: I'm going to deny the motion, and here's
17  why. A, I don't think it's inherently expert testimony.
18      B, I don't think there is a disclosure violation.
19  Assuming it's opinion testimony, which it is, it's opinion
20  testimony. I don't think there is a disclosure violation
21  because Rule 26(a)(2) requires a written report only from a
22  witness who has been retained or specially employed to provide
23  expert testimony in the case or whose duties as the employee
24  of a party regularly involved giving expert testimony. That's
25  26(a)(2)(B.) It doesn't apply to him.
```

31

```
1       26(a)(2)(A) says you have to disclose the identity of
2   witnesses you may use at trial to present evidence under three
3   particular rules: 702, 703 or 705.
4       He would be giving lay opinion testimony. And that
5   is 701. It's not 702, 3 or 5. I do think this is a lay
6   opinion even though he has a background in the area. So the
7   motion is denied.
8       Let me just make a note here.
9       (Brief interruption.)
10      MR. ALY: Your Honor, I would like to confirm that
11  ruling you made which we -- just included the specialized
12  knowledge provision of Rule 702, so that your ruling is that's
13  not what's at issue here.
14      THE COURT: I don't think it's what's at issue.
15      MR. ALY: Thank you.
16      THE COURT: I mean, it's certainly part of his
17  background, but I don't think that's what gives him the
18  ability to do that.
19      The next has to do with something called icon marks.
20  And just again to sort of lay the background for this, or set
21  the background for this, what is referred to as icon marks are
22  design marks that apparently in the claim charts are listed
23  only by name but no image allegedly was provided in discovery.
24      MS. KALEMERIS: Your Honor, not even the marks were
25  named by name in the claim charts.
```

32

```
1       THE COURT: Okay. And you have got a list of them in
2   the plaintiff's memorandum at footnote 3 on page 8, if my
3   notes are correct here. So let me just get to that icon.
4   Excuse me, in the defendant's memorandum.
5       MS. KALEMERIS: Correct.
6       THE COURT: It's a list of it looks like about 20, 25
7   things here.
8       Okay. The response basically just says, well, they
9   know what we're talking about. That is not particularly
10  helpful to me.
11      So on these marks, Mr. Moskin, is it the image that
12  you're saying was infringed?
13      MR. MOSKIN: Right.
14      THE COURT: Is it a copyright claim or a trademark
15  claim?
16      MR. MOSKIN: Copyright.
17      THE COURT: It's a copyright.
18      MR. MOSKIN: Well, there are --
19      Excuse me. This is not all trademark. I'm sorry.
20  There's an overlap, but they're talking now about on the
21  trademark side. So most of these are again, these are --
22      THE COURT: These are marks, okay.
23      MR. MOSKIN: -- the shoulder icons that the
24  different --
25      THE COURT: So the question is -- the argument that
```

1  is made is that the images have not been produced. So have
2  they and, if so, when and how?
3      MR. MOSKIN: What I had hoped to convey in our
4  response was that we think that they all have been produced,
5  and the only one they cite in their motion, they specifically
6  discuss -- they list all of the icon marks in the footnote,
7  but the only one they actually discuss in the motion that they
8  dispute is the black templars icon. But in that same
9  paragraph, they say they know what it is. It's an icon with a
10  cross with a skull in the middle.
11      So I don't know which ones they say they don't know.
12  What I was going to suggest, your Honor, either in the next
13  week or, you know, before we actually try this case, is to sit
14  down with them and say, look, which ones don't you know, and
15  we'll show you, we'll give you, we'll point you to a specific
16  document produced in discovery. All of the icons I think are
17  shown on the claim charts which are in color. And if we don't
18  have evidence of it, we'll just withdraw the claim.
19      But I don't know from reading their motion which ones
20  they say they're --
21      THE COURT: I mean, the thrust of the motion is, I
22  think, in the second paragraph on page -- second full
23  paragraph on page 9 of the motion. GW lists in the third
24  amended complaint the names of symbols that it alleges
25  Chapterhouse has infringed. However, nowhere in the third

1  amended complaint does Games Workshop actually disclose the
2  images that the names of these icon marks -- that the names of
3  those icon marks represent.
4      The responses to -- GW's responses to interrogatories
5  18 to 20 similarly do not identify any images or symbols but
6  simply refer to the unregistered icon marks simply by name, if
7  at all. None of the claim charts served by Games Workshop in
8  response to interrogatories 1 and 26 provide a copy of the
9  design constituting the icon marks. Ditto for the claim chart
10  for newly accused products. Ditto for the second revised
11  claim chart other than the fact that there's some sort of, I
12  guess, narrative description of what it means, of what it is.
13      I mean typically -- and I understand that there's a
14  lots of marks at issue in this case. But typically when you
15  have a copyright case, or a trademark case, rather, you know,
16  the complaint, or if not the complaint, in discovery, okay,
17  these are our images. This is our Fendi mark. You know, it's
18  the little "F" or +whatever.
19      Has that ever happened here? The response -- what I
20  get from the response is, yes, but they know what we're
21  talking about. There's no mystery here about what we're
22  talking about.
23      MR. MOSKIN: Right.
24      THE COURT: How am I supposed to know that?
25      MR. MOSKIN: Well, I don't know which ones they have

1  any genuine question about.
2      THE COURT: It's the ones in the footnote. It's
3  pretty clear to me.
4      MR. MOSKIN: As I read it, this was just a list of
5  all of the icon marks, and the only one that they discuss in
6  their motion that they say we have not identified is page 10,
7  the black templar icon, which they then in the next --
8      THE COURT: Well, that's for example. I mean, the
9  sentence starts with the words "for example."
10      MR. MOSKIN: But the only example they cite is one
11  that they acknowledge in the same breath they know what it is.
12  So, again, we gave them a listing.
13      THE COURT: Where are you saying they acknowledge
14  knowing what it is?
15      MR. MOSKIN: Here, it says on page 10 --
16      THE COURT: Yes, I'm looking at it.
17      MR. MOSKIN: For example, GW makes reference to the
18  black templars, stating their icon is a black cross with a
19  skull at its center, and so they know what the icon is. So
20  that's their example, but they know what the icon is.
21      THE COURT: Well, but what they go on to say there is
22  that the works that are referenced in that particular entry on
23  the claim chart don't have a black cross with a skull in the
24  middle.
25      MR. MOSKIN: Because the claim chart was prepared

1  primarily to show the copyright comparisons. We separately
2  produced volumes of packaging in response to their questions
3  about the trademarks that show -- and also as well as sales
4  summaries by product showing for each mark sales for each of
5  the products.
6      So as I said in the response to the motion,
7  obviously, if we have not produced those sorts of things, at
8  trial we're going to fail. So rather than waste time at
9  trial, what I thought we would do, we could spend half an hour
10  and say, look, which ones don't you have, we'll show you --
11  give you the evidence we plan to rely on at trial that shows
12  that icon.
13      THE COURT: Tell me your name again.
14      MS. KALEMERIS: I'm sorry?
15      THE COURT: Tell me your name again.
16      MS. KALEMERIS: Sarah Kalemeris.
17      THE COURT: Okay, talk to me.
18      MS. KALEMERIS: Okay. So even in response to our
19  motion in limine pointing out that they have not sufficiently
20  identified anything, they still have not pointed to anything
21  that identifies these marks. There the plaintiff -- and the
22  plaintiff has to identify the marks that it alleges are
23  infringed and the products are used as alleged to have
24  infringed those marks.
25      It was our understanding from the Court's

37

```
1   December 12th order that Games Workshop was supposed to
2   identify this information by January 11th.  They provided us a
3   new claim chart and said in the accompanying email that all of
4   the trademarks at issue would be highlighted in yellow.  None
5   of these marks either in word or --
6            THE COURT:  What's the date of the order that you
7   referred to, December the what?
8            MS. KALEMERIS:  December 12th, 2012.
9            THE COURT:  Okay.
10          (Brief interruption.)
11           THE COURT:  Plaintiff's amended claim chart is to be
12  served by January 11th.  It doesn't really say much more than
13  that, right?  I mean, I'm looking at the order.
14           MS. KALEMERIS:  Correct.  This was our understanding
15  from the teleconference and then from the ensuing order.
16           THE COURT:  That they were supposed --
17           You're saying that I said in the phone conference --
18  and God help me if this is the case in which I have to decide
19  that I'm never going to do another phone conference as an
20  accommodation to out-of-town lawyers because I'm now going to
21  be deemed to have been estopped by something -- you're telling
22  me that you --
23           Were you on the phone, by the way?
24           MS. KALEMERIS:  I was.
25           THE COURT:  Okay.  You're telling me that I said on
```

38

```
1   the phone that they're supposed to put the pictures in the
2   claim chart?
3            MS. KALEMERIS:  This was my understanding, and I may
4   have misinterpreted your Honor.  But when they did finally
5   produce the chart, they told us specifically that the marks at
6   issue would be highlighted in yellow, and they highlighted
7   none of these icon marks and they didn't highlight any --
8            THE COURT:  And the claim chart that you got, does it
9   cover both copyright and trademark?
10           MS. KALEMERIS:  Yes, it does.
11           THE COURT:  Okay.  Mr. Moskin, back to you.
12           MR. MOSKIN:  And your Honor's decision last week
13  ruled -- granted summary judgment for that for all but I think
14  eight of the icon marks.
15           THE COURT:  Granted summary judgment for who?
16  Honestly, I don't remember.  There is so much at issue in this
17  case.
18           MR. MOSKIN:  In part for plaintiff.
19           THE COURT:  Oh, on the ownership issue.
20           MR. MOSKIN:  Prior use in commerce.
21           THE COURT:  Yes, prior use issue, okay.
22           MR. MOSKIN:  That for eight of those marks -- for all
23  but eight, I think eight -- was it eight of the icon marks?
24           THE COURT:  Yes.
25           MR. MOSKIN:  I think that we had proved prior use in
```

39

```
1   commerce, so I think --
2            THE COURT:  How could they possibly not know what
3   we're talking about if there was a motion for summary judgment
4   about them?
5            MR. MOSKIN:  Well, not only that, but I asked the
6   defendant -- the premise of that motion was I showed the
7   defendant a list of all the marks.  He didn't raise any
8   question about -- the only ones he raised a question about
9   were those eight, and those are the eight that your Honor has
10  already said, well, you have got to prove it at trial that you
11  had used them previously.
12           So, again, if we don't -- if somehow we have missed
13  something, we'll withdraw the claim as to it if we don't have
14  evidence to go forward.  I'm not looking to waste time on
15  that.
16           THE COURT:  Okay.
17           MS. KALEMERIS:  Your Honor, respectfully, we are
18  reading a lot into the deposition transcripts where --
19           THE COURT:  Which deposition transcript?
20           MS. KALEMERIS:  The one of Mr. Villacci, the most
21  recent, where he was simply asked which marks he alleged that
22  he used before Games Workshop.  He never was asked whether he
23  knew if Games Workshop used these at all.
24           THE COURT:  I understand.
25           MR. MOSKIN:  Well, I --
```

40

```
1            THE COURT:  I get it.
2            MR. MOSKIN:  I differ.  I think he was asked that.
3            THE COURT:  I understand what everybody is saying.
4            I mean, what I think I'm being told here is that
5   whether or not the images themselves were in the claim chart,
6   which I gather they were not, there's a reference to them in
7   the claim chart.  We'll just call it a verbal reference to
8   them in the claim chart.  And I'm being told by the plaintiff
9   that the images were produced in some other connection.
10           MS. KALEMERIS:  May I clarify, your Honor, that they
11  were not referred to by, for example, blood angels icon.  They
12  made a reference to the blood angels chapter perhaps, but they
13  did not refer to the icon as something that was infringed.
14           THE COURT:  Well, then what made you think that they
15  were alleging this because you wouldn't have filed this motion
16  if you didn't think they were alleging infringement of these
17  marks?
18           MS. KALEMERIS:  Well, they were.
19           THE COURT:  Something must have led you to believe
20  that they were claiming infringement.
21           MS. KALEMERIS:  That's their response to
22  interrogatory set four, number 18, where they added on.
23           THE COURT:  All right.  So you were told at some
24  point that they're alleging infringement of these whether it's
25  in the claim chart or not.
```

41

```
 1        MS. KALEMERIS:  Correct, but we have no way to --
 2        THE COURT:  I understand.  Just let me finish what I
 3   was going to say here.
 4        The problem seems to me, or the potential problem
 5   seems to me, to lie in the fact that the plaintiff has told
 6   the defendant at some point, whether it's in the claim chart,
 7   an interrogatory answer or by smoke signal or whatever, that
 8   they're alleging infringement of certain marks but they have
 9   not -- they haven't described or produced or provided the
10   image.
11        MS. KALEMERIS:  Despite defendant's --
12        THE COURT:  You know, when I said just a second ago,
13   let me finish the thought --
14        MS. KALEMERIS:  I apologize.
15        THE COURT:  -- I meant don't interrupt.  Okay.
16        So since I've now been interrupted twice and I've
17   completely lost my train of thought, I'm just going to get to
18   the bottom line.
19        You need to sit down over the next 48 hours, go
20   through everything that's in footnote number 3.  The plaintiff
21   needs to show the defendant this is where we showed you what
22   this thing looks like, and then you're going to submit some
23   sort of a status report that is focused on this particular
24   motion.  It's defendant's motion paragraph 4.  And I will rule
25   on it once I get that.  And you will tell me either, you know,
```

42

```
 1   we did get it or we didn't get it or, you know, we're
 2   prejudiced for not getting it in the right way or at the right
 3   time or whatever you're going to tell me.  That's all going to
 4   go in the status report and I'm going to rule on it then.
 5   Again, I will circle back at the end and tell you when I need
 6   all this stuff.
 7        Number 5, spoliation on produced evidence.  So if I'm
 8   understanding this correctly, Chapterhouse's lawyers asked to
 9   inspect references that had -- among other things, asked to
10   inspect reference sources that were available to Games
11   Workshop's authors and the plaintiff produced those but didn't
12   produce them like where they were.  In other words, if in a
13   hypothetical Games Workshop office that's got three employees
14   and each employee had two books, you didn't go look at the two
15   books in employee A's office, two books in employee B's
16   office, and two books in employee C's office; rather, all six
17   books were sitting on a conference table somewhere.  That's
18   basically it, right?
19        That's not spoliation because there is nothing
20   missing.  It's just not spoliation.  Now, it might be an
21   issue.  There might still be an issue, but I just don't see
22   that as being spoliation.  You saw the stuff.
23        Was there a request to produce it without moving it,
24   in other words, in the site at which it existed at the moment
25   in time that the request was received because I could not see?
```

43

```
 1   I looked.  It was defendant's Exhibit S, S, as in Sam.  It
 2   looks like to me that this is item number 2 where you ask to
 3   "inspect, observe, ascertain and photograph any and all
 4   reference materials provided or stored for the use of artists,
 5   sculptors, painters, authors or other creators, including
 6   without limitation any and all books, magazines, photographs,
 7   files, binders and the like that contain visual material
 8   authored by third parties and including without limitation,"
 9   period.
10        I mean, was there something -- is there something
11   either there or somewhere else that would have put Games
12   Workshop's lawyers on notice that they weren't supposed to
13   move the stuff?
14        MR. ALY:  No, but that provision, we didn't know at
15   the time where the stuff was, if it's in a room already or an
16   individual, so we wouldn't have known to ask that.
17        THE COURT:  How can I penalize somebody for doing
18   something that you didn't tell him not to do?
19        MR. ALY:  Your Honor, it's because we're not saying
20   they did something wrong in moving it there.  What's really
21   wrong is not saying which individual author which stuff comes
22   from.
23        THE COURT:  What if I tell them to tell you that in
24   24 hours?
25        MR. ALY:  If they can, that's fine, but that's where
```

44

```
 1   our spoliation issue is that we understood we made that
 2   request and we would love for your Honor to make it, but I'm
 3   concerned --
 4        THE COURT:  Is that something you are able to answer,
 5   which books came from which people?
 6        MR. MOSKIN:  What I said to them is I'm not sure
 7   because --
 8        THE COURT:  Well, but you asked?
 9        MR. MOSKIN:  Yes, and what the way --
10        THE COURT:  So presumably after this inspection was
11   finished, the books went somewhere.  Now, judging by the one
12   picture that you gave me, God knows where they went.  You gave
13   me a picture of a desk which is --
14        MR. MOSKIN:  Yes.  It looks unfortunately a little
15   like my own office.
16        THE COURT:  Yeah, I mean a lot of lawyers, I suspect.
17   I mean, somebody's got to know what books were where,
18   unless you're going to agree that they were all available to
19   everybody.  I mean, would that satisfy your --
20        If they were to stipulate that all -- whatever books
21   there were, they're all available to everybody that works
22   there?
23        MR. ALY:  Yes.
24        MR. MOSKIN:  Well, we would prefer then to limit it
25   but --
```

45

```
1          THE COURT:  You just said you couldn't do that,
2    though.
3          MR. MOSKIN:  No.  I said I don't know to what extent,
4    but it was not --
5          THE COURT:  I asked you if you had asked, and you
6    said, yes, I did.
7          MR. MOSKIN:  I did, I did.  And what was told by my
8    client, that they collected books by department and put them
9    all in one place, and then they were returned back to the
10   departments.  It would require --
11         THE COURT:  Okay, but that's easy, though.  I mean,
12   so somebody ought to be able to say, okay, these books came
13   from this department, those books came from that department,
14   and these are the people that worked in these departments.
15         MR. MOSKIN:  Then it would require a further --
16         And the discussion broke off at that point.  I said
17   to them -- they said, well, give us a list of where they came
18   from.  I gave them a list of where they came from, and I never
19   heard from them again before they made this motion.
20         THE COURT:  Do I have the list that you just
21   referenced in this stuff somewhere?
22         MR. MOSKIN:  I think it's in an email I sent back to
23   them.
24         THE COURT:  Would this be in your response to the
25   motion?  Where would I find it?
```

46

```
1          MR. MOSKIN:  It would be in attachment G.
2          THE COURT:  G.  I'm looking at G.
3          (Brief interruption.)
4          THE COURT:  Okay.  There's some pretty long emails in
5    G.  Just tell me.
6          MR. MOSKIN:  So if you can see -- I'm just holding it
7    up.
8          THE COURT:  I've got it.
9          MR. MOSKIN:  Right down here, they listed a bunch of
10   crates.  So it's crates 12, and it says ForgeWorld.  Crate 17,
11   ForgeWorld; crate 103, Publications.
12         THE COURT:  So is ForgeWorld and Publications, are
13   those departments?
14         MR. MOSKIN:  Yes, those are parts of Games Workshop.
15         THE COURT:  Okay.
16         MR. MOSKIN:  And now --
17         THE COURT:  So why isn't that good enough?
18         MR. ALY:  It's not good enough because let me tell
19   you the practical thing we want to do at trial, and; that is,
20   they're going to have their designers up and we want to be
21   able to say, but you had this book in your office or in your
22   section or in your department.  And the problem is right now
23   at the ForgeWorld level, that's an entire company of people.
24   And if they just say, no, that's not me, then it wastes a lot
25   of time, and it doesn't really get to the point.
```

47

```
1          And with the linking, we'll be able to say, yes, this
2    is a book from your office.  And they can still say, I didn't
3    look at it or whatever, but at least we can show that it was
4    in their office and they had access to it when making the now
5    accused works.
6          So that's the practical concern is if they just say
7    it's the level of ForgeWorld or Publications department,
8    that's a lot of people.
9          THE COURT:  Is ForgeWorld something different from
10   Games Workshop?
11         MR. ALY:  ForgeWorld is a unit of Games Workshop
12   where they all sell all of their parts through.
13         THE COURT:  And so for your purposes, if there was an
14   understanding or if there was a stipulation or an agreement or
15   whatever you want to call it that anybody who worked at
16   ForgeWorld had access to everything that was at ForgeWorld,
17   would that solve your problem?
18         MR. ALY:  It would because then we could use --
19         THE COURT:  And what would be wrong with that, seeing
20   as how --
21         MR. MOSKIN:  Because they have actually identified on
22   their trial exhibit list six -- I think there's only six works
23   which they saw at this inspection.  So I think we can probably
24   narrow the focus to the six.
25         THE COURT:  Well, that should make it easy then.
```

48

```
1          MR. MOSKIN:  Right.  But, again, before filing this
2    motion, they didn't ask us.  And I said in our response to the
3    motion, they're free to ask the witnesses at trial.  I'm happy
4    with those six works to go back and say, can you try to find
5    out.  There is no interrogatory in this case asking that
6    question.  There is no document request asking for that
7    information.  I'm happy to do it.
8          THE COURT:  And I understand that we're talking about
9    something that may have happened after the, quote, unquote,
10   close of discovery although apparently there was a lot of that
11   going on.  But there is no rule that says that this -- that an
12   email saying, tell us where this stuff came from, it's not an
13   interrogatory.  There is nothing that says it has to have a
14   caption on it and say "interrogatory" and have, you know, 27
15   pages of definitions and instructions.
16         MR. MOSKIN:  And they just never responded.
17         THE COURT:  So here's the ruling.  You have got to do
18   something.  We're going to cut past all of this because it's
19   really -- it's not worth spending the amount of time that has
20   been spent on it already.
21         MR. MOSKIN:  I agree.
22         THE COURT:  No, don't you interrupt me either.
23         So you're going to need to -- I'm going to need to --
24   and I'm going to give you a really limited amount of time to
25   do it.
```

49

```
 1          Either within 24 hours, you have got to do one of two
 2   things.  You have either got to identify the specific people
 3   who had access to these things or you're going to be deemed to
 4   have stipulated that anybody who worked at ForgeWorld had
 5   access to everything that was in the crates for ForgeWorld and
 6   everybody who worked in Publications had access to everything
 7   that was in the crates for Publications, and everybody who
 8   worked in Miniatures had access to everything that was in the
 9   crates for Miniatures, which I think is really the more
10   sensible approach anyway because otherwise we're going to get
11   into this whole rigamarole at trial about, wait a second, so
12   your office is right next to his and you're saying you
13   couldn't go in his office.  I mean, look at his desk, for
14   crying out loud.  You're saying you couldn't go in his office.
15          We don't really need to do that.  That's the order.
16   That's the ruling.
17          MR. MOSKIN:  Judge, can I clarify?  Is it just the
18   six books on their exhibit list?
19          THE COURT:  I don't know.
20          MR. MOSKIN:  Because that would make this -- I don't
21   know that we can do this.
22          THE COURT:  Is it more than the six books on your
23   exhibit list?
24          MR. ALY:  There are six books, but there's also --
25   the exhibit list has the pictures of the actual crates that we
```

50

```
 1   saw in the form we saw them because, at the time of the
 2   inspection, we didn't know which crates went to who.
 3          THE COURT:  But what good is a picture of a crate
 4   going to do you?
 5          MR. ALY:  Access to all of the works.  So if the jury
 6   can see the 30 crates of books, all of them filled and we have
 7   insert --
 8          THE COURT:  That is an inefficient way to do this, by
 9   the way.  Just talk to me.
10          MR. ALY:  This is Mr. Cooper.
11          MR. COOPER:  I inspected the Games Workshop studios.
12   No, I would estimate there are probably about 25 books that we
13   took pictures of, maybe 30, within the crates.  So we took
14   pictures of the crates, opened up the crates.
15          THE COURT:  So you know which books were in which
16   crates.
17          MR. COOPER:  Absolutely.
18          THE COURT:  And so when the email that I was just
19   looking at in Exhibit G to the plaintiff's response identifies
20   crate numbers, you're going to know which books were in crate
21   12, which books were in crate 107 and so on?
22          MR. COOPER:  That's exactly right.
23          THE COURT:  Okay.  Well, then it's the books, okay.
24   I don't know if it's six or it's 25 or it's 225.  It sounds
25   like it's probably 25.  That's the ruling.  I'm just trying to
```

51

```
 1   be practical about this.
 2          Okay.  So that's the end of the defendant's motions
 3   in limine.  So the two things that I need from you are on
 4   number 1, I need the specifics from the defendant, or from the
 5   plaintiff, about what it is that -- we're going to call this a
 6   joint status report on defendant's motions in limine 1 and 4.
 7          So with regard to number 1, I need the specifics from
 8   the plaintiff of what from these postings and third party
 9   websites that you -- what specifically you want to have in,
10   and you're going to attach to it, here is the stuff.
11          And then I want from the -- I want from the defendant
12   then -- oh, and you need to tell me, and we produced it to
13   them, you know -- no, that's the other thing.  I'm sorry.  I'm
14   getting confused between the two things here.  My mistake.
15          This is what we want in.  And from the defendant, I
16   just want you to tell me on the particular thing, if you don't
17   think that the hearsay exception has been established, tell me
18   why.
19          Then on item number 4, that's the thing about where
20   you need to tell me when it was produced.  So this is the icon
21   marks.  And what I need you to do is, you know, you're just
22   going to work off of footnote 3 on page 8 of the motion in
23   limine filed by the defendant.  The plaintiff needs to tell
24   me, yes, this is how we communicated to the defendant what the
25   image is.  And the defendant will tell me whether you agree or
```

52

```
 1   disagree with that and, if you think it's insufficient, why
 2   you think it's insufficient.
 3          All right.  So we're moving on because I've got 13
 4   more motions to deal with here.
 5          Plaintiff's motion in limine number 1 about English
 6   law.  It seems moot to me.
 7          MR. MOSKIN:  I agree.
 8          THE COURT:  Does anybody think it's not moot?
 9          MR. ALY:  No.
10          THE COURT:  Okay.  Item number 2, expert reports or
11   an issue of untimely expert opinions, I guess, and I think
12   this largely concerns Professor Grindley.
13          MR. KEENER:  I think this one is Brewster and
14   Grindley.  It looks like they're not calling Wolfe, so he's
15   not part of it.
16          THE COURT:  Okay.
17          MR. KEENER:  The part with Brewster is pretty simple.
18   His expert opinion is five short paragraphs long, and we just
19   want to make sure he's limited to only testifying about those
20   five.  He only mentions two Games Workshop products.
21          THE COURT:  So Grindley is the guy that submitted the
22   supplemental report.
23          MR. KEENER:  Yes.
24          THE COURT:  Brewster is just -- you're working off of
25   one report.
```

53

```
1       MR. KEENER:  It's just the five paragraphs.
2       THE COURT:  So do you intend to ask Brewster about
3  stuff that's not in his report?
4       MR. COOPER:  We don't intend to ask him anything that
5  is not in his report or they did not proactively follow up on
6  in his deposition.
7       THE COURT:  I think the way to do this is --
8       I mean, the difficulty is here that, you know, the
9  way Rule 37(c) works is if something's not in a report,
10 exclude it unless it's substantially justified or it's
11 harmless.  And in a lot of situations even if --
12      I mean, the report doesn't have to repeat verbatim
13 his direct testimony.  I think the defendant is right about
14 that.  And a lot of times what you have is something that's a
15 nuance that is different, but it turns out it was asked about
16 in a deposition.  And that makes it harmless because you had
17 the opportunity to ask about it and did ask about it.  It's
18 both of those things together:  Had the opportunity to and
19 did.
20      And I honestly think that this is better dealt with
21 during the examination of the witness.  If there is something
22 -- I mean, whoever is going to be potentially crossing the
23 witness on the plaintiff's side, you're presumably going to
24 know better than me, obviously, you know, what was and what
25 wasn't covered in his expert report or otherwise.  And if you
```

54

```
1  think that he's strayed beyond the report in a way that runs
2  afoul of, you know, the rules and justifies excluding it, then
3  you're going to do what happens in pretty much every trial I
4  have in which there's an expert.  You're going to say, we
5  object and we need to be heard at sidebar, and that's the cue
6  to me that I know that this is an issue about the scope of
7  this report.
8       MR. KEENER:  Okay.
9       THE COURT:  Then we'll deal with it at sidebar.
10      And knowing that, obviously, and this is true for
11 everybody -- knowing that we're going to deal with it that
12 way, that's an incentive for the lawyer presenting the expert
13 to do his or her best to make sure that the expert's testimony
14 doesn't run far astray of what's in the report.  So that's
15 Brewster.
16      Grindley is, I think -- I'm not saying it's different
17 in terms of the outcome.  It's a different issue because it
18 has to do with a supplemental report.  And if I'm
19 understanding the defendant's response correctly, they're
20 saying that this was necessitated by two things that came
21 after, well after his initial report, and that was the
22 30(b)(6) deposition of Mr. Merrett and then an inspection of
23 some actual products.
24      So I had a threshold question, though.  The
25 supplemental report by Professor Grindley, does it concern
```

55

```
1  products that were at issue in what I will call case one or
2  does it just concern products that were in case two?
3       MR. COOPER:  Just case two.
4       THE COURT:  Just case two.
5       MR. KEENER:  In a way, your Honor.  That's not
6  completely correct.
7       THE COURT:  Why isn't it correct?
8       MR. KEENER:  For example, the --
9       THE COURT:  Shoulder pads.
10      MR. KEENER:  -- shoulder pads were all in case one.
11      In case two, there are a lot of shoulder pads.  His
12 only opinion on the shoulder pads is the basic shape and size
13 is not copyrightable or is common, and that's kind of the next
14 motion in limine on this list.
15      THE COURT:  And you're saying that even if in the
16 supplemental report it's only specifically referring to the
17 particular shoulder pads that were identified in the second
18 case, the opinion really does as a practical matter cover the
19 other ones, too.
20      MR. KEENER:  The new shoulder pad is just the same
21 shoulder pad with a different icon, and he's making no opinion
22 about the icon on it, just the underlying shoulder pad, which
23 was all extensively litigated in the first part of the case.
24      THE COURT:  Right.  Hang on a second.  I just want to
25 -- so why, if I could just ask, and I'm not sure how important
```

56

```
1  this is.  So why was Mr. Merrett's 30(b)(6) deposition done so
2  late in the ball game?
3       MR. COOPER:  That was simply because we were running
4  expert and fact discovery concurrently.
5       THE COURT:  At the same time.  Okay, so respond.
6  Basically what I understand Mr. Keener, right, to be saying,
7  is that, well, okay, yeah, Grindley's supplemental report on
8  the surface just maybe concerns the new case or the case two,
9  but the thrust of his report is really going to cover products
10 that were at issue in case one that he didn't opine about in
11 his original report in case one.
12      MR. COOPER:  I don't think that's actually true.  His
13 supplemental report did not change -- he did not supplement
14 anything in his supplemental report.
15      THE COURT:  Did he say anything about the size and
16 shape of the shoulder pads in his original report?
17      MR. COOPER:  In his original report, he did.
18      THE COURT:  He did, okay.
19      MR. COOPER:  And so this is kind of getting into the
20 third motion in limine, I think, specifically about the size
21 and shape of the shoulder pads.  If you would like me to
22 address that now, I --
23      THE COURT:  Yes, go ahead.
24      MR. COOPER:  Dr. Grindley will not be -- well, A,
25 first of all, he is not offering any expert opinion on what is
```

1 copyrightable. The Court has already done that.

2      THE COURT: That has been ruled on.

3      MR. COOPER: And the reason this is relevant is

4 simply to establish a background for the jury to do their

5 substantial similarity analysis which is --

6      THE COURT: Okay. That's the part I didn't

7 understand. You basically are arguing that this bears on fair

8 use and that it bears on substantial similarity. So why --

9      I mean, there is a definition of substantial

10 similarity. How does the fact that there's a whole bunch of

11 images like this out there have anything to do with whether

12 two particular images are similar or not?

13      MR. COOPER: Well, because you have to have a

14 background and a context to look at those images.

15      As Mr. Moskin said a little bit earlier, this is sort

16 of a niche area, and so people who are in this area understand

17 and know what the kind of imagery is here. But when you put

18 12 members of a jury in a box who maybe have never --

19 certainly might not have ever played war games and maybe have

20 never even seen science fiction works, then they're going to

21 look at two items that might appear under no context to be

22 substantially similar. But if you have some more background

23 in context for these science fiction works, then their

24 substantial similarity decision could be affected and it's

25 relevant.

1      THE COURT: Maybe it's just I'm dense, but I guess

2 I'm just still not quite getting it. Can you give me an

3 example on this?

4      MR. COOPER: Well, sure. I mean, one example that we

5 -- that Dr. Grindley put in his report is one of these

6 characters that is a sort of dragon-like scaly creature.

7      THE COURT: Okay.

8      MR. COOPER: Chapterhouse has created a product that

9 has several pieces for a dragon like wings, talons, things

10 like that.

11      THE COURT: Right.

12      MR. COOPER: And Games Workshop says that infringes

13 our work that also has wings and talons and things like that.

14      And so if the jury just looks at those two products

15 and they don't have any kind of background in science fiction,

16 they might just jump to the conclusion that even if some of

17 the details are different, they're still substantially

18 similar. But if you have an understanding of the context of

19 science fiction, and one of the examples that he, Dr.

20 Grindley, specifically mentions is the movie "Alien," and

21 including one of -- a piece of art that the alien from "Alien"

22 is based on.

23      And, you know, if you have that kind of context and

24 see that a lot of these sort of design elements are common to

25 this genre, then that's something that the jury could take

1 into consideration in deciding where does the copyrightable

2 elements end --

3      THE COURT: You just shifted there. You're not

4 talking about similarity anymore. You're talking about

5 copyrightable, copyrightable elements.

6      MR. COOPER: Well, it focuses them on what --

7 basically what parts of the product to look at. And so

8 another --

9      For that alien example, Dr. Grindley also included a

10 picture of another figurine that is also sort of dragon-like,

11 has wings, has very many of the same design elements. And so

12 I think that that gives the jury a context to start looking at

13 these products. It's to show what the nonprotectable elements

14 are out there. And that's -- you know, that's, I think, a big

15 part of this case is that Games Workshop says that some of

16 their products are infringed, and we would submit that they

17 have not exactly detailed what elements.

18      THE COURT: Tell me how this -- let's put that aside

19 for a second.

20      Tell me how this testimony bears on fair use.

21      MR. COOPER: Well, as your Honor pointed out in the

22 summary judgment motion, a lot of Games Workshop -- the traits

23 of many of the Games Workshop characters are common in science

24 fiction, in the science fiction and fantasy genre. And so as

25 part of our defense, that is one of the four factors. And so

1 that's something that I believe the Court specifically said is

2 a fact intensive inquiry and needs to be weighed.

3      THE COURT: I'm looking at the pattern instruction on

4 fair use. Does this go to the question of the degree of

5 creativity involved in plaintiff's work?

6      MR. COOPER: It certainly could, yes.

7      THE COURT: Stop right there.

8      What's wrong with that argument? Let's put aside the

9 whole similarity thing which I'm still not sure I'm getting.

10 Forget about that. Let's just talk about fair use because

11 something only has to be admissible for one purpose in order

12 for it to be admissible.

13      So if basically what this fellow is trying to show is

14 that there's a bazillion and one images of dragons with wings

15 out there, this one isn't all that creative and so we were

16 making a fair use out it, you know, for that and other

17 reasons, why shouldn't he be able to do that?

18      MR. KEENER: Two things. First, motion in limine 3

19 is just about the shoulder pads because that impacts the

20 Court's prior ruling.

21      THE COURT: Okay.

22      MR. KEENER: Number 4 is about the prior images. So

23 if that's what you want to discuss --

24      THE COURT: I'll talk about whatever you want to talk

25 about. I was just using the dragons as an example. But is he

61

```
 1   going to talk about shoulder pads, too?
 2        MR. COOPER:  He would talk about shoulder pads as
 3   well.
 4        THE COURT:  There's a bazillion and one shoulder pads
 5   out there.
 6        MR. KEENER:  Right.  The reason the shoulder pad one
 7   is specific is because that's what the Court has already ruled
 8   is copyrightable.  They're just trying to get a different --
 9        THE COURT:  I understand it's copyrightable, but
10   there is still -- I haven't ruled out the defense of fair use.
11        MR. KEENER:  Right.  So what he's trying to say --
12        THE COURT:  In other words, the defense of fair use
13   might be, well, isn't all that copyrightable.
14        MR. KEENER:  Two points, your Honor.
15        First is he's trying to use the fair use element to
16   say this part of the shoulder pad, the size, is not
17   copyrightable; it's so common.  That weakens -- that increases
18   our fair use defense.  The Court has already ruled on that
19   element.
20        THE COURT:  Well, I don't think that I would permit
21   him to testify that it is not copyrightable because that issue
22   has been ruled on.  It's been ruled on.
23        MR. KEENER:  The second issue with regard to how
24   common it is, that's the brunt of motion in limine 4 is that
25   there is no methodology.  He looked at thousands of images of
```

62

```
 1   military history and fantasy and science fiction and then in
 2   his report includes on this lizard creature two pictures that
 3   he found without any explanation or methodology on how he
 4   found those, how much they are prevalent in the industry, how
 5   many out of the thousand images he looked at those represent,
 6   how common they are.  There is no text or explanation at all
 7   to support any opinions about those.
 8        He never even opines that it's a common feature or
 9   any features on those images are common.  The entirety of his
10   report on that lizard creature is two pictures.  And in his
11   supplemental report, the entirety is those two pictures and
12   here are differences I see between the Chapterhouse and Games
13   Workshop products, again, nothing to go on, well, what
14   elements are common in the industry or how common.
15        THE COURT:  Was the supplemental report provided by
16   the date that was set for providing expert reports for case
17   two for the new stuff?
18        MR. COOPER:  No, because that was months before Mr.
19   Merrett was even deposed.
20        THE COURT:  Okay.  So the things that the plaintiff
21   is complaining about here, how did Mr. Merrett's deposition
22   impact those?  In other words, was there something you learned
23   in his deposition that led you to go out and say, okay,
24   Professor Grindley, now we need you to talk about this because
25   we know from Merrett's deposition that this is an issue?
```

63

```
 1        MR. COOPER:  Yes, and I think that -- I just want to
 2   make sure we understand that the supplemental report is only a
 3   select amount of additions.  A lot of the things we have been
 4   talking about here --
 5        THE COURT:  I understand.  I know we have kind of
 6   gone --
 7        MR. COOPER:  So for the supplemental report, as far
 8   as identifying nonsignificant differences or what Games
 9   Workshop believes are nonsignificant differences between the
10   two products, that -- as we were discussing earlier with the
11   deposition of Mr. Merrett, that was a big point of his
12   deposition was to identify these design elements that Games
13   Workshop believes are -- or that he believes, and it sounds
14   like he'll be able to get in that testimony, that he believes
15   are -- they are things that are copied.
16        And so once he was able to actually identify those
17   design elements, then that affected Dr. Grindley.  And what
18   Dr. Grindley said specifically after his original report and
19   in his deposition was that, I wish that Games Workshop would
20   have identified these things.  And then subsequently Mr.
21   Merrett did identify those things.
22        And so if you look at their original claim chart --
23        THE COURT:  Pause for a second.  So why wouldn't this
24   be -- I'm now back in sort of the rubric of Rule 26 and
25   Rule 37(c).  So why wouldn't the late taking of the Merrett
```

64

```
 1   30(b)(6) deposition be something that makes the submission of
 2   the supplemental report, quote, unquote, substantially
 3   justified, as Rule 37(c) uses that term?
 4        MR. KEENER:  Two reasons.  First, they don't address
 5   anything Merrett testified to.  So Mr. Merrett says, I see
 6   these things as similarities between those two products.  For
 7   example, it might be the Aztec weapon held by the lizard
 8   warrior.
 9        And in response, his new chart is just, I see all
10   these differences between the Games Workshop and
11   Chapterhouse product.  The tail is different, the toe is
12   different, the claw is different.  It's just a list of
13   differences.  So that doesn't address whether or not the
14   similarities are there, whether or not there's substantial
15   similarities.
16        In addition, it still doesn't address the fatal
17   defect that just putting two pictures of a prior lizard
18   warrior without any opinion or basis or justification saying
19   that these are somehow common in the industry or some
20   methodology on how common they are, no text or opinions at all
21   other than here are two images I found.  That's the entirety
22   of his report.
23        THE COURT:  Okay.  That would seem to me to be a nice
24   little basis to cross-examine him about.  This is all you
25   could come up with are two little images?
```

65

```
 1          MR. KEENER:  No.  I think it's unfairly prejudicial
 2   to the jury.  The Court has a role of keeping out the expert
 3   testimony that's not found in a solid methodology.  He looked
 4   at thousands, he says, of images and then picks out two, puts
 5   them on his report, and without any explanation of how common
 6   they are or if they're common or what elements in any of those
 7   pictures he's even focusing on.
 8          He says it's obvious to anyone looking at these what
 9   his opinion is going to be.  And he doesn't provide any
10   explanation of these features in this element are common as
11   shown here, which are representative, and explaining whatever
12   methodology he did.  He does none of that.  It's all based on
13   his misunderstanding of his role which was as long as I find
14   some prior work with this image, their images aren't novel and
15   not entitled to copyrightability.  That's what -- under his
16   deposition, he said that's what he thought his task was.  I
17   would have to find a prior image.
18          THE COURT:  We're going to table this one and move
19   on.  Is there anything else people want to tell me about the
20   shoulder pad thing that you haven't already told me?
21          MR. COOPER:  I think the analysis would be the same.
22   And Dr. Grindley specifically said he is not an expert in
23   copyright law.  He is not offering an opinion on
24   copyrightability.
25          THE COURT:  Let me just make a note here.
```

66

```
 1          (Brief interruption.)
 2          THE COURT:  Plaintiff's motion number 4, evidence of
 3   prior similarity works.  Is this also Grindley?
 4          MR. COOPER:  Yes.
 5          THE COURT:  This is also Grindley.
 6          MR. KEENER:  So 3 is just the shoulder pad --
 7          THE COURT:  4 is more stuff.
 8          MR. KEENER:  4 is just you have two images of a prior
 9   lizard.  No explanation of why they're relevant, what elements
10   are relevant, if it has anything to do with scenes a faire or
11   how common, what methodology you use.  It's just two pictures.
12   And I can point to an example in our exhibit, if you would
13   like.
14          THE COURT:  Do.
15          MR. KEENER:  In plaintiff's motion, if you look at
16   Exhibit 5 -- I'm sorry, Exhibit 4.  That's the claim chart.
17          THE COURT:  Okay.
18          MR. KEENER:  Turn to page -- it starts on 52 but it
19   really continues on to page 53.  This is one of the jet bikes
20   at issue.  The very bottom of 52 tells you the title.  Go to
21   53 and you see the picture.  So the left-hand column is
22   Chapterhouse.
23          THE COURT:  Right.
24          MR. KEENER:  Middle column is Games Workshop.  That
25   is Games Workshop's claim chart, those two pictures.  We
```

67

```
 1   created all that.  His only addition and his only opinion,
 2   because it's not anywhere in his report, is this one picture
 3   of an aircraft.
 4          MR. COOPER:  And in his deposition he said --
 5          THE COURT:  Wait, wait, wait.
 6          MR. COOPER:  Okay.
 7          THE COURT:  You mean this thing that says air/raft?
 8          MR. KEENER:  That's his only addition with no
 9   opinions, no text, no sense of why it's relevant, no sense of
10   how he found it, how common any features in there are.
11          THE COURT:  It looks like a bobsled.
12          MR. KEENER:  Yes, nothing.
13          THE COURT:  Your Honor, that's why he said in his
14   deposition he would not be offering an expert opinion on that
15   product.  So, I mean, counsel has picked one, but that is one
16   that is not --
17          THE COURT:  Time out, guys.  You know, I know I'm
18   dating myself here.  This is not an episode of "Law and Order"
19   like where everybody talks for a minute back and forth, they
20   go back and forth 15 times and there's a commercial, okay.  So
21   stop doing that.
22          Exhibit 4 is what?  It's not just the claim chart.
23          MR. KEENER:  He took our claim chart --
24          THE COURT:  It's his version of the claim chart.
25          MR. KEENER:  -- made a new column three and just put
```

68

```
 1   images on it.  And they said, my opinion is clear based on my
 2   images because he doesn't provide any text in his opinion
 3   about the vast majority of any of these images.
 4          THE COURT:  So if I let Grindley get up on the
 5   witness stand and go into this stuff, what is he going --
 6          I'm going to pull out a different page.  I'm going to
 7   pull out page 18, which is a space marine, I guess, or --
 8          MR. COOPER:  Which product number?
 9          THE COURT:  -- a bunch of space marines.
10          It's product -- oh, boy.  Well, it goes on for pages.
11   It's this one.  It's page -- it's Exhibit 4 to the plaintiff's
12   motion in limine page 18.  And in the right-hand column,
13   Professor Grindley has put in X-2500 Black Knight, Triax, and
14   a bunch of other stuff and then something called Environmental
15   Battle Armor From the Mechanoid Invasion.
16          MR. COOPER:  I'm sorry.  Page 11 of his chart?
17          THE COURT:  18.
18          MR. COOPER:  18.
19          THE COURT:  So what's he going to say about that?
20   Let's say he gets to this page.  What's he going to say?
21          MR. COOPER:  Now, first, I premise this by saying
22   when you look at Games Workshop's claim chart that they
23   provided to us, they didn't identify what design elements are
24   at issue.
25          THE COURT:  I understand.  But, I mean, you're
```

69

```
 1   talking about an expert report here.  So what's he going to
 2   say about that?
 3        MR. COOPER:  He'll take the particular products
 4   which, now, first of all, you have to realize on the left-hand
 5   column, that's not the product that Games Workshop sells.
 6        THE COURT:  It's a painted version.
 7        MR. COOPER:  And it's -- so they only sell some of
 8   the parts of that.  That's actually on top of Games Workshop
 9   products.  So you have to turn to page --
10        THE COURT:  Whatever.  What is he going to say about
11   the right-hand column?  I really want an answer to that
12   question.
13        MR. COOPER:  Okay.  So if he --
14        What he'll do is compare, for instance, if you take
15   just the leg pieces, and he would say that if you just isolate
16   those leg pieces, that there are certainly some similarities
17   between the Games Workshop and Chapterhouse product.
18        But then if you look at the many, many images from
19   prior science fiction works, they have the same sort of design
20   elements, the same sort of armory, the same sort of, you know,
21   plating in the calf, the same sort of flared armor.  And so
22   it's that level of generality that he's going to be opining on
23   because that's what we believe is the only similarity that
24   there is between the Games Workshop product and the
25   Chapterhouse.
```

70

```
 1        THE COURT:  It's sort of at this high level.
 2        MR. COOPER:  It is, and that's what he's offering it
 3   for.
 4        So as far as -- that's the kind of background that
 5   I'm talking about.
 6        THE COURT:  See, I've got to tell you, Mr. Keener,
 7   when you tell me that all Grindley says is, well, anybody
 8   looking at this chart could figure out what I was going to say
 9   about it, I think I could have.  I'm not sure I'm anybody, but
10   when I see this what I'm looking at here, it's pretty obvious
11   that what he's going to say is that, you know, the stuff that
12   they're saying that was infringed here, it's out there.
13   There's a lot of things like this.
14        Here's a couple of examples of it.  They have got the
15   shoulder pads; they have got the forearm pads; they have got
16   the ankle protectors.  You know, they're holding guns.  You
17   know, this stuff is out there all over the place.  I'm not
18   sure what's terribly harmful about this.
19        MR. KEENER:  May I respond?
20        THE COURT:  Yes, please do.
21        MR. KEENER:  First, the rule we're starting with is
22   the opinion must be a complete statement of his opinion.
23        THE COURT:  So what is the corresponding part of the
24   report which is Exhibit 3, I think?  His supplemental
25   report --
```

71

```
 1        MR. KEENER:  Now, you did pick one of the images
 2   where he does discuss space marines in his report.
 3        THE COURT:  Oh.  I guessed wrong.
 4        MR. KEENER:  His report focused on five products:
 5   The shoulder pad, three weapons and the space marine.  So you
 6   did happen to pick one where there is text to go along with
 7   it.
 8        THE COURT:  Okay.  Keep talking, though.
 9        MR. KEENER:  Now, the first prong that there's --
10        He lists basically ten images here, which image is
11   going to say the feet look like this image, the shoulder pad
12   looks like this image, the chest looks like this image.  We
13   don't have that understanding, so we don't know.
14        The second prong is it's conceded that there is no
15   evidence that either Chapterhouse was looking at these images
16   for independent creation or that Games Workshop was looking at
17   these images for originality.  So the only evidence we have is
18   if these are somehow common standard features.  There is no --
19        THE COURT:  It's the scenes a faire thing.
20        MR. KEENER:  Right.  There is no identification of
21   which features is he contending from which of these images are
22   the common essential features and how in the world did he
23   determine that.  What methodology was used is never disclosed.
24        THE COURT:  I think I understand the issues on this.
25   We're going to table all the Grindley stuff.  We're going to
```

72

```
 1   come back to that in a second because I want to deal with the
 2   other motions, most of which I think are easier.
 3        Number 5 is defendant's works that the plaintiff has
 4   dropped from its claims.  And the defendant's response says,
 5   well, you dropped the copyright claims, but you're still
 6   asserting trademark claims related to these, so we still have
 7   to put evidence about this in to defend against the trademark
 8   claims.  That kind of sounds right to me.
 9        What is wrong with it?
10        MR. MOSKIN:  The concern --
11        THE COURT:  In other words, I would not let and I
12   won't let, you know, the defendant put in evidence, well, they
13   made claims against this for these other 14 things but dropped
14   them.  No, that's not appropriate for any -- it's not relevant
15   to anything that is at issue in the case.
16        But what they're saying here is that, well, you have
17   a product here, you dropped the copyright claim, but you still
18   have a trademark claim, so we have still got to talk about it.
19        MR. MOSKIN:  Oh, that we agree with.  We may not --
20        Our concern was they seem to be wanting to say -- be
21   able to tell the jury, we abandoned our copyright claims.  We
22   made that decision.
23        THE COURT:  Pause for a second.  Do you want to tell
24   the jury that because your response doesn't say that?
25        MS. HARTZELL:  We want to be able to because there
```

73

1  are allegations by the plaintiff as part of their theme that
2  the entire business, that every product sold by Chapterhouse
3  infringes.  So we want to be able to say that there are
4  products that they're allowed to sell.
5       THE COURT:  Yes, but, I mean --
6       I'm going to confess that I have not looked at the
7  draft jury instructions.  Aren't the instructions to the jury
8  going to have to say that for the copyright claims, it's these
9  products?
10      MS. HARTZELL:  That is one of our disputes.  There is
11 an argument by the plaintiff that it is a matter that should
12 be considered in the aggregate.  I'm sure we'll get to that in
13 jury instructions.
14      THE COURT:  Not today we won't.
15      Well, okay, I just want to sort of set some general
16 parameters here.  Obviously, if there is a product that is at
17 issue for some purpose, even if it's just trademark, you know,
18 people are going to be allowed to put in evidence about
19 whether it's trademark infringement or not.  I don't think
20 it's appropriate to put in evidence that there once was a
21 claim on something but no longer is.  That's not relevant to
22 anything the jury has to decide.
23      Is there going to be some -- is there going to be a
24 contention by the plaintiff that there is some sort of
25 umbrella copyright infringement here?  I mean, doesn't it have

74

1  to be done on a product by product basis?
2       MR. MOSKIN:  Yes, but we say there are two elements
3  of the claim.  And clearly we failed in the summary judgment
4  briefing to explain a second part of our claim, but, yes,
5  start with the fact there has to be a one-to-one
6  correspondence that each product we're alleging is an
7  infringement, is infringing something specific on the other
8  side.
9       However, we also do say that there are patterns
10 within the case, and to some extent your Honor has
11 acknowledged that; for example, that Games Workshop has
12 developed this original system of numbering its tactical
13 assault and devastator space marines with the Roman numerals
14 one through ten and the chevron.
15      THE COURT:  Yeah, right.
16      MR. MOSKIN:  That is a pattern.  It's not an
17 accident.  Clearly it's not an accident that the defendant
18 happens to sell products that it calls tactical devastator and
19 assault --
20      THE COURT:  So you're putting that in to prove what,
21 though?
22      MR. MOSKIN:  It shows a pattern of copying.  It's not
23 --
24      THE COURT:  So it's sort of like on the question of
25 intent or deliberateness.

75

1       MR. MOSKIN:  So not substantial similarity.
2       But we also do want to say -- and here again we
3  failed when we were discussing earlier the part of your
4  Honor's decision that said that the defendant did not copy
5  plaintiff's website.  That was never our argument, and
6  obviously I failed in explaining what our position is.
7       What the position is and the best case that expressed
8  it was the case involving Jerry Seinfeld where the defendant
9  had a book of trivia questions based on 84 out of the 86
10 episodes.  And summary judgment was granted by then Judge
11 Sotomayor, and it was upheld by the Second Circuit on appeal
12 saying that if you look at those fragments, just the
13 individual questions, they are clearly all taken from the 84
14 episodes and we can look at those in the aggregate.  So in the
15 same way as we were saying earlier that his prior --
16      THE COURT:  I understand where you're coming from,
17 but if you're going to do something like that, aren't you
18 opening yourself up to them putting in the fact, hey, wait a
19 second, there isn't any copyright infringement claim about
20 items 1 through 14?
21      MR. MOSKIN:  Right, but what we're saying is --
22      THE COURT:  They should be able to do that, right?
23      MR. MOSKIN:  And they are able to do that, but --
24      THE COURT:  Okay.  Well, then I just solved that
25 motion.

76

1       MR. MOSKIN:  The point --
2       But, again, they're not -- we don't mind them saying
3  that we have withdrawn our claims.
4       THE COURT:  It's not a question of whether you have
5  withdrawn your claims.  The question is there isn't any claim
6  about that in the case.  In other words, there is no claim of
7  copyright infringement with regard to A, B, C, D and E or
8  whatever.
9       MR. MOSKIN:  And that's fine.  We just want to be
10 able to say to the jury there are patterns of copying here
11 that can be addressed but not that we admitted there was no
12 infringement of those other works.
13      THE COURT:  Yes.  So, I mean, just to sort of put
14 this in some context, let's say that the defendant has 50
15 products and you're claiming that there's infringement -- that
16 40 of them infringe your things.  You originally claimed that
17 the other ten did, but you decided not to pursue those, you
18 dropped it.  You still want to be able to argue, wait a
19 second, folks, 40 of their 50 products are copying errors.  We
20 all know what's going on here.
21      MR. MOSKIN:  Right.
22      THE COURT:  Okay.  I would think that's appropriate.
23 I mean, is there something that you think is inappropriate
24 about that as long as you are able to put in, but there is no
25 copyright infringement claim on the other ten?

1      MS. HARTZELL:  I think it's a little bit different

2 question than the aggregate analysis, but, yes, I agree they

3 are allowed -- or that we would not object to that.

4      THE COURT:  Okay.  Then the question -- and I think

5 those are then the parameters.  The question of whether

6 copyright infringement, you know, can apply to some sort of

7 blanket number of things I think is a separate question.

8      We're moving on.  Item number 6, pretrial order

9 rulings and disputes.  So, I mean, it doesn't seem to me that

10 there is really an objection to this.  In other words, if I

11 made a ruling on -- we're not going to be putting in my

12 summary judgment rulings other than I might say in an

13 instruction that there's been a ruling that the defendant --

14 that the plaintiff owns these copyrights, but there's not

15 going to be any questioning in front of the jury or argument

16 in front of the jury about discovery rulings I made or other

17 rulings, right?  Nobody is asking to do that.

18      MS. HARTZELL:  Correct.  There were two instances

19 that we identified, though.

20      THE COURT:  But that's motion 11, not motion 6.

21      MS. HARTZELL:  Okay, yes.

22      THE COURT:  We're going to get to that when we get to

23 11.

24      Plaintiff's number 7 is plaintiff's enforcement

25 efforts vis a vis third parties.  I want to focus on the

1 second part of what the plaintiff -- or what the defendant

2 argues first because I don't really understand the first part.

3 So I want to start with what I do understand.

4      It seems like to me that the defendant wants to put

5 in something about the lawsuit against Mr. Paulson,

6 P-a-u-l-s-o-n, basically to show that the defendant just goes

7 out suing people and, you know, shoot first and ask questions

8 later.  I'm sort of straining to figure out why that would be

9 relevant.

10      MR. ALY:  The relevance of that is there are

11 ways to do this that are through licenses or through

12 arrangements that can be made and here because this person

13 wasn't offered that, and that's the relevance.

14      THE COURT:  So you want to put in basically that they

15 shouldn't -- that the jury shouldn't find them liable because

16 the plaintiff declined to engage in settlement negotiations

17 with you because that's basically what you just told me?

18      MR. ALY:  That --

19      THE COURT:  That's not admissible, seriously.

20      Okay.  The first part of the response I really didn't

21 get.  It seems to me that what you were saying -- what I got

22 out of it is that there were some statements that you thought

23 the plaintiff is offering in evidence that were interlaced in

24 some way with their enforcement efforts, and you're basically

25 saying that if they're allowed to put in the statements, you

1 need to be able to put in the context, but I'm not sure that

2 that's what you were saying.

3      MS. HARTZELL:  This one was my addition.  There are

4 -- there is an exhibit from the Fiertek deposition that has

5 been identified.

6      THE COURT:  The who deposition?

7      MS. HARTZELL:  Mr. Fiertek.

8      THE COURT:  Okay.

9      MS. HARTZELL:  And the communication is an email from

10 this individual Dina, whatever his real name is, to

11 Mr. Fiertek discussing his opinion about whether or not

12 Chapterhouse's products infringe Games Workshop's copyrights.

13 But he was accused of infringement by Games Workshop with

14 similar products months before.  So to the extent that his

15 opinion later is in or is relevant to anything --

16      THE COURT:  Walk it past me again because I want to

17 make sure I have it.

18      MS. HARTZELL:  He was communicating with Mr. Fiertek

19 about Chapterhouse.

20      THE COURT:  The name of the he is who?

21      MS. HARTZELL:  On the email, it is Dina.

22      THE COURT:  Oh, it's a screen name.

23      MS. HARTZELL:  Yes, yes.

24      THE COURT:  Fine.  So this person is communicating

25 with Fiertek.  Go on from there.

1      MS. HARTZELL:  Yes, and they're communicating about a

2 potential product that Chapterhouse may be designing or

3 working on currently and Mr. Dina indicated that he believed

4 it would be an infringement.  But because his understanding of

5 what is or is not an infringement is influenced by the fact

6 that he was accused of infringement by Games Workshop on

7 similar products months earlier, if that email that we believe

8 is not relevant were to come in --

9      THE COURT:  And is that -- is the admissibility of

10 that email at issue on one of the other motions in limine?

11      MS. HARTZELL:  It's not in a motion in limine.  It's

12 on the trial exhibit list objections.

13      THE COURT:  Okay.  Respond to what she said.

14      MR. MOSKIN:  If you -- I don't think we're planning

15 to rely on that piece of evidence.  If you read on in

16 Mr. Fiertek's deposition and testimony, he said this concerned

17 a product that Chapterhouse hasn't even begun to sell yet.  So

18 we don't -- I don't see why -- we did.  You know, we are

19 weeding out a lot of the exhibits, so I don't think this is --

20 we're not planning on relying on it.

21      THE COURT:  I guess all I will say is that, you know,

22 doors can be opened by what people put in evidence.  That's a

23 truism.  And, you know, if somebody puts in evidence that

24 opens the door to something else, then you will tell me at the

25 time.  I mean, putting it in the pretrial order isn't the

81

```
 1   equivalent of putting it in evidence for door opening
 2   purposes.  So I'm just going to table that.  Question is
 3   whether plaintiff opens the door at trial.
 4        So what I am going to ask you, though, is that if you
 5   think they have opened the door before just going into it, you
 6   will need to address it with me outside the presence of the
 7   jury.
 8        MS. HARTZELL:  Yes, your Honor.
 9        THE COURT:  Okay.  Number 8.  Michael Moorcock,
10   M-o-o-r-c-o-c-k.  So the defendant says it has a license for
11   this space marines eight-pointed star icon from this fellow
12   Moorcock and that this is relevant to show -- or relevant on
13   the question of ownership and prior use in commerce.  Now,
14   I've already ruled on ownership, so that's not really an
15   issue.
16        MS. HARTZELL:  Not with respect to that product, to
17   that mark.
18        THE COURT:  Okay.  I haven't ruled on ownership on
19   that mark?
20        MS. HARTZELL:  Not on the chaos symbol, no.
21        THE COURT:  I thought there was no issue of ownership
22   even left in the case.
23        Ownership as opposed to prior use in commerce, two
24   different things.
25        MS. HARTZELL:  Got it.  I was thinking of the prior
```

82

```
 1   use in commerce.
 2        THE COURT:  But that's one of the things that I --
 3   page 13 says that ownership is basically done, but page 15,
 4   footnote 4 of the summary judgment motion says prior use
 5   hasn't been ruled on for this particular product.  So my
 6   question, though, is -- and this is the part I don't get --
 7   this is a question for the defendant.  How does the fact that
 8   Mr. Moorcock gave you a license for whatever he was doing bear
 9   on whether the plaintiff engaged in prior use in commerce of
10   the mark?
11        MS. HARTZELL:  That's the Lapinee case.
12        THE COURT:  The who?
13        MS. HARTZELL:  It's Lapinee Trade, 687 F.Supp 1262,
14   which says that "courts have recognized an exception to the
15   general prohibition of jus-" --
16        MR. MOSKIN:  Jus tertii.
17        MS. HARTZELL:  Jus tertii.
18        THE COURT:  J-u-s t-e-r-t-i-i.
19        MS. HARTZELL:  "The rights of third parties and their
20   respective marks do not inure to defendants in the absence of
21   a showing of privity or success or an interest status with
22   respect to such rights.  Therefore, if a third party permits a
23   defendant to use a trademark as part of a contractual
24   arrangement, the defendant can avoid liability for trademark
25   infringement by invoking the superior trademark rights of the
```

83

```
 1   third party."
 2        THE COURT:  So what you're saying is that what you
 3   were doing, whatever it was you were doing, you were licensed
 4   to do by this fellow Moorcock and he had this thing before the
 5   plaintiff did.
 6        MS. HARTZELL:  Correct.
 7        THE COURT:  When did you get the license, last week?
 8        MS. HARTZELL:  It was --
 9        THE COURT:  Two weeks ago?
10        MS. HARTZELL:  No, it was during -- before --
11        MR. MOSKIN:  You can look at these, if your Honor
12   wants.
13        THE COURT:  I'm still asking a question.
14        MS. HARTZELL:  July 2008.
15        THE COURT:  Oh, okay, it was before the lawsuit.
16        MS. HARTZELL:  Yes.
17        THE COURT:  Okay.
18        MR. MOSKIN:  A couple things.
19        One, if they were claiming a license, this is an
20   issue that was resolved in the summary judgment motion last
21   week when your Honor dismissed their defense of license
22   because it was never identified in discovery.
23        THE COURT:  Well, that was another question I had
24   here, whether the license defense was still alive because I
25   thought I struck it.  But what I'm getting from Ms. Hartzell
```

84

```
 1   is this isn't really about we were licensed to do this.  It's
 2   really about proof of prior use in commerce.
 3        MR. MOSKIN:  And there is no such proof.  If your
 4   Honor wishes, I could give you the --
 5        THE COURT:  Okay, let me see it.
 6        (Brief interruption.)
 7        MR. MOSKIN:  Those two documents, and counsel can
 8   correct me if she disagrees, are the only evidence of a
 9   supposed license, but there is --
10        THE COURT:  July 8, 2008.
11        "Dear Mr. Villacci, thanks for writing my agent
12   regarding the chaos symbol.  I will not ask you for a fee but
13   an acknowledgement, an acknowledgement reading.  This symbol
14   is a recognized trademark of Michael Moorcock in multiverse
15   ink."
16        And then there's an email later in the day.  It's
17   clearly responding to something, but I'm not sure what.
18        Mr. Moorcock says:  "Thanks.  Yes, that company has
19   appropriated other people's work as well as mine, and at
20   present our lawyers are preparing to deal with them."
21        That company, I assume, is Games Workshop.
22        "I've never charged for the various symbols and names
23   I've invented.  I have no problems dealing with people who
24   have the good manners to ask first."
25        Okay.  So what was your point about this, Mr. Moskin?
```

85

```
1        MR. MOSKIN:  So it's not a license.  There is no
2  evidence that Mr. Moorcock, who is just an author, ever sold
3  anything or has any trademark rights.  So there's no -- unless
4  Mr. Moorcock were to testify as to his actual ownership of a
5  trademark, he has nothing to license.  This is -- I think they
6  really want to use this to show for prejudicial reasons that
7  Mr. Moorcock doesn't like Games Workshop for whatever reason,
8  but there is no evidence he owes --
9        THE COURT:  Well, I wouldn't let in the second email
10  anyway because it's not really pertinent to the creation of a
11  license.  I mean, if there is anything that is pertinent to
12  the creation of the license, it's just the first email.
13        MR. MOSKIN:  So there is no evidence that
14  Mr. Moorcock owns a trademark.  He may think he does, but a
15  lot of people think that simply or misunderstand the
16  difference between trademarks and copyrights and think, well,
17  because I came up with something and there is -- I'm aware
18  generally that Mr. Moorcock did write a novel that has a chaos
19  star in it.
20        THE COURT:  How similar is it to the thing that the
21  plaintiff is claiming infringement of in this case?
22        MR. MOSKIN:  I don't know.
23        THE COURT:  I'm asking you.
24        MS. HARTZELL:  It's my understanding that it's fairly
25  close, but it's also my understanding that in the 1980s before
```

86

```
1  creation of their space marine and chaos space marine
2  miniatures that Games Workshop had a license from Mr. Moorcock
3  to use -- to create miniatures based upon his books that used
4  the same symbol, which we expect we should be able to.
5        THE COURT:  Wait.  Time out.  You're saying that your
6  understanding is that Mr. Moorcock back in the eighties gave
7  Games Workshop a license.
8        MS. HARTZELL:  For a short period of time.
9        THE COURT:  For a period of time, okay.
10        MR. MOSKIN:  Again, this was something that, if they
11  were planning on relying on this as one of their affirmative
12  defenses of license, they should have told --
13        THE COURT:  Well, but I think the point I was making
14  before is that that's not what it's about.  And, frankly, I've
15  made a ruling on summary judgment, and this wasn't offered.
16  So there is no defense of license.  So this bears -- if on
17  anything, it bears on the question of prior use in commerce.
18        And I guess the point that is being made is that if
19  we were licensed to use this thing by somebody who had made
20  prior use in commerce of the mark, we basically step into that
21  person's shoes and we get his prior use which preceded your
22  use.  That's the argument.
23        MS. HARTZELL:  That's the argument.
24        THE COURT:  Yes.
25        MR. MOSKIN:  But even --
```

87

```
1        THE COURT:  Is that wrong as a legal proposition?
2        MR. MOSKIN:  Yes.  Because even putting aside that
3  there is no factual predicate that he has such use and they're
4  not going to be able to show it at trial because they have
5  given us no evidence, he clearly does not own the right to use
6  a chaos symbol on a space marine, and that is how the
7  defendant is using the case symbol.
8        THE COURT:  How has the defendant proposed to get
9  in --
10        Mr. Moorcock is not going to come in here, I gather.
11        MS. HARTZELL:  Correct.
12        THE COURT:  Okay.  So how are you going to --
13        Other than this email, which Mr. Villacci is going to
14  say, I got this -- I got this email from Moorcock in July of
15  2008, how are you going to get in what rights Mr. Moorcock had
16  and when they arose?
17        MS. HARTZELL:  We expect that to the extent that
18  there was a license to Games Workshop for use on miniatures
19  prior to their use currently, that their witnesses would
20  acknowledge that on cross examination.  We lost the element of
21  surprise but --
22        THE COURT:  Well, it's kind of what happens.
23        Well, look, I mean, it seems to me logical just from
24  a purely legal standpoint that if there is a senior user, in
25  other words, somebody who has made prior use in commerce of
```

88

```
1  the mark to the plaintiff, and the senior user later licenses
2  the mark to the defendant, then logically the defendant ought
3  to be able to step into the senior user's shoes for purposes
4  of proving prior use in commerce.  That's just a purely legal
5  proposition that seems right to me.
6        Whether the defendant is going to be able to get in
7  the predicate, the predicate being that the senior user had
8  engaged in prior use in commerce, I think is an open question.
9  I don't know whether they're going to be able to.
10        So my ruling on this, and it's really the first --
11  the second email is not going to be admissible.  That's the
12  one where he makes disparaging comments about Games Workshop.
13  So the first email from July the 8th of 2008, its
14  admissibility is going to depend on whether the predicate is
15  laid for it, and the predicate being that Moorcock made prior
16  use in commerce.  And when I say "prior," I mean prior to the
17  plaintiff.
18        All right.  I'm going to give these documents back to
19  you, Mr. Moskin.
20        Number 9, plaintiff's IP policies.  The defendant
21  basically says you're only going to use these to impeach or
22  rebut.  I'm going to hold that for trial.  If there's
23  something that is covered by that motion that you want to use,
24  you have got to bring it up at a sidebar before you use it
25  just so we can address whether, you know, there's an
```

1   appropriate basis to do it.
2        Number 10 has to do -- although it's worded in sort
3   of a generic fashion, I assume this has to do with the fact
4   that the defendant's lawyers are handling the case pro bono.
5        Okay.  I understand what you think the jury might
6   think, but relevance under Rule 401 is not determined based on
7   whether the jury is going to like the color of the shoes that
8   the lawyers are wearing, okay.  It's defined in terms of
9   whether evidence has a tendency to make a fact more or less
10  probable than it would be without the evidence and the fact is
11  of consequence in determining the action.  So pray tell, what
12  is the fact of consequence in determining the action that is
13  influenced by whether the defendant's lawyers are being paid
14  or not?
15       MS. HARTZELL:  I think we viewed this one more as an
16  opening of the door to the extent that the plaintiff makes
17  comments about lavishness, about the defendant's spending.
18       THE COURT:  Okay.  My ruling is it's not relevant.
19  If the door gets opened, you will tell me that you think the
20  door has been opened, and then I will deal with it.  And if I
21  were in your shoes, I wouldn't open the door.
22       So number 11 is -- this was the thing we were talking
23  about before, amended or withdrawn pleadings and claims.  And
24  I'm not sure I'm getting what it is you want to put in on the
25  defense side and why.

1        MS. HARTZELL:  With respect to the amended complaint
2   and what products, when those newly accused products were
3   accused, much of the designated dep testimony by the plaintiff
4   deals with whether documents were retained and at what point
5   and that may -- we believe that it is relevant when products
6   were accused of infringement.
7        THE COURT:  Got it.  So, in other words, if the
8   defendant gets to put in something that you didn't save any of
9   the documents that had to do with product X that wasn't
10  identified as being an issue until January of this year, you
11  want to be able to put in evidence that it wasn't identified
12  as being an issue until January of this year.
13       MS. HARTZELL:  Yes.
14       THE COURT:  That kind of overlaps with the, quote,
15  unquote, motion to enforce the prior orders?
16       MS. HARTZELL:  It does.
17       THE COURT:  So let's hold this for that.  Relates to
18  discovery motion.
19       Number 12, questions that would invoke a claim of
20  privilege.  So is there something in particular that you have
21  in mind?
22       MR. MOSKIN:  Well, this would apply to both of us.
23       THE COURT:  So I'm just going to say this to
24  everybody, and this is my view.  If on a particular question
25  or topic a privilege was claimed during discovery and I didn't

1   overrule it, then it seems to me that you know or have good
2   reason to know that the privilege is going to be claimed if
3   you ask the same question at trial.  And that's really not the
4   type of thing that should be brought in front of the jury.
5        So if there is some sort of unadjudicated privilege
6   claim -- and what I mean by that is a privilege was asserted
7   and nobody came in and said, hey, this is a bogus privilege
8   claim, Judge, overrule it, and I overruled it -- if that
9   didn't happen, then I think people need to steer clear of
10  questions in which, you know, that based on the discovery
11  deposition answers or responses that you, you know, know or
12  have good reason to believe that a privilege is going to be
13  asserted.  I don't know what those topics are, but that's the
14  general rule.
15       So let's then flip over real fast to the motion to
16  enforce the prior orders.  So I was trying to sort of break
17  this down into digestible pieces.  So the easiest digestible
18  piece is what I will call the Villacci books.  This seems to
19  me to be a pretty easy thing.  The plaintiff may not have Mr.
20  Villacci's books, but they have -- you have the books.  You
21  know what the books are and you have them.  I don't think --
22  and I need the defendant to correct me right now if I'm wrong.
23  I don't think the defendant is disputing that Mr. Villacci had
24  the books and had access to them, is that right?
25       MS. HARTZELL:  That's correct.

1        THE COURT:  So I don't see anything as being lost
2   here.  You have -- you may not have his copies of the books,
3   but you have the books.  They're not contesting that he had
4   them and had access to them, and so you will be able to make
5   whatever use you can of them at trial.  In other words, you
6   will be able to stick them in his face and say, here, you had
7   this book here that had our product in it when you created
8   this device, this thing.
9        MR. KEENER:  On the Villacci book, the main instance
10  there was the needless trip we took to Dallas.  We said we
11  want to see his books.  These are the books.  And we repeated,
12  we really, really want to see this book.  We get to Dallas,
13  and they say, here's everything that he's got.  I say, there's
14  obviously stuff missing here.  They put on this fiction
15  saying, oh, there's stuff missing, let me give him a call.
16  Then they say, oh, he's got them at home.  We'll just bring
17  those to Chicago next week.  You can have them.
18       Discovery turned out, he told his lawyers three days
19  before, I don't have that book.  I just don't have it.  If
20  they would told that ahead of time --
21       THE COURT:  So you're saying you would not even have
22  gone to Dallas.
23       MR. KEENER:  Right.
24       THE COURT:  Was the sole purpose of going to Dallas
25  to look at the books?

93

1     MR. KEENER:  It was the primary purpose; it was not
2   the sole purpose.  We did inspect some of his miniatures and
3   take additional photos, but we told them repeatedly this was
4   the main thing.  Sixty percent of stuff is from this book.
5     THE COURT:  I know you wanted to look at the
6   miniatures because I'm pretty sure I had a discovery dispute
7   about that.  You wanted to look at the stuff.  I mean, I
8   remember discovery disputes.  That's one of the bad memories
9   about the earlier stages in this case that there was you
10  wanted -- they wanted to see the stuff that you had and you
11  wanted to be able to see his miniatures.
12    You know, I'm not going to impose a sanction for
13  that.  I'm not convinced that the trip wouldn't have been made
14  anyway.  But as far as any contention that there was something
15  lost, I don't think there's anything lost because, you know, I
16  have been told here in court by the -- I assume Ms. Hartzell
17  is the lead trial lawyer -- is going to, you know, that
18  there's not going to be a dispute that Villacci had the books
19  and had access to them.  If he gets up on the witness stand at
20  trial and says, oh, no, no, I didn't have that book, then
21  you're going to ask for a sidebar and it's Katie bar the door.
22  You will be able to put the whole mess in.
23    Okay.  The next thing that I thought was relatively
24  manageable had to do with Mr. Fiertek, F-i-e-r-t-e-k.  And I
25  guess some of this -- I guess there's other things.  So what I

94

1   understand to be part of the source of concern here is that
2   the defendant as part of whatever marketing they were doing
3   was going out -- or maybe it was Mr. Villacci, maybe it was
4   other people -- they were posting things on forums and on
5   blogs and whatever.  And the person would just sit there and
6   post them as people do on blogs.  They weren't printing them
7   out.  And so there's no contemporaneous record saved by the
8   defendant of what it was that they were posting.
9     Is that a fair summary of at least that piece of it?
10    MR. KEENER:  For that piece of Fiertek, yes.
11    THE COURT:  There may be some Villacci stuff, too,
12  I'm thinking.  All right.
13    And so then there's a question with Mr. Fiertek.  He
14  says, well, when I was doing these things, I would go online,
15  I would look at stuff.  You know, I would do -- I don't know
16  if he uses -- he probably wouldn't admit to using Google
17  because that's not cool enough.
18    MR. KEENER:  He did.
19    THE COURT:  He did, okay.
20    MR. KEENER:  He said, I'm designing something.
21    THE COURT:  So I go look at stuff at Google.
22    MR. KEENER:  I will go look at Google.  I will look
23  at various images.
24    THE COURT:  And part of the problem is he didn't
25  preserve what he did.

95

1     MR. KEENER:  Right.  This is after the lawsuit was
2   started.
3     THE COURT:  I understand.
4     MR. KEENER:  After we said we want to know exactly
5   what references you're using to create, and he says that's
6   just not how I work.  I'm not choosing to save any of these,
7   even though I know --
8     THE COURT:  Remind me where Fiertek fits in.  He's
9   not an employee, right?
10    MR. KEENER:  He owns half the company.
11    THE COURT:  Oh, he's the 49 percent guy.
12    MR. KEENER:  And he designs a large portion of the
13  works.
14    THE COURT:  Okay.  And so basically what your
15  contention is on that stuff, on the search material, I will
16  just call it the search material, is that there was a lawsuit
17  pending.  There was an outstanding request for documents, and
18  documents has a very broad definition and includes electronic
19  stuff.  There was an outstanding request for documents that
20  says, what did you rely on to create this.  Mr. Fiertek is out
21  there creating things.  He's relying on stuff that he sees on
22  the Internet by doing Google searches.  He's not preserving
23  any of it.
24    And you're saying that I should do what as a result
25  of that?

96

1     MR. KEENER:  And then he wants to come in and testify
2   that I didn't copy Games Workshop; I copied this unknown stuff
3   on the Internet I saw.  That's what I copied.
4     THE COURT:  What do you want me to do about that?
5   What specifically are you asking me for?
6     MR. KEENER:  We're looking for adverse inference of
7   twofold.  One --
8     THE COURT:  You want me to turn to the jury when he
9   says that and say, well, ladies and gentlemen, you can assume
10  from the fact that he didn't produce the stuff that he
11  actually did look at Games Workshop stuff.
12    MR. KEENER:  Yes.
13    THE COURT:  All right, just so we're clear.
14    MR. KEENER:  And, second, to preclude him from even
15  offering that testimony that I looked at anything else.
16    THE COURT:  Okay.
17    As opposed to, for example, you being able to simply
18  just question him:
19    Well, Mr. Fiertek, you knew there's a lawsuit, right?
20    Yes, I knew there was a law suit.
21    And you knew that what was at issue in the lawsuit
22  was whether you copied Games Workshop's material, right?
23    He's going to say, yes, I knew that.
24    And you're telling us that you didn't look at any
25  Games Workshop material; you just did these Google searches

97

```
 1   and you looked at other things.  Did you save any of that
 2   stuff?
 3        No, I didn't.  It's not the way I work.
 4        And you knew there was a lawsuit pending that
 5   challenged how you were creating this stuff, right?
 6        Yes, I did.
 7        And you're asking us to believe that you didn't look
 8   at any of this stuff.  Do you have any record of what it is
 9   you did look at?
10        Well, no, that's not the way I work.
11        So you don't have any record of the fact that you
12   looked at, you know, things that Games Workshop didn't create?
13        No, I don't have any record of it.
14        You don't have any record that you didn't look at
15   things that Games Workshop did create?
16        No, no, I don't have any record of that either.
17        So all we can rely on here is your believability,
18   right?
19        Yes.
20        And you're the 49 percent owner of this company,
21   aren't you?
22        Yes, I am.
23        So if the company goes under or if the company loses
24   a big judgment, you're going to get hurt by that, isn't that a
25   fact?
```

98

```
 1        Yeah, probably would.
 2        I mean, why isn't that good enough?
 3        MR. KEENER:  We definitely think we would pursue that
 4   line if we got nothing else, but this is a willful violation
 5   of the duty to preserve.  He was told and he acknowledged, I
 6   knew I needed to preserve the stuff.  That's just not the way
 7   I work.  And he chose not to preserve any --
 8        THE COURT:  When you say "acknowledged," did he
 9   acknowledge it in his deposition?
10        MR. KEENER:  Yes.
11        THE COURT:  You can bring that out, too.  Isn't that
12   the more effective way of doing it?  I mean, if it was me, I
13   would prefer to see the guy squirming on the witness stand
14   rather than having the judge sort of intone something.  I
15   don't know.
16        (Brief interruption.)
17        MR. KEENER:  But there's also the fact that this is
18   subject to one of your Honor's prior orders where you ordered
19   him to produce all of his records.  So he knew that not only
20   --
21        THE COURT:  You know, there was a reference made to
22   something in some order that I made in like December or
23   something.  When I looked at that, it basically just referred
24   to something that I said in court and said, answer
25   interrogatories 18, 20 and 24.  I really couldn't tell what it
```

99

```
 1   was.  I couldn't find the transcript.
 2        MR. KEENER:  Okay.  What that had to do with, your
 3   Honor, was initially in the beginning of the case when we
 4   asked for document requests, they only gave us Mr. Villacci's
 5   emails.  And we said, hey, what about Mr. Fiertek's.
 6        And the Court ruled, yes, you have to go search
 7   Mr. Fiertek's emails, too, and give those.
 8        Their position was, well, we have got one side of the
 9   conversation, we should have pretty much all of them.
10        So you ordered them, no, as part of this --
11        THE COURT:  I said, no, you don't just get to produce
12   Mr. Villacci's site.  You have to get the other sites, too.
13        MR. KEENER:  The second part of the case comes around
14   and we again issue our document requests, again, get nothing
15   except maybe five images from Mr. Fiertek.  We say:  Where are
16   Mr. Fiertek's emails?  They didn't even ask him to start
17   collecting emails until sometime in February, well after the
18   early January date for production of the documents.  They
19   didn't even ask him to start collecting emails.
20        So that was where they violated the Court's order
21   again to go and collect his emails.  This is a systematic just
22   failure to preserve collecting of these documents.
23        THE COURT:  Let me hear from Ms. Hartzell on this.
24        MS. HARTZELL:  As an initial matter, it is incorrect
25   to say that we did not ask him to collect the emails until
```

100

```
 1   February, but we did --
 2        THE COURT:  Oh.  So you asked him and he just didn't
 3   do it?
 4        MS. HARTZELL:  But we ultimately produced 14,000
 5   pages --
 6        THE COURT:  I understand, but --
 7        MS. HARTZELL:  -- of his emails.
 8        THE COURT:  Yes, but I'm really focusing on the
 9   Google searches at this point.
10        MS. HARTZELL:  Correct.
11        THE COURT:  Yes.
12        MS. HARTZELL:  The questioning that your Honor raised
13   as to whether or not he -- that you went through for
14   Mr. Fiertek is essentially in the transcript of his
15   deposition.  He was asked at his deposition about each of
16   those and about whether he knew he had to preserve them and
17   whether he did or did not.
18        But the procedure that he followed of running a
19   Google search and looking at the images and using that in his
20   mind to create his design is exactly the same process that was
21   described by Games Workshop's lead miniatures designer who
22   also does not preserve those searches.
23        THE COURT:  I don't know whether there is any
24   evidence that after the lawsuit was filed and after a
25   discovery request was made that Games Workshop's people didn't
```

```
1   preserve anything.  If so, those would be parallel situations.
2   If not, then they're really parallel.
3        And, I mean, there is a difference that comes from
4   the fact that not just a lawsuit pending, but there's an
5   outstanding, you know, request to produce material that you
6   relied on in designing certain things.
7        MR. KEENER:  Your Honor, one more important fact.
8   Mr. Fiertek is not coming to trial.
9        THE COURT:  But I just heard that you kind of asked
10  similar questions to what I just said in the deposition.
11       MR. KEENER:  We did ask some of those questions.
12       THE COURT:  I tell you what I think I'm inclined to
13  do on Mr. Fiertek is let you put it in, let you put in that
14  testimony.  And if there's some piece of it that is not
15  covered in his testimony, in other words, that there was a
16  discovery request, you know, or that they were on notice that
17  they had to produce his documents and that there was a request
18  for documents that shows what you used to create the disputed
19  products or images, you know, I'd let you get that in in some
20  other way.
21       But I think I'm going to need to hear the testimony
22  about that before determining whether I can tell the jury to
23  draw the inference as opposed to leaving it to you to argue it
24  to him.  I mean, there's an instruction on -- there's an
25  instruction that is out there on spoliation.  It may be -- I
```

```
1   think there is a failure to preserve evidence instruction in
2   the Seventh Circuit pattern civil instructions, and then there
3   is a threshold question as to whether it's given or not.  And
4   I guess I'm not prepared to say whether I will give the
5   instruction, but I do think it's appropriate for you to
6   question him about this because, if nothing else, it bears on
7   his credibility.  I mean, it's not just a question of failure
8   to preserve; it bears on his credibility because he's
9   essentially --
10       You know, the proposition is that you should rely on
11  what the man says as to how he created the stuff, and there is
12  really no written record of it.  And besides that, there was a
13  lawsuit pending and a request that he was aware of apparently
14  that he should keep the records.  So, I mean, just without
15  more, I think that would make it an appropriate topic of
16  examination.
17       And I'm just going to table until later whether you
18  get to -- whether you get the instruction or not.
19       MR. KEENER:  Your Honor, I don't know whether you
20  intended to cover this or not.  There's a separate Fiertek
21  issue with the stuff he affirmatively deleted from his
22  computer.
23       THE COURT:  Say it again.
24       MR. KEENER:  There's a separate issue.
25       THE COURT:  Give me in a nutshell what he deleted
```

```
1   from his computer.
2        MR. KEENER:  All right.  In a nutshell he admitted in
3   his deposition that he -- you know, he copies things from the
4   Internet, downloads movies and books from the Internet without
5   paying for them.
6        In addition, he downloaded a ton of Games Workshop
7   materials and has lots of them and doesn't know exactly what
8   all he has.
9        Then he says after the lawsuit started, I went
10  through and deleted all the stuff that I didn't also have a
11  physical copy of, a whole bunch of Games Workshop stuff.  He
12  didn't write a list of what he deleted.  He doesn't remember
13  what he deleted.
14       THE COURT:  And did you ask him -- did somebody ask
15  him why he did that?
16       MR. KEENER:  He said, because I didn't pay for them.
17  Again, this is after the lawsuit started.
18       Now, it wasn't just "yes" or "no" answers.  He
19  actually went on and gave explanations on exactly how he
20  deleted and didn't remember.  And then afterwards, after we
21  filed our motion for sanctions, two days later they give us an
22  errata sheet from Mr. Fiertek changing every single answer
23  from "no" to "the only thing I deleted were the things I had
24  physical copies of," which is exactly contrary to his
25  deposition testimony.  I can read you --
```

```
1        THE COURT:  No, no, you don't have to.
2        MR. KEENER:  One of the questions and answers is just
3   very telling, and now it just changes.
4        THE COURT:  Let me hear from the defendant on this.
5   Go ahead, whoever is going to talk about this.
6        MS. HARTZELL:  Go ahead.
7        MS. KALEMERIS:  So there was an errata sheet
8   submitted by Mr. Fiertek.  It was completely in compliance
9   with Federal Rule of Civil Procedure 30(e).
10       THE COURT:  But if this happens, doesn't the other
11  side at least get to put in the circumstances?
12       MS. KALEMERIS:  Yes, and so all we're asking is to be
13  able to add this to the deposition, to the errata sheet.
14       THE COURT:  Why isn't he coming to trial?  Is he
15  overseas or something?
16       MS. KALEMERIS:  He is.
17       THE COURT:  It might be worse for you if he was at
18  trial, I suppose.
19       MR. KEENER:  We don't get to cross-examine him on
20  his --
21       THE COURT:  God, why do you need to?
22       Okay.  The defendant doesn't dispute that they get --
23  that they would get to put in that when he was sitting in the
24  room with the court reporter there sitting across the table,
25  looking everybody in the eye, he said A and then afterwards,
```

1   you know, 21 days later, 30 days later or whatever, he sends

2   in this errata sheet which says, well, no, it's really not

3   that, it's this.

4         MS. KALEMERIS: Absolutely not. We just want to be

5   able to give the errata and his reasons for his

6   clarifications.

7         THE COURT: You don't dispute that they get to put in

8   the errata, do you?

9         MR. KEENER: We think it's not a proper errata. He

10   claims that it has something to do with the English language

11   which we covered extensively in his first deposition.

12         THE COURT: Is that not his main language?

13         MR. KEENER: It's not his first language. He's been

14   speaking it for over ten years. All the emails in this case,

15   thousands of them, have all been in English. He has great

16   fluency, whom and who, and his grammar is perfect. And now

17   he's claiming, I didn't understand the questions, and they

18   weren't "yes" and "no" questions.

19         THE COURT: Was it a paper deposition or a video?

20         MR. KEENER: Paper. I mean the question is:

21   "Q   Do you know which books you deleted?

22   A   No. As I said, I didn't keep track of specifics. I

23   deleted electronic copies of all -- well, pretty much

24   everything I have.

25   Q   So you deleted the current copies of pretty much

1   everything you had after the lawsuit started?

2   A   Yes.

3   Q   But a large portion of electronic copies of Games Workshop

4   materials you deleted after litigation started?

5   A   Yes.

6   Q   Do you know how far after the case started you did this?

7   A   I -- no. I just -- I just know I deleted stuff that I

8   don't own physically, that I haven't bought in a store."

9         Then he wanted to change --

10         THE COURT: Okay. Then what did he change it to?

11         MR. KEENER: "I deleted only the stuff that I had in

12   the store. I never had anything I didn't have in the store."

13         They want to completely reverse the testimony.

14         MS. KALEMERIS: Your Honor, may I say that's not

15   correct. These files only relate to Games Workshop works,

16   which we have already covered at length that we're not denying

17   that they had access to. These are --

18         THE COURT: I'm not going to exclude. I'm not going

19   to exclude the errata, but the plaintiff is going to get to

20   put in, you know, everything about the circumstances of that.

21         You will just have to figure out the best way to do

22   that.

23         MR. KEENER: Do we get any inference that he at least

24   had access to all the Games Workshop works since we have no

25   idea what he did and didn't have? He didn't keep a record.

1   He said:

2         "I had a whole bunch of stuff. I deleted it all. I

3   don't know what Games Workshop materials I deleted."

4         MS. HARTZELL: He does testify that he believed that

5   they were just novels.

6         THE COURT: You know, I'm not prepared to say that

7   I'm going to instruct the jury that he had access to

8   everything. That's, I think, part of what I tabled until the

9   end of the case.

10         I honestly think that, you know, if you do it right,

11   you're not going to need the inference, but that may be just

12   me. Too bad he's not coming in for trial. It would be more

13   fun.

14         So what else is at issue on this motion? What have I

15   left out?

16         MR. KEENER: It is the designers and the forum posts

17   and the painters. I think Mr. Moskin can handle this.

18         THE COURT: Okay. So on the rest of it -- and this

19   is what I wrote in my notes, entitled "the rest of it." It's

20   not clear to me what of significance the plaintiff contends is

21   lost.

22         And the point that was made in the last brief that

23   was filed by the defendant is that, wait a second, they have

24   got a whole boatload of this stuff that they're offering in

25   evidence, exhibits, you know, X through QQ.

1         In other words, if you want some sort of an adverse

2   inference, you have got to show -- at least make some sort of

3   a showing that there's some reason to believe that something

4   got lost that would be helpful to you. What do you think was

5   lost?

6         MR. MOSKIN: There are two different categories of

7   things here. One -- well, maybe three, but I will put --

8         There are the postings -- I will lump these

9   together -- on the forums and eBay, and we were talking about

10   the forums earlier. There are extensive comments, what we

11   think are the observations of individuals.

12         And when we raised this initially several months ago,

13   the defendant's reaction was, well, this is an issue of

14   control. We don't have control over these. These are third

15   party forums. So we addressed that issue in our motion and

16   said, yes, you do. These are all these cases that show you

17   could have saved these things, you did have control, you do

18   still have control, you could go out and even reconstruct it.

19   They made no effort to reconstruct it.

20         Now they have a different argument in their

21   opposition to the supplement to our motion that these are

22   just -- the forum postings and eBay postings, they're

23   ephemeral. So we should -- they cite a local patent rule on

24   electronic discovery which deals with truly ephemeral things,

25   but they also make the contrary argument in their brief that,

1  no, these aren't ephemeral, and plaintiff isn't prejudiced
2  because you could go out and find them anytime you want.
3      THE COURT:  That's exactly why I asked the question,
4  which I would now like you to answer.  What do you think was
5  lost?
6      MR. MOSKIN:  Vast quantities of every --
7      These email postings, these forum postings we have
8  looked at, there have been all these comments of people
9  saying, you know, I love your work, but it's just -- you know,
10  you did a great job of -- it looks like just Games Workshop
11  or, no, I don't like it because it's too similar or whatever,
12  how come you made it look so much like Games Workshop, those
13  sorts of things which we don't think are -- which we think are
14  admissible.  And that evidence has all been lost to us.
15      I can cite your Honor a case, since they have now
16  raised a new argument, where terminating sanctions were
17  entered against the defendant for failing to preserve forum
18  posts.
19      I can give a copy or hand up a copy, if you would
20  like.
21      THE COURT:  Okay.
22      MR. MOSKIN:  Columbia Pictures, Inc. v. Justin
23  Bunnell.
24      THE COURT:  Why would I want to enter a terminating
25  sanction?

1      MR. MOSKIN:  I'm not asking --
2      THE COURT:  The case is going to be so fun to try.
3      MR. MOSKIN:  We're not asking for a terminating
4  sanction.
5      THE COURT:  The record will reflect a tinge of
6  sarcasm.
7      MR. MOSKIN:  There is a wealth of evidence that,
8  given what we have seen, instances A through B, A through C.
9  D through Z, which we have not seen, we think would also be
10  extraordinarily relevant, and we should have at least had an
11  opportunity to review it and make our own determination.
12      The eBay postings.  One of their defenses, their
13  principal defense, to trademark infringement is, oh, we're
14  only making nominative fair use.
15      But in eBay --
16      And I would concede they have a better argument for
17  nominative fair use on their website.  At least I understand
18  the argument there.  But on the eBay postings that we have
19  seen, he just calls it, this is a terminator pad for space
20  marines.  And this is Exhibit M to our motion filed on
21  April 3rd.
22      THE COURT:  Oh, the April 3rd one.
23      (Brief interruption.)
24      THE COURT:  Oh, M, okay.
25      MR. MOSKIN:  And one of the fundamental claims we

1  have in this case is that he makes these products.  They don't
2  have any permanent markings on them that show they come from
3  Chapterhouse.  So not only when he puts them on eBay, but when
4  people resell -- and he acknowledges in his deposition
5  testimony he's bought many of his Games Workshop products --
6  and he's got a huge collection -- he's bought many of his own
7  products from eBay.
8      There's a lively market out there.  The secondary
9  market, there will be inevitable postsale confusion because
10  all of these things are going to be sold precisely as he does
11  when he sells -- I'm selling Space Marine 40K 10 Squad Kit
12  Salamanders Dragon.  That doesn't say -- there is no
13  indication there that there's a nominative fair use.  He's
14  just calling it a Games Workshop product.
15      And so we are prejudiced on our trademark claims
16  because we can't show both on the forum postings and on eBay
17  how he is marketing his product.  It's not so --
18      Going back to the forum postings, I should add,
19  typically when he's ready, that's how he markets.  He knows
20  where to find Games Workshop customers.
21      THE COURT:  He being Mr.?
22      MR. MOSKIN:  Mr. Villacci.
23      THE COURT:  Villacci.
24      MR. MOSKIN:  He knows where to find Games Workshop
25  customers.  They are all -- at least the best customers are

1  all participating or many of them are participating on the
2  forums.  So he puts pictures on the forums.
3      Some of the pictures we have seen use much more
4  explicit language tying the products to using Games Workshop
5  trademarks.  And all that evidence has been lost to us.
6      Again, in the Columbia Pictures against Bunnell case
7  in California, the deletion of forum postings was -- again,
8  I'm not asking for terminating sanctions.
9      THE COURT:  He's not -- you're not staying he deleted
10  them.  You're just saying he didn't print out a copy when he
11  made them.
12      MR. MOSKIN:  He didn't save it.  And he was ordered,
13  your Honor.  The December 16th order in this case in the
14  first --
15      THE COURT:  That's the one that I couldn't make out
16  what it says because it just says answer this and that
17  interrogatory.
18      MR. MOSKIN:  Right.  He was ordered to produce all
19  documents, all of his advertising and promotional materials.
20      THE COURT:  Okay.  But is there some --
21      Just so I'm sure about this, is there some contention
22  that after that date he continued not to preserve things?
23      MR. MOSKIN:  Yes.  He hasn't preserved any of them,
24  not a single one at any point in the case.
25      THE COURT:  Do we know for a fact that he's posted

113

1  something since that date?
2       MR. MOSKIN:  Oh, yes.
3       THE COURT:  Okay.
4       MR. MOSKIN:  And he identified --
5       And the part of the motion leading to your Honor's
6  December, I think it's 23rd, decision was his own
7  interrogatory answers, answers to interrogatory number 10 in
8  the first phase of the case.  He listed 10 --
9       THE COURT:  I need to hear from the defendant.  I've
10  got your point.  I need to hear from the defendant.
11      MS. HARTZELL:  There's a lot wrapped up in there.
12      I will start with the forum posts.  The plaintiff
13  contends that he has made no effort to reconstruct where he
14  posted, but there is significant testimony that he went back
15  to the forums where he posted and searched under his name and
16  identified those forum threads in response to an interrogatory
17  that related only to the newly accused products.
18      THE COURT:  But don't the threads go away after some
19  point in time?
20      MS. HARTZELL:  They do not.
21      THE COURT:  They don't.
22      MS. HARTZELL:  They don't.
23      THE COURT:  Okay, keep going.
24      MS. HARTZELL:  And on that point, the plaintiff
25  points to a few -- to testimony, saying that in the past,

114

1  historically, some of the forums have been known to remove
2  posts that were too commercial.  But the only testimony
3  relating to Chapterhouse products with respect to that is
4  Mr. Fiertek saying that long before the lawsuit, long before
5  Chapterhouse became Chapterhouse, he believes that there was a
6  forum that removed some posts made by Chapterhouse.
7       So there is no identification of any forum post after
8  the start of the lawsuit that are no longer in existence
9  publicly.  And Mr. Villacci has made an effort to reconstruct
10  the posts that he made to advertise the products.
11      With respect to the Court's order relating to
12  advertising and promotional materials, the forum posts
13  themselves were not addressed in the briefing for that, that
14  motion.  It only addressed advertising which was interpreted
15  to mean website postings where he himself -- on the
16  Chapterhouse website, which is where he primarily advertises
17  and maintains a copy of the things that are advertisements.
18      With respect to the eBay postings, Mr. Villacci also
19  testified that he does not make eBay postings for all of the
20  products.  I have learned since the completion of briefing on
21  this motion that he is able to identify what products he
22  advertised on eBay and would be happy to make that information
23  available to the plaintiff.
24      THE COURT:  Keep going.
25      MS. HARTZELL:  With respect to the interrogatory

115

1  number 10 raised by plaintiff, that was not at issue in the
2  briefing for the December 23rd order except as to say that it
3  was designated attorney's eyes only and should not have been.
4       THE COURT:  Is there anything else you want to tell
5  me?
6       MS. HARTZELL:  I think that covers most of the
7  points.
8       THE COURT:  Do you want to reply to anything that Ms.
9  Hartzell just said?
10      MR. MOSKIN:  Yes, I can cite to a few things.
11      One, I'm holding in my hand a May 29 letter I wrote
12  to Jennifer Golineaux in the first phase of the case.
13      THE COURT:  Of what year?
14      MR. MOSKIN:  2012.
15      THE COURT:  Okay.
16      MR. MOSKIN:  Citing your Honor's December 23 order
17  and specifically pointing out that in response to document
18  requests, that they had failed to respond to document request
19  16, that their own interrogatory 10 answer listed all the
20  forums.  They hadn't given us any of those things.
21      So they certainly knew as of that date.  They never
22  challenged this.  We discussed it in the summary judgment
23  briefing.  They have known for a long time.
24      When I asked Mr. Villacci, he says he didn't keep any
25  master list.  He didn't even go back and look at the 10 forums

116

1  that they had listed in their answer to interrogatory number
2  10 to -- when he reconstructed a few postings from memory.
3       He also testified he keeps no master list of what
4  he's produced, what he's posted on eBay.  So whatever he
5  creates now from memory is suspect.
6       THE COURT:  Let me ask Ms. Hartzell a question.  Do
7  you dispute that he ought to have preserved this stuff?
8       MS. HARTZELL:  I don't think that it was clear that
9  he had a duty to preserve the forum postings and especially
10  the request that he create a master list.
11      Under Rockwell International v. Wolfe Iron, which is
12  a district court case in Pennsylvania:
13      "Rule 34 does not -- cannot be used to require the
14  adverse party to prepare, or cause to be prepared, a writing
15  to be produced for inspection but can be used only to require
16  the production of things in existence."
17      So I read that to not require that he keep a master
18  list of places where he has posted and so dispute that that
19  was a responsibility.
20      With respect to the question as to why he did not go
21  back to the earlier websites that were identified in the first
22  phase of the litigation, Mr. Villacci testified that many of
23  those websites he doesn't post on anymore, and that for the
24  newly accused products, he did not believe that he posted
25  advertisements there.

117

```
 1       THE COURT:  On this question of whether you have to
 2   create documents, I mean, Rule 34(a) when it defines what you
 3   can ask somebody to produce, 34(a)(1) says:
 4       "Designated documents or electronically stored
 5   information... stored in any medium from which information can
 6   be obtained either directly or, if necessary, after
 7   translation by the responding party into a reasonably usable
 8   forum."
 9       So I'm not sure why I would regard posting something
10   on a forum that is posted by somebody else, it's
11   electronically stored information that I can access because I
12   can print it out.  I'm posting it.  I'm not sure why I would
13   regard that any differently than something -- than a document
14   that I create not in a hard copy, but just on my own computer
15   and it's on the hard drive of the computer in bits and bytes.
16   Why should I treat those differently?
17       MS. HARTZELL:  Because it is saved on your computer
18   and that is available to you.  The public availability of the
19   website forum, and it is available to everyone, does not give
20   him the responsibility to print it out when he makes the
21   posting.
22       THE COURT:  Well, you know, but if you are aware --
23   if you're aware that there is a pending request and at some
24   point, I guess, a direction by the judge, you know, that
25   you're to produce certain materials and you know that you're
```

118

```
 1   creating those types of materials on, let's say, a computer
 2   hosted by somebody else, I mean, I don't think you -- just to
 3   go back to my, you know, my desktop -- I don't think that you
 4   could get around that by having, you know, a computer in your
 5   buddy's garage that you go do the stuff on and it's there and
 6   you can say, well, it's not my computer, so I can't have it.
 7       I mean, if you're under an obligation to produce
 8   something, you're under an obligation to produce it if you
 9   have access to it, you know, whether it's on a device that you
10   own or whether it's just on a device that you can print out
11   something from, I would think.  I mean, it's not -- the law
12   has never -- that's why the rule says possession, custody or
13   control.
14       I mean, I wouldn't see why if I post, unless there's
15   some -- I'm not a person who posts things on blogs, just to be
16   clear.  But if I post something on a blog, I assume, and I
17   think it's fair to assume, that I can print it out when I post
18   it.  And so that information, it's electronically stored
19   information that is within my possession, custody or control.
20   It's maybe not in my possession, it's not in my custody, but
21   it's in my control because I can print it out, okay.
22       There's a pending request for documents that relate
23   to how you market your product.  There is at some point an
24   order that says you have to respond to that request.  And then
25   I'm told that even after that date, that Mr. Villacci is
```

119

```
 1   continuing to make these kind of posts and he's not doing
 2   anything to preserve them.  And all I'm told now is that,
 3   well, okay, here, we'll tell you where he posted stuff.
 4       And so it's now left to some extent to the
 5   imagination whether, you know, what he originally posted is
 6   still there or not.  I mean, I know you're telling me that the
 7   threads don't go away, but how I do know that?  I mean,
 8   there's plenty of -- I mean, I don't write on blogs, but I
 9   read some, and some of them do delete stuff after a period of
10   time.
11       MS. HARTZELL:  With respect to --
12       THE COURT:  EBay, for example.  I mean, there's not a
13   wayback machine that gets you into eBay.
14       MS. HARTZELL:  I do agree, eBay is a bit of a
15   different situation.
16       With respect to the forum posts and whether or not --
17   whether he merely said, I posted here, he actually did more
18   than that; went back to the websites, searched his name,
19   identified the posts where he posted an advertisement and
20   provided the forum threads for each of those.
21       THE COURT:  So are you telling me that on those,
22   you're saying that there is nothing lost?
23       MS. HARTZELL:  I cannot say that there is nothing in
24   the universe lost.
25       THE COURT:  And that's probably because you don't
```

120

```
 1   know to a moral certainty whether the person who hosts or the
 2   entity that hosts the site actually keeps everything for an
 3   indefinite period.  I mean, some blogs have archives on them.
 4   You know, you can go back to November of 2008 or whatever, but
 5   not all of them do.
 6       MR. MOSKIN:  Moreover, he only looked at four of the
 7   ten or five of the 10 sites that he listed in his --
 8       THE COURT:  So he gave you a list of 10 where he
 9   posted stuff, and you're saying that he's only gone back to
10   four or five of them?
11       MR. MOSKIN:  Right.  He said he didn't even go to
12   refresh his memory by consulting his own prior interrogatory
13   answer listing 10 of them.
14       And that doesn't even include this other one that Ms.
15   Hartzell mentioned where at some point this one other forum
16   called Bolter & Chainsword pulled his and his partner's posts
17   because they thought they were too overtly commercial.  That
18   wasn't even listed in answer to interrogatory 10 as a place
19   where they had ever posted.  So interrogatory 10 we know was
20   incomplete, and we know that he hasn't even made an effort to
21   try to provide a complete list now, even putting aside the
22   question of what may have been removed by the forums
23   themselves.
24       MS. HARTZELL:  I believe I've already addressed the
25   point of the differing websites that he went to for the
```

121

1   different phases of the lawsuit.
2           THE COURT:  Address it again.  I'm not sure I got it
3   then.
4           MS. HARTZELL:  The first interrogatory was with
5   respect to the original phase of the litigation and the
6   products that they had sold in that phase of the litigation.
7           In the second phase of the litigation, he testified
8   that he did not use many of the websites that he had
9   originally used when advertising the newly accused products.
10  And the second interrogatory was directed only to the newly
11  accused products.
12          THE COURT:  Okay.  I just need to look at one thing
13  here.  Give me just a moment.  We're almost done, Laura.
14  We're not going to go more than about five more minutes.  I
15  just need to look up something here.
16      (Brief interruption.)
17          THE COURT:  All right.  Carving out eBay for a
18  second, in terms of providing an adverse inference
19  instruction, or excluding evidence which is, I guess, what I'm
20  being asked to do, aside from eBay, I'm really not persuaded
21  enough that there is material of significance that is missing.
22  And when I say "of significance," it's essentially a
23  materiality ruling.  It's a materiality consideration.  And
24  I'm considering it in light of, not in a vacuum, but of all
25  the other evidence that is available.  That means there is

122

1   certainly some evidence that the plaintiff has been able to
2   recover.  And so I'm not persuaded enough that there is
3   something actually missing that is likely to have been --
4   that, A, is material compared to what is out there and, B,
5   would be beneficial to the plaintiff.
6           EBay seems to me to be a different story.  And I
7   guess -- and as much as I hate to have more stuff filed in
8   this case --
9           You know, I get these motions, and this is not
10  critical because there's a lot of stuff at issue.  I get these
11  motions and they involve 10 squad issues.  I need to have
12  something that like zeros in on eBay, just zeros in on that.
13  What is the testimony about what he did on eBay, what is the
14  testimony about what likely doesn't exist anymore, what is the
15  basis for thinking it would have been helpful to the
16  plaintiff.  And on the defendant, you're going to be telling
17  me the flip side of all of this.
18          And I would like to get this -- rather than in these
19  things that come in with, you know, you have to hire a pack
20  animal to bring them over here, I would like to get this in
21  this same status report that I'm talking about.  This is going
22  to be section three of the status report.  It's going to be
23  focused in on what is called the motion to enforce the prior
24  discovery order.  It's going to zero in on eBay.
25          And so now let's get back to the thing we started off

123

1   with because I need to bring this to an end.  We have all been
2   doing this for two and a half hours, so it's enough.  You
3   know, in light of what you guys told me in these letters, I'm
4   going to move the trial to the 3rd of June.  But I'm doing
5   this under strictly controlled conditions.  So one of the
6   things I'm going to do is I'm going to permit the plaintiff to
7   go back and depose Grindley on his supplemental report.
8           And I'm not going to shift costs for it because I do
9   think that there was some justification for doing it late.  It
10  maybe doesn't justify it a hundred percent, but the
11  justification, I think, arises in part from these two items of
12  late discovery that were done, you know, because of the way I
13  mushed the two cases together towards the tail end.  You know,
14  you can do it by video.  It's fine with me if you do it by a
15  video hookup or if you do it by audio or whatever.  You will
16  figure out how you want to do that.
17          So that's going to be the one and only item of
18  discovery that is permitted between now and the trial, and
19  that needs to be done sometime within the next four weeks.
20  And I would say let's -- you should try to err on the early
21  side of the four weeks.  You know the man is available on
22  certain days that he was going to be available for the trial
23  because he canceled classes.  That's what I have been told.
24  Maybe you shoot for that day because you know he's available.
25  You guys were available, too, because you had blocked it out

124

1   for the trial.  That's item number one.
2           Item number two is I'm imposing a moratorium on
3   motions.  I don't want any.  I won't entertain any.  If you
4   want to file a motion, you're just going to have to restrain
5   yourself because this is my way of dealing with the
6   proposition I stated earlier, that the amount of paper that
7   gets filed, it varies with the amount of time that you give
8   people to file it.  So there's a moratorium on motions.
9           The only thing I want from you is this status report.
10  That's just what I'm calling it.  It's really a further
11  submission on three of the motions, okay.  I would like to get
12  that by 10 days from now.
13          My advice to you is what you really ought to do, you
14  ought to do this like you're doing a pretrial order.  You
15  ought to exchange what you're proposing to put it in first so
16  everybody knows what the other side is going to say, so it's a
17  self-contained document that includes all the arguments in it.
18          So 10 days from now is the -- today is the 10th, so
19  that would be -- well, let's say Monday, the 22nd, is when
20  that's due.  Let me just write that down.
21      (Brief interruption.)
22          THE COURT:  We're going to -- sadly, we're going to
23  have to get together one more time.  Nothing personal.  Well,
24  sort of.  And let me just tell you when that's going to be.
25  I've just got to pull up my calendar here.

125

```
 1        Well, now I have all this time in the last couple of
 2   weeks of April. So I think I'd like to see you maybe on,
 3   let's say, the 24th of April.
 4        So if you're coming in from New York, is it better
 5   for you to do this at something like 11:00 so that you can
 6   come in and out on the same day?
 7        MR. MOSKIN: Well, you know, I thought today would be
 8   easy, but my flight, because of the storm --
 9        THE COURT: You had several flights leave as
10   you're --
11        MR. MOSKIN: Again, my flight was an hour and a half
12   late this morning. So I'm going to come in the night before
13   regardless.
14        THE COURT: Either way, okay.
15        All right. I'm going to make it 11:00 o'clock on the
16   24th of April. So that will just say continued pretrial
17   conference.
18        We're going to talk about --
19        Well, no, let's not do that because that may be one
20   of the dates you might want to depose the guy. Let's do it a
21   little later than that. I can't go much later because I have
22   another trial coming up after that. Let's do it on the 25th
23   of April at 11:00, continued pretrial.
24        And I guess I'm going to beg that somebody orders the
25   transcript from today so that I can have it handy if I need to
```

126

```
 1   revisit anything. But I'm really serious. I mean, I don't
 2   want -- everybody has had their motions in limine. I've got
 3   you know, these sort of sub rosa motions in limine that are
 4   contained in the letters about the trial time and whatnot.
 5        And then the other thing I'm going to tell you when
 6   you come in on the 25th is how much time I'm going to give you
 7   to try the case, and it will probably be expressed in a number
 8   of hours per side, but we'll talk about that more then. So
 9   June the 3rd is going to be the date. And so you just need to
10   figure that it's going to be, you know, that week and part of
11   the following week. And at the moment -- yes, it's going to
12   require me to move something else, you know, but so it goes.
13   Okay.
14        And, really, I need to sort of bring this to a close
15   like now even if you have other questions.
16        MS. HARTZELL: Thank you, your Honor.
17        THE COURT: Okay, bye.
18        MR. MOSKIN: Thank you.
19      (Which were all the proceedings had in the above-entitled
20   cause on the day and date aforesaid.)
```

127

```
 1              C E R T I F I C A T E
 2
 3        I hereby certify that the foregoing is a true and
 4   correct transcript of the above-entitled matter.
 5
 6
 7   /s/ Laura M. Brennan                    April 11, 2013
 8
 9   _____        _____
10   Laura M. Brennan
     Official Court Reporter                      Date
11   Northern District of Illinois
```