Tomas Fiertek       GamesWorkshop Ltd v Chatered House LLC       13 April 2012

**Page 81**

1     Q. What else?
2     A. I do not recall seeing or reading about
3 anything that has to do with -- I don't know -- I don't know
4 the correct terminology to describe the mythology or
5 history, but like old Celtic knot and tribal art. There is
6 a certain feeling theme popular amongst others on tattoos,
7 who have like Celtic-looking knots, ornamentation thingies,
8 and I do -- I did some of those for Chapterhouse. I don't
9 recall ever seeing Games Workshop use that genre or theme.
10     Q. Okay.
11     A. Old French.
12     Q. What did you say about French? I missed
13 that.
14     A. Well, I assume that's -- I don't know, since
15 I'm not a history teacher, I assume it has to do with
16 ancient -- where France is situated now, Celtic, Gallic,
17 those kind of historical themes.
18     Q. Okay. So other than the Spartan/Greek theme,
19 and the knotted Celtic theme, can you identify any other
20 Chapterhouse products that don't have a previous similar
21 theme in a Games Workshop product or material?
22     MR. OH: Objection. Vague and ambiguous, again at
23 this point argumentative and misleading.
24     A. I would say yes.
25 BY MR. KEENER

**Page 82**

1     Q. Okay, what else?
2     A. We -- I didn't do, some commission freelancer
3 did for Chapterhouse a set of alien heads that were based on
4 Giger's mythology, the guy who created the Alien movies, and
5 to my knowledge, Games Workshop has not done that.
6     Q. Anything else?
7     A. Not that I can come up with right now.
8     Q. Okay. We can now have you passed Exhibit 73.
9 It's Bates labeled TF3881 through 3883. It's an email from
10 you to Mr. Villacci, dated May 25, 2009.
11     (Plaintiff Exhibit 73 marked for identification)
12     Q. Do you have it?
13     A. Yes.
14     MR. OH: Again, for the record, it is designated
15 as highly confidential.
16 BY MR. KEENER
17     Q. I want to focus your attention on the very
18 top email from you to Mr. Villacci. It's about four
19 paragraphs long. Do you see that?
20     MR. OH: Can you give the witness a moment to read
21 the exhibit?
22 BY MR. KEENER
23     Q. I'm only going to concern myself with the
24 very first email, but you can refer to the other parts if
25 you need to, but my question will be directed only to the

**Page 83**

1 first few paragraphs you wrote.
2     A. Sure.
3     Done.
4     Q. Okay. Looking at the second paragraph, you
5 write:
6     "Imagine how much more we could make if we went
7 with a little more than word of mouth, but then I take it we
8 we'd have to remake all pads that clearly show they are GW
9 underneath such as the spiky PA dragon pads."
10     Do you see that paragraph?
11     A. Yes.
12     MR. OH: Objection, lack of foundation.
13 BY MR. KEENER
14     Q. Did you write that?
15     A. Yes.
16     Q. Does "GW" stand for Games Workshop?
17     A. Yes.
18     Q. What does "PA" stand for?
19     A. I think it stands for power armor.
20     Q. What is power armor?
21     A. I think it would be used to designate
22 a certain size of a sculpt.
23     Q. What is power armor?
24     MR. OH: Objection, asked and answered.
25     A. Well, what is power armor? It's power armor.

**Page 84**

1 I mean, it's in a lot of science fiction literature and
2 movies. It's what it is.
3 BY MR. KEENER
4     Q. Does power armor --
5     A. In this --
6     Q. You finish.
7     A. In this instant, I recall it being used to
8 designate a size.
9     Q. In the Games Workshop 40K universe, does
10 power armor have a specific meaning?
11     A. Yes.
12     Q. What is it?
13     A. A type of armor.
14     Q. What is the specific meaning in the Games
15 Workshop 40K universe?
16     MR. OH: Objection. Asked and answered.
17     A. A type of armor on a miniature.
18 BY MR. KEENER
19     Q. Is it worn by a certain type of miniature?
20     A. Mostly Space Marine miniatures.
21     Q. Okay, so power armor is a type of armor worn
22 by Space Marines?
23     A. Amongst others, yes.
24     Q. What were the spiky power armor dragon pads
25 you were referring to in this email?

21 (Pages 81 to 84)

**Page 85**

1  A. These are two of them -- yeah, two of them --
2  things that I sculpted about approximately one or -- one to
3  two years before I even met Mr. Villacci -- by "met" I say
4  talked or either wrote with. I did them for personal use,
5  to use with my personal collection of miniatures. Yeah.
6  That is those.
7  Q. And when you sculpted those for personal use,
8  did you use any Games Workshop materials?
9  A. While sculpting them?
10  Q. Yes.
11  A. No. Unless Games Workshop owns the sculpting
12  clay I used.
13  Q. What is your reference:
14  "... all pads that clearly show they are GW
15  underneath ..."
16  What did that refer to?
17  A. Because when I did them, I sculpted on
18  a plain pad that was a Games Workshop pad.
19  Q. Okay, so the finished pad that you made was
20  a plain Games Workshop power armor Space Marine pad that you
21  then added some modeling clay to the outside of?
22  MR. OH: Objection. Misstates prior testimony.
23  A. There was a Games Workshop pad, plain,
24  underneath. I added a shell of sculpting putty to give it
25  detail and texture and added bulk.

**Page 86**

1  BY MR. KEENER
2  Q. Was this product ever sold by Chapterhouse?
3  A. Yes.
4  Q. And what product was it sold as?
5  A. A loose shoulder pad.
6  Q. Chapterhouse sells many loose shoulder pads;
7  correct?
8  A. Yes.
9  Q. Did it have a name?
10  A. Yes.
11  Q. What was the name?
12  A. I don't remember.
13  Q. What did it look like?
14  A. Looked like a half sphere with a dragon head
15  on it and scales.
16  Q. For these shoulder pads that Chapterhouse
17  sold, were they selling it with the Games Workshop shoulder
18  pad underneath it?
19  MR. OH: Objection. Vague and ambiguous.
20  A. I don't know. I am not selling stuff.
21  BY MR. KEENER
22  Q. Okay. Do you understand the basic process of
23  how something you sculpt becomes an actual product that's
24  sold?
25  A. Vaguely, yes. Define "basic".

**Page 87**

1  Q. Describe it at the level of your
2  understanding.
3  MR. OH: Objection. Vague and ambiguous.
4  A. I sculpt something -- well, let's make it as
5  short as possible. I sculpt something, send it to Nick --
6  Mr. Villacci -- and then it's taken out of my hands. What
7  happens if it gets sold, et cetera, is not my decision to
8  make.
9  Q. So you don't have any understanding of how
10  this master sculpted product gets turned into many products
11  that actually physically sell?
12  MR. OH: Objection. Misstates prior testimony,
13  assumes facts not in evidence, and lacks foundation.
14  A. I have a somewhat limited understanding of
15  the process, since I don't -- since I'm not involved nor
16  handle it. That is Mr. Villacci's department.
17  BY MR. KEENER
18  Q. What's your understanding?
19  A. I sculpt something, I ship it to
20  Mr. Villacci, and then someone makes a mold -- should
21  Mr. Villacci accept the item I've sculpted and okay it, then
22  someone makes a mold out of it, and this mold is then used
23  by someone to do copies, to cast using the mold in various
24  materials.
25  Q. Okay. So you don't sculpt tens or hundreds

**Page 88**

1  of the same shoulder pad; you make a master, which is then
2  used to make a mold; you then use the mold to make copies?
3  Is that basically correct?
4  MR. OH: Objection. Lacks foundation, assumes
5  facts not in evidence.
6  A. That is basically, for the majority of the
7  examples, correct, yes.
8  Q. And that's what happened with this power
9  armor dragon shoulder pad; correct?
10  MR. OH: Objection, lacks foundation. Calls for
11  speculation.
12  A. I don't know what happened with it. I know
13  what happened with it until the moment I shipped it to
14  Mr. Villacci.
15  BY MR. KEENER
16  Q. And how many did you ship to Mr. Villacci of
17  this power armor dragon shoulder pad?
18  A. The two --
19  MR. OH: Objection. Mischaracterizes prior
20  testimony.
21  A. I shipped the two that I made, as
22  I said, about six years ago.
23  BY MR. KEENER
24  Q. So a right shoulder pad and a left shoulder
25  pad?

22 (Pages 85 to 88)

Tomas Fiertek          GamesWorkshop Ltd v Chatered House LLC          13 April 2012

| | |
|---|---|
| 1  A. No. | 1       MR. OH: Objection. Misstates past testimony, |
| 2  Q. What were the two shoulder pads? | 2  assumes facts not in evidence. |
| 3  A. They were both left. | 3       A. Could you -- |
| 4  Q. And is it your understanding that both were | 4       MR. OH: Lacks foundation. |
| 5  used to make molds, to make copies of to sell? | 5       A. -- restate the question, please? |
| 6       MR. OH: Objection. Assumes facts not in | 6  BY MR. KEENER |
| 7  evidence, lacks foundation. | 7       Q. Sure. So I believe you testified that for |
| 8       A. I don't know. I would have to guess. | 8  this product, power armor dragon shoulder pad, the final |
| 9  BY MR. KEENER | 9  mold product was the combination of sculpting clay on top of |
| 10      Q. What's your understanding? | 10  the Games Workshop manufactured shoulder pad; correct? |
| 11      A. My understand -- | 11      MR. OH: Objection. Lacks foundation, |
| 12      MR. OH: Objection, asked and answered. | 12  mischaracterizes past testimony, and assumes facts not in |
| 13      A. My understanding that Mr. Villacci received | 13  evidence. |
| 14  them and -- well, my guess is proceeded to make a mold or | 14      A. Yes. |
| 15  have someone make a mold of them. | 15  BY MR. KEENER |
| 16  BY MR. KEENER | 16      Q. Okay. My question is: other than that |
| 17      Q. And did he send any of those finished | 17  product, are you aware of any other Chapterhouse products |
| 18  products back to you? | 18  for which the final sculpture to be molded incorporates |
| 19      MR. OH: Objection. Assumes facts not in | 19  Games Workshop pieces? |
| 20  evidence. | 20      A. Yes. |
| 21      A. Yes. | 21      Q. What other Chapterhouse products have a mold |
| 22  BY MR. KEENER | 22  that includes Games Workshop pieces? |
| 23      Q. What were they made out of when they were | 23      A. An old miniature we called a chaplain. |
| 24  sent back to you? | 24      Q. A what? |
| 25      A. Pewter. | 25      A. A chaplain. We called it a chaplain. |
| Page 89 | Page 91 |
| 1      Q. And from the pewter shoulder pad you received | 1      Q. Was that sold by Chapterhouse? |
| 2  back, could you tell that they showed the Games Workshop | 2      A. No. |
| 3  shoulder pad underneath? | 3      Q. Why not? |
| 4      MR. OH: Objection. Assumes facts not in | 4      A. Mr. Villacci removed it from the Chapterhouse |
| 5  evidence, mischaracterizes prior testimony, and lacks | 5  range a couple of years ago. |
| 6  foundation. | 6      Q. Prior to its removal, was it sold by |
| 7      A. Personally, yes, I could see. | 7  Chapterhouse? |
| 8  BY MR. KEENER | 8      A. Yes. |
| 9      Q. Now, in this email in Exhibit 73, you used | 9      Q. Did he ever tell you why it was removed? |
| 10  the spiky power armor dragon pads as an example. You say | 10      A. No. |
| 11  "such as" those. What other shoulder pads did you create | 11      MR. OH: Ob -- |
| 12  that had a Games Workshop shoulder pad underneath it? | 12  BY MR. KEENER |
| 13      A. To my recollection, none. | 13      Q. Do you have any understanding of why it was |
| 14      Q. So although it says "such as", this is the | 14  removed? |
| 15  only one you think was ever made that way? | 15      A. Yes. |
| 16      MR. OH: Objection. Vague and ambiguous. | 16      Q. What's your understanding? |
| 17      A. I think I used it as a cautionary -- uh ... | 17      MR. OH: I'll object at this point. To the extent |
| 18  the word -- incentive for Mr. Villacci to actually change, | 18  that the witness can answer without revealing any privileged |
| 19  if he already hadn't -- change the pad for one without | 19  communication, he can do so, but to the extent that he |
| 20  a Games Workshop pad underneath. | 20  cannot, I'm instructing the witness not to answer the |
| 21  BY MR. KEENER | 21  question. |
| 22      Q. Okay. Other than a power armor dragon | 22      A. I cannot answer the question. |
| 23  shoulder pad, are you aware of any other Chapterhouse | 23  BY MR. KEENER |
| 24  product for which a Games Workshop piece is part of the | 24      Q. Because it contains privileged information? |
| 25  final sculpture? | 25      A. Yes. |
| Page 90 | Page 92 |

23 (Pages 89 to 92)

Tomas Fiertek          GamesWorkshop Ltd v Chatered House LLC          13 April 2012

| | |
|---|---|
| 1      Q.  Okay.  You can now, please, turn to | 1     BY MR. KEENER |
| 2   Plaintiff's Exhibit 74.  It's a document Bates labeled | 2      Q.  When you say "the copyright is not ours", |
| 3   TF1608 through 1610.  It's an email from you to Geoffrey | 3   what do you mean? |
| 4   Nagy, copied to Nick Villacci, dated June 19, 2009. | 4      MR. OH:  Objection, lacks foundation. |
| 5       (Plaintiff Exhibit 74 marked for identification) | 5      A.  I'll read through this so I can get more |
| 6      A.  Before this, is it okay I take a quick toilet | 6   understanding of context and maybe my memory gets back to me |
| 7   break? | 7   better. |
| 8      MR. KEENER:  Yeah, we can take a break. | 8      Sure. |
| 9      MR. OH:  Okay, can we go off the record. | 9   BY MR. KEENER |
| 10   (4:59 p.m.) | 10      Q.  My question is: when you say "the copyright |
| 11        (Break taken.) | 11   is not ours," what did you mean? |
| 12   (5:02 p.m.) | 12      A.  I think I meant the art in the books in |
| 13   BY MR. KEENER | 13   question is owned by somebody else than us, naturally, so we |
| 14      Q.  Mr. Fiertek, do you have Exhibit 74 in front | 14   can't -- |
| 15   of you? | 15      Q.  Okay. |
| 16      A.  Yes. | 16      A.  Oh. |
| 17      MR. OH:  And for the record -- | 17      Q.  And you're suggesting -- what product is it |
| 18      MR. KEENER:  I just want to ask -- | 18   referring to? |
| 19      MR. OH:  I was going to say, for the record, this | 19      MR. OH:  Objection.  Assuming facts not in |
| 20   is also designated as highly confidential. | 20   evidence.  Lacks foundation. |
| 21   BY MR. KEENER | 21      A.  I don't know.  I don't remember. |
| 22      Q.  I'm just going to focus your attention on the | 22   BY MR. KEENER |
| 23   very top email, which is from you.  Do you see that? | 23      Q.  Okay.  For whatever product it was, your |
| 24      A.  Yes. | 24   suggestion is to redo the artwork from the Games Workshop |
| 25      Q.  About the third paragraph down, you state: | 25   books somewhat? |
| Page 93 | Page 95 |

| | |
|---|---|
| 1      "About the HH art book and cover helmets I don't | 1      MR. OH:  Objection.  Lacks foundation, assumes |
| 2   know, the copyright is not ours it seems so we can't copy | 2   facts not in evidence, and calls for speculation. |
| 3   them but maybe redo them somewhat." | 3      A.  What I mean, I think, since I don't remember |
| 4   Do you see that? | 4   correctly, is -- well, obviously we -- what I meant was we |
| 5      A.  Yes. | 5   cannot just take something slavishly and copy.  That would |
| 6      Q.  What does "HH art book" refer to? | 6   not be okay, according to me.  But we could take something |
| 7      A.  Can I have some time to read the pages? | 7   and alter it significantly enough to be okay to do. |
| 8      Q.  Yeah, if you need to tell me what "HH art | 8   I think that's what I meant by that paragraph. |
| 9   book" means? | 9   BY MR. KEENER |
| 10      A.  Oh, that I don't need.  "HH" stands for Horus | 10      Q.  Okay.  So you were suggesting taking the |
| 11   Heresy art books. | 11   Games Workshop icon or picture from the book as the starting |
| 12      Q.  So the Horus Heresy art books, that's one of | 12   point and then altering it in some ways to make the product |
| 13   the books you mentioned before as Games Workshop books that | 13   you want to make? |
| 14   you own? | 14      MR. OH:  Objection.  Lacks foundation, assumes |
| 15      A.  Yes. | 15   facts not in evidence, calls for speculation, and misstates |
| 16      Q.  Do you know what "cover helmets" is referring | 16   prior evidence. |
| 17   to here? | 17      A.  I'm fairly certain this paragraph is not |
| 18      A.  Excuse me, what did you say? | 18   about an icon or even a book cover, but seems to have to do |
| 19      Q.  It says "the Horus Heresy art book and cover | 19   with a head or a helmet or its design. |
| 20   helmets."  What do you mean by "cover helmets"? | 20   BY MR. KEENER |
| 21      A.  I don't remember. | 21      Q.  Okay.  And your suggestion was to take the |
| 22      Q.  Would that refer to pictures on covers of | 22   design in the Horus Heresy art book as the starting point |
| 23   Games Workshop books? | 23   and then make changes to alter that slightly? |
| 24      MR. OH:  Objection, lacks foundation. | 24      MR. OH:  Objection.  Lacks foundation, assumes |
| 25      A.  I don't remember. | 25   facts not in evidence, and misstates |
| Page 94 | Page 96 |

24 (Pages 93 to 96)

Tomas Fiertek          GamesWorkshop Ltd v Chatered House LLC          13 April 2012

1   prior testimony.
2       A.   Well, again the word "slightly" is also
3   suffering from a definition lack, but I think what I meant
4   was: I loved the theme of something I've seen, let's make
5   something, but obviously we cannot do it the same because
6   that would be a bad thing to do, and -- hm, there seemed to
7   be a beginning of a discussion of altering or making
8   something that shares a common theme with something from the
9   HH art book.
10      Q.   You can put Exhibit 74 aside.  I'm going to
11  show you what's been marked Plaintiff Exhibit 75, a one-page
12  document labeled TF1611.
13          (Plaintiff Exhibit 75 marked for identification)
14      A.   Yes.
15      Q.   Is this your sketching?
16          MR. OH:  And just for the record, this is also
17  designated as highly confidential.
18      A.   Yes.  This is my sketching.
19  BY MR. KEENER
20      Q.   Okay.  The picture at the top left, what is
21  that a picture of?
22      A.   A back side of a shoulder pad.
23      Q.   A Chapterhouse shoulder pad or a Games
24  Workshop shoulder pad?
25      A.   That would be, as I recall from my head,

Page 97

1   BY MR. KEENER
2       Q.   Do you know if Chapterhouse's shoulder pads
3   contained these notches on the back of the shoulder pads?
4       A.   Yes.
5       Q.   So, despite your stating here not to make any
6   pads with these notches, Chapterhouse did anyway?
7           MR. OH:  Objection.  Assuming facts not in
8   evidence and mischaracterizing prior testimony.
9       A.   This, to my knowledge, is a later -- a later
10  discussion about making pads and I was involved in ideas,
11  design ideas, hence these drawings, and I think -- I'm not
12  certain, but I think somebody else also was involved in
13  design, and the idea of this all was to make a plain
14  shoulder pad with or without details or ornamentation on it,
15  that we could have as our own, cast up as our own, and use
16  to sculpt that, because until this moment -- or rather until
17  we made these, I used to sculpt shoulder pads from scratch,
18  which is very time-consuming, instead of relying on Games
19  Workshop pads, and again this is a necessity thing to save
20  bucket loads of time.  Doing in a geometric shape over and
21  over again and having it look identical in both shape,
22  statute and size, it's an inhuman task, so this is, as
23  I recall, a discussion of making our own template pad, and
24  I was suggesting not using the same type of rectangular
25  hollowed ornamentation as used on the Games Workshop pad.

Page 99

1   drawing the picture in the back side of a Games Workshop
2   shoulder pad.
3       Q.   And then I'm going to -- there's writing
4   directed to it with lines.  Do you see that?
5       A.   Yes.
6       Q.   I know it's faint to read; this is the best
7   copy we've been given.  I'm going to try and read what
8   I think it says and I want you to tell me if I'm wrong,
9   okay?
10      A.   Sure.
11      Q.   I think the first part says:
12  "Don't make any pads with these details."
13  Is that correct?
14      A.   Yes.
15      Q.   And the bottom part says:
16  "Just because we CAN do them doesn't mean we ought
17  to.  These we can always get from GW and they are not
18  original."
19  Does that appear correct?
20      A.   That appears correct.
21      Q.   When you said "don't make any pads with these
22  details", what details were you referring to?
23          MR. OH:  Objection.  Lack of foundation.
24      A.   I was referring to the rectangular-shaped
25  cavities along the rim.

Page 98

1   The reason for that is actually no reason at all besides my
2   own better-safe-than-sorry mentality.
3       Q.   Okay.
4       A.   Hence -- oh, sorry.
5       Q.   Oh, were you finished?
6       A.   Yeah.
7       Q.   Okay.  So before this idea to make
8   a template, the shoulder pads you had sculpted by hands, did
9   they include these rectangular notches ornamentation?
10          MR. OH:  Objection.  Lacks foundation and assumes
11  facts not in evidence.
12      A.   I don't remember.  I did a lot and a lot of
13  time passed since then, but I do remember doing detail on
14  the back side of them by hand.  I don't remember anything
15  more specifically than that.
16  BY MR. KEENER
17      Q.   Okay.  And the template, was it actually ever
18  made?
19      A.   Yes.
20      Q.   Did the template have notches ornamentation
21  on the back of it?
22      A.   I think so.  It was a while ago I actually
23  held one in my hand, but I am fairly certain that it does.
24  However, we made it in the significantly different size and
25  also shape, just to differentiate it even more from a Games

Page 100

Merrill Corporation                 www.merrillcorp.com/mls.com          8th Floor 165 Fleet Street
(+44) 207 404 1400                                                        London EC4A 2DY

1 Workshop plain shoulder pad, and again the reason for that,
2 as far as I know back then, was simply better safe than
3 sorry. Doesn't hurt to.
4     Q. So you're suggesting it doesn't have the
5 notches on the back at all? You lost that argument?
6     MR. OH: Objection. Mischaracterizes prior
7 testimony.
8     MS. STEVENSON: I think that's exactly saying what
9 he said.
10 BY MR. KEENER
11     Q. Let's rephrase that. Was this a discussion
12 between you and Mr. Villacci or somebody else involved on
13 this template design?
14     A. I do not remember to whom I posted this
15 particular picture but I do remember I did have a discussion
16 with Mr. Villacci regarding my better-safe-than-sorry
17 mentality.
18     Q. Who made the final decision about what it
19 should look like?
20     A. Mr. Villacci, and possibly a further fourth
21 party, but I do not know that. I'm not privy to all
22 Mr. Villacci's emails with all his friends and freelancers.
23     Q. Okay. You can put that exhibit aside.
24     A. Sure.
25     Q. Are you aware of a Space Marine chapter
Page 101

1 called the Iron Hands?
2     A. Yes.
3     Q. And according to the Games Workshop material
4 and literature, do they have any particular icon associated
5 with them?
6     A. I --
7     MR. OH: Objection, lacks foundation.
8     A. I don't remember. But I think -- this is not
9 anything to -- this is not my interest, nor touches my
10 hobby, but I've seen Games Workshop art and books that
11 relate to these names you said, and I think a symbol
12 associated with that would be a cog and a wrench together.
13 That is my recollection of it right now.
14     Q. And a cog as in a gear?
15     A. As I remember, an open gear cog bisected in
16 half and somewhere, maybe inside or by the side, is
17 a symbolic wrench icon.
18     Q. Let's go to Exhibit 76, Bates label TF3435 to
19 3436, an email from you to Mr. Villacci dated October 27,
20 2009.
21     (Plaintiff Exhibit 76 marked for identification)
22     Q. I'm just going to be asking you about the
23 very first three lines. Do you see those?
24     A. Yes.
25     Q. And do you understand the first two lines
Page 102

1 with a caret in front of them, that's Mr. Villacci's text,
2 and the line underneath with no caret, that's your text?
3     MR. OH: Objection. Lack of foundation.
4     A. Yes.
5 BY MR. KEENER
6     Q. Okay. So Mr. Villacci writes:
7 "I think the one with the complete cog was better
8 than the split cog."
9     Do you know what he's referring to?
10     MR. OH: Objection, lack of foundation.
11     A. Yes and no.
12 BY MR. KEENER
13     Q. What's your understanding of what he's
14 referring to?
15     A. The complete cog I do remember. The split
16 cog, no.
17     Q. Do you know if Chapterhouse ultimately went
18 with the complete cog?
19     A. I also don't know whether we discussed an
20 idea, a design concept or the actual finished cog shoulder
21 pad, of which we did, so --
22     Q. So does Chapterhouse have a cog shoulder pad
23 currently?
24     MR. OH: Objection. Vague and ambiguous.
25     A. To my knowledge, yes.
Page 103

1 BY MR. KEENER
2     Q. Would you characterize it as a complete cog?
3     A. Well, it's --
4     MR. OH: Objection, lacks foundation.
5     A. I think so, yes.
6 BY MR. KEENER
7     Q. Okay. It looks like your comment back to
8 Mr. Villacci is:
9 "Ok full cog it is but will they not look the same
10 as GW's IH icons that way?"
11 "GW" means Games Workshop; is that right?
12     A. Yes.
13     Q. And "IH" means Iron Hands?
14     A. Yes.
15     Q. So what did you mean by this statement?
16     MR. OH: Objection, lacks foundation.
17     A. This was an overly worried question on my
18 behalf, simply asking Mr. Villacci, "Hey, we just did a cog,
19 somebody else also made a cog, could that be okay?" And
20 this discussion, I think, bounced back and forth between me,
21 Mr. Villacci and legal counsel, so --
22     MR. OH: At this stage, to the extent that the
23 witness would be required to reveal any privileged
24 communication, I'm instructing the witness not to answer the
25 question.
Page 104

26 (Pages 101 to 104)

Tomas Fiertek       GamesWorkshop Ltd v Chatered House LLC       13 April 2012

**Page 105**

1      A. No, all I can remember, we were discussing
2  several, perhaps even drawn, but I don't remember, but
3  several concept ideas of making cog shapes or cog-ish icons.
4  BY MR. KEENER
5      Q. Okay. So the concern you're raising is:
6  "Games Workshop already uses a full cog in its
7  icon for Iron Hands. Are we okay using a full cog in our
8  shoulder pad icon for Iron Hands?"
9      Is that fairly what your concern was?
10  MR. OH: Objection. Misstating prior testimony,
11  and again, to the extent that he could comment on
12  discussions that did not involve legal counsel, the witness
13  can answer, but to the extent that he would receive advice
14  privileged communications I'm instructing him not to answer.
15      A. Well, no. We were just discussing a cog.
16  And I -- I don't remember if just a cog or half a cog or
17  a bisected cog or a cog with additional icons is the Games
18  Workshop thing that they do -- that they use, just that
19  I was overly cautious or worried: "Hey, we're making a cog;
20  I need feedback."
21  BY MR. KEENER
22      Q. And your overly cautiousness was because that
23  full cog would "look the same as Games Workshop's Iron Hands
24  icon"?
25      A. No.

**Page 106**

1      Q. Isn't that exactly what you write?
2      A. No.
3      Q. "A full cog [will look] the same as Games
4  Workshop's Iron Hands icons."
5      A. Well, that wasn't my concern, because how
6  many different ways can a cog look like? My concern was
7  based that -- that I'm just overly cautious by nature.
8      Q. What exactly were you cautious about?
9  MR. OH: Objection, argumentative.
10      A. Nothing in particular. That's just how I am:
11  better safe than sorry in most things I do.
12  BY MR. KEENER
13      Q. I understand, but what was the thing causing
14  you caution? It was because the full cog would look the
15  same as Games Workshop's Iron Hands icon?
16  MR. OH: Objection, asked and answered and
17  argumentative.
18      A. Well, no. My -- my concern or overly
19  cautiousness regarded, "Actually, hey, I'm making a cog,
20  somebody else made a cog, give me feedback to reassure me
21  that" -- I mean, this is all what it's about.
22  BY MR. KEENER
23      Q. Okay. That "somebody else" was Games
24  Workshop?
25  MR. OH: Objection. Vague and ambiguous.

**Page 107**

1      A. I did not hear that question. Could you
2  please repeat it?
3  BY MR. KEENER
4      Q. Yes. That "somebody else" in the answer --
5  you said "somebody else made a cog", that "somebody else"
6  was Games Workshop?
7      A. Yes.
8      Q. And the cog that Games Workshop used was in
9  their Iron Hands icon?
10      A. Yes. It's part of or the whole icon. I do
11  not remember what it looks like.
12      Q. Okay. Can you turn to Exhibit 77. It's
13  labeled TF958 through 961. An email from Mr. Villacci to
14  you dated November 26, 2009.
15  (Plaintiff Exhibit 77 marked for identification)
16      Q. I'm really only concerned with the very last
17  email that's on page 960 from you. It starts --
18  MR. OH: For the record, this document is also
19  designated highly confidential. In respect to the question,
20  it lacks foundation.
21      A. Yeah, I see it.
22      Q. My question, the first sentence you write:
23  "Hey dude, was thinking about the FT pads being
24  illegal since they do 2D to 3D."
25      Do you see that sentence?

**Page 108**

1      A. Yes.
2      Q. "FT pads", what does that mean?
3  MR. OH: Objection, lacks foundation.
4      A. Give me a minute to browse through the other
5  pages.
6  BY MR. KEENER
7      Q. If you need to, to determine what FT pads is.
8      A. I think I know. I'm not certain.
9      Q. Okay.
10      A. I think it stands for a term called Flesh
11  Tearers.
12      Q. What are Flesh Tearers?
13      A. That is a chapter created by Games Workshop.
14      Q. A chapter for Space Marines again?
15      A. Yes, a name and -- yeah, a name given
16  a chapter by Games Workshop.
17      Q. What were you trying to express with this
18  sentence as being illegal for 2D to 3D?
19      A. Give me a second.
20      Okay, what is the question?
21      Q. What did you think was illegal about going 2D
22  to 3D?
23  MR. OH: Objection, lacks foundation.
24      A. Nothing. Again this was a discussion,
25  a design discussion, and as always, me being overly

27 (Pages 105 to 108)

Tomas Fiertek GamesWorkshop Ltd v Chatered House LLC 13 April 2012

**Page 109**

1  cautious, asking for feedback and reminding Mr. Villacci
2  about evidence stuff that he apparently already knows about,
3  but I was basically making inquiries about if we make
4  a round shape -- which this is about, a round shape -- is
5  there any illegality, illegal differences making the round
6  shape etched into a surface or raising it slightly as a thin
7  pancake? Because this 2D versus 3D.
8  BY MR. KEENER
9      Q. So "2D" means two-dimensional?
10     A. Yeah, like you draw a pencil on a paper,
11  that's 2D, and actually having the pen -- the script raised
12  or sunk into the paper makes it 3D. Adds another dimension.
13     Q. Okay. So like a picture in a book is 2D?
14     A. Yeah. And you can make an etch --
15     Q. So a picture of an icon would be 2D, right?
16     A. Yes.
17     Q. And an actual sculpted three-dimensional of
18  that same icon would be 3D?
19     A. Technically yes, but I mean you can sculpt so
20  very thin that it it's basically flat and 2D anyway, so --
21     Q. Let's move on to Exhibit 78, which is TF1035
22  through 1037. It's an email from you to Mr. Villacci
23  dated January 30, 2010.
24     (Plaintiff Exhibit 78 marked for identification)
25     Q. And my only concern is on the very top email,

**Page 110**

1  which is Nick's communication appearing between you and
2  Mr. Villacci.
3      MR. OH: And again for the record, this document
4  has been designated as highly confidential.
5      A. So what is the question regarding this
6  document?
7      Q. So in that top email on the first half of the
8  first page, do you understand the text with carets in front
9  of it is Mr. Villacci speaking and the text without any
10  carets is you speaking?
11     MR. OH: Objection, lacks foundation.
12     A. Oh, this is weird, it doesn't make sense
13  regarding what you say I -- some parts I have troubles
14  recognizing what I wrote and what Mr. Villacci wrote. Those
15  little arrows might have come off somewhere or -- but what
16  would the question be with this?
17  BY MR. KEENER
18     Q. Sure, let's talk specifically on five
19  paragraphs down, it starts:
20     "1 PH segment pad with studs (looks good like a
21  proper old pad should and not the 3 segmented thing we sell
22  now) ..."
23     Do you see that?
24     A. Yes.
25     Q. Is that your words?

**Page 111**

1      MR. OH: Objection, lack of foundation.
2      A. I don't know. I'm not certain.
3  BY MR. KEENER
4      Q. Okay. Do you know what's meant by "1 PH
5  segment pad"?
6      MR. OH: Objection, lack of foundation.
7      A. Give me a sec.
8      Am I allowed to make notes here like a line that
9  I know I wrote and a line I'm not certain and a line where
10  I know Mr. Villacci wrote or is it --
11     MR. OH: I'm instructing the witness not to do
12  that.
13     MR. KEENER: Go ahead.
14     A. Okay, I'll follow my legal advice.
15     Q. Which one do you know you wrote? That
16  paragraph starting "1 PH" and the second paragraph that
17  starts "didn't mean to"?
18     A. I know what the abbreviation stands for, I'm
19  just uncertain of the context, so if you just give me
20  a minute to just browse through it, I might remember more.
21     Okay, the question again?
22     Q. What does "1 PH segment pad with studs" refer
23  to?
24     MR. OH: Objection, lacks foundation.
25     A. Refers to a shoulder pad.

**Page 112**

1  BY MR. KEENER
2      Q. What does "PH" stand for?
3      MR. OH: Objection, lacks foundation.
4      A. I think it stands for pre-Heresy.
5  BY MR. KEENER
6      Q. What is pre-Heresy?
7      A. Meanings its visual theme is made to look
8  more old and primitive rather than the today -- rather than
9  what Games Workshop sells.
10     Q. Is there something in the Games Workshop
11  universe called the Heresy?
12     A. Yes.
13     Q. And is there Games Workshop materials that
14  describe the theme and look of things pre-Heresy?
15     MR. OH: Objection. Lack of foundation.
16     A. Yes, I would say yes.
17  BY MR. KEENER
18     Q. Okay, is this a shoulder pad that's supposed
19  to fit with that theme and style in Games Workshop's
20  pre-Heresy materials?
21     MR. OH: Objection. Lacks foundation and assuming
22  facts not in evidence.
23     A. I think so, yes. It's meant to be fitting in
24  that theme rather than newer other themes, yes.
25  BY MR. KEENER

28 (Pages 109 to 112)

Merrill Corporation                    www.merrillcorp.com/mls.com          8th Floor 165 Fleet Street
(+44) 207 404 1400                                                          London EC4A 2DY

Tomas Fiertek · · · · · · · · · · GamesWorkshop Ltd v Chatered House LLC · · · · · · · · · · 13 April 2012

**Page 113**

1 · · Q. · Okay do you know if this was ever
2 a Chapterhouse product, a pre-Heresy segment pad with studs?
3 · · MR. OH: · Objection. · Assuming facts not in
4 evidence and mischaracterizing the document.
5 · · A. · The item discussed here I actually don't know
6 if it's a finished product or a design concept or a work in
7 progress, but -- the question again, sorry?
8 BY MR. KEENER
9 · · Q. · I think you answered me. · Was there actually
10 a Chapterhouse product that was sold?
11 · · A. · I don't know if this was the --
12 · · Q. · The paragraph underneath that starts "didn't
13 mean to", is that your words?
14 · · A. · I do not remember. · I don't know.
15 · · Q. · "... good news is if the pad sells well this
16 will sell better since it's a 'copy' of the HH art PH pad
17 which the current one isn't."
18 · · Do you see that?
19 · · A. · Yeah.
20 · · MR. OH: · Objection, lacks foundation.
21 · · A. · Those are my words, yes.
22 BY MR. KEENER
23 · · Q. · Okay.
24 · · A. · I recall them.
25 · · Q. · "HH art", is that the Horus Heresy art book

**Page 114**

1 we talked about earlier?
2 · · A. · Yes.
3 · · Q. · And the "PH pad", that's pre-Heresy?
4 · · A. · The meaning of this email is -- it's internal
5 humor for me. · Mr. Villacci made himself, I think, or had
6 someone make a shoulder pad based on -- I would say that was
7 to a degree based on the Heresy theme, and it was put up for
8 sale, and I thought it looked hideous, and I wanted to
9 already made by then I don't know, but I wanted to and
10 eventually make a better version of it, because
11 Mr. Villacci's not a sculptor. · So by "'copy' of the HH
12 art", by that I mean it's more similar, it looks sharper, it
13 looks actually like something made by a sculptor than the
14 current one, and it was meant as a friendly insult on my
15 part towards Mr. Villacci.
16 · · Q. · So the joke or humor you were trying to
17 convey is where Mr. Villacci tried and failed at copying the
18 HH art, you succeeded in doing a much better job of copying
19 the Horus Heresy art?
20 · · MR. OH: · Objection, mischaracterizes the
21 testimony.
22 · · A. · Again, "copy", I mean -- no.
23 BY MR. KEENER
24 · · Q. · That's the word you used, right?
25 · · A. · Neither the pad made by me nor Mr. Villacci

**Page 115**

1 is a copy of the Horus Heresy or any other art that I am
2 aware of. · It has --
3 · · Q. · Are you aware -- I'm sorry, are you finished?
4 · · A. · Yes, I'm finished. · Sorry, sir.
5 · · Q. · Are you aware of any Horus Heresy art that
6 has a segmented pad with studs?
7 · · A. · Segmented pad, yes. · Segmented with studs,
8 I don't remember.
9 · · Q. · Okay. · You can put that to the side. · Let's
10 skip to Plaintiff's Exhibit 80. · It's labeled TF5711 through
11 5714. · It's an email from you to Chapterhouse Studios sales
12 dated February 13, 2010.
13 · · (Plaintiff Exhibit 80 marked for identification)
14 · · Q. · My first question is: the email address,
15 "Chapterhouse Studios - Sales", is that Mr. Villacci?
16 · · MR. OH: · Objection, lacks foundation.
17 · · A. · I don't know. · A definition, is it his
18 personal email, his business email, his second email? · I do
19 not know. · I know that he answers or rather answered --
20 BY MR. KEENER
21 · · Q. · Okay, so when you send and receive emails
22 from "Chapterhouse Studios - Sales", you understand that to
23 be sent to and from Mr. Villacci?
24 · · A. · Yes.
25 · · Q. · Personally or business, it's from him?

**Page 116**

1 · · A. · Well, the thing is that when I write to
2 Mr. Villacci, I don't care what email I choose. · I take the
3 first available that I know he sent and I click the reply
4 button, so sometimes I end up at "sales" and sometimes at
5 another email.
6 · · Q. · Right. · "Sales" is one of his emails, right?
7 · · A. · As far as I hope, yes.
8 · · Q. · Okay. · I want to look at the second email on
9 here that's from you to "Chapterhouse Studios - Sales" that
10 starts:
11 · · "Ah, just exorcist pads then."
12 · · A. · Second page, second paragraph?
13 · · Q. · Same page, it starts right in the middle:
14 · · "Ah, just exorcist pads then."
15 · · A. · Oh sorry. · Sorry, I see.
16 · · Q. · Do you see that paragraph?
17 · · A. · Yes.
18 · · Q. · It's only one paragraph long.
19 · · MR. OH: · Before you move on I'll raise an
20 objection that there's been lack of foundation regarding
21 this exhibit.
22 · · MR. KEENER: · All right.
23 · · Q. · You state:
24 · · "Ask about the PH touch on the pads if he ok with
25 it, reason I suggested it is for legal purposes, dunno how

29 (Pages 113 to 116)

**Page 117**

1   else to different the pad from GW's art. If you or he want
2   me to do a plain ex pad then let me know exactly what
3   alteration I'm to make in order to make them legal."
4   Do you see that?
5   A. Yes.
6   MR. OH: Objection. Again, lack of foundation.
7   BY MR. KEENER
8   Q. What product are you referring to in this
9   email?
10   MR. OH: Objection, lack of foundation.
11   A. By reading just this, I have no clue. You
12   will have to give me a minute to sort through this and I'll
13   probably know more.
14   Q. You don't know what an Exorcist pad is?
15   MR. OH: Objection. Argumentative. The witness
16   has said he needed time to review this.
17   A. Yup, I am done.
18   Q. Okay, what part are you referring to in this
19   email?
20   A. Excuse me?
21   Q. What product are you referring to in this
22   email?
23   A. Oh.
24   MR. OH: Objection. Vague and ambiguous and also
25   lacks foundation.

**Page 118**

1   A. Well, a shoulder pad that we called an
2   Exorcist.
3   BY MR. KEENER
4   Q. For what? What's an Exorcist?
5   A. I'm not sure if I remember correctly, but
6   I think it's a word that Games Workshop used to describe one
7   of the chapters in the universe.
8   Q. And does Games Workshop have an icon or
9   a symbol associated with that?
10   MR. OH: Objection. Vague and ambiguous.
11   A. I don't remember. I -- I think so. I don't
12   remember, though, what it looks like, but --
13   BY MR. KEENER
14   Q. Okay. Can you tell me what you were trying
15   to express in this email that you're describing, that one
16   paragraph?
17   MR. OH: Again, lacks foundation. And to the
18   extent that the witness even recalls the email, I instruct
19   him not to answer if it requires disclosure of privileged
20   communications.
21   A. I can answer to a certain degree yes -- oh,
22   the question again?
23   BY MR. KEENER
24   Q. What were you trying to express with this
25   email?

**Page 119**

1   MR. OH: Same objections.
2   A. Okay. My usual cautiousness and concern
3   directed towards Mr. Villacci.
4   He or someone else, I don't remember, who, wanted
5   me to sculpt a special shoulder pad that would fit with
6   a certain theme, and the theme was a human skull with horns
7   pointing downwards, as in like goat horns. And I was
8   concerned again, as in the cog example: hey, if I sculpt
9   a skull with horns and somebody else has or uses or pictures
10   a skull with horns, which is very common, is it okay? And
11   what alterations, if necessary, need I make? Do I need to
12   add something or retract something?
13   And this was, I think, bounced back and forth
14   with legal counsel, so the result of it I could not reveal,
15   but it's -- the discussion here is just me being better safe
16   than sorry-ish as usual.
17   Q. Okay.
18   A. And --
19   Q. Are you --
20   A. Yeah, I'm done.
21   Q. You say it's not uncommon to have a skull
22   with downward-facing horns. Where else besides Games
23   Workshop materials have you seen that symbol?
24   A. Pagan -- you don't call it mythology, but
25   pagan symbolism -- symbolism. I've seen -- I mean --

**Page 120**

1   Q. And Games Workshop has that symbol for the
2   Exorcist chapter?
3   MR. OH: Objection. Vague and ambiguous.
4   A. This is what I right now do not remember,
5   unless somebody cares to show me said symbol. But since
6   I was cautious about a skull with horns, and maybe
7   additional things, logic dictates that it has to do
8   something with a skull, at least a skull.
9   BY MR. KEENER
10   Q. Okay. Let's go to Exhibit 81, which is
11   TF1103 through 1104, an email from sales@chapterhousestudios
12   to you dated March 23, 2010.
13   (Plaintiff Exhibit 81 marked for identification)
14   MR. OH: Counsel, we're getting close to 6 o'clock
15   local time. Do you mind if we take like a bathroom break at
16   the top of the hour?
17   MR. KEENER: Yeah, we'll finish this document and
18   we can do that.
19   MR. OH: Okay, thank you.
20   A. So what would the question be?
21   BY MR. KEENER
22   Q. Have you had a chance to read this document?
23   MR. OH: Yeah, and just for the record again this
24   one is also designated as highly confidential. And what is
25   the exhibit number we're at now?

30 (Pages 117 to 120)

| | |
|---|---|
| 1   MS. STEVENSON: 81. | 1   could be specific about that? |
| 2   MR. KEENER: This is 81. | 2   Q. Okay. A little later down you say, about the |
| 3   MR. OH: Okay, thank you. | 3   third-to-last paragraph of your email: |
| 4   **A. Okay. So what is the question?** | 4   "As for fists etc tell him those are illegal to |
| 5   BY MR. KEENER | 5   make so no competition will get word of the possibilities. |
| 6   Q. All right, let's start with your email, which | 6   Those will be the later super release we do." |
| 7   is the second email in this chain, do you see that, from you | 7   Do you see that? |
| 8   to Chapterhouse? | 8   **A. Is this on the first page?** |
| 9   MR. OH: Objection. Lacks foundation. | 9   Q. Yes. |
| 10   **A. Yes.** | 10   **A. Oh, thank you.** |
| 11   Q. Okay. So the third line down says -- second | 11   Q. In the middle. |
| 12   line says: | 12   **A. Yeah, I see.** |
| 13   "But I need: IP legal concepts, can't take raven = | 13   Q. What were you trying to say here? |
| 14   drop + wings as per GW's BR symbol." | 14   MR. OH: Again, the same general instructions to |
| 15   Do you see that? | 15   the witness regarding privileged communications. |
| 16   **A. Yes.** | 16   **A. I know that "him" refers to a potential** |
| 17   Q. What does "GW's BR symbol" mean? | 17   **customer who wanted us to sculpt things for him and that** |
| 18   **A. Games Workshop's Blood Raven symbol.** | 18   **raven --** |
| 19   Q. Is that again a chapter of Space Marines? | 19   BY MR. KEENER |
| 20   **A. Yes.** | 20   Q. All right. |
| 21   Q. And is Games Workshop's Blood Raven symbol | 21   **A. I don't know --** |
| 22   a raven and a drop with wings? | 22   Q. If you look at the next page, he asks: |
| 23   **A. Yes.** | 23   "Could you do power fist and lightning claws as |
| 24   Q. And you're saying -- what did you mean when | 24   well?" |
| 25   you said "can't take raven = drop + wings"? | 25   Is that what you meant by "as for fists etc"? |
| Page 121 | Page 123 |

| | |
|---|---|
| 1   **A. I meant I can't copy Games Workshop's symbol** | 1   **A. I think so.** |
| 2   **as it looks, that's not okay, according to me, hence again** | 2   Q. So you are saying: |
| 3   **I'm asking and being cautious and being overly worried. And** | 3   "As for the power fists and lightning claws, tell |
| 4   **the words I use here -- I mean, I'm not a lawyer, so when** | 4   him those were illegal to make so no competition will get |
| 5   **I say "IP legal concepts", that's my way of expressing,** | 5   word of the possibilities." |
| 6   **"Hey, dude, I'm worried. Is this okay?"** | 6   What were you suggesting? |
| 7   MR. OH: And again, regarding potentially -- | 7   MR. OH: Can the court reporter reread that |
| 8   strike that. I'm instructing the witness, to the extent | 8   question? |
| 9   that to answer questions related to the exhibit in a way | 9   (Record read.) |
| 10   that would disclose legal advice, privileged information, | 10   MR. OH: Objection. Mischaracterizing the |
| 11   I'm instructing the witness not to answer, but to the extent | 11   document and mischaracterizing past testimony and assumes |
| 12   he can answer without revealing the privileged | 12   facts not in evidence. |
| 13   communication, then he can go ahead and do so. | 13   **A. Okay, as I remember, this customer wanted us,** |
| 14   BY MR. KEENER | 14   **me, to sculpt a replica of a symbol used by Games Workshop.** |
| 15   Q. You mentioned a couple times being cautious | 15   **I said -- well, hence my concerns and since I don't remember** |
| 16   and wanting to be better safe than sorry. What were you | 16   **correctly, I'm making an assumption here, I think he also** |
| 17   worried about? | 17   **wanted me or us, Chapterhouse, to make other items alongside** |
| 18   **A. Nothing specific. As I said, better safe** | 18   **bodies, such as those fists and stuff, and to make them** |
| 19   **than sorry. I mean ...** | 19   **basically identical copies of what Games Workshop sold. I'm** |
| 20   Q. You didn't have any specific concerns? | 20   **having objection to this, or concerns.** |
| 21   **A. No. No specific concerns. Or in this** | 21   **As I recall, the whole conversation was along** |
| 22   **example, the specific concern would be: if I make a raven** | 22   **these lines, and I also ended up asking Mr. Villacci and** |
| 23   **that looks like a Games Workshop raven and put a drop inside** | 23   **bouncing back and forth with the legal counsel, so the** |
| 24   **it that looks like Games Workshop's symbol, is that okay?** | 24   **result of what happened I would not want to disclose.** |
| 25   **I mean, that's just common sense concern. I mean, what** | 25   BY MR. KEENER |
| Page 122 | Page 124 |

31 (Pages 121 to 124)

Tomas Fiertek                    GamesWorkshop Ltd v Chatered House LLC                    13 April 2012

Page 125

1     Q. What did you mean when you said "Those will
2  be the later super release we do"?
3     A. It's a talk about potential possibilities for
4  the future. If we do A and B, then we might as well do C
5  and D and release later.
6     Q. And those would be the power fists and
7  lightning claws that this person asked to you sculpt?
8     A. I don't know.
9     Q. Okay?
10    MR. OH: So, time for a bathroom break?
11    MR. KEENER: Yeah, let's do a bathroom break.
12 (6:01 p.m.)
13       (Break taken.)
14 (6:09 p.m.)
15 BY MR. KEENER
16    Q. Let's hand you what's been marked Exhibit 84.
17 It's labeled TF5491 through 5492. It's an email from you to
18 Mr. Villacci dated December 31, 2009.
19    (Plaintiff Exhibit 84 marked for identification)
20    Q. I'm going to ask you about your very first
21 email on the first page here.
22    MR. OH: For the record, this document is also
23 marked as highly confidential. Oh, and what is the exhibit
24 number now?
25    MS. STEVENSON: 84.

Page 126

1     MR. KEENER: 84.
2     MR. OH: Thank you.
3  BY MR. KEENER
4     Q. Okay, Mr. Fiertek, do you see about the sixth
5  paragraph down that starts "As for the SM heads"?
6     A. Yes.
7     Q. What does "SM" stand for?
8     A. Space Marine.
9     Q. Okay. So what product was this referring to?
10    MR. OH: Objection. Assuming facts not in
11 evidence. Lacks foundation.
12    A. Give me a sec.
13    Okay.
14 BY MR. KEENER
15    Q. Okay?
16    A. Yes.
17    Q. What product, if any, were you referring to
18 in that paragraph that starts "As for the SM heads"?
19    A. What part of what was I referring to?
20    Q. What "product".
21    A. Oh, heads. Heads for the Space Marine
22 miniature, heads with metal armor on them.
23    Q. Did you sculpt those heads?
24    A. I sculpted some heads, yes.
25    Q. And are they a product that Chapterhouse

Page 127

1  sells?
2     A. Yes.
3     Q. And you say:
4     "Well, I guess we can't call them death guard
5  heads."
6     What's a Death Guard?
7     MR. OH: Objection. Mischaracterizes the
8  document.
9     A. This would refer to a — oh, a name that
10 Games Workshop uses to describe one of the armies in the
11 universe of 40K.
12    MR. OH: And I'll retract that last objection.
13 BY MR. KEENER
14    Q. And why can't you call them Death Guard
15 heads?
16    MR. OH: To the extent he can answer the question
17 without him revealing privileged communication, I instruct
18 the witness to answer, but to the extent he cannot, then
19 I instruct him not to answer the question.
20    A. As I wrote here, I then — I didn't know
21 whether we can or can't call them Death Guard heads, hence
22 the question in the email.
23 BY MR. KEENER
24    Q. Did they look like pictures of Death Guard
25 heads from Games Workshop materials?

Page 128

1     A. No.
2     MR. OH: Objection.
3     MR. KEENER: Okay.
4     Q. It says:
5     "But I made —"
6     Is that supposed to be "made"? Is that a typo?
7     A. Yeah. Yes, yes.
8     Q. Okay, so it goes:
9     "But I made them into perfect pre-Heresy DG
10 helmets, so what do we call them then?"
11    "DG", is that Death Guard again?
12    A. Yes.
13    Q. What did you mean when you said you made them
14 into perfect pre-Heresy Death Guard helmets?
15    A. I meant that we caught the theme spot on.
16    Q. So that anyone looking at it would know that
17 that was a Death Guard?
18    A. No. No.
19    Q. Would someone familiar with Games Workshop's
20 depiction of Death Guards be able to determine that yours
21 was a Death Guard by looking at it?
22    MR. OH: Objection, hypothetical, calls for
23 speculation and lacks foundation —
24    A. This is —
25    MR. OH: — and calls for opinion.

32 (Pages 125 to 128)

1  A.  This is a subjective opinion, and mine is
2  actually no.
3  BY MR. KEENER
4     Q.  Why not?
5     A.  Because they were meant to fit into the theme
6  as a visually enriching replacement, add-on.  They're not
7  meant, nor are they made, to have somebody take a look and
8  say, "Oh, that is a Games Workshop Death Guard head."  No,
9  they were meant as, "Hey, this looks nice, I could use them
10  with my Death Guards."
11    Q.  Okay.  So was it your intention that someone
12  familiar with Games Workshop Death Guards theme would
13  recognize that you heads fit within that theme?
14    MR. OH:  Objection.  Lack of foundation.  Calls
15  for speculation.  Hypothetical.
16    A.  No.  Actually not.
17  BY MR. KEENER
18    Q.  Okay.  The last paragraph you mentioned an
19  Ultramarine helmet.  What's an Ultramarine?
20    A.  Oh, that is also a term, name, that Games
21  Workshop use to describe one of its chapters in the universe
22  of 40K.
23    Q.  All right.  And you're telling Mr.Villacci
24  that he will "NEED" to compare these against the "HH" -- is
25  that Horus Heresy art books?

Page 129

1  so, but to the extent he cannot, I'm instructing him not to
2  answer such questions.
3  BY MR. KEENER
4     Q.  What was the "thin legal line" you were
5  referring to?
6     MR. OH:  Again, same instructions.
7     A.  My urgent, well, need to know, to get the
8  answers.  It was an emphasis on getting the answers
9  regarding my cautiousness answered as fast as possible.
10  BY MR. KEENER
11    Q.  You think it was a close question, a thin
12  line?
13    MR. OH:  Can the court reporter re-read that
14  question.
15    (Record read.)
16    A.  Define "close question".  What is the meaning
17  of close question?
18  BY MR. KEENER
19    Q.  I'm trying to know what you meant by thin
20  line?  Did you mean it was a close question whether or not
21  it was okay to do?
22    MR. OH:  Objection.  Compound and we've covered
23  that already, it's asked and answered.
24    A.  This also had to do with -- I mean, the HH
25  art books is just one of many sources I look at for

Page 131

1     MR. OH:  Can the court reporter reread that
2  question?
3     (Record read.)
4     MR. OH:  Can I ask counsel to restate the
5  question?  I missed it.
6     MR. KEENER:  Sure.
7     Q.  In that last paragraph, is "HH art books" the
8  Horus Heresy art books?
9     A.  Yes.
10    Q.  And why are you telling Mr. Villacci to
11  compare the pre-Heresy Ultramarine helmet to the Horus
12  Heresy art books?
13    A.  Two parts.  One being, again, overly
14  cautious.  Second, by asking as early as possible if
15  something is wrong, I will save a lot of time, hence "NEED",
16  like do it now while I am still working before investing 30
17  hours into an item and then -- and again, this discussion
18  was, as far as I remember, also bouncing back and forth
19  between me, Mr. Villacci and our legal counsel, so
20  I basically needed to know -- to have my concerns either
21  validated or not validated regarding to if the work I was
22  doing by then was okay and I could continue.
23    MR. OH:  And again I'm going to instruct the
24  witness regarding this exhibit to the extent he can answer
25  questions without revealing privileged communications to do

Page 130

1  inspiration and guidance, and I had other sources, and
2  I really needed the feedback from Mr. Villacci and his --
3  the legal counsel.
4  BY MR. KEENER
5     Q.  That was my question.  What did you mean by
6  "thin line"?  Did you think it was a close question or did
7  you mean something else?
8     MR. OH:  Again objection.  Mischaracterizing the
9  document.
10    A.  As I remember, which is not correct, I think
11  "thin line" meant emphasis on urgentness and the referring
12  to an outside Games Workshop idea, source, inspiration,
13  source that I also needed to have clarification on.
14  BY MR. KEENER
15    Q.  Okay.  Let's go to Exhibit 87.  Bates labeled
16  TF3713 through 3715.  It's an email from you to Mr. Villacci
17  dated February 19, 2010.
18    (Plaintiff Exhibit 87 marked for identification)
19    MR. OH:  Just for the record so it's clear, this
20  document here is marked highly confidential and there's
21  several instances where there have been exhibits that have
22  been skipped.  This one -- we're going from 84 to 87, so
23  I just want the record to be reflecting that not all the
24  exhibits according by numbers have been part of this
25  testimony.

Page 132

1    MR. KEENER:  And I'm just going to ask you about
2    the first paragraph, "My idea is".
3       A.  Yeah.
4       Q.  What's a Carnifex?
5       MR. OH:  Objection.  Lack of foundation.
6       A.  Carnifex is, to my knowledge, a lot of
7    things.  Please be more specific.
8    BY MR. KEENER:
9       Q.  In the Warhammer 40K universe, does Carnifex
10   a particular meaning?
11      A.  Within the 40K context, yes.
12      Q.  What is that meaning?
13      A.  It's a word used by Games Workshop to -- not
14   invented, used to describe or name a monster creature in
15   their background, in their universe.
16      Q.  And what is a Tervigon?
17      A.  The same.  It's a Games Workshop name for
18   a creature in the universe of 40K.
19      Q.  And does Chapterhouse release a Tervigon
20   conversion kit for a Carnifex Games Workshop model?
21      A.  Yes.
22      Q.  And is this your idea on how to create that
23   conversion kit?
24      MR. OH:  Objection, lack of foundation.
25      A.  I do not understand the question.
Page 133

1    have a picture of a Tervigon?
2       A.  Yes.
3       Q.  And when you say "to do the codex art", is
4    that the picture you were referring to?
5       A.  Yes.
6       Q.  Okay. Let's go to Exhibit 89, which is not
7    labeled with a Bates No., it was produced natively.  The
8    Bates No. is CHS17302.
9       (Plaintiff Exhibit 89 marked for identification)
10      MR. OH:  What exhibit is --
11      MS. STEVENSON:  89.
12      MR. KEENER:  This is going to be Exhibit 89.
13      Q.  Is this a log of instant messages between you
14   and Mr. Villacci?
15      A.  Yes.
16      MR. OH:  Just -- again, just for the record, this
17   document may have been produced natively.  To the extent it
18   was, the native file may have been accompanied by
19   a confidentiality designation, which is or is not reflected
20   in this exhibit itself.  To the extent -- until Games
21   Workshop are able to determine whether it was, I'm asking
22   that Exhibit 89 be designated as highly confidential.
23   BY MR. KEENER
24      Q.  And where it says "Pyriel" in the top, is
25   that a text message that you wrote?
Page 135

1    BY MR. KEENER:
2       Q.  You say:
3       "My idea is ..."
4       And it continues.  Is this your idea on how to
5    create the Chapterhouse Tervigon kit that can convert
6    Carnifex into a Tervigon?
7       MR. OH:  Again, objection.  Lacks foundation.
8       A.  I just have to read this through.
9       This is a discussion about concept ideas,
10   I believe, and here I am giving part of my ideas and
11   feedbacks to Mr. Villacci in regard to saving time while
12   still maintaining a nice look that looks original.  And --
13      Q.  For what product?
14      A.  For a conversion kit, an add-on kit onto
15   a Games Workshop Carnifex model.
16      Q.  Is that the Tervigon kit we were just
17   discussing?
18      A.  Yes.
19      Q.  Okay.  Is it correct that your idea was to
20   "basically do the codex art"?
21      MR. OH:  Objection, lack of foundation.
22      A.  Hm.  Well, not as the question is phrased,
23   no.
24   BY MR. KEENER
25      Q.  Does the Codex -- does the Tyrianid Codex
Page 134

1       A.  Yes.
2       Q.  Where it says "Nick *hsus", is that a message
3    that Mr. Villacci wrote?
4       A.  Yes.
5       Q.  If you turn to the second page at around
6    12.42.38 seconds p.m., you write:
7       "Insurance paid btw?"
8       Does "btw" stand for "by the way"?
9       A.  Yes.
10      MR. OH:  Objection, lack of foundation.
11   BY MR. KEENER
12      Q.  What were you asking, "Insurance paid by the
13   way"?
14      A.  I don't know.  Don't remember.
15      Q.  Three seconds later, the next line you write:
16   "In case GW sues."
17      Is that Games Workshop?
18      A.  Yes.
19      Q.  Was there a consideration to buy insurance in
20   case Games Workshop sues?
21      MR. OH:  Objection, lack of foundation.
22      A.  I don't know, don't remember.  All I know is
23   it was me being better safe than sorry-ish but the insurance
24   rings no bell.
25      Q.  Do you know if Chapterhouse had insurance in
Page 136

34 (Pages 133 to 136)

**Page 137 (left column)**

1   case Games Workshop sues?
2     **A. No, I don't know.**
3     Q. Do you know if they applied for it?
4     **A. Don't know.**
5     Q. Do you know if it was rejected?
6     MR. OH: Objection, lack of foundation.
7     **A. Since I don't know if Games Workshop replied,**
8   **I'm not aware of the result.**
9   BY MR. KEENER
10    Q. Okay. Let's go to Exhibit 90.
11    MR. OH: Actually, before we move on, just for
12   clarification, the exhibit here has highlighted portions in
13   it. Can you clarify for the record that -- whether those
14   were highlighting inserted by Games Workshop and not --
15    MR. KEENER: Yes, that was not originally there.
16    MR. OH: Thanks for that clarification.
17   BY MR. KEENER
18    Q. Exhibit 90 is labeled TF24201 through 2423.
19   It's an email from Mr. Fiertek to Mr. Villacci dated January
20   11, 2010.
21    (Plaintiff Exhibit 90 marked for identification)
22    Q. And the only question I have for you on this
23   one is about the middle of the page where it starts:
24   "Business Legal insurance."
25    Do you see that paragraph?
               Page 137

**Page 139 (right column)**

1     MR. OH: Objection. Lack of foundation with
2   respect to the exhibit. And what exhibit number are we on
3   again?
4     MS. STEVENSON: 91.
5     **A. Jumppacks as in singular or plural?**
6   BY MR. KEENER
7     Q. Let's start with single. Did you sculpt
8   a jumppack for Chapterhouse?
9     **A. Yes.**
10    Q. And for that jumppack, did you refer to the
11   pictures of jumppacks in the Horus Heresy art books?
12    MR. OH: Objection. Vague and ambiguous.
13    **A. Define "refer to".**
14   BY MR. KEENER
15    Q. Did you use them in developing the concept of
16   what you were going to sculpt?
17    **A. I used them as part of the inspiration for**
18   **the sculpt.**
19    Q. Would you refer to the jumppacks in the Horus
20   Heresy art book as "bulky barrel jumppacks"?
21    MR. OH: Objection. Vague and ambiguous.
22    A. As what again?
23   BY MR. KEENER
24    Q. "Bulky barrel jumppacks".
25    MR. OH: Can you just repeat the entire question?
               Page 139

**Page 138 (left column)**

1     A. Yes.
2     MR. OH: For clarification on the record, this
3   document has been marked and designated as highly
4   confidential.
5   BY MR. KEENER
6     Q. Does this discussion about business legal
7   insurance refresh your memory at all on whether or not
8   Chapterhouse sought to obtain business legal insurance in
9   case Games Workshop sued?
10    **A. Just give me a sec.**
11    **So what was the question again?**
12    Q. Yeah, does the discussion here about "legal
13   business insurance" refresh your memory at all as to whether
14   Chapterhouse sought legal insurance in case Games Workshop
15   sued?
16    **A. No.**
17    Q. Okay. Let's go to Exhibit 91. TF1064
18   through 1070 and it's an email from Mr. Fiertek to
19   Mr. Villacci dated February 13, 2010.
20    (Plaintiff Exhibit 91 marked for identification)
21    MR. OH: Again for the record, this document has
22   been designated as highly confidential.
23    Q. My only question is about the very top email.
24   My first question is: did you sculpt any jumppacks for
25   Chapterhouse?
               Page 138

**Page 140 (right column)**

1     MR. KEENER: Yeah.
2     Q. Would you characterize the jumppacks in the
3   Games Workshop Horus Heresy book as a "bulky barrel
4   jumppack"?
5     **A. Yes, since that was part of the theme.**
6     Q. And did you then sculpt a bulky barrel
7   jumppack?
8     **A. Yes.**
9     Q. And you state here:
10    "I just made a slight alteration at the back
11   nozzle, making it look like a real jet engine instead of
12   loose jet plumes."
13    Do you see that?
14    **A. First page?**
15    Q. It's the second-to-last sentence in your
16   email on the first page.
17    **A. Yeah, I see.**
18    MR. OH: Objection, lack of foundation.
19   BY MR. KEENER
20    Q. When you say "a slight alteration", you mean
21   slight alteration from what was depicted in the Horus Heresy
22   art book?
23    MR. OH: Objection, lack of foundation.
24    **A. Actually, no.**
25   BY MR. KEENER
               Page 140

1      Q.   What did you mean when you said there was
2   a "slight alteration"? A slight alteration from what?
3      MR. OH: Objection, lack of foundation.
4      A.   In the art book you can see one end of an
5   object, not the back side of it, but one small part of the
6   whole picture, one detail just doesn't make sense. It's
7   there, I guess, because the artist who drew the picture just
8   put something in it with no logical use. So when I sculpted
9   my version, my -- my version of my -- what I understood to
10   be a bulky looking jumppack, I took that silly detail and
11   sculpted it into something making sense. I looked at
12   real-life jet engines and they have air brakes, so that's
13   what I refer to a "slight alteration". That is a slight
14   alteration from the point of the whole thing, but
15   detail-wise it's like day and night. I took a tiny
16   meaningless feature in the art and turned it into something
17   really like usable.
18   BY MR. KEENER
19      Q.   Right. So my question is: there's pictures
20   of the jumppack in the Horus Heresy art book and when you
21   say you made a slight alteration at the back nozzle, were
22   you saying a slight alteration in relation to what's in the
23   Horus Heresy art book?
24      MR. OH: Objection. Lack of foundation,
25   mischaracterizes past testimony, and vague and ambiguous.

1      A.   As I understood the question, I already
2   answered it. Could you please rephrase or clarify?
3   BY MR. KEENER
4      Q.   Sure. So the Horus Heresy art book had a
5   bulky barrel jumppack and you are creating a sculpt of
6   a bulky barrel jumppack and you refer to a "slight
7   alteration" you made at the back nozzle. My question is: a
8   slight alteration with respect to what? To the picture in
9   the book or to something else?
10      MR. OH: Objection. Lack of foundation, compound,
11   and vague and ambiguous.
12      A.   To -- hm. Well, I -- as I kind of already
13   said, I took a picture showing something from the front
14   side, I made a whole out of it, made up the back side.
15   I took a detail as seen in the picture and from being
16   completely pointless, I remade it into -- by using as little
17   change as possible, I remade it using Google picture --
18   after Google picturing jet engines, I remade it into
19   something that resembles a logical object in real life.
20   I don't know how to answer it any other way.
21   BY MR. KEENER
22      Q.   Okay. Let's turn to Plaintiff's Exhibit 94,
23   labeled TF3475 to 7485. It's an email from Mr. Villacci to
24   you dated February 7, 2010.
25      (Plaintiff Exhibit 94 marked for identification)

1      Q.   I'm only interested in the very -- your email
2   on the first page.
3      MR. OH: And for the record -- Sorry, I didn't
4   meant to speak over you at all. For the record, this
5   document has been designated as highly confidential, and
6   also for the record to reflect that there are some exhibit
7   numbers being skipped at this point with regards to this
8   exhibit.
9   BY MR. KEENER
10      Q.   Do you see your email on the first page?
11      A.   Yes.
12      Q.   What is a Wraithguard?
13      MR. OH: Objection, lack of foundation.
14      A.   It is a term used to describe a creature in
15   the world of Warhammer 40,000.
16   BY MR. KEENER
17      Q.   Is that part of the Eldar race?
18      A.   Yes.
19      Q.   And did Chapterhouse create its own
20   Wraithguard?
21      A.   To my knowledge -- to my knowledge,
22   Chapterhouse created a template miniature for a possible
23   future resculpting.
24      Q.   So is that a "yes" or "no"? Does
25   Chapterhouse have its own Wraithguard product on sale?

1      A.   As far as I know, no.
2      Q.   And it looks like you're commenting on
3   a picture of the Wraithguard, and you say in the second
4   paragraph:
5      "The problem is it looks exactly like a GW mini
6   and I see no reason they wouldn't give us the dress sue
7   thingy in a heart beat over this."
8      Do you see that?
9      MR. OH: Objection, lack of foundation.
10      A.   Yes, I see it.
11   BY MR. KEENER
12      Q.   What did you mean by that sentence?
13      MR. OH: Objection. Lack of foundation.
14      A.   I was worried, overly cautious. And
15   basically --
16   BY MR. KEENER
17      Q.   Why were you worried?
18      A.   Because the template, in my eyes, resembled --
19   a Games Workshop miniature, hence me asking Mr. Villacci for
20   feedback regarding if it's okay, if it's something should be
21   altered, and also it's my way of giving feedback, because
22   I was not the one doing the miniature. I think -- I don't
23   know; I think -- Mr. Villacci had a freelance commission
24   artist make it. I don't know who.
25      Q.   Okay. You can put that exhibit aside. Is it

Page 145

1  your opinion that Chapterhouse copies the style of the Horus
2  Heresy art --
3        MR. OH: Objection.
4  BY MR. KEENER
5        Q. -- in some of its products?
6        MR. OH: Objection. Lack of foundation.
7        A. No.
8  BY MR. KEENER
9        Q. Is it your opinion that Chapterhouse copies
10 the style of the Games Workshop shoulder pads in some of its
11 products?
12       MR. OH: Objection. Vague and ambiguous, and
13 lacks foundation.
14       A. Define "style".
15 BY MR. KEENER
16       Q. How would you use the word "style"?
17       A. I would use it the same way I would use the
18 word "theme" or "genre". The way I'm dressed is a certain
19 style and it's still open to a wide variety of different
20 ways. So when you question me about using the same "style"
21 as a Games Workshop shoulder pad, shape-wise it's
22 a geometric object, yes. As sculpting a cube, it's the same
23 style as another cube, maybe changing the angle, but
24 ornamentation and detail-wise, no.
25       Q. And the same thing about the Horus Heresy art

Page 146

1  books? Do you believe Chapterhouse copies the style in
2  those art books?
3        A. No.
4        Q. Do you believe that Chapterhouse captures the
5  style of the Eldar miniatures of Games Workshop?
6        MR. OH: Objection. Vague and ambiguous.
7        A. To a certain extent, yes, but it's
8  a definition of what style is.
9  BY MR. KEENER
10       Q. Okay. Let's turn to Exhibit 95, which is
11 Bates labeled TF6055 through 6066, an email from you to
12 Mr. Villacci dated March 10, 2010.
13       (Plaintiff Exhibit 95 marked for identification.)
14       Q. I am only going to ask questions about the
15 very top email on the first page, first half of the first
16 page.
17       MR. OH: Again, for the record this exhibit is
18 marked as highly confidential.
19       A. Okay. What is the question?
20 BY MR. KEENER
21       Q. Did you get a chance to read that email on
22 the first half of the first page?
23       A. Yes.
24       Q. Okay. Can you describe what the conversation
25 was between you and Mr. Fiertek regarding this Dreamforge

Page 147

1  Titan?
2        MR. OH: Objection. Vague and ambiguous, and
3  lacks foundation.
4        A. As I am Mr. Fiertek, I'm not in the habit of
5  talking to myself, but I guess it was just a slip-up, and
6  the question is --
7  BY MR. KEENER
8        Q. My apologies. Can you describe the
9  discussions between you and Mr. Villacci regarding the
10 Dreamforge Titan?
11       A. Yes.
12       Q. Please do.
13       A. It was a -- well, again a discussion between
14 me having my concern and issues. I was --
15       MR. OH: And again I'll --
16       A. I don't remember this.
17       MR. OH: With respect to this exhibit and the
18 testimony related to it, to the extent that the witness
19 would need to disclose privileged communications in order to
20 answer the question, I instruct him not to do so.
21       A. We were discussing my concerns regarding
22 sculpting things, if they were okay or not, also bouncing
23 this back and forth with legal counsel. Nick --
24 Mr. Villacci gave me -- he described an example to me that
25 I did not know about. There was another company, I think

Page 148

1  they were called Epic, it says here, but I don't know,
2  I think they were called Epic, and Mr. Villacci would know
3  this better than me, but I think they made a product that in
4  my eyes and from what I knew back then was completely okay
5  and somehow they were forced to withdraw it, and according
6  to Mr. Villacci, that was because Games Workshop thought it
7  was too similar to one of their items. Basically this is
8  taken out of a big discussion about, well, me being better
9  safe than sorry-ish.
10       What is the exact question about this half of the
11 email again?
12 BY MR. KEENER
13       Q. Okay, so there was another company that
14 created a Titan?
15       A. Yeah.
16       Q. That you believed had a similar style to the
17 Games Workshop Titan?
18       A. Yes.
19       Q. In the same way that Chapterhouse copied the
20 style of the Horus Heresy art book?
21       MR. OH: Objection. Argumentative. And
22 objection, misstates the prior testimony.
23       A. I mean, said company made a straight-out copy
24 of something Games Workshop do. That is -- by my
25 definition, that is not a style thing, that is copying, and

37 (Pages 145 to 148)

1  so I would answer no.
2  BY MR. KEENER
3   Q.  In this email, you -- I'm sorry, were you
4  finished?
5   A.  Yes, yes.  Sure.
6   Q.  In this email, isn't it correct that you
7  state that:
8   "... We [meaning Chapterhouse] copy the style of
9  the HH art and pads ..."
10   MR. OH:  Objection.  Mischaracterizes the
11  document, and mischaracterizes testimony.
12   A.  Again, it's a definition of what "copy" and
13  "style" is.  We use the same style as Games Workshop in
14  the Horus Heresy, and the style is not -- it's not original,
15  it's not created neither by Games Workshop or us.  We share
16  the same style.  This is the sole idea and mythology that
17  I like to use, and also part of the source for my -- for my
18  considerations and questions repeatedly.  So what else can
19  I say?  I mean, we use -- we share the same style.  We do
20  that.
21  BY MR. KEENER
22   Q.  And a couple lines down, do you express
23  concern that also your Eldar miniatures copy the same style
24  as the Games Workshop Eldar miniatures?
25   MR. OH:  Objection.  Misstating the document and

1  also misstating testimony.
2   A.  That is basically a continuation of the
3  previous paragraph, like a continuation of the discussion.
4  The Eldar that Mr. Tolkien created that are used by Games
5  Workshop and us.  We share the same theme.  They are even
6  described as "Eldar" in Mr. Tolkien's works.  We both,
7  meaning Chapterhouse and Games Workshop, gave the Eldar
8  a science fiction spin.  I don't know if I can call it
9  copying a style or copying, but again it's a definition
10  question.
11  BY MR. KEENER
12   Q.  You say the style has been copied in your
13  email, right?
14   A.  Yes, I do, but again, previously through this
15  deposition I explained my definition of "copy", what
16  "copy" is.
17   Q.  The last sentence refers to"insurance to help
18  cut the costs.  Do you have any idea what's being referred
19  to there?
20   A.  Just give me a second.
21   Again, the insurance thing still doesn't ring
22  a bell.  I know we discussed something about insurance,
23  although I don't remember the specific details or what it
24  was referring to.  And this, again, is Mr. Villacci's
25  department.  I'm sure he could answer that question much

1  better than I.
2   Q.  Okay.  You can put that aside.
3   A.  Okay.
4   Q.  Do you think it's --
5   A.  Yes, please.
6   Q.  Instead of copying the style of the Horus
7  Heresy art work, why didn't Chapterhouse create its own
8  style?
9   MR. OH:  Objection.  Argumentative.
10   A.  It assumes copying was being made, which
11  I am -- I don't think I'm qualified to answer that because
12  it's just my opinion, but I don't see any instance where
13  Games Workshop actually created their own genre, theme,
14  style.  It's inventing new things.  Nothing new is invented
15  today, just already existent inventions being mixed together
16  or slightly altered.
17  BY MR. KEENER
18   Q.  My question is: instead of copying that
19  style, even if you argue it's Games Workshop's creation,
20  why didn't Chapterhouse create its own style for its
21  products?
22   MR. OH:  Objection.  Argumentative, speculative,
23  and again assuming facts not in evidence.
24   A.  To answer -- since I'm not versed in neither
25  law nor economics nor business management, I could only be

1  guessing.  My personal -- well, let's call it guess, because
2  this is what it is, is that it's convenient, it saves money,
3  time, and basically that's what everybody, including
4  authors -- I mean, there are thousands of fantasy and sci-fi
5  books.  They all use the same basics.  There are trolls,
6  there are orks, there are elves.  Tolkien called them Eldar,
7  Games Workshop called them Eldar.  Might be a different
8  spelling of the word "ork" with a C, but it's still --
9  nobody creates new things, because, according to me -- and
10  this is my guess -- it's not economically feasible to do so.
11  BY MR. KEENER
12   Q.  Do you think it also increased Chapterhouse's
13  sales, to copy Games Workshop's style instead of creating
14  its own?
15   MR. OH:  Objection.  Mischaracterizing prior
16  testimony, assuming facts not in evidence, and
17  argumentative.
18   A.  Since I don't see nor think that it is --
19  Chapterhouse is copying anything Games Workshop do,
20  I wouldn't be able to answer that question.
21  BY MR. KEENER
22   Q.  Okay.  Have you ever cast -- taken Games
23  Workshop pieces or bits and cast molds of them to create
24  additional pieces?
25   A.  You mean multiplying one or several pieces

Tomas Fiertek  GamesWorkshop Ltd v Chatered House LLC  13 April 2012

**Page 153**

1 into more of the exact same?
2  Q. Yeah, taking a Games Workshop product and
3 making copies of it.
4  MR. OH: Objection, relevance.
5  A. Yes, I have.
6 BY MR. KEENER
7  Q. What products have you done that for?
8  A. I don't remember. I know I did it for my
9 personal use, for my personal collection years ago,
10 something that is even encouraged on Games Workshop's
11 website, so I don't see the relevance, but I have done so,
12 yes.
13  Q. Have you ever done so to sell pieces to
14 others?
15  A. No. If you refer to the copies that I copied
16 myself.
17  Q. Okay, are there any other copies? Have you
18 been involved in copying Games Workshop products and selling
19 to others?
20  A. Excuse me, I didn't get the question.
21  Q. Have you been involved in the copying of
22 Games Workshop products to sell to others?
23  MR. OH: Objection, relevance.
24  A. No. The instances where I copied Games
25 Workshop products I did for my own collection, my own

**Page 154**

1 personal use and, I must add for fairness sake, I gave away
2 the odd piece to close friends. We're talking one to three
3 items. No money was exchanged, as far as I remember.
4 I have not done that, no.
5 BY MR. KEENER
6  Q. Was Chapterhouse involved at all in the
7 copying of these products, Games Workshop products?
8  A. No, since those were just for my personal
9 use, my personal collection and on rare occasion for my
10 personal close friend -- friends. Chapterhouse, no. As far
11 as I know, no involvement.
12  Q. Did you ever consider getting Chapterhouse
13 involved in that business?
14  MR. OH: Objection. Argumentative,
15 mischaracterizes past testimony, and again assuming facts
16 that --
17 BY MR. KEENER
18  Q. Let me rephrase. Did you ever consider
19 involving Chapterhouse in a business of copying Games
20 Workshop products to sell to others?
21  MR. OH: Objection. Vague and ambiguous.
22  A. As far as I can recall, no.
23  Q. Let's turn to Plaintiff's Exhibit 98. Bates
24 No. TF4113 to 4116, an email --
25  MR. OH: I was going to say before we get to that

**Page 155**

1 exhibit, we're about at 7 o'clock. I'm wondering if we
2 should just take one final bathroom break.
3  MR. OH: Can I finish this document first?
4  MR. KEENER: Yeah.
5  MR. KEENER: Okay, thank you.
6  Q. Exhibit 98 is an email from Mr. Villacci to
7 Mr. Fiertek dated November 5, 2008.
8  (Plaintiff Exhibit 98 marked for identification)
9  Q. My question is concerning your email in the
10 middle of the first page. Do you see that?
11  A. Yes.
12  Q. And do you see the last paragraph of that
13 email, which states:
14  "Another thing, I have started to receive requests
15 of casting bitz for people such as existing GW bitz casted
16 up in the 100 to 200 ranges to be used for personal use for
17 armies of hardcore fans (that can afford to pay for both the
18 molds and the casting fees). Is this something that can be
19 exploited you think and if yes do we do this ONLY for
20 trusted customers?"
21  Do you see that?
22  A. Yes.
23  Q. Does this refresh your memory whether or not
24 you considered casting Games Workshop to sell to others?
25  MR. OH: Objection. Lacks foundation.

**Page 156**

1  A. Yes.
2 BY MR. KEENER
3  Q. What do you recall about that?
4  A. That we had a discussion regarding this,
5 obviously, and -- well, yes, apparently we did have
6 a discussion about it.
7  Q. And why did you think that was an appropriate
8 thing to do?
9  MR. OH: Objection. Argumentative and
10 mischaracterizing prior testimony.
11  A. I do not think it's appropriate to discuss
12 something, no matter how immoral, illegal or i-something it
13 might be. It's just a discussion.
14 BY MR. KEENER
15  Q. Why you were you suggesting to do this only
16 for trusted customers?
17  MR. OH: Objection. Lacks foundation.
18  A. Because this is a wrong thing to do, and if
19 we trust people, they are less likely to tell on you.
20 That's what the discussion is apparently about.
21  Q. And who are you afraid they would tell?
22  MR. OH: Objection. Lacks foundation, assumes
23 facts not in evidence, and --
24  A. No idea of specifics, but --
25 BY MR. KEENER

Merrill Corporation  www.merrillcorp/mls.com  8th Floor 165 Fleet Street
(+44) 207 404 1400   London EC4A 2DY

Tomas Fiertek                    GamesWorkshop Ltd v Chatered House LLC                    13 April 2012

**Page 157**

1    Q.  You --
2    A.  I fail to see the relevance.  We could be
3    discussing committing a bank robbery in Spain right here,
4    and since we didn't do it, I mean ...
5    Q.  It looks like Mr. Villacci responds:
6    "If you want to do, [this] personally, that's
7    fine, but I think we need to stay away from it with the
8    company."
9    Do you see that?
10    MR. OH:  Objection.  Lacks foundation.
11    A.  Yes, I see that.
12    BY MR. KEENER
13    Q.  Did you proceed with this personally?
14    A.  No.
15    Q.  Okay.  We can take a short break?
16    MR. OH:  Quick question.  Are you intending to go
17    beyond 7:30?  If so, then --
18    MR. KEENER:  I am not.
19    MR. OH:  Huh?
20    MR. KEENER:  I am not.
21    MR. OH:  Okay.  Then let's take a break and
22    I guess we won't need a dinner break then at this point.
23    Off the record.
24    MR. KEENER:  Okay.
25    (7:04 p.m.)

**Page 158**

1    (Break taken.)
2    (7:10 p.m.)
3    BY MR. KEENER
4    Q.  Let's look at Plaintiff's Exhibit 100, Bates
5    labeled TF5434 through 5438.  It's an email to Mr. Fiertek
6    from Mr. Villacci, dated November 9, 2009.
7    (Plaintiff Exhibit 100 marked for identification.)
8    MR. OH:  For the record, it's designated as highly
9    confidential and also note that this is another skip in
10    terms of the exhibit numbers.
11    Q.  Mr. Fiertek, I'm only interested in the two
12    emails on the first page.
13    A.  Yes.
14    Q.  Have you had a chance to read those two
15    emails?
16    A.  Not yet, sorry.
17    Q.  Are you done with those first few emails?
18    A.  Yes.
19    Q.  Okay?  Your email begins:
20    "Hey dude, I just got my hands on the set of old
21    GW books from rogue trader.  You want me to burn them for
22    you ..."
23    MR. OH:  Objection.  Lack of foundation.
24    BY MR. KEENER
25    Q.  What were you referring to?

**Page 159**

1    A.  Excuse me?
2    Q.  What were you referring to?
3    MR. OH:  Objection.  Lack of foundation.
4    A.  I was referring to very old Games Workshop
5    I think rulebooks.  Yeah.
6    BY MR. KEENER
7    Q.  Do you know which ones?
8    A.  If I remember correctly, I think they had to
9    do with very old versions of boards of Space Marines.  That
10    is all I remember seeing.
11    Q.  Do you still have them?
12    A.  No.
13    Q.  What happened to them?
14    A.  They got deleted.  If by chance or design,
15    I don't remember.
16    Q.  I didn't get it.  What?
17    A.  They were in an electronic form.  They got
18    deleted.
19    Q.  Okay.  So when you say you have got a set of
20    old GW books, you don't mean the actual physical books, you
21    mean electronic copies of those old books?
22    A.  Some copies and at least one or two in
23    physical form.
24    Q.  Do you still have those in physical form?
25    A.  I'm not sure.  I don't think so.  I made a --

**Page 160**

1    not a count, but I made a thorough search a couple of months
2    ago for my book inventory, and I did not find them then, so
3    I don't know, but I assume they're just gone.  Lost.
4    Stolen.  I don't know.
5    Q.  Okay.  Do you know when you deleted the
6    electronic versions?
7    A.  Oh.
8    MR. OH:  Objection.  Misstates prior testimony.
9    Q.  Didn't he just say he deleted some electronic
10    versions?
11    A.  Yeah.
12    MR. OH:  I believe he said they were deleted.
13    MR. KEENER:  Do you know when it happened?
14    A.  I don't know whether I deleted them by choice
15    or accident though.  This not directly happened yesterday,
16    it -- definitely more than one year ago.  That is as rough
17    as I can guess.
18    BY MR. KEENER
19    Q.  Okay.  Do you know if it was before this
20    lawsuit started?
21    A.  Before.
22    Q.  And when you asked whether Mr. Villacci
23    wanted you to burn them for him, what did you mean by that?
24    A.  As a gift.  I think it was either one of his
25    birthdays or a Christmas gift that I never sent.  It was

Merrill Corporation                    www.merrillcorp.com/mls.com                    8th Floor 165 Fleet Street
(+44) 207 404 1400                                                                    London EC4A 2DY

1  meant as a gift from me.  I kind of spawned ideas of what
2  Mr. Villacci might have -- might be wanting to get as
3  a gift, so that was one of the suggestions from my side.
4      Q.  What did you mean by "burn them"?
5      A.  As I said, some of them were in electronic
6  form.  Burn them on a CD, for example, or a DVD.  If I was
7  going to give him as a gift, I could have used regular post
8  to ship it.
9      Q.  Did you ever send Mr. Villacci any electronic
10  copies of any Games Workshop products?
11      MR. OH:  Objection.  Vague and ambiguous.
12      A.  Let's see, not those.  Huh.  I don't think
13  so.  I'm not 100 per cent, I don't remember correctly, but
14  I don't think so.
15  BY MR. KEENER
16      Q.  Do you know if he sent any to you?
17      A.  As far as I recall, I'm fairly certain he did
18  not send any.  No.
19      Q.  Okay, you can put that exhibit aside.  Do you
20  have any concern that people confuse Chapterhouse products
21  with Games Workshop products?
22      MR. OH:  Objection, lacks foundation.
23      A.  Well, define "people".  People who are in the
24  hobby?  People randomly taken from the street?  There is
25  a world of difference.

Page 161

1  BY MR. KEENER
2      Q.  Let's start with anyone.  If you have to
3  divide it up in your answer, divide it up how you will.
4      A.  Excuse me, repeat that?
5      Q.  My question is for anyone.  If you have to
6  divide it up into different groups to answer my question,
7  feel free to.
8      A.  Okay.  Well, I have to --
9      MR. OH:  Objection.  Compound, vague and
10  ambiguous, and calls for a narrative.
11      A.  This is my personal opinion, subjective as it
12  is.  Let's take the generic group of people who has never
13  heard of or lack knowledge of this hobby.  I don't know,
14  because I'm not a mind reader, but my guess is that they
15  would be more -- I lack the English -- be statistically
16  wise.  They would be more frequent to mix up and have
17  a problem distinguishing between Chapterhouse and Games
18  Workshop items, and that refers to people not knowing
19  anything about the hobby.  And this is my guess.
20      Regarding people who are in the hobby, I would say
21  not a chance.
22      Q.  Did Mr. Villacci ever suggest that people in
23  the hobby might confuse the two?
24      A.  Not as I can recall.
25      Q.  Okay.  Let's show you Exhibit 101, which is

Page 162

1  marked TF1327.  It's an email from you to Mr. Villacci dated
2  December 15, 2009.
3      (Plaintiff Exhibit 101 marked for identification)
4      A.  Yes.
5      Q.  It's just two short emails.  If you could
6  read those.
7      MR. OH:  For the record, this document is also
8  designated as highly confidential.
9      A.  I read it.
10  BY MR. KEENER
11      Q.  Okay.  And Mr. Villacci suggests branding the
12  Chapterhouse sculptures, right?
13      A.  Yes.
14      Q.  And his reason is:
15      "This helps to keep people from confusing our
16  sculpts from GW."
17      Which is Games Workshop, right?
18      MR. OH:  Objection.  Lack of foundation.  And just
19  based on some of the words in the document such as
20  "legally", to the extent that the witness would need to
21  divulge confidential privileged information to respond to
22  questions regarding this exhibit, I instruct him not to
23  answer, but to the extent he can answer without doing so,
24  then he's instructed to do so.
25      A.  Based on my recollection of this discussion,

Page 163

1  the answer would be no.
2  BY MR. KEENER
3      Q.  Mr. Villacci did not want to brand them to
4  stop people from confusing Chapterhouse sculpts with Games
5  Workshop sculpts?
6      A.  No.
7      Q.  Why did Mr. Villacci tell you he wanted to
8  brand the Chapterhouse products?
9      A.  Again -- oh.
10      MR. OH:  Objection.  Mischaracterizing prior
11  testimony.
12      A.  Again, my recollection of this discussion is
13  Mr. Villacci --
14      MR. OH:  Mr. Keener, are there some sirens going
15  on on your end?
16      MR. KEENER:  There are, past the building.
17  Nothing I can do about that.
18      MR. OH:  Okay, sorry.  I just --
19      MS. STEVENSON:  You're not on fire or anything?
20      MR. KEENER:  No.
21      MR. OH:  I just wanted to make sure that we
22  weren't hearing things.
23      MR. KEENER:  No, we're 30 floors up and still
24  here.
25      A.  Things happen.

Page 164

41 (Pages 161 to 164)

Page 165

1    My understanding, based on my memory -- again
2  Mr. Villacci would know this better than my guess -- is his
3  meaning was not that people meaning hobbyists will mistake
4  Chapterhouse bits with Games Workshop bits, but that Games
5  Workshop bits will later on, if it comes to a lawsuit, claim
6  that this is to be the fact.
7    Q.  Okay, so it's your testimony that when
8  Mr. Villacci says, "We need to brand our sculpts with
9  [Chapterhouse] information.  This helps to keep people from
10  confusing our sculpts from Games Workshop," it's your
11  testimony that you don't believe you were doing it to stop
12  people from confusing the products?
13    A.  According to me, as I recall this, we were
14  not worried about people having a problem distinguishing
15  between various products, but Games Workshop claiming that
16  people -- or the possibility of Games Workshop in the future
17  using this as a claim that, "Oh, people confuse your
18  products," and again it's a definition of who are "people",
19  but I --
20    Q.  Okay.  And Mr. Villacci continues:
21    "This is particularly important with items that
22  could be mistaken for GW bits."
23    Do you see that?
24    A.  What -- yes, I see that.
25    Q.  Okay.  What products did Chapterhouse have

Page 166

1  that you believe he was referring to that were items that
2  could be mistaken for Games Workshop bits?
3    MR. OH:  Objection.  Lack of foundation, calls for
4  speculation.
5    A.  I'm not certain.  I don't know, but I would
6  guess it would have to be some sort of shoulder pad, based
7  on the reasoning that Chapterhouse makes its, whilst Games
8  Workshop does not make its.  This is my speculation of what
9  Mr. Villacci might have had in mind here.  As I said, it
10  differs from my understanding of this discussion, based on
11  my memories of it.
12    Q.  Okay.  Did Chapterhouse go ahead and brand
13  its sculpts?
14    MR. OH:  Objection.  Vague and ambiguous.
15  Objection, lacks foundation.
16    A.  I'm fairly certain that they did, although
17  since -- this sounds weird, I produced these things, so
18  logically I should know everything, but I produced them,
19  shipped them to Mr. Villacci, and then no control, no
20  nothing, and seldom do I even care to follow up.  I'm busy
21  grinding away in the basement.  This question should be
22  directed to Mr. Villacci.  I gave my reasoning, my
23  speculation, and this is the most certain I can be of both
24  versions, both mine and Mr. Villacci's.
25  BY MR. KEENER

Page 167

1    Q.  For the ones that you sculpted, did you brand
2  them?
3    MR. OH:  Objection.  Lack of foundation.
4    A.  Some the items I did brand and some not.  I'm
5  not certain, I don't know, but I assume the branding would
6  be -- actually be put on the sprue the items are attached
7  to, rather than the items themselves, due to size issues.
8  You can't put a disclaimer on a grain of rice, there's just
9  no room for it.
10  BY MR. KEENER
11    Q.  Okay.  You stated that you didn't think
12  people knowledgeable about the hobby would confuse
13  Chapterhouse products with Games Workshop products.  Why is
14  that, do you believe?
15    A.  Because I think that people having a certain
16  thing as a hobby are well versed with the said hobby.  Take
17  me, for example.  I don't know anything about cars.  I can
18  see a Volvo on the street and a Saab right next to it and
19  I -- I don't know anything, whereas a mechanic or a race car
20  fanatic, he will tell you the brand and year and shape of
21  anything just based on a silhouette.  It seems logical.
22  I base it on my own logic and my own assumptions, how I see
23  my own hobby and other hobbies I had through life.  What
24  interests people, people know about and are good at.
25    Q.  Are there any distinguishing characteristics

Page 168

1  you could point to that would help someone distinguish Games
2  Workshop products from Chapterhouse products?  For example,
3  size, quality, material?  Anything you could say -- or --
4  theme?
5    MR. OH:  Objection.  Calls for speculation,
6  hypothetical, and compound.
7    A.  This is based on my personal opinion.  Quite
8  a wide range of items that differ in both size and quality
9  and themes.  I would honestly say that would be hard to
10  point out because the fact that Chapterhouse items and Games
11  Workshop items share the same themes -- I mean, dragon head
12  one, dragon head two -- what are the -- there are
13  differentiating things, as the dragon head I made is in 3D,
14  the dragon head Forge World made, because I'm not aware of
15  Games Workshop making one, is made in 2D.  People in the
16  hobby ought to know, and I'm not stating facts, I'm just
17  guessing based on common sense and logic.
18  BY MR. KEENER
19    Q.  Okay.  Have you ever visited any of Games
20  Workshop's manufacturing facilities?
21    A.  No.
22    Q.  Were you ever asked to save and not destroy
23  any documents after this case was started?
24    A.  Yes.
25    MR. OH:  Again, in terms of follow-up questions

42 (Pages 165 to 168)

Tomas Fiertek                 GamesWorkshop Ltd v Chatered House LLC                 13 April 2012

**Page 169**

1  there, to the extent that he's going to have to reveal
2  privileged communications and work product, I'm instructing
3  him not to answer.
4      MR. KEENER: Okay. I pass the witness.
5      MR. OH: Can you describe the — no, strike that.
6  Actually, I'll just state that I'll repeat that
7  the witness will review the transcript once the final
8  transcript has been made available, and we'll designate
9  confidentiality as part of that review and that the entire
10  deposition until that point pursuant to the protective order
11  will remain confidential. I think with that we can end this
12  deposition.
13      MR. KEENER: Thank you, Mr. Fiertek.
14      A. Thank you.
15      (Whereupon, the deposition concluded at 7:34 p.m.)
16
17
18
19
20
21
22
23
24
25

**Page 171**

1              CERTIFICATE OF COURT REPORTER
2
3  I, Leanne Shipp, an Accredited Real-time Reporter, hereby
4  certify that the testimony of the witness Tomas Fiertek in
5  the foregoing transcript, numbered pages 1 through 169,
6  taken on this 13th day of April, 2012 was recorded by me in
7  machine shorthand and was thereafter transcribed by me; and
8  that the foregoing transcript is a true and accurate
9  verbatim record of the said testimony.
10
11
12  I further certify that I am not a relative, employee,
13  counsel or financially involved with any of the parties to
14  the within cause, nor am I an employee or relative of any
15  counsel for the parties, nor am I in any way interested in
16  the outcome of the within cause.
17
18
19  Signed: _____
20  Name:  Leanne Shipp
21  Date: _____
22
23
24
25

**Page 170**

1
2              CERTIFICATE OF DEPONENT
3
4  I, Tomas Fiertek, hereby certify that I have read the
5  foregoing pages, numbered 1 through 169, of my deposition of
6  testimony taken in these proceedings on Friday, April 13,
   2012 and, with the exception of the changes listed on the
   next page and/or corrections, if any, find them to be a true
   and accurate transcription thereof.
7
8
9
10
11  Signed: _____
12  Name:  Tomas Fiertek
13  Date: _____
14
15
16
17
18
19
20
21
22
23
24
25

**Page 172**

1                   ERRATA SHEET
2  Case Name:    Games Workshop v Chapterhouse Studios
   Witness Name:   TOMAS FIERTEK
3  Date:
4  Page/Line       From            To
5   ___/___    _____    _____
6   ___/___    _____    _____
7   ___/___    _____    _____
8   ___/___    _____    _____
9   ___/___    _____    _____
10  ___/___    _____    _____
11  ___/___    _____    _____
12  ___/___    _____    _____
13  ___/___    _____    _____
14  ___/___    _____    _____
15  ___/___    _____    _____
16  ___/___    _____    _____
17  ___/___    _____    _____
18  ___/___    _____    _____
19  ___/___    _____    _____
20  ___/___    _____    _____
21  Subscribed and sworn to before
22  me this      day of      , 2012.
23  _____
24      Tomas Fiertek
25

Merrill Corporation          www.merrillcorp/mls.com          8th Floor 165 Fleet Street
(+44) 207 404 1400                                            London EC4A 2DY