Exhibit 1-C - Fiertek 2013 Transcript

# OPUS | 2

## INTERNATIONAL

**Games Workshop Limited**

**vs.**

**Chapterhouse Studios LLC**

**Highly Confidential - Attorneys' Eyes Only**

**Deposition of Tomas Fiertek**

**February 28, 2013**

Opus 2 International - Official Court Reporters

Phone:     +44 (0)20 3008 5900

Email:     depos@opus2international.com

Website:  www.opus2international.com

Case: 1:10-cv-08103 Document #: 370-5 Filed: 05/30/13 Page 2 of 66 PageID #:21395

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GAMES WORKSHOP LIMITED,          )
                                 )
          Plaintiff,             )
                                 ) Civil Action
vs.                              ) No.: 1:10-cv-08103
                                 )
CHAPTERHOUSE STUDIOS LLC,        )
                                 )
          Defendant.             )
_____)

** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

VIDEOCONFERENCE DEPOSITION OF
TOMAS FIERTEK
GOTHENBURG, SWEDEN
FEBRUARY 28, 2013

REPORTED BY:  BRENDA MATZOV, CA CSR NO. 9243

---

Page 2

```
 1       Videoconference deposition of TOMAS FIERTEK,
 2  taken in the above-entitled cause pending in the United
 3  States District Court, for the Northern District of
 4  Illinois, Eastern Division, pursuant to notice, before
 5  BRENDA MATZOV, CA CSR No. 9243, at Gothia Towers,
 6  Massans Gata 24, Third Floor, Room R33, Gothenburg,
 7  Sweden, and simultaneously in Chicago, Illinois, on
 8  Thursday, the 28th day of February, 2013, at 1:59 p.m.
 9
10  APPEARANCE OF COUNSEL:
11  FOR PLAINTIFF:
12     FOLEY & LARDNER, LLP
       By:  JASON J. KEENER, ESQ.
13        (via videoconference in Illinois)
       321 North Clark Street
14     Suite 2800
       Chicago, Illinois 60654-5313
15     (312) 832-4500 / Fax (312) 832-4700
       jkeener@foley.com
16
17  FOR DEFENDANTS:
18     MARSHALL GERSTEIN & BORUN, LLP
       By:  SARAH J. KALEMERIS, ESQ.
19        JULIANNE M. HARTZELL, ESQ.
          (both via videoconference in Illinois)
20     233 South Wacker Drive
       6300 Willis Tower
21     Chicago, Illinois 60606-6357
       (312) 474-6300 / Fax (312) 474-0448
22     skalemeris@marshallip.com
       jhartzell@marshallip.com
23
24  ALSO PRESENT:
25     GILL STEVENSON, Games Workshop (in Sweden)
```

---

Page 3

```
 1                    I N D E X
 2  WITNESS:
 3  TOMAS FIERTEK (Sworn)
 4
 5  EXAMINATION                              PAGE
 6  By Mr. Keener                              7
 7  By Ms. Kalemeris                         247
 8  By Ms. Hartzell                          248
 9
10
11
12               E X H I B I T S
13  NUMBER      DESCRIPTION                  PAGE
14  Exhibit 1    Document Entitled "Defendant
                 Chapterhouse Studios LLC's
15               Supplemental Responses to
                 Plaintiff's Seventh Set of
16               Interrogatories (Nos. 18-23),"
                 Dated February 25, 2013
17               (No Bates Number)            11
18  Exhibit 2    Internet Printout Entitled
                 "Felheart Shoulders by Jennifer
19               Biro on DeviantART"
                 (No Bates Number)            55
20
21  Exhibit 3    E-mail from Tomas Fiertek to Tomas F,
                 Dated February 3, 2013, Subject:
22               "Fwd:  Ideas (131-141 Plus
                 Unfinished/Unreleased Things)"
23               and Related E-mail Chain
                 (Bates CHS00032353 to CHS00032361)  59
24
25
```

---

Page 4

```
 1              E X H I B I T S (Continued)
 2  NUMBER      DESCRIPTION                  PAGE
 3  Exhibit 4    Document Entitled "Games Workshop
                 Claim Chart for Newly Accused
 4               Products - January 11, 2013-01-11"
                 (No Bates Number)            72
 5
    Exhibit 5    Internet Printout Entitled "Shop
 6               Roman Cuirass - Chest Plate -
                 Steel Breastplate Armor Halloween
 7               Costumes Pictures," Dated
                 October 3, 2012
 8               (No Bates Number)            94
 9  Exhibit 6    E-mail from Tomas Fiertek to Nick
                 Villacci, Dated May 24, 2011,
10               Subject:  "Re:  Um Helmet Concept
                 and Green" and Related E-mail Chain
11               (Bates CHS00018562 to CHS00018563)  104
12  Exhibit 7    E-mail from Tomas Fiertek to Nick
                 Villacci, Dated February 3, 2010,
13               Subject:  "Re:  Da Idea" and
                 Related E-mail Chain
14               (Bates CHS00030991 to CHS00031002)  120
15  Exhibit 8    E-mail from Nick Villacci to Tomas
                 Fiertek, Dated March 15, 2012,
16               Subject:  "Re:  Pics" and Related
                 E-mail Chain
17               (Bates CHS00030256 to CHS00030266)  171
18  Exhibit 9    E-mail from Dynath Kajira to Tomas
                 Fiertek, Dated January 26, 2013,
19               Subject:  "Re:  Maginot Lines"
                 and Related E-mail Chain
20               (Bates CHS00030057 to CHS00030081)  187
21  Exhibit 10   E-mail from Tomas Fiertek to Nick
                 Villacci, Dated September 28, 2011,
22               Subject:  "Re:  Video Spot" and
                 Related E-mail Chain
23               (Bates CHS00030267 to CHS00030276)  195
24
25
```

Case: 1:10-cv-08103 Document #: 370-5 Filed: 05/30/13 Page 3 of 66 PageID #:21396

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

## Page 5

E X H I B I T S (Continued)

NUMBER       DESCRIPTION                    PAGE

Exhibit 11   E-mail from Tomas Fiertek to Tomas F,
             Dated February 4, 2013, Subject:
             "Fwd:  Video Spot" and Related
             E-mail Chain
             (Bates CHS00031258 to CHS00031292)   205

Exhibit 12   E-mail from Tomas Fiertek to Nick
             Villacci, Dated October 19, 2011,
             Subject:  "Re:  A Little Help" and
             Related E-mail Chain
             (Bates CHS00031866 to CHS00031872)   211

Exhibit 13   E-mail from Tomas Fiertek to Tomas F,
             Dated February 3, 2013, Subject:
             "Fwd:  FW:  Psyker Sculpt (137-141
             162-163)" and Related E-mail Chain
             (Bates CHS00030683 to CHS00030690)   213

Exhibit 14   E-mail from Tomas Fiertek to Nick
             Villacci, Dated February 9, 2010,
             Subject:  "Re:  Da Idea" and
             Related E-mail Chain
             (Bates CHS00031658 to CHS00031672)   215

Exhibit 15   E-mail from Tomas Fiertek to Tomas F,
             Dated February 4, 2013, Subject:
             "Fwd:  Idea (161)" and Related
             E-mail Chain
             (Bates CHS00030382 to CHS00030396)   227

Exhibit 16   E-mail from Tomas Fiertek to Nick
             Villacci, Dated July 2, 2011,
             Subject:  "RE:  FW:  FW:  FW:
             Precinct Omega NDA" and Related
             E-mail Chain
             (Bates CHS00025126 to CHS00025137)   231

Exhibit 17   E-mail from Tomas Fiertek to Tomas F,
             Dated February 3, 2013, Subject:
             "Fwd:  FW:  Angel Referred Me to
             You for Painting (Post 3 About
             Item 135)" and Related E-mail Chain
             (Bates CHS00030549 to CHS00030562)   239

## Page 6

I N D E X (Continued)

Q U E S T I O N S   I N S T R U C T E D
N O T   T O   A N S W E R

        PAGE      LINE

        208        3
        208        23
        209        8
        228        5
        228        13
        244        14

## Page 7

P R O C E E D I N G S

TOMAS FIERTEK,
called as a witness, being first duly
sworn, was examined and testified as
hereinafter set forth.

EXAMINATION
BY MR. KEENER:

Q.  Good afternoon, Mr. Fiertek.

A.  Mr. Keener, hello.

Q.  Can you state your full name for the record?

A.  Tomas Fiertek.

Q.  And, Mr. Fiertek, you were deposed previous in this case; correct?

A.  Correct.

Q.  So you remember the rules on waiting for one person to finish their question before you finish your answer and so the court reporter can take everything down?

A.  Yes.

Q.  And if at any time you don't understand my question, please ask me to clarify it.

A.  Sure.

Q.  Do you recall that?

## Page 8

A.  Yes.

Q.  And, again, let me know if you need to take a break at any time.  I understand it's much later in the afternoon than it is here.  It's quite early here.  So whenever you need a break, just let us know.

A.  Sure.

Q.  What did you do to prepare for today's deposition?

A.  I had a talk with my counsel yesterday.

Q.  Do you know who that was?

A.  Julianne.

Q.  And how long was that conversation?

A.  Around two hours.

Q.  Was this a phone call or an in-person meeting?

A.  Phone call.

Q.  Do you know if anyone else was on the phone?

A.  Skype call.  Sorry.  Yes.

Q.  Who else was on the phone?

A.  I don't remember the name.  But I understand it to be a second counselor.

Q.  Do you know if her name was Sarah?

A.  Possible.

Q.  Did you review any documents in preparation for this deposition?

A.  No.

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                         Deposition of Tomas Fiertek

Page 9

1      Q.  Have you reviewed any transcripts of prior
2    depositions in this case?
3      A.  Yes.
4      Q.  Which transcripts did you review?
5      A.  I have no idea.  I took a glance at the files
6    posted on PACER.  And it was pretty much random stuff.
7      Q.  Were you provided with any full transcripts
8    of someone's full deposition testimony to review?
9      A.  No.
10     Q.  Not even your own?
11     A.  Yes.  I was given my --
12     Q.  Yes, you were given your own?
13     A.  Yes.  I was given my own to -- for the purpose
14   of correct -- proofreading and correction.
15     Q.  And so did you conduct a detailed review of
16   your prior deposition?
17     A.  Yes.
18     Q.  And about how long ago was that?
19     A.  It was, I think, a couple of weeks after the
20   deposition.
21     Q.  Did you notice any serious errors in your
22   prior deposition transcript?
23     MS. KALEMERIS:  Objection.  Form.
24     THE WITNESS:  I don't know whether they were
25   serious, but there were a handful of corrections.  Yes.

Page 10

1      Q.  BY MR. KEENER:  Beyond typographical errors,
2    any substantive corrections?
3      MS. KALEMERIS:  Objection.  Form.
4      THE WITNESS:  There was one or two.  But
5    I think one instance where something was miss --
6    misinterpreted.  Some --
7      Q.  BY MR. KEENER:  Do you recall what the --
8      A.  No, I do not.
9      Q.  Go ahead.
10     A.  No, I do not.  There was something that was
11   written in that I either didn't say or didn't mean to
12   say based on understanding a question wrongly.  That's
13   my recollection of the most so-called serious thing I --
14   I noticed.
15     Q.  Do you recall the issue or topic that that
16   related to?
17     A.  No, I do not.
18     MS. KALEMERIS:  I just want to say you're
19   asking about something that happened about a year ago.
20   And it's entirely outside of the scope of what this
21   deposition was to cover.
22     MR. KEENER:  Is that an objection?
23     MS. KALEMERIS:  Yes.  That's an objection.
24     (Court reporter clarification.)
25     MR. KEENER:  I am going to have handed to

Page 11

1    you -- Gill, document 1, which we can mark Fiertek
2    Exhibit No. 1, entitled:
3        "Defendant Chapterhouse Studios LLC's
4    Supplemental Responses to Plaintiff's Seventh Set
5    of Interrogatories (Nos. 18-23)."
6        (T. Fiertek Exhibit 1 marked.)
7      Q.  BY MR. KEENER:  Mr. Fiertek, have you ever
8    seen this document before?
9      A.  (Examining.)  I do not think so.
10     Q.  Okay.
11     A.  Give me a second.  I'm just going to quickly
12   take a glance at each page.
13        In the middle of the document seems to be a
14   list of items that a lot of them were frequent in the --
15   in some sort of summary list I was given by my counsel
16   that describe the things Games Workshop wanted to, well,
17   be reviewed for this deposition.  That's -- that's all
18   this thing shows me.
19     Q.  Okay.  If I could direct your attention to
20   page 11 of Fiertek Exhibit 1.
21     A.  Sure.
22     Q.  And there's -- at the bottom of page 11,
23   there's a chart that begins.  And it's got Chapterhouse
24   products on the left-hand column, and on the right-hand
25   column it says Chapterhouse product designers.

Page 12

1        Do you see that?
2      A.  Yes.
3      Q.  I want to -- to go through and confirm which
4    products you had some role in designing or developing
5    and creating, so we make sure we understand which
6    products you have been involved in and which products
7    you haven't been involved in.
8      A.  Sure.
9      Q.  So the first one says:  Abbithan Banshees
10   Guardswoman 28 mm.
11        Were you one of the designers of that product?
12     A.  No.
13     Q.  Do you see your name listed there first under
14   Chapterhouse designers?
15     A.  Yes.
16     Q.  Do you believe that's incorrect?
17     A.  I don't know who put my name there.  But I
18   did not -- I cannot recall having anything whatsoever
19   to do with that product.
20     Q.  When you say "anything whatsoever," you mean
21   any role in developing, creating --
22     A.  That's --
23     Q.  -- designing?
24     A.  I was referring to your previous mentioning
25   of those terms.  Yes.  I -- I did not have anything to

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

---

**Page 13**

1  do with creating, designing, ID'ing of this product.
2      Q.  Do you know who did?
3      A.  I do not, actually.
4      Q.  And looking at this list of other people's
5  names on the right-hand column, does that refresh your
6  memory of who might have been involved in this product?
7      A.  Yes.  The --
8      Q.  So who do you think was involved?
9      A.  The only person I know was involved -- I do
10 not know to which extent, though -- was Mr. Villacci.
11     Q.  Let's turn to page 12.  The next entry is:
12 TRU-Scale Knight Praetorius Conversion Kit - 6.
13         Were you involved at all?
14     A.  If you allow me to go back to the previous
15 one, I said that I know that Mr. Villacci was involved.
16 I base this only on pure logic.  I assume that he, well,
17 initiated the idea of this model.  I might be wrong,
18 though.  I have pretty much zero information of -- of
19 the making, origins, and ideas and et cetera of that
20 product.
21     Q.  Okay.  So you have no information about who
22 designed --
23     A.  No.  Not --
24     Q.  -- the first product?
25         MS. KALEMERIS:  Objection.

---

**Page 14**

1          THE WITNESS:  Not to my recollection.  No.
2      Q.  BY MR. KEENER:  Okay.  Let's turn to the next
3  product, the TRU-Scale Knight Praetorius Conversion Kit.
4          Were you involved in the design at all of that
5  product?
6      A.  No.
7      Q.  The next product, Hotshot Lasgun Pack, were
8  you involved in any way with that product?
9      A.  No.
10     Q.  The next one is:  Iconoclast Conversion Kit
11 for Space Marine Land Raider.
12         Were you involved at all in that product?
13     A.  No.
14     Q.  Were you at all involved with the Magnetic
15 Turret Kit for the Storm Raven?
16     A.  No.
17     Q.  Were you involved in any way with the Magnetic
18 Turret Kit for the Razorback?
19     A.  Let's just see what names are written under
20 that one.
21     Q.  On the right-hand column, it says Mr. Villacci
22 and Mr. Bullough.
23     A.  No, I was not.
24     Q.  Were you involved in any way with the
25 Open-Fisted Power Claws?

---

**Page 15**

1      A.  No.
2      Q.  Were you involved in any way in designing the
3  Close-Fisted Power Claws?
4      A.  No.
5      Q.  Were you involved in any way with the design
6  of the Pilum Imperial Attack Jetbike?
7      A.  Yes and no.  I -- I contributed ideas during
8  the development phase.  Although, to my knowledge, none
9  of these were selected.  So for the finished product,
10 I would have to say "no."
11     Q.  Do you know who was involved besides yourself
12 in the design and development of that product?
13         MS. KALEMERIS:  Objection.  Misstates
14 testimony.
15         THE WITNESS:  It's as the -- one of the
16 previous questions.  I assume Mr. Villacci was involved.
17 I, however, do not know as to what extent and in what
18 part of the phases of creating.
19     Q.  BY MR. KEENER:  Do you know if anyone else
20 was involved?
21     A.  Yes.
22     Q.  Who else?
23     A.  I do not know who.  I, however, know that
24 someone else was involved.
25     Q.  Were you involved in any way with the design

---

**Page 16**

1  for the Alternative Heads for Tau Crisis Suits?
2      A.  No.
3      Q.  Were you involved in any way with the design
4  of the Heresy-Era Shoulder Pads for Terminators?
5      A.  Yes.
6      Q.  And I believe Chapterhouse sells a Type A,
7  Type B, Type C, Type D, and Type E.
8          Is that correct?
9      A.  I could not say.  I don't know what visuals
10 those letters are connected to.
11     Q.  Do you understand that Chapterhouse sells five
12 different Heresy-Era Shoulder Pads for Terminators?
13     A.  As I recall, they sell four or five.  I --
14 I cannot recall the exact number, though.
15     Q.  Do you know if you were involved with each of
16 the -- the design and development of each of those?
17     A.  Yes, I was.
18     Q.  And do you know who else was involved in the
19 design and development of those?
20     A.  Yes.  Mr. Villacci had -- oh, how should I say
21 this? -- feedback and idea input.
22     Q.  Anyone else?
23     A.  Not that I know of or recall.  I -- I did,
24 however, ask at least one friend of input for -- feed --
25 feedback for ideas.  But I do not consider that as

---

4  (Pages 13 to 16)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                           Deposition of Tomas Fiertek

Page 17

1  having anything to do with the finished product.
2      Q.  Do you see on the right-hand column here where
3  it's listed "Robert Cirillo" as one of the designers for
4  these products?
5      A.  Give me a sec.
6      Q.  This is near the bottom of page 12.
7      A.  All right.  Yes, I see that.
8      Q.  Do you believe that to be incorrect?
9      A.  I have no idea who Robert Cirillo is and what,
10 if any, part of the item he -- he participated
11 in.  If Robert took part in creation, that would have
12 to be after I was done doing what I did without my
13 knowledge.
14     Q.  To the best of your knowledge, is the finished
15 product that you designed the same one that's on sale
16 by Chapterhouse, or does it look different?
17     MS. KALEMERIS:  Objection.  Form.
18     THE WITNESS:  Could you please restate the
19 question?
20     Q.  BY MR. KEENER:  Sure.  You said you designed
21 these different series of shoulder pads --
22     MS. KALEMERIS:  Objection.  Form.
23     Q.  BY MR. KEENER:  -- correct?
24     A.  Correct.
25     Q.  The question is:  Do you know if they

Page 18

1  subsequently changed prior to Chapterhouse selling them?
2      A.  I do not --
3      MS. KALEMERIS:  Objection.  Form.
4      THE WITNESS:  I do not know that.
5      Q.  BY MR. KEENER:  Are you aware of any changes
6  in any of the shoulder pads you designed, the -- the
7  Heresy-Era Shoulder Pads for Terminators, between when
8  you finished the design and Chapterhouse began selling
9  them?
10     MS. KALEMERIS:  Objection.  Form.
11     THE WITNESS:  I'm not aware of any of
12 these changes.  However, I did neither -- neither
13 did I specifically look for changes between the
14 master sculpt, as I remember it, and between --
15 and the finished product.  But to my best knowledge,
16 Robert Cirillo had nothing to do with that.
17     Q.  BY MR. KEENER:  Did you have any role in the
18 design or development of the TRU-Scale Knight Praetorius
19 Order of the Empress's Tears Conversion Kit?
20     A.  No.
21     Q.  Did you have any role in the design or
22 development of the Werecroc?
23     A.  No.
24     Q.  Did you have any role in the design and
25 development of the Iron Hand Nut Power Armor Pad?

Page 19

1      A.  Yes.
2      Q.  What was your role for that product?
3      A.  I created it.  I sculpted it.  And I also
4  contributed the majority of the ideas behind it.
5      Q.  Was anyone else involved in the design and
6  development of that product?
7      A.  Yes.  Mr. Villacci.
8      Q.  And what was his role?
9      A.  I do not recall what his role was.  The only
10 thing I remember was he had an input on the underlying
11 ideas and concepts to be used for it.  This creation --
12 creation of this product happened a very long time ago,
13 and that's all I remember regarding Mr. Villacci's
14 involvement.
15     Q.  Was anyone else involved in the design and
16 development of the Iron Hand Nut Power Armor Pad?
17     A.  No.
18     Q.  Were you involved in the design and
19 development of the Iron Hand Nut Terminator Pad?
20     A.  Yes.
21     Q.  And is that a similar role as what you had
22 with the similar power armor pad?
23     MS. KALEMERIS:  Objection.  Form.
24     THE WITNESS:  Let me just see what names are
25 under that product.  Could you refer me to the correct

Page 20

1  page, please?
2      Q.  BY MR. KEENER:  Sure.  It's on page 13.  It's
3  Item No. 147.
4      A.  Oh, thank you.  I created the product.  And
5  as previously stated, Mr. Villacci had idea input into
6  that.  That is, to my best recollection, the extent of
7  Mr. Villacci's involvement with that product.
8      Q.  And are you aware of anyone else being
9  involved in the design and development of that product?
10     A.  No.
11     Q.  Were you involved in the design and
12 development of the Hammer of Dorn shoulder pads?
13     A.  Yes.
14     Q.  Who else was involved in the design and
15 development of those pads?
16     MS. KALEMERIS:  Objection.  Form.
17     Q.  BY MR. KEENER:  We're on the same page,
18 Item 150.
19     A.  Oh, let me see.  As far as I remember, this
20 seems to be correct.  The customer and I was the only --
21 the only ones involved.  I, however, am pretty sure that
22 Mr. Villacci had something to say about that.  I do not
23 recall what or to what extent, though.  And I might be
24 wrong about that.  This happened quite some time ago
25 also.

Highly Confidential - Attorneys' Eyes Only

Case: 1:10-cv-08103 Document #: 370-5 Filed: 05/30/13 Page 7 of 66 PageID #:21400

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

Page 21

1  Q.  And the customer you're referring to is Thomas
2  Reed?
3       MS. KALEMERIS:  Objection.  Form.
4       THE WITNESS:  I think so.  It was a while ago.
5  I -- I had an e-mail conversation with the customer.
6  And as far as I remember, his name was Thomas Reed.
7  Yes.
8       Q.  BY MR. KEENER:  Were you involved in the
9  design and development of the P -- I'm sorry -- of the
10 V Power Armor Pad?
11      A.  Yes.
12      Q.  And who else was involved in the design and
13 development of that product?
14      MS. KALEMERIS:  Objection.  Form.
15      THE WITNESS:  This was between me and a
16 customer whose name I do not recall.  And I also recall
17 having Mr. Villacci something -- some sort of input on
18 that, possibly just answering a question or two put by
19 me.  But I -- I'm not 100 percent sure about that.  It
20 was also quite some time ago I created that thing.
21      Q.  BY MR. KEENER:  Looking on the right-hand
22 column for that product, there's a customer name Martin
23 Justesen, as well as an e-mail address.
24      Do either of those refresh your memory if
25 that's the customer that was involved?

Page 22

1       A.  No.
2       Q.  Were you involved in the design and
3  development of the Power Armor Shoulder Pads for
4  siths of the emperor -- Scythes of the Emperor?
5       A.  Yes.
6       Q.  Who else was involved in the design and
7  development of that product?
8       MS. KALEMERIS:  Objection.  Form.
9       THE WITNESS:  This was, as the previous one,
10 between me and a customer whose name I do not recall.
11 And, again, I'm pretty sure Mr. Villacci had some sort
12 of input or feedback of -- of a nature I do not recall.
13 And I might be wrong about that.  It's also a pretty
14 old creation.
15      Q.  BY MR. KEENER:  On the right-hand side of that
16 entry, it lists Chris Thomas as a customer and gives an
17 e-mail address.
18      Does that refresh your memory of who the
19 customer was?
20      A.  No.
21      Q.  Were you involved in the design and
22 development of the Scaled Rimless Power Armor Pad,
23 Item 155?
24      A.  Yes.
25      Q.  Was anyone else involved in the design and

Page 23

1  development of that product?
2       A.  No.
3       Q.  Were you involved in the design and
4  development of the Scaled Tactical Power Armor Pad?
5       A.  Yes.
6       Q.  Was anyone else involved in the design and
7  development of that product?
8       A.  It's a question of definition.  Mr. Villacci
9  was, as far as I recall, the one who asked me to do
10 something like that.  I do not know if that constitutes
11 for being involved in the design.  But I did not do
12 that on my own without -- without Mr. Villacci asking
13 me to.  So I would say "no."
14      Q.  Was anyone else involved?
15      A.  No.
16      Q.  I'm sorry.  Was anyone else involved?
17      Okay.  Were you involved with the design and
18 development of the Scaled with Rim Power Armor Shoulder
19 Pad?
20      A.  I think so.  I -- the funny thing is that I --
21 I remember doing two or three different versions of
22 those scaled items.  I do not recall the amounts --
23 the number I made.  But, logically speaking, yes, I --
24 I did them.
25      Q.  Do you know if anyone else was involved in the

Page 24

1  design and development of that product?
2       A.  No.  No one else was.
3       Q.  Were you involved with the design and
4  development of the Shrike Conversion Kit?
5       A.  Yes.
6       Q.  Who else was involved with the design and
7  development of the Shrike Conversion Kit?
8       A.  Mr. Villacci and Mr. Lee.
9       Q.  And what was your role in the design and
10 development of that product?
11      A.  I made the final touches, re-made errors, and
12 improved upon Mr. Lee's work.
13      Q.  To your knowledge, what was Mr. Lee's role
14 in the design and development of that product?
15      A.  As I understand, Mr. Lee pretty much made the
16 whole thing.
17      Q.  And to your knowledge, what was Mr. Villacci's
18 role in the design and development of that product?
19      A.  This would be a question of assumption.  I --
20 I do not know.  However, I assume Mr. Villacci ordered
21 that product.
22      Q.  Were you involved in the design and
23 development of the Dark Elf Arch-Torturess product?
24      A.  Yes.
25      Q.  Who else, if anyone, was involved in the

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                          Deposition of Tomas Fiertek

Page 25

1    design and development of that product?
2        A.  Mr. Villacci and Mr. Lee.
3        Q.  And what was your role in the design and
4    development of that product?
5        A.  The same as the previous one.  I improved
6    upon, took away errors, and made the finishing touches.
7        Q.  And to your knowledge, what was Mr. Lee's
8    role?
9        A.  He made the whole thing as far as I -- I know.
10       Q.  And to your knowledge, what was Mr. Villacci's
11   role?
12       A.  Again, I assume he asked Mr. Lee to create
13   said product.
14       Q.  I want to turn your attention back to the
15   Heresy-Era Shoulder Pads for Terminators.
16           Do you know when you created those?
17           MS. KALEMERIS:  Objection.  Compound.
18           THE WITNESS:  I -- I do not recall.  It was
19   a very long time ago.
20       Q.  BY MR. KEENER:  If you turn in Fiertek
21   Exhibit 1 to page 15 of the document, there's another
22   chart there.  And under entries 137 through 141 are the
23   entries for the various types of Heresy-Era Shoulder
24   Pads for Terminators.
25       A.  Yes.

Page 26

1        Q.  And under each of them, it lists a date for
2    the Chapterhouse product design time period of July 7th,
3    2011, to March 7th, 2012.
4           Do you see that?
5        A.  Yes.
6        Q.  Do you have any reason to believe that that
7    is inaccurate?
8           MS. KALEMERIS:  Objection.  Form.
9           THE WITNESS:  Those dates do not help me
10   recall when I created those products.  I simply do not
11   remember.  All I know is that it was a long while ago.
12   I instinctively feel that the date is slightly --
13   slight -- should be -- should be back -- further back.
14   But as I said, I have no -- no recollection when I
15   created those.
16       Q.  BY MR. KEENER:  So if I understand what you're
17   saying, the date could be earlier than this date listed
18   here, but you're not sure?
19           MS. KALEMERIS:  Objection.  Form.
20           THE WITNESS:  Correct.  It feels like the
21   date could be earlier.  Although I might be wrong.
22   It's a memory thing.
23       Q.  BY MR. KEENER:  As you sit here today, do you
24   have any reason to believe these dates are incorrect?
25           MS. KALEMERIS:  Objection.  Asked and

Page 27

1    answered.
2           THE WITNESS:  Not really.  There is a slight
3    conflict with my memory.  But we all know how reliable
4    memory is.  So my answer to that question would be "no."
5        Q.  BY MR. KEENER:  And the conflict with your
6    memory, is there anything in particular such as some
7    event that happened in your life around the time that
8    makes you think it was earlier than the dates listed
9    here?
10       A.  No.
11       Q.  When you were designing these Heresy-Era
12   Shoulder Pads for Terminators, what references, if any,
13   did you use?
14       A.  I used Google searches.  I used a series of
15   art books that I do not recall the names of, although
16   they are lying on the table right next to me -- but I'm
17   not sure if I'm allowed to take a peek -- which is kind
18   of funny.  But one of the reasons for my memory of those
19   products being started earlier than the dates stated is
20   that the process of idea gathering was pretty long and
21   held up the project for quite some time.
22       Q.  Beyond the Google Image searches and the art
23   books, do you recall any other references you used in
24   creating any -- any of the Heresy-Era Shoulder Pads for
25   Terminators?

Page 28

1        A.  Yes.
2        Q.  What else do you recall?
3        A.  There is this -- there is this thing, a
4    certain hobby of -- that many of my friends are doing.
5    I think in English it's called real-life re-enactment.
6    I don't do that myself.  Although since many of my
7    friends do, it's inevitable that I am dragged along
8    and see.
9           And they create their own equipment for
10   these re-enactment games or whatever you call them.
11   And the Google searches were -- actually, part of the
12   Google picture searches actually were directed at such
13   re-enactment groups, not -- not the ones my friends
14   participate in.  But in real-life world, not -- not
15   Google searches, I have taken quite -- well, I have
16   taken expression and seen what people create in the --
17   in the form of armor and clothing and equipment used
18   for fantasy re-enactment gaming.  So now that you
19   mention it, I kind of came to think about that.
20       Q.  Any other sources you can think of?
21       A.  No, not now.
22       Q.  All right.  The first one you mentioned were
23   Google Image searches?
24       A.  Yes.
25       Q.  Do you recall when you performed those

7 (Pages 25 to 28)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

Page 29

1    searches?
2         A.   This is not a single-time event.  This happens
3    constantly during the whole design process.  I -- I
4    couldn't even tell you what Google results I was given
5    since pictures disappear over time and new -- new ones
6    are added.  Thus, the same Google search performed by
7    me today would probably not show the same result as
8    the one performed one or even more years ago.  This
9    is an ongoing process.  So that's -- that's all I can
10   say about the Google Image searches.
11        Q.   Do you know how many times you performed
12   Google Image searches in designing and developing this
13   product?
14        A.   Oh, a lot.  I couldn't even start to guess.
15        Q.   And do you have any memory of what terms you
16   typed into Google to perform these searches?
17        A.   No.  This would be a question of assumption
18   again.  As in, if you present me with a computer, I
19   would -- I would experiment -- experiment myself towards
20   getting the best results I -- I can think of.  This
21   is -- this is how I do -- how I do it every time I
22   Google search.  Just because you type in a certain
23   word doesn't mean you're given the best images.
24        Q.   All right.  But sitting here today, you can't
25   remember the exact search phrases you used?

Page 30

1         A.   Not all of them.  I could -- I could take a
2    qualified guess at a -- at a few.
3         Q.   I don't want you to guess.
4              Can you remember what searches you used?
5         A.   No.
6         Q.   And I believe, as you said, even if you could
7    remember the search terms, it's very likely what results
8    we get today is different than what results you would
9    have gotten back when you were designing these products;
10   correct?
11             MS. KALEMERIS:  Objection.  Form.
12             THE WITNESS:  Well, very likely?  I -- I
13   don't know if it's very likely.  It's, however, the
14   logical assumption that a Google search performed
15   today during -- using the same phrase as one performed
16   one year ago would most probably not produce the same
17   results due to previously mentioned reasons.
18        Q.   BY MR. KEENER:  Did you retain copies of any
19   of the images that you found on the Google search that
20   you used as a reference in designing these products?
21        A.   I do not remember that.
22        Q.   Have you looked to see if you retained any
23   copies of any of the Google images you found and used
24   as a reference in designing these works?
25        A.   I don't understand the question.

Page 31

1         Q.   You said you don't recall whether you retained
2    any of these images you found on Google Image.
3              My question is:  Have you looked for them to
4    see if you retained them?
5         A.   Yes.
6         Q.   And did you find any?
7         A.   I don't remember that.  I -- I was asked by
8    my counselor to look through my computer --
9              MS. KALEMERIS:  Object -- I'll caution
10   Mr. Fiertek not to reveal the content of any privileged
11   conversations with counsel.
12        Q.   BY MR. KEENER:  I don't want to know what
13   you were asked by counsel.  I just want to know what
14   you physically -- what you yourself did.  So if you
15   can answer what you did search for, I think that would
16   be appropriate.
17        A.   Well, I searched for everything related
18   to these products that I happened to save on my hard
19   drive.  I do not recall what if I found -- and if I
20   found anything.  What I was trying to say previously is,
21   if I did, those things were presented to my counselor.
22   And I don't remember what I found.  It's -- it's all --
23   it's all accounted for.
24        Q.   How did you search your computer for images?
25        A.   I went through each and every folder

Page 32

1    containing pictures on my drive, as well as my e-mails,
2    to see if pictures were sent to other people or
3    received.
4         Q.   Do you have any recollection if you at any
5    point deleted any images of these Google search results
6    that you had found?
7              MS. KALEMERIS:  Objection.  Form.
8              THE WITNESS:  I know I did delete pictures
9    on my hard drive.  I cannot recall to what items those
10   pictures were related to, nor when I did that.
11        Q.   BY MR. KEENER:  What makes you believe that
12   you deleted pictures from your hard drive?
13        A.   In the beginning, before -- before this
14   lawsuit, I had no reason to save everything on my drive.
15   I -- deletion of unwanted -- unwanted pictures and
16   other things was just a normal part of how I handle
17   my computer.  Thus, it is also a logical assumption
18   that some of those things just had to be deleted.
19        Q.   And how about after this lawsuit started, have
20   you deleted any pictures from your computer?
21        A.   No.
22        Q.   Now, if you found an image on Google Image
23   search that you used as a reference for creating these
24   Heresy-Era Shoulder Pads for Terminators, why didn't you
25   save a copy of those pictures?

8  (Pages 29 to 32)

Case: 1:10-cv-08103 Document #: 370-5 Filed: 05/30/13 Page 10 of 66 PageID #:21403

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                              Deposition of Tomas Fiertek

Page 33

1          MS. KALEMERIS:  Objection.  Form.
2          THE WITNESS:  This is not the way I work.
3    I rarely -- I'm an artist.  I do not -- I do not
4    have a picture of something in front of me while I work.
5    I look at many things, form an idea in my head, and then
6    I work based on that.
7          Q.   BY MR. KEENER:  Do you have an understanding
8    that Games Workshop has asked Chapterhouse and its
9    designers to identify specifically any references they
10   used in the design and development of these products
11   at issue?
12         MS. KALEMERIS:  Objection.  Form.
13         THE WITNESS:  Yes.
14         Q.   BY MR. KEENER:  Is it also your understanding
15   that Games Workshop has asked Chapterhouse for copies of
16   any references they used in the design and development
17   of the products at issue?
18         A.   Yes.
19         Q.   And despite knowing that, is it true that you
20   didn't change your design practice in a way that would
21   retain these images?
22         MS. KALEMERIS:  Objection.  Form.
23         THE WITNESS:  Restate the question.  I did not
24   understand it.
25         Q.   BY MR. KEENER:  So you've told me the reason

Page 34

1    you didn't keep these Google Image pictures that you
2    used as a reference was because that's not how you work.
3    And after the start of this lawsuit, you said that
4    you've become aware that Games Workshop has physically
5    asked Chapterhouse to identify the references and
6    produce copies of any references used.
7          My question is:  With that knowledge, why
8    didn't you change the way you work to retain these
9    images?
10         MS. KALEMERIS:  Objection.  Form.
11         THE WITNESS:  Well, first of all, I -- I
12   don't think the -- saying that I never save anything
13   that I found, for example, on Google searches is
14   correct.  I -- this is how I tend to work.  Thus,
15   I tend not to save things.  I cannot remember if
16   I did and, if I did, then what I did.
17         I -- I am aware of what you said.  And as
18   for saving sources for inspiration, for example, I
19   don't really know what to say.  I have a hard time
20   changing the way I work.  I was asked for -- I was
21   asked to provide examples of Google imaging searches
22   and I did.  And I do not recall --
23         MS. KALEMERIS:  Again, in your answer,
24   Mr. Fiertek, I'll -- I'll caution you not to reveal
25   the content of any privileged conversations with

Page 35

1    counsel.
2          THE WITNESS:  Sure.
3          I -- I really don't know how to -- what to
4    answer to that.  I did not delete -- after the legal
5    cases started, I did not delete pictures from my hard
6    drive.  So -- sorry.  The question again?  I -- could
7    you restate the question?
8          Q.   BY MR. KEENER:  Okay.  So the question is:
9    You stated you understood that Games Workshop was asking
10   for specific identification of any references used to
11   create these products and copies of those references?
12         A.   Yes.
13         Q.   Now -- my question now is:  Did you make any
14   attempt to write down exactly which references you used
15   as you were designing these Heresy-Era Shoulder Pads for
16   Terminators?
17         MS. KALEMERIS:  Objection.  Form.  Misstates
18   testimony.
19         THE WITNESS:  Not as I recall, no.
20         Q.   BY MR. KEENER:  Did you make any effort to
21   save copies of the references you found on Google Image
22   searches that you used in the design and development
23   of the Heresy-Era Shoulder Pads for Terminators?
24         MS. KALEMERIS:  Objection.  Form.
25         THE WITNESS:  Not that I recall, no.

Page 36

1          Q.   BY MR. KEENER:  Were you ever under the
2    impression that you had a duty to write down and
3    preserve this information?
4          MS. KALEMERIS:  Objection.  Form.
5          THE WITNESS:  No.
6          Q.   BY MR. KEENER:  Were you ever under the
7    impression that you had a duty to save copies of these
8    images you used as resources in designing and developing
9    these products?
10         MS. KALEMERIS:  Objection.  Form.  Misstates
11   testimony.
12         THE WITNESS:  No.
13         Q.   BY MR. KEENER:  The next category you
14   mentioned that you used as a resource in design and
15   developing the Heresy-Era Shoulder Pads for Terminators
16   was various art books?
17         A.   Yes.
18         Q.   Do you recall that?
19         What art books are you referring to?
20         A.   I have four art books.
21         Q.   And did you bring those today?
22         A.   Yes.  I bring -- I did.
23         Q.   And if you need to refer to them, please feel
24   free.  Could you identify the titles of the art books
25   that you're referring to?

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

Page 37

1      A. Yes.  They are called the Horus Heresy
2   Vision -- Visions books.
3      Q.  And you said there's four different ones.
4         Could you identify the titles?
5      A.  Sure.
6         The first one is -- it's called "Visions of
7   War."  The second one, "Visions of Darkness."  Third
8   one, "Visions of Treachery."  And the last one, "Visions
9   of Death."
10     Q.  And do you understand all those books to be
11  Games Workshop books?
12        MS. KALEMERIS:  Objection.  Form.
13        THE WITNESS:  I don't know who produced them,
14  but -- so no.
15     Q.  BY MR. KEENER:  Do you understand that they're
16  sold by Games Workshop?
17     A.  No.
18     Q.  Do you have any belief on whether or not those
19  are Games Workshop's books?
20        MS. KALEMERIS:  Objection.  Form.
21        THE WITNESS:  Yes.
22     Q.  BY MR. KEENER:  What's your belief?
23     A.  They picture graphic descriptions of the
24  Warhammer universe.
25     Q.  And how does that relate to your belief on

Page 38

1   whether or not they're Games Workshop's books?
2      A.  Because I do not know if --
3         MS. KALEMERIS:  Objection.  Form.
4         THE WITNESS:  I did not know if Games Workshop
5   released or sold them or if another company such as, for
6   example, Black Library did.  So it's like a technicality
7   for me.
8      Q.  BY MR. KEENER:  Do you know when you acquired
9   those four Heresy Vision books?
10     A.  All I remember is that was a long time ago.
11     Q.  Can you quantify that in any way?
12        Was it more than five years ago?
13     A.  I would say "yes."
14     Q.  Do you have a copy of "Horus Heresy Collected
15  Visions"?
16     A.  No.
17     Q.  Have you ever had a copy?
18     A.  No.
19     Q.  Do you have an electronic copy of "Horus
20  Heresy Collected Visions"?
21     A.  No.
22     Q.  Beyond the four Horus Heresy Vision books
23  you've identified, did you use any other art books
24  as references in the design and development of the
25  Heresy-Era Shoulder Pads for Terminators?

Page 39

1         MS. KALEMERIS:  Objection.  Form.
2         THE WITNESS:  Not physi -- not physical books.
3   No.
4      Q.  BY MR. KEENER:  What do you mean by that
5   answer?
6      A.  Well, amongst Google picture searches are --
7   let's see the English word for that -- pictures of pages
8   taken from historical armor books.  It's like a page or
9   several electronically viewable online of -- of a -- of
10  a physical book.  I do not have the physical book.  But,
11  thus -- thus, the question was a little tricky for me
12  to answer.
13     Q.  Okay.  So that falls into the Google Image
14  search category that we've already discussed?
15     A.  Yes.
16     Q.  And is there any specific book on the four art
17  books -- let me rephrase that.
18        Did you refer to all four of the Horus Heresy
19  Vision books in the design and development of the
20  Heresy-Era shoulder pads?
21        MS. KALEMERIS:  Objection.  Form.
22        THE WITNESS:  I do not remember that.
23     Q.  BY MR. KEENER:  Do you know which other books
24  you referred to as resources?
25        MS. KALEMERIS:  Objection.  Form.

Page 40

1         THE WITNESS:  Don't remember that either.
2      Q.  BY MR. KEENER:  Do you know which pictures
3   out of any of the books that you referred to in the
4   design and development of the Heresy-Era Shoulder Pads
5   for Terminators?
6         MS. KALEMERIS:  Objection.  Form.
7         THE WITNESS:  No.
8      Q.  BY MR. KEENER:  Is there any way for you to
9   identify anything from any of the Horus Heresy Vision
10  books that you referred to in any way as a reference in
11  designing the Heresy-Era Shoulder Pads for Terminators?
12        MS. KALEMERIS:  Objection.  Form.
13        THE WITNESS:  Yes.
14     Q.  BY MR. KEENER:  And how would we identify
15  that?
16     A.  By looking at them and recalling, I guess.
17     Q.  So the only way for you to do that would be
18  to flip through each book page by page and see if any
19  pictures refreshed your memory on which ones you used?
20        MS. KALEMERIS:  Objection.  Form.
21        THE WITNESS:  Yes.
22     Q.  BY MR. KEENER:  Have you made any attempt
23  to do that and identify which pictures you used as
24  a reference in creating these products?
25        MS. KALEMERIS:  Objection.  Form.

10  (Pages 37 to 40)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

Page 41

1          THE WITNESS:  No.
2       Q.  BY MR. KEENER:  And about how long do you
3    think it would take you to flip through those four
4    books and identify the pictures you used as references?
5          MS. KALEMERIS:  Objection.  Form.
6          THE WITNESS:  I don't know.  It depends.
7    I might get lucky, or I might look for a longer time.
8       Q.  BY MR. KEENER:  I'm trying to figure out
9    whether today it's a five-minute exercise I can ask
10   you to do or whether it's going to be several hours
11   and we won't be able to do that today.
12      A.  I think you could ask me to do that today.
13      Q.  You think you could do it in a few minutes?
14      A.  I could give it a shot.
15      Q.  Please do so.
16      A.  (Examining.)  Found one example.
17      Q.  And which book are you in?
18      A.  "Treachery."
19      Q.  I didn't hear you.  I'm sorry.
20      A.  Book three, "Visions of Treachery."
21      Q.  And which page?
22      A.  Twenty-eight.
23      Q.  And which picture on page 28 did you use as
24   a reference?
25         MS. KALEMERIS:  Objection.  Form.

Page 42

1          THE WITNESS:  It's not the picture.  It's the
2    idea of having overlapping pieces of armor covering the
3    shoulders.
4       Q.  BY MR. KEENER:  And is that depicted in one
5    of the pictures on page 28?
6       A.  Yes.
7          MS. KALEMERIS:  Objection.  Form.
8       Q.  BY MR. KEENER:  Which picture on page 28?
9       A.  There is just one picture on page 28.
10      Q.  Could you show that to me, please, to the
11   camera so I can see what you're looking at?
12      A.  Sure.  (Indicating.)  Can you see that?
13      Q.  Yes.  Thank you.
14      A.  All right.
15      Q.  Could you please identify any other pictures
16   that you used as references in that book?
17         MS. KALEMERIS:  Objection.  Form.
18         THE WITNESS:  Excuse me?  I didn't catch your
19   question.
20      Q.  BY MR. KEENER:  If you could continue looking
21   for any other pictures that you used as references in
22   that book.
23         MS. KALEMERIS:  Objection.  Form.
24         THE WITNESS:  Sure.  (Examining.)  There is
25   one on page 18.

Page 43

1       Q.  BY MR. KEENER:  And which picture on page 18
2    did you use as a reference?
3          MS. KALEMERIS:  Objection.  Form.
4          THE WITNESS:  The bottom picture.
5       Q.  BY MR. KEENER:  And what does that picture
6    depict?
7       A.  A similar -- a similar form of armor usage.
8    But this -- again, it's not the picture.  It's the idea
9    of having two, instead of three, overlapping pieces of
10   armor.
11      Q.  And can you show that picture to the camera?
12      A.  Sure.  (Indicating.)
13      Q.  Okay.
14      A.  All right.
15      Q.  Any other pictures in that book?
16      A.  Let me see.  (Examining.)  Page 52.
17      Q.  And which image on page 52 did you use as
18   a reference in creating the Heresy-Era Shoulder Pads
19   for Terminators?
20         MS. KALEMERIS:  Objection.  Form.  Misstating
21   testimony.
22         THE WITNESS:  Again, not the picture.  The
23   idea of a style of armor consisting of two, not three,
24   overlapping pieces of armor.
25      Q.  BY MR. KEENER:  And is there more than one

Page 44

1    picture on page 52?
2       A.  There are two pictures.  I'm referring to the
3    bottom picture.
4       Q.  And can you show that picture to the camera?
5       A.  Sure.  (Indicating.)
6       Q.  Okay.
7       A.  All right.
8       Q.  Any other pictures in that book you used as
9    a reference in designing these products?
10         MS. KALEMERIS:  Objection.  Form.  Misstating
11   testimony.
12         THE WITNESS:  I do not know.  I would have
13   to keep looking.
14      Q.  BY MR. KEENER:  Please do so.
15      A.  Sure.  (Examining.)  Page 17.
16      Q.  And how many pictures on page 17?
17      A.  Four in total.
18      Q.  And which pictures on page 17 did you
19   as a reference in designing the Heresy-Era Shoulder
20   Pads for Terminators?
21         MS. KALEMERIS:  Objection.  Form.  Misstates
22   testimony.
23         THE WITNESS:  The lower-left picture is used
24   as inspiration for, well, Roman leather armor straps.
25      Q.  BY MR. KEENER:  And can you show me that

11 (Pages 41 to 44)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                          Deposition of Tomas Fiertek

---

Page 45

```
1   picture, please?
2       A.  Sure.  (Indicating.)
3       Q.  Thank you.
4           Any other pictures in that book that you used
5   as references?
6       A.  No.
7           MS. KALEMERIS:  Objection.  Form.  Misstates
8   testimony.
9       Q.  BY MR. KEENER:  I'm sorry.  Did you say "no,"
10  or are you still looking?
11      A.  "No."
12      Q.  Okay.  Can you take the next Horus Heresy
13  book, tell me which one you're looking at, and tell
14  me if there's any pictures in that book you used as
15  references for creating the Heresy-Era Shoulder Pads
16  for Terminators?
17          MS. KALEMERIS:  Objection.  Form.  Misstates
18  testimony.
19          THE WITNESS:  Sure.  (Examining.)  Page 53.
20      Q.  BY MR. KEENER:  Of which book are you looking
21  at now?
22      A.  First one.  It's called "Visions of War."
23      Q.  And which picture, if any, on page 53 of that
24  book did you use as a reference in creating any one of
25  the Heresy-Era Shoulder Pads for Terminators?
```

---

Page 46

```
1           MS. KALEMERIS:  Objection.  Form.  Misstates
2   testimony.
3           THE WITNESS:  The top-left picture has, again,
4   an idea of using two, not three, overlapping armor
5   plates.
6       Q.  BY MR. KEENER:  Can you show me that picture?
7       A.  Sure.  (Indicating.)
8       Q.  Thank you.
9       A.  Right.
10      Q.  Can you tell me if there's any other pictures
11  in that book that you used as a reference in creating
12  any of the Heresy-Era Shoulder Pads for Terminators?
13          MS. KALEMERIS:  Objection.  Form.  Misstates
14  testimony.
15          THE WITNESS:  I don't know that.  I'll have
16  to keep looking.
17          (Examining.)  No.
18      Q.  BY MR. KEENER:  Okay.  And what's the next
19  book in the "Visions" that you can take a look at?
20      A.  Number two.  It's called "Visions of" --
21      Q.  All right.
22      A.  Do you want me to --
23      Q.  Yes.  Please look through book two of the
24  Horus Heresy Visions series and tell me if there's
25  any pictures in that book you used as a reference in
```

---

Page 47

```
1   designing and developing any of the Heresy-Era Shoulder
2   Pads for Terminators.
3           MS. KALEMERIS:  Objection.  Form.  Misstates
4   testimony.
5           THE WITNESS:  Sure.  (Examining.)  Page 34.
6       Q.  BY MR. KEENER:  And how many pictures are
7   there on page 34?
8       A.  Two.
9       Q.  And which picture on page 34 of book two,
10  if any, did you use as a reference in the design and
11  development for the shoulder -- Heresy-Era Shoulder
12  Pads for Terminators?
13          MS. KALEMERIS:  Objection.  Form.  Misstates
14  testimony.
15          THE WITNESS:  The bottom picture is used,
16  the idea that two overlapping armor plates don't have
17  to be misaligned.
18      Q.  BY MR. KEENER:  What do you mean they don't
19  have to be misaligned?
20      A.  Well, from a certain angle, you don't have
21  to see actually that there are two overlapping.  It's
22  a concept I was toying with.
23      Q.  And can you show me the picture you're
24  referring to?
25      A.  Sure.  (Indicating.)
```

---

Page 48

```
1       Q.  Okay.  Any other pictures in the second book
2   of the Visions series that you used as a reference?
3           MS. KALEMERIS:  Objection.  Form.  Misstates
4   testimony.
5           THE WITNESS:  No.
6       Q.  BY MR. KEENER:  Okay.  I believe the only one
7   left is book four; is that correct?
8       A.  Yep.
9       Q.  All right.  If you could flip through book
10  four of the Visions series and identify for me if
11  there's any pictures you used as a reference in that
12  book in designing any of the Heresy-Era Shoulder Pads
13  for Terminators.
14          MS. KALEMERIS:  Objection.  Form.  Misstates
15  testimony.
16          (Court reporter clarification.)
17          THE WITNESS:  No.
18      Q.  BY MR. KEENER:  Okay.  So you were not able
19  to identify any pictures in book four?
20      A.  No.
21          MS. KALEMERIS:  We've been going for a little
22  over an hour.
23          MR. KEENER:  Yeah.
24          MS. KALEMERIS:  Do you think it's a good time
25  for a break now?
```

---

12  (Pages 45 to 48)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                          Deposition of Tomas Fiertek

---

Page 49

1    MR. KEENER:  Do you want a five-minute break?
2    THE WITNESS:  Sure.
3    MS. KALEMERIS:  Thanks.
4    (Recess from 3:17 p.m. to 3:34 p.m.)
5    Q.  BY MR. KEENER:  Mr. Fiertek, we've just gone
6    through the various Horus Heresy Vision books you have.
7    And you have identified several pictures that
8    you say you've used as a reference somehow in creating
9    the Heresy-Era Shoulder Pads for Terminators; is that
10   right?
11   MS. KALEMERIS:  Objection. Form. Mr. Fiertek
12   never stated that he used these pictures as references.
13   THE WITNESS:  I used them as one of several
14   inspiration sources.
15   Q.  BY MR. KEENER:  Did you use them as references
16   in any way for issues of compatibility?
17   MS. KALEMERIS:  Objection. Form. Again, the
18   term "reference."
19   THE WITNESS:  What do you mean
20   "compatibility"?
21   Q.  BY MR. KEENER:  For any issues of
22   compatibility, did you use those pictures in the
23   Horus Heresy books?
24   A.  I mean, the Horus Heresy books have one or
25   more -- how should I call that? -- themes or genres

---

Page 50

1    that I am trying to approach.  If -- if it's -- well,
2    for example, if the theme is wooden floor panels, you
3    don't do marble all of a sudden.  I mean, you keep to --
4    keep to the appropriate color and stuff.  It's a theme
5    thing.
6    Q.  And did you use any of those pictures in
7    developing the Heresy-Era shoulder pads for issues
8    of sizing?
9    A.  I would say "no" to that.  Not the pictures,
10   no.
11   Q.  If you could turn back in Fiertek Exhibit 1
12   and turn to the bottom of page 7 for me.  There's
13   another chart with one column on the left hand [sic]
14   saying Chapterhouse products and the right-hand column
15   saying sources.  And the last entry on page 7 is for
16   the:  Heresy-Era Shoulder Pads for Terminators.
17   Do you see that?
18   A.  Yes.
19   Q.  And the first sentence says:
20   "In designing these product, the designers
21   referenced images available via Google Images searches."
22   Do you see that?
23   A.  Yeah.  Sure.
24   Q.  And we've already discussed your -- your use
25   of Google Image; correct?

---

Page 51

1    A.  Correct.
2    Q.  Second sentence:
3    "Mr. Fiertek also referenced the Horus Heresy
4    Collected Visions work for purposes of compatibility
5    and sizing."
6    Do you see that sentence?
7    A.  Yeah.
8    Q.  Now, my first question is:  I believe you
9    testified that you don't have and have never had the
10   Horus Heresy Collected Visions work, have you?
11   A.  Not the -- not the Collected Visions.  No.
12   I don't have those -- or that.
13   Q.  So it would be -- it would be more accurate
14   to say the four Horus Heresy Vision books you brought
15   today are the ones you referenced?
16   MS. KALEMERIS:  Objection. Form. Misstates
17   testimony.
18   THE WITNESS:  Well, they -- they were -- they
19   were used as one source of inspiration.  Yes.
20   Q.  BY MR. KEENER:  It says here that the Visions
21   books were referenced for purposes of compatibility and
22   sizing.
23   Do you see that?
24   A.  Yes.
25   Q.  And you've already addressed compatibility

---

Page 52

1    when you said you didn't believe they were used for
2    sizing.
3    Does this document refresh your memory at
4    all as to whether they were used for sizing?
5    A.  No.
6    Q.  So do you believe that's inaccurate?
7    MS. KALEMERIS:  Objection. Form.
8    THE WITNESS:  It's a picture. How can you
9    determine size based on a picture?  Size -- when I
10   do stuff, size is more or less equivalent to fitting.
11   I can't use pictures to -- to determine or -- or do
12   size.  I don't know how to.  I don't know why it says
13   that, but it sounds illogical.  Maybe from a --
14   Q.  BY MR. KEENER:  What about relative size,
15   the size of the shoulder pads in relation to the rest
16   of the individual?
17   MS. KALEMERIS:  Objection. Form.
18   THE WITNESS:  I think you could use pictures
19   to -- to point to relevant -- relative size.  This is
20   nothing that I do, though.  As far as I remember, I
21   don't use pictures for sizing.  No.
22   Q.  BY MR. KEENER:  For example, would you agree
23   that the pictures that you identified in the Visions
24   books show oversized shoulder pads?
25   MS. KALEMERIS:  Objection. Form.

---

13  (Pages 49 to 52)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 53

1    THE WITNESS:  That is a matter of opinion.
2  Oversized for what?
3    Q.  BY MR. KEENER:  By "oversized," I mean larger
4  than would typically be used in real life.
5    MS. KALEMERIS:  Objection.  Form.
6    THE WITNESS:  I cannot answer that one.  We
7  are speaking about fantasy and sci-fi universe and
8  settings.  There is nothing real life.  If -- it's a
9  theme thing.  If everybody down the street are wearing
10  yellow pants, then isn't the guy wearing green pants
11  oversized or out of -- I don't know how to answer that
12  one.  I would say "no."
13    Q.  BY MR. KEENER:  Okay.  So did you use any
14  of the images you identified in the Visions books to --
15  as a reference for the relative size of the shoulder
16  pad in relation to the rest of the -- of the model?
17    MS. KALEMERIS:  Objection.  Form.
18    THE WITNESS:  Not that I remember now.
19    Q.  BY MR. KEENER:  Okay.  And then the next
20  sentence reads:
21    "Mr. Fiertek additionally referenced open
22  art communities such as"--
23    And there's a website address listed here.
24  Do you see that?
25    A.  What page?

---

Page 54

1    Q.  It starts on page 7 and goes to the top of
2  page 8.
3    A.  I remember referring to -- to art communities,
4  though the link typed there doesn't tell me anything.
5  It's a link.
6    Q.  As you sit here today, are you able to
7  identify which open art communities you looked at?
8    A.  Yes.
9    Q.  Which ones did you look at?
10    A.  The only one I remember the name of is
11  DevineArt.com [sic].
12    Q.  And do you know which specific pictures in
13  Divine Art [sic] you looked at as references?
14    A.  No.
15    Q.  Did you make any attempt to write down which
16  pictures you looked at on Divine Art [sic]?
17    MS. KALEMERIS:  Objection.  Form.
18    THE WITNESS:  When it comes to -- when it
19  comes to Divine Art [sic], I -- I don't remember.
20    Q.  BY MR. KEENER:  Did you make any attempt
21  to save the pictures you looked at -- at Divine Art
22  [sic] that you used as references?
23    MS. KALEMERIS:  Objection.  Form.
24    THE WITNESS:  I don't remember that either.
25    MR. KEENER:  I'm going to have, Gill, document

---

Page 55

1  25.  Can we have that marked as Fiertek Exhibit 2.
2    (T. Fiertek Exhibit 2 marked.)
3    Q.  BY MR. KEENER:  It's an eight-page document.
4  On the top left, it says:
5    "Felheart Shoulders."
6    A.  (Examining.)  Yeah.
7    Q.  Do you have the document?
8    A.  Yes.
9    Q.  Does this page look familiar to you at all,
10  this document?
11    A.  On page 4, I recognize the picture.  Let me
12  see.  That is the only picture -- or rather two that
13  I recognize.
14    Q.  And where do you recognize the pictures on
15  page 4 from?
16    A.  Well, it says on the paper they are from
17  Divine Art [sic].  If that wasn't written on the paper,
18  I don't think I would remember them being Divine Art
19  [sic] findings.  But I do recognize the picture.
20    Q.  Do you know if these pictures were created
21  before or after you created the product at issue, the
22  Heresy-Era Shoulder Pads for Terminators?
23    A.  I don't remember.
24    Q.  Okay.  And if you don't know if it was taken
25  before or after your creation, you don't remember if you

---

Page 56

1  used these as references in designing your Heresy-Era
2  Shoulder Pads, do you?
3    MS. KALEMERIS:  Objection.  Form.
4    THE WITNESS:  Well, I only remember
5  recognizing the picture.
6    Q.  BY MR. KEENER:  Other than recognizing the
7  picture, that you've seen it before, do you -- do you
8  have knowledge one way or the other whether or not you
9  used these exact pictures in designing the Heresy-Era
10  Shoulder Pads at issue?
11    A.  No.  I don't remember when I -- I don't
12  remember when I saw them.  I just remember seeing them.
13    Q.  But as you sit here today, you have no
14  basis for believing you used these in developing
15  the Heresy-Era Shoulder Pads, do you?
16    MS. KALEMERIS:  Objection.  Form.
17    THE WITNESS:  Well, as I said, I don't
18  remember -- I don't remember when I saw this -- these two
19  of these two pictures.  That's all I can say.  And now,
20  when Divine Art [sic] is mentioned on this very page,
21  I -- it rings a bell.  I connect them with Divine Art
22  [sic], but that's -- that's all.  So it could be either
23  one, I guess.
24    Q.  BY MR. KEENER:  Okay.  Are you able right
25  now to identify in any way the pictures from Divine

---

14 (Pages 53 to 56)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

Page 57

1    Art [sic] that you used as references in creating the
2    Heresy-Era Shoulder Pads for Terminators?
3         MS. KALEMERIS:  Objection.  Form.  Misstates
4    testimony.
5         THE WITNESS:  I could maybe answer that
6    question if I actually had a computer and Googled
7    Divine Art [sic].  But right on top of my memory, I --
8    I treated Divine Art [sic] the way I treated Google
9    searches pretty much.  And I don't -- I don't remember
10   specifics.  It's just another search.
11        Q.  BY MR. KEENER:  Do you remember anything
12   about the images you saw on Divine Art [sic] that would
13   help you identify which ones you used in designing the
14   Heresy-Era shoulder pads?
15        MS. KALEMERIS:  Objection.  Form.
16        THE WITNESS:  Well, if -- if -- if I'm shown
17   the pictures, I might have -- I might remember if I
18   used any of those.  But if not, then I don't remember.
19        Q.  BY MR. KEENER:  Prior to today, have you made
20   any attempt to go back and identify those pictures?
21        A.  These particular pictures or in gen --
22        Q.  No.  The pictures from -- I'm sorry.
23        Prior to today, have you made any attempt to
24   go back and identify the pictures from Divine Art [sic]
25   that you used as references in creating the Heresy-Era

Page 58

1    shoulder pads?
2         MS. KALEMERIS:  Objection.  Form.  Misstates
3    testimony.
4         THE WITNESS:  I'm -- say -- say that again.
5    I'm sorry.
6         Q.  BY MR. KEENER:  Prior to today --
7         A.  Yes.
8         Q.  -- have you made any attempt to go back
9    and identify from Divine Art [sic] those pictures you
10   used as references in designing any of the Heresy-Era
11   Shoulder Pads for Terminators?
12        MS. KALEMERIS:  Same objection.
13        THE WITNESS:  Yes.
14        Q.  BY MR. KEENER:  And what did you identify?
15        A.  I don't remember.
16        Q.  When did you do this identification?
17        A.  It was, I think, a month ago.
18        MS. KALEMERIS:  I'll caution Mr. Fiertek,
19   again, not to --
20        THE WITNESS:  Sure.  Sure.
21        MS. KALEMERIS:  -- reveal the content of any
22   confidential conversations with counsel.
23        THE WITNESS:  It was related to a request made
24   by counsel.
25        Q.  BY MR. KEENER:  But you think you did it about

Page 59

1    a month ago?
2         A.  Well, technically speaking, my counselor
3    should know the exact date.  But I -- I don't remember.
4    It feels like a month ago.  Maybe more.  It's just my
5    recollection of -- of the time.
6         Q.  Okay.  But as you sit here today, you can't
7    tell me whether the pictures in Fiertek 2 were the
8    one you identified?
9         MS. KALEMERIS:  Objection.  Asked and
10   answered.
11        THE WITNESS:  No.
12        MR. KEENER:  Okay.  Let's have document 19
13   marked as Fiertek Exhibit 3.  Gill --
14        MS. STEVENSON:  Sorry.
15        MR. KEENER:  -- document 19.
16        MS. STEVENSON:  I didn't realize you were
17   talking to me then.  Thank you for waking me up.
18        (T. Fiertek Exhibit 3 marked.)
19        Q.  BY MR. KEENER:  So Fiertek Exhibit 3 is a
20   document Bates labeled Chapterhouse 32353 through 32361.
21        Do you recognize this document?
22        A.  Give me a minute.  (Examining.)  Well, at
23   least based on the first two pages, it's obvious that
24   I have written this.  I do not recall it, however.
25        Q.  Okay.  The top of page -- the first page,

Page 60

1    it looks like an e-mail from you to you; is that
2    correct?
3         A.  Page 1?
4         Q.  Yeah.  The very top.
5         A.  From me to me?  I'm not quite following you.
6         Q.  On February 3rd.
7         A.  Hmm.  Well, yeah.  That's -- it says that.
8         Q.  Do you have any idea why you apparently
9    forwarded this e-mail to yourself on February 3rd, 2013?
10        A.  I think I do, actually.  Especially -- I
11   think it's part of me collecting -- it has to do with
12   a counselor request of collecting e-mails for -- to --
13   to meet against Workshop [sic] request of collecting
14   e-mails from my -- from my e-mail account that are --
15   that might be relevant to -- to this deposition or to
16   the list of items that Games Workshop -- well, I don't
17   know the legal terminology for that.  But the first
18   attempt at collecting e-mails, I apparently, well,
19   made -- made an error.  Each e-mail I --
20        MS. KALEMERIS:  And -- and, Mr. Fiertek I will
21   caution you not to reveal any confidential conversations
22   with counsel.
23        THE WITNESS:  Sure.  The question was why I
24   forwarded this e-mail to myself.
25        MS. KALEMERIS:  Right.

15  (Pages 57 to 60)

Case: 1:10-cv-08103 Document #: 370-5 Filed: 05/30/13 Page 17 of 66 PageID #:21410

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

Page 61

1      THE WITNESS: And that was -- that was because
2   I was -- again, I was asked by my counsel to collect
3   e-mails relevant to something. I don't remember what.
4   I think it had to do with today's deposition or parts
5   of it. And my idea of saving time was: Every time I
6   recognized an e-mail or an e-mail thread that I thought
7   was of potential interest, I forwarded it to myself,
8   thinking that -- I had like -- I think I had 1,200
9   e-mails to sort through. And as I understood, it was
10  a question of -- of -- of time.
11     So I thought I'd save time by -- again,
12  by every e-mail or e-mail thread I thought was of
13  relevance -- thus, ending up with a string of "forward"
14  marked e-mails that I later on just could simply fast
15  click on and send to -- to my counsel. Later I was --
16  I was told that this process is not --
17     MS. KALEMERIS: And, Mr. Fiertek, again, don't
18  reveal any confidential conversations --
19     THE WITNESS: Sure.
20     MS. KALEMERIS: -- with counsel.
21     THE WITNESS: Well, then I'll -- then I'll
22  hold here. That was my first obviously wrong attempt
23  at collecting e-mails as requested.
24     Q. BY MR. KEENER: Okay. So this reflects your
25  first attempt to collect e-mails on these new products

Page 62

1   on February 3rd?
2      A. Yes.
3      MS. KALEMERIS: Objection. Misstates
4   testimony.
5      Q. BY MR. KEENER: I'm sorry. Can you repeat
6   your answer?
7      A. "Yes."
8      Q. And under the "Subject" line, I see:
9   "(131-141 plus unfinished/unreleased things)."
10     Do you know what the numbers "131-141" mean?
11     A. Oh, under "Subject" you mean?
12     Q. Yes.
13     A. Oh, that's -- that's my -- every time I
14  forwarded the -- the relevant -- well, what I thought
15  was a relevant e-mail thread, I -- not every time, but
16  most of the times, I added my own comments to, in my
17  mind, ease things up for the counselor.
18     That -- it says "131-141." Those were
19  numbers -- item numbers of the lists that Games
20  Workshop made that I was given. And every time I --
21  I thought I recognized an e-mail thread that might
22  have something to do with one of those items, I made
23  a comment that basically: Hey, guys, this is an e-mail
24  thread, and Item 131 to 141 might be discussed there.
25     I -- as I said, I had roughly 1,200 e-mails

Page 63

1   to rush through. So those things might be wrong. But
2   it was -- it was my apparently foolish attempt of saving
3   time collecting e-mails.
4      Q. Okay. If you turn to page 7, which ends in
5   No. 359.
6      MS. KALEMERIS: Can I, just for one second,
7   say that many of these communications should have been
8   redacted for privilege. And we'll need to take a look
9   at this.
10     MR. KEENER: Is there something privileged
11  on this document I shouldn't be asking about?
12     MS. KALEMERIS: I think the -- the content
13  of the -- the header there is something that we'll
14  need to -- to re-evaluate for privilege.
15     MR. KEENER: Beyond the header, is there
16  any issue about me asking questions on the rest of
17  the document?
18     MS. KALEMERIS: I don't believe so.
19     Q. BY MR. KEENER: Would you turn to page 7,
20  please --
21     A. Yes.
22     Q. -- that ends on 359 at the bottom. It looks
23  like there's an e-mail from a Ken Perry to you.
24     Do you see that?
25     A. Yep.

Page 64

1      Q. Do you know who Ken Perry is?
2      A. Could you give me time to read that, and
3   I might answer who Ken Perry is? Because right now --
4      Q. Yes.
5      A. -- I have no idea. Sorry. I --
6      (Examining.) I think I know.
7      Q. Okay. Who is Ken Perry?
8      A. I believe he is a friend -- well, not friend.
9   Someone I exchanged e-mail conversation with from one of
10  the hobby boards online. And it seems that I'm actually
11  asking him of -- well, feedback for some idea I was
12  working on that. And that thing is not something
13  made nor released. It's -- at least then it was only
14  discussion -- discussion state and -- well, that's --
15  that's what I can say about that.
16     Q. Is there a name for -- for this product that
17  you can use?
18     MS. HARTZELL: Objection. Counsel, to the
19  extent that we're discussing products that have not
20  yet been released, then we would ask that counsel
21  for Games Workshop leave the room and the transcript
22  be designated "highly confidential."
23     MR. KEENER: We can wait on that. We'll
24  circle back.
25     THE WITNESS: All right.

16 (Pages 61 to 64)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 65

1    Q.  BY MR. KEENER:  Okay.  So the bottom of page 7
2  is an e-mail from Ken Perry to you; correct?
3    A.  Yes.
4    Q.  November 25th of 2011?
5    A.  Yeah.
6    Q.  And it starts out:
7       "I love pre-Heresy stuff, obviously, and there
8  are no really good pre-Heresy Terminator options out
9  there at all."
10      Do you see that?
11     A.  Yeah.
12     Q.  What did you take that to mean when you
13 received that?
14     A.  Well, it's his words.  And my guess is he's
15 referring to a specific theme that he --
16     Q.  And do you know what theme that is?
17     A.  Well, it's a thing called "pre-Heresy"
18 apparently.  And --
19     Q.  Do you have an understanding of what that is?
20     A.  Yes, I do.
21     Q.  And what is it?
22     A.  It has to do with a certain age in a fantasy
23 story that --
24     Q.  And is that pre-Heresy theme depicted in the
25 Horus Heresy Visions books we looked at earlier?

---

Page 66

1    A.  Well, the -- the Visions book [sic] describe
2  the fantasy story during the Heresy era of that universe
3  fantasy setting.  Pre-Heresy would --
4       MS. KALEMERIS:  May I -- may I interject one
5  second?  I believe counsel for Games Workshop is looking
6  at these e-mails right now, which are designated "highly
7  confidential, attorneys' eyes only."
8       MR. KEENER:  I believe she's allowed to under
9  the protective order.  Is there a reason to believe not
10 to?
11      MS. KALEMERIS:  I believe these were for
12 outside coun -- intended for outside counsel only,
13 as they often disclose -- since we agreed to produce
14 documents related to products that had not yet been
15 released.
16      MR. KEENER:  Right.  She's allowed to see
17 anything marked "confidential, AEO" under the protective
18 order.  Can you somehow identify which document she
19 should not be able to see?
20      MS. KALEMERIS:  Not at this time.
21      MR. KEENER:  Okay.
22      MS. KALEMERIS:  But we'll congress.
23     Q.  BY MR. KEENER:  When you reference pre-Heresy
24 of some game company, I'm trying to make sure we're
25 talking about the same thing.

---

Page 67

1       Are you talking about the pre-Heresy theme of
2  the Games Workshop 40K universe?
3    A.  Yes.
4    Q.  And he says there aren't any good pre-Heresy
5  Terminator options out there.
6       Did you agree with that?
7       MS. KALEMERIS:  Objection.  Form.
8       THE WITNESS:  Well, it's his -- it's his
9  opinion.  And -- and I cannot agree nor disagree with
10 that because I have actually not made a -- an active
11 effort to track down all eventual options.  So I don't
12 know if that's accurate.  I don't know.
13     Q.  BY MR. KEENER:  Would you understand a
14 pre-Heresy Terminator option to be a Terminator in
15 the style as depicted in the Horus Heresy Vision books?
16      MS. KALEMERIS:  Objection.  Form.
17      THE WITNESS:  No.  Actually not.
18     Q.  BY MR. KEENER:  Okay.  Two sentences down,
19 it says:
20      "I'm sure Forge World will eventually get
21 around to them...but that will be a while.  And it
22 will also be at FW prices too!"
23      Do you see that?
24     A.  Yes.
25     Q.  And Forge World, do you understand that to

---

Page 68

1  be Games Workshop products?
2    A.  I understand -- or rather I think they are
3  some company licensed to -- to Games Workshop.  That's
4  my understanding of Forge World.
5    Q.  Okay.  Two sentences down, it says:
6       "More of the 'leather straps' and
7  chain/chain-mail sections, as shown in the HH artwork."
8       Do you see that?
9    A.  Yes.
10     Q.  What do you understand the "HH artwork" to
11 mean?
12     A.  The Heresy art books I was looking -- looking
13 through earlier.
14     Q.  And do you have an idea of what it means
15 to be the leather straps as shown in the Horus Heresy
16 artwork?
17     A.  Give me a second.  I think he -- well,
18 he's referring to pictures or ideas of leather straps
19 and chain-mail that he sees in the artwork -- artwork
20 books.  But, then again, you should ask him.  I'm not
21 a mind-reader.
22     Q.  And some of the pictures you identified
23 earlier had leather straps, for example, hanging
24 down from the shoulder pad; correct?
25     A.  Correct.

---

17 (Pages 65 to 68)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

Page 69

```
 1        Q.   Now, if you look to page 6, which ends in
 2   page 358, on the bottom there is an e-mail from you
 3   to Ken Perry on November 25th, 2011.
 4        Do you see that?
 5        A.   Yes.
 6        Q.   And the second paragraph states:
 7        "With spikes I mean hmm" --
 8        H-m-m.
 9        -- "think of all the bronze bands covering
10   all 40K art on old armor.  In the corners, they all
11   have like 'asrrow'" --
12        A-s-r-r-o-w [sic].
13        -- "'points' as ornamentation, so no real
14   spiked as in sticking out.  3D spikes was what I meant."
15        Do you see that?
16        A.   Yes.
17        Q.   And when you're referring to "bronze bands
18   covering all 40K art on old armor," what were you
19   referring to?
20        A.   Well, first of all, it -- I think it's an
21   exaggeration.  There can't be bronze bands on all 40K
22   stuff.  I mean, I think we were discussing ideas of
23   what he or me wanted to do or not to do.  This is a
24   pretty old e-mail.  Well, my -- my current understanding
25   of that, what I understand is, well, it's part of an
```

Page 70

```
 1   exaggeration, because you cannot intrude.
 2        Q.   When you refer to "old armor," do you know
 3   if you're referring to depictions of what armor looked
 4   like in the old time in the universe, such as the --
 5   the Horus Heresy pictures, or old armor as in what
 6   Games Workshop used to make a long time ago?
 7        MS. KALEMERIS:  Objection.  Form.
 8        THE WITNESS:  I think I was referring to
 9   old as in that theme or style used in different --
10   in a different age in that fantasy story.
11        Q.   BY MR. KEENER:  So you're referring to the
12   fact that, in the -- the Heresy-Era time, much of the
13   40K armor had bronze banding around it?
14        MS. KALEMERIS:  Objection.  Form.
15        THE WITNESS:  I don't know that because
16   I don't know if that's a fact.  And I actually --
17   I actually wrote "all," not "some" or "most."  So
18   all I can say is it must be some sort of exaggeration
19   for some reason while we're discussing some thing.
20        Q.   BY MR. KEENER:  But the exaggeration you're
21   trying to convey was the exaggeration that many of the
22   40K armor depicted in the Heresy-Era time frame of
23   Games Workshop's universe have bronze banding around it?
24        MS. KALEMERIS:  Objection.  Form.
25        THE WITNESS:  I wouldn't say that.  I think
```

Page 71

```
 1   there was banding.  I don't know to what extent there
 2   was banding, though.  For that I would have to check
 3   it up.  But that's all I can say.  I mean, this is one
 4   and a half year old.
 5        Q.   BY MR. KEENER:  Would you -- I'm sorry.
 6   Finish.
 7        A.   No, I'm -- I'm -- I'm finished.  Sorry.
 8   Continue.
 9        Q.   Would you agree that a number of the pictures
10   that you identified earlier that you used as inspiration
11   depicted bronze banding around the armor?
12        MS. KALEMERIS:  Objection.  Form.
13        THE WITNESS:  I have no idea.  I would -- I
14   would need to look at the pictures again because banding
15   was not -- was not -- was not what I was looking for.
16   Sorry.  My English gets rough when I'm tired.
17        Q.   BY MR. KEENER:  Okay.  And if there's any
18   problem and you need a break, just let me know.
19        A.   Oh, sure.
20        MR. KEENER:  And just to put on the record,
21   instead of physically marking the books you brought
22   today, counsel has represented that they're going
23   to make copies of all those books and stipulate that
24   those copies are what you're referring to at today's
25   deposition.
```

Page 72

```
 1        Is that correct, Counsel?
 2        MS. KALEMERIS:  That's correct.
 3        THE WITNESS:  Sure.
 4        MR. KEENER:  All right.  Let's move -- Gill,
 5   if you can take document 24, the big chart.
 6        MS. STEVENSON:  Yes.
 7        MR. KEENER:  And let's mark that as Fiertek
 8   Exhibit 4.  And I understand there aren't any page
 9   numbers on this document.  But the products do go
10   in numerical order on the left-hand side.
11        MS. KALEMERIS:  Do you have one for me?
12        (T. Fiertek Exhibit 4 marked.)
13        Q.   BY MR. KEENER:  If you turn to about the
14   middle, there should be an entry for "137."  If you
15   could find that and let me know when you're there.
16        A.   (Examining.)  Yeah, I'm there.
17        Q.   And does 137 depict one of the Heresy-Era
18   Shoulder Pads for Terminators that you designed?
19        A.   Yes.
20        Q.   And do you notice any differences to that
21   picture from the one that you designed?
22        MS. KALEMERIS:  Objection.  Form.
23        THE WITNESS:  Slight differences.  Yes.
24        Q.   BY MR. KEENER:  What differences do you
25   identify?
```

18 (Pages 69 to 72)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                        Deposition of Tomas Fiertek

---

Page 73

1   A.  Lack of detail.  And straight lines are not
2   straight.  And I think it's -- it's either molding or
3   casting errors or maybe someone made an alteration
4   without my knowledge.  But there are slight differences.
5   Yes.
6   Q.  Okay.  And do you see in the -- do you see
7   that -- would you characterize it as having bronze
8   banding around the shoulder pads?
9        MS. KALEMERIS:  Objection.  Form.
10       THE WITNESS:  Yes.
11  Q.  BY MR. KEENER:  And on the bottom right-hand
12  corner of the banding, what would you characterize that
13  to be?
14       A.  A little tip of an arrow or spike or --
15  Q.  And looking back at Exhibit 3, is that what
16  you meant when you said in the corners they all have
17  arrow points as ornamentation?
18       MS. KALEMERIS:  Objection.  Form.
19       THE WITNESS:  I would say so.  Yes.
20  Q.  BY MR. KEENER:  And hanging down from the
21  shoulder pads, are those the leather straps we've been
22  discussing?
23       MS. KALEMERIS:  Objection.  Form.
24       THE WITNESS:  Well, those are leather straps.
25  I don't know if they are those we were discussing.  But

---

Page 74

1   they're obviously leather straps.
2   Q.  BY MR. KEENER:  But they are leather straps?
3        A.  Yes.
4   Q.  If you turn to the next page, on the
5   right-hand side, there's a picture there.
6        A.  Sure.
7   Q.  Is that one of the pictures you identified
8   earlier today?
9        A.  I don't think so.
10  Q.  Do you know if you've ever seen this picture
11  before?
12       A.  Yes.
13  Q.  I didn't hear that.
14       A.  Yes.  Yes.  Sorry.
15  Q.  Do you know if you've seen that picture before
16  you designed this product?
17       A.  Yes.
18  Q.  Do you know if you used this picture in any
19  way for the design of the Heresy-Era Shoulder Pads for
20  Terminators Type E?
21       MS. KALEMERIS:  Objection.  Form.  Vague as
22  to "use."
23       THE WITNESS:  I don't recall.  It was a long
24  time ago.
25  Q.  BY MR. KEENER:  Would you agree that both

---

Page 75

1   the picture and your product show shoulder pads with
2   overlapping armor?
3        A.  Yes.
4   Q.  Would you agree that they both appear to have
5   bronze banding around the shoulder pads?
6        A.  Yes.
7   Q.  Would you agree that both appear to have
8   leather straps hanging down?
9        A.  Yes.
10  Q.  Would you agree that the shape of the top
11  piece of the shoulder pad is a similar shape?
12       MS. KALEMERIS:  Objection.  Form.
13       THE WITNESS:  Well, define "similar."
14  Q.  BY MR. KEENER:  Do you see how theirs, it
15  appears to be a cut-out in the bottom right of that
16  piece of shoulder pad, the top layer?
17       A.  Well, the overall imagery is similar.  But
18  the angles are not.  So I mean --
19  Q.  Would you agree they both have that same
20  cut-out?
21       A.  Yes.  Oh, similar.  Yeah.  It's not the same.
22  Q.  If you turn to the next page, they still have
23  a cut-out?
24       A.  Excuse me?
25  Q.  Still are cut out?

---

Page 76

1        MS. KALEMERIS:  Objection.  Form.
2        THE WITNESS:  I didn't -- I didn't catch the
3   question.
4   Q.  BY MR. KEENER:  You said they weren't exactly
5   the same.
6        A.  Oh.
7   Q.  I'm asking:  Do you agree that they're a
8   similar cut-out?
9        MS. KALEMERIS:  Objection.  Form.
10       THE WITNESS:  To a certain degree, yes.
11  Q.  BY MR. KEENER:  If you turn to the next page,
12  on the right-hand side, there's another picture from
13  page 274 of Horus Heresy Collected Visions.
14  Do you see that picture?
15       A.  Yes.
16  Q.  And this is one of the pictures you identified
17  earlier today that you used as a reference in creating
18  the product; right?
19       MS. KALEMERIS:  Objection.  Form.  Misstates
20  testimony as to "reference."
21       THE WITNESS:  I don't think so, not that I
22  identified today.
23  Q.  BY MR. KEENER:  Okay.  Do you believe you
24  used this picture at all in any way in the design of
25  the product?

---

19 (Pages 73 to 76)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

Page 77

1    MS. KALEMERIS:  Objection.  Form.  Vague as
2  to "use."
3    THE WITNESS:  No.
4    Q.  BY MR. KEENER:  And do you believe you saw
5  this picture prior to you designing the product?
6    A.  Yes.
7    Q.  Do you agree this picture also shows the two
8  overlapping pieces of armor on the shoulder pad?
9    A.  Yes.
10   Q.  And it also shows the leather straps hanging
11  down?
12   A.  Well, one picture shows two overlapping armor
13  pieces.  And the other picture shows the leather straps.
14  Combining those pictures, you get two plus leather
15  straps.
16   Q.  I don't know if we're looking at the same one.
17      Are we looking at the picture that underneath
18  says page "274"?
19   A.  274?  Let's see here.
20   Q.  It's right --
21   A.  Oh.
22   Q.  -- before product entry 138.
23   A.  That was not the same picture.  Sorry.
24   Q.  There we go.
25   A.  There we go.

Page 78

1    Q.  Now, is this one of the pictures you
2  identified previously today?
3    A.  Yes.
4    Q.  And that was -- as one of the pictures you
5  used in designing, developing the Heresy-Era shoulder
6  pads?
7    MS. KALEMERIS:  Objection.  Form.  Vague as
8  to "use."
9    THE WITNESS:  One of the pictures giving me
10  ideas for the design, yes.
11   Q.  BY MR. KEENER:  And would you agree this
12  picture, again, shows two overlapping pieces of armor
13  on the shoulder pad?
14   A.  Yes.
15   Q.  And it shows the leather straps hanging down?
16   A.  Yes.
17   Q.  And it shows bronze banding around the armor?
18   A.  Yes.
19   Q.  And, like your design, it has rivets along
20  the bronze banding?
21   MS. KALEMERIS:  Objection.  Form.
22   THE WITNESS:  It has rivets.  Yes.
23   Q.  BY MR. KEENER:  And, again, it has a cut-out
24  in the bottom outside corner of the larger shoulder pad?
25   A.  It has a rounded cut-out.  Yes.

Page 79

1    Q.  Now, looking at the next product.  It starts
2  138, the Type D of the Heresy-Era shoulder pads.  The
3  actual picture is on the next page.
4    Do you see that picture at the bottom?
5    A.  Yes.
6    Q.  And is that the product you designed?
7    A.  Yes.
8    Q.  Are there any differences in this product from
9  the one that you designed?
10   A.  Detail is degraded.  Stuff is missing.  And
11  some things look bent.  But, otherwise, it's my product.
12   Q.  What is missing?
13   A.  At least one rivet.  And the leather straps
14  have metal rings to them.  I don't see two of them
15  that are supposed to be there.  Plus the -- hmm, I --
16  I -- there's a bent feeling towards it, but yeah.
17   Q.  So the missing pieces appear to be one of the
18  rivets and one or two of the metal rings?
19   MS. KALEMERIS:  Objection.  Form.
20   THE WITNESS:  Yes.
21   Q.  BY MR. KEENER:  Do you see the picture on the
22  right-hand side that says it's from page 78 of the Horus
23  Heresy Collected Visions?
24   A.  Yes.
25   Q.  And is that one of the pictures you identified

Page 80

1  earlier today as one that you used in designing and
2  developing these products?
3    MS. KALEMERIS:  Objection.  Form.  Vague as
4  to "use."
5    THE WITNESS:  I don't think so.
6    Q.  BY MR. KEENER:  Do you believe you -- have you
7  seen this picture before?
8    A.  Yes.
9    Q.  And you believe you saw it prior to creating
10  the -- the Chapterhouse Heresy-Era shoulder pads?
11   A.  Yes.
12   Q.  Would you agree that the picture, again, shows
13  two overlapping pieces of armor?
14   A.  Yes.
15   Q.  And it has bronze banding around the outside
16  again?
17   A.  Yes.
18   Q.  And it has rivets in that banding?
19   A.  Well, at least on one of the bands, not the
20  other.  But yes.
21   Q.  And it has leather straps hanging down?
22   A.  Yes.
23   Q.  And it, again, has a cut-out in the lower
24  outside portion of the larger piece of shoulder pad?
25   A.  Yes.

20  (Pages 77 to 80)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 81

1    Q.  Is it your belief that you did not refer to
2  this picture in any way in the design and development
3  of Heresy-Era Shoulder Pads for Terminator Type D?
4       MS. KALEMERIS:  Objection.  Form.
5       THE WITNESS:  Define "any way."
6    Q.  BY MR. KEENER:  All right.  Why don't you use
7  it in any way?  And then, if you did, I'll ask in what
8  way.
9    A.  Well --
10    Q.  So did you use it in any way?
11    A.  I used it in some way.  I don't know if I used
12  this particular picture.  There might be more similar or
13  like it in the books.  But I did use it for -- for the
14  theme and ideas.  Yes.
15    Q.  Okay.  So you used either this picture or
16  one very similar to it in designing Heresy-Era Shoulder
17  Pads for Terminators Type D?
18       MS. KALEMERIS:  Objection.  Form.  Vague as
19  to "use."
20       THE WITNESS:  As a inspiration and idea help,
21  yes.
22    Q.  BY MR. KEENER:  And those ideas would be some
23  of the ones we talked about such as two overlapping
24  pieces of armor?
25       MS. KALEMERIS:  Objection.  Form.

---

Page 82

1       THE WITNESS:  That would be one of the ideas.
2  Yes.
3    Q.  BY MR. KEENER:  And the bronze banding?
4       MS. KALEMERIS:  Objection.  Form.
5       THE WITNESS:  I don't know that.
6    Q.  BY MR. KEENER:  Did you use it for the idea
7  of rivets in the bronze banding?
8       MS. KALEMERIS:  Objection.  Form.
9       THE WITNESS:  I actually don't remember
10  where the idea for bronze banding came from in the
11  first place.
12    Q.  BY MR. KEENER:  Did you use it for the idea
13  of leather straps hanging down from the shoulder pad?
14       MS. KALEMERIS:  Objection.  Form.
15       THE WITNESS:  I think so.
16    Q.  BY MR. KEENER:  Did you use it for the idea
17  of the cut-out in the lower outside portion of the
18  bigger shoulder pad?
19       MS. KALEMERIS:  Objection.  Form.
20       THE WITNESS:  Yes.
21    Q.  BY MR. KEENER:  Did you use it for the overall
22  shape of the two pieces of the shoulder pad?
23       MS. KALEMERIS:  Objection.  Form.  Vague as
24  to "shape."
25       THE WITNESS:  No.

---

Page 83

1    Q.  BY MR. KEENER:  Did you use it for any other
2  idea that we did not identify already?
3       MS. KALEMERIS:  Objection.  Form.
4       THE WITNESS:  Yes.
5    Q.  BY MR. KEENER:  What other idea did you use
6  it for?
7    A.  To incorporate a style or theme that is,
8  according to my belief, at least back then, ancient
9  Roman in -- in its origins.
10    Q.  And you haven't collected or identified any
11  pictures of ancient Roman or otherwise shoulder pads
12  that you used in developing this product, did you?
13       MS. KALEMERIS:  Objection.  Misstates
14  testimony.
15       THE WITNESS:  I don't remember if I ever
16  saved or actively saved pictures originating in Internet
17  searches.  I don't remember that.
18    Q.  BY MR. KEENER:  Do you believe that you saw
19  any ancient Roman shoulder pads that were two large
20  overlapping pieces of armor with a cut-out in the
21  upper portion and the banding around the sides?
22       MS. KALEMERIS:  Objection.  Form.
23       THE WITNESS:  No.
24    Q.  BY MR. KEENER:  How about the two large
25  overlapping pieces with leather straps hanging down?

---

Page 84

1       MS. KALEMERIS:  Objection.  Form.
2       THE WITNESS:  That I don't remember.
3    Q.  BY MR. KEENER:  If you look at the next
4  product, it's under product 139, the picture of
5  the chopped-off part is on the next page.  This
6  is Heresy-Era Shoulder Pad for Terminators Type B.
7       Do you see it?
8    A.  Yeah, 139.
9    Q.  Is that a product you design -- is that a
10  product you designed?
11    A.  Yes.
12    Q.  Are there any changes in that product from
13  the one that you designed?
14    A.  Does it say "140" at the lower left corner?
15    Q.  It does.  But it's actually depicting product
16  139.
17    A.  All right.  All right.  All right.
18       Did -- did you ask me if I see any differences
19  between --
20    Q.  Yes.
21    A.  Yes, I do.
22    Q.  What differences?
23    A.  Again, detail degration [sic], size
24  and shapes of the studs, leather straps being not
25  consistent.  That's about it from that angle at least.

21 (Pages 81 to 84)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                        Deposition of Tomas Fiertek

## Page 85

1    Q.  And would this be another shoulder pad design
2    you created that are two large overlapping pieces of
3    armor?
4         MS. KALEMERIS:  Objection.  Form.
5         THE WITNESS:  Yes.
6    Q.  BY MR. KEENER:  With bronze banding around
7    them?
8         MS. KALEMERIS:  Objection.  Form.
9         THE WITNESS:  Yes.
10   Q.  BY MR. KEENER:  With rivets in the banding?
11        MS. KALEMERIS:  Objection.  Form.
12        THE WITNESS:  Unless half of the rivets are
13   missing -- I just see it now -- then yes.
14   Q.  BY MR. KEENER:  With leather straps hanging
15   down?
16        MS. KALEMERIS:  Objection.  Form.
17        THE WITNESS:  Yes.
18   Q.  BY MR. KEENER:  With a curved cut-out in the
19   bottom outside portion of the larger piece of armor?
20        MS. KALEMERIS:  Objection.  Form.
21        THE WITNESS:  Yes.
22   Q.  BY MR. KEENER:  Now, on the right-hand side,
23   do you see two pictures there that show they're from
24   page 103 and 268 of Horus Heresy Collected Visions?
25   A.  Yes.

## Page 86

1    Q.  The picture on the left, is that one you
2    identified earlier today?
3    A.  Not that I know of.
4    Q.  Do you know if you've seen that picture
5    before?
6    A.  Yes.
7    Q.  And did you see that picture prior to
8    designing the Heresy-Era Shoulder Pads for Terminators?
9    A.  Yes.
10   Q.  And the right-hand picture from page 268 of
11   the Horus Heresy Collected Visions, was that one of the
12   pictures you identified earlier today?
13   A.  No.
14   Q.  Do you -- have you seen that product -- that
15   picture before?
16   A.  Okay.  And did you see that picture prior to
17   Q.  Okay.  And did you see that picture prior to
18   designing the Heresy-Era Shoulder Pads for Chapterhouse?
19   A.  Yes.
20   Q.  Do you believe you used either of these two
21   pictures in any way in the design of the Heresy-Era
22   Shoulder Pads for Terminators?
23        MS. KALEMERIS:  Objection.  Form.
24        THE WITNESS:  No.
25   Q.  BY MR. KEENER:  On the picture to the -- on

## Page 87

1    the right-hand side from page 268, do you see how there
2    are large studs in the larger piece of the shoulder pad?
3         MS. KALEMERIS:  Objection.  Form.
4         THE WITNESS:  Subject matter.  I see small
5    studs, but yes.
6    Q.  BY MR. KEENER:  You see studs that are larger
7    than the rivets; correct?
8         MS. KALEMERIS:  Objection.  Form.
9         THE WITNESS:  Correct.
10   Q.  BY MR. KEENER:  And your product also has
11   studs on the main portion of the shoulder pad that
12   are larger than the rivets?
13        MS. KALEMERIS:  Objection.  Form.
14        THE WITNESS:  It has larger-than-rivet studs
15   on both parts of the major armor pieces.
16   Q.  BY MR. KEENER:  Have you been able to identify
17   specifically any pictures that you used in developing
18   these products other than Games Workshop pictures that
19   have these studs on the -- on the shoulder pad armor?
20        MS. KALEMERIS:  Objection.  Form.
21        THE WITNESS:  Yes.  But not of that size.
22   Q.  BY MR. KEENER:  The question is:  Have you
23   been able to identify any specific images other than
24   Games Workshop images that show these type of large
25   studs on the main portion of the shoulder pad?

## Page 88

1         MS. KALEMERIS:  Same objection.
2         THE WITNESS:  Not as I remember right now.
3    Q.  BY MR. KEENER:  So would the source of
4    inspiration for that idea be from the Games Workshop
5    artwork?
6         MS. KALEMERIS:  Objection.  Form.
7         THE WITNESS:  Partly from the Games Workshop
8    theme and genre.
9    Q.  BY MR. KEENER:  As depicted in the artwork?
10        MS. KALEMERIS:  Objection.  Form.
11        THE WITNESS:  Amongst other things, yes.
12   Q.  BY MR. KEENER:  Looking at the next
13   Chapterhouse product on page -- on -- product 140.
14   This is the Heresy-Era Shoulder Pad for Terminators
15   Type C.  The picture's on the next page.
16        Are you there?
17   A.  Yeah.
18   Q.  And is this another shoulder pad that you
19   designed?
20   A.  Yes.
21   Q.  Are there any differences in this shoulder pad
22   from the one that you designed?
23   A.  Sadly, yes.
24   Q.  What differences do you see?
25   A.  There appears to be a elongation or warping

22  (Pages 85 to 88)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 89

1  of the lower armor piece that I do not recall making.
2      Q.  Any other differences?
3      A.  And the leather straps are inconsistent.
4      Q.  Any other differences?
5      A.  Not that I can think of right now.
6      Q.  And is this another example of shoulder pads
7  you designed with two large overlapping plates?
8          MS. KALEMERIS:  Objection.  Form.
9          THE WITNESS:  Yes.
10     Q.  BY MR. KEENER:  With bronze banding around
11 them?
12         MS. KALEMERIS:  Objection.  Form.
13         THE WITNESS:  Yes.
14     Q.  BY MR. KEENER:  With rivets in the bronze
15 banding?
16         MS. KALEMERIS:  Objection.  Form.
17         THE WITNESS:  Yes.
18     Q.  BY MR. KEENER:  With leather straps hanging
19 down?
20         MS. KALEMERIS:  Objection.  Form.
21         THE WITNESS:  Yes.
22     Q.  BY MR. KEENER:  With a cut-out in the bottom
23 outside portion of the larger piece of armor?
24         MS. KALEMERIS:  Objection.  Form.
25         THE WITNESS:  Yes.

---

Page 90

1      Q.  BY MR. KEENER:  As you sit here today, are
2  you able to identify any image of a shoulder pad, other
3  than a Games Workshop shoulder pad, with those features
4  of two overlapping plates, bronze banding with rivets,
5  leather hanging down, and a cut-out in the bottom
6  outside portion of the larger piece of armor?
7          MS. KALEMERIS:  Objection.  Form.
8          THE WITNESS:  Not that I can think of.
9      Q.  BY MR. KEENER:  Only the Games Workshop
10 artwork?
11         MS. KALEMERIS:  Objection.  Form.  Misstates
12 testimony.
13         THE WITNESS:  Out of memory, no.
14     Q.  BY MR. KEENER:  So you agree that the only
15 place you see that is in the Games Workshop artwork?
16         MS. KALEMERIS:  Objection.  Form.
17         THE WITNESS:  No.
18         MS. KALEMERIS:  Misstates testimony.
19     Q.  BY MR. KEENER:  No, you don't see that in
20 Games Workshop artwork?
21     A.  No, I do not agree that I only see them in
22 Games Workshop's artwork.
23     Q.  My question is:  Where else have you seen
24 that?  What other pictures?
25     A.  I don't remember.  Thus, I can't be specific.

---

Page 91

1      Q.  On the right-hand page at the bottom, do you
2  see a picture of a miniature labeled mark 1 thunder
3  hammer -- I'm sorry -- "Mark 1 Thunder Armor"?  (As
4  read.)
5      A.  Yes.
6      Q.  Have you seen a picture of that model before?
7      A.  Yes.
8      Q.  Have you seen that physical model before?
9      A.  No.
10     Q.  Have you seen the picture of that model
11 prior to designing the Heresy-Era Shoulder Pads for
12 Terminators?
13     A.  I don't know.
14     Q.  Do you know if you used that picture in any
15 way in designing the Heresy-Era Shoulder Pads for
16 Terminators?
17         MS. KALEMERIS:  Objection.  Form.
18         THE WITNESS:  Yes, I know.  And I did not do
19 that.
20     Q.  BY MR. KEENER:  If you turn to the next page,
21 product 141, identified as Heresy Era Shoulder Pad for
22 Terminators Type A.
23         Do you see that?
24     A.  Yes.
25     Q.  Is that a product you designed for

---

Page 92

1  Chapterhouse?
2      A.  Yes.
3      Q.  Are there any differences in the one you
4  designed from what's depicted?
5      A.  Yes.
6      Q.  What differences do you see?
7      A.  Warping.  Missing rivets.  The straps are
8  inconsistent and warped.  And what's supposed to be
9  straight lines are not straight.  That's about it.
10     Q.  And does this shoulder pad show a shoulder
11 pad with overlapping armor pieces?
12         MS. KALEMERIS:  Objection.  Form.
13         THE WITNESS:  Yes.
14     Q.  BY MR. KEENER:  With rivets in it?
15         MS. KALEMERIS:  Objection.  Form.
16         THE WITNESS:  Yes.
17     Q.  BY MR. KEENER:  With leather straps hanging
18 down?
19         MS. KALEMERIS:  Objection.  Form.
20         THE WITNESS:  No.
21     Q.  BY MR. KEENER:  What's hanging down?
22     A.  Well, my idea was interlocking metal straps
23 for a change.
24     Q.  Are you able to point to any specific image,
25 other than Games Workshop images, you used in designing

---

23  (Pages 89 to 92)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

Page 93

1  this product?
2      MS. KALEMERIS:  Objection.  Form.  Vague as
3  to "use."
4      THE WITNESS:  From memory alone, no.
5      Q.  BY MR. KEENER:  With the aid of anything as
6  you sit here today?
7      MS. KALEMERIS:  Objection.  Form.
8      THE WITNESS:  Google searches.
9      Q.  BY MR. KEENER:  But you have not attempted to
10 go back and identify those pictures for us, have you?
11     MS. KALEMERIS:  Objection.  Form.
12     THE WITNESS:  Yes, I have.
13     Q.  BY MR. KEENER:  And you believe you have
14 identified a specific image you used in creating this
15 product?
16     A.  Yes, I have.
17     Q.  Did you provide that image to counsel?
18     A.  I provided everything asked of me by counsel.
19 So it's -- should be there somewhere.
20     Q.  Can you explain what this image looks like?
21     A.  Well, it's a piece of shoulder armor using
22 three -- well, possibly four overlapping armor pieces
23 and metal strings hanging down and little rivets thrown
24 in for -- for atmosphere.
25         MR. KEENER:  I'm going to have marked, Gill.

Page 94

1  document 22 as Fiertek Exhibit 5.
2         (T. Fiertek Exhibit 5 marked.)
3      Q.  BY MR. KEENER:  Are these the images you were
4  just referring to?
5      A.  (Examining.)  Well, this particular image was
6  not in my mind.  But it's one of them.
7      Q.  Are any of the images depicted in Fiertek
8  Exhibit 5 the image you were referring to?
9      A.  I think so.  The first image, I think, is
10 part of several Roman armor images I was looking at.
11 And, again, that was quite a while ago.  So I don't
12 remember if this very image is one of them or not.
13 But I think so.
14     Q.  And do you believe you were looking at this
15 webpage when you were designing the Heresy-Era Shoulder
16 Pads for Terminators?
17     A.  I have no idea.  I -- Google Image searches
18 mostly.  And what -- what pages those referred to, I
19 actually don't know.  But yeah, that's -- that's all
20 I can say right now.
21     Q.  Do you see on the first page where it shows
22 that this blog post was on October 3rd, 2012?
23     A.  Yes.
24     Q.  So would you agree that that was after you
25 had finished design of the Heresy-Era shoulder pads?

Page 95

1      A.  I would agree that this picture figured on
2  that particular page after.  Yes.
3      Q.  So you agree it would have been impossible
4  for you to be looking at this page when you were
5  designing the Heresy-Era shoulder pads because it was
6  posted after you were finished designing them; correct?
7      MS. KALEMERIS:  Objection.  Form.
8      THE WITNESS:  Absolutely.
9      Q.  BY MR. KEENER:  So as we sit here today,
10 is there any way for you to identify exactly which
11 pictures you were looking at other than the Games
12 Workshop pictures?
13     MS. KALEMERIS:  Objection.  Form.
14     THE WITNESS:  If you show me the pictures,
15 I might be able to do that, or present me with a means
16 of Googling.
17     Q.  BY MR. KEENER:  I'm showing you the pictures
18 counsel gave us.  And that's all I have.
19     A.  All right.  Well --
20     Q.  And it's your testimony that the pictures on
21 this blog post were not the ones you looked at; correct?
22     MS. KALEMERIS:  Objection.  Form.  Misstates
23 testimony.
24     THE WITNESS:  It was posted on a blog post
25 afterwards.  So, I mean, I was asked to produce examples

Page 96

1  of Google images or the exact Google images used as
2  helping creating stuff.  And as I said before, if
3  I Google something today, it's -- possibly it's not
4  going to come up as -- in the same way as if I Googled
5  it a year ago or two years ago.  And I know I Googled
6  pictures of Roman -- Roman armor of various types and
7  ages.  And that is the only thing I went after when
8  I Googled pictures asked to be as similar or same as
9  possible for those used back then.  It's nothing else
10 to it.
11     Q.  BY MR. KEENER:  Okay.  So recently you
12 attempted to redo Google Image searches -- searches
13 and find images similar to the ones you might have
14 been looking at?
15     MS. KALEMERIS:  Objection.
16     THE WITNESS:  Correct.
17     MS. KALEMERIS:  Form.  Misstates testimony.
18     THE WITNESS:  Similar or the same.
19     Q.  BY MR. KEENER:  And you identified this
20 picture in that process?
21     A.  Yes.
22     Q.  And you agree now that this picture is not
23 one that you looked at because it was posted after your
24 design was finished?
25     MS. KALEMERIS:  Objection.  Form.  Misstates

24  (Pages 93 to 96)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

Page 97

1   testimony.
2        THE WITNESS:  I agree that this picture was
3   posted on that particular website afterwards.  The
4   origins of that picture -- who took it, who posted it,
5   and what date -- I have no idea about.  So I cannot
6   agree to that.
7        Q.  BY MR. KEENER:  As you sit here today, can
8   you say with any certainty that this was the exact
9   picture that you were looking at?
10       A.  Not with 100 percent certainty.  These are
11  pretty old projects that I made.  And, thus, the Roman
12  armor pictures I looked at back then are also pretty
13  old.
14       Q.  Looking at this picture on page 1 of Fiertek
15  Exhibit 5, would you agree there's nothing hanging down
16  from these shoulder pads?
17       MS. KALEMERIS:  Objection.  Form.
18       THE WITNESS:  Yes.
19       Q.  BY MR. KEENER:  And would you agree there are
20  no rivets on these shoulder pads?
21       A.  Yes.
22       Q.  And would you agree that these shoulder pads
23  are articulated and that they follow the curve of the
24  shoulder?
25       A.  Yeah.

Page 98

1        MS. KALEMERIS:  Objection.  Form.
2        THE WITNESS:  More or less, yes.  I would
3   also say that the curvature will be -- will rise if
4   the wearer's arms were rised [sic] with it.  So it's
5   both a "yes" and "no."
6        Q.  BY MR. KEENER:  So they're articulated, that
7   they move with the wearer's movement of arms?
8        MS. KALEMERIS:  Objection.  Form.
9        THE WITNESS:  There's to be the idea behind
10  the construction.
11       Q.  BY MR. KEENER:  And the one you designed is
12  not articulating; is that correct?
13       MS. KALEMERIS:  Objection.  Form.
14       THE WITNESS:  Well, it's physically impossible
15  for it to be.  It's one centimeter long and made in
16  pewter.  So it can't.  It's --
17       Q.  BY MR. KEENER:  It's not meant to depict an
18  articulating shoulder pad, is it?
19       MS. KALEMERIS:  Objection.  Form.
20       THE WITNESS:  That's a matter of opinion.
21  If you want it to, then -- I mean, toy -- toy airplanes
22  are not made to fly.  But in your fantasy, they might
23  as well do that.  So it's -- again, it's a matter of
24  opinion of the -- the person who uses said piece.
25       Q.  BY MR. KEENER:  In your design of this

Page 99

1   product, were you meant, in designing it, to depict
2   an articulating shoulder pad or one that is fixed?
3        MS. KALEMERIS:  Objection.  Form.
4        THE WITNESS:  In my design, I meant it to be
5   fixed.
6        Q.  BY MR. KEENER:  Let's turn our attention to
7   the Iron Hand Nut Pad, which is product 146 in Fiertek
8   Exhibit 4.  Let me know when you're there.
9        A.  Yep.  I'm there.
10       Q.  Did you design this product?
11       A.  Yes.
12       Q.  Are there any changes from the one you
13  designed from what's depicted here?
14       A.  Missing rivets.  Warping.  Straight lines
15  are not straight anymore.  The usual.
16       Q.  But no substantive changes?
17       A.  No.
18       MS. KALEMERIS:  Objection.  Form.
19       THE WITNESS:  No substantive changes.
20       Q.  BY MR. KEENER:  And do you know when you
21  created this product?
22       A.  I am fairly certain that the creation and
23  release are widely differing from one another when it
24  comes to this product.  I created --
25       Q.  Do you have any idea when you created this

Page 100

1   product?
2        A.  No.  Just it was a long time ago.
3        Q.  If you turn back to Fiertek Exhibit 1, the
4   document with the -- the charts in it, and turn to
5   page 16.
6        A.  Yes.
7        Q.  Under Item 146, the Iron Hand Nut Power Armor
8   Pad, it says the date of design April 22nd, 2010,
9   through May 3rd, 2010.
10       Does that refresh your memory at all on the
11  time frame when you created this product?
12       A.  Well, it doesn't actually.  All I have is
13  a feeling of long ago.
14       Q.  Do you have any reason to believe it
15  was earlier or later than that date identified by
16  Chapterhouse?
17       MS. KALEMERIS:  Objection.  Form.
18       THE WITNESS:  Well, not really.  But if I had
19  to -- I had to move the date, I would move them back.
20       Q.  BY MR. KEENER:  How far back would you move
21  it?
22       A.  Maybe not more than one year.  I mean, it's
23  just my -- my recollection of this is that it took
24  place a long time ago.  But, unfortunately, I don't
25  remember when.

25 (Pages 97 to 100)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 101

1    Q.  Is there anything that would assist you in
2  determining when you created that?
3    A.  Maybe e-mail conversations mentioning nuts
4  and cog wheels.  Maybe.  It's just based on logic.
5    Q.  What references, if any, did you use in the
6  design of this product?
7    MS. KALEMERIS:  Objection.  Form.  Vague as
8  to "reference."
9    THE WITNESS:  Well, cogs and -- well, and the
10  piece of nut.
11    Q.  BY MR. KEENER:  Let me rephrase.
12    Did you use any images as references in
13  designing this product?
14    MS. KALEMERIS:  Objection.  Form.  Vague as
15  to "reference."
16    THE WITNESS:  Yes.
17    Q.  BY MR. KEENER:  What references?
18    MS. KALEMERIS:  Objection.  Form.  Vague as
19  to "references."
20    THE WITNESS:  I remember Googling for cog
21  wheel patterns or pictures of cogs.  Well, not pictures,
22  but like computer drawings, because pictures are fuzzy.
23  And I remember that because it was hell on earth to
24  finding something that I liked.  That's all I remember
25  regarding this item.

---

Page 102

1    Q.  BY MR. KEENER:  So after this -- this
2  difficult time in finding images through Google,
3  did you make any attempt to write down and retain
4  the exact Google image search that you used to find
5  the picture that you liked?
6    MS. KALEMERIS:  Objection.  Form.
7    THE WITNESS:  None whatsoever.
8    Q.  BY MR. KEENER:  Any attempt to save that
9  image?
10    MS. KALEMERIS:  Objection.  Form.
11    THE WITNESS:  Not back then when I was
12  creating this.  I didn't even think about those things
13  back then.
14    Q.  BY MR. KEENER:  Other than that Google image
15  that you found, anything else you used?
16    MS. KALEMERIS:  Objection.  Form.  Misstates
17  testimony.
18    THE WITNESS:  Not in creating this piece.
19  Not that I've -- I remember.  Give -- give -- give
20  me a second.  I only remember Googling for cogs of
21  a certain amount of, well, cog pieces.
22    Q.  BY MR. KEENER:  Right.  And the question is:
23  Other than the Google searching you did, can you --
24  did you use anything else in designing this product?
25    MS. KALEMERIS:  Objection.  Form.  Vague as

---

Page 103

1  to "use."
2    THE WITNESS:  Not as I remember.
3    Q.  BY MR. KEENER:  Do you know if this nut has
4  any meaning in the Warhammer 40K universe?
5    MS. KALEMERIS:  Objection.  Form.
6    THE WITNESS:  Well, there are two answers
7  to that.  I say "no."  But I know that I've seen --
8  I don't -- I don't remember when and -- nor do I
9  remember -- remember where.  But I've seen -- I think
10  it was a symbol or picture of three nuts in some sort
11  of free arrangement.  And I think I've seen that in
12  a Games Workshop content somewhere, maybe on a board.
13  That's -- regarding that nut thing, that's the only
14  nutty thing that I remember.  Well, that's it.
15    Q.  BY MR. KEENER:  And do you recall, from the
16  Google imaging -- image searching you did, whether or
17  not you saw any depictions of nuts on shoulder pads?
18    MS. KALEMERIS:  Objection.  Form.
19    THE WITNESS:  I don't remember.  I don't
20  think so, but I don't remember.
21    Q.  BY MR. KEENER:  Do you believe that --
22    A.  Sorry.
23    Q.  I'm sorry.  Did you say you don't think so?
24    A.  I don't think so.  But as -- as far as I
25  remember now, the answer is "no."

---

Page 104

1    Q.  Let's turn a couple pages to product 148,
2  the Winged Skull Power Armor Pad.
3    A.  All right.
4    MS. KALEMERIS:  Counsel, do you mind taking
5  a break before we start the next product?
6    MR. KEENER:  Sure.
7    MS. KALEMERIS:  Is that all right?  Is that
8  okay with everyone?
9    THE WITNESS:  Sure.
10    MR. KEENER:  Mr. Fiertek, is five minutes
11  okay with you?
12    THE WITNESS:  Yeah.  Yeah.  Go ahead.
13    MS. KALEMERIS:  Okay.  Great.  Thank you.
14    (Recess from 4:53 p.m. to 5:03 p.m.)
15    MR. KEENER:  Let's have marked document No. 2
16  as Fiertek Exhibit 6.  Gill, document No. 2.
17    MS. STEVENSON:  Sorry.
18    MR. KEENER:  Yep.  As Fiertek Exhibit 6.
19    (T. Fiertek Exhibit 6 marked.)
20    Q.  BY MR. KEENER:  It's Bates labeled
21  Chapterhouse 18562 through 63.  And at the top of this,
22  it appears to be an e-mail from you to Mr. Villacci,
23  dated May 24, 2011.
24    Do you see that?
25    A.  (Examining.)  Yes.

---

26 (Pages 101 to 104)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                          Deposition of Tomas Fiertek

---

Page 105

1    Q.  And you start out:
2        "Need to know how to proceed:  Which one
3    looks better, A: or B:?"
4        Do you see that?
5    A.  Yeah.
6    Q.  Were you referring to pictures labeled "A"
7    and "B" on the next page?
8        MS. KALEMERIS:  Objection.  Form.
9        THE WITNESS:  I think so.  Not 100 [sic] on
10   that one, but I think so.
11   Q.  BY MR. KEENER:  And the difference between
12   "A" and "B" on the next page appears to be that, on
13   the bottom of the shoulder pad, Picture A is straight
14   and Picture B has an arch in it.
15       Is that correct?
16       MS. KALEMERIS:  Objection.  Form.
17       THE WITNESS:  Well, that seems to be correct.
18   Yes.
19   Q.  BY MR. KEENER:  And that appears to be the
20   only difference; correct?
21       MS. KALEMERIS:  Objection.  Form.
22       THE WITNESS:  Yes.
23   Q.  BY MR. KEENER:  And do you know whether Games
24   Workshop's Space Marine shoulder pads are straight on
25   the bottom or if they have an arch?

---

Page 106

1        MS. KALEMERIS:  Objection.  Form.
2        THE WITNESS:  I -- about that arch thing,
3    I don't know.  I think that there are some that are
4    not straight at the bottom.  But that's just -- that's
5    just what I think.  I do not --
6    Q.  BY MR. KEENER:  Are you familiar --
7    A.  I do not recall --
8    Q.  Go ahead.
9    A.  I do not recall seeing one with an arched
10   bottom.  I can't remember seeing that.
11   Q.  The ones you do recall have a straight bottom?
12       MS. KALEMERIS:  Objection.  Form.
13       THE WITNESS:  Yes.  I'm, however, uncertain
14   if I have ever seen one that is not a straight bottom.
15   Possibly.  But right now, I only recall straight bottom.
16   Q.  BY MR. KEENER:  Do you know which design
17   choice was chosen?
18       MS. KALEMERIS:  Objection.  Form.
19       THE WITNESS:  I think "A."
20   Q.  BY MR. KEENER:  The straight bottom?
21   A.  Yes.
22   Q.  Looking back to the e-mail on the first page,
23   there is another e-mail on the bottom from you to
24   Mr. Villacci, dated May 22nd, 2011.
25       Do you see that?

---

Page 107

1    A.  Yes.
2    Q.  The second paragraph top says:
3        "Here is the original pic from the art book."
4        Do you know what art book you're referring to?
5    A.  I think it's -- it's referring to the Heresy
6    art books.
7    Q.  One of the ones -- go ahead.
8    A.  I think, yes, one of the ones I previously,
9    well, looked through.  I'm not sure, but that's what
10   I think.
11   Q.  You think it's one of the four Horus Heresy
12   Vision books you brought today?
13   A.  Either --
14       MS. KALEMERIS:  Objection.  Form.
15       THE WITNESS:  Either that or it might be
16   something in the possession of Mr. Villacci.
17   Q.  BY MR. KEENER:  If it was something in the
18   possession of Mr. Villacci, how would you be sending
19   him the e-mail saying "here is the original pic from
20   the art book"?
21   A.  Because this e-mail is old and I am yet to
22   read it all and, well, memory, memory.  You asked me --
23   Q.  Do you believe -- go ahead.
24   A.  You asked me what I think it was referring to.
25   And I just answered what I think it was referring to,

---

Page 108

1    giving two choices.
2    Q.  Now that you see that this was an e-mail you
3    sent to Mr. Villacci, do you believe it's some image
4    that you had in your possession?
5    A.  Yes.
6    Q.  And do you believe it's anything other than
7    one of the pictures from the Horus Heresy Vision books?
8    A.  I'm not sure.
9    Q.  The next sentence says:
10       "All I did was alter the 'earmuffs' to grilles
11   and maybe some detail on the plume base.  But I guess
12   this would be illegal to sell."
13       Do you know what's being referred to here?
14   A.  I think it's -- it refers to a series of
15   helmet heads that I made or was making.  That's my
16   guess.
17   Q.  And do you know if that's any of the
18   Chapterhouse products that have been released?
19   A.  It might be.
20   Q.  Do you know which product that is?
21   A.  It might be -- well, wait, wait, wait.
22       Well, there were plume -- there is just one
23   thing on the website with a plume on.  So if it's --
24   if it does refer to a released product, that would be
25   it.

---

27 (Pages 105 to 108)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                  Deposition of Tomas Fiertek

---

Page 109

1    Q.  And which product is that?
2    A.  Well, I don't -- sheesh.  I can't recall --
3  I don't recall the names.  Or that's one -- one of --
4  one Roman-themed armored helmet with a plume on.  That's
5  my guess.  And I made several.  I don't remember -- I
6  don't remember how many.  But there is more than one
7  for sure.
8    Q.  Do you know which one you're referring to
9  when you said "I guess this would be illegal to sell"?
10   A.  I think that comment referred to details
11 previously given to Mr. Villacci by his legal counsel.
12 So that's, I guess, privileged stuff.
13   Q.  Yeah.  I'm not asking for that.
14   I'm asking:  Do you know which of the several
15 heads that you designed that comment you made referred
16 to?
17   A.  No.  No idea.
18   Q.  The first sentence of that e-mail says:
19   "Told not to waste time and bandwidth on
20 downloading Thor movie.  It's a early poor-quality
21 version."
22   What were you referring to?
23   A.  The sentence doesn't make sense.  It says
24 "told not to."  And if I am saying this to Mr. Villacci,
25 then I'm wondering who told me.  I don't remember what

---

Page 110

1  this was about.  I do, however, remember Mr. Villacci
2  once asking me for a movie.  It might have something
3  to do with that.  But both -- this happened quite some
4  time ago.  I don't remember that much.  And the sentence
5  is weird.  It doesn't ease things for me.
6    Q.  Have you downloaded unauthorized movies on
7  the Internet?
8    MS. KALEMERIS:  I'm going to object to the
9  relevance of this line of questioning.
10   THE WITNESS:  And define -- well, restate the
11 question again, please.
12   Q.  BY MR. KEENER:  Yeah.  Have you downloaded
13 movies without paying for them over the Internet?
14   MS. KALEMERIS:  Objection.  Form.
15   THE WITNESS:  Of course.
16   MS. KALEMERIS:  Relevance.
17   Q.  BY MR. KEENER:  I didn't hear your answer.
18   A.  Of course I have.
19   Q.  And those would be what people might consider
20 pirated copies?
21   MS. KALEMERIS:  Objection.  Form.  Relevance.
22   THE WITNESS:  That I do not know.
23   Q.  BY MR. KEENER:  But they would be copies of
24 movies you didn't pay for?
25   MS. KALEMERIS:  Objection.  Form.  Relevance.

---

Page 111

1    THE WITNESS:  Yes.
2    Q.  BY MR. KEENER:  Such as movies in the theater
3  such as Thor?
4    MS. KALEMERIS:  Objection.  Form.  Relevance.
5    THE WITNESS:  Yes.  That's a good example.
6    Q.  BY MR. KEENER:  Did you see any problem in
7  infringing the copyrights of those movies?
8    MS. KALEMERIS:  Objection.  Form.  Relevance.
9    THE WITNESS:  Well, first of all, I don't know
10 if I downloaded it or my girlfriend did.  But no.
11   Q.  BY MR. KEENER:  How many movies do you think
12 you've downloaded like that?
13   MS. KALEMERIS:  Objection.  Form.  Relevance.
14   THE WITNESS:  I would be -- I don't know.
15 I don't keep track on what I do online.
16   Q.  BY MR. KEENER:  Would it be more than ten?
17   A.  Yes.
18   MS. KALEMERIS:  Objection.  Relevance.  Form.
19   Q.  BY MR. KEENER:  More than 50?
20   MS. KALEMERIS:  Objection.  Relevance.
21   THE WITNESS:  I don't know.
22   Q.  BY MR. KEENER:  Do you see any problem in
23 doing that?
24   MS. KALEMERIS:  Objection.  Relevance.  Form.
25   THE WITNESS:  No.

---

Page 112

1    Q.  BY MR. KEENER:  Do you likewise download
2  copies of books without paying for them?
3    MS. KALEMERIS:  Objection.  Form.  Relevance.
4    THE WITNESS:  I think I've done that a few
5  times.  I don't remember any specifics, though.
6    Q.  BY MR. KEENER:  Have you done it with any
7  of the Games Workshop books?
8    MS. KALEMERIS:  Objection.  Form.
9    THE WITNESS:  If you restate the question --
10 I didn't catch it.
11   Q.  BY MR. KEENER:  Yeah.  Have you copied --
12 have you downloaded or otherwise obtained electronic
13 versions of any Games Workshop books without paying
14 for them?
15   MS. KALEMERIS:  Objection.  Relevance.  Form.
16   THE WITNESS:  Yes.
17   Q.  BY MR. KEENER:  Which ones?
18   A.  I recall a very, very old book about games
19 and rules for games called something -- something with
20 "Road Trader."
21   Q.  Anything else?
22   A.  No, not without paying for them. [sic]
23   Q.  Any of the --
24   A.  I have --
25   Q.  Any of the codexes?

28  (Pages 109 to 112)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 113

1    A.  I -- I -- yes.  I've downloaded lots of those.
2  But I also have them in physical form in my bookshelf.
3  So you asked me if I downloaded stuff without paying.
4  No.
5    Q.  You paid for the physical copies on your
6  bookshelf; correct?
7    A.  Yes.
8    Q.  Did you pay for the electronic versions?
9      MS. KALEMERIS:  Objection.  Form.  Relevance.
10     THE WITNESS:  No.
11    Q.  BY MR. KEENER:  Which Games Workshop books
12  do you have in electronic version that you did not pay
13  for the electronic version?
14     MS. KALEMERIS:  Objection.  Form.  Relevance.
15     THE WITNESS:  I have some of the codexes as
16  they are called.
17    Q.  BY MR. KEENER:  Which codexes?
18    A.  I don't remember.  A number of them.
19    Q.  Can you identify any of them?
20    A.  I do remember three that I can identify.
21    Q.  Which ones are those?
22    A.  One is called Grey Knights.  One is called
23  Necrons.  And one is called, I think, Blood Angels.
24    Q.  Do you believe you have a physical copy of
25  codex Grey Nights?

---

Page 114

1    A.  No, I don't believe.  I know I have.
2    Q.  You do have a copy?
3    A.  Yes.
4    Q.  Do you have a physical copy of codex Blood
5  Angels?
6    A.  Yes.
7    Q.  And do you have an electronic copy of codex
8  Dark Eldar?
9    A.  Yes, I do.
10    Q.  Codex Tyranids, T-y-r-a-n-i-d-s?
11    A.  I don't know that.
12    Q.  Codex Eldar?
13    A.  Also don't know.
14    Q.  Codex Imperial Guard?
15    A.  I don't think so.
16    Q.  Codex Space Marines?
17    A.  I think I have that one.  I don't know which
18  one, though.  There are several different prints from
19  different years.  I think I --
20    Q.  Codex Ultramarines?
21    A.  No.
22    Q.  Codex Tau, T-a-u?
23    A.  I think so.  I'm not sure.
24    Q.  Do you have a physical copy of codex Tau?
25    A.  Yes.

---

Page 115

1    Q.  Do you have a physical copy of codex
2  Ultramarines?
3    A.  I don't recall that name ever being used.
4  So no.
5    Q.  Do you have an electronic copy of the
6  Warhammer 40K compilation?
7    A.  I don't think so.  I don't know what that is.
8  I mean, if you show it to me, it will refresh my memory
9  for sure.  But right now, I don't know what that is.
10    Q.  Do you have electronic copies of the Horus
11  Heresy Vision books?
12    A.  No.
13    Q.  The Collected Visions book?
14    A.  No.
15    Q.  Do you have an electronic copy of any of the
16  Imperial Armor books?
17    A.  Yes, I have.
18    Q.  What about Volume 9: The Badab War, B-a-d-a-b?
19    A.  I think so.
20    Q.  Do you know if you have a physical copy of
21  that book?
22    A.  I don't know.  I have some of those physical.
23  But I don't remember which ones.
24    Q.  Do you have an electronic copy of Warhammer
25  Armies: Lizardmen book?

---

Page 116

1    A.  If -- if you can allow me to go back to one
2  of the first questions --
3    Q.  Yes.
4    A.  -- about -- about deleting stuff after the
5  law case started.  I know that I deleted some of the
6  electronic copies.  I think I even said that during my
7  last deposition.  This is nothing I keep track of or so.
8  Well, I -- if asked to, I can re-check my drive to give
9  specifics.  But --
10    Q.  Do you know which books you deleted?
11    A.  No.  As I said, I don't keep track on the
12  specifics.  I just deleted electronic copies of, well,
13  pretty much everything I have.
14    Q.  So you deleted the current copies of pretty
15  much everything you have after the lawsuit started?
16    A.  Yes.
17      MS. KALEMERIS:  Objection.
18      THE WITNESS:  Not everything.
19    Q.  BY MR. KEENER:  I didn't hear your answer.
20    A.  Not everything.
21    Q.  But a large portion of electronic copies
22  of Games Workshop materials you deleted after the
23  litigation started?
24      MS. KALEMERIS:  Objection.
25      THE WITNESS:  Yes.

---

29 (Pages 113 to 116)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 117

1    Q.  BY MR. KEENER:  Do you know how far after the
2  case started you did this?
3    A.  I -- no.  I just -- I just know I deleted
4  stuff that I don't own physically, that I haven't
5  bought in a store.  Well, again, I can -- I can check
6  it for specifics.  But I don't remember the details
7  of that.
8    Q.  Prior to deleting them, did you ever attempt
9  to make a list of the books that you were deleting?
10   MS. KALEMERIS:  Objection.  Form.
11   THE WITNESS:  No.
12   Q.  BY MR. KEENER:  Back to do you -- do you
13  have the electronic copy of Warhammer Armies: Lizardmen?
14   A.  No.
15   Q.  Have you ever had that book?
16   A.  No.
17   Q.  Do you have an electronic copy of Insignium
18  Astartes?  I-n-s-i-g-n-i-u-m.  A-s-t-a-r-t-e-s.
19   A.  I don't know that.
20   Q.  Do you know if you've ever had an electronic
21  version of that book?
22   A.  I don't know that either.
23   Q.  Do you know if you have a physical copy of
24  that book?
25   A.  I'm pretty sure I have.  I'm not sure which

---

Page 118

1  book it is.  But the name rings a bell definitely.
2  And --
3    Q.  It's a rather thin book with various pictures
4  of Space Marine chapters and insignias and shoulder
5  pads --
6    MS. KALEMERIS:  Objection.
7    Q.  BY MR. KEENER:  -- and how to apply them and
8  paint colors.
9    MS. KALEMERIS:  Objection.  Form.
10   THE WITNESS:  I am pretty sure I do have that
11  book.  Not -- not -- not in --
12   Q.  BY MR. KEENER:  The physical copy?
13   A.  I'm -- I'm talking about physical copies.
14  I'm not 100 [sic] on that.  But I'm pretty sure I do
15  have that one.
16   Q.  Do you have an electronic copy of the Art
17  of Clint Langley, L-a-n-g-l-e-y?
18   A.  No.
19   Q.  Have you previously possessed an electronic
20  copy of that book?
21   A.  No.
22   Q.  Do you have a physical copy of that book?
23   A.  No.
24   Q.  Have you ever had a physical copy of that
25  book?

---

Page 119

1    A.  No.
2    Q.  Do you have an electronic copy of How to Paint
3  Space Marines?
4    A.  No.
5    Q.  Have you ever had an electronic copy of that
6  book?
7    A.  No.
8    Q.  Do you have a physical copy of How to Paint
9  Space Marines?
10   A.  No.
11   Q.  Have you had a physical copy?
12   A.  No.
13   Q.  Do you have an electronic copy of Index
14  Astartes, Volume III?
15   A.  I don't think so.
16   Q.  Have you ever had an electronic copy of that
17  book?
18   A.  Not sure.  Possible.
19   Q.  And if so, it would have been one of the ones
20  you deleted?
21   MS. KALEMERIS:  Objection.  Form.
22   THE WITNESS:  That depends if I have it in
23  physical form or not.
24   Q.  BY MR. KEENER:  Do you know if you have it
25  in physical form?

---

Page 120

1    A.  I don't know that.
2    Q.  The -- the series of books I just identified
3  for you, in the last month or two, have you made any
4  attempt to look through your computer and your bookshelf
5  to see whether you had the electronic or physical copies
6  of those specific books?
7    MS. KALEMERIS:  Objection.  Form.
8    THE WITNESS:  Restate the question.  I -- I
9  didn't catch the -- the beginning.
10   Q.  BY MR. KEENER:  Sure.  I listed various Games
11  Workshop books in the prior questions here.
12   In the past month or two, have you made any
13  attempt to identify if you have any electronic copies
14  of those specific books or physical copies of those
15  specific books?
16   MS. KALEMERIS:  Same objection.
17   THE WITNESS:  No.
18   MR. KEENER:  All right.  Let's go, Gill,
19  to document 14 and mark that Fiertek Exhibit 7.
20  Exhibit 17 -- 7 is Bates labeled Chapterhouse 30991
21  through 31002.
22   (T. Fiertek Exhibit 7 marked.)
23   Q.  BY MR. KEENER:  If you turn to that page that
24  ends in 998.  It's near the back and it's on page 8.
25   In the middle of the page, do you see an

---

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 121

1    e-mail from you to Mr. Villacci dated February 1st,
2    2010?
3         A.  (Examining.)  Yes.
4         Q.  And the middle paragraphs states:
5         "Maybe some things to think about the next
6    time a codex comes out with big things being needed by
7    players is maybe we should split up bigger work projects
8    so they are done faster.  After all, we" -- capital --
9    "ARE competing with other companies.  And whoever gets
10   things out first grabs customers."
11        Do you see that?
12        A.  Yes.
13        Q.  What did you mean by that paragraph?
14        MS. KALEMERIS:  I'll caution Mr. Villacci
15   [sic] to read the context of that paragraph so that
16   he understands -- or not Mr. Villacci, excuse me --
17   Mr. Fiertek to read the context of the e-mail to
18   understand fully what's been put in front of him.
19        THE WITNESS:  (Examining.)  I don't know what
20   project we are being discussed -- we are discussing here
21   or if it's even a project or if it's brainstorming or --
22   it's three years old.
23        Q.  BY MR. KEENER:  When it says "the next time
24   a codex comes out," is that fair to say that that's a
25   Games Workshop codex?

---

Page 122

1         MS. KALEMERIS:  Objection.  Form.
2         THE WITNESS:  Yes.
3         Q.  BY MR. KEENER:  And when you say you are
4    "competing with other companies" to see who comes
5    out and grabs customers first, would one of those
6    other companies be Games Workshop?
7         MS. KALEMERIS:  Objection.  Form.
8         THE WITNESS:  I don't think so.
9         Q.  BY MR. KEENER:  Would one of those other
10   companies be Forge World?
11        MS. KALEMERIS:  Objection.  Form.
12        THE WITNESS:  No.
13        Q.  BY MR. KEENER:  What other companies are you
14   referring to?
15        A.  I don't remember the names.  But I think there
16   are several companies that do things that can be used
17   with Games Workshop products also.
18        Q.  Is the -- go ahead.
19        A.  The -- the logical assumption is that's
20   what the -- that's what the -- that's what's being
21   referred to.
22        Q.  Is the concept you're trying to convey that,
23   when Games Workshop releases a new codex, there may be
24   certain vehicles or miniatures or otherwise in there
25   that there aren't miniatures for and that Chapterhouse

---

Page 123

1    should quickly design those miniatures to get to market
2    first --
3         MS. KALEMERIS:  Objection form.
4         Q.  BY MR. KEENER:  -- and grab customers?
5         MS. KALEMERIS:  Objection.  Form.
6         THE WITNESS:  This is a possibility.  Although
7    I would rephrase it.  It's not to design --
8         Q.  BY MR. KEENER:  But you --
9         A.  It's not to design the miniatures.  It's to --
10   as in replace.  But more like as in be possible to use
11   with based on the same theme.  And, again, I think what
12   is being referred to regarding "competing" is there are
13   other companies that are doing similar things.  That
14   is my understanding of that.
15        Q.  Okay.  So if I rephrase that, it would be:
16   When Games Workshop released a new codex, there may
17   be vehicles or other miniatures in there that aren't
18   released and, therefore, Chapterhouse wants to quickly
19   develop products that are similar in theme to the
20   pictures or miniatures for people to use with that
21   codex?
22        MS. KALEMERIS:  Objection.  Form.  Misstates
23   testimony.
24        THE WITNESS:  Well, not entirely.  It's not
25   about miniatures or toys that are not -- that are not

---

Page 124

1    yet released.  It's about -- rather it's more about
2    things that are not released whatsoever, not even
3    planned to be released and haven't been planned for
4    sometimes up to ten years or more.  And "similar,"
5    again, that's a definition issue.  There's nothing
6    similar about that, doing -- creating something that
7    shares a common theme.
8         Q.  BY MR. KEENER:  Okay.  So when you say there
9    aren't miniatures released even for a long time, all
10   that would be in the codex would be a picture of what
11   that thing might look like in the universe?
12        MS. KALEMERIS:  Objection.  Form.  Misstates
13   testimony.
14        THE WITNESS:  Sometimes there might be a
15   picture that shows either an idea, a concept, or a
16   part of something.  Far from always, though.  That's --
17   yeah, that's -- that's my take on that.
18        Q.  BY MR. KEENER:  Let's turn back a page to
19   30997.  At the bottom is another e-mail from you to
20   Mr. Villacci, dated February 1st, 2010.
21        Do you see that?
22        A.  Yes.
23        Q.  And the second paragraph starts:
24        "Regarding pre-Heresy pad series."
25        Stopping there, would that be the Heresy-Era

---

31 (Pages 121 to 124)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 125

1  Shoulder Pads for Terminators that we discussed already?
2       MS. KALEMERIS:  Objection.  Form.
3       THE WITNESS:  Hmm.  This is even older.  I
4  actually don't know exactly what pads are referred to
5  here.  It might be them.  It might be some project that
6  was talked about then that never -- never started.
7       Q.  BY MR. KEENER:  Okay.  And if we skip a
8  sentence, it goes on:
9       "They will be segmented just like the ones
10 in the HH art books with a lot of studs on them."
11      Do you see that?
12      A.  Yes.
13      Q.  And "HH art books," do you mean the Horus
14 Heresy Vision books that you brought with you today?
15      MS. KALEMERIS:  Objection.  Form.
16      THE WITNESS:  Yes.
17      Q.  BY MR. KEENER:  And the segmented ones with
18 lots of studs on them, would those be those shoulder
19 pads with overlapping armor?
20      MS. KALEMERIS:  Objection.  Form.
21      THE WITNESS:  I don't know.  This was -- this
22 was a discussion way before I even started that project
23 and --
24      Q.  BY MR. KEENER:  Do you recall --
25      A.  As -- as -- as the previous question, I

---

Page 126

1  don't know exactly what was discussed there.  I mean,
2  we had been brainstorming a bunch of things.  And not --
3  not all things are made.  I mean, if you -- if you --
4  if you read the same paragraph in the middle that it
5  says something about "wolfish."  I mean, I never made
6  anything wolfish.  As far as I'm concerned, there --
7  I don't see fur anywhere.
8       Q.  When you say -- when you say "they will be
9  segmented just like the ones in the Horus Heresy art
10 books with a lot of studs on them," do you know which
11 pictures in the Horus Heresy Vision books you're
12 referring to?
13      MS. KALEMERIS:  Objection.  Form.
14      THE WITNESS:  Not at all.  There are lots
15 of segmented stuff in those art books.
16      Q.  BY MR. KEENER:  With studs on them?
17      MS. KALEMERIS:  Objection.  Form.
18      THE WITNESS:  With and without.
19      Q.  BY MR. KEENER:  If you turn a page back
20 to 30996, at the top there is an e-mail that appears
21 to be an interleaving of Mr. Villacci to you and your
22 responses to Mr. Villacci.  Take a minute to see if
23 you look at it.  But it looks like the ones with the
24 most amount of arrows is Mr. Villacci and the ones
25 with one less arrow is your response.  But I want

---

Page 127

1  you to confirm that.
2       A.  Well, let's assume that for now.  If you want
3  to -- if you want me to re-read everything, we'll be
4  sitting here until 11:00.
5       Q.  That's fine.  Let's focus on the top.  Maybe
6  this will clear it up.
7       A.  Yeah.
8       Q.  The second sentence says:
9       "I really need to see pictures from you to
10 find out what you have in mind.  Sketches."
11      MS. KALEMERIS:  Objection.  And -- and I'll
12 just remind Mr. Fiertek to look at the context and
13 really know what you're looking at rather than assuming.
14      Q.  BY MR. KEENER:  Does that look like something
15 Mr. Villacci was asking you?
16      MS. KALEMERIS:  Objection.  Form.
17      THE WITNESS:  Well, he's -- he's saying
18 something to me.  He's not asking.
19      Q.  BY MR. KEENER:  Does that look like a
20 statement from Mr. Villacci?
21      A.  Well, he needs to --
22      MS. KALEMERIS:  Objection.  Form.
23      THE WITNESS:  Well, he -- he -- he obviously
24 conveys that he needs to see what ideas I have in mind.
25      Q.  BY MR. KEENER:  And the next paragraph down

---

Page 128

1  with one less carat, does that look like your response?
2       MS. KALEMERIS:  Objection.  Form.
3       THE WITNESS:  Yes.
4       Q.  BY MR. KEENER:  And your response is:
5       "To [sic] tired to draw and take pics right
6  now.  Look in the HH art book series.  On many pages,
7  there are shoulder pads with five segments on them
8  inside the rims.  Those are the ones I do in two
9  versions and I also add tiny rivets to the segments."
10      Do you see that?
11      A.  Yes.
12      Q.  And "HH art book series," is that the Horus
13 Heresy Visions books?
14      A.  Yes.
15      Q.  And are you making reference to many instances
16 in those books where there are shoulder pads with five
17 segments on them?
18      MS. KALEMERIS:  Objection.  Form.
19      THE WITNESS:  Apparently, I'm too tired to
20 draw and take pictures of my drawings and sending to --
21 send them to him that -- that -- at that time.  So
22 I refer to a quick look in the HH art book series to
23 satisfy his curiosity of what ideas I had.  And those
24 ideas were apparently segmented armor pieces with studs.
25 So --

---

Opus 2 International                    www.opus2international.com
Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                          Deposition of Tomas Fiertek

---

Page 129

1    Q.  BY MR. KEENER:  Well, the idea was five
2  segments?
3         MS. KALEMERIS:  Objection.  Form.
4         THE WITNESS:  We were talking about five
5  segments.  And I don't remember how many I did on the
6  pieces that have segments.  I do, however, know that
7  numbers have nothing to do with it.  Everything is
8  controlled by scale and skill in creating stuff.  If
9  I can do five and it looks good, I will do so.  If I
10 can do three and it looks good, I will do so.  That's --
11 that's -- that part of the process is determined while
12 creating, in other words, the last second without any
13 reference source to it.
14    Q.  BY MR. KEENER:  Mr. Fiertek, the question is:
15 In this response, you're telling him:  I'm too tired to
16 draw a picture, so instead look at the Horus Heresy
17 Vision pictures which show shoulder pads with five
18 segments inside of a rim with studs.
19    Correct?
20       MS. KALEMERIS:  Objection.  Form.  Misstates
21 testimony.
22       THE WITNESS:  Yes.
23    Q.  BY MR. KEENER:  And the idea of what you
24 wanted to create?
25       MS. KALEMERIS:  Objection.  Form.

---

Page 130

1         THE WITNESS:  That's -- I don't think that's
2  the intent.  That's the idea and theme I wanted to
3  create.  If you want to -- if you want to see what I --
4  what I had in my head, go ahead and check up this and
5  that.  I think that's what -- that's what's being meant
6  here.
7     Q.  BY MR. KEENER:  And the next sentence says:
8  "The pads literally scream pre-Heresy."
9     Are those your words?
10    A.  I think so.
11    Q.  If you turn back a page to 30995, at the top
12 it looks like an e-mail from you to Mr. Villacci.  But,
13 again, it looks like there's interspersing comments
14 from you and Mr. Villacci in here.
15    What I want you to focus on is -- it looks
16 like the third paragraph down.  It starts:
17    "I say do two or more IH pads.  They need
18 hands (in the right position, not reversed, etc.) and
19 keep it close to the GW basic idea but decorate it more
20 with more detail."
21    Do you see that?
22    A.  Yes.
23    Q.  Is that an instruction Mr. Villacci was giving
24 to you?
25       MS. KALEMERIS:  I'll caution you, Mr. Fiertek,

---

Page 131

1  to look through the entire e-mail to understand the
2  context of what was just read to you.
3         And also object to form.
4         THE WITNESS:  Well, first of all, I don't
5  know who wrote that, if that was me or him.  But --
6  well, give me a minute now to see if I can find out.
7         (Examining.)  So what was the question again?
8     Q.  BY MR. KEENER:  Do you know if those were your
9  words or Mr. Villacci's?
10       MS. KALEMERIS:  Objection.  Form.
11       THE WITNESS:  I don't know.  Let's see.
12    Q.  BY MR. KEENER:  When it says "IH pads," do
13 you know what that refers to?
14    A.  "Iron Hands."
15    Q.  And does "GW" refer to "Games Workshop"?
16    A.  Yes.
17    Q.  When it says the Iron Hand pads need to be
18 in the right position and not reversed, do you know
19 what that means?
20    A.  It refers to a -- "Iron Hand" refers to
21 a theme used by Games Workshop that I think we're
22 discussing to do something using the same theme.
23 And using words like "IH" is simply quick-speak to
24 convey the idea.  Otherwise -
25    Q.  My question is:  When -- when you say "in the

---

Page 132

1  right position, not reversed," what's that referring to?
2         MS. KALEMERIS:  Objection.  Form.
3         THE WITNESS:  I'm not sure.  Maybe -- maybe
4  putting a symbol in the middle of a pad.  I -- I don't
5  know.
6     Q.  BY MR. KEENER:  Do you think it means the
7  right position being the same position as in Games
8  Workshop's logo for the Iron Hands?
9         MS. KALEMERIS:  Objection.  Form.
10       THE WITNESS:  It might be having the thumb
11 in a certain -- I -- I mean, either left or right
12 or having the whole thing centered in the middle
13 of something.
14    Q.  BY MR. KEENER:  Right.  But when you say it's
15 "the right position," you mean at the same position
16 as Games Workshop's?
17       MS. KALEMERIS:  Objection.  Form.
18       THE WITNESS:  I cannot answer that because
19 I don't remember what Games Workshop's position is.
20 Well, I -- I don't --
21    Q.  BY MR. KEENER:  Do you know any -- do you
22 have any idea of what else this could be referring to?
23       MS. KALEMERIS:  Objection.  Asked and
24 answered.
25       THE WITNESS:  Well, I -- I said -- either the

---

33 (Pages 129 to 132)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 133

1    position of the thumb or a position of the overall whole
2    thing within the frame or maybe -- I mean, miniatures
3    come with two pads.  It might be talk about having it
4    either on the left or on the right.  And it's -- again,
5    I don't even know who wrote that little piece.
6         Q.  BY MR. KEENER:  Okay.  And -- and when it
7    says "keep it close to the Games Workshop basic idea
8    but decorate it more with more detail," do you know
9    what that means?
10        MS. KALEMERIS:  Objection.  Form.
11        THE WITNESS:  I think it's about theme --
12   similar theme.  But, apparently, still make for
13   variation, not making things too similar, if I can
14   use that word.
15        Q.  BY MR. KEENER:  And the variation is
16   decorating it with more detail?
17        MS. KALEMERIS:  Objection.  Form.
18        THE WITNESS:  Well, I don't know.  It's talked
19   about by someone apparently.
20        Q.  BY MR. KEENER:  Okay.  Let's turn back a page
21   to page 30994.  And this appears on the bottom half.
22        Do you see an e-mail from Mr. Villacci to you,
23   dated February 2nd, 2010?
24        A.  Yes.
25        Q.  And in there, the middle paragraph states:

---

Page 134

1         "The most important thing with the Iron Hands
2    is you use the same basic shape and position of the
3    icon, but you have to add detail to it so it's not the
4    same as GW's.  If you deviate from the same basic shape
5    and format, it won't sell to IH players."
6         Do you see that?
7         A.  Yes.
8         Q.  What did you understand those instructions
9    to mean?
10        MS. KALEMERIS:  Objection.  Form.
11        THE WITNESS:  This is from 2010.  And I
12   think -- I'm not sure.  But I think he's conveying
13   something that has to do with the attorney-client
14   stuff between him and the -- the advice he was
15   given by -- back then.
16        Q.  BY MR. KEENER:  Is -- is he instructing you
17   not to change the Iron Hands shape you were making in
18   basic shape and format or else it won't sell to Iron
19   Hands players?
20        MS. KALEMERIS:  Objection.  Form.
21        THE WITNESS:  I would say that is not the
22   case.
23        Q.  BY MR. KEENER:  The last sentence says:
24   "If you deviate from the same basic shape
25   and format, it won't sell to Iron Hands players."

---

Page 135

1    (As read.)
2         Correct?
3         A.  Correct.
4         Q.  So he's telling you not to deviate from the
5    same basic shape and format of the Games Workshop's
6    design or else it won't sell; right?
7         MS. KALEMERIS:  Objection.  Form.  Asked and
8    answered.
9         THE WITNESS:  I do not agree to that.  He is
10   apparently --
11        Q.  BY MR. KEENER:  What is he telling you?
12        A.  He's apparent -- well, I don't know.  But
13   my guess is that he is apparently talking about a hand.
14   And, I mean, how much can you deviate from a hand?
15   A hand looks like a hand.  Of course, if -- if you
16   deviate from a hand or remove two fingers, it's no
17   longer appealing.  I -- I mean, it's --
18        Q.  Do you agree that he's telling you, if it
19   deviates from Games Workshop's basic shape and format,
20   it won't sell?
21        MS. KALEMERIS:  Objection.  Form.  Asked and
22   answered three times now.
23        THE WITNESS:  No.
24        Q.  BY MR. KEENER:  You don't read it that way?
25        A.  No.

---

Page 136

1         Q.  Okay.
2         MS. KALEMERIS:  Objection.  Form.  Asked and
3    answered.
4         Q.  BY MR. KEENER:  And then on the top of the
5    page, there's an e-mail from you to Mr. Villacci on
6    February 2nd, 2010?
7         Do you see that?
8         A.  Yes.
9         Q.  At the end of the first paragraph, you ask:
10        "Will a segmented pad underneath the IH symbol
11   be enough deviation?"
12        Do you see that?
13        A.  Not yet.  Is --
14        Q.  The end of the first paragraph.
15        A.  On page 4?
16        Q.  Page 4, the paragraph that starts "Thanks."
17   The last line of that paragraph --
18        A.  Oh.  Oh, I see.
19        Q.  -- starts:
20        "Will" --
21        A.  I see.
22        Q.  -- "a segmented pad underneath the IH symbol
23   be enough deviation?"
24        Do you see that?
25        A.  Yes.

34  (Pages 133 to 136)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 137

1  Q.  And are you asking Mr. Villacci whether or not
2  adding Games Workshop's Iron Hand symbol to a segmented
3  pad will be enough deviation?
4  MS. KALEMERIS:  Objection.  Form.
5  THE WITNESS:  I think I'm discussing -- rather
6  asking questions that refer to what the then attorney
7  was discussing with Mr. Villacci.  It's a -- I mean,
8  it's a simple question.
9  Q.  BY MR. KEENER:  The -- the "IH symbol" refers
10 to Games Workshop's Iron Hand symbol?
11 A.  Yes.
12 Q.  And are you asking whether putting a segmented
13 pad underneath that symbol is enough deviation?
14 MS. KALEMERIS:  Objection.  Form.
15 THE WITNESS:  Well, that's -- that's what's --
16 that's what's written -- that's what's written there.
17 And I think I was -- it was part of a back and forth
18 asking what is okay and what is not okay and how far,
19 et cetera.  And, again, it had to do with the
20 attorney-client privilege.  I don't see anything bad
21 or wrong with the -- just a question.  It's -- I mean,
22 I don't know what the point is with -- I can't answer
23 that without revealing information, I mean.
24 Q.  BY MR. KEENER:  My question was just:  Is
25 that what you were asking?  I'm trying to understand

---

Page 138

1  the symbols here.
2  A.  Well, yes.
3  Q.  You were asking whether putting a segmented
4  pad under Games Workshop's Iron Hand symbol would be
5  enough deviation?
6  Is that the question you're asking?
7  MS. KALEMERIS:  Objection.  Form.
8  THE WITNESS:  Yes.
9  Q.  BY MR. KEENER:  Okay.  The next paragraph
10 starts:
11 "Look up the book cover of Prospero Burns.
12 I think it was with the segmented pads and armor the
13 Space Wolves have."
14 And:
15 "These are the pads I'm making."
16 And then it goes on.  Do you see that?
17 A.  Yes.
18 Q.  The Prospero Burns, what that is?
19 A.  It is a -- a -- it is a novel, a book.
20 Q.  Is that a Games Workshop book?
21 A.  I think Black Library released it.  If that's
22 the same thing, then yes.  If not, then I don't know.
23 Q.  And your -- is that a book that you own?
24 A.  Yes.
25 Q.  Is it a book you have an electronic copy of?

---

Page 139

1  A.  No.
2  Q.  What's depicted on the cover of Prospero
3  Burns?
4  A.  I don't know.  I will recognize it if it's
5  shown to me for sure.
6  Q.  Do you believe it would be a segmented
7  shoulder pad like the ones you're making?
8  MS. KALEMERIS:  Objection.  Form.
9  THE WITNESS:  Well, it says that there are
10 segmented pads there.  And that would mean I'm conveying
11 the idea of a segmented and studded theme.
12 Q.  BY MR. KEENER:  Okay.  Let's go back a page
13 to 30993.  And the bottom is an e-mail from Fiertek --
14 from you to Mr. Villacci.
15 Do you see that?
16 A.  Yes.
17 Q.  And in the middle of that e-mail, it says:
18 "As for the segmented pads, look at" the
19 "HH art books and compare for yourself."  (As read.)
20 Do you see that?
21 A.  Yes.
22 Q.  And, again, that would be you directing
23 Mr. Villacci to the Horus Heresy Visions books?
24 MS. KALEMERIS:  Objection.  Form.
25 THE WITNESS:  Yes.

---

Page 140

1  Q.  BY MR. KEENER:  And the pictures of segmented
2  pads in those books?
3  MS. KALEMERIS:  Objection.  Form.
4  THE WITNESS:  Yes.
5  Q.  BY MR. KEENER:  In order to get an idea of
6  what you were making?
7  MS. KALEMERIS:  Objection.  Form.
8  THE WITNESS:  Well, it says:
9  "Here are my ideas."
10 So I guess it was in order to convey the theme
11 and ideas I have.
12 Q.  BY MR. KEENER:  Okay.  Turn back to the first
13 page, 30991.
14 And in the middle is an e-mail from you to
15 Mr. Villacci dated February 3rd, 2010.
16 Do you see that?
17 A.  Yes.
18 Q.  At the end of the first paragraph, it states:
19 "Look up the UM art or Insignium Astartes.
20 There are skulls on freaking everything."
21 Do you see that?
22 A.  Not yet.  Give me a second.  Yeah, I see that
23 now.
24 Q.  What did you mean by "UM art"?
25 A.  I don't know.  It may be the same thing as

---

35 (Pages 137 to 140)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 141

1    what's -- what comes after, "Insignium Astartes."
2        Q.   And does that refresh your memory whether
3    or not you have ever had the Insignium Astartes?
4        A.   Might.  It might.
5        Q.   Do you now believe that you did at one time
6    have a copy of the Insignium Astartes?
7        A.   I don't know.  I have many things I -- if
8    asked, I can do a detailed list of everything written
9    I have.
10       Q.   But that wouldn't include anything that you
11   have deleted since the start of litigation; right?
12           MS. KALEMERIS:  Objection.  Form.
13           THE WITNESS:  I did not understand the
14   question.
15       Q.   BY MR. KEENER:  If you did a list now of what
16   you possess, that list would not include any of those
17   books you testified that you deleted after the start
18   of the litigation; correct?
19           MS. KALEMERIS:  Same objection.
20           THE WITNESS:  Of course.
21       Q.   BY MR. KEENER:  Okay.  So looking at this
22   e-mail, when you're referring Mr. Villacci to the
23   pictures in Insignium Astartes, does that lead you
24   to believe that at least as of this time you had a
25   copy of Insignium Astartes?

---

Page 142

1        A.   Or that he had or has.  I don't -- I don't
2    know.  I don't know.  I have so much [sic] things at
3    home.  It's possible it's sitting on a bookshelf right
4    now.  I don't remember it.  I mean, I did not do a list
5    of everything from the first book I obtained ages ago
6    until now.
7        Q.   And so throughout this entire case, you've
8    never looked to see if you have a copy of Insignium
9    Astartes?
10       A.   I don't remember that.
11           MS. KALEMERIS:  Objection.  Form.
12       Q.   BY MR. KEENER:  Do you recall ever looking for
13   that book in connection with this case?
14           MS. KALEMERIS:  Mr. Fiertek, I'd caution you
15   not to reveal any privileged conversations that you may
16   have had with counsel.
17           THE WITNESS:  I don't remember specifics.
18   I've looked up a lot of things for this case.  Exactly
19   what, where, when, and how, I just don't remember.
20       Q.   BY MR. KEENER:  Okay.  Let's go back to the
21   big chart, Fiertek Exhibit 4, and turn to product 148,
22   the Winged Skull Power Armor Pad.  It's about two thirds
23   of the way through.
24       A.   (Examining.)
25       Q.   Are you there?

---

Page 143

1        A.   Yep.
2        Q.   Is this a product you designed?
3        A.   Yes.
4        Q.   Any differences in the product you designed
5    from what's depicted here?
6        A.   Just less detail.  A little skewed.
7        Q.   Anything else?
8        A.   Just a little warped, detailed stuff.  Things
9    are not symmetric.
10       Q.   Do you know what references, if any, you used
11   in the development of this product?
12           MS. KALEMERIS:  Objection.  Form.  Vague as
13   to "references."
14           THE WITNESS:  I recall Googling pictures for
15   this one.
16       Q.   BY MR. KEENER:  Anything else?
17       A.   Not that I can think of.
18       Q.   And, again, would that fall within the same
19   category as your other Google searches, that you did
20   not retain a copy of the images you found?
21           MS. KALEMERIS:  Objection.  Form.
22           THE WITNESS:  I don't know.
23       Q.   BY MR. KEENER:  Do you know if you wrote down
24   the exact searches you performed?
25       A.   While -- while designing this, I'm fairly sure

---

Page 144

1    that I did not write down any searches.
2        Q.   When designing it, do you recall if you saved
3    the images you found?
4        A.   Same here.  I don't think I saved any images
5    while designing this.
6        Q.   Do you know when you designed this product?
7        A.   Excuse me?
8        Q.   Do you know when you designed the product?
9        A.   Don't remember.
10       Q.   If we look back to Exhibit 1, that document
11   with the various charts in it.
12       A.   Yes.
13       Q.   And turn to page 16.
14       A.   Sure.
15       Q.   Are you there?
16       A.   Yes.
17       Q.   The Winged Skull Power Armor Pad, Chapterhouse
18   has represented the design period as being July 15,
19   2011, through August 28th, 2011.
20           Do you see that?
21       A.   Yes.
22       Q.   Do you have any reason to disagree with those
23   dates?
24       A.   Not really.  It seems okay.  I don't remember
25   any specifics.  But it's -- it feels okay.

---

36 (Pages 141 to 144)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                              Deposition of Tomas Fiertek

---

Page 145

1    Q.  Okay.  So that was definitely while this case
2  was ongoing; correct?
3       MS. KALEMERIS:  Objection.  Form.
4       THE WITNESS:  I think so.  Yes.
5    Q.  BY MR. KEENER:  And even though your design
6  work for this product was while this case was ongoing,
7  you made no effort, when designing it, to retain copies
8  of the images that you used as references?
9       MS. KALEMERIS:  Objection.  Form.
10      THE WITNESS:  No.
11   Q.  BY MR. KEENER:  Beyond the image of the skull
12 with wings -- that's attached to a shoulder pad; right?
13   A.  Yes.
14   Q.  Did any of the images you find in -- using
15 as references for working on this product depict a skull
16 with wings attached to a shoulder pad?
17      MS. KALEMERIS:  Objection.  Form.
18      THE WITNESS:  No.
19   Q.  BY MR. KEENER:  Did any of them depict a skull
20 with wings?
21      MS. KALEMERIS:  Objection.  Form.
22      THE WITNESS:  I don't remember that.
23   Q.  BY MR. KEENER:  While you're sitting here
24 today, can you point or identify any pictures you looked
25 at that had a skull with wings?

---

Page 146

1       MS. KALEMERIS:  Objection.  Form.
2       THE WITNESS:  I don't think so.  There --
3  there are skull -- skull and wing symbols.  If shown,
4  maybe I'll recognize it.  But as far as I remember,
5  I used Google for this one.  But I did not -- I don't
6  remember seeing a skull and wings using those searches.
7    Q.  BY MR. KEENER:  Do you know if the skull with
8  wings means anything in the Games Workshop 40K universe?
9    A.  I don't know what it means.  However, I know
10 it's there.  So no, I don't know the meaning of it.
11   Q.  But you do know that a skull with wings is
12 in the Warhammer 40K universe?
13      MS. KALEMERIS:  Objection.  Form.
14      THE WITNESS:  Yes.
15   Q.  BY MR. KEENER:  And have you ever seen it
16 applied to a shoulder pad in the Warhammer 40K universe?
17      MS. KALEMERIS:  Objection.  Form.
18      THE WITNESS:  I don't know.  I think so.
19 It's -- it's possible.  But from my mind right now,
20 I cannot point to specifics.  It wouldn't -- it
21 wouldn't surprise me, though.
22   Q.  BY MR. KEENER:  If you turn to the next
23 product, product 149, identified -- there's -- there
24 is not actually a name on this one.  But it looks
25 like a shoulder pad with a fist holding a hammer.

---

Page 147

1    A.  Yes.
2    Q.  Do you see that for product 149?
3    A.  Yes.
4    Q.  Did you design that product?
5    A.  Yes.
6    Q.  Does Chapterhouse refer to that product as
7  a Hammer of Dorn shoulder pad?
8    A.  I don't --
9       MS. KALEMERIS:  Objection.  Form.
10      THE WITNESS:  I don't know.  That's -- that's
11 for Mr. Villacci to answer.
12   Q.  BY MR. KEENER:  Do you know if "Dorn" means
13 anything -- D-o-r-n -- in the Warhammer 40K universe?
14   A.  Yes, it does.
15   Q.  What does it mean?
16   A.  It's a fictional name of a character that is
17 in that universe.
18   Q.  And would that character be a Space Marine --
19 Space Marine related character?
20      MS. KALEMERIS:  Objection.  Form.
21      THE WITNESS:  I believe so.
22   Q.  BY MR. KEENER:  And do you know which Space
23 Marine chapter he is related to?
24   A.  The name is Imperial Fists.
25   Q.  Did you create this shoulder pad?

---

Page 148

1       MS. KALEMERIS:  Objection.  Asked and
2  answered.
3       THE WITNESS:  Yes.
4    Q.  BY MR. KEENER:  Do you know when you created
5  it?
6    A.  No.
7    Q.  If you look back at Exhibit 1, the one with
8  the dates in it, on page 16, for Item 149, it lists
9  September 2nd, 2010, through October 26, 2010.
10      Do you have any reason to dispute those dates
11 provided by Chapterhouse?
12      MS. KALEMERIS:  Objection.  Form.
13      THE WITNESS:  I -- instinctively, I would
14 have said it occurred later.  But it's my memory.  And
15 by now, we're pretty much sure that my memory of when
16 I create stuff is not really where it should be.  I --
17 I take the -- the written dates are accurate.  I mean,
18 but I -- I don't remember.  I just don't.
19   Q.  BY MR. KEENER:  What reference did you use,
20 if any, in creation of this product?
21      MS. KALEMERIS:  Objection.  Form.  Vague as
22 to "reference."
23      THE WITNESS:  Several number of references
24 were used for the ideas.  Yes.
25   Q.  BY MR. KEENER:  And when you say "references,"

---

Opus 2 International                        www.opus2international.com
          Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                              Deposition of Tomas Fiertek

---

Page 149

1    what do you mean?
2         A.   Well, it's a -- it's a mailed fist, a hammer,
3    and a laurel.  And the -- it was -- it was ordered by
4    a customer who I think -- it was a long time ago.  I
5    think he provided an imagery used, I think, in a book
6    by Games Workshop.  And he asked me to create this item.
7         Q.   So a customer sent you a picture from a Games
8    Workshop book with a fist, with a hammer, and a laurel
9    and asked you to create a shoulder pad with that
10   picture?
11        MS. KALEMERIS:  Objection.  Form.  Misstates
12   testimony.
13        THE WITNESS:  I'm not sure.  I mean, if it
14   is in an e-mail, then the e-mail is there.  I'm just
15   right now speaking out of my memory.  And I think a
16   customer asked me to do -- if he provided a picture,
17   I don't know.  It's -- it's a logical assumption.
18   But I just don't know.
19        Q.   BY MR. KEENER:  Beyond the Games Workshop
20   artwork, did you refer to any other materials in
21   designing this product?
22        A.   I -- I did Google armor -- armored, mailed
23   knights' fists and stuff like that.
24        Q.   Did you retain any of those pictures?
25        A.   I don't remember.

---

Page 150

1         MS. KALEMERIS:  Objection.  Form.
2         Q.   BY MR. KEENER:  Looking at the right-hand
3    column, there's a picture there that's titled:
4         "Imperial Fists Space Marine Chapter."
5         Have you ever seen that picture before?
6         A.   Yes.
7         Q.   And that picture is from page 53 of Insignium
8    Astartes.
9         Does that refresh your memory whether or not
10   you've ever had Insignium Astartes?
11        A.   No.  When you said that --
12        Q.   Where else did you --
13        A.   When you said "that picture," I didn't --
14   I didn't take it as literally that picture.  I mean,
15   a yellow -- a yellow figure with that insignia, I've
16   seen before, yes.  That exact picture, I don't know.
17   Maybe.
18        Q.   Okay.  So you've seen an Imperial Fist
19   shoulder pad of a yellow shoulder pad that's rimmed
20   with a circle inside, with a mailed fist inside of
21   it before, but maybe not this specific picture; is
22   that right?
23        MS. KALEMERIS:  Objection.  Form.
24        THE WITNESS:  Yes.
25        Q.   BY MR. KEENER:  Looking at that picture, do

---

Page 151

1    you see how the bottom of the fist has three points?
2         A.   Yes.
3         Q.   Do you see the product you designed also
4    having three points on the bottom?
5         MS. KALEMERIS:  Objection.  Form.
6         THE WITNESS:  Sure.
7         Q.   BY MR. KEENER:  Would you consider the fist
8    to not be an actual fist but a mailed gauntlet?
9         MS. KALEMERIS:  Objection.  Form.
10        Q.   BY MR. KEENER:  As opposed to a human hand?
11        MS. KALEMERIS:  Same objection.
12        THE WITNESS:  I don't know.  I never thought
13   about that.  Based on what?  Three points at the lower
14   border or --
15        Q.   BY MR. KEENER:  No.  The entire thing.
16        Were you trying to draw or sculpt a human hand
17   or a piece of armor that's a gauntlet that the human
18   hand goes in?
19        MS. KALEMERIS:  Objection.  Form.
20        THE WITNESS:  I don't remember what I was
21   going for.  It's -- possibly I was going for just a
22   stylized version of a hand or a mailed fist.  I don't
23   remember that.  But --
24        Q.   BY MR. KEENER:  Okay.  Do you see in the
25   Games Workshop Imperial Fist logo where there is a

---

Page 152

1    line separating the palm from the wrist?
2         A.   Yes.
3         Q.   And do you see in your product the same line
4    being there?
5         MS. KALEMERIS:  Objection.  Form.
6         THE WITNESS:  Of course.
7         Q.   BY MR. KEENER:  Yes?
8         A.   Yes.
9         Q.   And do both of these depict the left hand?
10        MS. KALEMERIS:  Objection.  Form.
11        THE WITNESS:  Yes.
12        Q.   BY MR. KEENER:  And do you see in the Games
13   Workshop product that there is a thumb bent over the
14   fingers of the hand?
15        A.   Yes.
16        Q.   Does your product also have a thumb bent over
17   the fingers of the hand?
18        MS. KALEMERIS:  Objection.  Form.
19        THE WITNESS:  How else are you -- are you
20   going to make a fist if not bending the thumb over the
21   fingers?  Yes.
22        Q.   BY MR. KEENER:  And do you see how the Games
23   Workshop logo has the thumb extending and covering the
24   first three fingers but not the pinky of the hand?
25        A.   Yes.  I also see the pinky of the hand being

---

38  (Pages 149 to 152)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 153

1   separated from the picture.  So what gives?
2       Q.   That was my question.
3           Do you see in the Games Workshop logo where
4   the thumb bent over covers the first three fingers but
5   not the pinky of the hand?
6       A.   Of course.
7       Q.   And do you agree that your product also has
8   a thumb covering the first three fingers but not the
9   pinky of the hand?
10      MS. KALEMERIS:  Objection.  Form.
11      THE WITNESS:  Yes.
12      Q.   BY MR. KEENER:  If you turn to the next page,
13  there's a picture on the right-hand side that says:
14          "Hammers of Dorn Space Marine Chapter...from
15  page 57 of the Art of Clint Langley."
16          Do you see that picture?
17      A.   Yes.
18      Q.   Have you ever seen that picture before?
19      A.   Yes.
20      Q.   Did you see that picture prior to designing
21  this product?
22      A.   I think so.  I'm not sure, but I think so.
23      Q.   And does that product show a gloved hand
24  holding a hammer?
25      A.   Yes.

---

Page 154

1       MS. KALEMERIS:  Objection.  Form.
2       Q.   BY MR. KEENER:  And that hammer has a square
3   overhead-sized [sic] head to it?
4       MS. KALEMERIS:  Objection.  Form.
5       THE WITNESS:  Yes.
6       Q.   BY MR. KEENER:  And the product you designed
7   also has a hammer with a square head to it?
8       MS. KALEMERIS:  Objection.  Form.
9       THE WITNESS:  I don't know that.  I don't see
10  the top of that pad, and I don't remember how I created
11  it.  So it might be a cut-off, as in Soviet communists'
12  iconography.
13      Q.   BY MR. KEENER:  Do you know from this picture
14  whether or not your product has a square head?
15      A.   The bottom is square.  I see that in the
16  picture.  What I'm saying is I don't remember how the
17  top looks.  It was quite a while I sculpted this thing.
18  And I don't handle them every day.  So it might --
19      Q.   Do you see in the Games Workshop picture where
20  the glove holding the hammer is over a laurel?
21      A.   Yes.
22      Q.   And in your product, did you also put the
23  glove holding the hammer over a laurel?
24      MS. KALEMERIS:  Objection.  Form.
25      THE WITNESS:  No.

---

Page 155

1       Q.   BY MR. KEENER:  Is there a laurel depicted
2   in your product?
3       MS. KALEMERIS:  Objection.  Form.
4       THE WITNESS:  The glove is above the laurel,
5   not over it.  But there is a laurel depicted.  Yes.
6       Q.   BY MR. KEENER:  And the hammer extends over
7   the laurel; right?
8       MS. KALEMERIS:  Objection.  Form.
9       THE WITNESS:  I think so.
10      Q.   BY MR. KEENER:  And the hammer in Games
11  Workshop's picture extends over the laurel?
12      MS. KALEMERIS:  Objection.  Form.
13      THE WITNESS:  It most certainly does.
14      Q.   BY MR. KEENER:  Do you believe you used this
15  picture in any way in designing your product, product
16  149?
17      A.   Yes, I did.
18      Q.   What did you use this picture for?
19      A.   It's a glove.  It's a hammer.  It's a laurel.
20  I don't know how to answer that question.  It's -- I
21  used the same configuration of hammer -- or almost the
22  same configuration of hammer, laurel, and fist.  And
23  I still don't know how the hammer top looks as in that
24  picture.  Well, the -- the -- the glove is not centered
25  on the laurel.  It's above the laurel.  And I added

---

Page 156

1   some sort of dual thing into the laurel.  But, of
2   course, I -- I used that picture as inspiration for
3   the pad.  It was, I think, even asked of me.
4       Q.   Are you able to -- are you able to point
5   to any other non-Games Workshop images that depict
6   a hand holding a hammer inside a laurel?
7       MS. KALEMERIS:  Objection.  Form.
8       THE WITNESS:  No.  However, I wouldn't be
9   surprised if there are mailed fists holding a various
10  collection of weapons in ancient heraldry and stuff.
11  But I can't point it out because I didn't search for --
12  for those.
13      Q.   BY MR. KEENER:  Right.  You didn't use any of
14  those pictures in designing this product; right?
15      MS. KALEMERIS:  Objection.  Form.
16      THE WITNESS:  If you're referring to heraldry,
17  I did not use heraldry in the design of this product.
18      Q.   BY MR. KEENER:  And even heraldry, are you
19  aware of ever seeing a hand holding a hammer inside
20  a laurel applied to a shoulder pad?
21      MS. KALEMERIS:  Objection.  Form.
22      THE WITNESS:  As far as I -- this is -- I'm
23  not a historian.  But as far as my limited knowledge
24  tells me, there are no shoulder pads in heraldry.  So
25  by definition, the answer to that question is "no."

---

39 (Pages 153 to 156)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 157

1      Q.   BY MR. KEENER:  If you look at the next
2    product, product 150, which is a:
3            "Hammer of Dorn Shoulder Pad for Terminators."
4    A.  Yes.
5      Q.   Do you see that?
6          Is this a product you designed?
7    A.  Yes.
8      Q.   And did you use the same Games Workshop
9    product you just talked about in the same way to design
10   this product?
11           MS. KALEMERIS:  Objection.  Form.  Misstates
12   testimony.
13           THE WITNESS:  I'm not sure.  I don't remember
14   if there was any different procedure in creating this
15   from the previous one.
16     Q.   BY MR. KEENER:  Do you also -- do you recall
17   using the Hammer of Dorn picture on the right-hand page
18   in designing this product?
19           MS. KALEMERIS:  Objection.  Form.
20           THE WITNESS:  Yes.
21     Q.   BY MR. KEENER:  And you also recall using
22   it for the picture of the hand with the hammer and the
23   laurel?
24           MS. KALEMERIS:  Objection.  Form.  Vague as
25   to "use."

---

Page 158

1            THE WITNESS:  To a certain degree, yes.
2      Q.   BY MR. KEENER:  Let's turn to the next
3    product, product 151.
4    A.  Sure.
5            MS. KALEMERIS:  Can we take a quick break
6    before the next product?
7            MR. KEENER:  Let's take a five-minute break.
8            THE WITNESS:  Sure.
9            (Recess from 6:21 p.m. to 6:29 p.m.)
10     Q.   BY MR. KEENER:  All right.  Let's turn to
11   product 153 in Exhibit 4, which is a:
12           "Power Armor Shoulder Pad for Scythes of the
13   Emperor."
14           S-c-y-t-h-e-s.  Do you see that?
15   A.  Yes.
16     Q.   Is that a product you created?
17   A.  Yes.
18     Q.   And do you know when you created that product?
19   A.  Oh, boy.  Same as the other ones, I don't
20   remember.  Quite some time ago.
21     Q.   If you go back to Exhibit 1, on page 16 --
22   A.  Yeah.
23     Q.   -- it lists a date of September 15, 2010,
24   through November 2010.
25           Do you have any reason to disagree with those

---

Page 159

1    dates that were design and development?
2            MS. KALEMERIS:  Objection.  Form.
3            THE WITNESS:  I don't think so.  It seems a
4    bit -- it seems a bit early for my liking, but I don't
5    think so.
6      Q.   BY MR. KEENER:  Do you recall, when we talked
7    about the Hammer of Dorn shoulder pad, you discussed
8    how a customer asked you to design that shoulder pad?
9            MS. KALEMERIS:  Objection.  Form.  Misstates
10   testimony.
11           THE WITNESS:  I remember something with a --
12   to do with the customer that made a request.  Yeah.
13     Q.   BY MR. KEENER:  Did you have a customer
14   request that also impacted this design?
15           MS. KALEMERIS:  Objection.  Form.  Misstates
16   testimony.
17           THE WITNESS:  Someone asked me to do that.
18   I don't recall if it was a customer or if it was
19   Mr. Villacci.  But I did not just cook it up on my
20   own accord.
21     Q.   BY MR. KEENER:  Do you recall what you were
22   asked?
23   A.  No.  No.
24     Q.   Do you see on the right-hand side, there's
25   a picture from page 88 of how to paint Space Marines?

---

Page 160

1    A.  Yes.
2      Q.   Have you ever seen that picture before?
3    A.  Not that I can recall.
4      Q.   Do you see, in the bottom right of that
5    picture, there's a shoulder pad with two crossed
6    scythes?
7    A.  Yes.
8            MS. KALEMERIS:  Objection.  Form.
9      Q.   BY MR. KEENER:  Have you ever seen that
10   shoulder pad with that symbol on it, if not from
11   this book, from someone else before?
12           MS. KALEMERIS:  Objection.  Form.
13           THE WITNESS:  I think so.  Although I don't
14   think I've seen this exact symbol on one before.  But
15   I'm pretty sure I've seen a crossed scythe before.
16     Q.   BY MR. KEENER:  In a Games Workshop book?
17   A.  Yes.  In --
18           MS. KALEMERIS:  Objection.  Form.
19           THE WITNESS:  I don't know if it was in a
20   book or in a -- I think I saw it somewhere online on
21   some board, forum.  But I'm not sure.
22     Q.   BY MR. KEENER:  And it was on a shoulder pad?
23           MS. KALEMERIS:  Objection.  Form.
24           THE WITNESS:  I don't know.  I don't know
25   what -- what it was on.

---

Opus 2 International                 www.opus2international.com
           Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 161

1    Q.  BY MR. KEENER:  This picture of a scythe that
2  you saw, do you know if you saw it before you designed
3  your product here?
4         MS. KALEMERIS:  Objection.  Form.  Misstates
5  testimony.
6         THE WITNESS:  You mean this picture in front
7  of me?
8    Q.  BY MR. KEENER:  No.  You referred to seeing
9  some picture --
10    A.  Oh, all right.  All right.  All right.
11    Q.  -- in the 40K universe of crossed scythes.
12    A.  Yes.
13    Q.  And my question is:  Did you see that picture
14  before designing your product 153?
15         MS. KALEMERIS:  Objection.  Form.  Misstates
16  testimony.
17         THE WITNESS:  I think so.
18    Q.  BY MR. KEENER:  What references, if any, did
19  you use in creating the scythes shoulder pads?
20         MS. KALEMERIS:  Objection.  Form.  Vague as
21  to "reference."
22         THE WITNESS:  I have a vague recollection of
23  seeing a sketch or drawing of a crossed scythe symbol.
24  I might be entirely wrong about that.  It's pretty vague
25  in my head.  But I -- that's what I think.  And beyond

---

Page 162

1  that, if it's even true, if my memory didn't just trick
2  me, I actually don't think I used anything.  It's --
3  it's -- it's two scythes that are crossed.  I mean, how
4  much do you use for -- I'm -- I'm -- I'm pretty sure I
5  Googled pictures of scythes because the handle is bent
6  in some weird shape I never remember.  I, obviously,
7  did not use that anyway.  But that's what I can recall
8  right now in -- in -- as -- as speaking about -- of
9  references.
10    Q.  BY MR. KEENER:  The sketch drawing you were
11  talking about, did you save a copy of that picture?
12         MS. KALEMERIS:  Objection.  Form.  Misstates
13  testimony.
14         THE WITNESS:  I have no idea.  I don't even
15  remember if that is an actual correct memory or that's
16  just something I think I remember.
17    Q.  BY MR. KEENER:  The images from Google, did
18  you save those images?
19         MS. KALEMERIS:  Objection.  Form.
20         THE WITNESS:  I don't think so.
21    Q.  BY MR. KEENER:  Did you save copies of any
22  of the images you used in creating this product?
23         MS. KALEMERIS:  Objection.  Form.
24         THE WITNESS:  Don't know.  Don't remember.
25    Q.  BY MR. KEENER:  If you turn back to Exhibit 1,

---

Page 163

1  on page 9 of Exhibit 1, there's an entry at the bottom
2  of the chart about the middle of the page for product
3  entry 154.
4    A.  Yeah.
5    Q.  It says:
6         "In designing this product, the designer
7  referenced the crossed scythes pictured here."
8         And there's a DeviantART picture --
9    A.  All right.
10    Q.  -- and a web address listed there.
11    A.  Sure.
12    Q.  Do you know if you looked at that page?
13         MS. KALEMERIS:  Objection.  Form.
14         THE WITNESS:  As I said, I don't remember.
15  And this does not refresh my memory.
16    Q.  BY MR. KEENER:  Did you produce a copy of that
17  page to counsel?
18         MS. KALEMERIS:  Objection.  Form.
19         THE WITNESS:  I don't remember.  It's just not
20  there.  I don't remember.  No.
21    Q.  BY MR. KEENER:  Do you recall looking at any
22  pictures from DeviantART in reference to this product?
23         (Court reporter clarification.)
24         THE WITNESS:  DeviantART.
25         MR. KEENER:  DeviantART.  D-e-v-i-a-n-t-A-R-T.

---

Page 164

1         THE WITNESS:  I -- I -- I just cannot remember
2  right now.  No, I don't -- I don't remember.
3    Q.  BY MR. KEENER:  Looking at the same document,
4  if you turn to page 10, on the bottom, there's an
5  additional entry for the same product.  It says:
6         "The designers referenced the Mortal Kombat
7  Scorpion character and the Army of Two video game."
8         MS. KALEMERIS:  Counsel, I don't believe
9  that's the same entry.
10    Q.  BY MR. KEENER:  Do you see the entry for Power
11  Armor Shoulder Pad for Scythes on the bottom of page 10?
12    A.  Yes.
13    Q.  And it says:
14         "The designers referenced the Mortal Kombat
15  Scorpion character and the Army of Two video game."
16         Do you see that?
17    A.  Yes.
18    Q.  Did you reference the Mortal Combat Scorpion
19  character in any way in designing this product?
20    A.  First of all, it says the "designers."  I
21  don't recall there ever being several designers.  And
22  as for the rest, I -- I don't know.  I don't remember.
23  I don't know.  I don't know.
24    Q.  Do you have any recollection of ever looking
25  at the Mortal Combat Scorpion character in designing

---

41  (Pages 161 to 164)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 165

1    this product?
2        MS. KALEMERIS: Objection. Form.
3        THE WITNESS: No. No recollection.
4        Q. BY MR. KEENER: Is there even two crossed
5    scythes on the Mortal Combat Scorpion character?
6        MS. KALEMERIS: Objection. Form.
7        THE WITNESS: I do not know that.
8        Q. BY MR. KEENER: Okay. Do you recall
9    referencing the Army of Two video game at all in
10   designing this product?
11       MS. KALEMERIS: Objection. Form.
12       THE WITNESS: Not that I can recall. I did
13   not.
14       Q. BY MR. KEENER: Do you know whether there's
15   any scythes at all present in the Army of Two video
16   game?
17       MS. KALEMERIS: Objection. Form.
18       THE WITNESS: I have no idea.
19       Q. BY MR. KEENER: Okay. Do you know if two
20   crossed scythes on a shoulder pad has any significance
21   in the Games Workshop 40K universe?
22       A. I believe there is some sort of significance.
23       Q. And do they represent the Scythes of the
24   Emperor Space Marine chapter?
25       MS. KALEMERIS: Objection. Form.

---

Page 166

1        THE WITNESS: That is my understanding.
2        Q. BY MR. KEENER: Now, looking at the product
3    you designed, the picture in the big chart, in
4    comparison to the one -- the Games Workshop symbol
5    on the right-hand side --
6        A. Sure.
7        Q. -- do you see how Games Workshop's handle
8    has a pointed protrusion pointing towards the inside
9    of the shoulder pad --
10       MS. KALEMERIS: Objection.
11       Q. BY MR. KEENER: -- on each handle?
12       MS. KALEMERIS: Objection. Form.
13       THE WITNESS: Yes.
14       Q. BY MR. KEENER: Do you also agree that your
15   product that you designed also has pointed protrusions
16   pointing towards the inside of the shoulder pad?
17       MS. KALEMERIS: Objection. Form.
18       THE WITNESS: Well, now when you mention it,
19   mine do have, well, protrusions as in something clearly
20   separate from -- from the handle. Whereas, the previous
21   picture just has a shape turning inwards. It could be
22   a protrusion or -- I don't know.
23       But to answer your question, yes, my -- my
24   thing has protrusion thingies pointing inwards at the
25   bottom.

---

Page 167

1        Q. BY MR. KEENER: And do you see on the Games
2    Workshop design where the blade of the scythe near the
3    handle has a cut-away?
4        A. Yes.
5        MS. KALEMERIS: Objection. Form.
6        Q. BY MR. KEENER: Do you see that?
7        A. Yes.
8        Q. And do you see in the product you designed
9    while -- where there's a -- where there's a -- a arch
10   or a cut-away where the handle meets the blade on your
11   product?
12       MS. KALEMERIS: Objection. Form.
13       THE WITNESS: It's not close to the handle.
14   But there is a cut-away in the general vicinity. Yes.
15       Q. BY MR. KEENER: Is it your belief that you
16   used Games Workshop's logo for Scythes of the Emperor
17   in any way in designing your product?
18       MS. KALEMERIS: Objection. Form.
19       THE WITNESS: Other than the idea of two
20   crossed scythes, no.
21       Q. BY MR. KEENER: And do you believe that
22   you've seen similar pictures of scythes with those
23   pointed protrusions in the bottom of the handle
24   pointing inward?
25       MS. KALEMERIS: Objection. Form.

---

Page 168

1        THE WITNESS: I cannot answer that. Because
2    even -- even if I am looking at crossed scythes symbols
3    I -- I don't even think about any protrusions at the
4    bottom. So it's -- it's -- you -- you see them when
5    you know what you're looking for. So the answer to
6    that question is "no," but it's not that simple.
7        Q. BY MR. KEENER: My question is: Are you
8    able to identify for me any pictures of crossed scythes
9    with a similar pointed protrusion at the bottom of the
10   handle?
11       MS. KALEMERIS: Objection. Form.
12       THE WITNESS: No.
13       Q. BY MR. KEENER: Are you able to point to
14   me any specific pictures of crossed scythes with that
15   cut-away at the top of the blade where the blade reaches
16   the handle?
17       MS. KALEMERIS: Objection. Form.
18       THE WITNESS: I don't know. Maybe that
19   cut-away is normal. I don't remember how a real-life
20   scythe looks like. I think they come with some sort of
21   cut-away. But as pointing out a picture, no, not from
22   just memory.
23       Q. BY MR. KEENER: So you don't know either way
24   if that is what they look like normally?
25       MS. KALEMERIS: Objection. Form. Misstates

---

Opus 2 International                    www.opus2international.com
Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

---

Page 169

1  testimony.
2        THE WITNESS:  I don't remember how they look
3  like normally.
4        Q.  BY MR. KEENER:  Okay.  Let's turn to product
5  159, which is near the end.  It's the:
6        "Shrike Conversion Kit for Tyranid Warrior
7  Models."
8        A.  Sure.
9        Q.  Are you there?
10       A.  Yes.
11       Q.  And I believe you testified that Mr. Lee did
12  the first part of sculpting the wings and then you made
13  some improvements and clean-up on it.
14       Is that right?
15       MS. KALEMERIS:  Objection.  Form.  Misstates
16  testimony.
17       THE WITNESS:  Are we just talking about the
18  wings or the whole thing?
19       Q.  BY MR. KEENER:  Just the wings.
20       A.  Just the wings.  My belief is -- well, I know
21  Mr. Lee created the wings or rather basic wing shapes.
22  And I improved, took away, added and, well, finished
23  the whole thing.
24       Q.  In the work that you did on this product,
25  did you refer to any images or other products?

---

Page 170

1        MS. KALEMERIS:  Objection.  Form.
2        THE WITNESS:  Well, part of the creation was
3  finding a nice-looking texture for the wing -- the --
4  the wings themselves.  And I know I was looking at
5  ideas everywhere.  Amongst others, I -- I took a look
6  at how Forge World, as they are known, how they made
7  wing textures.  I looked at Google pictures of -- I
8  think it was bat wings and dragon wings and stuff.
9  And finally I settled for what I did.
10       Q.  BY MR. KEENER:  The Forge World texture, are
11  you meaning the Forge World model of a Shrike?
12       MS. KALEMERIS:  Objection.  Form.
13       THE WITNESS:  I don't remember how they call
14  it.  But there is some winged monster being sold as a
15  model there.  So I -- it might be that.
16       Q.  BY MR. KEENER:  Would it be the model that you
17  see on the right hand of this page --
18       A.  That is --
19       Q.  -- Exhibit 4?
20       A.  That is one of them I was looking at.  Yes.
21       Q.  And you were looking at that model for the
22  texture on the wings?
23       MS. KALEMERIS:  Objection.  Form.  Misstates
24  testimony.
25       THE WITNESS:  Well, I was looking at the

---

Page 171

1  inspiration and ideas for good-looking textures.  So
2  that was what I was looking at.
3        Q.  BY MR. KEENER:  Did you look at this -- did
4  you look at this model for any other reasons regarding
5  this product?
6        MS. KALEMERIS:  Objection.  Form.
7        THE WITNESS:  Not that I can recall.
8        Q.  BY MR. KEENER:  Did you have a physical copy
9  of a Games Workshop Forge World Shrike product?
10       A.  No.
11       Q.  Do you recall Mr. Villacci ever telling you
12  to look at the Games Workshop wings?
13       A.  I don't know.  I -- I have some -- some
14  memory of -- of Forge World wings being mentioned.
15  I think it was as part of a -- like a feedback-seeking
16  process where I just was at a loss of what to do with
17  the textures.  That was the first wing that I've done
18  in my life.  I just -- I think we talked about how
19  other companies do textures.
20       MR. KEENER:  If we could, Gill, get document
21  No. 7 and have that marked Fiertek Exhibit 8.  It's
22  labeled Chapterhouse 30256 through 30266.
23       (T. Fiertek Exhibit 8 marked.)
24       Q.  BY MR. KEENER:  And I want to direct your
25  attention to page 4 that ends in 30259.

---

Page 172

1        Do you see, at the very top of the page,
2  it looks like a run-on of an e-mail from you to
3  Mr. Villacci, dated March 13th, 2012.
4        Do you see that?
5        A.  (Examining.)  Yes.
6        Q.  And the top of the page, it says:
7  "How thick are revs wings?"
8        A.  Yes.
9        Q.  Does "rev" refer to a person?
10       A.  That is Mr. Lee.
11       Q.  And when you're asking how thick are Mr. Lee's
12  wings, is that for this Shrike Conversion Kit model?
13       A.  I think it's actually Mr. Villacci asking me
14  and not me asking him.
15       Q.  Do you think this is -- okay.
16       So you think Mr. Villacci wrote that sentence?
17       A.  Well, I'm not sure.  But as -- again, I'm
18  not -- I don't remember when I did this thing.  But
19  since I had it in my hands and the -- there is a
20  question about the thickness, it doesn't seem logical
21  that I would ask him how thick they are.  So I think --
22       Q.  Do you understand the -- go ahead.
23       A.  I think this is actually Mr. Villacci asking
24  me.
25       Q.  Okay.  And so Mr. Villacci asks:  How thick

---

43 (Pages 169 to 172)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

Page 173

1   are Mr. Lee's wings?
2          Do you understand that to be referring to the
3   wings for the Shrike Conversion Kit?
4          A.  Yes.
5          Q.  And he says that:
6          "2.25 millimeter thickness should be okay,
7   that is about how thick GW's are."  (As read.)
8          Do you see that?
9          A.  Yes.
10         Q.  Do you understand "GW" to be "Games Workshop"?
11         A.  Yes.
12         Q.  So he's telling you that they should be a
13  similar thickness to Games Workshop's wings?
14         MS. KALEMERIS:  Objection.  Form.  Calls for
15  speculation.
16         THE WITNESS:  I'm fairly sure this
17  conversation is about casting technicalities.  There
18  was issue -- one of the things I had to do on those
19  models were to thicken the wings that Mr. Lee had
20  sculpted because they were too thin to be castable.
21  And as I understand it, we were bouncing questions
22  of thickness back and forth, me not -- me not wanting
23  to do them too thick because it's ugly.  But it needs
24  to be balanced with a -- well, they need to be castable.
25  And I think he or someone is asking how thick the wings

Page 174

1   Games Workshop, which I think was referring to Forge
2   World, are.  Because they are obviously cast.  And if
3   they are a certain thickness, then that thickness is
4   obviously okay for casting purposes.  This is my take
5   on this.
6          Q.  BY MR. KEENER:  So -- so your understanding
7   of this discussion is that Mr. Lee's wings were too
8   thin.  And Mr. Villacci was asking you to thicken them
9   up.  And he referred to making them the same size as
10  the Games Workshop wings for their Shrike?
11         MS. KALEMERIS:  Objection.  Form.  Misstates
12  testimony.
13         THE WITNESS:  Well, not the same size, but
14  thicker.  I don't know everybody's thoughts in this
15  e-mail.  But I do know for a fact that the wings were
16  too thin and I was supposed to thicken them up, amongst
17  other things.  And I don't recall it ever having to
18  be made similar or equal or et cetera to -- to someone
19  else's wings, just thicker.  I -- I recall this more
20  clearly because there was a degree of bickering between
21  me and Mr. Villacci.  We had like a -- a --
22         Q.  BY MR. KEENER:  Do you believe Mr. Villacci
23  to be asking you to make them 2.25 millimeters thick
24  because that's how thick Games Workshop's wings are?
25         MS. KALEMERIS:  Objection.  Form.  Misstates

Page 175

1   testimony.
2          THE WITNESS:  No.  I believe he is making
3   example to shut me up where I was nagging about making
4   them thinner than castable.
5          Q.  BY MR. KEENER:  Let's turn back a page to
6   30258.  In the middle of the page, there's an e-mail
7   from Mr. Villacci to you dated March 14, 2012.  It
8   states:
9          "Look at GW wings and you can see what's
10  needed."
11         Do you see that?
12         A.  Yes.
13         Q.  Is this, again, Mr. Villacci instructing
14  you to look at Games Workshop's wings for its Shrike
15  to see what needs to be done?
16         MS. KALEMERIS:  Objection.  Form.
17         THE WITNESS:  This is -- I don't know what
18  he means by that.  But let me take a look at the
19  dates here.  I understand that as being part of the
20  thickness bickering fight between us.  I -- I mean,
21  there's no -- as far as I'm -- as far as I know,
22  there's no mention or usage of any texture someone
23  else did.  That was never a question.
24         Q.  BY MR. KEENER:  Is it correct to say
25  Mr. Villacci tells you:

Page 176

1          "Look at Games Workshop's wings and you can
2   see what's needed."  (As read.)
3          MS. KALEMERIS:  Objection.  Form.
4          THE WITNESS:  I think he -- he was referring
5   to the thickness.
6          Q.  BY MR. KEENER:  That's not my question.
7          Did Mr. Villacci write to you, saying:
8          "Look at Games Workshop's wings and you can
9   see what's needed."
10         MS. KALEMERIS:  Objection.  Form.
11         THE WITNESS:  Well, it's -- it's his words.
12  So, yes, he wrote that to me.
13         Q.  BY MR. KEENER:  Turn forward again to 30259.
14  The second half of the page is an e-mail from you to
15  Mr. Villacci.  And the first paragraph says:
16         "So taking the eagle wing design straight
17  from him is a no-no?"
18         Do you have any idea what product is being
19  referred to there?
20         A.  I'll have to write a little bit -- read
21  a little bit more about this.  Because, right now,
22  I have no idea what he's meant with that.  I think
23  it's -- it's referring to a front of a Jetbike project
24  that was being discussed and have [sic] nothing to
25  do with the Shrike item.

44  (Pages 173 to 176)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 177

1    Q.   Does this relate at all to Chapterhouse's
2  Jetbike that it sells?
3    A.   No.  I think it refers to a idea of a further
4  future Jetbike project, not to the one already being
5  sold.
6    Q.   Do you know who the "him" in that sentence
7  refers to?
8    A.   Oh, no idea.
9    Q.   If you look near the top of that page, the
10 third paragraph down, it states:
11        "You can use the design on the prow if you
12 want.  I just said he pretty much copied that ship
13 design from GW and isn't very kosher."
14        Do you see that?
15    A.   Yes.
16    Q.   Do you know if those are your words or
17 Mr. Villacci's?
18    A.   Those would be Mr. Villacci's words.
19    Q.   Do you know what he's referring to there?
20    A.   I think he's talking about a -- as I said,
21 a future possible Jetbike model.  And that's -- I
22 think that's about that.
23    Q.   So he's referring to the prow or the front
24 of the Jetbike model?
25    A.   No.  I think he's --

---

Page 178

1    Q.   Is the prow in the front?
2    A.   The prow is the front.
3        I think he's actually referring to something
4  he saw online or that I saw online and was talking
5  about that as in -- as in -- sheesh, I don't -- some --
6  something someone else did apparently and it wasn't
7  okay.
8    Q.   The prow is the front; right?
9    A.   Yes.
10    Q.   And the product is a Jetbike?
11    A.   No.  There is no product.  This is discussion
12 of a possible future product or project that is -- has
13 something to do with a Jetbike.  What I do know is that
14 this has nothing to do with Item 159er [sic].
15    Q.   That's not my question.
16    A.   Sure.
17    Q.   This has to do with a design for the front
18 of a Jetbike; correct?
19    A.   That -- that is --
20        MS. KALEMERIS:  Objection.  Form.
21        THE WITNESS:  That is my understanding,
22 that it has to do with the design of a front of a
23 future possible Jetbike.
24    Q.   BY MR. KEENER:  And Mr. Villacci is telling
25 you you can use that design --

---

Page 179

1        MS. KALEMERIS:  Objection.  Form.
2    Q.   BY MR. KEENER:  -- correct?
3    A.   Well, that's what he writes here.  That's
4  correct, I mean.
5    Q.   And Mr. Villacci says he has pretty much
6  copied that ship design from Games Workshop; right?
7        MS. KALEMERIS:  Objection.  Form.  Misstates
8  testimony and misstates the evidence.
9        THE WITNESS:  That is up to Mr. Villacci.
10    Q.   BY MR. KEENER:  Now, when he says --
11    A.   That is up to Mr. Villacci to say.  I mean,
12 that is what he writes.  That is all I can comment on.
13 I -- I don't read minds.
14    Q.   Let's turn to product 160, which is the:
15        "Dark Elf Arch-Torturess."
16    A.   Yes.
17    Q.   Is this a product you designed?
18    A.   Amongst others.
19    Q.   On the picture on page -- on product 160 of
20 Exhibit 4, it states:
21        "Sculpted by Jae Lee and Tomas Fiertek."
22        Is that accurate?
23    A.   That is accurate.
24    Q.   What portions did you sculpt?
25    A.   It's like with the previous one.  Mr. Lee

---

Page 180

1  did everything.  I corrected mistakes, re-made some
2  details, added the finishing touches.  So that's what
3  I did.
4    Q.   Do you know when your portion of the design
5  work was on this product?
6    A.   Excuse me?
7    Q.   Do you know when your portion of the design
8  work on this product was done?
9    A.   Oh, no.  I don't remember.
10    Q.   Okay.  Let's look back at Exhibit 1, the
11 document with the dates in it.  And if you look at
12 the bottom of page 16 for the Dark Elf Arch-Torturess --
13    A.   Sure.
14    Q.   -- it identifies design dates of March 31st,
15 2011, through January 13, 2012.
16        Do you see that?
17    A.   Yes.
18    Q.   Do you have any reason to dispute those dates?
19        MS. KALEMERIS:  Objection.  Form.
20        THE WITNESS:  No.  No, no.  No, no reasons.
21 I mean, my memory would put them a little later.  But
22 those are perfectly okay.
23    Q.   BY MR. KEENER:  Now, in your work on the
24 Dark Elf Arch-Torturess, did you refer in any way to
25 any images?

---

45 (Pages 177 to 180)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 181

1       MR. KEENER:  Objection.  Form.  Vague as to
2   "refer."
3       THE WITNESS:  Not that I can remember now.
4       Q.  BY MR. KEENER:  And do you know if Mr. Lee
5   was provided with any images to refer to?
6       MS. KALEMERIS:  Objection.  Form.
7       THE WITNESS:  No.
8       Q.  BY MR. KEENER:  Are you able to identify any
9   non-Games Workshop images that were used in any way in
10  the creation of this project?
11      MS. KALEMERIS:  Objection.  Form.
12      THE WITNESS:  That -- that question is for
13  Mr. Lee and/or Mr. Villacci.  I -- I don't know.
14      Q.  BY MR. KEENER:  Did they ever tell you of
15  any images they used as references?
16      MS. KALEMERIS:  Objection.  Form.  Vague as
17  to "references."
18      THE WITNESS:  Not that I can remember.
19      Q.  BY MR. KEENER:  The product -- the picture
20  on the right-hand page [sic] on Exhibit 4 is labeled
21  Urien, U-r-e-n [sic], Rakarth, R-a-k-a-r-t-h.
22      Do you see that?
23      A.  Yes.
24      Q.  Have you ever seen a picture of that model
25  before?

---

Page 182

1       A.  I don't know.  I don't think so.
2       Q.  Have you ever seen a physical copy of that
3   model before?
4       A.  No.
5       Q.  Do you know what the character a Dark Eldar
6   Haemonculous, H-a-e-m-o-n-c-u-l-o-u-s, is?
7       A.  It's some sort of super bad guy from that
8   fantasy setting.
9       Q.  In the Games Workshop 40K universe?
10      MS. KALEMERIS:  Objection.  Form.
11      THE WITNESS:  As far as I know, yes.
12      Q.  BY MR. KEENER:  And related to the Army, the
13  Dark Eldar?
14      MS. KALEMERIS:  Objection.  Form.
15      THE WITNESS:  I think so.
16      Q.  BY MR. KEENER:  And looking at this picture
17  on the right-hand side of the Games Workshop miniature,
18  would you identify that as one of those creatures?
19      A.  I don't think so, actually.
20      Q.  Why not?
21      A.  I have little experience in that particular
22  section of the story or Games Workshop's products.
23  If shown -- if just randomly -- if this model was
24  randomly shown to me, I would not identify that as a --
25  any particular model or manufacturer, actually.

---

Page 183

1       Q.  Let's turn to the next page where there's
2   a picture from page 44 of codex Dark Eldar.
3       Have you ever seen that picture before?
4       A.  Yes.
5       Q.  And you saw that picture in codex Dark Eldar?
6       MS. KALEMERIS:  Objection.  Form.
7       THE WITNESS:  I think so.  I don't know.  I
8   don't remember.  But it's a possibility.
9       Q.  BY MR. KEENER:  And codex Dark Eldar is the
10  codex that you have?
11      A.  Yes.
12      Q.  And did you possess codex Dark Eldar prior
13  to any work you did on this product for Chapterhouse?
14      A.  I don't know.  I -- I think I possessed an
15  older version.  And, if so, then -- then I did possess
16  that version prior to creating this -- this product.
17  But yeah.
18      Q.  Do you recognize this picture to also be a
19  Dark Eldar Haemonculous?
20      MS. KALEMERIS:  Objection.  Form.
21      THE WITNESS:  Well, I -- I don't know.  As
22  I said, it's not my, so to speak, interest.  I -- I
23  didn't purchase the codex for -- for pictures or rules.
24  I just purchased it for -- for its background story,
25  read it once or -- or twice, and then it was collecting

---

Page 184

1   dust.  I -- I -- I'm not familiar -- that familiar with
2   those -- with that style or imagery or pictures.
3       Q.  BY MR. KEENER:  Do you believe you referred to
4   this picture in any way in your work on Chapterhouse's
5   Dark Elf Arch-Torturess?
6       MS. KALEMERIS:  Objection.  Form.  Vague as
7   to "reference."
8       THE WITNESS:  Not that I can remember.  No.
9       Q.  BY MR. KEENER:  If you turn the page, there's
10  another picture of a model.
11      Have you ever seen the picture of that model
12  before?
13      A.  If it is in the codex that I have, then I
14  have seen it.  Because I've -- I've read through the
15  book from cover to cover, but nothing that I can point
16  out or particularly place.
17      Q.  Are you looking at a picture of a model?
18      A.  Yes.
19      Q.  Okay.  And turn one more page.  There's
20  another picture from page 37 of codex Dark Eldar.
21      Have you ever seen that picture before?
22      A.  Maybe.  It doesn't ring any bells.  I don't
23  remember seeing it.  But it's possible I have.  I mean,
24  I've seen a lot of pictures, and I read through the
25  codexes.  So if it's there, I must have seen it.

---

46 (Pages 181 to 184)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 185

1    Q.  Is the Chapterhouse product supposed to
2  represent a Dark Eldar Haemonculous?
3          MS. KALEMERIS:  Objection.  Form.
4          THE WITNESS:  I don't know.  That's a question
5  Mr. Villacci should know the answer to.
6          Q.  BY MR. KEENER:  And do you believe the product
7  is supposed to represent a Dark Eldar Haemonculous?
8          MS. KALEMERIS:  Objection.  Form.
9          THE WITNESS:  My personal belief is that it --
10 it could be used as such.  But not specifically.  It's
11 just a weird monster that happens to fit with the --
12 with the theme of weird monsters.  I --
13         Q.  BY MR. KEENER:  Do you understand that the
14 Dark Eldar Haemonculous is a specific type of monster,
15 not just a category for any weird monster?  Right?
16         MS. KALEMERIS:  Objection.  Form.
17         THE WITNESS:  No, I don't do that.
18         Q.  BY MR. KEENER:  Would you ever call the
19 Chapterhouse product a Dark Eldar Haemonculous?
20         MS. KALEMERIS:  Objection.  Form.
21         THE WITNESS:  I think I have done that.  Yes.
22         Q.  BY MR. KEENER:  So you yourself have
23 referred to the Chapterhouse product as a Dark Eldar
24 Haemonculous?
25         MS. KALEMERIS:  Objection.  Form.

---

Page 186

1          THE WITNESS:  I'm pretty sure I did.  Yes.
2          Q.  BY MR. KEENER:  Has anyone ever told you
3  that it would be improper to copy the design of Games
4  Workshop's power armor legs?
5          MS. KALEMERIS:  Mr. Fiertek, I will remind
6  you not to reveal any confidential conversations you've
7  had with counsel.
8          Q.  BY MR. KEENER:  Yeah.  I'm not asking --
9  outside of counsel, has anyone ever told you that
10 you should not copy the lower leg designs of Games
11 Workshop's Power Armor Space Marines?
12         MS. KALEMERIS:  Objection to form.
13         THE WITNESS:  I most certainly think so.
14 I don't remember any specific instances, though.  But
15 the -- the answer to that question is, yes, I'm sure
16 someone said that.
17         Q.  BY MR. KEENER:  Do you know who?
18         A.  As I said, I don't remember any specifics.
19 But it wouldn't surprise me.
20         Q.  Do you know what your response was?
21         A.  Depends if it was on some board or if it was
22 an e-mail with a customer or with Mr. Villacci.  I would
23 need more information to guess my response.
24         Q.  Does Chapterhouse sell any Jetbikes?
25         MS. KALEMERIS:  Objection.  Form.

---

Page 187

1          THE WITNESS:  I don't remember what they
2  are called.  But I would say there are Jetbikes on
3  the website.
4          Q.  BY MR. KEENER:  And do those Jetbikes have
5  riders?
6          A.  I think they are sold with a pair of legs
7  that fit on the chair.  But that's what I remember.
8  So a whole rider?  I don't know.  But I seem to
9  recall there were legs added to -- to the bike.
10         Q.  BY MR. KEENER:  Do you know who designed
11 the legs?
12         A.  No.
13         MR. KEENER:  Gill, can we have document 5
14 and mark that Fiertek Exhibit 9.
15         (T. Fiertek Exhibit 9 marked.)
16         Q.  BY MR. KEENER:  Fiertek Exhibit 9 is labeled
17 Chapterhouse 30057 through 81.  And this is quite a
18 lengthy chain of e-mails here.  So I would direct your
19 attention to the one on page 17 that ends in 30073.
20         A.  (Examining.)
21         Q.  Are you there?
22         A.  I'm here.
23         Q.  All right.  So this e-mail, if you look
24 on the previous page, is from someone named Dynath,
25 D-y-n-a-t-h, Kajira, K-a-j-i-r-a.

---

Page 188

1          Do you know who that is?
2          A.  I know I should know who that is because
3  the name rings a bell and I know I've been -- well,
4  not speaking, but writing to whomever it is.  But I
5  have no recollection of the topics and who that is.
6  So I don't know who that is right now.
7          Q.  Do you know if that -- that's someone's real
8  name, or is that a pseudonym?
9          A.  I have no idea.
10         MS. KALEMERIS:  Objection.  Form.
11         Q.  BY MR. KEENER:  So if you look on the next
12 page, page 17, about two thirds of the page down,
13 there's a paragraph that starts:
14         "When I ask" --
15         A.  Yes.
16         Q.  Do you see that?
17         A.  Yes.
18         Q.  All right.  And then in about the middle of
19 that paragraph, it says:
20         "Until your legal battle proves the power
21 armor design is public domain, I don't feel comfortable
22 recreating the armor."
23         Do you see that?
24         A.  Yes.
25         Q.  Okay.  Now I want to look at your response

---

47 (Pages 185 to 188)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

---

Page 189

1  to this. So if you turn back to page 16, the third
2  paragraph down starts:
3              "Explain" --
4          Do you see that?
5      A. Yes.
6      Q. And your response is:
7          "Explain to me why it would give you trouble
8  to render a pair of power armor legs in the seat(s)
9  of that airspeeder? If you can't do it, then no biggie.
10 I'll sculpt them on separately although it would be a
11 timesaver not having to."
12         Do you see that?
13     A. Yes.
14     Q. Is that your response?
15         MS. KALEMERIS: Objection. Form.
16         THE WITNESS: Yes.
17     Q. BY MR. KEENER: And what's being discussed,
18 is that the sculpting of legs on the bottom of a
19 Jetbike?
20         MS. KALEMERIS: Mr. Fiertek, you should feel
21 free to take your time to read through the entire e-mail
22 so that you can get some context before you answer.
23         THE WITNESS: Sure. (Examining.)
24         By the way, I recall his real name.
25     Q. BY MR. KEENER: What is it?

---

Page 190

1      A. I know this person as William.
2      Q. Do you recall Mr. William's last name, or is
3  that a last name?
4      A. That's -- that's all I know. William and --
5      Q. Okay.
6      A. -- and the e-mail address.
7          By the way, what was the question while I
8  read through parts of this?
9      Q. The question is: Is the issue you and
10 Mr. William are discussing the sculpting of a pair
11 of power armor legs that would go in the seat of a
12 Jetbike?
13         MS. KALEMERIS: Objection. Form.
14         THE WITNESS: Well, this is -- first of all,
15 this is talk back and forth and brainstorming about
16 possible future projects. This to my -- well, this
17 is nothing that has been done and, to my knowledge,
18 is nothing that has -- that is even set in stone that
19 it will be made -- made. So --
20     Q. BY MR. KEENER: And that wasn't my question.
21         My question is: The issue you are
22 discussing --
23     A. Yes.
24     Q. -- is it the sculpting of power armor legs
25 that would be in the seat of a Jetbike?

---

Page 191

1          MS. KALEMERIS: Objection. Form.
2          THE WITNESS: Well, that is what we are
3  discussing. The --
4      Q. BY MR. KEENER: And are you asking him what --
5  asking him, if he won't sculpt them, that it's not a
6  big deal, that you'll sculpt them separately?
7          MS. KALEMERIS: Objection. Form.
8          THE WITNESS: That is a matter of context.
9  And I do remember some things, but I need to read a
10 little bit more. (Examining.)
11         It is -- as I remember, it is an expression
12 of frustration on my part, as well as maybe a little
13 sarcasm. William -- William was worried of being
14 sued by Games Workshop for rendering power armor legs
15 or some other thing. I don't remember what it was.
16 And he was reluctant to do something. And I was, well,
17 basically asking him what -- what is the problem. And
18 it's -- it's just a text with no facial expressions,
19 nor -- nor tone. So it can't be conveyed. But that's
20 what it's all about.
21     Q. BY MR. KEENER: And were you expressing that,
22 if he won't do it, it's not a big deal, that you'll
23 sculpt them instead?
24         MS. KALEMERIS: Objection. Form. Misstates
25 testimony.

---

Page 192

1          THE WITNESS: If this project will ever be
2  done -- it's not set in stone. If it will be done --
3  meaning the legs and, if so, who will do them and how.
4  This is just talk.
5      Q. BY MR. KEENER: I didn't ask -- what were you
6  trying to convey in this paragraph we've read?
7          MS. KALEMERIS: Objection.
8      Q. BY MR. KEENER: Were you trying to convey the
9  idea that, if he won't do it, it's not a big deal? You
10 will sculpt them?
11         MS. KALEMERIS: Objection. Form. Asked and
12 answered. Misstates testimony.
13         THE WITNESS: Well, he was more like conveying
14 the: What's the problem? How can -- how can you be
15 sued for making power armor legs? It's just -- it's
16 just a piece of sarcastic humor on my part.
17     Q. BY MR. KEENER: Okay. Let's look at his
18 response. If you turn to page 14, that's an e-mail
19 from William back to you. And near the bottom, about
20 two thirds of the way down, there's a line that starts:
21         "To hedge my bets" --
22         Do you see that?
23     A. Yes.
24     Q. And he tells you:
25         "All that means is I'm legally obligated

---

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 193

1    to point out recreating a close facsimile of Games
2    Workshop's power armor legs may constitute a violation
3    of U.S. intellectual property law."  (As read.)
4         Do you see that?
5         A.  Yes.
6         Q.  And so were you told by Mr. William, in
7    November of 2012, that recreating a close copy of
8    Games Workshop's power armor legs may infringe Games
9    Workshop's rights?
10        MS. KALEMERIS:  Objection.  Form.  Misstates
11   evidence.
12        THE WITNESS:  No.  I was told about his
13   personal opinion.  I mean, neither him nor me are
14   legally qualified to -- to have a "yes" or -- definitive
15   "yes" or "no" say on those opinions.  So, I mean, I --
16   I don't know what he meant or thought by writing that.
17   But that's his personal opinion.
18        Q.  BY MR. KEENER:  Do you know if Chapterhouse
19   sells any power armor legs?
20        MS. KALEMERIS:  Objection.  Form.
21        THE WITNESS:  I think -- I think Chapterhouse
22   does that.
23        Q.  BY MR. KEENER:  And they do that sitting down
24   on Jetbikes that Chapterhouse sells?
25        MS. KALEMERIS:  Objection.  Form.

---

Page 194

1         THE WITNESS:  I think so.
2         Q.  BY MR. KEENER:  And they also sell them
3    separately as part of their TRU-Scale Knight Praetorius
4    products?
5         MS. KALEMERIS:  Objection.  Form.
6         THE WITNESS:  I don't know that.  I don't know
7    that.
8         Q.  BY MR. KEENER:  You don't know if those look
9    like power armor legs to you?
10        MS. KALEMERIS:  Objection.  Form.
11        THE WITNESS:  I don't know if they are sold
12   separately.
13        Q.  BY MR. KEENER:  Okay.  Whether or not they
14   are sold separately or not, Chapterhouse also sells
15   power armor legs as part of its TRU-Scale Knight
16   Praetorius products?
17        MS. KALEMERIS:  Objection.  Form.
18        THE WITNESS:  All right.
19        Q.  BY MR. KEENER:  Do you agree with that?
20        A.  Well, I've seen power armor legs on the
21   website.  So yes.
22        Q.  Do you need a break, or do you want to
23   continue?
24        A.  Three minutes.
25             (Recess from 7:26 p.m. to 7:32 p.m.)

---

Page 195

1         MR. KEENER:  All right.  Let's take document
2    No. 8 and mark that Fiertek Exhibit 10.
3              (T. Fiertek Exhibit 10 marked.)
4         Q.  BY MR. KEENER:  Fiertek Exhibit 10 is labeled
5    Chapterhouse 30267 through 30276.  And let's start on
6    page 7 which is labeled 30273.
7              (Examining.)
8         Q.  And, actually, go back one more page to
9    page 6, the bottom of page 6.
10             This is an e-mail from you to Mr. Villacci,
11   dated September 26, 2011; correct?
12        A.  Yes.
13        Q.  And the bottom of the page states:
14             "All in all, I need good and I mean good
15   pre-Heresy terminator helmet concepts within these
16   rule frames to be made.  I tried looking at the
17   termie heads in the art books" --
18             Let's just stop there.
19             What art books are you referring to?
20        A.  The same Heresy art books.
21        Q.  The Horus Heresy Visions books?
22        A.  Correct.
23        Q.  And then if you turn the page, two sentences
24   later, it says:
25             "Also looking at the yellow Imperial Fist

---

Page 196

1    PA Marines and how their armor looks.  I think a helmet
2    that fits the PH termie torso made in the same style
3    would be the best bet."
4              What are you referring to when you say "yellow
5    Imperial Fist PA Marines"?
6         A.  I think I'm referring to pictures of -- of
7    figures in the books where a -- there is a certain way
8    the armor looks.  There's a certain theme they have,
9    like interlocking stuff.  And I -- I like to go with
10   that -- that theme.
11        Q.  All right.  So the -- you were looking at a
12   picture in a Games Workshop book of a yellow Imperial
13   Fist Power Armor Space Marine?
14        A.  Not exactly.
15        MS. KALEMERIS:  Objection.  Form.
16        THE WITNESS:  Not exactly.  I was looking
17   at the -- there is a -- on that armor is a certain
18   black line.  It's just how -- it's -- it's cog shaped
19   slightly.  It's like a crenulation on a -- on a
20   castle -- on a castle wall.
21             (Court reporter clarification.)
22        THE WITNESS:  A crenulation.  A crenulation
23   shape pattern, if that's even a correct English word.
24        MS. STEVENSON:  I think that's right.  The
25   up and down, like the rampart.

---

Opus 2 International                    www.opus2international.com
Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 197

1    THE WITNESS:  Yeah.  And that line on that
2  piece of armor is -- is a pretty nice theme that I want
3  to use.  That's what this --
4    Q.  BY MR. KEENER:  Do you know which -- do you
5  know which book you were looking at?
6    A.  No.  But if you want me to go through them
7  again, I could probably find them with a little bit of
8  luck.
9    Q.  Was it one of the Horus Heresy Visions books?
10    A.  I think so.  I'm pretty sure that --
11    Q.  And do you know --
12    A.  I'm pretty sure that it was.
13    Q.  Do you know what product you were discussing
14  here?
15    MS. KALEMERIS:  Objection.  Form.
16    THE WITNESS:  Hmm.  Well, I'll have to go --
17    Q.  BY MR. KEENER:  Do you know what Chapterhouse
18  product, if any, you were discussing here?
19    A.  Give me a minute.  A product that is not
20  done and it's still in the idea state.  So it's
21  nothing -- nothing that is being sold, released.
22  Or it is something I have actually started to do,
23  but it's far, far from finished.
24    Q.  And would this be torsos and heads for
25  pre-Heresy Terminators?

---

Page 198

1    MS. KALEMERIS:  Objection.  Form.
2    THE WITNESS:  Well, funny question.  It
3  would be I think -- let me see here.  It's -- I'm
4  talking about helmets -- helmets and heads that have
5  that theme that I was talking about previously with
6  the crenulation-shaped thingies.
7    Q.  BY MR. KEENER:  Okay.  If we turn back to
8  page 5, it ends on 30271.  This is, again, an e-mail
9  from you.  And in the middle of the page, it says:
10    "I suggest the salamanders terminator helmet
11  in the Visions books.  There is only one page of salli
12  terminators and they are yellow in color so cannot be
13  missed if you quickly check the pages from the end
14  forward."
15    Do you see that?
16    A.  I see that.
17    Q.  And does that refresh your memory that the
18  picture you're referring to is one of the Horus Heresy
19  Vision books?
20    A.  Yes.
21    Q.  And would that assist you in any way in
22  quickly identifying which picture you were referring to?
23    A.  I think so.
24    Q.  If you could try to identify the picture,
25  please.

---

Page 199

1    A.  I don't know what book.  But if you let me
2  quickly go through them.
3    Q.  Okay.
4    A.  Sure.  Well, I think I found it, actually.
5    Q.  Which book are you in?
6    A.  Book four.
7    Q.  And what page?
8    A.  Page 34.
9    Q.  And is that the page that has salamander
10  terminators in yellow color?
11    MS. KALEMERIS:  Objection.  Form.
12    THE WITNESS:  No.  It's the line from the
13  previous question.
14    Q.  BY MR. KEENER:  Okay.  On page 5, you made
15  a reference to:
16    "There is only one page of salli terminators"
17  that "are yellow in color, so" they "cannot be missed."
18  (As read.)
19    Do you know which page you're referring
20  to there?
21    A.  No.  I'm still looking for that one.
22    Q.  Okay.
23    A.  Book number three, page 46.
24    Q.  What page?
25    A.  Forty-six.

---

Page 200

1    Q.  So on page 46 of book three of Horus Heresy
2  Visions, there is a page you're referring to when you
3  said "salli terminators that are yellow in color"?
4    MS. KALEMERIS:  Objection.  Form.
5    THE WITNESS:  Well, yes.
6    Q.  BY MR. KEENER:  Was that "yes"?
7    A.  Yes.
8    Q.  Now let's go back to Exhibit 10 and turn
9  to page 3, which ends in 30269.
10    At the bottom is an e-mail from you to
11  Mr. Villacci on September 27th, 2011; is that right?
12    A.  Yes.
13    Q.  And you state:
14    "I really hate this.  Takes forever
15  to plow through all art books looking for termie
16  suitable helmets with the little crap that is there."
17    Do you see that?
18    A.  Yes.
19    Q.  And what art books are you referring to?
20    A.  Same art books.
21    Q.  So you were looking through the Horus
22  Heresy Vision books to look for suitable helmets for
23  a terminator?
24    MS. KALEMERIS:  Objection.  Form.  Misstates
25  testimony.

---

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                          Deposition of Tomas Fiertek

Page 201

1    THE WITNESS:  I was, at that time, looking
2  through the art books as a source for ideas for helmets.
3  Yes.
4    Q.  BY MR. KEENER:  And then Mr. Villacci's
5  response is right above that.
6    Do you see it, on September 28, 2011?
7    A.  Yes.
8    Q.  And he responds:
9    "It doesn't look like you referred to much at
10  all in the Google search.  Looks like you're limiting
11  yourself to exposure to the PH art book.  In any case,
12  these helmets I liked."
13    Do you see that?
14    A.  Yes.
15    Q.  Do you understand "PH art book" to, again,
16  be the Horus Heresy Vision books?
17    MS. KALEMERIS:  Objection.  Form.
18    THE WITNESS:  I think so.
19    Q.  BY MR. KEENER:  Do you have any other
20  understanding of what "PH art book" would mean?
21    A.  No.
22    Q.  And is it your understanding that Mr. Villacci
23  is saying it doesn't look like you're using any images
24  from Google search?
25    MS. KALEMERIS:  Objection.  Form.

Page 202

1    THE WITNESS:  Well, it depends on -- at what
2  time he -- he said that.
3    Q.  BY MR. KEENER:  At the time he wrote this
4  e-mail, was it your understanding when you read it that
5  he was conveying it didn't look like you were using any
6  images from Google search?
7    MS. KALEMERIS:  Objection.  Form.
8    THE WITNESS:  I don't know.  It depends on
9  how much Google search I have been doing at the time
10  he made this comment.  And --
11    Q.  BY MR. KEENER:  My question is:  What did you
12  understand this sentence to mean when you read it?
13    MS. KALEMERIS:  Objection.  Form.
14    THE WITNESS:  Well, I think he didn't like the
15  Google searches.
16    Q.  BY MR. KEENER:  And what about the rest of the
17  first sentence, what did you understand his reference to
18  "looks like you're limiting yourself to exposure" to the
19  Horus Heresy Vision books mean?
20    MS. KALEMERIS:  Objection.  Form.
21    THE WITNESS:  I don't know exactly what he
22  meant.
23    MS. KALEMERIS:  Misstates testimony.
24    THE WITNESS:  He should be able to answer that
25  question better than me.  He wrote it.

Page 203

1    Q.  BY MR. KEENER:  Well, I want to know:  What
2  did you understand it to mean?
3    MS. KALEMERIS:  Objection.  Form.
4    THE WITNESS:  To keep looking more in Google
5  searches.  It is, after all, a form of criticism.
6    Q.  BY MR. KEENER:  Okay.  And let's look at your
7  response, which is right above, from you to Mr. Villacci
8  on September 28, 2011.
9    Do you see that?
10    A.  Yes.
11    Q.  And your response starts out:
12    "I fear the medieval helmets with their
13  face plate sticking out too far won't be fitting.
14  Plus people might want to whine about the style."
15    Do you see that?
16    A.  Yes.
17    Q.  And when you're referring to the "medieval
18  helmets," are you referring to the Google images?
19    MS. KALEMERIS:  Objection.  Form.
20    THE WITNESS:  I don't know.  Maybe.  I don't
21  know.
22    Q.  BY MR. KEENER:  Do you have any idea what else
23  he could be referring to?
24    A.  The Heresy art books.
25    Q.  If it was the Heresy art books, do you know

Page 204

1  why you would have said "people might want to whine
2  about the style"?
3    MS. KALEMERIS:  Objection.  Form.
4    THE WITNESS:  I know I -- I looked at both
5  art books and medieval helmets.  And I know that both
6  examples have helmets that stick out too far.  And I
7  did not like that in neither of the cases.  That's what
8  I remember right now.
9    Q.  BY MR. KEENER:  Okay.  And then if you flip
10  in the prior pages, there's a whole lot of pictures,
11  including medieval helmets, that Mr. Villacci is sending
12  to you; is that right?
13    A.  Yes.
14    Q.  And then your response is at the very top of
15  the first page 30267; is that correct?
16    A.  Yes.
17    Q.  And the second paragraph of your response
18  states:
19    "Have you any idea of the nightmare to sculpt
20  these things by the way?"  (As read.)
21    Is that right?
22    A.  Oh, yeah.
23    Q.  And you're expressing that it would be
24  extremely difficult to sculpt the medieval pictures
25  that Mr. Villacci has sent you?

51  (Pages 201 to 204)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

Page 205

1      MS. KALEMERIS: Objection. Form.
2      THE WITNESS: Well, they -- they are hard to
3   sculpt. So my guess is "yes."
4      MR. KEENER: Okay. You can put that away.
5   Let's mark Fiertek Exhibit 11.
6      MS. STEVENSON: Which --
7      MR. KEENER: It is document 15. Fifteen.
8      MS. STEVENSON: Okay.
9      (T. Fiertek Exhibit 11 marked.)
10     Q.  BY MR. KEENER: So Fiertek document Exhibit 11
11  is labeled Chapterhouse 31258 through 31292. And here
12  I want to turn your attention to the third page labeled
13  31260 where there's an e-mail from you to Mr. Villacci
14  on October 4th, 2011.
15     Do you see that?
16     A.  (Examining.) Yes.
17     Q.  And the fifth paragraph down, you state:
18     "As for concept art, all I need is one good
19  take on how a PH torso back view of a terminator would
20  look. All the fronts are already portraited in the art
21  books. But I take it needs to be something different
22  and awesome for the back just to make it look much
23  better than original."
24     Do you see that?
25     A.  Yes.

Page 206

1      Q.  When you're saying "all the fronts are already
2   portraited in the art books," are you again referring to
3   the Horus Heresy Vision books?
4      MS. KALEMERIS: Objection. Form. And, also,
5   please take your time and -- and get some context for
6   this very long 35-page document.
7      THE WITNESS: Sure. (Examining.)
8      So what was the question again?
9      Q.  BY MR. KEENER: Page 3, middle of the page,
10  you state:
11     "All the fronts are already portraited in the
12  art books."
13     What art books are you referring to?
14     A.  The Heresy art books.
15     Q.  The Horus Heresy Vision books?
16     A.  Yes.
17     Q.  And when you say "the fronts," you mean the
18  pre-Heresy front torso of a terminator?
19     MS. KALEMERIS: Objection. Form.
20     THE WITNESS: Yes.
21     Q.  BY MR. KEENER: Now, if you turn back a page
22  to page 2 -- I'm sorry -- page 1. Bottom of page 1
23  is another e-mail from you to Mr. Villacci, dated
24  October 5th, 2011.
25     Do you see that?

Page 207

1      A.  Yes.
2      Q.  And you state:
3      "As I understood, copying details is okay like
4   making part of the torsos exactly alike" but "other
5   parts are altered." (As read.)
6      Do you see that?
7      A.  Yes.
8      Q.  Can you explain what you meant?
9      MS. KALEMERIS: And I'll caution you not
10  to reveal the content of any privileged conversations
11  you've had with counsel.
12     THE WITNESS: No. This has to do with the
13  attorney-client privilege between Mr. Villacci and
14  the -- and the --
15     Q.  BY MR. KEENER: I'm not asking for any details
16  of conversations. I just want to know what you meant
17  to convey when you wrote this sentence.
18     A.  I'm conveying a question to -- to really make
19  sure that a certain course of action is okay according
20  to what was being said to Mr. Villacci by the counselor.
21     Q.  And what is the question you were trying to
22  express in this statement?
23     A.  If --
24     MS. KALEMERIS: Objection. Form.
25     THE WITNESS: It -- it has to do with details

Page 208

1   taken out of a bigger picture. I don't know what else
2   I can say without saying what was said to Mr. Villacci.
3      Q.  BY MR. KEENER: Okay. I'm not asking for
4   that. Let me try.
5      Are you asking whether or not it's okay to
6   have some features exactly the same as Games Workshop's
7   while other features are different?
8      MS. KALEMERIS: Mr. Fiertek, to the extent
9   that the question reflects a request for legal advice,
10  I instruct you not to answer.
11     THE WITNESS: Well, I'll follow my legal
12  counsel.
13     Q.  BY MR. KEENER: Okay. I'm asking what you
14  meant when you wrote this sentence.
15     What were you trying to convey? Can you
16  answer that?
17     A.  To make sure that a certain course of action
18  was not wrong. It's --
19     Q.  And what course of action was that?
20     A.  It's about -- it's about taking small parts
21  out of a whole and not altering them. I was trying
22  to ensure whether that is okay or not okay.
23     Q.  And when you say "small parts out of the
24  whole," do you mean taking small details of Games
25  Workshop's art book or miniatures and keeping those

Opus 2 International                        www.opus2international.com
Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 209

1  details the same while altering other details?
2      MS. KALEMERIS:  Objection to form.
3      And, again, I will instruct Mr. Fiertek not
4  to answer to the extent that you were requesting legal
5  advice from a lawyer.
6      THE WITNESS:  Well, I'm -- I'm going to follow
7  that.
8      Q.  BY MR. KEENER:  Are you able to tell me
9  whether or not you were referring to copying details
10  from Games Workshop's products?
11     MS. KALEMERIS:  I'll instruct you not to
12  answer.
13     THE WITNESS:  Well, I'll -- I'll follow that
14  instruction.
15     Q.  BY MR. KEENER:  Are you able to tell me what
16  products you're referring to in this sentence?
17     A.  Yes.
18     Q.  What products?
19     A.  None.
20     Q.  Were you referring to any Games Workshop image
21  in this sentence?
22     MS. KALEMERIS:  Objection to form.
23     THE WITNESS:  No.
24     Q.  BY MR. KEENER:  Were you referring to copying
25  details of Games Workshop's torsos in this sentence?

---

Page 210

1      MS. KALEMERIS:  Objection to form.
2      THE WITNESS:  It was not about Games
3  Workshop's products.  It was -- it was about previous
4  discussions I had with Mr. Villacci, based on that
5  counsel, what that -- what his counsel at that time
6  had told him, if that was applicable to -- to a torso
7  that may or may not be made in the future.
8      Q.  BY MR. KEENER:  Okay.  And let's look at
9  Mr. Villacci's response to your question.  That is
10  the pre -- part of the e-mail right above this from
11  Mr. Villacci to you on October 5th, 2011.
12     Do you see that?
13     A.  Yes.
14     Q.  And the middle paragraph starts:
15     "You are correct."
16     Do you see that?
17     A.  Yes.
18     Q.  And do you take that to mean that Mr. Villacci
19  was agreeing with what you said "I understood" to be
20  okay?
21     MS. KALEMERIS:  Objection to form.
22     THE WITNESS:  Not really.
23     Q.  BY MR. KEENER:  So when he says "you are
24  correct," do you not believe he is agreeing with you?
25     MS. KALEMERIS:  Objection to form.

---

Page 211

1      THE WITNESS:  I'm believing he's not answering
2  my question, not -- not what I was asking exactly.
3      MR. KEENER:  Okay.  Let's get document 17
4  marked as Fiertek Exhibit 12.
5      (T. Fiertek Exhibit 12 marked.)
6      Q.  BY MR. KEENER:  All right.  This is a document
7  labeled Chapterhouse 31866 through 31872.
8      And my question is:  On page 2, labeled 31687,
9  and at the top of the page, which is an e-mail from you
10  to Mr. Fiertek [sic] dated October 18, 2011, do you see
11  the top there on page 2?
12     A.  (Examining.)  Yes.
13     Q.  And it starts out:
14     "I take it the Jetbikes are selling well.
15  Good job on those by the way."
16     What Jetbikes are you referring to?
17     A.  I think I am referring to the Jetbikes that
18  are sold by -- on the website.
19     Q.  By Chapterhouse?
20     A.  Yes.
21     MS. KALEMERIS:  Objection.  Form.
22     Q.  BY MR. KEENER:  And then you go on:
23     "You certain we can do exact replicas of GW
24  bitz [sic] like those rider legs, et cetera?"
25     Do you see that?

---

Page 212

1      A.  Yes.
2      Q.  Is that a reference to the legs of the rider
3  of the Chapterhouse Jetbike?
4      A.  Yes.
5      Q.  And are you commenting that those legs are,
6  quote, "exact replicas of Games Workshop's bitz [sic]"?
7      A.  No.
8      MS. KALEMERIS:  Objection.  Form.
9      And, Mr. Fiertek, to the extent that this
10  was a request for legal advice from counsel, I would
11  instruct you not to answer any more questions about it.
12     THE WITNESS:  Well, all I can say, it was
13  sarcasm.
14     Q.  BY MR. KEENER:  But the sarcasm you were
15  stating was that the power armor legs on Chapterhouse's
16  Jetbike are very similar to the Games Workshop power
17  armor legs?
18     MS. KALEMERIS:  Objection.  Form.  Misstates
19  testimony.
20     THE WITNESS:  No.
21     Q.  BY MR. KEENER:  What were you trying to say
22  in that sentence?
23     A.  That -- well, that there are other companies
24  out there, including Games Workshop, that make replicas
25  of -- or very similar pieces of things from real-world

---

53 (Pages 209 to 212)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                          Deposition of Tomas Fiertek

Page 213

1  settings.
2      Q.  You don't refer to any companies other than
3  Games Workshop in this paragraph, do you?
4      MS. KALEMERIS:  Objection.  Form.
5      THE WITNESS:  Not that I can remember.  No.
6      Q.  BY MR. KEENER:  And turning back to the first
7  page -- I think we're done with that document.
8      Do you know a person by the name of Warsmith?
9      A.  I don't think so.
10     Q.  No?
11     A.  I don't recall anything.
12     MR. KEENER:  Well, let's get document 13 and
13  mark that as Fiertek Exhibit 13.
14     (T. Fiertek Exhibit 13 marked.)
15     Q.  BY MR. KEENER:  And if you turn to page --
16  Fiertek Exhibit 13 is marked Chapterhouse 30683 through
17  30690.  Turn to page 5.  In the middle is an e-mail from
18  you to Mr. Villacci where you state:
19     "How about ask Warsmith to purchase his true
20  scale kit that GW threatened and see if we can sell it."
21     Do you see that?
22     A.  (Examining.)  Yes.
23     Q.  Do you know who Warsmith is?
24     MS. KALEMERIS:  Objection.  Form.
25     THE WITNESS:  No.

Page 214

1      Q.  BY MR. KEENER:  Do you know what true scale
2  kit you're referring to here?
3      A.  No.
4      Q.  What does "true scale" mean?
5      MS. KALEMERIS:  Objection.  Form.
6      THE WITNESS:  I think it refers to scale of
7  miniature casting.
8      Q.  BY MR. KEENER:  What does "true scale" mean?
9      MS. KALEMERIS:  Objection.  Asked and
10  answered.
11     THE WITNESS:  It refers to a scale related
12  to casting miniatures.
13     Q.  BY MR. KEENER:  How is that scale different
14  than other scales?
15     A.  It's either smaller or bigger than the
16  standard 28-millimeter scale.
17     Q.  If you were to describe what "true scale"
18  meant to someone, what would you say?
19     MS. KALEMERIS:  Objection.  Asked and
20  answered.
21     THE WITNESS:  Pretty much the same thing.
22     Q.  BY MR. KEENER:  And do you know someone who
23  goes by the name "Reaper"?
24     MS. KALEMERIS:  Objection.  Form.
25     THE WITNESS:  No.

Page 215

1      MR. KEENER:  Let's get document 16 marked
2  as Fiertek Exhibit 14.
3      Q.  BY MR. KEENER:  Fiertek Exhibit 14.
4      Q.  BY MR. KEENER:  Fiertek Exhibit 14 is labeled
5  Chapterhouse 31658 through 31672.  And I want to direct
6  your attention to the bottom of page 12, which is an
7  e-mail from Mr. Villacci to you, dated January 31st,
8  2010.
9      A.  (Examining.)  Yes.
10     Q.  And it says:
11     "Don't worry about the fist for the moment.
12  I have a local 3D designer who used to work for Reaper
13  working on it as a favor.  Maybe done this week."
14     Do you know if Reaper is a person or a
15  company?
16     MS. KALEMERIS:  Objection.  Form.
17     THE WITNESS:  I think it's actually a company.
18     Q.  BY MR. KEENER:  Would that be Reaper
19  Miniatures?
20     A.  Could be, but I don't know.
21     Q.  When he talks about the "fist," do you know
22  what product he's referring to?
23     MS. KALEMERIS:  Objection.  Form.
24     Q.  BY MR. KEENER:  Let me rephrase that.
25     Do you -- when you read that, do you have

Page 216

1  an understanding of what product that's referring to?
2      MS. KALEMERIS:  Objection.  Form.
3      THE WITNESS:  Maybe if I read a little more
4  into it.  Right now, I have no idea.
5      Q.  BY MR. KEENER:  Do you know if Chapterhouse
6  makes any fists?
7      MS. KALEMERIS:  Objection.  Form.
8      THE WITNESS:  I don't know.
9      Q.  BY MR. KEENER:  Do you know if Chapterhouse
10  makes and sells an open fist -- open-handed power fist
11  with claws on it?
12     MS. KALEMERIS:  Objection.  Form.
13     THE WITNESS:  Yes.  I believe they -- they
14  sell that one.
15     Q.  BY MR. KEENER:  And does Chapterhouse also
16  sell a closed -- closed-handed power fist with claws
17  on it?
18     MS. KALEMERIS:  Objection.  Form.
19     THE WITNESS:  I think so.
20     Q.  BY MR. KEENER:  And do you believe those
21  references to "fist" refer to either of those two
22  products?
23     MS. KALEMERIS:  Objection.  Form.  Calls for
24  speculation.
25     THE WITNESS:  I don't know.

54  (Pages 213 to 216)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

Page 217

1    Q. BY MR. KEENER: Do you know who the local
2  3D designer referred to is?
3    A. No.
4    Q. Since your prior deposition in this case,
5  have you posted any messages on any Internet forums
6  related to 40K?
7        MS. KALEMERIS: Objection. Foundation.
8  Relevance. Form.
9        THE WITNESS: Yes.
10   Q. BY MR. KEENER: Do you know which sites you
11  posted to?
12   A. A site called Dakka -- D-a-k-k-a -- .com.
13  And I -- I think another board whose name I do not
14  remember. Let's see. I think that's it.
15   Q. So you recall posting to Dakka and some other
16  site you can't remember?
17   A. Yes.
18   Q. Do you recall what your posts were about?
19        MS. KALEMERIS: Objection. Form.
20   Q. BY MR. KEENER: Let's start -- let me retry
21  that.
22        Do you recall how many posts you have made
23  on those two sites since your last deposition?
24        MS. KALEMERIS: Objection. Form.
25        THE WITNESS: I'm guessing a total of 20

Page 218

1  maybe.
2    Q. BY MR. KEENER: Do you recall what the topics
3  were on any of those posts?
4        MS. KALEMERIS: Objection. Form.
5        THE WITNESS: More or less, yes.
6    Q. BY MR. KEENER: Please describe the topics.
7        MS. KALEMERIS: Objection. Form.
8        THE WITNESS: It has to do with the hobby
9  in general, with painting, with asking for rules
10  clarification, just saying "hi" to friends, suggest --
11  suggesting rules or rule changes. I think I recall
12  one or two instances where a -- someone asked about
13  the Chapterhouse product also, like how would it look
14  like. And I posted an example of how I use something
15  myself for my personal collection. And I also recall
16  some mouthing off and bickering with someone I don't
17  like and that doesn't like me either. I think that's
18  it.
19   Q. BY MR. KEENER: Other than the post you
20  mentioned with a picture of a Chapterhouse product
21  from your own collection, do you recall any posts you
22  made regarding any Chapterhouse products?
23        MS. KALEMERIS: Objection. Form.
24        THE WITNESS: I posted a picture of -- showing
25  parts of my collection for a couple of friends. And I

Page 219

1  think in those are some Chapterhouse products. Although
2  the answer to that question is "no," because it wasn't
3  even mentioned and nobody brought it up.
4    Q. BY MR. KEENER: Other than that post, can you
5  recall any other ones where you mentioned Chapterhouse
6  products?
7        MS. KALEMERIS: Objection. Form.
8        THE WITNESS: Not that I remember.
9    Q. BY MR. KEENER: Did you make any post comments
10  about this lawsuit?
11        MS. KALEMERIS: Objection. Form.
12        THE WITNESS: I don't know. I don't think so.
13  I don't remember if I did.
14   Q. BY MR. KEENER: Did you make any attempt to
15  collect any of your postings from the forums?
16        MS. KALEMERIS: Objection. Form.
17        THE WITNESS: Not that I can recall.
18   Q. BY MR. KEENER: If you needed to, would you --
19  how would you go about collecting your posts on
20  DakkaDakka.com?
21        MS. KALEMERIS: Objection. Form.
22        THE WITNESS: I would ask an administrator
23  or moderator to collect them for me. That would be
24  the -- in my opinion, the safest and fastest way of
25  doing it without any errors creeping in and stuff

Page 220

1  being overlooked or forgotten.
2    Q. BY MR. KEENER: Besides posting on these
3  forums, have you reviewed postings by others on these
4  forums?
5        MS. KALEMERIS: Objection. Form. Relevance.
6        THE WITNESS: I don't understand the question.
7        Reviewed others' posts?
8    Q. BY MR. KEENER: Yeah. Have you read posts by
9  others on these forums?
10        MS. KALEMERIS: Same objection.
11        THE WITNESS: Yes.
12   Q. BY MR. KEENER: And is that only DakkaDakka
13  and the other forum you can't remember, or have you read
14  postings on forums in addition to those?
15        MS. KALEMERIS: Objection. Form.
16        THE WITNESS: I think I've been on a board
17  called bells -- Bell of Lost Souls or something and
18  read -- read in there forum discussions.
19   Q. BY MR. KEENER: Any others?
20   A. Yes. I remember reading posts on a site
21  called Warseer.
22   Q. Any others?
23   A. Not that I can recall right now.
24   Q. In the posts that you have read on these
25  sites, did any of them comment on Chapterhouse products?

55 (Pages 217 to 220)

Case: 1:10-cv-08103 Document #: 370-5 Filed: 05/30/13 Page 57 of 66 PageID #:21450

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                          Deposition of Tomas Fiertek

Page 221

1       MS. KALEMERIS: Objection. Form.
2       THE WITNESS: Yes.
3       Q. BY MR. KEENER: Did any of them comment on
4   Chapterhouse --
5       A. Oh, wait. Sorry, sorry, sorry.
6       Q. Go ahead.
7       A. I don't remember any comments on Chapterhouse
8   products. Give me a second. I need to try and remember
9   this.
10      Yes. On that site called Dakka, I think there
11  was a mentioning that I read then that some -- someone
12  said something about a Chapterhouse product.
13      Q. What product?
14      A. Well, one thing I do remember is that someone
15  asked me what a specific product would look like. And
16  I think it's even in here. No. 162. As for the rest
17  of the comments that I recall, I don't remember any
18  specifics, people showing something and other people
19  making comments. Let me -- let me think.
20      Q. Do you recall --
21      A. Let me think.
22      Yes. I think there was another product being
23  mentioned. Maybe it's here too. Let me see. Number
24  161. I recall that being mentioned by others.
25      Q. Do you recall, when you were reading the

Page 222

1   posts on these various websites, anyone making any
2   comments that compare a Chapterhouse product to any
3   Games Workshop product or image?
4       MS. KALEMERIS: Objection. Form.
5       THE WITNESS: No.
6       Q. BY MR. KEENER: Did you make any attempt to
7   collect copies of those posts that you reviewed that
8   mentioned Chapterhouse and Games Workshop products?
9       MR. KEENER: Objection. Form. Misstates
10  testimony. Asked and answered.
11      THE WITNESS: No.
12      Q. BY MR. KEENER: Have you ever heard of a post
13  being taken down from a forum?
14      MS. KALEMERIS: Objection. Form.
15      THE WITNESS: I've heard of a lot of posts
16  being taken down from lots of forums.
17      Q. BY MR. KEENER: What are some of the reasons
18  the posts are taken down?
19      MS. KALEMERIS: Objection. Form. Calls for
20  speculation.
21      THE WITNESS: They have to do with the
22  forum's own rules of posting. It could be such a
23  thing as swearing, as bringing irrelevant things into
24  a conversation, as starting conversations that have
25  ended months ago, those sort of things, insults and

Page 223

1   stuff like that that don't conform to forum rules.
2       Q. BY MR. KEENER: Do you know if any posts
3   get taken down because they're too commercial in nature,
4   such as advertising?
5       MS. KALEMERIS: Objection. Form.
6   Speculation.
7       THE WITNESS: Yes. Actually, yes.
8       Q. BY MR. KEENER: And do you know that's
9   happened to some Chapterhouse posts?
10      MS. KALEMERIS: Objection. Form.
11      THE WITNESS: The only thing I recall is maybe
12  five years ago, before the lawsuit started, there was a
13  forum that -- whose owner removed Mr. Villacci's posts,
14  claiming those were advertisements.
15      Q. BY MR. KEENER: What's your e-mail address?
16      A. It says right here, "tomas.fiertek@gmail.com."
17      Q. Have you ever used an e-mail address related
18  to Chapterhouse?
19      MS. KALEMERIS: Objection. Form.
20      THE WITNESS: Specify the question, please.
21      Q. BY MR. KEENER: Yeah. Have you ever used an
22  e-mail address that has "Chapterhouse" in the name?
23      A. Oh, oh. Not that I can recall.
24      Q. Have you ever used an e-mail address that has
25  "Villacci" in the name?

Page 224

1       A. I think I -- Villacci? Well, except for
2   Mr. Villacci's e-mail that I wrote to, I don't recall
3   ever using an e-mail with that name in it.
4       Q. Have you ever had access to the user name and
5   password for any Chapterhouse e-mail addresses?
6       MS. KALEMERIS: Objection. Form.
7       THE WITNESS: Yes and no. A couple of years
8   ago, I received the administrator password to the
9   Chapterhouse website. I think -- I don't know, because
10  I never looked into it. But I think that would give
11  me the possibility of obtaining a Chapterhouse e-mail
12  address. And as far as I recall, this is the closest
13  thing regarding password rights to a Chapterhouse
14  e-mail address I was -- I was to. I never used that --
15  as far as I recall, I never used an e-mail connected
16  to Chapterhouse nor Mr. Villacci.
17      Q. BY MR. KEENER: So if there's e-mails from
18  a Chapterhouse address that say "Hi, it's me Tomas,
19  the other half of Chapterhouse," do you have any idea
20  how that would be possible?
21      MS. KALEMERIS: Objection. Form. Calls for
22  speculation.
23      THE WITNESS: Well, I do know that I have
24  greeted customers using pretty much that line. And as
25  far as I know, I have been using my own personal e-mail

56 (Pages 221 to 224)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

Page 225

1  address in doing so.
2      Q.  BY MR. KEENER:  Do you have any idea how it
3  could come from a different e-mail address?
4      MS. HARTZELL:  Objection to form.  Calls for
5  speculation.
6      Q.  BY MR. KEENER:  Do you have any idea how it
7  could come from a different Chapterhouse e-mail address?
8      MS. KALEMERIS:  I objected to form and calling
9  for speculation.
10     THE WITNESS:  I would have to guess.  And
11 that would be either hacking or I made it in my sleep
12 or maybe Mr. Villacci copy/pasted stuff that I wrote
13 in my normal e-mail and sent that to some customer
14 for some weird reason.  I -- as far as I can recall,
15 I haven't done that knowingly at least.
16     Q.  BY MR. KEENER:  What is Photobucket?
17     A.  That is a -- a picture -- online web picture
18 hosting service, I think, call it a web hotel.  I
19 don't know the correct term.  But I use it to store
20 my pictures on it.
21     Q.  Have you used it to store any pictures related
22 to the Chapterhouse products?
23     A.  Yes.
24     Q.  And have you collected all the pictures from
25 Photobucket that have anything to do with Chapterhouse

Page 226

1  products?
2      MS. KALEMERIS:  I caution you not to reveal
3  the content of any conversations with counsel.
4      THE WITNESS:  To my best knowledge, yes.
5      Q.  BY MR. KEENER:  Do you know, if after the
6  start of this litigation, you ever asked Mr. Villacci
7  whether or not you should delete photos from
8  Photobucket?
9      MS. KALEMERIS:  Objection.  Form.
10     THE WITNESS:  I don't know.  I know I had some
11 issues with Photobucket.  But if I asked Mr. Villacci
12 whether I should delete some pictures on that, I don't
13 think so.  I can't remember.
14     Q.  BY MR. KEENER:  Have you deleted any pictures
15 related to Chapterhouse products from Photobucket?
16     MS. KALEMERIS:  Objection.  Form.  Vague as
17 to "related."
18     THE WITNESS:  I don't think so.
19     Q.  BY MR. KEENER:  And so to the best of your
20 memory, every picture you've ever had on Photobucket
21 since the start of this case related to Chapterhouse
22 is still there?
23     MS. KALEMERIS:  Objection.  Form.  Vague as
24 to "related."
25     THE WITNESS:  Well, I -- I know I have

Page 227

1  deleted -- previous to the law case, I have deleted
2  and uploaded a bunch of stuff there.  But after the
3  law case, I don't think so.
4      Q.  BY MR. KEENER:  Let's get document No. 10
5  and mark that Chapterhouse 15 -- I'm sorry -- Fiertek
6  Exhibit 15.  Fiertek Exhibit 15 is labeled Chapterhouse
7  30382 through 30396.
8      (T. Fiertek Exhibit 15 marked.)
9      Q.  BY MR. KEENER:  And I want to direct your
10 attention to page 4 on page 30385.  And near the bottom,
11 there's an e-mail from Mr. Villacci to you, dated
12 February 28, 2012.
13     Do you see that?
14     A.  (Examining.)  Yes.
15     Q.  And Mr. Villacci states:
16     "Go ahead and do 2k for yourself monthly.
17 FYI change any passwords you may have sent me.  This
18 includes Photobucket," Dakka -- "Dakka, etc.  GW will
19 have access to those logs maybe."  (As read.)
20     Do you see that?
21     A.  Not yet.  Still looking.  Yes.
22     Q.  It's a little below halfway on the page --
23     A.  I see them now.
24     Q.  And your response is right above that on
25 February 27, 2012.  And you say:

Page 228

1      "Hmm, any pics that should be taken away from
2  pbucket?"
3      Does "pbucket" mean "Photobucket"?
4      A.  Yes.
5      Q.  And after Mr. Villacci tells you Games
6  Workshop will have access to those, is it correct
7  you're asking Mr. Villacci whether or not you should
8  take any pictures away from Photobucket?
9      MS. KALEMERIS:  To the extent this represents
10 a request for legal advice, I instruct you not to answer
11 the question.
12     THE WITNESS:  I'll follow that advice.
13     Q.  BY MR. KEENER:  What did you mean when you
14 wrote this sentence, "Hmm, any pics that should be taken
15 away from Photobucket"?  (As read.)
16     MS. KALEMERIS:  Same instruction.
17     THE WITNESS:  Same answer.
18     Q.  BY MR. KEENER:  Are you refusing to answer the
19 question on what you meant when you wrote that sentence?
20     A.  I am following the advice put to me by my
21 legal counsel.
22     Q.  And I'm trying to understand that advice.
23     Are you refusing to answer the question of
24 what you meant when you wrote that sentence?
25     MS. KALEMERIS:  He's been instructed to not

57 (Pages 225 to 228)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                          Deposition of Tomas Fiertek

Page 229

1    answer to the extent that it represents a request for
2    legal advice.
3        THE WITNESS:  Well, I would like to discuss
4    this with my attorney first, if possible.
5        Q.  BY MR. KEENER:  I'm not asking for any legal
6    advice you got.
7            I'm just asking:  This sentence, which has
8    been produced and no claim of privilege has been made
9    on this sentence, what you meant when you wrote it?
10       A.  I don't know.  It's a question to
11   Mr. Villacci.
12       Q.  And is the question about removing pictures
13   from Photobucket?
14       A.  Yes.
15       Q.  And the question is prompted because you were
16   told Games Workshop may have access to Photobucket?
17       A.  I mean, this doesn't make sense.
18       MS. KALEMERIS:  Objection to form.
19       THE WITNESS:  So --
20       Q.  BY MR. KEENER:  Does the question come right
21   after Mr. Villacci tells you that Games Workshop may
22   have access to your Photobucket?
23       MS. KALEMERIS:  Objection.  Form.
24       THE WITNESS:  I have no idea.  This is highly
25   illogical.

Page 230

1        Q.  BY MR. KEENER:  Okay.
2        A.  It just doesn't make sense what I meant.
3        Q.  Do you use -- do you use FTP?
4        A.  On rare occasion, yes.
5        Q.  And do you use FTP to transfer information
6    back and forth between you and Mr. Villacci?
7        MS. KALEMERIS:  Objection.  Form.
8        THE WITNESS:  Define "information."
9        Q.  BY MR. KEENER:  Any -- anything.  It could be
10   documents, pictures, anything.
11       MS. KALEMERIS:  Objection.  Form.
12       THE WITNESS:  I recall setting up an FTP
13   server so that Mr. Villacci could access my -- my
14   folder with my movies on my hard drive.
15       Q.  BY MR. KEENER:  So you remember setting up an
16   FTP so Mr. Villacci could copy movies from your computer
17   without paying for them?
18       MS. KALEMERIS:  Objection.  Form.  Relevance.
19   Argumentative.
20       THE WITNESS:  And also giving him -- giving --
21   giving him access only to the movie folder.  So as I
22   recall, he -- he didn't have free reign to pillage my
23   hard drive.  And that was quite a while ago.
24       Q.  BY MR. KEENER:  Do you know if you transferred
25   anything else other than movies to Mr. Villacci over

Page 231

1    FTP?
2        MS. KALEMERIS:  Objection.  Form.  Misstates
3    the testimony.
4        THE WITNESS:  I only remember him wanting
5    a couple movies.  If he got other things, I don't know.
6    I don't remember.
7        MR. KEENER:  Okay.  Let's go to document 4 and
8    mark that Fiertek Exhibit 16.
9        (T. Fiertek Exhibit 16 marked.)
10       Q.  BY MR. KEENER:  Fiertek Exhibit 16 is marked
11   Chapterhouse 25126 through 137.  I want to direct your
12   attention to page 2, which is marked 25127.  And this
13   is an e-mail from you to Mr. Villacci, dated July 1st,
14   2011.
15          Do you see that?
16       MS. KALEMERIS:  Objection.  Form.
17       THE WITNESS:  (Examining.)  I think so.  There
18   are no page numbers.  So I think so.
19       Q.  BY MR. KEENER:  The one labeled 25127.
20       A.  Yes.
21       Q.  The top half of that page is an e-mail to you
22   from Mr. Villacci, dated July 1st, 2011; correct?
23       A.  Yes.
24       Q.  Okay.  And at the top of this page, you're
25   providing an IP address and a user name and a password.

Page 232

1            Is that for the FTP server?
2        MS. KALEMERIS:  Objection.  Form.
3        THE WITNESS:  I think so.
4        Q.  BY MR. KEENER:  Okay.  And right under that,
5    you talk about an "office zip file," which is very big
6    and is in a certain directory.
7            What are you referring to?
8        MS. KALEMERIS:  Objection.  Form.  Relevance.
9        THE WITNESS:  I don't remember.
10       Q.  BY MR. KEENER:  Do you know if that's a copy
11   of Microsoft Office?
12       MS. KALEMERIS:  Objection.  Form.  Relevance.
13       THE WITNESS:  I don't know.
14       Q.  BY MR. KEENER:  Do you believe it to be?
15       THE WITNESS:  Could be.
16       MS. KALEMERIS:  Same objections.
17       Q.  BY MR. KEENER:  I didn't hear your answer.
18       A.  It could be.
19       Q.  And do you recall sending Mr. -- or giving
20   Mr. Villacci access to Microsoft Office so he didn't
21   have to pay for it?
22       MS. KALEMERIS:  Objection.  Form.  Calls for
23   a legal conclusion.
24       THE WITNESS:  All I remember is giving him
25   access to my movies.

58 (Pages 229 to 232)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                                    Deposition of Tomas Fiertek

---

Page 233

1     Q.  BY MR. KEENER:  And the second sentence talks
2   about a couple of those movies; correct?
3         MS. KALEMERIS:  Objection.  Form.
4         THE WITNESS:  Yes.
5     Q.  BY MR. KEENER:  And then it also mentions
6   a PDF copy of Kymes, K-y-m-e-s, novel from Promethean
7   Sun.
8         Do you see that?
9     A.  Yes.
10    Q.  Is that a Games Workshop Black Library novel?
11        MS. KALEMERIS:  Objection.  Form.
12        THE WITNESS:  I think so.
13    Q.  BY MR. KEENER:  And how did you obtain a PDF
14  copy of that novel?
15    A.  I do not remember.
16        MS. KALEMERIS:  Objection.  Objection.  Form.
17  Relevance.
18    Q.  BY MR. KEENER:  Did you pay for that copy?
19        MS. KALEMERIS:  Objection.  Relevance.  Form.
20        THE WITNESS:  No.
21    Q.  BY MR. KEENER:  In fact, you go on to discuss
22  that buying that book would be very expensive, don't
23  you?
24        MS. KALEMERIS:  Objection.  Form.
25        THE WITNESS:  I'm apparently speculating on

---

Page 234

1   its price on eBay, none of which I remember.  But --
2   well, it's there.
3     Q.  BY MR. KEENER:  And you mentioned, if you were
4   to purchase it, it costs hundreds of dollars; correct?
5         MS. KALEMERIS:  Objection.  Form.  Relevance.
6         THE WITNESS:  I do mention that.
7     Q.  BY MR. KEENER:  Do you know if this book has
8   any pictures in it?
9     A.  No.
10    Q.  You don't know or it doesn't?
11    A.  I don't know.
12        MS. KALEMERIS:  Objection.  Form.
13    Q.  BY MR. KEENER:  Do you know if there's a
14  picture on the cover?
15        MS. KALEMERIS:  Objection.  Form.
16        THE WITNESS:  No.
17    Q.  BY MR. KEENER:  In the creation of any
18  Chapterhouse products, have you recast any Games
19  Workshop products or portions thereof?
20        MS. KALEMERIS:  Objection.  Form.
21        THE WITNESS:  I -- no, not me.
22    Q.  BY MR. KEENER:  Do you know if Chapterhouse
23  has?
24        MS. KALEMERIS:  Objection.  Form.  Calls for
25  speculation.

---

Page 235

1         THE WITNESS:  Yes.
2     Q.  BY MR. KEENER:  And which products have
3   involved recasting of Games Workshop products?
4         MS. KALEMERIS:  Objection.  Form.
5         THE WITNESS:  I remember the very first
6   shoulder pad.  And then there was a so-called Chaplain
7   miniature.  Yeah.
8     Q.  BY MR. KEENER:  Any other products or portions
9   thereof?
10    A.  Yes.  There were two pads in the very
11  beginning.
12    Q.  Which pads are those?
13    A.  I'm pretty sure there were two pads.  Both
14  are -- I don't know their names.  They were -- I think
15  I mentioned that during the last deposition.
16    Q.  Do you recall what the pads looked like?
17    A.  Yeah.  They had --
18        MS. KALEMERIS:  Objection.  Form.
19        THE WITNESS:  They had scaly patterns on them
20  and a little dragon head.
21    Q.  BY MR. KEENER:  Besides those two shoulder
22  pads and the Chaplain, do you know of any other
23  Chapterhouse product that involved the creation of
24  recasting of any Games Workshop product or portion?
25        MS. KALEMERIS:  Objection.  Form.

---

Page 236

1         THE WITNESS:  Not that I can think of.
2     Q.  BY MR. KEENER:  And what do you mean by the
3   word "recasting"?
4         MS. HARTZELL:  Counsel, the witness has
5   already been deposed with respect to the earlier
6   products.  To the extent that you have questions
7   about the new products, you can continue.  But we're
8   already late into the evening.
9         MR. KEENER:  I did question about existing
10  products.
11        MS. KALEMERIS:  Okay.  So ask those questions.
12    Q.  BY MR. KEENER:  What do you mean by
13  "recasting"?
14    A.  My idea or take on recasting is taking an
15  original piece of something and, with all its details
16  in intact as well as shape, make a mold of that thing
17  and then make a cast using that mold.  I think, yeah,
18  that's -- that's my take on recasting.
19    Q.  BY MR. KEENER:  If I broaden that to say
20  recasting is where you're using something to make a
21  mold and that something has any Games Workshop pieces
22  inside of it in any way, with that definition, are there
23  any other products that involved recasting at all?
24        MS. KALEMERIS:  Objection.  Form.
25        THE WITNESS:  Well, yes and no.

---

59 (Pages 233 to 236)

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 237

1      Q.  BY MR. KEENER:  Please explain.
2      A.  I know that for some item -- I don't remember
3  which one -- I used a piece of plastic taken from a
4  Games Workshop Sprue as --
5      (Court reporter clarification.)
6      THE WITNESS:  A Sprue, S-p-r-u-e.
7      -- to use as a -- how should I say? -- filler
8  or -- basically, a -- a piece of plastic, just plastic
9  scrap that was covered in -- in sculpting material to
10  use as a filler.  I don't -- I don't know if that --
11  if that is recasting, that will be laughable.  But
12  that's -- that's it.
13     Q.  BY MR. KEENER:  I appreciate your response.
14     Any other instances where Games Workshop
15  plastic or any Games Workshop pieces were used in the
16  mold?
17     MS. KALEMERIS:  Objection.  Form.
18     THE WITNESS:  As far as I know, no.  However,
19  I'm not doing the molds.  I'm sending -- I'm sending
20  my work to the molder.  So from my point of view, no.
21     Q.  BY MR. KEENER:  Do you know what CAD is?
22     A.  Yes.  Basically, more or less, I do know what
23  CAD is.
24     Q.  What is CAD?
25     A.  It's a computerized, oh, software linked to

---

Page 238

1  a -- to a hardware where you can -- you can make 3D
2  models of whatever you want.  And I -- I think that's
3  called a CAD file.  So it's my understanding of CAD.
4      Q.  Have you ever used CAD in the design or
5  development of any of the Chapterhouse products?
6      MS. KALEMERIS:  Objection.  Form.
7      THE WITNESS:  No.
8      Q.  BY MR. KEENER:  Do you know if you've ever
9  suggested to Mr. Villacci that he should have someone
10  create a CAD file of a product you had already designed
11  to use as evidence of the design process?
12     MS. KALEMERIS:  Objection.  Form.
13     THE WITNESS:  Evidence of the design process?
14     Q.  BY MR. KEENER:  To show in this lawsuit on the
15  design process.
16     A.  I have no idea.  I know I've mentioned wanting
17  to use CAD a lot with Mr. Villacci.  And if I mentioned
18  such a thing, it wouldn't surprise me with my sarcastic
19  humor.  But as I can recall right now, no.
20     Q.  So you don't ever recall suggesting to
21  Mr. Villacci the use of CAD to create an after-the-fact
22  design of a product for use in this -- for use in this
23  lawsuit?
24     MS. KALEMERIS:  Objection.  Asked and
25  answered.

---

Page 239

1      THE WITNESS:  I did mention CAD did templates.
2  I think I mentioned shoulder pads, to speed up the
3  process of creating them from scratch all the time.
4      Q.  BY MR. KEENER:  And that's not my question.
5      A.  I'm thinking.
6      MS. KALEMERIS:  And your question has been
7  answered, so if we could move along, because it is
8  getting late.
9      Q.  BY MR. KEENER:  Mr. Fiertek, again, my
10  question is:  Have you ever asked Mr. Villacci about
11  having someone create an after-the-fact CAD design for
12  use in this lawsuit?
13     MS. KALEMERIS:  Objection.  Asked and
14  answered.  Objection to form.
15     THE WITNESS:  I don't recall doing that.
16     MR. KEENER:  Let's get document 11.  Let's
17  mark that Fiertek Exhibit 17.
18     (T. Fiertek Exhibit 17 marked.)
19     Q.  BY MR. KEENER:  Fiertek Exhibit 17 is marked
20  Chapterhouse 30549 through 30562.  And could we turn to
21  30551 on page 3.
22     Do you see at the top it looks to be an e-mail
23  from Mr. Villacci to you on November 22nd, 2011, and
24  underneath that is a response from you embedded?
25     MS. KALEMERIS:  Objection.  Form.

---

Page 240

1      THE WITNESS:  (Examining.)  Yes.
2      Q.  BY MR. KEENER:  Okay.  And if you read those
3  first two paragraphs, there's a discussion of having
4  something CADed.  Quote:
5      "If someone later on asks for proof of
6  non-recast, the CAD can be shown."
7      Could you please read those two paragraphs
8  and tell me what the discussion was?
9      MS. KALEMERIS:  I'm going to object to
10  relevance on this line of questioning.  This has
11  absolutely nothing to do with the way the products
12  were designed.
13     THE WITNESS:  I'm not even sure what -- what
14  products, if any, this is about.
15     Q.  BY MR. KEENER:  Do you have any understanding
16  on what the discussion was?
17     A.  I'm working on that right now.
18     Q.  Okay.
19     A.  So what was the question again?
20     Q.  What's being discussed here with reference
21  to CAD?
22     MS. KALEMERIS:  I am going to object to this
23  line of questioning.  It has absolutely nothing to do
24  with the design of the products that we are here to
25  discuss.

---

60 (Pages 237 to 240)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 241

1    THE WITNESS:  This is, to my understanding,
2  back and forth idea bouncing, as well as referring
3  to previously given legal counsel regarding a future
4  possible product or --
5    Q.  BY MR. KEENER:  All right.  I'm sorry.  You
6  can finish.
7    A.  Sorry.  Sorry.  I need to get more context.
8    Or just me bickering about work time, fishing
9  for, well, information on a hypothetical, if we do this,
10  what will happen thing.
11    Q.  Reviewing these e-mails, does it refresh your
12  memory at all on whether or not there was any discussion
13  about having CAD files created after the fact for use
14  in this lawsuit?
15    MS. KALEMERIS:  Objection.  Relevance.  Form.
16    THE WITNESS:  First of all, no.  And, second
17  of all, I don't recall or am aware of any CAD files
18  being done after the lawsuit.  This is apparently about
19  a torso of some sort.  And, as far as I know, nothing
20  like that was done.
21    Q.  BY MR. KEENER:  Okay.  Looking at the same
22  on page 3, still in the paragraph with your response,
23  it says:
24    "As it is now, the template sculpt will
25  consist of GW plastic and then will be made into a

---

Page 242

1  template.  But the original does have GW plastic."
2    Do you know what you were referring to there?
3    MS. KALEMERIS:  Objection again to relevance.
4  This has nothing to do with any of the products that
5  we're here to discuss.
6    THE WITNESS:  This, I think, was a discussion
7  between me and Mr. Villacci during the creation --
8  either creation or idea phase of making a torso template
9  for --
10    Q.  BY MR. KEENER:  And what is your reference to
11  the template that's made from GW plastic?
12    MS. KALEMERIS:  Objection.  Form.
13    THE WITNESS:  Pretty much what I said
14  previously, using pieces of plastic as a filler.
15    Q.  BY MR. KEENER:  So you believe this is only
16  referring to little pieces of plastic being filler
17  inside a mold?
18    A.  Well --
19    MS. KALEMERIS:  Objection.  Form.  Misstates
20  testimony.
21    THE WITNESS:  I think it refers to more than
22  little pieces of plastic, but still pieces of plastic
23  inside a sculpt.
24    Q.  BY MR. KEENER:  If you turn back to page 2,
25  near the bottom, there's an e-mail from Mr. Villacci to

---

Page 243

1  you, dated November 22nd, 2011.  He states:
2    "That's not recasting at all.  Having a small
3  piece that normally comprises only 10 percent of a piece
4  is okay."
5    Do you see that?
6    A.  Yes.
7    Q.  And then your response above on November 21st
8  states:
9    "It will, however, be more than 10 percent."
10    And then at the bottom:
11    "So with the template Version 1.0 being
12  95 percent GW plastic and the template Version 2.0
13  being zero percent GW plastic, I will leave it to you
14  to determine" legally "if" this "should go through,
15  etc." (As read.)
16    Do you see that?
17    A.  Yes.
18    Q.  Does that refresh your memory at all whether
19  or not we're only talking about bits of plastic inside
20  the mold?
21    MS. KALEMERIS:  Objection to form.
22    THE WITNESS:  It's about pieces --
23    MS. KALEMERIS:  Misstates testimony.
24    THE WITNESS:  This is about pieces of plastic
25  inside a sculpt to save time making the sculpt and save

---

Page 244

1  material.  There is --
2    Q.  BY MR. KEENER:  So does it have anything to
3  do with you taking Games Workshop models and filing down
4  details and then casting final products?
5    MS. KALEMERIS:  Objection.  Form.  Misstates
6  testimony.
7    THE WITNESS:  No.
8    Q.  BY MR. KEENER:  Mr. Fiertek, do you know why
9  Chapterhouse has not released any products in the last
10  few months?
11    MS. KALEMERIS:  Objection.  Form.  Relevance.
12    THE WITNESS:  Could you state the question
13  again, please?
14    Q.  BY MR. KEENER:  Yeah.  Do you know why
15  Chapterhouse hasn't released any new products in the
16  last few months?
17    MS. KALEMERIS:  Objection.  Calls for
18  speculation.  It would reflect -- to the extent that
19  it would reflect any advice from counsel, you should
20  not answer.
21    THE WITNESS:  Well, I'll follow that advice,
22  then.
23    Q.  BY MR. KEENER:  Do you know if Chapterhouse
24  is planning to release any new products between now and
25  trial in this case?

---

61  (Pages 241 to 244)

Highly Confidential - Attorneys' Eyes Only

Case: 1:10-cv-08103 Document #: 370-5 Filed: 05/30/13 Page 63 of 66 PageID #:21456

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                          Deposition of Tomas Fiertek

Page 245

1       MS. KALEMERIS:  Same instruction.  To the
2   extent that it would reveal communications with counsel,
3   you should not answer.
4       THE WITNESS:  I think I recall asking
5   Mr. Villacci this.  But I don't recall getting the
6   answer.  At least I don't -- well, to put it plainly,
7   I do not know.
8       Q.  BY MR. KEENER:  Do you know if there are any
9   products that are done and ready to be released at some
10  point in the future?
11      MS. KALEMERIS:  Objection.  Form.
12      THE WITNESS:  Yes.
13      Q.  BY MR. KEENER:  What products are those?
14      MS. HARTZELL:  We would designate this portion
15  of the transcript "highly confidential."
16      MR. KEENER:  Okay.
17      THE WITNESS:  Is it okay for me to just
18  answer?
19      Q.  BY MR. KEENER:  Yes.
20      A.  All right.  It's a sculpt of a dragon.  What
21  else?  Some -- some arms for miniature -- miniature
22  toy soldiers.  And I think two or three whole miniatures
23  that are supposed to be, like, wizards or mystics of
24  sorts.  And right now, I don't recall anything else.
25  I'm not saying there is not anything else.  I just

Page 246

1   don't recall anything else.
2       Q.  Okay.  These wizards, mystics, are those for
3   fantasy or 40K?
4       MS. KALEMERIS:  Objection.  Form.
5       THE WITNESS:  I actually don't know.  I think
6   they're pretty generic to be used anywhere.
7       Q.  BY MR. KEENER:  Have you referred to them as
8   "Psykers"?
9       MS. KALEMERIS:  Objection.  Form.
10      (Court reporter clarification.)
11      MR. KEENER:  Psyker, P-s-y-c-h-e-r [sic].
12      THE WITNESS:  I think so.  I don't remember
13  when and where, but I think so.
14      Q.  BY MR. KEENER:  And is Psyker a term you
15  associate with the Warhammer 40K universe?
16      MS. KALEMERIS:  Objection.  Form.
17      THE WITNESS:  Amongst other things, yes.
18      Q.  BY MR. KEENER:  And the arms you mentioned
19  for a fantasy infantry soldier, would those arms have
20  power armor on them?
21      MS. KALEMERIS:  Objection.  Misstates
22  testimony.  Form.
23      THE WITNESS:  Those arms were not mentioned.
24  I mentioned "arms."  I didn't say they were going for
25  those models.  And --

Page 247

1       Q.  BY MR. KEENER:  That's what I'm asking.
2       A.  The answer is "no."
3       Q.  Can you describe the arms in any way?
4       A.  Excuse me?
5       Q.  Can you describe the arms in any way?
6       A.  Well, soldier arms made to look like they're
7   dressed in common fatigue with hard shoulder -- shoulder
8   armor on them, bear hands, no gloves.
9       Q.  Okay.
10      A.  And elbow guards.
11      MR. KEENER:  Mr. Fiertek, I appreciate you
12  staying late for me today.  I have no further questions.
13      THE WITNESS:  No problem.
14      MS. KALEMERIS:  Should we take a quick break
15  and then --
16      MS. HARTZELL:  Yeah.  We have just a few
17  questions to clarify.
18      (Recess from 9:00 p.m. to 9:05 p.m.)
19
20              EXAMINATION
21  BY MS. KALEMERIS:
22      Q.  So, Mr. Fiertek, do you remember earlier when
23  you -- when you testified about the Abbithan woman, you
24  were asked earlier about being involved in the design
25  of the Abbithan guardswoman figure?  I know it was a

Page 248

1   long time ago.
2       A.  Yes.  Yes, yes.
3       Q.  Okay.  Do you remember sculpting any part of
4   that figure?
5       A.  Oh, geez.  I got that wrong.  It says
6   "Abbithan Banshee."  And I read that while I was
7   given the question, and I associated the whole concept
8   to something called Banshees that Mr. Villacci has been
9   working on.
10      (Brief technical interruption.)
11      MS. HARTZELL:  Sarah had to step out.  So I
12  will be taking over.
13      THE WITNESS:  Sure.
14
15              EXAMINATION
16  BY MS. HARTZELL:
17      Q.  You were in the middle of talking about the
18  Abbithan woman.
19      And her question was:  Do you recall being
20  involved in any sculpting related to that product?
21      A.  Oh, yes.  Yes.  As I recall, Mr. Lee made the
22  arms for those miniatures.  And the arms were the only
23  thing I was involved with doing on those miniatures.
24      Q.  You were also asked some questions about
25  particular elements to the Heresy terminator armor.

Opus 2 International                        www.opus2international.com
            Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

Page 249

1     Do you recall being asked about that?
2     A.  I think so.
3         MR. KEENER: Objection.  Form.
4     Q.  BY MS. HARTZELL:  Did you have -- were you
5  aware of the idea of using overlapping armor from any
6  source other than Games Workshop?
7         MR. KEENER: Objection.  Leading.
8     THE WITNESS:  Yes.
9     Q.  BY MS. HARTZELL:  And what sources were you
10 aware of the idea of overlapping armor from?
11    A.  Live re-enactment gaming and pictures of
12 Roman -- Roman-era legionnaire armor.  I have seen
13 that in fiction and computer games, although I can't
14 point them out right now from memory.
15    Q.  And you were asked some questions about the --
16 the use of a cut-out in that armor.
17        Were you aware of the idea of a cut-out in
18 armor from any source other than Games Workshop?
19        MR. KEENER: Objection.  Leading.
20        THE WITNESS:  Depends on the cut-out, where
21 it is and what piece.  But it would surprise me that
22 there aren't cut-outs used anywhere else.  It's -- if
23 not anything else, that's a purely ergonomical [sic]
24 feature or rather could be.
25    Q.  BY MS. HARTZELL:  You were also asked about

Page 250

1  the use of hanging straps from the armor that you
2  designed.
3         Were you aware of the idea of using hanging
4  straps from any source other than Games Workshop?
5         MR. KEENER: Objection.  Leading.
6     THE WITNESS:  Yes.
7     Q.  BY MS. HARTZELL:  What other sources?
8     A.  Again, for most the Roman -- the entire Roman
9  soldier theme.
10    Q.  In the last month or two, did you review the
11 claim chart that's been marked as Fiertek Exhibit No. 4
12 to identify the Games Workshop products on that chart
13 that you possess?
14    A.  Yes.
15    Q.  And you provided an identification of those
16 that you possess after your review?
17    A.  I -- I hope you're referring to that --
18 that -- what was asked of me over e-mail, then yes.
19        (Brief technical interruption.)
20        MR. KEENER: Your camera picture is now gone,
21 but we can still hear you.
22        MS. HARTZELL: Yeah.  We can hear you.
23        MS. STEVENSON:  It's gone to sleep.
24        MR. KEENER: I think we're okay with audio.
25        MS. STEVENSON:  Okay.

Page 251

1     Q.  BY MS. HARTZELL:  Looking at Fiertek Exhibit 4
2  and product No. 149, you were asked about the image from
3  the Art of Clint Langley that is pictured in the chart
4  for that product.
5         Do you remember that?
6     A.  Yes.
7     Q.  And you indicated that you don't own the book
8  the Art of Clint Langley; is that correct?
9         MR. KEENER: Objection.  Misstates testimony.
10        THE WITNESS:  I -- I don't recall having a
11 book with this picture, unless it's in the Heresy art
12 books.  I don't remember every picture in there.  But
13 as far as I know, I do not own the Clint Langley artwork
14 stuff.
15    Q.  BY MS. HARTZELL:  I believe you testified that
16 you thought that you had seen this picture.
17        Do you know where you would have seen it if
18 you don't have the book Art of Clint Langley?
19    A.  Online.
20    Q.  Do you have a specific recollection of having
21 seen it online?
22    A.  No.  I just know I did during some --
23 sometime.
24    Q.  Turning to the Exhibit Fiertek 12, which is
25 an e-mail chain -- let me know when you have that in

Page 252

1  front of you since I can't see you.
2     A.  What number range is written on the --
3     Q.  31866 to 31872.
4     A.  All right.  Hold on.
5         MS. STEVENSON: I'll give it back to you.
6         THE WITNESS: I have it.
7     Q.  BY MS. HARTZELL:  You were asked about a
8  comment that you made that you identified as sarcasm.
9  Let me see if I can find the page.
10    A.  Sure.
11    Q.  It's on page 2 at the top of the page
12 referring to:
13        "GW bitz [sic] like those rider legs."
14        Do you see that?
15    A.  Yes.
16        MR. KEENER: Counsel, before you get into
17 this, you instructed him not to answer questions on
18 this sentence.  Are you waiving that privilege?
19        MS. HARTZELL: Well, he -- he answered that
20 he believed that it was sarcasm.
21        MR. KEENER: You also instructed him later to
22 not answer many questions that I had on this sentence.
23        Are you waiving that privilege?
24        MS. HARTZELL: We are not.
25        MR. KEENER: Okay.

63  (Pages 249 to 252)

Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                    Deposition of Tomas Fiertek

---

Page 253

1      Q.  BY MS. HARTZELL:  With respect to your
2  understanding of the sarcasm that you were invoking --
3      A.  Sure.
4      Q.  -- do you understand that to relate at all to
5  this scope of the allegations made by Games Workshop in
6  this lawsuit?
7          MR. KEENER:  Objection.  Form.  Objection.
8  Leading.  Objection.  Ms. Kalemeris would not let me
9  inquire about this on the basis of privilege.
10         THE WITNESS:  I actually don't understand the
11  question.  Sorry.
12     Q.  BY MS. HARTZELL:  That's okay.  We can move
13  on from that one.
14         You were asked some questions about whether
15  or not you had ever sent e-mails from an e-mail other
16  than your own that began "Hi, it's me Tomas."
17         Do you remember being asked about that?
18     A.  Yes.
19     Q.  At any time during the course of this lawsuit,
20  did you visit Mr. Villacci in Dallas?
21     A.  Yes.
22     Q.  During your visit to Dallas, did you at any
23  time have access to Mr. Villacci's computer or e-mails?
24     A.  Computer, yes.  E-mails, no.
25         (Brief technical interruption.)

---

Page 254

1          MS. STEVENSON:  Our lights have just gone off.
2          MS. HARTZELL:  Oh, my.
3          MR. KEENER:  I can still hear you, though.
4  Can you still hear us?
5          THE WITNESS:  We -- we hear you.  So that's
6  important.
7          MR. KEENER:  Great.  Let's keep going.
8          MS. HARTZELL:  Are you scared?
9          THE WITNESS:  Pitch black.  Shoot.
10         MR. KEENER:  Oh, the -- the lights are off?
11         THE WITNESS:  Yeah.
12         MS. HARTZELL:  Yeah.  I don't think we have
13  any further questions.  So in light of -- of the fact
14  that you're in the dark, I think we can finish the
15  deposition.
16         MR. KEENER:  Thank you.
17         THE WITNESS:  Thank you.
18         MS. STEVENSON:  Thank you.
19         MS. HARTZELL:  Thank you.
20         (The deposition concluded at 9:16 p.m.)
21
22
23
24
25

---

Page 255

1              CERTIFICATE OF WITNESS/DEPONENT
2
3          I, TOMAS FIERTEK, witness herein, do
4  hereby certify and declare the within and foregoing
5  transcription to be my examination under oath in said
6  action taken on February 28, 2013, with the exception
7  of the changes listed on the errata sheet, if any;
8          That I have read, corrected, and do hereby
9  affix my signature under penalty of perjury to said
10  examination under oath.
11
12
13
14
15  _____     _____
       TOMAS FIERTEK, Witness            Date
16
17
18
19
20
21
22
23
24
25

---

Page 256

1              CERTIFICATE OF REPORTER
2
3          I, BRENDA MATZOV, CA CSR No. 9243, do hereby
4  certify:
5          That, prior to being examined, the witness
6  named in the foregoing deposition was duly sworn by me
7  to testify the truth, the whole truth, and nothing but
8  the truth;
9          That the foregoing deposition was taken before
10  me at the time and place herein set forth, at which time
11  the aforesaid proceedings were stenographically recorded
12  by me and thereafter transcribed by me;
13         That the foregoing transcript, as typed, is a
14  true record of the said proceedings;
15         And I further certify that I am not interested
16  in the action.
17
18         Dated this 11th day of March, 2013.
19
20  _____
       BRENDA MATZOV, CA CSR No. 9243
21
22
23
24
25

---

Opus 2 International                    www.opus2international.com
           Highly Confidential - Attorneys' Eyes Only

Games Workshop Limited vs. Chapterhouse Studios LLC
February 28, 2013                              Deposition of Tomas Fiertek

Page 257

```
 1              ERRATA SHEET
 2    Case:   GAMES WORKSHOP LIMITED vs.
 3            CHAPTERHOUSE STUDIOS LLC
 4    Date:   FEBRUARY 28, 2013
 5    Witness: TOMAS FIERTEK
 6    Page _____ Line _____ Change _____
 7    Reason _____
 8    Page _____ Line _____ Change _____
 9    Reason _____
10    Page _____ Line _____ Change _____
11    Reason _____
12    Page _____ Line _____ Change _____
13    Reason _____
14    Page _____ Line _____ Change _____
15    Reason _____
16    Page _____ Line _____ Change _____
17    Reason _____
18    Page _____ Line _____ Change _____
19    Reason _____
20    Page _____ Line _____ Change _____
21    Reason _____
22    Page _____ Line _____ Change _____
23    Reason _____
24    _____ _____
         TOMAS FIERTEK, Witness          Date
25
```

65 (Page 257)

Highly Confidential - Attorneys' Eyes Only