Exhibit 1-D - Traina Transcript

          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS

          Civil Action No. 1:10-cv-08103


     *******************************

     GAMES WORKSHOP LIMITED,        )
                                    )
               Plaintiff,           )
                                    )
          v.                        )
                                    )
     CHAPTERHOUSE STUDIOS LLC and   )
     JON PAULSON d/b/a PAULSON      )
     GAMES,                         )
                                    )
               Defendants.          )
                                    )
                                    )
     _____)



          DEPOSITION OF WYATT TRAINA, a witness

     called on behalf of the Plaintiff, pursuant

     to the Federal Rules of Civil Procedure,

     before Kristin Kelley, a Registered

     Professional Reporter and Notary Public in

     and for the Commonwealth of Massachusetts,

     at the offices of Foley & Lardner, LLP,

     111 Huntington Avenue, Boston,

     Massachusetts, on Thursday, March 15, 2012,

     commencing at 2:04 p.m.

Page 2

```
 1   APPEARANCES:
 2
 3   FOLEY & LARDNER, LLP
        (by Lucas I. Silva, Esquire)
 4   111 Huntington Avenue
        Boston, Massachusetts 02199
 5   (617) 342-4000
        Fax (617) 342-4021
 6   lsilva@foley.com
        for the Plaintiff.
 7
 8   WINSTON & STRAWN, LLP
        (by Kathleen Lu, Esquire)
 9   101 California Street
        San Francisco, California 94111
10   (415) 591-1503
        Fax (415) 591-1400
11   klu@winston.com
        for the Defendants.
12
13   APPEARANCES VIA VIDEOCONFERENCE:
14
        FOLEY & LARDNER, LLP
15        (by Jason J. Keener, Esquire)
        321 North Clark Street
16   Chicago, Illinois 60654
        (312) 832-5109
17   Fax (312) 832-4700
        jkeener@foley.com
18        for the Plaintiff.
19
20
21
22
23
24
```

Page 3

```
 1            I N D E X
 2   DEPONENT:                    PAGE
 3   WYATT TRAINA
 4   Examination by Mr. Keener      5
 5
 6
 7          E X H I B I T S
 7
     NO.  DESCRIPTION           PAGE
 8
 9   18  Subpoena                4
10   20  NDA Agreement           4
11   21  E-mail chain WT30-34    4
12   22  E-mail chain WT15-21    4
13   23  E-mail chain CHS6504-05 4
14   24  E-mail chain CHS6443-45 4
15   25  E-mail chain CHS3639-40 4
16   26  E-mail chain CHS3597-99 5
17   27  E-mail chain CHS6266-71 5
18
19
20
21
22
23
24
```

Page 4

```
 1            P R O C E E D I N G S
 2                  * * *
 3            WYATT TRAINA, a witness called
 4   for examination by counsel for the
 5   Plaintiff, having been satisfactorily
 6   identified by the production of his driver's
 7   license, being first sworn by the Notary
 8   Public, was examined and testified as
 9   follows:
10                  * * *
11            (Subpoena marked Exhibit No. 18 for
12   Identification.)
13            (NDA Agreement marked Exhibit
14   No. 20 for Identification.)
15            (E-mail chain WT30-34 marked
16   Exhibit No. 21 for Identification.)
17            (E-mail chain WT15-21 marked
18   Exhibit No. 22 for Identification.)
19            (E-mail chain CHS6504-05 marked
20   Exhibit No. 23 for Identification.)
21            (E-mail chain CHS6443-45 marked
22   Exhibit No. 24 for Identification.)
23            (E-mail chain CHS3639-40 marked
24   Exhibit No. 25 for Identification.)
```

Page 5

```
 1            (E-mail chain CHS3597-99 marked
 2   Exhibit No. 26 for Identification.)
 3            (E-mail chain CHS6266-71 marked
 4   Exhibit No. 27 for Identification.)
 5                  EXAMINATION
 6   BY MR. KEENER:
 7   Q.  Good afternoon.
 8   A.  How you doing?
 9   Q.  Can you please state your name and address
10        for the record.
11   A.  My name is Wyatt Traina, and I live at 775
12        Parker Street in Boston, Massachusetts.
13   Q.  Mr. Traina, have you ever been deposed
14        before?
15   A.  No.
16   Q.  So, basically, you've probably been told how
17        this works.  I'm going to ask you a series
18        of questions and you'll give a series of
19        answers.  It's important since we have a
20        court reporter there taking down everything
21        that you wait until I get my question fully
22        out so she can take it down before you start
23        answering.  And I'll do my best to wait
24        until you complete your answer before I
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 6

1    start the next question. Does that make
2    sense?
3    A. Yes.
4    Q. Although I can see you, for the court
5        reporter taking everything down, everything
6        has to be yes or no, no shaking of the head
7        or nodding. It doesn't really transcribe
8        well in the transcript. Does that make
9        sense?
10   A. Yes.
11   Q. If at any time you don't understand my
12       question, either you don't understand what
13       I'm asking for or for some reason the audio
14       fades out in here, please feel free to ask
15       me to repeat the question or clarify
16       anything you don't understand. Does that
17       make sense?
18   A. Okay. Yes.
19   Q. And, if you don't do that and you answer my
20       question, it's fair for me to assume that
21       you understood the question. Is that okay?
22   A. Understood.
23   Q. Mr. Traina, is there a lawyer representing
24       you personally today?

Page 7

1    A. Yes, there is.
2    Q. Who is that?
3    A. Miss Lu.
4    Q. Do you know if Miss Lu is your personal
5        lawyer or representing Chapterhouse or both?
6    A. I'm not sure, but I think she represents
7        both.
8    Q. Just briefly, could you state your
9        educational background for me?
10   A. I have a BS in cellular and molecular
11       biology from the University of Maine and I'm
12       currently enrolled in a four-year DMD
13       program at Boston University Dental School.
14   Q. When did you get your BS from the University
15       of Maine?
16   A. I got it in the summer of '08.
17   Q. And after graduating with your BS did you
18       begin employment somewhere or did you go
19       straight to dental school?
20   A. I worked at McLean Mental Hospital for
21       almost two years.
22   Q. And what did you do there?
23   A. I did behavioral pharmacology research.
24   Q. And when did you leave that mental hospital

Page 8

1    facility?
2    A. I was laid off in, I think, early in --
3        early 2010, I think.
4    Q. And after leaving there in 2010 did you
5        become employed by anybody else?
6    A. No.
7    Q. Are you currently employed by anybody?
8    A. I am not.
9    Q. Are you familiar with this lawsuit at all?
10   A. Vaguely.
11   Q. What's your understanding of the lawsuit?
12           MS. LU: Objection. Calls for a
13       narrative.
14   A. My understanding is that Games Workshop is
15       taking issue with the works that
16       Chapterhouse makes.
17   Q. Do you have any understanding as to what the
18       problem is, why Games Workshop is taking
19       issue with those Chapterhouse products?
20           MS. LU: Objection. Calls for
21       speculation.
22   A. It seems to me that I think that Games
23       Workshop thinks that Chapterhouse is
24       infringing on their copyrights.

Page 9

1    Q. And where did your understanding of this
2        case come from?
3            MS. LU: Objection. Calls for
4        privilege.
5            To the extent that your knowledge of
6        the case comes from privileged
7        communications, I instruct you not to
8        answer, otherwise you may answer the
9        question.
10   A. I won't answer it then.
11   Q. So, if I understand the instruction and your
12       answer, your only basis for understanding
13       anything to do with the lawsuit is based on
14       a privileged communication you had with an
15       attorney?
16           MS. LU: If I may, I think you can
17       answer as to things you know before any
18       communications with an attorney.
19   A. I just know from what I've read on various
20       internet sites, and that's very little.
21   Q. Did you have any conversations with anyone
22       that wasn't an attorney?
23   A. Regarding the lawsuit?
24   Q. Regarding the lawsuit, yes.

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 10

1  A. The only thing I said when I found out about
2     the lawsuit was I sent an e-mail to Nick and
3     wished him good luck.
4  Q. And who is Nick?
5  A. The guy who runs Chapterhouse.
6  Q. Do you know if that's Nick Villacci?
7  A. Yes.
8  Q. And other than wishing him luck did you say
9     anything else in communication to
10    Mr. Villacci?
11 A. I don't think so.
12 Q. Do you know when you first learned of this
13    case?
14 A. I don't know.
15 Q. Do you know how you first learned of it?
16 A. Like I said, I first found out about it from
17    the internet.
18 Q. When were you notified that your deposition
19    was going to occur in this case?
20       MS. LU: Objection. Calls for
21    privilege.
22 A. I don't remember.
23 Q. Was it within the last couple days or weeks
24    or months?

Page 11

1        MS. LU: Objection. Calls for
2     privilege.
3        To the extent that your answer would
4     reveal privileged communications, I instruct
5     you not to answer.
6  A. All right. No answer.
7        MR. KEENER: Are you suggesting the
8     date of when he was told a deposition occurs
9     relates to legal advice?
10       MS. LU: I am saying that to the
11    extent that it would reveal confidential
12    communications, he is not to answer. He may
13    answer to the extent he remembers as to the
14    date only.
15 Q. So again, Mr. Traina, do you have any idea,
16    days, weeks, months, about how long you were
17    told your deposition was going to occur in
18    this case?
19       MS. LU: Objection. Vague and
20    ambiguous. Assumes facts not in evidence.
21 A. It was between now and February 15th.
22 Q. Is that when you were told the actual
23    deposition was going to occur or when you
24    received notice of the deposition?

Page 12

1        MS. LU: Objection. Compound.
2  A. I don't really understand the difference
3     between those two things.
4  Q. Okay. I'm trying to understand your answer.
5     Was your answer from February 15th to today
6     the date your deposition was going to occur
7     itself, like what we're doing now, or are
8     you trying to give me the date you first
9     heard that Games Workshop wanted to take
10    your deposition?
11       MS. LU: Objection. Vague and
12    ambiguous, compound.
13 A. The latter.
14 Q. What did you do to prepare for your
15    deposition today?
16       MS. LU: Objection. Calls for
17    privilege.
18       To the extent that your answer would
19    reveal privileged communications, I instruct
20    you not to answer. You may answer as to
21    dates, times.
22 A. To prepare I spoke to my lawyer.
23 Q. Is that Ms. Lu here or somebody else?
24 A. Yes.

Page 13

1  Q. Besides speaking to your lawyer did you
2     speak to anyone else about the deposition?
3  A. Only as part of, as part of scheduling
4     issues that might arise.
5  Q. In preparing for your deposition, did you
6     look at any documents, electronic or hard
7     copy?
8        MS. LU: Objection. Calls for
9     privilege.
10       To the extent that you can answer
11    without revealing privileged communications,
12    you may answer.
13 A. I don't think so.
14 Q. When did you speak to your lawyer to prepare
15    for this deposition?
16 A. Yesterday.
17 Q. And for about how long did you meet?
18 A. Two hours or so.
19 Q. Was anyone else present?
20 A. No.
21 Q. In preparing for your deposition today, did
22    you look at or review any of your own files?
23       MS. LU: Objection. Asked and
24    answered.

4 (Pages 10 to 13)

Page 14

1   A.  I did not.
2   Q.  If I can have handed to you what's been
3       marked Plaintiff's Exhibit 18.  It's a
4       subpoena consisting of a number of pages.
5       Do you have that there in front of you?
6   A.  I do.
7   Q.  If you could turn to the sixth page of this
8       document which is actually labeled page
9       three on the very bottom of the document.
10      It's entitled "documents to be produced".
11      Are you there?
12  A.  Yes.
13  Q.  Have you ever seen this document before?
14  A.  Yes, I have.
15  Q.  And is it your understanding this was Games
16      Workshop's request to you to look for and
17      provide to us certain categories of
18      documents?
19  A.  Yes.
20  Q.  What did you do to comply with this request
21      for documents?
22  A.  I contacted my lawyer and --
23          MS. LU:  I'm going to caution you
24      not to reveal any privileged communications

Page 15

1       with any attorney.  You may answer beyond
2       that.
3   A.  I contacted my lawyer and had them sort it
4       out.
5   Q.  I'm not asking for any conversations between
6       you and your lawyer.  I want to know
7       physically what did you do.  You talked to
8       your lawyer?
9   A.  Yes.
10  Q.  But did you physically search for or collect
11      anything?
12          MS. LU:  Objection.  Compound.
13  A.  I searched for -- searched in my e-mail for
14      the stuff that's set forth here, but I
15      didn't collect anything myself.
16  Q.  So you searched your e-mail for particular
17      information?
18  A.  Right.
19  Q.  Did you search anywhere else?
20  A.  No.
21  Q.  Let's look at category number one, all
22      documents concerning Chapterhouse including
23      Nick Villacci or any of its agents or its
24      employees.  Did you search your e-mail for

Page 16

1       documents responsive to that topic?
2   A.  Yes.
3   Q.  And did you find documents that pertained to
4       that topic?
5   A.  Yes.
6   Q.  What did you do with those?
7   A.  What I did with them?  Is that what you
8       said?
9   Q.  Yes.
10  A.  I forwarded them to my --
11          MS. LU:  Objection.  Calls for
12      privilege.  Don't answer that question.
13  Q.  How about category number two?  You can read
14      that to yourself. Did you look for --
15          MS. LU:  Take your time to read the
16      entire paragraph.
17  Q.  Did you look for documents responsive to
18      paragraph number two?
19  A.  Number two or three?
20  Q.  Two.
21  A.  Yes.  I did search for those.
22  Q.  And that search was only searching through
23      your e-mails; is that right?
24  A.  Yes.

Page 17

1   Q.  Do you know if you had any other documents
2       that you might have used as inspiration or
3       referred to in designing or creating any of
4       the pieces that you worked on?
5   A.  Define "document".
6   Q.  Could be artwork or books or magazines or
7       internet websites or pieces of paper,
8       anything other than e-mails.
9           MS. LU:  Objection.  Vague and
10      compound.
11  A.  There were other sources of inspiration
12      beyond just e-mails.
13  Q.  What other sources of inspiration do you
14      have in your possession?
15          MS. LU:  Objection.  Vague and
16      ambiguous.
17  A.  I don't have anything in my possession, but
18      the internet usually is where I'd go.
19  Q.  Other than internet websites is there any
20      other source that you used in the design and
21      creation process other than e-mails and the
22      internet?
23          MS. LU:  Objection.  Vague and
24      ambiguous.

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 18

1    A.  No.
2    Q.  Did you ever refer to any Games Workshop
3       publications, manuals, codexes, figures,
4       magazines, anything of that nature?
5           MS. LU:  Objection.  Compound.
6    A.  I -- yes.  I would sometimes use those items
7       as an inspiration.
8    Q.  And what specific Games Workshop materials
9       did you use for your inspiration?
10   A.  Usually photos on the Web.
11   Q.  Those would be Games Workshop Web photos?
12          MS. LU:  Objection.  Vague and
13      ambiguous.
14   A.  Sometimes it would be on Games Workshop's
15      site.  Sometimes they would be on Wiki,
16      Warhammer Wikis.
17   Q.  Besides Web photos what other Games Workshop
18      materials did you refer to in the design
19      process?
20          MS. LU:  Objection.  Vague and
21      ambiguous.
22   A.  Really just the online stores for creation
23      of the stuff that I made.
24   Q.  So to confirm, no hard copy, manuals,

Page 19

1       rulebook, codexes or magazine articles?
2    A.  Correct.
3    Q.  I think you testified that the main area you
4       searched in response to the subpoena was
5       your e-mails.  Do you have any habit or
6       policy of whether or not you save or delete
7       e-mails?
8           MS. LU:  Objection.  Vague and
9       ambiguous.
10   A.  I rarely delete e-mails and I archive almost
11      all of them unless it's junk mail.
12   Q.  Did you search your archive?
13   A.  Yes.
14   Q.  Do you know if you destroyed any documents
15      that are responsive to these categories?
16   A.  I don't know.
17   Q.  Are there any documents that you found that
18      are responsive to these categories that you
19      did not hand over to your lawyers?
20          MS. LU:  Objection.  Calls for
21      privilege.
22      You may answer to the extent it does
23      not reveal a communication with your
24      attorney.

Page 20

1    A.  No.
2    Q.  You can put that exhibit aside.
3       When is the last time you spoke to
4       Mr. Villacci?
5    A.  I'm not sure.
6    Q.  Can you give me a range?  Are we talking
7       days, months, years, some other metric?
8    A.  Probably -- maybe two months ago give or
9       take.
10   Q.  As best you can recall, can you describe
11      what that conversation was?
12   A.  The conversation was about when I received
13      the subpoena from Games Workshop.  I
14      e-mailed him to see what he knew about it
15      and he directed me to his, the law firm that
16      was representing him.
17   Q.  When you asked him what he knew about the
18      subpoena, what did he say?
19   A.  I'm not sure.  I think he said it was the
20      first he'd heard of it.
21   Q.  Besides saying that and referring you to his
22      lawyers was anything else said in the
23      conversation that you can recall?
24   A.  I don't know.

Page 21

1    Q.  Do you know about how long the conversation
2       was?
3           MS. LU:  Objection.  I think
4       there's a little confusion here.  I think,
5       Jason, you're thinking of a verbal
6       communication, but I think he said e-mail.
7           MR. KEENER:  Let's clarify.
8    Q.  I asked when did you last speak to him.  You
9       said two months ago.  Are you referring to
10      an e-mail correspondence?
11   A.  I am.
12   Q.  Or talking on the phone or face-to-face?
13   A.  E-mail.
14   Q.  Do you know if you gave that e-mail to your
15      lawyers?
16   A.  I'm not sure.
17   Q.  When you searched for any communications
18      between you and Chapterhouse, that would
19      have been one of those, correct?
20          MS. LU:  Objection.  Calls for
21      speculation.
22   A.  Probably.
23   Q.  So in the e-mail, besides telling you it's
24      the first he's heard and referring you to

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 22

```
 1      his lawyers, do you recall Mr. Villacci
 2      saying anything else?
 3  A.  No, I do not.
 4  Q.  Did you respond to the e-mail, his response
 5      to your e-mail?
 6          MS. LU:  Objection.  Ambiguous.
 7      Incomprehensible.
 8  Q.  Let's clear that up.  About two months ago
 9      you testified you e-mailed Mr. Villacci
10      about the e-mail you received, correct?
11  A.  Right.
12  Q.  And he responded back saying it's the first
13      he's heard and directed you to his lawyers;
14      is that right?
15  A.  If memory serves me correctly.
16  Q.  Did you respond to him?
17  A.  I am not sure.
18  Q.  About two months ago, is that the last
19      conversation, oral, e-mail or otherwise,
20      that you had with Mr. Villacci?
21  A.  I believe so.
22  Q.  I believe you testified earlier that
23      Mr. Villacci ran Chapterhouse.  Is that your
24      understanding?
```

Page 23

```
 1          MS. LU:  Objection.  I'm sorry,
 2      Jason.  I'll let you finish.
 3  Q.  Is that what you recall saying?
 4          MS. LU:  Objection.  Vague and
 5      ambiguous.
 6  A.  I recall saying that, yes.
 7  Q.  Do you know if there's any other employees
 8      of Chapterhouse?
 9          MS. LU:  Objection.  Assumes facts
10      not in evidence.  Calls for speculation.
11  A.  I think that he has other people who do work
12      for him, yes.
13  Q.  Can you identify any of those people?
14  A.  The only one I can remember off the top of
15      my head is a Swedish guy named Tomas Fiertek
16      or Fiertek or something.
17  Q.  Do you have any understanding what
18      Mr. Fiertek's relationship is with
19      Chapterhouse?
20          MS. LU:  Objection.  Calls for
21      speculation.
22  A.  My understanding is that -- I think what he
23      does is he polishes up the sculpts before
24      they're sent to Nick.
```

Page 24

```
 1  Q.  Do you know if he does anything else for
 2      Chapterhouse?
 3  A.  I don't know.
 4  Q.  Besides Mr. Fiertek, are you able to recall
 5      anyone else that you believe works for
 6      Chapterhouse?
 7  A.  There's someone else who is on forums that
 8      I've seen talk about their products, but I
 9      don't know his real name.
10  Q.  Does he have some pseudonym or handle on a
11      forum that you can recall?
12  A.  Yes.  I think it's Pyriel or Pyriel.
13  Q.  Can you spell that for the court reporter?
14  A.  P-Y-R-I-E-L.
15  Q.  What makes you think Pyriel works for
16      Chapterhouse?
17  A.  Occasionally, he'll post pictures of sculpts
18      in progress on forums.
19  Q.  And what forums are you referring to?
20  A.  I believe you can find them on Dakka Dakka
21      is the name of it.
22  Q.  Any other forums?
23  A.  Maybe Heresy-Online.
24  Q.  Any others?
```

Page 25

```
 1  A.  Those are the only two I frequent.
 2  Q.  When did you first learn of Chapterhouse?
 3  A.  I first learned of Chapterhouse when I was
 4      on Heresy-Online I think and he had a post
 5      on there that he was looking for freelance
 6      sculptors to do some work for him.
 7  Q.  Prior to this posting for freelancers did
 8      you ever heard of Chapterhouse before?
 9  A.  I don't think so.
10  Q.  What did you do upon seeing this post?
11  A.  I think what I did is I e-mailed him a
12      response with a photo of some of the
13      sculpting that I had done.
14  Q.  Prior to that e-mail did you go and look at
15      Chapterhouse's website?
16  A.  I'm not sure.
17  Q.  At the time you e-mailed the photo and
18      response did you have any idea what type of
19      business Chapterhouse was in?
20  A.  I don't know where I figured if but, yeah, I
21      think I knew at the time.
22  Q.  Can you describe what that understanding
23      was?
24  A.  He casts pieces for, third party pieces.
```

7 (Pages 22 to 25)

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 26

1  Q.  What do you mean by he casts third party
2     pieces?
3  A.  I guess the people who want design will --
4     he'll make a cast, pieces in designs, that
5     people want to buy.  I don't really know how
6     else to explain it.
7  Q.  Okay.  Let's try it this way.  You
8     referenced third party pieces.  Third
9     parties of what?
10 A.  I don't even -- that's how it's been
11    described.
12 Q.  Do you have any understanding of whether
13    it's a third party piece for something else?
14        MS. LU:  Objection.  Vague and
15    ambiguous.
16 A.  I think a lot of them are add-ons for
17    Warhammer models.
18 Q.  When you say Warhammer, do you mean
19    Warhammer fantasy battle, Warhammer --
20 A.  The --
21        MS. LU:  Wait until he finishes
22    before you answer for the court reporter.
23        Can you start again, please.
24 Q.  When you say Warhammer, can you explain what

Page 27

1     you mean by Warhammer?
2  A.  Yes.  Warhammer 40K.  He might do other
3     stuff, but that's -- I'm not sure.
4  Q.  But your understanding is he casts pieces
5     for third party add-ons for Warhammer 40K?
6        MS. LU:  Objection.  Misstates
7     prior testimony.
8  A.  More or less, yes.
9  Q.  Are you aware of any pieces he makes for
10    other products other than Warhammer 40K?
11        MS. LU:  Objection.  Vague and
12    ambiguous.
13 A.  I -- I don't know.
14 Q.  You can't name any as we're sitting here
15    today?
16 A.  No.
17 Q.  Are you a purchaser of any Chapterhouse
18    products?
19 A.  I am not.
20 Q.  Do you otherwise use any Chapterhouse
21    products even if you didn't buy them?
22        MS. LU:  I'm sorry, Jason.  I
23    didn't hear the last of that.
24 Q.  Even if you didn't buy them, do you use any

Page 28

1     Chapterhouse products?
2  A.  Yes.  Yes.  I think so.
3  Q.  What products of Chapterhouse do you use?
4  A.  I think I got a Celtic, like a Celtic shield
5     piece or something.  I think I got one.
6  Q.  Other than that one shield piece do you use
7     any other Chapterhouse products?
8  A.  I don't think so.
9  Q.  What do you use the Celtic shield piece for?
10 A.  To decorate one of my models.
11 Q.  Can I ask which model?
12 A.  It is a space wolf thunder lord.
13 Q.  And does the Celtic shield design have
14    anything to do with the space wolf thunder
15    lord?
16        MS. LU:  Objection.  Vague and
17    ambiguous.
18 A.  I think it looks good on him and it's -- I
19    use it for -- I have it as a stand-in for a
20    storm shield.
21 Q.  Did you ever enter into a business
22    relationship with Chapterhouse?
23        MS. LU:  Objection.  Vague and
24    ambiguous.

Page 29

1  A.  I did some freelance work for Chapterhouse.
2  Q.  When did that freelance work start?
3  A.  I'm not sure of the exact date.
4  Q.  Can you give me an approximate date?
5  A.  Would have been 2009 at some point.
6  Q.  And how long did you have this freelancer
7     relationship with Chapterhouse?
8  A.  Less than a year.
9  Q.  So did it end sometime in 2010?
10 A.  I believe so, yeah.
11 Q.  What were the terms of the freelance
12    relationship with Chapterhouse?
13 A.  Nick would tell me what he needed made and I
14    would make it basically.  And then I would
15    mail the sculpt to him and he would pay me.
16 Q.  And how many products did you work on?
17 A.  Well -- define product.  Does that mean they
18    went for sale?
19 Q.  Fair point.  Anything you did as a freelance
20    sculptor for Chapterhouse, whether it went
21    to sale or not.  Can you describe all of the
22    various things you did.
23 A.  Yup.  I worked on a power armor shoulder
24    pad, a terminator shoulder pad, some vehicle

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 30

1   icons. I also made another set of vehicle
2   icons that never made it into production
3   because they were lost in the mail.
4   Q. Anything else you can think of?
5   A. No.
6   Q. What were the payment terms?
7   A. We would just hammer that out beforehand and
8   just agree on how much I would get paid
9   before I made whatever it was. It was
10  usually, I think, $60 or less for each
11  thing.
12  Q. So since you listed four things in total,
13  you received something around or less than
14  $240 from Chapterhouse?
15  A. Around or less than -- probably around $100
16  actually. 60 was the top end.
17  Q. So for all four products together you
18  believe you received a total of about $100?
19         MS. LU: Objection. Vague and
20  ambiguous as to "product".
21  A. Yes. I'm guessing probably around 120
22  total.
23  Q. I'll have handed to you what's been marked
24  Exhibit 20. It's entitled "Confidential &

Page 31

1   Non-Disclosure Agreement" and is Bates
2   numbered WT22 through WT23. If you look at
3   the bottom right, you see those WT numbers I
4   referred to? You see those?
5   A. Yes.
6   Q. Those are what we call Bates numbers. I
7   believe the WT is supposed to represent you,
8   that these documents came from you, as
9   opposed to documents that say CHS that come
10  from Chapterhouse.
11  A. Okay.
12  Q. If you look at the first page of this
13  agreement at the top, it says it's a
14  confidential and non-disclosure agreement
15  between Chapterhouse and Wyatt Traina. You
16  see that?
17  A. Yes.
18  Q. Do you recall this document?
19  A. Vaguely.
20  Q. What do you recall?
21  A. I think I had to sign it and fax it to Nick
22  before I did any work for him.
23  Q. Do you know when you would have signed it
24  and faxed it?

Page 32

1   A. From the looks of it, probably a little bit
2   after October 31, 2009.
3   Q. On the second page, there's no signature on
4   this one.
5   A. Right.
6   Q. Do you know if you have in your possession a
7   signed copy of this agreement?
8   A. I don't -- probably not.
9   Q. Did you look for one?
10  A. I did not.
11  Q. Why not?
12  A. I had forgotten I had signed this until
13  yesterday.
14  Q. I guess I would ask you to go back and look
15  and see if you have a signed copy of this.
16  Are you able to do that and provide this to
17  your attorney?
18  A. I could look.
19  Q. So that's a yes, you will?
20  A. Sure.
21  Q. Is this the only agreement you signed with
22  regard to your freelance job with
23  Chapterhouse?
24  A. I think so.

Page 33

1   Q. Do you know if you were ever sent a newer
2   version of a confidential and non-disclosure
3   agreement?
4   A. I don't think so, no.
5   Q. Did Mr. Villacci ever explain to you why he
6   wanted you to sign this agreement?
7   A. Yes. He said I needed to sign it before I
8   could do work for him.
9   Q. Did he say what the purpose of the agreement
10  was?
11  A. I don't remember.
12  Q. Do you remember any other conversations
13  about this agreement?
14  A. Yes. I do now.
15  Q. What do you recall?
16  A. Just that we talked about this.
17  Q. I think you said you ended your freelance
18  job with Chapterhouse sometime in 2010; is
19  that right?
20  A. That sounds -- that's probably right, yes.
21  Q. Since that time in 2010 have you had any
22  other business relationship with
23  Chapterhouse?
24  A. No.

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

1  Q.  You can put that exhibit aside.  Thank you.
2       You described your freelance work for
3       Chapterhouse as freelance sculpting.  Is
4       that accurate?
5  A.  Yes.
6  Q.  Prior to your freelance sculpting job with
7       Chapterhouse have you done any freelance
8       sculpting before?
9  A.  Just for personal use.
10  Q.  Do you remember sculpting anything you sold
11       to anyone?
12  A.  I was not, no.
13  Q.  You never worked for any other company where
14       one of the job responsibilities was
15       sculpting?
16  A.  That's correct.
17  Q.  Did you ever receive any training for
18       sculpting?
19       MS. LU:  Objection.  Vague and
20       ambiguous.
21  A.  I took one class at a tournament in Chicago
22       a couple of years before I started doing
23       sculpting.
24  Q.  So around 2007 or so?

1  A.  Yeah, give or take.
2  Q.  And you said at a convention in Chicago?
3  A.  Yes.
4  Q.  Do you know what convention that was?
5  A.  AdeptiCon.
6  Q.  What is AdeptiCon?
7  A.  It's the largest independent Warhammer
8       tournament in states.
9  Q.  When you're saying Warhammer, do you mean
10       Warhammer 40K or something else?
11  A.  Warhammer 40K and fantasy and a host of
12       other games as well.
13  Q.  So at this convention for Warhammer 40K you
14       took a sculpting class?
15       MS. LU:  Objection.  Misstates the
16       testimony.
17  A.  Yes, I did.
18  Q.  Do you know who taught that class?
19  A.  His name was Joseph Orteza.
20       MS. LU:  Can you spell that for the
21       court reporter, please, if you can.
22       THE WITNESS:  J-O-S-E-P-H
23       O-R-T-E-Z-A.
24  Q.  Did you have any understanding if Mr. Orteza

1       worked for anybody at the time he was
2       teaching the class?
3  A.  No, he did not.  He's an art teacher.
4  Q.  As part of the class did he talk about any
5       limitations on sculpting works of others?
6  A.  He did not.
7  Q.  Anything in the realm of intellectual
8       property or copyrights or trademarks or
9       anything of that issue ever come up in the
10       class?
11       MS. LU:  Objection.  Vague and
12       ambiguous.
13  A.  No.  Nothing like that came up.  That I can
14       remember.
15  Q.  Prior to this sculpting class in 2007 did
16       you do any personal sculpting before then?
17  A.  I don't -- I don't remember.
18  Q.  What types of things did you sculpt for
19       personal use?
20       MS. LU:  Objection.  Relevance.
21  A.  I sculpted a lot of angel wings for models
22       of mine, various other things.
23  Q.  What other things can you think of?
24  A.  Sculpted faces on to like armor plates, just

1       add-ons to other Games Workshop model
2       things.
3  Q.  So the angel wings for models, were those
4       for Games Workshop models?
5  A.  Yes.
6  Q.  And the faces for armor plates, were those
7       for Games Workshop vehicles?
8  A.  Those were actually for Privateer Press
9       models.
10  Q.  I want to go back a little further.  When
11       did you first get interested in Warhammer
12       40K?
13  A.  I think I first started playing when I was
14       in junior high school.
15  Q.  Can you give me an approximate year on that?
16  A.  Let's see.  So that would have been '98,
17       '99.
18  Q.  Would you classify yourself as a hobbyist in
19       the 40K field?
20       MS. LU:  Objection.  Vague and
21       ambiguous.
22  A.  Yes, I would.
23  Q.  As a hobbyist over the last 14, 15 years can
24       you estimate about how much time you spent

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 38

1    playing Warhammer 40K?
2    A.  In the thousands of hours.
3    Q.  And same question for painting miniatures
4       for Warhammer 40K, about how many hours?
5    A.  Probably more than that.
6    Q.  More than thousands?
7    A.  Uh-hum.  Yeah.
8    Q.  How about building models for miniatures for
9       Warhammer 40K?  Same question.
10   A.  I don't know.  Several hundred hours.
11   Q.  How about sculpting?  Same question.
12   A.  Maybe 100 hours, 150.
13   Q.  You already mentioned going to AdeptiCon in
14      2007.  Are there any other Warhammer 40K
15      type events that you go to?
16   A.  I go to AdeptiCon every year since that
17      year.  I've been to DaBoyz GT.  It's in
18      Rochester.  I've been to the European team
19      championship in Germany.  And I went to
20      TEMPLCON recently this last year.  It's in
21      Rhode Island.  And probably some more that I
22      am forgetting.
23   Q.  When you say you go to AdeptiCon every year
24      since that year, are you referring to 2007

Page 39

1    one or the 1998?  What date are you
2    referring to?
3    A.  Yeah.  I think 2007 is when I started going.
4    Q.  Are you able to estimate how much money you
5       spend annually on Warhammer 40K?
6    A.  Are you including travel expenses to go to
7       the events?
8    Q.  Sure.  Why don't you break it out.
9    A.  Okay.  When I started out playing, I
10      probably spent $400 or $500 a year probably
11      on models, maybe $100 or $200 on hobby
12      paints a year.  Now I probably spend six to
13      $700 a year on travel expenses and
14      tournament entry fees, but not -- I don't
15      spend that much on models anymore.
16   Q.  For Warhammer 40K what Armies do you play?
17           MS. LU:  Objection as to relevance.
18   A.  I play Orks, Sisters of Battle, and Imperial
19      Guard, Tyranid's and Black Templars a little
20      bit.
21   Q.  What is a Tyranid?
22   A.  A Tyranid is an alien from another universe,
23      kind of like the aliens from the movie
24      Alien.

Page 40

1    Q.  The term "Tyranid", is that something in the
2       Warhammer 40K universe?
3           MS. LU:  Objection.  Vague and
4       ambiguous.
5    A.  I think they were named after the first
6       planet that they devoured.
7    Q.  In the history of the 40K universe?
8    A.  Right.
9    Q.  What are Black Templars?
10   A.  Black Templars are space marines who are
11      noted for their heraldry.  That's a multiuse
12      cross.
13   Q.  Why don't we start with what's a space
14      marine.
15   A.  Okay.
16           MS. LU:  Objection.  Vague and
17      ambiguous.
18   A.  According to the background, space marines
19      are genetically modified super soldiers.
20   Q.  And when you say "the background", you mean
21      the Games Workshop Warhammer 40K background?
22   A.  Correct.
23   Q.  So space marines is something very
24      particular in the 40K universe?

Page 41

1           MS. LU:  Objection.  Argumentative.
2    A.  Yes.  If you say space marine to someone who
3       plays Warhammer, they'll know what you're
4       talking about.
5    Q.  It's just not any soldier who's in space?
6       It's a particular type of soldier?
7           MS. LU:  Objection.  Argumentative.
8    A.  Yes.
9    Q.  And then the Black Templars sound like a
10      chapter or division of those space marines;
11      is that right?
12   A.  Right.
13   Q.  That's again according to the Warhammer 40K
14      history?
15   A.  Correct.
16   Q.  What about the Imperial Guard?  What are
17      they?
18   A.  Imperial Guard are, in the Warhammer 40K
19      background, the rank and file of recruits,
20      just humans, who fight against the aliens.
21   Q.  So when you say space marines in the 40K
22      Warhammer background, somebody will
23      understand, same as Imperial Guard?
24           MS. LU:  Objection.  Misstates

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 42

1    testimony.
2  A.  Yes.  I would say.
3  Q.  What are the Sisters of Battle?
4  A.  Sisters of Battle, according to the
5    background, are an order of militant nuns
6    basically.
7  Q.  Again, when you say "the background", you
8    mean the Games Workshop 40K history?
9  A.  Yes.
10  Q.  I think the last one you said was the Orks.
11    What are the Orks?
12  A.  Orks are, according to the 40K background,
13    they are like a barbaric race of green
14    humanoids.
15  Q.  How do you spell Orks?
16  A.  For 40K, it's spelled O-R-K-S.
17  Q.  When you say "for 40K", what do you mean by
18    for 40K it's spelled that way?
19  A.  Well, in fantasy and in Token and a lot of
20    other fantasy settings, it's spelled
21    O-R-C-S.
22  Q.  So these particular green humanoid monsters
23    in the 40K universe have a different
24    spelling than in other universes?

Page 43

1  A.  Correct.
2  Q.  What Warhammer 40K books or materials do you
3    have, excluding models?
4  A.  I own the rulebook and several codexes, the
5    Ork codex, Imperial Guard codex, I think
6    just the codexes from the Armies that I
7    have.
8  Q.  When you say "the rulebook", do you know
9    what edition?
10  A.  Fifth edition.
11  Q.  When you say "codexes", you mean the codexes
12    are for Orks, Sisters of Battle, Imperial
13    Guard, Tyranid's, and Black Templars?
14         MS. LU:  Objection.  Compound.
15  A.  Yes.  No.  That's right.
16  Q.  Other than that one rulebook and those five
17    codexes do you have any other Games Workshop
18    materials other than models?
19  A.  I have some Black Library books.
20  Q.  Do you know which ones?
21  A.  15 Minutes, Ultramarine, and several others.
22    I can't remember the names.
23  Q.  Besides the rulebook, the codexes and those
24    Black books do you know if you have any

Page 44

1    other materials?
2  A.  None that I can think of off the top of my
3    head.
4  Q.  Do you have any electronic copies of any
5    Games Workshop materials?
6         MS. LU:  Objection.  Vague and
7    ambiguous.
8  A.  I have a copy of Army Builder.
9  Q.  Anything else?
10  A.  I don't think so.
11  Q.  In your freelance sculpting job for
12    Chapterhouse, did you ever refer to the
13    rulebook?
14  A.  No.
15  Q.  Did you ever refer to any of the codexes?
16  A.  I don't think so.
17  Q.  Did you ever refer to any of the Black
18    Library books?
19  A.  No.
20  Q.  Have you ever received White Dwarf?
21  A.  I used to subscribe when I was in high
22    school.
23  Q.  What is White Dwarf?
24  A.  It's a monthly publication for Games

Page 45

1    Workshop enthusiasts.
2  Q.  Do you know when your subscription ended?
3  A.  I do not.
4  Q.  Do you still currently have any White
5    Dwarfs?
6  A.  Maybe at my mom's place, but I don't think
7    so.
8  Q.  Did you ever refer to any of those White
9    Dwarf's in your sculpting job for
10    Chapterhouse?
11  A.  No.
12  Q.  I want to talk about Games Workshop related
13    items on the internet.  You've already
14    referred to a couple, two forums, Dakka
15    Dakka, and Heresy-Online, and a Games
16    Workshop website and a Wiki about 40K.  Do
17    you access any online sites related to
18    Warhammer 40K?
19  A.  I frequently go to Bell of Lost Souls.
20  Q.  Any others?
21  A.  I don't think so.
22  Q.  On Dakka Dakka do you use your own name?
23  A.  I do not.
24  Q.  What name do you use?

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 46

1      MS. LU:  Objection.  Assumes facts
2  not in evidence.
3  A.  Pain Traina.
4  Q.  Can you spell that, please?
5  A.  P-A-I-N  T-R-A-I-N-A.
6  Q.  And same question for Heresy-Online.  What
7  name do you use?
8  A.  I think it's poly55.
9  Q.  And same question for Bell of Lost Souls.
10  What name do you use?
11  A.  Pain Traina.
12  Q.  Now I want to go back to your work with
13  Chapterhouse.  You said Mr. Villacci would
14  decide what products he needed and you would
15  make those.  Can you describe a little more
16  how it was decided what products you would
17  work on?
18      MS. LU:  Objection.  Vague and
19  ambiguous.  Assumes facts not in evidence.
20  A.  I don't know what metric he used to
21  determine what was going to be made next.
22  Q.  Did you have any input?
23  A.  I'd like to think that I did, but I don't
24  think I did.

Page 47

1  Q.  How would he tell you what product he wanted
2  you to make?
3  A.  He would usually e-mail me.
4  Q.  Any other way?
5  A.  I don't think so.
6  Q.  Do you have any understanding on what those
7  decisions were based on?
8  A.  I could probably speculate guesses, but I
9  don't know.
10  Q.  What was your speculation?
11      MS. LU:  Objection.  Calls for
12  speculation.
13  A.  I think that he probably thought that those
14  would sell well and that they are something
15  that people wanted.
16  Q.  What makes you think that that was the
17  reason?
18      MS. LU:  Objection.  Calls for
19  speculation.
20  A.  I can't think of another reason why you
21  would do it, I guess.
22  Q.  Did he ever tell you the reason why he
23  wanted you to create something specific?
24  A.  Not that I can remember.

Page 48

1  Q.  Besides sculpting the four products you
2  mentioned, did you ever perform any other
3  services for Chapterhouse?
4  A.  No, I did not.
5  Q.  Did you ever see the ideas for future
6  Chapterhouse products?
7  A.  I think they sent me a concepts drawing of
8  something they were working on and asked for
9  my opinion at one point.
10  Q.  Any other ideas for future products you can
11  think of that you contributed to?
12      MS. LU:  Objection.  Vague and
13  ambiguous.
14  A.  I don't think so.
15  Q.  Did you ever perform any sales function for
16  Chapterhouse?
17  A.  No.
18  Q.  Do you know how its products are sold?
19      MS. LU:  Objection.  Calls for
20  speculation.
21  A.  They're sold in his online store.
22  Q.  Do you know if they're sold anywhere else?
23  A.  He might use independent retailers.  I'm not
24  sure.

Page 49

1  Q.  Did you do any marketing for Chapterhouse?
2  A.  Can you repeat the question.
3  Q.  Did you do any marketing for Chapterhouse?
4  A.  I did not, no.  Not that I can think of.
5  Q.  Do you know how Chapterhouse markets its
6  products?
7      MS. LU:  Objection.  Calls for
8  speculation.
9  A.  I think they post on forums and word of
10  mouth.
11  Q.  Do you know what forums they post on?
12      MS. LU:  Objection.  Calls for
13  speculation.
14  A.  Like I said, I've seen posts of theirs
15  online on Heresy-Online and Dakka Dakka.
16  Q.  Besides the poster Pyriel, do you know
17  anyone else from Chapterhouse that posts
18  marketing posts on Heresy-Online or Dakka
19  Dakka?
20      MS. LU:  Objection.  Assumes facts
21  not in evidence.  Misstates prior testimony.
22  A.  I can't think of any.
23  Q.  Do you know if there are any and you just
24  don't know what the names are, or the only

13  (Pages 46 to 49)

Page 50

1    other one you've seen is Pyriel?
2         MS. LU: Objection. Argumentative.
3    Compound.
4    A. I'm not sure.
5    Q. Let's start with Exhibit 21, which is a five
6       page e-mail chain beginning with WT30 and
7       ending with WT34. Let me know when you have
8       that.
9    A. Yes.
10   Q. This is an e-mail chain that, ultimately,
11      you received from sales at
12      Chapterhousestudios.com on or about
13      October 30, 2009; is that right?
14         MS. LU: You can take your time
15    looking through all of it, Wyatt.
16   A. Yes. This looks familiar.
17   Q. Was I right characterizing it as an e-mail
18      that you ultimately received from
19      Chapterhousestudios.com on or about
20      October 30, 2009?
21   A. Yes.
22   Q. Do you recall this e-mail chain?
23   A. Yes.
24   Q. Even though the e-mail address says sales at

Page 51

1    Chapterhousestudios.com, do you know who
2    personally it was writing the messages?
3    A. That was the e-mail that Nick gave me to
4      contact him.
5    Q. And Nick, again, is Mr. Villacci?
6    A. Correct.
7    Q. Why don't be start with the last e-mail in
8      the chain on the last two pages. That's an
9      e-mail from you to Chapterhouse dated
10     October 28, 2009?
11   A. Say that again.
12   Q. Are you with me on the last e-mail, which is
13      your e-mail from you to Chapterhouse dated
14     October 28, 2009?
15        MS. LU: Do you have a page number?
16        MR. KEENER: Yes, WT34.
17   A. Okay.
18   Q. Are you there with me on that e-mail?
19   A. Yes.
20   Q. Is this an e-mail you sent to Chapterhouse?
21   A. The very first -- the original message?
22   Q. Yes, the one that spans from 33 to 34.
23   A. Okay. Yes. I sent that to Chapterhouse.
24   Q. Is that the one you were referring to

Page 52

1    earlier when you say you were referring to a
2    job posting you saw online?
3    A. Correct.
4         MS. LU: Objection. Misstates
5    prior testimony. Assumes facts not in
6    evidence.
7    A. Yes. That's the e-mail.
8    Q. And the e-mail starts out "I saw your site
9      linked online". What do you mean by that?
10   A. I was referring to the forum post.
11   Q. And do you remember which forum that was?
12   A. It was one of the two I mentioned.
13   Q. And at the bottom of the e-mail, it looks
14      like there's four hyperlinks. Do you see
15     those?
16   A. Yes.
17   Q. What are those links to?
18   A. Those are links of the angel wings that I
19     mentioned earlier.
20   Q. And in the links it refers to
21     photobucket.com. What is that?
22   A. It's a photo hosting website.
23   Q. Do you have an account with Photo Bucket?
24   A. I do.

Page 53

1    Q. Did you ever post any pictures in your Photo
2      Bucket account that were pictures of any of
3      the work or work in progress that you did
4      for Chapterhouse?
5    A. No.
6    Q. Do you know if Chapterhouse has a Photo
7      Bucket account?
8        MS. LU: Objection. Calls for
9    speculation.
10   A. I don't know.
11   Q. Did you ever post anything to Chapterhouse's
12      Photo Bucket account?
13        MS. LU: Objection. Assumes facts
14    not in evidence.
15   A. No.
16   Q. If you go up two lines to the very top of
17      page 33, that's again an e-mail from to
18      Chapterhouse on October 28, 2009.
19        MS. LU: Where are you, Jason?
20        MR. KEENER: Top of page 33.
21   Q. Are you there with me?
22   A. Yes.
23   Q. This is an e-mail from you to Mr. Villacci?
24   A. Yes.

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 54

1    Q.  The first sentence says "I understand that
2        you are looking to go forward with some
3        space wolves stuff".  You see that sentence?
4    A.  Yes.
5    Q.  What are space wolves?  You mentioned that
6        once before already.
7            MS. LU:  Objection.  Misstates
8        prior testimony.
9    A.  That is a different chapter of space
10       marines.
11   Q.  Is that a chapter that's based on the
12       history and literature of the Games Workshop
13       40K universe?
14   A.  That and some generic Nordic influences,
15       yes.
16   Q.  The term "space wolves" isn't Nordic; is
17       that right?
18           MS. LU:  Objection.  Argumentative.
19   A.  No.
20   Q.  The term "space wolves", is that a Games
21       Workshop related term?
22           MS. LU:  Objection.  Calls for
23       speculation.  Calls for a legal opinion.
24   A.  Yes.  I think it could be.

Page 55

1    Q.  What did you mean when you said you
2        understood he was looking for some space
3        wolves stuff?
4    A.  I don't remember.
5    Q.  Did you have any understanding of what he
6        was looking for?
7    A.  I don't know.
8    Q.  Did you make any space wolves items for
9        Chapterhouse?
10   A.  I did not.
11   Q.  If you flip back a page and look in the
12       bottom of WT32, there's two e-mails there,
13       one from you to Chapterhouse and one from
14       Mr. Villacci to you.  Do you see those two
15       at the bottom?
16   A.  Yes.
17   Q.  The one from Chapterhouse to you mentions
18       MSN Chat.  Do you see that?
19   A.  Yes.
20   Q.  And the one from you to Chapterhouse
21       references Gmail chat.  Do you see that?
22   A.  Yes.
23   Q.  Did you ever communicate with Chapterhouse
24       over MSN Chat?

Page 56

1    A.  No.
2    Q.  Did you ever communicate with Chapterhouse
3        over Gmail chat?
4    A.  I don't think so.
5    Q.  Did you ever message with Chapterhouse over
6        any instant messaging system or chat system?
7    A.  I don't think so.
8    Q.  Going up one more e-mail, that's an e-mail
9        from Chapterhouse to you beginning "space
10       wolves".  You see that?
11   A.  Yes.
12   Q.  The first sentence is "I'm not too sure
13       about making pads for them as they are
14       pretty well accessorized in the new box
15       sets, tons of pads, weapons, et cetera".  Do
16       you see that sentence?
17   A.  Yes.
18   Q.  What did you understand that sentence to
19       mean?
20   A.  That Games Workshop has already got that
21       area covered.
22   Q.  So why would that mean Chapterhouse is not
23       interested in making items in that area?
24           MS. LU:  Objection.  Calls for

Page 57

1        speculation.
2    A.  I guess -- I don't know.
3    Q.  The next sentence says "I do want to make a
4        Landraider set for them like our Salamander
5        one".  What's a Land Raider?
6    A.  A Land Raider is a large tank for space
7        marines.
8    Q.  Is that a specific type of vehicle in the
9        40K universe?
10   A.  Yes.
11   Q.  What is a Salamander?
12   A.  Salamander is another chapter of space
13       marines.
14   Q.  Did he ever tell you why he wanted to do a
15       Land Raider set like their Salamander one?
16   A.  He did not.
17   Q.  For "them", do you understand he's referring
18       to space wolves?
19           MS. LU:  Objection.  Calls for
20       speculation.
21   A.  Repeat the question.
22   Q.  It says "I want to make a Landraider set for
23       them like our Salamander one".  I'm trying
24       to figure out what "them" means.  I think we

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

1     previously said they were space wolves, but
2     I want to see if that's your understanding.
3  A. Yes. That makes sense.
4  Q. Did you ever contribute to a space wolves
5     Land Raider set?
6  A. I did not.
7  Q. If you go up one e-mail, that's an e-mail
8     from you to Chapterhouse. Do you see that?
9  A. Yes.
10  Q. You state "Njal Stormcaller in Power armor
11     will also do well I suspect". Do you see
12     that?
13  A. Yes.
14  Q. What is Njal Stormcaller and power armor?
15  A. Njal Stormcaller is a special character in
16     the space wolves chapter.
17  Q. So not just a class of people but a
18     character in the 40K universe?
19        MS. LU: Objection. Argumentative.
20  A. Yes.
21  Q. So in Harry Potter, that would be you want
22     to make Dumbledore or for Star Wars I want
23     to make Hans Solo, that type of thing?
24        MS. LU: Objection. Argumentative.

1  A. Yeah. The Star Wars analogy is close.
2  Q. Did you ever contribute to any Njal
3     Stormcaller and Power armor?
4        MS. LU: Objection. Vague and
5     ambiguous.
6  A. Not for Chapterhouse.
7  Q. Did you do sculpting for somebody else or
8     was that personal?
9        MS. LU: Objection. Compound.
10  A. I sculpted for him for the space wolf army I
11     mentioned earlier in the e-mail thread.
12  Q. That was a space wolf army for one of your
13     friends?
14  A. Correct.
15  Q. Do you know if that was ever used to make
16     additional copies of that model?
17        MS. LU: Objection. Calls for
18     speculation.
19  A. It was not, to my knowledge.
20  Q. At the end of that e-mail, you also mention
21     something named A-R-J-A-T. What is that?
22  A. Arjat is another special character in the
23     space wolves.
24  Q. Did you ever sculpt Arjat?

1  A. Again, I did a one-off sculpt for my
2     friend's army.
3  Q. If you go up one more e-mail, this one
4     begins on page 31 but goes over to page 32.
5     It's an e-mail from Chapterhouse to you. Do
6     you see that?
7  A. Yes.
8  Q. It starts out "do you have a Space Marines
9     codex". What is a space marines codex?
10  A. It's the army book for space marines.
11  Q. What's included in an army book for space
12     marines?
13  A. The rules for using them in the game as well
14     as some pictures of painted models.
15  Q. Does it also include history of that army?
16  A. Yes.
17  Q. Does it include portions of stories for that
18     army?
19  A. Yes.
20  Q. Does it include illustrations for that army?
21  A. Yes.
22  Q. Does it include banners or symbols that that
23     army might use?
24        MS. LU: Objection. Compound.

1  A. Yes.
2  Q. Does it include the color scheme for that
3     army?
4  A. Usually includes several color schemes.
5  Q. The next sentence is "we have a lot of
6     requests for Fleshtearers pads". What is
7     that?
8        MS. LU: Objection. Calls for
9     speculation.
10  A. Again, Flesh Tearers is another chapter of
11     space marines.
12  Q. What's a pad?
13        MS. LU: Objection. Calls for
14     speculation.
15  A. I believe he's describing a shoulder pad.
16  Q. Do you know if this shoulder pad is for a
17     particular type of model?
18        MS. LU: Objection. Calls for
19     speculation.
20  A. It would have been a pad to use on a space
21     marine.
22  Q. And I think you mentioned earlier that space
23     marines wear power armor. Do you recall
24     that?

Page 62

1   A.  Yes.
2   Q.  What is power armor?
3   A.  Power armor is a suit of mechanical armor
4       that space marines wear.
5   Q.  So is power armor a specific term in the 40K
6       universe that has specific meaning?
7           MS. LU:  Objection.  Argumentative.
8       Calls for speculation.
9   A.  It's specific in the 40K universe but not
10      specific to the 40K universe.
11  Q.  So if I understand your answer, in the 40K
12      universe, it's got a very specific meaning?
13  A.  Right, but other science fiction universes
14      also have power armor.
15  Q.  The next sentence says "we need it to be
16      more ornate then the icon in the codex
17      (basically a sawblade)".  Do you see that?
18  A.  Uh-hum.
19  Q.  Sorry.  Is that a yes?
20  A.  Yes.
21  Q.  When he's referring to the icon in the
22      codex, what is he referring to?
23          MS. LU:  Objection.  Calls for
24      speculation.

Page 63

1   A.  I assume he's referring to a picture in the
2       space marine codex.
3   Q.  So you understand this to mean that there's
4       a picture in the space marine codex of the
5       icon that's associated with Flesh Tearers?
6           MS. LU:  Objection.  Misstates
7       prior testimony.
8   A.  Yes.  There could be.
9   Q.  And when you say -- when it says "icon",
10      what do you mean by that?
11          MS. LU:  Objection.  Calls for
12      speculation.
13  A.  I think insignia.
14  Q.  So if I understand, different armies or
15      different chapters would have different
16      insignias, and this would be the insignia
17      for the Flesh Tearers?
18          MS. LU:  Objection.  Lack of
19      personal knowledge.  Compound.
20  A.  Yes.
21  Q.  Did he ever tell you why he wanted it more
22      ornate than the icon in codex?
23  A.  I don't think so.
24  Q.  Do you know what the icon in the codex look

Page 64

1       like?
2           MS. LU:  Objection.  Vague and
3       ambiguous.
4   A.  I don't know for sure.  Like I said, I don't
5       have the codex he's referring to.
6   Q.  Do you know what the Flesh Tearers icon is
7       in the 40K universe?
8   A.  Yes, I do.
9   Q.  What is it?
10  A.  It's a saw blade with a blood drop on it.
11  Q.  If you look at your reply to this, "yes, I
12      have a marines codex, and I am familiar with
13      the flesh tearers", what codex were you
14      referring to?
15  A.  The same guy that had the space wolves army
16      owns a marine codex, and he would have let
17      me look through it had I asked.
18  Q.  Did you look through it?
19  A.  No, not with this task in mind.
20  Q.  Why not?
21  A.  Because I could just look it up online, the
22      information about the chapter.
23  Q.  Did he look it up online?
24  A.  I think I did, yes.

Page 65

1   Q.  Do you know where you looked online for the
2       Flesh Tearers icon?
3   A.  I would usually go to Warhammer Wiki.
4   Q.  Do you remember what you found?
5   A.  I can't remember exactly, but I assume it
6       would be a saw blade.
7   Q.  Just a saw blade or a saw blade with a drop
8       of blood on it?
9   A.  Saw blade with the blood drop.
10  Q.  If you look up one e-mail, it says about
11      fourth sentence in, "how can we embellish
12      this".  Do you have any understanding why
13      Mr. Villacci wanted you to embellish this?
14  A.  Probably because he thought it was too
15      simple.
16  Q.  Did he ever tell you how to embellish it?
17  A.  I'm not sure.
18  Q.  The second paragraph starts out "remember,
19      it can't be too ornate that it won't be
20      recognizable as the FT icon".  Do you see
21      that?
22  A.  Can you direct me to it again?
23  Q.  Sure.  It's about in the middle of page 31,
24      that same e-mail from Mr. Villacci to you.

17  (Pages 62 to 65)

Page 66

1   It's the second paragraph right before he
2   signs off Nick.
3   A.  Yes.
4          MS. LU:  Can you repeat the
5   question.
6   Q.  "Remember, it can't be too ornate that it
7   won't be recognizable as the FT icon".
8   A.  Yes.
9   Q.  What does "FT" mean?
10         MS. LU:  Objection.  Argumentative.
11  The rest of the sentence says "but we tend
12  to shy away from flat boring icons as well".
13  Q.  What did you understand "FT icon" to mean?
14  A.  Probably stands for Flesh Tearer.
15  Q.  So what did you understand this sentence to
16  mean to you?
17  A.  He wants the icon to be recognizable but
18  still interesting.
19  Q.  Did you understand it was important for 40K
20  players to be able to recognize it as the
21  Flesh Tearer icon?
22         MS. LU:  Objection.  Lack of
23  personal knowledge.  Calls for speculation.
24  A.  That could be.

Page 67

1   Q.  Is this a piece that you sculpted?
2   A.  This is a piece that I sculpted, yes.
3   Q.  Did you, as a sculptor, take this as
4   instruction that whatever you did, make sure
5   it was still recognizable to 40K players as
6   Flesh Tearer icon?
7          MS. LU:  Objection.  Argumentative.
8   A.  Yes.
9   Q.  Did it have to be recognizable to 40K
10  players as a Flesh Tearer icon?
11         MS. LU:  Objection.  Calls for
12  facts not in evidence.
13  A.  So people could convert a Flesh Tearer army
14  or build a Flesh Tearer army.
15  Q.  If you look at the next e-mail up -- sorry.
16  Let's look at the e-mail that goes from page
17  30 to 31, the crossover e-mail that's from
18  you to Chapterhouse.  You see that?
19  A.  Yes.
20  Q.  It says, on the top of page 31, "if I
21  understand it correctly, you guys have basic
22  shoulder pads that I sculpt onto, correct?
23  If not, no big deal, I must have a thousand
24  shoulder pads kicking around".  Do you see

Page 68

1   that?
2   A.  Yes.
3   Q.  Why did you write that?
4          MS. LU:  What was the last
5   question, Jason?  We can't hear you.
6   Q.  Why did you write that?
7   A.  Because I think I must have known he had
8   some type of basic shoulder pad that he has
9   people sculpt on to.
10  Q.  Do you have any idea why he didn't want you
11  to sculpt on one of the shoulder pads you
12  had kicking around?
13         MS. LU:  Objection.  Calls for
14  speculation.
15  A.  I assumed it had something to do with he
16  didn't want to directly copy Games Workshop
17  pads.
18  Q.  And if you look at the next e-mail up from
19  Mr. Villacci, it ends stating "I just hate
20  using anything GW as a model, even if it is
21  a plain pad, stupid legal stuff :P".  You
22  see that?
23  A.  Yes.
24  Q.  What's your understanding of "GW" in that

Page 69

1   sentence?
2   A.  He's referring to Games Workshop.
3   Q.  Did he ever explain to you what he meant by
4   "stupid legal stuff"?
5   A.  I don't remember.
6   Q.  Did you ever discuss it with him?
7   A.  Beyond this e-mail, I don't really remember.
8   Q.  Your e-mail in response right above, in
9   part, states "I was actually pretty curious
10  about how the legal stuff works out".  You
11  see that?
12  A.  Yes.
13  Q.  What were you curious about?
14  A.  About why we can't use a regular shoulder
15  pad from GW.
16  Q.  What did you do to resolve your concern
17  here?
18         MS. LU:  Objection.  Argumentative.
19  Misstates prior testimony.  Vague and
20  ambiguous.  Assumes facts not in evidence.
21  A.  Which concern are you regarding?
22  Q.  You said you were curious about how the
23  legal stuff works out.  And I think you
24  explained that was curiosity why you

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 70

1  couldn't use a Games Workshop shoulder pad.
2  My question is did you do anything to
3  resolve your curiosity?
4  A. I'm not sure, but I don't think so.
5  Q. At the top of the exhibit, the last e-mail
6  is from Chapterhouse to you.  It starts
7  "GW".  That stands for Games Workshop?
8       MS. LU:  Objection.  Calls for
9  speculation.
10 A. Yes.
11 Q. Says "GW pretty much has no legal say about
12  what people have to use with their models as
13  long as it isn't direct copies or recast of
14  the models".  Do you see that?
15 A. Yes.
16 Q. Did Mr. Villacci ever tell you how he got
17  this understanding?
18 A. I don't know.
19 Q. The next paragraph says "still we have gone
20  through a lot of resources to design our own
21  stuff from scratch, while using the same
22  measured dimensions, in 3D applications".
23  You see that?
24 A. Yes.

Page 71

1  Q. What's your understanding of what he meant
2  by "using the same measured dimensions, in
3  3D applications"?
4       MS. LU:  Objection.  Calls for
5  speculation.  Lack of personal knowledge.
6  A. I'm guessing he was just making sure it
7  would fit onto a power armor model.
8  Q. Do you know how he obtained the measured
9  dimensions in 3D applications?
10      MS. LU:  Objection.  Calls for
11  speculation.  Lack of personal knowledge.
12 A. I don't know.
13 Q. Why don't we go to Exhibit 22, which is
14  Bates-labelled WT15 through WT21. Most of
15  this e-mail exchange is items we've already
16  gone through in the prior exhibit.  My
17  question is going to be focused on the very
18  last e-mail at the top.
19 A. Okay.
20 Q. Do you see where he references,
21  Mr. Villacci, "see the attached NDA, just
22  sign and scan it or fax".  Do you see that?
23 A. Yes.
24 Q. Is it your understanding he's referring to

Page 72

1  what we looked at before, the confidential
2  and non-disclosure agreement, Exhibit 20?
3       MS. LU:  Objection.  Calls for
4  speculation.  Lack of personal knowledge.
5  A. Yes.
6  Q. Okay.  Put that aside.
7       Let's look at Exhibit 23.  It's
8  Bates-labelled CHS6504 through CHS6505.  Do
9  you have that exhibit?
10 A. Yes.
11 Q. Looking at the oldest e-mail chain that's on
12  the last page of the document, it's an
13  e-mail from you to Mr. Villacci, correct?
14 A. Uh-hum.
15 Q. Is that a yes?
16 A. Yes.
17 Q. You state "I got the pads in the mail
18  yesterday.  I noticed there are a few
19  different ones.  There's one with a raised
20  ridge and some normal ones too.  Do you have
21  a preference on the one I work on?"  What
22  are you referring to?
23 A. Before I started sculpting he sent me a
24  little packet of pewter pads that he'd made

Page 73

1  and they were a couple different variations
2  on the pads.
3  Q. Can you describe the variations?
4  A. One had a raised ridge and the other just
5  looked like -- it just didn't have a raised
6  ridge I guess.
7  Q. What do you mean by a raised ridge?
8  A. I think the apex of the pad, it was raised
9  up a little more.
10 Q. He says "unless you are doing anything
11  different with the whole pad face (scales,
12  studs, et cetera) I would just use the GW
13  rimmed look alike instead of the flat one".
14  Do you see that?
15 A. Uh-hum.
16 Q. Is that a yes?
17 A. Yes, yes.
18 Q. GW again refers to Games Workshop?
19      MS. LU:  Objection.  Lack of
20  personal knowledge.  Calls for speculation.
21 A. I'm guessing yes.
22 Q. What was your understanding of the "Games
23  Workshop rimmed look alike"?
24      MS. LU:  Objection.  Lack of

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 74

1   personal knowledge.
2   A. I think he was referring to the pad without
3       the crest.
4   Q. Why would that be a Games Workshop rimmed
5       look alike?
6           MS. LU: Objection. Lack of
7       personal knowledge. Calls for speculation.
8   A. Probably because the majority of Games
9       Workshop pads don't have a raised crest.
10  Q. And your response above that says "if I make
11      a raised saw blade with a raised blood drop
12      on top, that's not going to violate any
13      copyright or anything, correct". You see
14      that?
15  A. Yes.
16  Q. What was your concern?
17  A. My concern was since I didn't know anything
18      about copyright law, I didn't want to step
19      on any toes.
20  Q. How did you resolve that concern?
21  A. He responded to me and said that it would be
22      fine.
23  Q. Do you have any understanding why it would
24      be fine?

Page 75

1           MS. LU: Objection. Lack of
2       personal knowledge. Calls for speculation.
3           To the extent your knowledge comes
4       from any conversations with your attorney, I
5       instruct you not to answer.
6   A. No answer.
7   Q. No answer because you don't know or no
8       answer because you're following the
9       instruction not to answer?
10  A. Following instructions.
11  Q. So the only understanding of why
12      Mr. Villacci thought it wouldn't be an issue
13      comes from a conversation you had with your
14      attorney?
15  A. Can you repeat the question.
16  Q. Sure. Is the only understanding you have of
17      why it would not be an issue for copyright
18      because of a conversation you had with an
19      attorney?
20          MS. LU: Objection. Vague and
21      ambiguous. Argumentative.
22  A. At the time this was written, it would have
23      just been the knowledge that I gained from
24      Nick.

Page 76

1   Q. What was that knowledge you gained from Nick
2       on why it wouldn't be an issue with
3       copyright?
4   A. Probably just the e-mail from the previous
5       exhibit about the topic.
6   Q. So just from what's written on this page
7       you're saying?
8           MS. LU: Objection. Misstates
9       prior testimony.
10  A. The previous exhibit or one of the previous
11      exhibits.
12  Q. You can put that exhibit aside.
13          Let's go to Exhibit 24, which is
14      labeled CHS6443 through 45. I want to start
15      with the second e-mail on the first page,
16      which is an e-mail from Chapterhouse to you
17      starting with "great" and a smiley face.
18      You see that?
19  A. Yes.
20  Q. The first paragraph references a terminator
21      reference plate. What's a terminator?
22  A. Terminator is a space marine that's inside
23      terminator armor.
24  Q. So instead of this power armor is inside of

Page 77

1   a terminator armor?
2   A. Correct.
3   Q. Is that a specific term for Warhammer 40K?
4           MS. LU: Objection. Vague and
5       ambiguous.
6   A. Like with the power armor, it's specific in
7       40K but not specific to 40K.
8   Q. So the movie Terminator uses the word
9       terminator, but we're not talking about that
10      terminator, correct?
11  A. Right.
12  Q. We're talking about specific type of
13      terminator that players of 40K would
14      understand?
15  A. Correct.
16  Q. The next paragraph refers to a blood angel
17      pad. What's a blood angel?
18          MS. LU: Objection. Calls for
19      speculation.
20  A. A blood angel is another chapter of space
21      marines.
22  Q. And it says it "would use a drop and wings".
23      You see that? What is the icon of blood
24      angels according to 40K universe?

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 78

1           MS. LU:  Objection.  Vague and
2     ambiguous.
3     A.  I believe it's a blood drop with wings.
4     Q.  The next paragraph says "blood angels are
5         coming out in a few months so that could be
6         cool".  You see that?
7     A.  Yes.
8     Q.  Do you have any understanding of how
9         Mr. Villacci knew blood angels were coming
10        out in the next few months?
11          MS. LU:  Objection.  Calls for
12        speculation.
13    A.  I don't know how he knew.
14    Q.  Do you know what he was referring to?
15          MS. LU:  Objection.  Calls for
16        speculation.
17    A.  I'm guessing he's referring to the blood
18        angel release when they rewrote the codex.
19    Q.  Does that mean there was release of the
20        codex or miniatures or both?
21    A.  Both.
22    Q.  Why was it important that the blood angel's
23        codex and miniatures were released by Games
24        Workshop?

Page 79

1           MS. LU:  Objection.  Calls for
2     speculation.
3     A.  I'm guessing he wanted to do blood angel
4         stuff because when they get re-released,
5         people tend to buy a lot of angel armies if
6         they want to spice up some custom pieces.
7     Q.  The next paragraph refers to a "Dreadnought
8         Sarcophagus covers for specific chapters".
9         You see that?
10    A.  Uh-hum.
11    Q.  Yes?
12    A.  Yes.
13    Q.  What's a Dreadnought?
14    A.  Sarcophagus is part of the Dreadnought, and
15        a Dreadnought is a walking vehicle which
16        also acts as a life support system for a
17        fatally injured space marine.
18    Q.  So that's a specific vehicle in the 40K
19        universe?
20    A.  Yes.
21    Q.  When it says "covers for specific chapters",
22        what's that referring to?
23          MS. LU:  Objection.  Calls for
24        speculation.

Page 80

1     A.  I believe he's referring to the space marine
2         chapters.
3     Q.  Is that what the next paragraph means,
4         "Dragon-Salamander one, Wolf, et cetera"?
5           MS. LU:  Objection.  Calls for
6         speculation.
7     A.  Yes.  I think so.
8     Q.  Those are different chapters of space
9         marines?
10    A.  They are.
11    Q.  Is Dragon-Salamander one chapter or two
12        chapters?
13          MS. LU:  Objection.  Calls for
14        speculation.
15    A.  I think Salamander refers to the chapter and
16        Dragon refers to the style.
17    Q.  What is a Dragon-Salamander icon?
18    A.  I think it's just a Salamander icon.
19    Q.  What's a Salamander icon?
20          MS. LU:  Objection.  Lack of
21        personal knowledge.
22    A.  I think it's -- it's basically a dragon, so
23        that's what he's referring to here.
24    Q.  What's the icon for the wolf chapter?

Page 81

1     A.  I believe he's referring to the space
2         wolves.
3     Q.  What's the icon for the space wolves
4         chapter?
5           MS. LU:  Objection.  Lack of
6         personal knowledge.
7     A.  There are several that I can think of.
8     Q.  What are those?
9     A.  I believe one is a paw and I think there's
10        also, I don't know, probably a wolf.  I'm
11        not sure.  I don't remember.
12    Q.  You can put that aside.
13        Let's go to Exhibit 25, a document
14        labeled CHS 3639 through 43.  Some of these
15        e-mails at the very beginning we covered
16        before.  Let's start with 3641, the last
17        e-mail on that page.  That's from
18        Chapterhouse to you.  You see that?
19          MS. LU:  Objection.  This document
20        we have already notified Mr. Moskin that
21        this document contains inadvertently
22        produced privilege material.  I'm going to
23        have to call it back.
24          MR. KEENER:  As lead, Mr. Moskin

21  (Pages 78 to 81)

Page 82

1   has asked Chapterhouse to identify what the
2   claim of privilege is here and you guys have
3   never responded. Are you guys going to
4   respond now what the privilege is?
5       MS. LU: I believe we sent you a
6   redacted copy of the document with the
7   privileged sections redacted.
8       MR. KEENER: I understand that. We
9   asked in response please identify the basis
10   for the claim of privilege and never
11   received a response. Are you prepared to
12   tell me the response?
13       MS. LU: The basis is
14   attorney-client privilege.
15 Q. Mr. Traina, in November of 2009 did you have
16   an attorney?
17 A. I don't think so.
18 Q. Did you ever correspond to an attorney in
19   2009?
20 A. Not that I can remember.
21 Q. Did you ever receive any advice from an
22   attorney in 2009?
23 A. Not that I can remember.
24 Q. Did you have any communications with

Page 83

1   attorneys in 2009?
2 A. I don't think so.
3 Q. In 2009, did Mr. Villacci -- were you an
4   employee of Mr. Villacci in 2009?
5       MS. LU: Objection. Vague and
6   ambiguous.
7 Q. As opposed to a freelance sculptor. Were
8   you an employee of Chapterhouse?
9 A. I was not.
10 Q. Did Mr. Villacci ever tell you or ever
11   disclose advice he received from his
12   attorneys to you?
13       MS. LU: Objection. Calls for
14   privilege.
15 Q. That's a yes or no at this point.
16       MS. LU: You can answer yes or no.
17 A. Can you repeat the question.
18 Q. Yes. In 2009, did Mr. Villacci ever
19   disclose to you advice he received from his
20   attorneys?
21       MS. LU: Objection. Lack of
22   personal knowledge. Same instruction.
23 A. I believe so.
24 Q. Did he ever tell you to keep that

Page 84

1   information -- to not repeat that
2   information to anybody?
3 A. I'm not sure.
4 Q. Do you ever recall an instruction from
5   Mr. Villacci not to repeat something he told
6   you?
7 A. I don't remember.
8       MS. LU: At this point I'd like to
9   put on the record that we notified Games
10   Workshop several weeks ago that this
11   document and others like it were privileged,
12   and pursuant to the Federal Rules of Civil
13   Procedure and the Federal Rules of Evidence
14   we notified Games Workshop that these
15   documents were inadvertently produced, that
16   all copies should be destroyed or returned
17   to Chapterhouse.
18     It is obvious that this was not done.
19   If Games Workshop had a disagreement with
20   regard to whether or not these documents
21   were, in fact, privileged, it should have at
22   the very least sequestered the documents
23   instead of continuing to use them in
24   litigation and moved in court for a ruling

Page 85

1   as to whether or not the privilege claimed
2   on these documents was, in fact, correct.
3     Now Games Workshop has had ample
4   opportunity to move before Judge Kennelly as
5   to whether or not these documents are
6   properly privileged and it has been in court
7   several times before Judge Kennelly since we
8   notified Games Workshop of the privileged
9   status of these communications and it has
10   not done so.
11     Instead, it has, contrary to the
12   Federal Rules of Civil Procedure, continued
13   to view the documents and use the documents
14   and then produce them before a third party
15   witness in this deposition.
16       MR. KEENER: Your objection is
17   noted. I would just briefly respond that we
18   did respond to you saying we challenge that
19   privilege, asked for an explanation back and
20   received no response from Chapterhouse.
21     In addition, this document is
22   submitted to the court as an exhibit in a
23   previous filing and there has been no effort
24   on the part of Chapterhouse to retrieve this

22 (Pages 82 to 85)

Page 86

1  document from court filings.  It's in the
2  public record.
3      In addition, this third party is the
4  one it was written to, who is not an
5  employee, and who testified he never had an
6  attorney in 2009, and never received any
7  attorney advice in 2009.
8      MS. LU:  I would like to state for
9  the record that under the Federal Rules of
10  Civil Procedure if Games Workshop disagrees
11  with a claim of privilege, the proper
12  procedure is to go before the federal court
13  and request that the privilege be denied.
14      And, furthermore, contrary to what
15  you've just said, we did reply to you and
16  tell you that the claim of privilege was for
17  attorney-client privilege.  If you wish to
18  challenge that privilege, you may go to
19  Judge Kennelly and challenge that privilege.
20  Furthermore, any document that was filed
21  with the federal court was filed under seal.
22      MR. KEENER:  That doesn't resolve
23  the privilege issue but we can go on.  It's
24  not a proper topic or conversation to get

Page 87

1  into between you and me.
2  Q.  My question for Mr. Traina is, in 2009, did
3  Mr. Villacci ever tell you not to disclose
4  something he said to anyone else?
5      MS. LU:  Asked and answered.
6  A.  I'm not sure.
7  Q.  What was your understanding as a sculpting
8  of what you could and could not do regarding
9  sculpting?
10  A.  My understanding was that I wasn't allowed
11  to make a copy of Games Workshop bits or --
12  that's what I couldn't do.
13  Q.  When you mean you couldn't make a copy, do
14  you mean casting it off of a bit or copying
15  the design or something else?
16      MS. LU:  Objection.  Vague and
17  ambiguous.  Compound.
18  A.  The former.
19  Q.  You couldn't physically cast a piece off of
20  a Games Workshop piece?  Is that what you
21  mean?
22  A.  Well, I didn't do any casting myself, but I
23  wasn't to submit to Nick for any casting any
24  Games Workshop pieces.

Page 88

1  Q.  As the sculptor of the case, what
2  understanding did you have of what you could
3  use and couldn't use in relation to Games
4  Workshop pieces?
5  A.  My understanding was that I couldn't submit
6  to Nick any sculpting inspired by any Games
7  Workshop models or art such that it was
8  recognizable in the universe, the background
9  of 40K.
10  Q.  Do you believe you were allowed to sculpt
11  something so it looked identical to
12  something that Games Workshop produced?
13      MS. LU:  Objection.  Calls for
14  speculation.
15  A.  I don't know.  I didn't try to make anything
16  look identical.
17  Q.  Was it your understanding that you were
18  allowed to copy icons or symbols from Games
19  Workshop armies and chapters?
20      MS. LU:  Objection.  Calls for
21  speculation.
22  A.  Define "copy".
23  Q.  What was your understanding of what you
24  could do with respect to Games Workshop

Page 89

1  icons and symbols?
2      MS. LU:  Objection.  Asked and
3  answered.
4  A.  I could use them as inspiration and make an
5  icon that was recognizable to one of the
6  chapters or the background of 40K.
7  Q.  What was your understanding of how close it
8  could come to the icon in the Games Workshop
9  materials?
10      MS. LU:  Objection.  Calls for
11  speculation.  Calls for a legal conclusion.
12  A.  I don't really know.
13  Q.  Let's make it a concrete example.  I think
14  you said the Flesh Tearers icon was a saw
15  blade with a drop of blood in it?
16  A.  Right.
17  Q.  That's from the Games Workshop codexes and
18  materials?
19      MS. LU:  Objection.  Argumentative.
20  Assumes facts not in evidence.  Calls for a
21  legal conclusion.
22  A.  I recall that, yes.
23  Q.  Was it your understanding you could make a
24  saw blade with a drop of blood to represent

23  (Pages 86 to 89)

Page 90

```
 1    the flesh tearers icon in your sculpting?
 2  A. Yes. That was my understanding, however,
 3    there's variations within that as to number
 4    of serrations on the saw blade, size,
 5    relative size of the saw blade and blood
 6    drop to each other.
 7  Q. What was your understanding of what
 8    variation you needed in your sculpting from
 9    the Games Workshop icon?
10        MS. LU: Objection. Calls for
11    speculation. Calls for a legal conclusion.
12  A. I'm not really sure.
13  Q. You were sculpting this, right?
14  A. Yes.
15  Q. When you were sculpting it, what was your
16    understanding of how different you had to
17    make it?
18        MS. LU: Objection. Calls for
19    speculation. Calls for legal conclusion.
20  A. My understanding of how different I should
21    make it was that I wasn't supposed to use --
22    I just had to make it myself and I couldn't
23    use any other, any Games Workshop bits for
24    it.
```

Page 91

```
 1  Q. Was it your understanding you saw a drawing
 2    of a saw blade with a drop of blood on it
 3    and you could sculpt that exact same
 4    picture?
 5        MS. LU: Objection. Lack of
 6    personal knowledge. Calls for a legal
 7    conclusion.
 8  A. I don't fancy myself good enough to do an
 9    exact copy of a picture, but it was
10    recognizable as a saw blade with a drop on
11    it.
12  Q. What did you do to make your saw blade with
13    the drop of blood on it different from the
14    Games Workshop icon for a Flesh Tearer?
15        MS. LU: Objection. Lack of
16    foundation.
17  A. My saw blade had fewer serrations, larger
18    individual cutting teeth and my blood drop
19    was detachable.
20  Q. Any other differences?
21  A. Not that I can think of. I'd have to see
22    them both together.
23  Q. What did you do to make sure it was
24    recognizable as a Flesh Tearer icon, in your
```

Page 92

```
 1    words?
 2  A. I think anything that looked like a saw
 3    blade with a drop of blood on it would be
 4    recognizable enough.
 5  Q. Why?
 6  A. Because a saw blade with a blood drop on it
 7    is the icon of flesh tearers.
 8  Q. So anyone interested in building a Flesh
 9    Tearer icon would know a saw blade with a
10    drop of blood was a Flesh Tearer icon?
11        MS. LU: Objection. Calls for
12    speculation.
13  A. Yes. They probably would know that.
14  Q. The rules of how you could sculpt and what
15    you could and could not do, how did you gain
16    that understanding?
17  A. E-mails from Nick and --
18  Q. So Mr. Villacci --
19  A. What he said I could and couldn't do with
20    regard to sculpting.
21  Q. So Mr. Villacci instructed you on these
22    various rules?
23        MS. LU: Objection. Misstates
24    prior testimony. Vague and ambiguous.
```

Page 93

```
 1  A. Yes, to the effect that we viewed in the
 2    e-mails that we saw.
 3  Q. Did Mr. Villacci say where he got his
 4    understanding of what could and could not be
 5    done?
 6        MS. LU: Objection. To the extent
 7    that the questioning calls for content of a
 8    privileged communication, I instruct you not
 9    to answer. Beyond that, you may answer.
10  A. I think I knew that Nick had some sort of
11    legal advice on his side.
12  Q. So if I understand what you're saying,
13    you're saying you understood Mr. Villacci
14    was talking to his lawyers and then he was
15    giving you all these instructions on what
16    you could and could not do in sculpting your
17    projects. Is that accurate?
18        MS. LU: Objection. Calls for
19    speculation. Assumes facts not in evidence.
20    And to the extent it calls for privileged
21    communications, beyond that you may answer.
22  A. Yeah. That's the gist of it.
23  Q. And the rules he then related to you were
24    things like we can't use Games Workshop bits
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 94

1  while you're sculpting?
2        MS. LU:  Objection.  Misstates
3  prior testimony.
4  A.  Correct.
5  Q.  And you can't cast something off of a Games
6  Workshop piece?  You have to sculpt it
7  yourself?
8        MS. LU:  Objection.  Misstates
9  prior testimony.
10  A.  Well, like I said, I didn't do any of the
11  casting.
12  Q.  I'm asking you of the instructions from
13  Mr. Villacci to you.
14  A.  He didn't tell me anything about how to
15  cast.  He took care of that himself.
16  Q.  One of the instructions from Mr. Villacci, I
17  think what you said, was that you could have
18  slight variations as long as it's still
19  recognizable as the Games Workshop icon and
20  be okay?
21        MS. LU:  Objection.  Misstates
22  prior testimony.
23  A.  I'd say that's a pretty accurate paraphrase.
24  Q.  Are there any other instructions you can

Page 95

1  recall Mr. Villacci giving you on what you
2  could and couldn't do?
3  A.  Not offhand.
4        MR. KEENER:  Miss Lu, are you
5  allowing him to testify on the e-mail that
6  begins on page 3639 that spans -- sorry.
7  The one at the top that's 3640.
8        MS. LU:  Which exhibit are you
9  referring to?
10        MR. KEENER:  Exhibit 25.
11        MS. LU:  You want him to testify as
12  to what?
13        MR. KEENER:  The e-mail at the top
14  of 3640.
15        MS. LU:  Do you not have another
16  copy of this document?
17        MR. KEENER:  I'm asking if you're
18  claiming privilege at the top of 3640.
19        MS. LU:  I am not claiming
20  privilege over the e-mail at the top of
21  3640, however, Exhibit 25 is a complete
22  document and I am claiming privilege to this
23  unredacted copy of the document.  If you
24  have another copy of the e-mail at the top

Page 96

1  of 3640, I will permit him to testify as to
2  that e-mail.
3        MR. KEENER:  I want to ask him
4  about the one that's at the top of 3640.
5        MS. LU:  I understand that, but if
6  you don't have a redacted copy, there's
7  nothing I can allow the court reporter to
8  take with her.
9        Do you have another copy of this
10  e-mail somewhere?
11        MR. SILVA:  I don't.
12        MR. KEENER:  Are you claiming any
13  privilege on the second or third e-mail on
14  page 3640?
15        MS. LU:  The one that is at
16  11:32 a.m.?  Is that the one you're
17  referring to?
18        MR. KEENER:  There's three.
19  There's one from 3:46, 11:32 and one from
20  12:29.
21        MS. LU:  No.  I'm not claiming
22  privilege over those two e-mails.
23        MR. KEENER:  If you could please
24  separate that page from the exhibit, we'll

Page 97

1  have this marked Exhibit 25.  Are you
2  comfortable with that?  There's nothing on
3  this page.
4        MS. LU:  I'm not sure that's
5  proper.  You're saying that Exhibit 25 is
6  just that one page?
7        MR. KEENER:  There's nothing
8  privileged on that, right?  We're removing
9  the pages that have privileged material on
10  it.
11        MS. LU:  You're saying you want
12  Exhibit 25 to be just 3639 and 3640?
13        MR. KEENER:  Yes.  Do you have a
14  problem with that?
15        MS. LU:  I think that's odd but I
16  don't claim privilege over those two.  Do
17  you have like a stapler remover or something
18  like that?  I'm trying to not tear the pages
19  here.
20        MR. KEENER:  I understand.  We'll
21  have the record reflect that you are
22  removing the pages 3641, 3642 and 3643 from
23  Exhibit 25.
24        MR. SILVA:  If you want to go off

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 98

1    the record for a second, I can get a staple
2    remover.
3            MS. LU:  Let's do that.
4        (Recess.)
5    Q.  Mr. Traina, what's in front of you is
6        Exhibit 25 bearing Bates-labelled CHS3639 to
7        3640.  Do you have that?
8    A.  Yes.
9    Q.  You had a chance during the break to read
10       through the e-mails in front of you?
11           MS. LU:  For the record, I
12       mentioned that this is the first two pages
13       of what I believe is a five page document.
14   A.  Yes.  I have read it.
15   Q.  Let's start on the second page, 3640.  I
16       want to ask you about the first e-mail on
17       that page.  It's an e-mail from Mr. Villacci
18       to you on November 25, 2009.  Do you see it?
19   A.  Yes.
20   Q.  It starts out "I just thought of something
21       while I was in the shower, lol".  Then it
22       goes on for a few paragraphs.  You see that?
23   A.  Yes.
24   Q.  What is your understanding of the idea

Page 99

1        Mr. Villacci was trying to describe to you?
2            MS. LU:  Objection.  Calls for
3        speculation.
4    A.  I'm guessing he wanted to make the stuff I
5        sculpted modular so you can mix and match it
6        with the different products he makes.
7    Q.  Can you describe what you mean by "modular"?
8    A.  So you can have a set of wings and a blood
9        drop and the sword or whatever and you can
10       just match between them to make whatever
11       insignia you might want.
12   Q.  I think you said the blood angels insignia
13       was the wings with a drop of blood in it; is
14       that right?
15           MS. LU:  Objection.  Misstates
16       prior testimony.
17   A.  Yes.
18   Q.  And the Flesh Tearer icon was a saw blade
19       with a drop of blood in it; is that right?
20   A.  Yes.
21   Q.  If I understand the concept here, you're
22       saying instead of making those two icons in
23       total, let's make a pair of wings, a saw
24       blade and a drop of blood, and then we can

Page 100

1    make either insignia we want with both
2    pieces?
3            MS. LU:  Objection.  Misstates
4    prior testimony.  Argumentative.
5    A.  That's what I'm getting at.
6    Q.  I accurately described the concept?
7    A.  Yes.
8    Q.  Mr. Villacci says in that second paragraph,
9        first long paragraph, I think the third
10       sentence, "this would make it totally not IP
11       infringement".  Any idea what he meant
12       there?
13           MS. LU:  Objection.
14       Mischaracterizes the document.  That is not
15       the complete sentence.  The sentence also
16       reads "and sell the blood drops for a very
17       small amount to go with the pad so the
18       customers can simply glue it on".
19   A.  I'm guessing he means he doesn't want to
20       infringe on IP and then that --
21   Q.  Right -- go ahead.
22   A.  -- and doing that would prevent it.
23   Q.  What is your understanding why this concept
24       of modular pieces would, quote, make it

Page 101

1    totally not IP infringement?
2            MS. LU:  Objection.  Calls for
3    privilege.
4        To the extent that your understanding
5    is as a result of conversations with
6    counsel, I instruct you not to answer.  If
7    your understanding comes from anything else,
8    you may answer.
9    A.  I don't really know.
10   Q.  Did he ever tell you why?
11           MS. LU:  Objection.  Vague and
12       ambiguous.
13   A.  Tell me what?
14   Q.  Why this concept would make it totally not
15       IP infringement?
16   A.  No.
17   Q.  The next paragraph refers to a dark angel.
18       What is that?
19   A.  Another chapter of space marine.
20   Q.  What is the content of that icon?
21           MS. LU:  Objection.  Asked and
22       answered.
23   A.  I think it's either a sword or a robed
24       figure, an angelic robe figure.

26 (Pages 98 to 101)

Page 102

```
 1  Q.  What is the reference to the sword in that
 2      paragraph?  What symbol is that?
 3          MS. LU:  Objection.  Vague and
 4      ambiguous.
 5  A.  I think the sword is referring to catering
 6      to the dark angel players.
 7  Q.  You described an angelic robe figure.  I'm
 8      trying to understand the difference.
 9          MS. LU:  Objection.  Vague and
10      ambiguous.
11  A.  The dark angels have several different
12      insignias.  A robed figure is one of them
13      and so is the sword.
14  Q.  What is the insignia with the sword?
15          MS. LU:  Objection.  Vague and
16      ambiguous.
17  A.  It's usually a sword with wings or a broken
18      sword with wings.
19  Q.  And that insignia comes from the Games
20      Workshop materials, such as the codex?
21          MS. LU:  Objection.  Assumes facts
22      not in evidence.
23  A.  I don't know if it's from the codex, but
24      yeah.  It's from the Games Workshop
```

Page 103

```
 1      background.
 2  Q.  The last sentence Mr. Villacci writes in
 3      that e-mail is "I don't think the blade
 4      sticking out of the pad would go too well
 5      for most players, most players are very
 6      hard-core players who don't like deviating
 7      too much from the 40K norm, sorry!"  Do you
 8      see that?
 9  A.  Yes.
10  Q.  What was your understanding of this
11      sentence?
12          MS. LU:  Objection.  Calls for
13      speculation.
14  A.  I think he was trying to say my idea about
15      making the blade come out of the pad wasn't
16      a good one.
17  Q.  Why was your idea not a good one?  Sorry.
18      What was your idea?
19  A.  That the saw blade would stick out of the
20      pad rather than lie flat against it.
21  Q.  And that was for the Flesh Tearer icon that
22      you were sculpting?
23  A.  Correct.
24  Q.  So your idea was instead of having the saw
```

Page 104

```
 1      blade flat on the pad you'd have it sticking
 2      out from the pad?
 3          MS. LU:  Objection.  Misstates
 4      prior testimony.
 5  A.  Yes, basically.
 6  Q.  Why did Mr. Villacci tell you that was a bad
 7      idea?
 8          MS. LU:  Objection.  Calls for
 9      speculation.
10  A.  Because he said they don't like deviating
11      too much from the norm, I guess.  That's
12      what it says.
13  Q.  What does that mean to you, deviate from the
14      norm?
15          MS. LU:  Objection.  Calls for
16      speculation.
17  A.  I think he means it's more recognizable if
18      it's not sticking out.
19  Q.  So as the sculptor of this icon, what do you
20      take this instruction from Mr. Villacci to
21      mean?
22  A.  Don't have the blade sticking out of the
23      pad.
24  Q.  And instead do what?
```

Page 105

```
 1  A.  Do it the way that we ended up doing it.
 2  Q.  Which was what?
 3  A.  Lie it up flat against the pad.
 4  Q.  And that's because it's more recognizable to
 5      40K players as the, quote, 40K norm?
 6          MS. LU:  Objection.  Argumentative.
 7      Calls for speculation.
 8  A.  Yes.
 9  Q.  In other words, he didn't want you to change
10      the icon too much?
11          MS. LU:  Objection.  Calls for
12      speculation.  Argumentative.
13          MR. KEENER:  Let me rephrase.
14  Q.  You were instructed not to change the icon
15      too much; is that true?
16          MS. LU:  Objection.
17      Mischaracterizes the document and
18      argumentative.
19  A.  I was instructed not to have the blade stick
20      out.
21  Q.  Okay.  You can put that exhibit aside.
22      Let's go to Exhibit 26.  This is a
23      document labeled CHS 3597 to 3599.  Do you
24      have the exhibit?
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 106

1  A.  Yes.
2  Q.  Earlier in the deposition you referred to
3      commenting on a concept artwork piece.  Is
4      this the e-mail you're referring to?
5  A.  No, it is not.
6  Q.  What were you referring to?
7  A.  I was referring to a design for a mycetic
8      spore.
9  Q.  Would that be --
10         MS. LU:  Can you spell that for the
11     reporter.
12         THE WITNESS:  M-Y-C-E-T-I-C.
13 Q.  What is a mycetic pore?
14         MS. LU:  Are we done with this
15     exhibit, 26?
16         MR. KEENER:  No.
17 Q.  What is a mycetic spore?
18 A.  It is a spore that holds Tyranid's inside
19     it.
20 Q.  Is that specific to the Warhammer 40K
21     universe?
22 A.  Yes.
23 Q.  Back to Exhibit 26, this is an e-mail from
24     Mr. Villacci to various people, one of them

Page 107

1      being you; is that correct?
2  A.  Uh-hum.
3  Q.  You said yes?
4  A.  Yes.
5  Q.  I notice the e-mail address is
6      Nvillacci@Verizon.net and the previous
7      e-mail was from the Chapterhouse e-mail.  Do
8      you see that?
9          MS. LU:  Objection.  I think you're
10     referring to an exhibit the witness no
11     longer has.
12 Q.  You've seen many e-mails using the
13     Chapterhouse e-mail, correct?
14 A.  Yes.
15 Q.  You said those were sent from Mr. Villacci?
16 A.  Yes.
17 Q.  I know this one is not from a
18     Chapterhouse.com e-mail address but
19     NVillacci@Verizon.net.  Do you see that?
20 A.  Yes.
21 Q.  Do you understand that to also be
22     Mr. Villacci's e-mail address?
23 A.  Yes.
24 Q.  When you searched for documents in response

Page 108

1      to the subpoena, did you search for any
2      documents from that e-mail address, the
3      Verizon.net e-mail address?
4          MS. LU:  Objection to the extent
5      that it calls for privilege.
6          I instruct you not to answer with
7      respect to anything you were instructed or
8      told to do by counsel.  Beyond that, you may
9      answer.
10 A.  I did not.
11 Q.  Why not?
12 A.  I'd forgotten that he had two e-mail
13     addresses.
14 Q.  Are your e-mails still archived or did you
15     delete some of them?
16 A.  They are.
17 Q.  Are you able to go back and search for this
18     e-mail address?
19 A.  I can do that for you.
20         MS. LU:  Actually, I'm going to
21     interrupt at this point.  The witness'
22     e-mail addresses were searched.  I'm not
23     going to allow you to bully the witness into
24     researching his e-mail.

Page 109

1          MR. KEENER:  He just said he never
2      searched for this e-mail address.
3          MS. LU:  He said he personally did
4      not search for that specific -- he did not
5      personally type that specific e-mail into
6      the search box.
7          MR. KEENER:  And he said he did
8      personally search for e-mails in his
9      production.
10         MS. LU:  He did search.
11         MR. KEENER:  Right.  So I'm asking
12     him to search for something he didn't search
13     for.
14         MS. LU:  The witness does not have
15     an obligation to search his e-mail for items
16     that have already been searched, when his
17     e-mail has already been searched on his
18     behalf.
19         MR. KEENER:  You're representing
20     that someone, maybe not him, has searched
21     all the e-mails, including his archive, for
22     any e-mails from NVillacci from Verizon.net?
23         MS. LU:  I'm saying the witness
24     does not have an obligation to research his

28  (Pages 106 to 109)

Page 110

1    e-mail.
2         MR. KEENER: I'm asking you, have
3    they been searched for this e-mail address?
4    He said he hadn't searched.
5         MS. LU: I am not revealing my work
6    product to you. I am telling you that the
7    witness does not have an obligation to
8    research his e-mail.
9         MR. KEENER: You aren't going to
10   tell me his e-mails have been searched for
11   this e-mail when he said he has not searched
12   for this e-mail address?
13        MS. LU: I'm not revealing work
14   product to you.
15        MR. KEENER: Are you, as an
16   attorney, willing to research his e-mails
17   for this e-mail address?
18        MS. LU: I am telling you that
19   there is no obligation on the part of
20   anybody to research his e-mail.
21        MR. KEENER: You agree this is a
22   responsive document?
23        MS. LU: I'm not sure that it is.
24        MR. KEENER: All communications

Page 111

1    from Chapterhouse or Nick Villacci?
2         MS. LU: I believe that we served
3    objections to that subpoena.
4    Q. Mr. Traina, you see the other people on the
5    bcc list in this e-mail?
6    A. Yes.
7    Q. I think you already testified a little bit
8    about Tomas Fiertek. That's the Swedish
9    person you referred to earlier? Is that
10   right?
11   A. Correct.
12   Q. Do you know who or what Pedro Navarro Design
13   is?
14   A. No.
15   Q. Do you know who Michael Sanford is?
16   A. No.
17   Q. Do you know if you had any personal
18   communications with Mr. Fiertek?
19   A. I don't remember.
20   Q. Do you know if you had any personal
21   communications with Pedro Navarro design?
22   A. I don't believe so.
23   Q. What about any communications between you
24   and Michael Sanford?

Page 112

1    A. I don't think so.
2    Q. Do you know if you communicated with anyone
3    related to Chapterhouse other than
4    Mr. Villacci?
5    A. Maybe Tomas, but I don't think so.
6    Q. Did you search your e-mails for any
7    correspondence between you and Tomas
8    Fiertek?
9    A. No, I didn't.
10   Q. Why not?
11   A. Because if I would have contacted him, it
12   would have just been to see if my pieces
13   that I sent to him arrived in tact.
14   Q. Would you still have those communications?
15   A. I don't know.
16   Q. The subject of the e-mail, "Eldar Warlock
17   Jetbike Rider Concept art"?
18   A. Yes.
19   Q. What's Eldar?
20   A. Eldar is another race in the Warhammer 40K
21   universe.
22   Q. Such as Tyranid? That's a specific Workshop
23   term in the 40K universe?
24        MS. LU: Objection. Calls for

Page 113

1    speculation. Argumentative.
2    A. Yes.
3    Q. And what is an Eldar warlock?
4    A. It's a unit in the Eldar army.
5    Q. So a 40K person would understand that to be
6    a very specific unit in this army?
7    A. Yes.
8    Q. And what's a jetbike?
9    A. It's a bike that floats.
10   Q. So an Eldar warlock jetbike, is that
11   something specific in the Games Workshop 40K
12   universe?
13        MS. LU: Objection. Speculation.
14   Argumentative.
15   A. It's in the rules but not as a model.
16   Q. What do you mean by that?
17   A. I mean that GW never made -- to my
18   knowledge, I don't think they made a jetbike
19   warlock.
20   Q. As an actual model you mean?
21   A. Correct.
22   Q. Do you know if they had illustrations of it?
23   A. I don't know.
24   Q. Looking at page two, do you know what these

Page 114

1 drawings are supposed to represent?
2 A. They look like the head gear for an Eldar
3 character.
4 Q. What makes you say it looks like the head
5 gear for an Eldar character?
6 A. They kind of have like a sleek look to them.
7 Q. As a 40K hobbyist over the last 15 years,
8 looking at this makes you think it's a Eldar
9 character or style?
10 MS. LU: Objection. Argumentative.
11 A. Yes.
12 Q. It says "Revliss is sculpting this one,
13 comments". You see that?
14 A. Uh-hum.
15 Q. Is that yes?
16 A. Yes.
17 Q. Do you know who or what Revliss is?
18 A. I'm guessing it's the handle of one of those
19 people in the bcc list, but I don't know.
20 Q. Do you know if you had any comments to this
21 design concept?
22 A. You can probably tell I don't know too much
23 about Eldar so I didn't have any comments.
24 Q. But you knew enough to recognize that as an

Page 115

1 Eldar character?
2 A. Yes.
3 Q. We're done with that exhibit.
4 Let's go to Exhibit 27. It's a
5 document labeled CHS 6266 through 6271. Do
6 you have it?
7 A. Yes.
8 Q. Let's start at the very last e-mail on page
9 6270. This is an e-mail from you to
10 Chapterhouse December 21, 2009?
11 A. Yes.
12 Q. Your e-mail refers to an angel icon. What
13 is that?
14 A. I think those were probably referring to the
15 modular pieces we had talked about earlier.
16 Q. Okay. That would be the blood angel and
17 dark angel or one of those?
18 MS. LU: Objection. Argumentative.
19 Compound.
20 A. Both.
21 Q. So what did you make that you sent?
22 A. I made a sword and a blood drop and a left
23 and right wing.
24 Q. Using those pieces, I think you said you

Page 116

1 could make either a blood angel or a dark
2 angel icon?
3 MS. LU: Objection. Misstates
4 prior testimony.
5 A. Yeah. That was the idea.
6 Q. Then you say something about working on a
7 Flesh Tearer icon. "The icon is basically a
8 saw blade the size of a quarter, with two
9 crossed chainsword scimitars on it".
10 A. Right.
11 Q. Can you describe anymore what you were
12 working on?
13 A. It was supposed to be a vehicle icon that a
14 Flesh Tearer player could use to convert his
15 vehicle.
16 Q. So a person playing a space marine could put
17 this vehicle icon on it and people would
18 recognize it as a Flesh Tearer icon?
19 MS. LU: Objection. Calls for
20 speculation. Lack of personal knowledge.
21 A. Yeah. That's pretty much the gist of it.
22 Q. Can you explain to me what this icon looked
23 like?
24 A. It was, like I said, about the size of a

Page 117

1 quarter. It had serrations and then had
2 crossed scimitars with a chain piece on the
3 cutting edge on top.
4 Q. And you mentioned before that the Flesh
5 Tearer icons are a saw blade with the drop
6 of blood on it; is that correct?
7 A. Correct.
8 Q. Where did the concept of this icon being a
9 saw blade with two crossed chainsword
10 scimitars on it?
11 A. I think I remember reading about that online
12 about that being another insignia of the
13 flesh tearers.
14 Q. So, according to the 40K universe, that's
15 another insignia that would be recognizable
16 as flesh tearers?
17 MS. LU: Objection. Calls for
18 speculation.
19 A. Less recognizable, but yes.
20 Q. But still from something in the Games
21 Workshop material books history?
22 A. Yes. I think so.
23 Q. If you go up one e-mail to the one from
24 Mr. Villacci to you, the second paragraph

30 (Pages 114 to 117)

Page 118

1    talks about "is the blood drop you sent for
2    the angel icon the right size for the Tearer
3    icon".  You see that?
4  A.  Yes.
5  Q.  What's your understanding of what the right
6    size means?
7  A.  I think he wanted to know if the blood drop
8    would fit onto the quarter size saw blade.
9  Q.  Was it your intention for the blood drop to
10    be the same size in relation to the saw
11    blade as 40K icon?
12        MS. LU:  Objection.  Argumentative.
13  A.  I don't remember.
14  Q.  Do you know if you made any conscious
15    attempt to make it different?
16  A.  Different than what?
17  Q.  Than the ratio, the size ratio in the
18    Warhammer 40K icons.
19        MS. LU:  Objection.  Vague and
20    ambiguous.
21  A.  Well, I assume that it wouldn't -- it would
22    be different by default since the GW doesn't
23    make vehicle icons for flesh tearers.
24  Q.  My question is you've seen the icon in the

Page 119

1    book for the flesh tearers?
2  A.  Right.
3  Q.  The saw blade with the drop of blood on it,
4    right?
5  A.  Right.
6  Q.  And there's an aspect size ratio between the
7    blood drop and the saw blade?
8  A.  Right.
9  Q.  Did you make any attempt when you were
10    making the vehicle icon to vary that ratio
11    and make the drop of blood either much
12    smaller or much bigger than the saw blade?
13        MS. LU:  Objection.  Compound.
14  A.  I don't remember.
15  Q.  You don't recall as you're sitting here any
16    conscious attempt to make a difference in
17    the size ratio?
18        MS. LU:  Objection.  Misstates
19    prior testimony.
20  A.  I don't remember doing that.  But the saw
21    blade it sits on was made different.
22  Q.  What was different about the saw blade?
23  A.  It had rivets in it that made it look like
24    it was crafted out of stone.

Page 120

1  Q.  Anything else?
2  A.  Not that I can think of.
3  Q.  Do you know if it had the same number of
4    teeth?
5  A.  I don't think I counted.
6  Q.  If you turn one page back, or forward
7    depending on how you look at it, to 6269.
8  A.  Yes.
9  Q.  This is an e-mail from you to Mr. Villacci.
10    In the middle paragraph, you state "I have
11    an idea for space world which might be
12    cool", and it goes on.
13  A.  Uh-hum.
14  Q.  Sorry.  Yes?
15  A.  Yes.
16  Q.  Do you know if you ever made this, sculpted
17    this piece?
18  A.  No.  He never did.
19  Q.  Sorry.  You said, "he never did."  My
20    question is did you ever end up sculpting
21    this piece?
22  A.  Yes.  I have them.
23  Q.  You did sculpt this piece?
24  A.  Yes.

Page 121

1  Q.  And what did you do with it?
2  A.  I used it in my friend's space wolves army
3    that we talked about previously.
4  Q.  At the bottom of your e-mail, you say "also,
5    let me know when FT pads are for sale.  I
6    want to see them".
7  A.  Yup.
8  Q.  What do you mean by "FT pads"?
9  A.  Flesh Tearer.
10  Q.  And "pads", you mean shoulder pads for space
11    marine in power armor?
12  A.  Correct.
13  Q.  Then, if you go back one more e-mail, it's a
14    long e-mail that spans from the bottom of
15    6267 all the way through 6269.  Do you see
16    that e-mail from Mr. Villacci to you?
17  A.  Yes.
18  Q.  Starts out "it got here today"?
19  A.  Yes.  Right.
20  Q.  Do you see the pictures in that e-mail on
21    page 6268?
22  A.  I do.
23  Q.  What do you recognize those pictures to be
24    of?

31 (Pages 118 to 121)

Page 122

1  A.  Looks like the blood angel and the dark
2     angel icons.
3  Q.  According to the Games Workshop 40K
4     materials?
5  A.  Correct.
6  Q.  Do you know where he got those icons, those
7     pictures?
8  A.  I don't know.
9        MS. LU:  Calls for speculation.
10 Q.  Right under the picture, that paragraph
11    refers to a Rhino.  What's a Rhino?
12       MS. LU:  Objection.  Calls for
13    speculation.
14 A.  Rhino is another space marine tank.
15 Q.  We're not talking about an animal?  We're
16    talking about a specific vehicle that space
17    marines use in the 40K universe?
18 A.  Correct.
19 Q.  If you read this e-mail, it refers to making
20    vehicle icons in various sizes.  Do you know
21    what he's talking about?
22       MS. LU:  Objection.  Calls for
23    speculation.
24 A.  Yeah.  I have a pretty good idea.

Page 123

1  Q.  Can you explain that?
2  A.  Land raiders and the Rhinos and drop pods
3     are different size vehicles, and so he
4     wanted to make sure that the icons that we
5     made fit on different size vehicles.
6  Q.  What are the three sizes of icons you were
7     asked to make?
8        MS. LU:  Objection.  Assumes facts
9     not in evidence.
10 A.  I wasn't given specific dimensions, but it
11    was big, medium, small.
12 Q.  If you go back one more e-mail on 6267, this
13    is your response to Mr. Villacci.  It says
14    "glad its safe".  You see that?
15 A.  Yes.
16 Q.  In about the middle of there, you talk about
17    the Drop Pod I see and the Rhino I see and
18    something referred to as "LR".  What is LR?
19 A.  Stands for Land Raider.
20 Q.  I think you talked about that before, some
21    specific tank type vehicle a space marine
22    would use in the 40K universe?
23 A.  Correct.
24 Q.  You also use the term "FT" in that e-mail.

Page 124

1     What did that refer to?
2  A.  Flesh Tearer.
3  Q.  Let's go back to the next e-mail, which is
4     on page 6266.  It's from Mr. Villacci to you
5     starting with "we have some templates".
6  A.  Yes.
7  Q.  "We have some templates we can use for
8     sizes.  You can even sculpt on them if you
9     want and we can cast as a whole door".  Do
10    you know what he's referring to?
11       MS. LU:  Objection.  Calls for
12    speculation.
13 A.  I think he's referring to these -- he sent
14    me templates that he made that would, that I
15    could sculpt the vehicle icons on to make
16    sure that they would fit the vehicles.
17 Q.  When you say he sent you templates, what did
18    he send you?
19 A.  They were like resin casts that he -- he had
20    somebody make for this purpose.
21 Q.  A physical piece of resin that you could use
22    for your sculpting?
23 A.  Right.
24 Q.  It also refers to Drop Pod panels.  What's a

Page 125

1     Drop Pod?
2  A.  Space marine vehicle.
3  Q.  Again, that's specific to the Games Workshop
4     universe?
5  A.  Yes.
6  Q.  The second to last paragraph, it says "if
7     possible I would like Dreadnought and Bikes
8     Icons, but they may need a separate size,
9     they may be able to fit on number three".
10    You see that?
11 A.  Yes.
12 Q.  What icons are being referred to here?
13       MS. LU:  Objection.  Calls for
14    speculation.
15 A.  I think he was referring to the smallest
16    size vehicle icon.
17 Q.  For any particular race or chapter?
18       MS. LU:  Objection.  Vague and
19    ambiguous.
20 A.  Can you repeat the question.
21 Q.  Sure.  We talked about lots of different
22    icons for different races and different
23    chapters of space marines and so forth.  I'm
24    trying to figure out are we talking about

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 126

1    any particular icons here.
2  A. I'm not sure.
3  Q. I think you can put that exhibit aside.
4        When we started the deposition, you
5    talked about four products that you worked
6    on, whether or not they ultimately were sold
7    for Chapterhouse or not.  Do you remember
8    that?
9  A. Yes.
10 Q. The first one was a power armor shoulder
11   pad?
12 A. Correct.
13 Q. Was that a particular icon that you were
14   referring to on the shoulder pad?
15 A. I did the Flesh Tearer pads for them.
16 Q. You sculpted the Flesh Tearer shoulder pads
17   for space marines?
18 A. Yes.
19 Q. The second one you mentioned was a
20   terminator pad.  What did you mean by that?
21 A. Flesh Tearer icon for the terminator armor.
22 Q. And the third you mentioned was a vehicle
23   icon.  What vehicle icon did you work on?
24 A. There were two, and one of them got made and

Page 127

1    one of them did not.  The set that did get
2    made was the flesh tearers and the set that
3    did not get made were the blood angel and
4    dark angel ones.
5  Q. And what did the Flesh Tearer one look like?
6        MS. LU:  Objection.  Vague and
7    ambiguous.
8  A. Like I was explaining before, it had like a
9    saw blade with stone rivulets in it with a
10   blood drop on top, three different sizes of
11   it.
12 Q. And the one that didn't get made, could you
13   repeat what that was for?
14 A. That was for the blood angels and the dark
15   angels.
16 Q. What did those icons look like?
17 A. They had the wings with -- just two wings
18   with a blood drop in the middle or two wings
19   with a sword in the middle.
20 Q. Do you have any understanding why those two
21   did not get made?
22 A. I was told that they got, they never arrived
23   to Sweden.
24 Q. The Flesh Tearer armor pad, what did that

Page 128

1    look like?
2        MS. LU:  Objection.  Vague and
3    ambiguous.
4  A. It was a saw blade with, I don't remember
5    how many teeth, with a blood drop on top, or
6    it came with a blood drop.
7  Q. Was that the saw that lay flat on the
8    shoulder pad?
9  A. Correct.
10 Q. And can you describe the terminator Flesh
11   Tearer shoulder pad that you made?
12 A. If memory serves, it had another saw blade
13   with the rivulets in it and then it had
14   maybe a facetted gem on top with some more
15   facetted gems on it.
16 Q. No drop of blood?
17 A. One of the gems was reminiscent of a blood
18   drop.
19 Q. You stated that you stopped working as a
20   freelancer for Chapterhouse sometime in
21   2010; is that correct?
22 A. I think so, yes.
23 Q. Why did you stop working for Chapterhouse?
24 A. Because I was frustrated that my pieces got

Page 129

1    lost in the mail.
2  Q. Why did that frustration lead you to stop
3    working for Chapterhouse?
4  A. Because I wasn't really making any money
5    doing it and I really wasn't making any
6    money working for free, so I stopped.
7  Q. So you were not paid for that -- were you
8    paid for the pieces that got lost in the
9    mail?
10 A. No.
11 Q. Was there any formal parting of the ways?
12       MS. LU:  Objection.  Vague and
13   ambiguous.
14 A. I don't know.
15 Q. Do you know how you communicated that you
16   wanted to cease the relationship?
17 A. Probably e-mailed him, but I'm not sure.
18 Q. Do you know if he responded to that e-mail?
19 A. I don't remember.
20 Q. After expressing your interest in ceasing
21   work, do you remember any communications
22   between you and Mr. Villacci prior to the
23   time you talked to him about the subpoena?
24       MS. LU:  Objection.

33 (Pages 126 to 129)

Page 130

1    Mischaracterizes the testimony.
2  A. Like I said, when I found out about the
3    lawsuit, I sent him a good luck e-mail, but
4    other than that, I don't think so.
5  Q. When you first found out about the lawsuit,
6    were you ever asked by Mr. Villacci or
7    anyone else to save any documents?
8         MS. LU: Objection. Calls for
9    privilege.
10        To the extent that your answer would
11   include communications with counsel, I
12   instruct you not to answer. Other than
13   that, you may answer.
14 A. No.
15 Q. When you found out about the lawsuit, did
16   you have any attorneys?
17 A. No.
18 Q. So when you answered no, that no one ever
19   told you to save any documents at that time,
20   you're not excluding anything you may have
21   heard from an attorney?
22        MS. LU: Objection. Vague and
23   ambiguous.
24 A. I think what you're saying is correct if I

Page 131

1    understand you right.
2  Q. Let's make sure I'm clear. I want to know
3    about the time frame when you first learned
4    about the lawsuit and reached out to
5    Mr. Villacci. Do you have that time frame
6    in your mind?
7  A. Yes.
8  Q. Did you have any attorney during that time
9    frame?
10 A. No.
11 Q. So did anyone ask you to save documents
12   during that time frame?
13 A. No.
14        MS. LU: Objection. Vague and
15   ambiguous.
16        MR. KEENER: Mr. Traina, thank you
17   for your time. That's all the questions I
18   have for you.
19        Do you have any questions?
20        MS. LU: I do not.
21        (Whereupon, the deposition was
22   concluded at 5:10 p.m.)
23
24

Page 132

1  DEPONENT'S ERRATA SHEET
2  AND SIGNATURE INSTRUCTIONS
3
4       The original of the Errata Sheet has
5  been delivered to Kathleen Lu, Esq.
6       When the Errata Sheet has been
7  completed by the deponent and signed, a copy
8  thereof should be delivered to each party of
9  record and the ORIGINAL delivered to Jason
10 Keener, Esq. to whom the original deposition
11 transcript was delivered.
12
13      INSTRUCTIONS TO DEPONENT
14
15      After reading this volume of your
16 deposition, indicate any corrections or
   changes to your testimony and the reasons
17 therefor on the Errata Sheet supplied to you
   and sign it. DO NOT make marks or notations
   on the transcript volume itself.
18
19 REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20 COMPLETED AND SIGNED ERRATA SHEET WHEN
21 RECEIVED.
22
24

Page 133

1  ATTACH TO THE DEPOSITION OF WYATT TRAINA
2  CASE: Games Workshop vs. Chapterhouse Studios
3       ERRATA SHEET
4  INSTRUCTIONS: After reading the transcript of your deposition, note any change or correction to your testimony and the reason
5  therefor on this sheet. DO NOT make any marks or notations on the transcript volume itself. Sign and date this errata sheet
6  (before a Notary Public, if required). Refer to Page 132 of the transcript for errata sheet distribution instructions.
8  PAGE LINE
9       CHANGE:
        REASON:
10      CHANGE:
        REASON:
11      CHANGE:
        REASON:
12      CHANGE:
        REASON:
13      CHANGE:
        REASON:
14      CHANGE:
        REASON:
15      CHANGE:
        REASON:
16      CHANGE:
        REASON:
17      CHANGE:
        REASON:
18      CHANGE:
        REASON:
19      CHANGE:
        REASON:
20 I have read the foregoing transcript of my deposition and except for any
21 corrections or changes noted above, I hereby subscribe to the transcript as an accurate
22 record of the statements made by me.
23
24      WYATT TRAINA      (DATE)

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Page 134

1    COMMONWEALTH OF MASSACHUSETTS
     MIDDLESEX, ss.
2
3     I, Kristin Kelley, a Certified Shorthand
4    Reporter and Notary Public duly commissioned
5    and qualified within and for the
6    Commonwealth of Massachusetts, do hereby
7    certify:
8     That WYATT TRAINA, the witness whose
9    deposition is hereinbefore set forth, was
10   duly sworn by me, and that such deposition
11   is a true record of the testimony given by
12   the witness to the best of my skill,
13   knowledge, and ability.
14    IN WITNESS WHEREOF, I have hereunto set my
15   hand and my affixed notarial seal this 23rd
16   day of March, 2012.
17
18
19           Kristin Kelley
             Notary Public
20
21
     My Commission expires:
22   November 14, 2014
23
24