IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GAMES WORKSHOP LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES<br><br>Defendants. | Civil Action No. 1:10-cv-8103<br><br>Hon. Matthew F. Kennelly |

**GAMES WORKSHOP MOTION FOR A DIRECTED VERDICT**

Games Workshop respectfully moves for a directed verdict on the following grounds.

1. <u>Access, Copying and Independent Creation</u>  Mr. Villacci conceded that he had identified no product sold by Chapterhouse that was not directly inspired by a prior Games Workshop work.

> Q. But you haven't identified any such example of something totally independently created by you in your testimony today?
> A. Not my testimony today, no. (Tr. 1037: 8-10.)

For precisely this reason, the vast majority of Chapterhouse's products are either named after Games Workshop's prior works or Games Workshop's prior works are referenced in the product descriptions on the Chapterhouse website.  If not for that direct linkage, there would be no reason for Chapterhouse to identify its products using Games Workshop's names. Although Chapterhouse raised questions about one image of the Games Workshop Power Fist (product 27); one image of the Ymgarl heads (product 43), and one image of a Servo harness (product 113), in each instance at least one prior GW work was also cited, and the fact that Chapterhouse used Games Workshop's names to identify these products leaves no doubt that they were not independently created.  Mr. Merrett also testified that the figure associated with the Servo Harness dated to the 1990's and that there were additional descriptions in the GW Tyranid Codex identifying the salient

1

features of the Ymgarl creature (including their name and backstory as Tyranid creatures, and their "tentacled maws"). Here again, the very fact that Chapterhouse calls its product an Ymgarl head means it must have been directly inspired by Games Workshop. *Paramount Pictures Corp. v. Carol Pub. Group*, 11 F.Supp.2d 329, 332 (S.D.N.Y. 1998) ("As an initial matter, it would be absurd to suggest that Ramer has not copied form the Star Trek Properties. His book contains quotations taken directly from these works, and the Middle Portion is devoted to telling a large portion of the Star Trek story.") Hence the only evidence in the record is that Chapterhouse had access to and copied Games Workshop copyrights. That would still leave the issue of infringement.

    2. <u>Substantial similarity</u> – All of the shoulder pad designs are built upon a literal and slavish copy of the iconic shoulder pad design, right down to the indents on the back. There was testimony that for some of its first products, Chapterhouse used actual Games Workshop pads and, and that the subsequent pads were created using the template created by Mr. Nagy that is an essentially exact copy of the basic Games Workshop shoulder pad design. Simply by adding surface details, Chapterhouse can not overcome a finding that it has copied protected expression from the work. This follows directly from the Court's prior finding that the shoulder pad design is itself copyrightable. As has often been noted, so long as there has been copying of protected expression, no accused infringer can excuse the claimed wrong by showing how much of his work was not copied. *Atari v. North American Phillips Consumer Elec. Corp.*, 672 F.2d 607, 619 (7th Cir 1982) (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir.), *cert. denied,* 298 U.S. 669 (1936)). Moreover, by virtue of Chapterhouse's trademark defense of nominative fair use, under which Chapterhouse concedes that it must use GW's character names to identify its products, Chapterhouse concedes that each of these products has no meaning in the world and no effective means of identification other than as a version of the GW original. As a result, all of the following

2

products copy protected expression and should be deemed infringing as a matter of law. 2, 4 - 7, 10 – 15, 17 – 20, 23, 24, 46 – 52; 54-62, 64, 65, 68, 69, 73, 74, 75, 78, 80, 98, 146-157, and 163.

3. <u>Scenes a faire</u>. As shown below, Chapterhouse's scenes a faire defense should be dismissed as a matter of law, and there being no other basis for Dr. Grindley's comparison of similarities or dissimilarities between Games Workshop's works and Chapterhouse's products, his entire testimony should be stricken.

Mr. Villacci admitted at trial there were limitless ways he could have designed the Dark Elf figure (Product No. 160). Dr. Grindley likewise repeatedly conceded that there were virtually limitless combinations of features possible and that he was not opining that any specific combinations were common in science fiction (much less in war gaming miniatures). Moreover, Dr. Grindley repeatedly admitted he had identified in his testimony no features of Games Workshop's originals that are "indispensable or standard in the treatment of a particular subject." *Atari v. North American Phillips Consumer Elec. Corp.*, 672 F.2d 607, 616 (7th Cir 1982). He did not even identify a relevant subject, as he conceded his opinions had nothing to do with miniature designs or tabletop wargaming. In every instance, he conceded that he did no more than identify one or two (or at most three) images that he thought showed the feature was common, without providing any methodology to assure any basis for such an opinion, because he did not save or reproduce any of the hundreds or thousands of other images he reviewed that would have permitted an informed assessment of the issue. In several instances, he produced no third-party images at all to show the feature was standard. Moreover, he admitted that, to genuinely show any given element to be truly standard or essential as a percentage of figures actually used in wargaming or even science fiction, one would have to do essentially PhD type research for each such element. His own testimony fell well short of this standard – which is particularly telling for someone whose only basis to qualify as an expert is his claimed academic credentials which he did not remotely seek to meet.

His testimony itself is also internally inconsistent, as his expressed opinion how common was a feature such as a large shoulder pads was contradicted by other futuristic shoulder "protections" he himself found on characters such as GI Joe, other covers of Heinlein books, and Analog Magazine. His ipse dixit testimony that some features are common is baseless, reveals his bias, and can only confuse the jury. Not only is this testimony without foundation, his report itself is not in evidence, as Chapterhouse never identified any actual exhibits, but only the demonstrative exhibit containing many images the Court had already deemed inadmissible.

Essentially, Dr. Grindley's methodology was that if he could find one or two images similar in some way to Games Workshop's or Chapterhouse's works, the subject material was automatically standard and effectively in the public domain. From that, he sought to imply that the entire subject matter is in the public domain, free to be copied. Moreover, his methodology further was to assume it is fair to break down Games Workshop's works into constituent elements without ever looking at the overall appearance of the Games Workshop works. By analogy, it would be as if one were to look at the image of Spiderman and say that so long as one could find one image of a spider, that could be subtracted out of the Marvel Comics copyrighted figure. So too, finding one instance of webbing or the colors red or blue would permit breaking the overall figure into constituent elements all of which could be found in the public domain. This is clearly an incorrect application of copyright law, and is both misleading to the jury and without foundation as there is no genuine evidence that any of the constituent elements here are truly standard.

The evidence also demonstrates there are innumerable ways to design a shoulder pad for a futuristic warrior without using the original and iconic Space marine shoulder pad design. Apart from the wide range of shoulder pad designs shown by Dr. Grindley, The Horus Heresy (PX 609) itself contains dozens of shoulder pad designs radically different from anything shown by Chapterhouse.

4

At any rate, there was no testimony whatsoever by any Chapterhouse witness that it was constrained in any way by limited design choices or that they even tried. Hence, there is no factual predicate for the claimed scenes a faire defense.

Finally, because the only premise for Dr. Grindley's comparison of similarities or dissimilarities between Games Workshop's works and Chapterhouse's products was his supposed identification of standard and indispensible features the materials had in common, his entire testimony should be stricken. Lacking this foundation to testify, his views as an English professor with no prior experience in tabletop miniatures is no more relevant to making product comparisons than that of any random individual.

3(a) In just the same way that Dr. Grindley affirmatively admitted there were no known limits on the numbers of ways one could design shoulder pads or other products and that there was no basis to find any of the design elements at issue standard or indispensible in any relevant field, Chapterhouse's other expert, Mr. Brewster conceded that, for each of the elements he identified as having been used previously (such as chevrons, Roman numeral, arrows or skulls), there was nothing standard in the usage of such symbols that would compel Chapterhouse to use those symbols, much less the specific combinations of elements Games Workshop used. There is, thus, no basis to conclude any of the images he identified are relevant to any issue in the case and do not begin to establish that anything about the specific designs Games Workshop is claiming in this case are in any respect standard or indispensible.

4. <u>Copyright fair use</u>. Chapterhouse, in its case in chief, identified no transformative purpose for any of the products and identified no other fair use purpose for any of the works. Moreover, the uncontradicted evidence is that the products are all purely commercial and that its only criteria for creating new products is how close to come to the GW original without making exact copies while still being able to make money. Mr. Villacci himself publicly admitted "…we

5

have to walk a fine line here. It is hard to predict what people will buy when it comes to existing chapters, how close to the original Iron Hands icon do we have to stay to make some money off it?" (PX744.) Chapterhouse has not identified at trial any non-commercial basis for its copying. To be transformative, a work must add something new for a different function, purpose or character than the original. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).[1] Laying aside whether Chapterhouse's copying constitutes an infringement, the trial evidence also confirms it makes and sells its copies for exactly the same purposes for which Games Workshop creates and produces miniatures: so that they can be used by fans of Warhammer 40,000 (either for collection or to play the game.) Moreover, neither Chapterhouse not its expert identified anything factual in any of the Games Workshop works. Dr. Grindley did not even identify anything common, as he merely presented testimony about the existence of a small number (typically only one or two and sometimes none) of prior works having one or more features in common. In short, Chapterhouse has presented no evidence to support its affirmative defense of copyright fair use. Regarding the amount of Games Workshop's works that Chapterhouse has copied, and the significance of the portion copied in relation to Games Workshop's copyrighted work as a whole, the evidence confirms that Chapterhouse takes sufficient amount of protected expression to make its works *immediately recognizable* to players of Warhammer 40,000. Because the products are directly competitive, Chapterhouse's use directly affects the value of or the potential market for Games Workshop's work. Moreover, "The burden of proof is on the copier because fair use is an

---

[1] The actual question presented in *Campbell* (truncated by Chapterhouse) was:

> …whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.
>
> *Campbell*, 510 U.S. at 579. Here the accused works both serve to supersede the originals and serve the exact same purpose as the originals.

6

affirmative defense." *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003), citing *Campbell*, *supra*, 510 U.S. at 590. Chapterhouse has presented no evidence to carry its burden.

5. <u>Trademark Rights</u>: <u>Absence of evidence of third party use to prove weakness or genericness of any Games Workshop trademarks</u>. Chapterhouse's witnesses repeatedly made references to third uses of the names such as Space Marine®, Eldar ®, Jetbike and others. However, there was no evidence that any such term has actually been used in commerce in the United States at any relevant time. Hence, judgment should be entered that there is no evidence to challenge Games Workshop's exclusive use of the terms. Mr. Villacci also admitted that one of the reasons he used the terms was precisely that they were already associated with Games Workshop at the time he commenced use.

Regarding the mark Space Marine, the contention the mark is generic is entirely without basis in the record. The starting premise is that the mark SPACE MARINE is registered (Reg. No. 1,922,180) and the registration is incontestable under 15 U.S.C. § 1115(b).[2] Hence, not only is the mark deemed *conclusively* to be protectable and not subject to attack on grounds of descriptiveness, *Park 'N Fly v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985), but the burden to challenge the validity of the mark (on one of few identified statutory grounds) rests on defendant. There is in the record zero evidence the mark is either descriptive or generic. The mark ELDAR is also incontestably registered (No. 1944847), hence making it entirely irrelevant that there may have been one or may uses of that word somewhere in The Lord of the Rings. Nor has Chapterhouse asserted a counterclaim to cancel either Games Workshop trademark, so the issue still is not in the case.

---

[2] The statutory provision states: "To the extent that the right to use the registered mark has become incontestable under section 15, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce."

7

"A generic term is one that does not distinguish the goods of one producer from the goods of others. Instead, it is one that either by definition or through common use 'has come to be understood as referring to the genus of which the particular product is a species.'" *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 373-74 (1st Cir. 1980) (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9* (2d Cir. 1976).). "The critical issue in determining genericness is whether members of the relevant public primarily use or understand the designation sought to be registered or that is already registered to refer to the genus or category of goods in question." *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 989-90, (Fed. Cir. 1986). Here there is no evidence whatsoever that the name Space Marine has ever been used in commerce to identify miniatures (other than Games Workshop's) or to identify any other relevant type of product. The record contains nothing more than unsubstantiated suggestions there may have been references to space marines in fiction (no actual book having actually been identified much less produced in evidence) and as the title of one obscure booklet or game published in 1980. No actual sales data about the 1980 publication has been provided.

      6. <u>Trademark Fair Use</u>. Chapterhouse's fair use defense should be dismissed because it proceeds from a mistaken premise that one can make an unlawful copy of plaintiff's copyrighted work and the bootstrap an argument that referring to that distinctive thing using plaintiff's trademarks is the only way it can be identified. In explaining the general elements of trademark fair use, *R. J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 2001 U.S. Dist. LEXIS 8896 at * 16 (N.D.Ill. June 29, 2001), quoted *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 546 (5th Cir. 1998)). *Pebble Beach* further noted that the fair use defense is limited to circumstances where "one who has lawfully copied another's product can tell the public what he has copied". By contrast, here, defendant has not lawfully copied. As such, its use of Games Workshop's names and marks is simply a reference to its own unauthorized and unlawful copying, not a fair reference to Games

8

Workshop's works. Such use is, by definition, unfair and Games Workshop is aware of no precedent applying the trademark fair use defense so as to allow a defendant to facilitate its copyright infringement or other unlawful conduct.

Dated: June 11, 2013

Respectfully submitted,
/s/ Jason J. Keener

Jason J. Keener (Ill. Bar No. 6280337)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: 312.832.4500
Facsimile: 312.832.4700
Email: jkeener@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

*Attorneys for Plaintiff*
*Games Workshop Limited*

## CERTIFICATE OF SERVICE

I, Jason J. Keener, an attorney, hereby certify that on June 11, 2013, I caused to be filed electronically the foregoing PLAINTIFF'S MOTION FOR A DIRECTED VERDICT with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

/s/ Jason J. Keener
Jason J. Keener