**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| |
|---|
| GAMES WORKSHOP LIMITED, |
| Plaintiff, |
| v. |
| CHAPTERHOUSE STUDIOS LLC and JON PAULSON d/b/a PAULSON GAMES |
| Defendants. |

Civil Action No. 1:10-cv-8103

Hon. Matthew F. Kennelly

## GAMES WORKSHOP'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Pursuant to Fed.R.Civ.P Rules 50 and 59, Games Workshop respectfully moves for judgment as a matter of law or for new trial on the following grounds.

### PRELIMINARY STATEMENT

Four principal issues warrant judgment as a matter of law or a new trial: (i) the lack of any factual basis for the jury finding that certain Chapterhouse shoulder pad products do not infringe, notwithstanding that they contain exact copies of the basic Space Marine shoulder pad design the Court has ruled copyrightable; (ii) the impropriety of the testimony of Chapterhouse's two experts (and the corresponding appropriateness of a new trial or judgment as a matter of law as to the products regarding which they testified); (iii) the lack of any factual or legal basis for Chapterhouse's copyright fair use defense; and (iv) the lack of any basis for Chapterhouse's trademark fair use defense for products that infringe Games Workshop's copyrights.

1. Exact Copying Regarding 14 Shoulder Pad Designs Constitutes Infringement

Although the jury found that 30 of Chapterhouse's Space Marine shoulder pads infringed copyright, including the most basic and unadorned models (Product Nos. 54 and 55), it also found

1

that 14 did not infringe.[1] (This does not include 17 shoulder pad designs that were found infringing but also fair use, addressed in greater detail below. (*See infra* § 3.)).

The trial testimony demonstrated that, although Chapterhouse used actual Games Workshop Space Marine shoulder pads for some of its first products (Ex. 1, Fiertek-Trial Tr. 1130:10-21; 1132:6-9; Ex. 2, PEX 198), the subsequent pads were created using the CAD template created by Mr. Nagy that is an exact copy of the basic Games Workshop shoulder pad design. (Ex. 1, Nagy-Trial Tr. 1309:24-1310:9; 1312:8-1314:6; 1315:11-16; Ex. 3, PEX 385) Thus, all of the shoulder pad designs are built upon a literal and slavish copy of the iconic Space Marine shoulder pad design, right down to the indents on the back. The indents are purely aesthetic and serve no actual function. (Ex. 1, Merrett-Trial Tr. 300:5-302:20.) The Court previously ruled that the shoulder pad design (even irrespective of the indents) is itself copyrightable. (Dkt. 258, 11/27/12 Order at 20; Dkt 333, 4/1/13 Order at 7-8, 11.)

Simply by adding surface details to literal copies of the original shoulder pad design, Chapterhouse cannot overcome a finding that it has copied protected expression from the original work. So long as there has been copying of protected expression, no accused infringer can excuse the claimed wrong by showing how much of his work was not copied. *Atari v. North American Phillips Consumer Elec. Corp.*, 672 F.2d 607, 619 (7th Cir 1982) ("[I]t is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate"). Despite the addition of surface ornamentation, the products are immediately recognizable as Space Marine shoulder pads and nothing else. That is their only purpose and why they are found under the "Space Marine" tab on the Chapterhouse website. If they were not immediately recognizable as Space Marine shoulder pads they would never sell.

---

[1] Shoulder pads where the issue was only underlying size, shape and dimensions, not the surface details, namely Product Nos. 2, 4-5, 6-7, 21-22, 101-102, 146-47; the Terminator Flesh Tearer shoulder pad (Product No. 13) and the Salamander shoulder pads (Product Nos. 64-65).

2

The jury's finding that 30 of Chapterhouse's Space Marine shoulder pads infringe copyright is consistent with the Court's prior ruling that the basic size, shape and dimensions of the Space Marine shoulder pad is copyrightable. Notably, this finding of infringement includes the most basic and unadorned shoulder pads sold by Chapterhouse (Product Nos. 54 and 55). So too, the jury's ruling that an additional 17 Space Marine shoulder pads based on the iconic shape infringed but were fair use, is, as to the finding of infringement, consistent with the Court's prior ruling. As to the issue of infringement, they all have in common the basic iconic Space Marine shoulder pad shape that is copyrightable and was copied exactly by Chapterhouse – right down to the little indents on the back. The fourteen shoulder pad designs for which the jury found no infringement simply contain additional ornamentation upon the basic shoulder pads already found infringing. As there is no factual basis for the jury finding these fourteen shoulder pad products do not infringe, they should all be deemed to infringe as a matter of law.

      2.    <u>There Was No Basis For The Testimony of Chapterhouse's Two Experts</u>.

Twenty of the Chapterhouse products that the jury found to be non-infringing or to fall under the fair use doctrine were the subject of testimony by Dr. Grindley[2] or Mr. Brewster.[3] Because Chapterhouse established no foundation for the testimony of either witness, under the scenes a faire defense or otherwise, the testimony of both witnesses should have been disallowed or stricken and the scenes a faire defense dismissed. Moreover, because there was no other basis for either witness' testimony, Dr. Grindley's specific discussion of dissimilarities between Games

---

[2] Hotshot lasgun pack (Product Nos. 128, 158), Iconoclast conversion kit for Land Raider (Product No. 129), Magnetic turret kit for Storm Raven and Razorback (Product Nos. 130-31), Pilum Imperial Attack Jetbike (Product No. 134), Alternative heads for Tau (Product Nos. 135-136), Heresy-era shoulder pads (Product Nos. 137-141), and Lizard-ogre characters (Product Nos. 144-145). Because of the similarity of the Javelin Class Jet Bike product (Product No. 121) to the Pilum Imperial Attack Jetbike, Games Workshop believes this product should be included as well.

[3] Tactical, Assault and Devastator Space Marine shoulder pads and "I" shoulder pad (Product Nos. 48, 50, 53 and 56)

Workshop's works and Chapterhouse's products had no foundation. Simply by virtue of teaching English at a community college, he had no better basis to compare the parties' works than any random soul picked off the street – even less, in fact, because his testimony was plainly biased against Games Workshop. Likewise, although Mr. Brewster made no efforts to compare the parties' products, argument of Chapterhouse's counsel based on his testimony was inherently misleading. Hence, the products as to which these experts testified should all be deemed infringing as a matter of law or a new trial should be granted as to such products.

None of Chapterhouse's fact witnesses identified any actual limits on the range of design choices available for any products. Jeremy Goodwin's testimony on behalf of Games Workshop showed that the very notion of design limits was baseless (Ex. 1, Goodwin Trial Tr. 1603:16-1614:9.) Dr. Grindley likewise repeatedly conceded that there were virtually limitless combinations of features possible and that he was not opining that any specific combinations or features were standard or indispensible in science fiction (much less in war gaming miniatures). (Ex. 1, Grindley Trial Tr. 1437:1-7; 1449:22-1450:16; 1459:6-1460:12; 1461:21-1462:1; 1462:15-19; 1464:2-4; 1465:1-1466:19; 1470:19-1471:1; 1471:8-24; 1482:13-16; 1485:6-8; 1488:11-19; 1490:18-1491:15; 1494:13-17; 1497:1-5; 1502:13-20.) Hence, there is no factual predicate for the claimed scenes a faire defense. *Atari v. N. Am. Phillips Consumer Elec. Corp*., 672 F.2d 607, 616 (7th Cir 1982).

In every instance, Dr. Grindley conceded that he did no more than identify a few images that he thought showed the feature was common, without providing any methodology to assure any basis for such an opinion. In several instances, no third party image was even found. He admitted that to genuinely show any element to be truly standard one would have to do essentially PhD-type research for each such element. (Ex. 1, Grindley Trial Tr. 1452:15-1453:3.) His own testimony fell well short of this standard – ironic given Grindley's solely claimed expertise as an academician.

His testimony itself was also internally inconsistent, opining that a feature such as a large

4

shoulder pad was common despite reviewing numerous other types of shoulder "protections" for futuristic warriors he himself found on characters such as GI Joe, other covers of Heinlein books, and Analog Magazine, which look nothing like the Space Marine shoulder pad. (Ex. 4, DX 321; Ex. 5, DX 300; Ex. 6, DX 299.) Dr. Grindley ignored evidence such as The Horus Heresy (PEX 676), which demonstrates innumerable ways to design a shoulder pad for a futuristic warrior without using the original and iconic Space Marine shoulder pad design. Mr. Goodwin identified many such designs in his testimony. (Ex. 1, Goodwin Trial Tr. 1604:1-1607:24.) Particularly given the inconsistencies in his analyses and lack of any foundation for any of his conclusions, Grindley's ipse dixit testimony that some features are common was baseless and simply revealed his bias. It could only have confused the jury to allow such a biased individual, with admittedly no knowledge of the facts concerning marketing and sale of the parties' products,[4] to testify as to purported salient differences between the products (hence *contradicting* the actual facts of record that all such products had to be immediately recognizable to Warhammer 40,000 fans to be salable).

Dr. Grindley's methodology also led him to apply an incorrect standard of analytical dissection of the subject works that is at odds with the ordinary observer standard. After finding any image with some similarity to a Games Workshop work, he concluded the subject material was automatically standard and in the public domain, thus leading him to assert that that the entire subject matter was free to be copied. His analysis thus assumed it was permissible to break down Games Workshop's works into constituent elements without ever looking at the overall appearance of the Games Workshop works. By analogy, it would be as if one were to look at the image of Spiderman and conclude that it could be freely copied as every individual element (spider, webbing, red color, mask, etc.) could be separately found in an image and thus subtracted out of the Marvel

---

[4] Dr. Grindley admitted he never reviewed any of the actual products or works in issue, or even looked at the Chapterhouse website; he simply reviewed the claim charts. (Ex. 1, Grindley Trial Tr. 1446:22-1447:18.)

Comics copyrighted figure. This is clearly an incorrect application of copyright law, and was both misleading to the jury and without foundation, as there is no genuine evidence that any of the constituent elements here is truly standard, much less that the specific *combinations* of features Games Workshop claims are not copyrightable. See 11/27/2012 Mem Dec. p. 21.[5]

In particular, the Court should enter judgment of infringement as a matter of law or a new trial on the sixteen products testified to by Grindley (identified in Note 2) for which there is no competent evidence that the admitted similarities between the products are in any way standard or indispensable in miniature design, tabletop wargaming, or even generally in science fiction. The jury evidently mistook his testimony as proof of independent creation, which it was not.

Similarly, Chapterhouse's other expert, Mr. Brewster conceded that, for each of the elements he identified as having been used previously (such as chevrons, Roman numeral, arrows or "X's"), there was nothing standard in the usage of such symbols that would compel Chapterhouse to use those symbols, much less compel it to use the *specific combinations* of elements Games Workshop created. (Ex. 1, Brewster Trial Tr. 1555:8-17; 1556:-1557:10.) There is, thus, no basis to conclude any of the images he identified is relevant to any issue in the case or begins to establish that anything about the specific designs Games Workshop claimed in this case are in any respect standard or indispensible. Hence, as shown more fully below (infra at Section 3) the jury's finding that four shoulder pad products (Tactical, Assault and Devastator Space Marine shoulder pads and "I" shoulder pad (Products 48, 50, 53 and 56)) were protected under the copyright fair use doctrine should be rejected and judgment entered in favor of Games Workshop. Certainly nothing about the

---

[5] *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 207 (3d Cir. 2005) ("When an author combines [otherwise non-protected] elements and adds his or her own imaginative spark, creation occurs, and the author is entitled to protection for the result."); *Tufenkian Imp/Exp Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003) ("[T]he defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art . . . are considered in relation to one another.")

6

specific combinations of features – size, shape and dimensions of the shoulder pad, and the specific symbols were shown to exist anywhere in the prior art.

3. <u>There Was No Basis For Chapterhouse's Copyright Fair Use Defense</u>.

Chapterhouse's use of Games Workshop's copyrights with respect to twenty-four of its products[6] was found to be a fair use.  However, in the course of the entire trial, Chapterhouse identified no specific products it deemed were protected expression under the fair use doctrine; identified no transformative purpose for any of its products; identified no other fair use purpose for any of the works and made no effort to show how any products satisfied the remaining elements of the fair use defense.  Moreover, the uncontradicted evidence is that defendant's products are all purely commercial; Chapterhouse's only criterion for new products being whether they could make money.  Mr. Villacci himself publicly admitted "…we have to walk a fine line here. It is hard to predict what people will buy when it comes to existing chapters, *how close to the original* Iron Hands icon *do we have to stay to make some money off it*?"  (Ex. 8, PEX 744 (emphasis added).) Chapterhouse never disputed that this is its business philosophy, and offered no other rationale for making and selling any of its products (including any of the 24 products found to be fair use).

While Chapterhouse identified no specific products it deemed were protected expression under the fair use doctrine, certain of its products that the jury deemed fair use were also the subject of testimony by Chapterhouse's experts, Dr. Grindley (Product Nos. 131, 137-139); or Mr. Brewster (Product Nos. 48, 50, 53 and 56).  As discussed above, Games Workshop submits that the testimony of the two experts was prejudicial and confused the jury even though the record contains no

---

[6] Howling Griffon Shoulder Pad (Product No. 14), Assault Shoulder pad (Product No. 48), Devastator shoulder pad (Product No. 50), I Shoulder pad (Product No. 53), Tactical shoulder pad (Product No. 56), Salamander dragon hammer (Product No. 66), Cog shoulder pad (Product No. 69), Dragon or Salamander kit for rhino (Product No. 94), Scarab shoulder pad (Product No. 97), Starburst shoulder pad (Product No. 98), Shoulder pad for mantis warriors (Product Nos. 99-100), Dragon door kit for rhino (Product No. 103), Magnetic turret kit for razorback (Product No. 131), Heresy-era shoulder pads (Product Nos. 137-139), Winged skull power armor pad (Product No. 148), V Power shoulder pads (Product Nos. 151-152), Scaled shoulder pads (Product Nos. 155-157), and Heraldic knight shoulder pads (Product No. 163).

7

testimony or evidence supporting a finding of fair use as to these products.

17 U.S.C. § 107 identifies four factors to be considered in assessing the affirmative defense:

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including … for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The quintessential fair use cases are for education, commentary, criticism or parody, which are utterly absent here.[7]  None of Chapterhouse's accused works, every one of which is purely commercial and designed only to profit on the success of Warhammer 40,000, even purports to be for one of these fair use purposes.  By definition, Chapterhouse's copying solely to sell merchandise in competition with Games Workshop simply can not be a fair use.  At trial, Chapterhouse identified not one work it contends is transformative.  "The burden of proof is on the copier because fair use is an affirmative defense." *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003), citing *Campbell v. Acuff-Rose Music, Inc.*, *supra*, 510 U.S. 569, 590 (1994).  That burden was not met.  Chapterhouse did not even try.

For the four fair use factors, *Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992), noted:

The first factor, purpose and character of the use, asks whether the original was copied in

---

[7]  The legislative committee notes to Section 107 set forth relevant examples, namely: quotation of excerpts in a review or criticism for purposes of illustration or comment; quotation of short passages in a scholarly or technical work, for illustration or clarification of the author's observations; use in a parody of some of the content of the work parodied; summary of an address or article, with brief quotations, in a news report; reproduction by a library of a portion of a work to replace part of a damaged copy; reproduction by a teacher or student of a small part of a work to illustrate a lesson; reproduction of a work in legislative or judicial proceedings or reports; incidental and fortuitous reproduction, in a newsreel or broadcast, of a work located in the scene of an event being reported.

8

> good faith to benefit the public or primarily for the commercial interests of the infringer.[8]
> *See MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981). Knowing exploitation of a
> copyrighted work for personal gain militates against a finding of fair use.

*Id*. at 309. The court also noted (in language directly relevant here): "[t]he Supreme Court

has held that copies made for commercial or profit-making purposes are presumptively

unfair." *Id*. at 309 (citing *Sony Corp. of America v. Universal City Studios, Inc* ., 464 U.S.

417, 449 (1984)). To be transformative, a work must add something new for a function,

purpose or character different from the original. *Campbell v. Acuff-Rose Music, Inc.*, 510

U.S. 569, 579 (1994)).[9] The trial evidence confirms Chapterhouse makes and sells its copies

for exactly the same purposes for which Games Workshop creates and produces miniatures:

so that they can be used by fans of Warhammer 40,000 to play the game.

Chapterhouse articulated at trial no such new or different purpose, and it is clear,

viewing its various works (all of which are directed at the fan base that Games Workshop

has developed with its imaginative universes) that its only purpose is to trade on that same

base (whose members are familiar with the Warhammer 40,000 iconography and back-

story) and avoid having to think up anything genuinely new. By definition, Chapterhouse's

copying from Warhammer 40,000 and now Warhammer can not possibly be treated as a fair

use where it simply seeks to supersede the demand for genuine Games Workshop products

and does nothing to convey any new meaning or message.

---

[8] In *Koons*, the artist Jeff Koons copied the plaintiff's photograph of puppies into sculptural format. Although he tried to excuse the copy as some sort of commentary on the materiality of modern society, the fact that he was not commenting on the plaintiff's photograph (but simply using it to advance other remunerative ends) precluded a finding of parody. Accord *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) (commercial use of Dr. Seuss' themes in a book commenting on the OJ Simpson murder trial was not a parody or comment upon the Dr. Seuss original.),

[9] The actual question presented in *Campbell* was, "…whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message. *Campbell*, 510 U.S. at 579. Here the accused works both serve to supersede the originals and serve the exact same purpose as the originals.

9

As this Court itself noted, based on Chapterhouse's arguments at trial, it is possible "a jury could conclude …. A shoulder pad that's got some fancy design in it that it would be enough to just put kind of a line through the design and, well, it transforms it into something different." (Ex. 1, Trial Tr. 1687:8-16). The Court correctly concluded that this was not the same type of transformative used allowed by the fair use doctrine. (Ex. 1, Trial Tr. 1687:16). Based on the jury's verdict, this potential confusion of the jury caused by Chapterhouse's arguments became a reality. For example, the jury concluded that the basic Space Marine shoulder pads (with and without rims) was infringed by Chapterhouse (Product Nos. 54-55). However, where Chapterhouse applied to this infringing shoulder pad design a surface decoration for which Games Workshop did not contend was also an infringing design, the jury improperly concluded that the addition "transformed" the shoulder pad into a fair use. (Product Nos. 14, 48, 50, 53, 56, 69, 97-100, 148, 151-152, 155-157, and 163).

Although there was some suggestion at trial (primarily in counsel's opening statement but conspicuously not in the actual evidence ultimately submitted) that Chapterhouse seeks to find ways for fans of Warhammer 40,000 to customize their armies, there is no indication how this differs in any way from what Games Workshop itself encourages its fans to do. Games Workshop sells numerous stand-alone products that permit its fans to customize their products (Ex. 1, Jones-Trial Tr. 566:6-572:18; PEX 416) Even if it did not, Chapterhouse's sales of replacement parts for Games Workshop's originals is not a transformative purpose. It is simply commerce of exactly the same kind in which Games Workshop engages.

By contrast, in *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006), where defendant incorporated a part of plaintiff's fashion photograph into a new work, the use was deemed fair because it was "in furtherance of distinct creative or commercial objectives." Here, no such distinct creative or commercial objectives have been shown. Indeed, *Blanch* noted expressly that

defendant's "purposes in using Blanch's image are sharply different from Blanch's goals in creating it." 467 F.3d at 252.[10]  The court there did also note that the commercial nature of the use is independently significant, stating:  "'whether [the] use [in question] is of a commercial nature or is for non-profit education purposes' is an explicit part of the first fair-use factor.  17 U.S.C. § 107(1)."  *Id*. at 253 (alteration in original).  Moreover, the court stated quite bluntly the importance of identifying some genuine independent rationale for the borrowing: "The question is whether Koons had a genuine creative rationale for borrowing Blanch's image, rather than using it merely 'to get attention or to avoid the drudgery in working up something fresh.'"  *Id*. at 255 (quoting *Campbell*, 510 U.S. at 580).  Here, Chapterhouse has added to Games Workshop's originals absolutely nothing in the way of commentary, scholarship, analysis, criticism or even parody.  It simply borrows from Games Workshop's originals enough material to makes its copies immediately recognizable to customers of Warhammer or Warhammer 40,000 so as to profit from and trade on Games Workshop's success in making the game and the books as popular as they are.  And it uses the Games Workshop materials for exactly the same purpose as Games Workshop does.

Turning to the remaining 3 factors, Games Workshop's sculptural and graphic works are purely fictional and imaginative.  Chapterhouse identified at trial nothing "factual" about any of the Games Workshop works, including any of the works from which Chapterhouse copied its 24 products the jury deemed to be fair use.  Indeed, most of these are shoulder pad designs, which are based on slavish copying of the underlying shape and dimensions (right down to the indents) that the Court has repeatedly held are original and copyrightable.

Although Dr. Grindley testified there were certain historical antecedents for shoulder pads,

---

[10] Koons' stated purpose: "'I want the viewer to think about his/her personal experience with these objects, products and images and at the same time gain new insight into how these affect our lives.'" *Id*. at 252.

this would not render the shoulder pad design anything other than pure fiction.[11]  Neither he nor any other witness identified any prior third-party designs that cast doubt on the originality and non-factual, purely fictional nature of the Space Marine shoulder pad design.  And almost all of the third-party designs he cited were themselves also purely fictional.  Even if he had so-testified, it would have been irrelevant because none of Chapterhouse's actual designers pointed to any historical references in describing how the accused products were created – or even that they were aware of any such prior designs when developing the works at issue.  The trial record thus confirms the only point of reference for Chapterhouse was Games Workshop.  There was no intended commentary on the Games Workshop designs and no historical perspectives were brought to bear on Chapterhouse's product development.

Chapterhouse likewise made no attempt at trial to identify even a single work for which it contends it took "no more than is reasonably necessary . . . to enable [it] to pursue an aim that the law recognizes as proper" *Chicago Bd. of Educ*, 354 F.3d at 629.  Rather, the only testimony and documentary evidence (elicited by Games Workshop) confirmed Chapterhouse took enough material from the Games Workshop originals to make its copies immediately recognizable to Games Workshop's customers.  (Ex. 1, Traina-Trial Tr. 1232:10-1233:12; Ex. 10, PEX 189.)  There was no testimony that, as to any such products, it sought to tailor the amount of the taking so as to be consistent with the supposedly transformative and new purpose for which it was aiming.

Finally, regarding the effect of the use upon the potential market for or value of the copyrighted work, Games Workshop sells numerous replacement shoulder pads and replacement door kits for its vehicles (Ex. 1, Jones-Trial Tr. 566:6-572:18; Ex. 9, PEX 416.)  Hence, Chapterhouse's products directly compete with Games Workshop's original product designs and

---

[11] Dr. Grindley did not even identify anything common, as he merely presented testimony about the existence of a small number (typically one, two, or none) of prior works having one or more similar features.

4843-5446-7860.1

simply supplant the demand for original Games Workshop replacement parts.  For example, Chapterhouse sells its Magnetic Combi-Weapon product (Product No. 34) specifically to save customers from purchasing multiple separate Games Workshop weapons.  (Ex. 1, Nagy-Trial Tr. 1323:7-1324:17.)  Recalling the question presented in *Campbell* whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message," 510 U.S. at 579, the answer here is clear.  Because the products are directly competitive, Chapterhouse's use directly affects the value of or potential market for Games Workshop's work.  Chapterhouse presented no evidence to carry its burden.

4. <u>Chapterhouse Can Not Claim Trademark Fair Use For Its Own Unlawful Products</u>.

Chapterhouse's fair use defense should have been dismissed because it proceeds from a mistaken premise that one can make an unlawful copy of plaintiff's copyrighted work and then bootstrap an argument that referring to that distinctive thing using plaintiff's trademarks is the only way it can be identified.  In explaining the general elements of trademark fair use, *R. J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 2001 U.S. Dist. LEXIS 8896 at * 16 (N.D.Ill. June 29, 2001), quoted  *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 545 (5th Cir. 1998)).  *Pebble Beach* further noted that the fair use defense is limited to circumstances where "one who has lawfully copied another's product can tell the public what he has copied".  By contrast, here, defendant has not lawfully copied.  As such, its use of Games Workshop's names and marks is simply an unfair reference to *its own* unauthorized and unlawful copying, not a fair reference to Games Workshop's works.  Such use is, by definition, unfair and Games Workshop is aware of no precedent applying the trademark fair use defense so as to allow a defendant to facilitate its copyright infringement or other unlawful conduct.

This very issue was raised in *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010),

where the plaintiff complained that because a significant percentage of "TIFFANY" goods offered

on eBay.com was counterfeit, eBay's use of the TIFFANY trademark was improper. Based on its

finding that eBay actively policed its website to limit sales of counterfeit goods and ensure the

genuineness of the TIFFANY-labeled products on the site, the district court held that eBay's use of

its mark in connection with sales of genuine TIFFANY products was a protected nominative fair

use. Although the Second Circuit did not find it necessary to resolve the question, it based its

decision on the fact that eBay's use of the mark TIFFANY was accurate to identify genuine goods

without suggesting any affiliation with the plaintiff. *Accord Coach Inc. v. Sassy Couture*, 2012 U.S.

Dist. LEXIS 6364 (W.D.Tex. Jan. 19, 2012). There the court granted partial summary judgment,

explaining:

> Unlike *Tiffany*, Defendants are not using the Coach trademark to describe the general
> availability of authentic goods for sale on their website. Rather Defendants used the Coach
> trademark for the sale of counterfeit Coach products. Moreover, while eBay merely
> provided an online center for auctions, Defendants sold their products directly to
> consumers. Defendants actions therefore created "a likelihood of confusion as to source,
> sponsorship, affiliation, or approval.

In the typical case where the trademark fair use defense is permitted, the underlying copying

is permitted, *see, e.g.*, *Societe Comptoir v. Alexander's Dep't Stores, Inc.*, 299 F.2d 33 (2d Cir.

1962) (underlying dress design in the public domain), or the defendant's use of the plaintiff's mark

is unquestionably to refer to a genuine product or service of the plaintiff. *See*, *New Kids on the*

*Block v. News Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992) (newspaper poll referred to musical

group by name); *WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d. 42 (1st Cir. 1991) (words "Boston

Marathon" used to describe the event); *Playboy Enter. v. Welles*, 279 F.3d 796, 802 (9th Cir. 2002)

(former Playboy model permitted truthfully to refer to her past association with the magazine). *New*

*Kids on the Block* explained the underlying logic of the defense:

> But, where the defendant uses a trademark *to describe plaintiff's product, rather than its*
> *own*, we hold that a commercial user is entitled to a nominative fair use defense provided
> he meets the following three requirements: First, the product or service in question must be

14

one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

971 F.2d at 308 (Emphasis added). *Accord*, *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010) ("But we've held that the [likelihood of confusion] analysis doesn't apply where a defendant uses the mark to refer to the trademarked good itself... [w]hen [defendants] say Lexus, they mean Lexus." )

Here, in promoting *its own goods* under the Games Workshop trademarks, Chapterhouse is not referring to plaintiff's products but is using plaintiff's marks to refer to its own copies of the originals. This is most clearly demonstrated with respect to the marks "Space Marine", "Warhammer", "40K", "40,000", "Drop Pod" and "Eldar"[12] that the jury deemed to have been used fairly[13] notwithstanding the manner in which Chapterhouse uses the Games Workshops marks to advertise and promote its own unlawful copies on eBay (*e.g.* Ex. 11, PEX 5) or its own website (*e.g.* Ex. 12, PEX 435). Similarly, the use of the tagline "Specializing in Custom Sculpts and Bits for Warhammer 40,000 and Fantasy" is plainly unfair as a means to advertise unlawful copies, and so too the use of Space Marine and Eldar tabs on the website to denominate unlawful copies of Space Marine, Eldar or Dark Eldar figures is not a fair use. (Ex. 12, PEX 435) The same analysis would apply to the "Tau" tab if the Court were to grant this motion for JMOL or new trial that some of the Tau products infringe. Nothing about these uses of Games Workshop's trademarks to promote unlawful copies of Games Workshop designs is fair, and the defense should not have been allowed.

---

[12] The most obvious use of Eldar on eBay was in the post-sale context**.** *CAE, Inc. v. Clean Air Eng'g Inc.*, 267 F.3d 660, 683 (7th Cir. 2001) (recognizing post-sale confusion).

[13] The full list of marks the jury found to have been used fairly is: (i) Warhammer, (ii) 40K, (iii) 40,000, (iv) Eldar, (v) Dark Angels, (vi) Space Marine, (vii) Tau, (viii) Assault Space Marine, (ix) Black Templars, (x) Blood Angels, (xi) Crimson Fists, (xii) Drop Pod, (xiii) Gaunt, (xiv) Heavy Bolter, (xv) Hive Tyrant, (xvi) Imperial Fists, (xvii) Inquisition, (xviii) Legion of the Damned, (xix) Librarian, (xx) Space Wolves, (xxi) Tactical Space Marine, (xxii) Terminator, (xxiii) Tyranid Warrior, (xxiv) Heavy Flamer, (xxv) Lascannon, and (xxvi) Lightning Claw.

15

Dated:  July 15, 2013

Respectfully submitted,
/s/  Jason J. Keener

Jason J. Keener (Ill. Bar No. 6280337)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone:  312.832.4500
Facsimile:  312.832.4700
Email:  jkeener@foley.com

Jonathan E. Moskin
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229
Email:  jmoskin@foley.com

*Attorneys for Plaintiff*
*Games Workshop Limited*

## CERTIFICATE OF SERVICE

I, Jason J. Keener, an attorney, hereby certify that on July 15, 2013, I caused to be

filed electronically the foregoing PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF

LAW with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of

the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure

5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

 /s/  Jason J. Keener
 Jason J. Keener