**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GAMES WORKSHOP LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:10-cv-08103 |
| v. | ) | |
| | ) | |
| CHAPTERHOUSE STUDIOS LLC | ) | |
| | ) | Judge Matthew F. Kennelly |
| | ) | |
| Defendant. | ) | |

**<u>BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER
OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL LIMITED TO CERTAIN
ISSUES AND CLAIMS</u>**

Chapterhouse seeks judgment as a matter of law on seven issues.

*First*, a reasonable jury could not find that Chapterhouse infringed some of Games Workshop's ("GW") trademarks, because trademark infringement requires proof that GW used the designations *as trademarks* before Chapterhouse did. Yet these designations were used only in an isolated, non-distinctive fashion.

*Second*, no reasonable jury could find that Chapterhouse infringed any of GW's trademarks, because trademark infringement requires proof of "likelihood of confusion" and none of the pertinent factors suggest that confusion is likely. Indeed, GW's only witness on confusion conceded that as a result of this lawsuit, "people ***wouldn't*** be confused." (Trial Transcript, "Tr.", at 823:22-23) (emphasis added).

*Third,* a reasonable jury could not find that Chapterhouse infringed GW's copyrights, because GW did not prove any of its works were "original." They show no signs of originality in and of themselves, and there was no other evidence.

*Fourth*, no reasonable jury could find that Chapterhouse infringed GW's copyrights, because GW did not prove that any of its works were protected expressions, rather than ideas.

*Fifth*, no reasonable jury could find Chapterhouse liable for infringement of GW's trademarks, because Chapterhouse's use of the marks was nominative fair use.

*Sixth*, no reasonable jury could find that Chapterhouse infringed GW's trademarks, because the alleged marks were invalid.

*Seventh*, judgment as a matter of law is required on the claims GW dropped during trial.

Chapterhouse has included an appendix, Exhibit A to this brief, that lists the products/alleged marks to which each argument applies.

**ARGUMENT**

On a motion for judgment as a matter of law, "the Court views the evidence and all reasonable inferences in the light most favorable to the non-moving party." *Yager v. ESA 0753, Inc.*, No. 00-C-6068, 2002 WL 31409551, *1 (N.D. Ill. Oct 25, 2002) (Kennelly, J.). The Court must overturn the verdict if "no rational juror could have found for the prevailing party." *Id.*

**I.      Games Workshop has not introduced sufficient evidence that it used each of its designations as a trademark prior to Chapterhouse.**

For certain of the designations at issue in this case, GW was required to prove that it "used the [designation] . . . in a way that allowed consumers to identify it with Games Workshop or its product before Chapterhouse began using the [designation]." (Tr. 1741:3-6). In other words, GW had to prove that "the designation in question, as actually used, [would] be recognized ***in and of itself*** as an indication of origin for this particular product or service." J. THOMAS MCCARTHY, 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 3:3 (4th ed. 2013) (emphasis added) (hereinafter, "MCCARTHY"); *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1051 (9th Cir. 1999).

GW wholly failed to present such proof. In order to establish prior use as a mark, GW had its Head of Legal Licensing and Strategic Products, Andrew Jones, simply identify a ***single prior use*** of each of the designations. Whether the designation was used ***as a mark*** was an afterthought. Indeed, GW did not offer any customer surveys tending to show that "people recognize these marks as belonging to Games Workshop." (Tr. 649:23-25). As a result, the jury was cast adrift, with nothing to go on except the references themselves. And for at least two separate reasons, no rational jury could infer from these references that the designations would "be recognized in and of [themselves] as an indication of origin."

***First***, Jones identified only a single, isolated use of each designation. A "designation is

2

not likely to be perceived as a mark of origin unless it is ***repetitively*** used, as opposed to only an occasional or isolated use." MCCARTHY § 3.3 (emphasis added).

***Second***, none of the designations were used in a distinctive way. There was no way for the public to discern that a given designation, ***in and of itself***, was intended to indicate Games Workshop. Not one of the fourteen designations appeared as the complete title for a product. Indeed, the vast majority of the designations were not associated with a product at all. They appeared only sporadically in books, in the midst of hundreds of other images, icons, designs, and stories. And the few designations that were associated with a product did not stand out in any way. The public is not "required or expected to browse through a group of words, or scan an entire page in order to decide that a particular word, separated from its context, may or may not be intended, or may or may not serve to identify the product." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 341 (4th Cir. 2001) (citations omitted).

***Designations not associated with a product cannot simply be reserved for later use.***[1]

Ten designations appeared only in the occasional reference in a book. But the "mere adoption of a mark without a bona fide use, in an attempt to reserve it for the future, does not create trademark rights." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1157 (9th Cir. 2001) (citations omitted).

GW cannot "save" the designations to create products at a later date if it is not using them as marks now. But that is exactly what GW admitted it was trying to do. (*See* Tr. 646:13-14) ("[I]t might be something we're saving up for two years later."). An infrequent, isolated use does not "create[] an association among consumers between the mark and the mark's owner." *Brookfield*, 174 F.3d at 1051; *see also Paramount Pictures Corp. v. Romulan Invasions,* 7

---

[1] This grouping covers: Blood Ravens, Exorcist, Mycetic Spore, Tervigon, Ymgarl, Exorcist Skull Icon, Iron Snakes Icon, Soul Drinkers Icon, Scythes of the Emperor Icon, and Hammer of Dorn Icon.

U.S.P.Q.2d 1897, 1900, 1988 WL 252376 (T.T.A.B. 1988) (appearance of the Romulans as characters in the storyline of television series or movies did not make Romulans a trademark); *In re D.C. Comics, Inc.,* 689 F.2d 1042, 1043, n.1, 215 U.S.P.Q. 394 (C.C.P.A. 1982) ("the appearance of the JOKER in a story in a BATMAN comic book does not make the JOKER a trademark for the book"). GW's intentions to create a product in the future are irrelevant.

### *Designations associated with a product were not used in a distinctive way.*

The Heavy Flamer, Lascannon, and Lightning Claw designations appeared only as one or two words in a longer product title. (*See* Tr. 585:21-23; 664:16-21; 665:8-25). Such a solitary appearance of a term is not sufficient to show that the term was used as a mark. *See Paramount Pictures,* 7 U.S.P.Q.2d at 1900 (listing an "Alien Action Figure, Mego Corporation, The Romulan, poseable with costume, 1975, 8[in.]" was not sufficient for "Romulan").

One designation, "jump pack," appeared on product packaging. But the designation was lost in a mass of information   It appeared on the back of the box in the midst of a description that read, in part: "Assault squads are equipped with close combat weapons, such as bolt pistols and chainswords. Their jump packs enable them to strike hard and fast, leaping over difficult terrain to quickly engage the enemy." (PEX-956.) This usage is both incredibly "isolated" and within the rule that the public is not "required or expected to browse through a group of words" to determine designation of origin. *MicroStrategy*, 245 F.3d at 341.

In sum, GW failed to present evidence that it used these designations as marks, in contrast to GW's prominent use of the Games Workshop and 40,000 logos on these products.

## II.    Games Workshop has not introduced sufficient evidence from which a jury could find a likelihood of confusion.

In order to establish a claim of trademark infringement, a plaintiff must prove a likelihood of confusion. The critical inquiry is whether a customer likely would believe that GW

sponsored, endorsed, or was otherwise affiliated with Chapterhouse's products. (*See* Tr. 1745:11-15). In making this inquiry, courts consider seven factors: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to 'palm off' his product as that of another." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001).

Notably, GW was required to prove a likelihood of confusion as to ***each*** mark. (*See* Tr. 1740:18-25). But GW did not even attempt to do so—a fateful decision. When the factors are considered through this lens, no reasonable jury could have found a likelihood of confusion.

### i.    Actual Confusion

As an initial matter, Chapterhouse's products have shared the marketplace with GW's products for five years. (Tr. 803:6-12). Accordingly, "some evidence of actual confusion should have become available." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842-43 (9th Cir. 2002); *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999) ("If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected . . . , that can be powerful  indication that the junior trademark does not cause a meaningful likelihood of confusion.") (overruled on other grounds); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 377 (1st Cir. 1980) (emphasizing 3.5 year coexistence) (abrogated on other grounds).

GW has failed to prove this critical element. GW's Head of Legal Licensing agreed, "you can't know what's in the minds of consumers." (Tr. 679:14-16). But GW could have offered survey evidence showing that customers have been confused. It chose not to.

In fact, GW's own witness ***affirmatively disavowed*** any actual confusion. Gillian

Stevenson, GW's Senior Legal Counsel, admitted that this very lawsuit cleared up any confusion. GW's "customers, [GW's] staff, and even just people who are interested all know about this case and have for a very long time." (Tr. 803:24-804:1). Because customers know that GW is suing Chapterhouse, they know the two are distinct. Accordingly, as Stevenson put it, "the likelihood of there being any confusion where there's such a publicly well-known case, it's just not really very likely because people know." (Tr. 804:1-3). ***People know.***

Further, the emails and eBay postings that GW presented at trial do not show actual confusion. Even if they did, there is no evidence that anyone in the United States was confused.

***The emails and eBay postings do not show confusion.*** The emails are deficient for a simple reason: the customers who sent the emails did not assume that GW was affiliated with Chapterhouse. On the contrary, they ***asked GW*** whether Chapterhouse was "legit" because it was different. (*See* PEX-107). This is not proof of actual confusion. What is more, GW apparently received multiple emails demonstrating that customers were not confused. As to one such email, Stevenson remarked: "And another one who clearly is not confused!" (DX-171).

The eBay postings are deficient too. (*See* PEX-1008, 1009). They were not Chapterhouse postings. There is no evidence that any prospective buyer saw them. There were no bids on either posting. (Tr. 812:3-21). And Stevenson testified that the auctions were reported to her "almost immediately" and pulled down "straight away"—before ***anyone*** could see them. (Tr. 812:22-24). As to the seller, the use of GW's trademarks to describe Chapterhouse products (Tr. 790:11-792:4) does not show the seller was confused, as opposed to describing the product and its intended use.

***No evidence that anyone was confused within the United States***. Moreover, there is no evidence of confusion within the United States (as is required under the Lanham Act). There is

6

no evidence that any of the e-mails were sent from the United States. Stevenson agreed that "two of those emails were sent from what appears to be U.K. email addresses," "the third one didn't show the sender's email address at all," and "Games Workshop has no way of knowing if any of these three individuals were in the United States." (Tr. 824:11-19). On both eBay postings, the seller was located in France. (Tr. 812:3-19). And the record indicates that no one else ever saw the postings, in the United States or elsewhere.

All told, GW presented no evidence of actual confusion. There were no surveys, and GW's purported anecdotal evidence was instead mere speculation.

*ii.*      *Area and Manner of Concurrent Use*

Chapterhouse products and GW products are advertised and sold through different channels. *See World Wide Sales, Inc. v. Church & Dwight Co., Inc.*, No. 08-C-1198, 2009 WL 3765881, at *6 (N.D. Ill. Nov. 9, 2009) (Kennelly, J.) (this factor only "slightly" relevant where plaintiff did "not offer a single instance where the two products were even for sale in the same store, nor [did] it indicate that the products were ever advertised in the same magazine").

GW sells its products at over 400 official, dedicated stores that it owns, as well as through independent hobby stores and the GW website. (Tr. 217:24-218:17).

Chapterhouse does not encroach on this territory ***at all***. Rather, Chapterhouse markets its products on its own website, as well as on internet forums and eBay. (Tr. 832:9-18). There is no evidence that a Chapterhouse product was ever sold in any store or event alongside GW.

Because of this divergence, this factor cuts strongly against a likelihood of confusion. *See Packman*, 267 F.3d at 646 ("Ms. Packman did not bring forth any evidence to show that her distribution channels in any way overlapped with defendants or that she advertised her products through the same media channels as defendants.").

7

### iii. Degree of Care Likely to Be Exercised By Consumers

Consumers of Chapterhouse products are sophisticated individuals who are already familiar with the Warhammer 40,000 universe and GW's products. Indeed, GW's own Head of Intellectual Property described the game's players as "aficionados." (Tr. 221:2). This too weighs against a finding of confusion. *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997) ("We have found that where consumers are sophisticated, deliberative buyers, confusion is less likely."); *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1045 (7th Cir. 2000) (fact that customers were "barbecue afficionados" weighed against confusion).

Chapterhouse's customers are aficionados of a niche hobby. The Warhammer game is "a very special kind of offer for a unique kind of or a specific kind of customer." (Tr. 218:21-23). It brings together two different skill sets: the mental wherewithal for strategy wargaming and the manual dexterity for assembling and painting the miniatures. And the customer must also appreciate the game's science-fiction imagery. (*See* Tr. 218:24-219:1). This case does not involve random customers off the street.

### iv. Similarity of the Marks and the Products

Chapterhouse differentiates its products with its marketing. It does not sell its products in stores; rather, it sells them on the Chapterhouse website, which prominently displays the Chapterhouse name and icon. Further, the site contains a disclaimer about Chapterhouse's non-affiliation with GW. (Tr. 755:7-23). Accordingly, confusion is unlikely. *See Packman*, 267 F.3d at 645 ("All of defendants' products—and their tags—prominently display the well-known Tribune masthead, providing a strong indication that there is no likelihood of confusion.").

### v. Strength of the Mark

GW did not even try to prove the commercial strength of the marks at issue in this case.

The best evidence would be consumer surveys, but GW offered none.  This deficiency is "telling."  *See George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 396 (4th Cir. 2009) (where "no consumer studies were performed," there was no "meaningful evidence demonstrating that consumers associate[d] the" designation with the plaintiff).  Even a made-up word does not become a strong mark unless the public associates the mark with GW.  MCCARTHY § 11:83 (strength of a mark cannot be determined without evaluating "the actual customer recognition value of the mark at the time").

vi.     Intent to "Palm Off"

Chapterhouse lacked any intent to "palm off" its products as those of GW.  Rather, Chapterhouse sought to ***differentiate*** itself from GW.  Nick Villacci testified that his business began when potential customers recognized that GW did not "have anything like" the custom components offered by him and Tomas Fiertek.  (Tr. 924:17-25).  And the business stayed true to this principle—Villacci testified about his desire to "do something different, add [his] own flair" to Chapterhouse's products.  (Tr. 980:23-24).

Further, Chapterhouse sold its products on its own website, adorned with the Chapterhouse logo and a disclaimer.  (Tr. 755:7-23).  This confirms the lack of any bad intent.  *See Packman*, 267 F.3d at 644 ("[T]he prominent display of the Tribune masthead . . . on each of defendants' products demonstrates the Tribune's intent to promote itself as the source.").

***

On each mark and all of them, the factors point in only one direction: no customer is likely to believe that Games Workshop is associated with Chapterhouse's products.  This Court should enter judgment as a matter of law for Chapterhouse on all trademark claims.

9

### III. Games Workshop has not introduced sufficient evidence that its purportedly copyrighted designs were original.

Copyright law "preclude[s] appropriation of only those elements of the work that are protected by the copyright." *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). The only elements of GW's works that are protected by copyright are those that are proven to be original. *Nova Design Build, Inc. v. Grace Hotels, LLC*, 652 F.3d 814, 817-18 (7th Cir. 2011). "Originality requires that the elements be independently created and possess at least some minimal degree of creativity." *Id.* at 818.

#### A. GW's designs do not show any originality.

Chapterhouse was not accused of copying the Warhammer game. Nor was Chapterhouse accused of copying the game mechanics. Instead, Chapterhouse was accused of copying only certain very narrow elements, mostly shoulder pads adorned with a design.

Under the *scènes à faire* doctrine, the size and shape of the shoulder pads are not protectable. *See Incredible Tech.,* 400 F.3d at 1011-12. The design of Games Workshop's shoulder pads is ubiquitous in the history of military-style shoulder pads. (Tr. 1551:23-1552:2). Such designs do not become protectable merely by describing them in relation to a hypothetical toy soldier. And though Games Workshop had previously argued that the size and shape of its pad was unusually large, at trial Mr. Goodwin explained that unusual size applied only to drawings and not to the actual products. (Tr. 1609:7-24; 1621:1-14). The actual product is just a cap that fits on the shoulder. (Tr. 1624:6-7).

In addition, the designs on these shoulder pads are strikingly unoriginal. A few examples include the iron snake design (product 18), the X and roman numeral designs (products 46-48), the chevron and roman numeral design (products 51-52), and the arrow design (product 156). (*See* PEX-1020, 1021). There is nothing creative here. Nor do such designs suggest that they

10

were created independently. In fact, this Court didn't "think it [was] necessary" to instruct the jury "that an arrow without more is [not] copyrightable." (Tr. 1679:20-24).

Indeed, all the evidence suggests that these designs are rooted in the medieval field of heraldry, "a system of symbols used in medieval society by the aristocratic families to define that particular family's badges or symbols." (Tr. 1508:8-22). Heraldic designs are used in the modern military as well. In fact, Chapterhouse's expert William Brewster testified about how chevrons, arrows, and roman numerals are used in the United States military. (Tr. 1536:15-1539:7; 1539:8-1541:18; 1544:4-1546:1).

It is not as if the jury could make assess this issue, since heraldry is not easily accessible to the average layperson. For example, one GW witness explained that there is a heraldic symbol called a "rampant lion," "a lion rearing up on its hind legs with its four limbs sort of extended in an aggressive pose." (Tr. 1509:8-9). A juror may not know this lexicography of the field. But GW did not introduce an expert of its own to explain how its designs were different— a critical deficiency in its case. *See Kohus v. Mariol*, 328 F.3d 848, 857-58 (6th Cir. 2003) (filtering out unprotected elements "will almost certainly require expert testimony, because the drawings are technical in nature and a lay person is unlikely to understand what constitutes creativity in this area"). The creativity demonstrated by a coiled snake, arrow, or roman numeral is hardly self-evident, and no evidence supports an originality determination.

### B. GW has not introduced any other competent evidence of originality.

GW introduced no additional evidence of independent creation or creativity. Its star originality witness, Alan Merrett, did not design any of the copyrighted products. (Tr. 390:3-5). And Merrett admitted he was unable to confirm that the designers actually generated original ideas. (*Id.* at 391:1-12). Indeed, for all Merrett knew, the designers "could have drawn

11

inspiration from the clouds in the sky." (*Id.* at 394:13-16).

And no other witness filled this gap. To the contrary, Jeremy Goodwin, who was also involved in the game's creation (Tr. 1602:24-1603:2) testified that in creating the game, GW "regurgitated" ideas that had come before. (*Id.* at 1627:9-14). Other GW designers explained where they got their ideas: historical references, not GW's own imagination. (Tr. 527:14-22; Tr. 529:1-12; Tr. 1505:5-12; Tr. 1508:14-1510:13).

Without expert or designer testimony explaining how the copied designs were original—or any other evidence of originality—GW did not meet its burden. Chapterhouse is entitled to judgment as a matter of law of noninfringement on the copyright claims.

## IV. GW's purported copyrights are based on unprotectable ideas or utilitarian considerations.

"The most fundamental axiom of copyright law is that '[n]o author may copyright his ideas.'" *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 344-45, 111 S.Ct. 1282 (1991) (citation omitted). Rather, "copyright . . . encourages others to build freely upon the ideas . . . conveyed by a work." *Id.* at 349-50. But GW's copyright claims are based on alleged similarities of unprotectable, abstract ideas, devoid of reference to any particularized expression. Indeed, *FASA Corp. v. Playmates Toys, Inc.*, 869 F. Supp. 1334 (N.D. Ill. 1994) ("*FASA I*"), a case similar to this one, held that plaintiffs could not claim protection for "general ideas and concepts [such as] (1) a futuristic, interstellar, battle dominated universe; (2) robot-like battle machines; (3) genetically manipulated warriors; and, (4) direct communication between machine and human brain." *Id.* at 1351 (footnote omitted). The Court noted the considerable body of work related to "concepts of interstellar, battle dominated universes, drivable giant robots, and genetically manipulated warriors." *Id.* at n.32. Similarly, GW's abstract ideas are not protected by copyright, and should not be considered in assessing its copyright claims. For instance, GW's

12

only claim as to Product No. 3 is that its "iconography features skulls"—precisely the sort of "general ideas and concepts" that cannot be protected.

And insofar as "the shapes of . . . toys and their dimensions and configurations . . . have been dictated primarily by utilitarian considerations," they are not protected by copyright. *Durham Indus.*, 630 F.2d at 915. For instance, with respect to some of the shoulder pad products, GW's only concern was with the size of the shoulder pad because it fit the GW product. (*See, e.g.*, Product Nos. 49, 54, 55). As these parts were dictated primarily by utilitarian considerations, they are not protected by copyright.

**V.      Chapterhouse's use of GW's alleged trademarks is nominative fair use.**

Chapterhouse's reference to GW's alleged marks is nominative fair use, as there is no infringement when a mark is used to truthfully identify a plaintiff's goods. The key factors are whether: 1) defendant's product is not reasonably identifiable without plaintiff's mark; 2) defendant uses no more of plaintiff's mark than is reasonably necessary; and 3) defendant does not use the mark in a manner likely to suggest sponsorship or endorsement of its product by the plaintiff. *See Ty, Inc. v. Publ'ns Intern., Ltd.*, No. 99 CC 5565, 2005 WL 464688, *5-6 (N.D. Ill. Feb. 25, 2005). All factors favor Chapterhouse.

First, Chapterhouse references GW terms on its home page to identify products that players may wish to use with those armies. Similarly, on its product pages, Chapterhouse references GW products to explain that Chapterhouse products are compatible with, fit on, or can be used to decorate such products. (*See, e.g.*, Tr. 950:20-21; Tr. 952:24-953:1).

Second, Chapterhouse uses no more of the (alleged) marks than necessary to identify GW's products and does not use any special stylization to call them out. (Tr. 1018:25-1019:1).

Third, Chapterhouse does not suggest sponsorship or endorsement by GW. It disclaims

connection on its website. (PEX-435 at 1062; PEX-690 at 28506; Tr. 930:10-11).

**VI.     GW's alleged marks are not valid trademarks.**

GW was required to prove that each designation at issue was a valid trademark.  (Tr. 1740:7-12).  "In other words, it is capable of distinguishing the trademark owner's product from the products of others."  (Tr. 1741:17-19).  Marks are classified according to their distinctiveness, and have been broken into the following categories: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; and 5) fanciful.  Generic marks cannot be protected; descriptive marks can be protected only if they have acquired secondary meaning.

The marks at issue here are unprotectable; they are descriptive at most, and there was no evidence of secondary meaning.  Tyrant is hardly inherently distinctive.  And Exorcist, Librarian, Salamander and Legion of the Damned all designate Space Marine chapters; Predator and Rhino are vehicles.  No one could contend that these words are off-limits in a competing science-fiction wargame.  Further, it does not matter that Rhino describes a vehicle rather than an animal.  GW does not market Rhinos or Salamanders apart from the Warhammer universe.  GW is not selling cars or armies; it is selling a game.  The titles of Space Marine chapters are not prominent enough to inherently distinguish GW's game from other science-fiction wargames.

And there was no evidence of secondary meaning.  There were no consumer surveys. (Tr. 649:23-25).  There was no other evidence tied to these marks.  Indeed "[t]here's a thousand chapters of Space Marines."  (Tr. 619:5-6).  It is hardly plausible that each chapter title, in and of itself, serves to distinguish GW in the minds of wargamers.

**VII.    In the alternative, this Court should grant a new trial, limited to the issues and claims specified in this brief.**

If the Court decides not to enter judgment as a matter of law for Chapterhouse, a new trial is warranted on the issues above.  *See* Fed. R. Civ. P. 59(a).  When the Court addresses a request

for a new trial, it may "get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook County, Ill.*, 650 F.3d 631, 633 (7th Cir. 2011). The Court may also consider "anything else which justice requires" when it assesses whether to grant a new trial. *Whitehead v. Bond*, 782 F. Supp.2d 685, 691 (N.D. Ill. 2011). A new trial should be granted if the verdict is against the "manifest weight of the evidence." *Mejia*, 650 F.3d at 633.

Here, the jury's verdict—to the extent it was against Chapterhouse—is against the weight of the proffered evidence for the reasons stated above. And "a motion for a new trial may be granted even if a motion for judgment as a matter of law must be denied." *Id.* at 634.

Because a court may grant a new trial on "all or *some of the issues*" at hand (*see* Fed. R. Civ. P. 59(e)) (emphasis added), the scope of the new trial should be limited to the issues raised in this motion and those claims identified in the Appendix.

### VIII. Chapterhouse is entitled to judgment in its favor on those products and marks dropped from the verdict form by Games Workshop at the end of the case.

After the close of evidence and before this case went to the jury, GW removed one product and nine trademarks from its case. (Tr. 1635:7-10; 1640:16-17.) These claims did not appear on the verdict form; therefore, judgment has not been entered on them. But because these claims were dropped so late in the case, Chapterhouse is entitled to judgment in its favor.

This Court made clear in its summary judgment ruling that, even at that point, GW could not "simply drop . . . claims without prejudice." SJ Opinion at 6 (Dkt. No. 258).

### CONCLUSION

For the foregoing reasons, this Court should enter judgment as a matter of law in favor of Chapterhouse for all claims in this case. In the alternative, this Court should order a new trial, limited to the claims and issues specified in this brief and the Appendix. (*See* Exhibit A).

Dated: July 15, 2013                         Respectfully submitted,

                                             /s/ Imron T. Aly


                                             Jennifer A. Golinveaux (CA Bar No. 203056)
                                             Thomas J. Kearney (CA Bar No. 267087)
                                                   WINSTON & STRAWN LLP
                                                   101 California Street
                                                   San Francisco, CA 94111-5802
                                                   Phone: (415) 591-1000
                                                   Fax: (415) 591-1400
                                                   jgolinveaux@winston.com
                                                   tkearney@winston.com

                                             Imron T. Aly (IL Bar No. 6269322)
                                             Bryce A. Cooper (IL Bar No. 6296129)
                                             Tyler G. Johannes (IL Bar No. 6300117)
                                                   WINSTON & STRAWN LLP
                                                   35 West Wacker Drive
                                                   Chicago, IL 60601-1695
                                                   Phone: (312) 558-5600
                                                   Fax: (312) 558-5700
                                                   ialy@winston.com
                                                   bcooper@winston.com
                                                   tjohannes@winston.com

                                             Julianne M. Hartzell (IL Bar No. 6275093)
                                             Sarah J. Kalemeris (IL Bar No. 6303644)
                                                   MARSHALL, GERSTEIN & BORUN LLP
                                                   233 S. Wacker Drive
                                                   Willis Tower Suite 6300
                                                   Chicago, IL 60606
                                                   Phone: (312) 474-6300
                                                   Fax: (312) 474-0448
                                                   jhartzell@marshallip.com
                                                   skalemeris@marshallip.com

## **CERTIFICATE OF SERVICE**

I, Imron T. Aly, an attorney, hereby certify that on July 15, 2013, I caused to be filed electronically the foregoing BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL LIMITED TO CERTAIN CLAIMS AND ISSUES with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

_____ /s/  Imron T. Aly_____