```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

4   GAMES WORKSHOP LIMITED,        )
                                   )
5                      Plaintiff,  )   Docket No. 10 C 8103
                                   )
6              vs.                 )
                                   )
7   CHAPTERHOUSE STUDIOS, LLC,     )   Chicago, Illinois
    et al.,                        )   June 3, 2013
8                                  )   9:35 a.m.
                       Defendants. )
9

10                         VOLUME 1
                  TRANSCRIPT OF PROCEEDINGS
11   BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

12
    APPEARANCES:
13

14   For the Plaintiff:    FOLEY & LARDNER, LLP
                           BY:  MR. JONATHAN E. MOSKIN
15                         90 Park Avenue
                           New York, New York   10017
16

17                         FOLEY & LARDNER, LLP
                           BY:  MR. JASON J. KEENER
18                         321 North Clark Street
                           Suite 2800
19                         Chicago, Illinois   60610

20

21   For the Defendant:   WINSTON & STRAWN, LLP
                           BY:  MR. IMRON T. ALY
22                         35 West Wacker Drive
                           Chicago, Illinois   60601
23

24                         WINSTON & STRAWN, LLP
                           BY:  MS. JENNIFER A. GOLINVEAUX
25                         101 California Street
                           San Francisco, California   94111
```

1          MARSHALL, GERSTEIN & BORUN
           BY:  MS. JULIANNE M. HARTZELL
2          233 South Wacker Drive
           Willis Tower #6300
3          Chicago, Illinois   60606

4

5   Also Present:          MR. NICHOLAS VILLACCI

6                          MS. GILLIAN STEVENSON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          LAURA M. BRENNAN - Official Court Reporter
            219 South Dearborn Street - Room 2102
24                  Chicago, Illinois  60604
                        (312) 435-5785
25

1      (The following proceedings were had in open court:)

2          THE COURT:  I'm going to call it, and let's get the

3   lawyers' names on the record.  10 C 8103, Games Workshop v.

4   Chapterhouse Studios.

5          So one person can give the names of everybody.

6          MR. MOSKIN:  Jonathan Moskin, Foley & Lardner, for

7   the plaintiff.

8          With me is Jason Keener, also from Foley & Lardner,

9   and Gillian Stevenson, who is not counsel.  She is the

10  designee.  She's in-house counsel at Games Workshop.

11         THE COURT:  She is the corporate rep.

12         MR. MOSKIN:  Yes.

13         MR. ALY:  Good morning, your Honor; Imron Aly from

14  Winston & Strawn.  I have Jennifer Golinveaux from Winston.

15         Also at our table is Julianne Hartzell from Marshall,

16  Gerstein & Borun; and our client rep Nick Villacci.

17         THE COURT:  Okay.  So the jurors are filling out the

18  questionnaires.  We should have those up here in a little bit.

19         There's a few things I wanted to go over.  So, first

20  of all, there was some reference in an email I got, I think

21  from Mr. Moskin, that was copied onto everybody else about

22  some sort of a partial consent judgment.

23         So can somebody like come up here or some collection

24  of you come up here and tell me what that's all about and when

25  I'm going to see it and what claims it affects and so on?

```
 1          MS. HARTZELL:  Your Honor, we have been able to reach
 2   agreement with the plaintiff for the plaintiff to withdraw a
 3   number of the copyright and trademark allegations and enter a
 4   partial consent judgment of noninfringement.  We have it
 5   prepared and ready to send to your proposed orders email
 6   address, but your instructions require that we have
 7   permission.
 8          THE COURT:  Yes, that's fine.  So how much of the
 9   copyright?
10          MS. HARTZELL:  It's probably about five copyrighted
11   works.
12          MR. KEENER:  Five or six copyrights and maybe --
13          MS. HARTZELL:  And ten trademarks.
14          MR. KEENER:  Yes, a dozen or so trademarks, so
15   narrowed somewhat.
16          THE COURT:  Okay.  So one of the things I have to --
17   obviously, I'm planning to tell the jurors this morning is how
18   long the trial is going to take.  So anytime something is
19   removed, one of the questions that comes to my mind is whether
20   I should, you know, make some sort of a modification to the
21   time limitation.  So give me your thoughts about that.  How
22   does this affect?
23          MS. HARTZELL:  Many of the claims had been dropped
24   over the course of the end of discovery as the parties were
25   narrowing issues.  So I think that our estimates during
```

1    pretrial are still fairly accurate.

2         MR. KEENER:  That's right.  They're just confirming

3    what we said, withdrawing --

4         THE COURT:  Stuff that you were talking about as you

5    were going along for the most part.

6         MS. HARTZELL:  Yes, your Honor.

7         THE COURT:  Okay.  All right.  So what other stuff do

8    we need to talk about while we have got a little bit of time

9    here before the jurors come up?

10        MR. KEENER:  I think there's four small issues.

11        THE COURT:  Okay.

12        MR. KEENER:  So there are for opening -- yes, I think

13   that's right.  There are maybe only three issues, generally

14   three issues remaining.

15        There is one exhibit on each side that we each want

16   to refer to in our openings.

17        THE COURT:  And I need to make a ruling on it.

18        So I know that I have got all the stuff on here.  Can

19   somebody just hand me copies of the stuff that I have to deal

20   with?

21        MR. ALY:  May I approach, your Honor?

22        THE COURT:  That is fine.  Just come right over here.

23   So it's Defense Exhibit 452 and Plaintiff's Exhibit 898.

24        So what's the objection to Plaintiff's 898?

25        MR. ALY:  Objection to Plaintiff's 898, your Honor,

1    is that it is an advertisement of a website from somebody

2    other than the defendant here, Chapterhouse, advertising a

3    product other than anyone that is accused here, and counsel

4    wants to use it at opening to explain that somebody who

5    designed that product referred to it with Space Marines, but

6    because --

7              THE COURT:  Referred to it?

8              MR. ALY:  As a Space Marine product.

9              THE COURT:  As a Space Marine.

10             MR. ALY:  Which is one of their allegations in the

11   case, but because it's not relevant.

12             THE COURT:  Mr. Moskin, how are you going to get it

13   in?

14             MR. MOSKIN:  Through two ways:  One through Mr.

15   Villacci himself.  He concedes that Stephen Smith, the

16   eponymous operator or former operator of WarSmith.

17             THE COURT:  Oh, of this website.

18             MR. MOSKIN:  Right.  He was the sole designer of the

19   so-called TRU-Scale Space Marine.  They use a different name

20   for it.  But we have emails from Mr. Villacci, if need be, to

21   Stephen Smith at WarSmith Miniatures.  We also --

22             And, again, there is no dispute he's the only person

23   who designed the -- what they call their Knights Praetorius.

24   TRU-Scale Knights Praetorius we say is simply a copy of the

25   TRU-Scale -- is a TRU-Scale Space Marine.

1    The picture on the website that you're looking at is

2  the same picture that appears on the -- yes, the Chapterhouse

3  website.  So it's the Stephen Smith model.

4    THE COURT:  Appears on the Chapterhouse website in

5  what way?

6    MR. MOSKIN:  Painted exactly like this.  So

7  Chapterhouse had its painter -- had a painter render the

8  product exactly this way.

9    Moreover, the second -- so there are very -- numerous

10  links connecting Mr. Villacci directly to Stephen Smith and

11  this website, and the identical product that appears on

12  Villacci's own website.

13    Moreover, Gillian Stevenson can testify that Games

14  Workshop separately communicated with Steven Smith, so she

15  knows what this website is.  She knows he's the designer of

16  this product and that that's what this website is, so it's

17  just being --

18    THE COURT:  That kind of sounds pretty much like

19  hearsay to me, but let's just focus on the first part of it.

20  Mr. Aly, what is your argument?

21    MR. ALY:  Two missing links, your Honor.  One is

22  that, yes, that artist called that thing a Space Marine, but

23  that is not the thing that's on the Chapterhouse website.  So

24  we have a dispute about that, it seems factually, about

25  whether that image really appears.  We do not believe it is on

1    the website.  There's a different product made by the same

2    author, the same artist, but it's a different product.

3              THE COURT:  The thing that is on the website that Mr.

4    Moskin says is a Space Marine and you're saying isn't a Space

5    Marine, what is it called on the website, on the Chapterhouse

6    website?

7              MR. ALY:  That thing is not on Chapterhouse's

8    website, and that is where we dispute.

9              THE COURT:  So the thing that is similar to this that

10   is on the Chapterhouse website, what is it called?

11             MR. ALY:  That's called the TRU-Scale model,

12   TRU-Scale Praetorius something.

13             THE COURT:  Praetorius?

14             MR. ALY:  TRU-Scale Praetorius model.

15             THE COURT:  Okay.  Does somebody have a picture of

16   that so that I can see whether it's the same, similar,

17   different?

18             MR. ALY:  I could show you one, your Honor.

19             THE COURT:  Yes.  Have you got one?  What exhibit

20   number are you giving me here, just so we have got a record of

21   it?

22             MR. MOSKIN:  It is Exhibit 1022, Plaintiff's

23   Exhibit 1022.  And in particular, the product on the bottom on

24   the right.

25             THE COURT:  Bottom right.

1           MR. MOSKIN:  Yes.

2           MR. ALY:  Did you show him this one?

3           THE COURT:  I'm just going to prove that I would

4   never be able to play this game.  These things all look the

5   same to me.  Sorry.

6           MR. MOSKIN:  Well, actually it can be either one on

7   the bottom left either.  They --

8           THE COURT:  Bottom left.

9           MR. MOSKIN:  There's a figure with the red gun.

10          THE COURT:  Yes, I see it.  Okay.  I see the one

11  you're talking about.  All right, give me just a second here.

12      (Brief interruption.

13          THE COURT:  This is part of what I will call the

14  claim chart, and it's item number 126, and on the Chapterhouse

15  model column, it's on the lower --

16          MR. MOSKIN:  Left.

17          THE COURT:  -- left, and it's the -- not the one at

18  the very bottom.  That has two pictures.  It's the one on the

19  upper right-hand corner of that little grid there.

20          MR. MOSKIN:  So we can see the same shoulder pad.  It

21  could be the red gun.  We think it's the identical model.

22          THE COURT:  I'm hard pressed to see a difference.

23  I'm looking at the WarSmith Miniatures, and it's on page

24  GW18162, the larger image.  It's about a third of the way down

25  on the right, and I'm comparing that to the left-hand column

1    of item 126 on the website, the uppermost of the two figures

2    there.  Like I say, I'm hard pressed to see a difference.

3             MR. ALY:  Your Honor, if I may just add one thing?

4             THE COURT:  Yes.

5             MR. ALY:  The thing that you're looking at that looks

6    similar on the right, it's because the parts that Chapterhouse

7    sells have been assembled along with Games Workshop parts to

8    create that thing.

9             On the left -- I'm sorry -- on your Honor's right,

10   which is the Smith email that is in dispute, that is assembled

11   sold product that that's what that company sold as is.  So

12   there's a real issue about --

13            THE COURT:  So the argument is -- the argument is the

14   objection is a relevance objection.

15            MR. ALY:  It's a relevance objection.

16            THE COURT:  It goes to weight, not admissibility.

17   You can use it.

18            So let me hang onto all this stuff.  So the defense

19   wants to use Exhibit 452, which is the copyright office's

20   letter of January the 4th, 2013.

21            MR. MOSKIN:  And our contention is that it's

22   inadmissible because your Honor has already made rulings

23   subsequent to having reviewed this that the shoulder pad, the

24   basic shoulder pad design itself, is copyrightable.  So this

25   also falls under the rubric of the prior order that your Honor

1    entered that the parties are not to make reference to other

2    rulings.

3         This seems to be -- this was an initial ruling of the

4    copyright office.  We think ultimately, your Honor, we will be

5    awaiting a direction, an instruction, from your Honor to the

6    jury as to -- if this is entitled to any weight in view of the

7    Court's prior ruling that the shoulder pad design itself is

8    copyrightable.

9         THE COURT:  I'm just -- I'm pulling up the second

10   assignment ruling.  Did I make any comments in there about the

11   admissibility one way or another of whatever the copyright

12   office had done?

13        MR. ALY:  I don't recall that, your Honor.  I just

14   recall there was a finding of protectability.

15        THE COURT:  I don't think I did.

16        So is this the same -- this is the same January 2013

17   letter that is referred to that is discussed in my summary

18   judgment ruling of April 1st.  It's from Carole Frenkel,

19   F-r-e-n-k-e-l, right?

20        MR. ALY:  That's correct.

21        THE COURT:  So why should I let -- I mean, I've

22   already made a ruling on the issue.  Why should I let this in?

23        MR. ALY:  You should let it in, your Honor, because

24   the ruling is clearly that the protectable aspects that your

25   Honor found, the shape and size, but this letter doesn't go to

1    what are the protectable aspects or not.  The letter as --

2         After the ruling that your Honor made, the letter

3    just says, here is a rejection, and in the opening, the point

4    is only to say that there's a rejection.  It's not going into

5    the reasons for --

6         THE COURT:  So why should you get in the fact that

7    it's a rejection?

8         MR. ALY:  Because it's on one of the asserted

9    products.

10        THE COURT:  No, I understand, but, I mean, is there

11   something relevant about the fact that it was rejected as

12   opposed to the fact that it's not a registered copyright?

13        MR. ALY:  There is, your Honor, the fact that it was

14   rejected for the reason of lacking originality.

15        THE COURT:  But that's what I made the ruling on.

16        MR. ALY:  We think that was on another basis that the

17   copyright office may have interpreted, but we understand the

18   issue, and, therefore, we're not invoking the ruling.

19        THE COURT:  It's excluded under Rule 403.  I think it

20   would extremely -- be extremely confusing to the jury.

21        Here is all this stuff.  Okay, that's item

22   number one.  What is next?  What is next?

23        MR. ALY:  Next is the summaries, your Honor.  So your

24   Honor has this sheet.  That was one example of it, the painted

25   examples.

1          THE COURT:  What should I be looking at here?

2          MR. ALY:  I'm going to hand them to you, your Honor.

3          THE COURT:  Well, I may have it, though.  What is it

4     called?

5          MR. ALY:  It's a brand new demonstrative, DX 1020 and

6     DX 1021.

7       (Brief interruption.)

8          THE COURT:  Okay, go ahead.

9          MR. ALY:  And here is the issue with this, your

10    Honor.  The parties have actually discussed these at length

11    and agree that all of the images that are in there, they're

12    accurate.  They can be used as demonstratives.  The only issue

13    issue left is whether that's evidence or not, and we have a

14    disagreement about your Honor's ruling in the past, which is

15    your Honor clearly ruled we can -- the parties can use painted

16    images, assembled images, to show what people, customers, can

17    do with the product.

18          THE COURT:  Right.

19          MR. ALY:  But the problem is by submitting this

20    particular chart as evidence, now the jury will compare the

21    two pictures together as what is alleged to infringe rather

22    than looking at the product itself, which is the thing that is

23    accused of infringement.

24          So what we propose, your Honor, is use the chart, but

25    just let's add a disclaimer to it that says at the top of

1    every page:  The thing accused of infringement is the product.

2    We ask you to look at the product that's referenced and the

3    number, and then that line number will have that product

4    available, so that the jury can consider, when they're making

5    their consideration, the physical product.

6              That's the debate.

7              THE COURT:  Can I ask a question that's not on point

8    here?  But in this chart there is commentary on the left-hand

9    column.  Does that come from like a website or something?

10             MR. ALY:  It does, your Honor, and that's pertinent,

11   too.

12             THE COURT:  Mr. Moskin.

13             MR. MOSKIN:  There are a number of issues here.

14   Defendants previously made a motion in limine that the Court

15   should not consider -- we should not be able to present at all

16   to the jury images of the painted product but only the

17   unassembled bits and pieces, and we raised various arguments

18   and your Honor agreed that we could show them the painted

19   pictures.  That is the heart of our claim of copyright

20   infringement.  We have no objection if they also want to show

21   them the unassembled unpainted products.

22             THE COURT:  But basically what Mr. Aly is basically

23   asking for here is the equivalent of a limiting instruction.

24             MR. MOSKIN:  Well, we have no objection to them

25   saying that in addition to marketing their products, as shown

1     here, they also shipped their products unassembled and

2     unpainted, but that's not the focus of our claim.

3              THE COURT:  And remind me.  The painted images that

4     are in the Chapterhouse column on this, where do those images

5     come from?  They come from Chapterhouse's materials?

6              MR. MOSKIN:  Website, and I think there are one or

7     two instances where they come from Internet forums where they

8     posted or other sorts of advertising.  99.9 percent of them

9     are from the Chapterhouse website.

10             THE COURT:  So basically what you are saying is that

11    they're marketed this way.  They're marketed this way and

12    what?

13             MR. MOSKIN:  And so in order for the jury to

14    understand what we're claiming is the real infringement here,

15    they have to see the painted images.

16             THE COURT:  How it's being marketed.

17             MR. MOSKIN:  How it's being marketed.

18             Frankly, even if they never sold a single one of

19    these things, just putting it on their website, we believe is

20    an infringement.  In the same way that, for example --

21             THE COURT:  Is this thing going to be used in

22    opening?

23             MR. MOSKIN:  I don't --

24             THE COURT:  This chart?

25             MR. MOSKIN:  -- think so.

1          MR. ALY:  Images from it will be just to show the
2    accusation.

3          THE COURT:  I understand that.

4          So I guess I would entertain -- I'm not sure that
5    there should be any kind of a limiting instruction.  I'm not
6    sure.  I'm certainly not inclined to, you know, stamp
7    something on each page here.  I'm willing to entertain some
8    form of a limiting instruction, but you're going to need to
9    draft something and give it to me.  Okay.

10          So the quicker you get it to me, the quicker I will
11   consider it.

12          MR. ALY:  Understood.

13          MR. MOSKIN:  If I can --

14          THE COURT:  You don't have to address it until you
15   see it.

16          MR. MOSKIN:  No, no, but just the underlying issue
17   that Mr. Aly raised, there is no -- they concede there is no
18   dispute that this is permissible as a demonstrative.  The real
19   question is --

20          THE COURT:  Is whether it comes into evidence or not.

21          MR. MOSKIN:  And there is no dispute that this is a
22   summary -- the underlying evidence is all admitted and there
23   is no dispute as to the accuracy of what is shown here.

24          THE COURT:  I understand.

25          MR. MOSKIN:  And again this was --

1    THE COURT:  And you will tell me all of that if and

2  when Mr. Aly gives me a limiting instruction, a proposed

3  limiting instruction.

4    MR. MOSKIN:  Yes.

5    THE COURT:  What is the third issue?

6    MR. ALY:  The third issue has to do --

7    THE COURT:  Where are they right now?

8    (Brief interruption.)

9    MR. ALY:  The third issue, you know, has to do with

10  new copyright office communications.

11    THE COURT:  Hang on a second.

12    (Brief interruption.)

13    THE COURT:  I'm sorry, go ahead.

14    MR. ALY:  Yes, your Honor.  This is about new

15  copyright office correspondence.

16    THE COURT:  Hang on a second.

17    MR. ALY:  Just one sentence of background.  In this

18  case, there had been an incidence where copyright office

19  rejections and communications had not been produced in a

20  timely manner, and your Honor had granted sanctions of that

21  incidence.

22    So now last week, it was on Thursday, Mr. Moskin sent

23  an email saying, oops, I forget to send this particular email

24  to you, which is a rejection from March 22nd, and from the

25  copyright office referring in turn to another rejection from

1   January of this year.  And we're not here to cast aspersions.

2   The point here is a practical one.  Because we just got this,

3   we don't really know now how thorough the production is in

4   terms of copyright office rejections and communications.  We

5   got this one.  That's great, but if there's a lot of other

6   rejections on other products, we need to know.

7          THE COURT:  So what particular product does this

8   involve and when did the rejection take place?

9          MR. ALY:  Tact --

10         MR. MOSKIN:  It's called a tactical --

11         MR. ALY:  Shoulder pad.

12         MR. MOSKIN:  -- squad shoulder pad.  I don't think

13  Mr. Aly's description of what transpired last week is

14  accurate.  I had done a -- I have done periodic searches of my

15  email inbox to find any correspondence with the copyright

16  office, and the --

17         I did a last minute check because we had gotten in

18  two weeks ago three new registrations, so I double-checked and

19  found, which I had never seen before, that while I was on

20  vacation one week, this email came in response to it -- it was

21  not a typical type of correspondence because -- and I will

22  show you the correspondence, if you would like to see it.

23         THE COURT:  Okay.

24         MR. MOSKIN:  I had requested for the copyright office

25  to explain why we had seen nothing on 11 applications that

1   were filed, and the copyright office responded and gave me a

2   list -- I gave them a list, and they sent a list back saying,

3   for every one of them, not yet reviewed, not yet reviewed, not

4   yet reviewed. Again, when I saw this for the first time last

5   week, I then -- I didn't even immediately notice this. I saw

6   that buried in there when I printed this out that one of the

7   11 said rejected.

8           THE COURT: When did the letter come in to you?

9           MR. MOSKIN: The email came to me --

10         THE COURT: Email.

11         MR. MOSKIN: -- March 22nd, I believe, while I was

12   out of the country.

13         THE COURT: So this came in response to some sort of

14   a request that you had sent to the copyright office.

15         MR. MOSKIN: I sent the copyright office.

16         THE COURT: Did the request that you had sent to the

17   copyright office, was that produced? Had that been produced

18   previously?

19         MR. MOSKIN: Yes.

20         THE COURT: Previously?

21         MR. ALY: Oh, yes.

22         MR. MOSKIN: The requested letter was previously

23   produced. Yes, my March 12th -- I think it was on March 12th

24   I sent an email because that's when we were briefing this

25   issue previously and I wanted to know why --

1      THE COURT:  I get it.

2      So the concern right now, Mr. Aly, is you need some

3 greater -- you think you need some greater degree of certainty

4 as to the completeness of production of correspondence with

5 the copyright office.

6      MR. ALY:  That's right, your Honor.

7      THE COURT:  Okay.  So what would you like me to do?

8      MR. ALY:  Two things, your Honor.  One, order a

9 request to search for any correspondence with the copyright

10 office referencing shoulder pads or this client number that

11 they have in that title, and; two, a declaration or letter at

12 least that says --

13      THE COURT:  That seems eminently reasonable to me.

14 Do that by this time tomorrow.

15      MR. MOSKIN:  Fine, because that's exactly what I did

16 already search for.

17      THE COURT:  I understand, but do it again because

18 you're going to have to submit an affidavit, you know, under

19 the penalty of perjury.

20      MR. MOSKIN:  Right.  That's fine.

21      THE COURT:  All right.  What other issues do we have?

22      MR. ALY:  The last issue on my list, your Honor, is a

23 rule on witnesses for opening except for one party

24 representative on each side.

25      THE COURT:  Yes.  I mean, I'm going to exclude

1  witnesses other than the corporate representatives.

2            MR. MOSKIN:  Including for opening.

3            THE COURT:  Yes, including for opening.

4            MR. ALY:  Perfect.

5            THE COURT:  Right.  That would be sort of the norm.

6            I think you each have one set of the questionnaires.

7  Okay.  We're making a second set for you so you have two per

8  side.  Those should be up here in a minute.

9            MR. ALY:  Thank you.  May I retrieve the --

10            THE COURT:  Yes, I'm sorry.  Distribute it to

11  whoever.  I think part of it is Mr. Moskin's stuff.

12            Mr. Moskin, he's got some of your stuff that you had

13  given me here.

14            So I think each of you has one set of the

15  questionnaires.  We're making a second set.  Those should be

16  up here in a couple of minutes, and then we'll get the jurors

17  up here immediately after that.

18       (Brief interruption.)

19            THE COURT:  Here is your second set.  We're going to

20  get the jurors now.  They're just up one floor.

21       (Brief interruption.)

22            MR. ALY:  Your Honor, we have two things to clarify.

23            THE COURT:  Okay.

24            MR. ALY:  One thing is for opening statements, we

25  understand that you allow or don't mind scant legal

1 references, so like the standards of the elements and things

2 like that.

3 　　　　　THE COURT:  I don't mind.

4 　　　　　MR. ALY:  Okay, just wanted to confirm.

5 　　　　　THE COURT:  The jury will have heard all of that from

6 me before your openings.

7 　　　　　MR. ALY:  That's right, and we both talked about it

8 just now to make sure.  We didn't want to do that before.

9 　　　　　The second question --

10 　　　　　THE COURT:  Go ahead.

11 　　　　　MR. MOSKIN:  Oh, just to confirm, we're both under

12 the impression that there are three peremptory challenges.

13 　　　　　THE COURT:  You're correct.

14 　　　　　MR. MOSKIN:  Good, thank you.

15 　　　　　MR. ALY:  Thank you.

16 　　　　　THE COURT:  I think the jurors are sort of gathering

17 outside the door here.  It's taking a little longer than I

18 thought for them to get up here.

19 　　(Brief interruption.)

20 　　(The following proceedings were had in the presence and

21 hearing of the prospective jury:)

22 　　　　　THE COURT:  Go into the second row of these seats

23 over here.  Just go all the way down to the end.  Thanks.

24 　　(Brief interruption.)

25 　　　　　THE COURT:  Once that row gets filled up, just go

1    down to the next row.  That's fine.  You can go into the next

2    row.  You don't have to squeeze.  If you want to go in the

3    next row, that's fine.

4           I think we're still missing one or two people.  Let

5    me just count here.

6         (Brief interruption.)

7           THE COURT:  We're waiting for two more people.  Let's

8    sit tight for a second and I will start when they get here.

9         (Brief interruption.)

10           THE COURT:  Have a seat right over here.  We have got

11   one more, okay.

12         (Brief interruption.)

13           THE COURT:  Have a seat right over here.  Have a seat

14   right over here.  All right, you guys can come up here.

15           Good morning, ladies and gentlemen.  My name is

16   Matthew Kennelly.  I'm a United States District Court judge,

17   and I'm the judge who presides in courtroom.  I'm also the

18   judge who will be presiding over the trial that you have been

19   brought up here for this morning as the prospective jurors.

20           So in a second here, I'm going to explain to you why

21   you're here, in other words, why we have jury trials, and I

22   will also explain the process that we go through to select a

23   jury.  But before I do that, I want to have the people at

24   these tables up here introduced to you.

25           So let me first talk to you a little bit about how

1    the courtroom is set up.  I sit here, obviously.  The

2    witnesses who testify sit over here to my right, your left.

3    The jury that is selected sits in this area over here, and

4    some of you will be sitting there shortly.

5           The table that is the closest to the jury box is

6    where the plaintiff sits.  The plaintiff is the party that

7    filed the lawsuit.  So the plaintiff's lawyers and a

8    representative of the plaintiff company sit there.

9           The table that is little bit farther from the jury

10   box is where the defendant and the defendants' lawyers sit.

11   The defendant is the party who is being sued.  So the lawyers

12   for the defendant are there and a representative of the

13   defendant.

14          So the way we're going to start here is I'm going to

15   ask one person at each table to introduce both themselves and

16   the others at their table.

17          Mr. Moskin.

18          MR. MOSKIN:  Good morning, ladies and gentlemen.  I'm

19   Jonathan Moskin from the law firm of Foley & Lardner.

20          And to my right is Jason Keener, my colleague, also

21   from Foley & Lardner, and we represent the plaintiff.

22          And to my left is Gillian Stevenson, who works for a

23   lawyer at the company Games Workshop Limited, the plaintiff in

24   the case.

25          THE COURT:  Thanks, Mr. Moskin.

1          Mr. Aly.

2          MR. ALY:  Good morning.  My name is Imron Aly.  I

3   work for the law firm Winston & Strawn.  I have my colleague

4   here, Jennifer Golinveaux, who I work with as well.  And from

5   another firm here is Julianne Hartzell.  And then our client

6   representative from Chapterhouse Studios is Nicholas Villacci.

7          THE COURT:  Thanks.

8          So before we start the process of actually selecting

9   the jurors who will be deciding, hearing and deciding, this

10  case, I want to explain a little bit about your service here

11  this morning as the potential jurors and possibly as the

12  actual jurors in the case, and I will also explain the process

13  that we go through to select a jury.

14         The jury as an institution basically doesn't exist

15  anywhere in the world except in the United States of America

16  for civil cases, a civil case being a dispute among private

17  parties as opposed to a criminal case.  In everyplace else in

18  the world, with a couple of really tiny exceptions, civil

19  lawsuits are decided by judges.  In the United States of

20  America, they're decided by the people.

21         There is a reason for that, and I want to explain a

22  little bit about what the reason is and how it comes to be and

23  why you're here.  So the specific reason why juries decide

24  civil cases in federal court in our country is that's what our

25  Constitution provides.  You may have some distant or, for some

1   of you, not so distant memories about high school civics

2   classes where you learned about the Constitution and about the

3   Bill of Rights.  The Bill of Rights was the first 10

4   amendments to the Constitution that were adopted almost

5   immediately after the Constitution itself was adopted back in

6   the late 1700s.  And the 13 original states, a number of them

7   insisted on having the Bill of Rights as a condition of them

8   joining the union and adopting the Constitution.

9            The Seventh Amendment to the Constitution provides

10  for the right to a jury trial in all civil cases decided in

11  federal court.  So that's the specific reason why you're here.

12  The historical reason is a little bit more complicated.

13           As you know, our country is a combination of a lot of

14  different cultures and a lot of different traditions.  Our

15  legal system as it was adopted by the founders of our country

16  back in the late 1700s primarily comes from the English legal

17  system as it existed at that point in time.  In the English

18  legal system, they began to use juries of citizens as a way of

19  deciding cases way back in the early 1200s, in other words, in

20  the early 13th century.  And some of you may have some equally

21  distant memories of something called the Magna Carta, which

22  was the first official document by which the right to a jury

23  trial was established in England back in the year 1215.  We're

24  about to hit the 800th anniversary of the adoption of the jury

25  trial.

1     Even though it's quite a long time ago, we know quite

2   a bit about why it was they began to use juries of citizens to

3   decide cases in England that long ago.  And it really boils

4   down to two things.  Number one, having a jury of people

5   decide a dispute was thought of as being a more just, more

6   fair and more accurate way of deciding disputes than the other

7   ways that had been tried up to that point in time.

8     And, number two, and equally as important, having a

9   jury of citizens decide a case was thought of as being a way

10  of putting more power and more authority in the hands of the

11  people and having less of it in the hands of the government

12  because up to that point in time, all cases were decided by

13  judges, and a judge is a government official.  So this was a

14  way of putting more authority in the hands of the people.

15    Now, if you fast forward from the early 1200s to the

16  late 1700s and you come across the ocean to the United States,

17  those same considerations played a very significant role in

18  the decision of the founders of our country to adopt the right

19  to a jury trial in civil cases.  The founders of our

20  country --

21    First of all, the founders of our country were very

22  wary about putting too much power and too much authority in

23  the hands of any one person, particularly if that person was a

24  government official such as a judge.  When it came to making

25  important decisions about the rights and responsibilities and

1  liabilities of people in our country, the founders of our

2  country had a lot more trust and a lot more faith in the

3  ability of a group of ordinary people to be just and fair and

4  accurate than they did in the ability of a single judge to be

5  just and fair and accurate.

6      And, secondly, I think the founders of our country

7  believed that better decisions would be made by a group of

8  people acting together rather than by one person like a judge

9  acting by him or herself.  When a group of people sits down to

10  make a decision, everybody has a little bit different set of

11  perspectives, and all of those perspectives are important in

12  making sure that the best possible decision is made.  So

13  that's why you're here.

14      I've heard it said that over 95 percent of the jury

15  trials in the whole world happen in the United States.  I

16  think that's actually probably a little on the low side.  I

17  think the number is probably higher than that.  Depending upon

18  what you read or watch or listen to, you may hear a lot of

19  things about our legal system, good, bad or indifferent, and

20  I'm not here to get up on a soapbox or anything, but I am here

21  to tell you as somebody who has worked in the legal system for

22  32 years now, the last 14 of them as a judge, that this is

23  what makes our legal system better than the rest of them.

24      I have had the privilege of working with thousands of

25  jurors over the years, many of them when I was a lawyer and

1 many of them since I have been a judge, and I am here to tell

2 you that, in fact, the founders of our country were right.

3 Jurors do a better job of deciding cases than judges do. The

4 founders of our country didn't get everything right. They

5 made a lot of mistakes in our Constitution. Among other

6 things, not everybody counted at that point in time, but this

7 is one thing they got right, and this is part of their legacy

8 that you're actually living out here as you come in here

9 today.

10 Now, you're all here, and I'm obviously aware, and

11 everybody is involved in the case is aware, that you all have

12 other things that you would normally be doing and you have

13 other demands on your time and your attention and you have

14 lives outside the courtroom. And I'm aware that we're asking

15 you to make a sacrifice, although not a terribly huge one in

16 the scheme of things, but we're asking you to make a sacrifice

17 by being here and being eligible for and perhaps serving on

18 the jury in this case.

19 And I want to talk to you a little bit about why we

20 ask that, and it comes down to this. There is a saying:

21 Freedom isn't free. I will let that sink in for a second. It

22 was actually a line from a song back in the sixties, and I

23 will not ask for a show of hands of who was actually around in

24 the sixties. I would be one of those hands. But freedom

25 comes with a price. We have this unique system in which the

1   people make the decision.  You know, you all have the right to

2   vote, obviously, and it's an important thing to do.  But when

3   you vote, you're voting for other people who are going to

4   make -- who are going to represent you and make decisions.

5   When you serve on a jury, you're actually making the decision

6   yourself.  It's a form of direct democracy, and it's the most

7   direct way in which people participate in our government in

8   this country.  And so it comes with a price.

9           The freedom we have, and part of the freedom is the

10  fact that the people make the decision, is that that system

11  doesn't work unless the people are willing to step up to the

12  plate and serve.  So what we hope and what we ask is that

13  you're willing to put aside your other obligations for what is

14  hopefully going to be a short period of time and that you will

15  do that with the same kind of care, and with the same kind of

16  conscientiousness that you would want if it was your case

17  being decided.

18          The lawyers and I have spent a good deal of time

19  trying to streamline things.  I'm not going to say we have

20  done a perfect job.  I'm going to talk about it a little bit

21  more.  We have done our best to kind of confine the time that

22  will be spent with you to what I've concluded is a reasonable

23  amount of time.  I think that you are going to find, if you're

24  selected for the jury in this case, that it's a positive and

25  rewarding experience.

1      As I said, I've worked with thousands of jurors over

2   the years, and at least in the last 14 since I've been a

3   judge, I have spoken to each and every one of them, and I

4   don't think they're just trying to lead me on.  But I do think

5   that when this process is conducted correctly, and that's what

6   I am here to do, it ends up being a positive experience for

7   the jurors to sit down with a group of your fellow Americans

8   that you didn't know before and make a decision about

9   something that is very, very important to all of the people

10   sitting up here.  So that's why you're here.

11      And so let me now talk a little bit about how we go

12   about selecting a jury.  Both sides are entitled to have a

13   jury that is fair and impartial and unbiased, and the process

14   of the jury selection is designed to make sure that that is

15   what they get.  Every one of us comes in here with certain

16   attitudes and opinions and biases and prejudices that come

17   from our background and our upbringing and our jobs and our

18   educations and so on.  And, of course, as you know, no two

19   people think in exactly the same way.

20      So the process of jury selection is designed, first

21   of all, for us to find out a little bit about your

22   backgrounds.  We need to know a little bit about you and about

23   various experiences that you have had so that I and the

24   lawyers in the case can make intelligent decisions on who is

25   qualified to serve as a juror in this case.  That's why you

1    filled out those questionnaires, and I'm going to be asking

2    each of you some follow-up questions about those.

3              So those questions aren't in there because we're nosy

4    or trying to pry in your background; we just need to know some

5    basic information about you because when you come in here, all

6    we know is your name and the city or town that you're from.

7    So we'll go through a process here where I'm going to ask each

8    of you some follow-up questions based on your written answers.

9              And then we get to the actual selection process.  And

10   that has two parts.  First of all, each side is allowed to

11   argue to me that particular jurors would have a hard time

12   being fair in this particular case because of something in the

13   juror's background.

14             And, second of all, each side is allowed to excuse a

15   certain number of people from the jury without giving me a

16   reason.  That's what we call a peremptory challenge.  And a

17   lawyer can exercise it for any reason at all with some

18   exceptions.  You can't exclude somebody from a jury based on

19   their race, their ethnic background or their gender, but aside

20   from that, any reason is fine.  And the reason we have the

21   peremptory challenge is we want to make sure that both sides

22   are comfortable that the jury that is actually selected is

23   fair and impartial.

24             Now, if you are excused from the jury in this case,

25   you shouldn't take that as an insult.  This is where I pause

1   to let all 24 of you laugh on the inside because I know at

2   least 23 of you, and probably 24, is saying, what planet is he

3   on talking about being insulted for being excused from the

4   jury because, if I'm excused from the jury, I get to leave the

5   room and go home, it's a good thing, right.  You're thinking

6   that.  I'm not going to ask for a show of hands.  I know

7   you're thinking it.

8         Well, first of all, you're wrong.  You don't get to

9   go home.  You actually go back down to the jury room, and I

10  know we were short on jurors today.  So you would be going to

11  some other courtroom where you're not going to have a judge

12  who is anywhere near as funny as I am, number one.  And,

13  number two, you might be on a trial that, unlike this one,

14  might be going three, four, five weeks, okay.  So it's a crap

15  shoot, so to speak, as to how long the trial is going to be

16  that you're ultimately assigned to.

17        On a more serious note, I do think that it is

18  possible that someone could be feel insulted or upset if

19  they're excused from the jury because you might think, gee,

20  that means somebody thinks I'm not a fair person, and most of

21  us think we're fair people, and you might take it as an insult

22  if somebody thinks otherwise.

23        I can't tell you what to think, of course.  It's a

24  free country.  But I can tell you that everybody in the room,

25  myself included, probably has some type of a case where it

1    would be hard for us to be fair because of something in our

2    background.  So if you're excused from the jury in this case,

3    you may be perfectly well-qualified in the next one.

4          So that's the process that we'll be going through.

5    We'll be done selecting a jury by the time we break for lunch,

6    which will be about 12:30, and then we'll start the trial this

7    afternoon.  I'm going to talk a little bit more about the

8    length of the trial in a second.

9          What we're going to do in a moment here is I'm going

10   to have you all sworn in.  The clerk, who is sitting to my

11   left here, is going to swear you in.  Then the oath, you're

12   going to stand up, not yet, and she is going to administer an

13   oath to you in which you're going to promise to answer

14   truthfully all of the questions that are asked of you that

15   touch on your qualifications as a juror in the case that is on

16   trial.

17         I want to emphasize how important this oath is.  The

18   only way we know anything about you is if you're willing to

19   tell us.  And so your honesty and your candor in responding to

20   the questions has a direct bearing on both sides' right to

21   have a fair trial, which is one of most cherished rights we

22   have in our legal system.

23         Secondly, you may say, wait a second, I already

24   filled out a questionnaire and I wasn't under oath when I

25   filled that out.  What about that?  Well, I got that covered.

1    When I question each one of you individually, I'm going to ask
2    each one of you whether your answers on the questionnaire were
3    true and correct.  And if they were, you will say yes, and
4    then it will be under oath.
5         It's not all that uncommon actually for people to
6    realize when they get up here that they made a mistake on the
7    questionnaire or left something off.  You may hear something
8    that somebody else says that jogs your memory.  If that
9    happens, it's fine, just so long as you tell me.  So if you
10   have already remembered something by the time I get to you,
11   when I ask you the question about whether your answers are
12   true and correct, you will say, well, I left something off or
13   I made a mistake and I will get it out.  I will ask you about
14   it.
15        If I have already gotten past you and I'm questioning
16   somebody else and you remember something, raise your hand, get
17   my attention and I will come back to you.  So that will be the
18   process we go through.  In a second here --
19        Well, first of all, why don't you all stand up and
20   she is going to administer an oath to you.
21        (Prospective jurors sworn.)
22        THE COURT:  Have a seat.
23        We're going to call off your names in an order.  I
24   don't determine the order.  It's determined by a computer
25   algorithm.  I'm going to have you move seats.  We're going to

1  have the first seven people called off sit in the first row of

2  the jury box, 1 at this end to 7.  So you're going to want to

3  in that way.  Is there room to get past that table there?

4  There is, okay.  You're going to have to kind of squeeze your

5  way.

6         Let's do this.  We're going to do it in reverse

7  order.  Why don't you come down to this end, and you will come

8  in through here.  1 will go down there through 7, and 8

9  through 14 in the back row.  So don't try to squeeze through

10  there.  Just kind of come through here and go in this end.

11  And then we'll fill up the pews.

12         I'm going to question everybody, so it doesn't really

13  matter where you're sitting.  I just need to know who is

14  where.  If your name gets mispronounced, I apologize.  We'll

15  get it right eventually.  Okay.

16         THE CLERK:  Lawrence Klema.

17         THE COURT:  So, Mr. Klema, just come right up here,

18  come in this end and go kind of down to that end.

19         THE CLERK:  Thomas White, Ruta Bowler-Stedt, Todd

20  Marsell, Leslie Peterson, September Wilson.

21         THE COURT:  Ms. Wilson, let Ms. Peterson, who is

22  behind you, get in before you.

23         THE CLERK:  Juanita Moton, Lisa Nelson.

24         THE COURT:  So, Ms. Nelson, you're going to go into

25  the second row all the way down to the end.

1    THE CLERK:  Jennifer Hon, William Potter, Darin

2  Snyder, Regina Gladney, Stacy McNally, Emma Baker.

3    THE COURT:  Okay.  Let's pause right here, and the

4  young lady who is sitting in the second row still, move back a

5  row.

6    All right.  So the next person is going to go into

7  that second row and go all the way down to that end.

8    THE CLERK:  Lynne Inglesby, Joseph Sebek, Michael

9  Witte, Brian Cadre, Gina Barger, Madison Gayda, Helen De La

10  Mata, Marian Stenner.

11    THE COURT:  So Ms. Stenner, you're going to be down

12  at the end of the next row there.  So this young lady, you

13  just need to let her get by you.

14    THE CLERK:  Emily Capettini.

15    THE COURT:  You're just going to slide down.

16    THE CLERK:  Jeffrey Adams.

17    THE COURT:  Okay.  So I'm going to start off asking

18  some questions, and I'm just asking to all of you as a group,

19  looking for a show of hands.

20    Do any of you have trouble seeing?  And what I mean

21  by that is if you have your glasses on or your contacts in,

22  are you having trouble seeing me right now?  So this is like

23  "Welcome Back, Kotter" for those of you old enough, you have

24  got to get the hand way up there because otherwise I don't see

25  you.

1          You can't see me right now?

2          PROSPECTIVE JUROR:  I can't see you but --

3          THE COURT:  Do you have glasses or contacts?

4          PROSPECTIVE JUROR:  I don't have my glasses.

5          THE COURT:  But you can bring them, right?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  I thought I saw another hand.  So that

8    was Ms. -- it's Ms. Gladney, right?  I am used to counting

9    from this way.  Okay.

10          Are there any of you who have trouble hearing?  And

11   what I mean by that is if I'm talking into the microphone, are

12   you having trouble hearing me?

13          No hands.

14          Okay.  Just so you know, the lawyers are on a

15   microphone, the witnesses are on a microphone and so am I.

16          Any there any of you who have trouble understanding

17   the English language as it's read or spoken?  If so, please

18   raise your hand.

19          No hands.

20          So you have been introduced to the people at these

21   tables here.  Have any of you ever met any of them before or

22   had dealings with them from what you can remember?  If so,

23   please raise your hand.

24          Hang on a second.  That's Mr. Adams.  Go ahead.

25          PROSPECTIVE JUROR:  -- my stepbrother's an employee.

1    THE COURT:  Okay.  I'm going to make a note of that

2  and I will come back to that.  Thanks.  Let me put a note on

3  your questionnaire.  Thanks, Mr. Adams.

4    All right.  The next thing I want to talk about is

5  the length of the trial.  So you have heard -- well, let me

6  ask you this.  You all read this little letter that came along

7  with the questionnaire.  I'm going to read it again.

8    The lawsuit is called Games Workshop Limited v.

9  Chapterhouse Studios, LLC.  Games Workshop is a company that

10  created and sells a tabletop war game that is called Warhammer

11  40,000 or it's sometimes called Warhammer 40K.  Games Workshop

12  makes and sells products that related to the game including

13  figurines, books, magazines and other accessories that are

14  used to play to game.

15    Chapterhouse is a company that makes and sells

16  products that are related to Warhammer 40K.  These products

17  include figurines and accessories that are used to play the

18  game.

19    So in the lawsuit, Games Workshop alleges that

20  certain products that Chapterhouse markets and sells infringe

21  on copyrights that are owned by Games Workshop and that they

22  also infringe on trademarks that are owned by Games Workshop.

23  Chapterhouse denies Games Workshop's claims, and it also

24  contends that any reference or use that it's made to Games

25  Workshop's copyrights and trademarks is what is called a fair

1  use that, according to Chapterhouse, is permitted under the
2  law, and Games Workshop denies that.

3  So before you came in here today, had any of you
4  heard or read or seen anything about this particular dispute,
5  not about the games?  We already asked a question.  Have any
6  of you heard anything about this dispute before you came in
7  here today?  If so, raise your hand.

8  You had heard something about this dispute?
9  PROSPECTIVE JUROR:  No.

10  THE COURT:  No, okay.  All right, no hands on that
11  one.

12  Okay.  So now I'm going to talk about the length of
13  the trial.  There is a pretty decent number, a pretty large
14  number, of products that are involved in this case.  So it's
15  going to take a little while to present the evidence.  So I
16  want to tell you what we have done to streamline things.

17  So, number one, I've reconfigured -- I'm responsible
18  as a judge for 290 civil cases and 35 criminal cases, so about
19  325 cases.  I've reconfigured the rest of my schedule to
20  devote as much of the day as reasonably possible to this
21  trial.  Now, you can't have a trial go too long during the day
22  because people; namely, you folks, get worn out after a while.
23  But normally on a daily basis, I have people coming in on
24  other cases, and we don't start a trial until a little bit
25  later.  I changed all of that so we can have as long as a day

1    as reasonably possible.  That's the first thing.

2          The second thing is I've put time limits on the

3    lawyers.  Each side has a particular number of hours to

4    present their case.  So any time a lawyer is questioning a

5    witness, making an argument, making an objection, there is an

6    clock that is running.  There's a time limit and which I'm

7    enforcing.  And so I know how long this trial is going to take

8    unless we have some, you know, big weather disaster or

9    something like that that throws monkey wrench into it.  And

10   the trial will be completed by next Wednesday.  So it's eight

11   days.  It may end up being seven if we can get along enough

12   days in.  It's a little bit longer than the normal trial.

13   Usually they're four or five days.

14         Now, in a second here, I'm going to ask whether it

15   would pose a severe hardship to any of you to serve on a jury,

16   but before I ask the question, I'm going to define the

17   terminology.  Severe hardship does not mean inconvenient.  If

18   it meant inconvenient, I would raise my hand because it's

19   inconvenient for me, too, and you would all get to go home,

20   okay.  That's not the definition.

21         The best way for me to define severe hardship is to

22   give you a couple of examples.  So one example might be if

23   you're the caretaker for a disabled person or a small child

24   who is at home and you're their caretaker and you can't get

25   anybody to fill in for you.  Or another example might be

1    you're leaving on vacation within the next two weeks.  You

2    have already paid for it and I will be asking you details

3    about all of this stuff.  That might be an example.  There are

4    other possibilities, but those are a couple of examples.  That

5    will give you an idea.

6            I'm going to tell you right now the fact that you

7    raise your hand and tell me something is not a guarantee that

8    you get out.  I have to make decisions about that.  That's

9    what they pay me the so-called big bucks for, so I make

10   decisions about things like this.

11           But what I need to know now is I need to know if

12   anybody would experience a severe hardship to serve on the

13   jury in this case.  If so, raise your hand.  So keep your hand

14   up until I take your name down.  So I've got Mr. Klema.  You

15   can put your hand down.  Mr. White.  Thanks.

16           Hang on a second.  Mr. Snyder or Potter?  Mr. Snyder.

17   That's Ms. McNally, right.  Ms. Baker.  I've got everybody in

18   the box.

19           Hang on a second.  Is it Mr. Cadre, Dr. Cadre?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  All right.  Okay.  I will ask each one of

22   you about the circumstances of that when I get to you.  If I

23   forget, please remind me.

24           Okay.  The next thing I'm going to do is I'm going to

25   read a list of names of people who might be called to testify

1   in this case.  I don't think they all will be, but I'm going

2   to err on the side of overinclusiveness, and many of these

3   people are not from anywhere around here, so I doubt that you

4   will know them, but I want to make sure that's the case.

5           So what I'm going to ask you at the end is whether

6   any of you know any of these people or have had dealings with

7   them.  A couple of people I named may have already been named

8   to you.

9           Jeremy Goodwin; Alan Merrett, M-e-r-r-e-t-t; Laurence

10  Blanche, B-l-a-n-c-h-e; Andrew Jones.  He lives in the United

11  Kingdom.  Nicholas Villacci, V-i-l-l-a-c-c-i, Gillian

12  Stevenson.  She's been introduced to you.  Thomas Nanson;

13  Daniel Brown, David Thomas.  He also lives in the United

14  Kingdom.  David Gallagher, Neil Hodgson, Martin Footitt,

15  F-o-o-t-i-t-t; Darius Hinks; Thomas Walton; Ed Spetigue,

16  S-p-e-t-i-g-u-e; Sandra Casey, Steve Horvath, David Anderson.

17  He lives in California.  Robert Naismith; Thomas Fiertek;

18  F-i-e-r-t-e-k, Wyatt Traina; T-r-a-i-n-a; Robert Lippman.

19  There may be some duplication here.

20          William Brewster; Carl Grindley, G-r-i-n-d-l-e-y;

21  Jeffrey Nagy, N-a-g-y; Gary Chalk.  Neil Hodgson, I think I

22  mentioned him already.  Sam Terry, who is from West Virginia.

23  Ashton Holbrook; Gary Wolfe, Gary Wolfe; W-o-l-f-e, Michiko

24  Okamura, O-k-a-m-u-r-a.  I think I've covered all of them.

25          So have any of you heard of any of those people or

1    had dealings with them?  If so, raise your hands.

2         No hands.

3         Now we get to the tedious part.  It's not fair to say

4    it's already been tedious.  I know it has.  This is the more

5    tedious part, and the reason it's tedious, I can only talk to

6    one of you at a time.

7         If I get to a question with any particular person

8    where it's something that you consider a little bit more

9    private that you would rather not answer in this setting where

10   everybody is listening, you need to tell me.  I still have to

11   ask the question, but I can do it in a somewhat more private

12   setting.  The way we'll do deal with that is if you tell me, I

13   would rather answer that privately, then we will hold the

14   question until the end of the process.  You and I, the court

15   reporter, and a lawyer for each side will go over to the side

16   of the room and we'll answer it over there.

17        So I still have to ask the question, but I can do it

18   a little bit more privately.  The only way I will know that is

19   if you tell me.  So we'll start off with -- is it pronounced

20   Klema?

21        PROSPECTIVE JUROR:  Klema.

22        THE COURT:  Klema.  Sorry about mispronouncing it at

23   least four times so far.

24        Were your answers on the questionnaire true and

25   correct?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  And how long have you been living in the

3    town where you live right now?

4          PROSPECTIVE JUROR:  Since '97.

5          THE COURT:  Okay.  You served in the military.  What

6    branch of the service?

7          MR. MOSKIN:  No, my brother did.

8          THE COURT:  Your brother served in the military.  And

9    you have a -- it looks like two years in commercial art.  What

10   was the focus in commercial art.

11         PROSPECTIVE JUROR:  Design.

12         THE COURT:  Design, okay.

13         I think your job is self explanatory.  I don't need

14   to ask you more questions about that.

15         MR. MOSKIN:  Well, I'm self-employed right now.  I'm

16   starting my own business.

17         THE COURT:  What type of business?

18         PROSPECTIVE JUROR:  Handyman business.

19         THE COURT:  Okay.

20         PROSPECTIVE JUROR:  And I got contracts that I'm

21   supposed to be doing.

22         THE COURT:  This is the hard --

23         So we're getting to the hardship issue.  So tell

24   me -- give me more specifics about what the issue is.

25         PROSPECTIVE JUROR:  I got jobs that I'm supposed to

1    be at today and all week to get done.

2         THE COURT:  Is it just you or are there other people

3    that work with you?

4         PROSPECTIVE JUROR:  Just me.

5         THE COURT:  Okay.  All right.  We'll take that into

6    consideration.  Thanks for telling me.

7         Let me just make a further note here.

8         You have heard of Games Workshop before coming to

9    court today.  How had you?  Did you read about them, hear

10   about them?

11        PROSPECTIVE JUROR:  My son plays video games and does

12   all that kind of stuff.  So I just vaguely heard it from him

13   maybe.

14        THE COURT:  And you think that you may have heard of

15   Warhammer 40,000?  Would it be the same way, through him?

16        PROSPECTIVE JUROR:  Through my son.

17        THE COURT:  Does he just play video games?  Does he

18   do anything that involves figurines or anything like that?

19        PROSPECTIVE JUROR:  Yes, he used to.  He's got

20   magazines.  He's got all that stuff.

21        THE COURT:  All right.  But you hadn't heard anything

22   about the dispute that is at issue here?

23        PROSPECTIVE JUROR:  No.

24        THE COURT:  All right.  You have a relative who has

25   worked -- either you or a relative has worked in a sales or

1    marketing job. Was it you or a relative?

2           PROSPECTIVE JUROR: My wife.

3           THE COURT: Your wife. What type of marketing or

4    sales does she do?

5           PROSPECTIVE JUROR: Car sales.

6           THE COURT: Car, okay. That's all I have got for you

7    right now. Thanks very much, Mr. Klema.

8           Next is Mr. -- is it pronounced -- oh, it's White. I

9    know I have a Witte back here somewhere. Mr. White, were your

10    answers on the questionnaire true and correct?

11           PROSPECTIVE JUROR: Yes, sir.

12           THE COURT: All right. And you raised your hand on

13    the hardship question. Tell me what your situation is.

14           PROSPECTIVE JUROR: I'm in full commission sales, a

15    hundred percent commission. I sell life insurance. Last

16    month was under water, so I'm already starting behind the

17    eight ball starting in June. I have a set expense, which if

18    you want to go over my financial, I would be happy.

19           THE COURT: You have a net that you have to meet

20    basically.

21           PROSPECTIVE JUROR: Yes.

22           THE COURT: Right.

23           MR. MOSKIN: I have two staff people; I have an ex-

24    wife that has money on a monthly basis.

25           Finally, I have another -- I am being recruited by

1    another firm with 30 other owners, and it's in Dallas, that

2    meeting, next Monday and Tuesday that I already have an agenda

3    for and a plane ticket for.

4            THE COURT:  And so you're supposed to go down there

5    for the meeting which you're being recruited for.

6            PROSPECTIVE JUROR:  Right.

7            THE COURT:  Again, I will take it into account.  But

8    let me ask you the other questions I need to ask you.

9            Was it you --

10           First of all, what part of Chicago do you live in,

11   North Side, South Side, West Side?

12           PROSPECTIVE JUROR:  Southern Gold Coast.

13           THE COURT:  And how long have you been living in that

14   part of Chicago?

15           PROSPECTIVE JUROR:  Ten years.

16           THE COURT:  Was it you or a relative who served in

17   the military?

18           PROSPECTIVE JUROR:  Father.

19           THE COURT:  Father, all right.

20           And where is your college degree from and what

21   subject was it in?

22           PROSPECTIVE JUROR:  Miami University in Oxford, Ohio,

23   and it was in arts and science, speech communication.

24           THE COURT:  Okay.  You have already explained to me

25   what your job is.  I get that.

1    There was a question on the back side of the page

2  that asked if you or a relative or close friend have ever

3  played any miniature war games.  You put yes.  Tell me about

4  that.

5    MR. MOSKIN:  Those war game computers you sit on each

6  side of each other.

7    THE COURT:  Got it.  So it was a computer game, in

8  other words.

9    PROSPECTIVE JUROR:  Correct.

10    THE COURT:  All right.  There was a question that

11  asked whether you have ever been involved in creating an

12  artistic work that was sold to others.  You put yes.  Tell me

13  a little bit about that.

14    PROSPECTIVE JUROR:  Like helping people create a

15  book.

16    THE COURT:  Okay.  What type of a book was it?

17    PROSPECTIVE JUROR:  Autobiography.

18    THE COURT:  Got it.

19    Were you -- are you one of the people that has a

20  copyright in the book, or do you know?

21    PROSPECTIVE JUROR:  No.

22    THE COURT:  You're not, okay.

23    You answered yes on the job about being paid on

24  commission.  You have already explained that.

25    You have asked --

1          You answered yes on the job about being -- or the

2     question about being involved in a sales job.  You have

3     explained that.

4          There was a question that asks whether you have ever

5     been involved in a lawsuit.  You said, yes, work related.  Can

6     you just tell me generally speaking what it was about?

7          PROSPECTIVE JUROR:  It actually happened earlier this

8     month.

9          We're regulated by FINRA, F-I-N-R-A.

10         THE COURT:  Yes.

11         PROSPECTIVE JUROR:  When I left my previous firm

12    three years ago, something was put on my --

13         THE COURT:  So there was a -- which you had to deal

14    with with --

15         Is it the NFA?

16         It's not the NFA.  Is it FINRA that you have to deal

17    with?

18         PROSPECTIVE JUROR:  Correct.

19         THE COURT:  Is it still going on or is it done with?

20         PROSPECTIVE JUROR:  Technically it's still going on.

21    It hasn't been closed out.

22         THE COURT:  Closed out, okay.

23         Did you have a lawyer representing you in that?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Do you remember what the name of the

1  lawyer or the law firm was?

2          PROSPECTIVE JUROR:  Jim Kopecki, Kopecki and two or

3  three others.

4          THE COURT:  Got it.  Everything else I'm asked you

5  about.

6          Thanks very much.

1        THE COURT:  Ms. is it Bowler-Stedt.  Did I say it

2    right?

3        PROSPECTIVE JUROR:  Yes.

4        THE COURT:  Okay.  Were your answers on the

5    questionnaire true and correct?

6        PROSPECTIVE JUROR:  Yes.

7        THE COURT:  How long have you been living in the town

8    where you live now?

9        PROSPECTIVE JUROR:  19 years.

10        THE COURT:  Where is your undergraduate degree from,

11    and what subject is it in?

12        PROSPECTIVE JUROR:  DePaul University in sociology.

13        THE COURT:  And your master's is from where and in

14    what subject?

15        PROSPECTIVE JUROR:  University of Illinois at

16    Chicago.  I have a master's in social work.

17        THE COURT:  And you work as a school social worker.

18    What grade level of kids do you deal with?

19        PROSPECTIVE JUROR:  Kindergarten through fourth

20    grade.

21        THE COURT:  Okay.  There was the question on the back

22    of the page about you, a relative or friend ever playing any

23    miniature war games.  You put, "yes, board games."  What type

24    of games are we talking about?

25        PROSPECTIVE JUROR:  I was thinking back to like Risk.

1      THE COURT:  Risk.  Okay.  Right.  That's what most
2  people of a certain age would say.  I would be one of those
3  people.

4      You answered yes on the question about whether you or
5  a relative has ever worked in sales or marketing.

6      PROSPECTIVE JUROR:  My husband sold produce.

7      THE COURT:  Got it.

8      And you served on a jury before.  Once or more than
9  once?

10      PROSPECTIVE JUROR:  Just once.

11      THE COURT:  How long ago was it?

12      PROSPECTIVE JUROR:  At least 20 years ago.

13      THE COURT:  20 years ago.  Do you remember what court
14  you went to?  Was it Will County or --

15      PROSPECTIVE JUROR:  No.  It was here.

16      THE COURT:  It was here.  So was it the Daley Center
17  maybe?

18      PROSPECTIVE JUROR:  Yes.

19      THE COURT:  Do you remember what type of case it was?

20      PROSPECTIVE JUROR:  It was a civil case.

21      THE COURT:  Was it an injury case maybe?

22      PROSPECTIVE JUROR:  It was an injury.

23      THE COURT:  Okay.  Did the jury deliberate and reach
24  a verdict?

25      PROSPECTIVE JUROR:  Yes.

1          THE COURT:  That's all I need.  Thanks very much.

2          Mr. Marsell, were your answers on the questionnaire

3     true and correct?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  How long have you been living in the town

6     where you live right now?

7          PROSPECTIVE JUROR:  18 years.

8          THE COURT:  Where is your college degree from, and

9     what subject is it in?

10         PROSPECTIVE JUROR:  Illinois State University,

11    Normal, Illinois, and it is in business administration -- or

12    excuse me, business management.

13         THE COURT:  Got it.

14         And you've worked in sales.  What type of sales have

15    you done?

16         PROSPECTIVE JUROR:  Financial investments.

17         THE COURT:  You answered yes on the question about a

18    job where you're paid on commission.  Obviously the type of

19    work you just described is a commission job.  You've also

20    answered the question about sales job.  I think that may be

21    all I have for you.  Give me just a second.

22         That is all I have.  Thanks very much, Mr. Marsell.

23         Ms. Peterson, were your answers on the questionnaire

24    true and correct?

25         PROSPECTIVE JUROR:  Yes.

1    THE COURT:  How long have you been living in the town
2  where you live now?
3         PROSPECTIVE JUROR:  22 years.
4         THE COURT:  Where did you get your college degree,
5  and what subject was it in?
6         PROSPECTIVE JUROR:  Illinois State University in
7  Normal, organizational management.
8         THE COURT:  Wow, two people from -- who went to
9  school in Normal right next to each other.  Okay.
10        And you've worked as a -- most recently as a
11 substitute teacher at what grade level?
12        PROSPECTIVE JUROR:  K through 5.
13        THE COURT:  Okay.  You noted that at one point in
14 time you worked in a job for a patent attorney.  In what --
15        PROSPECTIVE JUROR:  I was going through college.
16        THE COURT:  Okay.  What did you do, administrative --
17        PROSPECTIVE JUROR:  Secretarial type of work.
18        THE COURT:  Secretarial type of work.
19        Do you remember the name of the law firm?
20        PROSPECTIVE JUROR:  Lucas, Brugman and --
21        THE COURT:  Okay.  In Chicago?
22        PROSPECTIVE JUROR:  Yes.
23        THE COURT:  Okay.  All right.  They're not involved
24 in this case, just so you know.  I'm not sure they even exist
25 anymore, but if they do, they're not involved in this case.

1       Let's see.  You answered yes on the question about

2   whether you or a relative has ever worked in a sales or

3   marketing job.  Tell me about that.

4       PROSPECTIVE JUROR:  That would be my brother-in-law,

5   owns his own cars.  He sells cars.

6       THE COURT:  He sells cars.

7       There was a question about whether you, a relative or

8   friend has ever worked as a lawyer or for a law firm.  You've

9   already told me about that.  Is there anything other than what

10  we just talked about?

11      PROSPECTIVE JUROR:  A close friend of ours is an

12  attorney.

13      THE COURT:  Do you know what type of law the person

14  practices?

15      PROSPECTIVE JUROR:  He does injury cases and some

16  other pro bono work.

17      THE COURT:  Nothing like the type that you're in here

18  for?

19      PROSPECTIVE JUROR:  I don't believe.

20      THE COURT:  That you're aware of at least.

21      PROSPECTIVE JUROR:  Right.

22      THE COURT:  Okay.  That's all I've got, Ms. Peterson.

23  Thanks very much.

24      Ms. Wilson, were your answers on the questionnaire

25  true and correct?

1            PROSPECTIVE JUROR:  Yes.

2            THE COURT:  How long have you been living in the part

3    of Chicago where you live now?

4            PROSPECTIVE JUROR:  16 years.

5            THE COURT:  And you're a full-time student.  What are

6    you studying?

7            PROSPECTIVE JUROR:  I'm in the BASW program at

8    Northeastern, bachelor in social work.

9            THE COURT:  At Northeastern.  Okay.

10           There was a -- you mentioned -- you referenced a

11   lawsuit that you were involved in where you had your

12   deposition taken about a year and a half ago.  Just generally

13   speaking, what was the lawsuit about?

14           PROSPECTIVE JUROR:  It's actually a malpractice.  I'm

15   the legal guardian of the actual plaintiff, my granddaughter.

16           THE COURT:  Got it.

17           And so it's a medical malpractice case where you're

18   suing sort of for her?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Okay.  Is the case still going on?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Do you know the name of the lawyer or the

23   law firm that's handling it?

24           PROSPECTIVE JUROR:  Steinberg Burtker and Grossman.

25           THE COURT:  Okay.  And was it your deposition that

1  was taken back in October 2011?

2         PROSPECTIVE JUROR:  Yes, sir.

3         THE COURT:  Okay.  I think that's all I've got.

4  Thanks very much.

5         Ms. is it pronounced Moton?

6         PROSPECTIVE JUROR:  Moton.

7         THE COURT:  Moton.

8         Were your answers on the questionnaire true and

9  correct?

10        PROSPECTIVE JUROR:  Yes.

11        THE COURT:  How long have you been living in the town

12  where you live now?

13        PROSPECTIVE JUROR:  14 years.

14        THE COURT:  You attended a business school.  Was it

15  general business classes basically?

16        PROSPECTIVE JUROR:  Just generally.

17        THE COURT:  And your most recent job was with Spiegel

18  doing what exactly?

19        PROSPECTIVE JUROR:  HR.

20        THE COURT:  Okay.  All right.  You answered yes on

21  the question that asked whether you, a relative or friend has

22  ever played any miniature war games.  Tell me about that.

23        First of all, you, a relative or a friend?

24        PROSPECTIVE JUROR:  Just a relative.

25        THE COURT:  Relative.

1      Do you know what type of game the relative plays?

2      PROSPECTIVE JUROR:  Just -- no, I really don't.  Just

3   computer.

4      THE COURT:  But it's computer oriented, in other

5   words.  Okay.

6      And there was a question about whether you, a

7   relative or friend has ever collected or painted figurines,

8   and you put yes.  Tell me about that.

9      PROSPECTIVE JUROR:  Figurine, that's for myself.  I

10  collect angels.

11     THE COURT:  Angels.  Got it.

12     Pretty sure there are no angels involved in the games

13  that we're talking about.  It's sort of almost the opposite.

14  I don't know.

15     MR. MOSKIN:  If I could make a joke, there are dark

16  angels.

17     THE COURT:  Okay.  Fair enough.  Not the kind of

18  angels you're collecting, I'm guessing, I'm pretty sure.

19     Let's see.  You answered yes on the question about

20  whether you or a relative ever worked on a commission basis.

21  Was that yourself or a relative?

22     PROSPECTIVE JUROR:  Myself.

23     THE COURT:  Yourself.  What type of --

24     PROSPECTIVE JUROR:  That was for -- that was for

25  light and gas, processing applications.

1          THE COURT:  Got it.

2          And there was also a question about working in a

3   sales or marketing job.  Is that also the same thing you just

4   mentioned?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Okay.  That's all I've got.  Thanks very

7   much, Ms. Moton.

8          Ms. Nelson, were your answers on the questionnaire

9   true and correct?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  How long have you been living in the town

12   where you live right now?

13         PROSPECTIVE JUROR:  14 years.

14         THE COURT:  Was it you or a relative who served in

15   the military?

16         PROSPECTIVE JUROR:  My brother.

17         THE COURT:  And where did you get your nursing

18   degree?

19         PROSPECTIVE JUROR:  North Park University.

20         THE COURT:  North Park.

21         And at the company you're working for right now, what

22   type of work do you?

23         PROSPECTIVE JUROR:  They make personalized products,

24   so I just help them.

25         THE COURT:  Got it.  And I think your other jobs are

1    relatively self-explanatory, so I don't have to go through

2    those.

3        You put down that your brother has collected or

4    painted figurines.  Do you know what types of things?

5        PROSPECTIVE JUROR:  I mean, probably military -- I

6    mean Lord of the Rings.

7        THE COURT:  That kind of thing.

8        PROSPECTIVE JUROR:  That kind of thing.

9        THE COURT:  All right.  You answered yes on the

10   question about whether you or a relative has ever worked in a

11   job where you were paid on a commission basis.  Was that you

12   or a relative?

13       PROSPECTIVE JUROR:  A relative.

14       THE COURT:  Okay.  What type of job did the person --

15       PROSPECTIVE JUROR:  My brother, sales.

16       THE COURT:  What type of things does he sell?

17       PROSPECTIVE JUROR:  Don't know.

18       THE COURT:  Don't know.

19       PROSPECTIVE JUROR:  He doesn't do it anymore.

20       THE COURT:  Oh, used to.

21       PROSPECTIVE JUROR:  I don't remember.

22       THE COURT:  And you answered yes on the question

23   about whether you, a relative or friend has ever worked as a

24   lawyer or for a law firm.

25       PROSPECTIVE JUROR:  Yes.  My son's godson is a

1  lawyer.  And I don't think it's anything that would relate to
2  here.
3          THE COURT:  Is the godson a lawyer here in Chicago or
4  somewhere else?
5          PROSPECTIVE JUROR:  In Chicago.
6          THE COURT:  Do you know the name of the law firm he's
7  with?
8          PROSPECTIVE JUROR:  I want -- I'm trying to think of
9  his business card.  It was like Great Lakes something or
10  other.
11          THE COURT:  Okay.  But you don't think he practices
12  like copyright or trademark law or anything like that?
13          PROSPECTIVE JUROR:  No.
14          THE COURT:  All right.  And you answered yes on the
15  question that asked about whether you or a family member has
16  ever been involved in a lawsuit or has testified.  Tell me
17  about that.
18          PROSPECTIVE JUROR:  My husband is a physician, and
19  he's had to give depositions before.
20          THE COURT:  Got it.
21          That's all I've got.  Thanks very much.
22          Ms. Hon, did I pronounce it right?
23          PROSPECTIVE JUROR:  Yes.
24          THE COURT:  Were your answers on the questionnaire
25  true and correct?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  And how long have you been living in the

3   town where you live now?

4          PROSPECTIVE JUROR:  Four years.

5          THE COURT:  When you were in college, what college

6   were you attending, what did you study?

7          PROSPECTIVE JUROR:  It was South Suburban College.

8   It was just general types of courses.

9          THE COURT:  General types of courses.  Okay.

10         Okay.  The employment's I think pretty

11  self-explanatory.

12         You answered yes on the question about whether you, a

13  relative or friend has ever worked as a lawyer or for a law

14  firm.  Tell me about that.

15         PROSPECTIVE JUROR:  I have a stepmother that worked

16  in a law firm.  I'm not sure of the name of it.  And I also

17  have a friend that worked for Foley & Lardner.

18         THE COURT:  A friend who worked for Foley & Lardner,

19  worked for currently or in the past?

20         PROSPECTIVE JUROR:  One that works currently.  Two

21  were actually killed in a car accident.

22         THE COURT:  Do you know what type of work the people

23  did for Foley & Lardner?

24         PROSPECTIVE JUROR:  Legal assistant.

25         THE COURT:  Legal assistant.  Okay.

1          All right.  And did you ever talk to the any of these

2     people about the types of cases they were working on or

3     anything like that?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Do you think that you can be equally fair

6     to both sides, including the side that's not represented by

7     that law firm?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  You answered yes on the question that

10    asked whether you or somebody in your family has ever been

11    involved in a lawsuit or has testified.  Tell me about that.

12         PROSPECTIVE JUROR:  It's my husband.  He has an open

13    workers' comp case.

14         THE COURT:  Does he have a lawyer in the case?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Do you know what the name of the lawyer

17    is?

18         PROSPECTIVE JUROR:  The lawyer is Michael Hellman.

19         THE COURT:  That's all I need to know.  That's all

20    I've got.  Thanks very much, Ms. Hon.

21         Mr. Potter, were your answers on the questionnaire

22    true and correct?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  How long have you been living in the town

25    where you live right now?

1          PROSPECTIVE JUROR:  Eight months.

2          THE COURT:  Was it you or a relative who served in

3     the military?

4          PROSPECTIVE JUROR:  My father.

5          THE COURT:  Where did you get your degree in biology?

6          PROSPECTIVE JUROR:  University of Dayton at Ohio.

7          THE COURT:  And you work as a quality systems manager

8     for a company called Custom Culinary.  What's their business?

9          PROSPECTIVE JUROR:  Sauces, gravies, bases.  We're

10    part of Griffith Laboratories.

11         THE COURT:  And what do you do on a day-to-day basis?

12         PROSPECTIVE JUROR:  Ensure the quality of the product

13    we produce.

14         THE COURT:  Okay.

15         PROSPECTIVE JUROR:  Make sure it's safe.

16         THE COURT:  You answered yes on the question that

17    asked whether you, a relative or friend has ever played any

18    miniature war games.

19         PROSPECTIVE JUROR:  My nephew plays a lot of war

20    games.

21         THE COURT:  Do you know if he's played this Warhammer

22    40K?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Is his stuff all on computer or is any of

25    it --

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  It's all computer.  Okay.

3    And you answered yes on the question about whether

4  you, a relative or friend has ever collected or painted

5  figurines.

6    PROSPECTIVE JUROR:  I have bobbleheads.

7    THE COURT:  Bobbleheads, okay.

8    PROSPECTIVE JUROR:  Mostly sports figures.

9    THE COURT:  All right.  There was a question that

10  asked if you have any knowledge about or experience with

11  copyrights or trademarks, and you put yes.

12    PROSPECTIVE JUROR:  Yes.  I've been in the food

13  industry 33 years, and a lot of the companies I've worked for,

14  I've worked with food scientists that have patents,

15  trademarks.

16    THE COURT:  Have you ever gotten any kind of training

17  or, you know, in-house training or anything like that about

18  copyright law or trademark law or anything like that?

19    PROSPECTIVE JUROR:  No.

20    THE COURT:  No.  Okay.

21    You've served on a jury before.  How many times?

22    PROSPECTIVE JUROR:  Just once.

23    THE COURT:  How long ago?

24    PROSPECTIVE JUROR:  In New Jersey.

25    THE COURT:  In New Jersey you say?

1          PROSPECTIVE JUROR:  Yeah.  Probably about 17, 18

2     years ago.

3          THE COURT:  Do you remember what type of case it was?

4          PROSPECTIVE JUROR:  It was a civil case.

5          THE COURT:  Do you remember what type of civil case?

6          PROSPECTIVE JUROR:  Not really.

7          THE COURT:  Do you remember if the jury deliberated

8     and reached a verdict?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Did it?  Okay.

11          That's all I need to know.  Thanks, Mr. Potter.

12          Mr. Snyder, were your answers on the questionnaire

13     true and correct?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  You raised your hand on the hardship

16     question.  Tell me what your situation is.

17          PROSPECTIVE JUROR:  My wife has MS, and with my job,

18     I'm close to home, so if anything ever happened, I'm able to

19     get there right away.  But today I happen to have somebody

20     come in and help take care of stuff.  It's hard to be away

21     from home for a long time.

22          THE COURT:  And you live on the South Side.  About

23     how far -- how long does it take to get there from here?

24          PROSPECTIVE JUROR:  It took me about an hour and 20

25     minutes to drive here this morning.

 1          THE COURT:  Let me go ahead and ask you the other
 2   questions I need to ask you.
 3          How long have you been living in that part of
 4   Chicago?
 5          PROSPECTIVE JUROR:  About ten, 11 years.
 6          THE COURT:  You work for the Chicago Water
 7   Department.  What do you do on a day-to-day basis?
 8          PROSPECTIVE JUROR:  Concrete work mostly.
 9          THE COURT:  You answered yes on the question about
10   whether you've ever worked in a -- you or a relative has ever
11   worked in sales or marketing.  Tell me about that.
12          PROSPECTIVE JUROR:  I have a cousin that does sales
13   for a fuel company.
14          THE COURT:  Okay.  That's all I've got for now.
15   Thanks very much.
16          Ms. Gladney, were your answers on the questionnaire
17   true and correct?
18          PROSPECTIVE JUROR:  Yes.
19          THE COURT:  And how long have you been -- first of
20   all, what part of the city of Chicago do you live in?
21          PROSPECTIVE JUROR:  West Side.
22          THE COURT:  West Side.  How long have you been living
23   on the West Side?
24          PROSPECTIVE JUROR:  21 years.
25          THE COURT:  When you worked for is it CNA, the

1    insurance company, in other words?

2         PROSPECTIVE JUROR:  No.  I'm a certified nursing

3    assistant.

4         THE COURT:  Oh, you worked as a certified nursing

5    assistant.  I misread your answer.  You had it right.

6         And what type of place did you work at?

7         PROSPECTIVE JUROR:  In a hospital.

8         THE COURT:  At a hospital.  All right.

9         That may be all I have.  Give me just a second here.

10        How many years did you work there?

11        PROSPECTIVE JUROR:  Six years.

12        THE COURT:  Six years.  And what hospital was it?

13        PROSPECTIVE JUROR:  Northwestern.

14        THE COURT:  Got it.  That's all I've got.  Thanks

15   very much, Ms. Gladney.

16        Ms. McNally, were your answers on the questionnaire

17   true and correct?

18        PROSPECTIVE JUROR:  Yes.

19        THE COURT:  You raised your hand on the hardship

20   question.  Tell me what the situation is.

21        PROSPECTIVE JUROR:  I had plane tickets on Tuesday

22   next week to take my stepdaughter to college for orientation

23   in Kansas.

24        THE COURT:  So Tuesday next week, in other words, the

25   11th.

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  All right.  Let me go ahead and

3    ask you the other questions I need to ask you.

4          How long have you been living in the town where you

5    live right now?

6          PROSPECTIVE JUROR:  Six years.

7          THE COURT:  Where did you get your college degree,

8    and what subject was it in?

9          PROSPECTIVE JUROR:  University of Illinois,

10   Champagne, bachelor of science in (inaudible).

11         THE COURT:  And where is your master's from and in

12   what subject?

13         PROSPECTIVE JUROR:  Rush University, a master of

14   science in speech language pathology.

15         THE COURT:  And you work as a speech pathologist at a

16   hospital.  Okay.  That's, I think, fairly self-explanatory.

17         That may be all I have for you.  Give me just a

18   second here.  That is all I have.  Thanks very much.

19         Ms. Baker, were your answers on the questionnaire

20   true and correct?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  You also raised your hand on the hardship

23   question.  Tell me what the situation is.

24         PROSPECTIVE JUROR:  My husband has Parkinson's and --

25         THE COURT:  Husband has Parkinson's, and what was the

1  second thing?

2        PROSPECTIVE JUROR:  Asthma.

3        THE COURT:  Okay.

4        PROSPECTIVE JUROR:  He's diabetic.

5        THE COURT:  And so you're his care giver.  What does

6  it require on sort of a day-to-day basis?

7        PROSPECTIVE JUROR:  Everything.  He's gotten where he

8  can barely stand, falls a lot.  My granddaughter is staying

9  with him today.

10        THE COURT:  You said your grand --

11        PROSPECTIVE JUROR:  My granddaughter is staying with

12  him today.

13        THE COURT:  Your granddaughter is there today.

14        Let me ask you the other questions I need to ask you.

15        How long have you lived in the town where you live

16  right now?

17        PROSPECTIVE JUROR:  25 years.

18        THE COURT:  You answered yes on the question about

19  whether you or a relative has served in the military.

20  Yourself or a relative?

21        PROSPECTIVE JUROR:  Brothers.

22        THE COURT:  Brothers?  Okay.

23        How long have you been retired from Dominick's?

24        PROSPECTIVE JUROR:  I retired April 19th of this

25  year, 2013.

1    THE COURT:  And what did you do there before you
2  retired?

3         PROSPECTIVE JUROR:  Cashier.

4         THE COURT:  You answered yes on the question about
5  whether you or a relative ever worked in a job that involved
6  being paid on commission.

7         PROSPECTIVE JUROR:  I did.  Carson's, selling
8  jewelry.

9         THE COURT:  Oh, you sold jewelry.  At Carson Pirie
10  Scott?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  All right.  That's all I've got for now.
13  Thanks very much.

14         All right.  Now, so those of you who are sitting in
15  the cheap seats --

16         Yes, Mr. -- hang on a second.  I'm going to get it
17  right.  Mr. Klema.

18         PROSPECTIVE JUROR:  I got an open workmen's comp
19  case.  I don't know if that's --

20         THE COURT:  Thanks for telling me that.

21         It's still going on?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Do you have a lawyer?

24         PROSPECTIVE JUROR:  Yes.  John Pifelka; Annisey,
25  Osmond & Associates (phonetic).

1      THE COURT:   Thanks for letting me know that.

2      Have you had your deposition taken yet?

3      PROSPECTIVE JUROR:   No.

4      THE COURT:   Not yet.  All right.  Thanks.

5      So I was about to say that those of you sitting in

6  the cheap seats pay a small price.  You have to stand up.

7  Because you're far away, that's the only way I can hear you.

8      So, Ms. Inglesby, you're first.  So, first of all,

9  were your answers on the questionnaire true and correct?

10      PROSPECTIVE JUROR:   Yes.

11      THE COURT:   How long have you been living in the part

12  of Chicago where you live now?

13      PROSPECTIVE JUROR:   For about 50 years.

14      THE COURT:   When you attended college, what college

15  did you attend, what did you study?

16      PROSPECTIVE JUROR:   One year at Wright College, and

17  just general studies.

18      THE COURT:   Got it.

19      And of the jobs that you listed here, the most recent

20  one was at Martin Brower or at NKFE?

21      PROSPECTIVE JUROR:   NKFE.

22      THE COURT:   What do they do?

23      PROSPECTIVE JUROR:   Industrial real estate.

24      THE COURT:   Got it.  And what did you do on a

25  day-to-day basis?

1           PROSPECTIVE JUROR:  Admin assistant, secretarial.

2           THE COURT:  It's your spouse who served in the

3    military?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  So you answered yes on the question about

6    whether you, a relative or friend has ever played any

7    miniature war games, and you said your spouse.

8           PROSPECTIVE JUROR:  He does online.

9           THE COURT:  It's all computer based?

10          PROSPECTIVE JUROR:  Right.

11          THE COURT:  Okay.  You also had checked off that you

12   had heard of Warhammer 40,000.  Do you remember how you heard

13   of it?

14          PROSPECTIVE JUROR:  One of the gals I work with, her

15   son, I believe, plays Warhammer.

16          THE COURT:  Okay.  So you just might have -- casual

17   conversation basically?  Casual conversation?

18          PROSPECTIVE JUROR:  Right.

19          THE COURT:  Okay.  You served on a jury before.  How

20   many times?

21          PROSPECTIVE JUROR:  Once.

22          THE COURT:  How long ago was that?

23          PROSPECTIVE JUROR:  '99.

24          THE COURT:  And do you remember what courthouse you

25   went to?

1          PROSPECTIVE JUROR:  It was here.

2          THE COURT:  This building?

3          PROSPECTIVE JUROR:  Yeah.

4          THE COURT:  Do you remember what --

5          PROSPECTIVE JUROR:  Three weeks.  It was like tax

6     evasion, tax fraud.

7          THE COURT:  So it was a criminal case, in other

8     words?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Did the jury deliberate and reach a

11     verdict?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  So one thing I need to tell you since you

14     served on a jury in a jury case, and it's been a while ago, so

15     you may not remember this, but the judge would have told you

16     that the prosecution had to prove the charges beyond a

17     reasonable doubt.  In a civil case, it's a less severe burden.

18     The plaintiff has to prove the claims by what's called a

19     preponderance of the evidence, and there may be defenses that

20     the defendant has to prove by a preponderance of the evidence,

21     which is a less severe burden than beyond a reasonable doubt.

22     I'll explain it more later, but for now I just want to make

23     sure you know there's a difference.  Do you understand?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Okay.  I think that's all I've got.  Yes,

1    it is.  You can have a seat.  Thanks.

2           Give me just one second here.  I just need to look

3    back at a couple of things here.

4           I neglected to ask a question of Mr. Snyder.  You had

5    checked off that you had heard of Games Workshop before coming

6    in here today.  Do you remember how?

7           PROSPECTIVE JUROR:  My kids play video games.

8           THE COURT:  Video games.  All right.  Thanks.

9           Let me just look back at a couple of others here.

10   Just a second.  I want to make sure I didn't miss that

11   question with anybody else.  Nope.

12          Okay.  So we're now to Mr. -- is it pronounced Sebek?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Were your answers on the questionnaire

15   true and correct?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  How long have you been living in the town

18   where you live right now?

19          PROSPECTIVE JUROR:  13 years.

20          I do have a hardship, though.  I forgot.

21          THE COURT:  Okay.  What's the issue?

22          PROSPECTIVE JUROR:  I'm running a basketball game

23   next week starting Monday from 8 to 2.

24          THE COURT:  8 a.m. to 2 p.m.  Okay.  And I assume

25   it's for kids?

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  What age kids?

3           PROSPECTIVE JUROR:  My daughter.  Third through

4    eighth.

5           THE COURT:  So you have to be there on a daily basis?

6           PROSPECTIVE JUROR:  Yes.

7           THE COURT:  So you're basically taking off of work to

8    do that?

9           PROSPECTIVE JUROR:  Correct.

10           THE COURT:  Let me ask you the other questions I need

11   to ask you.

12           You answered yes on the military service.  Was it

13   yourself or a relative?

14           PROSPECTIVE JUROR:  My father.

15           THE COURT:  And where did you get your college degree

16   from, and what subject is it in?

17           PROSPECTIVE JUROR:  Benedictine, marketing.

18           THE COURT:  And you work in -- you're a vice

19   president of sales for something called Kane Millwork.

20   What --

21           PROSPECTIVE JUROR:  Woodworking.

22           THE COURT:  What do you do on a day-to-day basis?

23           PROSPECTIVE JUROR:  Sell.

24           THE COURT:  You also supervise other people?

25           PROSPECTIVE JUROR:  Correct.

1          THE COURT:   Your spouse is a college professor.
2     What's she teach?
3          PROSPECTIVE JUROR:   She teaches marketing
4     communications.
5          THE COURT:   Okay.   You wrote down that you had heard
6     of Games Workshop and Warhammer 40K.   Tell me how.
7          PROSPECTIVE JUROR:   Yes.   One of our estimators plays
8     it.
9          THE COURT:   When you say an es -- in other words,
10    somebody who works for your company.
11         PROSPECTIVE JUROR:   Yes.   Works for me, yes.
12         THE COURT:   Does he or she talk about the game at
13    all?
14         PROSPECTIVE JUROR:   Yeah.
15         THE COURT:   Had you heard anything about --
16         PROSPECTIVE JUROR:   I never heard of it before.
17         THE COURT:   Okay.   Had you heard anything about this
18    dispute?
19         PROSPECTIVE JUROR:   No.
20         THE COURT:   Okay.   All right.
21         So you answered yes on the question you, a relative
22    or friend ever played any miniature war games.   Same person?
23         PROSPECTIVE JUROR:   Same person.
24         THE COURT:   Have you, a relative or friend ever
25    collected or painted figurines?

1           PROSPECTIVE JUROR:  He did.

2           THE COURT:  Same person?

3           PROSPECTIVE JUROR:  Yes.

4           THE COURT:  Have you ever seen any of them?

5           PROSPECTIVE JUROR:  No.

6           THE COURT:  Have you, a relative or friend ever

7   attended any gaming conventions?  Same person?

8           PROSPECTIVE JUROR:  Same.

9           THE COURT:  Okay.  There was a question about whether

10  you have any knowledge about or experience with copyrights or

11  trademarks.

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Tell me about that.

14          PROSPECTIVE JUROR:  One of my friends came up with a

15  patent on backyard barkeep, it's called, for bags.

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR:  So he invented that and patented

18  it.

19          THE COURT:  Got it.

20          There was a question about whether you, a relative or

21  friend has ever made a claim of infringement of a copyright,

22  trademark or patent.  You put yes.  It should be a no?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Okay.  You've already talked to me about

25  being in a sales job.  You're paid on commission obviously.

1    You answered yes on the question about whether you, a

2    relative or friend has ever worked as a lawyer or for a law

3    firm.

4        PROSPECTIVE JUROR:  That's a wrong answer.

5        THE COURT:  That should be a no.  Okay.

6        PROSPECTIVE JUROR:  Yes.  Sorry.

7        THE COURT:  There was a question about being involved

8    in a lawsuit or testifying.

9        PROSPECTIVE JUROR:  No.

10       THE COURT:  That should be a no as well.

11       Okay.  That's all I got for now.  Thanks a lot.

12       Mr. Witte, first of all, is that the right

13   pronunciation?

14       PROSPECTIVE JUROR:  Yes.

15       THE COURT:  Were your answers on the questionnaire

16   true and correct?

17       PROSPECTIVE JUROR:  Yes.

18       THE COURT:  How long have you been living in the city

19   where you live right now?

20       PROSPECTIVE JUROR:  66 years.

21       THE COURT:  What branch of the service did you serve

22   in?

23       PROSPECTIVE JUROR:  Army.

24       THE COURT:  Were you overseas at all?

25       PROSPECTIVE JUROR:  Vietnam.

1    THE COURT:   You have a degree in personnel management

2    from what school?

3    PROSPECTIVE JUROR:   Northern Illinois.

4    THE COURT:   And how long have you been retired?

5    PROSPECTIVE JUROR:   February.

6    THE COURT:   February.

7    And what did you do on a day-to-day basis in your job

8    as a club manager?

9    PROSPECTIVE JUROR:   I was club manager.   Ran the

10   daily operations of a private social club.

11   THE COURT:   Got it.

12   You served on a jury twice in Kane County.   What

13   types of cases?

14   PROSPECTIVE JUROR:   One was a rape case, and one was

15   attempted murder case.

16   THE COURT:   So they were both criminal cases.

17   You heard what I said to the other juror about the

18   difference.

19   Did the juries deliberate and reach verdicts in both

20   cases.

21   PROSPECTIVE JUROR:   Yes.

22   THE COURT:   And the most recent of those was how long

23   ago?

24   PROSPECTIVE JUROR:   Four years ago.

25   THE COURT:   That's all I've got, Mr. Witte.   Thank

1    you very much.

2            Dr. Cadre, were your answers on the questionnaire

3    true and correct?

4            PROSPECTIVE JUROR:  I believe so, but after hearing

5    some of the responses, I just wanted to make sure.

6            THE COURT:  Okay.

7            PROSPECTIVE JUROR:  The question about the sales

8    commission, is that myself or anybody I know?

9            THE COURT:  You or a relative.

10           PROSPECTIVE JUROR:  Okay.  So my brothers-in-law both

11   and my father-in-law are salesmen for Select Metals, a company

12   that my wife's other uncle owns.

13           THE COURT:  Got it.

14           Is there anything else that --

15           PROSPECTIVE JUROR:  I'm friends with millions of drug

16   reps, which all sell on commission.

17           THE COURT:  Okay.  Fair enough.

18           You raised your hand on the hardship question.

19           PROSPECTIVE JUROR:  It may not apply assuming how

20   long -- I didn't know when the trial would start.  I will be

21   leaving town on a trip with my son actually the 19th of June.

22           THE COURT:  We'll be done by then.

23           How long have you been living in the town where you

24   live right now?

25           PROSPECTIVE JUROR:  Nine years.

1    THE COURT:  Where did you get your undergraduate

2    degree and what subject?

3    PROSPECTIVE JUROR:  Undergraduate was University of

4    Illinois in Chicago in biochemistry.

5    THE COURT:  Where did you get your MD?

6    PROSPECTIVE JUROR:  Loyola University Stritch School

7    of Medicine here in Maywood.

8    THE COURT:  You work as an anesthesiologist.  I think

9    that's relatively self-explanatory.

10   You answered yes on the question of whether you've

11   ever been involved in the creation or an artistic work that

12   was sold to others.

13   PROSPECTIVE JUROR:  My neighbor put together a CD as

14   a benefit for wounded war veterans that are involved in our

15   hospital and made a video, and my wife and kids and I are all

16   on the video.  I don't know if it's patented or anything or

17   copyright.

18   THE COURT:  And you were involved in a lawsuit during

19   your residency, so that's we'll just say a couple of years ago

20   now at this point.

21   PROSPECTIVE JUROR:  Yeah, that was a while ago.

22   THE COURT:  Did you have a deposition taken or

23   anything like that?

24   PROSPECTIVE JUROR:  In one suit I was named defendant

25   but got removed because I was named on accident due to a

1  computer error.  The one that was actually a lawsuit I was

2  named as a respondent in discovery and did give a deposition

3  in that case.

4         THE COURT:  About how long ago was that?

5         PROSPECTIVE JUROR:  That would have been --

6         THE COURT:  More than ten years, I'm guessing, right?

7  Maybe about ten years.

8         PROSPECTIVE JUROR:  Just a little more than ten years

9  ago.  I graduated '99.  Residency was '04.  It would have had

10 to have been before '03.

11        THE COURT:  And you answered yes on the question

12 about whether you've had any relatives or friends who've ever

13 worked as a lawyer or for a law firm.

14        PROSPECTIVE JUROR:  I'm friends with quite a few

15 lawyers.

16        THE COURT:  Do any of the lawyers that you're friends

17 with, do you know whether any of them handle patent, trademark

18 or copyright cases?

19        PROSPECTIVE JUROR:  One is an insurance attorney.

20 There's a corporate attorney that I think used to work for

21 Strawn but now is at Hastings.  I don't know for sure.  The

22 other one is Busse Busse & Grasse.  I know he adjudicated the

23 E-2 Nightclub thing here in Chicago, but I don't know what

24 kind of law he does.

25        THE COURT:  Thanks very much.

1       Let's see.  Is it Ms. is it Barger or Barger?

2       PROSPECTIVE JUROR:  Barger.

3       THE COURT:  Barger.

4       Were your answers on the questionnaire true and

5  correct?

6       PROSPECTIVE JUROR:  Yes.

7       THE COURT:  How long have you been living in the town

8  where you live right now?

9       PROSPECTIVE JUROR:  My whole life.

10      THE COURT:  When you attended college, what college

11  was it?  What did you study?

12      PROSPECTIVE JUROR:  Triton.  I studied court

13  reporting.

14      THE COURT:  I think your job is relatively

15  self-explanatory.  Don't need to ask you questions about what

16  you do.

17      Oh, you served on a jury before.  How many times?

18      PROSPECTIVE JUROR:  Once.

19      THE COURT:  How long ago?

20      PROSPECTIVE JUROR:  Six or seven years ago.

21      THE COURT:  Do you remember what courthouse you went

22  to?

23      PROSPECTIVE JUROR:  26th and California.

24      THE COURT:  So it was a criminal case.

25      PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Do you remember what type of criminal

2     case?

3          PROSPECTIVE JUROR:  It was a murder trial.

4          THE COURT:  Did the jury deliberate and reach a

5     verdict?

6          PROSPECTIVE JUROR:  Deliberated, did not reach a

7     verdict.

8          THE COURT:  So it was a hung jury basically.  All

9     right.

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  And you heard what I said to the other

12    jurors about the difference between civil and criminal cases.

13         PROSPECTIVE JUROR:  I did.

14         THE COURT:  That's all I've got for you.  You can

15    have a seat.

16         Ms. Gayda, is that the right pro --

17         PROSPECTIVE JUROR:  Gayda.

18         THE COURT:  Gayda.

19         Were your answers on the questionnaire true and

20    correct?

21         PROSPECTIVE JUROR:  The only thing was I said I knew

22    someone who went to a gaming convention, but actually I don't

23    think I did know anyone.

24         THE COURT:  So that should be a no.  Thank you.

25         How long have you been living in the -- not counting

1    college, how long have you been living in the town where you

2    live now?

3              PROSPECTIVE JUROR:  11 years.

4              THE COURT:  And what's your degree in and what

5    school?

6              PROSPECTIVE JUROR:  I went to three different

7    colleges.  I got my degree at Roosevelt in accounting.

8              THE COURT:  All right.  Your job is relatively

9    self-explanatory.  I don't think I need to ask you questions

10   about what you do.

11             So you checked off that you had heard of Games

12   Workshop and that you had heard of Warhammer 40,000.  Tell me

13   what you think you'd heard about.

14             PROSPECTIVE JUROR:  I've been into their store at the

15   shopping mall by my house, and back in 2008 I played Warhammer

16   40,000 for a bit with my friend.

17             THE COURT:  You said with some friends?

18             PROSPECTIVE JUROR:  With one of my friends.

19             THE COURT:  With a friend.

20             And you said in 2008?

21             PROSPECTIVE JUROR:  Yeah.

22             THE COURT:  Okay.  The store, what shopping mall?

23             PROSPECTIVE JUROR:  Woodfield in Schaumburg.

24             THE COURT:  And when you played the game -- so it's a

25   tabletop game with figures that get moved around and things

1     like that?

2           PROSPECTIVE JUROR:   (Nodding.)

3           THE COURT:   How long of a period of time did you play

4     it for?

5           PROSPECTIVE JUROR:   Maybe two months.

6           THE COURT:   Did you have any of the figures or pieces

7     yourself, or did you use somebody else's?

8           PROSPECTIVE JUROR:   I used his.  I never bought --

9           THE COURT:   Basically it was a friend's who was kind

10    of into it and you played?

11          PROSPECTIVE JUROR:   Right.

12          THE COURT:   All right.  So are you still -- are you

13    still in touch with that particular friend at all?

14          PROSPECTIVE JUROR:   I talk to him here and there, but

15    we're not nearly as close as --

16          THE COURT:   Do you talk to him at all about Warhammer

17    40K?

18          PROSPECTIVE JUROR:   No, not really.

19          THE COURT:   All right.  So on the question about --

20    there were two questions about knowing people who've played

21    war games and people who've collected or painted figurines.

22    Is that the same friend?

23          PROSPECTIVE JUROR:   Yes.

24          THE COURT:   So did he paint his own?  Do you know?

25          PROSPECTIVE JUROR:   Yes, he painted his own.

1          THE COURT:  You answered yes -- I may have to ask you

2     some follow-up questions about that, but I want to consult

3     with the lawyers first.

4          There was a question about whether you know anybody

5     who's worked in a sales or marketing job.

6          PROSPECTIVE JUROR:  My cousin used to work for

7     Brookstone.  He recently quit that job.

8          THE COURT:  That's all I've got for now.  Thanks very

9     much.

10         Ms. De La Mata, did I say it right?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Were your answers on the questionnaire

13    true and correct?

14         PROSPECTIVE JUROR:  Yes, sir.

15         THE COURT:  How long have you been living in the town

16    where you live now?

17         PROSPECTIVE JUROR:  About ten years.

18         THE COURT:  Where did you get your associates degree,

19    and what subject was it in?

20         PROSPECTIVE JUROR:  Oakton for geography, travel.

21         THE COURT:  And you work as a -- what does a rate

22    desk specialist do?

23         PROSPECTIVE JUROR:  We're a help desk for the other

24    departments.  We help them with the pricing and tariffs,

25    recalculate.

1    THE COURT:  So you're not dealing with the outside;
2 you're dealing with internal people.
3    PROSPECTIVE JUROR:  Internal.
4    THE COURT:  All right.  Okay.  You answered yes on
5 the question about working in a job where you were paid in
6 commission, either yourself or a relative.
7    PROSPECTIVE JUROR:  My sister.
8    THE COURT:  What type of work does she do?
9    PROSPECTIVE JUROR:  Television/radio.
10    THE COURT:  She sells ad space basically?
11    PROSPECTIVE JUROR:  Exactly.  She's a manager now.
12    THE COURT:  All right.  That's all I've got.  Thanks
13 a lot.
14    Ms. Stenner, were your answers on the questionnaire
15 true and correct?
16    PROSPECTIVE JUROR:  Yes.
17    THE COURT:  How long have you been living in the part
18 of Chicago where you live now?
19    PROSPECTIVE JUROR:  I'm going to say 35 years.
20    THE COURT:  Okay.  You answered yes on the military
21 service question.  Yourself or a relative?
22    PROSPECTIVE JUROR:  Children.
23    THE COURT:  Children.
24    PROSPECTIVE JUROR:  I have one son.
25    THE COURT:  Currently?

1          PROSPECTIVE JUROR:  Currently.

2          THE COURT:  Overseas at all?

3          PROSPECTIVE JUROR:  He was overseas.

4          THE COURT:  When you attended Everest College, what

5    did you study there?

6          PROSPECTIVE JUROR:  Medical administration.

7          THE COURT:  And in your job as a school bus driver,

8    did you work for a particular school district, or did you work

9    for the bus company?

10          PROSPECTIVE JUROR:  A bus company.

11          THE COURT:  How long ago was it that you were working

12    in that job?

13          PROSPECTIVE JUROR:  I worked there 17 years, so about

14    a year ago.

15          THE COURT:  Okay.  Your daughter worked in a

16    commission sales job.  What was she selling?

17          PROSPECTIVE JUROR:  She sold perfume at J.C. Penney,

18    but she's no longer working there.

19          THE COURT:  And your daughter has worked for a -- is

20    it the same daughter or different daughter who's worked for --

21          PROSPECTIVE JUROR:  Different.

22          THE COURT:  -- worked for a law firm.

23          Is she a lawyer, or does she work for a law firm?

24          PROSPECTIVE JUROR:  My daughter is a lawyer.

25          THE COURT:  What type of law does she practice?

1          PROSPECTIVE JUROR:  Divorce.

2          THE COURT:  Okay.  Is she here in Chicago?

3          PROSPECTIVE JUROR:  No.  Right now she's in Maywood.

4     She just got back from Mexico.

5          THE COURT:  And you served on a jury before.  Once or

6     more than once?

7          PROSPECTIVE JUROR:  Once, I believe.

8          THE COURT:  How long ago was it approximately?

9          PROSPECTIVE JUROR:  About 16 years ago.

10         THE COURT:  Do you remember what courthouse you went

11    to?

12         PROSPECTIVE JUROR:  26th and California.

13         THE COURT:  Okay.  So again it was a criminal case.

14    Do you remember what type of a criminal case?

15         PROSPECTIVE JUROR:  Attempted rape.

16         THE COURT:  Did the jury deliberate and reach a

17    verdict?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  And so you heard what I said to the other

20    jurors about the difference between civil and criminal cases?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  That's all I've got.  You can have a

23    seat.

24         Ms. Capettini, were your answers on the questionnaire

25    true and correct?

1            PROSPECTIVE JUROR:  I forgot two things.

2            THE COURT:  Okay.

3            PROSPECTIVE JUROR:  My brother-in-law is a lawyer, or

4    works for a lawyer, but I don't remember what firm or what he

5    does.

6            THE COURT:  Got it.

7            PROSPECTIVE JUROR:  And we have a close friend who

8    works for a divorce lawyer.

9            THE COURT:  Works for a?

10            PROSPECTIVE JUROR:  Divorce lawyer.

11            THE COURT:  Divorce lawyer.

12            PROSPECTIVE JUROR:  Or a family friend.

13            And there's a television show that might be relevant

14    that I watch, Big Bang Theory.

15            THE COURT:  How is it relevant?

16            PROSPECTIVE JUROR:  It's about nerds basically.

17            THE COURT:  Okay.  So the N word has come out.  It

18    was going to happen eventually.  I just didn't think it was

19    going to happen quite this quickly.  Here we go.  Okay.  Thank

20    you.

21            All right.  So how long have you been living in the

22    town where you live right now?

23            PROSPECTIVE JUROR:  Not including my education, 11

24    years.

25            THE COURT:  And what relative -- it was yourself or a

1　relative who was in the military?

2　　　　　PROSPECTIVE JUROR:  My grandfather and my aunt.

3　　　　　THE COURT:  And where did you get your undergraduate

4　degree and what subject?

5　　　　　PROSPECTIVE JUROR:  I went to Lake Forest College,

6　and it was a BA, English and in French.

7　　　　　THE COURT:  Is there a master's in there somewhere?

8　　　　　PROSPECTIVE JUROR:  Yes.  That was at the University

9　of Louisiana.  That's also a master's, part of it in French.

10　　　　　THE COURT:  In French.

11　　　　　And you're a Ph.D. student in English at what

12　institution?

13　　　　　PROSPECTIVE JUROR:  University of Louisiana.

14　　　　　THE COURT:  Also at the University of Louisiana.

15　Okay.  Got it.

16　　　　　And so I'm going to guess that you're teaching either

17　French or English.

18　　　　　PROSPECTIVE JUROR:  I'm teaching freshman

19　composition, and then I get literature courses.

20　　　　　THE COURT:  Let's see.  So you answered yes on the

21　question about whether you have a relative or friend who's

22　ever played any miniature war games.

23　　　　　PROSPECTIVE JUROR:  I have a friend that plays Risk.

24　　　　　THE COURT:  Risk.  Okay.

25　　　　　I've now learned something, that that's still being

 1    played.  All right, then.

 2          There was a question about experience or knowledge

 3    with copyrights and trademarks.  You put "a little."

 4          PROSPECTIVE JUROR:  Yes.  Just as far as it applies

 5    to literature, public domain.

 6          THE COURT:  Got it.

 7          PROSPECTIVE JUROR:  Just because I'm a creative

 8    writer.

 9          THE COURT:  Have you taken any courses or anything

10    like that in copyright that you remember?

11          PROSPECTIVE JUROR:  It's come up, but never a course.

12          THE COURT:  Okay.  All right.

13          There was a question about whether you've ever been

14    involved in the creation of an artistic work that was sold to

15    others.

16          PROSPECTIVE JUROR:  That's my own creative writing,

17    as well as I have a small press that does miniature books.

18          THE COURT:  Okay.  That's all I've got.  Thanks very

19    much.  You can have a seat.

20          Mr. Adams, were your answers on the questionnaire

21    true and correct?

22          PROSPECTIVE JUROR:  Yes.  I believe there may be a

23    little nuance on the copyright, trademark.

24          THE COURT:  Tell me about it.

25          PROSPECTIVE JUROR:  In my work we do often discuss

1   licensing issues with distributing software, but in no way is

2   my responsibility tied in with --

3           THE COURT:  You indicated -- I think when you raised

4   your hand earlier you said your -- I think you said your

5   stepbrother works for the Winston & Strawn law firm.

6           PROSPECTIVE JUROR:  Yeah.

7           THE COURT:  Attorney or not an attorney?

8           PROSPECTIVE JUROR:  He's not an attorney.  He started

9   as a clerk, and I believe what he's doing now is working with

10  their notes databases that they use to manage their --

11          THE COURT:  Got it.  So he's involved in the IT end

12  basically.

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Got it.

15          Do you think that you can be fair to both sides, even

16  the side that's not represented by that law firm?

17          PROSPECTIVE JUROR:  I do.

18          THE COURT:  How long have you been living in the town

19  where you live right now?

20          PROSPECTIVE JUROR:  We moved there in '04.

21          THE COURT:  And where did you get your college

22  degree, and what subject was it in?

23          PROSPECTIVE JUROR:  I got it at the University of

24  Illinois in Chicago, and it was in English literature.

25          THE COURT:  And you work at Accenture as an IT

1   engineer.  What's your responsibility on a day-to-day basis?

2           PROSPECTIVE JUROR:  We -- personally I build

3   different platforms, technology platforms that are used

4   globally to deliver training.

5           THE COURT:  So you checked off that you had heard of

6   Games Workshop and had heard of Warhammer 40,000.

7           PROSPECTIVE JUROR:  Yeah.  I'm a little -- little bit

8   of a gamer.  I haven't played this game.

9           THE COURT:  This is the second time.

10          PROSPECTIVE JUROR:  I still play Risk.  There are

11  actually, you'd be excited to know, several new versions.

12          THE COURT:  Of Risk?  No kidding.

13          PROSPECTIVE JUROR:  Yeah.

14          THE COURT:  Is it still a board game?

15          PROSPECTIVE JUROR:  Yeah, it's still a board game.

16  We could go at length about some of the nuances.

17          THE COURT:  Actually, no, we couldn't.  You could

18  maybe, but I don't think I could.

19          PROSPECTIVE JUROR:  We also play another game called

20  Twilight Imperium.

21          THE COURT:  How have you heard of Warhammer 40K?

22          PROSPECTIVE JUROR:  Probably just researching other

23  games.  There's one website in particular my friends and I go

24  and try to find new games on.

25          THE COURT:  Okay.  I need to know the name of the

1    website.

2           PROSPECTIVE JUROR:  Boardgamesgeek.com.

3           THE COURT:  Boardgamesgeek.com, so now the G word has

4    come out.  And I knew that was going to happen too, but it's,

5    again, not quite this early.  Okay, then.

6           And how have you heard of Games Workshop?  Same way

7    you've just described?

8           PROSPECTIVE JUROR:  Yeah.

9           THE COURT:  And you've already described to me

10   miniature war games that you've played.  There was a question

11   about collecting or painting figurines.

12          PROSPECTIVE JUROR:  Yeah.  No.  When I was in middle

13   school I did something, but we never really got into

14   figurines.

15          THE COURT:  Gaming conventions, which ones have you

16   attended?

17          PROSPECTIVE JUROR:  I haven't.  I have friend who've

18   gone.

19          THE COURT:  Do you remember any in particular that

20   you've gone to?

21          PROSPECTIVE JUROR:  No, I have not gone to.  I

22   have --

23          THE COURT:  Oh, you have not.  You have friends who

24   have.

25          Do you have any friends that you know play, actually

1    play Warhammer 40K?

2           PROSPECTIVE JUROR:  I'm not a hundred percent sure,

3    but I think my nephew does.

4           THE COURT:  Nephew might.  Okay.

5           Do you remember ever talking to him about it at all?

6           PROSPECTIVE JUROR:  (Shaking head.)

7           THE COURT:  You answered yes to the question about

8    sales jobs and commission jobs.  Tell me about them.

9           PROSPECTIVE JUROR:  I used to be a realtor before,

10   and my father is a realtor as well.

11          THE COURT:  And you were an alternate on a jury how

12   long ago?

13          PROSPECTIVE JUROR:  You know, I was trying to

14   remember that.  It was within the last ten years.  I can't say

15   precisely.

16          THE COURT:  Do you remember what courthouse you went

17   to?

18          PROSPECTIVE JUROR:  It was the DuPage County

19   courthouse.  It was a criminal case.

20          THE COURT:  And so you heard the case but didn't

21   deliberate.

22          PROSPECTIVE JUROR:  Yeah.

23          THE COURT:  And you heard what I said about the

24   difference between civil and criminal.

25          PROSPECTIVE JUROR:  (Nodding.)

1    THE COURT:  Okay.  That's all I've got.

2    So here's what we're going to do.  We're going to

3    take a --

4    MR. MOSKIN:  Judge.

5    THE COURT:  I'm sorry.  Hang on a second.  Let me

6    grab your questionnaire again.

7    Mr. Klema, go ahead.

8    PROSPECTIVE JUROR:  I also coach travel softball.  We

9    play Tuesday nights and Friday, Saturday, Sunday weekends.

10   THE COURT:  What time of day?

11   PROSPECTIVE JUROR:  From -- we got to be there at

12   4:00, and I live two and a half hours from here.

13   THE COURT:  All right.  Thanks for telling me that.

14   Okay.  So I need to have a short conversation with

15   the lawyers, and so I'm going to let you take a break, but

16   before anybody gets up to leave, you're in a courthouse, and

17   there's rules for everything, so I want to talk to you about

18   the rules a little bit.

19   So, first of all, you can't communicate about this

20   case with anybody.  I deliberately used a very broad term,

21   "communicate."  I don't just mean talk.  I mean communicate.

22   So you can't email, text, tweet, post it on your Facebook

23   page, blog about it.  No communication at all about the case,

24   about the subject matter of the case or about anybody who's

25   involved in the case.

1    And you also can't try to look up anything or do

2  research on the case.  Now, as we all know, in this day and

3  age there's plenty of ways to do research other than looking

4  at books.  So don't Goggle anything.  Don't try to search for

5  anything about the case, anybody who's involved in the case or

6  the subjects involved in the case.

7    Here's the reason for these rules:  It's not fair to

8  the people involved in the case.  So one of the most important

9  things about jury service is I need to make sure that all the

10  jurors are working off the exact same information and we don't

11  have people that are getting information from other sources.

12  If we do, then the lawyers don't know about it, and it's not

13  fair to them or their clients because they can't deal with it.

14  So we have to confine what you know about the case to what's

15  presented here in the courtroom.  So that's why you can't look

16  up anything, and that's why you shouldn't try to communicate

17  with anyone.

18    And the reason more specifically for the restriction

19  or the ban, if you will, on communication is that when people

20  start talking about what they're doing, they start kind of

21  making up their minds and forming opinions, and another very

22  important thing about jury service is you have to keep an open

23  mind until you've heard everything.  And you actually haven't

24  heard anything yet.

25    So don't communicate about the case.  Don't allow

1    anyone to communicate with you.  If anybody tries to give you

2    information about the case or tries to communicate with you

3    about the case, you need to tell me immediately.  And then

4    don't try to look up or research anything.

5         So when you go out the back door, the restrooms are

6    all going to be down to the left.  Men's room will be first,

7    ladies' room farther down.  There's a couple of water coolers

8    out there.

9         I need you back in your seats when the big hand hits

10   the nine.  Okay.  So synchronize your watches, as they say.

11   It's about a little under 15 minutes from now.

12        I'm going to need you all to clear out because I need

13   to talk to the lawyers about a couple of things, and I need to

14   do it outside of your presence.

15            (The following proceedings were had out of the

16            presence and hearing of the jury panel:)

17        THE COURT:  Okay.  The jurors are all out.

18        Are there any follow-up questions that anybody would

19   like me to ask to any particular jurors?

20        MS. HARTZELL:  No, your Honor.

21        THE COURT:  Okay.  I wasn't sure if there was more

22   that I should ask Ms. Gayda about her friend, the Warhammer

23   40K player, but I think we covered it.

24        Anything you can think of, Mr. Moskin?

25        MR. MOSKIN:  No, I don't believe so.  I was just

1    double checking.

2         THE COURT:  Okay.  All right.  So while we're here,

3    so let's talk about, first of all, the -- let's talk about --

4    there were six people, because I think Dr. Cadre basically

5    took himself off of the hardship list, so we've got six

6    people, Mr. Klema, Ms. -- Mr. White, Mr. Snyder, Ms. McNally,

7    Ms. Baker and Mr. Sebek.

8         Actually, let's put them to the side for a second.

9    Are there any -- aside from those six people, are there any

10   challenges for cause that the plaintiff has?

11        MS. HARTZELL:  No, your Honor.

12        THE COURT:  You're the defendant.

13        MS. HARTZELL:  Oh, sorry.

14        THE COURT:  You might want to be the plaintiff.

15        MR. MOSKIN:  And that's in fact what I was looking

16   for.  There was one juror who said he was hard of hearing.

17        THE COURT:  No.  It was the woman.  It was No. 13.

18   No.  I'm sorry.  There was one guy who said he was hard of

19   hearing in his questionnaire but didn't repeat it here, and

20   the difference between the way it was asked on the

21   questionnaire and the way I asked it here is if I'm talking

22   into the microphone.  And he actually -- I was paying

23   attention.  It was juror No. 12, I believe.  It was Mr. -- no,

24   not 12.

25        MS. HARTZELL:  11.

1          THE COURT:  It was Mr. Snyder, No. 11.  And he

2    answered immediately without hesitation every question I

3    asked, didn't ask me to repeat anything, so I don't really

4    think there's an issue there.

5          So if that's a challenge for cause, it's overruled.

6    He's also on the hardship list, by the way.

7          Any other challenges for cause that anybody can think

8    of?  Okay.  So I'll take that as a no.

9          I'm inclined, the six people who raised hardship

10   questions, Klema, White, Snyder, McNally, Baker and Sebek, to

11   let them all go.  Does anybody have a problem with that?  That

12   will leave us with 18.  That still gives everybody three

13   peremptories.  That still gives us 12 jurors.

14         MS. HARTZELL:  No objection.

15         THE COURT:  Any problem with that?

16         MR. MOSKIN:  No, your Honor.

17         THE COURT:  So I'm going to excuse all of them.  I'm

18   not going to tell them immediately.

19         So what we're going to do now is I'm going to give

20   you until the big hand hits the 11 let's say to take a break

21   and to confer with each other about peremptories.  One side

22   can use the jury room; one side can use the attorney/witness

23   room across the hall if you need a place to meet.

24         What we'll do when we come back, the jurors will be

25   back in the room by then.  We'll go over to side bar with the

1    court reporter.  We'll just go back and forth, plaintiff,

2    defendant, plaintiff, defendant, plaintiff, defendant.  And

3    then assuming everybody uses all their peremptories, that will

4    leave us twelve people and those will be the jurors.  If

5    somebody uses less than all three, then it will be the first

6    twelve who get selected.

7           So we're on break.  And then so we're done way

8    earlier than I thought.  We may resume at -- rather than

9    resuming at 1:30, we'll probably just take an hour for lunch

10   and then pick up whenever that is, an hour from when we

11   finish.

12          (Recess taken.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:   There was one juror who raised their hand.

2  Ms. Wilson, do you want to say something to me?

3    PROSPECTIVE JUROR:   Yes.   I forgot to mention that I

4  was part of a lawsuit, a class action lawsuit, that I initiated

5  myself against a former landlord.

6    THE COURT:   Could you speak up a little bit?

7    PROSPECTIVE JUROR:   I'm sorry.

8    THE COURT:   A class action suit that you initiated.

9  What did it involve?

10    PROSPECTIVE JUROR:   I sued a former landlord, a

11  property that I lived in, and I used the law firm Stark & Rowe

12  (phonetic) as my attorney.

13    THE COURT:   Sued the landlord over what?   What did the

14  issue involve?

15    PROSPECTIVE JUROR:   Security deposit.

16    THE COURT:   Security deposit.   And how long ago was it?

17    PROSPECTIVE JUROR:   2010.

18    THE COURT:   Was it settled out of court --

19    PROSPECTIVE JUROR:   Yes.

20    THE COURT:   -- or was there a trial?

21  It was settled out of court.

22    PROSPECTIVE JUROR:   It was settled, yes.

23    THE COURT:   Okay.   Thanks.

24  We're going to -- I'm going to go hit that button.

25  You're going to hear this annoying noise so that you can't hear

1    us.   I apologize.

2        (The following proceedings were had at the sidebar, out of

3        the presence and hearing of the jury:)

4            THE COURT:   Okay.   Does anybody want to change what

5    they're doing based on what she just said?

6        (No response.)

7            THE COURT:   Okay.   So, first of all, Augie, the people

8    that have been excused for cause are number one, Mr. Klemm,

9    number two, Mr. White.   Next page, number eleven, Mr. Snyder,

10   number 13, Ms. McNally, number 14, Ms. Baker, number 16,

11   Mr. Sebek.

12           Okay.   So, first preemptory for the plaintiff.

13           MR. KEENER:   Six.

14           THE COURT:   That's Ms. Wilson.

15           Okay.   First one for the defense.

16           MS. HARTZELL:   Nine.

17           THE COURT:   That is Ms. Hon.

18           MS. HARTZELL:   Yes.

19           THE COURT:   Number nine, Ms. Hon.

20           Second one, plaintiff.

21           MR. KEENER:   Twelve.

22           THE COURT:   Number twelve.   That's Ms. Gladney.

23           Second one for the defense.

24           MS. HARTZELL:   Five.

25           THE COURT:   That's Ms. Peterson.

1          Third and last for the plaintiff.

2          MR. KEENER:  Seventeen.

3          THE COURT:  Seventeen.  That's Witte.

4          And the third and last one for the defense.

5          MS. HARTZELL:  Eight.

6          THE COURT:  Eight is Ms. Nelson, right?

7          Okay.  So, everybody check your notes here.  That means

8     that the jurors would be number three, Ms. Bowler-Stedt, number

9     four, Mr. Marsell, number seven, Ms. Moton, number ten,

10    Mr. Potter, number 15, Ms. Inglesby, number 18, Dr. Cadre, and

11    basically everybody else.  Number 19, Ms. Barger, number 20,

12    Ms. Gayda, number 21, Ms. De La Mata, number 22, Ms. Stenner,

13    number 23, Ms. Capettini, and number 24, Mr. Adams.

14         Okay.  So, what we're going to do is I'm going to

15    excuse the others, swear in the jury, send them back, and we'll

16    break 'til, let's say, 1:15.  We'll resume at 1:15 with openings

17    or, actually, my preliminary instructions and then with

18    openings.

19         Okay.  So, once I swear them in and they get sent out,

20    if there's any other things you need to take up before opening

21    statements, now's the time to do it.

22    (The following proceedings were had in open court, in the

23         presence and hearing of the jury:)

24         THE COURT:  Okay.  First of all, I want to thank all of

25    you for your patience.  I know this is a tedious process.  I

1    also want to thank you for your willingness to serve.   What I

2    said at the beginning I really mean.   The process doesn't work

3    unless we've got people who are willing to serve, and I

4    appreciate that.

5           We've selected twelve jurors.   I'm going to read off

6    the names of those twelve people.   If I read your name, that

7    means you're on the jury, and you need to stay.   If I don't read

8    your name, that means you're excused, and my clerk will meet you

9    outside the back door, and she will tell you where you need to

10   go, which is going to be back down to the jury assembly room

11          So, the jurors are Ms. Bowler-Stedt, Mr. Marsell,

12   Ms. Moton, Mr. Potter, Ms. Inglesby, Dr. Cadre, Ms. Barger,

13   Ms. Gayda, Ms. De La Mata, Ms. Stenner, Ms. Capettini, and

14   Mr. Adams.   So, those twelve people, I need you to stay.   The

15   rest of you I need you to clear out, and my clerk will see you

16   right outside the back door.   And then once they've cleared out,

17   I'm going to need those of you who are still in the jury box to

18   come down to this end and then the others to fill in from the

19   other end.   Just be careful trying to walk past stuff that you

20   don't trip and hurt yourself.

21          So, if you folks could slide -- actually, no.   Why

22   don't you slide down that way, and why don't the rest of you

23   come through and come in this way.   If you've got any

24   belongings, bring them with you.   It doesn't matter where you're

25   sitting.   Just have a seat.   We'll talk about that in a second.

1    Okay.  It doesn't matter where you're sitting for now.  Just
2    find a seat because you're not going to be there for more than a
3    couple minutes.
4         If you would all stand up and raise your right hand,
5    I'm going to administer an oath to you, and at the end of it,
6    you'll say I do.  Raise your right hand.
7        (Jurors duly sworn.)
8         THE COURT:  Have a seat.  So, I'm going to talk to you
9    just about logistics and scheduling a little bit, and then we're
10   going to break for lunch.  So, as I told you, the lawyers are on
11   time clocks, and I've sort of, as I said, cleared out the rest
12   of my schedule.  And so, our schedule, it's going to be a little
13   bit of an exception today because, frankly, the jury selection
14   process went quicker than I thought it would.  So, we're going
15   to break for lunch now.  We're going to resume at 1:15.
16        Typically, we'll be breaking for lunch at 12:30, and
17   we'll resume at 1:30.  The more important things for you are the
18   start time and the end time.  So, our starting time is either
19   going to be 9:30 or 9:45 each day.  I'll tell you at the end of
20   each day exactly what time.  And then we'll go 'til
21   5:00 o'clock.  We'll take breaks in the middle of the morning
22   and the afternoon as necessary.
23        Generally speaking -- not generally speaking.  Each
24   morning we'll have -- not today, but starting tomorrow -- we'll
25   have coffee and rolls and stuff for you that usually get here

1    usually about 8:30 or 9:00 o'clock.  I can't start until

2    everybody's here.  So, you need to time your travel, and you

3    need to time your arrival so that you're here on time for us to

4    start.

5           And one thing I can tell you is that when you come

6    in -- you came in a little earlier this morning than you'll be

7    coming in tomorrow and future days -- that the lines at the

8    metal detectors tend to be longer around 9:00, 9:15 because

9    that's when most lawyers are coming in to have their cases heard

10   in front of judges.

11          From now on when you come here, you're not going to

12   come straight to the courtroom  You're going to come to the

13   jury room, which is back here in the back, and my clerk will

14   tell you how it is you get in and out of there.  You'll have

15   notebooks, which we'll have in there after you come back from

16   lunch.  You're free to take notes on anything, and I'll give you

17   some instructions about that.

18          When we resume, the way we'll start is I'll give you

19   some instructions, which I'm not going to hand to you, but we're

20   going to put some of them up on a screen so that you can look at

21   them, and I'll tell you more about that in a little bit.  And

22   then we'll start in with the lawyers' opening arguments, and

23   then we'll go right into the evidence, right into the testimony.

24          I want to repeat a couple of the instructions that I

25   gave you before, and I'll repeat them again when we start.  So,

PDF created with pdfFactory trial version www.pdffactory.com

1  don't try to look up or research anything having to do with the

2  case, the issues in the case, or any of the people or games or

3  anything involved in the case or the companies.

4      Don't communicate with anybody about the case.  It's

5  okay to tell your family members and your employers or coworkers

6  that you're on a jury in the federal court, but you need to

7  leave it at that.  Nothing about the subject of the case for the

8  reasons I described.  It's important for you to keep open mind,

9  and when you start communicating about what you're doing, that

10  affects your ability to do that.

11      Don't allow anyone to give you any information about

12  the case.  If somebody tries to give you information, you need

13  to tell me about it as quickly as you possibly can.  Along those

14  lines, I want -- there's two sets of elevators in the building,

15  north end -- we're at the north end -- and the south end.  I

16  want you to always use the north elevators and only the north

17  elevators, whether you're going down or up, to the cafeteria, or

18  in or out or anything else.  I want the lawyers and the people

19  involved with the lawyers and the parties to always use the

20  south elevators and only the south elevators.  I'm going to

21  leave it to you to instruct your people.  And that's so that

22  you're not on the same elevators.

23      Sometimes people make mistakes.  You may end up on an

24  elevator with somebody.  You'll probably notice that they're

25  trying to ignore you.  That's not because they're rude.  It's

PDF created with pdfFactory trial version www.pdffactory.com

1    because they can't have communication with you.  You'll probably

2    also see them in the cafeteria, if you go there, or coming in or

3    out of the building.  Again, just try to ignore them, and

4    they'll do the same.

5            I think that's it for now.  That is it for now.  So, my

6    clerk will come and take you out.  She'll take you to the jury

7    room, give you some instructions about how to get in and out,

8    and then just be back ready to go back in the jury room at 1:15.

9            All rise while they're going out, and then we'll talk a

10   little bit.

11       (The following proceedings were had in open court, out of

12           the presence and hearing of the jury:)

13           THE COURT:  I think I mentioned this in one of the

14   e-mails over the weekend.  And the record should reflect that we

15   had correspondence back and forth about the preliminary jury

16   instructions.  What I would like to be able to put up on the

17   screen as I'm reading them, because they won't have copies, are

18   four instructions.  The elements of the claims of trademark and

19   copyright and the elements of the fair use defense.

20           So, I'm hoping that somebody can get those onto your

21   computer, and so when I say put up this instruction that

22   somebody can flip a switch or push a button and put it up.  So,

23   hopefully, you'll get that worked out.  Nothing else.  I'm not

24   going to give them copies.  But those instructions, even in

25   their simplified form are kind of complicated, and I think it

PDF created with pdfFactory trial version www.pdffactory.com

1    will be helpful for them to see them, as well as hear them

2              So, are there any issues anybody wants to take up

3    before we break at all?

4              MR. MOSKIN:  I think you did ask, and I don't think we

5    ever answered.  On behalf of the plaintiff, we didn't have any

6    further comments about the jury instructions.

7              THE COURT:  Okay.

8              MR. ALY:  We're fine, your Honor.  We'll have a

9    limiting instruction.

10             THE COURT:  Yes.  You'll deal with it, and you'll just

11   let me know when you're ready.

12             Okay.  So, just be ready to go at 1:15.  Thanks.  And

13   I'm assuming somebody's going to get the contraptions all set up

14   and whatnot.  Okay.

15        (Whereupon, the within trial was recessed to 1:15 o'clock

16        p.m of the same day.)

17

18

19

20

21

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4   GAMES WORKSHOP LIMITED,        )
                                    )
 5                   Plaintiff,     )   Docket No. 10 C 8103
                                    )
 6             vs.                  )
                                    )
 7   CHAPTERHOUSE STUDIOS, LLC,     )   Chicago, Illinois
     et al.,                        )   June 3, 2013
 8                                  )   1:15 p.m.
                     Defendants.    )
 9

10                         VOLUME 1
                    TRANSCRIPT OF PROCEEDINGS
11      BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

12
     APPEARANCES:
13

14   For the Plaintiff:      FOLEY & LARDNER, LLP
                             BY:  MR. JONATHAN E. MOSKIN
15                           90 Park Avenue
                             New York, New York   10017
16

17                           FOLEY & LARDNER, LLP
                             BY:  MR. JASON J. KEENER
18                           321 North Clark Street
                             Suite 2800
19                           Chicago, Illinois   60610

20

21   For the Defendant:      WINSTON & STRAWN, LLP
                             BY:  MR. IMRON T. ALY
22                           35 West Wacker Drive
                             Chicago, Illinois   60601
23

24                           WINSTON & STRAWN, LLP
                             BY:  MS. JENNIFER A. GOLINVEAUX
25                           101 California Street
                             San Francisco, California   94111
```

1                      MARSHALL, GERSTEIN & BORUN
                        BY:  MS. JULIANNE M. HARTZELL

2                      233 South Wacker Drive
                      Willis Tower #6300

3                      Chicago, Illinois   60606

4

5   Also Present:               MR. NICHOLAS VILLACCI

6                       MS. GILLIAN STEVENSON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23           LAURA M. BRENNAN - Official Court Reporter
            219 South Dearborn Street - Room 2102

24               Chicago, Illinois  60604
                 (312) 435-5785

25

1     (The following proceedings were had in open court out of

2     the presence and hearing of the jury:)

3          THE COURT:  12 C 8103, Games Workshop v.

4     Chapterhouse.

5          THE COURT:  10 C.

6          THE CLERK:  Sorry.

7          THE COURT:  I don't have Mr. Moskin.

8          MR. KEENER:  He'll be back in a second, but the

9     parties do have a proposed limiting instruction.

10         THE COURT:  Okay.

11         MR. KEENER:  Do you want us to hand it to you?

12         THE COURT:  Yes.

13         MR. KEENER:  There is an agreed portion and there's

14    an additional sentence that Chapterhouse wants and Games

15    Workshop.

16         THE COURT:  Okay.

17         THE COURT:  So this has to do with the charts, and

18    the agreed part says:

19         "These charts are summaries of underlying

20    Chapterhouse website pictures and marketing materials compared

21    to Games Workshop materials.  While the parties display and

22    market painted and assembled products shown in the summaries,

23    they are sold unassembled and unpainted.  Moreover, for some

24    of the Chapterhouse products, the picture shows Chapterhouse

25    pieces added to an underlying Games Workshop product."

1  So I'm going to exercise editorial control, and I'm

2  going to take the word "underlying" out of there.  Nobody

3  other than a lawyer is going to understand that.  These charts

4  are summaries of Chapterhouse website pictures, and the

5  picture shows Chapterhouse pieces added to a Games Workshop

6  product.

7  All right.  Let me just see if there is anything else

8  just linguistically I want to fix.  I'm going to change the

9  word "while" to "though."  Sorry.  It's just a thing for me.

10  So the objected part that is proposed by Chapterhouse but

11  Games Workshop objects to says:

12  "When evaluating copyright infringement, however, you

13  must look at Chapterhouse's actual physical products

14  themselves which will also be made available."

15  Okay.  So articulate for me the objection.

16  MR. KEENER:  The objection is where you're saying

17  what the jury must do to find infringement.  As we have said

18  repeatedly, the pictures themselves are infringement.  Even if

19  no product is ever sold, there is copyright infringement in

20  displaying these painted products on the website and marketing

21  them.

22  And, additionally, the jury can figure out what it

23  wants to compare to do the comparison.  As your Honor has

24  said, when you're selling a model and there's a picture of a

25  car on the box of the model, the jury may have to look into

1  every individual piece of box of the model and say whether --

2  and when it's assembled, it looks like this model on the

3  picture.  That's what I want to compare to the Ford Mustang

4  it's supposed to be representing and make that comparison.

5       The use of the word, they must compare this to the

6  actual physical products, is improper.

7       THE COURT:  I'm sorry.  That's bad.

8       I'm sorry.  "That's bad" was not directed to you.  It

9  was directed to the note my courtroom deputy gave me.

10      Go ahead, Mr. Aly.

11      MR. ALY:  Your Honor, marketing materials are just

12 that, marketing materials.  The thing accused of infringement

13 is the products.  That's the things that they have sued us on

14 and have -- the whole case is about.  So now to submit the

15 claim charts we believe would be prejudicial and would be

16 erroneous to just have the jury consider that on its own

17 instead of the things themselves.

18      THE COURT:  I don't understand what you're saying

19 when you say, this is what they have sued about, I mean,

20 because the argument that Mr. Keener made is one that has

21 pretty much been articulated as long as I can remember us

22 being in here talking about these things, at least at the two

23 pretrial conferences.

24      MR. ALY:  That is certainly a part of it, your Honor,

25 and I agree those were raised at the pretrial conferences, but

1    the ultimate question of what --

2         For example, your Honor, profits.  When they want

3    damages, that is based on sales of products, not because of

4    the images that are on there.  And those product sales refer

5    to the actual physical --

6         THE COURT:  But this doesn't say when evaluating

7    damages; it says when evaluating copyright infringement.  And,

8    I mean, I would certainly think that if --

9         Let's assume somebody has a copyright on a particular

10   design of an accessory that goes with one of these figures and

11   Chapterhouse puts on its website a design that has enough

12   copying that the jury could conclude that it's copyright

13   infringement.

14        In other words, if they're marketing it in a way that

15   copies the actual product that Games Workshop is selling even

16   though it might be sold as what I will call a blank, in other

17   words, a gray unpainted piece, I mean, what Mr. Keener is

18   arguing is that that still can be copyright infringement.

19   Now, he may not be able to show there was any profit from

20   that, but that doesn't make it any less copyright

21   infringement.

22        Is there something wrong with that analysis?

23        MR. ALY:  Two things.

24        One, we don't believe that was asserted at the

25   infringement as the marketing pieces itself.  We believe the

1   contentions from the beginning of the case were about the

2   products, not the marketing.

3         THE COURT:  Well, then you were at a different

4   pretrial conference than I was.  What was the second?

5         MR. ALY:  The second point is that in terms of some

6   of the pictures, those are the ones that are assembled

7   products.  For the assembled products, it's not possible to

8   tell with the charts alone which products are added and which

9   are original.

10        THE COURT:  That part is covered by the agreed part

11  of the instruction.  I'm not going to give the objected-to

12  part.

13        Bear with me for a second.  I just need to --

14        Never mind.  Here they were all along.  Never had

15  them over there.

16        Okay.  We're ready to go.

17        MR. ALY:  Thank you.

18        THE COURT:  Let's bring the jury out.

19     (The following proceedings were had in the presence and

20  hearing of the jury:)

21        THE COURT:  Okay.  Everybody can have a seat.

22        Let me just start talking about logistics here a

23  little bit.  As I said to you right before the lunch break,

24  you do not have to sit in the same seat every time.  Once we

25  get going with witnesses, and even with the opening

1    statements, you're going to see things projected on this

2    screen over here.  It's conceivable that what we might find --

3    and we did some testing but not a lot.  What we may find is

4    that, you know, where the lawyer is standing might block your

5    view a little bit.  We don't have that many extra seats over

6    there, but it's okay to sort of adjust where you're sitting.

7    And if it's still a problem, just let me know and we'll try,

8    you know, at a break or something to make an adjustment in how

9    this is set up.

10              So I'm going to start off reading some instructions

11   to you about your role as jurors and the claims you will have

12   to decide.  And at some point, some of these are going to get

13   projected over there, and I will pause when we get to that

14   point.

15              You're free to take notes on anything from here on

16   in, including on the instructions that I'm about to tell you

17   now.

18              Ladies and gentlemen, you are now the jury in this

19   case.  I would like to take a few minutes to describe your

20   duties as jurors and to give you instructions concerning the

21   case.  I am doing this so that you have an understanding at

22   the outset of the case regarding the claims and defenses that

23   you will be called upon to decide and how you will go about

24   performing your duties as jurors.

25              At the end of the trial, I will give you more

1    detailed instructions.  The instructions that I give you at

2    the end of the case will differ in some respects from the

3    instructions I'm giving you now.  The instructions that I give

4    you at the end of the case are the ones that will control your

5    deliberations.  And each of you will have a copy of the

6    instructions that I give you at the end of the case.

7            As the judge in this case, one of my duties is to

8    decide all questions of law and procedure.  In these

9    preliminary instructions, during the trial, and at the end of

10   the trial, I will instruct you on the rules of law that you

11   must follow in making your decision.

12           You have two duties as jurors.  Your first duty to

13   decide the facts from the evidence that you see and hear in

14   court.  Your second duty is to take the law as I give it to

15   you and apply it to the facts as you find them.  You must

16   perform these duties fairly and impartially.  Do not let

17   sympathy, prejudice, fear or public opinion influence you.

18           Both parties to the case are entitled to the same

19   fair consideration.  You should not take anything I say or do

20   during the trial as indicating what I think of the evidence or

21   what I think your verdict should be.

22           In performing your duties as jurors, you may consider

23   only the evidence that you see and hear in court.  You may not

24   consider anything you may see or hear outside of court,

25   including anything from the newspaper, television, radio, the

1  Internet, or any other source.

2         The evidence includes only what the witnesses say

3  when they're testifying under oath, the exhibits that I allow

4  into evidence -- and as I said, those will all be projected

5  for you -- and any facts which the parties stipulate or agree

6  to.  Nothing else is evidence.  Any statements and arguments

7  that the lawyers make are not evidence.  If what a lawyer says

8  is different from the evidence as you hear or see it, the

9  evidence is what counts.  The lawyers' questions and their

10  objections likewise are not evidence.

11         A lawyer has a duty to object if he or she thinks a

12  question or evidence is improper.  When an objection is made,

13  I will be required to rule on the objection.  If I say that I

14  sustain the objection to a question the lawyer asks, you must

15  not speculate on what the answer might have been.  If I say

16  that I'm striking something from the record, whether it's

17  testimony or an exhibit or something else, or if I tell you to

18  disregard something, that means that you must not consider it.

19         Pay close attention to the evidence as it's being

20  presented.  During your deliberations, you will have copies of

21  any exhibits or documents that I allow into evidence, but you

22  will not have a transcript of the testimony.  You will have to

23  make your decision based on what you recall of the testimony.

24         You are permitted to take notes during the trial.  If

25  you take notes, you may use them during your deliberations to

1  help you remember what happened during the trial.  You should

2  use your notes only as aids to your memory.  The notes are not

3  evidence.  All of you should rely on your independent

4  recollection of the evidence, and you should not be unduly

5  influenced by the notes of other jurors.  Notes are not

6  entitled to any more weight than the memory or impressions of

7  each juror.

8  You may have heard the terms "direct evidence" and

9  "circumstantial evidence."  Direct evidence is evidence that

10  directly proves a fact.  Circumstantial evidence is evidence

11  that indirectly proves a fact.  You are to consider both

12  direct and circumstantial evidence.  The law does not say that

13  one is better than the other.  It's up to you to decide how

14  much weight to give to any evidence, whether it's direct or

15  circumstantial.

16  Give the evidence whatever weight you believe it

17  deserves.  Use your common sense in weighing the evidence and

18  consider the evidence in light of your own everyday

19  experience.

20  People sometimes look at one fact and conclude from

21  it that another fact exists.  This is called an inference.

22  You're allowed to make reasonable inferences so long as

23  they're based on the evidence.

24  Part of your job as jurors will be to decide how

25  believable each witness was and how much weight to give to

1    each witness' testimony.  I will give you additional

2    instructions about this at the end of the trial.  Don't make

3    any decisions by simply counting up the number of witnesses

4    who testify about a certain point.  What is important is how

5    believable the witnesses are and how much weight you think

6    their testimony deserves.

7           During this trial, you as jurors will be permitted to

8    submit questions for each witness after the lawyers have

9    finished questioning the witness.  You may submit questions

10   for a witness to clarify or to help you understand the

11   evidence.

12          So here is how the procedure will work.  After each

13   witness has testified and the lawyers have asked all of their

14   questions, I will turn to you, the jury, to see if any of you

15   have any additional questions.  If you have a question, you

16   should write it down in a page of your notebooks.  A member of

17   my staff, usually the court reporter, will collect all of the

18   questions.  If you submit a question, I will share it with the

19   lawyers, and we'll usually go over to what we call sidebar to

20   discuss it.

21          If your question is permitted under the Rules of

22   Evidence, I will read your question to the witness so that the

23   witness can answer it.  In some instances I may have to modify

24   the wording of a question so that it's a proper question under

25   the Rules of Evidence.

1    On other occasions I may not allow a witness to
2    answer a question that you have asked either because the
3    question can't properly be asked under the law or because
4    there may be some other witness who's in a better position to
5    answer the question.

6    If I don't allow a witness to answer a question that
7    you have proposed, you should not draw any conclusions from
8    that fact, and you should not speculate on what the answer
9    might be.

10   So there are several important things for you to keep
11   in mind about any questions you ask to the witnesses.

12   Number 1.  All questions must be submitted in
13   writing.  Please don't ask any questions out loud.

14   Number 2.  Witnesses, generally speaking, can't be
15   recalled to the witness stand after they're done testifying
16   for additional questions.  So if you have a question for a
17   particular witness, you should submit it at the end of that
18   witness' testimony.

19   And, finally, as jurors, you must remain neutral and
20   keep open minds throughout the trial.  As a result, you should
21   always phrase or word your questions in a neutral way that
22   doesn't express an opinion about the case or about a witness.

23   So next I'm going to talk about who the parties are
24   and what the claims are and defenses are that you will have to
25   decide.  The plaintiff in this case is Games Workshop Limited.

1    The defendant in this case is Chapterhouse Studios, LLC.  LLC

2    stands for limited liability company.

3         The lawsuit concerns a tabletop war game that Games

4    Workshop created called Warhammer 40,000, or Warhammer 40K.

5    Games Workshop claims that Chapterhouse has infringed

6    trademarks and copyrights that Games Workshop owns relating to

7    Warhammer 40K.  Chapterhouse denies Games Workshop's claims.

8         In a moment, I'm going to give you instructions

9    regarding what Games Workshop must prove in order to prevail

10   on its claims and what Chapterhouse must prove in order to

11   prevail on certain defenses that it's asserted.  The

12   instructions that I will be giving you are a simplified

13   version of the instructions that I will be giving you at the

14   end of the trial.  As I said a few moments ago, I'm giving you

15   these preliminary instructions so that you have a general

16   understanding at the start of the case regarding the claims

17   and defenses that you will be called upon to decide.  The

18   instructions that I will give you at the end of the trial are

19   the ones that will govern your deliberations, and at that time

20   you will each have a copy of them.

21        So in the instructions I'm about to use, I'm going to

22   use a phrase "preponderance of the evidence."  When I say that

23   a party has to prove something by a preponderance of the

24   evidence, I mean that the party must prove that the particular

25   proposition is more likely true than not true.

1    So at this point, I'm going to ask if we can put the

2    instruction that is called trademark claims up there.  So

3    please feel free to follow along as I'm reading it.

4    Games Workshop claims that Chapterhouse has infringed

5    Games Workshop's trademarks.  Chapterhouse denies Games

6    Workshop's claim.  A trademark is a word, symbol or

7    combination of words or symbols used to identify a product,

8    distinguish it from those manufactured or sold by others, and

9    indicate the source of the product.  The purpose of trademark

10   law is to prevent confusion among consumers about the source

11   of products and to permit trademark owners to show ownership

12   of their products and control their products' reputation.

13   To prevail on its claim with regard to a particular

14   trademark, Games Workshop must prove each of the following

15   things by a preponderance of the evidence, and there's three

16   things:

17   Number 1.  Games Workshop owns the symbol or term as

18   a trademark.  Games Workshop owns the symbol or term as a

19   trademark if it used the symbol or term in interstate or

20   foreign commerce in a way that allowed consumers to identify

21   it with Games Workshop or its product before Chapterhouse

22   began to use the symbol or term.

23   Number 2.  Games Workshop has to prove that the

24   symbol or term is a valid trademark.  A valid trademark is a

25   symbol or term that is distinctive.  In other words, it's

1    capable of distinguishing the trademark owner's product from

2    the products of others.  A symbol or term may be considered

3    distinctive if it's inherently distinctive or if it acquired

4    distinctiveness before Chapterhouse began to use the symbol or

5    term.  I will provide further explanation for these terms at

6    the conclusion of the trial.

7            Number 3.  Games Workshop has to prove that

8    Chapterhouse used the symbol or term in a manner that is

9    likely to cause confusion about the source, origin,

10   sponsorship or approval of Chapterhouse's product.

11           So the next instruction that is going to go up is

12   something that is called fair use.  Chapterhouse claims that

13   its use of Games Workshop's trademarks is permitted because

14   Chapterhouse made fair use of the trademarks.  To prevail on

15   this defense with regard to a particular trademark,

16   Chapterhouse must prove each of the following things by a

17   preponderance of the evidence.

18           Number 1.  It must prove that Chapterhouse used the

19   trademark to refer to a Games Workshop product that cannot be

20   easily identified without using the trademark.

21           Number 2.  Chapterhouse has to prove that it used the

22   trademark only as much as was reasonably necessary to identify

23   the product.

24           Number 3.  Chapterhouse has to prove that it did not

25   do anything in connection with using the trademark to suggest

1  that Games Workshop sponsored or endorsed Chapterhouse or its
2  product.
3       The next instruction that is going to go up on the
4  screen there is the one that concerns the copyright claims.
5  Games Workshop claims that Chapterhouse has infringed Games
6  Workshop's copyrights.  To prevail on its claim with regard to
7  a particular copyrighted work, Games Workshop must prove three
8  propositions by a preponderance of the evidence.
9       The first proposition that Games Workshop must prove
10  is that the particular work is the subject of a valid
11  copyright.  This requires the work to have been created
12  independently and with at least a minimal degree of
13  creativity.  A work can be original even if it incorporates
14  elements that are not original to the author, but only the
15  original elements added by the author are protected by
16  copyright.
17       The second proposition that Games Workshop must prove
18  is that it owns the copyright.  The third proposition that
19  Games Workshop must prove is that Chapterhouse copied
20  protected expression from the work.  The term "protected
21  expression" means any expression in Games Workshop's work that
22  was created independently, meaning that it was not copied from
23  some other work and involved some creativity.
24       Protected expression does not include matter that is
25  indispensable or standard in the treatment of a particular

1    subject.

2        You may infer that Chapterhouse copied Games

3    Workshop's work if Chapterhouse had a reasonable opportunity

4    to view the work before creating its own work and the two

5    works are so similar that a reasonable person would conclude

6    that Chapterhouse took protected expression from Games

7    Workshop's work.

8        In determining whether Games Workshop has proved

9    copying, you may consider evidence that Chapterhouse's work

10   was created independently of Games Workshop's copyrighted

11   work.

12       The next instruction you will see concerns the fair

13   use defense on copyright.  Chapterhouse contends that even if

14   it copied protected expression in Games Workshop's works, this

15   is allowed under what the law calls fair use.  Chapterhouse

16   must prove this defense by a preponderance of the evidence.

17   In deciding whether Chapterhouse has proven fair use as to a

18   particular instance of copying, you should consider the

19   following factors:

20       The purpose and character of Chapterhouse's use

21   including whether the use was of a commercial nature or

22   transformed Games Workshop's work into something of a

23   different character; the degree of creativity involved in

24   Games Workshop's works; whether Games Workshop's work was

25   published or unpublished; the amount of Games Workshop's work

1  that Chapterhouse copied; and the significance of the portion

2  copied in relation to Games Workshop's copyrighted work as a

3  whole; and how Chapterhouse's use affected the value of or the

4  potential market for Games Workshop's work.

5       Okay.  So the screen is going to come down at this

6  point.  I know that there's a lot there.  And this is just to

7  give you a preview, to give you a general sense of the issues.

8  You will have -- there will be further discussion about this

9  as we go, and then you will have a copy of all of it when you

10  deliberate at the end of the case.

11       So I'm going to go on at this point.  If you find in

12  favor of Games Workshop on one or more of its claims, then you

13  will be required to determine the amount of damages that Games

14  Workshop is entitled to recover from Chapterhouse.  If you

15  find in favor of Chapterhouse on all of Games Workshop's

16  claims, then you won't consider the question of damages.  And

17  I will give you further instructions regarding damages at the

18  end of the case.

19       Before we begin the trial, I want to discuss or more

20  particularly remind you of several rules of conduct that you

21  must follow as jurors.  First, you must keep an open mind

22  throughout the trial.  Don't make up your mind about what your

23  verdict should be until after the trial is over, you have

24  received my final instructions on the law and you and your

25  fellow jurors have discussed the evidence.  Your verdict in

1    this case must be based exclusively on the law as I give it to
2    you and the evidence that is presented during the trial.

3         For this reason, and to ensure fairness to both sides
4    in this case, you must obey the following rules.  These rules
5    apply both when you're here in court and when you're not in
6    court, and they apply until after you have returned your
7    verdict in the case.

8         Number 1.  You must not discuss the case or anyone
9    involved in the case among yourselves until you go to the jury
10   room to deliberate after the trial is completed.

11        Number 2.  You must not communicate with anyone else
12   about the case or about anyone who is involved in the case
13   until after you have returned your verdict.

14        Number 3.  When you're not in the courtroom, you must
15   not allow anyone to communicate with you about the case or
16   give you information about the case or about anyone who is
17   involved in it.  If someone tries to communicate with you
18   about the case or about someone involved in the case, or if
19   you overhear or learn any information from the case or someone
20   involved in it when you're not in the courtroom, you must
21   report that to me promptly.

22        Number 4.  You may tell your family and your employer
23   that you're serving on a jury so that you can explain that you
24   have to be in court.  However, you must not communicate with
25   them about the case or anyone involved in it until after you

1   have returned your verdict.

2          Number 5.  All of the information that you will need

3   to decide the case will be presented here in court.  You may

4   not look up, obtain or consider information from any outside

5   source.

6          As I've told you, there are two reasons for these

7   rules.  First, it would not be fair to the parties in the case

8   for you to consider outside information or communicate

9   information about the case to others.

10         Number 2.  Outside information may be incorrect or it

11  may be misleading.

12         When I say that you may not obtain or consider any

13  information from outside sources and may not communicate with

14  anyone about the case, I'm referring to any and all possible

15  means by which people can communicate or obtain information.

16  So this includes, for example, face-to-face conversations,

17  looking things up, doing research, reading, watching or

18  listening to reports in the news media, any kind of

19  communication using any electronic device such as a telephone,

20  smartphone, a cell phone, an iPhone, an Android, a BlackBerry

21  or any similar kind of device, a PDA or a computer, and any

22  sort of communication via the Internet, text messaging, chat

23  rooms, blogs, social networking sites like Facebook, LinkedIn,

24  Google Plus, YouTube, Twitter or any other form of

25  communication at all.

1        If you see, hear or receive any information about the

2  case by these or any other means, you must report that to me

3  immediately.  I want to reemphasize to you how important these

4  obligations are.  To put it simply, your compliance with these

5  rules is vital to the appropriate conduct of your duties as

6  jurors, and it's vital to the obligation we all have to ensure

7  that both parties receive a fair trial.  They cannot receive a

8  fair trial if any of you obtain information from outside

9  sources or if any of you communicate with anyone else about

10  the case or your deliberations before you have returned your

11  verdict.

12        So we're now ready to begin with the trial, and we'll

13  proceed in the following manner.  First, the attorney for

14  Games Workshop may make an opening statement.  Then the

15  attorney for Chapterhouse Studios may make an opening

16  statement.  An opening statement is not evidence.  Rather, it

17  is a summary of what each side's attorneys expect the evidence

18  will show.

19        After the opening statements, each side will present

20  evidence which will consist of testimony of witnesses and

21  presentation of exhibits.  After the evidence has been

22  presented, I will instruct you on the law that applies to the

23  case, and the attorneys will make their closing arguments.

24  After that, you will go to the jury room to deliberate on your

25  verdict.

1    So we'll begin with the opening statement on behalf

2 of the plaintiff, which I think Mr. Moskin is going to give.

3    MR. MOSKIN:  Thank you, your Honor.

4    OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

5    MR. MOSKIN:  Good afternoon, ladies and gentlemen of

6 the jury.  My name is Jonathan Moskin, and I represent Games

7 Workshop.

8    I hope you all had a very nice lunch because now you

9 must prepare to enter the dark world of the 41st millennium

10 where humanity teeters on the edge of extinction and can only

11 be saved by super human creatures called Space Marines.

12    Can we show it?

13    (Brief interruption.)

14    MR. MOSKIN:  Here is an image, an iconic image, of a

15 Space Marine.  You can see they are -- they're genetically --

16 well, you maybe can't see that, but they are genetically

17 engineered super humans who wear special armour, and that you

18 can see some of the armour that they wear, including, and you

19 will soon become experts in this, their shoulder pads, these

20 huge things that cover the upper portions of their arms.

21    The world in which the Space Marines live is

22 inhabited by many strange races such as Eldar, who are an

23 ancient race of elfin humanoids, and Tau, a fledgling race

24 that relies on advance technology to survive.

25    Tyranids.  Here is one example of a Tyranid, a

Moskin - opening

1  bioengineered race that devours everything in its path and

2  absorbs the genetic material of all that it consumes.

3       Now, although you won't be able to meet all of these

4  charming creatures in the next several days, you will be able

5  to meet some of the key creators of these -- of this fictional

6  world who are here in court or now sitting outside.  The

7  characters that they created 25 to 30 years ago, and many

8  others, are described in literally hundreds of books published

9  by Games Workshop.  Some of them -- several of them have been

10 New York Times best sellers.  They have been made into

11 miniature sculptures that are used to play a game, which we'll

12 see in a moment, that collectors acquire and paint and use in

13 the game and for collection purposes only.

14       Now, it takes the Games Workshop sculptors often

15 months, many, many months to conceive and create these

16 original creatures.  And I'd like to show you just a couple.

17 Typically the creatures are sculpted in roughly this size, and

18 this is called a cultist, not actually directly an issue in

19 the case, but just to give you an example.  They are then

20 through technical means shrunken down to as blown up on the

21 screen, but to this size, which is roughly a 28-millimeter

22 scale that Games Workshop was the first to use 25 years ago or

23 30 years ago.

24       And you can see the level of detail that goes into

25 the sculpting of these things, or perhaps I hope you can.

1       We will in short order give you -- although you heard

2   a little bit about the game, and some of the other jurors were

3   familiar with it, potential jurors, we'll give you a little

4   demonstration so you have some idea what the game is about

5   although I confess that, after working on this case for three

6   years, I still have no idea myself, or very little.

7       But you can think of it's sort of like if you're

8   aware of the kind of Civil War battle reenactments which are

9   sometimes done, you know, little soldiers.  Well, here it's

10  kind of like that except that instead of reenacting battles

11  that occurred 150 years ago, the battles occur in the 41st

12  millennium, thousands of years from now.

13      Now, you may not be familiar with Games Workshop or

14  Warhammer 40,000.  You might not have visited any of the 12

15  stores that the company owns in the Chicago area, or I think

16  there's roughly 16 additional independent hobby stores in the

17  area where you can buy their things.  Perhaps you have

18  probably not visited their website or many of these Internet

19  forums that are out there where fans of the game comment on

20  and debate virtually every new development whenever Games

21  Workshop is about to launch a new product or so forth.

22      And there are even conventions of fans, typically

23  held right here in Chicago.  They're kind of like Star Trek

24  conventions.  And even if you haven't heard of it, you will

25  come to understand that Games Workshop and Warhammer 40,000

1    has come to enjoy kind of a cult-like following that enables

2    the company to sell over $50 million worth of its stuff, the

3    books and the miniatures and so forth and some computer games

4    in the United States alone every year, all without a penny of

5    advertising.

6            Now, as the judge explained, a big part of this case

7    is copyright infringement.  The defendant Chapterhouse was

8    created by two very big fans of Warhammer 40,000.

9    Chapterhouse has one and only one purpose, and that is

10   apparent if you look at their web page, which it's a little

11   hard to -- maybe a little hard to see, but here you go, and,

12   as they have said about themselves, specializing in custom

13   sculpts and bits for Warhammer 40,000 and fantasy.  The only

14   thing they make and sell are products that fit within the

15   Warhammer 40,000 universe.

16           And even though these are fans that were drawn to the

17   game apparently because of its great originality and

18   creativity, they now want you to believe that there is nothing

19   original about it.  And even though every custom sculpt and

20   bit they make is made specifically for Warhammer 40,000, they

21   also want you to believe there has been no copying.

22           Now, although the defendant is a small company, it is

23   quite sophisticated.  They have employed roughly 25 designers

24   around the world.  They use digital tools to make exact copies

25   or nearly exact copies of key components of Games Workshop

1   products.  They use 3D printing high tech technology to

2   generate masters from which they then make their own pieces to

3   use in Warhammer 40,000, and they know exactly where to market

4   their products on the same Internet forums, which I mentioned

5   a moment ago, where fans of Warhammer 40,000 go to talk about

6   the game.

7          They have even taken to hiring former Games Workshop

8   employees to help them design their products so they can more

9   accurately capture the style and feel of the Games Workshop

10  originals.

11         Without all the years, literally 25 to 30 years,

12  invested in creating and developing these characters and

13  figures and products, at a fraction of the expense

14  Chapterhouse can generate its own custom sculpts for Warhammer

15  40,000 with little or no original thought and simply trading

16  on the popularity of the game that Games Workshop created.

17         Now, in this case you will have to decide, as in

18  every case, but in this case you will have to decide both on

19  evidence you see and evidence you don't see.  And one thing

20  you will not see is a single example of a product made by

21  Chapterhouse to stand on its own merit without having

22  someplace in the Warhammer 40,000 world.

23         Well, let me correct myself in just one modest way.

24  They have now very recently added a new product which is

25  called sort of a lizard man, which is copied from an earlier

1  game that Games Workshop developed called Warhammer.  And from

2  that, that character is called a Kroxigor, and I will show it

3  to you in a moment.

4        But because the only market for Chapterhouse's

5  products consists of fans of Warhammer 40,000 and this one new

6  product for Warhammer, they can only stray so far, which is

7  not very far from the Games Workshop originals or nobody is

8  going to want their product.  It doesn't typically make exact

9  copies, and we're not saying it does.  Again, it's a little

10  more sophisticated than that.  But it makes products that are

11  immediately recognizably similar so that fans, the fans that

12  Games Workshop has built up and created, that fan base, will

13  be attracted to the Chapterhouse versions.

14        As the judge said, what we're talking about is

15  copying a protected expression, not making literal or exact

16  counterfeit copies.

17        Now, there is a specific twist to the defendants'

18  business model, as I think you will learn during the course of

19  the trial, which is to find figures in this large body of

20  literature, the books that Games Workshop has created, where

21  Games Workshop has depicted the thing but hasn't yet made the

22  product.

23        So it's kind of like, if you think about it this way,

24  if you or I had gone to see Harry Potter, the first Harry

25  Potter movie, before they started selling all the figures and

Moskin - opening

1  so forth and licensed product, and decided to go and create a

2  website where we sold Nimbus 2000 broomsticks and Dumbledore

3  hats and Gryffindor ties and slithering waistcoats, things

4  like that, you would know exactly where the inspiration came

5  from, and that is exactly what they do.  It's trading on the

6  existing goodwill and the popularity of the Games Workshop

7  originals.

8        Now, the model, their business model, although it's

9  always focused on custom sculpts for Warhammer 40,000, it's

10  changed a little bit over time.  It began by making

11  replacements for parts of the armour of the -- particularly

12  the Space Marines.  By the way, there are supposedly 1,000

13  chapters of the Space Marines described in the literature.  So

14  you think it's no accident they happen to call themselves

15  Chapterhouse.

16        But if you remember, if you can go back to look at

17  that -- the 849, the Space Marine, that shoulder pad I told

18  you you will soon become experts in, there you go.  Now we can

19  jump ahead.  In the literature and in products that Games

20  Workshop sells, Games Workshop has created an elaborate set of

21  rules and customs and conventions to how the different

22  regiments or figures or types of Space Marines are demarcated

23  or identified.

24        And so if we can go to 849, I mean, rather, this

25  chart, you can see on the right over here, from the literature

1   and Games Workshop literature, there's this series for

2   tactical and Space Marines, which is one type of Space Marine.

3   They have shoulder pads with these types of markings with the

4   specific shape of an arrow and the Roman numerals I through

5   VI.

6           And if you go to the next page, for assault Space

7   Marines, which again is a different type of Space Marine, the

8   shoulder pads have these types of markings with this specific

9   design of a cross with flares at the end of the cross.  And,

10  again, it's only the numbers -- well, the numbers 7 and 8, and

11  the --

12          Well, if we go one more page ahead, for devastator

13  Space Marines, they have this chevron, or inverted vee, again,

14  combined with the numbers 9 and 10 typically with the gold

15  border around the edge, it's this elaborate system.  It's not

16  just that they have taken -- they will tell you, oh, you know,

17  we just copied.  Nobody can own Roman numerals, nobody can own

18  arrows, nobody can own chevrons, but it's the entire

19  combination of these features that have specific meanings in

20  the Games Workshop literature and in the products and in the

21  game.  That's what they're taking.  And that we believe is

22  exactly the sort of protected expression that is covered by

23  copyright.

24          And we can even start from a simpler point here

25  because one thing that you will not hear, there will be no

1   dispute in this case, that just the shape of the shoulder pad

2   itself all alone, even if there was no limitation on it, that

3   shape alone is original and copyrightable and is protectable.

4   So everything they add to it we believe just adds to the level

5   and type of infringement.

6          So, anyway, they started with these simple pieces

7   such as the shoulder pad, but then they moved on to more

8   complicated, more sophisticated copying.  Let's show this

9   jetbike.  Now, I don't know if any of you have even seen a

10  jetbike at all, much less a jetbike such as the one in Games

11  Workshop's literature over here on the right; that is, not

12  until you might have seen Chapterhouse's jetbike which

13  coincidentally shares this remarkable, we think, similarity to

14  the Games Workshop original.

15         And not only that, when Chapterhouse promotes this

16  product on its website and sells it, the legs and the arms it

17  makes -- now it looks like a Space Marine, but these legs and

18  the arms are copied by Chapterhouse, so that its figure -- the

19  bike is configured a little differently.  So it had to make

20  its own legs and arms so the figure can fit on it.

21         They have copied other characters as well, if we can

22  move on to show a Tyranid.  Now, here on the right is those --

23  again, I mentioned those genetically altered creatures that

24  steal the genes from all they consume and devour.  Well, here

25  is an example of a model of the product that Games Workshop

Moskin - opening

1    sells, and here is depicted -- it's called a Carnifex.

2          And here is a picture from one of the books of a

3    product that, when this case began, Games Workshop had not yet

4    begun to sell called the Tervigon.  Now, what Chapterhouse has

5    done is it took -- part of this is -- we don't say they copied

6    it in its entirety.  The underlying pieces, some of these

7    underlying pieces, such as the leg and the interior body are

8    simply taken from here.  But you can see they have added this

9    top with these distinctive chimneys that come out the top and

10   other features so that it creates a new figure which is a

11   copy, an almost exact copy, of the Games Workshop original.

12         Now, they say, well, we haven't made a copy.  All we

13   have made is these little blobs at the top that are

14   indistinct.  You know, they're not a copy from anything added

15   to Games Workshop's originals, but the point is what that

16   misses is that they only serve one purpose, and that one

17   purpose is to create a Tervigon, and that Tervigon was first

18   depicted here in an original game created by Games Workshop.

19         More recently they moved on to what we think is an

20   even more audacious form of copying called -- using a term

21   called TRU-Scale because the Space Marines -- you saw that --

22   I don't need to show it again -- that huge figure, it's

23   supposed to be awesome and powerful and mighty, and it gets

24   reduced down to a little, itty-bitty thing of 28 millimeters,

25   and many fans of Games Workshop have said for quite some time,

1    Games Workshop itself hasn't adequately in its miniatures

2    captured the awesomeness and might of the Space Marine, the

3    terror or the power that they're supposed to convey.

4           So we think that they should call -- create new

5    figures, new miniatures, that are truer to the original art.

6    And so there's been a long literature out there among the fans

7    of so-called TRU-Scale or art scale Space Marines that, again,

8    would better -- some things would better convey the grandeur

9    and size and strength.

10          Now, we show here is a product that is created -- it

11   was designed and sold -- it's a design that is sold by

12   Chapterhouse.  Chapterhouse doesn't use the name TRU-Scale

13   Space Marine, but the actual designer of this product, which

14   is sold by Chapterhouse, he calls it an art scale Space

15   Marine.  And, again, it builds on this rather audacious notion

16   that Chapterhouse can know better than Games Workshop itself

17   what it is to be true to the original literature that Games

18   Workshop has created.

19          Now, I did mention before that at the outset, there

20   is one product that Chapterhouse now sells that doesn't fit in

21   Warhammer 40,000.  I just want to give you a quick

22   introduction to it.  And that is called the Kroxigor.  Now,

23   here is the Games Workshop Kroxigor, which as you can see,

24   it's a lizard humanoid that has -- it has jewelry, Aztec-type

25   jewelry, around the legs and the arms and uses, admittedly,

Moskin - opening

1    you know, derived from Aztec lore, Aztec type weapons.

2          Now, if you go over to the Chapterhouse version,

3    remarkably they have an upright humanoid lizard with -- if you

4    can see on here, it's got jewelry around the arms, and it uses

5    the exact same weapons or types of weapons that Games Workshop

6    has combined.

7          Now, Games Workshop doesn't pretend that it owns all

8    lizards.  Of course not, although I think Chapterhouse will

9    want you to think that's what we're saying.  We don't.  It's

10   the combinations.  It's the original combinations to create a

11   wholly new character called a Kroxigor.  Chapterhouse's own

12   designer admits publicly that he is a fan and he created his

13   Kroxigor by copying from Games Workshop.

14         Now, what they want to defend is to say, well, he

15   also used other elements such as even going so far as to use

16   his son to pose when he created the -- created the model.  But

17   the fact is he only did that after --

18         He used his son to pose to create the model only

19   after he had already made up his mind that he was going to

20   make a Kroxigor.  So even if he had gotten Michael Jordan to

21   pose for his Kroxigor, it would still be a copy.

22         Now, the Court -- oh, excuse me.

23         Let me talk a little bit about trademark infringement

24   because the case isn't just about copyright.  And Chapterhouse

25   uses Games Workshop character names to identify almost all of

1   its products.  Again, all of its products are custom sculpts

2   for Warhammer 40,000, and the very fact that it can use Games

3   Workshop names to identify its products tells you something

4   about how similar those products are because you couldn't call

5   something a Kroxigor -- well, they don't use the term

6   Kroxidor -- you couldn't call something a Tervigon unless it

7   looked just like a Tervigon.

8          So it's no accident that Games Workshop -- that

9   Chapterhouse uses Games Workshop's names to identify its

10  products, and that's the heart of the trademark claim.

11         Now, the Court has given you some examples or some

12  explanation of what it means to be a protectable trademark.

13  Some terms are inherently distinctive.  And, for example, from

14  some of the terms I just mentioned, such as Tyranid or Tau or

15  Tervigon, those are all made-up names and are inherently

16  distinctive.

17         There are other names such as Space Marines.  Now,

18  that's a term that could have other meanings.  I mean, you

19  could imagine that there are Marines in space other than the

20  Space Marines that Games Workshop sells and describes in its

21  books.

22         But just like, for example, the word American

23  Airlines, love it or hate it -- and since I have been coming

24  here to Chicago quite a bit, I think I have to put myself in

25  the latter category lately -- American Airlines is the same

Moskin - opening

1    way.  Those are two words that nobody owns, but I think

2    everybody, if you say American Airlines, you know exactly what

3    you're talking about.  That's the kind of example of a word

4    that has acquired distinctiveness.

5         And Space Marines and many other terms, we don't

6    claim that we own them universally for every application, but

7    in the field of tabletop war gaming, or sometimes even more

8    broadly for all of science fiction, after 25 or 30 years of

9    sales by Games Workshop, those terms mean one thing.  They

10   mean Games Workshop.

11        One of the defenses that Chapterhouse raises in

12   trademark claim is that there's a little disclaimer on the

13   bottom of its website.  I don't know how many of you, when I

14   flashed that up there earlier, even noticed that there is this

15   language in here, and I don't know how many customers when

16   they're there out shopping on any website actually look at the

17   small print at the bottom of the page, but I don't think there

18   will be any evidence to show that this sort of a disclaimer at

19   the bottom of the page in small print will dissuade anybody

20   from thinking that a place that does a one and only thing,

21   such as specializing in custom sculpts and bits for Warhammer,

22   is something other than an approved site.

23        And the products are also sold on -- we can take that

24   down.

25        The products are also sold on eBay where there is no

Moskin - opening

1   such disclaimer.  As it happens, although we requested these

2   documents in the case, Chapterhouse didn't save any of its

3   eBay postings, but we happened to find a few which we'll show

4   you during the trial, and you can see the kind of trademark

5   usage that Chapterhouse didn't want you to see.

6           They also have copyright defenses, and I want to run

7   through those quickly before I sit down and let the

8   Chapterhouse's lawyers speak.  The Court has given you some

9   instruction of what it means for something to be original,

10  which largely just means it wasn't copied from something else.

11  And as I mentioned in this case, you can even start with the

12  proposition that that simple design of a shoulder pad, it's

13  conceded that is original.  There will be no argument to

14  suggest that that is anything other than an original

15  copyrightable design.

16          And from that, you can extrapolate or reason out or

17  make inferences as to even more complex figures with much more

18  detail such as the Kroxigor or the Tervigon or the space bike

19  and many others that we'll show you during the course of this

20  trial.

21          Now, rather than focusing on the overall look and

22  feel of the products that they sell and that Games Workshop

23  sells, what Chapterhouse, we suspect, will be doing will be

24  focusing on isolated aspects of those, such as, for example,

25  that a chevron can't be copied.  We would agree, nobody can

1  own a chevron.  Nobody can own the Roman Numeral I, but it's

2  the combinations that we say we own.

3         So that's what we're focusing on, and we don't think

4  that their defense really gets to the point that when people

5  look at these products, they don't dissect them into little

6  pieces.  They look at the whole product.

7         Think of it this way.  Nobody owns the letter S.

8  Nobody owns a basic shape of a badge, and nobody owns the

9  color red.  But you put them all together, and I bet every one

10  of you would know what the Superman logo looks like.  It's

11  that sort of combination that we say makes the Games Workshop

12  products distinctive and tearing them into little pieces just

13  misses the point.

14         Another defense they raise is that they don't sell

15  finished models.  What they sell are unpainted, unfinished

16  pieces that you have to assemble.  That's the way Games

17  Workshop does it, too.  But here, too, we think that, as a

18  defense, it misses the point.

19         For example, if I created a jigsaw puzzle with an

20  image of Harry Potter, would it be an excuse to say that when

21  I shipped out that jigsaw puzzle, it's only little

22  indecipherable pieces?  No.  What you're still selling is the

23  picture of Harry Potter that people want to reassemble into

24  the recognizable image, the whole.  It's the whole that

25  matters.

1        And on yet another level, many of you have -- not all

2    of you, but at least many of you, I am sure, have children.

3    If you have ever gone into a store to buy a son or a daughter

4    a Lego kit, those, too, they come in little pieces,

5    unassembled.  But I certainly know what my son always loved

6    was putting Legos together to make, for example, Star Wars

7    characters and ships.

8        Now, you can buy -- because the patents have all

9    expired, you can buy all those little blocks from a company

10   called Mega Blocks, but why Lego is still so popular is that

11   they're selling the fantasy, and that's what Games Workshop is

12   selling because people read the books.  They see the packaging

13   for our products.  They see there's a computer game and

14   there's a movie that we'll show you a little clip from.

15   They're buying the fantasy, and they want to -- the only

16   reason they buy these miniatures is so that they can recreate

17   them as part of that fantasy.

18       In fact, you will also see plenty of evidence that

19   Chapterhouse itself knows that the only way it can sell its

20   products is by presenting them on its website painted and

21   assembled and that it won't rush to put a product up there

22   until they can have a painter render it in adequate detail.

23       Now, Chapterhouse may also call one or two alleged

24   experts to talk about these models and so forth and science

25   fiction.  What these experts will show you are a bunch of

1  pictures, the images from science fiction that have some

2  similarity to some of the Games Workshop pieces.  What they

3  won't tell you -- they won't argue, and you can put this

4  aside, they won't be arguing that that affects the originality

5  because they don't say that -- and there is no evidence that

6  Games Workshop copied any of those pieces, and they won't

7  argue that it affects the -- that Chapterhouse independently

8  created its parts by looking at those pictures.

9        What it will say is that from the millions, we say,

10  of available images on the Internet -- not on the Internet --

11  in literature, in science fiction, the fact that they were

12  able to find a handful of images that have some similarity in

13  their minds allows some sort of an inference that Chapterhouse

14  was compelled to use those Games Workshop's designs because

15  there was no other way to do it.

16        But the reality is there is an infinite way.  There's

17  an infinite number of design choices that are available, just

18  as you can do a futuristic warrior people that looks like the

19  people from Star Trek that wear no armour to other -- you

20  know, there are Star Wars characters that look entirely

21  different.  There was no -- even within the Games Workshop's

22  literature itself, a wide array of different designs of

23  futuristic human warriors.

24        So coming -- I would like to draw this to a

25  conclusion.  I want to emphasize just a couple of last things.

Moskin - opening

1    One is that you're going to hear both lawyers argue, and, you

2    know, the point is not whether you believe the lawyers; it's

3    the way you believe the evidence.  And there are two sources

4    of evidence that I think you're going to find most compelling,

5    the words that come not from the mouths of the lawyers but

6    from the defendants themselves.  You will see plenty of emails

7    and even some prior testimony of the designers openly admitted

8    that the only sources of reference that Chapterhouse was

9    looking at in creating its products were Games Workshop

10   originals.

11          So you can listen to what Chapterhouse itself is

12   saying rather than what its lawyers are saying, or rather not

13   even what I'm saying.

14          The second piece of evidence that you will -- type of

15   evidence that you will be able to focus on are comments from

16   customers.  Although we had asked for Chapterhouse to save

17   these things, it so happened it didn't.  But we were able to

18   find on the Internet a number of examples of customer

19   reactions to the Chapterhouse products, and you will see

20   consistently that those customers immediately recognized the

21   similarities.  Some praised the accuracy or care with which

22   Chapterhouse made its copies.  Others are very critical.  But,

23   again, without having to focus on what the lawyers are saying,

24   listen to what the customers are saying.

25          The purpose of copyright law is to reward originality

Aly - opening

1   and creativity.  Chapterhouse will say, well, they're just a

2   small company being picked on by this big Games Workshop but,

3   that's not what this case really is about.  For 25 years, for

4   30 years, the designers, the artists, at Games Workshop have

5   given their lives to creating this elaborate fictional world,

6   to creating a business that is based on this elaborate

7   fictional world.  They just can't allow others to take what

8   they have created without any control.

9           With that, let me stop.  This is just my own

10  argument.  What matters more is the evidence that will come,

11  and there is going to be plenty of that.  So let's leave some

12  more time for the evidence to come.  Thank you again.

13          THE COURT:  Next we'll hear the opening statement for

14  the defendant by Mr. Aly.

15          OPENING STATEMENT ON BEHALF OF THE DEFENDANTS

16          MR. ALY:  Good afternoon, ladies and gentlemen.

17          My name is Imron Aly.  Again, I represent and have

18  the honor of representing Chapterhouse Studios today.

19          You heard part of the story from Mr. Moskin

20  representing Games Workshop, and I have learned something

21  about the game myself.  I'd like to tell you the rest of that

22  story.  The first thing I want to show you is an important

23  point that Mr. Moskin I think skipped over, and that is this.

24  Games Workshop sells its products and Chapterhouse adds onto

25  those products.  It's a big difference from copying because

Aly - opening

1  there's four points that I will go over with you today, ladies
2  and gentlemen.

3          One is gamers want personalization.  So these are
4  people who have already bought Games Workshop's products.
5  They have gone to the stores.  They have invested the money to
6  buy the models, and now they want to make their own.  They
7  want to personalize it.

8          They do that by -- the second point I'm going to show
9  you -- adding on pieces.  These are small add-on pieces that
10  work with.  Of course they work with the product.  That's what
11  they are designed to do.  They don't copy the product.  They
12  work with the product.  And for that reason, I'm going to show
13  you that the Chapterhouse products work with and not against
14  the market.

15          Games Workshop will tell you their business is not
16  impacted because Chapterhouse is around.  We're not
17  undercutting sales.  We're adding on small pieces, and I will
18  show you those.  And at the end of the day, Chapterhouse is
19  giving people choices.  You can add on and customize and just
20  have other things to do rather than only having to buy
21  everything always only the way Games Workshop wants you to buy
22  it, and that is where Chapterhouse came from.

23          Now, Warhammer 40,000 is the game that's out there.
24  We're not contesting that they made the game.  It's a game
25  which has a lot of pieces that you can buy straight from the

1  store.  The problem is this.  If everybody buys the exact same

2  kit and the exact same parts, it's not as fun.  You can't

3  customize them and make them your own, show them off to your

4  friends, go to these contests that he was talking about, these

5  conventions that exist, and say, here's what I made, here's

6  what I made, look at my little piece.  That just isn't

7  possible if you're stuck with your own skills and your own

8  product.  That's where Chapterhouse comes in.

9          Here is an example of one of those gaming

10  conventions.  Just to show you how the game is worked, there's

11  a whole bunch of pieces.  There's little parts and movies, and

12  somebody rolls the dice and says, hey, I point over here, I'm

13  going to attack this person, I'm going to attack that person.

14  I just want to show you a snippet to say that's what goes on.

15  And if everybody has the same thing -- and I'm doing the same

16  thing I promised I wouldn't do that.

17          If everybody did the same exact thing of just having

18  the same pieces, it wouldn't be distinctive.  It wouldn't be

19  personal.  It wouldn't be as fun.  So we want personalization

20  options.

21          And Nick, who is a gamer, and I want to introduce you

22  to Mr. Nicholas Villacci -- Nick played Games Workshop.  He's

23  a big fan of Games Workshop.  I agree with Mr. Moskin on that.

24  And what he said is, you know what, I like these pieces, I

25  like these parts, but I would really like to personalize them,

Aly - opening

1    and I wonder if other people would, too.  What if I have a

2    whole army and I want to make it distinctive by adding a

3    little different shoulder pad, for example.  And he started

4    this small company.  And it's a small company.  And it's our

5    goal -- I will read the goal to you because the part-about-us

6    page that he read -- he didn't read -- is our goal is to

7    provide the gamer with an affordable and unique alternative to

8    simple decals or time consuming sculpting.  We then combine

9    that with great product quality and customer service, unique.

10          That's the key word here, doing something different.

11   Yes, the parts are made to work with Games Workshop.  But

12   people don't read the disclaimer first.  They go to the top of

13   the website first where it says Chapterhouse.  We're not

14   selling things under the Games Workshop banner.  It says

15   Chapterhouse, and that's the website people go to to buy the

16   product.

17          It's an opportunity for customers.  It is.  But we

18   make one thing very clear, and Nick says from the very

19   beginning:  We will not copy, we will not copy a Games

20   Workshop symbol.  It wouldn't make any sense to copy it.  If

21   Games Workshop already had it, we wouldn't be doing the unique

22   different thing that we want to do, and that's what

23   Chapterhouse is about.  They will not copy.

24          Here is one example of an email.  This is an email

25   from Mike Earley.  He's one of the people who is helping

Aly - opening

1   design some products that he wanted to see out in existence.

2   So in 2008 he wrote to Nick and said, here is one idea for

3   shoulder pads, and he did his quick search, found some clip

4   art and said this is free clip art, public domain stuff, can

5   we use it.  They make it into a pad, and now he gets to see

6   his unique idea come to life.  Yes, it works with Games

7   Workshop, but it's different.  It's not a copy.

8           Another shoulder pad.  This is from Jeffrey Nagy,

9   another person who was interested in helping design some

10  products that he wanted to see come to life, another fan of

11  the Games Workshop game.  You will hear from Mr. Nagy in this

12  trial.

13          He then worked with Nick and said, here's my shoulder

14  pad idea.  It's a howling griffin picture that I saw, and that

15  shoulder pad I want to use, but I don't want to put a sticker

16  on it; I want to make a sculpted image with three-dimensional

17  lions coming out of the page, and that line here is the one he

18  made.

19          Now, this drawing down here on the bottom left,

20  that's actually a cad drawing.  So Mr. Nagy happened to be a

21  cad drawing person and he thought, maybe if I could put it in

22  my cad drawing, I can design it and sculpt it a little easier.

23  So he did the work himself.  It's not a copy.  He did the work

24  himself.  And he'll tell you about that.

25          After the cad drawing, after the idea, then we have

1    to sculpt it.  This is Chapterhouse Studios working on fine

2    skill.  You can see, for example, on the right shoulder pad,

3    it's got a skull, some wings coming out of it.  That's on the

4    fingertip here, and the zoomed-in picture is to show you the

5    intricate detail and the work that Chapterhouse Studios is

6    doing.  It's not a copy.

7            This is the procedure whole then, all the steps

8    Chapterhouse is doing.  If it wanted to, it could have just

9    said, here's the Games Workshop's piece, let's just copy it

10   and sell it.  That's not its business.  It wants to do

11   something different.

12           They think, Nick and his team, let's come up with an

13   idea.  Let's draw it out and see what it looks like.  Now

14   let's make a cad drawing out of it to see what we can do,

15   machine it if we need to machine it, sculpt it if we need to

16   sculpt it from scratch, and make it.

17           And now there's a product that you can actually hold

18   in your hand and you will be holding in your hands at the end

19   of the trial as well.

20           So this process -- Nick, very careful, said he will

21   not copy, that's the policy, and made sure that he was doing

22   things that were different.  So he had a good idea that he was

23   working forward with.  He thought this will be fine, I will go

24   forward with this.

25           But Games Workshop had a different idea.  They

1  thought if you were making something to use in our world,

2  that's the same as copying our world, and filed a lawsuit.

3  They filed this lawsuit here in Chicago.  Even though, as you

4  will hear, Nick lives in Texas and Games Workshop is in the

5  U.K., they picked Chicago.  That's what brings us here today.

6        And I highlight the date for one important reason.

7  This is just before Christmas 2010.  Nick is in his house in

8  Texas, doesn't know that this complaint is filed.  He finds

9  out about it because of the letter that Mr. Moskin sends.

10        And the letter says:

11        Your business, they're all copies, somehow or

12  another.  They're deliberate copies.  And you took unique

13  expressions from us, including the chevron, this inverted vee

14  that you heard about, the Roman numerals that you heard about,

15  and you have to stop.  Stop everything you're doing, Nick, put

16  it all aside.

17        Now, Nick had done all this work.  So he's sitting

18  here in Texas.  He had done all this work to put together this

19  team to come up with products that are adding on.  He was

20  disappointed.  He thought Games Workshop would love the fact

21  that he's adding on to their world.  He's not competing with

22  the world.  Why would he?  He has different unique things to

23  add on to it.  He's a fan.

24        When he got this letter, very disappointed, he tried

25  to work things out in the very beginning, and Games Workshop

1    wanted to proceed.  We are here today, ladies and gentlemen,

2    because two and a half years ago, this letter and this lawsuit

3    were filed.

4            Now, what is that add-on business?  What is it that

5    we think Games Workshop is missing the point about?  That's

6    this add-on piece.  It's not that we're trying to make the

7    same thing.  We're adding on.

8            A common example -- Mr. Moskin gave some examples.

9    Here's an example.  You have a cell phone.  You buy the cell

10   phone.  It's once you buy the cell phone, you can start adding

11   things onto it that work with it.  Of course they work with

12   it.  Sometimes they will even say, for use with your whatever

13   brand phone you have.  That's the purpose of the add-on

14   product.  That's under -- they're sometimes called value-add

15   products.  They're not taking away from the designer.  They're

16   adding to it.

17           In fact, sometimes people might think it's more

18   attractive to buy a particular product because there's other

19   options of things you can add on.  You can customize.  You can

20   personalize.  You can make things your own.

21           The same is true for another example with the car

22   market.  There's a whole bunch of ways after you buy the car

23   that you can add on anything you want to make it yours.  So

24   when I see it driving on the street, I know that car was built

25   by somebody else, you didn't build the car, but I also know

Aly - opening

1   that, oh, that's so and so's car because it has the funny

2   decal on it or it has the funny wheels on it.  Nobody is

3   claiming they built the car.  They're saying they helped make

4   it their own.  They personalized it.

5          We don't copy any of the points, and that's an

6   important thing that I want to make clear, and the judge

7   already described the law and will do so again, but a few

8   basic principles that I wanted to reinforce.

9          One is copyright protects expressions, specific

10  expressions, not general ideas.  So when Mr. Moskin said, hey,

11  well, we came up with an idea for a Kroxigor, a crocodile or

12  lizard-type character, maybe they did.  But that doesn't mean

13  they can forever protect anyone else from making a lizard man.

14  They just can't do that.  Copyright law, as you will learn and

15  you heard, protects the expression:  How did you put it

16  together?  Not the idea, how might somebody else put it

17  together.

18         At the end of the day, that's the difference between

19  an idea and an expression.  That's why you can't copy -- you

20  can't copyright basic shapes and common designs.  And we

21  didn't copy any of those basic designs.

22         You also heard a little bit about fair use, that

23  sometimes you're going to, for example, add on to a piece.

24  You might show it in a picture with your piece added on to

25  their piece.  That's, again, a fair use.  You're showing how

Aly - opening

1   your thing works, and you will hear more about the legal

2   arguments later, but for now I want to make sure the issue is

3   clear that copyright infringement protects certain things,

4   does not protect other things.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Here's one example, Tyranids.  Mr. Moskin showed you

2    this.  And Games Workshop, this is one of their races.  As a

3    matter of fact, Nick played with these particular characters

4    and said, hey, I would like a -- I want to make mine

5    different, make mine stand out, and to do that, he came up

6    with a team and built add-on pieces.

7    Now, what's important here is just -- I'm going to

8    show you a bunch of these examples, and this is one of them.

9    What's important is that on the left is the Games Workshop

10   product.  You have to buy that toy.  You have to buy that toy,

11   and then the add-on makes sense.  The Chapterhouse pieces on

12   its own, useless.  You can't do anything with them.  They

13   don't even fit together.  You can't even put them on the

14   board.  And why that's important is because, yes, they're

15   designed for Games Workshop, but they're not a copy.  They're

16   not a copy, and you have to already have bought that Games

17   Workshop product.

18   This is what it looks like when you put the pieces

19   together, and now you've got this Chapterhouse picture saying,

20   hey, we put our thing on top of the thing we bought directly

21   from Games Workshop.  We didn't copy the whole thing.  We put

22   our top thing on.  And here is a highlighted version showing

23   which pieces we're adding on.

24   Now, these may be small differences to say, hey,

25   this -- you piece this on and piece that on.  But when you put

1   it on a table, you show it off to your friends, people are,

2   hey, that's pretty cool, I want one of those, how do I get it,

3   and then they can go find out and to have the discussion about

4   what pieces they might want to add on, what design they want

5   to use, personalization, customization that customers ended up

6   loving.

7          It is a very personal game.  This isn't a hobby that

8   some people can do part time.  It really involves a lot of

9   time, so much that when customers were writing they said,

10  "Hey, thank you for your kit to my Tervigon.  By the way,

11  turned out looking awesome.  His name is Bob."  I mean, they

12  started naming their characters and naming their figures

13  because they have that kind of a relationship with them.  It's

14  not taking away from Games Workshop, adding to.

15         This is a good example because Chapterhouse came up

16  with this idea and started selling this conversion kit because

17  Games Workshop didn't have a product that was a Tervigon.

18  That's what they wanted to make, and they didn't have it.

19  Well, apparently that idea, as you saw, the customers reacted

20  favorably.  It looked cool.  And Games Workshop decided, you

21  know what, that is an interesting thing.  We should be making

22  one of these Tervigons.  And a year and a half later they did.

23  But it took time.  Chapterhouse didn't copy Games Workshop.

24  It turns out Games Workshop looked to Chapterhouse for

25  inspiration.  And you'll see from the timeline there are

Aly - opening

1  examples where Chapterhouse being involved as a fan in this

2  had a lot of good ideas.  That's one of them.

3        I want to show you now one point.  It's another

4  example, ladies and gentlemen, is what you buy is an add-on.

5  This is an example --

6        Your Honor, may I approach?

7        THE COURT:  Yes.

8        MR. ALY:  PEX 704 is an example of a Warhammer box.

9  This is from Games Workshop.  This is from Games Workshop.  So

10  if you buy this box, you open it up, you get all of these

11  parts inside.  And you can put them together, and you can

12  assemble them, and you'll get Space Marines, what they sell.

13  This is what they sell.  What Chapterhouse sells is an add-on,

14  a different kind of a shoulder pad.  So if you don't want this

15  plastic one that's kind of plain looking, you want to make it

16  like this fancy looking one, you can tack that on in its place

17  and your Space Marine becomes yours, becomes custom, becomes

18  different.  That's the difference.

19        There's a whole lot of other examples, but since

20  there's over a hundred products accused, I can't show them all

21  to you.  I can pick a few and show them.  Here's one product.

22  You'll hear it called Product 82.  It's a conversion kit for

23  the rhino on the left.  Games Workshop's product, a giant

24  tank-looking thing.  On the right a few doors that

25  Chapterhouse says you can stick these doors on it and replace

1     the doors that come with the kit.

2            Next product, another tank-looking thing.  Again,

3     Games Workshop sells the giant tank; Chapterhouse sells the

4     doors that stick onto it.

5            Next product, 130, Chapterhouse sells the little

6     magnetic guns that go on top of guns and replace guns that are

7     in this flying ship thing that Games Workshop created.  And

8     this one's pretty interesting to me at least because those

9     guns are magnetic, and so when you buy it from Games Workshop,

10    you glue the pieces together, but once they're glued together

11    you got to either snap it off or just keep it that way.  So

12    the Chapterhouse alternative was what if we had these guns

13    that we could put in place but they were magnetic, so if you

14    wanted to swap them out or make them different, you could do

15    that even during a game or after or just make it different

16    from day to day.  And those were an add-on piece as well.

17           63, a dragon drop pod door.  Now, here you've got

18    this thing called a drop pod that they put on a table and say,

19    here, I'm bring up my whole new alien plate.  Well, we just

20    have a different door for it if you want to buy that door.

21           And, lastly, for these alternative heads, Games

22    Workshop sell this impressing robot-looking thing, and

23    Chapterhouse sells alternative heads.  You don't want all of

24    the robots to look the same.  Maybe you want a different head

25    on some of them.  So we have some options that Chapterhouse

Aly - opening

1    sells just to stick to the head.

2            Bottom line here, you have to buy the Games Workshop

3    piece for the Chapterhouse piece to have the use.  So these

4    are the choices that you get.

5            There's another type of a combi weapon you can add on

6    to the games, and the jetbike is another example of an

7    alternative.  So I think Games Workshop explained and

8    Mr. Moskin did, that they sell jetbikes too, this one.  But

9    the top, importantly, is an image.  It's an image from one of

10   their books that they have.  And they say that that is a copy

11   of the Chapterhouse Studio bike as well.  But it's not a copy.

12   It's a jetbike.  Yeah, we get that.  But Mr. Nagy will be here

13   explaining to you how he came up with the design process once

14   he had the idea of a jetbike.  Difference between an idea of a

15   jetbike and an expression.  Copyright protects the expression,

16   not the idea.

17           A super heavy assault walker, you'll hear some about

18   this, Product 45.  Games Workshop sells some kind of

19   equipment, some vehicles, but Chapterhouse sells other

20   vehicles, alternatives, different.  One is not the copy of the

21   other.

22           And mycteic spore, we have another, Product 95 here.

23   There's a picture out of a page of a book that Games Workshop

24   sells.  It's got a creature, a turtle-looking thing over here.

25   And then Chapterhouse said, well, where did that turtle come

1    from?  Maybe it comes from something, and maybe we can

2    creatively make this product, this part.  I'm going to hold up

3    DX 75 to show you that that particular part, for example, is

4    the spore that you could put onto the game table and have

5    whatever different function that you think that should have

6    when you're playing that particular game.  But what is

7    interesting about it is --

8              If I may approach the screen, your Honor.

9              THE COURT:  Sure.

10             MR. ALY:  They're not saying this is a copy of it.

11   They're saying this is a copy of this little thing falling out

12   of the sky here.  That's what they're saying, this is a copy

13   of that little thing falling out of the sky.  And it's just

14   not.  The thing on the left is an image from a book, and it's

15   one part of it.  It's grainy.  I don't even know what it

16   really is.  But the study that Nick did was let's make a

17   design, let's make a product from scratch that will look cool,

18   look different and people might buy.

19             Another example of a product people wanted to look

20   cool but different.  Mr. Moskin did mention this one.  Games

21   Workshop sells lizard-looking creatures.  That they do.  And

22   another person who's a fan, Robert Lippman, also plays with

23   his kid with the Games Workshop lizard creatures.  But what

24   they said is, let's make this personal.  Let's just make this,

25   because it's a hobby.  It's hobby for those people, and that's

1   the whole point of this, is a hobby experience.  Let's do

2   something that we can say adding on to our existing lizard

3   army by making our own little lizard men.  And they did.  And

4   the way they did that is they built them.  They sculpted them

5   from scratch.  The way they sculpted them is, hey, son, Ethan

6   was his name, why don't you pose in different ways.  I'll

7   photograph them.  Then we'll model, we'll sculpt a little

8   lizard that then you can play with together as a family.

9   That's the hobby experience, and that's what Chapterhouse

10  really appreciated, really enjoyed.  The fans loved it too.

11  For that product, 144, that werecroc, the fans responded that

12  they loved the werecroc, they liked the werecroc, they really

13  loved the crocs.  So that's the reaction that people get, is

14  that we like something different.  And these are people that

15  are on these boards.  They know what the difference is between

16  Games Workshop and Chapterhouse.  And they see that -- they

17  like these alternatives.  So they work with, and not against.

18  Chapterhouse works with, and not against.

19          And I want to show you one more discussion here

20  before we move to trademark.  This discussion now is about the

21  shoulder pads, which you will become experts in after the end

22  of the trial.  And Mr. Moskin was right to point out a bunch

23  of different shoulder pad examples.  Well, I want to show you

24  that although they are protectible because they have a

25  particular size and shape, that protection we think is pretty

1    thin, and we can -- you can use it fairly.  Here's why,

2    because the Space Marine shoulder pad, where does it come

3    from?  It covers something.  It covers the shoulder.  And I

4    want to show you that relationship.  What's underneath the

5    pad?  The Space Marines box comes with a little assembly book.

6    The assembly book has a picture in it, and in the picture it

7    shows a pad going over a shoulder.  So the pad has to have a

8    particular shape if you're going to sit down and design it.

9    And Mr. Nagy, who made a bunch of these pads, will explain to

10   you he didn't copy a Games Workshop pad.  He looked at the

11   shoulder and said, what will it take to cover the shoulder and

12   make a design about that.  It's not a surprise that it's going

13   to have the shape that's an arc to cover the shoulder.  That's

14   what you need to cover the shoulder.  So that's what the Games

15   Workshop shoulder pad looks like because it's covering the

16   shoulder that's underneath.  It's not this giant kind of half

17   a quarter of a sphere or whatever.  It's really just a shell.

18   It's really just a cap that fits on top of it.  Here's an

19   example of how that cap looks, the outside, inside, just a

20   shell, just a cap that goes on top of the shoulder.  It's not

21   a whole giant shoulder thing, just a cap.

22          And from the Games Workshop view of things, this is

23   what they sell.  Games Workshop sells decals.  So if you want

24   to buy a particular army, and this one is a blood raven type

25   of an image, then you can buy the decal sheet, comes with some

Aly - opening

1  of the kits, and then stick the decals onto the shoulder pad.

2  The problem is a lot of people don't think that looks very

3  good.  Maybe it's not that artistic.  The decal wears off.

4  You can't see it very clearly because it's on a dark

5  background.  They have problems with it.  They don't like it.

6  Chapterhouse said, well, maybe we could just design a whole

7  new shoulder pad.  Maybe we can make something completely

8  different.  And took the idea of a bird thing.  I'm going to

9  convert that into an eagle.  Now I'm going to make a shoulder

10  pad that has an eagle on it but coming out of the pad.  That's

11  their new idea, and this is what they made.  Chapterhouse

12  makes a three-dimensional shoulder pad with an eagle coming

13  out with its wings folded out of the shoulder pad.

14        And Games Workshop thinks that the eagle on the right

15  is the copy of the stickers on the left.  You're going to get

16  a chance to make these comparisons yourselves, but that's what

17  this case is about.  They think that's a copy.

18        There's a lot of shoulder pads.  That's the bulk of

19  the case actually is in terms of the number of products, the

20  shoulder pads, but here's more examples of the same thing.  We

21  make three-dimensional shoulder pads that are very complex so

22  it gives you alternatives to add onto the existing models,

23  existing toys.

24        There's a bunch with lions and snakes.  There's a

25  whole theme of these with animals.  And, again, this is the

Aly - opening

1  difference between idea and expression.  Sure, if you want to

2  make your lion your way, Games Workshop, that's fine, and you

3  can't -- you know, people shouldn't copy that.  But if

4  somebody else wants to make a different lion, they should be

5  allowed to do that.  You can't own all lions here or snakes,

6  and that's where Chapterhouse comes up with its other areas,

7  but Games Workshop thinks these are also all copies because

8  they have animals on them where the animals are the ones they

9  use.  But with a thousand space chapters to choose from,

10  there's going to be a lot of animals there, so they can't --

11  what they essentially want you to say is can't use any animal

12  on any pad.

13          The same with the military markings.  And you saw

14  this from Mr. Moskin, and he explained that there's a

15  difference between just the marking and a combination of the

16  marking with a number.  But in the military setting that

17  doesn't really make much sense because if there's a particular

18  order, let's say they use a chevron and you want to have a

19  division of that, the most natural thing you'd think of is

20  one, two, three, four, five, six, seven, eight, nine, ten.

21  That's what they do.  That's all that that is.  It's not an

22  awesome artistic combination to put an X on top of the

23  chevron.

24          And on these military markings, this and others like

25  it, you'll hear from Mr. William Brewster.  Now, Mr. Brewster

Aly - opening

1   is a curator at a museum up in Wheaton.  He'll come by and

2   he'll tell you that he is seasoned in studying military

3   materials, military insignia, military uniforms, and from his

4   experience he can tell you about how common this all is.  It

5   doesn't matter if Games Workshop copied one particular

6   reference.  He's just here to tell you it's common.  That's

7   what people do.  If they want to make a military marking of a

8   certain kind, that's the way they do it.  That's not special.

9   That's not something Games Workshop owns just because they do

10  it too.

11          Here's just one example of an image that you'll see

12  of a U.S. military using a chevron.  And guess what.  There's

13  also a chevron with a number.  It's not surprising.  These are

14  common things that if you're in the military, you use those

15  kinds of markings.  Games Workshop doesn't own them and

16  shouldn't own them.

17          We asked then Games Workshop, what do you have in

18  terms of your reference materials?  What do you look at when

19  you're kind of coming up with your ideas?  Games Workshop took

20  us to a room and showed us this.  This is a box of books that

21  they have at their access and their ready.  And there's

22  different departments and divisions that they have.  And we

23  were able to look through these books.  Now, we couldn't read

24  all of them in the time that we had there, but we opened up

25  some of the boxes and weren't surprised to learn that they

1    have at their ready all kinds of the same military books and

2    things that are out there, and that's where they're getting

3    these ideas from.  Now, can we tie a specific book to a

4    specific copy?  Not right now because we don't have all of the

5    crates of books and we don't have all of the people that

6    designed them, and you won't hear from them all either.  But

7    we know they have access to all of those books.

8         Another person, then, this is Dr. Carl Grindley,

9    said, you know what, I'd like to do my own research and find

10   out what else is out there.  Let's put military to the side.

11   What about science fiction.  And Dr. Grindley is an English

12   professor from New York.  He's been a professor for 20 years,

13   and he has a Ph.D. in English, and he happens to be in an area

14   that I didn't know existed, which is science fiction in

15   literature.  And he's an English -- it's science fiction in

16   literature, and he'll tell you that the science fiction part

17   of this is also drawing from common elements.  Yes, there are

18   going to be some things that are different here and there, but

19   if you look at them, they're all common elements, and the

20   ideas aren't really that exciting, and the expressions might

21   be varying here and there, but the ideas are not really that

22   exciting.  And even Star Wars is one example that Dr. Grindley

23   can tell you about where you've got these storm troopers,

24   these futuristic-looking Space Marine type things with the

25   shoulder pads and everything.  So you'll hear from

Aly - opening

1   Dr. Grindley as well, who'll be coming in and telling you

2   about his experience of what he found in his study and

3   research.

4           Here's an example of what Dr. Grindley found.  This

5   is for Product 135, the alternative heads for the Tau.

6   Remember the Tau robot.  That's the thing on the left that

7   Games Workshop sells.  What Dr. Grindley found is those are in

8   science fiction.  So how can you really call it something

9   original and unique and genius when that's the way they're

10  depicted?

11          Now, on the right I'm showing you in the reference

12  material column something from somebody else, not Games

13  Workshop, and before Games Workshop, somebody else and before.

14  And you can see there are similarities there, and the ideas

15  are not new either.  And that's a part of the case that we'll

16  be discussing through Dr. Grindley.

17          I was surprised to see these.  They're -- even

18  pictures of guns that Games Workshop says there are certain

19  types of guns that they protect and they own and no one else

20  can make another toy gun like those particular guns.  Well,

21  Dr. Grindley will tell you here again any kind of gun shape

22  you can image is probably out there, and there's nothing

23  creative about little pieces and parts of the gun design.  And

24  Dr. Grindley found on the right reference material showing

25  some of those images.

Aly - opening

1    Space Marines and alien and the book and using it as

2    a game, that's been out too, so the Space Marines idea, this

3    is a 1970's book, it's a game book, and it's got the Space

4    Marines rule book for the tactical ground combat squad.  So

5    these things are out there.  It's not a Games Workshop

6    product.  Games Workshop comes twelve years later and says,

7    oh, we want to make a Space Marines game too.

8    So, ladies and gentlemen, on the copyright side,

9    after the case is over, I'll ask you -- we'll have more of a

10   discussion about that, but I want to now move and wind down

11   with the trademark section of the case that Mr. Moskin also

12   addressed.

13   The top points that the judge mentioned as well,

14   trademark protects brands and not names in a book, Games

15   Workshop didn't take any surveys and can't prove confusion.

16   The reason that is important is because the trademark is only

17   infringed if somebody is going to be confused by it.  So if

18   somebody says, I have a Games Workshop game here and another

19   person comes along saying, I have something you can use with

20   Games Workshop, the question is, is there any confusion.  And

21   in this case you wouldn't see evidence of confusion.  Why?

22   Because they didn't take a survey, which is one way of

23   showing, by asking customers, are you confused, did you think

24   this was a Games Workshop sponsored piece when they said it

25   can be used with Games Workshop.  And the question to that

Aly - opening

1  would be no.

2          And Chapterhouse refers to Games Workshop.  It does.

3  It uses the name Games Workshop, but it does so in a truthful

4  fair use, which is our product works with Games Workshop.

5  It's true just like any other accessory for any other thing

6  you can buy anywhere in the world.  If it's a true statement,

7  it's fair use, and that's what you're going to hear about

8  later.

9          Games Workshop, I said, does have trademarks.  These

10  are the Games Workshop trademarks.  But don't be confused.

11  Chapterhouse doesn't put these on its products and say buy

12  them, they're Games Workshop products.  No allegation of that.

13  It's not what happens.  It's very clear, on the other hand,

14  that everything we sell is made for.  Where it's made for a

15  specific thing, it's clear that's what it is.  It's always

16  going to have, again, the heading Chapterhouse Studios right

17  on top of the website, the website address, Chapterhouse

18  Studios.  And in the description, this is one product, Dragon

19  or Salamander Thunder Hammer, it's going to say it can be used

20  for these Space Marine armies.  That's a fact.  It can be used

21  for those.  It's not a trademark infringement when you have a

22  fair use by referring to what it can do, what it's for.  You

23  hear about those things all the time on TVs, accessories.

24          There is the disclaimer as well, but what's

25  interesting about the disclaimer is that's the disclaimer that

Aly - opening

1    Games Workshop wants people to use, and that's where that

2    disclaimer came from.  Now you're saying, well, that's too

3    small, it's too much fine print.  We'll get into that, but the

4    disclaimer is also there.

5         So there isn't evidence of confusion, but to the

6    contrary, just don't take my word for it, because internally

7    at Games Workshop they wondered, hey, are people being

8    confused?  We're getting reports about this other use by

9    somebody else named Chapterhouse.  And this is what they found

10   out.

11        This is from Miss Gill Stevenson.  You'll hear from

12   her testimony describing that in fact they did get these

13   emails describing reports about Chapterhouse, but they didn't

14   show confusion.  People knew the difference.  These are

15   professional Games Workshop players.  They know the difference

16   between something from Games Workshop and Chapterhouse.  And

17   the Games Workshop, this is a Games Workshop document, says

18   and another one who is clearly not confused.  They know that

19   their customers aren't confused because Chapterhouse makes it

20   clear that they're selling Chapterhouse products.  There's a

21   difference between Games Workshop and Chapterhouse, and people

22   know that.

23        Finally, there's a whole bunch of trademarks, again,

24   another hundred asserted here, and so I'm not going to go

25   through all of them, but we have to look carefully at some of

Aly - opening

1    them because when Games Workshop says we own Games Workshop,

2    yeah, they do.  We're not even going to contest that name.

3    People know it.  But here are other names and examples of them

4    that we think they're overreaching, go too far:  "assault

5    cannon", "librarian", "empire", "exorcist", "jetbike", "space

6    marine".  These are common words and common phrases that

7    anyone should be able to use that are in the common

8    vocabulary.  Games Workshop shouldn't be able to own them.

9    And to prove that it does own them, it will have to prove a

10   lot more than just, hey, we've used these words before, and

11   we'll talk about that later as well.

12            So, ladies and gentlemen of the jury, thank you very

13   much for your time.  And in closing, at the end of this

14   particular trial there will be two turns.  They're going to

15   get their turn; we get our turn.  And I ask you to wait until

16   the end of all the evidence, in which case we'll come back to

17   you and I'll ask you that you stand with us and say that it's

18   okay to have add-on products to an existing business and

19   therefore find that we don't have copyright infringement and

20   we don't have trademark infringement.

21            Thank you for your time.

22            THE COURT:  Okay.  Just so the jury knows, we're

23   going to take our afternoon break exactly halfway through the

24   afternoon session, which means at ten after three, so about 25

25   minutes.

Merrell - direct

1          So please call the first witness.

2          Just so you know why they went outside, so, as you

3    know, there is a corporate representative for each side

4    sitting at the attorneys' table.  The other witnesses

5    basically wait outside the courtroom when they're not

6    testifying and then come in when they testify.

7          Sir, you're coming right up here.

8          Please raise your right hand.

9          (Witness sworn.)

10          THE COURT:  Whenever you're ready.

11          MR. MOSKIN:  The witness has been sworn?

12          THE COURT:  Yes, he has.

13      ALAN ROY MERRETT, PLAINTIFF'S WITNESS, DULY SWORN

14                    DIRECT EXAMINATION

15   BY MR. MOSKIN:

16   Q   Can you please state your full name for the record?

17   A   My name is Alan Roy Merrett.

18          THE COURT:  Spell the last name, please.

19          THE WITNESS:  M-e-r-r-e-t-t.

20   BY MR. MOSKIN:

21   Q   And are you employed?

22   A   Yes.

23   Q   And how so?

24   A   By Games Workshop.

25   Q   Okay.  And what do you do there?

1   A   I'm the head of intellectual property for Games Workshop.

2   Q   And what does that mean?  What do you do as head of

3   intellectual property?

4   A   Well, I oversee all of the images, all of the characters

5   with the story development in our games and our images.

6   Q   And how long have you worked at Games Workshop?

7   A   I started working for Games Workshop in 1981, so that's

8   about 32 years.

9   Q   Where's the company based?

10  A   The company is based in Nottingham in England, home of

11  Robin Hood.

12  Q   The home of Robin Hood.  Is there actually still a

13  Sherwood Forest?

14  A   Yes, there's a Sherwood Forest.

15  Q   And can you describe generally the business of Games

16  Workshop?

17  A   Games Workshop publishes games and books and mostly

18  miniatures of a fantastical character in nature subject

19  matter.

20  Q   And are they -- are there specific subject areas that

21  these books and characters relate to?

22  A   Our two main systems or game systems or settings are

23  called, rather confusingly, Warhammer and Warhammer 40,000.

24  Normally we call that 40K or Warhammer 40K for short.

25          Warhammer is sourced in sorcery fantasy, dragons and

1  dwarves and elves, and 40K is a science fantasy, a futuristic

2  setting.

3  Q   Can you give us a little bit more of a summary of what the

4  story is in Warhammer 40,000?

5  A   It's a bit grim.  In fact, the catch phrase or the tag

6  line for the game is, "in the grim darkness of the far future

7  there is only war," which sounds a bit brutal and macabre, but

8  basically it's a setting where humanity is besieged by various

9  alien races, some of them of a truly monstrous character, and

10 they -- the aliens want to basically kill humans.  They want

11 to destroy the human empire, which is called the imperium, and

12 the imperium is defended by these star stern warriors called

13 the Space Marines.

14 Q   And where did this story come from?

15 A   The collective imaginations of a small group of people in

16 Nottingham back in 1987.

17 Q   And is there someone --

18         Where does one go to find what the story is about?

19 A   We publish a vast array of books, books about the game,

20 Warhammer 40K books that are stories set in that universe,

21 novels that you can buy in bookshops.  The game is told

22 through various games.  There are games that we've published

23 in the past and games that we've licensed through other people

24 to publish where you can get information about it.  Computer

25 games.  We've even had a movie.

Merrell - direct

1  Q   You mentioned this movie.  Would that be a good way to

2  introduce the jury to a little bit about what the story is

3  about?

4  A   It would certainly give them a flavor of the property,

5  yeah.

6        MR. MOSKIN:  Well, if I can, your Honor, I'd like to

7  play a movie trailer.

8        THE COURT:  Sure.  That's fine.

9        Is there an exhibit number to it?

10        MR. MOSKIN:  Yes.  Exhibit 328.

11        THE COURT:  All right.

12        MR. MOSKIN:  Oh, and I will note that we've turned

13  the computer screens to the jury.

14        THE COURT:  Okay.

15        (Video played.)

16  BY MR. MOSKIN:

17  Q   Can you tell us a little bit about what we just saw there?

18  A   That was the trailer for an animated film that we licensed

19  back in 2010 called The Ultra Marines, and it gives you a

20  snapshot of that dark future, the world of 40K.  It's a

21  dystopian landscape full of violence and death and savagery

22  and guns and tanks and things.

23  Q   Now, were you involved in creating all this futuristic

24  world, this terrible futuristic world?

25  A   Yes.

Merrell - direct

1   Q   And can you tell us what was your role?

2   A   Well, back in 1987 when we first published Warhammer

3   40,000, I was --

4   Q   Excuse me.  I'd also like to ask you to perhaps to speak

5   up a little bit.  If I can't hear you so well, maybe the jury

6   can't.

7           THE COURT:  That's partly a microphone issue, so

8   let's get it pointed the right way.

9           THE WITNESS:  I'm not at all intimidated by it, by

10  the way.

11          Yeah, in 1987 I was working in some sort of -- well,

12  in what we call the design studio, which is a tiny little

13  office in the center of Nottingham, with a handful of other

14  people, and we basically created this property.  We published,

15  created a book and a range of miniatures for the game, and

16  that was pretty much the start of it.

17          My exact function at the time is kind of a little bit

18  of a mystery.  I can't quite remember exactly what particular

19  role I was doing, but in those days we all kind of pitched in

20  and did a bit of everything, so I did some writing.  I did

21  some games design.  I did a little bit of graphic design.  I

22  did some illustration.  I think I was probably the

23  publication's manager at the time.

24          We're talking about it was created by kind of a hard

25  core of about seven or eight people.

Merrell - direct

1  BY MR. MOSKIN:

2  Q   Who were some of the people involved?

3  A   The guy who wrote it is a chap called Rick Priestley.

4          THE COURT:  Say the name again.

5          THE WITNESS:  Rick Priestley, Richard Priestley.  He

6  uses Rick for his publishing name as it were.

7          Art direction was by John Blanche, who did various

8  illustrations and also sort of did all the art direction for

9  the project.  Graphic design was handled by a guy called

10 Charlie Elliott and another chap, I can't remember his name,

11 who worked for Charlie.  Various of our miniature sculptors

12 worked on the project.  Jez Goodwin contributed a lot of

13 illustration, especially for all of the symbols and a lot of

14 the graphics.

15 BY MR. MOSKIN:

16 Q   Anybody else particularly involved?

17 A   I think our boss, the man who kind of managed -- the

18 general manager of the business at the time would claim some

19 credit, Brian Ansel.

20 Q   Now, you weren't in here to watch, but the lawyer for

21 Chapterhouse just showed a picture of a bunch of books.  Back

22 in 1987, did Games Workshop have any books or other resources

23 to look at?

24 A   Not really.  No, I mean, not -- we didn't have any library

25 or anything like that.  I mean, we were literally, you know, a

1  dozen guys in a small -- in a small, cheap office living by

2  our wits and imagination.  I can't recall us ever acquiring

3  libraries or books or references.  And there was no Internet

4  in those days.  There was no easy way to get hold of

5  information.  It was mostly stuff that we just kind of knew,

6  made up.

7  Q   And can you describe the working environment a little bit?

8  Maybe you already have a little bit.  Is there anymore to say

9  about the working environment, how these creatures were

10 created and the miniatures?

11 A   Not really.  It was very hand to mouth.  We had a small

12 manufacturing facility that made these metal miniatures, and

13 we just found ways to keep sending models to be made and

14 turned into product.

15        It was -- we tried all kinds of different things.  We

16 tried all manner of new ways to make miniatures.  We pioneered

17 making hobby miniatures in plastic around that kind of era

18 because no one else was really doing that kind of thing.  But

19 it was just a small group of guys working in this tiny office.

20

21

22

23

24

25

1    Q.   You said you had some sort of factory.  Had you been

2    making miniatures before that?

3    A.   Yeah.  We had been making miniatures since 1979.

4    Q.   Okay.  And had -- before you created Warhammer 40,000,

5    had there been any other stories that were -- miniature

6    products that Games Workshop sold?

7    A.   Well, yeah.  We had two -- we still do.  We have two

8    properties, Warhammer and Warhammer 40,000.  And they kind of

9    share a name because the one kind of grew out of the other

10   one.

11          So the first game we did was called Warhammer, and

12   a lot of the ideas in Warhammer 40K were derived from those

13   things.  A lot of the alien races were -- the fantasy races

14   were transformed into futuristic military versions.  So we

15   have orks in both game systems and we have types of elves in

16   both game systems.

17          So the one game was really the -- Warhammer was

18   like the father of 40K.  They kind of have that relationship.

19   Q.   And do you still sell Warhammer?

20   A.   Oh, yes.

21   Q.   You mentioned making miniatures.  Can you explain what

22   the role is of the miniatures?

23   A.   Well, they're the things that people collect and build

24   armies with, armies of little men, I suppose.  We've got an

25   example there in front of the --

1    Q.   Well, maybe you can give us --

2              MR. MOSKIN:   Again, with the Court's permission, if

3    Mr. Merrett can give us a little demonstration of how the

4    miniatures actually get used in the game?

5              THE COURT:   That's fine.   Just make sure when

6    you're down there you don't turn your back; that way we can

7    make sure the jury can hear you.

8              THE WITNESS:   Yeah, sure.   Okay.

9         (Witness left the stand.)

10   BY THE WITNESS:

11   A.   This is quite an elaborate table because it's got kind

12   of all sculptings and things on it.   But, generally speaking,

13   the -- the game will be played out on something like this,

14   very much like this.

15             Very often it's a bit longer and the -- generally

16   speaking, it's played between two people.   But there's no

17   real limit to the number of people that can actually get

18   involved in a game because you can take control of small

19   parts of the force.

20             And what you do is literally move the little models

21   around.   There are rules that dictate how far the models are

22   allowed to move in the game, and you make --

23             THE COURT REPORTER:   I'm sorry, can you please

24   repeat that?

25             THE COURT:   Yes.   You have to -- I tell you what,

1   my suggestion is you stand over here so that you're kind of

2   facing --

3           (Witness complies.)

4           THE COURT:  There you go.

5   BY THE WITNESS:

6   A.   You usually use a ruler or a tape measure to determine

7   how far the models can move.  It's quite a tactile

8   experience.  And the game books will explain exactly how many

9   inches a model is allowed to move in its turn.

10          And then again, the rules dictate what specific

11  kinds of weapons the troops have gotten, what those things

12  can do in a game.  And usually you'll end up rolling a whole

13  mess of dice and working out -- so it will be something like,

14  if I want to shoot the red guys here, these motorbikes --

15  BY MR. MOSKIN:

16  Q.   Can you actually pick up a motorbike and show --

17  A.   Oh, yes.  This is kind of like a futuristic motor --

18  motorbiker.  This particular character is called a Dark

19  Angel.  And if I was going to sort of attack these chaps here

20  with these chaps, I would work out how many attacks they've

21  got when looking and say each one of these guys can shoot

22  twice or hit them three or four times each.  I just roll that

23  number of dice and it will tell me -- and I'll know how many

24  -- what score I need to achieve on the dice.  Usually it's

25  going to be a lower number for the -- if the -- depending on

1  how elite the troops are.

2  Q.   How does each side get to decide which pieces they bring

3  to the battle?

4  A.   There are -- well, lots of ways you can -- you can do

5  it.  You can just decide to turn up with lots of models, but

6  the game has point values for every single model and every

7  single piece of equipment that they might be on, the kind of

8  gun.  And the better the -- the more elite the model, the

9  more powerful the miniature and the more powerful the

10  weaponry.  You have higher points just for that, and you --

11  well, we'll play a thousand point game or a 2000 point game,

12  and you total up all the points for all the models that

13  you've got in your army.

14          Inevitably you figure out that you can't include

15  all of the models you would like to use because you haven't

16  got enough points.  But, yeah, that's how it works.  In

17  theory that creates a balance between the forces.

18

19

20

21

22

23

24

25

Merrett - direct

1   Q.   And what are these red things, these big red vehicles?

2   A.   These are tanks.   The game includes -- the 40K game includes

3   all manner of different kinds of things from humble foot

4   soldiers all the way up to these magnificent fighting machines.

5   This is a Land Raider.

6          But it even includes giant aircraft and huge walking

7   robots the size of houses.   And, obviously, things like these

8   fortifications, these castles and things, all have a role.   You

9   can shoot these guns, and it's -- what's the word.   It's almost

10  infinitely expandable.   So, some guys will play on huge arrays

11  with massive tables with vast numbers of toy soldiers and dozens

12  of people involved in the game.

13  Q.   So, in this example, is it the same point value for the

14  armies on each side?

15  A.   Oh, I shouldn't think so, no, because we just randomly

16  pulled these models out.

17  Q.   But in a typical game would they be?

18  A.   In a typical game, yeah, you'd have equal sides or equal

19  points values.   If your troops are weaker, you're likely to have

20  more of them, and if they're very, very strong and powerful, the

21  chances are you'll have only a very small number.

22          And the game systems were balanced, so that kind of

23  will make a reasonably fair fight.   Of course, players with

24  ability to play vary just like any other kind of game, really.

25  So, it's customizable.   The armies are infinitely customizable

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    because you can keep collecting different ones and adding

2    different things in and trying different strategies, trying

3    different armies, trying different combinations of things.

4    Q.   Now, are the rules written down somewhere so that people

5    know how to play the games?

6    A.   Yes.

7    Q.   And where is that done?

8    A.   All the rules are created in Nottingham in our design

9    studio, and we publish new books with new rules almost every

10   month.   So, constantly producing new material for the game.

11   Q.   And do those books have a particular name?

12           THE COURT:   Is he done down here?

13           MR. MOSKIN:   Yes, I think we're done.

14           THE COURT:   Okay.   Go back up there.   It's a little bit

15   easier to hear if he's sitting down.

16           MR. MOSKIN:   Yes.

17           THE COURT:   Are you asking -- why don't you put the

18   question again.   It was something about whether the book has a

19   particular name.

20   BY MR. MOSKIN:

21   Q.   Is there a name for these types of books?

22   A.   Yeah.   The main book is supplemented by books we call

23   codexes, and each codex is a book that details all of the

24   characters and all of the models and all the points values for a

25   specific army, the type of army.   So, there are 16 or 17

Merrett - direct

1    different codexes in the current game system in the current

2    range.

3    Q.   These are elaborately painted figures.  Is there a place

4    where people get to see what the -- does Games Workshop provide

5    any references as to what the things look like, what you imagine

6    them to look like?

7    A.   Well, the codexes include full painting, full -- I'm sorry.

8    Every codex has got a section in it which shows all the painted

9    models.  We call it the showcase section.  But we also show

10   painted models on our website, and every month we publish a

11   magazine called White Dwarf, which has details of all the new

12   releases and all kinds of other information about the game and

13   about the things that you can do with it.  So, it would include

14   different ways to play, different kinds of scenarios, different

15   setups for the games, lots of photographs of painting

16   miniatures, yes.

17   Q.   Does it publish just art books about the characters?

18   A.   Yeah.  I mean, 25 odd years of publishing 40K generated an

19   awful lot of illustration, an awful lot of artwork, and, yeah,

20   we publish books of literary -- just catalogs of the art and

21   those images.

22   Q.   Is there a book you're familiar with called The Art of

23   Warhammer?

24   A.   Yeah.  That's, well, one of them, yes.

25   Q.   I'd like, if I can, to show you at least parts of what's

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    Plaintiff's Exhibit 844.   And what can somebody find generally

2    in this book?

3    A.   This book will be filled with cool art.   I mean, the best

4    art up to the point it was published.   It's got some small bits

5    of commentary in it, but it's mostly a literary and art book.

6    Q.   Can we jump to Page 17243?   And what's this?

7    A.   That's a Space Marine character, one of the great heros of

8    the Imperium

9    Q.   And are there any original distinguishing features about the

10   Space Marine character that Games Workshop believes it created?

11   A.   Yeah.   I mean, you can see here the extraordinary armour.

12   My screen is a bit distorted.

13   Q.   Would it help to give you a laser pointer?

14   A.   I'm not sure.   Yeah, probably.

15          MR. MOSKIN:   If I can approach the witness?

16          THE COURT:   That's fine.   Let me just try something

17   here.   I think it might make it a little bit easier to see that

18   screen.

19          THE WITNESS:   That's much better.

20          THE COURT:   It's not working.

21          MR. MOSKIN:   If I can approach.

22   BY THE WITNESS:

23   A.   Okay.   Here you can see sort of some of the key features.

24   There's super-enlarged breastplate on the chest armour.   The

25   massive shoulder pads.   They're usually fairly symmetrical,

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    though this one's got a slightly different pad on this side.

2    Because this guy's a hero, he's got a more elaborate shoulder

3    pad on what would be his right arm, which you can see has got

4    these big ridges on it and this decoration on the surface.  The

5    other feature is that you can see this great big blue thing here

6    is actually the top part of the backpack, which is actually like

7    a power unit that's attached to the back of his armour.

8         If you zoom out, you get some sense of the sort of

9    uniquely shaped armour.  Particularly in the lower leg area,

10   Space Marines have this kind of a crazy 1970s style flared leg.

11   And again because this guy's a hero, he's got unique features.

12   Like he's got this huge golden knee pad and silver arm with all

13   kinds of decoration, but the underlying form is very typical of

14   a sort of classic Space Marine.

15   Q.   And maybe we could jump to Pages 17302 and 303.

16        THE COURT:  Before you do that, we're going to take our

17   ten-minute break at this point.  So, I'll take the jury out.

18   We're going to break for ten minutes, and then we'll go 'til

19   5:00 o'clock.

20      (Brief recess.)

21        THE COURT:  All right.  Mr. Merrett, you can come back

22   on.

23        THE WITNESS:  Thank you.

24        THE COURT:  Okay.  Everybody can have a seat.

25   Mr. Moskin, can you proceed.  What's the number that's up there

Merrett - direct

1    right now?

2         MR. MOSKIN:   This is still part of Exhibit 844, Pages

3    17302, and we'll slip to 17303.

4    BY MR. MOSKIN:

5    Q.   Again, can you explain -- if you can toggle back between the

6    two screens, explain what we're looking at.

7    A.   Well, the Space Marines are the elite troops of the

8    Imperium  They're the mainstay of human defense against all the

9    alien races that are trying to destroy mankind.   And these are

10   the Space Marine chapters.   There are according to the fiction a

11   thousand Space Marine chapters, and each one has its own unique

12   heraldry and its own unique symbology attached to it and its own

13   name.   And this is just a few of those thousand chapters.   We've

14   never defined all 1,000 of them, but I think we've named a few

15   hundred at best.

16   Q.   And where did all those icons come from?

17   A.   The original icons were drawn by Jes Goodwin back in 1987

18   when we did the first book, and Jes just riffed off this series

19   of little drawings of interesting, cool icons, and then we

20   attached kind of names to them, and I think the idea of every

21   chapter having its own unique badge came from those very early

22   sketches.   And they were very stylized little graphics, and some

23   of them have survived through to -- this is quite a modern

24   poster.   This was created -- this page of art, all these pages,

25   were generated in -- sometime in the last decade.   I can't be

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    exactly sure when.

2            So, this is a quite modern iteration of the ideas, but

3    some of the symbols are very old.  There's a sort of winged

4    sword icon in this corner here.  That's the Dark Angels.  There

5    you can see the Flesh Tearers, which is again one of the

6    original drawings that Jes did of a blood drop on a kind of

7    razor saw idea.

8            I'm trying to find another older one.  Right down on

9    the bottom left, there's this yellow Space Marine which is the

10   Imperial Fists with this distinctive armoured fist icon.  Oh,

11   and there's the Ultramarines.  Yes, I know the Ultramarines are

12   ultramarine in color.  There's probably kind of an intentional

13   kind of gag there.  And that's this unusual sort of U-shape,

14   which is a stylized kind of a U-shaped rune.

15   Q.  When Games Workshop created all this heraldry, did it have

16   at its disposal a library of books of heraldry or other things?

17   A.  No, no.  In fact, actually, we're often asked, you know,

18   what interesting cool libraries or books could you recommend on

19   heraldry that we could -- we get asked that all the time.  There

20   aren't any.  I mean, of course, there's hundreds of books being

21   published every year about heraldry, but it's real heraldry.

22   It's actually stuff that you see on medieval knights, and, of

23   course, you can't not be aware of those things, but we've never

24   sort of used -- it's never been kind of a deliberate kind of

25   reference point for us because it doesn't serve the purpose.

Merrett - direct

1         I mean, real heraldry's to go on a knight shield or a
2  banner.  It doesn't fit on the shoulder pads.  It has to be
3  adapted.  It has to be -- and it has to sort of be about this
4  world, about the 41st Millennium, the dark future, not about --
5  Q.  Did medieval knights to your knowledge have heraldry on
6  their armour or shoulder pads?
7  A.  No.  They would carry it on their shields.  Sometimes on
8  tabards, like a knight's tabard, like a sur-coat that they would
9  wear over the armour that would be enblazoned with the crest of
10  the knight or the knight's family.  But medieval knight's armour
11  is tiny.  I mean, it doesn't have any space for any big icons on
12  it.  But they just didn't do it.  It just wasn't --
13  Q.  If we can jump to Page 17406, what's this?
14  A.  This is a picture of -- two pictures that show the Eldar,
15  some of the Eldar.  The Eldar are one of the alien races that
16  are enemies of humanity.  They're an ancient race that basically
17  did bad stuff in the past.  A terrible thing happened.  They
18  used to rule the galaxy, and they had a catastrophic fall from
19  grace.  They did terrible things.
20         And so, the remnants of the Eldar are kind of cast
21  adrift in these gigantic floating spaceships that are vast in
22  size, like huge floating city world type spaceship things called
23  Craftworlds.  And these are very much related to the elves in
24  our Warhammer game.  They're kind of elves in space, for a
25  better word.  And they have a -- kind of a weird esthetic.

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1   They're -- how can I describe it.  They're kind of like a little

2   bit hippie-ish.  They're into kind of -- they're into kind of

3   like grace and beauty, and they have kind of these cool symbols.

4           You can see these white runes that they have.  Well,

5   these are kind of runes that signify different things to the

6   Eldar.  They're supposed to be perfect little patterns that they

7   meditate on, and sometimes they actually can use the power of

8   the mind to make these kind of things grow out of this kind of

9   psychic material.  They're very weird, very alien.

10  Q.   And maybe we can jump to Page 17408.  And what's this?

11  A.   These are some Eldar vehicles.  These are typical of the

12  sort of flying vehicles they use.  The Eldar again are kind of

13  supposed to be like an ancient race that had sort of superior

14  technology.  So, they know stuff that we don't, and, of course,

15  they don't tell the humans all that stuff.  So, they have

16  incredible machines like that can fly.  So, these are part of

17  their armoury of weird and wacky flying machines.  Something

18  like a small aircraft with a gunner on the back.

19          And again you can see the -- again, in white these big

20  runes, and there's different runes, and each rune signifies

21  something very specific.  And then there's -- this guy's even

22  got one on his helmet.

23  Q.   Can we jump to Page 17438?  And what's this?

24  A.   This is another alien race.  These are the Tau, called the

25  Tau Empire.  The Tau Empire.  Tau, T-a-u.  And these are kind of

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    the opposite to the last aliens.   These are aliens that have

2    just emerged.   They've just kind of discovered space travel and

3    so are just starting out on a series of wars to expand their own

4    little miniature empire inside of the human one, and, of course,

5    that brings them into conflict with humanity.

6           So, where the Eldar are kind of an ancient race, the

7    Tau are kind of a modern, young race, and the way they look is

8    supposed to reflect that.   Quite a lot of the imagery in 40k is

9    very old looking.   It's intended to feel very ancient and very

10   old.   So, the buildings are supposed to look like ancient

11   castles, and the warriors are supposed to look like they've been

12   around a bit.   You know, go back to that Space Marine, and it

13   was all sort of battleworn and had a feeling of great antiquity

14   about it.   But the Tau are actually the opposite.   They're

15   supposed to look very modern.   And so, the shapes of their gear

16   and the kind of decoration on them are all very science

17   fictiony.

18   Q.   Maybe if you can jump to Page 17299.   What's this?

19   A.   That's a John Blanche concept drawing of a Space Marine

20   champion, and this is really typical of the Space Marines

21   antiquity, the great antiquity.   This is a character from the

22   very kind of origin of the Space Marine timeline.   This is when

23   the Space Marines were created, and it's called the Horus

24   Heresy, which is set 10,000 years before the game that's set in

25   the 41st Millennium

Merrett - direct

1  Q.  And who creates all this artwork?

2  A.  Well, this piece was created by John Blanche, but we have a

3  small team of illustrators that work out of our studio that

4  create all -- they do various kinds of art.  John does quite a

5  lot of this conceptual art.  That's then used by the other guys

6  as inspiration or guidance for the other guys.

7  Q.  You mentioned every year that Games Workshop has a magazine;

8  is that right?

9  A.  Yes.

10  Q.  And what's that?

11  A.  It's called White Dwarf.

12  MR. MOSKIN:  Before we move on, your Honor, would you

13  like us to offer exhibits into evidence?

14  THE COURT:  We can worry about that --

15  MR. MOSKIN:  At the end of the --

16  THE COURT:  We can worry about it a little -- it

17  doesn't necessarily need to wait 'til the end, but we don't have

18  to worry about it right now.

19  BY MR. MOSKIN:

20  Q.  Anyway, you mentioned a magazine.  I didn't mean to

21  interrupt.

22  A.  Yes.  Every month we publish a magazine called White Dwarf.

23  In fact, we've been publishing the magazine as long as we've had

24  a company.  So, the first White Dwarf magazine was published

25  like way back in 1978, I think, something like that.

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    And it contains all the information about what new

2  things we're releasing this month and general news about what's

3  happening in the world of Games Workshop and the world of 40k

4  Warhammer, and it includes all kinds of interesting cool stuff.

5  If you're a fan of 40k or of Warhammer, then it's a must-buy

6  purchase.

7  Q.  Well, why don't we have a look.  Can you show us Exhibit

8  427?

9  A.  It's available from all good new agencies.  Oh, you don't

10 have a news agency, do you.  Newsstands.

11 Q.  What is this?  What are we looking at here?

12 A.  That's the cover of the September -- I think this is from

13 2000.  So, this is from 13 years ago.  And it's fairly typical

14 of what the magazine would look like.  The cover painting, that

15 warrior, was painted by Dave Gallagher, who's one of our house

16 artists.

17 Q.  And how often is it published, did you say?

18 A.  Every month.

19 Q.  Could we jump to Page 1475?  And again we're still looking

20 at the same magazine.  What's shown on this page?

21 A.  This is an advert for an event that we call Games Day, and

22 we host Games Day every year.  We've hosted the Games Day in the

23 UK every year since 1979, and we've been running Games Days in

24 North America for -- gosh.  It must be all of 20 years.  In

25 fact, the last two Games Days were both in Chicago.

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1   Q.   And what happens at a Games Day?

2   A.   Lots of Games Workshop fans turn up in a big hall, and they

3   get very, very, very excited about talking to the guys that make

4   the stuff and seeing exhibits and participating in games and

5   doing some fun things.  They get to paint miniatures.  They get

6   to build scenery.  And they get to do their favorite hobby

7   activity, which is buy some product from Games Workshop, which,

8   of course, is very good for us as business.

9   Q.   This page mentions something about Golden Demon.  What is

10  that?

11  A.   Golden Demon is a painting competition that we host.  It

12  started off being a separate event, but we combined it with

13  Games Day sometime in the early nineties.  I have to confess I

14  can't remember exactly when we combined the two events together.

15       The Golden Demon is a painting competition.  We invite

16  people to bring along examples of models they've painted.  There

17  are different categories that you can enter into.  So, there are

18  categories for single miniatures and categories for regiments or

19  for vehicles or for monsters.

20       And it's a very, very popular event.  We get lots and

21  lots and lots of people who are desperate to win one of the kind

22  of cool statutes that we award as prizes for it, and the top

23  entry, the best in show, gets awarded this fantastic slayer

24  sword, which are one of the rarest things that you can win on

25  the planet, I suspect, because we only give away one at any

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1   Golden Demon event.

2   Q.   What is that little symbol in the right-hand corner of this

3   page?

4   A.   Down there?

5   Q.   Yes.

6   A.   That's a logo celebrating 25 years of Games Workshop, and

7   the -- obviously, it's got the 25 on it.   But it sets on the

8   Imperial Eagle, which is the signature sort of trademark of 40K,

9   of the Warhammer 40K line.   And it's supposed to be a symbol

10   that represents the might and majesty of the emperor who rules

11   mankind and who the Space Marines serve.

12        And it's quite an interesting thing because it's got

13   lots of interesting little nuances that apparently are quite

14   meaningful to the people in the Imperium   So, one of the eagles

15   is blind, one of the eagle heads is blind, and one has a single

16   eye, which kind of represents something, and I'm at a loss to

17   remember exactly what that is now.   But I think one head is

18   supposed to be looking into the future, and one head is supposed

19   to be looking into the past.

20   Q.   Can we jump to Page 1579, still in the same exhibit?   What

21   is Citadel Modeling?

22   A.   All our products are sold unpainted, and a lot of them are

23   kits, especially nowadays when a lot of our miniatures are

24   actually sold as plastic kits.   And so, a huge part of our hobby

25   isn't just gaming with the miniatures.   It's actually assembling

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    them and painting them   And that requires not only a lot of

2    patience and skill and dedication, but also requires you to have

3    the right tools because as everybody knows, if you don't have

4    the right tools, you can't do a good job.

5            And so, we actually sell the whole range of accessories

6    so that our customers have the right tools to help them prepare

7    the models and to assemble them correctly and also to paint

8    them   And you can see in the bottom corner there, these are

9    some cans of spray paint that you can mostly use to undercoat

10   the models and prep the models for painting.

11   Q.   And maybe we jump back one page to 1578.

12   A.   Oh, yeah.   You can see some of the paint pots there.   These

13   are an earlier version of our paint line.   The current paint

14   line's got 170 different colors because, clearly, you need lots

15   of different colors to paint all the different types of armours

16   and different models.

17   Q.   And if you can jump to Page 1356.   What is the Black

18   Library?

19   A.   I mentioned before that we not only do game books, but we

20   also do books that are really just fiction, novels, and the bit

21   of Games Workshop that publishes all the fiction or the novels

22   is called the Black Library.   It's kind of an in gag.   There's a

23   piece of the fiction that has -- the Black Library is a

24   mysterious repository of ancient knowledge that's stored in one

25   of those Eldar Craftworlds, and only very, very special people

Merrett - direct

1    ever get to visit the Black Library.  You have to be a really

2    sort of super special agent of the Imperium to have permission

3    to go there and negotiate with the aliens to go and have a look

4    in it.

5          So, we thought it was a great name to call our novel

6    publishing business, the Black Library.  And it does books,

7    traditional novels, and sometimes comics, and it's occasionally

8    published different kinds of magazines about fiction.

9    Q.  What kind of an audience do the Black Library -- the novels

10    appeal to?  How wide an audience?

11    A.  Oh, it's growing all the time.  We're now -- I think we've

12    had a string of fantastically successful books that have charted

13    on the New York Times Best Sellers list for science fiction

14    books, which we're very proud of.  I think five, five in a row,

15    which is pretty massive.

16          But most of the books we sell through our own stores,

17    but we also have them distributed in America by a company called

18    Simon & Schuster.  So, you can get Black Library books in just

19    about any bookstores, if only you still had bookstores here.

20    Q.  You mentioned a little while ago something called the Horus

21    Heresy.  What is that?

22    A.  The Horus Heresy is kind of like the origin myth of the

23    Space Marines.  It's set 10,000 --

24    Q.  Maybe you can bring up Exhibit 969.

25    A.  It all seems a bit weird.  We publish a game that's set in

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1   the 41st Millennium, and then we've subsequently created the

2   sort of history of that environment.  So, 10,000 years before

3   that, there's the -- if you like, the ancient history of the

4   41st Millennium, and it's called -- the big event that sort of

5   changed the galaxy as it was known at that time was called the

6   Horus Heresy, and this is where the Space Marines really became

7   kind of established as the sort of premier force in the galaxy.

8   Q.  Well, let's look at Page 18402 and 18405 of the Horus

9   Heresy.  And maybe you can bring the page up together.  What are

10  we looking at or will soon be looking at?

11  A.  Well, 10,000 years before the 40K game was set, the Space

12  Marines were organized into these vast armies, and each army was

13  called a legion, and each legion had its own unique heraldry.

14  So, in the 41st Millennium there are a thousand Space Marine

15  chapters.  Well, those chapters of Space Marines are quite

16  small.  The Space Marine legions in the Heresy era are vast.

17  Some of them are like many hundreds of thousands of Space

18  Marines, and they were the most powerful military formation that

19  the universe had ever seen or the galaxy had ever seen, and

20  these are the -- there were 20 legions.  So, this is the first

21  ten legions.  I think there must be another spread after this.

22  Q.  I think if you could go to the next two pages.

23  A.  Yes.  And what happens in the Horus Heresy is sort of a --

24  it's a great story of betrayal and treachery, and it ends up

25  with the Space Marines fighting this huge civil war where

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1   actually they split into two camps, and basically it's a war

2   that shakes the very galaxy to its foundations.  Out of the

3   carnage is born the Imperium that becomes the setting for 40K.

4   Q.   In the upper left-hand corner, it says one of those legions

5   is classified.  What does that mean?

6   A.   It means that we've never published any information about

7   its number, and it's Number XI, and it's expunged.  And we've

8   done -- there's two.  I think Number II is the other one on the

9   previous page.  And that's kind of us being playful with the

10  idea.  As I said, this is supposed to be an ancient myth.  And

11  so -- I know it's kind of weird because it's an ancient myth,

12  but it's still set in the future.

13          But to give it the sense of -- to give it a sense of

14  reality, to make it feel real and to give it that kind of

15  texture, we often do things like this, and this is one of the --

16  this has been a part of the kind of myth of 40k since the very

17  beginning, that there were these two original formations that no

18  one knows anything about.  It's kind of part of the texture of

19  the history.  It's kind of playful and gives people something to

20  think about, a puzzle for them to --

21  Q.   Let's jump to Page 18432.  And I want to ask you if there

22  are any distinctive characteristics of the armour worn in the

23  Horus Heresy era that differ from the contemporary 41st

24  Millennium era, if that's not a contradiction in terms.

25  A.   Yes.  Again, to create a sense of history and to make it --

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1  for our customers, who get like really, really, really involved

2  in this in a really sort of deeply emotional way, we want to

3  give them fun things to actually enjoy about the mythos.  And

4  so, creating a kind of a history within the fictional setting is

5  actually quite exciting for them, and part of the thing we did

6  with the Space Marines is we've kind of created a whole range of

7  sort of historical versions of their armour, of that power

8  armour.

9          And so, some of the later Marines have elements of the

10  old armour, and they're like the ancient relics.  It's a bit

11  like -- some of them are like a treasured family artifact, that

12  there's this -- you know, this piece of history that they carry

13  around with them.  But for that to work, when we went back

14  10,000 years into the back story, we had to create those

15  armours, the whole suits, so that there was a -- so it made

16  sense to people.

17          And so, some of these illustrations show some of the

18  older suits, and they have interesting features.  If you blow

19  this one up, you can see that here the helmets have got these

20  plates on the front, and the armour's got studs and banding, and

21  there's sort of spikes on the top of the helmet.  On this one

22  here, there's kind of a weird vibe going on with the face plate

23  and the crest of it.

24  Q.  How about the other image on the upper left?

25  A.  Oh, yeah.  And here you can see some of the segmented armour

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    form   So, that big, big shoulder pad with that great big --

2    that's part of a great big arrow, and you can see the armour is

3    kind of banded.  It's got kind of an old -- oldy worldly kind of

4    feel to it.

5    Q.  If we can jump to 18629.  What's shown here?

6    A.  All right.  A couple more things.  Again, you've got this

7    kind of like weird faceplate effect on the helmet.  This

8    character up on the top right, he's an Assault Marine.  So,

9    these dudes actually fight close up.  They like to get in there

10   and hit you with that big chain saw thing.  So, they're deadly

11   close combat fighters.

12   Q.  And what's it wearing on its back?

13   A.  Well, to get into close combat, it flies through the air

14   using this array as a jump pack.  So, it's kind of like the

15   standard Space Marine backpack, but it's got these huge sort of

16   turbines on it so it can kind of like leap huge distances and

17   come crashing down onto its opponent, and just the force of

18   landing on them can scatter the enemy when they hit them

19   Unfortunately, they do terrible damage with their big swords

20   then.

21   Q.  Let me back up a little to the full image of it.  And what's

22   going on with the shoulder pads on that character?

23   A.  These chaps are super elite Space Marines called

24   Terminators, and this is an arcane -- an ancient general form of

25   the Terminator armour, and it's got these very distinctive

### Merrett - direct

1    horizontal banded plates with the hanging leather straps and

2    quite impressive, I think.  The shoulder pads make them look

3    enormously wide, but these guys are, in fact, veritable giants.

4    I mean, this chap will stand about nine, ten feet tall.  He's

5    almost all sort of armour and muscle.  You wouldn't want to meet

6    one in a dark alley.  That's for sure.

7    Q.  If we jump to Page 18748, what does that show?

8    A.  This is the glorious emperor of mankind.  The Horus Heresy

9    is kind of like the story of the emperor, emperor effectively

10   being crippled.  In the 41st Millennium, he's actually a

11   horrible kind of vampiric zombie that's sort of tied into his

12   thone at the center of his palace on earth, and he's a bit of a

13   nasty character.

14          But in the Horus Heresy, he was this sort of super

15   heroic leader, enormously charismatic, and he's wearing a most

16   amazing version of a Space Marine power armour.  If you zoom out

17   a little bit for me, you can see here that the signature shapes

18   of the armour, the big chest plate, the huge shoulder pads, the

19   flared legs on the armour.  But his suit is massively ornate

20   with all of this crazy detailing all over it, and that's fairly

21   typical of the Horus Heresy era.  The Space Marines were so

22   powerful they could command entire armies to build them

23   fantastic looking suits of armour and decorate them all up.

24   Q.  I'd like to turn to one other thing from the book, Page

25   18763.  Generally what's shown on this page?

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

A.   The story of the Horus Heresy has been told in lots of
different bits and pieces since we first introduced it, which
was in 1988, and there were little snippets of the story all the
way up until we did this game, which is actually a collectible
card game.   I don't know if any of you have heard of collectible
card games.

           And we had a license -- we licensed, I think initially
licensed this to a company called Sabertooth Games to create the
card game, the collectible card game based on the Horus Heresy,
and these are some of the many hundreds of cards that were in
that game, and each card details a specific unit or character
from the Horus Heresy story line.

Q.   I wonder if we can zoom in on the one that's now on the
lower right.

A.   That one there.

Q.   And what's that?

A.   That's a Horus Heresy Space Marine Jetbike.

Q.   You mentioned licensing.   Does Games Workshop license its
intellectual property in any other prominent ways?

A.   Yeah.   I mean, our most successful licenses have been
computer games, and we had a really successful game with a
company called THQ, who don't exist anymore sadly, and that was
called Dawn of War.

Q.   Well, maybe we can show a little excerpt from that.   Exhibit
447.

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1     (Videotape played.)

2     BY THE WITNESS:

3     A.   Yes.   Pleasant, aren't they?

4     BY MR. MOSKIN:

5     Q.   What is that?  I'm sorry?

6     A.   That was a trailer for the Dawn of War game or an expansion

7     of the Dawn of War game by THQ.   Dawn of War was a realtime

8     strategy game where you'd play a battle with -- kind of like a

9     computer version of the tabletop game.

10    Q.   What does it take for somebody to become a licensee, an

11    actual licensee, of Games Workshop?

12    A.   They have to jump through quite a few hoops because we're

13    very particular about who we give licenses to.   So, we've got a

14    relatively small number of licensees or areas that we license

15    into.

16          We like computer games.   So, we look for people that

17    make good games because we want to be -- we want our property to

18    be associated with quality.   So, we choose our partners very

19    carefully with computer games licensing.   But that's been the

20    mainstay licensing over the years.   We've also got a license

21    with a company called Fantasy Flight Games, who are based in --

22    it's the Twin Cities.   Minnesota, isn't it?

23          THE COURT:   Minneapolis?

24          THE WITNESS:   Minneapolis, yes.

25

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

BY THE WITNESS:

A.   And they do board games and card games.  They've sort of become the inheritors of our Sabertooth license.  The idea has kind of ended up with Fantasy Flight.

I've actually got the -- although I don't actively -- I'm not actively involved in seeking the license partners, as head of intellectual property, I get to veto the licensees if they're not suitable.  And, generally speaking, we stick to things that we don't regard as being directly competitive with our miniatures business.  So, we don't license out any kind of three dimensional representation of Games Workshop's imagery because that's what we do.

And it might seem a bit weird, but we don't license out to any toy companies, either, and the reason we don't license out to toy companies is because our major -- a huge part of our customer base are impressionable teenagers, and we don't like to think that impressionable teenagers like to be associated with children's toys.  So, we think that would be diluting our brand and quality.

BY MR. MOSKIN:

Q.   Has Games Workshop given a license to Chapterhouse Studios for it to make its products?

A.   No.

Q.   Where can people buy the Games Workshop products, the Warhammer 40,000 or Warhammer products?

Merrett - direct

1    A.   We've got a whole bunch of Games Workshop stores dedicated

2    to selling our products all around the world.   I think we've got

3    over 400 around the world.   Actually, Chicago is one of our big

4    centers.   So, we've got twelve Games Workshop stores in the

5    greater Chicago area.

6    Q.   And are those stores that Games Workshop owns?

7    A.   Yes.

8    Q.   Are there other places, other stores, where you can buy it?

9    A.   Yes.   We also sell to independent game stores and hobby

10   stores and also to some distributors.   So, I would say -- I

11   don't know the exact number of stores around Chicago, but there

12   will be at least as many trade accounts in Chicago as there are

13   Games Workshop stores.   And those stores would be stores that

14   sell other gaming products or other hobby products or card games

15   or just about any -- comic stores, that kind of place.   And then

16   if you haven't got a store near you, then you can go on our

17   websites and order directly from our web store, obviously.

18   Q.   Does Games Workshop do any advertising for its products?

19   A.   Not in any kind of mass market way.   We're a niche business.

20   We know that actually our products don't appeal to everybody.

21   That's fairly evident from seeing what it is.   It's a very

22   special kind of offer for a unique kind of or a specific kind of

23   customer.   Contrary to belief, that's not defined by age and

24   gender or culture.   You have to be -- you know, you have to like

25   the models and like playing the games and like the kind of

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    imagery, which quite a lot of people, frankly, don't, which is

2    fair enough.

3              So, we don't mass market advertise anything.  We rely

4    on what we call word of mouth.  So, we rely hugely on the impact

5    that we can have on people that come to our own stores or read

6    the magazine or come to one of our events or maybe actually

7    order from us online.  And those people we hope actually give

8    great recommendations to their friends, and that's how it works.

9    That's how we advertise.

10   Q.   Is there any other particular means whereby word of mouth

11   spreads?

12   A.   Well, obviously, the Internet is the big one today and

13   social media, but the Internet is probably the biggest single

14   way that our kind of nerdy, geeky customers would communicate

15   with each other.  And actually, you can't -- if you were to go

16   online and type Games Workshop, you would find a myriad of

17   forums and blogs and websites of our fans goobering about our

18   stuff, basically.

19   Q.   Goobering?

20   A.   Getting excited about.

21   Q.   I don't know how to goober.  I'm sorry.

22             Can you describe some of these forums, the names of

23   them?

24   A.   Oh, Lord.  Well, off the top of my list, one's like Dakka

25   Dakka, Bell of Lost Souls, Warseer, Heresy Online, Librarium

Merrett - direct

1    Online, Lustria Online, the Warhammer Forum   I mean, they're

2    endless.   There are literally hundreds and hundreds of websites.

3    Q.   Let's dive in a little bit more to some of the specific

4    characters.   And I'd like to focus your attention on some of the

5    different codexes for the different characters.   Can we look at

6    Plaintiff's Exhibit 424?   What is this?

7    A.   This is the cover of one of the editions of the Space

8    Marines Codex.

9    Q.   And what can somebody find in a codex such as the Space

10   Marine Codex?

11   A.   What you'll find is the complete guide to collecting a Space

12   Marines army and all the rules that you would need to play it on

13   the tabletop, details of all the different characters and troops

14   and regiments and tanks and things in there and also quite a lot

15   of the back story, all that kind of interesting -- if you're a

16   fan, all the interesting things that you'd want to know about

17   Space Marines.   Who they are, what they eat for breakfast, all

18   that kind of stuff.

19   Q.   You mentioned rules.   Can we look at Page 1268?   Is this an

20   example?   What is this?

21   A.   This is a typical page.   This is a slightly old layout, but

22   it's very, very typical.   Fundamentally, the graphics change,

23   but the information doesn't really vary too much.   So, you've

24   got the name of the troops.   This is some back story here that

25   will give the context for who these chaps are.

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1          And then here are actually the stat lines, which the

2     aficionados of the game can translate this back into the scores

3     that you need to make on the dice when you're rolling for them

4     to do damage to their enemy and such like.  And these are the

5     various rules about how you can include them in your army and

6     what they can do when they're in it.  It's very, very arcane.

7     Q.  Let's look at Page 1240.

8     A.  This is a list of all of the different options for weapons

9     and upgrades for the model.  So, the models have different

10    configurations of guns.  They carry different equipment.  And

11    this lists all the points values for each of those different

12    kinds of guns and things.

13    Q.  Are there only specific types of weapons that Space Marines

14    are allowed to use?

15    A.  Yes.  Each army will have its own unique set of weapons, and

16    even if they share the same kinds of weapons, there will be

17    different sets of them, there will be different options,

18    depending on which army it is.  So, it's very much part of the

19    character of the army.

20    Q.  And let's look at Page 1274 to 75.  1274 even to 85.  But

21    start at 1274.  And if you can scroll through and just tell us

22    what we're seeing on these pages.

23    A.  Right.  These are pages from the showcase section of the

24    book, and what these pages do is they show off what the products

25    could look like if you paint them up, you know, and create the

Merrett - direct

1    battlefields for them and such like.  So, they're kind of --

2    they're intended to be both inspirational because, obviously,

3    when you sees these pages, if you're a fan, then you kind of go,

4    yeah, that's what I want my miniatures to look just like that.

5           And they're kind of also aspirational.  They give you

6    the information, and you say, well, I maybe can't paint that

7    well, but at least I know what colors to paint.  So, it gives

8    you a guide about, you know, what colors to use and which parts

9    of the models, which concerns mildly -- it sounds a little bit

10   trivial, but if you're actually -- some of our fans really just

11   want to get those facts right, you know.  To them, the

12   information is just as real as real world information about

13   uniforms and military formations.  They take it really

14   seriously.

15          So, if we show a model with a red sword, then that's

16   the rule.  It has to be a red sword.  Of course, we have fans

17   that like to make up their own color schemes, but that's the

18   function of these pages is to show the models off and also

19   provide that information for people.

20   Q.   If we can jump to Plaintiff's Exhibit 421.  And what is

21   this?

22   A.   This is the How to Paint Space Marines book that we did.

23   Q.   And why do you publish a book on how to paint Space Marines?

24   A.   To do exactly that thing.  To provide people with

25   information on what colors to paint where on the models, but

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    also this book actually provides information about the

2    techniques to use when you're painting it.  It's kind of like

3    the DIY guide to assembling and painting the Space Marine kits.

4    Q.   How many -- I think you may have mentioned something about

5    this before, but how many chapters of the Space Marines are

6    there?

7    A.   In the mythos there are 1,000 Space Marine chapters.

8    Q.   And let's look at Plaintiff's Exhibit 842.  And what is the

9    Insignium Astartes?

10   A.   This is a book that I wrote, and it's a book that describes

11   the, if you like, the official rules that the Space Marine

12   chapters created for what their uniforms should be.  So, this is

13   the book that kind of tells the collector what the rules of the

14   color schemes are, the actual -- I mean, they're made up,

15   obviously, but it's the -- again, it's to give it a sense of

16   reality.  It's to give it a sense of depth and profundity that

17   makes it interesting for people to sort of like spend their time

18   thinking about and engaging with as a miniatures collector.

19   It's not just about having the little -- it's not just about

20   having little game tokens.  It's much more engaging than that

21   for our customers.

22   Q.   Well, let's look at pages starting at 53 and I think maybe

23   scroll through some of the pages.  And what's shown here?  And

24   you can maybe jump -- show a couple pages together at the same

25   time.

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1  A.   This game shows some of those thousand Space Marine chapters

2  and the heraldry they use, the color schemes, and the specific

3  badges that mark which chapter they are, which regimen they

4  belong to.   And some of these are familiar.   You'll have seen

5  them on that previous image we looked at which had very many

6  more little pictures of Marines in it and some of the same ones

7  as that same yellow Marine with the --

8  Q.   If we can maybe just scroll through a few more pages.

9  A.   And you can see we're kind of constantly iterating.   One

10  thing you will notice is the similar little symbols appearing

11  again and again because one of the things we tend to do is to

12  use the same -- a lot of the same icons.   When we've invented or

13  created an icon, we'll try and get more use out of it.   We'll

14  show it in a different color or in a different chapter.

15  Q.   When were these icons and names created?

16  A.   Well, the original Space Marine chapter badges were created

17  by Jes Goodwin back in 1987, and since then we've added new ones

18  and created new ones over time, but a lot of the ones we've got

19  are ones that are just derived from those very original ideas.

20  For example, this one here, the Crimson Fists, use that

21  self-same arm and fist badge that was on the yellow Marine

22  earlier.

23  Q.   For Power Fists?

24  A.   Yes.

25  Q.   And are there different rankings within the chapters?

Merrett - direct

A.    We've created a complete kind of hierarchy and a complete

organization for the chapters.    I mean, it's intended to fill

like the kind of organization that a real military unit might

have.    Obviously, it has completely made-up structures, but --

Q.    I'm sorry.    I didn't mean to interrupt.    But let's look at

Page 16866, just that page alone.

A.    Right.

Q.    I'm sorry.    So, does this explain that system you were just

describing?

A.    Yeah.    These are the -- we call them the tactical markings.

These are the badges that are carried on the Space Marine

shoulder pads.    You know, big, big armoured section on their

shoulder.    And I always get this the wrong way around.    I think

this is actually on the right-hand part.

        So, every model or every warrior in the unit will

belong to a squad, and there are ten squads in every company, a

hundred warriors in a company.    So, each one of these shoulder

pad designs represents the shoulder pad of one squad in that

company.

        So, this is the second battle company, and that would

be Number I squad, and you can tell it's a tactical squad

because it's got this big white arrow.    So, Number I, II, III,

IV, V, and VI are all tactical squads.

Q.    And is there something distinguishing about what a tactical

squad does?

Merrett - direct

1    A.   A tactical squad's kind of like the basic unit.   So, the

2    guys are all armed with the signature Space Marine weapon, a

3    bolt gun, and one guy will carry a heavy weapon, and one guy

4    will carry what we call a special weapon.   And they're supposed

5    to be sort of all purpose, general kind of tactical deployment.

6         The cross design on VII and VIII are assault company

7    squads, and those are like -- remember the guy with the big jump

8    pack and the turbines on it?  Well, these are the close combat

9    specialists.   The assault squads are the ones that are tailored

10   to fight in close combat.   So, they tend to have swords or

11   chainsaws or power fists.

12   Q.   And what are the others?  The IX and X there?

13   A.   IX and X are the heavy weapon specialists, and they're

14   called Devastators, and they have a preponderance of heavy

15   ordnance.   So, they're the guys that you'd use to take out the

16   big tanks or the gigantic walkers.

17   Q.   And where did this system, this using these arrows and

18   crosses with those funny things at the ends and the chevrons,

19   the numbers I through X and the tactical Devastator and assault,

20   where does all that stuff come from?

21   A.   It came from work that we did sometime between 1987 when we

22   released the first Warhammer 40K book and 1995 when we released

23   the book called the Ultramarines Codex.   And the Ultramarines

24   Codex was the place where I sort of pulled all that information

25   together.   But I think John Blanche and I had been working on it

Merrett - direct

1    alongside with Jes at some point in that sort of eight-year

2    period, which -- and I can't remember exactly how and when, but

3    it was during that period we kind of brought together all the

4    information and created those symbols and all those icons.

5    Q.   Are you aware of anybody before Games Workshop adopted whole

6    complicated thing using this system or combinations?

7    A.   No.   The thing we loved about the Space Marines and what

8    made them and I think what made them so popular, the Space

9    Marines are like our stand-out, number one most popular models

10   to collect.   Like beyond any doubt at all they are the most

11   popular army.   And we think it's because they've got really

12   cool -- I mean, they look great.   Sort of fantastic kind of look

13   to them, the sort of awesome armour, they've got an amazing back

14   story, and they're fun to paint, and they're fun to engage with

15   in that way.   And, you know, the fact that they're these really

16   bright heraldic colors, that strong blues and reds and even the

17   yellow ones, which kind of like are a bit unusual for a military

18   unit, kind of works with the Space Marines.   We find the image

19   is very durable.

20            And the whole system of painting the markings on the

21   shoulder pads, which just kind of grew out of the fact that we

22   created those shapes.   The very early -- the very first Space

23   Marines, we used the one shoulder pad -- and I always get the

24   wrong way around -- for the badge that defines the regiment, the

25   chapter badge, and then the other pad was a studied thing.

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1          So, at some point we kind of evolved the Marine

2    shoulder pad to be able to have more interesting badges on it

3    because that seemed fun.  It kind of worked with the image.  And

4    so, it kind of -- the idea of putting these tactical markings on

5    the shoulder pads kind of grew with the design as the model

6    design changed and evolved into that thing.  We used it to

7    present this information.  And it was always kind of part of the

8    idea.  It was always just part of what we would do with it.

9    It's the reason we ended up with symmetrical pads in the way we

10   did.

11   Q.  If you can flip back one page on the bottom  Those pads at

12   the bottom where it says Terminators, is there something

13   different about those shapes of those pads?

14   A.  Well, the Space Marine Terminator is a slightly different

15   version of Space Marine army.  It's very much bigger, and it has

16   different shaped shoulder pads.  The Terminators are kind of

17   like the elite of the elite.  However fantastically tough and

18   powerful and popular the Space Marines are, the Terminators are

19   just that bit more popular.  The kind of cream colored models on

20   the layout are Terminators.

21          THE COURT:  He's pointing over here.

22   BY THE WITNESS:

23   A.  These models here.  And you can see they're actually quite a

24   lot bigger than the dark green models.  I've got my pointer on

25   that, if you can see that.  And they just have a different shape

Merrett - direct

1    shoulder pad, and it's -- I think I just illustrated the shape

2    of it quite clearly.

3    BY MR. MOSKIN:

4    Q.   Well, maybe we should move on to introduce some of the other

5    races then.   And maybe you can tell us a little bit what the

6    Eldar are.   And in doing that, if we can bring up Exhibit 845.

7    A.   This is the cover of the Eldar Codex.

8    Q.   And does this work in any way like the codex for the Space

9    Marines?

10   A.   It's the same kind of idea.   This is the complete guide to

11   the Eldar.   It will have a back story about them.   It will have

12   information about how to play with Eldar armies and models in

13   the game.   There will be sections that show you how to paint the

14   models and what kinds of models that you can collect for them

15   Q.   And when were the Eldar introduced into the back story?

16   A.   From the very beginning.   So, they're in the 1987 Rogue

17   Trader book.   That's the very first Warhammer 40,000 book.

18   Q.   And can you give a brief synopsis of who the Eldar are?

19   A.   Yeah.   Okay.   In a sort of sense, a little bit kind of

20   pixies and fairies, but the Eldar are the space elves.   So, they

21   are a type of humanoid alien, and the idea of the Eldar is that

22   they used to rule the galaxy, and then something terrible

23   happened.   They lost it in some mysterious, terrible way, the

24   net result of which was is that their civilization sort of

25   destroyed itself from within.   And so, the Eldar in the 40K

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    setting are the remnant of that former galactic ruling power.

2    Q.   Well, let's look at an example, if we can.   Same exhibit,

3    Pages 17475 and 476.

4    A.   Okay.   That's a page from the codex that shows an Eldar

5    Farseer.   The Farseers are kind of like the wizard generals of

6    the Eldar.   They are very enigmatic characters.   They're kind of

7    like -- I'm sorry.   I'm just trying to explain this in a way

8    which makes sense to me.

9            They're visionaries.   They have strange, dark visions

10   of the future.   So, they can predict what's going to happen.

11   They are -- I can't think of the phrase.   But they have that

12   kind of weird kind of ability to see into the future is the

13   truth of it.   And because of that, the other Eldar kind of

14   venerate them   They're sort of like the high priests of Eldar

15   society.   And when the Farseers make predictions, all the other

16   Eldar kind of follow them

17   Q.   And if we can jump forward one page to 17476.

18   A.   Okay.   Those are Warlocks.   They're sort of slightly weaker

19   versions of the Farseers.   These are the -- again, they're kind

20   of like -- well, they're called Warlocks.   So, they're kind of

21   like the wizards of the Eldar, and they will serve the Farseers.

22   Q.   Maybe we can just introduce one typical example.   Let's look

23   at Exhibit 530 at Page 5445.   And what's this?

24   A.   This is a box layout.   So, we create all our own packaging

25   for our miniatures, and they're printed all in different places

Merrett - direct

1    around the world.  We'll get to that.  So, this is actually the

2    box art from the box that sells the Eldar Striking Scorpion.

3    So, you've got the name here.  It's in six different languages

4    because we kind of sell these all over the world.

5            And you can see the front cover is actually -- it's the

6    photograph of the model.  It's been photo-shopped onto the

7    background.  And then on the back you can see other pictures.

8    This is one of the Eldar types.  They have a fighting style

9    which is supposed to be redolent of a kind -- or kind of a bit

10   like a scorpion, in fact.  They do sort of really fast kind of

11   attacks, and they've got these horrifying weapons built into

12   their sort of helmets and collars called mandibusters, which are

13   very, very short range.  So, they run up and they fire off these

14   sort of deadly weapons right in your face.  It's not very

15   pleasant, I have to say.

16   Q.   Is there another type of Eldar, a Dark Eldar?

17   A.   Oh.   There's two sort of inherited of the ancient Eldar

18   heritage, and the Craftworld Eldar, which these are examples of,

19   live on these big spaceships that float through the galaxy.  The

20   other ones are the Dark Eldar that live inside of this -- they

21   live in a sort of pocket dimension hidden away from the rest of

22   the galaxy, and they are -- these guys are really evil.  They're

23   evil, bitter, and twisted and every other kind of cliche we

24   could throw at them

25   Q.   Well, first can I have you identify what exhibit I've been

Merrett - direct

1    showing you now as Exhibit 851?

2    A.   Oh, I'm sorry.   This is the cover of the Dark Eldar Codex.

3    And you can see in the center of the picture is this very

4    macabre character, who's a kind of like a -- again, sort of kind

5    of a little bit like a wizard, but the Dark Eldar are spiky and

6    evil, and they have very black thoughts about the world.

7    They're psychic vampires, and they do terrible, terrible things.

8    They're really, really unpleasant.   They're very, very evil

9    chaps.

10          And the worst of them are actually psychic vampires.

11   They kind of leach life energy from other races.   And the life

12   energy they like the most is actually the life energy that's

13   being torn from torment and pain.   So, they torture their

14   victims to sort of suck the life out of them   I know it's

15   really horrible.

16   Q.   It's only appropriate that, you know, we've turned the

17   lights down a little.

18          Can we show Plaintiff's Exhibit 755?   And what is this?

19   A.   This is actually the epitome of the Eldar horror.   So, this

20   is a Haemonculus.   This is the worst kind of Eldar sort of

21   torturer, and basically he uses torture and torment as a means

22   of actually getting that life sustaining kind of energy from his

23   victims.

24          But they are vile beyond compare.   Not only do they do

25   that to others, but they do terrible things to themselves.   So,

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1  they're kind of into self-mutilation and things and bonkers,

2  crazy kind of surgery to augment their bodies.  So, they have

3  like extra limbs sewn onto them and things.  And, yes, it's

4  jolly unpleasant.  And I think this one -- so, this guy's kind

5  of floating because it's kind of like magic.  He's kind of like

6  using -- he's obviously filled with the energy that he's leached

7  from his victims, and he's back to do something unspeakably

8  violent and nasty to his enemy.

9  Q.  Let's try to, if we can, introduce the Tyranids.  And if we

10  can bring up Plaintiff's Exhibit 47.  And by the way, going

11  back, is that a product or is that book that we were looking at?

12  A.  The previous -- the Haemonculus is a miniature we sell.  So,

13  it's actually a sculpt.

14  Q.  So, Exhibit 55 is the packaging?

15  A.  Yeah.  That's the packaging slip that goes in the clamshell

16  that has that model in it.  Sculpted by Jes Goodwin, I believe.

17  Q.  When were the -- one more thing.  When were the Dark Eldar

18  introduced into the story?

19  A.  1998, I believe.

20  Q.  So, now if I could go back and if we can meet -- let's meet

21  the Tyranids.

22  A.  Okay.

23  Q.  What are we looking at in Plaintiff's Exhibit 47?

24  A.  This is the cover of the Tyranid Codex or one of the Tyranid

25  codexes.  Again, it's the same kind of book.  It will have back

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    story about the Tyranids.  It will have a showcase section

2    showing painted models and armies.  And it will have a complete

3    set of rules for using the Tyranids in a game of 40K for picking

4    an army and such like.

5    Q.   Let's look at Page 1424.  And what is shown here?

6    A.   This is again a typical page from the book with some cool,

7    interesting background if you're a fan, obviously, and some

8    rules for how they're used again.  This is actually for a thing

9    called a Mycetic Spore, which is kind of like a drop pod for the

10   Tyranids.  It's a strange organic thing that gets fired out of

11   the weird kind of organic ships of the Tyranids and fire down

12   off the planet surface, and when it cracks open, all those

13   Tyranid monsters come out of it.  The Tyranids are really vile.

14   There's no pleasant stuff in 40K.  I'm sorry.  I mean, I wish I

15   could talk about some good kind --

16   Q.   Well, there are angels, right?

17   A.   Only dark ones or Blood Angels.  I'm sorry.

18   Q.   If you can look at the text at the top.  And do you see it

19   refers to hive ships?  What is that talking about?

20   A.   The Tyranids are absolutely alien.  They have no -- they

21   behave in a mysteriously kind of knowing way.  They sort of act

22   like they're intelligent.  But an individual Tyranid monster

23   actually just has no sentience.  It's not aware.  It's just a

24   monster, has a sort of bestial fury.

25           But when you gather them all together, they have a kind

Merrett - direct

1   of hive consciousness.  So, the more Tyranids there are, the

2   more cleverly they behave.  They sort of act with strategy.

3   They appear to have intelligence.  And that hive consciousness

4   is how a collective of Tyranids is known, as they're known as a

5   hive, and their ships are therefore hive ships.

6   Q.   And if we can back out a little bit, can you show where on

7   this page the Mycetic Spores are shown?

8   A.   I have to dodge around this light, but the Mycetic Spores

9   are these things crushing down through the sky, and you can see

10  here there's one that's kind of trailing, trailing kind of

11  architectures, and you can see the sky is supposed to be filled

12  with these projectiles.  And the surface is covered in this

13  weird organic sort of texturing.  And so, it's kind of like

14  ribbing and such like.  And this shows the remnants of the spore

15  with this Tyranid creature crawling out of it.

16  Q.   Crawling out of a hive ship.

17  A.   He's crawling out of a Mycetic Spore that's crashed down to

18  the ground, yeah.

19  Q.   Let's go to Page 1422 and see if you can tell us what that

20  is.

21  A.   Okay.  This is a creature called Tervigon, and the Tervigon

22  is a large Tyranid monster, and it acts a bit like a personnel

23  carrier.  So, it's got smaller Tyranids inside of it, and when

24  it gets close to the enemy, it disgorges them  And you can see

25  here the sort of characteristics of the bloated underside, and

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1   you can see here it's disgorging these little maggot like things

2   out of the bottom  And again, the top is characterized by

3   having this triple row of chimney stack type things coming out

4   of its back.  They're not pleasant.

5   Q.   Now, does Games Workshop sell a product, a Tervigon product?

6   A.   Yes.

7   Q.   And you didn't hear, but counsel said in his opening that it

8   was inspired by Chapterhouse.  Is that correct?

9   A.   No.

10  Q.   What was the inspiration for it?

11  A.   It was when we created this codex.

12  Q.   And when was this codex created?

13  A.   I'm not sure what the dates on this codex is, but I think

14  it's -- we can find that information, can't we?  I don't know

15  exactly when.  It was earlier this century sometime.  2003

16  maybe.  I don't know.

17       I don't know the exact date of the codex, but the

18  Tervigon was part of an idea doing -- as a part of our kits,

19  actually, the plastic kits, you buy the plastic kit, and if you

20  assemble it one way, you create one creature or one type of

21  thing, and if you assemble it another way, you'll get another

22  thing, and the Tervigon was a plan right from the get-go as part

23  of a dual purpose kit.

24  Q.   And when was that plan conceived?

25  A.   That was planned when we did this book.

Merrett - direct

1   Q.   So, in early 2003?

2   A.   I can't remember the exact date, Jonathan, to be honest.

3   Q.   It would have been -- I don't want to put words in your

4   mouth.   Around 2003?  Would it help to see the book, the codex?

5   A.   Well, I don't know.   It would have the date in it, I

6   suppose, yeah.   I just can't remember the exact dates because,

7   you know, you have to bear in mind we release new products all

8   the time.   So, I mean, I can't remember a lot of the specific

9   dates.

10          MR. MOSKIN:   If I can approach the witness.

11          THE COURT:   What's the exhibit number?

12          MR. MOSKIN:   What is this.   Exhibit 461.

13   BY THE WITNESS:

14   A.   Thank you.

15   BY MR. MOSKIN:

16   Q.   Does that help refresh your memory as to when the Tervigons

17   were conceived by Games Workshop?

18   A.   No.   I can't see the dates, no.

19          THE COURT:   Just go point.

20          THE WITNESS:   If you can help me.   Sorry.

21      (Off-the-record discussion.)

22          THE COURT:   Print maybe too small?

23          THE WITNESS:   Yeah.

24   BY THE WITNESS:

25   A.   Sometime between 2000 and 2009.

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    BY MR. MOSKIN:

2    Q.   Well, let's move on.

3           If you can introduce us to the Tau, and if you can call

4    up Exhibit 864, Plaintiff's Exhibit 864.  What are we looking

5    at?

6    A.   This is the front cover of the Tau Empire Codex.

7    Q.   And you explained a little bit about this before, but can

8    you give us a brief synopsis of the back story?

9    A.   The idea of the Tau is -- I mean, most of the stuff -- most

10   of the armies in 40K are things that we -- in the fiction that

11   we created are very ancient.  So, they're sort of traditional

12   old enemies of humanity.  But the Tau were conceived as being a

13   kind of modern enemy of humanity.  The idea of the Tau empire is

14   it's an emerging kind of civilization in the galaxy.  And so,

15   it's just starting to interact with the Imperium and is just

16   starting to get into conflict with mankind.

17   Q.   Are the Tau humans, or what are they?

18   A.   They're kind of almost humanoid things.  They're bipedal,

19   but they have funky feet, and they have strange looking heads

20   because they are, after all, aliens.  In fact, you can -- on the

21   cover here, you can see most of these guys are actually in

22   armour, but this guy you can see that strange alien physique,

23   physiognomy.  He's got unusually colored skin, and his face

24   lacks a nose.  They just have a -- they have a weird kind of --

25   a slightly human look, but they're definitely alien.

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    Q.   And what's on his belt?  What is that?  What's that symbol?

2    A.   This symbol here is called a sect symbol.   Sect is a word,

3    it's sort of like clan or tribe, and each one has -- each of the

4    sects of the Tau have their own specific rune or symbol, which

5    in this case it's a kind of like a Y-shape, stylized Y-shaped

6    line on the disk.

7    Q.   And when were the Tau added to the Warhammer 40K story?

8    A.   Now, I remember this one quite clearly.   It was September

9    2001 that we introduced the Tau into the 40K universe.

10   Q.   And any particular reason you remember that so clearly?

11   A.   Yes.   Long story.   It's because it was part of the marketing

12   plan that we had at the time to do a slightly different approach

13   to releasing a new army, and the plan was that we would release

14   this army by doing an extraordinary number of plastic kits.   So,

15   we launched the army with the full array of warriors and tanks

16   and such like.

17            So, it was actually quite a big deal for us at the

18   time, which is why I remember it so clearly, because we invested

19   a lot of money in creating all of that and a lot of time and

20   effort in creating all those plastic kits.   It was a big deal

21   for us.

22   Q.   Well, let's then look at Page 16794 to 95 to get a little

23   better idea of what some of the Tau were like.   And can you tell

24   us what we're looking at here?

25   A.   You can see some of their fabulous modern -- the whole

Merrett - direct

1    purpose of the Tau, we wanted to give them a modern vibe.

2    Q.   Did you say modern vibe?

3    A.   Vibe, yes.   Sorry.   A modern flavor.   So, they don't have

4    kind of -- we wanted them to look very sci-fi and very kind of

5    fresh.   A lot of the things in 40K has an arcane filter, has an

6    ancient, old feel to it, and we wanted the Tau to look modern.

7              So, in our imagination the Tau have fantastic computers

8    and things.   I mean, these are the guys that use things a bit

9    like iPads and such like and have smart phones, where the rest

10   of the 40K universe is a bit weirdly old fashiony.   It doesn't

11   have technology in that way.   It's lost all that stuff millennia

12   before.   But the Tau have got that feeling.   So, their style is

13   actually very modern.

14             And you can see that's reflected in the shapes of the

15   vehicles.   They have a much more -- well, I can't explain --

16   sort of modern flavor to them and things that are redolent of

17   sort of a slightly more traditional science fictiony feel.

18   That's the best way I can put it, really.

19             But the other characteristic of the Tau are these

20   battle suits, and the battle suit is a one-man armoured fighting

21   vehicle in the shape of a robot.   So, you've got to imagine

22   there's a little Tau warrior sitting inside of that thing making

23   it go.

24   Q.   And do they use special weapons?

25   A.   Yeah.   The Tau have got a completely unique array of

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    weapons.  So, these big things here are called rail guns, I

2    believe.  I'm not actually necessarily exactly expert in the

3    names of every single thing.  There are so many things we

4    produce.  I sometimes make little mistakes.  But I think those

5    are called rail guns.  It's not an army I collect myself.  But

6    that's one of their signature weapons.

7            And if you look -- if you go -- if you just scroll up a

8    little bit, that's another very, very characteristic Tau weapon

9    with that kind of two very thin barrels.  That's called a burst

10   cannon.  And they're very unique to the Tau, those two weapons.

11   Q.  Now, earlier you were showing us models.

12           MR. MOSKIN:  If I can approach the board that's been

13   set up.

14           THE COURT:  Sure.

15   BY MR. MOSKIN:

16   Q.  Take one, for example.  Why is it made in this particular

17   size?  For the record, just referring to one of the miniatures.

18   A.  Okay.  Yeah.  There's a kind of tradition of making tabletop

19   war game figures in that kind of -- roughly that kind of size.

20   It goes back to, you know, the -- it's basically inch, inch and

21   a half tall model.  It's kind of a really -- you know, ever

22   since people made little toy soldiers for people to play war

23   games with, they kind of made them in those kinds of sizes.

24           And we used to make our models in a very traditional

25   size.  In the very earlier years, we used to make models that

### Merrett - direct

1    were technically described as being 25 millimeters, which is

2    just -- it's an inch and a half tall model.  But we didn't think

3    that that was a very good size to do models because we couldn't

4    capture all of the brutality and the monstrous character of a

5    lot of things we wanted to create at that size.

6            And so, in the course of those very, very early years,

7    and I'm talking way back in the early eighties, we kept making

8    our miniatures more and more robust and bigger and giving them

9    more presence on the tabletop, making them a more robust kind of

10   image.

11           It's a bit like if you -- if you ever see like really,

12   really ancient film of American football being played, the

13   players all look skinny, don't they.  They look all small

14   because they didn't have all that great big padding and stuff

15   that the modern American footballers have.  So, when you look at

16   old footage of American football being played, you kind of think

17   the guys all look small.

18           And that's kind of similar to where we were going with

19   our miniatures.  Our models just looked small, and we wanted

20   them to be bigger and have more presence on the tabletop.  And

21   so, we actually deliberately started making our miniatures

22   bigger than anybody else.  And because we were deliberately

23   making our models bigger than anybody else was making their

24   models at that time, we decided to give them a new name, and we

25   called them 28 millimeter models because that wasn't a size that

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1    anybody else was using.

2    Q.   And 28 millimeters corresponds to what?  What does that

3    mean?

4    A.   In theory, it's a measurement from the sole of the -- it's a

5    measurement from the foot to the top of the head on the

6    miniature.  So, it's not -- sometimes it's called a scale, but

7    it's not really a scale.  It's a size.  They're supposed to

8    measure 28 millimeters from the floor to top of the head.  Well,

9    actually, our models are a little bit bigger than that.  If you

10   measure them, some of them are actually way over 30 millimeters

11   tall, but that's because they're supposed to be much bigger in

12   the setting.

13   Q.   When you say the setting, you mean the fiction?

14   A.   In the fiction, yeah.

15   Q.   Now, we've seen all these pictures of colored images.  Is

16   that important at all to how Games Workshop markets its

17   products, the miniatures it sells?

18   A.   Yeah.  As I said before, we don't sell any painted

19   miniatures.  We only sell unpainted miniatures.  And these days

20   most of our miniatures are plastic kits.  So, they come attached

21   to little sprues, and they're in lots of different components.

22           And part of the hobby for an enormous -- the fun of the

23   hobby of collecting our miniatures is actually assembling those

24   little kits and then painting those miniatures.  Well, if you

25   think about it, just showing little frames with bits of plastic

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1  on them isn't a very effective way to explain to a customer,

2  potential customer, what the product is intended to look like.

3  And, of course, we stick them together and have top notch

4  painters paint them to make them look fabulous because that's

5  what's selling.  That's the thing that people are buying.

6  That's why we do that.

7  Q.  If I can approach the witness and if I can give the witness

8  Plaintiff's Exhibit 74, maybe you can tell us what that is.

9  A.  Okay.  This is a Space Marine tactical squad.  It's a

10  typical Games Workshop product.  It's the card box, and inside I

11  assume will be a whole set of frames, plastic frames with all

12  the parts.  So, you've got to imagine.  Can I take these out?

13  Q.  Yes.

14  A.  So, you've got all the little components on the frame, and

15  you trim these off and file off any little mold lines and any

16  little imperfections that have been introduced in the molding

17  process, and then you glue the models together.

18  Q.  And why do you show a painted picture on the cover of the

19  box?  I think you were trying to explain it before.

20  A.  If what you saw on the cover of the box was just a bunch of

21  frames, then you couldn't necessarily tell what the model would

22  look like when it's stuck together.  And when you see these, I

23  mean, that's --

24  Q.  For the record, let the record reflect that the witness is

25  showing the sprues or the interior frames of the product from

Merrett - direct

1    the box.

2    A.   Yes.   Unless you actually see all the parts assembled,

3    you've not really got any idea what the product is intended to

4    look like.   And then we paint them because obviously we want the

5    image to look as attractive as possible.   And it's kind of like

6    that's the thing we're selling is the promise that you can build

7    these models.

8    Q.   When you say these models, you're referring to the pictures

9    shown on the box?   I'm sorry.   Can you answer that?

10   A.   Yeah.   I mean, it's standard practice for selling plastic

11   kits, I have to say.   It's not unusual.

12   Q.   I wasn't suggesting it was.

13   A.   I'm sorry.   We're selling a product that people want to

14   engage with.   Our customers, our fans actually want to get

15   inside of the skin of the IP.   They want to understand all the

16   different facets of the back story, and they want to understand

17   all the kind of imagined history that we've created for these

18   little warriors.

19        And they can't go finding information, you know,

20   anywhere because it's stuff that we've all kind of -- that we've

21   just made up.   We've created it.   We've invented all that stuff.

22   And the great thing about what we do, I think, is that it's an

23   unfolding narrative.   We have some customers who have been

24   collecting Citadel miniatures -- I'm sorry -- our miniatures

25   since we were making them in the eighties, and, you know,

PDF created with pdfFactory trial version www.pdffactory.com

Merrett - direct

1   they're completely engaged with the history and the

2   paraphernalia of that and the character of the models and the

3   specific color schemes they are, and that's part of the appeal.

4   And that's what the painted stuff does. It kind of

5   ties these products into all of that glorious back story. Even,

6   you know, to show you a little tiny snippet of it. But there

7   are -- we've published millions of words over the last 25 years

8   about the Warhammer 40K universe and all the things in it.

9   Sorry, Jonathan.

10  Q.   No, no.   That's great.

11  Are you familiar at all with the defendant in this

12  case, Chapterhouse Studios?

13  THE COURT:   This suggests you're moving to a new topic.

14  MR. MOSKIN:   Yes.

15  THE COURT:   Let's stop right here for the day then.

16  We're going to stop for the day. Start time tomorrow I'm going

17  to say 9:40. I have a couple of other cases to deal with pretty

18  quickly at 9:30, but it shouldn't take more than a few minutes.

19  So, please be ready to go at 9:40.

20  So, my advice on the notebooks is write your name on

21  the front of it somewhere so that they don't confused tomorrow.

22  Take them back there. Leave them in a pile on the table. We

23  put them in my office so that nobody gets at them  We'll give

24  them back to you tomorrow.

25  Don't discuss the case with anyone. Continue to follow

1    the rules that I gave you at the start of the case.   Just be

2    ready to go at 9:40 tomorrow.   I'll be right back out to talk to

3    the lawyers.

4        (The following proceedings were had in open court, out of

5        the presence and hearing of the jury:)

6            THE COURT:   You know, as far as the exhibits are

7    concerned -- so, first of all, under the -- you can sit down.

8    Under the pretrial order rules, anything that wasn't objected to

9    in the pretrial order is deemed to be in evidence.

10           Having said that, I again have to sort of say out loud

11   what I said in an e-mail over the weekend.   You've got to think

12   about the jury before we sort of shovel several hundred or more

13   than several hundred exhibits at them   So, I guess I hope that

14   people can be a little bit more discerning than sort of I

15   perceive you as being so far.

16           As far as stuff that's objected to, you know, I

17   think -- and, honestly, I'm not going to sit up here and go

18   through the chart as you're going through them   I think what we

19   should probably do is a little bit of a change from what I

20   suggested earlier.   Let's do move them in as we go if they're

21   objected to.   The ones that haven't been objected to you don't

22   have to move them in because they're already in.   But the ones

23   that are objected to, as we go, move them in.   So, maybe you can

24   just come up with a list in the morning.

25           MR. KEENER:   We actually have some other suggestion for

1 you. We've exchanged with the other side all the exhibits we

2 plan to used today, and they withdrew all their objections to

3 all the exhibits we used with Mr. Merrett, except the one you

4 handled prior to court today.

5     THE COURT: Okay. Is that right?

6     MS. HARTZELL: That's correct.

7     THE COURT: Okay. Good. All right. Well, that's

8 actually a pretty decent way of handling it, I think.

9     MR. KEENER: We've been exchanging lists.

10     THE COURT: Well, that's good.

11     MR. KEENER: And it doesn't address any exhibits they

12 may use for cross. We may have to address those separately

13 because we aren't exchanging those ahead of time.

14     THE COURT: Okay. And then what I'm doing is I'm -- as

15 I speak here, I'm going to e-mail the time chart at the end of

16 each day, which I'm kind of keeping as we go. So, you will have

17 that. I'm e-mailing it to the same four people that I was

18 sending the other one to. So, it should be in your in-boxes.

19     So, as far as tomorrow morning is concerned, I get here

20 really early. Get in here as early as you want. What I'd like

21 you to do with those boxes, though, I think you can now use the

22 area in front of the jury box as kind of a storage area. And it

23 would be good not to have sort of the pile high thing so if

24 there's anybody who wants to sit back there and watch, they can

25 actually see. And you can leave stuff here overnight. It's

PDF created with pdfFactory trial version www.pdffactory.com

1    fine.   Just make sure you turn off the equipment before you go

2    so it isn't burning overnight.

3                Anything anybody wants to bring up before we stop for

4    the day?

5                MR. ALY:   Judge, just one question for clarification.

6    It will help both of us.   Some judges don't want witnesses even

7    on direct to be prepping overnight while they're still on.

8                THE COURT:   For me the rule is once they're being

9    questioned by the other side's lawyer, you can't discuss your

10   testimony.   While you're still being examined by your own side's

11   lawyer, that's okay.   Now, it will flip-flop if somebody calls

12   somebody else adversely, obviously.

13               MR. ALY:   Understood.   Thank you.

14               THE COURT:   Okay.   Great.   See you tomorrow.

15          (Whereupon, the within trial was adjourned to Tuesday,

16          June 4, 2013, at 9:40 o'clock a.m.)

17

18

19

20

21

22

23

24

25