IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
GAMES WORKSHOP LIMITED,        )
                              )
                  Plaintiff,   )   Docket No. 10 C 8103
                              )
          vs.                  )
                              )
CHAPTERHOUSE STUDIOS, LLC,     )   Chicago, Illinois
et al.,                        )   June 11, 2013
                              )   10:00 a.m.
                  Defendants.  )
```

VOLUME 7
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

APPEARANCES:

```
For the Plaintiff:      FOLEY & LARDNER, LLP
                        BY:  MR. JONATHAN E. MOSKIN
                        90 Park Avenue
                        New York, New York   10017


                        FOLEY & LARDNER, LLP
                        BY:  MR. JASON J. KEENER
                        321 North Clark Street
                        Suite 2800
                        Chicago, Illinois   60610



For the Defendant:      WINSTON & STRAWN, LLP
                        BY:  MR. IMRON T. ALY
                             MR. BRYCE COOPER
                             MR. THOMAS KEARNEY
                        35 West Wacker Drive
                        Chicago, Illinois   60601
```

1                            WINSTON & STRAWN, LLP
                                  BY:  MS. JENNIFER A. GOLINVEAUX

2                            101 California Street
                            San Francisco, California  94111

3

4                          MARSHALL, GERSTEIN & BORUN
                                BY:  MS. JULIANNE M. HARTZELL

5                            233 South Wacker Drive
                            Willis Tower #6300

6                            Chicago, Illinois   60606

7

8  Also Present:               MR. NICHOLAS VILLACCI

9                        MS. GILLIAN STEVENSON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24              LAURA M. BRENNAN - Official Court Reporter
                219 South Dearborn Street - Room 2102

25                    Chicago, Illinois  60604
                      (312) 435-5785

 1    (The following proceedings were had in open court:)

 2         THE COURT:  10 C 8103, Games Workshop v. Chapterhouse

 3    Studios.

 4         Can I get one lawyer for each side to give the names

 5    of the lawyers, please?

 6         MR. KEENER:  For Games Workshop, Jason Keener,

 7    Jonathan Moskin, and also with us is Gill Stevenson.

 8         MS. GOLINVEAUX:  For Chapterhouse Studios, Jennifer

 9    Golinveaux and Imron Aly and Tom Kearney.

10         THE COURT:  What issues did you have?

11         MR. KEENER:  Two issues.

12         One is with Brewster, their expert they're calling

13    today, and there's two exhibits we have an issue with.

14         One is Defense Exhibit 297, which is kind of a

15    Wikipedia type page and a picture.  Now, this issue is not the

16    same Wikipedia type issue before, although that's also an

17    issue.  This is an exhibit -- he's had two expert reports --

18    he's never referred to or cited or referenced or produced.

19         THE COURT:  It's something that is outside the scope

20    of his report basically.

21         MR. KEENER:  Yes, outside the scope.

22         THE COURT:  What is the second issue?

23         MR. KEENER:  The second issue is after the first

24    report, we gave them an arms and armor book from Games

25    Workshop.  He issues a supplementary report identifying

1   anything in that book he thought was relevant.

2            THE COURT:  Okay.

3            MR. KEENER:  And now they want to point to a picture

4   in the book he's never identified to.

5            THE COURT:  So, in other words, something that wasn't

6   even in the supplemental report.

7            MR. KEENER:  Yes.  It's an ax with a gun on it which

8   he's never commented on, or a Halberd -- gun-Halberd ever

9   before.  And now in the book they found some acts of the gun

10  and they want to offer testimony on that now.

11           THE COURT:  Ms. Golinveaux.

12           MS. GOLINVEAUX:  Your Honor, the first image is not

13  from a Wikipedia type site.  It's from the Anti-Defamation

14  League's website.  It's an image of which your Honor took

15  judicial notice in connection with the summary judgment

16  briefing.

17           THE COURT:  Yes, but the question is whether he

18  should be allowed to refer to it since it's not in his report

19  allegedly.

20           MS. GOLINVEAUX:  And, your Honor, Mr. Brewster

21  included an opinion about this image in his report, and during

22  deposition he said he went on to the Internet to confirm his

23  understanding of this symbol.  He did not specifically

24  reference this page, but if he testifies today about it, he'll

25  say that this image is consistent with the images he saw when

1  he went on the Internet.

2  THE COURT:  What about the second one?

3  MS. GOLINVEAUX:  The second one, your Honor, we would

4  offer as rebuttal to Mr. Merrett's direct testimony when he

5  said that the gun-Halberd is wholly original to Games Workshop

6  and so fantastical that no one would ever make it when, in

7  fact, it appears as a weapon within their reference library.

8  THE COURT:  Okay.  On the first point, Mr. Keener,

9  what is your response?  In other words, what I got from Ms.

10  Golinveaux is that he talked about this topic in his

11  deposition.  He said he had gone on to check.  He didn't have

12  the image at that time, and this is basically, he's saying,

13  okay, this is what I saw.

14  MR. KEENER:  In his report he has a section on these

15  arrow crosses, and he identifies numerous images in his report

16  that he wants reference to, and they're going to use some of

17  those images of other arrow crosses.  And he said, it's

18  similar stuff I have seen on the Internet.  We don't know what

19  he was talking about.  He never said the Anti-Defamation

20  League.  He never said this picture.

21  THE COURT:  The objection to both is sustained.

22  They're outside the scope of the report.  I don't think there

23  is good cause for including them.  Okay.

24  MR. KEENER:  And then there is one more issue about

25  the question your Honor wanted about the directed verdict.

1    Those couple products at the end of their directed verdict

2    motion, you wanted us to look at the transcript for.

3            THE COURT:  No, let's hold that for now.  I want to

4    get the jury out here.

5            Does somebody have the breakdown for the depositions?

6            MR. ALY:  I do, your Honor.  Do you want me to write

7    them down or pass a note?

8            THE COURT:  No, just tell me.

9            MR. ALY:  Tell you, okay.  Yesterday for Mr. Blanche,

10   it was 11 minutes to defendant, 1 minute to plaintiff.  Today

11   for Mr. Blanche, it will be 15 minutes to defendant, 2 minutes

12   to plaintiff.

13           The next deposition --

14           THE COURT:  Yes, except your time doesn't add up.  So

15   I'm going to use that ratio.  So it was 11 to 1 yesterday.

16   What is today on Blanche?

17           MR. ALY:  15 minutes defendant, 2 for plaintiff.

18           THE COURT:  15 to 2.  Okay.

19           And then the next deposition after Blanche?

20           MR. ALY:  Will be Mr. Footitt.  Footitt is six

21   minutes to defendant, one minute to plaintiff.

22           THE COURT:  Okay.

23           MR. ALY:  If you want seconds, we have that, but I'm

24   just --

25           THE COURT:  No, no.

Blanche - deposition

1    MR. ALY:  The third deposition --

2    THE COURT:  I could ask for them, but whatever.

3    MR. ALY:  The third deposition would be Mr. Hodgson,

4  22 minutes to defendant and 6 minutes to plaintiff.

5    THE COURT:  Okay.

6    MR. ALY:  And as far as our order plan today, we have

7  the one deposition to complete.  The second deposition will be

8  Footitt.  We'll then do the expert, Brewster.

9    THE COURT:  The live witness and then Hodgson last.

10    MR. ALY:  We will break up the deps.

11    THE COURT:  Fine, okay.  Let me get the jurors.

12    (The following proceedings were had in the presence

13  and hearing of the jury:

14    THE COURT:  Good morning.  Everybody can have a seat.

15  Sorry for the late start.  We had a couple of issues I had to

16  deal with and an issue on a different case.

17    We're ready to resume with Mr. Blanche's deposition.

18  So I'm going to flip off the lights again and make it easier

19  to see.

20    Okay, action.

21    JOHN BLANCHE, DEFENDANTS' WITNESS, THROUGH DEPOSITION

22  "BY MR. OH:

23  Q   Have you seen skulls used as part of flags before?

24  A   Yes.

25  Q   Where?

Blanche - deposition

1  A    English Civil War, Chechnya, in the Second World War.

2  Obviously pirates.

3  Q    Have you heard of something called a Maltese cross before?

4  A    I have.  I'm not so sure if my brain understands the

5  definition of various designs of cross as being the same as

6  what other people would use or that I might even be correct.

7  Q    Just so we have clarification, for the record, when I say

8  Maltese cross, what do you have envisioned?

9  A    Well, in vision, I would have a square cross with each of

10  the lines coming out of the cross being crossed again by a

11  smaller line, but I believe people refer to the Templars

12  Cross, and that is a ...

13  Q    When you mention a Templars Cross, is that related to

14  heraldry?

15  A    Yep.

16  Q    You mentioned a chevron earlier.

17  A    Yes.

18  Q    Can you describe what a chevron is?

19  A    A chevron is a V shape.

20  Q    Is it a chevron if it is an inverted V shape?

21  A    It is to me.

22  Q    Are you also familiar with military symbols?

23  A    To a lesser extent than Medieval, I would say.

24  Q    Strike that.  Are military symbols a point of reference

25  for Warhammer 40,000?

1    A    I believe they can be in a broad sense.  But as I have

2    stated my consciousness of certainly modern military symbols

3    is something I'm not very familiar with.

4    Q    For the Warhammer 40,000 games, there are symbols related

5    to some of the characters, is that correct?

6    A    Yes.

7    Q    As we are moving forward here, what is the best way to

8    refer to it?  Heraldic symbols, symbols, iconography?

9    A    We tend to call the use of such iconography within the

10   studio context --

11   Q    And iconography that is related to the Warhammer 40,000, a

12   point of reference to that iconography is heraldic symbols?

13   A    To some degree, but their origins are much wider than

14   that.  That is just a kind of base thought process at the

15   beginning, but rapidly took on a life of its own, and so we

16   don't need or use so much historical references at all.

17   Q    So it is not limited just to historical heraldic symbols?

18   A    Absolutely not, no.

19   Q    You mention it is much wider than that.  Could you

20   describe how wide it encompasses?

21   A    We will use alphabet motifs, Gothic alphabet motifs, runic

22   symbols, Japanese mons.

23   Q    Anything else, just taking an image and making a graphic

24   two-dimensional representation of that image?

25   A    It is hard to analyze and define these things because they

Blanche - deposition

1  are kind of creative thoughts that belong to a sort of a

2  mental process that is going on, not a sort of a very -- it is

3  not pointed.  It is not that we are doing that and doing that.

4  It is we are kind of evolving.

5  Q   And incorporating all the various points of references

6  artists encounter?

7  A   It could be.  Also, these things take a life of their own

8  and become part of themselves.

9  Q   And a moment ago you mentioned using alphabet as a point

10  of reference.  Does that include also numerals?

11  A   It can do, yes.

12  Q   Such as Roman numerals?

13  A   Yes.

14  Q   The Greek alphabet?

15  A   On certain occasions, yes.

16  Q   Can you name some certain occasions for the Greek

17  alphabet?

18  A   I do not know the Greek alphabet, but I think everybody

19  knows alpha, beta, gamma, delta, of course, Ultra Marines, I

20  suppose.

21  Q   Why do you mention Ultra Marines?

22  A   Because it is a Space Marine chapter symbol.

23  Q   Can you describe which symbol, for the record?

24  A   It is an inverted U, I believe.  It is one I personally

25  dislike immensely.

Blanche - deposition

1  Q   I think early earlier you mentioned something called Tau?

2  A   Tau, T-a-u.

3  Q   And there is a symbol related to the Tau?

4  A   There is a family of symbols related to the Tau.

5  Q   Is one of the symbols an upside-down omega symbol?

6  A   I don't recall.  You would have to describe the omega

7  symbol to me.

8  Q   What I am holding up right now is my representation of a

9  symbol.

10 A   No.

11         MR. MOSKIN:  Let the record reflect that counsel has

12 drawn what he contends is -- he is going to mark it as an

13 exhibit.

14         MR. OH:  I'm entering it as Exhibit 96 and I am going

15 to hold it upside down.

16 A   It is not one I would ever use if I did a Tau sketch.

17 Q   What was your involvement in the creation of the Tau?

18 A   Discussing the form they would take with various other

19 members of the studio and doing some of the initial sketches.

20 Q   Do you remember what some of the points of references were

21 for the Tau?

22 A   We wanted to reflect a younger race that had resonance

23 with the market that would be utilizing Japanese robots and

24 robot toys, like Transformers, for instance, type of that kind

25 of visual resonance, but using none of it as reference at

Footitt - deposition

1  all."

2          THE COURT:  Is that it?

3          MR. ALY:  That's it.

4          THE COURT:  Okay.  So next there is going to be

5  another deposition, and what is the name of the person?

6          MR. ALY:  Martin Footitt.

7          THE COURT:  Martin Footitt, F-o-o-t-i-t-t.  So "Foot"

8  with an "it" on the end.

9      (Brief interruption.)

10         THE COURT:  This one is, I think, considerably

11 shorter, if I'm recalling correctly.

12         MR. ALY:  Seven minutes.

13         THE COURT:  You can go ahead and queue it up.

14    MARTIN FOOTITT, DEFENDANTS' WITNESS, THROUGH DEPOSITION

15                        EXAMINATION

16 "Q   Could you please state and spell your name for the court

17 reporter?

18 A   My name is Martin Footitt.  M-a-r-t-i-n F-o-o-t-i-t-t.

19 Q   And are you currently employed?

20 A   Yes, I am.

21 Q   On who is your employer?

22 A   Games Workshop.

23 Q   What is your position now?

24 A   The senior miniatures designer.

25 Q   When did you start working at Games Workshop?

Footitt - deposition

1  A   September 1, 1996.

2  Q   So would you consider yourself a fan of science fiction?

3  A   Yes.

4  Q   Do you ever use your Internet browser to search for

5  images?

6  A   Yes.

7  Q   Do you ever use those images in your work as a senior

8  miniatures designer?

9  A   How do you mean "use"?

10  Q   Do you ever reference those images in your work as a

11  miniatures designer?

12  A   They might be useful for some things.

13  Q   Why are you searching for images in your work as a

14  miniatures designer?

15  A   For some like real life reference.

16  Q   What type of images have you searched for in your work as

17  a miniatures designer?

18  A   I think I've searched for Lizards.

19  Q   Do you ever look for images in places other than the

20  Internet?

21  A   Using my computer?

22  Q   Or any other resources that you might find.

23  A   Look in army books.

24  Q   What time of army books do you look in?

25  A   Books for Warhammer and Warhammer 40,000.

Footitt - deposition

1    Q    Are there any books anywhere else that you reference?

2    A    Yes.

3    Q    Where are those books?

4    A    On a bookcase.

5    Q    Your bookcase?

6    A    No.

7    Q    Whose bookcase?

8    A    The department.

9    Q    Which department?

10   A    Miniatures designers.

11   Q    Do other defendants have bookcases?

12   A    Yes.

13   Q    What magazines on your bookshelf?

14   A    Some modelling magazines.

15   Q    What type of modelling magazines?

16   A    I think historical vehicles.

17   Q    Do you know the title of those magazines?

18   A    I can't remember.

19   Q    Are those magazines associated with Warhammer or Warhammer

20   40K?

21   A    No.

22   Q    So when you're thinking about an idea for a model, how

23   does that process start?

24   A    I usually look through the old army books relating to that

25   product.

Footitt - deposition

1  Q    So when you are looking through the old army books, what

2  kind of things do you look for?

3  A    I will look for the century of the model I will be making

4  and the pictures of the old version of the model, if there is

5  any.

6  Q    So if you will turn in that document to the page labeled

7  GW 0017786, it's near the back.  If you could take a look at

8  that and the next couple of pages through to GW 0017789.  And

9  let me know when you are finished looking at those.

10          Do you recognize these images?

11  A   Yes.

12  Q   Where do you recognize these images from?

13  A   Images I searched for.

14  Q   Why did you search for these images?

15  A   In relation to a project I was working.

16  Q   Which project was that?

17  A   The Lizardman Kroxigor.

18  Q   So what is a Lizardman Kroxigor?

19  A   A large humanoid lizard warrior.

20  Q   So why were you searching for these images?

21  A   I was looking to see how typically say Lizard skin would

22  crease, and looking at how the scale is patterned.

23  Q   Why is it important to look at how Lizard skin would

24  crease?

25  A   I want my models to look like they had more realistic

1  Lizard skin texture.

2  Q   And why is it important to look at how scales are

3  patterned?

4  A   The Kroxigor is going to have scales.  I was just curious

5  to see how real world lizards, how their scales looked."

6           THE COURT:  All right.  Is that it?

7           MR. ALY:  That's it.

8           THE COURT:  And then next we're going to have a live

9  witness, right?

10          MR. ALY:  Right.

11          THE COURT:  Please call the witness.

12          MS. GOLINVEAUX:  Your Honor, defendant calls William

13 Brewster.

14          (Witness sworn.)

15          THE COURT:  Let me get the lights back on here.

16     (Brief interruption.)

17          THE COURT:  Okay, you can go ahead.

18      WILLIAM BREWSTER, DEFENDANTS' WITNESS, DULY SWORN

19                     DIRECT EXAMINATION

20 BY MS. GOLINVEAUX:

21 Q   Good morning, Mr. Brewster.

22          Would you please introduce yourself to the jury?

23 A   My name is William Brewster.  I'm the curator of

24 collections for the First Division Museum at Cantigny Park in

25 Wheaton, Illinois.

1  Q   Sir, are you testifying today as an expert witness?

2           THE REPORTER:  Please spell your last name.

3           THE WITNESS:  Last name.  B-r-e-w-s-t-e-r.

4  BY MS. GOLINVEAUX:

5  Q   Mr. Brewster, will you please tell the jury what you were

6  asked to do as an expert in this case?

7  A   Yes.  I was asked to analyze images of Games Workshop

8  products that are presented in this case and to determine

9  their use of symbols and to see if the use of symbols was

10  consistent with historic military insignia and heraldic

11  design.

12  Q   And how did you go about determining that?

13  A   I assessed binders of images of Games Workshop products.

14  I compared them to images in reference books and working from

15  my own knowledge of military material culture.

16           THE COURT:  Pause for one second.  The lawyers will

17  correct me if I'm wrong, but I just wanted to let the jury

18  know this.

19           The PowerPoint that you are going to see from Mr.

20  Brewster is what we call a demonstrative exhibit.  It is not

21  going to be part of the evidence.  It's sort of a -- it's a

22  PowerPoint.  It's sort of a tool that he is going to use.  So

23  you will not have this.  So if you want to take notes on it,

24  feel free to do that.

25           Go ahead.

1  BY MS. GOLINVEAUX:

2  Q   Sir, how much time did you spend on your research in this

3  case?

4  A   30 to 40 hours.

5  Q   And are you being compensated for your work in this case?

6  A   I wasn't compensated for my research or the creation of

7  the report, only for my time in deposition and for time in

8  trial.

9  Q   How much time are you paid for your time testifying?

10  A   My hourly rate is $30 an hour.

11  Q   Did you say $30 an hour?

12  A   $30, yes.

13  Q   And why did you agree to serve as an expert witness in

14  this case without being compensated for your time spent

15  researching?

16  A   I thought it sounded like an interesting project.

17  Q   Is your compensation for time spent testifying linked to

18  the substance of your testimony today?

19  A   No, it is not.

20  Q   And, sir, have you reached any conclusions based on your

21  research and expertise?

22  A   Yes.  I found that there are symbols used in Games

23  Workshop products that are consistent with use in military,

24  historic military insignia and heraldic design.

25  Q   Sir, before we go into that, I would like to ask you some

1 questions about your background.

2 A    Yes.

3 Q    Can you please tell us about your current employer, the

4 First Division Museum at Cantigny Park?

5 A    Oh, yes.

6       THE COURT:  I think it's pronounced Cantigny, right?

7       THE WITNESS:  It is Cantigny.

8       MS. GOLINVEAUX:  Thank you, your Honor.

9       THE WITNESS:  The First Division Museum at Cantigny

10 Park is part of the Robert R. McCormick Foundation, wholly

11 funded by the McCormick Foundation.  It tells the history of

12 the First Infantry Division of the United States army from its

13 inception during World War I through the current conflicts.

14       The collection currently has 15,000 three-dimensional

15 objects.

16 Q    And what are your responsibilities as a curator?

17 A    I curate or I supervise a staff of three including an

18 assistant curator, a registrar and a collections manager, and

19 we're responsible for managing the collection of

20 three-dimensional objects associated with the history of the

21 division and working with donors to bring in new objects and

22 collections and then use those objects to present exhibits and

23 tell the history of the division.

24 Q    And, sir, how long have you been the curator at the First

25 Division Museum?

Brewster - direct

1   A    For about two and a half years now.

2   Q    Where were you before that?

3   A    I previously was a curator of collections for the

4   Wisconsin Veterans Museum in Madison, Wisconsin.

5   Q    And how long were you at the Wisconsin Veterans Museum?

6   A    I was the curator there for 16 years.

7   Q    And can you tell us about your role there?

8   A    There I curated a collection, again, of three-dimensional

9   objects relating to Wisconsin military history, all branches

10  of service, from the Civil War on up through the current

11  conflicts.

12         That particular collection contains about 27,000

13  objects, and I was responsible for developing it and growing

14  it by about 75 percent.

15  Q    Sir, have you published any articles in the field of

16  military history?

17  A    I published approximately 40 articles in the Wisconsin

18  Veterans Museum newsletter, the Bugle.

19  Q    And have you lectured in the field of military history?

20  A    Yes, I have also lectured at college and university level

21  on military material culture and also to professional groups

22  and other museum professionals.

23  Q    Now, sir, you have used the term "military material

24  culture" several times.  Can you explain to us what you mean

25  by that?

1   A    Sure.  Military material culture is the three-dimensional

2   objects that are created for use by the military and issued

3   out to soldiers that consists of the uniforms, equipment,

4   weapons, insignia and decorations and vehicles used in the

5   military.

6   Q   And how did you initially become interested in military

7   material culture?

8   A   I started probably when I was six years old.  I had a

9   grandmother who had my great aunt living with her, and my

10  great aunt had an antique store in the basement, and I spent a

11  lot of time in that antique store.

12          And there were also some foot lockers down in that

13  basement, and those foot lockers belonged to my grandfather

14  who served in the Mexican border, was commander of an infantry

15  company in the Fourth Division in World War I, and then went

16  on to serve in World War II from 1941 to 1947.

17          And his foot lockers were there and contained his

18  materials from his service, and I searched through them and

19  became very interested in that type of -- well, in that

20  material culture.

21          Starting in high school, I went on and spent my

22  summers volunteering as a curatorial assistant at then the

23  Wisconsin Veterans Museum, which was a Civil War museum in the

24  state capital.  I did that for two years, and then I went on

25  and volunteered at the Wisconsin Historical Society with their

1    military collections for another two years.

2    Q    Mr. Brewster, what is your educational background?

3    A    I have degrees in social services in juvenile counseling,

4    horology, which is watch and clock repair, and then also a

5    degree in historic preservation of museum studies.

6    Q    And have you ever worked for Chapterhouse Studios before

7    this case?

8    A    No, I have not.

9    Q    Have you ever worked for Games Workshop?

10   A    No, I have not.

11   Q    Before this case, had you ever heard of Games Workshop?

12   A    No.

13   Q    Or Chapterhouse?

14   A    No.

15   Q    Have you ever testified in court as an expert witness

16   before?

17   A    No.

18   Q    Thank you for the background.

19          I would like to turn your attention to the works that

20   Games Workshop claims are infringed in this case.

21          What were you asked to do, sir, to form an expert

22   opinion?

23   A    I was presented with binders of images of Games Workshop

24   products.  I assessed those images using my knowledge of

25   military material culture and insignia and then found

Brewster - direct

1  reference books that we have in the collection of the First

2  Division Museum that would support use or particular symbols

3  and insignia.

4  Q   What were you looking for when you examined the images of

5  Games Workshop's products?

6  A   I was looking for particular uses of symbols that are

7  typically found in military insignia.

8  Q   And did you find any such common elements?

9  A   Yes, I did.

10  Q   Now, did you analyze every one of Games Workshop's

11  products at issue?

12  A   No, I didn't create any kind of a chart.  I didn't chart

13  these products at all.

14  Q   And are you offering an opinion today on every Games

15  Workshop product at issue in the case?

16  A   No, I'm not.

17  Q   So which ones did you focus your attention on?

18  A   Particularly the use of chevrons, arrow crosses, skulls,

19  and blood drops.

20  Q   And so can you tell the jury how did you go about as you

21  reviewed the Games Workshop images, what were you looking for?

22  A   Well, I was looking for consistent use of any particular

23  type of insignia that might be found in military material

24  culture, historic military material culture.

25  Q   And how did you go about researching such insignia?

Brewster - direct

1    A    Again, I used my own knowledge of the insignia and in the

2    insignia design and then would consult reference books where I

3    might be able to find information that supported that.

4    Q    And does your employer maintain a reference library?

5    A    Yes.  We have a reference library of approximately 150 to

6    200 books on military material culture.

7    Q    Did you refer to the reference library in your research?

8    A    Yes, I do.

9    Q    Did you refer to any other books as part of your research?

10   A    Well, there is also a Collins guide which I received, a

11   Collins guide on arms and armor that was presented from, I

12   believe, the Games Workshop library, and I also did some

13   online research for a particular symbol.

14   Q    Did you review images of the Chapterhouse Studios products

15   in performing with your analysis?

16   A    I had a binder of the material, but that wasn't really

17   part of my consideration.

18   Q    And, sir, do you know when the Games Workshop game that is

19   at issue in this case was created?

20   A    I believe probably after the 1970s.

21   Q    Mr. Brewster, you have mentioned heraldry.  Can you

22   explain in general terms what heraldry is?

23   A    Yes, heraldry.

24        In the United States Army, each unit has a

25   distinctive unit insignia, and for our purposes in military

1  heraldry, those insignia will incorporate a collection of

2  symbols that somehow tell the history of the particular unit.

3  Q    How is heraldry relevant to your work, sir?

4  A    Again, our museum tells a story of the United States Army

5  Division that is made up of various components, and each of

6  the subunits within the division have their own distinctive

7  unit insignia and heraldry.

8  Q    Are you an expert in medieval heraldry?

9  A    No, I'm not.

10  Q    But you encounter heraldry as it relates to modern

11  material military culture, is that correct?

12  A    Yes, absolutely.

13  Q    So I would now like to ask you some questions about the

14  specific symbols that you saw in Games Workshop's works.

15        Let's start with chevrons.  So what is a chevron?

16  A    A chevron is two bars that terminate in a point and that

17  can be oriented.  The point can be oriented upward or

18  downward, so in a V or in an inverted V shape, or

19  horizontally.

20  Q    And are chevrons encountered in military insignia?

21  A    Yes.  Chevrons are regularly encountered in military

22  insignia, particularly in United States military insignia,

23  starting in the 19th century.

24        They are commonly used for rank, insignia for non-

25  coms or for noncommissioned officers, sergeants, corporals,

Brewster - direct

1    and for enlisted men.

2            And they are also used at times in current military

3    for unit designators, armored unit designators.

4    Q    Now, Mr. Brewster, I'm showing you what has been marked as

5    PX-1020 at entry 50.  This is an example of one of

6    Chapterhouse's accused products in the case.

7            What is the design element on this product?

8    A    That appears to be a shoulder pad that incorporates a

9    single chevron.

10   Q    I'm now showing you examples of Games Workshop's claimed

11   works from Plaintiff's Exhibit 1020, entry 50 and entry 52.

12           What symbols do you see on these works?

13   A    Again, I believe those are two shoulder pads that

14   incorporate forms of chevrons and Roman numeral.

15   Q    Sir, have you brought images of chevrons appearing in

16   military material culture to discuss today?

17   A    Yes.

18   Q    Let's look at those.

19           I'm showing you now in the upper right corner, we're

20   seeing the two images from Plaintiff's Exhibit 1020 that we

21   just looked at, 50 and 52.

22           What is in the rest of the screen?

23   A    That's an image of an M1A1 Abrams tank, a United States

24   military tank, in the Gulf War, and it is incorporating two

25   different chevrons on the skirt around the body of the tank, a

1    single large chevron and then a chevron with number 3.

2    Q    And during what time period was this particular insignia

3    used?

4    A    In this case, that's a unit designator.  That dates from

5    the Gulf War from 1990 to 1991.

6    Q    Mr. Brewster, what is this book?

7    A    That's Stein's History of U.S. Heraldic Crests.

8    Q    Is this one of the reference books that you consulted in

9    looking for examples?

10   A    Yes.

11   Q    Again, we show examples of two of Games Workshop's claimed

12   works up in the upper right-hand corner.

13          Mr. Brewster, what are we looking at at the rest of

14   this slide here?

15   A    That's a distinctive unit insignia for the 198th armed

16   regiment.  You can see it's a shield that incorporates a

17   single chevron with a dragon design and a motto at the bottom.

18   Q    Sir, during what time period was this insignia used?

19   A    Starting in the late 1960s and onward.

20   Q    And -- oh, sorry.

21          For the record, the last crest he was discussing is

22   Defendants' Exhibit 285 at pages 97 and 101.

23          Sir, I'm now showing you images from Defendants'

24   Exhibit 285 at pages 98 and 103.

25          What are we looking at here?

1  A    This image is from Stein's Heraldic Crests, and it is

2  another distinctive unit insignia from the 89th Army Reserve

3  command.  And in this particular image, it's using a pair of

4  chevrons with a torch and two fleur de lis.

5  Q    And, sir, during what time period was this insignia used?

6  A    In the late 1960s into the early 1970s, or into the 1970s.

7  Excuse me.

8  Q    Let's turn to arrows.  Did you see examples of arrows in

9  the works that Games Workshop is claiming in this case?

10  A    Yes, I did.

11  Q    Now, can you tell me which specific works contained

12  arrows?

13  A    Not individual pieces.  I didn't chart individual pieces.

14  Q    And are arrows encountered in military insignia?

15  A    Yes, they are.

16  Q    In what form?

17  A    They're incorporated into shoulder insignia and into

18  distinctive unit insignia.

19  Q    Mr. Brewster, I'm showing you an example of one of

20  Chapterhouse's products that is accused in this case.

21        This is from Plaintiff's Exhibit 1020, entry 55.  Can

22  you describe the symbol you see on that?

23  A    Yes.

24  Q    What is that?

25  A    That's an -- again, I believe it's a shoulder pad that is

1  using a single arrow symbol.

2  Q   I'm showing you now examples of Games Workshop's claimed

3  works in this case from Plaintiff's Exhibit 1020, images from

4  entry 56.

5        Can you describe the symbol we're looking at here?

6  A   Yes.  There are two shoulder pads, each with a single

7  arrow on them.

8  Q   And is this type of arrow typical of arrow designs that

9  you are familiar with from military insignia?

10  A   It's the most basic form of arrow, so, yes, certainly.

11  Q   Sir, I'm now showing you the cover from Defendants'

12  Exhibit 285.  This is page 12.  Can you tell us what resource

13  we're looking at here?

14  A   That's Britton's U.S. Military Shoulder Patches of the

15  United States Armed Forces.

16  Q   Sir, is this one of the books from your reference library

17  at work?

18  A   Yes, it is.

19  Q   Now, I'm showing you an enlarged image of one of the

20  symbols that appears on Defendants' 285, page 12.  What are we

21  looking at here?

22  A   That's the shoulder insignia of the first logistical

23  command.

24  Q   During what time period was that particular insignia used?

25  A   1960s, 1970s.

1  Q    Sir, I'm showing you what's been marked Defendants'

2  Exhibit 285 at pages 100 and 104.

3        Where did you find these images and what are we

4  looking at here?

5  A    Those images are from Stein's U.S. Army Heraldic Crests,

6  and that particular image is distinctive unit insignia from

7  the 562nd Air Defense Artillery, and it incorporates an arrow

8  piercing a second arrow with a winged dragon on a shield.

9  Q    During what time period was this insignia approved?

10 A    Through the 1960s.

11 Q    And I'm showing you what has been marked as

12 Defendants' 285 at pages 100 and 109.

13       Where is this from and what are we looking at here?

14 A    And that's from Stein's Heraldic Crests.  That's the

15 distinctive unit insignia of the Third Artillery.  It

16 incorporates a barred arrow in the upper field, a pair of

17 chevrons with arrows, a dragon, a fleur de lis, and I believe

18 that's a thistle on a shield.

19 Q    So let's turn to another symbol that you encountered in

20 Games Workshop's works.

21       The cruciform, can you tell us what a cruciform is?

22 A    In this sense, a cruciform is made of two bars that create

23 an X, and that's also referred to as a St. Andrews cross.

24       And this particular form that we're examining is

25 called an arrow cross.  There are arrow points at the ends of

1   each arm of the cross.

2   Q   And what is the history of this particular form of arrow

3   cross?

4   A   Well, it's most associated with Neo-Nazi and white

5   supremacy movements in the post World War II era, but you also

6   find it incorporated into military distinctive unit insignia

7   with no association with the supremacy groups.

8   Q   Does this particular form of cruciform have a name?

9   A   An arrow cross.

10  Q   Arrow cross?

11  A   Yes.

12  Q   I'm showing you an example of one of Chapterhouse's

13  accused products.  This is from Plaintiff's Exhibit 1020 at

14  entry 47.

15          What symbol do you see on this product?

16  A   It appears to be a shoulder pad that incorporates an arrow

17  cross there.

18  Q   And did you see examples of cruciforms in the works that

19  Games Workshop is claiming in this case that you reviewed?

20  A   Yes, I did.

21  Q   I'm showing you examples of Games Workshop's claimed works

22  from Plaintiff's Exhibit 1020 images, from image 46.  What

23  symbol do we see on these works?

24  A   Well, there's a shoulder pad and then two standalone

25  insignia.  They all incorporate the arrow cross.  Two of them

1   also incorporate Roman numerals.

2   Q   What form of -- is this the -- strike that.

3           Is this the form of cruciform that you were

4   describing earlier as an arrow cross?

5   A   Yes, it is.

6   Q   Mr. Brewster, I'm showing you an image from Defendants'

7   Exhibit 285 at page 94.

8           What are we looking at here?

9   A   That's an image, again, from Stein's U.S. Army Heraldic

10  Crests, and that is the distinctive unit insignia of the 125th

11  Air Traffic Control Battalion.  It incorporates, again, an

12  arrow cross with a yin and yang -- yin and yang, a Korean

13  symbol, and then lightning bolts at the top.

14  Q   During what time period was this particular insignia

15  approved?

16  A   That would have been in the 1980s.

17  Q   I'm sorry?

18  A   Late 1970s and early -- or into the 1980s.

19  Q   And I'm showing you an image from Defendants' 285 at

20  pages 94 and 97.

21          Mr. Brewster, what are we looking at here?

22  A   That is, again, from Stein's U.S. Army Heraldic Crests.

23  That's a distinctive unit insignia for the 50th Armor.

24          That presents a shield with an artillery piece,

25  cactus, again, a Korean symbol and then St. Andrews cross in

1  the canton.

2  Q   During what time period was this insignia used?

3  A   In the later 1960s.

4  Q   Let's turn to Roman numerals.

5       Are you aware of examples of Roman numerals in

6  military insignia?

7  A   Yes.

8  Q   How are -- strike that.

9       How are Roman numerals used?

10  A   Roman numerals are used as unit designators in the United

11  States military.

12  Q   And I'm showing you examples of Games Workshop's claimed

13  works in this case from Plaintiff's Exhibit 1020 at entries

14  46, 47 and 50.

15       What symbols do you see on these works?

16  A   And there are arrows, chevrons and also the arrow cross

17  that all incorporate Roman numerals, in particular with the

18  arrows and numerals in series.

19  Q   Mr. Brewster, I'm showing you an image from

20  Defendants' 285 at page 19.

21       What are we looking at here?

22  A   That's from U.S. military shoulder patches by Britton, and

23  those are shoulder insignia for marine air wings.  Again, they

24  incorporate several symbols, stars, wings, and Roman numerals

25  in series to designate units, specific marine air units.

1    Q    Which symbol is designating the particular unit?

2    A    The Roman Numeral I, II, III, and IV.

3    Q    During what time period were these insignias used?

4    A    World War II.

5    Q    Mr. Brewster, I'm showing you an image from Defendants'

6    Exhibit 285 at page 18.

7              What are we looking at here?

8    A    Again, those are from U.S. military shoulder patches by

9    Britton, and they are again representing marine air wings, and

10   they incorporate the marine eagle globe and anchor, wings and

11   then again Roman numerals in series designating the particular

12   air wings.

13   Q    The Roman numerals designate what?

14   A    The marine air wings.

15   Q    And during what time period were these used?

16   A    In 1940s, 1950s.

17   Q    Mr. Brewster, I'm showing you an image from Defendants'

18   Exhibit 285 at page 16.

19              What are we looking at here?

20   A    Those are from Britton's U.S. Military Shoulder Patches.

21   They are shoulder insignia for United States Army Corps and

22   logistical commands.  They are incorporating, again, several

23   symbols, in particular, numbers or Roman numerals in three

24   examples.

25   Q    During what time period was this in use?

Brewster - direct

1    A    World War II.

2    Q    Let's turn to blood drop symbols.

3            Are you familiar with examples of the use of blood

4    drops in military insignia?

5    A    Yes.  Blood drops appear singly and in multiples in

6    different U.S. military insignia from the 1940s onward through

7    into the 1960s.

8    Q    Did you see them in the military insignia from the Vietnam

9    conflict period?

10   A    Well, specifically from the Vietnam conflict period,

11   that's where you see the proliferation of the use of blood

12   drops, specifically in small unit patches, special forces,

13   unit insignia patches that were designed for them at the time

14   during the Vietnam War.

15   Q    Did you identify the use of blood drops in the Games

16   Workshop's works that you reviewed --

17   A    Yes, I did.

18   Q    -- in forming your opinion?

19           I'm showing you examples of Games Workshop's claimed

20   works in this case for Plaintiff's Exhibit 1020 at entries 4

21   and 12.

22           Are these consistent with images you reviewed of

23   Games Workshop's works in forming your opinion?

24   A    Yes, they are.

25   Q    What symbols do we see here?

A    One symbol -- it appears to be two different shoulder
pads.  One of them incorporates the use of a bird with a
single blood drop.

          And the other appears to be a shoulder pad that
incorporates a circular saw blade with a single blood drop.

Brewster - direct

1  Q    Mr. Brewster, I'm showing you an image from Defendant's

2  Exhibit 286 at page 1.  What are we looking at here?

3  A    That is a shoulder sleeve insignia.  That's one where I

4  worked with the original piece.  A shoulder sleeve insignia of

5  the Surgical Team Bravo, which is a United States Navy

6  surgical team that operated off of a hospital ship during the

7  Vietnam War.  And it incorporated a collection of symbols,

8  again, to include a trident, a helicopter rotor blade, a

9  scalpel and multiple blood drops.

10  Q    During what time period was this particular insignia used?

11  A    Mid 1960s.

12  Q    I'm showing you an image from Defendant's Exhibit 286 at

13  page 2.  What are we looking at here?

14  A    That image is from Britain's U.S. military shoulder

15  patches.  That is the shoulder insignia of the 63rd Infantry

16  division, and it incorporates a flame and a dagger and a

17  single blood drop.

18  Q    This is a shoulder insignia, you said?

19  A    A shoulder insignia, correct.

20  Q    During what time period was this used?

21  A    1940s during World War II.

22  Q    I'm showing you an image from Defendant's Exhibit 286 at

23  page 18.  Mr. Brewster, what are we looking at here?

24  A    That image is from Tucker's shoulder -- or History on

25  Their Shoulders, and that is a small unit insignia for

1   Reconnaissance Team New York Command and Control Central.

2   That was a small reconnaissance team that operated during the

3   Vietnam War.  And it incorporates a grim reaper with a sickle

4   with the moon and mountains and a trail and then a single

5   blood drop coming from the end of the sickle.

6   Q   So what time period was this insignia used?

7   A   Mid to late 1960s.

8   Q   Mr. Brewster, let's talk about the use of skulls in

9   military insignia.  Are you familiar with the use of skulls in

10  military iconography?

11  A   Yes, I am.

12  Q   And how do you encounter skulls in military iconography?

13  A   The German military, both the Imperial German military and

14  the Nazi regime during World War II, used skulls as insignia,

15  so they really started in use in 1900 and on up through 1945

16  within the German military, and then again they were

17  incorporated into American Special Forces small unit insignia

18  during the Vietnam conflict.

19  Q   And do you see the use of skulls in the Games Workshop

20  works you examined in this case?

21  A   Yes.

22  Q   I'm showing you examples of Games Workshop's claimed works

23  in the case from Plaintiff's Exhibit 1020 at entries 3 and 19.

24  What symbols do you see here?

25  A   There are skulls incorporated into all of the -- all three

1  of these figures, and then in the center figure there's a --

2  appears to be a shoulder pad that uses a skull as a symbol.

3  Q    And is this use of skulls consistent with the use of

4  skulls you saw in the images of Games Workshop's works that

5  you examined in forming your opinion?

6  A    I didn't chart individual pieces, but generally, yes.

7  Q    In your opinion, is there anything unique about depicting

8  a skull in military insignia?

9  A    No.

10  Q    I'm showing you an image from Defendant's 285, page 72.

11  What are we looking at here?

12  A    That's a cover of Kraus's book The German Army in the

13  First World War: Uniforms and Equipment.

14  Q    And is this a book you consulted in forming your opinions

15  in this case?

16  A    Yes, I did.

17  Q    Mr. Brewster, I'm showing you an image from Defendant's

18  Exhibit 285 at page 82.  Could you please describe what we're

19  looking at here?

20  A    That is a skull insignia, actually in that case a fairly

21  large skull insignia that was used on a piece of German

22  headgear, Imperial German headgear from the First World War.

23  Q    Where is this image from?

24  A    That is from Kraus's book on The German Army in the First

25  World War: Uniforms and Equipment.

1    Q    I'm showing you images from Defendant's Exhibit 285 at

2    page 79. What images are we looking at here?

3    A    Those are images presented, again, in Kraus's German Army

4    in the First World War. They are excerpted from a pre-World

5    War I catalog of German unit military insignia, and in that

6    particular case that insignia is for an infantry regimen, and

7    then use of the skull down here is for a regimen of Hussars.

8    Q    What time period are we talking about for these symbols?

9    A    Really 1900 through World War I.

10    Q    Showing you an image from Defendant's Exhibit 286 at page

11    19, what are we looking at here?

12    A    That is from Tucker's History on Their Shoulders. That's

13    a skull wearing a green beret, so that is a specific unit

14    insignia for a United States Army Special Forces.

15    Q    During what time period were these symbols used?

16    A    Mid to late 1960s.

17    Q    Mr. Brewster, we've reviewed a number of symbols from

18    various resource books. Are these symbols that you used in

19    forming your opinion in this case?

20    A    Yes.

21    Q    And can you recap for the jury what your main conclusion

22    is?

23    A    Well, I again reviewed the materials presented and found

24    that particular symbols that are used by Games Workshop to

25    create insignia are also symbols that are found in use by the

Brewster - cross

1   United States military for their insignias and heraldic unit

2   designators.

3           MS. GOLINVEAUX:  Thank you, sir.

4           THE COURT:  Mr. Keener.

5                       CROSS EXAMINATION

6   BY MR. KEENER:

7   Q   Good morning, Mr. Brewster.

8   A   Good morning.

9   Q   I'm going to see where we can reach agreement because I

10  think we're going to agree about a lot of what you said today.

11          Now, you're an expert in military history, correct?

12  A   Military material culture, yes.

13  Q   You're not an expert in miniature war gaming?

14  A   No.

15  Q   Or any experience in Warhammer 40K?

16  A   No.

17  Q   And you've had no experience in miniature war gaming at

18  all since a couple of years in your teen years?

19  A   Yes.  That's accurate.

20  Q   And you're not offering any opinions whether or not

21  Chapterhouse copied any Games Workshop symbols or designs,

22  right?

23  A   No.

24  Q   And you didn't attempt to identify any similarities or

25  differences between the two products?

1   A   No, I did not.

2   Q   And you're not offering any opinion that Games Workshop

3   copied or even referred to any of the pictures you showed

4   during your presentation in creating and designing the icons

5   and designs they made, correct?

6   A   Correct.

7   Q   And you're not offering any opinion that Chapterhouse

8   looked at or was aware of or used any of the pictures you

9   showed in the creation of their designs, right?

10  A   Right.  Yes.

11  Q   Now, you're the expert who's been involved in this case

12  for a few years now, right?

13  A   Through last -- yeah, through last year.

14  Q   So you're the one who looked at all the products from the

15  first part of the case, though, 124 or 25 products?

16  A   Yes.  The initial group of products.

17  Q   If we can call up Plaintiff's Exhibit 1020.

18          And so on the left-hand side there's some

19  Chapterhouse products, and on the right side, hopefully, we

20  have some images that seem familiar to you from the big tabbed

21  book you looked at of various Games Workshop products; is that

22  right?

23  A   Yes.

24  Q   And there's a large number of products in this first set

25  of claim charts that you're not making any opinion on

Brewster - cross

1  whatsoever, right?

2  A   That's correct.

3  Q   For example, on this first page we see war hammers or

4  Games Workshop calls it a thunder hammer.  You're not offering

5  any opinions on those products?

6  A   No.

7  Q   If you can turn to page 17.  One more, 18.

8          We see icons such as these curled snake designs on

9  shoulder pads, so various icons like that other than the ones

10  that you testified about you're not offering any opinion on,

11  right?

12  A   No.

13  Q   Let's turn to page 29.

14          And various weapons in the case like these combi

15  weapons, you're not offering any opinion today on any of the

16  weapons in the case, right?

17  A   No, I'm not.

18  Q   Let's turn to page 35.

19          And the jury has heard about these weird and strange

20  races like Tyranids or Eldar.  You're not offering any opinion

21  that any of those are in prior military history, right?

22  A   No, I'm not.

23  Q   Now, even the basic design of the shoulder pad itself, in

24  this case that the jury has heard a lot of testimony about,

25  you haven't offered any opinion about that being a common

1  design in military history, right?

2  A    No.

3  Q    And the trademark issues in this case, the names Games

4  Workshop uses to identify its various insignia, you're not

5  offering any opinion on whether any of those names are common

6  or have ever been used in military history?

7  A    No.  I wouldn't be qualified to do that.

8  Q    Now, the jury has heard that they need to figure out if

9  certain images are indispensable or standard in the field of

10  science fiction or tabletop war gaming to help them determine

11  if there's copyright infringement in this case.  Now, you're

12  not expressing any opinion on any design elements that are

13  indispensable in a fantasy military world, right?

14  A    No, I'm not.

15  Q    Or even what design elements might be common in designing

16  a fantasy military world?

17  A    No.

18  Q    Now, let's talk about the insignias that you did mention.

19  In all of the shoulder pads that you looked at from prior

20  military history, you did not find a single shoulder pad with

21  any insignia or design on them, did you?

22  A    No, I didn't.

23  Q    So that combination of the unit insignias on an armored

24  shoulder pad is something you could not find anywhere in prior

25  military history?

Brewster - cross

1  A   Correct.

2  Q   In fact, you would agree with me that it would be uncommon

3  in military history to put a design or insignia on an armored

4  shoulder pad?

5  A   I didn't find any examples.

6  Q   So you would agree with me that would be an uncommon

7  combination?

8  A   On a shoulder pad, yes.

9  Q   And you talked about various elements, chevrons and arrows

10 and so forth.  You're not expressing any opinion that any

11 particular design of one of those elements is common in

12 military history, right?

13 A   Could you repeat the question?

14 Q   Yeah.

15       For example, a skull.  You testified skulls are

16 commonly used.  You're not offering any opinion that any

17 particular design of a skull is common in military history?

18 A   No.

19 Q   And you saw a lot of the Games Workshop symbols or

20 combinations of things, a blood drop with a raven?  You saw

21 that?

22 A   Yes.

23 Q   And you're not offering any opinion on what combinations

24 of design elements might be common in military history?

25 A   No.

Brewster - cross

1    Q    Now, you agree there's lots of different combinations you

2    could have in designing an insignia, lots of different

3    elements you could combine?

4    A    Certainly.

5    Q    There's almost an infinite amount of variability there?

6    A    Yes.

7    Q    And so you're not expressing out of that infinite amount

8    of designs which one of those might be common or standard in

9    military history?

10   A    No.  Only the elements.

11         MR. KEENER:  MR. KEENER:  Can we pull up Brewster 15.

12   BY MR. KEENER:

13   Q    So here's one of the insignias that you testified about a

14   few minutes ago, right?

15   A    Yes.

16   Q    I want to talk about the concept of a unit insignia.  Now,

17   the purpose of an insignia is to uniquely identify this unit

18   as opposed to other units out there, right?

19   A    It's a distinctive unit insignia.  Correct.

20   Q    So the actual idea in designing the insignia is to make

21   something unique and different and not used before?

22   A    To tell the history of a unit, yes.

23   Q    So you would agree with me that it would be

24   counterproductive and quite uncommon to find two units in

25   military history with the identical insignias?

Brewster - cross

1    A    Yes.

2    Q    Let's turn to Brewster 5.

3         So this is a picture you used for the chevron, right?

4    A    Yes.

5    Q    Now, your expert testimony is solely limited to the

6    concept of a chevron has been used in military history before,

7    right?

8    A    That the chevron has been used in military history?

9    Q    Right.  But not any particular design of a chevron is

10   common?

11   A    No.  There's many different designs of chevrons.

12   Q    And you didn't find any examples in all of the material

13   you looked at of any chevrons being used in shoulder pads as

14   it is in Games Workshop's and Chapterhouse's product?

15   A    No.

16   Q    And you're not expressing any opinion on whether in

17   designing a future military universe it would be common to use

18   chevrons as a design element?

19   A    No, I'm not.

20   Q    Let's turn to Brewster 7.

21        Now, again, this is not a shoulder pad, right?

22   A    Correct.

23   Q    And this unique insignia is a chevron with a dragon and a

24   slogan or motto underneath it?

25   A    Correct.

Brewster - cross

1    Q    And Chapterhouse did not use this insignia design on any

2    of its products that you saw, right?

3    A    Chapterhouse?

4    Q    Yeah.

5    A    Not that I'm aware of.

6    Q    And Games Workshop never used this insignia either, right?

7    A    Not that I'm aware of.

8    Q    Turn to page 8.

9        Another insignia that has a chevron in it, actually

10    two chevrons?

11    A    Yes.

12    Q    And this unique identifying design of two chevrons with a

13    torch and two fleur de lis, you didn't find that design on any

14    Games Workshop product, right?

15    A    Not that I saw.

16    Q    And Chapterhouse could have designed an insignia like

17    this, but you didn't see that in any Chapterhouse products

18    either, right?

19    A    No.

20    Q    Let's talk about arrows.  Can we go to page 13.

21        Now, you agree that you could design a unit insignia

22    with an arrow in, again, almost an infinite number of ways,

23    right?

24    A    Certainly.

25    Q    And here's an example of an arrow kind of pointing at a

1  diagonal direction inside of concentric circles?

2  A   Correct.

3  Q   And you didn't find that unique design on any Games

4  Workshop products?

5  A   No.

6  Q   And Chapterhouse could have used that design, and you

7  didn't see that on any Chapterhouse products?

8  A   I didn't really look at Chapterhouse products.

9  Q   You looked at a few during your direct, right?

10 A   Oh, yes.  Yes, certainly.

11 Q   So the ones you have looked at you haven't seen this

12 design anywhere?

13 A   No.

14 Q   So the extent of your opinion is the concept of using an

15 arrow somewhere in an insignia is a common element but not

16 that any particular design with an arrow is a common design?

17 A   Correct.

18 Q   So you're not offering any opinion that these unique

19 insignias Games Workshop came up with are somehow common in

20 military history?

21 A   Only that the arrow is a common element.

22 Q   I think if we turn to page 14 it might be the same.

23      Now, here we see I think you called it an arrow

24 inside of another arrow piercing a dragon with a logo on the

25 bottom, a motto?

Brewster - cross

1    A    Yes.

2    Q    And, again, no one in this case has used that insignia

3    design, right?

4    A    No.

5    Q    And page 15.

6         I think this is the one we looked at already.

7    This -- it's a very complicated design with arrows going

8    sideways and bars and a fleur de lis, then some chevrons and

9    stars and even more stuff going on.  No one in this case has

10   used that design for anything, right?

11   A    No.

12   Q    Your opinion is just that it's common to use arrows?

13   A    Correct.

14   Q    Let's talk about the arrow cross.  Slide 19.  I'm sorry,

15   20.

16        So here again we've got an arrow cross design with

17   dashed lines through it in kind of a yin-yang symbol, a motto,

18   and I don't know what's at the top here, some other design on

19   the top, right?

20   A    Lightning bolts.

21   Q    Lightning bolts.

22        And is the opinion kind of the same, no one in this

23   case has actually used this design on any product?

24   A    Correct.

25   Q    And your testimony is just that the concept of an arrow

1    cross has been used before in military history?

2    A    In insignia, yes.

3    Q    But not any particular design of an arrow cross?

4    A    In combination or --

5    Q    I don't think I've heard any opinion from you that any

6    particular design of a cruciform or arrow cross is common in

7    military history.  You didn't offer that opinion, did you?

8    A    No.

9    Q    And, again, you never found an example of an arrow cross

10   on a shoulder pad anywhere in military history?

11   A    No.

12   Q    Page 21.

13        Now, I'm not sure if we even call this one an arrow

14   cross, right?  I don't see arrow points on it.

15   A    It's pretty much a cruciform.

16   Q    So it's a cruciform, so a different type of cruciform than

17   the ones used by Chapterhouse and Games Workshop?

18   A    Yes.  Without the arrows.

19   Q    And, again, a lot of other symbols were used to combine

20   together to make this unit insignia you showed?

21   A    Correct.

22   Q    And no one in this case copied that insignia?

23   A    No.

24   Q    Let's talk about Roman numerals, 24.

25        I think your opinion is the same here, right?  You

1    didn't find any shoulder pads with Roman numerals on them,

2    right?

3    A    Correct.

4    Q    And you didn't find any Roman numerals combined with

5    arrows on them?

6    A    No.

7    Q    Or any Roman numerals combined with chevrons?

8    A    Correct.

9    Q    Or any Roman numerals combined with arrow crosses?

10   A    Correct.

11   Q    So the combination of elements Games Workshop chose to

12   design its unit insignias for shoulder pads, you didn't find

13   them anywhere in military history, right?

14   A    Correct.

15   Q    Your opinion is just by itself a Roman numeral has been

16   used in military history before?

17   A    Roman numerals in a series, yes.

18   Q    And what about the particular series Games Workshop uses?

19   Do you understand that they use Roman numerals I through VI

20   for a very particular type of unit, VII to VIII for another

21   unit and IX to X for a third type of unit?

22   A    No, I'm not aware of that particular --

23   Q    Assume for me they use Roman numerals I through VI with

24   the arrow to describe their tactical everyday Space Marines

25   and Roman numerals VII and VIII with the arrow cross to

Brewster - cross

1    describe their assault close combat, you know, sword and axe

2    type Space Marines, and then they use IX and X for their

3    chevron design to designate the guys with the big, heavy

4    weapons and lascannons and laser cannons and so on.  Do you

5    understand that?

6    A    Sure.

7    Q    You didn't find anywhere in modern military history or

8    prior military history where anyone else has used that kind of

9    sequence of Roman numerals associating with those particular

10   types of units, did you?

11   A    No.

12   Q    Let's go to slide 29.

13        Blood drops.  Is your opinion here pretty much the

14   same, that the concept of having a blood drop somewhere on an

15   insignia has been used before but not any particular insignia

16   design incorporating blood drops?

17   A    Correct.

18   Q    So the examples we see here of the blood drop inside of a

19   raven or a blood drop inside of a sawblade, you didn't have

20   any opinion that those combinations are common anywhere in

21   military history?

22   A    No.

23   Q    In fact, you didn't find any insignias that are even

24   similar to those designs, right?

25   A    No.

Brewster - cross

1    Q    And while we do see an example of an insignia with a blood

2    drop on it, I think you would agree with me that it is

3    actually uncommon in military history to use a blood drop

4    design for a unit insignia, right?

5    A    Or more common within that Special Forces unit insignia of

6    World War II.

7    Q    Right.  So in a specific branch of Special Forces in a

8    particular military you have found an example of an insignia

9    with a blood drop, but in the military history in general that

10   you looked at it's actually quite uncommon to see blood drops

11   as part of an insignia?

12   A    Yes.

13   Q    Let's talk about skulls.  Page 33.

14        These are some of the skull products you looked at,

15   right?

16   A    Yes.

17   Q    Now, on this product from image three you understand

18   what's at issue is the helmet with the skull design

19   incorporated into the Space Marine helmet?  Do you understand

20   that?

21   A    Okay.  Sure.

22   Q    You're not making any opinion today on whether or not this

23   skull design incorporated in a helmet for product three is

24   somehow common in military history, right?

25   A    No.

1   Q   And beyond this skull design on a shoulder pad, do you

2   notice how it's missing the lower jaw?

3   A   Yes.

4   Q   Now, you haven't offered any opinion that that particular

5   skull design missing a lower jaw is somehow common in military

6   history, right?

7   A   No.

8   Q   And I think there's some other skull designs at issue in

9   this case that we didn't see.

10          Can we go to Plaintiff's Exhibit 1020 at page 15.

11          Now, here we see on both the Games Workshop and the

12  Chapterhouse products this skull design that's --

13          Can we blow one of these up?

14          It's a skull design again missing the lower jaw with

15  two downturned horns, kind of a nonhuman skull.  Do you see

16  that?

17  A   Yes.

18  Q   Now, you didn't find any design like that anywhere in

19  prior military history, right?

20  A   No.

21  Q   Actually you agree with me that showing these types of

22  nonhuman skulls is quite uncommon in military history?

23  A   Yes.

24  Q   And how about page 22.

25          Another skull design at issue -- if we could blow it

1   up -- that Games Workshop uses for its Chaos Space Marines is

2   we've got this skull with flames coming out of the head that

3   both Games Workshop and Chapterhouse use, right?

4   A   Yes.

5   Q   And you haven't identified anywhere in prior military

6   history where someone has used that type of design, right?

7   A   No.

8   Q   So, again, it's just the concept of putting a skull

9   somewhere on an insignia has been done before in military

10  history?

11  A   Correct.

12  Q   But not even on a shoulder pad?  You couldn't find any

13  example of a skull on a shoulder pad, right?

14  A   No.

15          MR. KEENER:  Thank you, Mr. Brewster.  I don't have

16  any further questions for you.

17          THE COURT:  Redirect?

18          MS. GOLINVEAUX:  No.

19          THE COURT:  Any questions from any of the jurors?  I

20  don't think I see anybody writing.

21          Okay.  The witness is excused.

22          We're going to take our mid-morning break, and then

23  when you come back I think you're going to hear another

24  deposition.

25          All rise.  The jurors can come with me.

Hodgson - deposition

1     (Recess taken.)

2     (The following proceedings were had in the presence

3     and hearing of the jury:)

4     THE COURT:  Everybody can have a seat.  We're going

5  to hear the deposition of?

6     MR. ALY:  Neil Hodgson.

7     THE COURT:  Neil Hodgson, N-E-I-L, H-O-D-G-S-O-N.

8   NEIL HODGSON, DEFENDANT'S WITNESS, THROUGH DEPOSITION

9                      DIRECT EXAMINATION

10  Q   Please state your name and spell it for the record.

11  A   It's Neil John Hodgson.  That's N-E-I-L, J-O-H-N,

12  H-O-D-G-S-O-N.

13  Q   And could you please identify your current employer?

14  A   Games Workshop.

15  Q   What's your current position?

16  A   It's graphic illustrator.

17  Q   What are your general duties and responsibilities?

18  A   To produce artwork for Games Workshop.

19  Q   And what type of artwork do you produce?

20  A   Iconographic, shields, banners, color schemes.

21  Q   Do you use reference materials as part of your work?

22  A   Yes.

23  Q   Can you describe the reference materials you use?

24  A   Yes.  Everybody who works in the studio or most of the

25  creative people who work in the studio and some have a library

Hodgson - deposition

1    of books like medieval armor and stuff like that through the

2    ages and flavor pieces, really.

3    Q    Now, when you say flavor pieces, what do you mean by that?

4    A    It's to get reference for shapes of armor or how armor

5    will fit together so that you can see that when you draw maybe

6    something like that, how it's supposed to hang on the body

7    properly and all that kind of stuff, so.

8    Q    Are there other type of reference material that you use

9    besides the ones related to armor?

10   A    Weapons, tanks, World War II, World War I, classic, all

11   sorts, so.

12   Q    Anything else you can think of?

13   A    I use the Internet sometimes as well to reference things,

14   but I generally try not to do that.

15   Q    What type of things on the Internet would you try to

16   reference?

17   A    I generally use it to search through our archive stuff

18   because it's easier to call up an image on the screen rather

19   than try and troll through hundreds of issues, back issues of

20   White Dwarf.

21   Q    You would use previously published Games Workshop material

22   as a reference?

23   A    Absolutely.

24   Q    Anything else through the Internet that you use as a

25   reference?

1  A   Not that I could cite and give a specific example of, no,

2  no.  Goggle Images is great for seeing what things look like,

3  generally.

4  Q   Can you give me an example of something on Google Image

5  you looked at to see what it looked like generally?

6  A   No.

7  Q   But it is something you have used as part of your work?

8  A   Yes, sure.

9  Q   Do you have a personal library at work, a reference

10  library that you use at work?

11  A   No, not a personal one.

12  Q   And is there a reference library --

13  A   We have a collection of books.  You wouldn't exactly call

14  it a great library, but, yes.

15  Q   And is that something maintained by a specific person or

16  is it --

17  A   No.

18  Q   Can you describe what that is?

19  A   It tends to be -- I think we've got -- we had a

20  subscription to National Geographics.  We have that as a -- we

21  have that as a reference.

22      We have -- and then, just, as I said, all the books,

23  there's an interesting texture in this book or, you know, look

24  at the way that the rust is hanging off of that old tank, that

25  kind of stuff.  It's a technique and detail kind of thing.

Hodgson - deposition

1    Q   And if you had to estimate, how many of these types of

2    reference books are there at work?

3    A   I couldn't because they're all over the place.

4    Q   More than five?

5    A   Yes.

6    Q   More than 25?

7    A   Probably.

8    Q   And based on your experience at work, who uses these

9    reference materials?

10    A   Most people I should think.

11    Q   You also mentioned before you use other artists as

12    reference?

13    A   Yes.

14    Q   And can you clarify what you mean by that?

15    A   Our in-house staff.

16

17

18

19

20

21

22

23

24

25

1   Q.   And would they provide you a sketch or something written

2   to use as a reference material?  Or I'm trying to just

3   understand more about how that works.

4   A.   If I'm working on the same project as somebody else,

5   then there will be -- we'll keep up to date of what we're

6   doing by going and talking about I like what you've done

7   there and that's a nice shade and all that kind of stuff.

8        So, generally, by osmosis, I guess.

9   Q.   So it was by communicating with the other artists and by

10  viewing their sketches or their works in progress?

11  A.   Yeah.

12  Q.   Just for the record, was that a yes?

13  A.   Yes, sorry.

14  Q.   Can you describe your -- well, strike that.

15       So how do you go about creating your work?  What

16  materials do you use?  Or do you use a computer, do you do it

17  by hand, do you use a sketchbook?  That's the kind of

18  description I'm asking.

19  A.   All of my initial sketch work is done on a pad with

20  pencil or pen or whatever.

21  Q.   And can you then walk us through the process of initial

22  idea to a final product or final work?

23  A.   So I will do a -- it depends on what we're doing, but,

24  say, for instance, that we're going to do some banners for

25  something, then I'll do a bunch of sketches for banners.

1          And then I'll take those, refine them a bit, and

2    then scan them into the computer.  And then I will work on

3    them so that they become a more decipherable line drawing

4    than a bunch of scribbles.

5          And then at that point whoever else is in the

6    project team, I'll get their input on what's been produced,

7    whether it's relevant or whether we're all agreed it's the

8    direction that we should be going in.  And then it will be

9    rendered.

10   Q.   And what do you mean rendered?

11   A.   Taken from a line drawing to then being textured,

12   colored.

13   Q.   Previously you mentioned that you use reference

14   materials, for example, related to armors or World War II and

15   tanks.

16          What type of works would you use those reference

17   materials for?

18   A.   If I'm -- say if I'm drawing a tank with a color scheme

19   on it, then I will draw one of our battle tanks and I'll use

20   a color scheme.  And then I will generally use that to try

21   and show -- reference material to try and show weight or

22   texture or, you know, how does mud hang off of a set of

23   tracks, that kind of thing, just to try and give it a bit

24   more reality.

25   Q.   So you mention materials for tanks and for use when

1    drawing armor.  Any other things?

2    A.   Not really.

3    Q.   Are there any artists at Games Workshop who doesn't use

4    computers as part of creating works of art for Games

5    Workshop?

6    A.   Up until recently.  It's only a recent innovation that

7    most -- that they have computers.

8    Q.   And who has been using -- well, can you describe that,

9    when you say it's only a recent innovation?

10   A.   Up until a couple of years ago, everything that was done

11   was done in traditional media.

12   Q.   Can you describe what you mean by traditional media?

13   A.   Ink and pen on board, on paper, traditional media used

14   by artists.

15   Q.   Are you familiar with the term heraldry?

16   A.   Yes.

17   Q.   What is that term?  What does it mean?

18   A.   Heraldry is, in the traditional sense, what knights use

19   to distinguish themselves from other people or other knights.

20   Q.   Can you give me some examples?

21   A.   It can be as simple as a white fleur-de-lis on a blue

22   background as somebody's heraldry.  It could be as complex as

23   quartered with all in different colors with different icons

24   on each quarter.

25   Q.   And where would the -- these heraldry appear?  If I'm --

1    please correct me if I'm not using the phrase correctly.

2    A.   In what context?  In the traditional context?

3    Q.   In the traditional context.

4    A.   Anywhere that there was space, really, so banner,

5    shields, horse's comparison, banners, pennants.

6    Q.   You mentioned comparison?

7    A.   Yes, it's the cloth that covers a horse.

8    Q.   And how does heraldry relate to the works you do?

9    A.   It's Space Marines and knights in space.  And when I

10   work on Space Marines, it's all important, it's part of their

11   identity.

12   Q.   How so is it part of their identity?

13   A.   Each chapter of Space Marines has its own unique

14   character which is partially represented within the heraldry

15   that they use.

16   Q.   And do you use any reference materials related to

17   heraldry?

18   A.   There are rules in heraldry.  There are heraldic rules;

19   but beyond that, no.

20   Q.   Can you describe what these heraldic rules are?

21   A.   You have two types of colors.  You have metals and you

22   have colors.  And metals are white or silver and yellow or

23   gold; they're the same in heraldic terms.

24           And the only thing is, is that it's encouraged not

25   to put a metal on a metal or a color on a color.  You put a

1   color on a metal or you put a metal on a color.

2   Q.   Before you mentioned a fleur-de-lis?

3   A.   Fleur-de-lis.

4   Q.   Can you explain what that is?

5   A.   It's an ancient symbol.  It's a three -- it's a central

6   spike with two curved spikes coming off of it that's been

7   used in heraldry for hundreds of years.

8   Q.   Are there other symbols you can think of that are like

9   that?

10  A.   Pick a shape, it's been used.

11  Q.   Lions?

12  A.   Yes.

13  Q.   Griffins?

14  A.   Yes.

15  Q.   Crosses?

16  A.   Yes.

17  Q.   Skulls?

18  A.   Yes.

19  Q.   Circles?

20  A.   Yes.

21  Q.   Triangles?

22  A.   Yes.

23  Q.   Roman numerals?

24  A.   Yes.

25  Q.   And use of all these symbols dates back to the ancient

1    form of heraldry?

2    A.   Yes.

3    Q.   Dragons?

4    A.   Yes.

5    Q.   I'm going to hand you an exhibit that will be marked 23.

6              Do you recognize this?

7    A.   Yes.

8    Q.   And, for the record, these are Bates labeled pages

9    GW 0001726 through 27.  What is it?  What is this?

10   A.   What is this?  This looks like it was a reproduction of

11   a poster that I did, and I think it went into one of our book

12   products.

13   Q.   Were snakes also used as heraldry symbols or heraldic

14   symbols?

15   A.   I believe they were, yes.

16   Q.   Eagles or birds?

17   A.   Yes, yes.

18   Q.   Can you take a look on the second page.  It's in the

19   last column, and it's the second image down.  Do you see

20   something called a Howling Gryphons?

21   A.   Yes.

22   Q.   Did you create that design?

23   A.   No, that was a pre-existing design.

24   Q.   Do you know who did that?

25   A.   Originally I think I can recall where I first saw it,

1  but who did it, no.

2  Q.  Where did you first see it?

3  A.  I think it was issue 101 of White Dwarf.

4  Q.  The image is kind of murky on the copy we have here.  Do

5  you remember what's depicted on that oval shape -- it's kind

6  of like a half oval?

7  A.  The shoulder pads.

8  Q.  Okay.  And so do you remember what was depicted on that

9  shoulder pad?

10  A.  Yes, it's a rampant griffin.

11  Q.  What's a rampant griffin?

12  A.  It goes back to heraldry of depending on what the

13  creature is doing depends on what kind of -- what title it's

14  given.  So stood upright with claws out is rampant.

15  Q.  If you go back to the next page, which ends in Bates 27.

16        If you look down from the third row from the

17  bottom, towards the middle, do you see something called a

18  Blood Raven?

19  A.  Yes.

20  Q.  Did you create that design?

21  A.  That particular one?  Yes.

22  Q.  And what was the basis for that design?

23  A.  It was based on Relic's icon that they did, Blood

24  Ravens.  I think it was Relic, wasn't it, who did the Space

25  Marine game for computers, computer game?

1  Q.  And Relic, just so I understand that, you said it's

2  based on Relic?

3  A.  The company who made the computer game, designed the

4  Space Marine chapter to feature in their game.

5  Q.  And do you remember the name of the game?

6  A.  I think it was called Space Marine but --

7  Q.  So you created this design based on that video game?

8  A.  The color scheme is the same.  I just slightly altered

9  their icon that they used.

10  Q.  What icon did they use?

11  A.  They used a kind of stick bird or a bird with stick

12  wings and a blood drop in the middle of it, but its head was

13  pointing up.

14  Q.  I am handing you what is marked as Defendants' Exhibit

15  25.  For the record, it is Bates labeled page GW 0061 --

16  strike that -- GW 0001632.

17        Do you recognize this?

18  A.  Yes.

19  Q.  What is it?

20  A.  Again, it looks like an excerpt from White Dwarf that

21  was then re-published in Index Astartes.

22  Q.  If you take a look on the left-hand side, there are a

23  couple of shoulder pads?

24  A.  Yes.

25  Q.  What's depicted in those shoulder pads?

1    A.    A cross.

2    Q.    Is there any specific name for these crosses?

3    A.    I believe they're Maltese crosses.

4    Q.    And do you know what's the difference -- a Maltese

5    cross.  And what's the characteristics of a Maltese cross?

6    A.    They're chevroned ends.  They've got a distinctive sort

7    of kite-shaped tail.

8    Q.    Is this another heraldic type symbol?

9    A.    Yes.

10   Q.    And just so context for the record, when you say Black

11   Templars, what is that referring to?

12   A.    That's the name of their chapter.

13   Q.    And these are Space Marines depicted as -- that are in

14   --

15   A.    As Black Templars, yes.

16   Q.    I am handing you what has been marked as Defendants'

17   Exhibit 27, Bates labeled pages -- or page GW 0001503.

18         Do you recognize this?

19   A.    Yes.

20   Q.    What is it?

21   A.    It's a collection of Space Marines in different color

22   schemes and chapters.

23   Q.    Do you know where it was originally published?

24   A.    I think it was White Dwarf.

25   Q.    And let me draw your attention to the Celestial Lions?

1    A.    Yes.

2    Q.    Was this a pre-existing design?

3    A.    I'm not entirely sure on that one.

4    Q.    And can you tell me what's depicted on the shoulder pad?

5    A.    A roaring head of a lion.

6    Q.    And is a roaring lion head, is that a heraldic symbol?

7    A.    Could be.

8    Q.    And what color is the lion?

9    A.    It's a golden color.

10   Q.    And which way is it facing?

11   A.    It is facing to the left.

12   Q.    And is it fair to characterize it as a silhouette of a

13   lion's head?

14   A.    It's in profile, yes.

15   Q.    And what was the general color scheme for that shoulder

16   pad?

17   A.    It looks like a gold rim, blue field with a gold lion's

18   head in the middle.

19   Q.    And are those characteristics consistent with heraldry?

20   A.    Yes.

21   Q.    Handing you what has been marked as Exhibit 36,

22   GW 0001288.

23         Do you recognize this?

24   A.    Yes.

25   Q.    What is it?

 1    A.    It's a page of Ultramarine shoulder pads.

 2    Q.    And did you do all of the drawings on this page?

 3    A.    Yes.

 4    Q.    And were the designs on this page based on pre-existing

 5    published works?

 6    A.    Each individual element has been used on other shoulder

 7    pads, yes, but whether they've all been used exactly like

 8    this, too many to be sure to say.

 9    Q.    Can you identify the elements that have been used on --

10    strike that.

11          Can you identify each individual element that had

12    been used on other shoulder pads before?

13    A.    All of them.

14    Q.    Can you describe the elements, for the record?

15    A.    Okay.   There is a skull without a lower jaw, there is a

16    12-pointed halo, there is Roman Numeral III, there is a

17    stylized cross, there is other roman numerals, there is a

18    laurel wreath, there is double-headed arrows and

19    single-headed arrows, there are crossed arrows and a couple

20    of pieces of scroll work.

21          I think that's covered everything.

22    Q.    Is there a name for those, especially in the lower

23    right-hand corner, those, it looks like an upside-down V?

24    A.    It's -- I think the technical term is the chevron.

25    Q.    What's the chevron?

1   A.   It's an upside-down -- well, it's a V, either

2   upside-down or otherwise.

3   Q.   Where does chevrons come from?

4   A.   The past.  Don't know.

5   Q.   Is it also a heraldic symbol?

6   A.   Yes.

7            THE COURT:  Is that it?

8            MR. ALY:  That's it, Judge.

9            THE COURT:  Okay.  Let me just talk to the lawyers

10  briefly at sidebar.  Don't need the court reporter.

11       (Sidebar discussion had off the record.)

12           THE COURT:  Okay.  Mr. Aly?

13           MR. ALY:  Your Honor, we're resting our case

14  subject to the exhibits.

15           THE COURT:  Okay.  Rebuttal.

16           MR. KEENER:  Plaintiff calls Gill Stevenson.

17   GILLIAN STEVENSON, PLAINTIFF'S REBUTTAL WITNESS, DULY SWORN

18           THE COURT:  Ms. Stevenson, you've previously been

19  sworn.  Do you understand you're still under oath?

20           THE WITNESS:  Okay.

21           THE COURT:  Have a seat.

22                    DIRECT EXAMINATION

23  BY MR. KEENER:

24  Q.   Good morning Ms. Stevenson.

25  A.   Good morning.

1  Q.  Can you remind the jury what your position is at Games

2  Workshop?

3  A.  Yeah.  I'm senior legal counsel.

4  Q.  Now, do you recall hearing testimony from Mr. Villacci

5  and Mr. Nagy about a disclaimer that's put on the bottom of

6  Chapterhouse's website?

7  A.  Yes, I do.

8  Q.  And do you know where that disclaimer came from?

9  A.  I believe it came from the Games Workshop website.

10  Q.  And where would one find that disclaimer on the Games

11  Workshop website?

12  A.  On the legal pages -- the RP policy of the legal pages,

13  which is on the bottom of the website.

14  Q.  So how do you get to the legal portion of the website?

15  A.  On every page of the website, at the bottom, there is a

16  link called legal.  If you click on there, there are a number

17  of pages that are available, including a page of disclaimers.

18  Q.  And are you familiar with that legal section of the

19  website?

20  A.  Yes, I am.

21  Q.  And how long have you been with Games Workshop?

22  A.  Five-and-a-half years now.

23  Q.  And have you been familiar with that legal section of

24  the website since then?

25  A.  Yes.  I'm responsible for it.

1    Q.   Can we pull up Defendants' Exhibit 176?

2         Is this a -- what are we looking at?

3    A.   That is a printout of one of the pages that is part of

4    the legal pages on the website.

5    Q.   And what's the title of this page?

6    A.   It says:  (Reading:)

7         What you can and can't do with Games Workshop's

8    intellectual property.

9    Q.   Let's look at the second and third paragraphs of that --

10   of the first -- go back to the main one we just did.  And

11   highlight the second and third paragraphs and cull those out.

12        What is Games Workshop telling its customers here?

13   A.   Games Workshop is telling its customers that we're a

14   tabletop hobby war games company.  We want our customers to

15   enjoy the games and enjoy the IP.  So whilst most of the

16   company --

17             THE COURT:  IP meaning intellectual property?

18             THE WITNESS:  Yeah, sorry, intellectual property.

19             THE COURT:  Okay.

20   BY THE WITNESS:

21   A.   So most companies wouldn't allow you to convert their

22   products and make something else out of them, but it's a

23   hobby; we sell hobby knives.  And it's a craft element as

24   well.  So we think that converting your models into something

25   that's uniquely your own is part of that hobby, and so we

1   allow people to do that.

2   BY MR. KEENER:

3   Q.   Okay.  Now, if we go back to the main page here, the

4   first bolded point says General Principles.  And can you pull

5   up the General Principles, including the bullet points.

6           And what's that last -- that was -- right.

7           Under General Principles what's that last bullet

8   point we see there?

9   A.   It says that if you're going to use our IP on your

10  website, then you need to include an appropriate disclaimer.

11  And we have the list on the following page, which is why we

12  produce them.

13  Q.   Okay.  Then immediately under that we've got another big

14  bolded title.  What is that section?

15  A.   Yeah, that's what you cannot do with our intellectual

16  property.

17

18

19

20

21

22

23

24

25

Stevenson - direct

1  Q.   And what's the first sentence of that section?

2  A.   It says, "Please read the following in conjunction with the

3  What You Can Do section above and the specific examples section

4  below."

5  Q.   And what's the first example Games Workshop provides its

6  customers on what they cannot do with Games Workshop's

7  intellectual property?

8  A.   Yeah.  The first example is really the biggest issue and

9  actually the whole reason why we have the policy.  So,

10  effectively it says that you can't use our intellectual property

11  in relation to any commercial activity.

12  Q.   What does that mean?

13  A.   Making money.  So, you can make your own converted model for

14  your own use, but what you can't do is sell it to somebody else.

15  Q.   And what about making reproductions and selling multiple

16  copies?

17  A.   That's counterfeiting.

18  Q.   And the fourth bullet point there, what's that bullet point?

19  A.   Is that the use all trademarks?

20  Q.   No.  The intellectual property one.

21  A.   You can't use our intellectual property in relation to

22  third-party products or third-party intellectual property.

23  Q.   What does that mean?

24  A.   So, you can't -- we don't want to be linked with other

25  people's intellectual properties.  We don't want to cause

Stevenson - direct

1    confusion.   So, you can't link our intellectual property with

2    basically anybody else's intellectual property.

3    Q.   All right.   Let's turn to Page 3 of this exhibit.   There's a

4    section on online auctions.   Can we pull that up?   What are

5    online auctions?

6    A.   That would be like eBay.

7    Q.   And what does Games Workshop instruct its customers about

8    online auctions?

9    A.   It says do not use our trademarks in relation to products

10   that are not owned by or originate from Games Workshop.

11   Q.   What's that mean?

12   A.   Well, it's like we saw on the eBay auctions the other day

13   where they were selling Chapterhouse products using Games

14   Workshop trademarks.

15   Q.   And what's the second thing you tell them about online

16   auctions?

17   A.   It says, "Do not associate our products or IP with any

18   third-party products or IP."

19   Q.   And what does that mean?

20   A.   That would be where, for example, Chapterhouse is doing a

21   conversion kit.   So, they're using the Games Workshop model and

22   then putting their add-ons or their conversion bits onto that

23   model.

24   Q.   So, what's your view on whether putting the Games Workshop

25   disclaimer on the bottom of a website selling products using

PDF created with pdfFactory trial version www.pdffactory.com

Stevenson - direct

1   Games Workshop designs and names is expressly allowed by Games

2   Workshop?

3   A.   I'm sorry.   Can you repeat that?

4   Q.   Yes.   So, Mr. Villacci was suggesting by putting this

5   disclaimer that he gets from Games Workshop on the bottom of his

6   website, he's doing that because Games Workshop says it's okay

7   to sell his products and using the names he uses as long as he

8   has a disclaimer.   Is that what Games Workshop tells people?

9   A.   No, that's clearly not right because that would be a

10  commercial use.   The disclaimers are intended for fans who want

11  to enjoy the hobby by creating their own website, and so they

12  put the disclaimer on the bottom of their website so people know

13  it's not associated with those.   We ask them to make it clear

14  it's unofficial.   But the commercial use is the big thing,

15  really, and it says on the policy is the most important thing

16  that they can't do.

17  Q.   I just want to direct you to one other topic briefly.   We

18  just saw the video deposition of Mr. Hodgson.   Did you see that?

19  A.   I did, yes.

20  Q.   And he mentioned that the Blood Raven symbol was initially

21  created by a company called Relic for a game called Space

22  Marine.   Do you recall that testimony?

23  A.   I do recall that, yes.

24  Q.   What was the relationship between Games Workshop and Relic

25  regarding that computer game?

PDF created with pdfFactory trial version www.pdffactory.com

Stevenson - direct

1    A.   It wasn't actually that computer game.  I think he's

2    mistaken there.  Relic are a studio that were part of THQ.  I

3    don't think THQ are around anymore.  So, Games Workshop had a --

4    THQ had a license from Games Workshop to produce 40K computer

5    games, and as part of that, they did the Dawn of War series,

6    which was I think Dawn of War I and II, together with a couple

7    of expansions for each.  And Relic were the studio that created

8    those games on behalf of THQ for Games Workshop.

9    Q.   And do you have any understanding between the parties who

10   owns the copyrights on the Blood Raven symbol?

11   A.   Oh, yeah.  All of the copyright is owned by Games Workshop.

12   Everything that our licensees produce belongs to us.

13   Q.   And there's never been any suggestion that Relic or THQ owns

14   that symbol they designed for the game?

15   A.   No, absolutely not.

16   Q.   Thank you.  No more questions.

17   A.   Thank you.

18              THE COURT:   Mr. Aly.

19              MR. ALY:   Thank you, your Honor.

20                        CROSS EXAMINATION

21   BY MR. ALY:

22   Q.   Now, Ms. Stevenson, I want to be clear.  When you were

23   testifying, you said that Games Workshop allows people to

24   convert their models, correct?

25   A.   For their own use, yes.

PDF created with pdfFactory trial version www.pdffactory.com

Stevenson - cross

1    Q.   So, that means that when somebody buys a model from Games

2    Workshop, they're allowed to modify it if they want, correct?

3    A.   Yeah, as long as they don't profit from that.

4    Q.   And it also means that they can add on pieces that they

5    themselves choose to add on to their products; is that true?

6    A.   Yeah.  I think if you read the policy, it indicates that you

7    can sculpt your own add-ons.  So, if you create something

8    yourself using the green stuff that we've heard about, or as

9    we've heard about the kits, there are extra bits in the kits.

10   So, one pack of six Space Marines doesn't just make six Space

11   Marines.  It's got various arms and legs, and you can choose how

12   you do that.

13   Q.   But you understand that customers can also add on their own

14   pieces to the Games Workshop models if they want to.  That's

15   right.

16   A.   Yeah, but it does say you can't use third-party IP.

17   Q.   And that's what I want to talk to you about.  Because you

18   understand, don't you, Ms. Stevenson, that not all of Games

19   Workshops customers are master painters?  You understand that?

20   A.   Yeah.

21   Q.   You understand not all of your customers are master

22   sculptors, correct?

23   A.   Yeah.

24   Q.   You understand that not all of your customers are master

25   designers; is that correct?

PDF created with pdfFactory trial version www.pdffactory.com

Stevenson - cross

1    A.   Yeah.   They don't need to be.

2    Q.   And you understand that they're not all master illustrators,

3    either, right?

4    A.   I don't know that that would be relevant, but yeah.

5    Q.   Well, let me ask you this.   Do you see a problem, ma'am,

6    with somebody paying somebody else for a service that they can't

7    do themselves when it's completely allowed to convert the kits?

8    A.   Yeah, I do.   It's clearly spelled out in the IP policy as an

9    example of a commercial use of our IP.

10   Q.   And that's your problem, isn't it?   That you would let

11   anybody do what they want, but if they want help in doing that

12   and want to pay somebody to help them, you don't think that's

13   right.

14   A.   Because that third-party would be profiting from our IP.

15   Q.   And you're not a lawyer that can testify about what

16   trademark law is in the United States, right?   The jury will get

17   instructions on that later.

18   A.   I can't testify on U.S. law, no.

19   Q.   Let's talk about the trademark policy that you do have.

20   Let's go to the second page of this exhibit at the very top.   It

21   will be the website's section.

22          Now, Ms. Stevenson, this is a portion of your policy

23   that you did not talk about in direct examination; isn't that

24   right?

25   A.   That's right.

Stevenson - cross

1    Q.   And in this portion you say here's what you shouldn't do

2    with Games Workshop trademarks.  It's the first sentence.

3    "Please don't use any one of our trademarks to directly identify

4    your website, e.g., the Space Hulk Home Page."  You see that,

5    right?

6    A.   I do see that.

7    Q.   But the policy goes on to say that "This doesn't mean" --

8    "This doesn't mean that you can't use our trademarks to talk

9    about our stuff."  Do you see that?

10   A.   Yeah.  Well --

11   Q.   It says that there, doesn't it?

12   A.   It says that.  The policy is defined for hobbyists enjoying

13   their hobby, not commercial activity.  That's the overriding

14   principle.

15   Q.   I understand what you're saying here today, but I'm right

16   now asking you what your policy says on the website.

17   A.   Yes.  The policy is for hobbyists, for our customers, not

18   for third --

19   Q.   Pardon me?

20   A.   The policy is for our hobbyists, for our customers, not for

21   third-party commercial entities.

22   Q.   Ma'am, did you draft this policy?

23   A.   No, I didn't.

24   Q.   And those words that you're testifying about now aren't in

25   the policy, are they?

Stevenson - cross

1   A.   Yes, they are.

2   Q.   And when reading it, they say, "This doesn't mean you can't

3   use our trademarks to talk about our stuff." You see that,

4   don't you?

5   A.   Not if you're a hobbyist enjoying your hobby. You can do

6   that.

7         THE COURT:   Hang on a second.

8    (Brief pause.)

9         THE COURT:   Ask the question again, please.

10 BY MR. ALY:

11   Q.   The question is you do see the sentence, ma'am, that says,

12   "This doesn't mean that you can't use our trademarks to talk

13   about our stuff."

14   A.   As long as it's on a noncommercial basis, yeah.

15   Q.   So, you agree people can use the trademarks in some

16   situations, and that's what your website says, right?

17   A.   Yeah. For enjoying their hobby, they can do that.

18   Q.   Now, you keep saying you can't do things that are

19   commercial. You don't want other people to make money off of

20   products that they make; is that true?

21   A.   Off of products that we've made and the IP that we've

22   created, yeah.

23   Q.   And what if a person makes his own product and says here's

24   my product, and I will sell it to you to use with your product

25   that's a Games Workshop product?

PDF created with pdfFactory trial version www.pdffactory.com

Stevenson - cross

1    A.    As long as that doesn't infringe our IP, that's fine.

2    Q.    There's nothing wrong with making money off of selling

3    products that work with Games Workshop products.  You agree with

4    that.

5    A.    As long as it doesn't infringe our copyrights or trademarks,

6    I don't have a problem

7    Q.    In fact, on your website you also allow people and you say

8    you can sell products that work with Games Workshop, correct?

9    A.    I don't know.  Could you direct me to that?

10   Q.    I can.  It's the next page, Page 3.  We're going to the

11   online auction section.  And, Ms. Stevenson, you talked about

12   the second line here on your direct.  "Do not associate our

13   products or IP with any third-party products or IP," correct?

14   A.    Sorry.  Can you repeat that?

15   Q.    Did you talk about that sentence on direct examination?

16   A.    I didn't hear what you said.  Sorry.  I was reading the

17   exhibit.

18   Q.    My apologies.  The second sentence is "Do not associate our

19   products or IP with any third-party products or IP."  You talked

20   about that portion with Mr. Keener on direct examination?

21   A.    Yes, that's right.

22   Q.    But there's the next sentence that actually says, "We would

23   encourage you" -- you're talking to your customers here, right?

24   A.    Um-hm

25   Q.    To use -- is that a yes?

PDF created with pdfFactory trial version www.pdffactory.com

Stevenson - cross

1  A.   Yes.

2  Q.   (Continuing) -- "to use digital photographs of any materials

3  that you are planning on selling."  That word is there, right?

4  A.   It is.  If you read the first sentence, it says, "Do not use

5  our trademarks in relation to products that are not owned or

6  originate from Games Workshop."  So, we're talking about their

7  stuff.

8  Q.   Okay.  That's fine.  So, we're talking about stuff that

9  somebody makes themselves, you don't mind them selling them even

10  on eBay and online auctions; is that true?

11  A.   As long as they don't use our trademarks and copyright.

12  Q.   And when you say don't use our trademarks and copyright,

13  here you're just saying don't use them at all.  That's what your

14  position is; is that true?

15  A.   I'm sorry.  I don't follow the question.

16  Q.   When somebody is selling a product on eBay, you think they

17  shouldn't even be allowed to say what they work with; is that

18  true?

19  A.   Yeah.  Well, they need to be honest.  You know, they're

20  allowed to be honest.  They're allowed to be truthful.  But, you

21  know, actually, the legal policy, the IP policy, is guidelines

22  to people who want to enjoy their hobby.  We're trying to give

23  people guidelines.  We're not giving legal advice.  We encourage

24  them in the policy to seek their own legal advice on anything

25  they want to do.  So, you know, we're not saying they can't do

Stevenson - cross

1    anything.  We're just saying that they need to make sure that

2    they're honest.

3    Q.   You just want to make sure that they're true when they talk

4    about the trademarks?

5    A.   Absolutely.

6         MR. ALY:   No further questions, Judge.

7         THE COURT:   Redirect?

8         MR. KEENER:   No questions.

9         THE COURT:   Any questions that any of the jurors have?

10   All right.   You can step down.   I'm sorry.   There is one.

11        So, I'm going to tell you the same thing I would have

12   told the lawyers.   It needs to relate to the testimony she's

13   given just now, not to what she gave previously.

14        I'm having a hard time reading that.   I'm sorry.   Oh, I

15   get it.   Does it say, "How could one sell a GWS item on eBay?"

16   I'm just going to ask this.

17        The question is -- that's what happens with doctors.

18   You know, there's this whole thing about doctors, not being able

19   to read handwriting.   I'm working on it, though.

20        A JUROR:   That's good for me, by the way.

21        THE COURT:   Okay.   The question is you've talked about

22   somebody else selling a Games Workshop item on eBay.   How could

23   somebody do that properly as Games Workshop sees it?

24        THE WITNESS:   Okay.   So, say I was a hobbyist, I've

25   collected some armies and then, growing up a bit, moved on or

1   bought new armies, wanted to sell my own armies.  I can honestly

2   say what I'm selling.  So, if I'm selling my old Space Marine

3   army, I can say it's an old Space Marine Army.

4               THE COURT:  All right.  Any follow-up, Mr. Keener?

5               MR. KEENER:  No.

6               THE COURT:  Mr. Aly?

7               MR. ALY:  No, thank you.

8               THE COURT:  All right.  You're excused.

9        (Witness excused.)

10              THE WITNESS:  Thank you.

11              THE COURT:  Additional rebuttal?

12              MR. MOSKIN:  Yes, one further witness.

13       (The following proceedings were had at the sidebar, out of

14         the presence and hearing of the jury:)

15              MR. ALY:  Your Honor, we have an issue to discuss with

16   your Honor at sidebar.

17              THE COURT:  Okay.  While the person's coming in here --

18   sir, just come on up and have a seat.  We've got to talk about

19   you over here for a second.

20       (The following proceedings were had at the sidebar, out of

21         the presence and hearing of the jury:)

22              THE COURT:  What's the issue?  Who is the witness,

23   first of all?

24              MR. MOSKIN:  His name is Jeremy Goodwin, Jes Goodwin.

25   He's the sculptor.  He created this.  He's one of the

1  original --

2          THE COURT:  What is this guy?

3          MR. MOSKIN:  St. Celestine.

4          THE COURT:  Oh, my.  Okay.  Is that like a wine cork or

5  something?  What's the issue?

6          MR. ALY:  The issue is we object to him  He's not a

7  proper rebuttal witness.  He's going to be talking on the whole

8  about design, which is one of their -- they have models for, and

9  the other issues he's going to be addressing are not proper

10  rebuttal issues.  And counsel has told me what they are.

11          THE COURT:  Okay.

12          MR. MOSKIN:  So, a couple things.  This is just

13  background so people know this is the kind of thing he does.

14          THE COURT:  Okay.

15          MR. MOSKIN:  This is just a demonstrative exhibit.

16          THE COURT:  Okay.

17          MR. MOSKIN:  But I brought it up so I could show you

18  everything he's going to talk about.

19          The testimony yesterday was that -- by Mr. Grindley

20  that there's only a limited number of ways to make shoulder

21  pads, and he can refer to --

22          THE COURT:  He's going to say there's a whole bunch of

23  them

24          MR. MOSKIN:  Right.  So, these are taken from the Horus

25  Heresy book.

PDF created with pdfFactory trial version www.pdffactory.com

1    THE COURT:   So, he's rebutting Grindley on that.

2    MR. MOSKIN:   Right.   He also further will show -- we'll

3    have an objection, and you'll see in the motion for directed

4    verdict shortly, that we think that Dr. Grindley's testimony on

5    scenes a faire is inadmissible.   But what he didn't show is how

6    any of these figures -- he didn't ever show a picture of an

7    entire Space Marine, how the figure would look different if they

8    used any of these different shoulder pads.

9    THE COURT:   So, he's going to do what on it?

10   MR. MOSKIN:   He's going to come to the whiteboard and

11   show --

12   THE COURT:   Draw what?

13   MR. MOSKIN:   Draw a Space Marine and show how one of

14   those things look on --

15   THE COURT:   Okay.

16   MR. MOSKIN:   And I think the only other thing -- oh,

17   two other things.   One, there's a --

18   MR. ALY:   Can I address that issue ---

19   THE COURT:   Not yet.

20   MR. ALY:   Not yet.

21   MR. MOSKIN:   There's a statement made that we make all

22   our products in China so we can make them more cheaply.

23   Everything is made in Nottingham   So, he can say that.

24   And, finally, he can explain how Games Workshop had to

25   change its design of its Tervigon model which was in progress

1   when they found that they were selling it.  Tervigon conversion

2   kits for Tyranids.

3            THE COURT:  Go ahead, Mr. Aly.

4            MR. ALY:  Your Honor, as to the first issue, that issue

5   goes to the element of originality, what Goodwin did and

6   contributed in this selection once it was out there.  That's a

7   burden that they had to show in their opening case.  By choosing

8   not to do it then, it's improper rebuttal to address it now by

9   saying here's why we think it was original after all.  That's

10  the issue.  It's not proper rebuttal, and he's offering lay

11  opinion.  That's two objections to that point.

12           As to the second point, your Honor, on China, we can

13  stipulate to that.  There's no reason to have him testify to

14  that.  We'll just make an instruction of some kind, if that's

15  appropriate.

16           As to the third issue on the kit, again, that goes to

17  the issue of damages, another affirmative element of plaintiff's

18  case, when they're saying this is what we had to do differently

19  and wouldn't have had to do if it wasn't for Chapterhouse, which

20  is again not a proper rebuttal.  It was part of their

21  affirmative elements.  They shouldn't be allowed to patch up

22  these holes through a rebuttal witness, your Honor.

23           THE COURT:  Okay.  A, it's proper rebuttal.  It's not

24  patching up holes.  Rebuttal always relates to what the

25  plaintiff has to prove.  You can put on evidence about things

PDF created with pdfFactory trial version www.pdffactory.com

Goodwin - direct

1    you have to prove, and I think it's proper rebuttal in this

2    case.

3            B, the fact that somebody's going to stipulate, I'm not

4    going to make you stipulate to it, and that's very quick,

5    anyway.

6            And the third thing about lay opinion, I think it's a

7    proper lay opinion.  So, the objection's overruled.

8        (The following proceedings were had in open court, in the

9        presence and hearing of the jury:)

10            THE COURT:  Raise your right hand.

11        (Witness duly sworn.)

12            JEREMY GOODWIN, PLAINTIFF'S WITNESS, SWORN

13                    DIRECT EXAMINATION

14   BY MR. MOSKIN:

15   Q.   Can you please state your full name for the record for the

16   jury?

17   A.   My name is Mr. Jeremy Goodwin.

18            THE COURT:  Goodwin is G-o-o-d-w-i-n?

19            THE WITNESS:  Yeah.

20   BY MR. MOSKIN:

21   Q.   And are you employed?

22   A.   Yeah.  I'm employed by Games Workshop and have been for

23   27 years.  I'm a sculptor and a miniatures designer.

24   Q.   Did you -- just generally.  I don't won't to go into the

25   details.  Did you have any role in the original creation of

Goodwin - direct

1    Warhammer 40,000?

2    A.   Yes.

3    Q.   You said you're a sculptor.   Can we bring up images

4    Plaintiff's Exhibit 777 to 780?   And I'll approach the witness.

5    A.   That's a terrible photograph.

6    Q.   Is this an example of something that you have sculpted?

7    A.   Yes.

8    Q.   And what does this involve, this sculpting process?

9    A.   These are made by hand using dental tools and a sort of

10   plumber's putty that you put over a wire armature.   It's all

11   very old school.

12   Q.   Do you know where Games Workshop manufactures its products?

13   A.   Yes.

14   Q.   And where is that?

15   A.   In the UK.

16   Q.   Now, Chapterhouse has suggested that there's only a limited

17   number of ways to design shoulder pads.   Do you agree with that?

18   A.   No.

19   Q.   And why is that?

20   A.   Well, if you include things like size, proportion, where it

21   sat, the sort of detail that can go in it, before you get

22   towards colors and everything, there's hundreds of variations

23   that you could choose for these.   You have to make design

24   choices all the time about what you're going to do.   But there

25   are a huge amount of choices.

PDF created with pdfFactory trial version www.pdffactory.com

Goodwin - direct

1  Q.   Have you had an opportunity to look at Plaintiff's

2  Exhibit 969, which is the Horus Heresy Collected Visions, to see

3  if there are any examples of other design choices for shoulder

4  pads?

5  A.   I have.

6  Q.   Can you call up Plaintiff's Exhibit 969?  And let's go to

7  page Bates Number 18393.   And how would you describe this?

8  A.   Well, it's a shoulder pad.

9  Q.   Is that anything like the Space Marine shoulder pad?

10  A.   No, it's not like a standard marine shoulder pad.  It's only

11  got about two or three sections there.  It's much squarer as it

12  goes across the shoulder, and it doesn't extend as far down the

13  arm

14  Q.   And can we look at Page 18410?  And is this another example

15  of a type of shoulder pad?

16  A.   It is.  You can see it's a large size there, but the shape

17  itself is very different.  You have a sort of scallop in the

18  side of it.  It comes about halfway down the arm  But you have

19  it tilted up faced towards the head.  But the main thing is it's

20  really rounded, and it's got a sort of Gothic edge to it.

21  Q.   And I think this was implicit in your answer, but do you

22  think this looks anything like the iconic Space Marine shoulder

23  pad?

24  A.   No.

25  Q.   Let's go to Page 18439.  And what do we see here?

Goodwin - direct

1  A.   Okay.   Another shoulder pad there.

2  Q.   And do you think this looks anything like the iconic Space

3  Marine shoulder pad?

4  A.   Not really.   The general shape is very different.   The

5  proportions are not far off, but you've got those huge spikes

6  and the face on the side of it.

7  Q.   And let's go to Page 18442.

8  A.   I don't think there's much I need to say about that one, is

9  there?

10  Q.   Well, let's just confirm   You don't think this looks

11  anything like the Games Workshop?

12  A.   No.   That's about the farthest away that we've had so far.

13  Q.   On the Space Marine shoulder pad.

14  A.   Yes.   Yes, it's the furthest away from the Space Marine

15  we've had.

16  Q.   Another example, let's look at Page 18458.   And what are we

17  looking at here?

18  A.   Another shoulder pad.

19  Q.   And you don't think -- do you think this looks anything like

20  the Space Marine shoulder pad?

21  A.   No.

22  Q.   Let's look at one more.   I'm sorry.   Page 18470.   Would this

23  be another example of a different style of shoulder pad from the

24  Space Marine shoulder pad?

25  A.   It would.   You've got a much different shape on the

PDF created with pdfFactory trial version www.pdffactory.com

Goodwin - direct

1    left-hand side and the right-hand side, and you've got --

2    they're actually fully sculpted pieces with the eagles on the

3    inside of them

4    Q.   Let's go to Page 18515.   If you can focus in on the shoulder

5    pads.   Would this be another example of a different style?

6    A.   Yes, we've got another style here again.   Three different

7    segments, doesn't cover as much of the arm, not the same size,

8    no rim

9    Q.   And let's look at Page 18531 on the bottom

10   A.   Okay.   It's not the same size, it doesn't come down as far,

11   it's a different shape, and you've got a way tilted out bottom

12   edge and the top at the same time.

13   Q.   And Page 18532.   Look at any of these pictures, really.

14   Would those be a further example of different styles of shoulder

15   pad designs?

16   A.   Yeah.   You've got a completely different shape, a completely

17   different positioning, and the size is just different, as well.

18   Q.   Now let's look at Page 18535.

19   A.   Again, you've got two or three segments, including a piece

20   of leather there.   Much smaller, doesn't cover half as much of

21   the arm, doesn't come over onto the body, doesn't go up to the

22   ear.

23   Q.   Let's look at Page 18568.   And, again, you can probably look

24   at any one of these, but how about the one on the bottom right

25   there?

Goodwin - direct

1  A.  Yeah.  You can see that's made up of several different

2  plates, and it's fitted tight against the top part of the arm

3  Q.  Let's look at just a couple more.  18615.  And do you see

4  here any other different styles of shoulder pads?

5  A.  Yeah.  There you've got a big curve on that one, the

6  scalloped edge that runs down and makes it a completely

7  different shape.

8  Q.  Let's go to 18636.  And is this again another example of a

9  different style of shoulder pad?

10  A.  Yeah.  Again, you've got three segments there.  It sticks

11  way out from the body and doesn't go half as far down the arm

12  Q.  And just one more from this one book, Page 18697.  And is

13  this again another example of a very different style shoulder

14  pad?

15  A.  Yeah, but it's a little closer, but the profile is

16  different.  You've got three sort of sections running across and

17  then a big central boss in the middle that's been decorated.

18  Q.  As a designer at Games Workshop and a sculptor for 27 years,

19  do you have any view whether there are any actual limits in the

20  number of different styles of shoulder pad designs one could use

21  for futuristic warriors?

22  A.  Well, it should be unlimited.  You should be able to just

23  keep on coming up with different shapes.  And there might be a

24  finite of it, but we've not found it yet.

25  Q.  You weren't here for the testimony of a Dr. Grindley, but I

PDF created with pdfFactory trial version www.pdffactory.com

Goodwin - direct

1    think if I can summarize what he was trying to say is that there

2    are various elements of Space Marines --

3              MR. ALY:  Objection, your Honor.  Testimony.

4              THE COURT:  It's okay as a lead-in.  Obviously, the

5    jury has heard the testimony.  To the extent Mr. Moskin doesn't

6    summarize it accurately, you'll just rely on your memory.  Go

7    ahead, Mr. Moskin.

8    BY MR. MOSKIN:

9    Q.  At any rate -- and, again, if I'm inaccurate, please do

10   correct me.  I think Dr. Grindley broadly was seeking to say

11   that there are various elements of the Space Marine shoulder pad

12   design that were similar to prior features of other futuristic

13   soldiers.  However, he didn't show how any of these other

14   designs would actually look like or how they would affect the

15   appearance of the Space Marine figure in total.  And I wonder if

16   there's a way you could do that to show us how those things

17   would look.

18   A.  Well, I could draw you one, if you have something I could

19   write on.

20             THE COURT:  Take it over there so the jury can see it.

21   Is there paper up on that thing?  Or it's a whiteboard.  Okay.

22   So, here's the deal.  He's going to bring it over here.

23             THE WITNESS:  So, please forgive me because the --

24             THE COURT:  Time out.  Mr. Goodwin, listen to me.  He's

25   going to bring it over there, number one.  Number two, if you

Goodwin - direct

1    say anything, you got to say it loudly.  And if you need to move

2    to see it, just move.

3              My inclination, folks, is so that we can finish this

4    testimony is we might go a little bit later than our normal

5    lunch break so that we can get this done.

6    BY THE WITNESS:

7    A.   So, I'm going to do a rough Marine shape, one shoulder pad

8    on the other side, and then I'll try some of the other ones on

9    the other side.  So, we'll start with the head.  This one --

10             THE COURT:  My advice is don't talk as you're doing it.

11   Wait 'til you're done and then describe it to the jury while

12   you're facing them

13             THE WITNESS:  Okay.

14     (Brief pause.)

15   BY THE WITNESS:

16   A.   Okay.  So, that's roughly the fellow there, the one that

17   you've been seeing all week.  Does that look reasonably like

18   that?

19             THE COURT:  No, you don't get to ask them questions.

20   Sorry.

21   BY THE WITNESS:

22   A.   So, I put the shoulder pad on this side.  So, it runs from

23   nearly the ear of the Space Marine down to about there.  It

24   covers the whole of that part of the body.

25

Goodwin - direct

BY MR. MOSKIN:

Q.   When you say there, just about the elbow joint?

A.   Yes, just above the elbow joint.  It comes over and goes like that.  So, do we have an example of another one I can put on the other side to show you?

Q.   Before we do that, can you show me what -- it looks like a little shoulder device there on the right side?

A.   That's on the arm of the model.  It's like an under part there.  But I've left that on there because it shows you roughly where the shoulder muscle would be because we're talking about a shoulder pad because that's the obvious place that you want to protect first.

Q.   So, in the actual models, the physical models that Games Workshop sells, is there an underlying piece of the Space Marine that looks like what's now really the left shoulder of that figure?

A.   Yes.  There's a little piece underneath there that shows where that muscle would be.

Q.   And then the large shoulder pads get mounted on top?

A.   That's right.  These go on top.  So, actually, on the real Marine, these things are about two inches thick.  So, it's completely impractical.  You wouldn't actually want to wear it if it didn't have sort of like motors and things moving it around underneath there.

Q.   Okay.  And can we bring up Defendant's Exhibit -- the

### Goodwin - direct

1    Grindley slides?  And do you see in Dr. Grindley's slide in the

2    middle there's a picture of a Stars Wars figure with a shoulder

3    pad on it?

4    A.   Uh-huh.

5    Q.   Can you show us what it would look like for the Games

6    Workshop Space Marine to be wearing that kind of a shoulder pad?

7    A.   Can I use a different color?  And so, I'll just draw it on

8    first and then take the black line out so you can see it.

9         So, if you look at the one up there, it starts from

10   about here.  So, you start it from about there.  It comes across

11   like that.  As far as I can see, extends to about here.  So,

12   we're really talking about that is the shape, and I'm being

13   generous with how far that comes out.  And if you add the rim

14   in, which has a distinctive block there, and then put the little

15   pieces over the top, that is approximately what it would look

16   like as you attach it to a Space Marine.

17   Q.   Do you think that looks like the Games Workshop Space Marine

18   at all?

19   A.   No, I don't.  You don't have that right angle there.  The

20   shape's different, the size is different, and the placement is

21   different.

22   Q.   Let's look at one more example that Dr. Grindley showed from

23   the movie Alien, the one on the right.

24   A.   Okay.  So, let's take that one out.  As far as I can see,

25   that's a big astronaut collar.  So, again, we're starting about

Goodwin - direct

1   here with the shoulder pad.  Let's start there.  I think it

2   comes in a bit further looking than that one, but you have to

3   remember that's a big astronaut collar.  So, the collar would be

4   about to here.  So, if we drop that shape in like that, okay.

5           Now, the waist is behind the box.  So, the waist on any

6   figure is about there.  The elbow goes to the waist.  People's

7   elbows go into their waist.  So, that appears to finish about

8   halfway between the shoulder and where the waist would be.  So,

9   let's stick a line in there.  That looks about right to me.

10          And then you've got the added complication of the fact

11  that that's actually three parts.  Let's see.  So, let's be

12  generous.  There you go.  And you've got these sort of flat

13  disks in rows that run around here like this.  Concentric

14  things, just like that.

15  Q.   And do you think that looks anything like the Space Marine

16  shoulder pad?

17  A.   No.

18  Q.   And let's just do one more, which if you can look at the

19  picture from the Marvel Comics.

20  A.   Right.  This one here.  I'm just going to put the shoulder

21  back in there, just so we know where it is, because so much of

22  this is about where the shoulder sits.  There we go.  Okay.

23  Q.   Okay.  And again --

24  A.   The one in the middle there?  Now, again, those start low on

25  the shoulders.  They don't come up very far.  So, let's be

Goodwin - direct

1    generous.  Let's start, say, here, and we want to come down to

2    there.  And then you have a drop-off that does that just about

3    there.  You have that angled piece in there.  That looks about

4    right for the curve over the top of that one.  It might come

5    out -- I might make that a bit further out, but you've also got

6    this plate here that comes down like that.  So, again, I don't

7    think that's anything like it.

8    Q.   When you say like it, like the Space Marine shoulder pad?

9    A.   Yeah.  That's more like a historical style of armor pad,

10   which is a lot more realistic, and you can actually move your

11   arm around in there.

12   Q.   Whereas you don't think a real person could move his arm

13   around --

14   A.   Not without, like I say, motors and things like that.  You

15   can imagine when the Marine moves his arms, there's a whole

16   bunch of things in that shoulder and backpack.  But if somebody

17   turns the power off and he just stood like that, he wouldn't get

18   to move.

19   Q.   We're probably done with this, but you may want to refer to

20   this.  Is there a reason that Games Workshop, in describing

21   these futuristic warriors, hasn't adapted them with, you know,

22   futuristic materials so they could have thinner pads and more

23   sleek armor.

24   A.   They're not made to be futuristic in that way.  By the time

25   you get to the 41st Millennium, most of the knowledge that

PDF created with pdfFactory trial version www.pdffactory.com

Goodwin - direct

1    everybody's got is gone.  So, the technology is all really,

2    really clunky.  They have to pray to their machines.

3    Q.    Did you say pray?

4    A.    Pray to the machines to get them to work, or they think

5    that's the case, in other words.  So, actually, the secrets in

6    making the suits of armor are beginning to get lost.  So, they

7    just have to repair the ones they've got.  There's no

8    advancement like we have today.  They don't get better.  They

9    actually get worse.

10   Q.    Okay.  Thank you, Mr. Goodwin.

11            THE COURT:   About how much more do you have on your

12   direct?

13            MR. MOSKIN:   Maybe one minute or two.

14            THE COURT:   Okay.   Do you want him back up here then?

15            MR. MOSKIN:   Yes.

16   BY MR. MOSKIN:

17   Q.    Does Games Workshop currently sell a Tervigon model?

18   A.    We do.

19   Q.    And I'd like to do this on the ELMO.  Well, first let me ask

20   you if you can identify what's been marked as Exhibit 714.

21   A.    Okay.  This is one of the kits from our Tyranid range, and

22   it makes up into two different models.  On the front you have a

23   thing called a Tyrannofex, and on the back you have a thing

24   called a Tervigon.

25   Q.    And this is a box containing the actual miniature?

PDF created with pdfFactory trial version www.pdffactory.com

Goodwin - direct

1    A.   Yes, unassembled.

2    Q.   So, let's look first very quickly at the -- let me take the

3    plastic off.

4              A JUROR:   Judge, can they move the whiteboard so we can

5    see the screen, please?

6              THE COURT:   Yes.

7    BY MR. MOSKIN:

8    Q.   And what are we seeing on this side of the box?

9    A.   That's the Tyrannofex.

10   Q.   And if we turn the box over, what do we see here?

11   A.   That's the Tervigon.

12   Q.   Okay.  And did the Chapterhouse launch of its own Tervigon

13   conversion kit have any impact on the development of the Games

14   Workshop Tervigon model?

15   A.   It did.

16   Q.   And what was that?

17   A.   Well, we had already started the design process when they

18   released their product.  So, we had to go back to the drawing

19   board a bit.  We wanted to make it larger, more impressive, and

20   not look like what they'd put out.

21             So, we kept the spines on the back of it, but we

22   changed the back two sets of legs, and we did a lot of other

23   work on that.  Plus with that we had to redesign the other

24   version of the monster, the Tyrannofex, because the two things

25   were made from the same kit.  So, it just made a load more work

Goodwin - cross

1    for us.

2            MR. MOSKIN:  I have nothing further of this witness.

3            THE COURT:  Mr. Aly.

4                        CROSS EXAMINATION

5    BY MR. ALY:

6    Q.  Hi, Mr. Goodwin.  My name is Imron Aly.  We haven't met

7    before, right?

8    A.  Hi.

9    Q.  I wanted to ask you first about this kit that you had made.

10   This kit.  And what's the number on it?

11           MR. MOSKIN:  Oh, sorry.  714.

12   BY MR. ALY:

13   Q.  This kit 714, that's what Games Workshop sells, correct?

14   A.  Yes.

15   Q.  But it didn't start selling that until last year.  Is that

16   about right?

17   A.  That's correct.

18   Q.  And to make the Tervigon from the Games Workshop box, this

19   is what you have to buy now, correct?

20   A.  Yes.

21   Q.  Now, let's go back in time to 2010.  So, three years ago.

22   At that time Games Workshop did not have a Tervigon box kit,

23   correct?

24   A.  Yes.

25   Q.  People knew what a Tervigon was, but Games Workshop did not

Goodwin - cross

1   have a model to make it, correct?

2   A.   No, we didn't.

3   Q.   And did you know that people actually wanted to have a model

4   of a Tervigon to play on their games?

5   A.   Well, we had already intended to do it, as soon as we put

6   the codex out with the stats in it.  We were saving that so that

7   we could release it so that the Tyranid players wouldn't just

8   get one release and then not have any more models for their

9   armies for four years.

10  Q.   We'll get to that in just a moment, actually.  But first, in

11  2010 Games Workshop did sell a Carnifex kit, right?

12  A.   Yes.

13  Q.   And that's another Tyranid creature, correct?

14  A.   Yes.

15  Q.   So, until Games Workshop came out with its other creatures,

16  this one --

17  A.   Yep.

18  Q.   -- the Tervigon, if people wanted one, they would have to

19  somehow mess with their existing Carnifex animal; is that right?

20  A.   No.

21  Q.   And if you wanted to make a particular model, Chapterhouse

22  sold these little parts here, Plaintiff's Exhibit 37 I'm

23  holding.  You're aware of that, right?

24  A.   Yeah, but why would you do it from the Carnifex kit?  Why

25  that one?

Goodwin - cross

1    Q.   And, Mr. Goodwin, this kit was made to work with Games

2    Workshop's Carnifex kit, right?

3    A.   Okay.

4    Q.   Does this right here -- you agree with me that this doesn't

5    make a Tervigon, right?

6    A.   Not those bits on their own, no.

7    Q.   Now, you did mention that you thought Games Workshop should

8    be able to make its own Tervigon model, correct?

9    A.   Yes.

10   Q.   Now, in this case there's the assertion that Chapterhouse

11   copied Games Workshop, referring to a book.  You're familiar

12   with that book, the Warhammer 40,000 book?

13   A.   Yes.

14   Q.   And on the right-hand side, I'm showing you the image from

15   that book.  You've seen that before, right, sir?

16   A.   Yes, I have.

17   Q.   And that's in the book that was released in 2009, right?

18   A.   Okay.

19   Q.   Do you agree with that?  About right?

20   A.   Yes, if you've got the date for that.

21   Q.   And so, what happened is that there's this book that Games

22   Workshop put out and it had an image in it, but at that time it

23   didn't have a product for it, right?

24   A.   That's right.

25   Q.   And there's a copyright in 2009 that you're saying existed

PDF created with pdfFactory trial version www.pdffactory.com

Goodwin - cross

1    for the image, correct?

2    A.   I'm assuming so, yes.

3    Q.   Now, when the product came out, you thought the product was

4    something different than the image, didn't you?

5    A.   That product?

6    Q.   That's correct.

7    A.   Yes.

8    Q.   And, in fact, this one, if you were to look carefully at

9    it -- I don't know if I can put it on the dimensions here -- it

10   has a different copyright date, doesn't it?

11   A.   Yes.

12   Q.   And, in fact, I'll try to, but it's so close to the camera

13   it may or may not be visible.  It is not within range.  So, what

14   I'll do is I'll do something else.  I will take the lid off --

15   and that's not the type of lid that flips up.

16          You'll agree with me that this one -- and I'm going to

17   show it to you first, and then I'm going to ask you a question

18   again.   But this one has a copyright date on it of 2011.

19   A.   It does because that's when the model was made.

20   Q.   Okay.  So, you agree this one has a copyright that's later

21   than the image in the book, right?

22   A.   I agree that it has a copyright for the year that it was

23   made.

24   Q.   And this model, the model is not a copy of the image that

25   was in the book, right?  It's not.

Goodwin - cross

1    A.   No, it's not an exact copy, no.

2    Q.   And you had to do a lot of work to put that together?

3    A.   Yes.

4    Q.   And you testified that in making the model from the book,

5    it's not just a matter of taking the image and running it

6    through some kind of a machine.  You have to actually model

7    these parts, right?

8    A.   Yes.

9    Q.   For example, you held up in your hand to start the testimony

10   a little miniature sculpture that you've made, and that's what

11   you have to do, right?

12   A.   It's slightly different from that, but, in essence, yes.

13   Q.   In essence, that's the case.

14            So, there's no allegation at all that Chapterhouse

15   could not have copied that product, could they have?  It didn't

16   exist.

17   A.   No.

18   Q.   And for Chapterhouse, are you aware that their sales of the

19   Tervigon conversion kit, that baggie I held up, that those sales

20   disappeared when Games Workshop finally came out with its own

21   Tervigon box kit?

22   A.   No, I wasn't aware of that.

23   Q.   Now, there was another subject matter, sir, that you talked

24   about, and that was the design of the shoulder pads, right?

25   A.   Yes.

Goodwin - cross

1    Q.    And in the shoulder pads, you were showing to the jury the

2    different designs of shoulder pads, correct?

3    A.    Which ones?

4    Q.    The different designs that you had on here.  You were doing

5    some variations of drawings, right?

6    A.    So, the ones that Dr. Grindley brought up?

7    Q.    Sure.

8    A.    Okay.

9    Q.    And you drew your own versions of those that were on the

10   chart, correct?

11   A.    Yeah, I tried to do them as accurately as possible.

12   Q.    Now, Games Workshop doesn't sell any of the shoulder pads

13   that you drew on the board, correct?

14   A.    No.

15   Q.    And, in fact, from all of the products -- do you understand

16   there's 163 products that Games Workshop is accusing

17   Chapterhouse of copying?

18   A.    If you say so, yes.  I haven't counted them all.

19   Q.    And of all the products here, you talked about this one,

20   right?

21   A.    Yeah.

22   Q.    You didn't talk about any of the other 162 products?

23   A.    No.

24   Q.    As a matter of fact, Games Workshop doesn't have products

25   for anything else that Chapterhouse sells apart from a shoulder

Goodwin - cross

1    pad with an X on it; is that true?

2    A.    I couldn't possibly comment on that.  I can't say that.

3    Q.    You don't know one way or the other?

4    A.    I think there's a load of stuff that looks just like what we

5    do.

6    Q.    In terms of products or pictures, sir?

7    A.    Products.

8    Q.    Okay.  And in terms of the products, you are here to talk

9    about only this product from Games Workshop?

10   A.    That's what I was told.

11   Q.    All right.  And on the shoulder pads, when you were talking

12   about the design, the ones that you drew on the whiteboard,

13   those are different than the ones Games Workshop sells, correct?

14   A.    Yes.

15   Q.    Another product that you were involved in making is PX704,

16   the Warhammer box kit Tactical Squad; is that true?

17   A.    That's right.

18   Q.    And this is another box kit that you had some say in because

19   you helped with the drawings, right?

20   A.    I actually did some of the sculpting, as well, on those.

21   Q.    Right.  So, when it comes to the sculpting, the sculpting is

22   the actual parts that come inside the box, correct?

23   A.    Yes.

24   Q.    And so, they're made -- in imagination, they could look like

25   the images that are on the cover, but the real parts are the

PDF created with pdfFactory trial version www.pdffactory.com

Goodwin - cross

1    product kits that are inside, correct?

2    A.   Yes.

3    Q.   And so, of all of the different shoulder pads that you drew

4    and that you say someone could make, the actual shoulder pad

5    that Games Workshop actually sells is just this little piece

6    here, right?  The ones that are on the top row?

7    A.   That is one of the shoulder pads we sell.  We sell a lot

8    more than that.

9    Q.   And so, when you're buying that particular box set, that's

10   the shape that you get?

11   A.   That's the shape you get in that set, yes.

12   Q.   And that shape is meant to fit on the shoulder that comes

13   with that particular unit, correct?

14   A.   It does.

15   Q.   And that shoulder, if I was going to put that next to it,

16   this is an example of one of the shoulders, correct?  Right

17   here?

18   A.   That's right.  It's as I drew it on the picture.

19   Q.   Right.  So, the picture that you drew, you were drawing

20   something that was an image that was supposed to be like a

21   drawing, an illustration, correct?

22   A.   Yes, I suppose you could say that.

23   Q.   But the product itself, when you look inside and open the

24   box, the arm isn't exactly a human arm   It's kind of a

25   shoulder/forearm type of a thing, isn't it?  It's a combination

Goodwin - cross

1  of the two?

2  A.    No, I don't know what you mean.

3  Q.    Okay.  Is there sort of a blob here that's the shoulder,

4  that's meant to represent the entity of the shoulder?

5  A.    Yeah.

6  Q.    And the shoulder pad is a cap that fits on top of the

7  shoulder?

8  A.    That's correct.

9  Q.    And when we're talking about the fit, you didn't testify

10  about how those shoulder pads were to fit on top of a particular

11  shoulder, correct?

12  A.    They just go on top there.

13  Q.    And have you seen any of the Chapterhouse products in terms

14  of their shoulder pads?

15  A.    Not physically, no.

16  Q.    And so, you don't know if, in fact, they do have other

17  things on top of them such as the things that you drew, correct?

18  A.    Those -- which elements that I drew do you mean?

19  Q.    Any.  You don't know --

20  A.    Well, most of those were plain.  Come on.

21  Q.    Okay.  So, for example, you had one that had some banding on

22  it.  Do you remember that from the Alien movie?

23  A.    Yes.

24  Q.    You don't know if Chapterhouse actually sells a product

25  which has physical banding on it, as opposed to a plain pad,

Goodwin - cross

1   right?

2   A.   I don't know.

3   Q.   And, finally, Mr. Goodwin, you testified that there were

4   many, many ways to make shoulder pads, correct?

5   A.   Yes.

6   Q.   And in the art books that Games Workshop has put out, you

7   say there are a lot of ways to do things, and you went through

8   the art with us, right?

9   A.   Yes.

10  Q.   You're familiar with this book, The Art of Warhammer 40,000?

11  A.   I am

12  Q.   And I'm referring to PX448.

13  A.   Yes.

14  Q.   But to put it on the screen, because it will be a little bit

15  big, I'm referring to an electronic version of that, which is

16  PX844.  It's the same thing.  Are you familiar with that book?

17  A.   Yeah.

18  Q.   I'll put up the cover for you.  And that's a book that Games

19  Workshop puts out, correct?

20  A.   It is.

21  Q.   And within that book, if you were to look in -- you were, by

22  the way -- you participated, you were involved in this book

23  writing, correct?

24  A.   I think I have one line in that book.  I may have a picture,

25  but I'm really not sure.

Goodwin - cross

1  Q.   You know there's an introduction that comes with that

2  particular book, right?

3  A.   Okay.

4  Q.   And in the introduction -- okay.  And in the introduction

5  I'm going to point you to the bottom here.

6  A.   Yes.

7          MR. MOSKIN:   Objection.  I think this is beyond the

8  scope.

9          THE COURT:   Overruled.

10  BY MR. ALY:

11  Q.   And, Mr. Goodwin, I'm going to go up to the screen to show

12  you on the bottom here, you've got the Space Marines.  They're

13  your equivalents of knights in armor with heraldry to match?

14  A.   Yes.

15  Q.   And, in fact, those Space Marines are archaic soldiers,

16  archaic space heros.  Do you agree with that?

17  A.   Yes.

18  Q.   And what they are not are NATO special forces running around

19  with high tech weaponry.  You agree with that.

20  A.   Yes.

21  Q.   The Imperium, that's a set of Space Marines, right?

22  A.   No.

23  Q.   It's a unit of Space Marine types?

24  A.   No.

25  Q.   What is the Imperium?

PDF created with pdfFactory trial version www.pdffactory.com

Goodwin - cross

1   A.   The Imperium is a civilization or the remnants of one.

2   Q.   Fine.  And so, the Imperium, the civilization, that's the

3   setting in which this game is to take place; is that right?

4   A.   Yep.

5   Q.   And that game is an amalgamation of so many ideas that were

6   floating around, taken from sources like 2000 AD, right?  Isn't

7   that true?

8   A.   That just doesn't finish off the sentence, does it?

9   Q.   Well, let's look at the rest of the sentence.  Taken from

10  2000 AD and Michael Moorcock novels and real history all put

11  into a big pot and regurgitated by us.  Do you see that?

12  A.   Yes.

13  Q.   Isn't that what Games Workshop did?

14  A.   That's a very, very simplistic reading of it, yes.

15  Q.   And that's in The Art of Warhammer book, right?

16  A.   Yes.

17          MR. ALY:  No further questions.

18          THE COURT:  Redirect?

19          MR. MOSKIN:  No, your Honor.

20          THE COURT:  Any questions from any of the jurors?  I

21  see nobody writing.

22          Okay.  Any further rebuttal on behalf of the plaintiff?

23          MR. MOSKIN:  Nothing further.

24          THE COURT:  Aside from our exhibit issues and other

25  stuff we're got to deal with, is there any further evidence on

1    behalf of the defendant?

2            MR. ALY:   No.

3            THE COURT:   Okay.   So, you've now heard all the

4    evidence.   As I told you yesterday, the lawyers and I are going

5    to have to spend a good part of the afternoon working on the

6    instructions of the law I'll be giving you on the case.   So,

7    you're done for the day.

8            Tomorrow what you'll be hearing is initially the

9    instructions, and you'll each have a copy of those, and then the

10   lawyers' arguments.   I can't tell you an exact time frame on

11   that at this point.   My hunch is that we may not finish the

12   arguments before the lunch break, but we'll be getting you lunch

13   tomorrow.   We'll have a court security officer at some point,

14   and he or she will take you down there and get you lunch, and

15   we'll probably do a shorter lunch break for that reason.   So, if

16   we don't finish the arguments in the morning, we'll finish them

17   right after lunch, and then you'll start your deliberations at

18   that point.

19           So, you've heard all of the evidence, but you haven't

20   heard my instructions on the law, and you haven't heard the

21   lawyers' closing arguments.   So, don't start making up your

22   mind.   Don't start discussing the case.   Leave your notebooks in

23   the jury room   And tomorrow morning -- let me just look real

24   fast.   Yeah.   I'm going to say 9:40, nine four zero, is our

25   start time.   Okay?

1    I'll be right back out.  All rise.  The jurors can come

2    with me.

3        (The following proceedings were had in open court, out of

4        the presence and hearing of the jury:)

5            THE COURT:  Okay.  So, have you worked on a list of the

6    defense exhibits?  Are there things that I'm going to have to

7    rule on, or is it basically worked out?

8            MR. KEENER:  I think there's the issue we kind of

9    raised over there that both sides have about a thousand exhibits

10   on the list, and we don't think the pretrial order --

11           THE COURT:  Okay.  So, the only thing that's disputed

12   is however many actual products there are that the defendant

13   wants to put in.

14           MR. ALY:  Correct.  That's 1 to 163.

15           MR. KEENER:  That's one issue.

16           THE COURT:  One to 163.  That's one issue.  What other

17   issue is there?

18           MR. KEENER:  The other issue would be you made I think

19   abundantly clear that demonstratives that they used with their

20   two experts weren't coming into evidence.

21           THE COURT:  Right.

22           MR. KEENER:  All they showed to them were the

23   demonstratives, not any of the underlying exhibits.  Some were

24   for collections of all sorts of references.  We don't think

25   those were ever introduced in evidence.

1    THE COURT:  Okay.  So, what other issues are there?  I

2    just want to get them kind of teed up.  What else?

3    MR. KEENER:  For exhibits, I believe that's it for

4    exhibits.  We have not compared lists, other than at the end of

5    plaintiff's case to make sure our lists are together.

6    THE COURT:  Let me just make a note.  And I think that

7    Mr. Moskin had told me at one of the sidebars that there's a

8    Rule 50 motion that the defendants have.  Do you have a copy

9    that I can have?

10   MR. MOSKIN:  It was drafted as of last night, and in

11   view of Mr. Brewster's testimony, if time permits, I would add

12   one more paragraph to address some of the issues he raised.

13   THE COURT:  So, here's what I want to do.  I want to

14   get what you have now, and then you can add the other paragraph

15   verbally --

16   MR. MOSKIN:  Fine.

17   THE COURT:  -- just to be clear about it, when we come

18   back because I want to look at what you've got.  So, give me a

19   copy, give him a copy, file that one, and then we'll just talk

20   about the additional thing when we talk about this after the

21   lunch break.

22   MR. ALY:  And, of course, your Honor, I don't want to

23   waive anything.  So, I'll just say something about Rule 50 here

24   as we talked about --

25   THE COURT:  You're renewing your Rule 50 motion.

1     MR. ALY:  Yes.

2          THE COURT:  Okay.  Did you want to say something?

3          MR. MOSKIN:  And also I had started to raise earlier

4     that in defendant's Rule 50 motion, there were four products

5     mentioned.

6          THE COURT:  Oh, yes.  The things -- you were going to

7     tell me about those.  We're going to table all that 'til after

8     lunch.

9          MR. MOSKIN:  Okay.

10         THE COURT:  So, we'll talk about that after lunch.

11    We'll talk about your Rule 50 motion, the supplemental

12    paragraph.  We'll talk about this exhibit thing.  In the

13    meantime, I'd like you to get together on the list of the

14    defendant's exhibits so that aside from the category -- a couple

15    of categories of things that I have to rule on, you're

16    comfortable on everything else.

17         And so, I've got a couple of matters at 1:30, one of

18    which is a sentencing.  It should not take very long.  And so,

19    we're going to resume an hour from now.  So, five minutes to

20    2:00.

21         (Whereupon, the within trial was recessed to 1:55 o'clock

22         p.m of the same day.)

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

|    |    |
|----|----|
| 1  | IN THE UNITED STATES DISTRICT COURT |
|    | NORTHERN DISTRICT OF ILLINOIS |
| 2  | EASTERN DIVISION |

1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3

4  GAMES WORKSHOP LIMITED,     )

5                 Plaintiff,  )  Docket No. 10 C 8103

6          vs.         )

7  CHAPTERHOUSE STUDIOS, LLC,  )  Chicago, Illinois
   et al.,                )  June 11, 2013
8                     )  1:55 p.m.
              Defendants.  )

9

10                     VOLUME 7
               TRANSCRIPT OF PROCEEDINGS
11    BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

12
  APPEARANCES:
13

14  For the Plaintiff:     FOLEY & LARDNER, LLP
                       BY:  MR. JONATHAN E. MOSKIN
15                  90 Park Avenue
                  New York, New York  10017
16

17                       FOLEY & LARDNER, LLP
                       BY:  MR. JASON J. KEENER
18                  321 North Clark Street
                  Suite 2800
19                  Chicago, Illinois  60610

20

21  For the Defendant:     WINSTON & STRAWN, LLP
                       BY:  MR. IMRON T. ALY
22                           MR. BRYCE COOPER
                           MR. THOMAS KEARNEY
23                  35 West Wacker Drive
                  Chicago, Illinois  60601
24

25

```
 1                              WINSTON & STRAWN, LLP
                                  BY:  MS. JENNIFER A. GOLINVEAUX
 2                              101 California Street
                                San Francisco, California  94111
 3

 4                              MARSHALL, GERSTEIN & BORUN
                                  BY:  MS. JULIANNE M. HARTZELL
 5                              233 South Wacker Drive
                                Willis Tower #6300
 6                              Chicago, Illinois    60606

 7

 8   Also Present:            MR. NICHOLAS VILLACCI

 9                            MS. GILLIAN STEVENSON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24           LAURA M. BRENNAN - Official Court Reporter
               219 South Dearborn Street - Room 2102
25                  Chicago, Illinois   60604
                         (312) 435-5785
```

1    (The following proceedings were had out of the presence

2  and hearing of the jury:)

3        THE COURT:  Do we have everybody that we need?

4        MR. KEENER:  Mr. Moskin is out there.

5        THE COURT:  Somebody go out in the hall and whistle

6  him down here.

7    (Brief interruption.)

8        THE COURT:  Okay.  We're back on the record.

9        So where I want to start is where you -- Mr. Moskin's

10 argument on point four of the defendants' Rule 50 motion.

11 This was the argument that certain things were, quote,

12 unquote, conceded.

13       MR. MOSKIN:  Your Honor, I'm sorry.  I didn't hear

14 that.

15       THE COURT:  The two points.

16       MR. MOSKIN:  On their motion.

17       THE COURT:  On their motion.

18       MR. MOSKIN:  The conceded or not conceded.

19       THE COURT:  Right.

20       MR. MOSKIN:  Okay.  So there was at the bottom of

21 page 9, they identified two products.

22       THE COURT:  Right.

23       MR. MOSKIN:  Copyright issues.

24       THE COURT:  Celestial Lyons and the Death Watch

25 Runic.

1    MR. MOSKIN:  Yes, Death Watch pads, shoulder pads.

2    So product 6 was Celestial Lyons.  Mr. Merrett did

3    testify that the imagery on the Lyon is not -- we're not

4    claiming copyright in that, but the claim remains for the

5    shape, the underlying shape of the shoulder pad.

6    THE COURT:  Okay.

7    MR. MOSKIN:  The other product, the Death Watch

8    shoulder pads, which are product 9, that's -- they're gone.

9    They're out of the case.  He did concede that they're not --

10    THE COURT:  Okay, all right.

11    MR. MOSKIN:  Turning the page, page 11.

12    THE COURT:  So I assume that -- I assume that in

13    terms of what the jury is doing, all we really need to do on

14    that is remove that item from the verdict form, right?

15    MR. ALY:  That's right.  If they want to take it from

16    the chart, they can.

17    THE COURT:  Okay.  Well, I mean, the jury is going to

18    know from the verdict form.  They're going to know from the

19    verdict form these are things they have to decide.

20    MR. MOSKIN:  And we're at least agreed that there's a

21    separate listing for everything that corresponds to a product

22    in the --

23    THE COURT:  And the numbers correspond to the claim

24    chart basically.

25    MR. MOSKIN:  Exactly, yes.

1       The next two issues regard the Aquilla design.

2       THE COURT:  Right.

3       MR. MOSKIN:  There was substantial testimony that the

4   Eagle design with the two wings, that Chapterhouse's website

5   is an infringement of the Aquilla design.

6       THE COURT:  What's been referred to as the

7   Chapterhouse logo, you mean?

8       MR. MOSKIN:  Right.

9       THE COURT:  Okay, all right.

10      MR. MOSKIN:  And --

11      THE COURT:  I do remember some testimony about that.

12      MR. ALY:  And that logo is not asserted.

13      THE COURT:  I didn't ask you to talk yet.

14      MR. ALY:  I'm sorry.  I misunderstood.

15      MR. MOSKIN:  And the other one that is cited is the

16  Striking Scorpion.  There was evidence of actual confusion,

17  post-sale confusion.  One of the postings on eBay was somebody

18  selling the defendants' Armana'serq character and calling it a

19  Striking Scorpion.

20      THE COURT:  Okay.  Now you can talk.

21      MR. ALY:  Sorry.  So on the first two issues, we are

22  in agreement, the first two products being the Celestial

23  Lyons, and that product 9.

24      MR. MOSKIN:  Death Watch.

25      MR. ALY:  Death Watch.

1  And the third point, the Aquilla, your Honor, that

2  was as to the copyright claim, that was to be included in the

3  claim charts, Exhibit 1020 and 1021.  They were not asserted

4  or included in discovery and not included in the claim charts.

5  THE COURT:  So you're saying that one's not in the

6  claim chart?

7  MR. ALY:  That's correct.  So they shouldn't be

8  allowed to add Aquilla into the case now.

9  MR. MOSKIN:  Well --

10  THE COURT:  Wait a second.  Let me just look at

11  something.  Is it on the proposed verdict form?

12  MR. MOSKIN:  Yes, your Honor.

13  THE COURT:  What number's given to it on the verdict

14  form?

15  MR. MOSKIN:  Well, 9 or so.

16  MR. KEENER:  It's Exhibit 1023 of all the trademarks

17  being asserted, page 1 of the registered trademarks --

18  THE COURT:  All I'm asking about is the verdict form.

19  I'm looking at the plaintiff's proposed verdict form.  Where

20  do I find the Aquilla, A-q-u-i-l-l-a, Aquilla, or however it's

21  pronounced?

22  MR. KEENER:  It should be on the very first few on

23  the trademark section.  Page 9 -- sorry -- page 10, entry

24  number 9.

25  THE COURT:  And so these, the numbers that are on the

 1    trademark section, do they correspond to something on the

 2    claim charts?

 3            MR. KEENER:  Exhibit 1023 was the three different

 4    lists of various trademarks and --

 5            THE COURT:  So you're saying that this Eagle thing is

 6    on the claim chart.

 7            MR. KEENER:  On page 1023 of the claim chart was a

 8    listing of all the trademarks.  The trademark one, yes.  The

 9    claim chart, which is all the copyright issues --

10            THE COURT:  So you're saying --

11            What are you saying, Mr. Aly, there is some sort of

12    forfeiture because of -- on the chart?

13            MR. ALY:  Yes.  There's two different charts, your

14    Honor.  I'm sorry, but let me be more clear.

15            The copyright charts -- this is a copyright claim

16    portion of the motion, and in the dropped claims --

17            THE COURT:  I don't think that there is a -- I mean,

18    I don't think there's a copyright claim based on this; it's

19    just trademark.

20            MR. ALY:  Check that off on list.

21            Now, on the trademark side, they were supposed to

22    identify where it is that we infringe or use the mark, and

23    that's where is there no indication.  It is on the list, I

24    agree with that.  It is on the list.

25            THE COURT:  And you wanted to say something about the

1  Striking Scorpion.

2        MR. ALY:  Yes.  As shown in our motion, the Striking

3  Scorpion evidence of possible post-sale confusion was outside

4  the United States, he's referring to this French eBay posting.

5        THE COURT:  Does it matter?  Does it matter?  It's

6  outside the United States.

7        MR. ALY:  It does matter.

8        THE COURT:  Why?

9        MR. ALY:  Because the law, the trademark law, is

10  restricted to the United States.

11        THE COURT:  I see.  Okay.  What about that, Mr.

12  Moskin?

13        MR. MOSKIN:  We also showed that the product is

14  available to be purchased in the U.S.  It was --

15        THE COURT:  Basically what you're saying is even

16  though the evidence comes from outside the U.S., it's evidence

17  of potential confusion within the U.S.

18        MR. MOSKIN:  Right, and it also, more

19  inferentially --

20        THE COURT:  Anybody can look at an eBay posting from

21  anywhere in the world, right?

22        MR. MOSKIN:  Right.

23        And furthermore inferentially, a French individual is

24  not so fundamentally different in their thinking from an

25  American individual.

1  THE COURT:  Have you lived in France?

2  MR. MOSKIN:  I'm sorry.  No, I haven't.  So maybe --

3  THE COURT:  I have.

4  MR. MOSKIN:  -- that's why I made such a naive

5  comment.

6  But, anyway, more important, is the inferences that

7  can be drawn that one person anywhere in the world was

8  confused.  Simply the fact that it is available -- we took it

9  down very quickly, but it could have been purchased in the

10  U.S.  That's the nature of the Internet.

11  THE COURT:  Okay.  Then.  So I think -- I'm not

12  persuaded at this moment in time that there is insufficient

13  evidence on the Striking Scorpion.  I'm not persuaded that the

14  fact that the Eagle thing wasn't on this particular claim

15  chart precludes it from being asserted.  I think there is some

16  evidence about the Celestial Lyon and the Death Watch Runic

17  everybody is agreeing should come off.  So you should just

18  take the one off on the rest of them, and I'm overruling the

19  objection.

20  All right, so we're done with that.

21  So on the -- let me just make a note here.

22  MR. ALY:  Take the two off?

23  THE COURT:  Yes.  Well, no, because the other one

24  isn't on the copyright part.  It's just on the trademark part.

25  MR. ALY:  The Lyon, I'm sorry.  Maybe I should --

1    THE COURT:  The Lyon.

2    MR. ALY:  -- be clear.

3    You said to take the one off the copyright chart and

4    I think there should be two off the copyright chart.

5    THE COURT:  No.  I think Mr. Moskin argued that there

6    was evidence, that there was evidence about infringement of

7    the shape.

8    MR. ALY:  The underlying pad, but the claim chart for

9    the Celestial Lyon also asserts infringement of the Lyon

10   design for the copyright, so it's really as to that portion.

11   THE COURT:  So what we need to do is not change the

12   verdict form but change the claim chart.

13   MR. ALY:  I think that would be easier, yes, your

14   Honor, because in all other instances where plaintiff has that

15   similar type of allegation, it --

16   THE COURT:  I think that's appropriate.  So just fix

17   it.  You will look at the fix to make sure it's okay, and if

18   there is a problem, you will tell me in the morning.

19   MR. ALY:  Sure.

20   THE COURT:  On the defendants' --

21   On the plaintiff's Rule 50 motion, the only thing

22   that I really want to hear from you about is the argument

23   about -- I'm going to pronounce it right, but scenes a faire,

24   which everybody calls scenes a faire, s-c-e-n-e-s a f-a-i-r-e,

25   scenes a faire.  Scenes a faire.  I guess you could call it

1    scenes a faire.

2         The contention that Dr. Grindley really didn't offer

3    enough testimony nor does it come from any other source that

4    would warrant a scenes a faire defense, it's really a jury

5    instruction issue, too, but I would like to hear what you have

6    to say about it here.

7         MR. ALY:  Sure, your Honor.

8         On this issue on scenes a faire, we did a lot of

9    research to find out what the standard was with regard to the

10   motion in limine, and what we found, which was on the same

11   issue, we believe -- and what we found was that the quantum of

12   proof issue is not that much.  If somebody says this is a

13   standard, or sometimes the impression to the fact finder is

14   that we found that this was standard or believe that it is, it

15   doesn't require a survey of a bunch of materials or a

16   quantification of any kind.

17        And we were laughing yesterday about a case involving

18   a fantasy story about somebody in Hawaii using a certain kind

19   of a story line.  Just if there is enough combinations there

20   that they can say, yes, this is standard, and that is pretty

21   much what is adequate as far as legally, and then there is a

22   fact finding that goes thereafter, and so we believe it was

23   adequate and, in fact, exceeded that expectation here for Dr.

24   Grindley to have testified in his experience what else he had

25   seen and explained why it was a standard treatment.

1  THE COURT:  Mr. Moskin.

2  MR. MOSKIN:  Well, I don't know.  I'm not certain

3  which specific authority he's citing, but more than just the

4  neutral level that, you know, what minimum threshold must be

5  met, here there was affirmative testimony by Dr. Grindley that

6  there was nothing standard about any of these things.  He

7  admitted in every instance that there could have been other

8  examples, other ways to do these things.

9  So he I think affirmatively undermined any claim that

10  this was scenes a faire or scenes a faire.

11  And I will note and, by the way, have a similar

12  argument that I mentioned there were a couple things that we

13  hadn't yet built in -- a similar argument regarding -- I think

14  it's Mr., not Dr., Brewster that the -- there's a few

15  instances of a chevron here and there taken out of context

16  don't -- are irrelevant and misleading to the jury.

17  MR. ALY:  If I may be heard on that?

18  THE COURT:  Yes.

19  MR. ALY:  Sure, Judge.

20  The issue there is to the protected element.  So they

21  have a point, and that point is that Grindley's analysis

22  didn't go to the intricate level of detail to say that scenes

23  a faire.  His analysis stopped at a certain point.  If you

24  look at, for example, the legs or the legs testimony, it's at

25  a certain level of expression, an idea, that that is the

1  merger or that's the scenes a faire.

2          But then beyond that, there's also an area that --

3  this is where the cross examination was -- that intricate

4  details beyond that would not be -- scenes a faire would not

5  be -- and we're not arguing.

6          THE COURT:  Here is I guess the question I have, and,

7  again, this is sort of a -- it is sort of a jury instruction

8  issue as well as a Rule 50 issue.  And I guess I'm looking at

9  it more in a jury instruction sense.  I am just pulling it up.

10  I just want to pull up the pattern instruction on that.  Give

11  me just a second to get it in front of me.

12          "Protected expression does not include settings,

13  poses or characters that are indispensable or at least

14  standard in the treatment of a particular subject."

15          That's basically the sentence that covers scenes a

16  faire.  So what is the testimony from Dr. Grindley or anybody

17  else that what in particular would meet that standard?

18          MR. ALY:  Sure, your Honor.

19          There would be the examples that are what's the level

20  of protected expression that would not include, for example,

21  the joints of a leg or the expression of the --

22          THE COURT:  The fact that a leg has joints or the

23  particular way in which the joints are expressed in the little

24  covering that is given to them?

25          MR. ALY:  Having a covering would still be on the

1 scenes a faire side.  Going beyond that --

2          THE COURT:  That's not what the claim is.  The claim

3 isn't we get a -- we get a copyright in any kind of a shoulder

4 pad.

5          MR. ALY:  Sure.

6          THE COURT:  I mean, that would have gone out on

7 summary judgment motion.

8          MR. ALY:  Understood.

9          THE COURT:  That's not the claim.

10         So what is it about their claim, what they're

11 actually claiming, that falls within the scenes a faire

12 doctrine?

13         MR. ALY:  Sure.

14         So that they say they have -- on that leg example,

15 they have a boot, for example.  Dr. Grindley would say a boot,

16 having that futuristic boot, is a scenes a faire.  Now, within

17 the boot, if you have a particular marking on there, that

18 detail, that would be expressed.

19         Well, we did find one case, your Honor, if I may

20 address that one.  It's the Atari case that both sides have

21 cited.  In fact, it's the same one that plaintiffs cite, and

22 there is a discussion.

23         THE COURT:  What about Atari?

24         MR. ALY:  There is a discussion about the Pacman:

25         Quote:

1    "The maze and scoring table are standard game devices

2  and the tunnel exits are nothing more than the common" --

3    THE COURT:  Presumably that is part of what the

4  plaintiff was claiming in that case.

5    MR. ALY:  And that's the issue.

6    So in this case, the plaintiff is claiming that the

7  leg looks the same when you put the two together.  And we

8  would ask the jury and your Honor to break apart the

9  protectable and the nonprotectable elements of that.  So it's

10 not protection as a whole; it's you have got to look at what

11 the elements are.

12    THE COURT:  Mr. Moskin.

13    MR. MOSKIN:  I'm not aware of anyplace where we have

14 claimed legs as such.  What we have said is --

15    THE COURT:  Stop right there.  Show me the --

16    Somebody -- you don't have your tech guys here.

17    MR. ALY:  I could get something.

18    THE COURT:  Show me a claim chart and show me exactly

19 where on some claim chart --

20    You can show me the hard copy.  That's okay.

21    MR. ALY:  Sure.

22    THE COURT:  The claim chart that you're saying

23 somebody is claiming a leg.

24    MR. ALY:  It's Mr. Merrett's testimony, not

25 specifically with the leg, but that same point is made about

1   how Mr. Merrett says.  Another example would be their Space

2   Elves.  So we have a futuristic elf or Space Marines or

3   futuristic soldiers.

4           So it hasn't been made clear yet, and the

5   instructions don't either, about which the break-apart between

6   what is protected and what is not and that the jury is allowed

7   to say, this part's not protected, at whatever level they

8   reach, and then we can dig deeper than that if you want to say

9   what is protected.  That is what Dr. Grindley's testimony was

10  meant to offer.

11          Another example would be the weapon.  This is the

12  SCAR rifle weapon.

13          THE COURT:  May I look at it?

14          MR. ALY:  Sure.  Product 117.

15          THE COURT:  Number 117.  So what are you telling me

16  is the part of this that is covered by scenes a faire?

17          MR. ALY:  Everything except --

18          THE COURT:  The fact that the gun has a barrel?

19          MR. ALY:  Everything except for the tip at the end,

20  and this is an example where plaintiffs say we infringed by

21  copying their product, and Mr. Merrett's testimony was we have

22  guns that copy their guns.

23          THE COURT:  Why isn't this sufficiently covered by

24  the part of the pattern jury instruction that says that

25  copyright law protects only original expression?

1    MR. ALY:  Because the original -- what makes it

2   original is partly inspired by whether they have come up with

3   it first, but it's also -- it's not original even if they came

4   up with it originally independently, but it's still scenes a

5   faire.

6        This goes to Mr. Keener's cross examination from

7   yesterday saying that, if you came up with it on your own,

8   that can still be original, but that doesn't mean it's still

9   copyrightable under this protected expression limiting factor.

10  So even if you come up with it on your own to summarize, but

11  that's the way everybody else treats whatever that subject

12  matter is, then it's still not protectable.

13       MR. MOSKIN:  A couple of things.

14       First of all, Dr. Grindley didn't talk at all about

15  the Eldar figures because they were in the first part of the

16  case.  And on the Dark Eldar figure, Mr. Villacci himself

17  acknowledged affirmatively that it could have been done an

18  infinite number of ways.  So there was no testimony they are

19  drilling down to specific levels.

20       On the guns, I would concede the guns are -- some of

21  the guns are the weakest part of our case.  But we did also

22  hear testimony from Mr. Nagy that the dimensions, the specific

23  dimensions, were copied.  The combi weapons were made

24  specifically where they could be swapped in and out, copying

25  those dimensions.

1    So, again, I would concede as far as the guns go,

2    that that is the -- those are the weakest claims that we have

3    for copyright.

4         THE COURT:  Here is your document back.

5         Well, I have got to tell you -- I mean, I had -- you

6    know, Ms. Hartzell tried another copyright case in front of me

7    a few years back, and scenes a faire was one of the issues in

8    that case, too, I think.  It's hard sort of for me to draw a

9    clear line of demarcation between simply talking about

10   protected -- again, I'm quoting from the pattern instruction:

11        "Protected expression means expression in the

12   plaintiff's work that was created independently involving some

13   creativity."

14        It's hard for me to come up with a clear demarcation

15   between that concept and the concept that, quote, "protected

16   expression doesn't include settings, poses or characters that

17   are indispensable or at least standard in the treatment of a

18   particular subject," close quote, which is the Scenes a Faire

19   Doctrine.

20        It seems to me that those are almost two ways of

21   saying the same thing.  Having said that, you know, people who

22   sit on higher floors of the building than I do have said that

23   this is a doctrine of copyright law.  I'm not persuaded that

24   it's out of the case altogether.  I'm not persuaded that there

25   is not enough testimony to support the issue at all.  So I'm

1    going to overrule that part.

2          I want to say one thing about an aspect of that part

3    of the motion, and this also gives me an opportunity to say

4    something I forgot to say yesterday with regard to the

5    defendants' Rule 50 motion.

6          So I have a question for you, Mr. Moskin.  In the

7    section of the motion, of your motion, that concerns Dr.

8    Grindley, an argument is made that his testimony doesn't have

9    foundation and it should be stricken.  Okay.  So was that

10   objection made contemporaneously?

11         MR. MOSKIN:  No, your Honor.

12         THE COURT:  Okay.  Now my question is -- I have a

13   similar question for Mr. Aly.

14         In the defendants' motion for judgment as a matter of

15   law, on the section about Section 3 about originality, there

16   was a contention made that Merrett -- Merrett's testimony

17   regarding how the designer's work was incompetent because he

18   didn't have personal knowledge.  Was that objection made

19   contemporaneously?

20         MR. ALY:  Yes.

21         THE COURT:  Tell me when and how and show me in the

22   transcript which you have.

23         MR. ALY:  Fine.

24      (Brief interruption.)

25         MR. ALY:  It was on a sidebar.  We'll find it.

1    MS. HARTZELL:  It was on --

2    THE COURT:  I want to see it.  So just put the page

3 number in the record.  Cite the page number for the record,

4 and I will look at it.

5    MS. HARTZELL:  All right.  It began on page 309.

6 Line 22 was the objection, and it continued on to 310.

7    THE COURT:  Let me see it.

8    (Brief interruption.)

9    THE COURT:  Okay.  I'm not sure that that is -- that

10 what is cited there at pages 310, or 309 to 311, is precisely

11 the same thing we're talking about in this motion.  Let me

12 just look at one other thing for a second here.

13    (Brief interruption.)

14    THE COURT:  But I get the point.  An objection

15 similar to this was made.  On the one that is referred to in

16 the plaintiff's memorandum, I mean, if it's not a

17 contemporaneous objection, it's forfeited.  That's the bottom

18 line.

19    Okay.  So we're done with the Rule 50 motions.

20    MR. MOSKIN:  Just to clarify, there were -- we can

21 submit just for the record, just to preserve the point, the

22 full motion later today.

23    THE COURT:  Oh, yes.  There was the other issue that

24 you wanted to raise.

25    MR. MOSKIN:  I already alluded to it, and there are

1    two issues.  The one with regard to Brewster who, again, he

2    offered no opinion that any of the squad markings or, you

3    know, skulls or things were common and on cross examination

4    conceded that it would be very unusual.  I mean, the whole

5    point of squad markings is to distinguish one squad from

6    another.  So these would not be common at all.

7        Moreover, we believe that the specific copying of the

8    entire range of tactical devastator and assault squad markings

9    1 through 10, that again, that specific combination, it's

10   conceded there is nothing like it in any reference, prior

11   reference, that a directed verdict can be granted that that

12   range can be deemed infringing on top of these shoulder pad

13   design.

14           THE COURT:  I think there is jury questions on all

15   these.  But I will tell you, though, that what you just said

16   in the first part of your comments there, I think is a pretty

17   decent illustration of the problem I have with the application

18   of the Scenes a Faire Doctrine in this case.

19           I mean, I think it all depends on the level of

20   generality at which one defines what is copyrightable.

21   Brewster said all military units have insignia.  Of course

22   they do.  The claim in this case isn't that we have insignia.

23   The claim is the particular insignia.

24           MR. MOSKIN:  Right.

25           THE COURT:  And the problem with the Scenes a Faire

1  Doctrine -- and I don't know; I may change my mind on this as

2  we go through the rest of the jury instructions -- is that,

3  you know, it's -- the argument that including it is misleading

4  is something not an off-the-wall argument because, you know, I

5  don't understand there to be a claim in this case that the

6  fact that we have a shoulder pad is something that we own the

7  exclusive rights to that you can't infringe.

8       The fact that we have insignia is something that we

9  have exclusive rights to, you can't infringe.  The fact that

10  we have knee joints is something that we have exclusive rights

11  to that you can't infringe.  It's the particular expression of

12  those things.  And I guess I'm still not entirely comfortable

13  that there's enough evidence on the other side.  That's just a

14  comment.

15       We're going to move on to the next topic.  The next

16  topic is where are we as far as the defense --

17       MR. MOSKIN:  Can I just note the one other, for the

18  record?

19       THE COURT:  Yes.

20       MR. MOSKIN:  The other one other thing is on the

21  defendants' fair use defense to copyright -- to trademark,

22  rather --

23       THE COURT:  Fair use, yes.

24       MR. MOSKIN:  Fair use to trademark.

25       I can cite the Court to the case Pebble Beach Company

1    v. Tour 18, 155, F.3d 526, which is a Fifth Circuit case, but

2    I can also give you a place where it was cited approvingly

3    fairly recently in the Northern District of Illinois in R J

4    Reynolds against Premium Tobacco, 2001, U.S. District Lexis

5    8896, at star 16.  And what the Fifth Circuit said in Pebble

6    Beach was that one who has lawfully copied another product can

7    tell the public what he has copied.  So here --

8              THE COURT:  Say that again.

9              MR. MOSKIN:  One who has lawfully copied can tell the

10   public what he's copied.  So here the premise is you can't

11   make a copy of, say, an Exorcist pad and then say it's a fair

12   use to tell people it's a copy of an Exorcist pad or any of

13   the works in issue.

14             So where you start --

15             THE COURT:  Okay, I get that.

16             MR. MOSKIN:  Okay.

17             THE COURT:  What is your point, though?

18             MR. MOSKIN:  So that's something of which we want to

19   say that their fair use defense is flawed and there shouldn't

20   be an instruction to the jury on that.

21             THE COURT:  Well, you will remind me of that when we

22   get to the instructions.

23             MR. MOSKIN:  Again --

24             THE COURT:  I don't think it's a basis for Rule 50 at

25   this moment in time.

1    MR. MOSKIN:  Very well.

2    THE COURT:  Okay, defense exhibits.

3    So have you gone through the list and do you have it

4    narrowed down?

5    MR. KEENER:  We got a list about 15, 20 minutes ago.

6    We have substantial agreement, but there is probably a good,

7    except for the two categories we said, dozen or so on our list

8    on theirs and vice versa on theirs on ours.

9    THE COURT:  Let's talk about the two categories.  The

10   first category is Exhibits 1 through 163 which are the actual

11   products of the defendant that are claimed to be infringing.

12   So we talked about this at a sidebar where we were

13   really just talking about scheduling and I didn't have the

14   court reporter over there.  So, Mr. Keener, why don't you

15   repeat what you told me and make your record on this.

16   MR. KEENER:  On both parties' exhibit list, there's

17   800 or a thousand exhibits each, and lots of them without

18   objections.  And we think it's improper to admit to the jury

19   exhibits that no one has referred to at all throughout the

20   course of this case because that would be hundreds of other

21   exhibits.

22   And out of the physical exhibits they actually

23   referred to and used, I think three of them the entire time.

24   Now they're going to try and make a huge point in their

25   closing that you have to look at the actual physical exhibits,

 1 │ and they have not done that at all in the entire case.  Even
 2 │ the experts have said --
 3 │        THE COURT:  Well, there was some of that done.  I
 4 │ mean, Mr. Aly a couple of times got out, you know, the little
 5 │ gray things on the little grids and popped them up on the
 6 │ Elmo.
 7 │        MR. KEENER:  We saw the Tervigon.  We saw one
 8 │ shoulder pad with wings.  I think there was one other one that
 9 │ we saw.  Beyond those three, even their own expert said, all
10 │ you need to do is look at the claim charts and the pictures.
11 │ Now they're going to make a big issue about --
12 │        THE COURT:  Are you saying that none of the original
13 │ products should come in, even the ones that were used?
14 │        MR. KEENER:  No.  The ones that were used, no
15 │ problem.
16 │        THE COURT:  So which ones are those?
17 │        MR. KEENER:  Those are Exhibits 37, 83 and 95.
18 │        THE COURT:  Why do you need all 163?  Why can't we
19 │ just --
20 │        You know, part of the idea --
21 │        First of all, the verdict forms that we are giving to
22 │ the jury, I mean, I think lay this out pretty simply.  They're
23 │ going to have a -- I will just say boatload of work, okay, a
24 │ boatload of work to do without me, you know, backing up a dump
25 │ truck to the door of the jury room and saying, here's all the

1    exhibits.

2           So why do you need all 163 of these things?  Why

3    isn't it enough for me to say, here's three and all the rest

4    of them are the same?

5           MR. ALY:  Because, your Honor, they're not the same,

6    and, unfortunately, we've got different --

7           THE COURT:  They're all little gray things.

8           MR. ALY:  The shoulder pads maybe, but not like Land

9    Raider kits when we see the artwork on there.  It's a

10   copyright infringement case.  They're saying that the art on

11   top of things like door panels and things copies theirs, and

12   so they should be able to see the actual thing accused of

13   infringement.

14          We can fit it all into one box, and we're not talking

15   about all the other --

16          THE COURT:  How big is this box?

17          MR. ALY:  It will be one --

18          THE COURT:  Is it the size of a dumpster?

19          MR. ALY:  -- cardboard box.

20          No, you have seen it.  It's a card -- the cardboard

21   box is a standard cardboard box that is in the back of the

22   courtroom.  Because of the size of these parts being as small

23   as they are, we can do that.

24          MR. KEENER:  Your Honor, we have dozens of our

25   products as well, too.  We put two into evidence, two that we

1    actually used although there's hundreds listed on the exhibit

2    list we never used.  We used the Tactical Space Marines an

3    awful lot of times and used the Tervigon at the end.  I don't

4    think all of our products should go back there.

5         THE COURT:  Well, but doesn't Mr. Aly have some sort

6    of a point when he says, wait a second, it's a copyright

7    infringement case, doesn't the jury actually get to see the

8    item that is alleged to have infringed the plaintiff's

9    copyright?

10        MR. KEENER:  Well, two points.

11        One, their own experts say you don't need it.  You

12   only need to look at the claim charts.

13        THE COURT:  I know, but that's what the experts say.

14   That's not a binding admission that's binding on Chapterhouse.

15        MR. KEENER:  I agree.

16        Two, one exhibit they did use and get admitted is

17   they have got a collection of all detailed photographs of

18   every one of their products unpainted, unassembled, by itself,

19   and that is going back there.

20        THE COURT:  Is that true?  Do you have photographs of

21   everything?

22        MR. ALY:  Not of every single thing.  There are a lot

23   of them that are and a lot of them that are not.

24        THE COURT:  Well, what percentage?

25        MR. ALY:  I don't know, 50.

1        MR. KEENER:  Much more than that.

2        MR. ALY:  50 percent, something along those lines.

3        MR. KEENER:  Right.  And if the rest were so

4   important, it should have been brought at trial.

5        THE COURT:  Here's the flaw in that argument, okay.

6   The flaw in that argument is twofold.

7        Number one, I put time limits on you, okay.  And so

8   people had to make choices about what they were going to spend

9   time with witnesses on.

10       Number two is that there's a provision in the

11  pretrial order rule which says that anything that is not

12  objected to is in evidence.  Now, that doesn't mean that

13  everybody -- that everything automatically goes in because I

14  do think that it's unwise to, you know, to overload the jury

15  with exhibits just because somebody didn't object to them.

16       I mean, if nobody had objected to anything, we would

17  have, you know, a couple of thousand exhibits in this case.

18       But, I mean, I think the fact that they didn't use it

19  with a witness is, frankly, partly a function of the time

20  limits.  And I don't -- you know, the intention of the time

21  limits was not to say, okay, this supersedes the pretrial

22  order rule.

23       I'm inclined to let it in, and if that means you want

24  to put yours in, too, you can put yours in, too.

25       MR. KEENER:  Your Honor, that would mean as well as

1   our book or box of physical books for all of our products?

2   MR. ALY:  To the extent there was no objection, of

3   course.

4   THE COURT:  Give them everything.  I mean, and just

5   so you understand that you are both courting the wrath of the

6   people who will be deciding your case.  They're not going to

7   blame it on me.  They're not going to blame it on me.  They're

8   going to blame it on you.

9   So you will make judgments about what you want to put

10  in.  And I would certainly permit -- I would certainly permit

11  the defendants, if you make what in my view would be a wise

12  judgment not to put in all 163 things to say, you know, the

13  rest of these -- these are examples; extrapolate from there

14  the rest of our products are very similar to these, these

15  little gray things that are on, you know, little twisty things

16  that you snap them off of or whatever the lingo is.

17  I am just going to leave this to people's own

18  judgment.  Okay.

19  So the other category of objections that we can deal

20  with now is what?

21  MR. KEENER:  Is dealing with the experts.  So the

22  experts put on PowerPoint demonstratives which the Court made

23  clear with both experts are not coming into evidence.

24  THE COURT:  The PowerPoints are demonstratives,

25  right.

1       MR. KEENER:  Right.  They never went to the

2   underlying exhibits and used those at all during trial.  So,

3   again, it's a similar objection.

4       THE COURT:  So why should I let those in?

5       MR. ALY:  You should let just the pages in that were

6   shown from the actual exhibits.  We're not intending to put

7   the demonstrative.  We don't even need to put the whole book

8   from which they came in.

9       THE COURT:  When you say "the pages that were shown,"

10  you mean shown in what way and what?

11      MR. ALY:  They were shown on the PowerPoint as

12  call-outs from the actual pages.  So they were put into

13  PowerPoint format for the convenience of not having to blow

14  them up.

15      THE COURT:  So volume-wise, what are we talking about

16  on that?

17      MR. ALY:  Well, there's --

18      THE COURT:  How many pages?

19      MR. ALY:  40.

20      THE COURT:  Okay.

21      MR. ALY:  Total.

22      THE COURT:  Why shouldn't I let him do that?

23      MR. MOSKIN:  Again, they have never used them at all

24  during the case.

25      THE COURT:  But they did.  I mean, if they put a

1    picture of it up on the screen, that to me is using it.  Okay.
2    The objection is overruled.  We're done.
3         All right, now we're going to talk about jury
4    instructions.  As far as I'm concerned, we're done with
5    everything else.
6         So let me preface this by saying you obviously
7    noticed that I didn't include any instructions in there on the
8    state law claims.  And that is because, not because I made any
9    kind of judgments about preemption, but because I'm sitting
10   there looking at them and saying:  Why?  Why would I need to
11   instruct the jury four times on what amount to trademark
12   claims or whatever your claims are?
13        I don't see any significant difference.  I understand
14   there's this little issue about registered versus
15   unregistered.  I think that's a really small issue, and I
16   really don't see any need to do that.  And so the plaintiff is
17   going to have -- if you think I should be instructing on state
18   law claims, you're going to have to persuade me of that.
19        All right.  So the way I want to do this --
20        You know, the record should reflect that at about
21   8:00 this morning, I emailed a draft of the jury instructions
22   to both sides.  We're just going to go through these on a
23   page-by-page basis.
24        We're going to hear any objections that anybody has
25   including things you want to add to particular pages.  We'll

1    go through them from beginning to end.

2          And if there's other things that you want to add, you

3    will tell me when we get to the sort of corresponding point in

4    the instructions.

1    Page number one, are there any issues on that?

2    MS. HARTZELL:  No, your Honor.

3    THE COURT:  Page 2, any issues on page 2?

4    MS. HARTZELL:  No, your Honor.

5    MR. MOSKIN:  No.

6    THE COURT:  Page 3?

7    MS. HARTZELL:  No.

8    MR. MOSKIN:  Nothing.

9    THE COURT:  Page 4.

10   MS. HARTZELL:  No.

11   THE COURT:  Anything through page 7?

12   MS. HARTZELL:  No.

13   MR. MOSKIN:  Yes?  Oh, sorry.

14   THE COURT:  Go ahead.

15   MR. MOSKIN:  There is a standard instruction which we

16   believe could be included on page 5 that if a witness has

17   been --

18   THE COURT:  Talking to a lawyer.

19   MR. MOSKIN:  Excuse me?  No.

20   THE COURT:  Okay.

21   MR. MOSKIN:  If a witness has been untruthful in

22   one -- in a number of instances -- inferences --

23   THE COURT:  When you say "a standard instruction,"

24   pretty much everything could be called standard somewhere.  Is

25   it in the Seventh Circuit patterns?

1    MR. MOSKIN:  We can find it.

2    THE COURT:  No, you can't.  No, you can't.  I'll tell

3    you why I know that.  I've been on every jury instruction

4    committee in this circuit for the past 17, 18 years, and it

5    was -- we considered when we redid the civil instructions that

6    the first two sentences of that instruction, which say "you

7    must decide whether the testimony of each of the witnesses is

8    truthful and accurate in part, in whole, or not at all, you

9    must also decide what weight, if any, you give to the

10   testimony of each witness," is sufficient to cover pretty much

11   any argument you can make, and we don't need to go into minute

12   detail about it.

13        The other thing is it's such an obvious point, the

14   point you're making.  There's no need for an instruction.

15        Anything else through page 7?

16        Okay.  So any issues on page 8?

17        MR. MOSKIN:  Well, on page 7 --

18        THE COURT:  Oh, on page 7.

19        MR. MOSKIN:  -- just to note that, well, again, we,

20   just at least to preserve the issue, we believe there should

21   be an instruction on what weight, if any, if not, the striking

22   of the expert's testimony to the extent your Honor is

23   reserving decision --

24        THE COURT:  Yeah, but, no, I'm not striking it.  It's

25   too late for me to reserve a decision.  The case is going to

1  the jury in the morning.  Okay.  I'm not striking any expert

2  testimony.

3          MR. MOSKIN:  Well, and --

4          THE COURT:  So the testimony is in, and now we're

5  talking about what instruction should be given based on the

6  evidence that is in.

7          MR. MOSKIN:  Yes.

8          THE COURT:  You're not forfeiting an objection to the

9  striking of the testimony because you don't object to the

10  instruction that tells how you evaluate expert testimony.  I

11  can't even imagine even our court of appeals saying that.

12          So anything else on page 7.

13          Page 8, any issues on page 8?

14          MS. HARTZELL:  No, your Honor.

15          THE COURT:  Page 9, definition of preponderance of

16  the evidence, I assume there's nothing there.

17          MS. HARTZELL:  No, your Honor.

18          THE COURT:  Okay.  Page 10, the elements of the

19  copyright claim.  Let me hear first from the plaintiff.

20          MR. MOSKIN:  We have a further comment on the next

21  page, but nothing on this page.

22          THE COURT:  Nothing on page 10.

23          MS. HARTZELL:  Also true for the defendant.

24          THE COURT:  Okay.  All right.  Page 10's good.

25          Page 11 is the definitions on -- oops.  The

1    formatting error in that last paragraph I will fix.

2         So what issues does the plaintiff have on this page?

3         MR. MOSKIN:  One issue in the definition of a valid

4    copyright.

5         THE COURT:  Okay.

6         MR. MOSKIN:  That original combinations of elements

7    are protectible.

8         THE COURT:  All right.  And I'm not saying that it

9    has to be, but is there something you can refer me to in the

10   pattern instructions so that I can, you know, use some

11   language there?  If it's not there -- I mean, I'd like to know

12   if it's there, but if it's not there, just tell me what page

13   of the pretrial order I find your draft of this instruction

14   on.

15        MR. MOSKIN:  It's -- I don't believe that it is in

16   the proposed instructions.  The point is, is that in view of

17   the specific testimony that's come out and as we've just

18   discussed, I think there's a great risk of jury confusion

19   that --

20        And, again, I cited this example in my motion.

21        THE COURT:  I should be looking at No. 18 on page 24

22   of the pretrial order, which says the minimal originality

23   required for copyright protection can include original

24   combinations of elements even if some -- I'm leaving out some

25   language -- even if some or all the elements are not

1  themselves original.

2          MR. MOSKIN:  Yes.

3          THE COURT:  Okay.  But that would not be part of --

4  and I recognize that there is some -- that there's some

5  overlap between valid copyright and protected expression, but

6  that instruction that I just read to you appears in your

7  definition of protected expression, not in your definition of

8  validity.

9          I don't care where it goes.  I think it actually

10  may -- I'm not sure what's the best place actually.  Could

11  go -- could arguably go either place.  Because the validity

12  instruction, I essentially -- was an agreed instruction.  It's

13  No. 14 on page 17 in the pretrial order.  I may have changed a

14  word or two, but I did not otherwise change it at all.

15          So let me ask you this, Ms. Hartzell:  If I were to

16  add to the end of the valid copyright thing --

17          You sure this shouldn't go under the definition of --

18          MR. MOSKIN:  That's fine, your Honor.  I just think

19  there's a great deal of confusion in the case, so I think it

20  would be very --

21          THE COURT:  So would you have a -- and I think it

22  really should go under protected expression.  So,

23  Ms. Hartzell, would you have a problem if I added right

24  after -- between the two sentences that are currently in

25  there, the first being the definition and the second being the

1    scenes a faire sentence, the following?

2            Hang on a second.  I'm thinking.  Just bear with me.

3            The originality required for copyright protection can

4    include original combinations of elements, even if some or all

5    of the elements are not themselves original.

6            MR. MOSKIN:  I apologize.  Can I hear that back?

7            THE COURT:  The originality required for copyright

8    protection can include original combinations of elements, even

9    if some or all of the elements are not themselves original.

10            I basically took the second paragraph of the

11    instruction that the Games Workshop provided under No. 18 on

12    page 24 of the pretrial order and took out some of the, in my

13    view, unnecessary language.

14            MS. HARTZELL:  In that event, I think we would

15    believe that it would be necessary to also --

16            THE COURT:  You know what, I'm going to -- we're

17    going to deal with this one question at a time.

18            So do you have a problem with my adding that.

19            MS. HARTZELL:  By itself, yes.

20            THE COURT:  Okay.  Why?

21            MS. HARTZELL:  Because based upon the language in the

22    court's summary judgment order of November 27th, and we cited

23    to the copyright compendium, merely bringing together two or

24    three standard forms or shapes does not necessarily create

25    protectible expression, and we think that the first statement

 1   without the second statement is misleading.

 2        THE COURT:  Where do I find the language that you

 3   just gave me here?

 4        MS. HARTZELL:  It is in Chapterhouse's proposed jury

 5   instruction, page 26 of the pretrial order, and the court's

 6   November 27th memorandum.

 7        THE COURT:  Just where on page 26?  I'm looking at

 8   it.

 9        MS. HARTZELL:  It is the fourth paragraph.

10        THE COURT:  So, Mr. Moskin, when you're asking for

11   this instruction, is there a particular example of a work that

12   you have in mind that you could cite to me so that I could

13   have some context?

14        MR. MOSKIN:  I don't think --

15        THE COURT:  This combinations thing, in other words.

16        MR. MOSKIN:  Right.

17        I don't think there's any example of a work that

18   consists only of two elements.

19        THE COURT:  No.  It doesn't have to be two.  In other

20   words, you're asking me to give an instruction that says

21   something can be copyrightable if it includes original

22   combinations of elements, even if the elements themselves

23   aren't original, so what's the example of the item that that

24   would apply to?

25        MR. MOSKIN:  Well, for example, your Honor's decision

1    was directed to --

2           THE COURT:  You know what, let's talk about the

3    trial.

4           MR. MOSKIN:  No, no.  I am getting -- that's

5    exactly --

6           THE COURT:  Get to it quicker.

7           MR. MOSKIN:  So the actual Flesh Tearer shoulder pad.

8           THE COURT:  Um-hum.

9           I have to take a break.  Excuse me.

10          (Brief pause.)

11          MR. MOSKIN:  I think the perfect example one in which

12   we, frankly, had wanted a special instruction, anyway, not in

13   here, was the size, shape and configuration of the shoulder

14   pads itself, and which the court has already ruled it's

15   copyrightable.  So you've got size, shape and the rim.  Those

16   are three elements that the court has already determined is

17   copyrightable, so this would be a perfect example right here

18   where, again, the court has already ruled that that specific

19   combination of elements is copyrightable, and that doesn't

20   then require a separate --

21          THE COURT:  So if I give this, tell me where on page

22   11 you think is the best place for it to go.

23          MR. MOSKIN:  I would -- what I would request is

24   immediately after that sentence that your Honor just read to

25   propose to go into the heading of protected expression.

1    THE COURT:  Under the heading of protected

2    expression, not under the heading of valid copyright.

3    And, again, there's overlap between the two.  The

4    argument for putting it under the heading of valid copyright

5    is that the thrust of this has to do with originality, and

6    that valid copyright instruction, you know, is talking about

7    originality over and over again.  The other one, the protected

8    expression one talks about creativity.  And, you know, again,

9    there's -- these are terms that overlap with each other.

10   MR. MOSKIN:  Yeah.  I'm just trying to simplify it.

11   I think it would be more accurate to put an instruction at the

12   end of valid copyright, a specific instruction that the court

13   has already found that the size, shape -- and shape of the

14   specific Space Marine shoulder pad is copyrightable -- is

15   original copyrightable expression.

16   THE COURT:  Oh, you're talking about something

17   different now.  I'm talking about this sentence that I quoted

18   to you a bit ago.

19   MR. MOSKIN:  Right.  I mean, and that can then

20   also -- I mean, I think that arguably should go in the first

21   as well because you really are -- the valid copyrighted

22   section is talking about originality, and originality can vest

23   in combinations, and, again, I think we do -- we very much

24   would like a specific instruction that the court has already

25   ruled that the specific shape --

1    THE COURT:  Okay.  So I'm going to try this one more

2    time.  I'm inclined to add a sentence that says the

3    originality required for copyright protection can include

4    original combinations of elements, even if some or all of the

5    elements are not themselves original.  Assuming I am going to

6    add that, where precisely do you think I should put it on page

7    11?

8    MR. MOSKIN:  I would put it at the very end of the

9    section on valid copyright.

10   THE COURT:  Okay.  That's where I'm going to add it.

11   Let me just write it down here.

12   Okay.  Now, the other thing that you talked about is

13   an instruction that says I've already made a finding that X is

14   the subject of a valid copyright.  So let me ask this

15   question.  I don't have the thing in front of me, so I

16   don't -- I guess I could get it in front of me.  Was that --

17   did I make a finding in a motion for summary judgment that the

18   plaintiff filed on that, or did I conclude that the defendant

19   wasn't entitled to summary judgment on that point?

20   MR. MOSKIN:  There was an affirmative finding in the

21   court's December 27th opinion.

22   THE COURT:  I can get it here because I've got them

23   here.  What would be the page number?

24   Okay.  I've got it.  Never mind.  I have it here.

25   Just a second.

1    So there was a motion by Games Workshop that said

2    we've established copyrightability as a matter of law.  And

3    then over on -- in the Westlaw decision it's 2012 Westlaw 594,

4    9105, at star page 10 and 11.  Let me just read it to myself.

5    Okay.  Am I correct that when I made that finding it

6    concerned a particular item?  And it looks like it was entry

7    49 on whatever claim chart I was dealing with at the time.

8    Does that sound right to you?

9    MR. MOSKIN:  My understanding was that it was broader

10   than that, and, of course, your Honor will recall --

11   THE COURT:  Well, but the problem with that is that

12   the next paragraph says that I rejected Chapterhouse's

13   contention that other Games Workshop shoulder pad designs are

14   ineligible.  So -- I mean, I made findings that certain things

15   are copyrightable.

16   So let me ask the defense.  So there's no question

17   that I made findings that certain things are copyrightable.

18   So how, in the defendant's view, am I supposed to say that to

19   the jury, if at all?

20   MS. HARTZELL:  I think it would be possible to do a

21   listing because there are certain things that are both found

22   copyrightable and not copyrightable.  But I do think we would

23   need to include both if we're including any.

24   THE COURT:  Okay.  Do you agree on which things that

25   I found were copyrightable and which things that I found

1  weren't?

2      MS. HARTZELL:  I don't think we've discussed it with
3  the defendant.

4      THE COURT:  Gee.  It would have been --

5      MS. HARTZELL:  Or with the plaintiff.

6      THE COURT:  -- a pretty good time to do that.

7      You know, I guess the reason I asked if at all is
8  that one of the little concerns here is that, you know, all of
9  these things, or at least some of these things have
10  copyrightable elements probably and non-copyrightable
11  elements, and I'm not sure whether it's going to shed more
12  light or not with the jury to be -- me going through and
13  telling them, okay, on this one it's copyrightable, on this
14  one this isn't, on this one it isn't, this one it isn't.

15      But we're not going to spend time, by the way, it's
16  all being charged to you at this point, in the jury
17  instruction conference, you know, working through items one
18  through 300.  You're going to have to sit down, and it's going
19  to have to be before the close of business today, and attempt
20  to agree on what exactly have I found is the subject of a
21  valid copyright, what exactly have I found is not the subject
22  of a valid copyright, and give me a paragraph that I can plug
23  into this definition that says I've made determinations on
24  this subject already with regard to the following items and
25  here they are.  Okay.

1      MR. MOSKIN:  If I would just note, there was also, as

2   your Honor will recall, a motion for reconsideration filed by

3   the defendant --

4      THE COURT:  Yeah.

5      MR. MOSKIN:  -- not product specific, directed to the

6   court's finding, which I believe they acknowledged in that

7   motion for reconsideration that the basic iconic shape of the

8   Space Marine shoulder pad was copyrightable.  And that motion

9   for reconsideration was denied.  So I think that it's been

10  established in this case that the basic shape, you know,

11  regardless of the specific product --

12     THE COURT:  I don't think anybody is disagreeing.

13  Even, I don't think even the defendant is disagreeing that I

14  made findings on some of these things.

15     MR. MOSKIN:  Fine.

16     THE COURT:  I just need an instruction, and we're not

17  going to sit here and try to draft it right now.

18     MR. MOSKIN:  Okay.

19     THE COURT:  So, you know, your discussion,

20  Ms. Hartzell, earlier about the thing about, you know, the two

21  little pictures put together, you work that into that

22  instruction too because it's all part of the same thing.

23        So, Mr. Moskin, what else do you have on this page?

24     MR. MOSKIN:  That's it on this page.

25     THE COURT:  What else does the defense have on this

1    page?

2         MS. HARTZELL:  We believe that the standard jury

3    instruction on the idea expression dichotomy should be

4    included in the protected expression discussion in part based

5    on --

6         THE COURT:  I thought that -- I kind of thought I had

7    that in here somewhere.

8         MS. HARTZELL:  The sentence that is in the standard

9    jury instruction is not included.

10        THE COURT:  Which jury instruction?  Which number?

11        MS. HARTZELL:  It is 12.5.2 under --

12        THE COURT:  The one thing that I am sorry about on

13   these jury instructions is the numbering.  I was, sadly, the

14   chair of this committee.  They get out of control at some

15   point.  It was like five -- there's like a 12.3.1.2.6 or

16   something.

17        MS. HARTZELL:  It's the second paragraph that we

18   believe is, at least the first two sentences of it, copyright

19   law protects only original expression, that's in.  But this

20   includes the way that ideas and concepts are expressed in the

21   work.  It does not include --

22        THE COURT:  So there's this whole list of --

23        MS. HARTZELL:  Right.

24        THE COURT:  -- laundry list.  It should be --

25        MS. HARTZELL:  Ideas and concepts.

1      THE COURT:  -- ideas and concepts.  And then I should

2   include a sentence that says does not include the ideas and

3   concepts themselves.

4      MS. HARTZELL:  Correct.

5      THE COURT:  I'm not going to include the James Bond

6   example.

7      MS. HARTZELL:  Understood.

8      THE COURT:  Do you have a problem with me adding

9   that, Mr. Moskin?

10     MR. MOSKIN:  I'd just note I don't think there's any

11  instance in this case that requires that instruction because I

12  don't think there's any instance where we're claiming ideas,

13  you know, like, for example, the idea of a futuristic warrior.

14  They're all based very specifically, and so I think you can

15  only confuse the jury.

16     THE COURT:  You know, I don't necessarily disagree

17  with you about what you're claiming and not claiming, but I

18  think there's -- I think there's -- even if there's not going

19  to be argument about it, there's testimony, I think, from

20  which a jury could, without this instruction, get confused to

21  say, well, wait a second, you know, it's this whole concept.

22  So I'm going to add that.  So let me -- so that will go

23  between the two sentences under protected expression.

24     And, by the way, I'm going to get you a revised

25  version of these shortly after we finish up here.  So let me

1 │ just make a note.

2 │       Okay.  Anything else that either side has on this

3 │ particular page?

4 │       MS. HARTZELL:  Yes.  On that same instruction,

5 │ protected expression, we also think that protected expression

6 │ does not include common geometric shapes should be included as

7 │ well.

8 │       THE COURT:  So that's something that kind of cries

9 │ out for more definition.  What do you mean by "common

10 │ geometric shapes"?  Do you mean, trapezoids, rhombi?

11 │       MS. HARTZELL:  In the defendant's proposed

12 │ instructions we included, for example, arrows.  I think that

13 │ when --

14 │       THE COURT:  I don't think an arrow would be a

15 │ geometric shape, but I get your point.

16 │       MS. HARTZELL:  Yeah.  I think that with the addition

17 │ of the combination of elements instruction it's necessary to

18 │ also distinguish what is not included without that

19 │ combination.

20 │       THE COURT:  Is there any risk that a juror would

21 │ think that an arrow without more is copyrightable?

22 │       MS. HARTZELL:  I think there is that risk, yeah.

23 │       THE COURT:  Really.  I don't think so.  I'm not going

24 │ to include that.  I don't think it's necessary.

25 │       Anything else on this page?

1    MS. HARTZELL:  Yes.  Turning to the copying

2    instruction, there does not seem to be anything similar to the

3    Incredible Technologies or Atari conversations about whether

4    the accused work is so similar to the plaintiff's work that an

5    ordinary reasonable person would conclude that the defendant

6    unlawfully appropriated the plaintiff's protectible expression

7    by taking material of substance and value.  There doesn't seem

8    to be any quantification.

9         THE COURT:  The pattern instructions don't include

10   that substance and value thing.  And I think that -- you'll

11   need to show me where in Incredible Technologies you can show

12   me that that concept adds something beyond what is already

13   covered by the jury instructions.

14        MS. HARTZELL:  In page 7, which is 1011 of Incredible

15   Technologies, the paragraph is because --

16        THE COURT:  I know what it says.  My point is that

17   this is covered by other parts of the jury instruction.

18        MS. HARTZELL:  But I think that it is not covered by

19   this copying portion, which misleadingly implies that taking

20   any portion of protected expression is infringement.  Whereas

21   in Incredible Technologies the paragraph begins, it's clear

22   here that the defendant set out to copy the game, so the

23   question that we have to look at is the ordinary observer

24   test.

25        THE COURT:  Give me the pinpoint cite from --

1        Hang on a second.  Let me just sign back onto Westlaw

2   here.  I'm going to have you give me the pinpoint cite from

3   that case.  Just one second.  Sorry.  I'm having some problems

4   here.

5        Okay.  Give me the pinpoint cite.

6        MS. HARTZELL:  400 F3d, 1011.

7        MR. MOSKIN:  It's 1011?

8        MS. HARTZELL:  Yes.

9        THE COURT:  So what does material of substance or

10  value mean?  I mean, it's another term that cries out for

11  definition.

12        And, by the way, the beginning of that discussion in

13  Incredible Technologies says this:  "To establish copyright

14  infringement, a plaintiff must prove, one, ownership of a

15  valid copyright and, two, copying of constituent elements of

16  the work that are original," citing the Supreme Court of the

17  United States.  And that's it, period.

18        So how does one define material of substance and

19  value?  I mean, the court of appeals is not drafting a jury

20  instruction when it's writing this case.

21        MS. HARTZELL:  I don't think that it's necessary to

22  define material of substance and value, but its absence is

23  misleading.

24        THE COURT:  How would you define it?  If you don't

25  think we have to define it for the jury, I want to know what

1   you think it means.

2            MS. HARTZELL:  I think it turns to whether the end

3   result is substantially similar.  Here the mention is so

4   similar to the plaintiff's work that people would conclude

5   that --

6            THE COURT:  I think it's a confusing addition.  I'm

7   not adding it.

8            What else on this page?

9            MS. HARTZELL:  Nothing else on that page.

10           THE COURT:  Anything on the fair use page, first of

11  all, from the -- this is the defendant's instruction, so why

12  don't you go first.

13           MS. HARTZELL:  The last two paragraphs, "if you find

14  that Chapterhouse did not prove each of these elements by a

15  preponderance of the evidence as to a particular work," is

16  inconsistent with the jury instruction, the standard jury

17  instruction, which states "it's up to you to decide how much

18  weight to give each factor."  I don't believe that it's

19  accurate that Chapterhouse has to prove that every element in

20  that list.

21           THE COURT:  Okay.  That's actually a fair point.

22  That's a fair point.

23           So what I think I would modify that to say, "if you

24  find that Chapterhouse did not prove fair use by a

25  preponderance of the evidence as to a particular work."

1      MS. HARTZELL:  That I am comfortable with.

2      THE COURT:  And I'd make the same change in the next

3   sentence.

4      Do you disagree with that, Mr. Moskin, because she's

5   right?

6      MR. MOSKIN:  That's fine.

7      THE COURT:  All right.  Anything else on that page?

8      MS. HARTZELL:  No, your Honor.

9      THE COURT:  Your issues on this page, Mr. Moskin?

10      MR. MOSKIN:  Yes.  One thing which we previously

11   raised with the preliminary instructions, the first bullet

12   point, "the purpose and character of Chapterhouse's use,

13   including whether the use was of commercial nature or

14   transforms Games Workshop into something of a different

15   character," that is -- it has to be a character different from

16   the way Games Workshop has done it.  So I fear that what this

17   will allow is misleading argument to the jury, well, we just

18   made different versions, so that's enough.  And that's not

19   enough.  It has to be, the law is a hundred percent clear --

20      THE COURT:  So how would you modify that part of it?

21      MR. MOSKIN:  Just to say of a different character

22   from the way Games Workshop uses the subject matter.

23      I mean, they could write a book about the development

24   of the thing, and that's a different way, but just making

25   another -- anyway, I --

1  THE COURT:  Well, I guess what I'm wondering is

2  why do you -- I mean, just the way the sentence reads to me, I

3  don't know why you'd even need to add that, because you're

4  telling the jury that they're supposed to consider whether

5  Chapterhouse transformed Games Workshop's work into something

6  of a different character.  What is it they're having to have

7  transformed into something of a different character?  Well,

8  it's Games Workshop's work.

9  I guess I'm not getting your point.

10  MR. MOSKIN:  Well, it's clear from the opening

11  statement by defendant and much of the argument with the case

12  that they want to argue these are -- use the term add-ons.  I

13  don't think that's a term that has any legal meaning, and what

14  I think they're trying to argue is that as long as it's

15  something in addition to Games Workshop's works, that's

16  enough, and that it has to be something different from the

17  way -- the purpose for which Games Workshop uses it.  So it's

18  not transformative just to make another product competitive

19  with Games Workshop.  That's the same purpose for which Games

20  Workshop has created its product.

21  THE COURT:  So you're saying that 2 Live Crew's

22  version of Pretty Woman is not competitive with whoever the

23  folks in the 60s --

24  MR. MOSKIN:  Wait a minute.  I missed that reference.

25  THE COURT:  That's where the -- that's the case that

1    this test comes from.  It's 2 Live Crew's rap version of

2    Pretty Woman.

3           MR. MOSKIN:  Oh, yes, yes.  Yes, Pretty Woman.

4    Absolutely.

5           And there is language right in that decision that it

6    has to be of a purpose and character different from the

7    plaintiff's purpose and character.

8           THE COURT:  Let me just pull that up.  Give me just a

9    minute here.

10          Okay.  I've got Campbell versus Acuff-Rose Music up

11   here.  Tell me where to look.

12          MR. MOSKIN:  So one example, and actually it's cited

13   in our motion, Rule 50 motion this morning at footnote one on

14   page 5, the actual question presented in Campbell was whether

15   the new work merely supercedes the objects of the original

16   creation or instead adds something new with a further purpose

17   or a different character altering the first with new

18   expression, meaning or message.

19          THE COURT:  Yeah.  They weren't drafting a jury

20   instruction either.

21          MR. MOSKIN:  I understand.

22          THE COURT:  So you said that I can find this in the

23   Supreme Court decision.  Just tell me where.  I've got it on

24   the screen.

25          MS. HARTZELL:  Your Honor cited to page 579 in

1  determining on summary judgment that Chapterhouse had

2  identified uses that could be transformative.

3          THE COURT:  Give me your language again, Mr. Moskin,

4  that you want me to add to this.

5          MR. MOSKIN:  Just add to the end of that sentence

6  something of a different charac -- or of a character different

7  from the way Games Workshop uses the material.

8          THE COURT:  Well, it wouldn't be material.  It would

9  be the work.

10          MR. MOSKIN:  Work.  Uses work.  That's fine.

11          THE COURT:  So what are your thoughts about adding

12  that phrase, Ms. Hartzell?

13          MS. HARTZELL:  I think as we noted in the pretrial

14  order, that we don't believe it's necessary, and the purpose

15  and character of the use, as the case law notes, is

16  illustrative and not exhaustive when listing things like

17  educational purpose and --

18          THE COURT:  Yeah, but I didn't include that.

19          MS. HARTZELL:  I understand, but I think that this is

20  getting back towards that point to try and limit that list.

21  And as the court noted in the summary judgment motion,

22  Chapterhouse advertises a number of its products, its items

23  that can convert one Games Workshop product or sell products

24  that present alternatives --

25          THE COURT:  Yeah, and I know you all -- you all both

1  want me to basically make some sort of a legal ruling on that

2  issue as to whether that's in there or not, and you notice

3  that I didn't include the language that Chapterhouse wanted me

4  to put in the instruction that talks about compatibility or

5  whatever being fair use.  You know, I don't think that

6  decision needs to be made here, and I guess --

7          Hang on a second.

8          I'm inclined to add something that says this because

9  I do think it's important.  I mean, in other words, if -- you

10 know, I think that there is a potential, you know, that the

11 jury could conclude from this, you know, transformative use

12 instruction, just to take an example, it isn't part of the

13 case, that if you have a, you know, a shoulder pad that's got

14 some fancy design in it that it would be enough to just put

15 kind of a line through the design and, well, it transforms it

16 into something different, it's really not the same.

17         So I'm going to add to the end of that the following.

18 So that bullet point as a whole will say:  The purpose and

19 character of Chapterhouse's use, including whether the use was

20 of a commercial nature or transformed Games Workshop 's work

21 into something of a different character from the way in

22 which -- excuse me, into a different character from Games

23 Workshop's usage of the work.  It's a bit clunky, but I can't

24 come up with anything less clunky.  And the phrase that we

25 were working with before I think is clunkier.  Something of a

1    different character from Games Workshop's usage of the work.

2            Okay.  Mr. Moskin, other points on this page?

3            MR. MOSKIN:  Nothing else on this page, your Honor.

4            THE COURT:  Okay.  Moving over to trademark.  So page

5    13, Mr. Moskin, what issues do you have on that page?

6            MR. MOSKIN:  Nothing on page 13 or 14.

7            THE COURT:  Okay.

8            MS. HARTZELL:  Same here.

9            MR. MOSKIN:  Or 15.

10           THE COURT:  Oh.  I have a blank there on 14.  There's

11   got to be something.  So I didn't know what the number was.

12           MR. MOSKIN:  Oh, yeah.

13           MS. HARTZELL:  I think we can add those up from

14   Exhibit 1023.

15           THE COURT:  Okay.  So you need to get me that

16   information.

17           MS. HARTZELL:  Okay.

18           THE COURT:  Okay.  So now we're over to page 15.  All

19   right.  So it's really 15 and 16 are the --

20           MR. MOSKIN:  And I had nothing on 15, but I did on

21   16.

22           THE COURT:  What's your thing on 16?

23           MR. MOSKIN:  On 16, at the last bullet point.

24           THE COURT:  Yes.  Consumer testimony.

25           MR. MOSKIN:  Excuse me?

 1          THE COURT:  Consumer testimony.

 2          MR. MOSKIN:  After consumer testimony, that

 3     intentional copying is another factor from which --

 4          THE COURT:  So it's not in the pattern instruction,

 5     which doesn't mean it's not the law, but where do you -- I

 6     noticed that in your instruction, and where do I find that?

 7          MR. MOSKIN:  I can cite one case that we previously

 8     cited to the court, Decor Grates against Ferraro, 1997 US

 9     Lexis 3328.

10          THE COURT:  You got anything better than a

11     16-year-old district court opinion?  Just asking.

12          MR. MOSKIN:  I could give you the pinpoint cite.

13     That's better than just the cite.

14          THE COURT:  Fair enough.

15          Yeah.  So the concept -- what I thought about this --

16     I did think about it when I was looking at the instructions

17     here.  When I thought about it, I guess -- I mean, is

18     basically what you're saying is that if it's just descriptive

19     and it somehow proves that it's got, you know, what

20     copyright -- or what trademark lawyers call secondary meaning,

21     that you copied it?  Because that's what you're saying.

22          MR. MOSKIN:  Exactly.  So I asked Mr. Villacci --

23          THE COURT:  Logically it doesn't make sense to me, so

24     explain it.

25          MR. MOSKIN:  I asked Mr. Villacci the specific

1   question, why did you call your product a jump pack.  They had

2   said it's really just turbines as a booster, so why couldn't

3   you call it a turbine booster?  And I said, you named it that

4   because you new it had recognition from -- it was already a

5   recognized name by Games Workshop.  So if you don't call it

6   intentional copying, then --

7          THE COURT:  Okay.  I get what you're saying.  In

8   other words, the fact that somebody deliberately uses a

9   trademark is some indication that at least they think it has

10  acquired distinctiveness.

11         MR. MOSKIN:  Right.

12         THE COURT:  Talk to me about that.

13         MS. HARTZELL:  I think that the vast majority of the

14  alleged trademarks in this case never occurred to Chapterhouse

15  as a trademark, and jump pack is one of those examples, and

16  for that reason I don't think that that factor --

17         THE COURT:  Wait.  When you say didn't occur to them

18  as a trademark, you mean they didn't consider them to be a

19  trademark?

20         MS. HARTZELL:  Correct.  In using them.  So if --

21         THE COURT:  So would the deliberate copying have to

22  be deliberate copying of something that you know is a

23  trademark?

24         MR. MOSKIN:  It -- frankly, it doesn't even have to

25  be -- another way to frame this issue would be the defendant's

1   own awareness, and so the fact that as, again, I asked him

2   that, and he's aware that it has -- it's associated with Games

3   Workshop.  He said that's why he used it.  I framed that as a

4   matter of -- what I meant by that, saying intentional copying,

5   was a shorthand way of saying the same thing.

1    THE COURT:  So here's what I guess I'm sort of

2    drawn to on this.  Maybe -- without sort of singling that out

3    but still preserving the ability to argue it, because I do

4    think that -- I mean, there is some logic to it.

5    Do something like this:  So in the sentence that

6    comes before those bullet points, change it to read:  To

7    decide whether Games Workshop's symbol or term has acquired

8    distinctiveness, you may consider the following factors --

9    add the word factors -- colon, have the four factors and then

10   include a sentence at the end that says, you may also

11   consider any other evidence that bears on the question of

12   whether Games Workshop's symbol or term has acquired

13   distinctiveness.  Just sort of leave it a little bit

14   open-ended in that way.

15   I mean, I don't know that -- I don't know that the

16   law says that -- somebody once said everything in copyright

17   is a -- everything in trademark is a seven-factor test except

18   for the things that are an eight-factor test.

19   I don't know that there's law that says that the

20   bullet points that are in the pattern instruction -- we

21   didn't include a couple of them -- is an exhaustive list.  So

22   what about just adding that sentence and you can argue that?

23   MR. MOSKIN:  I would prefer the instruction I had.

24   But as an alternative, I would want to leave the door open to

25   say, because there are many other factors that can be

1    considered.

2             MS. HARTZELL:  I would be okay with that change.

3             THE COURT:  I'm going to add that sentence.

4             So add the word factors before the bullet points,

5    and then the sentence after the bullet points that says, you

6    may also consider any other evidence that bears on the

7    question of whether Games Workshop's symbol or term has

8    acquired distinctiveness.  Okay.

9             So those are all the issues you had on 50 and 60,

10   right, Mr. Moskin?

11            MR. MOSKIN:  Correct.

12            THE COURT:  Defense side.

13            MS. HARTZELL:  The only issue that we had was that

14   there was no inclusion of the generic trademark instruction

15   --

16            THE COURT:  There was a reason.  I was not seeing

17   what was generic.

18            MS. HARTZELL:  I think at least jetbike, jump pack,

19   items of that ilk, there has been evidence presented that

20   those are generic terms, particularly for jetbike, for a type

21   of flying bike.

22            THE COURT:  Okay.  So the way that the pattern

23   instruction defines generic terms -- I got to get to the

24   trademark instructions.  Give me just a second.

25            MS. HARTZELL:  A common or general name --

1        THE COURT:  A common or general name of a product

2    whose primary significance to the consuming public is to

3    identify a group or class of similar products regardless of

4    who makes or sells them.  For example, cola is a generic term

5    for a type of soft drink, so it can't function as a trademark

6    for this type of soft drink.

7        So you're saying that jetbike is in that same

8    category, is basically what you're saying?

9        MS. HARTZELL:  Yes.  And if you look at the burden

10   of proof portion of the instruction, it says that when a mark

11   claimed as a trademark is not federally registered, the

12   burden is on the claimant to establish that it is not an

13   unprotectable generic mark.

14       THE COURT:  Yeah, I understand, but you don't give

15   jury instructions on things that really aren't issues in the

16   case.  And so if everything in this case was called, you

17   know, a Kroxigor, you wouldn't give a generic instruction

18   even though the plaintiff has to still show, you know, that

19   the thing is trademarkable, because there just wouldn't be

20   any reason to provide it.

21       So anything other than jetbike and jump pack?

22       MS. HARTZELL:  My counsel --

23       THE COURT:  Your lawyers are telling you what?

24       MS. HARTZELL:  Space Marine as well.

25       THE COURT:  No, I don't think so.  I just -- I'm

1    having a hard time seeing that one as generic.

2            MR. MOSKIN:  In fact, we would request a specific

3    instruction --

4            THE COURT:  -- that it's not generic.

5            MR. MOSKIN:  It's not only registered, it's

6    incontestably registered.  There's no evidence that any --

7            THE COURT:  Okay.  Let's just do one thing at a

8    time here.

9            MR. MOSKIN:  Okay.

10           THE COURT:  So give me your view, Mr. Moskin, on

11   whether I should give a genericness instruction.

12           MR. MOSKIN:  I would concede those --

13           THE COURT:  Let's just talk about jetbike and jump

14   pack.

15           MR. MOSKIN:  Fine.  I would concede those two terms

16   are descriptive or suggestive.  They're not strong

17   trademarks, but there's no evidence that anybody -- the only

18   evidence that -- one of them, on jetbike, there was some

19   people in Europe that were identified as infringers -- first

20   of all, because this is the same issue that they raised

21   before about some -- but more pointedly, about somebody

22   selling on eBay where we said, yes, it can be purchased in

23   the U.S.  Here there are some listings of some Polish company

24   selling jetbikes that we said look like copies of ours.  So

25   that's not relevant use in the United States at all.  There's

1  nothing linking that.

2          And on none of these products did they offer

3  evidence that anybody else had ever used any of these

4  products in commerce.

5          I do think it's still our burden -- and I

6  acknowledge that -- to show the terms that are descriptive

7  like this are -- you know, that they --

8          THE COURT:  Have secondary meaning.

9          MR. MOSKIN:  Yes.  So I don't think it adds

10  anything to say they are generic and I think it's a misuse of

11  the term.

12          THE COURT:  I do, too.  I mean, I think your

13  argument -- the real argument on jetbike and jump pack and

14  space marine is that those are descriptive terms, not that

15  they're generic.  I don't think there's evidence in the case

16  that supports a genericness instruction.

17          What other issues?

18          MR. MOSKIN:  Before we go on -- this may be an

19  appropriate place to raise it.  We had --

20          THE COURT:  You were about to say you want an

21  instruction that says what?

22          MR. MOSKIN:  That the trademark Space Marine is

23  registered -- something to the effect it's registered and

24  incontestable and --

25          THE COURT:  Help me just find the pattern

1    instruction that goes with that.  Do you remember which one

2    that is?

3              Registered and -- just a second.

4         (Brief pause.)

5              MS. HARTZELL:  It's 13 --

6              THE COURT:  But isn't that an issue about validity?

7    Incontestability, isn't that just an issue about validity and

8    ownership?

9              You're getting an instruction on ownership.  We're

10   not talking -- oh, this is an issue of validity, okay.  We're

11   talking about the definition of validity.

12             So you want an instruction that says, I instruct

13   you that blank are valid trademarks?

14             MR. MOSKIN:  Well, and there were two -- although

15   most of the testimony concerned Space Marine, the only one

16   that I'm aware of where this came up is Eldar, which also is

17   incontestably registered.  I mean, others are registered as

18   well.  Tau and others and that I think is incontestable as

19   well, but they don't seem to challenge that one at all.

20             They did say that the word Eldar --

21             THE COURT:  Just give me the laundry list of the

22   things that you claim to be incontestable registered marks?

23   Space Marine?  What else?

24             MR. MOSKIN:  Okay.  I think the ones that are

25   relevant here would be really Space Marine and Eldar.  A

1    couple others are Tau and Warhammer.

2         THE COURT:  Tau is T-A-U?

3         MR. MOSKIN:  Uh-huh.

4         THE COURT:  And Eldar is E-L-D-A-R?

5         MR. MOSKIN:  Right.

6         THE COURT:  Okay.  So pattern instruction 13.1.2 in

7    the commentary, Comment 4, says:  (Reading:)

8         If the case involves a registered trademark or trade

9    dress that has become incontestable because it's been in use

10   for five consecutive years after registration, blah, blah,

11   blah, validity may be challenged on grounds enumerated in

12   Section 1115(b).

13        You can give an instruction that the plaintiff owns

14   a valid trademark, modify -- so it basically says, I instruct

15   you that blank is a valid trademark.

16        So basically what you're asking me to do is include

17   a sentence in here that says, I instruct you that the

18   following are valid trademarks, Space Marine, Eldar, Tau and

19   Warhammer?

20        MR. MOSKIN:  If we're going to do that, then I

21   would include all of the registered trademarks that -- do we

22   have that list, Jason?

23        MS. HARTZELL:  I think we've already addressed it

24   in breaking out the registered trademarks from the

25   unregistered trademarks.

```
 1              MR. MOSKIN:  But --

 2              THE COURT:  Why do you think that?

 3              When you say breaking them out, you mean on the

 4    verdict form?

 5              MS. HARTZELL:  On the verdict form and in

 6    Exhibit 1023, which was used with the witnesses.

 7              THE COURT:  Yeah, but the verdict form doesn't

 8    eliminate the need to prove validity.

 9              MS. HARTZELL:  In the defendants' form it does

10    eliminate that need with respect to the registered --

11              THE COURT:  Yeah, well, the -- I'm just going to

12    tell you now as a preview, the defendants' form would be a

13    form of -- it would be a violation of the Eighth Amendment

14    for me to give that to the jury.  It is cruel and unusual

15    punishment.

16              The plaintiff's form is not that far off, but it's

17    the difference between whipping with a cat of nine tails and

18    putting somebody in the stock, okay, the stock being a lesser

19    form of punishment than the cat of nine tails.

20              So let's not talk about the defendants' verdict

21    form because you ain't getting it.

22              So the plaintiff's verdict form doesn't really

23    eliminate the need to prove validity in regards to anything.

24              MR. MOSKIN:  But we do -- we can refer to the list

25    of --
```

1    THE COURT:  So where do I find this list?

2    MR. MOSKIN:  I --

3    THE COURT:  On the defendants' verdict form?  So

4  which --

5    MR. KEENER:  On the plaintiff's verdict form at

6  Page 9 to 10.  It's -- the trademarks 1 through 9 are the

7  registered ones.

8    THE COURT:  Okay.  So I would be giving the jury a

9  list of those things, and I guess this would mean that my

10  instructions would include pictures, right?  Okay.  That's

11  okay, because the jury is going to have the instructions.

12    Okay.  So what's the defendants' view on whether I

13  should give that?  I mean --

14    MS. HARTZELL:  As long as --

15    THE COURT:  Is there any dispute that those nine

16  are incontestable registered marks?

17    MS. HARTZELL:  No.

18    THE COURT:  Okay.  Then I think I need to give it.

19    MR. MOSKIN:  I just want to be clear, your Honor.

20  They're not all incontestable but they're all registered.

21  The ones I listed earlier -- I don't want to be misleading.

22  The ones --

23    THE COURT:  They are not all incontestable?

24    MR. MOSKIN:  They're all registered but the four

25  that I just quickly checked that are incontestable are Eldar,

1    Warhammer, Space Marine and Tau.

2    THE COURT:  Well, but if it's contestable, we don't

3    really give an instruction about it because it's the -- it's

4    only a presumption.

5    MR. MOSKIN:  Correct.

6    THE COURT:  It's a bursting bubble presumption.  We

7    don't give an instruction on it.  So I would really then only

8    give an instruction on the four.

9    MR. MOSKIN:  That's fine.

10    THE COURT:  Okay.  Then that's what I'm going to

11    do.  Add these --

12    MR. MOSKIN:  I just don't want it being misleading

13    that --

14    THE COURT:  Right.  No, I understand.  Let me just

15    make a note here.

16    Okay.  Any other issues that the defense has?

17    MS. HARTZELL:  No, your Honor.

18    THE COURT:  Okay.  Turning over to Pages 17 and 18,

19    that's the likelihood of confusion definition.  Does the

20    plaintiff have any issues on that?

21    MR. MOSKIN:  I'm sorry, just --

22    THE COURT:  17 and 18.

23    MR. MOSKIN:  No, nothing on 17 and 18.

24    MS. HARTZELL:  No, your Honor.

25    THE COURT:  Okay.  Page 19, fair use defense,

1    trademark.  This is the plaintiff's instruction.  Then this

2    one it is elements, right?

3             MS. HARTZELL:  Yes.

4             THE COURT:  It's not like the other one, where it's

5    just factors.

6             Okay.  So what issues do you have on this page, Ms.

7    Hartzell?

8             MS. HARTZELL:  I do not have any issues.

9             THE COURT:  Mr. Moskin?

10            MR. MOSKIN:  We would want an instruction on

11   Page 19 that they have to find that all of the uses are fair.

12            So, for example, we've -- we're not making any

13   claim for damages -- profits or damages in this case.  And

14   our expectation is that, you know --

15            THE COURT:  You are making a claim for profits, not

16   for damages?

17            MR. MOSKIN:  But on copyright, not on trademark.

18            THE COURT:  Oh, I misunderstood then.

19            MR. MOSKIN:  Well, then --

20            THE COURT:  We'll get to that in a second.  Go

21   ahead.

22            MR. MOSKIN:  And part of the reason we sought to

23   clarify that is if -- our expectation is that if the jury

24   finds -- the jury only needs to find one example of an

25   infringing use of a trademark.  Since we're not looking for

1    any money, they don't have to allocate how much of the

2    profits came from infringement or not.  And if there's a need

3    for an injunction, that's an issue for your Honor anyway.

4         So as long as there's one infringing use of each

5    mark, then --

6         THE COURT:  Okay.  So I get it.  What you want to

7    make sure that this instruction makes clear is that the

8    defendant has to prove that every way in which it used the

9    trademark was a fair use.  So what would you do to modify the

10   instruction to make that clear?

11        MR. MOSKIN:  Just preface each of the 1 through 3,

12   say all of Chapterhouse's uses of the trademarks to refer to

13   a Games Workshop product cannot be easily identified without

14   using the mark, or in every instance Chapterhouse used the

15   trademark.

16        THE COURT:  So I -- actually, the way the third

17   element is worded, I don't think we would have to change

18   that.  So here's what I would suggest on the first two.

19        Right now it says -- No. 1 says Chapterhouse used

20   the trademark to refer to a Games Workshop product that

21   cannot be easily identified without using a trademark.

22   Change that to say, in every instance in which Chapterhouse

23   used the trademark, comma, it did so to refer to a Games

24   Workshop product that cannot be easily identified without

25   using the trademark.

1        Second element would say the same thing:  In every

2    instance in which Chapterhouse used the trademark, comma, it

3    did so only as much as was even reasonably necessary to

4    identify the product.

5        I guess I could make the same changes to the third

6    one.  Let me just write it out here and I'll read it.

7        Now, I think I would modify the third one in a

8    different way to make the same point:  Chapterhouse did not

9    do anything in connection with any use of the trademark to

10   suggest that Games Workshop sponsored or endorsed

11   Chapterhouse or its product.

12       Would that cover your point?

13       MR. MOSKIN:  That's fine.

14       THE COURT:  Do you have an objection to any of

15   those changes?

16       MS. HARTZELL:  Yeah.  I think the concern is that

17   although it states at the beginning that it needs to be

18   considered with regard to a particular trademark, in

19   including that language it sounds like every instance of

20   every trademark ever used by Chapterhouse.

21       THE COURT:  I don't think that's right because it's

22   -- because the prefatory language says, to prevail on this

23   defense with regard to a particular trademark.  And then each

24   one refers to -- each bullet point refers to the trademark,

25   which is a pretty clear reference back to that element.

1          I don't think that's a problem.  I don't think it's

2     unclear.  So that objection is overruled.

3          MR. MOSKIN:  I just want to note, really more for

4     the record, because I previously --

5          THE COURT:  You don't think there should be an

6     instruction on this at all?

7          MR. MOSKIN:  Correct.

8          THE COURT:  Okay.  I get it.

9          MR. MOSKIN:  I don't want to argue --

10         THE COURT:  No, no.  I disagree.

11         Hang on a second.  I just got to do one thing here.

12     (Brief pause.)

13         THE COURT:  Okay.  We're on to damages.  So now go

14     back to the point you were just making.  I thought -- the way

15     I read the instructions is that you were asking for profits

16     on everything, both copyright and trademark.

17         MR. MOSKIN:  We're -- well, just to clarify, we're

18     not seeking any profits for trademark infringement.

19         THE COURT:  Are there any other kind of damages

20     you're seeking for trademark infringement?

21         MR. MOSKIN:  No.

22         THE COURT:  So you're just seeking a finding and

23     you're going to come ask me for an injunction?

24         MR. MOSKIN:  Right.

25         THE COURT:  Oh, okay then.  So I need to modify

1   this instruction.

2              MR. MOSKIN:  Yes.

3              THE COURT:  Yes.  So let me just come up with some

4   language here and then I will give it to you.

5              MR. MOSKIN:  But I will note, just before you do

6   that, that we are leaving in the claim for profits on

7   copyright infringement.

8              THE COURT:  No, I understand that.

9              I'm just writing here and I'll be back with you in

10  a second.

11            (Brief pause.)

12            THE COURT:  Okay.  So here's what I -- it requires

13  a little reconfiguration.  So here's what I propose to say.

14  So just listen; you're not going to see it anywhere.

15            With regard to Games Workshop's copyright claim, if

16  you find in favor of Games Workshop as to any particular

17  work, you will then be -- then you will be required to

18  determine the amount of damages that Games Workshop is

19  entitled to recover from Chapterhouse for infringement of

20  Games Workshop's copyright on that work.

21            Next paragraph:  If you find in favor of

22  Chapterhouse on Games Workshop's copyright claim as to all of

23  Games Workshop's works that are at issue, then you will not

24  consider the question of damages.

25            Next paragraph:  Games Workshop is not requesting

1    damages on its trademark claim.  On that claim you will

2    simply be making a finding of liability as to each trademark

3    at issue.

4              How does that sound?

5              MR. MOSKIN:  The only -- my only -- I have to hear

6    it back, but my only concern is that -- and this is going to

7    come up in a moment on the jury verdict form.  Limiting the

8    -- focusing in the singular on infringement of a work, we

9    have -- in almost every instance --

10             THE COURT:  We're going to come back to that.

11             MR. MOSKIN:  We've grouped numbers of works

12   together and the defendant has asked that they break out a

13   finding of infringement for each separate work, and we've

14   just asked as they find they have infringed the works, then

15   that would be sufficient.

16             THE COURT:  Point me someplace on your verdict form

17   where I can see that.

18             MR. MOSKIN:  You would have to look at defendants'

19   verdict form --

20             MS. HARTZELL:  It appears in the first entry on

21   defendants'.

22             THE COURT:  Eagle Thunder Hammer?  No, that's --

23             MS. HARTZELL:  Yeah.  The Thunder Hammer, they've

24   identified five separate works that they allege are

25   infringed.

1          THE COURT:  I see.  That's a verdict form issue.  I

2     understand your point.

3          I'm going to -- so putting that point aside, does

4     either side have any problem with that language change?

5          MR. MOSKIN:  No, your Honor.

6          THE COURT:  Does that cover it, in other words?

7          MR. MOSKIN:  No, your Honor.  That's fine.

8          MS. HARTZELL:  I think that language change makes

9     sense, but I think it makes sense to move the damages

10    discussion then to the end of the copyright language, and

11    then at the end of the trademark just say, Games Workshop is

12    not requesting damages on its trademark claims.

13         THE COURT:  That would be a way of doing it.

14         MR. MOSKIN:  I'm indifferent.

15         THE COURT:  Yeah, okay, I'll do that.  So let me

16    just make a note of that.

17         So then what I would -- but working from this

18    instruction, obviously the last paragraph that talks about --

19    well, do we need to have the finding of wilfulness now,

20    because that's just a damages issue?  So that comes out.

21         And so in the paragraph before that, I take out the

22    references to trademark.

23         MR. MOSKIN:  Uh-huh.

24         THE COURT:  Okay.  So the language about profits,

25    does either side have a problem with that language at all?

1           MR. MOSKIN:  No.

2           MS. HARTZELL:  We do not, your Honor.

3           MR. MOSKIN:  No.

4           THE COURT:  Okay.  So I'm going to move this to end

5   of copyright and then put this at end of trademark.  Okay.

6           So then the last three pages of the instructions,

7   in other words, not including the verdict form, does anybody

8   have any issues with those?

9           MS. HARTZELL:  No, your Honor.

10          MR. MOSKIN:  No, your Honor.

11          THE COURT:  Okay.  So before we get to the verdict

12  form, is there anything that we haven't covered that anybody

13  wants to add or thinks should be added to the instructions?

14          MR. MOSKIN:  No.

15          MS. HARTZELL:  No, your Honor.

16          THE COURT:  All right.  So let's now talk about

17  this issue that we were just talking about here.  I guess I

18  hadn't zeroed in on this before.

19          So in the -- Item 1 is a good example.  So in

20  Item 1, plaintiff's verdict form says, Eagle Thunder Hammer,

21  yes, no, on copyright infringement.

22          The defendants' verdict form has a couple of

23  different Eagle Thunder Hammers.  So I guess there were

24  probably two pictures on that particular part of the claim

25  chart?

1          MS. HARTZELL:  In --

2          THE COURT:  On the left side, in other words?

3          MS. HARTZELL:  On the left side --

4          THE COURT:  And on the right side there were five?

5          MS. HARTZELL:  On the left side it's our contention

6     that because the plaintiff has identified that the website

7     images are a separate and independent infringement, that that

8     also needs to be evaluated separately.

9          THE COURT:  Okay.  In other words, you're saying

10    that the Eagle Thunder Hammer is really two different Eagle

11    Thunder Hammers?

12         MS. HARTZELL:  It's the website image and the

13    product itself.

14         THE COURT:  And then the infringing products are

15    five different things, and this is consistent with the way

16    that you've dealt with it in the defendants' form on each one

17    of these things.

18              So any time there was more than one image

19    referenced on the left side of the claim chart, you've got

20    them split out separately.  Any time there was more than one

21    image on the right side of the claim chart, you've got those

22    split out separately.  The defendants' doesn't do that.  It

23    just has for each line item on the claim chart a yes, no.

24              So, let me hear your views in favor of your

25    approach and then I'll hear Ms. --

1  MR. MOSKIN:  Well, first and most important, on the
2  right side, the Games Workshop works or products that we've
3  shown, part of our contention is that the defendant has
4  copied elements not just from one; it's drawn from a number
5  of works.
6  And so, to require that you connect --
7  THE COURT:  That you have 1-to-1 correspondence.
8  So but that would be a reason -- that would be a reason to
9  not have multiple products on the first column of the verdict
10  form -- to put all of yours in one.  It's not necessarily a
11  reason to put all of theirs together.
12  MR. MOSKIN:  Right.
13  THE COURT:  In other words, what they're saying is
14  what if the jury finds, of our five Thunder Hammers, that
15  only two of them are infringing.
16  MR. MOSKIN:  Right.
17  THE COURT:  Your claim chart doesn't -- or your
18  verdict form doesn't allow for that?
19  MR. MOSKIN:  Right.  And -- I mean, there are two
20  reasons why.  One is just because of the complexity involved
21  in doing it that way.  But moreover, contrary to the way Ms.
22  Hartzell just characterized our claim, we've never said that
23  the products are somehow separate from the website.  They're
24  saying they are all inextricably linked.
25  So these are all --

1       THE COURT:  I'm talking about the right side at

2  this point.  Let's talk about the right side.

3       MR. KEENER:  On the left-hand side, there's only

4  one Chapterhouse product for each entry.  There's not

5  multiple Chapterhouse products on the left-hand side.

6       THE COURT:  Maybe I'm thinking of the claim charts

7  wrong.  I thought the left-hand side of the claim chart was

8  Games Workshop's product.

9       MR. KEENER:  No.  Left is Games Workshop and

10  there's one product.

11       MR. MOSKIN:  Left is Chapterhouse.

12       MR. KEENER:  Chapterhouse, and there's one product

13  on the left-hand side.

14       THE COURT:  Oh, I had it flipped backwards.

15       MR. KEENER:  On the right-hand side there's

16  multiple Games Workshop pictures.

17       THE COURT:  Okay.  Can I look at a claim chart for

18  a minute, or part of one?

19    (Document tendered.)

20       THE COURT:  My mistake.

21    (Brief pause.)

22       THE COURT:  Okay.  So on the left -- I'm looking at

23  Plaintiff's Exhibit 1020.  On the left-hand side, Item 1,

24  under Chapterhouse product, it says Eagle Thunder Hammer.

25       So you're saying that -- there's four pictures

1  there but that's four pictures of the same thing; it's just

2  four different views of the same product?

3          MR. KEENER:  Yes.

4          THE COURT:  Just a minute.

5      (Brief pause.)

6          THE COURT:  Okay.  So on the left-hand side of the

7  defendants' verdict form -- let me ask you this, Mr. Keener

8  -- and I'm interrupting my own question here.

9          Are you saying that on the claim charts, every time

10  on the claim chart that a Chapterhouse product is depicted on

11  the left side, it's only one; there's never an instance where

12  it's pictures of two different things?

13          MR. KEENER:  That is correct.

14          THE COURT:  Okay.  All right.

15          And so your point on the left side of your -- of

16  the claim chart on the left side of the verdict form, isn't

17  that the claim chart depicts more than one thing; it's that

18  there's also a reference to the website?

19          MS. HARTZELL:  Correct.

20          THE COURT:  Is there some belief that what's

21  depicted on the website differs from what's depicted on the

22  claim chart?

23          MS. HARTZELL:  Yes, your Honor.  We believe that

24  there are different issues with respect to the similarity of

25  the products because some of the argument has been with

1  respect to the coloring of the products, which the underlying

2  product does not include, and the representations of the

3  Chapterhouse product connected to or in use with Games

4  Workshop products which are shown on the website but are not

5  sold in that capacity.

6        We also expect that it would be relevant to damages

7  and scope of the injunction that would be entered whether or

8  not it is the underlying product that is found to infringe or

9  the image shown on the website, because if it's just the

10  image shown on the website, then that would be a marketing

11  matter.

12        MR. KEENER:  And, your Honor --

13        THE COURT:  Would you like to respond to that?

14        MR. KEENER:  -- we're back to the box -- cover on

15  the box with the stuff in between.  We're saying that product

16  and your marketing with it infringed their copyright.

17  They're inextricably interlinked.

18        Now, it could be on Ebay or a forum post or product

19  announcements where they have shown a picture.  Those are all

20  infringements.  The website, the product itself -- we would

21  have to list ten things on each side of the left-hand side of

22  all their uses.  It would be impossible --

23        THE COURT:  Okay.  I understand both sides'

24  argument on that.

25        Now let's talk about the right side of the verdict

1  form and the right side of the claim chart.

2  So your point on the -- the defendants' point on

3  that one is that, wait a second, on the -- are you saying

4  that on the claim chart there's more than one product

5  identified?  I guess it is.

6  MR. KEENER:  The idea is, and the way we presented

7  the case to the jury is, for example, you copied the Space

8  Marine iconic view.  And we gave examples of various Space

9  Marines in there.  We could have given a hundred more; we

10  gave three or four examples.

11  So we think it's enough for the jury to find this

12  product infringes one of Games Workshop's copyrights without

13  identifying exactly which one it is --

14  THE COURT:  So why -- on the defense side, why do

15  you think that we need to specify -- in these instances where

16  there's more than one image that the plaintiff is contending

17  is at issue --

18  MS. HARTZELL:  Because --

19  THE COURT:  -- why do you think that we need to

20  have the jury specify which one?

21  MS. HARTZELL:  Because the elements of copyright

22  infringement require a comparison of the particular work that

23  is subject to a valid copyright to the accused work.

24  MR. KEENER:  And they can do that comparison based

25  on your instructions.

1    We also think the combination -- it's not important

2  to damages which image they copied.  It's not important to

3  anything in the case in the verdict forms which image they

4  copied.

5    THE COURT:  Enough for there to be what?

6    So what about this, though -- I don't know what the

7  law is on this.  I'm just putting this question out.  This is

8  an issue that comes up in criminal cases from time to time.

9    So let's say on these Thunder Hammers that four

10  jurors think it infringes this Thunder Hammer, four jurors

11  think it infringes this Thunder Hammer and four jurors think

12  it infringes that Thunder Hammer.  Do they have to be

13  unanimous on the one they think it infringes?

14    MR. KEENER:  I don't think so.  I mean, if they

15  think these two products are similar -- if they think these

16  products are similar or different for different reasons but

17  they all come down to, based on your instructions of the law,

18  I think product X infringed Games Workshop's copyright, I

19  think they can say yes.

20    MS. HARTZELL:  But what's that copyright?

21    MR. KEENER:  Or the combination of copyrights.

22  However they come down to it, if each juror believes, based

23  on the instruction of the law you gave them, that the product

24  infringed one or more of Games Workshop's copyrights, they

25  can check yes under the box.

1    MR. MOSKIN:  Another example, to put this in a

2  different way, think if Walt Disney sued for an infringement

3  of Mickey Mouse.  They can put a -- if they put in a million

4  different images of Mickey Mouse and the defendant said --

5    MR. KEENER:  Which one?

6    MR. MOSKIN:  -- and the defendant said, no, it

7  wasn't that one, I actually copied this other one, it's

8  irrelevant because they -- they're all connected, they're all

9  related.

10   THE COURT:  Does anybody know of any law on this?

11 I'm guessing that's a no.

12   MS. HARTZELL:  We are not aware of any.  But the

13 concern comes up, for example, when there's a shoulder pad

14 that has studs and a shoulder pad that has a cross that are

15 identified as the copyrighted works, but the accused work is

16 a shoulder pad with studs with a shield with a chain, which

17 is somewhere there in the beginning of the chart.

18   THE COURT:  Give me a number.

19   MS. KALEMERIS:  No. 2.

20   THE COURT:  No. 2?

21   MS. HARTZELL:  So we would argue that it's not

22 proper to pick and choose from the copyrighted works.

23   MR. KEENER:  I think that proves our point, that

24 the jury can figure out that if it infringed either one of

25 those, they can check the box yes, it's not relevant.  Or if

1    they infringed both of them in making their design, they took

2    protected expression from each of our images to make their

3    product, they can check the box yes.

4           THE COURT:  I think the plaintiff has the better of

5    this argument.  So we're going to go with the plaintiff's

6    version of the verdict form.

7           Now, so let's just talk about what needs to be done

8    with this thing.  So you've got these different sections

9    here.  So you've got Section A is copyright.  I don't think

10   anything really needs to be done with that one.

11          On Section B, though, I think -- don't we need to

12   do some tweaking there?  Or maybe not.

13          I guess what I would think on Section B, which is

14   the trademark infringement part of it, we basically will have

15   covered in the jury instructions, in the elements

16   instructions, they've -- I found ownership, I found validity

17   as to, you know, the fourth -- the four items that -- you

18   know, Warhammer, Tau, Eldar and --

19          MR. KEENER:  -- Space Marine.

20          THE COURT:  -- Space Marine.

21          MR. KEENER:  Correct.

22          THE COURT:  And with that in there, I guess what

23   I'm wondering is why would there then be a need to break them

24   out separately in the verdict form.

25

1      MR. KEENER:  The only reason to do that is so they can

2  see which ones were -- because the jury was confused about

3  registered and unregistered.

4      THE COURT:  I don't think it's an opinion.  So, that

5  objection's overruled.  I think a sufficient foundation's been

6  laid.  The objection's overruled.

7      MR. KEENER:  Different categories of no dispute about

8  priority of use as a trademark in commerce, and there is a

9  dispute.  So, it's capturing the agreed --

10     THE COURT:  That's the ownership issue.

11     MR. KEENER:  Right.

12     THE COURT:  And that one I agree we still need to

13  separate them out.  But you've got more categories than that.

14     MR. KEENER:  I've just got the three.  Registered

15  trademarks --

16     THE COURT:  I'm just saying there only needs to be two.

17  In other words, we're covering in the jury instructions, ladies

18  and gentlemen, I've found that these four trademarks or five or

19  whatever it is are valid.

20     MR. KEENER:  Right.

21     THE COURT:  So, we don't have to tell them again.

22     MR. KEENER:  Right.

23     THE COURT:  I've found that -- I've found ownership

24  on -- so, I'm saying -- I guess what I'm saying is really as

25  between -- let me just make sure I'm getting this right here.

1    I don't know why there has to be a different -- why we

2  need to have the two categories on Pages 9 and 10 I guess is

3  what I'm saying.  I just don't see any reason to split them out

4  separately here.

5         MR. KEENER:  I guess the only reason is we need some

6  sort of an instruction then or clarification in the verdict form

7  that everything on this first list between nine --

8         THE COURT:  Yeah.  No, we definitely need --

9         MR. KEENER:  -- to 13, there's no dispute as to

10 priority of use by Games Workshop.

11        THE COURT:  There's no dispute.  We should really call

12 it ownership because that's the corresponding element.  There's

13 no dispute about the ownership for the following.

14        MR. KEENER:  Right.

15        THE COURT:  Bing.  Okay?  Find yes or no.  Because

16 we've told them on Page 14 of the instructions, I've previously

17 ruled that Games Workshop owns blank number of the claimed

18 trademarks that are at issue in this case.  A list of these

19 trademarks will be provided as part of the verdict form  I've

20 made no determination regarding ownership of the claimed

21 trademarks.  That's up to you to decide.

22        So, it seems to me we give them two categories.

23 Category one is trademarks as to which there's no dispute about

24 ownership.  Category two is trademarks as to which there is a

25 dispute about ownership.  And everything else is covered in the

1    elements instructions.

2         So, in other words, what I'm basically telling you is

3    that you don't have to have the subdivision that you now find on

4    Page 10 of your verdict form between registered and

5    unregistered.  First of all, I'm not even going to be telling

6    them that.  I'm telling them that four trademarks are valid.  On

7    the other ones I'm not giving an instruction because it's a

8    bursting bubble presumption.  So, there's no need to do that.

9    So, I think that it's much simpler than this.

10        MR. KEENER:  Understood.  That makes sense.

11        THE COURT:  So, then my -- let me just make sure I'm

12   getting this right here.

13        So, you've given me -- I didn't go in and look at it.

14   You've given me an electronic version of this that includes all

15   these little pictures on it.

16        MR. KEENER:  Yes.  What I e-mailed you has them all.

17        THE COURT:  So, I may -- what I may do -- because the

18   likelihood of you having access to a color printer is way

19   greater than mine.

20        MR. KEENER:  Not here, but --

21        THE COURT:  No, no.  Back at your office.

22        MR. KEENER:  Yes.

23        THE COURT:  What I may do is once I tweak the verdict

24   form, I may ask you to print out X number of copies of it and

25   bring them with.

PDF created with pdfFactory trial version www.pdffactory.com

1     MR. KEENER:    Understood.

2          THE COURT:    Because what I want to do is I want to give

3     them each -- I want to have a bunch of them    I want to give

4     them each their own.    They're going to have to have an official

5     one.    They may need to have a few extras because they're going

6     to be -- there's a lot of work for them to do here, and they're

7     going to be going through and marking them up.    But we need to

8     have the color version, and there's color printers around here,

9     but not good.    Okay.    So, I'll make those changes.

10         Anything else we need to talk about on instructions?

11         MS. HARTZELL:    On the verdict form, I do think that it

12    needs to be apparent whether or not a finding is made of

13    validity as to those trademarks as to which there is no

14    instruction.

15         THE COURT:    You're asking for a special interrogatory,

16    and I don't think there needs to be.    First of all, I think the

17    verdict form is complicated enough without adding more

18    interrogatories, and, secondly, the jury will be told that to

19    find yes on trademark infringement, that one of the three things

20    that has to be proven is validity, and I don't think we need to

21    tell them anything more than that.

22         I mean, in a simple enough case, you know, where the

23    verdict form wasn't already 17 pages long with, you know,

24    something like a couple of hundred, maybe --

25         MR. KEENER:    400.

1    THE COURT:  Okay.  (Continuing) -- 400 line items on

2  it, I might consider it, but I just think it gets into the level

3  of cruel and unusual punishment.  So, I'm not going to do that.

4    All right.  Anything else on the jury instructions

5  anybody can think of?

6    MR. KEENER:  No, your Honor.

7    MS. HARTZELL:  No, your Honor.

8    THE COURT:  You know what?  Something just occurred to

9  me.  Let me just put in a call to somebody.  I just need to talk

10  to the tech guy here.

11   (Brief pause.)

12    THE COURT:  I'm going to leave this door open so I can

13  hear when this guy comes up.

14    So, let's just talk about some logistical stuff.  So,

15  A, you've worked out you're going to have some sort of a laptop

16  that's going to have all the exhibits on them.  We just need to

17  have like a page of instructions that tells them how to find it.

18    MR. KEENER:  All right.

19    THE COURT:  And when he comes up with the thing, I'm

20  just going to make sure it has kind of the standard cable that

21  allows you to project things through, and I'm going to hope that

22  somebody on the jury is going to know how to do that.  But you

23  might want to come up with a Post-It note that tells them, you

24  know, which function key to push to project something onto a big

25  screen.  So, just make sure that's available tomorrow.

1    Make sure that we have -- and when I say have, I mean

2    have them ready so that when the jury goes out, I can say,

3    "Okay.  Mr. Officer, here's the hard copy of the exhibits," that

4    we've got those ready tomorrow.  We're not doing any fumbling

5    about them  I know you've still got some issues to conform the

6    two lists.

7            MR. KEENER:  I think all the plaintiff's ones are

8    agreed.

9            THE COURT:  You said there were a few defendant's ones

10    where the list didn't correspond.

11            MR. KEENER:  Right.  We've got a few of those we're

12    still working out any ideas.  We'll have all the plaintiff's

13    exhibits ready to go, and we're supposed to be getting an

14    electronic CD or USB or something of defendant's.

15            THE COURT:  All I care about is that's all done before

16    you walk in the door tomorrow.  And so, if there's going to be

17    some issues that I have to deal with on exhibits, I need

18    somebody to send me an e-mail this evening saying these are the

19    ones you're going to have to deal with, just so I have a heads

20    up.  You don't have to give me arguments.  Just say we're going

21    to have some issues on the defense exhibits.  These are the

22    exhibits at issue, so that everybody's on the same page when we

23    start in the morning.

24            MR. MOSKIN:  We have to send you the list of the

25    products to plug into the jury instructions, as well.

PDF created with pdfFactory trial version www.pdffactory.com

1   THE COURT:   The list of the products.

2   MS. HARTZELL:   The number.

3   THE COURT:   Yes, the number of products, right.   Right.

4   And you've got to do that tonight because the first thing that's

5   going to happen in the morning is these things are going to be

6   duplicated for the jurors, and I want to have sort of a --

7   MR. KEENER:   You wanted me to -- oh, the jury

8   instructions.

9   THE COURT:   No, the jury instructions.   Just all you're

10   going to do is the verdict form

11   I'll be instructing the jury before you give arguments,

12   except for the last instruction that talks about, you know, you

13   have to be unanimous.   So, I hold that until after the

14   instructions are done.

15   So, do you have a -- can you give me some sense of how

16   long we're talking about for closings?

17   MR. MOSKIN:   I haven't seen the latest time chart, but

18   I think we still have probably a couple hours left, but I

19   wouldn't contemplate using that much time.

20   THE COURT:   It's probably a little less than that

21   because some of it gets eaten up in this instruction conference.

22   I have to figure out how to decide how to allocate all that.

23   MR. MOSKIN:   Understood, but I would --

24   THE COURT:   What was your feel for how much you'd need

25   all together for your opening and your rebuttal?

PDF created with pdfFactory trial version www.pdffactory.com

1    MR. MOSKIN:  Just a little over an hour.

2    THE COURT:  Okay.  You're within that.

3    MS. HARTZELL:  Assuming we have the time left, we were

4    thinking an hour and a half.

5    THE COURT:  Don't go over an hour and a half.  And I'm

6    not confident that you have the time left.  But, actually, it

7    turned out the plaintiff was running way ahead in the time count

8    until yesterday.  Then you caught up yesterday.  So, you're

9    within 40 minutes of each other right now.  So, yeah, I'll send

10   this out in a bit here.

11         Okay.  Anything anybody can think of to talk about?

12   MS. HARTZELL:  No, your Honor.

13   MR. KEENER:  No, your Honor.

14   MR. MOSKIN:  We start at 9:40.

15   THE COURT:  9:40, yeah.

16         Okay.  See you in the morning.  I'm just going to --

17   you can go.  I'm just going to sit here and do some work on

18   these things.

19       (Whereupon, the within trial was adjourned to Wednesday,

20         June 12, 2013, at 9:40 o'clock a.m.)

21

22

23

24

25