**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GAMES WORKSHOP LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:10-cv-08103 |
| v. | ) | |
| | ) | |
| CHAPTERHOUSE STUDIOS LLC, | ) | |
| | ) | Judge Matthew F. Kennelly |
| | ) | |
| Defendant. | ) | |

**REPLY BRIEF IN SUPPORT OF DEFENDANT CHAPTERHOUSE STUDIOS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A
NEW TRIAL LIMITED TO CERTAIN ISSUES AND CLAIMS**

Games Workshop ("GW"), lacking evidence in support of its substantive claims, builds its brief around a theory of waiver. That theory is unsustainable, because Chapterhouse has put GW on notice of all the issues it now raises. On their merits, as set forth in Chapterhouse's opening brief ("Br.") and below, Chapterhouse is entitled to judgment of non-infringement on GW's trademark and copyright infringement claims as a matter of law.

## ARGUMENT

### I. Chapterhouse Has Preserved Its Grounds For Judgment As A Matter Of Law.

Relying only on *Jimenez v. City of Chicago*, 877 F. Supp. 2d 649, 674 (N.D. Ill. 2012), GW argues that Chapterhouse has waived certain of its Rule 50(b) grounds for judgment because it did not advance identical grounds in its Rule 50(a) motion. GW's argument is without merit.

***First***, GW's reliance on *Jimenez* is misplaced. In *Jimenez*, this Court held only that defendants waived ***claims*** that were not first raised in their Rule 50(a) motion. *See* 877 F. Supp. 2d at 672-74 (Rule 50(b) judgment on due process and malicious prosecution forfeited where Rule 50(a) motion only sought judgment on conspiracy). Unlike *Jimenez*, all of the ***claims*** on which Chapterhouse seeks judgment—trademark and copyright infringement—were raised in its Rule 50(a) motion, and have been preserved for Rule 50(b) adjudication.

***Second***, contrary to GW's contention—and consistent with *Jimenez*—Chapterhouse's Rule 50(b) motion need not assert the same grounds as its Rule 50(a) motion, provided GW and the Court had notice of the additional grounds. *See Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 777 (7th Cir. 2002); *Petit v. City of Chicago*, 239 F. Supp. 2d 761, 767 (N.D. Ill. 2002); *see also Jimenez*, 877 F. Supp. 2d at 674 (additional grounds may be advanced in support of claims raised in Rule 50(a) motion). Because Chapterhouse's summary judgment motion asserted that GW's works are unprotectable ideas (Dkt. 208 at 14-15), GW's marks are

1

insufficiently distinctive (*id.* at 24), and Chapterhouse's use of GW's marks was fair (*id.* at 21-22), those grounds were not waived.

**Third**, when advancing its Rule 50(b) motion on the same grounds asserted in its Rule 50(a) motion and other briefing before the Court, Chapterhouse is not required to make identical supporting arguments. *See Urso v. U.S.*, 72 F.3d 59, 61 (7th Cir. 1995) (Rule 50(b) motion not waived when Rule 50(a) motion made without supporting argument); *see also Petit*, 239 F. Supp. 2d at 767 (failure to state a sufficient argument in Rule 50(a) motion does not preclude Rule 50(b) motion); *Jimenez*, 877 F. Supp. 2d at 674 (providing only "cursory argument" in Rule 50(a) does not preclude Rule 50(b) motion). Accordingly, Chapterhouse is not precluded from making adaptions to the likelihood of confusion, trademark validity, and originality of works arguments raised in its Rule 50(a) motion. *See* Dkt. 388 at 2-5 (likelihood of confusion), 6-8 (validity and use of marks as trademarks), 8-9 (originality of works).[1]

## II.     GW Failed To Prove That It Used Its Marks As Trademarks Prior To Chapterhouse's Alleged Infringement.

As set forth in Chapterhouse's opening brief, GW failed to introduce sufficient evidence that it used fourteen of its marks as trademarks prior to Chapterhouse's alleged infringement. (Dkt. 410 at 2-4.)[2] Thus, Chapterhouse is entitled to a judgment of non-infringement with respect to those marks.[3] GW raises several arguments in response. None has merit.

---

[1] In any event, to the extent that Chapterhouse did waive judgment on certain of the grounds advanced in its Rule 50(b) motion, they are still appropriate grounds for a new trial. *See, e.g.*, *Neely v. Am. Family Mutual Ins. Co.*, 930 F. Supp. 360, 368 (N.D. Iowa 1996), *aff'd*, 123 F.3d 1127 (8th Cir. 1997); *Giles v. Rhodes*, 171 F. Supp. 2d 220, 224 (S.D.N.Y. 2001).
[2] Contrary to GW's assertion, Chapterhouse did not "drop" its position with respect to three marks—Tyranid Bonesword, Tyranid Lashwhip, and Howling Griffons Icon—but omitted them from its brief because the jury found no infringement of those marks. (Dkt. 399 at 15.)
[3] Chapterhouse's argument with respect to this issue applies to each mark on Verdict Form B-2 that the jury found to have been infringed, including those marks for which the jury found both infringement and fair use. The complete list of applicable marks is set forth in the appendix to Chapterhouse's opening brief. (Br. Appx. 2.)

*First*, GW mischaracterizes the fundamental trademark dispute—the question is not whether GW used the terms at issue prior to Chapterhouse, but whether GW had ever used those terms *as trademarks*, *i.e.*, to identify, distinguish, and indicate the source of its products.  15 U.S.C. § 1127; *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 162 (1995).  "Not every word, name, symbol or device qualifies as a protectable mark; rather, it must be proven that it performs the job of identification, *i.e.*, to identify one source and distinguish it from other sources.  If it does not do this, then ***it is not protectable as a trademark***."  *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 922 (6th Cir. 2003) (emphasis added).

Simply using a term to describe a character or item within a larger fictional universe is insufficient to turn that word into a trademark.  *Paramount Pictures Corp. v. Romulan Invasions*, 7 U.S.P.Q.2d 1897, 1900, 1988 WL 252376 (T.T.A.B. 1988) (use of term for fictional characters does not give rise to trademark protection); *In re D.C. Comics, Inc.*, 689 F.2d 1042, 1051 n.1 (C.C.P.A. 1982) (Nies, J., concurring) ("[T]he appearance of the JOKER in a story in a BATMAN comic book does not make the JOKER a trademark for the book."); *cf. Ideal Toy Corp. v. Kenner Prods. Div. of Gen. Mills Fun Grp., Inc.*, 443 F. Supp. 291, 306 n.14 (S.D.N.Y. 1977) ("Although [the characters in the movie *Star Wars*] obviously have a great deal of 'commercial magnetism,' they are not symbols of something else.  They are not guideposts by which the purchaser finds his way to a particular product; they are the product itself and are capable of protection in their own right, whether through copyright or unfair competition.") "[T]he public [is not] required or expected to browse through a group of words, or scan an entire page in order to decide that a particular word, separated from its context, may or may not be intended, or may or may not serve to identify the product."  *MicroStrategy Inc. v. Motorola Inc.*, 245 F.3d 335, 341 (4th Cir. 2001) (internal quotation omitted).

3

GW identifies, in total, three passages of trial testimony that allegedly demonstrate the "valuable commercial associations" of the marks at issue. (*See* GW Br. 3.) That testimony, however, relates to only two marks at issue—Exorcist and Jump Pack—and in all three passages, the testimony from Mr. Villacci simply reflects his recognition that GW had used those two terms within the context of its larger fictional universe. (Tr.[4] 836:7-837:20, 913:8-19, 913:20-914:5.)[5] GW also cites a sales spreadsheet as purported evidence of its use of the marks at issue, but that merely indicates that the terms appeared somewhere within a GW product such as a reference book describing GW's fictional universe—the vast majority did not appear on product names, packaging, or advertisements, and there is no evidence that customers used any particular mark to identify the corresponding GW product. (*See* GW Br. 4; Ex. A (GW Ex. 2 [PEX 865]) at 5-7.) As noted above, not every term in a fictional work qualifies as a trademark, and GW has presented no evidence that any of the marks at issue meet the standard for trademark protection.

*Second*, GW relies on several cases holding that a term can be adopted as a trademark for a product or market before the trademark owner commences sales in that specific arena. (GW Br. 2-3.) In each case, however, the court found that the plaintiff had previously used the mark as a trademark, *i.e.*, **to identify goods and to associate those goods with the plaintiff**.[6] Here, by contrast, there is **no evidence** that GW used any of the marks at issue **as a trademark**. As detailed above, GW's bare assertion that it used certain terms within the context of its fictional universe is insufficient to demonstrate that each term qualifies for protection as a trademark.

---

[4] All cited transcript pages are attached as Ex. G.
[5] Likewise, Mr. Villacci's question regarding how close to stay to "the original Iron Hands icon" to appeal to customers relates to the term's use within GW's larger fictional universe, not as a trademark used to identify GW as the source of particular goods. (*See* Ex. B (GW Ex. 1 [PEX 744]).) In any event, that mark is not a subject of Chapterhouse's motion on this issue.
[6] *See Johnny Blastoff Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 433-34 (7th Cir. 1999); *Plastic Co. V. Warner Comm'ns, Inc.*, 675 F.2d 852, 856 (7th Cir. 1982); *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir. 1981); *DC Comics, Inc. v. Powers*, 465 F. Supp. 843, 847 (S.D.N.Y. 1978).

***Third***, GW mischaracterizes Chapterhouse's argument that GW's three marks associated with one or more products—Lascannon, Lightning Claw, and Heavy Flamer—were not used in a distinctive way and therefore do not merit protection as trademarks. (GW Br. 4-5.)[7] In each case, the term appeared as part of a longer product name—Chaos SM Havoc W Lascannon, FW Lascannon Razorback Conversion Kit, Terminator Left Lightning Claw, and Heavy Flamer Battle Sister (Ex. A (GW Ex. 2 [PEX 865]) at 5-7)—but that alone is insufficient to demonstrate that the isolated terms are distinctive and qualify for protection as trademarks. *Paramount Pictures*, 7 U.S.P.Q.2d at 1900. GW does not identify any evidence that the particular marks themselves served to identify GW as the source of those particular products.[8]

***Fourth***, GW contends that several of the terms at issue refer to particular characters or items within GW's fictional universe. (GW. Br. 4-5.)[9] As noted above, that misses the point. Merely being a term within a fictional narrative is insufficient to transform a word into a trademark. GW bore the burden of demonstrating that it used each of these marks ***as a trademark***, and it failed to present any evidence to meet that burden.

***Finally***, there is no inconsistency between Chapterhouse's contention that GW failed to use these marks as trademarks and its fair use defense. (*See* GW Br. 2.) Even if the Court were to find that GW had used the marks as trademarks, Chapterhouse merely used them to refer to GW's fictional universe consistent with nominative fair use, as set forth in Section VI below.

---

[7] As noted in Chapterhouse's opening brief, one additional term—Jump Pack—appears as a small phrase on product packaging, in a manner insufficient to qualify as a trademark. (Br. 4.) None of the other marks at issue appear in a product name or on product packaging. (*See* Ex. A (GW Ex. 2 [PEX 865]).)

[8] Contrary to GW's claim (GW Br. 5), the issue is not whether an abbreviation or sub-part of a product name can *ever* be a valid trademark, but whether *these particular marks* are recognized (as shorthand or otherwise) as terms that identify particular items as GW products. Because GW failed to introduce any evidence of such association, its trademark infringement claims are inadequate as a matter of law.

[9] Soul Drinkers, Mycetic Spore, Tervigon, Ymgarl, Lascannon, and Lightning Claw. GW also contends that Soul Drinkers refers to a series of books, but it cites no evidence to support that contention, let alone evidence that it used the term as a trademark to identify and distinguish its products. (*See* GW Br. 4-5.)

### III.  GW Did Not Produce Sufficient Evidence From Which A Jury Could Find Likelihood Of Confusion.

As the party alleging trademark infringement, GW bore the burden of introducing sufficient evidence from which a jury could find a likelihood of confusion.  It failed to do so.  As set forth in Chapterhouse's opening brief, all seven likelihood of confusion factors weigh in its favor.  (Br. 4-9.)  Furthermore, the "ultimate issue in a trademark infringement suit . . . is the factual question of likelihood of confusion of ***U.S. customers***."  *Am. Circuit Breaker Corp. v. Oregon Breakers, Inc.*, 406 F.3d 577, 584 (9th Cir. 2004) (emphasis added).  GW does not dispute that there is no evidence of customer confusion within the United States.  (*See* GW Br. 6-8.)  Thus, Chapterhouse is entitled to a judgment of non-infringement as a matter of law.[10]

***Actual Confusion.***  GW's Senior Legal Counsel testified that its customers know that GW and Chapterhouse are distinct entities because of this litigation, which is well-publicized and of great significance to Warhammer aficionados.  (Br. 6.)  GW now asserts that, since the litigation is ending and the jury's verdict allows Chapterhouse to continue using certain marks and selling certain products, "that factor is no longer operative."  (GW Br. 6.)  GW's argument is nonsensical—it cannot contend that it proved ***actual confusion*** by speculating that such confusion may first arise after the litigation concludes.  Further, GW offers no evidence to indicate that customers will lose their ability to perceive GW and Chapterhouse as distinct entities simply because Chapterhouse continues to sell accessories to GW products.

GW also contends that customers exhibited actual confusion when they referred to Chapterhouse products as "TS Marine kits," "true scale Space Marine," and "new Eldar Scorpion."  (GW Br. 6 n.7.)  However, these references to GW products do not prove that

---

[10] Chapterhouse's argument with respect to this issue applies to each trademark that the jury found infringed, including those marks for which the jury found both infringement and fair use.  The complete list of applicable marks is set forth in the appendix to Chapterhouse's opening brief.  (Br. Appx. 2-4.)

customers believed that GW sponsored Chapterhouse's products; to the contrary, these comments—all direct communications to Mr. Villacci—indicate that, at most, Chapterhouse products **call to mind** GW's product.[11]  But Chapterhouse has never disputed this fact, and it is not a basis for trademark infringement.  *See Frosty Treats Inc. v. Sony Computer Entm't Am., Inc.*, 426 F.3d 1001, 1009 (8th Cir. 2005).

GW's other arguments about actual confusion are unavailing.  For instance, GW cites internet posts and emails in which customers ask whether Chapterhouse is licensed by GW. (GW Br. 6.)  These questions illustrate not that customers are confused, as GW contends, but that they perceive a distinction between the two companies.  (*See* Br. 6-7.)  GW's arguments about eBay posts by a third party are not persuasive because, as outlined in Chapterhouse's opening brief, they do not suggest that GW made or sponsored the products.[12]  (*Id.* at 6.)

Finally, even if GW had evidence of actual confusion, it incorrectly contends that "one or two instances" would demonstrate a likelihood of confusion.  (GW Br. 7.)  "Just as one tree does not constitute a forest, an isolated instance of confusion does not prove probable confusion.  To the contrary, the law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care."  *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200-01 (1st Cir. 1996).

**Area and Manner of Concurrent Use.**  GW does not dispute that the parties' products are advertised and sold through separate and distinct channels.  (*See* Br. 7; GW Br. 6-8.)

**Similarity of the Products and Marks.**  Contrary to GW's claim (GW Br. 7), the goods

---

[11] In one instance, the **same customer**, in the same email thread, told Mr. Villacci, "it looks like your resin is doing a bit better than GW's 'Finecast' blend!"  (Ex. C (GW Ex. 8 [PEX 655]) at 1.)

[12] Though GW contends that Chapterhouse failed to address "post-sale confusion," it addressed these third party posts, which are the only alleged evidence of post-sale confusion.  (*See* Br. 6-7; GW Br. 8.)

sold by Chapterhouse are not identical to, and do not directly compete with, GW's products. *First*, Chapterhouse's products are tangible accessories for Warhammer figurines, while in most cases GW's allegedly infringed trademark is simply a picture in a book. (*See* Ex. D [PX 1020]; Ex. E [PX 1021].) *Second*, even in cases where GW's allegedly competing product is a tangible item, Chapterhouse's products have a different appearance and convey a different message from GW's product. (Tr. 922:25-923:15; 953:20-955:8.) Thus, it is not dispositive that Chapterhouse sometimes uses some of the same words as GW in connection with its products.

*Strength of the Marks*. GW contends that most of the marks at issue are "arbitrary" or "fanciful." (GW Br. 7.) GW cites no evidence in support of that contention, and as demonstrated in Section VII, many of its marks are "generic" or, at most, "descriptive." Further, GW fails to acknowledge that "the actual customer recognition value of the mark" is a key component of strength; despite its burden, GW did not produce any consumer survey evidence showing that the public associates any particular mark with GW. (Br. 8-9.) Finally, GW claims that its sales records demonstrate the distinctiveness of its marks. But those records simply show, with respect to each mark, the sales for one product that features the mark somewhere in its pages, or, in a few cases, on its packaging or somewhere in the product name. (Ex. A (GW Ex. 2 [PEX 865].) These records do not show any connection between GW's sales and the mark at issue, nor any indication that consumers relate the mark to the corresponding GW product.

*Intent to Palm Off.* GW cites no evidence that Chapterhouse wanted consumers to believe that GW sponsored its products. (*See* GW Br. 7.) Instead, GW relies on a single statement by Mr. Villacci that he named one of the accused products a "jump pack" in part because it *called to mind* GW's game. (*Id.* (citing Tr. 913:8-19).) Merely calling to mind another product is not sufficient to show a likelihood of confusion. *Frosty Treats*, 426 F.3d at

1009. Mr. Villacci's testimony regarding the use of the mark "jump pack" is insufficient to support a finding that Chapterhouse used that mark—let alone the other 63 marks at issue—with the intent to persuade consumers that its products were sponsored by GW.

The record evidence, moreover, demonstrates that Chapterhouse sought to differentiate itself and its products from GW. (Br. 9.) For example, Chapterhouse's website affirmatively disclaimed any affiliation with GW. (Tr. 755:7-23.) Although GW contends that these disclaimers "are routinely ignored by consumers" (GW Br. 8), it relies solely on cases addressing different circumstances rather than any evidence that customers actually disregarded these disclaimers.[13] Moreover, the disclaimers on Chapterhouse's website were provided *by GW* to be used as disclaimers on third party websites. (Tr. 724:7-727:18; Ex. F [DX 177] at 1-2.)

*Degree of Care Likely to be Exercised by Consumers.* GW asserts that Warhammer players are not sophisticated consumers. (GW Br. 7.) GW appears to rely on the incorrect assumption that customers cannot exercise deliberation and care when purchasing inexpensive products. (*Id.*) GW's unsupported attorney argument is contrary to the testimony of its own witnesses, who described Warhammer players as "aficionados" and explained that the game is "a very special kind of offer for a unique kind of or a specific kind of customer." (Tr. 221:2, 218:21-23; *see also* Br. 8.) The evidence demonstrates that Warhammer players are sophisticated consumers who exercise a great deal of care in purchasing gaming products.

## IV.    GW Did Not Meet Its Burden To Prove That Its Designs Were Original.

As set forth in Chapterhouse's opening brief, GW failed to introduce sufficient evidence

---

[13] *See Au-Tomotive Gold, Inc. v. Volkswagen of Am. Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006) (disclaimers were inadequate because they were inconsistent, non-comprehensive, and contradictory); *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1093 (7th Cir. 1988) (affirming district court decision that disclaimer would not be an adequate remedy for consumer confusion due to trademark infringement because defendant had selectively used disclaimer in magazine advertisements but failed to do so on the products themselves, the accompanying literature, or in-store advertisements, and could not ensure the use of disclaimer by its distributors).

9

that its purportedly copyrighted designs were original. (Br. 10-12.) Thus, Chapterhouse is entitled to a judgment of non-infringement as a matter of law.[14]

GW raises three arguments to the contrary. None has merit. ***First***, GW contends that the testimony of three of its witnesses—Mr. Merrett, Mr. Goodwin, and Mr. Naismith—demonstrates that the design of GW's generic Space Marine shoulder pad is "original" to GW. (GW Br. 9, 11.) Mr. Merrett, however, testified that he did not design any of GW's works, and that he did not have personal knowledge as to whether GW's designers actually generated original ideas. (Tr. 390:3-5, 391:1-12, 394:13-16.) Similarly, Mr. Goodwin conceded that GW "regurgitated" ideas drawn from numerous sources, including the comic book series *2000 AD*, Michael Moorcock novels, and real history. (Tr. 1627:9-14.) And Mr. Naismith admitted that he drew inspiration from historical and other sources (*e.g.*, football players' shoulder pads) when designing the Space Marine. (Tr. 533:1-4, 536:1-13, 547:2-12.)

Although the Court previously held that "GW is entitled to copyright protection as to the design of its shoulder pads" (Dkt. 258 at 20), it did so based on the "unusually large proportional size of the shoulder pads as compared to the Space Marine's head," which the Court found to be a "creative addition to the common shoulder pads sometimes worn by real-life soldiers in battle." (*Id.* at 20.)[15] The evidence presented at trial, however, demonstrated that oversized shoulder pads are a common design feature, and that GW's designers were aware of these sources when designing GW's works. (*See, e.g.,* Tr. 536:1-13; Tr. 1507:21-23; *see also* Tr. 1295:3-1296:18, 1397:1-1398:14; *see generally* Tr. 492:8-494:4, 1568:21-1569:14.) Thus, to the extent the large

---

[14] Chapterhouse's argument with respect to this issue applies to each product that the jury found to infringe, including those products for which the jury found both infringement and fair use. The complete list of applicable products is set forth in the appendix to Chapterhouse's opening brief. (Br. Appx. 4-6.)

[15] The Court focused its analysis on a particular illustration of a Space Marine character, though as the Court noted, that illustration featured shoulder pads with significantly more exaggerated proportions than the allegedly infringed three-dimensional shoulder pads. (*See* Dkt. 258 at 11; Ex. D [PX 1020] at 49.)

proportional size of the shoulder pads is a "creative addition" sufficient to render the shoulder pads eligible for copyright protection (which Chapterhouse disputes, *see* Br. 10-12), GW failed to meet its burden of demonstrating that the large size was "original" to GW rather than the result of copying that feature from earlier works. *See Feist*, 499 U.S. at 345.

*Second*, GW contends that Chapterhouse's argument demonstrating that GW's shoulder pads are not original "improperly dissect[s]" GW's "overall works into constituent elements." (GW Br. 9.) It is axiomatic, however, that the *only* elements of GW's works that are protected by copyright are those that GW proved to be original. *Nova Design Build, Inc. v. Grace Hotels, LLC,* 652 F.3d 814, 817-18 (7th Cir. 2011). GW's shoulder pads are not entitled to copyright protection because GW did not prove the originality of their shape nor their decoration.

*Finally*, GW suggests that certain of its shoulder pads—featuring basic shapes such as snakes and arrows—may be protectable as original combinations of unprotectable constituent elements. (*See* GW Br. 9-10.) These simple combinations, however, are not sufficiently creative to merit copyright protection. Shoulder pads are a standard element in military settings and therefore *scènes à faire*, while the various generic symbols that GW added to its shoulder pads are common throughout history and not "original" to GW. (*See, e.g.*, Tr. 1536:13-1541:18; 1544:4-1546:1.) GW's rudimentary combinations do not rise to the "minimal degree of creativity" required for originality in copyrighted works. *Schrock v. Learning Curve Int'l., Inc.,* 586 F.3d 513, 519 (7th Cir. 2009); *see also Buckler v. Hawkins, Ash, Baptie & Co., LLP,* 329 F.3d 923, 930-31 (7th Cir. 2003) (overturning jury verdict of infringement where "only *scènes à faire* or non-expressive elements remained from the copying").

## V. GW's Infringement Claims Are Based On Alleged Copying Of Unprotectable Ideas Or Utilitarian Considerations.

As set forth in Chapterhouse's opening brief, GW's infringement claims are based on the

alleged similarity between Chapterhouse's works and the unprotectable ideas and utilitarian considerations behind GW's works, rather than GW's particularized expression of those ideas. (Br. 12-13.) Thus, Chapterhouse is entitled to a judgment of non-infringement as a matter of law. *See Feist*, 499 U.S. at 344-45; *FASA Corp. v. Playmates Toys, Inc.*, 869 F. Supp. 1334, 1351 (N.D. Ill. 1994).[16] GW does not present any evidence to rebut Chapterhouse's contention, but instead relies exclusively on the Court's November 27, 2012 summary judgment decision. (GW Br. 12-13.) That reliance is misplaced for several reasons.

*First*, GW notes that the Court previously denied Chapterhouse summary judgment on the ground that GW's copyright claims are based on unprotectable ideas. (GW Br. 12.) The Court, however, based its decision on the fact that GW presented photographs and drawings of its allegedly infringed works, *i.e.*, particular expressions rather than abstract ideas. (Dkt. 258 at 17-18.) GW's claim charts (Ex. D [PX 1020]; Ex. E [PX 1021]) reveal numerous substantial differences between its allegedly infringed works and Chapterhouse's products, such that any similarities are merely instances of different products serving as different expressions of similar underlying, unprotectable ideas. Further, with respect to numerous Chapterhouse shoulder pads, GW's claim chart demonstrates that its infringement theory is *entirely* predicated on the abstract dimensions of its shoulder pad, rather than any particular expression of that idea.[17]

*Second*, GW notes that the Court determined that GW's Space Marine Chaplain (Product No. 3) is copyrightable. (GW Br. 12-13.) The Court, however, simply found that "GW's *particular depiction* of a Chaplain in entry 3, which includes a skull with red eyes that wears a helmet, is copyrightable." (Dkt. 258 at 21 (emphasis added).) GW's copyright on that particular

---

[16] Chapterhouse's argument with respect to this issue applies to each product that the jury found to infringe, including those products for which the jury found both infringement and fair use. The complete list of applicable products is set forth in the appendix to Chapterhouse's opening brief. (Br. Appx. 6-7.)
[17] Product Nos. 53, 69, 97-100, 148, 151-52, and 155.

depiction does not provide a basis for GW to claim ownership of every expression of the *idea* of a skull with red eyes that wears a helmet. Yet those are the only features that Chapterhouse's accused product share with GW's Chaplain. (*See* Ex. D [PX 1020] at 6-7.) Thus, GW's claim again depends on the alleged copying of an idea, rather than a particular expression of that idea.

**Finally**, GW has no response to Chapterhouse's argument that the dimensions and configurations of GW's products were dictated by utilitarian considerations, and thus those aspects of the products are not protected by copyright. (Br. 13.) Because GW's infringement claims are based on Chapterhouse's alleged copying of those utilitarian aspects, Chapterhouse is entitled to judgment of non-infringement as a matter of law. *Durham Indus.*, 630 F.2d at 915.

## VI. Chapterhouse's Use Of GW's Alleged Trademarks Is Nominative Fair Use.

As set forth in Chapterhouse's opening brief, Chapterhouse is entitled to a judgment of non-infringement due to nominative fair use. (Br. 13-14.)[18]

GW's contrary arguments are without merit. *First*, GW claims Chapterhouse's use of GW marks on its website "would easily be understood by consumers as a license agreement." (GW Br. 13.) GW fails to account for the context in which Chapterhouse uses those marks—to explain that its products are *compatible with* GW's products, while disclaiming any sponsorship or connection with GW. (Br. 13-14; *see also* Section III *supra*.)[19] This is quintessential fair use. *See, e.g.*, *Waco Int'l, Inc. v. KHK Scaffolding Houston Inc.*, 278 F.3d 523, 534 (5th Cir. 2002).[20]

**Second**, GW asserts Chapterhouse may not assert the fair use defense because its

---

[18] Chapterhouse's argument with respect to this issue applies to each trademark that the jury found infringed, excluding those marks for which the jury found both infringement and fair use. The complete list of applicable marks is set forth in the appendix to Chapterhouse's opening brief. (Br. Appx. 8-9.)

[19] GW contends that certain unspecified eBay posts also support its argument. (GW Br. 13-14.) As explained in Chapterhouse's opposition to GW's Rule 50(b) motion, the eBay posts in evidence fairly use GW marks to identify the GW products compatible with Chapterhouse's accessories. (Dkt. 451 at 14-15.)

[20] GW relies on an inapplicable case in which the defendant used the plaintiff's mark as a trademark to identify its own product, and not to refer to the plaintiff's product. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 953-54 (7th Cir. 1992).

underlying works are "unlawful." (GW Br. 13.) Although none of Chapterhouse's products are unlawful (as explained in Chapterhouse's opening brief and herein), regardless of the issue of copyright infringement, GW cannot use trademark law to prevent Chapterhouse from informing consumers that its accessories are compatible with GW products. *Waco Int'l*, 278 F.3d at 524.

*Finally*, GW asserts that Chapterhouse's fair use defense is inconsistent with its claim that GW failed to use its marks as trademarks. (GW Opp. 14.) There is no inconsistency—merely using a term within a fictional work does not transform it into a trademark, regardless of whether that term may be necessary to refer to a particular aspect of the fictional work.[21]

## VII.   GW's Alleged Marks Are Not Valid Trademarks.

As set forth in Chapterhouse's opening brief, GW failed to meet its burden to prove that its alleged marks are valid trademarks. (Br. 14.) Thus, Chapterhouse is entitled to a judgment of non-infringement.[22] GW raises two arguments in response, neither of which has merit.

*First*, GW contends that the Court previously found that five of the marks at issue were valid. (GW Br. 14.) The Court, however, simply ruled that GW established its prior use of the marks—it did not determine that the marks were valid. (Dkt. 333 at 13-16.)

*Second*, GW contends that, within the hierarchy of trademark classifications, seven of the marks at issue—Librarian, Rhino, Tyrant, Predator, Salamander, Legion of the Damned, and Exorcist—are "arbitrary" or "fanciful" and, therefore, inherently valid trademarks. (GW Br. 14.) As applied to GW's products, however, these words convey attributes based on the plain meaning of the terms. For example, "Librarian" is used to describe a character responsible for

---

[21] For example, the term "Joker" does not become a trademark solely by virtue of appearing within a Batman comic book, *see* Section II *supra*, but it is reasonably necessary to use that term to refer to the Joker character regardless of whether other circumstances may elevate the term to trademark status.

[22] Chapterhouse's argument with respect to this issue applies to each mark that the jury found to have been infringed, including those marks for which the jury found both infringement and fair use, but excluding the four marks that the Court previously ruled are valid. (*See* Tr. 1741:20-22.) The complete list of applicable marks is set forth in the appendix to Chapterhouse's opening brief. (Br. Appx. 9-10.)

caring for books and maintaining records (*see* Tr. 616:18-24), and "Exorcist" is used to describe a demon-hunter (drawing on the popular association of the phrase with the demon-hunting priest in *The Exorcist*). (*See* Tr. 680:21-682:3, 913:20-914:5.)[23]  Because GW uses these terms to signify the characteristics of its products, they are "generic" or, at most, "descriptive" marks. *See Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986).

Generic marks are never valid trademarks, and descriptive marks are not protectable as trademarks unless they have acquired a secondary meaning. *Echo Travel, Inc. v. Travel Assoc., Inc.*, 870 F.2d 1264, 1266 (7th Cir. 1989). Thus, even if these terms were considered descriptive, GW bears the burden of showing that it has made long-term, exclusive use of the marks such that most consumers, when confronted with the marks, uniquely associate them with GW. *H-D Mich., Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 760 (7th Cir. 2007) ("A descriptive mark acquires secondary meaning if the product name comes to be uniquely associated with the original seller.") (internal quotation omitted). GW does not dispute that there is no evidence that **any** of the allegedly infringed marks have acquired a secondary meaning. (*See* GW. Br. 14.) Thus, GW failed to meet its burden to prove that its marks are valid trademarks.

## CONCLUSION

For the foregoing reasons, this Court shoulder enter judgment as a matter of law in favor of Chapterhouse for all claims in this case. In the alternative, this Court should order a new trial, limited to the claims and issues specified in this brief.

---

[23] Similarly, "Rhino" refers to a tank's similarity to the real-life military Rhino Armored Personnel Carrier (and in both cases describes the ability to charge like a rhinoceros). (*See* Tr. 1025:4-8, 1267:22-1268:5; *see also* Tr. 542:4-21, 546:7-547:1.) Likewise, "Salamander" refers to GW products decorated with an image of an "angry lizard or dragon-type thing." (Tr. 311:19-21.) GW identifies no evidence that the terms "Tyrant" and "Predator" are used in any way other than their normal, generic connotations. (*See* GW Br. 14.) And contrary to GW's unsupported claim (GW Br. 14), "Legion of the Damned" is not a phrase that GW coined but a combination of several well-understood words denoting physically or spiritually afflicted soldiers. *See, e.g.*, *Legion of the Damned* (1969 film starring Jack Palance), *Legion of the Damned* (1993 novel by William Dietz).

Dated: November 7, 2013         Respectfully submitted,

/s/ Imron T. Aly

Jennifer A. Golinveaux (CA Bar No. 203056)
Thomas J. Kearney (CA Bar No. 267087)
    WINSTON & STRAWN LLP
    101 California Street
    San Francisco, CA 94111-5802
    Phone: (415) 591-1000
    Fax: (415) 591-1400
    jgolinveaux@winston.com
    tkearney@winston.com

Imron T. Aly (IL Bar No. 6269322)
Bryce A. Cooper (IL Bar No. 6296129)
Tyler G. Johannes (IL Bar No. 6300117)
    WINSTON & STRAWN LLP
    35 West Wacker Drive
    Chicago, IL 60601-1695
    Phone: (312) 558-5600
    Fax: (312) 558-5700
    ialy@winston.com
    bcooper@winston.com
    tjohannes@winston.com

Julianne M. Hartzell (IL Bar No. 6275093)
Sarah J. Kalemeris (IL Bar No. 6303644)
    MARSHALL, GERSTEIN & BORUN LLP
    233 S. Wacker Drive
    Willis Tower Suite 6300
    Chicago, IL 60606
    Phone: (312) 474-6300
    Fax: (312) 474-0448
    jhartzell@marshallip.com
    skalemeris@marshallip.com

Donald R. Steinberg (MA Bar No. 553699)
Louis W. Tompros (MA Bar No. 657791)
Kevin A. Goldman (MA Bar No. 686609)
Elizabeth C. Mooney (MA Bar No. 679522)
    WILMER CUTLER PICKERING
        HALE AND DORR LLP
    60 State Street

16

Boston, MA 02109
Phone: (617) 526-6000
Fax: (617) 526-5000
don.steinberg@wilmerhale.com
louis.tompros@wilmerhale.com
kevin.goldman@wilmerhale.com
elizabeth.mooney@wilmerhale.com

## <u>CERTIFICATE OF SERVICE</u>

I, Imron T. Aly, an attorney, hereby certify that on November 7, 2013, I caused to be filed electronically the foregoing REPLY BRIEF IN SUPPORT OF DEFENDANT CHAPTERHOUSE STUDIOS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL LIMITED TO CERTAIN CLAIMS AND ISSUES with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.


_____/s/  Imron T. Aly_____