```
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   GAMES WORKSHOP LIMITED,        )
                                    ) Docket No. 10 C 8103
 4              Plaintiff,          )
                                    ) Chicago, Illinois
 5        v                         ) September 1, 2011
                                    ) 9:30 a.m.
 6   CHAPTERHOUSE STUDIOS LLC,      )
                                    )
 7              Defendant           )

 8
                      TRANSCRIPT OF PROCEEDINGS
 9           BEFORE THE HONORABLE JEFFREY T. GILBERT

10

11   PRESENT:

12   For the Plaintiff:      JONATHAN E. MOSKIN (By Telephone)
                             Foley & Lardner LLP
13                           90 Park Avenue
                             New York, New York 10017
14
                             SCOTT R. KASPAR
15                           Foley & Lardner LLP
                             321 North Clark Street
16                           Suite 2800
                             Chicago, Illinois 60610
17

18   (TRANSCRIBED FROM DIGITAL RECORDING.
      PLEASE PROVIDE CORRECT SPEAKER IDENTIFICATION)
19

20

21

22

23

24

25
```

```
 1   PRESENT:  (Cont'd)

 2
     For Defendant
 3      Chapterhouse:            ERIC J. MERSMANN
                                 Winston & Strawn
 4                               35 West Wacker Drive
                                 Chicago, Illinois 60601
 5
 6                               JENNIFER A. GOLINVEAUX (By Telephone)
                                 THOMAS J. KEARNEY (By Telephone)
 7                               JOHN C. DONALDSON (By Telephone)
                                 SHANE WITOV       (By Telephone)
 8                               Winston & Strawn LLP
                                 101 California Street
 9                               Suite 3900
                                 San Francisco, California 94111
10

11

12

13

14
     (TRANSCRIBED FROM DIGITAL RECORDING.
15    PLEASE PROVIDE CORRECT SPEAKER IDENTIFICATION)

16

17
     Court Reporter:             Lois A. LaCorte
18                               219 South Dearborn  Room 1918
                                 Chicago, Illinois 60604
19                               (312) 435-5558

20

21

22

23

24

25
```

1          THE CLERK:   10 C 8103, Games Workshop Limited v

2     Chapterhouse Studios LLC.

3          THE COURT:    We will do the courtroom first.

4          MR. KASPAR:    Scott Kaspar for Plaintiff Games Workshop.

5          THE COURT:    Good morning, Mr. Kaspar.

6          MR. MERSMANN:    Eric Mersmann for Defendant Chapterhouse.

7          THE COURT:    Good morning, Mr. Mersmann.  And who do we

8     have on the phone?

9          MR. MOSKIN: (By Telephone)   This is Jonathan Moskin at

10    Foley & Lardner in New York for Games Workshop.

11         THE COURT:    Okay.

12         MS. GOLINVEAUX: (By Telephone)   Good morning, your

13    Honor, this is Jennifer Golinveaux, Winston & Strawn for

14    Defendant Chapterhouse Studios, and with me on the line are

15    Caleb Donaldson, Tom Kearney and Shane Witnov of Winston &

16    Strawn.

17         THE COURT:    Okay.  All right, good morning, everybody.

18         Okay, I'll address myself to the folks in the courtroom,

19    but if the people on the phone want to respond to this, I'm

20    happy to do that too.

21         You have seen the order.  I spent a couple of sessions

22    with your Chicago counterparts, saw the order I issued last

23    week, and I'm wondering whether you have had a chance to talk

24    through those -- talk about those issues and what your

25    perspective -- your respective positions are on that.

1      I'll look to the plaintiff first, I guess, since this is

2   your lawsuit, or if somebody else wants to jump in, that's

3   fine.

4      Mr. Kaspar is waiting to see if, Mr. Moskin, you want to

5   take this up or not.

6      MR. MOSKIN:   Well, I have to say, and I apologize for

7   this because I was out of the office last week, that I want to

8   pull up -- I discussed with Scott the -- I think I know what

9   the content of the order is and I'm just pulling it up right

10  now to be sure that I have that -- one of the things I

11  believe -- the two things that seem to be issues --

12     THE COURT:   Hold on.  Before you begin speaking, why

13  don't we take a break, why don't you pull up the order.

14     MR. MOSKIN:   Right.

15     THE COURT:   Why don't you look at it.  We will wait.

16     MR. MOSKIN:   Right.

17     (Pause)

18     THE COURT:   And this is all in the context -- remember,

19  I'm the magistrate judge here, okay?

20     MR. MOSKIN:   Yes.

21     THE COURT:   And this case was referred to me for

22  settlement.  It wasn't referred to me for summary judgment or

23  for trial.  So my context is is it a case that we should sit

24  down and try and settle and if so, how and in what kind of

25  context or is it not or are there parts of this that we could

1   deal with.

2       But you're in front of Judge Kennelly on the merits for

3   the main case and I suppose it's also been referred to me for

4   some discovery too.  So --

5       MR. MOSKIN:   Well, as I understand the scope of your

6   Honor's proposal was that we contemplate some sort of a mock

7   trial for 10 -- each party pick 10 products and you know, we

8   get to pick our 10 best products and defendant, maybe call

9   them the 10 worst products, and I have two general concerns

10  with that, one, because the very heart of a claim for

11  copyright infringement is copying.

12      At this point we have essentially received, despite the

13  fact that we began the discovery process 5 months ago, we

14  still have received essentially zero information from the

15  defendant.  They have offered various excuses why they won't

16  provide us information and now they won't even answer my

17  letters seeking very basic information.

18      They have claimed as an affirmative defense in the case

19  that they independently created these works.  I think the law

20  is very clear, in fact, Judge Kennelly instructed us to take a

21  look at the model jury instructions that he himself had a hand

22  in drafting on copyright infringement, and they make very

23  clear that it's a common understanding in copyright law that

24  originality for purposes of copyright is not a broad objective

25  inquiry, it's essentially a subjective question of whether the

1    originator, the author, created the works him or herself, or

2    in the case of a company, by itself without copying from

3    others.

4         And as a corollary to that or the flip side of that, so

5    that, for example, if I sat down and composed, you know, just

6    started writing "When in disgrace with fortune in men's eyes I

7    all alone beweep my outcast fate," you might say that, you

8    know, I had copied Shakespeare, but if I could prove that I

9    was not looking at his sonnets but that I really came up with

10   that on my own, that's original to me and I'm entitled to

11   claim copyright in it, and whether I could show anybody copied

12   from me rather than Shakespeare is another matter, but just in

13   terms of owning copyright, it's a closed inquiry into the

14   state of mind effectively of the copyright creator.

15        And similarly, the law is clear that the infringer, if

16   the infringer is, they can try to show independent creation,

17   that is to say that they looked at -- either they created

18   things on their own or they relied on third-party sources, but

19   we have been seeking for five months to find out from the

20   defendant if it can identify any third-party sources on which

21   it relied in creating the roughly hundred or so works that we

22   have identified so far as infringement, and they have given us

23   nothing.  They have produced no documents, they have made some

24   very broad windy references to things out in the public

25   domain, but we, if we are to proceed with your Honor's

1 proposal, the first thing we need, and I think it's fair for

2 us to have to get this rather quickly, is, you know, would be

3 the documents and detailed interrogatory answers responding to

4 our requests, whether there really is any defense to the claim

5 of infringement in the case.

6     Moreover, another issue that just conceptually, part of

7 our claim in this case is, and there is abundant case law that

8 supports this, that when -- here, if you look at the website

9 as a whole, a website is a copyrightable work and the entire

10 website is devoted to selling and offering or depicting -- put

11 aside the sale issue because for purposes of copyright that's

12 less relevant -- it's for depicting the infringing items.

13 They're all collected together in one place and the entire

14 website is an infringement.

15     So -- and frankly, I think the law is sufficiently clear

16 that we could readily win summary judgment on that issue,

17 whether the website should be taken down even if some end

18 products could be sold independently as not infringing.

19     But the first step before we can move forward I think to

20 any settlement would be, and we would be very eager to do that

21 if, you know, given the right opportunity, is we need some

22 responses to discovery and really at this point, and I know

23 one of the other issues you had teed up is the issue of

24 whether there was sufficient prejudice that we should be able

25 to deal with the issue of the protective order, I'll put that

1    aside for a little later, but we really received no

2    information that I can share with my client to -- on which to

3    move forward to assess whether there are any of these products

4    that we could say are noninfringing.

5        THE COURT:   Well, I mean, I'm sure either Mr. Mersmann

6    or Ms. Golinveaux want to speak to this, but just a couple

7    things for the record here.

8        Number one, before you get to a claim of infringement and

9    whether it's copied or not, don't you have to preliminarily

10   show that the products are substantially similar or the works

11   are substantially similar?  So in your Shakespeare sonnet, you

12   know, if it's a work about the same thing Shakespeare talked

13   about, but it was a Dave Matthews band lyric, don't you first

14   have to show substantial similarity before you get to, "and

15   they copied it from us"?

16       I know -- I mean, I read the pattern jury instructions at

17   the Seventh Circuit to look at substantial similarity and

18   infringement and so forth, and I know that to some extent

19   there is some blend, but as I understand it, one of the points

20   the defendant is making is A, the chart you have given them

21   where you say "This is what we claim is infringed" is wanting,

22   but B, if you look at least at the works in the status report

23   where they reproduced in living color two different things,

24   they're saying "Look at this, Judge, look at this, Jury,

25   they're not the same."

1    So you would acknowledge you at least have to show the

2    similarity before you get to "and they copied it," right?

3        MR. MOSKIN:   Well, what you have to show is first

4    access, and they admit they had access to everything.

5        THE COURT:   Right, and I think --

6        MR. MOSKIN:   And -- I'm sorry, I didn't mean to talk

7    over you.

8        THE COURT:   Yes, I thought in one of the papers I saw

9    the defendant went so far as to say "For these purposes I'm

10   not even going to challenge access."  Go ahead.

11       MR. MOSKIN:   Right.  And you're right that you have to

12   prove substantial similarity, but what that means is not that

13   you have to show that the overall works are similar, you have

14   to simply show copying of protectable elements.

15       So for example, it's commonplace for courts to say in

16   copyright infringement cases you can't disprove copying by

17   showing how many elements of a work you didn't copy.  So as

18   long as they have taken discrete copyrightable elements in a

19   way that is clearly copied, that is sufficient.

20       But yes, there has to be substantial similarity, but you

21   don't -- it doesn't defeat a showing of substantial similarity

22   to show that there are other additional elements in a work

23   that are not similar.

24       So I think for every one of these we can show that they

25   have taken identifiable discernible original elements and

1    transposed them directly into the infringing work.

2        THE COURT:    Okay.   Let's say you could do that and

3    you're pretty confident you could do that.   But you know,

4    what, I'm putting the cart before the horse here.

5        Let me just say two more things and then I'll hear from

6    the defendant in terms of this general concept.

7        One, I think your understanding of why we're here today,

8    Mr. Moskin, is a bit circumscribed.   One of the things I

9    discussed in the two sessions I have already had with your

10   people here locally was some type of a, you know, shortened

11   proceeding like you just described, okay?   But that wasn't the

12   entirety of what I was trying to get at here.

13       If you look at my order, what I have said is what I

14   wanted to talk about today is what is necessary to put this

15   case in a posture for a productive settlement conference.   And

16   I suppose you're answering that by saying "We want the

17   discovery from the defendant that we have asked for and they

18   have stonewalled us on," and two, what information or

19   documents should be exchanged by the parties before the

20   settlement conference to increase the chances that the

21   settlement conference will be productive.   And again, I

22   suppose I hear you say "We want responses to our discovery."

23       And three, what three pre settlement conference

24   submissions should be required of the parties in terms of

25   letters or materials or other things.

1  So I'm a little bit broader than what you're talking

2  about here, and that's probably sometimes a problem of the

3  game of telephone with communications being exchanged.

4  But where I'm at is I understand you have served

5  discovery and I understand you're in a litigation here where

6  one party serves discovery and the other party opposes it and

7  we go on and on with that.  But another way to do -- another

8  way to get a case resolved is to exchange certain information

9  between the parties that give them a better sense of the

10  parties' positions and then without expenditures of hundreds

11  of thousands of dollars, come in and try and resolve it.  So

12  that's kind of why I'm here.

13  If the parties come before me and say "Judge, we have

14  read the Federal Rules of Civil Procedure and they don't say

15  anything about that stuff, and we're going to zealously

16  represent our client and we want to serve things under Rule 33

17  and 34 and 36 and we want to come before you under Rule 37 and

18  eventually we want to have a trial," that's fine.  And then

19  there is not much for a settlement judge to deal with.

20  But my goal is to try and shortcut that a little bit.

21  And you know, from what I see, let's say you're right.  Let's

22  say that you will be able to show -- I mean, the defendant is

23  not a stranger to the games, this particular game, that Games

24  Workshop puts out, right, he is a fan.  Isn't that right, Mr.

25  Mersmann?

1    MR. MERSMANN:    That's correct, your Honor.

2    THE COURT:    Okay.  And he makes these allegedly

3    infringing products, I think you said, in his garage?

4    MR. MERSMANN:    That is correct, your Honor.

5    THE COURT:    And so let's say for the sake of argument

6    and only for the sake of argument and not as any finding or

7    anything else that for at least some of your items you're

8    going to be able to show they're substantially similar and

9    you're going to be able to put together whatever

10   circumstantial or even direct evidence in terms of the types

11   of things you're asking for from the defendant of copying,

12   okay?  And for others it's going to be a little bit dicier.

13   You're not going to be able to show that they're that similar

14   and you're not going to be able to -- and maybe the defendant

15   is going to be able to articulate from whatever diaries he has

16   or whatever that he came up with the Shakespeare sonnet pretty

17   much on his own and it's going to be a bit of a reach.

18        But let say you're going to win on some of this stuff

19   after you go through all your discovery.  What then?  If Games

20   Workshop Limited's goal is to put Chapterhouse Studios out of

21   business, a death knell, cease and desist, go away, die, and

22   pay us whatever you can of our attorneys' fees, then you're

23   right, there is no basis to sit down and settle this case.

24        However, if you would like to work out some agreement

25   with Chapterhouse Studios, and I haven't yet heard whether

1    Chapterhouse is willing to do that, short of "We'll go away

2    roll up and die," but that allows both of you to go on and

3    attempt to continue to operate in the areas, the space that

4    you're operating in in some way without one or the other

5    having to give up, in the world I live that's called a

6    settlement, right?

7        So if there is a way to do that, I would love to help you

8    do that, and if there is information that should be exchanged

9    by the parties that would help you do that, I would like to do

10   that.

11       I understand that with respect to one of the defendants,

12   here, Paulson, Games Workshop already has had some productive

13   discussions that hopefully will lead toward a settlement and a

14   resolution that will not force Paulson to curl up and die.

15   And if there is a way to do that here, I would like to explore

16   that.  I would like to hear from the defendant, though.

17       MR. MERSMANN:   Your Honor, as you said, the primary

18   issue of contention that we see directly before us and that's

19   standing between us and settlement is the question of

20   substantial similarity.

21       Plaintiff obviously feels that it's -- it would be very

22   easy for them to show that there are clearly copyrightable

23   protectable elements that have been copied, and as we have

24   discussed in the previous two status hearings, we disagree.

25       So while we think that that is the number one issue that

both sides could use some input on, some guidance in terms of
coming together for a settlement, to the extent that plaintiff
does want broad discovery leading up to -- leading up to a
settlement conference that includes affirmative defenses and
the like, then all we would ask that it be mutual, that we get
discovery as to their communications about their inspirations
on designs and similar requests that we have tendered.

THE COURT:  Why has the plaintiff -- why is their
inspiration on designs relevant?  I understand why it's
relevant for the defendant because you have to show that you
didn't just copy what they did, but why is their inspiration
on something that they have a copyright or a common law
copyright on relevant?

MR. MERSMANN:  And that's to get to this issue of
protectable elements.  If it is a question of, you know, our
song lyric that's similar to their Shakespeare sonnet that is
similar to their sonnet that is similar to a Shakespeare
sonnet, if we have evidence that they did in fact copy their
Shakespeare sonnet from Shakespeare, then that's just not a
protectable element and they shouldn't be asserting that in
the substantially similar analysis.  That shouldn't be one of
the elements that the court should look at.

And there are, given the degree to which the phrase
"influence" or what the artist or designer has been influenced
by has been relied upon in this case by plaintiffs in

1  asserting my client's copying, it's -- the same question goes

2  back to them.

3      We believe that many of the elements that they claim are

4  the look and feel of their products that are the common

5  threads that run throughout their world are derived from other

6  creative works, other works in the public domain, and so they

7  shouldn't be, that they shouldn't be analyzed for their

8  substantial similarity.  So that's really the core of the

9  relevance there as to communications with their designers

10  saying what they were inspired by.

11      And the second issue as to individual designers, as we

12  spoke about previously, is that we actually don't even have

13  the information from them on the artists responsible for the

14  individual pieces of art that they're alleging we copied.

15  They're giving us lists of contributing artists to an entire

16  book or entire product line, and that's relevant to simple

17  ownership of the copyright, as we discussed previously.

18      MS. GOLINVEAUX:    Your Honor, this is Jennifer

19  Golinveaux, if I could just add one thing.

20      THE COURT:    Yes.

21      MS. GOLINVEAUX:    I heard opposing counsel mention in

22  terms of what discovery would be useful for a settlement

23  conference, he mentioned discovery on independent creation.

24  Defendant has supplemented an interrogatory relevant to

25  independent creation and provided detailed information as

1    specific example.  So if there are other categories of

2    discovery that plaintiff truly thinks would be useful in

3    evaluating settlement, we are certainly happy to consider

4    producing those in short order before our conference, but I

5    think your Honor put his finger on it, which is if the goal

6    here is at this point to get Chapterhouse Studios to walk away

7    from this business wholesale, then I'm just not sure a

8    settlement conference will be useful and we might be best

9    proceeding with a summary judgment motion, as burdensome as

10   that might be given the number of products.

11       But if clarity regarding whether and which of these

12   products are actually similar in any way to plaintiff's

13   products would be useful in evaluating settlement, then I

14   think a settlement conference could be productive here.

15       So I guess what I'm asking is if there are other

16   categories of documents that plaintiff thinks would be useful

17   in evaluating that issue, we would like to know what those

18   are.

19       THE COURT:   Mr. Moskin, first, I blanked when you were

20   talking about this first category of documents.  What was

21   that?

22       MR. MOSKIN:   I think -- I'm not sure -- you blanked on

23   something that I referred to?

24       THE COURT:   Well, Ms. Golinveaux was saying -- I'm

25   probably murdering that name.

1    MS. GOLINVEAUX:   Your Honor, that's exactly right,

2    actually.

3    THE COURT:   Okay.  -- was saying that you had said there

4    would be certain documents that would be helpful to you in

5    evaluating settlement.  What are those documents, whether

6    settlement would make sense?

7    MR. MOSKIN:   Right.  What I would like is -- I think

8    your Honor has seen the detailed essentially preliminary claim

9    chart that we prepared, and if what Ms. Golinveaux described

10   as a detailed interrogatory answer, I don't want to get into a

11   war of words on here, if she will stipulate that those are the

12   only sources of independent creation they can identify, then

13   we can move forward and frankly, you know, they basically have

14   no defense of independent creation.

15   If she will say on the record that there is no more

16   information they can provide on independent creation, then

17   that really -- that's fine with me, but they really haven't

18   provided any kind of detail, and I think what we would like

19   is -- I mean, my client spent dozens of hours with me putting

20   together that claim chart and they have given us slapdash

21   answers.

22   Again, I think they should give us a corresponding answer

23   for each one of the products if they can identify any actual

24   third-party works on which they relied.  I also think that

25   since he says -- I think they should give us the mockups or

1  working drawings that show how they created these things and

2  his correspondence then with the third-party designers.  This

3  goes to the confidentiality issue.

4      Your Honor left open the question of whether we were

5  prejudiced by our inability to discuss with our client these

6  matters.  I can't -- it's not just a matter of whether we want

7  to sue some third-party.  I can't -- clearly, he has got

8  designers all over the country and all over the world.  The

9  only way they can work together in creating these designs is

10 by exchanging e-mails.  These are all visual, so there have to

11 be documents, there have to be e-mails and we should have

12 those.

13     Mr. Villacci, the principal of Chapterhouse, was

14 interviewed publicly and we can provide the court a transcript

15 of his interview in which he said that the way the

16 third-party, at least some of the third-party designers make

17 these things is they get contacted by customers who want

18 specific types of products that they see in the Games Workshop

19 overall body or the Games Workshop universe of literature.

20 They request of these third-parties that they make copies and

21 then the third-party designers, you know, work together with

22 Chapterhouse to create these things and then Chapterhouse is

23 permitted to continue selling them itself.

24     So I think we should have all of the correspondence

25 between -- and we have been asking for it for four months

1    now -- between Mr. Villacci or Chapterhouse and his

2    independent designers, and we should have a detailed -- either

3    detailed interrogatory responses matching our claims chart or

4    an admission that, you know, if they can go on the record and

5    say that their interrogatory answer now is all they can tell

6    us, then that's fine.  It makes my job much easier.  But

7    again, I can't -- at this point I can't even advise the

8    client, you know, for example, some of these independent

9    designers may very well be former Games Workshop employees,

10   but if I can't tell my client their names, you know, and that

11   would be very relevant to know what access they had internally

12   to all these detailed works.

13       THE COURT:   Yes, but your client, just on that one

14   point, your client could give you a list of everybody who, you

15   know, current and former employees and you could check them

16   against the list of designers that you get under protective

17   order.

18       I'll tell you something, I think there are too many

19   lawyers here.  I like lawyers.  I am and was a lawyer, and I

20   was a lawyer in a small firm and I was a lawyer in a big firm,

21   but let's, let's assume, Mr. Moskin, you can prove exactly

22   what you just said.  Just again, for purpose of assumption

23   that communications with the designers are as what -- you will

24   prove in a court of law or in a summary judgment motion

25   through the expenditure of lots of money exactly what you have

1  shown that customers called the designers, they said "I saw

2  this Games Workshop character.  I would like you to design

3  one," they do design one, and you're going to be able to, you

4  know, show it's substantially similar and there is access and

5  copying and whatever you're going to need to show for purposes

6  of winning on that particular figure or that particular thing,

7  okay?

8      And maybe there is a bunch of them like that.  And --

9  but -- and I'll add in also I would bet with 97 or however

10  many works we are talking about here that defendant is going

11  to win some too.

12      So defendant is going to get some ruling someplace from

13  Judge Kennelly if this goes all the way through that you don't

14  have any protectable interest in certain of your works.  You

15  know, there may be some figures, there may be some other

16  things if you get into a battle on this, that lo and behold

17  Chapterhouse, which has a profitable business on this, there

18  is going to be a ruling on the record public in federal

19  district court in Chicago that you don't have rights to

20  certain things that you're now asserting rights in.

21      So let's assume that all that goes down.  But with

22  respect to the things that you win on, what do you want?  Do

23  you want Chapterhouse to cease and desist production of those

24  items, period?  Would you be satisfied if Chapterhouse owned

25  by a fan paid you a royalty of some, or your client a royalty

1   of some amount in order to do that or some other type of

2   relief that you could negotiate with them now?  Or is the only

3   way Chapterhouse is satisfied here is it proves its case, it

4   wins, and it puts Chapterhouse out of business.  I'm sorry, I

5   said Chapterhouse, I think I meant Games Workshop.

6       MR. MOSKIN:    Well, I don't think -- I hope there is no

7   issue here of Games Workshop being put out of business.

8       THE COURT:    No, no, no.

9       MR. MOSKIN:    Frankly, I'm not looking -- Games Workshop

10  is not looking to be punitive either, although concededly,

11  we're in a posture where, you know, we're not very friendly,

12  and I don't mean to -- I think it came up in the last hearing,

13  you know, this is just a fan site, but you know, it's not

14  really.  I don't think it's any more a fan site than if fans

15  of Walt Disney decided that they loved the Disney characters

16  so much that they could start create their own Mickey Mouse

17  products and so on because there is this untapped need.  You

18  know, if it's an infringement, it exceeds what fans are

19  permitted to do.

20      THE COURT:    Okay.  But let -- excuse me, let me

21  interrupt you.  I'm sorry, I'm being rude.

22      MR. MOSKIN:    Okay.

23      THE COURT:    I'm interrupting you.  First, you're right,

24  I said what does Games Workshop want from Chapterhouse, not

25  the opposite.

1    Two, I just had a Disney case, okay, and Disney came in

2  and said exactly what you wanted.  "This person is trading off

3  our names, trading off our products.  We want an injunction

4  against them doing this and if they do it again, then we want

5  a default judgment entered against this person," okay.  That

6  was clear to me.  They were not willing to settle for anything

7  less, I could not settle the case for anything less other than

8  scaling back the injunction, and the case was settled with the

9  defendant consenting to an injunction and a cease and desist

10  and an agreement if they did it again, there was a default

11  judgment, okay?

12    Chapterhouse is not willing to do that here, and so if

13  that's what you want, I can terminate my settlement referral,

14  okay?  However, if there is something short of that that you

15  would want -- what I'm trying to do is assume you win and you

16  can win or assume you get information on certain of these

17  products.  Is there a resolution here with Chapterhouse that

18  you're willing to explore?

19    Because what you're asking for, you know, what both sides

20  have said in their status report, what both sides have said

21  here is "We want lots of discovery and we want to have a

22  summary judgment proceeding in front of Judge Kennelly with

23  respect to all or most of 97 products," right?  Is that right,

24  Mr. Kaspar?

25    MR. MOSKIN:   Mr. Kaspar -- this is Mr. Moskin in New

1   York.

2       THE COURT:   I'm looking at Kaspar here.

3       MR. MOSKIN:   Okay.

4       THE COURT:   But that's what you want, Mr. Mersmann, you

5   want, you want to have a summary judgment proceeding on all

6   these things to show that they're not substantially similar?

7       MR. MERSMANN:   That was the way we had intended to

8   proceed before we were referred for settlement.

9       THE COURT:   You still may.

10      MR. MERSMANN:   That's correct.

11      MS. GOLINVEAUX:   Your Honor, I'm sorry, could I just add

12  one point there?

13      One of the reasons we think an early summary judgment

14  motion is really necessary is because it would limit the

15  discovery we would need to seek from plaintiff on ownership

16  and on protectability, on inspiration, because if we knock out

17  50 works, let's say, out of 96, then that's 50 works we don't

18  have to seek all this discovery on whereas if we don't knock

19  out those works early on, then we are going to have to serve

20  our client by seeking ownership discovery and the sources they

21  relied upon for each of those -- for each of the works in the

22  case.

23      THE COURT:   Yes, I know, but a couple of things.  One,

24  summary judgment is hard to get.  Two, staged discovery

25  sometimes makes sense and sometimes doesn't, and so nobody has

1  yet decided that your proposal that you put all substantial

2  similarity discussion on hold while you litigate this summary

3  judgment motion, nobody has yet agreed to that.  And a judge

4  could look at this and say "Look, the chances of you

5  succeeding on everything are slim and none," and yes, it could

6  cut down on the cost of expense but it may not.

7      And so a judge could say "You know what?  A pox on all

8  your houses.  Go ahead, everybody produce everything.  I'm not

9  going to stage discovery, and if, as, and when you think you

10  got a good summary judgment motion, bring it on.  And you

11  know, I'll deal with it, I'll deal with it at that time."

12      I think that the plaintiff has said that you know, some

13  of the discovery that they're seeking is necessary in order to

14  defend against some of what defendant will be raising in

15  anticipation on this summary judgment motion.  And I frankly

16  think that the -- you know, the reason that Judge Kennelly

17  candidly sent it down to me probably is because he would like

18  to avoid having to deal with this type of summary judgment

19  motion if he could at all help it.  But if he can't, you know,

20  that's fine.

21      And that's why I'm trying to force some discussion of

22  what happens at the end of the day.  I mean, does -- isn't

23  there a risk that Games Workshop will be adjudicated not to

24  have certain of the rights that it thinks it has or you think

25  that's a very, very, very minimal risk?

1     MR. MOSKIN:   I take it you're addressing that to the

2     plaintiff's side.

3     THE COURT:   Yes.

4     MR. MOSKIN:   And just to say a couple things here, of

5     course, there is some risk and I want -- you know, just to be

6     clear, I think that -- I do think that there are, conceptually

7     there are ways to try to settle this case, and just as we are

8     very close to settling the case, I would say, within

9     nanometers of settling the case with Paulson, who has done

10    something, you know, does similar -- there is a similar

11    business model to Chapterhouse but much smaller, he is only

12    selling 10 products or something, not over a hundred products,

13    you know and he is -- conceptually what we have agreed to do,

14    you know, is that he has agreed to stop selling some and make

15    changes to others.

16    And you know, that's -- you know, we're not trying to be

17    punitive to people that, you know, if we can work with them.

18    And you know, I -- it's just much harder to get to that

19    juncture with Chapterhouse partly because of the very -- well,

20    I have to say partly, and this may be the lawyers' fault, that

21    this case has been handled in a way that it has generated a

22    lot of unnecessary heat.  Maybe I'm somewhat guilty of that

23    myself, but I can tell you that the way Chapterhouse started

24    this case was by seeking leave to file what I thought was a

25    frivolous motion to dismiss that the judge wouldn't let them

file, that it cost us a lot of time and money to make clear
why it was not an appropriate motion.  We then had efforts to,
to make at least some minimal advances in discovery and
Chapterhouse has, as I said, completely stonewalled us.  They
won't even answer my letters.

The -- I thought we had resolved one issue in a meet and
confer in June and they then proceeded to make what I thought
was a, you know, completely inappropriate motion to compel.
It's been -- there has been a lot of unnecessary hostility
between counsel, but conceptually it's quite possible that,
more difficult and maybe that is a little naive, but at least
conceptually it's possible to work out a settlement where
Chapterhouse would agree to change, make enough changes in its
product and just continue selling some of them, that the
parties could move on.

But a license is not likely.  I would say that's a
non-starter for reasons I could explain, but it's not -- and
also just to say, you know, we are trying to figure out, we
have a deadline to amend our complaint.  We have in the
interrogatory responses, in that claim chart we didn't include
all 105 products that we had originally thought were
infringing because on closer inspection, you know, some of
them -- you know, we would probably be satisfied not to pursue
a claim.  There are some additional products that Chapterhouse
has just launched that we would need to amend the complaint,

1   but you know, I don't dispute the fact there are some, if

2   these products are viewed individually, there may be some that

3   Games Workshop would, on which it would lose, but I do think

4   it bears noting that Chapterhouse on its website

5   prominently -- not prominently, but it does, after it was sued

6   it added a statement admitting that Games Workshop owns

7   copyright in all of these things and Mr. Mersmann is raising a

8   non-issue when he says there is some question as to copyright

9   ownership or authorship because these are all made by

10  employees of Games Workshop, as we have told them repeatedly.

11      As a matter of copyright law, Games Workshop therefore

12  owns all the copyright under U.K. law.  There is just no issue

13  there.  So again, you know, there may be some risk we'll lose

14  on some of these things, and that's, of course, an incentive

15  to settle, but you know, if there is some opportunity to

16  settle based on changes in Chapterhouse's business model, then

17  that's something worth discussing.

18      MS. GOLINVEAUX:   Your Honor, may I respond briefly?

19      THE COURT:   Yes.

20      MS. GOLINVEAUX:   You know, I'm actually heartened by

21  what I have heard from plaintiff's counsel because it sounds

22  like conceptually that it's possible to reach a settlement,

23  which I hadn't heard before and that's encouraging.  I don't

24  think that defendant is adverse to producing the

25  correspondence for the designers that he is talking about if

1    they really feel like that's a sticking point for them to be

2    able to evaluate settlement.  But we would want the categories

3    that Mr. Mersmann identified earlier, which is the author

4    information and the sources that they have relied upon in

5    advance of settlement also.

6         And then I think one kind of broader category, which is

7    plaintiff hasn't produced a single e-mail to date in the case.

8    They have claimed that they have e-mails showing confusion,

9    which will be relevant on the trademark claim, for example,

10   but we haven't received a single e-mail from them.  So we

11   would want the e-mails, particularly if we're producing

12   correspondence to designers, we would want the e-mails in

13   advance of the settlement conference also so we have

14   everything on the table.

15       MR. MOSKIN:   The e-mails, there are two e-mails I think

16   that I should have this week.  As far as the authorship

17   information, they have all the authorship information and

18   the -- this is just -- again, Chapterhouse, the defendant,

19   concedes on its website that Games Workshop owns all of the

20   copyrights in all of these works, so again, they're just --

21   they're just putting us to needless burden.  If there are

22   specific issues they want to raise where they think that some

23   work was not original, that's fine, we're happy to answer

24   those questions, but just to say we have to -- this is, you

25   know, you have to understand, this business is not or the War

1    Hammer universe is not perhaps quite as vast as the Disney

2    universe, but it would be like saying to Disney, "You have to

3    identify every creative step in all of your works before we

4    can move the case forward," particularly here where they admit

5    that we own copyright in everything, that doesn't really make

6    sense, and so far that's all I can tell they're looking for,

7    is just to make us work needlessly.

8         If they have specific questions about specific works, you

9    know, what was your inspiration, that's fine, and we are happy

10   to answer that, but they haven't attempted to do that, they

11   have just said, you know, "Go reproduce for us 40 years or

12   30 years of creative inspiration, you know, for everything."

13   And that's, you know, a Sisyphean task.

14        THE COURT:   Ms. Golinveaux, if he is correct that on the

15   website or for purposes of the litigation you concede

16   authorship or ownership, I can't remember the way he phrased

17   it, but why do you need this information?

18        MS. GOLINVEAUX:   Thank you, your Honor.  I think what

19   plaintiff's counsel is referring to is simply a disclaimer

20   that Chapterhouse runs at the bottom of its website that says

21   certain trademarks, and I think it lists out the product names

22   and copyrights are claimed by plaintiff and it certainly is

23   not an admission as to ownership or scope of protectability.

24        You know, I think what -- and I think plaintiff's counsel

25   also said that we have already been given author information.

1    We have not.  And that could be highly relevant to the case

2    because if the claims were not created by employees in the

3    scope of their employment, plaintiff has already served

4    discovery responses saying that there are no chain of title

5    documents in their possession, you know, and these would be

6    documents like assignments from third-party designers.

7         So all we're asking for is the author of each of the

8    claimed works, not the entire universe of plaintiff's work,

9    but the works that they're claiming in that chart that he

10   refers to.  And that's critical to knowing whether or not they

11   even own the works that they're asserting.  We feel we have

12   not admitted or conceded ownership.

13        MR. MOSKIN:   The author of each work is Games Workshop

14   as a matter of law.  End of story.  And if there are specific

15   questions they have about any specific works, they can ask

16   them, but as a matter of law, Games Workshop is the owner of

17   every single work.  That's why there is no chain of title

18   issue because they're all written and created by employees

19   within the scope of their employment and again --

20        MS. GOLINVEAUX:   And, your Honor, that's exactly what we

21   need to test.

22        THE COURT:   Mr. Moskin, why should they take your word

23   for that?

24        MR. MOSKIN:   Well, they can -- again, they don't have to

25   take my word for it.  If they have questions about specific

1  works, that's fine.  But my client has said in an

2  interrogatory answer that that's the truth.  If they have a

3  basis to challenge that, then they can challenge it.  But they

4  have no basis to challenge it.

5      THE COURT:   You know what?  I don't have enough

6  information here to make discovery rulings as specific as what

7  we're talking about here.  The referral is for settlement and

8  I think it's for settlement related discovery.

9      So you know, Judge Kennelly and I would probably have to

10 decide if there are motions filed what is settlement related

11 discovery and what's not.  I will say that I think both --

12 just from what I'm seeing now, and this is not binding, but

13 what I'm hearing, both parties would need to explain -- on the

14 one hand, plaintiff would need to explain better why simply

15 answering an interrogatory insulates the plaintiff from

16 production of information that either could support the answer

17 to interrogatory or could be used by a defendant to

18 cross-examine and show that an interrogatory answer is

19 incomplete or not completely correct or not fully in keeping

20 with the documents or so forth.

21     So I would need to know a little bit better why an answer

22 to an interrogatory that says we own this and these all were

23 created by Games Workshop employees in and of itself would

24 insulate discovery.  By the same token, the defendant would

25 have to show a little bit more than I have seen now, it seems

1    to me, why truncated discovery so that a pretty complicated

2    summary judgment motion process could be instituted which

3    could delay this 2010 case by months or even more than that

4    should be countenanced as opposed to proceeding with all types

5    of discovery that would ready the case for trial if the

6    defendant is wrong that summary judgment is not going to

7    completely resolve this case or substantially narrow it,

8    similar to I think the motion to dismiss practice.

9        I mean, I don't know any defendant and I never

10    represented a defendant that didn't say to me at some point,

11    "Look, can't we get this resolved quicker?  Can't we just get

12    a ruling on this?  Can't we just get this done?  Why do I have

13    to respond to all of this stuff?"

14        And sometimes the answer to that is it's tough, but we

15    can't.  You know, you're in a lawsuit and you know, the other

16    side is making arguments and a judge is going to decide which

17    way to go and you know, one thing that settlement does is

18    allow the parties rather than the court and the lawyers to

19    control the outcome and that's why in our courthouse only

20    1.5 percent of the cases actually go to trial.  Most of them

21    get resolved before then, some on dispositive motions.

22        But just common sense tells me that with 97 works, you

23    know, if you knock out 30 on summary judgment, does that

24    justify staying discovery so you can go through all this

25    stuff?  And there is probably still discovery that has to be

1  had on, even with respect to the works that are subject to the

2  summary judgment.

3      But I'm speaking off-the-cuff here, and I want both sides

4  to appreciate that I'm speaking off-the-cuff and not totally

5  informed about the particular discovery issues that are going

6  to be raised and the context, and I or Judge Kennelly would

7  look at those very carefully before making any decision that

8  was controlling here.

9      Just in this conference, though, when you know -- I mean,

10  I appreciate what Mr. Moskin is saying that he as counsel to

11  Games Workshop is frustrated by his dealings with defendant's

12  counsel.  And I am sure defendant's counsel is frustrated by

13  dealings with plaintiff's counsel.  But in this exchange here

14  when Mr., when Ms. Golinveaux says she is encouraged by

15  certain things she has heard, you know, that's one of the good

16  things about parties sitting down and talking.

17      I'm not talking about a discovery request or an answer

18  date, or anything like that, but talking, because you learn

19  certain things.  Chapterhouse learned that a license is a

20  non-starter.  I'm not sure whether or not Chapterhouse knew

21  that before or not.

22      On the other hand, you know, I have heard Chapterhouse

23  say that it's encouraged that maybe there can be a settlement

24  here.  But I'm not going to wrestle you all to the ground.

25  That's not my job, okay, that's really not my job.  I think it

1  would be a shame for both sides here, one side is paying their

2  lawyers, one side is doing it for free, but it seems to me

3  both sides have risk in the litigation and it can be an

4  extremely expensive litigation.

5      And I'm very willing to sit down, even preliminarily, in

6  person, I think, rather than a phone call, to try and work out

7  either a discovery plan that gives both sides the information

8  they need to evaluate settlement or a preliminary settlement

9  discussion that brings people in to talk about things.

10      I mean, I will tell you I had a trademark case last, a

11  couple weeks ago, maybe a month ago now, that was very -- it

12  was also a zero sum game, it was very hotly fought.  The

13  principals came in, the settlement discussion for hours was

14  very hot, but in sitting with both parties I learned that the

15  principals really had a lot of animosity against each other

16  because of some prelitigation telephone calls that were had

17  and things that were said on those calls.

18      And one of the principals took it upon himself to say to

19  the other principal, "I'm sorry.  I'm sorry about how I

20  reacted when we had a phone call.  I'm sorry for saying that I

21  was going to bury you, that I was going to put you out of

22  business, that this was going to cost you too much and you

23  could not fight us.  And I have respect for your business,

24  your plan, your model and I would like to try and resolve

25  this."  The case got resolved.

1    So strange things happen when people sit down together

2    and good things happen when people sit down together to try

3    and resolve something as opposed to talking motion to dismiss

4    and all the rest.  But I can't force anybody to do that, and

5    I'm certainly not going to do that here.

6    And I don't think I have actually any motions in front of

7    me right now, do I?  I saw a motion in front of Judge Kennelly

8    to extend the time to amend pleadings because in part you

9    didn't have access to be able to talk to your client about the

10   stuff that was produced on a highly confidential basis.

11   Are there any motions in front of me?

12   MS. GOLINVEAUX:   Your Honor, defendant is prepared to

13   file a motion to compel soon, but we had wanted to wait for

14   today's call to try to figure out how that might work in the

15   context of a settlement conference and whether it made sense

16   to hold off.  But clarity as to whom we should file that in

17   front of or if you think it would be useful to do the sit down

18   that you were talking about on discovery, we would certainly

19   be open to that as an alternative.

20   MR. MOSKIN:   May I ask opposing counsel what would be

21   the subject of the motion to compel?  She refused to respond

22   to me in e-mails or my letters.  Maybe in open court you will

23   say what it is you think you're missing.  I have told you that

24   we're, for example on the, these couple e-mails that you will

25   have them shortly.  There is not a need to make a motion to

1    compel.  I previously explained that in a letter and asked if

2    there is anything else they needed and they haven't -- they

3    have refused to tell me if there is anything else, so I'm very

4    curious to know, maybe you will say so in open court, what it

5    is you think you need because I will say on, you know -- I'm

6    not aware of any motions that are pending now by Games

7    Workshop because it's not just a matter that we haven't

8    received -- I can't share this information about the creators,

9    these independent creators with my clients, but in five months

10    we have received zero, absolutely zero other information

11    except document requests and in 28 years of practice,

12    honestly, I have never had a case where I have had such

13    complete, total utter and complete lack of cooperation from

14    another side.

15    So you know, I will also say that just yesterday because

16    they refused to even tell us what documents they have or

17    produce any documents, I served a limited 30(b)(6) deposition

18    notice to take the deposition of somebody at Chapterhouse just

19    so we can identify what documents they do have so we know what

20    they're withholding from us.

21    And instead of saying -- I got an angry response saying

22    they want to just put this off indefinitely.  I said in

23    reaction to that, well, then let's pick a date within a few

24    days of that, but -- you know, discovery is set to close at

25    the end of October.  I have served discovery five months ago

1   and have learned zero in this case.  My client is as much in

2   the dark if there are any defenses or how close we are to

3   winning or losing because we have gotten no, absolutely zero

4   cooperation from the defendant.

5       So I'm really -- I would -- yes, I'm sorry.

6       THE COURT:   I would be interested too, Ms. Golinveaux,

7   but I would also say just for everybody's edification we

8   should all remember that under our local rules here, and I

9   think corresponding Rule 37, no motion to compel can be filed

10  without a Meet and Confer that goes through the details of the

11  motion.

12      So I would, I would hope that before any motion to compel

13  was filed, there was a substantive discussion by counsel for

14  the parties about the motion and efforts to resolve it because

15  it would really be a waste of time to file a motion to compel

16  that doesn't include a Rule 37.2 statement under our local

17  rule, which then could be denied simply on that basis alone.

18      MS. GOLINVEAUX:   Thank you, your Honor.  Understood.  I

19  have got to respond to a couple of things, which is

20  plaintiff's counsel, it seems to me, is trying to create the

21  impression that defendant hasn't produced documents in the

22  case and that's not accurate.  Defendant has produced

23  thousands of pages, has produced documents about financial

24  information, documents about the number of each of the

25  products sold, has produced advertising materials.

1    What neither side has produced yet is e-mail discovery

2 because that takes more time to go through, although

3 apparently plaintiff only has two responsive e-mails, maybe it

4 won't take them quite as long.

5    With respect to the motion that I mentioned, back on

6 July 29th we sent plaintiff's counsel a 6-page letter

7 detailing what we need that we haven't gotten, because they

8 have refused to provide any discovery on ownership or

9 protectability either on the trademark side or the copyright

10 side, and frankly, I think it's about 90 percent of our

11 request they just say "No,we aren't going to give this to

12 you."

13    And we got a letter in response, but it didn't address

14 our concerns and we told them that and for a little over

15 four weeks now, we have repeatedly asked plaintiff's counsel

16 for time to talk on the phone to walk through it and he has

17 flat out refused to get on the phone with us and he says he

18 does not intend to get on the phone with us.

19    The last e-mail said "I will think about whether I will

20 talk with you on the phone."  That was about 10 days ago.  So

21 we have held off from that July 29th letter that we initially

22 sent specifically to try to develop a Meet and Confer process

23 and see if there are some ways we can narrow this so that we

24 didn't have to burden the court with these issues, but if we

25 have -- we have to get this information.

1      MR. MOSKIN:    Your Honor, this is Mr. Moskin.  I just

2   cannot believe Ms. Golinveaux has the temerity to say what she

3   just said.  It is completely misleading, if not flat out

4   dishonest.  I responded to their July 29 letter in detail and

5   asked them repeatedly if there is any further -- if there were

6   any further questions they had, which I would be happy to

7   discuss on a telephone call if they would first just tell me

8   what issues they have.

9       They won't answer my e-mail.  They say they produced

10   documents.  They produced a disc that is unreadable.  I told

11   them that it's unreadable.  They refused to either give me a

12   new disc or tell me even what's on the disc.  I asked them

13   innumerable times just tell me what's on the disc.  The only

14   thing I can read on the disc are some public pages from the

15   website and yet this disc has also been designated, as far as

16   I can tell, in bad faith as attorneys' eyes only under the

17   protective order.

18       I don't know what's on it.  I have received not a single

19   document that I can read or share with my client in this case.

20   And I think it's just -- I think, Ms. Golinveaux, really, you

21   owe me and perhaps the court an apology for what you have just

22   said.

23       But they have filed motions to compel in this case

24   without meeting and conferring, without containing the Rule

25   37.2, local Rule 37.2 statement that they have met and

1    conferred.  So I also responded -- I have sent them repeated

2    letters asking, detailing what we're missing and they refuse

3    to respond to my letters.

4        So again, I just, I find it absolutely remarkable that

5    Ms. Golinveaux can say what she just said to the court with a

6    straight face.  And this is part of the problem why it's

7    difficult to discuss settlement in the case because again, I

8    can also tell you, I adverted to this earlier, and again, in

9    28 years I really have never encountered anything like this,

10   that I had a Meet and Confer, telephone call with, I think it

11   was Mr. Kearney in defendant counsel's office.  We, I thought,

12   had resolved all of the issues.  They then refused to comply

13   with the agreement that we worked out in that call and filed a

14   motion again without ever talking about me again.

15       The judge, Judge Kennelly instructed the parties to meet

16   and confer on a joint status report at the end of June.  We

17   sent them a draft joint status report, asked for comment, got

18   no comments.  We proceeded nonetheless to have a Meet and

19   Confer with us and they said "No, we're not going to give you

20   any comments on discovery because we want to move for summary

21   judgment instead."

22       So the times I have had meetings, had telephone calls

23   with them they have behaved, in all honesty, and I hate to say

24   this, but with utter bad faith, and that's why I have insisted

25   that they respond to -- respond to -- tell me what they need

1    or what they want, have an agenda for a call before we have

2    further calls where they can pull similar stunts.  And again,

3    I don't usually speak this way about opposing counsel, but

4    your Honor really must understand the level of frustration

5    here.

6         I stand by my position.  We have received absolutely zero

7    information from them in discovery.

8         THE COURT:   Well, I'm going to cut this off here now,

9    okay?  I'm going to say a couple things and then we will call

10   this hearing to a close, or a few things and we will call this

11   hearing to a close.

12        Number one, you're talking about your 28 years of

13   practice.  I have been on the bench I think for 14 months now

14   and you all win.  You win the award for, out of hundreds of

15   cases I have had, you know, big complicated cases and little

16   cases, you all win the award for the most contentious at least

17   presentation of discovery dispute and lack of cooperation in

18   discovery, from what I can see, to date.

19        So I'll give you that sense of where this case stands and

20   probably where, why Judge Kennelly was sending it down here to

21   see if we could get it resolved.  But you win that award here

22   among, you know, lots of multi party cases and contentious

23   police shooting cases and commercial cases and all the rest.

24        Two, I'm sure you can appreciate because I also practiced

25   for 28 years before I got on the bench and I don't know how

many years you have practiced -- Ms. Golinveaux, you can put
that of record too if you want, but I knew when I was
practicing that nobody wins in front of the court with this
kind of stuff, okay, because it's very, very hard for the
court, particularly orally, to be able to assess who really is
being tremendously obstreperous, dishonest, in bad faith, and
just totally blowing through professional obligations and who
is not in a food fight like I'm seeing here. It's really,
really difficult for the court to see.

And it always frustrated me, and I didn't get involved in
a lot of these, but I saw a lot of them and I was in some of
them. It always frustrated me because it was very difficult
for me to be able to let the court know that I was really
proceeding in a very legitimate way and the other side was
completely facetious, off the mark, and it's really hard.

Now, it's possible with, you know, very precise motions
attaching letters and e-mails and discovery requests and
responses and then talking about the law that needs to be
dealt with in the context on the merits and why one side or
the other has failed to produce and is stonewalling something,
why that is both objectionable and sanctionable behavior in
certain circumstances.

And if you have a judge who is willing to go through all
of the tedious process to look at that, at the end of that
process it's possible for the court to determine who is right

1    and who is wrong, who is bad and who is good, who should be
2    sanctioned and who shouldn't.  But it's tough, okay?  So right
3    now I'm hearing everything you all are saying and the
4    aspersions that you're talking about, but I honestly can't
5    assess with the information I have now who is right or who is
6    wrong.  Both sides to me look bad, I'll tell you that right
7    now, because it's -- you're costing a lot of money and not
8    getting anywhere.
9        Number two, I will continue, because I am an optimistic
10   person, I will continue to think about what would make sense
11   in terms of trying to move this case forward in settlement,
12   and from reviewing the file and thinking about it a little
13   more.
14       I'll note for the record that I really do not think
15   either side read my order and came prepared today to talk
16   constructively about how we could move to resolve the case.
17   And that's frustrating to me because, you know, I think both
18   sides came prepared to talk about what the other side was not
19   doing and why you needed discovery and so forth, but you know,
20   as evidenced by the fact that Mr. Moskin, who is participating
21   by phone, he had to pull up my order on the screen before he
22   could even respond to it, it means to me that although I'm
23   thinking about how to resolve this case, the parties are not
24   thinking hard enough about what to do and what they can do to
25   resolve the case.

1      So I urge you to do that.  I will continue to do it.  In

2  terms of the discovery motion practice, I think the safest

3  thing probably is to file that in front of Judge Kennelly,

4  because his referral order is not crystal clear as to what

5  comes to me and what comes to him.  I looked at the referral

6  order and it talks about discovery related to settlement

7  discussions, and on some level all discovery is related to

8  settlement discussions because it informs both parties as to

9  what is, what's going to be helpful to get a case settled.

10      So I think he and I will decide once the motion is filed

11  and I'll, you know, I don't know where you should file it,

12  Chapterhouse folks, but he and I will decide who should take

13  it up and so forth.  But I think it will be -- it will ill

14  serve the party filing it if you can't comply with our local

15  rules because both he and I come out of the same school of

16  trying to get that done.

17      But hearing what I hear, you know, I'm not optimistic,

18  but you got to comply with the rule or I guess in fairness the

19  rule also says you have to state in detail when you have tried

20  to comply and why you haven't and then the first threshold

21  question on the motion will be did somebody comply with it and

22  there will be a satellite proceeding on that.

23      I don't think one side or the other comes out of this in

24  front of me smelling like a rose.  I don't really.  A rose is

25  a rose, I could, you know, I don't know if that's Shakespeare

1   or somebody else, but I got to tell you that from my

2   perspective, the efforts you're putting in here, I think your

3   clients may be -- unless your clients both think you ought to

4   be gladiators here, I would put at least some effort into

5   thinking about creative approaches to information exchange,

6   whether that's through discovery or otherwise, that would

7   inform the parties so that they could sit down and try and

8   resolve all or portions of the case.

9       Those types of discussions with client and lawyer are

10  really important discussions to have here, I think, because I

11  think the way I look at it, both of you have something to lose

12  in the litigation and, you know, my experience with clients is

13  they would rather control their exposure rather than put it in

14  the hands of some judge or some jury someplace.

15      But I will say I understand this case a little bit better

16  now, having heard the perspectives of the folks on the phone

17  and I will say that if you all are the ones who are carrying

18  the laboring oar on this stuff, then I want you either here or

19  on the phone for future hearings because you have, it seems to

20  me, you know, things to offer here that I think are helpful to

21  getting down to the nitty-gritty.

22      MS. GOLINVEAUX:   Your Honor, may I ask one follow-up?

23      THE COURT:   Sure.

24      MS. GOLINVEAUX:   You had suggested that perhaps you

25  might be open to doing a sitdown conference on discovery.

1    Perhaps that would be, if plaintiff's counsel is open to that,

2    perhaps that would be a good way to try to move things forward

3    not only on the discovery issues because it would get us in

4    the same room, but in terms of teeing it up for settlement if

5    that's a possibility.

6         THE COURT:   I'm willing to do that, but I will say that

7    I'm going to need some stuff in writing to do it, whether it's

8    outlined in a motion to compel and a response that then I sit

9    down with you and try and work through or letters to me and a

10   response, which I would also entertain.

11        And I will put in my order so that nobody has to fall on

12   their sword on this, that I am willing to entertain with

13   respect to the discovery disputes you have a sitdown that

14   first I get a letter from, you know, the complaining side or

15   both of you are complaining and then a response so that I

16   actually have in front of me the issue framed, the documents

17   that we're talking about, the discovery request and response

18   that we are talking about rather than the free form that we

19   have had here, which I have a hard time with.

20        MR. MOSKIN:   If I may, your Honor, and first, I want to

21   apologize and also make clear, I wanted to be sure at the

22   outset, I hope my comments made clear I was well aware not

23   only of the content of your order but more specifically that's

24   in your order, I just wanted to be sure I hadn't forgotten

25   anything; the specific proposal of having, you know, the mock

1    trial.  But I do apologize if I created the appearance, and I

2    also think in fairness to the other side as well, I was away

3    on vacation and then the office was closed on Monday because

4    of the hurricane here.  It just has been a very -- I have only

5    had two days essentially to comply with your Honor's prior

6    order.

7        So you know, for that purpose, you know, I'll accept full

8    responsibility, but it's just -- and I don't want to foreclose

9    further discussion.  I do also want to say I think a very easy

10   way, without filing motions, we specifically -- I specifically

11   declined to file a motion in, when I thought there was a

12   reason to do it in earlier July because I thought maybe

13   informal letters would be better, is we can simply submit to

14   the court -- I have two letters to opposing counsel, they have

15   a letter to me and my response.  We can simply give those to

16   your Honor without motion practice and have a discussion about

17   what remains on those to be resolved without having the

18   burden -- that would be, give your Honor total maybe 10 pages

19   of documents to read rather than lengthy motions with long

20   arguments and so forth.

21       And I will also mention I have, in two weeks I will be in

22   Chicago anyway.  I'm happy to be in person then although it

23   may be a little unfair to opposing counsel if I happen to be

24   there.

25       But I would also just make one final request if I could.

1    I know your Honor seemed to have left open the issue whether

2    we could show sufficient prejudice beyond the scope of your

3    Honor's prior ruling to be permitted so I could share even

4    with just my in-house counsel, not with the client itself, the

5    information as to these third-party designers and suppliers,

6    but if we could -- if we could at the very least hold the

7    final resolution of that until I receive the e-mails that Ms.

8    Golinveaux I think said she would produce, the correspondence

9    between Chapterhouse and those third parties so I can at least

10   have something more substantive to look at and we can then

11   discuss this a little bit more profitably.

12        THE COURT:   With respect to your, what I'm interpreting

13   as an oral motion to reconsider the ruling on the motion to

14   continue the Highly Confidential, I think right now I'm not

15   prepared to deal with it, all right?  I mean, talk about it

16   and if you want relief from that order, having sat through

17   what I have sat through now, I think you're going to have to

18   give me a motion on it, all right, because I don't know

19   whether this is -- is this the first time you're hearing this,

20   Mr. Mersmann?

21        MR. MERSMANN:   It's the first time I'm hearing it.

22        THE COURT:   What about you, Ms. Golinveaux?

23        MS. GOLINVEAUX:   Yes, your Honor.

24        THE COURT:   I'm just not going to rule on it.  You know,

25   I mean, I don't know whether they object to it or they don't.

1   If they don't object to it, then you can agree to it among

2   yourselves without me.  If they do object to it, then I need

3   to get a better sense of -- I'm not going to wade into that

4   right here.

5       In terms of the suggestion to give me letters as opposed

6   to motions, if they frame the issues, I'm fine with that.  In

7   terms of the proposal to meet in Chicago in a couple of weeks,

8   my only problem with that is that if you're talking about the

9   week of the 12th, that's the -- I have criminal duty that

10  comes and goes.  The 12th and the 19th are weeks that I have

11  criminal duty.  However, early in the week it doesn't get as

12  busy as later in the week, and also, if you're willing to come

13  here and meet in my conference room and know that I may have

14  to absent myself for search warrants or arrest warrants or a

15  preliminary hearing or something like that while we're trying

16  to work this through, I'm fine to do it during that time.

17      I generally don't set -- for that reason I generally

18  don't set settlement conferences during that time, but if

19  we're talking on this basis, I'm happy to do that.  But I

20  am -- I'm done for the day right now, okay?  I don't want --

21  what I would like you to do is talk about whether or not you

22  will agree to submit these discovery issues to me and then

23  come in and try and work those through in a, you know, non

24  motion to compel way.  If you are willing to do that, I'm

25  willing to accommodate you and you ought to calling here and

1  start talking with my judicial assistant at the 312-435-5672

2  number and --

3      MS. GOLINVEAUX:   Your Honor, I'm actually traveling the

4  week of the 12th.  If it's possible for your schedule and for

5  opposing counsel for the week of the 19th, I could certainly

6  be there then.

7      THE COURT:   It is.  That's just the second week of my

8  criminal duty so you will, you know, you will just have to

9  work within that.  But I have some availability then too to

10  sit down and meet with you as well.  And I suppose, though I'm

11  not -- I really do think in person, and you guys are spending

12  so much money on this that I probably shouldn't even worry

13  about this, but an in-person meeting I think where I could

14  have everybody here is a lot more helpful than doing it on the

15  phone, it really is.

16      But I'm willing to do it -- you guys should consult each

17  other in terms of timing and then I have -- you know, again

18  because of the criminal duty it's tough, but I have Monday the

19  19th I could meet with you.

20      MR. MOSKIN:   That week, unfortunately, I have

21  commitments in New York throughout that week, which is bad,

22  and it was the week of the 12th I was proposing.

23      MS. GOLINVEAUX:   Unfortunately, I'm traveling the week

24  of the 12th.  We could do the week of the 26th if that works

25  for the court.

1    THE COURT:    You know what?  I'm not going to do this by

2  phone, okay?  You know, you guys should talk amongst

3  yourselves about what your proposed time would be, what you

4  would submit to me.  I mean, I want enough in advance, I want

5  information enough in advance so that I could understand the

6  nuances of the discovery disputes and what each side's

7  response is.

8    So for example, if you're just going to give me a letter

9  from one side that says "This is what we want," but I don't

10  have a response to that letter, that's not going to be helpful

11  to me.  So you need to structure this in a way that I find out

12  what plaintiff wants and what defendant wants, including this

13  issue potentially about sharing with in-house counsel, and

14  then -- and what the other side's perspective today is on

15  that, not what it was.  You know, if you're going to give me

16  letters that were exchanged on July 29th, but in between one

17  or the other parties has said "You know what, I don't have a

18  problem with that," I don't really want to waste my time

19  trying to figure out how I would propose a solution if you're

20  going to come in and tell me it was resolved.

21    So I want materials that tee up the current discovery

22  disputes that you would like to discuss and would like my help

23  in resolving.  I think it would be good to do that without

24  motion practice, without prejudice to either party's right to

25  do it on a motion, and I do want you to consider potentially

1   creative ways to bring this case to a conclusion.

2       But I need to go.  I need to close out this hearing and

3   move to something else and so I would ask you to confer about

4   potential dates, a potential structure and if you want to talk

5   to me about the structure that you're thinking about, which I

6   guess I would encourage, then you call my chambers, which is

7   312-435-5672, talk to my judicial assistant, Pat Hagenmaier,

8   Patricia Hagenmaier, we will tee it up, and we'll talk about

9   it.

10      MS. GOLINVEAUX:   Thank you, your Honor.

11      MR. MOSKIN:   Thank you, your Honor.

12      THE COURT:   Okay, hope to see you soon or talk to you

13  soon.  Bye.

14      MR. MOSKIN:   Thank you.

15          *                    *                    *

16

17          I certify that the above was transcribed was

18          digital recording to the best of my ability.

19          /s/ Lois A. LaCorte

20      _____     _____

21          Lois A. LaCorte               Date

22

23

24

25