IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
GAMES WORKSHOP LIMITED,          )
                                 )
              Plaintiff,         )
                                 )
   -vs-                          )   No. 10 C 8103
                                 )
CHAPTERHOUSE STUDIOS LLC,        )   Chicago, Illinois
                                 )   March 6, 2012
              Defendant.         )   10:30 a.m.
```

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiff:   FOLEY & LARDNER LLP
           BY: MR. JONATHAN E. MOSKIN
           90 Park Avenue
           New York, NY 10017
           212-338-3572

For the Defendant:   WINSTON & STRAWN LLP
Present Telephonically  BY: MR. THOMAS JAMES KEARNEY
             MS. JENNIFER A. GOLINVEAUX
           101 California Street
           San Francisco, California 94111
           415-591-6894

           WINSTON & STRAWN LLP
           BY: MR. JONATHON RAFFENSPERGER
           35 West Wacker Drive
           Chicago, Illinois 60601
           312-558-7129

Court Reporter:

MARY C. KELLY, CSR
Contract Court Reporter
United States District Court
219 South Dearborn Street, Suite 2144-A
Chicago, Illinois  60604
(708) 769-0950

1    (Proceedings heard in open court.)

2         THE CLERK:  10 C 8103, Games Workshop versus

3    Chapterhouse.

4         THE COURT:  Good morning.

5         MR. MOSKIN:  Good morning, your Honor.  My name is

6    Jonathan Moskin of Foley & Lardner.  I'm pleased that we have

7    an opportunity to meet in person.

8         THE COURT:  I don't need the pleasantries.

9         MR. MOSKIN:  All right.  I know.  But --

10        THE COURT:  Just your name.

11        MR. RAFFENSPERGER:  Your Honor, Jonathon

12   Raffensperger for defendant.

13        MR. KEARNEY:  Thomas Kearney for defendant.

14        THE COURT:  Just talk loud.  Don't lean into that

15   thing, otherwise you're going to be falling all over each

16   other.

17        So we got a call from Ms. Golinveaux -- is that how

18   you pronounce it?

19        MR. KEARNEY:  Yes.

20        THE COURT:  -- saying she's at home with the flu.

21        MR. KEARNEY:  That's correct.

22        THE COURT:  I have a telephone number for her which

23   I'm intending to call in a second here, but it's a cell phone

24   number, and I'm actually going to ask her for the home phone

25   number so --

1    MR. RAFFENSPERGER:  Your Honor, she's going to be at

2  her office, and we have her direct office phone number.

3    THE COURT:  So she's well enough to go to the office?

4    MR. RAFFENSPERGER:  She had a high fever yesterday

5  and was unable to fly.

6    THE COURT:  Okay.

7    MR. KEARNEY:  She's likely at home with soft phone.

8  We have voice over Internet.

9    THE COURT:  Yeah, yeah, I know.  We're about to get

10  that, too.

11    Honestly, I am going to be blunt about it.  I wanted

12  to make sure she's actually at home, so that's why I'm going

13  to ask for her home phone number.

14    So, Augie, dial the number or I can do it.  I can do

15  it.

16   (Telephone call placed.)

17    THE COURT:  Is this Ms. Golinveaux?

18    MS. GOLINVEAUX:  Hello?

19    THE COURT:  Is this Ms. Golinveaux?

20    MS. GOLINVEAUX:  Hello?

21    THE COURT:  Is this Ms. Golinveaux?

22    MS. GOLINVEAUX:  Yes.

23    THE COURT:  Okay.  What kind of a line are you on

24  right now?

25    MS. GOLINVEAUX:  Your Honor, I'm actually in my

1   office, but you reached my cell phone.

2           THE COURT:  I need your office number then.

3           MS. GOLINVEAUX:  It's 415-511-1506.

4           THE COURT:  Let me read that back to you.

5   415-511-1506.

6           MS. GOLINVEAUX:  It's 591.

7           THE COURT:  Okay.  So here's the deal.  When I dial

8   you on that phone, pick it up with the handset.  Do not put me

9   on speaker.  Hang up, and I'm going to dial you right back.

10          MS. GOLINVEAUX:  Okay.

11    (Telephone call placed.)

12          MS. GOLINVEAUX:  Hello.

13          THE COURT:  This is Judge Kennelly.  Can you hear me

14  okay?

15          MS. GOLINVEAUX:  Yes, your Honor.  I can hear you.

16          THE COURT:  Okay.  So the people I have here in the

17  courtroom are Mr. Moskin, Mr. Raffensperger and Mr. Kearney.

18          Give your name for the record, please.

19          MS. GOLINVEAUX:  Jennifer Golinveaux, counsel for

20  defendant Chapterhouse.

21          THE COURT:  Okay.  So you need to explain to me

22  something.  The voice message that I got said you were at home

23  with the flu.

24          MS. GOLINVEAUX:  I am, your Honor, but my cell

25  reception was very bad so I came into the office for this call

1    this morning in case you wanted to get me on the phone.

2         THE COURT:  Okay.  All right.

3         So I don't know if all of you thought that filing

4    this stuff was actually going to make me happy, but it kind of

5    had the opposite reaction or it kind of had the opposite

6    effect rather.

7         So I have looked at the plaintiff's request for a

8    status conference.  I looked at the defendant's response to

9    that.  And, basically, if I'm reading this right, both sides

10   are telling me the other side has lied to me at some point in

11   time.

12        The plaintiff is telling me that somebody lied to me

13   in an affidavit, and the defendant is telling me that the

14   plaintiff lied to me in the request for a status conference.

15   And I use the term "lie" advisedly because I'm being told that

16   somebody misrepresented something or selectively quoted or

17   whatever it is.

18        So I'm glad I have -- and, actually, I'm not

19   particularly glad that I don't have Ms. Golinveaux here, but I

20   am glad that I have at least her on the phone, and I'm glad

21   that I have Mr. Moskin here because, you know, henceforth,

22   it's not just going to be that you have to be here.  It's

23   going to be that you have to actually sign the thing.  I know

24   that in the defendant's case, materials were signed by Ms.

25   Golinveaux, and I know that Mr. Moskin is here so that means

1  he subscribes to it.

2  But this is a case that badly needs on both sides

3  deterrence of filing stuff because what's happening here is

4  that people -- you know, it kind of feels like it's a

5  republican primary.  People just sit back there lobbing

6  grenades at each other and accusing each other of doing bad

7  stuff, some of which may be true and some of which may be

8  overblown, and the bottom line is that everybody gets hit by

9  the shrapnel.  And, frankly, I'm kind of getting tired of it.

10  No, that's not true.  I'm past being tired of it.

11  So I don't know what people want to say, but I'm just

12  going to give each side the floor to say what you want to say,

13  and I'm going to rule on whatever people want me to rule on.

14  So, Mr. Moskin, you're here, so you get to go first.

15  MR. MOSKIN:  Thank you, your Honor.

16  There were -- the reason we filed this piece of paper

17  is that we have identified -- after repeated delays in trying

18  to take a document custodian deposition, we have identified

19  various systematic failures by the defendant to produce

20  documents, and it was only with great reluctance that we filed

21  this last paper, and I'm only -- and, essentially, what we're

22  requesting is simply that we be permitted to get the documents

23  that have been withheld before we have to take depositions

24  because these are documents based on discovery requests that

25  were served as long as a year ago, and one of the things that

1  I learned in the course of taking the deposition which I had
2  not known is that Winston & Strawn had taken possession of all
3  of these electronic records at the outset of the case, and --

4          THE COURT:  Let me ask you this question.  In a
5  response that got filed, I was told that there were some
6  materials that were going to be produced today.  Now, I know
7  it is still early in the day, but have you gotten anything
8  today yet?

9          MR. MOSKIN:  Last week the --

10         THE COURT:  I'm just asking you if you have gotten
11 anything today.

12         MS. GOLINVEAUX:  Your Honor, may I respond to that?

13         THE COURT:  No.  I'm asking him.  You don't get to
14 talk until you're spoken to unless you want to get on a plane
15 and get out here, okay?

16         MS. GOLINVEAUX:  Thank you, your Honor.

17         THE COURT:  So you just wait for a request by me to
18 speak, ma'am.

19         MR. MOSKIN:  My office yesterday received 2,500 pages
20 of new documents which were put in the mail a week ago by the
21 defendant's firm.

22         THE COURT:  Okay.  So let me ask.  I'm now going to
23 ask Ms. Golinveaux a question.

24         Is what he said he got in the material yesterday, is
25 that the material I was told in your response that you were

1  going to produce today or is that something different?

2      MS. GOLINVEAUX:  That's something different, your

3  Honor.

4      THE COURT:  Okay.  The stuff that is going to be

5  produced today, what time today is it going to be produced and

6  in what manner is it going to be transmitted to the

7  plaintiff's attorneys?

8      MS. GOLINVEAUX:  The disks are being burned right

9  now, and they will be overnighted to wherever Mr. Moskin

10  prefers to have them.

11      THE COURT:  Okay, fine.  So you haven't gotten the

12  March 6th stuff yet.  So go ahead, Mr. Moskin.

13      MR. MOSKIN:  Okay.  Again, we discovered that -- and

14  I'll just touch on four areas, I think, of systematic failures

15  to produce documents.

16      I don't know what is in the new production that we're

17  going to be getting, but the 2500 pages we inquired -- and I

18  can direct your Honor's attention to Exhibit 1 to my

19  declaration.

20      The day before I took the deposition of Mr. Villacci

21  as their 30(b)(6) document custodian, I specifically asked Ms.

22  Golinveaux would you tell me why -- because I'm going to ask

23  the witness tomorrow anyway -- would you tell me why we have

24  gotten no documents at all regarding 106 of the 121 products

25  at issue in the case?  She refused to answer my e-mail, and

1  we've highlighted the portion in my -- in Exhibit 1 where I
2  asked her that.

3          THE COURT:  Okay.  I see that.  All right.

4          MR. MOSKIN:  Okay.  Mr. Villacci said in response at
5  his deposition:  Well, I didn't do any searches.  I just gave
6  all the documents at the outset of the case to Winston &
7  Strawn.

8          And so I don't understand why it is so difficult for
9  us to get a simple answer.  I've asked -- this is not the
10  first time I've asked the question why have we not gotten any
11  documents on 106.  And if there are any, then just tell us or
12  give us the Bates number.  Similarly, why have we not gotten a
13  single e-mail after January 26th, 2011.

14          Again, they've got the documents.  The document were
15  not produced to us in any reasonable fashion as kept in the
16  ordinary course of business.  Mr. Villacci testified he has
17  folders not for every one of his products, but he has folders.
18  The documents were not produced in such an organized fashion,
19  nor were they produced in chronological order.

20          If there -- it's conceivable that we've missed
21  something, but it would have been very simple for opposing
22  counsel who have had these records from the outset of the case
23  just to answer a simple question.  It would have made it
24  unnecessary potentially for me to burden you with this motion.
25          And, again, they put these disks in the mail knowing

1   that I was going to be here all week.  I can't review the

2   documents this week while I'm here.  My colleague Scott Kasper

3   who you've met is in Boston because he's facing the close of

4   discovery in another case.  And so, as a practical matter, you

5   know, these are documents that we've been requesting really

6   since March or May of last year, and I just don't understand

7   why we have not received them and why it has been necessary to

8   have so many motions to get something so simple.

9           Again, in their papers submitted, the certification

10  they filed with the Court, Ms. Golinveaux cites not a single

11  Bates number to answer the question have they, in fact, given

12  us any documents regarding the 106 of the products.

13          So that's the first general issue.

14          There's been some major systematic questions that

15  have gone unanswered, and we still don't know the answer, and

16  I'm here in Chicago, and I can't begin to look at these

17  documents until the earliest next week.

18          Mr. Fiertek.  This is the second subject.  If one

19  reads Ms. Golinveaux's declaration in the certification, they

20  still -- and maybe this is what is being produced today, the

21  March 6th production -- but I still have yet to see a single

22  document from Mr. Fiertek.

23          And the one -- and I don't want to use the term -- I

24  don't use the term loosely, but Mr. Villacci represented in a

25  declaration of his that -- in response to a statement we

1  made -- because we found it on Mr. Fiertek's website -- that
2  he is a partner in the business, Mr. Villacci responded in the
3  declaration saying he's not a member, whatever that means.
4        THE COURT:  Well, actually, it has a specified
5  meaning.  If this company is an LLC -- and I don't know if
6  it's an LLC -- it has a specified meaning under Illinois law.
7  People are designated as members.  And I'm told in the
8  response that Ms. Golinveaux filed that he's not a member, so
9  there is nothing wrong with that.
10        So do you have some reason to believe he's a member?
11  I mean, he may be a 49 percent owner but not a member.  A lot
12  of LLCs are single member people -- single member entities.
13        MR. MOSKIN:  Well, no, but clearly he's somebody over
14  whom they've had control, which is the real issue and for --
15        THE COURT:  Real issue for document production.
16        MR. MOSKIN:  Exactly.
17        THE COURT:  Let me have you pause for a second.
18        Mrs. Golinveaux, the documents that -- where you are
19  burning -- somebody is burning the disk right now, do those
20  include Mr. Fiertek's documents?
21        MS. GOLINVEAUX:  Yes, your Honor.  We produced some
22  of Mr. Fiertek's documents last week, and we're producing the
23  remaining ones this morning.  They amount to -- I just checked
24  to get a total count.  They amount to about 400 pictures and
25  about 100 e-mails, and then his production will be complete,

1  and Chapterhouse's will be complete.

2         THE COURT:  Okay.  All right.  Go ahead, Mr. Moskin.

3         MR. MOSKIN:  I would further inquire though because

4  the statement is made in Ms. Golinveaux's declaration that

5  they are not producing e-mails from Mr. Fiertek.

6         THE COURT:  She just told me something different from

7  that.

8         MR. MOSKIN:  Well --

9         THE COURT:  I mean, you heard it when I did so --

10        MR. MOSKIN:  And I would say that although I'm not

11 looking to be burdened with thousands of more pages of

12 e-mails, the only way we discovered certain of these

13 systematic problems in this case is because we subpoenaed

14 other designers and found that there were documents

15 referring, for example, to Mr. Fiertek as a partner in the

16 case, referring to an agreement, which is the next point I'm

17 going to come to, that he has a right to demand documents from

18 all his designers.

19        THE COURT:  Okay.  But I'm looking at Page 2 of

20 Chapterhouse's -- the document is called Defendant

21 Chapterhouse Studio LLC Certification Re:  Document

22 Production, docket entry 186.  I assume that's what you're

23 talking about.

24        MR. MOSKIN:  Yes.

25        THE COURT:  It says, on Page 2, that Fiertek's

1  documents fall into two categories, e-mails and design

2  documents and photographs.  It says:  Chapterhouse has already

3  reviewed and produced its responsive e-mail communications of

4  Mr. Fiertek and is reviewing potentially responsive e-mails

5  that Fiertek had with anyone other than Chapterhouse for

6  production, as well as his design documents and photographs,

7  including what he maintained in Photo Bucket.  It's producing

8  his Photo Bucket documents today and is expecting to produce

9  the rest of them by the 6th.

10          So is there something about that you think doesn't

11  cover the waterfront?

12          MR. MOSKIN:  Well, my concern was --

13          THE COURT:  Assuming it's true, does it not cover the

14  waterfront?

15          MR. MOSKIN:  Well, my concern was the first clause

16  there.  Since Chapterhouse has reviewed and produced its own

17  responsive e-mails, I took that as --

18          THE COURT:  Something is being carved out.

19          MR. MOSKIN:  Right.

20          THE COURT:  So let me ask Ms. Golinveaux about that.

21          So the natural read -- I'm looking at Page 2 of the

22  certification on document production.  The first full

23  paragraph, the third sentence says, quote:  Since Chapterhouse

24  has already reviewed and produced its responsive e-mail

25  communications with Mr. Fiertek, it is reviewing potentially

1    responsive e-mails Mr. Fiertek had with anyone other than

2    Chapterhouse for production, and then the sentence goes on

3    from there.  So that kind of -- the natural reading of that

4    would be that if you get from Fiertek an e-mail that he had

5    with Chapterhouse, you're not even looking at that.

6         MS. GOLINVEAUX:  Yes, your Honor.  What we did we

7    collected initially tens of thousands of e-mails that we had

8    to sort for production from Chapterhouse, and a lot of those

9    are e-mails with Mr. Fiertek, and those have already been

10   produced.

11        So when we were ordered two weeks ago to collect and

12   produce Mr. Fiertek's documents, we got copies of his e-mails,

13   and we excluded his communications with Chapterhouse and are

14   reviewing, and what has been produced is his communications --

15   responsive communications with third parties because otherwise

16   we'd be looking again at the same, you know, tens of thousands

17   of e-mails that we have already gone through from

18   Chapterhouse's collection.

19        THE COURT:  I understand what you're telling me, but

20   I guess the concern there would be -- I mean, without knowing

21   -- and I don't know, okay?  Without knowing how good

22   Chapterhouse's archiving is or how much people retain stuff or

23   what's kept on the backup server or exactly what, I can

24   imagine a scenario in which there was an e-mail between

25   Chapterhouse on the -- or -- yeah, between Chapterhouse on the

1    one hand and Mr. Fiertek on the other hand, and Chapterhouse

2    for whatever reason didn't have it and, therefore, didn't

3    produce it, but Fiertek does.  So if you're not even looking

4    at the stuff he has with Chapterhouse, aren't we sort of

5    guaranteeing that issues like that aren't even going to be

6    caught?

7            MS. GOLINVEAUX:  Well, your Honor, I can tell you

8    that Winston & Strawn imaged Mr. Villacci's hard drive at the

9    beginning of the case where all the e-mails were, and that's

10   what we reviewed for communications for Mr. Fiertek.

11           THE COURT:  I understand that, but it's really not

12   responsive to my question.  It's not responsive to my

13   question.  I mean, it assumes that Mr. Villacci or Villacci,

14   whatever it is, it assumes he had everything on his hard

15   drive.  I mean, what if he deleted something?  What if he

16   deleted something from his sent box?  What if he deleted

17   something from his archive?  It wouldn't be there.  Unless

18   you're going back into a backup server somewhere.

19           I mean, I have got a problem with basically you've

20   been directed to produce documents from Fiertek.  You didn't

21   get authority from me to carve out a subset of those.  And I

22   recognize that that may mean that you have to, you know,

23   review more documents, but I don't know why somebody, you

24   know, in the face of a court order, after all of the problems

25   that we've had in this case, would take it upon themselves to

1  carve out a category of document unless somebody can give me

2  100 percent, absolute, beyond a reasonable doubt certainty

3  that there is nothing that Fiertek has in his e-mails with

4  Chapterhouse that hasn't already been produced?

5          MS. GOLINVEAUX:  I understand your concern, your

6  Honor.  We thought it was a practical approach, and that's why

7  I was absolutely candid about it in the certification, and I

8  spelled it out in detail exactly what we're doing.

9          I do want to add, however, the plaintiffs haven't

10  reviewed any e-mails for production yet.  We deposed a

11  designer yesterday, and he said nobody has collected his

12  e-mails and --

13          THE COURT:  Ms. Golinveaux.

14          MS. GOLINVEAUX:  -- no one has asked for his e-mails.

15  We've looked at tens of thousands of e-mails with every

16  designer Chapterhouse has.

17          THE COURT:  Are you finished?

18          MS. GOLINVEAUX:  Yes, your Honor.

19          THE COURT:  Okay.  I'll tell you what.  Now, you have

20  the privilege here of not having to fly to Chicago.  I have

21  the privilege of setting the agenda, ma'am, so don't change

22  the subject.  If you do it again, I'll push the disconnect

23  button, and I'll talk to you again when you're standing ten

24  feet from me.  Do you got it?

25          MS. GOLINVEAUX:  Yes, your Honor.

1          THE COURT:  Okay.  I don't want to talk at this
2    moment about the plaintiff's production issues.  I'm talking
3    about what I'm talking about.

4          Okay.  So you just evaded my question so I'm going to
5    take that as an answer, and I'm going to go on to the next
6    point.

7          What's your next point, Mr. Moskin?

8          MR. MOSKIN:  Thank you, your Honor.

9          Just as we discovered from e-mails we obtained by
10   subpoena from the third party designers, but not from the
11   defendant himself or itself, that the Chapterhouse has
12   agreements with every one of its designers.  They're styled as
13   non-disclosure agreements, but every one of them gives Mr.
14   Villacci and Chapterhouse the right to demand all of the
15   design documents that --

16         THE COURT:  Yes, but that's not really what it says.
17   I mean, this is one of the things that the defendant took
18   issue with.

19         I'm looking at this.  It's Exhibit 3.

20         By the way, there's a motion for leave to file under
21   seal, Augie.  It's Number 184.  That's granted.

22         Exhibit C, the paragraph that you're talking about is
23   Paragraph 5 entitled Return of Confidential Information, and
24   it says:  Employee will promptly return or destroy all annual
25   materials embodying confidential information in any form and

1    including without limitation all summaries, copies and

2    excerpts of confidential information following company's

3    request without retaining any copy or reproductions thereof of

4    any -- or any computer, electronic or other records of such

5    information.

6         Okay.  So the term "confidential information" is in

7    capital letters.  That's defined in Paragraph 1, and it's

8    defined -- it's defined to include written or oral information

9    and any other information that the company, which is

10   Chapterhouse, or its agents furnish to the employee.  That's

11   the way it's defined.  It's not defined to include materials

12   that the person who is referred to as the employee, which I

13   had previously been told were these independent contractors,

14   you know, generated on their own.  That's the problem I see.

15        MR. MOSKIN:  And the response is twofold.  One, as

16   your Honor noted, it includes oral information.  And when I

17   asked Mr. Villacci what does that mean, --

18        THE COURT:  Yeah.

19        MR. MOSKIN:  -- he said, and it's quoted in our

20   papers, as Mr. Villacci admitted.

21        "Question:  That covers all of the design documents

22     that the designers create?

23        "Answer:  In my interpretation, yes."

24        THE COURT:  So what you're saying is irrespective of

25   what the document says -- and Villacci, was he a 30(b)(6)

1    designee?

2            MR. MOSKIN:  Yes.

3            THE COURT:  The 30(b)(6) designee for Chapterhouse

4    has basically said we interpret this thing to permit us to ask

5    for anything that these guys have.

6            MR. MOSKIN:  Right.  And in one of the documents, he

7    even claims to own copyright in what they're doing.

8            THE COURT:  I get your point.  I understand your

9    point.

10            MR. MOSKIN:  He never asked, even asked them to

11    return the documents.

12            THE COURT:  Okay.  Let me just make a note of that.

13            So you don't have to respond to that right now, Ms.

14    Golinveaux, but just make a mental note because you're going

15    to in a second.

16            MS. GOLINVEAUX:  Yes, your Honor.

17            THE COURT:  What's your next point, Mr. Moskin?

18            MR. MOSKIN:  And, also, as your Honor noted, in these

19    documents created by Chapterhouse, these individuals are

20    characterized as employees.  So in a related vein -- now, they

21    have acknowledged that they have a duty to produce documents

22    with these third party designers.  To the extent that there

23    were exchanges of allegedly attorney-client privileged

24    information, one -- this is a very small point.

25            THE COURT:  Right.

1  MR. MOSKIN:  One of the documents -- they sent us a

2  letter last week trying to call back certain such documents,

3  and one of them was an e-mail to a Mr. Summers who is yet

4  another designer.  So -- and we haven't -- we don't know yet,

5  because we haven't seen documents from all of these

6  individuals, to what extent he was sharing attorney-client

7  privilege information.

8       But at any rate, that's a small point.  I don't want

9  to focus on that.

10      THE COURT:  I don't know either.

11      MR. MOSKIN:  The last point I want to raise is -- as

12  Ms. Golinveaux noted, this was a subject -- and this was a

13  subject of inquiry at Mr. Villacci's deposition.  I asked him.

14  Well, Ms. Golinveaux noted they were producing this Photo

15  Bucket account information or documents from Mr. Fiertek.

16      THE COURT:  Right.

17      MR. MOSKIN:  Now, I asked Mr. Villacci at his

18  deposition whether he had a Photo Bucket account of his own

19  because we'd received no documents from him on that subject.

20  And if you look at the carryover paragraph of Page 31 to 32 of

21  his transcript --

22      THE COURT:  I'm sorry, which exhibit is that?

23      MR. MOSKIN:  It's Exhibit 2, and I'll just read it

24  to --

25      THE COURT:  You said pages 30 to 31?

1    MR. MOSKIN:  31 to 32.

2    THE COURT:  Okay.  I've got it.

3    MR. MOSKIN:  Line 24.

4    "Question:  And can you explain to me how

5    Chapterhouse uses or you personally use Photo Bucket in

6    connection with the business of Chapterhouse?

7    "Answer:  I do not have a Photo Bucket account in

8    relation to myself or Chapterhouse."

9    Now, just coincidentally, and I'm willing to pass up

10   to the Court and give it to opposing counsel, I discovered an

11   e-mail over this past weekend from Mr. Villacci --

12   THE COURT:  Discovered among the documents you've

13   already gotten, in other words?

14   MR. MOSKIN:  Yes.

15   -- to a Mr. Sanford in which he says, on

16   September 10, 2009:  Yes or yeah, it would help to have access

17   to my Photo Bucket.  I have many photos in there, too many to

18   e-mail, and it then has a link to what is clearly a Villacci

19   Photo Bucket account because it has his name and character

20   string and together with a password.  So if your Honor would

21   like, if I can approach --

22   THE COURT:  I'll take your word for it.

23   MR. MOSKIN:  And there's no Bates number on this

24   document.

25   THE COURT:  So you're telling me Mr. Villacci's

1  answer on Page 32 is incorrect based on that e-mail.

2  MR. MOSKIN:  Yes.  I simply --

3  THE COURT:  And I take it you have not gotten

4  production of whatever was in his Photo Bucket account,

5  assuming it still exists?

6  MR. MOSKIN:  Right.  I took his answer in his

7  deposition at face value that he had no Photo Bucket account,

8  and, therefore, that explained why we received no such

9  documents.

10  THE COURT:  Okay.

11  MR. MOSKIN:  I would be happy to address, I think,

12  some of the --

13  THE COURT:  Well, I'm going to ask you about the

14  issues that are raised in the defendant's response before I

15  give Ms. Golinveaux the floor here.

16  So over on Page 4, and this is the topic that Ms.

17  Golinveaux was starting to talk about a few minutes ago, it

18  says that as of the date that this was filed, which was, I

19  guess, yesterday, plaintiff's production of documents, in

20  other words, Games Workshop's production of documents, does

21  not include a single internal e-mail, with fewer than two

22  dozen e-mails of third party in which Chapterhouse may have

23  independently discovered and not a single instant message log.

24  So what about that?

25  MR. MOSKIN:  We have previously told the Court, we

1 submitted a declaration from somebody at Games Workshop, and I
2 might mention that that someone is in the court today, Jill
3 Stevenson, who is the in-house counsel at Games Workshop,
4 together with other individual witnesses who are here for
5 their depositions this week, --

6         THE COURT:  Okay.

7         MR. MOSKIN:  -- that Chapterhouse heard in Ms.
8 Stevenson's declaration and they heard from two witnesses
9 yesterday, including Ms. Stevenson again, that Games
10 Workshop -- the only category to which this really relates is
11 the design, the creation of the plaintiff's work at issue.
12 They have heard repeatedly now under oath from Games Workshop
13 witnesses that Games Workshop's designers, the artists, don't
14 use e-mails as part of the design process.  So to say that we
15 haven't produced e-mails --

16         THE COURT:  The answer is you don't have any, and I'm
17 going to give Ms. Golinveaux a chance to address that in a
18 second.

19         MR. MOSKIN:  Again, I don't want to misrepresent.
20 There may have been a stray e-mail.  But Games Workshop -- the
21 in-house counsel spoke with the designers and knows the
22 business and knows they don't.  It's just not how they do
23 business and how they create, and that's why they don't exist.

24         THE COURT:  The next point about your responses to
25 discovery that's raised by the defendant is, I guess, the

1  supplemental response to the interrogatories about dates of

2  employment of authors, referred to documents which I pretty

3  clearly said was not going to be acceptable.  So what about

4  that?

5  　　　　MR. MOSKIN:  Well, again, I would be happy to pass up

6  to the Court the actual supplemental responses, and this is to

7  Interrogatory Number 1, and I had --

8  　　　　THE COURT:  Hand it to her.  Supplemental response to

9  Interrogatory 1?

10  　　　　MR. MOSKIN:  Right.  And this was produced in

11  January.

12  　　　　And as you can see, I have circled -- at the

13  beginning.  I had stopped because it just gets repetitive --

14  where back in -- let me back up a step.

15  　　　　In November or December when they previously raised

16  the issue whether we had adequately produced identified

17  authors --

18  　　　　THE COURT:  But that's a different issue.  I mean, I

19  see here -- and I don't know whether I had seen this before.

20  Some of it looks vaguely familiar.  You basically, for each

21  one of these things, you identified who designed them, but

22  Interrogatory Number 17 asked for dates of employment of the

23  authors and contact information, and I'm looking on here, and

24  I don't see that, at least on the few that you've circled

25  here.

1            In other words, one of the issues that has been

2  raised by the defendant -- give this back to Mr. Moskin.

3            One of the issues that has been raised by the

4  defendant is, okay, are these -- there's an issue about and

5  I've been told at least there may be some differences between

6  UK law and U.S. law on the question of works for hire and

7  issues related to that, and one of the issues raised by the

8  defendant is, well, you know, the employment relationship, if

9  any, that the designers had at the moment in time that they

10  designed the thing is a significant issue.

11            And so I was -- you know, I had a motion to compel, I

12  think, that dealt with this.  I ruled on it, and I basically

13  said, you know, the incorporation of documents under -- the

14  reference to documents under 33(d) wasn't going to be good

15  enough in this situation, and you were going to have to answer

16  it.

17            So what I'm being told now at Page 5 of the

18  defendant's response to your motion is you didn't do that.

19            MR. MOSKIN:  Well, what we did in our response -- and

20  I apologize.  I did not understand your Honor's direction if

21  your Honor's direction was we needed to supplement that to

22  provide information about the individual authors, and given

23  that your Honor's prior direction is that we had adequately

24  disclosed those individuals, that we identified these other

25  individual authors consistent with previous identification.

1    However, let me also explain that the law is clear,

2  and as far as I know has not been disputed, that the

3  employment histories of all these individuals are not

4  relevant.  Moreover --

5    THE COURT:  Well, time out.  Now I'm going to -- I'm

6  going to have to have a little heart to heart with you, okay?

7  And, you know, maybe you did not look at the transcript of

8  February the 23rd, you know, before you said what you just

9  said right now, and I will note, however, that it was prepared

10  on the 29th, and I assume both sides got it.

11    You know, there was a discussion in the early part of

12  that transcript about Interrogatory Number 17 and another

13  interrogatory that dealt with dates of first use, okay?  That

14  was 17 was the one about dates of employment, and 18 was the

15  one about dates of first use.  And so the -- I mean, there's a

16  discussion where I'm basically ruling on this and asking

17  questions to people, and I say, you know, what I've been told

18  is that the plaintiff had responded to those by a reference to

19  Rule 33(d), and you can look at documents, and the defendant

20  is basically saying we can't figure out from the documents,

21  you know, what's been produced.  And here is what I said:

22    My view of this -- and I'm quoting myself.  My view

23  of this is that if the plaintiff's position is that the

24  information is in the documents, then it shouldn't be all that

25  difficult for the plaintiff to provide an answer to the

1 interrogatories that says: Okay, for this work, you know,

2 this is our date of use in commerce. In other words, it's

3 easier for you to pull it off the documents than it is for the

4 defendants to do. And as far as the identifying information

5 on authors is concerned, I think it's the same thing. So what

6 I'm going to direct is the plaintiff needs to provide an

7 answer to those interrogatories and not a 33(d) or whatever it

8 is now, a 33(d) incorporation of documents.

9 Now, I don't have in front of me Interrogatory Number

10 17. I don't have it in front of me because if I kept all of

11 the hard copies of all the stuff you filed, they would have to

12 get me a new office, okay, which they're not doing.

13 My belief is that Interrogatory Number 17 asked for

14 dates of employment of these people. If it didn't, somebody

15 needs to tell me right now. Did it? Can somebody tell me one

16 way or the other whether Interrogatory 17 asked for employment

17 dates?

18 MS. GOLINVEAUX: Your Honor, may I speak?

19 THE COURT: Yes, please.

20 MS. GOLINVEAUX: Your Honor, it did, but by reference

21 to a definition of employee which your Honor had told us you

22 didn't like us to do, so we served a supplemental one 22 that

23 we also mentioned in our motion, and that specifically asked

24 for just the employment dates and contact information if

25 they're no longer employed.

1     THE COURT:  Yeah.  Hang on a second here.  Yes.  My
2  memory just got jogged on something which I'm not sure how I
3  could possibly remember this given the number of issues, but I
4  just need to look at something.

5     There was one of these -- there was one of these
6  issues in the defendant's motion that I dealt with back on the
7  29th of February -- I'm sorry, on the -- whatever that date
8  was -- the 23rd of February where the motion itself referenced
9  a particular interrogatory or set of interrogatories, and it
10  was responded to, and then the reply added something else in
11  or vice versa.  So when I said 17 and 18, I actually really
12  did mean 17 and 18.  So if what you're talking about is in 22,
13  then, you know, we may have a problem here.  I just have to
14  pull up the right document from the docket so give me a second
15  here.

16     Okay.  So the motion that I was dealing with was the
17  cross motion to compel responses to Interrogatories 17 and 18.
18  That was actually the title of it.  Cross motion to compel
19  responses to Interrogatory 17 and 18.  Okay?  And I got a
20  response to that, and I ruled on that, all right?

21     And I'm looking at the text of the motion and I just
22  have to -- the cross motion it is, and I just have to page
23  ahead here, but the motion referred to Interrogatories 17 and
24  18, and the plaintiff responded to it that way, okay, which is
25  what you would expect them to do.  If it says compel a

1  response to 17 and 18, they're going to talk about 17 and 18
2  and not 47, 2 and 5, all right?

3          Then I get in the reply something that says:  Well,
4  wait a second, you know, even if it's not covered by 17, it's
5  covered by this 22, which is a supplemental thing, and I
6  didn't deal with 22, and I didn't deal with it for a reason.
7  I didn't deal with it for a reason that it was not a part of
8  the motion that I dealt with.  It was plugged in in a reply
9  and not cricket, I guess, is my shorthand answer to that.
10 Since we have got a UK company involved, maybe somebody knows
11 what that means.

12          So if it was covered by Interrogatory 17 or
13 Interrogatory 18, I did, as you point out in the document that
14 you filed yesterday, order the defendant to provide a response
15 to -- excuse me, ordered the plaintiff to provide a response
16 to Interrogatories 17 and 18 that did not include an
17 incorporation of documents or a reference to documents under
18 Rule 33(d).  I only did that with regard to 17 and 18.

19          So does 17 ask for the information you're talking
20 about here with regard to dates of employment?  Do you know
21 off the top of your head?

22          MS. GOLINVEAUX:  Are you asking me, your Honor?
23          THE COURT:  I'm asking you.
24          MS. GOLINVEAUX:  Yes, it does.
25          THE COURT:  Okay.  So, I mean, it's going to be

1 easier -- you may have an easier time finding this than I
2 would. What does it say?

3 No, interrogatory says -- I'm looking at page 11 of
4 the -- it's the response to the plaintiff's motion to compel
5 which includes the cross motion to compel. It's Docket Number
6 162. It identifies Interrogatory 17 and is seeking
7 identification of, quote, the natural person who created each
8 of plaintiff's works, close quote, by identifying each
9 author's full name, present or last known business address,
10 telephone number and e-mail address, occupation or business
11 position or title held, and present or last known U.S. and
12 foreign residence address, telephone number and e-mail
13 address. It doesn't say anything about dates. It just says
14 to identify them by who they are, where they live and how you
15 can contact them.

16 So if you responded to -- I'm going to ask the
17 plaintiff's lawyer a question. Have you responded to this
18 Interrogatory Number 22 yet?

19 MR. MOSKIN: We have. I don't have a response in
20 front of me.

21 THE COURT: Okay. I'm going to assume for purposes
22 of argument here that it doesn't include dates, okay? So why
23 shouldn't it? I mean, I understand -- and please don't give
24 me the argument that it isn't relevant because the deal is
25 here I'm not going to decide the merits of this case in the

1  context of a discovery motion.

2  So why shouldn't I tell you -- even though I didn't

3  tell you before, and you haven't failed to comply with that

4  order on February 22nd.  That's pretty clear.  Why shouldn't I

5  tell you now just give them the gosh darn dates?

6  MR. MOSKIN:  It's just a very great burden, and I'll

7  tell you -- can I explain why?

8  THE COURT:  How many people are we talking about?

9  Authors?

10  MR. MOSKIN:  My client will know better than I, but I

11  think we're talking about over the course of -- the people who

12  have worked on all these works?  More than a hundred.  A few

13  hundred people.

14  THE COURT:  Turn around and look at him, and he'll

15  nod or shake his head.  Or go back and talk to him.  One or

16  the other.  Just get me a ballpark --

17  MR. MOSKIN:  Okay.  There's one other point I want to

18  make.

19  THE COURT:  I understand.  Just get me a ballpark

20  number on this.

21  MR. KEARNEY:  When your Honor is ready, I have --

22  MR. MOSKIN:  The client can't give an exact answer

23  because the company has been around 30 years, --

24  THE COURT:  Yes.

25  MR. MOSKIN:  -- and it's difficult to know.

1        THE COURT:  But the works you're talking about here,
2  do they go back as far as 30 years?
3        MR. MOSKIN:  Some of them do.
4        THE COURT:  Okay.
5        MR. MOSKIN:  And I will add that, as I understand it,
6  and I -- the -- under UK law, and this is part of the problem
7  we've had in finding certain documents regarding authorship,
8  the --
9        THE COURT:  There's some privacy thing.
10        MR. MOSKIN:  The Data Protection Act requires that
11  the company not retain any employment records after five
12  years.
13        THE COURT:  Even if the person is still working for
14  you?
15        MR. MOSKIN:  Now, for the people still working
16  there, we have them and --
17        THE COURT:  But the people that left, say they left
18  ten years ago, --
19        MR. MOSKIN:  -- that's not a problem.
20        THE COURT:  -- you don't have them.
21        MR. MOSKIN:  Or they left six years ago, we don't
22  have the records anymore.
23        THE COURT:  I guess what I -- I guess -- you know, I
24  guess what I'm inclined to say is I get all that, and, you
25  know, maybe it's not going to be -- it's not going to be like

1  a, you know, archived information or something, but why

2  shouldn't I just tell you do the best you can?

3  MR. MOSKIN:  Look, your Honor, this case has gotten

4  so vastly more complicated and expensive than I anticipated

5  when we began that I don't want to --

6  THE COURT:  I'm going to cut you off in the middle of

7  that sentence.  Here's why.  How many works are you alleging

8  that have been infringed here?  How many?  Ballpark?  More

9  than a hundred?

10  MR. MOSKIN:  More than a hundred.

11  THE COURT:  More than 200?

12  MR. MOSKIN:  Probably, yes.

13  THE COURT:  It's going to be complicated, all right?

14  It's going to be complicated.  Any copyright case that

15  involves more than ten works, it's going to be complicated.

16  MR. MOSKIN:  Which is why I don't really want to

17  argue the point.  I understood -- I really genuinely thought

18  we had answered the question, but we'll produce the

19  information we have.  I'm happy -- we will make it available.

20  THE COURT:  What I'm going to tell you is you have

21  got to do the best you can, okay?

22  MR. MOSKIN:  Right.  But I also, just to put this in

23  a little other context, and you can -- that in that 30 years,

24  none of these individuals has ever challenged Games Workshop's

25  ownership of its copyright, so this is a fishing expedition

1  really.

2      THE COURT:  Now you've given me either your closing

3  argument or your argument on the motion for summary judgment.

4  Just make a mental note to say it again when you do that.

5      MR. MOSKIN:  Your Honor, I haven't even got into

6  that.

7      THE COURT:  I won't remember what you told me.

8      You're going to have to do the best you can, and it's

9  going to have to be done pretty promptly, and I recognize your

10 people are all here, but people are going to have to get to

11 work.

12     MR. MOSKIN:  In summation?

13     THE COURT:  Yes.

14     MR. MOSKIN:  All we really want is that we get and I

15 have at least some opportunity -- defendant's counsel has had

16 these e-mail records for a full year.  We just want a couple

17 weeks to get these records to review them and to prepare for

18 depositions, and we don't want --

19     THE COURT:  What is the current cutoff date?

20     MR. MOSKIN:  Well, the current cutoff for fact

21 discovery is a week from this Friday.

22     THE COURT:  Okay.  So you're saying you don't have

23 enough time, right?

24     MR. MOSKIN:  But --

25     THE COURT:  You're saying you don't have enough time.

1    MR. MOSKIN:  Yes, but we don't -- we really don't

2  want to move the trial date, so what I propose is we simply be

3  able to do this during the expert discovery period without

4  moving any of the other dates once we get the documents.

5    THE COURT:  Okay.  I have one other thing I need to

6  ask you about from the defendant's response, and I'll turn

7  this over to Ms. Golinveaux.

8    At Page 6 of her response, she's basically saying

9  that your verification of completeness of document production

10  has way too many hedges in it, and she's referring to

11  Exhibit 4 to her thing where you basically say that you're

12  certifying it's to the best of your knowledge and information,

13  that you're not aware of any additional relevant documents,

14  and there's all sorts of little qualifiers in there, including

15  relevance, which is a qualifier, and including, you know, that

16  you're not aware of, which all sort of leaves things open.

17    And I recognize, honestly, I do, because I've been in

18  your position before, I recognize why lawyers want to hedge.

19  I mean, lawyers are kind of in the hedging business.  I get

20  it.

21    I also recognize in cases where there is difficulty

22  with discovery, judges want to get unhedged answers because

23  they want to know there is a finite deadline to things so

24  we're not dealing with them -- somebody coming in and saying,

25  well, Judge, yeah, the reason we just produced these 500

1  documents is we just found them out even though I told you to
2  the best of our knowledge and belief we didn't know about
3  this, and I can't begin to tell you how often that happens,
4  okay?  So that's why I wanted to get something, I think, that
5  was less hedged than this.

6          And, also, her other beef with what you're saying is
7  there wasn't any information in here about the breadth or
8  nature of the search that was done.

9          MR. MOSKIN:  Well, they deposed the in-house counsel
10  yesterday for two hours.

11          THE COURT:  Was that the record custodian thing or
12  part of it?

13          MR. MOSKIN:  Well, she's being produced on certain
14  issues --

15          THE COURT:  Okay.

16          MR. MOSKIN:  -- and has spent --

17          THE COURT:  Is that the young lady sitting back
18  there?

19          MR. MOSKIN:  Yes.

20          THE COURT:  Okay.

21          MR. MOSKIN:  And the scope of the -- I mean, she can
22  speak to this better than I can, but there has been an
23  extraordinary effort, I mean, really probably hundreds of
24  hours has gone into searching for documents complicated by the
25  fact that we confess Games Workshop is a creative place and

1  particularly in its early history was not the best at record
2  keeping.

3      Defendants themselves gave your Honor the last set of
4  motion papers something they found in the Internet archive
5  that in January, 2008, Games Workshop posted a notice to
6  artists please come get your work. We don't have room for it
7  in our archives anymore. That wasn't a copyright question.
8  That's was just a physical space question. They can't save
9  the stuff.

10      In plain English, all I really meant to say by the
11  hedging is, look, there may be some stray documents here and
12  there. Every case -- this is a bigger case, I confess, than I
13  expected and hoped it would be. We -- I can't -- except for
14  that sort of stray document, there are no -- virtually, every
15  stone has been overturned at least in using practical common
16  sense of where documents might be.

17      For example, on the e-mails, they have spent -- they
18  know their business. They know that the designers don't work
19  by trading e-mails to each other about creative concepts.
20  They're in a room -- they are all in a room with one or two
21  exceptions. They talk to each other. They sketch on paper.
22  They paint on pads. When works are nearly finished, then they
23  scan them into a computer. But that's not part of the
24  creative process.

25      We've given them a great deal of documentation on

1  that to the extent we still have it.  So that's really all I
2  was trying to convey.

3              THE COURT:  Ms. Golinveaux, your turn.

4              MS. GOLINVEAUX:  Thank you, your Honor.

5              I don't think we got Interrogatory 18 and their
6  supplemental response on that.  You want Mr. Moskin to address
7  that first or do you want me to address it?

8              THE COURT:  You go ahead.

9              MS. GOLINVEAUX:  Okay.  You ordered them to
10 supplement two interrogatories.  You just discussed 17 with
11 Mr. Moskin, and 18 was the one that asked them to provide the
12 dates of first use in U.S. commerce for the trademark, and you
13 said don't just give them a 33(d), and what we got was simply
14 a 33(d) on that one also.

15             THE COURT:  All right.  Just go on to your next
16 point, and I'll come back to that in a minute.

17             MS. GOLINVEAUX:  With respect to the certification,
18 your Honor, I think you hit the key points, but what we wanted
19 to do is what we thought you directed us at the last hearing,
20 which is to say under penalty of perjury, which he didn't do,
21 that after a reasonable and diligent search, their production
22 is complete.

23             We've put in hundreds and hundreds of hours reviewing
24 documents and were able to make that certification that as of
25 today, when the remainder of Mr. Fiertek's documents go out,

1  with the footnote regarding that issue you want to talk about

2  today on the rest of his e-mails, Chapterhouse's production is

3  complete under penalty of perjury, and I take that very

4  seriously. We didn't get anything like that from Mr. Moskin.

5  THE COURT: Okay. Just give me everything you want

6  to give me, and I'll come back to anything else I need to ask

7  him about.

8  MS. GOLINVEAUX: Your Honor, the other issue you

9  discussed with Mr. Moskin and you put on hold for me was

10  whether the NDAs give Chapterhouse a contractual right to

11  recall the documents, and I believe to kind of summarize Mr.

12  Moskin's argument, well, even if the language isn't quite that

13  broad, Mr. Villacci, as representing Chapterhouse, basically

14  said that he understood that he had that right at deposition,

15  and I disagree. That's not what he said at deposition. So I

16  was just going to refer your Honor to the two pages of

17  relevant deposition testimony.

18  The first --

19  THE COURT: Okay. What's your position as to what he

20  actually said?

21  MS. GOLINVEAUX: What he actually said was that his

22  understanding that the NDAs require -- and he's a non-lawyer.

23  He got this -- he testified he got this form agreement I can't

24  remember if it was off the Internet but it's some form of

25  form, and he said his understanding is it required them to

1   keep the design stuff confidential, and then Mr. Moskin

2   specifically asked him do you think they would give you

3   documents if you asked them?  What would they say?  And he

4   said:  I have no idea what they would say.

5          THE COURT:  All right.  Well, what about the part of

6   this that Mr. Moskin quotes where -- and I'm groping for it.

7   It's in his written submission here where Mr. Villacci says

8   something along the lines of -- let me just find it.

9          MR. MOSKIN:  It's at the top of page 4.

10         THE COURT:  Right.  So when he's asked questions

11  about does this cover all of the design documents that the

12  designers created, and Villacci says, in my interpretation,

13  yes?

14         MS. GOLINVEAUX:  Right.  There he's referring to

15  their duty to keep it confidential.

16         THE COURT:  All right.  I guess I need to look at

17  the -- I guess I need to look at the transcript here.  That's

18  Exhibit 237.

19         MS. GOLINVEAUX:  And I have it right here in front of

20  me, your Honor.

21         THE COURT:  I have it as well.  Just give me a

22  second.

23         MS. GOLINVEAUX:  I'm sorry.

24         THE COURT:  Just give me a second to look at it.

25         All right.  So the pages don't --

1    MR. MOSKIN:  I think it's page 36 is where the
2  question begins.

3    THE COURT:  Okay.  So it was cited as 37.  The cite
4  in the filing is wrong.  All right.  So give me just a second
5  here.

6    So he's asked in the middle of page 36:  Do you have
7  any understanding what is meant by confidential information as
8  referred to in Paragraph 1?  He gives an answer.  The question
9  is asked:  And that covers all the design documents that the
10  designers create?  And he says:  In my interpretation, yes.
11  He's asked the question:  Is that true of the current
12  agreement as well?  He says:  That's the whole point of the
13  agreement -- well, not the whole point.  It's a point of the
14  agreement.  And I'm done quoting from 36 to 37.

15    And the definition of confidential information is the
16  thing that is then interpreted in -- or incorporated, rather,
17  into the paragraph that provides for the right of return.  And
18  I understand what you're saying, but -- and I recognize that
19  Mr. Villacci may not be an attorney, but he's sort of said
20  there that the confidential information includes things that
21  the designer creates.  He said it covers the design documents
22  that the designer creates, and although he's not specifically
23  asked in that context, well, does that give you the right to
24  get that information back from them, that would be -- that
25  would be a reasonable inference from his testimony I think.

1          MS. GOLINVEAUX:  Yes, your Honor, but if you read the

2    answer just above where you started, he explains what he

3    thinks he's talking about by, quote, unquote, confidential

4    information.

5          Mr. Moskin says:  Do you have any understanding what

6    is meant by confidential information?  And he says:  From my

7    understanding, it is -- and this is how I have used NDAs and

8    confidentiality -- that any work they do for us is between

9    myself and the designer, and they are not to publicly disclose

10   that information unless given permission.  He doesn't say

11   anything about a right to call it back.

12         THE COURT:  No, I follow what you're saying.  I get

13   it.  But then the follow up question is:  And that covers all

14   the design documents that the designers create?  And he says:

15   In my interpretation, yes.

16         And, again, I agree that he has -- he's not been

17   asked -- the question was:  Do you have the right to ask for

18   that information back from them, that information including

19   the documents -- the design documents the designers create,

20   but he's defined confidential information in his

21   interpretation, his business person, non-lawyer

22   interpretation, as including design documents that the

23   designers create.

24         I recognize there's a couple of inferences here, but

25   a reasonable inference from that would be that because the

1   confidential information is defined in the agreement is what

2   Chapterhouse has the right to get back from the designers,

3   then that would include because he's -- that would include the

4   design documents that the designers create because Villacci

5   said that that's part of the definition.

6         MS. GOLINVEAUX:  I understand, your Honor, but he is

7   asked that followup question on page 51.

8         THE COURT:  Page 50 how many?

9         MS. GOLINVEAUX:  51.  It's right in the middle of the

10  page.

11        THE COURT:  You say that you've not asked your

12  independent designers, concept artists, to give you documents

13  that they might have.  Do you know what they would say if you

14  did ask?  Answer:  I don't know what they would say.

15        Actually, that anticipated the question I was just

16  about to ask you.  Has anybody gone to these people and said:

17  Hey, we'd like your design information?

18        MS. GOLINVEAUX:  We have with --

19        THE COURT:  The answer to that is, no, nobody has

20  gone and asked them, right?  I haven't told you to.

21        MS. GOLINVEAUX:  No -- I'm sorry, your Honor.

22        THE COURT:  I haven't told you to.

23        So how many people are we talking about?  How many of

24  the allegedly independent designers are there that we're

25  talking about who created, you know, or were involved in the

1   creation of the accused works?  How many?  Ballpark.

2          MS. GOLINVEAUX:  Dozen.

3          THE COURT:  Okay.  So less than 50?  More than 50?

4          MS. GOLINVEAUX:  A dozen.

5          THE COURT:  Oh, a dozen?

6          MS. GOLINVEAUX:  Yes, sir.

7          THE COURT:  So 12.

8          So at this point, and I know this has been the

9   subject of earlier discovery motion, have all those people

10  been identified and location information provided to the

11  plaintiff?

12         MS. GOLINVEAUX:  Yes, your Honor, all the information

13  that we have.

14         THE COURT:  Okay.  So let me ask Mr. Moskin a

15  question.  Do you know whether there has been any effort made

16  on the plaintiff's side to subpoena those people?

17         MR. MOSKIN:  Yes, the ones in the U.S.

18         THE COURT:  Some of them are overseas?

19         MR. MOSKIN:  There are actually 11, excluding Mr.

20  Villacci himself.  So their answer to Interrogatory 3, I

21  think, it is.

22         THE COURT:  So how many are overseas?

23         MR. MOSKIN:  I think six of them are overseas, and

24  two of the U.S. designers, one we didn't get any address for

25  them at all, the other we got an address which we certified to

1   serve a subpoena and were unsuccessful.

2           THE COURT: The ones that are overseas, are they all

3   in the same country or are they in different countries?

4           MR. MOSKIN: They are all over. Mr. Fiertek is in

5   Sweden. There's another person --

6           THE COURT: Fiertek you are allegedly getting his

7   documents.

8           Were the other people are they in countries where

9   it's going to be difficult to get documents from them by some

10   sort of legal process? I mean, that may be true of pretty

11   much anywhere, but it's probably easier in the UK, for

12   example, or in other common law countries than it is --

13           MR. MOSKIN: I can think of one in the UK. There is

14   a fellow named Adrian Smith, I believe, or Adam Smith. The

15   others, I think there is someone in Japan. There may be

16   someone in Korea I may have.

17           THE COURT: Okay. We're going to come back to that

18   point.

19           Ms. Golinveaux, what's your next point?

20           MS. GOLINVEAUX: That was all, your Honor.

21           THE COURT: Okay. So the one thing that Ms.

22   Golinveaux raised that I didn't ask you about, Mr. Moskin, was

23   Interrogatory 18. I mean, that's the same deal. That's the

24   thing I was reading you from the transcript of February 22nd

25   about.

1          MR. MOSKIN:  Right.  And to the extent that we --
2   we've given them all the information we have because --
3          THE COURT:  No, dates of first use.
4          MR. MOSKIN:  Yes.
5          THE COURT:  This was the thing where I said, no, you
6   can't just say go look at the documents.  You're going to have
7   to provide that.
8          MR. MOSKIN:  Right.
9          THE COURT:  And have you given them the dates?
10         MR. MOSKIN:  Only in the documents.  I apologize,
11  your Honor.  I will say though --
12         THE COURT:  Okay.
13         MR. MOSKIN:  -- every one of the -- for example, we
14  gave them all of the records from the trademark office which
15  are very simple to read.  The publication dates.  But for the
16  earlier works, that's what we have.  And there's no dispute in
17  this case that to prioritize --
18         THE COURT:  But then your answers to those is going
19  to be it's sometime before 1972 or whatever it's going to be,
20  you know.
21         MR. MOSKIN:  And, your Honor, if I misunderstood
22  that, it would be relatively simple just to give them the
23  approximate date based on the information we've already given
24  them.  I don't think it's very hard to do that.
25         THE COURT:  Ms. Golinveaux, one of the things that

1   Mr. Moskin said towards the end of what he was talking about
2   is it had to do with whether he has sufficient time to -- you
3   know, given when the documents have come in, to review the
4   documents and then take the depositions.  He made a suggestion
5   about, you know, not, you know, trying to move any of the
6   other dates, but perhaps taking the depositions of certain
7   fact witnesses after the fact discovery period is concluded
8   but before the expert -- during the period of expert
9   discovery.  Do you have any problem with that?

10          MS. GOLINVEAUX:  Well, your Honor, my one concern is
11  that we've gotten jammed up.  You see we didn't get the
12  supplemental interrogatory responses.  We still don't have a
13  number of the documents, but we're talking all the depositions
14  this week in order to meet the discovery deadline, and what
15  that would do is allow him the take extra time -- he hasn't
16  taken his depositions yet other than the custodian deposition.
17  So we've completed our production and we're taking all the
18  depositions this week, and I think we would be prejudiced if
19  he gets all the extra time on his side.

20          THE COURT:  Yeah, but, so when was Mr. Moskin
21  supposed to be taking depositions?

22          MR. MOSKIN:  Next week, your Honor.

23          THE COURT:  Okay.  And so you're telling me that
24  you've got how many documents did you say that are being
25  burned onto this CD that is going to be overnighted to him and

1  he's not going to get until tomorrow?

2         MS. GOLINVEAUX:  400 pictures, and 100 e-mails.

3         THE COURT:  Okay.

4         MS. GOLINVEAUX:  That's give or take a few.  Those

5  aren't exact numbers.

6         THE COURT:  Have you folks all worked out how and

7  when Mr. Fiertek's deposition is going to be taken?

8         MS. GOLINVEAUX:  Well, your Honor, they've noticed it

9  for Dallas, Texas.  He lives in Sweden.

10         THE COURT:  Does he live in Dallas, Texas?

11         MR. RAFFENSPERGER:  No.

12         MS. GOLINVEAUX:  He lives in Sweden and hasn't

13  traveled to the United States in 24 years.

14         THE COURT:  Yes.  So the suggestion was made in the

15  response -- I think it was in the response that if you want to

16  take his deposition in the United States, you're going to have

17  to pay his travel expenses, so why shouldn't that be the right

18  answer?

19         MR. MOSKIN:  Because he is a partner in the company.

20         THE COURT:  49 percent owner?  That means -- I guess

21  my short answer to that is so what?  I mean, they didn't file

22  the lawsuit here.  You did.

23         MR. MOSKIN:  Right.  And he is intimately involved in

24  all the business decisions that --

25         THE COURT:  Yes, but I mean -- let's just make this

1  sort of a normal kind of simple case rather than a copyright

2  case that involves more than a couple of hundred works.

3  Let's say you had a -- let's say you had filed an

4  employment discrimination case involving the termination of

5  somebody against, just to pick a name out of the air,

6  Walgreens.  I had a case earlier today involving Walgreens.

7  And let's say the decision maker from Walgreens was some HR

8  person who lives in Birmingham, Alabama.  The fact that

9  Walgreens might be, you know, here, doesn't mean that you get

10  to force that person to come here.

11  I mean, the normal rule is you depose people where

12  they live.  If they choose the forum of the lawsuit, then

13  there might be some adjustment to that, and a judge has the

14  authority to make some adjustments, but the bottom line is

15  that, you know, I suppose one could say, well, you don't get

16  to depose the guy at all unless you go to Sweden.  I don't

17  think you want that to be the answer.

18  I think you need to find a way to figure out, you

19  know, some accommodation of paying his travel expenses if you

20  want to depose him here, but that might mean that here is here

21  or in New York where Mr. Moskin is and not in Texas just so

22  you understand, Ms. Golinveaux.

23  MS. GOLINVEAUX:  Yes, your Honor.

24  MR. MOSKIN:  If I might add, you know, until

25  yesterday at 4 o'clock when Ms. Golinveaux served her papers,

1    they had not responded to any of our requests.  They just said
2    they were going to refuse to produce him, so there has not
3    been any real opportunity to discuss this.

4              THE COURT:  I know you haven't discussed it.  I'm
5    trying to avoid the next three motions to compel, okay,
6    because this is not exactly the most fun part of my day.

7              MR. MOSKIN:  I understand.  And one other possibility
8    may be to do this by telephone or video.

9              THE COURT:  I'm not going to preclude people trying
10   to do something like that.  I mean, that might be a perfectly
11   good way to deal with it.

12             So let me go through these issues here and see if I
13   can deal with them.

14             MS. GOLINVEAUX:  Your Honor, may I just add one
15   thing?

16             THE COURT:  Yes.

17             MS. GOLINVEAUX:  My other concern with Mr. Moskin's
18   suggestion that we extend fact discovery to the end of expert
19   discovery is I suspect, and I may be proven wrong, but I
20   highly suspect we're going to continue to get a significant
21   number of documents from plaintiff over the course of the next
22   several weeks and through the expert discovery period, and it
23   would not enable us to get our experts prepared in time to do
24   their reports, so perhaps if you're considering doing
25   something along those lines, to get experts ready for

1  discovery, we at least have a date certain by which they have
2  to complete their production.

3  THE COURT:  Okay.  I didn't think you were asking for
4  more time to produce documents.  I thought you were asking --

5  MR. MOSKIN:  No, I wasn't.  As I said, I tried to
6  explain we think we're done.  And if it comes up that some
7  cache of documents --

8  THE COURT:  Then you deal with it.  I didn't think
9  you were asking -- I thought you were asking for more time to
10  take the depositions of their people once you get all the
11  documents.

12  MR. MOSKIN:  That all.  Exactly right.

13  THE COURT:  The discussion is done.

14  MS. GOLINVEAUX:  Well, your Honor, Ms. Anderson
15  testified yesterday that she has a pallet of documents she
16  called up that she hasn't looked at yet that may be
17  responsive, and there are issues like that that raise a
18  concern.

19  THE COURT:  And I'll tell you what, I'll cross that
20  bridge when I come to it.  I'm now going to rule, so everybody
21  zip it and listen, okay?

22  As far as the completeness of the defendant's
23  production, I think that's an issue better dealt with once the
24  plaintiff gets in hand the materials that are going to be
25  overnighted to Mr. Moskin tonight.

1    I will say, however, and I know this has been an

2  issue on both sides of the case, I am hoping that when you

3  burn the CD you are not just going to send him some mishmash

4  of documents and that there's going to be some identification

5  here of which document are responsive to which requests

6  because we've had that issue, I think, on both sides before,

7  and that's what needs to be happening here.  So that part of

8  it, I think, is best tabled.

9    As far as mister -- and that, I think, deals with

10  Mr. Fiertek's documents.

11    As far as Mr. Fiertek's deposition, I want you to

12  confer about that.  If the plaintiff -- I mean, it may be --

13  if the plaintiff is willing to do a video deposition, unless

14  that violates the laws of Sweden or something like that, I

15  think that that may be a good alternative if the plaintiff is

16  willing to do that.  If not, I think the plaintiff is going to

17  have to pay for Mr. Fiertek to come to the United States

18  because he doesn't live here and doesn't regularly travel

19  here, and the fact that he may be a large minority owner of

20  the LLC on the defense side of the case, in my opinion,

21  doesn't affect that.

22    As far as -- as far as the documents in the hands of

23  the defendant's third party designers which I will note for

24  the record are referred to in the defendant's apparently

25  standard agreement with them as, quote, employees, close

1   quote, the defendant is going to have to make a diligent
2   effort to obtain documents from them, and that has to be done
3   promptly, and that's partly because of the characterization of
4   them as employees.  It's partly because of the interpretation
5   that Mr. Villacci gave in his deposition of the definition of
6   the term confidential information contained in that agreement,
7   and it's partly because some of these people are overseas and
8   that may be the only way to get their records in any practical
9   way, and that needs to be done very promptly.

10          The next point is if Mr. Villacci has or had some
11  Photo Bucket account, and if it's covered by somebody's, you
12  know, discovery request, then I would think that the
13  defendants -- the defendant better be about the business of
14  trying to figure out how to produce, you know, whatever is
15  responsive from the Photo Bucket account.  I'm not going to
16  make a judgment about whether he does or doesn't have it.

17          As far as Interrogatories 18 and 22, 18 I already
18  ordered a non-Rule 33(d) response, and so the defendant has
19  until this Friday to comply with the order that I gave you
20  before.  This Friday is the 9th of March.

21          As far as Interrogatory Number 22 is concerned, I
22  already explained that that wasn't included in the prior
23  order, but I think it's appropriate to require a non-33(d)
24  response to that, and that's due a week from today, and that's
25  the 13th, the 13th of March.

1   As far as the hedge and the -- or what's
2   characterized as the hedge in the plaintiff's affidavit
3   regarding the -- actually, let me go back.

4   Interrogatory 17 and 18, if I said the defendant has
5   to respond to those, that's the plaintiff that has to respond
6   to those.

7   As far as what's characterized as a hedge in the
8   plaintiff's affidavit or it's not an affidavit, it's a
9   submission regarding the nature of the document search and the
10  production, I'm satisfied for the time being that it's
11  adequate even though it's not under oath.  A lawyer who has an
12  appearance on file in the case has given it to me, and they
13  are just as subject to sanctions as anybody else would be for,
14  you know, submitting a document that turns out to be untrue.

15  I can't control whether either side has any
16  additional documents that pop up, but as Mr. Moskin has
17  supplemented what he said in the writing here in court, I'm
18  satisfied at least for the time being that an adequate search
19  has been done on that.

20  As far as -- let's see.  As far as the taking of the
21  depositions of the plaintiff's witnesses are concerned, I
22  really think -- I mean, the problem with adjusting the
23  schedule is that it's a bunch of little dominoes, and if I
24  start moving -- if I start moving one thing, you know, the
25  dominoes start teetering, and the one thing that I have told

1  you was not -- actually, I told you that none of it was going

2  to be moved, but absolutely the trial date is not going to be

3  moved, and I'm concerned about doing something that is going

4  to have a domino effect on that.

5  So assuming that Mr. Moskin has these documents, and

6  I'll just remind you that Ms. Golinveaux said you just tell

7  her where you want her to send them, and she'll send the disks

8  there, assuming that you get them tomorrow, I think you'll

9  just need to do your best, given the relatively limited volume

10  of stuff that's on there, to go ahead and take the depositions

11  next week.

12  I'm not going to rule out the possibility that you

13  may be able to come up with some, you know, specified date not

14  too far after the close of fact discovery to take, you know,

15  some portion of those depositions if there's documents -- you

16  know, significant documents that have come in late, but the

17  stuff you're getting tomorrow it sounds like it's largely

18  going to be Mr. Fiertek's documents, and you're not taking his

19  deposition not week.

20  So I think you're just going to have to do your best

21  on that, and I'll leave it open to further discussion.  I

22  think there is some legitimate concern that if the fact

23  discovery starts straying into the expert discovery period,

24  we're going to run into problems there.

25  The one thing that I skipped over here has to do with

1  what I guess what I will call the -- what I referred to in the
2  early part of the discussion of -- as sort of the carve out in
3  the defendant's certification regarding the nature of its
4  search, and I really don't think it's appropriate -- and I'm
5  referring to Document Number 186, Page 2, first full
6  paragraph, third sentence.  I really don't think it's
7  appropriate, given the fact that you're dealing with a court
8  order, to carve out of Mr. Fiertek's documents that are being
9  reviewed his e-mails with Chapterhouse.  I think you need
10  to -- I think you need to review those, too, so that needs to
11  be included in your review, so if that means that more
12  documents get produced from Fiertek, that's what it means.

13          Okay.  So the motion -- there was a motion asking for
14  a status conference.  I guess we've already had it, so that's
15  granted.

16          MR. MOSKIN:  May I --

17          THE COURT:  And I really need -- I really need to be
18  done with this, so if you have something else to say, it
19  better be really, really super important, so yes.

20          MR. MOSKIN:  Just to clarify because I -- again, none
21  of these roughly 3,000 documents, I can't even look at them
22  this week.  Is there --

23          THE COURT:  I'm saying I need you to do your best to
24  try to take those depositions; and if -- you know, if you
25  can't, what I'm telling you is that you need to confer, and I

1  said I'm not adverse to you pushing back the date, you know,
2  for some of them by some limited, finite period, but I am not
3  willing to give you cart blanche to say those can happen
4  anytime during the expert discovery period.

5  MR. MOSKIN:  All I'm requesting is a few weeks, your
6  Honor.

7  THE COURT:  That's actually not what you requested,
8  so I'm telling you you need to talk about this.

9  And, I guess, the deal in future is going to be --
10  and I need to add one more deterrence thing on here.  The deal
11  in the future is going to be on any motion that's made to me
12  loser pays.  It's going to be loser pays on any kind of
13  discovery related motion that is made to me.  So that is
14  basically a not so nice way of saying that everybody had
15  better be reasonable.

16  So in other words, if Mr. Moskin goes to Ms.
17  Golinveaux or whoever goes to whom and says:  Look, you know,
18  I got these documents just the other day, and I've had to take
19  these depositions all week so I really haven't had time to
20  look at these, so I'm looking for a little more time to take
21  your people's depositions, you know, if that's a reasonable
22  request, I'm expecting a reasonable response.  If it's an
23  unreasonable request, then you might get an unreasonable
24  response.

25  I'm not going to get into those details because I'm

1  really hoping and expecting you people will work these things

2  out on your own and not have to come back and ask me.  If

3  somebody does, it's going to be loser pays.

4          And I don't care how sick anybody is in the future.

5  I'm not talking to anybody over a telephone, okay?  So that's

6  my answer.

7          Anything else?

8          MS. GOLINVEAUX:  No, your Honor.

9          THE COURT:  Thanks.  Take care.  Have a nice day.

10          MR. MOSKIN:  Thank you.

11    (Which were all the proceedings heard.)

12                        CERTIFICATE

13    I certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.

15  */s/Mary C. Kelly*                *March 27, 2012*

16

17  _____          _____

18  Mary C. Kelly                    March 27, 2012
    Contract Court Reporter (f)

19

20

21

22

23

24

25